**HEARING DATE AND TIME: March 22, 2012 at 10:00 a.m. (Eastern Time)**

THE STOLAR PARTNERSHIP LLP
911 Washington Avenue, 7th Floor
St. Louis, Missouri 63101
Telephone: (314) 231-2800
Fax: (314) 436-8400
H. Kent Munson

Attorneys for Lutheran Senior Services

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
IN RE:                                          :        Chapter 11
                                                :
LEHMAN BROTHERS HOLDINGS, INC.,                 :        Case No. 08-13555 (JMP)
et al.,                                         :        (Jointly Administered)
                                                :
        Debtors.                                :
------------------------------------------------------------x

## LUTHERAN SENIOR SERVICES' RESPONSE TO DEBTORS' TWO HUNDRED SIXTY-FIRST OMNIBUS OBJECTION TO CLAIMS (NO GUARANTEE CLAIMS)

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lutheran Senior Services, a creditor of the debtor Lehman Brothers Holdings, Inc. ("LBH"), respectfully submits its Response to Debtors' Two Hundred Sixty-First Omnibus Objection to Claims (No Guarantee Claims) ("Objection").

### Preliminary Statement

1.      Lutheran Senior Services timely filed its proof of claim for Claim No. 23948 ("Claim") in this bankruptcy proceeding, based on Debtor Lehman Brothers Holdings, Inc.'s ("LBH") unconditional guarantee of the obligations of Lehman Brothers Special Financing, Inc.'s ("Special Financing") under a Reserve Fund Agreement ("Agreement") dated February 17, 2006 (**Global ID #2392963**) (the "Guarantee"). (A copy of Lutheran Senior Services' proof of

claim is attached as Exhibit 1 and incorporated by reference, and a copy of the Agreement is attached as Exhibit 2 and incorporated by reference).

2.        In the Objection, LBH asserts that because Lutheran Senior Services did not include with its proof of claim a copy of the Guarantee, the claim should be disallowed and expunged. (Objection at ¶11). From this failure to attach a copy of the executed Guarantee, LBH leaps to the conclusion that it did not issue one, and, therefore, that the Guarantee cannot be enforced against LBH.

3.        Because it is clear that the Guarantee was a condition precedent to the execution of the Agreement, and that the Agreement was executed, it is also evident that LBH must have executed the Guarantee. The Declaration of Scott Determan ("Determan Dec."), attached as Exhibit 3 and incorporated by reference, establishes that LBH would have been in possession and control of the executed Guarantee, and that Lutheran Senior Services was never provided with a copy of it. (Ex. 3, Determan Dec. at ¶7, and attachments to Ex. 3). The Agreement constitutes secondary evidence of the existence and material terms of the Guarantee, establishing LBH's unconditional obligation to Lutheran Senior Services. Thus, the Objection should be denied as to the Claim.

### Background

4.        In 2006, in conjunction with the Health and Educational Facilities Authority of the State of Missouri, Senior Living Facilities Revenue Bonds, Series 2005A ("Bonds") issued for the benefit of Lutheran Senior Services, the Agreement was executed by and among The Bank of New York Trust Company, N.A. ("BNY"), Lutheran Senior Services, and Special Financing for the investment of the debt service reserve funds related to the Bonds. (Ex. 3, Determan Dec. at ¶3; Agreement, Ex. 2).

5.     Special Financing breached its obligation to Lutheran Senior Services under that Agreement. LBH unconditionally guaranteed the obligations of Special Financing under that Agreement and also breached its obligation to Lutheran Senior Services under its Guarantee, as a result of which failure Lutheran Senior Services was deprived of the benefit to which it was entitled under that Agreement.

6.     The damages arising from such breach are the subject of a Termination Agreement by and among The Bank of New York Trust Company, N.A., Lutheran Senior Services and Special Financing dated September 22, 2009. (A copy of the Termination Agreement is attached as Exhibit 4 hereto and incorporated by reference). Payment of such damages are an unconditional obligation of LBH pursuant to the Guarantee.

## Argument

7.     Although the original Guarantee executed by LBH appears never to have been delivered to Lutheran Senior Services, it is clear for the following reasons that such obligations of Special Financing were in fact guaranteed by LBH:

a.     The Agreement is held as an investment for funds related to an issue of rated municipal bonds and the Indenture of Trust pursuant to which the bonds were issued does not permit the trustee to hold investments rated below A 3 by Moody's and/or A- by S&P. (Ex. 3, Determan Dec. at ¶4; Agreement, Ex. 2).

b.     When Special Financing originally bid to issue the Agreement, it represented in its Letter of Acceptance that the bidding entity had a credit rating of A1 from Moody's ratings and A+ from S&P ratings.  Special Financing has never held a rating.  Therefore, the only way Special Financing could have made this representation is if the Agreement was guaranteed by LBH. (A copy of the Letter of Acceptance from

3

Special Financing with respect to the Agreement is attached as Exhibit 5 and incorporated by reference).

       c.     Section 2.7 of the Agreement specifically provides that if the rating of LBH is downgraded below A3 by Moody's and A- by S&P, then, unless Special Financing provides collateral to restore the rating, the creditor has the right to terminate the Agreement. (Agreement, Ex. 2, p. 9).

       d.     The definition of "LBH" which appears in the Agreement as set out below makes it clear that LBH **unconditionally guarantees** the obligations of Special Financing:

> "'LBH' means Lehman Brothers Holdings, Inc. which wholly owns and unconditionally guarantees the obligations of Lehman Brothers Special Financing Inc. As of the date of this Agreement LBH has long-term senior unsecured debt obligations rated A+ by Fitch, A1 by Moody's and A+ by S&P."

(Agreement, Ex. 2, p. 4).

8.     The Guarantee was a condition precedent for the Agreement, such that the Agreement could not have been executed without the Guarantee. Because the Agreement was consummated, it necessarily follows that the Guarantee was executed.

9.     As the signatory to the Guarantee, LBH was last in control of the original. However, LBH purportedly conducted a "reasonable and diligent" search of its records and cannot locate the executed Guarantee. (Objection at ¶11). Moreover, LBH never provided Lutheran Senior Services with a copy of the executed Guarantee. (Ex. 3, Determan Dec. ¶7 and attachments to Ex. 3).

10.    Based on this evidence, the only reasonable inference is that the executed Guarantee was lost or destroyed by LBH. Accordingly, secondary evidence is admissible to

prove its existence and contents. See, e.g., A.F.L. Falk, S.p.A. v. E.A. Karay Co., Inc., 722 F.

Supp. 12, 16 (S.D.N.Y. 1989) ("where that writing was last in the control of the opposing party,

if the proponent of the writing can show that the opponent had control over the document, that he

demanded the document from the opponent and that the opponent has failed to produce the

document, secondary evidence may be used to illustrate the existence of the document."); see

also Fed. R. Evid. 1004(a) (secondary evidence of the content of a writing is admissible if "all

the originals are lost or destroyed, and not by the proponent acting in bad faith"); Fed. R. Evid.

1101 (making Fed. R. Evid. applicable in bankruptcy proceedings).

11.    This secondary evidence is provided by the Determan Declaration and the

Agreement, which establish the necessity and the material terms of the Guarantee, i.e., that LBH

"wholly owns and unconditionally guarantees the obligations of" Special Financing. (Ex. 3,

Determan Dec. ¶6, Agreement, Ex. 2, p. 4). The Agreement simply could not have been executed

and performed without the Guarantee.

12.    Because there is admissible evidence of the existence and terms of the Guarantee,

as well as evidence that the original Guarantee was last in the control of LBH, Lutheran Senior

Services respectfully submits that its Claim should not be disallowed and expunged.

13.    Moreover, Debtors' argument that the statute of frauds bars the enforcement of

the Guarantee against LBH fails because of the doctrine of part performance. (Objection at ¶13).

The conduct of Special Financing, LBH, Lutheran Senior Services and BNY in executing and

performing pursuant to the Agreement is expressly and unequivocally referable to the Guarantee,

in that the Guarantee was a condition precedent to execution of the Agreement and the

Agreement could not have been performed in the absence of the Guarantee. See, e.g., Carey &

Assocs v. Ernst, 810 N.Y.S. 2d 475, 478-79 (N.Y. App. Div. 1st Dept. 2006) (unwritten promise

to pay debt of another "may be enforceable despite the lack of writing where a plaintiff's part performance is 'unequivocally referable' to that oral agreement.").

14.    Moreover, LBH should be equitably estopped from denying that it executed the Guarantee. Special Financing, a wholly-owned subsidiary of LBH, consummated the Agreement and enjoyed the benefits of it, acting in a manner calculated to convey the impression that LBH had executed the Guarantee, with the intention or expectation that Lutheran Senior Services would execute the Agreement because of LBH's Guarantee. Lutheran Senior Services justifiably relied to its detriment on the representations that LBH had executed the Guarantee and lacked knowledge of the alleged fact that LBH would take the position that it had not executed the Guarantee. Accordingly, the doctrine of equitable estoppel precludes LBH from denying its obligations under the Guarantee. See River Seafoods, Inc. v. JPMorgan Chase Bank, 796 N.Y.S. 2d 71, 74 (N.Y. App. Div. 1st Dept. 2005) ("In order to prevail on the theory of equitable estoppel, the party seeking estoppel must demonstrate a lack of knowledge of the true facts; reliance upon the conduct of the party estopped; and a prejudicial change in position.").

15.    Alternatively, in the event it is determined that the Guarantee is not enforceable against LBH, LBH is still liable to Lutheran Senior Services under a theory of unjust enrichment. LBH and Special Financing received the benefits of the Agreement at Lutheran Senior Services' expense, while Lutheran Senior Services has been denied the benefit of its bargain because of the breach of the Agreement and LBH's failure to guarantee Special Financing's obligations thereunder. LBH should not be permitted to object to the Claim now, thereby allowing Special Financing to reap the benefits of the Agreement while disavowing its obligations. To do so would violate the principles of equity and would allow Debtors to be unjustly enriched at Lutheran Senior Services' expense. See, e.g., Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir.

6

2000) (elements of claim for unjust enrichment under New York law are: "(1) that [Debtors] benefitted; (2) at [Lutheran Senior Services'] expense; and (3) that 'equity and good conscience' require restitution."). Thus, the Claim should not be disallowed or expunged for this reason as well.

WHEREFORE, for all of the foregoing reasons, Creditor Lutheran Senior Services respectfully requests that the Court deny the relief sought in Debtors' Two Hundred Sixty-First Omnibus Objection to Claims (No Guarantee Claims) as to Claim No. 23948 and order such additional relief that the Court deems appropriate.

Dated: March 6, 2012
St. Louis, Missouri

H. KENT MUNSON
THE STOLAR PARTNERSHIP LLP
911 Washington Avenue, 7th Floor
St. Louis, Missouri 63101
Telephone: (314) 231-2800
Fax: (314) 436-8400
hkm@stolarlaw.com

Attorneys for Creditor
Lutheran Senior Services

# EXHIBIT 1

# PROOF OF CLAIM

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: | Chapter 11 |
|---|---|
| Lehman Brothers Holdings Inc., et al. | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
| **Lehman Brothers Holdings, Inc.** | **08-13555** |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Program Securities (See definition on reverse side.)

## THIS SPACE IS FOR COURT USE ONLY

**Name and address of Creditor:** (and name and address where notices should be sent if different from Creditor)

Creditor: Lutheran Senior Services, 1150 Hanley Industrial Court, Brentwood, MO 63144

Notices: The Stolar Partnership, LLP Attn: Karl E. Holderle, 911 Washington Ave. 7th Floor, St. Louis, MO 63101

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
*(If known)*

Filed on: _____

Telephone number: 314-231-2800   Email Address: eholderle@stolarlaw.com

Name and address where payment should be sent (if different from above):

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number: _____   Email Address: _____

**1. Amount of Claim as of Date Case Filed:** $103,187.74  (See attached Exhibit A)

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete Item 5.

If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☑ Check this box if all or part of your claim is based on a Derivative Contract.*
☑ Check this box if all or part of your claim is based on a Guarantee.*

***IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest for this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee See attached Exhibit A

**2. Basis for Claim:** See attached Exhibit A
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** 2963
**3a. Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff:  ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe: _____

Value of Property: $_____   Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____   Basis for perfection: _____

Amount of Secured Claim: $_____   Amount Unsecured: $_____

**5. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $-0-
(See instruction #6 on reverse side.)

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

Amount entitled to priority:

$ -0-

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary. See attached document.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

See attached Exhibit A

| FOR COURT USE ONLY |
|---|
|  |

Date: _____

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. LUTHERAN SENIOR SERVICES
By: _____
Paul Ogier, Chief Financial Officer

3/18/09

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

EXHIBIT A TO LUTHERAN SENIOR SERVICES PROOF OF CLAIM
AGAINST LEHMAN BROTHERS HOLDINGS, INC.

## Question 1.  Amount of Claim as of Date Case Filed

Creditor's Claim arises out of the breach by Debtor of its undertaking to guarantee the obligations of Lehman Brothers Special Financing, Inc. as described in more detail in the response to Question 2 below. The damages arising from such breach are the subject of an agreed upon allowance of claim approved on behalf of Lehman Brothers Special Financing, Inc. by the Settlement Adjudication Committee on September 17, 2009. As of the date of this Proof of Claim the Termination Agreement between Lehman Brothers Special Financing, Inc. and Creditor has not been finalized although it will be shortly. A final executed copy of the Termination Agreement will be provided as soon as it becomes available.

Please be aware that the agreed upon allowance of claim relates to the breach by Debtor of its undertaking to guarantee the obligations of Lehman Brothers Special Financing, Inc. with respect to (i) the agreement referenced in response to Question 2 below (Global ID #2392963) and (ii) a Debt Service Deposit Agreement dated February 28, 2007 (which is the basis of three separate claims of Creditor related to three series of bonds Global ID #2855498; Global ID #2855500; and Global ID #2835529). Because Creditor was instructed by the Debtor's claim agent, Epiq Bankruptcy Solutions, LLC to file a separate Proof of Claim for each Debtor Global ID Number and Debtor was unable to provide a breakdown of the agreed upon allowance of claim related to each Debtor Global ID Number, Creditor was forced to perform this allocation itself and, as a result, the amount of this claim may not precisely match the calculation of Debtor, but the total of Creditor's claims will not exceed the agreed upon allowance of claim as reflected in the Termination Agreement.

## Question 2.  Basis for Claim

Lehman Brothers Special Financing, Inc., a party to the attached Reserve Fund Agreement by and among The Bank of New York Trust Company, N.A., Lutheran Senior Services and Lehman Brothers Special Financing, Inc. dated February 17, 2006 (Global ID #2392963), breached its obligation to Creditor under that agreement. Debtor guaranteed the obligations of Lehman Brothers Special Financing, Inc. under that agreement and also breached its obligation to Creditor under its guaranty as a result of which failure Creditor was deprived of the benefit to which it was entitled under that agreement.

## 8.  Documents

A copy of the agreement referenced in response to Question 2 above is attached. With respect to the Reserve Fund Agreement dated August 23, 2009 (Global ID #2392963), a copy of the guaranty for Debtor in favor of Lehman Brothers Special Financing, Inc. was never provided to Creditor. However, it is clear from the terms of the Reserve Fund Agreement (particularly the definition of LBH and Section 2.7) that Debtor undertook to guaranty the obligations of Lehman Brothers Special Financing, Inc. under the above referenced Reserve Fund Agreement for the benefit of Creditor.

Execution Copy

CTRS# 116043

## RESERVE FUND AGREEMENT

This Reserve Fund Agreement (this "Agreement") dated as of February 17, 2006 by and among LUTHERAN SENIOR SERVICES, a Missouri non-profit corporation (the "Corporation"), THE BANK OF NEW YORK TRUST COMPANY, N.A. a national banking association (the "Trustee"), and LEHMAN BROTHERS SPECIAL FINANCING INC., a Delaware corporation ("Lehman").

SECTION I.            DEFINITIONS

For purposes of this Agreement, unless the context clearly indicates otherwise, the words and terms defined in this Section I have the respective meanings given to them herein:

"Bond Payment Date" means, with respect to each Deposit Date, each date identified as a "Bond Payment Date" on Exhibit A unless such date is not a Business Day, in which case "Bond Payment Date" means the immediately preceding Business Day; provided that in determining whether any such date is a Business Day no effect shall be given to clause (c) or (d) of the definition of Business Day.

"Bonds" means $30,000,000 Health and Educational Facilities Authority of the State of Missouri, Senior Living Facilities Revenue Bonds, Series 2005A, (Lutheran Senior Services Projects).

"Burdened Party" means, (i) in the case of (A) a Corporation Event of Default or a Trustee Event of Default or (B) a termination of this Agreement by the Corporation pursuant to Section 3.1 following a redemption, defeasance or refunding of the Bonds, Lehman and (ii) in the case of a Lehman Event of Default, the Corporation.

"Business Day" means any day other than (a) a Saturday or Sunday, (b) a day on which the principal corporate trust office of the Trustee is authorized or required by law to close, (c) a day on which banking institutions in the City of New York are authorized or required by law to close, or (d) a day on which any Qualified Securities which may be delivered hereunder are not subject to delivery in the City of New York.

"Closing Date" means February 17, 2006.

"Corporation Event of Default" means the occurrence of an event specified in Section 7.2 hereof.

"Coupon Payment" means, for any Qualified Security, a payment of interest which is due to be paid thereon prior to the scheduled maturity of such Qualified Security.

"Dealer" means a leading dealer in the relevant markets selected by Lehman in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that Lehman applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from such dealers having an office in the same City.

"Debt Service Payment" means (i) a scheduled payment of principal of or interest on the Bonds, including any such payment in connection with a scheduled mandatory sinking fund redemption of the Bonds from sinking fund installments but excluding any such payment in connection with any other redemption of the Bonds and excluding any payment required to make a regularly scheduled deposit to the principal account or interest account for the Bonds or (ii) a payment of principal of or interest on the Bonds upon an acceleration of the Bonds following an event of default under the Indenture.

"Default Rate" means a per annum rate equal to the lesser of (a) Three Month LIBOR plus 1% per annum, or (b) the maximum rate permitted by law.

"Delivery Notice" means a notice substantially in the form of Exhibit E or in such other form as provided by the Qualified Dealer and is reasonably acceptable to the Trustee.

"Deposit Date" means each date identified as a "Deposit Date" on Exhibit A unless such date is not a Business Day, in which case "Deposit Date" means the immediately preceding Business Day.

"Differential" means the amount, if any, by which the Purchase Price of any Qualified Security delivered hereunder exceeds the Market Value thereof.

"Eligible Securities" means if and to the extent the same are at the time legal for investment of funds held under the Bond Indenture,

    (a)    United States Government Obligations;

    (b)    bonds, debentures, notes, certificates of participation, or other similar obligations which are (i) issued by any state or political subdivision thereof or any agency or instrumentality of such state or political subdivision, and (ii) at the time of purchase, rated in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by Moody's, Standard and Poor's, or Fitch Ratings ("Fitch");

    (c)    bonds, debentures, notes, participation certificates, or other similar obligations issued by a government sponsored agency (such as the Federal National Mortgage Association, the Federal Home Loan Bank System, the Federal Home Loan Mortgage Corporation, the Federal Farm Credit Bank or the Student Loan Marketing Association) which is either (i) rated in the highest rating category by Moody's, Standard & Poor's or Fitch at the time of purchase, or (ii) backed by the full faith and credit of the United States of America;

Execution Copy

(d)     U.S. denominated deposit accounts, certificates of deposit, and banker's acceptances of any bank, trust, company, or savings and loan association, including the Master Trustee or Bond Trustee or its affiliates, which have a rating on their short-term certificates of deposit on the date of purchase in one of the two highest short-term rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by Moody's, Standard & Poor's or Fitch, and which matures not more than 360 days after the date of purchase;

(e)     commercial paper which is rated at the time of purchase in one of the two highest short-term rating categories assigned by Moody's, Standard & Poor's or Fitch, and which matures not more than 270 days after the date of purchase; and

(f)     bonds, notes, debentures or other evidences of indebtedness issued or guaranteed by a corporation which are, at the time of purchase, rated by Moody's, Standard & Poor's or Fitch in any of the three highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise).

"Financing Documents" means the Indenture and the Loan Agreement

"Guaranteed Rate" means a rate per annum equal to 4.94% assuming that the interest on the applicable security was compounded semi-annually on the basis of a year of 360 days with twelve thirty day months.

"Illegality" means that, due to the adoption of, or any change in, any applicable law after the date on which this Agreement is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of this Agreement or to comply with any other material provision of this Agreement.

"Incipient Illegality" means (a) the enactment by any legislative body with competent jurisdiction over the Corporation of legislation which, if adopted as law, would render unlawful (i) the performance by the Corporation of any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of this Agreement or the compliance by the Corporation with any other material provision of this Agreement or (ii) the performance by the Corporation of any contingent or other obligation which the Corporation relating to this Agreement, (b) any assertion in any proceeding, forum or action by the, in respect of the Corporation or in respect of any entity located or organized under the laws of the state in which the Corporation is located to the effect that performance under this Agreement or similar agreements is unlawful or (c) the occurrence with respect to the Corporation of any event that constitutes an Illegality.

"Indenture" means the Bond Trust Indenture dated as of August 1, 2005 between the Issuer and the Trustee.

"Insolvent" means (i) either the Trustee, the Corporation or Lehman as the case may be, shall (1) commence a voluntary case under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter), (2) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, (3) consent to any petition filed against it in an involuntary case under such bankruptcy or insolvency or other laws, (4) apply for or consent to the appointment of, or the taking of possession by, a trustee, receiver, custodian, liquidator or the like for itself or for all or a substantial part of its property, (5) admit in writing its inability to pay, or generally not be paying, its debts as they come due, (6) make a general assignment for the benefit of creditors, or (7) take any official action for the purpose of effecting any of the foregoing; or (ii) a case or other proceeding shall be commenced against either the Trustee, the Corporation or Lehman, as the case may be, in any court of competent jurisdiction seeking (1) relief under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter) or under any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, or (2) the appointment of a trustee, receiver, custodian, liquidator or the like for the Trustee, the Corporation or Lehman, as the case may be, or for all or a substantial part of its property, and any such case or proceeding shall continue undismissed and unstayed for a period of 60 consecutive calendar days, or an order granting the relief requested in any such case or proceeding against such party shall be entered and shall remain in effect and unstayed for a period of 60 consecutive days.

"Issuer" means the Health and Educational Facilities Authority of the State of Missouri.

"LBH" means Lehman Brothers Holdings Inc., which wholly owns and unconditionally guarantees the obligations of Lehman. As of the date of this Agreement, LBH has long-term senior unsecured debt obligations rated A+ by Fitch, A1 by Moody's and A+ by S&P.

"Lehman Cure Period" has the meaning specified in Section 7.3(a) hereof.

"Lehman Event of Default" means the occurrence of an event specified in Section 7.3 hereof.

"Loan Agreement" means the Loan Agreement dated as of August 1, 2005 between the Issuer and the Corporation.

"Market Value" means with respect to any Qualified Security, the market value thereof (including accrued interest thereon) as specified by the Qualified Dealer delivering that security, provided that the Market Value of any Qualified Security shall in no event exceed the Maturity Amount thereof.

"Maturity Amount" means, with respect to any Qualified Security, the amount, payable in cash, representing the principal and interest (including any Coupon Payments) due thereon on or prior to its maturity date.

"Purchase Price" means, for any Eligible Security delivered hereunder, that price for such security, as set forth in the Delivery Notice, which will produce a rate of return on such security

for the period from (and including) the date of its delivery to (but excluding) its maturity date equal to the Guaranteed Rate.

"Qualified Dealer" means Lehman Brothers Inc., its successors or assigns, or any other dealer in Eligible Securities selected by Lehman.

"Qualified Securities" means, for any Deposit Date or subsequent deposit date pursuant to Section 2.3 or 2.4, Eligible Securities which, to the extent available on the open market, (i) mature on or prior to the related Bond Payment Date and (ii) have an aggregate Purchase Price which is as close as possible to but does not exceed the related Scheduled Reserve Amount.

"Reserve Fund" means the account created pursuant to the Indenture and designated thereunder as the Reserve Account.

"Scheduled Reserve Amount" means, for each Deposit Date, the amounts shown on Exhibit A which, under the terms of the Indenture, will be the Reserve Fund Requirement on such date, assuming that (i) no withdrawals from the Reserve Fund have been made to make a Debt Service Payment and (ii) no Bonds will have been defeased or redeemed on or prior to such date except in connection with a scheduled sinking fund redemption.

"Specified Indebtedness" means any obligation of the Corporation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"Termination Amount" means an amount, as determined by Lehman reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers of the amount, if any, that each such Dealer would require the Burdened Party to pay to the Dealer (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Corporation) or would pay to the Burdened Party (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Corporation) in consideration of such Dealer entering into an agreement with the Burdened Party (with such documentation as Lehman and the Dealer may in good faith agree) which would have the effect of preserving for the Burdened Party the economic equivalent of its rights under this Agreement for the period commencing on the termination date of this Agreement and terminating on the last Bond Payment Date set forth in Exhibit A (assuming for these purposes that this Agreement were not terminating on the termination date and continued in full force through such last Bond Payment Date); provided, however, that:

(i)      if more than three quotations are provided, the Termination Amount will be the arithmetic mean of such quotations, without regard to the quotations having the highest and lowest values,

(ii)     if exactly three quotations are provided, the Termination Amount will be the quotation remaining after disregarding the highest and lowest quotations,

Securities and pay to the Qualified Dealer or Lehman, as applicable, in accordance with Section 2.2(b) hereof, an amount equal to the Purchase Price thereof.

Section 2.2   Delivery; Payment.

(a)   All Qualified Securities delivered hereunder shall be delivered to the Trustee to the account specified in Section 9.1 hereof, in such manner as at the time is generally acceptable for delivery of Qualified Securities.   All Qualified Securities delivered hereunder shall be delivered to the Trustee on a "delivery versus payment" basis.

(b)   (i)   Lehman shall cause the Qualified Dealer to send a Delivery Notice to the Trustee at least one Business Day prior to the delivery of any Qualified Securities which are in book-entry form and at least two Business Days prior to the delivery of any Qualified Securities which are being delivered in certificated form.   The Trustee may conclusively rely on the Qualified Dealer's specification in the Delivery Notice of the Market Value, the Maturity Amount and the Purchase Price of a Qualified Security.

(ii)   Concurrently with the delivery of any Qualified Securities, unless otherwise directed by Lehman in writing, the Trustee shall, subject to clause (iii) below, pay the Qualified Dealer delivering such Qualified Securities, in its individual capacity, the Market Value thereof, and to the Qualified Dealer as agent for Lehman, the Differential, if any.

(iii)   Lehman may in the Delivery Notice, direct the Trustee to pay (A) to the Qualified Dealer, the Market Value of any Qualified Securities delivered to the Trustee hereunder, and (B) to Lehman, the Differential, if any.   Any such payment to Lehman shall be at Lehman's account as set forth in the Delivery Notice.

(iv)   All payments to be made hereunder shall be made in immediately available funds by means of a bank or Federal funds wire.

Section 2.3   Subsequent Deliveries.   If any Qualified Securities delivered by a Qualified Dealer pursuant to Section 2.1 hereof (a) mature prior to the Bond Payment Date for which such Qualified Securities were delivered, or (b) have a Coupon Payment, Lehman shall have the right, upon at least one Business Day's prior written notice to the Trustee in the form of the Delivery Notice, to cause a Qualified Dealer to deliver to the Trustee, at any time on or after the maturity date of such Qualified Securities (or, as applicable, on or after the interest payment date of such Coupon Payment) but prior to the date which is one Business Day before such Bond Payment Date, other Qualified Securities, provided that the Maturity Amount thereof does not exceed the Maturity Amount of the securities which have so matured (or as applicable, the amount of the Coupon Payment).   Any such deliveries by the Qualified Dealer shall conform to the requirements of Section 2.2(a) and (b) hereof.   Upon the delivery by the Qualified Dealer of such Qualified Securities, the Trustee shall pay the Purchase Price thereof in the manner required by Section 2.2(b)(ii) hereof.

Section 2.4   Late Delivery; Failure to Deliver.

(a)    If Lehman fails to cause a Qualified Dealer to deliver Qualified Securities as required hereunder by 4:30 p.m. New York City time on any Deposit Date or during the Lehman Cure Period, the Trustee shall, on each such date, use its best efforts to invest the related Deposit Amount on an overnight basis in Permitted Investments (as defined in the Indenture) and if Lehman's failure continues beyond the Lehman Cure Period, the Trustee shall invest the related Deposit Amount in Permitted Investments with the longest possible maturities, provided such maturities are not later than the related Bond Payment Date.

(b)    No failure on Lehman's part to cause a Qualified Dealer to deliver Qualified Securities hereunder shall terminate or affect Lehman's right to cause future sales of Qualified Securities in accordance with this Agreement.

Section 2.5    Notice of Withdrawal from Reserve Fund; Replenishment.

(a)    If at any time the Corporation is required under the Indenture to withdraw any investments or other amounts from the Reserve Fund (including any Qualified Securities) to make a Debt Service Payment, the Trustee shall promptly give oral and written notice thereof to Lehman and shall in such written notice specify (i) the amount of investments which are to be withdrawn and (ii) the amount which will be in the Reserve Fund after giving effect to such withdrawal to be invested pursuant to this Agreement.

(b)    If, following the Trustee's withdrawal of funds from the Reserve Fund pursuant to Section 2.5(a), within twelve (12) months of such withdrawal, (i) sufficient funds are deposited into the related Reserve Fund to permit the purchase of Qualified Securities hereunder in the amount of such withdrawal or (ii) the Corporation has notified Lehman and the Trustee that it intends, in compliance with the Indenture to deposit sufficient funds in the Reserve Fund within twelve (12) months after such withdrawal from the Reserve Fund pursuant to Section 2.5(a), then the Trustee shall, within two Business Days following such replenishment of the Reserve Fund, give oral and written notice (a "Reserve Fund Replenishment Notice") to Lehman stating (A) the amount of funds which have been or will be deposited into the Reserve Fund (the "Replenishment Amount") and (B) the date(s) or expected date(s) of such deposit(s). If the Trustee has so delivered a Reserve Fund Replenishment Notice to Lehman, then by no later than the second Business Day after delivery thereof, the Trustee shall purchase any Qualified Securities duly tendered by the Qualified Dealer in accordance with Section 2.1 hereof, such Qualified Securities having a Purchase Price (by which amount the Scheduled Reserve Amount shall be increased) equal to the pro rata portion of the Replenishment Amount relating to the amount by which the Scheduled Reserve Amount was decreased pursuant to Section 2.5(a) above, such that the ratio of the amount invested hereunder to the Reserve Fund Requirement (as defined in the Indenture) remains constant.

(c)    If the Reserve Fund is not replenished within twelve (12) months of a withdrawal, Lehman may but shall not be required or obligated under this Agreement to cause the Qualified Dealer to make any delivery of Qualified Securities with respect to the pro rata portion of the Replenishment Amount upon the replenishment of the Reserve Fund.

Execution Copy

Section 2.6    Direction by Corporation to Trustee.  The Corporation hereby irrevocably instructs the Trustee and the Trustee agrees to take the actions and to make the purchases required hereby.   The Corporation represents to the Trustee that this Agreement and the investments provided hereunder are permitted under the Indenture.

Section 2.7    Lehman Downgrade

(a)    If during the term of this Agreement the long-term senior unsecured debt ratings of LBH are suspended, withdrawn or fall below "A3" by Moody's and "A-" by Standard & Poor's (in any such case, a "Lehman Downgrade"), Lehman shall provide written notice to the Corporation and the Trustee within five Business Days of such Lehman Downgrade.

(b)    Upon receipt of the written notice from Lehman of such Lehman Downgrade, Lehman shall within ten Business Days of a Lehman Downgrade:

(i)    assign and transfer this Agreement and its interests hereunder to a financial institution with the written consent of the Corporation (such consent not to be unreasonably withheld or delayed) and such financial institution has long-term unsecured debt ratings of at least A3 by Moody's and A- by Standard & Poor's, provided that in all such instances of transfer the transferee shall assume all of the rights and obligations of Lehman hereunder;

(ii)    have the obligations of Lehman hereunder guaranteed by a financial institution which has long-term debt ratings of at least A3 by Moody's and A- by Standard & Poor's and with the written consent of the Corporation and the Trustee (such consent not to be unreasonably withheld or delayed); or

(iii)    deliver collateral to the Trustee comprised of Qualified Securities (other than the Qualified Securities delivered to the Trustee pursuant to Section II hereof) such that (A) the market value of the collateral must be maintained at levels of 104% of the Termination Amount (in favor of the Corporation), if any, (B) the Trustee shall have a perfected first priority security interest in such collateral, and (C) the value of the collateral and the Termination Amount are determined by Lehman on the first Business Day of each week.

(c)    If Lehman fails to take any of the actions specified in (i), (ii) or (iii) above, the Corporation shall have the right, but not the obligation, to terminate this Agreement by giving written notice thereof to Lehman with a copy to the Trustee, whereupon Lehman shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one Business Day after written notice that such amount is due, pay such amount, in immediately available funds, to the Corporation and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Corporation of the Termination Amount in which case the Corporation shall promptly, but no later than one Business Day after notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman.  If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each day such amount is due but not paid at the

Default Rate. Any amounts due from the Corporation hereunder shall be paid solely from funds available under the Indenture for such purpose.

## SECTION III.         DEFEASANCE OR REFUNDING

Section 3.1    Defeasance or Refunding.

(a)    The Corporation may, by giving Lehman at least fifteen Business Days prior written notice, but without the consent of Lehman, cause the Issuer to (in whole or in part) redeem, defease, repurchase, or refund the Bonds as provided in the Indenture, provided that if the Corporation takes any such action (i) if the Termination Amount is a positive number, the Corporation shall pay or cause the Trustee to pay to Lehman in immediately available funds the Termination Amount and (ii) if the Termination Amount is a negative number, Lehman shall pay such amount to the Trustee. If the Termination Amount is payable pursuant to this Section 3.1, the party owing such amount shall pay such amount promptly but by no later than the later of (A) one Business Day after receipt of notice of the Termination Amount from Lehman or (B) the date of such redemption, defeasance or refunding. Such payment shall be made in immediately available funds, to or at the direction of the party to whom such Termination Amount is due.

(b)    Immediately upon payment of the Termination Amount in accordance with this Section 3.1 this Agreement shall terminate. The Corporation agrees that it shall not cause the Issuer to redeem, defease, refund or repurchase the Bonds unless it shall have sufficient funds to pay any Termination Amount which may be due as provided herein.

