HEARING DATE AND TIME: April 26, 2012 at 10:00 AM (Eastern Time)
RESPONSE DEADLINE: April 12, 2012 at 4:00 PM (Eastern Time)

---

**THE TWO HUNDRED SIXTY-NINTH OMNIBUS OBJECTION TO CLAIMS SEEKS TO DISALLOW AND EXPUNGE CERTAIN FILED PROOFS OF CLAIM. PARTIES RECEIVING THIS NOTICE SHOULD REVIEW THE OBJECTION TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE LOCATED IN THE OBJECTION AND/OR THE EXHIBITS ATTACHED THERETO TO DETERMINE WHETHER THE OBJECTION AFFECTS THEIR CLAIM(S).**

**IF YOU HAVE QUESTIONS, PLEASE CONTACT LEHMAN BROTHERS HOLDINGS INC.'S COUNSEL, ERIKA DEL NIDO, AT 212-310-8323.**

---

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Robert J. Lemons

Attorneys for Lehman Brothers Holdings Inc.
and Certain of its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
| | |
|---|---|
| **In re** | :   **Chapter 11 Case No.** |
| | : |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | :   **08-13555 (JMP)** |
| | : |
| **Debtors.** | :   **(Jointly Administered)** |
-------------------------------------------------------------------x

**NOTICE OF HEARING ON**
**THE TWO HUNDRED SIXTY-NINTH**
**OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY CLAIMS)**

        **PLEASE TAKE NOTICE** that on March 12, 2012, Lehman Brothers Holdings

Inc. ("LBHI" and the "Plan Administrator"), as Plan Administrator, under the Modified Third

Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors

(the "Plan") filed its two hundred sixty-ninth omnibus objection to claims (the "Two Hundred

Sixty-Ninth Omnibus Objection to Claims"), and that a hearing (the "Hearing") to consider the

Two Hundred Sixty-Ninth Omnibus Objection to Claims will be held before the Honorable

James M. Peck, United States Bankruptcy Judge, in Courtroom 601 of the United States

Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New

York 10004, on **April 26, 2012 at 10:00 AM (prevailing Eastern Time)**, or as soon thereafter

as counsel may be heard.

   **PLEASE TAKE FURTHER NOTICE** that any responses to the Two Hundred

Sixty-Ninth Omnibus Objection to Claims must be in writing, shall conform to the Federal Rules

of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with

the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be

found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system,

and (b) by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document

Format (PDF), WordPerfect, or any other Windows-based word processing format (with a hard

copy delivered directly to Chambers), in accordance with General Order M-182 (which can be

found at www.nysb.uscourts.gov), and served in accordance with General Order M-399, and on

(i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York

10004, Courtroom 601; (ii) attorneys for LBHI and certain affiliates, Weil, Gotshal & Manges

LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Robert J. Lemons, Esq.); and (iii)

the Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York,

New York 10004 (Attn: Tracy Hope Davis, Esq., Elisabetta Gasparini, Esq. and Andrea B.

Schwartz, Esq.); so as to be so filed and received by no later than **April 12, 2012 at 4:00 PM

(prevailing Eastern Time)** (the "Response Deadline").

   **PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and

served with respect to the Two Hundred Sixty-Ninth Omnibus Objection to Claims or any claim

set forth thereon, the Plan Administrator may, on or after the Response Deadline, submit to the

Bankruptcy Court an order substantially in the form of the proposed order annexed to the Two

Hundred Sixty-Ninth Omnibus Objection to Claims, which order may be entered with no further

notice or opportunity to be heard offered to any party.

Dated:  March 12, 2012
       New York, New York

                        /s/ Robert J. Lemons
                        Robert J. Lemons

                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, New York 10153
                        Telephone: (212) 310-8000
                        Facsimile: (212) 310-8007

                        Attorneys for Lehman Brothers Holdings Inc.
                        and Certain of its Affiliates

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Robert J. Lemons

Attorneys for Lehman Brothers Holdings Inc.
and Certain of its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

**THE TWO HUNDRED SIXTY-NINTH**
**OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY CLAIMS)**

---

**THE TWO HUNDRED SIXTY-NINTH OMNIBUS OBJECTION TO CLAIMS SEEKS TO DISALLOW AND EXPUNGE CERTAIN FILED PROOFS OF CLAIM.  PARTIES RECEIVING THIS NOTICE SHOULD REVIEW THE OBJECTION TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE LOCATED IN THE OBJECTION AND/OR THE EXHIBITS ATTACHED THERETO TO DETERMINE WHETHER THE OBJECTION AFFECTS THEIR CLAIM(S).**

**IF YOU HAVE QUESTIONS, PLEASE CONTACT LEHMAN BROTHERS HOLDINGS INC.'S COUNSEL, ERIKA DEL NIDO, AT 212-310-8323.**

---

US_ACTIVE:\43929557\03\58399.0008

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator"), as Plan

Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors (the "Plan") respectfully represents:

## **Relief Requested**

1.      The Plan Administrator files this omnibus objection to claims, pursuant to

section 502(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 3007(d) of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and this Court's order

approving procedures for the filing of omnibus objections to proofs of claim [Docket No. 6664]

(the "Procedures Order"), seeking to disallow and expunge certain claims for which LBHI has no

liability.

2.      The proofs of claim listed on Exhibit A annexed hereto (collectively, the

"401(k) Claims") were filed against LBHI (or did not identify any specific entity) asserting

claims for amounts that LBHI allegedly was required to contribute to the claimants' 401(k)

savings plans or for the loss of value in the claimants' 401(k) savings plans shortly before LBHI

filed for bankruptcy.  LBHI is not liable for any 401(k) contributions because the 401(k) savings

plan provides that it is within LBHI's discretion whether to match employees' contributions to

their 401(k) savings plans.  For the reasons explained below, LBHI also has no liability for any

loss in the value of the claimants' 401(k) savings plan.  As such, LBHI has no liability for the

401(k) Claims, and such claims should be disallowed and expunged.

## **Jurisdiction**

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2

## Background

4.      Commencing on September 15, 2008 and periodically thereafter, (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

5.      On September 17, 2008, the United States Trustee for Region 2 (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

6.      On January 14, 2010, the Court entered the Procedures Order, which authorizes the filing of omnibus objections to up to 500 claims at a time, on various grounds, including those set forth in Bankruptcy Rule 3007(d) and those additional grounds set forth in the Procedures Order.

7.      On December 6, 2011, the Court entered the order confirming the Plan. The Plan became effective on March 6, 2012.

8.      Pursuant to the Plan, the Plan Administrator is authorized to impose and prosecute objections to claims filed against LBHI.

## The 401(k) Claims Should Be Disallowed and Expunged

9.      Once objected to, a filed proof of claim is no longer "deemed allowed." 11 U.S.C. § 502(a) ("A claim or interest, proof of which is filed … is deemed allowed, unless a party in interest … objects.").  If an objection refuting at least one of the claim's essential allegations is asserted, the claimant has the burden to demonstrate the validity of the claim.  *See In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*,

US_ACTIVE:\43929557\03\58399.0008

Ch. 11 Case No. 02-41729 (REG), 2007 Bankr. LEXIS 660 at *15 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).

10.    In their review of the claims filed on the claims register in these chapter 11 cases, the Plan Administrator has identified the 401(k) Claims as asserting (i) claims for matching contributions to 401(k) savings plans and/or (ii) claims for the loss of value in the claimants' 401(k) savings plans shortly before LBHI and certain of its affiliates filed for bankruptcy. The Amended and Restated Lehman Brothers Savings Plan, effective as of January 1, 2008 (the "Savings Plan"), attached hereto as Exhibit B, governed LBHI's contributions to 401(k) savings plans during 2008, the year for which the 401(k) Claims assert claims for matching contributions. The Savings Plan provides that (i) matching contributions may be added to 401(k) savings plans at the end of the calendar year and (ii) the amount of matching contribution, if any, is solely within the discretion of LBHI. The Savings Plan states as follows:

> For Plan Years beginning on or after January 1, 2005, if and to the extent authorized by [LBHI] . . . each Employer shall make a contribution to the Plan, in the amounts set forth below, as applicable, on behalf of individuals who were (i) on the Employer's payroll for the Plan Year and (ii) who were employed on the last day of such Plan Year by (x) an Employer, or, (y) for Matching Contributions for Plan Years ending December 31, 2006 and thereafter, an Employer or an Affiliate . . .

Savings Plan, 4.1(c) (emphasis added).

11.    The Savings Plan provides that matching contributions for any year must be affirmatively authorized for such year and that an employee must remain employed with the Lehman enterprise on the last day of the calendar year to be eligible for a matching contribution. Anyone whose employment with LBHI or its affiliates ended before the last day of the year for any reason was not entitled to a matching contribution, nor was any matching contribution required absent affirmative authorization of a matching contribution. LBHI and its affiliates'

US_ACTIVE:\43929557\03\58399.0008

records do not indicate that LBHI authorized a matching contribution for 2008 or thereafter.  As such, LBHI is not liable for 401(k) Claims that assert claims based upon matching contributions.

12.    The claimants' 401(k) savings plans contain a variety of financial products, including stocks and bonds that were issued by companies unrelated to LBHI and funds that are in no way connected to LBHI.  The 401(k) savings plans may also contain common stock in LBHI.  The 401(k) Claims do not assert rights as owner of LBHI stock but merely assert claims for a decrease in the value of claimants' entire 401(k) account.  Furthermore, although market disruption around the time of LBHI and certain of its affiliates' bankruptcies may have led to a decline in the value of the 401(k) savings plan, a decrease in the value of the claimant's savings does not give rise to a valid claim against LBHI.  None of the 401(k) Claims offers any legal theory or basis for why LBHI is liable for a decrease in value of a 401(k) savings plan.  The claimants have access to their 401(k) savings plans, and such accounts are not property of LBHI.  To the extent that claimants submitted claims for LBHI stock held in their 401(k) accounts, such claims should be subordinated pursuant to Bankruptcy Code section 510(b) and reclassified as equity interests.

13.    LBHI is not liable for the 401(k) Claims.  Unless the 401(k) Claims are disallowed and expunged, parties who do not hold valid claims against LBHI may nonetheless recover from LBHI.  The Plan Administrator respectfully requests the Court enter an order disallowing and expunging the 401(k) Claims in their entirety.

**Reservation of Rights**

14.     The Plan Administrator reserves all rights to object on any basis to any No

Liability Claim as to which the relief requested herein is not granted.

**Notice**

15.     No trustee has been appointed in these chapter 11 cases.  Notice of this

Two Hundred Sixty-Ninth Omnibus Objection has been provided to:  (i) each claimant listed on

Exhibit A; (ii) the U.S. Trustee; (iii) the Securities and Exchange Commission; (iv) the Internal

Revenue Service; and (v) the United States Attorney for the Southern District of New York, in

accordance with the Amended Order Pursuant to Section 105(a) of the Bankruptcy Code and

Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management

Procedures, dated February 13, 2009 [Docket No. 2837] and the Procedures Order.  The Plan

Administrator submits that such notice is sufficient and no other or further notice need be

provided.

16.     No previous request for the relief sought herein has been made by the Plan

Administrator to this or any other Court.

6

WHEREFORE the Plan Administrator respectfully requests entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: March 12, 2012
New York, New York

/s/ Robert J. Lemons
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and of its Certain Affiliates

7

# **EXHIBIT A**

US_ACTIVE:\43929557\03\58399.0008

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

## OMNIBUS OBJECTION 269: EXHIBIT A - NO LIABILITY 401(k) CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | TOTAL CLAIM DOLLARS | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 1 | ANDREWS, TAMATHA LEE<br>3030 S MACON CIR<br>AURORA, CO 80014-3053 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 01/30/2009 | 2340 | $1,784.23 | No Liability |
| 2 | BAKER, CHRISTINE D.<br>9204 WEEPING WILLOW PLACE<br>LITTLETON, CO 80130 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 01/29/2009 | 2328 | $28,385.89 | No Liability |
| 3 | BERCELLIE, PATRICIA M. V.<br>4259 E LARK SPARROW ST<br>HIGHLAND RANCH, CO 80126 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 02/02/2009 | 2390 | $4,563.04 | No Liability |
| 4 | BIAMONTE, ANN M.<br>2132 RALEIGH STREET<br>DENVER, CO 80212 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 01/30/2009 | 2544 | $9,354.49 | No Liability |
| 5 | BYERS, KIMBERLEE<br>10656 CEDARCREST CIRCLE<br>HIGHLANDS RANCH, CO 80130 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 01/29/2009 | 2379 | $4,000.00 | No Liability |
| 6 | BYERS, LUCAS<br>10656 CEDARCREST CIRCLE<br>HIGHLANDS RANCH, CO 80130 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 01/29/2009 | 2381 | $4,000.00 | No Liability |
| 7 | CANHEDO, DANIELLE<br>15230 SW 74TH CT<br>PALMETTO BAY, FL 33157-2494 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/18/2009 | 18134 | $2,792.85 | No Liability |
| 8 | CHAN, MICHAEL H<br>4215 WESTMINSTER RD<br>GREAT NECK, NY 11020 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/18/2009 | 18951 | $4,000.00 | No Liability |
| 9 | CHIN, NEVILLE<br>61 RIDGEWAY AVENUE<br>STATEN ISLAND, NY 10314 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/10/2009 | 11321 | $4,000.00 | No Liability |
| 10 | DERIEG, MICAH<br>10233 URAVAN ST.<br>COMMERCE CITY, CO 80022 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 01/29/2009 | 2386 | $4,000.00 | No Liability |

* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

OMNIBUS OBJECTION 269: EXHIBIT A - NO LIABILITY 401(k) CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | TOTAL CLAIM DOLLARS | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 11 | DREYER, JERALD WAYNE<br>9797 MAYFAIR STREET #B<br>ENGLEWOOD, CO 80112 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 01/29/2009 | 2362 | $4,000.00 | No Liability |
| 12 | FORD, KAREN POST<br>12202 SHORT COURT<br>CYPRESS, TX 77429 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 07/23/2009 | 5972 | $7,192.56* | No Liability |
| 13 | GUERRA, ROBERTO<br>190 PARK AVENUE<br>HARRISON, NY 10528 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/21/2009 | 23778 | Undetermined | No Liability |
| 14 | HAYNES, SUSAN M<br>108 SAGAMORE ROAD<br>3G<br>TUCKAHOE, NY 10707 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/22/2009 | 28687 | $3,333.33 | No Liability |
| 15 | HOLLOWAY, ALEX B<br>3223 LEMMON AVE APT 5120<br>DALLAS, TX 75204-1879 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 08/06/2009 | 7552 | $5,891.24 | No Liability |
| 16 | INGRAM, EARON M.<br>1455 S. IVY WAY<br>DENVER, CO 80224 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 01/29/2009 | 2359 | $733.16 | No Liability |
| 17 | KAPLUN, ALEXANDER<br>45 RIDGE ROAD<br>NEWTON, MA 02468 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/22/2009 | 29899 | $4,000.00 | No Liability |
| 18 | KARR, RAYMOND P.<br>16494 E. POWERS AVENUE<br>CENTENNIAL, CO 80015 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 01/29/2009 | 2332 | $1,713.42 | No Liability |
| 19 | KASE, DAVID<br>305 W 50TH ST APT 10A<br>NEW YORK, NY 10019-8405 | | Lehman No Case Asserted/All Cases Asserted | 09/02/2009 | 10087 | $5,000.00 | No Liability |
| 20 | LENHART, DEBORAH A.<br>16494 E. POWERS AVENUE<br>CENTENNIAL, CO 80015 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 01/29/2009 | 2370 | $1,829.52 | No Liability |

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

## OMNIBUS OBJECTION 269: EXHIBIT A - NO LIABILITY 401(k) CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | TOTAL CLAIM DOLLARS | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 21 | LIU, TINA 56-15 206TH STREET OAKLAND GARDENS, NY 11364 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/22/2009 | 34215 | $4,000.00 | No Liability |
| 22 | LOOS, RICHARD JR. 129 CYPRESS DRIVE NEWARK, DE 19713 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/22/2009 | 31749 | $4,000.00 | No Liability |
| 23 | MALIZIA, ROSE M. 1109 BRASSIE AVENUE FLOSSMOOR, IL 60422 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 08/10/2009 | 7879 | $1,919.89* | No Liability |
| 24 | MALKANI, KUNAL 646 WARREN STREET APT #3 BROOKLYN, NY 11217 | | Lehman No Case Asserted/All Cases Asserted | 09/22/2009 | 28672 | $7,581.58 | No Liability |
| 25 | MCGEE, JENNY M. 3 PENNY LANE BEVERLY, MA 01915 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/10/2009 | 11235 | $4,000.00 | No Liability |
| 26 | MERRIMAN, SHAWNDA D. 567 KRYPTONITE DR. CASTLE ROCK, CO 80108 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 01/29/2009 | 2358 | $4,000.00 | No Liability |
| 27 | MESTAS, JENNIFER 9263 E. OXFORD DRIVE DENVER, CO 80237 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 01/30/2009 | 2342 | $8,123.59 | No Liability |
| 28 | METLITSKY, DMITRY 2469 65TH STREET APT 6A BROOKLYN, NY 11204 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 07/13/2009 | 5258 | $6,545.00 | No Liability |
| 29 | MOORMANN, DIANE KELLY 6612 W ELDORADO PLACE DENVER, CO 80227 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 01/29/2009 | 2366 | $4,000.00 | No Liability |
| 30 | MORRISON, E. VICTORIA 3912 ALCAZAR DR. CASTLE ROCK, CO 80109 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 01/29/2009 | 2371 | $4,000.00 | No Liability |

* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

## OMNIBUS OBJECTION 269: EXHIBIT A - NO LIABILITY 401(k) CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | TOTAL CLAIM DOLLARS | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 31 | NOVELLO, MICHAEL 511 WESTFIELD ROAD SCOTCH PLAINS, NJ 07076 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/21/2009 | 22993 | $4,000.00 | No Liability |
| 32 | OLDS, MICHELE LYNN 8475 LIVERPOOL CIRCLE LITTLETON, CO 80125 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 01/29/2009 | 2383 | $4,000.00 | No Liability |
| 33 | ORLOWSKY, JOSEPH 5411 PINEHURST DRIVE WILMINGTON, DE 19808 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/22/2009 | 28088 | $4,000.00* | No Liability |
| 34 | PARK, JENNIFER 26 ALEXANDER DRIVE SYOSSET, NY 11791 | | Lehman No Case Asserted/All Cases Asserted | 09/22/2009 | 28677 | $4,000.00 | No Liability |
| 35 | SARDINA, LAUREN 880 LOMBARD STREET SAN FRANCISCO, CA 94133 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/22/2009 | 31089 | $3,372.43 | No Liability |
| 36 | SHERMAN, LINDA A. 8775 S. CRESTHILL LANE HIGHLANDS RANCH, CO 80130 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 02/02/2009 | 2421 | $4,000.00 | No Liability |
| 37 | SLATTERY, RYAN GORDON 5509 E BRIARWOOD CIRCLE CENTENNIAL, CO 80122 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 01/29/2009 | 2378 | $4,000.00 | No Liability |
| 38 | STANFIELD, EARLANE 118-82 METROPOLITAN AVE APT 7C KEW GARDENS, NY 11415 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/22/2009 | 29460 | Undetermined | No Liability |
| 39 | STEVENSON, AUTUMN LYN 11857 E. FAIR AVE. GREENWOOD VILLAGE, CO 80111 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 01/29/2009 | 2361 | $4,000.00 | No Liability |
| 40 | SZABO, ZOLTAN 9591 PEARL CIRCLE #104 PARKER, CO 80134 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 02/02/2009 | 2391 | $184.60 | No Liability |

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

OMNIBUS OBJECTION 269: EXHIBIT A - NO LIABILITY 401(k) CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | TOTAL CLAIM DOLLARS | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 41 | TAKANO, NAO<br>8080 S. SAN JUAN RANGE RD.<br>LITTLETON, CO 80127 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 01/30/2009 | 2541 | $3,352.01 | No Liability |
| 42 | TSEKOV, GEORGI I.<br>213 S. SCOTCH PLAINS AVE<br>WESTFIELD, NJ 07090 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 12/31/2008 | 1525 | $2,268.51 | No Liability |
| 43 | VAUGHN, ANNE M<br>1 CRESCENT PLACE<br>HO HO KUS, NJ 07423 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/08/2009 | 10525 | $4,000.00 | No Liability |
| 44 | WENIG, BARBARA<br>24 RUTLEDGE ROAD<br>MARLBORO, NJ 07746 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/21/2009 | 23732 | $28,334.60 | No Liability |
| 45 | WU, JASON<br>2134 EAST 19TH STREET<br>BROOKLYN, NY 11229 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 07/21/2009 | 5824 | $4,000.00 | No Liability |
| | | | | TOTAL | | $222,255.94 | |

**EXHIBIT B**

US_ACTIVE:\43929557\03\58399.0008

Table of Contents

Page

ARTICLE I    DEFINITIONS...................................................................................4
      Section 1.1 -   Act...................................................................................4
      Section 1.2 -   Administrator ...............................................................4
      Section 1.3 -   Affiliate .......................................................................4
      Section 1.4 -   Alternate Payee ...........................................................4
      Section 1.5 -   American Express Stock ..............................................4
      Section 1.6 -   Applicable Plan Year ...................................................4
      Section 1.7 -   Basic Contributions.....................................................5
      Section 1.8 -   Beneficiary ..................................................................5
      Section 1.9 -   Black Out Period .........................................................5
      Section 1.10 -  Board of Directors.......................................................5
      Section 1.11 -  Catch-Up Contributions ..............................................5
      Section 1.12 -  Code ............................................................................5
      Section 1.13 -  Committee ....................................................................5
      Section 1.14 -  Company .....................................................................5
      Section 1.15 -  Company Representative ..............................................5
      Section 1.16 -  Company Stock ...........................................................6
      Section 1.17 -  Compensation .............................................................6
      Section 1.18 -  Daily Valuation Effective Date....................................8
      Section 1.19 -  Date of Disability ........................................................8
      Section 1.20 -  Distributable Account ..................................................8
      Section 1.21 -  Effective Date .............................................................8
      Section 1.22 -  Employee .....................................................................8
      Section 1.23 -  Employer......................................................................9
      Section 1.24 -  Employer Contributions...............................................9
      Section 1.25 -  Employment Date ........................................................9
      Section 1.26 -  Employer Suspense Account .......................................9
      Section 1.27 -  Form W-2 Earnings......................................................9
      Section 1.28 -  Highly Compensated Employee .................................10
      Section 1.29 -  Hour of Service ..........................................................10
      Section 1.30 -  Investment Fund.........................................................10
      Section 1.31 -  Lehman Stock .............................................................11
      Section 1.32 -  Lehman Stock Fund ....................................................11
      Section 1.33 -  Matching Contributions ..............................................11
      Section 1.34 -  Maternity or Paternity Absence .................................11
      Section 1.35 -  Member.......................................................................11
      Section 1.36 -  Member's Account......................................................11
      Section 1.37 -  Merger Date ................................................................12
      Section 1.38 -  Participant...................................................................13
      Section 1.39 -  Period of Severance ...................................................13
      Section 1.40 -  Plan .............................................................................13
      Section 1.41 -  Plan Year.....................................................................13
      Section 1.42 -  Qualified Domestic Relations Order..........................13
      Section 1.43 -  Reemployment Date....................................................13
      Section 1.44 -  Roth Contribution ......................................................14

i

Table of Contents
(continued)

Section 1.45 -  Section 401(k) Contributions.....................................................14
Section 1.46 -  Severance Date.......................................................................14
Section 1.47 -  Spinoff Date..........................................................................15
Section 1.48 -  Trust Agreement ....................................................................15
Section 1.49 -  Trust Fund(s)..........................................................................15
Section 1.50 -  Trustee..................................................................................15
Section 1.51 -  Twelve Month Period of Service ...............................................15
Section 1.52 -  Valuation Date .......................................................................17
Section 1.53 -  Years of Vesting Service .........................................................17

ARTICLE II        ELIGIBILITY.......................................................................18
Section 2.1 -    Eligibility for Participation ....................................................18
Section 2.2 -    Effective Date of Participation................................................18
Section 2.3 -    Duration of Participation........................................................18
Section 2.4 -    Reemployment ......................................................................19

ARTICLE III       SECTION 401(K) CONTRIBUTIONS, ROLLOVER CONTRIBUTIONS
                  AND TRANSFERS ...............................................................20
Section 3.1 -    Section 401(k) Contributions..................................................20
Section 3.2 -    Allocation to Participant's Account..........................................22
Section 3.3 -    Participant's Election of Section 401(k) Contributions...........23
Section 3.4 -    Limitation on Section 401(k) Contributions.............................24
Section 3.5 -    Contributions in Excess of Section 401(k) Limit ....................26
Section 3.6 -    ACP Limitation on Matching Contributions............................27
Section 3.7 -    Adjustment of Section 401(k) Contributions...........................29
Section 3.8 -    Special Rules........................................................................30
Section 3.9 -    Rollover Contributions and Other Transfers from
                  Qualified Plans....................................................................31
Section 3.10 -  Catch-Up Contributions .........................................................32

ARTICLE IV       EMPLOYER CONTRIBUTIONS................................................34
Section 4.1 -    Employer Contributions.........................................................34
Section 4.2 -    Transfer to Trust Fund ...........................................................38
Section 4.3 -    Allocation to Participant's Account..........................................38
Section 4.4 -    Qualified Military Service ......................................................39

ARTICLE V        LIMITATIONS ON ANNUAL ADDITIONS TO PARTICIPANT'S
                  ACCOUNT ...........................................................................40
Section 5.1 -    Limitations on Annual Additions.............................................40
Section 5.2 -    Application............................................................................40
Section 5.3 -    Ordering Rule for Multiple Plans ............................................41
Section 5.4 -    Definitions............................................................................41
Section 5.5 -    Limitation Year......................................................................42

ARTICLE VI       INVESTMENT OF TRUST FUND AND MEMBERS' ELECTIONS..........44
Section 6.1 -    Investment of Employee Contributions ....................................44

Table of Contents
(continued)

Page

Section 6.2 -    Investment Transfers.................................................46
Section 6.3 -    Investment of Employer Contributions....................47
Section 6.4 -    Investing of Employer Suspense Account ...............48
Section 6.5 -    Voting and Tender Offers .......................................48
Section 6.6 -    Rules Regarding Investment Instructions ...............49

ARTICLE VII    VESTING, DISTRIBUTION TO MEMBERS.................................50
Section 7.1 -    Vesting .....................................................................50
Section 7.2 -    Distribution Upon Termination of Employment or
                Disability................................................................53
Section 7.3 -    Distribution Upon Death.........................................56
Section 7.4 -    Timing of Distribution ............................................57
Section 7.5 -    Minimum Required Distributions ...........................57
Section 7.6 -    Direct Rollover of Eligible Rollover Distributions.................58
Section 7.7 -    Distributions in Cash and Stock.............................60
Section 7.8 -    Withdrawal of Rollover Contributions and After-Tax
                Contributions..........................................................60
Section 7.9 -    Withdrawals After Attainment of 59-1/2................61
Section 7.10 -   Hardship Withdrawals.............................................61
Section 7.11 -   Allocation Among Accounts and Investment Funds ..............64
Section 7.12 -   Distributions to Alternate Payees............................64
Section 7.13 -   30-Day Notice Waiver .............................................66
Section 7.14 -   Trust to Trust Transfers ..........................................67

ARTICLE VIII    FINANCING.........................................................................68
Section 8.1 -    Trust Funds .............................................................68
Section 8.2 -    Contributions to the Trust.......................................68
Section 8.3 -    Lehman Stock Fund ................................................68
Section 8.4 -    Non-Reversion........................................................70
Section 8.5 -    Expenses .................................................................70
Section 8.6 -    Rights in the Trust Fund .........................................70
Section 8.7 -    Exclusive Benefit ...................................................71

ARTICLE IX     ACCOUNTS AND RECORDS OF THE PLAN.........................................72
Section 9.1 -    Accounts and Records.............................................72
Section 9.2 -    Investment Funds ...................................................72
Section 9.3 -    Valuation of Investment Funds...............................73
Section 9.4 -    Election and Notice Procedures ..............................74

ARTICLE X      ADMINISTRATION ................................................................75
Section 10.1 -   Employee Benefit Plans Committee ........................75
Section 10.2 -   Committee Powers and Discretion...........................75
Section 10.3 -   Suspension of Investment Transfer Elections..........................77
Section 10.4 -   Claims Procedure ...................................................77
Section 10.5 -   Action by Majority..................................................77
Section 10.6 -   Retention of Advisors .............................................77

Table of Contents
(continued)

Section 10.7 - Committee Member Compensation .........................................78
Section 10.8 - Indemnification ....................................................................78
Section 10.9 - Named Fiduciary and Plan Administrator ..............................78
Section 10.10 -Service in Various Fiduciary Capacities ................................78
Section 10.11 -Power of Delegation ............................................................78
Section 10.12 -Named Fiduciary with Respect to Asset Management...........78
Section 10.13 -Funding Policy.....................................................................79
Section 10.14 -Recovery of Overpayments ..................................................80

ARTICLE XI        BENEFICIARY DESIGNATION, INCOMPETENCY AND NON-
                  ALIENATION .......................................................................81
Section 11.1 - Beneficiary Designation.........................................................81
Section 11.2 - Incompetence .......................................................................83
Section 11.3 - Non-Alienation ....................................................................83

ARTICLE XII       AMENDMENT AND TERMINATION ................................85
Section 12.1 - Amendment to Conform with Law .........................................85
Section 12.2 - Other Amendment and Termination .......................................85
Section 12.3 - Limitations on Amendments..................................................85
Section 12.4 - Termination of the Plan ........................................................86
Section 12.5 - Merger or Consolidation or Transfer ......................................86

ARTICLE XIII      SPECIAL TOP-HEAVY RULES ......................................87
Section 13.1 - Application...........................................................................87
Section 13.2 - Top-Heavy Plan ...................................................................87
Section 13.3 - Definitions...........................................................................87
Section 13.4 - Beneficiaries ........................................................................89
Section 13.5 - Present Value and Accounts ..................................................89
Section 13.6 - Minimum Contribution .........................................................90
Section 13.7 - Ceiling on Includable Compensation......................................91
Section 13.8 - Exception for Collectively Bargained Plans ...........................91
Section 13.9 - Compliance with Section 416 of the Code ..............................92

ARTICLE XIV       MISCELLANEOUS .......................................................93
Section 14.1 - Effect of Mistake..................................................................93
Section 14.2 - Inability to Locate Payee ......................................................93
Section 14.3 - Conclusiveness of Records ....................................................93
Section 14.4 - No Employment Rights..........................................................94
Section 14.5 - Gender; Headings..................................................................94
Section 14.6 - Counterparts ........................................................................94
Section 14.7 - Illegality of Particular Provision............................................94
Section 14.8 - Applicable Law.....................................................................94
Section 14.9 - Limitation of Liability...........................................................95
Section 14.10 -Doubt as to Right to Payment................................................95

iv

Table of Contents
(continued)

ARTICLE XV        SPECIAL PROVISIONS APPLICABLE TO SLHMC EMPLOYEES ..........96
                  Section 15.1 -  Definitions................................................................96
                  Section 15.2 -  Contributions............................................................96
                  Section 15.3 -  Distributions.............................................................97

ARTICLE XVI       PARTICIPANT LOANS ...........................................................98
                  Section 16.1 -  Loans to Parties in Interest.....................................98
                  Section 16.2 -  Loan Requirements ..................................................98
                  Section 16.3 -  Funding of Member Loans....................................100
                  Section 16.4 -  Loan Payments ......................................................101
                  Section 16.5 -  Loan Expenses .......................................................101
                  Section 16.6 -  Disposition of Loan Upon Distribution ................101
                  Section 16.7 -  Compliance with Applicable Law .........................101
                  Section 16.8 -  Default....................................................................102

ARTICLE XVII      Domestic Partner Treated as Spouse..........................................103
                  Section 17.1 -  Effective Date ........................................................103
                  Section 17.2 -  Definition of Domestic Partner..............................103
                  Section 17.3 -  Treatment as Spouse ..............................................103

ARTICLE XVIII     Leased Employees .......................................................................104
                  Section 18.1 -  Definitions..............................................................104
                  Section 18.2 -  Treatment of Leased Employees.............................104
                  Section 18.3 -  Exception for Employees Covered by Plans of Leasing
                                   Corporation ...........................................................104
                  Section 18.4 -  Construction ...........................................................105

ARTICLE XIX       Special Provisions Applicable to Non-Controlled Group Employers ..........106
                  Section 19.1 -  Separate Testing.....................................................106
                  Section 19.2 -  Maximum Limitations ............................................106
                  Section 19.3 -  Affiliated NCGE's .................................................107
                  Section 19.4 -  Participation and Nondiscrimination Requirements .............107
                  Section 19.5 -  Investment Funds ..................................................107

ARTICLE XX        MODIFICATION OF TOP-HEAVY RULES............................108
                  Section 20.1 -  Effective Date ........................................................108
                  Section 20.2 -  Determination of Top-Heavy Status ......................108
                  Section 20.3 -  Minimum Benefits .................................................109

ARTICLE XXI       ROTH CONTRIBUTIONS .....................................................110
                  Section 21.1 -  General....................................................................110
                  Section 21.2 -  Electing Roth Contributions ..................................110
                  Section 21.3 -  Pre-Tax Contributions ...........................................110
                  Section 21.4 -  Roth Contribution ..................................................110
                  Section 21.5 -  Distributions...........................................................111
                  Section 21.6 -  Loans......................................................................111

Table of Contents
(continued)

Page

Section 21.7 -  Ordering Rules for Loans and Distributions..........................111
Section 21.8 -  Rollovers...............................................................................111
Section 21.9 -  Operational Compliance .......................................................112

KL3 2630220.9

LEHMAN BROTHERS

SAVINGS PLAN


(as amended and restated effective January 1, 2008)

<u>INTRODUCTION</u>

The Lehman Brothers Savings Plan (the "Plan"), formerly known as the Lehman Brothers Holdings Inc. Tax Deferred Savings Plan, was adopted effective January 1, 1984 as the Shearson Lehman Brothers Holdings Inc. Tax Deferred Savings Plan.  The Plan was thereafter amended from time to time, and has been restated at various intervals, including a restatement effective January 1, 1988.  The Plan was further restated generally effective January 1, 1989, and again on November 15, 1998, to reflect, in each case amendments adopted since the prior restatement, to conform with applicable statutes and regulatory requirements, and to make other changes deemed desirable in order to effect the purposes of the Plan.

On March 29, 2001, the Plan was further restated to reflect amendments adopted since the prior restatement, to provide for daily valuation of Member Accounts, and to make further changes, including both changes intended to comply with subsequent regulatory and legislative requirements and changes desired as a matter of plan design, effective as of such dates as are expressly provided or are required by law.

On June 28, 2002, the Plan was amended and restated to make further changes deemed necessary or advisable to comply with changes in applicable law, including the Economic Growth and Tax Relief Reconciliation Act of 2001 ("EGTRRA"), and other amendments determined by the Company to be appropriate to further the purposes of the Plan, effective as of the dates required by such provisions of law or as expressly set forth, provided that clarifications of existing provisions are effective as of the same dates as the provisions which they clarify.  On June 14, 2004, the Plan was further amended and restated to incorporate amendments adopted since the prior restatement, to provide for the merger of the Neuberger Berman, LLC Profit Sharing Plan and Neuberger Berman, LLC Pension Plan into the Plan effective June 14, 2004 (including special provisions for employees of Neuberger Berman, LLC and its subsidiaries), and to clarify the character of the Investment Funds established by the terms of the Plan and the authority of the Committee to establish additional Investment Funds (such clarification to be effective as of the original effective dates of the provisions to which they relate).

KL3 2630220.9

On December 29, 2005, the Plan was further amended and restated to set forth more fully the nondiscrimination testing rules for Section 401(k) and Matching Contributions following EGTRRA, effective January 1, 2002; to increase Basic and Matching Contributions and add an applicable vesting requirement, effective for contributions for Plan Years beginning on or after January 1, 2005; to limit automatic cashouts following termination of employment to amounts no more than $1,000, effective March 28, 2005; to reflect the final section 401(k) regulations, effective as of such dates as are expressly provided; to add Supplements reflecting the transition of employees of Finance American, LLC and BNC Mortgage, Inc, into the Plan; and to make additional changes required by law or for purposes of clarification and ease of administration.  Clarifying changes contained in the Plan were effective as of the effective dates of the provisions to which they relate.  In addition, certain provisions that ceased to have current applicability as of various dates on or prior to January 1, 2002 (and/or related effective date provisions) were eliminated on the basis that they may be found in predecessor plans where necessary.

On December 22, 2006 the Plan was further amended and restated to expand eligibility for Matching Contributions to otherwise eligible Participants who are employed by an Affiliate on the last day of the Plan Year, effective January 1, 2006, and to make additional changes deemed advisable, including changes to reflect the final regulations under EGTRRA's catch-up provisions.  The Plan is now hereby further restated effective January 1, 2008, (i) to revise the provisions governing Plan Investment Funds to reflect a review thereof  in connection with changes made by the Pension Protection Act of 2006 (the "PPA") and regulations thereunder, (ii) to add a Roth Section 401(k) Contribution feature and make related definitional or conforming changes (including elimination of references to After-Tax Contributions and redesignation of "Before-Tax Contributions" as "Section 401(k) Contributions"), (iii) to allow non-spouse beneficiaries to make direct rollovers of Plan death benefits in accordance with the PPA, and (iv) to reflect PPA provisions requiring offering of a Qualified 75% Joint and Survivor Annuity" where a QJSA form is applicable and eliminating gap period income from the calculation of required corrective distribution; to add additional Supplements to the Plan to reflect actions and changes effected in connection with certain recent acquisitions, effective as of the dates therein provided; and to include amendments adopted since the prior restatement. Where the context requires, references to Sections or Articles of the Plan as restated shall include

- 2 -

references to corresponding provisions of the Plan as previously in effect.  The Plan as so restated reads as follows:

KL3 2630220.9

ARTICLE I

DEFINITIONS

When used in this Plan, the following terms shall have the designated meaning, unless a different meaning is clearly required by the context.

Section 1.1 - Act.  The Employee Retirement Income Security Act of 1974, as amended from time to time.

Section 1.2 - Administrator.  Effective as of the Daily Valuation Effective Date, the contract administrator retained by the Committee to carry out the principal recordkeeping and other administrative responsibilities of the Plan as delegated to it by the Committee.

Section 1.3 - Affiliate.  Any of the following:

(a)     Any incorporated or unincorporated trade or business which at the time of reference is controlled by, or is under common control with an Employer within the meaning of Section 414(b) or (c) of the Code and for purposes of Article V, Section 415(h) of the Code (a "Controlled Group Affiliate").

(b)     Any (i) member of an affiliated service group, within the meaning of Section 414(m) of the Code, that includes an Employer, or (ii) organization aggregated with an Employer pursuant to Section 414(o) of the Code, to the extent required by such Sections.

Section 1.4 - Alternate Payee.  Any spouse, former spouse, child or other dependent of a Member who is named in a Qualified Domestic Relations Order as having a right to receive all, or a portion of, a Member's benefits under the Plan.

Section 1.5 - American Express Stock.  Common shares issued by American Express Company, which up until the Spinoff Date was the parent corporation of the Company.

Section 1.6 - Applicable Plan Year.  For purposes of nondiscrimination testing under Sections 3.4 and 3.6, the current Plan Year.

KL3 2630220.9

Section 1.7 - Basic Contributions.  Employer Contributions made for a Participant in accordance with Section 4.1 without regard to Section 401(k) Contributions.

Section 1.8 - Beneficiary.  The person or persons entitled to benefits following a Member's death in accordance with Section 11.1.

Section 1.9 - Black Out Period.  Any period during which trading in American Express Stock, Lehman Stock or any other Investment Fund is prohibited by applicable law or regulation.

Section 1.10 - Board of Directors.  The Board of Directors of the Company or any duly authorized committee thereof (such as the Compensation and Benefits Committee).

Section 1.11 - Catch-Up Contributions.  Section 401(k) Contributions designated and qualifying as Catch-Up Contributions pursuant to Section 3.10 or excess deferrals recharacterized as Catch-Up Contributions under Section 3.10(d) in order to satisfy ADP nondiscrimination testing.

Section 1.12 - Code.  The Internal Revenue Code of 1986, as amended from time to time.

Section 1.13 - Committee.  The Employee Benefit Plans Committee which administers the Plan in accordance with Article X.

Section 1.14 - Company.  Lehman Brothers Holdings Inc., a Delaware corporation (known as Shearson Lehman Brothers Holdings Inc. prior to August 2, 1993), and any successor thereto which adopts the Plan.

Section 1.15 - Company Representative.  The Board of Directors or any other person or persons entitled to act as the representative of the Company exercising the rights of the Company as settlor and plan sponsor.  The persons acting as the Committee or, to the extent determined by such persons, any member or members of the Committee designated by such persons, shall be the Company Representative, except to the extent the Board of Directors determines otherwise or designates other person(s) (by name or position) to be Company Representative for any or all of such purposes.  Individuals acting as Company Representative

- 5 -

shall not be deemed to be fiduciaries with respect to the Plan when carrying out responsibilities assigned to the Company Representative under the Plan, even though, where applicable, such persons may be fiduciaries when carrying out their responsibilities as members of the Committee.

Section 1.16 - Company Stock.  Lehman Stock (and in certain instances American Express Stock).

Section 1.17 - Compensation.  For any Plan Year in which a Participant is an Employee, the total Form W-2 Earnings paid by the Employer to such Employee in such Plan Year, determined before giving effect to any salary reduction agreement under this Plan, or under any cafeteria plan and/or medical reimbursement or dependent care assistance plan, or for purposes of receiving qualified transportation fringe benefits (collectively, "salary reduction amounts"); provided that, for purposes of Article III, Compensation shall not include:

(a)    Any imputed income;

(b)    Compensation deferred during such Plan Year under the terms of any nonqualified deferred compensation program;

(c)    Any amount which an Employer pays to an Expatriate Employee as a goods and services differential allowance, a housing allowance, or other reimbursement pursuant to the Company's U.S. Expatriate Assignment Policy.  For this purpose, the term "Expatriate Employee" means: (i) any Employee who is a United States citizen or a resident alien of the United States and relocates from the United States to another country at the request of his Employer in order to work for the Employer in that country and is paid through a United States payroll; and (ii) any other individual employed by an Employer outside of the United States whom the Committee designates as an Expatriate Employee for the purposes of the Plan;

(d)    Compensation paid in Company Stock, restricted stock units, stock options, forgivable loans, contributions to partnership accounts, other property, or, in the event that an Employer of a Member shall pay compensation both in United States currency and in foreign currency, any amounts paid in foreign currency;

- 6 -

(e)    Payments made for services to an Employer rendered other than as an Employee; and

(f)    Payments otherwise includible (such as accrued vacation pay or pay for an Employee's final payroll period), if made after the last day of the month in which the Employee terminates employment with the Employer (whether or not the Employee continues to be employed by an Affiliate other than an Employer), and salary continuation or other severance payments (whether periodic or made in a lump sum) paid after the actual day of such termination;

And provided further, that Compensation of each Participant taken into account under the Plan for Plan Years beginning on or after January 1, 2002 shall not exceed $200,000 as adjusted from time to time in accordance with Section 401(a)(17) of the Code (the "Compensation Limit"). If the period for determining Compensation is a short plan year (i.e., shorter than 12 months), the annual Compensation Limit is an amount equal to the otherwise applicable annual Compensation Limit multiplied by a fraction, the numerator of which is the number of months in the short plan year and the denominator of which is 12. Except in the case of a short plan year, the Compensation Limit shall be applied to the Participant's aggregate Compensation for the entire twelve months of the Plan Year, without regard to the percentage contribution elected by the Participant during any particular pay period, provided that the aggregate contributions for the benefit of a Participant for any Plan Year, whether Section 401(k) Contributions or Employer Contributions, shall not exceed the maximum amount determined by applying the contribution rate or rates in effect with respect to such contributions from time to time during the year to the total amount of such Compensation not in excess of such Compensation Limit.

For purposes of Sections 3.4 and 3.6, Compensation for any Plan Year shall (x) include an Employee's imputed income to the extent includible in Form W-2 Earnings, and (b) be reduced by the aggregate of any salary reduction amounts (as defined in the first paragraph of this Section 1.17) that would otherwise be includible under the foregoing provisions of this Section 1.17.

For purposes of Articles V and XIII, Compensation shall mean total Form W-2 Earnings before giving effect to any such salary reduction amounts.

- 7 -

Section 1.18 - Daily Valuation Effective Date.  March 29, 2001.

Section 1.19 - Date of Disability.  The date a Participant is determined to be eligible for long-term disability benefits under the Employer's Long-Term Disability Plan.

Section 1.20 - Distributable Account.  The portion of a Member's Account that is vested on and after his termination of employment under the Plan or death.

Section 1.21 - Effective Date.  January 1, 1984.

Section 1.22 - Employee.  Effective July 1, 1995, (i) Any individual employed by an Employer on a salaried, commission or hourly basis in the United States or outside of the United States if such person receives his Compensation in United States currency, and (ii) any other individual employed by an Employer as a common-law employee outside of the United States who is designated as an Employee by the Committee; provided, however, that such term shall not include (A) any individual not employed by an Employer as a common law employee, including without limitation any leased employee (as defined in Article XVIII), (B) any individual employed pursuant to special purpose programs (including, but not limited to, programs for employment of students, the disadvantaged, or rehabilitative employment), (C) any individual who performs services for an Employer under an agreement or arrangement (which may be written, oral and/or evidenced by the Employer's payroll practice) with such individual (or with another organization that provides the services of such individual to the Employer) pursuant to which such individual is treated as a consultant or an independent contractor (or as an employee of an entity other than the Employer), irrespective of whether he is treated as an employee of an Employer under common-law employment principles or pursuant to the provisions of Section 414(m), 414(n), or 414(o) of the Code, (D) any individual whose compensation or conditions of employment are determined by collective bargaining with a union unless an applicable collective bargaining agreement especially provides that such individual is eligible to participate in this Plan, and (E) effective January 1, 2004, any individual who has not provided a valid Social Security number in accordance with procedures established by the Committee.

Section 1.23 - Employer.  The Company, and any Affiliate that adopts the Plan as a participating employer by communication to its eligible employees of their right to participate (fully or solely by making rollover contributions), and/or by making contributions for their benefit.  Such adoption may be reflected directly or through action taken on behalf of such Affiliate by authorized employees of the Company or any other Affiliate.  As to any Employee, at any time of reference, "Employer" means his employer.

Any Affiliate or successor Employer that has adopted the Plan shall cease to be an Employer upon the occurrence of any transaction which causes it to cease to be a member of the Company's controlled group within the meaning of Section 414(b) or (c) of the Code, unless specifically provided otherwise by the Company Representative in connection with such transaction.  In addition, an entity that is not a member of such a controlled group (an "NCGE") may, with the approval of the Company Representative, adopt the Plan and thereby become an Employer, subject to the right at any time of such entity to withdraw as an Employer and the right of the Company Representative to terminate such entity's status as an Employer.  Notwithstanding the foregoing, an NCGE may not participate in the Plan as an Employer if such participation would prevent the Plan from having the benefit of any prohibited transaction exemptions necessary to allow investment in all Investment Funds offered under the Plan.

Section 1.24 - Employer Contributions.  Basic and Matching Contributions made by the Employer in accordance with Article IV and, if applicable, qualified non-elective contributions made under Section 4.1(f).

Section 1.25 - Employment Date.  An employee's first paid working day for which he is credited with an Hour of Service under Section 1.29(a).

Section 1.26 - Employer Suspense Account.  The separate account established and maintained by the Trustee for Employer Contributions made to the Plan and for forfeitures under the Plan until such time as they are allocated to Member's Accounts.

Section 1.27 - Form W-2 Earnings.  Means such amount which is required to be reported by an Employer annually as wages and other compensation on Federal Form W-2 or, in the case of any Employee who is employed in Puerto Rico, such amount which is required to be

reported annually on such comparable form which is then in use for purposes of Puerto Rican income taxation.  In the case of an employee who, for a given Plan Year, receives income required to be reported on a Federal Form W-2, as well as income required to be reported on the comparable Puerto Rican tax form, such employee's Form W-2 Earnings for such Plan Year shall equal the sum of such two separately reportable amounts.

Section 1.28 - Highly Compensated Employee.  A "highly compensated employee" as defined in Section 414(q) of the Code and applicable regulations.  Effective December 31, 1997, "Highly Compensated Employee" means an employee who received compensation (as determined under Section 414(q) of the Code) for the calendar year beginning in the prior Plan Year in excess $80,000 (as adjusted pursuant to Section 414(q) of the Code) and was a member of the top-paid group of employees for such calendar year (as determined under Section 414(q)(3) of the Code), or who was a 5-percent owner (as described in Section 13.3(a)(iii)) at any time during the current or prior Plan Year.

Section 1.29 - Hour of Service.  Each hour (a) for which an employee is directly or indirectly compensated or entitled to compensation by the Employer or an Affiliate for the performance of duties; (b) for which an employee is directly or indirectly compensated or entitled to compensation by the Employer or an Affiliate (irrespective of whether the employment relationship has terminated) for reasons other than performance of duties (such as vacation, holiday, sickness, jury duty, disability, lay-off, military duty or leave of absence); or (c) for which back pay is awarded or agreed to by the Employer or an Affiliate without regard to mitigation of damages.  All Hours of Service will be counted in accordance with the provisions of Department of Labor Regulations 2530.200b-2(b) and (c).

Section 1.30 - Investment Fund.  (a) The Lehman Stock Fund established pursuant to Section 8.3, (b) until January 31, 2007, the "American Express Stock Fund", which shall be invested exclusively in American Express Stock except for such reserve invested in short-term fixed income investments or cash as shall be determined to be necessary or advisable for the purpose of maintaining appropriate liquidity, and (c) any other funds established by the Committee and held by the Trustee pursuant to Section 9.2.

Section 1.31 - Lehman Stock.  Common stock, par value $.10 per share, of the Company, or such other par value which may result from a change in the Company's capitalization.

Section 1.32 - Lehman Stock Fund.  The employee stock ownership (ESOP) component of the Trust Fund established and maintained pursuant to Section 8.3.

Section 1.33 - Matching Contributions.  The Employer Contribution made for a Participant in accordance with Section 4.1 based on the amount of his Section 401(k) Contributions.

Section 1.34 - Maternity or Paternity Absence.  An absence from work with an Employer or Affiliate for any period by reason of (A) an employee's pregnancy, (B) the birth of a child of the employee, (C) the placement of a child with the employee in connection with the adoption of such child by such employee, or (D) the caring for a natural or adopted child for a period beginning immediately following such birth or placement.

Section 1.35 - Member.  Either a Participant or a former Participant who has a Member's Account in the Plan.

Section 1.36 - Member's Account.  The separate account maintained for each Member which represents his total interest in the Trust Fund which consists of the sum of the following accounts:

(a)    "Section 401(k) Contributions Account."  That portion of the Member's Account which evidences the value of the contributions made by an Employer on his or her behalf to the Plan under Section 3.1 or 3.10, and the applicable amounts transferred to the Plan under Section 3.9, including the net worth of the Trust Fund attributable thereto.  Where applicable, the Section 401(k) Contributions Account shall include a subaccount for contributions made pursuant to Section 3.10 (which may be referred to as the "Catch-Up Contributions Account").

(b)    "Roth Contributions Account."  That portion of the Member's Account which evidences the value of contributions made by an Employer on his or her behalf to the

KL3 2630220.9

Plan under Article XXI, including any applicable amounts transferred to the Plan under Section 3.9, including the net worth of the Trust Fund attributable thereto.  Where applicable, the Roth Contributions Account shall include a subaccount for Catch-Up Contributions made under Section 3.10 as modified by Article XXI.

(c)     "Employer Contributions Account."  That portion of the Member's Account which evidences the value of the Employer Contributions made on his behalf to the Plan under Section 4.1 and the applicable amounts transferred to the Plan under Section 3.9, including the net worth of the Trust Fund attributable thereto.  The Employer Contributions Account shall include such subaccount as the Committee shall deem necessary or advisable to reflect the vesting schedule applicable to Employer Contributions for Plan Years beginning on and after January 1, 2005, and the immediate and fully vested status of any qualified non-elective contributions made under Section 4.1(d).

(d)     "Rollover Account."  That portion of the Member's Account which evidences the value of his applicable rollover contributions under Section 3.9, including the net worth of the Trust Fund attributable thereto.  Where applicable, the Rollover Account shall include a subaccount for Rollover Contributions consisting of after-tax contributions (which may be referred to as the "After-Tax Rollover Account").

(e)     "After-Tax Contribution Account."  That portion of the Member's Account which evidences the value of the contributions the Participant made to another employer tax-qualified plan on an after-tax basis (other than as Roth 401(k) Contributions described in Section 402A of the Code) and transferred to the Plan under Section 3.9 or an applicable Supplement, including the net worth of the Trust Fund attributable thereto.

A Member's Account shall also include, where applicable, such additional accounts or subaccounts as may be established pursuant to any Supplement to this Plan.

Section 1.37 - Merger Date.  August 10, 1990, which was the effective date of the merger of Shearson Lehman Hutton Holdings Inc. with a subsidiary of American Express Company, determined in accordance with the merger agreement dated as of March 26, 1990.

KL3 2630220.9

Section 1.38 - Participant.  Any Employee who becomes eligible for and commences participation in the Plan as provided in Article II.

Section 1.39 - Period of Severance.  For purposes of determining Years of Vesting Service, the period of time commencing on an employee's Severance Date and ending on the date on which the employee again performs an Hour of Service; provided, that the period between the first and second anniversaries of the first day of an employee's Maternity or Paternity Absence shall (except to the extent that such employee is otherwise credited with a Year of Vesting Service during such period pursuant to Section 1.46(b)) be neither a Period of Severance nor included in the determination of such employee's Years of Vesting Service.  An employee's Period of Severance shall be measured in one-year increments, with each such one-year Period of Severance beginning on the employee's Severance Date and each such succeeding anniversary of such Severance Date, as the case may be.

Section 1.40 - Plan.  The Lehman Brothers Savings Plan embodied herein and as amended from time to time, previously known as the Lehman Brothers Holdings Inc. Tax Deferred Savings Plan, and known prior to August 2, 1993 as the Shearson Lehman Brothers Holdings Inc. Tax Deferred Savings Plan.

Section 1.41 - Plan Year.  The calendar year.

Section 1.42 - Qualified Domestic Relations Order.  Any judgment, decree or order, including approval of a property settlement agreement, which relates to the provision of child support, alimony payments or marital property rights to a spouse, former spouse, child or other dependent of a Member, is made pursuant to a state domestic relations law, and which satisfies the provisions of Section 414(p) of the Code.

Section 1.43 - Reemployment Date.  For purposes of determining Years of Vesting Service, an employee's first paid working day credited as an Hour of Service under Section 1.29(a) following a Period of Severance for which an employee is not credited with vesting service under Section 7.1.2.

- 13 -

Section 1.44 - Roth Contribution. A Participant's elective deferrals that are includible in the Participant's gross income at the time deferred and have been irrevocably designated as Roth Contributions by the Participant in his or her deferral election.

Section 1.45 - Section 401(k) Contributions. Contributions made by an Employer on a pre-tax basis for the benefit of a Participant, in the amount by which such Participant has chosen, pursuant to Section 3.3, to reduce compensation otherwise payable, or to the extent the Participant has so elected pursuant to Article XXI, Roth Contributions.

Section 1.46 - Severance Date. For purposes of determining Years of Vesting Service:

(a)    The last day of the month in which occurs the earlier of:

(i)    the date on which an employee quits, is discharged by his Employer or an Affiliate, retires or dies; or

(ii)    the first anniversary of the date on which an employee begins an absence from service with the Employer or an Affiliate for reasons other than those described in (i) above, such as vacation, holiday, sickness, disability, leave of absence, layoff or maternity or paternity absence.

(b)    Notwithstanding the foregoing provisions of this Section 1.46, in the case of any employee who is absent from service with an Employer or an Affiliate on account of any paid or unpaid leave of absence (including an authorized leave of absence or a period for which a person is absent on account of a period of long-term disability) granted in accordance with an established nondiscriminatory policy:

(i)    if such person returns to employment with an Employer or an Affiliate upon the expiration of (and in accordance with the terms of) such leave of absence, (i) such person shall not be considered to have incurred a Severance Date on account of such period of leave of absence and (ii) such period of leave of absence shall, for purposes of determining such person's Years of Vesting Service be considered to be a period of employment; and

- 14 -

(ii)      if such person fails to return to employment with an Employer or an Affiliate upon the expiration of such leave of absence, such person's Severance Date shall be the later of the date determined under clause (ii) of Section 1.46(a) above or the date on which such person is, as a result of such failure to so return to employment, classified as terminated by the Employer or Affiliate by which such person was last employed prior to the commencement of such leave of absence.

Section 1.47 - Spinoff Date.  May 31, 1994, the date as of which American Express Company issued a special dividend to its common stockholders consisting of common shares of the Company and the Company and American Express Company ceased to be Affiliates.

Section 1.48 - Trust Agreement.  The agreement or agreements entered into between the Company and Trustee or Trustees to hold and administer the assets of the Plan.

Section 1.49 - Trust Fund(s).  The assets or any part thereof of every kind and description held under the Trust Agreement.

Section 1.50 - Trustee.  The trustee or trustees at any time holding the assets of the Plan as provided in Article VIII.

Section 1.51 - Twelve Month Period of Service.  For purposes of determining eligibility to share in Employer Contributions, the period beginning on an employee's Employment Date during which the employee has at least twelve months of service.  Service for this purpose shall continue until the employee incurs a severance from service date, as defined in paragraph (i) below.  Effective for Employer Contributions for the Plan Year beginning January 1, 2005, a month of service for this purpose means a calendar month during any part of which an employee completes an Hour of Service.  If an Employee has a severance from service date due to an event described in clause (A) of such paragraph before satisfying the twelve months of service requirement and then performs an Hour of Service before incurring a one-year period of severance (as defined in paragraph (ii) below), the period of severance will be taken into account in determining eligibility and will be deemed to be service.  If absence from service occurs due to an event described in clause (B) of paragraph (i) and a severance from service date described

- 15 -

such clause (A) occurs within the twelve consecutive month period commencing on the first day of such absence, service shall include the period of severance if an Hour of Service is performed within the twelve consecutive month period commencing on the first day of the absence from service described in such clause (B).  For purposes of the foregoing:

(i)      "Severance from service date" means the earlier of:  (A) the date on which the employee quits, retires or is discharged; or (B) the first anniversary of the date beginning a period of absence from service (with or without pay) with all Employers and Affiliates for any other reason (such as vacation, holiday, sickness, disability, leave of absence or layoff).  Notwithstanding the foregoing sentence, the severance from service date of an employee who is absent from service beyond the first anniversary of such absence by reason of a Maternity or Paternity Absence is the second anniversary of such absence.

(ii)      "One-year period of severance" means a 12-consecutive month period, beginning on the employee's severance from service date or on any anniversary of such date, during which the employee does not perform an Hour of Service.

(iii)      If a former employee of an Employer or an Affiliate (1) has not completed a Twelve Month Period of Service by his severance from service date as defined in paragraph (i) above, and (2) is reemployed by an Employer or Affiliate, all service during the prior period of employment will be aggregated with service following reemployment in determining when a Twelve Month Period of Service has been completed; provided, however, that any service before a period of consecutive one-year periods of severance (as defined in paragraph (ii) above) will not be taken into account in such determination if the number of consecutive one-year periods of severance equals or exceeds the greater of 5 or the aggregate number of years of service.

(iv)      An individual's Employment Date and Hours of Service (if applicable) shall be determined without regard to the provisions of  Article XVIII (i.e., only service as a common law employee shall be taken into account, and not service as a leased employee, whether or not such service is credited for other purposes under the Plan)

- 16 -

(v)      Notwithstanding anything in Section 1.3 or any other provision of the Plan to the contrary, an entity that is not an Employer shall be treated as an Affiliate for purposes of determining eligibility to share in the allocation of Employer Contributions by reason of completing a Twelve Month Period of Service only if such entity comes within the definition of "Affiliate" in Section 1.3(a) based solely on actual direct or indirect ownership of the requisite interests in such entity, and without regard to any constructive ownership attributed by reasons of options or otherwise (and which is therefore taken into account in determining Affiliate status for purposes of vesting).

Section 1.52 - Valuation Date.  Effective as of the Daily Valuation Effective Date, each business day on which the New York Stock Exchange is open for trading, and the last day of the Plan Year whether or not such a business day.

Section 1.53 - Years of Vesting Service.  Years of vesting service as determined under Section 7.1.2.

KL3 2630220.9

ARTICLE II

ELIGIBILITY

Section 2.1 - Eligibility for Participation

(a)     All Employees who were Participants on July 1, 1995 shall continue to participate in the Plan according to the provisions of the Plan in effect on and after July 1, 1995.

(b)     Each other Employee shall be eligible to become a Participant on the later of July 1, 1995 (if he is then an Employee) or his Employment Date (and the twelve-month waiting period formerly in effect shall cease to apply).

Section 2.2 - Effective Date of Participation

An eligible Employee must enroll in accordance with procedures established by the Committee in order to have the Employer begin making payroll deductions for Section 401(k) Contributions to the Plan.  Such Employee shall become a Participant as of the first day of the month in which payroll deductions begin  (or, if earlier, the date on which the Employee first makes a rollover contribution to the Plan, or any other amounts are transferred to the Plan for his benefit, pursuant to Section 3.9).  Notwithstanding the foregoing, an eligible Employee who does not enroll but who is entitled to receive an Employer contribution pursuant to Section 4.1, shall become a Participant as of the date the first such contribution is credited to his Employer Contributions Account.

At the election of the Employee pursuant to Section 3.3, payroll deductions hereunder shall commence at the percentage elected as soon as administratively practicable following the date on which the Employee enrolls.

Section 2.3 - Duration of Participation

An Employee who becomes a Participant shall continue to be a Participant until he ceases to be an Employee; provided, however, that such person shall continue to be a Member for as long as he has an undistributed Member's Account.

Section 2.4 - Reemployment

In the event a Member, former Member, or former employee of an Employer or an Affiliate is reemployed, he shall be eligible to recommence (or commence) participation in the Plan on the date he again becomes an Employee (or, if earlier, the date on which the Employee first makes a rollover contribution to the Plan, or any other amounts are transferred to the Plan for his benefit, pursuant to Section 3.9).  Such Employee shall again become (or first become) a Participant as of the earlier of the date he enrolls in accordance with procedures established by the Committee or the date a contribution made by the Employer pursuant to Section 4.1 is credited to the Participant's Employer Contributions Account.

- 19 -

## ARTICLE III

## SECTION 401(K) CONTRIBUTIONS, ROLLOVER CONTRIBUTIONS AND TRANSFERS

### Section 3.1 - Section 401(k) Contributions

(a)    Section 401(k) Contributions.  Each Employee may elect to have the Employer contribute on his behalf Section 401(k) Contributions in an amount equal to a whole percentage of his Compensation otherwise payable in cash, not to exceed twenty-five percent (25%) of such Compensation effective January 1, 2002, and fifty percent (50%) of such Compensation effective January 1, 2004; provided, that a whole percentage shall not be required if deemed necessary or appropriate to comply with any applicable limitations on the amount of Section 401(k) Contributions permitted.  For all or part of any Plan Year, the Committee may, in its sole discretion, establish a lower maximum elective percentage with respect to Section 401(k) Contributions either for all Employees or for a specified group of Employees which does not discriminate in favor of Highly Compensated Employees.  The Committee shall decrease the amount of Section 401(k) Contributions made on behalf of an Employee for any payroll period to the extent the sum of such Section 401(k) Contributions, the amount of the Employee's deductions for such payroll period for welfare benefits sponsored by the Employer, any withholding from pay required by law, and any other deductions requested by the Employee which under the Employer's payroll procedure are treated as a priority claim relative to the contributions to this Plan exceeds the Employee's Compensation for such payroll period.

(b)    Elective Deferral Limit.

No Participant shall be permitted to have Section 401(k) Contributions during the Employee's taxable year (which shall be presumed to be the calendar year) in excess of the Elective Deferral Limit in effect at the beginning of such taxable year.  Section 401(k) Contributions during an Employee's taxable year shall be discontinued for the remainder of that year when the aggregate Section 401(k) Contributions for the Participant equals the Elective Deferral Limit for that year.

- 20 -

For purposes of this Article III, the Elective Deferral Limit means the amount set forth in the table below, reduced by the amount of "elective deferrals" (as defined in Section 402(g)(3) of the Code) made by the Participant during his taxable year under any plans or agreements maintained by an Employer or Controlled Group Affiliate (described in Section 1.3(a)) other than this Plan (and, in the sole discretion of the Committee, any plans or agreements maintained by any other employer, if reported to the Committee at such time and in such manner as the Committee shall prescribe).

### Elective Deferral Limit Effective January 1, 2002

| Calendar Year | Amount |
|---|---|
| 2002 | $11,000 |
| 2003 | $12,000 |
| 2004 | $13,000 |
| 2005 | $14,000 |
| 2006 | $15,000 |
| Years subsequent to 2006 | $15,000, as adjusted in accordance with Section 402(g)(4) of the Code |

If the Elective Deferral Limit is exceeded for a Participant's taxable year, the excess of Section 401(k) Contributions (excluding amounts characterized or recharacterized as Catch-Up Contributions) made for such year over such limit may be distributed no later than April 15 following the close of the taxable year in the sole discretion of the Committee. Any amount so distributed shall be adjusted for income and loss for the Plan Year attributable thereto. The amount of excess contributions to be distributed for a taxable year shall be reduced by the amount of Section 401(k) Contributions previously distributed by the Plan on or after the beginning of such taxable year in order to comply with the limitations of Section 3.4. Such distribution shall be made on a pro rata basis from the Investment Fund or Funds in which such excess contributions were invested.

In order to receive such excess Section 401(k) Contributions, the Participant must make a claim therefore in accordance with procedures established by the Committee (but in no event later than March 1 of the year of distribution), which includes (a) a statement that the Participant's Elective Deferral Limit will be exceeded unless the excess Section 401(k)

KL3 2630220.9

Contributions are distributed, and (2) an agreement to forfeit (notwithstanding Section 7.1) any Matching Contributions made with respect to such excess Section 401(k) Contributions and allocated to his Employer Contributions Account.  Matching Contributions forfeited pursuant to this Section 3.1 shall be applied to reduce future Employer Contributions as provided in Section 4.1.

(c)    Optional Distribution of Excess Deferrals.  For purposes of this Section 3.1, "excess deferrals" means the excess of a Participant's Section 401(k) Contributions (excluding any amount designated as Catch-Up Contributions under Section 3.10) for a Plan Year over the Elective Deferral Limit applicable under Section 3.1(b), plus the excess of any Section 401(k) Contributions purportedly made as Catch-Up Contributions over the dollar limit on the amount of such contributions applicable under Section 3.10.  Excess Deferrals may, in the sole discretion of the Administrator, be distributed to the Participant no later than April 15 of the following Plan Year.

If the "elective deferrals" (as defined in Section 402(g)(3) of the Code) made by a Participant during his taxable year under this Plan and any other plans or agreements maintained by an Employer or Controlled Group Affiliate (described in Section 1.3(a)) shall exceed the Elective Deferral Limit (and where applicable, the catch-up limit of Section 3.10), the Committee shall deem such a claim to have been delivered by the Participant and make distribution in accordance with this Section 3.1 no later than such April 15.

## Section 3.2 - Allocation to Participant's Account

Effective on and after the Daily Valuation Effective Date, contributions made in accordance with Section 3.1 shall be credited to the Section 401(k) Contributions Accounts of Participants on the date on which such contributions are received by the Trustee and the Administrator has received the information necessary to permit such crediting; provided, however, that all Section 401(k) Contributions for a Plan Year shall be allocated no later than the last day of such Plan Year, and provided further that such allocation shall not be taken into account for purposes of adjusting the Member's Accounts for investment gains or losses until such contributions have been credited as above-provided.  Contributions under Section 3.1 shall be transferred to the Trust Fund as soon as administratively practicable after they are deducted

from the Compensation of the Participant (and, except as may be occasionally required by bona fide administrative considerations, shall in no event be transferred before the applicable election is made, or before the performance of services with respect to which such Compensation is paid (or when such Compensation would be currently available, if earlier).

Section 3.3 - Participant's Election of Section 401(k) Contributions

(a)    General.  Each Employee shall have the right to elect, in accordance with procedures established by the Committee, to have the Employer make Section 401(k) Contributions on his behalf pursuant to Section 3.1.  Such election shall be made prior to and be effective upon becoming a Participant and shall thereafter remain in effect until changed.

(b)    Election Changes.  Effective as of the Daily Valuation Effective Date, a Participant may increase or decrease, discontinue, or resume, his Section 401(k) Contributions to the Plan (within the limits permitted by Section 3.1) by requesting such change in accordance with procedures established by the Committee.  The contribution rate in effect for Section 401(k) Contributions shall apply both to periodic payments of Compensation and to Compensation paid in a single sum.  Contribution rates and any suspension of contributions, including without limitation a suspension of contributions due to a hardship withdrawal or a cessation of contributions due to a Participant's termination of employment or transfer to employment other than as an Employee, shall remain in effect until changed or suspended or reactivated or any other new election is made (as the case may be) in accordance with this Section 3.3.  However, a reduction or cessation of Section 401(k) Contributions solely to reflect the Elective Deferral Limit (as defined in Section 3.1), or adjustments of the contribution rate made pursuant to Section 3.7 in order to avoid a violation of nondiscrimination requirements or maximum limits on permitted allocations, shall apply only for the remainder of the Plan Year in which first effected, and if the Participant continues as an Employee to January 1 of the following Plan Year, the contribution rate previously in effect shall be reinstated as of such January 1, except as otherwise timely elected by the Participant or determined by the Committee pursuant to Section 3.4, 3.6, or 3.7, or as may be required by an intervening hardship withdrawal.  A former Employee who returns to employment as an Employee may

elect to resume Section 401(k) Contributions to the Plan in accordance with the same procedures that apply to a new Employee.

### Section 3.4 - Limitation on Section 401(k) Contributions

(a)    <u>Actual Deferral Percentage Test</u>. Notwithstanding Section 3.1, Section 401(k) Contributions for any Plan Year for a Participant who is a Highly Compensated Employee for such year shall be reduced if and to the extent deemed necessary or advisable by the Committee in order to satisfy either (i) or (ii) below:

(i)    The Actual Deferral Percentage for Participants who are Highly Compensated Employees for the Plan Year shall not exceed the Actual Deferral Percentage for the Applicable Plan Year for Participants who are not Highly Compensated Employees multiplied by 1.25.

(ii)    The Actual Deferral Percentage for the Plan Year for Participants who are Highly Compensated Employees shall not exceed the Actual Deferral Percentage for the Applicable Plan Year for Participants who are not Highly Compensated Employees multiplied by 2, provided that the Actual Deferral Percentage for Participants who are Highly Compensated Employees is not more than 2 percentage points higher than the Actual Deferral Percentage for the Applicable Plan Year for Participants who are not Highly Compensated Employees.

The status of an individual as a non-Highly Compensated Employee for an Applicable Plan Year shall be determined based on the definition of Highly Compensated Employee in effect for such Applicable Plan Year

(b)    <u>Calculation of Individual Ratios</u>.  For purposes of this Article III, the "Actual Deferral Percentage" for any group of individuals for a Plan Year (including an Applicable Plan Year) means the average of the individual ratios, for each person in such group, of (a) his share of Section 401(k) Contributions for the Plan Year, excluding any such contributions characterized or recharacterized as Catch-Up Contributions under Section 3.10(d), (and amounts taken into account as Section 401(k) Contributions pursuant to Section 3.4(d) below) to (b) his Compensation for the Plan Year.  The individual ratios, and the Actual

Deferral Percentage for any group of individuals, shall be calculated to the nearest one-hundredth of one percent (0.01%).

(c)    <u>Contributions in Excess of Elective Deferral Limit</u>.  Section 401(k) Contributions by a non-Highly Compensated Employee that exceed the Elective Deferral Limit (as defined in Section 3.1) (and where applicable, the catch-up limit set forth in Section 3.10(c)) based solely on elective deferrals under this Plan and any similar plan of an Employer or Affiliate, and which are therefore required to be refunded pursuant to the last paragraph of Section 3.1(b), shall be disregarded in determining Actual Deferral Percentages.  However, Section 401(k) Contributions that exceed the Elective Deferral Limit by reason of elective deferrals under plans of any other employer shall be taken into account, even if so refunded; and all Section 401(k) Contributions by Highly Compensated Employees shall be taken into account without regard to such limit.

(d)    <u>QNECs and QMACs</u>.  For purposes of calculating the Actual Deferral Percentage for Plan Years prior to January 1, 2005, Employer Contributions may be treated as Section 401(k) Contributions in accordance with Treasury Reg. § 1.401(k)-1(b)(5) as then in effect, to the extent such contributions are not taken into account for purposes of determining the Contribution Percentage under Section 3.6.  For subsequent Plan Years, Employer Contributions made as QNECs under Section 4.1(f) may be so taken into account in accordance with applicable regulations, including Treasury Reg. § 1.401(k)-2(a)(6).

(e)    <u>Compliance Testing</u>.  The Committee shall determine, during and as of the end of each Plan Year, the Actual Deferral Percentages relevant for purposes of this Section 3.4, based on the actual rate of Compensation and Section 401(k) Contributions then in effect for Participants in light of their salary reduction agreements under Section 3.3 and their projected Compensation and Section 401(k) Contributions (and amounts taken into account as Section 401(k) Contributions pursuant to Section 3.4(d) above) for the remainder of the Plan Year.  If, based on such determination, the Committee concludes that a reduction in the Section 401(k) Contributions (and amounts taken into account as Section 401(k) Contributions) made for any Participant is necessary in order to comply with the limitations of this Section 3.4, it shall so notify each affected Participant and his Employer of the reduction it deems necessary

- 25 -

or desirable for this purpose.  In such event, Section 401(k) Contributions shall be reduced in accordance with the Committee's determination, and the salary reduction agreement of each Participant affected by such determination modified accordingly.  Any such reduction may apply either to all Participants, only to Participants who are Highly Compensated Employees, or to any other group as the Committee shall determine, and in such manner as the Committee shall determine.

(f)    Participants for ADP Purposes.  For purposes of performing the Actual Deferral Percentage test of this Section 3.4, an individual eligible to make Section 401(k) Contributions who fails to do so shall be treated as a Participant with a contribution percentage of zero.

Section 3.5 - Contributions in Excess of Section 401(k) Limit

For purposes of this Section 3.5, "Excess ADP Contributions" means, with respect to any Plan Year, the excess of (i) the aggregate amount of Section 401(k) Contributions (and any amounts taken into account as Section 401(k) Contributions pursuant to Section 3.4(d)) actually paid into the Plan on behalf of Highly Compensated Employees for such year, over (ii) the maximum amount of Section 401(k) Contributions (and amounts taken into account as Section 401(k) Contributions) permitted for such year under the limitations set forth in Section 3.4, determined by reducing the amount of Section 401(k) Contributions (and amounts so taken into account as Section 401(k) Contributions) to be permitted on behalf of Highly Compensated Employees in the order of their Actual Deferral Percentages (as defined in Section 3.4), beginning with the highest of such percentages.  The aggregate amount of any Excess ADP Contributions so determined for any Plan Year shall be distributed in cash to Highly Compensated Employees on the basis of the respective amounts of Section 401(k) Contributions (and amounts so taken into account as Section 401(k) Contributions) made on their behalf, reducing the largest amounts of deferrals first, and successively to the extent necessary until the entire amount of such excess is distributed.

The amount of Excess ADP Contributions to be distributed or recharacterized under the foregoing provisions shall be reduced by Section 401(k) Contributions in excess of the

Elective Deferral Limit (as defined in Section 3.1(b)) previously distributed for the taxable year of the Participant ending in the same Plan Year.

Any distribution of Excess ADP Contributions shall be made no later than March 15 of the following Plan Year if possible, and in any event no later than the close of such following Plan Year. Any amount so distributed shall be adjusted for income and loss attributable thereto under the allocation rules of Section 9.3 in respect of the Plan Year in which such excess contributions were made, and, for the 2006 and 2007 Plan Years, the "gap period" income or loss for the period from the last day of the Plan Year to the date of distribution, as determined under the applicable safe harbor rule in Treasury Reg. § 1.401(k)-2(b)(2)(vi)(D). Such distribution shall be made pro rata from each account and pro rata from the Investment Fund or Funds in which such excess contributions were invested.

### Section 3.6 - ACP Limitation on Matching Contributions

(a)    In General.  Notwithstanding any other provision of this Plan, Matching Contributions for any Plan Year for a Participant who is a Highly Compensated Employee for that Plan Year shall be reduced if and to the extent deemed necessary or advisable by the Committee in order to satisfy either (i) or (ii) below:

(i)    The Contribution Percentage (as defined in Section 3.6(b)) for Participants who are Highly Compensated Employees for the Plan Year shall not exceed the Contribution Percentage for the Applicable Plan Year for Participants who are not Highly Compensated Employees multiplied by 1.25.

(ii)    The Contribution Percentage for Participants who are Highly Compensated Employees for the Plan Year shall not exceed the Contribution Percentage for the Applicable Plan Year for Participants who are not Highly Compensated Employees multiplied by 2, provided that the Contribution Percentage for Participants who are Highly Compensated Employees is not more than two percentage points higher than the Contribution Percentage for the Applicable Plan Year for Participants who are not Highly Compensated Employees.

(b)    Determination of Contribution Percentage.  For purposes of this Article III, the "Contribution Percentage" for any group of persons means the average of the individual

- 27 -

ratios, for each person in such group, of (x) such person's share of Matching Contributions (excluding Matching Contributions taken into account under Section 3.4 in determining the Actual Deferral Percentage) for the Plan Year (including an Applicable Plan Year) to (y) such person's Compensation for the Plan Year.  The individual ratios, and the Contribution Percentage for any group of individuals, shall be calculated to the nearest one-hundredth of one percent (0.01%).

(c)    Contributions Treated as Matching Contributions.  For purposes of calculating the Contribution Percentage, (i) Basic Contributions under Section 4.1 may be taken into account as Matching Contributions for Plan Years prior to January 1, 2005 if the conditions of Treasury Reg. § 1.401(m)-1(b)(5) as then in effect are met, and (ii) Employer Contributions made as QNECs under Section 4.1(f) for subsequent Plan Years may be so taken into account if the conditions of such regulation or, effective January 1, 2006, Treasury Reg. § 1.401(m)-2(a)(6), are met, to the extent such contributions are not taken into account for purposes of the Actual Deferral Percentage test pursuant to Section 3.4.  In addition, Section 401(k) Contributions may be taken into account as Matching Contributions if the Average Deferral Percentage Test for the Plan Year is met both including and excluding the Section 401(k) Contributions so taken into account.

(d)    Compliance Testing.  If, based on a determination similar to that described in Section 3.4, the Committee shall conclude that a reduction in the Matching Contributions made for or by any Participant is necessary or advisable in order to comply with the limitations of this Section 3.6, such Matching Contributions, shall be reduced in accordance with the direction of the Committee, and the election of any affected Participant made under Section 3.3 shall be modified accordingly.  Any such reduction may be made applicable to all Participants, only to Participants who are Highly Compensated Employees, or to any other group as the Committee shall determine, in such manner as the Committee shall determine.

(e)    Treatment of Excess Contributions.  For purposes of this Section 3.6(e), "Excess 401(m) Contributions" means, with respect to any Plan Year, the excess of (x) the aggregate amount of Matching Contributions and Section 401(k) Contributions that the Committee elects to take into account in determining the Contribution Percentage, if any

("401(m) Contributions"), actually paid into the Plan by or for Highly Compensated Employees for such Plan Year, over (y) the maximum amount of such contributions permitted for such Plan Year under the limitations set forth in Section 3.6(a), determined by reducing the amount of such contributions by or for Highly Compensated Employees in the order of their individual ratios (as described in Section 3.6(b)) beginning with the highest of such ratios.  The aggregate amount of any Excess 401(m) Contributions paid into the Plan for any such Plan Year shall be distributed to Highly Compensated Employees on the basis of their respective amounts of 401(m) Contributions first, and successively to the extent necessary until the entire amount of such Excess 401(m) Contributions is distributed.  The amount of Excess 401(m) Contributions to be so distributed for any Plan Year shall be paid to the affected Highly Compensated Employees in cash no later than March 15 of the following Plan Year if possible, and in any event no later than the close of such following Plan Year.  Any amount so distributed shall be adjusted for income and loss attributable thereto under the allocation rules of Section 9.3 in respect of the Plan Year in which such Excess 401(m) Contributions were made, and, for distributions for the 2006 and 2007 Plan Years, the "gap period" income or loss for the period from the last day of the Plan Year to the date of distribution, as determined under the applicable safe harbor rule in Treasury Reg. §1.401(m)-2(b)(2)(iv)(D).  If a Member's Account from which such a distribution is to be made is invested in more than one Investment Fund, such distribution shall be made pro rata, to the extent practicable, from all such Investment Funds.

(f)    Participants for ACP Purposes.  For purposes of performing the section ACP test of this Section 3.6, an individual eligible to make Section 401(k) Contributions who fails to do so shall be treated as a Participant with a contribution percentage of zero.

### Section 3.7 - Adjustment of Section 401(k) Contributions

Notwithstanding any of the foregoing provisions to the contrary, a Participant may, at such time and in such manner as the Committee may prescribe, or the Committee may, on its own initiative, suspend or change the amount of reduction in Compensation, or payroll deduction, provided for under the foregoing provisions of this Article III in order to avoid an allocation of contributions to a Participant's Member's Account which would violate the limitations of Section 3.4 or 3.6, or Article V.

- 29 -

Section 3.8 - Special Rules

3.8.1      Employees Included in Testing; Disregard of NHCE's with Less than 1 Year of Service.  In applying the Actual Deferral Percentage test of Section 3.4 or the Contribution Percentage test of Section 3.6, an Employee shall be taken into account as a Participant from the date he becomes an Employee eligible to make contributions taken into account thereunder, whether or not he elects to contribute or otherwise becomes a Participant under Section 2.2.  Notwithstanding the foregoing, if the Plan applies Section 410(b)(4)(B) of the Code in determining whether the Plan provisions for Section 401(k) Contributions meet the requirements of Section 410(b) of the Code, Participants who are non-Highly Compensated Employees for the Applicable Plan Year who have not completed a Twelve Month Period of Service shall be disregarded for purposes of the Actual Deferral Percentage test.

3.8.2      Multiple Arrangements for Highly Compensated Employees Combined.  If more than one plan providing for a cash or deferred arrangement, or for matching contributions, or employee contributions (within the meaning of Sections 401(k) and 401(m) of the Code) is maintained by the Employer or an Affiliate, the individual ratios of any Highly Compensated Employee who participates in more than one such plan or arrangement shall, for purposes of determining the Actual Deferral Percentage (as defined in Section 3.4) and Contribution Percentage (as defined in Section 3.6), be determined in accordance with applicable regulations as if all such arrangements were a single plan or arrangement.

3.8.3      Aggregation of Plans.  In the event that this Plan satisfies the requirements of Section 410(b) of the Code only if aggregated with one or more other plans, then this Article III shall be applied by determining the Actual Deferral Percentage and Contribution Percentage of Participants as if all such plans were a single plan.  Plans may be aggregated under this Section 3.8.3 only if they have the same plan year.

3.8.4      Collective Bargaining Unit Employees.  The provisions of Section 3.4 shall be applied separately to employees in any collective bargaining unit participating in the Plan.  If employees in more than one bargaining unit are eligible under the Plan, the Committee, in its discretion, may apply such provisions separately to each separate collective bargaining unit, on an aggregate basis with respect to all collective bargaining units, or separately with

- 30 -

respect to such collective bargaining units or combinations of bargaining units as it determines, provided that such treatment is determined on a basis that is reasonable and reasonably consistent from year to year.  Employees in a collective bargaining unit shall be disregarded in applying the provisions of Section 3.6.

<u>Section 3.9 - Rollover Contributions and Other Transfers from Qualified Plans</u>

(a)  <u>Rollovers</u>.  An Employee or a Participant may make a contribution, in cash or such other property as the Committee may permit, to the Plan of any amounts that qualify as rollover amounts under Sections 402(c), 403(a)(4), or 408(d)(3) of the Code, including eligible rollover distributions from a defined benefit plan, provided the Committee consents to the Employee's or the Participant's application to make such contributions following receipt of written certification from the Employee or Participant (or such other certification as the Committee may require) that such contribution is eligible for rollover into this Plan.  Any rollover contributions made to the Plan in accordance with this Section 3.9 shall be deposited in a Rollover Account established in the name of the Employee or the Participant.

(b)  <u>Trust-to-Trust Transfers</u>.  With the consent of the Company Representative, amounts may be transferred to the Plan on behalf of an Employee or Participant from other qualified plans, provided that the trust from which such funds are transferred permits the transfer to be made and, in the opinion of legal counsel for the Company, the transfer will not jeopardize the tax exempt status of the Plan or Trust or create adverse tax consequences for any Employer.  For purposes of this Section 3.9, amounts which may be transferred from another qualified plan are amounts transferred to the Plan directly from any tax qualified plan under Section 401(a) of the Code.  Prior to accepting any transfer to which this Section applies, the Committee may require the transferor plan to establish that the amounts to be transferred to this Plan meet the requirements of this Section and may also require the transferor plan to provide an opinion of counsel satisfactory to the Committee that the amounts to be transferred meet the requirements of this Section.  Any amounts transferred shall be deposited in an Employer Contributions Account, a Section 401(k) Contributions Account, After-Tax Contribution Account, and/or a Rollover Account, as applicable, established in the name of the Employee or the Participant.

KL3 2630220.9

(c)    Rollovers by Affiliate Employees.  An Affiliate may adopt this Plan and become an Employer hereunder solely for the purpose of authorizing its employees (excluding individuals described in clauses (A) through (E) of Section 1.22) to make Rollover Contributions to the Plan of eligible rollover distributions within the meaning of Section 3.9(a) above.  An employee of such an Employer who makes such a Rollover Contribution shall be a Participant solely with respect to his Rollover Account, and shall not be entitled to make or share in any other contributions under the Plan with respect to his employment by such Employer.

(d)    Prohibition of Transfers From Plans Requiring Life Annuity Forms.  With respect to transfers under Section 3.9(b), this Plan shall not accept any direct or indirect transfers from a defined benefit plan, money purchase plan (including a target benefit plan), stock bonus or profit sharing plan which would have provided for a life annuity form of payment to the Employee or Participant.

Section 3.10 - Catch-Up Contributions

(a)    Effective January 1, 2002 and thereafter, all employees who are eligible to make Section 401(k) Contributions under this Plan and who have attained age 50 before the end of the Plan Year (catch-up eligible employee) shall be eligible to make Catch-Up Contributions in accordance with, and subject to the limitations of, Section 414(v) of the Code.  Catch-Up Contributions shall not be taken into account for purposes of the provisions of the Plan implementing the required limitations of Section 402(g) of the Code (Section 3.1(b)) and Section 415 of the Code (Article V).  The Plan shall not be treated as failing to satisfy the provisions of the Plan implementing the requirements of Sections 401(k)(3), 410(b), or 416 of the Code (such as Section 3.4), as applicable, by reason of the making of Catch-Up Contributions.

(b)    Method of Contribution.  Catch-Up Contributions shall be made in accordance with such procedures as the Committee may specify from time to time.  Unless otherwise determined by the Committee, Section 401(k) Contributions intended to constitute Catch-Up Contributions may be made only by a separate election to have the Employer contribute on a Participant's behalf an additional amount equal to a whole percentage of his

Compensation otherwise payable in cash, not to exceed twenty-five percent (25%) of such Compensation, designating such amounts as Catch-up Contributions. Catch-Up Contributions, and any amounts so designated (even if they fail to qualify as catch-up contributions in accordance with Section 414(v) of the Code and regulations thereunder), shall not be eligible for Matching Contributions.

(c)     Limit on Catch-Up Contribution. The total amount of Catch-Up Contributions allowed for any Plan Year for any Participant shall not exceed the limit applicable under the following table:

| Plan Year | Limit |
|-----------|-------|
| 2002 | $1,000 |
| 2003 | $2,000 |
| 2004 | $3,000 |
| 2005 | $4,000 |
| 2006 | $5,000 |

The limit for 2007 and thereafter shall be the limit for 2006, as adjusted for cost of living increases in accordance with Section 414(v) of the Code.

(d)     If Catch-up Contributions by a Catch-up eligible employee for a Plan Year described in paragraph (b) above are less than the limit on Catch-up Contributions for such Plan Year, Section 401(k) Contributions by the Participant that are determined as of the end of the Plan Year to exceed the ADP limit applicable to Highly Compensated Employees for the Plan Year shall be treated as Catch-up Contributions up to the remaining balance of such limit.

(e)     Treatment of Catch-up Contributions. A Participant's Catch-up Contributions shall be credited to his Section 401(k) Contributions Account and shall be treated as Section 401(k) Contributions except to the extent that a different treatment is specified in this Section 3.10.

- 33 -

ARTICLE IV

EMPLOYER CONTRIBUTIONS

Section 4.1 - Employer Contributions

(a)    Plan Years beginning prior to December 31, 1994.  Removed.  Consult prior restatements.

(b)    December 31, 1994 to December 31, 2004.  For Plan Years beginning on or after December 31, 1994 and ending on or before December 31, 2004, if and to the extent authorized by the Company, each Employer shall contribute to the Plan on behalf of individuals on the Employer's payroll as Employees on the last day of such Plan Year, the following amounts as applicable:

(1)    If the Employee is an Eligible Participant (as defined in paragraph (3) below) and has a Twelve Month Period of Service, (i) a Basic Contribution of four hundred dollars ($400) and (ii) a Matching Contribution equal to one hundred percent (100%) of the first six hundred dollars ($600) of his Section 401(k) Contributions made in accordance with Section 3.1 during the Plan Year, beginning with the Plan Year in which he has satisfied the Twelve Month Period of Service requirement.

(2)    To the extent funds remain after contributions are allocated under (1), for each Employee who is not an Eligible Participant as so defined, who has a Twelve Month Period of Service and whose Compensation (as modified by Subsection (d ) below) does not exceed $100,000, a Matching Contribution in a uniform amount up to one hundred percent (100%) of the first one thousand dollars ($1,000) of Section 401(k) Contributions made in accordance with Section 3.1 during the Plan Year, beginning with the Plan Year in which he has satisfied the Twelve Month Period of Service requirement.

(3)    For purposes of this Subsection (b), "Eligible Participant" means any Employee who is not (1) an hourly or salaried Employee whose

- 34 -

Compensation (as modified by Subsection (d) below) exceeds $37,800, (2) prior to December 31, 1996, a salaried Employee who receives more than $1,000 in commissions for the Plan Year, or (3) a Branch Manager, Financial Consultant, Financial Consultant Associate, Institutional Salesperson or, effective August 2, 1993, Investment Representative or Investment Representative trainee, or any successor position or any other position designated to be excluded (as such position is described in the Company's job classifications).

(4)    The amount of the total contribution under this Section 4.1(b) and the portion to be made by each Employer for each Plan Year shall be determined by the Company; provided, however, that no contribution shall be made for the Plan Year beginning and ending on December 31, 2000.

(c)    Effective January 1, 2005.  For Plan Years beginning on or after January 1, 2005, if and to the extent authorized by the Company (where required, by action of the person or persons authorized to approve grants of equity compensation in accordance with rules of the New York Stock Exchange), each Employer shall make a contribution to the Plan, in the amounts set forth below, as applicable, on behalf of individuals who were (i) on the Employer's payroll for the Plan Year and (ii) who were employed on the last day of such Plan Year by (x) an Employer, or, (y) for Matching Contributions for Plan Years ending December 31, 2006 and thereafter, an Employer or an Affiliate,:

(1)    If the Employee is an Eligible Participant (as defined in paragraph (3) below) who has a Twelve Month Period of Service and an Employment Date no later than December 31 of the prior calendar year, (i) a Basic Contribution of five hundred dollars ($500) and (ii) a Matching Contribution equal to one hundred percent (100%) of the first three thousand five hundred dollars ($3,500) of his Section 401(k) Contributions made in accordance with Section 3.1 during the Plan Year, beginning with

- 35 -

the Plan Year in which he has satisfied the Twelve Month Period of Service requirement.

(2)     To the extent funds remain after contributions are allocated under (1), for each Employee who is not an Eligible Participant as so defined and who has (i) a Twelve Month Period of Service, (ii) an Employment Date no later than December 31 of the prior calendar year, and (iii) Compensation (as modified by Subsection (d) below) for the Plan Year that does not exceed $200,000, a Matching Contribution in a uniform amount up to one hundred percent (100%) of the first four thousand dollars ($4,000) of Section 401(k) Contributions made in accordance with Section 3.1 during the Plan Year, beginning with the Plan Year in which he has satisfied the Twelve Month Period of Service requirement.

(3)     For purposes of this Subsection (c), "Eligible Participant" means any Employee whose Compensation (as modified by Subsection (d) below) for the Plan Year does not exceed $50,000, and who is not a Branch Manager, Financial Consultant, Financial Consultant Associate, or Institutional Salesperson, or in any successor position or any other position designated to be excluded (as such position is described in the Company's job classifications).

(4)     Notwithstanding the discretion reserved to the Company to determine separately for each Plan Year whether and to what extent Employer Contributions shall be made for such Plan Year, the aggregate of the Basic Contributions and Matching Contributions to be made for each Plan Year shall not be less than the total amount of forfeitures during such Plan Year (as adjusted for earnings or other investment adjustments applicable to such amount) that were not applied prior to the end of such Plan Year to offset obligations for Employer Contributions under Section 4.1(c) or (f).

(5)     Unless otherwise determined by the Committee, in the event that an Employee is employed by more than one Employer during a Plan Year,

KL3 2630220.9

the contribution shall be made by the last Employer for whom the individual performed services as an Employee during such Plan Year.

(d)    <u>Compensation for 4.1 Purposes</u>.  Solely for purposes of this Section 4.1, Compensation shall mean W-2 earnings and (without duplication) Section 401(k) Contributions and Catch-Up Contributions, and any amounts deferred under any nonqualified deferred compensation plan of the Employer.

(e)    <u>Offset of Employer Contributions Obligation by Application of Forfeitures</u>.  Employer contributions described in this Section 4.1 may be reduced by any amount forfeited pursuant to Section 3.1, 7.1.3 or 14.2, or paid into the Plan and not allocable by reason of Section 5.2 or Subsection 4.1(g), and effective December 31, 2003, by any interest or other amounts earned on any such forfeited amounts prior to their application to offset such Employer contributions.  Forfeitures for a Plan Year occurring prior to the making of all Employer Contributions for the prior Plan Year shall be used first to offset such unpaid Employer Contributions for the prior Plan Year, and (if any balance remains) then to offset Employer Contributions for the year of forfeiture.

(f)    <u>QNEC's</u>.  The Company Representative may increase the amount of Basic Contributions for any Plan Year prior to January 1, 2005, and for subsequent Plan Years may create a new, additional class of Employer Contributions for such class of non-Highly Compensated Employees as it may specify ("QNECs"), if and to the extent it deems necessary or advisable in order to facilitate compliance within the Actual Deferral Percentage and Actual Contribution Percentage tests of Sections 3.4 and 3.6.  Any such Employer Contributions shall be nonforfeitable when made without regard to the age and service of the Members to whom they are allocated, and for Plan Years beginning on or after January 1, 2006, shall not exceed five percent of Compensation in the case of Members who are non-Highly Compensated Employees (or, if greater, twice the Plan's representative contribution rate as defined in Regulation § 1.401(k)-2(a)(6)(iv) or any successor regulations).

(g)    <u>Limit on Matching Contributions</u>.  No Matching Contributions shall be made with respect to (v) Section 401(k) Contributions which exceed the Elective Deferral Limit (as defined in Section 3.1), (w) Excess ADP Contributions (as defined in Section 3.5)

distributable pursuant to Section 3.5, (x) Catch-Up Contributions described in Section 3.10, or (y) Section 401(k) Contributions that the Participant elects to make on a basis that they are intended to constitute such Catch-Up Contributions, even though such contributions are ultimately determined not to qualify as Catch-Up Contributions.  Any amounts paid into the Trust Fund with the intention that they constitute Matching Contributions with respect to such amounts shall be retained in the Trust Fund and applied to meet the Employer's obligation to make other Employer Contributions pursuant to this Section 4.1.

<u>Section 4.2 - Transfer to Trust Fund</u>

The Employer Contributions under Section 4.1 shall be transferred to the Trust Fund at such time as the Employer may determine, but in no event shall the Employer Contributions be paid over to the Trust Fund later than the time prescribed by law for the Employer to obtain a federal income tax deduction for the Plan Year for which the contribution is made.  Nothing contained herein shall prohibit the Employer Contributions in advance of that time, provided, however, that effective January 1, 2006, Matching Contributions shall not (except as may be occasionally required by bona fide administrative considerations) be made prior to performance of the services with respect to which such contributions are made or the date of the election to make the related Section 401(k) Contributions (or the date the Compensation to which such election relates would be currently available, if earlier), or the actual making of such Section 401(k) Contributions.

<u>Section 4.3 - Allocation to Participant's Account</u>

The Employer Contributions made in accordance with Section 4.1 may be held in the Employer Suspense Account until such time as they are credited to the Employer Contributions Account of the respective Participants on whose behalf such contributions were made; provided, however, that Employer Contributions shall be credited to Participant's Employer Contributions Accounts no later than the last day of the Plan Year.  Contributions made after the close of a Plan Year in respect of that Plan Year shall be allocated as of the close of that Plan Year, but shall share in such valuation adjustment only for periods after they have been actually paid into the Trust Fund.

Section 4.4 - Qualified Military Service

Effective as of December 12, 1994, notwithstanding any provision of this Plan to the contrary, contributions shall be made with respect to a period in which an individual would have been an Employee eligible therefor but for his "qualified military service" as defined in Section 414(u) of the Code, and service for participation and vesting shall be credited for such qualified military service, to the extent required by Chapter 43 of Title 38 of the United States Code (USERRA). The amount of any Section 401(k) Contributions and Matching Contributions in respect thereof shall be based upon such individual's election made following his return to employment with the Employer following such military service (and within the time during which he had reemployment rights) in accordance with procedures established by the Committee; provided that no such Section 401(k) Contributions may exceed the amount the individual would have been permitted to elect to contribute had the individual remained continuously employed by the Employer throughout the period of such military service (and Matching Contributions shall be limited accordingly). Such contributions shall be taken into account as Annual Additions for purposes of Article V in the Limitation Year to which they relate, and for purposes of applying the Elective Deferral Limit in Section 3.1 in the calendar year to which they relate, rather than in the Limitation Year or calendar year in which made, and shall be disregarded for purposes of applying the limits described in Sections 3.4 and 3.6. Any such contribution shall be made no later than five years from the date of such return to employment or, if less, a period equal to three times the period of such military service.

- 39 -

ARTICLE V

LIMITATIONS ON ANNUAL ADDITIONS TO PARTICIPANT'S ACCOUNT

Section 5.1 - Limitations on Annual Additions

The "Annual Additions" (as hereinafter defined) allocated to a Participant in respect of any Plan Year beginning on or after January 1, 2002 shall not exceed in the aggregate the lesser of (a) $40,000 (as adjusted pursuant to section 415(d) of the Code) or (b) 100 percent of such Participant's Compensation.

Section 5.2 - Application

(a)     In the event that the Annual Additions allocated to a Participant under this Plan and all other Defined Contribution Plans maintained by an Employer exceed in the aggregate the limitations set forth in Section 5.1, the Employer shall first reduce the Annual Additions to such other Defined Contribution Plans to the extent necessary so that the aggregate Annual Additions to this Plan and to such other Defined Contribution Plans do not exceed such limitations for that Plan Year.

(b)     If the allocations to a Member's Account otherwise required under this Plan for any Plan Year would cause the limitations of this Article V to be exceeded for that Plan Year, contributions otherwise required with respect to such Participant under Articles III and IV shall be reduced to the extent necessary to comply with those limitations.  Such reductions shall be made first to Employer Contributions, and next to Section 401(k) Contributions.

If such reduction is not effected in time to prevent such allocations for any Plan Year from exceeding such limitations, any such reduction in Section 401(k) Contributions (adjusted for any gain attributable under the allocation rules of Section 9.3 to such excess contributions up to the last day of the Plan Year in which such contributions were made) shall be effected by distributing such excess Section 401(k) Contributions to the affected Participant. Distribution shall be made pro-rata from the Investment Fund or Funds in which such excess contributions were invested.

- 40 -

Any such distribution of excess contributions shall be limited to the extent such excess contributions were the result of a reasonable error in determining the amount of Section 401(k) Contributions permitted with respect to an individual under the limits of Section 415 of the Code after taking into consideration other Annual Additions for the year.

Excess Employer Contributions shall be used to reduce contributions for such Participant in the next Plan Year and each succeeding Plan Year if necessary; provided, that if the Participant is not covered by the Plan at the end of the current Plan Year, the portion exceeding the limitation of this Article V shall be held unallocated in a subaccount of the Employer Suspense Account for such Plan Year and shall be allocated and reallocated to the Member's Accounts of all Participants in the next Plan Year before any other contributions are allocated to the Member's Accounts of such Participants.  This subaccount of the Employer Suspense Account will reduce future contributions for all remaining Participants in the next Plan Year, and each succeeding Plan Year if necessary.

In the event of a termination of the Plan, unallocated amounts held in such subaccount of the Employer Suspense Account shall be allocated to the extent possible under this Article V for the Plan Year of termination.  Any amount remaining in such subaccount upon termination of the Plan shall then be returned to the Employer, notwithstanding any other provision of the Plan or Trust Agreement.

Section 5.3 - Ordering Rule for Multiple Plans

Reductions in allocations under this Article V arising by reason of a Participant's participation in multiple plans shall be effected in the reverse order in which such contributions would otherwise accrue, except as any other such plan may otherwise expressly provide.

Section 5.4 - Definitions

For purposes of this Article V, the following definitions shall apply:

(a)    "Annual Additions" shall mean the sum for any Plan Year of (1) employer contributions and forfeitures allocated to a Participant's Member's Account under this Plan for any Plan Year, (2) employer contributions and forfeitures allocated to his account under any

KL3 2630220.9

other Defined Contribution Plan (or portion thereof) of any Employer or Affiliate, (3) employee contributions under all such plans (or portions thereof), (4) amounts described in Section 419A(d)(2) of the Code (relating to post-retirement medical benefits of key employees) or allocated to a pension plan individual medical account described in Section 415(l) of the Code, to the extent includable for purposes of Section 415(c)(2) of the Code.  The employee contributions described in clause (3) hereof shall be determined without regard to (A) any rollover contributions, (B) any repayment of loans, (C) restoration of prior forfeitures following reemployment, or (D) Catch-Up Contributions.  Employer and employee contributions taken into account shall include "excess contributions" as defined in Section 401(k)(8)(B) of the Code, "excess aggregate contributions" as defined in Section 401(m)(6)(B) of the Code, and "excess deferrals" as described in Section 402(g) of the Code (to the extent such "excess deferrals" are not distributed to the Participant by the April 15th following the close of the taxable year of the Participant in which such deferrals were made), regardless of whether such amounts are distributed or forfeited.

(b)    "Defined Contribution Plan" shall mean a Retirement Plan that provides for an individual account for each participant and for benefits based solely on the amount contributed to the participant's account (and any income, expenses, gains and losses attributable thereto) and any forfeitures of accounts of other participants that may be allocated to such participant's account.  For this purpose, employee contributions made pursuant to Retirement Plan maintained by an Employer or an Affiliate that is not otherwise a Defined Contribution Plan shall be treated as a separate Defined Contribution Plan.

(c)    "Retirement Plan" shall mean (1) any profit sharing, pension or stock bonus plan described in Sections 401(a) and 501(a) of the Code, (2) any annuity plan or annuity contract described in Section 403(a) or 403(b) of the Code, or (3) a simplified employee pension described in Section 408(k) of the Code.

### Section 5.5 - Limitation Year

All determinations under this Article V shall be made by reference to the Plan Year.  The limitations imposed by this Article V shall be administered in accordance with any

- 42 -

rulings and regulations that are issued by the Secretary of Treasury under Section 415 of the

Code.

KL3 2630220.9

ARTICLE VI

INVESTMENT OF TRUST FUND AND MEMBERS' ELECTIONS

Section 6.1 - Investment of Employee Contributions.  Effective January 1, 2008, except as otherwise specified:

(a)    Section 401(k) Contributions.  Subject to the limitations relating to the Lehman Stock Fund set forth in Section 6.1(c), each Participant may elect to have his Section 401(k) Contributions invested in increments of one percent (1%) of the total in any one or more of the Investment Funds made available pursuant to Section 9.2 for the investment of such current contributions. A Participant may change his Investment Fund elections for such contributions by making new elections in accordance with procedures established by the Committee.

(b)    Failure to Elect. If a Participant initially fails to make an election pursuant to the provisions of this Section 6.1, his Member's Account shall be invested in the Investment Fund or Funds designated from time to time by the Committee.

(c)    Lehman Stock Fund Limitations. A Participant shall not be entitled to direct investment in  the Lehman Stock Fund  of (i) more than fifty percent (50%) of  his or her Section 401(k) Contributions prior to such pay date as of which the Committee determines that the procedures necessary to implement the reduced limit set forth in clause (ii) hereof are in place (the "New Limit Effective Date"),  or (ii) more than twenty percent (20%) of the total of his or her Section 401(k) Contributions as of any pay date on or  after the New Limit Effective Date (or after January 1, 2008, in the case of a Participant's initial election for the investment of Section 401(k) Contributions). In the event that a Participant's investment election for the allocation of  Section 401(k) Contributions  exceeded the 20% limit in clause (ii) prior to the New Limit Effective Date and the Participant  fails to make a new investment election compliant with such 20% limit by the deadline established by the Committee, the excess of his or her Section 401(k) Contributions for pay dates on and after the New Limit Effective Date shall be invested in such other Investment Fund as the Committee shall direct,  until such time as the Participant shall make a new election or new elections compliant with such 20% limit. The limitations of this Section 6.1(c) shall also apply to initial elections for the investment of

- 44 -

Rollover Contributions (and the date of such contribution shall be treated as a pay date in applying the New Limit Effective Date).

(d)    Investment of Income.  Dividends, interest, or other income or gains in respect of any Investment Fund shall be reinvested in such Investment Fund.

(e)    Resumption of Contributions by a Participant who was an Employee during an intervening period of suspension.  If –

(i)    a Participant's Section 401(k) Contributions are suspended for any reason during a period in which the Participant remains an Employee (such as may occur by reason of the Elective Deferral Limit as defined in Section 3.1(b), or in order to avoid a violation of nondiscrimination requirements, or by reason of an unpaid leave of absence or a hardship withdrawal, as well as pursuant to the Participant's election to suspend contributions) and

(ii)    the Participant fails to make a new or different election if and when such contributions resume (whether automatically, or by reason of an election by the Participant to resume contributions), his or her Section 401(k) Contributions shall be invested in accordance with the Participant's last election in effect under this Section 6.1 prior to such suspension of contributions.

If the Participant had no such election then in effect, and the Participant fails to make a timely election pursuant to the provisions of this Section 6.1 in connection with the resumption of such contributions, his or her Section 401(k) Contributions shall be invested in the Investment Fund or Funds designated from time to time by the Committee.

(f)    Return to Employment as an Employee.  If a Participant's Section 401(k) Contributions are suspended by reason of the Participant's termination of employment, transfer to employment with an Affiliate not participating in the Plan, or other cessation of employment as an Employee, and the Participant subsequently resumes employment as an Employee, Sections 6.1(a) and (b) shall apply as if the Participant were a new Employee who had never previously made any investment election under the Plan.

- 45 -

(g)   <u>Rollover Contributions</u>.  Each Participant who elects to make a Rollover Contribution to the Plan under Section 3.9 shall, in accordance with the Committee procedures established under Section 6.6 , direct the initial investment of  such contribution, in increments of one percent (1%) of the total, in any one or more of the Investment Funds made available pursuant to Section 9.2 for the investment of such contribution, subject to the limitations relating to the Lehman Stock Fund set forth in Section 6.1(c). No  purported Rollover Contribution shall be accepted on behalf of the Plan in the absence of or prior to the receipt of a timely and complete such investment direction.

<u>Section 6.2 - Investment Transfers</u>

(a)   <u>Participant Directions</u>.  Effective as of the Daily Valuation Effective Date, each Member, including a Participant who has terminated employment, and the Member's Beneficiary following the Member's death (with respect to the Beneficiary's proportionate share if there shall be more than one Beneficiary), may elect in accordance with procedures established by the Committee to have the assets of his Member's Account invested in any Investment Fund or Funds transferred in increments of one percent (1%) to any other Investment Fund or Funds.

(b)   <u>Lehman Stock Fund Limitations</u>.

(i)   <u>Prior to January 1, 2008</u>.  No transfer under this Section 6.2 prior to January 1, 2008 may result in more than fifty percent (50%) of the total amount in the Member's Account being invested in the Lehman Stock Fund, except as otherwise permitted under Section 6.2(c) in connection with the elimination of the American Express Stock Fund.

(ii)   <u>Effective January 1, 2008</u>.  No transfer under this Section 6.2 after January 1, 2008 may result in more than twenty percent (20%) of the total amount in the Member's Account being invested in the Lehman Stock Fund.

Nothing in this Section 6.2(b) shall require liquidation or transfer of any amount previously allocated in the Lehman Stock Fund if such prior allocation complied with the limitations of Section 6.1(c) (in the case of Section 401(k) Contributions) or with Sections 6.2(b) and (c)  at the time made.

- 46 -

(c)    <u>Elimination of American Express Stock Fund</u>. The American Express Stock Fund shall be discontinued after January 31, 2007.  Member-directed transfers out of the American Express Stock Fund may be made in accordance with applicable procedures at any time up to the deadline established by the Committee for effecting the necessary transactions consistent with the above.  Any amounts remaining in the American Express Stock Fund after the deadline for such Member-directed transfers shall be reallocated to a default Investment Fund selected by the Committee.  Assets in the American Express Stock Fund may be transferred into the Lehman Stock Fund during the period from January 31, 2005 through such deadline, or reallocated to the Lehman Stock Fund upon expiration of such deadline, whether or not the amount of the Member's Account invested in the Lehman Stock Fund at the time of such transfer exceeds the 50% limit of Section 6.2(b) or will exceed such 50% limit as a result of such transfer.  However, nothing in the foregoing shall permit transfers into the Lehman Stock Fund from any Investment Fund other than the American Express Stock Fund so long as the amount of the Member's Account invested in the Lehman Stock Fund exceeds the 50% limit of Section 6.2(b).

<u>Section 6.3 - Investment of Employer Contributions</u>

(a)    <u>Basic and Matching Contributions</u>.  Effective for Plan Years ending on or after December 31, 2007, Basic and Matching Contributions for Plan Years ending after the Spinoff Date and prior to December 31, 2007 shall be invested in the Lehman Stock Fund, subject to the Member's right  thereafter to elect transfers out of the Lehman Stock Fund in accordance with Section 6.2(a). Basic and Matching Contributions for Plan Years ending December 31, 2007 and thereafter shall be invested in accordance with the Participant's current election on file for the investment of Section 401(k) Contributions or, if no such election shall be on file, in the Investment Fund or Funds designated from time to time by the Committee.

(b)    <u>Transfers</u>.  A Member may elect to transfer Basic and Matching Contributions made in Company Stock, which have been credited to his Employer Contributions Account, in accordance with the provisions of Section 6.2.

Section 6.4 - Investing of Employer Suspense Account

All amounts held in the Employer Suspense Account shall be invested as directed by the Committee.

Section 6.5 - Voting and Tender Offers

(a)    Voting.  All American Express Stock, Lehman Stock and any voting Fund interests, including fractional shares, held in the Trust Fund, shall be voted by the Trustee to the extent permitted by law.  To the extent permitted by law, the Trustee may elect to vote such Stock or interests as directed by the Participants. Notwithstanding the foregoing, effective as of the Daily Valuation Effective Date, shares of Lehman Stock reflecting a Member's proportionate interest in the Lehman Stock Fund and shares of American Express Stock reflecting a Member's proportionate interest in the American Express Stock Fund ("Members' Credited Shares"), including fractional shares, shall be voted by the Trustee in accordance with the directions of the Member (or, if applicable, the Member's Beneficiary).  Shares of Lehman Stock held in the Employer Suspense Account and Members' Credited Shares for which the Trustee received no timely voting directions shall be voted by the Trustee in the same proportion on each issue as the Trustee votes Members' Credited Shares for which it received voting directions from Members (or their Beneficiaries).

(b)    Tender Offers.  In the event of any tender or exchange offer for shares of Lehman Stock or American Express Stock, Members' Credited Shares in the Lehman Stock Fund or in the American Express Stock Fund (as the case may be) shall be tendered in accordance with the directions of the Member.  Members' Credited Shares for which the Trustee received no timely directions with respect to a tender or exchange offer shall not be tendered by the Trustee.  Shares of Lehman Stock held in the Employer Suspense Account shall be tendered by the Trustee in the same proportion as the total number of Members' Credited Shares of Lehman Stock for which it has received tender instructions from participants. A Member's direction to tender shares under this Subsection 6.5(b) shall not be viewed as an election to receive any form of distribution under Article VII.

<u>Section 6.6 - Rules Regarding Investment Instructions</u>

Each Member shall have a reasonable opportunity to give investment instructions with respect to the investment of his Member's Account, in accordance with rules, policies, and procedures established by the Committee in such manner as it shall determine in its sole discretion to be necessary or desirable for the purpose (and subject to such restrictions with respect to the Lehman Stock Fund as the Committee shall impose pursuant to Section 10.3, relating to Black Out Periods and similar periods).  Without limiting the generality of the foregoing, the Committee may provide that investment elections shall not be given effect if they violate or are or may be viewed as inconsistent with such rules, policies, and procedures or the rules and policies of Investment Fund sponsors or regulatory agencies.  Different rules and procedures, including trading restrictions, may be applied to one or more Members as the Committee, in its discretion, shall determine.

KL3 2630220.9

ARTICLE VII

VESTING, DISTRIBUTION TO MEMBERS

Section 7.1 - Vesting

7.1.1    Vesting Rules.  A Member's interest in (i) his Section 401(k) Contributions Account and Rollover Account, (ii) his Employer Contributions Account attributable to Basic and Matching Contributions for Plan Years beginning prior to January 1, 2005, and (iii) his Employer Contributions Account attributable to qualified nonelective contributions (QNECs) under Section 4.1(f), shall at all times be fully vested and nonforfeitable. A Member shall have a fully vested and nonforfeitable interest in the portion of his Employer Contributions Account attributable to Basic and Matching Contributions for Plan Years beginning on and after January 1, 2005 upon completion of three Years of Vesting Service, or death while employed by an Employer or Affiliate, and prior thereto shall have no vested, nonforfeitable interest in such portion of such Account (except as may be otherwise provided pursuant to Section 12.2, if the Member is affected by a complete or partial termination of the Plan within the meaning of Section 411(d)(3) of the Code, or a complete discontinuance of contributions under the Plan).

7.1.2    Vesting Service

(a)    A Member's Years of Vesting Service shall be the period commencing on his Employment Date or Reemployment Date, whichever is applicable, and ending on his Severance Date.  All such periods, commencing on either such applicable date, will be aggregated, and will be expressed in terms of whole and fractional years, on the basis of 1/12 of a year for each Month of Vesting Service falling within each such period.  For purposes of this Section 7.1.2(a), "Month of Vesting Service" means a calendar month during any part of which an employee completes an Hour of Service.

(b)    A Member's Years of Vesting Service will also include the following Periods of Severance, on the basis of 1/12 of a year for each calendar month or part thereof during such Periods of Severance:

- 50 -

KL3 2630220.9

(i)      If an employee incurs a Severance Date by reason of a quit, discharge or retirement (other than during an absence described in subparagraph (ii) below) and he then performs an Hour of Service within 12 months of such Severance Date, his Years of Vesting Service will include such Period of Severance;

(ii)      If an employee incurs a Severance Date by reason of a quit, discharge or retirement during an absence from service of 12 months or less for any reason other than a quit, discharge or retirement, and then performs an Hour of Service within 12 months of the date as of which he was first absent from service, his Years of Vesting Service will include such Period of Severance.

(iii)      The period between the first and second anniversaries of the first day of an employee's Maternity or Paternity Absence shall (except to the extent that such employee is otherwise credited with Years of Vesting Service during such period pursuant to paragraph (i) or (ii) above), be included in neither a Year of Vesting Service nor a Period of Severance.

(c)      Notwithstanding the foregoing provisions of this Section 7.1.2 (and except as otherwise provided to the contrary in an applicable Supplement hereto), in determining a Member's Years of Vesting Service:

(i)      his Employment Date or Reemployment Date, as the case may be, shall be determined by disregarding all periods prior to the date that his employer became a participating Employer (or, if earlier, the date that such employee's employer became an Affiliate); and

(ii)      his Severance Date shall, except to the extent that such employer remains a participating Employer, be deemed to occur on the date that his employer ceases to be an employer having one of the relationships to an Employer described under the definition of Affiliate.

(d)      An employee who has a Period of Severance and thereafter resumes employment with the Employer or an Affiliate shall aggregate all of his Years of Vesting Service, including that prior to his Reemployment Date; provided, however, that in the case of

- 51 -

an employee with no nonforfeitable interest in his Member's Account prior to his Reemployment Date, all Years of Vesting Service prior to his Reemployment Date shall be disregarded if his Period of Severance ending on his Reemployment Date equals or exceeds the greater of (A) his aggregate number of prior Years of Vesting Service or (B) five years.

If any Years of Vesting Service are disregarded under the foregoing sentence, such Years shall continue to be disregarded in again applying the provisions of this Section in the event of the reemployment of such employee following any subsequent Period of Severance.

(e)     In no event shall any employee be credited with multiple Months of Vesting Service or Years of Vesting Service with respect to any single period of time.

(f)     In the event a Participant is transferred to an Affiliate that is not an Employer or employment with an Employer other than as an Employee, he shall continue to accumulate service for purposes of determining his Years of Vesting Service so long as he continues employed by an Employer or Affiliate.

(g)     To the extent that the foregoing rules are the same as those applied for purposes of vesting under the Lehman Brothers Holdings Inc. Retirement Plan  (as is generally the case), the records of such Retirement  Plan showing the Participant's service for vesting purposes shall be used for determining Years of Vesting Service hereunder. In any other case (such as where prior service was disregarded under the Retirement Plan under the rule of parity but would not be so disregarded under this Plan because the Participant was vested in his benefits under the Plan at the conclusion of such service,) the Committee shall determine the Participant's vesting service based on such information as may be available to it, including information provided by the Participant where applicable.

7.1.3     Forfeitures of Non-vested Employer Basic and Matching Contributions.

(a)     Time of Forfeiture.  The portion of a Member's Account that is not vested at the Member's termination of employment shall be forfeited (i) as of the Valuation Date on which the Member receives distribution of the vested portion of his Member's Account (his "Distributable Account"), either  upon election by the Member, if distribution is made by the close of the second Plan Year following termination of employment, or pursuant to the small

- 52 -

benefit cashout provisions of Section 7.2(a)(i), or (ii) if earlier, the expiration of a Period of Severance of five years.  If the Member has no vested interest in any portion of his Member's Account upon his termination of employment, he shall be deemed to have received a distribution of the vested portion of his Member's Account in the amount of zero, and his entire Member's Account shall be forfeited as of the Valuation Date coincident with or next following such termination.

(b)    If a Member had an unvested balance in his Member's Account at his termination of employment and is later reemployed by an Employer or Affiliate before incurring a Period of Severance of five years, the amount previously forfeited by reason of such an actual or deemed distribution as described above shall be restored to his Employer Contributions Account, and, if applicable, credited to the subaccount therein for Employer Contributions that are not fully vested, if and only if the Member repays to the Plan the amount distributed on account of his termination of employment before the expiration of five (5) years from the date he again becomes so reemployed.  Upon such repayment, the Member shall resume vesting in his Employer Contributions Account according to the rules in this Article VII and shall retain credit for his prior Years of Vesting Service in determining when he becomes fully vested in the amount so restored, as well as in any future Employer Contributions.  Such restoration shall be made first from available forfeitures and, if necessary, by a special Employer contribution made for that purpose.

(c)    Irrevocable Forfeitures.  Notwithstanding anything to the contrary in this Article VII, the non-vested portion of a Member's Account shall be irrevocably forfeited if he incurs a Period of Severance which is greater than five years and shall thereafter not be restored for any reason, notwithstanding any subsequent reemployment.

(d)    Application of Forfeitures.  Forfeitures shall be applied to reduce Employer Contributions as provided in Section 4.1(e)

Section 7.2 -  Distribution Upon Termination of Employment or Disability

(a)    Effective as of the Daily Valuation Effective Date:

KL3 2630220.9

(i)      <u>Small Benefit Cashouts</u>.  The value of the Distributable Account of each Member who has terminated employment shall be reviewed by the Administrator upon such event and, if applicable, periodically thereafter until distribution thereof has been made. If the value on such review does not exceed $1,000 ($5,000 prior to March 28, 2005) and continues to be no more than $1,000 ($5,000 prior to March 28, 2005) on the first Valuation Date after (A) the Member is both notified of such fact and the proposed distribution thereof pursuant to this Subsection (a)(i), and (B) the Member elects whether or not to make a direct rollover under Section 7.6 or the period allowed for such election expires, distribution of such Distributable Account shall be made in an amount equal to the value on such Valuation Date.

(ii)      <u>Elective Distributions</u>.  If a Member's employment terminates and no small benefit cashout is made under Subsection (a)(i), distribution of his Distributable Account shall be made as soon as practicable (taking into account the administrative procedures of the Committee) after the date on which the Member elects to receive such distribution, in an amount which shall be based on the value of the Member's Distributable Account as of the date on which such distribution is processed.  A Member who is fully vested in his Accounts may elect to take such a distribution in one or more payments, subject to Section 7.5 if distribution has not been completed prior to the Required Beginning Date thereunder.  If more than one payment is to be made, each payment shall be made only upon the direction of the Member, provided, that the requirement of such direction shall not apply to the extent necessary to comply with Section 7.5.  A Member who is partially vested in his or her Account may elect to take a lump sum distribution of his or her Distributable Account.

(iii)      <u>Distribution Following Age 65</u>.  If a Member has both terminated employment and attained age 65 and has not elected to defer distribution in whole or in part to a date later than age 65 (and has not received a small benefit cashout under Subsection (a)(i) above), distribution of his Distributable Account shall be made in accordance with Subsection (a)(ii), provided that he makes a claim for distribution in accordance with procedures established by the Committee (which shall include providing elections available under Section 7.6 and 7.7). If the Member fails to make such a claim prior to the date on which distribution must be made or begin in accordance with Section 7.5, distribution shall thereupon be required in accordance with Section 7.5.

- 54 -

(iv)    $1,000 Minimum.  Prior to December 4, 2006, a partial distribution in respect of a fully vested Account shall be not less than $1,000, except that following the Member's Required Beginning Date under Section 7.5, distributions may be made in the amount of the Minimum Required Distribution as calculated thereunder without regard to this requirement.

(b)    "Termination of Employment."  In determining whether a Member is entitled to distribution by reason of his termination of employment:

(i)    Disability.  A Member who incurs a Date of Disability shall be treated as terminating his employment, whether or not he is otherwise treated as so terminated.

(ii)    Affiliate Employment.  A Member shall not be considered to have terminated his employment if he is employed by an Affiliate. A Member must actually terminate employment with all of the Company and any other Employer or Affiliate prior to entitlement to a distribution due to termination of employment.

(iii)    Sale or Disposition of Assets.  If a Member ceases to be employed by an Employer or Affiliate because of a sale or other disposition of all or part of the assets or business operations of such Employer or Affiliate but continues in the employ of a purchaser or affiliate thereof (or any of their successors) to whose plan the assets and liabilities attributable to such Member are (or are to be) transferred in a transaction described in Section 12.5, such Member shall not thereby be deemed to retire or terminate employment for purposes of this Plan.

(iv)    Sale of Subsidiary.  If a Member ceases to be employed by an Employer or Affiliate because of the withdrawal of such entity from membership in the Company's controlled group within the meaning of Section 414(b) or (c) of the Code (such as by reason of the sale or other disposition of the stock of such Employer or Affiliate), the Member shall be treated as terminating employment unless such entity or an affiliate thereof (or any of their successors) establishes or maintains a plan to which the assets and liabilities attributable to such Member are (or are to be) transferred in a transaction described in Section 12.5, in which event such Member shall not thereby be deemed to retire or terminate employment for purposes of this Plan.

Section 7.3 - Distribution Upon Death

Effective as of the Daily Valuation Effective Date:

(a)    Time and Form of Payment:  General Rules.  Upon the death of a Member, whether before or after his termination of employment or commencement of distribution to him following such termination, any remaining balance in his Distributable Account shall be distributed to his Beneficiary or Beneficiaries as soon as practicable thereafter (taking into account required administrative procedures, including the period necessary for elections under Section 7.6 (relating to direct rollovers) if the Beneficiary is eligible to elect a Direct Rollover thereunder, and Section 7.7 (relating to distributions in cash and Lehman Stock) and the time at which the Member's death is reported to the Committee); provided, however, that (subject to the small benefit cashout provisions of Subsection 7.3(b)) a Beneficiary may elect, in accordance with the procedures prescribed by the Committee, to receive distribution either as a single sum or in one or more payments, the last of which shall be made no later than five years after the death of the Member, in an amount based in each case on the value of the Distributable Account (or, if there shall be more than one Beneficiary, such Beneficiary's share thereof) as of the date on which such distribution is processed.  If more than one payment is to be made, each payment shall be made only upon the direction of the Beneficiary, provided, that the requirement of such direction shall not apply, and a final payment may be made automatically, if necessary to complete distribution by the fifth anniversary of the death of the Member.  A Beneficiary shall be entitled to change the investment of the Distributable Account (or if applicable, the Beneficiary's share thereof), pursuant to Section 6.2, between the date of the Member's death and distribution to such Beneficiary under this Section 7.3.

(b)    Small Benefit Cashout.  The value of the Distributable Account of a Beneficiary (or, if there shall be more than one Beneficiary, any Beneficiary's share thereof) shall be reviewed by the Administrator periodically until distribution thereof has been made.  If such value on any Valuation Date does not exceed $1,000 ($5,000 prior to March 28, 2005) and, if the Beneficiary is eligible to elect a Direct Rollover pursuant to Section 7.6, continues to be no more than $1,000 ($5,000 prior to March 28, 2005) on the first Valuation Date after (x)

KL3 2630220.9

the Beneficiary is notified of such fact and the proposed distribution thereof pursuant to this Paragraph (ii), and (y) such Beneficiary elects whether or not to make a direct rollover under Section 7.6 (if eligible), or the period allowed for such election has expired, distribution of such Distributable Account (or share thereof) shall be made in an amount equal to the value on such Valuation Date.

(c)    $1,000 Minimum.  Prior to December 4, 2006, a partial distribution in respect of a fully vested Account (or, if applicable, any Beneficiary's share thereof) shall be not less than $1,000.

### Section 7.4 - Timing of Distribution

Unless a Member elects to defer distribution (or fails to make the required claim for benefits described in Section 7.2(a)(iii), which failure shall be deemed an election to defer), distribution of his Distributable Account shall be made or commence not later than sixty (60) days after the latest of (a) the close of the Plan Year in which the Member's employment terminates, (b) the close of the Plan Year in which the Member attains age 65, (c) the earliest date on which the amount to be distributed can be determined, or (d) the date on which a Member, whose whereabouts were previously not reasonably ascertainable, has been located, subject to Section 7.5.

### Section 7.5 - Minimum Required Distributions

(a)    Time of Commencement.

(i)    If a Member has attained age 70-1/2, distribution of his Distributable Account shall commence no later than April 1 of the calendar year following the calendar year in which the Member retires (his "Required Beginning Date"), subject to paragraph (ii) below.

(ii)    If a Member is a five percent owner within the meaning of Section 13.3(a)(iii) for the Plan Year ending with or within the calendar year in which the Member reaches the age of 70-1/2, his Required Beginning Date is the April 1 following the calendar year in which the Member reaches the age of 70-1/2.

(b)      Section 401(a)(9) Compliance.  Notwithstanding any provision of the Plan to the contrary, no distribution under the Plan (including any Supplement to the Plan) shall be permitted that fails to comply with Section 401(a)(9) of the Code, including the incidental death benefit requirement, as set forth in the final regulations under Section 401(a)(9) as published on April 17, 2002 and modified June 14, 2004.

(c)      Methods of Distribution.  Effective as of the Daily Valuation Effective Date, distribution of a Member's Account pursuant to Section 7.5(a) shall be made in a single sum, unless the Member elects before the Required Beginning Date to receive partial payments, which in each year shall be not less than the minimum required distribution amount determined under Section 7.5(b) above, in accordance with the regulations under Section 401(a)(9) of the Code. Elections under this Section 7.5 shall be made in accordance with procedures prescribed by the Committee.

(d)      Distributions to Beneficiaries.  If a Member dies prior to distribution of his entire Account, such Account shall be completely distributed to the Member's Beneficiaries within five years of the Member's death, as set forth in Section 7.3(a).

Section 7.6 - Direct Rollover of Eligible Rollover Distributions

(a)      Notwithstanding any provision of the Plan to the contrary that would otherwise limit a Distributee's election under this Section, a Distributee may elect, at the time and in the manner prescribed by the Committee, to have any portion of an Eligible Rollover Distribution paid directly to an Eligible Retirement Plan specified by the Distributee in a Direct Rollover.

(b)      For purposes of this Section 7.6, the following definitions shall apply effective January 1, 2002:

(1)      "Eligible Rollover Distribution" shall mean any distribution of all or any portion of the balance to the credit of the Distributee, except (1) any distribution to the extent such distribution is required under Section 401(a)(9) of the Code, or (2) hardship withdrawals.

- 58 -

(2)     "Eligible Retirement Plan" means an individual retirement account
described in Section 408(a) of the Code, an individual retirement annuity
described in Section 408(b) of the Code, an annuity plan described in
Section 403(a) of the Code, a qualified trust described in Section 401(a) of
the Code, and an annuity contract described in Section 403(b) of the Code
or an eligible deferred compensation plan described in Section 457(b) of
the Code maintained by a state, a political subdivision of a State, or any
agency or instrumentality of a State or political subdivision of a State, that
accepts the Distributee's Eligible Rollover Distribution.  With respect to
the portion of an Eligible Rollover Distribution, if any, that consists of a
distribution from the Distributee's After-Tax Contribution Account, an
Eligible Retirement Plan is only an individual retirement account or
annuity described in Section 408(a) or (b) of the Code or a qualified
defined contribution plan described in Section 401(a) or 403(a) of the
Code that agrees to separately account for amounts so transferred,
including separately accounting for the portion of such Eligible Rollover
Distribution which is includible in gross income and the portion of such
Eligible Rollover Distribution which is not so includible.

(3)     "Distributee" includes an employee or former employee.  In addition, the
employee's or former employee's surviving spouse and the employee or
former employee's spouse or former spouse who is the Alternate Payee
under a Qualified Domestic Relations Order are distributees with regard to
the interest of the spouse or former spouse.  Effective on or after January
1, 2008, "Distributee" shall include a Beneficiary, other than a surviving
spouse, who is an individual or is treated as such under applicable
regulations, but solely for purposes of a Direct Rollover to an individual
retirement account or annuity described in Section 408 of the Code.

(4)     "Direct Rollover" means a payment by the Plan to the Eligible Retirement
Plan specified by the Distributee in accordance with procedures
established by the Committee.

- 59 -

(c)     No more than one Direct Rollover may be elected by a Distributee for each Eligible Rollover Distribution.

(d)     If (i) the value of a terminated Member's vested interest in his Member's Account does not exceed $1,000 ($5,000 prior to March 28, 2005), (ii) a Member receives a distribution following his Required Beginning Date under Section 7.5 in excess of his minimum required distribution amount (which thereby constitutes an Eligible Rollover Distribution), or (iii) distribution is to be made to a Beneficiary otherwise eligible to elect a Direct Rollover pursuant to this Section 7.6, and such Member or Beneficiary (as the case may be) does not make a timely election whether or not to directly roll over his Eligible Rollover Distribution, such distribution shall be made directly to the Member or Beneficiary, as applicable.

(e)     This Section 7.6 applies to all distributions under the Plan as described above whether made under this Article VII or under any other Article of the Plan.

## Section 7.7 - Distributions in Cash and Stock

Effective as of the Daily Valuation Date, if a Member (or any Beneficiary or Beneficiaries) so elects in accordance with procedures established by the Committee, all distributions to be made pursuant to the provisions of this Article VII from the Lehman Stock Fund or the American Express Stock Fund shall be in whole shares of such Company Stock, provided that any fractional shares shall be paid in cash. If a Member (or Beneficiary) fails to so elect, the distribution shall be made in cash in lieu of Company Stock, the amount of such cash to be computed at the last reported sale price of such Company Stock on the principal national securities exchange on which shares of the stock are traded on the applicable Valuation Date.

## Section 7.8 - Withdrawal of Rollover Contributions and After-Tax Contributions

(a)     _Rollover Contributions_.  Any Member employed by an Employer or Affiliate may elect to withdraw all or part of his Rollover Account upon application therefore made in accordance with procedures established by the Committee, provided that, prior to December 4, 2006, the amount withdrawn is not less than $1,000 (or 100% of the Rollover Account balance if less than $1,000).  Distribution of such withdrawals shall be made in a single lump sum payment by check or, subject to the provisions of Section 7.7, in Company

- 60 -

Stock.  The amount available for withdrawal shall, effective as of the Daily Valuation Effective Date, be determined as of the Valuation Date on which the withdrawal is processed.

(b)    After-Tax Contributions.  Any Member employed by an Employer or Affiliate may elect to withdraw all or part of his After-Tax Contribution Account at any time upon application therefor made in accordance with procedures established by the Committee, provided that, prior to December 4, 2006, the amount withdrawn is not less than $1,000 (or 100% of the After-Tax Contribution Account balance if less than $1,000).  Distribution of such withdrawals shall be made in cash in a single lump sum payment or, subject to the provisions of Section 7.7, in Company Stock.

## Section 7.9 - Withdrawals After Attainment of 59-1/2

Any Member employed by an Employer or Affiliate who has attained the age of 59-1/2 may elect to withdraw all or part of his Member's Account upon application therefor in accordance with procedures established by the Committee.  Prior to December 4, 2006, any withdrawal under this Section 7.9 made before the Member attains age 70-1/2 must be in an amount of not less than $1,000 (or 100% of the vested portion of the Member's Account balance if less than $1,000), or such larger amount as may be established by the Committee from time to time under nondiscriminatory rules.  Such withdrawal will be made from the Member's Account (and pro rata from the Investment Funds each such account is invested in) in the following order of priority:  (x) Rollover Account; (y) Section 401(k) Contributions Account; and (z) Employer Contributions Account (or vested portion thereof, if applicable).  Effective on or after the Daily Valuation Effective Date, there shall be no limit to the number of withdrawals allowed to be made under this Section 7.9, and distributions shall be made as of the Valuation Date on which they are processed in accordance with procedures established by the Committee.

## Section 7.10 - Hardship Withdrawals

(a)    General.  Any Member employed by an Employer or Affiliate may, by applying in accordance with procedures established by the Committee, withdraw so much of his Section 401(k) Contributions Account as the Committee shall in a uniform and nondiscriminatory manner determine to be necessary (based on such representations or other

- 61 -

information as the Committee may request in its discretion) to meet any condition of "financial hardship" described below affecting such Member, to the extent necessary to satisfy such financial hardship. Such withdrawals shall be made only after all permitted withdrawals have been made from his Rollover Account. Hardship withdrawals from a Member's Employer Contributions Account and of post-1988 investment earnings on Section 401(k) Contributions are not permitted. Withdrawals shall be made pro rata from all Investment Funds in which the Member's Section 401(k) Contributions Account is invested. A Member may not return any amounts withdrawn hereunder.

      (b)    <u>"Hardship" Definitions</u>. Effective as of the Daily Valuation Date:

      (i)    The term "financial hardship" shall mean any one or more of the following needs:

      (A)    Expenses for medical care described in Section 213(d) of the Code previously incurred for a Member or a Member's spouse or dependents (including a child of divorced parents who together provide over half the child's support) and for which a deduction would be available under Code Section 213 after disregarding the limitation of deductions to amounts in excess of 7.5% of adjusted gross income, or expenses necessary in order for such persons to obtain such care, provided that such expenses have not been and will not in the future be covered by insurance;

      (B)    Payment of tuition, room and board and related educational fees (but not to include books) for the next 12 months of post-secondary education of a Member or a Member's spouse, children or dependents (as defined under applicable regulations);

      (C)    Costs (other than mortgage payments) directly related to the purchase of the principal residence of a Member;

      (D)    Payments necessary to prevent the eviction of a Member from, or a foreclosure on the mortgage of, the Member's principal residence;

(E)      Effective January 1, 2006, payments for funeral or burial expenses for the Member's deceased parent, spouse, child or dependent (as defined under applicable regulations); or

(F)      Effective January 1, 2006, expenses to repair damage to a Member's principal residence that would qualify for a casualty loss deduction under Section 165 of the Code (determined without regard to whether the loss exceeds 10 percent of adjusted gross income).

(ii)      The amount withdrawn under this Section 7.10 shall not exceed the amount necessary to meet the hardship plus the amount necessary to pay any federal, state or local income taxes or penalties that the Member reasonably anticipates will result from the withdrawal. Any withdrawal under this Section 7.10 must be in an amount of not less than $1,000 (or such larger amount as may be established by the Committee from time to time under nondiscriminatory rules).

(iii)      A withdrawal request shall be made in accordance with procedures established by the Committee which may, in the discretion of the Committee require that the spouse of the Member, if any, execute a notarized written consent thereto.  No withdrawal shall be made under this Section 7.10 unless the Member has already received all other amounts available to him as either a withdrawal or a loan under this Plan and all other plans maintained by any Employer or Affiliate. The Member's withdrawal request shall include an agreement by the Member to the suspension of Section 401(k) Contributions, and to a similar suspension of "elective deferrals" (as defined in Section 402(g)(3) of the Code) and of employee contributions under all other qualified and nonqualified plans of deferred compensation (excluding mandatory employee contributions under any defined benefit plan), or stock option, stock purchase, or similar plans, of any Employer or Affiliate for six months following the date of any such withdrawal, effective as of January 1, 2002.  Each such other plan shall be deemed amended by reason of this provision and the Member's execution of an agreement to such suspension.

(iv)      Distribution of a hardship withdrawal shall be made in cash in a single sum payment.

KL3 2630220.9

### Section 7.11 - Allocation Among Accounts and Investment Funds

(a)    Allocation Among Investment Funds.  If a Member receives a partial distribution or withdrawal of his Member's Account (or vested portion thereof, if applicable) under any provision of this Article VII and his Member's Account is invested in more than one Investment Fund, then the amount withdrawn from his Member's Account shall be debited, on a pro-rata basis, against each Investment Fund in which such Member's Account is invested, provided, however, that effective as of the Daily Valuation Effective Date, the Member (or, if applicable, his Beneficiary with respect to his share of the Member's Account) may direct the proportions in which such distribution or withdrawal shall be allocated among Investment Funds, except for hardship withdrawal distributions under Section 7.10.  Withdrawal shall be made pro rata from all Investment Funds in the absence of such direction.

(b)    After-Tax Contributions.  A Member or his Beneficiary may direct the extent to which payment shall be made from the Member's After-Tax Contribution Account (or if applicable, such Beneficiary's share thereof).  In the absence of such direction, distributions that are not by their terms required to be made solely from other portions of the Member's Account, shall be made pro rata from the Member's After-Tax Contribution Account and the balance of his Member's Account (or vested portion thereof, if applicable).

(c)    Termination of Employment or Death.  Partial distributions to a Member or Beneficiary following the Member's termination of employment or death or his Required Beginning Date shall, except as otherwise provided in Subsection 7.11(b) above, be in the following order of priority:  (x) Rollover Account; (y) Section 401(k) Contributions Account; and (z) Employer Contributions Account.

### Section 7.12 - Distributions to Alternate Payees

(a)    The Committee shall recognize and honor any judgment, decree or order entered on or after January 1, 1985 under a state domestic relations law which the Committee determines to be a Qualified Domestic Relations Order in accordance with reasonable procedures to determine such status as the Committee shall establish.

KL3 2630220.9

Without limitation of the foregoing, the Committee shall notify a Member and the Alternate Payee under a judgment, decree or order which purports to be a Qualified Domestic Relations Order of (1) the receipt thereof, (2) the Plan's procedures for determining whether such judgment, decree or order is a Qualified Domestic Relations Order, and (3) any determination made with respect to such status.

During any period which the Committee is determining whether any judgment, decree or order is a Qualified Domestic Relations Order, any amount which would have been payable to an Alternate Payee pursuant to such order shall be separately accounted for (and adjusted to reflect its appropriate share of the gains, losses or expenses of the Investment Funds pursuant to Section 9.3, but shall still be subject to the investment elections made by the Member pursuant to Section 6.2) pending payment to the proper recipient thereof.

If the Committee determines such judgment, decree or order to be a Qualified Domestic Relations Order within eighteen (18) full calendar months commencing with the date on which the first payment would be required to be made under such judgment, decree or order, the separately accounted for amount, as adjusted, shall be placed in a separate account ("Alternate Payee's Account") until such account is distributed to the Alternate Payee.

If the Committee is unable to make such a determination within the eighteen (18)-month time period, payment under the Plan shall be made as if such judgment, decree or order did not exist and any such determination made after such time period shall be applied prospectively only.

(b)    Distribution to an Alternate Payee under a Qualified Domestic Relations Order shall be made from the Alternate Payee's Account in accordance with the directions of the Qualified Domestic Relations Order, and to the extent not so designated, shall (effective as of the Daily Valuation Date) be allocated according to the direction of the Alternate Payee otherwise under rules comparable to those applicable to the Participant under Section 7.11.

(c)    If the Qualified Domestic Relations Order so specifies, distribution of benefits to the Alternate Payee under the order may be made (i) at any time after the date of the order, and (ii) as if the Participant had retired on the date on which such distribution is to begin

- 65 -

under such order, but shall in no event include any amounts in which the Member is not vested. Otherwise, distribution before the Earliest Retirement Date may be made of amounts attributable to the Participant's After-Tax Contribution Account or Rollover Account, to the extent the Participant could receive such a distribution.

(d)    Distributions after the Participant's Termination of Employment or Earliest Retirement Date may be made to the same extent that the Participant could have received such distribution (in one or more payments) after his termination of employment.

(e)    Notwithstanding the provisions of Subsection (c) above, if the value of the Alternate Payee's Account is $1,000 or less ($5,000 prior to March 28, 2005), payment shall be made as soon as practicable following the determination that an order is a Qualified Domestic Relations Order.

(f)    Until the Alternate Payee's Account is distributed to the Alternate Payee, it shall be adjusted to reflect its appropriate share of the gains, losses and expenses of the Investment Funds pursuant to Section 9.3 and shall be subject to the transfer elections (described in Section 6.2) made by the Alternate Payee as though he were a Member. Payment shall be made only after such Alternate Payee has consented to the payment, and in the absence of such consent, no later than the date as determined under Sections 7.2(b)(iii) and 7.5.

Section 7.13 - 30-Day Notice Waiver

Notices required for distributions under this Article VII pursuant to Section 402(f) of the Code and Treas. Reg. Section 1.411(a)-11(c) shall be given to the Member no less than thirty (30) days and no more than ninety (90) days prior to the date of distribution; provided, however, that such distribution may be made less than thirty (30) days after such notice is given, if (a) the Committee clearly informs the Member that the Member has a right to a period of at least thirty (30) days after receiving the notice to consider the decision of whether or not to elect a distribution, (and, if applicable, a particular distribution option), and (b) the Member, after receiving the notice, affirmatively elects a distribution.

KL3 2630220.9

Section 7.14 - Trust to Trust Transfers

        With the consent of the Committee, amounts may be transferred from the Plan on behalf of a Member to other qualified plans, provided that the trust to which such funds are transferred permits the transfer to be made and, in the opinion of legal counsel for the Company, the transfer will not jeopardize the tax exempt status of the Plan or Trust or create adverse tax consequences for any Employer.

- 67 -

ARTICLE VIII

FINANCING

Section 8.1 - Trust Funds

All of the contributions to the Plan shall be held by a Trustee appointed from time to time by the Board of Directors or the Committee in one or more trusts, under a Trust Agreement approved or authorized by the Board of Directors or the Committee. Those portions of the Trust Agreement that relate to the establishment or maintenance of the trust or trusts under the Plan or the rights of Members and Beneficiaries in respect of the Trust Fund (but exclusive of provisions governing the services of the Administrator as distinguished from the Trustee) shall be deemed to form a part of this Plan, and any and all rights which may accrue to any person under this Plan shall be subject to such provisions of the Trust Agreement.

Section 8.2 - Contributions to the Trust

Each Employer shall make such contributions to the Trustee under the Trust Agreement as is required by the provisions of the Plan as long as the Plan is in effect.

If more than one Employer participates in this Plan during a particular Plan Year, each such Employer shall make its own contributions only for the benefit of its own Employees who are Participants in the Plan, unless and to the extent that a particular Employer is permitted to contribute for the benefit of the Employees of another Employer who are Participants pursuant to Section 404(a)(3)(B) of the Code, and such Employer agrees to do so.

The foregoing shall not preclude one Employer from making contributions on behalf of and as agent for another Employer.

Section 8.3 - Lehman Stock Fund

(a)    Character of the Fund.  The Company has provided for establishment of the Lehman Stock Fund under the provisions of this Section 8.3 and other applicable provisions of the Plan with the intent that such Fund, as distinguished from the Investment Funds established and maintained in the discretion of the Committee, constitute an employee stock ownership plan (ESOP) or fund, thereby qualifying the Plan as an "eligible individual account

plan" as defined Section 407(d)(3) of ERISA ("EIAP").  Pursuant to  Section 404(b) of ERISA (which applies equally to all EIAPs, whether or not the ESOP component contains the additional provisions required in order to leverage the acquisition of employer stock or enjoy the benefit of certain special tax incentives, neither of which additional features are currently desired for the Company and Plan purposes),  the Plan is exempt from, and the Lehman Stock Fund shall accordingly be maintained and administered without regard to (i)  the general prohibition against investment of more than ten percent of plan assets in employer securities and (ii) the diversification requirement and  prudence requirement to the extent that it requires diversification of Section 404(a)(1) of ERISA. Consequently, and in furtherance of such intent and the policy underlying the special treatment of such ESOPs  and EIAPs under Section 404(b) of ERISA (including the perceived desirability of giving employees an ownership stake in the Company, with the  attendant potential benefits as well as risks), the Lehman Stock Fund shall at all times be invested exclusively in Lehman Stock except for such reserve invested in short-term fixed income investments or cash as shall be determined to be necessary or advisable for the purpose of maintaining appropriate liquidity in order to satisfy daily Participant exchange, transfer,  withdrawal or distribution requests,  all as more fully provided in the Trust Agreement.

(b)     Contributions to Lehman Stock Fund.  Section 401(k) Contributions or Employer Contributions previously elected to be invested in the Lehman Stock Fund (or Employer Contributions previously invested automatically in the Lehman Stock Fund under the Plan as in effect through December 31, 2006) may, at the Employer's election, be made in cash to be applied to the purchase of  Lehman Stock on the open market or from the Company, or in-kind in shares of Lehman Stock, in which event the Trustee shall be required to accept such in-kind contributions.  If the Employer wishes to make such contributions in Lehman Stock, it may acquire such stock from the Company, which may as agent for the Employer transfer such stock to the Trustee.  However, if applicable securities or other laws prohibit the making of contributions in Lehman Stock for the benefit of one or more Participants, in whole or in part, such contributions shall be made in cash and applied to the purchase of Lehman Stock only after such purchase becomes permitted by applicable law.

KL3 2630220.9

Section 8.4 - Non-Reversion

The Employers shall have no right, title or interest in the contributions made to the Trust Fund under the Trust and no part of the Trust Fund shall revert to the Employers, except that:

(a)    If a contribution is made to the Trust Fund by an Employer by mistake of fact, then such contributions may be returned to the Employer upon direction of the Company Representative within one year after the payment of the contribution; and

(b)    Every contribution by the Employer to the Trust Fund is conditioned on its current deductibility under Section 404 of the Code, and to the extent that the contribution is disallowed as a deduction, it may be returned to the Employer upon direction of the Company Representative within one year after the disallowance.

A contribution returned to an Employer pursuant to this Section 8.4 shall be adjusted to reflect its proportionate share of the Trust Fund's loss, if any, but not profit.

Section 8.5 - Expenses

Unless paid by the Employer, the expenses of administering the Plan, other than compensation of persons on the payroll of the Employer, but including fees of the Trustee, independent investment managers or advisors, counsel, accountants or other experts appointed under the Plan, shall be paid out of the Trust Fund to the extent allowed by law.

Section 8.6 - Rights in the Trust Fund

Persons eligible for benefits under the Plan are entitled to look only to the Trust Fund for the payment of such benefits and have no claim against an Employer, the Committee, or any other person.  No person shall have any right, title or interest in the Trust Fund except as expressly provided in the Plan.

KL3 2630220.9

<u>Section 8.7 - Exclusive Benefit</u>

The Trust Fund shall be used to provide the benefits and pay the expenses of this Plan and of the Trust Fund and, except as otherwise provided in Section 5.2 and Section 8.4, no part of the corpus or income shall be used for or diverted to purposes other than for the exclusive benefit of Participants, Members and their Beneficiaries and the payment of the expenses of this Plan.

KL3 2630220.9

ARTICLE IX

ACCOUNTS AND RECORDS OF THE PLAN

Section 9.1 - Accounts and Records

The Committee shall establish such account or subaccounts as it shall deem necessary for administration of the Plan, including without limitation the applicable components of each Member's Account referenced in the definition thereof or required pursuant to any Supplement hereto.  The accounts and records of the Plan shall be maintained by the Committee or its designee and shall be adjusted as more fully provided in Section 9.3 to reflect changes affecting the status of the accounts of each Member or his Beneficiary in the Plan.  For periods beginning on or after March 31, 2001, statements shall be made available regularly to each Member reflecting the status of his Member's Account and the portions thereof attributable to each separate account or subaccount included therein.

Section 9.2 - Investment Funds

(a)    The Trust Fund shall consist of the Lehman Stock Fund and, until January 31, 2007, the American Express Stock Fund, each as described more fully in Section 1.32, and such other Investment Funds as the Committee shall establish from time to time. The Committee shall have the right (i) to establish and disestablish such other Investment Funds from time to time to implement and carry out investment objectives and policies established by the Committee, and (ii) to eliminate or curtail investments in Lehman Stock (or, prior to January 31, 2007, American Express Stock) if and to the extent that the Committee determines that such action is required in order to comply with the fiduciary duty rules of section 404(a)(1) of ERISA, as modified by section 404(a)(2) of ERISA.

(b)    Each Member shall have an undivided interest in the Trust Fund consisting of the aggregate of his undivided proportionate interests in each Investment Fund in which such Member shall have an interest.  Each Member's undivided proportionate interest in each Investment Fund of the Trust Fund shall be measured by the proportion that the value of such part of his Member's Account as is invested in that Fund bears to the total of such parts of

all Member's Accounts as are invested in that Fund on the date that such interest is being
determined.

(c)    The Trustee shall maintain in cash, without obligation to credit interest
thereon, such part of the Trust Fund as the Committee specifies for the proper administration of
the Plan.  At the Committee's direction, the Trustee shall invest such cash in short-term
obligations as determined by the Trustee, which shall be treated as cash for purposes of the
Plan.

Section 9.3 - Valuation of Investment Funds

(a)    Effective as of February 1, 2001, the Committee shall retain a
recordkeeper for the Plan who shall be the Administrator.  The Administrator shall determine as
of each Valuation Date thereafter, the value of each Member's (or Beneficiary's) interest in the
Trust Fund, based on the fair market value of the assets of each Investment Fund in which such
Member or Beneficiary has an interest and his proportionate interest therein, in accordance with
such procedures as the Administrator shall adopt pursuant to authorization from the Committee
as appropriate for the purpose and administratively practicable (the "Administrator's
Procedures").  The Administrator shall adjust such interest as of each day the New York Stock
Exchange is open for trading to reflect all transactions affecting such interest and such value,
including contributions, distributions or withdrawals, transfers to or from other Investment
Funds and loans and expenses properly chargeable against the Trust Fund, in accordance with
the Administrator's Procedures.  In addition, if the last day of the Plan Year is not a day on
which the New York Stock Exchange is open for trading, the Administrator may treat the
valuation as of the last such day as the valuation for the last day of the Plan Year.  Based on
such adjustments, the Administrator shall determine the value of Member's Accounts as of each
Valuation Date.  In applying the foregoing requirements to daily valuation, it shall be
recognized that daily valuation is dependent upon the Administrator receiving complete and
accurate information from a variety of different sources on a timely basis.  Since events may
occur that cause an interruption in this process, affecting a single Member or a group of
Members (or their Beneficiary), there shall be no guarantee by the Plan that any given
transaction will be processed at the anticipated time and day.  In the event of any such

- 73 -

interruption, any affected transaction will be processed as soon as administratively feasible, and no attempt will be made to reconstruct events as they would have occurred absent the interruption, regardless of the cause, unless the Committee in its sole discretion directs the Administrator to do so.

<u>Section 9.4 - Election and Notice Procedures</u>

Elections and directions provided to the Administrator in accordance with procedures adopted by the Administrator and approved by the Committee shall be considered provided to the Committee, effective on the date the Administrator has received such elections and directions.  Such elections and directions may, without limitation, be transmitted by electronic media (internet and e-mail), automated telephonic communication, and recorded conversations with customer service representatives, to the extent permitted in Treas. Reg. §§ 1.402(f)-1, 1.411(a)-11, and 35.3405-1 and corresponding successor guidance to the extent so authorized by the Administrator and Committee.

KL3 2630220.9

# ARTICLE X

## ADMINISTRATION

### Section 10.1 - Employee Benefit Plans Committee

The complete authority and discretion to control and manage the operation and administration of the Plan shall be placed in the Employee Benefit Plans Committee of the Company.  The Committee shall consist of at least three members appointed from time to time by the Board of Directors or its delegate(s) to serve at the pleasure thereof.  Any member of the Committee may resign by delivering his written resignation to the Company.

### Section 10.2 - Committee Powers and Discretion

The Committee shall have all powers and discretion necessary or helpful for the carrying out its responsibilities, including the discretion and exclusive right to determine any question arising in connection with the interpretation, application or administration of the Plan. Without limiting the generality of the foregoing, the Committee shall have the power and complete discretion to:

(a)    Determine all questions arising out of or in connection with the provisions of the Plan or its administration, including, without limitation, the power and discretion to resolve ambiguities, to determine relevant facts, to rectify errors, and to supply omissions;

(b)    Make rules and regulations for the administration of the Plan which are not inconsistent with the terms and provisions of the Plan;

(c)    Construe all terms, provisions, conditions and limitations of the Plan;

(d)    Determine all questions relating to the eligibility of persons to receive benefits hereunder, all other matters upon which the benefits or other rights of a Member or other person shall be based hereunder;

(e)    Determine all questions relating to the administration of the Plan (1) when disputes arise between an Employer and a Member or his Beneficiary, spouse or legal

representatives, and (2) in order to promote the uniform administration of the Plan for the benefit of all parties concerned;

(f)    Direct the Trustee as to the method by which and persons to whom benefits will be paid;

(g)    Establish procedures for determining whether a domestic relations order is a qualified domestic relations order ("QDRO") as described in Section 7.12 and for complying with any such QDRO;

(h)    Determine the method of making corrections necessary or advisable as a result of operating defects in order to preserve qualification of the Plan under Section 401(a) of the Code pursuant to procedures of the Internal Revenue Service applicable in such cases (such as those set forth in Revenue Procedure 2006-27 and similar guidance);

(i)    Compromise or settle claims against the Plan and direct the Trustee to pay amounts required in any such settlements or compromise;

(j)    Appoint an Administrator and delegate to such Administrator those tasks of recordkeeping, Plan valuation, communication with Members, and other such ministerial and administrative tasks as the Committee deems appropriate; and

(k)    Exercise, in its capacity as named fiduciary under the Plan all discretion that the Trust Agreement or any other contract with the Administrator provides shall or may be exercised by the Company.

The foregoing list of powers and discretion is not intended to be either complete or exclusive, and the Committee shall, in addition, have such powers and discretion as it may determine to be necessary for the performance of its duties under the Plan and the Trust Agreement. The Committee's exercise of its discretion hereunder in good faith shall be conclusive and binding on all parties concerned, including without limitation, any and all Employees, Members, spouses, Beneficiaries, heirs, distributees, estates, executors, administrators, and assigns.

### Section 10.3 - Suspension of Investment Transfer Elections

In the event of a Black Out Period or other period for which the Committee determines that specific circumstances so require, no investment transfer elections with respect to the Lehman Stock Fund may be initiated until such period expires, as determined by the Committee (and any attempt to initiate such a transfer election during such period will be of no effect).  Upon the expiration of such period, a Member may again make such elections in accordance with the provisions of Section 6.2.

### Section 10.4 - Claims Procedure

Any Member or Beneficiary who believes that he is then entitled to receive a benefit under the Plan, including one greater than that determined by the Committee, may file a claim in writing with the Committee in accordance with the claims review procedure established by the Committee.

### Section 10.5 - Action by Majority

Any act which the Plan authorizes or requires the Committee to do may be done by a majority of its members.  The action of such majority, expressed from time to time by a vote at a meeting (at which members may be present in person or through telephonic or similar communication) or in writing without a meeting, shall constitute the action of the Committee and shall have the same effect for all purposes as if assented to by all members of the Committee at the time in office.  The members of the Committee may authorize one or more of their number to execute or deliver any instrument, make any payment or perform any other act which the Plan authorizes or requires the Committee to do.

### Section 10.6 - Retention of Advisors

The Committee or any fiduciary designated by the Committee pursuant to Section 10.11 may employ counsel and other agents and may procure such clerical, accounting, actuarial and other services as they may require in carrying out the provisions of the Plan.

KL3 2630220.9

### Section 10.7 - Committee Member Compensation

No member of the Committee shall receive any compensation for his services as such.

### Section 10.8 - Indemnification

The Company shall indemnify and save harmless each member of the Committee against all expenses and liabilities arising out of membership on the Committee, excepting only expenses and liabilities arising from his own gross negligence or willful misconduct, as determined by the Board of Directors.

### Section 10.9 - Named Fiduciary and Plan Administrator

For purposes of the Act, the "Named Fiduciary" for operation and administration of the Plan and the "Plan Administrator" shall be the Committee, and the Committee is hereby designated as agent for service of legal process.

### Section 10.10 - Service in Various Fiduciary Capacities

Any person or group of persons may serve in more than one fiduciary capacity with respect to the Plan.

### Section 10.11 - Power of Delegation

The Committee may designate in writing other persons to carry out a specified part or parts of its responsibilities hereunder (including the power to designate other persons to carry out a part of such designated responsibility).

### Section 10.12 - Named Fiduciary with Respect to Asset Management

The Committee shall be the "Named Fiduciary" with respect to control or management of the assets of the Plan, and shall have authority (a) to appoint an investment manager or managers (within the meaning of Section 3(38) of the Act) to manage (including the power to acquire and dispose of) any assets of the Plan), and (b) to direct the Trustee with respect to the management of assets of the Plan not subject to the authority of such an investment

- 78 -

manager (including, without limitation, the selection of such mutual funds or other investment options as it may deem appropriate to carry out the investment objectives of each of the respective Investment Funds established by the Committee as provided in Section 9.2). Without limiting the generality of the foregoing, the Committee as such Named Fiduciary shall have exclusive responsibility for determining whether the Plan provisions requiring the establishment and maintenance of the Lehman Stock Fund (and the American Express Stock Fund until January 31, 2007) may continue to be given effect in accordance with their terms as required by Section 401(a)(1)(D) of the Act, or whether such provisions are to any extent inconsistent with applicable requirements of the Act, including in particular the fiduciary duty rules of Section 404(a)(1) of the Act as modified  by Section 404(a)(2) of the Act;  and no other fiduciary of the Plan shall have responsibility therefor.

<u>Section 10.13 - Funding Policy</u>

The Committee shall establish and carry out, or cause to be established and carried out by those persons (including, without limitation, any trustee) to whom responsibility or authority therefore has been allocated or delegated in accordance with the Plan or the Trust Agreement, a funding policy and method consistent with the objectives of the Plan and the requirements of ERISA.  Without limiting the generality of the foregoing, it is recognized that Members (and their Beneficiaries) have many differing individual financial situations, and the funding policy of the Plan is therefore to allow Members and their Beneficiaries to choose, from a broad range of diversified investment options (as well as the Lehman Stock Fund or American Express Stock Fund until its elimination, subject to the limitations of Section 6.1(c)), the Investment Fund or Investment Funds which they believe best suit their individual objectives.  In the event of the elimination of a preexisting Investment Fund option, or a merger or spin-off of assets from another plan into this Plan, the foregoing principle shall not preclude the adoption of mapping rules under which assets previously invested for the benefit of the Member or Beneficiary in one or more investment options that are no longer available are transferred to specific Investment Funds under this Plan, subject to the right of the Member or Beneficiary to then reallocate his Member's Account among Investment Funds in accordance with Section 6.2. To the extent permitted by law, none of the Company, any Employer, the Committee, the Trustee nor any other fiduciary of the Plan shall be liable for any loss resulting from a Member's (or

- 79 -

Beneficiary's) exercise of his right to direct the investment of his Member's Account or his failure to exercise such rights.

**Section 10.14 - Recovery of Overpayments**

Without limiting the generality of the Committee's power and discretion under Section 10.2 to rectify errors and correct omissions, in the event that the Committee determines that overpayments have been made to a Member or his spouse or Beneficiary, the Committee shall take such steps as it shall deem appropriate under the relevant facts and circumstances to recover such payments, with or without interest, and in case repayment is not otherwise made, to offset the amount to be recovered against subsequent payments otherwise becoming due to or in respect of such Member, spouse, or Beneficiary at such time and to such extent as it shall deem appropriate.

## ARTICLE XI

## BENEFICIARY DESIGNATION, INCOMPETENCY AND NON-ALIENATION

### Section 11.1 - Beneficiary Designation

(a)    Each Member may designate, in accordance with procedures established by the Committee, a Beneficiary or Beneficiaries to receive his interest in the Plan in the event of his death, and may direct that payments be made in specific proportions to certain primary Beneficiaries if living at the date of his death, or if not so living, to certain secondary Beneficiaries, in specified portions, but such designation shall not be effective for any purpose unless it has been communicated by him during his lifetime nor until such communication has been received by the Committee.  He may, from time to time during his lifetime, in accordance with procedures established by the Committee, change the Beneficiary or Beneficiaries.

If more than one Beneficiary of a particular class (primary or secondary) is entitled to benefits, payments shall be made in equal shares to such Beneficiaries, unless some other specific proportions are clearly designated.  If more than one Beneficiary of a particular class (primary or secondary) is named, the interest of any deceased Beneficiary of that class shall pass to the surviving Beneficiary or Beneficiaries of that class except to the extent that the designation provides for payment to any secondary Beneficiary(s) upon the death of a primary Beneficiary.

(b)    Notwithstanding anything in this Section 11.1 to the contrary, for a Member who was legally married on the date of his death which occurs on or after August 23, 1984, and prior to distribution of his Distributable Account, the Beneficiary shall be his surviving spouse unless such Member designates some other Beneficiary and (i) the spouse waives the right to be the Member's Beneficiary, (ii) the Member establishes to the satisfaction of the Committee that the spouse cannot be located or has abandoned the Member within the meaning of local law, (iii) effective January 1, 2004, the spouse and the Member are legally separated and the Member has a court order to such effect, or (iv) the Member has no surviving spouse.  In such event, the designation of a Beneficiary other than the surviving spouse shall be made in accordance with procedures established by the Committee.

- 81 -

Any such designation may be revoked solely by the Member by written notice to the Committee in accordance with procedures established by the Committee; provided, however, the Member's spouse must consent in writing to any such change or revocation that does not designate such spouse as Beneficiary. Any consent by a Member's spouse to waive the rights provided under this Section 11.1 must be in writing, acknowledge the effect of such waiver, and be witnessed by a notary public. Further, a spouse's consent is irrevocable and must identify the designated non-spouse Beneficiary by name or class.

If a Member has failed effectively to designate a Beneficiary to receive the Member's death benefits, or a Beneficiary previously designated has predeceased the Member and no alternative designation has become effective, such benefits shall be distributed to the Member's surviving spouse, if any, or if no spouse survives the Member, to the Member's estate. In the event that the Committee determines, based on evidence satisfactory to it, that no executor or administrator has been appointed for the estate or is likely to be so appointed, the Committee may, in its discretion, distribute such benefits to such one or more of (i) the surviving child or children of the Member (who may include stepchildren) (ii) the surviving parent or parents of the Member, (iii) surviving siblings of the Member (who may include half-siblings), or (iv) surviving grandchildren of the Member. The decision of the Committee shall, in each case, be final and binding upon all parties, and any distribution made pursuant to the power herein conferred on the Committee shall, to the extent so made, be a complete discharge of the obligations under the Plan of the Employer, the Trustee, and the Committee in respect of such Member.

(c)     Before making distribution to a Beneficiary, the Committee may require such proof of death and such evidence of the right of any person to receive all or part of the death benefit of a deceased Member as the Committee may deem desirable. The Committee's determination of the fact of death of a Member and of the right of any person to receive distributions as a result thereof shall be conclusive upon such person or persons having or claiming any right in the Trust Fund on account of such Member.

(d)     If distribution in respect of any Member's Distributable Account is made to a person reasonably believed by the Committee or its delegate (taking into account any

document purporting to be a valid consent of the Member's spouse, or any representation by the Member that he is not married) to properly qualify as the Member's Beneficiary under the foregoing provisions of this Article XI, the Plan shall have no further liability with respect to such Member's Accounts (or the portion thereof distributed).

(e)     No purported designation of beneficiary (including change of designation) shall be valid or given effect unless it complies with the procedures established by the Committee, including use of such form or forms as the Committee has prescribed for the purpose.

Section 11.2 - Incompetence

Whenever and as often as any person entitled to receive a distribution under the Plan shall be under a legal disability or, in the sole judgment of the Committee, shall otherwise be unable to care for such distributions to his own best interest and advantage, the Committee, in the exercise of its discretion, may direct such distributions to be made in any one or more of the following ways:

(a)     To the spouse;

(b)     To the legal guardian or conservator; or

(c)     To any other person to be held and/or used for such person's benefit.

The decision of the Committee shall, in each case, be final and binding upon all parties, and any distribution made pursuant to the power herein conferred on the Committee shall, to the extent so made, be a complete discharge of the obligations under the Plan of the Employer, the Trustee, and the Committee in respect of such Member

Section 11.3 - Non-Alienation

(a)     Except as otherwise provided by applicable Federal law, the right to receive funds under the Plan may not be anticipated, alienated, sold, transferred, assigned, pledged, encumbered, or subjected to any charge or legal process; and if any attempt is made to do so, or a person eligible for any funds becomes bankrupt, the interest under the Plan of the

person affected may be terminated by the Committee, and such Committee may cause the same to be held or applied for the benefit of such person or one or more of his dependents in such manner as it deems proper.

(b)    The provisions of Subsection (a) shall not apply to a "qualified domestic relations order" as defined in Section 414(p) of the Code and any other domestic relations order permitted to be so treated by the Committee in accordance with Section 7.12.  The Committee shall establish a written procedure to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders.

KL3 2630220.9

## ARTICLE XII

## AMENDMENT AND TERMINATION

### Section 12.1 - Amendment to Conform with Law

The Company, acting through the Company Representative, reserves the right to make by amendment such changes in, additions to, and substitutions for the provisions of this Plan, to take effect retroactively or otherwise, as is deemed necessary or advisable from time to time to qualify the Plan under Sections 401(a) and 401(k) of the Code, to continue the Plan as so qualified, or to comply with any other provision of law relating to trusts and plans of this or a similar nature, and administrative regulations promulgated thereunder.

### Section 12.2 - Other Amendment and Termination

The Company, acting through the Company Representative, also reserves the right to amend this Plan at any time, and from time to time, in any manner it deems desirable including, but not limited to, changing or modifying contributions under the Plan, or changing any provision relating to the distribution or withdrawal, or both, with respect to any account balances, to the maximum extent permitted by Section 411(d)(6) of the Code and regulations thereunder. The Company further reserves the right to terminate this Plan at any time by resolution of the Board of Directors.

### Section 12.3 - Limitations on Amendments

The provisions of this Article XII are subject to and limited by the following restrictions:

(a)    No such amendment shall operate either directly or indirectly to give any Employer any interest whatsoever in any funds or property held by the Trustee under the terms hereof, or to permit corpus or income of the Trust to be used for or diverted to purposes other than the exclusive benefit of persons who are at any time on or after the date hereof, Members or Beneficiaries.

(b)    Except to the extent necessary to produce conformity to the laws and regulations described in Section 12.1, no such amendment shall operate either directly or

KL3 2630220.9

indirectly to deprive any Member of his nonforfeitable beneficial interest as it is constituted at the time of the amendment.

### Section 12.4 - Termination of the Plan

Upon complete or partial termination of the Plan (within the meaning of Section 411(d)(3) of the Code), the rights of all affected Members to their Member's Accounts as of the date of such termination shall be nonforfeitable.  If the Plan is completely terminated, the assets attributable to each Member's Account shall either be distributed to the Member (or his Beneficiary) to the extent permitted by applicable regulations (such as Treasury Regulation § 1.401(k)-1(d)(4), effective January 1, 2006), or transferred to a successor plan, as the Company Representative shall direct in accordance with applicable law.  Until all Member's Accounts are fully distributed or transferred, any remaining accounts held in the Trust Fund shall continue to be adjusted in accordance with Section 9.3, and to reflect their proportionate share of the expenses of termination to the extent such expenses are not paid by an Employer.

### Section 12.5 - Merger or Consolidation or Transfer

The Plan may be amended to provide for the merger of the Plan, in whole or in part, or a transfer of all or part of its assets, into or to any other qualified plan within the meaning of Section 401(a) of the Code, including such a merger or transfer in lieu of a distribution which might otherwise be required under the Plan.  No merger or consolidation of the Plan with, or any transfer of assets or liabilities of the Plan to or from any other plan, shall occur unless each Member in the Plan would be entitled to receive a benefit immediately after the merger, consolidation or transfer (if the Plan then terminated) which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation or transfer (if the Plan had then terminated).

ARTICLE XIII

SPECIAL TOP-HEAVY RULES

Section 13.1 - Application

If this Plan is or becomes a Top-Heavy Plan (as hereinafter defined) in any Plan Year, the provisions of this Article XIII shall apply notwithstanding any conflicting provisions of this Plan.  For purposes of this Article XIII, the term "Employer" shall include all Affiliates.

The date for determining the applicability of this Article (the "Determination Date") is the last day of the preceding Plan Year.

Other plans shall be included in determining whether this Plan is "Top-Heavy" based on the determination date as defined in Section 416(g)(4)(C) of the Code for each such plan which occurs in the same calendar year as such Determination Date for this Plan.

Section 13.2 - Top-Heavy Plan

The Plan shall constitute a Top-Heavy Plan if, as of the Determination Date, (a) the Plan is not part of an Aggregation Group (as hereinafter defined) and the aggregate of the Accounts of Key Employees (as hereinafter defined) under the Plan exceeds sixty percent (60%) of the aggregate of the Accounts of all Employees under the Plan or (b) the Plan is included in an Aggregation Group and such Group is a Top-Heavy Group (as hereinafter defined).

Section 13.3 - Definitions

For purposes of this Article XIII, the following definitions shall apply:

(a)     "Key Employee" in this Plan means an employee (including a former employee, whether or not deceased) of an Employer or Affiliate who, at any time during a given Plan Year or any of the four (4) preceding Plan Years is one or more of the following --

(i)     An officer of an Employer or an Affiliate having Compensation greater than fifty percent (50%) of the dollar amount in effect under Section 415(b)(1)(A) of the Code for any such Plan Year; provided, however, that no more than the lesser of (A) fifty (50)

- 87 -

employees or (B) the greater of three (3) employees or ten percent (10%) of all employees are to be treated as officers (exclusive of employees described in Section 414(q)(5) of the Code);

(ii)    One of the ten (10) employees (A) having Compensation greater than the dollar limit described in Subsection 5.1, and (B) owning (or considered as owning, within the meaning of Section 416(i) of the Code), the largest percentage interest in value of an Employer or Affiliate, provided that such percentage interest exceeds one-half percent (0.5%) in value.  If two (2) employees have the same interest in an Employer or Affiliate, the employee having greater Compensation shall be treated as having a larger interest;

(iii)    A person owning (or considered as owning, within the meaning of Section 416(i) of the Code), more than five percent (5%) of the outstanding stock of an Employer or Affiliate, or stock possessing more than five percent (5%) of the total combined voting power of all stock of an Employer or Affiliate (or having more than five percent (5%) of the capital or profits interest in any Employer or Affiliate that is not a corporation, determined under similar principles); or

(iv)    A one percent (1%) owner of an Employer or Affiliate having Compensation of more than $150,000.  A "one percent (1%) owner" means any person who would be described in clause (iii) hereof if "one percent (1%)" were substituted for "five percent (5%)" in each place where it appears in clause (iii).

For each other plan included in the Aggregation Group, "Key Employee" is as defined in Section 416(i) of the Code.

(b)    "Aggregation Group" means the group of plans that includes (i) any plan maintained by an Employer or an Affiliate in which a Key Employee participates during the five (5)-year period ending on such plan's Determination Date, and (ii) each other plan of an Employer or Affiliate which, during such period, enables any plan in clause (i) of this sentence to meet the requirements of Sections 401(a)(4) and 410 of the Code.  Collectively bargained plans that cover a Key Employee shall be included for this purpose.  Aggregation Group may include terminated plans, frozen plans and, to the extent that benefits are provided with respect to service with an Employer or Affiliate, multiemployer plans (described in Section 414(f) of

- 88 -

the Code) and multiple employer plans (described in Section 413(c) of the Code) to which an Employer or Affiliate makes contributions.  In any Plan Year, in testing for top-heaviness under Subsection (c) below, the Committee may in its discretion expand the Aggregation Group to take into account any other plan maintained by an Employer or Affiliate, but only if such expanded Aggregation Group does not as a result of such expansion, fail to meet the requirements of Sections 401(a)(4) and 410 of the Code.  Collectively bargained plans that do not cover a Key Employee may be included for this purpose.

(c)    The term "Top-Heavy Group" means an Aggregation Group as to which, as of the Determination Date, the sum of — (i) the present value of the cumulative accrued benefits for Key Employees under all defined benefit plans included in such Group (determined based on the actuarial assumptions set forth in the "top-heavy" provisions of such plans), and (ii) the aggregate of the accounts of Key Employees under all defined contribution plans included in such Group — exceeds sixty percent (60%) of a similar sum determined for all participants of such plans.

Section 13.4 - Beneficiaries

The terms "Key Employee" and "participant" include their Beneficiaries.

Section 13.5 - Present Value and Accounts

For purposes of Sections 13.2 and 13.3(c), the following rules shall apply in determining the present value of the cumulative accrued benefit for any employee and the amount of the account of any employee:

(a)    The present value of accrued benefits and the value of accounts shall be determined as of the last day of the twelve (12)-month period ending on the Determination Date;

(b)    Employer contributions and employee contributions, with the exception of accumulated deductible employee contributions, shall be taken into account;

(c)    All amounts distributed to an employee within the five (5)-year period ending on the Determination Date shall be taken into account, including any amount distributed

- 89 -

from a terminated plan that would have been required to be included in the Aggregation Group had it not been terminated;

(d)     With respect to a transferee plan, any rollover contribution or similar transfer initiated by an employee and made after December 31, 1983, shall be disregarded (except to the extent provided in regulations issued by the Secretary of the Treasury);

(e)     If an employee ceases to be a Key Employee, such employee's accrued benefit and account shall be disregarded (for purposes of determining the present value of cumulative accrued benefits and the amount of the accounts of both Key Employees and all employees) for any Plan Year after the last Plan Year for which he was treated as a Key Employee; and

(f)     The benefits and accounts of persons who have not performed services for an Employer or Affiliate for the five (5)-year period ending on the Determination Date shall be disregarded.

### Section 13.6 - Minimum Contribution

(a)     If this Plan is determined to be a Top-Heavy Plan in any Plan Year, then the Employer contribution for such Plan Year for each Participant who is employed by an Employer or Affiliate on the last day of the Plan Year and is not a Key Employee, exclusive of Section 401(k) Contributions shall be at least three percent (3%) of such Participant's Compensation.  The Employer contribution shall not, however, exceed the percentage of each Participant's Compensation that is equal to the highest percentage of Compensation at which contributions are made for the Plan Year for any Key Employee (i) under the Plan or (ii) if the Plan is part of an Aggregation Group, under any defined contribution plan in such Group; provided, however, that this sentence shall not apply if the Plan is required to be included in an Aggregation Group and enables a defined benefit plan to meet the requirements of Section 401(a)(4) or 410 of the Code.  For purposes of the preceding sentence, the percentage of Compensation at which contributions are made for a Key Employee shall be computed without regard to Compensation in excess of the ceiling on includable Compensation set forth in Section 13.7.

- 90 -

(b)    For purposes of this Section 13.6:

(1)    Contributions made pursuant to Chapter 21 of Title II of the Social Security Act shall be disregarded; and

(2)    For Plan Years beginning on or after January 1, 1989, (A) Employer Contributions attributable to a salary reduction or similar arrangement (which are made with respect to a Key Employee) shall be taken into account in determining the minimum contribution under this Section 13.6; and (B) Matching Contributions for a non-Key Employee that are taken into account to meet the minimum contribution requirements of this Section 13.6 shall be disregarded in applying the provisions of Section 3.4.

(c)    The provisions of Subsection (a) above shall apply without regard to Section 4.1.

(d)    The provisions of Subsection (a) above shall not apply with respect to any Participant who, for the Plan Year in question, receives the minimum contribution set forth in Subsection (a) above under another Defined Contribution Plan (as defined in Section 5.4(b)) maintained by the Employer or an Affiliate or receives the minimum benefit prescribed in Section 416(c) of the Code under a Defined Benefit Plan (any "Retirement Plan", as defined in Section 5.4(c) that is not a Defined Contribution Plan) maintained by the Employer or an Affiliate.

## Section 13.7 - Ceiling on Includable Compensation

If the Plan is determined to be a Top-Heavy Plan in any Plan Year, then only the Participant's Compensation up to the maximum amount described in Section 1.17, as adjusted from time to time, shall be taken into account in determining the allocation to the Member's Account of such Participant for the Plan Year.

## Section 13.8 - Exception for Collectively Bargained Plans

Section 13.6 shall not apply to any employee who is included in a collective bargaining unit if there is evidence that retirement benefits were the subject of good faith

- 91 -

bargaining between the representatives of such unit and the Employer or an Affiliate, except as to those employees who are Employees.

<u>Section 13.9 - Compliance with Section 416 of the Code</u>

The calculation of the "Top-Heavy" ratio, and the extent to which distributions, rollovers and transfers from this Plan or any other plan included in the Aggregation Group shall be taken into account, will be made in accordance with Section 416 of the Code and applicable regulations thereunder.

KL3 2630220.9

ARTICLE XIV

MISCELLANEOUS

### Section 14.1 - Effect of Mistake

In the event of a mistake or misstatement as to age or eligibility of any person, or the amount or kind of contributions, withdrawals or distributions made or to be made to a Member or other person, the Committee shall, to the extent it deems possible, make such adjustment as will in its judgment accord to such Member or other person the credits or distributions to which he is properly entitled under the Plan.

### Section 14.2 - Inability to Locate Payee

Notwithstanding Section 7.1, if any benefit becomes payable to any person, or to the executor or administrator of any deceased person, and if that person or his executor or administrator does not file a claim in writing with the Committee in accordance with the claims review procedure set forth in the Summary Plan Description of this Plan within two years after the Committee mails written notice of eligibility to his last known address, that benefit will be forfeited at such time as the Committee shall determine in its sole discretion (but in all events prior to the time such benefit would otherwise escheat under any applicable law).  However, the payee later may file a claim for that benefit under Section 10.4, provided the Plan has not been terminated.  If that claim is approved, the benefit will be restored; provided, however, that no interest or other earnings shall be paid with respect to such benefit.

Amounts forfeited pursuant to this Section 14.2 shall be used to reduce Employer contributions to the Plan under Section 4.1 or to pay expenses of the Plan.

### Section 14.3 - Conclusiveness of Records

In administering the Plan, the Committee may conclusively rely upon an Employer's payroll and personnel records maintained in the ordinary course of business.

- 93 -

<u>Section 14.4 - No Employment Rights</u>

This Plan is not a contract to employ nor a consideration or inducement for the employment of any person and does not give to any person the right to be continued in employment, not shall it be construed as limiting in any way the right of any Employer or Affiliate to treat any person without regard to the effect which such treatment might have upon him as a Participant under the Plan.

<u>Section 14.5 - Gender; Headings</u>

(a)    The masculine pronoun, wherever used herein, shall include the feminine pronoun, the singular as used herein shall include the plural, and the plural shall include the singular, unless the context clearly indicates a different meaning.

(b)    The headings of Sections and Subsections are included solely for convenience of reference and in no way define, limit, enlarge or describe the scope or intent of the Plan nor in any way shall affect the Plan or the construction of any provision thereof.

<u>Section 14.6 - Counterparts</u>

This Plan may be executed in any number of counterparts, each of which shall be deemed to be an original.  All the counterparts shall constitute but one and the same instrument and may be sufficiently evidenced by any one counterpart.

<u>Section 14.7 - Illegality of Particular Provision</u>

The illegality, invalidity or unenforceability of any particular provision of the Plan or Trust Agreement shall not affect any other provisions of the Plan or Trust Agreement, and the Plan and Trust Agreement shall be construed as if such provision had not been included therein.

<u>Section 14.8 - Applicable Law</u>

The Plan shall be governed by and construed according to the laws of the State of New York (without regard to its choice of law principles) except to the extent pre-empted by the

Act or any other applicable federal law.  No action (whether at law, in equity or otherwise) shall be brought by or on behalf of any Member or Beneficiary for or with respect to benefits due under this Plan unless the person bringing such action has timely exhausted the Plan's claims review procedure.  Any action (whether at law, in equity or otherwise) must be commenced within three years from the earlier of (a) the date a final determination denying such benefit, in whole or in part, is issued under the Plan's claim review procedure and (b) the date such person's cause of action first accrued.

### Section 14.9 - Limitation of Liability

Subject to Section 10.8, no liability shall attach to or be incurred by any stockholder, officer or director of an Employer or any Affiliate under or by reason of the terms, conditions and provisions contained in the Plan or Trust Agreement or for the acts or decisions taken or made thereunder or in connection therewith; and as a condition precedent to his participation in the Plan or the receipt of benefits thereunder, or both, such liability, if any, is expressly waived and released by each Member, spouse or Beneficiary, and by any and all persons claiming under or through such persons, such waiver and release to be conclusively evidenced by any act or participation in or the acceptance of benefits or the making of elections under the Plan.

### Section 14.10 - Doubt as to Right to Payment

In the event that at any time any doubt exists as to the right of any person to any payment hereunder or the amount or time of such payment (including, without limitation, any case of doubt as to identity, or any case in which any notice has been received from any other person claiming any interest in amounts payable hereunder, or any case in which a claim from other persons may exist by reason of community property or similar laws), the Committee shall be entitled, in its discretion, to direct the Trustee to separately account for such sum or hold such sum as a segregated amount in trust until such right or amount or time is determined or until order of a court of competent jurisdiction, or to pay such sum into court in accordance with appropriate rules of law in such case then provided, or to make payment only upon receipt of a bond or similar indemnification (in such amount and in such form as is satisfactory to the Committee).

- 95 -

ARTICLE XV

SPECIAL PROVISIONS APPLICABLE TO SLHMC EMPLOYEES

Section 15.1 - Definitions

As used in this Article XV, the following terms shall have the meanings hereinafter set forth:

(a)    "Closing" shall mean the closing to take place on or about August 31, 1993 in accordance with, and pursuant to, the transactions contemplated by the Purchase Agreement.

(b)    "GE Capital" shall mean GE Capital Mortgage Services, Inc., a New Jersey corporation.

(c)    "Purchase Agreement" shall mean the stock purchase agreement dated as of July 29, 1993 wherein Shearson agreed to sell to GE Capital the issued and outstanding shares of SLHMC and certain subsidiaries of SLHMC.

(d)    "Shearson" shall mean Shearson Holdings, Inc., a Delaware corporation.

(e)    "SLHMC" shall mean Shearson Lehman Hutton Mortgage Corporation, a Delaware corporation, and its subsidiary companies immediately after the Closing.

Section 15.2 - Contributions

Notwithstanding anything in Section 4.1 to the contrary, any Employer contribution to be made on behalf of SLHMC employees under this Plan pursuant to Section 4.1 for the Plan Year beginning in 1993 shall be made with respect to each eligible Participant employed by SLHMC on the Closing and without regard to whether such Participant is employed on the last day of such Plan Year; provided, however, in determining the amount of the contribution to be allocated to each such Participant, the threshold dollar amounts of $37,800 and $100,000 set forth in Section 4.1(c) shall be multiplied by a fraction where the numerator shall equal the number of days in such Plan Year prior to the Closing and the denominator shall equal 365.

KL3 2630220.9

<u>Section 15.3 - Distributions</u>

Each Member who is employed by GE Capital or any member of the GE Capital controlled group, within the meaning of Section 414(b), (c), (m) or (o) of the Code, on the Closing (or within six months thereafter in accordance with the terms of the Purchase Agreement) shall be entitled to receive a lump sum distribution of his Member's Account in accordance with the applicable provisions of Section 7.2, provided the distribution otherwise satisfies the applicable requirements of Section 401(k)(10) of the Code and the regulations thereunder.

KL3 2630220.9

# ARTICLE XVI

## PARTICIPANT LOANS

### Section 16.1 - Loans to Parties in Interest

Upon the application of a Participant or other Member who is a "party in interest" with respect to the Plan (within the meaning of Section 3(14) of the Act), the Trustee shall make a loan to such Member from his Member's Account, provided that such loan meets the requirements of Section 16.2. No more than two loans may be outstanding at any given time. The loan request shall be made on such form and in such manner as the Committee or its delegee (the "Loan Administrator"), shall prescribe, together with such application fee (if any) as the Loan Administrator may authorize with the approval of the Committee. The Loan Administrator shall notify the Member in writing within a reasonable time of the approval (such notification may include the issuance of a check) or denial of such loan request, and such notification by the Loan Administrator shall be final. The status and rights under the Plan of a Member who obtains a loan under this Article XVI shall not be affected, except to the extent that the Member has assigned an interest in his Member's Account pursuant to the applicable provisions of Section 16.2. All loans shall be granted according to rules adopted by the Loan Administrator applicable to all Members who are parties in interest on a uniform basis that does not discriminate in favor of Highly Compensated Employees. A Member who has defaulted on a prior loan (as described in Section 16.8) shall not be eligible for future loans under this Section 16.1; provided, however, if a Member has terminated employment and the defaulted loan has been treated as distributed for both Plan and income tax purposes, such Member following rehire shall be eligible for future loans under this Article 16 without regard to the prior loan default, and the amount of such future loans shall be determined without regard to such defaulted loan (except for purposes of the limit in Section 16.2.1, if applicable). The Committee may at any time suspend authorization for future loans to Members, but no such suspension shall affect any loan then outstanding under this Article XVI.

### Section 16.2 - Loan Requirements

A loan to a Member shall not be made pursuant to Section 16.1 unless such loan meets all of the following requirements:

- 98 -

KL3 2630220.9

16.2.1 <u>Amount</u>.  Such loan must be in an amount no less than one thousand dollars ($1,000) and shall not exceed the lowest of:

(a)     fifty thousand dollars ($50,000) reduced by the highest amount outstanding during the preceding twelve (12) months on all loans to the Member from this and any other qualified employer plan (as described in Section 72(p)(4) of the Code) which is maintained by an Employer or Affiliate ("controlled group loans");

(b)     one-half of the vested balance of his Member's Account;

(c)     if there is a "controlled group loan" (other than a loan made under this Plan) currently outstanding, one-half of the value of the Member's vested interest under this Plan and any other plan from which such loan was made, less the current amount outstanding on all controlled group loans; or

(d)     such other amount as may be determined by the Loan Administrator in order to comply with any restrictions under an Investment Fund that limit the liquidation of investments to fund Member loans or otherwise.

16.2.2     <u>Adequate Security</u>.  All loans must be adequately secured.  For this purpose, the Member's vested interest in his Member's Account shall be assigned as collateral security to the extent of one-half the value of the Member's vested interest in such Member's Account at the time the loan is made.  If the Loan Administrator subsequently determines that the loan is no longer adequately secured, additional security may be required.

16.2.3     <u>Interest</u>.  All loans must bear interest, payable with each scheduled loan payment (and in no event less frequently than quarterly), at the prime rate published by the Wall Street Journal or such other source as the Loan Administrator shall employ for the purpose plus 1%.  The Loan Administrator shall at regular intervals (but no less frequently than quarterly) determine the applicable rate on the basis of a review of pertinent information.

16.2.4     <u>Repayment</u>.  Such loan must provide for substantially level amortization (within the meaning of Section 72(p)(2)(C) of the Code) with payments made at least quarterly for a fixed term of any number of months less than or equal to sixty (60), or if the

- 99 -

loan is for the purchase of the Member's principal residence, any number of months not to exceed one hundred and twenty (120).  A Member shall have the right on any scheduled payment date to prepay the full outstanding balance of such loan and accrued interest without penalty. Partial prepayment shall not be permitted.  The Member shall agree to a repayment procedure that gives the Loan Administrator satisfactory assurance that the loan will be repaid on schedule, similar to the assurances that a commercial lender would require, such as an agreement to repay the loan by means of deductions from an Employer's or an Affiliate's payroll made in U.S. dollars.  Unless the Loan Administrator determines that it is impractical to do so, such loan shall be repaid by substantially level payroll deductions from pay in each pay period in which the loan is outstanding.  Any outstanding loan shall be repaid within ninety days following a Member's termination of employment. A terminated Member who seeks a distribution in excess of the amount of his Distributable Account exclusive of the balance of an outstanding loan must repay the loan no later than the date of distribution of his Distributable Account. Notwithstanding the foregoing, loan repayments will be suspended under the Plan as permitted under Section 414(u)(4) of the Code.

16.2.5    Binding Obligation.  Such loan must be evidenced by legally binding documentation, either written or the legal equivalent thereof, containing such terms and provisions as the Loan Administrator shall determine, and which is agreed to by the Member in such manner as the Loan Administrator shall prescribe, so as to be binding on such Member, and, if the Loan Administrator shall so determine, must be executed or otherwise agreed to by the Member's spouse.

Section 16.3 - Funding of Member Loans

16.3.1    Source of Funds.  A Member's loan shall be funded solely by reduction of his Member's Account as of the effective date of the loan in the following order of priority: First, from his Employer Contributions Account, next from his Section 401(k) Contributions Account, and then from his Rollover Account (if any), and last from his After-Tax Contribution Account; provided, however, that the Member may, in accordance with procedures established by the Loan Administrator, direct that this order be reversed and that loans be taken first from his After-Tax Contribution Account.  The loan obligation described in Section 16.2.4 of a Member

who receives a loan shall be held by the Trustee as an asset of the Trust Fund and allocated solely to the Member's Account from which the loan was made.  For all purposes hereunder, the value of such loan obligation shall be considered to be the outstanding unpaid principal amount of the loan plus accrued interest.

16.3.2    <u>Allocation Among Investment Funds; Valuation</u>.  A Member's loan will be funded pro-rata from among the Investment Funds in which the Member's Account (or portion thereof) from which the loan is taken are invested.

<u>Section 16.4 - Loan Payments</u>

Payments of principal and interest on a Member's loan shall be allocated among Investment Funds in accordance with rules adopted by the Loan Administrator.

<u>Section 16.5 - Loan Expenses</u>

The Loan Administrator may determine to charge any fees, taxes or other expenses incurred in connection with a loan to the Member's Account of the Member obtaining such loan or to the Member directly.  Such charges shall be imposed on a uniform and nondiscriminatory basis.

<u>Section 16.6 - Disposition of Loan Upon Distribution</u>

In the event that distribution of a Member's Account is required to be made under the terms of the Plan before the Member repays an outstanding loan, the Trustee shall offset the outstanding balance of any loan from such Account against the value of the Member's Account before making a distribution.

<u>Section 16.7 - Compliance with Applicable Law</u>

The Loan Administrator shall take such actions as are deemed appropriate in order to assure full compliance with all applicable laws and regulations relating to Member loans and the granting and repayment thereof.

KL3 2630220.9

<u>Section 16.8 -</u> Default

The outstanding principal amount and accrued interest of a loan made pursuant to Section 16.1 shall become immediately due and payable if the Member fails to make a scheduled loan payment by the required date and any grace period permitted by the Loan Administrator has expired.  In such event, the Loan Administrator may execute upon the Plan's security interest in his Member's Account to satisfy the debt; provided, however, that execution shall not occur until such time as the Member's Distributable Account could be distributed to the Member consistent with the requirements for qualification of the Plan under Section 401(a) of the Code.  The Loan Administrator may take any other action deemed appropriate to obtain payment of the outstanding amount of principal and accrued interest, which may include accepting payments of principal and interest that were not made on schedule and permitting the loan to remain outstanding under its original payment schedule.  Any costs incurred by the Loan Administrator in collecting, or attempting to collect, amounts in default shall be charged against the Member's Account.  If the Loan Administrator is unable to obtain payment of the outstanding principal and accrued interest (or, in the Loan Administrator's discretion, payment of only the overdue amount of such principal), the Loan Administrator shall take such further action as is deemed appropriate to prevent loss to the Plan as a result of the default.  Any discretion by the Loan Administrator in this regard shall be exercised in a uniform manner that does not discriminate in favor of Highly Compensated Employees.

KL3 2630220.9

# ARTICLE XVII

## Domestic Partner Treated as Spouse

### Section 17.1 - Effective Date

The provisions of this Article XVII shall be effective June 1, 2000 with respect to individuals who are Members on or after that date.

### Section 17.2 - Definition of Domestic Partner

An individual is a "Domestic Partner" with respect to a Member for purposes of this Plan if (i) such individual and the Member have a currently registered domestic partnership with a governmental body pursuant to state or local law authorizing such registration, or (ii) such individual and the Member are parties to a civil union or same-sex marriage that is lawful in the jurisdiction in which entered into.  In the absence of a formal registration, an Employee can register his or her domestic partnership with another individual by filing an affidavit with the Lehman Brothers Benefits Service Center, and such individual shall qualify as a Domestic Partner of such Employee for purposes of this Plan for so long as such domestic partnership shall remain in effect.  Notwithstanding the foregoing, an individual will not be regarded as a Domestic Partner of a Member if either such individual or the Member are married to another person (even if legally separated) or have a domestic partnership with another person.

### Section 17.3 - Treatment as Spouse

An individual shall be treated as the spouse of a Member and as legally married to such Member for such period as such individual shall qualify as the Domestic Partner of such Member, but shall not by reason thereof qualify for direct rollover rights of a spouse under Section 7.6 (but effective January 1, 2008, shall qualify for the right of direct rollover to an individual retirement account or annuity there authorized for other individual beneficiaries), nor as a spouse or former spouse for purposes of Section 1.42.

- 103 -

ARTICLE XVIII

Leased Employees

### Section 18.1 - Definitions

The term "Leased Employee" as used in the Plan means any person (a) who performs or performed services for an Employer or Affiliate (hereinafter referred to as the "Recipient") pursuant to an agreement between the Recipient and any other person (hereinafter referred to as the "Leasing Organization"), (b) who has performed such services for the Recipient or for the Recipient and related persons (within the meaning of Section 144(a)(3) of the Code) on a substantially full-time basis for a period of at least one year, and (c) whose services are performed under primary direction or control by the Recipient.

### Section 18.2 - Treatment of Leased Employees

For purposes of this Plan, a Leased Employee shall be treated as an employee of an Affiliate whose service for the Recipient (including service during the one-year period referred to in Section 18.1) is to be taken into account in determining compliance with the service requirements of the Plan relating to participation and vesting (but not for any other purposes, such as, for example determining eligibility to share in Employer Contributions based on completion of a Twelve Month Period of Service.  However, the Leased Employee shall not be entitled to share in contributions or forfeitures under the Plan with respect to any service or compensation attributable to the period during which he is a Leased Employee, and shall not be eligible to become a Member eligible to accrue benefits under the Plan unless and except to the extent that he shall at some time, either before or after his service as a Leased Employee, qualify as an Eligible Employee without regard to the provisions of this Article XVIII (in which event, status as a Leased Employee shall be determined without regard to clause (b) of Section 18.1).

### Section 18.3 - Exception for Employees Covered by Plans of Leasing Corporation

Section 18.2 shall not apply to any Leased Employee if such employee is covered by a money purchase pension plan of the Leasing Organization meeting the requirements of Section 414(n)(5)(B) of the Code and Leased Employees do not constitute more than twenty

percent (20%) of the aggregate "nonhighly compensated work force" (as defined in Section 414(n)(5)(C)(ii) of the Code) of all Employers and Affiliates.

<u>Section 18.4 - Construction</u>

The purpose of this Article XVIII is to comply with the provisions of Section 4l4(n) of the Code.  All provisions of this Article shall be construed consistently therewith, and, without limiting the generality of the foregoing, no individual shall be treated as a Leased Employee except as required under such Section.

KL3 2630220.9

ARTICLE XIX

Special Provisions Applicable to Non-Controlled Group Employers

Section 19.1 - Separate Testing

For Plan Years for which an NCGE (as defined in Section 1.23) is not controlled by or under common control with the Company within the meaning of Section 414(b) or (c) of the Code, and is not aggregated with the Company (or any other entity in such a controlled group with the Company) under Section 414(m) or (o) of the Code:

19.1.1    ADP/ACP Tests.  The limitations of Sections 3.4 and 3.6, shall be applied separately with respect to Participants of the NCGE and all other Participants in accordance with applicable regulations and guidance.  In the event that an Employer is an Affiliate for a portion of a Plan Year and an NCGE for another portion of the same Plan Year, the Committee may, in its discretion, apply the provisions of this Section 19.1.1 to such entity separately as if it were an NCGE for the entire Plan Year, or, in the alternative, apply such provisions solely for the portion of the Plan Year during which such entity is an NCGE.

19.1.2    HCE's.  Highly Compensated Employees of an NCGE shall be determined separately from those of other Employers.

19.1.3    Top-Heavy.  The determination of whether the Plan is "Top-Heavy" under Article XIII shall be made separately with respect to the portion of the Plan applicable to service with each NCGE and the balance of the Plan.  Accounts of Participants having service both with an NCGE and with other Employers shall be maintained in a manner that permits identification of the portion of their Accounts attributable to service with the NCGE to the extent necessary to make such determination.  If the portion of the Plan that applies to an NCGE (or the balance of the Plan) is Top-Heavy, the special provisions of Article XIII applicable by reason thereof shall apply only to that portion of the Plan (or that balance, as the case may be).

Section 19.2 - Maximum Limitations

The maximum limitations on the amount of compensation that may be taken into account for any purpose under the Plan, and the limitations of Article V, shall be applied on an

aggregate basis with respect to all Employers and Affiliates, including Employers that are NCGE's.

### Section 19.3 - Affiliated NCGE's

Two or more NCGE's that are affiliated with each other in a control or other relationship described in Section 19.1 shall be treated as a single NCGE in applying the provisions of this Article XIX.

### Section 19.4 - Participation and Nondiscrimination Requirements

An NCGE shall participate as an Employer only for so long as the Plan, as applied to the NCGE, separately meets the requirements of sections 410(b) and 401(a)(4) of the Code. If the requirements of such provisions shall not be met at any time, and such noncompliance is not remedied within the time permitted by law, the NCGE shall cease to participate in the Plan commencing with the initial Plan Year of such noncompliance, and the portion of the assets of the Plan allocable thereto shall be segregated and no longer be part of the Plan or the Trust Fund, but shall be transferred to a successor funding arrangement solely for such former portion of the Plan.

### Section 19.5 - Investment Funds

Members employed by an NCGE (and their Beneficiaries) shall not be eligible to participate in any Investment Fund in the event that the Committee determines that such participation could constitute a prohibited transaction for which no exemption is available, and may prohibit such Members and Beneficiaries from investing in the Lehman Stock Fund in any case in which Lehman Stock does not constitute a "qualifying employer security" with respect to such NCGE within the meaning of Section 407(d)(5) of the Act (such as in the case of an NHCE in which the Company has less than the 50% ownership interest required for it to be an "affiliate" of the Company within the meaning of Section 407(d)(7) of the Act).

KL3 2630220.9

ARTICLE XX

MODIFICATION OF TOP-HEAVY RULES

Section 20.1 - Effective Date

This Article shall apply for purposes of determining whether the plan is a top-heavy plan under Section 416(g) of the Code for plan years beginning after December 31, 2001, and whether the plan satisfies the minimum benefits requirements of Section 416(c) of the Code for such years.  This Article amends Article XIII of the Plan.

Section 20.2 - Determination of Top-Heavy Status

20.2.1    Key Employee.  Key employee means any employee or former employee (including any deceased employee) who at any time during the plan year that includes the determination date was an officer of the employer having annual compensation greater than $130,000 (as adjusted under Section 416(i)(1) of the Code for plan years beginning after December 31, 2002), a 5-percent owner of the employer, or a 1-percent owner of the employer having annual compensation of more than $150,000.  For this purpose, annual compensation means compensation within the meaning of Section 415(c)(3) of the Code.  The determination of who is a key employee will be made in accordance with Section 416(i)(1) of the Code and the applicable regulations and other guidance of general applicability issued thereunder.

20.2.2    Determination of Present Values and Amounts.  This Section 20.2.2 shall apply for purposes of determining the present values of accrued benefits and the amounts of account balances of employees as of the determination date.

(a)    Distributions during year ending on the determination date.  The present values of accrued benefits and the amounts of account balances of an employee as of the determination date shall be increased by the distributions made with respect to the employee under the plan and any plan aggregated with the plan under Section 416(g)(2) of the Code during the 1-year period ending on the determination date.  The preceding sentence shall also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with the plan under Section 416(g)(2)(A)(i) of the Code.  In the case of a

- 108 -

distribution made for a reason other than separation from service, death, or disability, this provision shall be applied by substituting "5-year period" for "1-year period."

(b)    Employees not performing services during year ending on the determination date.  The accrued benefits and accounts of any individual who has not performed services for the employer during the 1-year period ending on the determination date shall not be taken into account.

### Section 20.3 - Minimum Benefits

20.3.1    Matching Contributions.  Employer matching contributions shall be taken into account for purposes of satisfying the minimum contribution requirements of Section 416(c)(2) of the Code and the plan.  The preceding sentence shall apply with respect to matching contributions under the plan or, if the plan provides that the minimum contribution requirement shall be met in another plan, such other plan.  Employer matching contributions that are used to satisfy the minimum contribution requirements shall be treated as matching contributions for purposes of the actual contribution percentage test and other requirements of Section 401(m) of the Code.

20.3.2    Contributions Under Other Plans.  The minimum benefit requirement may be met in another plan (including another plan that consists solely of a cash or deferred arrangement which meets the requirements of section 401(k)(12) of the code and matching contributions with respect to which the requirements of section 401(m)(11) of the Code are met).

KL3 2630220.9

ARTICLE XXI

ROTH CONTRIBUTIONS

Section 21.1 - General.  Effective January 1, 2008, Roth Contributions shall be permitted under the Plan in accordance with the provisions of this Article XXI.  Roth Contributions shall be treated in the same manner as traditional pre-tax Section 401(k) Contributions ("Pre-Tax Contributions") for all Plan purposes except as provided in the following provisions of this Article XXI.  The Committee may, in operation, implement such deferral election procedures for Roth Contributions as it determines is desirable to carry out the purpose of this Article XXI, provided such procedures are communicated to Participants and permit Participants to modify their elections prospectively at least once each Plan Year.

Section 21.2 - Electing Roth Contributions.  A Participant may elect to defer as a Roth Contribution under the Plan any percentage of his or her Compensation as the Participant may specify, up to 50% (or such lower percentage as the Committee may have established for traditional Pre-Tax Contributions pursuant to Section 3.1(a)), plus any additional amount he or she is eligible to contribute as Catch-Up Contributions under Section 3.10, not to exceed 25% of his Compensation. A Participant may for any pay period elect to make elective deferrals either as Pre-Tax Contributions or as Roth Contributions, but may not make both types of elective deferrals in the same pay period.

Section 21.3 - Pre-Tax Contributions.  A Participant's Pre-Tax Contributions will be separately accounted for, as will gains, losses and expenses attributable to those Pre-Tax Contributions.

Section 21.4 - Roth Contribution.  A Participant's Roth Contributions, including amounts rolled over pursuant to Section 21.8.1, will be separately accounted for, as will gains, losses and expenses attributable to those Roth Contributions, in a Roth Contributions Account. However, forfeitures may not be allocated to such account.  The Plan must also maintain a record of a Participant's investment in the contract (e.g., Roth Contributions that have not been distributed, including any such contributions received by rollover pursuant to Section 21.8.1). Roth Contributions are not considered employee contributions for Plan purposes.

Section 21.5 - Distributions.

21.5.1    Hardship Distributions.  Roth Contributions may be withdrawn for hardship prior to age 59-1/2 subject to the same conditions that apply to Pre-Tax Contributions.

21.5.2    In-Service Distributions.  A Participant may receive an in-service distribution from his or her Roth Contributions Account for reasons other than hardship, provided that the distribution satisfies the same conditions that apply to similar in-service distributions from other accounts under the Plan.

21.5.3    Corrective Distributions.  For any Plan Year in which a Participant may make both Roth Contributions and Pre-Tax Contributions, the Committee operationally may implement an ordering rule procedure for the distribution of excess deferrals under Code Section 402(g), excess contributions under Code Section 401(k), and excess annual additions under Code Section 415.  Such ordering rules may specify whether the Pre-Tax Contributions or Roth Contributions are distributed first, to the extent such type of elective deferrals were made for the year.

Section 21.6 - Loans.  Loans under Article XVI may be taken from and secured by a Participant's Roth Contributions Account.

Section 21.7 - Ordering Rules for Loans and Distributions.  The Committee operationally may implement an ordering rule procedure for withdrawals, distributions or loans from a Participant's Roth Contributions Account and the different sources thereof (such as elective deferrals made as such or rollovers as described in Section 21.8.1).

Section 21.8 - Rollovers.  A direct rollover of a distribution from a Participant's Roth Contributions Account of the Plan shall only be made to another Roth elective contribution account of an applicable retirement plan as described in Code Section 402A(e)(1) or to a Roth IRA as described in Code Section 408A, and only to the extent the rollover is permitted under the rules of Code Section 402(c).

21.8.1    The Plan shall accept a rollover contribution to a Participant's Roth Contributions Account only if it is a direct rollover from another Roth contribution account of an

applicable retirement plan as described in Code Section 402A(e)(1) and only to the extent the rollover is permitted under the rules of Code Section 402(c).

       21.8.2       The provisions of the Plan that allow a Participant to elect a direct rollover of only a portion of an eligible rollover distribution is applied by treating any amount distributed from a Participant's Roth Contributions Account as a separate distribution from any amount distributed from the Participant's other accounts in the Plan, even if the amounts are distributed at the same time.

       <u>Section 21.9 - Operational Compliance</u>.  The Committee will administer Roth Contributions in accordance with applicable regulations or other binding authority not reflected in this Article XXI.  Any applicable regulations or other binding authority shall supersede any contrary provisions of this Article XXI.

KL3 2630220.9

To record the amendment and restatement of this Plan by the Company and its subsidiaries participating therein, the Company has caused this amended and restated Plan to be executed by its duly authorized corporate officers this 27th day of December, 2007.

LEHMAN BROTHERS HOLDINGS INC.

By_____
Authorized Officer

ATTEST:

_____

KL3 2630220.9

<u>SUPPLEMENT A</u>

Special provisions applicable to
<u>residents of the Commonwealth of Puerto Rico</u>

A-1     <u>Purpose and Effect</u> - This Supplement A was effective January 1, 1993 and has been
amended in order to comply with the requirements of Section 1165(a) and (e) of the
Puerto Rico Internal Revenue Code of 1994 (the "PRIRC"). The provisions of this
Supplement A shall only apply to any resident of the Commonwealth of Puerto Rico
("Supplement A Participant") who is employed by the Company or any corporation,
business association, partnership or proprietorship which shall be designated, by
appropriate action of the Company Representative as a participating employer under the
Plan (the "Employer").

A-2     <u>Type of Plan</u> - It is the intent of the Company that the Plan be a profit sharing plan as
defined in Article 1165-1(b)(1)(ii) of the regulations promulgated under the PRIRC and
that it include a qualified cash or deferred arrangement pursuant to Section 1165(e) of
PRIRC.

A-3     <u>Compensation</u> - Compensation received from sources in Puerto Rico without regard to
any exclusion from the gross income of a Supplement A Participant under Section 933 of
the Code shall be considered Compensation under Section 1.17 of the Plan.

A-4     <u>Section 401(k) Contributions</u> - A Supplement A Participant's Section 401(k)
Contributions under the Plan may not in any event exceed the lesser of ten percent (10%)
of the Supplement A Participant's Compensation or $7,500, as adjusted under PRIRC
($8,000 as of January 1, 1998).

A-5     <u>Actual Deferral Percentage Limits</u> - In addition to the limitations described in Section 3.4
of the Plan, the "Actual Deferral Percentage" (as defined in Section 3.4 of the Plan) for
"Highly Compensated Supplement A Participants" (as defined below) for each Plan Year
shall not exceed the limitations of Section 3.4(a) and (b) of the Plan by substituting the
terms "Highly Compensated Employees" and "not Highly Compensated Employees"
with the terms "Highly Compensated Supplement A Participants" and "Not Highly

KL3 2630220.9

Compensated Supplement A Participants", respectively, and applying these limitations as so modified by treating the current Plan Year as the Applicable Plan Year.

For purposes of calculating the Actual Deferral Percentage under this Section A-5, Employer Contributions under Section 4.1 of the Plan shall be treated as Section 401(k) Contributions. The Actual Deferral Percentage under this Section A-5 shall be calculated without regard to the limitations of Section 401(a)(17) of the Code.

For purposes of this paragraph A-5, the term "Highly Compensated Supplement A Participant" means any Supplement A Participant who is eligible to participate in the Plan for the current Plan Year and is more highly compensated than two-thirds of all other Supplement A Participants eligible to participate in the Plan and employed by the same Employer for the current Plan Year.  Any other Supplement A Participant is a "Not Highly Compensated Supplement A Participant."

For purposes of this paragraph A-5, if more than one plan providing a cash or deferred arrangement (within the meaning of Section 1165(e) of PRIRC) is maintained by the Employer or an Affiliate, the "Actual Deferral Percentage" (as defined in Section 3.4 of the Plan) of any Highly Compensated Supplement A Participant who participates in more than one such plan or arrangement shall be determined as if all such arrangements were a single plan or arrangement.

If two or more plans are aggregated for purposes of Sections 1165(a)(3) or 1165(a)(4) of PRIRC, such plans shall be aggregated for purposes of determining the "Actual Deferral Percentage" of Supplement A Participants as if all such plans were a single plan.

A-6    <u>Distribution of Puerto Rico Excess Contributions</u> - Puerto Rico Excess Contributions shall be determined by reducing the amount of Section 401(k) Contributions (and amounts taken into account as Section 401(k) Contributions) to be permitted on behalf of Highly Compensated Supplement A Participants in the order of the Actual Deferral Percentages, beginning with the highest of such percentages.  To the extent permitted under applicable laws and regulations, Puerto Rico Excess Contributions for a Plan Year, plus any income or minus any loss allocable thereto, shall be distributed no later than the

close of the following Plan Year.  For purposes of this paragraph A-6, the term "Puerto Rico Excess Contributions" means the Section 401(k) Contributions by Highly Compensated Supplement A Participants in excess of the limitations of Section 3.4(a) and (b) of the Plan.

A-7    Matching Contributions Only for Permissible Section 401(k) Contributions - To the extent permitted by applicable laws and regulations, no Matching Contributions shall be made with respect to Puerto Rico Excess Contributions distributable pursuant to paragraph A-6 or Section 401(k) Contributions in excess of the limitations of paragraph A-4.

A-8    Contributions May Not Exceed Amount Deductible - In no event shall Employer contributions under Article IV of the Plan for Supplement A Participants for any taxable year exceed the maximum amount (including amounts carried forward) deductible for that taxable year under Section 1023(n) of PRIRC.

A-9    Contributions Conditioned on Deductibility and Savings Plan Qualification - Each contribution by an Employer under Article IV of the Plan is conditioned on the deductibility of such contribution under Section 1023(n) of PRIRC for the taxable year for which contributed, and on the initial qualification of the Plan under Section 1165(a) of PRIRC.

A-10   Rollover Contributions - Contributions by a Supplement A Participant under Section 3.9 of the Plan are limited to amounts distributed from an employee retirement plan that also qualifies under Section 1165(a) of PRIRC.

A-11   Payment of Contributions - Contributions to the Plan by an Employer engaged in business in Puerto Rico shall be paid to the Trustee not later than the due date for filing its Puerto Rico Income Tax Return for the taxable year in which such payroll period falls, including any extension thereof.

A-12   Use of Terms - All terms and provisions of the Plan shall apply to this Supplement A, except that where the terms and provisions of the Plan and this Supplement A conflict, the terms and provisions of this Supplement A shall govern.

- 116 -

A-13    <u>Catch-Up Contributions</u> - Effective January 1, 2002 and thereafter, Catch-Up Contributions may be made by Supplement A Participants in accordance with Section 3.10, and applicable provisions of the PRIRC, for such purpose, the limits set forth in this Supplement A shall be treated as plan limits within the meaning of Section 414(v) of the Code and the regulations thereunder.

A-14    <u>Roth 401(k) Contributions.</u> Article XXI of the Plan as added effective January 1, 2008 shall not apply to Participants subject to this Supplement A until such time as the Committee shall determine upon advice of counsel that substantially similar provisions and treatment to that afforded Roth 401(k) contributions under the United States Internal Revenue Code are available to such Participants under the tax laws of the Commonwealth of Puerto Rico.

KL3 2630220.9

<u>SUPPLEMENT B</u>

Special provisions applicable to
<u>certain employees of Lehman Brothers Bank FSB</u>

B-1    <u>Purpose and Effect</u> - The purpose of this Supplement B is to amend the Plan in order to provide for the participation in the Plan of certain employees of Lehman Brothers Bank, FSB, including any affiliate thereof ("Lehman Brothers Bank").

B-2    <u>Eligibility</u> - Lehman Brothers Bank shall be an Employer as of January 1, 2000 and each employee of Lehman Brothers Bank who is not a participant in the Delaware Savings Bank and Subsidiaries 401(k) Plan ("Bank Eligible Employee") shall be eligible to participate in the Plan as of January 1, 2000.

B-3    <u>Past Service Credit</u> - With respect to each Bank Eligible Employee employed by Delaware Savings Bank ("Delaware Bank") on June 29, 1999 who became an employee of Lehman Brothers Bank on June 30, 1999, for purposes of calculating such individual's Twelve Month Period of Service and Years of Vesting Service, such individual's Employment Date shall be the date he began his last continuous period of service with Delaware Bank.

KL3 2630220.9

SUPPLEMENT C

Special provisions applicable to
certain former employees of SG Cowen

C-1    Purpose and Effect - The purpose of this Supplement C is to provide for prior service credit for certain employees of SG Cowen ("Cowen") who become employees of Lehman Brothers Inc. ("Lehman Brothers") on October 13, 2000.

C-2    Past Service Credit - With respect to each individual employed by Cowen on October 12, 2000 who becomes an employee of Lehman Brothers on October 13, 2000 (a "Cowen Employee"), for purposes of calculating such individual's Twelve Month Period of Service and Years of Vesting Service, such individual's Employment Date shall be the date he began his last continuous period of service with Cowen (and Societe Generale, if the individual previously transferred to employment with Cowen from Societe Generale).

C-3    Employer Contributions -  If a Cowen Employee has completed a Twelve-Month Period of Service on or before December 30, 2000 (determined after giving effect to Section C-2 above), his or her eligibility for (a) Basic Contributions for the Plan Year ending December 30, 2000 and (b) Matching Contributions for the period from October 13 (or later date of completion of such service requirement) to December 30, 2000, shall be determined by annualizing his or her Compensation for the period from October 13 to December 30, 2000.

KL3 2630220.9

## SUPPLEMENT D

Merger of the E.F. Hutton & Company Inc. Universal Savings Account Plan and
the Lehman Brothers Savings Plan For Former Employees Of E.F. Hutton & Company Inc.

D-1     Purpose and Effect.  This Supplement D provides for the merger of the E.F. Hutton & Company Inc. Universal Savings Account Plan and the Lehman Brothers Savings Plan For Former Employees Of E.F. Hutton & Company Inc. (individually or collectively, as the context may require, the "USA Plans") into this Plan (the "Merger").

D-2     Special Definitions.  For purposes of this Supplement D:

    D-2.1   "USA Plans Account" means an account maintained under either of the USA Plans immediately prior to the Merger.

    D-2.2   "USA Plans Member" means a participant in either of the USA Plans who had an undistributed account thereunder immediately prior to the Merger.

D-3     Merger.  Effective June 19, 2001, the USA Plans and the trusts thereunder are merged into this Plan and the trust thereunder respectively, and the terms of this Plan supersede the terms of the USA Plans.  All persons (including current and former employees and their beneficiaries) having an interest under either of the USA Plans immediately prior to the Merger shall, on and after the Merger, be entitled to benefits solely from the Plan (including this Supplement D), in lieu of any and all interest which they had or may have had under the USA Plans.

D-4     Transfer of Trust Funds.  The assets held by the trustees of the USA Plans shall be transferred to the Trustee on June 19, 2001 or as soon as practicable thereafter.  If and to the extent that such transfer is not completed on June 19, 2001, such trustees shall hold such assets, as adjusted for investment gain or loss thereon and expenses attributable thereto, as additional trustees under this Plan until such transfer is completed.

D-5     Allocation of Transferred Accounts.  Funds transferred to the Trustee in respect of a Member's USA Plans Account shall be allocated under the Plan to such Member's

Section 401(k) Contributions Account, notwithstanding that a portion thereof may be attributable to after-tax contributions.

D-6    <u>Investment of Transferred Assets</u>.  Funds transferred to the Trustee pursuant to Section D-4 shall be invested in accordance with Section D-7.  Thereafter, a Member may change the portion of his Member's Account that is invested in each Investment Fund in accordance with Section 6.2 of the Plan.

D-7    <u>Fund Mapping</u>.  Assets invested in an Investment Fund available under the Plan immediately prior to the transfer shall remain invested in such Investment Fund upon the transfer.  Transferred assets invested in the Fidelity Freedom Income Fund shall be invested in the Primco Stable Value Fund.

D-8    <u>USA Plans Amended</u>.  The provisions of this Supplement D shall be treated as an amendment to and a part of each of the USA Plans to the extent necessary to give full effect to this Supplement.  The provisions of this Plan, in its capacity as a continuation and amendment of the USA Plans, shall apply and be effective with respect to the USA Plans for periods prior to June 19, 2001 to the extent necessary for the USA Plans to meet applicable requirements of all provisions of law that became effective since the last determination letter with respect to the USA Plans, including, without limitation, the Uruguay Round Agreements Act (also referred to as GATT), the Uniformed Services Employment and Reemployment Rights Act, the Small Business Job Protection Act of 1996, the Taxpayer Relief Act of 1997, the IRS Restructuring and Reform Act of 1998, and the Community Renewal Tax Relief Act of 2000, effective as of their respective effective dates; such Plan provisions include, without limitation, the following:

(a)    Section 7.6, relating to the exclusion of hardship distributions described in section 401(k)(2)(B)(i)(IV) of the Code from the definition of eligible rollover distribution in accordance with section 402(c)(4) of the Code effective January 1, 1999.

- 121 -

<u>SUPPLEMENT E</u>

Special Provisions Applicable to Former Participants in
<u>the Lehman Brothers Bank FSB Employee 401(k) Plan</u>

Effective January 2, 2002, the Lehman Brothers Bank FSB Employee 401(k) Plan (the "Lehman Bank Plan") shall merge into this Plan. This Supplement E provides for such merger ("Merger") and sets forth special provisions that apply to current and former participants in the Lehman Bank Plan on or after the adoption of this Plan by Lehman Brothers Bank FSB effective January 2, 2002.

E-1.    <u>Special Definitions</u>. For purposes of this Supplement E:

E-1.1    "<u>Lehman Bank</u>" means Lehman Brothers Bank FSB.

E-1.2    "<u>Lehman Bank Account</u>" means an account maintained under the Lehman Bank Plan immediately prior to the Merger containing elective deferrals, matching contributions, and rollover contributions (as applicable) for a Lehman Bank Participant.

E-1.3    "<u>Lehman Bank Contract</u>" means the group annuity contract maintained under the Lehman Bank Plan immediately prior to the Merger.

E-1.4    "<u>Lehman Bank Participant</u>" means a participant in the Lehman Bank Plan who had an undistributed account thereunder immediately prior to the Merger.

E-2.    <u>Participation in Plan Effective January 2, 2002</u>. Each Lehman Bank Participant who is employed by an Employer on January 2, 2002 shall become a Participant of the Plan on that date. Any other employee of Lehman Bank who is employed by an Employer on such date shall become a Participant in accordance with Supplement B. Each Lehman Bank Participant who is not then employed by an Employer shall become a Member on January 2, 2002, but solely with respect to his Lehman Bank Account unless he otherwise qualifies as a Participant in the Plan.

KL3 2630220.9

E-3.    <u>Merger</u>.  Effective January 2, 2002, the Lehman Bank Plan and the Lehman Bank Contract are merged into this Plan, and the terms of this Plan supersede the terms of the Lehman Bank Plan.  All persons (including current and former employees and their beneficiaries) having an interest under the Lehman Bank Plan prior to January 2, 2002 shall, on and after January 2, 2002, be entitled to benefits solely from the Plan (including this Supplement E), in lieu of any and all interest which they had or may have had under the Lehman Bank Plan.

E-4.    <u>Transfer of Lehman Bank Contract</u>.  The assets held under the terms of the Lehman Bank Contract shall be transferred to the Trustee on January 2, 2002 or as soon as practicable thereafter.  If and to the extent that such transfer is not completed on January 2, 2002, the Lehman Bank Contract shall be treated as an asset of this Plan until such transfer is completed.

E-5.    <u>Allocation of Transferred Assets</u>.  Funds transferred to the Trustee in respect of a Member's Lehman Bank Account shall be allocated under the Plan to such Member's Section 401(k) Contribution, Employer Contribution, and Rollover Accounts as applicable.

E-6.    <u>Investment of Transferred Assets</u>.  Funds transferred to the Trustee pursuant to Section E-4 shall be invested in accordance with Section E-7.  Thereafter, a Member may change the portion of his Member's Account that is invested in each Investment Fund in accordance with Section 6.2 of the Plan.

E-7.    <u>Fund Mapping</u>.  The following fund mapping shall become effective upon the transfer pursuant to Section E-4:

KL3 2630220.9

| From the Lehman Bank Plan Funds | Into Investment Fund |
|---|---|
| Guaranteed Fund 1 | PRIMCO Stable Value |
| Guaranteed Fund 2 | PRIMCO Stable Value |
| Mass Mutual Institutional Core Bond | PIMCO Total Return |
| Mass Mutual Institutional Balanced | Fidelity Asset Manager |
| Mass Mutual Institutional Value Equity | Fidelity Equity Income |
| Mass Mutual Institutional Small Cap Value | Fidelity Low Priced Stock |
| Oppenheimer Discovery | Dreyfus Founders Discovery |
| Fidelity Contrafund | Fidelity Large Cap Stock |
| Mass Mutual Institutional International Equity | Putnam International Growth |

E-8.    Vesting and Forfeiture of Matching Account.  The portion of a Participant's Employer Contributions Account consisting of matching contributions made under the Lehman Bank Plan (and investment earnings allocable thereto) shall be fully vested and nonforfeitable upon such Participant's employment with an Employer.  The portions of Employer Contributions Accounts of all other Lehman Bank Participants consisting of matching contributions made under the Lehman Bank Plan (and investment earnings allocable thereto) shall remain subject to the forfeiture rules of section 15.1 of the Lehman Bank Plan.

E-9.    Alternative Forms of Payment Preserved to March 20, 2002.  Any individual who is a Lehman Bank Participant at the time of his termination of employment with an Employer or Affiliate, and any other Lehman Bank Participant who is not employed by an Employer or Affiliate, who has vested Member's Accounts exceeding $5,000 and who elects in accordance with procedures established by the Committee to receive a distribution commencing as of a date on or before March 20, 2002 may elect one of the forms of benefit available under Section 9.2 of

- 124 -

the Lehman Bank Plan prior to the Merger with respect to the vested amounts held in his Section 401(k) Contribution, Employer Contribution, and Rollover Contribution Accounts attributable to such individual's Lehman Bank Account.

E-10.    Withdrawals During Employment.

E-1.1    Withdrawals During Employment Irrespective of Age.  A Lehman Bank Participant who is employed by an Employer or Affiliate may elect to withdraw all or any portion of his Rollover Account (including investment earnings allocable thereto).

E-1.2    Withdrawals During Employment After Age 59½.  After attaining age 59½, a Lehman Bank Participant who is employed by an Employer or Affiliate may elect to withdraw from the Plan all or any portion of any of his Section 401(k) Contribution and Employer Contributions Accounts (including investment earnings allocable thereto).

E-11.    Outstanding Loans For a Lehman Bank Participant.  Loans held under the Lehman Bank Plan shall be transferred to this Plan to be held by the Trustee as assets of the Plan and shall be governed by the terms of such loans in effect immediately preceding the Merger.  A Lehman Bank Participant shall be entitled to additional loans in accordance with Article XVI, provided, however, that any loan transferred to the Plan that is still outstanding shall be taken into account in determining eligibility for future loans.

E-12.    Transfer of Forfeitures.  Assets held in the forfeiture account of the Lehman Bank Plan as of the Merger shall be transferred to the Employer Suspense Account to be invested as directed by the Committee and shall be applied as soon as practicable to reduce Employer Contributions under the Plan and when so applied shall be allocated in the same manner as the Employer Contributions that they offset.

E-13.    Lehman Bank Plan Amended.  The provisions of this Supplement E shall be treated as an amendment to and a part of the Lehman Bank Plan to the extent necessary to give full effect to this Supplement.  The provisions of this Plan, in its capacity as a continuation and

amendment of the Lehman Bank Plan, shall apply and be effective with respect to the Lehman
Bank Plan for periods prior to January 2, 2002 to the extent necessary for the Lehman Bank Plan
to meet applicable requirements of all provisions of law that became effective since the last
determination letter with respect to the Lehman Bank Plan, including, without limitation, the
Uruguay Round Agreements Act (also referred to as GATT), the Uniformed Services
Employment and Reemployment Rights Act, the Small Business Job Protection Act of 1996, the
Taxpayer Relief Act of 1997, the IRS Restructuring and Reform Act of 1998, and the
Community Renewal Tax Relief Act of 2000, effective as of their respective effective dates;
such Plan provisions include, without limitation, the following Sections as in effect on January 2,
2002:

      (a)      Section 1.17, relating to the determination of compensation for purposes
of (i) applying the limitation on annual additions under section 415 of the Code, (ii) determining
who is a key employee and the amount of any required minimum contribution under section 416
of the Code, and (iii) making elective deferrals, all before giving effect to any salary reductions
under section 132(f)(4) of the Code effective January 1, 2001;

      (b)      Section 1.28, relating to the definition of highly compensated employee
effective July 1, 1997;

      (c)      Section 3.5, relating to the distributions of aggregate excess deferrals
based on the amount of contribution by or on behalf of each highly compensated employee and
attributable first to the highly compensated employee with the greatest dollar amount of elective
deferrals effective July 1, 1997;

      (d)      Section 4.5, relating to contributions in respect of periods of qualified
military service as required under section 414(u) of the Code effective December 12, 1994;

      (e)      Section 5.1, relating to the limit on annual additions under section 415(c)
of the Code effective July 1, 1995;

      (f)      Sections 5.4 and 13.9, relating to limiting the application of section 415(e)
of the Code to limitation years beginning before January 1, 2000;

- 126 -

(g)      Section 7.6, relating to the exclusion of hardship distributions described in section 401(k)(2)(B)(i)(IV) of the Code from the definition of eligible rollover distribution in accordance with section 402(c)(4) of the Code effective January 1, 1999;

(h)      Section 14.9, relating to the repeal of the family aggregation rules effective July 1, 1997;

Section 13.3(a)(i), relating to determination of the number of officers taken into account as a key employee under section 416(1)(A) of the Code, effective July 1, 1997;

(i)      Section 18.1, relating to the definition of "leased employee" as defined under section 414(n) of the Code effective July 1, 1997;

(j)      Section 5.1, relating to the limitation on contributions under section 415(c) of the Code, effective July 1, 1995; and

(k)      Section 7.6(d), relating to the increase in the small benefit cashout limit under section 411(a)(11) of the Code from $3,500 to $5,000, effective for distributions on or after July 1, 1998.

<u>SUPPLEMENT F</u>

Special provisions applicable to certain former
<u>employees of Cohane Rafferty Securities, LLC</u>

F-1      With respect to each individual employed by Cohane Rafferty Securities, LLC ("Cohane") immediately prior to January 11, 2002 who became an employee of the Company on January 11, 2002, for purposes of calculating such individual's Twelve Month Period of Service and Years of Vesting Service, such individual's Employment Date shall be the date he began his last continuous period of service with Cohane.

- 128 -

<u>SUPPLEMENT G</u>

Special provisions applicable to certain former
<u>employees of Lincoln Capital Management, LLC</u>

G-1   <u>Past Service Credit</u> - With respect to each individual employed by Lincoln Capital Management, LLC ("Lincoln") immediately prior to January 31, 2003 who became an employee of Lehman Brothers on February 2, 2003, (a "Lincoln Employee"), for purposes of calculating such individual's Twelve Month Period of Service and Years of Vesting Service, such individual's Employment Date shall be the date he began his last continuous period of service with Lincoln.

G-2   <u>Employer Contributions</u> - If a Lincoln Employee has completed a Twelve-Month Period of Service on or before December 31, 2003 (determined after giving effect to Section G-1 above), his or her eligibility for (a) Basic Contributions for the Plan Year ending December 31, 2003 and (b) Matching Contributions for the period from February 2, 2003 (or later date of completion of such service requirement) to December 31, 2003, shall be determined by annualizing his or her Compensation for the period from February 2, 2003 to December 31, 2003.

KL3 2630220.9

<u>SUPPLEMENT H</u>

Special provisions applicable to certain
<u>former employees of The Crossroads Group</u>

H-1    <u>Past Service Credit</u> - With respect to each individual employed by
The Crossroads Group ("Crossroads") immediately prior to
October 9, 2003 who became an employee of Lehman Brothers on
October 9, 2003 (a "Crossroads Employee"), for purposes of
calculating such individual's Twelve Month Period of Service and
Years of Vesting Service, such individual's Employment Date
shall be the date he began his last continuous period of service with
Crossroads.

H-2    <u>Employer Contributions</u> - If a Crossroads Employee has completed
a Twelve-Month Period of Service on or before December 31,
2003 (determined after giving effect to Section H-1 above), his or
her eligibility for (a) Basic Contributions for the Plan Year ending
December 31, 2003 and (b) Matching Contributions for the period
from October 9, 2003 (or later date of completion of such service
requirement) to December 31, 2003, shall be determined by
annualizing his or her Compensation for the period from October
9, 2003 to December 31, 2003.

KL3 2630220.9

## SUPPLEMENT I

### Special Provisions Relating to Neuberger Berman

Effective October 31, 2003, a new Supplement I was added to the Plan containing special provisions relating to eligibility and past service credit for employees of Neuberger Berman, Inc. and its subsidiaries.  Supplement I is now amended and restated in its entirety to revise such provisions effective as of October 31, 2003, and to provide for the merger of the Neuberger Berman, LLC Pension Plan and the Neuberger Berman, LLC Profit Sharing Plan into this Plan, effective June 14, 2004.

**30.**    **Definitions**

30.1    <u>Special Definitions</u>.  For purposes of this Supplement I:

30.1.1    "<u>Merger</u>" means the merger of the Neuberger Berman, LLC Pension Plan and the Neuberger Berman, LLC Profit Sharing Plan into the Plan, effective June 14, 2004.

30.1.2    "<u>Neuberger</u>" means Neuberger Berman, Inc. or any of its subsidiaries.

30.1.3    "<u>Neuberger Account</u>" means an account maintained under a Neuberger Plan for a Neuberger Member as of June 11, 2004 and thereafter up to the Merger.

30.1.4    "<u>Neuberger Employee</u>" means an individual who is employed by Neuberger immediately prior to October 31, 2003 and who as of October 31, 2003 remains so employed or transfers to the employ of an Employer.

30.1.5    "<u>Neuberger Member</u>" means a participant in a Neuberger Plan with an undistributed Neuberger Account immediately prior to the Merger

30.1.6    "<u>Neuberger Pension Plan</u>" means the Neuberger Berman, LLC Pension Plan, as in effect prior to the Merger.

30.1.7    "<u>Neuberger Plan</u>" means the Neuberger Berman, LLC Pension Plan or the Neuberger Berman, LLC Profit Sharing Plan, as applicable.

30.1.8    "<u>Neuberger Profit Sharing Plan</u>" means the Neuberger Berman, LLC Profit Sharing Plan, as in effect prior to the Merger.

30.1.9    "<u>Neuberger Trust Fund</u>" means the trust funds maintained under each of the Neuberger Plans immediately prior to the Merger.

30.1.10    "<u>Pension Account</u>" means an account within a Member's Account reflecting amounts transferred from the Neuberger Pension Plan.

- 131 -

        30.1.11    "Profit Sharing Account" means an account within a Member's Account reflecting amounts transferred from the Neuberger Profit Sharing Plan.

        30.1.12    "Profit Sharing After-Tax Subaccount" means a subaccount within a Profit Sharing Account reflecting after-tax contributions made to the Neuberger Profit Sharing Plan.

        30.1.13    "Profit Sharing Rollover Subaccount" means a subaccount within a Profit Sharing Account reflecting rollover contributions made to the Neuberger Profit Sharing Plan.

## 31.    Eligibility, Participation, and Past Service Credit

        31.1    Neuberger a Participating Employer.  Neuberger and the following subsidiaries shall each become an Employer under the Plan effective June 18, 2004 (but each of them shall remain an Employer only so long as it remains a member of a controlled group, within the meaning of Section 414 (b) or (c) of the Code and regulations thereunder, of which the Company is the common parent, and subject to the right reserved to the Company Representative to terminate its status as an Employer under Section 1.23):

        Neuberger Berman, LLC
        Neuberger Berman Management Inc.
        Neuberger Berman Trust Company of Delaware
        Neuberger Berman Trust Company, N.A.
        Executive Monetary Management Inc.

        31.2    Eligibility to Participate.  A Neuberger Employee shall be eligible to become a Participant upon the earlier of (i) the date he transfers to the employ of an Employer other than Neuberger, or (ii) the date Neuberger becomes an Employer, provided he is then an Employee.

        31.3    Membership in Plan Effective June 14, 2004.  Neuberger Members who have not previously become Participants shall become Members of the Plan effective June 14, 2004.

        31.4    Past Service Credit.  The "Employment Date" used to calculate a Neuberger Employee's Twelve Month Period of Service and Years of Vesting Service shall be the date he began his last continuous period of service with (i) Neuberger prior to October 31, 2003, and (ii) a predecessor employer that the Committee in its discretion determines to take into account.

        31.5    Eligibility to Receive Employer Contributions.  In determining whether a Participant employed by Neuberger during 2004 and prior to June 14, 2004, is eligible for an Employer Contribution under Section 4.1(b) for the 2004 Plan Year, such Participant's Compensation shall include all compensation otherwise includible in the term "Compensation" as defined in Section 1.17 (as modified by Section 4.1(d)) that is paid by an Employer or an Affiliate to the Participant at any time during the 2004 Plan Year.  The amount of any Employee Contribution to be made for such a Participant for the 2004 Plan Year shall be reduced by the amount of any Matching Contribution to which such Participant is entitled under section 4.3 of the Neuberger Profit Sharing Plan for the plan year beginning January 1, 2004.

**32.    Merger, Investment of Transferred Assets, and Neuberger Plan Accounts**

32.1    <u>Vesting</u>.  All Neuberger Accounts shall be fully vested and nonforfeitable effective June 11, 2004.

32.2    <u>Merger</u>.  Effective as of June 14, 2004, the Neuberger Plans and Neuberger Trust Fund are merged into this Plan and the trust thereunder, respectively, and the terms of this Plan supersede in all respects the terms of the Neuberger Plans with respect to the Neuberger Accounts.  All persons (including current and former employees and their beneficiaries, and alternate payees under a Qualified Domestic Relations Order) having an undistributed interest under a Neuberger Plan immediately prior to June 14, 2004 shall, on and after June 14, 2004, be entitled to benefits provided solely from this Plan (including this Supplement I), in lieu of any and all interest which they had or may have had under the Neuberger Plan.

32.3    <u>Transfer of Neuberger Trust Fund</u>.  The assets held by the trustees of the Neuberger Trust Fund shall be transferred to the Trustee on June 14, 2004 or as soon as practicable thereafter.  If and to the extent that such transfer is not completed on June 14, 2004, such trustees shall hold such assets, as adjusted for investment gain or loss thereon and expenses attributable thereto, as an additional trustee under this Plan, until such transfer is completed.

32.4    <u>Allocation to Accounts</u>.  Funds transferred to the Trustee in respect of a Member's Neuberger Account shall be allocated under the Plan to such Member's existing Member's Account (if any), and otherwise to a Member's Account created for such Member as of the date of transfer, which shall in either case include a Profit Sharing and a Pension Account, as applicable.

32.5    <u>Investment of Transferred Accounts</u>.  Funds transferred to the Trustee in respect of a Member's Neuberger Account pursuant to Section 32.3 shall initially be invested in accordance with Section 32.6 and shall remain so invested until the end of the blackout period established under the Neuberger Plans in connection with the Merger. Thereafter, the Member may change such investments incident to a change made in the investment of his Member's Account in accordance with Section 6.2 of the Plan.

32.6    <u>Fund Mapping</u>:  The following fund mapping shall become effective upon the transfer pursuant to Section 32.3:

| From the Following Neuberger Plan Funds | Into Investment Fund |
| --- | --- |
| Neuberger Berman Value Equity Fund | Neuberger Berman Value Equity Fund |
| Neuberger Berman Genesis Fund | Neuberger Berman Genesis Fund |
| Neuberger Berman Socially Responsive Fund | Neuberger Berman Socially Responsive Fund |
| Neuberger Berman High Income Bond Fund | Neuberger Berman High Income Bond Fund |
| Neuberger Berman International Fund | Neuberger Berman International Fund |

- 133 -

| | |
|---|---|
| Vanguard Index 500 Fund | Vanguard Institutional Index Fund |
| Neuberger Berman Fasciano Fund | Neuberger Berman Fasciano Fund |
| Neuberger Berman Focus Fund | Neuberger Berman Focus Fund |
| Neuberger Berman Partners Fund | Neuberger Berman Partners Fund |
| Neuberger Berman Cash Reserves | Primco Stable Value Fund |
| Neuberger Berman Century Fund | Fidelity Large Cap Stock Fund |
| Neuberger Berman Guardian Fund | Neuberger Berman Partners Fund |
| Neuberger Berman Limited Maturity Bond Fund | Primco Stable Value Fund |
| Neuberger Berman Manhattan Fund | Calamos Growth Fund |
| Neuberger Berman Millennium Fund | Neuberger Berman Fasciano Fund |
| Neuberger Berman Real Estate Fund | Primco Stable Value Fund |
| Neuberger Berman Regency Fund | T. Rowe Price Mid Cap Value Fund |
| Vanguard Mid-Cap Index Fund | Vanguard Total Stock Market Index Fund |
| Vanguard Small-Cap Index Fund | Vanguard Total Stock Market Index Fund |

32.7    Outstanding Loans.  Loans outstanding under the Neuberger Profit Sharing Plan as of the date of Merger shall (i) be held by the Trustee as assets of this Plan, (ii) be governed by the terms of such loans in effect immediately preceding the Merger, and (iii) be treated as loans under this Plan in determining eligibility for future loans under Article XVI.

32.8    Contributions.  Prior to the filing deadline for its 2004 federal income tax return, Neuberger shall make a matching contribution to the Neuberger Profit Sharing Plan with respect to each Neuberger Member who was eligible to share in such a contribution under section 4.3 of the Neuberger Profit Sharing Plan, by paying such contribution into the Plan as the continuation of the Neuberger Profit Sharing Plan by reason of the Merger.  Such contribution shall be allocated among such Neuberger Members in accordance with the provisions of the Neuberger Profit Sharing Plan governing contributions for the 2004 plan year and credited to the Member's Profit Sharing Account (and the portion thereof reflecting matching contributions).

32.9    Use of Forfeitures.  Forfeitures, if any, transferred from a Neuberger Plan in connection with the Merger shall be used first to pay reasonable administrative expenses of the Plan, and to the extent forfeitures remain, shall be used to reduce Employer Contributions under Section 4.1(b) and matching contributions under Section 32.8.

32.10    Restoration of Forfeitures.  If a former participant in a Neuberger Plan who had received his entire vested interest thereunder is reemployed by an Employer before he has a Break in Service as defined in such Neuberger Plan, he may repay to the Plan an amount equal to the distribution, disregarding any portion thereof derived from after-tax or rollover contributions, at any time within five years from the date of such reemployment.  Any amount so repaid shall

- 134 -

be credited to the individual's Profit Sharing or Pension Account, as the case may be (whether already existing or created by reason of such repayment), plus an additional amount equal to the portion of his account in such Neuberger Plan that was previously forfeited. The amount so restored shall be funded by available forfeitures, if any, and otherwise by a special contribution by his Employer. For this purpose, a former participant in a Neuberger Plan who terminated with no vested interest thereunder shall be deemed to have repaid his entire vested interest on the date of his reemployment by an Employer.

32.11   Neuberger Plan Amended.  The provisions of this Supplement I shall be treated as an amendment to and part of the Neuberger Plans, effective June 11, 2004, to the extent necessary to give full effect to this Supplement.

## 33.    Special Distribution Rules

Distributions in respect of a Neuberger Member, including distribution in respect of his Pension Account or Profit Sharing Account, shall be made in the form and manner prescribed generally for his Member's Account under applicable provisions of Article VII of the Plan, except as provided in this Section 33.

33.1   Annuity Presumptive Payment Form for Pension Accounts.  If the balance of the Member's Account of a Neuberger Member at the time of a distribution in respect thereof exceeds $5,000, then unless the Member otherwise duly elects (with Spousal Consent if the Member is married at such distribution date), any such distribution in respect of his Pension Account shall be made by purchase of a nontransferable annuity contract from a reputable insurer providing --

(a)   If the Neuberger Member is not married on the annuity starting date under such contract, an immediate monthly life annuity for the life of the Neuberger Member, under which the last payment shall be made for the month of the Neuberger Member's death and no payments shall be made thereafter to any other person (a "Single Life Annuity"); and

(b)   If a Neuberger Member is married on such annuity starting date, (i) a "Qualified Joint and 50% Surviving Spouse Annuity," consisting of an immediate monthly annuity for the life of the Member and, if the Member shall die survived by the spouse to whom he was married at such annuity starting date, a continuing annuity for the life of such spouse in a monthly amount equal to fifty percent of the amount of the annuity payable during the joint lives of the Neuberger Member and his spouse, or (ii) if the Member shall so elect with Spousal Consent, a Single Life Annuity described in clause (a) above.

For benefits with an annuity starting date on or after January 1, 2008, such annuity contract shall permit a Neuberger Member who is married on his annuity starting date to elect to receive, in lieu of a Single Life Annuity or a Qualified Joint and 50% Surviving Spouse Annuity, a "Qualified Joint and 75% Surviving Spouse Annuity," consisting of an immediate monthly

- 135 -

annuity for the life of the Member and, if the Member shall die survived by the spouse to whom he was married at such annuity starting date, a continuing annuity for the life of such spouse in a monthly amount equal to seventy-five percent of the amount of the annuity payable during the joint lives of the Neuberger Member and his spouse.

33.2    <u>Spousal Consent</u>.  The "Spousal Consent" required for any election under this Section 33 (i) must be in writing and witnessed by a notary public, (ii) must acknowledge the effect of the election, and (iii) must explicitly provide either that the Beneficiary designated by the Neuberger Member pursuant to Section 11.1 with respect to his Pension Account, or his Profit Sharing Account, as applicable, and payment form may not subsequently be changed by the Neuberger Member without the spouse's further consent, or that they may be changed without such consent.  Notwithstanding the foregoing, Spousal Consent shall be deemed provided if (i) the Neuberger Member establishes to the Committee's satisfaction that his spouse may not be located or has abandoned the Neuberger Member within the meaning of local law, or (ii) the Neuberger Member and his spouse are legally separated, and the Neuberger Member has a court order to such effect.

33.3    <u>Election Notice</u>.  The Committee shall furnish to a Neuberger Member with a Pension Account at least 30 days (or less than 30 days but at least seven days, if the Neuberger Member is clearly advised that he has 30 days to consider the election, he consents to waiving the 30-day election period, and payments do not begin until seven days after the Neuberger Member receives the explanation) and not more than 90 days before the benefit commencement date, a written explanation in nontechnical language of the benefit forms available with respect to such Pension Account under this Section 33 or otherwise, a notification of the Neuberger Member's right to elect a form and revoke an election at any time until the date benefits begin, a statement that any annuity will be provided by purchasing an annuity contract from an insurance company with the Neuberger Member's Pension Account balance, and that the Neuberger Member may request additional information regarding the amounts that may be payable in the form of an annuity.  If the Neuberger Member is married, the written explanation shall describe the need for the Neuberger Member's spouse to consent to the election of any benefit form other than a Qualified Joint and 50% or 75% Surviving Spouse Annuity.

33.4    <u>Withdrawals During Employment</u>. A Neuberger Member who is employed by an Employer or Affiliate may elect the following withdrawals upon application therefor in accordance with procedures established by the Committee:

33.4.1    <u>After-Tax Contributions and Rollover Accounts</u>.  Withdrawal of all or any portion of his Profit Sharing After-Tax Subaccount, and Profit Sharing Rollover Subaccount.

33.4.2    <u>Profit Sharing Account Withdrawals After Age 59½</u>.  After attaining age 59½, withdrawal of all or any portion of his Profit Sharing Account.

33.4.3    <u>Pension Account Withdrawals After Age 65</u>.  After attaining age 65, withdrawal of all or any portion of his Pension Account.  The date as of which such withdrawal is made shall be treated as the Member's annuity starting date with respect to his Pension Account, and a Member's election to waive the annuity form of payment in respect thereof

- 136 -

(including Spousal Consent, if applicable) shall apply to all subsequent distributions from such Account or any benefit form other than a Qualified Joint and 50% Surviving Spouse Annuity (if the Neuberger Member so elects).

33.5    <u>Additional Distribution Forms Available Prior to October 1, 2004</u>.  If distribution following termination of employment commences on or before September 30, 2004 in respect of a Member's Account exceeding $5,000, a Neuberger Member may elect in accordance with procedures established by the Committee to receive --

33.5.1    Distribution in respect of his Pension Account (with Spousal Consent if the Member is married) in annual installments of at least $1,000 each for a period not exceeding his life expectancy or, if the Member's Beneficiary is his spouse, the joint and last survivor life expectancy of the Neuberger Member and his spouse, or by purchase of an annuity contract providing survivor benefits for a contingent annuitant (whether or not the surviving spouse) or benefits involving a fixed or minimum number of payments, and

33.5.2    Distribution in respect of his Profit Sharing Account in any form available for his Pension Account under Section 33.1 or Section 33.5.1.

## 34.    Payment of Pension Account Upon Death

34.1    <u>Beneficiary of Pension Account</u>.  Prior to the first day of the Plan Year in which a Neuberger Member attains age 35 or the date of his termination of employment if earlier, the Member's spouse as of the date of his death shall be his Beneficiary with respect to one-half of his Pension Account (the "QPSA Portion"), notwithstanding any contrary election by the Member under Section 11.1 or such spouse's consent thereto.  After such date, a Member may designate a Beneficiary other than such spouse with respect to such QPSA Portion with the consent of the Spouse as described in Section 33.2, but only if the spouse has been provided with a notice of his or her right to (i) otherwise receive an annuity providing monthly payments for the remainder of his or her life in the amount that can be purchased with such QPSA Portion, (ii) consent to the designated Beneficiary and payment form for such QPSA Portion, and (iii) indicate in his or her consent whether the designated Beneficiary and payment form may subsequently be changed without his or her further consent.

34.2    <u>Form of Payment</u>.  If a Member's surviving spouse shall be his Beneficiary with respect to any portion of his Pension Account, payment of benefits in respect thereof following death of the Member shall be made by purchase of an annuity contract providing a monthly life annuity for the life of the spouse unless the spouse elects a different form authorized by Section 7.3(b) of the Plan or Section 34.5 of this Supplement I.

34.3    <u>Time of Payment</u>.  Payment of the Member's Account of a Neuberger Member shall be made or begin by December 31 of the year following the year in which the death of the Member occurred, unless the Member or his Beneficiary elects to have such payments made in accordance with Section 7.3(b) of the Plan.

34.4    <u>Pre-Merger Elections and Designations</u>.  Notwithstanding any other provision of this Plan, (a) elections as to timing or form of benefit made, (b) designations of beneficiaries made, and (c) provisions that became applicable based on a failure to make an available election

or designation under the Neuberger Plans before June 14, 2004, shall be given effect with respect to Neuberger Members who retired or terminated employment under the terms of the Neuberger Plan, or died, before June 14, 2004, and distribution shall be made in respect of such Members in accordance with the applicable provisions of the Neuberger Plan as in effect at the relevant time or times prior to such date.  Beneficiary designations made under the Neuberger Plan before June 14, 2004 by Neuberger Members shall not be given effect after such date, and distribution shall be made in respect of such Members in accordance with the applicable provisions of this Plan.

34.5    <u>Payments on Death</u>. A Neuberger Member whose Member's Account exceeds $5,000 may elect to have his Beneficiary receive all or any portion of the benefits attributable to his Neuberger Account in one of the following forms of payment:

34.5.1    An immediate annuity for the Beneficiary, with or without a minimum number of payments guaranteed, in which case the Neuberger Account (or applicable portion thereof) shall be used to purchase and distribute to the Beneficiary one or more nontransferable annuity contracts from reputable insurers providing for such benefits.

34.5.2    Annual installments of at least $1,000, payable for five or fewer years, or, if the Beneficiary is the Neuberger Member's spouse (or a trust which primarily benefits the spouse) for a period not longer than the spouse's life expectancy as of the Participant's death, or, if the Beneficiary is any individual other than the spouse (or a trust which primarily benefits such individual, or a custodial account for such individual established under a state Uniform Transfers to Minors Act or similar statute) for a period not to exceed 15 years or the individual's life expectancy as of the Neuberger Member's death, whichever is less.  For purposes of the preceding sentence, the term "trust" shall mean a trust created by a written trust agreement or will.  Each installment shall be equal to (i) the balance credited to the Neuberger Member's Account, divided by (ii) the number of annual installments which remain to be paid (including the current payment being computed); provided, however, that where the benefits are payable to a trust for the benefit of a spouse and the Neuberger Member's executor has elected to treat the trust and the benefits as "qualified terminable interest property", each installment shall be increased, if necessary, so that it is not less than all of the income earned on the unpaid account balance in the current year.

The foregoing elections shall also be available to the Beneficiary of any deceased Neuberger Member who had not either (i) made an election under which benefit payments either had begun before his death, or had been provided for under an annuity contract purchased before his death, or (ii) made an election as to the form of death benefits which was not to be changed by the Beneficiary.  Any election shall be made by the Beneficiary not later than 60 days after benefits become payable.

- 138 -

<u>SUPPLEMENT J</u>

Special provisions applicable to certain former employees of
<u>SIB Mortgage Corp.</u>

J-1     <u>Past Service Credit</u> - With respect to each individual employed by SIB Mortgage Corp. ("SIB") immediately prior to March 1, 2004 who became an employee of Aurora Loan Services, Inc., a subsidiary of the Company, on March 1, 2004 and remained employed by an Employer on December 31, 2004 (an "SIB Employee"), for purposes of calculating such individual's Twelve Month Period of Service and Years of Vesting Service, such individual's Employment Date shall be the date he began his last continuous period of service with SIB.

J-2     <u>Employer Contributions</u> - If an SIB Employee has completed a Twelve-Month Period of Service on or before December 31, 2004 (determined after giving effect to Section J-1 above), his or her eligibility for (a) Basic Contributions for the Plan Year ending December 31, 2004 and (b) Matching Contributions for the period from March 1, 2004 (or later date of completion of such service requirement) to December 31, 2004, shall be determined by annualizing his or her Compensation for the period from March 1, 2004 to December 31, 2004.

- 139 -

<u>SUPPLEMENT K</u>

Special provisions applicable to certain former employees of
<u>CNL Commercial Finance, Inc.</u>

K-1    <u>Past Service Credit</u> - With respect to each individual employed by
CNL Commercial Finance, Inc. ("CNL") immediately prior to
December 18, 2004 who became an employee of Lehman Brothers
Bank, FSB on December 18, 2004 (a "CNL Employee"), for purposes
of calculating such individual's Twelve Month Period of Service and
Years of Vesting Service, such individual's Employment Date shall
be the date he began his last continuous period of service with CNL.

K-2    <u>Employer Contributions</u> - If a CNL Employee has completed a
Twelve-Month Period of Service on or before December 31, 2004
(determined after giving effect to Section K-1 above), his or her
eligibility for (a) Basic Contributions for the Plan Year ending
December 31, 2004 and (b) Matching Contributions for the period
from December 18, 2004 (or later date of completion of such
service requirement) to December 31, 2004, shall be determined by
annualizing his or her Compensation for the period from
December 18, 2004 to December 31, 2004.

- 140 -

SUPPLEMENT L

Special provisions applicable to certain former employees of
Tradepipe, Inc.

L-1    Past Service Credit - With respect to each individual employed by
Tradepipe, Inc. ("Tradepipe") immediately prior to August 22,
2005 who became an employee of Lehman Brothers Inc. on
August 22, 2005 (an "Eligible Tradepipe Employee"), for purposes
of calculating such individual's Twelve Month Period of Service
and Years of Vesting Service, such individual's Employment Date
shall be the date he began his last continuous period of service with
Tradepipe.

L-2    Employer Contributions - If an Eligible Tradepipe Employee has
completed a Twelve-Month Period of Service on or before
December 31, 2005 (determined after giving effect to Section L-1
above), his or her eligibility for (a) Basic Contributions for the
Plan Year ending December 31, 2005 and (b) Matching
Contributions for the period from August 22, 2005 (or later date of
completion of such service requirement) to December 31, 2005,
shall be determined by annualizing his or her Compensation for the
period from August 22, 2005 to December 31, 2005.

KL3 2630220.9

<u>SUPPLEMENT M</u>

Special Provisions Relating to Finance America LLC
<u>(including amendment of Finance America 401(k) Retirement Savings Plan)</u>

This Supplement M (i) provides past service credit for service with Finance America LLC ("Finance America") for purposes of eligibility to share in Employer Contributions and for vesting, effective for the Plan Year ending December 31, 2005, and (ii) provides for the merger of the Finance America 401(k) Retirement Savings Plan ("Finance America Plan") into this Plan, effective February 1, 2006. Supplement M shall constitute an amendment to the Finance America Plan to the extent necessary to give full effect thereto, as well as part of the Lehman Brothers Savings Plan.

**40. Definitions**

40.1   <u>Special Definitions</u>. For purposes of this Supplement M:

40.1.1  "<u>Finance America</u>" means Finance America, LLC.

40.1.2  "<u>Finance America Account</u>" means an account maintained under the Finance America Plan for a Finance America Account Holder as of December 31, 2005 and thereafter up to the Merger.

40.1.3  "<u>Finance America Employee</u>" means an individual who is employed by Finance America as of December 31, 2005 or any applicable earlier date during 2005 on which he transfers to the employ of an Employer.

40.1.4  "<u>Finance America Account Holder</u>" means a participant or beneficiary in the Finance America Plan with an undistributed Finance America Account immediately prior to the Merger

40.1.5  "<u>Finance America Plan</u>" means the Finance America 401(k) Retirement Savings Plan as in effect prior to the Merger.

40.1.6  "<u>Finance America Trust Fund</u>" means the trust funds maintained under the Finance America Plan immediately prior to the Merger.

40.1.7  "<u>Merger</u>" means the merger of the Finance America 401(k) Retirement Savings Plan into the Plan, effective February 1, 2006.

- 142 -

**41.    Past Service Credit, Transfer of Accounts and Discontinuance of Finance America Plan Contributions**

41.1.    <u>Vesting  Service Credit</u>.  In the case of a Finance America Employee who transferred to the employ of an Employer during the Plan Year ending December 31, 2005, the most recent continuous period of service with Finance America immediately preceding the date of such transfer (or if greater, his or her service with Finance America on or after June 1, 2004) shall be treated as service with the Company for purposes of determining his or her Years of Vesting Service.

41.2    <u>Eligibility for Employer Contributions</u>.  In the case of a Finance America Employee who transferred to the employ of an Employer during the Plan Year ending December 31, 2005, the most recent continuous period of service with Finance America immediately preceding the date of such transfer shall be treated as service with the Company in establishing the date he or she completes a Twelve Month Period of Service for purposes of eligibility to share in Employer Contributions for such Plan Year.  If a Finance America Employee has completed a Twelve-Month Period of Service on or before December 31, 2005 (determined after giving effect to the preceding sentence), his or her eligibility for (a) Basic Contributions for the Plan Year ending December 31, 2005, and (b) Matching Contributions for the portion of such Plan Year beginning with the period for which he made Section 401(k) Contributions hereunder (or if, later, the period from the date he completed such service requirement) to December 31, 2005, shall be determined by annualizing his or her Compensation from the date he first became an Employee to December 31, 2005.

41.3    <u>Membership based on Transfer of Plan Accounts</u>.  Finance America Account Holders who have not previously become Participants shall become Members, or if deceased, shall become Beneficiaries, under the Plan effective February 1, 2006.

41.4    <u>Finance America Plan Contributions Discontinued</u>.  Effective January 1, 2006, all contributions under the Finance America Plan shall be discontinued.

- 143 -

KL3 2630220.9

42.    **Merger, Investment of Transferred Assets, and Finance America Plan Accounts**

42.1    <u>Vesting</u>.  All Finance America Accounts shall be fully vested and nonforfeitable effective January 31, 2005.

42.2    <u>Merger</u>.  Effective as of February 1, 2006, the Finance America Plan and Finance America Trust Fund shall be merged into this Plan and the trust thereunder, respectively, and the terms of this Plan shall thereupon supersede in all respects the terms of the Finance America Plan with respect to the Finance America Accounts.  All persons (including current and former employees and their beneficiaries, and alternate payees under a qualified domestic relations order) having an undistributed interest under the Finance America Plan immediately prior to February 1, 2006 shall, on and after February 1, 2006, be entitled to benefits provided solely from this Plan (including this Supplement M), in lieu of any and all interest which they had or may have had under the Finance America Plan.

42.3    <u>Transfer of Finance America Trust Fund</u>.  The assets held by the trustees of the Finance America Trust Fund shall be transferred to the Trustee on February 1, 2006 or as soon as practicable thereafter.  If and to the extent that such transfer is not completed on February 1, 2006, such trustees shall hold such assets, as adjusted for investment gain or loss thereon and expenses attributable thereto, as an additional trustee under this Plan, until such transfer is completed.

42.4    <u>Allocation to Accounts</u>.  Funds transferred to the Trustee pursuant to Section 42.3 in respect of a Member's Finance America Account shall be allocated under the Plan to such Member's existing Member's Account (if any) and otherwise to a Member's Account created for such Member (including, if applicable, his or her Beneficiary) as of the date of transfer.  Within each Member's Account, the portion so transferred attributable to elective deferrals under Section 401(k) of the Code shall be allocated to the Member's Section 401(k) Contributions Account, the portion allocable to matching contributions shall be allocated to the Member's Employer Contributions Account, and the portion allocable to rollover contributions shall be allocated to the Member's Rollover Account.

42.5    <u>Investment of Transferred Accounts</u>.  Funds transferred to the Trustee in respect of a Member's Finance America Account pursuant to Section 42.3 shall initially be invested in accordance with Section 42.6 and shall remain so invested until the end of the blackout period established under Section 42.11 in connection with the Merger ("Blackout Period").  Thereafter, the Member may change such investments incident to a change made in the investment of his Member's Account in accordance with Section 6.2 of the Plan.

42.6    <u>Fund Mapping</u>:  The following fund mapping shall become effective upon the transfer pursuant to Section 42.3:

| **Your Current Investment Options** | | **New Investment Options** |
|---|---|---|
| Principal Fixed Income | ➜ | PRIMCO Stable Value Fund |
| Principal Investors Bond & Mortgage Secs Adv Sel Fund | ➜ | PIMCO Total Return Fund – Administrative Class |
| Russell LifePoints® Conservative Strategy D Fund | ➜ | PRIMCO Stable Value Fund |
| Russell LifePoints® Moderate Strategy D Fund | ➜ | Fidelity Freedom 2010 Fund® |
| Russell LifePoints® Aggressive Strategy D Fund | ➜ | Fidelity Freedom 2030 Fund® |
| Russell LifePoints® Balanced Strategy D Fund | ➜ | Fidelity *Asset Manager*SM |
| Russell LifePoints® Equity Aggressive D Fund | ➜ | Fidelity Freedom 2040 Fund® |
| American Funds Investment Company of America R3 Fund | ➜ | MFS Value Fund – Class A |
| Principal Investors Partners LargeCap Value Adv Sel Fund | ➜ | Fidelity Equity-Income Fund |
| Principal Investors LargeCap S&P 500 Index Adv Sel Fund | ➜ | Vanguard Institutional Index Fund – Institutional Class |
| Principal Investors Partners LargeCap Blend Adv Sel Fund | ➜ | Vanguard Institutional Index Fund – Institutional Class |

- 145 -

| Your Current Investment Options | | New Investment Options |
|---|---|---|
| Principal Investors Partners LgCap Growth I Adv Sel Fund | ➜ | Fidelity Large Cap Stock Fund |
| Principal Investors Partners LgCap Growth II Adv Sel Fund | ➜ | Fidelity Large Cap Stock Fund |
| Principal Investors Partners MidCap Value Adv Sel Fund | ➜ | T. Rowe Price Mid-Cap Value Fund |
| Fidelity Advisor Mid Cap T Fund | ➜ | CALAMOS Growth Fund – Class A |
| Fidelity Advisor Value Strategies T Fund | ➜ | Neuberger Berman Genesis Fund – Investor Class |
| Principal Investors MidCap S&P 400 Index Adv Sel Fund | ➜ | T. Rowe Price Mid-Cap Value Fund |
| Principal Investors SmallCap Value Adv Sel Fund | ➜ | Neuberger Berman Genesis Fund – Investor Class |
| Principal Investors SmallCap S&P 600 Index Adv Self Fund | ➜ | Neuberger Berman Fasciano Fund – Investor Class |
| Fidelity Advisor Small Cap T Fund | ➜ | Century Small Cap Select Fund |
| Principal Investors International Growth Adv Sel Fund | ➜ | Fidelity Diversified International Fund |

42.7    Outstanding Loans.  Loans outstanding under the Finance America Plan as of the date of Merger shall (i) be held by the Trustee as assets of this Plan, (ii) be governed by the terms of such loans in effect immediately preceding the Merger, and (iii) be treated as loans under this Plan in determining eligibility for future loans under Article XVI.  Notwithstanding the foregoing, repayments of such loans shall be suspended from January 1, 2006 until the end of the Blackout Period, at which time the outstanding loan balance shall be reamortized based on the number of loan repayments remaining and the payroll cycle applicable to the Member.

42.8    Restoration of Forfeitures.  If a former participant in the Finance America Plan who had received his entire vested interest thereunder is reemployed by an Employer before he has a break in service of five or more years as defined in such plan, he may repay to the Plan an

- 146 -

amount equal to the distribution, disregarding any portion thereof derived from rollover contributions, at any time within five years from the date of such reemployment.  Any amount so repaid shall be credited to the individual's Member's Account (whether already existing or created by reason of such repayment), plus an additional amount equal to the portion of his account in the Finance America Plan that was previously forfeited.  The amount so restored shall be funded by available forfeitures, if any, and otherwise by a special contribution by his Employer.  For this purpose, a former participant in the Finance America Plan who terminated with no vested interest thereunder and is reemployed within the applicable period described above shall be deemed to have repaid his entire vested interest on the date of his reemployment by an Employer.

42.9    Contributions.  Finance America shall make a matching contribution to the Finance America Plan with respect to each Finance America Account Holder who was eligible to share in such a contribution under the Finance America Plan.  If such contribution is not made prior to the Merger, it shall be made, no later than the filing deadline for its 2005 federal income tax return, by paying such contribution into the Plan as the continuation of the Finance America Plan by reason of the Merger.  Such contribution shall be allocated among the Members' Accounts of such Finance America Account Holders in accordance with the provisions of the Finance America Plan governing contributions for the 2005 plan year.

42. 10  Pre-Merger Elections and Designations.  Notwithstanding any other provision of this Plan, (a) elections as to timing or form of benefit made, (b) designations of beneficiaries made, and (c) provisions that became applicable based on a failure to make an available election or designation under the Finance America Plan on or before February 1, 2006, shall be given effect with respect to Finance America Account Holders who retired or terminated employment under the terms of the Finance America Plan, or died, on or before February 1, 2006, and distribution shall be made in respect of such Members in accordance with the applicable provisions of the Finance America Plan as in effect at the relevant time or times prior to such date.  Beneficiary designations made under the Finance America Plan on or before February 1, 2006 by Finance America Account Holders shall not be given effect after such date, and distribution shall be made in respect of such Members in accordance with the applicable provisions of this Plan.

- 147 -

42.11  <u>Blackout Period and Notice</u>.  To facilitate the Merger and related transactions described above, the Committee shall establish such blackout period or periods as it shall deem necessary or advisable, which may  differ as among the various functions to which such periods apply, and shall give such notice or notices as shall be required by Section 101(i) of ERISA and Department of Labor Regulation section 2520.1-101-3.

42.12  <u>Waiver of $1,000 Minimum for In-Service Distributions</u>.  The requirement of Section 7.8 that partial in-service distributions from the Rollover Account prior to age 59-1/2 be at least $1,000 is waived for Finance America Account Holders who become Members.

42.13  <u>Final MRD Regulations</u>.  Section 7.5(b) shall apply retroactively to the Finance America Plan effective for periods from the 2002 calendar year to the date of the Merger.

KL3 2630220.9

<u>SUPPLEMENT N</u>

Special Provisions Relating to BNC Mortgage, Inc. and Finance America, LLC after its merger
into BNC Mortgage, Inc.
<u>(including amendment of BNC Mortgage, Inc. 401(k) Plan)</u>

This Supplement N (i) provides past service credit for service with BNC Mortgage, Inc.,
("BNC") and Finance America, LLC ("Finance America") for purposes of eligibility to share in
Employer Contributions and for vesting, effective commencing with the Plan Year ending
December 31, 2005, (ii) records the adoption of the Plan by BNC effective January 1, 2006, and
(iii) provides for the merger of the BNC Mortgage, Inc. 401(k) Plan into this Plan, effective
February 1, 2006. Supplement N shall constitute an amendment to the BNC Plan to the extent
necessary to give full effect thereto, as well as part of the Lehman Brothers Savings Plan.

**43.     Definitions**

43.1    <u>Special Definitions</u>.  For purposes of this Supplement N:

43.1.1  "<u>BNC</u> " means BNC Mortgage, Inc.

43.1.2  "<u>BNC  Account</u>" means an account maintained under the BNC  Plan for a BNC
Account Holder as of December 31, 2005 and thereafter up to the Merger.

43.1.3  "<u>BNC  Employee</u>" means an individual who is employed by BNC as of January 1,
2006, including  a former employee of Finance America  who became such an employee by
reason of the merger of Finance America into BNC on January 1, 2006, or who was employed by
BNC on any applicable earlier date during 2005 immediately preceding his transfer to the
employ of an Employer.

43.1.4  "<u>BNC Account Holder</u>" means a participant or beneficiary in the BNC Plan with
an undistributed BNC Account immediately prior to the Merger

43.1.5  "<u>BNC Plan</u>" means the BNC Mortgage, Inc. 401(k) Plan as in effect prior to the
Merger.

43.1.6  "<u>BNC Trust Fund</u>" means the trust funds maintained under the BNC Plan
immediately prior to the Merger.

43.1.7  "<u>Finance America</u>" means Finance America, LLC.

43.1.9  "<u>Finance America Plan</u>" means the Finance America 401(k) Retirement Savings Plan as in effect prior to the Merger.

43.1.10 "<u>Merger</u>" means the merger of the BNC Mortgage, Inc. 401(k) Plan into the Plan, effective February 1, 2006.

**44.   Participation, Past Service Credit and Discontinuance of BNC Plan Contributions**

44.1   <u>BNC a Participating Employer</u>.  BNC shall become an Employer under the Plan effective January 1, 2006 (and shall remain an Employer so long as it remains a member of a controlled group, within the meaning of Section 414 (b) or (c) of the Code and regulations thereunder, of which the Company is the common parent, subject to the right reserved to the Company Representative to terminate its status as an Employer under Section 1.23).

44.2   <u>Eligibility to Participate</u>.  A BNC Employee shall be eligible to become a Participant as of January 1, 2006 (or, if applicable, any earlier date during 2005 on which he transfers to the employ of an Employer), provided he is then an Employee.  Notwithstanding the foregoing, any such individual who has made a hardship withdrawal of elective deferrals from the BNC Plan or the Finance America Plan within six months prior to the date of such initial eligibility shall not be entitled to make Section 401(k) Contributions under this Plan until six months have elapsed from the date of such hardship withdrawal.

44.3   <u>Membership Based on Transfer of Plan Accounts</u>.  BNC Account Holders who have not previously become Participants shall become Members, or if deceased, shall become Beneficiaries, under the Plan effective February 1, 2006.

44.4   <u>Vesting Service Credit</u>.  In the case of a BNC Employee who (i) transferred to the employ of an Employer during the Plan Year ending December 31, 2005, or (ii) is employed by BNC on January 1, 2006, his or her most recent continuous period of service with BNC and/or Finance America immediately preceding the date of such transfer or January 1, 2006, as the case may be,  shall be treated as service with the Company for purposes of determining his or her Years of Vesting Service; provided, however, that the service thereby  so credited shall not be less than the BNC Employee's aggregate service to such date with BNC after July 26, 2000 or with Finance America after June 1, 2004.

- 150 -

44.5    <u>Eligibility for Employer Contribution</u>.  In the case of a BNC Employee who (i) transferred to the employ of an Employer during the Plan Year ending December 31, 2005, or (ii) is employed by BNC on January 1, 2006, his or her most recent continuous period of service with BNC and/or Finance America immediately preceding the date of such transfer or January 1, 2006, as the case may be,  shall be treated as service with the Company in establishing the date he or she completes a Twelve Month Period of Service for purposes of  eligibility to share in Employer Contributions for Plan Years ending on or after December 31, 2005. If a BNC Employee has completed a Twelve-Month Period of Service on or before December 31, 2005 (determined after giving effect to the preceding sentence), his or her eligibility for (a) Basic Contributions for the Plan Year ending December 31, 2005, and (b) Matching Contributions for the portion of such Plan Year beginning with the period for which he made Section 401(k) Contributions hereunder (or if, later, the period from the date he completed such service requirement) to December 31, 2005, shall be determined by annualizing his or her Compensation from the date he first became an Employee to December 31, 2005.

44.6    <u>BNC Plan Contributions Discontinued</u>.  Effective January 1, 2006, all contributions under the BNC Plan shall be discontinued.

## 45.    Merger, Investment of Transferred Assets, and BNC Plan Accounts

45.1    <u>Vesting</u>.  All BNC Accounts shall be fully vested and nonforfeitable effective January 31, 2005.

45.2    <u>Merger</u>.  Effective as of February 1, 2006, the BNC Plan and BNC Trust Fund shall be merged into this Plan and the trust thereunder, respectively, and the terms of this Plan shall thereupon supersede in all respects the terms of the BNC Plan with respect to the BNC Accounts.  All persons (including current and former employees and their beneficiaries, and alternate payees under a qualified domestic relations order) having an undistributed interest under the BNC Plan immediately prior to February 1, 2006 shall, on and after February 1, 2006, be entitled to benefits provided solely from this Plan (including this Supplement N), in lieu of any and all interest which they had or may have had under the BNC Plan.

KL3 2630220.9

45.3    Transfer of BNC Trust Fund.  The assets held by the trustees of the BNC Trust Fund shall be transferred to the Trustee on February 1, 2006 or as soon as practicable thereafter. If and to the extent that such transfer is not completed on February 1, 2006, such trustees shall hold such assets, as adjusted for investment gain or loss thereon and expenses attributable thereto, as an additional trustee under this Plan, until such transfer is completed.

45.4    Allocation to Accounts.  Funds transferred to the Trustee pursuant to Section 45.3 in respect of a Member's BNC Account shall be allocated under the Plan to such Member's existing Member's Account (if any) and otherwise to a Member's Account created for such Member (including, if applicable, Beneficiary) as of the date of transfer. Within each Member's Account, the portion so transferred attributable to elective deferrals under Section 401(k) of the Code shall be allocated to the Member's Section 401(k) Contributions Account, the portion allocable to matching contributions shall be allocated to the Member's Employer Contributions Account, and the portion allocable to rollover contributions shall be allocated to the Member's Rollover Account.

45.5    Investment of Transferred Accounts.  Funds transferred to the Trustee in respect of a Member's BNC Account pursuant to Section 45.3 shall initially be invested in accordance with Section 45.6 and shall remain so invested until the end of the blackout period established under Section 45.11 in connection with the Merger ("Blackout Period").  Thereafter, the Member may change such investments incident to a change made in the investment of his Member's Account in accordance with Section 6.2 of the Plan.

45.6    Fund Mapping.  The following fund mapping shall become effective upon the transfer pursuant to Section 45.3:

| Your Current Investment Options | | New Investment Options |
|---|---|---|
| Fidelity Retirement Money Market Portfolio | ➜ | PRIMCO Stable Value Fund |
| Fidelity Intermediate Bond Fund | ➜ | PIMCO Total Return Fund – Administrative Class |
| Fidelity U.S. Bond Index Fund | ➜ | PIMCO Total Return Fund – Administrative Class |

- 152 -

| | | |
|---|---|---|
| Fidelity Freedom Income Fund® | ➔ | PRIMCO Stable Value Fund |
| Fidelity Freedom 2000 Fund® | ➔ | PRIMCO Stable Value Fund |
| Fidelity Freedom 2005 Fund® | ➔ | PRIMCO Stable Value Fund |
| Fidelity Freedom 2015 Fund® | ➔ | Fidelity Freedom 2010 Fund® |
| Fidelity Freedom 2025 Fund® | ➔ | Fidelity Freedom 2020 Fund® |
| Fidelity Freedom 2035 Fund® | ➔ | Fidelity Freedom 2030 Fund® |
| Fidelity Dividend Growth Fund | ➔ | Fidelity Equity-Income Fund |
| Spartan® U.S. Equity Index Fund | ➔ | Vanguard Institutional Index Fund – Institutional Class |
| Fidelity Blue Chip Growth Fund | ➔ | Fidelity Large Cap Stock Fund |
| Fidelity OTC Portfolio | ➔ | CALAMOS Growth Fund – Class A |
| Janus Mid Cap Value Fund | ➔ | T. Rowe Price Mid-Cap Value Fund |
| Fidelity Mid-Cap Stock Fund | ➔ | CALAMOS Growth Fund – Class A |
| Ariel Fund | ➔ | Neuberger Berman Genesis Fund – Investor Class |
| Fidelity Real Estate Investment Portfolio | ➔ | PRIMCO Stable Value Fund |
| Fidelity Small Cap Retirement Fund | ➔ | Century Small Cap Select Fund |

45.7    Outstanding Loans.  Loans outstanding under the BNC Plan as of the date of Merger shall (i) be held by the Trustee as assets of this Plan, (ii) be governed by the terms of such loans in effect immediately preceding the Merger, and (iii) be treated as loans under this Plan in determining eligibility for future loans under Article XVI. Notwithstanding the foregoing, repayments of such loans shall be suspended from January 1, 2006 until the end of the Blackout Period, at which time the outstanding loan balance shall be reamortized based on the number of loan repayments remaining and the payroll cycle applicable to the Member.

45.8    Restoration of Forfeitures.  If a former participant in the BNC Plan who had received his entire vested interest thereunder is reemployed by an Employer before he has a break in service of five or more years as defined in such plan, he may repay to the Plan an amount equal to the distribution, disregarding any portion thereof derived from rollover contributions, at any time within five years from the date of such reemployment.  Any amount so repaid shall be credited to the individual Member's Account (whether already existing or created

KL3 2630220.9

by reason of such repayment), plus an additional amount equal to the portion of his account in the BNC Plan that was previously forfeited. The amount so restored shall be funded by available forfeitures, if any, and otherwise by a special contribution by his Employer. For this purpose, a former participant in the BNC Plan who terminated with no vested interest thereunder and is reemployed within the applicable period described above shall be deemed to have repaid his entire vested interest on the date of his reemployment by an Employer.

45.9    Contributions. BNC shall make a matching contribution to the BNC Plan with respect to each BNC Account Holder who was eligible to share in such a contribution under the BNC Plan. If such contribution is not made prior to the Merger, it shall be made, no later than the filing deadline for its 2005 federal income tax return, by paying such contribution into the Plan as the continuation of the BNC Plan by reason of the Merger. Such contribution shall be allocated among the Members' Accounts of such BNC Account Holders in accordance with the provisions of the BNC Plan governing contributions for the 2005 plan year.

45. 10    Pre-Merger Elections and Designations. Notwithstanding any other provision of this Plan, (a) elections as to timing or form of benefit made, (b) designations of beneficiaries made, and (c) provisions that became applicable based on a failure to make an available election or designation under the BNC Plan on or before February 1, 2006, shall be given effect with respect to BNC Account Holders who retired or terminated employment under the terms of the BNC Plan, or died, on or before February 1, 2006, and distribution shall be made in respect of such Members in accordance with the applicable provisions of the BNC Plan as in effect at the relevant time or times prior to such date. Beneficiary designations made under the BNC Plan on or before February 1, 2006 by BNC Account Holders shall not be given effect after such date, and distribution shall be made in respect of such Members in accordance with the applicable provisions of this Plan.

45.11    Blackout Period and Notice. To facilitate the Merger and related transactions described above, the Committee shall establish such blackout period or periods as it shall deem necessary or advisable, which may differ as among the various functions to which such periods apply, and shall give such notice or notices as shall be required by Section 101(i) of ERISA and Department of Labor Regulation section 2520.1-101-3.

45.12    <u>Waiver of $1,000 Minimum for In-Service Distributions from the Rollover
Account</u>.  The requirement of Section 7.8 that partial in-service distributions from the Rollover
Account prior to age 59-1/2 be at least $1,000 is waived for BNC Account Holders who become
Members.

45.13    <u>Final MRD Regulations</u>.  Section 7.5(b) shall apply retroactively to the BNC Plan
effective for periods from the 2002 calendar year to the date of the Merger.

- 155 -

<u>SUPPLEMENT O</u>

Special Provisions Relating to Townsend Analytics LTD
<u>(including amendment of the Townsend Analytics, LTD 401(k) Plan )</u>

This Supplement O (i) provides past service credit for service with Townsend Analytics LTD ("TAL") for purposes of eligibility to share in Employer Contributions and for vesting, effective for Plan Years beginning on or after January 1, 2007, and (ii) provides for the merger of the Townsend Analytics, LTD 401(k) Plan (the "TAL Plan") into this Plan, effective January 2, 2007.  Supplement O shall constitute an amendment to the TAL Plan to the extent necessary to give full effect thereto, as well as part of the Lehman Brothers Savings Plan.

**46.    Definitions**

46.1    <u>Special Definitions</u>.  For purposes of this Supplement O:

46.1.1  "<u>TAL</u>" means Townsend Analytics, LTD.

46.1.2  "<u>TAL Account</u>" means an account maintained under the TAL Plan for a TAL Account Holder as of December 31, 2006 and thereafter up to the Merger.

46.1.3  "<u>TAL Employee</u>" means an individual who is employed by TAL as of January 1, 2007 or any applicable earlier date during 2005 or 2006 on which he transfers to the employ of an Employer.

46.1.4  "<u>TAL Account Holder</u>" means a participant or beneficiary in the TAL Plan with an undistributed TAL Account immediately prior to the Merger

46.1.5  "<u>TAL Plan</u>" means the Townsend Analytics, LTD 401(k) Plan as in effect prior to the Merger.

46.1.6  "<u>TAL Trust Fund</u>" means the trust fund maintained under the TAL Plan immediately prior to the Merger.

46.1.7  "<u>Merger</u>" means the merger of the TAL Plan into the Plan, effective January 2, 2007.

**47.    Past Service Credit, Transfer of Accounts and Discontinuance of TAL Plan Contributions**

47.1.    <u>Vesting Service</u>.  In the case of a TAL Employee who transferred to the employ of an Employer during the Plan Year ending December 31, 2005 or the Plan Year ending December 31, 2006 or was employed by TAL on January 1, 2007, the most recent continuous period of service with TAL immediately preceding January 1, 2007 or the date of such transfer shall be treated as service with the Company for purposes of determining his or her Years of Vesting Service.

47.2    <u>Eligibility for Employer Contributions</u>.  In the case of a TAL Employee who transferred to the employ of an Employer during the Plan Year ending December 31, 2005 or the Plan Year ending December 31, 2006, or who was employed by TAL on January 1, 2007, the most recent continuous period of service with TAL immediately preceding January 1, 2007 or the date of such transfer shall be treated as service with the Company in establishing the date he or she completes a Twelve Month Period of Service for purposes of eligibility to share in Employer Contributions for the Plan Year ending December 31, 2005, December 31, 2006 or December 31, 2007, as applicable.

47.3    <u>Membership based on Transfer of Plan Accounts</u>.  TAL Account Holders who have not previously become Participants shall become Members, Beneficiaries, or Alternate Payees, as applicable, under the Plan effective January 2, 2007.

47.4    <u>TAL Plan Contributions Discontinued</u>.  Effective January 1, 2007, all contributions under the TAL Plan shall be discontinued.

KL3 2630220.9

**48.    Merger, Investment of Transferred Assets, and TAL Plan Accounts**

48.1    <u>Vesting</u>.  TAL Accounts of TAL Employees who are employed by an Employer or an Affiliate on January 1, 2007 shall be fully vested and nonforfeitable as of such date.

48.2    <u>Merger</u>.  Effective as of January 2, 2007, the TAL Plan and TAL Trust Fund shall be merged into this Plan and the trust thereunder, respectively, and the terms of this Plan shall thereupon supersede in all respects the terms of the TAL Plan with respect to the TAL Accounts. All persons (including current and former employees and their beneficiaries, and alternate payees under a qualified domestic relations order) having an undistributed interest under the TAL Plan immediately prior to January 2, 2007 shall, on and after January 2, 2007, be entitled to benefits provided solely from this Plan (including this Supplement O), in lieu of any and all interest which they had or may have had under the TAL Plan.

48.3    <u>Transfer of TAL Trust Fund</u>.  The assets held by the trustees of the TAL Trust Fund shall be transferred to the Trustee on January 2, 2007 or as soon as practicable thereafter. If and to the extent that such transfer is not completed on January 2, 2007, such trustees shall hold such assets, as adjusted for investment gain or loss thereon and expenses attributable thereto, as an additional trustee under this Plan, until such transfer is completed.

48.4    <u>Allocation to Accounts</u>.  Funds transferred to the Trustee pursuant to Section 48.3 in respect of a Member's TAL Account shall be allocated under the Plan to such Member's existing Member's Account (if any) and otherwise to a Member's Account created for such Member (including, if applicable, his or her Beneficiary) as of the date of transfer.  Within each Member's Account, the portion so transferred attributable to elective deferrals under Section 401(k) of the Code shall be allocated to the Member's Section 401(k) Contributions Account, the portion allocable to matching contributions shall be allocated to the Member's Employer Contributions Account, and the portion allocable to rollover contributions shall be allocated to the Member's Rollover Account.

48.5    <u>Investment of Transferred Accounts</u>.  Funds transferred to the Trustee in respect of a Member's TAL Account pursuant to Section 48.3 shall initially be invested in accordance with Section 48.6 and shall remain so invested until the end of the blackout period established

under Section 48.11 in connection with the Merger ("Blackout Period").  Thereafter, the Member may change such investments incident to a change made in the investment of his Member's Account in accordance with Section 6.2 of the Plan.

48.6    Fund Mapping.  The following fund mapping shall become effective upon the transfer pursuant to Section 48.3:

| TAL Plan Current Investment Options | | New Investment Options |
|---|---|---|
| AllianceBernstein Global Technology Fund – Class A | → | Fidelity Select Technology Portfolio |
| AllianceBernstein International Value Fund – Class A | → | Neuberger Berman International Fund Investor Class |
| AllianceBernstein Small/Mid Cap Value Fund – Class A | → | T. Rowe Price Mid-Cap Value Fund |
| Calvert Income Fund – Class A | → | PIMCO Total Return Fund – Admin. Class |
| Calvert Large Cap Growth Fund – Class A | → | Fidelity Large Cap Stock Fund |
| Davis New York Venture Fund – Class A | → | Vanguard Institutional Index Fund |
| Davis Opportunity Fund – Class A | → | T. Rowe Price Mid-Cap Value Fund |
| Dreyfus Premier New Leaders Fund, Inc. – Class T | → | Calamos Growth Fund Class A |
| Eaton Vance Income Fund of Boston – Class A | → | Neuberger Berman High Income Bond Fund Investor Class |
| Eaton Vance Worldwide Health Sciences Fund – Class A | → | Fidelity Select Healthcare Portfolio |
| Evergreen Special Values Fund – Class A | → | Neuberger Berman Genesis Fund Inv. Class |
| Morgan Stanley Equally-Weighted S&P 500 Fund – Class A | → | Vanguard Institutional Index Fund |
| Morgan Stanley Nasdaq-100 Index Fund – Class A | → | Vanguard Institutional Index Fund |
| Morgan Stanley Stable Value Fund | → | PRIMCO Stable Value Fund[*] |
| Oppenheimer Global Fund – Class A | → | American Funds Capital World Growth and Income Fund Class R4 |
| Oppenheimer International Bond Fund – Class A | → | PIMCO Total Return Fund – Admin. Class |

- 159 -

| TAL Plan Current Investment Options | | New Investment Options |
|---|---|---|
| Oppenheimer Real Asset Fund® - Class A | → | PRIMCO Stable Value Fund[*] |
| Oppenheimer Small- & Mid- Cap Value Fund Class A | → | Neuberger Berman Genesis Fund Inv. Class |
| SSgA S&P 500 Index Fund | → | Vanguard Institutional Index Fund |
| Van Kampen Comstock Fund | → | MFS Value Fund Class A |
| Van Kampen Equity and Income Fund – Class A | → | Fidelity Asset Manager 50% |
| Van Kampen Real Estate Securities Fund – Class A | → | T. Rowe Price Mid-Cap Value Fund |

48.7    <u>Outstanding Loans</u>.  Loans outstanding under the TAL Plan as of the date of Merger shall (i) be held by the Trustee as assets of this Plan, (ii) be governed by the terms of such loans in effect immediately preceding the Merger, and (iii) be treated as loans under this Plan in determining eligibility for future loans under Article XVI.  Notwithstanding the foregoing, repayments of such loans shall be suspended from January 1, 2007 until the end of the Blackout Period, at which time the outstanding loan balance shall be reamortized based on the number of loan repayments remaining and the payroll cycle applicable to the Member.

48.8    <u>Restoration of Forfeitures</u>.  If a former participant in the TAL Plan who had received his entire vested interest and forfeited his unvested interest thereunder is reemployed by an Employer before he has a break in service of five or more years as defined in such plan, he may repay to the Plan an amount equal to the distribution, disregarding any portion thereof derived from rollover contributions, at any time within five years from the date of such reemployment.  Any amount so repaid shall be credited to the individual's Member's Account (whether already existing or created by reason of such repayment), plus an additional amount equal to the portion of his account in the TAL Plan that was previously forfeited.  The amount so restored shall be funded by available forfeitures, if any, and otherwise by a special contribution by his Employer.  For this purpose, a former participant in the TAL Plan who terminated with a vested interest thereunder of zero percent and is reemployed within the applicable period described above shall be deemed to have repaid his entire vested interest on the date of his reemployment by an Employer.

- 160 -

48.9    <u>Contributions</u>.  TAL shall make any contributions owed to the TAL Plan and not made prior to the Merger by paying such contribution into the Plan as the continuation of the TAL Plan by reason of the Merger.  Such contribution shall be allocated among the Members' Accounts of such TAL Account Holders in accordance with the provisions of the TAL Plan governing contributions for the 2006 plan year.

48.10    <u>Pre-Merger Elections and Designations</u>.  Notwithstanding any other provision of this Plan, (a) elections as to timing or form of benefit made, (b) designations of beneficiaries made, and (c) provisions that became applicable based on a failure to make an available election or designation under the TAL Plan on or before January 2, 2007, shall be given effect with respect to TAL Account Holders who retired or terminated employment under the terms of the TAL Plan, or died, on or before January 2, 2007, and distribution shall be made in respect of such Members in accordance with the applicable provisions of the TAL Plan as in effect at the relevant time or times prior to such date.  Beneficiary designations made under the TAL Plan on or before January 2, 2007 by TAL Account Holders shall not be given effect after such date, and distribution shall be made in respect of such Members in accordance with the applicable provisions of this Plan.

48.11    <u>Blackout Period and Notice</u>.  To facilitate the Merger and related transactions described above, the Committee shall establish such blackout period or periods as it shall deem necessary or advisable, which may  differ as among the various functions to which such periods apply, and shall give such notice or notices as shall be required by Section 101(i) of ERISA and Department of Labor Regulation section 2520.1-101-3.

KL3 2630220.9

<u>SUPPLEMENT P</u>

Special Provisions Relating to Campus Door
<u>(including amendment of the Campus Door 401(k) Plan )</u>

This Supplement P (i) provides past service credit for service with Campus Door Inc. ("Campus Door") for purposes of eligibility to share in Employer Contributions and for vesting, effective for Plan Years beginning on or after January 1, 2007, and (ii) provides for the merger of the Campus Door 401(k) Plan (the "Campus Door Plan") into this Plan, effective January 16, 2007.  Supplement P shall constitute an amendment to the Campus Door Plan to the extent necessary to give full effect thereto, as well as part of the Lehman Brothers Savings Plan.

**49.    Definitions**

49.1    <u>Special Definitions</u>.  For purposes of this Supplement P:

49.1.1  "<u>Campus Door</u>" means Campus Door Inc.

49.1.2  "<u>Campus Door Account</u>" means an account maintained under the Campus Door Plan for a Campus Door Account Holder as of December 31, 2006 and thereafter up to the Merger.

49.1.3  "<u>Campus Door Employee</u>" means an individual who is employed by Campus Door as of January 1, 2007 or any applicable earlier date during 2006 on which he transfers to the employ of an Employer.

49.1.4  "<u>Campus Door Account Holder</u>" means a participant or beneficiary in the Campus Door Plan with an undistributed Campus Door Account immediately prior to the Merger

49.1.5  "<u>Campus Door Plan</u>" means the Campus Door 401(k) Plan as in effect prior to the Merger.

49.1.6  "<u>Campus Door Trust Fund</u>" means the trust fund maintained under the Campus Door Plan immediately prior to the Merger.

49.1.7  "<u>Merger</u>" means the merger of the Campus Door Plan into the Plan, effective January 16, 2007.

KL3 2630220.9

50.    **Past Service Credit, Transfer of Accounts and Discontinuance of Campus Door Plan Contributions**

50.1.    <u>Vesting Service</u>.  In the case of a Campus Door Employee who transferred to the employ of an Employer during the Plan Year ending December 31, 2006 or was employed by Campus Door on January 1, 2007, the most recent continuous period of service with Campus Door immediately preceding January 1, 2007 or the date of such transfer shall be treated as service with the Company for purposes of determining his or her Years of Vesting Service.

50.2    <u>Eligibility for Employer Contributions</u>.  In the case of a Campus Door Employee who transferred to the employ of an Employer during the Plan Year ending December 31, 2006, or who was employed by Campus Door on January 1, 2007, the most recent continuous period of service with Campus Door immediately preceding January 1, 2007 or the date of such transfer shall be treated as service with the Company in establishing the date he or she completes a Twelve Month Period of Service for purposes of eligibility to share in Employer Contributions for the Plan Year ending December 31, 2006 or December 31, 2007 as applicable.

50.3    <u>Membership based on Transfer of Plan Accounts</u>. Campus Door Account Holders who have not previously become Participants shall become Members, Beneficiaries, or Alternate Payees, as applicable, under the Plan effective January 16, 2007.

50.4    <u>Campus Door Plan Contributions Discontinued</u>.  Effective January 1, 2007, all contributions under the Campus Door Plan shall be discontinued.

51.    **Merger, Investment of Transferred Assets, and Campus Door Plan Accounts**

51.1    <u>Merger</u>.  Effective as of January 16, 2007, the Campus Door Plan and Campus Door Trust Fund shall be merged into this Plan and the trust thereunder, respectively, and the terms of this Plan shall thereupon supersede in all respects the terms of the Campus Door Plan with respect to the Campus Door Accounts.  All persons (including current and former employees and their beneficiaries, and alternate payees under a qualified domestic relations order) having an undistributed interest under the Campus Door Plan immediately prior to January 16, 2007 shall, on and after January 16, 2007, be entitled to benefits provided solely

- 163 -

from this Plan (including this Supplement P), in lieu of any and all interest which they had or may have had under the Campus Door Plan.

51.2    Transfer of Campus Door Trust Fund.  The assets held by the trustees of the Campus Door Trust Fund shall be transferred to the Trustee on January 16, 2007 or as soon as practicable thereafter.  If and to the extent that such transfer is not completed on January 16, 2007, such trustees shall hold such assets, as adjusted for investment gain or loss thereon and expenses attributable thereto, as an additional trustee under this Plan, until such transfer is completed.

51.3    Allocation to Accounts.  Funds transferred to the Trustee pursuant to Section 51.2 in respect of a Member's Campus Door Account shall be allocated under the Plan to such Member's existing Member's Account (if any) and otherwise to a Member's Account created for such Member (including, if applicable, his or her Beneficiary) as of the date of transfer.  Within each Member's Account, the portion so transferred attributable to elective deferrals under Section 401(k) of the Code shall be allocated to the Member's Section 401(k) Contributions Account and the portion allocable to rollover contributions shall be allocated to the Member's Rollover Account.

51.5    Investment of Transferred Accounts.  Funds transferred to the Trustee in respect of a Member's Campus Door Account pursuant to Section 51.2 shall initially be invested in accordance with Section 51.5 and shall remain so invested until the end of the blackout period established under Section 51.9 in connection with the Merger

("Blackout Period").  Thereafter, the Member may change such investments incident to a change made in the investment of his Member's Account in accordance with Section 6.2 of the Plan.

51.6    Fund Mapping.  The following fund mapping shall become effective upon the transfer pursuant to Section 51.2:

| Campus Door Plan Current Investment Options | | New Investment Options |
| --- | --- | --- |
| Legg Mason Diversified Strategic Income | → | PIMCO Total Return Fund – Administrative |

- 164 -

| Campus Door Plan Current Investment Options | | New Investment Options |
|---|---|---|
| Fund | | Class |
| Legg Mason Partners Exchange Reserve Fund | → | PRIMCO Stable Value Fund* |
| Legg Mason Partners Aggressive Growth Fund | → | Fidelity Large Cap Stock Fund |
| Legg Mason Partners Appreciation Fund | → | Vanguard Institutional Index Fund – Institutional Shares |
| Legg Mason Partners Capital and Income Fund | → | Fidelity Asset Manager® 50% |
| Legg Mason Partners Fundamental Value Fund | → | Vanguard Institutional Index Fund – Institutional Shares |
| Legg Mason Partners Investment Grade Bond Fund | → | Fidelity U.S. Bond Index Fund |
| Legg Mason Partners Large Cap Growth Fund | → | Fidelity Large Cap Stock Fund |
| Legg Mason Partners Mid Cap Core Fund | → | T. Rowe Price Mid-Cap Value Fund |
| Legg Mason Partners Small Cap Growth Fund | → | Century Small Cap Select Fund – Institutional Shares |
| Legg Mason Partners U.S. Government Securities Fund | → | PRIMCO Stable Value Fund* |
| Legg Mason Partners International All Cap Growth Fund | → | Neuberger Berman International Fund – Investor Class |

51.7    Outstanding Loans.  Loans outstanding under the Campus Door Plan as of the date of Merger shall (i) be held by the Trustee as assets of this Plan, (ii) be governed by the terms of such loans in effect immediately preceding the Merger, and (iii) be treated as loans under this Plan in determining eligibility for future loans under Article XVI.  Notwithstanding the foregoing, repayments of such loans shall be suspended from January 1, 2007 until the end of the Blackout Period, at which time the outstanding loan balance shall be reamortized based on the number of loan repayments remaining and the payroll cycle applicable to the Member.

51.8    Contributions.  Campus Door shall make any contribution owed to the Campus Door Plan and not made prior to the Merger by paying such contribution into the Plan as the continuation of the Campus Door Plan by reason of the Merger.  Such contribution shall be allocated among the Members' Accounts of such Campus Door Account Holders in accordance with the provisions of the Campus Door Plan governing contributions for the 2006 plan year.

51.9    <u>Pre-Merger Elections and Designations</u>.  Notwithstanding any other provision of this Plan, (a) elections as to timing or form of benefit made, (b) designations of beneficiaries made, and (c) provisions that became applicable based on a failure to make an available election or designation under the Campus Door Plan on or before January 16, 2007, shall be given effect with respect to Campus Door Account Holders who retired or terminated employment under the terms of the Campus Door Plan, or died, on or before January 16, 2007, and distribution shall be made in respect of such Members in accordance with the applicable provisions of the Campus Door Plan as in effect at the relevant time or times prior to such date.  Beneficiary designations made under the Campus Door Plan on or before January 16, 2007 by Campus Door Account Holders shall not be given effect after such date, and distribution shall be made in respect of such Members in accordance with the applicable provisions of this Plan.

51.10    <u>Blackout Period and Notice</u>.  To facilitate the Merger and related transactions described above, the Committee shall establish such blackout period or periods as it shall deem necessary or advisable, which may  differ as among the various functions to which such periods apply, and shall give such notice or notices as shall be required by Section 101(i) of ERISA and Department of Labor Regulation section 2520.1-101-3.

51.11    <u>Final 401(k) Regulations</u>.  Revisions to the Plan to reflect the elimination of bottom-up QNECs, and the requirement for the distribution of gap period earnings in accordance with final regulations under section 401(k) of the Code, shall apply retroactively to the Campus Door Plan effective January 1, 2006.

- 166 -

KL3 2630220.9

<u>SUPPLEMENT Q</u>

Special Provisions Relating to Capital Crossing Inc.
<u>(including amendment of Capital Crossing Inc. 401(k) Plan)</u>

This Supplement Q (i) provides past service credit for certain employees for service with Capital Crossing Inc. for purposes of eligibility to share in Employer Contributions and for vesting, effective commencing July 1, 2007, and (ii) provides for the spinoff of a portion of the Capital Crossing Inc. 401(k) Plan into this Plan, effective August 1, 2007.  This Supplement, in addition to constituting part of the Lehman Brothers Savings Plan, shall constitute an amendment to the Capital Crossing Plan 401(k) Plan to the extent necessary to give full effect thereto,

## 52.    **Definitions**

52.1    <u>Special Definitions</u>.  For purposes of this Supplement Q:

52.1.1    "<u>Bank</u>" means Lehman Brothers Bank, FSB.

52.1.2    "<u>Capital Crossing</u>" means Capital Crossing Inc., a corporation all of whose capital stock was acquired by the Bank on February 15, 2007.

52.1.3    "<u>Capital Crossing Account</u>" means an account maintained under the Capital Crossing Plan for a Capital Crossing Employee as of July 31, 2007.

52.1.4    "<u>Capital Crossing Plan</u>" means the Capital Crossing Inc. 401(k) Plan.

52.1.5    "<u>Capital Crossing Trust Fund</u>" means the trust funds maintained under the Capital Crossing Plan immediately prior to August 1, 2007.

52.1.6    <u>Capital Crossing Employee</u>" means an individual who (i) is employed by the Bank as of July 1, 2007 in the division comprising the business formerly conducted by Capital Crossing (other than Dolphin), or (ii) who transferred from Capital Crossing to the employ of  any other Employer between February 15, 2007 and July 1, 2007 and remained in the employ of such Employer on July 1, 2007[1].

52.1.7    "<u>Spinoff</u> " means the transfer to the Plan of the portion of the net assets of the Capital Crossing Plan attributable to Capital Crossing Employees.

---

[1] We assume no such transferees came from the Dolphin division.

KL3 2630220.9

52.1.8    "Transferred Accounts" means the Capital Crossing Plan Accounts transferred to the Plan pursuant to the Spinoff.

## 53.    Participation, and Past Service

53.1    Eligibility to Participate.  A Capital Crossing Employee shall be eligible to become a Participant as of July 1, 2007 (or, if applicable, any earlier date during 2007 on which he transfers to the employ of an Employer other than the Bank and is enrolled in the Plan in accordance with the Committee's enrollment procedures), provided he is then an Employee. Notwithstanding the foregoing, any such individual who has made a hardship withdrawal of elective deferrals from the Capital Crossing Plan within six months prior to the date of such initial eligibility shall not be entitled to make Section 401(k) Contributions under this Plan until six months have elapsed from the date of such hardship withdrawal.

53.2    Membership Based on Transfer of Plan Accounts.  Capital Crossing Employees who have accounts under the Capital Crossing Plan on July 31, 2007 and who have not previously become Participants shall become Members under the Plan effective August 1, 2007.

53.3    Vesting Service Credit.  A Capital Crossing Employee's most recent continuous period of service with Capital Crossing immediately preceding February 15, 2007 shall be treated as service with the Company for purposes of determining such Capital Crossing Employee's Years of Vesting Service.

53.4    Eligibility for Employer Contribution.  A Capital Crossing Employee's most recent continuous period of service with Capital Crossing immediately preceding February 15, 2007 shall be treated as service with the Company in establishing the date he or she completes a Twelve Month Period of Service for purposes of  eligibility to share in Employer Contributions for  Plan Years ending on or after December 31, 2007.

53.5    Compensation for Employer Contribution.  Compensation of a Capital Crossing Employee for purposes of determining his or her eligibility for an Employer Contribution for the 2007 Plan Year shall be annualized in accordance with such procedures as the Committee shall establish, and shall be based on such data as is available to the Committee.

- 168 -

53.6    <u>Capital Crossing Plan Contributions Discontinued</u>. The Bank, as successor to Capital Crossing with respect to the business and assets comprising the Bank's Capital Crossing division, shall continue contributions under the Capital Crossing Plan (and in accordance with Section 12.10 thereof) for eligible employees of such Division for the period from February 15, 2007 through June 30, 2007.  Effective June 30, 2007, all contributions by the Bank under the Capital Crossing Plan shall be discontinued.

## 54.    Spinoff,  Investment of Transferred Assets, and Capital Crossing Accounts

54.1    <u>Vesting</u>.  All Transferred Accounts shall be fully vested and nonforfeitable effective August 1, 2007.

54.2    <u>Spinoff</u>.  Effective as of August 1, 2007, the portion of the net assets of the Capital Crossing Trust Fund attributable to Capital Crossing Employees shall be transferred to this Plan and the trust thereunder, respectively, and the terms of this Plan shall thereupon supersede in all respects the terms of the Capital Crossing Plan with respect to such Capital Crossing Accounts.  All persons (including current and former employees and their beneficiaries, and alternate payees under a qualified domestic relations order) having an undistributed interest in the Transferred Accounts immediately prior to August 1, 2007 shall, on and after August 1, 2007, be entitled to benefits provided solely from this Plan (including this Supplement Q), in lieu of any and all interest which they had or may have had under the Capital Crossing Plan.  Without limiting the generality of the foregoing, beneficiary designations under the Capital Crossing Plan shall not apply to the Transferred Accounts, and the Beneficiary with respect thereto shall be determined on and after August 1, 2007 based on designations made by the Member under this Plan (or this Plan's default rules in the absence of such a designation).

54.3    <u>Transfer of Capital Crossing Trust Fund</u>.  The portion of the Capital Crossing Trust Fund attributable to the Transferred Accounts held by the trustees of the Capital Crossing Trust Fund shall be transferred to the Trustee on August 1, 2007 or as soon as practicable thereafter.  If and to the extent that such transfer is not completed on August 1, 2007, such trustees shall hold such assets, as adjusted for investment gain or loss thereon and expenses attributable thereto, as an additional trustee under this Plan, until such transfer is completed.

- 169 -

54.4    <u>Allocation to Accounts</u>.  Funds transferred to the Trustee pursuant to Section 54.3 in respect of a Member's Transferred Account shall be allocated under the Plan to such Member's existing Member's Account (if any) and otherwise to a Member's Account created for such Member (including, if applicable, Beneficiary) as of the date of transfer. Within each Member's Account, the portion so transferred attributable to elective deferrals under Section 401(k) of the Code shall be allocated to the Member's Section 401(k) Contributions Account, the portion allocable to matching contributions shall be allocated to the Member's Employer Contributions Account, and the portion allocable to rollover contributions shall be allocated to the Member's Rollover Account.

54.5    <u>Investment of Transferred Accounts</u>.  Funds transferred to the Trustee in respect of a Member's Transferred Account pursuant to Section 54.3 shall initially be invested in accordance with Section 54.6 and shall remain so invested until the end of the blackout period established under Section 54.8 in connection with the Spinoff ("Blackout Period").  Thereafter, the Member may change such investments incident to a change made in the investment of his Member's Account in accordance with Section 6.2 of the Plan.

54.6    <u>Fund Mapping</u>.  The <u>following</u> fund mapping shall become effective upon the transfer pursuant to Section 54.3:

| Your Current Investment Options | | New Investment Options |
|---|---|---|
| Merrill Lynch Retirement Preservation Trust | ➔ | PRIMCO Stable Value Fund |
| Van Kampen Equity & Income – Class A | ➔ | PRIMCO Stable Value Fund |
| Calvert Income Fund | ➔ | PIMCO Total Return Fund – Administrative Class |
| BlackRock Fundamental Growth Fund – Class A | ➔ | Fidelity Large Cap Stock Fund |
| Massachusetts Investors Growth Stock Fund – Class A | ➔ | Fidelity Large Cap Stock Fund |
| BlackRock S&P 500 Index – Class I | ➔ | Vanguard Institutional Index Fund – Institutional Class |
| Davis NY Venture Fund – Class A | ➔ | Vanguard Institutional Index Fund – Institutional Class |
| Lord Abbett Mid Cap Value – Class P | ➔ | T. Rowe Price Mid Cap Value Fund |
| Loomis Sayles Mid Cap Growth – Class F | ➔ | Calamos Growth Fund – Class A |

- 170 -

| | | |
|---|---|---|
| BlackRock Aurora – Class A | ➔ | T. Rowe Price Mid Cap Value Fund |
| John Hancock Small Cap Equity – Class A | ➔ | Century Small Cap Select Fund – Institutional Class |
| Delaware Group Trend Fund | ➔ | Century Small Cap Select Fund – Institutional Class |
| ING International Value Fund – Class A | ➔ | Neuberger Berman International Fund – Investor Class |
| BlackRock Global Allocation – Class A | ➔ | PRIMCO Stable Value Fund |
| Oppenheimer Global Fund | ➔ | American Funds Capital Growth & Income Fund – Class R4 |

54.7   <u>Outstanding Loans</u>.  <u>Loans</u> with respect to the Transferred Accounts outstanding under the Capital Crossing Plan as of the date of Spinoff shall be (i) held by the Trustee as assets of this Plan, (ii) governed by the terms of such loans in effect immediately preceding the Spinoff, and (iii) treated as loans under this Plan in determining eligibility for future loans under Article XVI.  Notwithstanding the foregoing, repayments of such loans shall be suspended from June 30, 2007 until the end of the Blackout Period, at which time the outstanding loan balance shall be reamortized based on the number of loan repayments remaining and the payroll cycle applicable to the Member.

54. 8 <u>Blackout Period and Notice</u>.  To facilitate the Spinoff and related transactions described in above, the Committee shall establish such blackout period or periods as it shall deem necessary or advisable, which may  differ as among the various functions to which such periods apply, and shall give such notice or notices as shall be required by Section 101(i) of ERISA and Department of Labor Regulation section 2520.1-101-3.

KL3 2630220.9

<u>Supplement R</u>

TO THE

<u>LEHMAN BROTHERS SAVINGS PLAN</u>

**(Articles 55-57)**

Special Provisions Relating to Eagle Energy Partners LLP
<u>(including amendment of Eagle Energy Partners LLP 401(k) Plan)</u>

This Supplement R (i) provides past service credit for certain employees for service with Eagle Energy Partners LLP for purposes of eligibility to share in Employer Contributions and for vesting, effective commencing October 1, 2007, and (ii) provides for the merger of the Eagle Energy Partners LLP 401(k) Plan into this Plan, effective December 12, 2007.  This Supplement, in addition to constituting part of the Lehman Brothers Savings Plan, shall constitute an amendment to the Eagle Energy Partners LLP 401(k) Plan to the extent necessary to give full effect thereto,

**55.    Definitions**

55.1    <u>Special Definitions</u>.  For purposes of this Supplement R:

55.1.1    "<u>Lehman Brothers</u>" means Lehman Brothers Inc.

21.9.2    55.1.2    "<u>Eagle Energy</u>" means Eagle Energy Partners LLP, a corporation all of whose capital stock was acquired by Lehman Brothers on June 25, 2007.

55.1.3    "<u>Eagle Energy Account</u>" means an account maintained under the Eagle Energy Plan for a participant (or deceased participant's beneficiary) therein immediately prior to December 12, 2007.

55.1.4    "<u>Eagle Energy Plan</u>" means the Eagle Energy Partners LLP 401(k) Plan as in effect prior to the Merger.

55.1.5    "<u>Eagle Energy Trust Fund</u>" means the trust fund maintained under the Eagle Energy Plan immediately prior to December 12, 2007.

55.1.6    "<u>Eagle Energy Employee</u>" means an individual who (i) is employed by Eagle Energy as of October 1, 2007, or (ii) transferred from Eagle Energy to the employ of any other Employer between June 25, 2007 and October 1, 2007 and remained in the employ of an Employer on October 1, 2007.

55.1.7    "<u>Eagle Energy Account Holder</u>" means a participant (or deceased participant's beneficiary) in the Eagle Energy Plan with an undistributed Eagle Energy Account immediately prior to December 12, 2007.

KL3 2630220.9

55.1.8  "Merger" means the merger of the Eagle Energy Plan into the Plan, effective December 12, 2007.

55.1.9  "Transferred Accounts" means the Eagle Energy Accounts transferred to the Plan pursuant to the Merger.

## 56.    Participation, Past Service Credit, Transfer of Accounts, and Discontinuance of Eagle Energy Contributions

56.1    Eligibility to Participate.  An Eagle Energy Employee shall be eligible to become a Participant as of October 1, 2007 (or, if applicable, any earlier date between June 25, 2007 and October 1, 2007 on which he or she transfers to the employ of an Employer other than Eagle Energy and is enrolled in the Plan in accordance with the Committee's enrollment procedures), provided he or she is then an Employee.

56.2    Membership Based on Transfer of Plan Accounts.  Eagle Energy Account Holders who have not previously become Participants shall become Members (or, if applicable, Beneficiaries) under the Plan effective December 12, 2007.

56.3    Vesting Service Credit.  An Eagle Energy Employee's most recent continuous period of service with Eagle Energy immediately preceding June 25, 2007 shall be treated as service with the Company for purposes of determining such Eagle Energy Employee's Years of Vesting Service.

56.4    Eligibility for Employer Contribution.  An Eagle Energy Employee's most recent continuous period of service with Eagle Energy immediately preceding June 25, 2007, shall be treated as service with the Company in establishing the date he or she completes a Twelve Month Period of Service for purposes of eligibility to share in Employer Contributions for Plan Years ending on or after December 31, 2007.

56.5    Compensation Limit for 2007 Employer Contribution Eligibility.  Eligibility of an Eagle Energy Employee for an Employer Contribution for the 2007 Plan Year shall be determined based on the aggregate amount of his or her compensation from Eagle Energy or any other Employer during 2007, including compensation prior to the date of initial eligibility under the Plan.

56.6    Eagle Energy Plan  Superseded.  Effective September 30 2007, contributions by Eagle Energy in respect of elective deferrals and matching contributions by its employees shall be made solely in accordance and subject to all the terms and conditions of the Lehman Brothers Savings Plan (including this Supplement R) in lieu of the Eagle Energy Plan.

## 57.    Merger and Investment of Transferred Eagle Energy Accounts

57.1    Vesting.  All Transferred Accounts shall be fully vested and nonforfeitable effective December 12, 2007.

57.2    Merger.  Effective as of December 12, 2007, all net assets of the Eagle Energy Trust Fund shall be transferred to this Plan and the trust thereunder, respectively, and the

- 173 -

terms of this Plan shall thereupon supersede in all respects the terms of the Eagle Energy Plan with respect to the Eagle Energy Accounts. All persons having an undistributed interest in any such Account immediately prior to December 12, 2007 shall, on and after December 12, 2007, be entitled to benefits provided solely from this Plan (including this Supplement R), in lieu of any and all interest which they had or may have had under the Eagle Energy Plan. Without limiting the generality of the foregoing, beneficiary designations under the Eagle Energy Plan shall not apply to the Transferred Accounts, and the Beneficiary with respect thereto shall be determined on and after December 12, 2007 based on designations made by the Member under this Plan (or this Plan's default rules in the absence of such a designation).

57.3    Transfer of Eagle Energy Trust Fund. The net assets of the Eagle Energy Trust Fund held by the trustees of the Eagle Energy Trust Fund shall be transferred to the Trustee on December 12, 2007 or as soon as practicable thereafter. If and to the extent that such transfer is not completed on December 12, 2007, such trustees shall hold such assets, as adjusted for investment gain or loss thereon and expenses attributable thereto, as an additional trustee under this Plan, until such transfer is completed.

57.4    Allocation to Accounts. Funds transferred to the Trustee pursuant to Section 57.3 in respect of a Member's Transferred Account shall be allocated under the Plan to such Member's existing Member's Account (if any) and otherwise to a Member's Account created for such Member as of the date of transfer. Within each Member's Account, the portion so transferred attributable to elective deferrals under Section 401(k) of the Code shall be allocated to the Member's Section 401(k) Contributions Account, the portion allocable to matching contributions shall be allocated to the Member's Employer Contributions Account, and the portion allocable to rollover contributions shall be allocated to the Member's Rollover Account.

57.5    Investment of Transferred Accounts. Funds transferred to the Trustee in respect of a Member's Transferred Account pursuant to Section 57.3 shall initially be invested in accordance with Section 57.6 and shall remain so invested until the end of the blackout period established under Section 57.8 in connection with the Merger. Thereafter, the Member may change such investments incident to a change made in the investment of his Member's Account in accordance with Section 6.2 of the Plan.

57.6    Fund Mapping. The following fund mapping shall become effective upon the transfer pursuant to Section 57.3:

| Current Investment Options | | New Investment Options |
|---|---|---|
| American Funds® Capital World Growth and Income Fund$^{SM}$ – Class R4 | → | American Funds® Capital World Growth and Income Fund$^{SM}$ – Class R4[5] |
| American Funds® Fundamental Investors $^{SM}$ – Class R4 | → | MFS Value Fund – Class A |
| American Funds® Growth Fund of America® -- Class R4 | → | Fidelity Large Cap Stock Fund |
| American Funds® New Perspective Fund® -- Class R4 | → | American Funds® Capital World Growth and Income Fund® -- Class R4 |
| BlackRock Health Sciences Opportunities Portfolio – Service Class Shares[1] | → | Fidelity Select Health Care Portfolio |

- 174 -

KL3 2630220.9

| Current Investment Options | | New Investment Options |
|---|---|---|
| Fidelity Advisor Diversified International Fund[2] -- Class A | → | Fidelity Diversified International Fund[6] |
| Neuberger Berman Partners Fund® -- Advisor Class | → | Neuberger Berman Partners Fund® Investor Class[6] |
| North Track NYSE Arca Tech 100 Index – Fund A | → | Fidelity Select Technology Portfolio |
| SSgA S&P Index 500 | → | Vanguard Institutional Index Fund – Institutional Shares |
| T.Rowe Price Equity Income | → | MFS Value Fund – Class A |
| T.Rowe Price International Equity Index[3] | → | Fidelity Diversified International Fund |
| T.Rowe Price New Era | → | Neuberger Berman Partners Fund® -- Investor Class |
| Third Avenue Value | → | T.Rowe Price Mid-Cap Value Fund |
| Vanguard Inflation Protected Securities | → | INVESCO Stable Value Trust Fund |
| Vanguard Intermediate Bond Index | → | Fidelity U.S. Bond Index Fund |
| Vanguard Mid Cap Index | → | T.Rowe Price Mid-Cap Value Fund |
| Vanguard Prime Money Market | → | INVESCO Stable Value Trust Fund |
| Vanguard REIT Index[4] | → | T.Rowe Price Mid-Cap Value Fund |
| Vanguard Short-Term Bond Index | → | INVESCO Stable Value Trust Fund |
| Vanguard Short-Term Federal Fund | → | INVESCO Stable Value Trust Fund |
| Vanguard Small Cap Growth Index | → | Century Small Cap Select Fund – Institutional Class |
| Vanguard Small Cap Index | → | Neuberger Berman Genesis Fund – Investor Class |
| Vanguard Total Bond Market Index | → | Fidelity U.S. Bond Index Fund |
| Vanguard Total Stock Market Index | → | Vanguard Total Stock Market Index Fund Signal™ Shares |

57.7    <u>Outstanding Loans</u>.  Loans with respect to the Transferred Accounts outstanding under the Eagle Energy Plan as of the date of the Merger shall be (i) held by the Trustee as assets of this Plan, (ii) governed by the terms of such loans in effect immediately preceding the Merger, and (iii) treated as loans under this Plan in determining eligibility for future loans under Article XVI.  Notwithstanding the foregoing, repayments of such loans shall be suspended from October 1, 2007 until the first pay date in 2008, at which time the outstanding loan balance shall be reamortized based on the number of loan repayments remaining and the payroll cycle applicable to the Member.

57. 8    <u>Blackout Period and Notice</u>.  To facilitate the Merger and related transactions described above, the Committee shall establish such blackout period or periods as it shall deem necessary or advisable, which may differ as among the various functions to which such periods apply, and shall give such notice or notices as shall be required by Section 101(i) of ERISA and Department of Labor Regulation section 2520.1-101-3.

KL3 2630220.9

<u>Supplement S</u>

<u>TO THE</u>

<u>LEHMAN BROTHERS SAVINGS PLAN</u>

**(Articles 58-60)**

Special Provisions Relating to LightPoint Capital Management, LLC
<u>(including amendment of LightPoint Capital Management, LLC 401(k) Plan)</u>

      This Supplement S (i) provides past service credit for certain employees for service with LightPoint Capital Management, LLC for purposes of eligibility to share in Employer Contributions and for vesting, effective commencing August 26, 2007, and (ii) provides for the merger of the LightPoint Capital Management, LLC 401(k) Plan into this Plan, effective December 10, 2007.  This Supplement, in addition to constituting part of the Lehman Brothers Savings Plan, shall constitute an amendment to the LightPoint Capital Management, LLC 401(k) Plan to the extent necessary to give full effect thereto,

## 58.    **Definitions**

58.1    <u>Special Definitions</u>.  For purposes of this Supplement S:

    58.1.1  "<u>Lehman Asset Management</u>" means Lehman Brothers Asset Management, LLC.

    58.1.2  "<u>LightPoint</u>" means LightPoint Capital Management, LLC a corporation all of whose capital stock was acquired by Lehman Asset Management on August 26, 2007.

    58.1.3  "<u>LightPoint Account</u>" means an account maintained under the LightPoint Plan for a participant (or deceased participant's beneficiary) therein immediately prior to December 10, 2007.

    58.1.4  "<u>LightPoint Plan</u>" means the LightPoint Management, LLC 401(k) Plan as in effect prior to the Merger.

    58.1.5  "<u>LightPoint Trust Fund</u>" means the trust funds maintained under the LightPoint Plan immediately prior to December 10, 2007.

    58.1.6  "<u>LightPoint Employee</u>" means an individual who is employed by LightPoint immediately prior to  August 26, 2007. and is employed by LightPoint or another Employer on August 26, 2007.

    58.1.7  "<u>LightPoint Account Holder</u>" means a participant (or deceased participant's beneficiary) of the LightPoint Plan with an undistributed LightPoint Account immediately prior to December 10, 2007.

    58.1.8  "<u>Merger</u>" means the merger of the LightPoint Plan into the Plan, effective December 10, 2007.

58.1.9 "Transferred Accounts" means the LightPoint Plan Accounts transferred to the Plan pursuant to the Merger.

## 59.    Participation, Past Service Credit, Transfer of Accounts, and Discontinuance of LightPoint Contributions

59.1    Eligibility to Participate.  A LightPoint Employee shall be eligible to become a Participant as of August 26, 2007, provided he or she is then an Employee.

59.2    Membership Based on Transfer of Plan Accounts.  LightPoint Account Holders who have not previously become Participants shall become Members (or, if applicable, Beneficiaries) under the Plan effective December 10, 2007.

59.3    Vesting Service Credit.  A LightPoint Employee's most recent continuous period of service with LightPoint immediately preceding August 26, 2007 shall be treated as service with the Company for purposes of determining such LightPoint Employee's Years of Vesting Service.

59.4    Eligibility for Employer Contribution.  A LightPoint Employee's most recent continuous period of service with LightPoint immediately preceding August 26, 2007, shall be treated as service with the Company in establishing the date he or she completes a Twelve Month Period of Service for purposes of eligibility to share in Employer Contributions for Plan Years ending on or after December 31, 2007.

59.5    Compensation Limit for 2007 Employer Contribution Eligibility.  Eligibility of a LightPoint Employee for an Employer Contribution for the 2007 Plan Year shall be determined based on the aggregate amount of his or her compensation from LightPoint or any other Employer during 2007, including compensation prior to the date of initial eligibility under the Plan.

59.6    LightPoint Plan Superseded.  Effective August 26, 2007, contributions by LightPoint  in respect of elective deferrals and matching contributions by its employees shall be made solely in accordance and subject to all the terms and conditions of the Lehman Brothers Savings Plan (including this Supplement S), in lieu of the LightPoint Plan.

## 60.    Merger and Investment of Transferred LightPoint Accounts

60.1    Vesting.  All Transferred Accounts of LightPoint Employees who are employed by an Employer or an Affiliate on December 10, 2007 shall be fully vested and nonforfeitable as of such date.

60.2    Merger.  Effective as of December 10, 2007, all net assets of the LightPoint Trust Fund shall be transferred to this Plan and the trust thereunder, respectively, and the terms of this Plan shall thereupon supersede in all respects the terms of the LightPoint Plan with respect to the LightPoint Accounts.  Persons having an undistributed interest in the LightPoint Accounts immediately prior to December 10, 2007 shall, on and after December 10, 2007, be entitled to benefits provided solely from this Plan (including this Supplement S), in lieu

of any and all interest which they had or may have had under the LightPoint Plan.  Without limiting the generality of the foregoing, beneficiary designations under the LightPoint Plan shall not apply to the Transferred Accounts, and the Beneficiary with respect thereto shall be determined on and after December 10, 2007 based on designations made by the Member under this Plan (or this Plan's default rules in the absence of such a designation).

60.3    Transfer of LightPoint Trust Fund.  The net assets of the LightPoint Capital Fund attributable to the Transferred Accounts held by the trustees of the LightPoint Trust Fund shall be transferred to the Trustee on December 10, 2007 or as soon as practicable thereafter.  If and to the extent that such transfer is not completed on December 10, 2007, such trustees shall hold such assets, as adjusted for investment gain or loss thereon and expenses attributable thereto, as an additional trustee under this Plan, until such transfer is completed.

60.4    Allocation to Accounts.  Funds transferred to the Trustee pursuant to Section 60.3 in respect of a Member's Transferred Account shall be allocated under the Plan to such Member's existing Member's Account (if any) and otherwise to a Member's Account created for such Member as of the date of transfer.  Within each Member's Account, the portion so transferred attributable to elective deferrals under Section 401(k) of the Code shall be allocated to the Member's Section 401(k) Contributions Account, the portion allocable to matching contributions shall be allocated to the Member's Employer Contributions Account, and the portion allocable to rollover contributions shall be allocated to the Member's Rollover Account.

60.5    Investment of Transferred Accounts.  Funds transferred to the Trustee in respect of a Member's Transferred Account pursuant to Section 60.3 shall initially be invested in accordance with Section 60.6 and shall remain so invested until the end of the blackout period established under Section 60.8 in connection with the Merger.  Thereafter, the Member may change such investments incident to a change made in the investment of his Member's Account in accordance with Section 6.2 of the Plan.

60.6    Fund Mapping.  The following fund mapping shall become effective upon the transfer pursuant to Section 60.3:

| Current Investment Options | | New Investment Options |
|---|---|---|
| American Funds® American Balanced Fund | → | INVESCO Stable Value Trust Fund |
| American Funds® EuroPacific Growth Fund | → | Fidelity Diversified International Fund |
| American Funds® Growth Fund of America | → | Fidelity Large Cap Stock Fund |
| DWS RREEF Real Estate Securities Fund[1] | → | T.Rowe Price Mid Cap Value |
| John Hancock Classic Value – Class A | → | MFS Value – Class A |
| John Hancock Lifestyle Fund – Aggressive Portfolio | → | Fidelity Freedom 2040 Fund® |
| John Hancock Lifestyle Fund – Balanced Portfolio | → | Fidelity Freedom 2010 Fund® |
| John Hancock Lifestyle Fund – Conservative Portfolio | → | INVESCO Stable Value Trust Fund |
| John Hancock Lifestyle Fund – Growth Portfolio | → | Fidelity Freedom 2020 Fund® |
| John Hancock Lifestyle Fund – Moderate | → | INVESCO Stable Value Trust Fund |

KL3 2630220.9

| Current Investment Options | | New Investment Options |
|---|---|---|
| Portfolio | | |
| John Hancock Mid Cap Index Trust | → | Vanguard Total Stock Market Index |
| John Hancock Stable Value Fund | → | INVESCO Stable Value Trust Fund |
| Legg Mason Partners Global High Yield Bond Fund | → | Lehman Brothers High Income Bond Fund – Investor Class |
| Oppenheimer Developing Markets Fund | → | Templeton Developing Markets Trust |
| PIMCO Total Return Fund – Administrative Class | → | PIMCO Total Return Fund – Administrative Class[2] |
| T.Rowe Price Health Sciences Fund | → | Fidelity Select Biotechnology Portfolio |
| Vanguard Energy Fund | → | Neuberger Berman Partners Fund – Investor Class |
| Vanguard Explorer Fund | → | Century Small Cap Select Fund – Institutional Class |

60.7    Outstanding Loans.  Loans with respect to the Transferred Accounts outstanding under the LightPoint Plan as of the date of the Merger shall be (i) held by the Trustee as assets of this Plan, (ii) governed by the terms of such loans in effect immediately preceding the Merger, and (iii) treated as loans under this Plan in determining eligibility for future loans under Article XVI.  Notwithstanding the foregoing, repayments of such loans shall be suspended as of August 26, 2007 until the first pay date in 2008, at which time the outstanding loan balance shall be reamortized based on the number of loan repayments remaining and the payroll cycle applicable to the Member.

60. 8    Blackout Period and Notice.  To facilitate the Merger and related transactions described above, the Committee shall establish such blackout period or periods as it shall deem necessary or advisable, which may differ as among the various functions to which such periods apply, and shall give such notice or notices as shall be required by Section 101(i) of ERISA and Department of Labor Regulation section 2520.1-101-3.

KL3 2630220.9

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
In re                                    :    Chapter 11 Case No.
                                         :
LEHMAN BROTHERS HOLDINGS INC., et al.,   :    08-13555 (JMP)
                                         :
                    Debtors.             :    (Jointly Administered)
-----------------------------------------------------------------x
```

**ORDER GRANTING THE**
**TWO HUNDRED SIXTY-NINTH OMNIBUS**
**OBJECTION TO CLAIMS (NO LIABILITY CLAIMS)**

Upon the two hundred sixty-ninth omnibus objection to claims, dated March 12, 2012 (the "Two Hundred Sixty-Ninth Omnibus Objection to Claims"),[1] of Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator"), as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), pursuant to section 502 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 3007 of the Federal Rules of Bankruptcy Procedure, and this Court's order approving procedures for the filing of omnibus objections to proofs of claim [Docket No. 6664], seeking disallowance and expungement of the No Liability Claims on the basis that LBHI has no liability for such claims, all as more fully described in the Two Hundred Sixty-Ninth Omnibus Objection to Claims; and due and proper notice of the Two Hundred Sixty-Ninth Omnibus Objection to Claims having been provided, and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief requested in the Two Hundred Sixty-Ninth Omnibus Objection to Claims is in the best interests of LBHI, its estate, creditors, and all parties in interest and that the legal and factual bases set forth in the Two

---

[1] Terms not defined herein shall have the same meaning ascribed to them in the Two Hundred Sixty-Ninth Omnibus Objection to Claims.

Hundred Sixty-Ninth Omnibus Objection to Claims establish just cause for the relief granted

herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the relief requested in the Two Hundred Sixty-Ninth Omnibus

Objection to Claims is granted to the extent provided herein; and it is further

ORDERED that pursuant to section 502(b) of the Bankruptcy Code, the claims

listed on Exhibit 1 are disallowed and expunged in their entirety with prejudice; and it is further

ORDERED that the Court-appointed claims agent is authorized to modify the

claims register to reflect this order; and it is further

ORDERED that this Order has no res judicata, estoppel, or other effect on the

validity, allowance, or disallowance of, and all rights to object and defend on any basis are

expressly reserved with respect to any claim listed on Exhibit A annexed to the Two Hundred

Sixty-Ninth Omnibus Objection to Claims that is not listed on Exhibit 1 annexed hereto; and it is

further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: _____, 2012
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

2