**HEARING DATE AND TIME: March 22, 2012 at 10:00 a.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Robert J. Lemons

Attorneys for Lehman Brothers Holdings Inc.
and certain of its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

### REPLY TO RESPONSES OF MARQUETTE FINANCIAL COMPANIES AND HIGHLAND CREDIT STRATEGIES MASTER FUND, L.P. TO THE ONE HUNDRED AND EIGHTY-NINTH OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY REPO CLAIMS)

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI," and the "Plan Administrator"), as Plan

Administrator under the Modified Third Amended Chapter 11 Plan of Lehman Brothers Holdings

Inc. and its Affiliated Debtors (the "Plan") files this omnibus reply (the "Reply") to the responses

(the "Responses") [1] filed by Marquette Financial Companies ("Marquette Financial") and

Highland Credit Strategies Master Fund, L.P. ("Highland Credit" and, together with Marquette

Financial, the "Respondents") opposing the One Hundred and Eighty-Ninth Omnibus Objection to

---

[1] The Responses were filed on the Court's docket as Docket Entries Nos. 20821 and 22051.

US_ACTIVE:\43868086\04\58399.0003

Claims (No Liability Repo Claims) [Docket No. 19870] (the "<u>Omnibus Objection</u>")[2] and

respectfully represents as follows:

## Preliminary Statement

1.      The Omnibus Objection seeks to disallow and expunge the claims of the

Respondents (the "<u>No Liability Repo Claims</u>") on the grounds that Lehman Commercial Paper,

Inc. ("<u>LCPI</u>") is not liable for obligations underlying the No Liability Repo Claims.

Notwithstanding the Respondents' assertions, the No Liability Repo Claims arose from Repo

Transactions entered into between the Respondents and Lehman Brothers Inc. ("<u>LBI</u>") pursuant to

certain master repurchase agreements (the "<u>Master Repo Agreements</u>").  While LCPI may be a

party to the relevant Master Repo Agreements, the No Liability Repo Claims arose from Repo

Transactions under which the only Lehman counterparty was LBI.  Pursuant to the terms of the

Master Repo Agreements with Marquette Financial and Highland Credit, each of which is attached

hereto as **Exhibit A** and **Exhibit B**, only the parties to any particular transaction documented on a

confirmation are liable for the related obligations.

## LCPI is Not Liable Under the Outstanding Claims

2.      The Responses filed by Marquette Financial and Highland Credit

incorrectly assert that the applicable Repo Transactions that have given rise to their respective

claims were entered into with LCPI.  Each Respondent states that it received a trade confirmation

(the "<u>Trade Confirmations</u>") listing Lehman Brothers Global Trading and Finance ("<u>LBGTF</u>") as

the counterparty to the Repo Transaction.  Without any basis or evidence but rather on mere

conjecture, the Respondents allege that LBGTF is a "trade name" for LCPI and, therefore, LCPI is

liable for all obligations arising under such Repo Transactions.

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Omnibus Objection.

3.      As set forth in more detail in the Omnibus Objection, while LCPI is a party to the Master Repo Agreements, all Repo Transactions occurred solely with LBI, therefore, LCPI is not liable for any claims arising under such transactions.  LCPI does not have anything in its records indicating that LBGTF is a trade name for LCPI.  Conversely, Lehman's records indicate that these Repo Transactions were entered into by LBI.  Under the "Company/Ledger" code, Marquette Financial's Trade Confirmation lists "G4SK" and Highland Credit's Trade Confirmation lists "G422".  The "Company/Ledger" code is an internal code used by Lehman entities on Trade Confirmations to identify the Lehman entity that had engaged in a Repo Transaction.  On information and belief, all codes that start with the letter "G", including codes "G4SK" and "G422", are codes that were used company-wide to identify LBI when it was a counterparty to a Repo Transaction.  A list of the "Company/Ledger" codes is  attached hereto as **Exhibit C**.

4.      The "Trading Account Maintenance" statements attached hereto as **Exhibit D** and **E** (the "Trading Account Maintenance Statements"), which are the only records that LCPI has in its possession identifying the Repo Transactions conducted with Marquette Financial and Highland Credit, also lists "G4SK" and "G422" as the code for the entity that entered into the Repo Transactions.  Therefore, according to both the Respondents' and LCPI's books and records, LBI is the party obligated for liabilities, if any, arising under the Master Repo Agreements with the Respondents.

5.      A filed proof of claim is "deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  If an objection refuting at least one of the claim's essential allegations is asserted, the claimant has the burden to demonstrate the validity of the claim.  *See In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009) ("The burden … shifts to the claimant

if the objector produces 'evidence equal in force to the prima facie case … which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.'") (citation omitted); *In re Adelphia Commc'ns Corp.*, Ch. 11 Case No. 02-41729 (REG), 2007 Bankr. LEXIS 660 at *15 (Bankr. S.D.N.Y. Feb. 20, 2007) ("If the objecting party rebuts the claimant's *prima facie* case, 'it is for the claimant to prove his claim, not for the objector to disprove it.'") (citation omitted); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000) ("Once an objectant offers sufficient evidence to overcome the prima facie validity of the claim, the claimant is required to meet the usual burden of proof to establish the validity of the claim.").

6.      LCPI has met its burden of persuasion to overcome the *prima facie* validity of the Outstanding Claims.  *See*, *e.g.*, *In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009).  Neither of the Respondents has refuted LCPI's objection with sufficient evidence to allow their claim.  Therefore, the Reponses do not have merit and should be overruled, and the Outstanding Claims should be disallowed and expunged in full.

## **Conclusion**

WHEREFORE, for the reasons set forth above and in the Omnibus Objection, the

Debtors respectfully request that the Court enter an order disallowing and expunging the

Outstanding Claims, along with all of the No Liability Repo Claims, in their entirety and grant

such other and further relief as the Court may deem just and appropriate.

Dated:  March 15, 2012
      New York, New York

                      /s/ Robert J. Lemons
                      Robert J. Lemons

                      WEIL, GOTSHAL & MANGES LLP
                      767 Fifth Avenue
                      New York, New York  10153
                      Telephone:  (212) 310-8000
                      Facsimile:  (212) 310-8007

                      Attorneys for Lehman Brothers Holdings
                      Inc. and certain of its Affiliates

## **Exhibit A**

Master Repurchase Agreement with Marquette Financial Companies

EXHIBIT A



# Master Repurchase Agreement

September 1996 Version

Dated as of **September 8, 2004**

Between: **Lehman Brothers Inc.**
**Lehman Commercial Paper Inc.**

and **Marquette Financial Companies**

## 1. Applicability

From time to time the parties hereto may enter into transactions in which one party ("Seller") agrees to transfer to the other ("Buyer") securities or other assets ("Securities") against the transfer of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such Securities at a date certain or on demand, against the transfer of funds by Seller. Each such transaction shall be referred to herein as a "Transaction" and, unless otherwise agreed in writing, shall be governed by this Agreement, including any supplemental terms or conditions contained in Annex I hereto and in any other annexes identified herein or therein as applicable hereunder.

## 2. Definitions

(a) "Act of Insolvency", with respect to any party, (i) the commencement by such party as debtor of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency or similar law, or such party seeking the appointment or election of a receiver, conservator, trustee, custodian or similar official for such party or any substantial part of its property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the commencement of any such case or proceeding against such party, or another seeking such an appointment or election, or the filing against a party of an application for a protective decree under the provisions of the Securities Investor Protection Act of 1970, which (A) is consented to or not timely contested by such party, (B) results in the entry of an order for relief, such an appointment or election, the issuance of such a protective decree or the entry of an order having a similar effect, or (C) is not dismissed within 15 days, (iii) the making by such party of a general assignment for the benefit of creditors, or (iv) the admission in writing by such party of such party's inability to pay such party's debts as they become due;

(b) "Additional Purchased Securities", Securities provided by Seller to Buyer pursuant to Paragraph 4(a) hereof;

(c) "Buyer's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(d) "Buyer's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Seller's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction;

(e) "Confirmation", the meaning specified in Paragraph 3(b) hereof;

(f) "Income", with respect to any Security at any time, any principal thereof and all interest, dividends or other distributions thereon;

(g) "Margin Deficit", the meaning specified in Paragraph 4(a) hereof;

(h) "Margin Excess", the meaning specified in Paragraph 4(b) hereof;

(i) "Margin Notice Deadline", the time agreed to by the parties in the relevant Confirmation, Annex I hereto or otherwise as the deadline for giving notice requiring same-day satisfaction of margin maintenance obligations as provided in Paragraph 4 hereof (or, in the absence of any such agreement, the deadline for such purposes established in accordance with market practice);

(j) "Market Value", with respect to any Securities as of any date, the price for such Securities on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein (other than any Income credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) as of such date (unless contrary to market practice for such Securities);

(k) "Price Differential", with respect to any Transaction as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction on a 360 day per year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the date of determination (reduced by any amount of such Price Differential previously paid by Seller to Buyer with respect to such Transaction);

(l) "Pricing Rate", the per annum percentage rate for determination of the Price Differential;

(m) "Prime Rate", the prime rate of U.S. commercial banks as published in The Wall Street Journal (or, if more than one such rate is published, the average of such rates);

(n) "Purchase Date", the date on which Purchased Securities are to be transferred by Seller to Buyer;

(o) "Purchase Price", (i) on the Purchase Date, the price at which Purchased Securities are transferred by Seller to Buyer, and (ii) thereafter, except where Buyer and Seller agree otherwise, such price increased by the amount of any cash transferred by Buyer to Seller pursuant to Paragraph 4(b) hereof and decreased by the amount of any cash transferred by Seller to Buyer pursuant to Paragraph 4(a) hereof or applied to reduce Seller's obligations under clause (ii) of Paragraph 5 hereof;

(p) "Purchased Securities", the Securities transferred by Seller to Buyer in a Transaction hereunder, and any Securities substituted therefor in accordance with Paragraph 9 hereof. The term "Purchased Securities" with respect to any Transaction at any time also shall include Additional Purchased Securities delivered pursuant to Paragraph 4(a) hereof and shall exclude Securities returned pursuant to Paragraph 4(b) hereof;

(q) "Repurchase Date", the date on which Seller is to repurchase the Purchased Securities from Buyer, including any date determined by application of the provisions of Paragraph 3(c) or 11 hereof;

(r) "Repurchase Price", the price at which Purchased Securities are to be transferred from Buyer to Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price and the Price Differential as of the date of such determination;

(s) "Seller's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Seller's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(t) "Seller's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Buyer's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction.

## 3. Initiation; Confirmation; Termination

(a) An agreement to enter into a Transaction may be made orally or in writing at the initiation of either Buyer or Seller. On the Purchase Date for the Transaction, the Purchased Securities shall be transferred to Buyer or its agent against the transfer of the Purchase Price to an account of Seller.

(b) Upon agreeing to enter into a Transaction hereunder, Buyer or Seller (or both), as shall be agreed, shall promptly deliver to the other party a written confirmation of each Transaction (a "Confirmation"). The Confirmation shall describe the Purchased Securities (including CUSIP number, if any), identify Buyer and Seller and set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date, unless the Transaction is to be terminable on demand, (iv) the Pricing Rate or Repurchase Price applicable to the Transaction, and (v) any additional terms or conditions of the Transaction not inconsistent with this Agreement. The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and Seller with respect to the Transaction to which the Confirmation relates, unless with

respect to the Confirmation specific objection is made promptly after receipt thereof. In the event of any conflict between the terms of such Confirmation and this Agreement, this Agreement shall prevail.

(c) In the case of Transactions terminable upon demand, such demand shall be made by Buyer or Seller, no later than such time as is customary in accordance with market practice, by telephone or otherwise on or prior to the business day on which such termination will be effective. On the date specified in such demand, or on the date fixed for termination in the case of Transactions having a fixed term, termination of the Transaction will be effected by transfer to Seller or its agent of the Purchased Securities and any Income in respect thereof received by Buyer (and not previously credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) against the transfer of the Repurchase Price to an account of Buyer.

## 4. Margin Maintenance

(a) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer is less than the aggregate Buyer's Margin Amount for all such Transactions (a "Margin Deficit"), then Buyer may by notice to Seller require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional Securities reasonably acceptable to Buyer ("Additional Purchased Securities"), so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller).

(b) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Seller exceeds the aggregate Seller's Margin Amount for all such Transactions at such time (a "Margin Excess"), then Seller may by notice to Buyer require Buyer in such Transactions, at Buyer's option, to transfer cash or Purchased Securities to Seller, so that the aggregate Market Value of the Purchased Securities, after deduction of any such cash or any Purchased Securities so transferred, will thereupon not exceed such aggregate Seller's Margin Amount (increased by the amount of any Margin Excess as of such date arising from any Transactions in which such Seller is acting as Buyer).

(c) If any notice is given by Buyer or Seller under subparagraph (a) or (b) of this Paragraph at or before the Margin Notice Deadline on any business day, the party receiving such notice shall transfer cash or Additional Purchased Securities as provided in such subparagraph no later than the close of business in the relevant market on such day. If any such notice is given after the Margin Notice Deadline, the party receiving such notice shall transfer such cash or Securities no later than the close of business in the relevant market on the next business day following such notice.

(d) Any cash transferred pursuant to this Paragraph shall be attributed to such Transactions as shall be agreed upon by Buyer and Seller.

(e) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer or Seller (or both) under subparagraphs (a) and (b) of this Paragraph may be exercised only where a Margin Deficit or Margin Excess, as the case may be, exceeds a specified dollar amount or a specified percentage of the Repurchase Prices for such Transactions (which amount or percentage shall be agreed to by Buyer and Seller prior to entering into any such Transactions).

(f) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer and Seller under subparagraphs (a) and (b) of this Paragraph to require the elimination of a Margin Deficit or a Margin Excess, as the case may be, may be exercised whenever such a Margin Deficit or Margin Excess exists with respect to any single Transaction hereunder (calculated without regard to any other Transaction outstanding under this Agreement).

## 5. Income Payments

Seller shall be entitled to receive an amount equal to all Income paid or distributed on or in respect of the Securities that is not otherwise received by Seller, to the full extent it would be so entitled if the Securities had not been sold to Buyer. Buyer shall, as the parties may agree with respect to any Transaction (or, in the absence of any such agreement, as Buyer shall reasonably determine in its discretion), on the date such Income is paid or distributed either (i) transfer to or credit to the account of Seller such Income with respect to any Purchased Securities subject to such Transaction or (ii) with respect to Income paid in cash, apply the Income payment or payments to reduce the amount, if any, to be transferred to Buyer by Seller upon termination of such Transaction. Buyer shall not be obligated to take any action pursuant to the preceding sentence (A) to the extent that such action would result in the creation of a Margin Deficit, unless prior thereto or simultaneously therewith Seller transfers to Buyer cash or Additional Purchased Securities sufficient to eliminate such Margin Deficit, or (B) if an Event of Default with respect to Seller has occurred and is then continuing at the time such Income is paid or distributed.

## 6. Security Interest

Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, Seller shall be deemed to have pledged to Buyer as security for the performance by Seller of its obligations under each such Transaction, and shall be deemed to have granted to Buyer a security interest in, all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof.

## 7. Payment and Transfer

Unless otherwise mutually agreed, all transfers of funds hereunder shall be in immediately available funds. All Securities transferred by one party hereto to the other party (i) shall be in suitable form for transfer or shall be accompanied by duly executed instruments of transfer or assignment in blank and such other documentation as the party receiving possession may reasonably request, (ii) shall be transferred on the book-entry system of a Federal Reserve Bank, or (iii) shall be transferred by any other method mutually acceptable to Seller and Buyer.

8. **Segregation of Purchased Securities**

To the extent required by applicable law, all Purchased Securities in the possession of Seller shall be segregated from other securities in its possession and shall be identified as subject to this Agreement. Segregation may be accomplished by appropriate identification on the books and records of the holder, including a financial or securities intermediary or a clearing corporation. All of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities, but no such transaction shall relieve Buyer of its obligations to transfer Purchased Securities to Seller pursuant to Paragraph 3, 4 or 11 hereof, or of Buyer's obligation to credit or pay Income to, or apply Income to the obligations of, Seller pursuant to Paragraph 5 hereof.

---

**Required Disclosure for Transactions in Which the Seller Retains Custody of the Purchased Securities**

Seller is not permitted to substitute other securities for those subject to this Agreement and therefore must keep Buyer's securities segregated at all times, unless in this Agreement Buyer grants Seller the right to substitute other securities. If Buyer grants the right to substitute, this means that Buyer's securities will likely be commingled with Seller's own securities during the trading day. Buyer is advised that, during any trading day that Buyer's securities are commingled with Seller's securities, they [will]* [may]** be subject to liens granted by Seller to [its clearing bank]* [third parties]** and may be used by Seller for deliveries on other securities transactions. Whenever the securities are commingled, Seller's ability to resegregate substitute securities for Buyer will be subject to Seller's ability to satisfy [the clearing]* [any]** lien or to obtain substitute securities.

\* Language to be used under 17 C.F.R. ß403.4(e) if Seller is a government securities broker or dealer other than a financial institution.
\*\* Language to be used under 17 C.F.R. ß403.5(d) if Seller is a financial institution.

---

9. **Substitution**

(a) Seller may, subject to agreement with and acceptance by Buyer, substitute other Securities for any Purchased Securities. Such substitution shall be made by transfer to Buyer of such other Securities and transfer to Seller of such Purchased Securities. After substitution, the substituted Securities shall be deemed to be Purchased Securities.

(b) In Transactions in which Seller retains custody of Purchased Securities, the parties expressly agree that Buyer shall be deemed, for purposes of subparagraph (a) of this Paragraph, to have agreed to and accepted in this Agreement substitution by Seller of other Securities for Purchased Securities; provided, however, that such other Securities shall have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.

