doc of 24 Dec 2002; printed 12/24/2002 12:53 PM

**Schedule 4**
**to Tri-Party Custody Agreement**

**Form of Seller's Asset Composition Data File (Asset File)**

Below is the agreed upon file layout for the Lehman asset file. "Y" indicates that the field is required, "N" indicates that the field is not required.

File Header

| Data Field | Columns | Lehman File | Comments |
|---|---|---|---|
| Record Id | 1 – 2 | Y | "3H" |
| Creation Time Stamp | 3 – 16 | Y | YYYYMMDDHHMMSS |
| Production Date | 17 – 24 | Y | YYYYMMDD |
| Investment Bank Id | 25 – 26 | Y | 11 OR 12 |
| Custodian Id | 27 – 29 | N | Not required |
| Total Number of Records | 30 – 34 | Y | Not including header and trailer |
| Total Original Balance | 35 – 49 | Y | Optional |
| Total Current Balance | 50 – 64 | Y | Optional |
| Filler | 65 – 400 | Y | Blanks |

Detail Records

| Data Field | Columns | Lehman File | Comments |
|---|---|---|---|
| Record Id | 1 – 2 | Y | "3D" |
| MTS Pool Number | 3 – 11 | Y | Alphanumeric |
| Loan Number | 12 – 29 | Y | Alphanumeric |
| Coupon Rate | 30 – 36 | Y | ##.#### |
| Original Balance | 37 – 51 | Y | ############.## |
| Current Balance | 52 – 66 | Y | ############.## |
| Asset Grade | 67 – 67 | Y | A, B, C |
| Security Description | 68 – 72 | Y | GNMA, FNMA, FHLMC |
| Seller Price | 73 – 84 | Y | ###.########; Optional; for future use |
| Maturity Date | 85 – 92 | Y | YYYYMMDD; Optional |
| Months to maturity | 93 – 96 | Y | Optional; used for reports |
| Months from Issue Date | 97 – 100 | Y | Optional; used for reports |
| Issuer Name | 101 – 130 | N | Optional; used for reports |
| Trade Type | 131 – 132 | Y | Optional; for future use. |
| Asset Type | 133 – 134 | Y | Optional; for future use |
| Asset Sub-Type | 135 – 136 | Y | Optional; for future use. |
| Name | 137 – 186 | Y | Optional |
| Street Address | 187 – 266 | Y | Optional |
| City | 267 – 296 | Y | Optional |
| State Abbreviation | 297 – 298 | Y | Optional |
| Zip | 299 – 309 | Y | Optional |
| Country | 310 – 319 | Y | Optional |
| Coupon Spread | 320 – 324 | Y | ##.##; Optional; for future use |

| Data Field | Columns | Lehman File | Comments |
|---|---|---|---|
| Filler | 325 – 395 | Y | Optional; for future use |
| Record Number | 396 – 400 | Y | Not including header record |

File Trailer

| Data Field | Columns | Lehman File | Comments |
|---|---|---|---|
| Record Id | 1 – 2 | Y | "3T" |
| Creation Time Stamp | 3 – 16 | Y | YYYYMMDDHHMMSS |
| Production Date | 17 – 24 | Y | YYYYMMDD |
| Investment Bank Id | 25 – 26 | Y | 11 or 12 |
| Custodian Id | 27 – 29 | N | Not Required |
| Total Number of Records | 30 – 34 | Y | Not including header and trailer |
| Total Original Balance | 35 – 49 | Y | #############.## |
| Total Current Balance | 50 – 64 | Y | #############.## |
| Filler | 65 – 400 | Y | Blanks |

doc of 24 Dec 2002; printed 12/24/2002 12:53 PM

### Schedule 5
### to Tri-Party Custody Agreement

**File Format for Spreads File**

File Header

| Field name | Columns | Comments |
|---|---|---|
| Record Id | 1 – 2 | "9H" |
| Creation Time Stamp | 3 – 16 | YYYYMMDDHHMMSS |
| Production Date | 17 – 24 | YYYYMMDD of processing date |
| Investment Bank Id | 25 – 26 | 11 or 12 |
| Filler | 27 – 93 | Blanks |
| Total Records | 94 – 98 | Not including header and trailer |

Detail Records

| Field | Columns | Comments |
|---|---|---|
| Record Id | 1 – 2 | "9D" |
| Account/Investment Bank Id | 3 – 10 | Investor Id if allocated, Investment Bank Id if unencumbered |
| MTS Pool Number | 11 – 19 | Alphanumeric |
| Loan Number | 20 – 37 | Alphanumeric |
| Liability Maturity Date | 38 – 45 | YYYYMMDD |
| Asset Coupon Rate | 46 – 52 | ##.#### |
| Asset Grade | 53 – 53 | A, B, C |
| Market Price | 54 – 63 | ###.###### |
| Asset Current Balance | 64 – 78 | ############.## |
| MTS Trade Id | 79 – 92 | Alphanumeric; blank if unencumbered |
| Record Number | 93 – 97 | Not including header record |
| Asset Status | 98 – 98 | "A"llocated, "P"re-allocated or "F"ree |

File Trailer

| Field name | Columns | Comments |
|---|---|---|
| Record Id | 1 – 2 | "9T" |
| Creation Time Stamp | 3 – 16 | YYYYMMDDHHMMSS |
| Production Date | 17 – 24 | YYYYMMDD of processing date |
| Investment Bank Id | 25 – 26 | 11 or 12 |
| Filler | 27 – 93 | Blanks |
| Total Records | 94 – 98 | Not including header and trailer |

38

doc of 24 Dec 2002; printed 12/24/2002 12:53 PM

## Schedule 6
## to Tri-Party Custody Agreement

### Form of Detail Schedule For Buyer

**JPMORGAN CHASE BANK**
**TRI-PARTY**
Investor Allocation Report
Lehman Commercial Paper Inc.

Production Date:

Investor Name:

Type:                          G No:

Trade Number:

Investor Amount:        $

Margin Value:            $

Pricing Source:

| Custodian | Pool No | Loan No | Coupon | Price % | Status | Mat. Date | Face Amount | Market Value |
|-----------|---------|---------|--------|---------|--------|-----------|-------------|--------------|
|           |         |         |        |         |        |           |             |              |
|           |         |         |        |         |        |           |             |              |

39

doc of 24 Dec 2002; printed 12/24/2002 12:53 PM

**Schedule 7**
**to Tri-Party Custody Agreement**

ASSUMED PRICES FOR COMMERCIAL AND RESIDENT MORTGAGE LOANS

Assumed Price for Commercial Mortgage Loans:   100%

Assumed Price for Residential Mortgage Loans:   100%

40

**Schedule 8**
**to Tri-Party Custody Agreement**

[date]

JPMorgan Chase Bank,
  as Master Custodian
4 New York Plaza, 13 Fl.
New York, New York 10004
  Attn: Glenn Hett, Vice President
          New York Collateral Management

Ladies and Gentlemen:

Reference is made to that certain Tri-Party Custody Agreement dated as of _____ __, 20__ by and among Lehman Commercial Paper Inc., as Seller (the "Seller") JPMorgan Chase Bank, as Master Custodian (the "Master Custodian") and _____, as Buyer (the "Buyer") (as amended or modified by the parties thereto from time to time, the "Tri-Party Custody Agreement"). Initially capitalized terms not defined herein shall have the meanings ascribed to such terms in the Tri-Party Custody Agreement.

Pursuant to Section 5(e)(iii) of the Tri-Party Custody Agreement, you have informed us that as of 11:00 a.m. New York City time today you have not received [a] Sub-Custodian Data File[s]from the following Sub-Custodian[s],[each of] which you have assumed [is][are] open for business today as permitted pursuant to the terms of said Section 5(e)(iii):

You are hereby instructed pursuant to said Section 5(e)(iii) to accept, in lieu of the Sub-Custodian Data File[s] ordinarily received from the above-referenced Sub-Custodian[s], the transmission of a data file by Seller to Master Custodian in the same form as the Sub-Custodian Data File ordinarily sent by the above referenced Sub-Custodian[s] but by electronic means agreed upon between the Seller and the Master Custodian which may be different from the electronic means ordinarily employed by Sub-Custodian[s] for such purpose. Upon receipt of such data file from the Seller, Master Custodian may rely upon the contents of such data file, including, but not limited to, the existence and completeness of the Mortgage Files evidenced thereby, without further inquiry and Master Custodian shall not be liable to any Person whatsoever in so relying thereon.

Very truly yours,

LEHMAN COMMERCIAL PAPER, INC.

By:_____
    Name:
    Title:

41

**Schedule 9**
**to Tri-Party Custody Agreement**

[date]

[Name and Address
of Buyer]
 Attn: _____

Ladies and Gentlemen:

     Reference is made to that certain Tri-Party Custody Agreement dated as of _____ ___, 20__ by and among Lehman Commercial Paper Inc., as Seller (the "Seller") JPMorgan Chase Bank, as Master Custodian (the "Master Custodian") and _____, as Buyer (the "Buyer") (as amended or modified by the parties thereto from time to time, the "Tri-Party Custody Agreement"). Initially capitalized terms not defined herein shall have the meanings ascribed to such terms in the Tri-Party Custody Agreement.

     Pursuant to Section 5(e)(iii) of the Tri-Party Custody Agreement, the Master Custodian has informed the Seller that as of 11:00 a.m. New York City time today it has not received [a] Sub-Custodian Data File[s] from the following Sub-Custodian[s],[each of] which it has assumed [is][are] open for business today as permitted pursuant to the terms of said Section 5(e)(iii):

     This letter shall constitute notice to you that upon being informed as provided in the preceding paragraph hereof, the Seller has instructed the Master Custodian pursuant to said Section 5(e)(iii) to accept, in lieu of the Sub-Custodian Data File[s] ordinarily received from the above-referenced Sub-Custodian[s], the transmission of a data file by Seller to Master Custodian in the same form as the Sub-Custodian Data File ordinarily sent by the above referenced Sub-Custodian[s] but by electronic means agreed upon between the Seller and the Master Custodian which may be different from the electronic means ordinarily employed by Sub-Custodian[s] for such purpose. As is provided in said Section 5(e)(iii), upon receipt of such data file from the Seller, Master Custodian shall rely upon the contents of such data file, including, but not limited to, the existence and completeness of the Mortgage Files evidenced thereby, without further inquiry and Master Custodian shall not be liable to any Person whatsoever in so relying thereon.

             Very truly yours,

             JPMORGAN CHASE BANK,
             AS MASTER CUSTODIAN

             By:_____
               Name:
               Title:

**Schedule 10**
**to Tri-Party Custody Agreement**

**Form of Seller's Pre-Allocation Schedule**

File Header

| Field name | Columns | Comments |
|---|---|---|
| Record Id | 1 – 2 | "5H" |
| Creation Time Stamp | 3 – 16 | YYYYMMDDHHMMSS |
| Production Date | 17 – 24 | YYYYMMDD of processing date |
| Investment Bank Id | 25 – 26 | 11 or 12 |
| Filler | 27 – 111 | Blanks |
| Total Records | 112 – 116 | Not including header and trailer |

Detail Records

| Data Field | Columns | Comments |
|---|---|---|
| Record Id | 1 – 2 | "5D" |
| MTS Trade Id | 3 – 16 | Alphanumeric |
| MTS Pool Number | 17 – 25 | Alphanumeric |
| Loan Number | 26 – 43 | Alphanumeric |
| Liability Investment Amount | 44 – 58 | ############.##, Optional; not used |
| Investor Margin % | 59 – 71 | ##.#########, Optional; not used |
| Liability Required Amount | 72 – 86 | ############.##, Optional; not used |
| Asset Market Value | 87 – 101 | ############.##, Optional; not used |
| Record Number | 102 – 106 | Not including header record |
| Filler | 107 – 116 | Blanks |

File Trailer

| Field name | Columns | Comments |
|---|---|---|
| Record Id | 1 – 2 | "5T" |
| Creation Time Stamp | 3 – 16 | YYYYMMDDHHMMSS |
| Production Date | 17 – 24 | YYYYMMDD of processing date |
| Investment Bank Id | 25 – 26 | 11 or 12 |
| Filler | 27 – 111 | Blanks |
| Total Records | 112 – 116 | Not including header and trailer |

(Regarding Haircut Percentages)

**Exhibit A1 (Residential Mortgage Loans)**
**to Tri-party Custody Agreement**

| INVESTMENT CATEGORY | MARGIN PERCENTAGE |
|---|---|
| Grade A: X (Check) | |
| Cash | 100% |
| Grade B* X (Check) | |
| Residential Mortgage Loans | 100% + 5% |
| Grade C * ___ (Check) | |
| Commercial Mortgage Loans | 100% + ___ % |
| Grade D** ___ (Check) | |
| Other Assets: N/A | 100% + ____ % |

Note:   For additional asset types complete Schedule I.
Check A, B or C above.

\*     In the form of whole loans or represented by Trust Receipt taking the form of Exhibit 1 to the Tri-Party Sub-Custodial Agreement.
\*\*   To be designated by the parties hereto.

**Swedbank (Sparbanken Sverige AB (Publ)),**
**New York Branch**
Buyer

By: _____

Name:   JOHN MATTHEWS    JIM CRAWFORD

Title:   GENERAL MANAGER    SVP/TREASURER

**Lehman Commercial Paper Inc.**
Seller

By: _____

Name:   T. COURTNEY JENKINS

Title:   VICE PRESIDENT

**JPMorgan Chase Bank**
Master Custodian

By: _____

Name:   Glenn H. Hett

Title:   Vice President

(Regarding Haircut Percentages)

**Exhibit A2 (1ˢᵗ Lien Commercial Mortgage Loans)**
**to Tri-party Custody Agreement**

| INVESTMENT CATEGORY | MARGIN PERCENTAGE |
|---|---|
| Grade A: <u>X</u> (Check) | |
| Cash | 100% |

| | |
|---|---|
| Grade B* ___ (Check) | |
| Residential Mortgage Loans | 100% + __ % |

| | |
|---|---|
| Grade C * <u>X</u> (Check) | |
| Commercial Mortgage Loans | 100% + 5% |

___<u>X</u>___ Agrees to Seller Pricing (Check)

| | |
|---|---|
| Grade D** ___ (Check) | |
| Other Assets: N/A | 100% +_____% |

Note:    For additional asset types complete Schedule 1.
Check A, B or C above.

\*        In the form of whole loans or represented by Trust Receipt taking the form of <u>Exhibit 1</u> to the Tri-Party
         Sub-Custodial Agreement.
\*\*       To be designated by the parties hereto.

**Swedbank (Sparbanken Sverige AB (Publ)),**
**New York Branch**
Buyer

By: _____

Name: _____ JOHN MATTHEWS    Jan Linfors

Title: _____    SVP/Treasurer

**Lehman Commercial Paper Inc.**
Seller

By: _____

Name: ___ T. COURTNEY JENKINS _____

Title: ___ VICE PRESIDENT _____

**JPMorgan Chase Bank**
Master Custodian

By: _____

Name: _____ Glenn H. Heft _____

Title: _____ Vice President _____

(Relating to Representations and Covenants of Buyer and Seller)

**Exhibit B**
**to Tri-Party Custody Agreement**

a. Buyer's Delivery Instructions for Cash
ABA#:          021000018
Bank Name:   The Bank of New York
                        New York
Account No.:  890-0256834
Account Name: Swedbank New York

b.    Buyer's Authorized Persons

| Name | Title | Specimen Signature |
|------|-------|--------------------|
| Jim Linford | SVP | |
| Michael Ferrara | VP | |
| Luis Pino | AVP | |

c.    Authorized Persons for the purpose of confirming funds transfer instructions.

| Name | Title | Telephone Number |
|------|-------|------------------|
| Anna Magistrale | Supervisor | 212 317 3107 |
| Debbie Grant-Wynter | Treas. Operations | 212 317 3109 |
| Don Weiss | VP Operations | 212 317 3106 |

d.    Notices To Buyer

Name:    Margarita Salcedo
Title:    Vice President
Address:    Swedbank
         One Penn Plaza, 15th Fl., NY, NY 10119
Attn:
Phone:    212 317 3116
Facsimile:    212 486 3220

BUYER WILL BE ACTING AS:

Principal_X_                    Agent/Trustee____

**Exhibit C**
**to Tri-Party Custody Agreement**

**Seller Account Information**

Wiring Instructions for Lehman Commercial Paper Inc. (LCPI):

Bank:        JPMorgan Chase Bank
ABA #:       021-000-021
Acct:        507893077
Attn:        Lehman Commercial Paper Inc.

