**QUINN EMANUEL**
**URQUHART & SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
*Counsel for the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc.*

**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
*Counsel for Debtor Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., <u>et al.</u>,<br><br>        Debtors. | Chapter 11<br>Case No. 08-13555 (JMP) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>        Debtor. | Case No. 08-01420 (JMP) SIPA |

**MEMORANDUM OF LAW IN OPPOSITION TO JPMORGAN'S MOTION TO STRIKE PORTIONS OF OBJECTION TO PROOFS OF CLAIM NO. 66462 AGAINST LEHMAN BROTHERS HOLDINGS INC. AND NO. 4939 AGAINST LEHMAN BROTHERS INC. <u>REGARDING TRIPARTY REPO-RELATED LOSSES</u>**

# TABLE OF CONTENTS

**Page**

Preliminary Statement.................................................................................................1

Factual Background ....................................................................................................3

I.    JPMorgan is Left With a Deficiency Following the Liquidation of LBI Triparty
      Repo Collateral ..................................................................................................3

II.   JPMorgan Accuses Barclays of Causing the Deficiency and Receives
      Consideration From Barclays in Settlement of Potential Claims ........................4

III.  JPMorgan Claims the Full Deficiency Against LBI and LBHI, Including Interest,
      Without Reducing the Amount Sought to Account for the Settlement
      Consideration Received from Barclays ...............................................................6

IV.   JPMorgan Files its Counterclaims in the Adversary Proceeding Against LBHI.................7

V.    Objectors File the Deficiency Objection and JPMorgan Moves to Strike...........................8

Argument ....................................................................................................................9

I.    Legal Standards Governing Motion to Strike ....................................................9

II.   The Portion of the Objection Requesting Reduction of the Deficiency Claim in the
      Amount of Any Consideration Received by JPMorgan From Barclays for the
      Same Losses is Proper and Should not be Stricken ...........................................10

      A.    JPMorgan Cannot Recover Twice for the Same Alleged Injury ...........................10

      B.    The Rule Precludes Double Recovery on the Same Loss, Even if the
            Underlying Causes of Action are Different ............................................12

      C.    Nothing in the Law Cited by JPMorgan About Purchase of Claims
            Sanctions Double Recovery for the Same Loss....................................16

      D.    The December Settlement Agreement Does Not Block the Application of
            the Rule Against Double Recovery to Reduce the Deficiency Claim ..................19

III.  JPMorgan is Not Entitled to Interest on the Deficiency Claim and the Portion of
      the Deficiency Objection So Arguing Should Not be Stricken .........................21

Conclusion ................................................................................................................25

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*Barone v. Marone*,
 No. 04 Civ. 2001 (NRB), 2007 WL 4458118 (S.D.N.Y. Dec. 14, 2007)...............................12

*Central Soya Co. v. Epstein Fisheries, Inc.*,
 676 F.2d 939 (7th Cir. 1982) ...........................................................................................16

*In re Circuit City Stores, Inc.*,
 426 B.R. 560 (E.D. Va. 2010)...........................................................................................11

*Codest Eng'g v. Hyatt Int'l. Corp.*,
 954 F. Supp. 1224 (N.D. Ill. 1996) ..................................................................................14

*Diesel Props S.r.L. v. Greystone Bus. Credit II LLC*,
 No. 07 Civ. 9580, 2008 WL 4833001 (S.D.N.Y. Nov. 5, 2008) ...........................................10

*Durk v. Daum Trucking, Inc.*,
 No. 07 CV 6844, 2008 WL 4671721 (N.D. Ill. Oct.  22, 2008) ............................................12

*In re El Paso Refining, Inc.*,
 192 B.R. 144 (N.D. Tex. 1996)..........................................................................................16

*Equitable Life Assurance Soc'y v. Sublett (In re Sublett)*,
 895 F.2d 1381 (11th Cir. 1990) ........................................................................................23

*In re Exec. Office Ctrs., Inc.*,
 96 B.R. 642 (Bankr. E.D. La. 1988) ..................................................................................17

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*,
 116 F.3d 790 (5th Cir. 1997) ...........................................................................................23

*Freydl v. Meringolo*,
 No. 09 Civ. 07196(BSJ)(KNF), 2011 WL 2566082, at *1 (S.D.N.Y. June 16, 2011) .............9

*Gerber v. MTC Elec. Techs. Co., Ltd.*,
 329 F.3d 297 (2d Cir. 2003)..............................................................................................20

*In re Jason*,
 Case No. 01-10082-SSM, 2007 WL 4553608 (Bankr. E.D. Va. Dec. 19, 2007) ...................10

*Kassman v. American Univ.*,
 546 F.2d 1029 (D.C. Cir. 1976) ........................................................................................12

*Kitrosser v. CIT Group/Factoring, Inc.*,
 177 B.R. 458 (S.D.N.Y. 1995)...........................................................................................21

*Lamoureux v. Anazaohealth Corp.*,
 250 F.R.D. 100 (D. Conn. 2008).........................................................................................9

*In re Lapiana*,
909 F.2d 221 (7th Cir. 1990) ............................................................................23

*Lincoln Sav. Bank, FSB v. Suffolk Cnty. Treasurer (In re Parr Meadows Racing Ass'n, Inc.)*,
880 F.2d 1540 (2d Cir. 1989)...........................................................................23

*In re Masters Mates & Pilots Pension Plan and IRAP Litig.*,
957 F.2d 1020 (2d Cir. 1992)......................................................................11, 20

*Mokava Corp. v. Dolan*,
147 F.2d 340 (2d Cir. 1945).............................................................................17

*In re Morgan*,
Case No. 01-60889, 2003 WL 1728667 (Bankr. E.D. Ga. Mar. 14, 2003) ............................10

*In re Nixon*,
Case No. 09-3135, 2010 WL 5141339 (3d Cir. Dec. 15, 2010) ......................................22, 24

*In re Oakland City Apartments*,
1 B.R. 123 (N.D. Ga 1979) ...............................................................................11

*In re Park Forest Devel. Corp.*,
197 B.R. 388 (N.D. Ga. 1996) ........................................................................ 10-11

*People v. Chevron Corp.*,
872 F.2d 1410 (9th Cir. 1989) ...........................................................................12

*In re Pilgrim's Pride Corp.*,
453 B.R. 691 (N.D. Tex. 2011).............................................................................11

*Rake v. Wade*,
508 U.S. 464 (1993).....................................................................................23

*In re Refco*,
No. 05 Civ. 8626 (GEL), 2007 WL 57872 (S.D.N.Y. Jan. 9, 2007) ....................................20

*Resurgent Capital Servs. v. Burnett (In re Burnett)*,
206 B.R. 313 (B.A.P. 9th Cir. 2003)....................................................................17

*In re Rozel Indust., Inc.*,
120 B.R. 944 (Bankr. N.D. Ill. 1990) ..................................................................22

*Simon v. Mfrs. Hanover Trust  Co.*,
849 F. Supp. 880 (S.D.N.Y. 1994)....................................................................9-10

