# Exhibit 6

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | |
| Debtors. | |
| | |
| LEHMAN BROTHERS HOLDINGS INC. and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Adversary Proceeding No. 10-03266 (JMP) |
| Plaintiff/Counterclaim-Defendant and Plaintiff Intervenor, | |
| -against- | |
| JPMORGAN CHASE BANK, N.A., | |
| Defendant/Counterclaimant. | |

 

**AMENDED COUNTERCLAIMS OF JPMORGAN CHASE BANK, N.A.**

 

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
(212) 403-1000

*Attorneys for Defendant/Counterclaimant*
*JPMorgan Chase Bank, N.A.*

Dated:  February 17, 2011

Defendant and Counterclaimant JPMorgan Chase Bank, N.A. ("JPMorgan"), by its attorneys, upon knowledge as to itself and its conduct and otherwise upon information and belief, alleges for its Counterclaims against Lehman Brothers Holdings Inc. ("LBHI," together with its subsidiaries, "Lehman") as follows:

## NATURE OF THE ACTION

1.      These counterclaims seek relief for a fraud perpetrated by LBHI against JPMorgan after LBHI's bankruptcy filing and prior to the liquidation of Lehman Brothers Inc. ("LBI"). Through false and misleading representations and omissions, LBHI led JPMorgan to believe that Barclays Capital Inc. ("Barclays") had agreed and intended to purchase the LBI securities that secured JPMorgan's loans to LBI and that, with the proceeds of the sale, JPMorgan's loans to LBI would be repaid in full.  Acting in reliance on LBHI's false and misleading statements, JPMorgan loaned more than $70 billion to LBI on the morning of September 18, 2008 and, later that day, released to Barclays securities valued at $5 billion that JPMorgan was holding as margin for its loans to LBI.  Barclays, however, did not purchase all of the LBI securities that LBHI represented it had agreed to purchase, and LBI did not repay a large portion of the loans from JPMorgan.  Instead, with the help of LBHI and LBI, Barclays cherry picked the securities that it wanted, took JPMorgan's $5 billion of margin, and left behind securities that Lehman claimed were worth billions of dollars, but that Barclays described as "toxic waste" and LBHI described as "toxic crap" as well as "goat poo" to be scattered in "other people's backyards."  As a result, after LBI's liquidation proceeding commenced on Friday, September 19, JPMorgan was stuck with loans to LBI of more than $25 billion secured by many of LBI's worst securities.

2.      LBHI's fraud on JPMorgan was possible only because of JPMorgan's willingness to support LBHI and LBI through massive loans to LBI even after LBHI filed for bankruptcy.

When LBHI filed its chapter 11 case in the early hours of September 15, 2008, JPMorgan had relatively little clearance exposure to LBI, the broker-dealer for which JPMorgan acted as clearing bank.  Overnight investors under repurchase agreements, or "repos," and other short-term arrangements were holding LBI's securities, and JPMorgan had no obligation to lend LBI the approximately $87 billion that LBI needed to buy the portfolio back.  JPMorgan, accordingly, could have walked away from Lehman on the morning of September 15, as many of Lehman's customers, counterparties and other banks had already done.

3.      Instead, at the urging of LBHI and the Federal Reserve Bank of New York (the "Fed"), which had agreed to finance LBI on an overnight basis in lieu of the private investors who had fled the scene, JPMorgan made intraday loans to LBI of approximately $87 billion on the morning of Monday, September 15.  JPMorgan's loans were secured principally by LBI's holdings in commercial paper, government securities, and corporate debt and equity.  By making those loans, which it was not obliged to do, JPMorgan allowed LBI to repay its overnight investors the full amounts owed to them.  Had JPMorgan not done this, the overnight investors would have liquidated the securities pledged to them, LBHI would have been unable to sell LBI's business, thousands of Lehman employees would have lost their jobs, and the seamless transfer of customer accounts to Barclays would not have occurred.

4.      A sale transaction among LBHI, LBI, and Barclays took shape early in the week of September 15.  JPMorgan's loan exposure to LBI was to be fully repaid upon consummation of that transaction — or so JPMorgan was told.  On Wednesday, September 17, LBHI filed a motion with this Court (the "Sale Motion") seeking approval of the sale of LBI's operations and assets to Barclays.  The Asset Purchase Agreement ("APA") submitted with the Sale Motion stated that, with narrow exceptions not relevant here, Barclays had agreed to purchase *all* of

LBI's securities.  Based on the Sale Motion and the APA, and multiple representations by Barclays and LBHI executives, JPMorgan believed, and had every reason to believe, that its loans to LBI would be repaid in full as part of the sale transaction.  And, indeed, in anticipation of this purchase, beginning on the night of Monday, September 15, and continuing through the night of Wednesday, September 17, Barclays itself financed billions of dollars of LBI securities on an overnight basis, in increasing amounts each night.  Based on specific representations made by LBHI and Barclays, JPMorgan reasonably understood that Barclays had agreed to and would purchase the securities necessary to repay JPMorgan's loans in full, including all the securities that Barclays was already financing overnight.

5.    On the morning of Thursday, September 18, in reliance on numerous misrepresentations by LBHI and Barclays, and unaware of their true intentions, JPMorgan unwound LBI's entire overnight repo book, including by loaning $15.8 billion to LBI to repay *Barclays* the amount it had invested with LBI on Wednesday night through an overnight repo.  JPMorgan did so with the justified expectation that LBHI and LBI had reached an agreement with Barclays to sell all the securities that secured JPMorgan's intraday loans, including the securities that Barclays itself had financed Wednesday night.  Later on Thursday, after senior executives at Barclays again persuaded senior executives at JPMorgan that JPMorgan's outstanding loans to LBI would be repaid in full, JPMorgan acceded to Barclays' demand that JPMorgan release securities valued at $5 billion that it was holding as margin, which JPMorgan had the right to keep until its loans to LBI were repaid.

6.    Not until Friday, September 19, was JPMorgan told that, contrary to LBHI's and Barclays' representations, LBHI, LBI, and Barclays would leave JPMorgan with large portions of LBI's securities, including the very securities that Barclays itself had financed on Wednesday

night with a $15.8 billion repo.  At that point, when JPMorgan demanded that Barclays at least continue to finance the securities that backed its $15.8 billion repo from Wednesday night, a Barclays representative offered the excuse that Barclays "forgot" to finance those securities. Later that same morning, the representative stated that Barclays did not recognize any obligation to finance the securities, and refused to do so.  Thus, when the dust settled, JPMorgan was left holding the bag, with more than $25 billion of outstanding loans to LBI secured by a depleted collateral pool containing many of LBI's worst securities — securities that were illiquid, had never traded and were supported largely by Lehman's own credit.  The billions of dollars of collateral value attributed to these securities was often based on Lehman's own pricing, because no price was available for them from JPMorgan's usual third-party pricing sources.

7.     Only later was JPMorgan able to determine that the position in which it unexpectedly found itself was the result of collusion and deception by LBHI, LBI and Barclays.  It is now clear that the APA and the Sale Motion filed with the Court were false and misleading.  Contrary to LBHI's representations to the Court and to JPMorgan, when LBHI filed the Sale Motion, the amount and identity of the securities to be purchased by Barclays had not been determined, a fact that was known to LBHI executives — including Ian Lowitt, LBHI's CFO, and Paolo Tonucci, LBHI's Treasurer.  LBHI also knew that, notwithstanding the Sale Motion and the terms of the APA, LBHI and LBI had granted Barclays the option to refuse to purchase the LBI-owned securities that Barclays did not want.

8.     Indeed, when the APA was filed, Barclays had already made clear to LBHI that it did not intend to purchase all of the assets identified in the APA as "Purchased Assets."  Prior to the filing of the APA, on September 15 and September 16, Barclays, LBHI, and LBI had specific discussions in which Barclays representatives stated their intent *not* to purchase certain securities

defined in the APA as "Purchased Assets," including commercial paper called "RACERS" that Lehman valued at roughly $5 billion. Likewise, the schedule of assets that was circulated among Barclays, LBHI, and LBI personnel on Tuesday, September 16 stated that Barclays had agreed to purchase only $1.1 billion of commercial paper, again evidencing the parties' understanding that Barclays had not agreed to, and would not, purchase all of LBI's commercial paper holdings. In addition, as evidenced by multiple internal emails and by testimony, LBHI and LBI clearly understood, even before the filing of the Sale Motion and APA on Wednesday, September 17, that Barclays was picking and choosing the securities it wanted. In some of the relevant emails, Lehman employees explicitly recognized that "the balance sheet that was sent to court" was wrong, because it falsely showed that Barclays was "buying all the positions that LBI is carrying." In other emails, LBHI employees openly acknowledged that Barclays did not want and did not have to purchase "toxic waste" securities, notwithstanding the terms of the APA filed with the Court.

9.    Senior executives at LBHI, including Lowitt and Tonucci, recognized that there was a basic flaw in the sale transaction with Barclays: Barclays was unwilling to purchase the securities that it deemed undesirable, particularly those that its employees called "toxic waste" and LBHI employees called "goat poo." But JPMorgan, LBI's sole source of necessary financing until the agreed-upon transaction could be consummated, would not continue to provide such financing if it knew that the sale transaction would leave the bank with unpaid loans secured by triparty-repo assets, let alone the "toxic waste" and "goat poo" securities that Barclays refused to purchase. Therefore, LBHI, through its employees and through LBI employees, worked in cooperation with Barclays to deceive JPMorgan so LBHI could close the Barclays transaction,

which, as LBHI's board of directors explicitly recognized, "would benefit the creditors of
[LBHI] and also save the franchise and many jobs."

10.    A key part of that deception was the concealment of a written agreement between
Barclays and the Fed (the "Takeout Agreement"), executed soon after the Sale Motion was filed
but negotiated beforehand, that obligated Barclays to purchase the securities that *the Fed* was
financing, but said nothing about the remainder of LBI's securities, including those that *Barclays*
and *JPMorgan* were financing.  Once the Takeout Agreement was in place, LBI and/or LBHI
employees undertook to effectuate LBHI's fraud by manipulating the configuration of the LBI
repo book so that Barclays could leave the least desirable securities behind with JPMorgan.
Knowing that the Takeout Agreement only required Barclays to buy *the Fed's* position, on
Wednesday, September 17, Lehman — which had the ability to access JPMorgan's computer
system and allocate securities to particular investors — reallocated LBI's most illiquid securities
collateral, valued at many billions of dollars, away from overnight repo "shells" that had been
financed by the Fed the previous night to overnight repo shells that would be financed by *Bar-
clays* on Wednesday night.  This reconfiguration of the repo shells ensured that the securities that
Barclays was obligated to purchase under the Takeout Agreement, *i.e.*, those financed by the
Fed, were LBI's most desirable securities.  Meanwhile, RACERS and other illiquid securities
were moved out of the Fed's repo shell and into the Barclays shell, giving Barclays the ability to
comply with the Takeout Agreement yet, as JPMorgan was to discover after the fact, leave those
undesired securities behind as collateral for JPMorgan's unpaid loans.

11.    LBHI and LBI, employees of LBHI and its subsidiaries, and Barclays all bene-
fited greatly from the deception of JPMorgan.  LBHI obtained critical financing for LBI while
the sale to Barclays was pending, ensuring that the sale would go through as planned; senior

LBHI employees greased the wheels of a transaction with Barclays, the firm offering them future lucrative employment; and Barclays positioned itself to buy the securities of its choice and leave billions of dollars of illiquid securities behind with JPMorgan.  LBHI and LBI employees, therefore, had multiple motives to defraud JPMorgan:  not only would the fraud benefit their new employer, but it also would directly benefit LBHI by facilitating the sale of LBI, thus ensuring that the broker-dealer business would bring value to the LBHI estate, instead of collapsing altogether at substantial cost to LBHI.  As Bart McDade, President and Chief Operating Officer of LBHI, put it in his proffer in support of the Sale Motion in this Court, "[i]f the transaction [with Barclays] d[id] not close, . . . the effect on the broker-dealer[']s business and on Lehman Holdings would be devastating."

12.     After the Securities Investor Protection Corporation ("SIPC") commenced LBI's liquidation proceeding, JPMorgan was left with more than $25 billion of unpaid loans to LBI. As explained below, by virtue of LBHI's fraud on JPMorgan, LBHI was liable to JPMorgan for that entire amount as an administrative expense of its estate.  Although those loans have now been fully paid, JPMorgan had to use most of the approximately $8.6 billion in cash collateral that it received from Lehman in September 2008 to pay those loans, because it was unable to sell many of the illiquid and difficult-to-value securities that LBHI, in collusion with Barclays, had ensured would be left behind.  JPMorgan ultimately transferred the unsold securities to LBHI under the Collateral Disposition Agreement approved by this Court in March 2010.  Under that agreement, however, LBHI reserved its rights to challenge JPMorgan's entitlement to the cash collateral and JPMorgan reserved its rights to treat the value of any of the returned securities as collateral for its claims.

13.     Despite having deceived JPMorgan into making the massive loans to LBI that re-
quired JPMorgan to use much of the $8.6 billion in collateral that it received from Lehman,
LBHI is now seeking to recover that very collateral, as well as unspecified damages, through this
lawsuit.  As set forth in JPMorgan's motion to dismiss the First Amended Complaint, LBHI's
claims against JPMorgan fail for many reasons.  But if, as a result of being required to return any
of the $8.6 billion in collateral or pay damages to LBHI, JPMorgan is unable to recover the full
amount of its loans or is otherwise prejudiced, the harm that JPMorgan suffered as a direct and
proximate result of LBHI's fraudulent misconduct will entitle JPMorgan, among other things, to
recover as an administrative expense of the LBHI estate any portion of the more than $25 billion
of loans under the Clearance Agreement that has not been paid in full.

## PARTIES

14.     Defendant and Counterclaimant JPMorgan is a national banking association char-
tered under the laws of the United States with its principal place of business at 1111 Polaris
Parkway, Columbus, Ohio 43240.

15.     Plaintiff and Counterclaim-Defendant LBHI is a Delaware corporation with its
former principal place of business at 745 Seventh Avenue, New York, New York 10019, and its
current principal business address at 1271 Avenue of the Americas, New York, New York,
10020.  At all relevant times, LBI was a wholly-owned subsidiary of LBHI, and LBHI exercised
control over LBI's business and affairs.

