Page 1

1   UNITED STATES BANKRUPTCY COURT

2   FOR THE SOUTHERN DISTRICT OF NEW YORK

3   Case No. 09-14884 (JMP) (Jointly Administered)

4   - - - - - - - - - - - - - - - - - - - - -x

5   In Re:

6   LEHMAN BROTHERS HOLDINGS, INC., et al.

7   (Main Case 08-13555)

8   - - - - - - - - - - - - - - - - - - - - -x

9   D. GEOFFREY HUNTER and DAN SCHWARZMANN, as

10   Joint P and Lehman Brothers Finance AG, in

11   Liquidation

12

13            Debtors.

14   - - - - - - - - - - - - - - - - - - - - -x

15            United States Bankruptcy Court

16            One Bowling Green, Room 602

17            New York, New York, 10004-1408

18

19            March 21, 2012

20            10:04 AM

21

22   B E F O R E:

23   HON. JAMES M. PECK

24   U.S. BANKRUPTCY JUDGE

25   ECR OPERATOR: EMMANUEL

Page 2

1

2    Motion Filed by the Joint Provisional Liquidators of Lehman RE

3    Ltd. For Authorization and Approval of the Settlement Between

4    Lehman RE Ltd. And the Lehman U.S. Debtors.

5

6    Motion Filed by the Debtors' for Approval of a Settlement

7    Agreement with Lehman RE Ltd and Certain Other Parties.

8

9    Motion of Lehman Brothers Holdings Inc. For Authority to Use

10   Non-Cash Assets in Lieu of Available Cash as Reserves for

11   Disputed Claims Pursuant to Section 8.4 of the Debtors

12   Confirmed Joint Chapter 11 Plan [ECF No. 24726].

13

14   Motion of the Joint Provisional Liquidators of Lehman RE Ltd.

15   For Authorization and Approval of the Settlement Between Lehman

16   RE Ltd. And the Lehman U.S. Debtors [ECF No. 130].

17

18   Michigan State Housing Development Authority v. Lehman Brothers

19   Derivative Products Inc., et al. [Adversary Proceeding No. 09-

20   01728].

21

22   Turnberry Centra Sub, LLC et al. v. Lehman Brothers Holdings

23   Inc. [Adversary Case No. 09-01062].

24

25   Lehman Brothers Holdings Inc. v. Fontainebleau Resorts, LLC, et

1   al. [Adversary Case No. 10-02821].

2

3   Lehman Brothers Holdings Inc. v. Fontainebleau Resorts, LLC, et

4   al. [Adversary Case No. 10-02823].

5

6   Motion of Fidelity National Title Insurance Company to Compel

7   Compliance with Requirements of Title Insurance Policies [ECF

8   No. 11513].

9

10   Motion of Giants Stadium LLC for Leave to Conduct Discovery of

11   the Debtors Pursuant to Federal Rule of Bankruptcy Procedure

12   2004 (ECF No. 16016].

13

14   Motion of Monti Family Holding Company, Ltd for Leave to

15   Conduct Rule 2004 Discovery of Debtor Lehman Brothers Holding,

16   Inc. and Other Entities [ECF No. 16803].

17

18   Motion of Jason T. Taylor for Relief from the Automatic Stay

19   [ECF No. 14377].

20

21   Motion of Phillip Walsh for Relief from the Automatic Stay [ECF

22   No. 14571].

23

24   Amended Motion of Ironbridge Homes, LLC, et al. for Relief from

25   the Automatic Stay [ECF No. 23551].

Page 4

1

2    Motion of Edward J. Agnostini, et al. for Relief from the

3    Automatic Stay [ECF No. 24769].

4

5    Belmont Park Investments Pty Ltd., et al. v. Lehman Brothers

6    Special Financing Inc., et al. [Adversary Proceeding No. 12-

7    01045].

8

9    Lehman Brothers Holdings Inc., et al. v. Citibank, N.A., et al.

10   [Adversary proceeding No. 12-01044].

11

12   Cardinal Investment Sub I, L.P. and Oak Hill Strategic

13   Partners, L.P.'s Motion for Limited Intervention in the

14   Contested Matter Concerning the Trustee's Determination of

15   Certain Claims of Lehman Brothers Holding Inc. and Certain of

16   Its Affiliates [LBI Docket No. 4634].

17

18   Motion to Compel Compliance with Subpoena Duces Tecum [ECF No.

19   24602].

20

21

22

23

24

25   Transcribed by:  Donald Cohen

Page 5

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES LLP

3          Counsel for the Lehman Brothers Holdings Inc. and Certain

4    of its Affiliates

5          767 Fifth Avenue

6          New York, NY  10153

7

8    BY:   MAURICE HORWITZ, ESQ.

9          RICHARD K. KRASNOW

10         RICHARD W. SLACK, ESQ.

11

12

13   WEIL, GOTSHAL & MANGES LLP

14         Counsel for the Lehman Brothers Holdings Inc. and Certain

15   of its Affiliates

16         1395 Brickell Avenue, Suite 1200

17         Miami, FL  33131-3368

18

19   BY:   EDWARD R. MCCARTHY, ESQ.

20

21

22

23

24

25

Page 6

1    CADWALADER, WICKERSHAM & TAFT LLP

2         Counsel for the Joint Provisional Liquidators

3    of Lehman RE

4         Dashwood House

5         69 Old Broad Street, London, EC2M 1QS

6

7    BY:   GREGORY M. PETRICK, ESQ.

8

9

10   WILMER CUTLER PICKERING HALE AND DORR LLP

11        Counsel for Michigan State Housing and Development

12   Authority

13        1875 Pennsylvania Avenue, N.W.

14        Washington, D.C.   20006

15

16   BY:  LISA E. EWART, ESQ.

17

18

19   MEISTER SEELIG & FEIN LLP

20        Counsel for Non-Debtor Entities

21        2 Grand Central Tower

22        140 East 45th Street, 19th Floor

23        New York, NY   10017

24

25   BY:  CHRISTOPHER J. MAJOR, ESQ.

Page 7

1                    P R O C E E D I N G S

2            THE COURT:   Be seated, please.  Good morning.

3            MR. HORWITZ:   Good morning, Your Honor.  Maurice

4    Horowitz, Weil, Gotshal & Manges for the debtors.

5            The first item on today's agenda is the motion of the

6    debtors seeking authorization to enter into a settlement

7    agreement between, on the one hand, the debtors and two of

8    their non-debtor affiliates, Lehman Ali Inc. and Appalachian

9    Asset Management Corp, and on the other hand, Lehman RE

10   Limited, the debtors' Bermuda affiliate, its subsidiary,

11   Congress Life Insurance Company, and Pulsar RE Limited, which

12   is one of Lehman RE's creditors.  Lehman RE has filed a

13   concurrent motion in its Chapter 15 case, which is item 3 on

14   today's agenda.  Given that the two motions deal with the same

15   transaction we would propose that we address those two

16   concurrently as well.

17           THE COURT:   That's sensible.

18           MR. HORWITZ:   Okay.  The settlement agreement is the

19   product of more than two years of extensive negotiations

20   between the parties.  It resolves in particular two claims that

21   were the subject of likely litigation.  One is Lehman RE's

22   claim against LBHI, which is based on the net worth maintenance

23   agreement between Lehman RE and LBHI dated October 26, 2007,

24   and Lehman RE's claim against LCPI based on a master repurchase

25   agreement between, among other parties, Lehman RE and LCPI

Page 8

1     dated July 9, 1999.

2          Pursuant to the settlement agreement, Lehman RE will

3     have an allowed unsecured affiliate claim against LBHI in the

4     amount of $450 million, and LC -- Lehman RE will have a claim

5     against LCPI in the amount of $490 million based on the MRA.

6     The resolution of these two claims alone, Your Honor, has

7     resulted in a reduction of Lehman RE's claims against the

8     debtors from $2.3 billion to $1 billion in allowed claims.

