Hearing Date and Time: April 26, 2012 at 10:00 a.m. (Prevailing Eastern Time)

Mark. C. Ellenberg, Esq.
John H. Thompson, Esq.
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street N.W.
Washington, D.C. 20001
Telephone:  (202) 862-2200
Facsimile:  (212) 862-2400

**Attorneys for WestLB AG**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*<br><br>                              **Debtors.** | **Chapter 11**<br><br>**Case No. 08-13555 (JMP)**<br><br>**(Jointly Administered)** |

## RESPONSE OF WESTLB AG TO DEBTORS' FORTIETH OMNIBUS OBJECTION TO CLAIMS (LATE-FILED CLAIMS) AS TO CLAIM NO. 36789 AND MOTION TO DEEM CLAIM NO. 36789 AS TIMELY FILED

**TO:   THE HONORABLE JUDGE JAMES M. PECK**
**        UNITED STATES BANKRUPTCY JUDGE**

WestLB AG (f/k/a Westdeutsche Landesbank Giorzentrale) ("WestLB"), a bank organized and existing under the laws of Germany, hereby responds to Debtors' Fortieth Omnibus Objection to Claims (Late-Field Claims), which seeks to disallow claim number 36789 filed by WestLB ("Claim 36789") as untimely filed by moving for an order that deems Claim 36789 as timely filed.

## PRELIMINARY STATEMENT

The Court should deny the Debtors' objection for two reasons. First, WestLB, although known to the Debtors as a creditor, did not receive actual notice of the bar date. WestLB never received actual notice of the bar date because the Debtors mistakenly mailed the

bar date order to Dusseldorf, Georgia, instead of Dusseldorf, Germany.  Because WestLB is a known creditor that did not receive actual notice of the claims bar date, both due process and the bar date order itself dictate that the Court should deny the Debtors' objection as to Claim 36789.

Second, the Debtors' mailing mistake prevented a timely filing.  Therefore, this Court should find WestLB's filing delay was the result of excusable neglect.  According to the four factors set out in Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'Ship., 507 U.S. 380 (1993), WestLB's filing delay was the result of excusable neglect because:  (i) WestLB's delay was caused by the Debtors' mailing error, which was not within WestLB's reasonable control; (ii) the delay in WestLB's filing amounted to 13 days, which had no negative impact on judicial proceedings, especially since WestLB timely filed the related guarantee questionnaire; (iii) the delayed filing gave rise to no danger of prejudice to the Debtors; and (iv) WestLB has acted in good faith.  Therefore, under Pioneer and its progeny, this Court should deny the objection and deem Claim 36789 as timely filed.

## **FACTUAL BACKGROUND**

A.    **WestLB's Transactions with the Lehman Brothers Enterprise**

1.    On or about May 22, 2006, WestLB and Lehman Brothers Finance, S.A. ("LBFSA") entered into an ISDA Master Agreement with an accompanying schedule (collectively, the "ISDA").[1]  Lehman Brothers Holdings Inc. ("LBHI") guaranteed the obligations of LBFSA under the ISDA (the "Guarantee").[2]  Under the ISDA, LBHI is the credit support provider of LBFSA, and the Guarantee is a credit support document.

---

[1]    A copy of the ISDA is attached as Exhibit A.

[2]    A copy of the Guarantee is attached as Exhibit B.

2.      On September 15, 2008, LBHI filed for bankruptcy.    This filing constituted an event of default under section 5(a)(vii) of the ISDA.  The next day, the operations agent of WestLB delivered a letter to LBFSA terminating the five outstanding derivative transactions under the ISDA.[3]

3.      On December 4, 2008, WestLB delivered a calculation statement to LBFSA, specifying that it owes WestLB $21,252,180.52 (the "Settlement Amount") on account of the five terminated derivative transactions under the ISDA.[4]

4.      On July 2, 2009, this Court issued the *Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form* (the "Bar Date Order") [Dkt. No. 4271].  The Bar Date Order established September 22, 2009 as the bar date for filing claims against LBHI and designated October 22, 2099 as the date by which creditors must submit the related derivatives and guarantee questionnaires.

5.      The Bar Date Order and due process required the Debtors to deliver a copy of the Bar Date Order by first class mail to all of LBHI's known creditors to provide them with actual notice of the bar date.  On March 12, 2009, the Debtors identified WestLB as a known creditor on their schedules.  See Schedule G of Lehman Brothers Holding Inc. (the "LBHI Creditor Schedule") [Dkt. No. 3078].  Moreover, the Debtors previously had received the notices terminated the swap and setting forth the Settlement Amount.

6.      Despite its status as a known creditor, WestLB *never received notification* of the bar date.[5]  As confirmed by the claims agent's affidavit of service (the "Affidavit of

---

[3]    A copy of the termination letter is attached as Exhibit C.

[4]    A copy of the calculation statement is attached as Exhibit D.

Service"), the Bar Date Order that should have been sent to WestLB in Dusseldorf, Germany was mailed mistakenly to Dusseldorf, Georgia.[6]

7.     It was not until October 2, 2009, that WestLB first learned of the actual bar date, during discussions with WestLB, New York Branch ("WestLB NY") regarding the resolution of claims related to the Lehman bankruptcy proceedings.  In particular, WestLB NY informed WestLB that WestLB NY filed claims against Lehman Brothers Special Finance, Inc. ("LBSF") on the basis of derivative transactions between LBSF and WestLB NY.  WestLB NY also informed WestLB that it filed corresponding claims against LBHI as the guarantor under the derivative transactions between WestLB NY and LBSF.  It was at this time that WestLB first learned of the September 22, 2009 bar date, and that its claim against LBHI could be forever barred pursuant to the Bar Date Order.

8.     Immediately upon learning that the bar date had passed, WestLB requested assistance from WestLB NY in order to file Claim 36789 against LBHI for the Settlement Amount.  Three days after learning of the bar date and 13 days after the bar date had passed, WestLB filed Claim 36789 on October 5, 2009.  WestLB also filed timely both the derivatives questionnaire and the guarantee questionnaire for Claim 36789.

9.     On September 13, 2010, the Debtors filed the objection.  The objection seeks, among other things, to disallow and expunge Claim 36789 because it was filed after the bar date.

---

[5]    The Declaration of Michael Cherubim is attached as Exhibit E.

[6]    A copy of the Affidavit of Service is attached as Exhibit F.

**B.    The ISDA Required LBFSA and LBHI to Deliver Notices Related to the
ISDA to WestLB's Legal Department in Dusseldorf, Germany**

10.    All five of the derivative transactions between LBFSA and WestLB,
which were identified in the ISDA confirmations with a particular "Global ID," were governed
by the ISDA.[7]  LBFSA entered into its first derivative trade with WestLB in December 2004.
Thereafter, LBFSA and WestLB entered into four additional trades, the latest of which occurred
in November 2005.

11.    Part 4 of the ISDA schedule provides that LBFSA must send all
notifications relating to the ISDA to the attention of WestLB's legal department located in
Dusseldorf, Germany.  Because LBHI was the guarantor of LBFSA's obligations under the
ISDA, LBHI was required to send the Bar Date Order to the attention of WestLB's legal
department at the address specified in the ISDA.  However, WestLB never received a copy of the
Bar Date Order because, according to the Affidavit of Service, the Bar Date Order was delivered
to Georgia, not Germany.  Moreover, the Bar Date Order was not addressed to the attention of
WestLB's legal department as required by the ISDA.  Consequently, WestLB never received the
required notice of the bar date.

