# Exhibit A

**(Swap Agreement)**

(Local Currency-Single Jurisdiction)                                    Execution Copy

# ISDA®

### International Swaps and Derivatives Association, Inc.

# MASTER AGREEMENT
#### dated as of January 1, 2003



Lehman Brothers Special Financing Inc. and Minnesota Masonic Home Care Center have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement (the "Master Agreement"), which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

**1.      Interpretation**

(a)      *Definitions*.  The terms defined in Section 12 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency*.  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement*.  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.      Obligations**

(a)      *General Conditions*.

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)      Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)      Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b)    *Change of Account.*  Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.*  If on any date amounts would otherwise be payable:—

(i)    in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction.  The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date).  This election may be made separately for different groups of Transactions and will apply separately to each pairing of branches or offices through which the parties make and receive payments or deliveries.

(d)    *Default Interest; Other Amounts.*  Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate.  Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.  If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into) that:—

(a)    *Basic Representations.*

(i)    *Status.*  It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers.*  It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYB 1287071.5

perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorize such execution, delivery and performance;

(iii)  *No Violation or Conflict*.  Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)  *Consents*.  All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)  *Obligations Binding*.  Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)  *Absence of Certain Events*.  No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)  *Absence of Litigation*.  There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)  *Accuracy of Specified Information*.  All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

**4.    Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)  *Furnish Specified Information*.  It will deliver to the other party any forms, documents or certificates specified in the Schedule or any Confirmation by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)  *Maintain Authorizations*.  It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)  *Comply with Laws*.  It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

**5.    Events of Default and Termination Events**

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYB 1287071.5

(a)     *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)     *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)     *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)     *Credit Support Default*.

(1)     Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)     the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)     the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)     *Misrepresentation*. A representation made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)     *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)     *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount

Copyright © 1992 by International Swaps and Derivatives Association, Inc.
4

of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*.  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1)     is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*.  The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1)     the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)     the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)     *Termination Events*.  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYB 1287071.5

constitutes an Illegality if the event is specified in (i) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (ii) below or an Additional Termination Event if the event is specified pursuant to (iii) below:—

(i) *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(iii) *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

## 6. Early Termination

(a) *Right to Terminate Following Event of Default*. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b) *Right to Terminate Following Termination Event*.

(i) *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYB 1287071.5

Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii) *Two Affected Parties*. If an Illegality under Section 5(b)(i)(1) occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iii) *Right to Terminate*. If:—

(1) an agreement under Section 6(b)(ii) has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality other than that referred to in Section 6(b)(ii), a Credit Event Upon Merger or an Additional Termination Event occurs,

either party in the case of an Illegality, any Affected Party in the case of an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c) *Effect of Designation*.

(i) If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii) Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(d) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) *Calculations*.

(i) *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii) *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment), from (and including) the relevant Early Termination Date to (but excluding) the date such amount is

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYB 1287071.5

paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.*    If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss," and a payment method, either the "First Method" or the "Second Method." If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method," as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1)    *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party over (B) the Unpaid Amounts owing to the Defaulting Party.

(2)    *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)    *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)    *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)    *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)    *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)    *Two Affected Parties.* If there are two Affected Parties:—

(A)    if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYB 1287071.5

lower Settlement Amount ("Y") and (b) the Unpaid Amounts owing to X less (II) the Unpaid Amounts owing to Y; and

(B)      if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)    *Adjustment for Bankruptcy.*  In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    *Pre-Estimate.*  The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty.  Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7.      Transfer

Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)      a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)      a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.      Miscellaneous

(a)      *Entire Agreement.*  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)      *Amendments.*  No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)      *Survival of Obligations.*  Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYB 1287071.5

(d)     *Remedies Cumulative.*  Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)     *Counterparts and Confirmations.*

    (i)     This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

    (ii)     The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise).  A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement.  The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)     *No Waiver of Rights.*  A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)     *Headings.*  The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**9.     Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**10.     Notices**

(a)     *Effectiveness.*  Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

    (i)     if in writing and delivered in person or by courier, on the date it is delivered;

    (ii)     if sent by telex, on the date the recipient's answerback is received;

    (iii)     if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

    (iv)     if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

    (v)     if sent by electronic messaging system, on the date that electronic message is received,

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYB 1287071.5

unless the date of that delivery (or attempted delivery ) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.*  Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 11.    Governing Law and Jurisdiction

(a)    *Governing Law.*  This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.*  With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

   (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

   (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Waiver of Immunities.*  Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 12.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYB 1287071.5

indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

      (a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

      (b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

      (c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

      (d)    in all other cases, the Termination Rate.

*"consent"* includes a consent, approval, action, authorization, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iii).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"law"* includes any treaty, law, rule or regulation and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYB 1287071.5

bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them).  Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies.  Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 9.  A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable.  A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers.  Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date.  For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included.  The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree.  The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date.  The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other.  If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values.  If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations.  For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded.  If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYB 1287071.5

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

(a)    the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Event"* means an Illegality or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYB 1287071.5

market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate.   Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed.   The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS SPECIAL
FINANCING INC.

By: _____
    Name: T. Courtney Jenkins
    Title:  Vice President
    Date:  January 1, 2003

MINNESOTA   MASONIC   HOME   CARE
CENTER

By: _____
    Name:  Edwin A. Martini, Jr.
    Title:   President/CEO
    Date:   January 1, 2003

market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:

Name:  T. Courtney Jenkins
Title:   Vice President
Date:  January 1, 2003

MINNESOTA MASONIC HOME CARE CENTER

By:

Name:  Edwin A. Martini, Jr.
Title:   President/CEO
Date:  January 1, 2003

SCHEDULE
to the
MASTER AGREEMENT
dated as of January 1, 2003
between
LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A"),
a corporation organized under
the laws of
the State of Delaware
and
MINNESOTA MASONIC HOME CARE CENTER
a corporation organized under the laws of the State of Minnesota ("Party B"),

Part 1. **Termination Provisions.**

In this Agreement:—

(a)  *"Specified Entity"* means in relation to Party A for the purpose of:—

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transaction), | Lehman Brothers Holdings Inc. ("Holdings"). |
| Section 5(a)(vi) (Cross Default), | Holdings. |
| Section 5(a)(vii) (Bankruptcy), | Holdings. |
| Section 5(b)(ii) (Credit Event Upon Merger), | Holdings. |

and in relation to Party B for the purpose of:—

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transaction), | Not applicable. |
| Section 5(a)(vi) (Cross Default), | Not applicable. |
| Section 5(a)(vii) (Bankruptcy), | Not applicable. |
| Section 5(b)(ii) (Credit Event Upon Merger), | Not applicable. |

(b)  *"Specified Transaction"* will have the meaning specified in Section 12 of this Agreement.

