**HEARING DATE AND TIME: April 26, 2012 at 10:00 a.m. (Eastern Time)**
**RESPONSE DEADLINE: April 11, 2012 at 4:00p.m. (Eastern Time)**

HOGAN LOVELLS US LLP
Christopher R. Donoho, III
875 Third Avenue
New York, New York 10022
(212) 918-3000

*Attorneys for Banca Italease S.p.A.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X
                                                      :
                                                      :   Chapter 11
                                                      :
In re:                                                :   Case No. 08-13555 (JMP)
                                                      :
LEHMAN BROTHERS HOLDINGS, INC., et al.,               :   (Jointly Administered)
                                                      :
                                                      :
Debtors.                                              :
                                                      :
-----------------------------------------------------X

### RESPONSE OF BANCA ITALEASE S.P.A. TO THE TWO HUNDRED SEVENTY-SEVENTH OMNIBUS OBJECTION OF THE DEBTORS TO CLAIMS (NO GUARANTEE CLAIMS- CLAIM NO. 30708)

Banca Italease S.p.A. ("Italease"), by and through its undersigned counsel, hereby files

its response (the "Response") to the *Debtors' Two Hundred Seventy-Seventh Omnibus Objection*

*to Claims (No Guarantee Claims)* (the "Objection") [Docket No. 26241], and respectfully

represents as follows:[1]

---

[1] Italease is a company organized under the laws of Italy.  Italease enters this limited appearance in the Debtors' chapter 11 cases (collectively, the "Cases") for the purpose of making this Response to the Debtors' Objection. By making this limited appearance in the Cases, filing related objections, and submitting this and related responses, Italease does not submit itself or otherwise consent or acquiesce, and shall not be deemed to have submitted itself, consented or acquiesced, to the jurisdiction of this Court, or any other court of the United States, for any purpose other than with respect to this Response.  Italease does not waive any, and hereby reserves all, of its rights to object on jurisdictional grounds to the application of any procedural order or proposed assumption of any alleged contract, if ordered by this Court, or any other order of this Court, or any other court in the United States.

## **Background**

1.      On September 15, 2008 (the "Petition Date"), Lehman Brothers Holdings Inc. ("LBHI") filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"). On October 3, 2008, Lehman Brothers Special Financing Inc. ("LBSF") filed its voluntary chapter 11 bankruptcy petition under the Bankruptcy Code in the Court.  The Debtors' bankruptcy cases are being jointly administered.

2.      Prior to the commencement of the Cases, on October 3, 2003, Italease entered into an ISDA Master Agreement (Multicurrency-Cross-Border) (as amended, the "Master Agreement") with LBSF. On that same day, Italease entered into a related Credit Support Annex ("CSA") and a related Schedule ("Schedule," and together with the Master Agreement and the CSA, the "Master Agreement Documents") with LBSF.  A copy of the signed original of the Master Agreement and Schedule, along with the executed cover letter from the Debtors transmitting the documents to Italease (the "Cover Letter"), is annexed hereto as **Exhibit A.**

3.      Pursuant to the Master Agreement, and as a condition precedent thereto, LBHI was required to enter into a guarantee (the "Guarantee"), pursuant to which LBHI unconditionally guaranteed the due and punctual payment of all amounts owed by LBSF under the Master Agreement Documents.

4.      Pursuant to the terms of the Master Agreement Documents, Italease entered into numerous swap transactions with LBSF (the "Swap Transactions").  Further, as part of the Swap Transactions, Italease from time to time posted collateral with LBSF pursuant to the terms of the Master Agreement Documents (the "Collateral").

5.      All of the Master Agreement Documents[2] are governed by English law, with the exception of the Guarantee, which is governed by New York law.

6.      The filing of voluntary petitions under chapter 11 of the Bankruptcy Code by LBHI (the 'Credit Support Provider' pursuant to the Master Agreement) on the Petition Date and subsequently, by LBSF on October 3, 2008, constituted events of default by LBSF under Clause 5(a)(vii) of the Master Agreement.   In accordance with the 'safe harbor' provisions of the Bankruptcy Code, Italease gave notice to LBSF (via a Notice of Event of Default dated September 17, 2008) that, pursuant to Section 6(a) of the Master Agreement, September 22, 2008 was the Early Termination Date (as such term in defined in the Master Agreement) with respect to all Transactions (as such term in defined in the Master Agreement).   Pursuant to Section 6(d) of the Master Agreement, Italease calculated the amount owing by LBSF to Italease with respect to the Early Termination Date for the Swap Transactions and the current balance of Collateral posted with LBSF by Italease in accordance with Sections 6(e) and 11 of the Master Agreement. Italease demanded such payment from LBSF by a letter dated February 3, 2009, requesting the immediate payment EUR 3,494,439.74 ($5,163,384.15) (the "Settlement Amount").[3]   By a letter dated September 17, 2009, Italease demanded that LBHI fulfill its obligations to Italease for the Settlement Amount pursuant to the Guarantee.   To date, Italease has received no payment.

7.      On July 2, 2009, the Court entered an order setting forth the procedures and deadlines for filing proofs of claim in these Cases (the "Bar Date Order") [Docket No. 4271].

---

[2]   Not all of the Master Agreement Documents identified herein are annexed hereto because (i) the Master Agreement Documents and other writings executed or delivered in connection with them that support this Response are voluminous; and (ii) all of these documents are or should be in the Debtors' possession and were provided to the Debtors as part of submitting the Claim pursuant to the Bar Date Order (as defined below).   However, all such documents are expressly incorporated herein by reference and, subject to any confidentiality restrictions, will be made available upon reasonable request by contacting counsel to Italease.

[3] A copy of this letter is annexed hereto as **Exhibit B.**

## The Claim

8.     In compliance with the Bar Date Order, on September 22, 2009 Italease timely filed a proof of claim for the Settlement Amount against LBSF, which was assigned proof of claim number 30707 (the "LBSF Claim"), and a corresponding claim against LBHI, which was assigned proof of claim number 30708 (the "LBHI Claim", and together with the LBSF Claim, the "Claim"). Subsequently, pursuant to the terms of the Bar Date Order, Italease timely completed and uploaded the required Derivative Questionnaires and Guarantee Questionnaires in connection with the Claim (together, the "Questionnaires").[4]

9.     On March 12, 2012, the Debtors filed the Objection. Exhibit A to the Objection includes the LBHI Claim. The Objection asserts that "LBHI has no liability for the [LBHI Claim and other similarly situated claims] because they are based on Guarantees that have not been issued by and therefore cannot be enforced against LBHI." (Objection ¶12).

10.     The Debtors base the Objection on their failure to locate an executed version of the Guarantee and the fact that a copy of the executed Guarantee was not included in the proof of claim or in the Guarantee Questionnaire. (Objection ¶12).

