# **EXHIBIT B**

NASD Dispute Resolution
www.nasd.com
Midwest Region
55 West Monroe Street ● Suite 2600 ● Chicago, Il. ● 60603 ● 312-899-4440 ● Fax 312-236-9239

**NASD**

**RECEIVED**

August 23, 2006

AUG 3 1 2006

NEAL GERBER & EISENBERG
HNB

Thomas E. Hommel, Esq.
Lehman Brothers Inc
1301 Avenue of the Americas
5th Floor
New York, NY  10019

Subject:        NASD Dispute Resolution Case Number 06-03583
                Samuel Glazer v. Lehman Brothers, Inc., Lehman Brothers Holdings, Inc., SG Cowen
                Securities Corp., et al

Dear Mr. Hommel:

NASD Dispute Resolution provides a forum for the resolution of disputes involving public investors and
broker-dealers, and members of the American Stock Exchange ("AMEX"), International Stock Exchange
("ISE"), Nasdaq Liffe Markets ("NqLX"), and Philadelphia Stock Exchange ("PHLX"), and Municipal
Securities Rulemaking Board ("MSRB") registrants and/or their associated persons. This office administers
that forum according to the procedures set forth in the NASD Code of Arbitration Procedure ("Code").
The most up to date version of the Code can be accessed or downloaded from our Web site at
http://www.nasd.com. On the NASD Dispute Resolution Web site, you will also find important instructions
concerning filing your answer or other claims (The NASD Dispute Resolution Party's Reference Guide).
If you do not have access to the Internet, you may call our office to request a copy of these documents.

### Filing a Statement of Answer

Since you have been named as a party in this arbitration, enclosed is a copy of the Statement of Claim.
You are required by the rules of NASD Dispute Resolution to arbitrate this dispute.

Your Statement of Answer must specify all relevant facts and available defenses to the Statement of
Claims (See Rule 10314(b) of the Code). In addition, your Answer may include any related claim(s) that
you may have against the Claimant or any other party subject to arbitration under the Code. If you assert
any of these claims please refer to the Schedule of Fees in Rule 10332 of the Code for the related filing
fee. If you assert a claim, it should be submitted with the fee in the attached envelope.

Pursuant to Rule 10314(b) of the Code, you are required on or before October 12, 2006, to send to the
Claimant and all other parties, a signed Uniform Submission Agreement (form enclosed) and your Answer.
Claimant or Claimant's counsel's address is provided at the end of this service letter.

The Code also requires that you send to the Director of Arbitration: (a) the original and three copies of
the Uniform Submission Agreement, properly signed and dated by you; (b) the original and three copies
of your Answer; and (c) four copies of any document(s) referred to in your Answer. When sending copies
of your Answer to the Director of Arbitration, please indicate that you have properly served your Answer

on all parties. If you need an extension of time to file your Statement of Answer, you must contact the Claimant directly and request one.  If Claimant agrees to extend your time to file your Answer, please notify NASD in writing of the new deadline for filing your Answer. You should also send a copy of that notice to the Claimant and all other parties.

If your Answer is not served upon all parties, a motion to preclude your Answer may be made pursuant to Rule 10314(b)(2) of the Code.  In addition, failure to provide NASD Dispute Resolution with copies of your Answer as described above will preclude it from inclusion in the package of pleadings provided to the arbitrator(s).

## Hearing Location

If an arbitration involves a public customer, NASD Dispute Resolution will generally select a hearing location closest to the customer's residence at the time the dispute arose.

In disputes between AMEX, ISE, NASD, NqLX, or PHLX member firms, or MSRB Registrants and associated persons, NASD Dispute Resolution will select the hearing location that is closest to the location where the associated person was employed at the time the dispute arose.

In industry disputes involving only member firms and/or MSRB Registrants unless the firms are in the same locale or the parties agree to a specific hearing location, NASD Dispute Resolution will consider the following factors when deciding the hearing location:

1)    Which party initiated the transactional issue;
2)    The location of witnesses and documents; and
3)    The relative hardship for travel of a party to a specific location.

The **ANTICIPATED** hearing location of this case is: Cleveland, Ohio. This preliminary decision was made, pursuant to Rule 10315 of the Code, by me, acting on behalf of the Director of Arbitration, in accordance with Rule 10103 of the Code. A final decision regarding the initial hearing location will be rendered before the Panel is being appointed. In addition, Rule 10315 of the Code authorizes the presiding Panel to determine the time and place of all subsequent hearing(s).

If the anticipated initial hearing location listed above is **UNKNOWN**, NASD Dispute Resolution is requesting recommendations from all parties for the hearing location based on the above applicable guidelines.

## Other Information

If, after reading the Code and the "NASD Dispute Resolution Party's Reference Guide" booklet, you still have questions regarding NASD Dispute Resolution arbitration, please contact us. When contacting us, please refer to the number assigned to this case, which is 06-03583. NASD Dispute Resolution encourages the parties to communicate among themselves to resolve issues that do not require NASD Dispute Resolution intervention.

Pursuant to Article V, Section 2(c) of the NASD By-Laws, if you are a registered representative with the NASD, you are required to keep your registration application current.  You are therefore, advised to review the Form U-4 to determine if disclosure of this matter is required.  If so, your failure to update your registration application may result in the filing of a formal complaint based on any omission.  Any questions regarding this disclosure requirement should be directed to the NASD Member Services Phone Center (301) 590-6500.

## Motions

If a party files a motion before the initial pre-hearing conference that requires a panel's consideration, NASD Dispute Resolution will not solicit a response to the motion. However, the opposing party may expedite the process by filing a response to the motion. If the opposing party files a response at least ten days before the initial pre-hearing conference, the staff will have sufficient time to transmit the motion to the panel before the conference. If NASD Dispute Resolution does not receive a response to the motion at least ten days before the conference, we may not be able to transmit the motion to the panel before the conference. In this case, the moving party may raise the issue with the panel at the conference and ask the panel to establish a schedule for responding to the motion, as appropriate. We will advise the parties of the date of the conference in a later communication.


Very truly yours,


Midwest Processing Center
midwestprocessingcenter@nasd.com
312-899-4440  Fax:312-236-9239


IPC:TT:LC39E
rc:02/05
Enclosure
CC:
    K. Chris Todd, Esq., Samuel Glazer
    Kellogg, Huber, Hansen, Todd, Evans & Fi, 1615 M St. NW, Suite 400, Washington, DC  20036

RECIPIENTS:
    Thomas E. Hommel, Esq., Lehman Brothers Inc
    Lehman Brothers Inc, 1301 Avenue of the Americas, 5th Floor, New York, NY  10019

    The Company President, Lehman Brothers Holdings, Inc.
    Lehman Brothers Holdings, Inc., 745 Seventh Avenue, New York, NY  10019

    Mark A. Egert, CCO, Cowen and Company, LLC
    Cowen and Company, LLC a/k/a SG Cowen, Securities Corp.,
    1221 Avenue Of The Americas, New York, NY  10020

    The Company President, Societe Generale SA
    Societe Generale SA, 1221 Avenue Of The Americas, New York, NY  10020

UNIFORM SUBMISSION AGREEMENT

**NASD Dispute Resolution**

---

In the Matter of the Arbitration Between

Name of Claimant(s)

Samuel Glazer

06-03583

Name of Respondent(s)

Lehman Brothers Inc
Lehman Brothers Holdings, Inc.
Cowen and Company, LLC
Societe Generale SA

---

1. The undersigned parties hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, cross claims and all related counterclaims and/or third party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Rules, Regulations and/or Code of Arbitration Procedure of the sponsoring organization.

2. The undersigned parties hereby state that they have read the procedures and rules of the sponsoring organization relating to arbitration.

3. The undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The undersigned parties further agree and understand that the arbitration will be conducted in accordance with the Constitution, By-Laws, Rules, Regulations and/or NASD Code of Arbitration Procedure of the sponsoring organization.

4. The undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest due thereon may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5. IN WITNESS WHEREOF, the parties hereto have signed and acknowledged the foregoing Submission Agreement.

