HEARING DATE AND TIME:  June 28, 2012 at 10:00 a.m. (Prevailing Eastern Time)
RESPONSE DEADLINE:  May 29, 2012 at 4:00 p.m. (Prevailing Eastern Time)

**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
Facsimile: (212) 697-1559
L. P. Harrison 3rd
Cindi M. Giglio
Dienna Ching

*Counsel for Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

------------------------------------------------------------------x

**NOTICE OF HEARING ON PLAN ADMINISTRATOR'S**
**OBJECTION TO CLAIM OF AIG GLOBAL SERVICES, INC.**
**F/K/A AIG TECHNOLOGIES, INC. (CLAIM NO. 66918)**

        **PLEASE TAKE NOTICE** that on April 26, 2012, Lehman Brothers Holdings

Inc. ("LBHI" and the "Plan Administrator"), as Plan Administrator, under the Modified Third

Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors

(the "Plan"), filed its objection to claim number 66918 (the "Claim Objection"), and that a

hearing (the "Hearing") to consider the Claim Objection will be held before the Honorable

James M. Peck, United States Bankruptcy Judge, in Courtroom 601 of the United States

Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New

York 10004, on **June 28, 2012 at 10:00 a.m. (Prevailing Eastern Time)**, or as soon thereafter

as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that any responses to the Claim

Objection must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and

the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a)

electronically in accordance with General Order M-399 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by

all other parties in interest, on a 3.5-inch disk, preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format (with a hard copy delivered

directly to Chambers), in accordance with General Order M-182 (which can be found at

www.nysb.uscourts.gov), and served in accordance with General Order M-399, and on (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) attorneys for LBHI, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New

York, New York 10153 (Attn:  Robert J. Lemons, Esq. and Mark Bernstein, Esq.); (iii) conflicts

counsel for LBHI, Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, New

York 10178-0061 (Attn:  L. P. Harrison 3rd, Esq., and Cindi M. Giglio, Esq.); and (iv) the Office

of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York, New York

10004 (Attn:  Tracy Hope Davis, Esq., Elisabetta Gasparini, Esq., and Andrea B. Schwartz, Esq.)

so as to be so filed and received by no later than **May 29, 2012 at 4:00 p.m. (Prevailing**

**Eastern Time)** (the "Response Deadline").

         **PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and

served with respect to the Claim Objection or any claim set forth thereon, the Plan Administrator

may, on or after the Response Deadline, submit to the Bankruptcy Court an order substantially in

11618627

the form of the proposed order annexed to the Claim Objection as **Exhibit B**, which order may

be entered with no further notice or opportunity to be heard offered to any party.

Dated:  April 26, 2012
        New York, New York

**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**

By:  */s/ L. P. Harrison 3rd*
        L. P. Harrison 3rd
        Cindi M. Giglio
        Dienna Ching
101 Park Avenue
New York, New York 10178-0061
(212) 696-6000

*Counsel for Lehman Brothers Holdings Inc.*

11618627

**HEARING DATE AND TIME:  June 28, 2012 at 10:00 a.m. (Prevailing Eastern Time)**
**RESPONSE DEADLINE:  May 29, 2012 at 4:00 p.m. (Prevailing Eastern Time**

**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
Facsimile:  (212) 697-1559
L. P. Harrison 3rd
Cindi M. Giglio
Dienna Ching

