Page 1

1   UNITED STATES BANKRUPTCY COURT

2   FOR THE SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555 (JMP)

4   - - - - - - - - - - - - - - - - - - - - - -x

5   In Re:

6

7   LEHMAN BROTHERS HOLDINGS, INC., et al.,

8                   Debtors.

9

10  - - - - - - - - - - - - - - - - - - - - - -x

11

12                  United States Bankruptcy Court

13                  Southern District of New York

14                  One Bowling Green

15                  New York, New York  10004

16

17

18                  April 26, 2012

19                  10:00 AM

20

21

22  B E F O R E:

23  HON. JAMES M. PECK

24  U.S. BANKRUPTCY JUDGE

25

Page 2

1    Debtors' One Hundred Tenth Omnibus Objection to Claims (Pension

2    Claims)[Docket No. 15010]

3

4    Debtors' One Hundred Eighty-Sixth Omnibus Objection to Claims

5    (Mis classified Claims) [ECF No. 19816]

6

7    Debtors' Two Hundred Eighteenth Omnibus Objection to Disallow

8    and Expunge Certain Filed Proofs of Claim [ECF No. 20107]

9

10   Motion to Reconsider FRCP 60 or FRBP 3008 filed by William

11   Kuntz III [ECF No. 22236]

12

13   Debtors' Two Hundred Thirteenth Omnibus Objection to Disallow

14   and Expunge Certain Filed Proofs of Claim [ECF No. 20102]

15

16   Debtors' Two Hundred Fourteenth Omnibus Objection to Disallow

17   And Expunge Certain Filed Proofs of Claim [EeF No. 20103]

18

19   Debtors' Two Hundred Fifteenth Omnibus Objection to Disallow

20   and Expunge Certain Filed Proofs of Claim [EeF No. 20104]

21

22   Debtors' Two Hundred Sixteenth Omnibus Objection to Disallow

23   and Expunge Certain Filed Proofs of Claim [EeF No. 20105]

24

25   Motion of JPMorgan Chase Bank, N.A. to Strike Portions of the

Page 3

1  Objection to Proofs of Claim No. 66462 Against Lehman Brothers

2  Holdings Inc. and No. 4939 Against Lehman Brothers Inc.

3  Regarding Triparty Repo-Related Losses [ECF No. 25782]

4

5  Debtors' Twenty-Eighth Omnibus Objection to Claims (Valued

6  Derivative Claims) (ECF No. 9983]

7

8  Debtors' Thirty-Fifth Omnibus Objection to Claims (Valued

9  Derivative Claims)(EeF No. 11260]

10

11  Debtors' Sixty-Third Omnibus Objection to Claims (Valued

12  Derivative Claims)[EeF No. 11978]

13

14  Debtors' Seventy-First Omnibus Objection to Claims (Valued

15  Derivative Claims)[EeF No. 13230]

16

17  Debtors' Eighty-Fourth Omnibus Objection to Claims (Valued

18  Derivative Claims)[EeF No. 13955]

19

20  Debtors' Ninety-Second Omnibus Objection to Claims (No Blocking

21  Number LPS Claims) [ECF No. 14472]

22

23  Debtors' Ninety-Fifth Omnibus Objection to Claims (Valued

24  Derivative Claims)[ECF No. 14490]

25

Page 4

1   Debtors' Ninety-Sixth Omnibus Objection to Claims (Duplicative

2   LPS Claims) rEeF No. 14491]

3

4   Debtors' Ninety-Seventh Omnibus Objection to Claims

5   (Insufficient Documentation) rEeF No. 14492]

6

7   Debtors' One Hundred Third Omnibus Objection to Claims (Valued

8   Derivative Claims) [ECF No. 15003]

9

10  Debtors' One Hundred Eleventh Omnibus Objection to Claims (No

11  Liability Claims) [ECF No. 15012]

12

13  Debtors' One Hundred Twelfth Omnibus Objection to Claims

14  (Invalid Blocking Number LPS Claims) [ECF No. 15014]

15

16  Debtors' One Hundred Seventeenth Omnibus Objection to Claims

17  (No Liability Non-Debtor Employee Claims) [ECF No. 15363]

18

19  Debtors' One Hundred Twentieth Omnibus Objection to Claims (No

20  Blocking Number LPS Claims) [ECF No. 16074]

21

22  Debtors' One Hundred Twenty-Fifth Omnibus Objection to Claims

23  (Insufficient Documentation) [ECF No. 16079]

24

25  Debtors' One Hundred Twenty-Ninth Omnibus Objection to Claims

Page 5

1    (No Liability Derivatives Claims) (ECF No. 16114]

2

3    Debtors' One Hundred Thirty-Second Omnibus Objection to Claims

4    (Valued Derivative Claims) [ECF No. 16117]

5

6    Debtors' One Hundred Thirty-Sixth Omnibus Objection to Claims

7    (Misclassified Claims) [ECF No. 16867]

8

9    Debtors' One Hundred Thirty-Seventh Omnibus Objection to Claims

10   (Valued Derivative Claims) [EeF No. 16860]

11

12   Debtors' One Hundred Thirty-Eighth Omnibus Objection to Claims

13   (No Liability Derivatives Claims) [EeF No. 16865]

14

15   Debtors' One Hundred Fifty-Sixth Omnibus Objection to Claims

16   (No Liability Derivatives Claims) [EeF No. 17469]

17

18   Debtors' One Hundred Fifty-Ninth Omnibus Objection to Claims

19   (Invalid Blocking Number LPS Claims) [EeF No. 18407]

20

21   Debtors' One Hundred Sixtieth Omnibus Objection to Claims

22   (Settled Derivatives Claims) [EeF No. 18444] Debtors' One

23   Hundred Sixty-Third Omnibus Objection to Claims (No Liability

24   Derivatives Claims) [EeF No. 18409]

25

Page 6

1   Debtors' One Hundred Sixty-Second Omnibus Objection to Claims

2   (Valued Derivative Claims [EeF No. 18405]

3

4   Debtors' One Hundred Seventy-Third Omnibus Objection to Claims

5   (No Liability Employee Claims) [EeF No. 19399]

6

7   Debtors' One Hundred Seventy-Seventh Omnibus Objection to

8   Claims (No Liability Non-Debtor Employee Claims) [EeF No.

9   19393]

10

11   Debtors' One Hundred Seventy-Eighth Omnibus Objection to Claims

12   (Misclassified Claims) [EeF No. 19377]

13

14   Debtors' One Hundred Seventy-Ninth Omnibus Objection to Claims

15   (No Liability Derivatives Claims) [EeF No. 19378]

16

17   Debtors' One Hundred Eighty-Second Omnibus Objection to Claims

18   (Valued Derivative Claims) [EeF No. 19398]

19

20   Debtors' One Hundred Eighty-Fifth Omnibus Objection to Claims

21   (Compound Claims) [ECF No. 19714]

22

23   Debtors' One Hundred Eighty-Eighth Omnibus Objection to Claims

24   (Duplicative LPS Claims) [ECF No. 19871J]

25

Page 7

1    Debtors' One Hundred Ninety~First Omnibus Objection to Claims

2    (Valued Derivative Claims) (ECF No. 19888]

3

4    Debtors' Two Hundred Thirteenth Omnibus Objection to Disallow

5    and Expunge Certain Filed Proofs of Claim [ECF No. 20102]

6

7    Debtors' Two Hundred Sixteenth Omnibus Objection to Disallow

8    and Expunge Certain Filed Proofs of Claim [ECF No. 20105]

9

10   Debtors' Two Hundred Seventeenth Omnibus Objection to Disallow

11   and Expunge Certain Filed Proofs of Claim [ECF No. 20106]

12

13   Debtors' Two Hundred Twenty-Eighth Omnibus Objection to Claims

14   (No Liability Derivatives Claims) [ECF No. 20886]

15

16   Debtors' Two Hundred Thirty-Third Omnibus Objection to Claims

17   (Valued Derivative Claims) [ECF No. 21727]

18

19   Debtors' Two Hundred Thirty-Sixth Omnibus Objection to Claims

20   (No Liability Derivatives Claims) [ECF No. 23168]

21

22   Response of Massachusetts State College Building Authority

23   [ECF No. 24193]

24

25   Debtors' Two Hundred Fifty-Third Omnibus Objection to Claims

1    (Valued Derivative Claims) [ECF No. 24117]

2

3    Debtors' Two Hundred Fifty-Fourth Omnibus Objection to Claims

4    (Employment Related Claims) [ECF No. 25059J

5

6    Debtors' Two Hundred Fifty-Fifth Omnibus Objection to Claims

7    (No Liability Derivatives Claims) [ECF No. 24117J

8

9    Debtors' Two Hundred Fifty-Sixth Omnibus Objection to Claims

10   (Purchased Contract Claims) rECF No. 24933J

11

12   Debtors' Two Hundred Sixty-First Omnibus Objection to Claims

13   (No Guarantee Claims) [ECF No. 24995J

14

15   Debtors' Two Hundred Sixty-Sixth Omnibus Objection to Claims

16   (Valued Derivative Claims) [ECF No. 25000J

17

18   Debtors' Two Hundred Sixty-Eighth Omnibus Objection to Claims

19   (Duplicative Claims) [EeF No. 26189]

20

21   Debtors' Two Hundred Seventieth Omnibus Objection to Claims

22   (Valued Derivative Claims) [EeF No. 26324]

23

24   Debtors' Two Hundred Forty-First Omnibus Objection to Claims

25   (No Liability Claims) [EeF No. 23247]

1

2     Lehman Brothers Holdings Inc.'s and Creditors Committee's

3     Objection to Claim No. 67911 (the "Objection") [EeF No. 27050]

4

5     Debtors' Objection to Proof of Claim No. 66099 Filed by Syncora

6     Guarantee, Inc. [EeF No. 20087]

7

8     Debtors Objection to Proof of Claim Number 29702 [EeF No.

9     20100)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     Transcribed by:  Petra Garthwait, Michelle George and Don Cohen

Page 10

```
1    A P P E A R A N C E S :

2    WEIL GOTSHAL & MANGES LLP

3         Counsel for the Debtors

4         767 Fifth Avenue

5         New York, New York 10153

6

7    BY:   MARK BERNSTEIN, ESQ.

8    BY:   GARRETT A. FAIL, ESQ.

9

10

11   WILLIAM KUNTZ III, In Propria Persona

12

13

14   YOUNG CONAWAY STARGATT & TAYLOR, LLP

15        Counsel to Daryani Family

16        Rodney Square

17        100 North King Street

18        Wilmington, DE 19801

19

20   BY:  DAVID R. HURST, ESQ.

21

22

23

24

25
```

Page 11

```
 1   THE LAW OFFICES OF TALLY M. WEINER

 2        19 West 72nd Street, PMB 350

 3        New York, NY 10023

 4

 5   BY:  TALLY M. WEINER, ESQ.

 6

 7

 8   MOSES & SINGER, LLP

 9        The Chrysler Building

10        406 Lexington Avenue

11        New York, NY 10174-1299

12

13   BY:  JAMES M. SULLIVAN, ESQ.

14

15

16   VENTURINI & ASSOCIATES

17        230 Park Avenue, Suite 545

18        New York NY 10169

19

20   BY:  AUGUST C. VENTURINI, ESQ.

21

22

23

24

25
```

Page 12

1    FLEMMING ZULACK WILLIAMSON ZAUDERER LLP

2         One Liberty Plaza

3         New York, NY 10006-1404

4

5    BY:  WOLFGING A. DASE, ESQ.

6

7

8    PRYOR CASHMAN LLP

9         7 Times Square

10        New York, NY 10174-1299

11

12   BY:  PATRICK SIBLEY, ESQ.

13

14

15   WILMER HALE PICKERING HALE and DORR, LLP

16        399 Park Avenue

17        New York, NY  10222

18

19   BY:  CHRISTOPHER W. CARRION, ESQ.

20

21

22

23

24

25

Page 13

1   MARIANNA UDEM

2        151 West 48th Street, 4th Floor

3        New York, NY 10036

4

5   BY:  MARIANNA UDEM, ESQ.

6

7

8   WACHTELL LIPTON ROSEN & KATZ

9        51 West 52nd Street

10       New York, NY 10019-6150

11

12  BY:  HAROLD S. NOVIKOFF, ESQ.

13

14

15  KASOWITZ BENSON TORRES & FRIEDMAN LLP

16       1633 Broadway

17       New York, NY 10019

18

19  BY:  ROSS G. SHANK, ESQ.

20

21  QUINN EMANUEL URQUHART & SULLIVAN, LLP

22       865 South Figueroa Street, 10th Floor

23       Los Angeles, CA 90017

24

25  BY:  ERICA P. TAGGART, ESQ.

Page 14

3   By Telephone:

4   GENOVESE JOBLOVE & BATTISTA, P.A.

5        100 SE 2nd Street, 44th Floor

6        Miami, FL 33131

8   BY:  BARRY P. GRUHER, ESQ.

11  HUGHES & HUGHES

12       25 de Mayo 455

13       11000 Montevideo

14       Uruguay

16  BY:  ANDRES HAM

19  FOK YIM-SHEUNG FLORIA, In Propria Persona

22  ANTONIO BRICENO, In Propria Persona

25  ALBERTO BENSION, In Propria Persona

Page 15

1

2

3    DAVID ALPIZAR, In Propria Persona

4

5

6    FRANK COLE, In Propria Persona

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2         THE COURT:   Good morning.  Be seated, please.

3         MR. BERNSTEIN:   Good morning, Your Honor, Mark

4    Bernstein from Weil Gotshal & Manges on behalf of the Lehman

5    Chapter 11 debtors.  Before we get to the items on the agenda,

6    given where we are on the cases and the effective date has

7    recently passed, and the first distribution was recently made,

8    with the Court's permission I'd like to -- I propose giving a

9    very brief status update on the claims' reconciliation process.

10        THE COURT:   Okay.

11        MR. BERNSTEIN:   During these Chapter 11 cases, there

12   have been more than 68 thousand claims filed or scheduled,

13   asserting claims of more than $1.3 trillion.  As of April 23,

14   2012, there are approximately 35 thousand claims filed or

15   scheduled, remaining on the claims register, asserting claims

16   of approximately $493 billion.  So there's been substantial

17   progress made reducing the amount of filed claims.  The

18   reductions result primarily as a result of various settlements

19   that have been entered into with numerous creditors, and the

20   filing of more than 290 omnibus objections to claims seeking to

21   disallow, reduce and allow, or reclassify claims at this point.

22       A hundred and 18 of those omnibus objections are still

23   pending with respect to at least one claim on each of those,

24   and in the aggregate there's 1,583 claims still pending on

25   omnibus objections in the aggregate amount of $46 billion.  In

1    total, there are approximately 10 thousand claims asserting

2    approximately $188 billion that are, or may be disputed by the

3    debtors.

4        On April 17th, the debtors made their initial

5    distributions.  The distributions were made on 23,883 claims,

6    asserted in the -- or allowed in the amount of $303 billion in

7    connection with that distribution.  So, as you can see there's

8    still a significant amount of work left to do in order to get

9    the claims register aligned with the appropriate liabilities of

10   the debtors, and as a result, with the Court's permission,

11   going forward we would request the opportunity to schedule

12   certain claims matters on the Lehman's regular omnibus hearing

13   dates, to the extent there are no other larger, complicated

14   matters on those dates.

15           THE COURT:   That's fine.

16           MR. BERNSTEIN:  Thank you.

17           With that, we'll turn to the agenda.  We have three

18   uncontested items for this morning, and then several contested

19   items, and there's another contested item scheduled for 11

20   o'clock on a JPMorgan claim.

21           THE COURT:   I have a procedural question with

22   respect to the 11 o'clock calendar in particular.  It may be

23   that this won't be an issue because we may have everything

24   resolved by 11 o'clock, but assuming that the 10 o'clock

25   calendar may run past 11, is it your contemplation that we

1   would simply continue with the 10 o'clock calendar and have the

2   JPMorgan matter await the resolution of that calendar, or would

3   we take a break?

4          MR. BERNSTEIN:   I -- I think it depends on where

5   things are.  If it seems as if the -- the 10 o'clock matter is

6   going to require a significant longer period of time; when we

7   get to 11 o'clock perhaps it would make sense to take a break,

8   although I think the JPMorgan matter, I've been told, may take

9   up to an hour as well of argument, but if we are seem like

10   we're getting close to resolving the 10 o'clock calendar it

11   probably makes sense just to continue.

12          THE COURT:   Okay.  Let's just see where we are.

13          MR. BERNSTEIN:   Okay.

14          The first item on the agenda is the debtors' 110th

15   omnibus objection to claims.  This objection sought to disallow

16   claims that were filed based on pension obligations of LBHI --

17   there was this -- LBHI settled its obligation on its pensions

18   with the PBGC early in the case, and as a result, there has no

19   further liability for these claims.  One response remained on

20   this omnibus objection filed by Doris Phillips.  We have spoken

21   with Doris Phillips, and she, at this time no longer wishes to

22   pursue her response to the objection and consents to the claim

23   being disallowed.  So, with that we request Your Honor grant an

24   order disallowing the claim of Doris Phillips.

