# **EXHIBIT A**
## **(Loan Agreement)**

US_ACTIVE:\43927602\03\58399.0003

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 2 of 75
Case 1:08-cv-05353-CM   Document 1-1    Filed 06/11/08   Page 2 of 38

# LOAN AGREEMENT

Dated as of July 13, 2006

between

## MIDDLE MOUNTAIN 156, LLC
as Borrower

and

## LEHMAN BROTHERS HOLDINGS INC., d/b/a LEHMAN CAPITAL, a division of LEHMAN BROTHERS HOLDINGS INC.
individually and as Agent for one or more Co-Lenders,
as Lender

{10347125:14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 3 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 3 of 38

# TABLE OF CONTENTS

**Page**

ARTICLE 1    DEFINITIONS; PRINCIPLES OF CONSTRUCTION ............................... 1
    Section 1.1    Definitions................................................................. 1
    Section 1.2    Principles of Construction........................................ 14

ARTICLE 2    GENERAL TERMS ...................................................................... 14
    Section 2.1    Loan Commitment; Disbursement to Borrower. ........................ 14
        2.1.1    Agreement to Lend and Borrow. ........................................ 14
        2.1.2    The Loan. ........................................................................ 14
        2.1.3    The Note, Security Instrument and Loan Documents................ 15
        2.1.4    Use of Proceeds.............................................................. 15
        2.1.5    Loan Closing Fee. ........................................................... 15
        2.1.6    Loan Administration Fee. ................................................. 15
        2.1.7    Option to Extend. ........................................................... 15
    Section 2.2    Interest; Loan Payments; Late Payment Charge. ...................... 16
        2.2.1    Payments. ....................................................................... 16
        2.2.2    Interest Calculation. ....................................................... 16
        2.2.3    Intentionally Omitted. ..................................................... 16
        2.2.4    Payment on Maturity Date. ............................................... 16
        2.2.5    Payments after Default. ................................................... 16
        2.2.6    Late Payment Charge. ..................................................... 17
        2.2.7    Usury Savings. ................................................................ 17
        2.2.8    Governmental Taxes. ....................................................... 17
    Section 2.3    Prepayments. ..................................................................... 17
        2.3.1    Prepayments. ................................................................... 18
        2.3.2    Mandatory Prepayments. .................................................. 18
        2.3.3    Prepayments After Default. ............................................... 19
        2.3.4    Intentionally Omitted. ..................................................... 19
        2.3.5    Making of Payments. ....................................................... 19
        2.3.6    Application of Principal Prepayments. ................................ 19

ARTICLE 3    INTENTIONALLY OMITTED. ...................................................... 20

ARTICLE 4    REPRESENTATIONS AND WARRANTIES ..................................... 20
    Section 4.1    Borrower Representations.................................................... 20
        4.1.1    Organization.................................................................... 20
        4.1.2    Proceedings. ................................................................... 20
        4.1.3    No Conflicts. ................................................................... 20
        4.1.4    Litigation........................................................................ 20
        4.1.5    Agreements. .................................................................... 21
        4.1.6    Solvency......................................................................... 21
        4.1.7    Full and Accurate Disclosure. ........................................... 21
        4.1.8    No Plan Assets. ............................................................... 22

08-13555-mg   Doc 27854-1   Filed 05/14/12   Entered 05/14/12 16:52:48   Exhibit -
Exhibit A Part 1 of 2   Pg 4 of 75
Case 1:08-cv-05353-CM   Document 1-1   Filed 06/11/08   Page 4 of 38

## TABLE OF CONTENTS
(cont.)

Page

4.1.9    Compliance. ................................................. 22
4.1.10   Financial Information. .................................. 22
4.1.11   Condemnation. ............................................ 23
4.1.12   Federal Reserve Regulations. ..................... 23
4.1.13   Utilities and Public Access. ....................... 23
4.1.14   Not a Foreign Person. ................................ 23
4.1.15   Separate Lots. ........................................... 23
4.1.16   Assessments. ............................................. 23
4.1.17   Enforceability. ........................................... 23
4.1.18   Intentionally Omitted. ................................ 24
4.1.19   Insurance. ................................................. 24
4.1.20   Use of Property. ........................................ 24
4.1.21   Intentionally Omitted. ................................ 24
4.1.22   Flood Zone. ............................................... 24
4.1.23   Intentionally Omitted. ................................ 24
4.1.24   Boundaries. ............................................... 24
4.1.25   Leases and Other Agreements. ................. 24
4.1.26   Survey. ..................................................... 25
4.1.27   Intentionally Omitted. ................................ 25
4.1.28   Filing and Recording Taxes. ...................... 25
4.1.29   Equity Contribution ................................... 25
4.1.30   Intentionally Omitted. ................................ 25
4.1.31   Illegal Activity. .......................................... 25
4.1.32   No Change in Facts or Circumstances; Disclosure. ............... 25
4.1.33   Investment Company Act. ......................... 26
4.1.34   Principal Place of Business; State of Organization. ............. 26
4.1.35   Single Purpose Entity. ............................... 26
4.1.36   Business Purposes. .................................... 30
4.1.37   Taxes. ...................................................... 30
4.1.38   Forfeiture. ................................................. 31
4.1.39   Environmental Representations and Warranties. ............... 31
4.1.40   Taxpayer Identification Number. ................ 31
4.1.41   OFAC. ...................................................... 31
4.1.42   Embargoed Person. ................................... 31
Section 4.2   Survival of Representations. ................... 32

ARTICLE 5   BORROWER COVENANTS                        32
Section 5.1   Affirmative Covenants. ......................... 32
5.1.1    Existence; Compliance with Legal Requirements. ............. 32
5.1.2    Taxes and Other Charges. ......................... 33
5.1.3    Litigation. ................................................. 34
5.1.4    Access to Property. ................................... 34
5.1.5    Notice of Default. ...................................... 34
5.1.6    Cooperate in Legal Proceedings. ............... 34
5.1.7    Award and Insurance Benefits. .................. 34

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 5 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 5 of 38

## TABLE OF CONTENTS
(cont.)

|  |  | Page |
|---|---|---|
| 5.1.8 | Further Assurances | 34 |
| 5.1.9 | Mortgage and Intangible Taxes | 35 |
| 5.1.10 | Financial Reporting | 35 |
| 5.1.11 | Business and Operations | 38 |
| 5.1.12 | Costs of Enforcement | 39 |
| 5.1.13 | Estoppel Statement | 39 |
| 5.1.14 | Loan Proceeds | 39 |
| 5.1.15 | Performance by Borrower | 39 |
| 5.1.16 | Confirmation of Representations | 40 |
| 5.1.17 | Leasing Matters | 40 |
| 5.1.18 | Management Agreement | 40 |
| 5.1.19 | Environmental Covenants | 40 |
| 5.1.20 | Performance of the Work | 41 |
| 5.1.21 | OFAC | 43 |
| Section 5.2 | Negative Covenants | 43 |
| 5.2.1 | Liens | 43 |
| 5.2.2 | Dissolution | 43 |
| 5.2.3 | Change In Business | 43 |
| 5.2.4 | Debt Cancellation | 43 |
| 5.2.5 | Zoning; Alterations | 43 |
| 5.2.6 | No Joint Assessment | 44 |
| 5.2.7 | Name, Identity, Structure, or Principal Place of Business | 44 |
| 5.2.8 | ERISA | 44 |
| 5.2.9 | Affiliate Transactions | 45 |
| 5.2.10 | Transfers | 45 |

| ARTICLE 6 | INSURANCE; CASUALTY; CONDEMNATION; REQUIRED REPAIRS | 47 |
|---|---|---|
| Section 6.1 | Insurance | 47 |
| Section 6.2 | Casualty | 51 |
| Section 6.3 | Condemnation | 51 |
| Section 6.4 | Restoration | 52 |

| ARTICLE 7 | RESERVE FUNDS | 55 |
|---|---|---|
| Section 7.1 | Contingency Holdback | 55 |
| Section 7.2 | Tax and Insurance Escrow Fund | 55 |
| Section 7.3 | Water/Sewer Holdback | 56 |
| Section 7.4 | Debt Service Holdback | 58 |
| Section 7.5 | Reserve Funds, Generally | 58 |

| ARTICLE 8 | DEFAULTS | 59 |
|---|---|---|
| Section 8.1 | Event of Default | 59 |
| Section 8.2 | Remedies | 62 |
| Section 8.3 | Remedies Cumulative; Waivers | 63 |

| ARTICLE 9 | SPECIAL PROVISIONS | 64 |
|---|---|---|
| Section 9.1 | Sale of Notes and Securitization | 64 |

08-13555-mg   Doc 27854-1   Filed 05/14/12   Entered 05/14/12 16:52:48   Exhibit -
Exhibit A Part 1 of 2   Pg 6 of 75
Case 1:08-cv-05353-CM   Document 1-1   Filed 06/11/08   Page 6 of 38

## TABLE OF CONTENTS
(cont.)

|  |  | Page |
|---|---|---|
| Section 9.2 | Securitization Indemnification. | 65 |
| Section 9.3 | Servicer. | 68 |
| Section 9.4 | Exculpation. | 68 |
| Section 9.5 | Intentionally Omitted. | 72 |
| Section 9.6 | Intentionally Omitted. | 72 |
| Section 9.7 | Syndication | 72 |
| 9.7.1 | Syndication. | 72 |
| 9.7.2 | Sale of Loan, Co-Lenders, Participations and Servicing. | 72 |
| 9.7.3 | Cooperation in Syndication | 74 |
| 9.7.4 | Payment of Agent's, and Co-Lender's Expenses, Indemnity, etc. | 76 |
| 9.7.5 | No Joint Venture. | 77 |
| 9.7.6 | Voting Rights of Co-Lenders. | 77 |

**ARTICLE 10  MISCELLANEOUS** — 77

| Section 10.1 | Survival. | 77 |
|---|---|---|
| Section 10.2 | Lender's Discretion. | 78 |
| Section 10.3 | Governing Law; Submission to Jurisdiction. | 78 |
| Section 10.4 | Modification, Waiver in Writing. | 79 |
| Section 10.5 | Delay Not a Waiver. | 80 |
| Section 10.6 | Notices. | 80 |
| Section 10.7 | Trial by Jury. | 81 |
| Section 10.8 | Headings. | 82 |
| Section 10.9 | Severability. | 82 |
| Section 10.10 | Preferences. | 82 |
| Section 10.11 | Waiver of Notice. | 82 |
| Section 10.12 | Remedies of Borrower. | 82 |
| Section 10.13 | Expenses; Indemnity. | 83 |
| Section 10.14 | Schedules and Exhibits Incorporated. | 84 |
| Section 10.15 | Offsets, Counterclaims and Defenses. | 84 |
| Section 10.16 | No Joint Venture or Partnership; No Third Party Beneficiaries. | 84 |
| Section 10.17 | Publicity. | 85 |
| Section 10.18 | Waiver of Marshalling of Assets. | 85 |
| Section 10.19 | Waiver of Counterclaim. | 85 |
| Section 10.20 | Conflict; Construction of Documents; Reliance. | 85 |
| Section 10.21 | Brokers and Financial Advisors. | 86 |
| Section 10.22 | Prior Agreements. | 86 |
| Section 10.23 | Limitation of Liability. | 86 |
| Section 10.24 | Cross Collateralization/Cross Default. | 86 |

**ARTICLE 11  PARTIAL RELEASE OF PARCELS** — 87

| Section 11.1 | Release of Parcels. | 87 |
|---|---|---|
| Section 11.2 | Release of Additional Collateral Parcels. | 88 |

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 7 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 7 of 38

## TABLE OF CONTENTS
(cont.)

Page

Schedule I – Organizational Chart of Borrower ....................................................... S-I-1
Schedule II – Bankruptcy Matters .......................................................................... S-II-1
Schedule III – Project Schedule............................................................................... S-III-1
Exhibit A-1 - Legal Description of Middle Mountain Parcel ..................................... A-1
Exhibit A-2 - Legal Description of 163 Parcel ......................................................... A-2
Exhibit A-3 - Legal Description of Val Vista Parcel ................................................. A-3

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 8 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 8 of 38

## LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of July 13, 2006 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "Agreement"), between LEHMAN BROTHERS HOLDINGS INC., d/b/a LEHMAN CAPITAL, a division of LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation having an address at 399 Park Avenue, New York, New York 10022 ("Lender"), and MIDDLE MOUNTAIN 156, LLC, an Arizona limited liability company, having its principal place of business at 20837 North 41st Avenue, Glendale, Arizona 85308 ("Borrower").

### WITNESSETH:

WHEREAS, Borrower desires to obtain the Loan (as hereinafter defined) from Lender; and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents (as hereinafter defined).

NOW THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

ARTICLE 1        DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1    Definitions.

For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"163" shall have the meaning set forth in Section 11.2.

"163 Property" shall have the meaning set forth in the 163 Security Instrument.

"163 Security Instrument" shall mean that certain second priority Deed of Trust, Security Agreement and Fixture Filing, of even date herewith, executed and delivered by 163 as security for the Obligations and encumbering the 163 Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"A&N" shall have the meaning set forth in Section 11.2.

"Accountants" shall mean a firm of independent certified public accountants engaged by Borrower and approved by Lender.

"Act" shall have the meaning set forth in Section 4.1.35(cc).

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 9 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 9 of 38

"Additional Collateral Parcels" shall mean the parcels of land comprising the 163 Property and the Val Vista Property, which may be sold as separate developable lots to third parties.

"Affiliate" shall mean, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director or officer of such.

"Agent" shall have the meaning set forth in Section 9.7.2(d).

"ALTA" shall mean American Land Title Association, or any successor thereto.

"Applicable Laws" shall mean all existing and future federal, state and local laws, orders, ordinances, governmental rules and regulations and court orders.

"Applicable Interest Rate" shall mean from and including the date of this Agreement through the Maturity Date, an interest rate per annum equal to the greater of (a) 12.5% or (b) the Prime Rate in effect from time to time plus five percent (5.0%) per annum.

"Appraisal" shall mean an appraisal prepared in accordance with the requirements of FIRREA, prepared by an independent third party appraiser holding an MAI designation, who is State licensed or State certified if required under the laws of the State where the Property is located, who meets the requirements of FIRREA and who is otherwise satisfactory to Lender.

"Assignment and Assumption" shall have the meaning set forth in Section 9.7.2(a).

"Assignment of Leases" shall mean that certain first priority Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender all of Borrower's interest in and to the Leases and Rents of the Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Permits" shall mean that certain Assignment of Permits, Agreements, Licenses, Franchises and Authorizations dated the date hereof given by Borrower to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Award" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"Bankruptcy Code" shall mean Title 11 U.S.C. § 101 et seq., and the regulations adopted and promulgated pursuant thereto (as the same may be amended from time to time).

"Borrower" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"Borrower Party" shall mean, individually and collectively, Borrower, Guarantor.

2

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 10 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 10 of 38

"Business Day" shall mean any day other than a Saturday, Sunday or any other day on which national banks in New York, New York are not open for business.

"Business Party" shall have the meaning set forth in Section 4.1.35(aa).

"Casualty" shall have the meaning set forth in Section 6.2.

"Casualty Consultant" shall have the meaning set forth in Section 6.4(b)(iii).

"Casualty Retainage" shall have the meaning set forth in Section 6.4(b)(iv).

"Closing Date" shall mean the date of the funding of the Loan.

"Code" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and all applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Collateral" shall mean the Property, the Guaranty, the Personal Property, and all other real or personal property of Borrower or any Guarantor that is at any time pledged, mortgaged or otherwise given as security to Lender for the payment of the Debt under the Security Instrument, this Agreement or any other Loan Document.

"Condemnation" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"Condemnation Proceeds" shall have the meaning set forth in Section 6.4(b).

"Contingency Holdback" shall have the meaning set forth in Section 7.1.

"Control" (and the correlative terms "controlled by" and "controlling") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of the business and affairs of the entity in question by reason of the ownership of beneficial interests, by contract or otherwise.

"Co-Lender" shall have the meaning set forth in Section 9.7.2(a).

"Co-Lending Agreement" shall mean the Co-Lending Agreement entered into between Lender, individually as a Co-Lender and as Agent and the other Co-Lenders in the event of a Syndication, as the same may be further supplemented modified, amended or restated.

"Creditors Rights Laws" shall have the meaning set forth in Section 4.1.35(cc).

"Crossed Properties" shall have the meaning set forth in Section 10.24.

"Debt" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums

{10347125:14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 11 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 11 of 38

·due to Lender in respect of the Loan under the Note, this Agreement, the Security Instrument or any other Loan Document.

"Debt Service" shall mean, with respect to any particular period of time, the Interest Only Payment Amount for such period.

"Debt Service Holdback" shall have the meaning set forth in Section 7.4.

"Debt Service Shortfall" shall have the meaning set forth in Section 7.4.

"Default" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would constitute an Event of Default.

"Default Rate" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (a) the Maximum Legal Rate, or (b) five percent (5%) above the Applicable Interest Rate.

"Disclosure Document" shall mean each disclosure document in connection with a Securitization, including, without limitation, a prospectus supplement, private placement memorandum, offering circular or other offering document.

"Dollars" and the symbol "$" each mean the lawful money of the United States of America.

