## EXHIBIT D
### (Forbearance Agreement)

US_ACTIVE:\43927602\03\58399.0003

## FORBEARANCE AGREEMENT

## (MIDDLE MOUNTAIN)

THIS FORBEARANCE AGREEMENT (this "Agreement") is made and entered into as of the 16th day of April, 2008 (the "Effective Date"), by and among: LEHMAN BROTHERS HOLDINGS INC., a division of LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation ("Lender"); MIDDLE MOUNTAIN 156 LLC, an Arizona limited liability company ("Borrower"); NICHOLAS W. BONANNO, an individual resident of the State of Arizona ("N. Bonanno"); RITA BONANNO, an individual and a resident of the State of Arizona ("R. Bonanno"); ALLEN D. JENKINS, an individual and a resident of the State of Arizona ("A. Jenkins"; Borrower, N. Bonanno, and A. Jenkins occasionally being herein separately referred to as an "Indemnitor" and collectively referred to the "Indemnitors"); and ALLEN D. JENKINS, as executor of the last will and testament of TAMERA R. JENKINS late of that State of Arizona and County of Maricopa ("T. Jenkins"), as personal representative of the estate of T. Jenkins, or as successor in title, by survivorship, to property formerly jointly owned by T. Jenkins and A. Jenkins as tenancy by the entirety with right of survivorship or as joint tenancy with right of survivorship or as community property with right of survivorship, as the case may be ("Jenkins Executor"; N. Bonanno, R. Bonanno, A. Jenkins, and T. Jenkins occasionally being herein separately referred to as an "Original Guarantor" and collectively referred to as the "Original Guarantors"; N. Bonanno, R. Bonanno, A. Jenkins, and Jenkins Executor occasionally being herein separately referred to as a "Guarantor" and collectively referred to as the "Guarantors"); 163, LLC, an Arizona limited liability company ("163"); A & N INVESTMENT PROPERTIES, LLC, an Arizona limited liability company ("A & N"; Borrower, A & N, and 163 occasionally being herein separately referred to as a "Mortgagor" and collectively referred to as the "Mortgagors"). Borrower and the Original Guarantors are hereinafter occasionally separately referred to as an "Original Indemnitor" and are collectively referred to as the "Original Indemnitors". Borrower and the Guarantors are hereinafter occasionally separately referred to as an "Indemnitor" and are collectively referred to as the "Indemnitors". Borrower, each of the Guarantors, 163, and A & N are hereinafter occasionally separately referred to as a "Borrower Party" and are collectively referred to as the "Borrower Parties". Borrower, A & N, and 163 are hereinafter occasionally separately referred to as a "Borrower Party Entity" and collectively referred to as the "Borrower Party Entities".

## STATEMENT OF BACKGROUND

A.    On July 13, 2006 (the "Loan Closing Date"), Lender made a loan to Borrower in the original principal amount of $44,000,000.00 (the "Loan") pursuant to the terms of that certain Loan Agreement, dated as of July 13, 2006, between Borrower and Lender (the "Loan Agreement"), to refinance the Borrower's outstanding mortgage loan indebtedness then secured by that certain property containing approximately 196.4115 acres of land located in Maricopa County, Arizona, and being more particularly described on **Exhibit A** attached hereto and incorporated herein by this reference (the "Maricopa Property"), and to provide financing for Borrower's development of the Maricopa Property. The Loan is evidenced by that certain Promissory Note, dated as of July 13, 2006, from Borrower payable to the order of Lender in the original principal amount of $44,000,000.00 (the "Note"). The Loan is secured by, among other things: (i) that certain Deed of Trust, Security Agreement and Fixture Filing, dated as of July 13,

ATLANTA:4981771.7

2006, from Borrower to Guaranty Title Agency of Arizona, Inc. (the "Trustee"), for the benefit of Lender, recorded July 13, 2006, as Document No. 20060939573, encumbering the Maricopa Property (as rerecorded October 31, 2007, as Document No. 20071175846, and as amended by Corrective Amendment of Deed Of Trust, Security Agreement and Fixture Filing, and Assignment of Leases and Rents, recorded January 29, 2008, as Document No. 20080077989 (the "Corrective Amendment"), herein collectively referred to as the "Maricopa Security Instrument"); (ii) that certain Assignment of Leases and Rents, dated as of July 13, 2006, from Borrower to Lender, recorded July 13, 2006, as Document No. 20060939574, and encumbering, among other things, all leases and rents related to the Maricopa Property (as rerecorded October 31, 2007, as Document No. 20071175847, and as amended the Corrective Amendment, herein collectively referred to as the "Maricopa Lease Assignment"); (iii) that certain Guaranty of Recourse Obligations of Borrower, dated as of July 13, 2006, from the Original Guarantors in favor of Lender (the "Recourse Guaranty"); (iv) that certain Guarantor Full Repayment Guaranty, dated as of July 13, 2006, from the Original Guarantors in favor of Lender (the "Payment Guaranty"; the Recourse Guaranty and the Payment Guaranty are herein collectively referred to as the "Guaranties"); (vi) that certain Environmental Indemnity Agreement, dated as of July 13, 2006, from Borrower and Original Indemnitors in favor of Lender related to the Maricopa Property (as amended, the "Environmental Indemnity"); (vii) that certain Assignment of Permits, Agreements, Licenses, Franchises and Authorizations, dated as of July 13, 2006, from Borrower in favor of Lender and related to the Maricopa Property (as amended, the "Maricopa Assignment"); (viii) that certain Deed of Trust, Security Agreement and Fixture Filing, dated as of July 13, 2006, from A & N to Trustee, for the benefit of Lender, recorded July 13, 2006, as Document No. 2006099255 and encumbering that certain real property located in Pinal County, Arizona, containing approximately 79.986 acres and being more particularly described on **Exhibit B** attached hereto and incorporated herein by this reference (the "Pinal Property) (the "Pinal Security Instrument"); and (ix) that certain Deed of Trust, Security Agreement and Fixture Filing, dated as of July 13, 2006, from 163 to Trustee, for the benefit of Lender, recorded July 13, 2006, as in Book 4415 of Official Records, at page 739, and encumbering that certain real property located in Yavapai County, Arizona, containing approximately 163.22 acres and being more particularly described on **Exhibit C** attached hereto and incorporated herein by this reference (the "Yavapai Property"; the Maricopa Property, the Pinal Property, and the Yavapai Property are collectively herein referred to as the "Properties") (the "Yavapai Security Instrument"). The Note, the Maricopa Security Instrument, the Guaranties, the Environmental Indemnity, the Maricopa Assignment, the Pinal Security Instrument, the Yavapai Security Instrument, and any and all other documents evidencing, securing, guarantying, or otherwise in any manner relating to the Loan, as heretofore modified or amended, are herein collectively referred to as the "Loan Documents."

     B.    Borrower defaulted on the Loan by failing to pay the Loan in full on its maturity (the "Maturity Default") on August 1, 2007 ( the "Maturity Date"). Such failure to pay the Loan on the Maturity Date was, and is a continuing, "Event of Default" under the Loan Documents entitling Lender to exercise any or all of Lender's rights and remedies under the Loan Documents, at law, and in equity. The entire unpaid principal balance of the indebtedness evidenced by the Note, the accrued and unpaid interest thereon, and all other sums required to be paid under the Note and the other Loan Documents were not timely paid in accordance with the Loan Documents on the Maturity Date and, as of the Effective Date, remain unpaid, and, accordingly, the Loan remains in default and is immediately due and payable in full.

ATLANTA:4981771.7

C.    The Borrower Parties and Lender have reached certain agreements regarding the obligations of the Borrower Parties under the Loan, pursuant to which, among other things, from and after the Effective Date of this Agreement, Lender shall agree to forbear from exercising its rights and remedies under the Loan Documents until the "Termination Date" (as defined below), or such earlier date upon which a "Termination Event" (as defined below) occurs.

## STATEMENT OF AGREEMENT

**FOR AND IN CONSIDERATION** of the sum of Ten and No/100 Dollars ($10.00) in hand paid, the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, do covenant and agree as follows:

## ARTICLE I
## DEFINITIONS

1.01    **Definitions**.  For purposes of this Agreement, the following capitalized terms shall have the meanings set forth below, and any other words or phrases used in this Agreement with initial capitalization, but which are not expressly defined in this Agreement, shall have the definitions set forth in the Loan Agreement which definitions are hereby incorporated herein by this reference:

"**163 Organizational Chart**" shall mean **Exhibit D** attached hereto and incorporated herein by this reference.

"**A & N Organizational Chart**" shall mean **Exhibit E** attached hereto and incorporated herein by this reference.

"**Applicable Interest Rate**" shall have the meaning set forth in Section 1.1 of the Loan Agreement, which definition is incorporated herein by this reference.

"**Bankruptcy Code**" shall mean the United States Bankruptcy Code, 11 U.S.C. § 101, et seq.

"**Borrower Organizational Chart**" shall mean **Exhibit F** attached hereto and incorporated herein by this reference.

"**Default Rate**" shall have the meaning set forth in Section 1.1 of the Loan Agreement, which definition is incorporated herein by this reference.

"**Dells III Loan**" shall mean that mortgage loan in the original principal amount of $3,050,000.00 from Dells III Lender, LLC ("Dells III"), evidenced by that certain Multiple Advance Note, dated as of January 17, 2006, executed by 163 payable to the order of Dells III in the original principal amount of $3,050,000.00 (the "Dells III Note") and secured by the Dells III Deed of Trust, as defined in the Yavapai Security Instrument, which definition is incorporated herein by this reference.

ATLANTA:4981771.7

"**Dells Loan Documents**" shall mean the Dells III Note, the Dells III Deed of Trust, and all other loan documents now evidencing, securing or guarantying the Dells III Loan and heretofore disclosed to Lender.

"**Event of Default**" shall have the meaning set forth in Section 1.1 of the Loan Agreement, which definition is incorporated herein by this reference.

