Hearing Date: TBD (Prevailing Eastern Time)
Objection Deadline: TBD (Prevailing Eastern Time)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 Case No. |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | **08-13555 (JMP)** |
| **Debtors.** | (Jointly Administered) |

**COVER SHEET FOR THE TENTH INTERIM APPLICATION OF HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC., INVESTMENT BANKER TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR INTERIM ALLOWANCE OF COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND REIMBURSEMENT OF ACTUAL AND NECESSARY EXPENSES INCURRED FROM OCTOBER 1, 2011 THROUGH MARCH 6, 2012**

**NAME OF APPLICANT:** Houlihan Lokey Howard & Zukin Capital, Inc.

**TIME PERIOD:** October 1, 2011 through March 6, 2012

**DATE OF FINAL RETENTION:** December 17, 2008 (*nunc pro tunc* to September 17, 2008)

**ROLE IN THE CASE:** Investment Banker to the Official Committee of Unsecured Creditors

**CURRENT APPLICATION:**

Fees Incurred (Including 20% Holdback, Deferred Fee and Additional Fee): $28,745,846.52

Fee Payment Requested (Including 20% Holdback and 80% of Deferred Fee and 80% of Additional Fee) $21,748,677.21

Expenses Incurred: $23,058.75[1]

---

[1] The expenses sought by this Application reflect Houlihan Lokey's actual expenses billed of $22,685.59 plus $373.16 for expenses posted during the period but not yet invoiced.

**PRIOR APPLICATIONS:**[2]

| | |
|---|---|
| Fees Previously Requested: | $15,186,666.66 |
| Fees Previously Awarded: | $15,186,666.66 |
| Expenses Previously Requested: | $593,356.40 |
| Expenses Previously Awarded: | $536,627.55 |

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

---

[2] These figures include the Ninth Interim Compensation Period, which includes the full amount of fees and expenses requested by Houlihan Lokey as the Fee Committee has not submitted its final recommendation on reductions.

Hearing Date: TBD (Prevailing Eastern Time)
Objection Deadline: TBD (Prevailing Eastern Time)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 Case No. |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | **08-13555 (JMP)** |
| **Debtors.** | **(Jointly Administered)** |

**TENTH INTERIM APPLICATION OF HOULIHAN LOKEY
HOWARD & ZUKIN CAPITAL, INC., INVESTMENT BANKER TO THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS, FOR INTERIM ALLOWANCE OF
COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND
REIMBURSEMENT OF ACTUAL AND NECESSARY EXPENSES INCURRED
FROM OCTOBER 1, 2011 THROUGH MARCH 6, 2012**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey"), as investment banker to the Official Committee of Unsecured Creditors (the "Committee") of Lehman Brothers Holdings, Inc., ("LBHI") et al., the debtors and debtors-in-possession in the above captioned chapter 11 cases (collectively, the "Debtors"), and together with their non-debtor affiliates ("Lehman"), hereby submits this tenth application (the "Application"), pursuant to sections 328, 330 and 331 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991 and amended April 21, 1995 (together, the "Local Guidelines"), the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330, effective January 30, 1996 (the "U.S. Trustee

Guidelines"), and the Third Amended Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) Establishing Procedures for Interim Monthly Compensation and Reimbursement Of Expenses of Professionals, dated June 25, 2009 (the "Interim Compensation Order"), for the allowance of interim compensation for professional services rendered from October 1, 2011 through and including March 6, 2011 (the "Tenth Interim Compensation Period"), and for reimbursement of expenses incurred in connection with such services, and in support thereof respectfully represents as follows:

## BACKGROUND

1.    Bankruptcy Filing. On September 15, 2008, and periodically thereafter (the "Petition Date"), the Debtors commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases"). The Debtors' Chapter 11 Cases have been consolidated for procedural purposes and are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules. The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.    Creditors' Committee. On September 17, 2008, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Committee in the Chapter 11 Cases.

3.    SIPA Trustee. On September 19, 2008, a proceeding (the "SIPA Proceeding") was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"), a wholly owned subsidiary of LBHI and a registered broker-dealer. James W. Giddens, Esq. is the trustee appointed under SIPA (the "SIPA Trustee") administering LBI's estate.

4.    Examiner. The United States Bankruptcy Court for the Southern District of New York (the "Court") approved the appointment of Anton R. Valukas as examiner (the

2

"Examiner") in the Chapter 11 Cases in the Order Approving the Appointment of Examiner, dated January 20, 2009. In accordance with his appointment, the Examiner issued his report on February 8, 2010 under seal, which was subsequently unsealed on March 11, 2010.

5.       Fee Committee. On May 26, 2009, the Court appointed a fee committee (the "Fee Committee") and approved a fee protocol (the "Fee Protocol") in the Chapter 11 Cases. On January 24, 2011, the Court approved the Fee Committee's recommendation to appoint Richard A. Gitlin as the successor Independent Member on the Fee Committee. By motion dated March 11, 2011, the Fee Committee sought authorization to amend the Fee Protocol, which the Court granted on April 14, 2011 (the "Amended Fee Protocol") [Docket No. 15998].

6.       Debtors' Plan and Disclosure Statement. On March 15, 2010, the Debtors filed their Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors [Docket No. 7572]. Subsequently, on April 14, 2010, the Debtors filed their Disclosure Statement for Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code [Docket No. 8332], along with their revised Chapter 11 Plan [Docket No. 8330].

7.       Debtors' First Amended Plan and Disclosure Statement. On January 25, 2011, the Debtors filed their First Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (the "Debtors' First Amended Plan") [Docket No. 14150] and the Debtors' Disclosure Statement for First Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code (the "Debtors' First Amended Disclosure Statement") [Docket No. 14151].

3

8.    <u>Debtors' Second Amended Plan and Disclosure Statement</u>. Following the filing of competing plans of reorganization by the Ad Hoc Group of Lehman Brothers Creditors (the "<u>Ad Hoc Group Plan</u>") and the Non-Consolidation Plan Proponents (the "<u>Non-Con Plan</u>"), the Debtors filed their Second Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (the "<u>Second Amended Plan</u>") [Docket No. 18204] and the Disclosure Statement for Second Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code [Docket No. 18205] on June 30, 2011.

9.    <u>Debtors' Third Amended Plan and Disclosure Statement</u>. After numerous and lengthy negotiations among the Debtors, the Committee and multiple creditor groups, including Lehman's affiliates in countries outside of the U.S. (the "<u>Foreign Affiliates</u>"), on September 1, 2011, the Debtors filed the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (as amended, modified and supplemented, the "<u>Plan</u>") [Docket No. 19627] and the Debtors' Disclosure Statement for the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code (the "<u>Disclosure Statement</u>") [Docket No. 19629]. Also on September 1, 2011, the Court entered an amended order approving the Disclosure Statement, establishing solicitation and voting procedures in connection with the Plan, scheduling a confirmation hearing for December 6, 2011, and establishing notice and objection procedures for the confirmation hearing [Docket No. 19631]. On September 15, 2011, the Court entered an order approving a modification to the Disclosure Statement [Docket No. 20016]. On December 6, 2011, the Court entered an order confirming the Plan [Docket No. 23023]. The Plan went effective at 12:01 a.m. on March 6, 2012 (the "<u>Effective Date</u>").

4

10.    <u>Jurisdiction</u>. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Chapter 11 Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2). The statutory predicates for the relief sought herein are sections 328, 330 and 331 of the Bankruptcy Code. Pursuant to the Local Guidelines, a certification regarding compliance with the Local Guidelines is attached hereto as Exhibit "<u>A</u>."

**RETENTION OF HOULIHAN LOKEY
AND SUMMARY OF PROFESSIONAL COMPENSATION
<u>AND REIMBURSEMENT OF EXPENSES REQUESTED</u>**

12.    On December 17, 2008, pursuant to the Final Order Under 11 U.S.C. §§ 328(a) and 1103 And Fed. R. Bankr. P. 2014 And S.D.N.Y. LBR 2014-1 Authorizing The Retention And Employment Of Houlihan, Lokey, Howard, & Zukin Capital, Inc., As Investment Banker For The Official Committee Of Unsecured Creditors Effective As Of September 17, 2008, and as amended on July 2, 2009 (Docket No. 4265), (the "<u>Retention Order</u>"), the Court authorized Houlihan Lokey's retention as an investment banker for the Committee in these cases. The Retention Order authorized Houlihan Lokey to receive compensation pursuant to the procedures set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Guidelines, the U.S. Trustee Guidelines, and the local rules and orders of this Court.

13.    Houlihan Lokey prepared this Application in accordance with the Local Guidelines, the U.S. Trustee Guidelines and the Interim Compensation Order, and collectively with the Local Guidelines and U.S. Trustee Guidelines, the "<u>Guidelines</u>"). Pursuant to the Local Guidelines, a certification regarding compliance with the Guidelines is attached hereto as Exhibit "A".

