**Hearing Date: TBD**
**Objection Deadline: TBD**

Dennis F. Dunne
Dennis C. O'Donnell
Evan R. Fleck
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------ x
                                              :
In re:                                        :        Chapter 11 Case No.
                                              :
LEHMAN BROTHERS HOLDINGS INC., et al.,        :        08-13555 (JMP)
                                              :
                    Debtors.                  :        (Jointly Administered)
                                              :
------------------------------------------------------------ x
```

**TENTH APPLICATION OF MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP,
COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR
INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES
RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM
OCTOBER 1, 2011 THROUGH AND INCLUDING MARCH 6, 2012**

| | |
|---|---|
| Name of Applicant: | <u>Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP</u> |
| Authorized to Provide Professional Services to: | <u>Official Committee of Unsecured Creditors</u> |
| Date of Retention: | <u>November 18, 2008 (effective as of September 17, 2008)</u> |
| Period for which compensation and reimbursement is sought: | <u>October 1, 2011 – March 6, 2012</u> |

Amount of Compensation
requested:                                         $11,988,000.25

Amount of Expense
Reimbursement requested:                 $417,403.79

This is an: __X__ interim _____ final application.

This is the tenth interim fee application filed by Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP in these cases.

**TENTH INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>C</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(OCTOBER 1, 2011 – MARCH 6, 2012)**

| Name | Position; Experience | Hourly Rate | Total Hours | Total Compensation |
|------|---------------------|------------:|------------:|-------------------:|
| Paul Aronzon | Financial Restructuring Partner for 22 years; admitted in 1979. | $1,140<br>$1,095 | 15.00<br>26.90 | $17,100.00<br>$29,455.50 |
| Dennis Dunne | Financial Restructuring Partner for 14 years; admitted in 1991. | $1,140<br>$1,095 | 92.60<br>130.20 | $105,564.00<br>$142,569.00 |
| Elizabeth Besio Hardin | Global Finance Partner for 15 years; admitted in 1996. | $1,125<br>$1,025 | 3.70<br>23.40 | $4,162.50<br>$23,985.00 |
| Peter Benudiz | Global Corporate Partner for 19 years; admitted in 1987. | $1,025 | 5.90 | $6,047.50 |
| David Cohen | Litigation Partner for 10 years; admitted in 1994. | $1,125<br>$1,025<br>$562.5*<br>$512.5* | 261.10<br>399.30<br>31.30<br>27.00 | $293,737.50<br>$409,282.50<br>$17,606.25<br>$13,837.50 |
| Wilbur Foster Jr | Financial Restructuring Partner for 21 years; admitted in 1982. | $1,075<br>$995 | 104.40<br>131.00 | $112,230.00<br>$130,345.00 |
| Thomas C. Janson | Global Corporate Partner for 19 years; admitted in 1985. | $995 | 4.40 | $4,378.00 |
| Dale Ponikvar | Tax Partner for 22 years; admitted in 1981. | $1,075<br>$995<br>$497.5* | 68.30<br>146.10<br>3.60 | $73,422.50<br>$145,369.50<br>$1,791.00 |
| Paul Wessel | Tax Partner for 16 years; admitted in 1988. | $995 | 22.40 | $22,288.00 |
| David Lamb | Global Corporate Partner for 22 years; admitted in 1992. | $975<br>$1,030 | 53.10<br>8.50 | $51,772.50<br>$8,755.00 |
| Catherine Marsh | Global Project Finance Partner for 8 years; admitted in 1995. | $975 | 2.30 | $2,242.50 |
| Eric Moser | Global Finance Partner for 13 years; admitted in 1991. | $1,030<br>$975 | 4.60<br>29.10 | $4,738.00<br>$28,372.50 |
| Winthrop Brown | Global Finance Partner for 29 years; admitted in 1975. | $950 | 2.80 | $2,660.00 |
| Stacey J. Rappaport | Litigation Partner for 8 years; admitted in 1997. | $975<br>$925 | 85.70<br>77.40 | $83,557.50<br>$71,595.00 |
| James Warbey | Global Finance Partner for 7 years; admitted in 1996. | $975<br>$925 | 82.50<br>166.10 | $80,437.50<br>$153,642.50 |
| Thomas Ingenhoven | Global Leveraged Finance Partner for 5 years; admitted in | $900 | 7.70 | $6,930.00 |

|  | 2001. |  |  |  |
|---|---|---|---|---|
| Russell Kestenbaum | Tax Partner for 5 years; admitted in 1999. | $950 $900 | 9.00 13.90 | $8,550.00 $12,510.00 |
| Paul Denaro | Global Securities Partner for 4 years; admitted in 2000. | $925 $875 | 6.80 25.10 | $6,290.00 $21,962.50 |
| Evan R. Fleck | Financial Restructuring Partner for 2 years; admitted in 2002. | $900 $850 | 209.70 430.30 | $188,730.00 $365,755.00 |
| Risa Rosenberg | Financial Restructuring Of Counsel for 10 years; admitted in 1984. | $950 $900 | 5.90 30.00 | $5,605.00 $27,000.00 |
| Dennis O'Donnell | Financial Restructuring Of Counsel for 5 years; admitted in 1992. | $910 $860 | 534.70 650.00 | $486,577.00 $559,000.00 |
| Leah Karlov | Tax Of Counsel for 2 years; admitted in 2002. | $775 | 6.00 | $4,650.00 |
| Lena Mandel | Senior Attorney for 10 years; admitted in 1991. | $795 $705 | 85.20 201.90 | $67,734.00 $142,339.50 |
| Kevin Ashby | Senior Attorney for 9 years; admitted in 2004. | $725 $715 | 66.20 110.60 | $47,995.00 $79,079.00 |
| Adrian Azer | Litigation Associate for 9 years; admitted in 2003. | $750 $715 $375* $357.5* | 102.70 396.70 5.30 32.50 | $77,025.00 $283,640.50 $1,987.50 $11,618.75 |
| Edward G. Baldwin | Litigation Associate for 9 years; admitted in 2003. | $750 $715 | 42.00 27.30 | $31,500.00 $19,519.50 |
| Drew Batkin | Tax Associate for 10 years; admitted in 2003. | $750 $715 | 105.10 108.80 | $78,825.00 $77,792.00 |
| Lisa Brabant | Real Estate Associate for 14 years; admitted in 1999. | $750 $715 | 3.50 6.70 | $2,625.00 $4,790.50 |
| Brian Kinney | Financial Restructuring Associate at Milbank for 10 years; admitted in 2004. | $750 | 3.90 | $2,925.00 |
| Aaron Renenger | Litigation Associate for 10 years; admitted in 2002. | $750 $715 $357.5* | 102.10 109.20 6.30 | $76,575.00 $78,078.00 $2,252.25 |
| Brian Stern | Global Corporate Associate for 9 years; admitted in 2003. | $715 | 12.00 | $8,580.00 |

| | | | | |
|---|---|---|---|---|
| Steven Szanzer | Financial Restructuring Associate for 12 years; admitted in 2001. | $750 $715 | 15.10 147.70 | $11,325.00 $105,605.50 |
| Stephen Tudway | Litigation Associate for 14 years; admitted in 1998. | $750 $715 | 14.30 2.30 | $10,725.00 $1,644.50 |
| Kristie Hutchinson | Global Leveraged Associate at Milbank for 1 year; | $715 | 11.40 | $8,151.00 |
| Grace Gilligan | Litigation Associate for 8 years; admitted in 2005. | $735 $695 | 368.10 231.70 | $270,553.50 $161,031.50 |
| Justin McClelland | Litigation Associate for 20 years; admitted in 1993. | $695 | 11.30 | $7,853.50 |
| Peter Newman | Financial Restructuring Associate for 8 years; admitted in 2005. | $735 $695 | 2.00 2.80 | $1,470.00 $1,946.00 |
| Maximilian Schneider | Global Leveraged Finance Associate for 8 years; admitted in 2005. | $695 | 13.30 | $9,243.50 |
| Melanie Westover | Litigation Associate for 8 years; admitted in 2005 | $735 | 3.50 | $2,572.50 |
| Simran Bindra | Global Corporate Associate at Milbank for 1 year; admitted in 2001. | $675 | 15.00 | $10,125.00 |
| Karen Gartenberg | Financial Restructuring Associate for 7 years; admitted in 2006. | $675 | 11.80 | $7,965.00 |
| Sarah A. Sulkowski | Litigation Associate for 7 years; admitted in 2006. | $720 | 11.10 | $7,992.00 |
| John K. White Jr. | Litigation Associate for 7 years; admitted in 2006. | $720 $675 | 10.90 38.40 | $7,848.00 $25,920.00 |
| Nicholas Bassett | Litigation Associate for 6 years; admitted in 2007. | $695 $650 $347.5* $325* | 155.40 99.30 10.00 3.00 | $108,003.00 $64,545.00 $3,475.00 $975.00 |
| Melissa Ann Clark | Global Corporate Associate for 6 years; admitted in 2006. | $650 | 4.70 | $3,055.00 |
| James C. Harris | Financial Restructuring Associate for 6 years; admitted in 2008. | $695 $650 | 66.00 100.20 | $45,870.00 $65,130.00 |
| Aluyah Imoisili | Litigation Associate for 6 years; admitted in 2006. | $650 $325* | 77.20 14.90 | $50,180.00 $4,842.50 |
| Stephanie Sklar | Real Estate Associate for 6 years; admitted in 2007. | $695 $650 | 5.40 8.10 | $3,753.00 $5,265.00 |

| | | | | |
|---|---|---|---|---|
| Krista Smokowski | Litigation Associate for 6 years; admitted in 2007. | $695 | 12.30 | $8,548.50 |
| Jeremy Sussman | Financial Restructuring Associate for 6 years; admitted in 2007. | $695<br>$650 | 108.50<br>174.30 | $75,407.50<br>$113,295.00 |
| Oliver Irwin | Global Project Finance Associate for 5 years; admitted in 2007. | $625 | 4.00 | $2,500.00 |
| Nicole Leyton Rosser | Tax Associate for 5 years; admitted in 2008. | $625 | 2.70 | $1,687.50 |
| Gregory Papeika | Financial Restructuring Associate for 5 years; admitted in 2008. | $675<br>$625 | 10.30<br>77.70 | $6,952.50<br>$48,562.50 |
| Sangyoon Nathan Park | Litigation Associate for 5 years; admitted in 2008. | $675<br>$625 | 89.10<br>142.30 | $60,142.50<br>$88,937.50 |
| Charles Rubio | Financial Restructuring Associate for 5 years; admitted in 2008. | $625 | 61.80 | $38,625.00 |
| Mikhel Schecter | Alternative Investments Associate for 5 years; admitted in 2008. | $625 | 5.50 | $3,437.50 |
| Michael Weiner | Litigation Associate for 5 years; admitted in 2008. | $675<br>$625 | 188.10<br>8.00 | $126,967.50<br>$5,000.00 |
| Jennie Woltz | Litigation Associate for 5 years; admitted in 2008. | $625 | 76.80 | $48,000.00 |
| Andrew Young | Financial Restructuring Associate for 5 years; admitted in 2006. | $675<br>$625 | 26.20<br>110.90 | $17,685.00<br>$69,312.50 |
| Ateesh Chanda | Litigation Associate for 5 years; admitted in 2009. | $650<br>$600 | 9.10<br>23.40 | $5,915.00<br>$14,040.00 |
| Michael Clarke | Global Finance Associate for 4 years; admitted in 2009. | $650<br>$600 | 49.60<br>98.30 | $32,240.00<br>$58,980.00 |
| Joanna L. Grossman | Tax Associate for 4 years; admitted in 2009. | $650<br>$600 | 10.80<br>42.00 | $7,020.00<br>$25,200.00 |
| Jared Joyce-Schleimer | Financial Restructuring Associate for 4 years; admitted in 2009. | $650<br>$600<br>$325*<br>$300* | 167.00<br>569.40<br>1.40<br>6.00 | $108,550.00<br>$341,640.00<br>$455.00<br>$1,800.00 |
| Roger Lee | Financial Restructuring Associate for 4 years; admitted in 2009. | $600 | 2.50 | $1,500.00 |
| Ulric Lewen | Global Securities Associate for 4 years; admitted in 2009. | $650 | 8.10 | $5,265.00 |

| | | | | |
|---|---|---|---|---|
| Andrea McNamara | Financial Restructuring Associate for Associate for 4 years; admitted in 2009. | $650 | 297.20 | $193,180.00 |
| | | $600 | 488.90 | $293,340.00 |
| | | $325* | 8.90 | $2,892.50 |
| | | $300* | 8.30 | $2,490.00 |
| Rachel Pojunas | Litigation Associate for 4 years; admitted in 2009. | $600 | 39.40 | $23,640.00 |
| Mark Rockefeller | Litigation Associate for 4 years; admitted in 2009. | $650 | 56.60 | $36,790.00 |
| | | $600 | 158.20 | $94,920.00 |
| Jeremy Steckel | Global Securities Associate for 4 years; admitted in 2009. | $600 | 16.20 | $9,720.00 |
| Anna Thomander | Financial Restructuring Associate for 4 years; admitted in 2009. | $600 | 35.00 | $21,000.00 |
| Diane R. Young | Financial Restructuring Associate for 4 years; admitted in 2009. | $600 | 10.40 | $6,240.00 |
| Brittany Akins | Litigation Associate for 3 years; admitted in 2010. | $625 | 41.60 | $26,000.00 |
| | | $550 | 43.70 | $24,035.00 |
| John Calabrese | Litigation Associate for 3 years; admitted in 2010. | $625 | 28.00 | $17,500.00 |
| | | $550 | 55.10 | $30,305.00 |
| Randy Clark | Tax Associate for 3 years; admitted in 2010. | $625 | 3.40 | $2,125.00 |
| | | $550 | 16.90 | $9,295.00 |
| Bradley Friedman | Financial Restructuring Associate for 3 years; admitted in 2010. | $625 | 153.00 | $95,625.00 |
| | | $550 | 489.80 | $269,390.00 |
| Jacob Jou | Litigation Associate for 3 years; admitted in 2010. | $625 | 145.70 | $91,062.50 |
| | | $550 | 73.10 | $40,205.00 |
| Matthew Kanter | Financial Restructuring Associate for 3 years; admitted in 2010. | $625 | 137.90 | $86,187.50 |
| | | $550 | 281.30 | $154,715.00 |
| Denise Linton | Litigation Associate for 3 years; admitted in 2010. | $625 | 272.30 | $170,187.50 |
| | | $550 | 379.30 | $208,615.00 |
| Tiara Lipps | Real Estate Associate for 3 years; admitted in 2010. | $550 | 8.00 | $4,400.00 |
| James Marshall | Global Securities Associate for 3 years; admitted in 2010. | $625 | 2.60 | $1,625.00 |
| | | $550 | 10.30 | $5,665.00 |
| Andrew Morton | Financial Restructuring Associate for 3 years; admitted in 2010. | $550 | 10.50 | $5,775.00 |
| Jonathan Ostrzega | Financial Restructuring Associate for 3 years; admitted n 2010. | $550 | 41.30 | $22,715.00 |
| Neema Saran | Litigation Associate for 3 years; admitted in 2010. | $625 | 19.80 | $12,375.00 |
| | | $550 | 10.30 | $5,665.00 |
| Brian Sturm | Financial Restructuring Associate for 3 years; admitted in 2010. | $625 | 62.10 | $38,812.50 |
| | | $550 | 41.00 | $22,550.00 |

| Jeremy Wells | Global Securities Associate for 3 years; admitted in 2010. | $625 | 175.30 | $109,562.50 |
| | | $550 | 174.70 | $96,085.00 |
| Ranee Adipat | Global Securities Associate for 2 years; admitted in 2011. | $460 | 15.30 | $7,038.00 |
| Eluard Alegre | Financial Restructuring Associate for 2 years; admitted in 2011. | $460 | 142.10 | $65,366.00 |
| Alicia Bove | Litigation Associate for 2 years; admitted in 2011. | $570 | 265.20 | $151,164.00 |
| | | $460 | 135.60 | $62,376.00 |
| Matthew Brod | Financial Restructuring Associate for 2 years; admitted in 2011. | $570 | 159.90 | $91,143.00 |
| | | $460 | 434.00 | $199,640.00 |
| Hugh Carlson | Litigation Associate for 2 years; admitted in 2011. | $570 | 38.30 | $21,831.00 |
| | | $460 | 226.60 | $104,236.00 |
| Brenton T. Culpepper | Litigation Associate for 2 years; admitted in 2011. | $570 | 35.10 | $20,007.00 |
| | | $460 | 93.00 | $42,780.00 |
| Regina Gromen | Alternative Investments Associate for 2 years; admitted in 2011. | $460 | 20.90 | $9,614.00 |
| Katie J. Hamilton | Litigation Associate for 2 years; admitted in 2011. | $460 | 4.70 | $2,162.00 |
| Nicole J. Lee | Financial Restructuring Associate for 2 years; admitted in 2011. | $570 | 93.90 | $53,523.00 |
| | | $460 | 197.50 | $90,850.00 |
| Mark McCrone | Litigation Associate for 2 years; admitted in 2011. | $570 | 288.30 | $164,331.00 |
| | | $460 | 324.30 | $149,178.00 |
| | | $230* | 7.30 | $1,679.00 |
| Michael Price | Financial Restructuring Associate for 2 years; admitted in 2011. | $460 | 26.20 | $12,052.00 |
| Christina Totino | Litigation Associate for 2 years; admitted in 2011. | $570 | 241.30 | $137,541.00 |
| | | $460 | 232.90 | $107,134.00 |
| Greta Ulvad | Financial Restructuring Associate at Milbank for 2 years; admitted in 2011. | $570 | 80.10 | $45,657.00 |
| Jonathan Keen | Financial Restructuring Associate for 2 years; admitted in 2011. | $470 | 24.60 | $11,562.00 |
| | | $295 | 130.10 | $38,379.50 |
| Lysondra Ludwig | Tax Associate at Milbank for 2 years; admitted in 2012. | $470 | 7.00 | $3,290.00 |
| Andrew Tsang | Financial Restructuring Associate at Milbank for 2 years; admitted in 2012. | $470 | 11.80 | $5,546.00 |
| Monica Alston | Case Manager | $260 | 127.30 | $33,098.00 |
| | | $255 | 180.50 | $46,027.50 |
| Abayomi A. Ayandipo | Case Manager | $260 | 114.80 | $29,848.00 |
| | | $255 | 180.50 | $46,027.50 |

| Name | Title | Rate | Hours | Amount |
|---|---|---|---|---|
| Oscar Castrillon | Case Manager | $260 | 15.30 | $3,978.00 |
| | | $255 | 34.70 | $8,848.50 |
| Angel R. Anderson | Case Manager | $260 | 66.40 | $17,264.00 |
| | | $255 | 91.10 | $23,230.50 |
| Richard Cosentino | Legal Assistant | $290 | 201.50 | $58,435.00 |
| | | $280 | 348.30 | $97,524.00 |
| Randy Hooks | Legal Assistant | $290 | 139.00 | $40,310.00 |
| | | $280 | 236.20 | $66,136.00 |
| Kim Strosser | Legal Assistant | $290 | 14.40 | $4,176.00 |
| | | $280 | 37.40 | $10,472.00 |
| Charles J. Sheehan | Legal Assistant | $290 | 52.30 | $15,167.00 |
| | | $280 | 98.50 | $27,580.00 |
| Markus Franken | Legal Assistant | $245 | 2.50 | $612.50 |
| Stefanie Kupczak | Legal Assistant | $245 | 7.50 | $1,837.50 |
| Paul Butters | Legal Assistant | $235 | 37.80 | $8,883.00 |
| | | $225 | 64.30 | $14,467.50 |
| Mary A. Hood | Legal Assistant | $235 | 2.50 | $587.50 |
| | | $225 | 26.30 | $5,917.50 |
| Ali Khan | Legal Assistant | $200 | 3.70 | $740.00 |
| Peter Delfausse | Legal Assistant | $195 | 13.90 | $2,710.50 |
| Charmaine Thomas | Legal Assistant | $210 | 106.30 | $22,323.00 |
| | | $195 | 233.30 | $45,493.50 |
| Kyle Martin | Legal Assistant | $195 | 347.20 | $67,704.00 |
| | | $185 | 407.00 | $75,295.00 |
| Wendy Sobel Barr | Legal Assistant | $180 | 123.20 | $22,176.00 |
| | | $165 | 225.90 | $37,273.50 |
| Jacqueline Brewster | Legal Assistant | $195 | 16.60 | $3,237.00 |
| | | $185 | 31.20 | $5,772.00 |
| Theartis Everett | Litigation Support Specialist | $265 | 89.10 | $23,611.50 |
| | | $290 | 75.50 | $21,895.00 |
| James McGuire | Litigation Support Specialist | $295 | 2.40 | $708.00 |
| | | $290 | 8.80 | $2,552.00 |
| Rhodely Vallon | Litigation Support Specialist | $295 | 154.00 | $45,430.00 |
| | | $290 | 193.90 | $56,231.00 |
| Gabrielle Zsebi | Librarian | $220 | 7.40 | $1,628.00 |
| Maria Smilen | File Clerk | $130 | 26.40 | $3,432.00 |
| | | $125 | 19.80 | $2,475.00 |
| **Total** | | **$593.36 (blended rate)[1]** | **20,203.60 Hours** | **$11,988,000.25** |

---

[1]       The blended rate excluding paraprofessionals is $685.01 per hour.

TENTH INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>C</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(OCTOBER 1, 2011 – MARCH 6, 2012)

| ACTIVITY | HOURS | FEES |
|---|---|---|
| General Case Administration | 284.10 | 224,145.00 |
| General Case Strategy Meetings | 4.10 | 2,124.00 |
| Project Monitoring/Court Calendar & Docket Maintenance | 563.50 | 163,665.50 |
| Hearings and Court Communications | 338.10 | 218,256.50 |
| Non-Working Travel | 185.70 | 86,279.75 |
| Interested Party Communications/Website/Lehman Team Hotline | 288.30 | 162,098.00 |
| Communications with Debtors | 10.70 | 10,309.00 |
| Unsecured Creditors Issues/Meetings/Communications/Creditors' Committee | 758.60 | 568,327.00 |
| Secured Creditors Issues/Meetings/Communications | 1.40 | 273.00 |
| Equity Holders/Motions/Hearings | .30 | 58.50 |
| LBI/SIPC Coordination and Issues | 687.80 | 487,905.00 |
| Insurance Issues | 18.40 | 13,433.50 |
| Employee/ERISA/Benefits/Pension Issues | 58.80 | 46,575.50 |
| Tax Issues | 520.00 | 421,632.50 |
| Corporate Governance | 51.30 | 41,565.50 |
| Other General Business Operation Issues | 2.40 | 2,700.00 |
| Intercompany Issues | 155.10 | 96,247.00 |
| Real Estate Matters | 603.60 | 449,651.00 |
| Private Equity | 49.40 | 37,749.00 |
| Derivatives/SWAP Agreement Issues (Including Derivatives- Related Adversary Proceedings, Alternative Dispute Resolution, and Claims Reconciliation and Litigation) | 6,348.70 | 3,825,595.00 |
| Loans/Investments | 122.90 | 71,507.00 |
| Domestic Bank and Related Regulatory Issues | 27.60 | 17,397.50 |
| International Insolvency Issues | 559.30 | 361,044.00 |

| | | |
|---|---|---|
| Non-Derivative Automatic Stay/Safe Harbor Issues | 71.00 | 36,685.50 |
| Miscellaneous Asset Sales/363 Issues | 1.80 | 1,274.00 |
| Non-Derivative Executory Contracts/365 Issues | 8.60 | 4,452.00 |
| DIP Financing | 3.20 | 816.50 |
| Plan of Reorganization/Plan Confirmation/Plan Implementation | 1,262.50 | 857,666.50 |
| Disclosure Statement/Solicitation/Voting | 2.40 | 1,678.50 |
| Non-Derivative Claims | 1,364.70 | 818,423.50 |
| Other Bankruptcy Motions and Matters | 25.70 | 14,611.00 |
| Non-Derivative Adversary Proceedings Preparation and Litigation | 2,671.90 | 1,495,869.50 |
| Non-Bankruptcy Litigation | .10 | 62.50 |
| 2004 Issues | .10 | 55.00 |
| Firm's Own Billing/Fee Applications | 1,401.80 | 484,735.00 |
| Firm's Own Retention Issues | 163.90 | 94,117.50 |
| Third Party Retention/Fee Application/Other Issues | 509.80 | 283,358.50 |
| Stock Loan Litigation | 1,076.00 | 585,656.00 |
| **Total** | **20,203.60** | **$11,988,000.25** |

TENTH INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>c</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(OCTOBER 1, 2011 – MARCH 6, 2012)

| DISBURSEMENTS | AMOUNT |
|---|---|
| Airfreight | 1,864.08 |
| Cab Fares/Local Travel | 35,914.76 |
| Computer Database Research | 222,530.59 |
| Fees | 8,460.30 |
| Mail | 79.08 |
| Meals | 18,472.94 |
| Messenger | 1,762.23 |
| Misc | 213.09 |
| Outside Reproduction | 633.84 |
| Photocopies | 73,585.40 |
| Telephone | 15,511.82 |
| Travel | 38,375.66 |
| **TOTAL DISBURSEMENTS** | **$417,403.79** |

Dennis F. Dunne
Evan R. Fleck
Dennis C. O'Donnell
MILBANK, TWEED, HADLEY & MᶜCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------ x
                                          :
In re:                                    :        Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :        08-13555 (JMP)
                                          :
                    Debtors.              :        (Jointly Administered)
                                          :
------------------------------------------------------------ x
```

