Mrs. S.A.B. Van Rooy, DVM and LLM
Schoonouwenseweg 24
2821 NX STOLWIJK
THE NETHERLANDS
Telephone:     + 31 182 34 34 43
Facsimile:     + 31 182 34 34 43
Email:         sabvanrooy@hotmail.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

The Chambers of the Honorable James M. Peck
One Bowling Green
New York
New York 10004
Courtroom 601
UNITED STATES OF AMERICA

---

| | | |
|---|---|---|
| **In re** | ) | **Chapter 11** |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*) | ) | **Case No. 08 – 13555 (JMP)** |
| **Debtors.** | ) | **(Jointly Administered)** |

---

**SUPPLEMENTAL RESPONSE / MEMORANDUM OF MRS. S.A.B. VAN ROOY (CLAIM NUMBER 54549) TO DEBTORS' TWO HUNDRED THIRTEENTH OMNIBUS OBJECTION OF SEPTEMBER 16, 2011 TO DISALLOW AND EXPUNGE CERTAIN FILED PROOFS OF CLAIM AND IN THE ALTERNATIVE, TO RECLASSIFY THESE CLAIMS AS EQUITY INTERESTS**

**&**

**RESPONSE OF MRS. S.A.B. VAN ROOY TO DEBTORS' OMNIBUS REPLY OF APRIL 21, 2012 TO RESPONSES TO DEBTORS' TWO HUNDRED THIRTEENTH OMNIBUS OBJECTION TO CLAIMS**

Mrs. S.A.B. Van Rooy ("Van Rooy") hereby supplements her Response of November 22th 2011 [Docket No. 22959] (Van Rooy's Response") to the Two Hundred Thirteenth Omnibus Objection to Disallow and Expunge Certain Filed Proofs of Claim [Docket No. 20102] (the "Objection") by Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors, as debtors and debtors in possession (collectively, the "Debtors"), that seeked to disallow and expunge, or in the alternative, that seeks to reclassify as equity interests, *inter alia*, Van Rooy's Claim No. 54549 (the "Claim").


RECEIVED
JUN - 7 2012
U.S. BANKRUPTCY COURT, SDNY
JMP

Van Rooy hereby also responds to Debtors' Omnibus Reply to Responses to Debtors' Two Hundred

Thirteenth Omnibus Objection to Claims (dated April 21, 2012) (the "Omnibus Reply"). Van Rooy

respectfully states as follows:

## PERMISSION OF HONORABLE JUDGE J. M. PECK

## FOR SUPPLEMENTAL RESPONSE/ MEMORANDUM

1. Van Rooy reserved the right to amend or supplement her Response of November 22th 2011 in the case she

would obtain the complete copies of the Partnership Agreement of January 3, 2007 establishing LB UK IV

(*See* Exhibit D of Debtors' Objection). *See* Van Rooy's Reponse, ¶ 34-46 and ¶ 137.

2. Debtors' Objection is based on arguments that refer to the clauses of the Partnership Agreement.  The

terms, clauses and conditions of the Base Prospectus of January 4, 2007 refer also many times to the clauses

of the Limited Partnership Agreement[1].

3. The Debtors attached just 4 pages of in total 39 pages of the Partnership Agreement to the Objection, which

they considered as "relevant". As mentioned before in Van Rooy's Response, Debtors withheld the major and

crucial part of the Partnership Agreement in Exhibit D of Debtors' Objection and refused to convey the

complete copies of this document to Van Rooy:

4. When Van Rooy requested Debtors' attorney, Mr. Ryan Martin from Weil, Gotshal & Manges LLP, on

November 2, 2011 by phone to mail her the complete copies of the entire Partnership Agreement establishing

LB UK IV, Mr. Martin answered that he did not want to mail  these complete copies. According to Debtors'

attorney the major part of the Partnership Agreement was *"confidential"* and *"not open to the public."*

5. After this phone call on November 2, 2011, Van Rooy requested Mr. Martin again by email of November 2,

2011, by two emails of November 4, 2011 and by two emails of November 7, 2011 to mail the complete

copies of the entire Partnership Agreement. Mr. Martin answered on November 7, 2011 that *"he was afraid*

---

[1]Base Prospectus (Exhibit B of the Objection, e.g. p. 5, p. 20, p. 21, p. 34, p. 41, p. 42, p. 59, p. 60.

*that there is not much more he could convey.*" See **EXHIBIT A of Van Rooy's Response** (copy of earlier mentioned emails).

6. With this refusal, Debtors violated the terms of the Base Prospectus. Page 60 of the Base Prospectus refers to several documents (including the Partnership Agreement ), that must be available for inspection to the holders of the securities. However, the drafter of this Base Prospectus, LBHI, was not willing to convey the complete copies of earlier mentioned documents to claimant Van Rooy.

7. With this refusal, LBHI also violated article 14 (5) of the European Directive 2003/71/EC (The "Prospectus Directive")[2]: in the case of a prospectus comprising several documents and/or incorporating information by reference, the documents and information must made available to the public.

8. Van Rooy has – as a holder of the securities – the right to take notice of the complete copies of the Partnership Agreement as well of the other documents, that form part of the Base Prospectus.  LBHI has the legal duty to provide the requested documents to claimants.

9. Because 35 pages (of in total 39 pages) of the Partnership Agreement were missing, Van Rooy had at the time of filing her Response (on November 22, 2011) no way of taking notice of the complete copies of this document. She had no way of determining whether definitions, terms, clauses, conditions, purposes, etc. of the missing copies were relevant or not. It was unclear which actions should be performed by LBHI as a "Guarantor" and which liabilities, obligations and commitments LBHI had to perform (and/or did not perform) pursuant to the terms and clauses of this Partnership Agreement. Because Debtors' Exhibit D did not show the whole Partnership Agreement, many facts were unclear.

10. This selective documentation also prevented the Court from studying, assessing and evaluating the complete copies of the entire Partnership Agreement and its definitions, terms, conditions, purposes, clauses etc. in relation to Debtors' Objection and in relation to Van Rooy's Claim. Because of the incomplete documentation of the Partnership Agreement, Van Rooy was unable to oppose Debtors' Objection in a proper

---

[2] Article 14(5) of Directive 2003/71/EC (The Prospectus Directive"):

"In the case of a prospectus comprising several documents and/or incorporating information by reference, the documents and information making up the prospectus may be published and circulated separately provided that the said documents are made available, free of charge, to the public, in accordance with the arrangements established in paragraph. Each document shall indicate where the other constituent documents of the full prospectus may be obtained."

and lawful way. Without this information, Van Rooy could not fully respond to the Two Hundred Thirteenth

Objection. Without such disclosure, the Court was also insufficiently able to take into account, to assess and

to evaluate all definitions, terms, conditions, purposes, clauses etc. of this Partnership Agreement and other

documents that form part of the Base Prospectus. Without such disclosure, the Court was not fully equipped to

give a lawful ruling whether Van Rooy's Claim should be disallowed and expunged or not and whether Van

Rooy's Claim should be reclassified or not.

11. After investigating and enquiring for months (!) at different sources, Van Rooy obtained the complete

copies of the Partnership Agreement of "the Paying and Transfer Agent", ING Bank NV in the Netherlands

(*see* p. 60 and p. 63 of the Base Prospectus). Because Van Rooy obtained the complete copies shortly before

the hearing of April 26, 2011, she needed more time to study this complicated document carefully.

12. Van Rooy also needed more time to obtain the other documents, that form part of the Base Prospectus.

Pages 60-61 of the Base Prospectus enumerate: a) The Subscription Agreement, b) the Subordinated

Guarantee, c) The Limited Partnership Agreement, d) The Administrative Agreement, e) The Agency

Agreement, f) The Final Terms and g) The Restated Certificate of Incorporation and the Amended By-Laws

of LBHI.

13. On April 20, 2012 Van Rooy contacted the Judge's Chamber, Mrs. Stacy Lutkus, by phone and informed

Mrs. Lutkus about the foregoing. Van Rooy requested permission of the Honorable Judge J.M. Peck to file a

Supplemental Response / Memorandum (including exhibits) at a later moment in order to respond properly to

Debtors' Objection and to Debtors' Omnibus Reply. Mrs. Lutkus contacted the Honorable Judge J.M. Peck

by phone, who gave his permission to file a Supplemental Response / Memorandum. According the transcript

of the hearing of April 26, 2012, Honorable Judge J. M. Peck is referring to this phone call.[3] For the

foregoing reasons, Van Rooy requested Debtors' attorney, Mr. G. Fail, to adjourn Van Rooy's Claim to a next

hearing.

---

[3]Transcript of hearing of April 26, 2012, p. 41, sentences 1-25.

## JOINDER

14. Van Rooy hereby joins in the arguments made by other similarly situated claimants during the hearing of April 26, 2012 in connection with the Two Hundred Thirteenth Omnibus Objection up to Two Hundred Sixteenth Omnibus Objection.

## REQUEST TO STUDY VAN ROOY'S ENTIRE RESPONSE OF NOVEMBER 22, 2011

## (INCLUDING PART I. OF VAN ROOY'S RESPONSE

15. Although Debtors have withdrawn its request to disallow and expunge Van Rooy's claim, Van Rooy hereby requests Honorable Judge J.M. Peck nevertheless to read and study part I. of Van Rooy's Response of November 22, 2011 ("I. Claim should not be disallowed and expunged") carefully. Van Rooy disclosed in this Part facts about LBHI's "unclean hands" regarding the dissolution of LB UK IV and will come back to it later in this Supplemental Response/Memorandum. The disclosed facts about LBHI's unclean hands affect the whole law case, and thus also affect the requested relief to reclassify Van Rooy's Claim.

**Why did Debtors' attorneys spell Van Rooy's name wrong in the Omnibus Reply and why did they assert that Van Rooy's Response did not have a (legitimate) docket number? Was it Debtors' intention to hide Van Rooy's Response away, and with it, the disclosed facts about the unclean hands of LBHI regarding the alleged dissolution of LB UK IV, from other claimants worldwide?**

16. Debtors' attorneys did not spell Van Rooy's name properly in the Omnibus Reply, see Omnibus Reply ¶ 9. Debtors'attorneys spelled Van Rooy's name as "*Von Rooy*". Furthermore Debtors' attorneys asserted in the Omnibus Reply that Van Rooy's Response "*was not filed on the docket in the above-captioned chapter 11 cases.*", *see* footnote 6 of the Omnibus Reply ¶ 9.

17. These are remarkable facts, because Van Rooy has intensive email contacts with Debtors' attorneys during the last year. Debtors' attorneys never spelled Van Rooy's name as "Von Rooy" in their emails up to now. Debtors' attorneys also are aware of the fact that Van Rooy timely served her Response and obtained a

legitimate docket number "22959". Van Rooy refers to the fact that Debtors' attorney, Mr. R. Martin ,

provided an explicit extension of time to file the Response. *See* Van Rooy's Response ¶ 1.

