**SUPPLEMENTAL RESPONSE / MEMORANDUM OF MRS. S.A.B. VAN ROOY (CLAIMNUMBER 54549) TO DEBTORS' TWO HUNDRED THIRTEENTH OMNIBUS OBJECTION OF SEPTEMBER 16, 2011 TO DISALLOW AND EXPUNGE CERTAIN FILED PROOFS OF CLAIM AND IN THE ALTERNATIVE, TO RECLASSIFY THESE CLAIMS AS EQUITY INTERESTS**

**&**

**RESPONSE OF MRS. S.A.B. VAN ROOY TO DEBTORS' OMNIBUS REPLY OF APRIL 21, 2012 TO RESPONSES TO DEBTORS' TWO HUNDRED THIRTEENTH OMNIBUS OBJECTION TO CLAIMS**

# EXHIBIT I

**CONFORMED COPY**

# SUBSCRIPTION AGREEMENT

### DATED 23RD JANUARY, 2007

between

### LEHMAN BROTHERS HOLDINGS INC.

### LB GP NO. 1 LTD.

### LEHMAN BROTHERS INTERNATIONAL (EUROPE)

and

### BANCO BILBAO VIZCAYA ARGENTARIA, S.A.
### BANCO MILLENNIUM BCP INVESTIMENTO, SA
### DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBANK, FRANKFURT AM MAIN
### EFG EUROBANK ERGASIAS S.A.
### NORDEA BANK DANMARK A/S

in respect of

### LEHMAN BROTHERS UK CAPITAL FUNDING IV LP

€200,000,000
**Fixed Rate Enhanced Capital Advantaged Preferred Securities**

having the benefit of a subordinated guarantee of

### LEHMAN BROTHERS HOLDINGS INC.

## ALLEN & OVERY

### ALLEN & OVERY LLP

### LONDON

**THIS AGREEMENT** is made on 23rd January, 2007, **BETWEEN:**

(1)     **LEHMAN BROTHERS HOLDINGS INC.** (the **Guarantor**);

(2)     **LB GP NO. 1 LTD.** in its capacity as general partner (the **General Partner**) of Lehman Brothers UK Capital Funding IV LP (the **Issuer**);

(3)     **LEHMAN BROTHERS INTERNATIONAL (EUROPE)** (the **Lead Manager**); and

(4)     **BANCO BILBAO VIZCAYA ARGENTARIA, S.A.**
        **BANCO MILLENNIUM BCP INVESTIMENTO, SA**
        **DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBANK, FRANKFURT**
            **AM MAIN**
        **EFG EUROBANK ERGASIAS S.A.**
        **NORDEA BANK DANMARK A/S**
        (together with the Lead Manager, the **Managers**).

**WHEREAS:**

(A)     The General Partner has procured the creation by the Issuer of €200,000,000 Fixed Rate Enhanced Capital Advantaged Preferred Securities, each with a liquidation preference of €1,000 (the **Preferred Securities**), having the benefit of a subordinated guarantee (the **Subordinated Guarantee**) to be dated on or before the Closing Date (as defined below) executed by the Guarantor.

(B)     The Preferred Securities will be in registered form and will be constituted by a Limited Partnership Agreement dated 3rd January, 2007 (the **LPA**) between, *inter alios*, the General Partner and The Bank of New York Depository (Nominees) Limited (the **Initial Limited Partner**). The Preferred Securities will be issued with the benefit of an Agency Agreement (the **Agency Agreement**) to be dated the Closing Date between, *inter alios*, the Guarantor, the General Partner, the Registrar and the agents named therein. This Agreement, the Agency Agreement and the LPA together with the Administration Agreement to be dated the Closing Date between the Guarantor, the Issuer and The Law Debenture Trust Corporation p.l.c. (the **Administration Agreement**) shall be hereinafter referred to as the **Agreements**.

(C)     The proceeds of the issue of the Preferred Securities shall be used by the Issuer to subscribe for the €200,000,000 Fixed Rate Subordinated Notes dated 2037 (the **Subordinated Notes**) issued directly by Lehman Brothers Holdings Inc. and will be applied by the Guarantor to strengthen the capital base of the Guarantor and its subsidiaries (together, the **Group**).

(D)     References in this Agreement to any document being in the agreed form shall mean a draft of such document signed for identification purposes by Allen & Overy LLP with such amendments as may be approved by the Lead Manager on behalf of the Managers, by the General Partner and by the Guarantor.

(E)     References to this Agreement to a Directive include any relevant implementing measure of each Member State of the European Economic Area which has implemented such Directive.

**IT IS AGREED** as follows:

1. **SUBSCRIPTION**

1.1   Subject to the terms and conditions of this Agreement, the General Partner agrees to procure the issue of the Preferred Securities, the Guarantor agrees to guarantee (to the extent set forth in the Subordinated Guarantee) payment of all sums payable in relation to the Preferred Securities and the Managers jointly and severally agree to subscribe and pay, or procure subscriptions and payment for, the Preferred Securities on the Closing Date (as defined below) at a subscription price of €1,000 per Preferred Security (the **Subscription Price**).

1.2   The Guarantor confirms that:

    (a)   it has prepared the base prospectus dated 4th January, 2007 (the **Prospectus**) and the final terms dated 23rd January, 2007 (the **Final Terms** and, together with the Prospectus, the **Offering Documents**), and hereby authorises the Managers to distribute copies of the Offering Documents in connection with the offering of the Preferred Securities subject to the provisions of clause 9, copies of the Prospectus having already been distributed with the consent of the General Partner and the Guarantor; and

    (b)   the Guarantor has approved the arrangements made on its behalf by the Lead Manager, on behalf of the Managers, for announcements in respect of the Preferred Securities to be published on such dates and in such newspapers or other publications as it may agree with the Lead Manager on behalf of the Managers.