(c)    If pursuant to clause (a) above this Agreement would be terminated in connection with the issuance of bonds to refund the Bonds (the "Refunding Bonds") and a Termination Amount would be payable to Lehman, the Corporation may, by written notice to Lehman and with a copy to the Trustee, request that Lehman continue this Agreement and have such Agreement apply to the Refunding Bonds. Lehman agrees that if it receives such a request it shall agree to so continue this Agreement with respect to the Refunding Bonds and the Bonds remaining outstanding after such refunding, provided that:

(i)    Lehman receives such request (together with all relevant details relating thereto) at least 30 days in advance of the issuance of the Refunding Bonds;

(ii)    on or prior to the date the Bonds are to be refunded (the "Refunding Date") the Corporation and the trustee of the Refunding Bonds enter into such amendments of this Agreement with Lehman (the "Amended Agreement") as are necessary to have this Agreement pertain to the scheduled reserve amounts, deposit dates and bond payment dates applicable to the Refunding Bonds and to any Bonds which remain outstanding after giving effect to such refunding (the "Amended Cash Flows");

(iii)    if as determined on the Refunding Date, the Termination Amount payable to Lehman with respect to the Scheduled Reserve Amounts, Deposit Dates and Bond Payment

Dates which would be remaining hereunder on such date, assuming that the Bonds were not then refunded (the "Original Cash Flows"), would be greater than the Termination Amount which would be payable to Lehman for its investment rights with respect to the Amended Cash Flows, the Corporation shall on or before the Refunding Date pay to Lehman the amount of such difference;

(iv)    the last deposit date under the Amended Agreement is no later than the last Deposit Date hereunder;

(v)    the Refunding Bonds have a credit rating at least equivalent to the credit rating of the Bonds without giving effect to any bond insurance and are secured by revenues at least equivalent to the revenues securing the Bonds; and

(vi)    Lehman receives any opinions and other assurances it may reasonably request to assure that the protections afforded it hereunder will continue under the Amended Agreement.

If the conditions described in paragraphs (i) through (vi) are satisfied but the Termination Amount which would be payable to Lehman for its investment rights with respect to the Amended Cash Flows would be greater than the Termination Amount which would be payable to Lehman for its investment rights with respect to the Original Cash Flows, Lehman may, at its option, pay the Corporation the amount of such difference or retain investment rights only with respect to such portion of the Amended Cash Flows as would have a Termination Amount equal to the Termination Amount of the Original Cash Flows.

SECTION IV          REPRESENTATIONS AND WARRANTIES

Section 4.1    Representations and Warranties.    Each party hereto represents and warrants to the other parties hereto at all times during the term of this Agreement that:

(a)    it is duly organized and validly existing under the laws of its jurisdiction, incorporation or establishment;

(b)    it has the power to enter into and perform its obligations under this Agreement (including, in the case of the Corporation, to pay the Termination Amount in accordance herewith and, including, in the case of the Corporation or the Trustee, to enter into and perform its obligations under the Indenture and any other Financing Documents to which it is a party);

(c)    this Agreement has been duly authorized, executed and delivered by it and, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of it enforceable against it in accordance with the terms hereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law;

RFA: Lutheran Senior Services

Execution Copy

(d)    its execution and delivery of this Agreement and its performance of its obligations hereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws (or equivalent organizational documents), or any other agreement (including in the case of the Corporation and the Trustee, the Indenture or other Financing Documents to which it is a party), instrument, law, ordinance, regulation, judgment, injunction or order applicable to it or any of its property;

(e)    there is no proceeding pending or threatened against it at law or in equity, or before any governmental instrumentality or in any arbitration, which would materially impair its ability to perform its obligations under this Agreement, and there is no such proceeding pending against it which purports or is likely to affect the legality, validity or enforceability of the Agreement; and

(f)    in the case of the Corporation,

(i)    all Deposit Dates, Bond Payment Dates and Deposit Amounts as indicated on Exhibit A of this Agreement are true and correct in all respects;

(ii)    it is not entitled to claim, and shall not assert any claim, with respect to itself or its revenues, assets or property (irrespective of the use or intended use thereof), of immunity on the grounds of sovereignty or similar grounds from suit, jurisdiction of any court, relief by way of injunction, order for specific performance or for recovery of property, attachment of its assets (whether before or after judgment, in aid of execution, or otherwise) and execution or enforcement of any judgment to which it or its revenues or assets or property might otherwise be entitled in any suit, action or proceeding relating to this Agreement in the courts of any jurisdiction, nor may there be attributed to the Corporation or its revenues, assets or property any such immunity (nor shall such attribution be claimed by the Corporation);

(iii)    it has delivered to Lehman its most recent annual audited statement of financial condition and its most recent quarterly unaudited statement of financial condition and the Corporation has not experienced since the date of its last published financial statement any material adverse change in its business, assets, operations or financial condition;

(iv)    it has not nor does it anticipate that there shall be any occurrence or existence of (1) a default, event of default or other similar condition or event (however described and including any such conditions or events which will become events of default with the passing of time or the giving of notice) in respect of the Corporation under one or more agreements or instruments relating to any Specified Indebtedness of the Corporation which has resulted in any Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by the Corporation in making

Execution Copy

one or more payments on the due date thereof under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(v)    it is solvent and has, and will have after giving effect to this Agreement, sufficient capital to conduct its business and to pay its debts as they become due;

(vi)    it has not experienced any Incipient Illegality with respect to this Agreement; and

(vii)    it is not subject to any administrative, governmental or other investigation, special review or order, or pending order or similar event.


SECTION V.        COVENANTS AND ACKNOWLEDGMENTS

Section 5.1    Covenants.  Each of Lehman, the Corporation and the Trustee covenants to the other parties to this Agreement that so long as it shall have any obligations under this Agreement it shall:

(a)    maintain in full force and effect all authorizations and agreements of and exemptions, consents, licenses, actions or approvals by, and all filings with or notices to, any governmental or other authority that are required to be obtained or made by such party with respect to this Agreement and will use all reasonable efforts to obtain or make any that may become necessary in the future;

(b)    comply in all material respects with all applicable laws, rules, regulations and orders to which it may be subject if failure so to comply could materially impair its ability to perform its obligations under this Agreement;

(c)    if it is the Corporation or the Trustee, not enter into any amendment or modification of the Indenture or other Financing Documents to which it is a party which could impair its ability to perform its obligations to Lehman hereunder except nothing contained hereunder shall restrict the Corporation's ability to issue additional bonds under the Indenture;

(d)    if it is the Corporation, the Corporation agrees that, during the term of this Agreement, it shall deliver to Lehman its most recently available statement of financial condition (both audited and unaudited) as such are issued; and

(e)    if it is the Corporation, it shall not replace this Agreement or withdraw any amounts held in the Debt Service Reserve Fund for purposes of purchasing a surety bond or any similar financial instrument.

Section 5.2    Role of Lehman; Independent Judgment.  The Corporation acknowledges and agrees that in connection with its decision to enter into this Agreement and its subsequent negotiation and execution of this Agreement, (i) neither Lehman, nor any of its directors,

Execution Copy

officers, employees, agents or affiliates (each of the foregoing, including Lehman, a "Lehman Party") has acted as a fiduciary or financial or investment advisor to or agent or other representative of the Corporation, (ii) the Corporation has, to the extent it has deemed necessary, consulted with its own legal, tax, regulatory, accounting, financial and investment advisors in determining the suitability and appropriateness of this Agreement as well as in negotiating the specific terms hereof and has not relied upon any advice from any Lehman Party, with respect to such matters; the Corporation understands the terms, conditions and risks of this Agreement and is capable of assuming such risks; and (iii) the terms and conditions of this Agreement have been individually negotiated by the Corporation and are the result of arms-length negotiations among Lehman, the Trustee and the Corporation.

Section 5.3    No Liability.  Each of the Corporation and the Trustee agrees that no Lehman Party shall be liable or responsible for: (i) the payment of any amounts owing on or with respect to the Bonds; (ii) the Trustee's use or application of any moneys payable to the Trustee hereunder; (iii) any acts or omissions of the Corporation or the Trustee under, or with respect to, the Bonds or the Indenture or any related document; or (iv) determining whether the Corporation or the Trustee is in compliance with any applicable statute, regulation or law, the Bonds, the Indenture or any other related document.

Section 5.4    Fixed Rate of Return.   The Corporation has entered into this Agreement for purposes of managing its borrowings or investments by increasing the predictability of its cash flow from earnings on its investments and not for purposes of speculation. The Corporation understands that in consideration of its purchasing Qualified Securities at the Purchase Price on each Deposit Date, the Corporation has minimized the risks resulting from fluctuations in interest rates during the term of this Agreement on the Scheduled Reserve Amounts in the Reserve Fund but has also foregone the possibility of receiving greater returns on the Scheduled Reserve Amounts in the future from such fluctuations.

Section 5.5    Termination Amount.  The Corporation understands that if under any of the circumstances provided herein (including upon the occurrence of a redemption or a defeasance of the Bonds on or prior to the last Deposit Date), a Termination Amount may be due to Lehman, the size of such Termination Amount will vary depending, in large part, on prevailing interest rates at the time such Termination Amount is calculated. In certain market conditions the amount of the Termination Amount owed to Lehman by the Corporation could be substantial.

Section 5.6    Fees and Commissions.  The Corporation acknowledges that Lehman shall pay $3,000.00 to Ziegler Capital Markets Group on behalf of the Corporation, as a bidding agent's fee for services provided by to Ziegler Capital Markets Group to the Corporation.


SECTION VI          CLOSING CONDITIONS

Section 6.1    Closing Conditions

On or prior to the Closing Date the following shall occur:


RFA: Lutheran Senior Services

(a)    delivery to Lehman and Corporation of a certificate of the Trustee, in the form of Exhibit B;

(b)    delivery to Lehman and Trustee of an opinion of counsel to the Corporation, in the form of Exhibit D;

(c)    delivery to Lehman by the Corporation of a copy of the official statement for the Bonds;

(d)    delivery to Lehman by the Corporation of a true and correct copy of the Indenture and the Financing Documents as in full force and effect on the date hereof;

(e)    delivery to Lehman of a copy of any consent received by the Corporation to enter into this Agreement;

(f)    delivery to the Trustee and Corporation of an opinion of inside counsel to Lehman, in the form of Exhibit C, and a bankruptcy opinion of special counsel to Lehman; and

(g)    delivery to Lehman of a copy of the statutory or regulatory authority, if any, pursuant to which the Corporation is authorized to enter into this Agreement and a certified copy of any resolution or resolutions of the Corporation pursuant to which the Corporation is authorized to enter into this Agreement.

SECTION VII        DEFAULTS; TERMINATION

Section 7.1    Trustee Events of Default.  The occurrence of any of the following events shall constitute a Trustee Event of Default:

(a)    the Trustee shall fail for any reason (other than because such cash is not available because the Trustee withdrew funds from the Reserve Fund in order to make a Debt Service Payment for the Bonds on a Bond Payment Date) to apply any funds in the Reserve Fund to purchase, at the Purchase Price therefore, any Qualified Securities delivered by the Qualified Dealer in accordance with this Agreement and such failure is not cured within three (3) Business Days of telephonic and written notice thereof from Lehman to the Trustee and the Corporation (the "Trustee Cure Period"); provided that the Trustee shall promptly pay on demand, in immediately available funds, interest at the Default Rate, on the Maturity Amount of such Eligible Securities, for the period from and including the Deposit Date to but excluding the day on which the Trustee takes delivery of the such Eligible Securities;

(b)    the Trustee shall default in the performance of any other material covenant or obligation under this Agreement and such default is not cured within five Business Days of notice thereof from Lehman or the Corporation; or

(c)     any representation or warranty of the Trustee contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made.

Section 7.2     Corporation Events of Default.  The occurrence of any of the following events shall constitute a Corporation Event of Default:

(a)     the amount in the Reserve Fund available to purchase Qualified Securities on any Deposit Date is less than the Scheduled Reserve Amount (other than because such cash is not available because the Trustee withdrew funds from the Reserve Fund in order to make a Debt Service Payment for the Bonds on a Bond Payment Date);

(b)     the Corporation shall default in the performance of any material covenant or obligation under this Agreement, other than as described in clause (a) above, and such default is not cured within five Business Days of notice thereof from Lehman or the Trustee;

(c)     any representation or warranty of the Corporation contained in this Agreement proves to have been incorrect, false or misleading in any material respect;

(d)     the Corporation is Insolvent;

(e)     the Corporation consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if an entity such as an organization, board, commission authority, agency or body succeeds to the principal functions of, or powers and duties granted, to the Corporation) and, at the time of such consolidation, amalgamation, merger or transfer either (i) the resulting or surviving or transferee entity fails to assume all the obligations of the Corporation under this Agreement or by operation of law or pursuant to an agreement reasonably satisfactory to the other parties to this Agreement or (ii) the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of the Corporation; or

(f)     the Corporation shall default with respect to the Bonds and/or any Specified Indebtedness; or

(g)     a Trustee Event of Default has occurred which gives rise to Lehman's right to demand the resignation or replacement of the Trustee and following such demand by Lehman the Corporation has failed to appoint a successor trustee who is able to perform the Trustee's obligations hereunder within ten (10) Business Days of such demand.

Section 7.3     Lehman Events of Default.  The occurrence of any of the following events shall constitute a Lehman Event of Default:

(a)     Lehman shall fail, on any Deposit Date, to cause a Qualified Dealer to deliver Qualified Securities and such failure is not cured within five Business Days after written notice thereof to Lehman from the Trustee or the Corporation (the "Lehman Cure Period");

(b)    any representation or warranty of Lehman contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made;

(c)    Lehman is at any time Insolvent; or

(d)    Lehman has failed to take any of the actions required of it in Section 2.7 hereof.

In the event of a Lehman Event of Default, Lehman must within five Business Days of such event provide written notice to the Corporation and the Trustee

Section 7.4    Remedies Upon Occurrence of a Trustee Event of Default.    Upon the occurrence of a Trustee Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Deposit Date and which have not theretofore been delivered to and purchased by the Trustee and, subject to Section 8.2 hereof, make demand for the payment of its losses (calculated in accordance with Section 7.7 hereof) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    (i) upon the occurrence of a Trustee Event of Default under Section 7.1(a) hereof, immediately make written demand upon the Trustee to promptly resign as trustee under the Indenture, in which event the Trustee shall resign pursuant to the Indenture, even if the Trustee has paid in full any losses to Lehman as calculated in accordance with Section 7.7 and (ii) upon the occurrence of a Trustee Event of Default under Section 7.1(b) or (c) immediately make written demand upon the Trustee to promptly resign as trustee under the Indenture.

Section 7.5    Remedies Upon Occurrence of Corporation Event of Default.    Upon the occurrence of a Corporation Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Deposit Date which has occurred and which have not theretofore been delivered to and purchased by the Trustee and make demand for the payment of its losses (calculated in accordance with Section 7.7 hereof) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    immediately terminate this Agreement by giving written notice thereof to the Corporation with a copy to the Trustee, and (i) if the Termination Amount is a positive number, make demand upon the Corporation for the payment of the Termination Amount and (ii) if the Termination Amount is a negative number, pay such amount to the Corporation.

If a Termination Amount is payable pursuant to clause (b) above, the party owing such amount shall promptly, but by no later than one Business Day after notice that such amount is due from

Execution Copy

the party to whom such Termination Amount is due, pay such amount, in immediately available funds, to or at the direction of the party to whom such Termination Amount is due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each day such amount is due but not paid at the Default Rate.

Section 7.6     Remedies Upon Occurrence of a Lehman Event of Default.    Upon the occurrence of a Lehman Event of Default, the Corporation shall have the right to:

(a)     if such default is a default under Section 7.3(a), apply the Deposit Amount to purchase Permitted Investments in accordance with Section 2.4 hereof and make demand for the payment of its losses in connection therewith, calculated as provided in Section 7.7(b);

(b)     if such default is a default under Section 7.3(a) and Lehman has failed to pay the Corporation's losses (as described in Section 7.7(b)) upon demand therefore, immediately terminate this Agreement by giving written notice thereof to Lehman with a copy to the Trustee; and

(c)     if such default is a default under Sections 7.3(b) or (c) hereof immediately terminate this Agreement by giving written notice thereof to Lehman with a copy to the Trustee, whereupon Lehman shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one Business Day after written notice that such amount is due, pay such amount, in immediately available funds, to the Corporation and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Corporation of the Termination Amount in which case the Corporation shall promptly, but no later than one Business Day after written notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each day such amount is due but not paid at the Default Rate. Notwithstanding anything to the contrary in this Agreement, if Lehman fails to determine the Termination Amount within three Business Days of notice from the Corporation or the Trustee of the occurrence of a Lehman Event of Default then the Corporation (or if so directed by the Corporation, the Trustee) shall make such determination as if it were Lehman and the amount as so determined by the Corporation (or the Trustee) shall for purposes of this Section 7.6 be deemed the Termination Amount.

Section 7.7     Loss Amount if Failed or Late Purchase.

(a)     Subject to Section 8.2 hereof, if the Trustee fails to apply any funds in the Reserve Fund to purchase any Qualified Securities delivered by a Qualified Dealer in accordance with this Agreement or (b) if on any Deposit Date the amount in the Reserve Fund available to purchase Qualified Securities is less than the Scheduled Reserve Amount, the Trustee, in the case of clause (a) or the Corporation in the case of clause (b), shall pay to Lehman, as liquidated damages for its losses and not as a penalty, on demand by Lehman, the sum of (w) interest on the Purchase Price of such Qualified Securities which the Qualified Dealer tendered for delivery to, but were not purchased by, the Trustee for each day from and including the delivery date thereof to but excluding the date on which such securities are resold to a third party or to the Trustee, (x)

Execution Copy

the excess, if any, of the Purchase Price of such Qualified Securities over the amount received by the Qualified Dealer upon such resale of the securities (the "Shortfall Amount"), (y) interest on the Shortfall Amount from and including the resale date to but excluding the date on which the Trustee or the Corporation, as applicable, compensates Lehman for its losses as described herein, and (z) any incidental costs and expenses incurred by Lehman in connection with the Trustee's failure to so purchase such Qualified Securities. Interest shall accrue at a rate per annum equal to the Default Rate for purposes of clauses (w) and (y). Notwithstanding the foregoing, if Lehman does not on any date cause the delivery of Qualified Securities because the amount in the Reserve Fund is less than the Scheduled Reserve Amount, the Loss Amount shall equal the sum of (y) the amount, if any, by which the aggregate Purchase Price of the Qualified Securities which Lehman could have caused to be delivered exceeds the market value thereof (as reasonably determined by Lehman as of the date such tender was to be made) and (z) interest on such amount at the Default Rate for each day from the date such securities could have been delivered to the next succeeding Bond Payment Date plus any amounts specified in clause (x) above.

(b)    If there is a Lehman Event of Default as described in Section 7.3(a) hereof, the amount of losses payable by Lehman upon demand therefore pursuant to Section 7.6(a) shall equal the excess, if any, of (i) interest the Trustee would have earned on the related Deposit Amount had the Deposit Amount been invested in Qualified Securities at the Guaranteed Rate (the "Guaranteed Interest") over (ii) the interest the Trustee actually earned by investing the related Deposit Amount in Permitted Investments in accordance with Section 2.4 hereof (or if the Trustee fails to invest such Deposit Amount in Permitted Investments in accordance with Section 2.4, the amount of interest the Trustee would have earned on such Deposit Amount had the Trustee complied with the requirements of Section 2.4 hereof).

Section 7.8    Application of Excess Funds.  The Corporation hereby directs the Trustee and the Trustee agrees that if at any time any amounts are due Lehman from the Corporation in connection with a Corporation Event of Default, the Trustee shall, upon demand from Lehman, and without further direction or instruction from the Corporation, but not if an Event of Default had occurred and is continuing under the Indenture which are not subject to the lien of the Indenture or are otherwise required for the payment or security of the Bonds or the Trustee's fees and expenses (including any funds which would otherwise be released to the Corporation) to the payment of such amounts.

Section 7.9    Limited Rights Against the Reserve Fund.  Neither Lehman nor any Qualified Dealer shall have any right to any amounts held in the Reserve Fund except as expressly provided herein upon the delivery of a Qualified Security in accordance with this Agreement.

Section 7.10    No Waiver; Remedies Cumulative.  No failure or delay on any party's part in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy.  Such party's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law, this Agreement or

Execution Copy

otherwise. None of the terms or provisions of this Agreement may be waived, modified or amended except in a writing duly signed by the Trustee, the Corporation and Lehman.

## SECTION VIII    THE TRUSTEE

Section 8.1   Acceptance by Trustee. By execution and delivery of this Agreement, the Trustee accepts its duties and obligations hereunder, as an addition to its duties and obligations as Trustee under the Indenture. The provisions of the Indenture governing rights, immunities and protections are hereby granted to the Trustee by the Corporation.

Section 8.2   Liability of the Trustee; Consultation with Legal Counsel.

(a)   The Trustee shall not be liable to any person for any action taken or neglected to be taken in performing or attempting to perform its obligations hereunder or preserving or seeking to preserve the funds it maintains under the Indenture or to purchase the Qualified Securities tendered pursuant to this Agreement, except for actions arising from its negligence or willful misconduct. The Corporation hereby agrees to protect, defend, indemnify and hold harmless the Trustee against any and all costs, losses, damages, liabilities, claims, expenses (including reasonable counsel fees and expenses) and claims incurred by it without negligence or willful malfeasance on the Trustee's part arising out of or in connection with its entering into this Agreement and the carrying out of its duties hereunder, including the costs and expenses of defending itself against any claim of liability relating to this Agreement.

(b)   The Trustee may consult with counsel reasonably satisfactory to it with respect to any question relating to its duties or responsibilities hereunder or otherwise in connection herewith and, except as expressly provided herein, shall not be liable for any action taken, suffered, or omitted by the Trustee in good faith upon the advice of such counsel. The Trustee may act through its officers, employees, agents and attorneys.

Section 8.3   Payment of Trustee Fees. Lehman has no liability or responsibility for payment of the Trustee's fees or expenses for its services hereunder, including any such fees or expenses arising out of or in connection with the liquidation of the Qualified Securities as provided herein.

Section 8.4   Trustee Cooperation.

(a)   The Trustee shall not act in contravention of its obligations hereunder or invest amounts in the Reserve Fund other than pursuant to this Agreement and the Indenture.

(b)   The Trustee shall not make any payments or distributions from the Reserve Fund other than payments or distributions (i) required by this Agreement, (ii) to pay principal of, redemption premium and interest on the Bonds or (iii) to make payments required by the Indenture.

Section 8.5    Successor Trustee.    If the Trustee shall resign or be discharged from its duties and obligations under the Indenture, the Corporation shall appoint a successor Trustee pursuant to the terms of the Indenture. The Corporation agrees that if the Trustee fails for any reason to perform its duties to Lehman under this Agreement in accordance with the terms hereof, or is at any time Insolvent or breaches in any material respect its representations and warranties to Lehman hereunder, the Corporation shall promptly, upon written request of Lehman, appoint a successor Trustee reasonably acceptable to Lehman.

# SECTION IX    MISCELLANEOUS

Section 9.1    Notices and Delivery Instructions.    All notices, demands or other communications hereunder shall be given or made in writing and shall be delivered personally, or sent by certified or registered mail, postage prepaid, return receipt requested, or overnight delivery service, telex or telecopy to the party to whom they are directed at the following addresses, or at such other addresses as may be designated by notice from such party to all other parties:

To Lehman:

Lehman Brothers Special Financing Inc.
745 Seventh Avenue, 16th Floor
New York, NY 10019
Attention:     Municipal Financial Products - Middle Office
Telephone:     212-526-2240
Fax:           646-758-2988

To the Trustee:

Bank of New York Trust Company, N.A.
911 Washington Avenue, Suite 300
St. Louis, MO 63101
Attention:     Kerry McFarland, Vice President
Telephone:     (314)613-8202
Fax:           (314) 613-8238

[DELIVERY INSTRUCTIONS FOR BOOK-ENTRY GOVERNMENT OBLIGATIONS]

The Bank of New York
ABA #021000018
GLA #111-565
Account Name: Lutheran Senior-Series 2005A Reserve Fund
Account Number: 222436

RFA:  Lutheran Senior Services

Execution Copy

[DELIVERY INSTRUCTIONS FOR DTC]

DTC Participant #901
Account #222436

To the Corporation:

Lutheran Senior Services
709 S. Laclede Station Road
St. Louis, MO 63119-4911
Attention:      Carl Rausch, President
Telephone:     314/446-2408
Fax:           314/968-5590
Corporation Tax I.D. #: 43-0654682

Any notice, demand or other communication given in a manner prescribed in this Section shall be deemed to have been delivered on receipt.

Section 9.2    Binding Effect; Transfer.  This Agreement shall be binding upon and inure to the benefit of the Trustee, the Corporation and Lehman and upon their respective permitted successors and transferees.  Lehman shall be entitled to transfer all or any portion of this Agreement and its interests hereunder, to any subsidiary or affiliate of Lehman, or to any office, branch or subsidiary of any affiliate of Lehman upon written notice to the Corporation and the Trustee. Such subsidiary or affiliate shall be wholly owned by LBH and the obligations of such subsidiary or affiliate shall be unconditionally guaranteed by LBH. Lehman shall be able to transfer all or any portion of this Agreement only with the written consent of the Corporation (such consent not to be unreasonably withheld or delayed) and written notice to the Trustee; provided, however, that such consent shall not be required if such transfer is to any entity rated at least an "A-", "A3", or "A-" by Standard & Poor's, Moody's or Fitch, Inc., respectively, and provided further that in all such instances of transfer the transferee shall assume all of the rights and obligations of Lehman hereunder.  Neither the Corporation nor the Trustee (except with respect to a transfer to a successor trustee pursuant to the Indenture) may transfer this Agreement without the prior written consent of Lehman and the other party hereto.

Section 9.3    Limitation.  Nothing expressed or implied herein is intended or shall be construed to confer upon any person, firm or corporation other than the parties hereto, any right, remedy or claim by reason of this Agreement or any term hereof, and all terms contained herein shall be for the sole and exclusive benefit of the parties hereto, and their successors and permitted transferees.

Section 9.4    Severability.  If one or more provisions of this Agreement or the applicability of any such provisions to any set of circumstances shall be determined to be invalid or ineffective for any reason, such determination shall not affect the validity and enforceability of

Execution Copy

the remaining provisions or the applicability of the same provisions or any of the remaining provisions to other circumstances.

Section 9.5    <u>Amendments, Changes and Modifications</u>.    This Agreement may be amended or any of its terms modified only by a written document authorized, executed and delivered by each of the parties hereto.

Section 9.6    <u>Counterparts</u>.    This Agreement may be executed in one or more counterparts and when each party hereto has executed at least one counterpart, this Agreement shall become binding on all parties and such counterparts shall be deemed to be one and the same document.

Section 9.7    <u>Termination</u>.    Unless earlier terminated pursuant to Sections 3.1, 7.4, 7.5 or 7.6 hereof, this Agreement shall terminate on the later of the last Bond Payment Date set forth in <u>Exhibit A</u> and the date on which the Trustee and the Corporation have satisfied all of their obligations hereunder.

Section 9.8    <u>Entire Agreement</u>.    This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

Section 9.9    <u>Governing Law</u>.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law principles.

Execution Copy

IN WITNESS WHEREOF, the Trustee, the Corporation and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

LUTHERAN SENIOR SERVICES

By: _____
Name:
Title:

THE BANK OF NEW YORK TRUST COMPANY, N.A.,
AS TRUSTEE

By: _____
Name: Kerry A. McFarland
Title: Vice President

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name: T. Courtney Jenkins
Title: Vice President

RFA:  Lutheran Senior Services

24

Execution Copy

IN WITNESS WHEREOF, the Trustee, the Corporation and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

LUTHERAN SENIOR SERVICES

By:_____
Name:
Title:


THE BANK OF NEW YORK TRUST COMPANY, N.A., AS TRUSTEE

By:_____
Name: Kerry A. McFarland
Title: Vice President


LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name: T. Courtney Jenkins
Title: Vice President

Execution Copy

IN WITNESS WHEREOF, the Trustee, the Corporation and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

LUTHERAN SENIOR SERVICES

By: _____
Name:
Title:

THE BANK OF NEW YORK TRUST COMPANY, N.A., AS TRUSTEE

By: _____
Name: Kerry A. McFarland
Title: Vice President

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name: T. Courtney Jenkins
Title: Vice President

| Deposit Date* | Bond Payment Date* | Scheduled Reserve Amount |
|---|---|---|
| 02/17/06 | 08/01/06 | $1,581,433.76 |
| 08/01/06 | 02/01/07 | $1,581,433.76 |
| 02/01/07 | 08/01/07 | $1,581,433.76 |
| 08/01/07 | 02/01/08 | $1,581,433.76 |
| 02/01/08 | 08/01/08 | $1,581,433.76 |
| 08/01/08 | 02/01/09 | $1,581,433.76 |
| 02/01/09 | 08/01/09 | $1,581,433.76 |
| 08/01/09 | 02/01/10 | $1,581,433.76 |
| 02/01/10 | 08/01/10 | $1,581,433.76 |
| 08/01/10 | 02/01/11 | $1,581,433.76 |
| 02/01/11 | 08/01/11 | $1,581,433.76 |
| 08/01/11 | 02/01/12 | $1,581,433.76 |
| 02/01/12 | 08/01/12 | $1,581,433.76 |
| 08/01/12 | 02/01/13 | $1,581,433.76 |
| 02/01/13 | 08/01/13 | $1,581,433.76 |
| 08/01/13 | 02/01/14 | $1,581,433.76 |
| 02/01/14 | 08/01/14 | $1,581,433.76 |
| 08/01/14 | 02/01/15 | $1,581,433.76 |
| 02/01/15 | 08/01/15 | $1,581,433.76 |
| 08/01/15 | 02/01/16 | $1,581,433.76 |
| 02/01/16 | 08/01/16 | $1,581,433.76 |
| 08/01/16 | 02/01/17 | $1,581,433.76 |
| 02/01/17 | 08/01/17 | $1,581,433.76 |
| 08/01/17 | 02/01/18 | $1,581,433.76 |
| 02/01/18 | 08/01/18 | $1,581,433.76 |
| 08/01/18 | 02/01/19 | $1,581,433.76 |
| 02/01/19 | 08/01/19 | $1,581,433.76 |
| 08/01/19 | 02/01/20 | $1,581,433.76 |
| 02/01/20 | 08/01/20 | $1,581,433.76 |
| 08/01/20 | 02/01/21 | $1,581,433.76 |
| 02/01/21 | 08/01/21 | $1,581,433.76 |
| 08/01/21 | 02/01/22 | $1,581,433.76 |
| 02/01/22 | 08/01/22 | $1,581,433.76 |
| 08/01/22 | 02/01/23 | $1,581,433.76 |
| 02/01/23 | 08/01/23 | $1,581,433.76 |
| 08/01/23 | 02/01/24 | $1,581,433.76 |
| 02/01/24 | 08/01/24 | $1,581,433.76 |
| 08/01/24 | 02/01/25 | $1,581,433.76 |
| 02/01/25 | 08/01/25 | $1,581,433.76 |

\* If any Deposit Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately preceding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

A-1

EXHIBIT A

| Deposit Date* | Bond Payment Date* | Scheduled Reserve Amount |
|---|---|---|
| 08/01/25 | 02/01/26 | $1,581,433.76 |
| 02/01/26 | 08/01/26 | $1,581,433.76 |
| 08/01/26 | 02/01/27 | $1,581,433.76 |
| 02/01/27 | 08/01/27 | $1,581,433.76 |
| 08/01/27 | 02/01/28 | $1,581,433.76 |
| 02/01/28 | 08/01/28 | $1,581,433.76 |
| 08/01/28 | 02/01/29 | $1,581,433.76 |
| 02/01/29 | 08/01/29 | $1,581,433.76 |
| 08/01/29 | 02/01/30 | $1,581,433.76 |
| 02/01/30 | 08/01/30 | $1,581,433.76 |
| 08/01/30 | 02/01/31 | $1,581,433.76 |
| 02/01/31 | 08/01/31 | $1,581,433.76 |
| 08/01/31 | 02/01/32 | $1,581,433.76 |
| 02/01/32 | 08/01/32 | $1,581,433.76 |
| 08/01/32 | 02/01/33 | $1,581,433.76 |
| 02/01/33 | 08/01/33 | $1,581,433.76 |
| 08/01/33 | 02/01/34 | $1,581,433.76 |
| 02/01/34 | 08/01/34 | $1,581,433.76 |
| 08/01/34 | 02/01/35 | $1,581,433.76 |

*    If any Deposit Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately preceding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

<u>EXHIBIT B</u>

<u>February 17, 2006</u>

Lutheran Senior Services
St. Louis, MO 63119-4911

Lehman Brothers Special Financing Inc.
New York, NY 10019

CERTIFICATE OF TRUSTEE

Re:    $30,000,000 Health and Educational Facilities Authority of the State of Missouri

The undersigned, Kerry McFarland, a Vice President of The Bank of New York Trust Company, N.A. (the "Trustee"), hereby certifies as follows:

1.    The Reserve Fund Agreement dated as of February 17, 2006 (the "Agreement") among Lutheran Senior Services, Lehman Brothers Special Financing Inc. and the Trustee has been duly executed and delivered by an authorized signatory of the Trustee.

2.    The Trustee has full legal right, power and authority to enter into the Agreement.

3.    The Agreement has been duly authorized, executed and delivered by the Trustee.

4.    The Agreement is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

5.    The execution and delivery by the Trustee of the Agreement and the performance of its obligations thereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws, or the Indenture (as defined in the Agreement), the other Financing Documents (as defined in the Agreement) or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

6.    The Indenture is a legal, valid and binding obligation of the Trustee, Enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general

principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

IN WITNESS WHEREOF, the undersigned has hereunto set his signature such officer and has affixed the corporate seal of the Trustee, this 17th day of February, 2006.

The Bank of New York Trust Company, N.A.

By
Kerry McFarland
Vice President

# LEHMAN BROTHERS

February 17, 2006

Lutheran Senior Services
St. Louis, MO 63119-4911

Bank of New York Trust Company, N.A.
St. Louis, MO 63101

Re:   $30,000,000 Health and Educational Facilities Authority of the State of Missouri, Senior Living
      Facilities Revenue Bonds, Series 2005A, (Lutheran Senior Services Projects)

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc., a Delaware corporation ("Lehman") and Lehman Brothers Holdings Inc., a Delaware corporation ("LBH") and am familiar with matters pertaining to the execution and delivery of the Reserve Fund Agreement (the "Agreement") dated as of February 17, 2006 by and among Lehman, Lutheran Senior Services (the "Corporation") and Bank of New York Trust Company, N.A., as Trustee (the "Trustee"). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

In connection with this opinion, I have examined, or have had examined on my behalf, an executed copy of the Agreement, certificates and statements of public officials and officers of Lehman and such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion.

Except as expressly set forth herein, no independent investigation (including, without limitation, conducting any review, search or investigation of any public files, records or dockets) has been undertaken to determine the existence or absence of the facts that are material to my opinions, and no inference as to my knowledge concerning such facts should be made.

When used herein the phrase "to my knowledge" means to my actual knowledge without independent investigation.