## 10. Representations

Each of Buyer and Seller represents and warrants to the other that (i) it is duly authorized to execute and deliver this Agreement, to enter into Transactions contemplated hereunder and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery and performance, (ii) it will engage in such Transactions as principal (or, if agreed in writing, in the form of an annex hereto or otherwise, in advance of any Transaction by the other party hereto, as agent for a disclosed principal), (iii) the person signing this Agreement on its behalf is duly authorized to do so on its behalf (or on behalf of any such disclosed principal), (iv) it has obtained all authorizations of any governmental body required in connection with this Agreement and the Transactions hereunder and such authorizations are in full force and effect and (v) the execution, delivery and performance of this Agreement and the Transactions hereunder will not violate any law, ordinance, charter, by-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected. On the Purchase Date for any Transaction Buyer and Seller shall each be deemed to repeat all the foregoing representations made by it.

## 11. Events of Default

In the event that (i) Seller fails to transfer or Buyer fails to purchase Purchased Securities upon the applicable Purchase Date, (ii) Seller fails to repurchase or Buyer fails to transfer Purchased Securities upon the applicable Repurchase Date, (iii) Seller or Buyer fails to comply with Paragraph 4 hereof, (iv) Buyer fails, after one business day's notice, to comply with Paragraph 5 hereof, (v) an Act of Insolvency occurs with respect to Seller or Buyer, (vi) any representation made by Seller or Buyer shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, or (vii) Seller or Buyer shall admit to the other its inability to, or its intention not to, perform any of its obligations hereunder (each an "Event of Default"):

(a) The nondefaulting party may, at its option (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), declare an Event of Default to have occurred hereunder and, upon the exercise or deemed exercise of such option, the Repurchase Date for each Transaction hereunder shall, if it has not already occurred, be deemed immediately to occur (except that, in the event that the Purchase Date for any Transaction has not yet occurred as of the date of such exercise or deemed exercise, such Transaction shall be deemed immediately canceled). The nondefaulting party shall (except upon the occurrence of an Act of Insolvency) give notice to the defaulting party of the exercise of such option as promptly as practicable.

(b) In all Transactions in which the defaulting party is acting as Seller, if the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, (i) the defaulting party's obligations in such Transactions to repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase Date determined in accordance with subparagraph (a) of this Paragraph, shall thereupon become immediately due and payable, (ii) all Income paid after such exercise or deemed exercise shall be retained by the nondefaulting party and applied to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder, and (iii) the defaulting party shall immediately deliver to the nondefaulting party any Purchased Securities subject to such Transactions then in the defaulting party's possession or control.

(c) In all Transactions in which the defaulting party is acting as Buyer, upon tender by the nondefaulting party of payment of the aggregate Repurchase Prices for all such Transactions, all right, title and interest in and entitlement to all Purchased Securities subject to such Transactions shall be deemed transferred to the nondefaulting party, and the defaulting party shall deliver all such Purchased Securities to the nondefaulting party.

(d) If the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, the nondefaulting party, without prior notice to the defaulting party, may:

(i) as to Transactions in which the defaulting party is acting as Seller, (A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source, against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder; and

(ii) as to Transactions in which the defaulting party is acting as Buyer, (A) immediately purchase, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, securities ("Replacement Securities") of the same class and amount as any Purchased Securities that are not delivered by the defaulting party to the nondefaulting party as required hereunder or (B) in its sole discretion elect, in lieu of purchasing Replacement Securities, to be deemed to have purchased Replacement Securities at the price therefor on such date, obtained from a generally recognized source or the most recent closing offer quotation from such a source.

Unless otherwise provided in Annex I, the parties acknowledge and agree that (1) the Securities subject to any Transaction hereunder are instruments traded in a recognized market, (2) in the absence of a generally recognized source for prices or bid or offer quotations for any Security, the nondefaulting party may establish the source therefor in its sole discretion and (3) all prices, bids and offers shall be determined together with accrued Income (except to the extent contrary to market practice with respect to the relevant Securities).

(e) As to Transactions in which the defaulting party is acting as Buyer, the defaulting party shall be liable to the nondefaulting party for any excess of the price paid (or deemed paid) by the nondefaulting party for Replacement Securities over the Repurchase Price for the Purchased Securities replaced thereby and for any amounts payable by the defaulting party under Paragraph 5 hereof or otherwise hereunder.

(f) For purposes of this Paragraph 11, the Repurchase Price for each Transaction hereunder in respect of which the defaulting party is acting as Buyer shall not increase above the

amount of such Repurchase Price for such Transaction determined as of the date of the exercise or deemed exercise by the nondefaulting party of the option referred to in sub-paragraph (a) of this Paragraph.

(g)  The defaulting party shall be liable to the nondefaulting party for (i) the amount of all reasonable legal or other expenses incurred by the nondefaulting party in connection with or as a result of an Event of Default, (ii) damages in an amount equal to the cost (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of an Event of Default, and (iii) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default in respect of a Transaction.

(h)  To the extent permitted by applicable law, the defaulting party shall be liable to the non-defaulting party for interest on any amounts owing by the defaulting party hereunder, from the date the defaulting party becomes liable for such amounts hereunder until such amounts are (i) paid in full by the defaulting party or (ii) satisfied in full by the exercise of the nondefaulting party's rights hereunder. Interest on any sum payable by the default-ing party to the nondefaulting party under this Paragraph 11(h) shall be at a rate equal to the greater of the Pricing Rate for the relevant Transaction or the Prime Rate.

(i)  The nondefaulting party shall have, in addition to its rights hereunder, any rights other-wise available to it under any other agreement or applicable law.

## 12. Single Agreement

Buyer and Seller acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, each of Buyer and Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the perfor-mance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder and (iii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.

## 13. Notices and Other Communications

Any and all notices, statements, demands or other communications hereunder may be given by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the address specified in Annex II hereto, or so sent to such party at any other place specified in a notice of change of address hereafter received by the other. All notices, demands and requests hereun-der may be made orally, to be confirmed promptly in writing, or by other communication as specified in the preceding sentence.

## 14. Entire Agreement; Severability

This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions. Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

## 15. Non-assignability; Termination

(a) The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by either party without the prior written consent of the other party, and any such assignment without the prior written consent of the other party shall be null and void. Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. This Agreement may be terminated by either party upon giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

(b) Subparagraph (a) of this Paragraph 15 shall not preclude a party from assigning, charging or otherwise dealing with all or any part of its interest in any sum payable to it under Paragraph 11 hereof.

## 16. Governing Law

This Agreement shall be governed by the laws of the State of New York without giving effect to the conflict of law principles thereof.

## 17. No Waivers, Etc.

No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure herefrom shall be effective unless and until such shall be in writing and duly executed by both of the parties hereto. Without limitation on any of the foregoing, the failure to give a notice pursuant to Paragraph 4(a) or 4(b) hereof will not constitute a waiver of any right to do so at a later date.

## 18. Use of Employee Plan Assets

(a) If assets of an employee benefit plan subject to any provision of the Employee Retirement Income Security Act of 1974 ("ERISA") are intended to be used by either party hereto (the "Plan Party") in a Transaction, the Plan Party shall so notify the other party prior to the Transaction. The Plan Party shall represent in writing to the other party that the Transaction does not constitute a prohibited transaction under ERISA or is otherwise exempt therefrom, and the other party may proceed in reliance thereon but shall not be required so to proceed.

(b) Subject to the last sentence of subparagraph (a) of this Paragraph, any such Transaction shall proceed only if Seller furnishes or has furnished to Buyer its most recent available audited statement of its financial condition and its most recent subsequent unaudited statement of its financial condition.

(c) By entering into a Transaction pursuant to this Paragraph, Seller shall be deemed (i) to represent to Buyer that since the date of Seller's latest such financial statements, there has been no material adverse change in Seller's financial condition which Seller has not dis-closed to Buyer, and (ii) to agree to provide Buyer with future audited and unaudited statements of its financial condition as they are issued, so long as it is a Seller in any out-standing Transaction involving a Plan Party.

## 19. Intent

(a) The parties recognize that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Securities subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended (except insofar as the type of assets subject to such Transaction would render such definition inapplica-ble).

(b) It is understood that either party's right to liquidate Securities delivered to it in connec-tion with Transactions hereunder or to exercise any other remedies pursuant to Paragraph 11 hereof is a contractual right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as amended.

(c) The parties agree and acknowledge that if a party hereto is an "insured depository insti-tution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract," as that term is defined in FDIA and any rules, orders or policy statements thereunder (except insofar as the type of assets subject to such Transaction would render such definition inapplica-ble).

(d) It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation", respectively, as defined in and subject to FDI-CIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA).

## 20. Disclosure Relating to Certain Federal Protections

The parties acknowledge that they have been advised that:

(a) in the case of Transactions in which one of the parties is a broker or dealer registered with the Securities and Exchange Commission ("SEC") under Section 15 of the Securities Exchange Act of 1934 ("1934 Act"), the Securities Investor Protection Corporation has

taken the position that the provisions of the Securities Investor Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(b) in the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(c) in the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.

**Lehman Brothers Inc.**
**Lehman Commercial Paper Inc.**            **Marquette Financial Companies**

By: _____            By: _____

Name: _____            Name: _____

Title: _____            Title: _____

Date: _____            Date: _____

**ANNEX I**
**Supplemental Terms and Conditions**

This Annex forms a part of the Master Repurchase Agreement dated as of September 8, 2004 (the "Agreement") between Lehman Brothers Inc., Lehman Commercial Paper Inc., and **Marquette Financial Companies.**

Capitalized terms used but not defined in this Annex I shall have the meanings ascribed to them in the Agreement.

1.  In addition to this Annex I, Annex II shall be deemed executed by the parties hereto and shall also form a part of the Agreement.

2.  With respect to individual repurchase transactions, this Agreement shall only apply to the Lehman Brothers entity (i.e. Lehman Brothers Inc., Lehman Commercial Paper Inc.) printed in the confirmation (as described in Section 3(b) herein) provided to the counterparty of the Lehman Brothers entity.

3.  Definitions. For purposes of the Agreement, the following terms shall have the following meanings:
    (a) "Margin Notice Deadline", 10:00 am New York City time.
    (b) "Business Day" or "business day", with respect to any Transaction hereunder, a day on which regular trading may occur in the principal market for the Purchased Securities subject to such Transaction. In no event shall a Saturday or Sunday be considered a business day.

4.  Purchase Price Maintenance.
    (a) Unless otherwise expressly agreed by the parties hereto, the parties agree that in any Transaction hereunder whose term extends over an Income payment date for the Securities subject to such Transaction, Buyer shall on the date such Income is paid transfer to or credit to the account of Seller an amount equal to such Income payment or payments pursuant to Paragraph 5(i) and shall not apply the Income payment or payments to reduce the amount to be transferred to Buyer or Seller upon termination of the Transaction pursuant to Paragraph 5(ii) of the Agreement.

    (b) Unless otherwise expressly agreed by the parties hereto, notwithstanding the definition of Purchase Price in Paragraph 2 of the Agreement and the provisions of Paragraph 4 of the Agreement, the parties agree (i) that the Purchase Price will not be increased or decreased by the amount of any cash transferred by one party to the other pursuant to Paragraph 4 of the Agreement and (ii) that transfer of cash shall be treated as if it constituted a transfer of Securities (with a Market Value equal to the U.S. dollar amount of such cash) pursuant to Paragraph 4(a) or (b), as the case may be (including for purposes of the definition of "Additional Purchased Securities").

5.  Submission to Jurisdiction; Waiver of Immunity; Waiver of Jury Trial.
    (a) Each party irrevocably and unconditionally (i) submits to the non-exclusive jurisdiction of any United States Federal or New York State court sitting in Manhattan, and any appellate court from any such court, solely for the purpose of any suit, action or proceeding brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement and (ii) waives, to the fullest extent it may effectively do so, any defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right of jurisdiction on account of its place of residence or domicile.

    (b) To the extent that either party has or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit, or proceeding, from jurisdiction of any court or from set off or any legal process (whether service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) with respect to itself or any of its property, such party hereby irrevocably waives and agrees not to plead or claim such immunity in respect of any action brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement.

    (c) Each party hereto hereby irrevocably waives any right that it may have to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or the Transactions contemplated hereby.

Annex II
Names and Addresses for Communications Between Parties

LEHMAN BROTHERS
745 Seventh Avenue, 28th Floor
New York, New York  10019

Attn.:  Robert Guglielmo, Senior Vice President
Transaction Management
(212) 526-7121  phone
(212) 526-7672 fax

Legal/Documentation Information:

Name of Firm:        _____

Address:        _____

_____

_____

Attn        _____

Tel #:        _____

Fax #:        _____

Business/Trading Information:

Name of Firm:        MarqBank Division of Meridian Bank

Address:        2220 San Jacinto Blvd.

Suite 230

Denton, Texas 87205

Attn:        William E. Bonds

Tel #:        940-566-0017

Fax #:        940-387-1416

E-mail:        Bill.bonds@marqbank.com

AnnexII_745-28_8-02

Annex  II-1

## **Exhibit B**

Master Repurchase Agreement with Highland Credit Strategies Master Fund, L.P.



# Master Repurchase Agreement

September 1996 Version

Dated as of     October 1, 2007

Between:    **Lehman Brothers Inc.**
**Lehman Commercial Paper Inc.**

and          **Highland Credit Strategies Master Fund, L.P.**

## 1. Applicability

From time to time the parties hereto may enter into transactions in which one party ("Seller") agrees to transfer to the other ("Buyer") securities or other assets ("Securities") against the transfer of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such Securities at a date certain or on demand, against the transfer of funds by Seller. Each such transaction shall be referred to herein as a "Transaction" and, unless otherwise agreed in writing, shall be governed by this Agreement, including any supplemental terms or conditions contained in Annex I hereto and in any other annexes identified herein or therein as applicable hereunder.

## 2. Definitions

(a) "Act of Insolvency", with respect to any party, (i) the commencement by such party as debtor of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency or similar law, or such party seeking the appointment or election of a receiver, conservator, trustee, custodian or similar official for such party or any substantial part of its property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the commencement of any such case or proceeding against such party, or another seeking such an appointment or election, or the filing against a party of an application for a protective decree under the provisions of the Securities Investor Protection Act of 1970, which (A) is consented to or not timely contested by such party, (B) results in the entry of an order for relief, such an appointment or election, the issuance of such a protective decree or the entry of an order having a similar effect, or (C) is not dismissed within 15 days, (iii) the making by such party of a general assignment for the benefit of creditors, or (iv) the admission in writing by such party of such party's inability to pay such party's debts as they become due;

(b) "Additional Purchased Securities", Securities provided by Seller to Buyer pursuant to Paragraph 4(a) hereof;

(c) "Buyer's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(d) "Buyer's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Seller's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction;

(e) "Confirmation", the meaning specified in Paragraph 3(b) hereof;

(f) "Income", with respect to any Security at any time, any principal thereof and all interest, dividends or other distributions thereon;

(g) "Margin Deficit", the meaning specified in Paragraph 4(a) hereof;

(h) "Margin Excess", the meaning specified in Paragraph 4(b) hereof;

(i) "Margin Notice Deadline", the time agreed to by the parties in the relevant Confirmation, Annex I hereto or otherwise as the deadline for giving notice requiring same-day satisfaction of margin maintenance obligations as provided in Paragraph 4 hereof (or, in the absence of any such agreement, the deadline for such purposes established in accordance with market practice);

(j) "Market Value", with respect to any Securities as of any date, the price for such Securities on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein (other than any Income credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) as of such date (unless contrary to market practice for such Securities);

(k) "Price Differential", with respect to any Transaction as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction on a 360 day per year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the date of determination (reduced by any amount of such Price Differential previously paid by Seller to Buyer with respect to such Transaction);

(l) "Pricing Rate", the per annum percentage rate for determination of the Price Differential;

(m) "Prime Rate", the prime rate of U.S. commercial banks as published in The Wall Street Journal (or, if more than one such rate is published, the average of such rates);

(n) "Purchase Date", the date on which Purchased Securities are to be transferred by Seller to Buyer;

(o) "Purchase Price", (i) on the Purchase Date, the price at which Purchased Securities are transferred by Seller to Buyer, and (ii) thereafter, except where Buyer and Seller agree otherwise, such price increased by the amount of any cash transferred by Buyer to Seller pursuant to Paragraph 4(b) hereof and decreased by the amount of any cash transferred by Seller to Buyer pursuant to Paragraph 4(a) hereof or applied to reduce Seller's obligations under clause (ii) of Paragraph 5 hereof;

(p) "Purchased Securities", the Securities transferred by Seller to Buyer in a Transaction hereunder, and any Securities substituted therefor in accordance with Paragraph 9 hereof. The term "Purchased Securities" with respect to any Transaction at any time also shall include Additional Purchased Securities delivered pursuant to Paragraph 4(a) hereof and shall exclude Securities returned pursuant to Paragraph 4(b) hereof;

(q) "Repurchase Date", the date on which Seller is to repurchase the Purchased Securities from Buyer, including any date determined by application of the provisions of Paragraph 3(c) or 11 hereof;

(r) "Repurchase Price", the price at which Purchased Securities are to be transferred from Buyer to Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price and the Price Differential as of the date of such determination;

(s) "Seller's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Seller's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(t) "Seller's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Buyer's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction.

## 3. Initiation; Confirmation; Termination

(a) An agreement to enter into a Transaction may be made orally or in writing at the initiation of either Buyer or Seller. On the Purchase Date for the Transaction, the Purchased Securities shall be transferred to Buyer or its agent against the transfer of the Purchase Price to an account of Seller.

(b) Upon agreeing to enter into a Transaction hereunder, Buyer or Seller (or both), as shall be agreed, shall promptly deliver to the other party a written confirmation of each Transaction (a "Confirmation"). The Confirmation shall describe the Purchased Securities (including CUSIP number, if any), identify Buyer and Seller and set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date, unless the Transaction is to be terminable on demand, (iv) the Pricing Rate or Repurchase Price applicable to the Transaction, and (v) any additional terms or conditions of the Transaction not inconsistent with this Agreement. The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and Seller with respect to the Transaction to which the Confirmation relates, unless with

respect to the Confirmation specific objection is made promptly after receipt thereof. In the event of any conflict between the terms of such Confirmation and this Agreement, this Agreement shall prevail.