**AMENDED AND RESTATED**

August 26, 2008

Lehman Commercial Paper Inc.
745 Seventh Avenue
New York, NY 10019
Attn: Robert Guglielmo

Re:     Commitment to buy commercial mortgage loans and other assets between each of the Lehman Brothers entities listed on the signature page (each, "Lehman Brothers") and Swedbank AB (publ), New York Branch (the "Bank"), pursuant to the Master Repurchase Agreement dated as of December 3rd, 2002 (the "Master Agreement") between each of Lehman Brothers Inc., Lehman Commercial Paper Inc. ("LCPI") and the Bank, the Custodial Undertaking in Connection with the Master Agreement, dated as of December 23, 2002, among each of LCPI, the Bank and JPMorgan Chase Bank, whose custodial rights and obligations under such agreement were as assigned to and assumed by the Bank of New York on October 1, 2006 (the "Custodian") and such agreement, the "Tri-Party Custody Agreement") or other master repurchase and custody agreements that each Lehman Brothers entity and the Bank may agree to enter into (the "Other Master Agreements")

Dear Sir:

The Bank hereby agrees with Lehman Brothers as follows:

1.  Commitment Letter. The Bank shall enter into Transactions requested by Lehman Brothers. subject to the terms and conditions of the Master Agreement, the Other Master Agreements, the Tri-Party Custody Agreement, the Other Master Agreements (as applicable) and this Commitment Letter, including the Schedule I attached hereto (together, the "Agreements").

2.  Termination of Commitment Letter. This Commitment Letter shall have an initial maturity of seventeen (17) months from its Effective Date of [July 21, 2008], and shall automatically extend on each Notice Date for an additional three (3) months; provided, however that each of the Bank and Lehman Brothers may terminate this Commitment Letter by providing a notice to the other party on the 21st day of January, April, July or October of any year (each such day, other than July 21, 2008, a "Notice Date"), which shall cause this Commitment Letter to terminate fourteen (14) months after the relevant Notice Date (in the event that a Notice Date falls on a date that is not a Business Day, the

05-35902::2

Business Day immediately following such date shall be deemed the Notice Date.). Further, each of the Bank and Lehman Brothers may terminate this Commitment Letter with written notice immediately after declaring an Event of Default under the Agreements. For the avoidance of doubt, the termination of this Commitment Letter as to one Seller shall have no effect as to any other Seller.

3. <u>Representations and Warranties.</u> Each of the Bank and Lehman Brothers represents and warrants to each other the representations and warranties made under the Agreements.

4. <u>Separate Agreements.</u> Each of Lehman Brothers and the Bank acknowledge and agree that this Commitment Letter is to be treated as if it were separate Commitment Letters between the Bank and each of the four Lehman Brothers signatories. For the avoidance of doubt, an Event of Default as to one Lehman Brothers entity shall in no way be considered an Event of Default as to any other Lehman Brothers entity.

5. <u>Prior Agreements.</u> It is agreed that this Commitment Letter supercedes and replaces any and all existing agreements between the parties covering this subject matter including, without limitation, the most recent agreement between the Bank and Lehman Commercial Paper Inc., dated as of October 2, 2007.

6. <u>Assignments and Participations.</u> Neither the Bank nor Lehman Brothers may assign its respective rights and obligations hereunder without the prior written consent of the other party, such consent not to be unreasonably withheld. The Bank may sell participations in all or a portion of the Bank's rights and obligations hereunder, provided that:

    a. the Bank's obligations under this Commitment Letter shall remain unchanged,;

    b. the Bank shall remain the holder of any obligation owing to it under the Agreements;

    c. Lehman Brothers and the Custodian may continue to deal solely and directly with the Bank in connection with the rights and obligations under the Agreements; and

    d. the holders of such participation shall have no direct rights under the Agreements.

7. <u>Governing Law.</u> This Commitment Letter shall be governed by and construed in accordance with the law of the State of New York (including, without limitation, Section 5-1401 of the General Obligations Law) without regard to any other choice of law doctrine or principles.

8. <u>Definitions and Priority.</u> All capitalized terms used but not defined herein shall have the meanings ascribed to them under the other Agreements. In the event of any conflict between the other Agreements and this Commitment Letter, this Commitment Letter shall prevail.

9. The parties acknowledge that additional documentation may be needed to implement the intent of this Commitment Letter and agree to take all reasonable and necessary actions to execute the additional documentation. It is agreed and understood that the Bank's

US-359023 2

2

commitment hereunder is solely for the benefit of parties to a valid and existing
Agreement from time to time.

Accepted and agreed to as of the date first written above by:

**SWEDBANK AB (PUBL), NEW YORK BRANCH**

By _____

Name: John Matthews
General Manager

Title: _____

**SWEDBANK AB (PUBL), NEW YORK BRANCH**

By _____

Name: Don Weiss

Title: V.P.

**LEHMAN BROTHERS BANKHAUS AG (EUROPE)**

By _____

Name: David Rushton    Hns Rees
SVP

Title: SVP

**LEHMAN BROTHERS HOLDINGS INC.**

By _____

Name: Julie M. Boyle
Senior Vice President    Robert Azerad
SVP

Title: _____

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By _____

Name: David Rushton    Hns Rees
SVP

Title: SVP

**LEHMAN COMMERCIAL PAPER INC.**

By _____

Name: Julie M. Boyle
Senior Vice President    Robert Azerad
SVP

Title: _____

**LEHMAN BROTHERS INC.**

By _____

Name: Julie M. Boyle
Senior Vice President    Robert Azerad
SVP

Title: _____

05-359023.2                    3

**I.    Commitment Terms**

| | | | |
|---|---|---|---|
| 1 | Seller | | Any of the Lehman Brothers signatories named in the Commitment Letter to which this Schedule I is attached, as the case may be. |
| 2. | Buyer | | The Bank |
| 3. | Condition Precedent: | (i) | No Event of Default under the Agreements has occurred and is continuing. |
| | | (ii) | Undertaking of the Transaction would not violate any Limits. |
| 4 | Limits | Maximum Aggregate Purchase Price: | $1,350,000,000; provided, however that the Maximum Aggregate Purchase Price shall automatically be reduced to $1,000,000,000 on September 21, 2008. Buyer's failure to resell $350 million of the Purchased Assets to Seller, or Seller's failure to pay Buyer the Repurchase Price for such Purchased Assets, on September 21, 2008 shall constitute an Event of Default under the Master Agreement |
| | | Maximum Percentage of Aggregate Purchase Price Attributable to Commercial Mortgage Loans: | No single real estate loan can be in excess of $100,000,000 |
| | | , Corporate Bonds, Medium-Term Notes, and Municipal Securities | No single category of Purchased Securities or Purchased Assets (other than Commercial Mortgage Loans) can represent 25% or more of the Aggregate Purchase Price of Purchased Assets outstanding at any given time. |
| 5. | Purchase Date. | | Two Business Days after delivery of a written notice describing the intended Transaction (a "Notice of Purchase") |

| I. | Commitment Terms | |
|---|---|---|
| | | when such notice is delivered by 12:00 PM. |
| 6. | *Repurchase Date:* | As determined by Seller, but in no event less than thirty (30) days after the Purchase Date. |
| 7. | *Pricing Rate* | One (1) Month LIBOR plus one hundred fifty (150) basis points. |
| 8. | *Commitment Fee* | To the extent that the Maximum Aggregate Purchase Price is greater than the aggregate Purchase Price of all outstanding Transactions under this Commitment Letter on any day prior to termination of the Commitment Letter ( such excess on such day, a "Daily Unutilized Commitment"), Lehman Brothers shall owe to the Bank a fee equal to the daily application of sixty (60) basis points calculated on a 360 day per year basis on such Daily Unutilized Commitment, any such fees to be payable on a quarterly basis. |
| 9 | *Purchased Securities or Purchased Assets:* | (i)    Commercial Mortgage Loans with first liens and a loan-to-value ratio (or having an adjusted ratio, defined as the product of the collateral value and the margin percentage divided by the property value) of not more than 75%. |
| | | (ii)   Corporate Bonds rated at least B-. |
| | | (iii)  Medium-Term Notes rated at least B-. |
| | | (iv)   Municipal Securities rated at least B-. |
| | | (v)    Residential Whole Loans |

| 10. | *Buyer's Margin Percentage in regards to Purchased Securities* | Commercial Mortgage Loans | 105% |
|---|---|---|---|
| | | Corporate Bonds | 105% |
| | | Medium Term Notes | 105% |
| | | Municipal Securities | 105% |
| | | Cash | 100% |
| | | Residential Whole Loans | 105% |

| 11 | *Voluntary Prepayments by Seller:* | Seller may prepay the Repurchase Price for any Transactions in whole or in part with written notice delivered by 10:00 AM five (5) Business Days in advance (inclusive of the day upon which prepayment is to be made; *provided, however,* that Seller shall pay to Buyer all breakage costs, if any, incurred by Buyer in connection with such prepayment, such breakage costs equal to the product of (i) the prepaid amount, (ii) the positive difference if any between (A) current One (1) Month LIBOR rate (not including spread), and (B) the interpolated LIBOR rate with a designated maturity equal to the number of breakage days as determined through the end of the monthly interest period, and (iii) the number of breakage days divided by 360 |
|---|---|---|
| 12. | *Buyer's Reduction in Maximum Aggregate Purchase Price* | If the aggregate Purchase Price is less than the Maximum Aggregate Purchase on every Business Day for a period of six (6) months, then Buyer may reduce, with written notice of at least five (5) Business Days, the Maximum Aggregate Purchase Price by an amount equal to the *smallest* daily difference in such amounts. |
| | | Reduction by Buyer. If the aggregate Purchase Price is less than the Maximum Aggregate Purchase on every Business Day |

05-3590123.2

6

| 1. | Commitment Terms | |
|---|---|---|
| | | for a period of nine (9) months, then Buyer may reduce, with written notice of at least five (5) Business Days, the Maximum Aggregate Purchase Price by an amount equal to the *largest* daily difference in such amounts. |
| | 13 *Seller's Reduction in Maximum Aggregate Purchase Price* | Seller may reduce the Maximum Aggregate Purchase Price with written notice of at least six (6) months, provided, however, that such reduction shall not affect the Pricing Rate specified in Section 7 of this Schedule I to the Commitment Letter. |
| | 14 *Additional Terms* | Lehman Brothers Inc. (an affiliate of LCPI) may act as agent for LCPI.<br><br>Lehman Brothers Holdings Inc. shall provide a Payment Guaranty for all the obligations of each of the other Sellers in form and substance satisfactory to the Bank. |
| | 15. *Notices* | Notices shall be writing and sent to the following: |

If to Swedbank:

Swedbank AB (publ), New York Branch
One Penn Plaza, 15th Floor
New York, NY 10119
Attention: Michael Ferrara
Tel: 212-486-3220

If to Lehman Brothers Bankhaus AG (Europe):

c/o Lehman Brothers Inc.
745 Seventh Avenue, Fl. 4
New York City, NY 10019
Attention: Annina Youngblood
Tel: 212-526-9690

If to Lehman Brothers Holdings Inc.:

c/o Lehman Brothers Inc.
745 Seventh Avenue, Fl. 4
New York City, NY 10019
Attention: Annina Youngblood
Tel: 212-526-9690

If to Lehman Brothers International (Europe):

c/o Lehman Brothers Inc.
745 Seventh Avenue, Fl. 4
New York City, NY 10019
Attention: Annina Youngblood
Tel: 212-526-9690

If to Lehman Commercial Paper Inc.:

c/o Lehman Brothers Inc.

I.    Commitment Terms

745 Seventh Avenue, Fl. 4
New York City, NY 10019
Attention: Annina Youngblood
Tel: 212-526-9690

**If to Lehman Brothers Inc.:**

c/o Lehman Brothers Inc.
745 Seventh Avenue, Fl. 4
New York City, NY 10019
Attention: Annina Youngblood
Tel: 212-526-9690

05-359023 2

7



September 24, 2008

Lehman Brothers
745 Seventh Avenue
New York, NY 10019
Attn: Robert Guglielmo, Senior Vice President

Re: Default Notice relating to Master Repurchase Agreement

Ladies and Gentlemen:

Reference is hereby made to the Master Repurchase Agreement dated as of December 3, 2002 (including all annexes, schedules and exhibits thereto, collectively, the "MRA"), between Lehman Brothers Inc., Lehman Commercial Paper Inc. ("Lehman") and Swedbank AB, New York Branch. ("Swedbank"). Capitalized terms used herein without definition shall have the meanings specified in the MRA.

The exhibit attached to this letter shows the Purchased Securities that you have failed to repurchase upon the applicable Repurchase Date. Your failure to repurchase such securities on the applicable Repurchase Date is an Event of Default under the MRA and we hereby notify you that we have exercised our option to declare that an Event of Default has occurred with regard to the MRA. As a result, the Repurchase Date for each Transaction under the MRA is deemed to have occurred today and the aggregate Repurchase Prices for all Transactions under the MRA, and any and all other amounts owing by Lehman to Swedbank under the terms of the MRA, are now all immediately due and payable. Without in any way limiting any of Swedbank's rights under the MRA, we are hereby serving this Default Notice on you and notify you of the foregoing.

Swedbank reserves all of its rights and remedies under the MRA and any and all other related documents and agreements, available at law or otherwise, including without limitation all rights and remedies available under Paragraph 11 of the MRA.

SWEDBANK AB (PUBL), NEW YORK BRANCH

By:
Name: John Matthews   Magnus Francke
Title: Senior Vice Presidents

cc:
Michael Bond, via e-mail
Stephen Fischler, via e-mail and telefax

WSUMPCSRFX01-15        9/19/2008 5:11:09 PM    PAGE    3/003    Fax Server



THE BANK OF NEW YORK MELLON

# The Bank of New York
# TRI-PARTY
## Investor Allocation Detail Report
### Lehman Commercial Paper Inc.

Production Run : 09/19/2008        LCPI

Print Date : 09/19/2008 05:09 PM

| | |
|---|---|
| Investor Name : Swedbank, New York Branch | Investment Amount : $1,000,000,000.00 |
| Investor Reference No : WSWE | Required Amount : $1,070,000,000.00 |
| Trade Reference No : 941D680 | Trade Margin % : 7.00 |

Required Amount : $1,070,000,000.00

Excess Amount : $40,482,902.34

| | |
|---|---|
| Investor Name : Swedbank, New York Branch | Investment Amount : $350,000,000.00 |
| Investor Reference No : WSWE | Required Amount : $374,500,000.00 |
| Trade Reference No : 941G350 | Trade Margin % : 7.00 |

Asset Grade : C
Pricing Service : Seller

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 102 | WH9156 | WH9156 | 0.0001 | 100.000000 | P | 09/14/2009 | $99,999,999.00 | $99,999,999.00 |
| 102 | WH9187 | WH9187 | 0.0001 | 100.000000 | P | 01/09/2010 | $99,999,999.00 | $99,999,999.00 |
| 102 | WH8855 | WH8855 | 0.0000 | 100.000000 | P | 02/01/2009 | $41,280,000.00 | $41,280,000.00 |
| 102 | WH8538 | WH8538 | 8.0000 | 100.000000 | P | 10/31/2008 | $24,535,881.00 | $24,535,881.00 |
| 102 | WH6614 | WH6614 | 9.0000 | 100.000000 | P | 05/01/2009 | $19,531,702.46 | $19,531,702.46 |
| 102 | WH6501 | 100101819 | 0.0001 | 100.000000 | P | 01/01/2009 | $18,130,000.00 | $18,130,000.00 |
| 102 | WH8727 | 109101962 | 0.0001 | 100.000000 | P | 10/08/2008 | $17,262,780.55 | $17,262,780.55 |
| 102 | WH6812 | 100101856 | 0.0001 | 100.000000 | P | 08/03/2009 | $15,538,779.25 | $15,538,779.25 |
| 102 | WH6555 | 100101910 | 0.0001 | 100.000000 | P | 10/14/2008 | $12,871,476.49 | $12,871,476.49 |
| 102 | WH6598 | WH6598 | 8.0000 | 100.000000 | P | 08/01/2009 | $11,000,000.00 | $11,000,000.00 |
| 102 | WH4819 | 100101277 | 0.0001 | 100.000000 | P | 08/01/2009 | $10,891,229.63 | $10,891,229.63 |
| 102 | WH8944 | 100102036 | 0.0001 | 100.000000 | P | 12/01/2009 | $9,280,030.32 | $9,280,030.32 |
| 102 | WH8054 | 100101907 | 0.0001 | 100.000000 | P | 11/01/2012 | $7,048,189.44 | $7,048,189.44 |
| 102 | WH6540 | WH6540 | 8.0000 | 100.000000 | P | 10/31/2008 | $6,086,466.47 | $6,086,466.47 |
| 102 | WH6275 | 100101207 | 0.0001 | 100.000000 | P | 04/30/2010 | $5,644,482.76 | $5,644,482.76 |
| 102 | WH6539 | WH6539 | 8.0000 | 100.000000 | P | 10/31/2008 | $4,185,814.92 | $4,185,814.92 |
| 102 | WH8948 | 100102040 | 0.0001 | 100.000000 | P | 12/01/2009 | $2,178,905.47 | $2,178,905.47 |

Pricing Service Total :        17 Assets                $406,023,738.76    $406,023,738.76

Grade C Total :        17 Assets                $406,023,738.76    $406,023,738.76

Total :        17 Assets                $406,023,738.76    $406,023,738.76

Required Amount :    $374,500,000.00

Excess Amount :    $31,523,738.76

Status Key
A - Allocated
P - Preallocated

This document contains information that is confidential and the property of The Bank of New York. It may not be copied, published or used, in whole or in part for any purpose other than expressly authorized by The Bank of New York Copyright (c) 2006 The Bank of New York. All rights reserved.