*Singer v. Olympia Brewing Co.*,
878 F.2d 596 (2d Cir. 1989), *cert. denied*, 110 S. Ct. 729 (1990).......................................11

*Solomon v. Wein (In re Huhn)*,
145 B.R. 872 (W.D. Mich. 1992) ......................................................................22

*Sparaco v. Lawler, Matusky Skelly Eng'rs LLP*,
313 F. Supp. 2d 247 (S.D.N.Y. 2004)...............................................................12, 16

*Stockholders' Prot. Comm. for Moulded Products, Inc. v. Barry (In re Moulded Prods., Inc.)*,
474 F.2d 220 (8th Cir. 1973) .............................................................................................17, 18

*United States v. Ron Pair Enters., Inc.*,
489 U.S. 241 (1989)..........................................................................................................22

*Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.*,
394 B.R. 325 (S.D.N.Y. 2008)............................................................................................21

*Walsh v. City of New York*,
585 F. Supp. 2d 555 (S.D.N.Y. 2008)..................................................................................9

*In re Zelis*,
66 F.3d 205 (9th Cir. 1995) ..........................................................................................19, 20

## **Statutes**

11 U.S.C. § 506(b) ................................................................................................................21

Lehman Brothers Holdings Inc. ("LBHI") and the Official Committee of

Unsecured Creditors of Lehman Brothers Holdings Inc. (the "Committee" and, together with

LBHI, "Objectors") respectfully submit this opposition to JPMorgan's Motion to Strike (the

"Motion") Portions of Objection to Proofs of Claim No. 66462 Against Lehman Brothers

Holdings Inc. and No. 4939 Against Lehman Brothers Inc. Regarding Triparty Repo-Related

Losses (the "Deficiency Objection").  For the reasons set forth below, the Motion should be

denied in its entirety.

## Preliminary Statement

Right now, not only does JPMorgan hold the full cash payment for its alleged

triparty repo losses from LBHI, but it also has the benefit of the consideration Barclays gave to

compensate JPMorgan for the same losses.  JPMorgan has already applied over $6 billion of

LBHI cash collateral to fully pay its claims related to LBI's triparty repo financing.  This amount

was over and above consideration that JPMorgan extracted from Barclays based on the same

alleged triparty losses.  JPMorgan persuaded Barclays to drop a lawsuit allegedly worth hundreds

of millions of dollars and to accept over a billion dollars less than the $7 billion JPMorgan owed

Barclays based on JPMorgan's claim that Barclays caused JPMorgan's clearing and triparty

losses.

In its Motion, JPMorgan asks that this Court strike the portion of the Deficiency

Objection seeking reduction of JPMorgan's claim to reflect consideration received through the

settlement with Barclays.  JPMorgan justifies its ability to recover from both Barclays and LBHI

for the same loss on the ground that the legal theories JPMorgan asserted against Barclays were

different than its claims against LBHI.  But the legal rules preventing double recovery focus on

the loss at issue, not the legal theories a party asserts.  And according to the facts alleged in the

Deficiency Objection, which must be deemed true in deciding this Motion, the loss underlying

1

JPMorgan's settled claims against Barclays is the very same loss that JPMorgan has claimed against LBI (as primary obligor) and LBHI (as guarantor).

Faced with clear legal principles mandating a reduction of the Deficiency Claim, JPMorgan points to its settlement agreement with Barclays, which does not by its terms provide for any reduction in JPMorgan's Deficiency Claim. However, this portion of Objectors' Deficiency Objection is not based on the settlement agreement—a contract to which LBHI was not a party. Instead, it is based on the law prohibiting claimants from realizing double recoveries—a rule that cannot be contracted around, especially without the consent of the paying party.

JPMorgan does not deny that it received consideration from Barclays through the settlement or that the settlement and the Deficiency Claim both sought redress for the same economic loss. Under the circumstances, the Court should deny JPMorgan's Motion and move forward to determine the appropriate reduction to the Deficiency Claim. An alternative result enables JPMorgan to reap a windfall double recovery.

In its Motion to Strike, JPMorgan also asks that it keep payment on its Interest Claim regardless of what it did with LBHI's cash collateral or any equitable considerations. JPMorgan argues that Section 506(b) of the Bankruptcy Code requires the Court to grant postpetition interest no matter what. JPMorgan does not deny that, during the entire period for which it seeks interest through the Deficiency Claim, it was holding enough LBHI cash collateral in its own account to pay the entire Deficiency Claim. Nor does it deny that it enjoyed the benefits of the LBHI cash collateral during that period, functionally treating the cash as its own. No case cited by JPMorgan holds that a bankrupt estate must pay postpetition interest to an oversecured creditor under these extraordinary circumstances. Objectors are entitled to present

2

evidence in support of the Deficiency Objection in light of the injustice that would result if

JPMorgan is allowed to keep interest from the estate after it seized cash fully covering the claim,

unilaterally put it in JPMorgan's own account, and used it to benefit JPMorgan.

## **Factual Background**

### I.     **JPMorgan is Left With a Deficiency Following the Liquidation of LBI Triparty Repo Collateral**

JPMorgan served as primary clearing bank and triparty repo custodian for

Lehman Brothers Inc. ("LBI") from June 2000 until September 19, 2008, when LBI began its

SIPA proceedings.  (Obj. ¶ 11.)  In that role, JPMorgan extended credit to LBI each morning to

"unwind" LBI's triparty repo trades.  (Obj. ¶14.)  This "intraday" loan from JPMorgan was

secured by the repurchased securities and other LBI assets until LBI sold these assets again after

the close of the trading day in a repo with the same or another counterparty.  (*Id*.)

On the morning of September 19, 2008, JPMorgan unwound certain of LBI's

triparty repo trades.  Later that day, the Honorable Gerard E. Lynch, Judge of the United States

District Court for the Southern District of New York, entered the order commencing LBI's SIPA

liquidation.  (Obj. ¶ 7.)  At that time, LBI owed JPMorgan $25,279,675,964 for the unwinds,

secured by the securities in LBI's clearance account, which had a market value according to

JPMorgan's records of $27,218,845,261, as well as LBI cash and incoming payments totaling

$3,489,150,764.  (Obj. ¶ 22.)  Additionally, JPMorgan was holding LBHI securities

independently priced the week before at over $3.5 billion,[1] as well as $8.6 billion of LBHI cash

and money market funds that JPMorgan had demanded from LBHI in the week before its

Bankruptcy.  (Obj. ¶ 19.)  Through its "Project Tassimo," JPMorgan then liquidated most of the

---

[1]    Whitmer Decl. Ex. 1.

3

LBI securities for far less than the market price ascribed to such securities by JPMorgan's own records, including by "selling" many securities to itself.  After the liquidation, JPMorgan alleged a deficiency of $6,333,781,099 (the "Deficiency").[2]  (Obj. ¶ 2.)