## JURISDICTION AND VENUE

16.     On September 15, 2008 (the "Petition Date"), LBHI filed a voluntary petition for
relief under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy

Code"). LBHI continues to operate its business and manage its property as a debtor in posses-
sion pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

17.    The Court has jurisdiction over these counterclaims under 28 U.S.C. § 1334(b),
28 U.S.C. § 1334(a), and 28 U.S.C. § 959(a). This is a core proceeding within the meaning of 28
U.S.C. § 157(b).

18.    Venue in this district is proper in accordance with 28 U.S.C. § 1409(a).

## FACTS

### I.    JPMorgan's relationship with Lehman

### A.    JPMorgan's role as clearing bank

19.    Before September 22, 2008, JPMorgan served as the principal clearing bank for
LBI for a variety of securities transactions. JPMorgan maintained numerous accounts for LBI,
through which it processed billions of dollars of cash and securities transactions generated by
LBI's operations, and provided tens of billions of dollars of intraday loans to LBI on a daily ba-
sis to fund its clearance operations.

20.    As part of its clearing bank relationship, JPMorgan facilitated triparty repo trans-
actions involving LBI and triparty repo investors, such as money market funds. In the triparty
repo transactions, repo investors purchased LBI's securities in the evening, subject to LBI's
agreement to repurchase those securities the next morning. On the morning of each trading day,
JPMorgan made intraday extensions of credit to LBI, in amounts typically exceeding $100 bil-
lion, by paying the triparty repo investors the repurchase prices on behalf of LBI, transferring the
relevant securities from the investors' accounts back to LBI's clearance accounts, and thereby
settling LBI's repurchase of securities under the repurchase agreements. This process is referred

to as "unwinding" the triparty repos.  JPMorgan's clearance related loans to LBI, including those

made to unwind the triparty repos, were secured by the securities in LBI's clearance accounts at

JPMorgan, which typically included the same securities that were purchased by triparty investors

overnight.

21.     JPMorgan cleared securities transactions for LBI, including for triparty repos, un-

der a Clearance Agreement dated as of June 15, 2000 (as amended from time to time, the "Clear-

ance Agreement").  The Clearance Agreement did not require JPMorgan to extend credit to LBI.

Rather, section 5 of the Clearance Agreement gave JPMorgan the "discretion" to make intraday

loans to LBI.

22.     A large portion of the loans made to LBI under the Clearance Agreement was

made to "unwind" triparty repos.  In Section 9 of the Clearance Agreement, JPMorgan agreed to

serve as LBI's "non-exclusive tri-party custodian" and to "perform the services as set forth in the

form of tri-party custody agreement attached hereto as Exhibit A (or other forms of tri-party Cus-

tody Agreement which may be agreed upon from time to time)."  Pursuant to the Clearance

Agreement, therefore, LBI entered into "custody agreements" with investors in LBI's triparty

repo arrangement.

23.     The Custodial Undertaking in Connection with Master Repurchase Agreement

(the "Custodial Undertaking") of September 15, 2008 among LBI, Barclays and JPMorgan was

one such custody agreement, and it enabled Barclays to engage in triparty repos with LBI.  The

Custodial Undertaking, a standard-form agreement JPMorgan employed in triparty-repo transac-

tions, said nothing about, and did not concern, the sale transaction among LBHI, LBI and Bar-

clays.  Indeed, Barclays, LBI, and JPMorgan entered into the Custodial Undertaking before the

APA was finalized or disclosed, and its only purpose was to allow Barclays to provide overnight financing through JPMorgan's triparty arrangement.

24.    To secure, among other things, JPMorgan's loans and other advances to LBI under the Clearance Agreement, LBI granted to JPMorgan pursuant to Section 11 of the Clearance Agreement a lien on all of LBI's accounts at JPMorgan and all the property and balances in such accounts, other than segregated customer accounts.  The Clearance Agreement also contains a broad indemnification clause, which requires LBHI and LBI to indemnify JPMorgan in respect of "all losses, claims, damages, liabilities or actions" relating to the Clearance Agreement.  The Custodial Agreement contains a similarly broad indemnification clause in favor of JPMorgan.

25.    LBHI guaranteed LBI's clearance-related obligations under a Guaranty executed in favor of JPMorgan dated as of August 26, 2008 (the "August Guaranty"), and under a Guaranty executed in favor of JPMorgan dated as of September 9, 2008 (the "September Guaranty").

**B.    JPMorgan's postpetition clearing advances**

26.    By Friday, September 12, 2008, it had become apparent that Lehman's condition was quite grave, as customers, counterparties, and investors had stopped dealing with Lehman.  Lehman's stock price had dropped precipitously, credit default swap spreads on Lehman had widened dramatically, and concern was widespread that Lehman could not survive past the upcoming weekend without an acquisition or government rescue.  JPMorgan nonetheless loaned LBI sufficient funds to unwind triparty repos and other overnight financings on the morning of September 12, and during the day continued to make additional advances in connection with clearing and settlement operations.  At the end of the day on Friday, September 12, triparty repo investors and other overnight financing sources advanced sufficient funds to LBI to take out nearly all of JPMorgan's intraday loans, although JPMorgan was left with a "fail financing" to

- 11 -

LBI of approximately $1.3 billion.  Therefore, during the weekend of September 13-14, JPMorgan had relatively little clearance-related exposure to LBI.

27.     That weekend, the United States Department of the Treasury and the Fed made extensive efforts to encourage a sale of LBHI and its subsidiaries to Bank of America, Barclays PLC or another buyer.  After those efforts failed, on Sunday, September 14, the Fed and the Securities Exchange Commission pressured LBHI to file for bankruptcy.  LBHI understood that commencing a chapter 11 case would be the only way for LBI to be able to finance its triparty repo securities on an overnight basis through the Fed's Primary Dealer Credit Facility ("PDCF").  Triparty repo investors were not returning, and without PDCF financing, LBI would not survive long enough to effectuate a sale or an orderly liquidation of LBI's business.  LBHI accordingly filed a chapter 11 petition in the early morning hours of Monday, September 15.

28.     LBI did not enter a liquidation proceeding concurrently with LBHI's chapter 11 filing.  Rather, LBHI expected LBI to continue operating.  Once LBHI was in chapter 11, as expected the Fed permitted LBI to finance the triparty collateral pool on an overnight basis through the PDCF, and continued to provide access to the Open Market Operations ("OMO") and Term Securities Lending Facility ("TSLF").

29.     Over the weekend of September 13-14, representatives of both the Fed and LBHI, including Paolo Tonucci, the Treasurer of LBHI, requested that JPMorgan continue to finance LBI's triparty repo book with intraday loans.  These loans were essential to LBI's continued operation, which in turn was necessary for LBHI to be able to sell LBI.  Tonucci represented to Jane Buyers-Russo of JPMorgan that, in the absence of a sale of LBI, LBI would conduct an orderly wind-down of its business, in which its employees would sell LBI's securities and maximize the realization on such securities (including a sale of the securities that were pledged to

- 12 -

JPMorgan on an intraday basis), prior to the commencement of a liquidation proceeding for LBI. Tonucci further represented that, as confirmed by the Fed, the Fed would fully finance LBI on an overnight basis during the wind-down. Although JPMorgan was being asked to take major in-traday risk without additional collateral, it agreed to make further loans in order to reduce the disruption to the financial markets, based on representations that LBI would commence an or-derly wind-down, in which its employees would sell LBI's securities and maximize the realiza-tion on such securities. Thus, at the opening of business on Monday, September 15, just a few hours after the filing of the largest bankruptcy in history, JPMorgan extended approximately $87 billion of credit to LBI to unwind that weekend's triparty repos and other financings, and thereafter made additional intraday advances in connection with the clearance and settlement of LBI's securities transactions.

30.     Meanwhile, Barclays and LBHI were discussing a revised transaction for the sale of LBI's assets, including the assets being financed in its triparty repo book. As an initial step in that process, Barclays began to participate as an overnight investor in LBI's triparty repo ar-rangement. Accordingly, on Monday, September 15 — before LBHI, LBI, and Barclays had agreed to and documented the transactions contemplated by the APA and referenced in the Sale Motion — Barclays executed the Custodial Undertaking with LBI and JPMorgan to cover tri-party repo transactions with LBI. On Monday night, Barclays invested roughly $2 billion with LBI on an overnight basis. On Tuesday night, that amount increased to $10.5 billion, and on Wednesday night, it increased to $15.8 billion.

31.     With LBHI in bankruptcy, almost all of the triparty investors that had historically provided overnight financing to LBI stopped doing so. LBI was thus financed overnight through a combination of Fed-provided PDCF and OMO financings, blind bilateral repos through the

General Collateral Finance ("GCF") repo program administered by The Depository Trust and

Clearing Corporation ("DTCC"), triparty repos with Barclays, and a small amount of other tri-

party repos. To the extent that this financing was insufficient, JPMorgan provided additional

overnight financing, or "fail financing."

32.    On the morning of Tuesday, September 16, JPMorgan provided LBI with over

$70 billion in intraday loans that enabled LBI to unwind its overnight financings. JPMorgan did

so based on the representations that had been made to it, by Tonucci and others, that LBI would

repay the intraday loans with overnight financing from the Fed. Later that day, Gerard LaRocca,

Chief Administrative Officer of Barclays, had a conversation with Heidi Miller, CEO of Treas-

ury and Securities Services at JPMorgan, a member of JPMorgan's executive committee, and the

senior executive at JPMorgan responsible for JPMorgan's triparty and clearing business. La-

Rocca told Miller that, as part of an asset sale negotiated between Barclays and Lehman, Bar-

clays would take out LBI's entire triparty book, after which JPMorgan would no longer have to

provide LBI with intraday loans to finance that book. LaRocca also told Miller that Barclays

was working on an agreement under which LBI would move its securities to Bank of New York,

Barclays' clearing bank.

33.    Separately, on Tuesday, September 16, Tonucci and Ian Lowitt, then the CFO of

LBHI, contacted Buyers-Russo of JPMorgan to inform her that Lehman and Barclays had agreed

on the terms of an asset purchase agreement under which Barclays would buy all the assets sub-

ject to LBI's triparty repo and other overnight financing arrangements. Lowitt and Tonucci rep-

resented that Barclays had committed to support LBI fully until the deal closed, including by

providing overnight financing that would reduce or eliminate LBI's dependence on the Fed. At

the time Lowitt and Tonucci made these statements, they knew that LBHI and LBI had not in

fact reached an agreement with Barclays to sell to Barclays all the assets subject to LBI's triparty repo and other overnight financing arrangements. They also knew that Barclays had not committed to fully support LBI until the deal closed. Based on the statements made by Tonucci and Lowitt, Buyers-Russo reasonably understood that JPMorgan would be made whole each night by Barclays, if not by the Fed, until the deal closed, at which point JPMorgan would be taken out in full.

34.    Also on Tuesday, September 16, LBHI filed a motion in this Court to induce JPMorgan to continue to extend credit to settle and clear securities transactions for LBI (the "Comfort Order Motion"). In the Comfort Order Motion, LBHI recognized that JPMorgan was advancing LBI tens of billions of dollars a day "necessary to clear, and facilitate the settlement of, securities transactions." The motion further represented that JPMorgan's extensions of credit were "in its sole discretion" and were "payable . . . upon demand," and asked the Court to enter an order providing that JPMorgan's ongoing clearing advances would be treated as if they were prepetition advances for purposes of LBHI's August and September guaranties, as well as related security agreements, described below. LBHI represented to the Court that "[i]t is essential to Lehman's [defined as LBHI and its non-debtor affiliates] customers that [JPMorgan] continue to clear securities transactions for the Lehman Clearance Parties in accordance with its prepetition practices," and that the relief requested was needed to "facilitate a smooth and orderly transition of Lehman's operations into chapter 11, and minimize not only the disruption of Lehman's business affairs, but also the disruption of the financial markets as a whole."

35.    At the hearing on the Comfort Order Motion, which was held the same day the motion was filed, counsel for LBHI further emphasized the "critical function" of JPMorgan's continued extensions of credit to LBI. The Fed also supported the motion, telling the Court that

- 15 -

"the services that [JPMorgan] has been providing are critical to the smooth functioning of financial markets."  The Court granted the Comfort Order Motion the same day, September 16.

36.    On the night of Tuesday, September 16, in order to enable LBI to satisfy intraday loans from JPMorgan to LBI, Barclays provided $10.5 billion in cash to LBI through an overnight triparty repo, the Fed provided $26.7 billion in overnight financing, and the remainder of LBI's cash financing was provided through GCF repos, other triparty investors and a $1.9 billion loan from JPMorgan.  The following morning, Wednesday, September 17, consistent with its critical role in providing LBI with the support LBI needed to survive, JPMorgan made intraday loans to LBI exceeding $70 billion, which allowed LBI to continue functioning and to repay the full amounts LBI had received from Barclays, the Fed and other triparty investors on an overnight basis.  JPMorgan again reasonably understood, based on the statements that had been made by Tonucci and Lowitt, that the intraday loans would be repaid at the end of the trading day by the Fed or Barclays.

## II.    The fraud on JPMorgan

### A.    LBHI misrepresents its agreement with Barclays.

37.    On the morning of Wednesday, September 17, LBHI filed the Sale Motion with this Court to approve the sale of LBI's business and the assets defined in the APA as the "Purchased Assets."  LBHI served the Sale Motion on JPMorgan and a wide array of other creditors and parties-in-interest.  The Sale Motion sought an order approving the sale of the "Purchased Assets," as defined in the APA, and included the APA as an exhibit.  The Sale Motion described the "Purchased Assets" as "LBI's assets, as well as three real properties."  LBHI and Barclays knew when LBHI filed the Sale Motion that JPMorgan would rely on the motion and the APA in determining whether to continue to provide financing to LBI.  One of the main purposes of filing

the Sale Motion with the Court was to provide creditors and counterparties of LBHI and LBI, including JPMorgan, with notice of the agreed-upon terms of the sale.

38.    The APA provided in Section 2.1 that Barclays had agreed to purchase and would, upon approval of the APA, buy all the "Purchased Assets."  The APA defined the "Purchased Assets" as "all the assets of Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets)"; the APA defined "Business," in turn, to include the "brokerage, dealing, [and] trading" businesses.  The definition of "Purchased Assets" made explicit, moreover, that the acquired assets included *all* of LBI's "government securities, commercial paper, corporate debt, corporate equity, exchange traded derivatives and collateralized short-term agreements with a book value as of the date hereof of approximately $70 billion (collectively, 'Long Positions')."