9          In light of the multitude of legal issues attendant

10    to these claims, all of which are set forth in detail in our

11    papers and in the declarations of Mr. Daniel Ehrmann and

12    Jeffrey Fitts, both of whom are present in the Courtroom, the

13    debtors have concluded that these amounts represent a fair and

14    reasonable compromise of Lehman RE's claims against LBHI and

15    LCPI and adequately reflect the obligations of these debtors to

16    Lehman RE.

17         The settlement also fixes and allows Lehman RE's

18    claims against two other debtors, LBCC and LBSF.  The claim

19    against LBCC is based on certain foreign exchange transactions.

20    That claim will be allowed as an unsecured affiliate claim in

21    the amount of 86 -- $87.6 million and the claim against LBSF,

22    which is based on swap transactions based on an ISDA Master

23    Agreement will be allowed as an unsecured claim in the amount

24    of approximately $25.4 million.  Your Honor, unlike the claims

25    against LBHI, these two claims were not controversial claims,

1    but they are, nevertheless, the result of two years of

2    extensive reconciliation of the debtors' books and records with

3    Lehman RE's books and records.

4         The settlement also resolves a dispute which is

5    described in the motion concerning the allocation of certain

6    tax benefits and liabilities among the debtors, Lehman RE and

7    Congress Life.  To resolve the dispute the parties have agreed

8    that Lehman RE, on its behalf and on behalf of Congress Life,

9    will have the right to utilize up to $150 million of net

10   operating losses incurred by LBHI and LCPI, provided that, for

11   2008 onward, Lehman RE and Congress Life abide by the terms of

12   the debtor allocation agreement that is incorporated into the

13   plan.  This agreement among other things, deals with the

14   allocation of commonly held tax benefits and liabilities among

15   the debtors.

16        The NOLs that Lehman RE and Congress Life will be

17   entitled to constitute approximately less than half of one-

18   percent of the NOLs that are available to the debtors.  As

19   such, as stated in the motion, the debtors do not believe that

20   this reallocation of NOLs will have any detrimental effect on

21   them.

22        In addition to mutual releases between the parties,

23   the settlement agreement contains a mutual release between the

24   Lehman U.S. parties and Pulsar RE Limited and provides for the

25   elimination of certain litigation that has been commenced by

1    Pulsar RE against LBHI and LCPI.

2              Finally, Your Honor, pursuant to the settlement

3    agreement LCPI has agreed to purchase certain loans from Lehman

4    RE with an aggregate principal balance -- outstanding principal

5    balance of approximately $313 million, free and clear of all

6    liens, claims, and encumbrances for an aggregate purchase price

7    of $32 million.  As stated in the motion these loans are among

8    the loans that LCPI originally sold to Lehman RE pursuant to

9    the master repurchase agreement and therefore had been

10   carefully analyzed by LCPI in connection with determining

11   Lehman RE's claim against LCPI.  The price that LCPI has agreed

12   to pay for these loans is based on this analysis and in LCPI's

13   business judgment represents a fair price, particularly when

14   combined with the favorable resolution of Lehman RE's claim

15   against LCPI.  Moreover, Your Honor, LCPI is essentially a

16   strategic purchaser of these loans in the sense that it is

17   already invested in the capital structure of the assets that

18   underlie many of these loans.  For this reason, if LCPI has

19   the opportunity to manage these loans it believes it will

20   realize a substantial profit from a proactive management of the

21   loans.

22             Your Honor, the creditors' committee has filed a

23   statement in support of the motion.  In addition there have

24   been no objections filed to the motion.  I would also note that

25   one of the conditions precedent to the effectiveness of the

1       settlement agreement was the approval -- or is the approval of

2       the settlement agreement by the Bermuda Court that oversees

3       Lehman RE's provisional liquidation.  That order has been

4       entered and was attached to Lehman RE's papers.  In light of

5       these developments the debtors in Lehman Re filed on Monday a

6       revised proposed order that includes a waiver of the 14-day

7       stay required by Bankruptcy Rule 6004(h) to enable the parties

8       to proceed to closing if this Court approves the settlement.

9               Unless Your Honor has any questions, the debtors

10      request entry of the order approving the motion.

11              THE COURT:   Just a few questions.

12              This is obviously a comprehensive and integrated

13      settlement.  Are there any open issues that have not been

14      resolved between the parties by virtue of this settlement

15      agreement?  In other words, is anything left over?

16              MR. HORWITZ:   Between Lehman RE and the debtors

17      there are no more open issues.  The -- and all the other issues

18      between the other parties to the settlement, the non-debtors

19      and Lehman RE's subsidiaries are mostly resolved.  The only

20      unresolved -- the only matters that have not been resolved by

21      this settlement are any claims that Pulsar RE's affiliates may

22      have against the debtors.  Those have been carved out of the

23      settlement, and the debtors -- any defenses and claims that the

24      debtors may have against those affiliates are carved out.  It

25      didn't need to be in the motion -- I mean the settlement, but

Page 12

1    that has not been resolved by the settlement.

2              THE COURT:   All right.

3              And I'm just going to ask what is really a

4    theoretical question that came up in the context of another

5    settlement in which I had Chapter 11 debtors on one side and a

6    Chapter 15 entity on the other side -- that was Lehman Brothers

7    Bankhaus.  And I recognize that there are differences between

8    the Bankhaus settlement and the comprehensive settlement that

9    we have here, but I would like a showing that this is, in fact,

10   good for both sides.

11             MR. HORWITZ:   As in -- well, both declarants are

12   present in the Courtroom today and can the questions --

13             THE COURT:   Then I can probably draw that reasonable

14   inference because both Lehman and Lehman RE are moving jointly

15   at the same hearing for approval of a settlement, and Lehman

16   RE's part of the transaction has already been approved by the

17   Bermuda Court.  It almost speaks for itself, but from a

18   business perspective it would be useful for me to hear how this

19   actually works out well for both sides of the transaction.

20             MR. HORWITZ:   Your Honor, is your question directed

21   at the purchase that -- LCPS purchase of the loans from Lehman

22   RE or at the settlement of the claims between the debtors and

23   Lehman RE?

24             THE COURT:   It's not parsed; it relates to the

25   entirety of the transaction that's presented because I view it

1    as an integrated transaction.  If it should be more properly

2    viewed in parts, I can view it in parts.  Up to you.

3              MR. HORWITZ:   I can address the purchase of the

4    loans first, because that is a very similar situation to the

5    purchase that the Court alluded to, the purchase of loans from

6    Bankhaus, which was also between two debtors.

7              THE COURT:   Right.

8              MR. HORWITZ:   Just like in that settlement, in this

9    case these are loans that are of greater value to LCPI than to

10   Lehman RE because of LCPI's -- the strategic benefits that LCPI

11   will get from the loans.  So the price that has been agreed to

12   is a price that both sides believe is a fair price for the

13   loans, but LCPI believes that its -- it will have the ability

14   to maximize the value of those loans better than Lehman RE

15   does.

16             The purchase -- the price that was agreed to for

17   those loans was related to the claim that LCPI has agreed to

18   with Lehman RE.  So it wouldn't necessarily have been the same

19   claim amount that was agreed to if LCPI did not have the

20   ability to purchase these loans for this price.

21             THE COURT:   All right.

22             MR. HORWITZ:   In terms of the net worth maintenance

23   agreement that the --

24             THE COURT:   Will the senior partner who's jumping

25   down your back wants to say something either to you or to me.

1          MR. KRASNOW:   One thing to put in context, Your

2     Honor, is that there is a significant difference since I was

3     more involved with the Bankhaus, which your Honor was alluding

4     to -- it's Richard Krasnow from Weil, Gotshal & Manges -- is

5     unlike the Bankhaus settlement, while the purchase of these

6     assets does have an impact with respect to the claims, just by

7     looking at the numbers of attendant to the claims that are

8     being allowed here and the purchase price, while it is an

9     integrated settlement, clearly and it's all in one agreement,

10    the purchase of the assets, while a component of the claims,

11    are really a relatively minor component of the claims as is

12    reflected by the fact the purchase price is $30 million and the

13    claims that are allowed with respect to LCPI and LBHI are over

14    $400 million each.

15          So, they are integrated, they are related, there is

16    an impact on those allowed claims vis a vis the purchase of the

17    assets, but it is not as material as it was in the Bankhaus

18    scenario, where that was -- played a very significant role in

19    calculating the claim.  That's the only thing I wanted to --

20          THE COURT:  Correct

21          MR. KRASNOW:  -- help Mr. Horowitz, on that one

22    aspect.