**C.    German Insolvency Proceedings Do Not Have Strict Bar Dates**

12.    Because WestLB never received the Bar Date Order, WestLB did not
know that it had to file Claim 36789 by September 22, 2009.  Furthermore, WestLB had no
reason to suspect that it had to file Claim 36789 by September 22, 2099, because German
insolvency proceedings do not include a rigid claims bar date.  Instead, creditors of German
debtors are informed about a date on which to file their claims (the "Filing Date") and a hearing
date on which a court will approve their claims (the "Court Date").  In order for a creditor to

---

[7]    Copies of the ISDA confirmations are attached as Exhibits G.

participate in the first distribution round of the insolvency proceeding, its claim must be filed by

the Filing Date.   However, creditors that miss the Filing Date can start separate proceedings

through which they can apply for individual court dates on which to have their claims

acknowledged in the insolvency proceeding.   Because several distribution rounds occur, later-

filing creditors can expect to receive a distribution in a subsequent distribution round.   Creditors

can still participate in the debtor's insolvency proceedings until two weeks after the German

court publicly announces the final distribution round.   Even after all that time has passed, absent

complete dissolution of the debtor, creditors can still bring claims against the debtor after the

insolvency proceedings end.    Thus, absent receipt of the Bar Date Order from LBHI in

Dusseldorf, Germany, as specifically required under the ISDA, WestLB's German legal team did

not recognize that Claim 36789 would be barred if it was not filed by the bar date.

<u>**RESPONSE**</u>

**POINT I**

**DUE PROCESS AND THE BAR DATE ORDER PROHIBIT THE COURT FROM DISALLOWING CLAIM 36789 AS UNTIMELY FILED**

13.    Due process and the Bar Date Order dictate that WestLB, as a known

creditor, was entitled to receive actual notice of the bar date.   However, WestLB did not receive

actual notice of the bar date because the Debtors mistakenly sent the Bar Date Order to

Dusseldorf, Georgia.   WestLB should not be penalized for a filing delay caused by the Debtors'

mailing error.   Therefore, this Court should deny the objection and deem the Claim 36789 as

timely filed.

14.    The Supreme Court has held that "it is a fundamental principle of due

process that known creditors of a debtor are entitled to actual notice of a claims bar date before

their claims can be extinguished." <u>City of New York v. New York, New Haven & Hartford Railroad Co.</u>, 344 U.S. 293 (1953); <u>accord</u> <u>In re Premier Membership Servs., LLC</u>, 276 B.R. 709, 713 (Bankr. S.D. Fla. 2002).  Moreover, it is of no consequence that WestLB was aware of the Debtors' bankruptcy cases because [WestLB] has a "right to assume" that  will receive all required notices before its claim will be "forever barred."  <u>In re Premier Membership Servs., LLC</u>, 276 B.R. at 713.  Therefore, if WestLB was a known creditor, due process requires that WestLB receive actual notice of the bar date before Claim 36789 can be extinguished.

15.     In this case, WestLB was a known creditor because WestLB's identity was reasonably ascertainable by the Debtors. <u>See</u> <u>Tulsa Prof'l Collection Servs., Inc. v. Pope</u>, 485 U.S. 478, 490 (1988) (characterizing a "known" creditor as one whose identity is known or is "reasonably ascertainable by the debtor.").   More tellingly, WestLB was a known creditor because WestLB delivered a termination notice and calculation statement to the Debtors in accordance with the ISDA and WestLB was listed on the LBHI Creditor Schedule.  <u>See</u> <u>Premier Membership</u>, 276 B.R. at 713 (finding that there was "no doubt" that the creditor was known because it was listed in the debtors' schedules as holding a claim).  Due process entitled WestLB, as a known creditor, to actual notice of the bar date before Claim 36789 could be extinguished – notice that WestLB did not receive.  Therefore, because WestLB did not receive actual notice of the bar date, due process prohibits the disallowance and expungement of Claim 36789 as untimely filed.

### POINT II

### WESTLB'S MINOR DELAY WAS THE RESULT OF EXCUSABLE NEGLECT

16.     Bankruptcy Rule 9006(b)(1) authorizes the Court to exercise its discretion and deem Claim 36789 timely filed on the grounds that WestLB's filing delay was the result of

"excusable neglect." Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'Ship., 507 U.S. 380 (1993). In Pioneer, the Supreme Court identified four non-exhaustive factors that this Court should consider in deciding whether the delay in filing Claim 36789 was the result of excusable neglect. Id. at 395. These factors are: (1) the reason for the delay, including whether it was within the reasonable control of the movant; (2) the length of delay and its potential impact on judicial proceedings; (3) the danger of prejudice to the debtor; and (4) whether the moving party was acting in good faith. Id. As explained above, when these four factors are applied to WestLB's filing delay, this Court should find four sound reasons for finding that WestLB's filing delay was the result of excusable neglect.

A.      **The Debtors' Mailing Error Caused the Delay**

17.     The "reason for the delay" factor supports a finding of excusable neglect because it was the Debtors' failure to serve WestLB with the Bar Date Order that caused WestLB to file Claim 36789 after the bar date. The Second Circuit has found that when interpreting the Pioneer test, the Court should focus heavily on "the reason for [WestLB's] delay, including whether it was within the reasonable control of [WestLB]." Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.), 419 F.3d 115, 122 (2d. Cir. 2005). In this case, the delay was not within WestLB's reasonable control because the Debtors' mailing error was the sole reason for the delay. Had WestLB received the Bar Date Order in time, WestLB would have filed Claim 36789 on time. But, WestLB did not receive the Bar Date Order at all because it was sent to the wrong country, an event beyond WestLB's reasonable control. Moreover, given the differences between U.S. bankruptcy law and German bankruptcy law, WestLB had no reason to suspect that a strict bar date was rapidly approaching. Therefore, because the Debtors' mailing error caused the delay and because both the error and the resulting

delay were beyond WestLB's reasonable control, the "reason for the delay" factor supports a finding of excusable neglect.

## B.    The Length of the Delay Was Minor

18.    The "length of delay" factor also supports a finding of excusable neglect. In evaluating the length of delay, courts "generally consider the degree to which, in the context of a particular proceeding, the delay 'may disrupt the judicial administration of the case.'" In re Enron Corp., 419 F.3d at 128 (quoting In re Infiltrator Sys., Inc., 241 B.R. 278, 281 (Bankr. D. Conn. 1999)).  Where the debtor "has not yet filed a plan and is still engaged in assessing the validity and amounts of the timely filed claims, the impact upon the administration of the case of allowing [the] claim is not significant." Infiltrator Sys., 241 B.R. at 281.

19.    In this case, the delay was minor.  WestLB first learned of the bar date from WestLB NY on October 2, 2009.  Three days later, WestLB filed Claim 36789 against LBHI – 13 days after the bar date.  WestLB also timely filed its derivative and guarantee questionnaires, and thus provided the Debtors and their estates with the requisite information needed to evaluate and reconcile Claim 36789.

20.    On the day that WestLB filed Claim 36789, LBHI's professionals were still collecting information on the claims against the estate, the first step in assessing the validity and amounts of the claims.  As a result, WestLB's late-filed claim caused little to no disruption to the administration of LBHI's bankruptcy case.  Therefore, because WestLB's delay was minimal and had no negative impact on the administration of LBHI's bankruptcy case, the "length of delay" factor weighs in favor of this Court finding excusable neglect.

## C.    There Is No Danger of Prejudice to the Debtor

21.    In weighing the "danger of prejudice to the debtor," courts typically consider:  (i) the size of the claim compared to the size of the estate; (ii) whether the debtor had

knowledge of the claim when it filed the disclosure statement or plan; (iii) whether allowance of the claim would force creditors to return funds already paid out by the estate; and (iv) whether allowing the claim at issue would cause a flood of similarly situated late-filed claims.  See Enron, 419 at 130.  Because the focus is on the debtor, courts have found "very little danger of prejudice" when the debtor is winding down its estate under a liquidating plan, as is the case here.  See Premier Membership, 276 B.R. at 714 (collecting cases).

22.    In this case, all four considerations support a finding that the Debtors will not be prejudiced if the Court deems Claim 36789 as timely filed.  First, no danger of prejudice exists because the value of Claim 36789 is minuscule compared to the size of the Debtors' estates. WestLB filed Claim 36789 for approximately $21.2 million, which is less than 0.0037% of the $582.725 billion in total claims filed LBHI.  *Debtor's Disclosure Statement for Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code* at 451 [Dkt. No. 19629].