(c)  The *"Cross Default"* provisions of Section 5(a)(vi) will apply to Party A and Party B.

The following provisions apply:—

*"Specified Indebtedness"* will have the meaning specified in Section 12 of this Agreement.

*"Threshold Amount"* means two percent (2%) of the Stockholders' Equity of Holdings, in the case of Party A and Holdings (or its equivalent in any other currency), and USD 10,000,000 in the case of Party B.

(d)  The *"Credit Event Upon Merger"* provisions of Section 5(b)(ii) will apply to Party A and Party B.

(e)    The *"Automatic Early Termination"* provisions of Section 6(a) will not apply to either Party A or Party B.

(f)    *Payments on Early Termination.*    For the purpose of Section 6(e) of this Agreement, Market Quotation and the Second Method will apply.

Part 2.    **Agreement to Deliver Documents.**

For the purpose of Section 4(a) of this Agreement, each party agrees to deliver the following documents, as applicable:—

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Certified copies of all documents evidencing necessary corporate and other authorizations and approvals with respect to the execution, delivery and performance by the party and any Credit Support Provider of this Agreement, any Credit Support Document and any Confirmation, including, where applicable, certified copies of the resolutions of its Board of directors authorizing the execution and delivery of this Agreement, the relevant Credit Support Document or any Confirmation, substantially in the form of Exhibit E to this Schedule. | Upon execution of this Agreement and promptly at the request of the other party upon execution of a Confirmation. | Yes |
| Party A | A guarantee of Holdings in the form of Exhibit B to this Schedule. | Upon execution of this Agreement. | Yes |
| Party A | An opinion of counsel to Party A substantially in the form of Exhibit C to this Schedule. | Upon execution of this Agreement. | No |
| Party B | An opinion of counsel to Party B substantially in the form of Exhibit D to this Schedule. | Upon execution of this Agreement. | No |

NYB 1287071.5

| Party A and Party B | A certificate of an authorized officer of the party and any Credit Support Provider as to the incumbency and authority of the officers of the party and any Credit Support Provider signing this Agreement, any Credit Support Document or any Confirmation, substantially in the form of Exhibit F to this Schedule | Upon execution of this Agreement and promptly at the request of the other party upon execution of a Confirmation. | Yes |
|---|---|---|---|
| | | | |

Part 3.  **Miscellaneous.**

(a)    *Addresses for Notices.*  For the purpose of Section 10(a) to this Agreement:—

Address for notices or communications to Party A:—

Address:        745 Seventh Avenue, 5th Floor, New York, NY 10019

Attention:        Municipal Financial Products - Middle Office

Facsimile No.:  646-758-2988

Telephone No.: 212-526-2240

With a copy to:

101 Hudson Street, 33rd Floor, Jersey City, NJ 07302

Facsimile No.:  201-524-5833

Telephone No.: 201-524-5293

Address for notices or communications to Party B:—

Address:        11501 Masonic Home Drive, Bloomington, MN 55437

Attention:        CEO President

Facsimile No.:  952-948-6113

Telephone No.:  952-948-7000

Attention:        Vice President of Finance

Facsimile No.:  952-948-6210

3

Telephone No.: 952-948-7000

With a copy to:

Address:   Cain Brothers & Co., LLC, 452 Fifth Avenue, 25th Floor, New York, NY 10018
           Attention:     Derivatives Group
           Facsimile:     212-504-0807
           Telephone:     212-869-5600

(b) *Calculation Agent.* The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(c) *Credit Support Document.* Details of any Credit Support Document:—

In the case of Party A, a guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit B.

In the case of Party B, not applicable.

(d) *Credit Support Provider.* Credit Support Provider means in relation to Party A: Holdings. Credit Support Provider means in relation to Party B: Not applicable.

(e) *Governing Law.* This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(f) *Netting of Payments.* Subparagraph (ii) of Section 2(c) of this Agreement will not apply to all Transactions.

(g) *"Affiliate"* will have the meaning specified in Section 12 of this Agreement.

Part 4.  **Other Provisions.**

(a) *Agreements.*

(i) [Reserved]

Miscellaneous:

(b) Confirmation. A form of Confirmation is set forth as Exhibit A hereto or as mutually agreed upon by the parties.

(c) "Stockholders' Equity" means with respect to Holdings, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles.

(d) This Agreement is hereby amended by adding the following Section "13" hereto:—

"13.      **Relationship Between Parties**

Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):-

(a)      *Non-Reliance*. It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisors as it has deemed necessary.

4

It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. It has not received from the other party any assurance or guarantee as to the expected results of that Transaction.

(b)      *Assessment and Understanding.*   It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(c)      *Status of Parties.*   The other party is not acting as a fiduciary for or as an advisor to it in respect of the Transaction."

NYB 1287071.5

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____

TITLE: Vice President

MINNESOTA MASONIC HOME CARE CENTER

By: _____

Title: President/CEO

EXHIBIT A to Schedule

Form of Confirmation

[Date]

TRANSACTION

[address]

Attention:

Ladies and Gentlemen:

The purpose of this letter agreement is to set forth the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the Master Agreement specified below.

The definitions and provisions contained in the 1992 ISDA U.S. Municipal Counterparty Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between those Definitions and this Confirmation, this Confirmation will govern.

1. This Confirmation supplements, forms part of, and is subject to the Master Agreement dated as of ____ "Agreement") between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

2. The terms of the particular Transaction to which this Confirmation relates are as follows:—

Party A:                                LEHMAN BROTHERS SPECIAL FINANCING INC.

Party B:

[Notional Amount:]

Trade Date:

Effective Date:

Termination Date:

FIXED AMOUNTS:

Fixed Rate Payer:

[Party A/B]

Exhibit A
Page 1

[Fixed Rate Payer
  Currency Amount:]

| | |
|---|---|
| Fixed Rate Payer Payment Dates [or, Period End Dates, if Delayed Payment or Early Payment applies]: | [       ], subject to adjustment in accordance with the [Following/Modified] Payment or [Following/Preceding] Business convention, with respect to a _____ Banking Day and a _____ Banking Day [with No Adjustment of Period End Dates] |

[Fixed Amount:]

Fixed Rate:

Fixed Rate Day Count Fraction:

FLOATING AMOUNTS:

Floating Rate Payer:

       [Party B/A]

[Floating Rate Payer
  Currency Amount:]

| | |
|---|---|
| Floating Rate Payer Payment Dates [or, Period End Dates, if Delayed Payment or Early Payment applies]: | [       ], subject to adjustment in accordance with the [Following/Modified] Payment or [Following/Preceding] Business convention, with respect to a _____ Banking Day and a _____ Banking Day [with No Adjustment of Period End Dates] |

Floating Rate for initial Calculation Period:

Floating Rate Option:

Designated Maturity:

Floating Rate Spread:       [plus/minus]   % p.a.