11.     Italease was unable to locate an executed copy of the Guarantee because either (i) the Guarantee has been misplaced or (ii) due to an administrative oversight, LBSF or LBHI failed to deliver the executed Guarantee to Italease. However, consistent with standard protocol in such circumstances and the conditions precedent identified in the Schedule, it is abundantly

---

[4]     Pursuant to the Order of the Bankruptcy Court dated July 2, 2009 (Docket No. 4271), because the Claim is based on amounts owed by the Debtors to Italease pursuant to a Derivative Contract and a Guarantee, Italease was not required to attach supporting documentation to the Claim. Italease incorporates herein by reference the Derivative Questionnaire (including any amendments thereof) filed on or before October 22, 2009, the Guarantee Questionnaire filed on or before October 22, 2009 (including any amendments thereof), and all other documents that have been or will be submitted by Italease in connection with the Claim against the Debtors. Copies of the Master Agreement and other supporting documentation have been electronically uploaded to the website http://www.lehmanclaims.com in accordance with the requirements set forth in the Bar Date Order, Derivative Questionnaire, and the Guarantee Questionnaire.

clear that Italease would not have entered into the Master Agreement without LBHI's guarantee of LBSF's obligations under the Master Agreement.

### Response

12.     Italease disputes the contentions in the Objection and requests that the Court enter an Order allowing the LBHI Claim in the Settlement Amount plus interest and all fees allowed under the Master Agreement Documents (Sections 6(d)(ii) and 11 of the Master Agreement require LBSF, as the 'Defaulting Party', and by extension LBHI as the 'Guarantor', to indemnify Italease for all fees and expenses incurred in pursuing its rights under the Master Agreement Documents, as well as the requirement to pay all interest accrued on the Settlement Amount from the Early Termination Date). To the extent necessary, Italease requests a full evidentiary hearing - and the corresponding opportunity to take discovery - on the issues presented herein and related matters. Such discovery would include, amongst other things, discovery on LBHI's commitment to issue the Guarantee, as represented by LBSF and LBHI, the policies, practices and procedures employed in issuing the Guarantee, and the search conducted by the Debtors for the missing Guarantee.

13.     Upon information and belief, discovery will reveal either the existence of (i) the executed Guarantee, (ii) the agreement by LBHI to execute the Guarantee in connection with the execution of the Master Agreement Documents, or (iii) the existence of facts and evidence supporting the application of one or more theories of law that would result in the Guarantee being an enforceable obligation of LBHI.

14.     The Objection is predicated entirely upon (i) the application of the New York version of the Statute of Frauds, N.Y. Gen. Oblig. Law § 5-701 (McKinney 2011), and (ii) the assertion that the LBHI Guarantee was never executed. For the reasons discussed below, Italease disputes a number of the Objection's legal assertions and contentions, including the applicability of the Statute of Frauds.

**Statute of Frauds**

15.     Under New York law, the Statute of Frauds "may not be invoked to bar a party to an allegedly lost contract from proving the existence and contents of the writing by parol and circumstantial evidence." John J. Dvorske et al., 61 N.Y. Jur. 2d, Frauds Stat. § 326 (2012). New York courts have found that the enforcement of a lost contract was "not barred by the Statute of Frauds, since the plaintiff is entitled to the opportunity to prove, if she can, the existence and the contents of the lost writing 'by parol and circumstantial evidence.'" *Love v. Spector*, 215 A.D.2d 733, 733 (N.Y. App. Div. 1995) (citing *Taft v. Equitable Life Assur. Soc'y*, 173 A.D.2d 267, 268 (N.Y. App. Div. 1991)).

16.     Similarly, in *Posner v. Rosenbaum*, the court found that a lost contract falls outside the statute of frauds as no oral contract is at issue but rather the party seeking to enforce the contract must prove the existence and contents of the writing. *Posner v. Rosenbaum*, 240 A.D. 543, 546-47 (N.Y. App. Div. 1934) (finding that "the instrument of writing . . . was not produced; nor could it be, because it was lost, and from necessity parol evidence was admitted to prove, not a parol conveyance, but a conveyance in writing").

17.     The Debtors assert that because the only copies of the Guarantee that can be located are unsigned, the Guarantee is not enforceable because "an unexecuted guarantee is not enforceable." (Objection ¶14). When a contract has been lost, as made clear by *Love* and *Posner*, the party seeking enforcement must be provided with an opportunity to prove the existence and contents of the writing through parol evidence.

18.     Additionally, a signature need not be handwritten on a document to qualify as a signature for the purposes of the Statute of Frauds. In *Cloud Corp. v. Hasbro, Inc.*, Judge Posner opined:

> The purpose of the statute of frauds is to prevent a contracting party from creating a triable issue concerning the terms of the contract - or for that matter concerning whether a contract even exists - on the basis of his say-so alone. That purpose does not require a handwritten signature, especially in a case . . . in which there is other evidence, and not merely say-so evidence, of the existence of the contract . . . .

*Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 296 (7th Cir. 2002). In *Cloud Corp.* Judge Posner held "that the sender's name on an e-mail satisfies the signature requirement of the statute of frauds." *Id.* at 296; *see also Stevens v. Publicis*, SA., 50 A.D.3d 253, 255 (N.Y. App. Div. 2008) (finding that "e-mails from plaintiff constitute 'signed writings' within the meaning of the statute of frauds, since plaintiff's name at the end of his e-mail signified his intent to authenticate the contents").

19.     In this case, there is evidence, including, but not limited to, the unsigned Guarantee attached to the Schedule (which was part of a group of documents that included the signed Master Agreement and signed Cover Letter, which under Judge Posner's logic detailed above is arguably sufficient evidence to satisfy the signature requirement), and the terms in the Master Agreement Documents themselves, demonstrating the existence of the Guarantee beyond mere "say-so."

20.     The Master Agreement goes far beyond mere mention of the Guarantee; it contains numerous provisions that relate to the Guarantee and detail the Guarantee's contents. Italease and LBSF made their intent to have LBSF's obligations under the Master Agreement guaranteed by the Guarantee in numerous references in the Master Agreement. For example, the Guarantee is listed in Part 3(b) of the Schedule as a document to be delivered by LBSF upon execution of the Master Agreement. Further, the Guarantee is listed as a Credit Support Document in Part 4(f) of the Schedule to be provided by LBHI and LBSF to Italease. Part 5(e) of the Schedule makes all obligations of Italease and LBSF subject to the condition precedent that all Credit Support Documents shall have been received by the other party duly executed for the purposes of Sections 2(a)(i) and (iii) of the Master Agreement. These express references to the Guarantee in the Master Agreement Documents, in addition to the other references, constitute a portion of the parol evidence demonstrating the existence of the Guarantee that Italease would seek to introduce at an evidentiary hearing.

21.     Further, the Debtors have indicated that they may have in their possession an unsigned copy of the Guarantee. In fact, the unsigned guarantee is attached as an Exhibit to the Schedule to the Master Agreement that was part of the signed original Master Agreement Documents sent to Italease by the Debtors.  As the parties have a copy of the Guarantee, albeit unsigned, there is no uncertainty about the existence of the Guarantee or terms thereof. The only issue is whether the Guarantee is an enforceable contract, which can be proven through (i) identification of materials sufficient to satisfy the signature requirement, such as a signed copy of the Guarantee, the Cover Letter or related emails that fulfill the signature requirement, or (ii) parol evidence sufficient to indicate that there was signed copy of the Guarantee which has now been lost.

22.     The Debtors claim that they conducted a "reasonable and diligent search of their internal systems and files" and were unable to locate any "executed versions" of the Guarantee. (Objection ¶12).   The search for documents should not be limited to identifying only an "executed version" of the Guarantee, as the Debtors have indicated in the Objection that they may have in their possession an unsigned copy of the Guarantee and other documents and communications related to the Guarantee. Italease respectfully requests the right to discovery to obtain documents that relate to the Guarantee, including emails that would help satisfy the signature obligation, and documents or information that prove the existence of an executed version of the lost Guarantee.