Party(ies) Signature

_____

Lehman Brothers Inc

Date: _____

LC43A: SUBMISSION AGREEMENT
rc:06/02
CC:
    K. Chris Todd, Esq., Samuel Glazer
    Kellogg, Huber, Hansen, Todd, Evans & Fi, 1615 M St. NW, Suite 400, Washington,
    DC  20036

RECIPIENTS:
    Thomas E. Hommel, Esq., Lehman Brothers Inc
    Lehman Brothers Inc, 1301 Avenue of the Americas, 5th Floor, New York, NY  10019

    The Company President, Lehman Brothers Holdings, Inc.
    Lehman Brothers Holdings, Inc., 745 Seventh Avenue, New York, NY  10019

    Mark A. Egert, CCO, Cowen and Company, LLC
    Cowen and Company, LLC a/k/a SG Cowen, Securities Corp.,
    1221 Avenue Of The Americas, New York, NY  10020

    The Company President, Societe Generale SA
    Societe Generale SA, 1221 Avenue Of The Americas, New York, NY  10020

**NASD Dispute Resolution**
www.nasd.com

Midwest Region
55 West Monroe Street ● Suite 2600 ● Chicago, IL ● 60603 ● 312-899-4440 ● Fax 312-236-9239

**NASD**

August 23, 2006

Thomas E. Hommel, Esq.
Lehman Brothers Inc
1301 Avenue of the Americas
5th Floor
New York, NY  10019

Subject:     NASD Dispute Resolution Arbitration Number 06-03583
             Samuel Glazer v. Lehman Brothers, Inc., Lehman Brothers Holdings, Inc., SG Cowen
             Securities Corp., et al

Dear Mr. Hommel:

Under Rule 10308 of the *NASD Code of Arbitration Procedure (the Code)*, the parties participate in
appointing arbitrators through the Neutral List Selection System (NLSS).  All parties will receive a list
of arbitrators' names and their disclosures.  Each party may strike any names from the list, and then, in
order of their preference, rank the remaining arbitrators on the list. NASD Dispute Resolution consolidates
the rankings and contacts the arbitrators for service in the order of the consolidated ranking.

Pursuant to Rule 10308(b)(4)(B), any party may request that the list include arbitrators with certain subject
matter knowledge.  If we receive such a request (it is not a requirement,) NLSS will attempt to fill a
majority of the list with arbitrators possessing the special background requested.  **However, there is no
guarantee that the listed arbitrators will have any or all of the codes you select.**

Each side can select up to four controversy or security types combined.  We are enclosing a list of issues,
identifying the controversy and security types available in NLSS.  In order of preference (1 = most
desired; 4 = least desired), please number the codes to indicate any special skills or knowledge you desire
of the arbitrators appointed to this case.  Use caution in making your selection.  If you select more than
four controversy or security types, we will only use the first four you selected.

NLSS can accommodate only four controversy and securities types for **all parties combined**.  If the
parties collectively request more than four different types, the staff will enter all common choices,
followed by the highest ranked additional choices from the parties (alternate choices, starting with the
claimant's top choice) until four are entered.

Kindly submit your selections by October 12, 2006 which is the date the last answer is due. You should

notify all opposing parties of your selections. If a party fails to notify all opposing parties and provide NASD Dispute Resolution with proof of service, NASD Dispute Resolution will not honor the request. The parties will receive additional information about NLSS, as well as the list of arbitrators, approximately thirty days after the last answer is due.  If you have any questions about NLSS, please consult Rule 10308 of the Code or contact our office.

Very truly yours,


Midwest Processing Center
midwestprocessingcenter@nasd.com
312-899-4440  Fax:312-236-9239

IPC:TT:LC08A
rc:07/04

Enclosure

# LIST OF ISSUES

**Case Number:**_____    **Case Name:**

**Circle One:** Claimant or Respondent    **Party Name:**

In order of preference (1 = most desired; 4 = least desired), please number the codes below to indicate what skills / knowledge you desire of the arbitrators appointed to this case.  There is no guarantee that the appointed arbitrators will have any or all of the codes you select.  **Additionally, NASD Dispute Resolution has not investigated the information provided by the arbitrators to verify its accuracy.**

**NLSS limits the parties collectively to a total of four (4) codes.**

| | Account Related | | |
|---|---|---|---|
| | Dividends | | Fannie Mae |
| | Margin Calls | | Freddie Macs |
| | Transfer | | Futures (other than commodities) |
| | **Executions** | | Ginnie Maes |
| | Amex Floor Trading | | Government Securities |
| | Amex Specializing | | Limited Partnerships |
| | Execution Price | | Mutual Funds |
| | Limit/Stop/Market Order | | Municipal Bonds |
| | **Trading Dispute** | | Municipal Bond Funds |
| | Buy In | | Options |
| | Mark-ups | | Preferred Stock |
| | Sell Outs | | Recruitment Disputes |
| | Stock Loan | | Repurchase Agreements |
| | Other Floor Trading | | Real Estate Investment Trusts |
| | **Other** | | Stock Index Futures |
| | Annuities | | Warrant/Rights |
| | Clearing Disputes | | Underwriting |
| | Common Stock | | Unknown Type of Securities |
| | Commodities | | |
| | Corporate Bonds | | |

**ADDITIONAL CODES**  (Complete only for Employment cases)

| | Controversy | | Controversy |
|---|---|---|---|
| | Age Discrimination | | Libel or Slander |
| | Breach of Contract | | National Origin Discrimination |
| | Commissions | | Partnerships |
| | Compensation | | Promissory Notes |
| | Disability Discrimination | | Race Discrimination |
| | Employment Discrimination | | Religious Discrimination |

| | Employment Retaliation | | Sexual Harassment |
| --- | --- | --- | --- |
| | Gender Discrimination | | Sexual Orientation Discrimination |
| | Libel or Slander on Form U-5 | | Training Contracts |
| | | | Wrongful Termination |

CC:

    K. Chris Todd, Esq., Samuel Glazer
    Kellogg, Huber, Hansen, Todd, Evans & Fi, 1615 M St. NW, Suite 400, Washington, DC  20036

RECIPIENTS:

    Thomas E. Hommel, Esq., Lehman Brothers Inc
    Lehman Brothers Inc, 1301 Avenue of the Americas, 5th Floor, New York, NY  10019

    The Company President, Lehman Brothers Holdings, Inc.
    Lehman Brothers Holdings, Inc., 745 Seventh Avenue, New York, NY  10019

    Mark A. Egert, CCO, Cowen and Company, LLC
    Cowen and Company, LLC a/k/a SG Cowen, Securities Corp.,
    1221 Avenue Of The Americas, New York, NY  10020

    The Company President, Societe Generale SA
    Societe Generale SA, 1221 Avenue Of The Americas, New York, NY  10020

## Notice to Parties - NASD's Discovery Rules and Procedures

All parties to NASD arbitrations must cooperate in the exchange of documents and comply with NASD's discovery rules and procedures. Failure to do so may result in sanctions. Possible sanctions include:

- Assessing monetary penalties payable to one or more parties;
- Precluding a party from presenting evidence;
- Making an adverse inference against a party;
- Assessing postponement and/or forum fees;
- Assessing attorneys' fees, costs and expenses; and
- Dismissal of a claim, defense or proceeding.

In addition, members and associated persons may be referred to NASD Regulatory Policy and Oversight for possible disciplinary action, which can include suspension or termination of NASD membership or registration.

### Introduction

The timely exchange of relevant documents and information between parties to NASD arbitrations is vital to the efficient, cost-effective resolution of disputes. Recently, complaints from parties regarding possible abuses of the discovery process in NASD arbitrations have been on the rise. This trend suggests that some parties believe that noncompliance with the discovery process is a routine and acceptable part of arbitration strategy. It is not.

The purpose of this Notice is to remind all parties, claimants and respondents that failure to comply with the NASD discovery rules and procedures can result in sanctions, including dismissal of a claim, defense or proceeding. In addition, members and associated persons who fail to comply with a discovery order of the panel may be referred to NASD Regulatory Policy and Oversight for possible disciplinary action, which can include suspension or termination of NASD membership or registration. You may contact the NASD Investor Complaint Center for more information.

### Automatic Exchange of Documents

Rule 10321 of the NASD Code of Arbitration Procedure (Code) requires parties to NASD arbitrations to cooperate in the exchange of documents and information, and to respond to discovery requests from other parties within a certain time. Rule 10321 also requires parties to try to resolve any dispute regarding the production of documents or information before objecting to the production of requested documents or information. The NASD Discovery Guide and Document Production Lists specifically identify which documents parties should exchange before the hearing. Document Production Lists 1 and 2 apply to all customer disputes, while Lists 3 through 14 apply to specific types of claims. (For example, Lists 4 and 5 apply to cases involving churning allegations.)

Time Frames for Turning Over Documents

Parties receive the Discovery Guide and Document Production Lists at the time the statement of claim is served. Unless the parties agree otherwise, they must give each other copies of all documents in their possession or control that are on Document Production Lists 1 or 2, and any other lists applicable to the dispute, within 30 days of the date that the answer to the claim is due or filed, whichever is earlier. This exchange should happen automatically, without arbitrator or staff intervention.

Objections

If any party objects to the production of any document listed in the relevant Document Production Lists, the party must file a written objection on or before the date that the exchange of documents is due to occur. Objections should set forth the reasons the party objects to producing the documents. An objection to the production of a document or a category of documents is not an acceptable reason to delay the production of any document not covered by the objection. Parties may respond to an objection within 10 days from service of the written objections. The arbitrators will decide whether disputed documents must be exchanged, and resolve any other issues, including requests for confidential treatment of documents.

Additional Discovery Requests

Parties may also request documents or information not on the Document Production Lists under Rule 10321. Parties must either produce requested documents or information within 30 days of the time the request was received, or file a written objection in the manner described above.