*Counsel for Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
In re                                          :    Chapter 11 Case No.
                                               :
LEHMAN BROTHERS HOLDINGS INC., et al.,         :    08-13555 (JMP)
                                               :
                          Debtors.             :    (Jointly Administered)
-------------------------------------------------------------------x
```

**PLAN ADMINISTRATOR'S**
**OBJECTION TO CLAIM OF AIG GLOBAL SERVICES, INC.**
**F/K/A AIG TECHNOLOGIES, INC. (CLAIM NO. 66918)**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator"), as Plan

Administrator, under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors (the "Plan") respectfully represents:

**Relief Requested**

1.      The Plan Administrator files this objection (the "Objection") seeking to

reduce and allow the claim filed by AIG Global Services, Inc. f/k/a AIG Technologies, Inc.

("AIG"), Claim Number 66918 (the "Proof of Claim"), pursuant to section 502(b) of title 11 of

the United States Code, as amended (the "Bankruptcy Code") and Rule 3007(d) of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2.      The Plan Administrator has examined the Proof of Claim and determined that the amount set forth in the Proof of Claim should be reduced because the damages sought by AIG in connection with rejection of the License Agreement for Use of Co-Location Space, dated as of March 31, 2004, as amended from time to time (attached as **Exhibit A**, the "AIG Agreement") should be capped pursuant to Section 502(b)(6) of the Bankruptcy Code. Notwithstanding the label of the AIG Agreement as a "license agreement," the substance of the AIG Agreement is that of a nonresidential real property lease and should be treated as such under the Bankruptcy Code.  The Plan Administrator therefore requests that the Court reduce claim number 66918 against LBHI to $5,430,000.00 (the "Modified Amount") and allow such claim as a nonpriority general unsecured claim only to the extent of the Modified Amount.

3.      The Plan Administrator reserves all of its rights to object on any other basis to the Proof of Claim for which the Court does not grant the relief requested herein.

### Jurisdiction

4.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Article 14(c) of the Plan.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Background

5.      Commencing on September 15, 2008, and periodically thereafter, LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

6.      On September 17, 2008, the United States Trustee for Region 2 (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

11618627

7.    On July 2, 2009, the Court entered its Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form (the "Bar Date Order") [Docket No. 4271].  The Bar Date Order established the deadline for filing proofs of claims against the Debtors as September 22, 2009 (the "Bar Date"). *See* Bar Date Order at 2.  The Bar Date Order further established the deadline for filing claims related to the rejection of an executory contract or unexpired lease as the later of (a) the Bar Date or (b) the date which is forty-five days following the effective date of such rejection.  *See* Bar Date Order at 3.  On January 14, 2010, the Court entered the Procedures Order.

8.    On May 28, 2010, the Debtors notified AIG of its intention to reject the AIG Agreement as of June 15, 2010.  AIG filed the Proof of Claim on July 2, 2010.

9.    On December 6, 2011, the Court approved and entered an order confirming the Plan.  The effective date of the Plan was March 6, 2012.

10.    Pursuant to the Plan, the Plan Administrator is authorized to object to claims filed against LBHI.

**Proof of Claim Number 66918 Should Be Reduced and Allowed**

11.    In reviewing the claims filed on the claims register in these cases and maintained by the Court-appointed claims agent, the Plan Administrator has identified the Proof of Claim as being a claim that should be reduced and allowed on the basis that the damages sought by AIG should be capped pursuant to Section 502(b)(6) of the Bankruptcy Code because the AIG Agreement is, in substance, a lease of nonresidential real property.

12.    Section 502(b)(6) provides, in relevant part, that a claim is allowed

"except to the extent that . . . if such claim is the claim of a lessor
for damages resulting from the termination of a lease of real

property, such claim exceeds . . . (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of the lease, following the earlier of . . . (i) the date of the filing of the petition; and (ii) the date on which such lessor repossessed, or the lease surrendered, the lease property; plus (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates[.]"

13.     Section 502(b)(6) of the Bankruptcy Code operates as a cap on the damages that are available as a result of the termination of a lease.  The legislative history of this provision makes clear that Section 502(b)(6) is "designed to compensate the landlord for his loss while not permitting a claim so large as to prevent other general unsecured creditors from recovering a dividend from the estate."  Colliers on Bankruptcy ¶ 502.03[7][a], *quoting* H.R. Rep. No. 595, 95th Cong., 1st Sess. 353 (1977).  The legislative history also makes clear that the provision should cap damages for bona fide leases.  *See also Liona Corp., N.V. v. PCH Assocs.* (*In re PCH Assocs.*), 804 F.2d 193, 199 (2d Cir. 1986) (citing to the legislative history of Section 502(b)(6) and noting that a court is to look to the circumstances of the case and consider the economic substance of the transaction rather than form to determine whether an agreement is a lease).  Indeed, form must not give way to substance in applying the damages cap of Section 502(b)(6).  Although the AIG Agreement is facially denominated as a "license, " the essence and nature of the agreement is that of a lease.  Thus, the damages cap should apply to AIG's claim.

14.     Because the Bankruptcy Code does not define the term "lease," courts often apply the "economic realities" test to determine whether an agreement is a lease.  This test inherently recognizes that the label placed on an agreement is not dispositive.  Rather, courts should focus on the actual substance of the agreement, because a label "neither governs the rights of third parties nor affects the legal consequences of the parties' agreement." *Barney's, Inc. v. Isetan Co. Ltd.* (*In re Barney's, Inc.*), 206 B.R. 328, 332 (Bankr. S.D.N.Y. 1997).

-4-

15.     The following five factors tend to show an agreement is a lease:

(1) exclusive possession of the property to the exclusion of others, (2) fixed rental amount, (3)

the agreement is not revocable at will, (4) the agreement exists for a fixed term, and (5) the

agreement is assignable.  *Park v. Auto. Realty Corp.*, Case No. 94 Civ. 4451 (AGS), 1998 WL

40199, at *2-5 (S.D.N.Y. Jan. 30, 1998).  Application of each of the foregoing factors leads to

the conclusion that the AIG Agreement is a lease.

16.     First, like a typical lease, the AIG Agreement provides for LBHI to make

exclusive use of their defined portion of the premises, the "Customer Space."  AIG Agreement at

¶ 1(A).  Second, LBHI agreed to pay a "Monthly Recurring Charge," that is virtually identical to

fixed monthly rental payments normally associated with leases.  AIG Agreement at ¶ 3(A).

Third, neither LBHI nor AIG can terminate the Agreement at will; rather, both parties must have

some reason for termination, such as material, chronic default or breach.  AIG Agreement at ¶

4(C).  This restriction provides further support that the AIG Agreement is in fact a lease, because

licenses are generally freely revocable by the grantor.  *See generally Park*, 1998 WL 40199, at

*2; *In re Historical Locust St. Dev. Assocs.*, 246 B.R. 218, 224-25 (Bankr. E.D. Pa. 2000); *In re

Yachthaven Rest., Inc.*, 103 B.R. 68, 73 (Bankr. E.D.N.Y. 1989); *Thiokol Chem. Corp. v. Morris

Cnty. Bd. Of Taxation*, 197 A.2d 176, 182 (N.J. 1964).  Fourth, the AIG Agreement provides for

a fixed term of 10 years, subject to provisions for extension of the term.  AIG Agreement at ¶

4(A).  The presence of a fixed term is a hallmark of a lease.  *See Park*, 1998 WL 40199, at *2;

*Thiokol Chem. Corp.*, 197 A.2d at 183; *Miller v. New York*, 15 N.Y.2d 34, 37 (N.Y. 1964).

Finally, pursuant to the AIG Agreement, both LBHI and AIG may assign the agreement upon the

written consent of the non-assigning party, which is a typical provision in a lease.  AIG

Agreement at ¶ 16(B).

11618627

17.    Thus, notwithstanding the label of the AIG Agreement as a "license," the Court should find that the economic substance of the transaction demonstrates that the parties intended to impose obligations and confer rights such as those arising from a typical landlord/tenant relationship.  As such, Section 502(b)(6) should apply and the Court should enter an order reducing AIG's claim to the Modified Amount and allowing such claim as a nonpriority general unsecured claim only to the extent of the Modified Amount.

### Reservation of Rights

18.    The Plan Administrator reserves all of its rights to object on any other basis to the Proof of Claim for which the Court does not grant the relief requested herein.

### Notice

19.    No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Claim Objection on (i) the U.S. Trustee; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; (v) AIG; and (vi) all other parties entitled to notice in accordance with the procedures set forth in the second amended order entered on June 17, 2010, governing case management and administrative procedures for these cases [Docket No. 9635].  The Plan Administrator submits that no other or further notice need be provided.

20.    No previous request for the relief sought herein has been made by the Plan Administrator or the Debtors to this or any other Court.

WHEREFORE, the Plan Administrator respectfully requests that the Court grant the relief requested herein and such other and further relief as is just.

Dated: April 26, 2012
New York, New York

**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**

By: */s/ L. P. Harrison 3rd*
      L. P. Harrison 3rd
      Cindi M. Giglio
      Dienna Ching
101 Park Avenue
New York, New York 10178-0061
(212) 696-6000

*Counsel for Lehman Brothers Holdings Inc.*

11618627

**EXHIBIT A**

Execution Version

## LICENSE AGREEMENT FOR
## USE OF CO-LOCATION SPACE

LIVINGSTON, NEW JERSEY

### BASIC LICENSE INFORMATION

| | |
|---|---|
| Licensor: | AIG Technologies, Inc., a New Hampshire corporation ("**AIGT**") |
| Licensor's Address For Notice: | 2 Peach Tree Hill Road<br>Livingston, New Jersey 07039<br>Attn: Graham Alexander, Senior Vice President<br>Telephone: 973-533-3874<br>Fax: 973-535-0752<br><br>With a copy to:<br><br>AIGT Legal Department<br>2 Peach Tree Hill Road<br>Livingston, New Jersey 07039<br>Attn: David Jackson<br>Telephone: 973-533-2289<br>Fax: 973-533-2520 |
| Licensee: | Lehman Brothers Holdings Inc., a Delaware corporation ("**Lehman**") |
| Licensee's Address For Notice: | 745 Seventh Avenue<br>New York, New York 10019<br>Attn: Jaime Fuertes<br>    Telephone: 212-526-3926<br>    Fax: 212-548-9140<br>Attn: Beth Anisman<br>    Telephone: 212-526-9225<br>    Fax: 212-548-9502<br><br>with a copy to:<br>Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, New York 10019<br>Attn: Steven D. Klein<br>Telephone: 212- 728-8221<br>Fax: 212-728-9221 |
| Facility: | That certain building or buildings with a street address of 2 Peach Tree Hill Road, in the City of Livingston, State of New Jersey |

(i)

dc-369867

Execution Version

("**Facility**").

| | |
|---|---|
| Customer Space: | Approximately 22,500 square feet located in the Facility consisting of 20,000 square feet of Co-location Area (as hereinafter defined) and 2,500 square feet of space to be used as a staging area for the Co-location Area ("**Staging Area**"), as more particularly depicted on **Exhibit 1** attached hereto. (The Staging Area and the Co-location Area shall be referred to jointly herein and in the Exhibits as the "**Customer Space**.") |
| Co-location Area: | 20,000 square feet of raised floor space in the Customer Space indicated by the cross-hatched space on **Exhibit 1** attached hereto ("**Co-location Area**"). |
| Term: | The term commences on the Effective Date (as hereinafter defined) and expires ten (10) years after the Final Completion Date ("**Term**"). |
| Extension: | If the parties have not agreed to the terms and conditions of a new License term by the end of the initial Term, then Lehman may exercise its right to extend the Term as described in **Section 4(B)** hereof. |
| Customer Space Improvements: | Those improvements to be constructed by AIGT and Lehman, as more particularly described on **Exhibit 4** attached hereto and the Master Documents (as hereinafter defined). |
| Effective Date: | The date this License is fully executed by AIGT and Lehman. |
| License Commencement Date: | The License Commencement Date shall be the date upon which Lehman begins utilizing any portion of the Customer Space. |
| Monthly Recurring Charges: | Upon Final Completion (as hereinafter defined), Lehman shall owe AIGT Monthly Recurring Charges in an amount equal to the sum of (a) Four Hundred Forty Thousand and No/100 Dollars ($440,000.00) per month for the Co-Location Area ($22.00 per square foot of Co-Location Area) and (b) Twelve Thousand Five Hundred and No/100 Dollars ($12,500.00) per month for the Staging Area ($5.00 per square foot of Staging Area), each payable monthly pursuant to **Section 3** of the License (collectively, the "**Monthly Recurring Charges**"). |
| | Prior to Final Completion, and upon Substantial Completion of each milestone of Work (as described on **Exhibit 4**), Lehman shall owe AIGT a corresponding portion of the Monthly Recurring Charges in accordance with the terms of **Section 3** and **Exhibit 4**. From and after the first anniversary of Final Completion, the |

Execution Version

Monthly Recurring Charges shall be adjusted in accordance with the terms of **Section 3(F)**.

| | |
|---|---|
| Master Services Agreement: | That certain Master Information Technology Services Agreement between Lehman and AIGT, dated as of March 26, 2004. |
| Master Documents: | The master documents agreed upon by the parties for the Customer Space design, the construction plans and the buildout specifications to prepare the Customer Space in the Facility for Lehman's use, as more specifically described in **Exhibit 4**, include the following: (1) AIG Data Center Tenant Fitout Drawings issued by Gensler dated March 3, 2004 as modified by the documents referenced under sub (8) below; (2) The Project Plan / Construction Schedule by Structure Tone, Inc. dated March 29, 2004; (3) Cable Ready / Room Ready / Equipment Ready Definitions by JB&B dated February 24, 2004; (4) Design Criteria Tracking Matrix by JB&B Technologies, dated January 12, 2004; (5) Lehman's Phasing Plan by JBB Technologies dated February 24, 2004; (6) Severud Associates Second Floor Loading Analysis, dated October 14, 2003 and Purdy & Henderson Associates, Inc. letter dated January 15, 2004; (7) Lehman Brothers IT Drawings by JBB Technologies dated February 9, 2004; (8) Lehman Brothers Data Center Load Layout, Filename IT-DC-1_rev14 issued March 9, 2004; Equipment Branch Circuiting Matrix dated March 15, 2004, both by JB&B; and (9) Project Manual, Addendum #2 by Gensler (Architectural Specifications) dated March 3, 2004 and Addendum #1 by JB&B Consulting Engineers (MEP Specifications) dated February 12, 2004 (collectively, the "**Master Documents**"). |

Execution Version

**EXHIBITS**

| | |
|---|---|
| 1. | Location of Customer Space |
| 2. | Security and Access |
| 3. | Power, Environmental Conditions and Monitoring |
| 4. | Customer Space Improvements |
| 5. | Form of SNDA |
| 6. | Pre-Approved Security Auditors |
| 7. | Emergency Response Procedures |
| 8. | Maintenance Standards and Schedules |
| 9. | Change Order |
| 10. | Pre-Approved Lehman Employees and Subcontractors |
| 11. | Approved Subcontractors |
| 12. | Cash Flow Assurance Letter |
| 13. | Form of Certificate |
| 14 | Pre-Approved AIGT Employees and Subcontractors |

The Basic License Information set forth above and the Exhibits attached hereto are incorporated into and made a part of the following License Agreement for Use of Co-location Space ("**License**"). Each reference in this License to any of the Basic License Information shall mean the respective information above and shall be construed to incorporate all of the terms provided under the particular License paragraph pertaining to such information. In the event of any conflict between the Basic License Information and the provisions of the License, the latter shall control. In the event of any conflict between the License and the Exhibits, the latter shall control.

AIGT        (_____)        AND    LEHMAN        (_____)        AGREE.
            initial                                initial

dc-369867

Execution Version

LICENSE AGREEMENT FOR
USE OF CO-LOCATION SPACE

This License is made and entered into as of the 31st day of March, 2004 by and between AIG Technologies, Inc., a New Hampshire corporation ("**AIGT**"), having an office at 2 Peach Tree Hill Road, Livingston, New Jersey 07039 and Lehman Brothers Holdings Inc., a Delaware corporation ("**Lehman**") having an office at 745 Seventh Avenue, New York, New York 10019.

    A.    AIGT, on behalf of itself and its affiliates, controls, has primary use, and manages the use of the Facility which is suitable for the placement and operation of computer and communication equipment. AIGT is willing to grant Lehman the right to use a portion of the Facility upon the terms and conditions hereinafter set forth; and

    B.    Lehman desires to license from AIGT the Customer Space in the Facility to place therein certain servers and other equipment for its own use.

**1.    Grant of License**

(A)    Subject to the terms and conditions contained herein, AIGT hereby grants to Lehman as of the Effective Date, and Lehman hereby purchases from AIGT, a non-exclusive license to: (1) access the Facility; and (2) make exclusive use of the Customer Space for the primary purpose of installing, operating, servicing, repairing, or replacing certain servers and other equipment (collectively, the "**Equipment**"). Lehman may use the Customer Space during the Term only for the foregoing purpose, and ancillary purposes thereto which specifically further the primary purpose including, but not limited to, storage of Equipment to be used by Lehman in the Customer Space.

(B)    Lehman acknowledges that the rights granted hereunder do not constitute a lease of any portion of the Facility or an easement, or any other property right of any nature in the Facility or in any property located in the Facility. Lehman agrees and acknowledges that the rights granted hereunder constitute a mere license and do not and are not intended to create any relationship of landlord and tenant and that it will not maintain or seek to maintain that such rights create any tenancy relationship, including, but not limited to, a leasehold interest. Except as provided in **Section**

16(F), Lehman shall not at any time grant any sub-license of the rights under this License. This restriction against sub-licensing shall not be construed to restrict Lehman from allowing its Subcontractors (as hereinafter defined) to work in the Customer Space at Lehman's direction according to the terms hereof.

(C)    Lehman shall not use the Facility, nor shall it allow access thereto or use thereof, except in accordance with the terms of this License. In its use of the Facility, Lehman shall not interfere, nor shall it allow the use of the Customer Space to interfere, with AIGT or any other user of the Facility. As of the Effective Date, to the best knowledge of both parties: (1) Lehman's placement and operation of Equipment in the Customer Space pursuant to the Master Documents, on which the parties collaborated, is not expected to interfere with use of the Facility by AIGT or other users provided that Lehman observes the electrical loading and weight loading limitations contained in the Master Documents, and provided further that Lehman does not exceed the use of 1000 kw of power in any event; and (2) the construction of the Customer Space to the specifications contained in the Master Documents is expected to be suitable for Lehman's contemplated use of the Customer Space under this License.