25          THE COURT:   It's disallowed on consent.

1          MR. BERNSTEIN:   Thank you.

2          The 186th omnibus objection to claims sought to

3    reclassify certain claims that were filed as secured claims to

4    unsecured claims.  There are a number of remaining claims on

5    this objection and we have been discussing them with the

6    various claimants.  Most of the claims that relate -- that

7    remain on this objection were filed by Deutsche Bank, in its

8    capacity as indentured Trustee for numerous securitizations.

9    We have worked on and agreed to some additional language to the

10   order with Deutsche Bank, and I have blackline of the order, if

11   I may hand it up to Your Honor.

12         THE COURT:   Please.

13         MR. BERNSTEIN:   As indentured Trustee for these

14   securitizations, Deutsche Bank was granted a lien by the

15   securitization Trust over the assets in the securitizations,

16   and this language makes clear that the reclassification of the

17   claim against Lehman Brothers has no effect on the lien that

18   Deutsche Bank has on the assets of the securitization Trust or

19   any rights that they have with respect to those assets.  With

20   that, we have a consensual order, and request Your Honor grant

21   the 186th omnibus objection as to the claims of Deutsche Bank.

22         THE COURT:   It's granted on consent.

23         MR. BERNSTEIN:   Thank you, Your Honor.

24         The last uncontested item is the debtors' 118th

25   omnibus objection to claims.  This relates to certain

1   securities for which it was asserted that LBI issued a

2   guarantee of the security.  This is the same subject matter

3   that would be heard on the contested calendar later today.  The

4   initial objection initially sought to disallow the claims, or

5   alternatively to reclassify the claims as equity interests.  In

6   this particular creditor objected to having their claim

7   disallowed, but agreed to an order reclassifying their claim as

8   an equity interest in the debtor.  As a result, we've modified

9   the order to provide that their claim will only be

10  reclassified, and as such we're going forward and uncontested

11  with respect to this one particular creditor.

12          THE COURT:   That objection is granted as to that

13  particular creditor, on consent.

14          MR. BERNSTEIN:   Thank you.

15          The next item on the agenda is the first item on the

16  contested calendar, and that is the motion of William Kuntz III

17  to reconsider the Court's prior order and opinion disallowing

18  and expunging his claims.  I believe Mr. Kuntz is in the

19  Courtroom today.

20          THE COURT:   Mr. Kuntz, it's your motion.

21          MR. KUNTZ:   Good morning, Your Honor.

22          THE COURT:   Good morning.

23          MR. KUNTZ:   I'd like to say I'm happy to be back

24  here, although I left rather early.  The reason for bringing

25  this motion is explained in my papers as based part on your

1   denying my evidentiary hearing, and also at the close of the

2   last hearing, as you may recall, and Mr. Weisman's not here --

3   Mr. Weisman handed up a document to Your Honor, which was

4   unmarked and uncirculated.  Now that's in -- in contrast to my

5   effort at a previous part of the claims objection hearing to

6   have a document marked.  I don't know what that document was.

7   I'm assuming it relates to Grand Union, whatever, and I draw

8   Your Honor's attention to my Exhibit 4, of which I faxed the

9   entire fee application of Weil Gotshal in 1998, which was paid

10  over $400 thousand in fees in New Jersey in the Grand Union

11  case.  And all this time is -- where is its escrow account?  We

12  don't know anything about Grand Union.  You know, why are in

13  Lehman Brothers.  And, you know, I didn't bother to file the

14  full fee application with my affidavit or with the motion, but

15  I think it's pretty clear that Weil Gotshal was co-counsel, and

16  that's supported by the letter opinion of Judge Martini, Weil

17  Gotshal was co-counsel in New Jersey, in Grand Union when this

18  $3 million escrow account went down one rabbit hole and came up

19  another rabbit hole.

20          In any event, the reason I'm bringing this motion is

21  to resolve the inconsistencies as far as Mr. Weisman handing up

22  the document, and also so I'm in a better position to proceed

23  before the appeal with Judge Reinhold.

24          I'd like to also apologize to Mr. Bernstein; I left

25  his N in a correspondence that I sent to him, and aside from

Page 22

1     that there's some infirmities in their proofs of service

2     relating to facts, numbers, and so forth, but I won't bother

3     Your Honor with that.

4              THE COURT:   Why are you pressing this now?  I mean,

5     this decision that you're seeking to have me reconsider was

6     decided November 10 of 2010.

7              MR. KUNTZ:   That's correct, Your Honor, and a --

8              THE COURT:    And then --

9              MR. KUNTZ:   -- motion was filed within one year, and

10    it was noticed for today.

11             THE COURT:   Okay.

12             MR. KUNTZ:   And --

13             THE COURT:   I recognize that, but -- but why didn't

14    you move sooner?

15             MR. KUNTZ:   Why did -- why did Lehman file

16    bankruptcy?  Why does anybody do anything?  I mean, for

17    instance, in the affidavit of service, Weil Gotshal is using

18    addresses that I gave up six years before this case even

19    commenced.  You know, they -- they send out 15 or 20 express

20    mails all over the country.  They sent it to my sister's house,

21    because they sent it to Lake Placid.  They sent it to an

22    address on Nantucket that I invented just to show their level

23    of incompetence, and yet here we are.  We don't know anything

24    about Grand Union, and Your Honor can clearly see that they

25    were co-counsel and there is knowledge that the firm has or

Page 23

```
 1    should have -- what happened to this $3 million?

 2            THE COURT:   Well, I -- I don't think that anything

 3    you're saying actually changes --

 4            MR. KUNTZ:   That's fine -- that's fine, Your Honor -

 5    -   THE COURT:   -- changes the merits --

 6            MR. KUNTZ:   -- that's your impression.  To me, if

 7    they were co-counsel --

 8            THE COURT:   But --

 9            MR. KUNTZ:   -- in New Jersey

10    THE COURT:   -- but you're not even --

11            MR. KUNTZ:   -- where the money went missing --

12            THE COURT:   -- you're actually interrupting me as

13    I'm in the middle --

14            MR. KUNTZ:   That may be, --

15            THE COURT:   -- of a sentence.

16            MR. KUNTZ:   -- Your Honor.  I'll sit down and let

17    you talk.

18            THE COURT:   No.  I'm just really proposing the kind

19    of ordinary courtesy that exists when people talk to each

20    other.  Nothing -- I'm not asking you to sit down.  I'm just

21    asking you to give me the courtesy of allowing me to finish my

22    sentence, without interrupting me, and I'll do the same.  I

23    won't interrupt you.  Is that fair?

24            MR. KUNTZ:   Yes, Your Honor.  I understand.

25            THE COURT:   I don't see anything in your papers that
```

Page 24

1     changes the factual record that was before me at the time that

2     I decided the decision that you're seeking to have me

3     reconsider.  So my question to you is, what did I get wrong?

4     What is it that I did that you disagree with that you think I

5     should change my mind?  What's the reason for that?

6            MR. KUNTZ:   Your Honor has never reached the

7     decision or the fact whether this $3 million became estate

8     funds at Lehman Brothers.  Your Honor has never -- I mean, in -

9     - to my understanding, Weil Gotshal never should have even

10    brought the claims objection.  Their standing is so tainted by

11    their co-counsel relationship in New Jersey that it really

12    constitutes professional misconduct.  But I'm not complaining,

13    Your Honor, their conduct.  I'm complaining of the obvious

14    problems that they have, and will have in District Court, when

15    there's a decision of Judge Martini in New Jersey -- District

16    Judge Martini saying:  "Weil Gotshal's co-counsel of Grand

17    Union."  Weil is here saying, "We don't know anything about

18    Grand Union.  We don't know anything about this missing money."

19    How, if they took $400 thousand in fees in New Jersey in the

20    1998 case -- and that's not even touching on the 2000 Grand

21    Union bankruptcy, it's clear to me -- and Your Honor outlined

22    this -- that the level of -- how should we say -- skeleton or

23    skeletons over New Jersey that impact -- Lehman was a creditor

24    of Grand Union.  So if they were co-counsel to Grand Union, and

25    they also represented Lehman, and that conflict was not really

Page 25

1    exposed to Judge Winfield -- I mean -- I don't see it anywhere

2    in there fee applications -- then these are problems.  And

3    they're not really -- they're problems among the bar and the

4    Court.  I'm simply trying to collect on promissory notes that

5    were issued 20 years ago -- you know - $700 million was sold --

6    and Your Honor went around and around about the Martin Act and

7    this, that, the other and the -- the terms of the escrow said,

8    that if somebody has a colorable claim to this escrow greater -

9    - and I'm being in generalities -- if my claim is greater than

10   going back into Grand Union, then they should have gone to

11   Judge Winfield and said, "Let's have an order.  Let's have a

12   hearing; let's have an order."  Or if Judge Winfield didn't

13   want to do it, let's go back to Judge Walsh in Delaware, who

14   set up the escrow account, which was approved under the

15   original plan of reorganization.

16          You know, because there's this question of whether

17   Lehman -- whether these are estate funds -- I've been barred by

18   the automatic stay from going ahead in Westchester County and

19   getting a judgment for four or five years now.  If I'd gone and

20   sued, and Lehman, in fact, had those funds, these gentlemen

21   here -- the whole firm would have been on me like a ton of

22   bricks for violating the automatic stay.  I didn't.  I came

23   here, I was opposed by Weil Gotshal; I was opposed by the

24   Creditors' Committee.  Their entire rationale to me is:  We

25   don't know anything about Grand Union and we don't like the

Page 26

1    color of Mr. Kuntz' sales because he rises to the level of some

2    knowledge that causes us concern.

3           All I'm doing is trying to get paid.  And if the --

4    if the -- if the three and a half million was never Lehman

5    estate funds, then it should have gone unclaimed to the State

6    of New York, is my understanding.  And if that hasn't been done

7    other.  Thank you, Your Honor.

8           THE COURT:  Okay.

9           MR. BERNSTEIN:   I'll be brief here, Your Honor.

10   First, I'm not going to respond to any assertions by Mr. Kuntz

11   about any violations of ethics, professional responsibility by

12   Weil Gotshal.  That's certainly nothing that's before the Court

13   today.  Weil Gotshal was -- did represent Grand Union in one of

14   their bankruptcy cases; that's never been denied and I'm sure

15   they filed -- we filed fee apps in connection with those cases.

16   We're not talking about a claim against Weil; we're talking

17   about a claim against Lehman Brothers.  And Mr. Kuntz has not

18   provided any evidence of -- of that claim that Lehman took --

19   received anything from any escrow account.  He has added

20   nothing new in his motion for reconsideration that wasn't in

21   his initial papers.  He's just rehashed his same fictitious

22   arguments and suppositions, and there's no basis, under any of

23   the sections of Rule 60(b) for -- for relief today.  60(b)

24   should be granted only in exceptional circumstances.  It is

25   extraordinary relief.  Mr. Kuntz has not met that -- that

1    standard.  He cannot get over the burden -- and his motion

2    should be denied.  He -- he did say that a Court hasn't made a

3    decision on whether the $3 million dollars property of the

4    estate.  Well, he hasn't provided any evidence that $3 million

5    went to Lehman inappropriately in the Grand Union case, so I'm

6    not sure what $3 million he's -- he's talking about, but

7    there's -- he didn't provide any evidence, and that's what the

8    Court found the first time around -- that the debtors'

9    objection flipped to the burden on Kuntz' claims, and he was

10   responsible and required to prove by a preponderance of the

11   evidence, that he had valid claims, and he did not do so, and

12   he has not added anything today that -- that changes that.  So

13   his motion should be denied at this point, and happy to answer

14   any further questions Your Honor may have.

15            THE COURT:   No, I don't have any questions of you.

16            MR. BERNSTEIN:  Thank you.

17            THE COURT:   Mr. Kuntz, do you have anything further?

18            MR. KUNTZ:   In the telephone book-sized documents

19   filed in the claims objections, Weil Gotshal included the

20   Ravin, Greenberg Marks P.A. letter, Judge Winfield's order, and

21   I would refer Your Honor, which to page 3 of the letter, which

22   says -- specifically speaks about the money in the escrow

23   account.  That's their exhibit; they put that in.  To stand up

24   here and say: "Oh, we don't know anything about this escrow

25   account," when it was their exhibit that they obtained in New

Page 28

1     Jersey is fantastic.  It --

2           THE COURT:  Well, I think the issue, Mr. Kuntz, is

3     not whether or not there ever was an escrow account, but some

4     nexus between the Grand Union escrow account and anything that

5     involves the Lehman estate.

6           MR. KUNTZ:  Lehman had security interest in Grand

7     Union in the 1998 case, in round numbers, over $60 million.

8     They were paid -- it's my understanding -- out of the -- out of

9     the distribution of the second case.  See, Grand Union had

10    three cases.  Judge Walsh had one, Judge Winfield had two and

11    three.  Somewhere between two and three, the escrow account

12    went into Grand Union, out of the escrow agent or whatever, and

13    apparently ended up as a payment to Lehman on their security

14    interests at the time when Weil Gotshal was representing Grand

15    Union, and they were basically -- and I'm not sure -- I should

16    say this correctly -- they were more or less in-house counsel

17    to Lehman Brothers.

18           I mean, there's a long history of documents that I've

19    already produced that show Weil Gotshal's relationship to

20    Lehman Brothers -- obviously, you're hearing even today -- and

21    on security agreements Lehman Brothers filed in Grand Union.

22    And, I think the feeling was in New Jersey -- Judge Winfield --

23    and Your Honor is already aware of this -- Judge Winfield

24    already ordered the replacement of the bond that went missing,

25    and there was -- rather than the typical, oh out of an

1  abundance of caution, we come to Judge Winfield and ask for an

2  order out of a -- and how should we say it -- out of -- out of

3  a episode of sophistication, as I remember from the hearings

4  yesterday in London about the phone hacking -- they chose --

5  just simply Grand Union, put the money in your bank account for

6  the -- get the escrow, forget the fact that Kuntz is out there

7  -- we will run the risk that we don't put this in front of

8  Judge Winfield to have a hearing in New Jersey, because Kuntz

9  might win and he might get the money, and then we would be

10  angry that somebody got paid when we had decided that that

11  person shouldn't have been paid.

12          You know, this whole case is about interest money,

13  lending money, borrowing money and everything else.  I bought

14  these promissory notes 15, 17 years ago -- I'm simply trying to

15  get paid, and I'm following the money trail.  There was an

16  escrow account, which would have paid me a hundred cents on the

17  dollar.  I expected a hearing in New Jersey; there was no

18  hearing in New Jersey.  I've documented, I wrote Lehman

19  Brothers well in advance when this case commenced.  I never got

20  a response, here I am today -- I'm -- you know, Your Honor had

21  denied an evidentiary hearing before, and I'm simply saying:

22  "Here's the documents, here's copies of my promissory notes,

23  here's copies of Judge Winfield's order," -- in their own

24  exhibit they talk about this escrow fund.  If it's not funds of

25  this estate, then I shouldn't be here.

1            THE COURT:  Correct.

2            MR. KUNTZ:  If it's not funds of the estate.  But

3    then, there should be an order from Judge Winfield saying:

4    "Mr. Kuntz, too bad.  Go after the bank Trustees," -- which we

5    discussed at the prior hearing, or "here's your $3 million, Mr.

6    Kuntz -- you -- your claims are superior."  I -- see, I don't

7    understand how Lehman, as a creditor in the second bankruptcy

8    case could even reach an escrow account created under the first

9    bankruptcy case that they weren't a party to.  I mean, if they

10   -- if the -- if the security agreement was filed in the second

11   bankruptcy case, the escrow sort of floated along on the top.

12   So, without a hearing or an order from Judge Winfield or from

13   Judge Walsh, the fact that the money went into the general

14   operating account, as my understand of Grand Union, and came

15   back out as a distribution to Lehman Brothers as a creditor,

16   that money is still there.  That $3 million was not sunk in the

17   bottom of the ocean, it was put in one of Lehman's bank

18   accounts, and that's basically -- the whole problem is that the

19   -- the -- rather than three years ago, saying:  "Yes, there was

20   a thing -- we're going to go back over to New Jersey, we're

21   going to ask Judge Winfield to reopen Grand Union, and have a

22   hearing, whether this -- whether this -- dissolution of the

23   escrow was proper -- they've had me up here making you angry

24   for three years.

25            THE COURT:  You haven't --

 1            MR. KUNTZ:   On the other hand, I'd like to get my

 2     money so I could --

 3            THE COURT:  Well --

 4            MR. KUNTZ:   -- go to the Bahamas.

 5            THE COURT:  I'd like it to be clear that I've had no

 6     -- you haven't been making me angry since --

 7            MR. KUNTZ:   Well, I appreciate that --

 8            THE COURT:   -- at least --

 9            MR. KUNTZ:   -- Your Honor.

10            THE COURT:   -- November of 2010.  And I don't think

11     you've ever made me angry, Mr. Kuntz.  You have confused me

12     from time to time, and this is one of those times.  I'll give

13     this some further consideration and take this under advisement.