"Eligible Account" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (a) an account or accounts maintained with a federal or State-chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts maintained with a federal or State chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a State chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R.§9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and State authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"Eligible Institution" shall mean a depository institution or trust company, insured by the Federal Deposit Insurance Corporation, (a) the short term unsecured debt obligations or commercial paper of which are rated at least A-1+ by S&P, P-1 by Moody's and F-1+ by Fitch in the case of accounts in which funds are held for 30 days or less, or (b) the long term unsecured debt obligations of which are rated at least "AA" by Fitch and S&P and "Aa2" by Moody's in the case of accounts in which funds are held for more than thirty (30) days.

"Embargoed Person" shall have the meaning set forth in Section 4.1.42.

"Environmental Indemnity" shall mean that certain Environmental Indemnity Agreement executed by Borrower and Indemnitor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

4

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 12 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 12 of 38

"Environmental Law" shall mean any present and future federal, State and local laws, statutes, ordinances, rules, regulations, standards, policies and other governmental directives or requirements, as well as common law, that apply to Borrower or the Property and relate to Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Arizona Environmental Quality Act, Title 49, Arizona Revised Statutes and Arizona Water Quality Control, Title 49, Arizona Revised Statutes.

"Environmental Liens" shall have the meaning set forth in Section 5.1.19(a).

"Environmental Report" shall have the meaning set forth in Section 4.1.39.

"Equity Contribution" shall mean the sum of Five Million and 00/100 Dollars ($5,000,000.00).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"Event of Default" shall have the meaning set forth in Section 8.1(a).

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Exchange Act Filing" shall have the meaning set forth in Section 9.2(a).

"Extended Maturity Date" shall mean February 1, 2008.

"Extension Fee" shall mean an amount equal to three percent (3.0%) of the original principal amount of the Loan.

"Extension Notice" shall have the meaning set forth in Section 2.1.7.

"Extension Period" shall have the meaning set forth in Section 2.1.7.

"Fiscal Year" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during the term of the Loan.

"Fitch" shall mean Fitch, Inc.

"Flood Insurance Acts" shall have the meaning set forth in Section 6.1(a)(vii).

"GAAP" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"Governmental Authority" shall mean any court, board, agency, commission, office, central bank or other authority of any nature whatsoever for any governmental unit (federal, State, county, district, municipal, city, country or otherwise) or quasi-governmental unit whether now or hereafter in existence.

"Governmental Taxes" shall have the meaning set forth in Section 2.2(8).

5

{10347125:14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 13 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 13 of 38

"Guarantor" shall mean Nicholas Bonanno, Jr., an individual, and Allen Jenkins, an individual, and any other Person (other than Borrower) guaranteeing any payment or performance obligation of Borrower.

"Guaranty" shall mean collectively, the Guaranty of Recourse Obligations and the Payment Guaranty.

"Guaranty of Recourse Obligations" shall mean that certain Guaranty of Recourse Obligations of Borrower, dated as of the date hereof, from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Hazardous Materials" shall mean petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," "pollutant" or other words of similar import within the meaning of any Environmental Law.

"Improvements" shall have the meaning set forth in Article 1 of the Security Instrument.

"Indebtedness" of a Person, at a particular date, means the sum (without duplication) at such date of (a) all indebtedness or liability of such Person (including, without limitation, amounts for borrowed money); (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the deferred purchase price of property or services (including trade obligations); (d) obligations under letters of credit; (e) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person or entity, or otherwise to assure a creditor against loss; and (f) obligations secured by any Liens, whether or not the obligations have been assumed.

"Indemnified Liabilities" shall have the meaning set forth in Section 10.13(b).

"Indemnified Parties" shall mean Lender, any Affiliate of Lender who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan, any Person in whose name the encumbrance created by the Security Instrument is or will have been recorded, Persons who may hold or acquire or will have held a full or partial interest in the Loan, the holders of any Securities, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, Affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including but not limited to any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Property, whether during the term of the Loan or as a part of or

6

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 14 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 14 of 38

following a foreclosure of the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).

"Indemnitee" shall have the meaning set forth in Section 9.7.4(c).

"Indemnitor" shall mean any Person (other than Borrower) indemnifying any payment or performance obligation of Borrower.

"Independent Manager" shall have the meaning set forth in Section 4.1.35(aa).

"Information" shall have the meaning set forth in Section 9.7.3(b).

"Initial Advance" shall have the meaning set forth in Section 2.1.2.

"Initial Maturity Date" shall mean August 1, 2007.

"Insolvency Opinion" shall mean, that certain bankruptcy non-consolidation opinion letter delivered by counsel for Borrower in connection with the Loan, if required and approved by Lender or the Rating Agencies, as the case may be.

"Insurance Premiums" shall have the meaning set forth in Section 6.1(b).

"Insurance Proceeds" shall have the meaning set forth in Section 6.4(b).

"Interest Only Payment Amount" shall have the meaning set forth in Section 2.2.1.

"Interest Period" means, in connection with the calculation of interest accrued with respect to any specified Payment Date, the period commencing on the immediately preceding Payment Date and expiring on the date immediately preceding such specified Payment Date; provided, however, that with respect to the Interest Period ending on July 31, 2006, the Interest Period shall be the period commencing on the Closing Date; if any Interest Period would otherwise expire on a day which is not an Business Day, such Interest Period shall expire on the next succeeding Business Day; provided however, if such Interest Period would otherwise expire on the Maturity Date, and the Maturity Date is not a Business Day, such Interest Period shall expire on the immediately preceding Business Day; no Interest Period shall extend beyond the Maturity Date.

"Interest Shortfall" shall have the meaning set forth in Section 2.3.1(b).

"Investment Grade" shall mean a rating of BBB- or its equivalent by the Rating Agencies.

"Investor" shall have the meaning set forth in Section 5.1.10(g).

"Leases" shall have the meaning set forth in Article 1 of the Security Instrument.

"Legal Requirements" shall mean all federal, State, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Property or any part thereof, or the zoning,

{J0347125:14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 15 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 15 of 38

construction, use, alteration, occupancy or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"Lehman" shall have the meaning set forth in Section 9.2(b).

"Lehman Group" shall have the meaning set forth in Section 9.2(b).

"Lender" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"Liabilities" shall have the meaning set forth in Section 9.2(b).

"Lien" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Property, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"LLC Agreement" shall have the meaning set forth in Section 4.1.35(d).

"Loan" shall mean the loan made by Lender to Borrower pursuant to this Agreement and the other Loan Documents.

"Loan Administration Fee" shall have the meaning set forth in Section 2.1.6.

"Loan Documents" shall mean, collectively, this Agreement, the Note, the Security Instrument, the Assignment of Leases, the Environmental Indemnity, the Guaranty, the Assignment of Permits, the Val Vista Security Instrument, the 163 Security Instrument and all other documents executed and/or delivered in connection with the Loan.

"Losses" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement of whatever kind or nature (including but not limited to attorneys' fees and other costs of defense).

"Maturity Date" shall mean the earliest to occur of Initial Maturity Date, (ii) the Extended Maturity Date or (iii) such earlier date on which the payment of the principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, or by declaration of acceleration, or otherwise.

"Maximum Legal Rate" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the

8

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 16 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 16 of 38

indebtedness evidenced by the Note and as provided for herein or in the other Loan Documents, under the laws of such State or States whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"Member" shall have the meaning set forth in Section 4.1.35(cc).

"Monthly Insurance Premium Deposit" shall have the meaning set forth in Section 7.2.

"Monthly Tax Deposit" shall have the meaning set forth in Section 7.2.

"Moody's" shall mean Moody's Investors Service, Inc.

"Net Proceeds" shall have the meaning set forth in Section 6.4(b).

"Net Proceeds Deficiency" shall have the meaning set forth in Section 6.4(b)(vi).

"Note" shall mean that certain Promissory Note of even date herewith in the original principal amount of FORTY-FOUR MILLION AND 00/100 DOLLARS ($44,000,000.00) or so much thereof as may be advanced pursuant to the terms of this Agreement, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"Obligations" shall mean Borrower's obligation to pay the Debt and perform its obligations under the Note, this Agreement and the other Loan Documents.

"Officers' Certificate" shall mean a certificate delivered to Lender by Borrower which is signed by a Responsible Officer of Borrower. For purposes of Section 5.1.10(h), the term "Officers' Certificate" shall mean a certificate delivered to Lender by Borrower which is signed by the chief financial officer of Borrower.

"Other Charges" shall mean all maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"Parcel" shall have the meaning set forth in Section 11.1.

"Parcel Release" shall have the meaning set forth in Section 11.1.

"Participant" shall have the meaning set forth in Section 9.7.2(i).

"Payment Date" shall mean the first (1st) day of each calendar month during the term of the Loan or, if such day is not a Business Day, the immediately succeeding Business Day.

"Payment Guaranty" shall mean that certain Guarantor Full Repayment Guaranty, dated as of the date hereof, from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

9

{10347125:14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 17 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 17 of 38

"Permitted Encumbrances" shall mean, collectively, (a) the Liens and security interests created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy relating to the Property or any part thereof, (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet delinquent, and (d) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

"Person" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, State, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Personal Property" shall have the meaning set forth in Article 1 of the Security Instrument.

"Policies" shall have the meaning set forth in Section 6.1(b).

"Prepayment Date" shall have the meaning set forth in Section 2.3.1.

"Prepayment Premium" shall mean an amount equal to the difference, if any, between the aggregate amount of interest that would otherwise be payable on the Loan at the Applicable Interest Rate from the prepayment date to and including the sixth (6th) month anniversary of the Closing Date. No Prepayment Premium shall be payable if the applicable prepayment occurs on or after the sixth (6th) month anniversary of the Closing Date, or in connection with a Casualty or Condemnation pursuant to Article 6.

"Prime Rate" shall mean, on a particular date, a rate per annum equal to the rate of interest published in *The Wall Street Journal* as the "prime rate", as in effect on such day, with any change in the prime rate resulting from a change in said prime rate to be effective as of the date of the relevant change in said prime rate; provided, however, that if more than one prime rate is published in *The Wall Street Journal* for a day, the average of the prime rates shall be used; provided, further, however, that the Prime Rate (or the average of the prime rates) will be rounded to the nearest 1/16 of 1% or, if there is no nearest 1/16 of 1%, to the next higher 1/16 of 1%. In the event that *The Wall Street Journal* should cease or temporarily interrupt publication, then the Prime Rate shall mean the daily average prime rate published in another business newspaper, or business section of a newspaper, of national standing chosen by Lender. If *The Wall Street Journal* resumes publication, the substitute index will immediately be replaced by the prime rate published in *The Wall Street Journal*. In the event that a prime rate is no longer generally published or is limited, regulated or administered by a governmental or quasi-governmental body, then Lender shall select a comparable interest rate index which is readily available to Borrower and verifiable by Borrower but is beyond the control of Lender. Lender shall give Borrower prompt written notice of its choice of a substitute index and when the change became effective. Such substitute index will also be rounded to the nearest 1/16 of 1% or, if there is no nearest 1/16 of 1%, to the next higher 1/16 of 1%. The determination of the Prime Rate by Lender shall be conclusive and binding absent manifest error.

"Principal" shall have the meaning set forth in Section 4.1.35.

"Prohibited Person" shall mean any Person:

10

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 18 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 18 of 38

(a)    listed in the Annexo, or otherwise subject to the provisions of, the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism ("Executive Order");

(b)    that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed on the Annex to, or is otherwise subject to provisions of, the Executive Order;

(c)    with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(d)    who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)    that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gov.ofac/t11sdn.pdf or at any replacement website or other replacement official publication of such list; or

(f)    who is an Affiliate of or affiliated with a Person listed above.

"Projections" shall have the meaning set forth in Section 9.7.3(b).

"Property" shall mean, each parcel of real property, any Improvements thereon and all Personal Property owned by Borrower and encumbered by the Security Instrument, together with all rights pertaining to such Property and Improvements, as more particularly described in Exhibit A attached hereto.

"Provided Information" shall have the meaning set forth in Section 9.1(a).

"Qualified Insurer" shall have the meaning set forth in Section 6.1(b).

"Qualified Transferee" shall mean any of the following entities:

(a)    a pension fund, pension trust or pension account that (i) has total real estate assets of at least $500 million and (ii) is managed by a Person who controls at least $500 million of real estate equity assets; or

(b)    a pension fund advisor who (i) immediately prior to such transfer, controls at least $500 million of real estate assets and (ii) is acting on behalf of one or more pension funds that, in the aggregate, satisfy the requirements of clause (a) of this definition; or

(c)    an insurance company which is subject to supervision by the insurance commissioner, or a similar official or agency, of a state or territory of the United States (including the District of Columbia) (i) with a net worth, as of a date no more than six (6) months prior to the date of the transfer of at least $500 million and (ii), who, immediately prior to such transfer, controls real estate equity assets of at least $500 million; or

11

{10347125:14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 19 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 19 of 38

(d)    a corporation organized under the banking laws of the United States or any state or territory of the United States (including the District of Columbia) (i) with a combined capital and surplus of at least $500 million and (ii) who, immediately prior to such transfer, controls real estate equity assets of at least $500 million; or

(e)    any person (i) with a long-term unsecured debt rating from each of the Rating Agencies of at least investment grade or (ii) who owns or operates at least ten (10) properties (not including the Property) of a type, quality and size similar to the Property, each of whom has a net worth, as of a date no more than six (6) months prior to the date of such transfer, of at least $500 million, and, immediately prior to such transfer, controls real estate equity assets of at least $500 million.

"Rating Agencies" shall mean each of S&P, Moody's, and Fitch, and any other nationally-recognized statistical rating agency which has been approved by Lender and has rated the Securities.

"Register" shall have the meaning set forth in Section 9.7.2(h).

"Related Party" shall have the meaning set forth in Section 9.4(e).

"Release" with respect to any Hazardous Material means any release, deposit, discharge, emission, leaking, leaching, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials.

"Rents" shall have the meaning set forth in Article 1 of the Security Instrument.

"Reserve Funds" shall mean the Tax and Insurance Escrow Fund, or any other escrow or reserve fund established by the Loan Documents.

"Responsible Officer" means with respect to a Person, the chairman of the board, president, chief operating officer, chief financial officer, treasurer or vice president-finance of such Person.  For purposes of Section 5.1.10(h), the term "Responsible Officer" shall mean Borrower's chief financial officer.

"Restoration" shall mean the repair and restoration of the Property after a Casualty or Condemnation as nearly as possible to the condition the Property was in immediately prior to such Casualty or Condemnation, with such alterations as may be approved by Lender.

"Restricted Party" shall mean Borrower, any Guarantor, any Indemnitor or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of, Borrower, any Guarantor, any Indemnitor or any non-member manager.

"S&P" shall mean Standard & Poor's Ratings Group, a division of McGraw-Hill, Inc.

"Sale or Pledge" shall mean a voluntary or involuntary sale, conveyance, transfer or pledge of a direct or indirect legal or beneficial interest.

"Securities" shall have the meaning set forth in Section 9.1.

12

{10347125:14}

08-13555-mg   Doc 27854-1   Filed 05/14/12   Entered 05/14/12 16:52:48   Exhibit -
Exhibit A Part 1 of 2   Pg 20 of 75
Case 1:08-cv-05353-CM   Document 1-1   Filed 06/11/08   Page 20 of 38

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Securitization" shall have the meaning set forth in Section 9.1.

"Security Instrument" shall mean that certain first priority Deed of Trust, Security Agreement and Fixture Filing, of even date herewith, executed and delivered by Borrower as security for the Obligations and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Servicer" shall have the meaning set forth in Section 9.3.

"Servicing Agreement" shall have the meaning set forth in Section 9.3.

"Severed Loan Documents" shall have the meaning set forth in Section 8.2(c).

"Special Member" shall have the meaning set forth in Section 4.1.35.

"State" shall mean the State in which the Property or any part thereof is located.

"Survey" shall mean a survey prepared by a surveyor licensed in the State where the Property is located and satisfactory to Lender and the company or companies issuing the Title Insurance Policies, and containing a certification of such surveyor satisfactory to Lender.

"Syndication" shall have the meaning set forth in Section 9.7.2(a).

"Syndication Indemnified Liabilities" shall have the meaning set forth in Section 9.7.4(c).

"Tax and Insurance Escrow Fund" shall have the meaning set forth in Section 7.2.

"Taxes" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof.

"Title Insurance Policy" shall mean an ALTA mortgagee title insurance policy in a form acceptable to Lender (or, if the Property is located in a State which does not permit the issuance of such ALTA policy, such form as shall be permitted in such State and acceptable to Lender) issued with respect to the Property and insuring the lien of the Security Instrument encumbering the Property.

"Transfer" shall have the meaning set forth in Section 5.2.10.

"Transferee" shall have the meaning set forth in Section 5.2.10.

"UCC" or "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in the State in which the Property is located.

"Underwriter Group" shall have the meaning set forth in Section 9.2(b).

"U.S. Obligations" shall mean direct non-callable obligations of the United States of America.

13

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 21 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 21 of 38

"Val Vista Property" shall have the meaning set forth in the Val Vista Security Instrument.

"Val Vista Security Instrument" shall mean that certain first priority Deed of Trust, Security Agreement and Fixture Filing, of even date herewith, executed and delivered by A&N Investment Properties, L.L.C., as security for the Obligations and encumbering the Val Vista Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Water/Sewer Holdback" shall have the meaning set forth in Section 7.3(a).

"Water Work" shall have the meaning set forth in Section 7.3(a).

"Work" shall mean any work required to be performed by Borrower in order to subdivide the Property into saleable building lots, including the installation of roads and providing access for utilities and other infrastructure to the Property and any other work required to be performed by Borrower under any purchase and sale contract entered into in connection a Parcel Release.