"**Lender Parties**" shall mean, collectively, Lender, the Loan Servicer, their respective subsidiaries and affiliates, and all of their respective past, present, and future officers, directors, shareholders, members, managers, partners, employees, agents, representatives, loan servicers, attorneys, participants, heirs, successors, and assigns.

"**Loan Servicer**" shall mean TriMont Real Estate Advisors, Inc., a Georgia corporation, in its current capacity as loan servicer for Lender with respect to the Loan

"**Loan Title Policy/Policies**" shall mean, in the singular, any of, or, in the plural, all of, the Maricopa Loan Title Policy, the Pinal Loan Title Policy, and the Yavapai Loan Title Policy.

"**Maricopa Collateral**" shall mean the Maricopa Property, all rights appurtenant thereto, and all tangible and intangible personal property related thereto and which is security for the Loan.

"**Maricopa Loan Title Policy**" shall mean that certain First American Title Insurance Company ALTA 1992 Loan Policy No. GU005213-L, originally dated July 13, 2006, as heretofore endorsed and presently having an effective date of January 29, 2008.

"**Maricopa Permitted Encumbrances**" shall mean certain title exceptions which are listed in Schedule B-I or Schedule B-II of the Maricopa Loan Title Policy.

"**Pending Condemnation Action**" shall mean that certain now pending action styled State of Arizona ex rel. Victor M. Mendez, Director, Department of Transportation v. Middle Mountain 156, LLC, an Arizona limited liability company, Lehman Brothers Holdings, Inc. d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc., Middle Mountain 156 Lender, L.L.C. , an Arizona limited liability company; Maricopa County, Case No. CV2006-014089, in the Superior Court of the State of Arizona in and for Maricopa County

"**Permitted Encumbrances**" shall mean the Maricopa Permitted Encumbrances, the Pinal Permitted Encumbrances, and the Yavapai Permitted Encumbrances.

"**Pinal Collateral**" shall mean the Pinal Property, all rights appurtenant thereto, and all tangible and intangible personal property related thereto and which is security for the Loan.

"**Pinal Loan Title Policy**" shall mean shall mean that certain First American Title Insurance Company ALTA 1992 Loan Policy No. 221-187523-TAL, dated July 13, 2006, as heretofore endorsed.

"**Pinal Permitted Encumbrances**" shall mean certain title exceptions which are listed in Schedule B-I or Schedule B-II of the Pinal Loan Title Policy

4

"**Pre-Negotiation Agreement**" shall mean that certain letter agreement, dated as of September 6, 2007, executed by Lender, Mortgagors, and the Original Guarantors.

"**Termination Date**" shall mean May 15, 2008.

"**Yavapai Collateral**" shall mean the Yavapai Property, all rights appurtenant thereto, and all tangible and intangible personal property related thereto and which is security for the Loan.

"**Yavapai Loan Title Policy**" shall mean shall mean that certain First American Title Insurance Company ALTA 1992 Loan Policy No. 221-163376-TAL, dated July 13, 2006, as heretofore endorsed.

"**Yavapai Permitted Encumbrances**" shall mean certain title exceptions which are listed in Schedule B-I or Schedule B-II of the Yavapai Loan Title Policy

## ARTICLE II
## ACKNOWLEDGMENTS, WARRANTIES & REPRESENTATIONS

The Borrower Parties, and each of them, jointly and severally, hereby acknowledge, warrant and represent to, and agree with, and for the benefit of, Lender as follows:

2.01    **Authority of Borrower Party Entities**. That each of the Borrower Party Entities is a duly organized, validly existing corporation, limited liability company, or limited partnership, as applicable, in good standing under the laws of the state in which it was organized; that each of the Borrower Party Entities is organized pursuant to the articles of incorporation and bylaws, articles of organization and operating agreement, certificate of limited partnership and limited partnership agreement, as applicable, of such Borrower Party Entity as certified and delivered to Lender in connection with the closing of the Loan (the "Borrower Party Entities' Organizational Documents"); that the Borrower Party Entities' Organizational Documents have not been modified or amended since the Loan Closing Date; that each of the Borrower Party Entities has the power and authority to execute, deliver, and perform this Agreement to which it is a party; that the execution, delivery, and performance of this Agreement by each of the Borrower Party Entities have been duly and properly authorized pursuant to all requisite corporate, limited liability company, limited partnership, or action, as applicable, by such Borrower Party Entity; and that the execution, delivery, and performance of this Agreement by each of the Borrower Party Entities do not and will not violate any provision of the Borrower Party Entities' Organizational Documents applicable to such Borrower Party Entity, or any law, rule, regulation, order, writ, judgment, injunction, decree, determination, or award presently in effect having applicability to such Borrower Party Entity, or result in a breach or constitute or cause a default under any indenture, agreement, lease, or instrument to which such Borrower Party Entity is a party; and that this Agreement constitutes the valid and legally binding obligations of such Borrower Party Entity and is enforceable against such Borrower Party Entity in accordance with the terms hereof, except as such enforcement may be limited by application of bankruptcy, moratorium, or reorganization laws, and general principles of equity.

2.02    **Authority of Guarantors**. That the execution, delivery, and performance of this Agreement by each of the Guarantors, do not and will not (a) violate any provision of any law,

ATLANTA:4981771.7

rule, regulation, order, writ, judgment, injunction, decree, determination, or award presently in effect having applicability to such Guarantor, or (b) result in a breach or constitute or cause a default under any indenture, agreement, lease, or instrument to which such Guarantor is a party; and that this Agreement constitutes the valid and legally binding obligations of such Guarantor and is enforceable against such Guarantor, in accordance with the terms hereof, except as such enforcement may be limited by application of bankruptcy, moratorium, or reorganization laws, and general principles of equity; and that Jenkins Executor has full power and legal authority to execute, deliver, and perform under this Agreement for and on behalf of the estate of T. Jenkins.

2.03   **Status of Loan.**

(a)   **Loan Documents.**  That the Loan Documents constitute the valid and legally binding obligations of the Borrower Parties who are parties thereto, and of the estate of T. Jenkins and are enforceable against the Borrower Parties who are parties thereto, Jenkins Executor, the Properties, and all other collateral for the Loan in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, moratorium, or reorganization laws, and general principals of equity; that, except as may be expressly provided in this Agreement, this Agreement is not intended to be, and shall not be deemed or construed to be, a modification, amendment, or waiver of the Loan or all or any part of the Loan Documents; that none of the Borrower Parties has any defense, setoff, claim, counterclaim, or cause of action of any kind or nature whatsoever with respect to the Loan or the Loan Documents, or with respect to any other documents or instruments now or heretofore evidencing, securing, guarantying, or otherwise in any way relating to the Loan, or with respect to the administration or funding of the Loan, or the acquisition, ownership, development, improvement, or financing of any of the Properties, or otherwise related to any of the Properties; and that the Borrower Parties do hereby expressly waive, release, and relinquish any and all such defenses, setoffs, claims, counterclaims, and causes of action, whether known or unknown, if any, which any one or more of them may now have.

(b)   **Indebtedness.**  That (i) as of February 29, 2008, (A) the outstanding unpaid principal balance of the Loan was $42,649,554.02 (excluding protective advances heretofore made by Lender), and (B) protective advances theretofore have been made by Lender in the aggregate amount of $132,854.14; (ii) Late Fees are due and owing in accordance with the terms of the Loan Agreement and other Loan Documents; (iii) Borrower is required to reimburse Lender for its Legal Fees in accordance with the terms of the Loan Agreement and other Loan Documents; (iv) the Loan has matured on the Initial Maturity Date, i.e., August 1, 2007, without payment thereof and is and shall remain in default and immediately due and payable in full (subject to the Forbearance Covenant), and, notwithstanding the execution and delivery of this Agreement, the Maturity Default and the Tax Payment Defaults (as defined hereinbelow) continue to exist and to constitute Events of Default under the Loan Documents; (v) interest remains unpaid and has accrued, and shall continue to accrue in accordance with the terms of the Loan Agreement and the other Loan Documents, a portion of which is to be charged at the Default Rate notwithstanding the execution and delivery of this Agreement; and (vi) Lender has no obligation to make, and Borrower is not entitled to receive, any further disbursement of proceeds of the Loan whether from the Water/Sewer Holdback, the Debt Service Holdback, or the Tax and Insurance Escrow Fund, or otherwise.

ATLANTA:4981771.7

(c)    **Partial Payments**.  That in the event any of the Borrower Parties shall hereafter make, and Lender shall hereafter accept, any payment of any amount less than the full outstanding unpaid balance due under the Loan and Loan Documents (a "Partial Payment"), Lender, in such case, will apply such Partial Payment to the indebtedness owing under the Loan and the Loan Documents as a partial payment only. Lender has no obligation to accept any Partial Payment and, if Lender chooses, at its sole and absolute discretion, to accept any Partial Payment, Lender shall have the right to apply such Partial Payment against the outstanding indebtedness under the Loan Documents in such manner as Lender may elect in its sole and absolute discretion, as is permitted by the Loan Documents. No such Partial Payment or the acceptance thereof by Lender shall constitute, or be deemed or construed as, a cure or waiver of any Event of Default under the Loan Documents or as a reinstatement of the Loan or the Loan Documents, or as an extension of the maturity of the Loan, nor shall the same constitute any course of conduct or course of dealing between any of the Borrower Parties and Lender. In addition, no such Partial Payment or the acceptance thereof by Lender shall constitute, or be deemed or construed as, a modification of the Loan Documents or the terms of this Agreement, a satisfaction of the Loan, or a waiver, modification, relinquishment, or forbearance by Lender of any of Lender's rights or remedies under the Loan Documents or at law or in equity, all of which rights and remedies are hereby expressly reserved.