14.     Houlihan Lokey seeks allowance of interim compensation for professional services rendered to the Committee in the aggregate amount of $28,768,905.27, comprising: (a) $2,080,000.00 of monthly fees (of which $416,000.00 is unpaid), (b) $23,058.75[3] in adjusted actual and necessary expenses (of which $373.16 is unpaid), (c) a first Deferred Fee payment of $11,665,846.52 (payment of 80% of which, $9,332,677.21, is being sought as part of this Application) and (d) an Additional Fee of $15,000,000.00 (payment of 80% of which, $12,000,000, is being sought as part of this Application).

15.     With respect to the Deferred Fee, the Engagement Letter states that it "shall be paid (by the Debtors) as and when each payment or distribution is made to any unsecured creditor of the Debtors." As a result of the effective date of the Plan, the first distribution to unsecured creditors occurred on April 17, 2012. Accordingly, Houlihan Lokey herein requests an initial payment of 80% of the Deferred Fee, with the remaining 20% to be payable as part of Houlihan Lokey's upcoming final fee application in these cases. Given that distributions to unsecured creditors will likely be made over a number of years into the future, and so as to minimize the administrative burden with respect to the approval of future Deferred Fee payments, Houlihan Lokey will seek authorization in connection with its upcoming final fee application in these cases to arrange for payment in full of future Deferred Fees, following each subsequent distribution to unsecured creditors, upon submission by Houlihan Lokey of a fee statement to the Debtors, US Trustee, their respective counsel, and Committee counsel. Such fee statement will include the amount of the Deferred Fee payment request and the total distributions to unsecured creditors related thereto.

16.     Of the total amount requested above, $27,082,219.68 remains unpaid.

---

[3] The expenses sought by this Application reflect Houlihan Lokey's actual expenses billed of $22,685.59 plus $373.16 for expenses posted during the period but not yet invoiced.

(a)     In accordance with the Interim Compensation Order, Houlihan Lokey submitted monthly fee statements to the Debtors seeking interim compensation and reimbursement of expenses. During the Tenth Interim Compensation Period, Houlihan Lokey submitted the following fee statements:

(i)      On December 9, 2011, pursuant to the Interim Compensation Order, Houlihan served its thirty-seventh fee statement for the period from October 1, 2011 through and including October 31, 2011 (the "Thirty-Seventh Fee Statement"). The Thirty-Seventh Fee Statement sought (i) an allowance of $400,000.00 as compensation for services rendered and (ii) the reimbursement of $5,478.55 (as billed) in expenses. As of the date hereof, Houlihan Lokey has received a total of $325,478.55, which represents payment for (i) 80% of Houlihan Lokey's fees and (ii) 100% of the expenses billed in October 2011.

(ii)     On January 11, 2012, pursuant to the Interim Compensation Order, Houlihan served its thirty-eighth fee statement for the period from November 1, 2011 through and including November 30, 2011 (the "Thirty-Eighth Fee Statement"). The Thirty-Eighth Fee Statement sought (i) an allowance of $400,000.00 as compensation for services rendered and (ii) the reimbursement of $4,570.29 (as billed) in expenses. As of the date hereof, Houlihan Lokey has received a total of $324,570.29, which represents payment for (i) 80% of Houlihan Lokey's fees and (ii) 100% of the expenses billed in November 2011.

(iii)    On February 6, 2012, pursuant to the Interim Compensation Order, Houlihan served its thirty-ninth fee statement for the period from December 1, 2011 through and including December 31, 2011 (the "Thirty-Ninth Fee Statement"). The Thirty-Ninth Fee Statement sought (i) an allowance of $400,000.00 as compensation for services rendered and (ii) the reimbursement of $6,715.14 (as billed) in expenses. As of the date hereof, Houlihan Lokey has received a total of $326,715.14, which represents payment for (i) 80% of Houlihan Lokey's fees and (ii) 100% of the expenses billed in December 2011.

(iv)     On March 2, 2012, pursuant to the Interim Compensation Order, Houlihan served its fortieth fee statement for the period from January 1, 2012 through and including January 31, 2012 (the "Fortieth Fee Statement"). The Fortieth Fee Statement sought (i) an allowance of $400,000.00 as

7

compensation for services rendered and (ii) the reimbursement of $2,785.92 (as billed) in expenses. As of the date hereof, Houlihan Lokey has received a total of $322,785.92, which represents payment for (i) 80% of Houlihan Lokey's fees and (ii) 100% of the expenses billed in January 2012.

(v)    On April 6, 2012, pursuant to the Interim Compensation Order, Houlihan served its forty-first fee statement for the period from February 1, 2012 through and including March 6, 2012 (the "Forty-First Fee Statement"). The Forty-First Fee Statement sought (i) an allowance of $480,000.00 as compensation for services rendered and (ii) the reimbursement of $3,135.69 (as billed) in expenses. As of the date hereof, Houlihan Lokey has received a total of $387,135.69, which represents payment for (i) 80% of Houlihan Lokey's fees and (ii) 100% of the expenses billed in February and March 2012.

17.    Pursuant to Bankruptcy Rule 2016(a), there is no agreement or understanding between Houlihan Lokey and any other person for the sharing of compensation to be received for services rendered in these cases.

18.    Houlihan Lokey respectfully submits that (a) the services provided by Houlihan Lokey were necessary for, and beneficial to, the Committee, (b) Houlihan Lokey has satisfied the requirements of section 328(a) of the Bankruptcy Code as set forth in Retention Order, (c) the requested compensation is appropriate based on the complexity, importance and nature of the services provided, including the Additional Fee, which, as described for more fully below, is appropriate compensation for the necessary and important services performed by Houlihan Lokey that went well beyond what could have been expected of it at the beginning of these cases as financial advisor to the Committee.

19.    Pursuant to the U.S. Trustee Guidelines and the Retention Order, Houlihan Lokey has maintained a schedule setting forth all Houlihan Lokey professionals who have performed services in these Chapter 11 Cases during the Tenth Interim Compensation Period, the

8

capacities in which each such individual is employed by Houlihan Lokey and the aggregate number of hours expended by U.S. restructuring professionals in this matter, which totaled approximately 1,800 hours for the period from October 1, 2011 through and including March 6, 2012, pursuant to the Retention Order.

20.    Houlihan Lokey does not maintain, in the normal course of providing financial advisory and investment banking services to its clients, detailed written time records, and does not bill its clients based on the number of hours expended by its professionals. However, Houlihan Lokey has maintained written records in hour increments of the time expended by its U.S. restructuring professionals in the rendition of professional services to the Committee in the Tenth Interim Compensation Period in accordance with the terms of the Guidelines. Such time records were made in connection with the rendition of services by the person rendering such services. Non-U.S. restructuring professionals and all non-restructuring professionals have maintained weekly task summaries during the Tenth Interim Compensation Period. A schedule setting forth the number of hours expended by each of the U.S. restructuring professionals and the weekly tasks of the other professionals who rendered services to the Committee during the Tenth Interim Compensation Period is annexed hereto as Exhibit "B".[4]

21.    Annexed hereto as Exhibit "C"[4] is a schedule specifying the categories of expenses for which Houlihan Lokey is seeking reimbursement, the total amount and adjustments for each such expense category, and detail of expenses by employee and category.

22.    Houlihan Lokey has not received any payments from the Debtors other than those sought by this Application and those set forth in Houlihan Lokey's retention application.

---

[4] Due to the volume of the time records and the detailed expense descriptions at issue, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; and (v) the Fee Committee.

## SUMMARY OF SERVICES RENDERED

23.     Houlihan Lokey has been retained as investment banker to the Committee in respect of all of the Debtors in these unprecedented and complex cases because of Houlihan Lokey's extensive knowledge and reputation in financial restructuring, its familiarity with the issues involved in these cases and the Committee's belief that Houlihan Lokey possesses the requisite resources and is well qualified to represent the Committee in these cases. During the Tenth Interim Compensation Period, Houlihan Lokey rendered a broad range of professional services to the Committee in various areas, addressing critical issues faced by the Committee during these Chapter 11 Cases. The services that Houlihan Lokey has been required to perform and has performed have been substantial and necessary in the Chapter 11 Cases. Houlihan Lokey has worked extensively with other professionals retained by the Committee, the Debtors, and the Debtor's professionals (including but not limited to Alvarez & Marsal, LLC ("A&M"), Weil Gothsal & Manges LLC ("Weil") as counsel and Lazard Freres & Co. LLC ("Lazard") as investment banker, and), while at the same time Houlihan Lokey has attempted to perform its services with the minimum amount of duplication with the Committee's and other advisors.

24.     The following summarizes the significant professional services rendered by Houlihan Lokey during the Tenth Interim Compensation Period.

**Business Due Diligence & Analysis**

25.     Houlihan Lokey has conducted business due diligence and analysis on, and/or had meetings or discussions with, the following key areas and/or individuals in these Chapter 11 Cases, including, among others:

(a)     LBI/SIPA/Examiner (1100)[5]

---

[5] Figure in parentheses indicates the standardized Fee Committee code for hours.