**TENTH APPLICATION OF MILBANK, TWEED, HADLEY & MᶜCLOY LLP,**
**COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR**
**INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES**
**RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM**
**OCTOBER 1, 2011 THROUGH AND INCLUDING MARCH 6, 2012**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Milbank, Tweed, Hadley & MᶜCloy LLP ("Milbank"), counsel to the Official

Committee of Unsecured Creditors (the "Committee") of Lehman Brothers Holdings Inc.

("LBHI"), Lehman Brothers Special Financing Inc. ("LBSF"), Lehman Commercial Paper Inc.

("LCPI"), Lehman Brothers Commodity Services Inc. ("LBCS") and their affiliated debtors in

possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-

Debtor affiliates, "Lehman"), hereby submits its application (the "Application"), pursuant to

sections 330 and 331 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

(as amended, the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), the Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991, and

amended on April 21, 1995, and November 25, 2009 (collectively, the "Local Guidelines"), the

United States Trustee Guidelines for Reviewing Applications for Compensation and

Reimbursement of Expenses Filed Under 11 U.S.C. § 330, effective January 30, 1996 (the

"U.S. Trustee Guidelines"), the Fourth Amended Order Pursuant to Sections 105(a) and 331 of

the Bankruptcy Code and Bankruptcy Rule 2016(a) Establishing Procedures for Interim Monthly

Compensation and Reimbursement of Expenses of Professionals, dated April 14, 2011 (the

"Interim Compensation Order") [Docket No. 15997], and the guidelines contained in the Fee

Committee's Confidential Letter Report on the Sixth Interim Application of Milbank, dated

April 12, 2011 (the "Fee Committee Guidelines"), for the allowance of interim compensation for

professional services rendered from October 1, 2011 through and including March 6, 2012 (the

"Tenth Interim Compensation Period"), and for reimbursement of expenses incurred in

connection with such services.  In support thereof, Milbank respectfully represents as follows:

**INTRODUCTION**

A.      **Background**

              1.      Bankruptcy Filing.  On September 15, 2008, and periodically thereafter

(the "Petition Date"), the Debtors commenced the above-captioned chapter 11 cases (the

"Chapter 11 Cases").  The Debtors' Chapter 11 Cases have been consolidated for procedural

purposes and are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules.

The Debtors are authorized to operate their businesses and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      Creditors' Committee.  On September 17, 2008, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Committee in the Chapter 11 Cases.

3.      SIPA Trustee.  On September 19, 2008, a proceeding (the "SIPA Proceeding") was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"), a wholly owned subsidiary of LBHI and a registered broker-dealer.  James W. Giddens, Esq. is the trustee appointed under SIPA (the "SIPA Trustee") administering LBI's estate.

4.      Examiner.  The United States Bankruptcy Court for the Southern District of New York (the "Court") approved the appointment of Anton R. Valukas as examiner (the "Examiner") in the Chapter 11 Cases in the Order Approving the Appointment of Examiner, dated January 20, 2009.  In accordance with his appointment, the Examiner issued his report on February 8, 2010 under seal, which was subsequently unsealed on March 11, 2010.

5.      Fee Committee.  On May 26, 2009, the Court appointed a fee committee (the "Fee Committee") and approved a fee protocol (the "Fee Protocol") in the Chapter 11 Cases. On January 24, 2011, the Court approved the Fee Committee's recommendation to appoint Richard A. Gitlin as the successor Independent Member on the Fee Committee.  By motion dated March 11, 2011, the Fee Committee sought authorization to amend the Fee Protocol, which the Court granted on April 14, 2011 (the "Amended Fee Protocol") [Docket No. 15998].

6.      Debtors' Plan and Disclosure Statement.  On March 15, 2010, the Debtors filed their Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors [Docket No. 7572].  Subsequently, on April 14, 2010, the Debtors filed their Disclosure Statement for Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors

Pursuant to Section 1125 of the Bankruptcy Code [Docket No. 8332], along with their revised

Chapter 11 Plan [Docket No. 8330].

7.    Debtors' First Amended Plan and Disclosure Statement.  On January 25,

2011, the Debtors filed their First Amended Joint Chapter 11 Plan of Lehman Brothers Holdings

Inc. and its Affiliated Debtors [Docket No. 14150] (the "Debtors' First Amended Plan") and the

Debtors' Disclosure Statement for First Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code

[Docket No. 14151].

8.    Debtors' Second Amended Plan and Disclosure Statement.  Following the

filing of competing plans of reorganization by the Ad Hoc Group of Lehman Brothers Creditors

and the Non-Consolidation Plan Proponents, the Debtors filed their Second Joint Chapter 11 Plan

of Lehman Brothers Holdings Inc. and its Affiliated Debtors [Docket No. 18204] and the

Disclosure Statement for Second Amended Joint Chapter 11 Plan of Lehman Brothers Holdings

Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code [Docket No.

18205] on June 30, 2011.

9.    Debtors' Third Amended Plan and Disclosure Statement.  After numerous

and lengthy negotiations among the Debtors, the Committee and multiple creditor groups,

including Lehman's affiliates in countries outside of the U.S. (the "Foreign Affiliates"), on

September 1, 2011, the Debtors filed the Third Amended Joint Chapter 11 Plan of Lehman

Brothers Holdings Inc. and its Affiliated Debtors (as amended, modified and supplemented, the

"Plan") [Docket No. 19627] and the Debtors' Disclosure Statement for the Third Amended Joint

Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section

1125 of the Bankruptcy Code (the "Disclosure Statement") [Docket No. 19629].  Also on

September 1, 2011, the Court entered an amended order approving the Disclosure Statement,

establishing solicitation and voting procedures in connection with the Plan, scheduling a

confirmation hearing for December 6, 2011, and establishing notice and objection procedures for

the confirmation hearing [Docket No. 19631].  On September 15, 2011, the Court entered an

order approving a modification to the Disclosure Statement [Docket No. 20016].  On December

6, 2011, the Court entered an order confirming the Plan [Docket No. 23023].  The Plan went

effective at 12:01 a.m. on March 6, 2012 (the "Effective Date").

        10.    Jurisdiction.  This Court has jurisdiction over this matter pursuant to 28

U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases is proper pursuant to 28 U.S.C. §§ 1408

and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  The statutory

predicates for the relief sought herein are sections 330 and 331 of the Bankruptcy Code.

Pursuant to the Local Guidelines, a certification regarding compliance with the Local Guidelines

is attached hereto as Exhibit "A."

**B.**      **Retention of Milbank and Billing History**

        11.    Authorization for Milbank's Retention.  On November 5, 2008, pursuant

to the Interim Order Under 11 U.S.C. § 1103 And Fed. R. Bankr. P. 2014 And 5002 Authorizing

The Retention And Employment Of Milbank, Tweed, Hadley & M$^{c}$Cloy LLP, As Counsel For

The Official Committee Of Unsecured Creditors Effective As Of September 17, 2008 (the

"Retention Order"), the Court authorized Milbank's retention as counsel for the Committee in

these Chapter 11 Cases.  The Retention Order, which became a final order on November 21,

2008, authorized Milbank to receive compensation pursuant to the procedures set forth in the

Bankruptcy Code, the Bankruptcy Rules, the Local Guidelines, the U.S. Trustee Guidelines, and

the local rules and orders of this Court.  Among other things, the Retention Order provides that

5

Milbank's hourly rates are subject to periodic firm-wide adjustments in the ordinary course of Milbank's business.