18. Van Rooy wonders whether Debtors' attorneys spelled Van Rooy's wrong on purpose and whether

Debtors' attorneys did not mention Van Rooy's docket number on purpose . Was it Debtors' intention to hide

Van Rooy's Response, and with it, the disclosed facts about the unclean hands of LBHI regarding the alleged

dissolution of LB UK IV, away from other claimants worldwide? As a result, other claimants worldwide

probably will have more difficulties to track Van Rooy's Response in the digital Epiq-system. In the light that

19. Van Rooy disclosed evidence in her Response that the General Partner (that should be identified as LBHI)

and the Preferential Limited of LB UK IV did not comply several legal obligations and committed (criminal)

offences, it would suit LBHI - with respect to its involvement and liability to these facts - that no other

claimants could take notice of Van Rooy's Response.

20. Debtors' attorney asserted during the hearing of April 26th 2012 (the "Hearing") that Debtors' reply file

*"contained responses to each of the relevant procedural and substantive objections"*[4]. Debtors' attorney

asserted that *"he was happy to address the arguments of claimants individually"*[5] and that *"he was happy to

address the objections that they have passed – each one on the merits"*[6]. Debtors' assertions however are

incorrect.

21. Debtors failed however to mention many of Van Rooy's  substantive arguments in the Omnibus Reply and

also <u>did not address these omitted arguments</u>. The omitted arguments are important with respect to "the

unclean hands of Debtors", that not only affect the dispute about the disallowance of Van Rooy's claim but

also affect the dispute about the reclassification of Van Rooy's claim.

22. Furthermore Debtors enumerated some of Van Rooy's arguments and categorized these arguments in

Exhibit 2 (disallowance, <u>without</u> Debtors' reply), but these arguments are also relevant to the law case in

---

[4]Transcript of hearing of April 26, 2012, p. 33, sentences 12-13.

[5]Transcript of hearing of April 26, 2012, p. 54, sentences 4-5.

[6]Transcript of hearing of April 26, 2012, p. 54, sentence 9.

general and to the reclassification dispute in particular. However Debtors did not address these arguments with respect to the requested relief.

**LBHI drafted the Base Prospectus dated 4th January, 2007, including the documents incorporated by reference**

23. Pursuant Clause 1.2 of the "Subscription Agreement" of January 23, 2007 (see **EXHIBIT I**, p. 2), the Base Prospectus dated 4th January, 2007 (including "the Subordination Provision" and its references to other definitions) and the documents incorporated by reference, were drafted by the Guarantor/LBHI:

> *"The Guarantor confirms that: (a) it has prepared the base prospectus dated 4th January, 2007 (the **Prospectus**) and the Final terms dated 23rd January, 2007 (the **Final Terms**) and, together with the Prospectus, the **Offering Documents**) ... ".*

24. These other documents form part of the Base Prospectus and are enumerated on pages 60-61 of the Base Prospectus (Exhibit B of the Objection): a) The Subscription Agreement, b) the Subordinated Guarantee, c) The Limited Partnership Agreement, d) The Administrative Agreement, e) The Agency Agreement, f) The Final Terms and g) The Restated Certificate of Incorporation and the Amended By-Laws of LBHI ("The Documents"). As mentioned before, Debtors' attorneys hid these documents from claimants away and even refused to convey these documents to Van Rooy.

**LBHI's contractual warranties and guarantees towards the holders of the securities**

25. LBHI warranted and covenanted to the holders of the Securities that the Subordinated Guarantee would constitute legal, valid and binding obligations of the Guarantor enforceable against the Guarantor in accordance with its terms, subject to the effect of bankruptcy, insolvency, fraudulent conveyance and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law), an implied covenant of good faith and fair dealing and the possible judicial application of foreign laws or foreign governmental or judicial action affecting creditors' rights. Van Rooy refers to Clause 6.1 (9) of the "Subscription Agreement" of January 23, 2007 (*see* **EXHIBIT I**, p. 3, 5), that stipulates:

7

> *"the Subordinated Guarantee has been duly authorised by the Guarantor and will constitute legal, valid and binding obligations of the Guarantor enforceable against the Guarantor in accordance with its terms, subject to the effect of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law), an implied covenant of good faith and fair dealing and the possible judicial application of foreign laws or foreign governmental or judicial action affecting creditors' rights;".*

26. In addition LBHI covenanted and guaranteed to the holders of the Securities that LBHI would duly execute the Agreements, that formed part of the Base Prospectus. These Agreements constitute legal, valid and binding obligations of the Guarantor LBHI, in accordance with their respective terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law), an implied covenant of good faith and fair dealing and the possible judicial application of foreign laws or foreign governmental or judicial action affecting creditors' rights. Van Rooy refers to Clause 6.1 (h) of the "Subscription Agreement" (see **EXHIBIT I**, p. 3, 5), that stipulates:

> *"the Agreements[7] have been validly authorised by the General Partner and the Guarantor and have been (in the case of the LPA) or will be duly executed and delivered by the General Partner and the Guarantor, as the case may be, and constitute or will constitute, as the case may be, legal, valid and binding agreements of the General Partner and the Guarantor in accordance with their respective terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law), an implied covenant of good faith and fair dealing and the possible judicial application of foreign laws or foreign governmental or judicial action affecting creditors' rights...".*

27. Furthermore LBHI covenanted and guaranteed to the holders of the securities that LBHI would not violate its organisational documents or would be in default under the agreements, indentures or instruments. LBHI covenanted and guaranteed to the holders of the securities that the effect of a violation or default would be

---

[7]The definition of "the Agreements" according the first page of the "Subscription Agreement" (**EXHIBIT I**):

The Subscription Agreement, the Agency Agreement and the LPA together with the Administration Agreement between the Guarantor, the Issuer and the Law Debenture Trust Corporation p.l.c..

material to the General Partner, the Guarantor or the Group, as the case may be. Van Rooy refers to Clause 6.1 (i) of the "Subscription Agreement" (see **EXHIBIT I**, p. 3, 5), that stipulates:

> *(i) neither the General Partner and the Guarantor, is in violation of its organisational documents or in default under agreement, indenture or instrument, the effect of which violation or default would be material to the General Partner, the Guarantor or the Group, as the case may be..."*

**LBHI covenanted and guaranteed the holders of the Securities that it would not take any action that would or might cause the liquidation, dissolution or winding-up of the General Partner or the Issuer.**

28. Pursuant to

- the <u>Summary</u> of the Base Prospectus (Exhibit B of the Objection, p. 9-10), pursuant to
- § 3.3 of the Guarantee (Exhibit B of the Objection, p. 37) and
- term 18.2 of the Partnership Agreement of January 3, 2007 (**EXHIBIT II**, p. 32, "Undertakings of LBHI, Undertaking in respect of the General Partner"),

LBHI covenanted to the holders of the Securities that:

*"(a) unless LBHI is being wound-up, LBHI will not take any action that would or might cause the liquidation, dissolution or winding-up of the General Partner or the Issuer otherwise than with the prior written approval of any relevant Supervisory Authority (if required at such time); <u>and</u>*

*(b) the General Partner will at all times be a directly or indirectly wholly-owned Subsidiary of LBHI unless (i) otherwise approved by the Holders in accordance with the procedure set out in the Limited Partnership Agreement or (ii) after a substitution of the Preferred Securities for depositary shares representing Substituted Preferred Stock has occurred. "*

29. Van Rooy disclosed however in het Response of November 22, 2011 <u>evidence</u> that LBHI took, or caused to be taken, actions to bring about the dissolution of the General Partner and the Preferential Limited Partner of LB UK IV, and as a result, of LB UK IV itself.

**LBHI violated the terms of the Base Prospectus, including the documents (amongst them agreements)**

**incorporated by reference. LBHI has unclean hands regarding the dissolution of the issuer LB UK IV.**

**The Debtors do have <u>liability</u> to the holders of the Guarantee Claims.**

30. Although the Debtors asserted that the limited partnership LB UK IV was "automatically" dissolved

pursuant to the terms of the Partnership Agreement (Objection ¶ 10), the Debtors failed to provide any proof

of the "automatic" dissolution of LB UK IV up to now.

31. Based on the "Company Details" of the Companies House of November 4, 2011 the status of the limited

partnership under de name of LB UK IV is <u>to date</u> (!) still "<u>active</u>". See **EXHIBIT E  of Van Rooy's**

**Response** (extract of November 4, 2011) and **EXHIBIT III** (extract of June 5, 2012; obtained from website

of the Companies House).

32. In the event of a dissolution of a limited partnership, Section 6(3) of the Limited Partnerships Act 1907

stipulates that the general partners must wind up its affairs unless the court orders otherwise. [8]

---

[8]http://www.legislation.gov.uk/

**Limited Partnerships Act 1907**

**MODIFICATIONS OF GENERAL LAW IN CASE OF LIMITED PARTNERSHIPS**

6. (1) A limited partner shall not take part in the management of the partnership business, and shall not have power to bind the firm:
Provided that a limited partner may by himself or his agent at any time inspect the books of the firm and examine into the state and prospects of the partnership business, and may advise with the partner thereon.
If a limited partner takes part in the management of the partnership business he shall be liable for all debts and obligations of the firm incurred while he so takes part in the management as though he were a general partner.
(2) A limited partnership shall not be dissolved by the death or bankruptcy of a limited partner, and the lunacy of a limited partner shall not be a ground for dissolution of the partnership by the court unless the lunatic's share cannot be otherwise ascertained and realised.
(3) In the event of the dissolution of a limited partnership its affairs shall be wound up by the general partners unless the court otherwise orders.
(4) Repealed.
(5) Subject to any agreement expressed or implied between the partners
(a) Any difference arising as to ordinary matters connected with the partnership business may be decided by a majority of the general partners
(b) A limited partner may, with the consent of the general partners, assign his share in the partnership, and upon such an assignment the assignee shall become a limited partner with all the rights of the assignor
(c) The other partners shall not be entitled to dissolve the partnership by reason of any limited partner suffering his share to be charged for his separate debt
(d) A person be may introduced as a partner without the consent of the existing limited partners
(e) A limited partner shall not be entitled to dissolve the partnership by notice.

33. Section 9(1) of the Limited Partnerships Act 1907[9] stipulates that "if during the continuance of a limited partnership any change is made or occurs in ... (b) the general nature of the business, (d) the partners or the name of any partner, (e) the term or character of the partnership", the firm is _obliged_ to send a statement (specifying the nature of the change) to the Registrar. Furthermore article 9(2) stipulates that if default is made in compliance with the requirements of this section each of the general partners shall _on conviction_ under the Magistrates Courts Acts 1980 be _liable_ to a fine not exceeding one pound for each day during which the default continues.