2. **CLOSING**

2.1   On or before 10.00 a.m. (London time) on 25th January, 2007 or at such other time as the General Partner, the Guarantor and the Lead Manager may agree (the **Closing Date**), the Guarantor will procure the delivery of a single global certificate in respect of the Preferred Securities (the **Global Certificate**) to the Initial Limited Partner as nominee for the common depositary (the **Common Depositary**) for Euroclear Bank S.A./N.V., and Clearstream Banking, société anonyme to be held on terms agreed between the Managers, the Guarantor and the Common Depositary.

2.2   Against delivery of the Global Certificate, the Lead Manager shall procure that the Common Depositary on its behalf will pay or cause to be paid to the Issuer the gross subscription money for the Preferred Securities, namely the sum of €200,000,000, representing the Subscription Price for the Preferred Securities. Such payment shall be made by the Common Depositary on behalf of the Managers in euro in immediately available funds to such euro account as shall be notified by the Guarantor to the Lead Manager, evidence of such payment taking the form of a confirmation by the Common Depositary that it has made the relevant payment to the Issuer.

3. **UNDERTAKINGS**

3.1   Each of the General Partner and the Guarantor undertakes with the Managers that:

    (a)   it will on or before the Closing Date, execute the Agency Agreement and the Administration Agreement;

    (b)   unless required to do so by any applicable law or regulation, the Guarantor will not, between the date of this Agreement and the Closing Date (both dates inclusive), without prior consultation with the Lead Manager on behalf of the Managers, make

2

any announcement which, in its view, would have a material adverse effect on the marketability of the Preferred Securities;

(c)    it will not make any amendment or supplement to the Offering Documents without consultation with the Lead Manager on behalf of the Managers; and

(d)    it will at least annually provide a document that contains or refers to all information published or made available to the public by it over the preceding 12 months in compliance with applicable securities laws, as required by Article 10 of Directive 2003/71/EC (the **Prospectus Directive**).

3.2    The Guarantor further undertakes with the Managers that:

(a)    it will on or before the Closing Date, execute the Subordinated Guarantee; and

(b)    it will deliver to the Managers, without charge, promptly following the date of this Agreement, such number of copies of the Offering Documents as the Managers may reasonably request, and will give to the Lead Manager, on behalf of the Managers, on the date hereof a copy of each of the Offering Documents signed by a duly authorised officer of each of the General Partner and the Guarantor.

## 4.    COMMISSION

In consideration of the agreement by the Managers to act as the managers in relation to the issue of the Preferred Securities and to subscribe and pay or procure subscriptions and payment for the Preferred Securities as provided above, the Guarantor shall pay on the Closing Date to the Lead Manager total commissions of €20 per Preferred Security (representing a combined management and underwriting commission of €10 per Preferred Security and a selling concession of €10 per Preferred Security). The total of such commissions, namely €4,000,000, shall be paid by the Guarantor on the Closing Date to such account as the Lead Manager, on behalf of the Managers, shall notify to the General Partner. The commissions paid by the Guarantor will to be allocated by the Lead Manager on a pot basis and the Guarantor shall not be concerned by the allocation of such fees as between the Managers.

## 5.    EXPENSES

The General Partner, the Guarantor and the Lead Manager have made a separate agreement as to the costs and expenses in connection with the issue of the Preferred Securities.

## 6.    REPRESENTATIONS AND WARRANTIES OF THE GENERAL PARTNER AND THE GUARANTOR

6.1    As a condition of the obligation of the Managers to subscribe and pay for or procure subscriptions and payment for the Preferred Securities, each of the General Partner and the Guarantor represents and warrants to the Managers as follows:

(a)    each of the Prospectus and the Final Terms (at the dates of their publications) do not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading and the summary set out in the Prospectus was not at the date of its publication and is not misleading, inaccurate or inconsistent when read together with other parts of the Prospectus and with the Final Terms; **provided**, that each of the General Partner and the Guarantor

3

make no representation or warranty as to information contained in or omitted from the Offering Documents in reliance upon and in conformity with written information furnished to the General Partner and/or the Guarantor by the Managers specifically for inclusion therein;

(b) the Offering Documents contain all the information required by Section 87A of Financial Services and Markets Act 2000 (the **FSMA**) and otherwise comply with the prospectus rules made under the FSMA (the **Prospectus Rules**) and also contain all the information required by English law and regulations and otherwise comply with such law and regulations to the extent applicable to the issue of the Preferred Securities and have been published as required by the Prospectus Directive;

(c) each translation prepared by the General Partner and the Guarantor of the summary contained in the Prospectus as required by Article 18 of the Prospectus Directive is accurate in all material respects;

(d) the audited consolidated financial statements of the Guarantor for the two years ended 30th November, 2005 summarised and incorporated by reference in the Prospectus present fairly on a consolidated basis the financial position, results of operations, changes in common stock and stockholders' equity and changes in financial position of the Guarantor and its subsidiaries as of the respective dates and for the respective dates and for the respective periods indicated, all in conformity with generally accepted accounting principles in the United States applied on a consistent basis throughout the periods involved and the accounting principles required by the Prospectus Directive and relevant implementing measures in the United Kingdom. The unaudited consolidated financial statements of the Guarantor summarised and incorporated by reference in the Prospectus are true, complete and correct as of the respective dates and for the respective periods indicated, subject to normally recurring changes resulting from year-end audit adjustments, and prepared in accordance with Regulation S-X of the rules and regulations of the United States Securities and Exchange Commission under the U.S. Securities Act of 1933, as amended. The consolidated figures contained in the capitalisation table of the Guarantor included in the Prospectus are true, complete and correct as of 30th November, 2005 and 31st August, 2006, and prepared in accordance with generally accepted accounting principles in the United States and Regulation S-X of the rules and regulations of the United States Securities and Exchange Commission under the U.S. Securities Act of 1933, as amended, respectively;