References in this letter to "Applicable Laws" are to those laws, rules and regulations of the State of New York which, in my experience, are normally applicable to transactions of the type contemplated by the Agreement. References in this letter to "Governmental Authorities" are to executive, legislative, judicial, administrative or regulatory bodies of the State of New York. References in this letter to "Governmental Approval" are to any consent, approval, license, authorization or validation of, or filing, recording or registration with, any Governmental Authority pursuant to Applicable Laws.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.   Lehman is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.

2.   The execution, delivery and performance of the Agreement by Lehman is within its corporate power, has been duly authorized by all corporate action and does not conflict with any provision of its certificate of incorporation or by-laws.

3.  The Agreement has been duly executed and delivered and constitutes a legal, valid and binding obligation, enforceable against it in accordance with their respective terms.

4.  To the best of my knowledge, no Governmental Approval is required in connection with the execution, delivery and performance of the Agreement except those that have been obtained and, to my knowledge, are in effect.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.  My opinion in paragraph 3 above is subject to: (i) bankruptcy, insolvency, reorganization, receivership, moratorium or similar laws affecting creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers or conveyances); (ii) general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law; (iii) laws and considerations of public policy that may limit the enforceability of provisions (a) regarding indemnification and contribution rights and obligations, (b) regarding the waiver or limitation of rights to trial by jury, oral amendments to written agreements or rights of setoff, (c) relating to submission to jurisdiction, venue or service of process, and (d) purporting to prohibit or restrict, or require the consent of the "account debtor" (as defined in Section 9-102 of the Uniform Commercial Code as in effect in the State of New York (the "NYUCC" )) for, the creation, perfection or enforcement of a security interest in "accounts" or "general intangibles" (in each case, as defined in Section 9-102 of the NYUCC).

B.  I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the laws of the State of New York and the General Corporation Law of the State of Delaware. Except as described, I have not examined, or had examined on my behalf, and I do not express any opinion with respect to, Delaware law.

C.  My opinions are limited to the present laws and to the facts as they presently exist, and no opinion is to be inferred or implied beyond the matters expressly so stated. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.  This letter is rendered solely to you solely for your benefit in connection with the Agreement and the transaction related thereto and may not be relied upon by any other person, entity or agency or by you in any other context or for any other purpose. This letter may not be circulated, used or quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman, except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Lehman, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Agreement.

E.  I have assumed with your permission (i) the genuineness of all signatures by each party other than Lehman, (ii) the authenticity of documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, (iii) the accuracy of the matters set forth in the documents, agreements and instruments I reviewed, (iv) that each party other than Lehman is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (v) the due execution and delivery, pursuant to due authorization, of the Agreement by each party other than Lehman, and (vi) that the Agreement is legal, valid, binding and enforceable obligation of each party other than Lehman, enforceable against each such party in accordance with its terms.

F.    My opinion in paragraph 3 is subject to the qualification that certain provisions contained in the Agreement may not be enforceable, but such unenforceability will not render the Agreement invalid as a whole or substantially interfere with the practical realization of the principal benefits provided thereby.

The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal liability in connection with said opinions.

Very truly yours,

[LETTERHEAD OF COUNSEL TO CORPORATION]

[Date]

[Trustee]

Lehman Brothers Special Financing Inc.
New York, NY


Re:    [NAME OF BONDS]


Ladies and Gentlemen:

I have acted as counsel to _____ (the "Corporation") in connection with its execution and delivery of the Reserve Fund Agreement dated as of _____ (the "Agreement"), by and among Lehman Brothers Special Financing Inc. ("Lehman"), _____ _____, as Trustee (the "Trustee") and the Corporation and its execution and delivery of the Indenture (as defined in the Agreement). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

In rendering this opinion, we have examined, among other things, copies of the Agreement and the Financing Documents.

In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the laws of the State of [state of Corporation] (the "State").

Based upon the foregoing examination and review, we are of the opinion that:

(i)     The Corporation has full legal right, power and authority to enter into the Reserve Fund Agreement and the Financing Documents to which it is a party and to authorize and direct the Trustee, pursuant to the Reserve Fund Agreement, to make purchases of the Qualified Eligible Securities in accordance with the terms therein.

(ii)    The Agreement and the Financing Documents to which it is a party have been duly authorized, executed and delivered by the Corporation.

(iii)    The stipulation of New York law as the governing law of the Agreement is enforceable under the laws of the State.

(iv)    Assuming for purposes of the opinion expressed in this paragraph (iv) that State law and New York law are the same, the Agreement is a legal, valid and binding obligation of the Corporation, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(v)    The Corporation's execution and delivery of the Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under the Indenture, the Financing Documents to which it is a party, or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(vi)    The Loan Agreement is a legal, valid and binding obligation of the Corporation, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(vii)    The Corporation is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject to in any suit, action or proceedings relating to this Agreement in the courts of any jurisdiction and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

(ix)    All consents, authorizations and approvals requisite for its execution, delivery and performance of this Agreement have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority, regulatory body or any other entity is required for such execution, delivery or performance.

I am furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

EXHIBIT E

**Lehman Brothers Special Financing Inc.**
**Notice of Tender**
Under the [ _____ ] Agreement
Dated as of: [ _____ ]

To:        _____, as [Escrow
        Agent/Trustee]
        Attention:    _____
        Fax:    _____
        Phone: _____

From:     Lehman Brothers Inc. ("LBI")
        Attention:    _____
        Fax:    _____
        Phone: _____

Date:    [_____]
Re:      [_____]

**Date and Price**

Purchase Date:        [_____]
Specified Purchase Price:  [_____]

**Specific Government Obligations**

| Cusip | Type | Maturity | Coupon | Face Amount | Maturity Amount | Accrued Interest |
|-------|------|----------|--------|-------------|-----------------|------------------|
| [_____] | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |

**Delivery vs. Payment (Book Entry Delivery)**

On the Purchase Date, LBI will deliver Face value   [_____]   [BILLS/NOTES] maturing [_____]

to:   [_____]
       [_____]
       Re:
       [_____]

On the Purchase Date, LBI will receive [_____]
       JPMorgan Chase/Lehman
       ABA: 021000021
       A/C #066206677

**EXHIBIT 2**

Execution Copy

# RESERVE FUND AGREEMENT

This Reserve Fund Agreement (this "Agreement") dated as of February 17, 2006 by and among LUTHERAN SENIOR SERVICES, a Missouri non-profit corporation (the "Corporation"), THE BANK OF NEW YORK TRUST COMPANY, N.A. a national banking association (the "Trustee"), and LEHMAN BROTHERS SPECIAL FINANCING INC., a Delaware corporation ("Lehman").

SECTION I.            DEFINITIONS

For purposes of this Agreement, unless the context clearly indicates otherwise, the words and terms defined in this Section I have the respective meanings given to them herein:

"Bond Payment Date" means, with respect to each Deposit Date, each date identified as a "Bond Payment Date" on Exhibit A unless such date is not a Business Day, in which case "Bond Payment Date" means the immediately preceding Business Day; provided that in determining whether any such date is a Business Day no effect shall be given to clause (c) or (d) of the definition of Business Day.

"Bonds" means $30,000,000 Health and Educational Facilities Authority of the State of Missouri, Senior Living Facilities Revenue Bonds, Series 2005A, (Lutheran Senior Services Projects).

"Burdened Party" means, (i) in the case of (A) a Corporation Event of Default or a Trustee Event of Default or (B) a termination of this Agreement by the Corporation pursuant to Section 3.1 following a redemption, defeasance or refunding of the Bonds, Lehman and (ii) in the case of a Lehman Event of Default, the Corporation.

"Business Day" means any day other than (a) a Saturday or Sunday, (b) a day on which the principal corporate trust office of the Trustee is authorized or required by law to close, (c) a day on which banking institutions in the City of New York are authorized or required by law to close, or (d) a day on which any Qualified Securities which may be delivered hereunder are not subject to delivery in the City of New York.

"Closing Date" means February 17, 2006.

"Corporation Event of Default" means the occurrence of an event specified in Section 7.2 hereof.

"Coupon Payment" means, for any Qualified Security, a payment of interest which is due to be paid thereon prior to the scheduled maturity of such Qualified Security.

Execution Copy

"Dealer" means a leading dealer in the relevant markets selected by Lehman in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that Lehman applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from such dealers having an office in the same City.

"Debt Service Payment" means (i) a scheduled payment of principal of or interest on the Bonds, including any such payment in connection with a scheduled mandatory sinking fund redemption of the Bonds from sinking fund installments but excluding any such payment in connection with any other redemption of the Bonds and excluding any payment required to make a regularly scheduled deposit to the principal account or interest account for the Bonds or (ii) a payment of principal of or interest on the Bonds upon an acceleration of the Bonds following an event of default under the Indenture.

"Default Rate" means a per annum rate equal to the lesser of (a) Three Month LIBOR plus 1% per annum, or (b) the maximum rate permitted by law.

"Delivery Notice" means a notice substantially in the form of <u>Exhibit E</u> or in such other form as provided by the Qualified Dealer and is reasonably acceptable to the Trustee.

"Deposit Date" means each date identified as a "Deposit Date" on <u>Exhibit A</u> unless such date is not a Business Day, in which case "Deposit Date" means the immediately preceding Business Day.

"Differential" means the amount, if any, by which the Purchase Price of any Qualified Security delivered hereunder exceeds the Market Value thereof.

"Eligible Securities" means if and to the extent the same are at the time legal for investment of funds held under the Bond Indenture,

     (a)     United States Government Obligations;

     (b)     bonds, debentures, notes, certificates of participation, or other similar obligations which are (i) issued by any state or political subdivision thereof or any agency or instrumentality of such state or political subdivision, and (ii) at the time of purchase, rated in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by Moody's, Standard and Poor's, or Fitch Ratings ("Fitch");

     (c)     bonds, debentures, notes, participation certificates, or other similar obligations issued by a government sponsored agency (such as the Federal National Mortgage Association, the Federal Home Loan Bank System, the Federal Home Loan Mortgage Corporation, the Federal Farm Credit Bank or the Student Loan Marketing Association) which is either (i) rated in the highest rating category by Moody's, Standard & Poor's or Fitch at the time of purchase, or (ii) backed by the full faith and credit of the United States of America;

Execution Copy

(d)    U.S. denominated deposit accounts, certificates of deposit, and banker's acceptances of any bank, trust, company, or savings and loan association, including the Master Trustee or Bond Trustee or its affiliates, which have a rating on their short-term certificates of deposit on the date of purchase in one of the two highest short-term rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by Moody's, Standard & Poor's or Fitch, and which matures not more than 360 days after the date of purchase;

(e)    commercial paper which is rated at the time of purchase in one of the two highest short-term rating categories assigned by Moody's, Standard & Poor's or Fitch, and which matures not more than 270 days after the date of purchase; and

(f)    bonds, notes, debentures or other evidences of indebtedness issued or guaranteed by a corporation which are, at the time of purchase, rated by Moody's, Standard & Poor's or Fitch in any of the three highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise).

"Financing Documents" means the Indenture and the Loan Agreement

"Guaranteed Rate" means a rate per annum equal to        4.94%    assuming    that    the interest on the applicable security was compounded semi-annually on the basis of a year of 360 days with twelve thirty day months.

"Illegality" means that, due to the adoption of, or any change in, any applicable law after the date on which this Agreement is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of this Agreement or to comply with any other material provision of this Agreement.

"Incipient Illegality" means (a) the enactment by any legislative body with competent jurisdiction over the Corporation of legislation which, if adopted as law, would render unlawful (i) the performance by the Corporation of any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of this Agreement or the compliance by the Corporation with any other material provision of this Agreement or (ii) the performance by the Corporation of any contingent or other obligation which the Corporation relating to this Agreement, (b) any assertion in any proceeding, forum or action by the, in respect of the Corporation or in respect of any entity located or organized under the laws of the state in which the Corporation is located to the effect that performance under this Agreement or similar agreements is unlawful or (c) the occurrence with respect to the Corporation of any event that constitutes an Illegality.

"Indenture" means the Bond Trust Indenture dated as of August 1, 2005 between the Issuer and the Trustee.

Execution Copy

"Insolvent" means (i) either the Trustee, the Corporation or Lehman as the case may be, shall (1) commence a voluntary case under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter), (2) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, (3) consent to any petition filed against it in an involuntary case under such bankruptcy or insolvency or other laws, (4) apply for or consent to the appointment of, or the taking of possession by, a trustee, receiver, custodian, liquidator or the like for itself or for all or a substantial part of its property, (5) admit in writing its inability to pay, or generally not be paying, its debts as they come due, (6) make a general assignment for the benefit of creditors, or (7) take any official action for the purpose of effecting any of the foregoing; or (ii) a case or other proceeding shall be commenced against either the Trustee, the Corporation or Lehman, as the case may be, in any court of competent jurisdiction seeking (1) relief under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter) or under any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, or (2) the appointment of a trustee, receiver, custodian, liquidator or the like for the Trustee, the Corporation or Lehman, as the case may be, or for all or a substantial part of its property, and any such case or proceeding shall continue undismissed and unstayed for a period of 60 consecutive calendar days, or an order granting the relief requested in any such case or proceeding against such party shall be entered and shall remain in effect and unstayed for a period of 60 consecutive days.

"Issuer" means the Health and Educational Facilities Authority of the State of Missouri.

"LBH" means Lehman Brothers Holdings Inc., which wholly owns and unconditionally guarantees the obligations of Lehman. As of the date of this Agreement, LBH has long-term senior unsecured debt obligations rated A+ by Fitch, A1 by Moody's and A+ by S&P.

"Lehman Cure Period" has the meaning specified in Section 7.3(a) hereof.

"Lehman Event of Default" means the occurrence of an event specified in Section 7.3 hereof.

"Loan Agreement" means the Loan Agreement dated as of August 1, 2005 between the Issuer and the Corporation.

"Market Value" means with respect to any Qualified Security, the market value thereof (including accrued interest thereon) as specified by the Qualified Dealer delivering that security, provided that the Market Value of any Qualified Security shall in no event exceed the Maturity Amount thereof.

"Maturity Amount" means, with respect to any Qualified Security, the amount, payable in cash, representing the principal and interest (including any Coupon Payments) due thereon on or prior to its maturity date.

"Purchase Price" means, for any Eligible Security delivered hereunder, that price for such security, as set forth in the Delivery Notice, which will produce a rate of return on such security

Execution Copy

for the period from (and including) the date of its delivery to (but excluding) its maturity date equal to the Guaranteed Rate.

"Qualified Dealer" means Lehman Brothers Inc., its successors or assigns, or any other dealer in Eligible Securities selected by Lehman.

"Qualified Securities" means, for any Deposit Date or subsequent deposit date pursuant to Section 2.3 or 2.4, Eligible Securities which, to the extent available on the open market, (i) mature on or prior to the related Bond Payment Date and (ii) have an aggregate Purchase Price which is as close as possible to but does not exceed the related Scheduled Reserve Amount.

"Reserve Fund" means the account created pursuant to the Indenture and designated thereunder as the Reserve Account.

"Scheduled Reserve Amount" means, for each Deposit Date, the amounts shown on Exhibit A which, under the terms of the Indenture, will be the Reserve Fund Requirement on such date, assuming that (i) no withdrawals from the Reserve Fund have been made to make a Debt Service Payment and (ii) no Bonds will have been defeased or redeemed on or prior to such date except in connection with a scheduled sinking fund redemption.

"Specified Indebtedness" means any obligation of the Corporation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"Termination Amount" means an amount, as determined by Lehman reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers of the amount, if any, that each such Dealer would require the Burdened Party to pay to the Dealer (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Corporation) or would pay to the Burdened Party (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Corporation) in consideration of such Dealer entering into an agreement with the Burdened Party (with such documentation as Lehman and the Dealer may in good faith agree) which would have the effect of preserving for the Burdened Party the economic equivalent of its rights under this Agreement for the period commencing on the termination date of this Agreement and terminating on the last Bond Payment Date set forth in Exhibit A (assuming for these purposes that this Agreement were not terminating on the termination date and continued in full force through such last Bond Payment Date); provided, however, that:

     (i)     if more than three quotations are provided, the Termination Amount will be the arithmetic mean of such quotations, without regard to the quotations having the highest and lowest values,

     (ii)     if exactly three quotations are provided, the Termination Amount will be the quotation remaining after disregarding the highest and lowest quotations,

for purposes of clauses (i) and (ii), if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded, and

(iii)   if Lehman is unable to obtain three such quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by Lehman, to be the Burdened Party's total losses and costs (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Corporation), or gains (expressed as a negative number if Burdened Party is Lehman and a positive number if the Burdened Party is the Corporation) in connection with a termination of this Agreement, including any loss of bargain, cost of funding or, at the election of Lehman but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position, and;

provided further, however, that in any event the Termination Amount shall also include (A) any unpaid amounts due as of the date of termination of this Agreement (including any amounts due under Section 7.7 hereof) and (B) if such Termination Amount is being paid in connection with a termination of this Agreement following an Event of Default or if any Termination Amount otherwise due hereunder is not paid when due, the Termination Amount shall also include any incidental costs and expenses incurred by the Burdened Party in connection with such termination and the enforcement of its rights hereunder (including costs of collection and reasonable attorneys' fees).

"Three Month LIBOR" as of any date of determination means the rate for deposits in US dollars for a period of three months which appears on the Telerate Page 3750 as of 11:00 a.m., London time, on the day that is two Business Days before the day for which such determination is being made.  If no such rate appears on the Telerate Page 3750 as of such date, Lehman may select another nationally recognized published source to determine Three Month LIBOR.

"Trustee Event of Default" means the occurrence of an event specified in Section 7.1 hereof.

SECTION II.          PURCHASE AGREEMENT

Section 2.1   Purchase and Sale of Qualified Securities.

(a)   Lehman shall cause a Qualified Dealer to deliver to the Trustee, on any Deposit Date, in accordance with the delivery requirements of Section 2.2 hereof, to the extent such securities are available on the open market, Qualified Securities selected by Lehman or the Qualified Dealer.

(b)   If Lehman causes a Qualified Dealer to deliver Qualified Securities, the Trustee shall, out of funds available under the Indenture for such purpose or as otherwise provided by the Corporation, at the time of the delivery of such Qualified Securities, purchase such Qualified Securities and pay to the Qualified Dealer or Lehman, as applicable, in accordance with Section 2.2(b) hereof, an amount equal to the Purchase Price thereof.

Execution Copy

Section 2.2    <u>Delivery; Payment</u>.

(a)    All Qualified Securities delivered hereunder shall be delivered to the Trustee to the account specified in Section 9.1 hereof, in such manner as at the time is generally acceptable for delivery of Qualified Securities.  All Qualified Securities delivered hereunder shall be delivered to the Trustee on a "delivery versus payment" basis.

(b)    (i)    Lehman shall cause the Qualified Dealer to send a Delivery Notice to the Trustee at least one Business Day prior to the delivery of any Qualified Securities which are in book-entry form and at least two Business Days prior to the delivery of any Qualified Securities which are being delivered in certificated form.  The Trustee may conclusively rely on the Qualified Dealer's specification in the Delivery Notice of the Market Value, the Maturity Amount and the Purchase Price of a Qualified Security.

(ii)    Concurrently with the delivery of any Qualified Securities, unless otherwise directed by Lehman in writing, the Trustee shall, subject to clause (iii) below, pay the Qualified Dealer delivering such Qualified Securities, in its individual capacity, the Market Value thereof, and to the Qualified Dealer as agent for Lehman, the Differential, if any.

(iii)    Lehman may in the Delivery Notice, direct the Trustee to pay (A) to the Qualified Dealer, the Market Value of any Qualified Securities delivered to the Trustee hereunder, and (B) to Lehman, the Differential, if any.  Any such payment to Lehman shall be at Lehman's account as set forth in the Delivery Notice.

(iv)    All payments to be made hereunder shall be made in immediately available funds by means of a bank or Federal funds wire.

Section 2.3    <u>Subsequent Deliveries</u>.  If any Qualified Securities delivered by a Qualified Dealer pursuant to Section 2.1 hereof (a) mature prior to the Bond Payment Date for which such Qualified Securities were delivered, or (b) have a Coupon Payment, Lehman shall have the right, upon at least one Business Day's prior written notice to the Trustee in the form of the Delivery Notice, to cause a Qualified Dealer to deliver to the Trustee, at any time on or after the maturity date of such Qualified Securities (or, as applicable, on or after the interest payment date of such Coupon Payment) but prior to the date which is one Business Day before such Bond Payment Date, other Qualified Securities, <u>provided</u> that the Maturity Amount thereof does not exceed the Maturity Amount of the securities which have so matured (or as applicable, the amount of the Coupon Payment).  Any such deliveries by the Qualified Dealer shall conform to the requirements of Section 2.2(a) and (b) hereof.  Upon the delivery by the Qualified Dealer of such Qualified Securities, the Trustee shall pay the Purchase Price thereof in the manner required by Section 2.2(b)(ii) hereof.

Section 2.4    <u>Late Delivery; Failure to Deliver</u>.

(a)    If Lehman fails to cause a Qualified Dealer to deliver Qualified Securities as required hereunder by 4:30 p.m. New York City time on any Deposit Date or during the Lehman

Execution Copy

Cure Period, the Trustee shall, on each such date, use its best efforts to invest the related Deposit Amount on an overnight basis in Permitted Investments (as defined in the Indenture) and if Lehman's failure continues beyond the Lehman Cure Period, the Trustee shall invest the related Deposit Amount in Permitted Investments with the longest possible maturities, provided such maturities are not later than the related Bond Payment Date.

(b)     No failure on Lehman's part to cause a Qualified Dealer to deliver Qualified Securities hereunder shall terminate or affect Lehman's right to cause future sales of Qualified Securities in accordance with this Agreement.

Section 2.5     Notice of Withdrawal from Reserve Fund; Replenishment.

(a)     If at any time the Corporation is required under the Indenture to withdraw any investments or other amounts from the Reserve Fund (including any Qualified Securities) to make a Debt Service Payment, the Trustee shall promptly give oral and written notice thereof to Lehman and shall in such written notice specify (i) the amount of investments which are to be withdrawn and (ii) the amount which will be in the Reserve Fund after giving effect to such withdrawal to be invested pursuant to this Agreement.

(b)     If, following the Trustee's withdrawal of funds from the Reserve Fund pursuant to Section 2.5(a), within twelve (12) months of such withdrawal, (i) sufficient funds are deposited into the related Reserve Fund to permit the purchase of Qualified Securities hereunder in the amount of such withdrawal or (ii) the Corporation has notified Lehman and the Trustee that it intends, in compliance with the Indenture to deposit sufficient funds in the Reserve Fund within twelve (12) months after such withdrawal from the Reserve Fund pursuant to Section 2.5(a), then the Trustee shall, within two Business Days following such replenishment of the Reserve Fund, give oral and written notice (a "Reserve Fund Replenishment Notice") to Lehman stating (A) the amount of funds which have been or will be deposited into the Reserve Fund (the "Replenishment Amount") and (B) the date(s) or expected date(s) of such deposit(s). If the Trustee has so delivered a Reserve Fund Replenishment Notice to Lehman, then by no later than the second Business Day after delivery thereof, the Trustee shall purchase any Qualified Securities duly tendered by the Qualified Dealer in accordance with Section 2.1 hereof, such Qualified Securities having a Purchase Price (by which amount the Scheduled Reserve Amount shall be increased) equal to the pro rata portion of the Replenishment Amount relating to the amount by which the Scheduled Reserve Amount was decreased pursuant to Section 2.5(a) above, such that the ratio of the amount invested hereunder to the Reserve Fund Requirement (as defined in the Indenture) remains constant.

(c)     If the Reserve Fund is not replenished within twelve (12) months of a withdrawal, Lehman may but shall not be required or obligated under this Agreement to cause the Qualified Dealer to make any delivery of Qualified Securities with respect to the pro rata portion of the Replenishment Amount upon the replenishment of the Reserve Fund.

Section 2.6     Direction by Corporation to Trustee. The Corporation hereby irrevocably instructs the Trustee and the Trustee agrees to take the actions and to make the purchases required hereby. The Corporation represents to the Trustee that this Agreement and the investments provided hereunder are permitted under the Indenture.

RFA:  Lutheran Senior Services

Execution Copy

Section 2.7    Lehman Downgrade

(a)    If during the term of this Agreement the long-term senior unsecured debt ratings of LBH are suspended, withdrawn or fall below "A3" by Moody's and "A-" by Standard & Poor's (in any such case, a "Lehman Downgrade"), Lehman shall provide written notice to the Corporation and the Trustee within five Business Days of such Lehman Downgrade.

(b)    Upon receipt of the written notice from Lehman of such Lehman Downgrade, Lehman shall within ten Business Days of a Lehman Downgrade:

(i)    assign and transfer this Agreement and its interests hereunder to a financial institution with the written consent of the Corporation (such consent not to be unreasonably withheld or delayed) and such financial institution has long-term unsecured debt ratings of at least A3 by Moody's and A- by Standard & Poor's, provided that in all such instances of transfer the transferee shall assume all of the rights and obligations of Lehman hereunder;

(ii)    have the obligations of Lehman hereunder guaranteed by a financial institution which has long-term debt ratings of at least A3 by Moody's and A- by Standard & Poor's and with the written consent of the Corporation and the Trustee (such consent not to be unreasonably withheld or delayed); or

(iii)    deliver collateral to the Trustee comprised of Qualified Securities (other than the Qualified Securities delivered to the Trustee pursuant to Section II hereof) such that (A) the market value of the collateral must be maintained at levels of 104% of the Termination Amount (in favor of the Corporation), if any, (B) the Trustee shall have a perfected first priority security interest in such collateral, and (C) the value of the collateral and the Termination Amount are determined by Lehman on the first Business Day of each week.

(c)    If Lehman fails to take any of the actions specified in (i), (ii) or (iii) above, the Corporation shall have the right, but not the obligation, to terminate this Agreement by giving written notice thereof to Lehman with a copy to the Trustee, whereupon Lehman shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one Business Day after written notice that such amount is due, pay such amount, in immediately available funds, to the Corporation and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Corporation of the Termination Amount in which case the Corporation shall promptly, but no later than one Business Day after notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each day such amount is due but not paid at the Default Rate. Any amounts due from the Corporation hereunder shall be paid solely from funds available under the Indenture for such purpose.

SECTION III.        DEFEASANCE OR REFUNDING

Execution Copy

## Section 3.1    Defeasance or Refunding.

(a)    The Corporation may, by giving Lehman at least fifteen Business Days prior written notice, but without the consent of Lehman, cause the Issuer to (in whole or in part) redeem, defease, repurchase, or refund the Bonds as provided in the Indenture, provided that if the Corporation takes any such action (i) if the Termination Amount is a positive number, the Corporation shall pay or cause the Trustee to pay to Lehman in immediately available funds the Termination Amount and (ii) if the Termination Amount is a negative number, Lehman shall pay such amount to the Trustee. If the Termination Amount is payable pursuant to this Section 3.1, the party owing such amount shall pay such amount promptly but by no later than the later of (A) one Business Day after receipt of notice of the Termination Amount from Lehman or (B) the date of such redemption, defeasance or refunding. Such payment shall be made in immediately available funds, to or at the direction of the party to whom such Termination Amount is due.

(b)    Immediately upon payment of the Termination Amount in accordance with this Section 3.1 this Agreement shall terminate. The Corporation agrees that it shall not cause the Issuer to redeem, defease, refund or repurchase the Bonds unless it shall have sufficient funds to pay any Termination Amount which may be due as provided herein.

(c)    If pursuant to clause (a) above this Agreement would be terminated in connection with the issuance of bonds to refund the Bonds (the "Refunding Bonds") and a Termination Amount would be payable to Lehman, the Corporation may, by written notice to Lehman and with a copy to the Trustee, request that Lehman continue this Agreement and have such Agreement apply to the Refunding Bonds. Lehman agrees that if it receives such a request it shall agree to so continue this Agreement with respect to the Refunding Bonds and the Bonds remaining outstanding after such refunding, provided that:

(i)    Lehman receives such request (together with all relevant details relating thereto) at least 30 days in advance of the issuance of the Refunding Bonds;

(ii)    on or prior to the date the Bonds are to be refunded (the "Refunding Date") the Corporation and the trustee of the Refunding Bonds enter into such amendments of this Agreement with Lehman (the "Amended Agreement") as are necessary to have this Agreement pertain to the scheduled reserve amounts, deposit dates and bond payment dates applicable to the Refunding Bonds and to any Bonds which remain outstanding after giving effect to such refunding (the "Amended Cash Flows");

(iii)    if as determined on the Refunding Date, the Termination Amount payable to Lehman with respect to the Scheduled Reserve Amounts, Deposit Dates and Bond Payment Dates which would be remaining hereunder on such date, assuming that the Bonds were not then refunded (the "Original Cash Flows"), would be greater than the Termination Amount which would be payable to Lehman for its investment rights with respect to the Amended Cash Flows, the Corporation shall on or before the Refunding Date pay to Lehman the amount of such difference;

Execution Copy

(iv)   the last deposit date under the Amended Agreement is no later than the last Deposit Date hereunder;

(v)   the Refunding Bonds have a credit rating at least equivalent to the credit rating of the Bonds without giving effect to any bond insurance and are secured by revenues at least equivalent to the revenues securing the Bonds; and

(vi)   Lehman receives any opinions and other assurances it may reasonably request to assure that the protections afforded it hereunder will continue under the Amended Agreement.

If the conditions described in paragraphs (i) through (vi) are satisfied but the Termination Amount which would be payable to Lehman for its investment rights with respect to the Amended Cash Flows would be greater than the Termination Amount which would be payable to Lehman for its investment rights with respect to the Original Cash Flows, Lehman may, at its option, pay the Corporation the amount of such difference or retain investment rights only with respect to such portion of the Amended Cash Flows as would have a Termination Amount equal to the Termination Amount of the Original Cash Flows.

## SECTION IV        REPRESENTATIONS AND WARRANTIES

Section 4.1   <u>Representations and Warranties</u>.   Each party hereto represents and warrants to the other parties hereto at all times during the term of this Agreement that:

(a)   it is duly organized and validly existing under the laws of its jurisdiction, incorporation or establishment;

(b)   it has the power to enter into and perform its obligations under this Agreement (including, in the case of the Corporation, to pay the Termination Amount in accordance herewith and, including, in the case of the Corporation or the Trustee, to enter into and perform its obligations under the Indenture and any other Financing Documents to which it is a party);

(c)   this Agreement has been duly authorized, executed and delivered by it and, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of it enforceable against it in accordance with the terms hereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law;

(d)   its execution and delivery of this Agreement and its performance of its obligations hereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws (or equivalent organizational documents), or any other agreement (including in the case of the Corporation and the Trustee, the Indenture or other Financing Documents to which it is a party), instrument, law, ordinance, regulation, judgment, injunction or order applicable to it or any of its property;

RFA:  Lutheran Senior Services

Execution Copy

(e)    there is no proceeding pending or threatened against it at law or in equity, or before any governmental instrumentality or in any arbitration, which would materially impair its ability to perform its obligations under this Agreement, and there is no such proceeding pending against it which purports or is likely to affect the legality, validity or enforceability of the Agreement; and

(f)    in the case of the Corporation,

(i)    all Deposit Dates, Bond Payment Dates and Deposit Amounts as indicated on Exhibit A of this Agreement are true and correct in all respects;

(ii)    it is not entitled to claim, and shall not assert any claim, with respect to itself or its revenues, assets or property (irrespective of the use or intended use thereof), of immunity on the grounds of sovereignty or similar grounds from suit, jurisdiction of any court, relief by way of injunction, order for specific performance or for recovery of property, attachment of its assets (whether before or after judgment, in aid of execution, or otherwise) and execution or enforcement of any judgment to which it or its revenues or assets or property might otherwise be entitled in any suit, action or proceeding relating to this Agreement in the courts of any jurisdiction, nor may there be attributed to the Corporation or its revenues, assets or property any such immunity (nor shall such attribution be claimed by the Corporation);

(iii)    it has delivered to Lehman its most recent annual audited statement of financial condition and its most recent quarterly unaudited statement of financial condition and the Corporation has not experienced since the date of its last published financial statement any material adverse change in its business, assets, operations or financial condition;

(iv)    it has not nor does it anticipate that there shall be any occurrence or existence of (1) a default, event of default or other similar condition or event (however described and including any such conditions or events which will become events of default with the passing of time or the giving of notice) in respect of the Corporation under one or more agreements or instruments relating to any Specified Indebtedness of the Corporation which has resulted in any Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by the Corporation in making one or more payments on the due date thereof under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(v)    it is solvent and has, and will have after giving effect to this Agreement, sufficient capital to conduct its business and to pay its debts as they become due;

(vi)    it has not experienced any Incipient Illegality with respect to this Agreement; and

RFA:  Lutheran Senior Services

(vii)    it is not subject to any administrative, governmental or other investigation, special review or order, or pending order or similar event.

SECTION V.            COVENANTS AND ACKNOWLEDGMENTS

Section 5.1    Covenants.  Each of Lehman, the Corporation and the Trustee covenants to the other parties to this Agreement that so long as it shall have any obligations under this Agreement it shall:

(a)    maintain in full force and effect all authorizations and agreements of and exemptions, consents, licenses, actions or approvals by, and all filings with or notices to, any governmental or other authority that are required to be obtained or made by such party with respect to this Agreement and will use all reasonable efforts to obtain or make any that may become necessary in the future;

(b)    comply in all material respects with all applicable laws, rules, regulations and orders to which it may be subject if failure so to comply could materially impair its ability to perform its obligations under this Agreement;

(c)    if it is the Corporation or the Trustee, not enter into any amendment or modification of the Indenture or other Financing Documents to which it is a party which could impair its ability to perform its obligations to Lehman hereunder except nothing contained hereunder shall restrict the Corporation's ability to issue additional bonds under the Indenture;

(d)    if it is the Corporation, the Corporation agrees that, during the term of this Agreement, it shall deliver to Lehman its most recently available statement of financial condition (both audited and unaudited) as such are issued; and

(e)    if it is the Corporation, it shall not replace this Agreement or withdraw any amounts held in the Debt Service Reserve Fund for purposes of purchasing a surety bond or any similar financial instrument.

Section 5.2    Role of Lehman; Independent Judgment.  The Corporation acknowledges and agrees that in connection with its decision to enter into this Agreement and its subsequent negotiation and execution of this Agreement, (i) neither Lehman, nor any of its directors, officers, employees, agents or affiliates (each of the foregoing, including Lehman, a "Lehman Party") has acted as a fiduciary or financial or investment advisor to or agent or other representative of the Corporation, (ii) the Corporation has, to the extent it has deemed necessary, consulted with its own legal, tax, regulatory, accounting, financial and investment advisors in determining the suitability and appropriateness of this Agreement as well as in negotiating the specific terms hereof and has not relied upon any advice from any Lehman Party, with respect to such matters; the Corporation understands the terms, conditions and risks of this Agreement and is capable of assuming such risks; and (iii) the terms and conditions of this Agreement have been individually negotiated by the Corporation and are the result of arms-length negotiations among Lehman, the Trustee and the Corporation.