(c)  In the case of Transactions terminable upon demand, such demand shall be made by Buyer or Seller, no later than such time as is customary in accordance with market practice, by telephone or otherwise on or prior to the business day on which such termination will be effective. On the date specified in such demand, or on the date fixed for termination in the case of Transactions having a fixed term, termination of the Transaction will be effected by transfer to Seller or its agent of the Purchased Securities and any Income in respect thereof received by Buyer (and not previously credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) against the transfer of the Repurchase Price to an account of Buyer.

## 4.  Margin Maintenance

(a)  If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer is less than the aggregate Buyer's Margin Amount for all such Transactions (a "Margin Deficit"), then Buyer may by notice to Seller require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional Securities reasonably acceptable to Buyer ("Additional Purchased Securities"), so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller).

(b)  If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Seller exceeds the aggregate Seller's Margin Amount for all such Transactions at such time (a "Margin Excess"), then Seller may by notice to Buyer require Buyer in such Transactions, at Buyer's option, to transfer cash or Purchased Securities to Seller, so that the aggregate Market Value of the Purchased Securities, after deduction of any such cash or any Purchased Securities so transferred, will thereupon not exceed such aggregate Seller's Margin Amount (increased by the amount of any Margin Excess as of such date arising from any Transactions in which such Seller is acting as Buyer).

(c)  If any notice is given by Buyer or Seller under subparagraph (a) or (b) of this Paragraph at or before the Margin Notice Deadline on any business day, the party receiving such notice shall transfer cash or Additional Purchased Securities as provided in such subparagraph no later than the close of business in the relevant market on such day. If any such notice is given after the Margin Notice Deadline, the party receiving such notice shall transfer such cash or Securities no later than the close of business in the relevant market on the next business day following such notice.

(d)  Any cash transferred pursuant to this Paragraph shall be attributed to such Transactions as shall be agreed upon by Buyer and Seller.

(e) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer or Seller (or both) under subparagraphs (a) and (b) of this Paragraph may be exercised only where a Margin Deficit or Margin Excess, as the case may be, exceeds a specified dollar amount or a specified percentage of the Repurchase Prices for such Transactions (which amount or percentage shall be agreed to by Buyer and Seller prior to entering into any such Transactions).

(f) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer and Seller under subparagraphs (a) and (b) of this Paragraph to require the elimination of a Margin Deficit or a Margin Excess, as the case may be, may be exercised whenever such a Margin Deficit or Margin Excess exists with respect to any single Transaction hereunder (calculated without regard to any other Transaction outstanding under this Agreement).

## 5. Income Payments

Seller shall be entitled to receive an amount equal to all Income paid or distributed on or in respect of the Securities that is not otherwise received by Seller, to the full extent it would be so entitled if the Securities had not been sold to Buyer. Buyer shall, as the parties may agree with respect to any Transaction (or, in the absence of any such agreement, as Buyer shall reasonably determine in its discretion), on the date such Income is paid or distributed either (i) transfer to or credit to the account of Seller such Income with respect to any Purchased Securities subject to such Transaction or (ii) with respect to Income paid in cash, apply the Income payment or payments to reduce the amount, if any, to be transferred to Buyer by Seller upon termination of such Transaction. Buyer shall not be obligated to take any action pursuant to the preceding sentence (A) to the extent that such action would result in the creation of a Margin Deficit, unless prior thereto or simultaneously therewith Seller transfers to Buyer cash or Additional Purchased Securities sufficient to eliminate such Margin Deficit, or (B) if an Event of Default with respect to Seller has occurred and is then continuing at the time such Income is paid or distributed.

## 6. Security Interest

Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, Seller shall be deemed to have pledged to Buyer as security for the performance by Seller of its obligations under each such Transaction, and shall be deemed to have granted to Buyer a security interest in, all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof.

## 7. Payment and Transfer

Unless otherwise mutually agreed, all transfers of funds hereunder shall be in immediately available funds. All Securities transferred by one party hereto to the other party (i) shall be in suitable form for transfer or shall be accompanied by duly executed instruments of transfer or assignment in blank and such other documentation as the party receiving possession may reasonably request, (ii) shall be transferred on the book-entry system of a Federal Reserve Bank, or (iii) shall be transferred by any other method mutually acceptable to Seller and Buyer.

8. **Segregation of Purchased Securities**

To the extent required by applicable law, all Purchased Securities in the possession of Seller shall be segregated from other securities in its possession and shall be identified as subject to this Agreement. Segregation may be accomplished by appropriate identification on the books and records of the holder, including a financial or securities intermediary or a clearing corporation. All of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities, but no such transaction shall relieve Buyer of its obligations to transfer Purchased Securities to Seller pursuant to Paragraph 3, 4 or 11 hereof, or of Buyer's obligation to credit or pay Income to, or apply Income to the obligations of, Seller pursuant to Paragraph 5 hereof.

> **Required Disclosure for Transactions in Which the Seller Retains Custody of the Purchased Securities**
>
> Seller is not permitted to substitute other securities for those subject to this Agreement and therefore must keep Buyer's securities segregated at all times, unless in this Agreement Buyer grants Seller the right to substitute other securities. If Buyer grants the right to substitute, this means that Buyer's securities will likely be commingled with Seller's own securities during the trading day. Buyer is advised that, during any trading day that Buyer's securities are commingled with Seller's securities, they [will]* [may]** be subject to liens granted by Seller to [its clearing bank]* [third parties]** and may be used by Seller for deliveries on other securities transactions. Whenever the securities are commingled, Seller's ability to resegregate substitute securities for Buyer will be subject to Seller's ability to satisfy [the clearing]* [any]** lien or to obtain substitute securities.
>
> \* Language to be used under 17 C.F.R. ß403.4(e) if Seller is a government securities broker or dealer other than a financial institution.
> \*\* Language to be used under 17 C.F.R. ß403.5(d) if Seller is a financial institution.

9. **Substitution**

(a) Seller may, subject to agreement with and acceptance by Buyer, substitute other Securities for any Purchased Securities. Such substitution shall be made by transfer to Buyer of such other Securities and transfer to Seller of such Purchased Securities. After substitution, the substituted Securities shall be deemed to be Purchased Securities.

(b) In Transactions in which Seller retains custody of Purchased Securities, the parties expressly agree that Buyer shall be deemed, for purposes of subparagraph (a) of this Paragraph, to have agreed to and accepted in this Agreement substitution by Seller of other Securities for Purchased Securities; provided, however, that such other Securities shall have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.

## 10. Representations

Each of Buyer and Seller represents and warrants to the other that (i) it is duly authorized to execute and deliver this Agreement, to enter into Transactions contemplated hereunder and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery and performance, (ii) it will engage in such Transactions as principal (or, if agreed in writing, in the form of an annex hereto or otherwise, in advance of any Transaction by the other party hereto, as agent for a disclosed principal), (iii) the person signing this Agreement on its behalf is duly authorized to do so on its behalf (or on behalf of any such disclosed principal), (iv) it has obtained all authorizations of any governmental body required in connection with this Agreement and the Transactions hereunder and such authorizations are in full force and effect and (v) the execution, delivery and performance of this Agreement and the Transactions hereunder will not violate any law, ordinance, charter, by-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected. On the Purchase Date for any Transaction Buyer and Seller shall each be deemed to repeat all the foregoing representations made by it.

## 11. Events of Default

In the event that (i) Seller fails to transfer or Buyer fails to purchase Purchased Securities upon the applicable Purchase Date, (ii) Seller fails to repurchase or Buyer fails to transfer Purchased Securities upon the applicable Repurchase Date, (iii) Seller or Buyer fails to comply with Paragraph 4 hereof, (iv) Buyer fails, after one business day's notice, to comply with Paragraph 5 hereof, (v) an Act of Insolvency occurs with respect to Seller or Buyer, (vi) any representation made by Seller or Buyer shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, or (vii) Seller or Buyer shall admit to the other its inability to, or its intention not to, perform any of its obligations hereunder (each an "Event of Default"):

(a) The nondefaulting party may, at its option (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), declare an Event of Default to have occurred hereunder and, upon the exercise or deemed exercise of such option, the Repurchase Date for each Transaction hereunder shall, if it has not already occurred, be deemed immediately to occur (except that, in the event that the Purchase Date for any Transaction has not yet occurred as of the date of such exercise or deemed exercise, such Transaction shall be deemed immediately canceled). The nondefaulting party shall (except upon the occurrence of an Act of Insolvency) give notice to the defaulting party of the exercise of such option as promptly as practicable.

(b) In all Transactions in which the defaulting party is acting as Seller, if the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, (i) the defaulting party's obligations in such Transactions to repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase Date determined in accordance with subparagraph (a) of this Paragraph, shall thereupon become immediately due and payable, (ii) all Income paid after such exercise or deemed exercise shall be retained by the nondefaulting party and applied to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder, and (iii) the defaulting party shall immediately deliver to the nondefaulting party any Purchased Securities subject to such Transactions then in the defaulting party's possession or control.

(c)  In all Transactions in which the defaulting party is acting as Buyer, upon tender by the nondefaulting party of payment of the aggregate Repurchase Prices for all such Transactions, all right, title and interest in and entitlement to all Purchased Securities subject to such Transactions shall be deemed transferred to the nondefaulting party, and the defaulting party shall deliver all such Purchased Securities to the nondefaulting party.

(d)  If the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, the nondefaulting party, without prior notice to the defaulting party, may:

(i)  as to Transactions in which the defaulting party is acting as Seller, (A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source, against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder; and

(ii)  as to Transactions in which the defaulting party is acting as Buyer, (A) immediately purchase, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, securities ("Replacement Securities") of the same class and amount as any Purchased Securities that are not delivered by the defaulting party to the nondefaulting party as required hereunder or (B) in its sole discretion elect, in lieu of purchasing Replacement Securities, to be deemed to have purchased Replacement Securities at the price therefor on such date, obtained from a generally recognized source or the most recent closing offer quotation from such a source.

Unless otherwise provided in Annex I, the parties acknowledge and agree that (1) the Securities subject to any Transaction hereunder are instruments traded in a recognized market, (2) in the absence of a generally recognized source for prices or bid or offer quotations for any Security, the nondefaulting party may establish the source therefor in its sole discretion and (3) all prices, bids and offers shall be determined together with accrued Income (except to the extent contrary to market practice with respect to the relevant Securities).

(e)  As to Transactions in which the defaulting party is acting as Buyer, the defaulting party shall be liable to the nondefaulting party for any excess of the price paid (or deemed paid) by the nondefaulting party for Replacement Securities over the Repurchase Price for the Purchased Securities replaced thereby and for any amounts payable by the defaulting party under Paragraph 5 hereof or otherwise hereunder.

(f)  For purposes of this Paragraph 11, the Repurchase Price for each Transaction hereunder in respect of which the defaulting party is acting as Buyer shall not increase above the

amount of such Repurchase Price for such Transaction determined as of the date of the exercise or deemed exercise by the nondefaulting party of the option referred to in subparagraph (a) of this Paragraph.

(g)  The defaulting party shall be liable to the nondefaulting party for (i) the amount of all reasonable legal or other expenses incurred by the nondefaulting party in connection with or as a result of an Event of Default, (ii) damages in an amount equal to the cost (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of an Event of Default, and (iii) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default in respect of a Transaction.

(h)  To the extent permitted by applicable law, the defaulting party shall be liable to the nondefaulting party for interest on any amounts owing by the defaulting party hereunder, from the date the defaulting party becomes liable for such amounts hereunder until such amounts are (i) paid in full by the defaulting party or (ii) satisfied in full by the exercise of the nondefaulting party's rights hereunder. Interest on any sum payable by the defaulting party to the nondefaulting party under this Paragraph 11(h) shall be at a rate equal to the greater of the Pricing Rate for the relevant Transaction or the Prime Rate.

(i)  The nondefaulting party shall have, in addition to its rights hereunder, any rights otherwise available to it under any other agreement or applicable law.

## 12. Single Agreement

Buyer and Seller acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, each of Buyer and Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder and (iii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.

## 13. Notices and Other Communications

Any and all notices, statements, demands or other communications hereunder may be given by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the address specified in Annex II hereto, or so sent to such party at any other place specified in a notice of change of address hereafter received by the other. All notices, demands and requests hereunder may be made orally, to be confirmed promptly in writing, or by other communication as specified in the preceding sentence.

14. **Entire Agreement; Severability**

This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions. Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

15. **Non-assignability; Termination**

(a) The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by either party without the prior written consent of the other party, and any such assignment without the prior written consent of the other party shall be null and void. Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. This Agreement may be terminated by either party upon giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

(b) Subparagraph (a) of this Paragraph 15 shall not preclude a party from assigning, charging or otherwise dealing with all or any part of its interest in any sum payable to it under Paragraph 11 hereof.

16. **Governing Law**

This Agreement shall be governed by the laws of the State of New York without giving effect to the conflict of law principles thereof.

17. **No Waivers, Etc.**

No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure herefrom shall be effective unless and until such shall be in writing and duly executed by both of the parties hereto. Without limitation on any of the foregoing, the failure to give a notice pursuant to Paragraph 4(a) or 4(b) hereof will not constitute a waiver of any right to do so at a later date.

18. **Use of Employee Plan Assets**

(a) If assets of an employee benefit plan subject to any provision of the Employee Retirement Income Security Act of 1974 ("ERISA") are intended to be used by either party hereto (the "Plan Party") in a Transaction, the Plan Party shall so notify the other party prior to the Transaction. The Plan Party shall represent in writing to the other party that the Transaction does not constitute a prohibited transaction under ERISA or is otherwise exempt therefrom, and the other party may proceed in reliance thereon but shall not be required so to proceed.

(b) Subject to the last sentence of subparagraph (a) of this Paragraph, any such Transaction shall proceed only if Seller furnishes or has furnished to Buyer its most recent available audited statement of its financial condition and its most recent subsequent unaudited statement of its financial condition.

(c) By entering into a Transaction pursuant to this Paragraph, Seller shall be deemed (i) to represent to Buyer that since the date of Seller's latest such financial statements, there has been no material adverse change in Seller's financial condition which Seller has not disclosed to Buyer, and (ii) to agree to provide Buyer with future audited and unaudited statements of its financial condition as they are issued, so long as it is a Seller in any outstanding Transaction involving a Plan Party.

## 19. Intent

(a) The parties recognize that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Securities subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(b) It is understood that either party's right to liquidate Securities delivered to it in connection with Transactions hereunder or to exercise any other remedies pursuant to Paragraph 11 hereof is a contractual right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as amended.

(c) The parties agree and acknowledge that if a party hereto is an "insured depository institution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract," as that term is defined in FDIA and any rules, orders or policy statements thereunder (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(d) It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation", respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA).

## 20. Disclosure Relating to Certain Federal Protections

The parties acknowledge that they have been advised that:

(a) in the case of Transactions in which one of the parties is a broker or dealer registered with the Securities and Exchange Commission ("SEC") under Section 15 of the Securities Exchange Act of 1934 ("1934 Act"), the Securities Investor Protection Corporation has

taken the position that the provisions of the Securities Investor Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(b)  in the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(c)  in the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.


**Lehman Brothers Inc.**
**Lehman Commercial Paper Inc.**

By: _____

Name: Robert E. Guglielmo

Title: Senior Vice President

Date: _____


**Highland Credit Strategies Master Fund, L.P.**

By:  Highland General Partner LP,
     its general partner

  By:  Highland GP Holdings LLC,
       its general partner

    By:  Highland Capital Management, L.P.,
         its general partner

      By: Strand Advisors, Inc.,
        its general partner

      By: _____

      Name: _____

      Title: _____
Ken McGovern, Treasurer
Strand Advisors, Inc., General Partner of
      Date: Highland Capital Management, L.P.

# ANNEX I
## Supplemental Terms and Conditions

This Annex forms a part of the Master Repurchase Agreement dated as of  October 1, 2007
(the "Agreement") between **Lehman Brothers Inc., Lehman Commercial Paper Inc.**, and
**Highland Credit Strategies Master Fund, L.P.**

Capitalized terms used but not defined in this Annex I shall have the meanings ascribed to them in the Agreement.

1. In addition to this Annex I and Annex II the following Annexes (and any schedules or exhibits attached thereto) shall be deemed executed by the parties hereto and shall also form a part of the Agreement:

   X None
   --Annex IV Party as Agent
   --Annex VI Buy/Sell Back Transactions
   --Annex VII Transactions Involving Registered Investment Companies
   --Annex VIII Transactions in Equity Securities
   --Annex IX Transactions Involving Certain Japanese Financial Institutions

2. With respect to individual repurchase transactions, this Agreement shall only apply to the Lehman Brothers entity (i.e. Lehman Brothers Inc., Lehman Commercial Paper Inc.) printed in the confirmation (as described in Section 3(b) herein) provided to the counterparty of the Lehman Brothers entity.

3. Definitions.  For purposes of the Agreement, the following terms shall have the following meanings:
   (a) "Margin Notice Deadline", 10:00 am New York City time.
   (b) "Business Day" or "business day", with respect to any Transaction hereunder, a day on which regular trading may occur in the principal market for the Purchased Securities subject to such Transaction.  In no event shall a Saturday or Sunday be considered a business day.