Report ID : d_elc

H
A
N
D

D
E
L
I
V
E
R
Y

RECEIVED BY: _____

FILED / RECEIVED

SEP 2 0 2010

EPIQ BANKRUPTCY SOLUTIONS, LLC
DATE

5:12 PM
TIME

**EXHIBIT D**

**BANKRUPTCY COURT APPROVAL ORDER
AND SETTLEMENT AGREEMENT**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                  :
In re                                             :    Chapter 11 Case No.
                                                  :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,          :    08-13555 (JMP)
                                                  :
                  Debtors.                        :    (Jointly Administered)
                                                  :
------------------------------------------------------------x

### ORDER PURSUANT TO SECTION 105(a)
### OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE
### 9019(b) AUTHORIZING AND APPROVING A SETTLEMENT
### AND COMPROMISE AMONG LEHMAN BROTHERS HOLDINGS INC.,
### LEHMAN COMMERCIAL PAPER INC. AND SWEDBANK AB, NEW YORK BRANCH

Upon the motion (the "Motion"), of Lehman Brothers Holdings Inc. ("LBHI")

and Lehman Commercial Paper Inc. ("LCPI"), for an order, pursuant to section 105(a) of title 11

of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing and approving a settlement with

Swedbank AB, New York Branch ("Swedbank") on the terms set forth in a Settlement

Agreement,[1] as more fully set forth in the Motion; and the Court having jurisdiction to consider

the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and

the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York

Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Motion having been provided to (i) the United States

Trustee for the Southern District of New York; (ii) the attorneys for the Official Committee of

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the Motion.

Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue

Service; (v) the United States Attorney for the Southern District of New York; (vi) counsel to

Swedbank; and (vii) all other parties entitled to notice in accordance with the procedures set

forth in the second amended order entered on June 17, 2010 governing case management and

administrative procedures for these cases [Docket No. 9635]; and no objections to the Motion

having been filed; and a hearing having been held on the Motion on February 16, 2011; and the

Court having found and determined that the relief sought in the Motion is in the best interests of

LBHI and LCPI, their estates and creditors, and all parties in interest and that the legal and

factual bases set forth in the Motion establish just cause for the relief granted herein; and after

due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to Section 105 of the Bankruptcy Code and Bankruptcy

Rule 9019, the Settlement Agreement is approved, and LBHI and LCPI are each duly authorized

to (i) consummate all of the transactions contemplated thereby and (ii) execute and deliver such

documents and instruments and to take such other actions as may be reasonably necessary to

consummate the transactions contemplated by the Settlement Agreement, it being understood

that any actions described in this paragraph taken by LBHI, LCPI or any of the affiliates of LBHI

or LCPI may be taken without the necessity of any further Court proceedings or approval and

shall be conclusive and binding in all respects on all parties in interest in these cases; and it is

further

ORDERED that, upon and subject to the terms and conditions set forth in the

Settlement Agreement, with respect to Claim No. 67080 filed by Swedbank against LCPI and

Claim No. 67079 filed by Swedbank against LBHI (collectively, the "Allowed Repo Proofs of

2

Claim") from and after the Closing Date (as defined in the Settlement Agreement) in satisfaction

in full of such proofs of claim, Swedbank will have an allowed, non-priority, non-subordinated

unsecured claim against each of LCPI and LBHI in their respective chapter 11 cases in the

amount of $325,000,000 (the "Settlement Amount"); provided, however, that the aggregate

recovery of Swedbank in respect of the Allowed Repo Proofs of Claim shall not exceed the

Settlement Amount and that, for the avoidance of doubt, the claim set forth in each of the

Allowed Repo Proofs of Claim shall have the same treatment as other claims within its class

under the plan confirmed by the Court in the chapter 11 cases of LCPI and LBHI, as applicable;

and it is further;

ORDERED that the Settlement Agreement and any related agreements,

documents or other instruments may be modified, amended or supplemented by the parties

thereto, in a writing signed by such parties, and in accordance with the terms thereof, without

further order of the Court, *provided* that any such modification, amendment or supplement does

not have a material adverse effect on the Debtors' estates; and it is further

ORDERED that any and all claims, defenses, rights of setoff, debt, liens, losses,

demands, damages, costs, and causes of action of whatever nature in connection with or relating

to the Repurchase Agreement, the Mortgage Assets, the Settlement Agreement or any related

transaction by and among the Debtors and their affiliates shall be expressly reserved and not

affected by entry into the Settlement Agreement or consummation of the transactions

contemplated thereunder pursuant to section 2.9(f) of the Settlement Agreement; and it is further

ORDERED (a), that solely as among the Debtors, nothing herein shall determine

who is the owner of the proceeds of the Loans or who would otherwise be entitled to the

economic benefit, if any, of the Loans and (b) that any and all pre- and post-petition claims,

3

rights and obligations that the Debtors (including but not limited to LCPI and LBHI) may have among themselves in connection with the subject matter of the Motion are hereby preserved, and that the entry of this Order shall not constitute a waiver or relinquishment of the rights of any Debtor or party in interest with respect to such claims, rights and obligations; and it is further

ORDERED that nothing in the Motion, Settlement Agreement or herein shall affect or be construed as affecting any rights, title, interests, claims or obligations of Lehman Re Ltd. arising from any of its direct or indirect investments or interests in any real property that is directly or indirectly the subject of the Motion, the Settlement Agreement or the transactions contemplated thereunder; and it is further

ORDERED that nothing in the Motion or Settlement Agreement or herein shall be construed as affecting any rights of Lehman Brothers Inc. ("LBI") arising from or relating to any transactions entered by it under the Repurchase Agreement or any rights that LBI may have to pursue claims or causes of action arising from or relating to the Repurchase Agreement; and it is further

ORDERED that the Mortgage Assets are not and were not property of LBHI's estate or LCPI's estate; and it is further

ORDERED that neither LBHI nor LCPI have assumed or assumed and assigned nor will assume or assume and assign the Repurchase Agreement pursuant to the Bankruptcy Code, including section 365 thereof, in connection herewith or with the Settlement Agreement or any of the transactions contemplated thereby; and it is further

ORDERED that, Swedbank is the owner of the Mortgage Assets, other than the Swedbank Loans upon the closing of the Settlement Agreement; and it is further

4

ORDERED that the Bankruptcy Court retains jurisdiction to enforce the

Settlement Agreement and any disputes arising thereunder.


Dated: New York, New York
       February 17, 2011

                           __s/ James M. Peck_____
                           Honorable James M. Peck
                           United States Bankruptcy Judge

# SETTLEMENT AGREEMENT

## By and Among

## LEHMAN BROTHERS HOLDINGS INC.,

## LEHMAN COMMERCIAL PAPER INC.

### and

## SWEDBANK AB, NEW YORK BRANCH

### dated as of

## February 17, 2011

# SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (this "**Agreement**"), dated as of February 17, 2011 (the "**Execution Date**"), by and among **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation ("**LBHI**"), **LEHMAN COMMERCIAL PAPER INC.**, a New York corporation ("**LCPI**"), and **SWEDBANK AB, NEW YORK BRANCH** ("**Swedbank**"). The parties to this Agreement are sometimes referred to individually herein as a "**Party**" and collectively as "**Parties.**"

## W I T N E S S E T H :

WHEREAS, on September 15, 2008 LBHI commenced a voluntary case under the Bankruptcy Code, in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

WHEREAS, on October 5, 2008 (the "**LCPI Petition Date**"), LCPI commenced a voluntary case under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

WHEREAS, (i) LCPI, Lehman Brothers Inc. and Swedbank were parties to that certain Master Repurchase Agreement dated as of December 3, 2002, as amended (the "**Repurchase Agreement**"), pursuant to which LCPI sold to Swedbank, upon the terms as set forth in the Repurchase Agreement, certain commercial mortgage loans, which are listed on the attached Exhibit A (the "**Mortgage Assets**"), (ii) pursuant to two Guarantees delivered on or about December 23, 2002 and June 12, 2001, LBHI guaranteed payment by LCPI and its Affiliates of certain of their obligations to Swedbank under the Repurchase Agreement, (iii) pursuant to a Tri-Party Custody Agreement (the "**Custody Agreement**"), dated as of December 23, 2002, by and among Swedbank, LCPI and The Bank of New York as successor-in-interest to JPMorgan Chase Bank ("**Custodian**"), the files (collectively, the "**Collateral Files**") relating to the Mortgage Assets were held by the Custodian for the benefit of Swedbank and LCPI, and (iv) the Custodian arranged for one or more sub-custodians to take custody of the Collateral Files.

WHEREAS, September 8, 2008 was the last rollover date (the "**Last Rollover**") on which Mortgage Assets were sold to Swedbank pursuant to the Repurchase Agreement.

WHEREAS, pursuant to the Repurchase Agreement, Swedbank remitted cash to LCPI on or prior to the Last Rollover in exchange for the purchase of the Mortgage Assets.

WHEREAS, prior to the Last Rollover, LBHI sold all of the Mortgage Assets to LCPI pursuant to one or more repurchase transactions, and LCPI re-sold all of the Mortgage Assets to Swedbank in a back-to-back repurchase transaction pursuant to the Repurchase Agreement.

WHEREAS, on September 24, 2008 (the "**Default Date**"), Swedbank declared an Event of Default (as defined in the Repurchase Agreement) and notified LCPI in writing that it was in default under the Repurchase Agreement. On the same day, Swedbank advised the Custodian that there had been an Event of Default and, as a result and in accordance with the Custody Agreement, the Custodian was required to follow the directions of Swedbank with regard to the Collateral Files.

WHEREAS, since the LCPI Petition Date, either LCPI and/or LBHI, as assignor, and Swedbank as assignee, have entered into the Assignment Documents (as hereinafter defined) confirming that (i) LCPI or LBHI, as applicable, has sold, and Swedbank has purchased, all of LCPI's or LBHI's, as applicable, right, title and interest with respect to the Mortgage Assets pursuant to the Repurchase Agreement, and (ii) LCPI or LBHI, as applicable, has assigned, and Swedbank has assumed, all of LCPI's or LBHI's, as applicable, obligations as lender to arising from the documents evidencing such Mortgage Assets as of the Default Date and thereafter.

WHEREAS, the Parties desire to enter into this Agreement and to consummate each of the transactions described in Article II of this Agreement (collectively, the **"Settlement Transactions"**) on the Closing Date simultaneously pursuant to the terms, covenants and conditions set forth in this Agreement.

NOW, THEREFORE, upon the foregoing recitals, which are incorporated as though fully set forth and agreed to herein and in consideration of the premises and of the respective covenants and agreements contained herein, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

# ARTICLE I

# DEFINITIONS

1.1.    In addition to the terms defined above, in this Agreement (including the recitals hereto) and in the Schedules and Exhibits hereto, except as expressly provided or as the context otherwise requires:

**"816 Congress Agreements"** means those certain agreements relating to the 816 Congress Project, dated as of the Closing Date, in substantially the forms agreed upon by the Parties.

**"816 Congress Project"** means the real property and improvements commonly known as 816 Congress and located in Austin, Texas.

**"1100 Vermont Project"** means the real property and improvements commonly known as 1100 Vermont and located in Washington, D.C.

**"1407 Borrower"** means 1407 Broadway Real Estate LLC, a Delaware limited liability company.

**"1407 Net Profits Agreement"** means that certain Net Profits Agreement dated as of January 4, 2007, by and among LBHI and the 1407 Borrower.

**"1407 Net Profits Related Documents"** means, collectively, (i) the Pledge and Security Agreement Re: Net Profits Agreement (Interests in Mezzanine Borrower), dated as of January 4, 2007, by and between 1407 Broadway Mezz II LLC and LBHI, (ii) the UCC-1 Financing Statement between 1407 Broadway Mezz II LLC, as Debtor and LBHI, as Secured Party filed with the Secretary of State Delaware, (iii) the Pledge and Security Agreement Re: Net Profits Agreement (Interests in Project Owner), dated as of January 4, 2007, by and between 1407

Broadway Mezz LLC and LBHI, (iv) the UCC-1 Financing Statement between 1407 Broadway Mezz LLC, as Debtor and LBHI, as Secured Party filed with the Secretary of State Delaware, (v) the Joinder and Consent dated as of January 4, 2007 between LBHI and 1407 Borrower, and (vi) the Side Letter re: Net Profits Agreement dated January 4, 2006 between LBHI, 1407 Borrower and Lightstone Holdings LLC.

"**Accrued Interest Amount**" shall mean, with respect to any Lehman Loan or Swedbank Loan that is not in default with respect to the payment of principal and interest on the Closing Date, the amount of accrued but unpaid interest on such Lehman Loan or Swedbank Loan through and including the Closing Date.

"**Affiliate**" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with, such Person. A Person will be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, partnership interests or other equity interests, by contract or otherwise.

"**Allowed Repo Proofs of Claim**" shall have the meaning assigned to such term in Section 2.3 hereof.

"**Assignments**" mean with respect to (i) the Lehman Loans, those certain documents of assignment dated as of the Closing Date assigning LBHI's right, title and interest in the Lehman Loans to Swedbank in substantially the forms agreed upon by the Parties hereto, and (ii) the Swedbank Loans, those certain documents of assignment dated as of the Closing Date assigning Swedbank's right, title and interest in the Swedbank Loans to LBHI or its designee in substantially the forms agreed upon by the Parties hereto.

"**Assignment Documents**" shall have the meaning assigned to such term in Section 7.7 hereof.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder.

"**Bankruptcy Court Approval Order**" means the entry by the Bankruptcy Court of an order approving this Agreement and the transactions contemplated hereby substantially in the form of Exhibit B attached hereto, with such changes as may be reasonably agreeable to the Parties, and which has not as of the Closing Date been vacated or stayed or amended without the consent of each Party.

"**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which banks in New York are required or permitted to be closed.

"**Closing**" shall have the meaning assigned to such term in Article IV hereof.

"**Closing Date**" shall have the meaning assigned to it in Section 4.1.

"**Consent**" means any consent, approval, authorization, waiver, permit, grant, franchise, concession, agreement, license, order, registration, declaration, filing, or notice of, with or to any Person.

"**Enforcement Action**" means any judicial or non-judicial proceeding, including, without limitation, the foreclosure of any mortgage, the exercise of any power of sale, the sale by advertisement, the appointment of a receiver, taking of a deed or assignment in lieu of foreclosure, the pursuit of any judgment, or the taking of any other action concerning any of the Mortgage Assets by Swedbank in its sole and absolute discretion.