## II.    JPMorgan Accuses Barclays of Causing the Deficiency and Receives Consideration From Barclays in Settlement of Potential Claims

Immediately upon learning that it had been left with a multi-billion dollar secured extension of credit to LBI, JPMorgan blamed Barclays.  Beginning on September 19, 2008 and continuing throughout settlement negotiations ending in December 2008, JPMorgan claimed that Barclays had caused JPMorgan's triparty losses by allegedly reneging on an agreement to purchase all of the securities in LBI's clearance account as part of its purchase of Lehman's U.S. broker-dealer business.  (Obj. ¶ 25.)  With the help of the Federal Reserve Bank of New York (the "Fed"), JPMorgan and Barclays immediately entered negotiations that resulted in the Services and Settlement Agreement of September 22, 2008 ("SSA").  (Obj. ¶ 25.)  A key element of the SSA was a mutual release in which Barclays agreed to dismiss a lawsuit seeking hundreds of millions of dollars pending against Bear Stearns Asset Management, recently acquired by JPMorgan (the "Bear Stearns Lawsuit").  (Obj. ¶ 25.)  The lawsuit was dismissed specifically in consideration for the release of JPMorgan's claim based on Barclays' failure to take over $15.8 billion in repo financing, which allegedly left JPMorgan with triparty exposure.[3]

---

[2]    Although not at issue in JPMorgan's Motion, Objectors are also challenging JPMorgan's liquidation of LBI collateral through Project Tassimo, which JPMorgan used to sell LBI collateral to itself at discounted prices and to others in a commercially unreasonable manner in violation of New York's Uniform Commercial Code.

[3]    Kleinhaus Decl. Ex. G, SSA § 4(a) ("JPMorgan and BarCap shall be deemed to forever release . . . all claims . . . relating to . . . any disputes relating to a repurchase agreement allegedly agreed to on or about September 18, 2008 in respect of approximately $15.8 billion face amount of securities , and . . . in consideration of the release granted to it in immediately

(continued...)

4

Unbeknownst to Barclays, at the time the SSA was executed, JPMorgan had taken $7 billion out of a Barclays account at JPMorgan.  (Mot. at 6.)  When Barclays learned of this a few days later, Barclays and JPMorgan began negotiations surrounding the $7 billion dispute.  (Mot. at 6.)  Barclays claimed that it was entitled to the $7 billion in cash.  JPMorgan responded with a letter justifying its own entitlement to the $7 billion because Barclays had left JPMorgan with triparty exposure to LBI, stating that "Barclays Capital assured JPMorgan that it was going to fully repay JPMorgan's advances by purchasing or refinancing the entire LBI securities portfolio that we were financing as LBI's agent clearing bank."[4]  With the help of the Fed, JPMorgan and Barclays negotiated their dispute for the next two months.  (Obj. ¶ 26.)  Throughout this period, JPMorgan took the position that Barclays was not entitled to the full $7 billion in cash because Barclays' misrepresentations had caused JPMorgan to be left with triparty repo-related exposure to LBI.[5]

On December 5, 2008, JPMorgan and Barclays executed a second settlement agreement (the "December Settlement Agreement").  (Obj. ¶ 27.)  Pursuant to the December Settlement Agreement, JPMorgan transferred to Barclays approximately $1.25 billion in cash and a portfolio of securities in exchange for Barclays' release of claims, including those related to the $7 billion.[6]  On December 22, 2008, the date JPMorgan transferred the securities to Barclays, Barclays valued the securities at only $3.74 billion,[7] bringing the total payment from JPMorgan

---

(...continued)

preceding clause (a), BarCap shall promptly cause the lawsuit identified on Schedule B . . . to be withdrawn . . . .").

[4]   Whitmer Decl. Ex. 2, Dimon-Varley Letter at 2.

[5]   Whitmer Decl. Ex. 3, Leventhal Tr. at 138:6-15.

[6]   Kleinhaus Decl. Ex. H, December Settlement Agreement at §§ 1 and 4.

[7]   Whitmer Dec. Ex. 4, Opening Balance Sheet.

to Barclays under the December Settlement Agreement to just over $5 billion, nearly $2 billion

short of the cash Barclays claimed to be owed.  As with the SSA, Barclays reiterated its

agreement to dismiss the Bear Stearns Lawsuit, which witnesses have estimated was worth

approximately $400 million to Barclays.[8]  In exchange, JPMorgan released Barclays from all

claims related to Barclays' failure to take JPMorgan out of its financing of LBI.[9]

### III.    JPMorgan Claims the Full Deficiency Against LBI and LBHI, Including Interest, Without Reducing the Amount Sought to Account for the Settlement Consideration Received from Barclays

On May 29, 2009, JPMorgan filed a proof of claim against LBI seeking the full

amount of the Deficiency (the "Deficiency Claim").[10]  JPMorgan's claim against LBI does not

provide LBI any credit for the compensation JPMorgan received through the SSA or the later

December Settlement Agreement.

Relying on the August and September Agreements, JPMorgan then asserted the

full Deficiency Claim, plus interest, against LBHI as the purported guarantor of LBI's triparty

repo-related obligations.[11]

In addition to the amount of the Deficiency itself, JPMorgan's Deficiency Claim

also includes $280,224,670 (the "Interest Claim"), representing the interest on the Deficiency

through the execution of the Collateral Disposition Agreement ("CDA").  Under the CDA,

---

[8]    Kleinhaus Decl. Ex. H, December Settlement Agreement at §§4(b); Obj. ¶ 82; Whitmer Decl. Ex. 5, Keegan Tr. at 237:19-238:10 (describing the lawsuit as "worth about 400 million bucks").

[9]    Kleinhaus Decl. Ex. H, December Settlement Agreement at §§ 4(b)-(c).

[10]    Kleinhaus Decl., Ex. B at Exhibit B.

[11]    Kleinhaus Decl., Ex. B.

LBHI's cash collateral held by JPMorgan was applied to provisionally pay all of JPMorgan's claims against Lehman, including the full amount of the Deficiency Claim.[12]

## IV.    JPMorgan Files its Counterclaims in the Adversary Proceeding Against LBHI

On May 26, 2010, Objectors filed a complaint against JPMorgan, commencing Case No. 10-03266 (JMP) (the "Adversary Proceeding").  On December 1, 2010, JPMorgan filed counterclaims against LBHI alleging, *inter alia*, that LBHI aided and abetted a fraud perpetrated by Barclays' that led JPMorgan to have outstanding intraday financing to LBI.  On February 17, 2011, in response to a motion to dismiss filed by Objectors, JPMorgan filed its Amended Counterclaims of JPMorgan Chase Bank, N.A. (the "Amended Counterclaims").[13]

In the Amended Counterclaims, JPMorgan continued to allege that, along with certain Lehman employees, Barclays was at fault for leaving JPMorgan with outstanding intraday exposure to LBI.  In particular, JPMorgan alleged that "Barclays was able to cherry pick the securities that it purchased from LBI" and "JPMorgan, in turn, was left with unpaid loans to LBI exceeding $25 billion, which included both the $15.8 billion that JPMorgan loaned to repay Barclays on Thursday morning, September 18, and additional financing positions that Barclays did not assume."[14]  According to JPMorgan, "[t]his outcome was possible because Barclays, purportedly in an effort to support LBI, had financed increasingly large portions of LBI securities for three straight nights (Monday, Tuesday and Wednesday) — and then decided . . . to leave behind at JPMorgan the very securities it had financed on Wednesday night, September

---

[12]   Kleinhaus Decl., Ex. B at Exhibit B, p. 3.