39.    The APA provided in Section 2.2 that Barclays had not agreed to, and would not, purchase the "Excluded Assets."  The "Excluded Assets" were limited to certain specified assets, including commercial real estate investments and 50% of positions in residential real estate mortgage securities; they did not include the government securities, corporate debt, and commercial paper in LBI's triparty repo book.  Thus, securities such as RACERS — commercial paper that Lehman valued at approximately $5 billion — were included in the definition of "Purchased Assets," and were not included in the definition of "Excluded Assets."

40.    The net effect of these provisions of the APA was that Barclays had committed to purchase the securities against which JPMorgan was making loans to LBI — *i.e.*, securities with an estimated value of approximately $70 billion.  Through the Sale Motion, therefore, LBHI explicitly caused JPMorgan to believe that LBHI, LBI, and Barclays had entered into a transaction that would fully extinguish JPMorgan's clearance-related exposure to LBI.

41.    Senior executives of LBHI, including Ian Lowitt, Paolo Tonucci, Gerard Reilly, and Martin Kelly, were directly involved in the negotiation and preparation process that led to the execution and filing of the APA and the filing of the Sale Motion.  Senior executives of LBHI, as well as LBHI's board of directors, authorized the filing of the Sale Motion and the APA, and Steven Berkenfeld, an LBHI Vice President, signed the APA on behalf of LBHI and LBI.  LBHI's board of directors further authorized Lowitt, Tonucci, and other LBHI executives "in the name and on behalf of LBHI, to perform such acts and deeds and to negotiate, prepare, execute and deliver the Asset Purchase Agreement substantially in accordance with the material terms described to the Board of Directors, . . . with such changes, additions and modifications thereto as such [executive] shall deem necessary or appropriate . . . ."  Senior executives of Barclays were likewise directly involved in negotiating the APA and the process that led to the filing of the APA and the Sale Motion.  Gerard LaRocca signed the APA as "Chief Executive Officer" of Barclays Capital Inc.

42.    LBHI's representations in the Sale Motion and APA were intentionally, or at least recklessly, false and misleading.  Senior executives at LBHI knew, at the time that LBHI filed the Sale Motion, that LBHI had not bound Barclays to buy all the "Purchased Assets."  Lowitt has admitted that, despite the filing of the Sale Motion and the APA, it had not been determined "how we are going to identify the series of assets that are part of the transaction and at what price those are going to be marked at and that Barclays is going to purchase them at."  Barclays' then-General Counsel, Jonathan Hughes, has similarly admitted that as of the time the Sale Motion was filed on September 17, "there were aspects of the APA that upon signature were known among the parties to be the subject of ongoing discussion; and indeed it became apparent very quickly indeed that there were aspects of the APA which needed to be refined."

43.     Likewise, in an internal email sent on Wednesday, September 17, Jennifer Fitz-gibbon of LBHI stated to other employees that "the entire balance sheet will not move."  That same day, Gerard Reilly, LBHI's Global Product Controller, wrote to his colleagues that "the asset list . . . for the transfer to BarCap" would only be finalized "[t]he day we do the trade."  And in an email sent on Thursday, September 18, Daniel Flores of LBI again acknowledged, af-ter conversations with Ian Lowitt and Paolo Tonucci, that the schedule of assets to be sold to Barclays was "still a work in progress."

44.     Not only did LBHI executives know, at the time the Sale Motion was filed, that Barclays and LBHI had not agreed on the assets to be sold, but they also knew that LBHI and Barclays had agreed to let *Barclays* determine which securities it would purchase.  When the APA was signed, Barclays was in the midst of analyzing the securities held by LBI.  Conse-quently, both before and after the APA was filed, LBHI, LBI, and Barclays personnel worked hand in hand to figure out which securities Barclays should take and which it should leave be-hind.  Lowitt understood that, even after the filing of the Sale Motion, which expressly deline-ated the assets that Barclays had supposedly agreed to purchase, "[t]he Barclays folks determined which assets they were willing to purchase and which assets they didn't want to purchase.  So in that sense, the Barclays folks picked the assets" they would acquire.  Tonucci has likewise ad-mitted that, even after the filing of the Sale Motion and APA, Barclays still had "the final deci-sion on what assets are bought."

45.     Consistent with LBHI's knowledge that Barclays retained the ability to choose which securities it would purchase, despite the filed Sale Motion and APA, an internal Lehman email from the afternoon of Thursday, September 18 stated that Barclays "did not want" to ac-quire Pine, a security financed through the triparty book.  According to Martin Kelly, LBHI's

Global Financial Controller, Barclays "did not want [Pine], *did not want any of what they called*

*'toxic waste' . . . .   Don't think they will take it*."  Rather than write to his colleagues that the

filed APA obligated Barclays to acquire Pine, which satisfied the APA's definition of "Pur-

chased Assets," Kelly suggested that Tonucci or Robert Azerad, LBHI's Global Head of Assets

and Liabilities Management, call James Walker of Barclays to try to convince him to take Pine.

If Barclays chose not to take the security, Paolo Tonucci recognized that LBHI and LBI would

then have to figure out "how and where" Pine "c[ould] be financed."

46.    LBHI also knew that, to the extent there was an agreement as of September 17 on

the securities to be purchased by Barclays, it was different from the filed APA.  As Mike

Keegan, the head of principal trading at Barclays, has testified, representatives of Barclays and

Lehman agreed on Monday, September 15, before the Sale Motion and the APA were filed, that

Barclays would not purchase, and had no obligation to purchase, various securities in LBI's tri-

party book.  One of those securities was RACERS, a security designated as commercial paper by

Lehman that LBHI knew was illiquid and backed largely by Lehman's own credit.

47.    As LBHI knew on September 15 and well before that, RACERS was not appro-

priate collateral for the triparty repo or for JPMorgan's intraday loans.  In internal emails, LBHI

employees repeatedly denigrated RACERS.  In one case, LBHI's Lawrence Servidio and Colin

Telmer referred to both RACERS and another security called Fenway as "goat poo" to be scat-

tered in "other people's backyards."  In another email, Telmer, with the agreement of Paolo To-

nucci, explained that a large piece of RACERS would consist of "solely non-rated loans."  Yet

another Lehman employee, John Feraca of LBI, observed that RACERS was "[v]ery toxic and

concentrated collateral."  And in April 2008, when a Lehman counterparty declined to accept

RACERS as "acceptable collateral" for a "financing trade," Servidio told Telmer, "[a]nother one doesn't want your 'toxic' racer crap……"

48.    A schedule that Barclays, LBHI, and LBI prepared on Tuesday, September 16, which LBHI executives, including McDade and Berkenfeld, have described as the guiding document for the transaction, was also inconsistent with the subsequently filed APA.  While the APA explicitly includes "commercial paper" in the definition of "Purchased Assets," and does not include commercial paper in the definition of "Excluded Assets," the schedule, which was prepared by Kelly, Lowitt, Reilly, and Tonucci, states that Barclays had agreed to purchase only $1.1 billion of commercial paper.  The schedule thus indicates that LBHI, LBI, and Barclays had not agreed that Barclays was to purchase RACERS — commercial paper valued by Lehman at $5 billion — and, therefore, that LBHI and LBI did not intend to sell all of LBI's commercial-paper assets.  Nonetheless, LBHI filed the Sale Motion and the APA representing that Barclays had agreed to buy all of LBI's commercial paper and other "Purchased Assets."

49.    Moreover, internal Lehman emails from the evening of Tuesday, September 16 and the morning of Wednesday, September 17 show panic among Lehman employees when they realized that "the balance sheet that was sent to court" was based on the false premise that Barclays had agreed to buy, and would buy, all of LBI's securities inventory.  After 9:30 p.m. on September 16, prior to the filing of the Sale Motion, Michael McGarvey of Lehman forwarded to LBI's Paul Mitrokostas a list of LBI inventory that had been sent to Barclays.  Mitrokostas quickly wrote back to McGarvey:  "But they are not buying all of it."  McGarvey immediately responded:  "My understanding is they were buying all the positions that LBI is carrying?  That's what the balance sheet that was sent to court was based on.  Is that not correct?"  Mitrokostas replied that he "thought [Barclays was] buying a subset," to which McGarvey responded that he

"thought all of LBI was going."  Both Lehman employees went on to express their "hope" that Barclays would realize that the balance sheet sent by Lehman was incorrect, but nothing was done to assure that the parties' actual deal would be accurately disclosed to the Court, JPMorgan or other creditors.

50.     LBHI's own lawyers likewise knew, by no later than Wednesday afternoon of September 17, that Barclays had not in fact agreed to buy portions of LBI's securities portfolio. An email sent at 2:38 p.m. by a lawyer at LBHI's law firm, which had filed the Sale Motion earlier the same day, describes a proposed arrangement under which Barclays would finance "all or substantially all of LBI's assets" starting on Wednesday, but then states that "[m]any, but not all of the assets that are subject to this financing arrangement will be purchased by Barclays pursuant to the Asset Purchase Agreement on Friday."  The fact that Barclays was not going to purchase some of LBI's securities, which at the time were being financed intraday by JPMorgan, raised a concern:  "[a]s for the assets not being purchased under the Asset Purchase Agreement, I do not understand what the plan is."

51.     In addition, in an email sent at 11:08 a.m. on Thursday, September 18, a Lehman employee stated that RACERS "are not moving to BONY/Barclays."  The same employee also asked John Palchynsky of Lehman to "confirm that Chase will still take the RACERS as acceptable collateral tonight."  This email further demonstrates that, before the transfer of securities to Barclays even began, LBHI and LBI knew that Barclays had not agreed to buy, and would not buy, all of the securities defined in the APA as "Purchased Assets."  LBHI and LBI also knew that JPMorgan, rather than Barclays, would be stuck with RACERS.

52.     Despite all this, LBHI did not advise either JPMorgan or the Court that the terms of the filed APA did not reflect the true terms of the agreement between LBHI and Barclays.  In

particular, neither JPMorgan nor the Court was advised that, contrary to LBHI's representations in the Sale Motion, the APA, and other representations, the parties had not in fact agreed that Barclays would acquire all the securities defined as "Purchased Assets," and LBHI had granted Barclays the option to refuse to purchase the securities that it did not want.  Nor did anyone from LBHI, LBI, or Barclays advise JPMorgan that JPMorgan would be stuck with an unpaid loan against RACERS and other inappropriate collateral.

53.    LBHI also did not disclose to JPMorgan that, concurrently with the APA, LBI and Barclays had entered into a so-called "Interim Support and Cooperation Agreement."  On September 16, Lowitt and Tonucci had told JPMorgan that Barclays had agreed to support LBI fully until the deal closed.  But under the Interim Support and Cooperation Agreement of the same date, Barclays agreed only to "provide during the Interim Period to LBI such overnight collateralized financing and intraday financing as it deems appropriate in its sole discretion to support the Business, subject to such limits and conditions as [Barclays] determines appropriate."  The Interim Support and Cooperation Agreement contained a provision requiring the parties to keep its terms confidential, and it was not filed with the Court.

**B.    Barclays misrepresents its agreement
with LBHI and LBI.**

54.    On numerous occasions on Wednesday, September 17, Barclays reaffirmed the false representations that LBHI had made in the Sale Motion and the APA.  For example, early in the morning on Wednesday, Barclays represented in a press release, which LBHI had previously reviewed, that Barclays had agreed to "acquire trading assets with a current estimated value of £40bn (US$72bn)."  Likewise, John Varley of Barclays stated in an analyst call on Wednesday, without qualification, that "[w]e are acquiring trading assets with a current esti-

mated value of 72 billion dollars." Neither of these communications stated that LBHI had given Barclays the option not to purchase assets defined in the APA as "Purchased Assets," or that LBHI, LBI, and Barclays had already agreed that certain undesirable "Purchased Assets" would not be transferred.

55.     With the full knowledge of LBHI and LBI, Barclays also represented explicitly that JPMorgan's exposure to LBI would be fully extinguished as part of the sale. During a conference call on Wednesday evening among Ray Stancil, Jon Ciciola and Ed Corral of JPMorgan, David Petrie and John Rodefeld from Barclays, and LBHI's David Aronow and others from Lehman, the representatives of Barclays and Lehman told JPMorgan that on the next day, Thursday, September 18, Barclays would enter into a repurchase agreement with LBI under which it would transfer approximately $45 billion in cash to JPMorgan to purchase the LBI securities being financed by the Fed — which, including the PDCF, OMO and TSLF programs, were valued at roughly $50 billion. Rodefeld or Petrie also stated, without contradiction from Aronow or others at Lehman, that on Thursday, Barclays would purchase LBI's remaining securities on an ongoing basis, leaving JPMorgan with no outstanding exposure to LBI once the sale closed. No one from either Lehman or Barclays disclosed on that call, or at any other time, that Barclays had already determined not to purchase all the securities in LBI's triparty book and to leave behind undesirable securities to which LBI had attributed many billions of dollars of value.

56.     Later on Wednesday night, at approximately 9:00 p.m., Gerard LaRocca of Barclays and Arthur Certosimo of Bank of New York, Barclays' clearing bank, called Buyers-Russo of JPMorgan. LaRocca told Buyers-Russo that, under the deal with Barclays, JPMorgan would have no clearance exposure to LBI by the end of Thursday, September 18. LaRocca explicitly represented that all of JPMorgan's triparty exposure to LBI would be eliminated on Thursday,

September 18.  LaRocca stated further that, once the transaction was effectuated and JPMorgan

was repaid, JPMorgan would hold *surplus* LBI securities of $1.5 billion.  And, again, LaRocca

did not disclose on that call that Barclays would not purchase all the securities in LBI's triparty

book or that Barclays planned to leave behind securities to which LBI had attributed many bil-

lions of dollars of value.  LaRocca made these representations, and failed to disclose Barclays'

actual agreement and intentions, to induce JPMorgan to provide LBI with additional financing on

Thursday morning, including intraday loans in excess of $70 billion necessary to unwind LBI's

overnight repos and, in particular, to meet LBI's obligations to Barclays on its $15.8 billion

overnight repo from Wednesday night, September 17.

### C.    LBHI and LBI manipulate the securities to be transferred to Barclays.

57.    After representing to the Court and to JPMorgan in the Sale Motion and the APA

on the morning of September 17 that Barclays would purchase all the "Purchased Assets" that

served as JPMorgan's collateral, including all commercial paper, LBHI, LBI and Barclays took

further action that would allow Barclays to pick and choose the securities it would purchase and

leave the worst securities behind.