23          THE COURT:  It was a -- that was an elegant

24    interruption.

25          MR. KRASNOW:   Thank you, Your Honor.

1          MR. HORWITZ:   The other two -- the other major claim

2     that's being settled by this settlement agreement, the claim

3     that arises from the net worth maintenance agreement is a claim

4     that would have been subject of very uncertain, very

5     protracted, extensive fact-intensive litigation between the

6     parties, and neither party really preferred to engage in that -

7     - or go down that road.   Part of it -- even though the

8     agreement itself is not an uncommon agreement in Bermuda -- at

9     least that's my understanding -- the application of the

10    agreement in these circumstances, which by any measure are not

11    typical, where both parties are in bankruptcy and where the

12    insurance company, while it has a balance sheet, has not yet

13    called for claims in its own case, would have raised issues

14    under Bermuda law and under U.S. law that would have required

15    extensive litigation.   Both parties consulted extensively with

16    their Bermuda counsel and have reached the claim amount that

17    they have agreed to, in part based on an assessment of the

18    legal risks and in part through two years of negotiations over

19    what Lehman RE's true liabilities are in these circumstances.

20         THE COURT:   I'm satisfied by what you've said that

21    this is a transaction that from the debtors' perspective is,

22    not only integrated but beneficial.   I'd be interested in

23    hearing a comparable showing from counsel on behalf of the

24    foreign representative of Lehman RE.   Mr. Petrick, are you

25    prepared for that?

Page 16

1          MR. PETRICK:   Yes, Your Honor.

2          Good morning, Your Honor.  Gregory Petrick of

3     Cadwalader, Wickersham & Taft on behalf Garth Callow (phonetic)

4     and Dan Schwarzmann, the joint provisional liquidators of

5     Lehman RE.

6          Your Honor, there is a parallel application for

7     approval of the settlement in Lehman RE's Chapter 15

8     proceeding.  As Mr. Horwitz has mentioned, the settlement has

9     previously been approved by the Bermuda Supreme Court which is

10    the venue of the main proceeding.  In the Courtroom today with

11    me, Your Honor is Dan Schwarzmann, one of the joint provisional

12    liquidators.  He has functioned in that capacity since July

13    2010 and has been the principal architect and negotiator with

14    his counterparts on the LBHI side with respect to the

15    settlement.

16         Your Honor, I can do this as a presentation or as a

17    proffer of Mr. Schwarzmann's testimony, if he were called --

18    however you would like to do it.

19         THE COURT:   Well, since this is an uncontested

20    proceeding, and I don't think there's a need for an evidentiary

21    record beyond what has already been shown in the pleadings

22    let's simply view this as informal colloquy --

23         MR. PETRICK:   Sure.

24         THE COURT:   -- in which you're providing me with the

25    comfort that I seek that this is, in fact, beneficial on both

1    sides.  And all I'm really seeking from you is that reassurance

2    with such references to the record as you think appropriate.

3              MR. PETRICK:   Thank you, Your Honor.

4              Your Honor, I agree with Mr. Horwitz that this

5    settlement is a comprehensive, complex resolution.  It was

6    negotiated over an extended period of time and it was very much

7    an arm's length negotiation with give and take on both sides.

8    I think that there are several features of the settlement which

9    are important to our estate.  First off, Your Honor, it

10   resolves four claims of Lehman RE into the Lehman estates.  One

11   is a -- two of them -- a claim against LBSF under a swap

12   agreement and a claim against LBCC under inter-company

13   transactions, were relatively easy to resolve as a matter of

14   reconciling books and records claims.  And that fell in place

15   pretty quickly.

16             The other two claims, a claim under a net worth

17   maintenance agreement and a claim under the master repurchase

18   agreement, were the subject of substantial debate and

19   controversy.  The collateral that was transferred to Lehman RE

20   -- and Lehman RE transferred $715 million to LCPI in exchange

21   for collateral that consisted of 23 commercial property loans,

22   all property in the United States, and a portfolio of

23   residential mortgages that at one time was as high as 800

24   loans.  The commercial loan portfolio represented undeveloped

25   land in Nevada, California, mezzanine loans on properties in

1    New York, some development properties in Turks and Caicos -- a

2    real assortment of highly illiquid and very hard-to-value

3    loans.  The central issue was to figure out the claim under the

4    master repurchase agreement was valuing that collateral as of

5    the date of default of September 18, 2008.  From the Lehman

6    side -- from the Lehman RE side, we engaged in a very

7    comprehensive process to come up with the value.  We had a team

8    of evaluation experts -- Robert Charles Gleicher was engaged to

9    value the underlying real estate.  We had a team of Cambridge

10   associates to translate that real estate value into the value

11   of the loan.  We had an expert of Park Bridge Associates who

12   provided us some advice about what that loan might have been

13   worth in the dynamics of the market as it existed in 2000 --

14   September of 2008 for these highly illiquid properties.

15           We also, along the time of liquidating this

16   portfolio, have had advice from other real estate professionals

17   and have actually transacted some of the properties, so we had

18   a pretty good sense of what the properties were worth.  The

19   settlement value of $490 million represents a discount from a

20   full-out; our value being accepted as a hundred.  But it's

21   within a very reasonable range of what we thought we would come

22   out in a fully contested hearing before Your Honor and

23   valuation.  As Your Honor has said many times valuation is, you

24   know, somewhat of an art not a science, and it would have been

25   a substantial debate.  It would have taken many weeks to try

Page 19

1    the case and we believe that that resolution of the claim is

2    fair and reasonable and a reasonable exercise of business

3    judgment.

4            Resolution of the claim under the master repurchase

5    agreement drove resolution of the claim under the net worth

6    maintenance agreement -- a function of what value is realized

7    under that claim drove what the net worth maintenance was of

8    the entity.  Under the net worth maintenance agreement LBHI had

9    effectively guaranteed that Lehman RE would have a net worth of

10   $100 million, a positive net worth of $100 million.  There was

11   -- issues were raised about whether or not this was an

12   enforceable guarantee under the double dip theory that Your

13   Honor has heard before in this proceeding and the threat of

14   substantive consolidation.  From the Lehman RE perspective the

15   guarantee was given for purposes of compliance with Bermuda

16   regulatory requirements for an insurer doing business in

17   Bermuda and we thought it was a pretty good position that the

18   guarantee would be enforceable.  However the accepted claim

19   amount, the $450 million, again represents a discount from a

20   full-out win, recognizing that there was litigation risk and

21   time and expenses associated with resolution of that claim in a

22   contested hearing.  So both of those two features we believe

23   were -- have been settled at reasonable prices reflecting the

24   reality of litigation risk and the time and expense that it

25   takes to achieve that.

1         With respect to the sale of the five properties back

2    to LCPI, again the $32 million price is, by all the information

3    available to the provisional liquidator, at or near fair market

4    value for those properties.  Again, it's based on the work of

5    our experts and the other real estate advice that the

6    provisional liquidator has received throughout the course of

7    this proceeding.  It is also fair to say that liquidation of

8    these properties is a business goal of the estate in any event.

9         The other subsidiary benefit of selling the property

10   back -- and it's not an insignificant benefit to the properties

11   -- 237 Park Avenue and Pacific Point, were the subject of

12   substantial litigation.  The 237 property litigation is before

13   Your Honor and it relates to whether or not a guarantee of that

14   loan given by Broadway Partners was released as part of a

15   settlement before Your Honor with -- between LBHI and Broadway

16   Partners, I think in the summer of 2009.  That litigation has

17   been pending for about a year.  To pursue that litigation again

18   would have been an extensive and expensive process.  As part of

19   the settlement, that litigation is resolved with no additional

20   expense to the estate.

21        The second piece of litigation relates to the SunCal

22   bankruptcy and the Pacific Point property.  We're one of some

23   20 properties in which the SunCal debtors sought to equitably

24   subordinate our lien.  As part of this settlement we -- the

25   Lehman RE estate has extricated from that litigation, and in

1    effect Lehman Ali and LBHI become the party Defendants and have

2    the associated expense of dealing with that litigation.  So,

3    from our perspective the value of the properties were sold at

4    fair market value and resolution of a litigation is an added

5    substantial benefit to selling the properties back to LCPI.