23.    Second, there is no danger of prejudice to the Debtors because the Debtors knew about Claim 36789 before the Debtors filed the plan and disclosure statement.  Claim 36789 was scheduled by LBHI in March 2009 and filed by WestLB in October 2009, several months before the Debtors filed their first plan in March of 2012 and disclosure statement in April if 2010 (and well before the Debtors' plan was confirmed in December 2011).  Third, there is no danger of prejudice to the Debtor because allowing Claim 36789 would not force creditors to return funds paid out by the Debtors.  LBHI's initial distribution, currently schedule for April 17, 2012, has not yet occurred, and even after the initial distribution, the Debtors will have sufficient reserves to satisfy Claim 36789 in full without adjusting their distribution projections or requiring creditors to return estate funds.  *Debtor's Notice of Effective Date and Distribution Date* [Dkt. No. 26039].

24.     Finally, there is no danger of prejudice to the Debtors because allowing Claim 36789 would not cause a flood of similarly situated late-filed claims.  Deeming Claim 36789 as timely filed, will not cause a flood of similarly situated late-filed claims for a very simple reason: WestLB's situation is unique.  It is extremely unlikely that the Court will receive an influx of requests from known creditors that did not receive actual notice of bar date because of the Debtors' mailing error, but nonetheless filed their claim within two weeks of the bar date and then timely filed the related questionnaires.[8]  Therefore, the "prejudice to the debtor" factor weighs in favor of this Court finding excusable neglect.

**D.     WestLB Has Acted in Good Faith**

25.     Finally, the "good faith" factor supports a finding of excusable neglect because WestLB's delay in filing Claim 36789 was due to a lack of notice – not bad faith. Moreover, WestLB acted promptly as soon as it learned of the bar date and has acted in good faith throughout the entire claims resolution process.  Thus, all four Pioneer factors weigh in favor of WestLB.[9]  As a result, this Court should find that WestLB's failure to file Claim 36789 before the bar date was the result of excusable neglect and deem Claim 36789 as timely filed.

---

[8]     See, e.g., In re Lehman Brothers Holdings Inc., 433 B.R. 113 (2010) (declining to find excusable neglect where the movants filed their claims before the questionnaire bar date because, *inter alia*, the claimants received actual notice of the bar date).

[9]     All four Pioneer factors need not weigh in WestLB's favor in order for this Court to find excusable neglect.  See In re Enron, No. 01-16034 (AJG), 2003 WL 21756785 at 4 (Bankr. S.D.N.Y. July 30, 2003).

## CONCLUSION

WHEREFORE, WestLB respectfully requests that this Court (1) overrule the Objection; (2) find that the delay in filing Claim 36789 was due to excusable neglect and deem Claim 36789 as timely filed; (3) allow Claim 36789 in full; and (4) grant such other relief as is just and necessary.

Dated:     Washington, DC
           April 5, 2012

CADWALADER, WICKERSHAM & TAFT LLP

*/s/ Mark C. Ellenberg*
Mark C. Ellenberg, Esq.
John H. Thompson, Esq.
700 6th Street, NW
Washington, DC  20001
Telephone:  (202) 862-2200
Facsimile:  (202) 862-2400

*Attorneys for WestLB AG*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>                                        Debtors. | Chapter 11<br><br>Case No. 08-13555 (JMP)<br><br>(Jointly Administered) |

### ORDER GRANTING WESTLB AG'S MOTION
### <ins>TO DEEM CLAIM NO. 36789 AS TIMELY FILED</ins>

Upon consideration of the response (the "<ins>Motion</ins>") of WestLB[1] for entry of an order (this "<ins>Order</ins>") pursuant to 11 U.S.C. § 105 of the United States Bankruptcy Code and Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure, deeming that Claim 36789 shall be timely filed; and for such further relief as the Court may deem just and proper; and it appearing that the relief requested by the Motion is appropriate; and due notice of the Motion having been given; and it appearing that no other or further notice of the Motion need be provided; and the Court having found and determined that it should exercise its discretion in accordance with the relief requested in the Motion and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, it is hereby:

ORDERED that the Motion is granted as set forth herein; and it is further

ORDERED that the Debtors' Fortieth Omnibus Objection to Claims (Late-Filed Claims) is denied as to Claim 36789; and it is further

ORDERED that Claim 36789 filed by WestLB against LBHI on October 5, 2009 is hereby deemed timely filed without prejudice to the rights of WestLB; and it is further

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

ORDERED that Claim 36789 shall be allowed against LBHI in its entirety; and it is further

ORDERED that this Court shall retain the exclusive jurisdiction to hear and determine all matters relating to the implementation of this Order.

Dated:      New York, New York
            _____, 2012


By:_____
      Honorable James M. Peck
      United States Bankruptcy Judge

# EXHIBIT A

(Multicurrency—Cross Border)

*LeDIS: LBSFCH/ISDA92NY*

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of ....May 22, 2006................:

among

**LEHMAN BROTHERS FINANCE S.A.**      and      **WESTLB AG**
*(Party A)*                                                              *(Party B)*

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions. Accordingly, the parties agree as follows: —

1.      **Interpretation**

(a)      *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)      Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)      Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)      *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)      *Netting.* If on any date amounts would otherwise be payable:—

    (i)   in the same currency; and

    (ii)  in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)      *Deduction or Withholding for Tax.*

    (i)   *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

    (1)  promptly notify the other party ("Y") of such requirement;

    (2)  pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

    (3)  promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

    (4)  if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

    (A)  the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

    (B)  the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

2                                                             ISDA® 1992

(ii)  *Liability*. If: —

(1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)  X does not so deduct or withhold; and

(3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)  *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)   *Basic Representations*.

(i)   *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)  *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii) *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)  *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)   *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3                                    ISDA® 1992

(b)    *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

4                                    ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.    **Events of Default and Termination Events**

(a)    · *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    · *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default*:

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;·

(v)    *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

5

ISDA® 1992

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or; (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

6                                                                                                    ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i) *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v) *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

7                                                              ISDA® 1992

**6.    Early Termination**

**(a)    *Right to Terminate Following Event of Default*.** If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

**(b)    *Right to Terminate Following Termination Event*.**

    **(i)    *Notice*.** If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

    **(ii)    *Transfer to Avoid Termination Event*.** If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

    **(iii)    *Two Affected Parties*.** If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

    **(iv)    *Right to Terminate*.** If: —

        (1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

        (2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)  *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)   Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)  *Calculations.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)   *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)  *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)   *Termination Events.* If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties.* If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)   *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)   *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

7. · Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    Contractual Currency

(a)    *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA® 1992

**9.    Miscellaneous**

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

12    ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 12.    Notices

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 13.    Governing Law and Jurisdiction

(a)    *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

13                                        ISDA® 1992

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

14                                    ISDA® 1992

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

15

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

"*Non-default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

"*Non-defaulting Party*" has the meaning specified in Section 6(a).

"*Office*" means a branch or office of a party, which may be such party's head or home office.

"*Potential Event of Default*" means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"*Reference Market-makers*" means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

"*Relevant Jurisdiction*" means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

"*Scheduled Payment Date*" means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

"*Set-off*" means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

"*Settlement Amount*" means, with respect to a party and any Early Termination Date, the sum of: —

(a)   the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)   such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

"*Specified Entity*" has the meanings specified in the Schedule.

16                                ISDA® 1992

"*Specified Indebtedness*" means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"*Specified Transaction*" means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

"*Stamp Tax*" means any stamp, registration, documentation or similar tax.

"*Tax*" means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

"*Tax Event*" has the meaning specified in Section 5(b).

"*Tax Event Upon Merger*" has the meaning specified in Section 5(b).

"*Terminated Transactions*" means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

"*Termination Currency*" has the meaning specified in the Schedule.

"*Termination Currency Equivalent*" means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

"*Termination Event*" means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

"*Termination Rate*" means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

"*Unpaid Amounts*" owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

17

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS FINANCE S.A.
(Party A)

By:
Name: Barbara Grob
Title: Authorised Signatory

12 June 2006

By:
Name: Nadia Casanova
Title: Authorised Signatory

12 June 2006

WESTLB AG
(Party B)

By:
Name: Richard J. Pearse
Title: Executive Director

By:
Name:
Title: CORNELIA GRIESHEIMER
ASSOCIATE DIRECTOR AND COUNSEL

18

ISDA ® 1992

# ISDA

International Swaps and Derivatives Association, Inc.