Floating Rate Day Count Fraction:

Reset Dates:

[Rate Cut-off Dates:]

[Method of Averaging:

       Unweighted/Weighted Average Rate]

Compounding:       Applicable/Inapplicable

Exhibit A
Page 2

[Compounding Dates:]

[Initial Exchange:

Initial Exchange Date:

Party A Initial Exchange Amount:

Party B Initial Exchange Amount:

Final Exchange:

Final Exchange Date:

Party A Final Exchange Amount:

Party B Final Exchange Amount:]

Calculation Agent:

3.    Account Details

Payments to Party A

Account for payments in [first currency]:                              [    ]

Account for payments in [second currency]:                           [    ]

Payments to Party B

Account for payments in [first currency]:                              [    ]

Account for payments in [second currency]:                           [    ]

4.    Offices

The Office of Party B for the Transaction is [                .]

5.    [Broker/Arranger:        ]

NYB 1287071.5

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____

Name:_____

Title:_____

Confirmed as of the
date first written

By:_____

Name:_____

Title:_____

NYB 1287071.5

EXHIBIT B to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and _____("Party B") have entered into a Master Agreement dated as of_____, pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor; provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligation under the Agreement or to set off, counterclaim or withhold payment in respect of any Event of Default or potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    Guarantor shall be subrogated to all rights of Party B against Party A in respect of any amounts paid by Guarantor pursuant to the provisions of this Guarantee; provided, however, that Guarantor shall not be entitled to enforce or to receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by Party A under the Agreement, shall have been paid in full.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection

NYB 1287071.5

with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

Guarantor makes the same representations to and agreements with Party B as those made by Party A pursuant to Sections 3 and 4 of the Agreement, at the times set forth therein, except that references therein to "the party" will be deemed to be references to "the Guarantor" and references therein to "the Agreement" will be deemed to be references to "the Guarantee." Section 11 of the Agreement is incorporated by reference in this Guarantee except that references therein to "the Agreement" will be deemed to be references to "the Guarantee."

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee are defined in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Treasurer, at 745 Seventh Avenue, 28th Floor, New York, New York 10019 (Facsimile No. (212) 526-1466) with a copy to Lehman Brothers Special Financing Inc., Attention: Municipal Financial Products - Middle Office at 745 Seventh Avenue, 5th Floor, New York, New York 10019 (Facsimile No. (646) 758-2988).

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By:_____

Title:_____

EXHIBIT C to Schedule

[Form of Opinion of Counsel to
Lehman Brothers Special Financing Inc. and
Lehman Brothers Holdings Inc.]

[Date]

[address]

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc., a Delaware corporation ("Party A") and Lehman Brothers Holdings Inc., a Delaware corporation ("Guarantor"), and am familiar with matters pertaining to the execution and delivery of the Master Agreement (the "Master Agreement") dated as of _____ between Party A and _____ ("Party B") and the guarantee of Guarantor (the "Guarantee") delivered in connection with the Master Agreement. The Master Agreement is to be supplemented by confirmations of transactions to be entered into by Party A and Party B from time to time (each a "Confirmation") and the Master Agreement together with all such Confirmations shall constitute one agreement.

In connection with this opinion, I have examined, or have had examined on my behalf, an executed copy of each of the Master Agreement, the Guarantee, certificates and statements of public officials and officers of Party A and Guarantor and such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion.

Based upon the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.     Each of Party A and Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware.

2.     The execution, delivery and performance of the Master Agreement, in the case of Party A, and the Guarantee, in the case of Guarantor, are within its corporate power, have been duly authorized by all necessary corporate action and do not conflict with any provision of its certificate of incorporation or by-laws.

3.     Each of the Master Agreement, in the case of Party A, and the Guarantee, in the case of Guarantor, has been duly executed and delivered and constitutes, a legal, valid and binding obligation, enforceable against it in accordance with its terms.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.     My opinion in paragraph 3 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

Exhibit C
Page 1

NYB 1287071.5

B.    I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the laws of the State of New York, the United States of America and the General Corporation Law of the State of Delaware.

C.    My opinions are limited to the present laws and to the facts as they presently exist.   I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.    This letter is rendered to you in connection with the Master Agreement and the Guarantee and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose.  This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Party A and Guarantor, except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Party A or Guarantor, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Master Agreement or the Guarantee.

E.    I have assumed with your permission (i) the genuineness of all signatures by each party other than Party A or Guarantor, (ii) the authenticity of document submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Master Agreement by each party other than Party A.

Very truly yours,

Exhibit C
Page 2

NYB 1287071.5

EXHIBIT D to Schedule

[Form of Opinion of Counsel to Party B]

[Date]

Lehman Brothers Special Financing Inc.
New York, New York 10019

Lehman Brothers Holdings Inc.
New York, New York 10019

Ladies and Gentlemen:

We have acted as counsel to _____, a _____ ("Party B") in connection with the execution and delivery of the Master Agreement (the "Master Agreement") dated as of _____ - between Lehman Brothers Special Financing Inc. ("Party A") and Party B and the Confirmation (the "Confirmation"), dated _____, between Party A and Party B.

In connection with this opinion, we have examined an executed copy of the Master Agreement and the Confirmation and such documents and records of Party B, certificates of officers of Party B and such other documents as we have deemed necessary or appropriate for the purposes of this opinion. In such opinion, we have assumed the genuineness of all the signatures, the authenticity of all documents submitted to us as originals and the conformity to authentic original documents of all documents submitted to us as certified, conformed or photostatic copies.

Based upon the foregoing, we are of the opinion that:

1.      Party B is a _____ of the State of _____ duly organized and validly existing under the laws of the State of _____.

2.      Party B is authorized to enter into the Master Agreement and to perform its obligations thereunder and under the Confirmation.

3.      Party B has taken all necessary action required to be taken to ensure that the Master Agreement and the performance of its obligations thereunder and under the Confirmation comply in all respects with [its charter and/or by-laws].

4.      Each of the Master Agreement and the Confirmation has been duly executed and delivered by Party B and constitutes a legally valid and binding obligation of Party B enforceable against Party B in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

5.      To the best of our knowledge, no consent, authorization, license or approval of, or registration or declaration with, any governmental authority is required in connection with the execution, delivery and performance of the Master Agreement or the Confirmation.

NYB 1287071.5

Very truly yours,

NYB 1287071.5

<u>EXHIBIT E to Schedule</u>

<u>Form of Resolutions</u>

RESOLVED that (i) _____ (the "Corporation") enter into interest rate swap and any similar transactions and (ii) the form, terms and provisions of the Master Financing Agreement (the "Agreement") dated as of _____, between Lehman Brothers Special Financing Inc. ("Lehman") and the Corporation, in the form previously presented to the Corporation (with such changes, not inconsistent with the intent of these resolutions and the intent of the Board of Directors as the officer(s) executing the same, as evidenced by their execution thereof, shall deem necessary or desirable), and the actions contemplated thereby (including the entry by the Corporation into Transactions with Lehman evidenced by confirmations thereof) be, and they hereby are, in all respects approved, authorized, adopted, ratified and confirmed.