**Exceptions to the Statue of Frauds**

23.     New York's Statute of Frauds is subject to certain exceptions. Two exceptions to the Statute of Frauds that are applicable in this case are: (i) the "merchants exception" and (ii) the qualified financial contract exception. The application of both exceptions hinges on the agreement by the parties to be bound.

### a) **Merchants Exception**

24.     Section 2-201 of the New York Uniform Commercial Code contains a "merchants exception" to the Statute of Frauds which states that the statute is satisfied if, in a transaction between merchants, there is a confirmation of the contract that is not objected to within 10 days of receipt. N.Y. U.C.C. Law § 2-201(2) (McKinney 2011). The merchants exception applies when (i) both parties are merchants, (ii) the writing was sent within a reasonable time after the alleged agreement, (iii) the writing was received by a party with reason to know of its contents, and (iv) no written objection was made. *Bazak Int'l. Corp. v. Mast Indus.*, 535 N.E.2d 633, 638 (N.Y. 1989).

25.    The merchants exception applies to contracts between people "who deal[] in goods of the kind or otherwise by [their] occupation hold[] [themselves] out as having knowledge or skill peculiar to the practices or goods involved in the transaction." N.Y. U.C.C. Law § 2-104(1) (McKinney 2011). In New York, courts have applied the Uniform Commercial Code to matters concerning derivatives trades. *See, e.g., Wells Fargo Bank, NA. v. Sharma*, 642 F. Supp. 2d 242, 251 (S.D.N.Y. 2009). The Debtors and Italease are merchants in that they deal in goods, in this instance derivatives, and by their occupation hold themselves out as having knowledge and skill particular to such derivatives.

26.    Although the merchants exception requires that the confirmation of the agreement must be in writing, "neither explicit words of confirmation nor express references to the parties' agreement is required . . . so long as the writings afford a basis for believing that they reflect a real transaction between the parties." Glen Banks, 28 N.Y. Prac., Contract Law § 3:12 (2012); *see also Apex Oil Co. v. Vanguard Oil & Service Co. Inc.*, 760 F.2d 417, 423 (2d Cir. 1985). Further, "a document may constitute a writing in confirmation under [N.Y. U.C.C. Law § 2-201(2)] even though the 'customer's acceptance' space on the document is unsigned." *Bayside Fuel Depot Corp. v. Nu Way Fuel Oil Burners Inc.*, 2009 WL 4639727, *10 (N.Y. Sup. Ct. 2009) (citing *Bazak Int'l. Corp. v. Mast Indus.*, 535 N.E.2d 633, 635-36, 638-39 (N.Y. 1989)).

27.    In connection with the execution of the Master Agreement Documents, Italease indicated that it would be a condition precedent that LBHI provide a parent company guarantee pursuant to the Master Agreement, and LBHI and LBSF agreed that the Guarantee would be provided to Italease as soon as it had been executed by the necessary signatory at LBHI. These conditions are specifically and explicitly detailed in the Schedule.

28.    A review of the terms of the Master Agreement Documents indicates that the parties agreed to be bound. The provisions of the Master Agreement Documents integrate the Guarantee into the mechanics of the Master Agreement. Although the Debtors have searched for "executed versions" of the Guarantee, they have not indicated whether they are in possession of other relevant documents, including but not limited to, unexecuted copies of the Guarantee, the Master Agreement Documents, and correspondence related to either the Master Agreement Documents or the Guarantee.

29.    Italease believes that the provisions of the Master Agreement Documents incorporating the Guarantee provide sufficient evidence to indicate that the parties agreed to be bound and Italease is therefore entitled to relief. At a minimum, Italease believes that it is entitled to discovery to obtain relevant documents including (i) any correspondence between LBSF or Italease and LBHI confirming the Guarantee, (ii) any information or documents related to the intent of LBHI with respect to the Guarantee or the Master Agreement Documents, and (iii) any information or documents indicating LBHI's possession or knowledge of a signed or unsigned Guarantee.

### b) **Qualified Financial Contract Exception**

30.    New York General Obligations Law provides an exception to the Statute of Frauds if the contract is a "qualified financial contract," which is defined to include agreements "for a rate swap, basis swap, forward rate transaction, or an interest rate option." N.Y. Gen. Oblig. Law § 5-701(b)(2)(f) (McKinney 2011). The exception provides that:

> An agreement, promise, undertaking or contract, which is valid in other respects and is otherwise enforceable, is not void for lack of a note, memorandum or other writing and is enforceable by way of action or defense provided that such agreement, promise, undertaking or contract is a qualified financial contract . . . and (a) there is, as provided in paragraph three of this subdivision, sufficient evidence to indicate that a contract has been made, or (b) the parties thereto, by

> means of a prior or subsequent written contract, have agreed to be bound by the
> terms of such qualified financial contract from the time they reach agreement (by
> telephone, by exchange of electronic messages, or otherwise) on those terms.

N.Y. Gen. Oblig. Law § 5-701(b)(1) (McKinney 2011).

31.     The purpose of the qualified financial contract exception is to ensure that the law

reflects the reality of the marketplace in which certain financial institutions, "had come to rely on

e-mail and other electronic means of communication, rather than paper writings, to memorialize

[ ] transactions." *Naldi v. Grunberg*, 80 A.D.3d 1, 8 (N.Y. App. Div. 2010). The qualified

financial contract exception was enacted "to make clear that a 'qualified financial contract [as

defined] . . . is legally binding from the moment agreement is reached.'" *Id.* at 9 (quoting the

Senate Introducer Mem. in Support, Bill Jacket, L. 1994, ch. 467, at 10).

32.     Further, it is well settled New York law that contract formation outside the statute

of frauds is not dependent on a signature as long as a party manifests an intention to be bound to

the agreement.

> The absence of the signature of a contracting party is not necessarily inconsistent
> with the formation of a binding contract. A contract arises as long as the terms are
> understood by the parties and each manifests its intent to be bound even in the
> absence of one or more signatures.

*Aini v. Sun Taiyang Co., Ltd.*, 964 F. Supp. 762, 775 (S.D. N.Y. 1997); *see also Irving R. Boody*

*& Co. v. Winn Holdings, Int'l*, 213 F. Supp. 2d 378, 381 (S.D.N.Y. 2002) ("It is well settled in

New York, however, that contract formation is not dependent on a signature.").

33.     For contracts outside the statute of frauds, the courts can turn to "the course of

conduct between the parties to determine whether there was a meeting of minds sufficient to give

rise to an enforceable contract . . ." *Flores v. Lower E. Side Serv. Ctr., Inc.*, 828 N.E.2d 593, 598

(N.Y. 2005); *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 361 N.E.2d 999, 1001

(1977) (finding that the "course of conduct . . . including . . . writings, especially taken against

the continuum of events . . . was sufficient to spell out a binding contract"); *Brighton Inv., Ltd. v. Har-Zvi*, 88 A.D.3d 1220, 1222 (N.Y. App. Div. 2011) (finding contract formation was not dependant on signed document "but on whether the parties' words and deeds establish their intent to enter into a binding agreement given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain") (internal quotations omitted).