Sanctions for Noncompliance

As noted above, failure to comply with NASD's discovery rules and procedures, or orders of the arbitrators, can, and does, result in sanctions. The following is a partial list of cases in which arbitrators issued sanctions for discovery abuse in 2003:

- A member was ordered to pay $10,000 a day for each day that the firm continued to withhold documents that the panel ordered the firm to produce;
- A claimant was ordered to reimburse the respondent costs in the amount of $1,500 for failing to respond in a timely manner to ordered discovery requests;
- A member was assessed over $10,000 in sanctions and $2,500 in attorney's fees when a panel found that the member intentionally concealed documents and delayed the discovery process;
- A panel awarded a claimant over $7,000 due to a member firm's failure to cooperate in the discovery process;
- A claimant was ordered to pay to a respondent $1,475 as a sanction for failing to comply with discovery procedures;
- A panel awarded a claimant $2,750 in attorney's fees as a sanction for the member's failure to provide discoverable material.

•A panel awarded a claimant $3,000 in sanctions for a respondent's failure to provide discoverable material as ordered by the panel;

•Claimants were ordered to pay a respondent $1,000 as a sanction for failing to provide copies of expert witness exhibits; and

•A panel sanctioned a member $10,000 for failure to produce documents required by the chairperson of the panel.

In addition, during the past year, arbitrators dismissed several claims with prejudice when claimants failed to comply with discovery orders after previous sanctions proved ineffective. Arbitrators in several other cases referred members or associated persons for disciplinary review for discovery abuse.

To avoid discovery sanctions, parties should familiarize themselves with NASD's discovery rules and procedures, and make every attempt to cooperate in the exchange of documents and information within the designated time frames. Parties should assume that documents on Document Production Lists 1 and 2, and any other applicable lists, are discoverable, and, absent a written objection, should exchange such documents without waiting for an arbitrator order to do so. Any objections should be made in writing, in a timely manner, and should explain what efforts the party has made to resolve the dispute.

Other Arbitrator and Staff Actions to Deal with Discovery Abuse

In addition to reminding parties of their obligation to comply with NASD discovery rules and procedures, NASD will be reminding arbitrators about what they can do to manage the discovery process effectively, including what sanctions are available when parties violate either NASD rules or arbitrator orders. Among other things, NASD is creating a new discovery "mini-course" that will be offered to all arbitrators online in the first quarter of 2004. NASD Dispute Resolution staff has also initiated a practice of bringing all alleged discovery abuses to the attention of the Director of Arbitration and the President of NASD Dispute Resolution. These cases will be carefully reviewed and, when appropriate, NASD Dispute Resolution will refer such cases to NASD Regulatory Policy and Oversight for disciplinary review.

Conclusion

NASD hopes that these measures will lead to a significant reduction in the instances of discovery abuse in the forum, and alleviate the need for future rule changes or other additional steps to deter such abuse.

lc74A
rc:07/05

CC:
   K. Chris Todd, Esq., Samuel Glazer
   Kellogg, Huber, Hansen, Todd, Evans & Fi, 1615 M St. NW, Suite 400, Washington,

DC  20036

RECIPIENTS:

Thomas E. Hommel, Esq., Lehman Brothers Inc
Lehman Brothers Inc, 1301 Avenue of the Americas, 5th Floor, New York, NY  10019

The Company President, Lehman Brothers Holdings, Inc.
Lehman Brothers Holdings, Inc., 745 Seventh Avenue, New York, NY  10019

Mark A. Egert, CCO, Cowen and Company, LLC
Cowen and Company, LLC a/k/a SG Cowen, Securities Corp.,
1221 Avenue Of The Americas, New York, NY  10020

The Company President, Societe Generale SA
Societe Generale SA, 1221 Avenue Of The Americas, New York, NY  10020

## NASD ARBITRATION UNIFORM SUBMISSION AGREEMENT

Claimant(s)

**In the Matter of the Arbitration Between**

Name(s) of Claimant(s)
Samuel Glazer

**and**

Name(s) of Respondent(s)
Lehman Brothers, Inc., Lehman Brothers Holdings, Inc., SG Cowen Securities Corp., Societe Generale SA

1.  The undersigned parties hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

2.  The undersigned parties hereby state that they have read the procedures and rules of the sponsoring organization relating to arbitration.

3.  The undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The undersigned parties further agree and understand that the arbitration will be conducted in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

4.  The undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5.  The parties hereto have signed and acknowledged the foregoing Submission Agreement.

Samuel Glazer
Claimant Name (please print)

Claimant's Signature                                             07/28/2006
                                                                      Date

Claimant Name (please print)

Claimant's Signature                                             Date

**If needed, copy this page.**

23

# NATIONAL ASSOCIATION OF SECURITIES DEALERS

| | |
|---|---|
| SAMUEL GLAZER, )<br><br>     Claimant, )<br><br>vs. )<br><br>LEHMAN BROTHERS, INC., )<br>  a Delaware corporation, )<br><br>LEHMAN BROTHERS HOLDINGS, INC., )<br>  a Delaware corporation, )<br><br>SG COWEN SECURITIES CORP., )<br>  a New York corporation, and )<br><br>SOCIETE GENERALE SA, )<br>  a French corporation, )<br><br>     Respondents. ) | STATEMENT OF CLAIM |

Claimant Samuel Glazer brings this arbitration claim against Lehman Brothers, Inc. and Lehman Brothers Holdings, Inc. (collectively, "Lehman"), SG Cowen Securities Corp. ("SG Cowen") (formerly Cowen & Company ("Cowen & Co.")), and Societe Generale SA ("Societe," and, together with Lehman and SG Cowen, "Respondents"), and states as follows:

## INTRODUCTION

1.     For over a decade, a stockbroker named Frank Gruttadauria, along with his employers, SG Cowen and Lehman, stole from, cheated, and lied to numerous innocent victims who entrusted their money to these prestigious investment firms. Mr. Gruttadauria cultivated personal relationships of trust and, with Respondents' knowing participation and institutional backing, successfully defrauded clients out of tens of millions of dollars. Those clients, including Claimant Mr. Glazer, relied on Respondents' publicly marketed reputation for

institutional trustworthiness and good character, and trusted that the statements they were sent by SG Cowen and Lehman accurately reflected the funds in their accounts. In fact, while the monthly account statements sent by these firms showed growing balances of several millions of dollars, the accounts were almost empty. For his services, Respondents rewarded Mr. Gruttadauria with steady promotion and generous compensation.

2.      Mr. Glazer, now 83 years old, was a co-founder of North American Systems, Inc., also known as "Mr. Coffee," which introduced the first automatic drip coffee maker in 1972. After Mr. Glazer and his partner sold North American Systems, Inc. in July 1986, he went into business with his son Robert Glazer, and has since then managed his assets through their company, Glazer & Company. Mr. Glazer has consistently pursued an investment strategy that allocates the majority of his assets in treasury bills, which yield a low and steady return but carry little or no risk, and invests a portion of the remaining assets in high-risk stocks with the potential for correspondingly high returns. This strategy ensures that the bulk of Mr. Glazer's assets are protected, while retaining the possibility that the high-risk portion of his portfolio will give him a higher rate of return overall.

3.      In July 1998, Mr. Glazer was introduced to Mr. Gruttadauria, who was the Managing Director for SG Cowen in Cleveland, Ohio, and who managed the investments of several of Mr. Glazer's friends and acquaintances. Mr. Gruttadauria encouraged Mr. Glazer to transfer an existing account Mr. Glazer had at SG Cowen to Mr. Gruttadauria's management, and assured him that if he did so he would receive a higher rate of return than he was currently receiving. Mr. Glazer agreed to open a new account with SG Cowen in July 1998, and over a period of four months transferred approximately $5 million of cash and other investment assets into this account.

4.       For the next three years, Mr. Glazer received monthly account statements from Respondents showing that his investment was progressively increasing in value.  By allowing Respondents to pursue an aggressive and risky investment strategy during a period of unprecedented stock market growth, Mr. Glazer was able to increase the value of his portfolio held by SG Cowen and Lehman to almost $19 million by February 2001, at which point he decided to consolidate his gains, sell his high-risk stocks, and use the resulting funds to buy Treasury Notes and other corporate bonds that would preserve his assets with little or no risk. Mr. Gruttadauria agreed to sell those stocks and purchase bonds for Mr. Glazer, and those sales and purchases were reflected on Mr. Glazer's monthly statements.  At the end of November 2001, Mr. Glazer's last account statement from Lehman showed a balance of approximately $24 million, almost 93% of which was invested in Treasury Notes and corporate bonds.

5.       Unbeknownst to Mr. Glazer, Mr. Gruttadauria did not invest Mr. Glazer's money, but instead, with the assistance of Respondents, stole it as part of a massive fraudulent Ponzi scheme that robbed innocent investors of hundreds of millions of dollars and reaped substantial profits for each of the brokerage firms at which he worked.  From the outset of Mr. Glazer's relationship with Respondents, the demonstrated intention of Mr. Gruttadauria was to loot Mr. Glazer's accounts for his own purpose, and routinely to falsify documents and records in order to conceal the ongoing fraud from Mr. Glazer.  Mr. Gruttadauria stole the first $5 million Mr. Glazer deposited in his account, and then took an additional $2 million that Mr. Glazer added to his account in 2001.