Execution Version

(D)    AIGT reserves all rights not specifically granted to Lehman, including, without limitation, the right to: (1) access, use and operate the Facility for its own use and the use of its agents, customers, affiliates and licensees; (2) access the Customer Space for routine maintenance as specified in **Exhibit 8**, inspections, security purposes, in emergency situations and, subject to the terms of this License, for other agreed upon purposes; and (3) grant additional licenses or rights to use the Facility (other than the Customer Space). AIGT shall not exercise its foregoing rights in a manner that is reasonably expected to directly conflict with the rights granted to Lehman hereunder.

## 2.    Access; Rules and Regulations

(A)    Lehman, Lehman's employees and Lehman's Subcontractors ("**Subcontractors**" for either party shall include, without limitation, any contractor, security personnel, vendor, agent or consultant, together with the Subcontractor's employees) shall be permitted access to the Customer Space within the Facility 24 hours per day, 7 days per week, 365 days per year, subject to the access requirements, rules and regulations set forth herein and in **Exhibit 2** and AIGT's other reasonable rules and regulations pertaining to security, safety and operational procedures that are posted prominently in the Facility (collectively, the "**Rules and Regulations**"). AIGT reserves the right, from time to time, to adopt additional reasonable and non-discriminatory Rules and Regulations and to amend the Rules and Regulations then in effect, and Lehman agrees to abide by such new or amended Rules and Regulations; provided, however, that unless the parties have agreed to amend the License, such additional or amended Rules and Regulations shall not materially interfere with Lehman's use and occupancy of the Customer Space or access to the Facility or increase any of Lehman's material obligations or impair any of Lehman's material rights under this License. Lehman shall have the right to dispute the reasonableness of any additional Rules and Regulations hereafter adopted by AIGT pursuant to the provisions of **Section 17** hereof.

Lehman shall have the right, but shall not be obligated, to have certain designated employees present in the Customer Space 24 hours per day, 7 days per week, 365 days per year subject to the foregoing requirements.

(B)    Access rights to the Facility for Lehman employees and Subcontractors are described on **Exhibit 2**. As described on **Exhibit 2**, Employees of Lehman who Lehman hereby represents to AIGT have successfully passed Lehman's security screening procedures (this representation is a continuing representation for the Term, as may be extended), and whose names appear on the Preapproved Lehman Employees and Subcontractors List attached hereto as **Exhibit 10** (which shall be amended and updated by Lehman from time to time consistent with **Exhibit 2** and the notice provisions of **Section 27(E)** hereof), shall be issued AIGT photo identification badges, which shall be surrendered upon termination of this License, and shall also be surrendered upon demand by AIGT in the case of an Emergency (as hereinafter defined) involving the Lehman employee.

(C)    Notwithstanding any other provision of this License, AIGT shall have the right, in its reasonable discretion, to immediately terminate the right of access of any individual entering the AIGT Facility at Lehman's direction, if the actions of such individual are reasonably believed to be a potential cause of an Emergency (as hereinafter defined). All individuals entering the Facility at the direction of Lehman shall have appropriate identification, and shall display such identification to AIGT's representatives on reasonable request.

(D)    [intentionally omitted]

(E)    AIGT or AIGT's agents shall have the right to enter the Customer Space at all reasonable times for security purposes, routine inspections, maintenance as specified in **Exhibit 8** hereto, in the case of an Emergency as specified in **Exhibit 7** hereto, and for other agreed upon purposes in accordance with the terms of this License and upon

2

Execution Version

reasonable prior notice under the circumstances to Lehman. The AIGT employees and Subcontractors listed on **Exhibit 14** hereto shall be provided access cards for access to the Customer Space as described in **Exhibit 2**. To the extent a Lehman employee is present in or about the Customer Space at the time AIGT requires access, such employee may accompany AIGT's representatives while in the Customer Space.

(F)    Each party's work in the Facility shall be performed in a safe and workmanlike manner and in accordance with the License and industry standards. Each party remains directly and primarily liable for the acts and omissions of its employees or Subcontractors who perform work in or around the Facility. Subject to the terms of **Sections 11 and 12** hereof, each party must indemnify the other for losses that result from such acts or omissions.

(G)    While Lehman's placement and operation of its Equipment in the Customer Space pursuant to the Master Documents (as specifically limited by the Master Documents which specify the electrical loading and weight loading limitations for the Customer Space, and provided that Lehman does not exceed use of 1000 kw of power) is not expected to interfere with other users of the Facility, Lehman, its employees and Subcontractors shall use the Customer Space, and shall install and operate Equipment in the Customer Space in a manner that does not materially interfere with AIGT equipment or services, or the equipment or services of any other user of the Facility. Lehman will not alter or tamper with, in any manner, the property or space within the Facility outside of the Customer Space, and Lehman shall only take such action with the Customer Space and its Equipment during the Term that is consistent with the terms of this License, or as otherwise agreed upon, in writing, by Lehman and AIGT.

(H)    As described on **Exhibit 2**, Lehman will be charged AIGT's reasonable, then-current man-hour rates (with no profit or mark-up) for escorts, technical assistance or supervision provided by AIGT to Lehman's employees and Subcontractors

to the extent such employees or Subcontractors are performing work in the Facility outside of the Customer Space, or are performing cabling, electrical or other work which is reasonably anticipated to impact Facility Systems in the Customer Space. Such charges will not begin to accrue unless an AIGT employee has escorted, supervised or provided technical assistance to Lehman for greater than two (2) hours.

3.    **Monthly Recurring Charges**

(A)    Subject to the Basic License Information and this **Section 3**, Lehman agrees to pay AIGT the Monthly Recurring Charges from and after the License Commencement Date in the amount described herein.

(B)    The Monthly Recurring Charges, as defined in the Basic License Information, are payable monthly pursuant to **Section 3(E)** hereof. The Monthly Recurring Charges for any partial calendar month shall be equitably prorated. The Monthly Recurring Charges shall not be increased during the Term except as set forth in **Sections 3(D) and 3(F)**.

(C)    Prior to Final Completion, and upon Substantial Completion of each milestone of Work (as described on **Exhibit 4**), Lehman shall owe AIGT a corresponding portion of the Monthly Recurring Charges in accordance with the terms of this Section and as described on **Exhibit 4**.

(D)    Lehman shall be liable to AIGT for the following fees or charges related to its use of the Facility or Customer Space: the hourly rate for escorts, supervision or technical assistance as described in **Section 2(H) and Exhibit 2**; the cost of any extra power as described on **Exhibit 3**; and the cost of any labor or materials expended by AIGT in response to an **Exhibit 9** Change Order as described herein or in the Exhibits. Lehman shall also be liable for the cost of any local access or other telecommunications interconnections needed by Lehman in the Customer Space. Each of Lehman and AIGT shall bear sole responsibility for all personal property-related levies on its owned or

3

Execution Version

leased personal property. The parties shall agree in advance before AIGT invoices Lehman for any type of fee or charge that is not specifically contemplated pursuant to the terms of this License.

(E)    Lehman shall pay AIGT for the Monthly Recurring Charges corresponding to its use of the Customer Space as specified herein and on **Exhibit 4** in advance, by the first (1st) day of the month in which Lehman makes use of any portion of the Customer Space pursuant to the terms hereof. All other fees and charges shall be invoiced to Lehman by AIGT promptly after the end of the month in which service is rendered or materials are provided and shall be payable within forty-five (45) days after the receipt of such invoice. Late payments shall accrue interest from the date such payment is due until paid, including accrued interest, at an annual rate equal to the prime rate, as publicly quoted from time to time by The Wall Street Journal as the "prime rate," plus two percent (2%). No dispute with respect to the payment of any amount under this License shall relieve the disputing party of its obligation to pay all other amounts due and owing. All disputed or withheld amounts shall be paid into an interest-bearing escrow account with a third party escrow agent mutually agreed upon by the parties within fifteen (15) days of invoice. The release of the funds paid into the escrow account and the payment of the remaining balance of the disputed amount shall be subject to a final determination of such dispute by the parties or by arbitration in accordance with **Section 17** of this Agreement. The costs and fees associated with such escrow account shall be paid by each party in inverse proportion to the amounts received by each party.

(F)    From and after the first anniversary of Final Completion as defined in **Exhibit 4**, if the Labor Rates (as hereinafter defined) in effect for any Comparison Year (as hereinafter defined) (any part or all of which falls within the Term) shall be greater than the Base Labor Rates (as hereinafter defined), then the Monthly Recurring Charges for the Customer Space for such Comparison Year shall be increased by the same percentage increase

(carried to the fourth decimal point) between the Labor Rate for such Comparison Year, and the Labor Rate for the immediately preceding Comparison Year (in the case of the calculation at the end of the first anniversary of Final Completion, such increase in the Monthly Recurring Charges shall be equal to the percentage increase between the Labor Rates for such Comparison Year and the Base Labor Rates); provided, however, that the total Monthly Recurring Charges shall not increase during the Term (not including any extensions thereof) by more than a total of eighteen percent (18%) or eighty-one thousand four hundred fifty ($81,450.00) a month in the aggregate. In a determination of any increase in Monthly Recurring Charges under the provisions of this **Section 3(F)**, AIGT and Lehman agree as follows:

(i)    "**Comparison Year**" shall mean any Contract Year subsequent to the Base Labor Year during any or all of which there is an increase in the Labor Rates. "Contract Year" shall mean April 1st through March 31st of the following year.

(ii)    "**R.A.B.**" shall mean the Realty Advisory Board on Labor Relations, Incorporated, or its successor.

(iii)    "**Local 32B-32J**" shall mean Local 32B-32-J of the Building Service Employees International Union, AFL-CIO, or its successor.

(iv)    "**Class A Office Buildings**" shall mean first-class office buildings under any agreement between R.A.B. and Local 32B-32J.

(v)    "**Labor Rates**" shall mean a sum equal to the undiscounted regular hourly wage rate required to be paid to Others (as hereinafter defined) employed in Class A Office Buildings pursuant to an agreement between R.A.B. and Local 32B-32J,

4

Execution Version

without "fringe"; provided, however, that if, as of October 1st of any Comparison Year, any such agreement shall require Others in Class A Office Buildings to be regularly employed on days or during hours when overtime or other premium pay rates are in effect pursuant to such agreement, then the term "regularly hourly wage rate", as used in this **Subsection 3(F)(v)** shall mean the average hourly wage rate for the hours in a calendar week during which Others are required to be regularly employed; and provided, further, that if no such agreement is in effect as of October 1st of any Comparison Year with respect to Others, then the term "regularly hourly wage rate", as used in this **Subsection 3(F)(v)** shall mean the regular hourly wage rate actually paid to Others employed in the Facility by AIGT or by an independent contractor engaged by AIGT, but not in excess of the regular hourly wage rate for Others engaged in the general maintenance and operation of buildings of the type and in the vicinity of the Facility.

(vi) **"Others"** shall mean the classification of employee engaged in the general maintenance and operation of Class A Office Buildings most nearly comparable to the classification now applicable to "others" in the current agreement between R.A.B. and Local 32B-32J.

(vii) **"Base Labor Rates"** shall mean a sum equal to (x) fifty percent (50%) of the average Labor Rates in effect ($0.01/$0.01 without fringe) for calendar year 2004 plus (y) fifty percent (50%) of the average Labor Rates in effect ($0.01/$0.01 without fringe) for calendar year 2005.

(viii) **"Base Labor Year"** shall mean calendar year 2004.

(ix) **"AIGT's Statement"** shall mean an instrument or instruments containing a comparison of any increase or decrease in the Monthly Recurring Charges for the preceding Comparison Year pursuant to the provisions of this **Section 3(F)**.

Approximately one hundred twenty (120) days following the end of any Comparison Year, AIGT shall render to Lehman AIGT's Statement or Statements showing separately or together (1) a comparison of the Labor Rates for the Comparison Year with the immediately prior Comparison Year, and (2) the amount of the increase in the Monthly Recurring Charges resulting from such comparison. AIGT shall also send with the Statement copies of the documentation used to calculate the Labor Rate for the relevant period. Except as provided below, nothing contained herein shall be deemed to limit or waive AIGT's right to correct, reconcile or adjust any AIGT Statement, and to receive or credit any resulting increase or decrease in payments made or owing pursuant to this Section. Subject to the provisions of this Section, Lehman shall pay to AIGT the deficiency, or AIGT shall refund the excess, within thirty (30) days following any such correction, reconciliation or adjustment. AIGT shall waive the right to increase the Monthly Recurring Charges as specified in this Section for any year in which it fails to render a Statement demonstrating the increase within six (6) months after the end of any Comparison Year.

Lehman's obligations with respect to increases in Labor Rates shall be payable by Lehman on the first day of the second (2nd) month following the furnishing to Lehman of AIGT's Statement with respect to such Labor Rates in an amount equal to such increase in the Monthly Recurring Charges multiplied by the number of months (and any

5

Execution Version

fraction thereof) of the Term then elapsed since the commencement of the Comparison Year for which the increase is applicable, together with a sum equal to such increase with respect to the month or months following the furnishing to Lehman of AIGT's Statement; and thereafter, commencing with the next succeeding monthly installment of Monthly Recurring Charges and continuing monthly thereafter until rendition of the next succeeding AIGT's Statement, the monthly installments of Monthly Recurring Charges shall include an amount equal to such increase. Any increase in the Monthly Recurring Charges shall be collectible by AIGT in the same manner as Monthly Recurring Charges.

Any AIGT Statement sent to Lehman shall be conclusively binding upon Lehman unless, within one hundred twenty (120) days after such statement is sent, Lehman shall pay to AIGT the amount set forth in such statement, without prejudice to Lehman's right to dispute the same, and shall send a written notice to AIGT objecting to such statement and specifying the respects in which such statement is claimed to be incorrect. If such notice is sent, the parties agree to use the dispute resolution procedures set forth in **Section 17** hereof. If the parties are unable to resolve their differences, then either party may refer the decision of the issues raised to a reputable independent firm of certified public accountants selected by Lehman and reasonably acceptable to AIGT, and the decision of such accountants shall be conclusively binding upon the parties. The fees and expenses involved in such decision shall be borne by the unsuccessful party (and if both parties are partially unsuccessful, the accountants shall apportion the fees and expenses between the parties based on the degree of success of each party).

(G) From and after the date that the escalation mechanism described in **Section 3(F)** is no longer available in the marketplace, the Monthly Recurring Charges shall be adjusted annually (subject to the cap set forth in the first paragraph of **Section 3(F)**), on the anniversary date of Final Completion, by the change, if any, in the Consumer Price Index, All

Urban Consumers (CPI-U), U.S. City Average, published by United States Department of Labor, Bureau of Labor Statistics (1982-84=100), or such successor index (appropriately converted to an equivalent reference base) as shall be published by the Bureau of Labor Statistics, for the twelve (12) month period ending on such anniversary of Final Completion. In the event the parties cannot agree upon the successor index, the dispute will be resolved in accordance with **Section 17** hereof.

4.    **Term and Termination**

(A)    Subject to the provisions of **Section 4(B)** concerning renewals and extensions of this License, and subject to **Section 15** regarding extension of services and transfer assistance, the term of this License shall commence on the Effective Date and, unless earlier terminated in accordance with the provisions of this Section or **Section 10** herein, shall expire as of the end of the Term, provided that the Term will be extended to the last day of a calendar month if the Term will otherwise expire in the middle of a calendar month (the "**License Expiration Date**").

(B)    If the parties have not agreed to the terms and conditions of a new License term by the end of the initial Term then Lehman may exercise its right to extend the Term for two (2) separate but consecutive one (1) year time periods. Lehman shall provide AIGT with written notice of its extension election at least thirty (30) days prior to expiration of the then-current Term, or extension thereof. Before each extension of the term commences, AIGT shall notify Lehman in writing of the Monthly Recurring Charges that will apply during the extended term. The Monthly Recurring Charges for each Term extension shall be equal to the greater of one hundred twenty percent (120%) of the then-current Monthly Recurring Charges, or then current Market Rates as hereinafter defined and determined in accordance with **Section 29** herein.

(C)    Notwithstanding anything contained in this License to the contrary, the following circumstances

Execution Version

shall provide the non-defaulting party with the right to terminate this License on sixty (60) days prior written notice to the other party pursuant to the notice requirements contained in **Section 27(E)** hereof. Except for the provisions of the License that expressly survive termination, the License shall terminate as of the date set forth in the termination notice which shall not be less than sixty (60) days after the date of the written notice:

    (1) AIGT shall have the right to terminate the License:

        (a) upon Lehman's failure to pay the Monthly Recurring Charges, which failure accrues to an outstanding payable to AIGT of three million dollars ($3,000,000.00) or more;

        (b) upon failure to achieve Final Completion of the Customer Space Improvements due to Unavoidable Delay pursuant to and as described on **Exhibit 4, Paragraph L(2);** provided that AIGT shall pay Lehman the damages set forth on **Exhibit 4, Paragraph L(2)**, as Lehman's sole and exclusive remedy and the parties shall have no further duties, obligations or liabilities to each other; or

        (c) in the event of a material, chronic default or breach of the License by Lehman as specified in **Section 4(C)(3)** below.

    (2) Lehman shall have the right to terminate the License:

        (a) upon failure to achieve Final Completion of the Customer Space Improvements due to AIGT's primary fault as described on **Exhibit 4, Paragraph L(1)**, provided that AIGT shall pay Lehman the damages set forth on **Exhibit 4, Paragraph L(1)**, as Lehman's sole and exclusive remedy and the parties shall have no further duties, obligations or liabilities to each other;

        (b) upon failure to achieve Final Completion of the Customer Space Improvements due to Unavoidable Delay as described on **Exhibit 4, Paragraph L(2),** provided that Lehman shall pay AIGT the damages set forth on **Exhibit 4, Paragraph L(2)**, as AIGT's sole and exclusive remedy and the parties shall have no further duties, obligations or liabilities to each other;

        (c) if the Master Services Agreement is validly terminated by Lehman pursuant to the following sections of the Master Services Agreement -- **Section 20.03(1)**, **Section 9.04(4)** or **Section 20.05(1)**, provided that (notwithstanding the notice requirement in **Section 4(C)** hereof), Lehman must exercise such termination right by written notice to AIGT within thirty (30) days of the valid termination of the Master Services Agreement and the notice shall specify that this License shall be terminated no more than one hundred eighty (180) days after the giving of such notice, and provided further that such termination shall not be deemed a termination of this License for cause, nor shall it entitle Lehman to seek any form of damages from AIGT;

        (d) in the event of a material, chronic default or breach of the License by AIGT as specified in **Section 4(C)(3)** below; or

7

dc-369867

Execution Version

(e) pursuant to the terms of **Section 16(D)** hereof; provided that Lehman shall pay AIGT the termination fees set forth in **Section 16(D)** as AIGT's sole and exclusive remedy and the parties shall have no further duties, obligations or liabilities to each other; provided further that (notwithstanding the notice requirements of **Section 4(C)**), Lehman shall provide AIGT with ninety (90) days prior written notice in order to invoke this termination right.

(3) Lehman and AIGT shall each have the right to terminate the License if the other party chronically and materially defaults or breaches under the terms of this License, and the non-defaulting party must exercise its self-help rights under this License (including, but not limited to, the self-help rights contained in **Sections 5, 8 or 13**) or exercise its rights to dispute resolution through to arbitration pursuant to **Section 17** hereof, more than three (3) times in any twelve (12) month period with respect to the same type of breach provided the arbitration is resolved in favor of the non-defaulting party each time.

Upon termination of the License for any reason, Lehman shall observe the procedures set forth in **Section 14** herein regarding surrendering the premises by the License Expiration Date subject to the provisions of **Section 15** hereof.

## 5. Installation of Customer Space Improvements and Equipment; Additions and Alterations

(A)    AIGT and Lehman shall complete the installation of the Customer Space Improvements in a timely, good and workmanlike manner in accordance with the requirements of **Exhibit 4,** attached hereto.

(B)    Throughout the Term, Lehman shall have the right to install, repair, and replace its Equipment and other personal property in the Customer Space, provided such installation is made in a good and workmanlike manner and in accordance with the Master Documents and other requirements described herein including, without limitation, the requirements set forth in **Sections 1(C) and 2(G)**, the requirements set forth in **Exhibits 3 and 4**, and the following: (1) Lehman shall not exceed the weight loading limitation of 100 pounds of live load per square foot for any Equipment installed in the Customer Space as described in the Master Documents; and (2) Lehman shall not exceed the accepted electrical load limitations in each area of the Customer Space as set forth in the Master Documents; provided, however that Lehman shall not in any event exceed the use of 1000kw of power. Lehman shall use due diligence and its commercially reasonable efforts to refrain from installing Equipment or other personal property in violation of the foregoing. AIGT shall have the right to immediately require Lehman to reconfigure (and remove, if reconfiguration is not possible) any non-complying Equipment or personal property, or exercise self-help at Lehman's cost and expense to reconfigure (and remove, if reconfiguration is not possible) the non-complying Equipment. AIGT will have the right to exercise the foregoing self-help right after reasonable notice to Lehman and after two (2) hours in the event of an Emergency, and after twenty four (24) hours under all other circumstances. On a monthly basis, Lehman shall furnish AIGT, in writing, an up to date floor plan of its Equipment in the Co-Location Area, an updated list of Equipment installed in the Customer Space, and a cumulative report for each cabinet and each piece of stand-alone Equipment of: (i) the weight of each cabinet including its contents; (ii) the weight of any stand alone Equipment; (iii) the electrical loading for the Equipment in each cabinet including its contents; and (iv) the electrical loading for any stand alone Equipment. The parties shall also endeavor to hold monthly planning meetings in order to review the electrical loading, weight loading, heat output, floor plan and Equipment list.

dc-369867

Execution Version

Any cable installation work or other interconnections in the Customer Space or the Facility performed by or on behalf of Lehman shall be performed in accordance with **Exhibits 3 and 4** attached hereto at Lehman's sole cost and expense, including costs as specified in **Section 2(H)**.

Subject to completion of Punch List Items as specified on **Exhibit 4**, to the extent such completion materially adversely affects Lehman's beneficial use of the Customer Space, the installation of Equipment by Lehman in the Customer Space shall be conclusive evidence that Lehman accepts the Customer Space and that the Customer Space and Facility are suitable for the use intended by Lehman and are in satisfactory condition at the time the Equipment was installed. AIGT has duties hereunder to maintain security to the Facility as set forth in **Exhibit 2**, to maintain the environmental conditions to the Facility as set forth in **Exhibit 3**, and maintenance duties as set forth in **Exhibit 8**, but AIGT shall have no duty to monitor, maintain or care for the Equipment installed in the Customer Space by or for Lehman. AIGT hereby disclaims any warranties of habitability or fitness for a particular purpose, or any other warranties, express or implied, except for the purposes set forth in **Section 1(A)** hereof. Notwithstanding the acceptance of the Customer Space by Lehman, throughout the Term, AIGT shall make available and maintain the Facility Systems pursuant to **Section 7** of this License and shall make available and maintain all other maintenance, security and emergency response services specified herein and in the Exhibits attached hereto.

(C)   All Equipment installed in the Customer Space by Lehman, whether or not attached or built into the Customer Space, including all furniture, furnishings and other articles of movable personal property owned by Lehman, shall be and shall remain the property of Lehman and may be removed by Lehman at any time during the Term without causing damage to the Customer Space or the Facility and subject to the requirements of **Paragraph 3.1.2** of **Exhibit 2**. Lehman shall notify AIGT in writing of any damage caused by Lehman

to the Customer Space or the Facility due to Lehman's removal of the foregoing. Liability for repairing such damage shall be determined in accordance with **Section 12** hereof.

(D)   Subject to **Section 5(B)** herein, Lehman shall not make any material additions or structural alterations to the Customer Space that cause Lehman to exceed the use of 1000 kw of power, nor shall it deviate from the Master Documents, specifically including the Master Documents which contain electrical loading and weight loading limitations, unless approved in advance by AIGT via submission of a Change Order request form (attached hereto as **Exhibit 9**) by Lehman, and approval of the Change Order by AIGT, such approval not to be unreasonably withheld. Additional charges as specified and agreed upon in the Change Order, both one-time and monthly recurring, may apply, including, but not limited to, charges for labor, materials and extra power. For purposes of clarification, a material addition or structural alteration is one that: (1) is reasonably likely to affect the functioning of the Facility Systems; (2) is reasonably likely to result in damage to the Customer Space or the Facility; (3) is reasonably likely to create an Emergency; (4) is reasonably likely to increase costs to AIGT; (5) is reasonably likely to materially, adversely affect the use of the Facility by AIGT or other users; or (6) is reasonably likely to materially adversely affect, except to a de minimis extent, in AIGT's reasonable judgment, the structural elements of the walls, floors, ceiling or columns of the Facility.

If Lehman, its employees or Subcontractors damage the Customer Space or Facility in any way, Lehman shall promptly notify AIGT in writing. If AIGT, its employees or Subcontractors damage the Customer Space or Lehman's Equipment in any way, AIGT shall promptly notify Lehman in writing. Liability for such damage shall be determined in accordance with **Section 12** hereof.

dc-369867

Execution Version

### 6.    Security

(A)    AIGT will implement and maintain throughout the Term a security system and security procedures for the Facility in accordance with **Exhibit 2** hereto.    Lehman acknowledges and agrees that, as of the Effective Date, it has reviewed and examined AIGT's security procedures and systems for the Facility, and that such procedures and systems are acceptable to Lehman and are adequate for the purposes of this License as set forth in **Section 1(A)** hereof.

(B)    Lehman shall be responsible for installing, maintaining, repairing and replacing any and all systems it deems necessary to secure its Customer Space, as described in **Exhibit 2**, including its global access control and CCTV systems in the Customer Space (the "**Lehman Security System**"), and shall provide AIGT with access to the Customer Space as provided herein and in **Exhibit 2**.

(C)    Throughout the Term, AIGT will maintain security in the Facility at the level required by its parent, American International Group, Inc. ("AIG"), who uses the Facility as its primary data processing facility as of the Effective Date.  In the event AIG no longer uses the Facility as its primary data processing facility, then AIGT will provide the same quality of security in the Facility as that provided to AIG in its primary facility or, if no primary facility then exists, in AIG's significant data processing facilities. In the event AIG does not utilize a primary or significant data processing facility, or if AIG is no longer an internationally recognized financial services institution, then AIGT will provide the same quality of security in the Facility as is customarily provided in other data processing centers used by major investment banks in the United States. The determination of what is customarily provided in other data processing centers shall be made by an independent party that is mutually selected by AIGT and Lehman.  If AIGT and Lehman cannot agree on the selection of an independent party, then the dispute shall be determined pursuant to the provisions of **Section 17** hereof.    At least once every calendar year

throughout the Term, AIGT shall allow Lehman and its Subcontractors, at Lehman's own expense and under the supervision of AIGT, to conduct an audit of the physical security of the Facility.  If Lehman finds that any features of the physical security system listed on **Exhibit 2** are not functioning properly, Lehman will notify AIGT in writing and AIGT will undertake the work to correct or replace the non-complying security feature(s) at AIGT's expense. Lehman shall also have the right to make other suggestions for upgrades to the Facility security system to keep pace with data processing facilities used by other major investment banks, and AIGT shall consider such suggestions in good faith. AIGT shall be under no obligation to implement such suggestions unless such suggestions must be implemented by Lehman due to legal requirements or regulations, or Lehman's reasonable interpretations thereof, which are binding upon Lehman, in which case Lehman shall submit an **Exhibit 9** Change Order to AIGT and Lehman shall be responsible for all reasonable costs and expenses to implement such suggestions including AIGT's reasonable internal costs.

Before undertaking a security audit pursuant to the terms hereof, Lehman shall provide AIGT with thirty (30) days prior written notice of its intention to audit, which notice shall contain the identity of the security company who will conduct the audit which shall be selected by Lehman from the list of Pre-Approved Security Auditors contained in **Exhibit 6** hereto; provided, however, that if Lehman chooses an auditor whose name does not appear on **Exhibit 6**, then AIGT shall have the right to reject such auditor, in its reasonable discretion, and provide Lehman with the names of three qualified (3) alternate auditors who meet with AIGT's reasonable approval.  Before undertaking the audit, the selected auditor must enter into a confidentiality agreement with AIGT.

### 7.    Utilities, Services and Maintenance

(A)    AIGT shall maintain the Facility in good working order and shall perform such janitorial services, environmental systems maintenance, and

dc-369867

Execution Version

power plant maintenance as may be necessary in the Facility and in the Customer Space to create, in AIGT's reasonable judgment, an environment suitable for the functioning of the Facility and Lehman's use of the Customer Space. AIGT shall also comply with the maintenance standards and procedures set forth in **Exhibit 8**. AIGT will consider in good faith any suggestions from Lehman with respect to such service and maintenance procedures.

(B)     AIGT shall make available and maintain the facility systems described on **Exhibit 3** ("**Facility Systems**") according to the specifications set forth therein for the functioning of the Facility and Lehman's use of the Customer Space consistent with the primary purpose of this License. Such Facility Systems shall be maintained in accordance with **Exhibits 3 and 8**.

(C)     Subject to the provisions of **Exhibit 8**, AIGT shall have the right to stop, interrupt or reduce service of the Facility Systems for repairs, additions, alterations, replacements or improvements which are, in the reasonable judgment of AIGT, necessary to be made, until said repairs, alterations, replacements or improvements shall have been completed. In the event AIGT or other users in the Facility need to perform non-routine maintenance or material construction work in the portions of the Facility that are located on the floor above, the floor below or the areas immediately adjacent to the Co-Location Area, and if such work is reasonably expected to materially adversely affect Lehman's beneficial use of the Co-Location Area then, upon the request of Lehman, AIGT shall consult with Lehman (or its agents) prior to performing such work and shall cooperate with Lehman to minimize any interruption of Facility Systems to the Customer Space. All work to the hydronics systems (including, without limitation, sprinklers, chilled water and pantry systems) located directly above the Co-Location Area will be performed by AIGT on an overtime basis unless there is an Emergency. Except as provided above, to the extent Lehman requests that AIGT perform work under this paragraph on an

overtime basis or during non-business hours (and such work is not normally performed by AIGT on an overtime basis or during non-business hours), and to the extent AIGT is able to comply with such request, AIGT shall bill Lehman for the difference in labor costs associated with performing the work at such times, which Lehman shall pay in accordance with the terms of **Section 3(E)** herein. Lehman shall have the right to monitor such work at its own cost.

(D)     In making any repairs, alterations, additions, replacements or improvements to the Facility, AIGT shall use reasonable efforts to minimize interference with Lehman's access to and use and occupancy of the Customer Space in accordance with its License. AIGT shall perform any repairs, alterations, additions, replacements or improvements in the Facility or in the Customer Space in a commercially reasonable manner at reasonable times, taking into account the work in question and the affect of the performance of such work on the conduct of Lehman's use of the Customer Space. If Lehman requests an alteration to the Customer Space pursuant to an **Exhibit 9** Change Order, and if AIGT cannot perform the alteration within the time frame requested by Lehman, then AIGT will use commercially reasonable efforts to identify an Approved Subcontractor listed on **Exhibit 11** to perform the alteration for AIGT within the requested time frame at Lehman's sole cost and expense.

(E)     Subject to **Exhibit 8**, Lehman at its own cost and expense, shall maintain and keep in good order the Customer Space and any Equipment therein, and shall ensure that neither it nor its employees or Subcontractors damage any part of the Facility, the Customer Space or any equipment located in or about the Facility, and shall not allow any debris or supplies to be left in or about the Facility outside of the Customer Space. Lehman shall not maintain or permit by any Lehman employee, Subcontractor or invitee any nuisances or violations of governmental laws, rules, regulations or ordinances with respect to the Facility. Lehman shall ensure that its employees and Subcontractors comply with all

11

Execution Version

AIGT Rules and Regulations and all applicable laws, rules, regulations and ordinances. AIGT shall ensure that its employees, Subcontractors and other users in the Facility shall comply with all AIGT Rules and Regulations and all applicable laws, rules, regulations and ordinances.

(F)    AIGT agrees that no alterations, additions, replacements or improvements or other repairs or maintenance (other than Emergency repairs and maintenance) shall be performed in the Customer Space or to the Facility Systems that will have an adverse affect on the use and operation of the Customer Space during the following periods: (1) final two (2) weeks of June through and including the first week of July; (2) final week of November, commencing on the immediately preceding Saturday, through and including the first week of December; and (3) final week of December through and including the first week of January.  Lehman shall notify AIGT if such periods change at any time, by providing AIGT with at least sixty (60) days prior written notice according to the notice provisions contained in **Section 27(E)**.  AIGT will use commercially reasonable efforts to comply with such request.  Lehman shall endeavor to send AIGT written reminders of the restricted time periods set forth in this paragraph at least thirty (30) days prior to the beginning of each time period, provided that Lehman's failure to provide such reminders shall not constitute a waiver of its rights or relieve AIGT of its obligations under this paragraph.