14            MR. KUNTZ:  If -- may I see one more thing, Your

15     Honor.

16            THE COURT:   Is it relevant?

17            MR. KUNTZ:  Yes.

18            If the bank Trustees, one of which U.S. Bank, which

19     is on the creditors' committee, were not AWOL, I wouldn't be

20     here.

21            THE COURT:   Excuse me.

22            MR. KUNTZ:   The -- the -- in the Hong Kong case --

23     the mini bond case -- I believe Your Honor's ruling was that

24     the -- the bond holders did not have standing because it was

25     the Trustee -- indentured Trustees that had the powers.  The

1    two Trustees for Grand Union -- these notes.  HSBC, U.S. Bank -

2    - both represented counsel in this case, have been

3    conspicuously AWOL for years.  They've just decided, "we don't

4    want to hear about it; it's a de minimis amount of money -- go

5    away, goodbye."

6              THE COURT:   If you have claims against them, you can

7    pursue your claims.

8              MR. KUNTZ:   Thank you, Your Honor.

9              THE COURT:   I'm taking this under advisement.

10             MR. FAIL:   Good morning, Your Honor, Garrett Fail,

11   Weil Gotshal for Lehman Brothers.  The next items on the agenda

12   are the debtors' 213th, 214th, 215th, and 216th omnibus

13   objections to claim.

14             All of the objections sought to disallow or

15   subordinate the claims based on guarantees issued by Lehman

16   Brothers Holdings, Inc. in connection with securities issued by

17   non-debtors.  These are the objections that Mr. Bernstein

18   referred to earlier.  In total, more than 15 hundred 80 claims

19   were subject to the objections, and of these more than 14

20   hundred and 40 were disallowed or expunged by prior orders of

21   the Court on hearings on these objections.  In total,

22   approximately 146 objections were interposed and received.

23   Each of the objections opposed disallowance of the claims.

24   Only 33 by our count, Your Honor, responded to the debtors'

25   request to classify the claims as equity interests, as that

1    term is defined in the debtors' confirmed Chapter 11 plan.

2            On April 21st, Lehman filed an omnibus reply for each

3    of the omnibus objections.  In the reply, Lehman withdrew its

4    request to disallow the claims for which responses had been

5    filed.  The relief requested at this hearing today, Your Honor,

6    is solely to reclassify the majority of the claims for which

7    responses have been filed.  And I say, majority, because this

8    hearing was -- the hearing on the objection was adjourned for

9    three claimants holding a total of ten claims.

10           Lehman believes that the reply and the modified

11   relief should resolve the bulk of the responses that were

12   received.  The reply file contained responses to each of the

13   relevant procedural and substantive objections, and briefly,

14   Your Honor, Lehman believes that the objection was procedurally

15   proper.  Lehman is not estopped from prosecuting the

16   objections, and there is no ambiguity as to the subordination

17   of the subordinated guarantee issued by Lehman Brothers

18   Holdings, inc.

19           There may be parties, however, that wish to be heard,

20   and I believe there are a number that are on the phone, and

21   there may be some in the Courtroom today.  Unless the Court

22   prefers otherwise, I would propose going through the objections

23   in numerical order and seeing if there are any respondents that

24   which to prosecute their objections.

25           THE COURT:   There's probably no other way to deal

1    with this other than to take each party who is appearing on

2    their own or through counsel, and hear what they have to say.

3    I do have some concern that this could turn out to be a very

4    prolonged process, and I don't know whether we have sufficient

5    time to deal with it all, in which case we may need to either

6    adjourn a portion of today's hearing to this afternoon, but I

7    have other obligations starting at three o'clock, or to find

8    another day for it.  But before we determine that we have a

9    serious problem of scheduling, let's just get into it.

10           MR. FAIL:   Thank you, Your Honor.

11           THE COURT:   I mention this because I'm a little bit

12   concerned about the procedure of scheduling something as

13   potentially massive of this on a morning calendar that also

14   includes an 11 o'clock hearing in the JPMorgan matter, and so I

15   think we have potentially tried to put too many potatoes in one

16   bag, but let's find out.

17           MR. FAIL:   We're hopeful, Your Honor, that were --

18   we're limited to the 33, rather than the hundred and 46, and I

19   know that we've spoken to a number of the creditors that are

20   amongst those 33 and have reached consensus that our reply has

21   satisfied them.  The only other way to proceed is if your honor

22   has --

23           THE COURT:   Let's --

24           MR. FAIL:   -- has made a determination as to the

25   arguments that we've --

1          THE COURT:   -- let's at least find out who we have

2     in the class of continuing objectors who wish to be heard

3     today.  Let's start with at least finding out whose hear, and

4     who wish --

5          MR. FAIL:  Thank you, Your Honor.

6          THE COURT:   -- to be heard today.  Let's start with

7     at least finding out who's here and who wishes to be heard in

8     person, and then we'll find out who's present by telephone.

9          MR. HURST:   Good morning, Your Honor, this is David

10    Hurst from Young Conaway Stargatt & Taylor, representing the

11    Daryani family.  They have three claims, subject to the 214th

12    or --

13          THE COURT:   Please speak up.

14          MR. HURST:  Oh.  Sorry, Your Honor.  This is David

15    Hurst from Young Conaway Stargatt & Taylor, I represent the

16    Daryani family.  And they have three claims, subject either to

17    the 214th omnibus or 216th omnibus.

18          THE COURT:   Okay.  We're just -- we're just taking

19    attendance now.

20          MR. HURST:  Yep.

21          MS. WEINER:   Good morning, Your Honor, my name is

22    Tally Mindy Weiner.  I'm here for my Law Offices of Tally M.

23    Weiner, Esquire for Alex Wong, whose claim is subject to the

24    216th omnibus objection -- claimant in Hong Kong.  And for

25    Lionel Dardo Occhione, a claimant in Argentina, whose claim is

1     subject to the 214th omnibus claim objection.  Thank you.

2          MR. SULLIVAN:   Your Honor, James Sullivan of Moses &

3     Singer, counsel for Datsun Investments, which is a party to the

4     213th claim objection.

5          MR. VENTURINI:   On the 215th objection, my name is

6     August Venturini for creditor Lamita Jabbour.

7          MR. DASE:   Good morning, Your Honor, my name is

8     Wolfgang Dase, from Flemming Zulack Williamson Zauderer,

9     representing Bank Privée, Edmond de Rothschild, with respect to

10    the 216th omnibus objection.

11         MR. SIBLEY:   Good morning, Your Honor, Patrick

12    Sibley of Pryor Cashman on behalf of Bank of Valletta PLC, part

13    of the 216th omnibus objection.

14         MR. CARRION:   Good morning, Your Honor, Chris

15    Carrion from WilmerHale on behalf Banque Populaire Côte d'Azur.

16    I'm here simply to join in the arguments made by the other

17    claimant here today, in connection with their responses to the

18    213th, 214th omnibus objections by debtors and also other

19    similar objections.

20         MS. UDEM:   Good morning, Your Honor.  Marianna Udem

21    from Neiger LLP, on behalf of Banque Safdié, now known as Leumi

22    Private Bank, on the 216th omnibus objection.

23         THE COURT:   Okay.  That seems to be everybody who's

24    physically present in the Courtroom.  Let me ask those who are

25    participating by telephone if you could please identify

Page 37

1   yourselves and who you represent, or if you're appearing pro

2   se, please just state your name.

3           MR. GRUHER:   Good morning, Your Honor, Barry Gruher

4   on behalf of claimant James H. Murcia.  I'm appearing in

5   connection with the debtors' omnibus objection, the 215th

6   claim.

7           MR. FLORIA:   Your Honor, my is Fok --Yim-Sheung

8   Floria on debtor (indiscernible 10:39:29)--

9           THE COURT:   You're -- you're going to have to speak

10  because you're not coming through loud enough to be picked up

11  by our recording equipment.

12          MR. FLORIA:  Well enough, my name is Fok Yim-Sheung

13  Floria on the debtors' 43 omnibus objection, case number 6-5-0,

14  31,32, and 33 from Hong Kong.

15          THE COURT:  Is there anyone else on the telephone?

16          MR. HAM:  Yes, Your Honor.

17          MR. BENSION:  Yes.

18          MR. BRICENO:  Yes.

19          MR. BRICENO:   I am Antonia Briceno. I'm calling from

20  Mexico for the case number 2-15 and the claim number is 4-9-4-

21  8-8.

22          MR. HAM:   Good morning, Your Honor.  My name is

23  Andres Ham.  I'm (indiscernible 10:40:11)on behalf of, filing

24  also Ortiz on objection  regarding the 214th omnibus objection,

25  claim number 4-7-4-5-9.

1           MR. BENSION: (indiscernible 10:40:17)

2           THE COURT:   Whoever is currently speaking is not

3    being heard by anybody.

4           MR. BENSION:   Hello.  Sorry.  Sorry.  My name is

5    Alberto Bension.  I representing also my son, Andreas Bension,

6    we in the 215 objection.

7           MR. ALPIZAR:   Good morning, Your Honor, this is

8    David Alpizar, also calling from Mexico.  I'm part of the

9    omnibus objection 215, I represented myself.

10          THE COURT:   Is there anyone else?

11          MR. BRICENO:  I don't if you -- I am Antonio Briceno

12   from Mexico.  I am representing myself, too.

13          THE COURT:   I --

14          MR. BRICENO:  His name is 49-4-0-4-8-8, and we are in

15   the omnibus 215.

16          THE COURT:   I think we heard from you earlier in

17   this --

18          MR. BRICENO:  Oh.  Oh.  Okay, okay.

19          THE COURT:   I only want to know if it's anybody else

20   we haven't heard from.

21          MR. COLE:  Yes, Your Honor.  My name is Frank Cole.

22   I'm the 213th objection.  And my claim number is 37 thousand

23   200 and I'm representing myself.

24              THE COURT:   Is that it?  Apparently so.  Okay.

25          I don't know how many of the people who are present

1   in Court through counsel and how many who are appearing by

2   telephone, in effect will be saying the same things repeatedly

3   and how many of the people who are wishing to speak will be

4   saying things that are particular to them, but I do have one

5   question, and that is, are there any facts in dispute, or is

6   this purely a question of law?

7           MR. FAIL:   Your Honor, from Lehman's perspectives

8   there are -- there is no fact in dispute, with respect to the

9   relief requested.

10          MR. SULLIVAN:   Your Honor, James Sullivan, counsel

11  for Datsun.  One potential fact dispute -- and I've requested

12  discovery from the debtors, but they've refused to produce any

13  or provide any, is -- as you may recall from some of the other

14  cases and claims objections -- Lehman has, at various points in

15  time, issued guarantees -- although Lehman may dispute some

16  this -- but guaranteed certain obligations of certain

17  affiliates.  And a fact issue is -- you know -- it potentially

18  rises as to whether or not any such guarantee exists in

19  connection with these obligations.  I've made a request of the

20  debtor to represent whether or not any such guarantees exist,

21  and I'm not getting -- you know -- they've refused to provide

22  anything in writing responsive to that question.  So I would

23  like an opportunity to take some limited discovery on that

24  issue to determine whether or not there's any legal basis for a

25  non-subordinated -- non-subordinated claim against Lehman

Page 40

1    Brothers in connection with these claims.

2            THE COURT:  My Fail.

3            MR. FAIL:   Your Honor, Garrett Fail, for the record.

4            I disagree with Mr. Sullivan's characterization of

5    his previous requests.  That said, Your Honor, I'm happy make a

6    representation to the Court today that the Lehman is aware of

7    no fact or circumstance or argument in law that would prevent

8    it from prosecuting its objection, which it intends to do

9    today.  There is a subordinated guarantee in place, and Lehman

10   is not aware of any other guarantee, which would cover Lehman

11   Brothers UK Capital Funding for LP's obligations or Lehman

12   Brothers UK Capital Funding Five's LP's obligations from Lehman

13   Brothers Holdings Inc.

14           And Your Honor, I don't believe -- Lehman doesn't

15   believe that discovery on this or any other plan would

16   reasonably or yield any evidence that would be relevant.  One

17   additional point -- Datsun's claim -- the amount of the claim,

18   just for perspective, is 237 thousand 304 dollars and 48 cents.

19   Disclosure statement -- enough, Your Honor -- or are you

20   requesting -- okay.  Disclosure statement estimates for such

21   claims are 11 and a half percent, which would yield, over time,

22   would yield 27 thousand 290 dollars.  I think the cost of any

23   discovery would outweigh any -- any recovery that Datsun would

24   obtain.

25           THE COURT:   Okay, there is a question that occurs to

Page 41

1    me that involves the adjournment of at least one of the matters

2    originally scheduled for today in reference to a partnership

3    agreement.  I do not know what that's about, and I do know that

4    a call came in to chambers from a claimant requesting an

5    affiliated file -- a supplemental memorandum.  I'm frankly

6    confused as to whether or not the issue giving rise to that

7    request applies only to that claimant, or applies across the

8    board to a class of claimants.  Can you provide me with some

9    guidance on that?

10            MR. FAIL:   Your Honor, speaking for -- for Lehman

11    Brothers, and not for the claimant -- but our understanding --

12    having spoken to the claimant, as well, is that the request

13    doesn't apply to anybody currently, because the argument being

14    asserted relates to an argument that the debtors have

15    withdrawn.  Lehman is no longer prosecuting an objection at

16    this time to disallow the claims.  The partnership agreement

17    and -- and clauses of it, or pieces of it that the claimant

18    wants to refer to are in response or related to -- may have

19    something to do, or may not in our perspective, have to do with

20    the basis for which Lehman sought to disallow the claims.

21    Lehman is not seeking to disallow the claims.  We don't believe

22    a partnership agreement is relevant to the requests to enforce

23    the explicit, clear subordination that's in the subordinated

24    guaranteed from LBHI.  The partnership agreement is not

25    relevant to this, from Lehman's perspective.

1                    THE COURT:    Okay.

2                    Well, let's just -- let's just proceed.  We have --

3          by my count -- eight -- and I may have miscounted -- attorneys

4          in Court and we have another seven or eight parties on the

5          telephone.  At some point I suspect this will become

6          repetitious, but I don't know that until we start the process.

7          And so, why don't we just go in the very same order that people

8          had first identified themselves, and present your arguments,

9          and to the extent that they begin to overlap, presumably we'll

10         be able to get through this.  If it becomes time consuming and

11         begins to impinge upon the 11 o'clock calendar we may have to

12         adjourn this to another date.

13                   MR. HURST:    Good morning, Your Honor.  David Hurst

14         from Young Conaway Stargatt & Taylor, representing the Daryani

15         family.  As I mentioned initially, when I first stood here, we

16         have three claims; total claims amounts about 2.1 million,

17         subject to the 214th or the 216th omnibus objections.

18                   The two points I'll make out of my papers, Your

19         Honor.  The first point is -- that's a subordinated guarantee

20         that's the basis for the claim objection; it's not a signed

21         document.  It may seem like a minor point, but everything

22         that's going on here today is based on a document, which is not

23         signed by anybody; it's a -- could be a draft, it could be a

24         different version -- I don't really know.  But this is a case

25         where a couple of words could mean a big -- could make a big

Page 43

1    difference, okay.  So our view is, unless the debtors can

2    produce the actual document -- the true governing document,

3    they haven't overcome the, you know, prima facie validity of

4    the claims that have been filed, including my clients' claims.

5    Second point, Your Honor:

6         Even assuming that the documents before the Court do

7    govern this -- do govern this matter, we don't think there's a

8    basis to subordinate us or to reclassify us as equity interest.

9    And I'm basing this argument -- and really on just the debtors'

10   own language.  In the -- in the reply filed by the debtors,

11   they have a couple interesting sentences in there -- in the

12   matrix that was attached to the 214th omnibus reply.  I'll just

13   read those into the record:

14        "The subordinated guarantee claims are being

15   characterized as equity interest for distribution purposes

16   under the plan to enforce the contractual subordination.  While

17   the subordinated guarantees did not give rise to an equity

18   interest in LBHI, claimants' right to distributions are

19   subordinated to LBHI's other debt obligations."

20        You know, my reading of this, Your Honor, is that the

21   debtors are acknowledging these are not equity interests,

22   number one.  And number two, they're saying they're subordinate

23   to other debt obligations.  So this, indeed, is a debt

24   obligation.  So there's no basis to push us into the equity

25   class -- that's Class 12 -- so you have Class 10 a,b, and c are

1    subordinated classes, Class 11 is 510(b),Class 12 is the equity

2    interests. The 510(b) claims, I assume, are being subordinated

3    to the level of equity, if there are any -- I don't know.  The

4    way I read everything -- the documents -- is where we should

5    be, just based on the documents before the Court -- we should

6    be below Class 10(c)and above Class 11.  And I -- again -- I

7    recognize that it's not a -- it's not helpful, because we have

8    a plan, but there's no way I think we should be in the class of

9    equity interest, based on the debtors' own admissions in their

10   papers.