Section 1.2    Principles of Construction.

All references to articles, sections, exhibits and schedules are to articles, sections, exhibits and schedules in or to this Agreement unless otherwise specified. All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## ARTICLE 2  GENERAL TERMS

Section 2.1    Loan Commitment; Disbursement to Borrower.

2.1.1    Agreement to Lend and Borrow.

Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept the Loan on the Closing Date.

2.1.2    The Loan.

Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make the Loan to Borrower on the Closing Date in the original principal amount of $44,000,000.00; *provided, however,* that on the Closing Date, Lender shall only disburse to Borrower an amount equal to $37,735,000.00 (the "**Initial Advance**"). Portions of the Loan not disbursed on the Closing Date may be advanced in accordance with the provisions of Sections 7.1, 7.3 and 7.4. Any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

{10347125:14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 22 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 22 of 38

2.1.3    The Note, Security Instrument and Loan Documents.

The Loan shall be evidenced by the Note and is secured by the Security Instrument, the Assignment of Leases and the other Loan Documents.

2.1.4    Use of Proceeds.

Borrower shall use a portion of the proceeds of the Loan to (a) refinance the existing indebtedness on the Property, as approved by Lender on the Closing Date, (b) make deposits into the Reserve Funds on the Closing Date in the amounts provided herein, and (c) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender. In addition, Lender shall holdback from disbursement of the Loan proceeds certain amounts to be disbursed subject to the provisions of Sections 7.1, 7.3 and 7.4.

2.1.5    Loan Closing Fee.

On the Closing Date, Borrower shall pay to Lender a Loan closing fee equal to three percent (3.0%) of the original principal amount of the Loan.

2.1.6    Loan Administration Fee.

On the Closing Date, Borrower shall pay to Lender a loan administration fee (the "**Loan Administration Fee**") equal to two and one-half percent (2.5%) of the original principal amount of the Loan.

2.1.7    Option to Extend.

Borrower shall only have the one time option to extend the term of the Loan from the Initial Maturity Date to the Extended Maturity Date, upon satisfaction of each of the following conditions precedent:

(a)    Borrower shall provide Lender with irrevocable written notice (the "Extension Notice") of Borrower's request to exercise this option to extend not more than one hundred twenty (120) days but not less than sixty (60) days prior to the Initial Maturity Date;

(b)    As of the date of Borrower's delivery of the Extension Notice, and as of the Initial Maturity Date, no Event of Default shall have occurred and be continuing, and Borrower shall deliver, if requested by Lender, an Officer's Certificate to such effect on each such date;

(c)    Borrower shall deliver to Lender, at Borrower's sole cost and expense, an updated title search that shall show no encumbrances on the Property other than the Permitted Encumbrances and shall otherwise not show any matter not permitted by the Loan Documents;

(d)    Borrower shall have provided to Lender an estoppel certificate in compliance with Section 5.1.13;

(e)    Borrower shall have paid to Lender the Extension Fee; and

{10347125:14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 23 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 23 of 38

(f)    Borrower shall have paid to Lender any accrued and unpaid interest on the Loan through the Initial Maturity Date.

During the period from the Initial Maturity Date through the Extended Maturity Date (the "**Extension Period**"), the terms and conditions of this Agreement and the other Loan Documents as modified and approved by Lender and Borrower shall remain unmodified and in full force and effect.

Section 2.2    Interest; Loan Payments; Late Payment Charge.

2.2.1    Payments.

(a)    Interest Payments.  Interest on the outstanding principal balance of the Loan shall accrue from the Closing Date to but excluding the Maturity Date at the Applicable Interest Rate. Borrower shall pay to Lender commencing on August 1, 2006, and on each Payment Date thereafter through and including the Maturity Date, interest only on the outstanding principal balance of the Loan (the "**Interest Only Payment Amount**").

(b)    All payments and other amounts due under the Note, this Agreement and the other Loan Documents shall be made without any setoff, defense or irrespective of, and without deduction for, counterclaims.

2.2.2    Interest Calculation.

Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate equal to the Applicable Interest Rate divided by three hundred sixty (360) by (c) the outstanding principal balance.

2.2.3    Intentionally Omitted.

2.2.4    Payment on Maturity Date.

Borrower shall pay to Lender on the Maturity Date the outstanding principal balance of the Loan, all accrued and unpaid interest thereon and all other amounts due hereunder and under the Note, the Security Instrument and the other Loan Documents.

2.2.5    Payments after Default.

Upon the occurrence and during the continuance of an Event of Default, interest on the outstanding principal balance of the Loan and, to the extent permitted by Applicable Law, overdue interest and other amounts due in respect of the Loan, shall accrue at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein.  Interest at the Default Rate shall be computed from the occurrence of the Event of Default until the actual receipt and collection of the accrued and unpaid Debt (or that portion thereof that is then due).  To the extent permitted by Applicable Law, interest at the Default Rate shall be added to the Debt, shall itself accrue interest at the same rate as the Loan and shall be secured by the Security Instrument.  This paragraph shall not be construed as an

16

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 24 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 24 of 38

agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

### 2.2.6 Late Payment Charge.

If any principal, interest or any other sums due under the Loan Documents is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by Applicable Law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment; provided, however, that such late charge shall not be due and payable with respect to the final payment of principal due on the Maturity Date. Any such amount shall be secured by the Security Instrument and the other Loan Documents to the extent permitted by Applicable Law.

### 2.2.7 Usury Savings.

This Agreement and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

### 2.2.8 Governmental Taxes.

(a)    All payments made by Borrower hereunder shall be made free and clear of, and without reduction for or on account of, income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions, reserves or withholdings imposed, levied, collected, withheld or assessed by any Governmental Authority, which are imposed, enacted or become effective after the date hereof (collectively, "**Governmental Taxes**"), excluding, however, income and franchise taxes of the United States of America or any political subdivision or taxing authority thereof or therein imposed upon Lender. If any Governmental Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Governmental Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder. Whenever any Governmental Tax is payable pursuant to applicable law by Borrower, as promptly as possible thereafter, Borrower shall send to Lender an original official receipt, if

17

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 25 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 25 of 38

available, or certified copy thereof showing payment of such Governmental Tax. Borrower hereby indemnifies Lender for any incremental taxes, interest or penalties that may become payable by Lender which may result from any failure by Borrower to pay any such Governmental Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Lender the required receipts or other required documentary evidence.

(b)    In the event that any change in any requirement of law or in the interpretation or application thereof, or compliance by Lender with any request or directive (whether or not having the force of law) hereafter issued from any central bank or other Governmental Authority:

(i)    shall hereafter impose, modify or hold applicable any additional cost or reserve, special deposit, compulsory loan or similar requirement, against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender;

(ii)    shall hereafter have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material; or

(iii)    shall hereafter impose on Lender any other condition and the result of any of the foregoing is to increase the cost to Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder;

then, in any such case, Borrower shall promptly pay Lender, upon demand, any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable as determined by Lender. If Lender becomes entitled to claim any additional amounts pursuant to this Section, Lender shall provide Borrower with not more than ninety (90) days written notice specifying in reasonable detail the event by reason of which it has become so entitled and the additional amount required to fully compensate Lender for such additional cost or reduced amount. A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence submitted by Lender to Borrower shall be conclusive in the absence of manifest error.

(c)    This Section shall survive payment of the Note and the satisfaction of all other obligations of Borrower under the Note, this Agreement, the Security Instrument and the other Loan Documents.

Section 2.3    Prepayments.

2.3.1    Prepayments.

On any Payment Date, Borrower may, at its option, prepay the Loan, in whole, but not in part, upon satisfaction of the following conditions:

(a)    Borrower shall provide prior written notice to Lender specifying the date (the "Prepayment Date") upon which the prepayment is to be made, which notice shall be delivered to Lender not less than thirty (30) days prior to such payment. Borrower's notice of prepayment

18

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 26 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 26 of 38

in accordance with this subsection (a) shall be irrevocable, and the principal balance to be prepaid shall be absolutely and unconditionally due and payable on the date specified in such notice; and

(b)      Borrower shall pay to Lender, simultaneously with such prepayment (i) all accrued and unpaid interest on the amount of principal being prepaid through and including the Prepayment Date, (ii) if such payment is not made on a Payment Date, all interest on the principal amount being prepaid which would have accrued from the date of prepayment through and including the end of one Interest Period then in effect (the "Interest Shortfall"), (iii) the applicable Prepayment Premium (if the applicable prepayment occurs on or before the sixth (6th) month anniversary of the Closing Date), if any, and (iv) all other sums then due under this Agreement, the Note or the other Loan Documents.

2.3.2   Mandatory Prepayments.

On the next occurring Payment Date following the date on which Borrower actually receives any Net Proceeds, Borrower shall prepay the outstanding principal balance of the Note in an amount equal to one hundred percent (100%) of such Net Proceeds. No Prepayment Premium shall be due in connection with any prepayment made pursuant to this Section 2.3.2, and all other provisions of Section 2.3.1(a) and Section 2.3.1(b) shall apply.

2.3.3   Prepayments After Default.

If, following an Event of Default, Borrower tenders payment of all or any part of the Debt, or if all or any portion of the Debt is recovered by Lender after such Event of Default such tender or recovery shall be deemed a voluntary prepayment by Borrower and Borrower shall pay, in addition to the Debt, (i) all accrued and unpaid interest on the amount of principal being prepaid through and including the Prepayment Date, (ii) if such payment is not made on a Payment Date, the Interest Shortfall with respect to the amount prepaid, (iii) the applicable Prepayment Premium, and (iv) all other sums due under this Agreement, the Note or the other Loan Documents in connection with a partial or total prepayment.

2.3.4   Intentionally Omitted.

2.3.5   Making of Payments.

Each payment by Borrower hereunder or under the Note shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to Lender by 2:00 p.m., New York City time, on or prior to the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrower. Whenever any payment hereunder or under the Note shall be stated to be due on a day which is not a Business Day, such payment shall be made on the first Business Day succeeding such scheduled due date.

2.3.6   Application of Principal Prepayments.

All prepayments received pursuant to this Section 2.3 shall be accompanied by accrued interest and all other sums due as provided in this Section 2.3 and shall be applied first, to

19

08-13555-mg   Doc 27854-1   Filed 05/14/12   Entered 05/14/12 16:52:48   Exhibit -
Exhibit A Part 1 of 2   Pg 27 of 75
Case 1:08-cv-05353-CM   Document 1-1   Filed 06/11/08   Page 27 of 38

interest on the outstanding principal balance being prepaid that accrued through and including the date of prepayment, second, to interest on the outstanding principal balance being prepaid that would have accrued through the end of the Interest Period in which the prepayment occurred and third, to the payments of principal due under the Loan in the inverse order of maturity.

## ARTICLE 3   INTENTIONALLY OMITTED.

## ARTICLE 4   REPRESENTATIONS AND WARRANTIES

Section 4.1     Borrower Representations.

Borrower represents and warrants as of the Closing Date that:

### 4.1.1   Organization.

Borrower is organized and is validly existing and in good standing in the jurisdiction in which it is organized, with requisite power and authority to own the Property and to transact the businesses in which it is now engaged. Borrower is duly qualified to do business and is in good standing in the State of Arizona. Borrower possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own the Property and to transact the businesses in which it is now engaged. Attached hereto as Schedule 1 is a true, correct and complete organizational chart of Borrower.

### 4.1.2   Proceedings.

Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents. This Agreement and the other Loan Documents have been duly executed and delivered by or on behalf of Borrower and constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

### 4.1.3   No Conflicts.

The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, or other agreement or instrument to which Borrower is a party or by which any of Borrower's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over Borrower or any of the Property or Borrower's other assets, or any license or other approval required to operate the Property, and any consent, approval, authorization, order, registration or qualification of or with any

{10347125:14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 28 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 28 of 38

Governmental Agency required for the execution, delivery and performance by Borrower of this Agreement or any other Loan Documents have been obtained and is in full force and effect.

### 4.1.4    Litigation.

There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to the best of Borrower's knowledge, threatened against or affecting Borrower or the Property, which actions, suits or proceedings, if determined against Borrower or the Property, might materially adversely affect the condition (financial or otherwise) or business of Borrower or the condition or ownership of the Property.

### 4.1.5    Agreements.

Borrower is not a party to any agreement or instrument or, to the best of Borrower's knowledge, subject to any restriction which might materially and adversely affect either Borrower or the Property. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower or the Property is bound. Borrower has no material financial obligation under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation of the Property and (b) obligations under the Loan Documents.

### 4.1.6    Solvency.

Borrower (a) has not entered into the transaction or executed the Note, this Agreement or any other Loan Documents with the intent to hinder, delay or defraud any creditor and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to incur debt and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debt and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower). Except as set forth in Schedule II, no petition under the Bankruptcy Code or similar state bankruptcy or insolvency law has been filed against Borrower or any constituent Person in the last seven (7) years, and Borrower nor any constituent Person in the last seven (7) years has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. Neither Borrower nor any of its constituent Persons are contemplating either the filing of a petition by it under the Bankruptcy Code or similar state bankruptcy or insolvency law or the liquidation of all or a major portion of Borrower's assets or property, and Borrower has no knowledge of any Person contemplating the filing of any such petition against it or such constituent Persons.

{10347125:14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 29 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 29 of 38

4.1.7    Full and Accurate Disclosure.

No statement of fact made by Borrower in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no fact presently known to Borrower which has not been disclosed to Lender which materially and adversely affects, or might materially and adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower.

4.1.8    No Plan Assets.

Borrower is not an "employee benefit plan" (as defined in Section 3(3) of ERISA) subject to Title I of ERISA, and none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101. In addition, (a) Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA and (b) transactions by or with either Borrower are not subject to State statutes regulating investment of, and fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect, which prohibit or otherwise restrict the transactions contemplated by this Agreement.

4.1.9    Compliance.

Borrower and the Property and the use thereof comply in all material respects with all applicable Legal Requirements, including, without limitation, all Environmental Laws, building and zoning ordinances and codes. To the best of Borrower's knowledge after due inquiry, Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority. There has not been committed by Borrower any act or omission affording the federal government or any other Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. To the best of Borrower's knowledge after due inquiry, there has not been committed by any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any other Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

4.1.10    Financial Information.

To the best of Borrower's knowledge, all financial data that have been delivered to Lender in respect of Borrower and the Property (i) are true, complete and correct in all material respects, (ii) accurately represent in all material respects the financial condition of Borrower and the Property, as applicable, as of the date of such reports, and (iii) have been prepared on an accrual basis in accordance with GAAP throughout the periods covered, except as disclosed therein. Except for Permitted Encumbrances, Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a materially adverse effect on the Property except as referred to or reflected in said financial statements. To the best of Borrower's knowledge, since the date of such financial statements,

22

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 30 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 30 of 38

there has been no materially adverse change in the financial condition, operations or business of Borrower from that set forth in said financial statements.

### 4.1.11 Condemnation.

To the best of Borrower's knowledge, no Condemnation or other similar proceeding has been commenced or is threatened or contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

### 4.1.12 Federal Reserve Regulations.

No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

### 4.1.13 Utilities and Public Access.

The Property has rights of access to public ways. Except as otherwise disclosed to Lender in writing in that certain letter dated May 16, 2006 by the City of Phoenix Development Services Department with respect to water and sewer utilities, any public utilities necessary or convenient to the full use and enjoyment of the Property are located either in the public right-of-way abutting the Property (which are connected so as to serve the Property without passing over other property) or in recorded easements serving the Property and such easements are set forth in and insured by the Title Insurance Policy.

### 4.1.14 Not a Foreign Person.

Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Code.

### 4.1.15 Separate Lots.

The Property is comprised of one (1) or more parcels which constitute a separate tax lot or lots and does not constitute a portion of any other tax lot not a part of the Property.

### 4.1.16 Assessments.

To the best of Borrower's knowledge, there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

### 4.1.17 Enforceability.

The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, including the defense of usury, and Borrower has not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

{10347125:14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 31 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 31 of 38

4.1.18 <u>Intentionally Omitted.</u>

4.1.19 <u>Insurance.</u>

Borrower has obtained and has delivered to Lender certified copies of all insurance policies reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. No Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any such policy.

4.1.20 <u>Use of Property.</u>

The Property currently is vacant, and during the term of the Loan it is intended to be subdivided into saleable building lots to be developed for use as detached residential units, condominiums, apartments and for commercial development purposes and other appurtenant and related uses permitted pursuant to the current "R1-18", "R-3", "R-3A" and "C-2" zoning designations.

4.1.21 <u>Intentionally Omitted.</u>

4.1.22 <u>Flood Zone.</u>

The Property is not located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards.

4.1.23 <u>Intentionally Omitted.</u>

4.1.24 <u>Boundaries.</u>

Except as disclosed on the Survey or the Title Insurance Policy, no improvements on adjoining properties encroach upon the Property.

4.1.25 <u>Leases and Other Agreements.</u>

(a)    Except for (i) that certain Letter of Intent dated May 30, 2006, executed on behalf of D.R. Horton, Inc. with respect to the proposed sale of approximately 26 acres of the Property identified therein as Parcel B and (ii) that certain Purchase and Sale Agreement dated as of June 20, 2006, between Borrower and Colonial Realty Limited Partnership with respect to the proposed sale of approximately 29.6 acres of the Property identified therein as Parcel C, there are no Leases or other agreements which affect the Property and no Person has any possessory right or interest in, or right to use or occupy, the Property or any portion thereof or any claim, right, title or interest therein.