(d)    **Protective Advances**.  Borrower Parties acknowledge and agree, in furtherance of and not in limitation of any of Lender's rights and remedies under the Loan Documents, that Lender (i) as of February 29, 2008, had theretofore funded protective advances in the aggregate amount of $132,854.00 for payment of ad valorem real estate taxes related to the Maricopa Property and the Pinal Property (the "Prior Protective Advances") due to the failure of the Mortgagors to timely pay taxes on the Properties (such Events of Default being herein collectively referred to as the "Tax Payment Defaults") and (ii) may thereafter, in its sole and absolute discretion, and with absolutely no obligation to do so, make such additional protective advances under the Loan to protect and preserve its interests and rights under the Loan Documents for the purpose of, among other things, funding the payment of real estate taxes and/or insurance premiums related to the Maricopa Property, the Pinal Property, the Yavapai Property, debt service on the Dells III Loan, and other expenses of the Maricopa Property, the Pinal Property, or the Yavapai Property as Lender shall determine to so fund (collectively, "Additional Protective Advances"; the Prior Protective Advances and the Additional Protective Advances are herein collectively referred to as the "Protective Advances"). Any Additional Protective Advance shall be made only at Lender's sole and absolute discretion and at Lender's election in the event Lender determines such an advance is necessary or advisable to protect or preserve its interests under the Loan Documents in the Maricopa Property, the Pinal Property, the Yavapai Property, or any other collateral for the Loan. Any Additional Protective Advance shall be made on such conditions as Lender shall require, in its sole and absolute discretion. The Prior Protective Advances and all Additional Protective Advances (if any) shall constitute principal indebtedness evidenced by the Note and secured by the each of the Security Instruments and all of the other Loan Documents and shall accrue interest at the Default Rate from the date of each such advance. No Protective Advance shall constitute, or be deemed or construed as, a cure or waiver of the Maturity Default or any other then existing Event of Default under the Loan Documents, as a reinstatement of the Loan or the Loan Documents, or as an extension of the maturity of the Loan, nor shall the same constitute any course of conduct or course of dealing between any of the Borrower Parties and Lender. In addition, no such Protective Advance shall

ATLANTA:4981771.7

constitute, or be deemed or construed as, a modification of the Loan Documents or the terms of this Agreement, a satisfaction of the Loan, or a waiver, modification, relinquishment, or forbearance by Lender of any of Lender's rights or remedies under the Loan Documents or at law or in equity, all of which rights and remedies are hereby expressly reserved

(e) **Reaffirmation of Guaranties.** That each of the Guaranties constitutes the valid, legally binding obligation of the applicable Guarantor who is a party thereto and of the estate of T. Jenkins, enforceable against such Guarantor in accordance with its terms, except as such enforcement may be limited by bankruptcy, moratorium, or reorganization laws, and general principles of equity; that this Agreement is not intended to be, and shall not be deemed or construed to be, a modification, amendment, or waiver of any Guarantor's obligations, any Guaranty, or any of the other Loan Documents; that the Payment Guaranty is and remains a full recourse guaranty of payment by the Guarantors of the entire Debt of the Loan; that no Guarantor has any defense, setoff, claim, counterclaim, or cause of action of any kind or nature whatsoever with respect to the Loan, any Guaranty, or any of the other Loan Documents, or with respect to any other documents or instruments now or heretofore evidencing, securing, guarantying, or otherwise in any way relating to the Loan, or with respect to the administration or funding of the Loan, or the acquisition, ownership, development, improvement, operation, or financing of any of the Properties; that each Guarantor has waived, released, and relinquished, and does hereby expressly waive, release, and relinquish, any and all such defenses, setoffs, claims, counterclaims, and causes of action, whether known or unknown, if any; and that Guarantors have consented, and do hereby consent, to the execution and delivery of this Agreement and have acknowledged and agreed, and do hereby acknowledge and agree, that the obligations of Guarantors under the Guaranties or any of the other Loan Documents shall not be diminished in any way by the execution and delivery of this Agreement or by the consummation of any of the transactions contemplated hereby.

(f) **Reaffirmation of the Environmental Indemnity.** That the Environmental Indemnity constitutes the valid, legally binding obligation of each Indemnitor, enforceable against such Indemnitor in accordance with its terms, except as such enforcement may be limited by bankruptcy, moratorium, or reorganization laws, and general principles of equity, and that this Agreement is not intended to be, and shall not be deemed or construed to be, a modification, amendment, or waiver of the Environmental Indemnity, any of the other Loan Documents, or any obligation of any Indemnitor under the Environmental Indemnity or any of the other Loan Documents; that no Indemnitor has any defense, setoff, claim, counterclaim, or cause of action of any kind or nature whatsoever with respect to the Loan, the Environmental Indemnity, or any of the other Loan Documents, or with respect to any other documents or instruments now or heretofore evidencing, securing, guarantying, or otherwise in any way relating to the Loan, or with respect to the administration or funding of the Loan or the acquisition, ownership, development, improvement, operation, or financing of any of the Properties; that each Indemnitor has waived, released, and relinquished, and does hereby expressly waive, release, and relinquish, any and all such defenses, setoffs, claims, counterclaims, and causes of action, whether known or unknown, if any; and that the Indemnitors have consented, and do hereby consent, to the execution and delivery of this Agreement and have acknowledged and agreed, and do hereby acknowledge and agree, that the obligations of Indemnitors under the Environmental Indemnity or any of the other Loan

ATLANTA:4981771.7

Documents shall not be diminished in any way by the execution and delivery of this Agreement or by the consummation of any of the transactions contemplated hereby.

(g)    **No Satisfaction, Novation, Release, or Waiver**.    That the Loan has matured without payment and is immediately due and payable in full, subject, however, to the Forbearance Covenant and the other terms and conditions of this Agreement; that any and all notices thereof required by the Loan Documents to be sent to any or all of the Borrower Parties have been properly and timely provided and are otherwise hereby waived by the Borrower Parties; that this Agreement is not intended to be, and shall not be deemed or construed to be, a cure, satisfaction, reinstatement, novation, or release of the Loan or the Loan Documents, or any of them, or a waiver by Lender of any of the rights of Lender under the Loan Documents, or any of them, or at law or in equity, or of any Default or Event of Default under any of the Loan Documents, except as otherwise expressly provided herein; and that, except as otherwise expressly provided in this Agreement, Lender has reserved, and does hereby reserve, with respect to each now existing Default or Event of Default all of its rights and remedies under the Loan Documents, at law, and in equity.

(h)    **Ownership Interests**.    That true, correct, and complete copies of the organizational structure charts of the Borrower, A & N, and 163 are attached hereto as **Exhibit F** (the "Borrower Organization Chart"), **Exhibit E** (the "A & N Organizational Chart"), and **Exhibit D** (the "163 Organizational Chart"), respectively, and are incorporated herein by this reference; and that, as of the Effective Date, (i) the Borrower Organizational Chart accurately represents the ownership structure of Borrower, (ii) the A & N Organizational Chart accurately represents the ownership structure of A & N, and (iii) the 163 Organizational Chart accurately represents the ownership structure of 163.

2.04    **Title to the Properties, and Legal Proceedings**.    That, except for (a) the Maricopa Permitted Encumbrances, the Pinal Permitted Encumbrances, and the Yavapai Permitted Encumbrances related to the Maricopa Property, the Pinal Property, and the Yavapai Property, (b) liens and security interests granted or created by the Loan Documents and related to the Properties, (c) the Dells III Loan Documents encumbering only the Yavapai Property, and (d) the Pending Condemnation Action, there are no pending or threatened suits, judgments, arbitration proceedings, administrative claims, executions, or other legal or equitable actions or proceedings against any of the Mortgagors or any of the Properties, or any liens, claims of lien, or other encumbrances against any of the Properties, or any pending or threatened condemnation proceedings or annexation proceedings affecting any of the Properties, or, except for the Colonial Sale Contract (as defined hereinbelow) or as otherwise disclosed on **Exhibit G** attached hereto and incorporated herein by this reference, any oral or written sale agreement, right of first refusal agreement, option agreement, letter of intent, or any other agreement or offer to purchase or to enter into any of the foregoing types of agreements related to the conveyance or proposed conveyance of the Properties or any part thereof or any rights related to any part of any of the Properties to any Person, including, without limitation, any Governmental Authority (collectively, "Sale Contracts"); that Borrower Parties have delivered to Lender true, correct, and complete copies of all existing written Sales Contracts (including, without limitation, all amendments thereto) related to the Properties or any part of any Property or any interest in any Property, and there are no oral Sale Contracts; that that certain Purchase and Sale Agreement, dated 6/20/06, between Colonial Realty Limited Partnership ("Colonial") and Borrower (the

9

"Colonial Sale Contract") pertaining to that part of the Maricopa Property known as Parcel C containing approximately 29.6 acres and located as shown on **Exhibit H** attached hereto and incorporated herein by this reference (the "Maricopa Site Plan") has not been modified or amended in any respect, remains in full force and effect, and, pursuant to the Colonial Sale Contract, Colonial has deposited with Fidelity National Title Insurance Company, Phoenix, Arizona, earnest money in the aggregate amount of $600,000.00; and that the Borrower shall not terminate, rescind, revoke, repudiate, or, in any respect or to any extent, waive, modify, or amend the Colonial Sale Contract without the prior written consent of the Lender, which consent Lender may grant or withhold in its sole and absolute discretion. Notwithstanding the foregoing, Lender acknowledges that Colonial has certain rights pursuant to the terms of the Colonial Sales Contract to terminate said Contract without the consent of Borrower or Lender.

    2.05    **No Creditors; No Encumbrances**. That there are no creditors of Borrower other than Lender, and unsecured trade creditors incurred in the ordinary course of business as permitted by and in compliance with the Loan Documents; that there are no creditors of A & N other than unsecured trade creditors incurred in the ordinary course of business as permitted by and in compliance with the Loan Documents; that there are no creditors of 163 other than Dells III and unsecured trade creditors incurred in the ordinary course of business as permitted by and in compliance with the Dells III Loan Documents and the Loan Documents; that Borrower owns and holds title to the Maricopa Property and the other Maricopa Collateral free and clear of all liens, claims, and encumbrances other than the liens and security interests granted in and created by the Loan Documents and the Maricopa Permitted Exceptions; that A & N owns and holds title to the Pinal Property and the other Pinal Collateral free and clear of all liens, claims, and encumbrances other than the liens and security interests granted in and created by the Loan Documents and the Pinal Permitted Exceptions, and that 163 owns and holds title to the Yavapai Property and the other Yavapai Collateral free and clear of all liens, claims, and encumbrances other than the liens and security interests granted in and created by the Dells III Loan Documents, the Loan Documents, and the Yavapai Permitted Exceptions.