(b)    Investment Management Division ("<u>IMD</u>") Spin-Out Transaction (3100/2300)[6]

(c)    Private Equity (2300)[6]

(d)    Real Estate (2200)

(e)    Loan Book (2500)

(f)    Derivatives (2400)

(g)    International Operations and Other Foreign Assets (2700)

(h)    Lehman Banks (Bankhaus, LBCB, LBB, <u>et al.</u>) (2600)

(i)    Capital Structure/Cash Reports/Monthly Operating Report (1200/1800/1900/2100/2800)

26.    Houlihan Lokey's primary role has been to advise and represent the Committee in connection with the Debtors' vast, varied and complicated assets and operations. To do so, it is necessary for Houlihan to investigate and analyze the activities and assets of the Debtors and to report significant events and decisions to the Committee and its various subcommittees. In order to complete thorough due diligence processes and enable the Committee to be fully informed, along with the Committee's other professionals (including, but not limited to, FTI Consulting, Inc. ("<u>FTI</u>"), as financial advisor, and Milbank, Tweed, Hadley & McCloy, LLP ("<u>Milbank</u>"), as counsel, and Quinn Emanuel ("<u>Quinn</u>"), as conflicts counsel), when necessary, Houlihan Lokey attended numerous in-person meetings and participated in conference calls with the Debtors and the Debtors' professionals across the areas listed above and met with governmental regulators when necessary. These meetings allowed Houlihan Lokey to become more familiar with the relevant issues concerning the Debtors and their assets and monitor and participate in the processes of the Debtors and the Debtors' professionals, including sale

---

[6] Note that the IMD transaction was originally classified as a Non-Derivative Executory Contract/365 Issue (3100). Currently, the IMD/Neuberger Berman investment resides in the Private Equity (2300) portfolio and Houlihan Lokey records any hours associated with IMD/Neuberger Berman in Private Equity (2300). For consistency purposes, Houlihan Lokey continues to keep the write up regarding Neuberger Berman as its own separate section.

processes (e.g. IMD, private equity platforms, loan trading book transactions and derivative settlements). In conjunction with keeping the Committee informed, Houlihan Lokey prepared materials for distribution for weekly Committee and Committee co-chair calls, for regularly scheduled private equity, real estate, derivatives, loan book, and international subcommittee calls, and for monthly in-person Committee meetings. Houlihan Lokey researched underlying issues, compiled and analyzed data provided by the Debtors and the Debtors' professionals, and synthesized this information for the Committee and subcommittees. Based on all of the meetings, data analysis, and Houlihan Lokey's experience, Houlihan Lokey, along with the Committee's other advisors, continued to refine specific strategies for each of the asset classes.

LBI/SIPA/Examiner

27.    Houlihan Lokey continued to coordinate with the Committee's other professionals to provide appropriate updates to the Committee regarding LBI/SIPA proceedings.

IMD Spin-Out

28.    During the Tenth Interim Compensation Period, Houlihan Lokey continued to explore potential alternatives with the Debtors. The Debtors and Houlihan Lokey had protracted negotiations with Neuberger Berman management and their financial advisors throughout the summer, resulting in an agreement in principle to redeem the Debtors' preferred equity in Neuberger Berman at par at closing and a defined path to monetize the Debtors' common equity at closing and future purchases. Houlihan Lokey conducted extensive analyses, ran numerous scenarios and made several presentations to the Committee to garner support for the transaction. Houlihan Lokey, actively attended numerous calls and meetings to negotiate the critical terms of the transaction, coordinated positions with the Debtors and led the discussions with large creditors that resulted in the modifications that resulted in the consensual transaction

on improved terms. Subsequently on November 9, 2011, the Debtors filed the motion to authorize the transaction [Docket No. 21847], amended on December 9, 2011 [Docket No. 23169]. Houlihan Lokey spent significant time discussing the filed motion with the Committee and Ad Hoc Group throughout November 2011. On December 12, 2011, both the Committee and the Ad Hoc Group filed statements of support for the amended transaction [Docket Nos. 23212 and 23222, respectively].

Private Equity

29.     During the Tenth Interim Compensation Period, Houlihan Lokey devoted substantial time to the private equity work stream. Houlihan Lokey's activities included analyzing and assessing the value of the underlying investments within the principal investment platform and evaluating potential dispositions and funding requests of assets and investment platforms. In particular, Houlihan Lokey spent significant time continuing to develop frameworks to manage the estate's assets going forward, specifically discussing potential disposition strategies and situational factors for more illiquid positions. Houlihan Lokey also helped Lehman and their professionals proactively manage and reduce the outstanding unfunded commitments held by Lehman and evaluated and approved certain proposed dispositions.

30.     Lehman has a significant number of principal investments and investments in third-party hedge and private equity funds. Houlihan Lokey has been actively involved in Lehman's decision to provide on-going funding to some of these investments and to sell certain positions.

Real Estate

31.     During the Tenth Interim Compensation Period, the Debtors and the Debtors' professionals focused on the US commercial real estate asset portfolio as this area

13

continued to have immediate and substantial funding requests. Houlihan Lokey attended the bi-weekly real estate meeting with the Debtors and FTI. In these meetings, the group discussed weekly fundings, key issues, the process for evaluating property disposition and long term funding decisions, and third-party motions filed against the Debtors and their related action plans. Additionally, the group continued discussing the overall strategy for US commercial real estate, regarding long term hold and short term sale strategies by asset type, in order to maximize the return for the creditors and best utilize the estate's expertise in certain areas.

32.     Houlihan Lokey has continued to monitor and analyze the estate's real estate investments that require strategic decisions, including incremental funding, during the Tenth Interim Compensation Period. Houlihan Lokey, in coordination with FTI, met with the specific asset managers at the Debtors, reviewed deal memos, analyzed strategic alternatives and evaluated underlying cash flows associated with various investment positions. In particular, Houlihan Lokey spent considerable time evaluating the Debtors' options with regards to its Archstone investment.

Loan Book

33.     During the Tenth Interim Compensation Period, Houlihan Lokey continued to monitor Lehman's existing Loan Book positions, both un-pledged and pledged, including those held in special purpose vehicles, and participated in regularly scheduled bi-weekly calls with the Debtors, and provided updates to the Committee regarding such.

34.     During the Tenth Interim Compensation Period, Houlihan Lokey continued to monitor the process of eliminating unfunded loan commitments, which has reduced risk exposure, outstanding claims, and improved equity positions for the non-Debtor regulated banks. In addition, Houlihan Lokey reviewed and provided assistance to legal counsel in refining

the strategy for which unfunded loan commitments should be assumed as part of the Debtors' plan of reorganization in order to mitigate any potential cash reserves that may need to be set aside for cure costs and to meet future borrowing requests.

35.     Houlihan Lokey assisted Milbank with the LMA Elevation litigation, aimed at recouping additional funds for the Lehman estate, by reviewing and analyzing the LMA Transfer, Participation, and Termination Agreements for all elevated loans to verify the amount for each respective commitment. In addition to reviewing the aforementioned documents, Houlihan Lokey also worked with the Debtors to determine marks for the elevated loans as of their respective elevation dates and compare these marks to current prices. The result of Houlihan Lokey's analyses was a comprehensive spreadsheet that detailed the value of the elevated loans on a commitment-by-commitment basis.

36.     Additionally, Houlihan Lokey assembled a presentation and presented such to the new board of directors, which included an overview of the loan book, a summary of significant exposures and meaningful developments in the asset class during the case, as well as strategies being pursued by the Debtors with the loan book. Houlihan Lokey met with members of the new board on more than one occasion to discuss loan, other asset categories and plan-related topics as the new board was learning about the Debtors' business and the bankruptcy process.

Derivatives

37.     During the Tenth Interim Compensation Period, Houlihan Lokey continued its focus on asset recovery and value maximization of un-terminated "in-the-money" derivative positions. This effort included either the assignment, mutually negotiated termination, or hedging of receivables, depending on each situation. Important milestones in the Tenth

Interim Compensation Period included the implementation of additional commodity, credit, and interest rate hedges under the existing hedging protocol, the successful negotiation of SPV derivative settlements, continued efforts to facilitate the settlement of both in-the-money derivatives positions and derivatives claims filed prior to the bar date, and the continued collection of cash payments on both settled and live transactions.

38.    Houlihan Lokey also worked with FTI, Milbank, Weil, and the Debtors on court orders to ensure continued progress is made on the winding down of the derivatives book. This included monitoring of the retention plan for key derivative employees as well as working through additional plans for 2012 and developing and executing strategy for mediations under the November 2009 mediation order. The derivatives incentive plan, accepted by the court in December 2009, allowed the estate to retain individuals with key talents required to value and negotiate settlements on the derivatives book; the extension of the plan in 2012 will continue to ensure retention of these key individuals.

39.    The mediation order accepted by the court in November 2009, allows the Debtors additional avenues to pursue settlements outside of the Court at a lower cost for the estate and counterparties. Prior to serving mediation notices, Houlihan Lokey, in coordination with Milbank and FTI, reviewed draft mediation statements, vetted valuation and legal issues with the Debtors and Weil, and reported settlement proposals to the Committee to obtain Committee consent on final settlements, where necessary. Houlihan also attended selected mediations as an observer on behalf of the Committee when requested by the Committee's legal advisors at Milbank and Quinn.