12.     First Interim Fee Application.  On April 10, 2009, Milbank filed its First Application Of Milbank, Tweed, Hadley & McCloy LLP, Counsel to Official Committee of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services Rendered And For Reimbursement Of Expenses During Period From September 17, 2008 Through And Including January 31, 2009 (the "First Interim Fee Application").  In the First Interim Fee Application, Milbank requested (i) allowance of compensation for professional services rendered during the period from September 17, 2008 through and including January 31, 2009 (the "First Interim Compensation Period") in the total amount of $12,123,376.00,[1] and (ii) reimbursement of its actual and necessary expenses incurred during the First Interim Compensation Period in the amount of $668,388.72.  Pursuant to the Interim Compensation Order, Milbank received payment in the amount of $10,397,943.56 during the First Interim Compensation Period.  On August 5, 2009, the Court approved the First Interim Fee Application, subject to a ten percent holdback pursuant to the recommendation of the Fee Committee.  On September 10, 2009, the Court approved the release of the remaining holdback, subject to a $69,990.04 deduction, at the recommendation of the Fee Committee.[2]

13.     Second Interim Fee Application.  On August 14, 2009, Milbank filed its Second Application Of Milbank, Tweed, Hadley & McCloy LLP, Counsel to Official Committee of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

---

[1]     Milbank voluntarily reduced the fees it sought to have allowed for the First Interim Compensation Period by $129,111.00.  However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[2]     Milbank reserved and continues to reserve the right to seek, at a later date, the allowance of all or a portion of such fees.

Rendered And For Reimbursement Of Expenses During Period From February 1, 2009 Through

And Including May 31, 2009 (the "Second Interim Fee Application").  In the Second Interim Fee

Application, Milbank requested (i) allowance of compensation for professional services rendered

during the period from February 1, 2009 through and including May 31, 2009 (the "Second

Interim Compensation Period") in the total amount of $16,829,521.00,[3] and (ii) reimbursement

of its actual and necessary expenses incurred during the Second Interim Compensation Period in

the amount of $1,019,754.61.  Pursuant to the Interim Compensation Order, Milbank received

payment in the amount of $14,582,737.21 during the Second Interim Compensation Period.  On

September 25, 2009, the Court approved the Second Interim Fee Application, subject to a ten

percent holdback pursuant to the recommendation of the Fee Committee.  On December 23,

2009, the Court released the ten percent holdback, subject to a $311,734.82 deduction, at the

recommendation of the Fee Committee.[4]

        14.     Third Interim Fee Application.  On December 14, 2009, Milbank filed its

Third Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee of

Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From June 1, 2009 Through And

Including September 30, 2009 (the "Third Interim Fee Application").  In the Third Interim Fee

Application, Milbank requested (i) allowance of compensation for professional services rendered

during the period from June 1, 2009 through and including September 30, 2009 (the "Third

---

[3]     Milbank voluntarily reduced the fees it sought to have allowed for the Second Interim Compensation Period by $154,700.25, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[4]     Milbank reserved and continues to reserve the right to seek, at a later date, the allowance of all or a portion of such fees.

Interim Compensation Period") in the total amount of $10,881,540.00,[5] and (ii) reimbursement

of its actual and necessary expenses incurred during the Third Interim Compensation Period in

the amount of $583,803.10.  Pursuant to the Interim Compensation Order, Milbank received

payment in the amount of $7,480,652.96 during the Third Interim Compensation Period.  On

April 9, 2010, the Court approved the Third Interim Fee Application, subject to a $292,555.40

deduction, at the recommendation of the Fee Committee.[6]

        15.    Fourth Interim Fee Application.  On April 16, 2010, Milbank filed its

Fourth Application Of Milbank, Tweed, Hadley & McCloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From October 1, 2009 Through

And Including January 31, 2010 (the "Fourth Interim Fee Application").  In the Fourth Interim

Fee Application, Milbank requested (i) allowance of compensation for professional services

rendered during the period from October 1, 2009 through and including January 31, 2010 (the

"Fourth Interim Compensation Period") in the total amount of $13,595,778.50,[7] and (ii)

reimbursement of its actual and necessary expenses incurred during the Fourth Interim

Compensation Period in the amount of $451,410.54.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $11,341,325.19 during the Fourth Interim

Compensation Period.  On September 7, 2010, the Court approved the Fourth Interim Fee

---

[5]      Milbank voluntarily reduced the fees it sought to have allowed for the Third Interim Compensation Period by $419,548.50, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[6]      Milbank reserved, and continues to reserve, the right to seek, at a later time, the allowance of all or a portion of such fees.

[7]      Milbank voluntarily reduced the fees it sought to have allowed for the Fourth Interim Compensation Period by $111,446.50, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

Application, subject to a holdback of $733,570.87, relating to certain unresolved objections asserted by the Fee Committee.[8]

16.    <u>Fifth Interim Fee Application</u>.  On August 16, 2010, Milbank filed its Fifth Application Of Milbank, Tweed, Hadley & M^cCloy LLP, Counsel to Official Committee of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services Rendered And For Reimbursement Of Expenses During Period From February 1, 2010 Through And Including May 31, 2010 (the "<u>Fifth Interim Fee Application</u>").  In the Fifth Interim Fee Application, Milbank requested (i) allowance of compensation for professional services rendered during the period from February 1, 2010 through and including May 31, 2010 (the "<u>Fifth Interim Compensation Period</u>") in the total amount of $19,450,342.75,[9] and (ii) reimbursement of its actual and necessary expenses incurred during the Fifth Interim Compensation Period in the amount of $851,804.27.  Pursuant to the Interim Compensation Order, Milbank received payment in the amount of $16,427,844.72 during the Fifth Interim Compensation Period.[10]  On May 12, 2011, the Court approved the Fifth Interim Fee Application, subject to a holdback of $413,818.13, relating to certain unresolved objections asserted by the Fee Committee.[11]

17.    <u>Sixth Interim Fee Application</u>.  On December 14, 2010, Milbank filed its Sixth Application Of Milbank, Tweed, Hadley & M^cCloy LLP, Counsel to Official Committee of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

---

[8]    Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[9]    Milbank voluntarily reduced the fees it sought to have allowed for the Fifth Interim Compensation Period by $199,247.00, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[10]    Milbank reserves the right to seek the allowance of all or a portion of such fees at a later date.

[11]    Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

9

Pg 22 of 85

Rendered And For Reimbursement Of Expenses During Period From June 1, 2010 Through And

Including September 30, 2010 (the "Sixth Interim Fee Application").  In the Sixth Interim Fee

Application, Milbank requested (i) allowance of compensation for professional services rendered

during the period from June 1, 2010 through and including September 30, 2010 (the "Sixth

Interim Compensation Period") in the total amount of $18,359,367.75,[12] and (ii) reimbursement

of its actual and necessary expenses incurred during the Sixth Interim Compensation Period in

the amount of $792,924.64.  Pursuant to the Interim Compensation Order, Milbank received

payment in the amount of $15,491,759.01 during the Sixth Interim Compensation Period.  On

October 25, 2011, the Court approved the Sixth Interim Fee Application, subject to a

$173,410.66 deduction, at the recommendation of the Fee Committee.[13]

       18.     Seventh Interim Fee Application.  On June 2, 2011, Milbank filed its

Seventh Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From October 1, 2010 Through

And Including January 31, 2011 (the "Seventh Interim Fee Application").  In the Seventh Interim

Fee Application, Milbank requested (i) allowance of compensation for professional services

rendered during the period from October 1, 2010 through and including January 31, 2011 (the

"Seventh Interim Compensation Period") in the total amount of $14,180,784.75,[14] and (ii)

---

[12]    Milbank voluntarily reduced the fees it sought to have allowed for the Sixth Interim Compensation Period by $229,420.50, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[13]    Milbank reserved, and continues to reserve, the right to seek, at a later time, the allowance of all or a portion of such fees.

[14]    Milbank voluntarily reduced the fees it sought to have allowed for the Seventh Interim Compensation Period by $133,519.75, on account of, among other things, certain matters identified by the Fee Committee.

reimbursement of its actual and necessary expenses incurred during the Seventh Interim

Compensation Period in the amount of $633,261.80.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $11,995,760.01 during the Seventh Interim

Compensation Period.  On December 20, 2011, the Court approved the Seventh Interim Fee

Application, subject to a $563,718.73 deduction, at the recommendation of the Fee Committee.[15]

19.    Eighth Interim Fee Application.  On August 15, 2011, Milbank filed its

Eighth Application Of Milbank, Tweed, Hadley & M^cCloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From February 1, 2011 Through

and Including May 31, 2011 (the "Eighth Interim Fee Application") in the total amount of

$14,678,049.25,[16] and (ii) reimbursement of its actual and necessary expenses incurred during

the Seventh Interim Compensation Period in the amount of $794,661.63.  Pursuant to the Interim

Compensation Order, Milbank received payment in the amount of $11,742,439.40 during the

Eighth Interim Compensation Period.  On December 20, 2011, the Court approved the Eighth

Interim Fee Application, subject to a $1,756,689.00 deduction, at the recommendation of the Fee

Committee.[17]

---

However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of
such fees at a later date.

[15]    Milbank reserved, and continues to reserve, the right to seek, at a later time, the allowance of all or a
portion of such fees.

[16]    Milbank voluntarily reduced the fees it sought to have allowed for the Eighth Interim Compensation Period
by $191,269.75, on account of, among other things, certain matters identified by the Fee Committee.
However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of
such fees at a later date.

[17]    Milbank reserved, and continues to reserve, the right to seek, at a later time, the allowance of all or a
portion of such fees.

20.    <u>Ninth Interim Fee Application</u>.  On December 14, 2011, Milbank filed its

Ninth Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee of

Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From June 1, 2011 Through and

Including September 30, 2011 (the "<u>Ninth Interim Fee Application</u>") in the total amount of

$12,334,262.25,[18] and (ii) reimbursement of its actual and necessary expenses incurred during

the Ninth Interim Compensation Period in the amount of $493,651.21.  Pursuant to the Interim

Compensation Order, Milbank received payment in the amount of $10,361,061.01 during the

Ninth Interim Compensation Period.  No hearing date has yet been scheduled with respect to the

Ninth Interim Fee Application.

21.    <u>Application</u>.  Milbank makes this tenth interim application for approval

and allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331

of the Bankruptcy Code.

22.    In accordance with the Interim Compensation Order, Milbank submitted

monthly fee statements to the Debtors seeking interim compensation and reimbursement of

expenses.  During the Tenth Interim Compensation Period, Milbank submitted the following fee

statements:

    a.    On December 6, 2011, pursuant to the Interim Compensation Order, Milbank
served its thirty-seventh fee statement for the period from October 1, 2011
through and including October 31, 2011 (the "<u>Thirty-Seventh Fee Statement</u>").
The Thirty-Seventh Fee Statement sought (i) an allowance of $2,714,970.50 as
compensation for services rendered and (ii) the reimbursement of $84,975.43 in
expenses.  As of the date hereof, Milbank has received a total of $2,256,951.83

---

[18]    Milbank voluntarily reduced the fees it sought to have allowed for the Ninth Interim Compensation Period
by $164,335.25, on account of, among other things, certain matters identified by the Fee Committee.
However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of
such fees at a later date.

which represents payment for (y) 80% of Milbank's fees and (z) 100% of the expenses incurred pursuant to the Thirty-Seventh Fee Statement.

b.    On March 12, 2012, pursuant to the Interim Compensation Order, Milbank served its thirty-eighth fee statement for the period from November 1, 2011 through and including November 30, 2011 (the "Thirty-Eighth Fee Statement"). The Thirty-Eighth Fee Statement sought (i) an allowance of $2,435,329.25 as compensation for services rendered and (ii) the reimbursement of $101,111.73 in expenses. As of the date hereof, Milbank has received a total of $2,049,375.13 which represents payment for (y) 80% of Milbank's fees and (z) 100% of the expenses incurred pursuant to the Thirty-Eighth Fee Statement.

c.    On April 9, 2012, pursuant to the Interim Compensation Order, Milbank served its thirty-ninth fee statement for the period from December 1, 2011 through and including December 31, 2011 (the "Thirty-Ninth Fee Statement"). The Thirty-Ninth Fee Statement sought (i) an allowance of $1,921,981.25 as compensation for services rendered and (ii) the reimbursement of $62,367.91 in expenses. As of the date hereof, Milbank has received a total of $1,599,952.91 which represents payment for (y) 80% of Milbank's fees and (z) 100% of the expenses incurred pursuant to the Thirty-Ninth Fee Statement.

d.    On May 2, 2012, pursuant to the Interim Compensation Order, Milbank served its fortieth fee statement for the period from January 1, 2012 through and including January 31, 2012 (the "Fortieth Fee Statement"). The Fortieth Fee Statement sought (i) an allowance of $2,316,417.00 as compensation for services rendered and (ii) the reimbursement of $97,212.87 in expenses. As of the date hereof, Milbank has received a total of $1,950,346.47 which represents payment for (y) 80% of Milbank's fees and (z) 100% of the expenses incurred pursuant to the Fortieth Fee Statement.

e.    On May 15, 2012, pursuant to the Interim Compensation Order, Milbank served its forty-first fee statement for the period from February 1, 2012 through and including March 6, 2012 (the "Forty-First Fee Statement," and together with the Thirty-Seventh, Thirty-Eighth, Thirty-Ninth and Fortieth Fee Statements, the "Fee Statements"). The Forty-First Fee Statement sought (i) an allowance of $2,486,460.75 as compensation for services rendered and (ii) the reimbursement of $72,415.85 in expenses. As of the date hereof, Milbank has received a total of $2,061,584.45 which represents payment for (y) 80% of Milbank's fees and (z) 100% of the expenses incurred pursuant to the Forty-First Fee Statement.

23.    Milbank has not entered into any agreement, express or implied, with any other party for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in these cases. No promises have been received by Milbank or

any member thereof as to compensation in connection with these cases other than in accordance

with the provisions of the Bankruptcy Code.

## II.

## APPLICATION

24.    By this Application, Milbank is seeking allowance of (a) compensation for

professional services rendered by Milbank, as counsel for the Committee, during the Tenth

Interim Compensation Period and (b) reimbursement of expenses incurred by Milbank in

connection with such services during the Tenth Interim Compensation Period.

25.    In this Application, Milbank seeks approval of $11,988,000.25[19] for legal

services rendered on behalf of the Committee during the Tenth Interim Compensation Period and

$417,403.79[20] for reimbursement of expenses incurred in connection with the rendering of such

services, for a total award of $12,405,404.04.

26.    Pursuant to the Interim Compensation Order, Milbank has already

received payment of $4,133,453.16 during the Tenth Interim Compensation Period.  Milbank

will seek a total payment of $8,271,950.88 pursuant to this Application, which amount represents

the portion of Milbank's fees for legal services rendered and expenses incurred during the Tenth

Interim Compensation Period not previously paid to Milbank pursuant to the Interim

Compensation Order.[21]

---

[19]    The compensation sought by this Application reflects a voluntary reduction of approximately $132,986.25 including, but not limited to, certain fee issues identified by the Fee Committee.  However, Milbank reserves the right to seek allowance of all or a portion of such fees at a future date.

[20]    This amount reflects a reduction of certain expenses as per the Fee Committee Guidelines, including overtime meal expenses for which Milbank seeks reimbursement of no more than $20 per meal.  Milbank reserves the right to seek, at a later date, reimbursement for the total amount of expenses incurred in connection with its representation of the Committee.

[21]    As is customary, in connection with the preparation of this Application, Milbank has reviewed the fees and expenses set forth in its Fee Statements.  Based on this review, the amount requested herein on account of fees and expenses incurred by Milbank during the Tenth Interim Compensation Period is $115,049.50

27.     The fees sought by this Application reflect an aggregate of 20,203.6 hours of attorney and paraprofessional time spent and recorded in performing services for the Committee during the Tenth Interim Compensation Period, at a blended average hourly rate of $593.36 for both professionals and paraprofessionals.  The blended hourly rate for professionals only is $685.01.

28.     Milbank rendered to the Committee all services for which compensation is sought solely in connection with the Chapter 11 Cases, in furtherance of the duties and functions of the Committee.

29.     Milbank maintains computerized records of the time expended in the rendering of the professional services required by the Committee.  These records are maintained in the ordinary course of Milbank's practice.  For the convenience of the Court and parties in interest, a billing summary for the Tenth Interim Compensation Period is attached as part of the cover sheet, setting forth the name of each attorney and paraprofessional for whose work on these cases compensation is sought, each attorney's year of bar admission, the aggregate of the time expended by each such attorney or paraprofessional, the hourly billing rate for each such attorney or paraprofessional at Milbank's current billing rates, and an indication of the individual amounts requested as part of the total amount of compensation requested.  In addition, set forth in the billing summary is additional information indicating whether each attorney is a partner, counsel or associate, the number of years each attorney has held such position, and each attorney's area of concentration.  The compensation requested by Milbank is based on the

---

more than the sum of fees and expenses set forth in the Fee Statements, due to certain fees and expenses posted after our submission of the Thirty-Seventh Fee Statement.  Accordingly, upon approval of the relief requested herein, Milbank will reduce its request for payment from the Debtors by such amount.

customary compensation charged by comparably skilled practitioners in cases other than cases

under the Bankruptcy Code.