34. Debtors' statement that LB UK IV was "_automatically_" dissolved (Objection ¶ 10) is incorrect under English law. The registration of a dissolution of a limited partnership is _mandatory_. Even if Debtors' statement that LB UK IV was dissolved would be correct, the General Partner LB GP No. 1 Ltd and, _in its absence LBHI, is on conviction_ under the Magistrates Courts Acts 1980 and is liable to a fine not exceeding one pound for each day during which the default continues.

35. The General Partner LB GP No. 1 Ltd and in its absence LBHI, apparently failed to date to notify the Companies House about the dissolution of the limited partnership LB UK IV. The Debtors do have _liability_ to the holders of the Guarantee Claims and to Van Rooy in particular, because the issuer LB UK IV is not

---

[9]http://www.legislation.gov.uk

**Limited Partnerships Act 1907**

**REGISTRATION OF CHANGES IN PARTNERSHIPS**

**9.** (1) If during the continuance of a limited partnership any change is made or occurs in

(a) the firm name
(b) the general nature of the business
(c) the principal place of business
(d) the partners or the name of any partner
(e) the term or character of the partnership
(f) the sum contributed by any limited partner
(g) the liability of any partner by reason of his becoming a limited instead of a general partner or a general instead of a limited partner

a statement, signed by the firm, specifying the nature of the change shall within seven days be sent by post or delivered to the Registrar at the registry office in that part of the United Kingdom in which the partnership is registered.

(2) If default is made in compliance with the requirements of this section each of the general partners shall on conviction under the Magistrates Courts Acts 1980 be liable to a fine not exceeding one pound for each day during which the default continues.

"automatically" dissolved and thus the Guarantee is <u>not</u> terminated. **<u>Debtors did not address these facts up to now.</u>**

**Facts prove that LBHI took, or caused to be taken, actions to bring about the dissolution of LB UK IV**

**Details regarding the circumstances surrounding the alleged dissolution of the General Partner and the Preferential Limited Partner, that caused the dissolution of LB UK IV. The General Partner was struck off the register and dissolved due to its failure to file the Group of companies' accounts (including LB UK IV) in compliance with (amongst others) the requirements of the Companies Act 2006.**

**LB Investment Holdings Ltd also failed to file its accounts in compliance with (amongst others) the requirements of the Companies Act 2006 and applied for a voluntary striking off, while it failed to comply to perform its duty to inform its creditors (i.e. Van Rooy) about the application.**

36. Pursuant to the terms of the Base Prospectus regarding LB UK IV, "LHBI will undertake in the Subordinated Guarantee to ensure that, unless otherwise approved by a simple majority of the Holders, the <u>General Partner</u> will at <u>all times</u> be either <u>LBHI itself</u> <u>or</u> a <u>directly or indirectly wholly-owned Subsidiary of LBHI</u>". *See* Exhibit B of the Objection, § 3.3(b) p. 37 and p. 41.

37. Pursuant to the Base Prospectus IV (Exhibit B of the Objection, p. 5 and p. 22), the definition of "<u>Preferential Limited Partner</u>" is: "LB Investment Holdings Ltd (…), a wholly-owned Subsidiary of LBHI <u>or</u> any other Subsidiary of LBHI." With other words:  The Preferential Limited Partner will be at all times a wholly-owned Subsidiary of LBHI.

38. Pursuant Section 386(1) of the Companies Act 2006[10] every company, whether or not they are trading, must keep adequate accounting records. All private limited companies must file every year their accounts at the Registrar. The failure to file accounts is under the Companies Act 2006 a criminal offence.

---

[10]http://www.legislation.gov.uk

**Section 386 of the Companies Act 2006: Duty to keep accounting records**
(1) Every company must keep adequate accounting records.
(2) Adequate accounting records means records that are sufficient—
(a) to show and explain the company's transactions,
(b) to disclose with reasonable accuracy, at any time, the financial position of the company at that time, and

39. According to the information Van Rooy obtained from several employees of the Registrar and based on the Company Details (*see* **EXHIBIT G of Van Rooy's Response**) & the Filing History of the General Partner LB GP No. 1 Ltd (*see* **EXHIBIT H of Van Rooy's Response**) from the Registrar, the General Partner failed to file the Group of companies' accounts (including LB UK IV) in compliance with (amongst others) the requirements of the Companies Act 2006.

40. This documentation demonstrates that the General Partner filed on July 25, 2009 its last Group of companies' accounts of November 30, 2006. As a result, the General Partner kept essential annual financial information regarding the limited partnership away from the holders of the Securities. Pursuant to the terms of the Base Prospectus regarding LB UK IV, "LHBI will undertake in the Subordinated Guarantee to ensure that, unless otherwise approved by a simple majority of the Holders, the General Partner will at all times be either **LBHI itself** or a directly or indirectly wholly-owned Subsidiary of LBHI". *See* Exhibit B of the Objection, p. 41. Pursuant Clause 3.2 (f), (1), (2), (4), (6) (p. 11); Clause 3.7 (e) (p. 14) and Clause 13.1 and 13.2 (p. 24) of the Partnership Agreement (**EXHIBIT II**), the General Partner covenanted to the holders of the Securities that it will keep, or cause to be kept, proper books of account in relation to the Issuer LB UK IV. Pursuant Clause 13.2 (p. 24) of the Partnership Agreement the General Partner shall appoint Auditors, which may be the auditors of LBHI.

---

(c) to enable the directors to ensure that any accounts required to be prepared comply with the requirements of this Act (and, where applicable, of Article 4 of the IAS Regulation).

(3) Accounting records must, in particular, contain—
(a) entries from day to day of all sums of money received and expended by the company and the matters in respect of which the receipt and expenditure takes place, and
(b) a record of the assets and liabilities of the company.

(4) If the company's business involves dealing in goods, the accounting records must contain—
(a) statements of stock held by the company at the end of each financial year of the company,
(b) all statements of stocktakings from which any statement of stock as is mentioned in paragraph (a) has been or is to be prepared, and
(c) except in the case of goods sold by way of ordinary retail trade, statements of all goods sold and purchased, showing the goods and the buyers and sellers in sufficient detail to enable all these to be identified.

(5) A parent company that has a subsidiary undertaking in relation to which the above requirements do not apply must take reasonable steps to secure that the undertaking keeps such accounting records as to enable the directors of the parent company to ensure that any accounts required to be prepared under this Part comply with the requirements of this Act (and, where applicable, of Article 4 of the IAS Regulation).

42. Due to the General Partner's failure to file the Group of companies' accounts, the Registrar took pursuant

to the terms of Section 1000 of the Companies Act 2006[11] several steps to strike the General Partner off the

register. The Registrar has sent to LB GP No. 1 Ltd several letters inquiring whether the company is carrying

on business or in operation. On March 9, 2010 the Registrar published pursuant Section 1000 of the

Companies Act 2006 a (first) notice in the Gazette that at the expiration of three months from the date of the

notice LB GP No. 1 Ltd would, unless cause to the contrary is shown, be struck off the registrar and would be

dissolved. Pursuant to Section 1000(4) the Registrar may not strike a company off under this section until

after the expiration of three months from the publication of this notice in the Gazette, unless cause to the

contrary is shown by the company. *See* **EXHIBIT I of Van Rooy's Response**. This file copy shows the

Registrar's first notice pursuant <u>Section 1000</u> about LB GP No. 1 Ltd in the Gazette of March 3, 2010.

43. When the time expired as mentioned in the notice and no person (<u>including LBHI!</u>) showed cause that the

striking off of and dissolution of LB GP No. 1 Ltd should not be done, the Registrar published on June 22,

2010 a second notice in the Gazette that the name of LB GP No. 1 Ltd has been struck off the register. On the

publication of the notice in this final Gazette, LB GP No. 1 Ltd was dissolved.

---

[11] http://www.legislation.gov.uk

**PART 31 of the Companies Act 2006:**
DISSOLUTION AND RESTORATION TO THE REGISTER

CHAPTER 1 STRIKING OFF
*Registrar's power to strike off defunct company*

**Section 1000: Power to strike off company not carrying on business or in operation**
(1) If the registrar has reasonable cause to believe that a company is not carrying on business or in operation, the registrar may send to the company by post a letter inquiring whether the company is carrying on business or in operation.
(2) If the registrar does not within one month of sending the letter receive any answer to it, the registrar must within 14 days after the expiration of that month send to the company by post a registered letter referring to the first letter, and stating—
(a) that no answer to it has been received, and
(b) that if an answer is not received to the second letter within one month from its date, a notice will be published in the Gazette with a view to striking the company's name off the register.
(3) If the registrar—
(a) receives an answer to the effect that the company is not carrying on business or in operation, or
(b) does not within one month after sending the second letter receive any answer, the registrar may publish in the Gazette, and send to the company by post, a notice that at the expiration of three months from the date of the notice the name of the company mentioned in it will, unless cause is shown to the contrary, be struck off the register and the company will be dissolved.
(4) At the expiration of the time mentioned in the notice the registrar may, unless cause to the contrary is previously shown by the company, strike its name off the register.
(5) The registrar must publish notice in the Gazette of the company's name having been struck off the register.
(6) On the publication of the notice in the Gazette the company is dissolved.
(7) However—
(a) the liability (if any) of every director, managing officer and member of the company continues and may be enforced as if the company had not been dissolved, and
(b) nothing in this section affects the power of the court to wind up a company the name of which has been struck off the register.

44. However pursuant to the terms of Section 1000(7) of the Companies Act 2006 —

> (a) the liability (if any) of every director, managing officer and member of the company continues and may be enforced as if the company had not been dissolved, and
> (b) nothing in this section affects the power of the court to wind up a company the name of which has been struck off the register.

45. Furthermore, the Company Details (**EXHIBIT J of Van Rooy's Response**, obtained from the Registrar) & Filing History of the Preferential Limited Partner LB Investment Holdings Ltd (**EXHIBIT K of Van Rooy's Response**, obtained from the Registrar) demonstrate that LB Investment Holdings Ltd filed on July 27, 2008 its last accounts of November 30, 2006. LB Investment Holdings Ltd thus also failed to file its accounts on time and as a result, kept essential annual financial information from the holders of the Securities away.

46. On January 19, 2011 LB Investment Holdings Ltd applied to the Registrar to be struck off the register and to dissolve. *See* **EXHIBIT L Van Rooy's Response** (application of LB Investment Holdings Ltd, that Van Rooy obtained from the Registrar). This is called a "voluntary striking off" pursuant Section 1003 of the Companies Act 2006[12].