(e) except as described in or contemplated by the Prospectus, (i) there has not been any material adverse change, or any adverse development which materially affects, the business, properties, financial condition or results of operations of the General Partner, the Guarantor or the Group and (ii) there has been no material transaction entered into by the General Partner, the Guarantor or any member of the Group other than those in the ordinary course, in each case from the dates of which information is given in the Prospectus;

(f) the Preferred Securities and the Subordinated Guarantee each conform to the description thereof contained in the Offering Documents. The Preferred Securities have been duly and validly authorised, and will (upon receipt of the subscription proceeds and on all applicable registrations with the Limited Partnership Register and publication in the London Gazette having been made) constitute legal, valid and binding obligations of the Issuer enforceable against the Issuer in accordance with their respective terms, subject to the effects of bankruptcy, insolvency, fraudulent

conveyance, reorganisation, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law), an implied covenant of good faith and fair dealing and the possible judicial application of foreign laws or foreign governmental or judicial action affecting creditors' rights, and will be entitled to the benefits of the Agency Agreement;

(g)     the Subordinated Guarantee has been duly authorised by the Guarantor and will constitute legal, valid and binding obligations of the Guarantor enforceable against the Guarantor in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganisation, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law), an implied covenant of good faith and fair dealing and the possible judicial application of foreign laws or foreign governmental or judicial action affecting creditors' rights;

(h)     the Agreements have been validly authorised by the General Partner and the Guarantor and have been (in the case of the LPA) or will be duly executed and delivered by the General Partner and the Guarantor, as the case may be, and constitute or will constitute, as the case may be, legal, valid and binding agreements of the General Partner and the Guarantor, as the case may be, enforceable against the General Partner or Guarantor in accordance with their respective terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganisation, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law), an implied covenant of good faith and fair dealing and the possible judicial application of foreign laws or foreign governmental or judicial action affecting creditors' rights and except for rights to indemnity and contribution hereunder which may be limited by applicable law;

(i)     neither the General Partner or the Guarantor is in violation of its organisational documents or in default under any agreement, indenture or instrument, the effect of which violation or default would be material to the General Partner, the Guarantor or the Group, as the case may be.  The execution, delivery and performance of the Agreements and the consummation of the related transactions described in the Offering Documents will not conflict with, result in the creation or imposition of any material lien, charge or encumbrance upon any of the assets of the General Partner or the Guarantor pursuant to the terms of, or constitute a default under, any material agreement, indenture or instrument or result in a violation of the organisational documents of the General Partner, the Guarantor or any member of the Group or any order, rule or regulation of any court or governmental agency having jurisdiction over the General Partner or the Guarantor or their respective property;

(j)     all requested consents, authorisations or order of, or filings or registrations with, any court or governmental agency have been given, fulfilled or done for the execution, delivery and performance of the Agreements, the Subordinated Guarantee or the issuance of the Preferred Securities;

(k)     each of the General Partner and the Guarantor has been duly organised, are validly existing and are duly qualified to do business in each jurisdiction in which their respective ownership of property or the conduct of their respective businesses requires such qualification or registration and in which the failure to qualify or register would be reasonably likely, individually or in the aggregate, to have a material adverse effect

on the business, condition or properties of the Group (a **Material Adverse Effect**). Each of the General Partner and the Guarantor holds all material licences, permits and certificates from governmental authorities necessary for the conduct of its businesses and owns, or possesses adequate rights to use, all material rights necessary for the conduct of such business and has not received any notice of conflict with the asserted rights of others in respect thereof, except in each case where the failure to do so would not be reasonably likely, individually or in the aggregate, to have a Material Adverse Effect; and each of the General Partner and the Guarantor has the corporate power and authority necessary to own or hold its properties and to conduct the businesses in which it is engaged;

(l)   except as described in the Prospectus, there is no material litigation, arbitration or governmental proceeding pending or, to the knowledge of the General Partner or the Guarantor, threatened against the General Partner, the Guarantor or any member of the Group which might reasonably be expected to result in any material adverse change in the business, properties, profitability, financial condition or results of operations of the General Partner, the Guarantor or the Group or which is otherwise required to be disclosed in the Prospectus;

(m)   the Issuer has been formed and is registered with the Registrar at Companies House on the Limited Partnerships Register pursuant to the Limited Partnerships Act 1907;

(n)   none of the General Partner, the Guarantor or any of their affiliates or any person acting on their behalf have engaged or will engage in any "directed selling efforts" (as such term is defined in Regulation S under the United States Securities Act of 1933, as amended (the **Securities Act**) with respect to the Preferred Securities and the General Partner, the Guarantor, such affiliates and such persons have complied and will comply with the offering restrictions requirement of Regulation S;

(o)   none of the General Partner, the Guarantor or any subsidiary or affiliate of any of them or any person acting on behalf of any of them have made or will make offers or sales of the Preferred Securities under circumstances that would require the registration of the Preferred Securities under the Securities Act; and

(p)   neither the General Partner nor the Guarantor has issued and neither the General Partner nor the Guarantor will issue, without the consent of the Managers, any press or other public announcement referring to the proposed issue of the Preferred Securities unless the announcement adequately discloses that stabilising activities may take place in relation to the Preferred Securities and each of the General Partner and the Guarantor authorises the Managers to make all appropriate disclosure in relation to stabilisation instead of the General Partner and the Guarantor.