Execution Copy

Section 5.3    No Liability.  Each of the Corporation and the Trustee agrees that no Lehman Party shall be liable or responsible for:  (i) the payment of any amounts owing on or with respect to the Bonds; (ii) the Trustee's use or application of any moneys payable to the Trustee hereunder; (iii) any acts or omissions of the Corporation or the Trustee under, or with respect to, the Bonds or the Indenture or any related document; or (iv) determining whether the Corporation or the Trustee is in compliance with any applicable statute, regulation or law, the Bonds, the Indenture or any other related document.

Section 5.4    Fixed Rate of Return.   The Corporation has entered into this Agreement for purposes of managing its borrowings or investments by increasing the predictability of its cash flow from earnings on its investments and not for purposes of speculation.  The Corporation understands that in consideration of its purchasing Qualified Securities at the Purchase Price on each Deposit Date, the Corporation has minimized the risks resulting from fluctuations in interest rates during the term of this Agreement on the Scheduled Reserve Amounts in the Reserve Fund but has also foregone the possibility of receiving greater returns on the Scheduled Reserve Amounts in the future from such fluctuations.

Section 5.5    Termination Amount.  The Corporation understands that if under any of the circumstances provided herein (including upon the occurrence of a redemption or a defeasance of the Bonds on or prior to the last Deposit Date), a Termination Amount may be due to Lehman, the size of such Termination Amount will vary depending, in large part, on prevailing interest rates at the time such Termination Amount is calculated.  In certain market conditions the amount of the Termination Amount owed to Lehman by the Corporation could be substantial.

Section 5.6    Fees and Commissions.  The Corporation acknowledges that Lehman shall pay $3,000.00 to Ziegler Capital Markets Group on behalf of the Corporation, as a bidding agent's fee for services provided by to Ziegler Capital Markets Group to the Corporation.


SECTION VI        CLOSING CONDITIONS

Section 6.1    Closing Conditions

On or prior to the Closing Date the following shall occur:

(a)    delivery to Lehman and Corporation of a certificate of the Trustee, in the form of Exhibit B;

(b)    delivery to Lehman and Trustee of an opinion of counsel to the Corporation, in the form of Exhibit D;

(c)    delivery to Lehman by the Corporation of a copy of the official statement for the Bonds;

RFA:  Lutheran Senior Services

14

Execution Copy

(d)      delivery to Lehman by the Corporation of a true and correct copy of the Indenture and the Financing Documents as in full force and effect on the date hereof;

(e)      delivery to Lehman of a copy of any consent received by the Corporation to enter into this Agreement;

(f)      delivery to the Trustee and Corporation of an opinion of inside counsel to Lehman, in the form of Exhibit C, and a bankruptcy opinion of special counsel to Lehman; and

(g)      delivery to Lehman of a copy of the statutory or regulatory authority, if any, pursuant to which the Corporation is authorized to enter into this Agreement and a certified copy of any resolution or resolutions of the Corporation pursuant to which the Corporation is authorized to enter into this Agreement.


SECTION VII        DEFAULTS; TERMINATION

Section 7.1    Trustee Events of Default.  The occurrence of any of the following events shall constitute a Trustee Event of Default:

(a)      the Trustee shall fail for any reason (other than because such cash is not available because the Trustee withdrew funds from the Reserve Fund in order to make a Debt Service Payment for the Bonds on a Bond Payment Date) to apply any funds in the Reserve Fund to purchase, at the Purchase Price therefore, any Qualified Securities delivered by the Qualified Dealer in accordance with this Agreement and such failure is not cured within three (3) Business Days of telephonic and written notice thereof from Lehman to the Trustee and the Corporation (the "Trustee Cure Period"); provided that the Trustee shall promptly pay on demand, in immediately available funds, interest at the Default Rate, on the Maturity Amount of such Eligible Securities, for the period from and including the Deposit Date to but excluding the day on which the Trustee takes delivery of the such Eligible Securities;

(b)      the Trustee shall default in the performance of any other material covenant or obligation under this Agreement and such default is not cured within five Business Days of notice thereof from Lehman or the Corporation; or

(c)      any representation or warranty of the Trustee contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made.

Section 7.2    Corporation Events of Default.  The occurrence of any of the following events shall constitute a Corporation Event of Default:

(a)      the amount in the Reserve Fund available to purchase Qualified Securities on any Deposit Date is less than the Scheduled Reserve Amount (other than because such cash is not available because the Trustee withdrew funds from the Reserve Fund in order to make a Debt Service Payment for the Bonds on a Bond Payment Date);

RFA:  Lutheran Senior Services

15

Execution Copy

(b)    the Corporation shall default in the performance of any material covenant or obligation under this Agreement, other than as described in clause (a) above, and such default is not cured within five Business Days of notice thereof from Lehman or the Trustee;

(c)    any representation or warranty of the Corporation contained in this Agreement proves to have been incorrect, false or misleading in any material respect;

(d)    the Corporation is Insolvent;

(e)    the Corporation consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if an entity such as an organization, board, commission authority, agency or body succeeds to the principal functions of, or powers and duties granted, to the Corporation) and, at the time of such consolidation, amalgamation, merger or transfer either (i) the resulting or surviving or transferee entity fails to assume all the obligations of the Corporation under this Agreement or by operation of law or pursuant to an agreement reasonably satisfactory to the other parties to this Agreement or (ii) the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of the Corporation; or

(f)    the Corporation shall default with respect to the Bonds and/or any Specified Indebtedness; or

(g)    a Trustee Event of Default has occurred which gives rise to Lehman's right to demand the resignation or replacement of the Trustee and following such demand by Lehman the Corporation has failed to appoint a successor trustee who is able to perform the Trustee's obligations hereunder within ten (10) Business Days of such demand.

Section 7.3    Lehman Events of Default.  The occurrence of any of the following events shall constitute a Lehman Event of Default:

(a)    Lehman shall fail, on any Deposit Date, to cause a Qualified Dealer to deliver Qualified Securities and such failure is not cured within five Business Days after written notice thereof to Lehman from the Trustee or the Corporation (the "Lehman Cure Period");

(b)    any representation or warranty of Lehman contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made;

(c)    Lehman is at any time Insolvent; or

(d)    Lehman has failed to take any of the actions required of it in Section 2.7 hereof.

In the event of a Lehman Event of Default, Lehman must within five Business Days of such event provide written notice to the Corporation and the Trustee

Execution Copy

Section 7.4    Remedies Upon Occurrence of a Trustee Event of Default.   Upon the occurrence of a Trustee Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Deposit Date and which have not theretofore been delivered to and purchased by the Trustee and, subject to Section 8.2 hereof, make demand for the payment of its losses (calculated in accordance with Section 7.7 hereof) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    (i) upon the occurrence of a Trustee Event of Default under Section 7.1(a) hereof, immediately make written demand upon the Trustee to promptly resign as trustee under the Indenture, in which event the Trustee shall resign pursuant to the Indenture, even if the Trustee has paid in full any losses to Lehman as calculated in accordance with Section 7.7 and (ii) upon the occurrence of a Trustee Event of Default under Section 7.1(b) or (c) immediately make written demand upon the Trustee to promptly resign as trustee under the Indenture.

Section 7.5    Remedies Upon Occurrence of Corporation Event of Default.   Upon the occurrence of a Corporation Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Deposit Date which has occurred and which have not theretofore been delivered to and purchased by the Trustee and make demand for the payment of its losses (calculated in accordance with Section 7.7 hereof) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    immediately terminate this Agreement by giving written notice thereof to the Corporation with a copy to the Trustee, and (i) if the Termination Amount is a positive number, make demand upon the Corporation for the payment of the Termination Amount and (ii) if the Termination Amount is a negative number, pay such amount to the Corporation.

If a Termination Amount is payable pursuant to clause (b) above, the party owing such amount shall promptly, but by no later than one Business Day after notice that such amount is due from the party to whom such Termination Amount is due, pay such amount, in immediately available funds, to or at the direction of the party to whom such Termination Amount is due.  If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each day such amount is due but not paid at the Default Rate.

Section 7.6    Remedies Upon Occurrence of a Lehman Event of Default.   Upon the occurrence of a Lehman Event of Default, the Corporation shall have the right to:

(a)    if such default is a default under Section 7.3(a), apply the Deposit Amount to purchase Permitted Investments in accordance with Section 2.4 hereof and make demand for the payment of its losses in connection therewith, calculated as provided in Section 7.7(b);

Execution Copy

(b)    if such default is a default under Section 7.3(a) and Lehman has failed to pay the Corporation's losses (as described in Section 7.7(b)) upon demand therefore, immediately terminate this Agreement by giving written notice thereof to Lehman with a copy to the Trustee; and

(c)    if such default is a default under Sections 7.3(b) or (c) hereof immediately terminate this Agreement by giving written notice thereof to Lehman with a copy to the Trustee, whereupon Lehman shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one Business Day after written notice that such amount is due, pay such amount, in immediately available funds, to the Corporation and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Corporation of the Termination Amount in which case the Corporation shall promptly, but no later than one Business Day after written notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman.  If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each day such amount is due but not paid at the Default Rate.  Notwithstanding anything to the contrary in this Agreement, if Lehman fails to determine the Termination Amount within three Business Days of notice from the Corporation or the Trustee of the occurrence of a Lehman Event of Default then the Corporation (or if so directed by the Corporation, the Trustee) shall make such determination as if it were Lehman and the amount as so determined by the Corporation (or the Trustee) shall for purposes of this Section 7.6 be deemed the Termination Amount.

Section 7.7    Loss Amount if Failed or Late Purchase.

(a)    Subject to Section 8.2 hereof, if the Trustee fails to apply any funds in the Reserve Fund to purchase any Qualified Securities delivered by a Qualified Dealer in accordance with this Agreement or (b) if on any Deposit Date the amount in the Reserve Fund available to purchase Qualified Securities is less than the Scheduled Reserve Amount, the Trustee, in the case of clause (a) or the Corporation in the case of clause (b), shall pay to Lehman, as liquidated damages for its losses and not as a penalty, on demand by Lehman, the sum of (w) interest on the Purchase Price of such Qualified Securities which the Qualified Dealer tendered for delivery to, but were not purchased by, the Trustee for each day from and including the delivery date thereof to but excluding the date on which such securities are resold to a third party or to the Trustee, (x) the excess, if any, of the Purchase Price of such Qualified Securities over the amount received by the Qualified Dealer upon such resale of the securities (the "Shortfall Amount"), (y) interest on the Shortfall Amount from and including the resale date to but excluding the date on which the Trustee or the Corporation, as applicable, compensates Lehman for its losses as described herein, and (z) any incidental costs and expenses incurred by Lehman in connection with the Trustee's failure to so purchase such Qualified Securities.  Interest shall accrue at a rate per annum equal to the Default Rate for purposes of clauses (w) and (y).  Notwithstanding the foregoing, if Lehman does not on any date cause the delivery of Qualified Securities because the amount in the Reserve Fund is less than the Scheduled Reserve Amount, the Loss Amount shall equal the sum of (y) the amount, if any, by which the aggregate Purchase Price of the Qualified Securities which Lehman could have caused to be delivered exceeds the market value thereof (as reasonably determined by Lehman as of the date such tender was to be made) and (z) interest on such amount at the Default Rate for each day from the date such securities could have been

RFA:  Lutheran Senior Services

Execution Copy

delivered to the next succeeding Bond Payment Date plus any amounts specified in clause (x) above.

(b)    If there is a Lehman Event of Default as described in Section 7.3(a) hereof, the amount of losses payable by Lehman upon demand therefore pursuant to Section 7.6(a) shall equal the excess, if any, of (i) interest the Trustee would have earned on the related Deposit Amount had the Deposit Amount been invested in Qualified Securities at the Guaranteed Rate (the "Guaranteed Interest") over (ii) the interest the Trustee actually earned by investing the related Deposit Amount in Permitted Investments in accordance with Section 2.4 hereof (or if the Trustee fails to invest such Deposit Amount in Permitted Investments in accordance with Section 2.4, the amount of interest the Trustee would have earned on such Deposit Amount had the Trustee complied with the requirements of Section 2.4 hereof).

Section 7.8    Application of Excess Funds.  The Corporation hereby directs the Trustee and the Trustee agrees that if at any time any amounts are due Lehman from the Corporation in connection with a Corporation Event of Default, the Trustee shall, upon demand from Lehman, and without further direction or instruction from the Corporation, but not if an Event of Default had occurred and is continuing under the Indenture, apply any funds available under the Indenture which are not subject to the lien of the Indenture or are otherwise required for the payment or security of the Bonds or the Trustee's fees and expenses (including any funds which would otherwise be released to the Corporation) to the payment of such amounts.

Section 7.9    Limited Rights Against the Reserve Fund.  Neither Lehman nor any Qualified Dealer shall have any right to any amounts held in the Reserve Fund except as expressly provided herein upon the delivery of a Qualified Security in accordance with this Agreement.

Section 7.10    No Waiver; Remedies Cumulative.  No failure or delay on any party's part in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy.  Such party's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law, this Agreement or otherwise.  None of the terms or provisions of this Agreement may be waived, modified or amended except in a writing duly signed by the Trustee, the Corporation and Lehman.

SECTION VIII        THE TRUSTEE

Section 8.1    Acceptance by Trustee.  By execution and delivery of this Agreement, the Trustee accepts its duties and obligations hereunder, as an addition to its duties and obligations as Trustee under the Indenture. The provisions of the Indenture governing rights, immunities and protections are hereby granted to the Trustee by the Corporation.

Section 8.2    Liability of the Trustee; Consultation with Legal Counsel.

Execution Copy

(a)    The Trustee shall not be liable to any person for any action taken or neglected to be taken in performing or attempting to perform its obligations hereunder or preserving or seeking to preserve the funds it maintains under the Indenture or to purchase the Qualified Securities tendered pursuant to this Agreement, except for actions arising from its negligence or willful misconduct. The Corporation hereby agrees to protect, defend, indemnify and hold harmless the Trustee against any and all costs, losses, damages, liabilities, claims, expenses (including reasonable counsel fees and expenses) and claims incurred by it without negligence or willful malfeasance on the Trustee's part arising out of or in connection with its entering into this Agreement and the carrying out of its duties hereunder, including the costs and expenses of defending itself against any claim of liability relating to this Agreement.

(b)    The Trustee may consult with counsel reasonably satisfactory to it with respect to any question relating to its duties or responsibilities hereunder or otherwise in connection herewith and, except as expressly provided herein, shall not be liable for any action taken, suffered, or omitted by the Trustee in good faith upon the advice of such counsel. The Trustee may act through its officers, employees, agents and attorneys.

Section 8.3    Payment of Trustee Fees.    Lehman has no liability or responsibility for payment of the Trustee's fees or expenses for its services hereunder, including any such fees or expenses arising out of or in connection with the liquidation of the Qualified Securities as provided herein.

Section 8.4    Trustee Cooperation.

(a)    The Trustee shall not act in contravention of its obligations hereunder or invest amounts in the Reserve Fund other than pursuant to this Agreement and the Indenture.

(b)    The Trustee shall not make any payments or distributions from the Reserve Fund other than payments or distributions (i) required by this Agreement, (ii) to pay principal of, redemption premium and interest on the Bonds or (iii) to make payments required by the Indenture.

Section 8.5    Successor Trustee.    If the Trustee shall resign or be discharged from its duties and obligations under the Indenture, the Corporation shall appoint a successor Trustee pursuant to the terms of the Indenture. The Corporation agrees that if the Trustee fails for any reason to perform its duties to Lehman under this Agreement in accordance with the terms hereof, or is at any time Insolvent or breaches in any material respect its representations and warranties to Lehman hereunder, the Corporation shall promptly, upon written request of Lehman, appoint a successor Trustee reasonably acceptable to Lehman.

SECTION IX        MISCELLANEOUS

Section 9.1    Notices and Delivery Instructions.    All notices, demands or other communications hereunder shall be given or made in writing and shall be delivered personally, or sent by certified or registered mail, postage prepaid, return receipt requested, or overnight

RFA:  Lutheran Senior Services

Execution Copy

delivery service, telex or telecopy to the party to whom they are directed at the following addresses, or at such other addresses as may be designated by notice from such party to all other parties:

To Lehman:

Lehman Brothers Special Financing Inc.
745 Seventh Avenue, 16th Floor
New York, NY 10019
Attention:      Municipal Financial Products - Middle Office
Telephone:     212-526-2240
Fax:            646-758-2988

To the Trustee:

Bank of New York Trust Company, N.A.
911 Washington Avenue, Suite 300
St. Louis, MO 63101
Attention:      Kerry McFarland, Vice President
Telephone:     (314)613-8202
Fax:            (314) 613-8238

[DELIVERY INSTRUCTIONS FOR BOOK-ENTRY GOVERNMENT OBLIGATIONS]

The Bank of New York
ABA #021000018
GLA #111-565
Account Name: Lutheran Senior-Series 2005A Reserve Fund
Account Number: 222436

[DELIVERY INSTRUCTIONS FOR DTC]

DTC Participant #901
Account #222436

To the Corporation:

Lutheran Senior Services
709 S. Laclede Station Road
St. Louis, MO 63119-4911
Attention:      Carl Rausch, President
Telephone:     314/446-2408
Fax:            314/968-5590
Corporation Tax I.D. #: 43-0654682

RFA: Lutheran Senior Services

Execution Copy

Any notice, demand or other communication given in a manner prescribed in this Section shall be deemed to have been delivered on receipt.

Section 9.2    Binding Effect; Transfer.  This Agreement shall be binding upon and inure to the benefit of the Trustee, the Corporation and Lehman and upon their respective permitted successors and transferees. Lehman shall be entitled to transfer all or any portion of this Agreement and its interests hereunder, to any subsidiary or affiliate of Lehman, or to any office, branch or subsidiary of any affiliate of Lehman upon written notice to the Corporation and the Trustee. Such subsidiary or affiliate shall be wholly owned by LBH and the obligations of such subsidiary or affiliate shall be unconditionally guaranteed by LBH. Lehman shall be able to transfer all or any portion of this Agreement only with the written consent of the Corporation (such consent not to be unreasonably withheld or delayed) and written notice to the Trustee; provided, however, that such consent shall not be required if such transfer is to any entity rated at least an "A-", "A3", or "A-" by Standard & Poor's, Moody's or Fitch, Inc., respectively, and provided further that in all such instances of transfer the transferee shall assume all of the rights and obligations of Lehman hereunder.  Neither the Corporation nor the Trustee (except with respect to a transfer to a successor trustee pursuant to the Indenture) may transfer this Agreement without the prior written consent of Lehman and the other party hereto.

Section 9.3    Limitation.  Nothing expressed or implied herein is intended or shall be construed to confer upon any person, firm or corporation other than the parties hereto, any right, remedy or claim by reason of this Agreement or any term hereof, and all terms contained herein shall be for the sole and exclusive benefit of the parties hereto, and their successors and permitted transferees.

Section 9.4    Severability.  If one or more provisions of this Agreement or the applicability of any such provisions to any set of circumstances shall be determined to be invalid or ineffective for any reason, such determination shall not affect the validity and enforceability of the remaining provisions or the applicability of the same provisions or any of the remaining provisions to other circumstances.

Section 9.5    Amendments, Changes and Modifications.  This Agreement may be amended or any of its terms modified only by a written document authorized, executed and delivered by each of the parties hereto.

Section 9.6    Counterparts.  This Agreement may be executed in one or more counterparts and when each party hereto has executed at least one counterpart, this Agreement shall become binding on all parties and such counterparts shall be deemed to be one and the same document.

Section 9.7    Termination.  Unless earlier terminated pursuant to Sections 3.1, 7.4, 7.5 or 7.6 hereof, this Agreement shall terminate on the later of the last Bond Payment Date set forth in Exhibit A and the date on which the Trustee and the Corporation have satisfied all of their obligations hereunder.

Execution Copy

Section 9.8    Entire Agreement.  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

Section 9.9    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law principles.

Execution Copy

IN WITNESS WHEREOF, the Trustee, the Corporation and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

LUTHERAN SENIOR SERVICES

By:_____

Name:

Title:

THE BANK OF NEW YORK TRUST COMPANY, N.A., AS TRUSTEE

By:_____

Name: Kerry A. McFarland

Title: Vice President

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____

Name: T. Courtney Jenkins

Title: Vice President

Execution Copy

IN WITNESS WHEREOF, the Trustee, the Corporation and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

LUTHERAN SENIOR SERVICES

By: _Carl G. Lausch_

Name:

Title:


THE BANK OF NEW YORK TRUST COMPANY, N.A., AS TRUSTEE


By:_____

Name: Kerry A. McFarland

Title: Vice President


LEHMAN BROTHERS SPECIAL FINANCING INC.


By:_____

Name: T. Courtney Jenkins

Title: Vice President


RFA:  Lutheran Senior Services

Execution Copy

IN WITNESS WHEREOF, the Trustee, the Corporation and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

LUTHERAN SENIOR SERVICES

By:_____

Name:

Title:


THE BANK OF NEW YORK TRUST COMPANY, N.A., AS TRUSTEE

By:_____

Name: Kerry A. McFarland

Title: Vice President


LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____

Name: T. Courtney Jenkins

Title: Vice President

IN WITNESS WHEREOF, the Trustee, the Corporation and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

LUTHERAN SENIOR SERVICES

By:_____
Name:
Title:

THE BANK OF NEW YORK TRUST COMPANY, N.A., AS TRUSTEE

By:_____
Name: Kerry A. McFarland
Title: Vice President

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name: T. Courtney Jenkins
Title: Vice President

**EXHIBIT A**

| Deposit Date* | Bond Payment Date* | Scheduled Reserve Amount |
|---|---|---|
| 02/17/06 | 08/01/06 | $1,581,433.76 |
| 08/01/06 | 02/01/07 | $1,581,433.76 |
| 02/01/07 | 08/01/07 | $1,581,433.76 |
| 08/01/07 | 02/01/08 | $1,581,433.76 |
| 02/01/08 | 08/01/08 | $1,581,433.76 |
| 08/01/08 | 02/01/09 | $1,581,433.76 |
| 02/01/09 | 08/01/09 | $1,581,433.76 |
| 08/01/09 | 02/01/10 | $1,581,433.76 |
| 02/01/10 | 08/01/10 | $1,581,433.76 |
| 08/01/10 | 02/01/11 | $1,581,433.76 |
| 02/01/11 | 08/01/11 | $1,581,433.76 |
| 08/01/11 | 02/01/12 | $1,581,433.76 |
| 02/01/12 | 08/01/12 | $1,581,433.76 |
| 08/01/12 | 02/01/13 | $1,581,433.76 |
| 02/01/13 | 08/01/13 | $1,581,433.76 |
| 08/01/13 | 02/01/14 | $1,581,433.76 |
| 02/01/14 | 08/01/14 | $1,581,433.76 |
| 08/01/14 | 02/01/15 | $1,581,433.76 |
| 02/01/15 | 08/01/15 | $1,581,433.76 |
| 08/01/15 | 02/01/16 | $1,581,433.76 |
| 02/01/16 | 08/01/16 | $1,581,433.76 |
| 08/01/16 | 02/01/17 | $1,581,433.76 |
| 02/01/17 | 08/01/17 | $1,581,433.76 |
| 08/01/17 | 02/01/18 | $1,581,433.76 |
| 02/01/18 | 08/01/18 | $1,581,433.76 |
| 08/01/18 | 02/01/19 | $1,581,433.76 |
| 02/01/19 | 08/01/19 | $1,581,433.76 |
| 08/01/19 | 02/01/20 | $1,581,433.76 |
| 02/01/20 | 08/01/20 | $1,581,433.76 |
| 08/01/20 | 02/01/21 | $1,581,433.76 |
| 02/01/21 | 08/01/21 | $1,581,433.76 |
| 08/01/21 | 02/01/22 | $1,581,433.76 |
| 02/01/22 | 08/01/22 | $1,581,433.76 |
| 08/01/22 | 02/01/23 | $1,581,433.76 |
| 02/01/23 | 08/01/23 | $1,581,433.76 |
| 08/01/23 | 02/01/24 | $1,581,433.76 |
| 02/01/24 | 08/01/24 | $1,581,433.76 |
| 08/01/24 | 02/01/25 | $1,581,433.76 |
| 02/01/25 | 08/01/25 | $1,581,433.76 |
| 08/01/25 | 02/01/26 | $1,581,433.76 |

\*       If any Deposit Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately preceding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

A-1

**EXHIBIT A**

| Deposit Date* | Bond Payment Date* | Scheduled Reserve Amount |
|---|---|---|
| 02/01/26 | 08/01/26 | $1,581,433.76 |
| 08/01/26 | 02/01/27 | $1,581,433.76 |
| 02/01/27 | 08/01/27 | $1,581,433.76 |
| 08/01/27 | 02/01/28 | $1,581,433.76 |
| 02/01/28 | 08/01/28 | $1,581,433.76 |
| 08/01/28 | 02/01/29 | $1,581,433.76 |
| 02/01/29 | 08/01/29 | $1,581,433.76 |
| 08/01/29 | 02/01/30 | $1,581,433.76 |
| 02/01/30 | 08/01/30 | $1,581,433.76 |
| 08/01/30 | 02/01/31 | $1,581,433.76 |
| 02/01/31 | 08/01/31 | $1,581,433.76 |
| 08/01/31 | 02/01/32 | $1,581,433.76 |
| 02/01/32 | 08/01/32 | $1,581,433.76 |
| 08/01/32 | 02/01/33 | $1,581,433.76 |
| 02/01/33 | 08/01/33 | $1,581,433.76 |
| 08/01/33 | 02/01/34 | $1,581,433.76 |
| 02/01/34 | 08/01/34 | $1,581,433.76 |
| 08/01/34 | 02/01/35 | $1,581,433.76 |

\*  If any Deposit Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately preceding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

<u>February 17, 2006</u>

Lutheran Senior Services
St. Louis, MO 63119-4911

Lehman Brothers Special Financing Inc.
New York, NY 10019

CERTIFICATE OF TRUSTEE

Re:    $30,000,000 Health and Educational Facilities Authority of the State of Missouri

The undersigned, Kerry McFarland, a Vice President of The Bank of New York Trust Company, N.A. (the "Trustee"), hereby certifies as follows:

1.      The Reserve Fund Agreement dated as of February 17, 2006 (the "Agreement") among Lutheran Senior Services, Lehman Brothers Special Financing Inc. and the Trustee has been duly executed and delivered by an authorized signatory of the Trustee.

2.      The Trustee has full legal right, power and authority to enter into the Agreement.

3.      The Agreement has been duly authorized, executed and delivered by the Trustee.

4.      The Agreement is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

5.      The execution and delivery by the Trustee of the Agreement and the performance of its obligations thereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws, or the Indenture (as defined in the Agreement), the other Financing Documents (as defined in the Agreement) or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

6.      The Indenture is a legal, valid and binding obligation of the Trustee, Enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general

principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

IN WITNESS WHEREOF, the undersigned has hereunto set his signature such officer and has affixed the corporate seal of the Trustee, this 17th day of February, 2006.

The Bank of New York Trust Company, N.A.

By _____
      Kerry McFarland
      Vice President

principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

IN WITNESS WHEREOF, the undersigned has hereunto set his signature such officer and has affixed the corporate seal of the Trustee, this 17th day of February, 2006.

The Bank of New York Trust Company, N.A.

By _____
Kerry McFarland
Vice President

B-2

**EXHIBIT C**

[LETTERHEAD OF COUNSEL TO LEHMAN]

[Date]

[Corporation]

[Trustee]

Re:

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc., a Delaware corporation ("Lehman"), and am familiar with matters pertaining to the execution and delivery of the Reserve Fund Agreement (the "Agreement") dated as of                    by    and    among Lehman,                    (the "Issuer") and                    , as Trustee (the "Trustee").

In connection with this opinion, I have examined, or have had examined on my behalf, an executed copy of the Agreement, certificates and statements of public officials and officers of Lehman and such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion.

Except as expressly set forth herein, no independent investigation (including, without limitation, conducting any review, search or investigation of any public files, records or dockets) has been undertaken to determine the existence or absence of the facts that are material to my opinions, and no inference as to my knowledge concerning such facts should be made.

When used herein the phrase "to my knowledge" means to my actual knowledge without independent investigation.

References in this letter to "Applicable Laws" are to those laws, rules and regulations of the State of New York and the United States of America which, in my experience, are normally applicable to transactions of the type contemplated by the Master Agreement. References in this letter to "Governmental Authorities" are to executive, legislative, judicial, administrative or regulatory bodies of the State of New York and the United States of America. References in this letter to "Governmental Approval" are to any consent, approval, license, authorization or validation of, or filing, recording or registration with, any Governmental Authority pursuant to Applicable Laws.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.    Lehman is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.

2.    The execution, delivery and performance of the Agreement is within its corporate power, have been duly authorized by all corporate action and do not conflict with any provision of its certificate of incorporation or by-laws.

3.    The Agreement has been duly executed and delivered and each constitutes a legal, valid and binding obligation, enforceable against it in accordance with its respective terms.

4.    No Governmental Approval is required in connection with the execution, delivery and performance of the Agreement except those that have been obtained and, to my knowledge, are in effect.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.    My opinion in paragraph 3 above is subject to: (i) bankruptcy, insolvency, reorganization, receivership, moratorium or similar laws affecting creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers or conveyances); (ii) general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law; (iii) laws and considerations of public policy that may limit the enforceability of provisions (a) regarding indemnification and contribution rights and obligations, (b) regarding the waiver or limitation of rights to trial by jury, oral amendments to written agreements or rights of setoff, (c) relating to submission to jurisdiction, venue or service of process, and (d) purporting to prohibit or restrict, or require the consent of the "account debtor" (as defined in Section 9-102 of the Uniform Commercial Code as in effect in the State of New York (the "NYUCC" )) for, the creation, perfection or enforcement of a security interest in "accounts" or "general intangibles" (in each case, as defined in Section 9-102 of the NYUCC).

B.    I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the laws of the State of New York, the federal laws of the United States of America and the General Corporation Law of the State of Delaware. Except as described, I have not examined, or had examined on my behalf, and I do not express any opinion with respect to, Delaware law.

C.    My opinions are limited to the present laws and to the facts as they presently exist, and no opinion is to be inferred or implied beyond the matters expressly so stated. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.    This letter is rendered solely to you solely for your benefit in connection with the Agreement and the transactions related thereto and may not be relied upon by any other person, entity or agency or by you in any other context or for any other purpose. This letter may not be circulated, used or quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman, except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Lehman, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Agreement.

E.    I have assumed with your permission (i) the genuineness of all signatures by each party other than Lehman, (ii) the authenticity of documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, (iii) the accuracy of the matters set forth in the documents, agreements and instruments I reviewed, (iv) that each party other than Lehman is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (v) the due execution and delivery, pursuant to due authorization, of the Agreement by each party other than Lehman, and (vi) that the Agreement is the legal, valid, binding and enforceable obligation of each party other than Lehman, enforceable against each such party in accordance with its terms.

F.    My opinion in paragraph 3 is subject to the qualification that certain provisions contained in the Agreement may not be enforceable, but such unenforceability will not render the Agreement invalid as a whole or substantially interfere with the practical realization of the principal benefits provided thereby.

The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal liability in connection with said opinions.

Very truly yours,

C-3

# LEHMAN BROTHERS

February 17, 2006

Lutheran Senior Services
St. Louis, MO 63119-4911

Bank of New York Trust Company, N.A.
St. Louis, MO 63101

Re:   $30,000,000 Health and Educational Facilities Authority of the State of Missouri, Senior Living
Facilities Revenue Bonds, Series 2005A, (Lutheran Senior Services Projects)

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc., a Delaware corporation ("Lehman")
and Lehman Brothers Holdings Inc., a Delaware corporation ("LBH") and am familiar with matters
pertaining to the execution and delivery of the Reserve Fund Agreement (the "Agreement") dated as of
February 17, 2006 by and among Lehman, Lutheran Senior Services (the "Corporation") and Bank of
New York Trust Company, N.A, as Trustee (the "Trustee"). Capitalized terms used herein and not
defined herein have the respective meanings given to them in the Agreement.

In connection with this opinion, I have examined, or have had examined on my behalf, an
executed copy of the Agreement, certificates and statements of public officials and officers of Lehman
and such other agreements, instruments, documents and records as I have deemed necessary or
appropriate for the purposes of this opinion.

Except as expressly set forth herein, no independent investigation (including, without limitation,
conducting any review, search or investigation of any public files, records or dockets) has been
undertaken to determine the existence or absence of the facts that are material to my opinions, and no
inference as to my knowledge concerning such facts should be made.

When used herein the phrase "to my knowledge" means to my actual knowledge without
independent investigation.

References in this letter to "Applicable Laws" are to those laws, rules and regulations of the State
of New York which, in my experience, are normally applicable to transactions of the type contemplated
by the Agreement. References in this letter to "Governmental Authorities" are to executive, legislative,
judicial, administrative or regulatory bodies of the State of New York. References in this letter to
"Governmental Approval" are to any consent, approval, license, authorization or validation of, or filing,
recording or registration with, any Governmental Authority pursuant to Applicable Laws.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations
hereinafter expressed, I am of the opinion that:

1.     Lehman is a corporation duly incorporated, validly existing and in good standing under
the laws of the State of Delaware.

2.     The execution, delivery and performance of the Agreement by Lehman is within its
corporate power, has been duly authorized by all corporate action and does not conflict
with any provision of its certificate of incorporation or by-laws.

3.      The Agreement has been duly executed and delivered and constitutes a legal, valid and
binding obligation, enforceable against it in accordance with their respective terms.

4.      To the best of my knowledge, no Governmental Approval is required in connection with
the execution, delivery and performance of the Agreement except those that have been
obtained and, to my knowledge, are in effect.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and
limitations:

A.      My opinion in paragraph 3 above is subject to: (i) bankruptcy, insolvency,
reorganization, receivership, moratorium or similar laws affecting creditors' rights generally (including,
without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers or
conveyances); (ii) general principles of equity, regardless of whether enforceability is considered in a
proceeding in equity or at law; (iii) laws and considerations of public policy that may limit the
enforceability of provisions (a) regarding indemnification and contribution rights and obligations,
(b) regarding the waiver or limitation of rights to trial by jury, oral amendments to written agreements or
rights of setoff, (c) relating to submission to jurisdiction, venue or service of process, and (d) purporting
to prohibit or restrict, or require the consent of the "account debtor" (as defined in Section 9-102 of the
Uniform Commercial Code as in effect in the State of New York (the "NYUCC" )) for, the creation,
perfection or enforcement of a security interest in "accounts" or "general intangibles" (in each case, as
defined in Section 9-102 of the NYUCC).

B.      I am a member of the Bar of the State of New York and render no opinion on the laws of
any jurisdiction other than the laws of the State of New York and the General Corporation Law of the
State of Delaware. Except as described, I have not examined, or had examined on my behalf, and I do not
express any opinion with respect to, Delaware law.