4. Purchase Price Maintenance.
   (a) Unless otherwise expressly agreed by the parties hereto, the parties agree that in any Transaction hereunder whose term extends over an Income payment date for the Securities subject to such Transaction, Buyer shall on the date such Income is paid transfer to or credit to the account of Seller an amount equal to such Income payment or payments pursuant to Paragraph 5(i) and shall not apply the Income payment or payments to reduce the amount to be transferred to Buyer or Seller upon termination of the Transaction pursuant to Paragraph 5(ii) of the Agreement.
   (b) Unless otherwise expressly agreed by the parties hereto, notwithstanding the definition of Purchase Price in Paragraph 2 of the Agreement and the provisions of Paragraph 4 of the Agreement, the parties agree (i) that the Purchase Price will not be increased or decreased by the amount of any cash transferred by one party to the other pursuant to Paragraph 4 of the Agreement and (ii) that transfer of cash shall be treated as if it constituted a transfer of Securities (with a Market Value equal to the U.S. dollar amount of such cash) pursuant to Paragraph 4(a) or (b), as the case may be (including for purposes of the definition of "Additional Purchased Securities").

5. Submission to Jurisdiction; Waiver of Immunity; Waiver of Jury Trial.
   (a) Each party irrevocably and unconditionally (i) submits to the non-exclusive jurisdiction of any United States Federal or New York State court sitting in Manhattan, and any appellate court from any such court, solely for the purpose of any suit, action or proceeding brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement and (ii) waives, to the fullest extent it may effectively do so, any defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right of jurisdiction on account of its place of residence or domicile.

(b)  To the extent that either party has or hereafter may acquire any immunity (sovereign or otherwise), such party irrevocably waives, with respect to itself and its revenues and assets, from (i) any legal action, suit or proceeding (ii) jurisdiction of any court, (iii) arbitration, (iv) relief by way of arbitration award, injunction, order for specific performance or recovery of property, (v) attachment of its assets (whether before or after judgment) and (vi) execution or enforcement of any judgment or arbitration award and irrevocably agrees, to the fullest extent permitted by applicable law, that it will not raise, claim or cause to be pleaded any such immunity at or in respect of any such action or proceeding brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement.

(c)  Insofar as permitted by law, each party hereto hereby irrevocably waives any right that it may have to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or the Transactions contemplated hereby.

6.  <u>Right of Set-off</u>

(a)  In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the declaration of an Event of Default, the non-defaulting party shall have the right (but not the obligation), without prior notice to the defaulting party, to set-off or apply any obligation of the defaulting party owed to the non-defaulting party or to any affiliate of the non-defaulting party (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of the non-defaulting party or any affiliate thereof owed to the defaulting party (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation).

(b)  For purposes of cross-currency set-off, the non-defaulting party may convert either obligation at the applicable market exchange rate selected by the non-defaulting party on the relevant date.

(c)  If the amount of an obligation has not been ascertained, the non-defaulting party may in good faith estimate that amount and set-off in respect of the estimate, subject to a later adjustment when the amount of the obligation has been finally determined.

**Annex II**
**Names and Addresses for Communications Between Parties**

**LEHMAN BROTHERS**
745 Seventh Avenue, 19th Floor
New York, New York  10019

Attn.:  Robert Guglielmo, Senior Vice President
Transaction Management
(212) 526-7121  phone
(212) 526-7672 fax

**Legal/Documentation Information:**

Name: _____

Address: _____

_____

_____

Attn: _____

Tel #: _____

Fax #: _____

E-mail: _____

**Business/Trading Information:**

Name:             Highland Credit Strategies Master Fund, LP

Primary Contact:  Britt Brown

Address:          13455 Noel Rd.
Suite 800
Dallas, TX  75240

Tel #:            972-628-4100

Email Address:    bbrown@hcmlp.com

Secondary Contact: Andrew Lenge

Address:          13455 Noel Rd.
Suite 800
Dallas, TX  75240

Tel #:            972-628-4100

Email Address:    alenge@hcmlp.com

**<u>Exhibit C</u>**

Lehman's Company/Ledger Codes

US_ACTIVE:\43868086\04\58399.0003

# PATHFINDER - COMPANY/LEDGER CODE
Generated: 03/25/2009 13:04:49

| MTS Code | GL Code | Lehman Entity | Abbreviation | Open Date | Last Update |
|---|---|---|---|---|---|
| KH | 14 | ARGONAUT INVESTMENT FUND LTD | ARIF | 6/6/2001 13:34 | 9/12/2003 11:08 |
| KJ | 15 | ARGONAUT PARTNERSHIP, LP | ARPA | 6/6/2001 13:36 | 9/12/2003 11:09 |
| KL | 16 | QUOTA RABBICO II, LTD | QURA | 6/6/2001 13:55 | 9/12/2003 11:08 |
| KM | 17 | MOORE U.S. RESTRUCTURING, L.P. | MREST | 5/31/2001 17:11 | 5/31/2001 17:11 |
| PM | 18 | MMP FUNDING CORP | MMPF | 5/21/2001 16:23 | 5/21/2001 16:23 |
| KG | 19 | CAXTON RELATIVE VALUE HOLDINGS LIMITED | CRVF | 5/17/2001 14:19 | 2/20/2002 15:37 |
| **G** | **20** | **LEHMAN BROTHERS INC.** | **LGSI** | **12/21/2000 12:51** | **12/21/2000 12:51** |
| C | 21 | LEHMAN COMMERCIAL PAPER INC. | LCPI | 12/21/2000 12:54 | 12/21/2000 12:54 |
| 8 | 23 | LEHMAN BROTHERS INC. | LBIC | 12/21/2000 13:58 | 12/21/2000 13:58 |
| K1 | 24 | LEHMAN BROTHERS BANK | LBBK | 12/21/2000 12:53 | 2/5/2001 12:20 |
| U | 25 | LW REAL ESTATE INVEST LP | LW LP | 12/21/2000 14:05 | 12/21/2000 14:05 |
| K7 | 27 | QUANTUM PARTNERS LDC-NEXUS | QTPN | 1/2/2001 11:33 | 1/2/2001 11:45 |
| K8 | 28 | HOULTON INVESTMENTS INC | HLTN | 1/26/2001 8:55 | 9/12/2003 11:10 |
| PA | 29 | LEHMAN LOAN FUNDING I, LLC | LH LN | 12/21/2000 14:22 | 12/21/2000 14:22 |
| N | 30 | LEHMAN SYNDICATED LOAN FUNDING INC. | LH SY | 12/21/2000 14:26 | 12/21/2000 14:26 |
| P | 31 | LEHMAN BROTHERS INC. | LBI | 12/21/2000 14:29 | 12/21/2000 14:29 |
| PR | 33 | LEHMAN RISK ADVISORS INC. | RISK | 12/21/2000 14:47 | 12/21/2000 14:47 |
| PB | 34 | APPALACHIAN ASSET MANAGEMENT CORP | APAM | 12/21/2000 12:35 | 12/21/2000 12:35 |
| KA | 35 | SG NEW YORK BRANCH | SGNY | 1/2/2001 10:28 | 1/2/2001 11:45 |
| D | 37 | LEHMAN BROTHERS CANADA INC. | LBC | 12/21/2000 15:09 | 12/21/2000 15:09 |
| 0 | 38 | LEHMAN RE LIMITED | LHRE | 8/21/2000 9:16 | 8/21/2000 9:16 |
| KB | 39 | SG COWEN-BD | SGBD | 1/2/2001 10:30 | 1/2/2001 10:43 |
| PE | 40 | LB INTERNATIONAL (EUROPE) | LBIE | 3/13/2002 10:23 | 3/13/2002 10:23 |
| 4 | 41 | LEHMAN BROTHERS HOLDINGS INC. | LBH | 12/21/2000 15:35 | 12/21/2000 15:35 |
| X | 42 | ALI INC | ALI | 12/21/2000 15:36 | 12/21/2000 15:36 |
| O | 43 | LB I GROUP INC. | LB 1 | 12/21/2000 15:40 | 12/21/2000 15:40 |
| 5 | 46 | LEHMAN INVESTMENTS INC. | LII | 12/21/2000 10:26 | 12/21/2000 10:26 |
| KR | 47 | RED WOLF CAPITAL MGT LLC | RWCM | 1/2/2001 10:40 | 9/12/2003 11:10 |
| KF | 48 | BMO NESBITT BURNS CORP | BMONB | 2/5/2001 12:17 | 9/12/2003 11:11 |
| PW | 49 | LW-RTC, INC. | LWRTC | 12/22/2000 10:25 | 12/22/2000 10:25 |
| H | 50 | LEHMAN BROTHERS CANADA INC. | LBCI | 12/22/2000 10:30 | 12/22/2000 10:30 |
| F | 51 | LB PASS-THROUGH SECURITIES INC. | LPTI | 12/22/2000 10:38 | 12/22/2000 10:38 |
| T | 52 | LEHMAN ABS CORP | LABS | 12/22/2000 10:38 | 12/22/2000 10:38 |

**PATHFINDER - COMPANY/LEDGER CODE**
**Generated: 03/25/2009 13:04:49**

| MTS Code | GL Code | Lehman Entity | Abbreviation | Open Date | Last Update |
|---|---|---|---|---|---|
| PF | 53 | ABEL HEALTH VENTURE (LLC) | ABEL | 12/21/2000 12:33 | 12/21/2000 12:33 |
| A | 54 | STRUCTURED ASSET SECURITIES CORP. | SASCO | 12/22/2000 10:41 | 12/22/2000 10:41 |
| PG | 55 | PENTARING INC | PENT | 12/22/2000 11:29 | 12/22/2000 11:29 |
| K2 | 57 | QUANTUM PARTNERS LDC-QP1 | QTP1 | 1/2/2001 10:46 | 1/2/2001 11:45 |
| I | 58 | PROPERTY ASSET MANAGEMENT INC | PAMI | 12/22/2000 11:37 | 12/22/2000 11:37 |
| K9 | 59 | QUANTUM PARTNERS LDC-TREASURY | QPTR | 10/4/2001 16:42 | 10/4/2001 16:42 |
| R | 60 | ARMCO | ARMCO | 12/22/2000 10:45 | 12/22/2000 10:45 |
| L | 62 | LB FINANCIAL PRODUCTS INC. | LBFP | 12/22/2000 10:46 | 12/22/2000 10:46 |
| PH | 64 | N.P. HOLDCO INC. | NPHCI | 12/22/2000 10:47 | 12/22/2000 10:47 |
| 6 | 66 | LB SPECIAL FINANCING INC. | LBSF | 12/22/2000 10:47 | 12/22/2000 10:47 |
| 1 | 67 | LEHMAN STRUCTURED SECURITIES CORP | LSSC | 12/22/2000 10:49 | 12/22/2000 10:49 |
| 2 | 68 | DL MORTGAGE | DLMOR | 12/22/2000 10:50 | 12/22/2000 10:50 |
| 3 | 69 | LEHMAN SENIOR FUNDING INC. E | LSFI | 12/22/2000 10:50 | 12/22/2000 10:50 |
| 7 | 73 | QUALITY PORK PARTNERS, INC. | QPPI | 12/22/2000 10:51 | 12/22/2000 10:51 |
| KC | 74 | BT PYRAMID DIVERSIFIED CASH FUND | BTPDF | 9/12/2003 11:11 | 9/12/2003 11:11 |
| KD | 81 | WEYERHAEUSER COMP MASTER RET. TRUST | WMRT | 9/12/2003 11:10 | 9/12/2003 11:10 |
| KE | 82 | CONCERT SERIES I, LTD | CONC | 5/3/2001 15:33 | 5/3/2001 15:33 |
| E | 83 | LB SPECIAL FINANCING INC. | LBSF2 | 12/22/2000 10:58 | 12/22/2000 10:58 |
| 9 | 84 | LB DERIVATIVE PRODUCTS INC. | LBDP | 12/22/2000 11:00 | 12/22/2000 11:00 |
| J | 85 | LW-MULTI, INC. | LPART | 12/22/2000 11:04 | 12/22/2000 11:04 |
| PD | 86 | LB DALLAS HOLDING INC. | LDAL | 12/22/2000 11:04 | 12/22/2000 11:04 |
| N/A | 87 | LB ILLINOIS LIMITED | LILL | 12/22/2000 11:05 | 12/22/2000 11:05 |
| PC | 88 | LB CHICAGO LIMITED | LCHI | 5/2/2003 16:40 | 5/2/2003 16:40 |
| B | 89 | LB INTERNATIONAL (EUROPE) | LBIE | 12/22/2000 11:08 | 12/22/2000 11:08 |
| Y | 90 | LUBS INC | LUBS | 12/22/2000 11:09 | 12/22/2000 11:09 |
| W | 91 | LEHMAN BROTHERS BANK | LBBK | 12/22/2000 11:09 | 12/22/2000 11:09 |
| Q | 92 | LEHMAN HOUSING CAPITAL INC. | LHCI | 12/22/2000 11:10 | 12/22/2000 11:10 |
| PV | 93 | LB VIN CO. | LBVIN | 12/22/2000 11:11 | 12/22/2000 11:11 |
| K4 | 94 | PEARLINGTON INVESTMENTS LTD | PEARL | 12/22/2000 11:16 | 1/2/2001 11:16 |
| V | 95 | TELEOS INTERNATIONAL | TLTD | 5/3/2001 16:21 | 2/20/2002 15:37 |
| K5 | 96 | TELEOS FUND, L.P. | TLLP | 5/3/2001 15:53 | 2/20/2002 15:37 |
| K6 | 97 | QUANTUM PARTNERS LDC | QTPT | 12/22/2000 11:24 | 1/2/2001 11:45 |
| KP | 101 | G7 ARBITRAGE FUND | G7FD | 7/23/2001 13:34 | 7/25/2001 14:48 |

## PATHFINDER - COMPANY/LEDGER CODE
### Generated: 03/25/2009 13:04:49

| MTS Code | GL Code | Lehman Entity | Abbreviation | Open Date | Last Update |
|---|---|---|---|---|---|
| KS | 102 | Lily Pond Master Fund, Ltd. | LILY | 7/30/2001 11:19 | 7/30/2001 11:19 |
| KT | 103 | ARGONAUT AGGRESSIVE GLOBAL FUND LTD | ARGF | 8/28/2001 16:18 | 9/12/2003 11:09 |
| KQ | 104 | Millennium Partners ,L.P.- Fermat | MILL | 10/4/2001 10:08 | 10/4/2001 10:08 |
| KK | 105 | MIZUHO CORPORATE BANK LTD | IBJL | 3/27/2002 15:04 | 3/28/2002 12:51 |
| KU | 106 | FrontPoint Fixed Income Opportunities Fu | FFIO | 12/20/2001 17:03 | 2/20/2002 15:37 |
| KV | 107 | Metacapital Fixed Income Relative Value | META | 12/20/2001 16:49 | 12/20/2001 16:49 |
| KW | 108 | PUTNAM MORTGAGE HEDGE FUND, LP | PUMHF | 10/26/2001 12:23 | 10/26/2001 12:23 |
| KX | 109 | PUTNAM EMERGING MARKETS DEBT HEDGE FUND, | PUEMK | 10/26/2001 12:24 | 10/26/2001 12:24 |
| KY | 110 | VICTORY MASTER, LTD | VIML | 11/1/2001 11:22 | 12/12/2001 15:45 |
| PS | 111 | STOCKHOLM INVESTMENTS LIMITED | STHOM | 12/12/2001 15:48 | 1/9/2002 14:09 |
| PK | 112 | LB BANKHAUS AKTIENGESELLSCHAFT | LBB | 1/8/2002 11:03 | 1/15/2002 17:10 |
| LA | 113 | THE ALTAR ROCK FUND, L.P. | AROCK | 1/15/2002 17:10 | 1/15/2002 17:10 |
| LB | 114 | THE TUDOR BVI GLOBAL PORTFOLIO | TBVI | 1/15/2002 17:12 | 1/15/2002 17:12 |
| LC | 115 | CONSERVATION FOUNDATION | CONSF | 1/16/2002 10:14 | 1/16/2002 10:14 |
| LD | 116 | TUDOR EMERGING MARKETS PORTFOLIO, LTD | TEMGP | 1/16/2002 10:17 | 1/16/2002 10:17 |
| LE | 117 | TUDOR HAWTHORN FUND, LTD | THAWF | 1/16/2002 10:19 | 1/16/2002 10:19 |
| LF | 118 | THE OSPRAIE PORTFOLIO, LTD | OSPP | 1/16/2002 10:26 | 1/16/2002 10:26 |
| LG | 119 | PAUL TUDOR JONES, II | PTJ2 | 1/16/2002 10:28 | 1/16/2002 10:28 |
| LH | 120 | THE RAPTOR GLOBAL PORTFOLIO, LTD | RAPGP | 1/16/2002 10:23 | 1/16/2002 10:23 |
| LJ | 121 | RHINO PARTNERS, LP | RHINO | 1/16/2002 10:21 | 1/16/2002 10:30 |
| LK | 122 | TUDOR FUTURES FUND | TFUTF | 1/16/2002 10:48 | 1/16/2002 10:48 |
| LL | 123 | TUDOR PROPRIETARY TRADING, LLC | TPROP | 1/15/2002 17:05 | 1/15/2002 17:05 |
| LM | 124 | KALLISTA GLOBAL MACRO MASTER FUND LIMITE | KGMMF | 1/25/2002 8:35 | 9/12/2003 11:10 |
| LN | 125 | FP FIXED INCOME OPPORTUNITIES INVESTOR, | FFOI | 2/22/2002 17:04 | 2/22/2002 17:04 |
| LP | 126 | Aequilibrium Capital Investments Limited | ACIL | 3/25/2002 15:37 | 3/28/2002 12:50 |
| LQ | 127 | INTERNATIONAL BANK FOR RECONSTRUCTION & | IBRD | 3/12/2002 13:15 | 3/15/2002 15:14 |
| LR | 128 | INTERNATIONAL DEVELOPMENT ASSOCIATION | IDA | 3/12/2002 13:13 | 3/15/2002 15:14 |
| LS | 129 | PRUDENTIAL RELATIVE VALUE MASTER FUND I | PRVF | 4/25/2002 11:21 | 4/25/2002 11:21 |
| PJ | 130 | RIBCO LLC | RIBC | 4/25/2002 11:19 | 4/25/2002 11:19 |
| LT | 131 | HIGHLAND MASTER FUND | HLND | 5/15/2002 16:47 | 5/15/2002 16:47 |
| LV | 132 | QUOTA RABBICO N.V. | QUTA | 6/12/2002 9:49 | 6/12/2002 9:49 |
| PL | 133 | ARMCO - CONSOLIDATED | ARMC2 | 6/17/2002 12:11 | 6/17/2002 12:11 |
| LU | 134 | APPLETON FIXED INCOME OPPORTUNITY FD LT | APPL | 8/29/2002 16:25 | 4/5/2004 15:50 |