"**Escrow Accounts**" means, in connection with any Loan, those reserves or accounts established and maintained for the deposit and retention of all collections of taxes, assessments, ground rents, hazard and other insurance and comparable items.

"**Governmental Approval**" means any Consent of or with any Governmental Authority.

"**Governmental Authority**" means any nation or government (foreign or domestic), and any state or political subdivision thereof; any self-regulatory organization acting under color of authority granted under any Legal Requirement; and any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States or any other nation, or any foreign or domestic, state, county, city or other political subdivision thereof.

"**Independent Borrower Parties**" means collectively, the direct and/or indirect real property owner of each of the La Posada Project and the Telluride Project, as set forth on Schedule G attached hereto.

"**La Posada Principal Agreement**" means the Principal Agreement dated as of July 31, 2007 by Karim Alibhai and PAMI, LLC to and for the benefit of Swedbank, as successor-in-interest to LBHI, as amended, restated, supplemented or otherwise modified and as in effect on the date hereof.

"**La Posada Project**" means the real property and improvements commonly known as La Posada and located in Santa Fe, New Mexico.

"**Legal Requirements**" in respect of any Person means all (i) constitutions, treaties, statutes, laws, ordinances, codes, rules, regulations, standards, judgments, decrees, writs, rulings, injunctions, orders and other requirements of any Governmental Authority, (ii) Governmental Approvals and (iii) orders, decisions, injunctions, judgments, awards and decrees of or agreements with any Governmental Authority.

"**Lehman Controlled Affiliate**" means any Person directly or indirectly controlled by a Lehman Party. A Person shall be deemed to be directly or indirectly controlled by a Lehman Party if such Lehman Party possesses, directly or indirectly, the power to direct or cause the direction of such Person, whether through the ownership of voting securities, partnership interests or other equity interests, by contract or otherwise; provided, however, that "Lehman Controlled Affiliates" shall not include any of the Independent Borrower Parties.

"**Lehman Released Claims**" shall have the meaning assigned to it in Section 2.9 hereof.

"**Lehman Loans**" means the loans and interests in loans identified on <u>Schedule A-1</u> attached hereto.

"**Lehman Parties**" means collectively, LBHI and LCPI.

"**Lien**" means any lien, mortgage, charge, restriction, option, contractual restriction on transfer, security interest, tax lien, pledge, encumbrance, conditional sale or title retention arrangement, or any other claim of any kind or nature against any property or other asset securing any indebtedness, or any agreement to create or confer any of the foregoing, in each case whether arising by agreement or under any statute or law or otherwise.

"**Loans**" means, collectively, the Swedbank Loans and the Lehman Loans.

"**Loan Documents**" means (i) with respect to whole loans, all Notes, Mortgages, pledge agreements, loan agreements, credit agreements, security agreements, environmental indemnities, guaranties, and other documents and agreements evidencing or securing any of the Loans and (ii) with respect to syndicated loans, all Notes being assigned pursuant to this Agreement and related assignment and assumption agreements, including, without limitation, those documents set forth on <u>Schedule B</u> with respect to the Swedbank Loans and those documents set forth on <u>Schedule C</u> with respect to the Lehman Loans. In the event any such document also secures or relates to one or more other loans which is not one of the Loans, such document shall be deemed a Loan Document, however, only such portion thereof securing or relating to the Loan shall be assigned hereunder by the Transferor.

"**Loan File**" means (i) with respect to the Lehman Loans, all records in the actual possession of a Lehman Party or any custodian or servicer relating to the servicing, title, ownership or enforcement of the Lehman Loans, as well as all third-party reports prepared with respect to the assets securing the Lehman Loans, such as environmental and engineering reports, but excluding any appraisals, valuations, analysis, work product, attorney work product and all other internally prepared documents, materials or information created by or on behalf of the Lehman Parties or any of their Affiliates or any of their respective employees, agents, representatives or counsel with respect thereto and (ii) with respect to the Swedbank Loans, all records in the actual possession of Swedbank or any custodian or servicer, relating to the servicing, title, ownership or enforcement of the Swedbank Loans, as well as all third-party reports prepared with respect to the assets securing the Swedbank Loans, such as environmental and engineering reports, but excluding any appraisals, valuations, analysis, work product, attorney work product and all other internally prepared documents, materials or information created by or on behalf of Swedbank or any of its Affiliates or any of their respective employees, agents, representatives or counsel with respect thereto.

"**Master Assignment Agreement**" shall have the meaning assigned to such term in Section 7.7 hereof.

"**Material Adverse Effect**" means (a) a material adverse effect on the business, operations, assets, liabilities, operating results or financial condition of the applicable Party or any of its assets, or (b) a material adverse effect on the ability of such Party to execute and deliver this Agreement or to perform its obligations hereunder.

"**Mortgage**" means the mortgage, deed of trust or other security instrument creating a lien upon the real property described therein, and the improvements located on such real property, which secures a Loan.

"**Non-Released Parties**" means, collectively, the borrower and/or real property owner under each of the commercial mortgage loans included in the Mortgage Assets and any other direct obligor under any of the commercial mortgage loans included in the Mortgage Assets that is not one of the Lehman Parties or Lehman Controlled Affiliates.

"**Note**" means the promissory note or similar instrument that evidences a Loan.

"**Person**" means and includes an individual, corporation, partnership (limited or general), joint venture, association, trust, limited liability company, any other unincorporated organization or entity, or any Governmental Authority.

"**Proceeds**" means any payments made on any of the Loans together with any other consideration received from the sale, exchange, license, lease or other disposition of any specified asset or property, any value received as a consequence of the possession thereof, and any payment received from any insurer or other person or entity as a result of the destruction, loss, theft, damage or other involuntary conversion of whatever nature thereof and shall include (a) all properties or other assets acquired through foreclosure or deed in lieu of foreclosure and (b) all "proceeds" as defined in the Uniform Commercial Code as in effect in the jurisdiction in which the specified asset or property is located.

"**Reference Period**" means the period commencing on the Execution Date and ending on the Closing Date.

"**Reference Period Principal Payments**" shall mean, (i) with respect to the Lehman Loans, payments of principal received by the Lehman Parties or their Affiliates during the Reference Period and (ii) with respect to the Swedbank Loans, payments of principal received by Swedbank or its Affiliates during the Reference Period.

"**Repo Documents**" means (i) the Repurchase Agreement, (ii) the Custody Agreement, (iii) those certain Guarantees delivered on or about December 23, 2002 and June 12, 2001 by LBHI in favor of Swedbank in respect of the obligations of LCPI and its Affiliates under the Custody Agreement, (iv) the notices of default, each dated September 24, 2008, from Swedbank to LCPI and the Custodian and (v) all other agreements, instruments and documents executed and delivered in connection with any of the foregoing, as all such agreements instruments and documents have been amended, restated, supplemented or otherwise modified and as in effect on the date hereof.

"**Seaview Project**" means the real property and improvements commonly known as Seaview and located in Ocean Township, New Jersey

"**Swedbank Released Claims**" shall have the meaning assigned to it in Section 2.9 hereof.

"**Swedbank Loans**" means the loans identified on <u>Schedule A-2</u> attached hereto.

"**Telluride Project**" means the real property and improvements (i) formerly known as Capella Telluride and (ii) commonly known as The Inn at Lost Creek, both located in Mountain Village, Colorado.

"**Transferee**" means (a) with respect to the Lehman Loans, Swedbank and (b) with respect to the Swedbank Loans, LBHI or its designee.

"**Transferor**" means (a) with respect to the Lehman Loans, LBHI or its Affiliate that is the holder of the Lehman Loans and (b) with respect to the Swedbank Loans, Swedbank.

## ARTICLE II

## EXCHANGE OF LOANS
## AND OTHER SETTLEMENT TRANSACTIONS

2.1.    Exchange.

Upon and subject to the terms and conditions herein set forth on the Closing Date, (i) Swedbank shall transfer, assign, convey and deliver to LBHI or such other parties as LBHI shall designate, and LBHI or its designee, as applicable, shall accept from Swedbank, all of Swedbank's right, title and interest in and to the Swedbank Loans free and clear of any Liens and (ii) LBHI shall transfer, assign, convey and deliver, or shall cause to be transferred, assigned, conveyed and delivered, to Swedbank, and Swedbank shall accept, the Lehman Loans free and clear of any Liens. With respect to the foregoing assignments, each assignment shall include, without limitation, (A) all Loan Documents and Loan Files with respect to the applicable Loans and (B) all Proceeds (other than interest) of such Loans received after the Execution Date. The sale and exchange of the Loans and the delivery of the Assignments in connection therewith shall be made without recourse and without representation or warranty other than as expressly provided in Article III hereof.

2.2.    Payments.

(a)    Upon and subject to the terms and conditions herein set forth, (i) on the Closing Date, LBHI shall pay or cause to be paid to Swedbank the sum of TEN MILLION DOLLARS AND NO/100 ($10,000,000.00) by wire transfer of immediately available funds to the account(s) designated by Swedbank, plus (ii) (A) if the 1407 Borrower validly and timely delivers its NPA Election Notice (as defined in the 1407 Net Profits Agreement) as determined by LBHI in accordance with Section 2.8 hereof, and the 1407 Borrower closes on its purchase of LBHI's interest in the 1407 Net Profits Agreement in accordance with the terms thereof as determined by LBHI, then five days after the date that LBHI's interest in the 1407 Net Profits Agreement is sold to the 1407 Borrower pursuant to such NPA Election Notice LBHI shall pay or cause to be paid to Swedbank the sum of TEN MILLION DOLLARS AND NO/100 ($10,000,000) by wire transfer of immediately available funds to the account(s) designated by Swedbank, or (B) if the Borrower fails to validly and timely delivers its NPA Election Notice as determined by LBHI in accordance with Section 2.8 hereof, or wrongfully fails to close on its purchase of LBHI's interest in the 1407 Net Profits Agreement in accordance with the terms thereof as determined by LBHI, then on the 1407 Closing Date, LBHI shall pay or cause to be

paid to Swedbank the sum of TEN MILLION DOLLARS AND NO/100 ($10,000,000) by wire transfer of immediately available funds to the account(s) designated by Swedbank.

(b)    On the Closing Date, (i) the Lehman Parties shall prepare and deliver to Swedbank a statement setting forth (A) the outstanding principal balance of, and accrued and unpaid interest on, each Lehman Loan as of the Closing Date, and (B) the balance of any Escrow Accounts of each Lehman Loan, as of the Closing Date, and (C) a calculation of all Reference Period Principal Payments received by the Lehman Parties or their Affiliates with respect to the Lehman Loans and (ii) Swedbank shall prepare and deliver to the Lehman Parties a statement setting forth (A) the outstanding principal balance of, and accrued and unpaid interest on, each Swedbank Loan as of the Closing Date and (B) the balance of any Escrow Accounts of each Swedbank Loan, as of the Closing Date, and (C) a calculation of all Reference Period Principal Payments received by Swedbank or its Affiliates with respect to the Swedbank Loans. If, based on such statements, the Parties determine that Reference Period Principal Payments with respect to the Lehman Loans together with any Accrued Interest Amounts in respect of the Swedbank Loans exceeded Reference Period Principal Payments with respect to the Swedbank Loans together with any Accrued Interest Amounts in respect of the Lehman Loans, then the Lehman Parties shall pay to Swedbank the amount of such excess and, conversely, if, based on such statements, the Parties determine that Reference Period Principal Payments with respect to the Swedbank Loans together with any Accrued Interest Amounts in respect of the Lehman Loans exceeded Reference Period Principal Payments with respect to the Lehman Loans together with any Accrued Interest Amounts in respect of the Swedbank Loans, then Swedbank shall pay to the Lehman Parties the amount of such excess. The Parties shall cooperate with one another to reconcile Reference Period Principal Payments and Accrued Interest Amounts and shall make any payments required by the immediately preceding sentence in immediately available funds on the Closing Date.

2.3.    Deficiency Claim. Upon and subject to the terms and conditions herein set forth, with respect to the proofs of claim listed on Schedule D attached hereto that were filed by Swedbank against LBHI and/or LCPI (collectively, the "**Allowed Repo Proofs of Claim**"), from and after the Closing Date in satisfaction in full of such proofs of claim, Swedbank will have an allowed, non-priority, non-subordinated unsecured claim against each of LCPI and LBHI in their respective chapter 11 cases in the amount of THREE HUNDRED TWENTY FIVE MILLION DOLLARS AND NO/100 ($325,000,000) (the "**Settlement Amount**"); provided, however, that the aggregate recovery of Swedbank in respect of the Allowed Repo Proofs of Claim shall not exceed the Settlement Amount and that, for the avoidance of doubt, the claim set forth in each of the Allowed Repo Proofs of Claim shall have the same treatment as other claims within its class under the plan confirmed by the Bankruptcy Court in the chapter 11 cases of LCPI and LBHI, as applicable. The Allowed Repo Proofs of Claim shall not be subject to objections or defenses, whether by way of netting, set off, recoupment, counterclaim or otherwise, or be subject to any claim under section 510 of the Bankruptcy Code or otherwise that would have the effect of subordinating such claims to the claims of other general unsecured creditors.

2.4.    816 Congress. The Parties agree that, on the Closing Date, each of the Parties shall execute and deliver to the other Parties the 816 Congress Agreements.

2.5.    La Posada, Seaview, Telluride and 1100 Vermont. Each of the Lehman Parties covenants, agrees, warrants, and represents that from and after the Closing Date, (i) it shall not, and shall take such action to cause each of the Lehman Controlled Affiliates not to, in any manner, directly or indirectly, hinder, delay, frustrate, impede, object to, obstruct or prevent Swedbank or its Affiliates, successors or assigns from commencing, pursuing, consummating, and completing any Enforcement Action that Swedbank or its Affiliates, successors or assigns may determine and elect to pursue, in its sole and absolute discretion, with respect to the La Posada Project, the Seaview Project, the Telluride Project or the 1100 Vermont Project or any loans held by Swedbank secured by any of the La Posada Project, the Seaview Project, the Telluride Project or the 1100 Vermont Project, and (ii) it shall take such action, and shall cause each of the Lehman Controlled Affiliates to take such action, to cooperate, in good faith, with Swedbank or its Affiliates, successors and assigns in connection with any Enforcement Action that Swedbank or its Affiliates, successors and assigns may determine and elect to pursue, in its sole and absolute discretion, with respect to the La Posada Project, the Seaview Project, the Telluride Project or the 1100 Vermont Project or any loans held by Swedbank or its Affiliates, successors and assigns secured by any of the La Posada Project, the Seaview Project, the Telluride Project or the 1100 Vermont Project (including, but not limited to, in the case of the La Posada Project, consenting to a stipulated judgment of foreclosure in form agreed to by the Parties hereto); provided, however, that notwithstanding the foregoing, the Lehman Parties shall not be required by the foregoing to take, or refrain from taking, any action that could breach or violate, or cause any Affiliate to breach or violate, (i) any existing contractual obligations that the Lehman Parties or their Affiliates owe to any unrelated third party, (ii) any obligations the Lehman Parties or their Affiliates owe to unrelated third parties provided for under applicable law or (iii) any fiduciary duties that the Lehman Parties or their Affiliates may owe to any equity holder in any entity in which any Lehman Party or its Affiliate holds an interest. Notwithstanding the foregoing or anything to the contrary contained herein, it is understood and agreed that (a) neither the Lehman Parties nor any of their Affiliates shall have any obligation to cause any of the Independent Borrower Parties to take any action or refrain from taking any action with respect to any such Enforcement Action nor shall any Lehman Party or any Affiliate thereof have any responsibility or liability with respect to the action or inaction of any Independent Borrower Party in connection with any such Enforcement Action and (b) the Lehman Parties shall have no further obligation under this Section 2.5 if a deficiency judgment is sought by Swedbank or its Affiliates, successors or assigns against either Lehman Party or any of its Affiliates (other than the Independent Borrower Parties) in connection with any Enforcement Action, unless such effort is abandoned within ten (10) Business Days after notice of such attempt is given to Swedbank by any of the Lehman Parties. For the avoidance of doubt, the term "Lehman Controlled Affiliates" shall not include any of the Independent Borrower Parties, and the Lehman Parties shall have no obligation to cause any of the Independent Borrower Parties to take, or refrain from taking, any action pursuant to this Section 2.5 or otherwise.