[13]   Whitmer Decl. Ex. 6, Amended Counterclaims.

[14]   Whitmer Decl. Ex. 6, Amended Counterclaims ¶ 89.

17."[15]  JPMorgan also accused Barclays—and only Barclays—of misleading it into releasing $5 billion of margin when transferring securities to Barclays during the day on September 18, 2008.[16]

Under the heading "JPMorgan's Damages," JPMorgan then described the same purported triparty deficiency it now seeks against LBHI, alleging that "JPMorgan ended up with over $25 billion in claims against the LBI estate from extensions of credit under the Clearance Agreement," and described how it was "forced to apply most of the approximately $8.6 billion in cash collateral that it received from [LBHI] in September 2008 to satisfy LBI's unpaid loans."[17] The Amended Counterclaims further alleged that LBHI "aided and abetted Barclays in perpetrating a fraud on JPMorgan" and that, "[a]s a direct and proximate result of Barclays' false and misleading statements, Barclays' material omissions, and LBHI's aiding and abetting of Barclays' fraud, JPMorgan incurred over $25 billion in claims against LBHI's estate that it otherwise would not have incurred."[18]

## V.    Objectors File the Deficiency Objection and JPMorgan Moves to Strike

On August 31, 2011, Objectors filed the Deficiency Objection, seeking a reduction in the Deficiency Claim on three grounds: (1) that JPMorgan's disposition of the LBI collateral was commercially unreasonable and included self-sales to JPMorgan at prices below the fair market value of the collateral; (2) that the Deficiency Claim should be reduced by the

---

[15]    Whitmer Decl. Ex. 6, Amended Counterclaims ¶ 89.

[16]    Whitmer Decl. Ex. 6, Amended Counterclaims ¶¶ 74-77.

[17]    Whitmer Decl. Ex. 6, Amended Counterclaims ¶¶ 100-01.

[18]    Whitmer Decl. Ex. 6, Amended Counterclaims ¶¶ 142-51.

value of any consideration received by JPMorgan through its settlement with Barclays; and (3) that the Interest Claim is improper.[19]

On November 15, 2011, JPMorgan filed the Response of JPMorgan Chase Bank, N.A. to Objection to Portions of Proofs of Claim No. 66462 Against Lehman Brothers Holdings Inc. and No. 4939 against Lehman Brothers Inc. Regarding Triparty Repo-Related Losses (the "Response").[20]  Pursuant to a briefing schedule agreed upon by the parties, JPMorgan filed the Motion on February 24, 2012.[21]  The Motion does not address the propriety of the collateral liquidation but seeks to strike from the Deficiency Objection the arguments concerning the Barclays settlement and the Interest Claim.  As explained in this Opposition, JPMorgan's Motion should be denied in its entirety.

<u>Argument</u>

## I.    Legal Standards Governing Motion to Strike

As JPMorgan states in its brief, this motion is governed by Bankruptcy Rule 7012(b) and Rule 12(f) of the Federal Rules of Civil Procedure.  (Mot. at 8-9.)  "Motions to strike are generally disfavored, but are within the district court's sound discretion."  *Freydl v. Meringolo*, No. 09 Civ. 07196(BSJ)(KNF), 2011 WL 2566082, at *1 (S.D.N.Y. June 16, 2011) (quoting *Lamoureux v. Anazaohealth Corp.*, 250 F.R.D. 100, 102 (D. Conn. 2008)).  "The moving party has the burden of demonstrating to the Court 'to a certainty that plaintiff[ ] would succeed despite any set of facts which could be proved in support of the defense.'"  *Walsh v. City of New York*, 585 F. Supp. 2d 555, 557 (S.D.N.Y. 2008) (quoting *Simon v. Mfrs. Hanover Trust*

---

[19]   Case No. 08-13555 Docket No. 19604.

[20]   Case No. 08-13555 Docket No. 22164.

[21]   Case No. 08-13555 Docket No. 25782.

*Co.*, 849 F.Supp. 880, 882 (S.D.N.Y. 1994)); *see also Diesel Props S.r.L. v. Greystone Bus.*

*Credit II LLC*, No. 07 Civ. 9580, 2008 WL 4833001, at *4 (S.D.N.Y. Nov. 5, 2008) (in deciding

motion to strike, courts "deem the non-moving party's well-pleaded facts to be admitted, draw all

reasonable inferences in the pleader's favor, and resolve all doubts in favor of denying the

motion to strike").  Because JPMorgan has not met its burden of demonstrating, to a certainty,

that there are no set of facts that would support Objectors' claims, JPMorgan's Motion should be

denied.

**II.    The Portion of the Objection Requesting Reduction of the Deficiency Claim in the Amount of Any Consideration Received by JPMorgan From Barclays for the Same Losses is Proper and Should not be Stricken**

In its Motion, JPMorgan argues that the Court should strike the portion of the

Deficiency Objection requesting reduction of the Deficiency Claim to reflect consideration

received from Barclays based on the same alleged loss.  JPMorgan makes two main arguments:

(1) that JPMorgan's dispute with Barclays was based on a different underlying cause of action

than its Deficiency Claim against LBHI; and (2) the December Settlement Agreement does not

provide for a reduction in the Deficiency Claim.

As described below, that portion of the Objection should remain because

JPMorgan received valuable consideration from Barclays to compensate it for the same losses it

now claims against LBI and LBHI as guarantor.  JPMorgan cannot recover twice for the same

alleged injury.  Nor can it contract around that fundamental principle of law.

**A.    JPMorgan Cannot Recover Twice for the Same Alleged Injury**

A "creditor is entitled to only a single satisfaction of its claim."  *In re Jason*, Case

No. 01-10082-SSM, 2007 WL 4553608, at *5 (Bankr. E.D. Va. Dec. 19, 2007); s*ee also In re*

*Morgan*, Case No. 01-60889, 2003 WL 1728667, at *1 (Bankr. E.D. Ga. Mar. 14, 2003) ("For

every debt there can be only one satisfaction."); *In re Park Forest Devel. Corp.*, 197 B.R. 388,

397 (N.D. Ga. 1996) ("A creditor is only entitled to a single satisfaction of its claim."); Am. Jur.