58.    On the afternoon of Wednesday, September 17, hours after LBHI filed the Sale

Motion, Barclays entered into a written agreement with the Fed — the Takeout Agreement —

that was not disclosed to JPMorgan or the Court.  The negotiation of the Takeout Agreement had

commenced at least a day earlier, before the filing of the Sale Motion and the APA.  The Takeout

Agreement required Barclays, "[b]y not later than the opening of business on Monday, Septem-

ber 22, 2008," to purchase "the entirety of the [Fed']s position . . . for a payment equal to the ag-

gregate outstanding amount then due to the [Fed]."  Ian Lowitt met with representatives of Bar-

clays, Bank of New York, and the Fed on Wednesday, September 17, to discuss how the Takeout Agreement would be implemented.

59.    At the same time as it was entering into the Takeout Agreement, Barclays was working with LBHI and LBI to ensure that Barclays would be able to cherry pick LBI's best securities without running afoul of the Takeout Agreement.  Each night, the securities that were eligible for LBI's triparty repo were allocated into overnight "shells" for different investors.  The shells were used by JPMorgan customers, such as LBI, to designate the investor accounts into which securities subject to a triparty repo would be placed overnight.  LBI operations personnel, acting under the control and supervision of LBHI, had access to the computer system at JPMorgan through which securities were allocated into the overnight shells.  Using that access, LBHI and LBI had control over, and the ability to alter, the configuration of the shells so that eligible securities would be allocated to particular investors.  Because most of the triparty investors had fled after LBHI filed its chapter 11 petition, the key shells during the week of September 15 were the shell for the Fed's financing and the shell for Barclays' triparty repo financing.

60.    On Tuesday night, September 16, many of the riskiest securities that were eligible for the triparty repo had been financed by the Fed.  Those securities included RACERS, as well as securities called SASCO, which, like RACERS, were backed largely by Lehman's own credit, were priced on the basis of Lehman's own marks, and had never traded.  Numerous other illiquid securities were also financed by the Fed on Tuesday night.  Those securities — RACERS in particular — were known by LBHI to be illiquid structured securities that were not appropriate collateral for the triparty repo or to secure JPMorgan's clearing advances.

61.    If the same securities that the Fed had financed on Tuesday night, September 16, continued to be financed by the Fed on Wednesday night, September 17, and if the sale transac-

tion was implemented on September 18 — as LBHI, LBI, and Barclays expected it would be as of September 17 — the Takeout Agreement would have required Barclays to pay billions of dollars to purchase many of LBI's riskiest securities.

62.     Barclays, however, did not want LBI's riskiest securities, which were not among the securities that Barclays had financed on Monday and Tuesday nights.  And LBHI and LBI were ready and willing to help Barclays avoid buying those securities when it acquired the Fed's position.  Thus, during the day on Wednesday, September 17, the same day the Takeout Agreement was executed, LBI and/or LBHI employees, in order to effectuate LBHI and Barclays' fraud, altered the allocation of securities into overnight shells, causing the illiquid, hard-to-value securities that had been financed by the Fed on Tuesday night to be financed by Barclays for the first time on Wednesday night, when Barclays provided $15.8 billion in triparty repo financing to LBI.  Since Barclays was only obligated under the undisclosed Takeout Agreement to purchase the securities that the Fed was financing, the reconfiguration of the shells put Barclays in a position to purchase LBI's best securities while leaving behind the riskiest securities, including the RACERS and SASCO securities, among others.

63.     The manipulation of LBI's triparty shells was dramatic, and JPMorgan did not learn of it (or its significance) until after the transaction was completed.  On Tuesday night, September 16, the vast majority of the Collateralized Mortgage Obligations (CMOs) held by LBI — valued at some $2.2 billion — were financed by the Fed.  Likewise, commercial paper valued at approximately $5.2 billion (*i.e.*, mostly RACERS securities, valued at $5 billion) and other Lehman-priced structured products were financed by the Fed on Tuesday night.  On Wednesday night, September 17, the vast majority of the CMOs and the Lehman-priced structured products were financed by Barclays.  Lehman-priced securities with an ascribed "market value" in excess

of $7 billion (of which $5 billion is attributable to RACERS) had made their way from the Fed's
portfolio to Barclays' portfolio.

64.    The manipulation of the overnight shells further demonstrates that, as of September 17, LBHI and Barclays knew that Barclays at least had the option not to acquire securities
falling within the APA's definition of "Purchased Assets," and thus that the APA filed with the
Court that day did not accurately describe the material terms of their deal.  If, as Barclays and
LBHI executives had told JPMorgan, Barclays was obligated to purchase all of the securities in
the triparty repo book, other than "Excluded Assets," the manipulation of the triparty shells
would have served no purpose.

65.    An internal LBHI email further demonstrates that LBHI knew no later than
Wednesday, September 17 that JPMorgan would be left with the "toxic waste" that Barclays had
told LBHI and LBI it did not want:  Lowitt wrote to Tonucci on Wednesday night, in an email
captioned "Please assure me I am worrying about nothing":  "With all our pdcf, tslf, and omo
collateral at Barclays, and no ongoing access to pdcf, how will we fund our box tomorrow?  Barclays are going to be full to the gunnels; will chase give us a box loan again?"  Lowitt, accordingly, was acutely aware that JPMorgan was the only source of financing for, and would soon be
stuck with unpaid loans secured by, the "toxic" securities that LBHI, LBI and Barclays had secretly agreed Barclays had no obligation to purchase.

     **D.**      **LBHI, LBI, and Barclays implement their
             transaction before the Court approves it.**

66.    The Takeout Agreement required Barclays to take out the Fed's financing position by no later than Monday, September 22, the anticipated closing date of the sale.  In the
meantime, the hearing date on the Sale Motion had been set for Friday, September 19.  The APA

did not require the transfer of securities from LBI to Barclays to take place before September 22. Nonetheless, on Wednesday, September 17, LBHI and Barclays determined that the transfer of securities to Barclays should occur the next day, Thursday, September 18, in advance of this Court's approval of the proposed transaction. They also decided to go forward without informing the Court or LBHI's creditors about the transfer of the securities, or that LBHI and LBI had not agreed to sell to Barclays billions of dollars of securities identified in the filed APA as "Purchased Assets."

67.     The timing of the transfer of the securities contributed to the success of the fraudulent scheme. The transfer had to be completed *before* the Court hearing on September 19, or JPMorgan would learn that Barclays was not buying LBI's undesirable securities. LBHI and Barclays executives knew that, as of Thursday morning, September 18, JPMorgan expected that LBI would repay all of its outstanding loans as part of the Barclays transaction. They also knew that JPMorgan, based on representations by Tonucci of LBHI, Rodefeld and Petrie of Barclays, and others, believed that Barclays had agreed to provide overnight financing to support LBI until closing, when Barclays would purchase all the assets it was financing. By transferring Barclays' hand-picked securities to its custodian, Bank of New York, prior to Court approval of the sale, at a time when the Court and creditors (including JPMorgan) were in the dark about the parties' actual deal, LBHI, LBI, and Barclays completed a transaction that JPMorgan would not have facilitated or permitted had it known the truth. As a result, as described further below, JPMorgan was stuck with a $25 billion loan to LBI against a depleted collateral pool consisting largely of inappropriate and inferior securities.

E.    **JPMorgan lends more than $70 billion to LBI and releases
$5 billion in margin.**

68.    Overnight on Wednesday, September 17, Barclays provided $15.8 billion in tri-party repo financing of LBI securities, while the Fed provided approximately $27.5 billion of overnight cash financing through the PDCF and the OMO.  The remainder of LBI's securities was financed through triparty repos and overnight repos under the GCF program administered by the DTCC and by a $4.4 billion fail financing loan from JPMorgan.  As of Wednesday night, LBI securities valued at over $70 billion were being financed.  That amount broadly corre-sponded to the value placed by the APA on the securities that Barclays had, under the terms of the APA, agreed to purchase from LBI.

69.    On the morning of Thursday, September 18, in reliance upon LBHI's and Bar-clays' numerous representations that Barclays' agreement with LBHI and LBI would eliminate JPMorgan's clearance-related exposure to LBI, and unaware of any other plan, JPMorgan exer-cised its discretion to loan more than $70 billion to LBI to unwind the overnight repos and repay the Fed's overnight cash financing.  Of this amount, $15.8 billion was credit extended to LBI to pay cash to Barclays to repurchase the securities that Barclays had financed overnight through its triparty repo.  Had JPMorgan known that the representations made in the Sale Motion, the APA and otherwise were false and misleading — and omitted material facts necessary to make the statements, in the circumstances under which they were made, not misleading — and that LBHI, LBI, and Barclays were working together to ensure that Barclays could pick and choose the secu-rities it wanted, JPMorgan would not have loaned $15.8 billion to LBI to take out the Barclays triparty repo, or the other amounts needed to repay LBI's overnight investors on the morning of September 18.

70.    When JPMorgan advanced more than $70 billion to LBI on the morning of Thursday, September 18, it had been led to believe, by Barclays and LBHI, that LBHI and LBI had agreed to sell to Barclays all of the securities defined in the APA as "Purchased Assets" and, as a result, repay all of JPMorgan's loans to LBI.  JPMorgan reasonably understood, based on the numerous misrepresentations and misleading statements that had been made to it, that Barclays would provide sufficient funding to LBI to finance all the securities remaining in LBI's portfolio on the evening of September 18, including by "rolling" the $15.8 billion repo provided by Barclays the previous night (increased in size as necessary to repay JPMorgan's intraday loans in full).  JPMorgan did not know that Barclays and LBI had entered into an agreement under which Barclays' overnight financing was entirely discretionary.  Nor did JPMorgan know that LBHI had not bound Barclays to purchase the entire triparty repo book.

71.    On the morning of September 18, LBHI and LBI did not and could not have believed that LBI would repay in full the $70 billion loan that it obtained from JPMorgan.  When JPMorgan loaned over $70 billion to LBI on Thursday morning, in justifiable reliance on LBHI's representations and omissions regarding the Barclays sale transaction, senior LBHI executives, including Lowitt, Tonucci, Reilly, and Kelly, knew that:  (1) LBI would be put into liquidation on Friday, September 19; (2) Fed financing would not be available to LBI on Thursday night; (3) Barclays had the undisclosed right not to purchase the LBI securities it did not want, including what it called the "toxic waste" and LBHI called "goat poo"; and (4) Barclays had told LBHI that it did not intend to purchase those securities.  Accordingly, it was clear to senior LBHI executives that JPMorgan would get stuck with an unpaid loan collateralized by securities that Barclays did not want.  And indeed, at 7:07 a.m. on Thursday, September 18, Tonucci emailed LBHI's Aronow — copying Dan Fleming and Servidio of LBHI and LBI's John Feraca — in-

structing him to ensure that "RACERs . . . not be funded by Barclays" that evening, even though Barclays had financed RACERS the night before and JPMorgan was making loans against RACERS on Thursday morning.

72.     Starting on the morning of Thursday, September 18, LBHI, LBI, and Barclays began to implement their transaction. To commence the transfer of securities to Bank of New York, Barclays wired $5 billion to JPMorgan. As a result of operational issues, however, the delivery of the additional $40 billion that Barclays had said it would deliver early on Thursday was delayed.

73.     In the meantime, Barclays discussed internally — at the highest levels — that it would not purchase major pieces of LBI's triparty book, notwithstanding the APA and in spite of its pattern of financing activity from the previous nights. At 5:38 p.m. on Thursday, September 18, Gerard LaRocca of Barclays wrote an email to Richard Ricci, Barclays' Chief Operating Officer and its chief negotiator in connection with the APA, with the following subject line: "JPM will BE ANNOYED with several billion of collateral tonight that we will not finance." At 5:48 p.m., LaRocca wrote an email to Ricci and Robert Diamond, the CEO of Barclays Capital Inc. and President of Barclays PLC, with the subject: "Urgent WE NEED TO TALK, JPM IS GOING TO BE MORE ANNOYED WITH WHAT I HAVE PLANNED THAT WILL SAVE BARCLAYS SIZE."

74.     In addition to operational issues, the transfer of securities to Barclays was also held up on September 18 because Barclays did not want JPMorgan to hold the margin on the securities that LBI was transferring. Prior to and after the unwind on Thursday morning, JPMorgan employees had informed Barclays, LBHI, and LBI that JPMorgan would transfer LBI securities to Barclays on Thursday on a "dollar-for-dollar" basis: in exchange for a $45 billion pay-

ment by Barclays, JPMorgan would transfer collateral valued at the same amount, withholding the margin, or the difference between the cash received and the value attributed to the securities being delivered.  One of JPMorgan's objectives in keeping the margin was to protect against potential liabilities arising out of its continued clearing advances, including any shortfall that might result if the sale to Barclays fell through and JPMorgan had to liquidate the securities on its own.  Thus, when JPMorgan made loans to LBI during the morning of Thursday, September 18, JPMorgan believed that it would end the day on Thursday not only without exposure to LBI, but also with securities valued at more than $4.6 billion, *i.e.*, the estimated amount of the margin that it was keeping.  Once the APA was consummated and JPMorgan's exposure to LBI was eliminated and the other securities transferred, JPMorgan would then release the margin.

75.    Had JPMorgan kept the margin on the securities being transferred on Thursday, September 18, it could have retained those securities as collateral for the large loan that it was ultimately stuck with after the Barclays transaction was complete.  In that case, however, Barclays would not have received securities valued at approximately $5 billion above the level of the cash that it had delivered to LBI.  Robert Diamond dealt with this problem.  At around 6:00 p.m. on Thursday, September 18, during a phone call with senior executives of JPMorgan, including Miller, Barry Zubrow (Chief Risk Officer), William Winters (co-CEO of the investment bank) and Stephen Cutler (General Counsel), Diamond, who was joined on the call by Rich Ricci, Barclays' Chief Operating Officer, insisted that JPMorgan not keep the margin embedded in the securities valued at $50 billion that Barclays was buying for $45 billion.

76.    To induce JPMorgan to release the margin, Diamond, through his affirmative statements and failure to reveal Barclays' true agreements and intentions, persuaded JPMorgan that, by the end of Thursday, JPMorgan's triparty exposure to LBI would be extinguished and, at

the conclusion of the transaction, JPMorgan would not have further exposure to LBI.  Diamond

did so even though LaRocca had emailed Diamond and Ricci before the call:  "Urgent WE

NEED TO TALK, JPM IS GOING TO BE MORE ANNOYED WITH WHAT I HAVE

PLANNED THAT WILL SAVE BARCLAYS SIZE."