6            There are certain other minor aspects of it -- there

7    was a claim relating to the residential portfolio at the

8    default date Aurora, the servicer of the residential portfolio,

9    had accumulated principal and interest that had been received

10   from the underlying borrowers.  Payment was made to Lehman RE

11   estate of approximately $20 million.  There was a $4.4 million

12   balance in which Lehman RE claimed that it was entitled to;

13   LBHI claimed it was entitled to, depending on the timing of the

14   payments.  This settlement also resolves that dispute as well.

15           So, Your Honor, for those are the principal

16   components of the settlement, but for all of those reasons we

17   believe it is a fair exercise of business judgment and fair and

18   reasonable settlement from the point of the Lehman RE estate.

19           THE COURT:   Thank you very much.

20           MR PETRICK:   Thank you, Your Honor.

21           THE COURT:   Does anyone else wish to say anything?

22           I'm satisfied based upon my review of the papers that

23   have been submitted, both in support of the debtors'

24   application for approval of the settlement and the parallel

25   application brought on behalf of the fine representatives of

1    Lehman RE that the transaction, which is a comprehensive one

2    and which has been described in at least general terms by

3    counsel, is in the best interests of the Chapter 11 estates and

4    also in the best interests of the Chapter 15 debtor.  Moreover,

5    approval of the transaction in Bermuda is a strong indication

6    that, at least from the perspective of the Bermuda proceeding,

7    approval of the transaction makes good sense and would be

8    consistent with the obligations this Court has under Chapter 15

9    of the Bankruptcy Code.  For those reasons, and notably because

10   this is uncontested and represents the product of good faith,

11   arms-length negotiations over an extended period of time by

12   sophisticated parties, the transaction is approved.

13           MR. PETRICK:   Thank you, Your Honor.

14       (Whereupon these proceedings were adjourned until 2:00 PM)

15       (Thereupon the proceedings continued.)

16           THE COURT:   Be seated, please.  Good afternoon.

17           Mr. Slack, how are you?

18           MR. SLACK:   Very well, Your Honor.  Good afternoon.

19           Your Honor, we're here this afternoon; the first

20   matter on is the Michigan State Housing Development Authority

21   versus Lehman Brothers Derivative Products, Inc., adversary

22   proceeding which is 09-01728.  And we are here for a pre-motion

23   conference, Your Honor, where the parties have after some

24   discussion agreed subject to Your Honor's approval of the

25   schedule to brief what are probably the primary issues relating

Page 23

```
 1    to the derivative transactions between the parties.  And so we

 2    have after some discussion set out a proposed briefing schedule

 3    on what is effectively Lehman's counter-claims to the original

 4    complaint.  And maybe, Your Honor, I can just take two minutes

 5    and go through the procedural history just to put everything in

 6    framework.

 7              The complaint was filed in November of 2009 --

 8              THE COURT:   Mr. Slack, I'm interested in having you

 9    do that, but --

10              MR. SLACK:   Okay.

11              THE COURT:   -- the real focus on for me this

12    afternoon is why summary judgment makes sense in this case.

13    What's happened in the six months since the District Court

14    denied the Michigan State Housing Authority motion to withdraw

15    reference because six months have gone by and this is the first

16    I'm seeing you.  I'm also frankly troubled by the fact that

17    this is an exceptional case in that it is one of the few cases

18    I'm aware of in the mediation program that has resulted in a

19    failure to reach an agreement.  I don't want to go into the

20    substance of that, but I'd like to know whether or not the

21    passage of time may have made this a case that may be

22    susceptible to mediation before everybody does all this work.

23    Just because it failed once doesn't mean that it is a dispute

24    beyond the ability of reasonable people to reach compromise.

25              MR. SLACK:   Those are all accurate and fair points.
```

Page 24

1        Let me address what's on Your Honor's mind.

2                Since the motion to withdraw the reference was

3        denied, frankly the parties have not taken any steps until this

4        time to do anything.  So there's been no discovery.  I think

5        the parties spoke at some various times, but recently upon

6        discussion it was, let's see if we can tee up the primary

7        issue.

8                Along the lines is your question about settlement.

9        Let me say the following; there haven't been any subsequent

10       discussions about settling the entire case.  There have been

11       recently some discussions about settling the affirmative claims

12       of MSHDA and the parties have agreed to discuss those,

13       essentially separate them.  I think the original mediation was,

14       let's see if we can put everything together and settle it all

15       as one package.  That didn't work, and now the idea is maybe if

16       we separated out their -- it's possible to settle one or both

17       pieces.  And so we have agreed to discuss the affirmative

18       claims which is why those are not going to be subject of

19       summary judgment, at least with respect to this application.

20               I can tell Your Honor we are open to continuing

21       settlement discussions on the other piece, and if there's an

22       appetite for doing so, we certainly wouldn't shun those.  We

23       would be happy to continue, and Your Honor has, I think,

24       because it's public, essentially, the overall number is not in

25       any particular case, but, you know, the success rate for the

Page 25

1    ADRs is one that's been remarkable and this is one of the cases

2    that was not able to settle in mediation.

3            THE COURT:   Well, as an outlier, I frankly think

4    that the parties have an even higher burden here of

5    demonstrating that it makes sense to proceed with expensive and

6    burdensome litigation.  Under the present circumstances I do

7    not understand what makes this case different from all the

8    others that are of like type.  And that's really a question for

9    Michigan State Housing Authority to answer at some point.

10           MR. SLACK:   So let me, Your Honor, say this, is that

11   -- and then I'm going to turn it over so you can ask your

12   questions.  Is it, you know, to the extent that Your Honor

13   approves going forward, we have a schedule that we think makes

14   sense with the other party.  If Your Honor would like to see if

15   the parties can, you know, take two weeks, three weeks, a month

16   and discuss things, I can tell you again we have approached

17   them with respect to a part and we're happy to expand that and

18   see if there's any room for discussion of the entire case or in

19   pieces.  And so we would be open to that, but if Your Honor

20   does approve it, we would recommend the schedule that the

21   parties have agreed to.

22           THE COURT:   I'm not going to interfere with the

23   schedule, but I do have two independent related questions.  The

24   first question is what makes this the matter ripe for summary

25   judgment, and am I going to be met at some point with an

1       argument, well, this fact or another fact that will be the

2       subject of discovery that will in effect delay resolution.  So

3       since I know nothing about the issues to be presented in the

4       motion for partial summary judgment other than the fact that

5       the parties seem to think that this is an approach that works

6       and has developed a schedule to allow it to work, I'd like to

7       know more about what makes this ripe for summary judgment such

8       that I can exercise my appropriate gatekeeper function which

9       the stipulation purports to take away from me.  So that's

10      question one.

11              And question two is why are you doing this now as

12      opposed to getting back to the table where presumably if it

13      were possible to exercise reasonable business judgment, parties

14      could make an agreement comparable to the agreements made in

15      virtually every other case of like type.  So question one is

16      clear and question two is what makes this case different from

17      all the others.

18              MR. SLACK:   Yup.

19              THE COURT:   It may not be.

20              MR. SLACK:   Would you like me to discuss a little

21      bit about the subject matter or would you like to talk to

22      Michigan State Housing where --

23              THE COURT:   Let's deal with each question separately

24      --

25              MR. SLACK:   Okay.  So --

1          THE COURT:   -- and I guess I'd like to know why the

2     parties think that summary judgment is appropriate.  If it is

3     believed that summary judgment if it could be achieved would

4     facilitate a resolution of everything, that would be one

5     approach.  But I'd like to know why the parties believe that

6     summary judgment on a partial basis is an efficient way to see

7     (indiscernible 14:13:14).