## SCHEDULE
to the

### Master Agreement

dated as of May 22, 2006
between

### LEHMAN BROTHERS FINANCE S.A. ("Party A")

and

### WESTLB AG ("Party B")

**Part. 1 Termination Provisions**

(a)     *"Specified Entity"* means in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v) | Not applicable |
| Section 5(a)(vi) | Not applicable |
| Section 5(a)(vii) | Not applicable |
| Section 5(b)(iv) | Not applicable |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v) | Not applicable |
| Section 5(a)(vi) | Not applicable |
| Section 5(a)(vii) | Not applicable |
| Section 5(b)(iv) | Not applicable |

(b)     *"Specified Transaction"* will have the meaning specified in Section 14 of this Agreement.

(c)     The *"Cross Default"* provisions of Section 5(a)(vi) will apply to Party A and will apply to Party B.

*"Specified Indebtedness"* will have the meaning specified in Section 14 of this Agreement provided, however, that it shall not include obligations in respect of deposits received in the ordinary course of a party's banking business.

*"Threshold Amount"* means in respect of Party A or any Credit Support Provider of Party A, three percent (3%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. determined as of the end of the most recent quarterly period for which financial statements have been prepared; and in respect of Party B, three percent (3%) of the total capital and reserves of Party B, determined as of the end of the most recent quarterly period for which financial statements have been prepared.

(d)     The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) will apply to Party A and will apply to Party B.

(e)    *"Automatic Early Termination"*.  The Automatic Early Termination provisions of Section 6(a) will apply to Party A and will not apply to Party B; provided, however, that (i) where the Event of Default specified in Section 5(a)(vii)(1), (3), (4), (5), (6) or, to the extent analogous thereto, (8), is governed by a system of law which does not permit termination to take place after the occurrence of the relevant Event of Default, then the Automatic Early Termination provision of Section 6(a) will apply to the Defaulting Party for purpose of such Event of Default, and (ii) to the extent that Section 6(a) is applicable, the second sentence of Section 6(a) shall only apply with respect to an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, Section 5(a)(vii)(8), if the relevant petition is presented to a court or other authority in the jurisdiction where the Defaulting Party is incorporated.

(f)    *Payments on Early Termination.*  For the purpose of Section 6(e) of this Agreement:

    (i)    Market Quotation will apply.

    (ii)    The Second Method will apply.

(g)    *"Termination Currency"* means U.S. Dollars.

(h)    The *"Additional Termination Event"* provisions of Section 5(b)(v) will apply.  The occurrence of the following will constitute an Additional Termination Event, with respect to each of Party A or Party B:

    Downgrading Event. Notwithstanding Section 7, Transfer, the Downgraded Party (as defined herein) shall as soon as practicable and in any case within thirty (30) Local Business Days of the occurrence of a Downgrading Event (as defined herein) either:

        (a)    transfer its rights and obligations under all outstanding Transactions (the "Assigned Transaction(s)") by concluding a novation agreement ("Transfer by Novation", each as acceptable to the non-Downgraded Party in its reasonable discretion) to a third party or parties (the relevant party or parties each being a "Transferee") provided that the relevant Transferee has accepted the Transfer by Novation of the Assigned Transaction(s) (having agreed to the amounts it shall pay or receive pursuant to the transfer and in particular has accepted its obligations under the Assigned Transactions, and the policies in effect at such time would permit the non Downgraded Party to enter into the Assigned Transaction(s) with the relevant Transferee(s) on the terms proposed; or

        (b)    post collateral in an amount, type and manner and, subject to documentation and governing law, acceptable to the non Downgraded Party; or

        (c)    secure a third-party guarantee or letter of credit acceptable to the non Downgraded Party; or

        (d)    enter into any other arrangement acceptable to the non Downgraded Party.

    If the Downgraded Party fails to take such remedial action within thirty (30) Local Business Days of the occurrence of a Downgrading Event (as herein defined), the non Downgraded Party shall have the right to terminate the Assigned Transaction(s) upon notice to the Downgraded Party. For the purposes of the foregoing Termination Event, the Downgraded Party shall be the Affected Party.

    For the purpose of the foregoing Additional Termination Event, "Downgrading Event" means with respect to Party A or Party B (the "Downgraded Party") an event whereby the rating issued or maintained by Standard & Poor's Rating Group, a division of McGraw-Hill Companies Inc. and its successors ("S&P") and Moody's Investors Service, Inc. and its successors ("Moody's") or any rating agency substituted for either of them by

-20-

agreement between Party A and Party B with respect to any of the long term, unsecured, unsubordinated debt securities of such party, whether or not such rating is under review with positive or negative implications, is below BBB- in the case of S&P and below Baa3 in the case of Moody's (or their respective equivalents for the time being) or fails to be rated by S&P and Moody's.

**Part. 2 Tax Representations**

(a)   *Payer Representations.* For the purpose of Section 3(e) of this Agreement, Party A and Party B will make no representations.

(b)   *Payee Representations.* For the purpose of Section 3(f) of this Agreement, Party A and Party B make the following representations:-

(i)   For the purpose of Section 3 (f) of this Agreement, Party A will make the following representation with respect to each Transaction entered into hereunder:

It is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits" provision, as the case may be, the "Interest" provision or "Other Income" provision (if any) of the double tax treaties concluded with Germany.

(ii)   For the purpose of Section 3 (f) of this Agreement, Party B will make the following representation:

(A)   Party B will identify by prior written notice or in the relevant Confirmation each Transaction as to which Party B is acting through an Office or agent located in the United States (including only the States thereof and the District of Columbia).

(B)   With respect to such Transactions, each payment received or to be received by Party B in connection with this Agreement will be effectively connected with its conduct of a trade or business in the United States.

(ii)   The following representation applies to Party B, and only with respect to Transactions that Party B has not identified pursuant to clause (b)(ii)(A) of Part-2 hereof:

Party B is a "non-U.S. branch of a foreign person" for purposes of sections 1.1441-4(a)(3)(ii) and 1.6041-4(a)(4) of the United States Treasury Regulations.

(iii)   The following representation applies to Party B, and only with respect to Transactions that Party B has not identified pursuant to clause (b)(ii)(A) of Part 2 hereof:

It is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits" provision, as the case may be, the "Interest" provision or "Other Income" provision (if any) of the double tax treaties concluded with Switzerland.

(iii)   For the purpose of Section 3 (f) of this Agreement, Party A and Party B make no representations if, with respect to a Transaction, the Offices of Party A and Party B entering into such Transaction are located in the same tax jurisdiction.

-21-

**Part. 3  Documents to be delivered**

For the purpose of Sections 4(a)(i) and (ii) this Agreement, each party agrees to deliver the following documents, as applicable:

(a)     Tax forms, documents or certificates to be delivered are:

| Party Required to Deliver Document | Form/Document/ Certificate | Date by Which To be Delivered |
|---|---|---|
| Party A and Party B | Any form or document required or reasonably requested to allow the other party to make payments under the Agreement without any deduction or withholding for or on account of any Tax, or with such deduction or withholding at a reduced rate, including without limitation, relevant IRS Forms W-8BEN, W-8ECI and W-9. | (i) Upon execution of this Agreement, and (ii) promptly upon reasonable demand by the other party. |

(b)     Other documents to be delivered are:

| Party required to deliver document | Form/Document or Certificate | Date by which to be delivered | Covered by Section 3(d) representation |
|---|---|---|---|
| Party A and Party B | A certificate (or, if available, the current authorized signature book of such party) specifying the names, titles, authority and specimen signatures of the persons authorized to execute this Agreement, any Credit Support Documents, each Confirmation on its behalf or other document entered into in connection with this Agreement on its behalf or on behalf of a Credit Support Provider or otherwise, as the case may be. | Upon execution of this Agreement | Yes |
| Party A and Party B | A copy of its annual reports containing audited consolidated financial statements for its fiscal year certified by independent public accountants, and all periodic unaudited consolidated financial statements, if any, in each case prepared in conformity with Generally Accepted Accounting Principles in the jurisdiction in which it is organized. | On demand after having become publicly available | No |
| Party A | A guarantee of Lehman Brothers Holdings Inc. in the form of Exhibit A specified in Part 4(l) of this Agreement. | On or before the execution of this Agreement | Yes |