RESOLVED that the Corporation is hereby authorized to enter into the Agreement, in substantially the form presented to this meeting and, from time to time, one or more interest rate swap transactions and agreements terminating any such interest rate swap transaction, pursuant to the Agreement and the documents (each a "Confirmation") exchanged between the parties confirming such interest rate swap transactions. The terms of each interest rate swap transaction, including interest rate, term, Notional Amount (as defined in the Agreement) and options as to commencement and termination of payments, and each termination agreement shall be as described in the Agreement and as provided in the related Confirmation, as approved from time to time by the officers of the Corporation authorized to execute the Confirmation. The aggregate Notional Amount, as defined in the Agreement, of such interest rate swap transactions outstanding at any one time, net of offsetting interest rate swap transactions, shall not exceed $_____ and each such interest rate swap transaction shall terminate not exceeding _____ years after its effective date. The aggregate Notional Amount of all such interest rate swap transactions as of any time shall be determined on a <u>net</u> basis, <u>i.e.</u>, where any such transaction is entered into to offset or reverse an earlier transaction, to the extent of the offsetting or reversing effect, the Notional Amounts of such offsetting or reversing interest rate swap transactions shall not be included in the aggregate total.

RESOLVED that the actions contemplated in the Agreement, and each Confirmation, are hereby in all respects approved, authorized, adopted, ratified and confirmed.

RESOLVED that all officers or officials of the Corporation be, and each of them hereby is, authorized to execute and deliver (i) the Agreement in the name and on behalf of the Corporation and if necessary or advisable under its corporate seal (which may be attested by the [Secretary or any Assistant Secretary or the equivalent thereof] of the Corporation) or otherwise and (ii) such other agreements and documents as are contemplated by the Agreement or are otherwise necessary in connection with entering into interest rate swap and any similar transactions, as any such officer or official shall deem appropriate, including without limitation, officer certificates, legal opinions and credit support documents.

RESOLVED that all officers or officials of the Corporation and its agents and counsel be, and each of them hereby is, authorized to take all such further actions, to execute and deliver such further instruments and documents in the name and on behalf of the Corporation and if necessary or advisable under its corporate seal (which may be attested by the [Secretary or any Assistant Secretary or the equivalent thereof] of the Corporation) or otherwise to pay all such expenses as in his judgment shall be necessary or advisable in order fully to carry out the purposes of the foregoing resolutions.

NYB 1287071.5

RESOLVED that all actions previously taken or that will be taken by any director, officer, official, employee or agent of the Corporation in connection with or related to the matters set forth in or reasonably contemplated by the foregoing resolutions be, and each of them hereby is, adopted, ratified, confirmed and approved in all respects as the acts and deeds of the Corporation.

NYB 1287071.5

EXHIBIT F to Schedule

Officer's Certificate

The undersigned the [Chief Executive Officer] [Chief Financial Officer] of _____(the "Corporation") hereby certifies in connection with the Master Agreement (the "Master Agreement") dated as of _____, between Lehman Brothers Special Financing Inc. ("Lehman") and the Corporation that:

The Corporation has taken all action required to be taken to ensure that the Master Agreement and any Confirmation entered into or to be entered into, and the Transactions contemplated thereby, are authorized under and comply in all respects with [its charter and/or by-laws], including

[set forth any actions required to be taken.]

Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Master Agreement.

IN WITNESS WHEREOF, this Certificate has been executed as of this _____ day of _____, 200_.

NYB 1287071.5

Execution Copy

CONFIRMATION

January 1, 2003

TRANSACTION

Minnesota Masonic Home Care Center
11501 Masonic Home Drive
Bloomington, MN 55437
Attn:    CEO and President
Fax:    952-948-6113

Attn:    Vice President of Finance
Fax:    952-948-6210

Re:    Summit ID:  434011L

Ladies and Gentlemen:

The purpose of this letter agreement is to set forth the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction").  This letter agreement constitutes a "Confirmation" as referred to in the Master Agreement specified below.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation.   In the event of any inconsistency between those Definitions and this Confirmation, this Confirmation will govern.

1.    This Confirmation supplements, forms part of, and is subject to the Master Agreement dated as of January 1, 2003 (the "Agreement") between you and us.  All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

2.    The terms of the particular Transaction to which this Confirmation relates are as follows:

| | |
|---|---|
| Party A: | LEHMAN BROTHERS SPECIAL FINANCING INC. |
| Party B: | MINNESOTA MASONIC HOME CARE CENTER |
| Notional Amount: | $20,331,667, which shall reduce on the dates and in the amounts set forth in Annex I hereto.  The Notional Amount following each such reduction shall be referred to herein as a "Revised Notional Amount." |
| Trade Date: | December 19, 2002 |
| Effective Date: | January 1, 2003 |

Termination Date:                    July 1, 2022


FIXED AMOUNTS:

Fixed Rate A Payer:                  Party B

Fixed Rate A Payer Payment Dates:    Semiannually, on each January 1 and July 1, beginning July 1, 2003 up to, and including, the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention.

Fixed Rate A Payer Period End Dates: Each January 1 and July 1, commencing on July 1, 2003. No Adjustment shall apply to Period End Dates.

Fixed Rate A:                        3.346%

Fixed Rate A Day Count Fraction:     30/360


FLOATING AMOUNTS:

Floating Rate Payer:                 Party A

Floating Rate Payer Payment Dates:   Semiannually, on each January 1 and July 1, beginning July 1, 2003 up to, and including, the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention.

Floating Rate Payer Period End Dates: Each January 1 and July 1, commencing on July 1, 2003. No Adjustment shall apply to Period End Dates.

Floating Rate Option:                67% of USD-LIBOR-BBA

Designated Maturity:                 One month

Reset Dates:                         Two London Business Days prior to each Floating Rate Payer Period End Date.