34.    As determined by N.Y. Gen. Oblig. Law § 5-70l(b), the Guarantee, as a qualified financial contract, falls outside the statute of frauds and consequently does not require a signature to be an enforceable contract. Further, N.Y. Gen. Oblig. Law § 5-701(b)(l) requires only that the parties agreed to be bound to the contract "from the time they reach[ed] agreement (by telephone, by exchange of electronic messages, or otherwise) . . . ." N.Y. Gen. Oblig. Law § 5-701(b)(1) (McKinney 2011).

35.    By the Debtors' own filings with this Court, the understanding of the parties was that the Guarantee was in effect from the moment LBSF and Italease were in agreement as to the terms of the Master Agreement. See Disclosure Statement, p. 65 [Docket No. 19629] ("LBHI's guarantee of the obligations of its subsidiaries under derivatives contracts was given as a matter of course and did not need to be requested or negotiated"). Both the Debtors and Italease acted as though the LBHI Guarantee was in place.

36.    Italease asserts that the provisions of the Master Agreement Documents incorporating the Guarantee, namely the "signed original" of the Master Agreement and Schedule which attached an execution copy of the Guarantee as an exhibit,[5] provide more than sufficient evidence to indicate that a contract has been made and that LBHI agreed to be bound by the terms of the Guarantee. Further, Italease asserts that the course of conduct between the

---

[5] See Exhibit A.

parties, as evidenced by the general conduct in the industry, LBHI's prior dealings with Italease

and its affiliated entities, LBHI's prior course of dealing with thousands of other derivative

contract counterparties of LBSF similarly situated to Italease, and LBHI's prior dealings with

other creditors, indicates that LBHI intended to be bound by the terms of the Guarantee. In the

alternative, as with the merchants exception, Italease believes that at a minimum, it is entitled to

discovery to assess whether additional information, communications and documents exist

indicating that a contract has been made or that the parties agreed to be bound by the terms of the

Guarantee.

### **Reservation of Rights**

37.      Given the limited analysis and scant support set forth in the Objection, Italease is

not using this Response to set forth a detailed analysis of the legal issues related to the LBHI

Claim beyond the issues outlined above in relation to the Statute of Frauds. Italease reserves any

and all applicable rights at law and/or equity, all claims, and all defenses, including without

limitation the right to discovery in connection with the Debtors' Objection and the right to

amend or supplement this Response, provide further briefing with respect to any issue related to

the Objection, and to join in the response of any other party to the Objection.

*Remainder of page intentionally left blank*

## Conclusion

WHEREFORE, Italease respectfully requests that the Court enter an Order (i) overruling the Objection as it pertains to Italease's LBHI Claim; (ii) allowing the LBHI Claim in full; and (iii) granting Italease such further relief as the Court deems just or, in the alternative, (iv) schedule an evidentiary Claims Hearing and permit discovery in connection therewith.


Dated: New York, New York
      April 11, 2012

                                            **HOGAN LOVELLS US LLP**

                                            /s/ Christopher R. Donoho, III_____
                                            Christopher R. Donoho, III
                                            875 Third Avenue
                                            New York, NY 10022
                                            (212) 909-0630 Telephone
                                            (212) 918-3100 Facsimile

                                            *Attorneys for Banca Italease S.p.A.*

## **EXHIBIT A**

# LEHMAN BROTHERS

8 March 2004

Mr Alessandro Bolognini
Banca Per Il Leasing – Italease S.p.A.
Vi Cino del Duca 12
20122 Milano
ITALY

Dear Alessandro,

**Re: ISDA Master Agreement between Lehman Brothers Special Financing Inc. ("LBSF") and Banca Per Il Leasing – Italease S.p.A.**

Please find enclosed a signed original of the ISDA Master Agreement and Schedule thereto together with the English Law Transfer Annex and attached Paragraph 11.

Should you wish to discuss anything relating to these documents, please do not hesitate to contact me by telephone on: 44 20 7102 7352, or by e-mail on: ohallswo@lehman.com. I look forward to hearing from your shortly.

Best regards,

O.C. Hallsworth
**Transaction Management Group**

LEHMAN BROTHERS (INTERNATIONAL) EUROPE

25 BANK STREET   LONDON   E14 5LE   ·   TELEPHONE 020 7101 1000   ·   TELEX 88888 1 LEHMAN G
Regulated by the Financial Services Authority   ·   Member of the London Stock Exchange and the International Securities Market Association
Registered in England No 2538254 at the above address

(Multicurrency-Cross Border)



# ISDA®

**International Swaps and Derivatives Association, Inc.**

# MASTER AGREEMENT

**dated as of 3rd October, 2003.**

| LEHMAN BROTHERS SPECIAL | and | BANCA PER IL LEASING – |
|---|---|---|
| FINANCING INC. | | ITALEASE S.P.A. |

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:-

**1.      Interpretation**

(a)      *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.      Obligations**

(a)      *General Conditions.*

(i)   Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

**Copyright © 1992 by International Swaps and Derivatives Association, Inc.**

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:-

(i)    in the same currency; and

(ii)   in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

(i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:-

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:-

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992



(ii) *Liability*. If:-

(1)    X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)    X does not so deduct or withhold; and

(3)    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(e), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:-

(a)    *Basic Representations*.

(i) *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii) *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii) *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv) *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v) *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3

ISDA® 1992



(b)      *Absence of Certain Events*.  No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)      *Absence of Litigation*.  There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)      *Accuracy of Specified Information*.  All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)      *Payer Tax Representation*.  Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)      *Payee Tax Representations*.  Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.      Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:-

(a)      *Furnish Specified Information*.  It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:-

> (i) any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

> (ii) any other documents specified in the Schedule or any Confirmation; and

> (iii) upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)      *Maintain Authorisations*.  It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)      *Comply with Laws*.  It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)      *Tax Agreement*.  It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)      *Payment of Stamp Tax*.  Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

ISDA® 1992



organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.      Events of Default and Termination Events**

(a)      *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:-

(i)      *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)      *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)      *Credit Support Default.*

(1)      Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)      the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)      the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, the validity of, such Credit Support Document;

(iv)      *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)      *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)      *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however



described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii)*Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:-

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*.   The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:-

(1)   the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)   the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)      *Termination Events.*  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event



Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:-

(i) *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):-

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v) *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

ISDA® 1992



6.    **Early Termination**

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)  *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)  *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)  *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)  *Right to Terminate.* If:-

(1)  a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)  an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then



continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    *Effect of Designation.*

(i)  If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii) Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    *Calculations.*

(i)  *Statement.*  On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii) *Payment Date.*  An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event).  Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate.  Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.*  If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method"- or the "Second Method".  If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply.  The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)  *Events of Default.*  If the Early Termination Date results from an Event of Default:-

(1)  *First Method and Market Quotation.*  If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)  *First Method and Loss.*  If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)  *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the



Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)    *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii) *Termination Events*. If the Early Termination Date results from a Termination Event:-

(1)    *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)    *Two Affected Parties*. If there are two Affected Parties:-

(A)    if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)    if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992



7.      **Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:-

(a)      a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)      a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.      **Contractual Currency**

(a)      *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)      *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)      *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)      *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA® 1992

9.    **Miscellaneous**

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    **Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.    **Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document



to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)      *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:-

> (i)    if in writing and delivered in person or by courier, on the date it is delivered;

> (ii)   if sent by telex, on the date the recipient's answerback is received;

> (iii)  if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

> (iv)   if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

> (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)      *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)      *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)      *Jurisdiction*.    With respect to any suit, action or proceedings relating to this Agreement ("Proceedings'), each party irrevocably:-

> (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

> (ii)   waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)      *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)   *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.   Definitions

As used in this Agreement:-

"*Additional Termination Event*" has the meaning specified in Section 5(b).