6.       As the senior most employee in the Cleveland office of SG Cowen, and later Lehman, Mr. Gruttadauria forged documents and client signatures, and sent false account statements to his clients showing significant profits, while the Respondent firms directed the real

statements to post office box and/or "care of" addresses Mr. Gruttadauria controlled, thus

concealing the true facts from the victims of the fraud. When clients sought to withdraw funds

from their pillaged accounts, Mr. Gruttadauria would satisfy their requests by stealing from

another customer or by transferring money from one of the sham company accounts he

maintained for this purpose, all by openly using an off-network computer placed in plain view on

his company desk, paid for by Respondents.

7.    In addition to helping himself to his clients' funds, Mr. Gruttadauria was amply

rewarded for his fraudulent activities by rapid promotion by SG Cowen and Lehman, and by

generous compensation and bonuses. Indeed, Lehman was so keen to retain Mr. Gruttadauria

when it purchased SG Cowen's Cleveland office, that it offered (and gave) him a $5 million

dollar signing bonus in the form of a "loan" that Lehman would forgive at the rate of $1 million

dollars for each year Gruttadauria continued to provide the company with his fraudulent services.

8.    Incredibly, Respondents placed the very person responsible for ensuring that Mr.

Gruttadauria complied with the rules designed to protect customers in a position where Mr.

Gruttadauria would determine his compensation. This fox-guarding-the-hen-house system was

embraced notwithstanding that SG Cowen previously had been fined $380,000 by the New York

Stock Exchange ("NYSE") for its failure (as Cowen & Co.) to adequately supervise branch

office managers in the 1990s. SG Cowen and Lehman were also fined by the NYSE and the

Securities and Exchange Commission ("SEC") in 2003 after the fraud was revealed. Both the

SEC and the NYSE found that Respondents had failed to adequately supervise Mr. Gruttadauria

and failed to maintain complete and accurate books and records.

9.    Lehman's failure to stop Mr. Gruttadauria's ongoing fraud is all the more

egregious in light of the fact that at the same time it was conducting due diligence of SG

Cowen's high-net-worth business in July 2000, it was defending an almost identical fraud effected by another Lehman broker from another Lehman branch office. Between 1988 and 1995, Lehman's broker in Beirut, Lebanon, Ahmad Ihsan El-Daouk, defrauded hundreds of investors out of tens of millions of dollars. Just like Mr. Gruttadauria, Mr. Daouk: (i) used phony account statements to cover up his theft; (ii) routinely transferred funds between customer and sham company accounts when he needed to cover withdrawal requests; (iii) directed Lehman to send the real account statements for hundreds of customers to post office boxes he controlled; (iv) forged client signatures; and (v) conducted the whole fraudulent scheme from his own laptop computer. At the time Lehman did its due diligence of the Cleveland branch office – when it received documents revealing key elements of Mr. Gruttadauria's fraud – it was taking the deposition of Mr. Daouk, who laid out this fraudulent scheme in detail.

10.    This massive fraud has caused financial and personal damage to Mr. Glazer, who relied on Respondents and their employees to operate honestly and professionally. Respondents solicited investments in part by touting their institutional integrity and long-standing "reputation" for trustworthiness and devotion to their clients. In a statement that no doubt echoes Lehman's advertising campaign at the time, Lehman's Chairman and CEO wrote in Lehman's 2000 annual report:

> At Lehman Bros., we believe that our culture creates the ultimate cornerstone for our competitive advantage. Our culture is one of trust and commitment, and we extend that commitment to our clients, employees and shareholders.

Less than a year later, in January 2002, Mr. Gruttadauria turned himself in and confessed that "I can hardly believe that I could have done this without detection for so long, the various firms greed and lack of attention at the senior level contributed greatly to that."

11.     While Mr. Glazer reasonably believed, based on Respondents' status as legal fiduciaries and their publicly marketed reputation for institutional trustworthiness and good character, that Respondents would provide legitimate, high-quality investment advice, faithfully execute securities transactions, manage Mr. Glazer's investments in a trustworthy manner, and provide honest and accurate transaction-reports, monthly balances, annual reports, and tax information, Respondents did nothing of the kind.  They paid lip service to compliance procedures, and ignored blatant violations of internal rules and federal and state laws. Respondents shirked their duty to supervise Mr. Gruttadauria and directly caused this enormous fraud.  They either knew of the fraud or intentionally turned a blind eye to obvious signs of wrongdoing because they were earning millions of dollars in commissions through Mr. Gruttadauria's conduct.  While Respondents profited handsomely from this fraudulent scheme, Mr. Glazer suffered enormous losses.

12.     Mr. Glazer now seeks to recover what he would have earned if he had been dealing with an honest broker.  Mr. Glazer chose to pursue an aggressive and speculative investment strategy with the portion of his money he entrusted to SG Cowen and Lehman, and he understood that by doing so he risked losing all of that investment.  SG Cowen and Lehman, by contrast, risked nothing.  Mr. Glazer is therefore entitled to the benefit of his bargain with SG Cowen and Lehman, namely, the returns produced by his investments, as measured by the account balance on the last statement he received from Lehman before Respondents' fraud was revealed, along with prejudgment and post-judgment interest to compensate him for the amount that his assets would have increased in value since that time.  This simple and equitable measure of damages is nothing more than Respondents would demand for themselves if they were in a similar position:  Lehman's SEC filings have stated every year since this fraud began that "[w]e

seek to achieve adequate returns from each of our businesses commensurate with the risks they assume." Mr. Glazer likewise seeks the returns produced by his high-risk investments with SG Cowen and Lehman, as those returns were represented to him by both companies.

## PARTIES

13.     Claimant Samuel Glazer is domiciled in the City of Naples, Florida. At all times relevant to this action, Mr. Glazer maintained a residence in the State of Ohio.

14.     Respondent SG Cowen is incorporated under the laws of the State of New York with its principal place of business in the State of New York. At all times relevant to this action, SG Cowen operated as a licensed broker-dealer in the sale of securities. SG Cowen was created in 1998 when Societe acquired Cowen & Co.'s retail business, including its Cleveland branch. SG Cowen became the investment banking arm of Societe. Upon information and belief, SG Cowen had 2000 annual revenues in the amount of $527 million.

15.     Societe is a French corporation operating as a bank, with its principal place of business in the United States in the State of New York. Societe is the parent corporation of SG Cowen. According to its annual reports Societe had a net income for 2000 (based on a January 1, 2000 exchange rate) of over $2.6 billion.

16.     Lehman Brothers, Inc. is a registered broker-dealer engaged in the sale of securities. Lehman Brothers, Inc. is incorporated under the laws of the State of Delaware with its principal place of business in the State of New York. According to its annual reports, Lehman Brothers, Inc. had a net income of $975 million and net revenues of over $6 billion for 2002; net income of $1.7 billion and net revenues of $8.6 billion for 2003; net income of $2.4 billion and net revenues of $11.6 billion for 2004; and net income of $3.3 billion and net revenues of $14.6 billion for 2005.

17.     Lehman Brothers Holdings, Inc. is the parent corporation of Lehman Brothers, Inc., and is a Delaware corporation with its principal place of business in the State of New York.

## PROCEDURAL BACKGROUND

18.     In February 2002, Mr. Glazer filed a complaint in the United States District Court for the Northern District of Ohio, Eastern Division, regarding the matters alleged in this Statement of Claim.  Several other similar cases were filed by victims of Mr. Gruttadauria, and the cases were assigned to the Honorable John M. Manos.

19.     In April 2002, the defendants in those cases filed motions to stay the cases pending arbitration and/or to dismiss certain counts.  Plaintiffs subsequently filed a motion to lift the stay of discovery, which was granted by the court on May 16, 2002.  The court ordered that discovery proceed on a consolidated basis.  Accordingly, all of the plaintiffs in the Cleveland cases divided up discovery tasks and shared that information pursuant to a protective order entered in the case.

20.     On July 19, 2002, the district court issued an opinion holding that the plaintiffs were not required to proceed to arbitration, on the ground that the fraud committed by the defendants rendered the victims' brokerage agreements void *ab initio*.  The defendants filed a notice of appeal and moved in the Sixth Circuit to stay discovery pending resolution of their appeal.  That motion was denied by the Sixth Circuit on September 18, 2002.

21.     With the district court's and Sixth Circuit's blessing to proceed with discovery, all parties served document requests and interrogatories on opposing parties, and took depositions.  Defendants produced over 160,000 pages of documents; plaintiffs likewise produced voluminous discovery.

22.     On August 13, 2003, the Sixth Circuit reversed the district court, holding that, under the Supreme Court's decision in *Prima Paint v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967), all issues regarding the enforceability of a contract, including fraudulent inducement, must be arbitrated unless the arbitration clause, standing alone, was induced by fraud.  The court of appeals remanded all of the cases to the district court for an individual evaluation of whether each victim's arbitration clause was valid.