## 8.    Emergency Situations

(A)    In the event of an Emergency, the parties shall comply with the emergency notification procedures set forth on **Exhibit 7** and take such other corrective action as is required herein (the "**Emergency Notification Procedures**").  For the purposes of this License, an "**Emergency**" shall mean any situation in which the person or party discovering the situation concludes, in its reasonable judgment, that a particular action is immediately necessary: (a) to avoid or put an end to imminent material damage to all or any material portion of the Facility or the Customer Space; (b) to

protect any person in or about the Facility or the Customer Space from imminent harm; (c) to avoid or put an end to imminent material interference with or impairment of the use of the Facility by AIGT, Lehman or any other user of the Facility; (d) to avoid violating or prevent further violation of any applicable privacy laws; or (e) to avoid or put an end to any imminent material security breaches to the Facility or the Customer Space.  It shall also be considered an Emergency hereunder if (x) there is a sustained outage of two (2) hours or more in a Facility System which materially adversely affects Lehman's use of the Customer Space or (y) there is a situation in which a person or party concludes, in its reasonable judgment, that a particular action is immediately necessary to avoid or put an end to a circumstance that is reasonably expected to cause a sustained Facility System outage that would materially adversely affect Lehman's use of the Customer Space.

(B)    In the event of an Emergency, the party discovering the Emergency shall immediately contact the other party pursuant to the procedures set forth on **Exhibit 7**, which procedures include a notification call tree and the response times required.  In the event of an Emergency caused by the sustained outage of a Facility System for two (2) hours or more, if AIGT has not repaired the Facility System or contacted the relevant critical support vendor within two (2) hours of when the outage was first reported to AIGT, then Lehman shall have the right to exercise self-help by contacting such critical support vendor(s) in accordance with the procedures set forth on **Exhibit 7** at AIGT's sole cost and expense.    Lehman shall provide AIGT with simultaneous notice of its contact with the critical support vendor.

(C)    If AIGT determines, in its reasonable business judgment, that any Lehman employee, Subcontractor, the Equipment or any other property of Lehman in or around the Facility creates an Emergency, AIGT shall give notice to Lehman pursuant to **Exhibit 7**, and Lehman shall respond to the Emergency as required by **Exhibit 7**.  If Lehman fails to respond to the Emergency as

Execution Version

required by **Exhibit 7**, then AIGT may take such self-help action as it deems appropriate to correct the violation at Lehman's expense. AIGT shall provide reasonable notice to Lehman prior to taking such self-help action and shall have no liability to Lehman for any damages arising from such action unless caused by AIGT's gross negligence or willful misconduct.

(D)    In the event of any Emergency in which AIGT reasonably determines that it must exercise its self-help rights, such rights shall be exercised upon reasonable notice to Lehman and shall not be conditioned upon resolution of any disputes pursuant to **Section 17** hereof, nor shall such rights be delayed due to the tolling of any time periods due to a Force Majeure Event.

## 9.    Insurance

(A)    Prior to Lehman's use or occupancy of the Customer Space and during the entire Term of this License, and any extensions thereof, each party shall procure and maintain, at its sole cost and expense, the following minimum insurance coverages from an insurance company or companies licensed to do business in the state in which the Facility is located, rated by Best's Insurance Reports or any successor publication of comparable standing and carrying a rating of not less than A-VII or the then equivalent of such rating:

(1) Comprehensive Automobile Liability, including all owned, non-owned and hired autos, with a limit of two million dollars ($2,000,000.00) Combined Single Limit for bodily injury and property damage liability;

(2) Commercial General Liability, including, but not limited to: Premises and Operations, Independent Contractors, C.G.L. Broad Form Endorsement, Personal Injury, Contractual Liability, Products/Completed Operations, with a limit of twenty five million dollars ($25,000,000.00) per occurrence and in the aggregate Combined

Single Limit for bodily injury and property damage liability; and

(3) Worker's Compensation coverage for all employees in all applicable states, with a limit as mandated under the Worker's Compensation laws of the state or federal body having jurisdiction over the location of the Facility.

Notwithstanding anything to the contrary contained herein: (x) Lehman shall also carry "all-risk" of physical loss or damage insurance covering all of Lehman's Equipment and other personal property located in the Facility and (y) AIGT shall also carry insurance against physical loss or damage to the Facility, including the Customer Space Improvements (exclusive of Lehman's Equipment), in an amount equal to one hundred percent (100%) of the replacement value thereof and with no exclusion for acts of terrorism (or, if acts of terrorism are excluded from AIGT's "all-risk" insurance, AIGT shall cause the Facility to be separately insured against all acts of terrorism). Each party shall be responsible for any applicable deductible under their respective all risk property policy.

(B)    The minimum insurance limits of policies required under this License will in no event limit the liability of the parties under this License. However, liability is limited according to the terms of **Section 11(C)** hereof. All insurance carried pursuant to the terms of this License will: (1) name the other party as additional insured and, in addition, Lehman shall also name AIG and Eastgreen, Inc. as additional insureds, and AIGT shall name Lehman Brothers Inc. as an additional insured; (2) specifically cover the liability assumed by each party, respectively, under this License, limited to the indemnity obligations under this License as set forth in **Section 12** and as limited by **Section 11**; and (3) be primary insurance as to all claims thereunder and provide that any insurance carried by the other party is excess and is non-contributing or participating with any other valid and collectable insurance requirement of the policy

13

Execution Version

holder; provided, however, that the other party's insurance shall become primary hereunder in the event a claim arises due to the gross negligence of such party, in which case the cumulative liability is capped at fifteen million dollars ($15,000,000.00) as set forth in **Section 11(C).**

The total amount of coverage to be paid on all claims for any additional insureds under either party's insurance policies specified above shall not exceed the insurance required by this License. Notwithstanding the fact that there are multiple named additional insureds under each parties' insurance policies hereunder, the total aggregate amount to be paid to or on behalf of such additional insureds for any one incident giving rise to potential recovery of insurance proceeds shall not exceed the total of damages incurred by one or a single named additional insured thereunder.

(C)    Anything in this License to the contrary notwithstanding, to the extent that such waiver and release will not impair the insurance coverage of the releasing party, AIGT and Lehman each hereby waive and release each other of and from any and all rights of recovery, liability, claims, actions, or causes of action, whether directly against each other, their partners, agents, officers and employees, or indirectly or by way of subrogation for any loss or damage that may occur to the Facility, the Customer Space, or personal property within the Facility which is covered by valid and collectible insurance in effect at the time of such loss or damage unless same results from the gross negligence or willful misconduct of the other party. All policies shall provide that each party's insurers waive all rights of subrogation against the other party and shall provide that the insurance company will defend any suit or proceeding against an injured party, or any of their partners, agents, officers and employees arising out of any claim covered thereby, even if such claim is groundless, false or fraudulent.

(D)    Each party shall furnish the other with certificates of insurance demonstrating that it has obtained the required insurance coverage.    Such

certificates shall contain a statement that the insurance coverage shall not be (1) reduced or (2) cancelled by lapse of time or otherwise, except upon at least thirty (30) days prior written notice to the named additional insured.    Any certificate submitted and found to be incomplete or not according to the prescribed form will be returned as unsatisfactory.    In the event either party receives a notice that required insurance coverage hereunder was cancelled, or any other notice from the issuers of the insurance policies required under this **Section 9** that may adversely affect the coverage under such policy of insurance, the party whose insurance was cancelled or adversely affected shall immediately deliver a copy of such notice to the other party. Unless the parties mutually agree that the cancelled insurance does not need to be replaced, the party whose insurance was cancelled or adversely affected shall make commercially reasonable efforts to replace the insurance in accordance with the provisions of this **Section 9** within thirty (30) days of cancellation or, thereafter, the named additional insured may obtain the required insurance coverage at the sole cost and expense of the party whose insurance was cancelled.

(E)    All insurance required to be maintained hereunder may be effected pursuant to blanket policies covering other locations, provided that such blanket policies:    (1) provide that the amount of insurance allocable to the Facility shall at all times not be less than the amounts set forth above, and that such amounts will not be reduced by any loss at any other location, and (2) shall comply with the provisions of this **Section 9**.

(F)    AIGT and Lehman each reserve the right, through its parent or through an affiliate (as appropriate), to self-insure or maintain substantial levels of deductibles and, where applicable, the self-insuring party agrees to defend and indemnify on behalf of the other party, claims to the extent that insurance terms and conditions would be generally available as required by the terms of this Section.

14

Execution Version

## 10.    Casualty and Condemnation

(A)    In the event of any damage, destruction, condemnation or taking by eminent domain of part of the Facility, to the extent any of which renders the Customer Space partially or wholly unusable or inoperable, AIGT shall cause an independent reputable contractor or architect, selected by AIGT in accordance with **Section 10(D)** below, to give notice to Lehman in writing, not later than thirty (30) days after AIGT first becomes aware of such damage, destruction, condemnation or taking, of the date by which the contractor or architect believes the Customer Space will be usable and operable.  If the independent contractor determines that the time to restore the Customer Space will be greater than three (3) months, then Lehman shall have the right within ten (10) business days of receiving the estimate to terminate the License upon written notice to AIGT.  If Lehman has not terminated the License pursuant to the terms of this Paragraph, then AIGT shall be afforded a period of three (3) months (or whatever greater time period for restoration as specified by the contractor or architect) after the expiration of Lehman's ten (10) day review period, within which to recover its rights (in the event of a taking or condemnation) or restore the usability or operability of the Customer Space.  If the work to restore the Customer Space or the recovery of AIGT's rights is not complete within the three (3) month period (or whatever greater time period for restoration as specified by the contractor or architect), then, Lehman may terminate this License by giving written notice to AIGT within thirty (30) days after expiration of the three (3) month period (or whatever greater time period for restoration as specified by the contractor or architect).  Upon termination according to the terms of this paragraph, the parties shall have no further rights or obligations to each other hereunder (except those rights expressly stated to survive), nor any liability to each other, unless the damage or destruction is caused by the fault of one of the parties, in which case the party who is not at fault may exercise its rights and remedies hereunder.

Notwithstanding the foregoing, if there is damage or destruction to the Customer Space pursuant to this **Section 10(A)**, and if the parties agree in writing to waive the requirement of an independent appraisal, then AIGT will immediately begin work to diligently restore the space.  If the work to restore the Customer Space is not complete or if AIGT's rights are not recovered within three (3) months after the written waiver agreement (or whatever greater time period upon which the parties may agree), then, Lehman may terminate this License by giving written notice to AIGT within thirty (30) days after expiration of the three (3) month period (or whatever greater time period upon which the parties may agree).

(B)    If the Facility suffers a complete destruction, condemnation or taking, AIGT shall notify Lehman in writing within thirty (30) days of such event whether or not AIGT decides, in its sole discretion, to rebuild the Facility at the current location or a new one.  If AIGT elects to rebuild the Facility, AIGT shall cause an independent reputable contractor or architect selected by AIGT in accordance with **Section 10(D)** to give notice to Lehman in writing, not later than forty five (45) days after AIGT first becomes aware of such damage, destruction, condemnation or taking, of the date by which such contractor or architect believes the restoration of the Facility and the Customer Space shall be substantially completed.  The notice may also contain other options for co-location space, including an offer of comparable co-location space in other buildings or in AIGT's Fort Worth facility at then-current Market Rates, terms and conditions.  Lehman shall respond to AIGT within fifteen (15) business days and inform AIGT whether it wishes to continue under the License at the Facility after reconstruction, whether it wishes to accept one of AIGT's other proposals, or whether it wishes to terminate this License.

If AIGT elects not to rebuild the Facility, or if Lehman elects not to accept one of AIGT's proposals for alternate or reconstructed space, then the License shall be terminated, and the

dc-369867

Execution Version

terminating party shall provide the other with written notice of termination. Thereafter, the parties shall have no further rights or obligations to each other hereunder (except those rights expressly stated to survive), nor any liability to each other, unless the damage or destruction is caused by the fault of one of the parties, in which case the party who is not at fault may exercise its rights and remedies hereunder.

(C)    If no termination notice under **Sections 10(A) or 10(B)** is timely given, and the parties agree to relocate all or any portion of the Customer Space, AIGT shall provide Lehman with the same amount of Customer Space in the alternate facility. AIGT shall rebuild (including infrastructure and power as generally set forth in the Master Documents) or make any repairs as promptly as is reasonably practicable. Until such time as equivalent space to the Customer Space is provided by AIGT to Lehman, AIGT shall (1) reduce or abate the Monthly Recurring Charges in proportion to the actual reduction or abatement of the use of the Customer Space caused by the damage, destruction or condemnation and (2) make any repairs to the Customer Space (including infrastructure and power as generally set forth in the Master Documents) or Facility that are reasonably required to restore full or equivalent use to Lehman as existed prior to the damage, destruction or condemnation.

Lehman has no property interest in the Facility. AIGT shall be entitled to any condemnation proceeds paid as a result of any condemnation of the Facility, and Lehman shall have no claim thereto. Nothing in this Section 10(C) shall be deemed to prevent Lehman from making a separate claim against the applicable governmental authorities in any condemnation proceedings in which the Facility is condemned for moving expenses and the then-current value of any of Lehman's Equipment or personal property which Lehman is unable to remove from the Facility after making commercially reasonable efforts to remove such Equipment and personal property.

(D)    AIGT shall not designate a particular person as the independent reputable contractor or architect for purposes of **Section 10(A)** or **Section 10(B)** unless: (1) such person has at least five (5) years of experience in providing such estimates, and (2) such person has not been employed by AIGT or Lehman (or their respective affiliates) for a period of three (3) years prior to the date of the event which requires the restoration of the Customer Space or Facility; provided, however, that if, in AIGT's reasonable judgment, there exists no such person that satisfies the provisions of this clause (2), then AIGT shall have the right to designate a person that complies only with the provisions of clause (1) above, if such person is otherwise reputable and AIGT and Lehman receive reasonable assurances from such person that such person is preparing the restoration estimate impartially.

**11.    Waiver of Liability:** AIGT and Lehman hereby agree that:

(A)    LEHMAN ACKNOWLEDGES THAT AIGT INTENDS TO ALLOW OTHER LICENSEES TO INSTALL EQUIPMENT IN THE FACILITY.

(B)    AIGT HAS DUTIES HEREUNDER TO MAINTAIN SECURITY TO THE FACILITY AS SET FORTH IN **EXHIBIT 2**, TO MAINTAIN THE ENVIRONMENTAL CONDITIONS TO THE FACILITY AS SET FORTH IN **EXHIBIT 3**, AND MAINTENANCE DUTIES AS SET FORTH IN **EXHIBIT 8**, BUT AIGT SHALL HAVE NO DUTY TO MONITOR, MAINTAIN OR CARE FOR LEHMAN'S EQUIPMENT, REGARDLESS OF WHETHER AIGT INSTALLED SUCH EQUIPMENT OR ACCOMPANIED LEHMAN OR LEHMAN'S EMPLOYEES OR SUBCONTRACTORS IN PERFORMING ANY SERVICES. AIGT SHALL HAVE NO DUTY TO MONITOR OR SUPERVISE LEHMAN'S EMPLOYEES OR SUBCONTRACTORS, AND LEHMAN HEREBY ASSUMES RESPONSIBILITY FOR ANY LOSS OR DAMAGE WHICH THE FOREGOING PARTIES MAY CAUSE. AIGT SHALL HAVE NO

16

Execution Version

RESPONSIBILITY OR LIABILITY TO LEHMAN FOR ANY DAMAGE TO LEHMAN OR ITS EQUIPMENT RESULTING FROM LEHMAN'S PLACEMENT, STORAGE OR USE OF SUCH EQUIPMENT IN THE CUSTOMER SPACE PRIOR TO FINAL COMPLETION.

(C)    Notwithstanding anything in this License to the contrary, the entire cumulative liability (not including charges due under **Section 3** hereof) of either party hereunder, together with their respective affiliates, employees, officers, directors, Subcontractors, suppliers and licensors, arising from or relating to this License or the subject matter hereof, under any legal theory (whether in contract (including breach of warranty), tort (including negligence and strict liability), indemnity or otherwise), shall not exceed the sum of fifteen million dollars ($15,000,000.00).    This cap on liability shall not restrict recovery of one party against another for acts of willful misconduct.

(D)    The parties acknowledge that the limitations of liability contained in this Section are a fundamental part of the basis of the bargain hereunder, and the parties would not enter into this License absent such limitations.

(E)    The limitations of liability provided for in this Section shall survive the expiration or termination of this License.