11            Those are my two points.  I'd just add one thing.  As

12   I come to the hearing today and I talk to other claimants, it

13   does seem like there is a factual issue of whether or not

14   there's a separate guarantee out there, and indeed I believe

15   that some of the claimants that have been adjourned for a day

16   came upon these facts, and that's why the debtors probably are

17   adjourning with respect to certain claimants.  I think it's

18   unfair to have everyone else be their -- you know -- well, I

19   guess, reclassified if there's sort of this factual issue out

20   there.  But I think everyone deserves the opportunity to

21   investigate, because it was never raised in the debtors'

22   papers.  And it may turn out it's not meaningful, but I think

23   an adjournment, so that people have a chance to investigate

24   would be appropriate.

25            THE COURT:  Well, I asked earlier whether or not

Page 45

1    there were any factual issues, and you're telling me that, from

2    your perspective, there are.

3              MR. HURST:  Yes, and Mr. Sullivan-- that's, I

4    believe, what he was talking about.  So that -- yes, I do

5    believe that's a factual issue.

6              THE COURT:   And what facts would you be exploring?

7              MR. HURST:   Well, the existence of a separate

8    guarantee -- that that's the -- I mean, that's the fact, and

9    apparently a number of claimants have begun this investigation,

10   have obtained a partnership agreement, and are in a much better

11   position than me, probably to articulate it to Your Honor.  I'm

12   just saying, as I stand here today I feel, you know,

13   uncomfortable that these -- nothing comes up in the debtors'

14   papers, so it wasn't what I addressed when I filed my response.

15   If it's truly something else going on that I'm unaware of, you

16   know, I'd least like to have the opportunity to investigate it.

17             THE COURT:   Okay.  I understand that.

18             MR. HURST:   Thank you, Your Honor.

19             THE COURT:   Thank you.

20             Before we go to the next person, I'm just going to

21   comment generally to the people that are on the telephone.  You

22   probably don't know who are, but we have heavy breather on the

23   telephone, and so I'm going to ask all of you -- and you to

24   have to acknowledge who you are -- to mute your phones or at

25   least to move the speaker away from your nose.  Do we have

Page 46

1    anybody else in Court to speak?  You're to speak in the same

2    order in which you presented yourself before, and you look like

3    -- you look like a new face to me.

4              UNKNOWN VOICE #1:  No, I think I was fourth.

5              MS. WEINER:   Ah.  Good morning again, Your Honor.  I

6    joint Mr. Hurst in asking for an adjournment.  I'd like to

7    point out something -- I'll be brief -- that occurred to me in

8    hearing the debtors' presentation, which is that they came

9    after some 15 thousand claims here, saying that they should be

10   disallowed and equitably subordinated.  They're not asserting

11   that they withdraw their request for a disallowance.  Just the

12   way these claim objection procedures work, Your Honor has

13   entered orders knocking out 14 thousand claims.  Had people

14   filed responses, they wouldn't have disallowed, but I think it

15   is understandable, and you get it listening to people on the

16   phone, what a hardship it is to file responses on time.  I'm

17   not sure what the right procedure is, but I would ask Your

18   Honor to adjourn in order to give people an opportunity to get

19   those orders withdrawn.  I don't think those claims should've

20   been disallowed.  Weil Gotshal is now moving forward with its

21   disallowance.  Thank you, Your Honor.

22             THE COURT:   Well, I hear what you're saying, but

23   what you're saying is inconsistent with the procedures that

24   have been applied in this case now for years.  You're not

25   speaking on behalf of a class of unrepresented third parties

Page 47

1   whose claims have all been disallowed in the last two years,

2   are you?

3            MS. WEINER:  I don't know that I -- that I can, Your

4   Honor --

5            THE COURT:  Right. I don't think you can --

6            MS. WEINER:  I -- I should very much like to, but

7   this is a Court of Equity, and I know you are committed to a

8   clean and transparent process in this case.  I think there is

9   something just fundamentally wrong with 14 thousand claims

10  getting knocked out.

11           THE COURT:  As long as parties had notice and had an

12  opportunity to be heard, that's all the law requires.

13           MS. WEINER:  Ah, perhaps Your Honor.  I'll tell you,

14  having filed responses for parties who got very short notice,

15  because they got documents sent to them in Hong Kong and

16  Argentina -- that it's very difficult.  And I can certainly

17  understand why some people did not respond.  But, in any event,

18  I would ask for an adjournment.  Thank you.

19           THE COURT:  Okay.

20           Is there anyone else who wishes to be heard who is

21  present in Court?

22           MR. VENTURINI:  Yes, Your Honor.

23           My name is August Venturini for claimant Lamita

24  Jabbour on the 215th omnibus objection.  Very briefly, Your

25  Honor, there's no grounds to reclassify the guarantee

1   obligations as debt or equity interests for a number of

2   reasons.  Number one is that the debtors have conceded that the

3   guarantee obligations, under the terms of the guarantee, are

4   senior to common stock.  What they do try to do is they try to

5   hang onto to this pari passu language in the guarantee, which

6   says these obligations are pari passu with parity securities.

7   And in the definition of parity securities we maintain in our

8   papers is circular and vague and ambiguous, and therefore,

9   unenforceable, because it basically says that it's on a pari

10  passu basis with any other security that's pari passu with it.

11  And the debtors have not come up with any other security that

12  says it -- it's pari passu with ours, except for the other

13  guarantees -- they're all in the same boat.  So, in other

14  words, there's no connection between the obligations, under the

15  guarantee, with preferred stock or any securities -- oh, I'm

16  sorry -- any common or preferred stock, which would then allow

17  the debtors to lump the guarantee obligations into the equity

18  interests as defined under the plan, because the equity

19  interests in the plan are defined as common and preferred.  So

20  because there's no nexus to tie the guarantee obligations to

21  preferred stock, then there's no basis to claim that these are

22  equity interests.  Now, there is certainly a claim that there's

23  subordinated guarantees and -- and the question would be, well

24  if they are subordinated they are still senior to the common

25  stock, which is clearly going to guarantee and clearly conceded

1     by debtors in this matter.  I -- I would draw on my papers in

2     terms of the analysis of parity securities -- it's set forth

3     pretty well there.

4              THE COURT:  What happens to these claims and,

5     assuming I accept your argument, do they end up as unclassified

6     junior claims and if so, what treatment are they entitled to?

7

8              MR. VENTURINI:   Two arguments to tell Your Honor.

9     First is that we're saying that the whole subordination

10    agreement is ambiguous because it relates to the parties'

11    securities and therefore is unenforceable.

12              Secondly, or in the alternative, if the Court accepts

13    that there is a lease of subordination element but were senior

14    to common stock than there should have been some type of class

15    to account for us -- to account for our claims and those claims

16    would be before equity interests so there would have to be

17    another level, I suppose, that we would take after the main

18    creditors but before the equity interests.

19              THE COURT:   I'm not sure there is anything for you

20    to take.

21              MR. VENTURINI:   That's what the Debtors have told

22    us, but nevertheless, we still think that it should be superior

23    to the equity interests by the nature of the guarantee, I hold

24    a clear language of the guarantees.

25              THE COURT:   All right.  Thank you.

Page 50

1           MR. VENTURINI:   Thank you.

2           MR. DASE:   Good morning, Your Honor.  My name is

3    Wolfgang Dase for Banque Privée Edmond de Rothschild , the

4    216th Omnibus Objection.

5    We would like to join Mr. Hurst's request for an adjournment,

6    specifically our response incorporated by reference, the

7    arguments of Lloyd's TSB Bank, Geneva Branch, and my

8    colleagues, Lyle, granted them an adjournment and we

9    respectfully submit that the issues are identical with Lloyd's

10   and therefore the adjournment should be granted.

11          THE COURT:   Okay.  Thank you.  But let me -- let me

12   speak with Debtors' counsel about an issue before hearing from

13   others because there are now at least three independent

14   requests for an adjournment for varying reasons, one having to

15   do with the possibly need to take some discovery or obtain some

16   information, one having to do with equitable concerns, one now

17   having to do with what I characterize as it's unfair for us to

18   go forward today while others have been granted an opportunity

19   to have some more time and we'll be going forward some other

20   date, and why do we need to do this today.  And so, my

21   question, Mr. Fail, is why do we need to do this today?

22          MR. FAIL:   Thank you, Your Honor.  I think it was

23   fitting that we had Mr. Bernstein start this morning off with a

24   status conference regarding the number of claims that are

25   pending objection -- the objection is pending.  I believe the

1    number was over 100 omnibus objections out of the 290 or so

2    that were filed remain pending with responses such as the

3    Respondents on the phone and in the courtroom today pending.

4    At some point, Your Honor, we need to move forward and clear

5    those out.  There will be additional omnibus objections and

6    other individual objections coming along.  As Mr. Bernstein

7    indicated.  I believe there are over 10,000 claims that remain

8    subject to review and possible objection.

9            This is not the first hearing on these objections so

10   that means that parties had from between the first hearing

11   which was at least a month ago till today -- this wasn't sprung

12   on anyone -- addressing the three bases that were mentioned by

13   Your Honor just now, in reverse order if I may, objections --

14   the adjournments were granted not to hide anything from the

15   Court, not to -- not out of fear from the Debtors of where the

16   adversary -- a professional courtesy was extended to one

17   counsel -- to counsel for Lloyd's who had a personal conflict

18   and wasn't able to attend today.  The Debtors had extended and

19   adjourned this hearing once before and extended a professional

20   courtesy to counsel.  The fact that other counsel joined that

21   objection doesn't replace each individual counsel's or

22   creditor's obligation to represent their client and, I'm sure,

23   everyone in the party was ably -- well able to do so and the

24   arguments were set forth in someone else's pleading and, to the

25   extent that counsel wishes to prosecute them, they may today,

Page 52

1    address them in the equity argument, I think, Your Honor, has

2    covered that.  Notice's been provided.  30 days, I believe plus

3    three for mailing is required by the bankruptcy rules.

4    Lehman's practice for over three and one half years, or two and

5    one half years, that the Claimants' process has been going, is

6    to provide creditors with more than 30 days and we granted

7    extensions for response deadlines and so, I have no -- I'm very

8    confident that this Court and Lehman has treated creditors

9    fairly and I give no weight to the equity argument.

10           And with respect to the discovery, Mr. Sullivan made

11   a limited request this morning.  He hasn't provided -- he

12   hasn't handed Your Honor -- he hasn't handed counsel, he hasn't

13   handed Lehman a discovery request that would be narrow or

14   tailored.  He seemed to say he's wondering if there are any

15   other guarantees out there.  It's very hard to prove a

16   negative, Your Honor, but Lehman is not aware of any other

17   guarantee other than the subordinated guarantee at issue that

18   could give rise to liability in whatever priority or fashion

19   for Lehman Brothers Holdings, Inc., so we don't believe that

20   discovery would be fruitful or yield a different result.  That

21   said, the others that are joining in the request for recovery

22   haven't contacted counsel to ask for anything in advance and

23   so, I don't know what benefit we will achieve by -- by having

24   an -- additional time for an adjournment, Your Honor.  The

25   costs -- the costs would certainly outweigh.  I'm happy to

1    address the other arguments that were raised if there would --

2    if Your Honor wants to go through this.

3            THE COURT:    Don't we have a minimum of law of the

4    case problem with respect to the treatment today of your legal

5    arguments and the responding of other similarly situated

6    Claimants to another hearing day.    Just speaking

7    hypothetically, assuming I were to agree with every single one

8    of the Lehman arguments concerning this matter, that means you

9    win.    And that means that, as far as the matters that have been

10   adjourned, they necessarily must lose, because there are

11   similarly situated.    So, I'm just concerned from a case

12   administration perspective.    I'd be interested in your views on

13   this as to how rationally we can deal with a class of claimants

14   that is diverse in number, international in character, includes

15   some represented by counsel, some pro se, some who are here to

16   observe in person, some who are simply listening on crackling

17   phone lines, how do we deal with this in a fair and reasonable

18   way so that everybody is able at the end to have an Order which

19   is then either accepted or is the subject to final appeal.

20           MR. FAIL:    Your Honor, I think, the way to proceed

21   is the way that we're doing it, not to treat these as class

22   claims.    There is no class claim before Your Honor.    The

23   Debtors filed omnibus objections to 1,500 -- it's not 15,000 --

24   and it was 1,400 not 14,000 that were -- were expunged, just so

25   that we're clear on the record.    It's a large case but it

1    should work.  It's a large number, but it's not 14,000.

2          We're treating these individually, so there are

3    however many parties that are here today prosecuting their

4    objection, and I'm happy to address their arguments

5    individually.  To the extent that the parties adjourned are

6    worried about law of the case, they haven't expressed that to

7    Lehman and Lehman doesn't represent them.  Lehman isn't arguing

8    law of the case with respect to the objections that we're

9    passed.  We are happy to address it -- each one on the merits.

10          Further, while Lehman has gathered over 1,580 claims

11    based on these two funding entities and these subordinated

12    guarantees and while Lehman has strived for efficiency, there

13    is no guarantee that there are not other guarantees, similar

14    claims out there, that will need to be objected to in the

15    future.  As Mr. Bernstein indicated, there are over 10,000, I

16    believe, claims that are yet to be reconciled and there is -- I

17    cannot the possibility that one of those claims has the same

18    CUSIP embedded within it and that will need to be addressed in

19    the future, so I think, we'll have to just deal with, on a case

20    by case basis, each -- each of the claims.  There is no other -

21    - there is no other practical way to proceed.

22          THE COURT:  I'm not getting into the question of

23    whether or not there may be some other claimants out there.

24    I'm getting into something that's more fundamental, which is

25    just this particular group, this particular identified class,

Page 55

1    not in a class action sense, but in the sense that there are

2    certain parties that are the subject of four currently pending

3    omnibus objections who have responded.  Some with overlapping

4    arguments and in the case of Banque Privée and one party who

5    has almost identical positions that has gotten the benefit of

6    an adjournment, there is at least as to that example an issue

7    of, what I call, fair treatment.

8              MR. FAIL:   Your Honor, if I may though, you're

9    flipping the argument that's being made.  The parties were not

10   at the next hearing were the Debtors' made the arguing law of

11   the case.  In that case, this conversation may be relevant.

12   Was it fair that we went forward and they shouldn't be bound

13   where they weren't a party.  These are parties saying "wait,

14   someone else may do the work for me.  Wait because someone else

15   may do something in the future."  It's -- They are not being

16   prejudiced by going forward and having a fair and full hearing

17   today on the arguments.  They are looking for the benefit of

18   something else in the future, not complaining about law of the

19   case going forward and prejudicing them.

20             THE COURT:   No, I think, what they're basically

21   saying is, at least some people have said "We would like an

22   adjournment".  And if it's good enough for three parties who,

23   for whatever reason had an adjournment, why isn't it good

24   enough for us.  Why shouldn't this all be heard at the same

25   time instead of in parts.  I have, frankly, some appreciation

1    for that argument.  I'm concerned from my perspective as to

2    what I'm supposed to do today.  Let's just assume for the sake

3    of argument that we set aside time this afternoon and tomorrow

4    afternoon and I'm able to get through however people are

5    currently in person and on the phone and have things to say

6    about this issue.  Then what?  Is it your position that I

7    should rule from the bench and say "Lehman, you win"?  Or is it

8    your position that I should take it under advisement and wait

9    until I see what others have to say in a month?  What am I

10   supposed to do with this, Mr. Fail?

11             MR. FAIL:   There are --

12             THE COURT:   I think what we have is an

13   administrative problem that we share.

14             MR. FAIL:  -- I agree with that, Your Honor.

15             THE COURT:   And because you brought it to Court, you

16   actually own it.

17             MR. FAIL:   Yes, Your Honor.  The Debtors' request

18   would be that Your Honor rule from the bench in the Debtors' --

19   in Lehman's favor.  Another alternative would be as Your Honor

20   suggested to hear the parties that are present today with no

21   guarantee that they would be available at the next adjourn date

22   that everyone's schedule would be satisfied and go forward at

23   an additional hearing.  In the interim though, Your Honor --

24             THE COURT:   Let me tell how I think we should

25   proceed based upon where we are.  I'm not going to rule today,

1     so that becomes easy.  Administratively, however, it seems to

2     me that everybody who has gone to the trouble of hiring counsel

3     and having them show up today should at least the opportunity

4     today to say what they want to say.  We're not going to waste

5     the day.  Those that are on the telephone also will have an

6     opportunity to either choose not to say anything, or if they

7     wish to add something, to have that opportunity.  But I'm not

8     deciding this question until after the last cock has crowed.