(b)    Based upon the Environmental Reports and information that Borrower knows, after due inquiry, no Hazardous Materials have been disposed, stored or treated by any Person nor does Borrower have any actual knowledge of any Person's intention to use the Property for any activity which, directly or indirectly, involves the use, generation, treatment, storage, disposal or transportation of any Hazardous Materials, except those that are both (i) in compliance with current Environmental Laws and with permits issued pursuant thereto (if such

24

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 32 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 32 of 38

permits are required), and (ii) either (A) in amounts not in excess of that necessary to operate, clean, repair and maintain the Property, or (B) fully disclosed to and approved by Lender in writing pursuant to the Environmental Reports.

4.1.26  Survey.

To the best of Borrower's knowledge after due inquiry, the Survey for the Property delivered to Lender in connection with this Agreement does not fail to reflect any material matter affecting the Property or the title thereto.

4.1.27  Intentionally Omitted.

4.1.28  Filing and Recording Taxes.

All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Property to Borrower have been paid.  All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Security Instrument, have been paid.

4.1.29  Equity Contribution.  As a condition to Lender's willingness to make the Loan, as of the date of this Agreement, Borrower has invested the Equity Contribution in the Property in a manner satisfactory to Lender, which investment does not include fees, payments or commission paid to Borrower, any Principal or Guarantor or any affiliates thereof.

4.1.30  Intentionally Omitted.

4.1.31  Illegal Activity.

There are no illegal activities or activities relating to any controlled substances at the Property.

4.1.32  No Change in Facts or Circumstances; Disclosure.

All information submitted by Borrower to Lender and in all financial statements, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are accurate, complete and correct in all material respects.  To the best of Borrower's knowledge, there has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or might materially and adversely affect the value of the Property or the business operations or the financial condition of Borrower.  Borrower has disclosed to Lender all material facts known to Borrower and has not failed to disclose any material fact known to Borrower that could cause any Provided Information or representation or warranty made herein to be materially misleading.

25

{10347125:14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 33 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 33 of 38

### 4.1.33 Investment Company Act.

Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) subject to any other federal or State law or regulation which purports to restrict or regulate its ability to borrow money.

### 4.1.34 Principal Place of Business; State of Organization.

Borrower's principal place of business as of the date hereof is the address set forth in the introductory paragraph of this Agreement. Borrower is organized under the laws of the State of Arizona and its organizational identification number is L-1174489-2.

### 4.1.35 Single Purpose Entity.

Borrower represents, warrants, covenants, and agrees that (i) other than with respect to subsections (v), (aa), (bb) and (cc) below, it has not since formation and (ii) its organizational documents shall provide that it shall not, and that its general partner(s), if Borrower is a partnership, or its member(s), if Borrower is a limited liability company (in each case, "Principal") (I) have not since formation (other than with respect to subsections (v), (aa), (bb) and (cc) below) and (II) each Principal's organizational documents shall provide that it shall not:

(a)     with respect to Borrower, engage in any business or activity other than the acquisition, development, ownership, managing and maintenance of the Property, entering into the Loan, and activities incidental thereto;

(b)     with respect to Borrower, acquire or own any material assets other than (i) the Property, and (ii) such incidental Personal Property as may be necessary for the operation of the Property, and with respect to Principal, engage in any business or activity or acquire or own any assets, other than its interest in Borrower;

(c)     merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(d)     (i) fail to observe its organizational formalities or preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, qualification to do business in the State where the Property is located, if applicable, (ii) without the prior written consent of Lender, terminate or fail to comply with the provisions of Borrower's limited liability company operating agreement, dated as of November 8, 2005, and amended as of the date hereof (the "LLC Agreement"), certificate of formation, articles of organization or similar organizational documents, as the case may be, or (iii) without the prior written consent of Lender, amend or modify Sections 5(b) and (c), 7-10, 15, 18-22, 24 and 29 of the LLC Agreement (and all definitions utilized in such Sections), as well as the entire amendments to the limited liability company operating agreements for the two Members of Borrower;

26

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 34 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 34 of 38

(e)    other than Principal's ownership interest in Borrower, own any subsidiary or make any investment in, any Person without the prior written consent of Lender;

(f)    commingle its assets with the assets of any of its members, general partners, Affiliates, principals or of any other Person participate in a cash management system with any other Person or fail to use its own separate stationery, invoices and checks;

(g)    with respect to Borrower, incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than its obligations set forth in the Note and hereunder, except for trade payables in the ordinary course of its business of owning and operating the Property, provided that such debt (i) is not evidenced by a note, (ii) is paid within sixty (60) days of the date incurred, (iii) does not exceed, in the aggregate, one percent (1%) of the outstanding principal balance of the Note and (iv) is payable to trade creditors and in amounts as are normal and reasonable under the circumstances, and with respect to Principal, incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation);

(h)    become insolvent and fail to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due;

(i)    (i) fail to maintain its records (including financial statements), books of account and bank accounts separate and apart from those of the members, general partners, principals and Affiliates of Borrower, or of Principal, as the case may be, the Affiliates of a member, general partner or principal of Borrower, or of Principal, as the case may be, and any other Person, (ii) permit its assets or liabilities to be listed as assets or liabilities on the financial statement of any other Person or (iii) include the assets or liabilities of any other Person on its financial statements;

(j)    enter into any contract or agreement with any member, general partner, principal or Affiliate of Borrower or of Principal, as the case may be, Guarantor, Indemnitor, or any member, general partner, principal or Affiliate thereof (other than a business management services agreement with an Affiliate of Borrower, or of Principal, as the case may be, provided that (i) such agreement is acceptable to Lender, (ii) the manager, or equivalent thereof, under such agreement holds itself out as an agent of Borrower, or of Principal, as the case may be, and (iii) the agreement meets the standards set forth in this subsection (j) following this parenthetical), except upon terms and conditions that are commercially reasonable, intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any member, general partner, principal or Affiliate of Borrower, or of Principal, as the case may be, Guarantor, Indemnitor or any member, general partner, principal or Affiliate thereof;

(k)    seek the dissolution or winding up in whole, or in part, of Borrower;

(l)    fail to correct any known misunderstandings regarding the separate identity of Borrower, or of Principal as the case may be, or any member, general partner, principal or Affiliate thereof or any other Person;

27

{10347125:14}

08-13555-mg   Doc 27854-1   Filed 05/14/12   Entered 05/14/12 16:52:48   Exhibit -
Exhibit A Part 1 of 2   Pg 35 of 75
Case 1:08-cv-05353-CM   Document 1-1   Filed 06/11/08   Page 35 of 38

(m)   guarantee or become obligated for the debts of any other Person or hold itself out to be responsible for the debts of another Person;

(n)   make any loans or advances to any third party, including any member, general partner, principal or Affiliate of Borrower, or of Principal, as the case may be, or any member, general partner, principal or Affiliate thereof, and shall not acquire obligations or securities of any member, general partner, principal or Affiliate of Borrower, or of Principal, as the case may be, or any member, general partner, or Affiliate thereof;

(o)   fail to file its own tax returns or be included on the tax returns of any other Person except as required by Applicable Law;

(p)   fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name or a name franchised or licensed to it by an entity other than an Affiliate of Borrower, or of Principal, as the case may be, and not as a division or part of any other entity in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that Borrower, or Principal, as the case may be, is responsible for the debts of any third party (including any member, general partner, principal or Affiliate of Borrower, or Principal, as the case may be, or any member, general partner, principal or Affiliate thereof);

(q)   fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(r)   share any common logo with or hold itself out as or be considered as a department or division of (i) any general partner, principal, member or Affiliate of Borrower, or of Principal, as the case may be, (ii) any Affiliate of a general partner, principal or member of Borrower, or of Principal, as the case may be, or (iii) any other Person;

(s)   fail to allocate fairly and reasonably any overhead expenses that are shared with an Affiliate, including paying for office space and services performed by any employee of an Affiliate;

(t)   pledge its assets for the benefit of any other Person other than with respect to the Loan;

(u)   fail to maintain a sufficient number of employees in light of its contemplated business operations;

(v)   fail to provide in its (i) articles of organization, certificate of formation and/or limited liability company operating agreement, as applicable, if it is a limited liability company, (ii) limited partnership agreement, if it is a limited partnership or (iii) certificate of incorporation, if it is a corporation, that for so long as the Loan is outstanding pursuant to the Note, this Agreement and the other Loan Documents, it shall not file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, or make an assignment for the benefit of creditors without the affirmative vote of the Independent Manager and of all other general partners/members/directors;

28

{10347125:14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 36 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 36 of 38

(w)    fail to hold its assets in its own name;

(x)    fail to consider the interests of its creditors in connection with all company actions to the extent permitted by Applicable Law;

(y)    have any of its obligations guaranteed by an Affiliate except the Guarantor in connection with the Loan;

(z)    violate or cause to be violated the assumptions made with respect to Borrower in the Insolvency Opinion;

(aa)    with respect to Borrower and its member, fail at any time to have at least one (1) independent manager (the "**Independent Manager**") that is not and has not been for at least five (5) years: (a) a stockholder, director (other than an independent director), officer, employee, partner, member, manager (other than an independent manager), attorney or counsel of Borrower, its members, or Principal or any Affiliate of either of them, or any Person directly or indirectly controlling or controlled by or under direct or indirect common control with any of them; (b) a customer, supplier or other Person who derives its purchases or revenues (other than any fee paid to such Independent Manager as compensation for its services to serve as an Independent Manager) from its activities with Borrower, its members, Principal or any Affiliate of either of them (a "**Business Party**"); (c) a Person controlled by or controlling or under common control with any such stockholder, partner, member, manager, director, officer, attorney, counsel or Business Party; or (d) a member of the immediate family of any such stockholder, director, officer, employee, partner, member, manager, attorney, counsel or Business Party; or

(bb)    with respect to Borrower, take any action which, under the terms of any certificate of incorporation, by-laws, voting trust agreement with respect to any common stock, certificate of formation, LLC Agreement or other applicable organizational documents, requires the unanimous vote of one hundred percent (100%) of the members of the board without the vote of the Independent Manager.

(cc)    The LLC Agreement shall provide that (i) upon the occurrence of any event that causes the sole member of Borrower ("Member") to cease to be the sole member of Borrower (other than (A) upon an assignment by Member of all of its limited liability company interest in Borrower and the admission of the transferee in accordance with the Loan Documents and the LLC Agreement, or (B) the resignation of Member and the admission of an additional member of Borrower in accordance with the terms of the Loan Documents and the LLC Agreement), any Person acting as the Independent Manager of Borrower shall, without any action of any other Person and simultaneously with the Member ceasing to be the member of Borrower, automatically be admitted to Borrower ("Special Member") and shall continue Borrower without dissolution and (ii) no Special Member may resign from Borrower or transfer its rights as Special Member unless (A) a successor Special Member has been admitted to Borrower as Special Member in accordance with requirements of Delaware law in its place and (B) such successor Special Member has also accepted its appointment as an Independent Manager. The LLC Agreement shall further provide that (i) Special Member shall automatically cease to be a member of Borrower upon the admission to Borrower of a substitute Member, (ii) each Special

29

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 37 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 37 of 38

Member shall be a member of Borrower that has no interest in the profits, losses and capital of Borrower and has no right to receive any distributions of Borrower assets, (iii) pursuant to the Arizona Limited Liability Company Act (the "Act"), the Special Member shall not be required to make any capital contributions to Borrower and shall not receive a limited liability company interest in Borrower, (iv) no Special Member, in its capacity as Special Member, may bind Borrower and (v) except as required by any mandatory provision of the Act, the Special Member, in its capacity as Special Members, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, Borrower, including, without limitation, the merger, consolidation or conversion of Borrower; provided, however, such prohibition shall not limit the obligations of the Special Member, in its capacity as an Independent Manager, to vote on such matters required by the Loan Documents or the LLC Agreement. In order to implement the admission to Borrower of the Special Member, the Special Member shall execute a counterpart to the LLC Agreement. Prior to their admission to Borrower as a Special Member, the Special Member shall not be a member of Borrower. Upon the occurrence of any event that causes the Member to cease to be a member of Borrower, to the fullest extent permitted by law, the personal representative of Member shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of Member in Borrower, agree in writing (i) to continue Borrower and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower, effective as of the occurrence of the event that terminated the continued membership of Member in Borrower. Any action initiated by or brought against Member or the Special Member under any Creditors Rights Laws (as defined below) shall not cause Member or the Special Member to cease to be a member of Borrower and upon the occurrence of such an event, the business of Borrower shall continue without dissolution. The LLC Agreement shall provide that each of Member and the Special Member waives any right it might have to agree in writing to dissolve Borrower upon the occurrence of any action initiated by or brought against Member or the Special Member under any Creditors Rights Laws, or the occurrence of an event that causes Member or the Special Member to cease to be a member of Borrower. The term "Creditors Rights Laws" shall mean with respect to any Person any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

4.1.36 <u>Business Purposes.</u>

The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

4.1.37 <u>Taxes.</u>

Borrower Parties have filed all federal, State, county, municipal, and city income and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it. Borrower knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

30

{10347125:14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 38 of 75
Case 1:08-cv-05353-CM    Document 1-1    Filed 06/11/08    Page 38 of 38

4.1.38  Forfeiture.

Neither Borrower nor any other Person in occupancy of or involved with the operation or use of the Property has committed any act or omission affording the federal government or any State or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under the Note, this Agreement or the other Loan Documents.  Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.

4.1.39  Environmental Representations and Warranties.

Borrower represents and warrants, except as disclosed in the written reports resulting from the environmental site assessments of the Property delivered to and approved by Lender prior to the Closing Date (the "Environmental Report") and information that Borrower knows that: (a) there are no Hazardous Materials or underground storage tanks in, on, or under the Property, except those that are both (i) in compliance with current Environmental Laws and with permits issued pursuant thereto (if such permits are required), and (ii) in amounts not in excess of that necessary to maintain the Property, (b) there are no past, present or threatened Releases of Hazardous Materials in violation of any Environmental Law and which would require remediation by a Governmental Authority in, on, under or from the Property; (c) there is no threat of any Release of Hazardous Materials migrating to the Property; (d) there is no past or present non-compliance with current Environmental Laws, or with permits issued pursuant thereto, in connection with the Property except as described in the Environmental Reports; (e) Borrower does not know of, or has received, any written or oral notice or other communication from any Person (including but not limited to a Governmental Authority) relating to Hazardous Materials in, on, under or from the Property; and (f) Borrower has provided to Lender, in writing, any and all information relating to environmental conditions in, on, under or from the Property known to Borrower or contained in either Borrower's files and records, including but not limited to any reports relating to Hazardous Materials in, on, under or migrating to or from the Property and/or to the environmental condition of the Property.

4.1.40  Taxpayer Identification Number.

Borrower's United States taxpayer identification number is 20-2135737.

4.1.41  OFAC

Borrower represents and warrants that neither Borrower, Guarantor, or any of their respective Affiliates is a Prohibited Person, and Borrower, Guarantor, and their respective Affiliates are in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.

4.1.42  Embargoed Person.

As of the date hereof and at all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower, Principal and Guarantor constitute property of, or are beneficially

31

{10347125:14}

owned directly or indirectly, by any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§1701 et seq., The Trading with the Enemy Act: 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower, Principal, or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan made by the Lender is in violation of law ("Embargoed Person"); (b) no Embargoed Person has any interest of any nature whatsoever in Borrower, Principal, or Guarantor, as applicable, with the result that the investment in Borrower, Principal, or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law; and (c) none of the funds of Borrower, Principal, or Guarantor, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower, Principal, or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

Section 4.2    Survival of Representations.

Borrower agrees that all of the representations and warranties of Borrower set forth in Section 4.1 and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

## ARTICLE 5  BORROWER COVENANTS

Section 5.1    Affirmative Covenants.

From the date hereof and until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Liens of the Security Instrument (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lender that:

5.1.1    Existence; Compliance with Legal Requirements.

(a)    Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises, and comply, in all material respects, with all Legal Requirements applicable to it and the Property. There shall never be committed by Borrower, and Borrower shall use its best efforts to ensure that any other Person involved with the Property or the use or operation thereof shall not commit any act or omission affording the federal government or any State or local government the right of forfeiture against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture. Borrower shall keep the Property insured at all times by financially sound and reputable insurers, to such extent and against such risks, and maintain liability and such other insurance, as is more fully provided in this Agreement.

32

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower or the Property or any alleged violation of any Legal Requirement, provided that (i) no Default or Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Applicable Laws; (iii) neither the Property nor any part thereof or interest therein is subject to being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (v) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower or the Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith. Lender may apply any such security or part thereof, as necessary to cause compliance with such Legal Requirement at any time when, in the reasonable judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost.

5.1.2    Taxes and Other Charges.

Borrower shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable. Borrower shall furnish to Lender receipts, or other evidence for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent (provided, however, that Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender pursuant to Section 7.2). Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge whatsoever which may be or become a Lien or charge against the Property, and shall promptly pay for all utility services provided to the Property. After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (i) no Default or Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Applicable Laws; (iii) neither the Property nor any part thereof or interest therein is subject to being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon. Lender may apply such security or part thereof held by Lender at any time when, in the reasonable judgment of Lender, the validity or applicability of such Taxes or Other Charges are established or the Property (or part thereof or interest therein) shall be in danger of being sold, forfeited,

33

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 41 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 3 of 39

terminated, cancelled or lost or there shall be any danger of the Lien of the Security Instrument being primed by any related Lien.