    2.06    **Status of the Properties.**

        (a)    **Environmental Liability**. That none of the Borrower Parties has received any notice of or is otherwise aware of (i) the presence, storage, use, treatment, transportation, release, or disposal on or at any of the Properties or any part thereof of petroleum, any petroleum product, any compound containing petroleum (including, without limitation, gasoline or diesel fuel), asbestos, any asbestos containing material, or any "hazardous substance" (as that term is defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 601, et seq.), or any other substance or material defined, designated, classified, regulated, or considered as toxic waste, hazardous, or toxic material, or a hazardous, toxic, radioactive, or dangerous substance under any law relating to any hazardous substance, or any other substance the presence, storage, use, treatment, transportation, release, or disposal of which is regulated by any Governmental Authority (any of the foregoing, herein, a "Hazardous Substance"); (ii) the existence on or at any of the Properties or any part thereof of any underground or aboveground storage tank which now contains or previously contained any petroleum product or any other Hazardous Substance; (iii) any investigation, inquiry, order, hearing, action, or other proceeding by or before any Governmental Authority in connection with any actual or alleged use, storage,

ATLANTA:4981771.7

holding, existence, release, emission, discharge, generation, processing, abatement, removal, disposition, handling, or transportation of any petroleum product, asbestos, any asbestos containing material, or any other Hazardous Substance on or at any of the Properties or any part thereof.

(b)    **Leases**. That no part of any of the Properties is subject to any lease, license agreement, occupancy agreement, or any similar agreement, oral or written.

(c)    **Service Contracts Affecting Project**. That each of the Properties is presently unimproved, and there is no service contract of any kind related to any of the Properties.

(d)    **Real Estate Brokerage Agreements**. That, except as disclosed on **Exhibit I** attached hereto and incorporated herein by this reference, there is no real estate brokerage agreement, listing agreement, or any similar agreement related to any of the Properties or any part thereof (any such agreement, herein, a "Real Estate Brokerage Agreement"); and that Borrower has delivered to Lender a true, complete, and correct copy of each Real Estate Brokerage Agreement listed on said **Exhibit I**.

(e)    **Compliance with Laws**. That none of the Borrower Parties has received any written notice from any Governmental Authority claiming that Borrower or any other Borrower Party or any part of any of the Properties is presently in non-compliance with any law, ordinance, rule, or regulation bearing upon the use of any of the Properties, including specifically, but without limitation, any such notice relating to zoning laws, housing codes, or building codes or regulations.

2.07    **Access**. That each of the Properties has direct vehicular and pedestrian access to a dedicated hard surface publicly maintained road adjacent to such Property which access is usable without the necessity of any Additional Required Permit from any Governmental Authority or any access easement from any owner of any privately owned land adjacent to such Property.

2.08    **Utilities**. That, except (a) as disclosed in that certain letter, dated May 16, 2006, from the City of Phoenix Development Services Department with respect to availability of potable water and sanitary sewer services to the Maricopa Property (the "Phoenix Utilities Letter") a true, correct, and complete copy of which has been delivered to Lender, or (b) as otherwise disclosed on **Exhibit J** attached hereto and incorporated herein by this reference ("Additional Utilities Requirements"), all public utilities services necessary or convenient to the full use of the Maricopa Property are located either in public right of way abutting such Property (which are situated so as to serve such Property without crossing any other land) or in recorded perpetual easements serving such Property which easements are insured by the applicable Loan Title Policy as being appurtenances to the title to such Property.

2.09    **Insurance**. That all insurance coverages required by the Loan Documents are in full force and effect; that Borrower is not in material default with respect to any provision contained in any of the insurance policies providing such insurance coverages; and that Borrower has delivered to Lender true, complete, and accurate copies of Accord statements evidencing the existence of such liability insurance coverage for the Properties.

ATLANTA:4981771.7

2.10   **Taxes**.   That Lender paid the first installment of 2007 real estate taxes for the Maricopa Property and the Pinal Property, as well as previously delinquent 2006 real estate taxes for the Pinal Property by the Prior Protective Advances.

2.11   **Restrictive Covenants and Agreements Affecting the Properties**.

(a)   **Restrictive Covenants**.   That none of the Borrower Parties has received any notice asserting that any part of any Property does not presently comply with all applicable requirements of all restrictive covenants, easement agreements, development agreements, or other agreements of record relating to such Property or any portion thereof, and, to the best knowledge and belief of the Borrower Parties, no sum is owed by any of the Borrower Parties to any other party under any such covenants or agreements.

(b)   **No Breach**.   That none of the Borrower Parties has received any notice asserting that there is any breach or default, or any circumstance, event, or condition which, with notice or the lapse of time, or both, would become a breach or default, by any of the Borrower Parties under or with respect to any restrictive covenant, easement agreement, development agreement, or other agreement pertaining to any Property or any part thereof other than the Loan Documents.

2.12   **Onsite and Offsite Infrastructure Related to Properties**.   That neither Borrower, nor any other Borrower Party, has caused to be constructed, commenced construction of, or entered into any contract for the construction of, any of the Water Work (as defined in the Loan Agreement) to serve the Maricopa Property or any other road or utilities infrastructure or other improvements either on-site at, or off-site from, but intended to serve, the Maricopa Property, the Pinal Property, or the Yavapai Property, and no Person has, has asserted, or is entitled to assert, the existence of, any mechanic's or materialman's lien against any of the Properties or any part thereof arising from or related to the performance of any work on or for, or the providing of any labor, materials, equipment, or services for on-site or off-site infrastructure or other improvements of any type whatsoever on, related to, or otherwise for the benefit of any of the Properties or any part thereof.

2.13   **Zoning**.   The zoning classification of each of the Properties remains the same as of the Effective Date hereof as existed on the Loan Closing Date, and there is no application presently pending for any change to the zoning classification of any of the Properties or for the issuance of any variance or any special use permit related to any of the Properties.

### ARTICLE III
### COVENANTS OF BORROWER PARTIES

The Borrower Parties, and each of them, jointly and severally, covenant and agree with Lender that:

3.01   **Notice of Proceedings**.   The Mortgagors shall notify Lender in writing, promptly upon learning thereof, of the institution of any suit, administrative proceeding, adversary proceeding, or other legal proceedings which may affect any of the Mortgagors, any of the Properties or the operations, financial condition, or business of any of the Mortgagors.

ATLANTA:4981771.7

3.02 **Further Assurances**. The Mortgagors, and each of them, shall execute and deliver to Lender such agreements, instruments, documents, and other writings as may be reasonably requested from time to time by Lender (and hereby authorize Lender to file all UCC financing statements as may be reasonably necessary) to perfect and to maintain the perfection of Lender's security interest in each of the Properties and all other collateral related thereto and to consummate the transactions contemplated by or in the Loan Documents or this Agreement.

3.03 **Releases of Collateral**. Each of the Borrower Parties acknowledges and agrees that, due to the Maturity Default and the Tax Payment Defaults, none of the Mortgagors has or will have any right to require Lender to release, and Lender has and will have no obligation to release any of the Properties or any part thereof or any other collateral for the Loan from its deed of trust lien or its lien or security interest under any of the other Loan Documents in connection with any closing under the Colonial Sale Contract or any other Sale Contract.

3.04 **Financial Covenants; Prohibited Transfers**.

(a) **Indebtedness; Transfer or Encumbrance**. From and after the Effective Date hereof, the Mortgagors shall not incur any additional indebtedness, whether for borrowed money or in respect of any promissory note or other similar evidence of indebtedness or in connection with any lease arrangement, which indebtedness is secured by a security title upon or a security interest in (i) any Property or any part thereof, (ii) any other collateral for the Loan, or (iii) any other real or personal property owned by any Mortgagor. Borrower Party, and none of the Mortgagors shall voluntarily transfer, convey, lease, license, pledge, encumber, or hypothecate, or enter into any Sale Contract (including, without limitation, any right of first refusal agreement, option agreement, or any similar agreement) or any lease related to all or any part of any Property or any other collateral for the Loan, or any beneficial or other ownership, leasehold, or possessory interest therein, or create or allow to exist any lien or encumbrance on all or any part of any Property or any other collateral for the Loan.

3.05 **Modifications**. None of the Borrower Parties shall directly or indirectly take any action of any kind or nature whatsoever seeking in whole or in part to modify, alter, or diminish the force or effect of any of the terms and conditions of this Agreement. The foregoing shall not be construed as prohibiting any Borrower Party from requesting Lender to agree to modify this Agreement, but the Borrower Parties specifically understand and agree that Lender shall have no obligation of any kind to consent to any such requested modification and that no modification shall exist or be deemed to exist unless and until such time as all parties have executed and delivered complete documentation, in form and substance satisfactory to Lender evidencing such modification.

3.06 **Notices under Loan Documents**. In Section 10.6 of the Loan Agreement and in all similar notice provisions of contained in any of the other Loan Documents, each reference or requirement therein for copies of notices to Lender to be provided to Windels Marx Lane & Mittendorf LLP ("Windels Marx") as counsel for Lender shall be, and are hereby modified by deleting reference to Windels Marx and its address and substituting therefor McKenna Long & Aldridge LLP and its address as set forth in Section 7.08, below.