40.    Houlihan Lokey participated in the daily valuation and settlement discussions of derivative positions with the Debtor and other Committee professionals. Given the

volume of transactions, the evaluation of proposed settlement terms has been divided between Houlihan Lokey and FTI, who each subsequently present their respective settlement proposals to the Derivatives subcommittee or the Committee for approval, as appropriate. Houlihan Lokey has focused on the largest open receivable positions and complex SPV related positions to-date and has produced analyses, including calculation of settlement values, which supported counterparty negotiations.

41.     In particular, Houlihan Lokey provided invaluable support to the Debtors when reviewing derivatives where the counterparties are SPVs (such as credit default swaps of asset back securities or collateralized loan obligations issuers, mortgage trusts, etc.). Houlihan Lokey was involved in developing and executing the appropriate strategy through each stage of the process, which included either a negotiated settlement or a novation, and in some cases litigation. In each instance, Houlihan Lokey played an integral role in negotiating settlements and novation agreements and determining the value of trades.

42.     Houlihan Lokey has closely worked with the Debtors, Milbank and Weil, to successfully undertake and extract additional value from unresolved SPV matters via the note purchase strategy. This approach has proven to be very attractive from a risk / reward perspective and is expected to lead to significant value realization for the estate.

43.     Houlihan Lokey continued to be involved in the oversight of a portfolio of notes (par value of €100 million) issued by European corporations. These notes were primarily managed by a Lehman affiliate with the input of Houlihan Lokey as the Committee's investment banking advisor. As of the end of the Tenth Interim Compensation Period, Houlihan Lokey is still working with the Lehman affiliate to implement an appropriate liquidation strategy for these notes.

44.    During the Tenth Interim Compensation Period, Houlihan Lokey along with the Committee's other advisors, continued its involvement in the Debtors' Derivatives Claims Settlement Framework, which was eventually adopted by eight of the Big Banks and has spurred fruitful negotiations with the remainder. The current effort involved working with the Committee's legal advisors at Milbank and Quinn Emmanuel to evaluate and provide feedback on the on-going negotiations with the remaining banks. Various offers were exchanged and discussions went back and forth between each of the remaining Big Banks which were assessed and discussed with the Committee. Outside of the original thirteen Big Banks, an additional broker dealer settlement was achieved with a claimant who had been in litigation and therefore not included in the development of the Derivatives Claims Settlement Framework. Houlihan Lokey's efforts included review and validation of the underlying valuation methodologies and mechanics used in the Derivatives Claims Settlement Framework and providing actionable feedback where appropriate.

International Operations and Other Foreign Assets

45.    During the Tenth Interim Compensation Period, Houlihan Lokey continued to coordinate with the Debtors on foreign proceedings and provided updates to the Committee, as appropriate. Additionally, Houlihan Lokey coordinated with A&M to review and comment on transactions involving Lehman Brothers' foreign affiliates that have remained under the control of LBHI. These transactions included whole-entity and asset sales and recapitalizations, amongst other intercompany affairs.

Lehman Banks

46.    During the Tenth Interim Compensation Period, Houlihan Lokey continued to evaluate the wind-down and disposition processes for Woodlands and Aurora. This

18

included a number of calls with the Debtors and updates to the Committee. Of particular focus
was the analysis of the process to effectuate the transfer of Woodlands' CD's to a third party in
order to facilitate a wind-down of the bank.

Liquidity/Capital Structure/Monthly Operating Reports

47.     During the Tenth Interim Compensation Period, Houlihan Lokey analyzed
cash distributions and receipts pertaining to each of the major asset work streams. Houlihan
Lokey also reviewed and commented on the monthly operating reports and responded to
numerous inquiries from public bondholders and the Ad Hoc Group regarding operating reports
filed by the Debtors with the Court.

48.     Houlihan Lokey also worked with A&M and legacy estate personnel to
manage the growing cash balances of the various Debtors. Houlihan Lokey continued to be
involved in the development and oversight of the cash investment portfolio, expanding the
universe of Estate approved investments to enhance the returns of invested cash within the
guidelines of the Bankruptcy Code.

**Plan Development** (3400)

49.     During the Tenth Interim Compensation Period, Houlihan Lokey
continued to work with the other Committee professionals to garner support, and eliminate Plan
objections of, various creditor constituencies. In this regard, Houlihan Lokey played a significant
role in interacting with the Debtors with respect to such efforts.

50.     During the period, Houlihan Lokey also had numerous "public-
information only" interactions with various creditors to understand their views on a number of
Plan-related topics. During this period Houlihan Lokey also had numerous calls with the
Committee on which updates to the Plan objections and related matters were discussed.

51.    Houlihan Lokey's efforts in this regard ultimately contributed to achieving overwhelming creditor support in favor of the Plan, which was confirmed during the Period on December 6, 2012.

**Committee and Advisor Interaction** (200/700/800)

52.    In connection with weekly Committee, subcommittee, and co-chair calls during the Tenth Interim Compensation Period, Houlihan Lokey drafted multiple presentations with analyses and summaries of the work streams described above in order to keep the Committee and subcommittees well-informed and apprised of situations. Houlihan Lokey coordinated with the Committee's other advisors via calls and meetings. In addition to the full Committee calls, each of the subcommittees continued to have weekly conference calls to discuss asset specific issues and decision points.

**Case Administration and Other** (100/3800/3900/4000/4100/4200/4300/4400/4500/4600/4700)

53.    Houlihan Lokey spent significant time developing its ninth interim fee application, preparing the monthly reimbursement statements and reconciling expense issues with the Fee Committee. While Houlihan Lokey does not generally keep time records, Retention Order stipulated that all US restructuring personnel keep hourly time and task records. The tracking and compilation of hours occurs monthly. For all other Houlihan Lokey employees associated with this case, weekly task summaries are required on an individual basis.

54.    Houlihan Lokey has also provided its input to the Committee's advisors, the Debtors, and the Debtors' advisors regarding litigation issues. Additionally, Houlihan Lokey fielded numerous calls from creditors and other interested parties.

\* \* \*

55.     The professional services performed by Houlihan Lokey were necessary and appropriate to the administration of the Chapter 11 Cases and were in the best interests of the Committee and other parties in interest. Compensation for the services described above is commensurate with the complexity, importance, and nature of the problems, issues, or tasks involved.

## ACTUAL AND NECESSARY DISBURSEMENTS OF HOULIHAN LOKEY

56.     Houlihan Lokey has disbursed $23,058.75[7] as expenses incurred in providing professional services during the Tenth Interim Compensation Period, which has been adjusted per the Fee Committee guidelines. It is Houlihan Lokey's policy to charge its clients for all actual and necessary expenses incurred in connection with the engagement. The expenses charged to clients include, among other things, telephone and telecopier charges, regular mail and express mail charges, special or hand delivery charges, document processing, photocopying charges, travel expenses, expenses for "working meals," and computerized research. In accordance with the applicable factors enumerated in the Bankruptcy Code, it is respectfully submitted that the amount requested by Houlihan Lokey is fair and reasonable given (a) the complexity of these cases, (b) the time expended, (c) the nature and extent of the services rendered, (d) the value of such services, and (e) the costs of comparable services other than in a case under this title.

57.     In addition, because the location of the Debtors' businesses in relation to Houlihan Lokey's offices, long distance telephone calls were often required. In some instances, overnight delivery of documents and other materials was required as a result of circumstances necessitating the use of such express services. These disbursements are not included in Houlihan

---

[7] The expenses sought by this Application reflect Houlihan Lokey's actual expenses billed of $22,685.59 plus $373.16 for expenses posted during the period but not yet invoiced.

Lokey's overhead. Houlihan Lokey has made every effort to minimize its disbursements in these cases. The actual expenses incurred in providing professional services were absolutely necessary, reasonable, and justified under the circumstances to serve the needs of the Committee.

## THE ADDITIONAL FEE

58.     Pursuant to this Interim Fee Application, Houlihan Lokey requests a modification of the terms of its engagement pursuant to section 328(a) of the Bankruptcy Code. Specifically, Houlihan Lokey requests $15,000,000 (the "Additional Fee") in addition to its Deferred Fee and Monthly Fee.[8] This is *not* a request for a fee enhancement based upon the results achieved by Houlihan Lokey or the massive effort undertaken in these cases, but rather, it is a request that this Court adjust the fees of Houlihan Lokey to take into account certain unforeseeable circumstances that rendered the original terms of the Engagement Letter improvident. Houlihan Lokey's request for the Additional Fee is made with the support of the Committee.