30.    Attached hereto as Exhibit "B" are time entry records broken down in

tenths of an hour by project category, based on the U.S. Trustee Guidelines, setting forth a

detailed description of services performed by each attorney and paraprofessional on behalf of the

Committee.[22]

31.    Milbank also maintains computerized records of all expenses incurred in

connection with the performance of professional services.  A summary of the amounts and

categories of expenses for which reimbursement is sought, as well as a breakdown of expenses

by project category and detailed descriptions of these expenses, are attached hereto as

Exhibit "C."

## III.

## SUMMARY OF PROFESSIONAL SERVICES RENDERED

32.    To provide an orderly summary of the services rendered on behalf of the

Committee by Milbank, and in accordance with the U.S. Trustee Guidelines, the Fee Committee

adopted the following billing categories in connection with these cases:

| | |
|---|---|
| 00100 | General Case Administration |
| 00200 | General Case Strategy Meetings |
| 00300 | Project Monitoring/Court Calendar & Docket Maintenance |
| 00400 | Hearings and Court Communications |
| 00500 | Non-Working Travel |
| 00600 | Interested Parties Communications |
| 00700 | Communications with Debtors |
| 00800 | Unsecured Creditors Issues/Meetings/Communications/Creditors' Committee |
| 00900 | Secured Creditors Issues/Meetings/Communications |
| 01000 | Equity Holders/Motions/Hearings/Communications |

---

[22]    Due to the volume of the time and expense records, and consistent with the Interim Compensation Order, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the U.S. Trustee; (iii) the Debtors; (iv) counsel for the Debtors; and (v) the Fee Committee.

| | |
|---|---|
| 01100 | LBI/SIPC Coordination and Issues |
| 01200 | Cash Management |
| 01300 | Insurance Issues |
| 01400 | Employee/ERISA/Benefits/Pension Issues |
| 01800 | Tax Issues |
| 01900 | Corporate Governance |
| 02000 | Other General Business Operation Issues |
| 02100 | Intercompany Issues |
| 02200 | Data Preservation/Migration |
| 02300 | Real Estate Matters |
| 02400 | Private Equity |
| 02500 | Derivatives/Swap Agreement Issues |
| 02600 | Loans/Investments |
| 02700 | Domestic Bank and Related Regulatory Issues |
| 02800 | International Insolvency Issues |
| 02900 | Schedules/Statement of Financial Affairs |
| 03000 | Non-Derivative Automatic Stay/Safe Harbor Issues |
| 03100 | Miscellaneous Asset Sales/363 Issues |
| 03200 | Non-Derivative Executory Contracts/365 Issues |
| 03300 | DIP Financing |
| 03400 | Exit Financing |
| 03500 | Plan of Reorganization/Plan Confirmation/Plan Implementation |
| 03600 | Disclosure Statement/Solicitation/Voting |
| 03700 | Non-Derivative Claims Reconciliation, Estimation, Litigation, and Alternative Dispute Resolution and Bar Date Issues |
| 03800 | Other Bankruptcy Motions and Matters |
| 03900 | Non-Derivative Adversary Proceedings Preparation and Litigation |
| 04000 | Non-Bankruptcy Litigation |
| 04100 | Rule 2004 Issues |
| 04200 | Appeals |
| 04300 | US Trustee Related Issues |
| 04400 | SEC/DOJ Issues |
| 04500 | Examiner Issues |
| 04600 | Firm's Own Billing/Fee Applications |
| 04700 | Firm's Own Retention Issues |
| 04800 | Third Party Retention/Fee Application/Other Issues |
| 04900 | Tax Litigation |

33.    The following summary is intended only to highlight key services rendered by Milbank in certain project billing categories where Milbank has expended a considerable number of hours on behalf of the Committee, and is not meant to be a detailed description of all of the work performed.  Detailed descriptions of the day-to-day services

provided by Milbank and the time expended performing such services in each project billing category are fully set forth in Exhibit "B" hereto.  Such detailed descriptions demonstrate that Milbank was heavily involved in the performance of services for the Committee on a daily basis, including night and weekend work, often under extreme time constraints, to meet the needs of the Committee.  The sheer magnitude of matters in these Chapter 11 Cases has required and continues to require substantial and continuing efforts on the part of the Committee and its professional advisors, including Milbank, to address the many complicated issues and problems that are presented by these extraordinary and complex cases.

A.    **General Case Administration**

34.    During the Tenth Interim Compensation Period, Milbank continued to maintain and undertake action in accordance with an elaborate protocol developed earlier in these Chapter 11 Cases for the organization and delegation of the substantial number of tasks engendered by Lehman's chapter 11 process.  The protocol is designed to ensure that the Committee is kept apprised of all aspects of the Chapter 11 Cases.  The protocol also guarantees that all matters are addressed, without duplication of effort.  Due to the highly complex nature of the Debtors' cases, these tasks require knowledge, expertise, and input from a range of Milbank timekeepers, from paralegals to senior partners, all of whom have become intimately familiar with the issues and the parties in the Chapter 11 Cases.

35.    Additionally, Milbank has established a system whereby all substantive court filings are reviewed to provide the Committee with a comprehensive summary and analysis of each material pleading filed in the Chapter 11 Cases.  Milbank's efforts in setting up efficient methods of administering the Committee's needs ensure that the Committee has the information

necessary to effectively carry out its fiduciary responsibilities to the unsecured creditors of each

of the Debtors through the conclusion of the Chapter 11 Cases.

**B.**      **Unsecured Creditors' Issues/Meetings/Communications/Creditors' Committee**

36.      During the Tenth Interim Compensation Period, the Committee held

weekly telephonic meetings and an in-person meeting in connection with the in-person meetings

with the Debtors and the new Board of Directors of LBHI.  In addition, the Committee convened

special telephonic meetings dedicated to discussing particular issues of import, most notably the

Plan.  Prior to each Committee meeting, Milbank prepared and distributed memoranda,

presentations, and other materials for the Committee members' review and consideration.

During the Committee meetings, Milbank discussed with Committee members and their counsel

all significant matters arising during the Tenth Interim Compensation Period, in particular, the

confirmation of the Plan, the Effective Date, and distributions to creditors, and assisted the

Committee in formulating positions with respect to such issues.

37.      Through Committee meetings, conference calls and numerous other

communications with members of the Committee, Milbank has assisted the Committee in

(i) fulfilling its obligations to unsecured creditors of each of the Debtors' estates, and (ii) making

informed decisions regarding the multitude of issues that have arisen in the Chapter 11 Cases.

Indeed, without such meetings and the advice furnished to it by attorneys with expertise in a

variety of different practice areas, the Committee could neither function as a committee nor

make the many decisions that its statutory role and fiduciary duties require it to make in

connection with these cases.

C.    **Project Monitoring/Court Calendar & Docket Maintenance**

38.    During the Tenth Interim Compensation Period, Milbank continued to

maintain internal filing, record-keeping, docket-monitoring, and calendaring systems to organize

and track (i) pleadings filed in the Chapter 11 Cases, the SIPA Proceeding, and related adversary

proceedings; (ii) ongoing projects; and (iii) upcoming deadlines.  On a real-time basis, Milbank

downloaded, consolidated, and organized pleadings to ensure efficient access.  Milbank also

monitored the dockets and summarized and circulated substantive pleadings to the Milbank

team.  These summaries enabled Milbank to stay abreast of ongoing developments in these cases,

facilitated the assignment of projects and helped ensure that deadlines were not missed.

39.    Additionally, Milbank maintained a comprehensive calendar of active

matters in these cases.  This calendar ensured that Milbank could effectively monitor and update

the status of all pending matters, a resource that proved beneficial in responding to inquiries and

discussing these matters with the Committee and other parties in interest.  Milbank also

maintained, and circulated to the Committee on a weekly basis, a calendar of upcoming motions,

hearing dates, and other important deadlines in the Chapter 11 Cases.

D.    **Hearings and Court Communications**

40.    During the Tenth Interim Compensation Period, Milbank prepared for and

appeared at each of the hearings conducted before this Court, including, among others,

(i) numerous regularly scheduled omnibus hearings; (ii) hearings on claims-related matters;

(iii) special hearings and case conferences; (iv) hearings in the SIPA Proceeding; (v) hearings in

a wide variety of adversary proceedings arising out of the Chapter 11 Cases and the SIPA

Proceeding; and (vi) hearings in related cases and litigations, including the chapter 11 cases of

the SunCal Debtors (as defined below) and a number of matters before the High Court of Justice

for England and Wales (the "UK High Court").

41.    In advance of each hearing, Milbank conferred internally to address the

issues presented by each motion or other substantive pleading and coordinate a response thereto.

To that end, among other things, Milbank reviewed and analyzed documents, including

correspondence and pleadings, conducted factual and legal research, and met with numerous

parties to work toward the consensual resolution of any objections raised by the Committee or

other parties in interest.  Following each hearing, Milbank promptly advised the Committee of

pertinent Court rulings and developments.

**E.    Interested Party Communications/Website/Lehman Team Hotline**

42.    In accordance with the Stipulation and Agreed Order Between the Debtors

and the Official Committee of Unsecured Creditors Regarding Creditor Access to Information

Pursuant to 11 U.S.C. §§ 105(a), 1102(b)(3) and 1103(c) [Docket No. 498], which the Court

approved on October 1, 2008 (the "Creditor Information Protocol"), Milbank, on behalf of the

Committee, continued to populate and maintain a public website (the "Committee Website").

The Committee Website contains a significant amount of content produced by Milbank, which is

updated frequently and designed to provide information to creditors worldwide, including,

among other things, (i) general information concerning the Chapter 11 Cases, including

adversary proceedings and the SIPA Proceeding; (ii) highlights of significant events; (iii) a

database of the Court's memorandum decisions and opinions issued in the Chapter 11 Cases,

adversary proceedings and the SIPA Proceeding; (iv) a listing of the orders granting the Debtors'

omnibus objections to claims, detailing the affected claims by claim number; (v) a case calendar;

(vi) a catalogue of materials and important dates and deadlines related to the Disclosure

Statement, the Plan and the Effective Date; and (vii) answers to frequently asked questions, which are available in several languages.

43.    The Committee Website also acts as a critical pathway for the dissemination of information between Milbank and the Debtors' creditors.  For example, the Committee Website permits creditors to register to receive monthly reports and to submit inquiries directly to Milbank, as to which Milbank works in collaboration with the Debtors' counsel (as required by the Creditor Information Protocol) to provide responses.

44.    During the Tenth Interim Compensation Period, Milbank continued to expend substantial time maintaining and improving the Committee Website.  In addition, hundreds of creditors contacted Milbank via the Committee Website and telephonically with questions concerning the Chapter 11 Cases and, more specifically, inquiries concerning the proposed treatment of certain claims under the Debtors' Second Amended Plan, the Plan and the Debtors' omnibus claim objection process.  In accordance with the Creditor Information Protocol, Milbank reviewed and responded to all such creditor inquiries.

45.    Milbank also spent considerable time working with each of the *ad hoc* groups that formed during the Chapter 11 Cases, as well as with numerous individual creditors, to advance the objectives of various creditor constituencies, assist such creditors' understanding of critical issues in the Chapter 11 Cases, and negotiate resolutions of disputed issues.  At the Court's direction, Milbank also frequently acted as an information "liaison" between the Debtors, these *ad hoc* groups, and other creditors.

**F.    Communications with Debtors**

46.    During the Tenth Interim Compensation Period, Milbank continued its frequent communication and exchange of correspondence with the Debtors' counsel regarding,

among numerous other issues, case administration, responses to pleadings, issues related to the

Debtors' Second Amended Plan and the Plan, and negotiations with the administrators and

trustees (the "<u>Foreign Administrators</u>") managing the affairs of the numerous proceedings (the

"<u>Foreign Proceedings</u>") initiated by or against the Foreign Affiliates.  Furthermore, Milbank

prepared for and attended in-person meetings with the Committee members, the Debtors, and

their respective professionals to, among other things, discuss the ongoing administration of the

Chapter 11 Cases, the Debtors' emergence from chapter 11, and the confirmation and

implementation of the Plan.

**G.       LBI/SIPC Coordination and Issues**

47.       During the Tenth Interim Compensation Period, Milbank devoted

significant time to analyzing various aspects of LBI's claims reconciliation process including, in

pertinent part, (i) monitoring and, where contested, analyzing, the SIPA Trustee's objections to

claims; (ii) reviewing and making recommendations to the Committee with respect to

stipulations to close out prepetition transactions between LBI and various counterparties;

(iii) evaluating and making recommendations to the Committee regarding various motions and

applications filed in the SIPA Proceeding (iv) reviewing and analyzing the SIPA Trustee's

second motion requesting a certain allocation of its funds to LBI's creditors and customers; (v)

participating in meetings between the Debtors and LBI regarding potential settlement options;

and (vi) researching, analyzing and preparing a memorandum with respect to the Debtors'

negotiations with LBI to reconcile outstanding intercompany claims between their estates and the

Debtors' ultimate decision to enter into a global settlement with LBI.  In addition, Milbank

regularly participated in Court hearings related to the administration of the LBI estate on behalf

of the Committee.

48.    Specifically, much of Milbank's time analyzing LBI's claim reconciliation process was dedicated to a review of the SIPA Trustee's efforts to resolve certain outstanding claims not yet categorized by the SIPA Trustee (the "TBA Claims").  This review involved research and analysis of the legal issues implicated by the expunging of such claims.  After analyzing the TBA Claims, Milbank prepared and filed, on behalf of the Committee, a statement with respect the SIPA Trustee's proposed resolution of the issue [Adv. Proc. No. 08-01420; Docket No. 4670].  During the Tenth Interim Compensation Period, Milbank researched additional issues raised by objections to the Trustee's motion to expunge the TBA Claims and drafted a memorandum analyzing the same for the Committee.

49.    Milbank also began reviewing issues raised by the SIPA Trustee's second motion requesting a certain allocation of property of the LBI estate [Adv. Proc. No. 08-01420; Docket No. 4760] (the "Second SIPA Allocation Motion").  This involved multiple meetings among Milbank, the Committee's financial advisors, the SIPA Trustee, the Debtors and their respective counsel and financial advisors.  Milbank also conducted comprehensive research with respect to various issues raised in the Second SIPA Allocation Motion and requested from the SIPA Trustee additional supporting documents regarding the same.  After reviewing and analyzing the additional materials received from the SIPA Trustee, Milbank drafted a detailed memorandum presenting its analysis and recommendations to the Committee.

50.    Finally, Milbank spent a significant amount of time working with the Debtors to address numerous inter-estate issues between the Debtors and LBI.  Milbank and the Debtors' counsel worked closely to prepare for meetings with the SIPA Trustee and representatives of the LBI estate to discuss various issues related to administration of LBI and to reconcile the claims filed between the parties.  Milbank analyzed multiple rounds of proposals

and counter-proposals submitted by the Debtors and the SIPA Trustee to reconcile such claims, which included analyzing the factual circumstances with respect to specific transactions between LBI and one or more of the Debtors and researching the various legal issues related to the treatment of claims under SIPA, the standards for determining the status of claims filed against a broker-dealer, and the contractual rights underlying certain of the claims at issue.  In that connection, Milbank drafted a comprehensive memorandum analyzing for the Committee all of the above-mentioned issues concerning LBI and the Debtors' claims reconciliation efforts.

**H.     <u>Insurance Issues</u>**

51.     During the Tenth Interim Compensation Period, Milbank analyzed the Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for Authorization to Implement the Defense Costs Fund (the "<u>Defense Costs Motion</u>") [Docket No. 22647].  Pursuant to the Defense Costs Motion, the Debtors sought authorization to utilize $2 million previously authorized for use to reimburse directors with respect to costs incurred in connection with new claims asserted between May 2011 and the Effective Date for use to cover ongoing legal costs for directors of LBHI and officers of LAMCO Holdings LLC with respect to existing litigation after the Effective Date.  Milbank reviewed the Defense Costs Motion, researched relevant legal issues and drafted a memorandum to the Committee analyzing the merits of the Defense Costs Motion and providing a recommendation with respect to the same.  On behalf of the Committee, Milbank drafted an objection to the Defense Costs Motion [Docket No. 23178] indicating that the Committee opposed the Defense Costs Motion on the ground that the Debtors had failed to demonstrate a sound business justification therefor.  To address the Committee's concerns, the Debtors filed a Revised Proposed Order that clarified that (i) the defense costs fund would not be replenished once it is exhausted, and (ii) any distributions

25

and/or entitlements that a covered person may have under the Plan with respect to any

indemnification proofs of claim that he or she has filed against LBHI shall be reduced, on a

dollar for dollar basis, by that amount advanced from the defense costs fund to such covered

person and/or his or her designated counsel [Docket No. 23595].  On December 22, 2011, the

Court entered an order approving the Defense Costs Motion [Docket No. 23660].