47. However, LB Investment Holdings Ltd failed to perform the duty imposed by Section 1006(1)(c)[13] to inform its creditors (as Van Rooy) about the application. A person who fails to perform the duty imposed on

---

[12]http://www.legislation.gov.uk

*Voluntary striking off*
**Section 1003 of the Companies Act 2006:Striking off on application by company**
(1) On application by a company, the registrar of companies may strike the company's name off the register.
(2) The application—
(a) must be made on the company's behalf by its directors or by a majority of them, and
(b) must contain the prescribed information.
(3) The registrar may not strike a company off under this section until after the expiration of three months from the publication by the registrar in the Gazette of a notice—
(a) stating that the registrar may exercise the power under this section in relation to the company, and
(b) inviting any person to show cause why that should not be done.
(4) The registrar must publish notice in the Gazette of the company's name having been struck off.
(5) On the publication of the notice in the Gazette the company is dissolved.
(6) However—
(a) the liability (if any) of every director, managing officer and member of the company continues and may be enforced as if the company had not been dissolved, and
(b) nothing in this section affects the power of the court to wind up a company the name of which has been struck off the register.
[13]http://www.legislation.gov.uk

**Section 1006 of the Companies Act 2006: Copy of application to be given to members, employees, etc**

him by this section commits an <u>offence</u> pursuant Section 1006(4) of the Companies Act 2006. If he does so

with the intention of concealing the making of the application from the person concerned, he commits an

<u>aggravated offence</u> pursuant Section 1006(7).

48. On February 1, 2011 the Registrar published in the Gazette the first notice about the voluntary striking off

of LB Investment Holdings Ltd. Pursuant to Section 1003(3) the Registrar may not strike a company off under

this section until after the expiration of three months from the publication by the Registrar in the Gazette of a

notice (a) stating that the Registrar may exercise the power under this section in relation to the company, and

(b) <u>inviting any person to show cause why that should not be done.</u>

49. When the time expired as mentioned in the notice and no person (including LBHI!) showed cause that the

striking off of and dissolution of LB Investment Holdings Ltd should not be done, the Registrar published on

June 22, 2010 a second notice in the Gazette that the name of LB GP No. 1 Ltd had been struck off the

register. On May 17, 2011 the Registrar published in the Gazette the final notice that LB Investment Holdings

Ltd had been dissolved via a voluntary strike off. On the publication of the notice in this final Gazette, LB

Investment Holdings Ltd was dissolved. *See* **EXHIBIT K of Van Rooy's Response**, copy of Filing History

of LB Investment Holdings Ltd (obtained from website of Companies House).

---

(1) A person who makes an application under section 1003 (application for voluntary striking off) on behalf of a company must secure that, within seven days from the day on which the application is made, a copy of it is given to every person who at any time on that day is—
(a) a member of the company,
(b) an employee of the company,
(c) <u>a creditor of the company,</u>
(d) a director of the company,
(e) a manager or trustee of any pension fund established for the benefit of employees of the company, or
(f) a person of a description specified for the purposes of this paragraph by regulations made by the Secretary of State. Regulations under paragraph (f) are subject to negative resolution procedure.
(2) Subsection (1) does not require a copy of the application to be given to a director who is a party to the application.
(3) The duty imposed by this section ceases to apply if the application is withdrawn before the end of the period for giving the copy application.
(4) A person who fails to perform the duty imposed on him by this section commits an offence.
If he does so with the intention of concealing the making of the application from the person concerned, he commits an aggravated offence.
(5) In proceedings for an offence under this section it is a defence for the accused to prove that he took all reasonable steps to perform the duty.
(6) A person guilty of an offence under this section (other than an aggravated offence) is liable—
(a) on conviction on indictment, to a fine;
(b) on summary conviction, to a fine not exceeding the statutory maximum.
(7) A person guilty of an aggravated offence under this section is liable—
(a) on conviction on indictment, to imprisonment for a term not exceeding seven years or a fine (or both);
(b) on summary conviction—
(i) in England and Wales, to imprisonment for a term not exceeding twelve months or to a fine not exceeding the statutory maximum (or both);
(ii) in Scotland or Northern Ireland, to imprisonment for a term not exceeding six months, or to a fine not exceeding the statutory maximum (or both).

50. Section 386(5) of the Companies Act 2006 stipulates that a parent company that has a subsidiary undertaking in relation to which the requirements regarding accounting records do not apply must take reasonable steps to secure that the undertaking keeps such accounting records as to enable the directors of the parent company to ensure that any accounts required to be prepared under this Part comply with the requirements of this Act (and, where applicable, of Article 4 of the IAS Regulation).

51. Pursuant to the terms of Section 386(5) of the Companies Act 2006 LBHI had as the ultimate parent company the duty to ensure that its subsidiary undertakings LB GP No. 1 Ltd and LB Investment Holding Ltd were keeping and filing adequate accounting records that complied with the requirements of (amongst others) the Companies Act. As mentioned before, pursuant Clause 13.2 (p. 24) of the Partnership Agreement (**EXHIBIT II**) the General Partner would appoint Auditors, which might be the auditors of LBHI.

52. If a company fails to comply with any provision of Section 386 (duty to keep accounting records), an criminal offence is committed by every officer of the company who is in default (pursuant Section 387 of the Companies Act 2006).[14] All the directors of the company risk prosecution. On conviction, a director could end up with a criminal record and a fine of up to £5,000 for each offence. In addition, the law imposes a civil penalty for late filing of accounts on the company. The amount of the penalty depends on how late the accounts arrive and whether the company is private or public at the date of the balance sheet.

53. Facts show that the General Partner LB GP No. 1 Ltd and the Limited Partner LB Investment Holdings Ltd failed to comply with the requirements of the Companies Act 2006 and that criminal offences were committed by every officer of these companies who were in default.

54. The failure of LB GP No. 1 Ltd to deliver the Group of companies' accounts (including LB UK IV) on time caused its strike off by the Registrar and caused its dissolution on June 22, 2010.

---

[14] http://www.legislation.gov.uk

**Section 387 of the Companies Act 2006: Duty to keep accounting records: offence**
A person guilty of an offence under this Section is liable—
(a) on conviction on indictment, to imprisonment for a term not exceeding two years or a fine (or both);
(b) on summary conviction—
(i) in England and Wales, to imprisonment for a term not exceeding twelve months or to a fine not exceeding the statutory maximum (or both);
(ii) in Scotland or Northern Ireland, to imprisonment for a term not exceeding six months, or to a fine not exceeding the statutory maximum (or both).

55. The failure of LB Investment Holdings Ltd to deliver timely accounting records also led to several warning letters from the Registrar. Finally LB Investment Holdings Ltd applied for a voluntary strike off, that caused its dissolution on May 17, 2011. LB Investment Holdings Ltd failed to perform its duty of Section 1006(1)(c) and did not inform its creditors about the application for a voluntary striking off. However the liability of every director, managing officer and member of both companies continues and may be enforced as if the companies had not been dissolved (*See* Section 1000(7) and Section 1003(6) of the Companies Act 2006).

56. The ultimate parent company of LB GP No. 1 Ltd and LB Investment Holdings Ltd, LBHI, did apparently not take any reasonable steps to secure that its subsidiary undertakings were keeping accounting records that complied with the requirements of (among others) the Companies Act 2006 and that would prevent the Registrar to strike off and to dissolve the companies.

57. When the Registrar published on March 9, 2010 the first notice of LB GP No. 1 Ltd's striking off and dissolution, LBHI apparently did not take any action to show cause that the striking off of and dissolution of LB GP No. 1 Ltd should not be done (pursuant Section 1000(3)(b)). By not taking any action, LBHI caused the dissolution of the General Partner, and with it, LB UK IV's dissolution.

58. In addition LBHI violated the terms of the Base Prospectus (Exhibit B, p. 41 and p. 60), because it guaranteed to the Holders of the Securities that it would prepare audited annual financial statements of LB UK IV: "No financial statements of the Issuer have yet been prepared. The first financial statements of the Issuer are expected to be prepared for the period ending 30 November 2007. Thereafter, it is intended that the Issuer will prepare audited annual financial statements."

59. LBHI took, or caused to be taken, actions to bring about the dissolution of LB UK IV. Accordingly LBHI violated a) the express terms of the Summary of the Base Prospectus (Exhibit B of the Objection, p. 9-10), b) § 3.3 of the Guarantee (Exhibit B of the Objection, included in the Summary, p. 37) and c) term 18.2 of the Partnership Agreement of January 3, 2007 (**EXHIBIT II**, p. 32).

**The complete copies of the Partnership Agreement reveal the fact that LBHI did not take any actions to substitute and/or replace the General Partner and/or Limited Partner in order to continue the Limited Partnership LB UK IV**

60. The Debtors asserted that "LB UK IV, the Issuer of the securities, was automatically dissolved pursuant to the terms of the Partnership Agreements establishing LB UK IV, which provide for the dissolution of the issuer when the partnership no longer has at least one general partner <u>or</u> at least one limited partner." (Objection ¶ 10).

61. However Clause 2.3 of the Partnership Agreement stipulates <u>differently</u> and provides <u>cumulative</u> (four times "and" instead of once "or") conditions (see **EXHIBIT II**, p. 6):

    (1) The Issuer LB UK IV shall not be terminable by the General Partner (whether on notice or otherwise) **and** (cumulative)

    (2) The Issuer LB UK IV shall continue until the earlier of the date on which the Issuer is dissolved or terminated in accordance with the provisions of this Agreement, **and** (cumulative)

    (3) The Issuer LB UK IV shall continue until the first date on which there is not at least one general partner **and** (cumulative)

    (4) The Issuer LB UK IV shall continue until at least one limited partner for the purposes of the Act.

62. In order to mislead the claimants and the Court, Debtors had hidden away the complete copies of the Partnership Agreement. Debtors even <u>refused</u> to convey the complete copies to Van Rooy, while she had the full right to take notice of this agreement.

63. The reason of this inequitable conduct, is that the Partnership Agreement would reveal the fact that LBHI, who was in fact the General Partner itself, was <u>not</u> willing to substitute and/or replace the General Partner and/or Limited Partner in order to keep LB UK IV alive. The Partnership Agreement provides several clauses to substitute and/or replace the General Partner and/or Limited Partner of LB UK IV.

64. The complete copies of the Partnership Agreement reveals that LBHI did not comply with the requirements of the Partnership, did not do " *all things necessary to carry out the purposes of the Issuer*" and did not perform its obligations to the holders of the securities.

19

65. The Partnership Agreement also provides several clauses to <u>guarantee</u> the <u>continuation of the Limited Partnership LB UK IV</u>.