6.2   Each of the General Partner and the Guarantor jointly and severally undertakes to each Manager that if that Manager or any director of that Manager or any person who controls that Manager within the meaning of the Securities Act (each a **Related Party**) incurs any loss, claim, damage, liability or action (a **Loss**) arising out of, in connection with or based on:

(a)   any untrue or alleged untrue statement in clause 6.1 hereof; or

(b)   any untrue statement or alleged untrue statement of a material fact contained in the Offering Documents, or which arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in the light of circumstances under which they were made, not misleading,

the General Partner and the Guarantor shall (i) pay to that Manager on demand an amount equal to such Loss and (ii) reimburse each such Manager for any legal or other expenses reasonably incurred by it in connection with investigating or defending any such Loss; **provided, however,** that the General Partner and the Guarantor will not be liable to a Manager in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon any untrue statement or alleged untrue statement or omission or alleged omission made therein in reliance upon and in conformity with written information furnished to the General Partner and the Guarantor as herein stated by such Manager specifically for inclusion therein.

No Manager shall have any duty or obligation, whether as fiduciary or any of its Related Parties or otherwise, to recover any such payment or to account to any other person for any amounts paid to it under this clause 6. The indemnity in this clause 6 will be in addition to any liability which the General Partner and the Guarantor may otherwise have to any Manager or any controlling person.

6.3    Each Manager severally undertakes to each of the General Partner and the Guarantor that if the General Partner, the Guarantor, or any Related Party of either of them incurs any Loss arising out of or based upon;

(a)    any untrue statement or alleged untrue statement or material fact contained in the Offering Documents; or

(b)    the omission or the alleged omission to state in the Offering Documents a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading,

that Manager shall:

(i)    pay to the General Partner or the Guarantor, as the case may be, on demand an amount equal to such Loss; (in each case to the extent, but only to the extent, that the same was made therein in reliance upon and in conformity with written information furnished to the General Partner or the Guarantor, as the case may be, as herein stated by such Manager specifically for inclusion therein); and

(ii)    reimburse each of the General Partner and/or the Guarantor, as the case may be, for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such Loss. The indemnity in this clause 6 will be in addition to any liability which the Manager(s) may otherwise have.

The names and addresses of the Managers set forth in the Offering Documents constitute the only information furnished in writing by the Managers for inclusion in the Offering Documents, and the Managers confirm that such statements are correct.

Each of the General Partner and the Guarantor shall have no duty or obligation, whether as fiduciary for any of its Related Parties or otherwise, to recover any such payment or to account to any other person for any amounts paid to it under this clause 6.

6.4    (a)    Promptly after receipt by an indemnified party under this clause 6 of notice of the commencement of any action, such indemnified party will, if a demand in respect thereof is to be made against the indemnifying party under this clause 6, notify the indemnifying party in writing of the commencement thereof but the omission so to

notify the indemnifying party will not relieve it from any liability which it may have to any indemnified party otherwise than under this clause 6.

(b)     In case any such action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled to participate therein, and to the extent that it may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defence thereof, with counsel satisfactory to such indemnified party; **provided, however** that if the defendants in any such action include both the indemnified party and the indemnifying party and either (1) the indemnifying party or parties and the indemnified party or parties mutually agree or (2) representation of both the indemnifying party or parties and the indemnified party or parties by the same counsel is inappropriate under applicable standards of professional conduct due to actual or potential differing interests between them, the indemnified party or parties shall have the right to select separate counsel to assume such legal defences and to otherwise participate in the defence of such action on behalf of such indemnified party or parties.

(c)     Upon receipt of notice from the indemnifying party to such indemnified party of its election so to assume the defence of action and approval by the indemnified party of counsel, the indemnifying party will not be liable to such indemnified party under this clause 6 for any legal or other expenses subsequently incurred by such indemnified party in connection with the defence thereof unless (1) the indemnified party shall have employed counsel in connection with assumption of legal defences in accordance with the proviso to the next preceding sentence (it being understood, however, that the indemnifying party shall be liable for the expenses of more than one separate counsel, approved by the Managers in the case of paragraph (a) of this clause 6 representing the indemnified parties under paragraph (a) of this clause 6, as the case may be, who are parties to such action) (2) the indemnifying party shall have employed counsel within a reasonable time after notice of commencement of the action or (3) the indemnifying party has authorised the employment of counsel for the indemnified party at the expense of the indemnifying party.

(d)     The indemnifying party shall not be liable for any settlement of any proceeding effected without its written consent unless settled with such indemnified party from and against any loss or liability by reason of such settlement or judgement. Notwithstanding the foregoing sentence, if at any time an indemnified party shall have requested an indemnifying party to reimburse the indemnified party for fees and expenses of counsel, the indemnifying party agrees that it shall be liable for any settlement of any proceeding effected without its written consent if (1) such settlement is entered into more than 30 days after receipt by such indemnifying party of the aforesaid request and (2) such indemnifying party shall not have reimbursed the indemnified party in accordance with such request prior to the date of such settlement.

(e)     No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened proceeding in respect of which any indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party, unless such settlement includes an unconditional release of such indemnified party from all liability on claims that are the subject matter of such proceeding.

6.5    (a)    If the indemnification provided for in this clause 6 shall for any reason be unavailable to an indemnified party in respect of any Loss, then each indemnifying party shall, in lieu of indemnifying such indemnified party, contribute to the amount paid or payable by such indemnified party as a result of such Loss in respect thereof, (1) in such proportion as shall be appropriate to reflect the relative benefits received by the General Partner and the Guarantor on the one hand and the Managers on the other hand from the offering of the Preferred Securities or (2) if the allocation provided by (1) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in (1) above but also the relative fault of the General Partner and the Guarantor on the one hand and the Managers on the other hand with respect to the statements or relative fault of the General Partner and the Guarantor on the one hand and the Managers on the other hand with respect to the statements or omissions which resulted in such Loss in respect thereof, as well as any other relevant equitable considerations.