C.      My opinions are limited to the present laws and to the facts as they presently exist, and no
opinion is to be inferred or implied beyond the matters expressly so stated. I assume no obligation to
revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B
above be changed by legislative action, judicial decision or otherwise.

D.      This letter is rendered solely to you solely for your benefit in connection with the
Agreement and the transaction related thereto and may not be relied upon by any other person, entity or
agency or by you in any other context or for any other purpose. This letter may not be circulated, used or
quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without
the prior written consent of Lehman, except that you may furnish copies hereof (i) to your independent
auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or
over Lehman, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any
governmental agency, and (iv) in connection with any legal action arising out of the Agreement.

E.      I have assumed with your permission (i) the genuineness of all signatures by each party
other than Lehman, (ii) the authenticity of documents submitted to me as originals and the conformity to
authentic original documents of all documents submitted to me as copies, (iii) the accuracy of the matters
set forth in the documents, agreements and instruments I reviewed, (iv) that each party other than Lehman
is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization,
(v) the due execution and delivery, pursuant to due authorization, of the Agreement by each party other
than Lehman, and (vi) that the Agreement is legal, valid, binding and enforceable obligation of each party
other than Lehman, enforceable against each such party in accordance with its terms.

F.    My opinion in paragraph 3 is subject to the qualification that certain provisions contained in the Agreement may not be enforceable, but such unenforceability will not render the Agreement invalid as a whole or substantially interfere with the practical realization of the principal benefits provided thereby.

The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal liability in connection with said opinions.

Very truly yours,

**EXHIBIT D**

[LETTERHEAD OF COUNSEL TO CORPORATION]

[Date]

[Trustee]

Lehman Brothers Special Financing Inc.
New York, NY


Re:    [NAME OF BONDS]


Ladies and Gentlemen:

I have acted as counsel to _____ (the "Corporation") in connection with its execution and delivery of the Reserve Fund Agreement dated as of _____ (the "Agreement"), by and among Lehman Brothers Special Financing Inc. ("Lehman"), _____ _____, as Trustee (the "Trustee") and the Corporation and its execution and delivery of the Indenture (as defined in the Agreement). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

In rendering this opinion, we have examined, among other things, copies of the Agreement and the Financing Documents.

In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the laws of the State of [state of Corporation] (the "State").

Based upon the foregoing examination and review, we are of the opinion that:

(i)    The Corporation has full legal right, power and authority to enter into the Reserve Fund Agreement and the Financing Documents to which it is a party and to authorize and direct the Trustee, pursuant to the Reserve Fund Agreement, to make purchases of the Qualified Eligible Securities in accordance with the terms therein.

(ii)    The Agreement and the Financing Documents to which it is a party have been duly authorized, executed and delivered by the Corporation.

(iii)    The stipulation of New York law as the governing law of the Agreement is enforceable under the laws of the State.

D-1

(iv)    Assuming for purposes of the opinion expressed in this paragraph (iv) that State law and New York law are the same, the Agreement is a legal, valid and binding obligation of the Corporation, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(v)    The Corporation's execution and delivery of the Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under the Indenture, the Financing Documents to which it is a party, or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(vi)    The Loan Agreement is a legal, valid and binding obligation of the Corporation, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(vii)    The Corporation is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject to in any suit, action or proceedings relating to this Agreement in the courts of any jurisdiction and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

(ix)    All consents, authorizations and approvals requisite for its execution, delivery and performance of this Agreement have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority, regulatory body or any other entity is required for such execution, delivery or performance.

I am furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

D-2



THE **STOLAR**

P A R T N E R S H I P LLP

———————————————

A T T O R N E Y S   A T   L A W

THOMAS E. LOWTHER
(314) 641-5134
TEL@STOLARLAW.COM

February 17, 2006

The Bank of New York Trust Company, N.A.
St. Louis, Missouri

Lehman Brothers Special Financing Inc.
New York, NY

Re:    $30,000,000 Health and Educational Facilities Authority of the State of Missouri, Senior
       Living Facilities Revenue Bonds, Series 2005A (Lutheran Senior Services Projects)

Ladies and Gentlemen:

        We have acted as counsel to <u>Lutheran Senior Services</u> (the "Corporation") in connection with
its execution and delivery of the Reserve Fund Agreement dated as of <u>February 17, 2006</u> (the
"Agreement"), by and among Lehman Brothers Special Financing Inc. ("Lehman"), <u>The Bank of
New York Trust Company, N.A.</u>, as Trustee (the "Trustee") and the Corporation and its execution
and delivery of the Indenture (as defined in the Agreement).  Capitalized terms used herein and not
defined herein have the respective meanings given to them in the Agreement.

        In rendering this opinion, we have examined, among other things, copies of the Agreement
and the Financing Documents.

        In connection with the foregoing, we have also examined originals or copies satisfactory to
us of all such corporate records, agreements, certificates and other documents as we have deemed
relevant and necessary as a basis for the opinions hereinafter expressed.  In such examination we
have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as
originals, and the conformity with the original documents of all documents submitted to us as copies.

        In giving the opinions expressed below we do not purport to be experts in or generally
familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than
the laws of the State of Missouri (the "State").

        Based upon the foregoing examination and review, we are of the opinion that:

        (i)    The Corporation has full legal right, power and authority to enter into the Agreement
and the Financing Documents to which it is a party and to authorize and direct the Trustee, pursuant



to the Reserve Fund Agreement, to make purchases of the Qualified Securities in accordance with the terms therein.

(ii)    The Agreement and the Financing Documents to which it is a party have been duly authorized, executed and delivered by the Corporation.

(iii)    The stipulation of New York law as the governing law of the Agreement is enforceable under the laws of the State.

(iv)    Assuming for purposes of the opinion expressed in this paragraph (iv) that State law and New York law are the same, the Agreement is a legal, valid and binding obligation of the Corporation, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(v)    The Corporation's execution and delivery of the Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under the Indenture, the Financing Documents to which it is a party, or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(vi)    The Loan Agreement is a legal, valid and binding obligation of the Corporation, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(vii)    The Corporation is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject to in any suit, action or proceedings relating to this Agreement in the courts of any jurisdiction and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

(ix)    All consents, authorizations and approvals requisite for its execution, delivery and performance of this Agreement have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority, regulatory body or any other entity is required for such execution, delivery or performance.



I am furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon.  This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

The Stolar Partnership LLP

TEL/tlr

786465

EXHIBIT E

# Lehman Brothers Special Financing Inc.
## Notice of Tender
### Under the [ _____ ] Agreement
### Dated as of:  [ _____ ]

**To:**              _____, as [Escrow
                 Agent/Trustee]
                 Attention:        _____
                 Fax:         _____
                 Phone:  _____
**From:**      Lehman Brothers Inc. ("LBI")
                 Attention:        _____
                 Fax:         _____
                 Phone:  _____
**Date:**      [_____]
**Re:**        [_____]

| Date and Price |
| --- |

**Purchase Date:**                          [_____]
**Specified Purchase Price:**            [_____]

| Specific Government Obligations |
| --- |

| Cusip | Type | Maturity | Coupon | Face Amount | Maturity Amount | Accrued Interest |
| --- | --- | --- | --- | --- | --- | --- |
| [_____] | [_____] | [_____ ] | [_____] | [_____] | [_____] | [_____] |

| Delivery vs. Payment (Book Entry Delivery) |
| --- |

On the Purchase Date, LBI will deliver Face value    [ _____ ]        [BILLS/NOTES] maturing [
_____ ]
**to:**
                 [_____]
                 [_____]
                 Re:
                 [_____]
On the Purchase Date, LBI will receive [ _____ ]
                 **JPMorgan Chase/Lehman**
                 **ABA: 021000021**
                 **A/C #066206677**

**EXHIBIT 3**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:                                                )
                                                      )
LEHMAN BROTHERS HOLDINGS, INC.,    )    Case No. 08-13555 (JMP)
et al.,                                               )
                                                      )
              Debtors.                        )

**Declaration of Scott Determan pursuant to 28 U.S.C. § 1746**

COMES NOW Scott Determan, Senior Vice President of B.C. Ziegler and Company
("Ziegler"), pursuant to 28 U.S.C. §1746, and makes the following declaration under penalty of
perjury:

1.      Declarant is Senior Vice President of Investment Banking/Structured Products for
Ziegler.

2.      This Declaration is given based upon personal knowledge and based upon the
records of Ziegler.

3.      In 2006, in conjunction with the Health and Educational Facilities Authority of
the State of Missouri, Senior Living Facilities Revenue Bonds, Series 2005A (the "Bonds")
issued for the benefit of Creditor Lutheran Senior Services, Ziegler acted as bidding agent and
facilitated a Reserve Fund Agreement (the "Agreement") between Creditor and Lehman Brothers
Special Financing, Inc. ("Special Financing") for the investment of the debt service reserve funds
related to the Bonds.

4.      Pursuant to the Indenture under which the Bonds were issued, the debt service
reserve funds were required to be invested in Permitted Investments (as defined in the Indenture)

and, furthermore, pursuant to  the Bid Request Form, the awarded financial institution must maintain a rating of at least A 3 by Moody's and/or A- by S&P.

5.    Attached to this Declaration are genuine copies of the documents that Ziegler has in its file from the transaction related to the Agreement.

6.    The Agreement specifically contemplated that the obligation of Special Financing would be guaranteed by Lehman Brothers Holdings, Inc. ("LBH"), which, pursuant to the provisions of the Agreement, "wholly owns and unconditionally guarantees the obligations of" Lehman Brothers Special Financing, Inc.

7.    Although the Agreement clearly contemplated that LBH would guarantee the obligations of Special Financing, LBH never sent and Ziegler never received the signed guaranty, issued by LBH.

Executed this 6th day of March 2012, in the City of Chicago.

Scott Determan
Senior Vice President

# Ziegler Capital Markets Group

One South Wacker Drive, Suite 3080
Chicago, IL 60606
Phone 312-263-0110 Fax 312-803-2892

## Request for Forward Delivery Agreement

**Date:**            January 30, 2006

**To:**              Interested Parties

**From:**            John Kautz, Managing Director, Risk Management and Advisory
                     Scott Determan, Vice President, Risk Management and Advisory

**Subject:**         Request for Bids for Forward Delivery Agreement (the "Agreement")

**Corporation:**              Lutheran Senior Services

**Program:**                  Health and Educational Facilities Authority of the State of Missouri
                              Senior Living Facilities Revenue Bonds, Series 2005A
                              (Lutheran Senior Services Projects)

**Rating:**                   'A-' Fitch

**Type of Agreement:**        Forward Delivery Agreement

**Trustee:**                  Bank of New York Trust Company, N.A.

**Fund Type:**                Debt Service Reserve Fund

**Initial Deposits:**         $1,581,433.76

Future deposits are limited to the replenishment of the Debt Service
Reserve Fund due to a debt service shortfall. In the case of a
withdrawal to satisfy a debt service shortfall for regularly scheduled
payments, the Corporation agrees to restore the amount on deposit to an
amount equal to the applicable Debt Service Reserve Fund requirement
amount, per the Trust Agreement, as soon as reasonably possible and in
not more than 12 substantially equal consecutive monthly installments
beginning with the first day of the seventh month after the month in
which the Breakage Event took place.

Withdrawals may be made by the Trustee from the Agreement pursuant
to the terms of the Trust Agreement upon one business day's notice.
Funds may be withdrawn without penalty to pay debt service on the
Series 2005 Bonds in the event of a scheduled debt service shortfall
according to the terms of the Trust Agreement.

**Commitment Date:**          February 2, 2006

| | |
|---|---|
| Settlement Date: | February 16, 2006 |
| Termination Date: | February 1, 2035 |
| Permitted Securities: | The securities delivered pursuant to the Forward Delivery Agreement must be allowable securities for the Corporation, further defined as: |
| | See Appendix A for Permitted Investments. |
| Provider Requirements: | The Financial Institutions (the "Provider") must have a minimum unsecured, long-term credit rating ("Rating") of 'A3' and 'A-'from Moody's and S&P, respectively. |
| Substitution of Securities: | The Provider will also be entitled to deliver substitute Forward Delivery Agreement Securities to the extent any previously delivered Forward Delivery Agreement Securities mature prior to the applicable Debt Service Payment Date. |
| Optional Redemption: | In the event of a refunding of the underlying Bonds, the Agreement will transfer to the refunding bonds upon opinion from Bond Counsel. If a cash defeasance (partial or full) of the outstanding Bonds is effected without the issuance of refunding bonds or, if in a refunding, the Agreement cannot legally be transferred in full or in part to the deposits required for tax-exempt or taxable refunding bonds, then the Corporation will be subject to a breakage fee. The formula for calculating the breakage fee will be determined by mutual agreement prior to closing. |
| Securities Settlement: | Delivery versus Payment and securities will by held by the Trustee for the Debt Service Reserve Fund account. |
| | The purchase price of securities may not exceed the maturity amount of the securities and the maturity amount must not be less than the semiannual principal and interest requirements on the Bonds. |
| | The provider shall have no lien on the securities or assets of the Debt Service Reserve Fund. |
| Downgrade Provisions: | The Provider must notify the Corporation and the Trustee in the event of a downgrade, withdrawal or suspension of any existing Rating and the following Downgrade Provision will apply: |
| | (a) if the Provider's Rating by S&P or Moody's is suspended, withdrawn or falls below 'A-' or 'A3', respectively, the Agreement must provide for termination at market at the option of the Trustee, upon direction from the Corporation. Alternatively, the Provider may assign the Agreement to a party acceptable to the Trustee, with the approval of the Corporation. |
| Events of Default: | Events of Default under the Agreement will include, without limitation, the following: |
| | a) Failure of the Provider to make a delivery when due; |

b) Failure of the Provider to observe any covenant under the Agreement;

c) Any representation of or warranty furnished to the Trustee or the Corporation in connection with the Agreement (or guaranty, if applicable) is false or misleading;

d) The Provider admits its inability to pay its debts or a petition in bankruptcy is filed.

Breakage:    Withdrawal of funds from the Accounts by Trustee prior to the Agreement Maturity will constitute a "Breakage Event".

If a Breakage Event occurs and is not cured by the Corporation within two (2) business days, the Provider will have the right to terminate the related portion of the Agreement and to demand a Breakage Fee equal to the market value of the terminated portion of the Agreement. The market value calculation will be a market quotation outlined in the Agreement.

The Breakage Fee shall not be offset against withdrawal requests or against any Corporation funds held by the Provider. The demand for payment of a Breakage Fee shall be an unsecured general claim against the Corporation.

A Breakage Event and any subsequent delay in payment of the Breakage Fee will not constitute an event of default under the Bond Indenture or any related documents.

Bid Parameters:    The Agreement will be awarded to the Provider who provides *the highest earnings rate on the Agreement.*

The Corporation reserves the right in its sole discretion to reject any and all bids and to accept the bid deemed by it to be in the best interest of the Corporation.

Bid Submittal:    Bids should be phoned to Scott Determan at 312-596-1528 **Thursday, February 2nd at 2:00pm ET**. The telephone bid should be immediately followed by a facsimile transmission of the bid sheet (Appendix B) to 312-873-4063. The bids will be deemed firm for five (5) minutes. The Agreement is expected to be awarded immediately following review of all bids.

Documentation:    The winning provider will submit its own form of Agreement within three (3) business days of the award. Final documentation is subject to the approval of the Corporation and the Corporation's counsel. The winning provider's counsel shall provide opinions that the Agreement is legal, valid, binding and enforceable upon the Provider in accordance with its terms, subject to usual creditors' rights and enforcement limitations. The Provider's counsel shall also provide a bankruptcy opinion concerning the Forward Delivery Agreement Securities.

Counsel to the Provider and the Corporation shall provide an opinion stating that the Agreement has been duly authorized, executed and delivered and is enforceable, subject to customary limitation.

| | |
|---|---|
| Governing Law: | New York |
| Jurisdiction: | Exclusive jurisdiction will not be specified. |
| Waiver of Jury Trial: | Each Party waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any proceedings relating to this Agreement. |
| Comments: | No members of the working group shall be liable for any losses incurred or damages sustained by any party as a result of a failure to close on the Agreement solicited herein for any reason.  All offers to provide the forward delivery agreement shall be net of all fees and expenses, including but not limited to any legal fees incurred by the bidding institution. |
| Fees: | The Provider will pay a Structuring Fee equal to the lesser of (i) $32,000 or (ii) .20% of the amount expected to be initially invested (such amount shall be at least $3,000).  This fee will be paid to B.C. Ziegler and Company via wire transfer on the Settlement Date.  The yield offered to the Corporation shall be net of this Structuring Fee.  In structuring this transaction, obtaining bids and assisting the corporation in selecting the appropriate Provider, Ziegler Capital Markets Group is acting as agent for the Corporation. |
| Disclosure: | This Request for Bid ("RFB") and the submission of a bid by any party does not obligate the Corporation in any manner whatsoever. |
| | The Corporation reserves the right to amend, modify or withdraw this RFB; to waive or revise any requirement of the RFB; to acquire any supplemental information from any responding party; to reject any bids submitted hereto in order to obtain a lower bid than those previously submitted; to accept or reject any or all bids; or to negotiate or hold discussions with any responding party. |
| | A first draft of the Agreement from the Provider must be submitted to all interested parties via telecopy by no later than **February 6, 2006.** |

**Appendix A:**

**"Permitted Investments"** means, if and to the extent the same are at the time legal for investment of funds held under the Bond Indenture,

(a)    United States Government Obligations;

(b)    bond, debenture, note, certificate of participation, or other similar obligations which are (i) issued by any state or political subdivision thereof or any agency or instrumentality of such state or political subdivision, and (ii) at the time of purchase, rated in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by Moody's, Standard and Poor's, or Fitch Ratings ("Fitch");

(c)    bond, debenture, note, participation certificate, or other similar obligations issued by a government sponsored agency (such as the Federal National Mortgage Association, the Federal Home Loan Bank System, the Federal Home Loan Mortgage Corporation, the Federal Farm Credit Bank or the Student Loan Marketing Association) which is either (i) rated in the highest rating category by Moody's, Standard & Poor's or Fitch at the time of purchase, or (ii) backed by the full faith and credit of the United States of America;

(d)    U.S. denominated deposit account, certificate of deposit, and banker's acceptances of any bank, trust, company, or savings and loan association, including the Master Trustee or Bond Trustee or its affiliates, which have a rating on their short-term certificates of deposit on the date of purchase in one of the two highest short-term rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by Moody's, Standard & Poor's or Fitch, and which matures not more than 360 days after the date of purchase;

(e)    commercial paper which is rated at the time of purchase in one of the two highest short-term rating categories assigned by Moody's, Standard & Poor's or Fitch, and which matures not more than 270 days after the date of purchase;

(f)    bonds, notes, debentures or other evidences of indebtedness issued or guaranteed by a corporation which are, at the time of purchase, rated by Moody's, Standard & Poor's or Fitch in any of the three highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise);

(g)    investment agreements with banks that at the time such agreement is executed are rated in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by any rating agency or investment agreements with non-bank financial institutions, provided that (1) all of the unsecured, direct long-term debt of either the non-bank financial institution or the related guarantor of such non-bank financial institution is rated by any rating agency at the time such agreement is executed in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) for obligations of that nature; or (2) if such non-bank financial institution and any related guarantor have no outstanding long-term debt that is rated, all of the short-term debt of either the non-bank financial institution or the related guarantor of such non-bank financial institution is rated by any rating agency in one of the two highest rating categories (without regard to any refinement or gradation of the rating category by numerical modifier or otherwise) assigned to short term indebtedness by any rating agency. If such non-bank financial institution and any guarantor do not have any short-term or long-term debt, but do have a rating in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise), then investment agreements with such non-bank financial institutions will be permitted;

(h)    repurchase agreements with respect to and secured by United States Government Obligations or by obligations described in clause (b) and (c) above, which agreements may be entered into with a bank (including without limitation the Master Trustee or the Bond Trustee), a trust company, financial services firm, or a broker dealer which is a member of the Securities Investors Protection Corporation, provided that (i) the Master Trustee or a custodial agent of the Master Trustee has possession of the collateral and that the collateral is, to the knowledge of the Master Trustee, free and clear of third party claims,

(ii) a master repurchase agreement or specific written repurchase agreement governs the transaction, (iii) the collateral securities are valued no less frequently than monthly, and (iv) the fair market value of the collateral securities in relation to the amount of the repurchase obligation, including principal and interest, is equal to at least 103%, and (v) such obligations must be held in the custody of the Bond Trustee or the Bond Trustee's agent;

　　　　(i)　　investments in a money market fund, which may be funds of the Bond Trustee or an affiliate of the Bond Trustee, rated (at the time of purchase) in the highest rating category for this type of investment by any rating agency.

**Appendix B:**

# Lutheran Senior Services
## LETTER OF ACCEPTANCE

We hereby confirm our bid and commit to provide an Agreement subject to all the terms and conditions stated in the foregoing Request for Forward Delivery Agreement.

In making this bid, we represent as follows:

1.      We believe we are a reasonably competitive provider of the Agreement described in the Request for Bids.

2.      You have not provided us any information which induced us to bid an amount lower than the amount induced by the Request for Bid.

3.      The bid is at least equal to the yield which we would offer for agreements set forth in the Request for Bids to other persons from a source of funds other than the gross proceeds of an issue of tax-exempt bonds.

4.      This offer is an arm's length transaction and no payments besides those specified herein or in the Request for Bids, will be made or received from either party to the other or from the Provider to any third party for the benefit of the Corporation.

5.      We have submitted this bid in good faith and without reviewing other bids. Other than the Forward Delivery Agreement, we have no financial interest in the bond financing related to this bid.

6.      We represent that we did not consult with any other potential provider about this bid, that this bid was determined without regard to any other formal or informal agreement we have with the Corporation or any other person (whether or not in connection with the bond issue), and that this bid is not being submitted solely as a courtesy to the Corporation or any other person for purposes of satisfying the safe harbor provisions of the Treasury Regulations.

7.      The yields quoted in our Request for Bid included consideration of the Corporation's expected deposit schedule provided to us for the amounts to be invested.

8.      Based on our experience in the field and on all the facts and circumstances, the terms of the specifications in the Request for Bids are commercially reasonable.

|  | Yield % |
|---|---|
| Series 2005A DSRF: | _____% |

Firm: _____

By: _____
     Authorized Representative

Date: _____

|  | Moody's Rating | S&P Rating |
|---|---|---|
| Credit Rating of Bidding Entity: | _____ / | _____ |

# Ziegler Capital Markets Group

One South Wacker Drive, Suite 3080
Chicago, IL 60606
Phone 312-263-0110 Fax 312-803-2892

## Bid Results for Guaranteed Investment Agreement / Forward Delivery Agreement

**Date:** February 2, 2006

**To:** Interested Parties

**From:** John Kautz, Managing Director, Risk Management and Advisory
Scott Determan, Vice President, Risk Management and Advisory

**Subject:** Bid Results for Guaranteed Investment Contract /
Forward Deliver Agreement – Lutheran Senior Services

**GIC Bidders:**

| Firm | Moody's Rating | S&P Rating | Dealer | Phone | Date | Time |
|------|------|------|------|------|------|------|
| AIG | Aa2 | AA | Keith Stein | 203-222-4716 | 02/02/2006 | 2:00pm |
| Aegon | Aa3 | AA | Stephen Curry | 502-560-2061 | 02/02/2006 | 2:00pm |
| MBIA | Aaa | AAA | Jim Bennett | 914-765-3207 | 02/02/2006 | 2:00pm |

**FDA Bidders:**

| Firm | Moody's Rating | S&P Rating | Dealer | Phone | Date | Time |
|------|------|------|------|------|------|------|
| Bank of America | Aa2 | AA- | Danielle Lardinais | 704-388-5407 | 02/02/2006 | 2:00pm |
| Lehman Brothers | A1 | A+ | Anatoly Zelikoff | 212-528-6027 | 02/02/2006 | 2:00pm |
| Morgan Stanley | Aa3 | A+ | Kevin Schwartz | 914-225-0249 | 02/02/2006 | 2:00pm |
| Wachovia Bank | Aa3 | A+ | Erin O'Keefe | 704-383-5485 | 02/02/2006 | 2:00pm |

**Bid Summary:**

| Firm | DSR Fund - Yield |
|------|------|
| AIG | 4.360% |
| Aegon | 4.690% |
| MBIA | 4.801% |
| Bank of America | Pass |
| Lehman Brothers | **4.940%** |
| Morgan Stanley | 4.655% |
| Wachovia Bank | 4.815% |

All times are eastern, bold indicates awarded swap rate.

**Appendix A:**

# Lutheran Senior Services
## LETTER OF ACCEPTANCE

We hereby confirm our bid and commit to provide an Agreement subject to all the terms and conditions stated in the foregoing Request for Investment Agreement.

In making this bid, we represent as follows:

1.    We believe we are a reasonably competitive provider of the Agreement described in the Request for Bids.

2.    You have not provided us any information which induced us to bid an amount lower than the amount induced by the Request for Bid.

3.    The bid is at least equal to the yield which we would offer for agreements set forth in the Request for Bids to other persons from a source of funds other than the gross proceeds of an issue of tax-exempt bonds.

4.    This offer is an arm's length transaction and no payments besides those specified herein or in the Request for Bids, will be made or received from either party to the other or from the Provider to any third party for the benefit of the Corporation.

5.    We have submitted this bid in good faith and without reviewing other bids.  Other than the Investment Agreement, we have no financial interest in the bond financing related to this bid.

6.    We represent that we did not consult with any other potential provider about this bid, that this bid was determined without regard to any other formal or informal agreement we have with the Corporation or any other person (whether or not in connection with the bond issue), and that this bid is not being submitted solely as a courtesy to the Corporation or any other person for purposes of satisfying the safe harbor provisions of the Treasury Regulations.

7.    The yields quoted in our Request for Bid included consideration of the Corporation's reasonably expected deposit schedule for the amounts to be invested.

8.    Based on our experience in the field and on all the facts and circumstances, the terms of the specifications in the Request for Bids are commercially reasonable.

| | Yield % |
|---|---|
| Series 2005A DSRF: | 4.69 % |

Firm: _Aegon / Transamerica_

By: _Stephen Carroll_
Authorized Representative

Date: _2/2/06_

| | Moody's Rating | | S&P Rating |
|---|---|---|---|
| Credit Rating of Bidding Entity: | Aa 3 | / | AA |

*(312) 873 4063*

**Appendix A:**

## Lutheran Senior Services
### LETTER OF ACCEPTANCE

We hereby confirm our bid and commit to provide an Agreement subject to all the terms and conditions stated in the foregoing Request for Investment Agreement.

In making this bid, we represent as follows:

1.    We believe we are a reasonably competitive provider of the Agreement described in the Request for Bids.

2.    You have not provided us any information which induced us to bid an amount lower than the amount induced by the Request for Bid.

3.    The bid is at least equal to the yield which we would offer for agreements set forth in the Request for Bids to other persons from a source of funds other than the gross proceeds of an issue of tax-exempt bonds.

4.    This offer is an arm's length transaction and no payments besides those specified herein or in the Request for Bids, will be made or received from either party to the other or from the Provider to any third party for the benefit of the Corporation.   *material*

5.    We have submitted this bid in good faith and without reviewing other bids. Other than the Investment Agreement, we have no financial interest in the bond financing related to this bid.

6.    We represent that we did not consult with any other potential provider about this bid, that this bid was determined without regard to any other formal or informal agreement we have with the Corporation or any other person (whether or not in connection with the bond issue), and that this bid is not being submitted solely as a courtesy to the Corporation or any other person for purposes of satisfying the safe harbor provisions of the Treasury Regulations.

7.    The yields quoted in our Request for Bid included consideration of the Corporation's reasonably expected deposit schedule for the amounts to be invested.

8.    Based on our experience in the field and on all the facts and circumstances, the terms of the specifications in the Request for Bids are commercially reasonable.

|  | Yield % |
|---|---|
| Series 2005A DSRF: | *4.36* % |

Firm: _____ *A16~MF* _____           *Std Opinion, Certs, Disclosure*

By: _____ *Vin M* _____
        Authorized Representative

Date: _____ *2-2-06* _____

*A16 Inc.* *(6-month)*

Credit Rating of Bidding Entity: ___ **Moody's Rating** *Aa2*  /  **S&P Rating** *AA*
                                                *(Stable)*              *(neg. outlook)*

3/2 - 813 - 4063

Appendix B:

# Lutheran Senior Services
## LETTER OF ACCEPTANCE

We hereby confirm our bid and commit to provide an Agreement subject to all the terms and conditions stated in the foregoing Request for Forward Delivery Agreement.

In making this bid, we represent as follows:

1.    We believe we are a reasonably competitive provider of the Agreement described in the Request for Bids.

2.    You have not provided us any information which induced us to bid an amount lower than the amount induced by the Request for Bid.

3.    The bid is at least equal to the yield which we would offer for agreements set forth in the Request for Bids to other persons from a source of funds other than the gross proceeds of an issue of tax-exempt bonds.

4.    This offer is an arm's length transaction and no payments besides those specified herein or in the Request for Bids, will be made or received from either party to the other or from the Provider to any third party for the benefit of the Corporation.

5.    We have submitted this bid in good faith and without reviewing other bids.  Other than the Forward Delivery Agreement, we have no financial interest in the bond financing related to this bid.

6.    We represent that we did not consult with any other potential provider about this bid, that this bid was determined without regard to any other formal or informal agreement we have with the Corporation or any other person (whether or not in connection with the bond issue), and that this bid is not being submitted solely as a courtesy to the Corporation or any other person for purposes of satisfying the safe harbor provisions of the Treasury Regulations.

7     The yields quoted in our Request for Bid included consideration of the Corporation's expected deposit schedule provided to us for the amounts to be invested.

8.    Based on our experience in the field and on all the facts and circumstances, the terms of the specifications in the Request for Bids are commercially reasonable.

| | Yield % |
|---|---|
| Series 2005A DSRF: | 4.94 % |

Firm: _LBSF_

By: _____
    Authorized Representative

Date: _2/2/06_

|  | Moody's Rating | | S&P Rating |
|---|---|---|---|
| Credit Rating of Bidding Entity: | A1 | / | A+ |

Appendix B:

# Lutheran Senior Services
## LETTER OF ACCEPTANCE

We hereby confirm our bid and commit to provide an Agreement subject to all the terms and conditions stated in the foregoing Request for Forward Delivery Agreement.

In making this bid, we represent as follows:

1.      We believe we are a reasonably competitive provider of the Agreement described in the Request for Bids.

2.      You have not provided us any information which induced us to bid an amount lower than the amount induced by the Request for Bid.

3.      The bid is at least equal to the yield which we would offer for agreements set forth in the Request for Bids to other persons from a source of funds other than the gross proceeds of an issue of tax-exempt bonds.

4.      This offer is an arm's length transaction and no payments besides those specified herein or in the Request for Bids, will be made or received from either party to the other or from the Provider to any third party for the benefit of the Corporation.

5.      We have submitted this bid in good faith and without reviewing other bids. Other than the Forward Delivery Agreement, we have no financial interest in the bond financing related to this bid.

6.      We represent that we did not consult with any other potential provider about this bid, that this bid was determined without regard to any other formal or informal agreement we have with the Corporation or any other person (whether or not in connection with the bond issue), and that this bid is not being submitted solely as a courtesy to the Corportion or any other person for purposes of satisfying the safe harbor provisions of the Treasury Regulations.

7       The yields quoted in our Request for Bid included consideration of the Corporation's expected deposit schedule provided to us for the amounts to be invested.

8.      Based on our experience in the field and on all the facts and circumstances, the terms of the specifications in the Request for Bids are commercially reasonable.

|  | Yield % |
|---|---|
| Series 2005A DSRF: | 4.815 % |

Firm: _Wachovia Bank, N.A._

By: _Wm M. O'Keefe_
      Authorized Representative

Date: _2/2/06_

|  | Moody's Rating | S&P Rating |
|---|---|---|
| Credit Rating of Bidding Entity: | _____ | / _____ |

FEB-02-2006  15:32      MOGAN STANLEY MUNIS                914 225 9289    P.01/01

Appendix B:

# Lutheran Senior Services

## LETTER OF ACCEPTANCE

*enter into*

We hereby confirm our bid and commit to ~~provide~~ an Agreement subject to all the terms and conditions stated in the foregoing Request for Forward Delivery Agreement.

In making this bid, we represent as follows:

1.  We believe we are a reasonably competitive provider of the Agreement described in the Request for Bids.

2.  You have not provided us any information which induced us to bid an amount lower than the amount induced by the Request for Bid.

3.  The bid is at least equal to the yield ~~which we would offer for agreements set forth in the~~ Request for Bids to other persons from a source of ~~funds~~ other than the gross proceeds of an issue of tax-exempt bonds.

4.  This offer is an arm's length transaction and no payments besides those specified herein or in the Request for Bids, will be made or received from either party to the other or from the Provider to any third party for the benefit of the Corporation *in connection with entering into, or performing under, the Agreement*

5.  We have submitted this bid in good faith and without reviewing other bids. ~~Other than the Forward Delivery Agreement, we have no financial interest in the bond financing related to this bid~~ *we are not lead underwriter for the Bonds.*

6.  We represent that we did not consult with any other potential provider about this bid, that this bid was determined without regard to any other formal or informal agreement we have with the Corporation or any other person (whether or not in connection with the bond issue), and that this bid is not being submitted solely as a courtesy to the Corportion or any other person for purposes of satisfying the safe harbor provisions of the Treasury Regulations.

7.  The yields quoted in our Request for Bid included consideration of the ~~Corporation's expected~~ deposit schedule provided to us for the amounts to be invested.

8.  ~~Based on our experience in the field and on all the facts~~ and circumstances, ~~the terms of the specifications in the~~ Request for Bids are commercially reasonable.

| | Yield % |
|---|---|
| Series 2005A DSRF: | 4.655 % |

Firm: MORGAN STANLEY

By: _____
Authorized Representative

Date: 2/2/06

| Moody's Rating | | S&P Rating |
|---|---|---|
Credit Rating of Bidding Entity: Aa3 / A-+

TOTAL P.01

Appendix A:

# Lutheran Senior Services
## LETTER OF ACCEPTANCE

We hereby confirm our bid and commit to provide an Agreement subject to all the terms and conditions stated in the foregoing Request for Investment Agreement.

In making this bid, we represent as follows:

1.      We believe we are a reasonably competitive provider of the Agreement described in the Request for Bids.

2.      You have not provided us any information which induced us to bid an amount lower than the amount induced by the Request for Bid.

3.      The bid is at least equal to the yield which we would offer for agreements set forth in the Request for Bids to other persons from a source of funds other than the gross proceeds of an issue of tax-exempt bonds.

4.      This offer is an arm's length transaction and no payments besides those specified herein or in the Request for Bids, will be made or received from either party to the other or from the Provider to any third party for the benefit of the Corporation.

5.      We have submitted this bid in good faith and without reviewing other bids. Other than the Investment Agreement, we have no financial interest in the bond financing related to this bid.