**PATHFINDER - COMPANY/LEDGER CODE**
**Generated: 03/25/2009 13:04:49**

| MTS Code | GL Code | Lehman Entity | Abbreviation | Open Date | Last Update |
|---|---|---|---|---|---|
| LW | 135 | GLG CREDIT FUND | GLGC | 9/9/2002 12:52 | 9/9/2002 12:52 |
| PN | 136 | LB OTC DERIVATIVES INC | LBOTC | 9/10/2002 13:10 | 9/10/2002 13:10 |
| LX | 137 | LYXOR FIXED INCOME ARBITRAGE FUND LIMITE | LXOR | 9/25/2002 8:28 | 9/25/2002 8:28 |
| LY | 138 | S.A.C GENESIS FUND,LLC | SACG | 2/10/2003 13:33 | 2/10/2003 13:33 |
| LZ | 139 | WINDMILL FUND, LTD | WIND | 10/2/2002 14:42 | 10/21/2002 11:23 |
| L1 | 140 | EDGEWORTH GLOBAL OPPORTUNITIES FD, LP | EGOF | 2/4/2003 9:38 | 6/16/2004 8:41 |
| L2 | 141 | MILLENNIUM PARTNERS, LP | MILL | 1/22/2003 14:26 | 2/4/2003 10:11 |
| L3 | 142 | MILLENNIUM PARTNERS, LP EH CAPITAL | MEHC | 2/6/2003 16:16 | 2/6/2003 16:16 |
| PU | 143 | LEHMAN NIM DERIVATIVES INC | LNIMD | 10/2/2002 8:53 | 10/2/2002 8:53 |
| L4 | 144 | CQS CAPITAL STRUCTURE ARBITRAGE MASTER F | CQSM | 10/29/2002 13:02 | 10/29/2002 13:02 |
| L5 | 145 | EDGEWORTH GLOBAL OPPORTUNITIES FUND EUR | EGOE | 10/29/2002 13:04 | 10/29/2002 13:04 |
| L6 | 146 | EDGEWORTH GLOABL OPPORTUNITIES FUND USD | EGOU | 10/29/2002 13:07 | 6/16/2004 8:42 |
| L7 | 147 | CRC GLOBAL STRUCTURED CREDIT FUND, LTD | CRCG | 11/15/2002 9:44 | 11/15/2002 9:44 |
| PP | 148 | STRUCTURED ASSET SECURITIES CORP II | SASC2 | 11/15/2002 9:45 | 11/26/2002 15:47 |
| PT | 149 | TALLUS INC | TALL | 11/25/2002 13:34 | 11/25/2002 13:34 |
| PX | 150 | MARCY LTD | MARC | 12/5/2002 14:44 | 12/5/2002 14:44 |
| PY | 151 | 314 COMMONWEALTH AVE. INC. | COMW | 12/4/2002 17:09 | 12/4/2002 17:09 |
| PZ | 152 | PLATFORM HME MORTGAGE SEC NO 5 LTD | MABL | 12/4/2002 17:06 | 12/4/2002 17:06 |
| P9 | 153 | LOTUS GLOBAL MULTI STRATEGY MASTER FUND | LOTG | 1/3/2003 9:00 | 1/3/2003 9:00 |
| L8 | 154 | BRASSTOWN LLC | BRASS | 1/3/2003 9:02 | 1/3/2003 9:02 |
| P1 | 155 | MANSFIELD I S.C.A | MSCA | 1/3/2003 9:04 | 1/3/2003 9:04 |
| P2 | 156 | MANSFIELD II SARL | MSAR | 1/3/2003 9:05 | 1/3/2003 9:05 |
| P3 | 157 | S.A.C. CAPITAL ASSOCIATES, LLC | SACC | 2/10/2003 13:53 | 7/12/2004 10:49 |
| L9 | 158 | FIRST EDITION LIMITED | FLTD | 2/25/2003 14:41 | 2/27/2003 13:03 |
| N1 | 159 | ATHENAEUM GLOBAL OPPORTUNITIES MASTER FU | ATHN | 3/24/2003 14:13 | 4/5/2004 14:50 |
| N2 | 160 | FIRSTCARIBBEAN INTL BANK (JAMAICA) LIMIT | FCJA | 4/14/2003 11:08 | 4/14/2003 11:08 |
| N3 | 161 | FIRSTCARIBBEAN INTL BANK (BAHAMAS) LTD | FCBB | 4/3/2003 16:01 | 4/3/2003 16:01 |
| N4 | 162 | FIRSTCARIBBEAN INTERNATIONAL BK (CAYMAN) | FCCA | 4/14/2003 11:11 | 4/14/2003 11:11 |
| N5 | 163 | FIRSTCARIBBEAN INTL BK (OFFSHORE) LTD | FCIOF | 4/3/2003 16:27 | 4/14/2003 11:42 |
| N6 | 164 | FIRSTCARIBBEAN INTL BK - BARBADOS LTD | FCIBA | 4/10/2003 11:41 | 4/10/2003 11:41 |
| N7 | 165 | QUANTUM PARTNERS LDC-MSBB | QMSBB | 4/10/2003 10:24 | 4/5/2004 15:50 |
| N8 | 166 | PEQUOT CREDIT OPPORTUNITIES FUND, LP | PCOF | 4/25/2003 15:52 | 4/25/2003 15:45 |
| N9 | 167 | HARMONIC FIXED INCOME MASTER FUND | HFIM | 4/25/2003 14:40 | 4/28/2003 15:45 |

**PATHFINDER - COMPANY/LEDGER CODE**
**Generated: 03/25/2009 13:04:49**

| MTS Code | GL Code | Lehman Entity | Abbreviation | Open Date | Last Update |
|---|---|---|---|---|---|
| NB | 168 | HARMONIC GLOBAL FUND | HGLB | 4/25/2003 14:38 | 4/28/2003 15:45 |
| NC | 169 | HARMONIC CURRENCY MASTER FUND | HCMF | 4/24/2003 15:52 | 4/24/2003 15:52 |
| ND | 170 | PARSIMONY LIMITED | PARS | 5/6/2003 15:30 | 5/13/2003 13:56 |
| NE | 171 | OLEA GLOBAL MASTER FUND | OLEA | 5/8/2003 16:23 | 5/8/2003 16:23 |
| NF | 172 | NEXUS DKR MACRO HOLDINGS FUND LTD | DNEX | 6/6/2003 10:17 | 6/6/2003 10:17 |
| NG | 173 | Prudential Relative Value Master Fund II | RVII | 7/9/2003 12:34 | 7/9/2003 12:34 |
| P4 | 174 | LB 745 LLC | LB745 | 6/27/2003 17:09 | 6/27/2003 17:09 |
| NH | 175 | RCG ENDEAVOUR, L.L.C | RCGE | 7/16/2003 11:07 | 3/6/2006 14:19 |
| NJ | 176 | THE COAST FUND, LP | X | 7/16/2003 11:03 | 7/16/2003 11:03 |
| NK | 177 | RAM FIXED INCOME ARBITRAGE TRADING LTD | RAMAT | 7/16/2003 12:57 | 7/16/2003 12:57 |
| NL | 178 | RAM TRADING,LTD | X | 7/15/2003 11:03 | 7/15/2003 11:03 |
| NM | 179 | OLEA G2 GLOBAL MASTER FUND | OLEA | 8/8/2003 16:00 | 8/8/2003 16:00 |
| NN | 180 | ASUKA FIXED INCOME LTD | ASUK | 8/8/2003 16:01 | 8/8/2003 16:01 |
| NP | 181 | GUGGENHEIM PORTFOLIO COMPANY XX, LLC | LGUG | 8/14/2003 9:51 | 11/19/2003 16:06 |
| P5 | 182 | PICNIC 1 INC | PICN1 | 8/11/2003 8:22 | 8/11/2003 8:22 |
| P6 | 183 | PICNIC 2 INC | PICN2 | 8/11/2003 8:22 | 8/11/2003 8:22 |
| NQ | 184 | SAN GABRIEL OPPORTUNITY FUND, LLC | SGOF | 9/3/2003 10:22 | 9/11/2003 16:46 |
| NR | 185 | MILLENNIUM PARTNERS LP-OMNIBUS II | MILP | 9/3/2003 13:10 | 9/3/2003 13:10 |
| NS | 186 | PRUDENTIAL RELATIVE VALUE MASTER FUND II | PRUDV | 10/1/2003 14:13 | 10/1/2003 14:13 |
| NT | 187 | LYXOR JULIUS BAER DIVERSIFIED FIXED INCO | LYXFI | 10/1/2003 10:21 | 10/1/2003 10:21 |
| NU | 188 | AUTONOMY MASTER FUND LIMITED | AMFL | 10/28/2003 11:23 | 10/28/2003 11:23 |
| NV | 189 | RUBICON MASTER FUND | RUMF | 10/28/2003 14:35 | 10/28/2003 14:35 |
| NW | 190 | IBRD TRUST FUND | IBRT | 11/21/2003 15:43 | 11/21/2003 15:43 |
| P7 | 191 | PICNIC NJ INC | PICN | 12/11/2003 14:05 | 12/11/2003 14:05 |
| NX | 192 | PELTON LIMITED | PELT | 12/11/2003 14:04 | 12/11/2003 14:04 |
| NY | 193 | AEQUILIBRIUM GLOBAL MACRO FUND LTD | AEQUI | 12/15/2003 13:22 | 12/15/2003 13:22 |
| NZ | 194 | JULIUS BAER GLOBAL RATES MASTER HEDGE FU | JBGR | 12/17/2003 15:59 | 12/29/2003 13:15 |
| AA | 195 | THE COAST FUND, LP. II | COAFD | 1/5/2004 16:25 | 1/5/2004 16:25 |
| AB | 196 | FIRST CARIBBEAN INTERNATIONAL BANK LIMIT | FCBAH | 1/5/2004 16:26 | 1/5/2004 16:26 |
| AC | 197 | CALIBERONE PRIVATE MASTER FUND, LTD | CAL1 | 1/7/2004 16:02 | 2/10/2004 16:47 |
| AD | 198 | TJC PARTNERSHIP, L.P | TJCP | 2/10/2004 13:40 | 6/16/2004 8:42 |
| AE | 200 | LONDON CREDIT FUND LIMITED | LDCF | 3/16/2004 14:49 | 3/17/2004 16:48 |
| AF | 201 | CURRENCY PORTFOLIO MAC 49 LTD | CPML | 3/4/2004 16:53 | 3/4/2004 16:53 |

**PATHFINDER - COMPANY/LEDGER CODE**
Generated: 03/25/2009 13:04:49

| MTS Code | GL Code | Lehman Entity | Abbreviation | Open Date | Last Update |
|---|---|---|---|---|---|
| AG | 202 | GRAHAM DISCRETIONARY GLOBAL FIXED INCOME | GDGF | 3/4/2004 16:54 | 3/4/2004 16:54 |
| AH | 203 | DRAWBRIDGE GLOBAL QUANTITATIVE STRATEGIE | DGQS | 3/4/2004 16:55 | 3/4/2004 16:55 |
| AJ | 204 | Premium Series PCC Limited, Cell C32 | PS32 | 3/30/2004 14:37 | 3/30/2004 14:37 |
| AK | 205 | PREMIUM SERIES PCC, LTD C33 | PS33 | 4/2/2004 13:24 | 4/2/2004 13:24 |
| AL | 206 | PREMIUM SERIES PCC, LTD C34 | PS34 | 4/6/2004 14:15 | 4/6/2004 14:15 |
| AM | 207 | PREMIUM SERIES PCC, LTD C35 | PS35 | 4/6/2004 14:16 | 4/6/2004 14:16 |
| AN | 208 | PREMIUM SERIES PCC, LTD C36 | PS36 | 4/6/2004 14:16 | 4/6/2004 14:16 |
| P8 | 209 | LEHMAN BROTHERS JAPAN INC. | LEHJ | 4/6/2004 14:16 | 4/6/2004 14:16 |
| AP | 210 | FCIBL (Cayman-Caribbean) | FCYM | 4/2/2004 13:28 | 4/2/2004 13:28 |
| AQ | 211 | ELLINGTON FIXED INCOME FUND, LTD | EFIF | 4/16/2004 10:15 | 4/16/2004 10:15 |
| AR | 212 | TIEDEMANN BGS PARTNERS, LP | TIED | 4/23/2004 9:16 | 4/23/2004 9:16 |
| AS | 213 | PEQUOT PARTNERS FUND,L.P. | PCPF | 4/23/2004 9:18 | 4/23/2004 9:18 |
| AT | 214 | PEQUOT NAVIGATOR ONSHORE FUND,LP | PNON | 4/28/2004 16:25 | 4/28/2004 16:25 |
| AU | 215 | PEQUOT NAVIGATOR OFFSHORE FUND, Inc. | PNOF | 4/23/2004 11:01 | 4/23/2004 11:01 |
| AV | 216 | PEQUOT INTERNATIONAL FUND, INC | PCIF | 4/23/2004 11:03 | 4/23/2004 11:03 |
| AW | 217 | PEQUOT ENDOWMENT FUND, L.P. | PCEF | 4/28/2004 16:26 | 4/28/2004 16:26 |
| AX | 218 | GOLDMAN SACHS PROFIT SHARING MASTER TRUS | PCGS | 4/28/2004 16:27 | 4/28/2004 16:27 |
| AY | 219 | PEQUOT SCOUT FUND, LP | PESF | 4/28/2004 16:28 | 4/28/2004 16:28 |
| AZ | 220 | ELLINGTON MORTGAGE INVESTORS, LP | EMIF | 4/23/2004 11:05 | 4/23/2004 11:05 |
| BA | 221 | CLEARWATER OPPORTUNITY FUND, LTD | CLOF | 4/23/2004 9:17 | 4/23/2004 9:17 |
| BB | 222 | NAYAN CAPITAL FUND LTD | NCFL | 4/28/2004 16:46 | 4/28/2004 16:46 |
| BC | 223 | PEQUOT CORE INVESTORS FUND,INC | PCFI | 4/28/2004 16:30 | 4/28/2004 16:30 |
| BD | 224 | PEQUOT SELECT OFFSHORE FUND, INC | PSOF | 5/12/2004 14:53 | 5/12/2004 14:55 |
| BE | 225 | PEQUOT SELECT FUND, L.P. | PSFL | 5/6/2004 12:24 | 5/6/2004 12:24 |
| BF | 226 | THE DRAKE LOW VOLATILITY FUND, LTD | X | 5/27/2004 9:21 | 5/27/2004 9:21 |
| BG | 227 | FFTW DIVERSIFIED ALPHA FUND LTD-CLASS A | X | 5/27/2004 9:22 | 5/27/2004 9:22 |
| BH | 228 | QUANTUM PARTNERS LDC-RS | QPDC | 5/6/2004 12:22 | 5/6/2004 12:22 |
| BJ | 229 | FFTW DIVERSIFIED ALPHA FUND LTD-CLASS M | X | 9/1/2004 15:04 | 9/1/2004 15:04 |
| BK | 230 | FFTW DIVERSIFIED ALPHA FUND LTD-CLASS Z | X | 9/1/2004 15:05 | 9/1/2004 15:05 |
| BL | 231 | MULTILATERAL INVESTMENT GUARANTEE AGENCY | X | 9/1/2004 15:05 | 9/1/2004 15:06 |
| BM | 232 | FFTW GLOBAL CREDIT FUND SPC | | 9/1/2004 15:06 | 9/1/2004 15:07 |
| BN | 233 | MILLENNIUM PARTNERS LP-DHOLAKIA | MILD | 9/1/2004 15:15 | 9/1/2004 15:15 |
| BP | 234 | Pequot Institutional Fund, inc | PCIN | 6/7/2004 16:01 | 6/7/2004 16:01 |