2.6.    Intentionally Omitted.

2.7.    Additional La Posada Agreement. Effective as of the Closing Date, (i) PAMI LLC's obligations under the La Posada Principal Agreement shall be limited to only those items set forth in Sections 9(c)(vii) and 9(d)(iii) of the La Posada Note and (ii) PAMI LLC shall be released and discharged of all its obligations under the La Posada Principal Agreement upon the

completion of the foreclosure sale of the La Posada Project, all as provided in a separate agreement in form agreed to by the Parties hereto.

2.8.    1407 Net Profits Agreement. On the Closing Date, LBHI will provide the 1407 Borrower with the NPA ROFO Notice (as defined in the 1407 Net Profits Agreement) with respect to the proposed sale of LBHI's interest in the 1407 Net Profits Agreement to Swedbank pursuant to the terms of this Agreement. If the 1407 Borrower either (i) fails to validly and timely deliver the NPA Election Notice (as defined in the 1407 Net Profits Agreement) in response thereto, or (ii) fails to timely close upon its purchase of LBHI's interest in the 1407 Net Profits Agreement in accordance with such NPA Election Notice and the terms of the 1407 Net Profits Agreement, then subject to the terms and conditions herein set forth, within five (5) days after the later of (i) if the Borrower fails to validly and timely deliver such NPA Election Notice as determined by LBHI, the date that is thirty days after the 1407 Borrower's receipt of the NPA ROFO Notice, or (ii) if the Borrower validly and timely delivers such NPA Election Notice, but wrongfully fails to close on its purchase of LBHI's interest in the 1407 Net Profits Agreement in accordance with the terms thereof as determined by LBHI, the NPA ROFO Closing Date (as defined in the 1407 Net Profits Agreement) the date that is five days after the later of such dates being the **"1407 Closing Date"**), LBHI shall transfer, assign, convey and deliver to Swedbank, and Swedbank shall accept from LBHI, LBHI's rights, title and interest in, the 1407 Net Profits Agreement, and each of the 1407 Net Profits Related Documents, free and clear of any Liens, and, in exchange therefor, Swedbank shall pay to LBHI or its designee the sum of TEN MILLION DOLLARS AND NO/100 ($10,000,000) by wire transfer of immediately available funds to the account designated by LBHI. On the 1407 Closing Date, LBHI shall deliver to Swedbank (i) an Assignment with respect to LBHI's interest in the 1407 Net Profits Agreement and each of the 1407 Net Profits Related Documents and (ii) originals (if available) or copies of the 1407 Net Profits Agreement and the 1407 Net Profits Related Documents. The sale of LBHI's interest in the 1407 Net Profits Agreement and each of the 1407 Net Profits Related Documents and the delivery of the Assignment in connection therewith shall be made without recourse, representation or warranty other than as expressly provided in Article III hereof.

2.9.    Mutual Releases.

(a)    Except as to the acknowledgements, agreements and performance of the obligations set forth in the Assignment Documents, this Agreement and the documents, instruments and agreements executed in connection herewith, effective from and after the Closing Date, Swedbank, for itself and its Affiliates, and their successors and assigns, expressly releases and waives, unconditionally and irrevocably, any claims, counterclaims, defenses, rights of setoff, debt, liens, losses, demands, damages, costs and causes of action of whatever nature, whether asserted or unasserted, known or unknown, in contract or tort, unsecured, secured, priority, administrative or otherwise (collectively, **"Swedbank Released Claims"**), that Swedbank or any of its Affiliates may have against any of the Lehman Parties and/or any of their respective direct or indirect parents, subsidiaries and Affiliates, or the respective officers, directors, shareholders, partners, members, employees, agents, servants, counsel, representatives, participants, successors or assigns of any and all of the foregoing (other than the Non-Released Parties), arising from, in connection with, or relating in any manner to the Repo Documents, the Lehman Loans or the Mortgage Assets or the transactions contemplated thereby, including, without limitation (i) any delay in the execution and delivery of the Assignment Documents; (ii)

acts or omissions of any kind occurring prior to, or on or after the Default Date by the Lehman Parties or any of their affiliates, in the capacity as lender, or as agent, administrative agent, collateral agent, servicer, trustee, or in any other capacity on behalf or at the direction of the lenders under any of the Mortgage Assets, or in connection with the ownership, administration or servicing thereof; (iii) other than as provided in Section 2.7, the La Posada Principal Agreement and any other agreement, instrument or document evidencing or securing, or otherwise in connection with, the loan in the original principal amount of $40,000,000 held by Swedbank and encumbered by the La Posada Project; and (iv) any acts or omission of any kind by the Lehman Parties or their Affiliates, as the holder of the mezzanine loan with respect to, or any other matters relating to, the Seaview Project. The foregoing release shall not waive, diminish or in any way prejudice any rights of Swedbank under this Agreement or any of the Assignment Documents. Notwithstanding anything to the contrary contained herein, (i) the Parties expressly acknowledge and agree that the foregoing release does not release, waive or limit the validity or effectiveness of any of the Assignment Documents, and (ii) the Lehman Parties expressly acknowledge that with respect to the Seaview Project, Swedbank and its Affiliates do not control any of the other holders of the mortgage loan encumbering the Seaview Project and, accordingly, with respect to such other holders, Swedbank and its Affiliates can only release Swedbank Released Claims held by Swedbank. Swedbank shall not, and shall take such action to cause such holders and each of its Affiliates under its control not to, in any manner, directly or indirectly, pursue any Swedbank Released Claims they may have against the Lehman Parties and/or their Affiliates in connection with the mezzanine loan with respect to the Seaview Project; provided, however, that notwithstanding the foregoing, Swedbank shall not be required by the foregoing to take, or refrain from taking, any action with respect to the Seaview Project that could breach or violate, or cause any Affiliate to breach or violate (i) any existing contractual obligations that Swedbank or its Affiliate owe to any unrelated third party, (ii) any obligations Swedbank or its Affiliates owe to unrelated third parties provided for under applicable law or (iii) any obligations that Swedbank may owe to any co-lenders having an interest in the Seaview Project.

(b)      Except as to the acknowledgements, agreements and performance of the obligations set forth in the Assignment Documents, this Agreement and the documents, instruments and agreements executed in connection herewith, effective from and after the Closing Date, each of the Lehman Parties, for itself, and its Affiliates, and their successors and assigns, expressly waives and releases, unconditionally and irrevocably, any claims, counterclaims, defenses, rights of setoff, debts, liens, losses, demands, damages, costs and causes of action of whatever nature, whether asserted or unasserted, known or unknown, in contract or tort, unsecured, secured, priority, administrative or otherwise (collectively, "**Lehman Released Claims**"), that the Lehman Parties (or any of their Affiliates) may have against Swedbank and/or any of its respective direct or indirect parents, subsidiaries and Affiliates, or the respective officers, directors, shareholders, partners, members, employees, agents, servants, counsel, representatives, participants, successors or assigns of any and all of the foregoing, arising from, in connection with, or relating in any manner to the Repo Documents, the Swedbank Loans or the Mortgage Assets or the transactions contemplated thereby, including, without limitation (i) any delay in the execution and delivery of the Assignment Documents; and (ii) acts or omissions of any kind occurring on or after the Default Date by Swedbank or any of its Affiliates, in the capacity as lender, or as agent, administrative agent, collateral agent, servicer, trustee, or in any other capacity on behalf or at the direction of the lenders under any of the Mortgage Assets, or in

connection with the ownership, administration or servicing thereof. The foregoing release shall not waive, diminish or in any way prejudice any rights of the Lehman Parties under this Agreement or any of the Assignment Documents.

(c)    Notwithstanding anything to the contrary contained herein, the releases set forth in Sections 2.9(a) and (b) do not release any Party or any of their Affiliates in their respective capacities as borrower under, or the holder of a direct or indirect interest in any loan that is either senior, subordinate or pari passu to, any of the Mortgage Assets identified on Schedule E attached hereto and the Parties retain all of their respective rights with respect to their borrower-lender, mezzanine lender-mortgage lender, or co-lender relationship relative to such Mortgage Assets, as applicable.

(d)    To the extent that after the Closing Date hereof a borrower (or other party to a Mortgage Asset asserting a claim) asserts a claim against either Party in its capacity as lender, or as agent or in any other capacity under any of the Mortgage Assets based on an affirmative act or omission of such lender or agent prior to the date hereof, the Parties shall cooperate with one another (at no cost or liability to the cooperating party unless reimbursed by the party requesting such cooperation) in the defense of such claim to the extent practical and consistent with applicable fiduciary duties and rules of privilege.

(e)    Notwithstanding anything to the contrary contained herein, the release set forth in this Section shall not waive, diminish, release in any way, or prejudice, any defenses or affirmative defenses (but not counterclaims) (i) that Swedbank may have with respect to any Lehman Released Claims brought by, through or on behalf of any of the Lehman Parties or any of their respective Affiliates, or any of their respective successors or assigns or (ii) that any of the Lehman Parties may have with respect to any Lehman Released Claims brought by, through or on behalf of Swedbank, or any of its Affiliates, or any of their respective successors or assigns.

(f)    Nothing in this Agreement shall constitute a release or waiver of any Lehman Released Claims that any Lehman Party or any of its Affiliates may have against any other Lehman Party or any of its Affiliates.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

3.1.    Representations and Warranties by the Lehman Parties. Each Lehman Party hereby represents and warrants to Swedbank with respect to itself as follows, as of the date hereof:

(a)    Organization; Power and Authority of the Lehman Parties. (i) LBHI is a corporation duly organized and validly existing under the laws of the State of Delaware, (ii) LCPI is a corporation duly organized and validly existing under the laws of the State of New York, and (iii) each of the Lehman Parties has the corporate power and authority to own, lease and operate its property and to conduct its business as it is now being conducted.

(b)    Authority, Approvals and Consents. Such Lehman Party has the corporate power and authority to execute and deliver and, subject to receipt of the Bankruptcy Court

Approval Order, perform this Agreement and consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized and approved by all necessary action on the part of such Lehman Party and no other corporate proceedings on the part of such Lehman Party are necessary to authorize and approve this Agreement and the transactions contemplated hereby. This Agreement has been duly executed and delivered by such Lehman Party and constitutes a valid and binding obligation of such Lehman Party. The execution, delivery and performance of this Agreement by each Lehman Parties and the consummation by each Lehman Parties of the Settlement Transactions do not (a) contravene or otherwise violate any provisions of the Articles of Incorporation or By-Laws or other organizational documents of such Lehman Party, (b) conflict with, result in a breach of any provision of, constitute a default under, result in the modification, acceleration or cancellation of, or give rise to any right of termination in respect of, any contract, agreement, commitment, understanding or arrangement of any kind to which such Lehman Party is a party or which, to such Lehman Party's knowledge, relates to the Lehman Loans or by which, to such Lehman Party's knowledge, any of the Lehman Loans are bound, (c) violate or conflict with any Legal Requirements applicable to the business conducted by such Lehman Party except for such violations and conflicts as have not had and would not be reasonably expected to have a Material Adverse Effect with respect to such Lehman Party or (d) require any Governmental Approval or other Consent except for any such Governmental Approval or other Consent that has heretofore been obtained, and the Bankruptcy Court Approval Order.

(c)    Interests in the Lehman Loans. The Lehman Parties have good and valid title to the participation interest in the mortgage loan encumbering the 1407 Broadway project and are the sole owners and holders of the participation interest in the mortgage loan encumbering the 1407 Broadway project and the related Loan Documents, free and clear of all Liens. On the Closing Date, the Lehman Parties will have good and valid title to the Project Deuce 1888 B-2 loan and C-2 loan and will be the sole owners and holders of the Project Deuce 1888 B-2 loan and C-2 loan. The Lehman Parties right to sell and assign the participation interest in the mortgage loan encumbering the 1407 Broadway project to Swedbank is not subject to any other party's right, title or interest or to an agreement with any other party that would be binding on Swedbank or the participation interest in the mortgage loan encumbering the 1407 Broadway project. On the Closing Date, the Lehman Parties' right to sell and assign the Project Deuce 1888 B-2 loan and C-2 loan to Swedbank will not be subject to any other party's right, title or interest or an agreement with any other party that would be binding on Swedbank or the Project Deuce 1888 B-2 loan or C-2 loan. Neither of the Lehman Parties has terminated, modified or canceled in writing any Loan Document relating to any Lehman Loan except as reflected on Schedule C attached hereto and neither of the Lehman Parties has foreclosed or exercised any similar remedies upon any collateral securing any Lehman Loan.

(d)    Legal Matters. To the best of such Lehman Party's knowledge, except to the extent Swedbank has previously received notice to the contrary, (i) such Lehman Party has not received written notice of any claim, action, suit, litigation, investigation or proceeding pending or threatened against or in respect of any of the Lehman Loans which would affect the execution, delivery or enforceability of this Agreement and (ii) neither Lehman Party has received written notice of any non-compliance by either Lehman Party with any Legal Requirements governing or affecting their ownership and use of the Lehman Loans.

(e)    <u>Loan Documents</u>.  Attached hereto as <u>Schedule C</u> is a true, correct and complete list of all of the Loan Documents (as the same may have been amended, restated, replaced, supplemented or otherwise modified in writing) as of the date hereof that contain and/or disclose any material obligations and/or liabilities of the borrower, any guarantor or indemnitor, or the Lehman Parties or any other lenders relating to the Lehman Loans (other than the 1407 Broadway mortgage loan) and that the Lehman Parties have furnished to Swedbank true and correct copies thereof.  The terms of the Loan Documents for each such Lehman Loan have not been waived in writing, modified or altered in writing, satisfied, cancelled, subordinated or rescinded in writing in any respect except as set forth on <u>Schedule C</u>; the related collateral has not been released from the lien or other encumbrance of, nor has the mortgagor or pledgor under such Lehman Loan been released from its obligations under, such Loan Documents, in whole or in any part, in a manner which materially interferes with the benefits of the security intended to be provided by any such Loan Documents or the use, enjoyment, value or marketability of such collateral for the purposes specified in such Loan Documents.

(f)    <u>Loan and Escrow Balances</u>.  <u>Schedule F</u> attached hereto accurately identifies (a) the outstanding principal balance of, and past due interest on, each Lehman Loan and (b) the balance of any Escrow Accounts of each Lehman Loan, in each case, as of the Execution Date.

(g)    <u>Claims by Borrowers and Co-Lenders</u>.  Except to the extent Swedbank has previously received notice to the contrary, such Lehman Party has no actual knowledge of any claims by the borrower, any guarantor or any other obligor of any default or breach by any Lehman Party under any of the Loan Documents relating to any of the Lehman Loans.  Except to the extent Swedbank has received notice of the same, such Lehman Party has no actual knowledge of any claims by any co-lender of any default by any Lehman Party under any of the Loan Documents relating to the Lehman Loans.

(h)    <u>No Claims</u>.  To the best of such Lehman Party's knowledge, except to the extent Swedbank has previously received notice to the contrary, such Lehman Party has not received written notice of any claim or right of rescission, setoff, counterclaim, claims of lender liability, or defense by the mortgagor or any other obligor(s) under any Lehman Loan or by any other Person obligated to perform under any Loan Documents for any such Lehman Loans.

3.2.    <u>Representations and Warranties by Swedbank</u>.  Swedbank hereby represents and warrants to the Lehman Parties as follows as of the date hereof:

(a)    <u>Organization and Good Standing of Swedbank</u>.  Swedbank (a) is the New York branch of Swedbank AB, which is duly organized and validly existing under the laws of Sweden and (b) has the corporate power and authority to own, lease and operate its property and to conduct its business as it is now being conducted.