2d Secured Transactions § 534 ("A secured creditor may take any action or combination of

actions until the debt is satisfied, subject to the limitation that the creditor can obtain only one

satisfaction of the debt.").  Accordingly, bankruptcy courts often use their equitable powers to

prevent creditors from receiving windfall double recoveries.  *See*, *e.g.*, *In re Pilgrim's Pride*

*Corp.*, 453 B.R. 691, 695-98 (N.D. Tex. 2011) (explaining that a double recovery would "run[]

contrary to the Congressional policy that 'equity is equality' – that is, similarly situated creditors

should be treated the same"); *In re Oakland City Apartments*, 1 B.R. 123, 125 (N.D. Ga 1979)

(invoking "the equitable powers vested in this Court" and "the anti-preference principles

embodied in the pre-emptive Federal law of bankruptcy" to prevent a potential double recovery

by a creditor after foreclosure sale of a property); *In re Circuit City Stores, Inc.*, 426 B.R. 560,

577-78 (E.D. Va. 2010) ("[T]he Court agrees with the Debtors that the best approach is to

temporarily disallow the Claims and hold them in abeyance until the preference litigation takes

place so that the Court can adjudicate these issues together and ensure that Claimants do not

receive windfalls to which they may not be entitled to the detriment of other creditors.").

Because a party cannot recover twice for the same harm, consideration received

for a loss must be credited against any further claims based on that same loss.  *See Singer v.*

*Olympia Brewing Co.*, 878 F.2d 596 (2d Cir. 1989), *cert. denied*, 110 S. Ct. 729 (1990) (holding

that the "one satisfaction" rule requires that a defendant "at least" receive full credit for any

payments made by earlier setting defendants on account of the same injury); *In re Masters Mates*

*& Pilots Pension Plan and IRAP Litig.*, 957 F.2d 1020, 1030 (2d Cir. 1992) ("[W]here a

settlement and a judgment compensate a plaintiff for the same injury, a nonsettling defendant is

entitled to a judgment reduction at least in the amount of a prior settlement.").

11

B.      **The Rule Precludes Double Recovery on the Same Loss, Even if the Underlying Causes of Action are Different**

JPMorgan's main argument in support of its Motion is that JPMorgan's claims against Barclays were based on a different legal theory than JPMorgan's claims against LBI (and LBHI as guarantor).  (Mot. at 2 ("The Objectors conflate two independent obligations."); Mot. at 13 ("JPMorgan's claim against Lehman is a contract claim . . . Barclays, by contrast was never obligated under the Clearance Agreement to repay LBI's financing.").  But it does not matter if the underlying causes of action are different so long as the alleged damages are the same. "Where there has been only one injury, the law confers only one recovery, irrespective of the multiplicity of parties whom or theories which the plaintiff pursues."  *Barone v. Marone*, No. 04 Civ. 2001 (NRB), 2007 WL 4458118, at *3 (S.D.N.Y. Dec. 14, 2007) (quoting *Kassman v. American Univ.*, 546 F.2d 1029, 1033-34 (D.C. Cir. 1976)) (holding that judgment against non-settling defendant must be reduced, "at a minimum," by amount paid in settlement by another, settling defendant and noting that although the theories against them differed, "there are no factual distinctions between the injuries resulting from their alleged conduct: the . . . loss represents a single, indivisible harm"); *see also Sparaco v. Lawler, Matusky Skelly Eng'rs LLP*, 313 F. Supp. 2d 247, 255 (S.D.N.Y. 2004) ("[T]he key issue to be determined in potential double recovery cases is 'the nature of the injury that is compensated, rather than the policies or interests embodied in the multiple legal theories on which a plaintiff prevails.'") (quoting *Lyons P'Ship, LP v. AAA Entm't, Inc.*, No. 98 Civ. 0475, 1999 WL 1095608, at *10 (S.D.N.Y. Dec. 3, 1999)); *People v. Chevron Corp.*, 872 F.2d 1410, 1414 (9th Cir. 1989) (cautioning district court in an antitrust action to ensure plaintiff does not recover twice for "two different claims for the same injury"); *Durk v. Daum Trucking, Inc.*, No. 07 CV 6844, 2008 WL 4671721, at *3 (N.D. Ill. Oct.

12

22, 2008) (noting that "there cannot be double recovery for the same injury alleged under different claims").

According to the allegations in the Objection, which must be deemed true for purposes of the Motion and are also supported by evidence, JPMorgan has sought compensation from both Barclays and LBHI for the same injury. (Obj. ¶ 26 ("JPMorgan maintained its position that Barclays' actions had caused JPMorgan to be exposed to the full amount of the deficiency between the loan amount and the value of the collateral."); Obj. ¶ 72 ("JPMorgan blamed Barclays—and only Barclays—for the very same losses it now seeks to have paid by LBHI."); Obj. ¶ 75 ("JPMorgan has repeatedly blamed Barclays for causing most if not all the losses it seeks through its Deficiency Claim.").)  As explained in the Objection, the fact that the alleged injury resulting in JPMorgan's claims against Barclays is the same as the loss underlying the Deficiency Claim is clear from a letter JPMorgan's CEO, Jamie Dimon, sent to Barclays in the middle of settlement negotiations in October 2008. (Obj. at ¶ 74.)  In that letter, Mr. Dimon argued that "Barclays Capital assured JPMorgan that it was going to fully repay JPMorgan's advances . . . [and] succeeding to all of the assets that [JPMorgan was] financing."[22]  Also as explained in the Objection, JPMorgan's Amended Counterclaims in the Adversary Proceeding make it clear that JPMorgan's claims against Barclays concern the same injury as the Deficiency Claim against LBI and LBHI. (Obj. at ¶ 75.)  In that pleading, JPMorgan accuses LBHI of aiding and abetting an alleged fraud perpetrated by Barclays that led to the Deficiency.[23]

---

[22]    Whitmer Decl. Ex. 2, Dimon-Varley Letter at 2.

[23]    Whitmer Decl. Ex. 6, Amended Counterclaims ¶¶ 100-02 and 142-51 ("As a direct and proximate result of Barclays' false and misleading statements, Barclays' material omissions, and LBHI's aiding and abetting of Barclays' fraud, JPMorgan incurred over $25 billion in claims against LBHI's estate that it otherwise would not have incurred.").

Furthermore, JPMorgan's own witnesses have testified that JPMorgan's dispute with Barclays centered around JPMorgan's belief that Barclays caused the Deficiency by not taking JPMorgan out of its triparty financing of LBI in the week after LBHI's bankruptcy.[24]  For example, Mr. Dimon recounted a conversation he had with Bob Diamond of Barclays outlining the dispute, saying that they discussed "[t]hat I thought they were taking all of the securities [securing the LBI financing] . . . [a]nd he thought that we had taken cash out that belonged to them, which was completely untrue.  That's the dispute.  It's all been resolved since then."[25] Similarly, JPMorgan's General Counsel, Steve Cutler, testified about discussing the dispute with Barclays prior to the SSA and telling representatives from Barclays "[i]n general terms, that we weren't supposed to be continuing to finance the positions that we were financing."[26]  Testifying about the same post-SSA settlement discussions brokered by the Fed, Cutler testified:

> The sum and substance I think of the JPMorgan position
> communicated at those meetings was that we believed that there
> was an agreement to take JPMorgan out of its financing position,
> by Barclays, and that that didn't happen.  And we landed up with a
> fail financing, we landed up with a repo financing, that we
> shouldn't have landed up with.[27]

Shari Leventhal, who participated in negotiations on behalf of the Federal Reserve Bank of New York, similarly summarized JPMorgan's position in the settlement negotiations as follows:

> That Barclays had committed to take out all of the Lehman
> exposure, and that Chase was surprised when in fact that didn't
> happen, and consequently they had felt entitled to put the $7 billion

---

[24]    Courts may also consider additional evidence in deciding a motion to strike.  *Codest Eng'g v. Hyatt Int'l. Corp.*, 954 F. Supp. 1224, 1229-30 (N.D. Ill. 1996) (considering deposition testimony in denying motion to strike defenses as insufficiently pled).