77.     Based on Diamond's representations, which were entirely consistent with the rep-

resentations that LBHI and Barclays had made to JPMorgan on prior occasions about the elimi-

nation of JPMorgan's exposure to LBI, as well as Diamond's failure to reveal Barclays' true in-

tentions and correct the misrepresentations and misleading statements made on prior occasions,

JPMorgan's senior executives agreed to transfer securities valued at roughly $50 billion upon

receipt of $45 billion in cash.  Had JPMorgan known that Barclays was not obligated to, had de-

cided not to, and would not purchase all of the "Purchased Assets," and that Barclays, LBHI, and

LBI had been working together to ensure that JPMorgan was left with a large loan against LBI's

least desirable securities, JPMorgan would not have released its margin valued at $5 billion.

78.     Internal LBHI emails show that LBHI participated in Barclays' urgent efforts to

complete the asset transfer on Thursday, September 18 and to obtain the release of $5 billion in

margin from JPMorgan.  In the afternoon of September 18, Lowitt wrote to Tonucci:  "Asked

Gerard [LaRocca] to escalate with [JPMorgan] [C]hase.  Think he is calling Heidi Miller.  May

need to get Bob Diamond to call Jamie [Dimon, the CEO of JPMorgan].  They are [f***ing] this

up."  LBHI and Barclays knew that, if JPMorgan realized that Barclays was not obligated to buy

LBI's worst securities, and was not buying them, JPMorgan would then refuse to release the se-

curities that Barclays did want.  LBHI, therefore, was as eager as Barclays to make sure that the

transfer went forward on Thursday.

**F.    JPMorgan transfers securities valued at $42.7 billion to Barclays and then advances $7 billion to LBI.**

79.    After JPMorgan agreed to release its margin valued at approximately $5 billion, the transfer of securities to Barclays went forward.  Starting at approximately 6:30 p.m. on Thursday, September 18, an additional $40 billion in cash was transferred to LBI's account at JPMorgan.  The transfer of securities to Barclays subsequently resumed, with LBHI and LBI personnel directing which securities were to be transferred — or not transferred — to Barclays' account at Bank of New York based on a list that had been provided to them by Wednesday, September 17.  Ultimately, the transfer of securities could not be completed before DTCC closed for the night.  When DTCC closed at around 11:00 p.m., securities valued at approximately $42.7 billion had been transferred to Barclays, out of securities valued at roughly $50 billion that were supposed to be transferred in exchange for $45 billion.

80.    During the securities transfer, employees of LBHI and LBI relied on a list of the securities that Barclays did not want to purchase, and thus did not want to be transferred.  Nancy Denig of LBI has testified that Barclays had excluded from the asset transfer LBI's "more toxic securities" — "Lehman paper, real estate type of CUSIPs, certain equities, just more toxic, no value, you know, not able to determine a market value . . . ."  Meanwhile, James Hraska of LBI has testified that "one particular Cusip . . . was very specifically supposed to be excluded": RACERS.  Thus, Alastair Blackwell of LBHI instructed Hraska, LBHI's Neal Ullman, and LBI's John Feraca at 7:06 p.m. on Thursday, September 18:  "We CANNOT PLEDGE the RACER's."  Ten minutes later, Ullman wrote to Hraska, Lehman's Palchynsky, and LBHI's Ricky Policke, "We need to be 100000000000000000000000000000000000000000000000% sure that the RACER does not make its way to BONY/Barcap."  This was all consistent with To-nucci's directive, made early that morning, that "RACERs . . . not be funded by Barclays."

81.    Before the transfer of securities was completed, LBHI and LBI took additional steps to ensure that Barclays left JPMorgan with outstanding loans collateralized by LBI's least desirable securities.  On the night of September 17, the Fed had financed asset-backed securities valued at almost $4 billion, while Barclays had financed asset-backed securities valued at approximately $200 million.  Recognizing that Barclays did not want these securities, just as it did not want RACERS and other securities that Barclays itself financed on Wednesday night, during the day on Thursday, September 18, LBHI and LBI ensured that, notwithstanding the Takeout Agreement, the majority of these asset-backed securities were not transferred to Barclays.  As a result, asset-backed securities valued at approximately $2.9 billion were left at JPMorgan when the securities transfer was complete on September 18.

82.    In addition, late on Thursday, September 18, LBHI's James Seery (Global Head of Fixed Income) stated in at least one phone call with John Mahon of Barclays that Barclays should avoid purchasing RACERS.  Seery believed that the value of RACERS was "suspect" and, in his discussion with Mahon, Seery questioned whether RACERS was an "appropriate" security.  RACERS, meanwhile, had already been intentionally moved on Wednesday out of the Fed portfolio that Barclays had committed to purchase, so Barclays was in a position to leave it behind.  An email sent by LBHI's Robert Azerad at 3:18 p.m. on Thursday September 18 set forth the means through which Barclays would leave "behind" the collateral it did not want — "a large box loan from JPM."

83.    LBHI and Barclays were so committed to ensuring that Barclays did not take RACERS that, by 8:20 p.m., Lowitt himself sought confirmation from those overseeing the transfer that "no racers" had gone to Barclays.  And later that night, when LBHI's Aronow expressed concern that LBHI and LBI had mistakenly transferred a particular CUSIP to Barclays

(reportedly exclaiming, "[s**t] that one went out"), Hraska asked Palchynsky in an email, "[w]as

that the racer?"  Told by Palchynsky that some SASCO securities had inadvertently gone to Bar-

clays, Hraska responded "Phew.  Better than racer."

84.     In an effort to finish the transfer on Thursday night even after the DTCC had

closed, LBHI and LBI decided to pledge cash collateral to Barclays in lieu of the securities re-

maining to be transferred.  Accordingly, John Palchynsky and LBHI's Dan Fleming instructed

JPMorgan to transfer $7 billion of cash — representing an estimate of the value of the remaining

securities to be delivered to Bank of New York — from LBI's Demand Deposit Account at

JPMorgan into a triparty cash collateral account to secure Barclays.  Because the Demand De-

posit Account was in overdraft, LBI required a discretionary advance from JPMorgan to transfer

the $7 billion.  In further reliance upon LBHI's and Barclays' prior representations that Barclays'

transaction with LBHI and LBI would extinguish JPMorgan's clearance exposure in full, and

unaware of any other agreement or plan, JPMorgan advanced LBI the $7 billion.

### G.     Barclays, LBHI, and LBI reveal that JPMorgan would be stuck with a massive unpaid loan secured by the worst LBI collateral.

85.     Beginning after 1:00 a.m. on Friday, September 19, representatives of LBHI, LBI,

Barclays and JPMorgan had a series of telephone communications during which it began to

emerge that, contrary to all the representations that had been made to JPMorgan, Barclays had

not agreed to, and would not, purchase or finance the securities left at LBI, including the securi-

ties that Barclays had financed on Wednesday night with its $15.8 billion triparty repo.  With

LBI's SIPA liquidation proceeding to commence on September 19, Barclays knew (as Barclays'

Alan Kaplan has testified) that LBI "would not be in a position to repurchase the securities" that

Barclays financed overnight on Thursday night, September 18.  Barclays thus did not finance

*any* securities that night, despite its prior conduct, beyond those it had purchased under the

Takeout Agreement.  LBI, accordingly, did not repay a large portion of its intraday loans from

JPMorgan and, as LBHI's Azerad had foretold in an email to Tonucci that afternoon, "a large

box loan from JPM" was therefore necessary on Thursday night.

86.    In the first call, which took place at approximately 1:30 a.m., LBI's Hraska in-

formed Corral and Ciciola of JPMorgan that, after receiving the $45 billion from Barclays, LBI

had a funding shortfall of more than $23 billion, which included both the $15.8 billion previ-

ously funded by Barclays and an additional funding gap of well over $7 billion.  Since Barclays

was not closing the funding gap, as JPMorgan had been told that it had agreed to do, LBI needed

to turn its intraday loans from JPMorgan for those amounts into an overnight loan.  In response,

Corral insisted to Hraska that Barclays at least provide the $15.8 billion of funding that it had

provided on Wednesday night.

87.    Soon thereafter, during another call, Hraska of LBI and Dan Fleming of LBHI

represented to Corral that they had checked with Barclays and that Barclays had confirmed that it

*would* provide the $15.8 billion of funding as soon as the transfer facilities opened the next

morning.

88.    At approximately 8:00 a.m. on Friday morning, September 19, during a phone call

in which David Aronow of LBHI participated, Petrie of Barclays claimed to Ciciola of JPMor-

gan that Petrie was "confused" and "forgot" about the $15.8 billion repo.  Then, in a call at ap-

proximately 8:30 a.m. among Petrie of Barclays, Fleming of LBHI and Corral of JPMorgan,

Petrie announced that Barclays did not recognize an obligation on its part to finance the securi-

ties that it had financed the night of Wednesday, September 17 with its $15.8 billion triparty

repo.  Soon after that call, Corral called Fleming separately to discuss the situation.  Fleming,

evidencing his recognition that JPMorgan had been wronged, told Corral that he was "sick to his stomach" about Barclays not taking the securities that secured its $15.8 billion repo of Wednesday night.

89.    Accordingly, when SIPC commenced LBI's liquidation proceeding on Friday, September 19, JPMorgan's exposure to LBI had not remotely been retired.  As a result of the actions of LBHI and LBI personnel, who manipulated the allocation of securities collateral between the Fed and Barclays on Wednesday night and worked with Barclays to ensure that LBI's least desirable securities stayed behind at JPMorgan, Barclays was able to cherry pick the securities that it purchased from LBI.  JPMorgan, in turn, was left with unpaid loans to LBI exceeding $25 billion, which included both the $15.8 billion that JPMorgan loaned to repay Barclays on Thursday morning, September 18, and additional financing positions that Barclays did not assume.  JPMorgan's loans, moreover, were secured by RACERS and other inferior collateral that Barclays itself had financed on Wednesday night and yet had managed, with the aid of LBHI executives, as well as LBHI and LBI employees, to avoid taking as part of the acquisition.  In addition, JPMorgan had been misled into releasing some $5 billion in margin, further depleting its collateral position.  This outcome was possible because Barclays, purportedly in an effort to support LBI, had financed increasingly large portions of LBI securities for three straight nights (Monday, Tuesday, and Wednesday) — and then decided, with the active participation of LBHI and LBI, and contrary to the terms of the filed APA, to leave behind at JPMorgan the very securities that it had financed on Wednesday night, September 17.

90.    The position in which JPMorgan ultimately found itself was the product of fraud by LBHI, LBI and Barclays.  Originally, LBHI executives, including Lowitt and Tonucci, told JPMorgan that LBI would sell all its securities through an orderly wind-down, a process that

would help maximize the recovery from the sale of the securities collateral.  Later, LBHI and

Barclays executives told JPMorgan that LBHI and LBI had obligated Barclays to purchase

LBI's entire triparty book, and that Barclays would be supporting LBI in the interim, a process

that would leave JPMorgan with no exposure.  Instead, JPMorgan was left with the worst of all

worlds:  more than $25 billion of unpaid clearing loans;  a collateral pool largely comprising the

"toxic waste," "toxic racer crap," and "goat poo" securities that Barclays declined to purchase —

one depleted by the release of much of the margin in the portfolio; no orderly sell-down of the

remaining securities by the LBI employees who knew the securities; and the unprecedented task

of selling those securities on its own during a period of historic market distress.  LBHI, mean-

while, benefited greatly from this outcome by completing the sale of LBI, which relieved LBHI

and its unsecured creditors of significant potential liabilities, and ensured that the estate received

value on account of the broker-dealer business, rather than letting it collapse.

91.    As LBHI's Alex Kirk succinctly and blandly put it, "at some point during th[e]

process, Barclays became very uncertain as to some percentage of th[e] collateral, I don't recall

the exact amount, but it was a large number, maybe as much as, you know, 20 percent of the col-

lateral, and when Barclays didn't accept those positions, they, by definition, just got left at

JPMorgan. . . .  [S]o JPMorgan was left with collateral that [JPMorgan] w[as] not comfortable

with but Barclays would not accept . . . ."

**H.    LBHI misleads the Court again at the sale hearing.**

92.    In Court on Friday, September 19, 2008, at the hearing to approve the sale trans-

action and APA that LBHI had filed on September 17, counsel to LBHI told the Court, based on

false information provided by LBHI, that Barclays was buying only $47.4 billion in securities,

rather than the approximately $70 billion in "Purchased Assets" under the APA, because "the markets dropped and the value of the securities dropped as well."

93.     This explanation was false.  The primary cause of the decline from $70 billion in securities to $50 billion was not a decline in the market value of the securities.  Rather, it was that, contrary to what had been represented to the Court and JPMorgan in the Sale Motion, Barclays was not actually purchasing all or even close to all of the assets defined in the APA as "Purchased Assets."  Instead, Barclays was purchasing a cherry-picked portion of those assets and sticking JPMorgan with the remainder.  At the time, JPMorgan did not yet know about LBHI's and Barclays' machinations that left JPMorgan with a claim for more than $25 billion against LBI secured largely by LBI's least desirable collateral.

94.     Only after the Court had approved the sale transaction did LBHI disclose the actual transaction between itself and Barclays.  A "Clarification Letter" dated "as of" Saturday, September 20, 2008, but executed only on September 22, 2008, finally disclosed that the approximately $50 billion in collateral value of assets purchased by Barclays on Thursday, September 18, pursuant to the $45 billion cash amount repurchase arrangement between Barclays and the Fed, would constitute the securities to be purchased by Barclays under the APA.  In other words, the $45 billion repo would be cancelled and Barclays would simply keep the securities it received on Thursday, September 18, leaving behind the rest of LBI's securities.  The Clarification Letter, therefore, was not a "clarification" at all:  it fundamentally changed the APA's definition of "Purchased Assets"; it purported to correct the completely false description of the deal that had been given to the Court prior to approval of the sale on Friday night; and it disclosed to the Court and to creditors for the first time the details of the repo transaction that became the sale transaction.  The person who signed the Clarification Letter on LBHI's behalf, Steven Berk-

enfeld, has admitted that the Clarification Letter was a "different deal" than the deal disclosed to the Court and creditors on September 17, 2008.

95.     LBHI's own counsel, at the hearing on LBHI's motion under Federal Rule of Civil Procedure 60(b) to set aside this Court's order approving the Barclays sale, has likewise admitted that the Clarification Letter, by changing the definition of "Purchased Assets," had the effect of "strik[ing] out the agreement that's been there all week."  LBHI's counsel further admitted that the deal disclosed in the APA was not the deal that had been "actually transacted" at the time.