8          MR. SLACK:   So, Your Honor, the answer to that is

9     that with respect to the counter-claims, it really centers

10    around one issue and one clause.  So Michigan State Housing and

11    LBDP had entered into a number of interest rate swaps, and

12    those swaps had a particular provision that I wouldn't say is

13    unique to it, but let's say rare in these swaps, at least to

14    the overall portfolio, which is that upon an early termination

15    what it says is that the early termination amount that gets

16    paid is determined based on a mid-market formula.  And after

17    the LBHI bankruptcy, what the parties did here was instead of

18    having these terminate and paid at the mid-market amount, the

19    parties agreed to essentially have this assigned from LBDP to

20    LBSF, and that happened after the LBHI bankruptcy.

21          So there was an assignment agreement, and that

22    assignment agreement had a particular clause in it that I'm

23    going to paraphrase as follows, but I'm happy to hand up to you

24    because I have a copy.  It essentially says, Your Honor, that

25    in all circumstances other than a circumstance where LBSF goes

1    into bankruptcy, you continue to determine the amount of the

2    payment upon an early termination based on a mid-market amount.

3    But upon a Lehman bankruptcy, an LBSF bankruptcy, that amount

4    gets determined according to what I'll call the more typical

5    market quotation methodology that's in the ISDA.  It's our

6    view, Your Honor, that that is an ipso facto clause, much the

7    same way we've litigated those issues before Your Honor in both

8    Metavante, BNY, and Ballyrock (phonetic).  Obviously the clause

9    is different.  Here the effect is in some ways very similar.

10           THE COURT:  I take it that the change in the formula

11   for determination would result in less money coming to Lehman.

12           MR. SLACK:  That's right.  In this case, Your Honor,

13   it's somewhere in the range of $23 million.

14           THE COURT:  That's the spread?

15           MR. SLACK:  That's the spread.

16           THE COURT:  So we're fighting here over $23 million?

17           MR. SLACK:  I'm sorry?

18           THE COURT:  I don't mean to make it sound like it's

19   not a lot of money, but we're fighting here over $23 million?

20           MR. SLACK:  That is the amount, Your Honor.

21           THE COURT:  Okay.  In the context of this case, that

22   is not a lot of money.

23           MR. SLACK:  That -- Your Honor, that is the amount,

24   though, and that is where we are.

25           THE COURT:  And this has been going on since 2009.

1          MR. SLACK:   So in 2009, Your Honor, as Your Honor is

2     aware we -- that's when it was filed, and we took the better

3     part of 2010 in mediation; 2011, the better part of that was on

4     the motion to withdraw, and now we filed an amended set of

5     counter-claims, and that's where we are.

6          THE COURT:   Okay.  It seems to be a case that is

7     characterized by frolics and detours and a refusal to get to

8     yes.  And that's really, I think, a good time to hear from

9     Michigan State Housing Authority, because maybe outlay why

10    you're here.

11         MS. EWART:   Good afternoon, Your Honor.  My name is

12    Lisa Ewart, I'm with the law firm of Wilmer, Cutler, Pickering,

13    Hale & Dorr.  My application for a pro hac motion was filed

14    yesterday.

15         THE COURT:   Deem it granted for today's purposes.

16         MS. EWART:   Thank you, Your Honor.  I represent

17    Michigan State Housing Development Authority, and I think if

18    you could just permit me a minute or two to give a little bit

19    more factual background, I think it would be helpful in

20    explaining why this case is different and why this case makes

21    sense to go forward on summary judgment.

22         So MSHDA did file in 2009.  Initially when MSHDA

23    filed, it was over an erroneous payment or MSHDA submits was an

24    erroneous payment that was made to LBDP, which was the original

25    party with MSHDA under the ISDA agreement.  As Mr. Slack

Page 30

1    explained, although one slight difference -- under the original

2    ISDA agreement, if a bankruptcy filing by LBDP or LBSF had

3    happened, then you would have gone forward with the normal

4    market quotation, calculation of damages.  However under a

5    schedule attached to the ISDA agreement, if LBHI filed, then

6    you would have this mid-market theory that Mister -- excuse me

7    -- mid-market approach that Mr. Slack explained.

8           LB -- as you know, LBHI filed first.  Lehman

9    representatives approached MSHDA and said, look, you know,

10   instead of going forward as how the schedule would have us go,

11   let's enter into this assignment agreement which I think all

12   parties found was beneficial.  Under that assignment agreement

13   as he mentioned, in the event that LB -- at this point, LBFS is

14   now the counter-party, not LBDP; they are out of it.  If LBFS

15   filed for bankruptcy, then we would do the normal market

16   quotation under the ISDA agreement, similar to how it would

17   have been structured had LBDP filed initially.  And now,

18   obviously, LBHI is out of it.  However, if for any other reason

19   other than failure to pay or bankruptcy, then we would go back

20   to the mid-market theory.

21          LBSF filed for bankruptcy on, I believe, October 3.

22   On November 5, MSHDA terminated under the assignment agreement

23   under the market quotation because it was in a vote of LBSF

24   filing for bankruptcy.  MSHDA paid the calculation amount,

25   which I think in there was around -- excuse me -- $20 million.

Page 31

1   Then within the proper amount of time, the Lehman entities

2   answered MSHDA's complaint and LBSF filed counter-claims for

3   breach of contract and unjust enrichment.  At that point, they

4   did not raise the ipso facto issue.

5           The Court, through the mandatory mediation process,

6   ordered ADR I believe at some point in 2010.  The parties, you

7   know, as the mediator found engaged in good faith resolution,

8   or good faith mediation of the issues.  We exchanged documents,

9   we exchanged mediation statements, we engaged in mediation.

10  The one issue that changed, I think, in between the time that

11  MSHDA -- or excuse me -- that Lehman originally answered, and

12  then we have the mediation, was this Court's decision in BNY

13  Trustee.  And I do not profess to be in complete understanding

14  of the facts of that case.  It was quite a complicated

15  transaction, but in MSHDA's position, we think that -- you

16  know, and our views have changed on this -- but we think not

17  only we have differing opinions as to the implications of BNY

18  on this case, and we have different understanding of what BNY

19  means.  And I think the sticking point for the parties here,

20  unfortunately, is, you know, we can't come to an agreement on

21  what that means.  And if we are correct and it was not an

22  invalid ipso facto clause, if instead the liquidation of the

23  swap agreement under the assignment agreement is protected by

24  the safe harbors, then we're pretty much done.  We've got

25  MSHDA's affirmative claim for the, I believe, it's around $2

Page 32

1    million that was in MSHDA's mind was erroneously sent over to

2    LBDP, who at the time that received that money was not even a

3    counter-claim -- a counter-party to the swap, and, you know, I

4    think that can certainly be easily resolved by the parties.

5    But where we're sticking is, you know, a claim by Lehman for

6    $23 million which for my client which is a public housing

7    authority, $23 million is a lot of money.  And either we're

8    right or we're wrong about the implications of BNY Trustee and

9    whether or not what we did was protected by the safe harbor.

10           But if we're right, then, you know, that's money that

11   we can save for our client.  And so I think without going into

12   the details of the mediation as obviously those are

13   confidential between the parties, but, you know, my

14   understanding is really that sticking point is that one issue

15   of law.  And in, you know, we can certainly --

16           THE COURT:   Is that the issue of law that is going

17   to be the subject of the motion for summary judgment?

18           MS. EWART:   It's our belief, and as I think all

19   parties represented to the District Court during the motion to

20   withdraw the reference hearing, that is the issue that's sort

21   of the sticking point here that I think can resolve Lehman's

22   counter-claims, and then once those are resolved, I think we --

23   the parties as Mr. Slack mentioned -- I think that the parties

24   can reach agreement on MSHDA's affirmative claim.

25           So, yes, so the idea here is to try to get before

1    this Court that issue of law.  The parties, you know -- there

2    will be other things that are discussed in the summary judgment

3    brief because we have to be able to show why that issue of law

4    then dictates the, you know, that we prevail or that they

5    prevail on Lehman's counter-claims, and we do feel like that

6    issue which I think can be streamlined and efficiently

7    presented to this Court will allow the parties to then go

8    forward and reach an agreement.  But until then, I fear that

9    we're sort of at this very challenging point where they have

10   one idea about whether this was protected to the safe harbor.

11   We have an absolute separate idea.  And if we're right, we

12   don't owe them any money, and if they're right, we do.

13          And, again, my client is a -- he's a public entity.

14   This is a lot of money to my client, and we think that it can

15   be efficiently and quickly presented to the Court for summary

16   judgment.