-22-

| Party required to deliver document | Form/Document or Certificate | Date by which to be delivered | Covered by Section 3(d) representation |
|---|---|---|---|
| Party A | A certified copy of the resolution of the Board of Directors of Lehman Brothers Holdings Inc. approving the issuance of the Guaranty on behalf of Party B. | On or before the execution of this Agreement | Yes |
| Party A | A certified copy of the resolution of the Board of Directors approving the entering of this Agreement and each Transaction hereunder. | Upon execution of this Agreement | Yes |
| Party A and Party B | Such other documents as the other party may reasonably request in connection with each Transaction. | As soon as possible upon request | No |

**Part. 4  Miscellaneous**

(a)    *Addresses for Notices.* For the purpose of Section 12(a) of this Agreement:

Address for notices or communications to Party A:

Address:  Lehman Brothers Finance S.A.
Talstrasse 82, PO Box 2828
CH-8021  Zurich, Switzerland
Attention:  Documentation Manager
Facsimile No.: +41 1 287 8826
Telephone No.: +41 1 287 8825

Address for notices or communications to Party B:

With respect to Transactions through that Office and with respect to the Agreement generally (including, but not limited to, all notices or communications under Sections 5 and 6 of this Agreement):

**Düsseldorf Head Office**
Address: Herzogstraße 15, D-40217 Düsseldorf, Germany
Attention: Global Financial Markets
Facsimile No.: 00 49211 826 2612
Telephone No.: 00 49211 826 01
(For Transactions through that office)

or

**London Branch**
Address:  Woolgate Exchange, 25 Basinghall Street, London EC2V 5HA
Attention: Global Financial Markets
Facsimile No.:44 20 7020 2430
Telephone No.: 44 20 7020 2000
(For Transactions through that office)

-23-

or

**New York Branch**
Address:  1211 Avenue of the Americas, New York, NY 10036
Attention: Global Financial Markets
Facsimile No.: 001 212 597 8592/768 4781
Telephone No.: 001 212 597 8580
(For Transactions through that office)

or

**Tokyo Branch**
Address:  Roppongi Hills Mori Tower 37th Floor, 6-10-1 Roppongi, Minato-ku, Tokyo 106-6137, Japan
Attention: Legal Department/Global Financial Markets
Facsimile No.:00 813 6439 8341
Telephone No.: 00 813 6439 8200
(For Transactions through that office)

**With a copy of all notices under Sections 5 and 6 of this Agreement to:**

**Düsseldorf Head Office**
Address: WestLB AG, Herzogstraße 15, D-40217 Düsseldorf, Germany
Attention: Legal Department (Documentation Unit)
Facsimile No.: 00 49211 826 6124
Telephone No.: 00 49211 826 71709

(b)     *Process Agent.* For the purpose of Section 13(c) of this Agreement:

| | |
|---|---|
| Party A appoints as its Process Agent: | Lehman Brothers Inc.<br>Head of Transaction Management Group, New York<br>745 Seventh Avenue, 28th Floor<br>New York, NY 10019 |
| Party B appoints as its Process Agent: | WestLB AG<br>London Branch<br>Woolgate Exchange25 Basinghall Street<br>London EC2V 5HAAttention:  Legal Department |

(c)     *Offices.* The provisions of Section 10(a) of this Agreement will apply.

(d)     *Multibranch Party.* For the purpose of Section 10(c) of this Agreement:

Party A is not a Multibranch Party.

Party B is a Multibranch Party and may act through any office specified in a Confirmation.

(e)     *Calculation Agent.* The Calculation Agent is Party A, unless otherwise specified in a relevant Confirmation in relation to the relevant Transaction.

(f) *Credit Support Document.* Details of any Credit Support Document means (i) in relation to Party A: (a) The Guaranty of Lehman Brothers Holdings, Inc. in the form as attached hereto as Exhibit A; and (ii) in relation to Party B, None.

(g) *Credit Support Provider.* Credit Support Provider means (i) in relation to Party A: Lehman Brothers Holdings, Inc. with respect to Part 4(f)(i) above; and in relation to Party B: not applicable.

(h) *Governing Law.* This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(i) *Netting of Payments.* Subparagraph (ii) of Section 2(c) of this Agreement will apply to all Transactions.

(j) *"Affiliate"* will have the meaning specified in Section 14 of this Agreement; provided, however, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

**Part 5 Other Provisions**

(a) *Additional Basic Representations.* In Section 3(a) of this Agreement the following representations which shall be construed as Section 3(a)(vi), (vii) and (viii) shall be added:

    (vi) *No Agency.* It is entering into this Agreement and each Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

    (vii) *Organization.* It is, in the case of Party A, a company duly organized under the laws of Switzerland, and in the case of Party B, a corporation organized under the laws of Germany.

    (viii) *Eligible Contract Participant.* It is an "eligible contract participant" as defined in Section 1a (12) of the Commodity Exchange Act (7 U.S.C. 1a), as amended by the Commodity Futures Modernization Act of 2000.

(b) *Absence of Litigation.* In Section 3(c) of this Agreement the words "or any of its Affiliates" shall be deleted.

(c) *Tax Event.* In Section 5(b)(ii)(y) of this Agreement the words ", or, there is a substantial likelihood that it will," shall be deleted.

(d) *Set-off.* Section 6 of this Agreement shall be amended by adding a new Section 6(f):

"*Set-off.* Any amount (the "Early Termination Amount") payable to one party (the "Payee") by the other party (the "Payer") under Section 6(e), in circumstances where there is a Defaulting Party or one Affected Party in the case where a Termination Event under Sections 5(b)(i) or 5(b)(iv) or 5(b)(v), if applicable, has occurred, will at the option of the party ("X") other than the Defaulting Party or the Affected Party (and without prior notice to the Defaulting Party or the Affected Party) be reduced by its set-off against any amount(s) (the "Other Agreement Amount") payable (whether at such time or in the future or upon the occurrence of a contingency) by the Payee to the Payer (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement(s) between the Payee and the Payer or instrument(s) or undertaking(s) issued or executed by one party to, or in favour of, the other party (and the Other Agreement Amount will be discharged promptly and in all respects to the extent it is so set-off). X will give notice to the other party of any set-off effected under this Section 6(f).

For this purpose, either the Early Termination Amount or the Other Agreement Amount (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency. The term "rate of exchange" includes, without limitation,

any premiums and costs of exchange payable in connection with the purchase of or conversion into the relevant currency.

If an obligation is unascertained, X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section shall be effective to create a charge or other security interest. This Section shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise)"

(e)   *Recording of Telephone Conversations.* Each party (i) consents to the recording of the telephone conversations of trading and marketing personnel of the parties, and (ii) agrees that recordings may be submitted in evidence in any proceedings relating to this Agreement or any potential Transaction.

(f)   *Relationship Between Parties.* Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

   (i)   *Non-Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction: it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

   (ii)   *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

   (iii)   *Status of Parties.* The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(g)   *Escrow.* If (whether by reason of time difference between the cities where the payments are made or otherwise) it is not possible for simultaneous payments to be made on any date on which both parties are required to make a payment under the Agreement, either party may at its option and in its sole discretion notify the other party that the payments on any date are to be made in escrow.

If payment is to be made in escrow, deposit of the earlier payment to be made on that date shall be made by 2:00 p.m., local time, in the place of the earlier payment on that date with an escrow agent selected by the party giving the notice, accompanied by irrevocable payment instructions:

   (i)   to release the deposited amount to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date, accompanied by irrevocable payment instructions to the same effect; or

   (ii)   if the required deposit of the corresponding payment is not made on the same date, to return the payment deposited to the party that paid it into escrow.

The party that elects to have the payments made in escrow shall pay the costs of the escrow arrangements and shall cause the arrangements to provide that the escrow agent will pay interest on each amount deposited with it, for each day such amount remains in escrow past 5 p.m. local

-26-

time in the place where such deposit is held), at the same rate and calculated in the same way as it would pay interest on overnight deposits placed with it in the relevant currency on such day. Such interest shall be payable to the intended payee of the amount on which it has accrued, provided that such party has made the required deposit of the corresponding amount payable by it, failing which such interest shall be payable to the depositor.