Method of Averaging:                 Weighted Average

Floating Rate Day Count Fraction:    Actual/Actual

3.      Payment Instructions:

        Payments to Party A:

            JPMorgan Chase
            ABA:  021000021
            for the Account of Lehman Brothers Special Financing Inc.
            Account No. 066 143 543

        Payments to Party B:

            Bank Name: U.S. Bank National Association

            Bank Location: 800 Nicollet Mall, Minneapolis MN  55402

            ABA Routing #: 091000022

            Customer Name: Minnesota Masonic Home Management Services Customer

            Account # 1702-2500-8524

            Note: Credit Company #2 MMHCC

4.      Party B acknowledges that Lehman Brothers Inc. ("LBI"), an affiliate of Party A, has a minority, non-controlling interest in Cain Brothers & Company, LLC ("Cain").   Party B further acknowledges that Party A has paid, at the direction of Party B, a swap advisory fee to i) Cain Brothers & Co., LLC and ii) Dougherty & Co. (collectively the "Swap Advisors") on behalf of Party B for swap advisory services provided by the Swap Advisors to Party B in connection with this Transaction.   This swap advisory fee has been fully disclosed to Party B in the request for interest rate swap dated December 18, 2002.

5.      In the event i) Party B exercises its rights under sub paragraph (i) of the Optional Termination Date section of Total Return Swap dated as of January 1, 2003 between the parties hereto or ii) if Party A exercises its rights under sub paragraph (iii) of the Optional Termination Date section of Total Return Swap, Party B shall within five Business Days post sufficient collateral to Party A, in the event Party B fails to post collateral within five Business Days this
transaction will also terminate.

Please check this Confirmation carefully and immediately upon receipt so that errors or discrepancies can be promptly identified and rectified.  Please confirm that the foregoing correctly sets forth the terms of the agreement between Party A and Party B with respect to the particular Transaction to which this Confirmation relates by signing in the space provided below and immediately returning a copy of the executed Confirmation to Party A.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.


By:_____
Name:    T. Courtney Jenkins
Title:    Vice President


Confirmed as of the
date first above written:

MINNESOTA MASONIC HOME CARE CENTER


By:_____
Name:
Title:

Please check this Confirmation carefully and immediately upon receipt so that errors or discrepancies can be promptly identified and rectified. Please confirm that the foregoing correctly sets forth the terms of the agreement between Party A and Party B with respect to the particular Transaction to which this Confirmation relates by signing in the space provided below and immediately returning a copy of the executed Confirmation to Party A.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____

Name:   T. Courtney Jenkins
Title:    Vice President

Confirmed as of the
date first above written:

MINNESOTA MASONIC HOME CARE CENTER

By: _____

Name:   Edwin A. Martini, Jr.
Title:   President/CEO

4

ANNEX I
to Confirmation, dated January 1, 2003,
between Lehman Brothers Special Financing Inc.
and
Minnesota Masonic Home Care Center

| Reduction Date | Notional Amount Reduction | Revised Notional Amount |
|---|---|---|
| 01/01/03 | | $20,331,667.00 |
| 07/01/03 | $550,000.00 | $19,781,667.00 |
| 07/01/04 | $620,000.00 | $19,161,667.00 |
| 07/01/05 | $575,000.00 | $18,586,667.00 |
| 07/01/06 | $660,000.00 | $17,926,667.00 |
| 07/01/07 | $686,000.00 | $17,240,667.00 |
| 07/01/08 | $728,000.00 | $16,512,667.00 |
| 07/01/09 | $771,000.00 | $15,741,667.00 |
| 07/01/10 | $838,000.00 | $14,903,667.00 |
| 07/01/11 | $891,000.00 | $14,012,667.00 |
| 07/01/12 | $940,000.00 | $13,072,667.00 |
| 07/01/13 | $998,000.00 | $12,074,667.00 |
| 07/01/14 | $1,056,000.00 | $11,018,667.00 |
| 07/01/15 | $1,119,000.00 | $9,899,667.00 |
| 07/01/16 | $1,182,000.00 | $8,717,667.00 |
| 07/01/17 | $1,255,000.00 | $7,462,667.00 |
| 07/01/18 | $1,328,000.00 | $6,134,667.00 |
| 07/01/19 | $1,405,000.00 | $4,729,667.00 |
| 07/01/20 | $1,487,000.00 | $3,242,667.00 |
| 07/01/21 | $1,575,000.00 | $1,667,667.00 |
| 07/01/22 | $1,667,667.00 | $0.00 |

## **Exhibit B**

**(Novation Agreement)**

**DRAFT**



International Swaps and Derivatives Association, Inc.

# NOVATION AGREEMENT

dated as of [_], 2012 among:

MINNESOTA MASONIC HOME CARE CENTER,

LEHMAN BROTHERS SPECIAL FINANCING INC.,

DEUTSCHE BANK AG, LONDON BRANCH (the "**New Credit Support Provider**")

and

1271 COUNTERPARTY COMPANY LLC

Minnesota Masonic Home Care Center (the "**Remaining Party**") and Lehman Brothers Special Financing Inc. (the "**Transferor**") have entered into a Transaction (the "**Old Transaction**"), evidenced by a Confirmation dated January 1, 2003 identified by Summit ID 434011L (the "**Old Confirmation**"), attached hereto as Annex A, subject to an ISDA Master Agreement (1992 Local Currency-Single Jurisdiction) dated as of January 1, 2003 (the "**Old Master Agreement**"), and Schedule to the ISDA Master Agreement, dated as of January 1, 2003 (the "**Old Schedule**") (the Old Transaction, the Old Confirmation, the Old Master Agreement and the Old Schedule, collectively, the "**Old Agreement**"), and Lehman Brothers Holdings Inc. (the "**Credit Support Provider**") has agreed to act as Credit Support Provider for the Transferor pursuant to the Old Agreement.

Pursuant to this Novation Agreement, the Remaining Party and 1271 Counterparty Company LLC (the "**Transferee**") will be deemed to have entered into an ISDA Master Agreement (1992 Local Currency-Single Jurisdiction) (the "**New Agreement**") on the terms and conditions provided for herein.

With effect from and including [_], 2012 (the "**Novation Date**") the Transferor wishes to transfer by novation to the Transferee, and the Transferee wishes to accept the transfer by novation of, all of the rights, liabilities, duties and obligations of the Transferor under and in respect of the Old Agreement, with the effect that the Remaining Party and the Transferee enter into (i) a new transaction (each a "**New Transaction**") between them having terms identical to those of each Old Transaction (except as expressly described below) and (ii) the New Agreement between them, as more particularly described below.

The Remaining Party wishes to accept the Transferee as its sole counterparty with respect to the New Transaction and the New Agreement.

The Transferor and the Remaining Party wish to have released and discharged, as a result and to the extent of the transfer described above, their respective obligations, and those of the Credit Support Provider, under and in respect of the Old Agreement.

Accordingly, the parties agree as follows: ---

1. **Definitions.**

Terms defined in the Old Agreement or the New Agreement, as the context may require, are used herein as so defined, unless otherwise provided herein.