"*Affected Party*" has the meaning specified in Section 5(b).

"*Affected Transactions*" means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

"*Affiliate*" means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"*Applicable Rate*" means:-

(a)   in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)   in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)   in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)   in all other cases, the Termination Rate.

"*Burdened Party*" has the meaning specified in Section 5(b).

"*Change in Tax Law*" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

"*consent*" includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

"*Credit Event Upon Merger*" has the meaning specified in Section 5(b).

"*Credit Support Document*" means any agreement or instrument that is specified as such in this Agreement.

"*Credit Support Provider*" has the meaning specified in the Schedule.

"*Default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.



"*Defaulting Party*" has the meaning specified in Section 6(a).

"*Early Termination Date*" means the date determined in accordance with Section 6(a) or 6(b)(iv).

"*Event of Default*" has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

"*Illegality*" has the meaning specified in Section 5(b).

"*Indemnifiable Tax*" means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

"*law*" includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and "lawful" and "unlawful" will be construed accordingly.

"*Local Business Day*" means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

"*Loss*" means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

"*Market Quotation*" means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have



been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

"*Non-default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

"*Non-defaulting Party*" has the meaning specified in Section 6(a).

"*Office*" means a branch or office of a party, which may be such party's head or home office.

"*Potential Event of Default*" means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"*Reference Market-makers*" means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

"*Relevant Jurisdiction*" means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

"*Scheduled Payment Date*" means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

"*Set-off*" means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

"*Settlement Amount*" means, with respect to a party and any Early Termination Date, the sum of:-

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

"*Specified Entity*" has the meaning specified in the Schedule.

ISDA® 1992



*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

ISDA® 1992



value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By: _____

Print Name: Zdenka S. Griswold
Authorized Signatory

Title: _____

Date: _____

**BANCA PER IL LEASING – ITALEASE S.P.A.**

By: _____

Print Name: Banca per il Leasing
Italease S.p.A.
Il Consigliere Delegato

Title: _____

Date: _____

By: _____

Print Name: _____

Title: _____

Date: _____

ISDA® 1992



EXECUTION COPY

**(Multicurrency-Cross Broder)**

**SCHEDULE**
**to the**
**Master Agreement**

dated as of 3rd October, 2003

between

(1)    **LEHMAN BROTHERS SPECIAL FINANCING INC** ("Party A");

and

(2)    **BANCA PER IL LEASING – ITALEASE S.P.A.** ("Party B").

**Part 1. Termination Provisions.**

(a)    "*Specified Entity*" means in relation to Party A for the purpose of:

Section 5(a)(v), none

Section 5(a)(vi), none

Section 5(a)(vii), none

Section 5(b)(iv), none

and in relation to Party B for the purpose of:

Section 5(a)(v), none

Section 5(a)(vi), none

Section 5(a)(vii), none

Section 5(b)(iv), none

(b)    "*Specified Transaction*" will have the meaning specified in Section 14.

(c)    The "*Cross Default*" provisions of Section 5(a)(vi), will apply to Party A and will apply to Party B, provided however that notwithstanding the foregoing, an Event of Default shall not occur under either Section 5(a)(vi)(1) or (2) if: (i) the event or condition referred to in Section 5(a)(vi)(1) or the failure to pay referred to in Section 5(a)(vi)(2) is a failure to pay caused by an error or omission of an administrative or operational nature; and (ii) funds were available to such party to enable it to make the relevant payment when due; and (iii) such relevant payment is made within three Local Business Days following receipt of written notice from the relevant party of such failure to pay.

If such provisions apply:



EXECUTION COPY

*"Specified Indebtedness"* will have the meaning specified in section 14 of this Agreement.

*"Threshold Amount"* means the lesser of (i) USD 40 million or 2% of Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in case of Party A and Holdings (or its equivalent in any other currency), and the lesser of (i) USD 40 million or (ii) two percent (2%) of the Stockholders' Equity of Party B, in the case of Party B (or its equivalent in any other currency).

For purposes hereof, *"Stockholders' Equity"* means with respect to an entity, t any time, the sum at each time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(g)   The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) will apply to Party A and will apply to Party B.

(h)   The *"Automatic Early Termination"* provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(i)   *Payments on Early Termination.*   For the purposes of Section 6(e) of this Agreement:

   (i)   Market Quotation will apply; provided, however, that for the purposes of the definition of Settlement Amount all Currency Option Transactions and FX Transactions (each as defined in Part 6 of this Schedule) shall be conclusively and irrevocably deemed to be Transactions for which a Market Quotation cannot be determined.

   (ii)   The Second Method will apply.

(j)   *"Termination Currency"* means, unless otherwise indicated in the Confirmation, Euro if such currency is specified and freely available, and otherwise United States Dollars.

(k)   *"Additional Termination Event"* will not apply.



EXECUTION COPY

**Part 2. Tax Representations**

(a)  *Payer Representations.*  For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)  *Payee Representations.*  For the purpose of Section 3(f) of this Agreement, Party A represents that it is a corporation duly organised and validly existing under the laws of the State of Delaware and Party B represents that it is a bank duly organised and validly existing under the laws of the Republic of Italy.

21

EXECUTION COPY

**Part 3.  Agreement to Deliver Documents**

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)     Tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| None | None | Not Applicable |

(b)     Other documents to be delivered are:

| Party required To deliver Document | Form/Document/ Certificate | Date by which To be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Appropriate evidence reasonably satisfactory to the other party of the authority of such party and its Credit Support Provider to enter into the Agreement, and any Credit Support Document and each Transaction entered into hereunder | On signing of this Agreement and, if requested, as soon as practicable after execution of any Confirmation of any Transaction | Yes |
| Party A and Party B | A copy of its annual consolidated financial statements (i) in the case of Party A, of its Credit Support Provider and (ii) in the case of Party B, Party B, such financial statements certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | Promptly upon request | Yes |
| Party A and Party B | For its most recent fiscal quarter, a copy of the unaudited financial statements of (i) in the case of Party A, its Credit Support Provider and (ii) in the case of Party B, Party B, prepared in accordance with generally | Promptly upon request | Yes |

22



EXECUTION COPY

| | | | |
|---|---|---|---|
| | accepted accounting principles consistently applied. | | |
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of this Schedule. | Upon execution of this Agreement. | No |
| Party B | A copy of the *statuto della societa'*. | Upon execution of this Agreement. | Yes |

EXECUTION COPY

## Part 4. Miscellaneous

(a)     *Addresses for Notices*.  For the purpose of Section 12(a) of this Agreement:

Address for notices or communications to Party A:

Address:       Lehman Brothers Special Financing Inc.
               c/o Lehman Brothers Inc.
               Transaction Management
               745 Seventh Avenue, 28th Floor
               New Yory, NY10019
Attention:     Documentation Manager
Facsimile No.:  +1 212 526-7672
Telephone No.:  +1 212 526-7187

For all purposes.