23.     On remand, Mr. Glazer argued that the arbitration clause in his contract with Respondents was invalid because he had signed the agreement only after obtaining Mr. Gruttadauria's assurance that Respondents would never seek to enforce the arbitration clause. The district court agreed with Mr. Glazer, and refused to order arbitration.

24.     On January 12, 2005, the Sixth Circuit again reversed the district court.

25.     On April 11, 2005, Mr. Glazer filed a petition for certiorari with the United States Supreme Court, but that petition was denied on February 27, 2006.

26.     Mr. Glazer now files this Statement of Claim.

## FACTUAL BACKGROUND

<u>Samuel Glazer</u>

27.     As noted above, Mr. Glazer sold his interest in Mr. Coffee in 1972, and thereafter focused his business activities on managing and increasing his assets.  He began working with his son Robert Glazer at Glazer & Company, a family business founded by Robert Glazer in 1983 after his graduation from the University of Pennsylvania Wharton School of Business. Through Glazer & Company, the Glazers invested and managed their assets, and coordinated their insurance planning, accounting, and tax and estate planning.

28.    Although Mr. Glazer is a knowledgeable and successful businessman, neither he nor his son Robert has any particular expertise in the fields of tax planning, accounting, or the law.  Accordingly, Mr. Glazer was always careful to consult with sophisticated outside counsel with respect to tax, legal, and accounting matters, and Glazer & Company always employed an in-house staff of certified public accountants, and legal and real estate advisors, which coordinated and acted as intermediaries with those outside advisors.  Similarly, although Mr. Glazer invested some of his assets in the stock market, and understood the risks and potential benefits of different types of investments, he was not a sophisticated investor and recognized that he would need investment managers to assist him.

29.    Since the mid-1980s, Mr. Glazer has pursued an investment strategy that allocates the majority of his assets in no-risk Treasury Notes, which yield a low and steady return, and a portion of the remaining assets in high-risk stocks and investment partnerships (also known as "hedge funds") with the potential to yield high returns.  By pursuing this strategy, Mr. Glazer has tried to ensure that the bulk of his assets are protected, while retaining the possibility that the high-risk portion of his portfolio will give him a favorable rate of return overall.  Although Mr. Glazer understood the risks, and potential benefits, of investing in hedge funds, he was not, and never claimed to be, a sophisticated investor in securities, and agreed that the general partner of each fund would have full, exclusive, and complete authority in the management and control of the investment assets of the fund.

Mr. Glazer's Investments with Respondents

30.    In 1998, Mr. Glazer met Mr. Gruttadauria, who was the Managing Director for SG Cowen in Cleveland, Ohio.  Mr. Gruttadauria solicited Mr. Glazer's investment business and specifically touted his investment performance.  Mr. Gruttadauria reviewed the existing

investments Mr. Glazer had with SG Cowen, which were then managed by another broker at the firm, emphasized the investment success of several of his other clients, and assured Mr. Glazer that he would get a better rate of return if he transferred his SG Cowen account to Mr. Gruttadauria's management. Mr. Glazer was impressed and relied upon those representations. As a result, Mr. Glazer agreed to open a new account with SG Cowen in July 1998, and over a period of four months transferred approximately $5 million of cash and other investment assets into this account, including funds from the existing SG Cowen account.

31.    From July 1998 through October 2000 (when SG Cowen sold the Cleveland office and other operations to Lehman), Mr. Glazer spoke to Mr. Gruttadauria on a regular basis, and received monthly and annual account activity reports and tax information from SG Cowen at his office addresses in Pepper Pike, Ohio, and later Beachwood, Ohio, which were the only addresses designated by Mr. Glazer to receive such reports and materials. Following Lehman's purchase, from October 2000 through December 2001, Mr. Glazer continued to speak to Mr. Gruttadauria on a regular basis, and receive monthly and annual account activity reports from Lehman.

32.    As of December 31, 1998, Mr. Glazer's SG Cowen account had grown in value to $6.6 million. From January 1, 1999 to December 31, 1999, during one of the biggest bull markets in history, Mr. Glazer's assets invested with SG Cowen increased to $18.8 million. From January 1, 2000 through October 2000, when Lehman took over his account, Mr. Glazer's assets invested with SG Cowen increased from $18.8 million to $19.2 million. From October 2000 through November 2001, Mr. Glazer's assets invested with Lehman increased from $19.2 million to over $24 million, although this amount included $2 million that Mr. Glazer deposited into his account in September 2001. These account balances were confirmed by the monthly

account activity statements that Mr. Glazer received from SG Cowen and Lehman. (The

monthly account statements received by Mr. Glazer from SG Cowen and Lehman are attached as

Exhibit A hereto.)

33.    Mr. Glazer carefully monitored and reviewed the materials he received from SG

Cowen and Lehman, which were all consistent with his investment experience and risk exposure

as described by Mr. Gruttadauria during their regular telephone conversations and meetings.

34.    The gains shown on Mr. Glazer's monthly account statements were also

consistent with other investment gains experienced by Mr. Glazer during the same time period as

a result of other investments carrying similar risk. In October 1997, Mr. Glazer transferred $1

million of the speculative portion of his assets to RS Emerging Growth Premium Partners LP, a

fund managed by RS Investments. RS Partners was devoted to small capitalization emerging

growth common stocks, and targeted emerging technology and internet companies. The

partnership invested predominately in businesses involved in internet software, internet

commerce, internet services, computer hardware, computer software, computer services, network

systems, semi conductors and telecommunication equipment and services. Mr. Glazer's

investment with RS Investments was very successful, with returns of 51.96% for 1998, and

184% for 1999.

35.    Mr. Glazer's investments in the RS Premium Partnership and the RS Investment

Partnership, which had a similar risk profile to his investments with SG Cowen and Lehman, and

included similar types of internet and new-economy stocks, had rates of returns similar to those

reported by SG Cowen and Lehman. For example, for the year ended December 31, 1999 the RS

Investment Partnership increased 184%, while the growth reported on the annual report Mr.

Glazer received from SG Cowen was approximately 212%. Mr. Glazer's SG Cowen portfolio

included less than 30 stocks, and was accordingly riskier (and more profitable) than the RS

Investment Partnership, which included over 200 stocks.

36.    In February 2001, Mr. Glazer sought to substantially reduce the level of

investment risk, and informed Mr. Gruttadauria that he wished to sell all of his internet company

holdings, and that he intended to purchase Treasury Notes through Huntington Bank.  In an

effort to retain the proceeds from the sale of these stocks in Mr. Glazer's account at Lehman and

avoid detection of the fraud, Mr. Gruttadauria advised Mr. Glazer that he could get him a higher

rate of return on Treasury Notes through Lehman than would be available at Huntington Bank.

On the basis of that representation, Mr. Glazer left his money with Lehman and directed Mr.

Gruttadauria to purchase Treasury Notes.  The monthly account statements Lehman sent to Mr.

Glazer from that date forward reflected the sale of the internet stocks and the purchase of

Treasury Notes.

37.    Lacking any reason to question the oral and written representations he received

from Respondents, Mr. Glazer believed those representations, and trusted the account statements

he received from Respondents just as he would statements from his bank.  Mr. Glazer relied on

those statements in making financial decisions including, most significantly, the decision to

continue to expose this portion of his assets to the high levels of risk associated with his

investment portfolio at SG Cowen and Lehman, and the decision to leave his money with

Lehman when he decided in 2001 to sell his high-risk stocks and buy Treasury Notes.  He also

based his personal tax planning on years of securities transactions that Respondents assured him

were being made on his behalf.

38.    Mr. Glazer's last monthly account statement from Lehman showed a balance of

approximately $24 million at the end of November 2001, almost 93% of which was invested in

Treasury Notes and corporate bonds. *See* November 2001 Lehman Brothers Account Statement

(Exh. A).

The Fraudulent Scheme

      39.    Beginning in the late 1980s, Mr. Gruttadauria, with the assistance of Respondents,

orchestrated a massive fraudulent Ponzi scheme that robbed innocent investors of hundreds of

millions of dollars and reaped substantial profits for each of the brokerage firms at which he

worked. The scope of that fraud included, among other things, intentionally:

    (i)    obtaining money and securities from investors, including Mr. Glazer, without the intent to invest it on the investors' behalf;

    (ii)    forging and falsifying account opening applications, address forms, and other company documents in connection with Mr. Glazer's accounts;

    (iii)    making fraudulent representations concerning purchases made and investments sold, and their status or performance of such investments;

    (iv)    failing to disclose transactions actually made, and falsely indicating on account statements that such transactions were not made;

    (v)    failing to deposit customers' checks written to the broker/dealer into their accounts;

    (vi)    taking money from customers' accounts and paying it to third parties without the customers' knowledge or permission;

    (vii)    conspiring with third parties either to set up sham companies for the purpose of facilitating improper and unauthorized transfers between and among accounts or to participate in the scheme by receiving, facilitating the distribution of, or preparing fraudulent account documents;

    (viii)    preparing and sending false account statements and other false documentation to Mr. Glazer;

    (ix)    directing, without Mr. Glazer's authorization, real account statements and other material to a post office box address controlled by Mr. Gruttadauria;

    (x)    preparing and accepting forged letters of authorization in order to facilitate the looting of money from client accounts; and

(xi)    providing fraudulent documentation for tax purposes to customers and/or their accountants.