**12.    Indemnification:**    AIGT and Lehman hereby agree that:

(A)    Subject to **Section 11**, Lehman agrees to indemnify, hold harmless and defend AIGT, AIG, Eastgreen, Inc., its and their employees, Subcontractors, customers (for whom AIGT is providing services in the Facility), affiliates, and licensees from and against any and all demands, claims, causes of action, fines, penalties, damages, losses, liabilities, judgments, and expenses (including without limitation reasonable attorneys' fees and court costs) incurred in connection with or arising from the gross negligence or willful misconduct of Lehman, its employees and

Subcontractors arising out of or in connection with its performance under this License.

(B)    Subject to **Section 11** above, AIGT agrees to indemnify and hold harmless and defend Lehman, Lehman Brothers Inc., its and their affiliates, its employees, its permitted sub-licensees pursuant to **Section 16(F)**, and its Subcontractors from and against any and all demands, claims, causes of action, fines, penalties, damages, losses, liabilities, judgments, and expenses (including without reasonable limitation attorneys' fees and court costs) incurred in connection with or arising from the gross negligence or willful misconduct of AIGT, its employees, Subcontractors, customers, affiliates, and licensees arising out of or in connection with its performance under this License.

(C)    If a claim is made under any of the indemnification provisions set forth in this **Section 12** or otherwise in this Agreement, the entity requesting indemnification in accordance with this **Section 12** (the "Indemnitee") and the party providing such indemnification in accordance with this **Section 12** (the "Indemnitor") shall each comply with the following procedures:

(1)    Indemnitor shall reimburse Indemnitee promptly for any legal or other reasonable fees or expenses finally awarded by a court of competent jurisdiction: (a) for investigating, preparing or pursuing any action or other proceeding (whether formal or informal) or threat thereof, in connection with pending or threatened litigation or arbitration to which Indemnitee is a party (an **"Action"**) and (b) in connection with enforcing such Indemnitee's rights under this **Section 12**); provided, however, that in the event it is finally judicially determined by a court of competent jurisdiction that the costs incurred by such Indemnitee arose solely out of the gross negligence or bad faith of such Indemnitee, such Indemnitee will promptly remit to the Indemnitor any amounts expended by Indemnitor under this **Section 12(C)**.

17

Execution Version

(2)    Indemnitor shall, if requested by Indemnitee, assume the defense of any such Action including the employment of counsel reasonably satisfactory to Indemnitee and will not settle, compromise, consent or otherwise resolve or seek to terminate any pending or threatened Action unless it obtains the prior written consent of Indemnitee (such consent not to be unreasonably withheld or delayed) or an express, unconditional release of Indemnitee from all liability relating to such Action. Any Indemnitee shall be entitled to retain separate counsel of its choice and participate in the defense of any Action in connection with any of the matters to which this **Section 12** relates, but the fees and expenses of such counsel shall be at the expense of such Indemnitee unless: (a) the Indemnitor has failed promptly to assume the defense and employ counsel; or (b) the named parties to any such Action (including any impleaded parties) include such Indemnitee and the Indemnitor, and such Indemnitee shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or in addition to those available to the Indemnitor; provided that the Indemnitor shall not in such event be responsible under this **Section 12** for the fees and expenses of more than one firm of separate counsel (in addition to local counsel) in connection with any such Action in the same jurisdiction.

(3)    The Indemnitor agrees that if any right of any Indemnitee is finally judicially determined to be unavailable (except by reason of the gross negligence or bad faith of such Indemnitee), or is insufficient to hold such Indemnitee harmless against such costs as contemplated in this **Section 12(C)**, then the Indemnitor shall contribute to such costs (a) in such proportion as is appropriate to reflect the relative benefits received by the Indemnitor and its beneficiaries, on the one hand, and such Indemnitee, on the other hand, in connection with the transactions contemplated hereby, and (b) if (and only if) the allocation provided in clause (a) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (a) but also the relative fault of the Indemnitor and such Indemnitee. Relative fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any other alleged conduct relates to information provided by the Indemnitor or other conduct by the Indemnitor (or the Indemnitor's employees or other agents) on the one hand or by the Indemnitee (or the Indemnitee's employees or other agents) on the other hand. The parties hereto agree that it would not be just and equitable if contribution were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to above.

(4)    The rights of the Indemnitee hereunder shall be in addition to any other rights that any Indemnitee may have at common law, by statute or otherwise, as limited by the terms of this License. The reimbursement, indemnity and contribution obligations of the Indemnitor set forth herein shall apply to any modification of this License and shall remain in full force and effect regardless of any termination of, or the completion of any Indemnitee's services under or in connection with, this License.

(D)    The provisions of this **Section 12** shall survive the expiration or earlier termination of this License.

dc-369867

Execution Version

## 13.    Default

(A)    Each of the following events shall be an **"Event of Default"** hereunder:

(1) Events of Default by Lehman:

(a)    If Lehman defaults in the payment when due of the Monthly Recurring Charges, and such default continues for a period of thirty (30) days after written notice thereof from AIGT.

(b) If Lehman, its employees or Subcontractors make any material additions or structural alterations to the Customer Space in violation of **Section 5(D)** hereof.

(c) If Lehman, its employees or Subcontractors fail to perform or observe any other term, covenant or condition of this License, and if the failure continues for thirty (30) days after notice has been given to Lehman. Or, if such default is of a nature that it cannot be completely remedied within such thirty (30) day period, if Lehman fails to commence and diligently pursue to completion all steps necessary to remedy the default as soon as commercially reasonably                  practicable. Notwithstanding the foregoing, if Lehman disputes any default alleged by AIGT and either party invokes its rights under **Section 17** hereto, the time periods set forth in this Section shall be extended until such dispute is resolved.

(d) If Lehman does not timely cure an Emergency in accordance with **Section 8(C)** herein.

(2) Events of Default by AIGT

(a)    If AIGT fails to achieve Final Completion of the Customer Space Improvements by January 1, 2005 through its primary fault.

(b) If there is a sustained outage of two (2) hours or more in a Facility System that renders all or a mission critical portion of the Customer Space wholly unusable for two (2) hours or more, and AIGT has not taken steps to fix the outage or call the relevant critical support vendor(s) within two (2) hours of its first notice of the outage.

(c) If AIGT fails to perform or observe any material term, covenant or condition of this License, and if the failure has a material adverse effect on Lehman's use of the Customer Space and if such failure continues for thirty (30) days after written notice has been given to AIGT. Or, if such default is of a nature that it cannot be completely remedied within such thirty (30) day period, if AIGT fails to commence and diligently pursue to completion all steps necessary to remedy the default as soon as commercially reasonably                  practicable. Notwithstanding the foregoing, if AIGT disputes any default alleged by Lehman and either party invokes its rights under **Section 17** hereof, the time periods set forth in this Section shall be extended until such dispute is resolved.

(3) Events of Default by Either Party

(a)    If Lehman or AIGT transfers or assigns its interest in this License, except as specifically permitted by the terms of this License.

dc-369867

Execution Version

(b)    If Lehman or AIGT becomes insolvent.

(B)    If an Event of Default has occurred or is alleged to have occurred, the non-defaulting party may invoke dispute resolution procedures under **Section 17** hereof, but shall not file suit (except for injunctive or equitable relief). The parties agree that the exclusive method of recourse hereunder shall be dispute resolution and arbitration procedures as set forth in **Section 17**.

(C)    If Lehman is responsible for an Event of Default, AIGT shall have the right to take self-help measures to cure the Default, after reasonable notice to Lehman, at Lehman's sole cost and expense. Lehman's self-help right for an Event of Default under **Section 13(A)(2)(b)** which is caused by a sustained Facility System outage is set forth in **Section 8(B)** and on **Exhibit 7** hereof.

14.    **Surrender of Customer Space**

(A)    Within thirty (30) days after the License Expiration Date, Lehman shall remove all Equipment, additions and alterations made or installed by or on behalf of Lehman, except for the Customer Space Improvements and cabling, and shall restore the Customer Space to the same condition as existed on the day of Final Completion, reasonable wear and tear excepted. If Lehman fails to remove its Equipment, additions or alterations and return the Customer Space to the same condition as existed on the day of Final Completion within thirty (30) days of the License Expiration Date, or fails to make agreed-upon Transfer Assistance arrangements with AIGT pursuant to **Section 15(B)** (including Monthly Recurring Charges), or fails to invoke its extension rights under **Section 15(A)** hereof, AIGT shall have the unilateral right, but not the obligation, to diligently perform such work at Lehman's sole cost and expense (including Monthly Recurring Charges), and shall invoice Lehman in accordance with the procedures set forth in **Section 3** hereof or AIGT may, without further notice to Lehman, remove and store Lehman's Equipment for Lehman's benefit and at Lehman's sole cost, expense and risk.

(B)    If Lehman fails to invoke its rights under **Sections 4(B), 14(A) or 15** hereof, and it holds-over by failing to remove its Equipment or personal property from the Customer Space within thirty (30) days after the License Expiration Date, or failing to make agreed-upon arrangements with AIGT for Transfer Assistance as described in **Sections 14(A) and 15(B)**, then Lehman's continued possession of the Customer Space shall be construed as a license from month to month and AIGT reserves the right to charge Lehman two hundred percent (200%) of the Monthly Recurring Charges for each month in which Lehman's Equipment or personal property remains in the Customer Space, plus any taxes. Lehman shall also be liable to AIGT for any losses and/or damages AIGT sustains as a result of lost business opportunities or other consequences flowing from Lehman's failure to timely return the Facility and/or Customer Space to a neat and orderly condition as specified in **Section 14(A)**; provided that AIGT provides Lehman with reasonable evidence of such losses and/or damages.

15.    **Extension of Services and Transfer Assistance.**

(A)    Apart from Lehman's right to extend the Term pursuant to **Section 4(B)** hereof, if Lehman is unable to complete the removal and transition of its Equipment to a location other than the Customer Space and/or the Facility by the License Expiration Date, Lehman may request to temporarily extend this License beyond the License Expiration Date, and AIGT shall grant Lehman's request provided that AIGT determines, in its sole discretion, that AIGT has contractually uncommitted space available to meet Lehman's needs. Lehman shall pay AIGT one hundred fifty percent (150%) of the then-current Monthly Recurring Charges for the temporary extension of this License for a duration to be determined by Lehman up to a maximum of six (6) months (a "**Temporary Extension of Services**"). Lehman's request for a Temporary Extension of Services shall be made in writing at

20

Execution Version

least ninety (90) days prior to the License Expiration Date, or if ninety (90) days advance notice is not possible due to early termination of the License, then such request shall be made at least forty five (45) days prior to the License Expiration Date provided that sixty (60) days prior written notice of termination was given according to the terms of **Section 4** hereof. If sixty (60) days prior written notice of termination was not provided, then the request shall be made as much in advance of the actual termination of the License as is reasonably practicable. If AIGT terminates this License under **Section 4(C)(1)(a) or (c)**, AIGT shall not be obligated to grant Lehman's request for a Temporary Extension of Services unless and until Lehman becomes current to AIGT on all amounts due under the License and Lehman pays AIGT in advance for the Temporary Extension of Services. The applicable provisions of this License shall remain in full force and effect during the Temporary Extension of Services.

(B)    If Lehman desires AIGT's assistance in transferring its Equipment to another facility upon termination or expiration of this License ("**Transfer Assistance**"), it shall submit an **Exhibit 9** Change Order requesting Transfer Assistance to AIGT in writing. To the extent Transfer Assistance is provided, it shall be deemed a new service and subject to separate pricing. Transfer Assistance shall include AIGT providing Lehman with a written transition plan setting forth the respective tasks to be performed by each party in connection with the transition. All Transfer Assistance shall be performed on a time-and-materials basis at AIGT's then-current rates. Accordingly, Lehman shall pay AIGT for all time spent performing the Transfer Assistance, plus the reasonable cost of any materials, taxes, travel, lodging, communications, shipping charges and out-of-pocket expenses incurred by AIGT in connection with providing the Transfer Assistance. AIGT will provide Lehman, at no extra charge, any remaining reports and documentation belonging to Lehman which are in AIGT's possession and relate to Lehman's Equipment. AIGT shall not be obligated to provide Transfer Assistance if AIGT has terminated this License under **Section 4(C)(1)(a) or (c)**, unless and until Lehman becomes current to AIGT on all amounts due under the License and Lehman pays AIGT in advance for all costs associated with Transfer Assistance.

**16.    Assignment Rights**

(A)    This License shall be binding on the parties hereto and their respective successors and permitted assigns. Neither party may, or shall have the power to, assign this License without the prior written consent of the other, except that either party may assign or otherwise transfer this License, in its entirety, upon thirty (30) days prior written notice to the other party, but without requiring the prior consent of the other party, provided the License is assigned to a Related Corporation (as hereinafter defined) and the assigning party agrees to remain liable hereunder for the Term, as may be extended.

> "**Related Corporation**" shall mean (1) a corporation or other business entity into which a party is merged or consolidated, (2) an entity acquiring all or substantially all of the assets of a party, (3) any parent, successor, affiliate or subsidiary of party, or (4) any corporation or other business entity that controls, is controlled by, or is under common control with a party.

> "**Control**" shall mean ownership (directly or indirectly) of not less than fifty percent (50%) of all of the voting stock of such corporation or not less than fifty percent (50%) of all of the legal and equitable interest in any other business entities or the possession (directly or indirectly) of the power to direct or cause the direction of management and policies of such Related Corporation.

(B)    Any assignment or transfer of this License other than to a Related Corporation, shall be subject to the following conditions: (1) any proposed assignee or other transferee must be approved, in writing, by the non-assigning party, such approval

21

dc-369867

Execution Version

not to be unreasonably withheld, conditioned or delayed; (2) any assignee or other transferee shall abide by all terms and conditions set forth in this License; and (3) the assigning party agrees to remain liable hereunder for the Term, as may be extended.

(C)    In the event either party assigns or transfers this License in a manner that does not comply with the terms of this **Section 16**, the assignment or transfer shall be null and void and the assigning party shall remain liable hereunder for the Term, as may be extended, and the non-assigning party may initiate dispute resolution procedures pursuant to **Section 17** of this License.

(D)    In the event AIGT assigns or transfers the License to a Related Corporation pursuant to the terms of **Section 16(A)**, and (1) AIGT becomes, or the new vendor under this License is a competitor or an affiliate of a competitor of Lehman as reasonably determined by Lehman, or (2) if Lehman reasonably and objectively determines no later than six (6) months after the assignment or transfer is effective that such transfer or assignment is likely to have a material adverse effect on the ability of AIGT to perform the services provided under the License and on Lehman's beneficial use of the Customer Space, then Lehman shall have the right, upon ninety (90) days prior written notice to terminate the License. Lehman shall pay AIGT termination fees pursuant to the procedures set forth in **Section 3(E)** hereof consisting of the costs and expenses associated with Transfer Assistance as defined in **Section 15** hereof, plus Wind-Down Expenses (as hereinafter defined), plus ten percent (10%) of all Monthly Recurring Charges that would have been paid by Lehman to AIGT if the Agreement had expired on the tenth (10th) anniversary of Final Completion. Any disputes with respect to the foregoing shall be resolved in accordance with the dispute resolution procedures contained in **Section 17**.

"**Wind-Down Expenses**" shall mean those out-of-pocket expenses actually incurred by AIGT in order to wind down the provision

of the Customer Space from AIGT to Lehman, including, without limitation: (a) employee severance obligations in accordance with AIGT's or its AIGT Agents' standard policies for similarly situated employees; (b) unamortized construction costs (including actual construction work and architectural services and other professional services related to the construction of the Customer space); (c) contract termination charges for other contracts used in providing the Customer Space to Lehman; and (d) the net book value of any AIGT machinery and equipment acquired by AIGT in order for AIGT to provide the Customer Space to Lehman based upon a 10-year life. Wind-Down Expenses will be payable by Lehman to AIGT as incurred by AIGT for so long as AIGT incurs such expenses. To the extent that any expense may be deemed to be included in more than one category of Wind-Down Expenses listed above, Lehman shall not be charged for such expense more than once. AIGT shall make commercially reasonable efforts to mitigate Wind-Down Costs.

(E)    In the event Lehman assigns or transfers this License to a Related Corporation pursuant to the terms of **Section 16(A)** and (1) Lehman becomes, or the new customer under this License is, a competitor of AIGT, its parents or its affiliates, or (2) if AIGT reasonably determines within sixty (60) days after the assignment or transfer is effective that the new customer is incapable of fulfilling all of Lehman's duties under the License in all material respects, then AIGT shall have the right, upon thirty (30) days prior written notice to require Lehman to pre-pay, on a three-months rolling basis the Monthly Recurring Charges on behalf of the new customer. Any disputes with respect to the foregoing shall be resolved in accordance with the dispute resolution procedures contained in **Section 17**.