9     The way in having certain claims go to another day effectively

10    would be the default decision.  There will be no decision until

11    -- there will be no decision that affects all until we've heard

12    from all.  I think that's a fair way to approach this, because

13    that also gives those parties that are here today, if they need

14    some more time to ask some questions, if there are questions to

15    ask, to find out what they can find out about other guarantees

16    that may apply.  I heard what you said and I accept what you

17    said, but presumably parties may want to ask that more

18    directly.

19              MR. FAIL:  Certainly, Your Honor.

20              THE COURT:   So let's just -- let's do the following.

21    We have an 11:00 o'clock -- it's now 11:15 -- let's take the

22    next fifteen minutes to get to 11:30 to see what we can

23    accomplish in that period of time.  We'll then go to the JP

24    Morgan matter and we'll adjourn till 2:00 o'clock and the

25    parties who wish to be heard at 2:00 o'clock who haven't been

Page 58

1    heard with respect to these claim objections can be heard at

2    that time, recognizing that I only have an hour this afternoon

3    for that purpose.

4              MR. FAIL:  Thank you, Your Honor.

5              UNKNOWN SPEAKER TELEPHONIC:  Your Honor.

6              THE COURT:  We still have people in Court that wish

7    to be heard.

8              UNKNOWN SPEAKER TELEPHONIC:  May I speak for the

9    people on the telephone.

10             THE COURT:  We can, but -- those people who are

11   physically present in Court are at the head of the line and

12   then we'll get to the people that on the telephone.

13             MR. SIBLEY:  Good morning, Your Honor, Patrick

14   Sibley again, Pryor Cashman, on behalf Bank of Valletta. My

15   client simply just wishes to join in all the arguments

16   presented today.  I have nothing else to add.

17             THE COURT:  Okay.

18             MR. SIBLEY:  Thank you, Your Honor.

19             MR. SHANK:  Your Honor, I am a new face.  My client

20   is also joining in the responses to the omnibus objections.  My

21   name is Ross Shank, Kasowitz Benson.  My client's name is Suad

22   Salumeh (phonetic).

23             I am here continuing to join in the objection

24   including the objection -- response of the Lloyd's TSB which

25   has been adjourned.

1          MR. CARRION:  Good morning, Your Honor, I'm Chris

2     Carrion, again on behalf of WilmerHale, representing Banque

3     Populaire Côte d'Azur.

4          I just wanted to reiterate that my client joins in

5     the arguments of all the claimants made today.  Thank you.

6          THE COURT:  Sorry, who were your clients? Banque

7     Populaire?

8          MR. CARRION: Banque Populaire.

9          MR. UDEM:  Good morning, Your Honor.  Marianna Udem,

10    Neiger LLP, for Banque Safdié, now known as Leumi Private Bank,

11    and I would simply like to join in the arguments already made

12    by counsel today on behalf of my client.  Thank you.

13         THE COURT:  Is there anyone else who is physically

14    present in Court who wishes to be heard.  Okay.  Begin with the

15    telephone.

16         MR. ALPIZAR:  Your Honor, this is David Alpizar from

17    Mexico, and actually, we just want that we are treated like

18    everybody else in the claims.  We cannot be calling every day

19    or every time, because this is no, you know, we are thousands

20    of miles away and we have a life to go with, and we just wish

21    the Court takes our petition to be treated the same as

22    everybody else in the claims and whatever we can go by or not),

23    we're not.

24         MR. BENSION:  Your Honor, can I just ask for the

25    creditors to say if it's possibly to say their claim number,

Page 60

1   because the names are a little bit hard to hear, if it's

2   possible.

3          MR. ALPIZAR:  Yeah, my claim number is 4940481.

4   David Alpizar for Mexico.

5          MR. BENSION:   Thank you.

6          THE COURT:  Okay.  Is there anyone else who wishes

7   to be heard is on the telephone?

8          THE COURT:  Whoever is now speaking, I can tell you

9   at least I'm not hearing you.

10         MR. BENSION: Okay, sorry, Your Honor.

11  Alberto Bension, I'm on with my son Andreas, I'm for claims 47-

12  4-9-5 and 96, represented, pursuing their answer, so we'll have

13  at least our go at this case.  Thank you.

14         MR. FLORIA:   Your Honor --

15         THE COURT:  Yes.

16         MR. FLORIA:  My name.  I'm number (indiscernible

17  11:18:20).  The claimant's name -- Fok Yim-Sheung Floria.  Case

18  number 6-5-0-3-1-6-5-0-3-2  6-5-0-3-2.  This is a claim

19  relating to --

20         THE COURT:  I have to break in and just say this

21  that the way this works, we have recording equipment that

22  accepts sounds. but the sounds have to be audible in order for

23  the system to work and you're not speaking loud enough or the

24  connection is not good enough for you to be heard by the

25  equipment, so you have to really speak up.

Page 61

1          MR. FLORIA:  Yeah, Claimant's name is Fok Yim-Sheung

2    Floria, case number 65021, 65022, and 65023 (indiscernible

3    11:19:12).  In fact, for this matter, (indiscernible

4    11:19:20)about seven weeks before the deadline, September ---

5    normally it takes about one week from Hong Kong -- and from

6    Hong Kong to New York  (indiscernible 11:19:25) approximately,

7    which is six days after the deadline -- four days after the

8    deadline --

9          THE COURT:  Can I break in one, can I break in -- I

10   have a feeling you're talking about something completely

11   different from the issues that are before the Court today.  It

12   sounds  to me as if you're talking about an objection that your

13   claim was received late because of time spent in mailing.

14   That's not before me today, so while you may have an argument

15   to make, this is not the time to make it.

16          MR. FLORIA:  (indiscernible 11:20:36) I think --

17   because I had (indiscernible 11:20:37) all my (indiscernible

18   11:20:38), seven weeks before the post date.  But a couple of

19   weeks -- for the (indiscernible 1:20:53)  I don't what I'm

20   telling (indiscernible 11:20:54) the same (indiscernible

21   11:20:55) seven weeks to (indiscernible 11:20:56) only take one

22   week --

23          THE COURT:  May I suggest that rather than dedicate

24   time on the record with perhaps 35 people sitting in the

25   courtroom that you have a conversation directly with Debtors'

Page 62

1    counsel to see if you can reconcile issues relating to your

2    claim and if you can't, you can find out when it will be heard.

3    It's not being heard today.

4              Is there anyone else dealing with a particular

5    omnibus objection that the Court is dealing with now?

6              MR. HAM:   Yes, Your Honor, my name is Andres Ham.

7    I'm calling from Montevideo, Uruguay on behalf of Mr. --I filed

8    that onto a disc.  The claim number is 47459.

9              In the first place I wanted to say that on the writ

10   filed by the Debtors' counsel, on the 25 of April, my client is

11   the least of people that who need a claim, but it says here

12   that the response was received after the initial hearing date

13   and after claimant's claim has already been expunged which is

14   not exactly accurate because my client's response was received

15   by way -- but it was somehow mistake -- submitted another

16   response.  The way it's already -- have already acknowledged

17   the situation and said to us via e-mail that our response was

18   going to be considered --

19             MR. FAIL:   Your Honor, if --

20             MR. HAM:   -- but I wanted to -- just to make clear

21   that what he says here in the writ is not exactly accurate.

22             THE COURT:   Mr. Fail, do you want to comment?

23             MR. FAIL:   Yes, if I may, Your Honor.  We recognize

24   that with respect to this claim 47459, a response was received.

25   It was -- the claim was, however, expunged, on the previous

Page 63

1   Order by the Court.  We acknowledged in the reply that we were

2   treating it as if it -- the reply had been received to the

3   extent that the Order is not granted -- to the extent that Your

4   Honor agrees with the Debtor and Lehman currently and were to

5   reclassify the claim, we would contact Epic and have the claim

6   restored to the claim's registry and reclassified as equity. To

7   the extent that Your Honor orders otherwise, we'll contact Epic

8   and arrange for that.  It was inadvertently expunged rather put

9   it back as a regular claimant and move it subsequently we chose

10  to deal with it this way.

11          THE COURT:  So for purposes of the pending motions,

12  even though this particular claim has been expunged, it would

13  be treated as if it has not been expunged for purposes of

14  whatever relief my apply to the class of claims affected by any

15  order I may entered.

16          MR. FAIL:  I wish I could have said it that clearly,

17  yes, Your Honor.

18          MR. HAM:  Thank you, Your Honor, and having said

19  that, I want to join the arguments of the claimants that have

20  been disposed today on behalf of Mr. Rafael, also.

21          THE COURT:  Okay, thank you.

22      Is there anyone else who wishes to be heard on this

23  question, and, by the way, what I think I am hearing as a

24  pattern, and I can make this statement for everyone who's on

25  the phone is that everyone who is on the phone wishes to be

Page 64

1    treated equally and basically adopt all of the arguments that

2    other parties have made as to why their claims should not be

3    reclassified.  I believe that is probably a common theme.  I

4    don't wish to put my words in your mouth, but to the extent

5    that you agree with what I've said, you can just say that and

6    we can then probably close this phase of the hearing.

7         MR. ALPIZAR:   I agree, Your Honor, I'm David

8    Alpizar, case 49481.

9         MR. BENSION: I agree, Your Honor.  Case 4-7-4-5-9.

10   Mr. Rafael Alonso Ortiz.

11        MR. BRICENO:  Your Honor (indiscernible 11:25:49),

12   Antonio Briceno, case 4-9-4-9-7-4-8-8.

13        MR. BENSION:  Alberto Bension, (indiscernible

14   11:26:00), Your Honor, case 47-49-5 and 6.

15        MR. COLE:  I thank, Your Honor.  My name's Frank

16   Cole.  My case number is 7-0-2-0.  Thank you.

17        THE COURT:   Now I'm not going to assume that silence

18   is agreement.  So is there anyone on the phone who wishes to

19   say something in addition to a general statement I made which

20   attempted to summarize what I believe I have been hearing from

21   everybody.  Is there anything in addition -- additional, that

22   anyone wishes to add at this point?

23        MR. HAM:   I would like to add one more thing, Your

24   Honor.  Anyone that fails to call is not taken as a withdrawal.

25        THE COURT:   I'm sorry I didn't understand that

1    point.

2            MR. HAM:   Well we are in countries away and if we

3    cannot call that doesn't mean that we are withdrawing our

4    claims.

5            THE COURT:   Okay, I understand.

6            Here is what I think makes sense at this point.

7    Unless there is someone in Court who wishes to speak at this

8    juncture, I'm going to treat this as, effectively, oral

9    argument with respect to the written positions that have been

10   submitted by the various parties who are affected by these four

11   omnibus objections.  I'm also going to treat all of the

12   objections as if they're being made on behalf of all of the

13   objectors.  I'm not going to segregate, for example, an

14   argument about ambiguity and treat that as applicable to only

15   the objector who raised that point, because in dealing with

16   this issue, effectively, with what is a legal question.  And so

17   everybody is going to -- everybody who is objecting to the

18   omnibus treatment is going to be supporting one another and

19   their arguments will apply across the board.  That said, I'm

20   deciding this question until we've heard from the group to be

21   heard at the omnibus hearing or whenever their claims are to be

22   heard and it is more likely than not that I will take this

23   under advisement and I need to reflect on this rather than

24   simply rule from the bench.  And, during the interval between

25   this hearing and the next hearing on these objections, and Mr.

1    Fail, do we have a date?

2            MR. FAIL:   Your Honor, the next claims hearing is

3    May 31.  I'm not sure what's scheduled for that calendar or

4    what's on for the omnibus hearing in the interim.

5            THE COURT:   Well, I don't know what arrangements

6    have been made with those attorneys who requested adjournments,

7    but I'm assuming that they'll be heard on a common date.  Well

8    the parties who participated in today's hearing will have

9    notice of that date and will have an opportunity, should they

10   wish to participate to participate, either to listen or to make

11   additional comments.

12           Moreover, to the extent that any party has a desire

13   for targeted discovery of an informal nature with regard to the

14   existence of guarantees that may be applicable to these claims,

15   I presume that that will take place during the interval between

16   this hearing and the next hearing, whenever that is, so that,

17   at least at that point, we'll not have any issues of unanswered

18   questions and I will suggest, that at the next hearing, those

19   attorneys in particular who wish to make legal arguments will

20   have an opportunity to make those arguments for a last and

21   final time before this -- this is to be decided.  So this will

22   be adjourned to that date to be determined.  Notice will be

23   provided.  We'll take a five minute break.  Those who wish to

24   leave may leave.  The attorneys who are involved in the JP

25   Morgan matter can come forward and I'll see you in five

1    minutes.

2              MR. FAIL:  Thank you, Your Honor.

3

4         (Whereupon the Court recessed till 11:42 A.M.)

5

6              THE COURT:  Be seated, good morning.

7              MR. NOVIKOFF:   Good morning, Your Honor, Harold

8    Novikoff, Wachtell, Lipton, Rosen & Katz on behalf JP Morgan

9    Chase Bank.

10             We are here today on JP Morgan's Motion to Strike

11   certain of the objections contained in LBHI and its former

12   creditors' committee's objection to JP Morgan's proofs of claim

13   that covered its clearance-related extensions of credit both

14   against LBHI and against LBI.  The principal issue raised in

15   that objection is whether JP Morgan liquidated the securities

16   collateral posted by LBI in a commercially reasonable matter.

17   As reflected in our materials, Your Honor, we're prepared to

18   vigorously contest that portion of the objection.  We feel JP

19   Morgan, in fact, did an exemplary job of liquidating the

20   securities, but that part of the objection, Your Honor,

21   involves a number of issues of disputed fact, which I imagine

22   will be resolved at some point in due course.

23             THE COURT:  What's the time table for that as far as

24   you know?

25             MR. NOVIKOFF:  The -- we are in the process of

1   discovery on that.  I don't -- honestly I don't know the full

2   schedule of that discovery at that moment, but that is in

3   process now.

4          THE COURT:   Does the disposition of the pending

5   procedural motion in any way affect the discovery program

6   that's under way?

7          MR. NOVIKOFF:   What it would do, Your Honor, is what

8   -- is the issue -- there are factual issues which are

9   extraneous, meaning that they are only related to the two

10  objections that we want to strike.  Those would have to go

11  through additional discovery, if they are not stricken,

12  otherwise they will be put into the hopper as well.  It could

13  extend the schedule, but I don't think that is set one way or

14  the other at the moment.

15          THE COURT:   Okay.

16          MR. NOVIKOFF:   The two objections that I'm referring

17  to, and these are again -- are apart from the commercial

18  reasonableness, is first that the objectors argue that the

19  clearance claim should be reduced by the value that they

20  attribute to the release by Barclay's of the law suit they had

21  brought against Behr Sterns.  In addition, they say that post-

22  Petition interest should be disallowed here on an equitable

23  basis.  And, we're here today on JP Morgan's Motion to Strike

24  those as legally deficient and under the applicable rules, Your

25  Honor, and case law, they should be stricken if there is no

1    question of fact or substantial question of law that might

2    allow the objection to succeed and if the Claimant is

3    prejudiced by the inclusion of the objection.  In the Coach v.

4    K-Mart case cited in our materials, the District Court for the

5    Southern District of New York recognized that increased

6    litigation time and expenses are types of prejudice that would

7    qualify for Fed.R.Civ.P. 12(f), which we're asking to be

8    adopted in this case.

9            JP Morgan and the objectors would be particularly

10   prejudiced here, if these objections are not stricken now,

11   because there is substantial extraneous factual disputes that

12   relate solely to these objections.  Extensive discovery time,

13   expense, would have to be undertaken to value this law suit

14   that was released by Barclay's against Behr Sterns, and it

15   relates to Behr Sterns' mortgage-related hedge funds.  We're

16   talking about a law suit that was settled in 2008, will never

17   be litigated, is totally unrelated to Lehman, and in fact,

18   arose from events that occurred before JP Morgan acquired Behr

19   Sterns.  If we were to proceed with the first of the two

20   objections that I referred to, we would have to determine the

21   value of that law suit.  That is a whole set of discovery that

22   we would like to avoid.

23           THE COURT:  Why does the number $400 Million Dollars

24   stick in my head?

25           MR. NOVIKOFF:  $400 Million Dollars was the ad

1      damnum clause in that law suit, it's the amount that the

2      Plaintiff asserted was owed in the law suit.

3              THE COURT:  So the maximum amount that would be

4      involved as to this piece of the puzzle presumably is $400

5      Million Dollars because it's unlikely that, unless there was an

6      amendment, we're talking about a bigger number.

7              MR. NOVIKOFF:  That's correct, Your Honor.  But the

8      issue, of course, would be if you receive a release of a law

9      suit that was totally unresolved, the damage claim was for $400

10     Million but what was that release actually worth, which would

11     involve and carry into all of the facts and circumstances of

12     that law suit, which are otherwise not before this Court.