### 5.1.3    Litigation.

Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened in writing against Borrower which might materially adversely affect Borrower's condition (financial or otherwise) or business or the Property.

### 5.1.4    Access to Property.

Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice.

### 5.1.5    Notice of Default.

Borrower shall promptly advise Lender of any material adverse change in either Borrower's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge.

### 5.1.6    Cooperate in Legal Proceedings.

Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way adversely affect the rights of Lender hereunder or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

### 5.1.7    Award and Insurance Benefits.

Borrower shall cooperate with Lender in obtaining for Lender the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Property, and Lender shall be reimbursed for any expenses reasonably incurred in connection therewith (including reasonable attorneys' fees and disbursements, and the payment by Borrower of the expense of an appraisal on behalf of Lender in case of Casualty or Condemnation affecting the Property or any part thereof) out of such Award or Insurance Proceeds.

### 5.1.8    Further Assurances.

Borrower shall, at Borrower's sole cost and expense:

(a)    furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by Borrower pursuant to the terms of the Loan Documents or reasonably requested by Lender in connection therewith;

34

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 42 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 4 of 39

(b)    execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may reasonably require including, without limitation, the execution of UCC financing statements; and

(c)    do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time.

### 5.1.9  Mortgage and Intangible Taxes.

Borrower shall pay all State, county and municipal recording, mortgage, and intangible, and all other taxes imposed upon the execution and recordation of the Security Instrument and/or upon the execution and delivery of the Note.

### 5.1.10  Financial Reporting.

(a)    Borrower will keep and maintain or will cause to be kept and maintained on a Fiscal Year basis, in accordance with GAAP (or such other accounting basis acceptable to Lender), proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense in connection with the operation on an individual basis of the Property. Lender shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or any other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire. After the occurrence of an Event of Default, Borrower shall pay all costs and expenses incurred by Lender to examine either Borrower's accounting records with respect to the Property, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(b)    Borrower will furnish to Lender annually, within ninety (90) days following the end of each Fiscal Year, a complete copy of Borrower's annual financial statements audited by a the Accountants in accordance with GAAP (or such other accounting basis acceptable to Lender) covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower. Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year, and shall include, but not be limited to, amounts representing annual gross income, net cash flow, net operating income, and operating expenses. Borrower's annual financial statements shall be accompanied by (i) a certificate executed by a Responsible Officer or other appropriate officer of Borrower stating that each such annual financial statement presents fairly the financial condition and the results of operations of Borrower and the Property being reported upon and has been prepared on an accrual basis in accordance with GAAP and (ii) an unqualified opinion of the Accountant. Together with Borrower's annual financial statements, Borrower shall furnish to Lender an Officer's Certificate certifying as of the date thereof whether there exists an event or circumstance which constitutes a Default or Event of Default under the Loan Documents executed and delivered by, or applicable to, Borrower, and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to

35

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 43 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 5 of 39

remedy the same. In addition, on or prior to the Closing Date, Borrower shall provide Lender with a balance sheet of Borrower (taking into account the acquisition of the Property and the Loan), together with a certificate executed by a Responsible Officer or other appropriate officer of Borrower stating that such opening balance sheet presents fairly the financial condition and results of operations of Borrower and the Property and has been prepared on an accrual basis in accordance with GAAP.

(c)    Intentionally Omitted.

(d)    Intentionally Omitted.

(e)    Borrower shall furnish to Lender, within ten (10) Business Days after request such detailed information with respect to the operation of the Property, the financial affairs of Borrower and such other financial or statistical information as may be reasonably requested by Lender, including, without limitation, a statement of any tenants then in default under any of the Leases.

(f)    Any reports, statements or other information required to be delivered under this Agreement shall be delivered (i) in paper form, (ii) on a diskette or by e-mail, and (iii) if requested by Lender and within the capabilities of Borrower's data systems without change or modification thereto, in electronic form and prepared using a Microsoft Word for Windows or WordPerfect for Windows files (which files may be prepared using a spreadsheet program and saved as word processing files).

(g)    Borrower agrees that Lender may forward to each purchaser, transferee, assignee, servicer, participant, Co-Lender or investor in all or any portion of the Loan or any Securities (collectively, the "Investor") or any Rating Agency rating such participations and/or Securities and each prospective Investor, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, any Guarantor, any Indemnitor and the Property, whether furnished by Borrower, any Guarantor, any Indemnitor or otherwise, as Lender determines necessary or desirable. Borrower irrevocably waives any and all rights they may have under any Applicable Laws to prohibit such disclosure, including, but not limited, to any right of privacy.

(h)    If requested by Lender, Borrower shall provide Lender, promptly upon request or within the time periods set forth in this subsection (h), with the following financial statements if, at the time a Disclosure Document is being prepared for a Securitization, it is expected that the principal amount of the Loan together with any Affiliated Loans at the time of Securitization may, or if the principal amount of the Loan together with any Affiliated Loans at any time during which the Loan and any Affiliated Loans are included in a Securitization does, equal or exceed 20% of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the Securitization:

(i)    To the extent in Borrower's possession, a balance sheet with respect to the Property for the two most recent fiscal years, meeting the requirements of Section 210.3 01 of Regulation S-X of the Securities Act and statements of income and statements of

36

cash flows with respect to the Property for the three most recent fiscal years, meeting the requirements of Section 210.3 02 of Regulation S-X, and, to the extent that such balance sheet is more than 135 days old as of the date of the document in which such financial statements are included, interim financial statements of the Property meeting the requirements of Section 210.3 01 and 210.3 02 of Regulation S-X (all of such financial statements, collectively, the "Standard Statements"); provided, however, that with respect to the Property (other than properties that are hotels, nursing homes, or other properties that would be deemed to constitute a business and not real estate under Regulation S-X or other legal requirements) that has been acquired by Borrower from an unaffiliated third party (such Property, "Acquired Property"), as to which the other conditions set forth in Section 210.3 14 of Regulation S-X for provision of financial statements in accordance with such Section have been met, in lieu of the Standard Statements otherwise required by this section, Borrower shall instead provide the financial statements required by such Section 210.3 14 of Regulation S-X ("Acquired Property Statements").

(ii)    Not later than 30 days after the end of each fiscal quarter following the date hereof, a balance sheet of the Property as of the end of such fiscal quarter, meeting the requirements of Section 210.3 01 of Regulation S-X, and statements of income and statements of cash flows of the Property for the period commencing following the last day of the most recent fiscal year and ending on the date of such balance sheet and for the corresponding period of the most recent fiscal year, meeting the requirements of Section 210.3 02 of Regulation S-X (provided, that if for such corresponding period of the most recent fiscal year Acquired Property Statements were permitted to be provided hereunder pursuant to subsection (i) above, Borrower shall instead provide Acquired Property Statements for such corresponding period).

(iii)    Not later than 75 days after the end of each fiscal year following the date hereof, a balance sheet of the Property as of the end of such fiscal year, meeting the requirements of Section 210.3 01 of Regulation S-X, and statements of income and statements of cash flows of the Property for such fiscal year, meeting the requirements of Section 210.3 02 of Regulation S-X.

(iv)    Within ten Business Days after notice from the Lender in connection with the Securitization of the Loan, such additional financial statements, such that, as of the date (each an "Offering Document Date") of each Disclosure Document, Borrower shall have provided Lender with all financial statements as described in subsection (h)(i) above; provided that the fiscal year and interim periods for which such financial statements shall be provided shall be determined as of such Offering Document Date.

(i)    If requested by Lender, Borrower shall provide Lender, promptly upon request (but in no event later than the time periods set forth in Section 5.1.10(h) hereof), with summaries of the financial statements referred to in Section 5.1.10(h) hereof if, at the time a Disclosure Document is being prepared for a Securitization, it is expected that the principal amount of the Loan and any Affiliated Loans at the time of Securitization may, or if the principal amount of the Loan and any Affiliated Loans at any time during which the Loan and any Affiliated Loans are included in a Securitization does, equal or exceed 10% (but is less than 20%) of the aggregate

37

principal amount of all mortgage loans included or expected to be included, as applicable, in a Securitization. Such summaries shall meet the requirements for "summarized financial information," as defined in Section 210.1 02(bb) of Regulation S-X, or such other requirements as may be determined to be necessary or appropriate by Lender.

(j)    All financial statements provided by Borrower hereunder pursuant to Section 5.1.10(h) and (i) hereof shall be prepared in accordance with GAAP, and shall meet the requirements of Regulation S-X and other applicable legal requirements. All financial statements referred to in Subsections 5.1.10(h)(i) and 5.1.10(h)(iii) above shall be audited by independent accountants of Borrower acceptable to Lender in accordance with Regulation S-X and all other applicable legal requirements, shall be accompanied by the manually executed report of the independent accountants thereon, which report shall meet the requirements of Regulation S-X and all other applicable legal requirements, and shall be further accompanied by a manually executed written consent of the independent accountants, in form and substance acceptable to Lender, to the inclusion of such financial statements in any Disclosure Document and any Exchange Act filing and to the use of the name of such independent accountants and the reference to such independent accountants as "experts" in any Disclosure Document and Exchange Act filing, all of which shall be provided at the same time as the related financial statements are required to be provided. All financial statements (audited or unaudited) provided by Borrower under this Section 5.1.10 shall be certified by the chief financial officer or administrative member of Borrower, which certification shall state that such financial statements meet the requirements set forth in the first sentence of this Section 5.1.10(j).

(k)    If requested by Lender, Borrower shall provide Lender, promptly upon request, with any other or additional financial statements, or financial, statistical or operating information, as Lender shall determine to be required pursuant to Regulation S-X or any amendment, modification or replacement thereto or other legal requirements in connection with any Disclosure Document or any Exchange Act filing in connection with or relating to a Securitization or as shall otherwise be reasonably requested by the Lender.

(l)    In the event Lender determines, in connection with a Securitization, that the financial statements required in order to comply with Regulation S-X or other legal requirements are other than as provided herein, then notwithstanding the provisions of Section 5.1.10(h), (i) and (j) hereof, Lender may request, and Borrower shall promptly provide, such combination of Acquired Property Statement and/or Standard Statements or such other financial statements as Lender determines to be necessary or appropriate for such compliance.

(m)    The term "Affiliated Loans" shall mean a loan made by Lender to a parent, subsidiary or such other entity affiliated with Borrower, any Indemnitor or any Guarantor.

5.1.11  Business and Operations.

Borrower will continue to engage in the businesses presently conducted by it as and to the extent the same are necessary for the ownership and maintenance of the Property. Borrower will remain in good standing under the laws of the State of its organization and under the laws of each jurisdiction to the extent required for the ownership, maintenance, management and operation of the Property.

38

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 46 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 8 of 39

5.1.12  Costs of Enforcement.

In the event (a) that the Security Instrument is foreclosed in whole or in part or that the Security Instrument is put into the hands of an attorney for collection, suit, action or foreclosure, (b) of the foreclosure of any mortgage prior to or subsequent to the Security Instrument in which proceeding Lender is made a party, or (c) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or any of its constituent Persons or an assignment by Borrower or any of its constituent Persons for the benefit of its creditors, Borrower, and their successors or assigns, shall be chargeable with and agrees to pay all costs of collection and defense, including reasonable attorneys' fees and costs, incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes.

5.1.13  Estoppel Statement.

(a)    After request by Lender, Borrower shall within ten (10) days furnish Lender with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the Applicable Interest Rate of the Note, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt then known to Borrower, and (vi) that the Note, this Agreement, the Security Instrument and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

(b)    After request by Borrower, Lender shall within ten (10) days furnish Borrower with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the Applicable Interest Rate of the Note, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt then known to Lender, and (vi) that the Note, this Agreement, the Security Instrument and the other Loan Documents have not been modified or if modified, giving particulars of such modification.

5.1.14  Loan Proceeds.

Borrower shall use the proceeds of the Loan received by it on the Closing Date only for the purposes set forth in Section 2.1.4.

5.1.15  Performance by Borrower.

Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by, or applicable to, Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by, or applicable to, Borrower without the prior written consent of Lender.

08-13555-mg     Doc 27854-1     Filed 05/14/12     Entered 05/14/12 16:52:48     Exhibit -
Exhibit A Part 1 of 2     Pg 47 of 75
Case 1:08-cv-05353-CM     Document 1-2     Filed 06/11/08     Page 9 of 39

5.1.16 <u>Confirmation of Representations.</u>

Borrower shall deliver, in connection with any Securitization or Syndication, (a) one or more Officer's Certificates certifying as to the accuracy in all material respects of all representations made by Borrower in the Loan Documents as of the date of the closing of such Securitization or Syndication in all relevant jurisdictions, and (b) certificates of the relevant Governmental Authorities in all relevant jurisdictions indicating the good standing and qualification of Borrower as of the date of the closing of such Securitization or Syndication.

5.1.17 <u>Leasing Matters.</u>

Borrower shall not enter into any Leases for any portion of the Property or accept any Rents (including security deposits) in connection with such Leases without the Lender's prior written consent.

5.1.18 <u>Management Agreement.</u>

Borrower shall not enter into any management agreement relating to the Property without the Lender's prior written consent.

5.1.19 <u>Environmental Covenants.</u>

(a)     Borrower covenants and agrees that so long as the Loan is outstanding (i) all uses and operations on or of the Property, by Borrower shall, and Borrower shall use its best efforts to cause all uses and operations on or of the Property by any other Person to be in compliance in all material respects with all Environmental Laws and permits issued pursuant thereto; (ii) there shall be no Releases of Hazardous Materials in, on, under or from the Property by Borrower in violation of Environmental Law and Borrower shall use its best efforts to cause any other Person not to Release same in violation of Environmental Law; (iii) there shall be no Hazardous Materials in, on, or under any of the Property by Borrower and Borrower shall use its best efforts to cause no other Person to place any Hazardous Materials in, on or under any of the Property, except those that are both (A) in compliance with all Environmental Laws and with permits issued pursuant thereto, if and to the extent required, and (B) (1) in amounts not in excess of that necessary to operate the Property or (2) fully disclosed to and approved by Lender in writing; (iv) Borrower shall keep the Property free and clear of all liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of Borrower or any other Person (the "Environmental Liens"); (v) Borrower shall, at its sole cost and expense, reasonably cooperate in all activities pursuant to paragraph (b) below, including but not limited to providing all relevant information and making knowledgeable persons available for interviews; (vi) Borrower shall, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with the Property, pursuant to any reasonable written request of Lender, upon Lender's reasonable belief that the Property is not in full compliance with all Environmental Laws, and share with Lender the reports and other results thereof, and Lender and other Indemnified Parties shall be entitled to rely on such reports and other results thereof; (vii) Borrower shall, at its sole cost and expense, comply with all reasonable written requests of Lender to (A) reasonably effectuate remediation of any Hazardous Materials in, on, under or from the Property; and (B) comply with any

40

Environmental Law; (viii) Borrower shall use its best efforts to prevent any user of any portion of the Property to violate any Environmental Law; and (ix) Borrower shall immediately notify Lender in writing after it has become aware of (A) any presence or Release or threatened Releases of Hazardous Materials in, on, under, from or migrating towards the Property; (B) any non-compliance with any Environmental Laws related in any way to the Property; (C) any actual or potential Environmental Lien; (D) any required or proposed remediation of environmental conditions relating to the Property; and (E) any written or oral notice or other communication of which Borrower becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials.

(b)    Upon Lender's reasonable belief that the Property is not in full compliance with all Environmental Laws, Lender and any other Person designated by Lender, including but not limited to any representative of a Governmental Authority, and any environmental consultant, and any receiver appointed by any court of competent jurisdiction, shall have the right, but not the obligation, to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Lender's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing. Borrower shall cooperate with and provide access to Lender and any such Person designated by Lender.

5.1.20  Performance of the Work.

(a)    Borrower shall commence the Work in accordance with the project schedule attached hereto as Schedule III (the "Project Schedule") and shall at all times thereafter diligently pursue the completion of, and shall use best efforts to complete, the Work in accordance with the Project Schedule. Borrower shall complete all Work in accordance with the Loan Documents and in a good and workmanlike manner following the commencement of the Work. Borrower will notify Lender of any material delays from the estimated dates set forth in the Project Schedule in connection with the Work.

(b)    Lender reserves the right, at its option, to approve all contracts or work orders with materialmen, mechanics, suppliers, subcontractors, contractors or other parties providing labor or materials in connection with the Work, which approval shall be in Lender's reasonable discretion; provided, however, unless otherwise notified by Lender to the contrary, Lender's approval shall not be required for contracts (i) involving total expenditures less than $5,000 in the aggregate and (ii) involving a maximum time period of not more than two (2) months, but in any event, Borrower shall provide copies of the same to Lender and all such contracts, by their own terms and provisions, shall be assignable to Lender.

(c)    In the event Lender determines in its reasonable discretion that any portion of the Work has not been commenced as required by this Section, any portion of the Work is not being performed in a workmanlike or timely manner or that any portion of the Work has not been completed in a workmanlike or timely manner, Lender shall have the option to proceed under existing contracts or to contract with third parties to complete such portion of the Work and all sums so expended by Lender shall be deemed to have been advanced under the Loan to

41

{10347125:14}

08-13555-mg   Doc 27854-1   Filed 05/14/12   Entered 05/14/12 16:52:48   Exhibit -
Exhibit A Part 1 of 2   Pg 49 of 75
Case 1:08-cv-05353-CM   Document 1-2   Filed 06/11/08   Page 11 of 39

Borrower and the provisions of subsection (d) of this Section 5.1.20 shall govern all sums so advanced by Lender.