ATLANTA:4981771.7

## ARTICLE IV
## LENDER COVENANTS

### 4.01   Forbearance Covenant.

(a)   **General Forbearance Covenant**. Subject to the limitations set forth in Section 4.01(d), below, Lender covenants and agrees that, unless and until a Termination Event shall have occurred,   Lender shall not hereafter (i) commence any foreclosure proceedings against any Property or any other collateral for the Loan, (ii) seek any monetary judgment against or otherwise seek to impose personal liability on any Guarantor with respect to such Guarantor's obligations under any Guaranty, (iii) seek to impose personal liability on Borrower with respect to its obligations under, and subject to the nonrecourse limitations as set forth in, the Loan Documents or otherwise exercise any other remedy under or in connection with any of the Loan Documents or otherwise available at law or in equity, as a result of the now existing Maturity Default or Tax Payment Defaults thereunder (the foregoing covenant, subject to the terms and conditions of this Agreement, being herein referred to as the "Forbearance Covenant").

(b)   **Workout/Loan Restructuring Negotiations**.   It is the present intent of Lender to commence negotiations with the Borrower Parties concerning the possible restructuring of the indebtedness of the Loan or means by which to effectuate an amicable resolution of the now existing Events of Defaults (including, without limitation, the Maturity Default) and the other obligations of the Borrower Parties to Lender which are created, evidenced, guaranteed, or secured by  or related to the Loan Documents. The foregoing to the contrary notwithstanding, the parties hereto acknowledge and agree that neither Lender, nor any Borrower Party, shall have any obligation to continue with any such negotiations, or to ultimately reach any agreement with respect to any such restructuring or other amicable resolution, and that any party hereto, in such party's absolute and sole discretion, may terminate such negotiations at any time and for any reason or no reason, with or without cause or notice. It is further understood that such negotiations and all communications related thereto shall be governed in all respects by that certain Pre-Negotiation Agreement, dated as of September 6, 2007, executed by Lender, Mortgagors, and the Original Guarantors, and which provides, among other things, that such negotiations and communications related thereto shall be made  with a view toward compromise and settlement, and that such negotiations and communications shall be protected accordingly and shall not be admissible as evidence on any issue which may hereafter be before any court or administrative body.

(c)   **Termination of Forbearance Covenant**. The Borrower Parties expressly acknowledge and agree that, upon the occurrence of any Termination Event hereunder, Lender shall have the immediate right, at any time and from time to time, to exercise any and all rights and remedies available against the Borrower Parties, or any of them, and/or against any or all of the Properties and/or any or all other collateral for the Loan, under this Agreement, the Guaranties (including, without limitation, commencement of a suit or suits thereon against Guarantors to the same extent as Lender would be entitled if the Forbearance Covenant had never been a part of this Agreement), the other Loan Documents, and at law or in equity, to the same extent as Lender would be entitled if the Forbearance Covenant had never been part of this Agreement.

ATLANTA:4981771.7

(d)    **Limitations on Applicability**.  The Borrower Parties understand and specifically acknowledge and agree that the Forbearance Covenant does not relate or extend to any actions that Lender may take under the Loan Documents, at law, or in equity to preserve and protect any of the collateral described in the Loan Documents or the interests of Lender in any such collateral, including, without limiting the generality of the foregoing, the filing of actions, or the defending of or intervention in actions (such as lien foreclosure proceedings) brought by the holder of the Dells III Loan, any Borrower Party, any affiliate of any Borrower Party, or any other Person relating to any such collateral or the interests of Lender therein, the sending of notices to any persons or entities concerning the existence of security interests or liens in favor of Lender relating to such collateral (but specifically excluding the commencement or continuation of any action to foreclose on such collateral), taking any and all actions as may be reasonable or necessary to preserve any and all claims of Lender under Guaranties and the Environmental Indemnity against T. Jenkins and/or the estate of T. Jenkins actions including the filing of a claim in the probate estate of T. Jenkins, delivering notice of claim to Jenkins Executor or any other personal representative for the estate of T. Jenkins, filing a request for notice, filing an action against Jenkins Executor or any other personal representative for the estate of T. Jenkins, and the filing of UCC-1 Financing Statements and UCC Amendments (continuations) related thereto.

(e)    **Existing Sales Contract**.  Notwithstanding Section 3.03, above, and subject to full compliance by the Borrower with its obligations under Section 2.04, above, in the event that there is a closing under the Colonial Sale Contract, Lender agrees to release that part of the Maricopa Property which is subject to the Colonial Sale Contract from Lender's Deed of Trust lien and Lender's lien and security interests under any of the other Loan Documents upon Lender's receipt of the net sales proceeds from such closing.

4.02    **Lender Acknowledgments**.  Lender acknowledges that pursuant to Section 2.1.4 of the Loan Agreement, the proceeds of the Loan were used to refinance the then existing indebtedness on the Maricopa Property and not any then existing indebtedness on the Yavapai Property or the Pinal Property, and that the provisions of Sections 4.1.13, 4.1.20, 5.1.20, 7.1, and 7.3 of the Loan Agreement are applicable only to the Maricopa Property and not to the Yavapai Property or the Pinal Property.

## ARTICLE V
## RELEASE AND COVENANT NOT TO SUE

5.01    **Release and Covenant Not To Sue Lender Parties**.  The Borrower Parties and each of them, jointly and severally, on behalf of themselves and all of their respective heirs, successors, and assigns, do hereby remise, release, acquit, waive, satisfy, and forever discharge the Lender Parties from any and all manner of debts, accountings, bonds, warranties, representations, covenants, promises, contracts, controversies, agreements, liabilities, obligations, expenses, damages, judgments, executions, objections, defenses, setoffs, actions, claims, demands, and causes of action of any nature whatsoever, whether at law or in equity, whether known or unknown, either now accrued or hereafter maturing, which the Borrower Parties, or any of them, now have or hereafter can, shall, or may have by reason of any matter, cause, or thing from the beginning of the world to and including the Effective Date of this Agreement, arising out of or relating to (a) the Loan, including, but not limited to, the

ATLANTA:4981771.7

administration or funding thereof, (b) the Loan Documents or the indebtedness evidenced and secured thereby, (c) the acquisition, ownership, development, financing, and/or operation of any Property or any part thereof, and (d) any other agreement or transaction between any of the Borrower Parties or any of their respective affiliates and any of the Lender Parties; and the Borrower Parties, jointly and severally, for themselves and all of their respective heirs, successors, and assigns, hereby covenant and agree never to institute or cause to be instituted or continue prosecution of any suit or other form of action or proceeding of any kind or nature whatsoever against any of the Lender Parties by reason of or in connection with any of the foregoing matters, claims, or causes of action. Lender acknowledges and agrees that the foregoing release and covenant not to sue do not apply to any breach by Lender of Lender's obligations under this Agreement or the Loan Documents which may occur after the Effective Date of this Agreement.

## ARTICLE VI
## TERMINATION EVENTS; REMEDIES

6.01    **Termination Events**.  For purposes of this Agreement, each of the following shall constitute a "Termination Event":

(a)    **Misrepresentations**.  Any representation or warranty of any of the Borrower Parties in this Agreement shall be untrue or inaccurate in any material respect.

(b)    **Denial of Acknowledgments**.  Any of the Borrower Parties shall repudiate or deny the truth of any acknowledgment of the Borrower Parties set forth in this Agreement.

(c)    **Judgments**.  Any judgment shall be rendered against any of the Mortgagors in an amount in excess of $25,000.00.

(d)    **Third Party Lawsuits Involving Lender**.  As a result of any lawsuit, administrative proceeding, or other judicial or quasi-judicial proceeding commenced by any third party and relating to any Property or any part thereof, any other collateral for the Loan, or any of the transactions contemplated by any of the Loan Documents or this Agreement, Lender or any of its directors, officers, employees, affiliates, agents, legal counsel, participants, or Loan Servicer shall be exposed to any liability or other judicial or quasi-judicial relief.

(e)    **Breach of Covenant Not to Sue**.  Any of the Borrower Parties shall breach the covenant not to sue contained in Section 5.01, above.

(f)    **Attempt to Modify Transaction**.  Any of the Borrower Parties shall breach the covenant contained in Section 3.05, above.

(g)    **Breach of Other Covenants**.  Any of the Borrower Parties shall breach, default under, or fail to fully perform any of their respective covenants, agreements, and obligations under this Agreement (other than as described in any other provision of this Section 6.01) and shall fail to cure such breach within five (5) days of written notice thereof from Lender.

ATLANTA:4981771.7

(h)    **Non-Payment Defaults Under Loan Documents**. The occurrence or existence hereafter of any additional Default or Event of Default under any of the Loan Documents (including, without limitation, any default or event of default under the Dells Loan Documents, and specifically excluding the now existing Tax Payment Defaults and the Maturity Default), and the failure of Borrower to cure such Default or Event of Default within any applicable grace or cure period, if any, applicable to such Default or Event of Default.

(i)    **Bankruptcy or Insolvency Action**.

(i)    Any of the Borrower Parties shall file any voluntary petition under any Chapter of the Bankruptcy Code, or shall file any petition for dissolution or liquidation, or shall in any manner seek any relief under any local, state, federal, or other insolvency laws or other laws providing for relief of debtors; or

(ii)    Any involuntary petition under any chapter of the Bankruptcy Code shall be filed against any of the Borrower Parties, or any of the Borrower Parties shall become the subject of any dissolution, liquidation, or insolvency proceeding or any other proceeding pursuant to any local, state, federal, or other insolvency laws or other laws providing for relief of debtors; or

(iii)    Any Property or any part thereof or any interest therein shall become the property of any bankruptcy estate or the subject of any local, state, federal, or other bankruptcy, dissolution, liquidation, or insolvency proceedings; or

(iv)    Any other collateral for the Loan or any part thereof or any interest therein shall become the property of any bankruptcy estate or the subject of any local, state, federal, or other bankruptcy, dissolution, liquidation, or insolvency proceedings.

(j)    **Lawsuits Against Lender; Inconsistent Positions**.  Any of the Borrower Parties shall (i) file any lawsuit or commence any other administrative, judicial, or quasi-judicial proceeding, or (ii) assert any counterclaim or cross-claim in any lawsuit or other such proceeding, seeking to enjoin or restrain Lender from taking any remedy enforcement or other action permitted hereunder, the Loan Documents, or under applicable law, or seeking to recover damages from any of the Lender Parties or otherwise establish liability on the part of any of the Lender Parties in any manner whatsoever.