59.     Repeatedly and throughout multiple facets of these cases, Houlihan Lokey performed services that were much more considerable than a Committee advisor could expect to perform. Houlihan Lokey requests the Additional Fee as compensation for these expanded services, which included (i) analyzing and valuing a substantial portion of the Debtors' derivative contracts, (ii) multiple asset recovery projects, (iii) the development of fundamental Plan concepts and compromises, (iv) settlement negotiations with non-debtor foreign affiliates, and (v) the resolution of Lehman Brothers' two banks and certain structured loan transactions (collectively, items (i) through (v), the "Additional Material Services"). Even though Houlihan Lokey was retained solely as a Committee advisor, given the overwhelming size and complexity

---

[8] As part of this Application, Houlihan Lokey is seeking approval of the full amount of the Additional Fee, but only payment of 80% of such amount. Payment of the remaining 20% of the Additional Fee will be requested as part of Houlihan Lokey's upcoming final fee application in these cases.

of these cases, Houlihan Lokey assumed a much more substantial role than would typically be played by a Committee advisor in connection with the Additional Material Services, as described in more detail below. In these matters, Houlihan Lokey's role went well beyond the customary Committee advisory role envisioned in the Engagement Letter, and in each of the Additional Material Services it worked directly with the Debtors. As described below, these efforts took several years to perform and it could not have been expected that Houlihan Lokey (or any other non-Debtor professional) would be required to commit the amount of time and resources necessary to perform these tasks. Accordingly, it would be appropriate to adjust the terms of Houlihan Lokey's engagement to account for the Additional Material Services which materially benefitted the Debtors' estates by billions of dollars.

Houlihan Lokey's Engagement

60.    The Engagement Letter provided that Houlihan Lokey would be expected to perform the following services:

(a)    Analyzing the Debtors' business plans and forecasts;

(b)    Evaluating the Debtors' assets and liabilities;

(c)    Assessing the financial issues and options concerning (i) the sale of the Debtors, either in whole or in part, (ii) the sale of any or all assets of the Debtors, (iii) the sale, either in whole or in part, of any non-debtor affiliates of the Debtors or any assets of such non-debtors, and (iv) the Debtors' chapter 11 plan(s) of reorganization or liquidation or any other chapter 11 plan(s);

(d)    Analyzing and reviewing the financial and operating statements of the Debtors and their non-debtor affiliates;

(e)    Assisting in the review of claims and with the reconciliation, estimation, settlement, and litigation with respect thereto;

(f)    Assisting the Committee in identifying potential alternative sources of liquidity in connection with any debtor-in-possession financing, any chapter 11 plan(s) or otherwise;

23

(g)     Representing the Committee in negotiations with the Debtors and third parties with respect to any of the foregoing;

(h)     Providing such financial analyses as the Committee may require in connection with the Chapter 11 Cases;

(i)     Providing testimony in court on behalf of the Committee with respect to any of the foregoing, if necessary; and

(j)     Providing such other financial advisory and investment banking services as may be agreed upon by Houlihan and the Committee, provided however, that if the Debtors, the Committee and Houlihan agree that Houlihan shall act as the lead investment banker for any sale of Debtor or non-debtor assets, or procurement of financing for same, or provide any other services for any Debtor or non-Debtor affiliate, Houlihan shall be entitled to customary fees for such activities as may be agreed to by the parties and such fees shall be in addition to any other fee payable pursuant to the Engagement Letter.

61.     As described above, this Court entered the Retention Order, approving both the Deferred Fee and the Monthly Fee under section 328(a) of the Bankruptcy Code. Under that provision (as opposed to section 330 of the Bankruptcy Code), a professional may obtain, at the outset of the retention, (i) advance court approval of compensation terms agreed to with the debtor's estate, and (ii) a finding that such terms are reasonable, before actual performance of the services to be compensated. *See In re Nat'l Gypsum Co.,* 123 F.3d 861, 863-64 (5th Cir. 1997). Section 328(a) directs a bankruptcy court to forgo a post-hoc reasonableness inquiry if it pre-approves the "employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a). Once section 328 approval has been granted, an increase or a decrease in compensation may only be made in rare circumstances. *See In re Smart World Technologies, LLC,* 552 F.3d 228, 232 (2nd Cir. 2009). A court may only "allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to

24

have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." 11 U.S.C. § 328(a).

62.     In this case, Houlihan Lokey is entitled to the Additional Fee because it will compensate for services that could not have been anticipated at the time of Houlihan Lokey's engagement, rendering the terms of the Engagement Letter improvident for purposes of section 328(a). Whether the terms of employment were "improvident" is really an inquiry as to whether developments occurred following retention that could not have been anticipated at the time of retention that merit an alteration of the terms of the engagement. *See In re Barron,* 325 F.3d 690, 693 (5th Cir. 2003) (the relevant inquiry in modifying an engagement following a 328 retention is "whether developments, which made the approved fee plan improvident, had been incapable of anticipation at the time the award was approved."); *accord*, *In re Smart World*, 552 F.3d at 235.

63.     Due to the complexity and size of these unprecedented cases it is fair to say that much of what transpired since the Petition Date was unanticipated by estate professionals. However, Houlihan Lokey does not seek the Additional Fee merely because of the long and winding road these cases have taken; surely, if anything could have been anticipated, it was that a tremendous amount of work and effort would have to be devoted by all professionals involved. However, it was not (and could not) be anticipated that there would be simply too much work to be accomplished in these cases by the Debtors' professionals alone, or that Houlihan Lokey, as Committee financial advisor, would be required to perform the Additional Material Services. Such services involved, among other things, a massive amount of time and effort pursuing derivatives settlements, playing a lead role amongst advisors, working directly with the Debtors on specific asset recovery projects, development of essential chapter 11 plan

structures and strategies, negotiations with non-debtor foreign affiliates and resolution of Lehman Brothers' two banks.

64.    The Additional Material Services not only required more time and resources than could have been anticipated at the time of the Engagement Letter but the tasks themselves were not anticipated. The Engagement Letter encompassed services such as "evaluating the assets and liabilities of the Debtors" and "assessing the financial issues and options concerning…the Debtors' chapter 11 plan(s)," but these cases were so unimaginably complex that Houlihan Lokey had to assume a much more prominent role with respect to the Additional Material Services. Accordingly, Houlihan Lokey seeks the Additional Fee as compensation for such efforts.

<u>Derivatives-related Work</u>

65.    Over the course of approximately three and a half years, Houlihan Lokey had up to five employees working full-time out of the Debtors' offices reviewing and analyzing the Debtors' derivative contracts. All in all, Houlihan Lokey analyzed, modeled and developed or reviewed negotiating strategies for approximately 1,500 derivative master agreements that covered approximately two-thirds of all non-"Big Bank" derivative asset value recovered ($6 billion) and claims allowed ($6.1 billion), thus far. Houlihan Lokey also did substantial work on the "Big Bank" settlement framework, which required the analysis of over $20 billion of filed claims. By assisting the Debtors, Houlihan Lokey helped resolve nearly all such filed claims at over a 35% discount to the aggregate filed claim amount. This substantial role involved working directly with the Debtors and was not something Houlihan Lokey, as a Committee advisor, contemplated at the outset of these cases, nor is there precedent for it.

66.    The Engagement Letter makes no mention of derivatives-related work at all, and yet such efforts became one of the most time-consuming and resource-draining activities undertaken by Houlihan Lokey. Indeed, when these cases began not even the Debtors had an accurate understanding of the amount and complexity of their derivatives exposure. Eventually it was discovered that the Debtors' derivatives portfolio dwarfed anything that had ever been at issue in a chapter 11 case before. The scope of work related to derivatives was so enormous that the Committee enlisted the services of both Houlihan Lokey and FTI, splitting the pool between the two firms. In FTI's case, the massive additional workload was covered by its hourly billing arrangement; ultimately, FTI billed approximately $25 million for such services.[9] Houlihan Lokey, however, received no additional compensation for its efforts. During these cases, Houlihan Lokey raised its concerns with respect to this situation with the Committee, but at the request of the Committee, waited until now to seek any modification to the Engagement Letter.

67.    Experts from Houlihan Lokey's Financial Advisory Services were called upon to assist in unraveling the Debtors' derivatives portfolio beginning in October 2008. Over the course of the next three and a half years, these experts committed over 40,000 hours[10] to reviewing more than 1,500 derivative master agreements that involved approximately 500,000 to 750,000 trade legs, conducting complex valuations of collateral, which included developing intricate proprietary valuation models, reviewing whether the derivatives were properly terminated and closed out, working with the Debtors to engage with approximately one hundred or more contract counterparties, including intercompany and "Big Bank" derivatives relationships, and developing, reviewing and implementing settlements and resolutions. Other

---

[9] FTI reviewed 3,000 master agreements covering approximately $3 billion in derivative asset recoveries and $4 billion in allowed claims, thus far. Houlihan Lokey assumed responsibility for the balance of the Debtors' master agreements, as described herein.

[10] The Houlihan Lokey experts from Financial Advisory Services, because they are not in the Restructuring Group, were not required by the Retention Order to maintain time records. The total number of hours presented here is a conservative estimate.

27

than a few limited exceptions where A&M and the Debtors retained a separate advisor, only the Committee's professionals worked on the analysis and resolution of derivatives transactions. Houlihan Lokey, therefore, was not shadowing or double-checking the efforts of the Debtors' advisors, rather Houlihan Lokey performed unique work that had to be accomplished to resolve these monumental cases.

68.     Houlihan Lokey worked directly with transaction parties and traders to identify relevant settlement issues, provided strategic guidance in developing claim resolution strategies and independently assessed the value of the derivative products and appropriate settlement amounts. The net results were that Houlihan Lokey experts were directly involved in billions of dollars of derivatives-based claims elimination and asset recoveries for these estates.