**I.**     **Tax Issues**

52.     During the Tenth Interim Compensation Period, Milbank analyzed and

evaluated federal, state, local, and international tax issues relating to the Debtors' estates.  A

subcommittee (the "Tax Subcommittee") convened, as necessary, to address the myriad tax

issues arising in the Chapter 11 Cases.  In addition to attending meetings of the Tax

Subcommittee, Milbank participated in the Committee's weekly telephonic meetings to:  (i)

inform the Committee of significant tax matters (e.g., the structure of the Plan, the status and

substance of the Debtors' private letter ruling request from the Internal Revenue Service ("IRS")

and related filings); (ii) obtain Committee input as to certain tax matters and settlements; and (iii)

ascertain information that may be relevant to the tax analysis.

53.     In addition, Milbank participated in weekly conferences with the Debtors'

in-house tax department and outside counsel to discuss (i) the Debtors' ongoing business

activities; (ii) the Debtors' tax compliance activities and preparedness; (iii) the progress of

negotiations with the IRS, the Department of Justice, and state and local taxing authorities

concerning tax audits by, and settlement discussions with, those authorities; (iv) certain tax

issues with LBI's counsel; and (v) the draft IRS ruling regarding the tax consequences of the

Plan.

54.     Milbank also continued to review and analyze (i) tax issues related to the disposition of certain of the Debtors' assets; (ii) the Debtors' federal, state, local, and international tax exposures and potential refund claims; (iii) tax allocation issues among the Debtors, non-Debtor affiliates, and LBI; (iv) structural issues related to the Plan; and (v) the Debtors' request for a ruling from the IRS regarding the tax consequences of the Plan.

55.     Finally, Milbank researched, prepared legal memoranda, and corresponded with the Debtors regarding (i) New York State settlement issues; (ii) the LBI/LBHI settlement agreement and tax reserve requirements; (iii) the effects of the Neuberger Berman tax opinion; (iv) trigger events for cancellation of indebtedness income; and (iv) the potential application of section 505 of the Bankruptcy Code to a determination as to the potential applicability of a withholding tax for distributions made pursuant to the Plan.

56.     **Tax Litigation**.  Milbank, on behalf of the Committee, continued to participate as intervenor in the Debtors' action against the United States (the "Government") for a tax refund relating to the "stock loan" transactions (the "Tax Litigation"), and undertook activities associated with representing the Committee's interests in that litigation.  Milbank participated in the discovery process and analyzed various legal issues relevant to the litigation.

57.     Milbank participated actively in negotiations between the Debtors and the Government concerning discovery issues and helped to broker a compromise with respect to the privileged treatment of the Debtors' tax reserve information, resolving a longstanding dispute between the Debtors and the Government.  Milbank reviewed and commented on drafts of the agreement to ensure that the interests of the Debtors and their creditors would be protected in the compromise.

27

58.      Milbank also conferred with the Debtors and the Government regarding the potential consolidation of the "stock loan" issue in the 2001 through 2004 tax years into the Tax Litigation, to avoid re-litigating the same issue with respect to the later tax years.  The parties decided consolidation was an appropriate course of action and began working on satisfying the procedural prerequisites.

59.      Finally, Milbank reviewed supplemental document productions by the Debtors and the Government, and discussed relevant documents with Debtors' counsel. Milbank also conferred with the Debtors about upcoming depositions in the Tax Litigation and negotiated with the Debtors and the Government regarding protocols to be followed in depositions to be taken in the United Kingdom.

**J.      Intercompany Issues**

60.      During the Tenth Interim Compensation Period, Milbank continued to investigate the various intercompany issues raised by the Plan.  These issues not only encompassed claims and settlements with the Foreign Affiliates, but also the ownership and allocation of assets among the Debtors.

61.      **Bankhaus Claims Classification**.  Lehman Brothers Bankhaus AG ("Bankhaus") is a wholly-owned subsidiary of LBHI that was placed into an insolvency proceeding by the Frankfurt Local Court (*Amtsgericht*) on November 13, 2008.  In January 2010, certain of the Debtors entered into a settlement agreement with Bankhaus (the "Settlement Agreement") that, among other things, fixed the amount of the allowed claims that Bankhaus would have against LBHI and LCPI.  Bankhaus subsequently assigned these claims to a third-party, which then filed a motion seeking the proper classification of such claims under the Plan. Because of the significant impact that such classification could have on unsecured creditor

28

recoveries, during the Tenth Interim Compensation Period, Milbank expended significant time

researching and analyzing the terms of the Settlement Agreement and the terms of the Plan to

assist the Committee's understanding of the proper classification of these claims.  On behalf of

the Committee, Milbank worked with the Debtors to come to a consensual resolution of this

matter.

      62.    **Main Street Bondholders Settlement**.  In addition, Milbank conducted

research and analyzed issues in connection with the claims arising from a prepetition gas

purchase agreement (the "GPA") that LBCS had entered into with Main Street Natural Gas Inc.

("Main Street"), pursuant to which Main Street prepaid LBCS over $680 million for the delivery

of natural gas.  To finance this prepayment, Main Street issued a series of bonds with an

aggregate face value of over $700 million.  LBHI had guaranteed LBCS's performance under the

GPA.  The holders of the bonds issued by Main Street (the "Main Street Bondholders") filed

claims in the amount of $769 million against LBCS and LBHI.  After reviewing the terms of the

GPA and the related guarantee and analyzing the relative strengths and weaknesses of the claims

and objections thereto, Milbank participated in the settlement discussions between the Debtors

and the Main Street Bondholders regarding the proper valuation of these claims.  Such

discussions culminated in a settlement agreement, in support of which the Committee filed a

statement [Docket No. 22867], and which was approved by this Court on December 14, 2011

[Docket No. 23335].

      63.    **Intercompany Repurchase Agreements**.  Finally, Milbank continued to

examine the Debtors' treatment of claims arising in connection with the Debtors' prepetition

intercompany repurchase agreements and the considerations affecting such treatment.  In

connection therewith, Milbank assessed the potential recharacterization of such claims as equity,

as well as defenses that could be asserted against such recharacterization. Milbank also

evaluated issues with respect to valuation and alternatives to the Debtors' proposed treatment of

intercompany claims.

**K.      Real Estate Matters**

64.      As reflected in the First Interim Fee Application, due to the size,

complexity and potential for exposure, the Committee established a subcommittee (the "Real

Estate Subcommittee") to evaluate issues relating to the Debtors' extensive real estate portfolio.

During the Tenth Interim Compensation Period, the Real Estate Subcommittee held regular

telephonic meetings to address and make recommendations to the full Committee with respect to

issues related to the Debtors' real estate holdings in discrete assets (e.g., Archstone, Calvino,

Excalibur, Hamilton Praedium, Innkeepers, LCOR, Moonlight Basin, Monument Realty, One

Kansas City Place, ProLogis, Ritz Carlton Kapalua, Rosslyn, SunCal, TPG Austin, 116

Huntington and 425 Park Avenue) and work with the Debtors under previously approved

protocols to maximize the value of the Debtors' real estate assets.

65.      The Debtors' real estate portfolio includes commercial, residential and

corporate interests in which the Debtors hold both debt and equity positions, often in the form of

joint ventures to develop large commercial projects. During the Tenth Interim Compensation

Period, Milbank continued to work closely with the Committee's financial advisors to assess

whether the Debtors should continue to meet various real estate-related funding obligations and

whether to invest additional funds in certain assets to increase the potential sale value. In

addition, Milbank continued to evaluate the terms of the Debtors' proposed restructuring of

certain debt facilities (e.g., the Calvino/Zwinger facility). In connection therewith, Milbank

reviewed the Debtors' rights, obligations and exposures relative to joint venture partners,

borrowers, senior secured lenders, unsecured creditors and other third parties, to further analyze

the potential consequences of the proposed restructurings or failures to fund capital calls on the

Debtors' creditors.  Milbank also participated in the consensual resolution of several outstanding

real estate-related motions.

66.    During the Tenth Interim Compensation Period, Milbank researched and

drafted memoranda in connection with certain real estate matters, prepared and filed several

pleadings in connection with real estate transactions requiring Court approval, and monitored

legal proceedings related to the Debtors' real estate assets.  Milbank also met regularly with the

Debtors and the Debtors' advisors regarding how the Debtors should use their real estate assets

to generate maximum value for the Debtors' creditors.

67.    **Archstone**.  In 2007, certain of the Debtors and their non-Debtor affiliates

made equity investments and loans in connection with the leveraged buyout of Archstone-Smith

Trust ("Archstone"), a publicly-traded real estate investment trust.  The acquisition of Archstone

was financed with more than $16 billion in secured financing either assumed or provided by

affiliates of the Debtors, affiliates of Bank of America, N.A ("Bank of America") and affiliates

of Barclays Capital Real Estate Inc. ("Barclays" and, together with Bank of America, the

"Banks" and, collectively with affiliates of the Debtors, the "Co-Sponsors").  The Co-Sponsors

invested approximately $4.8 billion in the aggregate in common equity of Archstone, with

approximately $2.4 billion attributable to the Debtors' indirect interests.

68.    In January 2009, the Court authorized LBHI, LCPI and the Banks to

commit an additional aggregate amount of $485 million, plus available letters of credit, as new

priority financing to provide Archstone with customary operating liquidity [Docket No. 2677].

The Court subsequently approved a more comprehensive restructuring on May 25, 2010 (and

modifications thereto, approved on November 18, 2010) [Docket No. 12894].  As part of the

modified restructuring, the Co-Sponsors entered into an agreement, dated as of December 1,

2010 (the "Bridge Equity Agreement"), pursuant to which, if any Co-Sponsor attempted to

transfer its interest in Archstone, the other Co-Sponsors would have a right of first offer (the

"ROFO") to purchase such interests consistent with the terms of said agreement.  At the

beginning of the Tenth Interim Compensation Period, Lehman held a 47% ownership interest in

Archstone, Bank of America held a 28% ownership interest, and Barclays held a 25% ownership

interest.

        69.      During the Tenth Interim Compensation Period, the Debtors received the

Banks' ROFO notice, which provided, in relevant part, for Bank of America and Barclays to

transfer approximately 50% of each of their interests in Archstone (approximately 26.5% of total

ownership in Archstone), comprised of equity owned, partnership interests, governance interests,

membership interests, and voting interests (collectively, the "Transferred Securities") to Equity

Residential – a Maryland real estate investment trust and Archstone's biggest competitor – for an

aggregate purchase price of $1.325 billion, subject to certain adjustments for additional

expenses.  Pursuant to the terms of the Bridge Equity Agreement, the Debtors had the right to

purchase the Transferred Securities on the terms set forth on the Banks' ROFO notice, which

right had to be exercised by December 16, 2011.  In addition, Lehman had 50 days from receipt

of the Banks' ROFO notice to deliver a binding notice of its decision to exercise the ROFO or

tag-along rights and deposit an amount equal to 5% of the aggregate price for the Transferred

Securities.

        70.      The Real Estate Subcommittee held weekly meetings regarding the status

of Archstone, one of the Debtors' largest and most valuable assets.  Milbank and the

Committee's financial advisors were also actively involved in negotiations relating to the
Archstone portfolio and were in constant contact with the Debtors and their advisors regarding
whether Lehman should exercise the ROFO or pursue another course of action.  Milbank
reviewed and evaluated numerous internal analyses, valuation models and other materials
assessing the optimal use of the Archstone assets.  After extensive research, valuation and
analysis, and lengthy and detailed deliberations among Milbank, the Committee's financial
advisors, and the Committee, Milbank advised the Committee that the exercise of the ROFO was
within the Debtors' sound business judgment and recommended that the Committee
affirmatively support the Debtors' intent to exercise the ROFO.   In addition, Milbank assisted in
the Committee's determination that the alternative course of action – foregoing the ROFO and
allowing Equity Residential to purchase half of Barclays' and Bank of America's interests in
Archstone for a price that was below market-value – was an inferior option that would not
maximize the value of the Debtors' estates for all unsecured creditors.  Accordingly, Milbank
drafted a statement in support of the Debtors' intent to exercise the ROFO [Docket No. 24121]
and the Court ultimately approved the Debtors' exercise of the ROFO [Docket No. 24197]

71.    **SunCal**.  SunCal is a collection of large-scale residential and commercial
real estate projects in California.  Prior to the Petition Date, Lehman ALI, LCPI and certain other
non-Debtor affiliates of LBHI provided debt financing for the SunCal projects totaling over $2
billion.  As a result of its financial difficulties, SunCal and several affiliates became debtors in
possession (collectively, the "SunCal Debtors") in the United States Bankruptcy Court for the
Central District of California (the "SunCal Cases") and the Debtors filed a proof of claim against
certain of the SunCal Debtors in the SunCal Cases.

72.    Most significantly, during the Tenth Interim Compensation Period, Milbank participated telephonically in status conferences and the SunCal Debtors' confirmation hearing.  After each conference or hearing, Milbank reported back to the Committee regarding significant issues arising from the SunCal Debtors' proceedings.  The SunCal Debtors' plans of reorganization were confirmed during the Tenth Interim Compensation Period.

73.    In addition, during the Tenth Interim Compensation Period, Milbank reviewed and analyzed, *inter alia*, the following pleadings related to the SunCal Debtors, and provided recommendations to the Committee with respect thereto: (i) Debtors' Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 6004 and 9019 for Approval of that Certain Settlement Among the Lehman Parties and the SunCal Parties [Docket No. 21181] and (ii) numerous Stipulations Between Lehman Commercial Paper Inc. and Certain SunCal Voluntary Debtor Entities Granting Limited Relief from the Automatic Stay [Docket Nos. 22852, 23151, 23184, 23473 and 25700].

## L.    **Private Equity**

74.    As reflected in the First Interim Fee Application, the Committee established a subcommittee (the "Private Equity Subcommittee") to monitor and analyze developments with respect to the Debtors' private equity assets.  During the Tenth Interim Compensation Period, the Private Equity Subcommittee continued to review specific issues surrounding the Debtors' private equity portfolio with a view toward helping the Debtors maximize the value of such portfolio for the benefit of all creditors.  Specifically, Milbank worked closely with the Debtors, the Debtors' professionals and the Committee's financial advisors regarding these assets.

34

75.    Most significantly, Milbank reviewed a transaction pursuant to which
LBHI sought authority to monetize its equity interest in Neuberger Berman Group LLC
("Neuberger Berman").  Milbank fully analyzed and evaluated the terms of the proposed
transaction and, based on such detailed analysis, determined that the proposed transaction was
fair, reasonable and within the Debtors' sound business judgment.  Accordingly, Milbank filed a
statement in support of authorizing the Debtors to monetize their equity interests in Neuberger
Berman [Docket No. 23212], which the Court ultimately approved [Docket No. 23348].

**M.    Derivatives Issues**

76.    As reflected in the First Interim Fee Application, the Committee
established a subcommittee (the "Derivatives Subcommittee") to evaluate issues and develop
value-maximizing strategies relating to the Debtors' valuable derivatives portfolio.  During the
Tenth Interim Compensation Period, Milbank continued to conduct regular meetings with the
Derivatives Subcommittee to address and, where appropriate, make recommendations to the
Committee with respect to specific issues concerning the Debtors' portfolio of derivatives
positions.

77.    **Derivatives ADR**.  On September 17, 2009, this Court entered an order
approving the Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and General
Order M-143 for Authorization to Implement Alternative Dispute Resolution Procedures for
Affirmative Claims of Debtors Under Derivative Contracts (the "Derivatives ADR Order")
[Docket No. 5207], pursuant to which the Committee, the Debtors and derivatives counterparties
mediate disputes arising from the closing out of the Debtors' "in-the-money" derivatives
portfolio.  During the Tenth Interim Compensation Period, Milbank continued to work closely
with the Debtors to review and respond to counterparty notices filed under the Derivatives ADR

35

Order, and to evaluate settlement proposals arising under the alternative dispute resolution

process.  In addition, Milbank participated in mediations on behalf of the Committee or

Derivatives Subcommittee, as applicable.  In preparation for each such mediation, Milbank

conducted extensive legal and factual research on the issues in dispute and drafted numerous

memoranda, including memoranda to the Derivatives Subcommittee, describing such issues and

seeking approval of minimum settlement amounts.  Such efforts have been instrumental in

helping the Debtors achieve settlements in a total of 194 matters involving 216 counterparties, as

of April 17, 2012, resulting in the recovery of over $1.1 billion into the Debtors' estates.

78.    **Derivatives Litigation**.  Milbank also continued to address issues related

to, and provided recommendations regarding, the highly complex derivatives-related adversary

proceedings commenced by and against the Debtors.  To that end, Milbank devoted resources to

analyzing derivative contracts and other related transaction documents, monitoring and

participating actively in the derivatives-related adversary proceedings, communicating with the

Debtors' counsel and the Committee's financial advisors, and developing and evaluating

strategies to monetize complicated derivative transactions for the benefit of unsecured creditors

of each of the Debtors' estates.  In particular, Milbank researched and analyzed issues presented

in, and advised the Committee or Derivatives Subcommittee (as applicable) with respect to,

certain contested matters and adversary proceedings, or potential settlements related thereto,

including, among others:  (i) the Debtors' objection to Proof of Claim No. 66099 filed by

Syncora Guarantee, Inc.; (ii) *Wong v. HSBC USA Inc.*, S.D.N.Y. Case No. 10-cv-00017, Bankr.