- Clause 2.3 (p. 6) stipulates that the Issuer LB UK IV shall <u>not</u> be terminable by the General Partner whether on notice or otherwise. Furthermore Clause 16.1 of the Partnership Agreement (p. 25) stipulates that *"no Partner shall have the right to cause the dissolution of the Issuer by notice."*

- Clause 16.2 of the Partnership Agreement (p. 26) <u>guarantees</u> the <u>continuation of the Limited Partnership LB UK IV</u>: *"The Issuer shall not be dissolved or terminated by the Incapacity of any Limited Partner, the assignment or transfer by any Limited Partner of its Preferred Securities, or the admission of a new or substituted General Partner or Limited Partner."*

- Pursuant Clause 2.6 (d) of the Partnership Agreement (p. 7): *"The General Partner shall be entitled to <u>admit any additional partner</u> to the Issuer as a Limited partner in accordance with the provisions of the Conditions. Each Partner agrees to <u>accept</u> any person to whom a limited partnership interest is assigned or otherwise transferred in accordance with the provisions of this Agreement and of the Conditions as a Limited Partner as of the date of such Partner being entered as a limited partner on the Limited Partnerships Register and notice of the arrangement under which such person becomes a limited partner being advertised in the London Gazette, as required by the Act."*

- Clause 3.2 (e) of the Partnership Agreement (p. 10) stipulates: *"Without the prejudice to the generality of sub-clause 3.1. above, and subject to the Act and the FSMA, the General Partner shall have all rights and powers required or appropriate to manage and operate the Issuer and to do all things necessary to carry out the purposes of the Issuer, <u>including</u> ... the power and authority to do the following: ...*

  *(e) <u>admit additional limited partners</u> (including the Initial Limited Partner) and permit the transfer or assignment of limited partnership interests in the Issuer and the withdrawal of limited partners as contemplated by this Agreement:".*

- According to Clause 10.1 (h) of the Partnership Agreement (p. 21-22): *"Upon the Incapacity of a limited partner other than an individual, the authorized representative of such entity shall have all rights of a limited partner for the purposes of effecting the orderly winding up and disposition of the business of such entity and such power as such entity possessed to constitute a <u>successor</u> to its interest*

20

*in the Issuer and to join with such person in making application to substitute an assignee of the relevant Preferred Securities as a limited partner all as provided in sub-clause 10.1, and such other rights for such purposes as are provided by the Act."*

- Pursuant to the terms of the Base Prospectus regarding LB UK IV, "LHBI will undertake in the Subordinated Guarantee to ensure that, unless otherwise approved by a simple majority of the Holders, the General Partner will at all times be either LBHI itself or a directly or indirectly wholly-owned Subsidiary of LBHI". *See* Exhibit B of the Objection, § 3.3(b) p. 37 and p. 41.

- Pursuant to the Base Prospectus IV (Exhibit B of the Objection, p. 5 and p. 22), the definition of "Preferential Limited Partner" is: "LB Investment Holdings Ltd (…), a wholly-owned Subsidiary of LBHI or any other Subsidiary of LBHI." With other words: The Preferential Limited Partner will be at all times a wholly-owned Subsidiary of LBHI.

- Further Clause 10.1 (i) of the Partnership Agreement (p. 22): *"A person who has been registered as a Limited Partner pursuant to this clause 10 shall succeed to all rights and be subject to all the obligations of the transferor Limited partner in respect of the Preferred Securities transferred, including the part of the Capital Contribution of the transferor Limited Partner related to those Preferred Securities."*

- Pursuant clause 10.2 (p. 22) the General Partner may transfer its General Partnership Interest to a directly or indirectly wholly-owned Subsidiary of LBHI … *"and no transfer of the General Partner's Partnership Interest shall be effective until the new general partner is registered as such on the Limited Partnerships Register …."*.

- Pursuant Clause 10.3 (p. 23):*"The Preferential Limited Partner may transfer its Partnership Interest … to any Subsidiary of LBHI."*

- Clause 14.1 (p. 24) stipulates: *"The General Partner shall not have the right to retire as general partner of the Issuer for so long as the Preferred Securities are outstanding unless any Regulator has not objected and except by way of a transfer of the General Partner Partnership Interest as provided in sub-clause 10.2."*

66. As long as the contrary is not proven by Debtors, it's a fact that LBHI was <u>not</u> willing to take any actions to replace and/or to substitute the General Partner LB GP No. 1 Ltd for another General Partner or a "directly or indirectly wholly-owned Subsidiary of LBHI" or "LBHI itself".

67. In addition it's also clear that LBHI was <u>not</u> willing to take any timely action to replace and/or to substitute the Limited Partner LB Investment Holdings Ltd, that was also a wholly-owned Subsidiary of LBHI.

68. Although the terms of the Partnership Agreements establishing LB UK IV provided for the replacement and/or substitution of the General Partner and the Limited Partner and stipulated that LB UK IV should <u>not</u> be terminable by the General Partner, LBHI apparently took not any timely actions to replace and/or to substitute the General Partner and the Limited Partner that caused the dissolution of LB UK IV.

69. Accordingly LBHI violated the express terms of § 3.3 of the LBHI Guarantee (Exhibit B of the Objection, § 3.3 p. 37). LBHI caused the dissolution of the General Partner, caused the dissolution of the Limited Partner and with this, also the dissolution of LB UK IV itself.

LBHI should not benefit from its violation of the express terms of § 3.3 of the Guarantee. LBHI should not benefit from the earlier mentioned violations of law. LBHI does not have clean hands.

70. It is well settled that the doctrine of unclean hands requires that a party seeking equity must come into court with clean hands. See Gilpin, 930 N.Y.S.2d at 124 (citing *Pecorella v. Greater Buffalo Press*, 107 A.D.2d 1064, 1065 (N.Y. App. Div. 4th Dept. 1985). Such doctrine may bar recovery where a party seeking such recovery " 'is guilty of immoral, unconscionable conduct.' " *Id.* (quoting *National Distillers & Chem. Corp. v. Seyopp Corp.*, 17 N.Y.2d 12, 16 (N.Y. 1966)). As a result, LBHI should not be allowed to obtain the requested relief, while it failed to take any (timely) actions that would have prevented the dissolution of the General Partner or the Issuer LB UK IV otherwise.

**Debtors' assertions that the Partnership Agreement is not relevant with respect to Debtors' requested relief is incorrect**

71. Debtors asserted during the hearing of April 26, 2012 that the Partnership Agreement and clauses of it, or pieces of it that "claimant" (Debtors meant Van Rooy) wanted to refer were "only in response or related to the basis for which LBHI sought to disallow the claims". Debtors were referring to Van Rooy's Response and to Van Rooy's phone calls with Debtors' attorneys (Mr. R. Martin and Mr. G. Fail).

72. Further Debtors asserted that - upon their "belief "- the Partnership Agreement was not relevant to the requests to enforce the subordination that would be in LBHI's Subordinated Guarantee.[15] These assertions are fully incorrect.


**Clause 6.3 of the Partnership Agreement confirms the factual issue about the existence of one or more (separate) "other forms of guarantees" with respect to Van Rooy's claim and with respect to Debtors' requested relief.**

73. There are facts in dispute with respect to the relief requested by Debtors. There is a factual issue whether or not there's a separate other guarantee out there, which is <u>confirmed</u> by Clause 6.3 of the Partnership Agreement (**EXHIBIT II**, p. 18): *"The Subordinated Guarantee shall be substantially in the form set out in the Base Prospectus <u>or such other form as the General Partner may require.</u>"*

74. This Clause confirms the factual issue about the existence of one or more (separate) "other forms of guarantees", which would cover Lehman Brothers UK Capital Funding IV LP's obligations from LBHI.

75. The existence of one or more separate "other forms of guarantees" is furthermore <u>supported</u> by Van Rooy's phone conversation on May 21, 2012 with a spokesman of "the Paying and Transfer Agent", ING Bank NV in the Netherlands.

---

[15]Transcript of hearing of April 26, 2012, p. 41, sentences 10-25.

76. Because Debtors refused to provide Van Rooy the requested Partnership Agreement establishing LB UK IV, Van Rooy started an investigation where she could obtain these documents. Van Rooy requested "the Paying and Transfer Agent", ING Bank NV in the Netherlands, to provide the Partnership Agreement.

77. The ING Bank NV requested Allen & Overy LLP in London to convey the Partnership Agreement. Allen & Overy LLP was/is - pursuant Clause 8.1 (b)(i) of the "Subscription Agreement" (see **EXHIBIT I**, p. 11) - the legal adviser of the Guarantor LBHI regarding the deal establishing LB UK IV and LB UK V (as to English law and as to United States and New York law).

78. Van Rooy obtained the Partnership Agreement - as mentioned before - just before the hearing of April 26, 2012 from the ING Bank NV.

79. Because of the fact Debtors also failed to attach other documents that form part of the Base Prospectus (enumerated on p. 60-61 of the Base Prospectus), Van Rooy requested the spokesman of ING Bank NV, Mr. Arthur Aardewijn, by email of May 20, 2012 to provide all other documents that were mentioned on p. 60-61 of the Base Prospectus. I.e.: a) The Subscription Agreement, b) the Subordinated Guarantee, d) The Administrative Agreement, e) The Agency Agreement, f) The Final Terms and g) The Restated Certificate of Incorporation and the Amended By-Laws of LBHI.

80. Furthermore Van Rooy requested *"the financial statements of the Issuer Lehman Brothers UK Capital Funding IV LP & Lehman Brothers UK Capital Funding V"; the "audited annual financial statements" of the Issuers' Lehman Brothers UK Capital Funding IV LP & Lehman Brothers UK Capital Funding V and the "copies of the "Issuers' most recently published annual reports and audited annual financial statements" (Lehman Brothers UK Capital Funding IV LP & Lehman Brothers UK Capital Funding V).*

81. Van Rooy also requested *"Any documents, communications or related material in connection with any entities' guaranty (including, but not limited to, Lehman Brothers Holdings Inc) of the obligations of Lehman Brothers UK Capital Funding IV LP & Lehman Brothers UK Capital Funding V LP".*

82. When Van Rooy did not receive a quick reply at the end of the day of May 21, 2012, Van Rooy contacted Mr. Aardewijn by phone. Mr. Aardewijn confirmed that he had received Van Rooy's email and that he contacted Allen & Overy in London.

83. When Van Rooy asked Mr. Aardewijn to investigate and request Allen & Overy in London if there were any other guarantees in connection with the securities issued by LB UK IV and LB UK V (including, but not limited to LBHI), Mr. Aardewijn answered that *"Allen & Overy LLP in London would and could not provide any confidential documents and guarantees"*. This answer of the spokesman of the Paying and Transfer Agents supports the assumption and confirms the factual issue about the existence of one or more "other forms of guarantees" with respect to Van Rooy's claim and with respect to the relief requested by Debtors.