(b)    The relative benefits received by the General Partner and the Guarantor on the one hand and the Managers on the other hand with respect to such offering shall  be deemed to be in the same proportion as the total net proceeds from the offering of the Preferred Securities (before deducting expenses) received by the General Partner and the Guarantor bears to the total commissions received by the Managers with respect to the offering.  The relative fault shall be determined by reference to whether the untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by the General Partner and the Guarantor or the Managers, the intent of the parties and their relative knowledge, access to information and opportunity to correct or prevent such statement or omission.

(c)    The General Partner and the Guarantor and the Managers agree that it would not be just and equitable if contributions pursuant to this clause 6.5 were to be determined by *pro rata* allocation or by any other method of allocation which does not take into account the equitable considerations referred to herein.  The amount paid or payable by an indemnified party as a result of the loss, claim, damage or liability, or action in respect thereof, referred to above in this clause 6.5 shall be deemed to include, for purposes of this clause 6.5, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim.

(d)    Notwithstanding the provisions of this clause 6.5, no Manager shall be required to contribute any amount in excess of the amount by which the compensation received by such Manager pursuant to this Agreement exceeds the amount of any damages which such Manager has otherwise paid or become liable to pay by reason of any untrue or alleged untrue statement or omission or alleged omission.

(e)    No person guilty of fraudulent misrepresentation (within the meaning of Section 11.6 of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

6.6    The Guarantor undertakes with the Managers that it will forthwith notify the Managers of any change affecting any of the representations and warranties in clause 6.1 (assuming and deeming them to have been repeated at the time of the change), at any time before payment is made to the Issuer on the Closing Date and that it will take those steps which may be requested by the Managers to remedy and/or publicise the change (including, if requested, the publication of a supplement to the Prospectus).  Upon any breach of any of the above

representations and warranties or any change rendering any of the above representations and warranties inaccurate coming to the notice of the Managers before payment being made to the Issuer on the Closing Date, the Managers shall be entitled (but not bound) by notice to the Guarantor to elect to treat such breach or change as (except as otherwise specifically provided) releasing and discharging the Managers from their obligations under this Agreement.

6.7    The above provision of this clause 6 shall continue in full force and effect in relation to each Manager notwithstanding its actual or constructive knowledge with respect to any of the matters referred to in the representations and warranties, any investigation by or on behalf of the Managers or the completion of the arrangements set out in this Agreement for the subscription and issue of the Preferred Securities or the termination of this Agreement pursuant to clauses 6.6, 8 or 11 provided that each of the representations and warranties contained in this clause 6 shall be qualified by, and to the extent of, any information disclosed in writing for the purpose of such qualification to, and acknowledged for such purpose by, the Managers before the Closing Date.

## 7.    LISTING AND PASSPORTING

7.1    The General Partner confirms it has made or cause to be made an application for the Preferred Securities to be admitted to the Official List and admitted to trading on the Gilt Edged and Fixed Interest Market of the London Stock Exchange plc (the **London Stock Exchange**). In connection with such application, the General Partner shall furnish any and all documents, instruments, information and undertakings that may be necessary or advisable in order to obtain or maintain the listing.

7.2    Each of the General Partner and the Guarantor undertakes that it shall comply with Section 87G of the FSMA (if applicable) and the Prospectus Rules in that regard.   Each of the General Partner and the Guarantor undertakes that during the period between the preparation of the Final Terms for submission to the UK Listing Authority and the commencement of dealings in the Preferred Securities following their admission to the Official List, it will only prepare and publish a supplement to, or replacement of, the Prospectus if it is required, or has reasonable grounds to believe that it is required, to do so in order to comply with Section 87 of the FSMA.  The General Partner and the Guarantor shall supply to each Manager the number of copies of any such supplement to, or replacement of, the Prospectus as that Manager may reasonably request.

7.3    If the Preferred Securities cease to be listed on the London Stock Exchange's Gilt Edged and Fixed Interest Market, the General Partner shall use its reasonable endeavours promptly to list the Preferred Securities on a stock exchange to be agreed between the General Partner and the Lead Manager, on behalf of the Managers.  For the avoidance of doubt, the undertaking extends to maintaining the listing of the Preferred Securities on the London Stock Exchange's Gilt Edged and Fixed Interest Market or, if this is not possible, to obtaining the listing of the Preferred Securities on another European Economic Area regulated market.

7.4    Each of the General Partner and the Guarantor shall comply with the rules of each relevant Stock Exchange and shall otherwise comply with any undertakings given by them from time to time to the relevant Stock Exchange in connection with the listing or admission to trading of the Preferred Securities on that Stock Exchange and, without prejudice to the generality of the foregoing, shall furnish or procure to be furnished to the relevant Stock Exchange all the information which the relevant Stock Exchange may require in connection with the listing or admission to trading on that Stock Exchange of the Preferred Securities.

7.5   For the purposes of this clause 7, **Stock Exchange** means the UK Listing Authority and the London Stock Exchange or any other authority or stock exchange on which the Preferred Securities may from time to time be listed or admitted to trading, and references in this clause to the **relevant Stock Exchange** shall be references to the authority and/or stock exchange or stock exchanges on which the Preferred Securities are from time to time, or are intended to be, listed or admitted to trading.

7.6   Each of the General Partner and the Guarantor confirms that it has requested the Financial Services Authority to provide a certificate of approval to the competent authority of each of Italy, Luxembourg, The Netherlands, Belgium, Spain, Portugal and Germany (together, the **Relevant Competent Authorities**) in accordance with the procedures established by Article 17 and 18 of the Prospectus Directive and the Prospectus Rules and, in this connection, each of the General Partner and the Guarantor confirms that it has taken all necessary steps (including providing translations of the summary contained in the Prospectus for the purposes of the Relevant Competent Authorities), as required by the Financial Services Authority and by the Relevant Competent Authorities.