6.      We represent that we did not consult with any other potential provider about this bid, that this bid was determined without regard to any other formal or informal agreement we have with the Corporation or any other person (whether or not in connection with the bond issue), and that this bid is not being submitted solely as a courtesy to the Corporation or any other person for purposes of satisfying the safe harbor provisions of the Treasury Regulations.

7.      The yields quoted in our Request for Bid included consideration of the Corporation's reasonably expected deposit schedule for the amounts to be invested.

8.      ~~Based on our experience in the field and on all the facts and circumstances, the terms of the specifications in the Request for Bids are commercially reasonable.~~

|                      | Yield %   |
| -------------------- | --------- |
| Series 2005A DSRF:   | 4.801 %   |

Firm: _MBIA Inc._

By: _Tony A Burt_
Authorized Representative

Date: _2/2/06_

| | Moody's Rating | S&P Rating |
| --- | --- | --- |
| ~~Credit~~ _Financial Strength_ Rating of Bidding Entity: | _Aaa_ / | _AAA_ |

Execution Copy

# RESERVE FUND AGREEMENT

This Reserve Fund Agreement (this "Agreement") dated as of February 17, 2006 by and among LUTHERAN SENIOR SERVICES, a Missouri non-profit corporation (the "Corporation"), THE BANK OF NEW YORK TRUST COMPANY, N.A. a national banking association (the "Trustee"), and LEHMAN BROTHERS SPECIAL FINANCING INC., a Delaware corporation ("Lehman").

SECTION 1.          DEFINITIONS

For purposes of this Agreement, unless the context clearly indicates otherwise, the words and terms defined in this Section 1 have the respective meanings given to them herein:

"Bond Payment Date" means, with respect to each Deposit Date, each date identified as a "Bond Payment Date" on Exhibit A unless such date is not a Business Day, in which case "Bond Payment Date" means the immediately preceding Business Day; provided that in determining whether any such date is a Business Day no effect shall be given to clause (c) or (d) of the definition of Business Day.

"Bonds" means $30,000,000 Health and Educational Facilities Authority of the State of Missouri, Senior Living Facilities Revenue Bonds, Series 2005A, (Lutheran Senior Services Projects).

"Burdened Party" means, (i) in the case of (A) a Corporation Event of Default or a Trustee Event of Default or (B) a termination of this Agreement by the Corporation pursuant to Section 3.1 following a redemption, defeasance or refunding of the Bonds, Lehman and (ii) in the case of a Lehman Event of Default, the Corporation.

"Business Day" means any day other than (a) a Saturday or Sunday, (b) a day on which the principal corporate trust office of the Trustee is authorized or required by law to close, (c) a day on which banking institutions in the City of New York are authorized or required by law to close, or (d) a day on which any Qualified Securities which may be delivered hereunder are not subject to delivery in the City of New York.

"Closing Date" means February 17, 2006.

"Corporation Event of Default" means the occurrence of an event specified in Section 7.2 hereof.

"Coupon Payment" means, for any Qualified Security, a payment of interest which is due to be paid thereon prior to the scheduled maturity of such Qualified Security.

Execution Copy

"Dealer" means a leading dealer in the relevant markets selected by Lehman in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that Lehman applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from such dealers having an office in the same City.

"Debt Service Payment" means (i) a scheduled payment of principal of or interest on the Bonds, including any such payment in connection with a scheduled mandatory sinking fund redemption of the Bonds from sinking fund installments but excluding any such payment in connection with any other redemption of the Bonds and excluding any payment required to make a regularly scheduled deposit to the principal account or interest account for the Bonds or (ii) a payment of principal of or interest on the Bonds upon an acceleration of the Bonds following an event of default under the Indenture.

"Default Rate" means a per annum rate equal to the lesser of (a) Three Month LIBOR plus 1% per annum, or (b) the maximum rate permitted by law.

"Delivery Notice" means a notice substantially in the form of <u>Exhibit E</u> or in such other form as provided by the Qualified Dealer and is reasonably acceptable to the Trustee.

"Deposit Date" means each date identified as a "Deposit Date" on <u>Exhibit A</u> unless such date is not a Business Day, in which case "Deposit Date" means the immediately preceding Business Day.

"Differential" means the amount, if any, by which the Purchase Price of any Qualified Security delivered hereunder exceeds the Market Value thereof.

"Eligible Securities" means if and to the extent the same are at the time legal for investment of funds held under the Bond Indenture,

      (a)      United States Government Obligations;

      (b)      bonds, debentures, notes, certificates of participation, or other similar obligations which are (i) issued by any state or political subdivision thereof or any agency or instrumentality of such state or political subdivision, and (ii) at the time of purchase, rated in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by Moody's, Standard and Poor's, or Fitch Ratings ("Fitch");

      (c)      bonds, debentures, notes, participation certificates, or other similar obligations issued by a government sponsored agency (such as the Federal National Mortgage Association, the Federal Home Loan Bank System, the Federal Home Loan Mortgage Corporation, the Federal Farm Credit Bank or the Student Loan Marketing Association) which is either (i) rated in the highest rating category by Moody's, Standard & Poor's or Fitch at the time of purchase, or (ii) backed by the full faith and credit of the United States of America;

RFA: Lutheran Senior Services

2

Execution Copy

(d)    U.S. denominated deposit accounts, certificates of deposit, and banker's acceptances of any bank, trust, company, or savings and loan association, including the Master Trustee or Bond Trustee or its affiliates, which have a rating on their short-term certificates of deposit on the date of purchase in one of the two highest short-term rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by Moody's, Standard & Poor's or Fitch, and which matures not more than 360 days after the date of purchase;

(e)    commercial paper which is rated at the time of purchase in one of the two highest short-term rating categories assigned by Moody's, Standard & Poor's or Fitch, and which matures not more than 270 days after the date of purchase; and

(f)    bonds, notes, debentures or other evidences of indebtedness issued or guaranteed by a corporation which are, at the time of purchase, rated by Moody's, Standard & Poor's or Fitch in any of the three highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise).

"Financing Documents" means the Indenture and the Loan Agreement

"Guaranteed Rate" means a rate per annum equal to          4.94%  assuming  that  the interest on the applicable security was compounded semi-annually on the basis of a year of 360 days with twelve thirty day months.

"Illegality" means that, due to the adoption of, or any change in, any applicable law after the date on which this Agreement is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of this Agreement or to comply with any other material provision of this Agreement.

"Incipient Illegality" means (a) the enactment by any legislative body with competent jurisdiction over the Corporation of legislation which, if adopted as law, would render unlawful (i) the performance by the Corporation of any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of this Agreement or the compliance by the Corporation with any other material provision of this Agreement or (ii) the performance by the Corporation of any contingent or other obligation which the Corporation relating to this Agreement, (b) any assertion in any proceeding, forum or action by the, in respect of the Corporation or in respect of any entity located or organized under the laws of the state in which the Corporation is located to the effect that performance under this Agreement or similar agreements is unlawful or (c) the occurrence with respect to the Corporation of any event that constitutes an Illegality.

"Indenture" means the Bond Trust Indenture dated as of August 1, 2005 between the Issuer and the Trustee.

Execution Copy

"Insolvent" means (i) either the Trustee, the Corporation or Lehman as the case may be, shall (1) commence a voluntary case under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter), (2) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, (3) consent to any petition filed against it in an involuntary case under such bankruptcy or insolvency or other laws, (4) apply for or consent to the appointment of, or the taking of possession by, a trustee, receiver, custodian, liquidator or the like for itself or for all or a substantial part of its property, (5) admit in writing its inability to pay, or generally not be paying, its debts as they come due, (6) make a general assignment for the benefit of creditors, or (7) take any official action for the purpose of effecting any of the foregoing; or (ii) a case or other proceeding shall be commenced against either the Trustee, the Corporation or Lehman, as the case may be, in any court of competent jurisdiction seeking (1) relief under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter) or under any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, or (2) the appointment of a trustee, receiver, custodian, liquidator or the like for the Trustee, the Corporation or Lehman, as the case may be, or for all or a substantial part of its property, and any such case or proceeding shall continue undismissed and unstayed for a period of 60 consecutive calendar days, or an order granting the relief requested in any such case or proceeding against such party shall be entered and shall remain in effect and unstayed for a period of 60 consecutive days.

"Issuer" means the Health and Educational Facilities Authority of the State of Missouri.

"LBH" means Lehman Brothers Holdings Inc., which wholly owns and unconditionally guarantees the obligations of Lehman. As of the date of this Agreement, LBH has long-term senior unsecured debt obligations rated A+ by Fitch, A1 by Moody's and A+ by S&P.

"Lehman Cure Period" has the meaning specified in Section 7.3(a) hereof.

"Lehman Event of Default" means the occurrence of an event specified in Section 7.3 hereof.

"Loan Agreement" means the Loan Agreement dated as of August 1, 2005 between the Issuer and the Corporation.

"Market Value" means with respect to any Qualified Security, the market value thereof (including accrued interest thereon) as specified by the Qualified Dealer delivering that security, provided that the Market Value of any Qualified Security shall in no event exceed the Maturity Amount thereof.

"Maturity Amount" means, with respect to any Qualified Security, the amount, payable in cash, representing the principal and interest (including any Coupon Payments) due thereon on or prior to its maturity date.

"Purchase Price" means, for any Eligible Security delivered hereunder, that price for such security, as set forth in the Delivery Notice, which will produce a rate of return on such security

Execution Copy

for the period from (and including) the date of its delivery to (but excluding) its maturity date equal to the Guaranteed Rate.

"Qualified Dealer" means Lehman Brothers Inc., its successors or assigns, or any other dealer in Eligible Securities selected by Lehman.

"Qualified Securities" means, for any Deposit Date or subsequent deposit date pursuant to Section 2.3 or 2.4, Eligible Securities which, to the extent available on the open market, (i) mature on or prior to the related Bond Payment Date and (ii) have an aggregate Purchase Price which is as close as possible to but does not exceed the related Scheduled Reserve Amount.

"Reserve Fund" means the account created pursuant to the Indenture and designated thereunder as the Reserve Account.

"Scheduled Reserve Amount" means, for each Deposit Date, the amounts shown on Exhibit A which, under the terms of the Indenture, will be the Reserve Fund Requirement on such date, assuming that (i) no withdrawals from the Reserve Fund have been made to make a Debt Service Payment and (ii) no Bonds will have been defeased or redeemed on or prior to such date except in connection with a scheduled sinking fund redemption.

"Specified Indebtedness" means any obligation of the Corporation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"Termination Amount" means an amount, as determined by Lehman reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers of the amount, if any, that each such Dealer would require the Burdened Party to pay to the Dealer (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Corporation) or would pay to the Burdened Party (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Corporation) in consideration of such Dealer entering into an agreement with the Burdened Party (with such documentation as Lehman and the Dealer may in good faith agree) which would have the effect of preserving for the Burdened Party the economic equivalent of its rights under this Agreement for the period commencing on the termination date of this Agreement and terminating on the last Bond Payment Date set forth in Exhibit A (assuming for these purposes that this Agreement were not terminating on the termination date and continued in full force through such last Bond Payment Date); provided, however, that:

(i)     if more than three quotations are provided, the Termination Amount will be the arithmetic mean of such quotations, without regard to the quotations having the highest and lowest values,

(ii)     if exactly three quotations are provided, the Termination Amount will be the quotation remaining after disregarding the highest and lowest quotations,

Execution Copy

for purposes of clauses (i) and (ii), if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded, and

     (iii)   if Lehman is unable to obtain three such quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by Lehman, to be the Burdened Party's total losses and costs (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Corporation), or gains (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Corporation) in connection with a termination of this Agreement, including any loss of bargain, cost of funding or, at the election of Lehman but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position, and;

provided further, however, that in any event the Termination Amount shall also include (A) any unpaid amounts due as of the date of termination of this Agreement (including any amounts due under Section 7.7 hereof) and (B) if such Termination Amount is being paid in connection with a termination of this Agreement following an Event of Default or if any Termination Amount otherwise due hereunder is not paid when due, the Termination Amount shall also include any incidental costs and expenses incurred by the Burdened Party in connection with such termination and the enforcement of its rights hereunder (including costs of collection and reasonable attorneys' fees).

"Three Month LIBOR" as of any date of determination means the rate for deposits in US dollars for a period of three months which appears on the Telerate Page 3750 as of 11:00 a.m., London time, on the day that is two Business Days before the day for which such determination is being made. If no such rate appears on the Telerate Page 3750 as of such date, Lehman may select another nationally recognized published source to determine Three Month LIBOR.

"Trustee Event of Default" means the occurrence of an event specified in Section 7.1 hereof.

SECTION II.        PURCHASE AGREEMENT

Section 2.1    Purchase and Sale of Qualified Securities.

(a)    Lehman shall cause a Qualified Dealer to deliver to the Trustee, on any Deposit Date, in accordance with the delivery requirements of Section 2.2 hereof, to the extent such securities are available on the open market, Qualified Securities selected by Lehman or the Qualified Dealer.

(b)    If Lehman causes a Qualified Dealer to deliver Qualified Securities, the Trustee shall, out of funds available under the Indenture for such purpose or as otherwise provided by the Corporation, at the time of the delivery of such Qualified Securities, purchase such Qualified Securities and pay to the Qualified Dealer or Lehman, as applicable, in accordance with Section 2.2(b) hereof, an amount equal to the Purchase Price thereof.

Execution Copy

Section 2.2    Delivery; Payment.

(a)    All Qualified Securities delivered hereunder shall be delivered to the Trustee to the account specified in Section 9.1 hereof, in such manner as at the time is generally acceptable for delivery of Qualified Securities.  All Qualified Securities delivered hereunder shall be delivered to the Trustee on a "delivery versus payment" basis.

(b)    (i)    Lehman shall cause the Qualified Dealer to send a Delivery Notice to the Trustee at least one Business Day prior to the delivery of any Qualified Securities which are in book-entry form and at least two Business Days prior to the delivery of any Qualified Securities which are being delivered in certificated form.  The Trustee may conclusively rely on the Qualified Dealer's specification in the Delivery Notice of the Market Value, the Maturity Amount and the Purchase Price of a Qualified Security.

(ii)    Concurrently with the delivery of any Qualified Securities, unless otherwise directed by Lehman in writing, the Trustee shall, subject to clause (iii) below, pay the Qualified Dealer delivering such Qualified Securities, in its individual capacity, the Market Value thereof, and to the Qualified Dealer as agent for Lehman, the Differential, if any.

(iii)    Lehman may in the Delivery Notice, direct the Trustee to pay (A) to the Qualified Dealer, the Market Value of any Qualified Securities delivered to the Trustee hereunder, and (B) to Lehman, the Differential, if any.  Any such payment to Lehman shall be at Lehman's account as set forth in the Delivery Notice.

(iv)    All payments to be made hereunder shall be made in immediately available funds by means of a bank or Federal funds wire.

Section 2.3    Subsequent Deliveries.  If any Qualified Securities delivered by a Qualified Dealer pursuant to Section 2.1 hereof (a) mature prior to the Bond Payment Date for which such Qualified Securities were delivered, or (b) have a Coupon Payment, Lehman shall have the right, upon at least one Business Day's prior written notice to the Trustee in the form of the Delivery Notice, to cause a Qualified Dealer to deliver to the Trustee, at any time on or after the maturity date of such Qualified Securities (or, as applicable, on or after the interest payment date of such Coupon Payment) but prior to the date which is one Business Day before such Bond Payment Date, other Qualified Securities, provided that the Maturity Amount thereof does not exceed the Maturity Amount of the securities which have so matured (or as applicable, the amount of the Coupon Payment).  Any such deliveries by the Qualified Dealer shall conform to the requirements of Section 2.2(a) and (b) hereof.  Upon the delivery by the Qualified Dealer of such Qualified Securities, the Trustee shall pay the Purchase Price thereof in the manner required by Section 2.2(b)(ii) hereof.

Section 2.4    Late Delivery; Failure to Deliver.

(a)    If Lehman fails to cause a Qualified Dealer to deliver Qualified Securities as required hereunder by 4:30 p.m. New York City time on any Deposit Date or during the Lehman

Execution Copy

Cure Period, the Trustee shall, on each such date, use its best efforts to invest the related Deposit Amount on an overnight basis in Permitted Investments (as defined in the Indenture) and if Lehman's failure continues beyond the Lehman Cure Period, the Trustee shall invest the related Deposit Amount in Permitted Investments with the longest possible maturities, provided such maturities are not later than the related Bond Payment Date.

(b)    No failure on Lehman's part to cause a Qualified Dealer to deliver Qualified Securities hereunder shall terminate or affect Lehman's right to cause future sales of Qualified Securities in accordance with this Agreement.

Section 2.5    Notice of Withdrawal from Reserve Fund; Replenishment.

(a)    If at any time the Corporation is required under the Indenture to withdraw any investments or other amounts from the Reserve Fund (including any Qualified Securities) to make a Debt Service Payment, the Trustee shall promptly give oral and written notice thereof to Lehman and shall in such written notice specify (i) the amount of investments which are to be withdrawn and (ii) the amount which will be in the Reserve Fund after giving effect to such withdrawal to be invested pursuant to this Agreement.

(b)    If, following the Trustee's withdrawal of funds from the Reserve Fund pursuant to Section 2.5(a), within twelve (12) months of such withdrawal, (i) sufficient funds are deposited into the related Reserve Fund to permit the purchase of Qualified Securities hereunder in the amount of such withdrawal or (ii) the Corporation has notified Lehman and the Trustee that it intends, in compliance with the Indenture to deposit sufficient funds in the Reserve Fund within twelve (12) months after such withdrawal from the Reserve Fund pursuant to Section 2.5(a), then the Trustee shall, within two Business Days following such replenishment of the Reserve Fund, give oral and written notice (a "Reserve Fund Replenishment Notice") to Lehman stating (A) the amount of funds which have been or will be deposited into the Reserve Fund (the "Replenishment Amount") and (B) the date(s) or expected date(s) of such deposit(s). If the Trustee has so delivered a Reserve Fund Replenishment Notice to Lehman, then by no later than the second Business Day after delivery thereof, the Trustee shall purchase any Qualified Securities duly tendered by the Qualified Dealer in accordance with Section 2.1 hereof, such Qualified Securities having a Purchase Price (by which amount the Scheduled Reserve Amount shall be increased) equal to the pro rata portion of the Replenishment Amount relating to the amount by which the Scheduled Reserve Amount was decreased pursuant to Section 2.5(a) above, such that the ratio of the amount invested hereunder to the Reserve Fund Requirement (as defined in the Indenture) remains constant.

(c)    If the Reserve Fund is not replenished within twelve (12) months of a withdrawal, Lehman may but shall not be required or obligated under this Agreement to cause the Qualified Dealer to make any delivery of Qualified Securities with respect to the pro rata portion of the Replenishment Amount upon the replenishment of the Reserve Fund.

Section 2.6    Direction by Corporation to Trustee. The Corporation hereby irrevocably instructs the Trustee and the Trustee agrees to take the actions and to make the purchases required hereby. The Corporation represents to the Trustee that this Agreement and the investments provided hereunder are permitted under the Indenture.

Execution Copy

Section 2.7    Lehman Downgrade

(a)    If during the term of this Agreement the long-term senior unsecured debt ratings of LBH are suspended, withdrawn or fall below "A3" by Moody's and "A-" by Standard & Poor's (in any such case, a "Lehman Downgrade"), Lehman shall provide written notice to the Corporation and the Trustee within five Business Days of such Lehman Downgrade.

(b)    Upon receipt of the written notice from Lehman of such Lehman Downgrade, Lehman shall within ten Business Days of a Lehman Downgrade:

(i)    assign and transfer this Agreement and its interests hereunder to a financial institution with the written consent of the Corporation (such consent not to be unreasonably withheld or delayed) and such financial institution has long-term unsecured debt ratings of at least A3 by Moody's and A- by Standard & Poor's, provided that in all such instances of transfer the transferee shall assume all of the rights and obligations of Lehman hereunder;

(ii)    have the obligations of Lehman hereunder guaranteed by a financial institution which has long-term debt ratings of at least A3 by Moody's and A- by Standard & Poor's and with the written consent of the Corporation and the Trustee (such consent not to be unreasonably withheld or delayed); or

(iii)    deliver collateral to the Trustee comprised of Qualified Securities (other than the Qualified Securities delivered to the Trustee pursuant to Section II hereof) such that (A) the market value of the collateral must be maintained at levels of 104% of the Termination Amount (in favor of the Corporation), (B) the Trustee shall have a perfected first priority security interest in such collateral, and (C) the value of the collateral and the Termination Amount are determined by Lehman on the first Business Day of each week.

(c)    If Lehman fails to take any of the actions specified in (i), (ii) or (iii) above, the Corporation shall have the right, but not the obligation, to terminate this Agreement by giving written notice thereof to Lehman with a copy to the Trustee, whereupon Lehman shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one Business Day after written notice that such amount is due, pay such amount, in immediately available funds, to the Corporation and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Corporation of the Termination Amount in which case the Corporation shall promptly, but no later than one Business Day after notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each day such amount is due but not paid at the Default Rate. Any amounts due from the Corporation hereunder shall be paid solely from funds available under the Indenture for such purpose.

SECTION III.    DEFEASANCE OR REFUNDING

RFA: Lutheran Senior Services

Execution Copy

Section 3.1    Defeasance or Refunding.

(a)    The Corporation may, by giving Lehman at least fifteen Business Days prior written notice, but without the consent of Lehman, cause the Issuer to (in whole or in part) redeem, defease, repurchase, or refund the Bonds as provided in the Indenture, provided that if the Corporation takes any such action (i) if the Termination Amount is a positive number, the Corporation shall pay or cause the Trustee to pay to Lehman in immediately available funds the Termination Amount and (ii) if the Termination Amount is a negative number, Lehman shall pay such amount to the Trustee.  If the Termination Amount is payable pursuant to this Section 3.1, the party owing such amount shall pay such amount promptly but by no later than the later of (A) one Business Day after receipt of notice of the Termination Amount from Lehman or (B) the date of such redemption, defeasance or refunding.  Such payment shall be made in immediately available funds, to or at the direction of the party to whom such Termination Amount is due.

(b)    Immediately upon payment of the Termination Amount in accordance with this Section 3.1 this Agreement shall terminate.  The Corporation agrees that it shall not cause the Issuer to redeem, defease, refund or repurchase the Bonds unless it shall have sufficient funds to pay any Termination Amount which may be due as provided herein.

(c)    If pursuant to clause (a) above this Agreement would be terminated in connection with the issuance of bonds to refund the Bonds (the "Refunding Bonds") and a Termination Amount would be payable to Lehman, the Corporation may, by written notice to Lehman and with a copy to the Trustee, request that Lehman continue this Agreement and have such Agreement apply to the Refunding Bonds.  Lehman agrees that if it receives such a request it shall agree to so continue this Agreement with respect to the Refunding Bonds and the Bonds remaining outstanding after such refunding, provided that:

(i)    Lehman receives such request (together with all relevant details relating thereto) at least 30 days in advance of the issuance of the Refunding Bonds;

(ii)    on or prior to the date the Bonds are to be refunded (the "Refunding Date") the Corporation and the trustee of the Refunding Bonds enter into such amendments of this Agreement with Lehman (the "Amended Agreement") as are necessary to have this Agreement pertain to the scheduled reserve amounts, deposit dates and bond payment dates applicable to the Refunding Bonds and to any Bonds which remain outstanding after giving effect to such refunding (the "Amended Cash Flows");

(iii)    if as determined on the Refunding Date, the Termination Amount payable to Lehman with respect to the Scheduled Reserve Amounts, Deposit Dates and Bond Payment Dates which would be remaining hereunder on such date, assuming that the Bonds were not then refunded (the "Original Cash Flows"), would be greater than the Termination Amount which would be payable to Lehman for its investment rights with respect to the Amended Cash Flows, the Corporation shall on or before the Refunding Date pay to Lehman the amount of such difference;

Execution Copy

(iv)    the last deposit date under the Amended Agreement is no later than the last Deposit Date hereunder;

(v)    the Refunding Bonds have a credit rating at least equivalent to the credit rating of the Bonds without giving effect to any bond insurance and are secured by revenues at least equivalent to the revenues securing the Bonds; and

(vi)    Lehman receives any opinions and other assurances it may reasonably request to assure that the protections afforded it hereunder will continue under the Amended Agreement.

If the conditions described in paragraphs (i) through (vi) are satisfied but the Termination Amount which would be payable to Lehman for its investment rights with respect to the Amended Cash Flows would be greater than the Termination Amount which would be payable to Lehman for its investment rights with respect to the Original Cash Flows, Lehman may, at its option, pay the Corporation the amount of such difference or retain investment rights only with respect to such portion of the Amended Cash Flows as would have a Termination Amount equal to the Termination Amount of the Original Cash Flows.

## SECTION IV    REPRESENTATIONS AND WARRANTIES

Section 4.1    <u>Representations and Warranties</u>.    Each party hereto represents and warrants to the other parties hereto at all times during the term of this Agreement that:

(a)    it is duly organized and validly existing under the laws of its jurisdiction, incorporation or establishment;

(b)    it has the power to enter into and perform its obligations under this Agreement (including, in the case of the Corporation, to pay the Termination Amount in accordance herewith and, including, in the case of the Corporation or the Trustee, to enter into and perform its obligations under the Indenture and any other Financing Documents to which it is a party);

(c)    this Agreement has been duly authorized, executed and delivered by it and, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of it enforceable against it in accordance with the terms hereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law;

(d)    its execution and delivery of this Agreement and its performance of its obligations hereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws (or equivalent organizational documents), or any other agreement (including in the case of the Corporation and the Trustee, the Indenture or other Financing Documents to which it is a party), instrument, law, ordinance, regulation, judgment, injunction or order applicable to it or any of its property;

RFA:  Lutheran Senior Services

(e)    there is no proceeding pending or threatened against it at law or in equity, or before any governmental instrumentality or in any arbitration, which would materially impair its ability to perform its obligations under this Agreement, and there is no such proceeding pending against it which purports or is likely to affect the legality, validity or enforceability of the Agreement; and

(f)    in the case of the Corporation,

(i)    all Deposit Dates, Bond Payment Dates and Deposit Amounts as indicated on Exhibit A of this Agreement are true and correct in all respects;

(ii)    it is not entitled to claim, and shall not assert any claim, with respect to itself or its revenues, assets or property (irrespective of the use or intended use thereof), of immunity on the grounds of sovereignty or similar grounds from suit, jurisdiction of any court, relief by way of injunction, order for specific performance or for recovery of property, attachment of its assets (whether before or after judgment, in aid of execution, or otherwise) and execution or enforcement of any judgment to which it or its revenues or assets or property might otherwise be entitled in any suit, action or proceeding relating to this Agreement in the courts of any jurisdiction, nor may there be attributed to the Corporation or its revenues, assets or property any such immunity (nor shall such attribution be claimed by the Corporation);

(iii)    it has delivered to Lehman its most recent annual audited statement of financial condition and its most recent quarterly unaudited statement of financial condition and the Corporation has not experienced since the date of its last published financial statement any material adverse change in its business, assets, operations or financial condition;

(iv)    it has not nor does it anticipate that there shall be any occurrence or existence of (1) a default, event of default or other similar condition or event (however described and including any such conditions or events which will become events of default with the passing of time or the giving of notice) in respect of the Corporation under one or more agreements or instruments relating to any Specified Indebtedness of the Corporation which has resulted in any Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by the Corporation in making one or more payments on the due date thereof under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(v)    it is solvent and has, and will have after giving effect to this Agreement, sufficient capital to conduct its business and to pay its debts as they become due;

(vi)    it has not experienced any Incipient Illegality with respect to this Agreement; and

Execution Copy

(vii)   it is not subject to any administrative, governmental or other investigation, special review or order, or pending order or similar event.

## SECTION V.          COVENANTS AND ACKNOWLEDGMENTS

Section 5.1   Covenants.  Each of Lehman, the Corporation and the Trustee covenants to the other parties to this Agreement that so long as it shall have any obligations under this Agreement it shall:

(a)      maintain in full force and effect all authorizations and agreements of and exemptions, consents, licenses, actions or approvals by, and all filings with or notices to, any governmental or other authority that are required to be obtained or made by such party with respect to this Agreement and will use all reasonable efforts to obtain or make any that may become necessary in the future;

(b)      comply in all material respects with all applicable laws, rules, regulations and orders to which it may be subject if failure so to comply could materially impair its ability to perform its obligations under this Agreement;

(c)      if it is the Corporation or the Trustee, not enter into any amendment or modification of the Indenture or other Financing Documents to which it is a party which could impair its ability to perform its obligations to Lehman hereunder except nothing contained hereunder shall restrict the Corporation's ability to issue additional bonds under the Indenture;

(d)      if it is the Corporation, the Corporation agrees that, during the term of this Agreement, it shall deliver to Lehman its most recently available statement of financial condition (both audited and unaudited) as such are issued; and

(e)      if it is the Corporation, it shall not replace this Agreement or withdraw any amounts held in the Debt Service Reserve Fund for purposes of purchasing a surety bond or any similar financial instrument.

Section 5.2   Role of Lehman; Independent Judgment.  The Corporation acknowledges and agrees that in connection with its decision to enter into this Agreement and its subsequent negotiation and execution of this Agreement, (i) neither Lehman, nor any of its directors, officers, employees, agents or affiliates (each of the foregoing, including Lehman, a "Lehman Party") has acted as a fiduciary or financial or investment advisor to or agent or other representative of the Corporation, (ii) the Corporation has, to the extent it has deemed necessary, consulted with its own legal, tax, regulatory, accounting, financial and investment advisors in determining the suitability and appropriateness of this Agreement as well as in negotiating the specific terms hereof and has not relied upon any advice from any Lehman Party, with respect to such matters; the Corporation understands the terms, conditions and risks of this Agreement and is capable of assuming such risks; and (iii) the terms and conditions of this Agreement have been individually negotiated by the Corporation and are the result of arms-length negotiations among Lehman, the Trustee and the Corporation.

Execution Copy

Section 5.3    No Liability.  Each of the Corporation and the Trustee agrees that no Lehman Party shall be liable or responsible for: (i) the payment of any amounts owing on or with respect to the Bonds; (ii) the Trustee's use or application of any moneys payable to the Trustee hereunder; (iii) any acts or omissions of the Corporation or the Trustee under, or with respect to, the Bonds or the Indenture or any related document; or (iv) determining whether the Corporation or the Trustee is in compliance with any applicable statute, regulation or law, the Bonds, the Indenture or any other related document.

Section 5.4    Fixed Rate of Return.   The Corporation has entered into this Agreement for purposes of managing its borrowings or investments by increasing the predictability of its cash flow from earnings on its investments and not for purposes of speculation. The Corporation understands that in consideration of its purchasing Qualified Securities at the Purchase Price on each Deposit Date, the Corporation has minimized the risks resulting from fluctuations in interest rates during the term of this Agreement on the Scheduled Reserve Amounts in the Reserve Fund but has also foregone the possibility of receiving greater returns on the Scheduled Reserve Amounts in the future from such fluctuations.

Section 5.5    Termination Amount.  The Corporation understands that if under any of the circumstances provided herein (including upon the occurrence of a redemption or a defeasance of the Bonds on or prior to the last Deposit Date), a Termination Amount may be due to Lehman, the size of such Termination Amount will vary depending, in large part, on prevailing interest rates at the time such Termination Amount is calculated.  In certain market conditions the amount of the Termination Amount owed to Lehman by the Corporation could be substantial.

Section 5.6    Fees and Commissions.  The Corporation acknowledges that Lehman shall pay $3,000.00 to Ziegler Capital Markets Group on behalf of the Corporation, as a bidding agent's fee for services provided by to Ziegler Capital Markets Group to the Corporation.


SECTION VI        CLOSING CONDITIONS

Section 6.1    Closing Conditions

On or prior to the Closing Date the following shall occur:

(a)    delivery to Lehman and Corporation of a certificate of the Trustee, in the form of Exhibit B;

(b)    delivery to Lehman and Trustee of an opinion of counsel to the Corporation, in the form of Exhibit D;

(c)    delivery to Lehman by the Corporation of a copy of the official statement for the Bonds;

Execution Copy

(d)    delivery to Lehman by the Corporation of a true and correct copy of the Indenture and the Financing Documents as in full force and effect on the date hereof;

(e)    delivery to Lehman of a copy of any consent received by the Corporation to enter into this Agreement;

(f)    delivery to the Trustee and Corporation of an opinion of inside counsel to Lehman, in the form of Exhibit C, and a bankruptcy opinion of special counsel to Lehman; and

(g)    delivery to Lehman of a copy of the statutory or regulatory authority, if any, pursuant to which the Corporation is authorized to enter into this Agreement and a certified copy of any resolution or resolutions of the Corporation pursuant to which the Corporation is authorized to enter into this Agreement.


SECTION VII        DEFAULTS; TERMINATION

Section 7.1    Trustee Events of Default.  The occurrence of any of the following events shall constitute a Trustee Event of Default:

(a)    the Trustee shall fail for any reason (other than because such cash is not available because the Trustee withdrew funds from the Reserve Fund in order to make a Debt Service Payment for the Bonds on a Bond Payment Date) to apply any funds in the Reserve Fund to purchase, at the Purchase Price therefore, any Qualified Securities delivered by the Qualified Dealer in accordance with this Agreement and such failure is not cured within three (3) Business Days of telephonic and written notice thereof from Lehman to the Trustee and the Corporation (the "Trustee Cure Period"); provided that the Trustee shall promptly pay on demand, in immediately available funds, interest at the Default Rate, on the Maturity Amount of such Eligible Securities, for the period from and including the Deposit Date to but excluding the day on which the Trustee takes delivery of the such Eligible Securities;

(b)    the Trustee shall default in the performance of any other material covenant or obligation under this Agreement and such default is not cured within five Business Days of notice thereof from Lehman or the Corporation; or

(c)    any representation or warranty of the Trustee contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made.

Section 7.2    Corporation Events of Default.  The occurrence of any of the following events shall constitute a Corporation Event of Default:

(a)    the amount in the Reserve Fund available to purchase Qualified Securities on any Deposit Date is less than the Scheduled Reserve Amount (other than because such cash is not available because the Trustee withdrew funds from the Reserve Fund in order to make a Debt Service Payment for the Bonds on a Bond Payment Date);

RFA:  Lutheran Senior Services

Execution Copy

(b)     the Corporation shall default in the performance of any material covenant or obligation under this Agreement, other than as described in clause (a) above, and such default is not cured within five Business Days of notice thereof from Lehman or the Trustee;

(c)     any representation or warranty of the Corporation contained in this Agreement proves to have been incorrect, false or misleading in any material respect;

(d)     the Corporation is Insolvent;

(e)     the Corporation consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if an entity such as an organization, board, commission authority, agency or body succeeds to the principal functions of, or powers and duties granted, to the Corporation) and, at the time of such consolidation, amalgamation, merger or transfer either (i) the resulting or surviving or transferee entity fails to assume all the obligations of the Corporation under this Agreement or by operation of law or pursuant to an agreement reasonably satisfactory to the other parties to this Agreement or (ii) the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of the Corporation; or

(f)     the Corporation shall default with respect to the Bonds and/or any Specified Indebtedness; or

(g)     a Trustee Event of Default has occurred which gives rise to Lehman's right to demand the resignation or replacement of the Trustee and following such demand by Lehman the Corporation has failed to appoint a successor trustee who is able to perform the Trustee's obligations hereunder within ten (10) Business Days of such demand.