**PATHFINDER - COMPANY/LEDGER CODE**
**Generated: 03/25/2009 13:04:49**

| MTS Code | GL Code | Lehman Entity | Abbreviation | Open Date | Last Update |
|---|---|---|---|---|---|
| BR | 235 | DEUTSCHE BANK AG LONDON | DBAL | 6/16/2004 11:06 | 6/17/2004 15:18 |
| BQ | 236 | ARCHE MASTER FUND, L.P. | ARCH | 6/16/2004 11:04 | 6/16/2004 11:04 |
| BS | 237 | GLG STRATEGIC FIXED INCOME FUND | GSFI | 6/17/2004 10:23 | 6/22/2004 16:45 |
| BT | 238 | NEXUS DKR FXD INC HOLDING FUND LTD | NEXUS | 6/30/2004 10:16 | 6/30/2004 10:16 |
| BU | 239 | OTA MULTI-STRATEGY HOLDINGS LTD | OTAM | 8/10/2004 10:57 | 8/16/2004 11:57 |
| BV | 240 | LILY POND CURRENCY MASTER FUND LTD | LILY | 8/6/2004 14:10 | 8/6/2004 14:10 |
| BW | 241 | MAN MAC MONCH 9A LTD | MANM | 8/25/2004 12:04 | 8/25/2004 12:04 |
| BX | 242 | HIGHLAND SPECIAL OPPORTUNITY MASTER FUND | HSOPM | 8/25/2004 12:11 | 8/25/2004 12:11 |
| BY | 243 | RADAR S.A. | RADR | 9/1/2004 16:35 | 9/1/2004 16:35 |
| BZ | 244 | CANYON BALANCED EQUITY MASTER FUND, LTD | CANB | 9/2/2004 9:54 | 9/1/2004 16:35 |
| A1 | 245 | CANYON CAPITAL ARBITRAGE MASTER FUND, LT | CCAM | 9/2/2004 17:11 | 9/14/2004 15:21 |
| A2 | 246 | CANYON VALUE REALIZATION FUND,LTD | CANY | 9/3/2004 10:42 | 9/14/2004 15:21 |
| A3 | 247 | CANYON VALUE REALIZATION MAC-18 LTD | CVRF | 9/14/2004 15:25 | 9/14/2004 15:25 |
| A4 | 248 | CITI CANYON, LTD | CCAN | 9/1/2004 16:51 | 9/14/2004 15:24 |
| A5 | 249 | THE CANYON VALUE REALIZATION FUND/CAYMAN | CVRC | 9/1/2004 15:00 | 9/14/2004 15:21 |
| A6 | 250 | LYXOR/JULIUS BAER GLOBAL RATES HEDGE FUN | LYXOR | 9/16/2004 11:27 | 9/16/2004 11:27 |
| A7 | 251 | D_QUANT FUND,LLC | RQSI | 9/23/2004 8:57 | 9/23/2004 8:57 |
| A8 | 252 | CAPRA GLOBAL MANAGED ASSETS LTD | CAPRA | 9/24/2004 11:36 | 9/24/2004 11:36 |
| A9 | 253 | CGMA SPECIAL ACCOUNTS LLC | CGSA | 9/24/2004 11:15 | 12/28/2004 12:36 |
| C1 | 254 | JB CREDIT AND EMERGING MARKETS HEDGE FUN | CREM | 10/14/2004 14:54 | 10/28/2004 16:22 |
| C2 | 255 | PEQUOT DIVERSIFIED MASTER FUND,LTD | PDMF | 10/22/2004 9:20 | 10/25/2004 13:33 |
| C3 | 256 | Pequot Corporate Opportunities Instituti | PCOI | 10/27/2004 10:34 | 10/28/2004 16:57 |
| C4 | 257 | Avendis Enhanced Fixed Income Trading Lt | AVFI | 11/18/2004 8:35 | 11/26/2004 10:35 |
| C5 | 258 | Canyon Value Realization Fund LP (Conv | XXXX | 11/17/2004 10:10 | 11/17/2004 10:10 |
| C6 | 259 | SIGMA FIXED INCOME FUND LTD 1 | SFIF | 12/8/2004 12:43 | 12/29/2004 10:10 |
| C7 | 260 | SIGMA FIXED INCOME FUND LTD 2 | SFIC | 12/8/2004 12:44 | 12/29/2004 10:40 |
| C8 | 261 | GALT FUND, LTD | GALT | 12/23/2004 9:03 | 12/29/2004 10:24 |
| C9 | 262 | RCG RESOLUTION, LLC | RCGG | 1/12/2005 13:57 | 1/12/2005 11:50 |
| CA | 263 | VEGA INSTITUTIONAL LIBOR FD LTD | VILF | 1/12/2005 14:47 | 1/26/2005 11:50 |
| CB | 264 | DRAWBRIDGE GLOBAL MACRO MASTER FUND LTD | DGMM | 1/12/2005 15:24 | 1/26/2005 11:32 |
| CC | 265 | DRAWBRIDGE DSO SECURITIES II LLC | DSOL | 3/2/2005 16:19 | 3/2/2005 16:19 |
| CD | 266 | DRAWBRIDGE OSO SECURITIES II LLC | DSOF | 3/2/2005 16:20 | 3/2/2005 16:20 |
| CE | 267 | THE DRAKE OFFSHORE MASTER FUND LTD | DOMF | 2/2/2005 10:13 | 2/2/2005 10:13 |

## PATHFINDER - COMPANY/LEDGER CODE
### Generated: 03/25/2009 13:04:49

| MTS Code | GL Code | Lehman Entity | Abbreviation | Open Date | Last Update |
|---|---|---|---|---|---|
| CF | 268 | MILL PARTNERS LP(ELLIOTT HORNBLASS) | MPEH | 2/24/2005 9:36 | 3/1/2005 16:09 |
| CG | 269 | FFTW DIV ALPHA FD LTD-CLASS C SHARES | FDAC | 2/24/2005 9:37 | 2/28/2005 16:18 |
| CH | 270 | DKR VARICK HOLDING FUND LTD | DKRV | 3/3/2005 12:36 | 3/3/2005 12:36 |
| CJ | 271 | FC INTL BANK OFFSHORE LTD (OFFSHORE CARI | FOFC | 3/8/2005 16:08 | 3/28/2005 14:30 |
| CK | 272 | FC INTL BANK BARBADOS LTD (BARBADOS-CARI | FCBC | 3/8/2005 16:09 | 3/28/2005 14:30 |
| CL | 273 | FC INTERNATIONAL JAMAICA LTD (CARIB) | FCJC | 3/9/2005 11:22 | 3/28/2005 14:08 |
| CM | 274 | VEGA ELEMENT CAPITAL MASTER FUND LTD | ECMF | 4/11/2005 14:08 | 4/11/2005 14:08 |
| CN | 275 | DRAWBRIDGE RV PLUS MASTER FUND LTD | DRVP | 3/9/2005 14:42 | 3/9/2005 14:44 |
| CP | 276 | OHP LIBOR PLUS MASTER FUND, LTD | ZX | 3/23/2005 14:38 | 3/23/2005 14:38 |
| CQ | 277 | H/2 CREDIT PARTNERS MASTER FUND LTD | H2CR | 3/24/2005 9:41 | 3/24/2005 9:41 |
| CR | 278 | RCG CONSTELLATION LLC | X | 3/24/2005 9:49 | 3/24/2005 9:49 |
| P9 | 279 | LB COMMERCIAL BANK (LBCB) | LBCB | 3/23/2005 14:35 | 3/23/2005 16:11 |
| CS | 280 | ROBECO FIXED INCOME STRATEGIES SPC | X | 4/8/2005 16:44 | 4/8/2005 16:44 |
| CW | 281 | THE 3D CAPITAL FUND LTD | 3DCF | 4/18/2005 15:39 | 4/18/2005 15:39 |
| CX | 282 | LONDON DIVERSIFIED FUND LTD | LDFL | 5/19/2005 9:16 | 5/26/2005 16:01 |
| CY | 283 | LONDON SELECT FUND LIMITED | LSFL | 5/12/2005 12:27 | 5/26/2005 16:01 |
| CZ | 284 | RAMIUS CAPITAL GROUP | RACG | 5/18/2005 8:43 | 5/26/2005 16:01 |
| D1 | 285 | RAMIUS MASTER FUND, LTD | RMFL | 5/18/2005 9:06 | 5/26/2005 16:01 |
| D2 | 286 | RCG HALIFAX FUND, LTD | RCHG | 5/18/2005 17:07 | 5/26/2005 16:01 |
| D3 | 287 | RCG MULTI STRATEGY MASTER FUND,LTD | RCGM | 5/18/2005 17:06 | 5/26/2005 16:01 |
| D4 | 288 | PEQUOT DIVERSIFIED MASTER FUND CORE/SMAL | PSCF | 5/23/2005 16:14 | 5/26/2005 16:01 |
| D5 | 289 | PEQUOT DIVERSIFIED MASTER FUND CREDIT | PCMF | 5/23/2005 16:24 | 5/26/2005 16:01 |
| D6 | 290 | PEQUOT DIVERSIFIED MASTER FUND SCOUT/DIV | PDIV | 5/23/2005 16:30 | 5/26/2005 16:01 |
| D7 | 291 | TUDOR FAMILY FUND II LLC | TTF2 | 5/23/2005 12:11 | 5/31/2005 13:57 |
| D8 | 292 | BREVAN HOWARD MASTER FUND LTD | BHMF | 6/6/2005 16:07 | 6/24/2005 12:12 |
| D9 | 293 | SFVJ 2003-1 LLC | SFVJ | 5/25/2005 13:48 | 5/25/2005 13:48 |
| QA | 294 | FPCM INFLATION-LINKED OPPORTUNITIES FUND | FILO | 6/24/2005 12:13 | 6/24/2005 12:13 |
| DA | 295 | SAILFISH MULTI-STRATEGY FIXED INCOME MAS | SAIL | 6/24/2005 12:15 | 6/24/2005 12:15 |
| QB | 296 | ARISTOS, LLC. | ARIS | 7/19/2005 10:51 | 7/19/2005 10:51 |
| DB | 297 | VEGA RELATIVE VALUE FUND LTD | VRVF | 6/24/2005 12:17 | 6/24/2005 12:17 |
| DC | 298 | PEQUOT SHORT CREDIT MASTER FUND | PEQS | 6/28/2005 16:38 | 6/28/2005 16:38 |
| DH | 300 | ROCK RIDGE MASTER FUND | ROCK | 6/29/2005 14:57 | 7/12/2005 9:25 |
| DD | 301 | THE 3D CAPITAL YEN FUND, LTD | X | 7/7/2005 13:59 | 7/7/2005 13:59 |

## PATHFINDER - COMPANY/LEDGER CODE
### Generated: 03/25/2009 13:04:49

| MTS Code | GL Code | Lehman Entity | Abbreviation | Open Date | Last Update |
|---|---|---|---|---|---|
| DE | 302 | SORIN MASTER FUND LTD | X | 7/7/2005 8:51 | 7/7/2005 8:51 |
| DF | 303 | AHL EXTRA LTD | MAHL | 7/25/2005 12:38 | 12/27/2005 15:16 |
| DG | 304 | THE BANK OF KOREA | X | 8/4/2005 9:24 | 8/4/2005 9:24 |
| DJ | 305 | Liquid Trading Opportunities Insurance F | LTIC | 9/29/2005 8:30 | 9/29/2005 8:30 |
| DK | 306 | PEQUOT UTILITY MASTER FUND LTD | PUMF | 8/10/2005 16:59 | 8/10/2005 16:59 |
| DL | 307 | PEQUOT PROPRIETARY RISK ALLOCATION FUND | PPRA | 8/10/2005 16:55 | 8/10/2005 16:55 |
| DM | 308 | CATLERIGG MASTER INVESTMENTS | CATG | 8/12/2005 16:13 | 8/12/2005 16:13 |
| DN | 309 | TUDOR TENSOR PORTFOLIO LTD | TUTE | 9/14/2005 16:01 | 9/14/2005 16:01 |
| DP | 310 | SAILFISH MULTI-STRAT FI MSTER FD G2 | GUGG | 9/18/2006 10:34 | 9/18/2006 10:34 |
| DQ | 311 | MOORE MACRO FUND LP | X | 10/14/2005 10:43 | 10/14/2005 10:43 |
| DR | 312 | PARC MOORE LP | X | 10/14/2005 10:43 | 10/14/2005 10:43 |
| DS | 313 | MOORE CREDIT FUND (MASTER) LP | X | 10/14/2005 10:42 | 10/14/2005 10:42 |
| DT | 314 | MOORE GLOBAL FIXED INCOME FUND(MASTER) L | X | 10/14/2005 10:41 | 10/14/2005 10:41 |
| QC | 315 | KILLINGTON SARL | 00V6 | 10/3/2005 17:40 | 10/3/2005 17:40 |
| QD | 316 | WEST DOVER LLC | OC09 | 10/3/2005 17:42 | 10/3/2005 17:42 |
| QE | 317 | BROMLEY LLC | 0B96 | 10/3/2005 17:42 | 10/3/2005 17:42 |
| QF | 318 | EAST DOVER LIMITED | 00V5 | 10/3/2005 17:41 | 10/3/2005 17:41 |
| QG | 319 | JET PARTNERS LLC | 0C10 | 10/3/2005 17:43 | 10/3/2005 17:43 |
| DU | 320 | FPCM INFLATION OPPORTUNITIES FUND LTD/CA | FPCM | 10/19/2005 14:27 | 10/19/2005 14:28 |
| DV | 321 | S.A.C. CAPITAL ASSOCIATES, LLC | X | 10/19/2005 14:28 | 10/19/2005 14:28 |
| DW | 322 | PROTEAN GLOBAL MASTER FUND LTD | X | 10/24/2005 9:12 | 10/24/2005 9:12 |
| DX | 323 | WITCHES ROCK PORTFOLIO LTD | TUDR0 | 11/29/2005 21:35 | 11/29/2005 21:35 |
| DY | 324 | WMG GLOBAL MACRO MASTER FUND LTD | X | 11/3/2005 14:24 | 11/3/2005 14:24 |
| DZ | 325 | LM MOORE LP | MOOR | 11/29/2005 22:02 | 11/29/2005 22:02 |
| EA | 326 | MILLENNIUM EUROPEAN HOLDINGS S.A.R.L. | X | 11/29/2005 16:33 | 11/29/2005 16:33 |
| EB | 327 | LYXOR/HARMONIC CURRENCY MASTER FUND | LHCM | 12/9/2005 10:08 | 12/9/2005 12:23 |
| QH | 328 | ACADIA RJV, LLC | X | 12/14/2005 17:03 | 12/14/2005 17:03 |
| EC | 329 | MOORE MACRO MARKETS FUND LP | MMMF | 12/20/2005 12:22 | 12/20/2005 12:03 |
| ED | 330 | HIGHBRIDGE FIXED INCOME OPPORTUNITY MAST | HIFO | 1/6/2006 11:51 | 1/9/2006 15:23 |
| EE | 331 | STICHTING PENSIOENFONDS ABP | ABPF | 1/13/2006 10:30 | 1/30/2006 12:03 |
| EF | 332 | S.A.C. Global Macro Fund LLC (PING) | PING | 1/19/2006 9:28 | 1/30/2006 12:03 |
| EG | 333 | S.A.C. Global Macro Fund LLC (ANKER) | ANKE | 1/19/2006 9:50 | 1/30/2006 12:03 |
| EH | 334 | S.A.C. Global Macro Fund LLC (SAKKAL) | SAKK | 1/19/2006 10:13 | 1/30/2006 12:03 |

**PATHFINDER - COMPANY/LEDGER CODE**
**Generated: 03/25/2009 13:04:49**

| MTS Code | GL Code | Lehman Entity | Abbreviation | Open Date | Last Update |
|---|---|---|---|---|---|
| EJ | 335 | GLG ABSOLUTE RETURN BOND FUND | GARB | 1/17/2006 10:19 | 1/27/2006 10:35 |
| EK | 336 | CEDAR TACTICAL FUND | CEDA | 1/27/2006 9:12 | 1/27/2006 10:35 |
| EL | 337 | S.A.C. Global Macro Fund LLC (CASH) | CASH | 1/23/2006 12:22 | 1/30/2006 12:03 |
| EM | 338 | DRAKE GLOBAL OPPORTUNITY (MASTER) FUND, | DOMF | 1/25/2006 16:10 | 1/25/2006 16:10 |
| EN | 339 | Tribeca Global Investments LP | TGML | 2/3/2006 11:04 | 2/17/2006 8:44 |
| EP | 340 | CASTLERIGG MASTER INVESTMENTS SOVEREIGN | CAST | 2/6/2006 13:37 | 2/6/2006 13:37 |
| EQ | 341 | FRONTPOINT FIXED INCOME OPPORTUNITIES IN | FFIO | 2/7/2006 15:29 | 2/7/2006 15:29 |
| ER | 342 | GOLDMAN SACHS EMERGING MARKETS OPPORTUNI | LTIC | 2/9/2006 9:05 | 2/21/2006 16:13 |
| ES | 343 | Goldman Sachs Emg Mkts Op (Offshore), L | LTIC | 2/9/2006 9:13 | 2/21/2006 16:13 |
| QJ | 344 | CLARKS SUMMIT I, LLC | CLRK | 2/7/2006 15:28 | 3/4/2008 15:23 |
| ET | 345 | OMEGA CAPITAL PARTNERS LP | X | 2/17/2006 9:41 | 2/17/2006 9:41 |
| EU | 346 | Omega Capital Investors,LP | X | 2/17/2006 8:37 | 2/17/2006 8:37 |
| EV | 347 | OMEGA OVERSEAS PARTNERS,LTD | X | 2/17/2006 10:57 | 2/17/2006 10:57 |
| EW | 348 | BETA EQUITIES, INC | X | 2/17/2006 10:53 | 2/17/2006 10:53 |
| EX | 349 | GS & CO. PROFIT SHARING MASTER TRUST | X | 2/17/2006 11:02 | 2/17/2006 11:02 |
| EY | 350 | PRESIDENTIAL LIFE CORP | X | 2/17/2006 14:39 | 2/17/2006 14:39 |
| EZ | 351 | AGEMO FUND LTD | X | 2/17/2006 14:42 | 2/17/2006 14:42 |
| E1 | 352 | PERMAL LGC LTD | X | 2/17/2006 14:48 | 2/17/2006 14:48 |
| E2 | 353 | LYXOR/ODYSSEY VALUE FUND LIMITED | X | 2/17/2006 14:57 | 2/17/2006 14:57 |
| E3 | 354 | SHOOTER MULTI STRATEGY MASTER FUND LTD | X | 2/16/2006 9:19 | 2/16/2006 9:19 |
| E4 | 355 | RCG WALT LLC | X | 2/23/2006 13:34 | 2/23/2006 13:34 |
| E5 | 356 | GOLDMAN SACHS LIQUID TRADING OPPORT OFFS | X | 4/3/2006 13:53 | 4/3/2006 13:53 |
| E6 | 357 | GOLDMAN SACHS LIQUID TRADING OPPORT FUND | X | 4/3/2006 13:52 | 4/3/2006 13:52 |
| E7 | 358 | JULIUS BAER/ALTMA SICAV-PARK GATE | X | 4/5/2006 11:49 | 4/5/2006 11:49 |
| E8 | 359 | RAMIUS FUND III LTD | RFLT | 4/5/2006 9:27 | 4/5/2006 9:27 |
| E9 | 360 | RAMIUS FUND III LTD-2 | RFND | 5/1/2006 9:27 | 5/1/2006 9:27 |
| FA | 361 | SHK US DOLLAR YIELD PLUS FUND | X | 5/1/2006 9:36 | 5/1/2006 9:36 |
| FB | 362 | MLP INVESTMENTS (CAYMANS) LTD | MPEH | 4/20/2006 8:58 | 4/20/2006 8:58 |
| FC | 363 | MILLENNIUM ADMIN-INTEREST | MIAI | 3/24/2006 13:13 | 3/27/2006 13:21 |
| FD | 364 | COMAC MASTER FUND LIMITED | X | 3/27/2006 14:49 | 3/31/2006 8:19 |
| FE | 365 | RCG Halifax Fund, Ltd-2 | RCGH | 4/12/2006 9:26 | 4/12/2006 9:26 |
| FF | 366 | RAMIUS MASTER FUND, LTD-2 | RMFL | 4/12/2006 14:10 | 6/5/2006 17:11 |
| FG | 367 | RAMIUS CAPITAL GROUP-2 | RACG | 4/17/2006 16:42 | 4/17/2006 16:42 |