(b)    <u>Authority, Approvals and Consents</u>.  Swedbank has the corporate power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized and approved by all necessary action on the part of Swedbank and no other corporate proceedings on the part

of Swedbank are necessary to authorize and approve this Agreement and the transactions contemplated hereby. This Agreement has been duly executed and delivered by Swedbank and constitutes a valid and binding obligation of Swedbank. The execution, delivery and performance of this Agreement by Swedbank and the consummation of the transactions contemplated hereby by Swedbank does not (a) contravene or otherwise violate any provisions of the Articles of Incorporation, By-Laws or other organizational documents of Swedbank, (b) conflict with, result in a breach of any provision of, constitute a default under, result in the modification, acceleration or cancellation of, or give rise to any right of termination in respect of, any contract, agreement, commitment, understanding or arrangement of any kind to which Swedbank is a party or to which Swedbank is subject, (c) violate or conflict with any Legal Requirements applicable to Swedbank or any of its business or property except for such violations and conflicts as have not had and would not be reasonably expected to have a Material Adverse Effect with respect to Swedbank or (d) require any Governmental Approval or other Consent on the part of Swedbank.

(c)    Interests in the Swedbank Loans. Swedbank has good and valid title to each of the Swedbank Loans and is the sole owner and holder of the Swedbank Loans and the related Loan Documents, free and clear of all Liens. Swedbank's right to sell and assign the Swedbank Loans to LBHI or its designee is not be subject to any other party's right, title or interest or to an agreement with any other party that would be binding on the Lehman Parties or the Swedbank Loans. Swedbank has not terminated, modified or canceled in writing any Loan Document relating to any Swedbank Loan except as reflected on Schedule B attached hereto and Swedbank has not foreclosed or exercised any similar remedies upon any collateral securing any Swedbank Loan.

(d)    Legal Matters. To the best of Swedbank's knowledge, except to the extent the Lehman Parties have previously received notice to the contrary, (i) Swedbank has not received written notice of any claim, action, suit, litigation, investigation or proceeding pending or threatened against or in respect of any of the Swedbank Loans which would affect the execution, delivery or enforceability of this Agreement and (ii) Swedbank has not received written notice of any non-compliance by Swedbank with any Legal Requirements governing or affecting its ownership and use of the Swedbank Loans.

(e)    Loan Documents. Attached hereto as Schedule B is a true, correct and complete list of all of the Loan Documents (as the same may have been amended, restated, replaced, supplemented or otherwise modified in writing) as of the date hereof that contain and/or disclose any material obligations and/or liabilities of the borrower, any guarantor or indemnitor, or Swedbank or any other lenders relating to the Swedbank Loans and that Swedbank has furnished to the Lehman Parties true and correct copies thereof. The terms of the Loan Documents for each Swedbank Loan have not been waived in writing, modified or altered in writing, satisfied, cancelled, subordinated or rescinded in writing in any respect except as set forth on Schedule B; the related collateral has not been released from the lien or other encumbrance of, nor has the mortgagor or pledgor under such Swedbank Loan been released from its obligations under, such Loan Documents, in whole or in any part, in a manner which materially interferes with the benefits of the security intended to be provided by any such Loan Documents or the use, enjoyment, value or marketability of such collateral for the purposes specified in such Loan Documents.

(f)    Loan and Escrow Balances. Schedule F attached hereto accurately identifies (a) the outstanding principal balance of, and past due interest on, each Swedbank Loan and (b) the balance of any Escrow Accounts of each Swedbank Loan, in each case, as of the Execution Date.

(g)    Claims by Borrowers and Co-Lenders. Except to the extent the Lehman Parties have previously received notice to the contrary, Swedbank has no actual knowledge of any claims by the borrower, any guarantor or any other obligor of any default or breach by Swedbank under any of the Loan Documents relating to any of the Swedbank Loans. Except to the extent the Lehman Parties have received notice of the same, Swedbank has no actual knowledge of any claims by any co-lender of any default by Swedbank under any of the Loan Documents relating to the Swedbank Loans.

(h)    No Claims. To Swedbank's actual knowledge, except to the extent the Lehman Parties have previously received notice to the contrary, Swedbank has not received written notice of any claim or right of rescission, setoff, counterclaim, claims of lender liability, or defense by the mortgagor or any other obligor(s) under any Swedbank Loan or by any other Person obligated to perform under any Loan Documents for any such Swedbank Loans.

(i)    Allowed Repo Proofs of Claim. Swedbank owns all of the legal and beneficial interest in, and has good, valid title to the Allowed Repo Proofs of Claim, free and clear of all Liens, claims, set-off rights, security interests, participations or encumbrances, and Swedbank has not transferred or assigned to any other Person any of the claims or receivables that are the subject of this Agreement, including, without limitation, the Allowed Repo Proofs of Claim or any interest therein.

3.3.    DISCLAIMER OF REPRESENTATIONS AND WARRANTIES. EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE 3, THE LOANS ARE BEING SOLD AND ASSIGNED "AS IS" WITHOUT ANY RECOURSE, REPRESENTATION OR WARRANTY OF ANY KIND OR NATURE, EXPRESS OR IMPLIED.    EACH OF THE PARTIES HERETO ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS ARTICLE, THE PARTIES HAVE NOT MADE, DO NOT MAKE AND SPECIFICALLY NEGATE AND DISCLAIM ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE LEHMAN LOANS OR THE SWEDBANK LOANS, AS APPLICABLE. EACH PARTY HERETO ACKNOWLEDGES THAT THE OTHER PARTIES HAVE NOT AUTHORIZED ANY EMPLOYEE, AGENT, REPRESENTATIVE, BROKER, THIRD PARTY OR OTHER PARTY TO MAKE AND, TO THE EXTENT SO MADE, SPECIFICALLY NEGATE AND DISCLAIM, ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE SWEDBANK LOANS OR THE LEHMAN LOANS, AS APPLICABLE, SUCH PARTY IS RELYING SOLELY ON ITS OWN INVESTIGATION AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED, DIRECTLY OR INDIRECTLY, BY ANY OTHER PARTY.    EACH PARTY HERETO FURTHER ACKNOWLEDGES AND

AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED BY ANY OTHER PARTY WITH RESPECT TO THE SWEDBANK LOANS OR THE LEHMAN LOANS, AS APPLICABLE, WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SUCH OTHER PARTY HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. IT IS UNDERSTOOD AND AGREED THAT THE SWEDBANK LOANS AND THE LEHMAN LOANS ARE SOLD AND TRANSFERRED AS IS, WHERE IS AND SUBJECT TO THE FOREGOING.

    3.4.    <u>Survival of Representations and Warranties</u>. The representations and warranties of the Lehman Parties and Swedbank set forth in Sections 3.1(a),(b),(c) and (d) and Sections 3.2(a),(b),(c) and (d) shall survive the Closing for a period of two (2) years and all other representations and warranties of the Lehman Parties and Swedbank set forth in Sections 3.1 and 3.2, respectively, shall survive the Closing for a period of one (1) year.

# ARTICLE IV

## CLOSING AND TERMINATION

    4.1.    <u>Closing</u>. The closing of the Settlement Transactions (the **"Closing"**) shall occur and the documents referred to in Sections 4.2 and 4.3 shall be delivered at the offices of the Lehman Parties' counsel, Weil, Gotshal & Manges, LLP, 767 Fifth Avenue, New York, New York 10153, or at such other place as is mutually agreed upon by the Parties on a date mutually agreed by the Parties but not later than the date ten (10) Business Days following the Bankruptcy Court Approval Order (the **"Closing Date"**).

    4.2.    <u>Lehman Deliveries</u>. At the Closing, the Lehman Parties shall deliver or cause to be delivered to Swedbank each of the following:

        (a)    With respect to each Lehman Loan, to the extent applicable (i) an original allonge endorsement to the Note, (ii) the Loan Documents and Loan File (including, without limitation, the original Note or, if such original Note has been lost, a lost note affidavit and indemnity or equivalent documents), (iii) an original Assignment of Mortgage in recordable form, (iv) an original Assignment, (v) UCC-3s assigning to Swedbank the secured party's rights under all financing statements and (vi) if required by the applicable Loan Documents, a notice to each borrower of the transfer of such Lehman Loan.

        (b)    To the extent required, counter-signatures by LBHI or its designee to the Assignment for each Swedbank Loan.

        (c)    An agreement, in form and substance reasonably satisfactory to the Parties, evidencing the agreements described in Section 2.7 hereof.

        (d)    Executed counterparts of each of the 816 Congress Agreements.

4.3.    Swedbank Deliveries.  At the Closing, Swedbank shall deliver to the Lehman Parties each of the following:

(a)    With respect to each Swedbank Loan, to the extent applicable (i) an original allonge endorsement to the Note, (ii) the Loan Documents and Loan File (including, without limitation, the original Note or, if such original Note has been lost, a lost note affidavit and indemnity or equivalent documents), (iii) an original Assignment of Mortgage in recordable form, (iv) an original Assignment, (v) UCC-3s assigning to LBHI or its designee the secured party's rights under all financing statements and (vi) if required by the applicable Loan Documents, a notice to each borrower of the transfer of such Swedbank Loan.

(b)    To the extent required, counter-signatures by Swedbank to the Assignment for each Lehman Loan.

(c)    An agreement, in form and substance reasonably satisfactory to the Parties, evidencing the agreements described in Section 2.7 hereof.

(d)    Executed counterparts of each of the 816 Congress Agreements.

4.4.    Termination of Agreement.  This Agreement may be terminated as follows:

(a)    by mutual written consent of the Lehman Parties and Swedbank;

(b)    by Swedbank, if the conditions precedent to the obligations of Swedbank set forth in Section 5.2 shall have not been fulfilled by the Closing Date;

(c)    by the Lehman Parties, if the conditions precedent to the obligations of the Lehman Parties set forth in Section 5.3 shall have not been fulfilled by the Closing Date; or

(d)    by Swedbank or the Lehman Parties if the Bankruptcy Court Approval Order has not been obtained on or prior to March 31, 2011.

4.5.    Procedure Upon Termination; Effect of Termination.  In the event of termination by Swedbank or the Lehman Parties, or both, pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other Party and this Agreement shall terminate and the Settlement Transactions shall be abandoned, without further action by any Party.  In the event that this Agreement is validly terminated as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement (other than any such obligations that expressly survive such termination), no Party shall have any further rights or obligations pursuant to this Agreement, and such termination shall be without liability to the Parties except as otherwise provided in this Agreement, including, without limitation, the last sentence of Section 6.3.

## ARTICLE V

## CONDITIONS PRECEDENT

5.1.    <u>Conditions Precedent to the Obligations of each of the Parties</u>.  The obligation of Swedbank to effect the Settlement Transactions is subject to the entry of the Bankruptcy Court Approval Order, and all obligations of the Lehman Parties under this Agreement (other than the obligations set forth in Section 6.2) are subject to the entry of the Bankruptcy Court Approval Order.

5.2.    <u>Conditions Precedent to the Obligations of Swedbank</u>.  The obligations of Swedbank to close the Settlement Transactions shall be subject to the fulfillment or waiver by Swedbank at or prior to the Closing Date of the following conditions:

(a)    <u>Representations and Warranties</u>.  The representations and warranties of the Lehman Parties contained in Article III hereof shall be true and correct in all material respects as of the Closing Date, as though made at and as of the Closing Date; and

(b)    <u>Performance of Obligations</u>.  The Lehman Parties shall have made the payment described in Section 2.2 hereof and shall have delivered, or caused to be delivered in all material respects the items set forth in Section 4.2 hereof.

5.3.    <u>Conditions Precedent to the Obligations of the Lehman Parties</u>.  The obligations of the Lehman Parties to close the Settlement Transactions shall be subject to the fulfillment or waiver by the Lehman Parties at or prior to the Closing Date of the following conditions:

(a)    <u>Representations and Warranties</u>.  The representations and warranties of Swedbank contained in Article III hereof shall be true and correct in all material respects as of the Closing Date, as though made at and as of the Closing Date; and

(b)    <u>Performance of Obligations</u>.  Swedbank shall have delivered or caused to be delivered in all material respects the items set forth in Section 4.3 hereof.

## ARTICLE VI

## COVENANTS

6.1.    <u>Conduct Prior to Closing</u>.  From the date hereof to the earlier to occur of the Closing or termination of this Agreement, except as may be consented to in writing by the Transferee or as otherwise expressly provided for in this Agreement, neither Transferor shall:

(a)    sell, assign, transfer or otherwise dispose of any Loan or any interest therein, whether in whole or in part;

(b)    encumber any Loan;

(c)    amend, modify, terminate or subordinate any Loan Document, waive, alter, cancel or accept a discounted payoff of any Loan in any respect, or foreclose or otherwise

proceed against the collateral for, accept a deed in lieu of foreclosure of, or compromise or settle any claims with respect to, any Loan, or rescind, and the related collateral shall not be released from, the Lien or other encumbrance of, nor shall the mortgagor be released from its obligations under, the related Mortgage, in whole or in part, nor shall any instrument be executed by the Transferor that would effect any such waiver, modification, alteration, cancellation, discounted payoff, subordination, foreclosure, deed in lieu of foreclosure, compromise or settlement, rescission or release, except as required by law or by the related Loan Documents;

(d)    take any action which would cause any of the representations or warranties contained in Section 3.1 or Section 3.2, as applicable, to be untrue in any material respect; and

(e)    agree to do, directly or indirectly, any of the foregoing items (a) through (d) of this Section.

6.2.    Bankruptcy Court Approval Order.  The Lehman Parties have filed a motion with the Bankruptcy Court seeking approval of the Settlement Agreement and the Settlement Transactions, it being agreed and understood by Swedbank that neither Lehman Party makes any assurance or guarantee of any kind that the Bankruptcy Court Approval Order will be received.

6.3.    Swedbank Cooperation.  From the date hereof to the earlier to occur of the Closing or termination of this Agreement, (i) Swedbank shall cooperate, in good faith, with the Lehman Parties to effectuate a discounted payoff of, or a sale or "short sale" of the collateral securing the mortgage loans encumbering the Kapalua Project and/or the 1107 Broadway Project, provided, that if the closing of any such transactions occurs prior to the Closing, the discounted payoff, sale or "short sale" of the collateral securing, the mortgage loans encumbering the Kapalua Project and/or the 1107 Broadway Project shall be at a price not less than the respective prices agreed to in writing among the Parties on or prior to the date hereof and (ii) Swedbank shall cooperate with and consent to the Lehman Parties, other lenders and/or the applicable Independent Borrower Parties entering into agreements with Eastdil Secured, L.L.C. and Replay Management Ltd. with respect to the Kapalua Project.  If this Agreement is validly terminated and, prior to such termination, agreements with Eastdil Secured, L.L.C. or Replay Management Ltd. have been entered into, in each case, in accordance with the immediately preceding sentence, then any such agreements with Eastdil and/or Replay shall continue in effect and Swedbank's consent thereto shall be effective for all purposes, notwithstanding the termination of this Agreement.

6.4.    Swedbank Claims.  From the Execution Date until the earlier of the Closing Date or the termination of this Agreement, Swedbank shall not transfer any of the Swedbank Loans, the Proceeds of the Swedbank Loans, the Swedbank Released Claims or the Allowed Repo Proofs of Claim, or any interest in any of the foregoing, or any rights or interests arising thereunder, in whole or in part; provided, however, that, notwithstanding the foregoing, Swedbank shall have the right to transfer the Allowed Repo Proofs of Claim to any of its wholly-owned subsidiaries provided that such subsidiary agrees to be bound by the terms of this Agreement in all respects.  From and after the Closing Date, if Swedbank shall transfer any of the Mortgage Assets with respect to which any Lehman Party and/or Affiliate has the benefit of a release pursuant to Section 2.9 hereof, Swedbank shall make such transfer subject to the release

of such Lehman Party and/or Affiliate. Anything herein to the contrary notwithstanding, this Agreement shall not prevent Swedbank from entering into discussions or negotiations concerning the possible sale of the Allowed Repo Proofs of Claim at any time, nor shall it restrict Swedbank's right to sell after the Closing Date the Allowed Repo Proofs of Claim, which upon entry of the Bankruptcy Court Approval Order shall be in the fixed Settlement Amount.

## ARTICLE VII

### MISCELLANEOUS

7.1.    Further Assurances. After the Closing, the Transferor will, at the Transferee's sole cost and expense, promptly execute, acknowledge and deliver any other assurances or documents reasonably requested by the Transferee from time to time to satisfy the Transferor's obligations hereunder or to accomplish the purposes of this Agreement. After the Closing, the Transferor and the Transferee shall furnish to each other such information and assistance as may reasonably be requested in connection with the transactions consummated pursuant to this Agreement.