[25]    Whitmer Decl. Ex. 7, Dimon Tr. at 585:11-586:3.

[26]    Whitmer Decl. Ex. 8, Cutler Tr. at 198:20-199:16.

[27]    Whitmer Decl. Ex. 8, Cutler Tr. at 231:17-232:5.

back into the Lehman account, but as additional collateral for their exposure.[28]

JPMorgan's lead outside counsel for the negotiation made the point even more clear, testifying that "[p]art of the damages that would have been asserted against Barclays was . . . the damages suffered by JPMorgan as a result of Barclays' failure to refinance the . . . clearance advances."[29]

JPMorgan does not dispute that it sought compensation from Barclays based on the same underlying damages. Instead, it disputes the amount of compensation it received. For example, it claims that only the value of the Bear Stearns Lawsuit should be considered—completely ignoring the consideration it received in the December Settlement Agreement, where it used its allegations against Barclays to negotiate a substantial discount to the $7 billion it owed Barclays.[30] JPMorgan also claims—without factual support—that the dismissal of the Bear Stearns Lawsuit was worth less to JPMorgan than the $400 million in damages sought by the lawsuit. (Mot. at 18 n. 8.) But the Court need not resolve the dispute about the value of the

---

[28]    Whitmer Decl. Ex. 3, Leventhal Tr. at 138:6-15. When asked whether JPMorgan ever expressed "that they believed Barclays' actions had caused JPMorgan to be exposed to the amount of the deficiency between the loan amount [extended to unwind LBI's repos] and the security value," Leventhal answered "[y]eah, I think that's fairly accurate." *Id*. at 139:5-11.

[29]    Whitmer Decl. Ex. 9, Novikoff Tr. at 173:19-174:10.

[30]    Whitmer Decl. Ex. 8, Cutler Tr. at 244:14-22 (explaining how he was "quite sure Barclays understood that it was getting less than $7 billion of value."); Whitmer Decl. Ex. 7, Dimon Tr. at 596:24-597:6 (testifying that he was satisfied with the Barclays settlement); Whitmer Decl. Ex. 10, Declaration of Jeffrey M. Moore in Support of Trustee's Motion for Entry of an Order Approving Settlement Agreement (declaring that, "[i]n my opinion, the value on the date of the 'Settlement Consideration Fed Portfolio Securities' identified on Annex A to the Settlement Agreement that is subject of the Motion is substantially less than $5.743 billion (i.e., the difference between (x) $7.0 billion and (y) the sum of $1.25 billion and $7.1 million referred to in Sections 1(a) and 1(c)(y) of such Settlement Agreement)").

consideration Barclays gave to deny JPMorgan's Motion to Strike—it is enough that Objectors

have alleged that Barclays gave consideration for the same injury asserted against LBHI.[31]

Because Objectors have alleged that JPMorgan already received compensation

from Barclays for the same loss JPMorgan claims against LBHI, Objectors' request for a

reduction of JPMorgan's claim by the amount of compensation received is proper and should not

be stricken.  *See Sparaco*, 313 F. Supp 2d at 250-56 (consideration received from one defendant

on contract claim credited against second defendant on copyright infringement claim).

### C.    Nothing in the Law Cited by JPMorgan About Purchase of Claims Sanctions Double Recovery for the Same Loss

In its Motion, JPMorgan does not refute this law prohibiting double recovery or

cite to any case allowing a claimant to recover on the full amount of a claim when it has already

received consideration from another party for that same loss.  Instead, JPMorgan points to law

holding that one who purchases a claim at a discount can seek to recover the entire amount of

that claim.  (Mot. at 14-16.)  Based on this law of claims purchases, JPMorgan argues that

consideration received from Barclays should not be deducted from the Deficiency Claim.[32]  But

---

[31]    In any event, even if JPMorgan were right to focus solely on the dismissal of the Bear Stearns lawsuit, it is clear that the dismissal conferred value to JPMorgan  that should be set off against the Deficiency Claim.  *See Central Soya Co. v. Epstein Fisheries, Inc.*, 676 F.2d 939, 941-43 (7th Cir. 1982) (holding debt of guarantor reduced by value to creditor of primary obligor dismissing suit against creditor); *In re El Paso Refining, Inc.*, 192 B.R. 144, 148-49 (N.D. Tex. 1996) (considering value of a foregone lawsuit in determining amount of claim against guarantor).

[32]    JPMorgan further explains its position as follows: "The JPMorgan-Barclays dispute . . . was in substance a dispute over Barclays' failure to purchase JPMorgan's clearance financing claim against Lehman.  As discussed above, the putative claim seller (JPMorgan) asserted that the putative claim purchaser (Barclays) was obligated to purchase the claim from the seller (JPMorgan).  The purchaser (Barclays) then denied any obligation to purchase the claim, and the putative seller (JPMorgan) and purchaser (Barclays) settled their dispute. Whatever consideration was ultimately exchanged between the putative buyer and seller in connection with a disputed agreement to purchase a claim does not limit the value of the holder's

(continued...)

law regarding purchase of claims is not on point.  Barclays did not purchase a claim and is not

the one seeking recovery against LBI.  Nor did JPMorgan sell its claim or seek to recover based

on a purchased claim.  This is simply not a claim-purchase situation.

Even if the settlement between JPMorgan and Barclays could somehow be

considered analogous to a settlement payment following an unfulfilled agreement to purchase a

claim, it would not follow that JPMorgan would be entitled to recover the full amount of the

claim from LBI or LBHI.  All of the cases in the Motion cited by JPMorgan on this point involve

completed claims purchases and the issue of whether the purchaser may recover on the full claim

despite purchasing the claim at a discount.[33]  But applying the analogy to the facts in this case,

JPMorgan would be the seller who received consideration for the claim—not the purchaser who

paid for the claim.  And this distinction makes all the difference when it comes to the rule against

double recovery.  In the ordinary situation, recovering on a purchased claim does not result in

double recovery because the purchaser has paid something for the claim—not received money

from another source on the same claim.  Thus, the purchaser never receives more than the full

amount of the claim.  Here, by contrast, JPMorgan is the one who received consideration for the

alleged claim purchase/settlement and is also the party who seeks recovery under that claim.  If

_____

(...continued)

underlying claim *as against the debtor or its guarantor* (LBI and LBHI)."  (Mot. at 14 (emphasis
in original).)