96.     Despite spending months in this Court litigating the issues surrounding the Barclays sale, neither LBHI nor Barclays has ever made clear to the Court why the transaction described in the Sale Motion, under which Barclays supposedly agreed to purchase securities with a book value of approximately $70 billion, ended up as a transaction under which Barclays purchased less than $50 billion of securities.  Nor have the parties to LBHI's Rule 60(b) motion explained to the Court why Barclays purchased LBI's securities portfolio a full day before the sale hearing on September 19, or why JPMorgan was never told about the Takeout Agreement and was otherwise left out of key discussions about the transaction.  Neither LBHI nor Barclays has wanted to admit that the machinations that followed LBHI's filing, as well as the inaccurate statements made in court filings, resulted in leaving JPMorgan with a loan of over $25 billion secured largely by LBI's least desirable collateral.

97.     In its post-trial brief in the Rule 60(b) litigation, LBHI asserts, citing documentary evidence and testimony that it introduced in this Court, that at the hearing on the Sale Motion the Court was told virtually nothing of the Takeout Agreement or the repo transaction Barclays employed to satisfy its obligations thereunder.  LBHI also admits that — by no later than September

18 — the APA filed on September 17, which "set forth the terms of" the Barclays deal for "the Court, the Lehman Boards *and creditors*," had been abandoned, and that the Takeout Agreement and related repo transaction had come to constitute the framework for the deal that ultimately closed. These changes, LBHI repeatedly asserts in its brief, constituted material amendments to the transaction, amendments that this Court never approved and which were never disclosed to JPMorgan or other creditors in advance of the sale hearing.

98.    Further evidencing the fraud Barclays, LBHI, and LBI perpetrated upon JPMorgan, Barclays asserted in the Rule 60(b) litigation that on September 18 it received "different collateral than it had been promised" by LBHI. This again confirms that LBHI had agreed, prior to the transfer, and prior to public disclosure of such change, that Barclays would not acquire all the "Purchased Assets." According to Barclays' post-trial submission, moreover, Barclays declined to acquire all the "Purchased Assets" defined in the APA because the deal became more risky once the Takeout Agreement required Barclays to purchase assets that were "not subject to adequate due diligence and . . . of uncertain value." But under the APA filed with the Court and disclosed by LBHI to JPMorgan and other creditors, Barclays was already obligated to purchase those assets. Barclays' assertion that the transaction changed on account of this new risk further demonstrates that LBHI and Barclays had misrepresented their transaction to the Court and to creditors, most notably JPMorgan, which made tens of billions of dollars in loans in reliance on LBHI's misrepresentations.

99.    Despite taking extensive discovery in connection with their motion under Rule 60(b) to set aside the order approving the Barclays sale, and despite calling numerous witnesses at an extended evidentiary hearing, LBHI and its creditors' committee took only minimal docu-

ment discovery from JPMorgan.  No depositions were taken of anyone from JPMorgan, and no one from JPMorgan was called as a witness at trial.

### III.    JPMorgan's damages

100.    As a result of LBHI's and LBI's fraudulent inducement of JPMorgan to extend credit to LBI on September 18, 2008, JPMorgan ended up with over $25 billion in claims against the LBI estate from extensions of credit under the Clearance Agreement.  Major portions of the securities left in LBI's clearing account, which secured those claims, were illiquid, had never traded, were priced on the basis of Lehman's own marks and were structured largely based on Lehman's own credit.  LBHI's own employees called JPMorgan's collateral "toxic racer crap" and "goat poo."

101.    When JPMorgan proved unable to sell much of the collateral that Barclays left behind for it on September 18, 2008, it was forced to apply most of the approximately $8.6 billion in cash collateral that it received from Lehman in September 2008 to satisfy LBI's unpaid loans.  JPMorgan subsequently transferred to LBHI the unsold portion of the illiquid securities collateral that Barclays had left behind under the Collateral Disposition Agreement approved by this Court in March 2010, but JPMorgan reserved its rights to access the value of the returned collateral in the event it would be needed.

102.    On May 26, 2010, LBHI and its creditors' committee initiated this adversary proceeding against JPMorgan, seeking the return of the $8.6 billion in collateral that was delivered to JPMorgan in September 2008, most of which JPMorgan used to pay the outstanding loans under the Clearance Agreement.  If JPMorgan is required to return any significant portion of that collateral to LBI, and the value of the securities transferred to LBHI under the Collateral Disposition Agreement is inadequate to satisfy any outstanding claims, JPMorgan will no longer be

fully paid on its claims.  In that event, or if JPMorgan is otherwise required to pay damages to the LBHI estate, JPMorgan will have an administrative claim against LBHI on account of the direct and proximate harm caused by LBHI's tortious misconduct.

### IV.    LBHI's and LBI's motive to deceive JPMorgan

103.    As alleged above, numerous executives and employees at LBHI and LBI participated extensively in effectuating the series of transactions that resulted in JPMorgan being left with a more than $25 billion loan to LBI secured by a collateral pool that included much of LBI's least desirable securities.  Senior executives at LBHI, who were acting to further the interests of LBHI, as well as their own interests, were highly motivated to work with Barclays in defrauding JPMorgan.  The executives and employees knew that, without a transaction with Barclays, LBI would have been obliged to unwind its business and liquidate, at great potential cost to LBHI, which had guaranteed certain of LBI's debts.  Indeed, Bart McDade's proffer at the September 19 hearing on the Sale Motion was that only Barclays could and would purchase LBI's business.  McDade's proffer continued:

> consummation of the transaction[] [with Barclays] makes available a greater pool of assets to the debtors' estates, because the exposure under Lehman Holdings['] guarantee to the broker-dealer will be substantially less.  If the transaction does not close today or over this weekend, . . . the effect on the broker-dealers['] business and on Lehman Holdings would be devastating.  First, the failure to consummate the transaction would cause default under the DIP facility and require Lehman Holdings to repay the outstanding amounts under that facility. . . .  [Moreover,] liabilities in the hundreds of billions of dollars would be triggered against Lehman Holdings which would in turn deplete the property available to distribution [*sic*] to creditors.

Crediting this testimony, the Court observed that the Barclays deal was "the only available transaction" for the sale of LBI — "only Barclays can do it" — and "the consequences of not approv-

ing a transaction could prove to be truly disastrous," including "to the debtor [*i.e.*, LBHI], its es-

tates, the customers, [and] creditors."

104.    Further, when LBHI's board voted to approve the APA on September 16, it did so

on the understanding that the Barclays "transaction would benefit the creditors of the Corpora-

tion [*i.e.*, LBHI] and also save the franchise and many jobs." Lowitt had informed the LBHI

board that "LBI would not be able to fund itself that day [*i.e.*, September 16] without this deal,

based on how funding went yesterday."

105.    LBHI's senior executives, including Lowitt, Tonucci, Kelly, and Reilly, also

knew that JPMorgan's intraday financing was essential to LBI's continued operation, and thus to

any transaction with Barclays. LBHI executives were fully aware that, had JPMorgan realized

that it would be left with a large loan to LBI secured by inappropriate collateral, the Barclays

sale would have been jeopardized, thus putting LBHI and its unsecured creditors at risk. But it

was also clear to LBHI that Barclays had no obligation to purchase, and did not want to buy, all

the securities that JPMorgan was financing. Simply put, there was a basic flaw in the transac-

tion: Barclays' goals and JPMorgan's interests were in conflict, and each had the power to block

the transaction if not satisfied. Faced with these realities, senior LBHI executives tried to protect

the interests of LBHI and its creditors, as well as their own interests, by participating in a scheme

to mislead JPMorgan and stick it with the securities that Barclays did not want. In doing so, the

executives knew that they were causing JPMorgan to make loans secured by inappropriate col-

lateral that JPMorgan would not have made had it been aware of the true facts.

106.    Moreover, Ian Lowitt, Paolo Tonucci, Martin Kelly, Gerard Reilly, and James

Seery of LBHI — among other employees and executives of LBHI and employees of Lehman

acting at the direction of LBHI and in furtherance of LBHI's interests — were also personally

motivated to close the Barclays transaction.  At the same time that Lowitt, Tonucci, Kelly, Reilly, Seery and others were negotiating a sale of LBI's assets to Barclays, they were negotiating, or about to negotiate, employment agreements for themselves with Barclays.

107.    Thus, on September 18, the same day that LBI securities were transferred to Barclays, Lowitt signed a multimillion-dollar employment contract with Barclays, which was contingent on the Barclays deal closing.  Likewise, prior to closing, Barclays offered Tonucci a lucrative contract, which Tonucci accepted, but Tonucci knew at least as early as the morning of September 17 that he would "move over to Barclays."  Seery joined Barclays soon after the closing, where he was paid several million dollars despite having no specific responsibilities.  When, late in the week of September 15, it appeared to Lowitt that the Barclays deal might not close, Lowitt wrote to Tonucci that if that happened, "you and I are toast despite all our heroics."

108.    LBHI knew that its executives and employees, as well as LBI's employees, would personally benefit from consummation of the APA.  The APA required that eight senior Lehman executives — some of whom, including Lowitt, were employed by LBHI — and a substantial majority of approximately 200 designated key Lehman employees join Barclays.  And LBHI's board approved the APA in order to "save . . . many jobs."  Fully aware that LBHI's employees and executives would support a transaction with Barclays, LBHI's board recognized that "interested . . . employees [of LBHI and its subsidiaries] were involved in transaction negotiations on [their] behalf," and authorized these very employees to handle all aspects of the negotiation and implementation of the sale transaction, including LBI's financing.

109.    All of these LBHI executives, therefore, had a motive to facilitate a Barclays purchase and curry favor with Barclays, at the same time they were advancing the interests of LBHI and acting on its behalf, by deceiving JPMorgan and by aiding and abetting Barclays in deceiv-

ing JPMorgan.  Executives and employees of LBI were similarly motivated both to advance the interests of LBI by consummating the sale and to advance their own interests by currying favor with Barclays.

## FIRST CAUSE OF ACTION
### (Fraudulent Misrepresentation)

110.    The allegations of all of the preceding paragraphs are realleged and incorporated herein by reference.

111.    On September 17, 2008, LBHI made intentionally, or at least recklessly, false and misleading representations of material fact — and omitted material facts necessary to make the representations not misleading — to JPMorgan.  Among other things, LBHI represented in the Sale Motion and related filings:  (a) that the APA constituted an agreement between LBHI and Barclays accurately describing the sale transaction that the parties had agreed would take place upon Court approval; (b) that the securities defined in the APA as "Purchased Assets" were securities that Barclays had agreed to purchase and LBHI had agreed to sell and would require Barclays to purchase; and (c) that the only LBI securities that Barclays had not agreed to purchase, and that LBHI would permit Barclays not to purchase, were those defined in the APA as "Excluded Assets."  In addition, on September 16, 2008, Tonucci and Lowitt of LBHI made materially false and misleading representations to Buyers-Russo that persuaded Buyers-Russo that JPMorgan's loans to LBI would be repaid each night, either by Barclays or the Fed, until the sale transaction closed, at which point JPMorgan would be taken out in full.

112.    At the time LBHI executives made those representations, LBHI knew that it was making representations of material fact that were false and misleading, and made such false and misleading representations intentionally or with reckless indifference to the truth.  Executives at

- 48 -

LBHI knew at the time:  (a) that the APA was false when filed and subject to change in the most material ways, including with respect to the securities that would be purchased; (b) that Barclays had already conveyed to LBHI that it would not purchase certain securities in the triparty repo portfolio, including RACERS and other illiquid securities, even though they fell within the definition of "Purchased Assets"; (c) that LBHI had given Barclays the option to refuse to purchase significant portions of the $70 billion in securities defined as "Purchased Assets"; (d) that Barclays' overnight extensions of credit to LBI were entirely discretionary; and (e) accordingly, that it was up to Barclays to decide whether JPMorgan would be repaid in full on outstanding loans to LBI.  LBHI also knew on Wednesday, September 17, that LBI's triparty repo shells were being reconfigured to divert securities from the Fed's shell to Barclays' shell, and that LBHI, LBI, and Barclays personnel had been working together for several days to identify securities that Barclays would not purchase from LBI.

113.    LBHI's materially false and misleading statements were reasonably calculated to deceive, were made with the intent to deceive or with reckless indifference to the truth, and did in fact deceive JPMorgan to unwind LBI's overnight financings on the morning of September 18, to release margin, and to facilitate the transfer from LBI to Barclays of the securities that Barclays had chosen to purchase.  By filing its Sale Motion and failing to disclose the true status of the transactions contemplated by the Sale Motion, LBHI misled not only the Court, but also LBI's creditors, including, most notably, JPMorgan.  At the time of LBHI's Sale Motion and other misrepresentations and misleading statements, LBHI knew that JPMorgan was making vast discretionary intraday loans to LBI, secured by LBI's securities portfolio, which were necessary to keep LBI alive for long enough to effectuate either an orderly liquidation or a sale to Barclays.

114.    LBHI and its representatives were highly motivated to deceive JPMorgan. JPMorgan's extensions of credit to LBI were critical to any sale of LBI, without which LBHI would suffer "devastating" damage.  In addition, senior LBHI executives depended on the closing of the sale to Barclays to benefit from lucrative employment contracts with Barclays.  Had JPMorgan known that Barclays was not committed to purchase the "Purchased Assets" under the APA, it would not have unwound the Barclays triparty repo and other overnight financings on the morning of September 18.  Nor would JPMorgan have released margin valued at $5 billion to Barclays later that day.

115.    JPMorgan reasonably believed LBHI's misrepresentations to be true and justifiably relied upon them to its detriment.  Unaware of the contrary facts, JPMorgan had every reason to believe:  (a) that the Sale Motion and the APA, which were filed with this Court, accurately described the agreement between LBHI and Barclays; and (b) the representations made by LBHI and Barclays that upon consummation of the APA, and the transactions contemplated by the APA, JPMorgan's loans to LBI would be repaid in full.  Based on JPMorgan's reasonable understanding and expectation that Barclays had agreed to buy, and would buy, the securities that JPMorgan was financing, JPMorgan unwound LBI's overnight financings on the morning of September 18, 2008, including by advancing $15.8 billion at LBI's and Barclays' direction for Barclays' benefit, and agreed to release margin valued at $5 billion later that day, also at Barclays' request.