17          THE COURT:   Okay.  I guess what I'd like to clarify

18   from Mr. Slack who is familiar with the issues in what I

19   personally refer to as the perpetual case --

20          MS. EWART:   I apologize.

21          THE COURT:   -- whether or not in fact this is going

22   to be a summary judgment that will in effect re-litigate issues

23   that were decided in the context of perpetual in Ballyrock.

24          MS. EWART:   I would like to respond to that question

25   as well, Your Honor, once Mr. Slack has an opportunity.

1          THE COURT:   I'm not going to prevent you from doing

2     that.  I just wanted to ask Mr. Slack that question because you

3     indicated a lack of full familiarity with the facts are in that

4     earlier case.

5          MS. EWART:   Yes, Your Honor.

6          MR. SLACK:   So, Your Honor, the best way to answer

7     that I think is that we think in many ways this is an easier

8     decision than the one in perpetual and Ballyrock, and the

9     reason for that is is that you don't have to worry in this

10    matter about whether it is an ipso facto, because in that case

11    you had, if you remember in perpetual and in Ballyrock, there

12    were arguments that the bankruptcy of LBHI was the trigger for

13    the ipso facto and therefore we had argued as Your Honor is

14    well aware a number of arguments that, you know, that said that

15    that didn't matter for purposes of ipso facto law and Your

16    Honor has ruled on that.  Here we have a bankruptcy -- the

17    bankruptcy event is LBSF's bankruptcy.  It's clear it's LBSF's

18    bankruptcy, so you don't have that issue at all.  So in some

19    ways, it's an easier case.  We think that the ruling with

20    respect to the safe harbors that was made in both the perpetual

21    matter and Metavante, for that matter, and Ballyrock will

22    essentially control the outcome here, and I recognize that my

23    colleague is going to disagree with me on that.  But we would

24    argue that the same construction of those safe harbors that

25    were rendered in those cases would, you know, would answer the

Lehman Brothers Holdings Inc.

Page 35

1    question here.

2              So, you know, in our view, this is an easier case

3    than perpetual but I do recognize, Your Honor, that, you know,

4    that those cases had different clauses that we were trying to

5    invalidate; the flip clause while it is somewhat related to and

6    can argue it's analogous to in some ways the clause here on

7    methodology of payment, it is obviously a different clause.

8              THE COURT:   Okay.  Go ahead.

9              MS. EWART:   Thank you, Your Honor.  We do believe

10   this is an easier case than BNY but I think we unsurprisingly

11   come out to being that it's easier in the sense that you would

12   find in our favor.

13             As I understand BNY there was a separate agreement

14   that contained the flip provision that changed the property

15   that Lehman would or wouldn't get in the event that the swap

16   was terminated.  Here there's no question but that the

17   assignment agreement is part of the swap agreement and that you

18   don't have to worry about that second issue of whether or not

19   this is a totally separate, not a swap agreement.

20             Second, Your Honor, I think that here we have the

21   termination and calculation of settlement amount, and without

22   going into the merits of what we'll say on summary judgment

23   which we are prepared to file, we would submit that the

24   liquidation which is part of the safe harbor, is exactly what

25   it means to terminate and calculate settlement amount.  And,

1       Your Honor, without fully understanding Lehman's position on

2       these issues, because obviously we've, you know, had some

3       discussion.  We've gotten a hint of what they will argue both

4       at the motion to withdraw the reference and also when they

5       sought leave before Your Honor to amend their counter-claims,

6       we would submit that the part of your decision in BNY that is

7       being relied on is, you know, a clause where Your Honor

8       mentioned the alteration of rights as they exist.  We have a

9       way that we would distinguish that that is just not applicable

10      to our situation here.  But even setting that aside, if it's

11      the alteration of rights that then exist that vitiates the

12      protections of the safe harbor, then we would submit that

13      there's no protection in the safe harbor whatsoever.

14              So we do think that this case is different than BNY.

15      We do think this is easier to decide than BNY, and we would

16      appreciate the opportunity, Your Honor, to be able to move

17      forward and put our arguments in summary judgment.  And as I

18      mentioned, I do think that the resolution of that issue of law

19      will go a long way towards getting the parties to where they

20      need to be.  And without that resolution I don't see how

21      mediation can be successful.

22              THE COURT:  So let me ask a question that is on my

23      mind but you should feel free not to answer if you think it

24      leads you into either revealing a client confidence or puts you

25      in a position that you consider unfair under the circumstances.

Page 37

1    When your firm moved towards your other reference, that was

2    part and parcel of what I view as an attempt at forum shopping

3    to be able to argue certain issues that you assert would

4    distinguish your situation from the perpetual and Ballyrock

5    situation.  By presenting those arguments to a District Court

6    judge that has no background whatsoever in the history of the

7    Lehman case, that to me suggests that there is a strong

8    likelihood that if I were to find in Lehman's favor with

9    respect to the pending motion, or the motion that you propose

10   to file, that your next step would be to take it to the

11   District Court and to have the hearing that you would have had

12   in the District Court if you had been successful in your

13   attempt to withdraw the reference in the first instance,

14   thereby leading to a proliferation of litigation and delay as

15   opposed to getting to a result.  In other words, unless you

16   win, you're likely to appeal, which means that from the

17   perspective of case administration, this becomes, and pardon

18   the reference, vexatious litigation from the perspective of

19   Lehman, because you represent a client that doesn't want to pay

20   the money even if you owe the money, and you have an ability as

21   a matter of law to continue delaying the payment.

22          So my concern here is that permitting a summary

23   judgment isn't a means to an end to bring the case to a prompt

24   conclusion as much as it is a means to foster further delay.

25          MS. EWART:   Your Honor, respectfully I disagree with

1    your understanding of the reason for withdrawing the reference,

2    but appreciate your thoughts.

3              THE COURT:   It was forum shopping in my view and you

4    can disagree with that all you like.  That's what it was.

5              MS. EWART:   I understand your opinion, Your Honor.

6    I mean, yes, we would preserve all rights that our client has

7    and we think our client is correct on this issue of law.  And

8    our client, as I mentioned, is a public entity, doesn't have

9    the ability to pay $23 million if it is not legally required to

10   do so.  And certainly if a Court determines, and we, you know,

11   don't have any appeal rights or we go through our appeal rights

12   and the Court determines that our client is required to pay the

13   money because our client has a wrong understanding of what the

14   safe harbor does --

15             THE COURT:   What Court has to decide that?

16             MS. EWART:   I think, Your Honor, that we would

17   ultimately reserve --

18             THE COURT:   -- ultimately go where; the Supreme

19   Court of the United States?

20             MS. EWART:   Your Honor, I think we would reserve our

21   appeal rights.  And I do think that as Your Honor is well

22   aware, as your parties get more information as to whether their

23   understanding of the law is correct or not correct, it does

24   help push settlement forward.  But I can't at this point tell

25   you that if you rule against us, that we won't exercise our

1    appeal rights and that --

2              THE COURT:   I fully expect that you will.  It was

3    one of the reasons that I raised the question.  It is unclear

4    to me whether or not given the parties the right to proceed by

5    summary judgment at this point is a means to expedite the

6    litigation or a means to extend and prolong the litigation.

7    That's the point of the question, and that's why I have asked

8    you the somewhat convoluted question that I have about the

9    nature of your client and your client's long-term objectives.

10   It seems to me that your client's long-term objective is to

11   prolong for as long as one possibly can having to pay an

12   obligation that may in fact be doing harm.  And that it may be

13   more politically expedient for Michigan State Housing Authority

14   not to pay in any particular year than it is to pay in a

15   particular year.  And that for that reason, mediation has

16   failed because private litigants can exercise in forum judgment

17   on a risk adjusted basis to determine what the likelihood is of

18   ultimate success and can make business judgments.  It's not

19   clear to me that your client can or will.

20             MS. EWART:   Your Honor, I think my client's

21   objective is to get back the $2-something million that was

22   erroneously transferred from its accounts over to LBDP, a party

23   that was not even a party to the swap agreement.