(h)   "**Stockholders' Equity**" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles.

(j)   **Notices.** For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(k)   **Service of Process.** The penultimate sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(l)   **Accuracy of Specified Information.** Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

(m)   **Credit Support Default.** Section 5(a)(iii)(3) of this Agreement shall be amended by adding the following words: "or amends or modifies such Credit Support Document without the prior written consent of the other party."

(n)   **Third Party Rights.** Nothing in this Agreement is intended to confer on any person any right to enforce any term which that person would not have but for the Contracts (Right of Third Parties) Act 1999.

(o)   **Waiver of Trial By Jury.** To the fullest extent permitted by applicable law, each party irrevocably waives any and all rights to trial by jury with respect to any suit, action or legal proceeding arising under, or in connection with this Agreement or any Transaction or any Credit Support Document, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(p)   **Disclosure of Details.** The parties hereby irrevocably agree that each party may disclose details with respect to this Agreement and the Transactions documented hereunder to, and share information concerning this Agreement and the Transactions documented hereunder with, their respective branches and Affiliates.

(q)   The following shall be added to Section 4 of the Agreement:

"(f)   **Change of Place of Incorporation or Organization.** It will not change its place of incorporation or organization without prior written notice to the other party and it will not change the country of its incorporation or organization without the prior written consent of the other party."

(r)   *Transfer to Avoid Termination Event.* In Section 6(b)(ii) of this Agreement, first paragraph, the words "or Affiliates" shall be deleted with respect to Party B.

* * * *

-27-

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS FINANCE S.A.

By: _____
Name:
Title:    Barbara Grob
Date:    Authorised Signatory

*12 June 2006*

By: _____
Name:
Title:    Nadia Casanova
Date:    Authorised Signatory

*12 June 2006*

WESTLB AG

By: _____
Name:    Richard J. Pearse
Title:    Executive Director
Date:

By: _____
Name:    CORNELIA GRIESHEIMER
Title:    ASSOCIATE DIRECTOR AND COUNSEL
Date:    May 22, 2006

-28-

# EXHIBIT B

# LEHMAN BROTHERS

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

**LEHMAN BROTHERS FINANCE S.A.** ("Party A") and **WESTLB AG** ("Party B") have entered into a Master Agreement dated as of May 22, 2006, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, **LEHMAN BROTHERS HOLDINGS INC.**, a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a) Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b) Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c) Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived); provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d) This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e) Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f) Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

# LEHMAN BROTHERS

**IN WITNESS WHEREOF,** Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

2

# EXHIBIT C



BY COURIER
September 16, 2008

Lehman Brothers Finance S.A.
200 Vesey Street
New York
NY
10285
U.S.A.

Lehman Brothers Finance S.A.
Talstrasse 82, PO Box 2828
CH-8021 Zurich, Switzerland
Attention: Legal Department

Re:   Transactions between WestLB AG (f/k/a Westdeutsche Landesbank
      Girozentrale) and Lehman Brothers Finance S.A.

Dear Sir or Madam,

We refer to the Transactions and the ISDA Master Agreement, including the respective
Schedule thereto, dated as of May 22, 2006 to which the transactions are subject (the
"Master Agreement").  All terms not defined herein shall have the meanings assigned
in the Transactions or the Master Agreement, as the case may be.

This is to notify you that, due to Lehman Brothers Holdings Inc.'s institution of
bankruptcy proceedings, we are declaring an Event of Default pursuant to Section
5(a)(vii) of the Master Agreement and hereby designate tomorrow, September 17, 2008
as the Early Termination Date for the Transactions.

This notification letter is being delivered to you pursuant to Section 6(a) of the Master
Agreement.

Although your acknowledgement of receipt of this notification letter is not required for
this letter to be effective under the Master Agreement, we kindly request that you
acknowledge receipt hereof by signing below and faxing such acknowledgment to the
attention of: WestLB AG, London, Fax: 00 44 207 020 8600.

**WestLB AG**
**London Branch**

Woolgate Exchange
25 Basinghall Street
London EC2V 5HA
Tel: +44 (0)20 7020 2000
Fax: +44 (0)20 7020 2002
Telex: 884689
SWIFT: WELAGB2L
www.westlb.com

Managing Board:
Heinz Hilgert (Chairman),
Hubert Beckmann (Vice Chairman)
Dietrich Voigtländer (Vice Chairman)
Klemens Breuer, Dr. Wolfgang Nickels,
Dr. Hans-Jürgen Niehaus,
Werner Taiber
Head of the Supervisory Board:
Michael Breuer

Branch registered in
England No. BR001899
Incorporated with limited liability
in the Federal Republic of Germany
Reg. Amtsgerichte
Düsseldorf, HRB 42975
Münster, HRB 6400

Authorised by Bundesanstalt für Finanzdienstleistungsaufsicht ("BaFin") and regulated by the Financial Services
Authority for the conduct of UK business.



Sincerely,

L.N.P. Milburn
Authorised Signatory

Name:
Title:

Name: Tara McKee
Title: Authorised Signatory

Receipt Acknowledged September __, 2008

**LEHMAN BROTHERS FINANCE S.A.**

Name:
Title:

WestLB AG
London Branch

Woolgate Exchange
25 Basinghall Street
London EC2V 5HA
Tel: +44 (0)20 7020 2000
Fax: +44 (0)20 7020 2002
Telex: 884689
SWIFT: WELAGB2L
www.westlb.com

Managing Board:
Heinz Hilgert (Chairman),
Hubert Beckmann (Vice Chairman)
Dietrich Voigtländer (Vice Chairman)
Klemens Breuer, Dr. Wolfgang Nickels,
Dr. Hans-Jürgen Niehaus,
Werner Taiber
Head of the Supervisory Board:
Michael Breuer

Branch registered in
England No. BR001899
Incorporated with limited liability
in the Federal Republic of Germany
Reg. Amtsgerichte
Düsseldorf, HRB 42975
Münster, HRB 6400

Authorised by Bundesanstalt für Finanzdienstleistungsaufsicht ("BaFin") and regulated by the Financial Services
Authority for the conduct of UK business.

# EXHIBIT D



Lehman Brothers Finance S.A.
200 Vesey Street
New York
NY 10285, U.S.A.

Lehman Brothers Finance S.A. in Liquidation
Talstrasse 82, PO Box 2828
Attn.: Legal Department
        Documentation Manager
CH-8021 Zurich, Switzerland

| | |
|---|---|
| Ref. | 001-24310jd |
| Official in Charge | Jens Dohmessen |

| | |
|---|---|
| Telephone | + 49 211 826-71709 |
| Fax No. | + 49 211 826-6124 |
| E-Mail | jens_dohmessen@westlb.de |
| Date | December 4, 2008 |

Re:    Transactions between WestLB AG (f/k/a Westdeutsche Landesbank Girozentrale) and
Lehman Brothers Finance S.A. as follows (the "Transactions"):

| Type of Transaction | Trade Date | Confirmation dated as of | Global ID |
|---|---|---|---|
| Option Transaction | 02-Dec-04 | 09-Jun-06 | 2036495 |
| Option Transaction | 04-Mar-05 | 28-Feb-06 | 2098217 |
| Option Transaction | 18-Nov-05 | 04-May-06 | 2322784 |
| Option Transaction | 21-Sep-05 | 14-Nov-05 | 2266515 |
| Option Transaction | 24-Jun-05 | 21-Apr-06 | 2195942 |

Dear Sir or Madam,

We refer to the Transactions described above, the ISDA Master Agreement, including the respective
Schedule thereto, dated as of August 18, 1997 (the "Master Agreement 1997") and the ISDA Master
Agreement, including the respective Schedule thereto, dated as of May 22, 2006 to which the
transactions are subject (the "Master Agreement 2006", and together with the Master Agreement

WestLB AG

Herzogstraße 15
40217 Düsseldorf
Post office address:
40199 Düsseldorf

Tel. + 49 211 826-01
Fax + 49 211 826-6119
www.westlb.com

Managing Board:
Heinz Hilgert (Chairman),
Hubert Beckmann (Vice Chairman),
Dietrich Voigtländer (Vice Chairman),
Klemens Breuer, Thomas Groß,
Dr. Wolfgang Nickels,
Dr. Hans-Jürgen Niehaus, Werner Taiber

Head of the Supervisory Board:
Michael Breuer

Reg. Amtsgerichte:
Düsseldorf, HRB 42975
Münster, HRB 6400
Registered Office:
Düsseldorf/Münster

SWIFT address WELA DE DD
USt-IdNr. DE119379254



Page 2
of our Letter dated December 4, 2008

1997 the "Master Agreements"). All terms not defined herein shall have the meanings assigned in the Transactions or the Master Agreements, as the case may be.