2. **Transfer, Release, Discharge and Undertakings.**

With effect from and including the Novation Date and in consideration of the mutual representations, warranties and covenants contained in this Novation Agreement and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by each of the parties):

(a)     the Remaining Party, the Transferor and the Credit Support Provider are each released and discharged from all further obligations to each other with respect to the Old Agreement and the Credit Support Documents thereunder, and their respective rights against each other thereunder, whensoever arising, are cancelled or are hereby deemed waived, and each of the Remaining Party, the Transferor and the New Credit Support Provider hereby acknowledges, agrees and consents to this Novation Agreement; provided, however, that such release, discharge, cancellation or waiver shall not affect any rights, liabilities or obligations of the Remaining Party, the Transferor or the Credit Support Provider solely with respect to any payments or other obligations due and payable or due under Section 2(g) below;

(b)     in respect of each New Transaction and the New Agreement, the Remaining Party and the Transferee each undertake liabilities and obligations towards the other and acquire rights against each other identical in their terms to each corresponding Old Transaction (and, for the avoidance of doubt, as if the Transferee were the Transferor and with the Remaining Party remaining the Remaining Party, save for any rights, liabilities or obligations of the Remaining Party or the Transferor with respect to payments or other obligations due and payable or due to be performed on or prior to the Novation Date), subject to the modifications to each corresponding Old Transaction as set forth herein;

(c)     without limitation of the foregoing, the terms of that certain Order Approving Consensual Assumption and Assignment of Prepetition Derivative Contracts (the **"Order"**) attached hereto as Annex D, which Order was entered by the bankruptcy court having jurisdiction over the Transferor's Chapter 11 bankruptcy case, shall be binding in all respects upon, and shall inure to the benefit of, the Transferor, the Remaining Party, the Transferee, the New Credit Support Provider, each of their respective affiliates, successors and assigns and any affected third parties;

(d)     each New Transaction shall be governed by and form a part of the New Agreement and the relevant Old Confirmation (which, in conjunction with and as deemed modified to be consistent with this Novation Agreement shall be deemed to be a Confirmation between the Remaining Party and the Transferee), except as provided for in Annex C hereto;

(e)     the Remaining Party and the Transferee hereby agree and acknowledge that the terms of the New Agreement and each New Transaction shall be the same as the terms of the Old Agreement and each Old Transaction, respectively, except that (i) the terms of the Old Master Agreement and Old Schedule shall be modified as provided in Annex B hereto and (ii) the terms of each Old Transaction shall be modified as provided in Annex C hereto;

(f)     the Remaining Party and the Transferee agree that the amount of the first payment payable by the Remaining Party to the Transferee and/or by the Transferee to the Remaining Party, as applicable, under each New Transaction will be determined on the basis of a full calculation period (which period shall commence on and include one Fixed Rate A Payer Period End Date (as defined in the Old Transaction) and end on and exclude the next following Fixed

Rate A Payer Period End Date), commencing with the Payment Date immediately preceding the Novation Date to, but excluding the Payment Date immediately following the Novation Date; and

(g)     on the Novation Date, the Transferor hereby agrees to pay the Remaining Party an amount equal to $[_] (the "**Novation Expenses**"), which represents the reasonable costs and expenses (including legal and advisory fees) incurred by the Remaining Party in connection with this Novation Agreement.

**3.     Representations and Warranties.**

(a)     On the date of this Novation Agreement and on the Novation Date:

(i)     Except as may be otherwise set forth in clause (iv)(B) below, each of the parties makes to each of the other parties those representations and warranties set forth in Section 3(a) of the 1992 ISDA Master Agreement with references in such Section to "this Agreement" or "any Credit Support Document" being deemed references to this Novation Agreement alone.

(ii)    Each of the parties represents and warrants to each of the other parties that this Novation Agreement is being executed and performed in the ordinary course of such party's business and that it is not required to obtain the approval of any court or regulatory agency as a condition to such execution and performance. Notwithstanding the foregoing, the Transferor represents and warrants that this Novation Agreement is being entered into in accordance with and pursuant to the Order.

(iii)   The Remaining Party and the Transferee each makes to the other the representation set forth in Section 3(b) of the 1992 ISDA Master Agreement, in each case with respect to the New Agreement, and taking into account the parties entering into and performing their obligations under this Novation Agreement.

(iv)    Each of the Transferor and the Remaining Party represents and warrants to each other and to the Transferee that:

(A)    it has made no prior transfer (whether by way of security or otherwise) of the Old Agreement or any interest or obligation in or under the Old Agreement or in respect of any Old Transaction; and

(B)    as of the Novation Date and other than with respect to any payments remaining unpaid as of the Novation Date, all obligations of the Transferor, the Credit Support Provider and the Remaining Party under each Old Transaction and the Old Agreement required to be performed on or before the Novation Date, have been fulfilled or are hereby deemed waived; *provided*, that one or more Events of Default and/or Termination Events have occurred in respect of the bankruptcy, ratings and/or other credit standing of the Transferor and, if applicable, Transferor's Credit Support Provider and any other applicable Specified Entity of the Transferor, which Event(s) of Default or Termination Event(s) shall be deemed to have been cured by the terms of this Novation Agreement and pursuant to the Order.

(b)     The Transferor makes no representation or warranty and does not assume any responsibility with respect to the legality, validity, effectiveness, adequacy or enforceability of any New Transaction or the New Agreement or any documents relating thereto (except as set forth in Section 3(a)(ii) above) and assumes no responsibility for the condition, financial or

3

otherwise, of the Remaining Party, the Transferee or any other person or for the performance and observance by the Remaining Party, the Transferee or any other person of any of its obligations under any New Transaction or the New Agreement or any document relating thereto and any and all such conditions and warranties, whether express or implied by law or otherwise, are hereby excluded.

(c)     Each party to this Novation Agreement represents to the other parties (i) that it is acting for its own account, and it has made its own independent decisions to enter into this Novation Agreement and the transactions contemplated hereby (collectively, the "**Novation Transaction**") and as to whether the Novation Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary; (ii) it is not relying on any communication (written or oral) of another party as investment advice or as a recommendation to enter into the Novation Transaction, and it is not acting with respect to any communication (written or oral) delivered in connection with the Novation Transaction as a "municipal advisor," as such term is defined in Section 975 of the U.S. Dodd-Frank Wall Street Reform & Consumer Protection Act; it being understood that information and explanations related to the terms and conditions of the Novation Transaction will not be considered investment advice, advice provided by a municipal advisor or a recommendation to enter into the Novation Transaction; and (iii), it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Novation Transaction and is capable of assuming, and assumes, the risks of the Novation Transaction.  No communication (written or oral) received from any party will be deemed to be an assurance or guarantee as to the expected results of the Novation Transaction, and no party to the Novation Transaction is acting as a fiduciary for or an advisor to any other party with respect to the Novation Transaction.