Address for notices or communications to Party B:

Address:       Banca Per Il Leasing – Italease S.p.A.
               Vi Cino del Duca 12
               20122 Milano
               ITALY
Attention:     Massimo Sarandrea
Facsimile No.:  +39 02 7765 381
Telephone No.:  +39 02 776 643

(b)     *Process Agent.* For the purpose of <u>Section 13(c)</u> of this Agreement:

Party A appoints as its Process Agent:   Lehman Brothers International (Europe),   Attention:
Head of Transaction Management Group, Europe, 25 Bank Street, London E14 5LE.

Party B appoints as its Process Agent: Not applicable; provided, that, if Party A so requests
(which request may be made by telephone or in writing), Party B shall forthwith appoint an agent
for the service of legal proceedings on its behalf with an office in London. If Party B fails to
appoint such an agent within 3 business days of Party A's request therefor, then Party A shall be
entitled to appoint such an agent on Party B's behalf, in Party B's name and at Party B's expense.
Party A shall notify Party B forthwith of the appointment of any such agent.

(c)     *Offices.*  The provisions of Section 10(a) will apply to this Agreement.

(d)     *Multibranch Party.*  For the purpose of Section 10(c) of this Agreement:

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e)     *Calculation Agent.*    The Calculation Agent is Party A, unless otherwise specified in a
Confirmation in relation to the relevant Transaction.

(f)     *Credit Support Document.*  Details of any Credit Support Document:



EXECUTION COPY

In respect of Party A:    A Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.

In respect of Party B:    Not Applicable.

(g)    ***Credit Support Provider.***  Credit Support Provider means in relation to Party A, Lehman Brothers Holdings Inc.

Credit Support Provider means in relation to Party B, Not Applicable.

(h)    ***Governing Law.***  This Agreement will be governed by and construed in accordance with the laws of England & Wales.

(i)    ***Netting of Payments.***  Subparagraph (ii) of Section 2(c) of this Agreement will not apply to Transactions entered into under this Agreement unless otherwise specified in a Confirmation.

(j)    "***Affiliate***" will have the meaning specified in Section 14 of this Agreement.

25



EXECUTION COPY

**Part 5. Other Provisions**

(a)    *Set-Off*

(i)    In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default with respect of a party ("X") or an Illegality or Credit Event upon Merger where X is the sole Affected Party, the other party ("Y") will have the right (but will not be obliged) without prior notice to X or any other person to set off any obligation of X owing to Y (whether or not arising under this Agreement, whether or not matured, whether or not contingent and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y owing to X (whether or not arising under this Agreement, whether or not matured, whether or not contingent and regardless of the currency, place of payment or booking office of the obligation).

(ii)    For the purpose of cross-currency set-off, Y may convert any obligation to another currency at a market rate determined by Y.

(iii)    If an obligation is unascertained, Y may in good faith estimate that obligation and, with prior notice to X, set off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

(iv)    Nothing in this provision will be deemed to create a charge or other security interest.

(b)    *No Agency Representation*

Section 3 is amended by the addition at the end thereof of the following additional representation:

    "(g)    *No Agency.* It is entering into this Agreement and each Transaction as principal and not as agent of any person."

(c)    *Recording of Conversations*

Each party to this Agreement (i) acknowledges and agrees to the tape recording of conversations between the parties to this Agreement whether by one or other or both Party A and Party B; (ii) agrees to such tape recording and (iii) consents to the submission of any such type recording in evidence to any court or judicial proceedings for the purposes of establishing any matters relating to this Agreement.

(d)    *ISDA Representation Regarding Relationship Between The Parties*

The Agreement is amended by the insertion after section 14 of an additional Section 15, reading in its entirety as follows:

"15.    **Relationship between the parties**

Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(a)    *Non Reliance.* It is acting for its own account, and it has made its own decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it



EXECUTION COPY

based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. It has not received from the other party any assurance or guarantee as to the expected results of that Transaction.

(b)   *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the financial and other risks of that Transaction.

(c)   *Status of Parties.* The other party is not acting as a fiduciary or an adviser for it in respect of that Transaction.

(d)   *Eligible Contract Participant.* It is an "eligible contract participant" within the meaning of Section 1(a)(12) of the Commodity Exchange Act."

(e)   *Condition precedent to delivery of Credit Support Documents*

For the purposes of Section 2(a)(iii) of this Agreement, and notwithstanding anything to the contrary included in this agreement, each obligation of Party A and Party B under this Agreement, including those set forth under section 2(a)(i) with respect to each Transaction entered into pursuant hereto, is, where there is a Credit Support Document specified in this Agreement or in any Confirmation, subject to the condition precedent that the relevant Party will have received all Credit Support Documents duly executed and in a form satisfactory to the other Party.

(f)   *Transfer.* Notwithstanding anything to the contrary in **Section 7** of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favour of Party B, of the obligations of such Affiliate, such guarantee to be otherwise identical to the guarantee then in effect of the obligations of the transferor.

(g)   *Outstanding Specified Transactions.* Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(h)   *Accuracy of Specified Information.* Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

27



EXECUTION COPY

**Part 6. FX Transactions and Currency Options**

(a)      **Incorporation and Amendment of 1998 FX and Currency Option Definitions**

(i)      <u>Incorporation of 1998 FX and Currency Option Definitions</u>. The 1998 FX and Currency Option Definitions (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation.

(ii)     <u>Amendment of 1998 FX and Currency Option Definitions</u>. The following amendments are made to the 1998 Definitions:

Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):

**Currency Obligation.** "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations.

(b)      **Confirmations.** Any confirmation (whether provided by mail, facsimile, e-mail or other electronic means, and whether manually or electronically generated) in respect of any FX Transaction or Currency Option Transaction into which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement even where not so specified in such confirmation and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as modified therein.

(c)      **Netting.** Unless otherwise agreed by the parties, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, having the identical terms, written by the other party, and, upon the occurrence of such termination and discharge, neither party shall have any further obligation to the other party in respect of the Currency Option Transaction or parts thereof so terminated and discharged (except for the obligation of either party to pay any Premium due, but not paid, thereunder), provided that the remaining portion of any Currency Option Transaction which is partially discharged and terminated shall continue to be a Currency Option Transaction for all purposes of this Agreement.

(d)      **Inconsistencies.** In the event of any conflict between:

(1)      the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this Agreement shall supersede;

(2)      the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states that is shall so prevail and has been signed by both parties, its terms shall supersede the terms of this Agreement;

(3)      the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction

28

EXECUTION COPY

Confirmation and this Agreement, the terms of the Confirmation shall supersede.

(e)   **Definitions.** Section 14 is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

<table>
<tr><td style="text-align:center">**LEHMAN BROTHERS**<br>**SPECIAL FINANCING INC.**<br>*(Name of Party)*</td><td style="text-align:center">**BANCA PER IL LEASING – ITALEASE S.p.A.**<br><br>*(Name of Party)*</td></tr>
</table>

By: _____

Name:

Title: Zdenka S. Griswold

Date: Authorized Signatory

By: _____

Name:

Title:

Date:

Banca per il Leasing
Italease S.p.A.
*Il Consigliere Delegato*

29



EXECUTION COPY

EXHIBIT A to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and BANCA PER IL LEASING – ITALEASE S.p.A. ("Party B") have entered into a Master Agreement dated as of 3RD October, 2003 (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided. however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 2(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.