40.    This fraudulent scheme began as early as 1987 when Mr. Gruttadauria was an agent and broker for Hambrecht & Quist. In 1989, he joined Cowen & Co., and four years later was promoted to manager of the Cleveland office. Just five years after that, in 1998, he became an officer and agent of SG Cowen, and was given the title of Managing Director for SG Cowen in Cleveland, Ohio. In October 2000, when Lehman acquired SG Cowen's lucrative high-net-worth business, Mr. Gruttadauria was the largest "producer," having generated more than $7.6 million in commission revenues for SG Cowen in a twelve month period shortly before Lehman's acquisition. In order to secure this revenue stream for itself, Lehman offered Mr. Gruttadauria (and subsequently paid him) a $5 million signing bonus, described as a "loan" – forgivable at the rate of $1 million a year – in order to secure his employment at Lehman. Mr. Gruttadauria became an officer and agent of Lehman and was appointed the Managing Director of Lehman's Cleveland office.

41.    Throughout his tenure as the senior most employee in SG Cowen's and Lehman's Cleveland offices, Mr. Gruttadauria repeatedly forged documents, forged or cut-and-pasted client signatures on account documents, openly used an off-network personal computer at his desk (specifically against the governing rules of SG Cowen and Lehman, and the practices of the securities industry), and sent fake account statements to clients while the Respondent firms concealed the true facts from the victims of the fraud by directing the real statements (which documented Mr. Gruttadauria's theft and deception) to post office box and/or "care of" addresses Mr. Gruttadauria controlled. Mr. Glazer's genuine account statements were sent by SG Cowen and Lehman to a fictional accounting firm (JYM Accounting) at a post office box in Gates Mills, Ohio that Mr. Gruttadauria established for his criminal use.

42.     Mr. Gruttadauria used the accounts of Respondents' customers as a slush fund, and covered up the theft by moving money from one account to another. When clients sought to withdraw funds from their pillaged accounts, Mr. Gruttadauria would satisfy their requests by stealing from another customer or by transferring money from one of the sham company accounts that he maintained for this purpose (the rob-Peter-to-pay-Paul part of the scheme). Mr. Gruttadauria did all of this from the Respondents' company offices, using an off-network computer placed in plain view on his company desk, and paid for by the firms.

43.     In January 2002, Mr. Gruttadauria turned himself in, confessing his fraudulent conduct in a letter to the Federal Bureau of Investigation. Mr. Gruttadauria wrote: "I can hardly believe that I could have done this without detection for so long, the various firms greed and lack of attention at the senior level contributed greatly to that." Letter attached to Memorandum of Frank Gruttadauria Opposing the Government's Motion for Pretrial Detention, *United States v. Gruttadauria*, No. 1:02-MJ-9010 (N.D. Ohio, filed Feb. 13, 2002) (attached as Exhibit B hereto). In August 2002, Mr. Gruttadauria pleaded guilty to multiple counts of securities fraud, mail fraud, and bank fraud, admitting that from September 1987 until January 2002 he engaged in a "massive fraud scheme" to conceal losses in his clients' accounts involving a "misapplication and misappropriation of [client] funds exceeding $40 million between January 1, 1996 and January 11, 2002, alone." *See* Plea Agreement, *United States v. Gruttadauria*, No. 1:02-CR-344, at 9 (N.D. Ohio Aug. 12, 2002) (attached as Exhibit C hereto).

44.     Although Mr. Glazer's last monthly account statement from Lehman showed a balance of approximately $24 million at the end of November 2001, almost 93% of which was invested in Treasury Notes and corporate bonds, Respondents now maintain that Mr. Glazer's account contained only $15,000. In 2003, SG Cowen paid Mr. Glazer $1.1 million of the $19.2

million shown on his last SG Cowen statement. Lehman returned to Mr. Glazer the $2 million
he transferred into his account in 2001.

45.     In all of Mr. Gruttadauria's dealings with Mr. Glazer, Mr. Gruttadauria was acting
within the scope of his employment, and with actual and apparent authority to act on behalf of
SG Cowen and Lehman. Mr. Gruttadauria's actions were calculated to promote both his
interests and the interests of Respondents by generating commissions and profits for both himself
and his employers. Respondents are liable based on their direct actions, and under the doctrine
of respondeat superior.

46.     Additionally, when SG Cowen and Lehman discovered, consciously avoided
discovering, or recklessly failed to discover in its pre-acquisition due diligence or otherwise, and
when SG Cowen and its parent discovered, consciously avoided discovering, or recklessly failed
to discover, that Mr. Gruttadauria was perpetrating a fraudulent scheme that generated
substantial benefits in commissions for the firms, Lehman and SG Cowen agreed to cover up that
scheme, and knowingly participated in and substantially assisted Mr. Gruttadauria in carrying out
the fraud.

47.     In the alternative, based on Respondents' knowledge, or reckless disregard, of Mr.
Gruttadauria's patterns of theft, embezzlement, and flagrant misconduct, each of Respondents
knowingly or recklessly participated in Mr. Gruttadauria's criminal and fraudulent scheme,
and/or conspired with unrelated third parties to defraud investors, including Mr. Glazer.

48.     Respondents acted with malice and in wanton and reckless disregard of Mr.
Glazer's rights.

Respondents' Wanton Disregard of Compliance Procedures

49.     Respondents are substantial and elite financial services institutions, characterized by law as broker-dealers, and, as such, have comprehensive legal and fiduciary obligations to their clients.  As fiduciaries, they are obligated by law to supervise their brokers and to protect their clients from fraud, theft, deception, and material misrepresentation.  Respondents, separately and collectively, failed to fulfill their fundamental legal and fiduciary obligations to Mr. Glazer.

50.     Respondents failed to exercise even minimal oversight of Mr. Gruttadauria, much less effective supervision.  Any minimal oversight of Mr. Gruttadauria would have disclosed suspicious and alarming patterns of behavior, including, but not limited to:

(i)      the use of an off-network computer in plain view in the office;

(ii)     the diversion of client statements to either phony or real accounting firms;

(iii)    the diversion of client statements to post office boxes and/or "care of" addresses;

(iv)    the rapid siphoning of client assets and the systematic reduction of client accounts from several millions of dollars to a few thousand dollars;

(v)     the rapid and clearly artificial transfer of millions of dollars by one broker from account to account in order to meet personal needs and/or client demands for withdrawals;

(vi)    the repeated use of forged authorization letters;

(vii)   the excessive trading or churning of accounts to generate substantial commissions;

(viii)  the replenishing of accounts notwithstanding trading losses and excessive trading of accounts;

(ix)    the improper use of bunched orders; and

(x)     the transfer of funds between client accounts and accounts owned and/or controlled by the broker for those clients.

51.     In August 2003, the SEC and the NYSE fined both SG Cowen and Lehman, finding that the "firms failed reasonably to supervise" Mr. Gruttadauria in numerous respects

while he "defrauded over 60 customers by lying about purchases and sales of securities, misappropriating funds and securities, and sending falsified account documents." *See In re SG Cowen Sec. Corp.*, Exchange Act Release No. 48335, ¶ 1 (Aug. 14, 2003) ("SEC SG Cowen Order") (attached as Exhibit D hereto); NYSE, Inc., Exchange Hearing Panel Decision 03-156, SG Cowen Sec. Corp. Member Org., ¶ 4 (Aug. 6, 2003) (attached as Exhibit E hereto); *In re Lehman Bros., Inc.*, Exchange Act Release No. 48336, ¶ 1 (Aug. 14, 2003) ("SEC Lehman Order") (attached as Exhibit F hereto); NYSE, Inc., Exchange Hearing Panel Decision 03-157, Lehman Bros., Inc. Member Org., ¶ 4 (Aug. 6, 2003) (attached as Exhibit G hereto).

52.    In their 2003 decisions, the SEC and NYSE made specific findings that the firms failed "reasonably to supervise Mr. Gruttadauria with a view to detecting and preventing his fraudulent conduct" in the following ways:

(i)    the firms failed adequately to handle the accounts transferred to them when acquiring the Cleveland branch, which allowed Mr. Gruttadauria to continue diverting the real account statements for many of his victims;

(ii)    the firms did not have an adequate system for applying their respective procedures for the review of Mr. Gruttadauria's incoming and outgoing correspondence;

(iii)    the firms lacked procedures for monitoring Mr. Gruttadauria's use of the off-network computer system that he used to create falsified account statements and other account documents;

(iv)    the firms lacked an adequate system for applying its procedures for detecting and preventing unauthorized third-party transfers;

(v)    SG Cowen failed to have adequate procedures to prevent Mr. Gruttadauria from authorizing third-party disbursement requests for his clients and deviating from the firm's cashiering and related procedures in processing such requests;

(vi)    SG Cowen failed to have adequate procedures for a supervisor not subordinate to Mr. Gruttadauria to follow up on critical missing account documentation involving the accounts of some of Mr. Gruttadauria's victims;

(vii)    SG Cowen failed to have an adequate system for applying its procedures related to the periodic review of client account statements with an eye to identifying

unusual transfers of funds and reviewing the underlying documentation, including the verification of customer signatures;

(viii)  SG Cowen failed to comply with its responsibility regarding the undertaking imposed in the NYSE's enforcement action against Cowen & Co.; and

(ix)  Lehman failed to have an adequate system for applying its procedures concerning accounts with post office box and "care of" mailing addresses.