22

Execution Version

(F)    Notwithstanding the provisions of Section 1(B) of this License, Lehman, upon ten (10) days' prior written notice to AIGT, shall have the right to sub-license all or part of the Customer Space to a Related Corporation, without AIGT's prior written consent, provided that: (1) such sub-license is for a tax, accounting, or regulatory purpose; (2) prior to such sub-license Lehman furnishes AIGT with the name of the sub-licensing company, with an explanation of how it is a Related Corporation; and (3) such sub-license will not materially increase AIGT's obligations, risks or exposures under the License and will not materially increase the number of Lehman employees visiting the Facility or the Customer Space on a regular basis. Such sub-license shall not be deemed to vest in the sub-licensing company any right or interest in this License or the Customer Space nor shall it relieve, release, impair or discharge any of Lehman's obligations hereunder.    Lehman shall remain directly liable to AIGT for any and all acts or omissions of the sub-licensing company.

## 17.    Dispute Resolution; Arbitration; Waiver of Jury Trial

The parties have chosen dispute resolution procedures and arbitration as the exclusive method for resolving disputes hereunder, except for injunctive or equitable relief as set forth below.

(A)    The parties shall initially attempt to resolve informally any dispute arising out of or relating to this License. Upon the written date of receipt of notice by one party to the other of a dispute ("**Dispute Date**"), each party shall appoint a designated representative with authority to resolve the dispute whose task it will be to meet for the purpose of endeavoring to resolve the dispute. The designated representatives shall meet as often as the parties reasonably deem necessary in order to gather and furnish to the other party information with respect to the dispute, which information the parties believe to be appropriate and germane in connection with its resolution.    The representatives shall discuss the problem and attempt to resolve the dispute without the necessity of any formal

proceeding. The specific format for the discussions shall be left to the discretion of the designated representatives. During the course of discussion, all reasonable requests made by one party to the other for non-confidential and non-legally privileged information reasonably related to this License shall be honored in order that a party may be fully advised of the other party's position.

(B)    If the parties are unable to resolve a dispute informally within thirty (30) days of the applicable Dispute Date, either party may submit the dispute to binding arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association as modified by this Section. The arbitration shall be conducted in New York, New York, U.S.A. Any award rendered shall be final and conclusive upon the parties and a judgment thereon may be entered in any court having competent jurisdiction. Each party shall appoint a single independent arbitrator who has substantial experience in data center related arrangements in the first instance, and if such an arbitrator is not available, then it shall appoint an arbitrator with substantial experience in technology related arrangements. The two appointed arbitrators shall select a third arbitrator with at least seven (7) years experience in data center related arrangements in the first instance, and if such an arbitrator is not available, then an arbitrator with at least seven (7) years experience in technology related arrangements. The arbitrators shall apply New York state law, or if applicable, U.S. federal law. Notwithstanding the foregoing, either party may seek injunctive or other equitable relief in a court of competent jurisdiction pending the outcome of such arbitration. Either party may also file suit with respect to a disputed matter if such party reasonably determines that the commencement of litigation is necessary to avoid the expiration of any applicable limitations period or to preserve a superior position with respect to other creditors. All costs and expenses, including reasonable attorney's fees and expert's fees, of all parties incurred in any dispute which is determined and/or settled by arbitration pursuant to this Section shall be borne by the party determined to be liable in respect of such dispute by

dc-369867

Execution Version

the arbitrator, or whatever other equitable award of costs and expenses as the arbitrator may otherwise determine.

(C)    AIGT and Lehman each waive trial by jury in any action or proceeding brought by either party against the other or on any counterclaim in respect thereof on any matters whatsoever arising out of, or in any way connected with, this License or the relationship of AIGT and Lehman.

## 18.    Representations and Warranties

In addition to representations and warranties made by the parties throughout this License, the parties make the following representations and warranties:

(A)    Each party represents and warrants to the other party that: (1) each has all requisite corporate power and authority to execute, deliver, and perform its obligations under this License; (2) its execution of and agreement to this License have been duly authorized by all requisite corporate actions; (3) this License is a valid and binding obligation, enforceable against it in accordance with its terms (assuming the due authorization, execution, and delivery by the other party); (4) there is no outstanding litigation, arbitrated matter or other dispute to which either party is a party which, if decided unfavorably, would reasonably be expected to have a material adverse effect on Lehman's or AIGT's ability to fulfill its obligations under this License, (5) neither party has breached the terms of any confidentiality agreement entered into between them prior to the date hereof; and (6) it has not engaged, formally or informally, any broker in connection with this License.

(B)    AIGT represents and warrants to Lehman that: (1) the real property constituting the Facility is owned by Eastgreen, Inc., an affiliate of AIGT; (2) AIGT, on behalf of itself and its affiliates, controls, has primary use, and manages the use of the Facility which is suitable for the placement and operation of computer and communication equipment; (3) the Facility is in material compliance with all laws and regulations applicable to the Facility as of the date

hereof, the Facility contains no illegal hazardous wastes, toxic materials, asbestos or environmental pollutants in violation of any applicable environmental or other laws and, throughout the Term, AIGT, Eastgreen or their affiliates will, at its sole cost and expense, comply with all laws and regulations applicable to the Facility; (4) it is a New Hampshire corporation, validly existing and in good standing under the laws of New Hampshire, (5) it has and shall maintain all requisite corporate power and authority to execute, deliver and perform its obligations under this License; (6) AIGT does not have any commitments to third parties that conflict with AIGT's obligations to Lehman in this License; (7) AIGT is duly licensed, authorized or qualified to do business and is in good standing in the State of New Jersey; and (8) if there is no continuing Event of Default by Lehman, Lehman's quiet and peaceable enjoyment of the Customer Space during the Term or any extensions hereof shall not be disturbed or interfered with by AIGT prohibiting Lehman from entering the Facility and/or the Customer Space.

(C)    Lehman represents and warrants to AIG that: (1) it is a Delaware corporation, validly existing and in good standing under the laws of Delaware; (2) it is duly licensed, authorized or qualified to do business and is in good standing in the State of New Jersey; (3) it has and shall maintain all requisite corporate power and authority to execute, deliver and perform its obligations under this License; and (4) it does not have any commitments to third parties that conflict with its obligations under this License.

(D)    Each party shall at its own cost and expense comply with all federal, state and local laws, rules, regulations, ordinances and requirements, whether now in force or hereinafter enacted, and obtain all required permits and licenses, relating to their respective obligations under this License.

(E)    To the best of each party's knowledge, no person involved in the transactions or provision of services under this License nor any entity related thereto is a country, territory, individual or entity

named on an Office of Foreign Assets Control ("OFAC") list, nor is a person or entity prohibited under the OFAC sanctions or embargo program. Each party shall promptly and completely respond to any reasonable request by the other for information about personnel and agents to satisfy any obligations that the requesting party may face under the USA PATRIOT Act and the OFAC sanctions program.

## 19.    Applicable Law

This License is to be construed in accordance with and governed by the internal laws of the State of New York (as permitted by Section 5-1401 of the New York General Obligations Law or any similar successor provision) without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of New York to the rights and duties of the parties. Any legal suit, action or proceeding arising out of or relating to this License shall be commenced in a federal court in the Southern District of New York or in state court in the County of New York, New York, and each party hereto irrevocably submits to the exclusive jurisdiction and venue of any such court in any such suit, action or proceeding. Except for actions for nonpayment, neither AIGT nor Lehman may bring a claim or action more than two (2) years after the cause of action arose.

## 20.    Entire Agreement; No Oral Modifications

This License, including any attachments, constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior or contemporaneous agreements of such parties in connection herewith including, without limitation, that certain Letter for Authorization for Services dated December 18, 2003 between AIG Technologies, Inc. f/k/a American International Technology Enterprises, Inc. and Lehman. The parties have also entered into a Master Services Agreement and, except for the cross termination provision contained in **Section 4(C)(2)(c)** hereof, the transactions are unrelated, separate and distinct.

Lehman acknowledges that it has not been induced to enter into this License by any representation or promise not specifically expressed in this License. **Any future amendment or modification made hereto shall not be valid and binding unless it is in writing (not electronic) and signed by both parties.**

## 21.    Attorneys' Fees

Subject to **Section 17** hereof, in the event either party invokes dispute resolution procedures, or brings suit for equitable relief, or brings any other action for relief against the other as allowed under the terms of this License, or otherwise, then all costs and expenses, including reasonable attorneys' fees and expert's fees, incurred by the prevailing party therein shall be paid by the other party, which obligation on the part of the other party shall be deemed to have accrued on the date of the commencement of such action and shall be enforceable whether or not the action is prosecuted to judgment. Notwithstanding anything to the contrary contained herein, AIGT shall not be permitted to place a lien on any Equipment owned or leased by Lehman during the Term of this License.

## 22.    Subordination and Non-Disturbance

(A)    Subject to the provisions of this **Section 22**, this License and all rights of Lehman hereunder are and shall be subject and subordinate in all respects to the rights of AIGT to the Facility and the ownership interests of Eastgreen, Inc. to the Facility and the following: (1) any mortgage that may now or hereafter affect the Facility and all renewals, extensions, supplements, amendments, modifications, consolidations and replacements thereof or thereto, substitutions therefore, and advances made thereunder (collectively, "**Mortgages**") and (2) any ground or underlying lease of the Facility or any part thereof, now existing or hereafter entered into by AIGT or its affiliates, and all renewals, extensions, supplements, amendments and modifications thereof (collectively, "**Superior Leases**").    **Exhibit 5**,

25

Execution Version

attached hereto, contains the mutual understandings of Lehman, AIGT and Eastgreen, Inc. with respect to the subordination and non-disturbance of Lehman's rights hereunder to Eastgreen, Inc.

(B)    Notwithstanding the provisions of this **Section 22**, as a condition to Lehman's agreement hereunder to subordinate Lehman's interest in this License to any future Mortgages or Superior Leases, AIGT or Eastgreen, Inc. shall obtain from each mortgagee or superior lessor a subordination non-disturbance agreement in said mortgagee's or superior lessor's standard format, that is reasonably acceptable to Lehman, and pursuant to which such mortgagee or superior lessor shall agree that if and so long as no Event of Default hereunder shall have occurred and be continuing, the license granted to Lehman and the rights of Lehman pursuant to this License shall not be terminated, modified, affected or disturbed by any action which such mortgagee or superior lessor may take to foreclose any such Mortgage or Superior Lease, and that any successor licensor shall recognize this License as being in full force and effect as if it were a direct license between such successor licensor and Lehman upon all of the terms, covenants, conditions and options granted to Lehman under this License (any such agreement, a "**Non-Disturbance Agreement**"). Lehman agrees to execute, acknowledge and deliver to AIGT any such Non-Disturbance Agreement within ten (10) days after delivery by Lehman or any mortgagee or superior lessor.  Lehman agrees that Lehman shall be responsible for all fees including but not limited to review costs, recording fees and processing fees, with respect to such Non-Disturbance Agreement.

### 23.    Certificate

Each party agrees, at any time and from time to time, as requested by the other party, upon not less than ten (10) business days' notice, to execute and deliver to the other a written statement, substantially in the form attached hereto as **Exhibit 13**, executed and acknowledged by such party (1) stating that this License is then in full force and effect and has not been modified (or if modified, setting forth all

modifications), (2) setting forth the then-Monthly Recurring Charges, (3) setting forth the date to which the Monthly Recurring Charges have been paid, (4) stating whether or not, to the best knowledge of the signatory, the other party is in default under this License, and if so, setting forth the specific nature of all such defaults, (5) stating the address of the signatory to which all notices and communications under the License shall be sent, the Effective Date and the License Expiration Date, and (6) as to any other matters reasonably requested by the party requesting such certificate.  The issuance of such certificate shall not be deemed a waiver by the party executing the certificate of its rights under this License to declare a breach or default or otherwise, nor shall it estop such party from exercising its rights.

### 24.    Roof Space

To the extent Lehman requires access to the roof of the Facility for the installation and operation of telecommunications equipment in conjunction with the purpose of this License, Lehman shall notify AIGT of the dimensions, make and model number of each piece of equipment Lehman wishes to install on the rooftop together with its planned method to mount such equipment on the rooftop.  If AIGT has rooftop space available for lease, and can reasonably accommodate Lehman's rooftop needs, then the parties shall negotiate in good faith the appropriate terms and conditions for such rooftop access and use, and Market Rates as determined in accordance with **Section 29** hereof, as an amendment to this License.

### 25.    Freight Elevator

Throughout the Term, AIGT shall provide Lehman with shared access to one (1) freight elevator in the Facility at no additional charge to Lehman.  Except for routine use of the freight elevator, which will be available to Lehman on a first-come, first served basis, Lehman shall request any special or extended use of the freight elevator at least forty-eight (48) hours in advance and shall specify to AIGT the expected duration of such use.  AIGT will use

26

Execution Version

commercially reasonable efforts to accommodate Lehman's request for special or extended use of the freight elevator, and if it is not available, AIGT shall endeavor to make the passenger elevator available to Lehman if such use is appropriate in view of what Lehman must transport in the elevator. AIGT shall endeavor to inform Lehman in advance when the freight elevator will be in use or when it will be out of service.

## 26. Compliance with Applicable Law

In addition to expressions of compliance with laws that are contained elsewhere in this License, the parties agree as follows:

(A)    AIGT shall cooperate with Lehman, at Lehman's sole cost and expense, in connection with Lehman's performance of any reviews, audits or other actions necessary for Lehman to comply with any laws or regulations applicable to the License or reasonable interpretation thereof by Lehman, provided that Lehman furnishes AIGT with an officer's certificate from Lehman attesting to the legal necessity of the review or audit.

(B)    Each party is fully aware of and has complied with, and in the performance of its obligations under this License shall not take any action or omit to take any action that would cause it to be in violation of, the U.S. Foreign Corrupt Practices Act of 1977 and all regulations promulgated thereunder.

## 27. Miscellaneous

(A)    Severability:    If any term, covenant, condition or provision of this License, or the application thereof to any person or circumstance, shall ever be held to be invalid or unenforceable, then in each such event the remainder of this License or the application of such term, covenant, condition or provision to any other person or any other circumstance (other than those as to which it shall be invalid or unenforceable) shall not be thereby affected, and each term, covenant, condition and provision hereof shall remain valid and enforceable to the fullest extent permitted by law.

(B)    [Intentionally omitted].

(C)    Headings:    The Section headings are for reference and convenience only and shall not be considered in the interpretation of this License.

(D)    References; Construction:    In this License (including the Exhibits):

(1)    the Exhibits to this License shall be deemed part of this License and all references to this License shall include the Exhibits to this License;

(2)    references to an Exhibit, Section or Article shall be to such Exhibit, Section or Article of this License, unless otherwise provided;

(3)    references to and mentions of the word "include," "included" or "including" or the phrase "*e.g.*" shall not be limiting; and

(4)    all definitions are equally applicable to the singular and plural forms of the terms defined.

(E)    Notices:    Except as otherwise specified in this License, all requirements for notices, requests, consents, approvals, agreements, authorizations, acknowledgments, waivers and other communications required or permitted under this License shall be in writing (except for emergency or crisis situations, in which case telephonic notice is acceptable) and addressed to the attention of the contact person and sent by certified mail, return receipt requested, to the address specified in the Basic License Information. All such notices, requests, consents, approvals, agreements, authorizations, acknowledgments, waivers and other communications required or permitted under this License shall be deemed given by the sending party when received by the receiving party or when receipt is denied. Either party may change its contact person, address or telecopy number for notification purposes by giving the other party five (5) business days' written notice of the new contact

Execution Version