13     Similarly, with respect to the post-Petition interest

14     objection, the objectors say that, based on the equities of the

15     case, that should be disallowed and the equity that they are

16     pointing to is that the -- a great deal of the cash collateral

17     posted by LBHI was not applied against the clearance claims,

18     the total of closing under the collateral disposition

19     agreement.  We would have to get into something again,

20     otherwise extraneous to the entire matter, what were the facts

21     and circumstances relating to why or why not the collateral was

22     applied when it was applied.

23              THE COURT:  Is there a real disputed issue of fact

24     as to whether JP Morgan Chase was oversecured at relevant

25     times?

Page 71

1          MR. NOVIKOFF:   Yes.

2          THE COURT:   There is no disputed issue --

3          MR. NOVIKOFF:   No, there is -- there is a disputed

4    issue.  We still don't know whether that's true because, in

5    part, that will -- that may depend on Your Honor's rulings on

6    the portions of the adversary proceeding on which you did not

7    grant a motion to dismiss.

8          THE COURT:   So, if hypothetically, 8.6 Billion

9    Dollars, just to pick a number, is removed from the collateral

10   pool, would JP Morgan be over-secured?

11         MR. NOVIKOFF:   Well, even then, Your Honor, we don't

12   know the answer.  First, the number now is probably 7.9

13   Billion, because $700 Million was returned in a separate

14   settlement of the assessment management funds in Highbridge

15   (phonetic).  But if 7.9 Million was removed, then we would have

16   the further question of what was the value of the securities

17   that were returned by JP Morgan to Lehman under the collateral

18   disposition agreement, because under the collateral disposition

19   agreement, to the extent that those served as collateral, we

20   need to figure out that value and we'll treat it as a secured

21   creditor to the extent of that value.

22         THE COURT:   Help me with this -- how am I supposed

23   to decide as a preliminary question issues that just in

24   colloquy now you're incapable of answering.  In other words,

25   why are you indisputably entitled to post-Petition interest in

Page 72

1      a situation where everything is in dispute.

2              MR. NOVIKOFF:   Your Honor, we're not saying we're

3      indisputably entitled to post-Petition interest until a

4      determination can be made that, in fact, we are oversecured

5      within the meaning of 506(b) --

6              THE COURT:   So, is this a hypothetical Motion to

7      Strike or is this an actual Motion to Strike?

8              MR. NOVIKOFF:   This is an actual Motion to Strike,

9      because if Your Honor doesn't cut off the objection that's been

10     made now, which is that you can simply disallow on equitable

11     grounds, we may all be off on a frolic and detour, taking

12     discovery and wasting the -- the resources both of JP Morgan

13     and of the estate in pursuing discovery which is entirely

14     unnecessary.

15             THE COURT:   Why is this even an issue that requires

16     separate discovery?  Isn't this either you have the

17     entitlement, which is what you say or you may not have the

18     entitlement, which is what they say, but why does this lead to

19     any incremental cost and expense to either party in terms of

20     the discovery efforts?  Isn't that simply a legal argument that

21     could be heard later in the case?

22             MR. NOVIKOFF:   No, Your Honor, because I -- it

23     involves factual issues.  It's their position that JP Morgan

24     delayed in applying the cash collateral.  It's our position

25     that the reason it was not delayed earlier is they did not want

Page 73

1   us to apply the money there and there are -- they did not want

2   us to apply the money and we didn't apply the money as part of

3   a cooperative arrangement that ultimately led to the collateral

4   disposition agreement.  And the issue of whether, you know, the

5   delay -- to use that word -- the fact that it wasn't applied to

6   the collateral disposition agreement, the issue of whether this

7   is something that JP Morgan did to, as they say in their Brief,

8   to just run up the tab, was it running up the tab or was

9   something done on a cooperative basis.  In fact we were

10  encouraged not to apply the money, should that come into

11  consideration to determine any equitable considerations, if

12  equitable considerations are something that should be

13  considered in this context.  Were we would like Your Honor to

14  rule is that the equitable consideration simply don't get into

15  it so we don't have to get into discovery, don't have to get

16  into a great deal of cost, expense, and delay in trying to run

17  all of those issues to ground.

18          THE COURT:  Is that it?

19          MR. NOVIKOFF:  That's it on -- in addressing Your

20  Honor's question.

21          THE COURT:  Okay.

22          MR. NOVIKOFF:  I would like to --

23          THE COURT:  Well maybe this was a wonderfully

24  concise argument.  I would applaud you for that.

25          MR. NOVIKOFF:  I -- I can't do it that quickly, Your

Page 74

1      Honor.

2              THE COURT:   Okay.

3              MR. NOVIKOFF:   Let me turn to their first point,

4      that is the -- that the clearance claim should be reduced for

5      the value of the settlement with Barclay's.  It is their

6      contention that the deficiency claim -- the LBHI deficiency

7      claim -- should be reduced by the asserted value of the

8      settlement, the release of the law suit.  That release was

9      incorporated into a settlement agreement dated December 5,

10     2008, among JP Morgan, Barclay's, and LBI's SIPA Trustee, and

11     that was approved by an Order of Your Honor dated December 22,

12     2008, in the LBI SIPA proceeding.  In that, there was a

13     settlement between JP Morgan and Barclay's, relating to

14     Barclay's failure to roll a 15.8 billion Dollar Repurchasing

15     Agreement and otherwise take other steps necessary to replace

16     JP Morgan's clearance financing of LBI.  It had been JP

17     Morgan's position that Barclay's had promised to do those

18     things.

19              Because of JP Morgan's -- excuse me, because of

20     Barclay's failure to replace the financing, JP Morgan had to

21     use an army of traders and other personnel to generate more

22     than 19 Billion of sales proceeds and other collections from

23     the securities collateral posted by LBI, for which JP Morgan

24     did not collect any commissions from Lehman as it acknowledged

25     by the objectors in the objection.  JP Morgan incurred

1    substantial fees and expenses to recover on the claims.  They

2    incurred substantial fees and expenses to defend against

3    Lehman's efforts to avoid and challenge JP Morgan's claims,

4    liens, and collection efforts, including this objection and it

5    will bear the shortfall, which Your Honor referred to, if JP

6    Morgan's ultimate recovery on the clearance claims, if there is

7    in fact a shortfall.

8              At the time of the settlement agreement, however, in

9    2008, the extent of JP Morgan's losses and expenses was unknown

10   and, indeed, is still unknown.  But notwithstanding that

11   uncertainty, JP Morgan/Barclay's, decided to settle their

12   disputes through this two-way JP Morgan's/Barclay's settlement

13   included in that separate, included in that settlement

14   agreement.  So in exchange for JP Morgan's release of each

15   claims against Barclay's for its failure to roll the 15.8 Repo

16   and otherwise replace the clearance financing, Barclay's

17   released its unrelated law suit against Behr Sterns with

18   respect to the Behr Sterns hedge funds.  And just as the amount

19   of the losses sustained by JP Morgan was unknown at that time,

20   the value of the law suit was also unknown at that time and

21   also still remains unknown and by this Motion to Strike, we are

22   hoping to avoid the necessity or trying to figure out the value

23   of that law suit which is otherwise extraneous to this

24   objection.  So sophisticated parties like JP Morgan Barclay's

25   often enter into settlements where the facts are unknown, but

Page 76

1    in doing so, they take on some very important risks.  So JP

2    Morgan accepted the risk that when additional facts where

3    known, it might turn out that it was undercompensated, so if in

4    fact, JP Morgan ends up underpaid by a huge amount here, then

5    in retrospect, it may turn out to have been a very unfortunate

6    settlement from JP Morgan's perspective.

7              On the other hand, Barclay's accepted the risk that

8    when additional facts were known, it might turn out to have

9    paid too much.  Maybe JP Morgan suffered no shortfall and ran

10   up very little in the way of expenses.  They each took on those

11   risks and move forward.  People settle and move on.

12             Lehman, however, accepted no such risk in either

13   direction.  LBHI was simply unaffected by this settlement and

14   had no role in this settlement.  It was not a party.  The

15   Lehman estates and the amounts available for other creditors

16   were in no way diminished by the settlement between JP Morgan

17   and Barclay's.  LBHI wasn't a party and LBHI contributed

18   nothing to the settlement.  JP Morgan alone contributed

19   valuable claims against Barclay's as part of the settlement and

20   JP Morgan alone accepted the risk that it was being

21   undercompensated as part of the deal. This was really a

22   bilateral settlement transaction.  It was included in the

23   settlement agreement to which the LBI Trustee was a party, but

24   the LBI Trustee was a party to another aspect of it, which I'll

25   discuss in a moment, was not involved in portions of the

Page 77

1    settlement agreement on this transaction.

2              But even though LBHI had no role in this, the

3    objectors now audaciously now argue that LBHI not JP Morgan is

4    entitled to the value that JP Morgan received under the

5    settlement.  According to the objectors, it's possibly,

6    although certainly not known at this time as Your Honor

7    discussed, that JP Morgan might ultimately be fully paid by

8    Lehman on its clearance-related claims.  So objectors say that

9    the value of the law suit released by Barclay's, whatever that

10   may be, is an added recovery to JP Morgan and JP Morgan can't

11   get a double recovery, even though it doesn't have any effect

12   whatsoever on the Lehman estates.  Therefore, according to the

13   objectors' argument, LBI should have its obligation to JP

14   Morgan reduced by the amount of any potential excess recovery

15   that JP Morgan got from Barclay's, even though such recovery

16   would have come solely from Barclay's.  LBHI had no role in it,

17   JP Morgan obtained the recovery by giving up valuable rights

18   and taking on substantial risks and that any reduction of that

19   type would simply be a total windfall to LBHI.

20             Now, we don't dispute that a creditor cannot receive

21   a double payment on its claim from a debtor, but here there is

22   no chance.  I repeat, no chance, that Lehman, LBHI, and LBI

23   will be required to pay more than their contractual obligation.

24   The potential for JP Morgan to recover more, whatever that

25   potential is, is to recover more, it's -- the -- the credit

1    recovery will come from Barclay's and it exists solely because

2    JP Morgan took the risk that it might be undercompensated.  It

3    also took the risk or Barclay's took the risk that it might be

4    overcompensated, but the only potential exists because JP

5    Morgan took that risk on of undercompensation by settling

6    before the full extent of its losses were ascertainable.  Had

7    JP Morgan and Barclay's actually known the full amount that JP

8    Morgan's losses and expenses at the time they entered into the

9    settlement, there is no way that Barclay's would have agreed to

10   pay JP Morgan more than the amount of its losses. Again, it

11   just points out that the only reason that this exists is

12   because JP Morgan took on the risk of settling early back in

13   2008, and seeing -- and taking on the risk that it could be

14   undercompensated.  So therefore the possibility that in

15   hindsight JP Morgan might recover from its settlement with

16   Barclay's more than its losses and expenses exists only because

17   it took on that risk of undercompensation.

18          Now Chapter 11 itself contemplates a similar

19   situation in which a creditor can be ultimately overcompensated

20   in hindsight for taking on a risk of being undercompensated.

21   So, for example, while it didn't happen actually in this

22   Chapter 11 case, it happens in a lot of other Chapter 11 cases

23   in which Your Honor was involved, equity and other property is

24   distributed to creditors, and in a cram-down case, is valued as

25   of the effective date of the plan under Section 1129(b)2.  So

1    years after confirmation, it might turn out that the value of

2    the equities increased to the point where the senior creditor

3    actually receives more than the original amount of its claim,

4    so even if that valuation of the equity was a result of a cram-

5    down which caused junior creditors to receive nothing, they

6    don't get an adjustment years later because now the equities

7    become more valuable, and there is no refund back to the

8    estate.  And I cite -- refer Your Honor to the PWS Holding

9    case, cited in our materials.  The reason the senior creditor

10   gets to keep this potential greater recovery is because it took

11   on the risk that equity it received might in fact hopefully

12   turn out to be less.  That's the nature of it.

13            In Chapter 11, just in settlements, you settle and

14   you move on, and that's what we do.

15            We could have drafted the settlement agreement to

16   eliminate the possibility of overcompensation without any

17   effect on the Lehman estate, so JP Morgan could have agreed, if

18   it ever got an excess amount, to simply return it to Barclay's

19   or Barclay's could have been subrogated to JP Morgan's claims

20   to the extent that JP Morgan had actually been fully paid out.

21   We didn't include provisions of that sort, maybe they should

22   have been included; they were not included, but had they been

23   included, the objectors had what -- would now have no argument

24   at all, because there would be no possibility that JP Morgan

25   would receive more than full recovery on its claims, but those

Page 80

1    provisions would have had no effect on the estate. It  just

2    shows that that, what we are talking about here is simply a

3    bilateral resolution between Barclay's and Lehman and the

4    estate should not now --

5             THE COURT:   You mean a bilateral between Barclays

6    and JPMorgan?

7             MR. NOVIKOFF:   Yes, I misspoke, Your Honor. Thank

8    you.  Yes, between Barclays and JPMorgan.

9             THE COURT:   Now, the parties to the applicable

10   settlement agreements included: Barclays, JPMorgan, LBI --

11            MR. NOVIKOFF:   And LBI.

12            THE COURT:   Was LBHI involved at all?

13            MR. NOVIKOFF:   LBHI was in court.

14            THE COURT:   Yes, but were they a signatory to the

15   agreement?

16            MR. NOVIKOFF:   They were not a signatory to the

17   agreement, but, Your Honor's order says that the approval of

18   the agreement is binding in the Chapter 11 cases and related

19   cases.

20            THE COURT:   Well, don't you have an optical problem,

21   of sorts, though?

22            I mean this is a very dense and complicated fact

23   pattern.  And JPMorgan is a very significant financial player.

24   If you made what turns out in retrospect to have been a

25   fabulous deal and you end up profiting on the Lehman

Page 81

1    settlement, I think it looks bad.  I'm telling you I think it

2    looks bad. And I think it's going to look bad to creditors and

3    observers who are looking from outside into this case.  You're

4    making a very reasoned, but highly technical argument at the

5    beginning of a process and before I have access to all the

6    background information that entered into the settlement.

7              I know a lot about this case.  But a lot of what I

8    know is superficial because it's what's presented in Court.

9    All that hard work that's done outside, it's presented, it's

10   explained, it's approved; or not, as the case may be.  And here

11   we're talking about something that occurred during the hot and

12   heavy, early days of the case.  And if you made a deal, that in

13   retrospect, was hugely advantageous to JPMorgan, you're

14   basically asking me today to declare that the estate gets no

15   credit, under any theory, for the bilateral aspects of the

16   agreement between JPMorgan and Barclays.

17             Why should I do that now?

18             MR. NOVIKOFF:   Well, actually, Your Honor, it's our

19   position that you did it in December of 2008.

20             THE COURT:   Okay. I'm not sure I knew I did it, and

21   you may be right but that's a legal consequence to be drawing

22   from it, but I'm certainly not prepared to do that today.

23             If you have a good argument, you can make that good

24   argument a year from now, or whenever this is trial-ready.  I

25   don't understand why I should be, in effect, cutting you free

1   of this potential exposure now, just because it's good for

2   JPMorgan.

3           MR. NOVIKOFF:   Well, it's good for the estate also,

4   Your Honor.

5           THE COURT:   I can't believe it is because they're

6   telling me they want very much to be able to have this little

7   "got-ya" for you.

8           MR. NOVIKOFF:   If, a year from now, Your Honor

9   determines that, you know, JPMorgan was right all along when I

10  go through the careful analysis, they're right as a matter of

11  law, then we will have, at that point, simply wasted a great

12  deal of time and expense.  A lot of expense, both JPMorgan and

13  the estate, in trying to come to -- no, development of all of

14  the facts and circumstances behind a lawsuit that otherwise has

15  nothing to do with the Lehman case.

16          THE COURT:   It doesn't seem like that big of a deal

17  to me, frankly, Mr. Novikoff.  We know it's no more than $400

18  million. We know that financial advisors and lawyers handicap

19  the value of litigation all the time.  There may be some

20  agreement.  I suspect that sophisticated lawyers with some

21  financial advisors sitting in a room could figure out the fair

22  value of that case in 3 hours.  At least in a range.  So, let's

23  just say that's done.  Is this really that big of a deal, given

24  all the other huge issues that will occupy the parties over the

25  next however many months?  Because it doesn't seem like that

1    big of a deal to me.  Tell me why I'm wrong.

2           MR. NOVIKOFF:   Your Honor, this is a case where

3    there, frankly, was not a great deal of factual development.

4    It is -- $400 million is still a lot of money to some people.

5    I understand in the context of Lehman, it's not the biggest

6    amount in the world, but even to an institution like JPMorgan

7    that's a lot of money. And I think it's going to involve a lot

8    more effort than Your Honor is attributing to it to get to --

9           THE COURT:   Let's just say that a range of values.

10   We know it's probably no more than $400 million --

11          MR. NOVIKOFF:   Uh huh.

12          THE COURT:   -- and we know it's more than zero.  So,

13   it's some number -- no offense, but, so what. How much time can

14   parties actually spend pricing that imponderable?  It's not

15   worth that much time and effort.  It's just some number.  And

16   no one's going to know for sure what that number is. So, let's

17   just say it's a black box, with a question mark in it --

18          MR. NOVIKOFF:   Okay.

19          THE COURT:   -- Why should anybody spend significant

20   time focused on that black box?  It becomes, potentially, a

21   credit against your claim.  If it ever does become a credit

22   against your claim, then we can spend a lot of time trying to

23   figure out what it is.  But why do we need to spend time now

24   doing that?