(d)     In order to facilitate Lender's completion or performing of any Work pursuant to this Section, Borrower hereby grants Lender the right to enter onto the Property and perform any and all work and labor necessary to complete or perform any portion of the Work and/or employ watchmen to protect the Property from damage.  All sums so expended by Lender shall be deemed to have been advanced under the Loan to Borrower and secured by the Security Instrument.  For this purpose, Borrower hereby constitutes and appoints Lender its true and lawful attorney-in-fact with full power of substitution to (i) complete or undertake any portion of the applicable Work in the name of Borrower, (ii) make such additions, changes and corrections to the Work as shall be necessary to complete the same in accordance with applicable Legal Requirements or such other conditions previously approved and accepted by Lender; (iii) to employ such contractors, subcontractors, agents, architects and inspectors as shall be required for such purposes; (iv) to pay, settle or compromise all existing bills and claims which are or may become Liens against the Property, or as may be necessary or desirable for the completion of the Work or for clearance of title; (v) to execute all applications and certificates in the name of Borrower which may be required by any of the contract documents; (vi) in its reasonable discretion, to prosecute and defend all actions or proceedings in connection with the Property or the rehabilitation and repair of the Property; and (vii) to do any and every reasonable act which Borrower might do in its own behalf to fulfill the terms of this Agreement.

(e)     Nothing in this Agreement shall: (i) make Lender responsible for performing or completing the Work or any portion thereof; (ii) require Lender to expend funds to make or complete any portion of the Work; or (iii) obligate Lender to demand from Borrower additional sums to make or complete any portion of the Work.

(f)     Borrower shall permit Lender and Lender's agents and representatives (including Servicer, Lender's or Servicer's construction consultant, engineer, architect or inspector) or third parties performing any portion of the Work pursuant to this Section to enter onto the Property during normal business hours to inspect the progress of any Work and all materials being used in connection therewith, to examine all plans and shop drawings relating thereto which are or may be kept at the Property, and to complete any Work pursuant to this Section.  Borrower shall request all contractors and subcontractors to cooperate with Lender or Lender's representatives or such other Persons described above in connection with inspections described herein or the completion of the Work pursuant to this Section..

(g)     The Work and all materials, equipment, fixtures, or any other item comprising a part of any such Work shall be constructed, installed or completed, as applicable, in a good and workmanlike manner, free and clear of all mechanic's, materialman's or other Liens.  Lender may require Borrower to provide Lender with a search of title to the Property effective to the date of the disbursement, which search shows that no mechanic's or materialmen's Liens or other Liens of any nature have been placed against the Property since the date hereof and that title to the Property is free and clear of all Liens (other than the Lien of the Security Instrument).  All Work shall comply with all Legal Requirements and all requirements of the Loan Documents.

42

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 50 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 12 of 39

5.1.21 OFAC.

At all times throughout the term of the Loan, Borrower, Guarantor, Indemnitor and their respective Affiliates shall be in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.

Section 5.2    Negative Covenants.

From the date hereof until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Security Instrument in accordance with the terms of this Agreement and the other Loan Documents, Borrower covenants and agrees with Lender that it will not do, directly or indirectly, any of the following:

5.2.1    Liens.

Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Property or permit any such action to be taken, except for Permitted Encumbrances.

5.2.2    Dissolution.

Borrower shall not (a) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (b) transfer, lease or sell, in one transaction or any combination of transactions, the assets or all or substantially all of the properties or assets of Borrower except to the extent expressly permitted by the Loan Documents, or (c) except as expressly permitted under the Loan Documents, modify, amend, waive or terminate its organizational documents or its qualification and good standing in any jurisdiction.

5.2.3    Change In Business.

Borrower shall not enter into any line of business other than the ownership and maintenance of the Property (including providing services in connection therewith), or make any material change in the scope or nature of its business objectives, purposes or operations or undertake or participate in activities other than the continuance of its present business.

5.2.4    Debt Cancellation.

Borrower shall not cancel or otherwise forgive or release any material claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

5.2.5    Zoning; Alterations.

(a)    Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance, without the prior written consent of Lender.

43

{10347125;14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 51 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 13 of 39

(b)    Except with respect to the intended use of the Property as set forth in Section 4.1.20 above, Borrower shall not in any respect alter, add to or otherwise improve, excavate, develop or renovate the Property, or any part thereof, in connection with any development or otherwise, without the prior written consent of Lender, which consent may be given or withheld in Lender's sole and absolute discretion.

(c)    Borrower shall not (i) change the use of the Property, or (ii) take any steps whatsoever to convert the Property, or any portion thereof, to a condominium or cooperative form of ownership, without the prior written consent of Lender which consent may be given or withheld in Lender's sole and absolute discretion.

(d)    Borrower will not, without the prior written consent of Lender which consent may be given or withheld in Lender's sole and absolute discretion, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Property, regardless of the depth thereof or the method of mining or extraction thereof.

5.2.6    No Joint Assessment.

Borrower shall not suffer, permit or initiate the joint assessment of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

5.2.7    Name, Identity, Structure, or Principal Place of Business.

Borrower shall not change its name, identity (including its trade name or names), or principal place of business set forth in the introductory paragraph of this Agreement, without, in each case, first giving Lender thirty (30) days prior written notice. Borrower shall not change its corporate, partnership or other structure, or the place of its organization as set forth in Section 4.1.34, without, in each case, the consent of Lender. Upon Lender's request, Borrower shall execute and deliver additional financing statements, security agreements and other instruments which may be necessary to effectively evidence or perfect Lender's security interest in the Property as a result of such change of principal place of business or place of organization.

5.2.8    ERISA.

(a)    Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)    Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its sole discretion and represents and covenants that (A) Borrower is not and does not maintain an "employee benefit plan" as defined in Section 3(32) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(3) of ERISA; (B) Borrower is

44

{10347125:14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 52 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 14 of 39

not subject to State statutes regulating investments and fiduciary obligations with respect to governmental plans; and (C) one or more of the following circumstances is true:

(i)    Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3-101(b)(2);

(ii)    Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2); or

(iii)    Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. § 2510.3-101(c) or (e).

5.2.9    Affiliate Transactions.

Borrower shall not enter into, or be a party to, any transaction with an Affiliate of Borrower, or any of the partners of Borrower except in the ordinary course of business and on terms which are fully disclosed to Lender in advance and are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.

5.2.10    Transfers.

(a)    Borrower shall not sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or any part thereof or any legal or beneficial interest therein or permit a Sale or Pledge of an interest in any Restricted Party (collectively, a "Transfer"). Lender may, but is under no obligation to, consent to such Transfer upon Borrower's satisfaction of the following conditions precedent: (i) the prior written consent of Lender shall have been obtained, and (ii) if a Securitization has occurred (A) Lender shall have obtained written confirmation from the Rating Agencies that the Transfer will not result in the downgrade, withdrawal or qualification of the then current ratings assigned to any Securities or the proposed rating of any Securities, (B) Lender shall have received satisfactory evidence that the transferee ("Transferee") in connection with such proposed Transfer shall be a Transferee who meets the requirements of clauses (a), (b), (c), (d) or (e) of the definition of "Qualified Transferee" herein or who is any other Person approved by Lender and the Rating Agencies, and Borrower shall have assigned, and such Transferee and replacement guarantor, as applicable, shall have assumed, all obligations and liabilities of Borrower or guarantor, as applicable, under the Loan Documents, (C) the Transferee's organizational documents contain provisions acceptable to Lender, including without limitation, the following single purpose entity and other provisions of the LLC Agreement: Sections 5, 7, 8, 9, 10, 18, 19, 20, 21, 22, 29 and 29 (and all definitions utilized in such Sections including but not limited to "Independent Manager"), (D) Transferee shall deliver an endorsement to the existing title policy insuring the Security Instrument, as modified by the assumption agreement, as a valid first lien on the Property and naming the Transferee as the owner of the fee estate of the Property, subject only to Permitted Encumbrances, (E) Borrower or Transferee shall pay any and all costs and expenses incurred in

45

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 53 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 15 of 39

connection with such Transfer (including, without limitation, Lender's counsel fees and disbursements and all recording fees, title insurance premiums and taxes), (F) Lender shall have received a substantive non-consolidation opinion, and other opinions of counsel reasonably requested by Lender or the Rating Agencies including, without limitation, opinions as to organization, authorization, due execution, enforceability and other matters in respect of the organization and assignment and assumption documents, acceptable to Lender and the Rating Agencies, (G) payment to Lender of an assumption fee equal to one percent (1.0%) of the outstanding principal balance of the Loan, and (H) any other requirements imposed by Lender shall have been satisfied.

The foregoing provisions of Section 5.2.10(a)(ii) shall also apply in the case of a Transfer of any legal or beneficial interest in the Property or a Transfer of an interest in any Restricted Party and shall be incorporated to the maximum extent possible so as to have the same substantive effect as when applied to a Transfer of the Property.

(b)      A Transfer shall include, but not be limited to: (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interests or the creation or issuance of new limited partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non-managing membership interests or the creation or issuance of new non-managing membership interests; (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; or (vii) the removal or the resignation of the managing agent other than in accordance with Section 5.1.18; (vii) the dissolution or termination of a Restricted Party; (viii) any transfer of a direct or indirect interest in Borrower between Persons holding a direct or indirect ownership interest in Borrower on the Closing Date except for Transfers permitted in accordance with Section 5.2.10(c); (ix) any other transaction pursuant to which any Person not holding a direct or indirect ownership interest in Borrower on the Closing Date acquires a direct or indirect (and no matter how remote) ownership interest in Borrower; (x) any swap, derivative or other transaction shifting the risks and rewards of ownership of the Property, unless otherwise expressly required by the Loan Documents; (xi) any transaction pursuant to which any Person is granted an option to purchase all or any portion of the Property or any direct, indirect or beneficial interest in Borrower; and (xii) any transaction, agreement or arrangement pursuant to which any Person is given any right to control, direct or veto any material actions or decisions by Borrower, directly or indirectly, whether through an ownership interest, contract right or otherwise; provided, however, that any

46

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 54 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 16 of 39

of the foregoing Transfers that are also permitted in accordance with Section 5.2.10(c), shall be authorized and permitted.

(c)    Notwithstanding the provisions of Sections 5.2.10(a) and (b), the following transfers shall not be deemed to be a Transfer:

(i)    the transfer by devise or descent or by operation of law upon the death of a member, partner or shareholder of a Restricted Party or a Restricted Party itself, which do not affect the management or control of Borrower; or

(ii)    a Parcel Release made in full compliance with the provisions of Section 11.1 below.

(d)    Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Transfer in violation of this Section 5.2.10. This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer. Notwithstanding anything to the contrary contained in this Section 5.2.10 in the event any transfer (whether or not such transfer shall constitute a Transfer) results in any Person owning in excess of forty-nine percent (49%) of the ownership interest in a Restricted Party, Borrower shall, prior to such transfer, deliver an updated Insolvency Opinion to Lender, which opinion shall be in form, scope and substance acceptable in all respects to Lender and the Rating Agencies.

## ARTICLE 6  INSURANCE; CASUALTY; CONDEMNATION; REQUIRED REPAIRS

Section 6.1    Insurance.

(a)    Borrower shall obtain and maintain, or cause to be maintained, Policies for Borrower and the Property providing at least the following coverages:

(i)    if and when any Improvements are constructed on the Property, comprehensive all risk insurance on the Improvements and the Personal Property, in each case (ii) in an amount equal to 100% of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation, but such amount, when taken together with the amount of insurance required under Section 6.1(a)(iii), shall in no event be less than the outstanding principal balance of the Loan; (iii) containing an agreed amount endorsement with respect to the Improvements and Personal Property waiving all co-insurance provisions updated at least annually; (iv) providing for no deductible in excess of $25,000 (or not in excess of five percent (5%) of the value of the Property at risk, but subject to a minimum of $100,000, for windstorm or hail coverage); and (v) providing coverage for contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements together with an "Ordinance or Law Coverage" or "Enforcement" endorsement if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses. The Full Replacement Cost shall be redetermined from time to time (but not more frequently than once in any twenty-four (24) calendar months)

47

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 55 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 17 of 39

at the request of Lender by an appraiser or contractor designated and paid by Borrower and approved by Lender, or by an engineer or appraiser in the regular employ of the insurer. After the first appraisal, additional appraisals may be based on construction cost indices customarily employed in the trade. No omission on the part of Lender to request any such ascertainment shall relieve Borrower of any of its obligations under this Subsection;

(ii)    commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a combined single limit of not less than $1,000,000.00 per occurrence; (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all written and oral contracts; and (5) contractual liability covering the indemnities contained in Article 10 of the Security Instrument to the extent the same is available;

(iii)    if and when any Lease is entered into, business interruption/loss of rents insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in Section 6.1(a)(i); (C) in an amount equal to 100% of the projected gross income from the Property (on an actual loss sustained basis) for a period continuing until the Restoration of the Property is completed; the amount of such business interruption/loss of rents insurance shall be determined prior to the Closing Date and at least once each year thereafter based on the greatest of: (x) Borrower's reasonable estimate of the gross income from the Property and (y) the highest gross income received during the term of the Note for any full calendar year prior to the date the amount of such insurance is being determined, in each case for the succeeding eighteen (18) month period and (D) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and the Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; All insurance proceeds payable to Lender pursuant to this Section 6.1(a)(iii) shall be held by Lender and shall be applied to the obligations secured hereunder from time to time due and payable hereunder and under the Note and this Agreement; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured hereunder on the respective dates of payment provided for in the Note and this Agreement except to the extent such amounts are actually paid out of the proceeds of such business interruption/loss of rents insurance.

(iv)    at all times during which structural construction, repairs or alterations are being made with respect to the Improvements (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the insurance provided for in Section 6.1(c)(ii); and (B) the insurance provided for in Section 6.1(a)(i) shall be written in a so-called builder's risk completed value form (1) on a

48

{10347125:14}

08-13555-mg   Doc 27854-1   Filed 05/14/12   Entered 05/14/12 16:52:48   Exhibit -
Exhibit A Part 1 of 2   Pg 56 of 75
Case 1:08-cv-05353-CM   Document 1-2   Filed 06/11/08   Page 18 of 39

non-reporting basis, (2) against all risks insured against pursuant to Section 6.1(a)(i), (3) shall include permission to occupy the Property, and (4) shall contain an agreed amount endorsement waiving co-insurance provisions;

(v)   workers' compensation, subject to the statutory limits of the State in which the Property is located, and employer's liability insurance with a limit of at least $1,000,000.00 per accident and per disease per employee, and $1,000,000.00 for disease aggregate in respect of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable);

(vi)   if and when Improvements are constructed on the Property, comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under Section 6.1(a)(i);

(vii)   umbrella liability insurance in an amount not less than $15,000,000.00 per occurrence on terms consistent with the commercial general liability insurance policy required under Section 6.1(a)(ii); *provided, however,* that Lender reserves the right to require Borrower to increase, at Borrower's cost and expense, the minimum umbrella liability insurance coverage amount hereunder from $15,000,000.00 per occurrence to $25,000,000.00 per occurrence in Lender's sole and absolute discretion;

(viii)   motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of $1,000,000.00; and

(ix)   such other insurance and in such amounts or as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

(b)   All insurance provided for in Section 6.1(a) shall be obtained under valid and enforceable policies (the "Policies" or in the singular, the "Policy"), in such forms and, from time to time after the date hereof, in such amounts as may be satisfactory to Lender, issued by financially sound and responsible insurance companies authorized to do business in the State in which the Property is located and approved by Lender. The insurance companies must have a claims paying ability/financial strength rating of "A" (or its equivalent) or better by at least two (2) Rating Agencies (one of which will be S&P if they are rating the Securities and one of which shall be Moody's if they are rating the Securities), or if only one Rating Agency is rating the Securities, then only by such Rating Agency (each such insurer shall be referred to below as a "Qualified Insurer"). No Policy shall contain an exclusion from coverage under such Policy for loss or damage incurred as a result of an act of terrorism, terrorist acts (including bioterrorism) or similar acts of sabotage, which coverage must be included in the Policies obtained on the Closing Date and shall be included in the Policies maintained throughout the term of the Loan. Not less than thirty (30) days prior to the expiration dates of the Policies theretofore furnished to Lender pursuant to Section 6.1(a), Borrower shall deliver certified copies of the Policies marked

{10347125:14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 57 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 19 of 39

"premium paid" or accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder (the "Insurance Premiums").

(c) . Borrower shall not obtain (i) any umbrella or blanket liability or casualty Policy unless, in each case, such Policy is approved in advance in writing by Lender and Lender's interest is included therein as provided in this Agreement and such Policy is issued by a Qualified Insurer, or (ii) separate insurance concurrent in form or contributing in the event of loss with that required in Section 6.1(a) to be furnished by, or which may be reasonably required to be furnished by, Borrower. In the event Borrower obtains separate insurance or an umbrella or a blanket policy, Borrower shall notify Lender of the same and shall cause certified copies of each Policy to be delivered as required in Section 6.1(a). Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 6.1(a). Notwithstanding Lender's approval of any umbrella or blanket liability or casualty Policy hereunder, Lender reserves the right, in its sole discretion, to require Borrower to obtain a separate Policy in compliance with this Section 6.1.