(k)    **Termination Date**.  Borrower shall have failed to repay the Debt in full or the parties hereto shall have failed to execute and deliver a debt restructuring agreement or some other workout agreement related to the Loan on or before the Termination Date (the parties hereto acknowledging and agreeing that none of the parties hereto has or shall have any obligation to execute and deliver any such restructuring or other workout agreement, and that such restructuring or other workout agreement, if any, must be satisfactory to each of the parties hereto in his or its sole and absolute discretion).

6.02    **Lender's Rights Upon Occurrence of Termination Event**.    Upon the occurrence of a Termination Event hereunder, all of Lender's covenants and obligations under this Agreement shall immediately and without further notice to any of the Borrower Parties terminate and be of no further force or effect, and Lender shall immediately be entitled, and

ATLANTA:4981771.7

without further notice to any of the Borrower Parties, to exercise any or all of Lender's rights and remedies under this Agreement, the Loan Documents, and at law and in equity (all of such rights and remedies being cumulative), including specifically, but without limitation, (i) the right to seek to obtain the ex parte appointment of a receiver for any or all of the Properties; (ii) the right to elect to take any and all actions which Lender deems necessary or appropriate to foreclose on any or all of the Properties (by either judicial or, if then available, non-judicial foreclosure) pursuant to the terms of the Loan Documents and applicable law and to take any and all other actions deemed necessary or appropriate by Lender in order to vest complete and exclusive ownership, possession, and control of any or all of the Properties in Lender or its designee at any foreclosure sale of any or all of the Properties; (iii) the right to sue Borrower on the Note; and (iv) the right to sue any one or more of the Guarantors under the Guaranties.

6.03    **Tolling and Waiver of Statute of Limitations**.    The Borrower Parties hereby covenant and agree that, in consideration of Lender's covenants and agreements contained in this Agreement, including, without limitation, the Forbearance Covenant, any and all statutes of limitations or similar laws or rules of procedure provided for under any applicable law, which would affect Lender's right to commence suit against the Guarantors in accordance with the terms and conditions of the Guaranties or against any of the other Borrower Parties under any of the other Loan Documents are hereby tolled, and the Guarantors and the other Borrower Parties do hereby waive the right to assert as a defense any such statute or rule in any suit brought by Lender against any of the Guarantors or any of the other Borrower Parties with respect to the Loan, the Guaranties, the other Loan Documents, or this Agreement.

**ARTICLE VII**
**MISCELLANEOUS**

7.01    **Survival of Provisions**.    Except as expressly herein provided, the covenants, acknowledgments, representations, agreements, and obligations contained in this Agreement shall survive the consummation of the transactions contemplated by this Agreement.

7.02    **No Limitation of Remedies**.    No right, power, or remedy conferred upon or reserved to or by Lender in this Agreement is intended to be exclusive of any other right, power, or remedy conferred upon or reserved to or by Lender hereunder, under the Loan Documents, or at law or in equity, but each and every remedy shall be cumulative and concurrent and shall be in addition to each and every other right, power, and remedy given hereunder or under the Loan Documents, or now or hereafter existing at law or in equity.

7.03    **No Waivers**.    Except as specifically and expressly set forth in this Agreement, nothing contained in this Agreement shall constitute a waiver of any rights or remedies of any party under the Loan Documents or at law or in equity. No delay or failure on the part of any party hereto in the exercise of any right or remedy hereunder shall operate as a waiver thereof, and no single or partial exercise of any right or remedy hereunder shall preclude other or further exercise thereof or the exercise of any other right or remedy. No action or forbearance by any party contrary to the provisions of this Agreement shall be construed to constitute a waiver of any of the express provisions hereof or thereof. Any party may in writing expressly waive any of such party's rights under this Agreement without invalidating this Agreement or any portion hereof.

18

7.04    **No Partnership, Joint Venture, or Agency.** This Agreement shall not in any respect be interpreted, deemed, or construed as making Lender a partner or joint venturer with the Borrower Parties, or any of them. This Agreement shall not be interpreted, deemed, or construed as making Lender the agent or representative of any of the Borrower Parties. In no event shall Lender be liable for debts or claims accruing or arising against the Borrower Parties, or any of them. The relationship of Lender to Borrower is that of "lender" and "borrower", and the relationship of Lender and the Guarantors is that of "lender" and "guarantor".

7.05    **Successors or Assigns.** Whenever in this Agreement any party is named or referred to, the heirs, executors, legal representatives, successors, successors-in-title, and assigns of such party shall be included, and all covenants and agreements contained in this Agreement shall bind and inure to the benefit of each such party's respective heirs, executors, legal representatives, successors, successors-in-title, and assigns whether so expressed or not.

7.06    **Construction of Agreement.** Each party acknowledges that it has participated in the negotiation of this Agreement, and no provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party's having, or being deemed to have, structured, dictated, or drafted such provision; that the Borrower Parties, and each of them, at all times have had access to an attorney in the negotiation of the terms of and in the preparation and execution of this Agreement, and the Borrower Parties, and each of them, has had the opportunity to review and analyze this Agreement for a sufficient period of time prior to the execution and delivery hereof; that no representations or warranties have been made by or on behalf of Lender, or relied upon by the Borrower Parties, or any of them, pertaining to the subject matter of this Agreement, and all prior statements, representations, and warranties, if any, are totally superseded and merged into this Agreement, which represents the final and sole agreement of the parties with respect to the matters which are the subject hereof and thereof; that all of the terms of this Agreement were negotiated at arm's-length and that this Agreement were prepared and executed without fraud, duress, undue influence, or coercion of any kind exerted by any of the parties upon the others; and that the execution and delivery of this Agreement constitute the free and voluntary act of each of the Borrower Parties.

7.07    **No Admissions.** The Borrower Parties expressly acknowledge and agree that the waivers, estoppels, releases, and covenants not to sue contained in this Agreement shall not be construed as an admission of wrongdoing, liability, or culpability on the part of Lender Parties or as an admission by Lender Parties of the existence of any claims of any of the Borrower Parties against any of Lender Parties. The Lender Parties expressly acknowledge and agree that the waivers, estoppels, releases, and covenants not to sue contained in this Agreement shall not be construed as an admission of wrongdoing, liability, or culpability on the part of any Borrower Parties or an admission by any of the Lender Parties of the existence of any claims of any of the Lender Parties against any of the Borrower Parties except for those claims arising as a result of Borrower's or any Mortgagor's default under the Loan Documents.

7.08    **Notices.** Any and all notices, elections, approvals, consents, demands, requests, and responses thereto permitted or required to be given under this Agreement ("Communications") shall be in writing, shall be signed by or on behalf of the party giving the same, and shall be deemed to have been validly given or served by delivery of the same in

ATLANTA:4981771.7

person to the intended addressee, or by depositing the same with United Parcel Service, or another reputable private courier service for next business day delivery, or by depositing the same in the United States mail, postage prepaid, registered or certified mail, return receipt requested, in any event addressed to the intended addressee at its address provided hereinbelow or at such other address as may be designated by such party as herein provided. All such Communications shall be effective upon such personal delivery, or one (1) business day after being deposited with the private courier service, or three (3) business days after being deposited in the United States mail as required above. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given as herein required shall be deemed to be receipt of the notice, demand, or request sent. By giving to the other party hereto at least fifteen (15) days' prior written notice thereof in accordance with the provisions hereof, the parties hereto shall have the right from time to time to change their respective addresses, and each shall have the right to specify as its address any other address within the United States of America. Any Communication, if given to Lender, must be addressed as follows, subject to change as provided hereinabove:

> Lehman Brothers Holdings Inc.
> 399 Park Avenue, 8th Floor
> New York, New York 10022
> Attn: Abbey B. Kosakowski, Esq.

| | |
|---|---|
| With copies to: | TriMont Real Estate Advisors, Inc.<br>Monarch Tower<br>Suite 2200<br>3424 Peachtree Road NE<br>Atlanta, GA 30326<br>Attention: Mr. J. Gregory Winchester |
| and to: | Charles D. Weiss, Esq.<br>McKenna Long & Aldridge LLP<br>303 Peachtree Street, Suite 5300<br>Atlanta, Georgia 30308 |

and, if given to any of the Borrower Parties, must be addressed as follows, subject to change as provided hereinabove:

> [Name of Borrower Party]
> c/o Middle Mountain 156, LLC
> 20837 North 41st Avenue
> Glendale, Arizona 85308
> Attention: Mr. Nicholas W. Bonanno, Jr.

| | |
|---|---|
| With a copy to: | Beus Gilbert PLLC<br>4800 North Scottsdale road<br>Suite 6000<br>Scottsdale, Arizona 85251<br>Attention: Steven W. Bienstock, Esq. |

ATLANTA:4981771.7

7.09    <u>Governing Law, Submission to Jurisdiction</u>.

(a)    THIS AGREEMENT WAS NEGOTIATED IN PART IN THE STATE OF NEW YORK, WHICH STATE THE LENDER AND EACH BORROWER PARTY AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE LENDER AND EACH BORROWER PARTY AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE, THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (EXCLUDING APPLICATION OF ANY PRINCIPLE OF CONFLICT OF LAWS WHICH WOULD DIRECT THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER PARTIES HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, AND THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1401.