69.     It was not anticipated, nor could it have been, that Houlihan Lokey would have to commit a full-time team of non-restructuring analysts and advisors on-site at Lehman to pursue derivative settlements. Accordingly, the Additional Fee is appropriate in part because neither the Deferred Fee nor the Monthly Fee would compensate Houlihan Lokey for its efforts in this crucial aspect of these cases.

Asset Recovery Efforts – Private Equity and Real Estate

70.     Months after the Engagement Letter was executed, the Debtors decided to pursue a "hold and manage" strategy with its assets. This strategy resulted in a massive amount of work for estate professionals and in Houlihan Lokey's case it resulted in work that went well beyond the Engagement Letter provisions which set forth that Houlihan Lokey was retained to represent the Committee to evaluate the Debtors' assets and liabilities and to negotiate with the Debtors and third parties on behalf of the Committee, in relation thereto. For a variety of reasons, Houlihan Lokey ended up working directly with the Debtors' staff and A&M on a day to day

28

basis to review, analyze and help set priorities and make decisions with respect to over 1700

private equity and real estate positions involving over 1000 unique relationships. In fact, this

close coordination and work relationship, while adding a significant burden to Houlihan Lokey,

resulted in great savings to these estates – over the course of this long case, there have been

virtually no disagreements on funding and asset monetizations between the Debtors and the

Committee. The workload became so great that FTI, the Committee's other financial advisors,

were brought in to focus on approximately half of the real estate investments. Just as with the

derivatives analysis work, FTI has been compensated at an hourly rate for that work, while

Houlihan Lokey, thus far, has only received its original flat monthly rate. This work was beyond

the scope of services contemplated in the Engagement Letter and could not have been anticipated

at the outset of the engagement.

71.    In addition to the day to day non-traditional role, Houlihan Lokey also

played an extremely active and significant role in a number of other large asset transactions in

which it participated directly with the Debtors in resolving large private equity and real estate

matters. Houlihan Lokey's work on large asset recovery transactions in these cases generated

substantial value for the Debtors' estates. Given the volume of transactions and the extent

Houlihan Lokey had to interact with the Debtors on such matters, these services were outside the

scope of the Engagement Letter. Such matters included the following specific transactions,

among others:

    (a)    *R3 Capital* ("R3"): Houlihan Lokey and the Debtors spent significant time negotiating with R3 regarding the buyout of the Debtors' 45% general and 48% limited partnership interests. After several months of analysis and negotiations, Houlihan Lokey was able to enhance the recovery to the Debtors versus R3's initial proposal by $200 million.

    (b)    *Wilton RE* ("Wilton"): Following a 2008 capital call by Wilton, Houlihan Lokey negotiated directly with Wilton's management an

adjustment of the proposed funding price and assisted in getting it reduced to $50.00 a share. At the end of the 2011, the Debtors sold back to Wilton the Debtors' investment at $69.00 per share, netting a gross recovery of $390 million and a gain of approximately $90 million for the Debtors.

(c) *Greenbrier Minerals* ("Greenbrier"): Houlihan Lokey assisted the Debtors directly in managing a majority of their energy portfolio companies, including Greenbrier. Following a detailed marketing process, the Debtors' recovery on this asset increased by 24% as compared to the initial offer from Greenbrier (based upon a total final recovery to the Debtors of 72% of $250 million gross sale consideration).

(d) *Quadrant Structured Products* ("Quadrant"): The Debtors had originally invested $80 million for a 20% equity stake in Quadrant. Houlihan Lokey assisted in negotiating a sale of the Debtors' position back to Quadrant for $90 million – an increase of 225% over Quadrant's initial proposal.

(e) *Neuberger Berman*: Since the beginning of the case, Houlihan Lokey has been instrumental in the progress made to date regarding Neuberger Berman. Houlihan Lokey was actively involved in the original negotiations with Bain / Hellman & Friedman during the first few months of case and was instrumental in the decision to terminate that deal and proceed with the management buyout of the Debtors' position for approximately $1.0 billion of consideration (as compared to the approximate $806 million proposed by Bain / Hellman & Freidman).

Houlihan Lokey continued to monitor and analyze Neuberger Berman's performance relative to its peers and explore, in conjunction with the Debtors, strategic alternatives to monetize the position. As such, at the end of 2010, Houlihan Lokey began actively participating in negotiations with Neuberger Berman management and its advisors. Ultimately, in November 2011, an agreement was reached that would provide the Debtors with $814 million of cash today and a gradual exit of the Debtors' remaining equity position over time. It is estimated that the Debtors could potentially realize $1.3-$1.5 billion of value versus the initial management buyout value of $1.0 billion.

(f) *Rosslyn Syndication Partners JV LP* ("Rosslyn"): Houlihan Lokey participated directly with the Debtors in evaluating the sale of its 78.5% limited partner interest in Rosslyn. The Debtors had received Court approval to sell its limited partner interest for $385 million. After an extensive sale process and negotiations, the

Debtors ultimately received $438 million in connection with the sale of its interest.

(g) *Heritage Fields Property* ("Heritage"): Houlihan Lokey participated directly with the Debtors in evaluating a settlement amongst multiple parties related to Heritage. The settlement allowed the Debtors to exit their debt and equity interests in Heritage (other than a cash-flow participation). The Debtors were able to negotiate a discounted pay off in the amount of $125 million, as well as repayment of a $28 million participation interest plus interest and a residual cash-flow participation.

(h) *Other Private Equity Principal Investments Assets*: The Debtors' portfolio of private equity principal investments consists of approximately 250 other investments in both Debtor and non-Debtor entities. Throughout these cases, Houlihan Lokey devoted substantial time evaluating individual funding requests, asset dispositions, restructurings, and quarterly valuations of the portfolio regardless of legal entity (a large percentage reside in non-Debtor entities) as well developing an overall disposition strategy directly with the Debtors. To date, approximately $5 billion of the portfolio has been liquidated.

72.     The work described above was not something that Houlihan Lokey, or any Committee advisor, would have anticipated performing in these cases, or in any chapter 11 case, without the input and analysis typically provided by the Debtors' financial advisor. The Deferred Fee and the Monthly Fee do not compensate Houlihan Lokey for such asset recovery efforts and the Additional Fee should be approved to do so.[11] Beyond the contributions that Houlihan Lokey made to specific asset transactions as described above, the entire asset oversight process took far longer and required more resources than could have been anticipated at the beginning of these cases given the "hold and manage" strategy that was adopted months after the Engagement Letter was executed.

73.     While there was no expectation that the Lehman assets would be sold on a "fire-sale" basis, it was expected that in a liquidating chapter 11 case, assets would be disposed

---

[11] Houlihan Lokey (as would the Debtors' financial advisor) typically receives an investment banking fee for advising a debtor-in-possession on transactions such as those above.

of sooner than they actually were. For example, three years after the Engagement Letter was negotiated, the Debtors are still holding approximately $24 billion of non-cash assets. The slower-than-anticipated disposition of assets, and general "hold and manage" strategy that was employed led to a much higher level of direct asset-by-asset involvement, analysis, oversight and negotiation by Houlihan Lokey than was anticipated at the outset of these cases, and required substantial additional work.

<u>Development of Fundamental Plan Compromises</u>

74.    Working directly with the Debtors, Houlihan Lokey played a leading role in the development of the Plan and made a contribution well beyond what could have been expected or required of a creditor-side advisor.

75.    Houlihan Lokey developed the fundamental plan mechanics by which the highly charged issues of substantive consolidation and inter-company claim validity were settled through a series of economic compromises, including primarily:

> (a)    a percentage compromise on funding inter-company balances to resolve issues concerning the validity of inter-company claims,
>
> (b)    a percentage reallocation on guarantee claim recoveries to reflect substantive consolidation risks, and
>
> (c)    entity-level specific reallocation percentages for creditors of Participating Debtors based on a formula developed by Houlihan Lokey to take into account recovery loss in a substantive consolidation scenario.

76.    After developing and reviewing with the Committee numerous versions of a complex iterative model to integrate these key economic aspects into an alternative plan concept (the "<u>Alternative Plan Concept</u>"), Houlihan Lokey worked collaboratively with the Debtors to develop different plan structures and refined the Alternative Plan Concept directly with the Debtors over several weeks. This required the development by Houlihan Lokey of a

mathematic formula to refine the reallocation percentages of subsidiary level creditors to appropriately reflect each affiliate's substantive consolidation risk.

77.    The Alternative Plan Concept became the cornerstone of the economic compromise embodied in the Debtors' Plan. Houlihan Lokey also played a significant role, together with the Debtors, in negotiating resolutions to outstanding issues with the various at-large creditors groups, including the "Ad Hoc" LBHI, LBSF and LBT unsecured creditors groups.

78.    These efforts resulted in the overwhelming, unanimous acceptance of the Plan by all 134 classes of creditors of 23 Debtors. These outstanding results were not without significant additional effort by the Debtors in developing certain other aspects of the Plan, and the Debtors' financial advisor in supplying necessary modeling, documents and back-up, but the significant role that Houlihan Lokey assumed working directly with the Debtors in these matters could not have been anticipated at the outset of its engagement.