Ct. Adv. Proc. No. 09-01120; (iii) *Nomura Global Financial Products Inc. v. Lehman Brothers

Special Financing Inc.*, Bankr. Ct. Adv. Proc. No. 09-01061; (ii) *Michigan State Housing

Development Authority v. Lehman Brothers Derivative Products Inc., et al.*, Bankr. Ct. Adv.

Proc. No. 09-01728; and (iv) UK proceedings involving Belmont Park Investments Pty Limited,

Carlton Communications Ltd., and Credit Agricole Corporate and Investment Bank (f/k/a

Calyon).

79.    **Derivatives Settlements**.  On December 16, 2008, this Court entered an

order to establish procedures for the settlement or assumption and assignment of prepetition

derivative contracts (the "December Order") [Docket No. 2257], pursuant to which the

Committee, the Debtors and derivatives counterparties negotiate outstanding derivative and

guarantee claims of the counterparties or amounts due to the Debtors as they may arise from the

closing out of the Debtors' derivatives portfolio.  On March 11, 2009 and April 22, 2010,

respectively, this Court entered further orders authorizing the Debtors to grant first priority liens

in cash collateral posted in connection with the hedging transactions entered into through certain

futures and prime brokerage accounts (the "Hedge Order") [Docket No. 3047], and to purchase

and sell notes issued by certain special purpose vehicles that are party to transactions with certain

Debtors (the "SPV Notes Purchase Order") [Docket No. 8596].

80.    Furthermore, as described in the Disclosure Statement, the Debtors

engaged in negotiations with a number of their largest derivatives counterparties regarding a

common approach for settlement of their derivatives claims pursuant to uniform and transparent

methodologies (the "Derivatives Framework").  Multiple attendant negotiations and

accompanying settlement agreements had resolved, as of August 31, 2011, approximately $9.6

billion of asserted derivatives claims and $6.2 billion of asserted derivatives guarantee claims.

81.    Pursuant to the December Order, the Hedge Order, and the SPV Notes

Purchase Order, and taking into account the Derivatives Framework, during the Tenth Interim

Compensation Period, Milbank continued to work closely with the Debtors to review claims or

37

receivables, hedge proposals, and proposed note purchases, and to arrive at negotiated

settlements or transactions with respect thereto.  To that end, Milbank devoted resources to

analyzing derivative contracts and other related transaction documents, communicating with the

Debtors' counsel and the Committee's financial advisors, and developing and evaluating

strategies to monetize complicated derivatives transactions for the benefit of unsecured creditors

of each of the affected Debtors' estates.  Milbank also expended time describing such analyses

and recommendations in presentations and memoranda to the Committee or Derivatives

Subcommittee, as applicable.

        82.    Notably, Milbank analyzed the Debtors' unresolved derivative contracts,

monitoring the Debtors' triage of negotiations and settlements before and after the confirmation

of the Plan, and formulated strategies to maximize returns to the unsecured creditors in respect of

unresolved derivative contracts both leading up to, and looking forward from, confirmation.  In

connection therewith, Milbank researched and analyzed novel issues regarding various sections

of the ISDA Master Agreement and their intersection with the Bankruptcy Code and certain

foreign laws and regulations.  Milbank also advised the Committee or Derivatives

Subcommittee, as applicable, with respect to the same and related ongoing settlement

negotiations, describing such analyses and recommendations in presentations and memoranda.

**N.**      **Loans/Investments**

        83.    As reflected in the First Interim Fee Application, the Committee

established a subcommittee (the "Loan Book Subcommittee") to review and analyze issues

related to the Debtors' portfolio of commercial loans.  During the Tenth Interim Compensation

Period, the Loan Book Subcommittee reviewed and considered the proposed termination of the

Spruce CCS, Ltd. securitization structure.  Specifically, Milbank reviewed and analyzed the

Debtors' Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code for Approval of the

Termination of the Spruce CCS, Ltd. Securitization [Docket No. 20338].  In connection

therewith, Milbank researched relevant legal issues, drafted a memorandum to the Committee

analyzing the merits of the motion and provided a recommended course of action to the

Committee.

        84.     In addition, Milbank continued to evaluate various options proposed by

the Debtors to facilitate the management and monetization of the Debtors' loan book portfolio.

Milbank reviewed and considered, among other things, (i) factual, financial and legal issues

related to the assumption or rejection of the Debtors' loan agreements; (ii) the circumstances

under which an asset transfer transaction would be anticipated to give rise to a true sale of loan

interests; (iii) the likelihood that a final court order approving the Debtors' proposed transfer

could be modified or reversed upon reconsideration or appeal; and (iv) other issues related to

the potential management of the Debtors' loan portfolio.  Milbank provided the Committee with

its analyses of the Debtors' proposed transfer and the potential implications such transfer would

have on the Debtors' estates.  In connection therewith, Milbank analyzed the Debtors'

restructuring plan for Edam Acquisition Holdings BV, a leading global independent TV

production company to which LCPI UK held approximately €151.3 million in senior debt

exposure.  Milbank also continued to monitor the Debtors' termination of unfunded loan

commitments and loan restructurings as reported by the Debtors in accordance with that certain

Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule

9019 Authorizing the Establishment of Procedures to Terminate Unfunded Commitments and

Restructure Corporate Loan Agreements, entered on June 3, 2009 [Docket No. 3753].

85.     Finally, Milbank continued to work with the Committee's financial advisors to present the legal and financial implications of the Debtors' loan book transactions to the Loan Book Subcommittee in order to facilitate its recommendations and responsive courses of action to the full Committee.  To that end, the Loan Book Subcommittee convened meetings to discuss and formulate recommendations regarding all outstanding loan book matters.

**O.    Domestic Bank and Related Regulatory Issues**

86.     Milbank continued to expend time in connection with analyzing issues related to Woodlands Commercial Bank ("Woodlands") and Aurora Bank FSB ("Aurora" and, together with Woodlands, the "Banks"), which are overseen by the Office of Thrift Supervision (the "OTS") and the Federal Deposit Insurance Company (the "FDIC" and, together with the OTS, the "Regulators").  Throughout the Chapter 11 Cases, the Debtors and the Committee's professionals have sought to improve the capital levels at each of the Banks to satisfy regulatory requirements, avoid potential seizures and liquidations by the Regulators, and facilitate the resumption of depository functions at the Banks to preserve and maximize value.  Accordingly, Milbank worked closely with the Debtors and their advisors to finalize the terms of settlements among the Debtors and the Banks to achieve the Regulators' approval to resume normal profit-generating banking and lending operations.

87.     During the Tenth Interim Compensation Period, Milbank continued to work with the Committee's financial advisors, the Debtors and the Debtors' bankruptcy and regulatory counsel concerning implementation of the settlements.  Milbank attended multiple telephonic meetings to discuss issues surrounding such implementation, which included, without limitation, mortgage foreclosure issues associated with the sale of Aurora and its subsidiaries and the wind-down of Woodlands.

P.    **International Insolvency Matters**

88.    During the Tenth Interim Compensation Period, Milbank continued to monitor and analyze issues regarding the Foreign Proceedings.  Specifically, Milbank attorneys and paraprofessionals across various jurisdictions continued to collaborate with each other, the Debtors' counsel and the Foreign Administrators regarding the status of major issues among the Debtors and certain of the Foreign Affiliates and potential settlements thereof.  Milbank also reviewed and analyzed status reports published by the Foreign Administrators – including reports published by the administrators of Lehman Brothers Securities N.V., Lehman Brothers International (Europe) ("LBIE"), Lehman Brothers Treasury Co. B.V., and Lehman Brothers Finance AG ("LBF") – and other publicly available information to keep the Committee informed with respect to, among other things, asset recoveries and claims reconciliation.  Based on such analyses, Milbank provided regular updates to the Committee regarding the status of the Foreign Proceedings, and their impact on the Debtors and the overall recoveries of the Debtors' creditors.

89.    Furthermore, Milbank worked closely with the Debtors' counsel and the Committee's financial advisors concerning the development and implementation of numerous settlement agreements with the Foreign Affiliates located in the UK, Hong Kong, Japan, the Netherlands, Luxembourg, and Bermuda.  In connection therewith, Milbank reviewed and commented on numerous drafts of the settlement agreements, researched relevant factual and legal issues implicated by such review, communicated regularly with the Committee's financial advisors and Debtors' counsel, and presented the settlements and legal issues to the Committee. Milbank and the Committee's financial advisors prepared comprehensive analyses describing the terms and issues of each settlement.  In each such instance, based on the foregoing analyses

41

08-13555-mg    Doc 27999    Filed 05/21/12    Entered 05/21/12 19:43:50    Main Document
Pg 54 of 85

and discussions with the Committee, the Committee concluded that the settlements were in the

best interests of the Debtors and supported the Debtors' entry into such settlements.

90.    **UK Issues**.  During the Tenth Interim Compensation Period, Milbank

monitored and discussed the implications with the Committee of the following ongoing

litigation proceedings in the UK:  (i) the appeal of the UK High Court's decision holding that

any client whose money has not been segregated by a Financial Services Authority regulated

firm in accordance with Chapter 7 of its Client Assets Sourcebook will, upon the firm's

insolvency, be unable to assert a claim against the pool of segregated money; and (ii) the appeal

of the UK High Court's decision holding that Financial Support Directives should be treated as

an "expense" of a company in administration and consequently rank in priority to the claims of

all other unsecured creditors.  Milbank also reviewed and analyzed for the Committee the Sixth

Progress Report issued by PricewaterhouseCoopers as joint administrators of LBIE.

## Q.    Non-Derivative Automatic Stay/Safe Harbor Issues

91.    During the Tenth Interim Compensation Period, Milbank reviewed

numerous motions filed by parties in interest seeking to lift the automatic stay in order to enforce

various contractual agreements or otherwise exercise rights against the Debtors' estates.

92.    Specifically, Milbank analyzed lift stay motions filed by

(i) the Estate of Fannie Marie Gaines; (ii) Michael A. Couch and Melissa A. Couch; (iii) the

Setai Group, LLC, NC Land Corporation, Jonathan J. Breene, John P. Conroy, and Setai (Turks

& Caicos) Ltd; and (iv) Benisasia Investment and Properties Limited.  In each case, Milbank

reviewed the motion, researched relevant legal issues, and drafted a memorandum to the

Committee analyzing the merits of the motion and providing a recommended course of action

with respect thereto.

42

93.    Milbank also analyzed the motion of Turnberry/Centra Sub, LLC, Turnberry/Centra Office Sub, LLC, Turnberry Retail Holding, L.P., Jacquelyn Soffer, and Jeffrey Soffer (collectively, the "Turnberry Plaintiffs") for relief from the automatic stay [Docket No. 19591] (the "Turnberry Motion").  On behalf of the Committee, Milbank drafted a joinder in the Debtors' objection [Docket No. 20790] to the Turnberry Motion indicating the Committee's agreement with the Debtors that (i) relief from the automatic stay should be denied because the Turnberry Plaintiffs had failed to demonstrate that requisite cause therefor existed under the controlling Sonnax precedent and (ii) the Turnberry Plaintiffs' request for this Court's abstention from adjudicating the adversary proceeding in favor of a Nevada court should be denied because no state court action was pending in Nevada.  On October 25, 2011, the Debtors and the Turnberry Plaintiffs filed a stipulation whereby the Turnberry Plaintiffs agreed to withdraw the Turnberry Motion [Docket No. 21249].

94.    **Motion to Enforce the Automatic Stay**.  Milbank also analyzed the motion of the SIPA Trustee for an order enforcing the automatic stay and the stays imposed by the order commencing the SIPA proceeding and compelling payment of amounts payable by Deutsche Bank AG [Docket No. 4688].  Milbank reviewed the motion, researched relevant legal issues, drafted a memorandum to the Committee analyzing the merits of the motion and provided a recommended course of action to the Committee.

R.    **Plan of Reorganization/Plan Confirmation/Plan Implementation**

95.    The Committee, as one of the two principal fiduciaries in the Chapter 11 Cases, was instrumental in developing, together with the Debtors, a chapter 11 plan construct that is fair and equitable to all the diverse constituents in the Chapter 11 Cases, and assuring, through the numerous settlements integrated into the Plan, that the Plan garnered the support of

most of the Debtors' creditors.  Over the course of the past three years, the Committee, with the

assistance of its advisors, has evaluated the claims, factual contentions and legal theories of all

key constituencies in the Chapter 11 Cases, and has analyzed numerous recovery scenarios and

conducted frequent meetings with individual creditors and various *ad hoc* creditor groups to

better understand their respective views.  In addition, the Committee developed its own legal

theories and strategies regarding, among other matters, the appropriate allocation of value

distributable under the Plan to various classes of creditors.  In that connection, the Committee

reviewed and analyzed such issues as substantive consolidation, intercompany claims re-

characterization, and the enforceability of guarantees, all of which had the potential effect of

reallocating value from one group of creditors to another.  In so doing, the Committee brought

to bear a comprehensive knowledge of each Debtor's assets and claims pool, as well as a global

perspective on the key value drivers, each acquired as a result of the Committee's immersion in

every aspect of the Chapter 11 Cases.

96.      The Committee's perspective on the issues confronting, and the options

available to, the Debtors allowed it to become, together with the Debtors, a principal architect of

a plan construct that achieved the most fair and equitable result for creditors available under the

circumstances.  The centerpiece of such construct was a global settlement of the numerous

critical issues, including the risk of substantive consolidation of the Debtors' estates and those

of its affiliates, the potential re-characterization of intercompany balances between LBHI and

certain other Debtors, the allowed amount of claims among the Debtors and the Foreign

Affiliates, the proper allocation among the Debtors of the costs and expenses of administering

the Chapter 11 Cases, and the Debtors' ownership rights to certain assets, through a reallocation

of value among the various affected Debtors.  This concept was included in all iterations of the

chapter 11 plan for the Debtors on which the Committee and the Debtors collaborated,

beginning with the Debtors' First Amended Plan filed on January 25, 2011, and culminating

with the Plan.  To preserve this critical concept, during the Tenth Interim Compensation Period,

the Committee worked with the Debtors to forge the various settlements embodied in the Plan.

97.    **The Plan**.  During the Tenth Interim Compensation Period, Milbank

continued to work on the implementation of the corporate governance provisions of the Plan,

which provided for, among other things, the formation of a committee (the "Director Selection

Committee") to select the post-Effective Date board of directors of LBHI.  In that connection,

Milbank convened various meetings relating to the formation and mandate of the Director

Selection Committee and aided its members in the execution of their duties under the terms of

the Plan.

98.    Milbank also devoted significant time and effort to the process for

confirmation of the Plan.  In connection with Plan confirmation, Milbank (i) reviewed and

commented on the documents contained in the Plan Supplement filed in connection with the

Plan; (ii) reviewed and analyzed numerous objections to confirmation that were filed against the

Plan and consulted with the Debtors on responses to such objections; and (iii) researched several

legal elements essential to confirmation of the Plan pursuant to section 1129 of the Bankruptcy

Code and other applicable law.  Milbank, on behalf of the Committee, filed the Statement of

Official Committee of Unsecured Creditors (i) in Support of Third Amended Joint Chapter 11

Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors and (ii) in Response to

Objections to Such Plan [Docket No. 22773].  Milbank's efforts played a part in the Court's

confirmation of the Plan on December 6, 2011.

45

99.     During the Tenth Interim Compensation Period Milbank, together with the Committee's other professionals, prepared and made a comprehensive presentation to the new Board of Directors of LBHI, which addressed, among other things, the Debtors' various asset categories, claims management and mitigation, the administration of the SIPA proceeding of LBI, outstanding litigation, and tax issues.

100.     After the Plan was confirmed, Milbank continued to work to ensure that its terms were implemented and distributions to creditors were effected and maximized.  In that connection, Milbank reviewed and analyzed LBHI's Motion for Authority to Use Non-Cash Assets in Lieu of Available Cash as Reserves for Disputed Claims Pursuant to Section 8.4 of the Debtors' Confirmed Joint Chapter 11 Plan [Docket No. 24726] (the "Reserve Motion").  Milbank researched relevant legal issues, drafted a memorandum to the Committee analyzing the merits of the Reserve Motion, and provided a recommended course of action to the Committee.  On behalf of the Committee, Milbank drafted a statement in support of the Reserve Motion [Docket No. 25546] indicating the Committee's agreement with the Debtors that the Reserve Motion reflected a mechanism by which holders of allowed claims would receive the maximum permissible distribution under the Plan, while protecting the rights of other claimants.  On February 22, 2012, the Court entered an order approving the Reserve Motion [Docket No. 25641].