84. Mr. Aardewijn sent with his email of May 23, 2012 the earlier mentioned documents[16] regarding LB UK IV to Van Rooy, that he received from a certain "Richard" from Allen & Overy in London.  In this email he attached an email string with "Richard" from Allen & Overy in London (email of May 23, 2012; *see*

**EXHIBIT IV**):

> **"Sent:** woensdag 23 mei 2012 10:50
> **To:** Aardewijn, A.M. (Arthur)
> **Subject:** RE: Lehman Brothers UK Capital Funding III LP , Lehman Brothers UK Capital Funding IV LP and Lehman Brothers UK Capital Funding V LP
>
> Arthur,
>
> Please find attached the documents I'm able to source from our bible for this deal. These are the Subordinated Guarantee, Subscription Agreement, Administration Agreement, Agency Agreement, Final Terms and Restated Certificate of Incorporation and the Amended and Restated By-Laws of LBHI.
>
> I understand that we don't have any financials for these entities, they were SPVs when we were involved. I've also been told that there isn't anything to send on the guarantee other than the Subordinated Guarantee itself (attached).
>
> Kind regards,
>
> Richard"

85. Van Rooy called Mr. Aardewijn the same day to thank for the documents that he had mailed regarding LB UK IV. Van Rooy requested to mail the documents regarding LB UK V as well, that Richard probably had forgotten to mail. Van Rooy asked who was "Richard" at Allen & Overy (the person who had mailed the documents) and which job he was doing at Allen & Overy. Van Rooy asked if Richard was an attorney of Allen & Overy LLP.

---

[16]a) The Subscription Agreement, b) the Subordinated Guarantee, d) The Administrative Agreement, e) The Agency Agreement, f) The Final Terms and g) The Restated Certificate of Incorporation and the Amended By-Laws of LBHI.

86. Mr. Aardewijn answered that "Richard" was *"a clerk of Allen & Overy LLP, who was instructed by the attorneys of Allen & Overy to search for certain documents regarding LB UK IV and LB UK V."*

Richard writes to Mr. Aardewijn that he sent the documents *"he was able to source from Allen & Overy's bible for this deal."* Apparently there exists a (holy?) "bible" for the deal regarding LB UK IV at Allen & Overy, from which bible clerk Richard was told to extract some documents. "A bible" suggests much more available documents (including one or more other forms of guarantees) than the documents that Richard was told to select.

87. Apparently clerk Richard was also told by the attorneys of Allen & Overy *"that there isn't anything to send on the guarantee other than the Subordinated Guarantee itself."* , suggesting that one or more (confidential) other forms of guarantees could exist with respect to Van Rooy's claim and with respect to Debtors' requested relief, which documents (including guarantees) would or could not be provided by Allen & Overy to claimant Van Rooy. Foregoing also supports the existence of one or more (confidential) other forms of guarantees with respect to Van Rooy's claim and with respect to Debtors' requested relief. Van Rooy hereby also remarks that Debtors did not provide any written evidence regarding this factual dispute so far.

Although some claimants have handed LBHI a discovery request, Debtors did not prove a negative so far.

88. Debtors' attorney himself confirmed this factual issue during the hearing of April 26, 2012: *"there is no guarantee that there are not other guarantees"*[17].

89. It's also clear that at the time Allen & Overy was involved, there were not any financials regarding LB UK IV and LB UK V available.

---

[17]Transcript of hearing of April 26, 2012, p. 54, sentences 12-13.

**The "Subordination Provision" and its references to circular definitions are not presented in an easily analyzable and comprehensible form**

90. In the alternative, the Debtors allege that the Preferred Securities Claims should be reclassified as equity interests. *See* Objection ¶11. In support of their claim, the Debtors cite to § 2.9 of the Guarantee in the Base Prospectus (Exhibit B of the Objection, p. 36), the "Subordination Provision":

*"Subject to applicable law, LBHI agrees that its obligations hereunder constitute unsecured obligations of LBHI subordinated in right of payment to Senior Creditors and will at all times rank:*

    *(a)  junior to all subordinated liabilities of LBHI (in each case other than any liability of LBHI which is referred to in (b) or (c) below and any other liability expressed to rank pari passu with or junior to this Subordinated Guarantee (the Senior Creditors);*

    *(b)  pari passu with Parity Securities, if any, issued by LBHI and any guarantee or support agreement of LBHI raking pari passu with this Subordinated Guarantee and issued in respect of parity Securities issued by the Issuer or any Subsidiary; and*

    *(c)  Senior to the Junior Share Capital of LBHI.*

92. The definition of "Parity Securities" *(*Exhibit B of the Objection, p. 34) is defined as:

*"...any non-cumulative preferred stock, non-cumulative preferred securities (other than the Preferred Securities) or other securities either (a) issued directly by LBHI and ranking pari passu with LBHI's obligations under this Subordinated Guarantee or (b) issued by the Issuer or any Subsidiary or other entity and entitled to the benefit of this Subordinated Guarantee or benefiting from any other guarantee or support agreement from LBHI ranking pari passu with this Subordinated Guarantee."*

93. Van Rooy refers hereby to the arguments in Van Rooy's Response as well as to the arguments made by other claimants in similar situated positions. It's a fact that the information provided in the "Subordination Provision" and its references to circular definitions are far from an "easily analyzable and comprehensible form". This is an important to the following matter.

**Legal basis for a non-subordinated claim against LBHI in connection with Van Rooy's claim**

94. In this case the Base Prospectus, including the documents incorporated by reference, shall by, and construed in accordance with, English law.[18] Pursuant Clause 1.2 of the "Subscription Agreement" of January 23, 2007 (see **EXHIBIT I**, p. 2), the Base Prospectus of January 4, 2007 and together with it, the documents incorporated by reference, were drafted by the Guarantor LBHI.

95. The Base Prospectus of January 4, 2007 is a prospectus in the meaning of the European Directive 2003/71/EC (the "Prospectus Directive", *see* **EXHIBIT D of Van Rooy's Response**) and its implementing measuring, *see* page 1 of the Base Prospectus (Exhibit B of the Objection) and *see* Term (E) of the "Subscription Agreement" of January 23, 2007 (**EXHIBIT I**)[19].

96. The Prospective Directive is implemented in the United Kingdom[20] by way of "The Prospectus Regulations 2005"[21] (the Prospectus Regulations 2005, Section 87A of the Financial Services and Markets Act 2000).

97. Pursuant to Article 6 (1) of the Prospectus Directive (**EXHIBIT D of Van Rooy's Response**)[22] responsibility and liability for the information given in the Base Prospectus attaches the Guarantor (i.e. LBHI).

---

[18] *See* § 14.1 (p. 32) of Base Prospectus (Exhibit B of the Objection); Clauses 13.1 and 13.4 of the Subscription Agreement (**EXHIBIT I**, p. 17); Clauses 19.2 (a) and (b) and (e) of the Partnership Agreement (p. 33, **EXHIBIT II**).

[19] Term (E) of the "Subscription Agreement" of January 23, 2007: *"References to this Agreement to a Directive include any relevant implementing measure of each Member State of the European Economic Area which has implemented such Directive."*

[20] See Section 103 (1) of the Prospectus Regulations 2005 and its Explanatory Note (last page of **EXHIBIT V**).

[21] At the time the Base Prospectus of January 4, 2011 was published, the Prospectus Directive was implemented in "The Prospectus Regulations 2005". Some minor amendments were later made up in "The Prospectus Regulations 2011".

[22] **Article 6 of Prospective Directive 2003/71/EC:**
**Responsibility attaching to the prospectus**
1. Member States shall ensure that responsibility for the information given in a prospectus attaches at least to the issuer or its administrative, management or supervisory bodies, the offeror, the person asking for the admission to trading on a regulated market or the guarantor, as the case may be. The persons responsible shall be clearly identified in the prospectus by their names and functions or, in the case of legal persons, their names and registered offices, as well as declarations by them that, to the best of their knowledge, the information contained in the prospectus is in accordance with the facts and that the prospectus makes no omission likely to affect its import.
2. Member States shall ensure that their laws, regulation and administrative provisions on civil liability apply to those persons responsible for the information given in a prospectus. However, Member States shall ensure that no civil liability shall attach to any person solely on the basis of the summary, including any translation thereof, unless it is misleading, inaccurate or inconsistent when read together with the other parts of the prospectus.

98. The Subordination Provision and its references to circular definitions regarding the alleged subordination of Van Rooy's Claim in the Base Prospectus are not drawn up in accordance with the legal requirements of the Prospective Directive and in particular with the requirements of Section 87A of the Financial Services and Markets Act 2000 ("FSMA 2000") (**EXHIBIT V**), as mentioned below. In addition, the information in the Summary of the Base Prospectus regarding the alleged subordination of Van Rooy's Claim also does not comply with the requirements of the Prospective Directive and with the requirements of Section 87A of the FSMA 2000. The Subordination Provision (and its references to circular definitions) regarding the alleged subordination of Van Rooy's Claim are also in breach of LBHI's contractual agreements to the holders of the securities, as mentioned below.

99. The legal basis for a non-subordinated claim against LBHI in connection with Van Rooy's claim are:

I.  the European Directive 2003/71/EC (the "Prospective Directive");

II. the implementing measuring of the Prospective Directive in "the Prospectus Regulations 2005" and in particular Section 87A of the FSMA 2000 in the United Kingdom;

III. LBHI's covenanted to the holders of the securities that the Base Prospectus of January 4, 2007 and including the documents incorporated by reference, contain all the information required by Section 87A of the FSMA and otherwise comply with the prospectus rules made under the FSMA and also contain all the information required by English law and regulations and otherwise comply with such law and regulations to the extent applicable to the issue of the Preferred Securities and have been published as required by the Prospectus Directive (*See* Clause 6.1 (b) of the "Subscription Agreement", see **EXHIBIT I**, p. 4);

IV. LBHI's covenanted to the holders of the securities that each of the Prospectus and the Final Terms (at the dates of their publications) do not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, were not misleading (Clause 6.1 (a) of the "Subscription Agreement", see **EXHIBIT I**, p. 3);

V. LBHI's covenanted to the holders of the securities that <u>the Summary</u> set out in the Base Prospectus was the date of its publication <u>not misleading, inaccurate or inconsistent</u> when read together with other parts of the Prospectus and with the Final Terms (Clause 6.1(a) of the "Subscription Agreement", see **EXHIBIT I**, p. 3). According to the "Contents" of Base Prospectus (p. 4), the Summary is set out in the Base Prospectus on pages 5, 6, 7, 8, 9, 10, 11 and 12.