## 8.   CONDITIONS

8.1   This Agreement and the respective rights and obligations of the parties to this Agreement are conditional upon:

  (a)   no event making any of the representations and warranties contained in clause 6.1 untrue or incorrect in any material respect on the Closing Date as though they had been given and made on such date and each of the General Partner and the Guarantor having performed all the obligations to be performed by it under this Agreement on or before the Closing Date;

  (b)   the delivery to the Lead Manager, on behalf of the Managers, on or before the Closing Date of:

    (i)   legal opinions in such form and with such contents as the Lead Manager, on behalf of the Managers, may require from Allen & Overy LLP (as to English law and as to United States and New York law), legal advisers to the Managers and from the Associate General Counsel of the Guarantor;

    (ii)   a certificate signed by a duly authorised officer of the General Partner (in relation to itself and the Issuer only) and a certificate signed by a duly authorised officer of the Guarantor, each to the effect stated in paragraph (a) above; and

    (iii)   a letter dated the Closing Date in such form and with such content as the Lead Manager, on behalf of the Managers, may require from Ernst & Young LLP;

  (c)   confirmation that the Offering Documents have been approved as a prospectus by the Financial Services Authority and that it and the final terms have been published in accordance with the Prospectus Directive and the Preferred Securities being admitted to trading on the London Stock Exchange's Gilt Edged and Fixed Interest Market and on Eurolist by Euronext Amsterdam N.V., subject only to the issue of the Preferred Securities on or before the Closing Date or the Lead Manager, on behalf of the Managers, being satisfied that such listing will be granted shortly after the Closing Date;

(d)    confirmation from the General Partner of each Relevant Competent Authority where the Preferred Securities are intended to be listed (which shall include the Relevant Competent Authority in The Netherlands) and/or offered to the public in circumstances which require the publication of a prospectus under the Prospectus Directive having been notified in accordance with the procedures set out in Articles 17 and 18 of the Prospectus Directive and all requirements under those Articles having been satisfied;

(e)    the issue of the Subordinated Notes by the Guarantor and the subscription for the Subordinated Notes by the Issuer on or before the Closing Date;

(f)    the execution of the Agreements and the Subordinated Guarantee by the parties thereto on or before the Closing Date; and

(g)    confirmation of rating of the Preferred Securities of "A3" by Moody's Investors Service Limited, "A" by Fitch Ratings and "A-" by Standard & Poor's Ratings Service, a division of the McGraw-Hill Companies, Inc. and no rating agency having downgraded, nor given notice or made any public announcement of any intended or potential downgrading or of any review or surveillance with negative implications of, the rating accorded to the Preferred Securities or any other debt securities of the Guarantor.

8.2    In the event that any of the conditions set out in clause 8.1 is not satisfied on or before the Closing Date, this Agreement shall (subject as mentioned below) terminate and the parties hereto shall (except for the liability of the Guarantor in relation to expenses as provided under the arrangements referred to in, clause 5 and except for any liability arising before or in relation to such termination) be under no further liability arising out of this Agreement, provided that the Lead Manager, on behalf of the Managers, may in its discretion and by notice to the Guarantor waive satisfaction of any of the above conditions or of any part of them (other than as set out in clause 8.1(e)).

## 9.    MANAGERS' REPRESENTATIONS, WARRANTIES AND UNDERTAKINGS

9.1    (a)    Each Manager understands that neither the Preferred Securities nor the Subordinated Guarantee have been and will not be registered under the Securities Act and may not be offered or sold within the United States except in accordance with Regulation S or pursuant to any other exemption from the registration requirements of the Securities Act. Each Manager represents, warrants and agrees that it has not offered or sold, and will not offer or sell, any Preferred Securities constituting part of its allotment within the United States except in accordance with Rule 903 of Regulation S under the Securities Act. Each Manager also represents, warrants and agrees that it has offered and sold the Preferred Securities, and will offer and sell the Preferred Securities (i) as part of their distribution at any time and (ii) otherwise until 40 days after the later of the commencement of the offering and the Closing Date (the **distribution compliance period**), only in accordance with Rule 903 of Regulation S under the Securities Act. Each Manager agrees that, at or prior to confirmation of sale of Preferred Securities, it will have sent to each distributor, dealer or person receiving a selling concession, fee or other remuneration that purchases Preferred Securities from it during the distribution compliance period a confirmation or notice to substantially the following effect:

"The Securities covered hereby have not been registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), and may not be

offered and sold within the United States or to, or for the account or benefit of, U.S. persons (i) as part of their distribution at any time or (ii) otherwise until 40 days after the later of the commencement of the offering and the closing date, except in either case in accordance with Regulation S under the Securities Act.   Terms used above have the meaning given to them by Regulation S."

Terms used in subclause (a) have the meanings given to them by Regulation S.

(b)  Each Manager represents and agrees that neither it, its affiliates nor any persons acting on its or their behalf have engaged or will engage in any directed selling efforts with respect to the Preferred Securities, and it and they have complied and will comply with the offering restrictions requirement of Regulation S.  Terms used above have the meaning given to them by Regulation S.

9.2  Each Manager represents and agrees that:

(a)  it has only offered or sold and will only offer or sell Preferred Securities to (a) investment professionals falling within article 14(5) of the Financial Services and Markets Act 2000 (Promotion of Collective Investment Schemes) (Exemptions) Order 2001 (the **Promotion of CIS Order**) and article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2001 (the **Financial Promotion Order**), who have professional experience of participating in unregulated schemes and of matters relating to investments, and/or (b) persons falling within article 22(2) of the Promotion of CIS Order and article 49(2) of the Financial Promotion Order and/or (c) any other persons to whom the Prospectus may be communicated lawfully;

(b)  it has in place and will have in place proper systems and procedures to prevent any person other than those persons described in (b) above from participating in the Preferred Securities;

(c)  it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act 2000 (the **FSMA**) received by it in connection with the issue of any Preferred Securities in circumstances in which Section 21(1) of the FSMA does not apply to the Guarantor; and

(d)  it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the Preferred Securities in, from or otherwise involving the United Kingdom.