Section 7.3    Lehman Events of Default.  The occurrence of any of the following events shall constitute a Lehman Event of Default:

(a)     Lehman shall fail, on any Deposit Date, to cause a Qualified Dealer to deliver Qualified Securities and such failure is not cured within five Business Days after written notice thereof to Lehman from the Trustee or the Corporation (the "Lehman Cure Period");

(b)     any representation or warranty of Lehman contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made;

(c)     Lehman is at any time Insolvent; or

(d)     Lehman has failed to take any of the actions required of it in Section 2.7 hereof.

In the event of a Lehman Event of Default, Lehman must within five Business Days of such event provide written notice to the Corporation and the Trustee

Execution Copy

Section 7.4    Remedies Upon Occurrence of a Trustee Event of Default.    Upon the occurrence of a Trustee Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Deposit Date and which have not theretofore been delivered to and purchased by the Trustee and, subject to Section 8.2 hereof, make demand for the payment of its losses (calculated in accordance with Section 7.7 hereof) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    (i) upon the occurrence of a Trustee Event of Default under Section 7.1(a) hereof, immediately make written demand upon the Trustee to promptly resign as trustee under the Indenture, in which event the Trustee shall resign pursuant to the Indenture, even if the Trustee has paid in full any losses to Lehman as calculated in accordance with Section 7.7 and (ii) upon the occurrence of a Trustee Event of Default under Section 7.1(b) or (c) immediately make written demand upon the Trustee to promptly resign as trustee under the Indenture.

Section 7.5    Remedies Upon Occurrence of Corporation Event of Default.    Upon the occurrence of a Corporation Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Deposit Date which has occurred and which have not theretofore been delivered to and purchased by the Trustee and make demand for the payment of its losses (calculated in accordance with Section 7.7 hereof) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    immediately terminate this Agreement by giving written notice thereof to the Corporation with a copy to the Trustee, and (i) if the Termination Amount is a positive number, make demand upon the Corporation for the payment of the Termination Amount and (ii) if the Termination Amount is a negative number, pay such amount to the Corporation.

If a Termination Amount is payable pursuant to clause (b) above, the party owing such amount shall promptly, but by no later than one Business Day after notice that such amount is due from the party to whom such Termination Amount is due, pay such amount, in immediately available funds, to or at the direction of the party to whom such Termination Amount is due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each day such amount is due but not paid at the Default Rate.

Section 7.6    Remedies Upon Occurrence of a Lehman Event of Default.    Upon the occurrence of a Lehman Event of Default, the Corporation shall have the right to:

(a)    if such default is a default under Section 7.3(a), apply the Deposit Amount to purchase Permitted Investments in accordance with Section 2.4 hereof and make demand for the payment of its losses in connection therewith, calculated as provided in Section 7.7(b);

Execution Copy

(b)    if such default is a default under Section 7.3(a) and Lehman has failed to pay the Corporation's losses (as described in Section 7.7(b)) upon demand therefore, immediately terminate this Agreement by giving written notice thereof to Lehman with a copy to the Trustee; and

(c)    if such default is a default under Sections 7.3(b) or (c) hereof immediately terminate this Agreement by giving written notice thereof to Lehman with a copy to the Trustee, whereupon Lehman shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one Business Day after written notice that such amount is due, pay such amount, in immediately available funds, to the Corporation and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Corporation of the Termination Amount in which case the Corporation shall promptly, but no later than one Business Day after written notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman.  If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each day such amount is due but not paid at the Default Rate.  Notwithstanding anything to the contrary in this Agreement, if Lehman fails to determine the Termination Amount within three Business Days of notice from the Corporation or the Trustee of the occurrence of a Lehman Event of Default then the Corporation (or if so directed by the Corporation, the Trustee) shall make such determination as if it were Lehman and the amount as so determined by the Corporation (or the Trustee) shall for purposes of this Section 7.6 be deemed the Termination Amount.

Section 7.7    Loss Amount if Failed or Late Purchase.

(a)    Subject to Section 8.2 hereof, if the Trustee fails to apply any funds in the Reserve Fund to purchase any Qualified Securities delivered by a Qualified Dealer in accordance with this Agreement or (b) if on any Deposit Date the amount in the Reserve Fund available to purchase Qualified Securities is less than the Scheduled Reserve Amount, the Trustee, in the case of clause (a) or the Corporation in the case of clause (b), shall pay to Lehman, as liquidated damages for its losses and not as a penalty, on demand by Lehman, the sum of (w) interest on the Purchase Price of such Qualified Securities which the Qualified Dealer tendered for delivery to, but were not purchased by, the Trustee for each day from and including the delivery date thereof to but excluding the date on which such securities are resold to a third party or to the Trustee, (x) the excess, if any, of the Purchase Price of such Qualified Securities over the amount received by the Qualified Dealer upon such resale of the securities (the "Shortfall Amount"), (y) interest on the Shortfall Amount from and including the resale date to but excluding the date on which the Trustee or the Corporation, as applicable, compensates Lehman for its losses as described herein, and (z) any incidental costs and expenses incurred by Lehman in connection with the Trustee's failure to so purchase such Qualified Securities.  Interest shall accrue at a rate per annum equal to the Default Rate for purposes of clauses (w) and (y).  Notwithstanding the foregoing, if Lehman does not on any date cause the delivery of Qualified Securities because the amount in the Reserve Fund is less than the Scheduled Reserve Amount, the Loss Amount shall equal the sum of (y) the amount, if any, by which the aggregate Purchase Price of the Qualified Securities which Lehman could have caused to be delivered exceeds the market value thereof (as reasonably determined by Lehman as of the date such tender was to be made) and (z) interest on such amount at the Default Rate for each day from the date such securities could have been

Execution Copy

delivered to the next succeeding Bond Payment Date plus any amounts specified in clause (x) above.

(b)    If there is a Lehman Event of Default as described in Section 7.3(a) hereof, the amount of losses payable by Lehman upon demand therefore pursuant to Section 7.6(a) shall equal the excess, if any, of (i) interest the Trustee would have earned on the related Deposit Amount had the Deposit Amount been invested in Qualified Securities at the Guaranteed Rate (the "Guaranteed Interest") over (ii) the interest the Trustee actually earned by investing the related Deposit Amount in Permitted Investments in accordance with Section 2.4 hereof (or if the Trustee fails to invest such Deposit Amount in Permitted Investments in accordance with Section 2.4, the amount of interest the Trustee would have earned on such Deposit Amount had the Trustee complied with the requirements of Section 2.4 hereof).

Section 7.8    Application of Excess Funds.  The Corporation hereby directs the Trustee and the Trustee agrees that if at any time any amounts are due Lehman from the Corporation in connection with a Corporation Event of Default, the Trustee shall, upon demand from Lehman, and without further direction or instruction from the Corporation, but not if an Event of Default had occurred and is continuing under the Indenture, apply any funds available under the Indenture which are not subject to the lien of the Indenture or are otherwise required for the payment or security of the Bonds or the Trustee's fees and expenses (including any funds which would otherwise be released to the Corporation) to the payment of such amounts.

Section 7.9    Limited Rights Against the Reserve Fund.  Neither Lehman nor any Qualified Dealer shall have any right to any amounts held in the Reserve Fund except as expressly provided herein upon the delivery of a Qualified Security in accordance with this Agreement.

Section 7.10    No Waiver; Remedies Cumulative.  No failure or delay on any party's part in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy.  Such party's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law, this Agreement or otherwise.  None of the terms or provisions of this Agreement may be waived, modified or amended except in a writing duly signed by the Trustee, the Corporation and Lehman.

SECTION VIII    THE TRUSTEE

Section 8.1    Acceptance by Trustee.  By execution and delivery of this Agreement, the Trustee accepts its duties and obligations hereunder, as an addition to its duties and obligations as Trustee under the Indenture. The provisions of the Indenture governing rights, immunities and protections are hereby granted to the Trustee by the Corporation.

Section 8.2    Liability of the Trustee; Consultation with Legal Counsel.

Execution Copy

(a)     The Trustee shall not be liable to any person for any action taken or neglected to be taken in performing or attempting to perform its obligations hereunder or preserving or seeking to preserve the funds it maintains under the Indenture or to purchase the Qualified Securities tendered pursuant to this Agreement, except for actions arising from its negligence or willful misconduct. The Corporation hereby agrees to protect, defend, indemnify and hold harmless the Trustee against any and all costs, losses, damages, liabilities, claims, expenses (including reasonable counsel fees and expenses) and claims incurred by it without negligence or willful malfeasance on the Trustee's part arising out of or in connection with its entering into this Agreement and the carrying out of its duties hereunder, including the costs and expenses of defending itself against any claim of liability relating to this Agreement.

(b)     The Trustee may consult with counsel reasonably satisfactory to it with respect to any question relating to its duties or responsibilities hereunder or otherwise in connection herewith and, except as expressly provided herein, shall not be liable for any action taken, suffered, or omitted by the Trustee in good faith upon the advice of such counsel. The Trustee may act through its officers, employees, agents and attorneys.

Section 8.3    Payment of Trustee Fees.   Lehman has no liability or responsibility for payment of the Trustee's fees or expenses for its services hereunder, including any such fees or expenses arising out of or in connection with the liquidation of the Qualified Securities as provided herein.

Section 8.4    Trustee Cooperation.

(a)     The Trustee shall not act in contravention of its obligations hereunder or invest amounts in the Reserve Fund other than pursuant to this Agreement and the Indenture.

(b)     The Trustee shall not make any payments or distributions from the Reserve Fund other than payments or distributions (i) required by this Agreement, (ii) to pay principal of, redemption premium and interest on the Bonds or (iii) to make payments required by the Indenture.

Section 8.5    Successor Trustee.   If the Trustee shall resign or be discharged from its duties and obligations under the Indenture, the Corporation shall appoint a successor Trustee pursuant to the terms of the Indenture. The Corporation agrees that if the Trustee fails for any reason to perform its duties to Lehman under this Agreement in accordance with the terms hereof, or is at any time Insolvent or breaches in any material respect its representations and warranties to Lehman hereunder, the Corporation shall promptly, upon written request of Lehman, appoint a successor Trustee reasonably acceptable to Lehman.

# SECTION IX        MISCELLANEOUS

Section 9.1    Notices and Delivery Instructions.   All notices, demands or other communications hereunder shall be given or made in writing and shall be delivered personally, or sent by certified or registered mail, postage prepaid, return receipt requested, or overnight

Execution Copy

delivery service, telex or telecopy to the party to whom they are directed at the following addresses, or at such other addresses as may be designated by notice from such party to all other parties:

To Lehman:

Lehman Brothers Special Financing Inc.
745 Seventh Avenue, 16th Floor
New York, NY  10019
Attention:      Municipal Financial Products - Middle Office
Telephone:     212-526-2240
Fax:               646-758-2988

To the Trustee:

Bank of New York Trust Company, N.A.
911 Washington Avenue, Suite 300
St. Louis, MO  63101
Attention:      Kerry McFarland, Vice President
Telephone:     (314)613-8202
Fax:               (314) 613-8238

[DELIVERY INSTRUCTIONS FOR BOOK-ENTRY GOVERNMENT OBLIGATIONS]

The Bank of New York
ABA #021000018
GLA #111-565
Account Name: Lutheran Senior-Series 2005A Reserve Fund
Account Number: 222436

[DELIVERY INSTRUCTIONS FOR DTC]

DTC Participant #901
Account #222436

To the Corporation:

Lutheran Senior Services
709 S. Laclede Station Road
St. Louis, MO 63119-4911
Attention:      Carl Rausch, President
Telephone:     314/446-2408
Fax:               314/968-5590
Corporation Tax I.D. #: 43-0654682

RFA:  Lutheran Senior Services

Execution Copy

Any notice, demand or other communication given in a manner prescribed in this Section shall be deemed to have been delivered on receipt.

Section 9.2     Binding Effect; Transfer.  This Agreement shall be binding upon and inure to the benefit of the Trustee, the Corporation and Lehman and upon their respective permitted successors and transferees.  Lehman shall be entitled to transfer all or any portion of this Agreement and its interests hereunder, to any subsidiary or affiliate of Lehman, or to any office, branch or subsidiary of any affiliate of Lehman upon written notice to the Corporation and the Trustee. Such subsidiary or affiliate shall be wholly owned by LBH and the obligations of such subsidiary or affiliate shall be unconditionally guaranteed by LBH. Lehman shall be able to transfer all or any portion of this Agreement only with the written consent of the Corporation (such consent not to be unreasonably withheld or delayed) and written notice to the Trustee; provided, however, that such consent shall not be required if such transfer is to any entity rated at least an "A-", "A3", or "A-" by Standard & Poor's, Moody's or Fitch, Inc., respectively, and provided further that in all such instances of transfer the transferee shall assume all of the rights and obligations of Lehman hereunder.  Neither the Corporation nor the Trustee (except with respect to a transfer to a successor trustee pursuant to the Indenture) may transfer this Agreement without the prior written consent of Lehman and the other party hereto.

Section 9.3     Limitation.  Nothing expressed or implied herein is intended or shall be construed to confer upon any person, firm or corporation other than the parties hereto, any right, remedy or claim by reason of this Agreement or any term hereof, and all terms contained herein shall be for the sole and exclusive benefit of the parties hereto, and their successors and permitted transferees.

Section 9.4     Severability.  If one or more provisions of this Agreement or the applicability of any such provisions to any set of circumstances shall be determined to be invalid or ineffective for any reason, such determination shall not affect the validity and enforceability of the remaining provisions or the applicability of the same provisions or any of the remaining provisions to other circumstances.

Section 9.5     Amendments, Changes and Modifications.  This Agreement may be amended or any of its terms modified only by a written document authorized, executed and delivered by each of the parties hereto.

Section 9.6     Counterparts.  This Agreement may be executed in one or more counterparts and when each party hereto has executed at least one counterpart, this Agreement shall become binding on all parties and such counterparts shall be deemed to be one and the same document.

Section 9.7     Termination.  Unless earlier terminated pursuant to Sections 3.1, 7.4, 7.5 or 7.6 hereof, this Agreement shall terminate on the later of the last Bond Payment Date set forth in Exhibit A and the date on which the Trustee and the Corporation have satisfied all of their obligations hereunder.

RFA:  Lutheran Senior Services

Execution Copy

Section 9.8     Entire Agreement.  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

Section 9.9     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law principles.

Execution Copy

IN WITNESS WHEREOF, the Trustee, the Corporation and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

LUTHERAN SENIOR SERVICES

By:_____
Name:
Title:

THE BANK OF NEW YORK TRUST COMPANY, N.A., AS TRUSTEE

By:_____
Name: Kerry A. McFarland
Title: Vice President

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name: T. Courtney Jenkins
Title: Vice President

Execution Copy

IN WITNESS WHEREOF, the Trustee, the Corporation and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

LUTHERAN SENIOR SERVICES

By: _____
Name:
Title:


THE BANK OF NEW YORK TRUST COMPANY, N.A., AS TRUSTEE


By:_____
Name: Kerry A. McFarland
Title: Vice President


LEHMAN BROTHERS SPECIAL FINANCING INC.


By:_____
Name: T. Courtney Jenkins
Title: Vice President

Execution Copy

IN WITNESS WHEREOF, the Trustee, the Corporation and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

LUTHERAN SENIOR SERVICES

By:_____

Name:

Title:


THE BANK OF NEW YORK TRUST COMPANY, N.A., AS TRUSTEE

By:_____

Name: Kerry A. McFarland

Title: Vice President


LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____

Name: T. Courtney Jenkins

Title: Vice President

Execution Copy

IN WITNESS WHEREOF, the Trustee, the Corporation and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

LUTHERAN SENIOR SERVICES

By:_____
Name:
Title:

THE BANK OF NEW YORK TRUST COMPANY, N.A., AS TRUSTEE

By:_____
Name: Kerry A. McFarland
Title: Vice President

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name: T. Courtney Jenkins
Title: Vice President

**EXHIBIT A**

| Deposit Date* | Bond Payment Date* | Scheduled Reserve Amount |
|---|---|---|
| 02/17/06 | 08/01/06 | $1,581,433.76 |
| 08/01/06 | 02/01/07 | $1,581,433.76 |
| 02/01/07 | 08/01/07 | $1,581,433.76 |
| 08/01/07 | 02/01/08 | $1,581,433.76 |
| 02/01/08 | 08/01/08 | $1,581,433.76 |
| 08/01/08 | 02/01/09 | $1,581,433.76 |
| 02/01/09 | 08/01/09 | $1,581,433.76 |
| 08/01/09 | 02/01/10 | $1,581,433.76 |
| 02/01/10 | 08/01/10 | $1,581,433.76 |
| 08/01/10 | 02/01/11 | $1,581,433.76 |
| 02/01/11 | 08/01/11 | $1,581,433.76 |
| 08/01/11 | 02/01/12 | $1,581,433.76 |
| 02/01/12 | 08/01/12 | $1,581,433.76 |
| 08/01/12 | 02/01/13 | $1,581,433.76 |
| 02/01/13 | 08/01/13 | $1,581,433.76 |
| 08/01/13 | 02/01/14 | $1,581,433.76 |
| 02/01/14 | 08/01/14 | $1,581,433.76 |
| 08/01/14 | 02/01/15 | $1,581,433.76 |
| 02/01/15 | 08/01/15 | $1,581,433.76 |
| 08/01/15 | 02/01/16 | $1,581,433.76 |
| 02/01/16 | 08/01/16 | $1,581,433.76 |
| 08/01/16 | 02/01/17 | $1,581,433.76 |
| 02/01/17 | 08/01/17 | $1,581,433.76 |
| 08/01/17 | 02/01/18 | $1,581,433.76 |
| 02/01/18 | 08/01/18 | $1,581,433.76 |
| 08/01/18 | 02/01/19 | $1,581,433.76 |
| 02/01/19 | 08/01/19 | $1,581,433.76 |
| 08/01/19 | 02/01/20 | $1,581,433.76 |
| 02/01/20 | 08/01/20 | $1,581,433.76 |
| 08/01/20 | 02/01/21 | $1,581,433.76 |
| 02/01/21 | 08/01/21 | $1,581,433.76 |
| 08/01/21 | 02/01/22 | $1,581,433.76 |
| 02/01/22 | 08/01/22 | $1,581,433.76 |
| 08/01/22 | 02/01/23 | $1,581,433.76 |
| 02/01/23 | 08/01/23 | $1,581,433.76 |
| 08/01/23 | 02/01/24 | $1,581,433.76 |
| 02/01/24 | 08/01/24 | $1,581,433.76 |
| 08/01/24 | 02/01/25 | $1,581,433.76 |
| 02/01/25 | 08/01/25 | $1,581,433.76 |
| 08/01/25 | 02/01/26 | $1,581,433.76 |

\*    If any Deposit Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately preceding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

**EXHIBIT A**

| Deposit Date* | Bond Payment Date* | Scheduled Reserve Amount |
| --- | --- | --- |
| 02/01/26 | 08/01/26 | $1,581,433.76 |
| 08/01/26 | 02/01/27 | $1,581,433.76 |
| 02/01/27 | 08/01/27 | $1,581,433.76 |
| 08/01/27 | 02/01/28 | $1,581,433.76 |
| 02/01/28 | 08/01/28 | $1,581,433.76 |
| 08/01/28 | 02/01/29 | $1,581,433.76 |
| 02/01/29 | 08/01/29 | $1,581,433.76 |
| 08/01/29 | 02/01/30 | $1,581,433.76 |
| 02/01/30 | 08/01/30 | $1,581,433.76 |
| 08/01/30 | 02/01/31 | $1,581,433.76 |
| 02/01/31 | 08/01/31 | $1,581,433.76 |
| 08/01/31 | 02/01/32 | $1,581,433.76 |
| 02/01/32 | 08/01/32 | $1,581,433.76 |
| 08/01/32 | 02/01/33 | $1,581,433.76 |
| 02/01/33 | 08/01/33 | $1,581,433.76 |
| 08/01/33 | 02/01/34 | $1,581,433.76 |
| 02/01/34 | 08/01/34 | $1,581,433.76 |
| 08/01/34 | 02/01/35 | $1,581,433.76 |

\*      If any Deposit Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately preceding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

A-2

**EXHIBIT B**

February 17, 2006

Lutheran Senior Services
St. Louis, MO 63119-4911

Lehman Brothers Special Financing Inc.
New York, NY 10019

CERTIFICATE OF TRUSTEE

Re:    $30,000,000 Health and Educational Facilities Authority of the State of Missouri

The undersigned, Kerry McFarland, a Vice President of The Bank of New York Trust Company, N.A. (the "Trustee"), hereby certifies as follows:

1.    The Reserve Fund Agreement dated as of February 17, 2006 (the "Agreement") among Lutheran Senior Services, Lehman Brothers Special Financing Inc. and the Trustee has been duly executed and delivered by an authorized signatory of the Trustee.

2.    The Trustee has full legal right, power and authority to enter into the Agreement.

3.    The Agreement has been duly authorized, executed and delivered by the Trustee.

4.    The Agreement is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

5.    The execution and delivery by the Trustee of the Agreement and the performance of its obligations thereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws, or the Indenture (as defined in the Agreement), the other Financing Documents (as defined in the Agreement) or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

6.    The Indenture is a legal, valid and binding obligation of the Trustee, Enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general

B-1

principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

IN WITNESS WHEREOF, the undersigned has hereunto set his signature such officer and has affixed the corporate seal of the Trustee, this 17th day of February, 2006.

The Bank of New York Trust Company, N.A.

By _____
          Kerry McFarland
          Vice President

principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

IN WITNESS WHEREOF, the undersigned has hereunto set his signature such officer and has affixed the corporate seal of the Trustee, this 17th day of February, 2006.

The Bank of New York Trust Company, N.A.

By _____

Kerry McFarland
Vice President

B-2

**EXHIBIT C**

[LETTERHEAD OF COUNSEL TO LEHMAN]

[Date]

[Corporation]

[Trustee]

Re:

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc., a Delaware corporation ("Lehman"), and am familiar with matters pertaining to the execution and delivery of the Reserve Fund Agreement (the "Agreement") dated as of                by    and    among Lehman,                (the "Issuer") and                , as Trustee (the "Trustee").

In connection with this opinion, I have examined, or have had examined on my behalf, an executed copy of the Agreement, certificates and statements of public officials and officers of Lehman and such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion.

Except as expressly set forth herein, no independent investigation (including, without limitation, conducting any review, search or investigation of any public files, records or dockets) has been undertaken to determine the existence or absence of the facts that are material to my opinions, and no inference as to my knowledge concerning such facts should be made.

When used herein the phrase "to my knowledge" means to my actual knowledge without independent investigation.

References in this letter to "Applicable Laws" are to those laws, rules and regulations of the State of New York and the United States of America which, in my experience, are normally applicable to transactions of the type contemplated by the Master Agreement. References in this letter to "Governmental Authorities" are to executive, legislative, judicial, administrative or regulatory bodies of the State of New York and the United States of America. References in this letter to "Governmental Approval" are to any consent, approval, license, authorization or validation of, or filing, recording or registration with, any Governmental Authority pursuant to Applicable Laws.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.  Lehman is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.

2.  The execution, delivery and performance of the Agreement is within its corporate power, have been duly authorized by all corporate action and do not conflict with any provision of its certificate of incorporation or by-laws.

3.  The Agreement has been duly executed and delivered and each constitutes a legal, valid and binding obligation, enforceable against it in accordance with its respective terms.

4.  No Governmental Approval is required in connection with the execution, delivery and performance of the Agreement except those that have been obtained and, to my knowledge, are in effect.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.  My opinion in paragraph 3 above is subject to: (i) bankruptcy, insolvency, reorganization, receivership, moratorium or similar laws affecting creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers or conveyances); (ii) general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law; (iii) laws and considerations of public policy that may limit the enforceability of provisions (a) regarding indemnification and contribution rights and obligations, (b) regarding the waiver or limitation of rights to trial by jury, oral amendments to written agreements or rights of setoff, (c) relating to submission to jurisdiction, venue or service of process, and (d) purporting to prohibit or restrict, or require the consent of the "account debtor" (as defined in Section 9-102 of the Uniform Commercial Code as in effect in the State of New York (the "NYUCC" )) for, the creation, perfection or enforcement of a security interest in "accounts" or "general intangibles" (in each case, as defined in Section 9-102 of the NYUCC).

B.  I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the laws of the State of New York, the federal laws of the United States of America and the General Corporation Law of the State of Delaware. Except as described, I have not examined, or had examined on my behalf, and I do not express any opinion with respect to, Delaware law.

C.  My opinions are limited to the present laws and to the facts as they presently exist, and no opinion is to be inferred or implied beyond the matters expressly so stated. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.      This letter is rendered solely to you solely for your benefit in connection with the Agreement and the transactions related thereto and may not be relied upon by any other person, entity or agency or by you in any other context or for any other purpose. This letter may not be circulated, used or quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman, except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Lehman, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Agreement.

E.      I have assumed with your permission (i) the genuineness of all signatures by each party other than Lehman, (ii) the authenticity of documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, (iii) the accuracy of the matters set forth in the documents, agreements and instruments I reviewed, (iv) that each party other than Lehman is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (v) the due execution and delivery, pursuant to due authorization, of the Agreement by each party other than Lehman, and (vi) that the Agreement is the legal, valid, binding and enforceable obligation of each party other than Lehman, enforceable against each such party in accordance with its terms.

F.      My opinion in paragraph 3 is subject to the qualification that certain provisions contained in the Agreement may not be enforceable, but such unenforceability will not render the Agreement invalid as a whole or substantially interfere with the practical realization of the principal benefits provided thereby.

The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal liability in connection with said opinions.

Very truly yours,

C-3

# LEHMAN BROTHERS

February 17, 2006

Lutheran Senior Services
St. Louis, MO 63119-4911

Bank of New York Trust Company, N.A.
St. Louis, MO 63101

Re:     $30,000,000 Health and Educational Facilities Authority of the State of Missouri, Senior Living
Facilities Revenue Bonds, Series 2005A, (Lutheran Senior Services Projects)

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc., a Delaware corporation ("Lehman")
and Lehman Brothers Holdings Inc., a Delaware corporation ("LBH") and am familiar with matters
pertaining to the execution and delivery of the Reserve Fund Agreement (the "Agreement") dated as of
February 17, 2006 by and among Lehman, Lutheran Senior Services (the "Corporation") and Bank of
New York Trust Company, N.A, as Trustee (the "Trustee"). Capitalized terms used herein and not
defined herein have the respective meanings given to them in the Agreement.

In connection with this opinion, I have examined, or have had examined on my behalf, an
executed copy of the Agreement, certificates and statements of public officials and officers of Lehman
and such other agreements, instruments, documents and records as I have deemed necessary or
appropriate for the purposes of this opinion.

Except as expressly set forth herein, no independent investigation (including, without limitation,
conducting any review, search or investigation of any public files, records or dockets) has been
undertaken to determine the existence or absence of the facts that are material to my opinions, and no
inference as to my knowledge concerning such facts should be made.

When used herein the phrase "to my knowledge" means to my actual knowledge without
independent investigation.

References in this letter to "Applicable Laws" are to those laws, rules and regulations of the State
of New York which, in my experience, are normally applicable to transactions of the type contemplated
by the Agreement. References in this letter to "Governmental Authorities" are to executive, legislative,
judicial, administrative or regulatory bodies of the State of New York. References in this letter to
"Governmental Approval" are to any consent, approval, license, authorization or validation of, or filing,
recording or registration with, any Governmental Authority pursuant to Applicable Laws.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations
hereinafter expressed, I am of the opinion that:

1.      Lehman is a corporation duly incorporated, validly existing and in good standing under
the laws of the State of Delaware.

2.      The execution, delivery and performance of the Agreement by Lehman is within its
corporate power, has been duly authorized by all corporate action and does not conflict
with any provision of its certificate of incorporation or by-laws.

3. The Agreement has been duly executed and delivered and constitutes a legal, valid and binding obligation, enforceable against it in accordance with their respective terms.

4. To the best of my knowledge, no Governmental Approval is required in connection with the execution, delivery and performance of the Agreement except those that have been obtained and, to my knowledge, are in effect.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A. My opinion in paragraph 3 above is subject to: (i) bankruptcy, insolvency, reorganization, receivership, moratorium or similar laws affecting creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers or conveyances); (ii) general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law; (iii) laws and considerations of public policy that may limit the enforceability of provisions (a) regarding indemnification and contribution rights and obligations, (b) regarding the waiver or limitation of rights to trial by jury, oral amendments to written agreements or rights of setoff, (c) relating to submission to jurisdiction, venue or service of process, and (d) purporting to prohibit or restrict, or require the consent of the "account debtor" (as defined in Section 9-102 of the Uniform Commercial Code as in effect in the State of New York (the "NYUCC" )) for, the creation, perfection or enforcement of a security interest in "accounts" or "general intangibles" (in each case, as defined in Section 9-102 of the NYUCC).

B. I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the laws of the State of New York and the General Corporation Law of the State of Delaware. Except as described, I have not examined, or had examined on my behalf, and I do not express any opinion with respect to, Delaware law.

C. My opinions are limited to the present laws and to the facts as they presently exist, and no opinion is to be inferred or implied beyond the matters expressly so stated. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D. This letter is rendered solely to you solely for your benefit in connection with the Agreement and the transaction related thereto and may not be relied upon by any other person, entity or agency or by you in any other context or for any other purpose. This letter may not be circulated, used or quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman, except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Lehman, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Agreement.

E. I have assumed with your permission (i) the genuineness of all signatures by each party other than Lehman, (ii) the authenticity of documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, (iii) the accuracy of the matters set forth in the documents, agreements and instruments I reviewed, (iv) that each party other than Lehman is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (v) the due execution and delivery, pursuant to due authorization, of the Agreement by each party other than Lehman, and (vi) that the Agreement is legal, valid, binding and enforceable obligation of each party other than Lehman, enforceable against each such party in accordance with its terms.

F.     My opinion in paragraph 3 is subject to the qualification that certain provisions contained in the Agreement may not be enforceable, but such unenforceability will not render the Agreement invalid as a whole or substantially interfere with the practical realization of the principal benefits provided thereby.

The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal liability in connection with said opinions.

Very truly yours,

**EXHIBIT D**

[LETTERHEAD OF COUNSEL TO CORPORATION]

[Date]

[Trustee]

Lehman Brothers Special Financing Inc.
New York, NY

Re:    [NAME OF BONDS]

Ladies and Gentlemen:

I have acted as counsel to _____ (the "Corporation") in connection with its execution and delivery of the Reserve Fund Agreement dated as of _____ (the "Agreement"), by and among Lehman Brothers Special Financing Inc. ("Lehman"), _____ _____, as Trustee (the "Trustee") and the Corporation and its execution and delivery of the Indenture (as defined in the Agreement). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

In rendering this opinion, we have examined, among other things, copies of the Agreement and the Financing Documents.

In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the laws of the State of [state of Corporation] (the "State").

Based upon the foregoing examination and review, we are of the opinion that:

(i)    The Corporation has full legal right, power and authority to enter into the Reserve Fund Agreement and the Financing Documents to which it is a party and to authorize and direct the Trustee, pursuant to the Reserve Fund Agreement, to make purchases of the Qualified Eligible Securities in accordance with the terms therein.

(ii)    The Agreement and the Financing Documents to which it is a party have been duly authorized, executed and delivered by the Corporation.

(iii)    The stipulation of New York law as the governing law of the Agreement is enforceable under the laws of the State.

D-1

(iv)    Assuming for purposes of the opinion expressed in this paragraph (iv) that State law and New York law are the same, the Agreement is a legal, valid and binding obligation of the Corporation, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(v)    The Corporation's execution and delivery of the Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under the Indenture, the Financing Documents to which it is a party, or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(vi)    The Loan Agreement is a legal, valid and binding obligation of the Corporation, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(vii)    The Corporation is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject to in any suit, action or proceedings relating to this Agreement in the courts of any jurisdiction and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

(ix)    All consents, authorizations and approvals requisite for its execution, delivery and performance of this Agreement have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority, regulatory body or any other entity is required for such execution, delivery or performance.

I am furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

D-2



THE **STOLAR**

PARTNERSHIP LLP

ATTORNEYS AT LAW

THOMAS E. LOWTHER
(314) 641-5134
TEL@STOLARLAW.COM

February 17, 2006

The Bank of New York Trust Company, N.A.
St. Louis, Missouri

Lehman Brothers Special Financing Inc.
New York, NY

Re:    $30,000,000 Health and Educational Facilities Authority of the State of Missouri, Senior
       Living Facilities Revenue Bonds, Series 2005A (Lutheran Senior Services Projects)

Ladies and Gentlemen:

        We have acted as counsel to Lutheran Senior Services (the "Corporation") in connection with
its execution and delivery of the Reserve Fund Agreement dated as of February 17, 2006 (the
"Agreement"), by and among Lehman Brothers Special Financing Inc. ("Lehman"), The Bank of
New York Trust Company, N.A., as Trustee (the "Trustee") and the Corporation and its execution
and delivery of the Indenture (as defined in the Agreement). Capitalized terms used herein and not
defined herein have the respective meanings given to them in the Agreement.

        In rendering this opinion, we have examined, among other things, copies of the Agreement
and the Financing Documents.

        In connection with the foregoing, we have also examined originals or copies satisfactory to
us of all such corporate records, agreements, certificates and other documents as we have deemed
relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we
have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as
originals, and the conformity with the original documents of all documents submitted to us as copies.

        In giving the opinions expressed below we do not purport to be experts in or generally
familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than
the laws of the State of Missouri (the "State").

        Based upon the foregoing examination and review, we are of the opinion that:

        (i)     The Corporation has full legal right, power and authority to enter into the Agreement
and the Financing Documents to which it is a party and to authorize and direct the Trustee, pursuant



THE STOLAR
PARTNERSHIP LLP
ATTORNEYS AT LAW

to the Reserve Fund Agreement, to make purchases of the Qualified Securities in accordance with the terms therein.

(ii)     The Agreement and the Financing Documents to which it is a party have been duly authorized, executed and delivered by the Corporation.

(iii)     The stipulation of New York law as the governing law of the Agreement is enforceable under the laws of the State.

(iv)     Assuming for purposes of the opinion expressed in this paragraph (iv) that State law and New York law are the same, the Agreement is a legal, valid and binding obligation of the Corporation, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(v)     The Corporation's execution and delivery of the Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under the Indenture, the Financing Documents to which it is a party, or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(vi)     The Loan Agreement is a legal, valid and binding obligation of the Corporation, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(vii)     The Corporation is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject to in any suit, action or proceedings relating to this Agreement in the courts of any jurisdiction and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

(ix)     All consents, authorizations and approvals requisite for its execution, delivery and performance of this Agreement have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority, regulatory body or any other entity is required for such execution, delivery or performance.