**PATHFINDER - COMPANY/LEDGER CODE**
**Generated: 03/25/2009 13:04:49**

| MTS Code | GL Code | Lehman Entity | Abbreviation | Open Date | Last Update |
|---|---|---|---|---|---|
| FH | 368 | DILLON READ U.S. FINANCE L.P. | X | 6/1/2006 8:51 | 6/1/2006 8:51 |
| FM | 369 | DIAMONDBACK MASTER FUND LTD | DIAM | 4/24/2006 12:11 | 4/24/2006 12:11 |
| FJ | 370 | SAC INTERNATIONAL EQUITIES,LLC-FMPJ | SIEL | 4/26/2006 15:51 | 4/26/2006 15:51 |
| FK | 371 | SAC INTERNATIONAL EQUITIES,LLC-CASH | SIEC | 4/26/2006 16:07 | 4/26/2006 16:49 |
| FL | 372 | CR INTRINSIC INVESTMENTS,LLC | CRIN | 5/8/2006 11:17 | 5/8/2006 11:17 |
| FN | 373 | FIRST CARIBBEAN INTL BANK(BAHAMAS) LTD-P | X | 6/8/2006 13:11 | 6/8/2006 13:11 |
| FP | 374 | CR INTRINSIC INVESTMENTS,LLC-CASH | CRIC | 5/8/2006 11:25 | 5/8/2006 11:25 |
| FQ | 375 | FIRST CARIBBEAN INTL BANK(BAHAMAS) LTD-C | X | 6/8/2006 13:12 | 6/8/2006 13:12 |
| FR | 376 | MILLENNIUM PARTNERS LP-SRP | X | 2/2/2007 15:23 | 2/2/2007 15:23 |
| FS | 377 | TYKHE FUND LTD | TYKH | 6/16/2006 11:12 | 6/16/2006 11:14 |
| FT | 378 | SOLENT RELATIVE VALUE CREDIT MASTER FUND | SOLE | 6/14/2006 16:57 | 6/26/2006 14:02 |
| FU | 379 | UBS CURRENCY PORTFOLIO MASTER LTD | X | 6/14/2006 17:07 | 6/14/2006 17:07 |
| FW | 381 | SAC GENESIS FUND LLC-ERIC NADL | SGEN | 7/3/2006 13:47 | 7/3/2006 13:47 |
| FX | 382 | SAC GENESIS FUND LLC-MARK FISHMAN | SGMF | 7/3/2006 13:48 | 7/3/2006 13:48 |
| FY | 383 | UBS MULTI STRATEGY ALPHA MASTER LTD | UBSM | 6/16/2006 11:13 | 6/26/2006 14:07 |
| F2 | 386 | CGS LTD | CGSL | 7/3/2006 9:15 | 7/3/2006 9:15 |
| F3 | 387 | CLL LTD | CLLL | 7/24/2006 14:08 | 7/24/2006 14:08 |
| F4 | 388 | CGO LTD | CGOL | 7/3/2006 9:23 | 7/3/2006 9:23 |
| F5 | 389 | CARLYLE MULTI-STRATEGY MASTER FUND LTD | CMSM | 2/9/2007 11:48 | 2/9/2007 11:48 |
| F6 | 390 | STICH PENS ZORG | X | 12/28/2007 11:07 | 12/28/2007 11:07 |
| F7 | 391 | SAC MULTI-STRATEGY FUND,LTD.(CASH) | SMFC | 7/10/2006 11:59 | 7/10/2006 11:59 |
| F8 | 392 | SAC MULTI-STRATEGY FUND,LP.(CASH) | SMLC | 7/10/2006 12:28 | 7/10/2006 12:28 |
| F9 | 393 | ROCK RIDGE EAST LTD | RORE | 7/10/2006 13:01 | 7/10/2006 13:01 |
| HA | 394 | PERSEUS I, INC | PERS | 7/24/2006 13:00 | 8/1/2006 10:59 |
| HB | 395 | COMMONFUND INST ENHANCED SHORT DUR LTD | X | 7/24/2006 12:04 | 7/24/2006 12:04 |
| HC | 396 | CARLYLE CAPITAL CORP | X | 7/28/2006 13:56 | 7/28/2006 13:56 |
| HD | 397 | FHC MASTER FUND.,LTD | X | 8/2/2006 12:50 | 8/2/2006 12:50 |
| HE | 398 | GRAHAM EQD1 LLC | X | 8/4/2006 11:40 | 8/4/2006 11:40 |
| HF | 399 | CAXTON INTERNATIONAL LIMITED | X | 8/21/2006 15:18 | 8/21/2006 15:18 |
| HG | 400 | FRONTPOINT VOLATILITY OPPT FUND,LP | FPVO | 8/14/2006 12:49 | 8/14/2006 12:49 |
| HJ | 402 | CAXTON INTERNATIONAL LIMITED - GREN | GREN | 10/6/2006 10:35 | 10/6/2006 10:35 |
| HK | 403 | MAC/EAGH LP | X | 8/1/2006 9:23 | 8/1/2006 9:23 |
| HL | 404 | MAC/EAGH LP2 | X | 8/1/2006 9:36 | 8/1/2006 9:36 |

**PATHFINDER - COMPANY/LEDGER CODE**
**Generated: 03/25/2009 13:04:49**

| MTS Code | GL Code | Lehman Entity | Abbreviation | Open Date | Last Update |
|---|---|---|---|---|---|
| HM | 405 | FORTIS HEDGE GLOBAL FIXED INCOME MASTER | X | 8/8/2006 16:47 | 8/8/2006 16:47 |
| HN | 406 | CAXTON INTERNATIONAL LIMITED - MASTER | X | 8/21/2006 14:08 | 8/21/2006 14:08 |
| HP | 407 | CAXTON INTERNATIONAL LIMITED - GLASSER | X | 8/24/2006 13:13 | 8/24/2006 13:13 |
| HQ | 408 | CAXTON INTERNATIONAL LIMITED - LIN | X | 8/23/2006 16:09 | 8/23/2006 16:09 |
| HR | 409 | CAXTON INTERNATIONAL LIMITED - HADDAD | X | 8/28/2006 9:14 | 8/28/2006 9:14 |
| HS | 410 | CAXTON INTERNATIONAL LIMITED - KOVNER | X | 8/23/2006 13:00 | 8/23/2006 13:00 |
| HT | 411 | CAXTON INTERNATIONAL LIMITED - ENSLIN | X | 8/23/2006 11:37 | 8/23/2006 11:37 |
| HU | 412 | CAXTON INTERNATIONAL LIMITED - OSTLUND | X | 8/22/2006 15:55 | 8/22/2006 15:55 |
| HV | 413 | CAXTON INTERNATIONAL LIMITED - HADDAD RV | X | 8/22/2006 15:07 | 8/22/2006 15:07 |
| HW | 414 | CAXTON INTERNATIONAL LIMITED - KLODNICKI | X | 8/22/2006 13:50 | 8/22/2006 13:50 |
| HX | 415 | CAXTON INTERNATIONAL LIMITED - HAWK | X | 8/22/2006 10:59 | 8/22/2006 10:59 |
| HY | 416 | DILLON READ FINANCIAL PRODUCTS TRD LTD | DRFP | 9/14/2006 9:54 | 9/14/2006 9:54 |
| HZ | 417 | MECSA SA | MECS | 10/4/2006 13:29 | 10/4/2006 13:29 |
| H1 | 418 | TENSOR OPPORTUNITY LTD | TENS | 10/4/2006 12:48 | 10/4/2006 12:48 |
| H2 | 419 | TRIBECA ASIAN STRATEGIES LP | TASL | 10/16/2006 14:49 | 10/16/2006 14:49 |
| H3 | 420 | LYXOR/FORUM ABSOLUTE RETURN FUND LTD | X | 3/6/2007 14:31 | 3/6/2007 14:31 |
| H4 | 421 | CQS ABS MASTER FUND LIMITED | X | 9/14/2006 12:36 | 9/14/2006 12:36 |
| QK | 422 | 737 PORTFOLIO TRUST | X | 10/4/2006 16:39 | 10/4/2006 16:39 |
| H6 | 423 | PEQUOT COSMOS MASTER FUND LIMITED | X | 3/8/2007 15:59 | 3/8/2007 15:59 |
| H7 | 424 | ACA CAPITAL PARTNERS I MASTER FUND LTD | ACAC | 10/23/2006 12:33 | 10/23/2006 12:33 |
| H8 | 425 | CAXTON INTERNATIONAL LIMITED - GROUP | GRUP | 10/10/2006 12:43 | 10/10/2006 12:43 |
| H9 | 426 | MILLENNIUM PARTNERS OMNIBUS III-GOUGENHE | x | 3/13/2007 8:13 | 3/13/2007 8:13 |
| H5 | 427 | TAMARACK INTL LTD | TAMA | 11/13/2006 13:55 | 11/13/2006 13:55 |
| QL | 428 | ROYALTY ASSET INVESTMENT LLC | X | 10/31/2006 10:33 | 10/31/2006 10:33 |
| J1 | 429 | MERCED PARTNERS LTD PARTNERSHIP | MERC | 11/17/2006 11:21 | 11/17/2006 11:21 |
| J2 | 430 | MILLENNIUM PARTNERS LP-DOLFMAN | DOLF | 11/3/2006 10:27 | 11/3/2006 10:27 |
| J3 | 431 | RCG PB LTD | RCGP | 3/14/2007 10:54 | 3/14/2007 10:54 |
| J4 | 432 | PEQUOT EVENT DRIVEN MASTER FD LTD | X | 3/28/2007 18:08 | 3/28/2007 18:08 |
| J5 | 433 | PEQUOT DYNAMIC STRATEGIES MASTER FUND LT | PCOF | 4/9/2007 12:13 | 4/9/2007 12:13 |
| J6 | 434 | WFC HOLDINGS CORPORATION | WELL | 3/16/2007 15:57 | 3/16/2007 15:57 |
| J7 | 435 | CR INTRINSIC INVESTMENTS, LLC-GDIS | CRIG | 3/19/2007 12:41 | 3/19/2007 12:41 |
| J8 | 436 | SP STRATEGIC INVESTMENTS I,INC | PSSI | 4/4/2007 11:41 | 4/4/2007 11:41 |
| J9 | 437 | SAC CAPITAL ASSOCIATES LLC-CULINANE | SCCA | 4/24/2007 9:49 | 4/24/2007 9:49 |

**PATHFINDER - COMPANY/LEDGER CODE**
**Generated : 03/25/2009 13:04:49**

| MTS Code | GL Code | Lehman Entity | Abbreviation | Open Date | Last Update |
|---|---|---|---|---|---|
| JA | 438 | CAXTON INTERNATIONAL LIMITED-PG | CRVF | 4/11/2007 10:32 | 4/11/2007 10:32 |
| JB | 439 | BASIS YIELD ALPHA FUND (MASTER) | BAS1 | 12/8/2006 11:55 | 12/8/2006 11:55 |
| JC | 440 | BASIS PAC-RIM OPPORTUNITY FUND (MASTER) | BAS1 | 12/8/2006 11:55 | 12/8/2006 11:55 |
| QM | 441 | LB BANKHAUS LONDON BRANCH | LBBAG | 1/16/2007 16:41 | 1/16/2007 16:41 |
| QN | 442 | LBS HOLDINGS SARL | X | 1/12/2007 16:15 | 1/12/2007 16:15 |
| JD | 443 | AUTONOMY MASTER FUND II LIMITED | X | 1/18/2007 15:31 | 1/18/2007 15:31 |
| JE | 444 | YIELD MASTER FUND LIMITED | X | 2/16/2007 10:44 | 2/16/2007 10:44 |
| JF | 445 | SOTHERTON FUND LIMITED | X | 5/8/2007 12:06 | 5/8/2007 12:06 |
| JG | 446 | CHINA DEVELOPMENT INDUSTRIAL BANK | X | 5/21/2007 11:48 | 5/21/2007 11:48 |
| JJ | 448 | SAC CAPITAL ASSOCIATES LLC(CASH)-CULINAN | SCCC | 4/24/2007 9:47 | 4/24/2007 9:47 |
| JK | 449 | ING PROPRIETARY ALPHA FUND LLC-PAF ABS | X | 5/1/2007 10:45 | 5/1/2007 10:45 |
| JM | 451 | SAC CAPITAL ASSOCIATES LLC - HATFIELD | SAAH | 4/20/2007 14:36 | 4/20/2007 14:36 |
| JN | 452 | SAC CAPITAL ASSOCIATES LLC (CASH)- HATF | SCCH | 4/20/2007 14:57 | 4/20/2007 14:57 |
| JP | 453 | CR INTRINSIC INVESTMENTS LLC-GGEN | GGEN | 4/24/2007 12:30 | 4/24/2007 12:30 |
| JQ | 454 | CR INTRINSIC INVESTMENTS LLC(CASH) - GGE | CGEN | 4/24/2007 12:43 | 4/24/2007 12:43 |
| JR | 455 | SIGMA CAPITAL ASSOCIATES LLC | X | 5/4/2007 16:46 | 5/4/2007 16:46 |
| JS | 456 | SAILFISH MULTI-STRATEGY FI MASTER FUND G | X | 4/26/2007 17:08 | 4/26/2007 17:08 |
| JT | 457 | SIGMA CAPITAL ASSOCIATES LLC ( CASH ) | X | 5/4/2007 12:55 | 5/4/2007 12:55 |
| JU | 458 | CANVAS CAPITAL ASSOCIATES, LLC | X | 5/9/2007 12:09 | 5/9/2007 12:09 |
| JV | 459 | CANVAS CAPITAL ASSOCIATES, LLC - CASH | X | 5/10/2007 13:07 | 5/10/2007 13:07 |
| JW | 460 | Brevan Howard Master Fund Limited - Naji | BHMN | 5/24/2007 11:32 | 5/24/2007 11:32 |
| JX | 461 | CAXTON INTERNATIONAL LIMITED -CI-NOEL | CACI | 5/16/2007 13:42 | 5/16/2007 13:42 |
| JY | 462 | HIGHVIEW POINT MASTER FUND , LTD | X | 5/23/2007 9:15 | 5/23/2007 9:15 |
| JZ | 463 | PEQUOT PE FUND , L.P. | X | 5/31/2007 13:57 | 5/31/2007 13:57 |
| CO | 464 | PEQUOT HEALTHCARE FUND , L.P. | PHFL | 6/5/2007 11:54 | 6/5/2007 11:54 |
| AO | 465 | PEQUOT HEALTHCARE INSTITUTIONAL FUND,L.P | X | 6/1/2007 14:44 | 6/1/2007 14:44 |
| QQ | 466 | LB GPS LIGHTFOOT LLC | X | 2/20/2007 14:48 | 2/20/2007 14:48 |
| BO | 467 | PEQUOT HEALTHCARE OFFSHORE FUND,INC | X | 6/1/2007 16:06 | 6/1/2007 16:06 |
| QR | 468 | LB COMMODITY SERVICES INC. | LBCS | 3/30/2007 17:36 | 3/30/2007 17:36 |
| QS | 469 | LPJ AIRCRAFT FINANCE LLC | X | 4/24/2007 16:32 | 4/24/2007 16:32 |
| QT | 470 | LEHMAN BROTHERS SPECIAL LENDING | X | 5/2/2007 8:58 | 5/2/2007 8:58 |
| R1 | 471 | CARLYLE BLUE WAVE ABS MASTER FD LTD | CBWA | 6/5/2007 15:57 | 6/5/2007 15:57 |
| R2 | 472 | OPPENHEIMER DISTRESSED OPPORTUNITIES ,LP | ODOL | 6/8/2007 11:01 | 6/8/2007 11:01 |