7.2.    Expenses. The fees and expenses incurred by each Party (including the fees of any lawyers, accountants, investment bankers or others engaged by such party) in connection with this Agreement and the transactions contemplated hereby, whether or not the transactions contemplated hereby are consummated, will be paid by such Party.

7.3.    Headings. The Section headings herein are for convenience of reference only, do not constitute part of this Agreement and will not be deemed to limit or otherwise affect any of the provisions hereof. References to Sections, unless otherwise indicated, are references to Sections of this Agreement.

7.4.    Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next Business Day, (c) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) Business Day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent:

To LCPI or LBHI at:

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, New York 10020
Attn: Joelle Halperin
Telephone: (646) 285-9066
Facsimile: (646) 285-9305

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn: W. Michael Bond, Esq.
Telephone: (212) 310-8035
Facsimile: (212) 310-8007

To Swedbank at:

Swedbank AB, New York Branch
One Penn Plaza
15th Floor
New York, New York 10119
Attention: John Matthews, General Manager
Telephone: 212 486-8400
Facsimile: 212 486-3220

with a copy to:

DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020-1104
Attention: William M. Goldman, Esq.
Telephone: 212 335-4770
Facsimile: 212 884-8589

and a copy via email to:

Erik Odhnoff at erik.odhnoff@swedbank.se

or to such other address as may have been furnished by a party to each of the other parties by
notice given in accordance with the requirements set forth above.

     7.5.   Assignment. This Agreement and all provisions hereof will be binding upon and
inure to the benefit of the parties hereto and their respective successors and permitted assigns;
provided, however, that neither this Agreement nor any right, interest, or obligation hereunder
may be assigned by any party hereto without the prior written consent of the other Parties;
provided, further, that Swedbank may assign (a) the Allowed Repo Proof of Claim that it has in
the LBHI and LCPI chapter 11 cases pursuant to Section 2.3 hereof and (b) its other interests, in
each case in accordance with the provisions of Section 6.4 hereof.

     7.6.   Entire Agreement. This Agreement shall be of no force or effect until executed
and delivered by each of the parties hereto. Subject to Section 7.7 below, this Agreement and the
other documents contemplated hereby (which documents are not a part of or incorporated by

22

reference into this Agreement) embody the entire agreement and understanding of the parties with respect to the transactions contemplated hereby and supersedes all prior written or oral commitments, arrangements or understandings with respect thereto.

7.7.    <u>Assignment Documents</u>. The Parties hereto acknowledge and agree that the letter agreement dated as of November 20, 2008 between Swedbank and LCPI (the "**Master Assignment Agreement**") has been terminated; provided however that (i) the assumption of obligations by Swedbank under the Mortgage Assets pursuant thereto shall remain in full force and effect and (ii) except for the assignment of the Swedbank Loans to LBHI pursuant hereto, this Agreement does not waive, alter, modify, or otherwise amend the various assignment agreements, note allonges and other instruments, agreements and documents executed and delivered pursuant to or in connection with the Master Assignment Agreement (collectively, the "**Assignment Documents**"). Except as modified hereby, the Assignment Documents are and remain in full force and effect, unmodified, enforceable in accordance with their terms and shall remain in full force and effect unless and until amended or modified by a written agreement (and only to the extent provided therein) executed hereafter in accordance with the provisions of the Assignment Documents. In addition, each of Swedbank and LCPI hereby otherwise reserves all of its respective rights, remedies, claims and defenses, available at law or in equity, and under, related to, or in connection with, the Assignment Documents.

7.8.    <u>Lehman Brothers Inc.</u>. Notwithstanding anything to the contrary contained herein or in any of the agreements, instruments and documents executed and delivered in connection herewith, neither this Agreement nor any of such agreements, instruments and documents are intended to affect in any manner the rights and obligations of Lehman Brothers Inc. under the Repurchase Agreement and the agreements, instruments and documents executed and delivered in connection therewith.

7.9.    <u>Amendment; Waiver</u>.

(a)    This Agreement may only be amended or modified in writing signed by the party against whom enforcement of any such amendment or modification is sought.

(b)    Any party hereto may, by an instrument in writing, waive compliance with any term or provision of this Agreement on the part of such other party hereto. The waiver by any party hereto of a breach of any term or provision of this Agreement will not be construed as a waiver of any subsequent breach.

7.10.    <u>Counterparts</u>. This Agreement may be executed in two or more counterparts (including via facsimile or other electronic means), all of which will be considered one and the same agreement and each of which will be deemed an original.

7.11.    <u>Governing Law</u>. This Agreement will be governed by the laws of the State of New York (regardless of the laws that might be applicable under principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect and performance.

7.12.    <u>Severability</u>. If any one or more of the provisions of this Agreement is held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining

provisions of this Agreement will not be affected thereby, and the parties hereto will use their reasonable efforts to substitute one or more valid, legal and enforceable provisions which insofar as practicable implement the purposes and intent hereof. To the extent permitted by applicable law, each party waives any provision of law which renders any provision of this Agreement invalid, illegal or unenforceable in any respect.

7.13. <u>Third Person Beneficiaries</u>. Except as expressly provided herein, this Agreement is not intended to confer upon any other Person (other than PAMI LLC) any rights or remedies hereunder, except as provided herein with respect to successors and, if approved by the other party pursuant to Section 7.5 above, such permitted assigns.

7.14. <u>No Strict Construction</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

7.15. <u>Survival</u>. Subject to the limitations set forth in Section 3.4 above, the provisions of this Agreement shall survive the Closing.

7.16. <u>Jurisdiction</u>.

(a)    Commencing on September 15, 2008, LBHI and certain of its affiliates filed voluntary petitions for relief under the Bankruptcy Code in the United States Bankruptcy Court which are being jointly administered under Case No. 08-13555 (collectively, the "**Bankruptcy Case**"). LBHI is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The parties hereto agree that no action relating to the interpretation and enforcement of this Agreement may be brought in a court that is not located within New York County, the State of New York. To the maximum extent permissible by law, the parties hereto expressly consent and submit to the exclusive jurisdiction of the Bankruptcy Court over such actions. Each of the parties hereto agrees that a final judgment in any such action, including all appeals, shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the LBHI, LCPI, Swedbank or any other party may otherwise have to bring any action or proceeding to enforce any Loan or any of the documents, instruments or agreements evidencing or securing any Loan or otherwise relating to any Loan against any obligor or its respective properties in the courts of any jurisdiction.

(b)    Each party to this Agreement hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (A) any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any document executed pursuant hereto in any court referred to in paragraph (a) of this subsection; and (B) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 7.4 hereof. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

7.17.    **WAIVER OF JURY TRIAL.** **EACH OF THE PARTIES HERETO HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION HEREWITH, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RESPECTIVE RIGHTS UNDER THIS AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION HEREWITH OR IN ANY WAY RELATING TO THE EXCHANGE OF LOANS CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION HEREWITH, WHETHER IN CONTRACT OR IN TORT, AND WITH RESPECT TO ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION HEREWITH WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF THE PARTIES HERETO ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.**

7.18.    Approvals by Parties. Unless otherwise provided herein to the contrary, any matter to be approved by any Party hereto shall be subject to the approval of such Party in its sole and absolute discretion.

7.19.    Loan Files. (a) Notwithstanding anything to the contrary contained in this Agreement, (i) for the purpose of ascertaining the existence of Loan Files (or portions thereof) in the actual possession of the Lehman Parties, the Lehman Parties shall only be obligated to make commercially reasonable inquiry of those current employees of the commercial real estate group of the Lehman Parties that the Lehman Parties reasonably determine would be likely to possess such Loan Files or portions thereof, and (ii) on the Closing Date, the Lehman Parties shall only be obligated to deliver to Swedbank those Loan Files in the actual possession of the Lehman Parties that were found as the result of the commercially reasonable inquiry set forth in clause (i) above. From time to time, upon written request of Swedbank (setting forth with reasonable

specificity documents that would constitute Loan Files that Swedbank has reason to believe were not included in the delivery of Loan Files at Closing), the Lehman Parties shall make commercially reasonable inquiries and shall promptly deliver to Swedbank any such requested additional Loan Files discovered by the Lehman Parties through such process. Provided that the Lehman Parties use commercially reasonable efforts to locate any requested additional Loan Files as provided in the preceding sentence and promptly deliver any such later discovered Loan Files to Swedbank as provided herein, the Lehman Parties shall have no obligation or liability for the failure to discover and deliver any such missing documents held by the Lehman Parties to Swedbank. Notwithstanding anything to the contrary contained in this Agreement, while electronic mail correspondence shall be considered a writing for purposes of this Agreement, electronic mail correspondence shall not be considered a Loan File or be subject to search or delivery by the Lehman Parties as provided in this Section.

(b) Notwithstanding anything to the contrary contained in this Agreement, (i) for the purpose of ascertaining the existence of Loan Files (or portions thereof) in the actual possession of Swedbank, Swedbank shall only be obligated to make commercially reasonable inquiry of those current employees of Swedbank that Swedbank reasonably determines would be likely to possess such Loan Files or portions thereof, and (ii) on the Closing Date, Swedbank shall only be obligated to deliver to LBHI those Loan Files in the actual possession of Swedbank that were found as the result of the commercially reasonable inquiry set forth in clause (i) above. From time to time, upon written request of LBHI (setting forth with reasonable specificity documents that would constitute Loan Files that LBHI has reason to believe were not included in the delivery of Loan Files at Closing), Swedbank shall make commercially reasonable inquiries and shall promptly deliver to LBHI any such requested additional Loan Files discovered by Swedbank through such process. Provided that Swedbank uses commercially reasonable efforts to locate any requested additional Loan Files as provided in the preceding sentence and promptly delivers any such later discovered Loan Files to LBHI as provided herein, Swedbank shall have no obligation or liability for the failure to discover and deliver any such missing documents held by Swedbank to LBHI. Notwithstanding anything to the contrary contained in this Agreement, while electronic mail correspondence shall be considered a writing for purposes of this Agreement, electronic mail correspondence shall not be considered a Loan File or be subject to search or delivery by Swedbank as provided in this Section.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the parties hereto have caused this Settlement Agreement to be duly executed as of the day and year first above written.

SWEDBANK AB (publ)
NEW YORK BRANCH

By: _____

    Name:   John Matthews

    Title:    General Manager

By: _____

    Name:   DONALD WEISS

    Title:    VICE PRESIDENT

LEHMAN COMMERCIAL PAPER INC., a New York corporation, as debtor and debtor in possession in its Chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____

    Name: _____

    Title: _____

LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, as debtor and debtor in possession in its Chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____

    Name: _____

    Title: _____

IN WITNESS WHEREOF, the parties hereto have caused this Settlement Agreement to be duly executed as of the day and year first above written.

SWEDBANK AB (publ)
NEW YORK BRANCH

By:_____
    Name: _____
    Title: _____


By:_____
    Name: _____
    Title: _____


LEHMAN COMMERCIAL PAPER INC., a New York corporation, as debtor and debtor in possession in its Chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By:_____
    Name: _____Jeffrey Fitts_____
    Title: _____Authorized Signatory_____


LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, as debtor and debtor in possession in its Chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By:_____
    Name: _____Jeffrey Fitts_____
    Title: _____Authorized Signatory_____

(#43599539)

## LIST OF SCHEDULES AND EXHIBITS

Schedule A-1 –    Lehman Loans

Schedule A-2 –    Swedbank Loans

Schedule B    –    List of Loan Documents for Swedbank Loans

Schedule C    –    List of Loan Documents and Modifications for Lehman Loans

Schedule D    –    Allowed Repo Proofs of Claim

Schedule E    –    On-Going Borrower-Lender and Mezzanine Lender-Mortgage Lender Relationships

Schedule F    –    Balances, Escrow Balances and Unfunded Amounts of Loans

Schedule G        Independent Borrower Parties

Exhibit A    –    Mortgage Assets

Exhibit B    –    Form of Bankruptcy Court Approval Order

## SCHEDULE A-1

### Lehman Loans

1.    1407 Broadway participation interest in mortgage loan

2.    Project Deuce 1888 B-2 loan and C-2 loan

## SCHEDULE A-2

### Swedbank Loans

1.    1107 Broadway Project A loan

2.    425 Park Avenue leasehold mortgage loan

3.    Kapalua B-2 loan and C-2 loan

4.    Austin-One American Center B loan

## SCHEDULE B

### List of Loan Documents for Swedbank Loans

**1107 Broadway Project Loan Note A**

1. Project Loan Promissory Note A, dated as of October 16, 2007, made by 1107 Broadway LLC to the order of Lehman Brothers Holdings Inc. ("LBHI") in the principal face amount of $45,734,783.40

2. Allonge from LBHI to Lehman Commercial Paper Inc. ("LCPI") dated as of December 5, 2008

3. Allonge from LCPI to Swedbank AB, New York Branch ("Swedbank") dated as of December 5, 2008

4. Assignment from LBHI to LCPI dated as of December 5, 2008

5. Assignment and Assumption from LCPI to Swedbank dated as of December 5, 2008

6. Intercreditor Agreement, dated October 16, 2007, among LBHI, as Senior Lender, LBHI, as First Mezzanine Lender, and 1107 Broadway Mezz Holdings LLC, as Second Mezzanine Lender

7. Side Letter Re: "Additional Fee", dated October 16, 2007, among LBHI, as Senior Lender, LBHI, as Senior Mezzanine Lender, and 1107 Broadway Mezz Holdings LLC, as Junior Mezzanine Lender

**425 Park Mortgage Loan**

1. Promissory Note, dated as of July 19, 2006 made by 425 Park Avenue Ground Lessee, L.P. to the order of LBHI, in the principal face amount of $27,000,000.00

2. Allonge from LBHI to LCPI dated as of June 24, 2009

3. Allonge from LCPI to Swedbank dated as of June 24, 2009

4. Leasehold Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Financing Statement, dated as of July 19, 2006 made by 425 Park Avenue Ground Lessee, L.P. for the benefit of LBHI to secure the principal sum of $27,000,000.00 and recorded in the Office of the City Register, City of New York on August 21, 2006 under CRFN 2006000470909

5. Assignment of Leasehold Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Financing Statement, dated as of June 24, 2009, made by LBHI to LCPI and recorded in the Office of the City Register, City of New York on July 22, 2009 under CRFN 2009000225416

6. Assignment of Leasehold Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Financing Statement, dated as of June 24, 2009, made by LCPI to

Swedbank and recorded in the Office of the City Register, City of New York on July 22, 2009 under CRFN 2009000225417

7. Absolute Assignment of Leases and Rents, dated as of July 19, 2006, from 425 Park Avenue Ground Lessee, L.P. to LBHI, recorded at the Office of the City Register, City of New York County on August 21, 2006 under CRFN 2006000470910

8. Assignment of Absolute Assignment of Leases and Rents, dated as of June 24, 2009, from LBHI to LCPI and recorded in the office of the City Register, City of New York on July 22, 2009 under CRFN 2009000225418

9. Assignment of Absolute Assignment of Leases and Rents, dated as of June 24, 2009, from LCPI to Swedbank and recorded in the office of the City Register, City of New York on July 22, 2009 under CRFN 2009000225419

10. UCC-1 Fixture Financing Statement, made by 425 Park Avenue Ground Lessee, L.P., as debtor, in favor of LBHI, as secured party. 8/10/06 – 2006000451556

11. UCC-1 Financing Statement, made by 425 Park Avenue Ground Lessee, L.P., as debtor, in favor of LBHI, as secured party. 8/9/06 – 62755999

12. UCC-1 Financing Statement, made by 425 Park Avenue Ground Lessee, L.P., as debtor in favor of Swedbank, as secured party. 9/30/09 - 2009 3126254

13. UCC-3 Fixture Assignment from LBHI to LCPI. 7/22/09 – 2009000225420

14. UCC-3 State Assignment from LBHI to LCPI. 1/11/11 - 2011 0117518

15. UCC-3 Fixture Assignment from LCPI to Swedbank. 7/22/09 – 2009000225421

16. UCC-3 State Assignment from LCPI to Swedbank. 1/11/11 - 2011 0146822


**Kapalua B2 Loan and C2 Loan**

1. Amended and Restated Promissory Note Facility B2 in the principal amount of $4,041,441.55 dated February 11, 2009, made by Kapalua Bay, LLC in favor of Swedbank

2. Amended and Restated Promissory Note Facility C2 in the principal amount of $10,983,892.07 dated February 11, 2009, made by Kapalua Bay, LLC in favor of Swedbank

3. Co-Lending Agreement dated as of February 1, 2007 among LBHI, Central Pacific Bank, Deutsche Hypothekenbank (Actien-Gesellschaft), and Landesbank Baden-Wurttemberg

**One American Center B Loan**

1. Amended and Restated One American Center Promissory Note B dated July 11, 2007 made by TPG-One American Center LLC to LBHI in the amount of $69,100,000

2. Allonge to Amended and Restated One American Center Promissory Note B from LBHI to LCPI dated as of March 16, 2009

3. Allonge to Amended and Restated One American Center Promissory Note B from LCPI to Swedbank dated as of March 16, 2009

4. Assignment Agreement from LBHI to LCPI dated as of March 16, 2009

5. Assignment and Assumption Agreement from LCPI to Swedbank dated as of March 16, 2009

6. Stipulation, Agreement and Order Resolving Motion of TPG-Austin Portfolio Holdings LLC dated March 2009 filed in the United States Bankruptcy Court Southern District of New York with respect to Chapter 11 Case No. 08-13555 (JMP)

7. Intercreditor Agreement dated June 1, 2007, between LBHI and LCPI

8. Co-Lender Agreement dated July 11, 2007 between LBHI, as A Note Holder and LBHI, as B Note holder [unexecuted]

## SCHEDULE C

## List of Loan Documents for Lehman Loans

### 1407 Broadway Participation Interest in Mortgage Loan

1. Participation Agreement dated as of August 12, 2008, by and between Lehman Brothers Holding Inc. ("LBHI") and Lehman Brothers Bankhaus AG ("LBB"), as assigned by LBB to LBHI by Assignment and Assumption Agreement dated as of February 4, 2010.