[33]    *See* Mot. at 15-16, citing *Mokava Corp. v. Dolan*, 147 F.2d 340, 341 (2d Cir. 1945)
(refusing to limit participation in plan by purchaser of debtor mortgage after plan of
reorganization filed); *Stockholders' Prot. Comm. for Moulded Products, Inc. v. Barry (In re
Moulded Prods., Inc.)*, 474 F.2d 220, 223-25 (8th Cir. 1973) (bankruptcy trustee alleged to have
breached fiduciary duties in approving post-petition assignment of claim); *Resurgent Capital
Servs. v. Burnett (In re Burnett)*, 206 B.R. 313, 319 (B.A.P. 9th Cir. 2003) (overruling decision
disallowing claims by post-petition purchaser for failure to disclose purchase price); *In re Exec.
Office Ctrs., Inc.*, 96 B.R. 642, 649-50 (Bankr. E.D. La. 1988) (denying debtor request to
disallow or reduce a claim based on its post-petition acquisition by the creditor).

paid in full, JPMorgan will therefore receive more than the amount of the claim, violating the rule against double recovery.

Indeed, JPMorgan does not cite to any case allowing a party who received consideration for a failed claims purchase to nevertheless receive full payment for the underlying claim. Although JPMorgan argues that "payment of consideration for damages for breach of a purchase agreement is not payment of the underlying claim and does not reduce that claim," the case it cites in support says no such thing. (Mot. at 15.) *In re Moulded Prods.* dealt with the completed purchase of a claim after bankruptcy, not consideration for damages for breach of an agreement to purchase a claim. 474 F.2d at 223-24 (describing post-petition claim assignment approved by bankruptcy trustee). Indeed, the court began its analysis of whether to limit the assignee's recovery on the claim to the discounted price it paid for the claim with a quote from *Collier on Bankruptcy* that analyzes what happens when "claims or interests *have been assigned or purchased*." *Id*. at 224 (quoting 6A *Collier on Bankruptcy* § 9.04 at 155-56 (14th Ed. 1971)) (emphasis added). No claim was purchased here, and *In re Moulded Prods.* is therefore inapposite.

Thus, JPMorgan's case law regarding post-petition claim purchases does not warrant striking any portion of the Deficiency Objection. This is not a claim-purchase scenario, and it is not even analogous to that scenario because, here, the party receiving value for the claim is the same party seeking to recover in full on that same claim. To allow JPMorgan to recover its claim in full would violate the rule against double recovery, and nothing in the case law permits that.

### D.    The December Settlement Agreement Does Not Block the Application of the Rule Against Double Recovery to Reduce the Deficiency Claim

JPMorgan also argues that the "December Settlement Agreement . . . dispels any notion that the parties to that agreement intended that the settlement of the [Bear Stearns] Lawsuit would reduce the amounts that LBHI and LBI were obligated to repay under the Clearance Agreement and related guaranty."  (Mot. at 12.)  But Objectors have not asserted a breach of contract claim, nor are they invoking the December Settlement Agreement as the basis for the reduction to the Deficiency Claim.  Neither Objector is a party to the December Settlement Agreement.  And the section JPMorgan relies on, entitled "Trustee Consent and Acknowledgement" concerns only the Trustee's consent—and not any agreement by LBHI or the Committee.[34]

Moreover, to the extent JPMorgan argues that section 2 of the December Settlement Agreement overrides the rule against double recovery, it is wrong.  Parties cannot contract their way around that fundamental rule.  In *In re Zelis*, for example, the lower court awarded sanctions against two partners, Zelis and Day, jointly and severally.  66 F.3d 205, 208 (9th Cir. 1995).  The plaintiffs settled with Day, and the settlement agreement purported not to affect Zelis's obligation.  *Id*. at 209.  The Ninth Circuit found that the "settlement's explicit exclusion of Zelis is irrelevant" and put the burden on the plaintiff to prove "that the entire joint and several debt was not satisfied by Day."  *Id*. at 210.  With no evidence in the record to show that Day's debt was anything other than fully satisfied by the settlement, the court held that the

---

[34]    Kleinhaus Decl. Ex. H, December Settlement Agreement § 2.  While JPMorgan also points out that the Committee filed a limited objection to the December Settlement Agreement that did not raise the issues addressed in the Deficiency Objection, the Motion does not attempt to argue that this constituted a waiver of any of the Committee's rights.  (Mot. at 10.)

plaintiffs had no claim against Zelis for the sanction, stating that "[r]equiring Zelis to pay the sanctions again would constitute an impermissible double recovery." *Id.*

Cases involving settlements that require court approval make it even more clear that settling parties cannot contract around the one-satisfaction rule's requirement that non-settling defendants receive a credit of at least the amount of the settlement consideration. The court in *In re Refco* was presented with a settlement agreement that included a specific clause governing how the settlement would affect potential recoveries against non-settling defendants through an allocation. No. 05 Civ. 8626 (GEL), 2007 WL 57872, at *1 (S.D.N.Y. Jan. 9, 2007). The proponents of the settlement argued that the allocation made sense because different defendants were alleged to be liable under different legal theories, and that "[i]t would be unfair . . . for a defendant who faces claims only under the Securities Act to receive a 'windfall judgment credit' for another defendant's settlement of Exchange Act claims." *Id.* at *4. Quoting *Masters Mates*, the court explained that "[t]he Second Circuit's formulations have been clear that the [one satisfaction] rule deals with underlying damages, not legal claims." *Id.* at *4. Because the allocation provision in the settlement agreement could have resulted in a settlement credit smaller than the settlement consideration and therefore a double recovery on the same injury the court rejected the settlement agreement. *Id.* at *5; *see also Masters Mates*, 957 F.2d at 1032 (overruling district court's approval of settlement because "[t]he settlement provides for a judgment reduction that may be less than the amount paid by the settling defendants"); *Gerber v. MTC Elec. Techs. Co., Ltd.*, 329 F.3d 297, 304-05 (2d Cir. 2003) (examining a settlement agreement with provisions allocating settlement consideration and approving the settlement only because "the non-settling defendants' judgment credit will be the greater of the settling defendants' proportionate share of liability or the amount of the settlements attributable to

20

common damages, regardless of how the settlement amounts are ultimately allocated or re-allocated").

JPMorgan's related argument that the December Settlement Agreement superseded the SSA, and that therefore the SSA has no impact, is a red herring. The Deficiency Objection only cites to the SSA insofar as it provides evidence that the agreement to dismiss the Bear Stearns Lawsuit was provided in exchange for a release of any claim that JPMorgan had that Barclays caused the Deficiency. (Obj. at 11-12.) Thus, whether the SSA remains effective as a matter of contract law in light of sections 4(a) and 5 of the December Settlement Agreement is simply not relevant.

### III. JPMorgan is Not Entitled to Interest on the Deficiency Claim and the Portion of the Deficiency Objection So Arguing Should Not be Stricken

As discussed in the Objection, it is well-established that interest on claims ceases to accrue when a bankruptcy case is commenced. *See Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.*, 394 B.R. 325, 333 (S.D.N.Y. 2008) ("The general rule is that interest stops accruing when the bankruptcy petition is filed."). Section 506(b) of the Bankruptcy Code simply creates an exception to this general rule in cases where a creditor is oversecured on account of its allowed secured claim. 11 U.S.C § 506(b); s*ee also Kitrosser v. CIT Group/Factoring, Inc.*, 177 B.R. 458, 467 n. 4 (S.D.N.Y. 1995) ("Section 506(b) provides an exception to the rule in Section 502(b)(2) for debt that is oversecured, that is, when the value of the property held as security for the claim exceeds the amount of the claim.").