116.    As a direct and proximate result of LBHI's false and misleading statements, JPMorgan incurred over $25 billion in claims against LBHI's estate that it otherwise would not have incurred.  The collateral securing those claims included much of LBI's most illiquid, least

- 50 -

desirable securities, and in fact JPMorgan could not sell many of those securities to recover its claims against LBI.

117.    JPMorgan is entitled to administrative expense priority for damages in connection with LBHI's post-petition fraud.

## SECOND CAUSE OF ACTION
### (Fraudulent Concealment)

118.    The allegations of all of the preceding paragraphs are realleged and incorporated herein by reference.

119.    LBHI intentionally, or at least recklessly, failed to disclose and omitted material facts that it had a duty to disclose to JPMorgan.  LBHI also engaged in active concealment of material facts by taking actions designed to prevent, and which did prevent, the discovery of facts giving rise to JPMorgan's fraud claims; LBHI employed artifices to prevent JPMorgan from gaining knowledge of the facts; and LBHI made representations intended to avoid suspicion by JPMorgan and to prevent JPMorgan from making inquiry.

120.    LBHI failed to disclose, concealed and omitted material facts from JPMorgan, including: (a) that the APA, even upon signature, was inaccurate and subject to change in material ways, including with respect to the securities that Barclays had agreed to purchase and LBHI would require Barclays to purchase; (b) that notwithstanding the terms of the APA, LBHI had given Barclays the option, which it later exercised, to refuse to purchase significant portions of the $70 billion in securities included in the APA's definition of "Purchased Assets"; (c) that Barclays' overnight extensions of credit to LBI were entirely discretionary; (d) that Barclays had entered into the Takeout Agreement with the Fed; (e) that Lehman and Barclays had actively manipulated LBI's triparty repo shells on September 17, 2008 to divert unwanted securities from

the Fed's overnight shell to Barclays' shell; (f) that Barclays had reserved to itself the right to

decide, and in fact had decided prior to signing the APA, not to purchase certain securities, in-

cluding RACERS and other illiquid securities, that fell within the definition of "Purchased As-

sets; and (g) that Barclays had reserved to itself the right to decide, and in fact had decided prior

to the time that JPMorgan extended intraday financing to LBI on Thursday, September 18, 2008,

and prior to the time that JPMorgan agreed to release margin valued at $5 billion, not to purchase

certain securities, including RACERS and other illiquid securities, that fell within the definition

of "Purchased Assets."

121.    These facts were material.  Had JPMorgan known that Barclays was not required

to purchase the securities defined as the "Purchased Assets" in the APA, and instead could

cherry pick the securities it would purchase and seek to stick JPMorgan with LBI's least desir-

able securities, JPMorgan would not have extended credit to LBI to repay its overnight financ-

ings on the morning of September 18.  In particular, JPMorgan would not have unwound the

Barclays triparty repo on the morning of September 18 and would not have released margin val-

ued at approximately $5 billion to Barclays later that day.

122.    LBHI had a duty to disclose the concealed, undisclosed and omitted facts because

LBHI executives and employees, including Lowitt and Tonucci, made statements and representa-

tions — in court filings and directly to JPMorgan — that were false and misleading, and omitted

material facts necessary to make the statements made, in the light of the circumstances under

which they were made, not misleading; LBHI possessed superior knowledge and information

about the material facts that would have revealed that the statements and representations made to

JPMorgan were materially false and misleading; the material facts were not readily available to

JPMorgan, but instead were peculiarly within the knowledge of Barclays and LBHI; and LBHI

was on notice, and knew, that JPMorgan was justifiably relying upon the incomplete, false, and

misleading statements made by LBHI and that JPMorgan was acting under a mistaken belief that

those statements and representations were true and complete.

123.    LBHI's concealment, non-disclosure and omission of material facts were rea-

sonably calculated to deceive, intended to deceive or reckless, and did in fact deceive JPMorgan.

For the reasons described herein, LBHI and its representatives were highly motivated to deceive

JPMorgan and knew that JPMorgan would have declined to unwind LBI's overnight repos or

insisted that its intraday loans to LBI be satisfied in full, thereby imposing upon Barclays an ob-

ligation that it did not want to assume.

124.    JPMorgan justifiably relied to its detriment on LBHI's concealment, non-

disclosure and omission of material facts.  The facts that were concealed from JPMorgan were

within the peculiar knowledge of LBHI and were not readily ascertainable by JPMorgan.

125.    As a direct and proximate result of LBHI's concealment, non-disclosure and

omission of material facts, JPMorgan incurred over $25 billion in claims against LBHI's estate

that it otherwise would not have incurred.  The collateral securing those claims included much of

LBI's most illiquid, least desirable securities, and in fact JPMorgan could not sell many of those

securities to recover its claims against LBI.

126.    JPMorgan is entitled to administrative expense priority for damages in connection

with LBHI's post-petition fraud.

## THIRD CAUSE OF ACTION
### (Fraudulent Inducement to Lend)

127.    The allegations of all of the preceding paragraphs are realleged and incorporated herein by reference.

128.    On the morning of September 18, 2008, LBHI, through fraudulent schemes, artifices and devices, obtained from JPMorgan more than $70 billion in intraday loans for the benefit of LBI.  The loans were secured in part by a pool of difficult-to-value and illiquid securities. Later in the day, LBI paid back a portion of the intraday loan, and JPMorgan released the better-quality collateral to Barclays.  LBHI had previously led JPMorgan to believe, through materially false misrepresentations and fraudulent omissions, that Barclays had agreed to purchase, and would buy, the less desirable securities collateralizing the remainder of the loan.

129.    Unbeknownst to JPMorgan, LBHI knew that LBI would not and could not repay the full amount that LBI borrowed from JPMorgan on the morning of Thursday, September 18. Rather, when LBI obtained the $70 billion intraday loan from JPMorgan on September 18, LBHI knew, or recklessly disregarded:   (a) that LBI would be put into liquidation the next day; (b) that LBI lacked the ability to repay JPMorgan on its loans; (c) that Fed financing would not be available that evening; (d) that Barclays did not have the obligation to and did not want to purchase significant amounts of securities on LBI's balance sheet that Barclays considered to be "toxic" and that LBHI had called "goat poo" and "toxic racer crap"; and (e) that, on the evening of September 18, Barclays could and would decline to provide overnight financing to LBI on such securities.  In inducing JPMorgan to make an intraday loan to LBI on the morning of September 18, therefore, LBHI intended to, and did, induce JPMorgan to part with property on false pretenses, and with the intent that JPMorgan not recover that property.

130.    Further demonstrating LBHI's intent, LBHI's treasurer Paolo Tonucci instructed Lehman employees at 7:07 a.m. on September 18 to ensure that "RACERs . . . not be funded by Barclays" that evening.  Because no Fed financing would be available, Tonucci knew, and intended, that JPMorgan continue to finance certain securities, including RACERs, overnight on September 18 — and thus that LBI not repay its intraday loans to JPMorgan.

131.    JPMorgan would not have unwound LBI's overnight financings on the morning of September 18 had JPMorgan known that LBI did not intend to, and would not, repay the intraday loan in full.  Nor would JPMorgan have retained LBI's least desirable securities as collateral while releasing LBI's more liquid securities.

132.    As a direct and proximate result of LBHI's scheme to defraud, which was effectuated through, among other things, court filings, other representations by senior LBHI executives, and LBHI's failure to disclose facts known to it that were unknown (and not reasonably knowable) to JPMorgan, JPMorgan incurred over $25 billion in claims against LBHI's estate that it otherwise would not have incurred.  The collateral securing those claims included much of LBI's most illiquid, least desirable securities, and in fact JPMorgan could not sell many of those securities to recover its claims against LBI.

133.    JPMorgan is entitled to administrative expense priority for damages in connection with LBHI's post-petition fraud.

## FOURTH CAUSE OF ACTION
### (Aiding and Abetting LBI's Fraud)

134.    The allegations of all of the preceding paragraphs are realleged and incorporated herein by reference.

135.    On the morning of September 18, 2008, LBI, through fraudulent schemes, arti-

fices and devices, obtained from JPMorgan more than $70 billion in intraday loans for its bene-

fit.  The loans were secured in part by a pool of difficult-to-value and illiquid securities.  Later in

the day, LBI paid back a portion of the intraday loan, and JPMorgan released the better-quality

collateral to Barclays.  LBHI and LBI had previously led JPMorgan to believe, through materi-

ally false misrepresentations and fraudulent omissions, that Barclays had agreed to purchase, and

would purchase, all the securities subject to the triparty repo, including all the undesirable securi-

ties collateralizing the remainder of the loan.

136.    Unbeknownst to JPMorgan, LBI never intended to repay the full amount that it

borrowed from JPMorgan on the morning of Thursday, September 18.  Rather, when LBI ob-

tained the $70 billion intraday loan from JPMorgan on September 18, LBI knew, or recklessly

disregarded:   (a) that it would be put into liquidation the next day; (b) that it lacked the ability to

repay JPMorgan on its loans; (c) that Fed financing would not be available that evening; (d) that

Barclays was not obligated and did not intend to purchase significant amounts of securities on

LBI's balance sheet, including securities that Barclays considered to be "toxic" and that LBHI

had called "goat poo" and "toxic racer crap"; and (e) that, on the evening of September 18, Bar-

clays could and would decline to provide overnight financing to LBI on such securities.  In in-

ducing JPMorgan to make an intraday loan to LBI on the morning of September 18, therefore,

LBI intended to, and did, induce JPMorgan to part with property on false pretenses, and with the

intent that JPMorgan not recover that property.

137.    JPMorgan would not have unwound LBI's overnight financings on the morning

of September 18 had JPMorgan known that LBI had no intention to, and would not, repay the

intraday loan in full. Nor would JPMorgan have retained LBI's least desirable securities as col-
lateral while releasing LBI's more liquid securities.

138. As a direct and proximate result of LBI's fraud, which was effectuated through,
among other things, representations by LBI employees or representatives, or failure to disclose
facts known that were unknown (and not reasonably knowable) to JPMorgan, JPMorgan incurred
over $25 billion in claims against LBI's and LBHI's estates that it otherwise would not have in-
curred. The collateral securing those claims included much of LBI's most illiquid, least desir-
able securities, and in fact JPMorgan could not sell many of those securities to recover its claims
against LBI.

139. LBHI actually knew that LBI was perpetrating a fraud upon JPMorgan. On the
morning of September 18, LBHI knew that JPMorgan was extending credit to LBI on the mis-
taken belief — perpetuated by LBI's and LBHI's fraudulent schemes, artifices, and devices —
that the Barclays transaction would extinguish JPMorgan's exposure to LBI. LBHI also knew
that LBI had no intention of repaying JPMorgan in full on its intraday loan to LBI. Indeed,
LBHI's treasurer Paolo Tonucci instructed Lehman employees at 7:07 a.m. on September 18 to
ensure that "RACERs . . . not be funded by Barclays" that evening. Because no Fed financing
would be available, Tonucci knew, and intended, that JPMorgan continue to finance certain secu-
rities, including RACERs, overnight on September 18 — and thus that LBI not repay its intraday
loans to JPMorgan.

140. As alleged herein, LBHI provided LBI with substantial assistance in perpetrating
a fraud upon JPMorgan. Among other things, LBHI induced JPMorgan to extend credit to LBI
on September 18 by filing the Sale Motion and the APA, which misrepresented the agreement
between LBHI and Barclays as alleged herein. Further, Lowitt and Tonucci told JPMorgan's

Buyers-Russo on September 16 that Barclays would fully support LBI until the Barclays transaction closed, at which point Barclays would acquire all the securities on LBI's triparty book. Moreover, LBHI executives and employees assisted LBI personnel to identify more desirable securities for transfer to Barclays, ensuring that the most illiquid and difficult-to-value LBI collateral would remain behind with JPMorgan. Without LBHI's assistance, LBI would not have been able to accomplish its fraud on JPMorgan.

141.    JPMorgan is entitled to administrative expense priority for damages in connection with LBHI's post-petition aiding and abetting of fraud.

### FIFTH CAUSE OF ACTION
#### (Aiding and Abetting Barclays' Fraud)

142.    The allegations of all of the preceding paragraphs are realleged and incorporated herein by reference.

143.    LBHI aided and abetted Barclays in perpetrating a fraud on JPMorgan. On multiple occasions prior to JPMorgan's unwind of LBI's overnight financings on the morning of Thursday, September 18, and the release of margin valued at $5 billion, Barclays affirmatively misrepresented, and failed to disclose, material facts to JPMorgan concerning its purchase of assets from LBHI and LBI. Among other things:

A.    LaRocca of Barclays told Miller of JPMorgan on Tuesday, September 16 that Barclays had agreed to, and would, purchase the entire LBI repo book, and failed to disclose Barclays' actual plans and agreements relating to the sale transaction.

B.    Barclays entered into the APA knowing that the APA did not accurately set forth its agreement with LBHI and LBI, that LBHI would file the false and misleading APA with the Court, and that the Court and JPMorgan would rely on it.

C.    During a conference call during the evening of Wednesday, September 17 among Stancil, Ciciola and Corral of JPMorgan, Petrie, Rode-

feld and others from Barclays, and Lehman representatives, the Barclays representatives stated that Barclays, in addition to purchasing the securities that were financed by the Fed, would continue to finance whatever securities remained at LBI after the purchase of the Fed position, even though Barclays, LBHI, and LBI knew that Barclays had not agreed to do so. They also failed to disclose Barclays' actual plans and agreements relating to the sale transaction.

D.    At around 9:00 p.m. on Wednesday, September 17, LaRocca of Barclays and Certosimo of Bank of New York called Buyers-Russo of JPMorgan and told her again that, as a result of the Barclays/LBHI/LBI transaction, JPMorgan would have no clearance exposure to LBI by the end of Thursday, September 18 — although LaRocca knew otherwise.

E.    At around 6 p.m. on Thursday, September 18, Diamond of Barclays, through affirmative statements and material omissions, persuaded JPMorgan that, by the end of Thursday, JPMorgan's triparty exposure to LBI would be extinguished and, at the conclusion of the transaction, JPMorgan would not have further exposure to LBI — although Diamond knew that Barclays had not agreed to, and would not, purchase all securities on LBI's triparty book.