24             THE COURT:   We had a discussion about this point in

25   2010, other lawyers were present, and I raised the question as

Page 40

1    to why the rule party who apparently committed this error

2    wasn't even put into the litigation, and nobody fully answered

3    that question to my satisfaction at the time.

4              MS. EWART:   Your Honor, I believe that they are a

5    defendant in this litigation.  LBDP is a defendant in this

6    litigation.  LBSF is the defendant that's brought the counter-

7    claims --

8              THE COURT:   I think the Trustee was the party that

9    misapplied the funds.

10             MS. EWART:   The Trustee transferred the funds from

11   MSHDA's account to LBDP's account, that LBDP is the entity that

12   holds the money and that requested that transfer.

13             THE COURT:   Yes, but the Trustee was never named as

14   a defendant.

15             MS. EWART:   That's correct.  The Trustee is not a

16   defendant.

17             THE COURT:   So the party that actually committed the

18   error that you're now complaining about isn't here to expunge

19   in respect of their error.

20             MS. EWART:   Your Honor, we brought the action

21   against LBDP, that is my client's objective, to get that money

22   back.  Your Honor asked whether my client's objective is to try

23   and delay through summary judgment.  I think the answer is no.

24   I think my client wants a clear answer from the Court as to

25   whether or not my client is required to pay additional money or

Page 41

1    whether my client acted appropriately under the Bankruptcy

2    Codes -- or excuse me, acted appropriately under the contract

3    as protected by the safe harbors of the Bankruptcy Code.  Your

4    Honor asked whether or not mediation will be effective.  I

5    would like to hear, you know -- I would appreciate Mr. Slack's

6    thoughts on this point, but I think the answer is probably no,

7    because I think at the end of the day, the entities have a

8    fundamental disagreement of what the law requires and it's not

9    a factual dispute.  It's a fundamental disagreement about what

10   the law requires, and if we are right that we're not required

11   to pay, then, you know, we would hope to get that ruling from

12   Your Honor.  Your Honor may disagree with us.  Your Honor may

13   review our summary judgment briefs and think we're absolutely

14   wrong, and in that case, we'll get a ruling from Your Honor,

15   that will be a point of information that my client can have and

16   can understand in its dealings with trying to resolve this

17   issue.  If Your Honor rules in our favor, I think it's quite

18   likely that Lehman will appeal.  And so I see Your Honor's

19   point that yes, there could be appeal practice here, but I

20   think until my client gets what is entitled to which is a

21   ruling as to whether or not it acted correctly under the law, I

22   think it's very challenging for us to be able to move forward

23   in mediation.  We tried.  We exchanged documents, we had

24   conversations with the principals, and we were unable to

25   resolve.  And so I do think that makes this case different and

1    I do think that is why I think going forward on summary

2    judgment on this point would go a long way to one, giving my

3    client the, you know -- its -- what its entitled to which is a

4    legal judgment as to whether or not it acted correctly under

5    the law, and then also towards resolving the dispute.

6              THE COURT:   Okay.  Mr. Slack, anything more?

7              MR. SLACK:   Your Honor, I just would -- I would just

8    point out what I think Your Honor already knows, and that is

9    that, you know, we've had a number of cases with counter-

10   parties where we've had vehement disagreements on the law and

11   been able to settle, and I don't want to get into the

12   specifics, but I think Your Honor knows that we are willing to

13   compromise and are here as well.  So this is not a question of

14   us treating Michigan State differently than we have other

15   counter-parties, and we are prepared to sit down with them over

16   the next couple of weeks and try again.  I don't know whether

17   that has any chance of success, but we're willing to do it.

18             THE COURT:   I'm going to make the following

19   suggestion.  I think that the parties have clarified, at least

20   for my purposes this afternoon, the status of the case, and

21   that was not evident from simply reading the letter submitted

22   on March 20 that proposed the schedule.  It was lacking in any

23   detail as to what was going on and this was helpful.

24             I believe that what makes this case different from

25   other cases that were resolved and through the mediation

1    process is not the facts but rather the character of Michigan

2    State Housing Authority as counter-party, and the political

3    restraints that affect that entity.  That's a perfectly

4    acceptable reason for counsel to suggest that mediation is not

5    likely to be successful.

6              I'm going to grant the authority to proceed by means

7    of summary judgment, but I'm going to propose that the summary

8    judgment papers be deemed mediation statements as well as

9    statements of legal position for the Court, and that prior to

10   argument with respect to this matter, that the parties return

11   to former Judge Mabey in his capacity as mediator assuming he's

12   willing to do it and the parties are willing to appear before

13   him again, given his familiarity with the issues, and to see

14   whether or not a risk adjusted approach to this may lead to

15   some productive compromise.  I would simply note that the

16   Lehman case has been characterized throughout by parties of all

17   kinds including foreign administrators, foreign receivers,

18   fiduciaries for bond holders acting rationally and making

19   compromises based upon not every last piece of information that

20   might be available, but based upon a reasoned assessment as to

21   the likelihood of success or failure.  I suspect that it would

22   be of some use if when we cut, would his client would act in a

23   similar way after the papers had been filed and with the

24   guidance of Judge Mabey.

25              So I'm going to propose that happen before we have

Page 44

1    argument with respect to the pending motion.  Is that

2    acceptable to the parties?

3            MR. SLACK:   Your Honor, it's acceptable to us.

4            MS. EWART:   Your Honor, it's acceptable to us as

5    well, if I could just have one point of clarification.  So we

6    will go forward with filing, but we'll also then submit that

7    filing as mediation statements.

8            THE COURT:   All I'm suggesting is the very -- so you

9    don't have to duplicate your effort, the papers that have been

10   prepared and filed in support of the motion for summary

11   judgment in an opposition to the motion for summary judgment

12   would function as what is really in substance a supplemental

13   mediation statement which would inform a discussion that you

14   could then have with the aid of Ralph Mabey and hopefully that

15   will produce an environment in which your client in particular

16   may recognize the wisdom of acting rationally.  You don't have

17   to act rationally.  You can take an all-or-nothing position.

18   And you can take the position that unless and until this legal

19   issue is finally resolved by some court, whatever that court

20   may be, to your satisfaction that you're not going to pay,

21   that's your legal right.  But presumably, there are business

22   judgments that will be made along the way.  This is one of the

23   points along the way.

24           MS. EWART:   Thank you, Your Honor.

25           MR. SLACK:   Thank you, Your Honor.

```
 1                THE COURT:   Okay.

 2                MR. SLACK:   Your Honor, I believe that the order was

 3      submitted by disc this morning, and if it was --

 4                THE COURT:   I'm sorry.  What about the order?

 5                MR. SLACK:   I believe -- I believe that the order

 6      was submitted on the disc that was submitted this morning.  If

 7      that's not the case -- at least that's my understanding; right?

 8      Correct.  Okay.  That's what I understand.

 9                THE COURT:   When you say the order --

10                MR. SLACK:   We had a proposed order with the

11      schedule that was --

12                THE COURT:   Oh, the scheduling order?

13                MR. SLACK:   -- of the scheduling order, and so we

14      had --

15                THE COURT:   Assuming that we still have that disc,

16      it will be entered in due course.

17                MR. SLACK:   Okay.  Thank you, Your Honor.

18                THE COURT:   And if we need it, we'll contact you to

19      get another copy.

20                MR. SLACK:   Great.  Thank you.

21                MS. EWART:   Thank you, Your Honor.

22                MR. MAJOR:   Good afternoon, Your Honor.  Chris Major

23      of Meister, Seelig & Fein.  I represent the non-debtor entities

24      in the next three matters that are on.

25                THE COURT:   Uh-huh.
```

1          MR. MAJOR:   It's numbers 5, 6, and 7.

2          THE COURT:   These are on for status conference.

3          MR. MAJOR:   They are, Your Honor.  We were last

4     before Your Honor --

5          THE COURT:   What's the status?

6          MR. MAJOR:   Here's the status, Your Honor.  We were

7     last before Your Honor about a month ago.  There was motions to

8     dismiss that were argued, and at the conclusion of those

9     arguments Your Honor directed the parties to discuss potential

10    settlement, and failing that, then to discuss whether the

11    parties were willing to mediate.  And as Your Honor put it, if

12    the parties couldn't agree on mediating, you would likely order

13    it when we came before you today.  The parties did have those

14    settlement discussions and while they didn't result in an

15    agreement on settlement, they did result in an agreement that

16    we should of course work towards identifying a mediation

17    procedure and the parties have done that.  The parties have

18    agreed to go to JAMS.  We've actually identified the specific

19    arbitrator, it's retired Justice Crane of JAMS who will --

20    excuse me, mediator -- and he'll be the mediator.  We've

21    narrowed down dates for the latter half of May which we'll be

22    confirming with Justice Crane's secretary at JAMS.  And so

23    we're proceeding toward mediation at the end of May.  And

24    that's where the status on that is.