By a letter dated September 15, 2008, WestLB AG ("WestLB") has notified you of a declaration of default pursuant to Section 5(a)(vii) of the Master Agreement 1997 and has designated September 16, 2008 as the Early Termination Date. By a letter dated September 16, 2008, WestLB has notified you of a declaration of default pursuant to Section 5(a)(vii) of the Master Agreement 2006 and has designated September 17, 2008 as the Early Termination Date for the Transactions.

This notification letter is being delivered to you pursuant to Sections 6(d) and 6(f) of the Master Agreements.

In accordance with the terms of the Master Agreements, the amount payable upon an Early Termination shall be determined by Loss if a market quotation cannot be determined or would not (in WestLB's reasonable belief) produce a commercially reasonable result. We have determined that the Settlement Amount plus Unpaid Amounts with respect to the above Transactions is equal to USD 21.252.180,52 (the "Termination Amount").

The Termination Amount has been calculated as of 11 am (New York City time) on September 17, 2008, and in accordance with Section 6(e) of the Master Agreements, using Loss because WestLB was unable to obtain quotations from the following Reference Market-makers: Credit Suisse Securities (Europe) Limited, Bank of America and JPMorgan Securities Limited. Since such quotations could not be obtained from these Reference Market-makers, the Termination Amount has been calculated in accordance with the fall-back provisions of the Master Agreements, Loss.

| Global ID | Trade Date | Confirmation dated as of | Termination Amount (in USD) |
|---|---|---|---|
| 2036495 | 02-Dec-04 | 09-Jun-06 | 36.671.636,45 |
| 2098217 | 04-Mar-05 | 28-Feb-06 | 222.707,95 |
| 2322784 | 18-Nov-05 | 04-May-06 | 15.993,49 |
| 2266515 | 21-Sep-05 | 14-Nov-05 | - 3.015.844,12 |
| 2195942 | 24-Jun-05 | 21-Apr-06 | - 12.642.313,25 |
| Total | | | 21.252.180,52 |

This is to notify you that you are required to pay WestLB the Termination Amount in accordance with Section 6 of the Master Agreements to WestLB's account as follows:

Page 3
of our Letter dated December 4, 2008

 WestLB

JP Morgan Chase Bank, NY
    Acct. #11352275
    Acct. Name: WestLB AG
    Swift Code: CHASUS33

Although your acknowledgement of receipt of this notification is not required for this letter to be
effective under the Master Agreement, we kindly request that you acknowledge receipt hereof by
signing below and faxing such acknowledgment to the attention of: WestLB AG, Legal Department,
001-24310, Fax: +49 (0) 211 826 9230.

A copy of this letter has been sent to PricewaterhouseCoopers, Attn.: Ms. Christiana Suhr, Mr.
Pascal Portmann, Birchstr. 160, 8050 Zurich, Switzerland.

Sincerely,

Name: ppa. Dr. Carsten Römmer-Collmann
Title: Director

Name: Jens Dohmessen
Title: Associate Director

Receipt Acknowledged December ___, 2008

Lehman Brothers Finance S.A.

Name:
Title:

# EXHIBIT E

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x

In re                                    :          **Chapter 11**

**LEHMAN BROTHERS HOLDINGS INC.,** *et. al.,*   :          **Case No. 08-13555 (JMP)**

                        **Debtors**      :          **(Jointly Administered)**

-----------------------------------------------------------------x

### DECLARATION OF MICHAEL CHERUBIM IN SUPPORT OF WESTLB AG'S RESPONSE TO DEBTORS' FORTIETH OMNIBUS OBJECTIONS TO CLAIMS (LATE-FILED CLAIMS) AS TO CLAIM NO. 36789 AND MOTION TO DEEM CLAIM NO. 36789 TIMELY FILED

I, Michael Cherubim, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

1.      I am an Executive Director of WestLB AG (f/k/a Westdeutsche Landesbank Giorzentrale) ("WestLB").

2.      WestLB and Lehman Brothers Finance, S.A. ("LBFSA") entered into an ISDA Master Agreement, together with a Schedule on or about May 22, 2006 (collectively, the "ISDA"). The ISDA includes a guarantee by Lehman Brothers Holdings Inc. ("LBHI") of any and all LBFSA's obligations under the ISDA (the "Guarantee").

3.      On October 2, 2009, WestLB and WestLB AG, New York Branch ("WestLB NY") discussed the resolution of the claims each had in regards to the various Lehman entities involved in the Lehman bankruptcy proceedings. WestLB NY informed WestLB that it filed claims against Lehman Brothers Special Finance, Inc. ("LBSF"), a U.S. affiliate of LBHI, which resulted from derivative transactions between LBSF and WestLB NY. Furthermore, WestLB NY informed WestLB that it filed corresponding claims against LBHI as the guarantor under the derivative transactions between WestLB NY and LBSF. It was at this time and through these conversations that WestLB first learned that its right to bring a claim against LBHI under the ISDA may be barred by the Claims Bar Date.

4.      WestLB did not receive the Bar Date Order from LBHI.

5.      On October 5, 2009, immediately after learning that the Claims Bar Date had passed, WestLB promptly filed a claim against LBHI for the Settlement Amount with the assistance of WestLB NY.  This claim was filed by WestLB just 3 days from learning of the Claims Bar Date and only 13 days after the actual Claims Bar Date had passed, yet before the Questionnaire Bar Date.

6.      On October 22, 2009, WestLB also filed both the derivatives questionnaire and the guarantee questionnaire relating to its claim against LBHI with the assistance of WestLB NY.

7.      At the time of LBHI's bankruptcy filing, WestLB had five outstanding derivative transactions with LBFSA.

8.      Insolvency proceedings in Germany do not contain the type of strict claims bar dates that U.S. bankruptcy proceedings institute.  Absent WestLB actually receiving the Bar Date Order, it would have no reason to suspect that it would be prohibited from bringing claims against LBHI.  As is customary in bankruptcy proceedings in Germany, creditors are informed about a date to file their claims (the "Filing Date") as well as a date for a court hearing in order to have their claims approved (the "Court Date").  In order for a creditor to get approval of the existence of its claim on the Court Date, and to recoup under its claim in the first distribution round of the bankruptcy proceeding, its claim needs to be filed by the Filing Date.

9.      In Germany, creditors that miss the Filing Date can start separate proceedings and apply for individual court dates to have their claims acknowledged in the bankruptcy proceeding.  Because there are several distribution rounds in German bankruptcy proceedings, these creditors can expect to recoup under their claims during subsequent distribution rounds.  It is not uncommon for creditors to do so and costs for such proceeding are quite low, and vary from EUR 6 to 15.  It is not until the German court gives public announcement about the final distribution round, and thereafter an additional two weeks pass, that creditors are prohibited from participating in the debtor's insolvency proceedings.  Moreover, even after all of this time passes, absent complete dissolution of the debtor, creditors are still able to bring claims against the debtor after the insolvency proceedings end.  Conceptually German insolvency proceedings provide for factually unlimited filing periods as long as the debtor is not completely dissolved.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on February 2, 2012.

Michael Cherubin

# EXHIBIT F

USActive 25684221.1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------x

| | : | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------------------------x      **Ref. Docket No. 4271**


### AFFIDAVIT OF SERVICE

STATE OF NEW YORK      )
                                        ) ss.:
COUNTY OF NEW YORK   )

          HERB BAER, being duly sworn, deposes and says:

1.    I am employed by Epiq Bankruptcy Solutions, LLC, located at 757 Third Avenue, New York, New York 10017.  I am over the age of eighteen years and am not a party to the above-captioned action.