(d)     The Remaining Party represents and agrees that (i) neither Deutsche Bank AG, London Branch nor any of its affiliates (collectively, "**DBAG**") have proposed, structured, or negotiated the Novation Transaction and are not serving as a counterparty on the Novation Transaction and (ii) it is has not relied in any way on any statements by, information from or reference to DBAG in determining to execute the Novation Transaction except as it relates solely to DBAG's role as New Credit Support Provider.

(e)     With the exception of the representations and warranties made under this Section 3, each of the Transferor, the Remaining Party and the Transferee represents and warrants to each other that none of the other parties to this Novation Agreement nor their respective Affiliates have made, as of the Novation Date, any representation on which it is relying or is entitled to rely.

## 4.  Conditions Precedent.

The obligations of each of the parties hereto are subject to the satisfaction of each of the following conditions precedent, unless otherwise waived:

(a)     All consents, waivers, approvals, authorizations, and ratings confirmations of any third party which are necessary in connection with the consummation of the transactions contemplated hereby shall have been obtained; and

(b)     The representations and warranties of each of the parties hereto set forth or incorporated herein shall be true and correct in all respects as of the Novation Date.

5.  **Counterparts.**

This Novation Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

6.  **Costs and Expenses.**

Except with respect to Novation Expenses, the parties will each pay their own costs and expenses (including legal fees) incurred in connection with this Novation Agreement and as a result of the negotiation, preparation and execution of this Novation Agreement.

7.  **Amendments.**

No amendment, modification or waiver in respect of this Novation Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

8.  (a)  **Governing Law.**

This Novation Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Novation Agreement, or the negotiation, execution or performance of this Novation Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Novation Agreement or as an inducement to enter into this Novation Agreement) shall be governed by the internal laws of the State of New York.

(b)  **Jurisdiction.**

The terms of Section 11(b) of the 1992 ISDA Master Agreement shall apply to this Novation Agreement with references in such Section to "this Agreement" being deemed references to this Novation Agreement alone.

(c)  **Trial by Jury.**

The parties waive, to the fullest extent permitted by applicable law, any right they may have to a trial by jury in respect of any suit, action or proceeding relating to this Novation Agreement.  The parties certify that no representative, agent or attorney of either other party has represented, expressly or otherwise, that such other party would not, in the event of such a suit, action or proceeding, seek to enforce the foregoing waiver and acknowledge that they have been induced to enter into this Novation Agreement by, among other things, the mutual waivers and certifications in this Section 8.

(d)  **Limited Recourse.**

None of the Remaining Party, the Transferor or the New Credit Support Provider will have any recourse to any of the directors, officers, employees, shareholders or affiliates of the Transferee with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby, and each of the Remaining Party, the Transferor and the New Credit Support Provider hereby agrees not to commence, or join in the commencement of, any proceedings in any jurisdiction for the bankruptcy, winding-up or liquidation of the Transferee or any similar proceedings.

IN WITNESS WHEREOF the undersigned have caused this Novation Agreement to be executed and delivered on their behalf as of the date first written above.

**MINNESOTA MASONIC HOME CARE CENTER**


By: _____

    Name:

    Title:


**LEHMAN BROTHERS SPECIAL FINANCING INC.**


By: _____

    Name:

    Title:


**1271 COUNTERPARTY COMPANY LLC**


By: _____

    Name:

    Title:


**DEUTSCHE BANK AG, LONDON BRANCH**


By: _____

    Name:

    Title:


By: _____

    Name:

    Title:

## ANNEX A

**OLD AGREEMENT (INCLUDING OLD MASTER AGREEMENT,
OLD SCHEDULE AND OLD CONFIRMATION)**

## ANNEX B

**MODIFICATIONS TO OLD SCHEDULE TO OLD MASTER AGREEMENT**

1.    The New Agreement shall be in the same form as the Old Master Agreement, except that all references to "Lehman Brothers Special Financing Inc." shall be changed to "1271 Counterparty Company LLC".

2.    Except as modified herein, the terms of the Schedule to the New Agreement shall be in the same form as the Old Schedule, except that all references to (a) "Lehman Brothers Special Financing Inc." shall be changed to "1271 Counterparty Company LLC" and (b) "Holdings" shall be changed to "Party A's Credit Support Provider".

3.    Part 1(c) of the Old Schedule is hereby amended by deleting such section in its entirety and replacing it with the following:

"Notwithstanding anything in this Agreement to the contrary, the following Events of Default shall apply to each party as specified below:

|       |                                              | **Party A** | **Party B** |
|-------|----------------------------------------------|-------------|-------------|
| (i)   | Section 5(a)(i) (Failure to Pay or Deliver)  | Applicable  | Applicable  |
| (ii)  | Section 5(a)(ii) (Breach of Agreement)       | Applicable  | Applicable  |
| (iii) | Section 5(a)(iii) (Credit Support Default)   | Applicable  | Not applicable |
| (iv)  | Section 5(a)(iv) (Misrepresentation)         | Applicable  | Applicable  |
| (v)   | Section 5(a)(v) (Default under Specified Transaction) | Applicable | Applicable |
| (vi)  | Section 5(a)(vi) (Cross Default)             | Applicable  | Applicable  |
| (vii) | Section 5(a)(vii) (Bankruptcy)               | Applicable  | Applicable  |
| (viii)| Section 5(a)(viii) (Merger Without Assumption) | Applicable | Applicable |

Notwithstanding anything in this Agreement to the contrary, the following Termination Events shall apply to each party as specified below:

|      |                                          | **Party A** | **Party B** |
|------|------------------------------------------|-------------|-------------|
| (i)  | Section 5(b)(i) (Illegality)             | Applicable  | Applicable  |
| (ii) | Section 5(b)(ii) (Credit Event Upon Merger) | Applicable | Applicable |

For purposes of Section 5(a)(vi) (Cross Default), the following provisions apply:

"***Specified Indebtedness***" will have the meaning specified in Section 12 of this Agreement.

"***Threshold Amount***" means, in the case of Party A, two percent (2%) of Party A's Credit Support Provider's Stockholder's Equity, and in the case of Party B, $10,000,000.

"***Stockholder's Equity***" means, with respect to Party A's Credit Support Provider, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, plus (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each as determined in accordance with generally accepted accounting principles."

4.   Part 1(d) of the Old Schedule is hereby amended by deleting such section in its entirety and replacing it with "[Reserved]".