EXECUTION COPY

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, 399 Park Avenue, 11th Floor, New York, NY 10022 USA (Facsimile No. (212) 520-0176) with a copy to Lehman Brothers Special Financing Inc., Attention: Transaction Management, 745 Seventh Avenue, 28th Floor, New York, NY 10019 USA.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name:

Title:

Date:



**<u>EXHIBIT B</u>**

\\NY - 003128/000001 - 2387981 v3

**BANCAITALEASE**

To:   Lehman Brothers Special Financing Inc.
      c/o Lehman Brothers Inc.
      Transaction Management
      745 Seventh Avenue, 28th Floor
      New York, NY 10019
      **For the attention of: Documentation Manager**

      *By hand*

3 February 2009

Dear Sirs

**Re: ISDA Master Agreement dated as of 3 October 2003 between Banca Italease S.p.A. (formerly Banca per il Leasing – Italease S.p.A.) and Lehman Brothers Special Financing Inc.**

We refer to the notice of Event of Default dated 17 September 2008 (the **"Notice of Default"**) served by us on you in accordance with Section 6(a) of the ISDA Master Agreement (as amended, modified or supplemented from time to time and together with all schedules and exhibits thereto, and all confirmations entered into in connection therewith, the **"ISDA Master Agreement"**) dated 3 October 2003 between Banca Italease S.p.A. (formerly Banca per il Leasing – Italease S.p.A.) (**"Italease"** or **"us"**) and Lehman Brothers Special Financing Inc. (**"LBSF"** or **"you"**). Terms used but not defined herein will have the meaning ascribed in them in the ISDA Master Agreement.

The Notice of Default designated 22 September 2008 as the Early Termination Date in respect of all outstanding Transactions under the ISDA Master Agreement as a result of the Event of Default specified therein. The schedule to this notice (the **"Schedule"**) constitutes the statement required by Section 6(d)(i) of the ISDA Master Agreement of the calculations contemplated by Section 6(d) of the ISDA Master Agreement. Such Schedule sets forth such calculations, which have been made by us in accordance with the methodology set out in Section 6(e) of the ISDA Master Agreement.

As stated in the Schedule, pursuant to Section 6(e)(i)(3), the amount payable by LBSF to Italease is equal to the amount of <u>EUR 3,425,922.38</u> and such amount is due to Italease pursuant to Section 6(d)(ii) of the ISDA Master Agreement on 3 February 2009.

Pursuant to Section 11 of the ISDA Master Agreement, LBSF is obliged to indemnify us, on demand, for all reasonable out-of pocket expenses, including legal fees, incurred by us by reason of the enforcement and protection of our rights under the ISDA Master Agreement or by reason of the early termination of any Transaction. Our estimated legal fees in this regard are <u>EUR 68,517.36</u>.

Banca Italease S.p.A.
Via Cino Del Duca, 12 - 20122 Milano - Telefono 02 7765.1 - Telefax 027765.2261
Cost. 1968 - N. Iscrizione al Registro Imprese di Milano, Codice Fiscale e Partita IVA 0084618U0156 Capitale Sociale € 868.966.074,48 i.v.
Iscritta Albo delle Banche - Capogruppo Gruppo bancario Banca Italease iscritto all'Albo dei Gruppi Bancari
Aderente al Fondo Interbancario Tutela dei Depositi e al Fondo Nazionale di Garanzia





We should be grateful if you would please therefore pay such amounts, plus interest on any overdue amounts calculated in accordance with the ISDA Master Agreement in immediately available funds to the following account:

| Correspondent: | Istituto Centrale delle Banche Popolari Italiane Spa - Milan | Swift Code: CIPBITMM |
|---|---|---|
| For account: | Banca Italease SpA | BIC CODE: BLEAITM1 |
| Favour: | Banca Italease Spa | |
| Account number: Iban code | 000000302650 IT50L0302601600000000302650 | |

Italease hereby reserves all of its rights in respect of the ISDA Master Agreement whether arising under the ISDA Master Agreement, at law or otherwise (and for the avoidance of doubt this letter does not constitute a waiver of any such rights) including but not limited to the right to serve any further notice on you.

This letter is governed by the laws of England and Wales.

Yours faithfully

Banca Italease S.p.A.

By:
Name: MASSINO MAZZEGA
Title: CEO

By:
Name:

Title:

Banca Italease S.p.A.
Via Cino Del Duca, 12 - 20122 Milano - Telefono 02 7765.1 - Telefax 027765.2261
Cost 1968 - N. Iscrizione al Registro Imprese di Milano, Codice Fiscale e Partita IVA 00846180156 Capitale Sociale € 858.960.674,48 i.v
Iscritta Albo delle Banche - Capogruppo Gruppo bancario Banca Italease iscritto all'Albo dei Gruppi Bancari
Aderente al Fondo Interbancario Tutela dei Depositi e al Fondo Nazionale di Garanzia

**BANCAITALEASE**

## SCHEDULE

1.    Pursuant to pursuant to Section 6(e)(i)(3) of the ISDA Master Agreement an amount will be payable equal to:

  (A)    the sum of the Settlement Amount (determined by the Non-defaulting Party (Italease Finance)) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party; less

  (B)    the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party (LBSF).

  If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

2.    The Settlement Amount [1] with respect to a party and the Early Termination Date, is the sum of:

  (A)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

  (B)    the relevant party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

  Therefore, the Settlement Amount is the sum of:

  (A)    - EUR 4,583,358.26; and

  (B)    - EUR 2,532,856

  =    - EUR 7,116,214.26.

3.    Therefore, the amount payable pursuant to Section 6(e) of the ISDA Master Agreement is:

  (A)    - EUR 7,116,214.26 plus EUR 10,542,136.64 [2]; less

  (B)    zero,

  =    **EUR 3,425,922.38, payable by LBSF.**

---

[1] Please see the Annex for details of the relevant quotations and other details.
[2] The Unpaid Amount constituted by the Value of the Credit Support Balance pursuant to the Credit Support Annex to ISDA Master Agreement.

Banca Italease S.p.A.
Via Cino Del Duca, 12 - 20122 Milano - Telefono 02 7765.1 - Telefax 027765.2261
Cost. 1968 - N. Iscrizione al Registro Imprese di Milano, Codice Fiscale e Partita IVA 00846180156. Capitale Sociale € 868.966.074,48 i.v.
Iscritta Albo delle Banche - Capogruppo Gruppo Bancario Banca Italease iscritto all'Albo dei Gruppi Bancari
Aderente al Fondo Interbancario Tutela dei Depositi e al Fondo Nazionale di Garanzia