*See* Press Release, SEC, SG Cowen and Lehman Brothers Settle Enforcement Actions with SEC

and NYSE for Supervisory Failures in Frank Gruttadauria Case, at 3-4 (Aug. 14 2003) (attached

as Exhibit H hereto).

53.    The ability of Mr. Gruttadauria and Respondents to conceal these blatant

violations of internal rules and the law was virtually assured by the fact that, at each firm, Mr.

Gruttadauria had supervisory responsibility over the very compliance officer charged with

ensuring that Mr. Gruttadauria complied with the rules and regulations designed to protect

customers.  It is no surprise that compliance procedures and federal regulations went unheeded

when the person responsible for protecting Mr. Glazer and for rooting out fraud was supervised

by, and had his compensation determined by Mr. Gruttadauria.  As the SEC and NYSE explained

in their 2003 decisions:

> By choosing persons subordinate to Gruttadauria to oversee his daily retail brokerage activity, [SG Cowen] structured its supervisory and compliance functions in a manner that created an inherent risk that Gruttadauria would not be adequately supervised.  As [Branch Office Manager], Gruttadauria had broad authority within the branch relating to personnel matters, such as salaries, bonuses, and continued employment of the branch staff, including that of the individual assigned to oversee his activities as a broker.  This type of authority can lead to conflicts of interest that, in turn, can compromise the ability of those subordinate to the [Branch Office Manger] to oversee adequately the [Branch Office Manager's] activity.

SEC SG Cowen Order, at ¶ 15; *see also* SEC Lehman Order, at ¶ 15. This patently flawed system of accountability shows Respondents' flagrant disregard of their legal and fiduciary obligations.

54.     In fact, discovery taken in this case has revealed that Respondents' culpability goes much further than their failure to supervise Mr. Gruttadauria. Respondents were aware of, but chose to ignore key elements of Mr. Gruttadauria's scheme, including his use of post office box and "care of" addresses, and the multiple inter-account transfers that Mr. Gruttadauria used to conceal the fraud from his customers. For example, a 1999 SG Cowen internal compliance report documented Mr. Gruttadauria's use of post office box and "care of" addresses, and noted that in many cases "the true beneficial owner of the account was not receiving original and/or duplicate confirms and statements. There are no [letters of authorization] on file to authorize the setting up of accounts in this manner." *See* SG Cowen Securities Corporation, Cleveland Compliance Examination, Aug. 19, 1999 (excerpts attached as Exhibit I hereto). Respondents continued to support Mr. Gruttadauria, despite this evidence of the pervasive fraud he was perpetrating on clients, because Mr. Gruttadauria generated millions of dollars of commission revenue – in one year more than $7.6 million.

Respondents' History of Similar Misconduct

55.     What makes Respondents' conduct in this case so egregious is that both firms had clear prior warnings about their lax oversight and about specific problems in the Cleveland office that went unheeded and unremedied.

56.     In 1998, the NYSE fined SG Cowen $380,000 for violations of exchange rules and federal securities regulations based on misconduct similar to that in this case. The fine was based on a compliance investigation by the NYSE that began at SG Cowen's predecessor, Cowen & Co., in 1994, including the Cleveland office in which Mr. Gruttadauria was the branch

manager. The NYSE found, among other things, that there were "numerous instances" of "bunched orders" – multiple orders listed on order tickets without the participating accounts being identified – in the Cleveland office (among others), and that "[t]he Firm's policies and procedures providing for supervision of producing [branch office managers] acting in the capacity of registered representatives were deficient." *See* NYSE, Inc., Exchange Hearing Panel Decision 98-64, Cowen & Co. Member Org., ¶ 63 (July 10, 1998) (attached as Exhibit J hereto). SG Cowen undertook to fix these compliance problems, but never did.

57.    Lehman fares no better. In fact, Lehman had even more specific notice of the type of red flags characteristic of Mr. Gruttadauria's fraud because an almost identical fraud had occurred on its watch before. Between 1988 and 1995, Ahmad Ihsan El-Daouk, a broker in Beirut, Lebanon who had been employed in the Beirut office of Lehman and its predecessor until 1988, and who continued to run a de facto branch office for Lehman in Beirut and to act as a broker on Lehman's behalf until 1992, perpetrated an almost identical fraud to the one that ensnared Mr. Glazer in this case. Mr. Daouk directed Lehman to send real statements showing losses and depletion of funds for multiple accounts to a few post office box addresses that he controlled, while he sent clients phony statements on Lehman letterhead showing profits. Like Mr. Gruttadauria, Mr. Daouk transferred money from account to account – both between client accounts and through shell entities that he controlled – in order to meet investors' demands for withdrawals. He forged client signatures on account opening documents and documents authorizing the transfers of funds from accounts. And he made numerous unauthorized trades with the remainder of the clients' accounts. The Daouk fraud "collapsed" in 1995 when he, like Mr. Gruttadauria a few years later, disappeared. *See AIA Holdings, S.A. v. Lehman Bros.*, No. 97 Civ. 4978 (LMM), 2002 WL 88226 (S.D.N.Y. Jan. 23, 2002) (attached as Exhibit K hereto).

58.    Lehman was aggressively litigating the Daouk fraud in a New York federal court at the time that Lehman was performing its due diligence on SG Cowen's high-net-worth business, including Mr. Gruttadauria's multi-million dollar book of business.  In short, Lehman was on notice of the very red flags for the Gruttadauria fraud at the time it was paying substantial sums of money – including a $5 million payment to Mr. Gruttadauria – to purchase his services and the ongoing fraud.

59.    The public record shows that Lehman and SG Cowen have been sanctioned numerous times by regulators for failing properly to supervise their brokers.  Despite clear and specific warnings of repeated compliance and supervision failings, Respondents deliberately ignored identical compliance violations by Mr. Gruttadauria and indeed provided him with the tools and freedom from oversight he needed to carry out the fraudulent scheme.

60.    Obviously, the sanctions previously imposed on SG Cowen and Lehman had absolutely no deterrent effect on either of those firms.  It is time to send a clear and unmistakable message to Respondents that will not only compensate Mr. Glazer in full, but will also deter SG Cowen and Lehman from perpetrating similar misconduct in the future.

## COUNT ONE
### (Breach of Fiduciary Duty)

61.    Claimant incorporates by reference the allegations in paragraphs 1 through 60, as if set forth fully herein.

62.    Respondents owed Claimant a fiduciary duty.

63.    Respondents, through their own actions and the actions of their agents, breached the fiduciary duties they owed Claimant.

64.    Claimant has been damaged as a direct and proximate result of Respondents' breaches of their fiduciary duties.

## COUNT TWO
### (*Fraud*)

65.     Claimant incorporates by reference the allegations in paragraphs 1 through 64, as if set forth fully herein.

66.     Respondents and their agents have a duty to disclose to their clients the true status of their brokerage accounts.  This duty includes, but is not limited to, telling the truth about the status of their clients' accounts, providing clients with accurate account statements, and providing complete, accurate, and appropriate documentation for investment and taxation purposes.

67.     Respondents and their agents made misrepresentations and failed to disclose information to Claimant about his investment accounts that they had a duty to disclose.

68.     Respondents' misrepresentations and omissions were material.

69.     Respondents knew their misrepresentations and omissions were false and misleading when they made them, or they acted with willful blindness or reckless disregard for whether their misrepresentations and omissions were true when they made them.  Their misrepresentations and omissions were made with the intent of inducing Claimant's reliance upon them.

70.     Claimant reasonably and justifiably relied upon Respondents' misrepresentations and omissions.

71.     Claimant was damaged as a direct and proximate result of Respondents' misrepresentations and omissions.

## COUNT THREE
### (*Negligent Retention/Hiring/Supervision*)

72.     Claimant incorporates by reference the allegations in paragraphs 1 through 71, as if set forth fully herein.

73.     Respondents had a duty to ensure that Mr. Gruttadauria was competent to discharge faithfully his responsibilities and fiduciary duties as an investment advisor and broker, as they held him out to be. Respondents also had a duty to ensure that Mr. Gruttadauria would not injure Claimant by failing to discharge faithfully his responsibilities and fiduciary duties as an investment advisor. Respondents breached this duty by, among other things, failing to investigate and supervise Mr. Gruttadauria in a reasonably prudent manner.