person, address or telecopy number and the date upon which such change will become effective.

(F) **Waivers:** No delay or omission by either party to exercise any right or power it has under this License shall impair or be construed as a waiver of such right or power. A waiver by either party of any breach or covenant shall not be construed to be a waiver of any other, or any succeeding, breach or any other covenant. All waivers must be signed by the party waiving its rights. Except as expressly set forth herein, no remedy made available to either party hereunder is intended to be exclusive of any other remedy provided hereunder or available at law or equity.

(G) **Publicity:** Each party shall (1) submit to the other prior to any publication or use all advertising, written sales promotions, press releases and other publicity matters relating to this License in which the other party's name, mark or brand is mentioned or which contains language from which said name, mark or brand, or the identity of such other party, may be inferred or implied and (2) not publish or use such advertising, sales promotions, press releases or publicity matters without the other party's written consent. Notwithstanding the foregoing, AIGT shall have the right to mention Lehman in any hard copy version of any list of all of its customers; *provided* that each such mention shall be in a form and emphasis consistent with the form and emphasis in which all other customers are mentioned.

(H) **Third Party Beneficiaries:** This License does not create any benefits, rights, claims, obligations or causes of action in, to, or on behalf of, any person or entity other than Lehman and AIGT, except to the extent that certain employees, Subcontractors, customers, affiliates and licensees of AIGT and Lehman, as specifically identified in **Section 12** hereof, are entitled to indemnification pursuant to the terms of **Section 12** as limited by **Section 11**.

(I) **Force Majeure:** AIGT and Lehman shall not be liable for any default or delay in the performance of their respective obligations under this License, to the extent that such default or delay is caused,

directly or indirectly, by an event beyond the reasonable control of the party who is unable to perform (the "**Nonperforming Party**"), including, but not limited to, fire, flood, earthquake, elements of nature, acts of war, terrorism, riots, civil disorders, rebellions, or revolutions, strikes, lockouts or labor difficulties (collectively a "**Force Majeure Event**"). The Nonperforming Party shall be excused from performance of its obligations affected by such Force Majeure Event for as long as such Force Majeure Event continues and the Nonperforming Party continues to use commercially reasonable efforts to resume performance. The Nonperforming Party shall notify the other party in writing within five (5) business days of the beginning of such default or delay. The provisions of this paragraph shall not apply to Unavoidable Delays as defined on **Exhibit 4.** The applicability of this paragraph shall also be limited as set forth in **Paragraph 6.1 of Exhibit 3** for purposes of calculating Facility System Outage Credits (as therein defined).

(J) **Confidentiality:** The parties acknowledge that the transaction described herein is of a confidential nature and neither AIGT nor Lehman shall disclose the terms of this License to any third party except (1) AIGT's and Lehman's outside legal counsel and accountants, brokers and financial advisors, (2) as required by applicable law or by subpoena or other similar legal process after providing the non-disclosing party with written notice and an opportunity to object, (3) for financial reporting or regulatory purposes, or (4) to any permitted or prospective mortgagee, superior lessor or to any prospective transferee or assignee. Before the terms of this License are disclosed pursuant to subsection (4) of this Paragraph, the individuals or companies to whom disclosure will be made, shall sign a commercially standard confidentiality agreement.

(K) **Survival:** The following Sections shall survive any termination or expiration of this License, including any other provisions of this License which, by their very terms, are intended to survive: **Sections 3(D), 3(E), 4(C), 9** (to the extent Transfer Assistance is provided post-termination),

**Section 10** (for purposes of enforcing any rights or remedies that the parties may have arising from events occurring or circumstances or facts existing prior to the date of termination), **Sections 11, 12** (for purposes of enforcing any rights or remedies that the parties may have arising from events occurring or circumstances or facts existing prior to the date of termination), **Sections 14, 15, 17(C), 19, 20, 21, 27, Paragraph L on Exhibit 4** (for purposes of enforcing any rights or remedies that the parties may have arising from events occurring or circumstances or facts existing prior to the date of termination), and **Paragraphs 2.4 and 6 on Exhibit 3** (for credits or increases which accrued prior to termination).

(L)  Covenant of Further Assurances:  Lehman and AIGT covenant and agree that, subsequent to the execution and delivery of this License and, without any additional consideration, each of Lehman and AIGT shall execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this License.

(M)  Negotiated Terms:  The parties agree that the terms and conditions of this License are the result of negotiations between the parties and that this License shall not be construed in favor of or against any Party by reason of the extent to which any Party or its professional advisors participated in the preparation of this License.

(N)  Relationship:  Nothing contained in this License shall be construed to make either Lehman or AIGT partners, joint venturers, principals, agents or employees of the other.  Neither Party shall have any right, power or authority, express or implied, to bind the other.

(O)  Consents, Approvals and Requests:  Except as otherwise specifically stated in this License, all consents and approvals to be given by either party under this License shall not be unreasonably withheld, conditioned, or delayed.

**28.    Option for Additional Space**

If at any time during the term of this License, AIGT should engage a real estate broker or real estate agent to market to the public rights to lease or license all or any portion of the Facility that is not part of the Customer Space to any person or entity that is not an affiliate of AIGT, is not an existing customer of AIGT, or is not a potential customer of AIGT (i.e., is not, at the time, on an AIGT list of potential customers who are engaged in discussions with AIGT regarding services at the Facility) (such space, the **"Potential Offering Space"**), then before allowing a real estate broker or real estate agent to market the Potential Offering Space to the public, AIGT shall deliver to Lehman a notice (the **"ROFO Offer"**) setting forth the Monthly Recurring Charges upon which AIGT would be willing to lease or license the Potential Offering Space. Lehman shall, by written notice to be delivered to AIGT before 5:00 p.m. New York time on the tenth (10th) business day following Lehman's receipt of the ROFO Offer (such 10-business day period, the **"ROFO Offer Response Period"**), TIME BEING OF THE ESSENCE WITH RESPECT TO SUCH TIME AND DATE, either (i) accept the ROFO Offer or (ii) decline the ROFO Offer. If Lehman accepts the ROFO Offer, then the Potential Offering Space shall become part of the Customer Space pursuant to the terms and conditions of this License except that the Monthly Recurring Charges for and other financial terms with respect to the Potential Offering Space shall be as set forth in the ROFO Offer. If Lehman fails to accept the ROFO Offer during the ROFO Offer Response Period, then AIGT shall have the right to market and lease or license the Potential Offering Space to any person or entity on substantially the same terms and conditions set forth in the ROFO Offer with no further obligations to Lehman.

**29.    Arbitration for Determining Market Rates**

(A)    For purposes of determining the then current market rates (the **"Market Rate"**) for purposes of **Section 4(B)**, **Section 10(B)** or **Section 24** hereof, the following procedures shall apply:  Within ten (10) business days of Lehman providing written notice to AIGT that it desires an extension of the

Execution Version

Term pursuant to **Section 4(B)** hereof, or written notice that it desires to lease rooftop space from AIGT pursuant to **Section 24** hereof, and as part of the notice AIGT will provide to Lehman in accordance with **Section 10(B)** hereof, AIGT shall provide Lehman with written notice setting forth AIGT's determination of the applicable Market Rate (the **"Rate Notice"**). AIGT shall only be required to provide a Rate Notice with respect to rooftop space if it has such space available and can reasonably accommodate Lehman's needs.

(B)    If AIGT shall fail or refuse to provide a Rate Notice, then in the case of a Term extension as set forth in **Section 4(B)**, AIGT's Rate Notice regarding the Monthly Recurring Charges for such extension shall be deemed to be 120% of the Monthly Recurring Charges then payable by Lehman. AIGT must provide a Rate Notice to Lehman within ten (10) business days of Lehman's request with respect to the Market Rate applicable to **Section 10(B)** or **Section 24** hereto, provided that AIGT first determines that it has space available and can reasonably accommodate Lehman's needs. If AIGT fails to provide the Rate Notice within such time frame, then Lehman can make a second written request for the space and a Market Rate. If AIGT fails to respond to Lehman's second request within ten (10) business days, then:

(1) as to rooftop space offered pursuant to **Section 24**, Lehman may offer Lehman's Determination (as hereinafter defined) of the Market Rate and, provided such rate is reasonable, it will become the Market Rate for the rooftop lease;

(2) as to data center space offered pursuant to **Section 10(B)**, Lehman may offer Lehman's Determination of the Market Rate and if AIGT finds such rate reasonable, then Lehman's Determination shall become the Market Rate for the data center space; provided, however, that if AIGT does not agree with Lehman's Determination, then the Market Rate shall be submitted for dispute resolution pursuant to **Section 17**.

(C)    Within five (5) business days after Lehman's receipt of the Rate Notice, Lehman shall have the right to give AIGT written notice (**"Lehman's Notice"**) of whether Lehman accepts or disputes the Rate Notice. If Lehman in Lehman's Notice accepts AIGT's Rate Notice or if Lehman fails or refuses to give Lehman's Notice as aforesaid, Lehman shall be deemed to have accepted AIGT's Rate Notice for the Term extension, the space in AIGT's Fort Worth facility, or the rooftop lease, as applicable. If Lehman in Lehman's Notice disputes AIGT's Rate Notice, Lehman shall deliver to AIGT, together with Lehman's Notice, Lehman's determination of the Market Rate (**"Lehman's Determination"**) as determined by an independent arbitrator who has substantial experience in data center related arrangements (**"Lehman's Arbitrator"**). AIGT shall have the right to give Lehman written notice (**"AIGT's Notice"**), within five (5) days after AIGT's receipt of Lehman's Determination, of whether AIGT accepts or disputes Lehman's Determination. If AIGT in AIGT's Notice accepts Lehman's Determination or if AIGT fails or refuses to give AIGT's Notice as aforesaid, AIGT shall be deemed to have accepted Lehman's Determination.

(D)    If AIGT in AIGT's Notice disputes Lehman's Determination, AIGT shall appoint an independent arbitrator who has substantial experience in data center related arrangements (**"AIGT's Arbitrator"**). If within twenty (20) days after Lehman's receipt of AIGT's Notice in dispute, AIGT's Arbitrator and Lehman's Arbitrator shall mutually agree upon the determination of the Market Rate (the **"Mutual Determination"**), their determination shall be final and binding upon the parties. If AIGT's Arbitrator and Lehman's Arbitrator shall be unable to reach a Mutual Determination within said twenty (20) day period, both of the Arbitrators shall jointly select a third independent arbitrator who has at least five (5) years experience in data center related arrangements who has not been in the employ of AIGT or Lehman or their respective Affiliates during the preceding three (3) years (**"Third Arbitrator"**), whose fee shall be borne equally by AIGT and Lehman. In the event that AIGT's Arbitrator and

30

Execution Version

Lehman's Arbitrator shall be unable to jointly agree on the designation of the Third Arbitrator within five (5) Business Days after they are requested to do so by either party, then the parties agree to allow the American Arbitration Association (or any successor organization; **"AAA"**) to designate the Third Arbitrator in accordance with the rules, regulations and/or procedures then used by the AAA. The Third Arbitrator shall conduct such hearings and investigations as he may deem appropriate and shall, within twenty (20) days after the date of designation of the Third Arbitrator, choose either AIGT's Determination or Lehman's Determination, and such choice by the Third Arbitrator shall be conclusive and binding upon AIGT and Lehman. Each party shall pay its own counsel fees and expenses if any, in connection with any arbitration under this Section, including the expenses and fees of any Arbitrator selected by it in accordance with provisions of this Section. Prior to his or her appointment, the Third Arbitrator shall agree to be bound by the provisions hereof, including the obligation to render a determination within twenty (20) days after the date of his or her designation. The Arbitrators shall not have the power to add to, modify or change any of the provisions of this License.

(E) With respect to the Term extension described in **Section 4(B)** hereof, if the final determination of the Market Rate shall not be made on or before the first day of the applicable extension Term in accordance with the provisions of this Section, pending such final determination Lehman shall continue to pay, as the Monthly Recurring Charges for such extension Term, an amount equal to 120% of the then current Monthly Recurring Charges. If, based upon the final determination hereunder of the Market Rate, the payments made by Lehman on account of the Monthly Recurring Charges for such portion of the extension Term were less than the Monthly Recurring Charges payable for the extension Term, Lehman shall pay to AIGT the amount of such deficiency within ten (10) days after demand therefor.

**30.    Cash Flow Assurance.**

AIG has provided to Lehman written assurance that AIG Funding, Inc. will provide to AIGT access to sufficient funds to meet AIGT's financial obligations under this Agreement, which written assurance is attached hereto as **Exhibit 12**.

**[Signature Page Follows]**

31

dc-369867

Execution Version

IN WITNESS WHEREOF, this License may be executed in one or more counterparts, each counterpart shall be considered an original and all counterparts, together, shall constitute one in the same document. Delivery by facsimile of any executed counterpart of a signature page to this License shall be as effective as delivery of a manually executed counterpart of this License. The parties have executed this License as of the date first above written.


**AIG TECHNOLOGIES, INC.**


By:_____
    Paul Madarasz, President


**LEHMAN BROTHERS HOLDINGS INC.**


By:_____
    Jonathan E. Beyman, Executive Vice President
    and Chief of Operations and Technology


dc-369867

Execution Version

IN WITNESS WHEREOF, this License may be executed in one or more counterparts, each counterpart shall be considered an original and all counterparts, together, shall constitute one in the same document. Delivery by facsimile of any executed counterpart of a signature page to this License shall be as effective as delivery of a manually executed counterpart of this License. The parties have executed this License as of the date first above written.

**AIG TECHNOLOGIES, INC.**

By: _____
     Paul Madarasz, President

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____
     Jonathan E. Beyman, Executive Vice President
     and Chief of Operations and Technology

dc-369867

Execution Version

IN WITNESS WHEREOF, this License may be executed in one or more counterparts, each counterpart shall be considered an original and all counterparts, together, shall constitute one in the same document. Delivery by facsimile of any executed counterpart of a signature page to this License shall be as effective as delivery of a manually executed counterpart of this License. The parties have executed this License as of the date first above written.


**AIG TECHNOLOGIES, INC.**


By:_____
     Paul Madarasz, President


**LEHMAN BROTHERS HOLDINGS INC.**


By:_____
     Jonathan E. Beyman, Executive Vice President
     and Chief of Operations and Technology

dc-369867

**EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
In re                                                      :    **Chapter 11 Case No.**
                                                           :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,    :    **08-13555 (JMP)**
                                                           :
                                      **Debtors.**    :    **(Jointly Administered)**
------------------------------------------------------------------x

### ORDER GRANTING THE PLAN ADMINISTRATOR'S OBJECTION TO CLAIM OF AIG GLOBAL SERVICES, INC. F/K/A AIG TECHNOLOGIES, INC. (CLAIM NO. 66918)

Upon the objection to proof of claim number 66918, dated April 26, 2012 (the

"Claim Objection"),[1] of Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator"),

as Plan Administrator, under the Modified Third Amended Joint Chapter 11 Plan of Lehman

Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), pursuant to section 502(b) of title

11 of the United States Code, as amended (the "Bankruptcy Code") and Rule 3007(d) of the

Federal Rules of Bankruptcy Procedure, seeking to reduce and allow proof of claim number

66918 on the basis that the damages asserted in such Proof of Claim is capped pursuant to

Section 502(b)(6) of the Bankruptcy Code, all as more fully described in the Claim Objection;

and due and proper notice of the Claim Objection having been provided to (i) the U.S. Trustee;

(ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission;

(iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of

New York; (vi) AIG; and (vii) all other parties entitled to notice in accordance with the

procedures set forth in the second amended order entered on June 17, 2010, governing case

management and administrative procedures for these cases [Docket No. 9635]; and it appearing

that no other or further notice need be provided; and the Court having found and determined that

the relief sought in the Claim Objection is in the best interests of the Debtors, their estates,

---
[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Claim Objection.

creditors, and all parties in interest and that the legal and factual bases set forth in the Claim

Objection establish just cause for the relief granted herein; and after due deliberation and

sufficient cause appearing therefor, it is

ORDERED that the relief requested in the Claim Objection is granted to the

extent provided herein; and it is further

ORDERED that, pursuant to section 502(b) of the Bankruptcy Code, proof of

claim number 66918 against LBHI is modified and allowed as a nonpriority general unsecured

claim in the amount of $5,430,000.00 (the "Modified Amount"); and it is further

ORDERED that claim number 66918 will remain on the claims register subject to

the Debtors' rights to further object as set forth herein; and it is further

ORDERED that this order supersedes all previous orders regarding proof of claim

number 66918; and it is further

ORDERED that this Order has no res judicata, estoppel, or other effect on the

validity, allowance, or disallowance of, and all rights to object and defend on any basis are

expressly reserved with respect to claim number 66918; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.


Dated: _____, 2012
          New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

11625801