25          MR. NOVIKOFF:   Well, Your Honor, if what we can do

Page 84

1    is put off the discovery on that until we have to figure out

2    whether we actually need to take that discover. That's

3    something I think, you know, would be interesting to us. But we

4    don't want to engage in the discovery before we find out that

5    it's actually something that's going to be meaningful.

6              THE COURT:   I think the parties might reasonably

7    talk about that.  Because it doesn't seem to me that it's worth

8    spending a whole lot of time trying to figure out what that is.

9    It's some number.

10             MR. NOVIKOFF:   Uh huh.

11             THE COURT:   It's some number that presumably experts

12   could put a range on.  Why anybody should spend a lot of time

13   now trying to figure that out, eludes me.  So I don't -- I

14   guess what I'm telling you is, I don't get why this is such a

15   big deal.

16             MR. NOVIKOFF:   Well --

17             THE COURT:   Why this piece of it is such a big deal.

18             MR. NOVIKOFF:    -- because, Your Honor, I think

19   without this motion to strike and having brought this attention

20   to Your Honor, and you making that suggestion, I think we would

21   have had to have go through that discover.  It's expensive,

22   time consuming and distracting, and otherwise extraneous to

23   this case.  We do think -- and the reason we brought it now --

24   is we think, as a matter of law, regardless of what the number

25   is and regardless of what JPMorgan's recovery ultimately is,

1    LBHI is not entitled to a credit for it.  Period.  And I

2    understand that other creditors may take losses on this case

3    and somebody's going to say, gee, maybe it doesn't look quite

4    right if JPMorgan somehow received a recovery greater.  It's

5    not going to appear that way because nobody will ever know, in

6    that circumstance, what the value of that lawsuit would be.  We

7    brought it now because we think that as matter of law, Your

8    Honor can decide it.  But the purpose of bringing it up now,

9    rather than a year from now, Your Honor is right.  It was to

10   avoid -- the prejudice we are seeking to avoid is the cost of

11   this discovery.  If the discovery can be put off and Your Honor

12   want to -- would prefer to decide this issue later on, that's

13   something that I think we can certainly take up.

14            THE COURT:   Okay.

15            MR. NOVIKOFF:   With that, let me move on to the

16   post-petition interest point.

17            As Your Honor knows, Bankruptcy Code, Section 506(b),

18   states "to the extent that a secured claim is secured by

19   collateral having a value in excess of the pre-petition claim"

20   -- and I quote -- "there shall be allowed to the holder of such

21   claim, interest on such claim" -- close quote. The United

22   States Supreme Court in Ron Pair said that the secured

23   creditors right to post-petition interest is unqualified.  The

24   Supreme Court in Ron Pair describes Section 506(b) as a

25   contrary standard to pre-code cases such as Vanston Bondholders

Page 86

1   Protective Committee v. Green that weigh equitable

2   considerations in determining whether to allow post-petition

3   interest.

4          Well, our position is that shall means shall.  And

5   the objector's position is that Vanston should be the law.

6   They assert that JPMorgan's entitlement to post-petition

7   interest should be denied based on their review of the equities

8   in the situation. So the objector's have grasped onto some

9   language in Ron Pair, in that case The Supreme Court noted that

10  the plain language of Section 506(b) entitling an oversecured

11  creditor post-petition interest should be conclusive.  But The

12  Supreme Court -- quoting from language in prior Supreme Court

13  cases, needed to have a narrow escape clause to avoid the

14  absurd, unintended results from a straight-forward application

15  of statutory language and included language, and I quote

16  "except in the rare cases in which the literal application of a

17  statute would presult a result, which produce (phonetic

18  12.15.20) a result demonstratively at odds with the intention

19  of the drafters" -- so, the objector's assert that this is such

20  a rare case because JPMorgan was secured by cash in its'

21  possession and this allowed the bank to use the cash and

22  generate profits from that cash.  But, as Your Honor knows,

23  most cases involving a bank as a secured creditor, which is

24  probably most bankruptcy cases, involves some cash collateral.

25  Any time that a bank has a security interest in a cash deposit

Lehman Brothers Holdings Inc.

Page 87

1    account, or even settle-off rights in a deposit account, for

2    that matter, the bank has use of the funds and can generate

3    profits from those funds.  So, there's no rarity here at all.

4    Creating an exception to 506(b)'s entitlement to post-petition

5    interest to the extent that claims are secured by cash would be

6    a massive and totally unexpected change in the law, with

7    enormous commercial and financial consequences.  This is not a

8    rarity.  What they are asking for would put them in the

9    debtor's lawyers hall of fame.  Such a change would be totally

10   unjustifiable.

11            THE COURT:   Let me ask you a question that occurs to

12   me as you are presenting this argument.

13            Does the entitlement to post-petition interest carry

14   with it an entitlement to a priority distribution with respect

15   to that interest?  In other words, just because the interest

16   accrues, does that mean that it's payable; could it also be

17   subordinated?  If a creditor engaged in inequitable conduct of

18   some sort, it would seem to me to be within the court's power

19   to allow the interest but to subordinate it to the point that

20   it never gets paid.

21            MR. NOVIKOFF:   I would expect, Your Honor, that if a

22   secured claim was equitably subordinated that both the

23   principal and interest, and presumably post-petition interest,

24   could be subject to subordination.  It's pretty unusual, but --

25            THE COURT:   It could happen.

Page 88

1          MR. NOVIKOFF:   -- but it could happen.  506(b) deals

2    with allowance, it does not do -- it does not create, so far at

3    least as I'm aware, an immunity against equitable subordination

4    under Section 510.

5          THE COURT:   Well, there are a whole bunch of legal

6    issues that are pending, both in connection with this objection

7    to claim and in connection with the litigation against JPMorgan

8    brought by the estate, that conceivably could give rise to some

9    findings.  Just as a theoretical proposition that would suggest

10   that you shouldn't get the interest.  Is your, what I'll call

11   preemptive objection, one that goes simply to whether or not

12   the interest is to be calculated under 506(b) or does it go to

13   entitlement to retain the accrued interest?

14         MR. NOVIKOFF:   Your Honor, I don't believe that we

15   are arguing that the post-petition interest has a higher

16   priority than the pre-petition claim.  So, to the extent that

17   they would all be subject to equitable subordination, that

18   would be the case.  What we are saying though, is that as a

19   matter of law we are entitled to the allowance of the claim

20   under 506(b) and we'd like the objection saying that equitable

21   considerations can cut off the allowance to be stricken, so we

22   don't have to go through, again, the discovery and the further

23   distraction expense of dealing with discovery relating to the

24   facts underlying the equitable considerations to which the

25   objector's point.

 1          THE COURT:    I'm confused again as to the discovery

 2    burden associated with something that seems to be a mere

 3    calculation.

 4          MR. NOVIKOFF:    Your Honor, this is -- I don't

 5    believe this is a mere calculation.  The objector's point out,

 6    correctly, that much of the LBHI cash collateral was not

 7    applied against the debt until -- to the clearance debt, until

 8    the closing under the collateral disposition agreement.  We

 9    don't disagree that that is, in fact, true.  They say that fact

10    -- equitable considerations underlying that fact should

11    disallow the interest.  We say, if we're going to get into

12    those equitable considerations, then we need to know all of the

13    facts as to why, in fact, the money was not applied until that

14    time.  And we -- if we had to do it, we would prove that the

15    principle reason it wasn't applied is because they didn't want

16    us to apply it and that that should enter into Your Honor's

17    considerations.  So that's going to get into a lot of

18    discovery, which otherwise is irrelevant to anything going on

19    in this case as to what was happening, what the discussions

20    were about that cash, what the discussions were about the

21    collateral disposition agreement, what the parties understood

22    and why in fact it wasn't paid.  It'll also require then, for

23    example, to into issues where they would have to reconcile

24    their position.  For example, why they say here there was

25    something wrong with the fact that JPMorgan did not apply the

1    LBHI cash collateral in -- against the clearance debt, while

2    which Your Honor knows in the adversary proceeding, they say

3    that JPMorgan violated the automatic stay, when it applied the

4    same type of cash collateral against derivatives claims.  So,

5    we've got a huge number of issues which we're going to have to

6    get into to and it'll cost money, both to JPMorgan and the

7    estate, to get into, unless that part is stricken.  You're

8    right, at the end of the day, if we -- if the $280 million of

9    post-petition interest at stake is allowed as a claim, the

10   equitable subordination claim in the adversary proceeding might

11   still move that down to a subordinated claim.  I'm not trying

12   to say that that's not in it, but the equitable issues there

13   are totally different equitable issues, as Your Honor knows.

14           THE COURT:   Let's just say, for the sake of

15   discussion, that I agreed with you and I struck off that part

16   of the objection that relates to the calculation of post-

17   petition interest, would that, in fact, end the discovery with

18   respect to your conduct in connection with the collateral

19   disposition agreement, because isn't your conduct, all of your

20   conduct, relevant to the objection that would remain?  In other

21   words, I don't understand how granting this motion to strike

22   actually limits the discovery. Because it seems to me that

23   everything you did reflects on everything that you did. It's

24   all there. It can't -- I don't see how you parse it.

25           MR. NOVIKOFF:   Your Honor, I don't think there's any

1    allegations in the adversary proceeding; that anything that

2    JPMorgan or the parties who negotiated the collateral

3    disposition agreement did in the period -- and we're talking

4    about a period probably starting December of 2008 and

5    stretching into March of 2010, I don't know that anybody is

6    raising an issue that any of that conduct has anything to do

7    with the equitable subordination issues and the adversary

8    proceeding.  I don't think there's anything in the complaint

9    that says that.  I don't think anybody suggested that any of

10   those issues are coming up in discovery and I've never

11   understood the objectors to state that.  They can correct me,

12   but I don't think those issues are relevant to anything else,

13   with all respect.

14          THE COURT:  Well, What I'm trying to get at, to be

15   simplistic about it, is -- does granting the motion to strike

16   actually change the discovery associated with this objection?

17   It's not clear to me that it does.

18          MR. NOVIKOFF:  Well, it's -- honestly, it's -- I'm

19   closer to it than Your Honor.  It's my understanding is -- the

20   answer to your question is just, yes.

21          THE COURT:  Okay, well, I'll ask the same --

22          MR. NOVIKOFF:  That discovery would then be off the

23   table.

24          THE COURT:  -- I'll ask the same question of the

25   estate.

Page 92

1              MR. NOVIKOFF:   Okay.

2              Now, I just wanted to point -- did the key case cited

3      by the objectors, which is the 7th Circuit's decision, Lapiana,

4      contains an excellent discussion of this relationship between

5      506(b), traditional defenses and equitable considerations,

6      there the bankruptcy court said that the creditor forfeited

7      its' right to post-petition interest because it had delayed in

8      collecting and applying proceeds of its' collateral.  Not that

9      dissimilar from what's being alleged here.  But Judge Posner,

10     in the 7th Circuit, recognized that traditional defenses like

11     estoppel or statute of limitations might act as a defense

12     against interest.  But then he went on to say "we deprecate

13     flaccid invocations of equity and bankruptcy proceedings.

14     Creditors have rights; among them the right of oversecured

15     creditors to post-petition interest; and bankruptcy judges are

16     not empowered to dissolve rights in the name of equity.

17     Flexible interpretation designed to allow the judicial

18     interpolation of judicial defenses in a statute silent on

19     defenses is one thing, standardless decision making in the name

20     of equity is another" -- it then goes on, says -- "if 506(b)

21     were read merely to authorize the bankruptcy judge to award

22     post-petition interest as a matter of grace, secured creditors

23     would lack a clear idea of what their rights would be if the

24     debtor went broke.  It would complicate the law needlessly by

25     requiring a searching, and often inconclusive, inquiry into the

1    relative fault of a debtor and creditor" -- this is exactly

2    that searching inquiry.

3            THE COURT:   Okay.  It's always good to end with a

4    Posner quote.

5            MR. NOVIKOFF:   Thank you, Your Honor.

6            MS. TAGGART:   Good afternoon, Your Honor. Erica

7    Taggart with Quinn Emanuel Urquhart & Sullivan on behalf of the

8    committee.  I'm going to be addressing the portion of the

9    argument about the Barclays issue and then my colleague, Joe

10   Pizzurro, will be addressing the post-petition interest.

11           I want to start by discussing very briefly the law

12   because I understand Your Honor saying that the equities

13   wouldn't look very good if JPMorgan were to profit off of the

14   estate.  And I understand Mr. Novikoff's position that as a

15   legal matter, though, since it doesn't hurt Lehman then it's

16   okay though, under a legal matter, for JPMorgan to get the same

17   damages from Barclays as from Lehman and that that is just a

18   risk that a creditor is allowed to take; but that doesn't

19   comport with the law.  There is a rule that the 2nd Circuit

20   follows, it's called The One Satisfaction Rule and it says that

21   a plaintiff is entitled to only one satisfaction for each

22   injury.  This isn't just one satisfaction from one party; it's

23   one satisfaction for many parties, for many causes of action.

24   The 2nd Circuit announced that rule in Singer v. Olympia

25   Brewing Co., 878 F.2d 596.  It's been followed consistently,

1    such as in Gerber v. MTC Electronic Technologies 329 F.3d 297.

2    In there, the 2nd Circuit held a judgment must be reduced by at

3    least the amount that a prior settlement had with -- that the

4    plaintiff had with another party and is allocated to the common

5    damages.  It -- there are a number of citations also in our

6    brief; I'll only mention a few more.  That in the -- in re

7    Refco Case and in the Sparron Co v. Lawlor (12.27.34).  What's

8    important is that even when a plaintiff has recovered for

9    common damages from a party that is not in this case, it needs

10   to be deducted or else there's a chance of a double-recovery.

11   In this case it appears that Mr. Novikoff is conceding that at

12   least some of the damages that it was asserting against

13   Barclays relate to the same clearance advances that it has now,

14   and as a matter of law, it has to have a deduction now.  Lehman

15   is entitled to a deduction for whatever value JPMorgan did have

16   in its' settlement against Barclays to the extent as the same

17   damages.  And -- in JPMorgan's briefs it appeared to take an

18   issue whether those damages were the same, I think Mr. Novikoff

19   is now conceding that it is going for the clearing advances. I

20   just want to point out two quotes that are also in our briefs,

21   but I think make this crystal clear. And one is actually from

22   Mr. Novikoff himself, who testified recently at deposition,

23   quote "part of the damages that would have been asserted

24   against Barclays was, in essence, the damages suffered by

25   JPMorgan as a result of Barclays failure to refinance the

Page 95

1    portfolio, the, excuse me, the clearance advances" -- also

2    Steve Cutler, General Counsel for JPMorgan, testified at

3    deposition, and this was in connection negotiations for the

4    December settlement agreement, quote "the sum and substance, I

5    think, of the JPMorgan position, communicated at those

6    meetings" -- those were the meetings among Barclays, JPMorgan,

7    actually the Fed Bank of New York -- "was that we, JPMorgan,

8    believed that it was in agreement to take JPMorgan out of its'

9    financing position by Barclays and that didn't happen.  We

10   ended up with fail financing; we ended up with repo-financing,

11   that we shouldn't have landed up with" -- so, we are following

12   squarely within the one satisfaction rule, there has been a

13   prior settlement. That prior settlement had at least some

14   consideration for common damages that are being asserted now

15   against Lehman and there needs to be an allowance for those

16   common damages.

17          There's another question then that Your Honor and Mr.

18   Novikoff raise and that is, okay, what is the appropriate

19   amount of the deduction?  Let me suggest that this doesn't need

20   to be resolved on a motion to strike.  We have had a -- we have

21   a legally defensible claim and it is clear again that at least

22   some, and I think not an insignificant amount of value, was

23   attributed to the settlement for the common damages.  But I'll

24   spend just a brief amount talking about what those are.  The

25   first part is easy, at least easy as a theoretical matter, and

1    then we'll talk about discovery.  And that is that Barclays

2    dropped the Bear Sterns lawsuit because of the damages that

3    JPMorgan was associating with the clearing advances.  In the

4    fall of 2008, JPMorgan blamed Barclays, and only Barclays, for

5    leaving JPMorgan with financing that at that time it didn't

6    know if it was going to have a deficiency, but if it did, it

7    was blaming it on Barclays for not taking over all the

8    financing in the asset process agreement.  So, whatever the

9    value was to JPMorgan of that lawsuit, should be deducted

10   against its' clearing claim.  Mr. Novikoff raises an issue that

11   is really a discovery issue, saying but there's just so much

12   discovery why get into it.  Let me suggest that although $400

13   million is not a lot of -- as he says it, it might not be a lot

14   of money in the Lehman case, I think it's probably worth some

15   discovery.  But, I would also agree with Your Honor that it

16   doesn't mean we need to litigate the entire Bear Sterns case.