(d) All Policies provided for or contemplated by Section 6.1(a), except for the Policy referenced in Section 6.1(a)(v), shall name Lender and Borrower as the insured or additional insured, as their respective interests may appear, and in the case of property damage, boiler and machinery, and flood insurance, shall contain a so-called New York standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender.

(e) All Policies provided for in Section 6.1(a) shall contain clauses or endorsements to the effect that:

(i) no act or negligence of Borrower, or anyone acting for Borrower, or failure to comply with the provisions of any Policy which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

(ii) the Policy shall not be materially changed (other than to increase the coverage provided thereby) or cancelled without at least 30 days' written notice to Lender and any other party named therein as an insured; and

(iii) each Policy shall provide that the issuers thereof shall give written notice to Lender if the Policy has not been renewed thirty (30) days prior to its expiration; and

(iv) Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(f) Borrower shall furnish to Lender, on or before thirty (30) days after the close of each of Borrower's fiscal years, a statement certified by Borrower or a duly authorized officer of Borrower of the amounts of insurance maintained in compliance herewith, of the risks covered by such insurance and of the insurance company or companies which carry such insurance and, if

50

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 58 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 20 of 39

requested by Lenders-erification of the adequacy of such insurance by an independent insurance broker or appraiser acceptable to Lender.

(g)    If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate, and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Security Instrument and shall bear interest at the Default Rate. Lender shall use its commercially reasonable efforts to notify Borrower prior to exercising any rights under this subsection (g), provided, however, that any failure or inability to deliver such notice shall in no way affect or impair any rights Lender may have hereunder.

(h)    In the event of a foreclosure of the Security Instrument, or other transfer of title to the Property in extinguishment in whole or in part of the Debt all right, title and interest of Borrower in and to the Policies then in force and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

Section 6.2    Casualty.

If any Improvements that may be installed on the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "Casualty"), Borrower shall give prompt notice of such damage to Lender and provided Lender makes the Net Proceeds available to Borrower in accordance with Section 6.4, shall promptly commence and diligently prosecute the completion of the Restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such Casualty, with such alterations as may be reasonably approved by Lender and otherwise in accordance with Section 6.4. In the event Lender makes the Net Proceeds available to Borrower in accordance with Section 6.4, Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance. Lender may, but shall not be obligated to make proof of loss if not made promptly by Borrower.

Section 6.3    Condemnation.

Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of all or any part of the Property and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of

51

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 59 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 21 of 39

expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. If the Property or any portion thereof is taken by a condemning authority, provided Lender makes the Net Proceeds available to Borrower in accordance with Section 6.4, Borrower shall, promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 6.4. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

Section 6.4    Restoration.

The following provisions shall apply in connection with the Restoration of the Property:

(a)    If the Net Proceeds shall be less than Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) and the costs of completing the Restoration shall be less than Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00), the Net Proceeds will be disbursed by Lender to Borrower upon receipt, provided that all of the conditions set forth in Section 6.4(b)(i) are met and Borrower delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.

(b)    If the Net Proceeds are equal to or greater than Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) or the costs of completing the Restoration are equal to or greater than Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Section 6.4. The term "Net Proceeds" shall mean: (i) the net amount of all insurance proceeds received by Lender pursuant to Section 6.1(a)(i), (iv), (vi), (vii) and (viii) as a result of such damage or destruction, after deduction of (A) Lender's reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same and (B) Borrower's reasonable costs and expenses in collecting same, if any ("Insurance Proceeds"), or (ii) the net amount of the Award, after deduction of (A) Lender's reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same and (B) Borrower's reasonable costs and expenses in collecting same, if any ("Condemnation Proceeds"), whichever the case may be.

(i)    The Net Proceeds shall be made available to Borrower for Restoration provided that each of the following conditions are met:

(A)    no Default or Event of Default shall have occurred and be continuing;

(B)    (1) in the event the Net Proceeds are Insurance Proceeds, less than twenty-five percent (25%) of the square footage of the Improvements has been damaged, destroyed or rendered unusable as a result of such Casualty or (2) in the event the Net Proceeds are Condemnation Proceeds, less than ten percent (10%)

52

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 60 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 22 of 39

·f the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property, and no portion of the Improvements is located on such land;

(C)    Borrower shall commence the Restoration as soon as reasonably practicable (but in no event later than thirty (30) days after such Casualty or Condemnation, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion in compliance with all Applicable Laws, including, without limitation, all applicable Environmental Laws;

(D)    Lender shall be satisfied that any operating deficits, including all scheduled payments of principal and interest under the Note, which will be incurred with respect to the Property as a result of the occurrence of any such Casualty or Condemnation, whichever the case may be, will be covered out of (1) the Net Proceeds, (2) the insurance coverage referred to in (iii), if applicable, or (3) by other funds of Borrower;

(E)    Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (1) six (6) months prior to the Maturity Date, (2) six (6) months after the occurrence of such Casualty or Condemnation, or (3) the earliest date required for such completion under the terms of any Leases which are required in accordance with the provisions of this Section 6.4(b) to remain in effect subsequent to the occurrence of such Casualty or Condemnation and the completion of the Restoration, or (4) such time as may be required under Applicable Law, in order to repair and restore the Property to the condition it was in immediately prior to such Casualty or Condemnation or (5) the expiration of the insurance coverage referred to in Section 6.1(a)(iii);

(F)    the Property and the use thereof after the Restoration will be in compliance with and permitted under all Applicable Laws;

(G)    such Casualty or Condemnation, as applicable, does not result in the total loss of access to the Property or the Improvements; and

(H)    the Net Proceeds together with any cash or cash equivalent deposited by Borrower with Lender are sufficient in Lender's discretion to cover the cost of the Restoration.

(ii)    The Net Proceeds shall be held by Lender in an interest-bearing account and, until disbursed in accordance with the provisions of this Section 6.4(b), shall constitute additional security for the Debt and other obligations under the Loan Documents. The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of

{10347125:14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 61 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 23 of 39

intention to file same, or any other Liens or encumbrances of any nature whatsoever on the Property which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company issuing the Title Insurance Policy.

(iii)    All plans and specifications required in connection with the Restoration, shall be subject to prior review and acceptance in all respects by Lender and by an independent consulting engineer selected by Lender (the "Casualty Consultant"), which acceptance shall not be unreasonably withheld, conditioned or delayed so long as the same are substantially in accordance with the appearance, quality and materials of the Improvements prior to such Casualty or Condemnation. Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration. The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and the Casualty Consultant, which acceptance shall not be unreasonably withheld, conditioned or delayed. All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(iv)    In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Casualty Retainage. The term "Casualty Retainage" shall mean an amount equal to ten percent (10%), of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until the Restoration has been completed. The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section 6.4(b), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 6.4(b) and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, and Lender receives evidence satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company issuing the Title Insurance Policy for the Property, and Lender receives an endorsement to such Title Insurance Policy insuring the continued priority of the Lien of the Security Instrument and evidence of payment of any premium payable for such endorsement. If required by Lender, the release of any such portion of the Casualty

54

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 62 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 24 of 39

Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)     Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Lender in consultation with the Casualty Consultant, if any, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "Net Proceeds Deficiency") with Lender before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 6.4(b) shall constitute additional security for the Debt and other obligations under the Loan Documents.

(c)     All Net Proceeds not required to be made available for the Restoration may be retained and applied by Lender toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its sole discretion shall deem proper, and, upon irrevocable and indefeasible payment in full of the Debt, any balance of such Net Proceeds remaining thereafter shall be paid to Borrower. If Lender shall receive and retain Net Proceeds, the Lien of the Security Instrument shall be reduced only by the amount thereof received and retained by Lender and actually applied by Lender in reduction of the Debt.

## ARTICLE 7  RESERVE FUNDS

Section 7.1     Contingency Holdback.

At Closing, Lender shall holdback from disbursement of the Loan proceeds the amount of One Hundred Forty Thousand and 00/100 ($140,000.00) Dollars (the "Contingency Holdback") for use by Borrower for costs incurred by Borrower in connection with the development of the Property. Any disbursement of funds provided for under the Contingency Holdback shall be subject to Lender's reasonable approval and Borrower shall be required to submit copies of invoices for all items requested to be paid for with funds from the Contingency Holdback. Lender shall not be obligated to make disbursements more frequently than once every thirty (30) days. Interest under the Note shall commence to accrue on each and any disbursement of the Contingency Holdback as of the date of disbursement or wire transfer by Lender to or for the benefit of Borrower.

Section 7.2     Tax and Insurance Escrow Fund.

Borrower shall pay to Lender on each Payment Date (a) one-twelfth of the Taxes (the "Monthly Tax Deposit") that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates; and (b) at the option of Lender, if the liability or casualty Policy maintained by Borrower covering the Property shall not constitute an

{10347125:14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 63 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 25 of 39

approved blanket or umbrella Policy pursuant to Section 6.1(c), or Lender shall require Borrower to obtain a separate Policy pursuant to Section 6.1(c), one-twelfth of the Insurance Premiums (the "Monthly Insurance Premium Deposit") that Lender estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (said amounts in (a) and (b) above hereinafter called the "Tax and Insurance Escrow Fund"). The Tax and Insurance Escrow Fund and the payments of interest or principal or both, payable pursuant to the Note and this Agreement, shall be added together and shall be paid as an aggregate sum by Borrower to Lender. Lender will apply the Tax and Insurance Escrow Fund to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Section 5.1.2. In making any payment relating to the Tax and Insurance Escrow Fund, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If the amount of the Tax and Insurance Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Section 5.1.2, Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax and Insurance Escrow Fund. In allocating such excess, Lender may deal with the Person shown on the records of Lender to be the owner of the Property. Any amount remaining in the Tax and Insurance Escrow Fund after the Debt has been paid in full shall be returned to Borrower. If at any time Lender reasonably determines that the Tax and Insurance Escrow Fund is not or will not be sufficient to pay Taxes and Insurance Premiums by the dates set forth in (a) and (b) above, Lender shall notify Borrower of such determination and Borrower shall increase its monthly payments to Lender by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to delinquency of the Taxes and/or thirty (30) days prior to expiration of the Policies, as the case may be.

Section 7.3    Water/Sewer Holdback.

(a)    At Closing, Lender shall holdback from disbursement of the Loan proceeds the amount of One Million Two Hundred Fifty Thousand and 00/100 ($1,250,000.00) Dollars (the "Water/Sewer Holdback") for use by Borrower for costs to be incurred in connection with Borrower extending and connecting water and sewer utilities to the Property (the "Water Work"). Lender shall make disbursements to Borrower, subject to the terms and conditions hereof. Lender shall not be obligated to make disbursements more frequently than once every thirty (30) days. Interest under the Note shall commence to accrue on each and any disbursement of the Water/Sewer Holdback as of the date of disbursement or wire transfer by Lender to or for the benefit of Borrower.

(b)    Each request for disbursement shall be in a form or forms specified by Servicer and shall specify (i) the dollar amount for the specific Water Work for which such payment is requested, (ii) the quantity and price of each item purchased, if the request includes the purchase or replacement of specific items, (iii) the price of all materials (grouped by type or category) other than the purchase or replacement of specific items, and (iv) the cost of all contracted labor or other services (if applicable) to each matter for which such request for disbursement is made. With each request, Borrower shall, to the extent applicable, certify that any Water Work that is

56

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 64 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 26 of 39

the subject of the requisition has been completed in accordance with all Legal Requirements and all requirements of the Loan Documents. Each request for disbursement shall include copies of invoices for all items or materials purchased and all contracted labor or services provided. Except as otherwise provided herein, each request for disbursement shall be made only after completion, as applicable, of the related Water Work for which such disbursement is requested. In no event shall Borrower be entitled to request more than one (1) disbursement per month from the Water/Sewer Holdback and in an amount of not less than Twenty-Five Thousand Dollars ($25,000.00) per disbursement request. Provided no Event of Default exists and further provided Lender does not require an inspection of the Property prior to authorizing the disbursement request, Lender shall endeavor to approve and process such request for payment within twenty (20) days of Borrower having submitted such disbursement request and all backup materials reasonably requested by Lender.   Borrower shall provide Lender evidence of completion satisfactory to Lender in its reasonable judgment.

(c)    Lender may disburse the amount for all invoices for materials purchased (or to be purchased) and all contracted labor or services directly to the applicable vendors, suppliers, mechanics, materialmen, subcontractors or any other Person or directly to Borrower and, to the extent the funds are disbursed to Borrower, Borrower covenants and agrees to promptly pay such invoices. Borrower shall provide evidence reasonably satisfactory to Lender (including, without limitation, access to the Property by Lender, Servicer and an architect and/or engineer specified by Lender for the purpose of an inspection of work done, at Borrower's expense, if requested by Lender) that the Water Work for which the disbursement is being requested has been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements. Additionally, if required by Lender, Lender may require Borrower to obtain Lien waivers from each vendor, contractor, supplier, materialman, mechanic, subcontractor or any other Person who receives payment in an amount equal to or greater than $10,000.00 for completion of its work or delivery of its materials. Any Lien waiver delivered hereunder shall conform to the requirements of applicable Legal Requirements and the requirements of the Loan Documents and shall cover all work performed and materials supplied (including equipment and fixtures) for the Property by that vendor, contractor, supplier, subcontractor, mechanic or materialman through the date covered by the current disbursement request. No further disbursements from the Water/Sewer Holdback shall be made unless and until Borrower provides Lender or Servicer with evidence that amounts previously disbursed to Borrower from Water/Sewer Holdback on account of Water Work were paid to the appropriate vendors, suppliers, contractors, mechanics, materialmen and/or subcontractors.

(d)    If (i) the time required to complete a portion of the Water Work reasonably exceeds one month, (ii) the contractor performing such Water Work requires periodic payments pursuant to the terms of a written contract, and (iii) Lender has approved in writing in advance such periodic payments, then disbursements shall be made as the Water Work progresses and prior to full completion; provided (A) such contract requires payment upon completion of such portion of the Water Work, (B) the materials (if applicable) for which the request is made are located and stored on site at the Property, are properly insured in accordance with the terms of the Loan Documents and are properly secured or have been installed in the Property, (C) all other conditions in this Agreement for disbursement have been satisfied, and (D) each contractor, subcontractor and/or other Person receiving payments under such contract shall provide a waiver

57

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 65 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 27 of 39

of Lien, reasonably acceptable to Lender in Lender's sole and absolute discretion, with respect to amounts which have been paid to that contractor, subcontractor, and/or any other Person.

(e)    Lender shall have no obligation and shall not be required to disburse or otherwise release any amounts from the Water/Sewer Holdback unless (i) there is no Event of Default then existing, and (ii) there are sufficient amounts in the Water/Sewer Holdback in Lender's reasonable judgment, to make the requested disbursement. In addition, Lender shall have no obligation and shall not be required to disburse or release amounts in the Water/Sewer Holdback until (i) Lender shall have approved the general contractor or construction manager and architect, if any, retained to do the Water Work and (ii) all other conditions specified in the Loan Agreement for the use of Loan proceeds have been satisfied.

(f)    Notwithstanding anything to the contrary contained in this Section 7.3, Borrower acknowledges that the portion of the Loan proceeds to be made available for the Water/Sewer Holdback will be funded entirely by IMH Secured Loan Fund, LLC, a Delaware limited liability company ("IMH"), which is acquiring a participation interest in the Loan. If for any reason, IMH fails to provide funds for the Water/Sewer Holdback, Lender shall have no obligation to make such funds available to Borrower.

Section 7.4    Debt Service Holdback.

At Closing, Lender shall holdback from disbursement of the Loan proceeds the amount of Four Million Eight Hundred Thousand and 00/100 Dollars ($4,800,000.00) (the "Debt Service Holdback"), which shall be used, absent the occurrence of an Event of Default, to fund on a monthly basis the Debt Service, together with any late payment charges or interest accruing at the Default Rate (collectively, the "Debt Service Shortfall") for such month. On the date immediately preceding each Payment Date, if a Debt Service Shortfall shall exist, Lender shall advance, on behalf of Borrower, an amount equal to such Debt Service Shortfall. Lender may make advances from the Debt Service Holdback from time to time without in each case the consent of or notice to Borrower. Interest under the Note shall commence to accrue on each and any disbursement of the Debt Service Holdback as of the date of disbursement or wire transfer by Lender to the Servicer. Lender has no obligation to advance any amount in excess of the balance of the remaining Debt Service Holdback, if any, on any Payment Date. Notwithstanding anything to the contrary contained herein, the insufficiency of the Debt Service Holdback or Lender's failure to advance proceeds from the Debt Service Holdback as a result of the occurrence and continuation of an Event of Default shall not relieve Borrower from its obligation under the Loan Documents to make payment to Lender of the monthly Debt Service together with any late payment charges or interest accruing at the Default Rate.

Section 7.5    Reserve Funds, Generally.

(a)    Borrower grants to Lender a first-priority perfected security interest in each of the Reserve Funds and any and all monies now or hereafter deposited in each Reserve Fund as additional security for payment of the Debt. Until expended or applied in accordance herewith, the Reserve Funds shall constitute additional security for the Debt.

58

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 66 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 28 of 39

(b)    Upon the occurrence of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in any or all of the Reserve Funds to the payment of the Debt in any order in its sole discretion.

(c)    The Reserve Funds shall not constitute trust funds and may be commingled with other monies held by Lender.