(b)    ANY SUIT, ACTION, OR PROCEEDING AGAINST ANY BORROWER PARTY ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY, AT LENDER'S OPTION, BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, OR IN THE STATE OF ARIZONA, AND IN EITHER INSTANCE, BORROWER PARTIES WAIVE ANY OBJECTIONS WHICH THEY MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR <u>FORUM NON CONVENIENS</u> OF ANY SUCH SUIT, ACTION, OR PROCEEDING, AND BORROWER PARTIES HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION   OF ANY SUCH COURT IN ANY SUIT, ACTION, OR PROCEEDING. BORROWER PARTIES   HEREBY DESIGNATE   AND APPOINT DELANEY CORPORATE SERVICES, 41 STATE STREET, SUITE 405, ALBANY, NEW YORK 12207, AS THEIR AUTHORIZED AGENT   TO ACCEPT AND ACKNOWLEDGE ON THEIR BEHALF ANY AND ALL PROCESS WHICH MAY BE SERVED  IN ANY SUCH SUIT, ACTION, OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREE THAT SERVICE  OF PROCESS ON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO THE BORROWER PARTIES IN THE MANNER PROVIDED  HEREINBELOW IN THIS AGREEMENT SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER PARTIES IN ANY SUCH SUIT, ACTION, OR PROCEEDING IN THE STATE OF NEW YORK. THIS CHOICE OF FORUM IS MADE PURSUANT TO NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1402.

7.10    <u>Waiver of Trial by Jury</u>.  AS PART OF THE CONSIDERATION FOR NEW VALUE THIS DAY GIVEN BY LENDER AND BY THE BORROWER PARTIES, EACH TO THE OTHER, EACH OF THE LENDER AND THE BORROWER PARTIES

ATLANTA:4981771.7

**HEREBY EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE LOAN DOCUMENTS.**

7.11    **Headings**.    The headings of the articles, sections, and subsections of this Agreement are for the convenience of reference only, are not to be considered a part hereof or thereof, and shall not limit or otherwise affect any of the terms hereof or thereof.

7.12    **Pronouns**.    All personal pronouns used in this Agreement, whether used in the masculine, feminine, or neuter gender, shall include all other genders; the singular shall include the plural, and vice versa.

7.13    **Modifications**.    The terms of this Agreement may not be changed, modified, waived, discharged, or terminated orally, but only by an instrument or instruments in writing and signed by all parties thereto.

7.14    **Time of Essence**.    Time is of the essence of this Agreement.

7.15    **Counterparts**.    This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all such counterparts together shall constitute one and the same instrument.

7.16    **Future Negotiations**.    The Borrower Parties acknowledge and agree (a) that Lender has no obligation whatsoever to discuss, negotiate, or agree to any restructuring of the Loan, or any modification, amendment, restructuring, or reinstatement of the Loan Documents or to forbear from exercising its rights and remedies under the Loan Documents, except as expressly provided in this Agreement; and (b) that if there are any future discussions among Lender and any of the Borrower Parties concerning any such restructuring, modification, amendment, or reinstatement, then no restructuring, modification amendment, reinstatement, compromise, settlement, agreement, or understanding with respect to the Loan, the Loan Documents, any Property or any part thereof or any interest therein, or any aspect of any of the foregoing, shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until reduced to writing and signed by authorized representatives of the parties hereto, and that none of the parties hereto shall assert or claim in any legal proceedings or otherwise that any such agreement exists except in accordance with the terms of this Section.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

ATLANTA:4981771.7

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement, as of the above stated Effective Date.

LENDER:

LEHMAN BROTHERS HOLDINGS INC., d/b/a
Lehman Capital, a Division of Lehman Brothers
Holdings Inc., a Delaware corporation

By:

Name: Abbey B. Kosakowski
Title: Authorized Signatory

[SIGNATURES CONTINUE ON FOLLOWING PAGES]

23

**BORROWER:**

**MIDDLE MOUNTAIN 156, LLC,** an Arizona
limited liability company

By:  Middle Mountain 39, LLC, an Arizona limited
     liability company, its Member

     By: _____
         Name: Nicholas W. Bonanno
         Title: Manager

By:  Allen D. Jenkins & Associates, LLC, an
     Arizona limited liability company, its Member

     By: _____
         Name: Allen D. Jenkins
         Title: Manager

**GUARANTORS:**

_____
**NICHOLAS W. BONANNO, JR.,** Individually

_____
**RITA BONANNO,** Individually

_____
**ALLEN D. JENKINS,** Individually

_____
**ALLEN D. JENKINS,** as executor of the last will
and testament of **TAMERA R. JENKINS** late of
that State of Arizona and County of Maricopa
("T. Jenkins"), as personal representative of the
estate of T. Jenkins, or as successor in title, by
survivorship, to property formerly jointly owned by
T. Jenkins and A. Jenkins as tenancy by the entirety
with right of survivorship or as joint tenancy with
right of survivorship or as community property with
right of survivorship, as the case may be

**[SIGNATURES CONTINUE ON FOLLOWING PAGES]**

24                                        ATLANTA:4981771.7

**OTHER MORTGAGORS:**

**A & N INVESTMENT PROPERTIES, LLC,**
an Arizona limited liability company

By: _____

    Name: Nicholas W. Bonanno, Jr.
    Title: Manager


**163, LLC,** an Arizona limited liability company


By: _____

    Name: Allen D. Jenkins
    Title: Manager

ATLANTA:4981771.7

## SCHEDULE OF EXHIBITS

**EXHIBIT A** - LEGAL DESCRIPTION OF MARICOPA PROPERTY

**EXHIBIT B** - LEGAL DESCRIPTION OF PINAL PROPERTY

**EXHIBIT C** - LEGAL DESCRIPTION OF YAVAPAI PROPERTY

**EXHIBIT D** - 163 ORGANIZATIONAL CHART

**EXHIBIT E** - A & N ORGANIZATIONAL CHART

**EXHIBIT F** - BORROWER ORGANIZATIONAL CHART

**EXHIBIT G** - SALE CONTRACTS

**EXHIBIT H** - MARICOPA SITE PLAN

**EXHIBIT I** - REAL ESTATE BROKERAGE AGREEMENTS

**EXHIBIT J** - ADDITIONAL UTILITIES REQUIREMENTS

ATLANTA:4981771.7

## EXHIBIT A

## LEGAL DESCRIPTION

## (MARICOPA)

**PARCEL NO. 1:**

THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA.

**PARCEL NO. 2:**

THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT THAT PORTION OF SECTION 26 BEING THE PHOENIX-ROCK SPRINGS HIGHWAY (BLACK CANYON INTERSTATE HIGHWAY NO. 17) WHICH IS THAT PORTION OF SECTION 26 LYING EASTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT ON THE NORTH LINE OF SAID NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, WHICH IS 80.36 FEET WESTERLY OF THE NORTHEAST CORNER THEREOF;

THENCE SOUTH 9 DEGREES 57 MINUTES 36 SECONDS EAST 478.57 FEET, TO A POINT ON THE EAST LINE OF SAID NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26 AND TO THE END OF THIS LINE DESCRIPTION. THE PORTION OF SECTION 26 THAT ENCOMPASSES THE PHOENIX-ROCK SPRINGS HIGHWAY WAS DEDICATED TO THE STATE OF ARIZONA BY WARRANTY DEED DATED JULY 9, 1963, RECORDED SEPTEMBER 5, 1963 IN DOCKET 4718, PAGE 237, ACCORDING TO THE RECORDS OF THE COUNTY RECORDER OF THE COUNTY OF MARICOPA, STATE OF ARIZONA.

**PARCEL NO. 3:**

THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

AND THAT PART OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 26, LYING WEST OF THE CENTERLINE OF THE PHOENIX-ROCK SPRINGS HIGHWAY;

EXCEPT THAT PORTION OF THE NORTHWEST QUARTER OF AND A PORTION OF THE NORTHEAST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTH QUARTER CORNER OF SAID SECTION 26;

THENCE SOUTH 89 DEGREES 38 MINUTES 14 SECONDS WEST ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER OF SECTION 26, A DISTANCE OF 283.46 FEET TO A POINT ON THE WESTERLY RIGHT-OF-WAY LINE OF INTERSTATE 17;

THENCE SOUTH 09 DEGREES 56 MINUTES 54 SECONDS EAST, ALONG SAID RIGHT-OF-WAY LINE, 2012.91 FEET TO THE POINT OF BEGINNING;

THENCE CONTINUING SOUTH 09 DEGREES 56 MINUTES 54 SECONDS EAST ALONG SAID RIGHT-OF-WAY LINE, 671.09 FEET TO A POINT ON THE SOUTH LINE OF SAID NORTHEAST QUARTER OF SECTION 26;

THENCE SOUTH 89 DEGREES 42 MINUTES 21 SECONDS WEST, ALONG SAID SOUTH LINE OF THE NORTHEAST QUARTER AND THE SOUTH LINE OF THE NORTHWEST QUARTER, 1178.61 FEET;

THENCE NORTH 00 DEGREES 18 MINUTES 18 SECONDS WEST, 172.10 FEET;

THENCE SOUTH 89 DEGREES 42 MINUTES 21 SECONDS WEST, 319.00 FEET TO A POINT ON THE WEST LINE OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER;

THENCE NORTH 00 DEGREES 18 MINUTES 57 SECONDS WEST, ALONG SAID WEST LINE, 489.46 FEET;

THENCE NORTH 89 DEGREES 42 MINUTES 02 SECONDS EAST, 1385.32 FEET TO THE POINT OF BEGINNING;

AND EXCEPT THE SOUTH 172 FEET OF THE WEST 319 FEET OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

**PARCEL NO. 4:**

THE NORTH HALF OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT ALL URANIUM, THORIUM OR ANY OTHER MATERIAL WHICH IS OR MAY BE DETERMINED TO BE PECULIARLY ESSENTIAL TO THE PRODUCTION OF FISSIONABLE MATERIALS, WHETHER OR NOT OF COMMERCIAL VALUE, PURSUANT TO THE PROVISIONS OF THE ACT OF AUGUST 1, 1946 (60 STAT. 755) AS SET FORTH IN THE PATENT OF SAID LAND.

**PARCEL NO. 5:**

THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT ALL MINERALS IN THE LAND AS SET FORTH IN THE PATENT THEREOF; AND

EXCEPT ALL URANIUM, THORIUM OR ANY OTHER MATERIAL WHICH IS OR MAY BE DETERMINED TO BE PECULIARLY ESSENTIAL TO THE PRODUCTION OF FISSIONABLE MATERIALS, WHETHER OR NOT OF COMMERCIAL VALUE, PURSUANT TO THE PROVISIONS OF THE ACT OF AUGUST 1, 1946 (60 STAT. 755) AS SET FORTH IN THE PATENT OF SAID LAND.