Resolution of Foreign Estates

79.    Houlihan Lokey played a similar role in the resolution of the Debtors' relationships with foreign affiliates and estate administrators. The scope of this work far exceeded "assisting in the review of claims and settlement thereof," provided for in Houlihan Lokey's engagement.

80.    The resolution of relationships with certain key foreign affiliates and estate administrators was pivotal in developing overall momentum for the Plan. The most critical of these, given their size, were Lehman Brothers Bankhaus AG ("Bankhaus"), Lehman Brothers Treasury Co. B.V. ("LBT") and Lehman Brothers International (Europe) ("LBIE"). Houlihan Lokey played an integral role, working directly with the Debtors, in the ultimate resolution of

33

these relationships. Such matters involved multiple legal jurisdictions, foreign regulators, numerous domestic Debtor and foreign non-Debtor estates, and both claims against, and assets of, the Debtors and non-Debtor affiliates, including claims that settling non-Debtors had against other non-Debtors.

81.    Again, because of the tremendous volume of issues and matters that needed to be addressed in these cases, Houlihan Lokey, working directly with the Debtors, assumed a much more substantial role than what a typical Committee advisor would in the resolution of LBIE, LBT and Bankhaus. In particular, with respect to Bankhaus, Houlihan Lokey's involvement helped reach a favorable settlement, which included the purchase of assets from Bankhaus that were the subject of a significant valuation dispute. The Debtors recognized an approximate $750 million gain on the purchased assets less than a year later. Resolving the Bankhaus relationship was critical, both from the standpoint of the additional value the purchased assets brought to the domestic estates, as well as the momentum that a settlement brought to the overall Plan process because Bankhaus was the first foreign affiliate to support the Plan.

Resolution of Aurora and Woodlands Banks

82.    Houlihan Lokey devoted considerable time, working directly with the Debtors, in dealing with the estate's interests in Woodlands Commercial Bank and Aurora Bank FSB (collectively, the "Banks"), including participating directly in meetings with the FDIC and other regulators.

83.    Specifically, Houlihan Lokey provided key assistance in evaluating numerous issues which Houlihan Lokey was uniquely qualified to handle given its considerable experience with failed banking institutions. The issues focused on by Houlihan Lokey included

34

the (i) trade-off between infusion of additional capital into the Banks versus risk of a priority claim being filed by regulators against LBHI, (ii) determination of the best form for additional capital to be infused into the Banks, (iii) mitigation of advance funding needs at Aurora Bank FSB's loan servicer, and (iv) ultimate global settlement between the Banks, Debtors and regulators. Again, fulfilling a more significant role than a typical Committee advisor would by working directly with the Debtors on these tasks was not contemplated at the time of the Engagement Letter. Ultimately, Houlihan Lokey's efforts, along with the Debtors,' turned the Banks from a potential multi-billion dollar liability into an estimated $2 billion positive value for these estates.

Loan Book

84.     Finally, Houlihan Lokey participated directly with the Debtors in resolving a number of large structured loan situations, including Fusion Funding Ltd/Fusion Funding Luxembourg, Bankhaus participations, Pine CCS, Ltd., Sumitomo Mitsui Banking Corporation and MetLife, Inc. Houlihan Lokey negotiated directly with the counterparties in certain of these situations, which generated in aggregate approximately $2 billion in recovery value and resolved approximately $2 billion in claims.

Summary

85.     As evidenced by the work described above, Houlihan Lokey had an unusually, and unexpectedly, close working relationship with the Debtors that led to Houlihan Lokey working directly alongside, and in the case of derivatives, physically inside, the offices of the Debtors. Due to the vast amount of work to be accomplished in these cases, which no single financial advisor could have accomplished on its own, Houlihan was required to perform the

35

Additional Material Services. This could not have been anticipated by the Debtors or Houlihan Lokey at the time the Engagement Letter was negotiated.

The Additional Fee is Reasonable

86.    Section 328 approval precludes revisiting the reasonableness of the Deferred Fee and the Monthly Fee under section 330 of the Bankruptcy Code. *See In re Smart World*, 552 F.3d at 233 ("[t]here is no question that a bankruptcy court may not conduct a § 330 inquiry into the reasonableness of the fees and their benefit to the estate if the court already has approved the professional's employment under 11 U.S.C. § 328.") *citing In re B. U.M. Int'l, Inc.*, 229 F.3d 824, 829 (9th Cir. 2000). However, the amount of the Additional Fee is subject to such review and Houlihan Lokey submits that the Additional Fee is wholly reasonable and should be approved.

87.    When evaluating whether compensation is "reasonable" under section 330, a "court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors." 11 U.S.C. § 330. Several factors that a court may consider are enumerated in section 330 and include:

> (A) the time spent on such services; (B) the rates charged for such services; (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title; (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

*Id*. Based solely on the derivatives-related work described above, the Additional Fee is reasonable under section 330, because (i) it is far less than the amount that has already been paid to other professionals in these cases for comparable services; (ii) if Houlihan Lokey charged

customary rates for the work performed, such fees would be well in excess of the Additional Fee; (iii) the complexity and importance of the derivatives-related work performed by Houlihan Lokey was unique, and the ultimate results of its efforts speak for themselves; and (iv) the professionals that performed the services were uniquely qualified to do so. The Additional Fee is even more reasonable when the remainder of the Additional Material Services are taken into account.

88.    In conclusion, the Additional Fee (i) is reasonable under section 330 of the Bankruptcy Code, (ii) is supported by the Committee, and (iii) should be approved under section 328(a) of the Bankruptcy Code because the Additional Material Services performed by Houlihan Lokey could not have been anticipated at the time of Houlihan Lokey's engagement.

## THE REQUESTED COMPENSATION SHOULD BE ALLOWED

89.    Houlihan Lokey respectfully submits that the services for which it seeks compensation in the Application were necessary for, and beneficial to, the Committee and that Houlihan Lokey has satisfied the requirements of sections 328(a), 330(a), and 331 of the Bankruptcy Code as set forth in the Retention Order. Houlihan Lokey's requested compensation is appropriate based on the complexity, importance and nature of the services provided, and is consistent with the customary compensation charged by comparable professionals both in and out of the bankruptcy context. Houlihan Lokey therefore respectfully requests that the Court grant the relief requested in this Application.

## NO DUPLICATION OF SERVICE

90.    Houlihan Lokey has developed a cooperative working relationship on behalf of the Committee with Milbank, the Committee's counsel, Quinn, as the Committee's conflicts counsel and the Committee's financial advisor, FTI. Because each firm has been aware

of the others' role and services to the Committee, Houlihan Lokey believes that no unnecessary duplication of services has occurred.

## **NO PRIOR REQUEST**

91.    No previous motion for the relief sought herein has been made to this or any other court.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

**CONCLUSION**

WHEREFORE, Houlihan Lokey respectfully requests the Court enter an order conforming to the amounts set forth in Fee Schedule A(1) attached hereto as Exhibit "D" (a) allowing Houlihan Lokey (i) an interim allowance of compensation for professional services rendered during the Tenth Interim Compensation Period in the amount of $28,768,905.27, comprising: (a) $2,080,000.00 of monthly fees (of which $416,000.00 is unpaid), (b) $23,058.75 in adjusted actual and necessary expenses (of which $373.16 is unpaid), (c) a first Deferred Fee payment of $11,665,846.52 (payment of 80% of which, $9,332,677.21, is being sought as part of this Application) and (d) an Additional Fee of $15,000,000.00 (payment of 80% of which, $12,000,000, is being sought as part of this Application); (ii) the allowance of such compensation for professional services rendered and reimbursement of actual and necessary expenses incurred be without prejudice of Houlihan Lokey's right to seek additional compensation for expenses incurred during the Tenth Interim Compensation Period, which were not processed at the time of this Application and for those expenses reduced due to the Fee Committee guidelines and recommendations; and (iii) such other and further relief as is just and proper, and (b) authorizing and directing the Debtors to pay Houlihan Lokey $21,749,050.37, which includes 80% of the Deferred Fee and 80% of the Additional Fee and is the difference between (i) the amount of monthly fees and expenses and the 80% of the Deferred Fee and Additional Fee, $23,435,735.96 and (ii) $1,686,685.59, which is the total amount the Debtors have previously paid Houlihan Lokey pursuant to the Interim Compensation Order for services rendered and expenses incurred.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

Dated: New York, New York
      May 21, 2012

HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC.
Investment Banker to the Official Committee of Unsecured
Creditors


By: _____

    P. Eric Siegert
    Senior Managing Director

245 Park Avenue, 20th Floor
New York, New York 10167
Telephone:      (212) 497-4100
Facsimile:      (212) 661-1070

**EXHIBIT A**

**SIEGERT CERTIFICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., et al., | 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

**CERTIFICATION UNDER GUIDELINES FOR FEES AND
DISBURSEMENTS FOR PROFESSIONALS IN RESPECT OF
TENTH APPLICATION OF
HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC.,
FOR INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES**

I, P. Eric Siegert, hereby certify that:

1.    I am a senior managing director with the applicant firm, Houlihan Lokey Howard & Zukin Capital, Inc., ("Houlihan Lokey"), as investment banker for the Official Committee of Unsecured Creditors (the "Committee") for the jointly administered chapter 11 cases of Lehman Brothers Holdings Inc., et. al. (together, the "Debtors"), and submit this certification in respect of compliance with the Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases adopted by the Court on April 19, 1995 (the "Local Guidelines"), the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330, adopted January 30, 1996 (the "UST Guidelines") and the third amended Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals (Docket No. 4165) (the "Interim Compensation Order," and collectively with the Amended Local Guidelines and UST Guidelines, the "Guidelines").