**S.     Claims Analysis**

101.     **Claims Database**.  Milbank continued, during the Tenth Interim Compensation Period, to refine the database of the Debtors' and certain of the Foreign Affiliates' debt offering documents (the "Database") that was created during the First Interim Compensation Period.  Milbank continued to use the Database to develop and present summary

forensic capital structure information to the Committee and its advisors, as well as to answer

individual queries from the Committee and the public about specific Lehman debt instruments.

The Database is used by Milbank and the Committee's financial advisors on a regular basis to

understand the Debtors' and certain Foreign Affiliates' capital structures, review proofs of

claim, establish a basis upon which to determine and validate claim amounts, and analyze

substantive consolidation, intercompany, preference, seniority and other potential issues.

Access to the Database has proven invaluable to the Committee and its advisors, particularly

with respect to the matters related to the claims reconciliation process and the Plan.

   102. **OMX Claims Objection**.  On November 10, 2011, LBHI, the Committee,

Boise Land & Timber II, LLC ("Boise"), OMX Timber Finance Investments II, LLC ("OMX"),

Wells Fargo Bank Northwest, N.A., and certain financial institutions and funds entered into a

stipulation (the "Stipulation") concerning the proof of claim filed by OMX on September 18,

2009 [Claim No. 17120] (the "OMX Claim") and the disputed portion of the proof of claim

filed by Boise on April 17, 2009 [Claim No. 3813] (the "Boise Claim").  The Court approved

the Stipulation on December 14, 2011 [Docket No. 23339].  Milbank reviewed and analyzed the

issues raised in connection with the Stipulation and subsequently filed, on behalf of the

Committee, a preliminary objection to the OMX Claim and the Boise Claim asserting, among

other things, that (i) LBHI has no liabilities under the guaranty at issue because OMX has not

served demand notices on LBHI (except to the extent notices may have been served in violation

of the automatic stay); and (ii) even if the Court permits OMX to trigger LBHI's obligations

under the guaranty, the OMX Claim is duplicative of the allowed portion of the Boise Claim

[Docket No. 25925].  Discussions among OMX, Boise and Milbank regarding this preliminary

objection remain ongoing.

47

103.    **Estimation of Claims**.  Milbank reviewed and analyzed the Debtors'

Motion Pursuant to Section 8.4 of the Modified Third Amended Joint Chapter 11 Plan of

Lehman Brothers Holdings Inc. and Its Affiliated Debtors and Sections 105(a), 502(c) and

1142(b) of the Bankruptcy Code to Estimate the Amounts of Claims filed by Indenture Trustees

on Behalf of Issuers of Residential Mortgage-Backed Securities for Purposes of Establishing

Reserves (the "RMBS Motion") [Docket No. 24254].  On behalf of the Committee, Milbank

drafted a statement in support of the RMBS Motion [Docket No. 24598] indicating the

Committee's agreement with the Debtors that in order to expedite distributions to unsecured

creditors and to make the amount of the initial distribution meaningful, it was imperative that

the Court estimate the identified mortgage-backed security claims for the purposes of

establishing appropriate reserves.  On February 22, 2012, the Court entered an order approving

the RMBS Motion [Docket No. 25643].

104.    Milbank also reviewed and analyzed the Debtors' Motion Pursuant to

Section 8.4 of the Modified Third Amended Chapter 11 Plan of Lehman Brothers Holdings Inc.

and Its Affiliated Debtors to Estimate the Amount of Disputed Claims filed by Lehman Brothers

Finance AG (In Liquidation) for Purposes of Establishing Reserves (the "LBF Motion") [Docket

No. 24253].  On behalf of the Committee, Milbank drafted a statement in support of the LBF

Motion [Docket No. 24611] indicating the Committee's agreement with the Debtors that the

Court should estimate certain claims filed by LBF (the "LBF Claims") for the purpose of

establishing reserves so that proper distributions could be made to the Debtors' unsecured

creditors.  On January 26, 2012, the Court ruled that it would estimate the LBF Claims at $3

billion for purposes of the reserves.  See Transcript of Hr'g at 46.  In connection therewith,

Milbank prepared a memorandum for the Committee that provided an overview of the claims

48

filed by LBF against LBHI and LBSF as well as an analysis of the primary outstanding legal issues that may affect the LBF Claims.

105.    **Omnibus Claims Objections**.  During the Tenth Interim Compensation Period, Milbank reviewed and analyzed the Debtors' omnibus objections to claims, and spoke regularly with the Debtors and their counsel regarding such objections.  In that connection, Milbank researched and analyzed legal issues and responded to various creditor inquiries regarding objections to such creditors' claims.  Specifically, Milbank analyzed various discrete issues that arose in connection with the Debtors' omnibus objections, including the classification of claims arising from Lehman's issuance of "restricted stock units" to its employees and the validity of the omnibus proofs of claim filed by the indenture trustees to certain residential mortgage-backed securities transactions.

106.    In connection therewith, Milbank reviewed and analyzed the Debtors' Seventy-Third Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [Docket No. 13295]; One Hundred Eighteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [Docket No. 15666]; One Hundred Thirtieth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [Docket No. 16115]; One Hundred Thirty-First Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [Docket No. 16116]; One Hundred Thirty-Third Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [Docket No. 16530]; One Hundred Thirty-Fourth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [Docket No. 16532]; One Hundred Thirty-Fifth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [Docket No. 16808]; and One Hundred Seventy-Sixth

Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [Docket No. 19392] (collectively, the "RSU Objections").

107.    On behalf of the Committee, Milbank drafted a statement in support of the RSU Objections [Docket No. 23604] indicating that the Committee supported the relief requested in the RSU Objections and agreed with the Debtors that the claims (the "RSU Claims") asserted with respect to restricted stock units or contingent stock awards, under section 510(b) of the Bankruptcy Code, should have the same priority as LBHI's common stock.  On December 21, 2011, after a lengthy hearing, the Court ruled that the Debtors must amend the RSU Objections to address the issues raised at the hearing and thereafter engage in a dialogue with, among others, those claimants who were represented by counsel at the hearing for the purpose of developing a set of procedures so that a record could be established.  See Transcript of Hr'g at 127-28.

108.    **Structured Securities Valuation Motion**.  Prior to the Tenth Interim Compensation Period, the Court granted the Debtors' Amended Motion Pursuant to Sections 105(a) and 502(b) of the Bankruptcy Code and Bankruptcy Rule 9019 for Approval of Procedures for Determining the Allowed Amount of Claims Filed Based on Structured Securities Issued or Guaranteed by Lehman Brothers Holdings Inc. [Docket No. 19120], which allowed the Debtors to implement a methodology to value claims arising from certain structured securities issued or guaranteed by LBHI (the "Structured Securities").  During the Tenth Interim Compensation Period, Milbank, together with FTI, continued to work with the Debtors to resolve outstanding issues regarding the valuation of the Structured Securities claims.

**T.    Other Bankruptcy Motions and Matters**

109.    On August 31, 2011, Milbank prepared and filed a motion with the Court

seeking authority to prosecute and, if appropriate, settle causes of action on behalf of LCPI

[Docket No. 19622] (the "STN Motion").  Through the STN Motion, the Committee sought

authorization to prosecute LCPI's loan elevation avoidance action proceedings.  This Court

granted the STN Motion on September 15, 2011 [Docket No. 20019].  During the Tenth Interim

Compensation Period, Milbank continued to review and evaluate the transactional documents

relating to the loan elevations, and correspond with the defendants regarding litigation and/or

settlement intentions.  In that connection, Milbank analyzed the claims and defenses against each

of the loan elevation defendants and developed settlement constructs for each.

U.      **Non-Derivative Adversary Proceedings Preparation and Litigation**

110.    During the Tenth Interim Compensation Period, Milbank researched and

prepared memoranda regarding the claims and issues raised by a wide range of pending and

potential lawsuits and settlements impacting the Debtors' estates.  Milbank also held

teleconferences and meetings, both internally and with the Debtors, and provided regular

updates to the Committee regarding numerous adversary proceedings related to the Chapter 11

Cases.  In preparation of such teleconferences and meetings, Milbank drafted various

presentation materials and analyzed issues which were related to the Chapter 11 Cases and

material to the Committee's interests.

111.    Excluding cases in which the Committee's interests are represented by

conflicts counsel, Milbank monitored developments in and provided updates in the form of

reports and presentations to the Committee with respect to (i) all pending and potential

adversary proceedings commenced, or to be commenced, in this Court; (ii) pre-petition lawsuits

commenced against the Debtors and pre- and post-petition lawsuits against non-Debtor

affiliates, officers, directors, and related parties; (iii) litigation issues similar to those raised, or

to be raised, in the Chapter 11 Cases; and (iv) contested matters in the Chapter 11 Cases

(collectively, the "Monitored Matters").  When appropriate and directed by the Committee,

Milbank intervened in the Monitored Matters, prepared pleadings, and participated in oral

arguments and other proceedings with respect to the Monitored Matters on the Committee's

behalf.

112.    In connection with the Monitored Matters, Milbank reviewed and

analyzed proposed settlement agreements and advised the Committee regarding the same.  More

specifically, Milbank reviewed and analyzed proposed motions related to the Debtors' various

director and officer insurance policies and advised the Committee regarding the same.   Milbank

also participated in numerous settlement negotiations, hearings, conferences and mediations

with respect to the Monitored Matters on behalf of the Committee.  Milbank also investigated

various issues related to certain participation and other investment agreements involving the

Debtors and reviewed the viability of certain causes of action.  Milbank also analyzed the

implications of recent court opinions on potential claims involving the Debtors and certain third

parties.  Likewise, Milbank also researched and analyzed issues related to certain claims

involving the Debtors and drafted memoranda relating to the settlement and/or resolution of

said claims.  Although the number of Monitored Matters has been reduced, Milbank continues

to review legal theories and engage in discussions with the Debtors regarding the potential of

certain pending claims.

## V.    Firm's Own Billing/Fee Applications

113.    During the Tenth Interim Compensation Period, Milbank reviewed the Fee

Statements for, among other purposes, compliance with the Interim Compensation Order, the

Local Guidelines and the Fee Committee Guidelines.  Milbank also prepared and served its Fee

Statements on all parties, as required by the Interim Compensation Order.

114.    In addition, Milbank continued to work cooperatively with the Fee

Committee to settle certain outstanding issues identified in the Fee Committee reports pertaining

to the retained professionals' Interim Fee Applications.

**W.    Third Party Retention/Fee Application/Other Issues**

115.    During the Tenth Interim Compensation Period, Milbank reviewed the

applications to expand the retention of Ernst & Young LLP and Dechert LLP, the Debtors'

auditors and special counsel, respectively.  In addition, Milbank reviewed and analyzed issues

related to the Debtors' proposed retention of Gleacher & Company Securities, Inc. ("Gleacher"),

as the Debtors' financial advisors in connection with any transaction related to Archstone.  In

particular, Milbank sought to address the Committee's concerns over duplication of efforts and

fees between Gleacher and Lazard Freres & Co, LLC ("Lazard"), the Debtors' investment

bankers.  Accordingly, Milbank prepared and filed an objection to the Debtors' retention of

Gleacher [Docket No. 23166], arguing that Gleacher's retention be conditioned on Lazard's

agreement not to seek fees in connection with Archstone.  The parties agreed to the Committee's

condition, and Gleacher's retention, as modified, was ultimately approved [Docket No. 23679].

116.    Finally, Milbank assisted in the filing and service of the ninth interim fee

applications of other Committee professionals.

117.    **Committee Member Fee Application**.  In light of the unprecedented size

and complexity of the Debtors' Chapter 11 Cases and the corresponding burdens that these cases

have imposed on the members of the Committee (the "Committee Members"), and in recognition

of the time and effort devoted by the Committee Members to developing, refining and securing

creditor support for the Plan, the Debtors included a provision for payment of the professional

fees and expenses incurred by the Committee Members during the pendency of these cases.  (See

Plan at § 6.7).  In this connection and as part of its overall effort to implement the terms of the

Plan, during the Tenth Interim Compensation Period, Milbank prepared and filed an omnibus

application (the "Omnibus Application") on behalf of the Committee Members for the

reimbursement of professional fees and expenses [Docket Nos. 24762 and 24881].  In connection

with the Omnibus Application, Milbank also prepared and filed supporting declarations from

each of the Committee Members detailing the extent of his/her work on these cases and

explaining the non-duplicative nature of the work rendered by the Committee Members'

professionals.  The Omnibus Application remains pending while the Committee Members, the

Debtors and the U.S. Trustee work to resolve objections to the relief requested therein.

## IV.

## ALLOWANCE OF COMPENSATION

118.    The professional services rendered by Milbank have required a high

degree of professional competence and expertise to address, with skill and dispatch, the

numerous issues requiring evaluation and action by the Committee.  The services rendered to the

Committee were performed efficiently, effectively and economically, and the results obtained to

date have benefited not only the members of the Committee, but also the unsecured creditors of

each of the Debtors' estates.

119.    The allowance of interim compensation for services rendered and

reimbursement of expenses in bankruptcy cases is expressly provided for in section 331 of the

Bankruptcy Code:

> Any professional person . . . may apply to the court not more than once
> every 120 days after an order for relief in a case under this title, or more
> often if the court permits, for such compensation for services rendered . . .
> as is provided under section 330 of this title.

11 U.S.C. § 331.

120.    With respect to the level of compensation, section 330(a)(1)(A) of the

Bankruptcy Code provides, in pertinent part, that the Court may award to a professional person,

"reasonable compensation for actual, necessary services rendered."  Section 330(a)(3), in turn,

provides that:

> In determining the amount of reasonable compensation to be awarded to
> . . . [a] professional person, the court shall consider the nature, the extent,
> and the value of such services, taking into account all relevant factors,
> including –
>
> (A)    the time spent on such services;
>
> (B)    the rates charged for such services;
>
> (C)    whether the services were necessary to the administration of, or
> beneficial at the time which the service was rendered toward the
> completion of, a case under this title;
>
> (D)    whether the services were performed within a reasonable amount
> of time commensurate with the complexity, importance, and nature
> of the problem, issue, or task addressed;
>
> (E)    with respect to a professional person, whether the person is board
> certified or otherwise has demonstrated skill and expertise in the
> bankruptcy field; and
>
> (F)    whether the compensation is reasonable based on the customary
> compensation charged by comparably skilled practitioners in cases
> other than cases under this title.

11 U.S.C. § 330(a)(3).

121.    The congressional policy expressed above provides for adequate

compensation in order to continue to attract qualified and competent professionals to bankruptcy

cases.  In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 850 (3d Cir. 1994) ("Congress rather

clearly intended to provide sufficient economic incentive to lure competent bankruptcy

specialists to practice in the bankruptcy courts.") (citation and internal quotation marks omitted);

In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 18 (Bankr. S.D.N.Y. 1991)

("Congress' objective on requiring that the market, not the Court, establish attorneys' rates was

to ensure that bankruptcy cases were staffed by appropriate legal specialists.").

122.    In assessing the "reasonableness" of the fees requested, courts have looked

to a number of factors, including those first enumerated by the Fifth Circuit in In re First

Colonial Corp. of America, 544 F.2d 1291, 1298-99 (5th Cir. 1977), and thereafter adopted by

most courts.[23]  See In re Nine Assocs., Inc., 76 B.R. 943, 945 (S.D.N.Y. 1987) (adopting First

Colonial/Johnson analysis); In re Cuisine Magazine, Inc., 61 B.R. 210, 212-13 (Bankr. S.D.N.Y

1986) (same); see generally 3 Collier on Bankruptcy ¶ 330.04[3] (Lawrence P. King, et al., eds.,

15th rev. ed. 2009) (enumerating First Colonial and Johnson as the "leading cases to be

considered in determining a reasonable allowance of compensation").  Milbank respectfully

submits that the consideration of these so-called Johnson factors should result in this Court's

allowance of the full compensation requested.

(A)    The Time and Labor Required.  The Debtors' cases are among the largest, most
complex and active bankruptcy cases ever filed.  Accordingly, the professional
services rendered by Milbank on behalf of the Committee have required the
continuous expenditure of substantial time and effort, under time pressures which
sometimes required the performance of services late into the evening and, on a
number of occasions, over weekends and holidays.  The services rendered
required a high degree of professional competence and expertise in order to be
administered with skill and dispatch.

---

[23]    The factors embraced by the Fifth Circuit in First Colonial were first adopted by the Fifth Circuit's decision
in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), except that First Colonial also
included the "spirit of economy" as a factor expressly rejected by Congress in enacting section 330 of the
Bankruptcy Code.  Stroock & Stroock & Lavan v. Hillsborough Holdings Corp. (In re Hillsborough
Holdings Corp.), 127 F.3d 1398, 1403 (11th Cir. 1997).  A majority of the First Colonial factors are now
codified in section 330(a)(3).  3 Collier on Bankruptcy ¶ 330.04[3].

(B)   <u>The Novelty and Difficulty of Questions</u>.  Novel and complex issues have arisen
in the course of these Chapter 11 Cases, and it is anticipated that other such issues
will be encountered.  In these cases, as in many others in which the firm is
involved, Milbank's effective advocacy and creative approach to problem solving
have helped clarify and resolve difficult issues and will continue to prove
beneficial.