*Ad I. The Prospective Directive 2003/71/EC*

*<u>Reliable, easily analysable and comprehensible information in a prospectus is the key factor in investor protection</u>*

100. The Base Prospectus of January 4, 2007 has to comply with the requirements of the Prospectus Directive 2003/71/EC *(***EXHIBIT D of Van Rooy's Response***)* and its implementing measures. Therefore the terms of the Base Prospectus of January 4, 2007 and its Documents, including the LBHI Guarantee, the various clauses regarding the alleged subordination of Van Rooy's Claim, <u>must</u> be interpreted by the <u>main objective</u> of Prospective Directive: <u>ensuring the protection of investors.</u>  Van Rooy refers to ¶ 22 - 33 of Van Rooy's Response, which is hereby repeated and inserted. **Debtors did not address Van Rooy's disclosed facts about the requirements that LBHI had to comply regarding the Prospective Directive and its implementing measures.**

101. Pursuant to preamble (21) of the Prospectus Directive reliable, easily analysable and comprehensible information in a prospectus is the key factor in investor protection. This information needs to be <u>sufficient</u> and as <u>objective</u> as possible as regards the financial circumstances of the issuer and the rights attaching to the securities. The information must be provided in <u>an easily analysable and comprehensible form</u>. Harmonisation of the information contained in the prospectus should provide <u>equivalent investor protection</u> at Community level (preamble (20)). Investors must be protected by ensuring publication of reliable information. The issuers whose securities are admitted to trading on a regulated market are subject to an ongoing disclosure obligation. Issuers must, at least annually, list all relevant information published or made available to the public over the preceding 12 months, including information provided to the various reporting requirements laid down in other

Community legislation. This should make it possible to ensure the publication of consistent and easily understandable information on a regular basis (preamble (27)).

*Requirements for drawing up a prospectus*

102. Pursuant Article 5 (1) of the Prospectus Directive a prospectus must contain all information which, according to the particular nature of the Issuer and of the securities offered to the public or admitted to trading on a regulated market, is necessary to enable investors to make an informed assessment of the assets and liabilities, financial position, profit and losses, and prospects of the Issuer and of the Guarantor, and of the rights attaching to such securities. This information must be presented in an easily analyzable and comprehensible form.

103. Pursuant Article 5 (2) of the Prospectus Directive must the Base Prospectus contain information concerning the issuer and the securities to be offered to the public or to be admitted to trading on a regulated market.

104. Pursuant to Article 10 (1) of the Prospectus Directive issuers whose securities are admitted to trading on a regulated market shall at least annually provide a document that contains or refers to all information that they have published or made available to the public over the preceding 12 months in one or more Member States and in third countries in compliance with their obligations under Community and national laws and rules dealing with the regulation of securities, issuers of securities and securities markets. Issuers shall refer at least to the information required pursuant to company law directives, Directive 2001/34/EC and Regulation (EC) No 1606/ 2002 of the European Parliament and of the Council of 19 July 2002 on the application of international accounting standards.

*Stringent requirements for drawing up the Summary of a prospectus*

105. Pursuant Preamble (21) and article 5 (2) of the Prospectus Directive the prospectus must include a summary. The summary must convey the essential characteristics of, and risks associated with, the issuer, any guarantor and the securities. To ensure easy access to this information, the summary must be written in a brief manner and in non-technical language. The summary may normally not exceed 2 500 words in the language in which the prospectus was originally drawn up.

106. The summary must also contain a <u>warning</u> that <u>civil liability</u> attaches to those persons who have tabled the summary including any translation thereof, and applied for its notification, <u>if the summary is misleading, inaccurate or inconsistent when read together with the other parts of the Base Prospectus.</u>

*Ad II. Section 87A of the FSMA 2000 in the United Kingdom.*

*Ad. III, IV and V. LBHI's warranties and guarantees that the Base Prospectus, including the documents incorporated by reference, are drafted in compliance with the requirements of Section 87A of the FSMA and otherwise comply with the prospectus rules made under the FSMA.*

107. Clause 6.1 of the "Subscription Agreement" of January 23, 2007 (see **EXHIBIT I**, p. 3) stipulates that LBHI warrant and covenant to the holders of the securities as follows:

> (a) *the Offering Documents contain all information required by Section 87A of Financial Services and Markets Act 2000 (the FMSA) and otherwise comply with the prospectus rules made under the FSMA (the **Prospectus Rules**) and also contain all the information required by English law and regulations and otherwise comply with such law and regulations to the extent applicable to the issue of the Preferred Securities and have been published as required by the Prospectus Directive.*

108. Pursuant Clause 6.1 of the "Subscription Agreement" the <u>intent</u> of LBHI was to draft a Base Prospectus and to draft documents (that form part of the Base Prospectus), that fully complied with the requirements of the Prospectus Directive and Section 87A of the FSMA 2000.

Clause 7.2 of the "Subscription Agreement" (see **EXHIBIT I**, p. 10) stipulates:

> *"Each of the General partner and the Guarantor undertakes that it shall comply with Section 87G of the FSMA (if applicable) and the Prospectus Rules in that regard. Each of the General Partner and the Guarantor undertakes that during the period between the preparation of the Final Terms for submission to the UK Listing Authority and the commencement of dealings in the Preferred Securities following their admission to the Official List, it will only prepare and publish a supplement to, or replacement of, the Prospectus if it is required, or has reasonable grounds to believe that it is required, to do so in order to comply with Section 87 of the FSMA...."*

109. Section 87A of the FSMA 2000 (**EXHIBIT V**, p. 4) stipulates that:

The necessary information about the assets and liabilities, financial position, profits and losses, and prospects of the issuer LB UK IV and of the guarantor LBHI; and the rights of the holders of the securities attaching to the securities must be presented in a form which is comprehensible and easy to analyse:

> *"(b) the prospectus contains the necessary information, and*
> *(c) all of the other requirements imposed by or in accordance with this Part or the prospectus directive have been complied with (so far as those requirements apply to a prospectus for the transferable securities in question).*
> *(2) The necessary information is the information necessary to enable investors to make an informed assessment of—*
> *(a) the assets and liabilities, financial position, profits and losses, and prospects of the issuer of the transferable securities and of any guarantor; and*
> *(b) the rights attaching to the transferable securities.*
> *(3) The necessary information must be presented in a form which is comprehensible and easy to analyse.*
> *(4) The necessary information must be prepared having regard to the particular nature of the transferable securities and their issuer."*

110. The Summary included in the Base Prospectus, must be in a brief manner and in non-technical language. The Summary must convey the essential characteristics of, and risks associated with, the Issuer LB UK IV, the Guarantor LBHI and the Preferred Securities to which the Base Prospectus relates. If the Summary is misleading, inaccurate or inconsistent when read together with the other parts of the Base Prospectus, civil liability will apply to those persons responsible for the information given in a prospectus (see also article 5 (2) of Directive 2003/71/EC). Section 87A of the FSMA 2000 stipulates regarding "the Summary of a prospectus" :

> *"(5) The prospectus must include a summary (unless the transferable securities in question are ones in relation to which prospectus rules provide that a summary is not required).*
> *(6) The summary must, briefly and in non-technical language, convey the essential characteristics of, and risks associated with, the issuer, any guarantor and the transferable securities to which the prospectus relates. ...*
> *(8) "Prospectus" (except in subsection (5)) includes a supplementary prospectus."*

111. Section 90 (compensation for false or misleading particulars), (12) (p. 10 of Section 87A, **EXHIBIT V**) of the FSMA 2000 stipulates:

> *"(12) A person is not to be subject to civil liability solely on the basis of a summary in a prospectus unless the summary is misleading, inaccurate or inconsistent when read with the rest of the prospectus; and, in this subsection, a summary includes any translation of it."*

112. It's a fact that the various clauses regarding the alleged subordination of van Rooy's Claim (i.e. "the Subordination Provision[23]" and its references to other definitions as the circular definition of "Parity Securities") in the Base Prospectus, including the documents incorporated by reference, are <u>not</u> drafted "in a form which is comprehensible and easy to analyse". These clauses are far from "comprehensible" and far from "easy to analyse".

113. In addition, these clauses are inconsistent, contradicting, inaccurate, ambiguous and even misleading, which is in breach of the Prospectus Directive and its implementing measures in Section 87A of the FSMA 2000. As mentioned before by Van Rooy (*see* Van Rooy's Response, ¶ 130-135) and by other Claimants, these clauses are also ambiguous.

114. Pursuant to the "<u>Contents</u>" of the Base Prospectus of January 4, 2007 (Exhibit B of the Objection, p. 4), its <u>Summary</u> is set out on pages 5, 6, 7, 8, 9, 10, 11 and 12. The text on page 5 of the Summary confirms that civil liability will apply to those persons responsible for the information given in a prospectus if this Summary is misleading, inaccurate or inconsistent when read together with the other parts of the Base Prospectus.

115. The information that is given in the Summary of the Base Prospectus (Exhibit B of the Objection, p. 4 and p. 9-10) regarding the alleged subordination of Van Rooy's Claim is <u>not</u> drafted in a "briefly manner" and <u>not</u> drafted in "a non-technical language". The information about the essential characteristics of, and risks associated with, the Issuer LB UK IV, the Guarantor LBHI and the securities does <u>not</u> meet the "easily analyzable, comprehensible and unambiguous standard" that must be present.

116. Furthermore the information that is given in the Summary regarding the alleged subordination of Van Rooy's Claim, when read with the rest of the Base Prospectus (including the documents incorporated by reference) and in particular when read with "the Subordination Provision and its references to circular definitions), is inconsistent, contradictory, inaccurate, ambiguous and thus misleading.

For example:

> *The Subordinated Guarantee will rank pari passu with the non-cumulative perpetual securities or preferred stock of LBHI, whether or not issued.  (Summary, p. 6)*

---

[23]"The Subordination Provision", § 2.9, that includes clauses  (a) & (b) & (c), page 36 of the Base Prospectus.

<u>versus</u>

*"LBHI agrees that its obligations hereunder constitute unsecured obligations of LBHI ... that will rank (b) pari passu with Parity Systems (Base Prospectus, p. 36).* It refers to the circular definition of "Parity Securities" *(Exhibit B of the Objection, p. 34): "...any non-cumulative preferred stock, non-cumulative preferred securities (other than the Preferred Securities) or other securities either (a) issued directly by LBHI and ranking pari passu with LBHI's obligations under this Subordinated Guarantee or (b) issued by the Issuer or any Subsidiary or other entity and entitled to the benefit of this Subordinated Guarantee or benefiting from any other guarantee or support agreement from LBHI ranking pari passu with this Subordinated Guarantee."*

117. In addition the Summary of the Base Prospectus provides the following information regarding the "Ranking of the Preferred Securities" (p. 9), that is not included (and thus inconsistent) in the rest of the Base Prospectus (i.e. in the Subordination Provision and its references to circular definitions):

*"The Preferred Securities, together with the Subordinated Guarantee, are intended to provide Holders, with respect to the Issuer, with rights on liquidation of the Issuer equivalent to non-cumulative preferred stock of LBHI, whether or not issued. Claims under the Preferred Securities in respect of any Liquidation Distributions will rank:*

*(a)  senior to the rights of the General Partner and the Preferential Limited Partner; and*

*(b)  junior to the claims of creditors of the Issuer (if any)."*

118. The various terms of the Summary <u>in itself</u> (!) are even inconsistent and contradictory. For example:

*"The Subordinated Guarantee will not cover payments on liquidation of the Issuer.  See "Rights upon Liquidation" below."(p. 6)* <u>versus</u> *"In the event of the dissolution of the Issuer, Holders will be entitled to receive, subject as set out below, for each Preferred Security a Liquidation Distribution out of the assets of the Issuer legally available for distribution."(p. 9).*

119. LBHI also covenanted in the Summary (p. 9) to the Holders of the Securities that:

*"(a) unless LBHI is being wound-up, LBHI will not take any action that would or might cause the liquidation, dissolution or winding-up of the General Partner or the Issuer otherwise than with the prior written approval of any relevant Supervisory Authority (if required at such time); <u>and</u>*

*(b) the General Partner will at all times be a directly or indirectly wholly-owned Subsidiary of LBHI unless (i) otherwise approved by the Holders in accordance with the procedure set out in the Limited Partnership*

*Agreement or (ii) after a substitution of the Preferred Securities for depositary shares representing Substituted*

*Preferred Stock has occurred. "*

**Conclusion regarding I, II, III, IV and IV**

120. The Court should consider the various clauses regarding the alleged subordination of Van Rooy's Claim (including the Subordination Provision and its references to circular definitions) in the Base Prospectus, including the agreements incorporated by reference, in the context of the main objective of the Prospectus Directive and its implementing measures Section 87A of FSMA 2000. This context is that reliable, easily analyzable and comprehensible prospectus information must be the key factor in investor protection. The context are stringent legal requirements of the Prospectus Directive and Section 87A of the FSMA 2000 with respect to the manner information in a prospectus must be set out.