9.3  In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a **Relevant Member State**), each Manager represents and agrees that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the **Relevant Implementation Date**) it has not made and will not make an offer of Preferred Securities to the public in that Relevant Member State prior to the publication of a prospectus in relation to the Preferred Securities which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of Preferred Securities to the public in that Relevant Member State at any time:

(a)  to legal entities which are authorised or regulated to operate in the financial markets or, if not so authorised or regulated, whose corporate purpose is solely to invest in securities;

(b)  to any legal entity which has two or more of (i) an average of at least 250 employees during the last financial year; (ii) a total balance sheet of more than €43,000,000 and (iii) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

(c)  in any other circumstances which do not require the publication by the Issuer and the Guarantor of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of Preferred Securities to the public" in relation to any Preferred Securities in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the Preferred Securities to be offered so as to enable an investor to decide to purchase or subscribe the Preferred Securities, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression **Prospectus Directive** means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

9.4  The Prospectus has not been registered as a prospectus with the Monetary Authority of Singapore under the Securities and Futures Act, Chapter 289 of Singapore (the **Securities and Futures Act**).  Each Manager represents, warrants and agrees that the Preferred Securities may not be offered or sold or made the subject of an invitation for subscription or purchase nor may the Prospectus or any other document or material in connection with the offer or sale or invitation for subscription or purchase of any Preferred Securities be circulated or distributed, whether directly or indirectly, to any person in Singapore other than (a) to an institutional investor or other person falling within Section 274 of the Securities and Futures Act, (b) to a relevant person, or any person pursuant to Section 275(1A) of the Securities and Futures Act, and in accordance with the conditions specified in Section 275 of the Securities and Futures Act, or (c) pursuant to, and in accordance with the conditions of, any other applicable provision of the Securities and Futures Act.

Each Manager further represents, warrants and agrees to notify (whether through the distribution of the Prospectus or any other document or material in connection with the offer or sale or invitation for subscription or purchase of any Preferred Securities or otherwise) each of the following relevant persons specified in Section 275 of this Securities and Futures Act which has subscribed or purchased Preferred Securities from and through that Manager, namely a person who is:

(a)  a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b)  a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor,

that shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for six months after that corporation or trust has acquired the Preferred Securities under Section 275 of the Securities and Futures Act except:

     (i)     to an institutional investor under Section 274 of the Securities and Futures Act or to a relevant person, or any person pursuant to Section 275(1A) of the Securities and Futures Act, and in accordance with the conditions, specified in Section 275 of the Securities and Futures Act;

     (ii)    where no consideration is given for the transfer; or

     (iii)   by operation of law.

9.5     Each Manager represents and agrees that:

     (a)    it has not offered or sold and will not offer or sell in Hong Kong, Special Administrative Region of the People's Republic of China (**Hong Kong**), by means of any document, any Preferred Securities other than (i) to "professional investors" as defined in the Securities and Futures Ordinance (Cap. 571) of Hong Kong and any rules made under that Ordinance or (ii) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (Cap. 32) of Hong Kong or which do not constitute an offer to the public within the meaning of that Ordinance; and

     (b)    it has not issued or had in its possession for the purposes of issue and will not issue or have in its possession for the purposes of issue any advertisement, invitation or document relating to the Preferred Securities, whether in Hong Kong or elsewhere, which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to Preferred Securities which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571) of Hong Kong and any rules made under that Ordinance.

9.6     No action has been taken by the Issuer, the Guarantor or any of the Managers in any jurisdiction that would, or is intended to, permit a public offer of the Preferred Securities or possession or distribution of the Offering Documents or any amendment or supplement thereto or any other offering or publicity material relating to the Preferred Securities in any country or jurisdiction where any such action for that purpose is required. Accordingly, each Manager undertakes that it will not, directly or indirectly, offer or sell any Preferred Securities or have in its possession, distribute or publish any offering circular, prospectus, form of application, advertisement or other document or information in any country or jurisdiction except under circumstances that will, to the best of its knowledge and belief, result in compliance with any applicable laws and regulations and all offers and sales of Preferred Securities by it will be made on the same terms.

9.7     Without prejudice to the generality of clause 9.6, each Manager agrees that it will obtain any consent, approval or permission which is (to the best of its knowledge and belief) required for the offer, purchase or sale by it of Preferred Securities, or possession or distribution of the Prospectus or any amendment or supplement thereto or any other such offering material, under the laws and regulations in force in any jurisdiction to which it is subject or in which it makes such offers, purchases or sales, or so possess or distributes such documents as aforesaid and it will (to the best of its knowledge and belief) comply with all such laws and regulations.

9.8     Without prejudice to the other rights and remedies of the Guarantor, each Manager undertakes to indemnify the Guarantor, and its respective directors, officers, employees and controlling persons against any losses, liabilities, costs, claims, charges, expenses, actions or demands

which the Guarantor may incur, or which may be made against it, as a result of or in relation to any failure by that Manager to observe any of the above restrictions or requirements. The provisions of clauses 6.3 to 6.5 with respect to the conduct and settlement of actions shall apply, *mutatis mutandis* to this indemnity.