THE **STOLAR**
PARTNERSHIP LLP
ATTORNEYS AT LAW

    I am furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon.  This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

                    Very truly yours,

                    *The Stolar Partnership LLP*

TEL/tlr


786465

<u>**EXHIBIT E**</u>

# Lehman Brothers Special Financing Inc.
## Notice of Tender
### Under the [ _____ ] Agreement
### Dated as of:  [ _____ ]

To:              _____, as [Escrow
                 Agent/Trustee]
                 Attention:     _____
                 Fax:           _____
                 Phone:  _____
From:        Lehman Brothers Inc. ("LBI")
                 Attention:     _____
                 Fax:           _____
                 Phone: _____
Date:        [_____]
Re:            [_____]

| Date and Price |
| --- |

Purchase Date:                                  [_____]
Specified Purchase Price:                 [_____]

| Specific Government Obligations |
| --- |

| Cusip | Type | Maturity | Coupon | Face Amount | Maturity Amount | Accrued Interest |
| --- | --- | --- | --- | --- | --- | --- |
| [_____] | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |

| Delivery vs. Payment (Book Entry Delivery) |
| --- |

On the Purchase Date, LBI will deliver Face value     [ _____ ]          [BILLS/NOTES] maturing [ _____ ]
to:
                 [_____]
                 [_____]
                 Re:
                 [_____]
On the Purchase Date, LBI will receive [ _____ ]
                 JPMorgan Chase/Lehman
                 ABA: 021000021
                 A/C #066206677

E-1



# Lutheran Senior Services

709 South Laclede Station Road • St. Louis, MO 63119
(314) 968-9313 • (314) 968-5590 FAX

## FAX Cover Sheet

Date: _Feb 17 2006_  Time: _9:22 am_

To: _Thomas Costello_

Firm: _Lehman Brothers_  Re.: _Signature Page_

FAX No.: _646 758 1594_

Total number of pages (including this cover sheet): _2_

From: _Gary Winschel (GW)_  (314) 446-_2405_

Comments: _____

_Please confirm receipt of this fax._

_Thanks_
_Gary_

This fax contains **PRIVILEGED AND CONFIDENTIAL INFORMATION** intended only for the use of the
addressee(s) named above. If you are not the intended recipient of this fax, or the employee or agent
responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying
of this fax is strictly prohibited. If you have received this fax in error, please notify us by telephone immediately
to arrange for the return of the original document. Thank you.

*Senior Living Communities* • *Affordable Housing Facilities* • *In-Home Services* • *Pastoral Care*

10/01

Execution Copy

IN WITNESS WHEREOF, the Trustee, the Corporation and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

LUTHERAN SENIOR SERVICES

By: _____
Name:
Title:


THE BANK OF NEW YORK TRUST COMPANY, N.A., AS TRUSTEE


By:_____
Name: Kerry A. McFarland
Title: Vice President


LEHMAN BROTHERS SPECIAL FINANCING INC.


By:_____
Name: T. Courtney Jenkins
Title: Vice President



THE **STOLAR**

P A R T N E R S H I P LLP

—————————————————

A T T O R N E Y S   A T   L A W

THOMAS E. LOWTHER
(314) 641-5134
TEL@STOLARLAW.COM

February 17, 2006

The Bank of New York Trust Company, N.A.
St. Louis, Missouri

Lehman Brothers Special Financing Inc.
New York, NY

Re:    $30,000,000 Health and Educational Facilities Authority of the State of Missouri, Senior
Living Facilities Revenue Bonds, Series 2005A (Lutheran Senior Services Projects)

Ladies and Gentlemen:

We have acted as counsel to Lutheran Senior Services (the "Corporation") in connection with
its execution and delivery of the Reserve Fund Agreement dated as of February 17, 2006 (the
"Agreement"), by and among Lehman Brothers Special Financing Inc. ("Lehman"), The Bank of
New York Trust Company, N.A., as Trustee (the "Trustee") and the Corporation and its execution
and delivery of the Indenture (as defined in the Agreement). Capitalized terms used herein and not
defined herein have the respective meanings given to them in the Agreement.

In rendering this opinion, we have examined, among other things, copies of the Agreement
and the Financing Documents.

In connection with the foregoing, we have also examined originals or copies satisfactory to
us of all such corporate records, agreements, certificates and other documents as we have deemed
relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we
have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as
originals, and the conformity with the original documents of all documents submitted to us as copies.

In giving the opinions expressed below we do not purport to be experts in or generally
familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than
the laws of the State of Missouri (the "State").

Based upon the foregoing examination and review, we are of the opinion that:

(i)    The Corporation has full legal right, power and authority to enter into the Agreement
and the Financing Documents to which it is a party and to authorize and direct the Trustee, pursuant



to the Reserve Fund Agreement, to make purchases of the Qualified Securities in accordance with the terms therein.

(ii)    The Agreement and the Financing Documents to which it is a party have been duly authorized, executed and delivered by the Corporation.

(iii)    The stipulation of New York law as the governing law of the Agreement is enforceable under the laws of the State.

(iv)    Assuming for purposes of the opinion expressed in this paragraph (iv) that State law and New York law are the same, the Agreement is a legal, valid and binding obligation of the Corporation, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(v)    The Corporation's execution and delivery of the Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under the Indenture, the Financing Documents to which it is a party, or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(vi)    The Loan Agreement is a legal, valid and binding obligation of the Corporation, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(vii)    The Corporation is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject to in any suit, action or proceedings relating to this Agreement in the courts of any jurisdiction and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

(ix)    All consents, authorizations and approvals requisite for its execution, delivery and performance of this Agreement have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority, regulatory body or any other entity is required for such execution, delivery or performance.



I am furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon.  This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

The Stolar Partnership LLP

TEL/tlr

786465

# LEHMAN BROTHERS

February 17, 2006

Lutheran Senior Services
St. Louis, MO 63119-4911

Bank of New York Trust Company, N.A.
St. Louis, MO 63101

Re: $30,000,000 Health and Educational Facilities Authority of the State of Missouri, Senior Living
Facilities Revenue Bonds, Series 2005A, (Lutheran Senior Services Projects)

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc., a Delaware corporation ("Lehman")
and Lehman Brothers Holdings Inc., a Delaware corporation ("LBH") and am familiar with matters
pertaining to the execution and delivery of the Reserve Fund Agreement (the "Agreement") dated as of
February 17, 2006 by and among Lehman, Lutheran Senior Services (the "Corporation") and Bank of
New York Trust Company, N.A, as Trustee (the "Trustee"). Capitalized terms used herein and not
defined herein have the respective meanings given to them in the Agreement.

In connection with this opinion, I have examined, or have had examined on my behalf, an
executed copy of the Agreement, certificates and statements of public officials and officers of Lehman
and such other agreements, instruments, documents and records as I have deemed necessary or
appropriate for the purposes of this opinion.

Except as expressly set forth herein, no independent investigation (including, without limitation,
conducting any review, search or investigation of any public files, records or dockets) has been
undertaken to determine the existence or absence of the facts that are material to my opinions, and no
inference as to my knowledge concerning such facts should be made.

When used herein the phrase "to my knowledge" means to my actual knowledge without
independent investigation.

References in this letter to "Applicable Laws" are to those laws, rules and regulations of the State
of New York which, in my experience, are normally applicable to transactions of the type contemplated
by the Agreement. References in this letter to "Governmental Authorities" are to executive, legislative,
judicial, administrative or regulatory bodies of the State of New York. References in this letter to
"Governmental Approval" are to any consent, approval, license, authorization or validation of, or filing,
recording or registration with, any Governmental Authority pursuant to Applicable Laws.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations
hereinafter expressed, I am of the opinion that:

1. Lehman is a corporation duly incorporated, validly existing and in good standing under
   the laws of the State of Delaware.

2. The execution, delivery and performance of the Agreement by Lehman is within its
   corporate power, has been duly authorized by all corporate action and does not conflict
   with any provision of its certificate of incorporation or by-laws.

3. The Agreement has been duly executed and delivered and constitutes a legal, valid and binding obligation, enforceable against it in accordance with their respective terms.

4. To the best of my knowledge, no Governmental Approval is required in connection with the execution, delivery and performance of the Agreement except those that have been obtained and, to my knowledge, are in effect.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A. My opinion in paragraph 3 above is subject to: (i) bankruptcy, insolvency, reorganization, receivership, moratorium or similar laws affecting creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers or conveyances); (ii) general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law; (iii) laws and considerations of public policy that may limit the enforceability of provisions (a) regarding indemnification and contribution rights and obligations, (b) regarding the waiver or limitation of rights to trial by jury, oral amendments to written agreements or rights of setoff, (c) relating to submission to jurisdiction, venue or service of process, and (d) purporting to prohibit or restrict, or require the consent of the "account debtor" (as defined in Section 9-102 of the Uniform Commercial Code as in effect in the State of New York (the "NYUCC" )) for, the creation, perfection or enforcement of a security interest in "accounts" or "general intangibles" (in each case, as defined in Section 9-102 of the NYUCC).

B. I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the laws of the State of New York and the General Corporation Law of the State of Delaware. Except as described, I have not examined, or had examined on my behalf, and I do not express any opinion with respect to, Delaware law.

C. My opinions are limited to the present laws and to the facts as they presently exist, and no opinion is to be inferred or implied beyond the matters expressly so stated. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D. This letter is rendered solely to you solely for your benefit in connection with the Agreement and the transaction related thereto and may not be relied upon by any other person, entity or agency or by you in any other context or for any other purpose. This letter may not be circulated, used or quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman, except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Lehman, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Agreement.

E. I have assumed with your permission (i) the genuineness of all signatures by each party other than Lehman, (ii) the authenticity of documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, (iii) the accuracy of the matters set forth in the documents, agreements and instruments I reviewed, (iv) that each party other than Lehman is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (v) the due execution and delivery, pursuant to due authorization, of the Agreement by each party other than Lehman, and (vi) that the Agreement is legal, valid, binding and enforceable obligation of each party other than Lehman, enforceable against each such party in accordance with its terms.

F.    My opinion in paragraph 3 is subject to the qualification that certain provisions contained in the Agreement may not be enforceable, but such unenforceability will not render the Agreement invalid as a whole or substantially interfere with the practical realization of the principal benefits provided thereby.

The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal liability in connection with said opinions.

Very truly yours,



## FACSIMILE TRANSMITTAL SHEET

**DATE: February 17, 2006**

**TO:**        Scott Determan

**COMPANY:**  Ziegler

**ADDRESS:** _____

**RECEIVING FAX NUMBER:**  312-873-4063

**FROM:**      Kerry A. McFarland

**TELEPHONE NUMBER:**    314-613-8202

**FAX NUMBER:**   314-613-8227

**TOTAL NUMBER OF PAGES (INCLUDING COVER): ____4_____**

**IF ALL PAGES RECEIVED ARE NOT COMPLETE AND FULLY LEGIBLE, PLEASE LET SENDER KNOW AS SOON AS POSSIBLE.**

**MESSAGE:**

_____

_____

_____

_____

**CONFIDENTIALITY NOTE:  THE INFORMATION IN THIS FACSIMILE MESSAGE AND ANY ATTACHMENTS HEREIN ("FAX") MAY CONTAIN CONFIDENTIAL OR PROPRIETARY INFORMATION FOR USE BY THE ADDRESSEE ONLY.  IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE NOTIFIED THAT RETENTION, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS FAX IS STRICTLY PROHIBITED. IF YOU RECEIVE THIS FAX IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN IT TO THE SENDER ABOVE.  THANK YOU.**

Execution Copy

IN WITNESS WHEREOF, the Trustee, the Corporation and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

LUTHERAN SENIOR SERVICES

By:_____

Name:

Title:

THE BANK OF NEW YORK TRUST COMPANY, N.A.,
AS TRUSTEE

By:_____

Name: Kerry A. McFarland

Title: Vice President

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____

Name: T. Courtney Jenkins

Title: Vice President

RFA: Lutheran Senior Services

24

**EXHIBIT B**

February 17, 2006

Lutheran Senior Services
St. Louis, MO 63119-4911

Lehman Brothers Special Financing Inc.
New York, NY 10019

CERTIFICATE OF TRUSTEE

Re:  $30,000,000 Health and Educational Facilities Authority of the State of Missouri

The undersigned, Kerry McFarland, a Vice President of The Bank of New York Trust Company, N.A. (the "Trustee"), hereby certifies as follows:

1.  The Reserve Fund Agreement dated as of February 17, 2006 (the "Agreement") among Lutheran Senior Services, Lehman Brothers Special Financing Inc. and the Trustee has been duly executed and delivered by an authorized signatory of the Trustee.

2.  The Trustee has full legal right, power and authority to enter into the Agreement.

3.  The Agreement has been duly authorized, executed and delivered by the Trustee.

4.  The Agreement is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

5.  The execution and delivery by the Trustee of the Agreement and the performance of its obligations thereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws, or the Indenture (as defined in the Agreement), the other Financing Documents (as defined in the Agreement) or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

6.  The Indenture is a legal, valid and binding obligation of the Trustee, Enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general

B-1

principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

IN WITNESS WHEREOF, the undersigned has hereunto set his signature such officer and has affixed the corporate seal of the Trustee, this 17th day of February, 2006.

The Bank of New York Trust Company, N.A.

By _____
Kerry McFarland
Vice President

# EXHIBIT 4

## TERMINATION AGREEMENT

This Termination Agreement (the "Termination Agreement") is made and entered into as of the 22nd day of September, 2009, by and among LUTHERAN SENIOR SERVICES ("Counterparty"), THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A. (the "Trustee") and LEHMAN BROTHERS SPECIAL FINANCING INC. ("Lehman") (each of the foregoing a "Party" and collectively the "Parties").

RECITALS:

WHEREAS, the Parties entered into the Reserve Fund Agreement, February 17, 2006, which included certain schedules and documents (collectively, the "Agreement Documents").

WHEREAS, commencing on September 15, 2008 and thereafter, Lehman Brothers Holdings Inc. ("Holdings") and certain of its affiliates, including Lehman, each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (collectively, the "Bankruptcy Cases").

WHEREAS, the Parties wish to terminate and/or acknowledge the termination of the Agreement Documents as of the effective date of this Termination Agreement.

WHEREAS, on December 16, 2008 the court having jurisdiction over the Bankruptcy Cases (the "Bankruptcy Court") entered an Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption or Assignment of Prepetition Derivative Contracts (the "December Order").

WHEREAS, as of the date hereof, the Parties have agreed to a settlement amount in favor of Counterparty in the amount of $105,378.80 (the "Settlement Amount") and Counterparty has already filed Proofs of Claim (as defined in the Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rules 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form (the "Bar Date Order") entered into Bankruptcy Cases on July 2, 2009) (the "Proofs of Claim") arising under the Agreement Documents against Holdings and Lehman.

NOW, THEREFORE, in consideration of the recitals set forth above and promises made herein, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

Section 1.     Termination. All of the Agreement Documents are hereby terminated and the rights and obligations of all the Parties thereunder are hereby fully and finally extinguished, without liability to any Party (excluding any liability relating to the Allowed Claim set forth in Section 2 hereof) notwithstanding any provision therein that provides for any term or condition to survive the termination or cancellation thereof. The Parties agree that this Termination Agreement shall constitute or waive any termination notice requirement under the Agreement Documents.

1

Section 2.    Allowance of General Unsecured Claim.  In consideration of the termination of the Agreement Documents by Counterparty, Lehman hereby agrees to the allowance of a general, unsecured claim against it in its chapter 11 case (the "Claim Allowance"), in favor of Counterparty in the amount of the Settlement Amount (the "Allowed Claim") in full and complete satisfaction of all of the claims of Counterparty under the Agreement Documents; provided, however, that the aggregate recovery of Counterparty in respect of the Allowed Claim shall not exceed the Settlement Amount.

Section 3.    Release.  In consideration of each other Party's execution of this Termination Agreement and the Claim Allowance, each Party on behalf of itself and any other party, person or entity claiming under or through it, hereby generally releases, discharges and acquits each other Party, and its respective current and former agents, servants, officers, directors, shareholders, employees, subsidiaries, divisions, branches, units, affiliates, parents, attorneys, successors, predecessors, heirs, personal representatives, and assigns (each of the foregoing, a "Released Party"), from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, and claims of every kind, nature, and character whatsoever, other than the Allowed Claim and the rights and obligations of the Parties set forth under this Termination Agreement, whether in law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort (including, without limitation, intentional torts, fraud, misrepresentation, defamation, breaches of alleged fiduciary duty, recklessness, gross negligence, or negligence) or otherwise, accrued or unaccrued, known or unknown, matured, unmatured, liquidated or unliquidated, certain or contingent, that such releasing Party ever had or claimed to have or now has or claims to have presently or at any future date, against any Released Party arising under or related to the Agreement Documents, their negotiation, execution, performance, any breaches thereof, or their termination.

Section 4.    Representations.  Each Party represents and warrants to each other Party that (i) the execution, delivery, and performance by such Party of this Termination Agreement are within the powers of such Party and have been duly authorized by all necessary action on the part of such Party and (ii) this Termination Agreement has been duly executed and delivered by such Party and constitutes a valid and binding obligation of such Party, enforceable against such Party in accordance with the terms hereof, (iii) it is not relying upon any statements, understandings, representations, expectations, or agreements other than those expressly set forth in this Termination Agreement, (iv) it has had the opportunity to be represented and advised by legal counsel in connection with this Termination Agreement, which it enters voluntarily and of its own choice and not under coercion or duress, (v) it has made its own investigation of the facts and is relying upon its own knowledge and the advice of its counsel, (vi) it has no expectation that any of the other Parties will disclose facts material to the Agreement Documents or this Termination Agreement, and (vii) it knowingly waives any and all claims that this Termination Agreement was induced by any misrepresentation or non-disclosure and knowingly waives any and all rights to rescind or avoid this Termination Agreement based upon presently existing facts, known or unknown.  Additionally, Lehman represents and warrants to Counterparty that the Agreement Documents are covered by the December Order and that this Termination Agreement is being entered into in accordance with the terms of the December Order.  The Parties agree and stipulate that each Party is relying upon the representations and warranties in this Section in entering into the Termination Agreement.  Furthermore, the Parties agree that

2

these representations and warranties are a material inducement for entering into this Termination Agreement. These representations and warranties shall survive the execution of this Termination Agreement indefinitely without regard to statutes of limitations.

Section 5.    Setoff. Counterparty agrees that it will not, nor will the Counterparty permit any affiliate or third party to set-off, recoup, appropriate, or otherwise apply any deposits (general, special, time or demand, provisional or final) in any currency, or any other credits, indebtedness or claims, in any currency, whether direct or indirect, absolute or contingent, matured or unmatured, that is held or owing by the Counterparty or any third party or affiliate against the Allowed Claim and Counterparty hereby irrevocably and unconditionally waives any and all rights to do so, whether such rights arise by virtue of contract or law.

Section 6.    Execution in Counterparts. This Termination Agreement may be executed in any number of counterparts and by different Parties in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page by facsimile or PDF transmission shall be as effective as delivery of a manually executed counterpart.

Section 7.    Effectiveness. This Termination Agreement shall become effective upon execution hereof by each of the Parties.

Section 8.    Amendment of Proofs of Claim. Counterparty agrees, promptly after this Termination Agreement becomes effective, to amend any filed Proofs of Claim in respect of the Agreement Documents against Holdings, Lehman and any other Debtor (as defined in the Bar Date Order) to the extent necessary to reflect the entry into this Termination Agreement and the Claim Allowance, subject to Section 12 hereof and, pending such amendment, such Proofs of Claim shall be deemed so amended.

Section 9.    Governing Law. This Termination Agreement will be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York, without regard for conflicts of laws principles.

Section 10.    Special Provision for Unknown Claims. All rights under Section 1542 of the California Civil Code, or any analogous state or federal law, are hereby expressly WAIVED, if applicable, with respect to any of the claims, injuries, or damages described in the Release in Section 3. Section 1542 of the California Civil Code reads as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

Section 11.    Confidentiality. Counterparty shall not disclose this Termination Agreement or its terms, including the Settlement Amount ("Confidential Information"), to any person other than to the Bankruptcy Court and Counterparty's directors, officers, employees, counsel and other advisors (hereinafter, such persons other than the Bankruptcy Court be referred to collectively, as the "Related Parties"), in each case who need to know such information solely

3

for the purpose of effecting this Termination Agreement (it being understood that such Related Parties will be informed in advance of the confidential nature of the Confidential Information and will be directed to treat such Confidential Information confidentially), except as may be required by law, including but not limited to as may be required by United States federal securities and bankruptcy laws.

If the Counterparty becomes legally obligated (whether by court or regulatory order or otherwise), other than due to Counterparty's compliance with United States federal securities laws, to disclose any of the Confidential Information, Counterparty will endeavor to provide Lehman, if permitted by law, with prompt notice so that Lehman may seek a protective order or other appropriate remedy. If such a protective order or other protective remedy is not obtained, Counterparty will furnish only that portion of the Confidential Information which is legally required, in the opinion of its own counsel, and Counterparty will exercise its reasonable efforts to obtain reliable assurances that confidential treatment will be accorded the Confidential Information.

Section 12.    Claim of Guaranty. Lehman acknowledges that Counterparty has asserted that the obligations of Lehman under the Agreement Documents are guaranteed by Holdings and the Counterparty has filed a Proof of Claim in respect of the Agreement Documents against Holdings (the "Holdings Claim"). While Counterparty has asserted that the Holdings Claim is valid based on references to the definition of "LBH" and Section 2.7 of the Agreement Documents, Lehman and Counterparty acknowledge that neither party has a record of a guaranty issued by Holdings to Counterparty for guaranteeing obligations of Lehman under the Agreement Documents. Lehman specifically does not consent to or agree to the Holdings Claim. However, to allow Counterparty to pursue the Holdings Claim and permit the ultimate determination of the validity of the Holdings Claim by the Bankruptcy Court, the Parties agrees that nothing in this Termination Agreement shall be construed to effect a release or termination of the Holdings Claim.

Section 13.    Successors and Assigns. The provisions of this Termination Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

Section 14.    Amendment. This Termination Agreement may only be amended, modified, superseded or canceled and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the Parties.

Section 15.    Entire Agreement. This Termination Agreement constitutes the entire agreement and understanding of the Parties relating to the subject matter hereof and supersede all prior agreements and understandings relating to the subject matter hereof.

Section 16.    Construction. This Termination Agreement has been negotiated by the Parties and their respective legal counsel, and legal or equitable principles that might require the construction of this Termination Agreement or any of its provisions against the Party responsible for drafting this Termination Agreement will not apply in any construction or interpretation of this Termination Agreement.

*[Signature pages follow]*

4

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Termination Agreement on the date first written above.

LUTHERAN SENIOR SERVICES

By: _____
Name: Paul Ogier
Title: CFO

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.

By: _____
Name:
Title:

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name: Daniel Ehrmann
Title: Vice President

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name: Daniel Ehrmann
Title: Senior Vice President

5

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Termination Agreement on the date first written above.

LUTHERAN SENIOR SERVICES

By: _____
Name:
Title:

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.

By: _____
Name:    KERRY A. McFARLAND
Title:    VICE PRESIDENT

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name: Daniel Ehrmann
Title:   Vice President

5

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Termination Agreement on the date first written above.

LUTHERAN SENIOR SERVICES

By: _____
Name:
Title:

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.

By: _____
Name:
Title:

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name: Daniel Ehrmann
Title:   Vice President

5

**EXHIBIT 5**

02/02/2005  16:14  LEHMAN BROTHERS  76132875063  NO.926  P01

312-873-4063

**Appendix B:**

# Lutheran Senior Services
## LETTER OF ACCEPTANCE

We hereby confirm our bid and commit to provide an Agreement subject to all the terms and conditions stated in the foregoing Request for Forward Delivery Agreement.

In making this bid, we represent as follows:

1.      We believe we are a reasonably competitive provider of the Agreement described in the Request for Bids.

2.      You have not provided us any information which induced us to bid an amount lower than the amount induced by the Request for Bid.

3.      The bid is at least equal to the yield which we would offer for agreements set forth in the Request for Bids to other persons from a source of funds other than the gross proceeds of an issue of tax-exempt bonds.

4.      This offer is an arm's length transaction and no payments besides those specified herein or in the Request for Bids, will be made or received from either party to the other or from the Provider to any third party for the benefit of the Corporation.

5.      We have submitted this bid in good faith and without reviewing other bids.  Other than the Forward Delivery Agreement, we have no financial interest in the bond financing related to this bid.

6.      We represent that we did not consult with any other potential provider about this bid, that this bid was determined without regard to any other formal or informal agreement we have with the Corporation or any other person (whether or not in connection with the bond issue), and that this bid is not being submitted solely as a courtesy to the Corporation or any other person for purposes of satisfying the safe harbor provisions of the Treasury Regulations.

7       The yields quoted in our Request for Bid included consideration of the Corporation's expected deposit schedule provided to us for the amounts to be invested.

8.      Based on our experience in the field and on all the facts and circumstances, the terms of the specifications in the Request for Bids are commercially reasonable.

| | Yield % |
|---|---|
| Series 2005A DSRF: | 4.94 % |

Firm: _LBSF_

By: _____
Authorized Representative

Date: _2/2/06_

| | Moody's Rating | | S&P Rating |
|---|---|---|---|
| Credit Rating of Bidding Entity: | A1 | / | A+ |

**Appendix B:**

# Lutheran Senior Services
### LETTER OF ACCEPTANCE

We hereby confirm our bid and commit to provide an Agreement subject to all the terms and conditions stated in the foregoing Request for Forward Delivery Agreement.

In making this bid, we represent as follows:

1.  We believe we are a reasonably competitive provider of the Agreement described in the Request for Bids.

2.  You have not provided us any information which induced us to bid an amount lower than the amount induced by the Request for Bid.

3.  The bid is at least equal to the yield which we would offer for agreements set forth in the Request for Bids to other persons from a source of funds other than the gross proceeds of an issue of tax-exempt bonds.

4.  This offer is an arm's length transaction and no payments besides those specified herein or in the Request for Bids, will be made or received from either party to the other or from the Provider to any third party for the benefit of the Corporation.

5.  We have submitted this bid in good faith and without reviewing other bids. Other than the Forward Delivery Agreement, we have no financial interest in the bond financing related to this bid.

6.  We represent that we did not consult with any other potential provider about this bid, that this bid was determined without regard to any other formal or informal agreement we have with the Corporation or any other person (whether or not in connection with the bond issue), and that this bid is not being submitted solely as a courtesy to the Corportion or any other person for purposes of satisfying the safe harbor provisions of the Treasury Regulations.

7   The yields quoted in our Request for Bid included consideration of the Corporation's expected deposit schedule provided to us for the amounts to be invested.

8.  Based on our experience in the field and on all the facts and circumstances, the terms of the specifications in the Request for Bids are commercially reasonable.

|  | Yield % |
|---|---|
| Series 2005A DSRF: | 4.815 % |

Firm: *Wachovia Bank, N.A.*

By: *Ruth M. O'Keefe*
     Authorized Representative

Date: *2/2/06*

|  | Moody's Rating | S&P Rating |
|---|---|---|
| Credit Rating of Bidding Entity: | _____ / | _____ |

**Appendix B:**

# Lutheran Senior Services

## LETTER OF ACCEPTANCE

*enter into*

We hereby confirm our bid and commit to ~~provide~~ an Agreement subject to all the terms and conditions stated in the foregoing Request for Forward Delivery Agreement.

In making this bid, we represent as follows:

1.  We believe we are a reasonably competitive provider of the Agreement described in the Request for Bids.

2.  You have not provided us any information which induced us to bid an amount lower than the amount induced by the Request for Bid.

3.  The bid is at least equal to the yield ~~which we would offer for agreements set forth in the Request for Bids to other persons from a source of funds other than the gross proceeds of an issue of tax-exempt bonds.~~

4.  This offer is an arm's length transaction and no payments besides those specified herein or in the Request for Bids, will be made or received from either party to the other or from the Provider to any third party for the benefit of the Corporation *in connection with entering into, or performing under, the Agreement*

5.  We have submitted this bid in good faith and without reviewing other bids. ~~Other than the Forward Delivery Agreement, we have no financial interest in the bond financing related to this bid.~~ *we are not lead underwriter for the Bonds.*

6.  We represent that we did not consult with any other potential provider about this bid, that this bid was determined without regard to any other formal or informal agreement we have with the Corporation or any other person (whether or not in connection with the bond issue), and that this bid is not being submitted solely as a courtesy to the Corportion or any other person for purposes of satisfying the safe harbor provisions of the Treasury Regulations.

7.  The yields quoted in our Request for Bid included consideration of the ~~Corporation's expected~~ deposit schedule provided to us for the amounts to be invested.

8.  Based on our experience in the field and on all the facts and circumstances, the terms of the specifications in the Request for Bids are commercially reasonable.

|  | Yield % |
|---|---|
| Series 2005A DSRF: | 4.655 % |

Firm: MORGAN STANLEY

By: _____
Authorized Representative

Date: 2/2/06

|  | Moody's Rating | S&P Rating |
|---|---|---|
| Credit Rating of Bidding Entity: | Aa3 | A+ |

**Appendix A:**

# Lutheran Senior Services
## LETTER OF ACCEPTANCE

We hereby confirm our bid and commit to provide an Agreement subject to all the terms and conditions stated in the foregoing Request for Investment Agreement.

In making this bid, we represent as follows:

1.   We believe we are a reasonably competitive provider of the Agreement described in the Request for Bids.

2.   You have not provided us any information which induced us to bid an amount lower than the amount induced by the Request for Bid.

3.   The bid is at least equal to the yield which we would offer for agreements set forth in the Request for Bids to other persons from a source of funds other than the gross proceeds of an issue of tax-exempt bonds.

4.   This offer is an arm's length transaction and no payments besides those specified herein or in the Request for Bids, will be made or received from either party to the other or from the Provider to any third party for the benefit of the Corporation.

5.   We have submitted this bid in good faith and without reviewing other bids.  Other than the Investment Agreement, we have no financial interest in the bond financing related to this bid.

6.   We represent that we did not consult with any other potential provider about this bid, that this bid was determined without regard to any other formal or informal agreement we have with the Corporation or any other person (whether or not in connection with the bond issue), and that this bid is not being submitted solely as a courtesy to the Corporation or any other person for purposes of satisfying the safe harbor provisions of the Treasury Regulations.

7.   The yields quoted in our Request for Bid included consideration of the Corporation's reasonably expected deposit schedule for the amounts to be invested.

8.   ~~Based on our experience in the field and on all the facts and circumstances, the terms of the specifications in the Request for Bids are commercially reasonable.~~

|                    | Yield %   |
|--------------------|-----------|
| Series 2005A DSRF: | 4.801 %   |

Firm:  *MBIA Inc*

By:  *Tara L Burt*
Authorized Representative

Date:  *2/2/06*

*Financial Strength*
~~Credit~~ Rating of Bidding Entity:  Moody's Rating  *Aaa*  /  S&P Rating  *AAA*

**Appendix A:**

# Lutheran Senior Services
## LETTER OF ACCEPTANCE

We hereby confirm our bid and commit to provide an Agreement subject to all the terms and conditions stated in the foregoing Request for Investment Agreement.

In making this bid, we represent as follows:

1. We believe we are a reasonably competitive provider of the Agreement described in the Request for Bids.

2. You have not provided us any information which induced us to bid an amount lower than the amount induced by the Request for Bid.

3. The bid is at least equal to the yield which we would offer for agreements set forth in the Request for Bids to other persons from a source of funds other than the gross proceeds of an issue of tax-exempt bonds.

4. This offer is an arm's length transaction and no payments besides those specified herein or in the Request for Bids, will be made or received from either party to the other or from the Provider to any third party for the benefit of the Corporation.

5. We have submitted this bid in good faith and without reviewing other bids. Other than the Investment Agreement, we have no financial interest in the bond financing related to this bid.

6. We represent that we did not consult with any other potential provider about this bid, that this bid was determined without regard to any other formal or informal agreement we have with the Corporation or any other person (whether or not in connection with the bond issue), and that this bid is not being submitted solely as a courtesy to the Corporation or any other person for purposes of satisfying the safe harbor provisions of the Treasury Regulations.

7. The yields quoted in our Request for Bid included consideration of the Corporation's reasonably expected deposit schedule for the amounts to be invested.

8. Based on our experience in the field and on all the facts and circumstances, the terms of the specifications in the Request for Bids are commercially reasonable.

| | Yield % |
|---|---|
| Series 2005A DSRF: | 4.69 % |

Firm: _Aegon / Transamerica_

By: _Stephen Caroyn_
Authorized Representative

Date: _2/2/06_

| | Moody's Rating | | S&P Rating |
|---|---|---|---|
| Credit Rating of Bidding Entity: | Aa3 | / | AA |

(312) 873 4063

**Appendix A:**

# Lutheran Senior Services
## LETTER OF ACCEPTANCE

We hereby confirm our bid and commit to provide an Agreement subject to all the terms and conditions stated in the foregoing Request for Investment Agreement.

In making this bid, we represent as follows:

1.   We believe we are a reasonably competitive provider of the Agreement described in the Request for Bids.

2.   You have not provided us any information which induced us to bid an amount lower than the amount induced by the Request for Bid.

3.   The bid is at least equal to the yield which we would offer for agreements set forth in the Request for Bids to other persons from a source of funds other than the gross proceeds of an issue of tax-exempt bonds.

4.   This offer is an arm's length transaction and no payments besides those specified herein or in the Request for Bids, will be made or received from either party to the other or from the Provider to any third party for the benefit of the Corporation.

5.   We have submitted this bid in good faith and without reviewing other bids.  Other than the Investment Agreement, we have no financial interest in the bond financing related to this bid.

6.   We represent that we did not consult with any other potential provider about this bid, that this bid was determined without regard to any other formal or informal agreement we have with the Corporation or any other person (whether or not in connection with the bond issue), and that this bid is not being submitted solely as a courtesy to the Corporation or any other person for purposes of satisfying the safe harbor provisions of the Treasury Regulations.

7.   The yields quoted in our Request for Bid included consideration of the Corporation's reasonably expected deposit schedule for the amounts to be invested.

8.   Based on our experience in the field and on all the facts and circumstances, the terms of the specifications in the Request for Bids are commercially reasonable.

| | Yield % |
|---|---|
| Series 2005A DSRF: | 4.36 % |

Firm: _____AIG~MF_____          Std Opinion, Counties, Disclosure

By: _____
Authorized Representative

Date: ____2-2-06_____

Credit Rating of Bidding Entity: _____AIG Inc. (Guaranty)_____
Moody's Rating: __Aa2__ (Stable)          S&P Rating: __AA__ (neg. outlook)