## PATHFINDER - COMPANY/LEDGER CODE
### Generated: 03/25/2009 13:04:49

| MTS Code | GL Code | Lehman Entity | Abbreviation | Open Date | Last Update |
|---|---|---|---|---|---|
| R3 | 473 | ADM CAPITAL EUROPE LLP A/C GLADIUS FD LT | X | 6/18/2007 14:51 | 6/18/2007 14:51 |
| R4 | 474 | MILLENNIUM PARTNERS LP-OMNIBUS IV-KORE | X | 6/19/2007 16:16 | 6/19/2007 16:16 |
| R5 | 475 | ALLIANCE BERNSTEIN ALTERNATIVE INVEST MA | ABHA | 7/6/2007 9:52 | 7/6/2007 9:52 |
| R6 | 476 | H2 SPECIAL OPPORTUNITIES LTD | X | 10/30/2007 15:32 | 10/30/2007 15:32 |
| R7 | 477 | CONGRESS LIFE INSURANCE COMPANY | CONG | 7/16/2007 9:48 | 7/16/2007 9:48 |
| R8 | 478 | FFTW MULTI-STRATEGY ALPHA FUND | X | 7/17/2007 14:00 | 7/17/2007 14:00 |
| RA | 480 | LEHMAN BROTHERS ASSET MGMT(EUR)LTD MYRYL | X | 7/12/2007 14:33 | 7/12/2007 14:33 |
| RB | 481 | ACM BERNSTEIN VALUE INV-FXD INCOME ALPHA | X | 7/17/2007 10:41 | 7/17/2007 10:41 |
| RC | 482 | PEQUOT DIVERSIFIED MASTER FUND LTD-HLTH | X | 7/19/2007 10:57 | 7/19/2007 10:57 |
| RD | 483 | ASARGO GLOBAL OPPT MASTER SEG PORTFOLIO | X | 7/25/2007 9:44 | 7/25/2007 9:44 |
| RE | 484 | ARSAGO ACTIVE OVERLAY MASTER SEGREGATED | ARSA | 7/23/2007 12:10 | 7/23/2007 12:10 |
| RF | 485 | MILLENNIUM PARTNERS LP-KANG | AAOM | 7/23/2007 12:21 | 7/23/2007 12:21 |
| RG | 486 | QUINTESSENCE FUND,LP | KANG | 8/2/2007 16:57 | 8/2/2007 16:57 |
| RH | 487 | QVT FUND LP | QUIN | 8/2/2007 16:57 | 8/2/2007 16:57 |
| RI | 488 | DB BANK AG LONDON | QVTF | 7/27/2007 16:07 | 7/27/2007 16:07 |
| RJ | 489 | ARSAGO PREMIUM CURR 3XL FEEDER SEG PORTF | DBQV | 8/2/2007 16:50 | 8/2/2007 16:50 |
| RK | 490 | ARSAGO MULTISTRATEGY FEEDER SP | APCF | 7/26/2007 13:40 | 7/26/2007 13:40 |
| RL | 491 | RCG PB-JV | AMSF | 7/26/2007 16:56 | 7/26/2007 16:56 |
| RM | 492 | H/2 TARGETED RETURN STRATEGIES LTD | RCGJ | 8/13/2007 12:52 | 8/13/2007 12:52 |
| RN | 494 | THE RAPTOR GLOBAL PORTFOLIO LTD | HTRS | 8/13/2007 8:50 | 8/13/2007 8:50 |
| RP | 495 | ING PROPRIETARY ALPHA FD LLC-OVERLAY ALP | TRGP | 8/14/2007 8:23 | 8/14/2007 8:23 |
| RQ | 496 | ARSAGO STIRT MASTER SEGREGATED PORTFOLIO | PAFS | 10/3/2007 16:52 | 10/3/2007 16:52 |
| RR | 497 | HIGHBRIDGE INTERNATIONAL LLC | ARSA | 8/16/2007 13:02 | 8/16/2007 13:02 |
| RS | 498 | ARSAGO PREMIUM CURR MASTER SEGREGATED PO | HIGH | 8/16/2007 12:56 | 8/16/2007 12:56 |
| RT | 499 | EMERGING MARKET DEBT ABSOLUTE RETURN FD | APCM | 8/23/2007 11:19 | 8/23/2007 11:19 |
| QU | 500 | LB3 GMBH | LB3GM | 7/30/2007 15:01 | 7/30/2007 15:01 |
| RU | 501 | MULTI STRATEGY ABSOLUTE RETURN FUND | X | 9/4/2007 10:40 | 9/4/2007 10:40 |
| RV | 502 | TURNBERRY LEVERAGED CREDIT MASTER, LP | TURN | 8/30/2007 12:43 | 8/30/2007 12:43 |
| RX | 504 | ARROWGRASS CAP PARTNERS A/C MASTER FD LT | ARRO | 9/11/2007 9:55 | 9/11/2007 9:55 |
| RY | 505 | SPNY MASTER FUND L.P. | X | 9/6/2007 12:34 | 9/6/2007 12:34 |
| RZ | 506 | RCG ENTERPRISE LTD | RENT | 9/12/2007 10:27 | 9/12/2007 10:27 |
| QV | 507 | LB SKYPOWER, INC | X | 9/18/2007 15:58 | 9/18/2007 15:58 |
| T1 | 508 | H/2 SPEC OP REALTY | H2CY | 9/24/2007 9:55 | 9/24/2007 9:55 |

## PATHFINDER - COMPANY/LEDGER CODE
### Generated: 03/25/2009 13:04:49

| MTS Code | GL Code | Lehman Entity | Abbreviation | Open Date | Last Update |
|---|---|---|---|---|---|
| T2 | 509 | COMMINGLED PENSION (ABS RET CR) JP MORGA | COMP | 9/24/2007 13:07 | 9/24/2007 13:07 |
| T3 | 510 | HALBIS US CREDIT ALPHA MASTER FUND LTD | USCA | 9/25/2007 14:18 | 9/25/2007 14:18 |
| T4 | 511 | ROUND TABLE GLOBAL MULTI-STRATEGY MASTER | X | 10/2/2007 8:58 | 10/2/2007 8:58 |
| T5 | 512 | QUANTLAB TRADING PARTNERS LP | X | 10/1/2007 14:01 | 10/1/2007 14:01 |
| QW | 513 | GT INVESTMENT COMPANY I, LLC | X | 9/27/2007 13:17 | 9/27/2007 13:17 |
| T6 | 514 | INTEGRATED CORE STRATEGIES(EUR) SARL | SARL | 3/4/2008 15:31 | 3/4/2008 15:31 |
| T7 | 515 | SWISS RE FUNDS (LUX) - FIXED INC EURO | X | 10/16/2007 10:38 | 10/16/2007 10:38 |
| T9 | 517 | NATIONAL PENSION SERVICE-REPUBLIC OF KOR | KNPS | 11/27/2007 13:14 | 11/27/2007 13:14 |
| TA | 518 | TIKEHAU SPECIAL SITUATIONS FUND LTD | TIKH | 10/18/2007 16:19 | 10/18/2007 16:19 |
| TB | 519 | MILLENNIUM EUROPEAN HOLDINGS II SARL | X | 11/6/2007 14:25 | 11/6/2007 14:25 |
| QX | 520 | LAMINAR HOLDINGS , LLC | X | 10/25/2007 13:08 | 10/25/2007 13:08 |
| QY | 521 | CONGRESS LIFE INSURANCE COMPANY | CLIC | 10/30/2007 14:57 | 10/30/2007 14:57 |
| TC | 522 | SIGMA FIXED INCOME FUND FIXED INCOME DER | SFID | 11/8/2007 12:34 | 11/8/2007 12:34 |
| TD | 523 | LILY POND CURRENCY PLUS MASTER FD LTD | LILY | 11/19/2007 12:32 | 11/19/2007 12:32 |
| TE | 524 | SYNERGY GLOBAL FINANCE MASTER FD LTD | SYNE | 11/29/2007 17:33 | 11/29/2007 17:33 |
| TF | 525 | MLP INVESTMENTS (LUXEMBOURG) SARL-OMNI B | SARO | 12/4/2007 18:37 | 12/4/2007 18:37 |
| TG | 526 | ING PROPRIETARY ALPHA FD-STRUCT CREDIT | PASC | 12/6/2007 12:10 | 12/6/2007 12:10 |
| QZ | 527 | LEHMAN RESIDENTIAL OPPORTUNITY CORP | LROC | 11/28/2007 15:43 | 11/28/2007 15:43 |
| TH | 528 | VALORICA ALFA | VALO | 12/21/2007 14:29 | 12/21/2007 14:29 |
| TJ | 529 | CAXTON INTERNATIONAL LTD-LA | X | 12/18/2007 12:17 | 12/18/2007 12:17 |
| TK | 530 | SPNY MP I LLC | SPMP | 12/18/2007 17:08 | 12/18/2007 17:08 |
| TL | 531 | FIELD STREET MASTER FUND , LTD | FILM | 2/7/2008 15:17 | 2/7/2008 15:17 |
| TM | 532 | VALORICA MACRO | X | 1/11/2008 13:07 | 1/11/2008 13:07 |
| TN | 533 | SARACEN MERCHANT ENERGY LP | X | 1/16/2008 10:21 | 1/16/2008 10:21 |
| TP | 534 | SARACEN ENERGY LP | X | 1/16/2008 15:01 | 1/16/2008 15:01 |
| TQ | 535 | ING PROPRIETARY ALPHA FD-LONG SHORT CRED | LOSO | 1/22/2008 14:49 | 1/22/2008 14:49 |
| TR | 536 | BLACKROCK GLOBAL MACRO HEDGE MASTER FD L | BLAC | 1/23/2008 14:42 | 1/23/2008 14:42 |
| TS | 537 | CAXTON INTERNATIONAL LTD - IM | CAIM | 1/24/2008 14:01 | 1/24/2008 14:01 |
| TT | 538 | INST BENCHMARKS (MASTER FD) LTD - AUGUST | AUGU | 1/25/2008 16:11 | 1/25/2008 16:11 |
| TU | 539 | BETA MENA FUND | ALGE | 3/3/2008 11:49 | 3/3/2008 11:49 |
| TV | 540 | MILLENNIUM PAN-ASIA HOLDINGS PTE-CR OMNI | X | 2/5/2008 15:28 | 2/5/2008 15:28 |
| TW | 541 | MILLENNIUM PAN-ASIA HOLDINGS PTE-LTD-RAT | X | 2/8/2008 13:32 | 2/8/2008 13:32 |
| TX | 542 | CAXTON INTERNATIONAL LTD - PC | PECK | 2/4/2008 14:49 | 2/4/2008 14:49 |

**PATHFINDER - COMPANY/LEDGER CODE**
**Generated: 03/25/2009 13:04:49**

| MTS Code | GL Code | Lehman Entity | Abbreviation | Open Date | Last Update |
|---|---|---|---|---|---|
| TY | 543 | ONE WILLIAM STREET CAPITAL MASTER FD LTD | ONEW | 2/11/2008 12:26 | 2/11/2008 12:26 |
| TZ | 544 | ING PROPRIETARY ALPHA FUND-MACRO | MACO | 2/27/2008 9:53 | 2/27/2008 9:53 |
| U1 | 545 | MKP FIXED INCOME FUND, LP | MKPF | 3/5/2008 18:18 | 3/5/2008 18:18 |
| U2 | 546 | SAC GLOBAL MACRO FUND LLC - BPAN | BPAN | 2/28/2008 15:56 | 2/28/2008 15:56 |
| U3 | 547 | WAM IV, LLC | WAMF | 3/26/2008 16:07 | 3/26/2008 16:07 |
| U4 | 548 | FRONTPOINT FIXED INCOME STRATEGIC CR FD | FPSC | 3/18/2008 16:39 | 3/18/2008 16:39 |
| U5 | 549 | ARSAGO GLB MACRO OPP FEEDER SEG PORTFOLI | ARSA | 3/11/2008 12:29 | 3/11/2008 12:29 |
| U6 | 550 | LIBERTY HARBOR MASTER FUND I LP | X | 3/11/2008 10:31 | 3/11/2008 10:31 |
| U7 | 551 | CAXTON INTERNATIONAL LTD - OSSW | X | 3/20/2008 10:31 | 3/20/2008 10:31 |
| U8 | 552 | INST BENCH-EPI OP | IBSL | 3/17/2008 16:31 | 3/17/2008 16:31 |
| U9 | 553 | TUDOR GLOBAL EMERGING MKT PORTFOLIO LP | TEMP | 3/17/2008 12:06 | 3/17/2008 12:06 |
| UA | 554 | TUDOR GLB EMERGING MARKETS CR PORTFOLIO | TECP | 3/31/2008 12:06 | 3/31/2008 12:06 |
| UB | 555 | FORTRESS MORTGAGE OPP MASTER FUND 1 LP | X | 3/26/2008 18:56 | 3/26/2008 18:56 |
| UC | 556 | THE DRAKE GLOBAL OPPORTUNITIES FD II, LT | X | 5/19/2008 11:57 | 5/19/2008 11:57 |
| UD | 557 | CAXTON INTERNATIONAL LTD - LX | DGRV | 4/3/2008 10:39 | 4/3/2008 10:39 |
| UE | 558 | OWS MORTGAGE OPP MASTER FUND, LP | LEXX | 4/14/2008 16:36 | 4/14/2008 16:36 |
| UF | 559 | R3 CAPITAL PARTNERS MASTER LP | X | 4/25/2008 16:08 | 4/25/2008 16:08 |
| UG | 560 | FORTRESS MORTGAGE OPP MASTER FD SR 2 LP | X | 6/19/2008 16:54 | 6/19/2008 16:54 |
| UH | 561 | ZURGG RISK PROTECTION FUND LTD | X | 5/12/2008 14:32 | 5/12/2008 14:32 |
| UI | 562 | RAM HOLDCO, LLC | MIDC | 5/14/2008 13:56 | 5/14/2008 13:56 |
| Q1 | 563 | PETERBOROUGH 850, LLC | X | 4/1/2008 14:34 | 4/1/2008 14:34 |
| Q2 | 564 | DCI LONG SHORT CREDIT | X | 4/23/2008 9:54 | 4/23/2008 9:54 |
| Q3 | 565 | EJF DISTRESSED MASTER FUND II,LP | X | 4/23/2008 11:03 | 4/23/2008 11:03 |
| UJ | 566 | EJF CAPITAL LLC SERIES D | EJFC | 5/8/2008 10:34 | 5/8/2008 10:34 |
| UK | 567 | PING EXCEPTIONAL VALUE MASTER FUND, LP | ESED | 6/2/2008 11:46 | 6/2/2008 11:46 |
| UL | 570 | HARMONIC ALPHA PLUS GLOBAL CURR FUND | X | 6/10/2008 14:35 | 6/10/2008 14:35 |
| UM | 571 | GOLDENTREE CREDIT OPP MASTER FUND LTD | X | 6/5/2008 15:46 | 6/5/2008 15:46 |
| UP | 572 | GOLDENTREE MULTISTRATEGY LTD | X | 5/22/2008 11:00 | 5/22/2008 11:00 |
| UQ | 573 | GPC LVIII, LLC | X | 6/12/2008 14:36 | 6/12/2008 14:36 |
| UR | 574 | GOLDENTREE MULTISTRATEGY LP | X | 6/17/2008 18:38 | 6/17/2008 18:38 |
| US | 575 | GOLDENTREE MASTER FUND , LTD | X | 6/12/2008 11:07 | 6/12/2008 11:07 |
| UT | 576 | GOLDENTREE MASTER FUND , LTD | X | 6/12/2008 11:24 | 6/12/2008 11:24 |
| UU | 575 | GOLDENTREE MASTER FUND , LTD | X | 6/19/2008 12:46 | 6/19/2008 12:46 |
| UV | 576 | GOLDENTREE MASTER FUND II, LTD | X | 6/19/2008 12:48 | 6/19/2008 12:48 |
| UW | 577 | GOLDENTREE EUROPEAN SELECT OPP MASTER LP | X | 6/12/2008 11:54 | 6/12/2008 11:54 |

## PATHFINDER - COMPANY/LEDGER CODE
### Generated: 03/25/2009 13:04:49

| MTS Code | GL Code | Lehman Entity | Abbreviation | Open Date | Last Update |
|---|---|---|---|---|---|
| UX | 578 | GTAM FUND I, LTD | X | 6/12/2008 12:29 | 6/12/2008 12:29 |
| UY | 579 | GOLDENTREE LEVERAGE LOAN MASTER FD., LTD | X | 6/12/2008 13:30 | 6/12/2008 13:30 |
| UZ | 580 | DIAMONDBACK FIXED INCOME MASTER FD LTD | DFIM | 6/25/2008 12:43 | 6/25/2008 12:43 |
| V4 | 584 | GOLDENTREE HIGH YIELD VALUE MASTER FD | X | 7/21/2008 15:23 | 7/21/2008 15:23 |
| V5 | 585 | OWS I ACQUISTIONS LLC | OWAC | 8/4/2008 17:38 | 8/4/2008 17:38 |
| V6 | 586 | ARSAGO STIRT SP | ARSA | 6/23/2008 10:39 | 6/23/2008 10:39 |
| V7 | 587 | FALCON RELATIVE VALUE FUND | GULF | 7/8/2008 16:07 | 7/8/2008 16:07 |
| V8 | 588 | ARROWGRASS SPECIAL SITUATIONS MASTER FUN | ARR5 | 7/24/2008 14:49 | 7/24/2008 14:49 |
| V9 | 589 | M. SAFRA EMERGING MARKETS MASTER FUND LT | X | 8/6/2008 13:22 | 8/6/2008 13:22 |
| VA | 590 | QUANTUM MBS LTD | X | 8/20/2008 11:49 | 8/20/2008 11:49 |
| VB | 591 | RCG ENTERPRISE LTD - JNPC | JNPC | 8/27/2008 10:04 | 8/27/2008 10:04 |
| VC | 592 | RCG PB LTD-JNMBS | JNMB | 8/27/2008 9:26 | 8/27/2008 9:26 |
| VF | 595 | STRAUMUR BUDARAS INV BANK HF | STRA | 8/20/2008 13:34 | 8/20/2008 13:34 |
| VG | 596 | ABERDEEN GLOBAL III-GLOBAL RATES ABSOLUT | AGRF | 9/9/2008 8:44 | 9/9/2008 8:44 |
| VP | 604 | LEHMAN TAX CREDIT ADVISOR INC | X | 3/13/2009 9:17 | 3/13/2009 9:17 |
| VQ | 605 | REAL ESTATE PRIVATE EQUITY INC | X | 3/25/2009 12:22 | 3/25/2009 12:22 |
| VR | 606 | PAMI LBREP II LLC | X | 3/25/2009 12:23 | 3/25/2009 12:23 |
| Z | 700 | BARCLAYS CAPITAL INC. | X | 9/19/2008 10:12 | 9/19/2008 10:12 |
| XP | 701 | BARCLAYS CAPITAL INC | X | 9/19/2008 14:14 | 9/19/2008 14:14 |

**Exhibit D**

Trade Account Maintenance Statement of Marquette Financial Companies



## **Exhibit E**

Trade Account Maintenance Statement of Highland Credit Strategies Master Fund, L.P.