### Project Deuce 1888 B-2 and C-2 Loan

- Co-Lender Agreement, dated as of August 9, 2007, by and between Greenwich and Lehman ALI Inc.

- Amended and Restated Promissory Note B-2, dated as of August 9, 2007 in the stated amount of $12,250,000.00, executed by Borrower and payable to the order of Lehman ALI Inc.

- Amended and Restated Promissory Note C-2, dated as of August 9, 2007 in the stated amount of $16,047,772.93, executed by Borrower and payable to the order of Lehman ALI Inc.

- Notice of Loan Extension dated November 23, 2009 by Tenucp Property LLC to Greenwich and Lehman ALI Inc.

- Intercreditor Agreement, dated as of December 28, 2006, between Greenwich, as Senior Loan Agent and Senior Lender, and Greenwich, as Mezzanine Loan Agent and Mezzanine Lender

- Notice of Loan Extension, dated November 30, 2010, from TENUCP Property LLC to Greenwich and Lehman ALI, Inc., and accompanying Certificate of Officer of TENUCP Property LLC

- Allonge to Amended and Restated Promissory Note B-2 to Lehman Brothers Holdings Inc. dated February __, 2011

- Assignment Agreement dated as of February __, 2011 from Lehman ALI Inc. to Lehman Brothers Holdings Inc. relating to Amended and Restated Promissory Note B-2.

- Allonge to Amended and Restated Promissory Note C-2 to Lehman Brothers Holdings Inc. dated February __, 2011

- Assignment Agreement dated as of February __, 2011 from Lehman ALI Inc. to Lehman Brothers Holdings Inc. relating to Amended and Restated Promissory Note C-2.

## SCHEDULE D

### Allowed Repo Proofs of Claim

| Claim | Creditor Name | Date | Total Claim Value |
|-------|---------------|------|-------------------|
| 67079 | Swedbank AB, New York Branch | 9/20/2010 | $565,870,087.00 |
| 67080 | Swedbank AB, New York Branch | 9/20/2010 | $565,870,087.00 |

**SCHEDULE E**

**On-Going Borrower-Lender and Mezzanine Lender-Mortgage Lender Relationships**

1.    2300 Cropsey

2.    AGC Philadelphia (Ritz Philly)

3.    Bachelors Gulch

4.    Cumberland Galleria

5.    Harbor View

6.    Riande – 1825 Collins Avenue

7.    LeCraw

8.    North Beach Tower

9.    Potomac

## SCHEDULE F

**Outstanding Principal Balances, Unpaid Interest, Escrow Balances and Unfunded Commitment**

**Outstanding Principal Balances, Past Due Interest, Escrow Balances and Unfunded Commitment**

### Swedbank Loans

| Loan | Principal Balance | Past Due Interest (as of 1/31/11) | Escrow Balance | Unfunded Commitment |
|---|---|---|---|---|
| 1. 1107 Broadway Project A Loan* | $13,960,999.52 | $4,067,129.00 | $0 | $0 |
| 2. 425 Park Mortgage Loan | $27,000,000.00 | $0 | $0 | $0 |
| 3. Kapalua B2 Loan | $4,041,441.55 | $47,756.81 | $0 | $0 |
| 4. Kapalua C2 Loan | $10,938,892.07 | $733,560.26 | $0 | $0 |
| 5. One American Center B Loan | $69,100,000.00 | $0 | $0 | $0 |

### Lehman Loans

| Loan | Principal Balance | Past Due Interest (as of 1/31/11) | Escrow Balance | Unfunded Commitment |
|---|---|---|---|---|
| 1. Project Deuce 1888 B2 Loan** | $12,250,000.00 | $0 | $2,349,547.43 | $0 |

SCH F - 1

US_ACTIVE:\43599539\17\58399.0008

| | | |
|---|---|---|
| 2. Project Deuce 1888 C2 Loan | $16,647,772.93 | $0 | $0 |
| 3. 1407 Broadway Participation | $26,989,950.08 | - | $260,950.82 |

*Unpaid interest for 1107 Broadway above includes default interest beginning 10/15/2008.  The current outstanding interest is $2,419,924.95

*Unfunded commitment for 1107 Broadway per the documents is $31,773,783.88.  It is represented above as $0 due to default.

**The $2,349,547.43 in Escrow Balance listed under Note B-2 is the remaining amount of Rollover Reserve from the $5,390,000.00 Additional Advance made under the B-2 note. Additional escrows and/or reserves may be maintained in connection with the Project Deuce 1888 A or D loans and, upon liquidation, all such escrows and/or reserves may be distributed for the benefit of the holders of the Project Deuce 1888 B2 loan and C2 loan, provided, that the foregoing is provided for informational purposes only and the Lehman Parties shall have no liability under this Agreement with respect to same.

SCH F - 2

## SCHEDULE G

### Independent Borrower Parties

**La Posada**

GENLB La Posada Hotel LLC, a Delaware limited liability company

GENLB La Posada Mezzanine LLC, a Delaware limited liability company

GENLB La Posada LLC, a Delaware limited liability company

**Telluride**

RAL Mountain Village Lodging LLC, a Delaware limited liability company

Mountain Village Hotel Development LLC, a Delaware limited liability company

## EXHIBIT A

## MORTGAGE ASSETS

1. 425 Park Avenue Leasehold Mortgage Loan
2. 610 Lexington Acquisition B Loan, Project B Loan, and Building B Loan
3. 816 Congress Deed of Trust Loan
4. 1100 Vermont Deed of Trust Loan
5. 1107 Broadway Project A Loan
6. 1133 Westchester Acquisition Loan B and Project Loan B
7. 1150 18th Street B Loan
8. 1407 Broadway Leasehold Mortgage Loan
9. 2300 Cropsey Consolidated Acquisition Loan and Project Loan
10. AGC Philadelphia (Ritz Philly) Construction Loan
11. Austin-Corporate Loan (Frost Bank) Loan
12. Austin-One American Center B Loan
13. Austin-One Congress B Loan
14. Bachelors Gulch Deed of Trust Loan
15. Bulletin Building A-2 Loan
16. Castle Hot Springs Deed of Trust Loan
17. Cherry Lawn Consolidated Mortgage Loan, Building Loan, and Project Loan
18. Concordia Deed of Trust Loan
19. Cumberland Galleria A Loan
20. East 46th Acquisition Loan Mortgage, Building Loan Mortgage, and Project Loan Mortgage
21. East 49th Consolidated Acquisition Loan Mortgage, Consolidated Building Loan Mortgage, and Consolidated Project Loan Mortgage
22. Four Seasons Bermuda Mortgage Loan
23. Harbor View Mortgage Loan
24. Hollins Ferry Mortgage Loan
25. Howard Building Deed of Trust Loan
26. Icon Brickell Mortgage Loan
27. Kapalua B2 Loan, C2 Loan, and Interest in Construction Loan
28. Kulalani Senior Loan and Subordinate Loan
29. La Posada Deed of Trust Loan
30. LeCraw A Loan
31. Lyons Monarch B Loan
32. North Beach Tower Construction Loan
33. Potomac Mortgage Loan
34. Project Deuce 1888 D-2 Loan
35. Project Easy Living A-1 Loan
36. Retreat at Speedway Deed of Trust Loan
37. Riande-1825 Collins Avenue A-2 Loan
38. Seaview Square A-3 Loan
39. SGS Holdings (Sunset Gower) Fee and Leasehold Deed of Trust Loan

40.    Somerhill Farm Credit Line Deed of Trust Loan
41.    South Park Deed of Trust Loan
42.    Storage Deluxe-47th Avenue Building Loan Leasehold Mortgage, Supplemental Building Loan Leasehold Mortgage, and Project Loan Leasehold Mortgage
43.    Storage Deluxe-481 Grand Consolidated Mortgage Loan
44.    Storage Deluxe-Cromwell Building Loan
45.    Storage Deluxe-Pitkin Building Loan
46.    Storage Deluxe-Shelton Open-Ended Building Loan
47.    Storage Deluxe-Stanley Acquisition Loan, Building Loan, and Project Loan
48.    Storage Deluxe-White Plains Building Loan
49.    Storage Deluxe-Van Buren Acquisition Loan, Project Loan, Building Loan, and Supplemental Building Loan
50.    Telluride Construction Loan
51.    Trump Hollywood B Loan
52.    Williamsburg Building Loan, Project Loan, Acquisition Loan, and Junior Building Loan

## EXHIBIT B

### FORM OF BANKRUPTCY COURT APPROVAL ORDER

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x

| | |
|---|---|
| In re : | Chapter 11 Case No. |
| : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, : | 08-13555 (JMP) |
| : | |
| Debtors. : | (Jointly Administered) |
| : | |

------------------------------------------------------x

### ORDER PURSUANT TO SECTION 105(a)
### OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE
### 9019(b) AUTHORIZING AND APPROVING A SETTLEMENT
### AND COMPROMISE AMONG LEHMAN BROTHERS HOLDINGS INC.,
### LEHMAN COMMERCIAL PAPER INC. AND SWEDBANK AB, NEW YORK BRANCH

Upon the motion (the "Motion"), of Lehman Brothers Holdings Inc. ("LBHI")

and Lehman Commercial Paper Inc. ("LCPI"), for an order, pursuant to section 105(a) of title 11

of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing and approving a settlement with

Swedbank AB, New York Branch ("Swedbank") on the terms set forth in a Settlement

Agreement,[1] as more fully set forth in the Motion; and the Court having jurisdiction to consider

the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and

the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York

Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the Motion.

1409; and due and proper notice of the Motion having been provided to (i) the United States

Trustee for the Southern District of New York; (ii) the attorneys for the Official Committee of

Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue

Service; (v) the United States Attorney for the Southern District of New York; (vi) counsel to

Swedbank; and (vii) all other parties entitled to notice in accordance with the procedures set

forth in the second amended order entered on June 17, 2010 governing case management and

administrative procedures for these cases [Docket No. 9635]; and the Court having found and

determined that the relief sought in the Motion is in the best interests of LBHI and LCPI, their

estates and creditors, and all parties in interest and that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein; and after due deliberation and sufficient

cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to Section 105 of the Bankruptcy Code and Bankruptcy

Rule 9019, the Settlement Agreement is approved, and LBHI and LCPI are each duly authorized

to (i) consummate all of the transactions contemplated thereby and (ii) execute and deliver such

documents and instruments and to take such other actions as may be reasonably necessary to

consummate the transactions contemplated by the Settlement Agreement, it being understood

that any actions described in this paragraph taken by LBHI, LCPI or any of the affiliates of LBHI

or LCPI may be taken without the necessity of any further Court proceedings or approval and

shall be conclusive and binding in all respects on all parties in interest in these cases; and it is

further

ORDERED that, upon and subject to the terms and conditions set forth in the

Settlement Agreement, with respect to Claim No. 67080 filed by Swedbank against LCPI and

US_ACTIVE:\43599539\17\58399.0008          EX B - 2

Claim No. 67079 filed by Swedbank against LBHI (collectively, the "Allowed Repo Proofs of

Claim") from and after the Closing Date (as defined in the Settlement Agreement) in satisfaction

in full of such proofs of claim, Swedbank will have an allowed, non-priority, non-subordinated

unsecured claim against each of LCPI and LBHI in their respective chapter 11 cases in the

amount of $325,000,000 (the "Settlement Amount"); provided, however, that the aggregate

recovery of Swedbank in respect of the Allowed Repo Proofs of Claim shall not exceed the

Settlement Amount and that, for the avoidance of doubt, the claim set forth in each of the

Allowed Repo Proofs of Claim shall have the same treatment as other claims within its class

under the plan confirmed by the Court in the chapter 11 cases of LCPI and LBHI, as applicable;

and it is further;

ORDERED that the Settlement Agreement and any related agreements,

documents or other instruments may be modified, amended or supplemented by the parties

thereto, in a writing signed by such parties, and in accordance with the terms thereof, without

further order of the Court, *provided* that any such modification, amendment or supplement does

not have a material adverse effect on the Debtors' estates; and it is further

ORDERED that any and all claims, defenses, rights of setoff, debt, liens, losses,

demands, damages, costs, and causes of action of whatever nature in connection with or relating

to the Repurchase Agreement, the Mortgage Assets, the Settlement Agreement or any related

transaction by and among the Debtors and their affiliates shall be expressly reserved and not

affected by entry into the Settlement Agreement or consummation of the transactions

contemplated thereunder pursuant to section 2.9(f) of the Settlement Agreement; and it is further

ORDERED (a), that solely as among the Debtors, nothing herein shall determine

who is the owner of the proceeds of the Loans or who would otherwise be entitled to the

economic benefit, if any, of the Loans and (b) that any and all pre- and post-petition claims, rights and obligations that the Debtors (including but not limited to LCPI and LBHI) may have among themselves in connection with the subject matter of the Motion are hereby preserved, and that the entry of this Order shall not constitute a waiver or relinquishment of the rights of any Debtor or party in interest with respect to such claims, rights and obligations; and it is further

ORDERED that nothing in the Motion, Settlement Agreement or herein shall affect or be construed as affecting any rights, title, interests, claims or obligations of Lehman Re Ltd. arising from any of its direct or indirect investments or interests in any real property that is directly or indirectly the subject of the Motion, the Settlement Agreement or the transactions contemplated thereunder; and it is further

ORDERED that nothing in the Motion or Settlement Agreement or herein shall be construed as affecting any rights of Lehman Brothers Inc. ("LBI") arising from or relating to any transactions entered by it under the Repurchase Agreement or any rights that LBI may have to pursue claims or causes of action arising from or relating to the Repurchase Agreement; and it is further

ORDERED that the Mortgage Assets are not and were not property of LBHI's estate or LCPI's estate; and it is further

ORDERED that neither LBHI nor LCPI have assumed or assumed and assigned nor will assume or assume and assign the Repurchase Agreement pursuant to the Bankruptcy Code, including section 365 thereof, in connection herewith or with the Settlement Agreement or any of the transactions contemplated thereby; and it is further

ORDERED that, Swedbank is the owner of the Mortgage Assets, other than the Swedbank Loans upon the closing of the Settlement Agreement; and it is further

ORDERED that the Bankruptcy Court retains jurisdiction to enforce the

Settlement Agreement and any disputes arising thereunder.

Dated: February __, 2011
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

EX B - 5