Thus, in order for JPMorgan to be entitled to its Interest Claim, this Court must determine that JPMorgan has an allowed secured claim against LBHI and that JPMorgan is oversecured as to such claim. Accordingly, if LBHI and the Committee prevail in the Adversary Proceeding causing JPMorgan to lose its status as a secured creditor or its right to assert claims

against LBHI under the challenged guaranties, the Interest Claim cannot stand.  In any event,
even if LBHI and the Committee are unsuccessful in the Adversary Proceeding, the unique facts
of this case compel disallowance or reduction of the Interest Claim regardless of the outcome of
the Adversary Proceeding.

Contrary to JPMorgan's argument, the grant of postpetition interest set forth in
Section 506(b) is not absolute.  Cases have recognized that there are circumstances where the
continued accrual of postpetition interest is inequitable and ought to be disallowed or reduced.
*See In re Nixon*, Case No. 09-3135, 2010 WL 5141339 (3d Cir. Dec. 15, 2010) (affirming
bankruptcy court's decision to reduce award of postpetition interest based on creditor's actions);
*In re Rozel Indust., Inc*., 120 B.R. 944, 952 (Bankr. N.D. Ill. 1990) (cutting off postpetition
interest on tax claim on earliest date setoff could have occurred); *see also Solomon v. Wein (In re
Huhn)*, 145 B.R. 872, 878 (W.D. Mich. 1992) (upholding bankruptcy court decision denying
postpetition interest where delay in payment was creditor's fault).  In particular, courts have often
so held when the creditor's claim could have been satisfied if not for the creditor's delay.  The
Third Circuit Court of Appeals has explained that a bankruptcy court is empowered to deny a
claim for postpetition interest where the creditor was simply "running up the tab" at the expense
of others.  *In re Nixon*, at *3.

JPMorgan argues that *United States v. Ron Pair Enters., Inc.*, 489 U.S. 241 (1989)
makes clear that the statutory right to postpetition interest is unqualified.  This is simply not the
case.  The "narrow statutory issue" considered by the Supreme Court in *Ron Pair* was whether
Section 506(b) entitled a creditor to receive postpetition interest on a nonconsensual oversecured
claim allowed in a bankruptcy proceeding.  *Id*. at 237.  In fact, although the *Ron Pair* Court
relied on the plain language of Section 506(b) in reaching its holding, it nevertheless

22

acknowledged "that the plain meaning of legislation should be conclusive, *except in the rare cases [in which] the literal application of a statute would produce a result demonstrably at odds with the intentions of its drafters*." *Id.* at 242 (internal citation omitted) (alteration in original) (emphasis supplied).  Objectors submit that the unique facts here make this the rare case expressly contemplated by the Supreme Court that is the exception to an oversecured creditor's right to postpetition interest.

Unsurprisingly, none of the cases cited by JPMorgan discussing the proper treatment of the interest claims of creditors under Section 506(b) involve circumstances where the creditor is secured by <u>cash</u> in its possession, which is the case here.  *See Rake v. Wade*, 508 U.S. 464, 464 (1993) (notes secured by home mortgages); *Lincoln Sav. Bank, FSB v. Suffolk Cnty. Treasurer (In re Parr Meadows Racing Ass'n, Inc.)*, 880 F.2d 1540, 1542-43 (2d Cir. 1989) (lien on debtor's racetrack); *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 794-95 (5th Cir. 1997) (lien on hotel); *Equitable Life Assurance Soc'y v. Sublett (In re Sublett)*, 895 F.2d 1381, 1382-83 (11th Cir. 1990) (lien on farm); *In re Lapiana*, 909 F.2d 221, 222 (7th Cir. 1990) (lien on commercial properties).

This is a critical distinction.  The idea that an oversecured creditor may collect postpetition interest after it has effectively paid its claim with the debtor's own cash is absurd, and that is exactly what happened here.  JPMorgan immediately benefitted from the cash collateral by sweeping it into its own account prior to the bankruptcy.  JPMorgan essentially satisfied its claims before they arose.  Moreover, the financial purpose of interest is to compensate a creditor for the time value of money and for the risk of not being paid.  Here, JPMorgan had already paid itself with LBHI's cash, so it had the immediate use of the cash and no risk.  Thus, the facts here are virtually the opposite of what the statutory provision was

23

designed to address.  Indeed, a cursory examination of the facts of this case reveals that the entire Interest Claim is nothing more than the most extreme version of what the *Nixon* court warned against: "running the tab" on LBHI's estate and its creditors.

By taking LBHI's cash into its own bank account immediately after it was posted as collateral, depriving LBHI of access to that cash and giving itself full use of that cash, JPMorgan effectively paid itself on account of any debts incurred by LBHI and effectively satisfied its entire claim.  JPMorgan's head of funding recently testified about the value to JPMorgan of having that LBHI cash available, stating that "it either increases the surplus funding we have or it decreases a funding need . . . that creates a source of funds of which there's value attached."[35]  In response to the question of whether JPMorgan used Lehman's cash to earn money for itself, JPMorgan's head of funding responded "functionally, yes."[36]  In other words, JPMorgan has been realizing the full economic benefits of the LBHI cash purportedly securing the Deficiency Claim since the week before LBHI's bankruptcy filing and now seeks to have LBHI pay interest on a deficit it never suffered through the Deficiency Claim.  Under the circumstances, allowing the Interest Claim would be wholly inequitable.

Moreover, at a minimum, there is a factual issue that must be resolved in connection with the Objectors' assertion that JPMorgan routinely delayed the application of proceeds from the sales of securities.  As noted in the Deficiency Objection, this delay in the application of cash proceeds kept the debt on which JPMorgan was charging interest at an incorrectly high level.

---

[35]    Whitmer Decl. Ex. 11., Paterson Tr. at 130:11-131:10.

[36]    *Id.*

## Conclusion

For all of the reasons stated above, JPMorgan's Motion should be denied in its

entirety.

Dated:  March 26, 2012
      New York, New York

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

By:   /s/ John B. Quinn
John B. Quinn
Erica Taggart
Tyler G. Whitmer
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000

Susheel Kirpalani
Andrew J. Rossman
James Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000
*Counsel for the Official Committee of
Unsecured Creditors of Lehman Brothers
Holdings Inc.*

**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**

By:   /s/ Joseph D. Pizzurro
Joseph D. Pizzurro
L.P. Harrison 3rd
Michael J. Moscato
Nancy E. Delaney
Peter J. Behmke
Cindi M. Giglio
101 Park Avenue
New York, New York 10178-0061
(212) 696-6000
*Counsel for Debtor Lehman Brothers
Holdings Inc.*

25