144.    Barclays knew that it was making representations of material fact that were false and misleading, and made such false and misleading representations, and omitted to disclose material facts, intentionally or with reckless indifference to the truth. On September 17, before representing to JPMorgan that its exposure to LBI would be extinguished in full, Barclays had already taken steps, with the aid of LBHI and LBI, to ensure that LBI's lower-quality securities were moved from the Fed portfolio, which Barclays had committed to purchase under the Takeout Agreement, to Barclays' own overnight portfolio. And on September 18, when Diamond induced JPMorgan to release margin valued at $5 billion on the basis that JPMorgan's exposure would be entirely extinguished, Diamond knew that Barclays had not agreed to, and would not, purchase large portions of the securities that JPMorgan was financing.

145.    Barclays' materially false and misleading statements were reasonably calculated to deceive, were made with the intent to deceive or with reckless indifference to the truth, and

did in fact deceive JPMorgan.  Barclays wished to purchase LBI as a going concern at a favor-able price.  To do so, Barclays needed LBI to remain in business until the transaction was com-plete — and for that, JPMorgan's financing was essential.  At the same time, Barclays wished to avoid purchasing the illiquid, never-traded, difficult-to-value securities on LBI's balance sheet. The materially false and misleading statements made to JPMorgan, on which Barclays knew JPMorgan would rely, were designed to accomplish these goals by deceiving JPMorgan into con-tinuing to extend credit to LBI, to release margin, and to transfer LBI's higher-quality securities to Bank of New York, Barclays' clearing bank.

146.    JPMorgan reasonably believed Barclays' misrepresentations to be true and, un-aware of Barclay's true agreements and intentions, justifiably relied upon them.  With the justifi-able expectation that Barclays had agreed to, and would, purchase all of LBI's trading assets, and thus provide LBI with cash sufficient to repay JPMorgan's clearance-related exposure, JPMor-gan unwound LBI's overnight financings on the morning of Thursday, September 18, 2008 and agreed to release margin valued at $5 billion to Barclays later that day.  Had JPMorgan known that Barclays was not committed to purchase all of the securities defined in the APA as "Pur-chased Assets," it would not have unwound the Barclays triparty repo and other overnight fi-nancings on the morning of September 18.  Nor would JPMorgan have released margin valued at $5 billion to Barclays later that day.

147.    Barclays had a duty to disclose the concealed, undisclosed and omitted facts be-cause Barclays made statements and representations — directly to JPMorgan — that were false and misleading, and omitted material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; Barclays possessed superior knowledge and information about the material facts that would have revealed that the statements

and representations made to JPMorgan were materially false and misleading; the material facts were not readily available to JPMorgan, but instead were peculiarly within the knowledge of Barclays and LBHI; and Barclays was on notice, and knew, that JPMorgan was justifiably relying upon the incomplete, false, and misleading statements made by Barclays and that JPMorgan was acting under a mistaken belief that those statements and representations were true and complete.

148.    As a direct and proximate result of Barclays' false and misleading statements, Barclays' material omissions, and LBHI's aiding and abetting of Barclays' fraud, JPMorgan incurred over $25 billion in claims against LBHI's estate that it otherwise would not have incurred. The collateral securing those claims included much of LBI's most illiquid, least desirable securities, and in fact JPMorgan could not sell much of it to repay all of its claims against LBI.

149.    LBHI actually knew that Barclays was perpetrating a fraud upon JPMorgan. On the morning of September 18, LBHI knew that JPMorgan was extending credit to LBI on the mistaken belief, perpetuated by Barclays, that Barclays had agreed to, and would, purchase all of the securities that JPMorgan was financing. LBHI also knew that Barclays had caused that mistaken but justifiable belief by representing to JPMorgan that, among other things, the Barclays repo from Wednesday night would be renewed on Thursday night and by failing to disclose that Barclays had not agreed to, and would not, purchase all of LBI's triparty book. Nor did LBHI disclose that Barclays intended to, and would, leave JPMorgan with LBI's least desirable securities.

150.    LBHI provided Barclays with substantial assistance in perpetrating a fraud upon JPMorgan. Among other things, LBHI filed the Sale Motion and the APA, which misrepresented the agreement between LBHI and Barclays and induced JPMorgan to extend credit to LBI

on September 17 and 18.  LBHI representatives helped Barclays identify undesirable securities in

LBI's triparty repo book; Lehman manipulated the repo shells on Wednesday, September 17 to

ensure that Barclays could cherry pick LBI's best securities; and Lehman personnel, including

senior LBHI executives, took numerous steps to ensure that only the securities Barclays wanted

were actually transferred to Barclays on September 18.  Without LBHI's substantial assistance,

Barclays would not have been able to accomplish its fraud on JPMorgan.

151.    JPMorgan is entitled to administrative expense priority for damages in connection

with LBHI's post-petition aiding and abetting of fraud.

## SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

152.    The allegations of all of the preceding paragraphs are realleged and incorporated

herein by reference.

153.    In the Rule 60(b) proceeding presently before this Court, LBHI alleges that, on

September 18, 2008, Barclays wrongfully obtained approximately $5 billion from the LBI estate

by purchasing roughly $50 billion of collateral in exchange for $45 billion in cash.  This $5 bil-

lion is the same $5 billion of margin value that LBI, LBHI and Barclays caused JPMorgan to re-

lease on September 18 through their deception.  Immediately prior to its release, the $5 billion

margin at issue was subject to a lien in favor of JPMorgan.  Had LBHI and Barclays not wrong-

fully obtained the release of that margin from JPMorgan through misrepresentations and omis-

sions relating to the terms of the sale transaction, JPMorgan would have been able to use the

margin to satisfy some of the exposure to LBI that resulted from LBHI's and Barclays' miscon-

duct.  Accordingly, if LBHI is able to recover from Barclays in the Rule 60(b) proceeding, the

recovered property will be traceable to margin that secured JPMorgan's loan to LBI — the re-lease of which LBHI and Barclays wrongfully obtained.

154.    LBHI would be unjustly enriched if it were allowed to keep any portion of the ap-proximately $5 billion in margin that JPMorgan released to Barclays on September 18.

155.    In the event that, on account of LBHI prevailing on claims asserted against JPMorgan, JPMorgan's loans to LBI are not satisfied in full, equity and good conscience will demand a return of money and/or the imposition of a constructive trust to remedy LBHI's unjust enrichment.

**SEVENTH CAUSE OF ACTION**
**(Indemnification under the Clearance Agreement)**

156.    The allegations of all of the preceding paragraphs are realleged and incorporated herein by reference.

157.    Section 16 of the Clearance Agreement, entitled "Indemnification," provides in relevant part:  "Except where we [JPMorgan] are negligent or have engaged in willful miscon-duct, or have breached this Agreement for reasons other than those listed in Section 12 hereof, you will indemnify us and hold us harmless against any and all losses, claims, damages, liabili-ties or actions to which we may become subject, and reimburse us for any expenses (including reasonable attorneys' fees and expenses) incurred by us in connection therewith, insofar as such losses, claims, damages, liabilities or actions arise out of or are based upon or are in any way re-lated to this Agreement.  Without limiting the generality of the foregoing indemnification, we shall be indemnified for all reasonable costs and expenses, including reasonable attorneys' fees, for our successful defense against claims by you that we were negligent or engaged in willful misconduct."

158.    Under an Amendment to the Clearance Agreement between JPMorgan and LBHI dated as of August 26, 2008, LBHI is a party to the Clearance Agreement, including the indemnification provision therein.

159.    Under the August and September guaranties executed by LBHI in favor of JPMorgan, LBHI guaranteed payment of all obligations and liabilities to JPMorgan under the Clearance Agreement of all LBHI subsidiaries.

160.    Under the Security Agreement between LBHI and JPMorgan dated as of August 26, 2008 (the "August Security Agreement"), and under the Security Agreement between the parties dated as of September 9, 2008 (the "September Security Agreement"), JPMorgan has a lien on certain of LBHI's accounts at JPMorgan, the assets contained therein, and the proceeds thereof, as security for payment of LBHI's obligations under the August and September Guaranties and the Clearance Agreement, as well as all the obligations of LBHI's subsidiaries.

161.    On September 15, 2010, LBHI filed the First Amended Complaint in this adversary proceeding, seeking, among other things, the return of collateral that was delivered to JPMorgan in September 2008 to secure payment of LBHI's guaranty of its subsidiaries' obligations under the Clearance Agreement.  The First Amended Complaint further seeks to hold JPMorgan liable for actions and omissions it allegedly took in its role as clearing bank for LBHI and LBI pursuant to the Clearance Agreement, including JPMorgan's requests for collateral to secure loans that it made, both before and after LBHI's bankruptcy filing, under Section 5 and Section 9 of the Clearance Agreement.  The First Amended Complaint also seeks the return of the collateral posted to JPMorgan that secured loans made to LBI under Section 5 and Section 9 of the Clearance Agreement.

162.    If JPMorgan is unable to recover the full amount of any of its loans to LBI, or otherwise is required to pay damages to the Lehman estates, JPMorgan will have suffered losses — caused by LBHI's misconduct relating to the sale transaction with Barclays, and through no fault of JPMorgan — that "arise out of," are "based upon" and are "related to" the Clearance Agreement.

163.    LBHI is obligated to indemnify JPMorgan and hold JPMorgan harmless against any and all losses, claims, damages, liabilities or actions to which it has subjected JPMorgan, and to reimburse JPMorgan for all expenses, including attorneys' fees and expenses, incurred by JPMorgan in connection therewith.

164.    JPMorgan's claims against LBHI for indemnification are secured by liens on LBHI's accounts at JPMorgan, which liens were granted to JPMorgan pursuant to the August and September Security Agreements.

**EIGHTH CAUSE OF ACTION**
**(Indemnification under the Custodial Undertaking)**

165.    The allegations of all of the preceding paragraphs are realleged and incorporated herein by reference.

166.    On September 15, 2008, JPMorgan (as "Bank"), LBI (as "Seller"), and Barclays (as "Buyer") entered into the "Custodial Undertaking." The first "whereas" clause of the Custodial Undertaking notes that Barclays and LBI "have entered into a Master Repurchase Agreement (the 'Repurchase Agreement') dated December 19, 1996." The second "whereas" clause explains that "Buyer and Seller have requested that Bank undertake certain agency and custodial functions in connection with the Repurchase Agreement." The Custodial Undertaking specified the functions JPMorgan agreed to undertake.

167.    Paragraph 9 of the Custodial Undertaking, captioned "Indemnification," provides in relevant part:  "Seller and Buyer hereby agree, jointly and severally, to indemnify Bank for, and hold it harmless against, any loss, liability or expense in connection with, arising out of or in any way related to this Agreement or the Repurchase Agreement, or any action or omission by Bank in connection with this Agreement, including the reasonable costs, expenses and fees of attorneys chosen by Bank incurred in defending any claim of such liability, except that Seller and Buyer shall not be liable for any loss, liability or expense to the extent that it is determined to be the direct result of acts or omissions on the part of Bank constituting negligence or willful mis-conduct.  Notwithstanding the foregoing, Bank shall be absolutely indemnified by each other party for, and held harmless against, any loss, liability or expense (including the reasonable costs, expenses and fees of attorneys chosen by Bank incurred in defending any claim of such liability) incurred as a result of complying with the instructions of Buyer or Seller, including without limitation any such compliance which constitutes or is alleged to constitute a violation of the rights of any party or a violation of an injunction, stay, order or law."

168.    During the week of September 15, 2008, the repo transactions between Barclays and LBI were effectuated under the Repurchase Agreement at the instructions of LBI and Bar-clays.  Moreover, each repo transaction required the agency and custodial services of JPMorgan pursuant to the Custodial Undertaking.  LBI instructed JPMorgan to unwind the repo transaction between Barclays and LBI on the morning of September 18, 2008, which resulted in JPMorgan advancing approximately $15.8 billion to LBI pursuant to the Clearance Agreement.  JPMorgan was also acting on LBI's instructions when it unwound the overnight repos throughout the week of September 15.

169.    If JPMorgan is unable to recover the full amount of any of its loans to LBI, or otherwise is required to pay damages to the LBHI and/or LBI estates, JPMorgan will have suffered losses — caused by LBHI's misconduct relating to the sale transaction with Barclays, and through no fault of JPMorgan — "in connection with, arising out of or in any way related to th[e] [Custodial Undertaking] or the Repurchase Agreement."  For the reasons set forth herein, moreover, the "loss" will have been occasioned "as a result of [JPMorgan] complying with the instructions of Buyer or Seller."

170.    In defending against the First Amended Complaint and prosecuting these Counterclaims, JPMorgan has incurred, and will continue to incur, "expense[s] in connection with, arising out of or in any way related to th[e] [Custodial Undertaking] or the Repurchase Agreement" and "as a result of complying with the instructions of Buyer or Seller."

171.    LBI, as Seller, is therefore obligated under the Custodial Undertaking to indemnify JPMorgan and hold JPMorgan harmless against any and all losses, claims, damages, liabilities or actions to which it and Barclays have subjected JPMorgan, and to reimburse JPMorgan for all expenses, including attorneys' fees and expenses, incurred by JPMorgan in connection therewith.

172.    Under the September Guaranty, LBHI guaranteed payment of all obligations and liabilities of its subsidiaries, including LBI, to JPMorgan.  Under the September Security Agreement, LBHI's guaranty is secured by liens on LBHI's accounts at JPMorgan.

## PRAYER FOR RELIEF

WHEREFORE, Defendant and Counterclaimant JPMorgan prays as follows:

i.    For damages in an amount to be determined at trial;

ii.       For costs and expenses of this action, including expert and attorneys' fees;

iii.      For a declaration that JPMorgan is entitled to any amounts unjustly obtained as a result of JPMorgan's financing of LBI, including any amounts recovered by LBHI from Barclays in the Rule 60(b) proceeding;

iv.      For a declaration and order requiring LBHI to indemnify JPMorgan for the losses, claims, damages, liabilities or actions to which it has subjected JPMorgan, and to reimburse JPMorgan for all expenses incurred in connection therewith.

v.      For interest at the legal rate; and

vi.      For such other and further relief as this Court may deem just and proper.


Dated:  February 17, 2011
       New York, New York

*Of Counsel:*

Harold S. Novikoff
Marc Wolinsky
Amy R. Wolf
Douglas K. Mayer
Ian Boczko
Emil A. Kleinhaus
Alexander B. Lees
S. Christopher Szczerban
Vincent G. Levy

WACHTELL, LIPTON, ROSEN & KATZ

By: /s/ Paul Vizcarrondo, Jr.
     Paul Vizcarrondo, Jr.

51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000

*Attorneys for Defendant and Counterclaimant
JPMorgan Chase Bank, N.A.*