25          And then there's one other point that I'd like to

1    update the Court on. We don't need the Court's intervention at

2    this point, but I think it's fruitful to let Your Honor know

3    about this. We've been discussing a discovery schedule for a

4    period of time now as the case has kind of adapted over the

5    last few months with amended pleadings, the argument, and now

6    the fact that we're going to mediation. And in an attempt to

7    balance competing interests of not expending unnecessary

8    resources on e-discovery, for example, while you're getting

9    ready for hopefully a fruitful mediation, with the idea of

10   keeping the pressure on the parties and that expense having to

11   hang over their head may be forcing a settlement. We've

12   discussed, and we haven't hammered this out yet, but setting a

13   deadline for the production of these e-discovery documents that

14   is a sufficient time after the scheduled mediation session such

15   that the parties would not have to be reviewing documents

16   around the clock between now and the mediation that as Your

17   Honor knows very great expense. So we would propose -- we

18   still have some discussions that have back-and-forth on the

19   details -- but we could submit an order to Your Honor that

20   would give the parties a cushion so to speak so that they could

21   focus on the mediation, and if the mediation fails, there is a

22   schedule in place for litigation if it becomes necessary.

23           THE COURT:   Okay. One of the issues that I recall

24   from the argument on the motion to dismiss touches on the scope

25   of discovery because of the claims based on, I'll use the

Page 48

1    buzzword "fraud".  Have the parties reached any agreement

2    concerning the scope of discovery in connection with this so-

3    called protocol?

4              MR. MAJOR:   I have to give Your Honor a "yes, but"

5    answer.  The answer is yes, but frankly that agreement was

6    reached before the oral argument on the motion to dismiss.  So

7    we had agreed on the scope on search terms.  In fact, the

8    parties have already collected and have in their respective

9    databases the documents that are to be reviewed and produced.

10   So there was an agreement but it did frankly occur before we

11   were last here in this court.

12             THE COURT:   So what does that mean from the

13   perspective of Lehman?

14             MR. MCCARTHY:   Your Honor, what that means -- Ed

15   McCarthy on behalf of Lehman Brothers, Your Honor.  Thank you.

16             What that means is that we did agree to search terms,

17   and what we did as an accommodation -- and I think this would

18   go for Mr. Major's side, too -- there was accommodation with

19   respect to search terms, with respect to documents that were

20   pulled from our own clients.  So as an accommodation, we agreed

21   to pull documents that related to the buzzword that you've

22   used, the fraud claims.  We've pulled those documents, we're in

23   the process of reviewing those documents, but we have not

24   reached an agreement on producing those documents.  We also

25   haven't reviewed all of those documents.

1           So I think the major point that -- the major point

2     here is Lehman would not want to review all of those documents

3     its already collected, and certainly not produce all of those

4     documents which we view as irrelevant to this case.  So I think

5     there is much more work to be done, although both parties have

6     done quite a bit of work and have worked together to reach

7     agreement on search terms and to reach agreements on -- we were

8     almost there, reaching an agreement on the production dates,

9     Your Honor, which is really the start date for the rest of the

10    schedule.  And now that we've come to an agreement on mediation

11    which I think is excellent, and my client is certainly hopeful

12    that this mediation will be fruitful, the parties are in a

13    little bit of a different position on where we go with the case

14    in discovery while the mediation is going forward.

15           THE COURT:   So, in reference to this issue, is there

16    a need to resolve the scope of discovery prior to mediation or

17    is it something that can simply be put to one side?

18           MR. MCCARTHY:   I think requiring Your Honor to

19    resolve the scope of discovery before mediation is not

20    necessary.  However, I think that will certainly be a point

21    that will come about after mediation, what --

22           THE COURT:   If mediation is successful, this is all

23    moot.  If mediation is unsuccessful, we're going to be back to

24    a status conference at which we'll talk about the timing of a

25    decision with regard to the pending motion to dismiss.  I have

1     I believe communicated my views concerning the pending motion

2     to dismiss without actually ordering on it.  And that will

3     probably lead to predictable results with respect to the scope

4     of discovery as well.  Rather than get into the merits of any

5     of this now, I'm simply going to encourage the parties to have

6     a productive, good faith effort at resolving all of these

7     disputes through mediation and hopefully will succeed.  If you

8     don't succeed, we'll deal with the consequences of that.

9          MR. MCCARTHY:   Thank you, Your Honor, and to

10    clarify, one point that we do want to understand is what should

11    the parties do with their discovery efforts in the meantime,

12    which we don't -- we are -- neither of us believe that there

13    will be necessarily any productions before the mediation.  What

14    my client would like is to move forward with the discovery

15    process which requires a lot of internal work in the meantime,

16    and not move forward at a bulldozer speed or at an aggressive

17    speed, but to move forward so that both parties are in a

18    position, assuming the unfortunate assumption that mediation

19    doesn't result in a fruitful resolution, that we're not back to

20    square one again, and that we haven't lost all this time out of

21    just sitting back on our laurels while we're waiting a month to

22    mediate.

23         So we would ask that the parties are able to get

24    together and try to reach an agreement on a date of a

25    production that is, while it's after the mediation, is within a

1     timeframe, whether it be a month or a month-and-a-half after

2     the mediation that the parties can move forward towards that

3     date in the meantime.  And what that will do is allow the

4     parties to have the incentive to settle this matter as opposed

5     to sitting back on their laurels, and also allow us that,

6     again, in the unfortunate situation that we aren't able to

7     reach a resolution, we're able to move forward in the case and

8     not be where this case has been numerous times before, with

9     start and stops.

10           THE COURT:   Well, I appreciate what you're saying,

11    but my view of this is that the only discovery that should be

12    taking place between now and the mediation is that discovery

13    which is either necessary or desirable to advance the causes of

14    the mediation, and that to the extent that the mediation proves

15    to be unsuccessful, I'll be determining the scope and pace of

16    discovery.  You don't have to worry about prepping for it now.

17           MR. MCCARTHY:   Thank you, Your Honor.  I understand

18    the position.

19           THE COURT:   Okay.

20           MR. MCCARTHY:   What we will plan to do then moving

21    forward with your blessing is contact former Judge Crane's

22    office this afternoon, finalizing that date, and moving forward

23    with the mediation.

24           THE COURT:   Great.  Okay.

25           MR. MCCARTHY:   Thank you, Your Honor.

Page 52

1          THE COURT:   I think that's the only other matter --

2     we've now completed the afternoon calendar --

3          UNKNOWN SPEAKER:   Yeah.

4          THE COURT:   -- and we're adjourned until 4 o'clock

5     when I have a matter on another case.

6

7          (Whereupon these proceedings concluded at 2:51 PM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 53

1                         **I N D E X**

2

3                          RULINGS

4                                           Page      Line

5   08-13555 Debtors' Motion for Approval     22        12

6   of a Settlement

7   Motion for Summary Judgment - granted     43         6

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 54

1                  C E R T I F I C A T I O N

2

3     I, Donald Cohen, certify that the foregoing transcript is a

4     true and accurate record of the proceedings.

5

6

7     Donald        Digitally signed by Donald Cohen
                     DN: cn=Donald Cohen, o=Veritext,
                     ou, email=digital@veritext.com,
      Cohen         c=US
8                    Date: 2012.03.28 10:36:31 -04'00'

9     DONALD COHEN

10

11    Veritext

12    200 Old Country Road

13    Suite 580

14    Mineola, NY 11501

15

16

17    Date:  March 27, 2012

18

19

20

21

22

23

24

25