2.    On July 8, 2009, I caused to be served the:

   a)   "NOTICE OF DEADLINES FOR FILING PROOFS OF CLAIM", dated July 8, 2009, a copy of which is attached as Exhibit "A" (the "Bar Date Notice"),

   b)   "PROOF OF CLAIM" form, a copy of which is attached hereto as Exhibit "B", (the "General Proof of Claim Form"), and

   c)   "PROOF OF CLAIM" form with a legend stating "Notice of Scheduled Claim", a copy of which is attached hereto as Exhibit "C", (the "Schedule Proof of Claim Form")

by causing true and correct copies of the:

   a)   Bar Date Notice and a blank General Proof of Claim Form to be enclosed securely in separate postage pre-paid envelopes and delivered by first class mail to those parties listed on the attached Exhibit "D",

   b)   Bar Date Notice and a General Proof of Claim Form, personalized to include the name and address of the creditor, to be enclosed securely in separate postage pre-paid envelopes and delivered by first class mail to those parties listed on the attached Exhibit "E", and

   c)   Bar Date Notice and a Schedule Proof of Claim Form, personalized to include the name and address of the creditor and debtor, amount, nature, classification and description of the scheduled claim, to be enclosed securely in separate postage pre-paid envelopes and delivered by first class mail to those parties listed on the attached Exhibit "F".

3. All envelopes utilized in the service of the foregoing contained the following legend:
"LEGAL DOCUMENTS ENCLOSED. PLEASE DIRECT TO ATTENTION OF
ADDRESSEE, PRESIDENT OR LEGAL DEPARTMENT."

_____
Herb Baer

Sworn to before me this
10th day of July, 2009

_____
Notary Public

**Exhibit "E"**

| Claim Name | Address Information |
|---|---|
| WESTIN NEW YORK AT TIMES SQUARE | 270 WEST 43RD STREET NEW YORK NY 10036 |
| WESTIN PALACE MILAN | PIAZZA DELLA REPUBBLICA MILAN 202-0124 ITALY |
| WESTIN PALO ALTO HOTEL | 675 EL CAMINO REAL PALO ALTO CA 94301 |
| WESTIN SEATTLE | 1900 FIFTH AVENUE SEATTLE WA 98101 |
| WESTIN STAMFORD HOTEL | ONE FIRST STAMFORD PLACE STAMFORD CT 06902 |
| WESTIN TAMPA HARBOUR ISLAND | 725 SOUTH HARBOUR ISLAND BLVD TAMPA FL 33602 |
| WESTIN TOKYO | 1-4-1 MITA MEGURO-KU 13 153-8580 JAPAN |
| WESTLB | GIROZENTRALE LONDON BRANCH WOOLGATE EXCHANGE 25 BASINGHALL STREET LONDON EC2V 5HA UK |
| WESTLB | GIROZENTRALE LONDON BRANCH WOOLGATE EXCHANGE 25 BASINGHALL STREET LONDON EC2V 5HA UNITED KINGDOM |
| WESTLB AG | WESTDEUTSCHE LANDESBANK GIROZENTRALE HERZOGSTRABE 15 D-40217 ATTN: INVESTMENT BANKING, SWAP DEPT DUSSELDORF GEORGIA |
| WESTLB AG | ATTN: LEGAL DEPARTMENT WESTDEUTSCHE LANDESBANK GIROZENTRALE 1211 AVENUE OF THE AMERICAS 25TH FLOOR NEW YORK NY 10036 |
| WESTLB AG | WESTDEUTSCHE LANDESBANK GIROZENTRALE NEW YORK BRANCH 1211 AVENUE OF THE AMERICAS ATTN: LEGAL DEPARTMENT NEW YORK NY 10036 |
| WESTLB AG | 1211 AVE OF THE AMERICAS NEW YORK NY 10036 |
| WESTLB PANMURE | NEW BROAD STREET HOUSE 35 NEW BROAD STREET LONDON EC2M 1SQ UK |
| WESTLB PANMURE | NEW BROAD STREET HOUSE 35 NEW BROAD STREET LONDON EC2M 1SQ UNITED KINGDOM |
| WESTLB UK PENSION PLAN | ATTN: LEGAL GROUP PIMCO 840 NEWPORT CENTER DRIVE SUITE 100 NEWPORT BEACH CA 92660 |
| WESTLIN TAMPA HARBOUR ISLAND | 725 SOUTH HARBOUR ISLAND BLVD TAMPA FL 33602 |
| WESTMINSTER ADVISERS | 48 WESTMINSTER PALACE GARDENS 1-7 ARTILLERY ROW LONDON SW1P 1RR UK |
| WESTMINSTER ADVISERS | 48 WESTMINSTER PALACE GARDENS 1-7 ARTILLERY ROW LONDON SW1P 1RR UNITED KINGDOM |
| WESTMINSTER CHALLENGE | C/O SMITHFIELD 10 ALDERSGATE STREET LONDON EC1A 4HJ UK |
| WESTMINSTER CHALLENGE | C/O SMITHFIELD 10 ALDERSGATE STREET LONDON EC1A 4HJ UNITED KINGDOM |
| WESTMINSTER KENNEL CLUB | 169 MADISON AVE SUITE 603 NEW YORK NY 10016 |
| WESTMINSTER RESEARCH ASSOC. | 1633 BROADWAY 48TH FLOOR NEW YORK NY 10019 |
| WESTMINSTER SCHOOLS, INC. | 1424 W. PACES FERRY RD N.W. ATLANTA GA 30327 |
| WESTMINSTER THEOLOGICAL SEMINARY | P.O. BOX 27009 PHILADELPHIA PA 19118 |
| WESTMONT COLLEGE | 955 LA PAZ ROAD SANTA BARBARA CA 93103 |
| WESTMOOR CLUB MANAGEMENT, LLC | 10 WESTMOORE LANE NANTUCKET MA 02554 |
| WESTOBY,RICHARD ALEXANDER WATMOUGH | THE BROMPTON 82 REDCLIFFE GARDENS LONDON, GT LON SW10 9HE UNITED KINGDOM |
| WESTON | ROPPONGI SHINSEI BLDG 4F 3-1-18 NISHIAZABU MINATO-KU 106-0031 JAPAN |
| WESTON | ROPPONGI SHINSEI BLDG 4F 3-1-18 NISHIAZABU MINATO-KU 13 106-0031 JAPAN |
| WESTON CAPITAL MANAGEMENT | ATTN: MARK SZYCHER 264 RIVERSIDE AVE. WESTPORT CT 06880 |
| WESTON FINANCIAL | ATTN: JIM DAVIDSON 40 WILLIAM ST WELLESLEY MA 02481 |
| WESTON P CLAYTON | 2107 S CURSON AVE LOS ANGELES CA 90016 |
| WESTON SR.,DAVID E | 216 RAMBO HILL ROAD SHERMANS DALE PA 17090 |
| WESTON, CHRIS | 15 CLAYLANDS ROAD LONDON SW8 1NX UNITED KINGDOM |
| WESTON, DAVID | 311 EAST 38TH STREET APT 18A NEW YORK NY 10016 |
| WESTON, GERALD | 249 MEADOWBROOK RD WYCKOFF NJ 07481 |
| WESTON, GERALD S | 249 MEADOWBROOK RD WYCKOFF NJ 07481-3435 |
| WESTON, MATTHEW J | MARL FARM BYERS LANE SURREY SOUTH GODSTONE RH98JH UNITED KINGDOM |
| WESTON,CHRIS | 15 CLAYLANDS ROAD LONDON, GT LON SW8 1NX UNITED KINGDOM |
| WESTON,DANIELA | 11 GULLYMORE BRETTON PETERBOROUGH, CAMBS PE3 8LD UNITED KINGDOM |
| WESTON,GERALD S. | 249 MEADOWBROOK RD WYCKOFF NJ 07481 |
| WESTON,MATTHEW J | MARL FARM BYERS LANE SOUTH GODSTONE, SURREY RH98JH UNITED KINGDOM |
| WESTOVER, CATHERINE M. | C/O MARY ANN FESSLER 2722 N. 10TH STREET, APT 105 SHEBOYGAN WI 53083-4059 |