5.   Part 2 of the Old Schedule is hereby amended by deleting such section in its entirety and replacing it with the following:

"For the purpose of Section 4(a) of this Agreement, each party agrees to deliver the following documents, as applicable:—

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A | An opinion of in-house counsel to Party A's Credit Support Provider, substantially in the form of Exhibit C to this Schedule. | Promptly after execution of this Agreement; Party A will use commercially reasonable efforts to deliver such opinion no later than 15 Business Days after execution of this Agreement.. | No |
| Party A | An opinion of outside counsel to Party A's Credit Support Provider, substantially in the form of Exhibit D to this Schedule. | Upon execution of this Agreement. | No. |
| Party A | An opinion of counsel to Party A, substantially in the form of Exhibit G to this Schedule. | Promptly after execution of this Agreement. | No |
| Party A | An opinion of counsel to Lehman Brothers Special Financing Inc. ("**LBSF**"), as Transferor under that certain Novation Agreement dated as of the date hereof, by and among Party B, LBSF, Party A's Credit Support Provider and Party A, substantially in the form of Exhibit H to this Schedule.<br><br>**OR** | Promptly after execution of this Agreement. | No |

|  | An order of the Bankruptcy Court authorizing Lehman Brothers Special Financing Inc. ("**LBSF**") to enter into that certain Novation Agreement dated as of the date hereof, by and among Party B, LBSF, Party A's Credit Support Provider and Party A. |  |  |
|---|---|---|---|

6.   Part 3(a) of the Old Schedule is hereby amended by deleting the existing address for notices or communications to Party A and replacing it with the following:

> 1271 Counterparty Company LLC
> c/o Corporation Service Company
> 2711 Centerville Road, Suite 400
> Wilmington, Delaware 19808
>
> with a copy to:
>
> Deutsche Bank AG, London Branch
> Winchester House
> One Great Winchester Street
> London EC2N 2DB
> United Kingdom
> Attention: CPM – Peter E. Haagensen
>
> and:
>
> Deutsche Bank Trust Company Americas
> 60 Wall Street
> MS NYC 60-2606
> New York, NY 10005
> Attention:  Conduit Management Services
> Telephone No:  (212) 250-2275
> Facsimile No:  (212) 553-2464
>
> and:
>
> Lehman Brothers Special Financing Inc.
> 1271 Sixth Avenue, 40th Floor
> New York, New York  10020
> Attn: General Counsel / Derivatives
> derivativeslegal@lehmanholdings.com"

7.    Part 3(c) of the Old Schedule is hereby amended by deleting such section in its entirety and replacing it with the following:

"**Credit Support Document.**  Details of any Credit Support Document:

(i)    Party A: The Guarantee of Deutsche Bank AG, London Branch; and

(ii)    Party B: Not applicable."

8.    Part 3(d) of the Old Schedule is hereby amended by deleting such section in its entirety and replacing it with the following:

"**Credit Support Provider.**  Details of any Credit Support Provider:

(i)    Party A: Deutsche Bank AG, London Branch; and

(ii)    Party B: Not applicable."

9.    Part 3(f) of the Old Schedule is hereby amended by deleting such section in its entirety and replacing it with "[Reserved]".

10.    Part 3(g) of the Old Schedule is hereby amended by deleting such section in its entirety and replacing it with the following:

"**Affiliate**" will have the meaning specified in Section 12 of this Agreement, provided, however, that neither Party A nor Party B shall be deemed to have Affiliates for purposes of this Agreement."

11.    Part 4(c) of the Old Schedule is hereby amended by deleting such section in its entirety and replacing it with "[Reserved]".

12.    A new Part 4(e) is hereby added to the Old Schedule:

"Notwithstanding anything in Section 7 of this Agreement, at any time on or after the entry of an order confirming a plan of reorganization in the Chapter 11 case of Lehman Brother Special Financing Inc. (Case No. 08-13888) pending before the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Case**"), dismissal of the Bankruptcy Case, appointment of a trustee in the Bankruptcy Case or conversion of the Bankruptcy Case to a case under a Chapter of the Bankruptcy Code other than Chapter 11, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to Deutsche Bank AG (including any branch thereof) with such modifications as may be necessary or convenient to effectuate such transfer; provided, that (a) Party A shall obtain the prior written consent of Party B to such modifications (except such consent will not be required for certain necessary factual modifications as to the identity of the new counterparty (including without limitation, names, addresses, bank accounts and wiring instructions and tax representations), the effective date of the assignment and the removal of provisions relating to the Party A Credit Support Provider) and (b) any transfer to a branch of Deutsche Bank AG shall be to the London Branch, the New York Branch or any other branch reasonably acceptable to Party B."

13.    A new Part 4(f) is hereby added to the Old Schedule:

"**Amendment**.  This Agreement will not be amended unless the parties shall have received the prior written consent of the Party A Credit Support Provider."

14.    A new Part 4(g) is hereby added:

**"Limited Recourse**:  Neither party will have any recourse to any of the directors, officers, employees, shareholders or affiliates of the other party with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby.

**No Petition**:  Neither party may institute against, or join any other person in instituting against, the other party any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under U.S. federal or state bankruptcy or other bankruptcy or similar laws.  Nothing in this section shall preclude, or be deemed to stop, a party from taking any action in (i) any case or proceeding voluntarily filed or commenced by the other party or (ii) any involuntary insolvency proceeding filed or commenced by a person other than such party.  The provisions of this paragraph of Part 4(g) shall survive termination of this Schedule."

15.    Exhibit B to the Old Schedule is hereby replaced in its entirety with the Guarantee of Deutsche Bank AG, London Branch being delivered simultaneously herewith.

16.    Exhibit C to the Old Schedule is hereby deleted in its entirety and replaced with the opinion of in-house counsel to Party A's Credit Support Provider.

17.    Exhibit D to the Old Schedule is hereby deleted in its entirety and replaced with the opinion of outside counsel to Party A being delivered simultaneously herewith.

18.    A new Exhibit G is hereby added to the Agreement to contain the opinion of counsel to Party A being delivered simultaneously herewith.

[19.    A new Exhibit H is hereby added to the Agreement to contain the opinion of counsel to LBSF being delivered simultaneously herewith.]


[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

## ANNEX C

### MODIFICATIONS TO OLD CONFIRMATION (Summit ID: 434011L)

1.    Except as modified herein, the terms of the New Transaction shall be as specified in the Old Confirmation.

2.    All references in the Old Confirmation to "Lehman Brothers Special Financing Inc." are hereby deleted and replaced with "1271 Counterparty Company LLC".

3.    Section 3 (Payment Instructions) of the Old Confirmation is hereby amended by deleting the existing account details for Party A and replacing it with the following:

> "Payments to Party A:        Deutsche Bank Trust Company Americas, New York
> ABA 021-001-033
> A/C # 01419647
> Ref: PORT SWAPCO11.2 – 1271 Counterparty Co LLC"

4.    Section 4 of the Old Confirmation is hereby deleted in its entirety and replaced with "[Reserved]".

5.    Section 5 of the Old Confirmation is hereby deleted in its entirety and replaced with "[Reserved]".

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

## ANNEX D

**ORDER APPROVING CONSENSUAL ASSUMPTION AND ASSIGNMENT OF PREPETITION DERIVATIVE CONTRACTS**