**4** ANNI
1968 2008

**Annex**

| N | ref1 | ref2 | ref BankTL | Start Date | Maturity Date | Notional | Quote DB | Quote HVB | Quote Barclays | Quote RBS | Market Quotations |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | SWAP TRANSACTIONS | | | | | MARKET QUOTATIONS | | |
| 1 | 4089960 | 3178241L | 138 | 29-ott-2003 | 29-ott-2008 | 500.000 | 1.397 | 500 | 2.200 | 1.897 | 1.647 |
| 2 | 422317 | 32437BL | 268 | 03-dic-2003 | 03-dic-2008 | 350.000 | 1.401 | 1.700 | | 2.202 | 1.551 |
| 3 | 438817 | 33318L | 369 | 21-gen-2004 | 21-gen-2009 | 151.000 | 1.214 | 800 | 3.000 | 2.411 | 1.812 |
| 4 | 443654 | 335792L | 390 | 28-gen-2004 | 28-gen-2009 | 100.000 | 779 | 1.000 | 1.900 | 2.080 | 1.450 |
| 5 | 471365 | 35310ZL | 100258 | 25-mar-2004 | 25-mar-2009 | 100.000 | 989 | 700 | 4.000 | 2.738 | 1.864 |
| 6 | 471529 | 35313BL | 596 | 25-mar-2004 | 25-mar-2009 | 500.000 | 4.701 | 1.400 | 9.800 | 7.313 | 6.007 |
| 7 | 475394 | 355314L | 100267 | 25-mar-2004 | 25-mar-2009 | 180.000 | 1.781 | 6.600 | 5.000 | 3.728 | 4.384 |
| 8 | 478538 | 356736L | 619 | 31-mar-2004 | 31-mar-2009 | 250.000 | 3.220 | 2.600 | 6.000 | 4.219 | 3.719 |
| 9 | 2119651 | 465340L | 290 | 12-mar-2005 | 12-dic-2008 | 500.000 | 590 | 3.100 | 2.000 | 1.489 | 1.745 |
| 10 | 2865001 | 622712L | 103146 | 28-feb-2007 | 28-feb-2012 | 1.150.000 | 9.991 | 10.500 | 19.000 | 9.255 | 10.245 |
| 11 | 2955986 | 633128L | 103220 | 01-apr-2007 | 01-apr-2010 | 2.347.585 | 39.455 | 23.800 | 32.000 | 21.987 | 27.900 |
| 12 | 2955987 | 633130L | 103220 | 01-apr-2007 | 01-apr-2010 | 2.347.585 | 28.886 | 23.800 | 32.000 | 21.987 | 25.343 |
| 13 | 2962976 | 634022L | 103198 | 30-mar-2007 | 30-mar-2011 | 961.644 | 8.777 | 8.400 | 14.500 | 8.207 | 8.598 |
| 14 | 3791882 | 79339RL | XX95TD | 28-apr-2008 | 28-apr-2011 | 25.000.000 | 75.485 | 53.000 | 64.000 | 60.000 | 62.000 |
| 15 | 3791902 | 79339RL | XX95TE | 28-apr-2008 | 28-apr-2010 | 37.000.000 | -144.513 | -177.000 | -180.000 | -185.000 | -165.500 |
| 16 | 429571 | 329824L | 100152 | 16-dic-2003 | 18-dic-2008 | 250.000 | 2.246 | 1.200 | 4.000 | 2.696 | 2.456 |
| 17 | 448022 | 338836L | 423 | 04-feb-2004 | 04-feb-2009 | 240.000 | 600 | 200 | 2.500 | 1.700 | 1.150 |
| 18 | 472655 | 353974L | 618 | 24-mar-2004 | 24-mar-2009 | 150.000 | -1.088 | -1.700 | 0 | -1.344 | -1.216 |
| 19 | 2061655 | 438652L | 100105 | 26-nov-2003 | 26-nov-2008 | 300.000 | 0 | 0 | 500 | 1.000 | 250 |
| 20 | 2077001 | 447208L | 100100 | 25-nov-2004 | 25-nov-2008 | 3.000.000 | 0 | 500 | 1.000 | 1.000 | 0 |
| 21 | 2268791 | 50167BL | 101575 | 19-ott-2005 | 19-ott-2015 | 50.000.000 | -1.570.000 | -1.551.000 | -1.755.000 | -1.500.000 | -1.560.500 |
| 22 | 2273669 | 502730L | 101575 | 10-ott-2005 | 10-ott-2010 | 3.000.000 | -96.626 | n.a. | -12.000 | 55.000 | -12.000 |
| 23 | 2353438 | DL-108911 | XX92QN | 01-feb-2006 | 01-feb-2012 | 18.150.000 | -881.790 | -1.062.000 | -927.000 | -883.000 | -905.000 |
| 24 | 2374697 | DL-108915 | XX92RT | 06-mar-2006 | 06-mar-2012 | 30.000.000 | -1.483.744 | -1.740.000 | -1.544.000 | -1.558.000 | -1.558.500 |
| 25 | 404590 | DL-110589 | 100070 | 15-ott-2003 | 15-ott-2008 | 3.000.000 | 0 | 0 | 0 | 1.000 | |
| 26 | 418211 | DL-110585 | 100054 | 21-nov-2003 | 21-nov-2008 | 2.000.000 | 0 | 0 | 0 | 1.000 | |
| 27 | 2151836 | DL-111025 | 762 | 04-mag-2005 | 04-mag-2009 | 300.000 | 1.032 | 0 | 2.500 | 1.500 | 1.266 |
| 28 | 581325 | DL-111700 | 100839 | 08-giu-2005 | 08-giu-2009 | 10.000.000 | -560.000 | -500.000 | -565.000 | -527.000 | -546.000 |

see Note (1)

4

| | | | SWAP TRANSACTIONS (see Note (2)) | | | | LOSS (see Note (3)) |
|---|---|---|---|---|---|---|---|
| N | ref | ref2 | ref Ban/TL | Start Date | Maturity Date | Notional | |
| 29 | 463984L | | X91VF | 23-mar-2005 | 14-set-2020 | 811.424.144 | 0 |
| 30 | 531312 | 382362L | X909O | 24-giu-2004 | 14-ott-2017 | 908.973.000 | -2.295.226 |
| 31 | 531311 | 383594L | X909P | 24-giu-2004 | 14-ott-2017 | 151.134.598 | -237.630 |

**Note**

(1)    With respect to Transaction N. 22, only three quotations were provided. In such a case, the Market Quotation is the remaining quotation after disregarding the highest and the lowest quotations.

(2)    This list consists of three back-to-back interest rate swap transactions entered into relating to two securitisation transactions conducted by Italease Finance S.p.A.

(3)    With respect to Transactions N. 29, 30 and 31, in each case less than three quotations were provided and therefore the Market Quotation cannot be determined. As a result, Loss applies to them. The Loss with respect to each of these Transactions have been determined as being the aggregate of:

(a)    the replacement cost of the replacement transactions entered into in respect of them on 29 September 2008 for Transaction N.29 (being zero) and 24 October 2008 for Transactions N. 30 (being EUR 644.000 payable by Banca Italease to the replacement counterparty) and 31 (being EUR 56.000 payable to Banca Italease by the replacement counterparty); and

(b)    the net gain accruing to Banca Italease as a result of the payments due on 1 and 13 October 2008 in respect of Transactions N.30 and 31 (there were no such payments in respect of Transaction N. 29) not having been paid, as follows:

(i)    in respect of Transaction N. 30 on 1 October 2008, LBSF was due to pay EUR 1.467,232 and on 13 October, Italease was due to pay EUR 4.405,458, resulting in a net gain to Italease of EUR 2,939.226; and

(ii)   in respect of Transaction N. 31 on 1 October 2008, LBSF was due to pay EUR 44.079 and on 13 October, Italease was due to pay EUR 225,709, resulting in a net gain to Italease of EUR 181.630.

Therefore:

for Transaction N. 29, the Loss is **zero**;

for Transaction N. 30, the Loss is (A) EUR 644.000 plus (B) - EUR 2.939.226 = **- EUR 2.295.226**, and

for Transaction N. 31, the Loss is (A) - EUR 56.000 plus (B) - EUR 181.630 = **- EUR 237.630**.

5