74.     Respondents and their related entities failed to supervise Mr. Gruttadauria and uncover or disclose his specific and alarming patterns of behavior as described above.

75.     Mr. Gruttadauria's criminal and fraudulent scheme to defraud investors of their money and securities predated Mr. Gruttadauria's employment with Respondents, and continued throughout his employment with Respondents. Despite this, Respondents hired Mr. Gruttadauria even after engaging in their obligations to complete due diligence prior to their merger or acquisition. Respondents also continued to retain Mr. Gruttadauria despite their on-going compliance obligations, and never uncovered or disclosed the massive fraud perpetrated upon their clients. Mr. Gruttadauria was not competent to discharge faithfully the responsibilities and fiduciary duties entrusted to an investment advisor or broker. Further, Respondents knew, or should have known, that Mr. Gruttadauria had a propensity to commit the conduct described above.

76.     Claimant was damaged as a direct and proximate result of Respondents' negligence in hiring, retaining, and/or supervising Mr. Gruttadauria.

## COUNT FOUR
### (Negligent/Reckless Misrepresentation)

77.     Claimant incorporates by reference the allegations in paragraphs 1 through 76, as if set forth fully herein.

78.    Respondents (both through Mr. Gruttadauria and others) made misrepresentations and failed to disclose information to Claimant about Claimant's investment accounts.

79.    Respondents' misrepresentations and omissions were material.

80.    Respondents knew, or should have known, that Claimant would rely upon their misrepresentations and omissions.

81.    Claimant justifiably relied upon Respondents' misrepresentations and omissions.

82.    Respondents failed to exercise reasonable care or competence in providing information to Claimant.

83.    Claimant was damaged as a direct and proximate result of Respondents' misrepresentations and omissions.

### COUNT FIVE
### (*Breach of Contract*)

84.    Claimant incorporates by reference the allegations in paragraphs 1 through 83, as if set forth fully herein.

85.    Respondents entered into express and implied-in-fact contracts with Claimant, pursuant to which Claimant provided money to Respondents for investment.

86.    Respondents expressly agreed to invest Claimant's assets in accordance with all applicable securities laws and regulations.  Respondents also expressly agreed to purchase and sell specific securities and bonds or types of securities and bonds at the request of, and/or with the approval or authorization of, Claimant.

87.    The monthly, quarterly, and annual account activity statements sent by Respondents to Claimant evidenced Respondents' express and implied-in-fact agreements to purchase and sell securities and bonds on behalf of Claimant, and also constituted implied-in-fact

contracts, under which Respondents agreed to pay claimant the market value of the assets shown on those statements upon demand.

88.    Claimant gave valuable consideration in exchange for these contracts, and substantially performed all of his obligations under their respective contracts.

89.    As a result of the conduct described above, Respondents each breached their obligations under their respective contracts with Claimant.

90.    Claimant has been damaged as a direct and proximate result of each Respondent's breach of contract.

## COUNT SIX
### (*Conversion*)

91.    Claimant incorporates by reference the allegations in paragraphs 1 through 90, as if set forth fully herein.

92.    Claimant had a legal right to exercise dominion over the investments and investment monies he entrusted to Respondents.

93.    Claimant's investments and investment monies are specifically identified in the account statements that Respondents mailed to Claimant.

94.    Respondents were obligated to return Claimant's investments and investment monies to Claimant upon demand or otherwise treat Claimant's investments and investment monies in accordance with their representations concerning Claimant's accounts' value as detailed in the statements Respondents mailed to Claimant.

95.    Respondents have, without Claimant's consent, excluded Claimant from exercising dominion over his investments and investment monies by failing to return Claimant's investments and investment monies to them and by making false representations about the nature and value of Claimant's accounts.

96.    By the time Respondents' wrongful conduct had been discovered, any demand by Claimant for the return of his property would have been futile.  Virtually all of the property placed into the accounts, as well as gains from that property, had been dissipated by the action of Respondents and their agents acting within the scope of their authority, or whose actions were authorized or otherwise ratified by Respondents' actions or inactions.

97.    Claimant was damaged as a direct and proximate result of Respondents' unlawful conversion.

## COUNT SEVEN
### (*Federal Statutory Securities Claim* – § 10(b), 15 U.S.C. § 78(j)(b))

98.    Claimant incorporates by reference the allegations in paragraphs 1 through 97, as if set forth fully herein.

99.    Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78(j)(b), along with Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5, prohibit the fraudulent sale or purchase of any security.  Specifically, Rule 10(b)(5) makes it unlawful to defraud someone, to make any untrue statement of material fact, or to engage in any act or practice which is a fraud or deceit in connection with the purchase or sale of a security.

100.    Respondents are strictly liable for their agents' or related entities' violations of the securities law under the doctrine of respondent superior.

101.    As described in detail above, Respondents (both through Mr. Gruttadauria and others) made materially false and misleading representations to Claimant, and further omitted material facts necessary to make such statements true, in connection with the purchase and sale of numerous securities.

102.    As described in detail above, Respondents (both through Mr. Gruttadauria and others) engaged in the misrepresentations and concealments with scienter, with the intent to deceive and commit fraud.

103.    Claimant justifiably relied upon these representations and concealments.

104.    Claimant was damaged as a direct and proximate result of Respondents' misrepresentations and omissions.

## COUNT EIGHT
*(Federal Statutory Securities Claim – § 20(a),*
*15 U.S.C. § 78(t)(a))*

105.    Claimant incorporates by reference the allegations in paragraphs 1 through 104, as if set forth fully herein.

106.    Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(t)(a), provides that every entity who, directly or indirectly, controls any person who violates any provision of the securities laws or any rule or regulation thereunder is liable for all damage caused unless the entity acts in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

107.    Respondents had direct or indirect control over Mr. Gruttadauria.

108.    Respondents, by their failure to supervise Mr. Gruttadauria appropriately, failed to act in good faith.

109.    Respondents, by their failure to supervise and by their reckless indifference to the manner in which they allowed Mr. Gruttadauria to manage the office (including the legal compliance officer), and to use his authority systematically to loot their clients' assets throughout the years of his employment with Respondents, directly or indirectly induced the acts constituting the violation or cause of action.

110.    Claimant was damaged as a direct and proximate result of Respondents' statutory violations.

## COUNT NINE
### (*Civil Conspiracy*)

111.    Claimant incorporates by reference the allegations in paragraphs 1 through 110, as if set forth fully herein.

112.    Respondents, along with un-named co-conspirators, by their actions, inaction, and failures to perform oversight and due diligence functions, combined to commit the wrongful acts done to Claimant as described above, without any reasonable or lawful excuse.

113.    Respondents, along with un-named co-conspirators, by their actions, inaction, and oversight and due diligence failures, came to an explicit or implicit understanding or design to accomplish and permit the underlying unlawful acts against Claimant as described herein.

114.    Claimant has been damaged as a direct and proximate result of this conspiracy.

## COUNT TEN
### (*Aiding and Abetting*)

115.    Claimant incorporates by reference the allegations in paragraphs 1 through 114, as if set forth fully herein.

116.    Because of the length of time that the scheme persisted, the magnitude of the scheme, and the duties that Respondents had to monitor the activities of Mr. Gruttadauria and their customers' accounts, Respondents knew, consciously avoided knowing, or reasonably should have known that Mr. Gruttadauria was perpetrating a fraud on Claimant and breaching the fiduciary duties owed to Claimant.

117.    Respondents knowingly provided substantial assistance to Mr. Gruttadauria in perpetrating the fraud on Claimant and breaching the fiduciary duties owed to Claimant.

118.     Claimant was damaged as a direct and proximate result of the assistance that Respondents provided Mr. Gruttadauria.

## COUNT ELEVEN
### (*Promissory Estoppel*)

119.     Claimant incorporates by reference the allegations in paragraphs 1 through 118, as if set forth fully herein.

120.     Respondents made clear and unambiguous written and oral promises to Claimant.

121.     Claimant reasonably and foreseeably relied upon Respondents' promises.

122.     Respondents' promises were false and misleading.

123.     Claimant was damaged as a direct and proximate result of his reasonable and foreseeable reliance on Respondents' false promises concerning his investment accounts.

**WHEREFORE**, Claimant demands judgment against Respondents, jointly and severally, as described below:

A.     For compensatory damages in an amount exceeding $24 million, less the $3.1 million returned to Mr. Glazer by Respondents ($1.1 million refunded by SG Cowen; $2 million refunded by Lehman);

B.     For pre-judgment interest and post-judgment interest of at least $10 million;

C.     For punitive damages in the amount of $100 million;

D.     For the costs and expenses of this action, including reasonable attorneys fees; and

E.     For such other and further relief as this arbitration panel may deem just and proper.

Dated: July **31**, 2006

Respectfully submitted

K. Chris Todd, Esq.
Antonia M. Apps, Esq.
Andrew M. Hetherington, Esq.
KELLOGG, HUBER, HANSEN,
 TODD, EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036

*Attorneys for Claimant*