17   There's already been some testimony and discovery where

18   Barclays' negotiators have said what the value they thought was

19   associated with the case and it includes the fact that the

20   compensatory damages sought were 400 million plus punitive.

21   And the counsel of Barclays says, banks don't sue banks

22   lightly, and it has some value to JPMorgan and I think there

23   probably could be a resolution along the lines that Your Honor

24   thinks where we'd get advisors to take, you know, maybe

25   handicap the chances that there would be recovery on those

1    damages to come up with a non-insignificant amount of money.

2           There is though, one other part of potential damages

3    that I understand there's a dispute but I don't think needs to

4    be resolved on this motion to strike.  And that is, is there

5    anything else of the December settlement that JP -- that Lehman

6    did not get credit for?  Because although the Bear Sterns

7    lawsuit with that agreement to dismiss happened in September,

8    the issue, and I think you know a little bit about it of this

9    dispute with Barclays and JPMorgan over a $7 billion.

10   Throughout all those negotiations, too, JPMorgan said it was

11   entitled to keep the $7 billion.  In part, because of this

12   alleged fraud that Barclays had made upon it.  And there is a

13   compromise that is reached, as Mr. Novikoff says, bilaterally

14   between JPMorgan and Barclays, resulting in a payment from

15   JPMorgan in securities and also cash, not worth $7 billion to

16   resolve that.  JPMorgan says in its' reply that "Lehman, don't

17   worry, you got all the credit that you were supposed to get for

18   that settlement and you go dollar for dollar credit for the $7

19   billion" -- I would just suggest that it's a bit premature to

20   decide that.  We have not said -- heard, for example, and

21   gotten discovery on, where JPMorgan got the cash payments that

22   was given to Barclays, it could be that they liquidated

23   securities that were not supposed go over.  As part of this

24   general clearing claim we will be getting a further accounting

25   of how the clearing claim broke down and I would just suggest,

1   at this point, to the extent that there is additional

2   consideration that has not been given credit to Lehman

3   Brothers, that was gotten from Barclays about common damages,

4   we would be entitled to that.  I can't tell on the record now

5   whether that is any more than the Bear Sterns lawsuit.  But we

6   should be entitled to discovery, in part because of that actual

7   Steve Cutler quote about the -- JPMorgan's position being that

8   they caused the clearing advances.  That was in negotiations

9   for the December settlement agreement and it's just not clear

10  that there was (wasn't? 12.33.29) additional compensation.

11  But, at the very least, we have gotten past the standard for

12  motion to strike, which is a very high one, as you know.  There

13  has to be no question of fact to allow the defense to succeed.

14  No substantial question of law to have allowed the defense to

15  succeed and the plaintiff must be prejudice by inclusion of the

16  defense.  We're just saying, at this point, that JPMorgan is

17  only entitled to one satisfaction of its' claim, whether it be

18  from Barclays or Lehman, and so, to the extent there has been

19  compensation for those single damages.  We will resolve it

20  later but it should be taken away from the eventual claim.

21          Thank Your Honor.

22          THE COURT:   Thank you.

23          MR. PIZZURRO:   Good afternoon, Your Honor.  Joseph

24  Pizzurro, Curtis Mallet-Prevost Colt & Mosle for the Lehman

25  Estate.  And I'm going to address that portion of the motion to

Page 99

1   strike that deals with the interest.

2           Let me make something clear from the outset.  I want

3   to clarify that as is in our papers, the argument that we have

4   made here is not simply based on equitable principles, although

5   it, in part, is and I will address that.  But, as we have said

6   in our papers, the conduct of JPMorgan in these circumstances

7   as we've alleged it, amounts to JPMorgan having paid itself on

8   these claims.  Indeed, prior to the time the claims even arose.

9   And that, therefore, 506(b) simply does not apply at all.  And

10  this is not a case -- the ordinary case where a bank is holding

11  onto cash as collateral in a liened account.  More technically

12  correct, has a security interest in the account.  This is a

13  case where JPMorgan, having had l lien on an account, swept

14  those funds out of that account, put those funds into its' own

15  general ledger account and, as we have alleged, in the

16  collateral case, as a result, lost its' lien and lost its'

17  status as a secured creditor.  And that's a claim which, Your

18  Honor, has recently held that we are entitled to pursue and

19  develop the facts on that, and survives as a matter of law.

20  Now, we would contend, Your Honor, that if there's no logical

21  consistency between a finding that 506(b) would apply to

22  JPMorgan in these circumstances, and the possibility that

23  JPMorgan lost its' lien as a result of its' conduct in sweeping

24  those funds out of the account.  Because once those funds left

25  the account as we have alleged, and as Your Honor has held that

08-13555-mg   Doc 27739   Filed 04/30/12   Entered 05/08/12 10:44:23   Main Document
Lehman Brothers Holdings Inc.
Pg 100 of 109

Page 100

1    we have an opportunity to prove, they were no longer collateral

2    and they were no longer proceeds of collateral, if we're

3    correct.  And if they weren't collateral, then they could only

4    be either our money, which clearly that was not the case or

5    JPMorgan took the funds, treated those funds as its' own money,

6    effectively paying itself before a claim even arose.  Before

7    exposures even existed.  Before there was an issue with whether

8    they would've violated the automatic stay or not because the

9    claim had not -- there had been no claim filed, no bankruptcy

10   had been filed.  Now that is a set of facts which is imbedded

11   in the claims objection with respect to the entitlements of the

12   interest, as it is embedded in the claim that we've asserted in

13   the collateral case.  And to grant a motion to strike at this

14   stage is clearly unwarranted as a matter of law.  Let me point

15   out that in the papers, JPMorgan has never refuted the

16   assertion that they effectively treated this money as their own

17   once they swept it out of that account.  So, they had the

18   money.  They paid themselves, or put themselves into a position

19   where they would be paid.  There was no claim, there is not

20   entitlement to interest.  506(b) simply does not apply as a

21   matter of law.  But let's assume, and get very quickly to the

22   equitable argument, that 506(b) does apply and they have an

23   entitlement, potentially as an oversecured creditor.  First of

24   all, as we did point out in our papers, we totally agree with

25   Your Honor, it's not ripe for decision now, they may or may not

1    end up having oversecured status, which means they may or may

2    not have a right to interest or a portion of the interest that

3    they are claiming.  More that that though, we're troubled by

4    the argument that JPMorgan makes, based on The Supreme Court

5    decision in Ron Pair.  Because JPMorgan suggests that the

6    language of The Supreme Court where it held that the right of

7    an oversecured creditor to pre-petition interest is

8    unqualified.  It's tantamount to The Supreme Court having held

9    that it is absolute and that was not anything that the Court

10   was talking about or held.  The issue before the Court in Ron

11   Pair was whether or not a creditor that was oversecured because

12   it had a non-consentual lien was entitled to pre-petition

13   interest, and that question hinged on whether or not the right

14   to interest, in the sentence of the statute, was qualified by

15   the language dealing with "reasonable, fees, costs or charges

16   provided for under the agreement under which such claims arose"

17   -- and what The Supreme Court held in parsing the statute,

18   doing the judicial equivalent of diagramming the sentence, was

19   to say because of the placement of the comma in the sentence,

20   it was clear that the entitlement to pre-judgment interest was

21   unqualified by this subordinate clause.  Not unqualified in the

22   terms that it was absolute, not unqualified in terms that

23   equitable considerations could not be taken into account as to

24   whether and the extent to which interest is allowed.  It's

25   simply unqualified by the existence of an agreement, and that

1    had to be decided because, of course, in a non-consentual lien

2    situation, if the entitlement to interest was qualified by

3    agreement, in the absence of an agreement, that oversecured

4    creditor is not entitled to interest.  That's the law issue

5    that The Supreme Court held and that's all that Ron Pair stands

6    for.  And -- the cases that come after it, including the

7    Lapiana case, Judge Posner's decision, recognized that there

8    are circumstances in which equitable considerations can result

9    in the tolling or elimination of an oversecured creditor's

10   right to interest, pre-petitioned interest.  And we've asserted

11   here, Your Honor, that the circumstances of this case, where

12   JPMorgan waited 18 months, holding onto that cash, having full

13   use of the property as its' own, being able to make money on

14   Lehman's money and yet, charge Lehman's interest is completely

15   inequitable, and there are, as Mr. Novikoff said, there may be

16   fact questions embedded in that, but that's no reason why there

17   ought to be a motion to strike.  To argue that they are

18   entitled as a matter of law to their interest, regardless of

19   equitable concerns, is simply not the case.  That's not the

20   law.

21            If Your Honor has any questions.

22            THE COURT:   I don't, thank you.

23            MR. NOVIKOFF:   Can I respond briefly, Your Honor?

24            THE COURT:   Of course.

25            MR. NOVIKOFF:   Thank you.

Page 103

1          First, with respect to the Barclay settlement issue,

2     the objectors refer to, in their papers and Ms. Taggart today,

3     to cases in which joint and several obligors are entitled to a

4     credit when another joint and several obligor makes a payment

5     on a debt for which they are all liable.  That's the 2nd

6     Circuit Rule, we're not challenging that rule. But Barclays was

7     not joint and severally liable with LBI and LBHI.  LBI and LBHI

8     were jointly and severally contractually liable for the debt,

9     the extensions of credit to LBI.  But Barclays was only liable

10    for the consequences of its' own breach of its' promise.  So,

11    if JPMorgan ultimately sustains a shortfall in recovering from

12    LBI and LBHI, then Barclays, in our view, would have been

13    responsible for that shortfall.  That would have been only

14    after LBI and LBHI failed to satisfy their obligations.  And

15    so, Barclays liability for the shortfall would be measured by

16    the amount that LBI and LBHI paid, or the value of the

17    collateral that got used, to satisfy that debt.  But that

18    doesn't mean that the converse is true.  It doesn't mean that

19    settlement value from Barclays to JPMorgan in any way reduces

20    LBI's and LBHI's contractual obligation on their debt.  Of

21    course it doesn't.  Just as Lehman would not have been entitled

22    to a contribution payment from Barclays because it paid its'

23    contractual debt to JPMorgan.  They've twisted it around; this

24    is not a joint & several case, and all those cases that they've

25    cited, in which they have joint tortfeasors challenging

1   settlements that don't have a proper judgment reduction in it

2   are simply inapposite.  This is not a joint and several

3   situation, it flows in one direction, not the other.  Also, Ms.

4   Taggart is raising an issue which it's really inconceivable to

5   me exists.  But on the evening before -- September 18, the

6   evening before, or possibly the wee hours of the same day, that

7   Your Honor approved the sale of most of LBI's business to

8   Barclays.  As Your Honor knows, it was this $45 billion pre-

9   sale of a portfolio of securities to Barclays for $45 billion

10  in cash.  As Your Honor, I believe, is aware, before DTTC and

11  Fed Wire closed the evening of the eighteenth, securities

12  valued at roughly $42 billion moved but not the $49 billion,

13  which they thought.  So JPMorgan advanced $7 billion and it got

14  put into a cash collateral account for Barclays.  So they had

15  roughly $7 billion valued of securities, which still remained

16  with LBI and that morning the $7 billion of cash also moved in.

17  That's the disputed cash.  It's recited in the settlement

18  agreement.  The estate has had materials showing the deduction

19  of that cash, literally, for years.  I don't think there's any

20  dispute from anybody about what that cash is and for a dispute

21  to be raised at this point strikes me a very odd and really

22  questionable.  And that's what the dispute was that was

23  settled; the $7 billion of cash remained with LBI and got

24  applied to the debt; and the securities, which were supposed to

25  have been transferred over, got transferred over or that

1    because some of them had been liquidated, there was a cash

2    adjustment that also went over.  That was the deal. That was

3    the deal, wasn't more complicated than that, there's not a lot

4    of mystery about the $7 billion.  It was cash that was advanced

5    and the next morning moved in, and they got the full credit for

6    the $7 billion so I don't know that there's some other issue

7    lurking out there.

8            I wanted to also respond to Mr. Pizzurro's argument

9    on 506(b).  The position that JPMorgan paid itself with the

10   cash sweep is totally inconsistent with the position that the

11   objectors have taken, although in this case as plaintiffs, same

12   two parties, in the adversary proceeding.  In the adversary

13   proceeding, as Your Honor knows, in one of the -- a couple of

14   the counts, which were -- have not been dismissed, they argued

15   that as a result of the cash sweep, the cash was moved into a

16   collateral account but JPMorgan did not, either have a security

17   interest in, or was not perfected in that account and, as a

18   result, it their position, as I understand it in the adversary

19   proceeding, that JPMorgan lost it's lien and, therefore the

20   money should be returned to LBHI.  Not that it should be

21   treated as paid, but that it should be treated as returned.

22   They really have to come up with what is their story on this.

23   I understand people can allege or can assert different legal

24   theories, but they really shouldn't be asserting different

25   factual theories.  And either we paid ourselves or we didn't

Page 106

1    pay ourselves.  Now, with respect to The Supreme Court's

2    decision in Ron Pair, very important case.  I would have to

3    tell Mr. Pizzurro what I often have to tell younger lawyers,

4    and sometimes not so young lawyers in my forum --

5              THE COURT:  Apparently, you're telling a not-so-

6    young lawyer something right now.

7              MR. NOVIKOFF:  I hope he's younger than me, I'm not

8    really sure.  We'll discuss that later.  But my advice is, and

9    it's free and I won't charge you for it, is keep reading.

10   After the unqualified language, the Court goes into discussion

11   and it talks about the Vanston case and it says that 506(b) is

12   a contrary standard and Vanston's no longer good law; you don't

13   apply equitable considerations anymore in 506(b) cases.  So,

14   while I understand his point about the use of the term

15   unqualified, Supreme Court keeps on talking and it's there.

16   And in the Lapiana case, Judge Posner did acknowledge that

17   traditional defense is continued to apply to interest and we're

18   not disagreeing with that.  But the objectors here have not

19   asserted that any traditional defense applies and I don't think

20   they can.  They certainly haven't tried and what they are

21   trying to do is come up with an equitable consideration, which

22   Judge Posner, I'm going to ask -- end with another Judge Posner

23   quote. He referred to --

24             THE COURT:  A short one, I hope.

25             MR. NOVIKOFF:  Excuse me?

1          THE COURT:   A very short one.

2          MR. NOVIKOFF:   It's a very short one. He referred to

3     it as a "watered-down version of equitable estoppel" -- that's

4     what their trying to do and he wouldn't accept it and Your

5     Honor shouldn't accept it.

6          THE COURT:   Okay.

7          MR. NOVIKOFF:   Thank you, Your Honor.

8          THE COURT:   I'm going to take this under advisement

9     and thanks for the argument.  You'll hear from us when we've

10    made a decision. We're adjourned.

11         MR. NOVIKOFF:   Thank you, Your Honor.

12         MR. PIZZURRO:   Thank you, Your Honor.

13

14

15    (Whereupon these proceedings were concluded at 12:49 PM)

16

17

18

19

20

21

22

23

24

25

```
                                                    Page 108

 1                        I N D E X

 2

 3                        RULINGS

 4                                        Page    Line

 5   Motion to disallow claim of Doris Phillips   18      25

 6   on Debtors' 110th omnibus objection to

 7   claims - approved

 8

 9   Debtors' 186th omnibus objection to claims of  19    23

10   Deutsche Bank - approved

11

12   Debtors' 118th omnibus objection to claims   20      13

13   regarding creditor LBI. - approved

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 109

1

2                    C E R T I F I C A T I O N

3

4    We, Petra Garthwait, Michelle George, Don Cohen, certify that

5    the foregoing transcript is a true and accurate record of the

6    proceedings.

7    Petra Garthwait   Digitally signed by Petra Garthwait
                        DN: cn=Petra Garthwait, o, ou,
                        email=digital1@veritext.com, c=US
8    _____  Date: 2012.04.30 10:57:43 -04'00'

9    PETRA GARTHWAIT   Michelle   Digitally signed by Michelle George
                       George     DN: cn=Michelle George, o, ou,
                                  email=digital1@veritext.com, c=US
10   _____      Date: 2012.04.30 11:00:03 -04'00'

11   MICHELLE GEORGE   Donald   Digitally signed by Donald Cohen
                       Cohen     DN: cn=Donald Cohen, o, ou,
                                 email=digital1@veritext.com,
12   _____     c=US
                                  Date: 2012.04.30 11:00:39 -04'00'

13   DON COHEN

14

15   Veritext

16   200 Old Country Road

17   Suite 580

18   Mineola, NY 11501

19

20   Date:  April 27, 2012

21

22

23

24

25