(d)    The Reserve Funds shall be held in interest bearing accounts and all earnings or interest on a Reserve Fund shall be added to and become a part of such Reserve Fund and shall be disbursed in the same manner as other monies deposited in such Reserve Fund, except that earnings or interest on the Tax and Insurance Escrow Fund shall not be added to or become a part thereof and shall be the sole property of and shall be paid to Lender.

(e)    Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Reserve Fund or the monies deposited therein or permit any Lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

(f)    Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys fees and expenses) arising from or in any way connected with the Reserve Funds or the performance of the obligations for which the Reserve Funds were established, except to the extent arising from the gross negligence or willful misconduct of Lender, its agents or employees. Borrower shall assign to Lender all rights and claims Borrower may have against all Persons supplying labor, materials or other services which are to be paid from or secured by the Reserve Funds; provided, however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

## ARTICLE 8  DEFAULTS

Section 8.1    Event of Default.

(a)    Each of the following events shall constitute an event of default hereunder (an "Event of Default"):

(i)    if any portion of the Debt is not paid on or before the date the same is due and payable;

(ii)    if any of the Taxes, unless Lender has received sufficient funds for Taxes pursuant to Section 7.2, or Other Charges are not paid on or before the date when the same are due and payable, subject, however, to Borrower's right to contest set forth in Section 5.1.2;

(iii)    if the Policies are not kept in full force and effect or if certified copies of the Policies are not delivered to Lender on request;

59

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 67 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 29 of 39

(iv)    if any breach of any of the covenants set forth in Section 5.2.10 or Article 7 of the Security Instrument occurs;

(v)    if any representation or warranty made by Borrower, Indemnitor or Guarantor herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made;

(vi)    if Borrower, Indemnitor, Guarantor or any other guarantor under any guaranty issued in connection with the Loan shall make an assignment for the benefit of creditors;

(vii)    if a receiver, liquidator or trustee shall be appointed for Borrower, Indemnitor, Guarantor or any other guarantor under any guarantee issued in connection with the Loan or if Borrower, Indemnitor, Guarantor or such other guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to the Bankruptcy Code, or any similar federal or State law, shall be filed by or against, consented to, or acquiesced in by, Borrower, Indemnitor, Guarantor or such other guarantor, or if any proceeding for the dissolution or liquidation of Borrower, Indemnitor, Guarantor or such other guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, Indemnitor, Guarantor or such other guarantor, upon the same not being discharged, stayed or dismissed within sixty (60) days;

(viii)    if Borrower attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(ix)    if Borrower breaches any of its respective negative covenants contained in Section 5.2;

(x)    if Borrower violates or does not comply with any of the provisions of Section 4.1.35;

(xi)    if the Property becomes subject to any mechanic's, materialman's or other Lien other than a Lien for local real estate taxes and assessments not then due and payable and the Lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days after Borrower receives actual or constructive notice thereof;

(xii)    if any federal tax Lien or state or local income tax Lien is filed against Borrower, any Guarantor, Indemnitor or the Property and same is not discharged of record within thirty (30) days after same is filed; provided, however, that Borrower shall have the right to contest such Lien in the same manner set forth in Section 5.1.2 with respect to Taxes or Other Charges;

60

{10347125:14}

(xiii)  (A)  Borrower fails to timely provide Lender with the written certification and evidence referred to in Section 5.2.8, or (B) Borrower consummates a transaction which would cause the Security Instrument or Lender's exercise of its rights under the Security Instrument, the Note, this Agreement or the other Loan Documents to constitute a nonexempt prohibited transaction under ERISA or result in a violation of a State statute regulating governmental plans, subjecting Lender to liability for a violation of ERISA or a State statute;

(xiv)  if Borrower shall fail to deliver to Lender, within ten (10) days after request by Lender, the estoppel certificates required pursuant to the terms of Section 5.1.13(a);

(xv)  if any default occurs under any guaranty or indemnity executed in connection herewith (including, without limitation, the Guaranty and the Environmental Indemnity) and such default continues after the expiration of applicable grace periods, if any;

(xvi)  if Borrower shall be in default beyond applicable notice and grace periods under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to the Security Instrument;

(xvii)  if Borrower shall be in default beyond applicable notice and grace periods under the 163 Security Instrument;

(xviii)  if Borrower shall be in default beyond applicable notice and grace periods under the Val Vista Security Instrument;

(xix)  with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice or the expiration of such grace period;

(xx)  if any of the assumptions contained in the Insolvency Opinion, or in any other "non-consolidation" opinion delivered to Lender in connection with the Loan, or in any other "non-consolidation" opinion delivered subsequent to the closing of the Loan, is or shall become untrue in any material respect;

(xxi)  if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) to (xviii) above, for fifteen (15) days after written notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after written notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such 30-day period and provided further that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall

61

be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed sixty (60) days; or

(xxii)  if there shall be default under the Security Instrument or any of the other Loan Documents beyond any applicable notice and cure periods contained in such documents, whether as to Borrower or the Property, or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt.

(b)  Upon the occurrence of an Event of Default (other than an Event of Default described in clauses (vi) or (vii) above) and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and the Property, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vi) or (vii) above, the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waive any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

Section 8.2    Remedies.

(a)  Subject to the terms of Section 9.4, upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to the Property or any other Collateral.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by Applicable Law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by Applicable Law, equity or contract or as set forth herein or in the other Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the other Collateral and the Security Instrument has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

62

{10347125:14}

(b)    With respect to Borrower and the Property, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Property or Collateral for the satisfaction of any of the Debt in preference or priority to any other Collateral, and Lender may seek satisfaction out of the Property or all of the Collateral or any part thereof, in its absolute discretion in respect of the Debt. In addition, Lender shall have the right from time to time to partially foreclose the Security Instrument in any manner and for any amounts secured by the Security Instrument then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Security Instrument to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Security Instrument to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Security Instrument as Lender may elect. Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Security Instrument to secure payment of sums secured by the Security Instrument and not previously recovered.

(c)    Lender shall have the right, from time to time, to sever the Note and the other Loan Documents into one or more separate notes, Security Instruments and other security documents (the "Severed Loan Documents") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder. Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoint Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until three (3) days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power. The Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date.

Section 8.3    Remedies Cumulative; Waivers.

Subject to the terms of Section 9.4, the rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one or more Defaults or Events of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

{10347125:14}

## ARTICLE 9  SPECIAL PROVISIONS

### Section 9.1    Sale of Notes and Securitization

Lender may, at any time, sell, transfer or assign the Note, this Agreement, the Security Instrument and the other Loan Documents, and any or all servicing rights with respect thereto, or grant participations therein or split the Note on a pari passu or senior/subordinate basis or issue mortgage pass-through certificates or other securities (the "Securities") evidencing a beneficial interest in one or more rated or unrated public offerings or private placements (in any such case, a "Securitization").  At the request of the holder of the Note and, to the extent not already required to be provided by Borrower under this Agreement, Borrower, at Borrower's expense shall satisfy the market standards to which the holder of the Note customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies in connection with a Securitization or the sale of the Note or the participations or split of the Note as aforesaid or Securities, including, without limitation, to:

(a)    (i)    provide such financial and other information with respect to the Property and Borrower, (ii) provide any information that may reasonably be required by Lender in connection with the Securitization, including budgets, operating statements and updated financial information relating to the Property, (iii) participate with Lender in one or more meetings with prospective investors or with Rating Agencies, (iv) work with Lender to procure a rating for the Loan by the Rating Agencies and (v) to perform or permit or cause to be permitted such site inspection, appraisals, market studies, environmental reviews and reports (Phase I's and, if appropriate, Phase II's), engineering reports and other due diligence investigations of the Property, as may be reasonably requested by the holder of the Note or the Rating Agencies (the "Provided Information"), together, if customary, with appropriate verification and/or consents of the Provided Information through letters of auditors or opinions of counsel of independent attorneys acceptable to Lender and the Rating Agencies;

(b)    if required by the Rating Agencies, deliver (i) a revised Insolvency Opinion, (ii) revised opinions of counsel as to due execution and enforceability with respect to the Property, Borrower, Guarantor, Indemnitor, and their respective Affiliates and the Loan Documents, and (iii) revised organizational documents for Borrower (including, without limitation, such revisions as are necessary to comply with the provisions of Section 4.1.35), which counsel opinions and organizational documents shall be satisfactory to Lender and the Rating Agencies;

(c)    if required by the Rating Agencies, exercise commercially reasonable efforts to obtain and deliver estoppel letters, subordination agreements or other agreements from any parties to agreements that affect the Property, which estoppel letters, subordination agreements or other agreements shall be satisfactory to Lender and the Rating Agencies.

(d)    execute such amendments to the Loan Documents and organizational documents as may be requested by the holder of the Note or the Rating Agencies or otherwise to effect the Securitization, including, without limitation, (1) requiring two (2) Independent Directors, (2) changing interest periods under the Loan to conform to interest and payment periods in the Securitization and/or Rating Agency requirements, (3) changing the date of the Payment Date

{10347125;14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 72 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 34 of 39

(including that if such changed payment date does not fall on a Business Day, the payment date shall be on the preceding Business Day) and Maturity Date under the Loan to conform to interest and payment periods in the Securitization and/or Rating Agency requirements (provided that Lender shall use reasonable commercial efforts not to change the Payment Date to a date prior to the ninth day of the month), and (4) providing that in connection with any prepayment or repayment of the Loan, interest accrued through the end of the interest period in which such payment occurs must be paid and, if a payment is made after a payment date (as same may be changed in connection with the Securitization), interest accrued through the next succeeding interest period must also be paid; provided, however, that Borrower shall not be required to modify or amend any Loan Document if such modification or amendment would (except for modifications and amendments required to be made pursuant to Section (e) below,) (i) change the interest rate or the stated maturity or the amortization of principal set forth in the Note, (ii) modify or amend any other material economic term of the Loan, or (iii) otherwise materially increase its obligations under the Loan (it being agreed that the items in clauses (1) through (4) of this Section 9.1(d) are not material for the purposes of clause (ii) and shall not be deemed to materially increase Borrower's obligations for the purposes of clause (iii)).

(e)    if Lender elects, in its sole discretion, prior to or upon a Securitization, to split the Loan into two or more parts, or the Note into multiple component notes or tranches which may have different interest rates and principal amounts, Borrower agrees to cooperate with Lender in connection with the foregoing and to execute, or cause to be executed, the required modifications and amendments to the Note, this Agreement and the Loan Documents and to provide opinions necessary to effectuate the same.  Such Notes or components may be split on a pari passu basis or into a senior first mortgage portion and a subordinate first mortgage portion, in Lender's sole discretion, and may be assigned different interest rates, amortization payments, principal amounts and maturities, so long as the initial weighted average of such interest rates does not exceed the Applicable Interest Rate;

(f)    make such representations and warranties as of the closing date of the Securitization with respect to the Property, Borrower and the Loan Documents as are customarily provided in such transactions and as may be reasonably requested by the holder of the Note or the Rating Agencies and consistent with the facts covered by such representations and warranties as they exist on the date thereof, including the representations and warranties made in the Loan Documents;

(g)    supply to Lender such documentation, financial statements and reports in form and substance required for Lender to comply with Regulation S-X of the federal securities law, if applicable.

All reasonable third party costs and expenses incurred by Lender or Borrower in connection with Borrower complying with requests made under this Section 9.1 shall be paid by Borrower.

Section 9.2    Securitization Indemnification.

(a)    Borrower understands that certain of the Provided Information may be included in Disclosure Documents in connection with the Securitization, and may also be included in filings

{10347125;14}

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 73 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 35 of 39

(an "Exchange Act Filing") with the Securities and Exchange Commission pursuant to the Securities Act or the Exchange Act, or provided or made available to Investors or prospective Investors in the Securities, the Rating Agencies, and service providers relating to the Securitization. In the event that the Disclosure Document is required to be revised prior to the sale of all Securities, subject to the provisions of this Agreement, Borrower will cooperate with the holder of the Note in updating the Disclosure Document by providing all current information necessary to keep the Disclosure Document accurate and complete in all material respects.

(b)    Borrower agrees to provide in connection with each of (i) a preliminary and a private placement memorandum or (ii) a preliminary and final prospectus or prospectus supplement, as applicable, an indemnification certificate (A) certifying that Borrower has examined the sections of the memorandum or prospectus, as applicable, making specific reference to the Loan, including without limitation, the sections entitled "Special Considerations," "Description of the Mortgages," "Description of the Mortgage Loans and Mortgaged Property," "The Borrower" and "Certain Legal Aspects of the Mortgage Loan," and such sections (and any other sections reasonably requested) do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying Lender (and for purposes of this Section 9.2, Lender hereunder shall include its officers and directors), the Affiliate of Lehman Brothers Inc. ("Lehman") that has filed the registration statement relating to the Securitization (the "Registration Statement"), each of its directors, each of its officers who have signed the Registration Statement and each Person who controls the Affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "Lehman Group"), and Lehman, each of its directors and each Person who controls Lehman within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act (collectively, the "Underwriter Group") for any losses, claims, damages or liabilities (collectively, the "Liabilities") to which Lender, the Lehman Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in such sections described in clause (A) above, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in such sections or necessary in order to make the statements in such sections or in light of the circumstances under which they were made, not misleading and (C) agreeing to reimburse Lender, the Lehman Group and the Underwriter Group for any legal or other expenses reasonably incurred by Lender the Lehman Group and the Underwriter Group in connection with investigating or defending the Liabilities; provided, however, that Borrower will be liable in any such case under clauses (B) or (C) above only to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the memorandum or prospectus or in connection with the underwriting of the debt, including, without limitation, financial statements of Borrower, operating statements, environmental site assessment reports and property condition reports with respect to the Property.  Subject to Section 9.4 hereof, this indemnification will be in addition to any liability which Borrower may otherwise have. Moreover, the indemnification provided for in Clauses (B) and (C) above shall be effective whether or not an indemnification certificate described in (A) above is provided and shall be applicable based on information previously provided by Borrower or its Affiliates if Borrower does not provide the indemnification certificate.

66

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 74 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 36 of 39

(c)    In connection with filings under the Exchange Act, Borrower agrees to indemnify (i) Lender, the Lehman Group and the Underwriter Group for Liabilities to which Lender, the Lehman Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon the omission or alleged omission to state in the Provided Information a material fact required to be stated in the Provided Information in order to make the statements in the Provided Information, in light of the circumstances under which they were made not misleading and (ii) reimburse Lender, the Lehman Group or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Lehman Group or the Underwriter Group in connection with defending or investigating the Liabilities.

(d)    Promptly after receipt by an indemnified party under this Section 9.2 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.2, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party. In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party. After notice from the indemnifying party to such indemnified party under this Section 9.2 the indemnifying party shall not be responsible for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party to parties. The indemnifying party shall not be liable for the expenses of more than one such separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to another indemnified party.

(e)    In order to provide for just and equitable contribution in circumstances in which the indemnifications provided for in Section 9.2(a) or (b) is or are for any reason held to be unenforceable by an indemnified party in respect of any losses, claims, damages or liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.2(a) or (b), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages or liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) Lehman's and Borrower's relative knowledge and access to information concerning the matter with respect to which claim was asserted; (ii) the opportunity to correct

67

08-13555-mg    Doc 27854-1    Filed 05/14/12    Entered 05/14/12 16:52:48    Exhibit -
Exhibit A Part 1 of 2    Pg 75 of 75
Case 1:08-cv-05353-CM    Document 1-2    Filed 06/11/08    Page 37 of 39

and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances. Lender and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined solely by pro rata or per capita allocation.

(f)     Subject to Section 9.4 hereof, the liabilities and obligations of Borrower under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

Section 9.3    Servicer.

At the option of Lender or Agent, the Loan may be serviced by a servicer/trustee (the "Servicer") selected by Lender or Agent and Lender or Agent may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "Servicing Agreement") between Lender or Agent and Servicer.

Section 9.4    Exculpation.

·(a)     Except as otherwise provided herein, in the Security Instrument or in the other Loan Documents, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in this Agreement, the Note, the Security Instrument or any other Loan Document by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, action for specific performance or other appropriate action or proceeding to enable Lender to enforce and realize.. upon this Agreement, the Note, the Security Instrument, the other Loan Documents, and the interest in the Property, the Rents, the Collateral and any other collateral given to Lender pursuant to this Agreement, the Note, the Security Instrument and the other Loan Documents; provided, however, that any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, the Rents, the Collateral and in any other collateral given to Lender. Lender, by accepting this Agreement, the Note, the Security Instrument and the other Loan Documents, agrees that it shall not, except as otherwise provided herein or in the Security Instrument, sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding, under or by reason of or under or in connection with this Agreement, the Note, the Security Instrument or the other Loan Documents. The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by this Agreement, the Note, the Security Instrument or the other Loan Documents; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for judicial foreclosure and sale under the Security Instrument or this Agreement; (iii) affect the validity or enforceability of any indemnity (including, without limitation, the Environmental Indemnity), guaranty (including, without limitation, the Guaranty), master lease or similar instrument made in connection with this Agreement, the Note, the Security Instrument, or the other Loan Documents; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases; (vi) impair the right of Lender to enforce the provisions of Sections 10.2 of the Security Instrument or Sections 4.1.8, 4.1.28, 5.1.9, 5.2.8 and 10.13; or (vii) impair the right of Lender to obtain a deficiency judgment or other judgment on the Note against Borrower if necessary to (A) preserve or enforce its rights and remedies against the Property or (B) obtain any Insurance Proceeds or Awards to which Lender would otherwise be entitled under the terms of this Agreement or the

68