TOGETHER WITH AN EASEMENT TO CONSTRUCT, RECONSTRUCT, MAINTAIN AND USE AS AN ACCESS ROAD AND UTILITIES CERTAIN LANDS FOR THE BENEFIT OF THE ABOVE-DESCRIBED PARCEL OF LAND AS SET FORTH IN GRANT OF EASEMENT RECORDED IN DOCKET 14214, PAGE 275.

**PARCEL NO. 6:**

THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT ALL MINERALS IN THE LAND AS SET FORTH IN THE PATENT THEREOF; AND

TOGETHER WITH AN EASEMENT TO CONSTRUCT, RECONSTRUCT, MAINTAIN AND USE AS AN ACCESS ROAD AND UTILITIES CERTAIN LANDS FOR THE BENEFIT OF THE ABOVE-DESCRIBED PARCEL OF LAND AS SET FORTH IN GRANT OF EASEMENT RECORDED IN DOCKET 14214, PAGE 275.

EXCEPT ALL URANIUM, THORIUM OR ANY OTHER MATERIAL WHICH IS OR MAY BE DETERMINED TO BE PECULIARLY ESSENTIAL TO THE PRODUCTION OF FISSIONABLE MATERIALS, WHETHER OR NOT OF COMMERCIAL VALUE, PURSUANT TO THE PROVISIONS OF THE ACT OF AUGUST 1, 1946 (60 STAT. 755) AS SET FORTH IN THE PATENT OF SAID LAND.

PARCEL NO. 7:

THE SOUTH 172 FEET OF THE WEST 319 FEET OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA.

PARCEL NO. 8:

A PORTION OF THE NORTHWEST QUARTER AND A PORTION OF THE NORTHEAST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTH QUARTER CORNER OF SAID SECTION 26;

THENCE SOUTH 89 DEGREES 38 MINUTES 14 SECONDS WEST ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER OF SECTION 26, A DISTANCE OF 283.46 FEET TO A POINT ON THE WESTERLY RIGHT-OF-WAY LINE OF INTERSTATE 17;

THENCE SOUTH 09 DEGREES 56 MINUTES 54 SECONDS EAST ALONG SAID RIGHT-OF-WAY LINE, 2012.91 FEET TO THE POINT OF BEGINNING;

THENCE CONTINUING SOUTH 09 DEGREES 56 MINUTES 54 SECONDS EAST ALONG SAID RIGHT-OF-WAY LINE, A DISTANCE OF 671.09 FEET TO A POINT ON THE SOUTH LINE OF SAID NORTHEAST QUARTER OF SECTION 26;

THENCE SOUTH 89 DEGREES 42 MINUTES 21 SECONDS WEST ALONG SAID SOUTH LINE OF THE NORTHEAST QUARTER AND THE SOUTH LINE OF THE NORTHWEST QUARTER, 1178.61 FEET;

THENCE NORTH 00 DEGREES 18 MINUTES 57 SECONDS WEST, 172 FEET;

THENCE SOUTH 89 DEGREES 42 MINUTES 21 SECONDS WEST, 319.00 FEET TO A POINT ON THE WEST LINE OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER;

THENCE NORTH 00 DEGREES 18 MINUTES 57 SECONDS WEST ALONG SAID WEST LINE 489.46 FEET;

THENCE NORTH 89 DEGREES 42 MINUTES 02 SECONDS EAST, 1385.32 FEET TO THE POINT OF BEGINNING.

PARCEL NO. 9:

THAT PORTION OF THE SOUTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, LYING NORTH OF THE CENTRAL ARIZONA PROJECT AQUEDUCT TRACT GR-10-6 AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE WEST QUARTER CORNER OF SAID SECTION 26;

THENCE FROM SAID POINT OF BEGINNING ALONG THE WEST BOUNDARY OF SAID SECTION 26, SOUTH 00 DEGREES 00 MINUTES 14 SECONDS WEST 1069.43 FEET TO A POINT ON THE NORTHERLY BOUNDARY OF THE CENTRAL ARIZONA PROJECT AQUEDUCT TRACT GR-10-6;

THENCE ALONG SAID NORTHERLY BOUNDARY LINE SOUTH 76 DEGREES 41 MINUTES 08 SECONDS EAST A DISTANCE OF 270.41 FEET TO A POINT;

THENCE CONTINUING ALONG SAID NORTHERLY BOUNDARY LINE NORTH 79 DEGREES 43 MINUTES 58 SECONDS EAST A DISTANCE OF 465.02 FEET TO A POINT;

THENCE CONTINUING ALONG SAID NORTHERLY BOUNDARY LINE NORTH 58 DEGREES 08 MINUTES 14 SECONDS EAST A DISTANCE OF 2007.63 FEET TO THE INTERSECTION OF SAID NORTHERLY BOUNDARY LINE WITH THE EAST-WEST MID-SECTION LINE OF SAID SECTION 26;

THENCE ALONG SAID MID-SECTION LINE SOUTH 89 DEGREES 44 MINUTES 26 SECONDS WEST A DISTANCE OF 2427.41 FEET TO THE POINT OF BEGINNING.

EXCEPT AN UNDIVIDED 25% INTEREST IN AND TO ALL OIL, GAS AND OTHER MINERALS LYING WITHIN THE NORTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SAID SECTION 26, AS RESERVED IN DEEDS RECORDED NOVEMBER 6, 1973 IN DOCKET 10386, PAGE 339.

TOGETHER WITH A PERPETUAL EASEMENT TO CONSTRUCT, RECONSTRUCT, MAINTAIN, AND USE AN ACCESS ROAD AND UTILITIES TO AND FROM AND AS APPURTENANT TO THE PARCEL DESCRIBED ABOVE, ALL AS SET FORTH IN THAT CERTAIN GRANT OF EASEMENTS RECORDED JANUARY 29, 1976 IN DOCKET 11522, PAGE 464, OVER, ACROSS AND UNDER THE FOLLOWING DESCRIBED REAL PROPERTY:

BEGINNING AT A POINT IN THE EAST-WEST MIDSECTION LINE OF SAID SECTION 26 THAT BEARS NORTH 89 DEGREES 44 MINUTES 26 SECONDS EAST 2300.97 FEET FROM THE EAST QUARTER CORNER OF SAID SECTION 26;

THENCE FROM SAID POINT OF BEGINNING AND LEAVING SAID MIDSECTION LINE NORTH 58 DEGREES 16 MINUTES 39 SECONDS EAST 126.45 FEET;

THENCE NORTH 89 DEGREES 44 MINUTES 26 SECONDS EAST 405.24 FEET TO A POINT IN THE WESTERLY RIGHT OF WAY LINE OF INTERSTATE SEVENTEEN LAST SAID POINT BEARS SOUTH 09 DEGREES 54 MINUTES 15 SECONDS EAST 337.15 FEET FROM AN ARIZONA STATE HIGHWAY DEPARTMENT BRASS DISK STAMPED "A. H. D. 1039+00" MARKING SAID WESTERLY RIGHT OF WAY LINE;

THENCE ALONG SAID RIGHT OF WAY LINE SOUTH 09 DEGREES 54 MINUTES 15 SECONDS EAST 66.95 FEET TO A POINT IN THE EAST-WEST MIDSECTION LINE OF SAID SECTION 26;

THENCE LEAVING SAID RIGHT OF WAY LINE ALONG SAID MIDSECTION LINE SOUTH 89 DEGREES 44 MINUTES 26 SECONDS WEST 524.32 FEET TO THE POINT OF BEGINNING.

**EXHIBIT B**

**LEGAL DESCRIPTION**

**(PINAL)**

**PARCEL 1:**

The Southeast quarter of the Northwest quarter of Section 26, Township 5 South, Range 6 East of the Gila and Salt River Base and Meridian, Pinal County, Arizona.

**PARCEL 2:**

The Northeast quarter of the Northwest quarter of Section 26, Township 5 South, Range 6 East of the Gila and Salt River Base and Meridian, Pinal County, Arizona.

## EXHIBIT C

## LEGAL DESCRIPTION

## (YAVAPAI)

Parcel 3, according to the map  on file in the office of the County Recorder  of Yavapai County, Arizona, in Book 7 of Results of Survey, Page 56.

Except all coal and other minerals as reserved in Patent to said land.

## EXHIBIT D

### 163 ORGANIZATION CHART

**LEHMAN BROTHERS HOLDINGS INC.**
**$44,000,000 LOAN TO MIDDLE MOUNTAIN 156, LLC**
**(04406.0222)**





EXHIBIT E
A & N ORGANIZATION CHART

LEHMAN BROTHERS HOLDINGS INC.
$44,000,000 LOAN TO MIDDLE MOUNTAIN 156, LLC
(0406,0222)

ATLANTA:4981771.7



**EXHIBIT F**
**BORROWER ORGANIZATION**

LEHMAN BROTHERS HOLDINGS INC.
$44,000,000 LOAN TO MIDDLE MOUNTAIN 156, LLC
(04406.0222)

## EXHIBIT G

## SALE CONTRACTS

1.      Letter Offer, dated September 21, 2007, from the Ellman Companies.

ATLANTA:4981771.7

# EXHIBIT H

## MARICOPA SITE PLAN

ATLANTA:4981771.7

### EXHIBIT H

### MARICOPA SITE PLAN



## EXHIBIT I

## REAL ESTATE BROKERAGE AGREEMENTS

1.    Real Estate Brokerage Agreement, dated _____, between Borrower and Triplett Land and Realty Company, related to Parcel C of the Maricopa Property, containing approximately 15.67 acres and located as shown on the **Exhibit H** to this Agreement

# EXHIBIT J

## ADDITIONAL UTILITIES REQUIREMENTS

Intentionally Left Blank