2.      This certification is made in respect of Houlihan Lokey's application, dated May 21, 2012, (the "Application"), for interim compensation and reimbursement of expenses for the period commencing October 1, 2011, through and including March 6, 2012, (the "Tenth Interim Compensation Period") in accordance with the Guidelines.

3.      In respect of section B.1 of the Local Guidelines, I certify that:

(a)      I have read the application;

(b)      To the best of my knowledge, information, and belief formed after reasonable inquiry, the fees and disbursements sought fall within the Local Guidelines;

(c)      The Application respectfully requests that this Court enter an Order awarding Houlihan Lokey $28,768,905.27, comprising:  (a) $2,080,000.00 of monthly fees (of which $416,000.00 is unpaid), (b) $23,058.75 in adjusted actual and necessary expenses (of which $373.16 is unpaid), (c) a first Deferred Fee payment of $11,665,846.52 (payment of 80% of which, $9,332,677.21, is being sought as part of the Application) and (d) an Additional Fee of $15,000,000.00 (payment of 80% of which, $12,000,000, is being sought as part of the Application);

(d)      The fees and disbursement requested in the Application are billed in accordance with practices customarily employed by Houlihan Lokey and generally accepted by Houlihan Lokey's clients; and

(e)      In providing a reimbursable service, Houlihan Lokey does not make a profit on that service, whether the service is performed by Houlihan Lokey in-house or through a third party.

4.      In respect of section B.2 of the Local Guidelines and as required by the Interim Compensation Order, I certify that Houlihan Lokey has provided, on a monthly basis, statements of Houlihan Lokey's fees and disbursements accrued during the previous month, in accordance with the Interim Compensation Order, to the Debtors, the Debtors' counsel, the Committee's counsel, the Office of the United States Trustee for the Southern District of New York, and the Fee Committee (as defined in the Application).

5.    In respect of section B.3 of the Local Guidelines, I certify that the Debtors,

the Debtors' counsel, the United States Trustee for the Southern District of New York and the

Committee are each being provided a copy of the Application.

Dated: New York, New York
          May 21, 2012          Respectfully submitted,


                                HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC.
                                Investment Banker to the Official Committee of Unsecured
                                Creditors



                                By:_____
                                      P. Eric Siegert
                                      Senior Managing Director

                                245 Park Avenue, 20th Floor
                                New York, New York 10167
                                Telephone:      (212) 497-4100
                                Facsimile:      (212) 661-1070

**EXHIBIT B**

Time Entry Records[1]

---

[1] Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; and (v) the members of the Fee Committee.

**EXHIBIT C**

Expenses[1]

---

[1] Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; and (v) the members of the Fee Committee.

**EXHIBIT D**

SCHEDULE A(1)

CASE NO.:  08-13555 (JMP) (Jointly Administered)

CASE NAME:  IN RE LEHMAN BROTHERS HOLDINGS INC., et al.

| TENTH INTERIM FEE PERIOD OCTOBER 1, 2011 – MARCH 6, 2012 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED AND PAYABLE BY DEBTOR |
| Houlihan Lokey Howard & Zukin Capital, Inc. | 5/21/2012 Docket No. [x] | $28,745,846.52 [100% of Monthly Fee, 100% of Deferred Fee and 100% of Additional Fee] | $28,745,846.52 [100% of Monthly Fee, 100% of Deferred Fee and 100% of Additional Fee] | $5,749,169.31 [20% of Monthly Fee, 20% of Deferred Fee and 20% of Additional Fee] | $21,748,677.21 [20% of Monthly Fee, 80% of Deferred Fee and 80% of Additional Fee] | $23,058.75[1] | $23,058.75 |

| NINTH INTERIM FEE PERIOD JUNE 1, 2011 – SEPTEMBER 30, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED AND PAYABLE BY DEBTOR |
| Houlihan Lokey Howard & Zukin Capital, Inc. | 12/14/2011 Docket No. 23319 | $1,600,000.00 | $1,600,000.00 | $320,000.00 [20% of $1,600,000.00] | $320,000.00 [20% of $1,600,000.00] | $43,745.69[2] | $43,745.69[3] |

[1] This figure is the adjusted amount of expenses billed and paid of $22,685.59 plus the expense adjustments of $373.16 per the guidelines of the Fee Committee.
[2] This figure is the adjusted amount of expenses billed and paid of $45,142.24 less the expense adjustments of $1,396.55 per the guidelines of the Fee Committee.
[3] The Fee Committee has not filed its final recommendations on the Ninth Interim Fee Period and thus this figure does not reflect any reductions.

1

**FEE SCHEDULE A(1)**                                                                 **SO ORDERED:** _____

| EIGHTH INTERIM FEE PERIOD FEBRUARY 1, 2010 – MAY 31, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED AND PAYABLE BY DEBTOR |
| Houlihan Lokey Howard & Zukin Capital, Inc. | 8/15/2011 Docket No. 19266 | $1,600,000.00 | $1,600,000.00 | $0 | $0 | $47,312.89[4] | $46,884.11 |

| SEVENTH INTERIM FEE PERIOD OCTOBER 1, 2010 – JANUARY 31, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED AND PAYABLE BY DEBTOR |
| Houlihan Lokey Howard & Zukin Capital, Inc. | 6/2/2011 Docket No. 17334 | $1,600,000.00 | $1,600,000.00 | $0 | $0 | $35,936.59 | $35,801.93 |

---

[4] Houlihan originally billed $45,749.49 during the Eighth Interim Compensation Period; this figure included a reduction of $1,563.40 for erroneous airfare charged originally in December 2010. However, Houlihan also included the $1,563.40 reduction in its filed Seventh Fee Application. Hence, Houlihan is owed $1,563.40 above the $45,749.49 to account for the duplication of this reduction in the Eighth Interim Compensation Period.

2

**FEE SCHEDULE A(1)**                                          SO ORDERED: _____

| SIXTH INTERIM FEE PERIOD JUNE 1, 2010 – SEPTEMBER 30, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED AND PAYABLE BY DEBTOR** |
| Houlihan Lokey Howard & Zukin Capital, Inc. | 12/14/2010 Docket No. 13489 | $1,600,000.00 | $1,600,000.00 | $0 | $0 | $27,042.78 | $26,802.89 |

| FIFTH INTERIM FEE PERIOD FEBRUARY 1, 2010 – MAY 31, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED AND PAYABLE BY DEBTOR** |
| Houlihan Lokey Howard & Zukin Capital, Inc. | 8/16/2010 Docket No. 10799 | $1,600,000.00 | $1,600,000.00 | $0 | $0 | $54,675.06 | $53,107.01 |

| FOURTH INTERIM FEE PERIOD OCTOBER 1, 2009 – JANUARY 31, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED AND PAYABLE BY DEBTOR** |
| Houlihan Lokey Howard & Zukin Capital, Inc. | 4/14/2010 Docket No. 8328 | $1,600,000.00 | $1,600,000.00 | $0 | $0 | $56,067.42 | $40,506.87 |

3

**FEE SCHEDULE A(1)**

**SO ORDERED:** _____

| THIRD INTERIM FEE PERIOD JUNE 1, 2009 – SEPTEMBER 30, 2009 | | | | | | | |
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED AND PAYABLE BY DEBTOR |
|---|---|---|---|---|---|---|---|
| Houlihan Lokey Howard & Zukin Capital, Inc. | 12/14/2009 Docket No. 6194 | $1,600,000.00 | $1,600,000.00 | $0 | $0 | $70,239.57 | $48,378.32 |

| SECOND INTERIM FEE PERIOD FEBRUARY 1, 2009 – MAY 31, 2009 | | | | | | | |
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED AND PAYABLE BY DEBTOR |
|---|---|---|---|---|---|---|---|
| Houlihan Lokey Howard & Zukin Capital, Inc. | 8/14/2009 Docket No. 4816 | $1,753,333.33 | $1,753,333.33 | $0 | $0 | $99,265.60 | $82,363.40 |

| FIRST INTERIM FEE PERIOD SEPTEMBER 17, 2008 – JANUARY 31, 2009 | | | | | | | |
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED AND PAYABLE BY DEBTOR |
|---|---|---|---|---|---|---|---|
| Houlihan Lokey Howard & Zukin Capital, Inc. | 4/10/2009 Docket No. 3339 | $2,233,333.33 | $2,233,33.33 | $0 | $0 | $159,070.80 | $159,037.33 |

FEE SCHEDULE A(1)                                                    SO ORDERED: _____