(C)   <u>The Skill Requisite to Perform the Legal Services Properly</u>.  Milbank believes
that its recognized expertise in the area of financial restructuring, its ability to
draw from highly experienced professionals in other areas of its practice such as
securities, structured products, asset divestiture, litigation, and regulatory law and
its practical approach to the resolution of issues help maximize the distributions to
the unsecured creditors of each of the Debtors.

(D)   <u>The Preclusion of Other Employment by Applicant Due to Acceptance of the
Case</u>.  Due to the size of Milbank's financial restructuring department and the
firm as a whole, Milbank's representation of the Committee has not precluded the
acceptance of new clients.  However, the number of matters needing attention on
a continuous basis has required numerous Milbank attorneys, across multiple
practice groups, to commit significant portions of their time to these cases.

(E)   <u>The Customary Fee</u>.  The compensation sought herein is based upon Milbank's
normal hourly rates for services of this kind.  Milbank respectfully submits that
the compensation sought herein is not unusual given the magnitude and
complexity of these cases and the time dedicated to the representation of the
Committee.  Such compensation is commensurate with fees Milbank has been
awarded in other cases, as well as with fees charged by other attorneys of
comparable experience.

(F)   <u>Whether the Fee is Fixed or Contingent</u>.  Milbank charges customary hourly rates,
adjusted annually, for the time expended by its attorneys and paraprofessionals in
representing the Committee, and Milbank's fee is not outcome dependent.

(G)   <u>Time Limitations Imposed by Client or Other Circumstances</u>.  As stated above,
Milbank has been required to attend to various issues as they have arisen in these
cases.  Often, Milbank has had to perform these services under significant time
constraints requiring attorneys and paraprofessionals assigned to these cases to
work evenings and on weekends.

(H)   <u>The Amount Involved and Results Obtained</u>.  The Committee represents the
interests of unsecured creditors of each of the Debtors that, in the aggregate, hold
unsecured claims estimated to be valued in the hundreds of billions of dollars in
what has been widely described as the largest chapter 11 case ever filed.  The
Committee's participation, with Milbank's counsel and guidance, has greatly
contributed to the efficient administration and prospects for reorganization of
these cases.

(I)    <u>The Experience, Reputation and Ability of the Attorneys</u>.  Milbank has a sophisticated and nationally recognized corporate reorganization and financial restructuring practice, and Milbank attorneys involved in this representation have played a major role in numerous complex restructurings including, for example, the chapter 11 cases of Lyondell Chemical Company, Nortel Networks Inc., Capmark Financial Group Inc., Hayes Lemmerz International, Inc., DBSD North America, Inc., Refco, Inc., Enron Corp., TOUSA, Inc., Vicorp, Interstate Bakeries Corp., Winn-Dixie Stores, Inc., Fruit of the Loom Inc., Adelphia Communications Corp., Maxxim Medical Group, Inc., RCN Corp., US Airways Group, Inc., Global Crossing Ltd., Fleming Companies, Inc., Dairy Mart Convenience Stores, Inc., Lernout & Hauspie Speech Products N.V., Teligent, Inc., World Access, Inc., ORBCOMM Global, L.P., ICO Global Communications Inc., Safety-Kleen Corp., HomePlace Stores, Inc., Hvide Marine, Inc., Sun TV and Appliances, Inc., Seven-Up/RC Bottling Company of Southern California, Inc. and Ames Department Stores, Inc.  Milbank's experience enables it to perform the services described herein competently and expeditiously.

(J)    <u>The "Undesirability" of the Case</u>.  These cases are not undesirable but, as already indicated, have required a significant commitment of time from many of Milbank's attorneys.

(K)    <u>Nature and Length of Professional Relationship</u>.  Milbank was selected as the Committee's counsel shortly after the Committee's formation, on September 17, 2008, and was retained <u>nunc</u> <u>pro</u> <u>tunc</u> to that date pursuant to an order of the Court dated November 21, 2008.  Milbank has been rendering services continuously to the Committee since the Committee was formed, and Milbank has rendered such services in a necessary and appropriate manner.

123.    The total time spent by Milbank attorneys and paraprofessionals during the Tenth Interim Compensation Period was 20,203.6 hours and has a fair market value of $11,988,000.25.  As shown by this Application and supporting exhibits, Milbank's services were rendered economically and without unnecessary duplication of efforts.  In addition, the work involved, and thus the time expended, was carefully assigned in consideration of the experience and expertise required for each particular task.

# V.

# EXPENSES

124.    Milbank has incurred a total of $417,403.79 in expenses in connection with representing the Committee during the Tenth Interim Compensation Period.  Milbank

records all expenses incurred in connection with the performance of professional services.  A schedule of expenses by project billing category, as well as a summary of these expenses and detailed descriptions of these expenses, is annexed hereto as Exhibit "C."

125.    In connection with the reimbursement of expenses, Milbank's policy is to charge its clients in all areas of practice for expenses, other than fixed and routine overhead expenses, incurred in connection with representing its clients.  The expenses charged to Milbank's clients include, among other things, telephone and telecopy toll and other charges, mail and express mail charges, special or hand delivery charges, photocopying charges, out-of-town travel expenses, local transportation expenses, expenses for working meals, computerized research and transcription costs.

126.    Milbank charges the Committee for these expenses at rates consistent with those charged to Milbank's other bankruptcy clients, which rates are equal to or less than the rates charged by Milbank to its non-bankruptcy clients.  Milbank seeks reimbursement from the Debtors at the following rates for the following expenses:  (i) ten cents ($0.10) per page for photocopying and printing; (ii) fifty cents ($0.50) for color copies; (iii) no charge for incoming facsimiles; (iv) toll charges only for outgoing facsimiles; and (v) an average of nineteen cents ($0.19) per minute for long distance.  Specifically, with respect to phone charges over $100.00, such charges were generally accrued in connection with (i) conference calls in which the Committee, the Debtors and/or other parties in interest participated; and (ii) mobile phone charges for selected attorneys who were required to participate in Committee conference call while traveling on Committee business.

127.    In accordance with section 330 of the Bankruptcy Code, the Local Guidelines and the U.S. Trustee Guidelines, Milbank seeks reimbursement only for the actual

cost of such expenses to Milbank.[24]  Additionally, Milbank has further limited and defined its

expenses in accordance with the Fee Committee Guidelines.

128.    In providing or obtaining from third parties services which are

reimbursable by clients, Milbank does not include in such reimbursable amount any costs of

investment, equipment or capital outlay.

129.    Milbank regularly charges its non-bankruptcy clients for ordinary business

hourly fees and expenses for secretarial, word processing and other staff services because such

items are not included in the firm's overhead for the purpose of setting the billing rates.

However, in light of discussions with Fee Committee, no reimbursement for the charges incurred

in connection with such services is requested in the Application.

130.    Attorneys at Milbank have not incurred expenses for luxury

accommodations or deluxe meals.  The Application does not seek reimbursement of air travel or

train fare expenses in excess of coach fares.[25]  Further, all overtime transportation costs were

incurred after 8:00 p.m. for transporting timekeepers to their respective homes.  Moreover,

although overtime meal expenses are listed in their actual amounts, per the Fee Committee

guidelines, Milbank does not seek reimbursement for overtime meal expenses beyond the $20.00

maximum per meal.  Throughout the Tenth Interim Compensation Period, Milbank has been

keenly aware of cost considerations and has tried to minimize the expenses charged to the

Debtors' estates.

---

[24]    The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts
which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a
retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted
cost of such expenses.

[25]    Except in the instance of Amtrak's Acela Express train, where the lowest class is "business class."

## VI.

## <u>NOTICE</u>

131.    Notice of this Application has been given to (a) the Debtors, (b) counsel for the Debtors, (c) the United States Trustee, and (d) the Fee Committee.

## VII.

## <u>CONCLUSION</u>

WHEREFORE, Milbank respectfully requests the Court to enter an order conforming to the amounts set forth in Fee Schedule A(1) attached hereto as Exhibit "<u>D</u>" (i) allowing Milbank (a) interim compensation for professional services rendered as counsel for the Committee during the Tenth Interim Compensation Period in the amount of $11,988,000.25 and (b) reimbursement of expenses incurred in connection with rendering such services in the aggregate amount of $417,403.79 for a total award of $12,405,404.04; (ii) authorizing and directing the Debtors to pay to Milbank $8,271,950.88 which is an amount equal to the difference between (a) this $12,405,404.04 award and (b) $4,133,453.16, the total of all amounts that the Debtors have previously paid to Milbank pursuant to the Interim Compensation Order for services rendered and expenses incurred during the Tenth Interim Compensation Period; and (iii) granting such further relief as is just.

Dated:  New York, New York
        May 21, 2012

                                    **MILBANK, TWEED, HADLEY & McCLOY LLP**

                                    By:  /s/ Dennis F. Dunne

                                    Dennis F. Dunne
                                    Evan R. Fleck
                                    Dennis C. O'Donnell
                                    1 Chase Manhattan Plaza
                                    New York, New York 10005
                                    Telephone:  (212) 530-5000

                                    Counsel for Official Committee of Unsecured
                                    Creditors of Lehman Brothers Holdings Inc., et al.

# **<u>EXHIBIT A</u>**

**Certification**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                                                     :
In re:                                               :          Chapter 11 Case No.
                                                     :
LEHMAN BROTHERS HOLDINGS INC., et al.,               :          08-13555 (JMP)
                                                     :
                        Debtors.                     :          (Jointly Administered)
                                                     :
------------------------------------------------------------- x

**CERTIFICATION UNDER GUIDELINES FOR FEES AND DISBURSEMENTS
FOR PROFESSIONALS IN RESPECT OF TENTH APPLICATION OF MILBANK,
TWEED, HADLEY & McCLOY LLP, COUNSEL TO
OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR INTERIM
ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND
FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM
OCTOBER 1, 2011 THROUGH AND INCLUDING MARCH 6, 2012**

Pursuant to the Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991, and

amended on April 21, 1995 and November 25, 2009 (collectively, the "Local Guidelines"), the

United States Trustee Guidelines for Reviewing Applications for Compensation and

Reimbursement of Expenses Filed Under 11 U.S.C. § 330, effective January 30, 1996 (the "U.S.

Trustee Guidelines"), and the guidelines contained in the Fee Committee's Confidential Letter

Report on the Sixth Interim Application of Milbank, Tweed, Hadley & McCloy LLP, dated April

12, 2011 (the "Fee Committee Guidelines" and, together with the Local Guidelines and the U.S.

Trustee Guidelines, the "Guidelines"), the undersigned, a member of the firm Milbank, Tweed,

Hadley & McCloy LLP ("Milbank"), counsel to the Official Committee of Unsecured Creditors of

Lehman Brothers Holdings Inc., Lehman Brothers Special Financing Inc., Lehman Commercial

Paper Inc. and their affiliated debtors in possession in the above-captioned cases (collectively,

the "Debtors"), hereby certifies with respect to Milbank's tenth application for allowance of

compensation for services rendered and for reimbursement of expenses, dated May 21, 2012 (the

"Application"), for the period of October 1, 2011 through and including March 6, 2012 (the

"Tenth Interim Compensation Period") as follows:

      1.   I am the professional designated by Milbank in respect of compliance with

the Guidelines.

      2.   I make this certification in support of the Application, for interim

compensation and reimbursement of expenses for the Tenth Interim Compensation Period, in

accordance with the Local Guidelines.

      3.   In respect of section A.1 of the Local Guidelines, I certify that:

        a.     I have read the Application.

        b.     To the best of my knowledge, information and belief formed after
reasonable inquiry, the fees and disbursements sought fall within
the Guidelines.

        c.     Except to the extent that fees or disbursements are prohibited by
the Guidelines, the fees and disbursements sought are billed at
rates in accordance with practices customarily employed by
Milbank and generally accepted by Milbank's clients.

        d.     In providing a reimbursable service, Milbank does not make a
profit on that service, whether the service is performed by Milbank
in-house or through a third party.[1]

      4.   In respect of section A.2 of the Local Guidelines, I certify that Milbank has

provided statements of Milbank's fees and disbursements previously accrued, by filing and

serving monthly statements in accordance with the Interim Compensation Order (as defined in

the Application), except that completing reasonable and necessary internal accounting and

---

[1]   The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts
which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a
retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted
cost of such expenses.

review procedures have at times precluded filing fee statements within the time periods

established in the Interim Compensation Order.

5.   In respect of section A.3 of the Local Guidelines, I certify that copies of the

Application are being provided to (a) the Court, (b) the Debtors, (c) counsel for the Debtors, (d)

the Office of the United States Trustee, and (e) the Fee Committee.

6.   I certify that the Application for interim compensation and reimbursement of

expenses for the Tenth Interim Compensation Period has been prepared in accordance with the

Fee Committee Guidelines.

7.   Pursuant to the Fee Committee Guidelines, I certify that all transportation

charges fall within the reimbursement rule for transportation expenses.

Dated:        New York, New York
              May 21, 2012


                                        By:  /s/ Dennis F. Dunne
                                             Dennis F. Dunne

3

# **EXHIBIT B**

**Time Entry Records**[1]

---

[1]    Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; and (v) the Fee Committee.

# **EXHIBIT C**

**Expenses**[1]

---

[1] Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; (v) the Fee Committee.

# <u>EXHIBIT D</u>

**Fee Schedule A(1)**

CASE NO.:  08-13555 (JMP) (Jointly Administered)

CASE NAME:  IN RE LEHMAN BROTHERS HOLDINGS INC., et al.

| FIRST INTERIM FEE PERIOD SEPTEMBER 17, 2008 – JANUARY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 4/10/09 Docket No. 3337 | $12,132,376.00 | $12,062,428.50 | $1,213,237.60 | $1,143,247.54 | $668,388.72 | $668,346.18 |

| SECOND INTERIM FEE PERIOD FEBRUARY 1, 2009 – MAY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 8/14/09 Docket No. 4821 | $16,829,521.00 | $16,233,210.42 | $1,682,952.10 | $1,371,217.28 | $1,019,754.61 | $1,006,175.08 |

| THIRD INTERIM FEE PERIOD JUNE 1, 2009 – SEPTEMBER 30, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & | 12/14/09 | $10,881,540.00 | $10,689,053.40 | $1,088,154.00 | $795,598.60 | $583,803.10 | $483,734.30 |

FEE SCHEDULE A(1)

| McCloy LLP | Docket No. 6203 | | | | | | |
|---|---|---|---|---|---|---|---|

| FOURTH INTERIM FEE PERIOD OCTOBER 1, 2009 – JANUARY 31, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 4/16/10 Docket No. 8432 | $13,595,778.50 | $12,908,822.79 | $1,359,577.85 | $6,211,791.04 | $451,410.54 | $404,795.38 |

| FIFTH INTERIM FEE PERIOD FEBRUARY 1, 2010 – MAY 31, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 8/16/10 Docket No. 10804 | $19,450,342.75 | $19,041,118.43 | $1,945,034.28 | $11,674,570.75 | $851,804.27 | $847,210.46 |

| SIXTH INTERIM FEE PERIOD JUNE 1, 2010 – SEPTEMBER 30, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 12/14/10 Docket No. 13493 | $18,359,367.75 | $18,191,238.85 | $1,835,936.78 | $3,681,873.55 | $792,924.64 | $787,642.86 |

**FEE SCHEDULE A(1)**

| SEVENTH INTERIM FEE PERIOD OCTOBER 1, 2010 – JANUARY 31, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 6/2/11 Docket No. 17343 | $14,180,784.75 | $13,617,066.02 | $2,818,286.54 | $2,271,117.05 | $633,261.80 | $631,940.63 |

| EIGHTH INTERIM FEE PERIOD FEBRUARY 1, 2011 – MAY 31, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 8/15/11 Docket No. 19273 | $14,678,049.25 | $12,921,360.25 | $2,935,609.85 | $1,178,920.85 | $794,661.63 | $794,661.63 |

| NINTH INTERIM FEE PERIOD JUNE 1, 2011 – SEPTEMBER 30, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 12/14/11 Docket No. 23418 | $12,334,262.25 | [ ] | $2,466,787.45 | [ ] | $493,651.21 | [ ] |

FEE SCHEDULE A(1)

| TENTH INTERIM FEE PERIOD OCTOBER 1, 2011 – MARCH 6, 2012 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 5/21/12 Docket No. [    ] | $11,988,000.25[1] | [ ] | $9,590,400.20 | [ ] | $417,403.79 | [ ] |

---

[1]    As set forth in the Application, the amount requested on account of fees and expenses incurred by Milbank during the Tenth Interim Compensation Period was $115,049.50 more than the sum of fees and expenses set forth in the Fee Statements served during the Tenth Interim Compensation Period.

**FEE SCHEDULE A(1)**