121. LBHI covenanted to the holders of the securities in an explicit way that the clauses of the Base Prospectus and its Documents fully complied with the requirements of the Prospectus Directive and Section 87A of the FSMA.

122. In addition LBHI covenanted and guaranteed to the holders of the securities that LBHI would duly execute the Agreements (including Clause 6.1 (b) of the Subscription Agreement, LBHI's guarantee to comply with requirements of Section 87A of the FSMA 2000), that formed part of the Base Prospectus. Pursuant Clause 6.1 (b) of the Subscription Agreement the intent of LBHI was to draft a Base Prospectus and to draft documents (that form part of the Base Prospectus), which information would fully comply with the *requirements* of the Prospectus Directive and Section 87A of the FSMA 2000.

123. Under New York law, where a contractual provision is ambiguous, it is up to the court to interpret and enforce the provision in accordance with the intent of the parties.[24] The intent of LBHI's drafted clauses in the Base Prospectus (including the Subordination Provision and its references) was to fully comply with the

---

[24]*See Kass v. Kass*, 91 N.Y.2d 554, 567 (1998) ("Where the document makes clear the parties' over-all intention, courts examining isolated provision should then choose that construction which will carry out the plain purpose and object of the agreement"); *see also In re Enron Creditors Recovery Corp.*, 370 B.R. 64, 71-72 (Bankr. S.D.N.Y. 2007); 22 N.Y. Jur. 2d Contracts § 222 ("Where the parties have chosen words which leave room for construction, that construction of the contract should be adopted which will carry out its plain purpose and object.").

stringent requirements of the Prospectus Directive and Section 87A of the FSMA 2000. This means that the necessary information about the assets and liabilities, financial position, profits and losses, and prospects of the issuer LB UK IV and of the guarantor LBHI; and the rights of the holders of the securities attaching to the securities must be presented in a form which is comprehensible and easy to analyse. This information needs to be sufficient and as objective as possible as regards the financial circumstances of the issuer and the rights attaching to the securities.

124. It's a fact that the various clauses regarding the alleged subordination of Van Rooy's rights and Van Rooy's Claim are inconsistent, contradicting, inaccurate, ambiguous and thus misleading. The whole Subordination Provision and its references are not drafted in a "comprehensible" and "easy to analyse" form; the information is far from clean and not sufficient as regards the rights attaching to the Securities.

125. LBHI also covenanted and guaranteed the holders of the Securities that it would not take any action that would or might cause the liquidation, dissolution or winding-up of the General Partner or the Issuer. With respect to the alleged "automatic" dissolution of LB UK IV, Van Rooy disclosed evidence with respect of LBHI's unclean hands.

126. These Agreements (that form part of the Base Prospectus) constituted legal, valid and binding obligations of the Guarantor, in accordance with their respective terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law), an implied covenant of good faith and fair dealing and the possible judicial application of foreign laws or foreign governmental or judicial action affecting creditors' rights. Van Rooy refers to Clause 6.1 (h) of the "Subscription Agreement" (see **EXHIBIT I**, p. 3, 5).

127. Furthermore LBHI covenanted and guaranteed to the holders of the securities that LBHI would not violate its organisational documents or would be in default under the agreements. LBHI covenanted and guaranteed to the holders of the securities that the effect of a violation or default would be material to the General Partner, the Guarantor or the Group, as the case may be. Van Rooy refers to Clause 6.1 (i) of the "Subscription Agreement".

128. A party to a contract who fails to perform a material obligation of the contract is not in court with clean hands and may not seek the aid of a court of equity in protection of alleged rights arising out of or connected with the contract.

129. The foregoing is the legal basis/fundament for Van Rooy's non-subordinated claim against LBHI. LBHI is responsible and liable for the drawing up of the inconsistent, contradicting, inaccurate, ambiguous and misleading clauses regarding the alleged subordination of Van Rooy's Claim and should not benefit from its insufficient drafting. LBHI cannot benefit from its breaches of the Prospectus Directive and Section 87A of the FSMA. LBHI cannot benefit from its contractual breaches with respect to the holders of the securities.

130. Van Rooy's Claim should not be reclassified as an equity interest because the Debtors cannot demonstrate an unambiguous subordination right inasmuch as it uses terms and clauses that are inconsistent, contradictory, inaccurate, ambiguous and misleading and far from easily analyzable and comprehensible. There is ambiguity to the subordination of the subordinated guarantee issued by LBHI. Under New York law, courts "generally interpret contractual ambiguities against the drafter." *Photopaint Techs, v. Smartlens Corp.*, 335 F.3d 152 (2d Cir. 2003).

131. As a result, the inconsistent, inaccurate, ambiguous and contradicting clauses regarding the alleged subordination of Van Rooy's Claim **as a whole** (including the <u>entire</u>[25] ambiguous not easily analyzable and comprehensible Subordination Provision & its references to (circular) definitions) as well as the inconsistent, contradicting, inaccurate, ambiguous and  misleading terms in the Summary regarding the alleged purported subordination of Van Rooy's claim, should be interpreted against the drafter LBHI and in favor of the holders of the securities (whose rights are at stake and whose rights should be protected).

132. Accordingly, the "not easily analyzable and not comprehensive", inconsistent, contradicting, inaccurate, ambiguous and misleading clauses regarding the alleged subordination of Van Rooy's Claim (including the entire Subordination Provision and its references to (circular) definitions as well as the inconsistent, contradicting, inaccurate, ambiguous and  misleading terms in the Summary) should as **a whole** <u>not</u> be given effect and should as **a whole** thus <u>not</u> be enforceable. The Court must consider the Subordination Provision in

---

[25]"The Whole Subordination Clause" = the <u>entire</u> Clause 2.9: (a) + (b) + (c) on p. 36 of the Base Prospectus.

the context of the agreement as a whole, which is in this case the context of stringent legal requirements of the Prospectus Directive and Section 87A of the FSMA 2000.

133. Also should the Court take the Debtors' "unclean hands" into account regarding the dissolution of LB UK IV, that affected the rights of innocent holders of securities. LBHI is in breach of several legal, valid and binding agreements, that are enforceable against LBHI, subject to the effects of bankruptcy and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing. Debtors did not comply with several legal requirements and were in breach of several contractual clauses. A party to a contract who fails to perform a material obligation of the contract is not in court with clean hands and may not seek the aid of a court of equity in protection of alleged rights arising out of or connected with the contract. The one who commits a material breach of a contract cannot sue to enforce the contract for its benefit.

134. Debtors hid important documents (that form part of the Base Prospectus) away, and with it crucial information, in order to seek relief to disallow and expunge Van Rooy's Claim and in the alternate, to reclassify Van Rooy's Claim. This immoral behavior should be regarded as a breach of the internationally respected principles of "fair play" and "fair trial".

When equitable relief is sought, moral considerations of fundamental importance require that the litigant comes into court with clean hands (*see* Pecorella v. Greater Buffalo Press, 107 A.D.2d 1064, 1065, 486 N.Y.S.2d 562).

135. The foregoing constitute a valid legal basis for a non-subordinated claim against LBHI in connection with Van Rooy's Claim. The Court should thus invalidate the entirety of the Subordination Provision and its references. It implies that the various (and to date still not all revealed/disclosed) Guarantees of LBHI with respect to Van Rooy's Claim should yield an enforceable general unsecured non-subordinated claim. In the alternative, Debtors' relief to reclassify Van Rooy's claim should be denied.

## CONCLUSION

136. For the foregoing reasons, Van Rooy respectfully requests that the Court (i) enter an order allowing Van Rooy's Claim as a general unsecured non-subordinated claim in an amount no less than $ 106,132.50 together with interest and (ii) granting Van Rooy such other and further relief as this Court deems just and proper under the circumstances.

## RESERVATION OF RIGHTS

137. Van Rooy reserves any and all applicable rights at law and/or equity, all claims, and all defenses, including without limitation the right to discovery in connection with Debtors' Objection and the right to amend or supplement this Response and to join in the response of any other party to the Objection. Without limiting the foregoing, Van Rooy reserves the right to amend or supplement this Supplemental Response/Memorandum in the event she would discover more relevant documents to this matter, that needed to be disclosed to the Court.

138. Van Rooy requests the Debtors to return any reply to this Response to Van Rooy's address (*see* below). Any reply in order to reconcile, settle, or otherwise resolve the Claim should also be conducted to the claimant herself, Mrs. S.A.B. Van Rooy.

Dated: June 5, 2012

Stolwijk, The Netherlands

Respectfully submitted

by Mrs. S.A.B. van Rooy, DVM and LLM

Schoonouwenseweg 24,

2821 NX Stolwijk,

THE NETHERLANDS

| | |
|---|---|
| Telephone: | + 31 182 34 34 43 |
| Facsimile: | + 31 182 34 34 43 |
| Email: | sabvanrooy@hotmail.com |

40

*Exhibits attached to Van Rooy's Supplemental Response (Claim Number 54549):*

I.      The "Subscription Agreement" of January 23, 2007;

II.     The "Partnership Agreement" of January 3, 2007;

III.    Extract of Companies House of June 5, 2012 regarding LB UK IV; obtained from website of the Companies House.

IV.     Email of May 23, 2012 of the spokesman of "the Paying and Transfer Agent", ING Bank NV in the Netherlands, and together with it, an email string with clerk Richard from Allen & Overy LLP in London.

V.      The Prospectus Regulations 2005 (Section 87A of the FSMA 2000)