## 10.    STABILISATION

If the Lead Manager, on behalf of the Managers, in connection with the distribution of the Preferred Securities, offers Preferred Securities in excess of the aggregate principal amount to be issued or effects transactions with a view to supporting the market price of the Preferred Securities at a level higher than that which might otherwise prevail in the open market, it shall not in doing so be deemed to act as an agent of the Issuer or the Guarantor. The Issuer will not as a result of any action taken by the Lead Manager, on behalf of the Managers, under this clause be obliged to issue Preferred Securities in excess of the aggregate amount of Preferred Securities to be issued under this Agreement, nor shall the Issuer or the Guarantor be liable for any loss, or entitled to any profit, arising from any excess offers or stabilisation. Any stabilisation will be conducted in accordance with all applicable regulations.

## 11.    TERMINATION

Notwithstanding anything contained in this Agreement, the Lead Manager, on behalf of the Managers, may by notice to the General Partner and the Guarantor terminate this Agreement at any time before the time on the Closing Date when payment would otherwise be due under this Agreement to the Issuer in respect of the Preferred Securities if, in the opinion of the Lead Manager, on behalf of the Managers, there shall have been such a change in national or international financial, political or economic conditions or currency exchange rates or exchange controls as would in its view be likely to prejudice materially the success of the offering and distribution of the Preferred Securities or dealings in the Preferred Securities in the secondary market, and upon the notice being given, the parties to this Agreement shall (except for the liability of the Guarantor in relation to expenses as provided in clause 5 and except for any liability arising before or in relation to such termination) be released and discharged from their respective obligations under this Agreement.

## 12.    NOTICES

12.1    Any notice or notification in any form to be given by the Managers to the Issuer, the General Partner or the Guarantor may be given by the Lead Manager, on behalf of the Managers, and may be delivered in person or sent by fax or telephone addressed to:

Lehman Brothers Holdings Inc.
1301 Avenue of the Americas
New York
New York 10019

Fax number:          +1 212 526 0339
Attention of:          Corporate Counsel

12.2    Any notice or notification in any form to be given by the Issuer, the General Partner or the Guarantor to the Managers or any of them may be given to the Lead Manager, on behalf of the Managers, and may be delivered in person or sent by fax or telephone addressed to:

Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE

| Fax number: | +44 20 7067 9474 |
| Attention of: | Fixed Income, New Issues Syndicate |

12.3 A communication shall be deemed received (if by fax) when an acknowledgement of receipt is received, (if by telephone) when made or (if by letter) when delivered, in each case in the manner required by this clause. However, if a communication is received after business hours on any business day or on a day which is not a business day in the place of receipt it shall be deemed to be received and become effective at the opening of business on the next business day in the place of receipt. Every communication shall be irrevocable save in respect of any manifest error in it.

12.4 Any notice given under or in connection with this Agreement shall be in English. All other documents provided under or in connection with this Agreement shall be:

(a) in English; or

(b) if not in English, accompanied by a certified English translation and, in this case, the English translation shall prevail unless the document is a statutory or other official document.

## 13.    GOVERNING LAW AND JURISDICTION

13.1 This Agreement is governed by, and shall be construed in accordance with, English law.

13.2 The parties to this Agreement irrevocably agree that the courts of England are to have jurisdiction to settle any dispute which may arise out of or in connection with this Agreement and that accordingly any suit, action or proceedings arising out of or in connection with this Agreement (together referred to as **Proceedings**) may be brought in the courts of England.

13.3 Each party to this Agreement irrevocably and unconditionally waives and agrees not to raise any objection which it may have now or subsequently to the laying of the venue of any Proceedings in the courts of England and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably and unconditionally agrees that a judgment in any Proceedings brought in the courts of England shall be conclusive and binding upon the Issuer and may be enforced in the courts of any other jurisdiction.

13.4 Nothing contained in this clause shall limit any right to take Proceedings in any other court of competent jurisdiction, nor shall the taking of Proceedings in one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction, whether concurrently or not.

13.5 The Guarantor hereby irrevocably agrees that the documents which start any Proceedings and any other documents required to be served in relation to those Proceedings may be served on it by being delivered to it at 25 Bank Street, London, E14 5LE, England or at any other address in Great Britain at which service of process may be served on it in accordance with Part XXIII of the Companies Act 1985. This paragraph applies to Proceedings in England and to Proceedings elsewhere. If the appointment of the person mentioned in this paragraph ceases to be effective, the Guarantor shall forthwith appoint a person in England to accept service of process on its behalf in England and notify the name and address of such person to the Managers and, failing such appointment within fifteen days, the Lead Manager, on behalf of the Managers shall be entitled to appoint such a person by written notice addressed to the Guarantor and delivered to the Guarantor. Nothing in this paragraph shall affect the right of the Administrator to serve process in any other manner permitted by law.

## 14.   MISCELLANEOUS

14.1   Time shall be of the essence of this Agreement.

14.2 ·  The heading to each clause is included for convenience only and shall not affect the construction of this Agreement.

14.3   This Agreement may be executed in any number of counterparts, all of which, taken together, shall constitute one and the same agreement and any party may enter into this Agreement by executing a counterpart.

14.4   A person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement, but this does not affect any right or remedy of a third party which exists or is available apart from that Act.

AS WITNESS the hands of the parties (or their duly authorised representatives) on the date which appears first on page 1.

**LEHMAN BROTHERS HOLDINGS INC.**
as the Guarantor

By:    **CARLO PELLERANI**

**LB GP NO. 1 LTD.**
in its capacity as the General Partner of Lehman Brothers UK Capital Funding III LP

By:    **SARAH MCMORROW**

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By:    **SARAH MCMORROW**

**BANCO BILBAO VIZCAYA ARGENTARIA, S.A.**
**BANCO MILLENNIUM BCP INVESTIMENTO, SA**
**DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBANK, FRANKFURT AM MAIN**
**EFG EUROBANK ERGASIAS S.A.**
**NORDEA BANK DANMARK A/S**

By its duly authorised signatory:    **SARAH MCMORROW**

ICM:3789140.5