

# FREE TRANSLATION – FOR INFORMATION PURPOSES ONLY

RECEIVED
JUN 1 8 2012
U.S. BANKRUPTCY COURT

<u>By registered mail</u>

11 June 2012,

Dear Shareholder and/or Warrantholder,

<u>Re</u>:  <u>Easdaq N.V. – Annual General Meeting of Shareholders and Extraordinary Shareholder Meeting of June 28, 2012</u>

The Annual General Meeting of the Shareholders of Easdaq N.V. (the "Company") will take place on **June 28, 2012 at 10 a.m**. at the offices of our notary, **1000 Brussel, Lloyd Georgelaan 11**. An Extraordinary Shareholder Meeting will take place the same day at the same location at **11.30 a.m**.

In this respect, please find enclosed the notices for these meetings and their annexes in Dutch, and in English for information purpose only.

If, as a shareholder, you cannot attend the meetings, you may give a power of attorney.  The proxyholder does not have to be a shareholder.  A proxy form to be executed by you if you choose to be represented at one or both meeting(s) is attached to the notice.  Please ensure that the duly signed proxy is returned by <u>June 26, 2012</u> to attention of Anthony Ball.

Please do not hesitate to contact Anthony Ball (tel: +44 (0)20 3595 1530), or Arlette Vercammen (tel: +32 (0)473 56 50 98 or by email: <u>investor-relations@equiduct.com</u>), should you require any further information.

Sincerely yours,



Arlette Vercammen
Daily Manager

EASDAQ n.v.

De Jonge St. Jacob
Lei 19/11 • B-3000 Leuven • Belgium
Tel.: +32 (0)473 56 50 98 • Website: www.equiduct.com
RPR Leuven • BTW BE 0455.240.893

*Extraordinary Shareholders Meeting of Easdaq NV to be held on or about 28 June 2012*

*Unofficial English translation of a Dutch original*

to whom the undersigned gives power of attorney to represent it for the purposes of the extraordinary general meeting of the company Easdaq NV, having its registered offices at Lei 19 box 11, B-3000 Leuven (Belgium) (number 0455.240.893 – RPR Leuven) that will be held at the offices of Berquin Notarissen, Lloyd Georgelaan 11, B-1000 Brussels, on or about 28 June 2012 at 11:30 am CET, and that shall resolve on the agenda attached to the notice.

The undersigned hereby gives the special proxyholder the instructions to vote as follows at the EGM, on the items on the agenda mentioned in the notice:

| Item | Yes | No | Abstention |
|------|-----|-----|-----------|
| 1.  Acknowledgement Special Board Report | *Since it concerns a mere acknowledgement, the EGM need not come to a decision* | | |
| 2.  Ackowledgement Statutory Auditor Report | *Since it concerns a mere acknowledgement, the EGM need not come to a decision* | | |
| 3.  Capital increase | Yes | No | Abstention |
| 4.  Power of attorney to the Board of Directors | Yes | No | Abstention |
| 5.  Power of attorney | Yes | No | Abstention |

The undersigned hereby confirms that it has knowledge of the fact that, if it does not give instructions, the special proxyholder will approve all proposals in relation to the items of agenda.

The proxyholder may, amongst other things, without limitation:

- Participate in any meeting with the same agenda (possibly, except for minor details) in case the first meeting could not validly deliberate or could not be held on the date mentioned above.

- Declare that the undersigned considers itself as having been validly convened, that it is aware of the provisions of Articles 64,1°, 178, 533 and 535 of the Belgian Company Code, and that it renounces to the notice period and formalities and to the right to initiate a possible claim to obtain the nullity of any decision taken on the basis of a formal irregularity.

- Declare that the undersigned has received in advance all reports mentioned on the agenda, that it had sufficient time to review them and that it has no questions regarding or remarks in relation to these reports.

- In general, to execute all minutes, attendance lists, agreements, confirmations, notifications and any other document, to substitute and, in general, to do all that is useful or necessary for the performance of this power of attorney, with a promise of ratification, to the extent necessary.

Instructions to the proxyholder

The undersigned hereby explicitly authorizes and instructs the proxyholder to take part in the extraordinary general meeting, even if no proof is presented that the shareholders, the directors, the statutory auditor and/or the other relevant holders of securities have been validly convened for the extraordinary general meeting and, to the extent applicable, if not all relevant parties have renounced to (i) the notice terms and formalities for the extraordinary general meeting and (ii) the right to receive specific reports and other documents, as provided by the relevant provisions of the Belgian Company Code.

Indemnification of the proxyholder

The undersigned undertakes to indemnify the proxyholder for any damage it could sustain as a result of any action undertaken by the proxyholder in performing this power of attorney, to the extent that the proxyholder has observed the limits of its powers. In addition, the undersigned undertakes not to claim any damages from the proxyholder, to the extent that the proxyholder has observed the limits of its powers.

**Done on:**_____(date).


_____                    _____
(signature)                                 (signature)


_____                    _____
(name)                                      (name)


_____                    _____
(function)                                  (function)



(for Lehman Brothers Holdings Plc)
Vito Genna
Clerck of the US Bankruptcy Court
SDNY
One Bowling Green,
New Tork, New York 10004
USA

<u>Per Aangetekend Schrijven</u>



11 juni 2012

Geachte aandeelhouder en/of warranthouder,

<u>Betreft</u>:  <u>Easdaq NV – Jaarlijkse Algemene Vergadering en Buitengewone Algemene
Vergadering van 28 juni 2012</u>

De Jaarlijkse Algemene Vergadering van de aandeelhouders van Easdaq NV zal
plaatsvinden op **28 juni 2012** om **10 uur** in de kantoren van onze notaris, **Lloyd
Georgelaan 11, B-1000 Brussel**. Er zal op dezelfde dag om **11.30 uur** ook een
Buitengewone Algemene Vergadering worden gehouden.

Gelieve hierbij de oproeping tot de Jaarlijkse Algemene Vergadering en de
Buitengewone Algemene Vergadering aan te treffen, alsmede de bijlagen daarbij
(officiële Nederlandse versies alsook Engelse vertalingen, ter informatie).

Indien u als aandeelhouder niet aan de vergaderingen kan deelnemen, dan kan u een
volmacht geven. De volmachthouder hoeft geen aandeelhouder te zijn. Een vorm van
volmachtformulier dat daartoe door u ondertekend moet worden – indien u ervoor
kiest om op één van de vergaderingen, of beide, vertegenwoordigd te zijn – is
aangehecht aan de oproeping. Gelieve een ingevulde en ondertekende volmacht aan
ons te bezorgen <u>ten laatste op 26 juni 2012</u>, ter attentie van Anthony Ball.

Aarzel niet om contact op te nemen met Anthony Ball (tel: +44 (0)20 3595 1530) of
Arlette Vercammen (tel: +32 (0)473 56 50 98), of via email (<u>investor-
relations@equiduct.com</u>), indien u bijkomende informatie zou wensen.

Met de meeste hoogachting,

Arlette Vercammen
Daily Manager

**EASDAQ n.v.**

De Jonge St. Jacob
Lei 19/11 • B-3000 Leuven • Belgium
Tel.: +32 (0)473 56 50 98 • Website: www.equiduct.com
RPR Leuven • BTW BE 0455.240.893

JAARVERGADERING VAN EASDAQ NV DIE ZAL PLAATSVINDEN

OP OF ROND 28 JUNI 2012

ANNUAL GENERAL MEETING OF THE SHAREHOLDERS OF

EASDAQ NV

TO BE HELD ON OR ABOUT 28 JUNE 2012



RECEIVED
JUN 1 8 2012
U.S. BANKRUPTCY COURT
SO DIST OF NEW YORK



# EASDAQ

**EASDAQ NV • Lei 19 • Box 11 • B-3000 Leuven • Belgium**
**Tel +32 16 28 41 10 • Fax +32 16 28 41 11 • RPR Leuven, VAT BE 0455.240.893**



RECEIVED
JUN 1 8 2012
U.S. BANKRUPTCY COURT
SO. DIST. NEW YORK

## EASDAQ

Naamloze vennootschap
Maatschappelijke zetel: Lei 19 Bus 11,
B-3000 Leuven, België
RPR Leuven 0455.240.893

(de "**Vennootschap**")

---

UITNODIGING VOOR DE JAARVERGADERING VAN EASDAQ NV DIE ZAL PLAATSVINDEN OP OF ROND 28 JUNI
2012

---

*Per aangetekend schrijven.*
*De Bijlagen maken integraal deel uit van deze uitnodiging.*

Hierbij worden de aandeelhouders, warranthouders, bestuurders en commissaris van EASDAQ NV (de
"**Vennootschap**") uitgenodigd voor de jaarvergadering van de Vennootschap die zal plaatsvinden in de
kantoren van Berquin Notarissen, **Lloyd Georgelaan 11, B-1000 Brussel, om 10:00 CET** op **28 juni
2012** (de "**AV**"), om te beraadslagen en te beslissen over de punten en voorstellen die hierna zijn
uiteengezet.

<u>AGENDA</u>

1. Kennisname van het ontslag van een bestuurder genomineerd voor benoeming onder de
   kandidaten voorgesteld door Citadel Tactical Investments LLC ("**Citadel**"). Kennisname van
   de coöptatie door de raad van bestuur van de Vennootschap (de "**Raad**"), op 11 juni 2012,
   van de heer Alan McGroarty als een nieuwe bestuurder die de ontslagnemende bestuurder
   vervangt. Bevestiging door de AV van de benoeming van de heer McGroarty als bestuurder,
   voor een termijn van zes jaar. Benoeming van bestuurders en beëindiging van
   bestuursmandaten.

2. Kennisname van het gecombineerd verslag van de Raad, bestaande uit het jaarverslag van de
   Raad voor het boekjaar eindigend op 31 december 2011 en het bijzonder verslag van de Raad
   overeenkomstig artikel 633 van het Wetboek van Vennootschappen ("**W. Venn.**") in verband met
   de voortzetting van de activiteiten, of de ontbinding, van de Vennootschap indien het netto-actief
   gedaald is tot beneden 25% van het maatschappelijk kapitaal (<u>Bijlage 1</u>); kennisname van de
   maatregelen die door de Raad worden voorgesteld om de financiële situatie van de



**EASDAQ NV • Lei 19 • Box 11 • B-3000 Leuven • Belgium**
**Tel +32 16 28 41 10 • Fax +32 16 28 41 11 • RPR Leuven, VAT BE 0455.240.893**

Vennootschap te herstellen. Er wordt in dit verband verwezen naar de agenda van de buitengewone algemene vergadering die zal plaatsvinden op of rond 28 juni 2012 onmiddellijk na de AV en de voorziene kapitaalverhoging waarover deze buitengewone algemene vergadering zal besluiten.

3.  Beslissing ingevolge artikel 633 W.Venn.; voorstel tot goedkeuring van de voortzetting van de activiteiten van de Vennootschap.

4.  Kennisname van het verslag van de commissaris over de jaarrekening voor het boekjaar eindigend op 31 december 2011 (Bijlage 2).

5.  Goedkeuring van de jaarrekening van de Vennootschap voor het boekjaar eindigend op 31 december 2011 en de bestemming van het resultaat (Bijlage 3).

6.  Verlening van kwijting aan alle bestuurders in functie in 2011 voor de uitoefening van hun mandaat gedurende het boekjaar eindigend op 31 december 2011.

7.  Verlening van kwijting aan de commissaris voor de uitoefening van zijn mandaat gedurende het boekjaar eindigend op 31 december 2011.

8.  Machtiging aan mevrouw Diane Bils, vertegenwoordiger van Accounting & Tax Partners BVBA, met mogelijkheid tot indeplaatsstelling, om de nodige formaliteiten te vervullen bij de Kruispuntbank voor Ondernemingen, het ondernemingsloket en de administratie van de belasting over de toegevoegde waarde, indien noodzakelijk.

9.  Varia.

In overeenstemming met artikel 29 van de statuten, moeten alle eigenaars van aandelen op naam de Raad kennis geven van hun intentie om deel te nemen aan de AV, om toegelaten te worden tot de AV, door middel van e-mail naar investor-relations@equiduct.eu, en dit ten laatste op 26 juni 2012.

In overeenstemming met artikel 30 van de statuten, heeft de Raad de vorm van de volmacht vastgelegd. Gelieve als Bijlage 4 een kopie te vinden van het volmachtformulier dat kan ingevuld worden en vervolgens moet overgemaakt worden aan de Vennootschap, overeenkomstig de instructies bepaald in het volmachtformulier, en dit ten laatste op 26 juni 2012.

De Raad van Bestuur stelt voor dat de aandeelhouders bovenstaande voorstellen goedkeuren; in dat verband wordt verwezen naar wat is uiteengezet in de aangehechte verslagen van de Raad van Bestuur en de commissaris.

12 juni 2012,



**EASDAQ NV • Lei 19 • Box 11 • B-3000 Leuven • Belgium**
**Tel +32 16 28 41 10 • Fax +32 16 28 41 11 • RPR Leuven, VAT BE 0455.240.893**

Voor de Raad van Bestuur,

Door:            Peter Randall
Functie:         Bestuurder en bijzondere volmachthouder

Bijlage 1:    Gecombineerd verslag van de Raad van Bestuur, bestaande uit het Jaarverslag van de Raad van Bestuur voor het boekjaar eindigend op 31 december 2011 en het Bijzonder Verslag van de Raad van Bestuur ingevolge artikel 633 van het Wetboek van Vennootschappen in verband met de voortzetting van de activiteiten van de Vennootschap, of haar ontbinding, ingeval het netto-actief van de Vennootschap gedaald is beneden 25% van het maatschappelijk kapitaal;

Bijlage 2:    Verslag van de commissaris over het boekjaar eindigend op 31 december 2011;

Bijlage 3:    Jaarrekening voor het boekjaar eindigend op 31 december 2011;

Bijlage 4:    Volmachtformulier.

*Unofficial English translation of a Dutch original*



EASDAQ NV • Lei 19 • Box 11 • B-3000 Leuven • Belgium
Tel +32 16 28 41 10 • Fax +32 16 28 41 11 • RPR Leuven, VAT BE 0455.240.893

**EASDAQ NV**

Limited liability company
Registered office: Lei 19 Box 11, 3000 Leuven
Company number: 0455.240.893 (RPR Leuven)

(the "**Company**")

---

NOTICE FOR THE ANNUAL GENERAL MEETING OF THE SHAREHOLDERS OF EASDAQ NV
TO BE HELD ON OR ABOUT 28 JUNE 2012

---

*By registered mail.*
*The Exhibits are an integral part of this notice.*

Notice is hereby given to the shareholders, warrant holders, directors and statutory auditor of Easdaq NV (the "**Company**") for the annual general meeting of the Company's shareholders (the "**AGM**") to be held at the offices of Berquin Notarissen, **1000 Brussels, Lloyd Georgelaan 11**, at **10.00 a.m. CET** on **28 June 2012**, to discuss and decide on the items and proposals set out in the following agenda.

<u>**AGENDA**</u>

1. Acknowledgement of the resignation of a Director nominated for appointment among candidates proposed by Citadel. Acknowledgement of the self-appointment ("*coöptatie*") by the Board of Directors on 11 June 2012 of Mr Alan McGroarty as a new Director replacing the resigning Director. Confirmation by the AGM of the appointment of Mr McGroarty as a Director, for a six year term. Appointment of Directors and termination of Director mandates.

2. Acknowledgement of the Combined Board Report, consisting of the Annual Board Report for the financial year ending 31 December 2011 and the Special Board Report pursuant to Article 633 of the Belgian Company Code ("**BCC**") regarding the continuation of the activities of the Company, or its dissolution, in case the net assets of the Company have fallen below 25% of the capital (<u>Exhibit 1</u>); acknowledgement of the measures proposed by the Board of Directors to restore the Company's financial situation. Reference is made in this respect to the agenda for the Extraordinary General

Meeting to be held on or about 28 June 2012 immediately after the AGM and the envisaged capital increase on which such Extraordinary General Meeting will resolve.

3. Decision pursuant to Article 633 BCC; proposal to approve the continuation of the activities of the Company.

4. Acknowledgement of the report by the Statutory Auditor with regard to the annual accounts for the financial year ending 31 December 2011 (Exhibit 2).

5. Approval of the Company's Annual Accounts for the financial year ending on 31 December 2011 and allocation of the result (Exhibit 3).

6. Grant of discharge to the Directors in function in 2011 for the fulfillment of their mandate during the financial year ending 31 December 2011.

7. Grant of discharge to the Statutory Auditor for the fulfillment of its mandate during the financial year ending 31 December 2011.

8. Authorization to Ms. Diane Bils, representative of Accounting & Tax Partners, with power of substitution, to fulfill the necessary formalities in connection with the "Kruispuntbank voor Ondernemingen", the "Ondernemingsloket" and the value added tax, if necessary.

9. Miscellaneous.

In accordance with Article 29 of the Articles of Association, in order to be admitted to the AGM, all owners of registered shares must notify the Board of their intention to attend the AGM by e-mail at investor-relations@equiduct.eu at the latest on 26 June 2012.

In accordance with Article 30 of the Articles of Association, the Board has fixed the proxy format. Please find attached as Exhibit 4 a copy of the proxy format that can be completed and which subsequently must be provided to the Company, in accordance with the instructions set out in the proxy form, at the latest on 26 June 2012.

The Board recommends that the shareholders approve the above proposals; in this respect, reference is made to what is stated in the attached reports of the Board and of the Statutory Auditor.

**\*\*\*\***

12 June 2012

For the Board of Directors,

By:              Peter Randall
Function:        Director and special proxyholder


Exhibit 1:    Combined Board Report, comprising the Annual Board Report for the financial year ending
              31 December 2011 and the Special Board Report pursuant to Article 633 of the Belgian
              Company Code regarding the continuation of the activities of the Company, or its
              dissolution, in case the net assets of the Company have fallen below 25% of the capital

Exhibit 2:    Report of the Company's Statutory Auditor for the financial year ending 31 December 2011

Exhibit 3:    Annual Accounts for the financial year ending 31 December 2011

Exhibit 4:    Proxy Form

**EASDAQ**

Naamloze vennootschap

Lei 19 Bus 11, B-3000 Leuven, België

RPR Leuven 0455.240.893

(de "Vennootschap")

---

### GECOMBINEERD VERSLAG VAN DE RAAD VAN BESTUUR AAN DE AANDEELHOUDERS VAN DE VENNOOTSCHAP OPGESTELD OVEREENKOMSTIG DE ARTIKELEN 95, 96 EN ARTIKEL 633 VAN HET BELGISCHE WETBOEK VAN VENNOOTSCHAPPEN DAT VOORGELEGD ZAL WORDEN AAN DE JAARLIJKSE VERGADERING VAN AANDEELHOUDERS VAN 28 JUNI 2012

---

**Dit jaarverslag vat de financiële resultaten van Easdaq voor 2011 samen.**

Geachte Aandeelhouders,

Ik ben verheugd te rapporteren dat, na de herkapitalisatie van uw vennootschap in mei 2010 (EUR 5M, het opvragen van de laatste tranche van een kapitaalverhoging in 2009) en juni 2011 (EUR 4,2M; uitoefenen van warrants door aandeelhouders) en de aanstelling van 4 nieuwe bestuurders in oktober 2011, Easdaq NV ("**Easdaq**") en haar dochtervenootschap Equiduct Systems Limited ("**ESL**") de nieuwe pan-Europese verhandelingsdienst verder hebben ontwikkeld. We blijven klanten factureren en inkomsten ontvangen. We leveren op dit ogenblik diensten aan investeerders in de Euronext markten, het Verenigd Koninkrijk en Duitsland, Italië en Zwitserland. We exploiteren twee belangrijke producten, een standaard "*lit*" orderportefeuille en een innovatieve dienst die voornamelijk gericht is op het aanbieden aan retail-makelaars van de mogelijkheid om de 'best beschikbare' prijs voor hun klanten te behalen in een gefragmenteerde markt. Deze laatste dienst heeft bemoedigende steun aangetrokken. Tijdens het boekjaar werden een aantal belangrijke mijlpalen door de vennootschap behaald. We zijn nu, op dagelijkse basis, groter dan de Gereglementeerde Markten van Ierland en Oostenrijk, en de MTF's TOM, Burgundy en Quote MTF.

Gedurende de betrokken periode heeft de vennootschap hard gewerkt om een ondubbelzinnige opinie van ESMA te verkrijgen over de status van ons aanbod aan retail-makelaars, en in het bijzonder of de vennootschap voldoet aan MiFID, alsook of de vennootschap de voorwaarden voor *pre-trade* transparantie vervult. Ik ben verheugd te kunnen melden dat deze opinie werd ontvangen na het aflopen van 2011.

Dit verslag van de Raad van Bestuur (de "Raad") geeft een overzicht van de financiële resultaten van het boekjaar dat op 31 december 2011 werd afgesloten, en bevat de verscheidene zaken opgelegd door de Belgische wetgeving (het "Verslag"),

Peter Randall
Bestuurder en bijzondere volmachthouder

1.    **Financiële prestaties (art. 96, 1° Wetboek van Vennootschappen)**

**Winst- en Verliesrekeningen**

Het boekjaar toonde het tweede volledige jaar van aanhoudende tradingactiviteiten. De business bleef groeien en genereerde inkomsten van EUR 1,3M tegenover inkomsten van EUR 0,05M gedurende het vorige boekjaar.

Voortgezette initiatieven gericht op kostenefficiëntie werden verwezenlijkt gedurende het jaar, met operationele kosten ten belope EUR 9,0M. Kosten waren EUR 1,0M hoger vergeleken met het vorige jaar, maar werden aangedreven door hogere tradingactiviteiten en daarmee gerelateerde marginale kosten.

De Vennootschap genereerde operationele verliezen van EUR 7,8M. Dit verlies was gegenereerd voor andere financiële inkomsten van EUR 0,5M en andere financiële kosten van EUR 0,2M. Het nettoverlies over het boekjaar (EUR 7,4M) zal worden voorgesteld geboekt te worden als overgedragen verliezen.

**Balans**

Het maatschappelijk kapitaal verhoogde gedurende het boekjaar met EUR 4,3M ten gevolge aandeelhouderinvesteringen. Twee aandeelhouders oefenden warrants uit.

Niet volgestort kapitaal verminderde gedurende de periode met EUR 5,0M gezien een EUR 5,0M investeringstranche werd opgevraagd.

De Vennootschap behoudt een bestaande leningsovereenkomst met Börse Berlin voor EUR 3,2M (de "**2009 Leningsovereenkomst**"). De lening diende te worden terugbetaald aan Börse Berlin in het vierde kwartaal van het boekjaar 2012. Echter, BSX heeft zeer recent (als tegenprestatie voor een wijziging aan de Master Agreement met BSX, en een investeringsverbintenis door Citadel en Knight, zoals hieronder beschreven) de vervaldag van de 2009 Leningsovereenkomst verlengd tot 31 december 2013.

De risico's waarmee de business geconfronteerd wordt, zijn voornamelijk het gevolg van het wijzigende economische klimaat. De onzekerheid van de Eurozone heeft een aanzienlijke impact gehad op het retail-marktvertrouwen, en had tot gevolg dat volumes en waardes blijven dalen, daarbij een nadelig effect uitoefenend op inkomstengroei.

Regulering blijft voor zowel mogelijkheden als voor risico's zorgen. MiFID II is er tot nu toe niet in geslaagd "beste uitvoering" aan te pakken, en bijgevolg loopt het Equiduct model het risico dat ze geen voordeel zal kunnen halen uit deze sleutelmaterie, die het business model onderbouwt.

Wanneer het Equiduct Market Model verder gevestigd wordt, vergroot het risico voor de business om meer uitgedaagd te worden op concurrentieel vlak. Concurrenten trachten een model te ontwikkelen dat rechtstreeks concurreert met Equiduct. Indien deze uitdaging betekenisvol wordt, kan deze druk gaan uitoefenen op de prijszettingsstructuren en inkomstengroei negatief beïnvloeden.

2. **Belangrijke gebeurtenissen die na het einde van het boekjaar hebben plaatsgevonden (art. 96, 2° Wetboek van Vennootschappen)**

Er waren geen belangrijke gebeurtenissen die na het einde van het boekjaar hebben plaatsgevonden, andere dan elders in dit verslag omschreven (dewelke gebeurtenissen onder deze sectie vallen door verwijzing).

3. **Informatie met betrekking tot omstandigheden die een aanzienlijke invloed zouden kunnen hebben op de ontwikkeling van de Vennootschap (art. 96, 3° Wetboek van Vennootschappen)**

Op 28 juni 2012, onmiddellijk na de jaarvergadering die zal besluiten over de goedkeuring van de Jaarrekening, zal een buitengewone algemene vergadering worden gehouden, die zal besluiten over (onder andere) de aanvang van een kapitaalverhoging voor een maximaal bedrag van EUR 7.494.9000 (en met een minimumbedrag van EUR 7.000.000)(de "Rights Issue").

Citadel en Knight hebben een *Participation Commitment Letter* ondertekend op 4 juni 2012, waarin Citadel en Knight (onder een aantal opschortende voorwaarden) elk apart zich ertoe verbinden deel te nemen aan de Rights Issue aan een uitgifteprijs van EUR 0,20, voor een totaal bedrag tot EUR 7.494.900 (de "Investeringsverbintenis"), *i.e.* het maximaal bedrag van de Rights Issue (aannemend dat geen warrants zullen worden uitgeoefend)(zoals verder uiteengezet in sectie 10 van dit verslag). Deze financiering is vereist voor de Vennootschap om haar activiteiten te kunnen verderzetten voor een periode van ongeveer 12 maanden, na juni 2012.

4. **Onderzoek en Ontwikkeling (artikel 96, 4° Wetboek van Vennootschappen)**

De Vennootschap voerde tijdens het boekjaar 2011 geen onderzoeks- of ontwikkelingsactiviteiten uit.

5. **Het bestaan van bijkantoren (Artikel 96, 5° Wetboek van Vennootschappen)**

De Vennootschap baat geen buitenlandse bijkantoren uit.

6. **Bestemming van het resultaat (artikel 96, 6° Wetboek van Vennootschappen)**

Er wordt voorgesteld om het verlies op het einde van het boekjaar van EUR 7.401.015 per einde van het jaar over te dragen, als overgedragen verlies.

Als gevolg van het overgedragen verlies op de balans ging de Raad van Bestuur over tot een herziening van de waarderingsregels uitgaande van de continuïteit van de bedrijfsactiviteiten, in overeenstemming met artikel 96, 6° van het Belgische Wetboek van Vennootschappen.

De Raad van Bestuur is van oordeel dat de bedrijfsresultaten in lijn blijven met het business plan en, op basis van de huidige omstandigheden, wordt redelijkerwijze verwacht dat deze zullen opbouwen tot een break-even tegen het einde van het boekjaar 2014. De aandeelhouders zijn commerciële en financiële steun blijven geven en de Raad, op basis van de huidige omstandigheden en de feiten waarvan hij van op de hoogte is, waaronder de afgifte van de *Participation Commitment Letter* en de overeenkomst om de 2009 Leningsovereenkomst te verlengen tot 31 december 2012, verwacht dat de activiteiten zullen worden voortgezet uitgaande van de continuïteit van de bedrijfsactiviteiten.

De Raad verwijst naar de delen van dit verslag opgesteld overeenkomstig artikel 633 W.Venn. (sectie 10 van dit verslag), die door verwijzing deel uitmaken van deze sectie.

### 7.    Financiële Instrumenten / Afdekkingscontracten (artikel 96, 8° Belgisch Wetboek van Vennootschappen)

De Vennootschap gebruikte geen financiële instrumenten en nam geen deel in afdekkingscontracten gedurende het boekjaar 2011.

### 8.    Vrijstelling van de verplichting om geconsolideerde jaarrekeningen op te stellen overeenkomstig artikel 112 van het Wetboek van Vennootschappen

Easdaq geniet van de vrijstelling overeenkomstig artikel 112 van het Belgisch Wetboek van vennootschappen om geen geconsolideerde jaarrekeningen op te stellen, gezien zij kwalificeert als "kleine groep" zoals gedefinieerd onder artikel 16 van het Belgische wetboek van Vennootschappen.

### 9.    Verklaring van mogelijke belangenconflicten overeenkomstig artikel 523 van het Wetboek van Vennootschappen

Tijdens het boekjaar 2011 deden zich geen mogelijke belangenconflicten voor overeenkomstig artikel 523 van het Wetboek van Vennootschappen.

### 10.    Bespreking in het kader van artikel 633 van het Wetboek van Vennootschappen

Dit onderdeel van het jaarverslag geldt als bijzonder verslag voorgeschreven door Artikel 633 van het Belgisch Wetboek van Vennootschappen.

a.  **Situatie beschreven in artikel 633 W.Venn.**

Vermits de verliezen van de Vennootschap niet als kapitaalvermindering werden geabsorbeerd en de verliezen zich accumuleerden, bedraagt het netto-actief van de Vennootschap (EUR 2.950.422,68 op 31 December 2011) nog steeds minder dan een kwart van het maatschappelijk kapitaal (EUR 137.411.819,68), daardoor voldoet de Vennootschap nog steeds aan de voorwaarden beschreven in artikel 633 van het Belgische Wetboek van vennootschappen.

b.  **Vooruitzichten**

De activiteiten blijven voortgezet worden als een verliesgevende organisatie en vertrouwen als dusdanig op financiering door aandeelhouders om te blijven bestaan uitgaande van een continuïteit van de bedrijfsactiviteiten. Echter, succes met betrekking tot interne resultaatsmaatregelen, toont een belangrijke vooruitgang. Vanuit een kwantitatieve aanpak zijn de kosten lager dan gebudgetteerd. Inkomsten echter, aangepast aan de vermindering in marktvolumes, zijn lager dan de doelstellingen. Winst en verlies zijn in lijn met de doelstellingen. Op basis van dit en van de huidige omstandigheden blijft de Raad vertrouwen houden in de business en het vermogen om de vastgestelde groeiobjectieven te behalen.

Kijkende naar de resultaten vanuit een kwalitatief standpunt, verwacht de Raad blijvende organische groei van de activiteiten in de toekomst. Onderhandelingen met potentiële cliënten zijn gestructureerd, boeiend en positief. De behandeling van de business in de pers blijft consistent positief, waardoor een kwaliteitsmerk ontstaat, herkenbaar in Europa. Het businessmodel heeft interessante discussies doorheen de industrie doen ontstaan, wat een rechtstreekse afspiegeling is van de groei van de status van de onderneming. Op het einde van 2011 en in het begin van 2012 werd het businessmodel in detail onderzocht door ESMA met betrekking tot het voldoen aan de MiFID-reglementering. Het business model werd geacht te volkomen te voldoen, zonder een enkel verzoek tot wijziging. De Raad, op basis van de huidige omstandigheden en de feiten waar ze kennis van heeft, gelooft redelijkerwijze dat het volgende boekjaar verdere groei zal tonen, in lijn met het businessmodel, zoals aangetoond door de recente historische resultaten en de tractie die deze hebben doen ontstaan.

Daarnaast blijft de Raad zoeken naar verdere business partnerschappen, die succes zullen blijven verwekken. De Raad heeft daarom, op basis van de huidige omstandigheden, geen reden die zou doen vermoeden dat de activiteiten niet zouden voldoen tegenover het business plan, dat vastgesteld is om break-even te halen tegen het einde van het boekjaar 2012.

De Raad gelooft dat onze belangrijke aandeelhouders een blijvende interesse in de business blijven aantonen, met de duidelijke intentie om de activiteiten commercieel te ondersteunen.

c.  **Maatregelen**

Bovenop de beschrijving van de vooruitzichten van de Vennootschap hierboven, wenst de Raad nog enkele zaken uiteen te zetten:

*(i)*    *Investeringsverbintenis door Citadel en Knight*

De Vennootschap heeft de laatste maanden een aantal gesprekken gevoerd met Citadel en Knight, de twee grootste aandeelhouders. Als resultaat van deze gesprekken, hebben Citadel, Knight en de Vennootschap een Participation Commitment Letter ondertekend op 4 juni 2012, waarin elk van Citadel en Knight (onder de voorwaarden hieronder uiteengezet) er zich afzonderlijk toe heeft verbonden om deel te nemen aan de Rights Issue aan een uitgifteprijs van EUR 0,20, waarbij Citadel en Knight zullen deelnemen aan de Rights Issue voor een totaal bedrag van maximaal EUR 7.494,900 (de "**Investeringsverbintenis**"), *i.e.* het maximale bedrag van de Rights Issue (aannemend dat geen warrants zullen worden uitgeoefend). Bijgevolg, indien geen andere aandeelhouders hun voorkeurrecht zouden uitoefenen (en aannemend dat geen warrants zullen worden uitgeoefend, in welk geval de maximale grootte van de Rights Issue groter zou zijn), zullen Citadel en Knight inschrijven op het totale bedrag van de Rights Issue.

Om elke twijfel te vermijden, wordt er opgemerkt dat indien warrants zouden worden uitgeoefend, de maximale grootte van de Right Issue zou toenemen, maar dat dit geen effect zou hebben op Citadels en Knights verbintenis (zoals hierboven uiteengezet) om in te schrijven voor een totaal bedrag tot EUR 7.494.900, zodat als gevolg van de Investeringsverbintenis, in ieder geval zou worden ingeschreven op de Rights Issue voor een bedrag van ten minste EUR 7.494.900.

Indien andere aandeelhouders echter hun voorkeurrecht zouden uitoefenen, zou dit het bedrag van de Investeringsverbintenis verminderen. Citadel zal in ieder geval inschrijven voor een bedrag van EUR 2.997.690 (hetgeen overeenkomt met ongeveer 65% van haar huidige aandeelhouderschap) en Knight zal inschrijven voor elk zulk bedrag zo dat het totale aantal inschrijvingen onder de Rights Issue EUR 7.494.900 zal bereiken; Knights verbintenis dient daarbij in wezen als een "back-stop" (bij wijze van voorbeeld: indien aandeelhouders (andere dan Citadel en Knight) hun voorkeurrecht zouden uitoefenen voor een totaal bedrag van ongeveer EUR 1.000.000, dan zal Knight inschrijven voor het "resterende" bedrag van ongeveer EUR 3.500.000, opdat het totale investeringsbedrag van EUR 7.494.900 zou worden bereikt).

Er dient te worden opgemerkt dat de Investeringsverbintenis onderworpen is aan een aantal opschortende voorwaarden:

- de Wijzigingsovereenkomst (zoals hieronder gedefinieerd) zal ten volle van toepassing blijven en zal niet worden beëindigd;

- de Aandeelhoudersovereenkomst van 24 juni 2010 (zoals van tijd tot tijd gewijzigd) tussen Citadel, Knight, BSX, de heer Jos B. Peeters en de Vennootschap zal worden gewijzigd in overeenstemming met de principes apart overeengekomen door Citadel en Knight.

In dit opzicht merkt de Raad op dat de wijzigingen aan de Aandeelhoudersovereenkomst (die worden verwacht overeen te worden gekomen na de datum van dit Verslag, maar voor de datum van de BAV) ook zullen moeten worden weerspiegeld in de statuten van de Vennootschap, hetgeen een statutenwijziging veronderstelt. Daartoe dient een buitengewone algemene vergadering te worden georganiseerd die zal besluiten over deze wijzigingen, dewelke verwacht wordt plaats te vinden enige tijd na de afsluiting van de Rights Issue.

De Raad is ingelicht door de partijen bij de Aandeelhoudersovereenkomst dat de wijzigingen aan dit document substantieel zullen inhouden dat Knight substantieel dezelfde rechten als Citadel zal hebben met betrekking tot de gereserveerde materies bepaald in de artikelen 18 en 33 van de statuten, en dat Knight het recht zal worden toegekend om, in totaal, vier bestuurders te nomineren voor benoeming.

- de Vennootschap is niet het onderwerp van een procedure van ontbinding of vereffening, faillissement of gerechtelijke organisatie, noch werden er daartoe enige stappen ondernomen, ze is ook niet het onderwerp van enige andere gelijkaardige insolventieprocedure onder eender welke toepasselijke wet, noch is ze anderzijds beperkt in haar rechten om te beschikken over haar activa, noch is ze het onderwerp van maatregelen als de aanstelling van een voorlopig bewindvoerder, of van sekwester, noch werden er stappen daartoe ondernomen.

Om elke twijfel te vermijden: de procedure onder artikel 633 W.Venn., die zal worden toegepast in het kader van de jaarvergadering van de Vennootschap die zal worden gehouden op 28 juni 2012, zal niet worden geacht te vallen onder één van bovenstaande situaties.

- de Rights Issue zal worden goedgekeurd door de aandeelhouders van de Vennootschap op de BAV, en de afsluiting van de uitgifte van, en de inschrijving op, de aandelen onder de Rights Issue zal plaatsvinden op of voor 30 september 2012.

De Raad verwacht dat de Rights Issue inderdaad zal worden voltooid voor 30 september 2012.

In de Participation Commitment Letter heeft de Vennootschap ermee ingestemd om een zakenbank te selecteren en aan te stellen om alle strategische opties te onderzoeken.

*(ii)    Roll-over van de lening van BSX onder de 2009 Leningsovereenkomst*

Zoals hierboven opgemerkt, is een belangrijke passiefpost op de balans van de Vennootschap toe te kennen aan een lening met BSX als tegenpartij.

De lening van BSX (*i.e.* hoofdsom en verworven interesten) zou volledig terugbetaalbaar zijn geworden tegen het einde van het boekjaar 2012, onder de oorspronkelijke 2009 Leningsovereenkomst. Echter, als gevolg van de wijziging van de 2009

**page 8/10**

Leningsovereenkomst, aangegaan door de Vennootschap, de heer Jos B. Peeters en BSX op 4 juni 2012 (de "**Wijzigingsovereenkomst**"), als tegenprestatie voor Citadels en Knights Investeringsverbintenis, alsook voor de instemming van de Vennootschap om de Master Agreement met BSX te wijzigen (zoals hieronder besproken), heeft BSX ingestemd om de termijn van de 2009 Leningsovereenkomst te verlengen tot 31 december 2013.

Meer specifiek zal de beëindigingsdatum van de 2009 Leningsovereenkomst de volgende zijn:

    (a) indien de Outsourcing Agreement[1] is beëindigd op of na 1 januari 2012, maar voor 31 december 2013, de datum waarop de Outsourcing Agreement is beëindigd; en

    (b) in alle omstandigheden anders dan die voorzien in paragraaf (a), 31 december 2013.

Onder voorwaarde van de ondertekening (en het effectief worden) van de Wijzigingsovereenkomst met betrekking tot de 2009 Leningsovereenkomst, hebben de Vennootschap, ESL en BSX overeengekomen de Master Agreement[2] te wijzigen met als effect dat de bepalingen inzake de beëindiging zullen worden gewijzigd om te weerspiegelen dat ieder van BSX en de Vennootschap het recht hebben om de overeenkomst te beëindigen mits de andere partij hiervan niet minder dan 3 (drie) jaar voordien schriftelijk van in kennis te stellen (de overige modaliteiten en voorwaarden inzake beëindiging blijven ongewijzigd).

**d.    Conclusie en voorstel overeenkomstig artikel 633 W.Venn.**

Gezien hetgeen hierboven is uiteengezet, is de Raad van mening dat de vaststelling van de jaarrekening uitgaande van de continuïteit van de bedrijfsactiviteiten, gerechtvaardigd is.

De Raad stelt de aandeelhouders voor om, op de jaarvergadering, te stemmen voor de voortzetting van de activiteiten van de Vennootschap.

---

[1] De Outsourcing Agreement is een overeenkomst tussen BSX, de Vennootschap en ESL, ondertekend op 19/20 maart 2009, die de rechten en verplichtingen bepaalt tussen BSX als de *Regulated Market Operator* voor het Equiduct handelsplatform aan de ene kant en de Vennootschap & ESL als de aanbieder van technische diensten met betrekking tot de werking van het Equiduct Platform aan de andere kant.

[2] De Master Agreement van 7 augustus 2009 tussen de Vennootschap, ESL en BSX, werd ondertekend om bijkomende leveringen van diensten tussen de partijen te annuleren, aan te passen en/of te wijzigen.

**11.    Kwijting van de Raad van Bestuur en van de Commissaris.**

Er wordt voorgesteld aan de aandeelhouders om, bij goedkeuring van de jaarrekeningen van Easdaq, kwijting te verlenen aan de volgende leden van de Raad van Bestuur.

| Bestuurder | Titel | Periode |
|---|---|---|
| Dr. Jos B Peeters | Bestuurder | Het volledige jaar |
| Artur Fischer | Bestuurder / Voorzitter (tot 23 februari 2012) | Het volledige jaar |
| Martin Mannion | Bestuurder | Het volledige jaar |
| Serge Demoliere | Bestuurder | Het volledige jaar |
| Matteo Cassina | Bestuurder | Het volledige jaar |
| Kee-Meng Tan | Bestuurder | Het volledige jaar |
| Stuart Leichenko *(nam ontslag op 14 mei 2012)* | Bestuurder | Het volledige jaar |
| Jonathan Graham | Bestuurder | Sinds 14.11.2012 |
| Jamil Nazarali | Bestuurder | Sinds 14.11.2012 |
| Peter Randall | Bestuurder | Sinds 14.11.2012 |
| Euro Trading Commercial Ltd, with as permanent representative Mr. Daniel Pouget | Bestuurder / Voorzitter (vanaf 23 februari 2012) | Sinds 14.11.2012 |

Bij goedkeuring van de jaarrekeningen van Easdaq worden de aandeelhouders ook verzocht kwijting te verlenen aan de Commissaris voor zijn werk tijdens het boekjaar 2011.

12 juni 2012,

Namens de Raad van Bestuur,

'12. JUNE. 2012

Peter Randall
*Bestuurder       en       bijzondere
volmachthouder*

*Unofficial English translation of a Dutch original*

**EASDAQ NV**

Lei 19 Box 11, B-3000 Leuven, Belgium

RPR Leuven 0455.240.893

**COMBINED REPORT OF THE BOARD OF DIRECTORS TO THE SHAREHOLDERS OF THE COMPANY PREPARED PURSUANT TO ARTICLES 95, 96 AND ARTICLE 633 OF THE BELGIAN COMPANY CODE TO BE PRESENTED AT THE ANNUAL SHAREHOLDERS MEETING OF 28 JUNE 2012.**

---

**This annual report summarises the financial performance of Easdaq NV over 2011.**

Dear Shareholders,

I am pleased to report that following the further re-capitalization of your company in May 2011 (EUR5.0M; calling of the final tranche of a 2009 capital increase) and June 2011 (EUR4.2M; exercise of warrants by two shareholders) and the appointment of 4 new directors in October 2011, Easdaq NV (ENV) and its subsidiary Equiduct Systems Limited (ESL) have continued to progress the pan European trading service. We continue to invoice customers and receive revenues. We currently offer a service to investors in the Euronext markets, the UK, Germany, Italy and Switzerland. We operate two main products, a standard lit order book and an innovative service principally targeted at offering retail brokers the opportunity to achieve the 'best available' price for their customers in a fragmented marketplace. This latter service has attracted encouraging support. A number of important milestones for your company were passed during the year under review. We are now bigger on a daily basis than the Regulated Markets of Ireland and Austria, and the MTF's TOM, Burgundy, and Quote MTF.

During the period under review, your company has worked hard to secure an unequivocal opinion from ESMA about the status of our offer to retail brokers and in particular whether it is both MiFID compliant and meets the requirements for pre-trade transparency. I am delighted to advise you that subsequent to the year-end of 2011 such an opinion has been received.

This report will present an overview of the financial results of the fiscal year ended 31 December 2011 and the various matters required under Belgian Law.

Peter Randall
**Director and special proxy holder**

*Unofficial English translation of a Dutch original*

## 1.  Financial Performance (art. 96,1 Belgian Company Code)

**Profit and Loss Account**

The financial period under review proved to be the second full period of continued trading activity. The business continued to grow and generated revenues of EUR 1.3M against revenues of EUR 0.05M during the prior reporting period.

Continued initiatives that centred on cost efficiencies were realised in the year with operating charges amounting to EUR 9.0M. Costs were up on the prior year by EUR1.0M but were driven by increased trading activity and related marginal costs.

The Company generated an operating loss of EUR7.8M. This loss was generated before other financial income of EUR 0.5M and other financial charges of EUR 0.2M. The net loss of the financial period (EUR 7.4 M) will be proposed to be transferred to losses carried forward.

**Balance Sheet**

Equity share capital increased during the period by EUR 4.3M as a result of additional shareholder investment. Two existing shareholders exercised warrants.

Unpaid share capital decreased in the period by EUR 5.0M leaving a zero balance as a final EUR5.0M investment tranche was called down.

The Company maintains an existing loan agreement with Börse Berlin AG ("**BSX**") for EUR 3.2M (the "**2009 Loan Agreement**"). The loan was due to be repaid to BSX by the end of 2012. However, BSX has very recently (in consideration for an amendment to the Master Agreement with BSX, and an investment commitment by Citadel and Knight, all as described below) extended maturity date of the 2009 Loan Agreement until 31 December 2013

Risks that face the business exist primarily as a result of the changing economic landscape. The uncertainty of the Eurozone has severely impacted retail market confidence and as a result volumes and values remain on the decline adversely affecting revenue growth.

Regulation continues to provide both opportunity and risk. MiFID II has hitherto failed to address "Best Execution" sufficiently and as such the Equiduct model faces the risk of being unable to capitalise on this key issue that underpins the business model.

As the Equiduct Market Model becomes further established the business increases its risk of being more competitively challenged. Competitors look to develop a model that competes directly with Equiduct. If such a challenge becomes significant it could prove to create pressure on pricing structures and impede revenue growth.

2

*Unofficial English translation of a Dutch original*

2.   **Post-Balance Sheet Events (art. 96,2 Belgian Company Code)**

No material post-Balance Sheet events took place, otherwise than as described elsewhere in this Report (which events are incorporated by reference into this section).

3.   **Information regarding circumstances which could have a significant impact on the development of the Company (art. 96,3 Belgian Company Code)**

On 28 June 2012, immediately after the annual general meeting which will vote on the approval of the Annual Accounts, an extraordinary general meeting of shareholders will be held, which will resolve (amongst other things) on the launch of a capital increase for a maximum amount of EUR 7,494,900.00 (and a minimum amount of EUR 7,000,000) (the "**Rights Issue**").

Citadel and Knight have executed a Participation Commitment Letter on 4 June 2012, in which Citadel and Knight (subject to a number of conditions precedent) severally undertake to participate in the Rights Issue at an issue price of EUR 0.20, for an aggregate amount of up to EUR 7,494,900 (the "**Investment Commitment**"), *i.e.* the maximum amount of the Rights Issue (in the assumption that no warrants would be exercised) (as further specified under Section 10 of this Report). Such funding is required for the Company in order to be able to continue its activities for a period of approximately 12 months as of June 2012.

4.   **Research and Development (art. 96,4 Belgian Company Code)**

The Company did not carry out any research or development activities during the financial year 2011.

5.   **Existence of Branches (art. 96,5 Belgian Company Code)**

The Company does not operate any foreign branch companies.

6.   **Losses carried forward/going concern (art. 96,6 Belgian Company Code)**

It is proposed that the loss at year end of EUR 7,401,015 be carried forward as part of profits (losses) carried forward.

Given that profits (losses) carried forward for the Company show a brought forward loss, the Board of Directors reviewed the application of the valuation rules assuming continuity of the activities of the Company, in accordance with article 96, 6° of the Belgian Company Code.

The Board believes that operating performance continues to track broadly in-line with the business forecast and, on the basis of the current circumstances, it is reasonably expected this will build to a position of break-even the early part of FY2014. The shareholders have

3

*Unofficial English translation of a Dutch original*

continued to provide commercial and financial support and the Board, on the basis of the current circumstances and the facts known to it, including the delivery of the Participation Commitment Letter and the agreement to roll the 2009 Loan Agreement until 31 December 2013, expects that the business will continue as a going concern.

The Board refers to the portions of this Combined Board Report prepared pursuant to Article 633 BCC (Section 10 of this Report), which are incorporated into this section by reference.

## 7.    Financial Instruments and Hedging Contracts (art. 96,8 Belgian Company Code)

The Company did not utilise any financial instruments or partake in any hedging contracts during the period.

## 8.    Exemption from preparing consolidated accounts pursuant to article 112 of the Belgian Company Code

The Company has taken advantage of the exemption under article 112 of the Belgian Company Code not to prepare consolidated accounts as it qualifies as a "small group" as defined in article 16 of the Belgian Company Code.

## 9.    Declaration of potential conflicts of interest pursuant to article 523 of the Belgian Company Code

There were no potential conflicts reported under Article 523 of the Belgian Company Code during the year 2011.

## 10. Article 633 of the Belgian Company Code

This section serves as a special report pursuant to Article 633 of the Belgian Company Code.

### a.  Situation described in Article 633 BCC

As the losses of the Company were not incorporated by way of a capital reduction, the net assets of the Company (EUR 2.950.422,68 as per 31 December 2011) remains below a quarter of the amount of the paid-in capital of the Company (EUR 137.411.819,68) due to accumulated losses, and hence the Company continues to satisfy the conditions set forth in article 633 of the Belgian Company Code.

### b.  Business prospects

The business continues to operate as a loss generating organisation and as such relies on shareholder funding to exist as a going-concern. However, success in respect of internal performance measures dictates significant improvement. From a quantitative approach,

4

*Unofficial English translation of a Dutch original*

costs run below budget. However, revenues, adjusted for decline in market volumes, are tracking below target. Profit and loss are in-line with target. On this basis, and the current circumstances and facts known to it, the Board remains confident in the business and its ability to deliver the growth objectives set.

Looking at performance from a qualitative viewpoint, the Board expects continued organic growth of the business going forward. Discussions with potential clients are structured, engaging and positive. Press coverage surrounding the business remains consistently complimentary giving rise to a quality intangible brand recognisable across Europe. The business model has generated interesting discussion across the industry which is a direct reflection of the organisation's growth in stature. In the latter part of 2011 and early 2012, the business model was examined in detail by ESMA for its compliance with MiFID regulation. The business model was found to be entirely compliant without a single remedial change request. The Board, on the basis of the current circumstances and facts known to it, reasonably believes that the next financial period will see further growth in-line with the business model, as demonstrated by recent historic performance and the traction which it has generated.

In addition, the Board continues to seek further business partnerships that will continue to promote success. The Board therefore, on the basis of the current circumstances, reasonably have no issue to suggest that the business will fail to deliver against the existing business plan, and that is set to achieve break-even in the early part of FY2014.

The Board believes that key shareholders continue to demonstrate ongoing interest in the business with a clear intention to continue to support operations commercially.

## c. Measures

In addition to the above description of the Company's prospects, the Board wishes to set out a number of points:

### (i)    *Investment Commitment by Citadel and Knight*

The Company has conducted a number of discussions with Citadel and Knight, the two largest shareholders, over recent months. As a result of such discussions, Citadel, Knight and the Company have executed a Participation Commitment Letter on 4 June 2012, in which each of Citadel and Knight (subject to the conditions set out below) severally undertakes to participate in the Rights Issue at an issue price of EUR 0.20, whereby Citadel and Knight shall participate in the Rights Issue for an aggregate amount of up to EUR 7,494,900 (the "**Investment Commitment**"), *i.e.* the maximum amount of the Rights Issue (in the assumption that no warrants would be exercised). Therefore, if no other shareholders would exercise their preferential subscription right (and if no warrants would be exercised, in which case the maximum size of the Rights Issue would be higher), Citadel and Knight will subscribe for the total amount of the Rights Issue.

5

For the avoidance of doubt, it is specified that if warrants would be exercised, the maximum size of the Rights Issue would increase, but this would not have any effect on Citadel's and Knight's commitment (as set out above) to suscribe for an aggregate amount of up to EUR 7,494,900, so that further to the Investment Commitment, the Rights Issue would in any event be subscribed for, for at least an amount of EUR 7,494,900.

If other shareholders would however exercise their preferential subscription right, such would decrease the amount of the Investment Commitment. Citadel will in any event subscribe for an amount of EUR 2,997,960.00 (which is approximately 65% of its current participation in the Company), and Knight will subscribe for any such amount so that the total subscription amount of the Rights Issue will reach EUR 7,494,900; Knight's commitment thereby effectively serves as a "back-stop" (by way of example: if shareholders (other than Citadel and Knight) would exercise preferential subscription rights for an aggregate amount of approximately EUR 1,000,000, then Knight will subscribe for the "remaining" amount of approximately EUR 3,500,000, so as to reach the total investment amount of EUR 7,494,900.00).

However, it should be noted that the Investment Commitment is subject to a number of conditions precedent:

- the Amendment Agreement (as defined above) will remain in full force and will not be terminated;

- the Shareholders' Agreement dated 24 June 2010 (as amended from time to time) between Citadel, Knight, BSX, Mr. Jos B. Peeters and the Company will be amended in accordance with the principles separately agreed by Citadel and Knight.

  In this respect, the Board specifies that the amendments to the Shareholders' Agreement (which are expected to be agreed after the date of this Report but prior to the date of the EGM) will have to be reflected in the Company's Articles of Association as well, which will require an amendment of the Articles of Association. For that purpose, an extraordinary general shareholders meeting that will resolve on such amendments will have to be called, which is expected to occur some time after the completion of the Rights Issue.

  The Board has been informed by the parties to the Shareholders' Agreement that the amendments thereto will substantially be that Knight will substantially have similar rights as Citadel in respect of the reserved matters set forth in Articles 18 and 33 of the Articles of Association, and that Knight will be granted the right to nominate a total of four Directors for appointment.

- the Company is not subject to, and no steps have been taken to initiate, winding-up or dissolution proceedings, proceedings for bankruptcy ("*faillite / faillissement*") or judicial reorganisation ("*réorganisation judiciaire / gerechtelijke reorganisatie*") or any other similar insolvency proceedings under any applicable law or is not otherwise

*Unofficial English translation of a Dutch original*

limited in its rights to dispose of its assets, or is not subject to, and no steps have been taken to obtain, measures such as the appointment of a provisional administrator ("*administrateur provisoire / voorlopig bewindvoerder*") or a sequestrator ("*séquestre / sekwester*").

For the avoidance of doubt: the Article 633 Belgian Company Code procedure, which will be applied in the context of the annual general meeting of the Company that will be held on 28 June 2012, will not be deemed to constitute any of the foregoing.

- the Rights Issue will be approved by the shareholders of the Company at the EGM, and the completion of the issue of and subscription for the shares pursuant to the Rights Issue takes place on or before 30 September 2012.

The Board expects that the Rights Issue will indeed be completed before 30 September 2012.

Additionally, under the Participation Commitment Letter, the Company has agreed to select and engage an investment bank, by 31 July 2012, to explore all strategic options.

*(ii)    Roll-over of the loan from BSX under the 2009 Loan Agreement*

As noted above, a significant liability attributable to a loan with BSX as counterparty resides on the Company's balance sheet.

The loan from BSX (i.e., principal and accrued interest) would have been due for repayment in full by the end of the financial year 2012, under the original 2009 Loan Agreement. However, further to an amendment to the 2009 Loan Agreement, entered into by the Company, Mr. Jos B. Peeters and BSX on 4 June 2012 (the "**Amendment Agreement**"), and in consideration for Citadel's and Knight's Investment Commitment, as well as the Company's consent to amend the Master Agreement with BSX (as specified below), BSX has agreed to extend the term of the 2009 Loan Agreement until 31 December 2013.

More specifically, the termination date of the 2009 Loan Agreement will be the following:

(a) if the Outsourcing Agreement[1] is terminated on or after 1 January 2012 but before 31 December 2013, the date on which the Outsourcing Agreement is terminated; and

(b) in all circumstances other than as contemplated in paragraph (a), 31 December 2013.

Subject to the execution (and effectiveness) of the Amendment Letter relating to the 2009 Loan Agreement, the Company, ESL and BSX have agreed to amend the Master

---

[1] The Outsourcing Agreement is an agreement between BSX, ENV and ESL, signed on 19/20 March 2009, which stipulates the rights and obligations between BSX as the Regulated Market Operator for the Equiduct trading platform on the one side and ENV & ESL as the provider of technical services in relation to the operation of the Equiduct Platform on the other side.

7

*Unofficial English translation of a Dutch original*

Agreement[2] to the effect that the provisions on termination will be amended to reflect that each of BSX and the Company have the right to terminate the contract by providing the other party with no less than 3 (three) years' prior written notice (the other provisions on termination remaining unaffected).

### d. Conclusion and proposal in accordance with Article 633 BCC

Further to what is set out above, the Board is of the opinion that the establishment of the Annual Accounts in a "going concern" hypothesis is justified.

The Board proposes to the shareholders to, at the annual general meeting, vote for the continuation of the activities of the Company.

### 11. Discharge of the Directors and Statutory Auditor

Upon approval of the 2011 Annual Accounts, it is proposed to the shareholders to grant discharge to the following members of the Board of Directors:

| Board member | Title | Period |
|---|---|---|
| Dr. Jos B Peeters | Director | Full year |
| Artur Fischer | Director / Chairman (until 23 February 2012) | Full year |
| Martin Mannion | Director | Full year |
| Serge Demoliere | Director | Full year |
| Matteo Cassina | Director | Full year |
| Kee-Meng Tan | Director | Full year |
| Stuart Leichenko *(resigned on 14 May 2012)* | Director | Full year |
| Jonathan Graham | Director | Since 14.11.2011 |

---

[2] The Master Agreement, dated 7 August 2009 between ENV, ESL and BSX, was signed to cancel, alter and/or amend additional provisions of services between the parties.

8

*Unofficial English translation of a Dutch original*

| Jamil Nazarali | Director | Since 14.11.2011 |
|---|---|---|
| Peter Randall | Director | Since 14.11.2011 |
| Euro Trading Commercial Ltd, with as permanent representative Mr. Daniel Pouget | Director / Chairman (as of 23 February 2012) | Since 14.11.2011 |

Upon approval of the 2011 Annual Accounts, it is also proposed to the shareholders to discharge the Statutory Auditor for his tasks during the financial year 2011.

12 June 2012

On behalf of the Board of Directors of Easdaq NV,

Peter Randall
Director and special proxy holder

**≡Ⅱ** *ERNST & YOUNG*

**Ernst & Young**
**Réviseurs d'Entreprises**
**Bedrijfsrevisoren**
De Kleetlaan 2
B · 1831 Diegem

Tel: +32 (0)2 774 91 11
Fax: +32 (0)2 774 90 90
www.ey.com/be

## Verslag van de commissaris aan de algemene vergadering der aandeelhouders van Easdaq nv over de jaarrekening over het boekjaar afgesloten op 31 december 2011

Overeenkomstig de wettelijke en statutaire bepalingen, brengen wij u verslag uit in het kader van ons mandaat van commissaris. Dit verslag omvat ons oordeel over de jaarrekening evenals de vereiste bijkomende vermeldingen.

### Verklaring zonder voorbehoud over de jaarrekening

Wij hebben de controle uitgevoerd van de jaarrekening over het boekjaar afgesloten op 31 december 2011, opgesteld overeenkomstig het in België van toepassing zijnde boekhoudkundig referentiestelsel, met een balanstotaal van € € 8.368.922 en waarvan de resultatenrekening afsluit met een verlies van het boekjaar van € 7.401.015.

*Verantwoordelijkheid van de raad van bestuur voor het opstellen en de getrouwe weergave van de jaarrekening*

Het opstellen van de jaarrekening valt onder de verantwoordelijkheid van de raad van bestuur. Deze verantwoordelijkheid omvat: het opzetten, implementeren en in stand houden van een interne controle met betrekking tot het opstellen en de getrouwe weergave van de jaarrekening die geen afwijkingen van materieel belang als gevolg van fraude of het maken van fouten bevat; het kiezen en toepassen van geschikte waarderingsregels; en het maken van boekhoudkundige schattingen die onder de gegeven omstandigheden redelijk zijn.

*Verantwoordelijkheid van de commissaris*

Het is onze verantwoordelijkheid een oordeel over deze jaarrekening tot uitdrukking te brengen op basis van onze controle. Wij hebben onze controle uitgevoerd overeenkomstig de wettelijke bepalingen en volgens de in België geldende controlenormen, zoals uitgevaardigd door het Instituut van de Bedrijfsrevisoren. Deze controlenormen vereisen dat onze controle zo wordt georganiseerd en uitgevoerd dat een redelijke mate van zekerheid wordt verkregen dat de jaarrekening geen afwijkingen van materieel belang bevat.

Overeenkomstig deze controlenormen hebben wij controlewerkzaamheden uitgevoerd ter verkrijging van controle-informatie over de in de jaarrekening opgenomen bedragen en toelichtingen. De keuze van deze controlewerkzaamheden hangt af van onze beoordeling alsook van onze inschatting van het risico dat de jaarrekening afwijkingen van materieel belang bevat als gevolg van fraude of het maken van fouten.

Société civile ayant emprunté la forme d'une société coopérative
à responsabilité limitée
Burgerlijke vennootschap die de rechtsvorm van een coöperatieve
vennootschap met beperkte aansprakelijkheid heeft aangenomen
RPM Bruxelles · RPR Brussel · T.V.A. · B.T.W. BE 0446.334.711
Banque · Fortis · Bank 210-0905900-69

**≣ıJ** ERNST & YOUNG

*Verslag van de commissaris d.d. 12 juni 2012 over de jaarrekening*
*van Easdaq nv over het boekjaar afgesloten op*
*31 december 2011 (vervolg)*

Bij het maken van onze risico-inschatting houden wij rekening met de bestaande interne controle van de vennootschap met betrekking tot het opstellen en de getrouwe weergave van de jaarrekening ten einde in de gegeven omstandigheden de gepaste werkzaamheden te bepalen, maar niet om een oordeel te geven over de effectiviteit van de interne controle van de vennootschap. Wij hebben tevens de gegrondheid van de waarderingsregels, de redelijkheid van de betekenisvolle boekhoudkundige schattingen gemaakt door de vennootschap, alsook de voorstelling van de jaarrekening, als geheel beoordeeld. Ten slotte hebben wij van de raad van bestuur en van de verantwoordelijken van de vennootschap de voor onze controlewerkzaamheden vereiste ophelderingen en inlichtingen verkregen. Wij zijn van mening dat de door ons verkregen controle-informatie een redelijke basis vormt voor het uitbrengen van ons oordeel.

*Oordeel*

Naar ons oordeel, geeft de jaarrekening afgesloten op 31 december 2011 een getrouw beeld van het vermogen, de financiële toestand en de resultaten van de vennootschap, overeenkomstig het in België van toepassing zijnde boekhoudkundig referentiestelsel.

**Bijkomende vermeldingen**

Het opstellen en de inhoud van het jaarverslag, alsook het naleven door de vennootschap van het Wetboek van vennootschappen en van de statuten, vallen onder de verantwoordelijkheid van de raad van bestuur.

Het is onze verantwoordelijkheid om in ons verslag de volgende bijkomende vermeldingen op te nemen die niet van aard zijn om de draagwijdte van onze verklaring over de jaarrekening te wijzigen:

- Het jaarverslag behandelt de door de wet vereiste inlichtingen en stemt overeen met de jaarrekening. Wij kunnen ons echter niet uitspreken over de beschrijving van de voornaamste risico's en onzekerheden waarmee de vennootschap wordt geconfronteerd, alsook van haar positie, haar voorzienbare evolutie of de aanmerkelijke invloed van bepaalde feiten op haar toekomstige ontwikkeling. Wij kunnen evenwel bevestigen dat de verstrekte gegevens geen onmiskenbare inconsistenties vertonen met de informatie waarover wij beschikken in het kader van ons mandaat.

- Onverminderd formele aspecten van ondergeschikt belang, werd de boekhouding gevoerd overeenkomstig de in België van toepassing zijnde wettelijke en bestuursrechtelijke voorschriften.

2

**≣⌶ ERNST & YOUNG**

*Verslag van de commissaris d.d. 12 juni 2012 over de jaarrekening*
*van Easdaq nv over het boekjaar afgesloten op*
*31 december 2011 (vervolg)*

- Wij dienen u geen verrichtingen of beslissingen mede te delen die in overtreding met de statuten of het Wetboek van vennootschappen zijn gedaan of genomen. De verwerking van het resultaat die aan de algemene vergadering wordt voorgesteld, stemt overeen met de wettelijke en statutaire bepalingen.

Brussel, 12 juni 2012

Ernst & Young Bedrijfsrevisoren bcvba
Commissaris
Vertegenwoordigd door

*Weymeersch*

Christel Weymeersch
Vennoot

*12CW0197*

**⫸⫷ ERNST & YOUNG**

Ernst & Young
Réviseurs d'Entreprises
Bedrijfsrevisoren
De Kleetlaan 2
B - 1831 Diegem

Tel: +32 (0)2 774 91 11
Fax: +32 (0)2 774 90 90
www.ey.com/be

<u>Free translation from the Dutch original</u>

## Statutory auditor's report to the general meeting of shareholders of Easdaq nv on the financial statements for the year ended 31 December 2011

In accordance with the legal and statutory requirements, we report to you on the performance of our mandate of statutory auditor. This report contains our opinion on the financial statements as well as the required additional comments.

### Unqualified opinion on the financial statements

We have audited the financial statements for the year ended 31 December 2011, prepared in accordance with the financial reporting framework applicable in Belgium, which show a balance sheet total of € 8.368.922 and a net loss for the year of € 7.401.015.

*Responsibility of the board of directors for the preparation and fair presentation of the financial statements*

The board of directors is responsible for the preparation and fair presentation of the financial statements. This responsibility includes: designing, implementing and maintaining internal control relevant to the preparation and fair presentation of financial statements that are fee from material misstatement, whether due to fraud or error; selecting and applying appropriate accounting policies; and making accounting estimates that are reasonable in the circumstances.

*Responsibility of the statutory auditor*

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with the legal requirements and the auditing standards applicable in Belgium, as issued by the Institute of Registered Auditors (Institut des Réviseurs d'Entreprises/Instituut van de Bedrijfsrevisoren). Those standards require that we plan and perform the audit to obtain reasonable assurance whether the financial statements are free from material misstatement.

In accordance with these standards, we have performed procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on our judgment, including the assessment of the risk of material misstatement of the financial statements, whether due to fraud or error.

Société civile ayant emprunté la forme d'une société coopérative
à responsabilité limitée
Burgerlijke vennootschap die de rechtsvorm van een coöperatieve
vennootschap met beperkte aansprakelijkheid heeft aangenomen
RPM Bruxelles - RPR Brussel - T.V.A. - B.T.W. BE 0446.334.711
Banque - Fortis - Bank 210-0905900-69

**⧓ ERNST & YOUNG**

*Audit report dated 12 June 2012 on the statutory financial statements
of Easdaq nv for the year ended 31 December 2011*

In making those risk assessments, we have considered internal control relevant to the company's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the company's internal control. We have evaluated the appropriateness of accounting policies used, the reasonableness of significant accounting estimates made by the company and the presentation of the financial statements, taken as a whole. Finally, we have obtained from the board of directors and the company's officials the explanations and information necessary for executing our audit procedures. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

*Opinion*

In our opinion, the financial statements for the year ended 31 December 2011 give a true and fair view of the company's financial position and the results of its operations in accordance with the financial reporting framework applicable in Belgium.

**Additional comments**

The preparation and the assessment of the information that should be included in the director's report and the company's compliance with the requirements of the Company Code (Wetboek van vennootschappen/Code des sociétés) and its articles of association are the responsibility of the board of directors.

Our responsibility is to include in our report the following additional comments, which do not modify the scope of our opinion on the financial statements:

- The director's report deals with the information required by law and is consistent with the financial statements. We are, however, unable to comment on the description of the principal risk and uncertainties which the company is facing, and on its financial situation, its foreseeable evolution or the significant influence of certain facts on its future development. We can nevertheless confirm that the matters disclosed do not present any obvious inconsistencies with the information that we became aware of during the performance of our mandate.

2

**⧈ ERNST & YOUNG**

*Audit report dated 12 June 2012 on the statutory financial statements*
*of Easdaq nv for the year ended 31 December 2011*

- Without prejudice to formal aspects of minor importance, the accounting records were maintained in accordance with the legal an regulatory requirements applicable in Belgium.

- We do not report any transaction undertaken or decisions taken in violation of the company's articles of association or the Company Code. The appropriation of the results proposed to the shareholder's meeting complies with the legal and statutory provisions.

Brussels, 12 June 2012

Ernst & Young Bedrijfsrevisoren bcvba
Statutory auditor
represented by

Christel Weymeersch
Partner

*12CW0197*

3

| 40 | | | | 1 | EUR | |
|---|---|---|---|---|---|---|
| NAT. | Datum neerlegging | Nr.  0455.240.893 | Blz. | E. | D. | VOL 1.1 |

## JAARREKENING IN EURO

NAAM:  EASDAQ

Rechtsvorm: NV

Adres:  LEI                                                                              Nr.:  19 Bus 11

Postnummer: 3000                          Gemeente:  Leuven

Land: België

Rechtspersonenregister (RPR) - Rechtbank van Koophandel van  Leuven

Internetadres *:

Ondernemingsnummer    **0455.240.893**

DATUM    **28/11/2011**    van de neerlegging van de oprichtingsakte OF van het recentste stuk dat de datum van bekendmaking van de oprichtingsakte en van de akte tot statutenwijziging vermeldt.

---

JAARREKENING goedgekeurd door de algemene vergadering van    **28/06/2012**

met betrekking tot het boekjaar dat de periode dekt van    **1/01/2011**    tot    **31/12/2011**

Vorig boekjaar van    **1/01/2010**    tot    **31/12/2010**

De bedragen van het vorige boekjaar zijn / ~~zijn niet~~ ** identiek met die welke eerder openbaar werden gemaakt.

---

VOLLEDIGE LIJST met naam, voornamen, beroep, woonplaats (adres, nummer, postnummer en gemeente) en functie in de onderneming, van de BESTUURDERS, ZAAKVOERDERS EN COMMISSARISSEN

**ERNST & YOUNG BEDRIJFSREVISOREN    CVBA    0446.334.711**

De Kleetlaan 2 , 1831 Diegem, België

Functie : Commissaris, Lidmaatschapsnummer : B00160

Vertegenwoordigd door :

WEYMEERSCH Christel

De Kleetlaan 2 , 1831 Diegem, België

Lidmaatschapsnummer : A01705

**FISCHER Artur Klaus**

Jänickestrasse 121 , 14167 Berlin, Duitsland

Functie : Gedelegeerd bestuurder

Mandaat : 7/08/2009- 25/06/2015

**PEETERS Josephus Bonifacius**

Beatrijslaan 29 , 3110 Rotselaar, België

Functie : Bestuurder

Mandaat : 22/06/2006- 28/06/2015

Zijn gevoegd bij deze jaarrekening:

---

Totaal aantal neergelegde bladen:    **31**    Nummers van de secties van het standaardmodel die niet werden neergelegd omdat ze niet dienstig zijn:  5.1, 5.2.1, 5.2.3, 5.2.4, 5.3.1, 5.3.3, 5.3.4, 5.3.5, 5.3.6, 5.4.2, 5.4.3, 5.5.2, 5.8, 5.13, 5.16, 5.17.2, 8, 9

Handtekening
(naam en hoedanigheid)

Peter Randall,
... van Bestuurder

12. JUNE. 2012

* Facultatieve vermelding.
** Schrappen wat niet van toepassing is.

| Nr. | 0455.240.893 | | VOL 1.1 |

LIJST VAN DE BESTUURDERS, ZAAKVOERDERS EN COMMISSARISSEN (vervolg van de vorige bladzijde)

**MANNION Martin**

N. Marshfield Ave. 3920 , bus 980, 60613 IL Chicago, Verenigde Staten van Amerika

Functie : Bestuurder

Mandaat : 7/08/2009- 25/06/2015

**CASINA Matteo**

Tulse Hill 82 , SW SW 2 PU London, Verenigd Koninkrijk

Functie : Bestuurder

Mandaat : 7/08/2009- 25/06/2015

**DEMOLIERE Serge Paul Ehrhard**

August-Viktoriastrasse 99 , Berlin, Duitsland

Functie : Bestuurder

Mandaat : 7/08/2009- 25/06/2015

**KEE-MENG Tan**

Wolseley Road 25 , N8 8RS London, Verenigd Koninkrijk

Functie : Bestuurder

Mandaat : 24/06/2010- 25/06/2015

**LEICHENKO Stuart**

3100 N Sheridan Road 5 , bus C, IL 6065 Chicago, Verenigde Staten van Amerika

Functie : Bestuurder

Mandaat : 7/06/2010- 25/06/2015

**GRAHAM Jonathan**

Magnolia Ave 2612 , bus N, IL Chicago 60614-1214, Verenigde Staten van Amerika

Functie : Bestuurder

Mandaat : 14/11/2011- 22/06/2017

**NAZARILI Jamil**

Blackburn 36 , bus PL, NJ Summit 07901-2324, Verenigde Staten van Amerika

Functie : Bestuurder

Mandaat : 14/11/2011- 22/06/2017

**EuroTrading Commercial Limited**

Haverstone Valley Road 2 , CR3 6HB CATERHAM, Verenigd Koninkrijk

Functie : Bestuurder

Mandaat : 14/11/2011- 26/06/2014

Vertegenwoordigd door :

    Pouget Daniel

    Chateau de Bellefontaine  , 77940 FLAGY, Frankrijk

| Nr. | 0455.240.893 | VOL 1.1 |

LIJST VAN DE BESTUURDERS, ZAAKVOERDERS EN COMMISSARISSEN (vervolg van de vorige bladzijde)

**RANDALL Peter**
Bunyan Court 208 , EC2Y8DH Barican, Verenigd Koninkrijk
Functie : Bestuurder
Mandaat : 14/11/2011- 22/06/2017

| Nr. | 0455.240.893 | | VOL 1.2 |
|---|---|---|---|

## VERKLARING BETREFFENDE EEN AANVULLENDE OPDRACHT VOOR NAZICHT OF CORRECTIE

Het bestuursorgaan verklaart dat geen enkele opdracht voor nazicht werd gegeven aan iemand die daar wettelijk niet toe gemachtigd is met toepassing van de artikelen 34 en 37 van de wet van 22 april 1999 betreffende de boekhoudkundige en fiscale beroepen.

De jaarrekening ~~werd~~ / werd niet* geverifieerd of gecorrigeerd door een externe accountant of door een bedrijfsrevisor die niet de commissaris is.

In bevestigend geval, moeten hierna worden vermeld: naam, voornamen, beroep en woonplaats van elke externe accountant of bedrijfsrevisor en zijn lidmaatschapsnummer bij zijn Instituut, evenals de aard van zijn opdracht:

- A.   Het voeren van de boekhouding van de onderneming **,
- B.   Het opstellen van de jaarrekening **,
- C.   Het verifiëren van de jaarrekening en/of
- D.   Het corrigeren van de jaarrekening.

Indien taken bedoeld onder A. of onder B. uitgevoerd zijn door erkende boekhouders of door erkende boekhouders-fiscalisten, kunnen hierna worden vermeld: naam, voornamen, beroep en woonplaats van alle erkende boekhouder of erkende boekhouder-fiscalist en zijn lidmaatschapsnummer bij het Beroepsinstituut van erkende Boekhouders en Fiscalisten, evenals de aard van zijn opdracht.

| Naam, voornamen, beroep en woonplaats | Lidmaatschaps-nummer | Aard van de opdracht (A, B, C en/of D) |
|---|---|---|
| **ACCOUNTING & TAX PARTNERS BVBA**      0475.026.024<br>Industrieweg 4 , bus 5, 3001 Heverlee, België<br>Functie : Externe accountant | 221955-N-01 | A B |

---

*    Schrappen wat niet van toepassing is.
**   Facultatieve vermelding.

| Nr. | 0455.240.893 | | VOL 2.1 |

## BALANS NA WINSTVERDELING

| | Toel. | Codes | Boekjaar | Vorig boekjaar |
|---|---|---|---|---|
| **ACTIVA** | | | | |
| **VASTE ACTIVA** ................................................... | | 20/28 | 1.364.442 | 1.415.691 |
| **Oprichtingskosten** ............................................. | 5.1 | 20 | | |
| **Immateriële vaste activa** .................................. | 5.2 | 21 | | 51.249 |
| **Materiële vaste activa** ..................................... | 5.3 | 22/27 | | |
| Terreinen en gebouwen ..................................... | | 22 | | |
| Installaties, machines en uitrusting ................... | | 23 | | |
| Meubilair en rollend materieel .......................... | | 24 | | |
| Leasing en soortgelijke rechten ........................ | | 25 | | |
| Overige materiële vaste activa .......................... | | 26 | | |
| Activa in aanbouw en vooruitbetalingen ........... | | 27 | | |
| | 5.4/ | | | |
| **Financiële vaste activa** ..................................... | 5.5.1 | 28 | 1.364.442 | 1.364.442 |
| Verbonden ondernemingen ............................... | 5.14 | 280/1 | 1.364.442 | 1.364.442 |
| Deelnemingen ................................................. | | 280 | 1.364.442 | 1.364.442 |
| Vorderingen .................................................... | | 281 | | |
| Ondernemingen waarmee een deelnemingsverhouding bestaat .............................................................. | 5.14 | 282/3 | | |
| Deelnemingen ................................................. | | 282 | | |
| Vorderingen .................................................... | | 283 | | |
| Andere financiële vaste activa .......................... | | 284/8 | | |
| Aandelen ........................................................ | | 284 | | |
| Vorderingen en borgtochten in contanten .......... | | 285/8 | | |
| **VLOTTENDE ACTIVA** ......................................... | | 29/58 | 7.004.480 | 4.845.802 |
| **Vorderingen op meer dan één jaar** ................... | | 29 | | |
| Handelsvorderingen ......................................... | | 290 | | |
| Overige vorderingen ........................................ | | 291 | | |
| **Voorraden en bestellingen in uitvoering** ......... | | 3 | | |
| Voorraden ....................................................... | | 30/36 | | |
| Grond- en hulpstoffen ..................................... | | 30/31 | | |
| Goederen in bewerking .................................... | | 32 | | |
| Gereed product ............................................... | | 33 | | |
| Handelsgoederen ............................................ | | 34 | | |
| Onroerende goederen bestemd voor verkoop ..... | | 35 | | |
| Vooruitbetalingen ............................................ | | 36 | | |
| Bestellingen in uitvoering ................................ | | 37 | | |
| **Vorderingen op ten hoogste één jaar** .............. | | 40/41 | 255.826 | 926.322 |
| Handelsvorderingen ......................................... | | 40 | 236.720 | 75.018 |
| Overige vorderingen ........................................ | 5.5.1/ | 41 | 19.106 | 851.304 |
| **Geldbeleggingen** .............................................. | 5.6 | 50/53 | 2.398.460 | |
| Eigen aandelen ............................................... | | 50 | | |
| Overige beleggingen ........................................ | | 51/53 | 2.398.460 | |
| **Liquide middelen** .............................................. | | 54/58 | 4.224.578 | 3.869.999 |
| **Overlopende rekeningen** .................................. | 5.6 | 490/1 | 125.616 | 49.481 |
| **TOTAAL DER ACTIVA** ....................................... | | 20/58 | 8.368.922 | 6.261.493 |

| Nr. | 0455.240.893 | | VOL 2.2 |

| PASSIVA | Toel. | Codes | Boekjaar | Vorig boekjaar |
|---|---|---|---|---|
| **EIGEN VERMOGEN** ................................ | | 10/15 | 2.950.423 | 1.085.298 |
| **Kapitaal** ................................ | 5.7 | 10 | 137.411.820 | 128.145.680 |
| Geplaatst kapitaal ................................ | | 100 | 137.411.820 | 133.145.680 |
| Niet-opgevraagd kapitaal ................................ | | 101 | | 5.000.000 |
| **Uitgiftepremies** ................................ | | 11 | | |
| **Herwaarderingsmeerwaarden** ................................ | | 12 | | |
| **Reserves** ................................ | | 13 | | |
| Wettelijke reserve ................................ | | 130 | | |
| Onbeschikbare reserves ................................ | | 131 | | |
| Voor eigen aandelen ................................ | | 1310 | | |
| Andere ................................ | | 1311 | | |
| Belastingvrije reserves ................................ | | 132 | | |
| Beschikbare reserves ................................ | | 133 | | |
| **Overgedragen winst (verlies)** ................(+)/(-) | | 14 | -134.461.397 | -127.060.382 |
| **Kapitaalsubsidies** ................................ | | 15 | | |
| **Voorschot aan de vennoten op de verdeling van het netto-actief** | | 19 | | |
| **VOORZIENINGEN EN UITGESTELDE BELASTINGEN** ......... | | 16 | | |
| **Voorzieningen voor risico's en kosten** ................................ | | 160/5 | | |
| Pensioenen en soortgelijke verplichtingen ................ | | 160 | | |
| Belastingen ................................ | | 161 | | |
| Grote herstellings- en onderhoudswerken ................ | | 162 | | |
| Overige risico's en kosten ................................ | 5.8 | 163/5 | | |
| **Uitgestelde belastingen** ................................ | | 168 | | |
| **SCHULDEN** ................................ | | 17/49 | 5.418.499 | 5.176.195 |
| **Schulden op meer dan één jaar** ................................ | 5.9 | 17 | | 3.244.127 |
| Financiële schulden ................................ | | 170/4 | | 3.244.127 |
| Achtergestelde leningen ................................ | | 170 | | |
| Niet-achtergestelde obligatieleningen ................ | | 171 | | |
| Leasingschulden en soortgelijke schulden ................ | | 172 | | |
| Kredietinstellingen ................................ | | 173 | | |
| Overige leningen ................................ | | 174 | | 3.244.127 |
| Handelsschulden ................................ | | 175 | | |
| Leveranciers ................................ | | 1750 | | |
| Te betalen wissels ................................ | | 1751 | | |
| Ontvangen vooruitbetalingen op bestellingen ................ | | 176 | | |
| Overige schulden ................................ | | 178/9 | | |
| **Schulden op ten hoogste één jaar** ................................ | | 42/48 | 5.133.624 | 1.767.722 |
| Schulden op meer dan één jaar die binnen het jaar vervallen ................................ | 5.9 | 42 | 3.244.127 | |
| Financiële schulden ................................ | | 43 | | |
| Kredietinstellingen ................................ | | 430/8 | | |
| Overige leningen ................................ | | 439 | | |
| Handelsschulden ................................ | | 44 | 1.209.746 | 1.662.958 |
| Leveranciers ................................ | | 440/4 | 1.209.746 | 1.662.958 |
| Te betalen wissels ................................ | | 441 | | |
| Ontvangen vooruitbetalingen op bestellingen ................ | | 46 | | |
| Schulden met betrekking tot belastingen, bezoldigingen en sociale lasten ................................ | 5.9 | 45 | 37.525 | 31.110 |
| Belastingen ................................ | | 450/3 | | 355 |
| Bezoldigingen en sociale lasten ................................ | | 454/9 | 37.525 | 30.755 |
| Overige schulden ................................ | | 47/48 | 642.226 | 73.654 |
| **Overlopende rekeningen** ................................ | 5.9 | 492/3 | 284.875 | 164.346 |
| **TOTAAL DER PASSIVA** ................................ | | 10/49 | 8.368.922 | 6.261.493 |

| Nr. | 0455.240.893 | | VOL 3 |

## RESULTATENREKENING

| | Toel. | Codes | Boekjaar | Vorig boekjaar |
|---|---|---|---|---|
| **Bedrijfsopbrengsten** ............................................... | | 70/74 | 1.251.605 | 50.604 |
| Omzet ...................................................... | 5.10 | 70 | 1.243.708 | 27.030 |
| Voorraad goederen in bewerking en gereed product en bestellingen in uitvoering: toename (afname) ............(+)/(-) | | 71 | | |
| Geproduceerde vaste activa | | 72 | | |
| Andere bedrijfsopbrengsten ............................................. | 5.10 | 74 | 7.897 | 23.574 |
| **Bedrijfskosten** ............................................. | | 60/64 | 9.066.835 | 8.046.707 |
| Handelsgoederen, grond- en hulpstoffen .......................... | | 60 | | |
| Aankopen ................................................. | | 600/8 | | |
| Voorraad: afname (toename) ............................(+)/(-) | | 609 | | |
| Diensten en diverse goederen ........................................... | | 61 | 8.886.802 | 8.944.128 |
| Bezoldigingen, sociale lasten en pensioenen ............(+)/(-) | 5.10 | 62 | 125.944 | 258.833 |
| Afschrijvingen en waardeverminderingen op oprichtingskosten, op immateriële en materiële vaste activa ......................... | | 630 | 51.249 | 205.313 |
| Waardeverminderingen op voorraden, bestellingen in uitvoering en handelsvorderingen: toevoegingen (terugnemingen) ................................................(+)/(-) | | 631/4 | -633.214 | -1.364.433 |
| Voorzieningen voor risico's en kosten: toevoegingen (bestedingen en terugnemingen) ............................(+)/(-) | 5.10 | 635/7 | | |
| Andere bedrijfskosten .............................................. | 5.10 | 640/8 | 636.054 | 2.866 |
| Als herstructureringskosten geactiveerde bedrijfskosten .................................................. (-) | | 649 | | |
| **Bedrijfswinst (Bedrijfsverlies)** .......................(+)/(-) | | 9901 | -7.815.230 | -7.996.103 |
| **Financiële opbrengsten** ............................................. | | 75 | 465.969 | 72.588 |
| Opbrengsten uit financiële vaste activa .......................... | | 750 | | |
| Opbrengsten uit vlottende activa ....................................... | | 751 | | 2.680 |
| Andere financiële opbrengsten ......................................... | 5.11 | 752/9 | 465.969 | 69.908 |
| **Financiële kosten** ............................................. | 5.11 | 65 | 153.864 | 112.764 |
| Kosten van schulden ...................................... | | 650 | 119.704 | 109.628 |
| Waardeverminderingen op vlottende activa andere dan voorraden, bestellingen in uitvoering en handelsvorderingen: toevoegingen (terugneming) ................(+)/(-) | | 651 | | |
| Andere financiële kosten .................................... | | 652/9 | 34.160 | 3.136 |
| **Winst (Verlies) uit de gewone bedrijfsuitoefening voor belasting** ................................................. (+)/(-) | | 9902 | -7.503.125 | -8.036.279 |

| Nr. | 0455.240.893 | | VOL 3 |

| | Toel. | Codes | Boekjaar | Vorig boekjaar |
|---|---|---|---|---|
| **Uitzonderlijke opbrengsten** ................................................ | | 76 | 102.110 | 1.141 |
| Terugneming van afschrijvingen en van waardeverminderingen op immateriële en materiële vaste activa ......................... | | 760 | | |
| Terugneming van waardeverminderingen op financiële vaste activa ............................. | | 761 | | 9 |
| Terugneming van voorzieningen voor uitzonderlijke risico's en kosten ................................ | | 762 | | |
| Meerwaarde bij de realisatie van vaste activa .................. | | 763 | | |
| Andere uitzonderlijke opbrengsten .................................. | | 764/9 | 102.110 | 1.132 |
| **Uitzonderlijke kosten** ................................................ | | 66 | | |
| Uitzonderlijke afschrijvingen en waardeverminderingen op oprichtingskosten, op immateriële en materiële vaste activa ......................... | | 660 | | |
| Waardeverminderingen op financiële vaste activa ............ | | 661 | | |
| Voorzieningen voor uitzonderlijke risico's en kosten Toevoegingen (bestedingen) ...................................(+)/(-) | | 662 | | |
| Minderwaarden bij de realisatie van vaste activa ............. | | 663 | | |
| Andere uitzonderlijke kosten ............................................ | 5.11 | 664/8 | | |
| Als herstructureringskosten geactiveerde uitzonderlijke kosten ................................................................ (-) | | 669 | | |
| **Winst (Verlies) van het boekjaar voor belasting**.........(+)/(-) | | 9903 | -7.401.015 | -8.035.138 |
| **Onttrekkingen aan de uitgestelde belastingen** .................. | | 780 | | |
| **Overboeking naar de uitgestelde belastingen** .................... | | 680 | | |
| **Belastingen op het resultaat** .......................................(+)/(-) | 5.12 | 67/77 | | |
| Belastingen ........................................................... | | 670/3 | | |
| Regularisering van belastingen en terugneming van voorzieningen voor belastingen ........................................ | | 77 | | |
| **Winst (Verlies) van het boekjaar** ....................................(+)/(-) | | 9904 | -7.401.015 | -8.035.138 |
| **Onttrekking aan de belastingvrije reserves** ........................ | | 789 | | |
| **Overboeking naar de belastingvrije reserves** ..................... | | 689 | | |
| **Te bestemmen winst (verlies) van het boekjaar** ..........(+)/(-) | | 9905 | -7.401.015 | -8.035.138 |

| Nr. | 0455.240.893 | | VOL 4 |

**RESULTAATVERWERKING**

| | Codes | Boekjaar | Vorig boekjaar |
|---|---|---|---|
| **Te bestemmen winst (verlies)** .........................(+)/(-) | 9906 | -134.461.397 | -127.060.382 |
| Te bestemmen winst (verlies) van het boekjaar ..........(+)/(-) | (9905) | -7.401.015 | -8.035.138 |
| Overgedragen winst (verlies) van het vorige boekjaar .........(+)/(-) | 14P | -127.060.382 | -119.025.244 |
| **Onttrekking aan het eigen vermogen** ......................... | 791/2 | | |
| aan het kapitaal en aan de uitgiftepremies ..................... | 791 | | |
| aan de reserves ..................................................... | 792 | | |
| **Toevoeging aan het eigen vermogen** ......................... | 691/2 | | |
| aan het kapitaal en aan de uitgiftepremies ..................... | 691 | | |
| aan de wettelijke reserves ........................................ | 6920 | | |
| aan de overige reserves .......................................... | 6921 | | |
| **Over te dragen winst (verlies)** .........................(+)/(-) | (14) | -134.461.397 | -127.060.382 |
| **Tussenkomst van de vennoten in het verlies** ............ | 794 | | |
| **Uit te keren winst** ................................................ | 694/6 | | |
| Vergoeding van het kapitaal ..................................... | 694 | | |
| Bestuurders of zaakvoerders ..................................... | 695 | | |
| Andere rechthebbenden ........................................... | 696 | | |

| Nr. | 0455.240.893 | | VOL 5.2.2 |
| --- | --- | --- | --- |

|  | Codes | Boekjaar | Vorig boekjaar |
| --- | --- | --- | --- |
| **CONCESSIES, OCTROOIEN, LICENTIES, KNOWHOW, MERKEN EN SOORTGELIJKE RECHTEN** | | | |
| **Aanschaffingswaarde per einde van het boekjaar** ...................................... | 8052P | xxxxxxxxxxxxxxx | 34.995.646 |
| **Mutaties tijdens het boekjaar** | | | |
| Aanschaffingen, met inbegrip van de geproduceerde vaste activa ............ | 8022 | | |
| Overdrachten en buitengebruikstellingen .................................................. | 8032 | | |
| Overboeking van een post naar een andere ....................................(+)/(-) | 8042 | | |
| **Aanschaffingswaarde per einde van het boekjaar** ...................................... | 8052 | 34.995.646 | |
| **Afschrijvingen en waardeverminderingen per einde van het boekjaar** ...... | 8122P | xxxxxxxxxxxxxxx | 34.944.397 |
| **Mutaties tijdens het boekjaar** | | | |
| Geboekt ...................................................................................................... | 8072 | 51.249 | |
| Teruggenomen ............................................................................................. | 8082 | | |
| Verworven van derden .................................................................................. | 8092 | | |
| Afgeboekt na overdrachten en buitengebruikstellingen ............................. | 8102 | | |
| Overgeboekt van een post naar een andere ....................................(+)/(-) | 8112 | | |
| **Afschrijvingen en waardeverminderingen per einde van het boekjaar** ...... | 8122 | 34.995.646 | |
| **NETTOBOEKWAARDE PER EINDE VAN HET BOEKJAAR** ......................... | 211 | | |

| Nr. | 0455.240.893 | | VOL 5.3.2 |

|  | Codes | Boekjaar | Vorig boekjaar |
|---|---|---|---|
| **INSTALLATIES, MACHINES EN UITRUSTING** | | | |
| **Aanschaffingswaarde per einde van het boekjaar** ..................................... | 8192P | xxxxxxxxxxxxxxx | 6.045 |
| **Mutaties tijdens het boekjaar** | | | |
| Aanschaffingen, met inbegrip van de geproduceerde vaste activa ........... | 8162 | | |
| Overdrachten en buitengebruikstellingen .................................. | 8172 | | |
| Overboeking van een post naar een andere ...................................(+)/(-) | 8182 | | |
| **Aanschaffingswaarde per einde van het boekjaar**...................................... | 8192 | 6.045 | |
| **Meerwaarde per einde van het boekjaar** ...................................... | 8252P | xxxxxxxxxxxxxxx | |
| **Mutaties tijdens het boekjaar** | | | |
| Geboekt ........................................................................... | 8212 | | |
| Verworven van derden ............................................................ | 8222 | | |
| Afgeboekt ......................................................................... | 8232 | | |
| Overgeboekt van een post naar een andere ...................................(+)/(-) | 8242 | | |
| **Meerwaarde per einde van het boekjaar**...................................... | 8252 | | |
| **Afschrijvingen en waardeverminderingen per einde van het boekjaar** ······ | 8322P | xxxxxxxxxxxxxxx | 6.045 |
| **Mutaties tijdens het boekjaar** | | | |
| Geboekt ........................................................................... | 8272 | | |
| Teruggenomen ..................................................................... | 8282 | | |
| Verworven van derden ............................................................ | 8292 | | |
| Afgeboekt na overdrachten en buitengebruikstellingen ........................... | 8302 | | |
| Overgeboekt van een post naar een andere ...................................(+)/(-) | 8312 | | |
| **Afschrijvingen en waardeverminderingen per einde van het boekjaar** ...... | 8322 | 6.045 | |
| **NETTOBOEKWAARDE PER EINDE VAN HET BOEKJAAR** ......................... | (23) | | |

| Nr. | 0455.240.893 | | VOL 5.4.1 |
| --- | --- | --- | --- |

## STAAT VAN DE FINANCIËLE VASTE ACTIVA

| | Codes | Boekjaar | Vorig boekjaar |
| --- | --- | --- | --- |
| **VERBONDEN ONDERNEMINGEN - DEELNEMINGEN EN AANDELEN** | | | |
| Aanschaffingswaarde per einde van het boekjaar ...................................... | 8391P | xxxxxxxxxxxxxxx | 1.364.442 |
| **Mutaties tijdens het boekjaar** | | | |
| Aanschaffingen.......................................................................... | 8361 | | |
| Overdrachten en buitengebruikstellingen ................................................. | 8371 | | |
| Overboeking van een post naar een andere ...................................(+)/(-) | 8381 | | |
| Aanschaffingswaarde per einde van het boekjaar ...................................... | 8391 | 1.364.442 | |
| Meerwaarde per einde van het boekjaar ...................................................... | 8451P | xxxxxxxxxxxxxxx | |
| **Mutaties tijdens het boekjaar** | | | |
| Geboekt ..................................................................................... | 8411 | | |
| Verworven van derden ................................................................... | 8421 | | |
| Afgeboekt ................................................................................. | 8431 | | |
| Overgeboekt van een post naar een andere ...................................(+)/(-) | 8441 | | |
| Meerwaarde per einde van het boekjaar...................................................... | 8451 | | |
| Waardeverminderingen per einde van het boekjaar.................................... | 8521P | xxxxxxxxxxxxxxx | |
| **Mutaties tijdens het boekjaar** | | | |
| Geboekt ..................................................................................... | 8471 | | |
| Teruggenomen ............................................................................ | 8481 | | |
| Verworven van derden ................................................................... | 8491 | | |
| Afgeboekt na overdrachten en buitengebruikstellingen ............................ | 8501 | | |
| Overgeboekt van een post naar een andere ...................................(+)/(-) | 8511 | | |
| Waardeverminderingen per einde van het boekjaar.................................... | 8521 | | |
| Niet-opgevraagde bedragen per einde van het boekjaar............................ | 8551P | xxxxxxxxxxxxxxx | |
| Mutaties tijdens het boekjaar ...................................................(+)/(-) | 8541 | | |
| Niet-opgevraagde bedragen per einde van het boekjaar............................ | 8551 | | |
| NETTOBOEKWAARDE PER EINDE VAN HET BOEKJAAR .......................... | (280) | 1.364.442 | |
| **VERBONDEN ONDERNEMINGEN - VORDERINGEN** | | | |
| NETTOBOEKWAARDE PER EINDE VAN HET BOEKJAAR .......................... | 281P | xxxxxxxxxxxxxxx | |
| **Mutaties tijdens het boekjaar** | | | |
| Toevoegingen ............................................................................ | 8581 | | |
| Terugbetalingen........................................................................... | 8591 | | |
| Geboekte waardeverminderingen ....................................................... | 8601 | | |
| Teruggenomen waardeverminderingen ................................................. | 8611 | | |
| Wisselkoersverschillen ...........................................................(+)/(-) | 8621 | | |
| Overige mutaties ..................................................................(+)/(-) | 8631 | | |
| NETTOBOEKWAARDE PER EINDE VAN HET BOEKJAAR .......................... | (281) | | |
| GECUMULEERDE WAARDEVERMINDERINGEN OP VORDERINGEN PER EINDE BOEKJAAR ....................................................................................... | 8651 | | |

| Nr. | 0455.240.893 | | VOL 5.5.1 |

## INLICHTINGEN OMTRENT DE DEELNEMINGEN

## DEELNEMINGEN EN MAATSCHAPPELIJKE RECHTEN IN ANDERE ONDERNEMINGEN

Hieronder worden de ondernemingen vermeld waarin de onderneming een deelneming bezit (opgenomen in de posten 280 en 282 van de activa), alsmede de andere ondernemingen waarin de onderneming maatschappelijke rechten bezit (opgenomen in de posten 284 en 51/53 van de activa) ten belope van ten minste 10 % van het geplaatste kapitaal.

| NAAM, volledig adres van de ZETEL en zo het een onderneming naar Belgisch recht betreft, het ONDERNEMINGSNUMMER | Aangehouden maatschappelijke rechten | | | Gegevens geput uit de laatst beschikbare jaarrekening | | | |
|---|---|---|---|---|---|---|---|
| | rechtstreeks | | doch-ters | Jaarrekening per | Munt-code | Eigen vermogen | Nettoresultaat |
| | Aantal | % | % | | | (+) of (-) *(in eenheden)* | |
| **EQUIDUCT SYSTEMS LTD BO** St Mary Axe 70 EC3A8BE London Verenigd Koninkrijk GEWONE AANDELEN | 1 | 100,00 | 0,00 | 31/12/2011 | GBP | 1.945.910 | 858.897 |

| Nr. | 0455.240.893 | VOL 5.6 |

## GELDBELEGGINGEN EN OVERLOPENDE REKENINGEN (ACTIVA)

|  | Codes | Boekjaar | Vorig boekjaar |
|---|---|---|---|
| **OVERIGE GELDBELEGGINGEN** |  |  |  |
| **Aandelen** .................................................................. | 51 |  |  |
| Boekwaarde verhoogd met het niet-opgevraagde bedrag ..................... | 8681 |  |  |
| Niet-opgevraagd bedrag ............................................... | 8682 |  |  |
| **Vastrentende effecten** ................................................ | 52 |  |  |
| Vastrentende effecten uitgegeven door kredietinstellingen ................... | 8684 |  |  |
| **Termijnrekeningen bij kredietinstellingen** ............................. | 53 | 2.398.460 |  |
| Met een resterende looptijd of opzegtermijn van |  |  |  |
| hoogstens één maand ................................................. | 8686 | 599.615 |  |
| meer dan één maand en hoogstens één jaar .............................. | 8687 | 1.798.845 |  |
| meer dan één jaar .................................................... | 8688 |  |  |
| **Hierboven niet-opgenomen overige geldbeleggingen** ......................... | 8689 |  |  |

|  | Boekjaar |
|---|---|
| **OVERLOPENDE REKENINGEN** |  |
| **Uitsplitsing van de post 490/1 van de activa indien daaronder een belangrijk bedrag voorkomt.** |  |
| Exchange fees | 83.116 |
| Verkopen Market Data | 1.110 |
| Registratiekosten | 887 |
| Abonnementen en boeken | 38 |
| Onderhoud & herst computers personeel | 22.740 |
| Huur opslagruimte | 1.608 |
| Verzekering BA | 96 |
| supply of services - reference data | 14.355 |
| Erelonen consulting en advis. | 1.667 |

| Nr. | 0455.240.893 | | VOL 5.7 |
|-----|--------------|--|---------|

## STAAT VAN HET KAPITAAL EN DE AANDEELHOUDERSSTRUCTUUR

### STAAT VAN HET KAPITAAL

**Maatschappelijk kapitaal**

| | Codes | Boekjaar | Vorig boekjaar |
|---|-------|----------|----------------|
| Geplaatst kapitaal per einde van het boekjaar.................... | 100P | XXXXXXXXXXXXXX | 133.145.680 |
| Geplaatst kapitaal per einde van het boekjaar.................... | (100) | 137.411.820 | |

| | Codes | Bedragen | Aantal aandelen |
|---|-------|----------|-----------------|
| Wijzigingen tijdens het boekjaar | | | |
| kapitaalverhoging dd 23/06/2011 | | 4.192.486 | 6.024.214 |
| Kapitaalverhoging dd 14/11/2011 | | 73.654 | 105.834 |
| Samenstelling van het kapitaal | | | |
| Soorten aandelen | | | |
| AANDELEN OP NAAM ZONDER NOMINALE WAARDE | | 137.411.820 | 64.830.944 |
| Aandelen op naam................................. | 8702 | XXXXXXXXXXXXXX | 64.830.944 |
| Aandelen aan toonder en/of gedematerialiseerde aandelen............... | 8703 | XXXXXXXXXXXXXX | |

| | Codes | Niet-opgevraagd bedrag | Opgevraagd, niet-gestort bedrag |
|---|-------|------------------------|----------------------------------|
| **Niet-gestort kapitaal** | | | |
| Niet-opgevraagd kapitaal .................................. | (101) | | XXXXXXXXXXXXXX |
| Opgevraagd, niet-gestort kapitaal ...................... | 8712 | XXXXXXXXXXXXXX | |
| Aandeelhouders die nog moeten volstorten | | | |

| | Codes | Boekjaar |
|---|-------|----------|
| **Eigen aandelen** | | |
| Gehouden door de vennootschap zelf | | |
| Kapitaalbedrag ......................................... | 8721 | |
| Aantal aandelen ........................................ | 8722 | |
| Gehouden door haar dochters | | |
| Kapitaalbedrag ......................................... | 8731 | |
| Aantal aandelen ........................................ | 8732 | |
| **Verplichtingen tot uitgifte van aandelen** | | |
| Als gevolg van de uitoefening van CONVERSIERECHTEN | | |
| Bedrag van de lopende converteerbare leningen ......... | 8740 | |
| Bedrag van het te plaatsen kapitaal ....................... | 8741 | |
| Maximum aantal uit te geven aandelen ..................... | 8742 | |
| Als gevolg van de uitoefening van INSCHRIJVINGSRECHTEN | | |
| Aantal inschrijvingsrechten in omloop ..................... | 8745 | 1.541.247 |
| Bedrag van het te plaatsen kapitaal ....................... | 8746 | 926.392 |
| Maximum aantal uit te geven aandelen ..................... | 8747 | 2.104.769 |
| **Toegestaan, niet-geplaatst kapitaal** ..................... | 8751 | |

| Nr. | 0455.240.893 | | VOL 5.7 |

## STAAT VAN HET KAPITAAL EN DE AANDEELHOUDERSSTRUCTUUR

| | Codes | Boekjaar |
|---|---|---|
| **Aandelen buiten kapitaal** | | |
| Verdeling | | |
| Aantal aandelen ............................................................................................. | 8761 | |
| Daaraan verbonden stemrecht ....................................................................... | 8762 | |
| Uitsplitsing van de aandeelhouders | | |
| Aantal aandelen gehouden door de vennootschap zelf ................................. | 8771 | |
| Aantal aandelen gehouden door haar dochters ............................................ | 8781 | |

**AANDEELHOUDERSSTRUCTUUR VAN DE ONDERNEMING OP DE DATUM VAN DE JAARAFSLUITING, ZOALS DIE BLIJKT UIT DE KENNISGEVINGEN DIE DE ONDERNEMING HEEFT ONTVANGEN**

Citadel Tactical Inv. LLC: 61,70%
Börse Berlin AG: 9,13%
Knight Capital Group: 23,22%
Remaining shareholders: 5,96%

16/31

| Nr. | 0455.240.893 | VOL 5.9 |

## STAAT VAN DE SCHULDEN EN OVERLOPENDE REKENINGEN (PASSIVA)

**UITSPLITSING VAN DE SCHULDEN MET EEN OORSPRONKELIJKE LOOPTIJD VAN MEER DAN EEN JAAR, NAARGELANG HUN RESTERENDE LOOPTIJD**

Schulden op meer dan één jaar die binnen het jaar vervallen

| | Codes | Boekjaar |
|---|---|---|
| Financiële schulden | 8801 | 3.244.127 |
|   Achtergestelde leningen | 8811 | |
|   Niet-achtergestelde obligatieleningen | 8821 | |
|   Leasingschulden en soortgelijke schulden | 8831 | |
|   Kredietinstellingen | 8841 | |
|   Overige leningen | 8851 | 3.244.127 |
| Handelsschulden | 8861 | |
|   Leveranciers | 8871 | |
|   Te betalen wissels | 8881 | |
| Ontvangen vooruitbetalingen op bestellingen | 8891 | |
| Overige schulden | 8901 | |
| **Totaal der schulden op meer dan één jaar die binnen het jaar vervallen** | (42) | 3.244.127 |
| | | |
| Schulden met een resterende looptijd van meer dan één jaar doch hoogstens 5 jaar | | |
| Financiële schulden | 8802 | |
|   Achtergestelde leningen | 8812 | |
|   Niet-achtergestelde obligatieleningen | 8822 | |
|   Leasingschulden en soortgelijke schulden | 8832 | |
|   Kredietinstellingen | 8842 | |
|   Overige leningen | 8852 | |
| Handelsschulden | 8862 | |
|   Leveranciers | 8872 | |
|   Te betalen wissels | 8882 | |
| Ontvangen vooruitbetalingen op bestellingen | 8892 | |
| Overige schulden | 8902 | |
| **Totaal der schulden met een resterende looptijd van meer dan één jaar doch hoogstens 5 jaar** | 8912 | |
| | | |
| Schulden met een resterende looptijd van meer dan 5 jaar | | |
| Financiële schulden | 8803 | |
|   Achtergestelde leningen | 8813 | |
|   Niet-achtergestelde obligatieleningen | 8823 | |
|   Leasingschulden en soortgelijke schulden | 8833 | |
|   Kredietinstellingen | 8843 | |
|   Overige leningen | 8853 | |
| Handelsschulden | 8863 | |
|   Leveranciers | 8873 | |
|   Te betalen wissels | 8883 | |
| Ontvangen vooruitbetalingen op bestellingen | 8893 | |
| Overige schulden | 8903 | |
| **Totaal der schulden met een resterende looptijd van meer dan 5 jaar** | 8913 | |

| Nr. | 0455.240.893 | | VOL 5.9 |
|-----|--------------|--|---------|

|  | Codes | Boekjaar |
|--|-------|----------|

**GEWAARBORGDE SCHULDEN** *(begrepen in de posten 17 en 42/48 van de passiva)*

**Door Belgische overheidsinstellingen gewaarborgde schulden**

| | Codes | Boekjaar |
|---|---|---|
| Financiële schulden ............................................................................................................... | 8921 | |
|     Achtergestelde leningen .................................................................................................. | 8931 | |
|     Niet-achtergestelde obligatieleningen ........................................................................... | 8941 | |
|     Leasingschulden en soortgelijke schulden .................................................................... | 8951 | |
|     Kredietinstellingen ......................................................................................................... | 8961 | |
|     Overige leningen ........................................................................................................... | 8971 | |
| Handelsschulden .................................................................................................................. | 8981 | |
|     Leveranciers .................................................................................................................. | 8991 | |
|     Te betalen wissels ......................................................................................................... | 9001 | |
| Ontvangen vooruitbetalingen op bestellingen ..................................................................... | 9011 | |
| Schulden met betrekking tot bezoldigingen en sociale lasten ............................................. | 9021 | |
| Overige schulden ................................................................................................................. | 9051 | |
| **Totaal door Belgische overheidsinstellingen gewaarborgde schulden** ........................... | 9061 | |

**Schulden gewaarborgd door zakelijke zekerheden gesteld of onherroepelijk beloofd op activa van de onderneming**

| | Codes | Boekjaar |
|---|---|---|
| Financiële schulden ............................................................................................................... | 8922 | |
|     Achtergestelde leningen .................................................................................................. | 8932 | |
|     Niet-achtergestelde obligatieleningen ........................................................................... | 8942 | |
|     Leasingschulden en soortgelijke schulden .................................................................... | 8952 | |
|     Kredietinstellingen ......................................................................................................... | 8962 | |
|     Overige leningen ........................................................................................................... | 8972 | |
| Handelsschulden .................................................................................................................. | 8982 | |
|     Leveranciers .................................................................................................................. | 8992 | |
|     Te betalen wissels ......................................................................................................... | 9002 | |
| Ontvangen vooruitbetalingen op bestellingen ..................................................................... | 9012 | |
| Schulden met betrekking tot belastingen, bezoldigingen en sociale lasten ........................ | 9022 | |
|     Belastingen ..................................................................................................................... | 9032 | |
|     Bezoldigingen en sociale lasten.................................................................................... | 9042 | |
| Overige schulden ................................................................................................................. | 9052 | |
| **Totaal der schulden gewaarborgd door zakelijke zekerheden gesteld of onherroepelijk beloofd op activa van de onderneming** ...................................................................................................... | 9062 | |

**SCHULDEN MET BETREKKING TOT BELASTINGEN, BEZOLDIGINGEN EN SOCIALE LASTEN**

**Belastingen** *(post 450/3 van de passiva)*

| | Codes | Boekjaar |
|---|---|---|
| Vervallen belastingschulden ................................................................................................ | 9072 | |
| Niet-vervallen belastingschulden ......................................................................................... | 9073 | |
| Geraamde belastingschulden ............................................................................................... | 450 | |

**Bezoldigingen en sociale lasten** *(post 454/9 van de passiva)*

| | Codes | Boekjaar |
|---|---|---|
| Vervallen schulden ten aanzien van de Rijksdienst voor Sociale Zekerheid ......................... | 9076 | |
| Andere schulden met betrekking tot bezoldigingen en sociale lasten ..................................... | 9077 | 37.525 |

| Nr. | 0455.240.893 | | VOL 5.9 |
|---|---|---|---|

## OVERLOPENDE REKENINGEN

**Uitsplitsing van de post 492/3 van de passiva indien daaronder een belangrijk bedrag voorkomt.**

| | Boekjaer |
|---|---|
| intrest lening BSX | 272.594 |
| Auditkosten | 6.680 |
| erelonen accountant | 5.100 |
| neerlegging jaarrekening | 330 |
| Proximus | 170 |

| Nr. | 0455.240.893 | | VOL 5.10 |
| --- | --- | --- | --- |

# BEDRIJFSRESULTATEN

|  | Codes | Boekjaar | Vorig boekjaar |
| --- | --- | --- | --- |
| **BEDRIJFSOPBRENGSTEN** | | | |
| **Netto-omzet** | | | |
|    Uitsplitsing per bedrijfscategorie | | | |
|    Uitsplitsing per geografische markt | | | |
| **Andere bedrijfsopbrengsten** | | | |
|    Exploitatiesubsidies en vanwege de overheid ontvangen compenserende bedragen ................................................... | 740 | | |
| **BEDRIJFSKOSTEN** | | | |
| **Werknemers waarvoor de onderneming een DIMONA-verklaring heeft ingediend of die zijn ingeschreven in het algemeen personeelsregister** | | | |
|    Totaal aantal op de afsluitingsdatum ................................ | 9086 | 1 | 1 |
|    Gemiddeld personeelsbestand berekend in voltijdse equivalenten .................. | 9087 | 0,2 | 1,0 |
|    Aantal daadwerkelijk gepresteerde uren ................................ | 9088 | 502 | 1.839 |
| **Personeelskosten** | | | |
|    Bezoldigingen en rechtstreekse sociale voordelen ................................ | 620 | 80.030 | 194.346 |
|    Werkgeversbijdragen voor sociale verzekeringen ................................ | 621 | 54.903 | 48.384 |
|    Werkgeverspremies voor bovenwettelijke verzekeringen .......................... | 622 | 4.904 | 14.488 |
|    Andere personeelskosten ................................ | 623 | -13.893 | 1.615 |
|    Ouderdoms- en overlevingspensioenen ................................ | 624 | | |
| **Voorzieningen voor pensioenen en soortgelijke verplichtingen** | | | |
|    Toevoegingen (bestedingen en terugnemingen) .......................... (+)/(-) | 635 | | |
| **Waardeverminderingen** | | | |
|    Op voorraden en bestellingen in uitvoering | | | |
|       Geboekt ................................ | 9110 | | |
|       Teruggenomen ................................ | 9111 | | |
|    Op handelsvorderingen | | | |
|       Geboekt ................................ | 9112 | | |
|       Teruggenomen ................................ | 9113 | 633.214 | 1.364.433 |
| **Voorzieningen voor risico's en kosten** | | | |
|    Toevoegingen ................................ | 9115 | | |
|    Bestedingen en terugnemingen ................................ | 9116 | | |
| **Andere bedrijfskosten** | | | |
|    Bedrijfsbelastingen en -taksen ................................ | 640 | 853 | 853 |
|    Andere ................................ | 641/8 | 635.201 | 2.013 |
| **Uitzendkrachten en ter beschikking van de ondernemng gestelde personen** | | | |
|    Totaal aantal op de afsluitingsdatum ................................ | 9096 | | |
|    Gemiddeld aantal berekend in voltijdse equivalenten .......................... | 9097 | | |
|    Aantal daadwerkelijk gepresteerde uren ................................ | 9098 | | |
|    Kosten voor de onderneming ................................ | 617 | | |

| Nr. | 0455.240.893 | | VOL 5.11 |
| --- | --- | --- | --- |

## FINANCIËLE EN UITZONDERLIJKE RESULTATEN

| | Codes | Boekjaar | Vorig boekjaar |
| --- | --- | --- | --- |
| **FINANCIËLE RESULTATEN** | | | |
| **Andere financiële opbrengsten** | | | |
| Door de overheid toegekende subsidies, aangerekend op de resultatenrekening | | | |
| Kapitaalsubsidies ........................................................................... | 9125 | | |
| Interestsubsidies ........................................................................... | 9126 | | |
| Uitsplitsing van de overige financiële opbrengsten | | | |
| Interesten bankrekening | | 22.531 | 20.540 |
| Voordelige koersverschillen | | 443.438 | 38.633 |
| Overige intresten | | | 10.735 |
| **Afschrijvingen van kosten bij uitgifte van leningen en van disagio** .................... | 6501 | | |
| **Geactiveerde intercalaire interesten** ................................................... | 6503 | | |
| **Waardeverminderingen op vlottende activa** | | | |
| Geboekt ....................................................................................... | 6510 | | |
| Teruggenomen ............................................................................... | 6511 | | |
| **Andere financiële kosten** | | | |
| Bedrag van het disconto ten laste van de onderneming bij de verhandeling van vorderingen ............................................................................... | 653 | | |
| **Voorzieningen met financieel karakter** | | | |
| Toevoegingen ................................................................................ | 6560 | | |
| Bestedingen en terugnemingen ......................................................... | 6561 | | |
| **Uitsplitsing van de overige financiële kosten** | | | |
| BANKKOSTEN | | 2.456 | 3.136 |
| nadelinge koersverschillen | | 17.636 | |
| Nadelige betalingsverschillen | | 14.068 | |

| | Boekjaar |
| --- | --- |
| **UITZONDERLIJKE RESULTATEN** | |
| **Uitsplitsing van de andere uitzonderlijke opbrengsten** | |
| Verwijlintresten | 442 |
| Andere uitz opbrengsten | 86.668 |
| Recuperatie fiscale procedurekosten | 15.000 |
| **Uitsplitsing van de andere uitzonderlijke kosten** | |

| Nr. | 0455.240.893 | | VOL 5.12 |
| --- | --- | --- | --- |

## BELASTINGEN EN TAKSEN

### BELASTINGEN OP HET RESULTAAT

| | Codes | Boekjaar |
| --- | --- | --- |
| Belastingen op het resultaat van het boekjaar ................................................................. | 9134 | |
| Verschuldigde of betaalde belastingen en voorheffingen ..................... | 9135 | 2.326 |
| Geactiveerde overschotten van betaalde belastingen en voorheffingen ..................... | 9136 | 2.326 |
| Geraamde belastingsupplementen ................................... | 9137 | |
| Belastingen op het resultaat van vorige boekjaren ................................ | 9138 | |
| Verschuldigde of betaalde belastingsupplementen ................................ | 9139 | |
| Geraamde belastingsupplementen of belastingen waarvoor een voorziening werd gevormd .................. | 9140 | |
| **Belangrijkste oorzaken van de verschillen tussen de winst voor belastingen, zoals die blijkt uit de jaarrekening, en de geraamde belastbare winst** | | |

Invloed van de uitzonderlijke resultaten op de belastingen op het resultaat van het boekjaar

| | Codes | Boekjaar |
| --- | --- | --- |
| **Bronnen van belastinglatenties** | | |
| Actieve latenties ................................................................. | 9141 | 159.402.135 |
| Gecumuleerde fiscale verliezen die aftrekbaar zijn van latere belastbare winsten ............... | 9142 | 159.402.135 |
| Andere actieve latenties | | |
| Passieve latenties ................................................................. | 9144 | |
| Uitsplitsing van de passieve latenties | | |

| | Codes | Boekjaar | Vorig boekjaar |
| --- | --- | --- | --- |
| **BELASTINGEN OP DE TOEGEVOEGDE WAARDE EN BELASTINGEN TEN LASTE VAN DERDEN** | | | |
| In rekening gebrachte belasting op de toegevoegde waarde | | | |
| Aan de onderneming (aftrekbaar) ......................... | 9145 | 35.107 | 40.223 |
| Door de onderneming ................................ | 9146 | | |
| Ingehouden bedragen ten laste van derden als | | | |
| Bedrijfsvoorheffing ................................ | 9147 | 32.220 | 73.804 |
| Roerende voorheffing ................................ | 9148 | | |

| Nr. | 0455.240.893 | VOL 5.14 |
|---|---|---|

## BETREKKINGEN MET VERBONDEN ONDERNEMINGEN EN MET ONDERNEMINGEN WAARMEE EEN DEELNEMINGSVERHOUDING BESTAAT

| | Codes | Boekjaar | Vorig boekjaar |
|---|---|---|---|
| **VERBONDEN ONDERNEMINGEN** | | | |
| **Financiële vaste activa** ............................................... | (280/1) | 1.364.442 | 1.364.442 |
| Deelnemingen ................................................. | (280) | 1.364.442 | 1.364.442 |
| Achtergestelde vorderingen ................................ | 9271 | | |
| Andere vorderingen ......................................... | 9281 | | |
| **Vorderingen op verbonden ondernemingen** ............... | 9291 | | 58.025 |
| Op meer dan één jaar ...................................... | 9301 | | |
| Op hoogstens één jaar ..................................... | 9311 | | 58.025 |
| **Geldbeleggingen**.................................................. | 9321 | | |
| Aandelen ..................................................... | 9331 | | |
| Vorderingen .................................................. | 9341 | | |
| **Schulden**.......................................................... | 9351 | 5.133.624 | 4.732.104 |
| Op meer dan één jaar ...................................... | 9361 | | 3.244.127 |
| Op hoogstens één jaar ..................................... | 9371 | 5.133.624 | 1.487.977 |
| **Persoonlijke en zakelijke zekerheden** | | | |
| Door de onderneming gestelde of onherroepelijk beloofd als waarborg voor schulden of verplichtingen van verbonden ondernemingen ........................ | 9381 | | |
| Door verbonden ondernemingen gestelde of onherroepelijk beloofd als waarborg voor schulden of verplichtingen van de onderneming............ | 9391 | | |
| **Andere betekenisvolle financiële verplichtingen**................... | 9401 | | · |
| **Financiële resultaten** | | | |
| Opbrengsten uit financiële vaste activa ................. | 9421 | | |
| Opbrengsten uit vlottende activa ....................... | 9431 | | |
| Andere financiële opbrengsten .......................... | 9441 | | |
| Kosten van schulden ...................................... | 9461 | 119.704 | 109.476 |
| Andere financiële kosten ................................. | 9471 | | |
| **Realisatie van vaste activa** | | | |
| Verwezenlijkte meerwaarden .............................. | 9481 | | |
| Verwezenlijkte minderwaarden ........................... | 9491 | | |
| **ONDERNEMINGEN WAARMEE EEN DEELNEMINGSVERHOUDING BESTAAT** | | | |
| **Financiële vaste activa** ............................................... | (282/3) | | |
| Deelnemingen ................................................. | (282) | | |
| Achtergestelde vorderingen ................................ | 9272 | | |
| Andere vorderingen ......................................... | 9282 | | |
| **Vorderingen**........................................................ | 9292 | | |
| Op meer dan één jaar ...................................... | 9302 | | |
| Op hoogstens één jaar ..................................... | 9312 | | |
| **Schulden**.......................................................... | 9352 | | |
| Op meer dan één jaar ...................................... | 9362 | | |
| Op hoogstens één jaar ..................................... | 9372 | | |

| Nr. | 0455.240.893 | | VOL 5.14 |

## BETREKKINGEN MET VERBONDEN ONDERNEMINGEN EN MET ONDERNEMINGEN WAARMEE EEN DEELNEMINGSVERHOUDING BESTAAT

**TRANSACTIES MET VERBONDEN PARTIJEN BUITEN NORMALE MARKTVOORWAARDEN**

Vermelding van dergelijke transacties indien zij van enige betekenis zijn, met opgave van het bedrag van deze transacties, de aard van de betrekking met de verbonden partij, alsmede andere informatie over de transacties die nodig is voor het verkrijgen van inzicht in de financiële positie van de vennootschap:

Nihil

| Boekjaar |
| --- |
| |

| Nr. | 0455.240.893 | | VOL 5.15 |

## FINANCIËLE BETREKKINGEN MET

| | Codes | Boekjaar |
|---|---|---|

**BESTUURDERS EN ZAAKVOERDERS, NATUURLIJKE OF RECHTSPERSONEN DIE DE ONDERNEMING RECHTSTREEKS OF ONRECHTSTREEKS CONTROLEREN ZONDER VERBONDEN ONDERNEMINGEN TE ZIJN, OF ANDERE ONDERNEMINGEN DIE DOOR DEZE PERSONEN RECHTSTREEKS OF ONRECHTSTREEKS GECONTROLEERD WORDEN**

| | Codes | Boekjaar |
|---|---|---|
| Uitstaande vorderingen op deze personen | 9500 | |
| Voorwaarden betreffende de uitstaande vorderingen | | |
| Waarborgen toegestaan in hun voordeel | 9501 | |
| Voornaamste voorwaarden van de toegestane waarborgen | | |
| Andere betekenisvolle verplichtingen aangegaan in hun voordeel | 9502 | |
| Voornaamste voorwaarden van deze verplichtingen | | |
| Rechtstreekse en onrechtstreekse bezoldigingen en ten laste van de resultatenrekening toegekende pensioenen, voor zover deze vermelding niet uitsluitend of hoofdzakelijk betrekking heeft op de toestand van een enkel identificieerbaar persoon | | |
| Aan bestuurders en zaakvoerders .......................................................... | 9503 | |
| Aan oud-bestuurders en oud-zaakvoerders ................................................ | 9504 | |

| | Codes | Boekjaar |
|---|---|---|

## DE COMMISSARIS(SEN) EN DE PERSONEN MET WIE HIJ (ZIJ) VERBONDEN IS (ZIJN)

| | Codes | Boekjaar |
|---|---|---|
| Bezoldiging van de commissaris(sen) ...................................................... | 9505 | 7.978 |
| **Bezoldiging voor uitzonderlijke werkzaamheden of bijzondere opdrachten uitgevoerd binnen de vennootschap door de commissaris(sen)** | | |
| Andere controleopdrachten ................................................................... | 95061 | |
| Belastingadviesopdrachten ................................................................... | 95062 | |
| Andere opdrachten buiten de revisorale opdrachten ................................... | 95063 | 500 |
| **Bezoldiging voor uitzonderlijke werkzaamheden of bijzondere opdrachten uitgevoerd binnen de vennootschap door personen met wie de commissaris(sen) verbonden is (zijn)** | | |
| Andere controleopdrachten ................................................................... | 95081 | |
| Belastingadviesopdrachten ................................................................... | 95082 | |
| Andere opdrachten buiten de revisorale opdrachten ................................... | 95083 | |

Vermeldingen in toepassing van het artikel 133, paragraaf 6 van het Wetboek van vennootschappen

25/31

| Nr. | 0455.240.893 | | VOL 5.17.1 |

## VERKLARING BETREFFENDE DE GECONSOLIDEERDE JAARREKENING

**INLICHTINGEN TE VERSTREKKEN DOOR ELKE ONDERNEMING DIE ONDERWORDEN IS AAN DE BEPALINGEN VAN HET WETBOEK VAN VENNOOTSCHAPPEN INZAKE DE GECONSOLIDEERDE JAARREKENING**

~~De onderneming heeft een geconsolideerde jaarrekening en een geconsolideerd jaarverslag opgesteld en openbaar gemaakt*~~

**De onderneming heeft geen geconsolideerde jaarrekening en een geconsolideerd jaarverslag opgesteld, omdat zij daarvan vrijgesteld is om de volgende reden(en)***

De onderneming en haar dochterondernemingen overschrijden op geconsolideerde basis niet meer dan één van de in artikel 16 van het Wetboek van vennootschappen vermelde criteria*

~~De onderneming is zelf dochteronderneming van een moederonderneming die een geconsolideerde jaarrekening, waarin haar jaarrekening door consolidatie opgenomen is, opstelt en openbaar maakt*~~

In voorkomend geval, motivering dat aan alle voorwaarden tot vrijstelling, opgenomen in artikel 113, paragrafen 2 en 3 van het Wetboek van vennootschappen, is voldaan:

Naam, volledig adres van de zetel en, zo het een onderneming naar Belgisch recht betreft, het ondernemingsnummer van de moederonderneming die de geconsolideerde jaarrekening opstelt en openbaar maakt, op grond waarvan de vrijstelling is verleend:

**INLICHTINGEN DIE MOETEN WORDEN VERSTREKT DOOR DE ONDERNEMING INDIEN ZIJ DOCHTERONDERNEMING OF GEMEENSCHAPPELIJKE DOCHTERONDERNEMING IS**

Naam, volledig adres van de zetel en, zo het een onderneming naar Belgisch recht betreft, het ondernemingsnummer van de moederonderneming(en) en de aanduiding of deze moederonderneming(en) een geconsolideerde jaarrekening, waarin haar jaarrekening door consolidatie opgenomen is, opstelt (opstellen) en openbaar maakt (maken)**:

Indien de moederonderneming(en) (een) onderneming(en) naar buitenlands recht is (zijn), de plaats waar de hiervoor bedoelde geconsolideerde jaarrekening verkrijgbaar is**

---

* Schrappen wat niet van toepassing is.
** Wordt de jaarrekening van de onderneming op verschillende niveaus geconsolideerd, dan worden deze gegevens verstrekt, enerzijds voor het grootste geheel en anderzijds voor het kleinste geheel van ondernemingen waarvan de onderneming als dochter deel uitmaakt en waarvoor een geconsolideerde jaarrekening wordt opgesteld en openbaar gemaakt.

| Nr. | 0455.240.893 | | VOL 6 |
|---|---|---|---|

# SOCIALE BALANS

Nummers van de paritaire comités die voor de onderneming bevoegd zijn:

## STAAT VAN DE TEWERKGESTELDE PERSONEN
## WERKNEMERS WAARVOOR DE ONDERNEMING EEN DIMONA-VERKLARING HEEFT INGEDIEND OF DIE ZIJN INGESCHREVEN IN HET ALGEMEEN PERSONEELSREGISTER

| Tijdens het boekjaar en het vorige boekjaar | Codes | 1. Voltijds (boekjaar) | 2. Deeltijds (boekjaar) | 3. Totaal (T) of totaal in voltijdse equivalenten (VTE) (boekjaar) | 3P. Totaal (T) of totaal in voltijdse equivalenten (VTE) (vorig boekjaar) |
|---|---|---|---|---|---|
| Gemiddeld aantal werknemers .............. | 100 | 0,2 | | 0,2  (VTE) | 1,0  (VTE) |
| Aantal daadwerkelijke gepresteerde uren | 101 | 502 | | 502  (T) | 1.839  (T) |
| Personeelskosten ................................. | 102 | 125.944 | | 125.944  (T) | 258.833  (T) |
| Bedrag van de voordelen bovenop het loon ..................................................... | 103 | xxxxxxxxxxxxxxx | xxxxxxxxxxxxxx | (T) | (T) |

| Op de afsluitingsdatum van het boekjaar | Codes | 1. Voltijds | 2. Deeltijds | 3. Totaal in voltijdse equivalenten |
|---|---|---|---|---|
| Aantal werknemers  .............................................. | 105 | 1 | | 1,0 |
| Volgens de aard van de arbeidsovereenkomst | | | | |
| Overeenkomst voor een onbepaalde tijd ......................... | 110 | 1 | | 1,0 |
| Overeenkomst voor een bepaalde tijd ............................ | 111 | | | |
| Overeenkomst voor een duidelijk omschreven werk ........ | 112 | | | |
| Vervangingsovereenkomst ............................................ | 113 | | | |
| Volgens het geslacht en het studieniveau | | | | |
| Mannen ........................................................................ | 120 | 1 | | 1,0 |
| lager onderwijs ...................................................... | 1200 | | | |
| secundair onderwijs ............................................... | 1201 | | | |
| hoger niet-universitair onderwijs .............................. | 1202 | | | |
| universitair onderwijs ............................................. | 1203 | 1 | | 1,0 |
| Vrouwen ....................................................................... | 121 | | | |
| lager onderwijs ...................................................... | 1210 | | | |
| secundair onderwijs ............................................... | 1211 | | | |
| hoger niet-universitair onderwijs .............................. | 1212 | | | |
| universitair onderwijs ............................................. | 1213 | | | |
| Volgens de beroepscategorie | | | | |
| Directiepersoneel .......................................................... | 130 | | | |
| Bedienden ..................................................................... | 134 | 1 | | 1,0 |
| Arbeiders ...................................................................... | 132 | | | |
| Andere .......................................................................... | 133 | | | |

| Nr. | 0455.240.893 | | VOL 6 |
|-----|--------------|--|-------|

## UITZENDKRACHTEN EN TER BESCHIKKING VAN DE ONDERNEMING GESTELDE PERSONEN

| Tijdens het boekjaar | Codes | 1. Uitzendkrachten | 2. Ter beschikking van de onderneming gestelde personen |
|---|---|---|---|
| Gemiddeld aantal tewerkgestelde personen ......................................... | 150 | | |
| Aantal daadwerkelijk gepresteerde uren ............................................. | 151 | | |
| Kosten voor de onderneming ............................................................. | 152 | | |

## TABEL VAN HET PERSONEELSVERLOOP TIJDENS HET BOEKJAAR

| INGETREDEN | Codes | 1. Voltijds | 2. Deeltijds | 3. Totaal in voltijdse equivalenten |
|---|---|---|---|---|
| Aantal werknemers waarvoor de onderneming tijdens het boekjaar een DIMONA-verklaring heeft ingediend of tijdens het boekjaar werden ingeschreven in het algemeen personeelsregister ............................................. | 205 | | . | |
| Volgens de aard van de arbeidsovereenkomst | | | | |
| Overeenkomst voor een onbepaalde tijd .......................... | 210 | | | |
| Overeenkomst voor een bepaalde tijd ............................... | 211 | | | |
| Overeenkomst voor een duidelijk omschreven werk ......... | 212 | | | |
| Vervangingsovereenkomst ............................................. | 213 | | | |

| UITGETREDEN | Codes | 1. Voltijds | 2. Deeltijds | 3. Totaal in voltijdse equivalenten |
|---|---|---|---|---|
| Aantal werknemers met een DIMONA-verklaring aangegeven of een in het algemeen personeelsregister opgetekende datum waarop hun overeenkomst tijdens het boekjaar een einde nam ............................................. | 305 | | | |
| Volgens de aard van de arbeidsovereenkomst | | | | |
| Overeenkomst voor een onbepaalde tijd .......................... | 310 | | | |
| Overeenkomst voor een bepaalde tijd ............................... | 311 | | | |
| Overeenkomst voor een duidelijk omschreven werk ......... | 312 | | | |
| Vervangingsovereenkomst ............................................. | 313 | | | |
| Volgens de reden van beëindiging van de overeenkomst | | | | |
| Pensioen ............................................................. | 340 | | | |
| Brugpensioen ...................................................... | 341 | | | |
| Afdanking ............................................................ | 342 | | | |
| Andere reden ...................................................... | 343 | | | |
| Waarvan:  het aantal werknemers dat als zelfstandige ten minste op halftijdse basis diensten blijft verlenen aan de onderneming .................... | 350 | | | |

| Nr. | 0455.240.893 | | VOL 6 |

## INLICHTINGEN OVER DE OPLEIDING VOOR DE WERKNEMERS TIJDENS HET BOEKJAAR

| | Codes | Mannen | Codes | Vrouwen |
|---|---|---|---|---|
| **Totaal van de formele voortgezette beroepsopleidingsinitiatieven ten laste van de werkgever** | | | | |
| Aantal betrokken werknemers ........................................ | 5801 | | 5811 | |
| Aantal gevolgde opleidingsuren ...................................... | 5802 | | 5812 | |
| Nettokosten voor de onderneming ................................... | 5803 | | 5813 | |
| waarvan brutokosten rechtstreeks verbonden met de opleiding .......... | 58031 | | 58131 | |
| waarvan betaalde bijdragen en stortingen aan collectieve fondsen  .... | 58032 | | 58132 | |
| waarvan ontvangen tegemoetkomingen (in mindering).. .................... | 58033 | | 58133 | |
| **Totaal van de minder formele en informele voortgezette beroeps- opleidingsinitiatieven ten laste van de werkgever** | | | | |
| Aantal betrokken werknemers ........................................ | 5821 | | 5831 | |
| Aantal gevolgde opleidingsuren ...................................... | 5822 | | 5832 | |
| Nettokosten voor de onderneming ................................... | 5823 | | 5833 | |
| **Totaal van de initiële beroepsopleidingsinitiatieven ten laste van de werkgever** | | | | |
| Aantal betrokken werknemers ........................................ | 5841 | | 5851 | |
| Aantal gevolgde opleidingsuren ...................................... | 5842 | | 5852 | |
| Nettokosten voor de onderneming ................................... | 5843 | | 5853 | |

## WAARDERINGSREGELS

Samenvatting van de waarderingsregels

I. Beginsel

De waarderingsregels zijn opgesteld in lijn met de Internationale Boekhoudstandaarden, voor zover deze niet in strijd zijn met de bepalingen van het Belgisch Koninklijk Besluit van 30 januari 2001 tot uitvoering van het Wetboek van vennootschappen.

II. Bijzondere regels

Oprichtingskosten:
------------------
Worden onmiddellijk ten laste genomen van het resultaat van het boekjaar.

Immateriële vaste activa:
------------------------
De immateriële vaste activa die door derden werden ontwikkeld worden geboekt tegen aanschaffingprijs en afgeschreven over de verwachte levensduur, of gewaardeerd aan de geschatte marktwaarde indien lager. Afschrijvingen worden geboekt volgens de 'pro rata temporis' regeling, vanaf het moment dat de activa in productie worden genomen.
De afschrijvingen gebeuren lineair volgens volgende percentages:
- Licenties     33.33%
- Software  33.33%
De kosten in verband met immateriele vaste activa die door de vennootschap zelf of de met haar verbonden vennootschappen worden ontwikkeld, worden onmiddellijk ten laste genomen van het resultaat van het boekjaar waarin ze werden gemaakt.

Materiële vaste activa:
-----------------------
Materiële vaste activa worden ten laste genomen tegen kostprijs en afgeschreven over de verwachte levensduur, of gewaardeerd aan de geschatte marktwaarde indien lager.
Afschrijvingen worden geboekt volgens de 'pro rata temporis' regeling, vanaf het moment van aanschaf.
De afschrijvingen gebeuren lineair volgens volgende percentages:
- Kantoorbenodigdheden  25%
- Computers (hardware)  33.33%
- Kantoormeubels  20%
- Verbouwingswerken    33.33%

Financiële Vaste Activa:
-----------------------
Financiële Vaste Activa worden gewaardeerd tegen aanschaffingswaarde. Waardeverminderingen worden toegekend in geval van permanente dalingen van de waarde ten overstaanvan de boekwaarde, gejustifieerd door de financiële positie, winstgevendheid en vooruitzichten van de activiteiten van de dochteronderneming. Deze waardeverminderingen zullen worden tegengedraaid in het geval een permanente stijging in waarde wordt vastgesteld.

Handelsvorderingen:
------------------
Worden gewaardeerd aan nominale waarde. Provisies zullen worden aangelegd op een individuele basis in het geval een betaling, geheel of gedeeltelijk, wordt beschouwd als onzeker of twijfelachtig.

Liquide middelen:
----------------
Worden gewaardeerd aan nominale waarde.

Aandelenopties plan:
-------------------
De vennootschap beschikt over een stock option plan onder dewelke aandelenopties worden toegekend aan de leden van de Raad van Bestuur, alsook aan consultants en personeel in sleutelposities van de vennootschap.

Voorzieningen voor risico's en kosten:
-------------------------------------
Geïndividualiseerde voorzieningen zullen worden aangelegd teneinde duidelijk omschreven verliezen of kosten te dekken, die op balansdatum waarschijnlijk of zeker zijn, maar waarvan het bedrag niet volstaat. Rekening wordt gehouden met alle voorzienbare risico's, mogelijke verliezen en ontwaardingen, ontstaan tijdens het boekjaar of voorgaande boekjaren, zelfs indien slechts gekend tussen balansdatum en ogenblik waarop het bestuursorgaan de jaarrekening opstelt.

Schulden op meer dan één jaar of op minder dan één jaar:
-------------------------------------------------------
Worden gewaardeerd aan nominale waarde.

| Nr. | 0455.240.893 | | VOL 7 |

## WAARDERINGSREGELS

Wisselkoersverschillen:
-----------------------

Transacties uitgevoerd in vreemde munten (andere dan de EUR) worden omgerekend naar
de EUR tegen een maandelijkse vaste wisselkoers. Gerealiseerde wisselkoersverschillen
worden geboekt als inkomsten of kosten op het moment dat ze zich voordoen. Op jaareinde worden de monetaire activa & passiva
omgerekend op basis van de wisselkoers per 31/12.

Revenue Recognition:
--------------------

Inkomsten worden herkend over de periode dat de diensten werden uitgevoerd.

Hoewel de Raad besliste om de waarde van de immateriële vaste activa (en meer bepaald van het verhandelingsplatform) op 1,00 Euro
te zetten uit voorzichtigheidsoverwegingen, moet dit niet geïnterpreteerd worden als een reflectie van de eigenlijke waarde van de
immateriële activa van de vennootschap en haar verhandelingsplatform.

| 40 | | | | 1 | **EUR** | | |
|----|--|--|--|---|--------|--|--|
| Nr. | Date of the deposition | No. 0455.240.893 | PP. | E. | D. | | C 1.1 |

## ANNUAL ACCOUNTS IN EURO

NAME:  **EASDAQ**

Legal form:  **PLC**

Address: **LEI**                                                                                    Nr.:  **19 Box 11**

Postal Code:  **3000**                    City:  **Leuven**

Country:  **Belgium**

Register of Legal Persons (RLP) - Office of the commercial court at:   **Leuven**

Internet address *:

Company number:   **0455.240.893**

DATE    **28/11/2011**    of the deposition of the partnership deed OR of the most recent document mentioning the date of publication of the partnership deed and the act changing the articles of association.

---

ANNUAL ACCOUNTS approved by the General Meeting of     **28/06/2012**

concerning the financial year covering the period from     **1/01/2011**     till     **31/12/2011**

Previous period from     **1/01/2010**     till     **31/12/2010**

The amounts of the previous financial year  are  / ~~are not~~ ** identical to those which have been previously published.

---

COMPLETE LIST WITH name, first name, profession, residence-address (address, number, postal code, municipality) and position with the enterprise, OF DIRECTORS, MANAGERS AND AUDITORS

**ERNST & YOUNG BEDRIJFSREVISOREN    CALL    0446.334.711**

De Kleetlaan 2, 1831 Diegem, Belgium

Title : Auditor, Number of membership : B00160

Represented by:

   WEYMEERSCH Christel

   De Kleetlaan 2 , 1831 Diegem, Belgium

   Number of membership : A01705

**FISCHER Artur Klaus**

Jänickestrasse 121, 14167 Berlin, Germany

Title : Delegated director

Mandate : 7/08/2009- 25/06/2015

**PEETERS Josephus Bonifacius**

Beatrijslaan 29, 3110 Rotselaar, Belgium

Title : Director

Mandate : 22/06/2006- 28/06/2015

Enclosed to these annual accounts:

---

Total number of pages deposited:          29          Number of the pages of the standard form not deposited for not being
of service:   5.1, 5.2.1, 5.2.3, 5.2.4, 5.3.1, 5.3.3, 5.3.4, 5.3.5, 5.3.6, 5.4.2, 5.4.3, 5.5.2, 5.8, 5.13, 5.16, 5.17.2, 7, 8, 9

Signature                                                 Signature
(name and position)                                  (name and position)

---

*  Optional statement.
** Delete where appropriate.

| Nr. | 0455.240.893 | | C 1.1 |

LIST OF DIRECTORS, MANAGERS AND AUDITORS (continuation of the previous page)

**MANNION Martin**
N. Marshfield Ave. 3920, box 980, 60613 IL Chicago, United States of America
Title : Director
Mandate : 7/08/2009- 25/06/2015

**CASINA Matteo**
Tulse Hill 82, SW SW 2 PU London, United Kingdom
Title : Director
Mandate : 7/08/2009- 25/06/2015

**DEMOLIERE Serge Paul Ehrhard**
August-Viktoriastrasse 99 Berlin, Germany
Title : Director
Mandate : 7/08/2009- 25/06/2015

**KEE-MENG Tan**
Wolseley Road 25, N8 8RS London, United Kingdom
Title : Director
Mandate : 24/06/2010- 25/06/2015

**LEICHENKO Stuart**
3100 N Sheridan Road 5, box C, IL 6065 Chicago, United States of America
Title : Director
Mandate : 7/06/2010- 25/06/2015

**GRAHAM Jonathan**
Magnolia Ave 2612, box N, IL Chicago 60614-1214, United States of America
Title : Director
Mandate : 14/11/2011- 22/06/2017

**NAZARILI Jamil**
Blackburn 36, box PL, NJ Summit 07901-2324, United States of America
Title : Director
Mandate : 14/11/2011- 22/06/2017

**EuroTrading Commercial Limited**
Haverstone Valley Road 2, CR3 6HB CATERHAM, United Kingdom
Title : Director
Mandate : 14/11/2011- 26/06/2014
Represented by:
    Pouget Daniel
    Chateau de Bellefontaine  , 77940 FLAGY, France

| Nr. | 0455.240.893 | | C 1.1 |

LIST OF DIRECTORS, MANAGERS AND AUDITORS (continuation of the previous page)

**RANDALL Peter**
Bunyan Court 208, EC2Y8DH Barican, United Kingdom
Title : Director
Mandate : 14/11/2011- 22/06/2017

| Nr. | 0455.240.893 | C 1.2 |
|-----|--------------|-------|

## DECLARATION ABOUT SUPPLEMENTARY AUDITING OR ADJUSTMENT MISSION

The managing board declares that the assignment neither regarding auditing nor adjusting has been given to a person who was not authorised by law pursuant to art. 34 and 37 of the Law of 22nd April 1999 concerning the auditing and tax professions.

The annual accounts  ~~have/~~ have not * been audited or adjusted by an external accountant or auditor who is not a statutory auditor.

If YES, mention here after: name, first names, profession, residence-address of each external accountant or auditor, the number of membership with the professional Institute ad hoc and the nature of this engagement:

        A. Bookkeeping of the undertaking**,
        B. Preparing the annual accounts**,
        C. Auditing the annual accounts and/or
        D. Adjusting the annual accounts.

If the assignment mentioned either under A or B is performed by authorised accountants or authorised accountants-tax consultants, information will be given on: name, first names, profession and residence-address of each authorised accountant or accountant-tax consultant, his number of membership with the Professional Institute of Accountants and Tax consultants and the nature of this engagement.

| Name, first name, profession, residence-address | Number of membership | Nature of the engagement (A, B, C and/or D) |
|---|---|---|
| ACCOUNTING & TAX PARTNERS BVBA    0475.026.024<br>Industrieweg 4 , box 5, 3001 Heverlee, Belgium<br>Title : External accountant | 221955-N-01 | A B |

| Nr. | 0455.240.893 | | C 2.1 |
|-----|--------------|--|-------|

## BALANCE SHEET

| | Notes | Codes | Period | Previous period |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **FIXED ASSETS** ............................................... | | 20/28 | 1.364.442 | 1.415.691 |
| **Formation expenses** ................................. | 5.1 | 20 | | |
| **Intangible fixed assets** ........................... | 5.2 | 21 | | 51.249 |
| **Tangible fixed assets** .............................. | 5.3 | 22/27 | | |
| Land and buildings ................................. | | 22 | | |
| Plant, machinery and equipment ..................... | | 23 | | |
| Furniture and vehicles .............................. | | 24 | | |
| Leasing and other similar rights .................... | | 25 | | |
| Other tangible fixed assets ......................... | | 26 | | |
| Assets under construction and advance payments ...... | | 27 | | |
| **Financial fixed assets** ............................ | 5.4/ 5.5.1 | 28 | 1.364.442 | 1.364.442 |
| Affiliated enterprises ............................... | 5.14 | 280/1 | 1.364.442 | 1.364.442 |
| Participating interests .......................... | | 280 | 1.364.442 | 1.364.442 |
| Amounts receivable ............................... | | 281 | | |
| Other enterprises linked by participating interests ... | 5.14 | 282/3 | | |
| Participating interests .......................... | | 282 | | |
| Amounts receivable ............................... | | 283 | | |
| Other financial assets .............................. | | 284/8 | | |
| Shares ........................................... | | 284 | | |
| Amounts receivable and cash guarantees .......... | | 285/8 | | |
| **CURRENT ASSETS** ................................... | | 29/58 | 7.004.480 | 4.845.802 |
| **Amounts receivable after more than one year** ....... | | 29 | | |
| Trade debtors ....................................... | | 290 | | |
| Other amounts receivable ............................ | | 291 | | |
| **Stocks and contracts in progress** .................. | | 3 | | |
| Stocks .............................................. | | 30/36 | | |
| Raw materials and consumables ................... | | 30/31 | | |
| Work in progress ................................. | | 32 | | |
| Finished goods ................................... | | 33 | | |
| Goods purchased for resale ....................... | | 34 | | |
| Immovable property intended for sale ............. | | 35 | | |
| Advance payments ................................. | | 36 | | |
| Contracts in progress .............................. | | 37 | | |
| **Amounts receivable within one year** ................ | 5.5.1/ 5.6 | 40/41 | 255.826 | 926.322 |
| Trade debtors ....................................... | | 40 | 236.720 | 75.018 |
| Other amounts receivable ............................ | | 41 | 19.106 | 851.304 |
| **Current investments** ............................... | | 50/53 | 2.398.460 | |
| Own shares .......................................... | | 50 | | |
| Other investments and deposits ...................... | | 51/53 | 2.398.460 | |
| **Cash at bank and in hand** .......................... | | 54/58 | 4.224.578 | 3.869.999 |
| **Deferred charges and accrued income** ............... | 5.6 | 490/1 | 125.616 | 49.481 |
| **TOTAL ASSETS** ..................................... | | 20/58 | 8.368.922 | 6.261.493 |

| Nr. | 0455.240.893 | | | C 2.2 |

| EQUITY AND LIABILITIES | Notes | Codes | Period | Previous period |
|---|---|---|---|---|
| **EQUITY** | | 10/15 | 2.950.423 | 1.085.298 |
| **Capital** | 5.7 | 10 | 137.411.820 | 128.145.680 |
| Issued capital | | 100 | 137.411.820 | 133.145.680 |
| Uncalled capital | | 101 | | 5.000.000 |
| **Share premium account** | | 11 | | |
| **Revaluation surpluses** | | 12 | | |
| **Reserves** | | 13 | | |
| Legal reserve | | 130 | | |
| Reserves not available | | 131 | | |
| In respect of own shares held | | 1310 | | |
| Other | | 1311 | | |
| Untaxed reserves | | 132 | | |
| Available reserves | | 133 | | |
| **Accumulated profits (losses)** ...(+)/(-) | | 14 | -134.461.397 | -127.060.382 |
| **Investment grants** | | 15 | | |
| **Advance to associates on the sharing out of the assets** | | 19 | | |
| **PROVISIONS AND DEFERRED TAXES** | | 16 | | |
| Provisions for liabilities and charges | | 160/5 | | |
| Pensions and similar obligations | | 160 | | |
| Taxation | | 161 | | |
| Major repairs and maintenance | | 162 | | |
| Other liabilities and charges | 5.8 | 163/5 | | |
| **Deferred taxes** | | 168 | | |
| **AMOUNTS PAYABLE** | | 17/49 | 5.418.499 | 5.176.195 |
| **Amounts payable after more than one year** | 5.9 | 17 | | 3.244.127 |
| Financial debts | | 170/4 | | 3.244.127 |
| Subordinated loans | | 170 | | |
| Unsubordinated debentures | | 171 | | |
| Leasing and other similar obligations | | 172 | | |
| Credit institutions | | 173 | | |
| Other loans | | 174 | | 3.244.127 |
| Trade debts | | 175 | | |
| Suppliers | | 1750 | | |
| Bills of exchange payable | | 1751 | | |
| Advances received on contracts in progress | | 176 | | |
| Other amounts payable | | 178/9 | | |
| **Amounts payable within one year** | | 42/48 | 5.133.624 | 1.767.722 |
| Current portion of amounts payable after more than one year falling due within one year | 5.9 | 42 | 3.244.127 | |
| Financial debts | | 43 | | |
| Credit institutions | | 430/8 | | |
| Other loans | | 439 | | |
| Trade debts | | 44 | 1.209.746 | 1.662.958 |
| Suppliers | | 440/4 | 1.209.746 | 1.662.958 |
| Bills of exchange payable | | 441 | | |
| Advances received on contracts in progress | | 46 | | |
| Taxes, remuneration and social security | 5.9 | 45 | 37.525 | 31.110 |
| Taxes | | 450/3 | | 355 |
| Remuneration and social security | | 454/9 | 37.525 | 30.755 |
| Other amounts payable | | 47/48 | 642.226 | 73.654 |
| **Accrued charges and deferred income** | 5.9 | 492/3 | 284.875 | 164.346 |
| **TOTAL LIABILITIES** | | 10/49 | 8.368.922 | 6.261.493 |

**6/29**

| Nr. | 0455.240.893 | | C 3 |
|-----|--------------|---|-----|

## INCOME STATEMENT

| | Notes | Codes | Period | Previous period |
|---|---|---|---|---|
| **Operating income** ................................................ | 5.10 | 70/74 | 1.251.605 | 50.604 |
| Turnover ................................................................ | | 70 | 1.243.708 | 27.030 |
| Increase (decrease) in stocks of finished goods, work and contracts in progress ..........(+)/(-) | | 71 | | |
| Own construction capitalised ............................... | | 72 | | |
| Other operating income .................................... | | 74 | 7.897 | 23.574 |
| **Operating charges** ............................................... | | 60/64 | 9.066.835 | 8.046.707 |
| Raw materials, consumables .............................. | | 60 | | |
| Purchases .................................................... | | 600/8 | | |
| Decrease (increase) in stocks ............................(+)/(-) | | 609 | | |
| Services and other goods ................................... | | 61 | 8.886.802 | 8.944.128 |
| Remuneration, social security costs and pensions ....(+)/(-) | 5.10 | 62 | 125.944 | 258.833 |
| Depreciation of and amounts written off formation expenses, intangible and tangible fixed assets .................. | | 630 | 51.249 | 205.313 |
| Amounts written down stocks, contracts in progress and trade debtors - Appropriations (write-backs) .............(+)/(-) | 5.10 | 631/4 | -633.214 | -1.364.433 |
| Provisions for risks and charges - Appropriations (uses and write-backs) .........................................(+)/(-) | 5.10 | 635/7 | | |
| Other operating charges .................................... | 5.10 | 640/8 | 636.054 | 2.866 |
| Operation charges carried to assets as restructuring costs ......................................................... (-) | | 649 | | |
| **Operating profit (loss)** ..........................................(+)/(-) | | 9901 | -7.815.230 | -7.996.103 |
| **Financial income** ................................................. | | 75 | 465.969 | 72.588 |
| Income from financial fixed assets .................... | | 750 | | |
| Income from current assets ............................. | | 751 | | 2.680 |
| Other financial income .................................... | 5.11 | 752/9 | 465.969 | 69.908 |
| **Financial charges** ............................................... | 5.11 | 65 | 153.864 | 112.764 |
| Debt charges ................................................ | | 650 | 119.704 | 109.628 |
| Amounts written down on current assets except stocks, contracts in progress and trade debtors ..........................................(+)/(-) | | 651 | | |
| Other financial charges .................................... | | 652/9 | 34.160 | 3.136 |
| **Gain (loss) on ordinary activities before taxes** ........ (+)/(-) | | 9902 | -7.503.125 | -8.036.279 |

7/29

| Nr. | 0455.240.893 | | | C 3 |
|-----|-------------|--|--|-----|

| | Codes | Period | Previous period |
|---|-------|--------|-----------------|
| **Extraordinary income** ............................................... | 76 | 102.110 | 1.141 |
| Write-back of depreciation and of amounts written down intangible and tangible fixed assets ................................. | 760 | | |
| Write-back of amounts written down financial fixed assets . | 761 | | 9 |
| Write-back of provisions for extraordinary liabilities and charges ............................................................ | 762 | | |
| Gains on disposal of fixed assets ................................... | 763 | | |
| Other extraordinary income ........................................... | 764/9 | 102.110 | 1.132 |
| **Extraordinary charges** ............................................. | 66 | | |
| Extraordinary depreciation of and extraordinary amounts written off formation expenses, intangible and tangible fixed assets ............................................................ | 660 | | |
| Amounts written down financial fixed assets .................... | 661 | | |
| Provisions for extraordinary liabilities and charges - Appropriations (uses) ...............................................(+)/(-) | 662 | | |
| Loss on disposal of fixed assets ..................................... | 663 | | |
| Other extraordinary charges ............................... 5.11 | 664/8 | | |
| Extraordinary charges carried to assets as restructuring costs .................................................................(-) | 669 | | |
| **Profit (loss) for the period before taxes** ......................(+)/(-) | 9903 | -7.401.015 | -8.035.138 |
| **Transfer from postponed taxes** ............................................ | 780 | | |
| **Transfer to postponed taxes** ................................................ | 680 | | |
| **Income taxes** .......................................................... 5.12 | 67/77 | | |
| Income taxes ............................................................ | 670/3 | | |
| Adjustment of income taxes and write-back of tax provisions ............................................................ | 77 | | |
| **Profit (loss) for the period** ...............................................(+)/(-) | 9904 | -7.401.015 | -8.035.138 |
| **Transfer from untaxed reserves** .......................................... | 789 | | |
| **Transfer to untaxed reserves** ............................................ | 689 | | |
| **Profit (loss) for the period available for appropriation** (+)/(-) | 9905 | -7.401.015 | -8.035.138 |

| Nr. | 0455.240.893 |

C 4

## APPROPRIATION ACCOUNT

| | Codes | Period | Previous period |
|---|---|---|---|
| **Profit (loss) to be appropriated** .................................................(+)/(-) | 9906 | -134.461.397 | -127.060.382 |
| Gain (loss) to be appropriated  ............................................(+)/(-) | (9905) | -7.401.015 | -8.035.138 |
| Profit (loss) to be carried forward  .....................................(+)/(-) | 14P | -127.060.382 | -119.025.244 |
| **Transfers from capital and reserves** .......................................... | 791/2 | | |
| from capital and share premium account  ............................... | 791 | | |
| from reserves  ............................................................ | 792 | | |
| **Transfers to capital and reserves** ............................................ | 691/2 | | |
| to capital and share premium account ................................... | 691 | | |
| to the legal reserve .......................................................... | 6920 | | |
| to other reserves ............................................................. | 6921 | | |
| **Profit (loss) to be carried forward** .......................................(+)/(-) | (14) | -134.461.397 | -127.060.382 |
| **Owner's contribution in respect of losses**  ............................. | 794 | | |
| **Profit to be distributed**  ...................................................... | 694/6 | | |
| Dividends .......................................................................... | 694 | | |
| Director's or manager's entitlements ....................................... | 695 | | |
| Other beneficiaries .............................................................. | 696 | | |

| Nr. | 0455.240.893 | | C 5.2.2 |

**CONCESSIONS, PATENTS, LICENCES, KNOWHOW, BRANDS AND SIMILAR RIGHTS**

| | Codes | Period | Previous period |
|---|---|---|---|
| Acquisition value at the end of the period ............................................ | 8052P | xxxxxxxxxxxxxxx | 34.995.646 |
| Movements during the period | | | |
| Acquisitions, including produced fixed assets ...................................... | 8022 | | |
| Sales and disposals ............................................................................ | 8032 | | |
| Transfers from one heading to another ...................................... (+)/(-) | 8042 | | |
| Acquisition value at the end of the period ............................................ | 8052 | 34.995.646 | |
| Depreciation and amounts written down at the end of the period ....... | 8122P | xxxxxxxxxxxxxxx | 34.944.397 |
| Movements during the period | | | |
| Recorded ............................................................................................. | 8072 | 51.249 | |
| Written back ........................................................................................ | 8082 | | |
| Acquisitions from third parties ............................................................ | 8092 | | |
| Cancelled owing to sales and disposals .............................................. | 8102 | | |
| Transfers from one heading to another ...................................... (+)/(-) | 8112 | | |
| Depreciation and amounts written down at the end of the period ......... | 8122 | 34.995.646 | |
| NET BOOK VALUE AT THE END OF THE PERIOD ................................. | 211 | | |

| Nr. | 0455.240.893 | | C 5.3.2 |

## PLANT, MACHINERY AND EQUIPMENT

| | Codes | Period | Previous period |
|---|---|---|---|
| Acquisition value at the end of the period ............................................ | 8192P | xxxxxxxxxxxxxxx | 6.045 |
| **Movements during the period** | | | |
| Acquisitions, including produced fixed assets ........................................ | 8162 | | |
| Sales and disposals ................................................................ | 8172 | | |
| Transfers from one heading to another ........................................ (+)/(-) | 8182 | | |
| Acquisition value at the end of the period ............................................ | 8192 | 6.045 | |
| Revaluation surpluses at the end of the period ................................... | 8252P | xxxxxxxxxxxxxxx | |
| **Movements during the period** | | | |
| Recorded ................................................................................ | 8212 | | |
| Acquisitions from third parties ................................................ | 8222 | | |
| Cancelled ............................................................................. | 8232 | | |
| Transfers from one heading to another ........................................(+)/(-) | 8242 | | |
| Revaluation surpluses at the end of the period ................................... | 8252 | | |
| Depreciation and amounts written down at the end of the period ....... | 8322P | xxxxxxxxxxxxxxx | 6.045 |
| **Movements during the period** | | | |
| Recorded ................................................................................ | 8272 | | |
| Written back ......................................................................... | 8282 | | |
| Acquisitions from third parties ................................................ | 8292 | | |
| Cancelled owing to sales and disposals ................................................ | 8302 | | |
| Transfers from one heading to another ........................................(+)/(-) | 8312 | | |
| Depreciation and amounts written down at the end of the period ....... | 8322 | 6.045 | |
| NET BOOK VALUE AT THE END OF THE PERIOD ................................... | (23) | | |

| Nr. | 0455.240.893 | | C 5.4.1 |

## STATEMENT OF FINANCIAL FIXED ASSETS

| | Codes | Period | Previous period |
|---|---|---|---|
| **AFFILIATED ENTERPRISES - PARTICIPATING INTERESTS AND SHARES** | | | |
| **Acquisition value at the end of the period** ............................................. | 8391P | xxxxxxxxxxxxxx | 1.364.442 |
| **Movements during the period** | | | |
| Acquisitions, including produced fixed assets ........................................ | 8361 | | |
| Sales and disposals ................................................................. | 8371 | | |
| Transfers from one heading to another ........................................ (+)/(-) | 8381 | | |
| **Acquisition value at the end of the period** ............................................. | 8391 | 1.364.442 | |
| **Revaluation surpluses at the end of the period** ...................................... | 8451P | xxxxxxxxxxxxxx | |
| **Movements during the period** | | | |
| Recorded ............................................................................. | 8411 | | |
| Acquisitions from third parties ...................................................... | 8421 | | |
| Cancelled ............................................................................ | 8431 | | |
| Transfers from one heading to another .........................................(+)/(-) | 8441 | | |
| **Revaluation surpluses at the end of the period** ...................................... | 8451 | | |
| **Amounts written down at the end of the period** ...................................... | 8521P | xxxxxxxxxxxxxx | |
| **Movements during the period** | | | |
| Recorded ............................................................................. | 8471 | | |
| Written back ......................................................................... | 8481 | | |
| Acquisitions from third parties ...................................................... | 8491 | | |
| Cancelled owing to sales and disposals ............................................. | 8501 | | |
| Transfers from one heading to another .........................................(+)/(-) | 8511 | | |
| **Amounts written down at the end of the period** ...................................... | 8521 | | |
| **Uncalled amounts at the end of the period** .......................................... | 8551P | xxxxxxxxxxxxxx | |
| **Movements during the period** .........................................(+)/(-) | 8541 | | |
| **Uncalled amounts at the end of the period** .......................................... | 8551 | | |
| **NET BOOK VALUE AT THE END OF THE PERIOD** .................................... | (280) | 1.364.442 | |
| **AFFILIATED ENTERPRISES - AMOUNTS RECEIVABLE** | | | |
| **NET BOOK VALUE AT THE END OF THE PERIOD** .................................... | 281P | xxxxxxxxxxxxxx | |
| **Movements during the period** | | | |
| Additions ............................................................................ | 8581 | | |
| Repayments ......................................................................... | 8591 | | |
| Amounts written down ............................................................... | 8601 | | |
| Amounts written back ............................................................... | 8611 | | |
| Exchange differences .........................................................(+)/(-) | 8621 | | |
| Other ..........................................................................(+)/(-) | 8631 | | |
| **NET BOOK VALUE AT THE END OF THE PERIOD** .................................... | (281) | | |
| **ACCUMULATED AMOUNTS WRITTEN OFF ON AMOUNTS RECEIVABLE AT THE END OF THE PERIOD** ........................................... | 8651 | | |

| Nr. | 0455.240.893 | | C 5.5.1 |
|---|---|---|---|

## INFORMATION RELATING TO THE SHARE IN THE CAPITAL

### SHARE IN THE CAPITAL AND OTHER RIGHTS IN OTHER COMPANIES

List of both enterprises in wich the enterprise holds a participating interest (recorded in the heading 28 of assets)
and other enterprises in which the enterprise holds rights (recorded in the headings 28 and 50/53 of assets)
in the amount of at least 10% of the capital issued.

| NAME, full address of the REGISTERED OFFICE and for the enterprise governed by Belgian law, the COMPANY NUMBER | Shares held by | | | Information from the most recent period for which annual accounts are available | | | |
|---|---|---|---|---|---|---|---|
| | directly | | subsi-diaries | Primary financial statement | Mone-tary unit | Capital and reserves | Net result |
| | Number | % | % | | | (+) or (-) *(in monetary units)* | |
| EQUIDUCT SYSTEMS LTD FC<br>St Mary Axe 70<br>EC3A8BE London<br>United Kingdom | | | | 31/12/2011 | GBP | 1.945.910 | 858.897 |
| | 1 | 100,00 | 0,00 | | | | |

| Nr. | 0455.240.893 | | C 5.6 |

**OTHER INVESTMENTS AND DEPOSIT, DEFFERED CHARGES AND ACCRUED INCOME (ASSETS)**

| | Codes | Period | Previous period |
|---|---|---|---|
| **INVESTMENTS: OTHER INVESTMENTS AND DEPOSITS** | | | |
| **Shares** .................................................................. | 51 | | |
| Book value increased with the uncalled amount ..................... | 8681 | | |
| Uncalled amount ......................................................... | 8682 | | |
| **Fixed income securities** ............................................... | 52 | | |
| Fixed income securities issued by credit institutions .............. | 8684 | | |
| **Fixed term deposit with credit institutions** ...................... | 53 | 2.398.460 | |
| Falling due | | | |
| less or up to one month ............................................... | 8686 | 599.615 | |
| between one month and one year ................................... | 8687 | 1.798.845 | |
| over one year ........................................................... | 8688 | | |
| **Other investments not yet shown seperately** ..................... | 8689 | | |

**DEFFERED CHARGES AND ACCRUED INCOME**

Allocation of heading 490/1 of assets if the amount is significant.

| Period |
|---|
| 83.116 |
| 1.110 |
| 887 |
| 38 |
| 22.740 |
| 1.608 |
| 96 |
| 14.355 |
| 1.667 |

| Nr. | 0455.240.893 | | C. 5.7 |
|-----|--------------|--|--------|

## STATEMENT OF CAPITAL AND STRUCTURE OF SHAREHOLDINGS

### STATEMENT OF CAPITAL

#### Social capital

| | Codes | Period | Previous period |
|--|-------|--------|-----------------|
| Issued capital at the end of the period .................................................... | 100P | XXXXXXXXXXXXX | 133.145.680 |
| Issued capital at the end of the period .................................................... | (100) | 137.411.820 | |

| | Codes | Amounts | Number of shares |
|--|-------|---------|------------------|
| Changes during the period: | | 4.192.486 | 6.024.214 |
| | | 73.654 | 105.834 |
| Structure of the capital | | | |
| Different categories of shares | | | |
| SHARES WITHOUT NOMINAL VALUE | | 137.411.820 | 64.830.944 |
| Registered shares............................................................................ | 8702 | XXXXXXXXXXXXX | 64.830.944 |
| Bearer shares and/or dematerialized shares....................................... | 8703 | XXXXXXXXXXXXX | |

| | Codes | Uncalled capital | Capital called, but not paid |
|--|-------|------------------|------------------------------|
| **Capital not paid** | | | |
| Uncalled capital ............................................................... | (101) | | XXXXXXXXXXXXX |
| Capital called, but not paid ............................................. | 8712 | XXXXXXXXXXXXX | |
| Shareholders having yet to pay up in full | | | |

| | Codes | Period |
|--|-------|--------|
| **OWN SHARES** | | |
| Held by the company itself | | |
| Amount of capital held    ............................................................ | 8721 | |
| Number of shares held    ............................................................ | 8722 | |
| Held by the subsidiaries | | |
| Amount of capital held    ............................................................ | 8731 | |
| Number of shares held    ............................................................ | 8732 | |
| **Commitments to issue shares** | | |
| Following the exercising of CONVERSION RIGHTS | | |
| Amount of outstanding convertible loans    ............................................ | 8740 | |
| Amount of capital to be subscribed    ................................................... | 8741 | |
| Corresponding maximum number of shares to be issued    ......................... | 8742 | |
| Following the exercising of SUBSCRIPTION RIGHTS | | |
| Number of outstanding subscription rights    ......................................... | 8745 | 1.541.247 |
| Amount of capital to be subscribed    ................................................... | 8746 | 926.392 |
| Corresponding maximum number of shares to be issued    ......................... | 8747 | 2.104.769 |
| **Authorized capital, not issued**    ............................................................ | 8751 | |

| Nr. | 0455.240.893 | | C. 5.7 |
|-----|--------------|--|--------|

## STATEMENT OF CAPITAL AND STRUCTURE OF SHAREHOLDINGS

|  | Codes | Period |
|--|-------|--------|
| **Shared issued, not representing capital** | | |
| Distribution | | |
| Number of shares held ................................................................................................ | 8761 | |
| Number of voting rights attached thereto ................................................................... | 8762 | |
| Allocation by shareholder | | |
| Number of shares held by the company itself ............................................................ | 8771 | |
| Number of shares held by its subsidairies ................................................................. | 8781 | |

**STRUCTURE OF SHAREHOLDINGS OF THE ENTERPRISE AS AT THE ANNUAL BALANCING OF THE BOOKS, AS IT APPEARS FROM THE STATEMENT RECEIVED BY THE ENTERPRISE**

Citadel Tactical Inv. LLC: 61,70%
Börse Berlin AG: 9,13%
Knight Capital Group: 23,22%
Remaining shareholders: 5,96%

| Nr. | 0455.240.893 | | C 5.9 |

## STATEMENT OF AMOUNTS PAYABLE, ACCRUED CHARGES AND DEFERRED INCOME

**ANALYSIS BY CURRENT PORTIONS OF AMOUNTS INITIALLY PAYABLE AFTER MORE THAN ONE YEAR**

| | Codes | Period |
|---|---|---|
| **Amounts payable after more than one year, not more than one year** | | |
| Financial debts | 8801 | 3.244.127 |
| Subordinated loans | 8811 | |
| Unsubordinated debentures | 8821 | |
| Leasing and other similar obligations | 8831 | |
| Credit institutions | 8841 | |
| Other loans | 8851 | 3.244.127 |
| Trade debts | 8861 | |
| Suppliers | 8871 | |
| Bills of exchange payable | 8881 | |
| Advance payments received on contracts in progress | 8891 | |
| Other amounts payable | 8901 | |
| **Total amounts payable after more than one year, not more than one year** | (42) | 3.244.127 |
| **Amounts payable after more than one year, between one and five years** | | |
| Financial debts | 8802 | |
| Subordinated loans | 8812 | |
| Unsubordinated debentures | 8822 | |
| Leasing and other similar obligations | 8832 | |
| Credit institutions | 8842 | |
| Other loans | 8852 | |
| Trade debts | 8862 | |
| Suppliers | 8872 | |
| Bills of exchange payable | 8882 | |
| Advance payments received on contracts in progress | 8892 | |
| Other amounts payable | 8902 | |
| **Total amounts payable after more than one year, between one and five years** | 8912 | |
| **Amounts payable after more than one year, over five years** | | |
| Financial debts | 8803 | |
| Subordinated loans | 8813 | |
| Unsubordinated debentures | 8823 | |
| Leasing and other similar obligations | 8833 | |
| Credit institutions | 8843 | |
| Other loans | 8853 | |
| Trade debts | 8863 | |
| Suppliers | 8873 | |
| Bills of exchange payable | 8883 | |
| Advance payments received on contracts in progress | 8893 | |
| Other amounts payable | 8903 | |
| **Total amounts payable after more than one year, over five years** | 8913 | |

| Nr. | 0455.240.893 | | C 5.9 |
|-----|--------------|---|-------|

**AMOUNTS PAYABLE GUARANTEED** *(headings 17 and 42/48 of liabilities)*

| | Codes | Period |
|---|---|---|
| **Amounts payable guaranteed by Belgian public authorities** | | |
| Financial debts .................................................................. | 8921 | |
| Subordinated loans .......................................................... | 8931 | |
| Unsubordinated debentures ............................................. | 8941 | |
| Leasing and other similar obligations ............................. | 8951 | |
| Credit institutions ........................................................... | 8961 | |
| Other loans .................................................................... | 8971 | |
| Trade debts ....................................................................... | 8981 | |
| Suppliers ........................................................................ | 8991 | |
| Bills of exchange payable .............................................. | 9001 | |
| Advance payments received on contracts in progress .......... | 9011 | |
| Remuneration and social security ....................................... | 9021 | |
| Other amounts payable ....................................................... | 9051 | |
| **Total amounts payable guaranteed by Belgian public authorities** ......... | 9061 | |
| **Amounts payable guaranteed by real guarantees given or irrevocably promised by the enterprise on its own assets** | | |
| Financial debts .................................................................. | 8922 | |
| Subordinated loans .......................................................... | 8932 | |
| Unsubordinated debentures ............................................. | 8942 | |
| Leasing and other similar obligations ............................. | 8952 | |
| Credit institutions ........................................................... | 8962 | |
| Other loans .................................................................... | 8972 | |
| Trade debts ....................................................................... | 8982 | |
| Suppliers ........................................................................ | 8992 | |
| Bills of exchange payable .............................................. | 9002 | |
| Advance payments received on contracts in progress .......... | 9012 | |
| Taxes, remuneration and social security ............................. | 9022 | |
| Taxes .............................................................................. | 9032 | |
| Remuneration and social security .................................. | 9042 | |
| Other amounts payable ....................................................... | 9052 | |
| **Total amounts payable guaranteed by real guarantees given or irrevocably promised by the enterprise on its own assets** ......... | 9062 | |
| **AMOUNTS PAYABLE FOR TAXES, REMUNERATION AND SOCIAL SECURITY** | | |
| **Taxes** *(heading 450/3 of the liabilities)* | | |
| Expired  taxes payable .................................................... | 9072 | |
| Non expired taxes payable .............................................. | 9073 | |
| Estimated taxes payable ................................................. | 450 | |
| **Remuneration and social security** *(heading 454/9 of the liabilities)* | | |
| Amount due to the National Office of Social Security ......... | 9076 | |
| Other amounts payable relating to remuneration and social security ......... | 9077 | 37.525 |

| Nr. | 0455.240.893 | | C 5.9 |
|-----|--------------|---|-------|

| | Period |
|---|---|

**ACCRUED CHARGES AND DEFERRED INCOME**

**Allocation of the heading 492/3 of liabilities if the amount is considerable**

| | Period |
|---|---|
| | 272.594 |
| | 6.680 |
| | 5.100 |
| | 330 |
| | 170 |

| Nr. | 0455.240.893 | | | C 5.10 |

## OPERATING RESULTS

|  | Codes | Period | Previous period |
|---|---|---|---|
| **OPERATING INCOME** | | | |
| **Net turnover** | | | |
| Broken down by categories of activity | | | |
| Allocation into geographical markets | | | |
| **Other operating income** | | | |
| Total amount of subsidies and compensatory amounts obtained from public authorities ................................................................................ | 740 | | |
| **OPERATING COSTS** | | | |
| **Employees for whom the company has submitted a DIMONA declaration or are recorded in the general personnel register** | | | |
| Total number at the closing date ........................................ | 9086 | 1 | 1 |
| Average number of employees calculated in full-time equivalents ........................ | 9087 | 0,2 | 1,0 |
| Number of actual worked hours ........................................ | 9088 | 502 | 1.839 |
| **Personnel costs** | | | |
| Remuneration and direct social benefits ................................ | 620 | 80.030 | 194.346 |
| Employers' social security contributions ................................ | 621 | 54.903 | 48.384 |
| Employers' premiums for extra statutory insurances ........................ | 622 | 4.904 | 14.488 |
| Other personnel costs ................................................ | 623 | -13.893 | 1.615 |
| Old-age and widows' pensions ........................................ | 624 | | |
| **Provisions for pensions** | | | |
| Additions (uses and write-back) ............................... (+)/(-) | 635 | | |
| **Amounts written off** | | | |
| Stocks and contracts in progress | | | |
| Recorded ................................................ | 9110 | | |
| Written back ................................................ | 9111 | | |
| Trade debtors | | | |
| Recorded ................................................ | 9112 | | |
| Written back ................................................ | 9113 | 633.214 | 1.364.433 |
| **Provisions for risks and charges** | | | |
| Additions ................................................ | 9115 | | |
| Uses and write-back ........................................ | 9116 | | |
| **Other operating charges** | | | |
| Taxes related to operation ........................................ | 640 | 853 | 853 |
| Other charges ................................................ | 641/8 | 635.201 | 2.013 |
| **Hired temporary staff and persons placed at the enterprise's disposal** | | | |
| Total number at the closing date ........................................ | 9096 | | |
| Average number calculated as full-time equivalents ........................ | 9097 | | |
| Number of actual worked hours ........................................ | 9098 | | |
| Charges to the enterprise ........................................ | 617 | | |

| Nr. | 0455.240.893 | | C 5.11 |

## FINANCIAL AND EXTRAORDINARY RESULTS

### FINANCIAL RESULTS

| | Codes | Period | Previous period |
|---|---|---|---|
| **Other financial income** | | | |
| Amount of subsidies granted by public authorities, credited to income for the period | | | |
| Capital subsidies ............................................................................... | 9125 | | |
| Interest subsidies ............................................................................... | 9126 | | |
| Allocation of other financial income | | | |
| Interest bank account | | 22.531 | 20.540 |
| Favorable exchange rate differences | | 443.438 | 38.633 |
| Other interests | | | 10.735 |
| **Amounts written down off loan issue expenses and repayment premiums** ....... | 6501 | | |
| **Intercalary interests recorded as assets** ........................................... | 6503 | | |
| **Value adjustments to current assets** | | | |
| Appropriations ................................................................................... | 6510 | | |
| Write-backs ....................................................................................... | 6511 | | |
| **Other financial charges** | | | |
| Amount of the discount borne by the enterprise, as a result of negotiating amounts receivable | 653 | | |
| **Provisions of a financial nature** | | | |
| Appropriations ................................................................................... | 6560 | | |
| Uses and write-backs ......................................................................... | 6561 | | |
| **Allocation of other financial charges** | | | |
| Bank costs | | 2.456 | 3.136 |
| | | 17.636 | |
| | | 14.068 | |

### EXTRAORDINARY RESULTS

| | Period |
|---|---|
| **Allocation other extraordinary income** | |
| | 442 |
| | 86.668 |
| | 15.000 |
| **Allocation other extraordinary charges** | |

| Nr. | 0455.240.893 | | C 5.12 |
|-----|--------------|---|--------|

## INCOME TAXES AND OTHER TAXES

**INCOME TAXE**

| | Codes | Period |
|---|---|---|
| Income taxes on the result of the current period | 9134 | |
| Income taxes paid and withholding taxes due or paid ............................... | 9135 | 2.326 |
| Excess of income tax prepayments and withholding taxes recorded under assets .................... | 9136 | 2.326 |
| Estimated additional taxes ............................... | 9137 | |
| Income taxes on previous periods | 9138 | |
| Taxes and withholding taxes due or paid ............................... | 9139 | |
| Estimated additional taxes estimated or provided for ............................... | 9140 | |

**In so far as income taxes of the current period are materially affected by differences between the profit before taxes, as stated in the annual accounts, and the estimated taxable profit**

**An indication of the effect of extraordinary results on the amount of income taxes relating to the current period**

| | Codes | Period |
|---|---|---|
| Status of deferred taxes | | |
| Deferred taxes representing assets ............................... | 9141 | 159.402.135 |
| Accumulated tax losses deductible from future taxable profits ............................... | 9142 | 159.402.135 |
| Other deferred taxes representing assets | | |
| Deferred taxes representing liabilities ............................... | 9144 | |
| Allocation of deferred taxes representing liabilities | | |

| | Codes | Period | Previous Period |
|---|---|---|---|
| THE TOTAL AMOUNT OF VALUE ADDED TAX AND TAXES BORNE BY THIRD PARTIES | | | |
| The total amount of value added tax charged | | | |
| To the enterprise (deductible) ............................... | 9145 | 35.107 | 40.223 |
| By the enterprise ............................... | 9146 | | |
| Amounts retained on behalf of third parties for | | | |
| Payroll withholding taxes ............................... | 9147 | 32.220 | 73.804 |
| Withholding taxes on investment income ............................... | 9148 | | |

| Nr. | 0455.240.893 | | C 5.14 |

**RELATIONSHIPS WITH AFFILIATED ENTERPRISES AND ENTERPRISES LINKED BY PARTICIPATING INTERESTS**

|  | Codes | Period | Previous period |
|---|---|---|---|
| **AFFILIATED ENTERPRISES** | | | |
| **Financial fixed assets** | (280/1) | 1.364.442 | 1.364.442 |
| Investments | (280) | 1.364.442 | 1.364.442 |
| Amounts receivable subordinated | 9271 | | |
| Other amounts receivable | 9281 | | |
| **Amounts receivable** | 9291 | | 58.025 |
| After one year | 9301 | | |
| Within one year | 9311 | | 58.025 |
| **Current investments** | 9321 | | |
| Shares | 9331 | | |
| Amounts receivable | 9341 | | |
| **Amounts payable** | 9351 | 5.133.624 | 4.732.104 |
| After one year | 9361 | | 3.244.127 |
| Within one year | 9371 | 5.133.624 | 1.487.977 |
| **Personal and real guarantees** | | | |
| Provided or irrevocably promised by the enterprise, as security for debts or commitments of affiliated enterprises | 9381 | | |
| Provided or irrevocably promised by affiliated enterprises as security for debts or commitments of the enterprise | 9391 | | |
| **Other substancial financial commitments** | 9401 | | |
| **Financial results** | | | |
| Income from financial fixed assets | 9421 | | |
| Income from current assets | 9431 | | |
| Other financial income | 9441 | | |
| Debts charges | 9461 | 119.704 | 109.476 |
| Other financial charges | 9471 | | |
| **Gains and losses on disposal of fixed assets** | | | |
| Obtained capital gains | 9481 | | |
| Obtained capital losses | 9491 | | |
| **ENTERPRISES LINKED BY PARTICIPATING INTERESTS** | | | |
| **Financial fixed assets** | (282/3) | | |
| Investments | (282) | | |
| Amounts receivable subordinated | 9272 | | |
| Other amounts receivable | 9282 | | |
| **Amounts receivable** | 9292 | | |
| After one year | 9302 | | |
| Within one year | 9312 | | |
| **Amounts payable** | 9352 | | |
| After one year | 9362 | | |
| Within one year | 9372 | | |

| Nr. | 0455.240.893 | | C 5.14 |
|-----|-------------|---|--------|

## RELATIONSHIPS WITH AFFILIATED ENTERPRISES AND ENTERPRISES LINKED BY PARTICIPATING INTERESTS

**TRANSACTIONS WITH RELATED PARTIES OUTSIDE NORMAL MARKET CONDITIONS**

**Mention of such operations if they are material, stating the amount of these transactions, the nature of the relationship with the related party and other information about the transactions necessary for the understanding of the financial position of the company:**

| Period |
|--------|
|        |

Nil

| Nr. | 0455.240.893 | | C 5.15 |

## FINANCIAL RELATIONSHIPS WITH

| | Codes | Period |
|---|---|---|

**DIRECTORS AND MANAGERS, INDIVIDUALS OR BODIES CORPORATE WHO CONTROL THE ENTERPRISE WITHOUT BEING ASSOCIATED THEREWITH OR OTHER ENTERPRISES CONTROLLED BY THESE PERSONS, OTHER ENTERPRISES CONTROLLED BY THE SUB B. MENTIONED PERSONS WITHOUT BEING ASSOCIATED THEREWITH**

| | Codes | Period |
|---|---|---|
| **Amounts receivable from these persons** | 9500 | |
| Conditions on amounts receivable | | |
| **Guarantees provided in their favour** | 9501 | |
| Guarantees provided in their favour - Main condition | | |
| **Other significant commitments undertaken in their favour** | 9502 | |
| Other significant commitments undertaken in their favour - Main condition | | |

**Amount of direct and indirect remunerations and pensions, included in the income statement, as long as this disclosure does not concern exclusively or mainly, the situation of a single identifiable person**

| | Codes | Period |
|---|---|---|
| To directors and managers ............................................................................................................ | 9503 | |
| To former directors and former managers ..................................................................................... | 9504 | |

## AUDITORS OR PEOPLE THEY ARE LINKED TO

| | Codes | Period |
|---|---|---|
| **Auditor's fees** ................................................................................................................................ | 9505 | 7.978 |

**Fees for exceptional services or special missions executed in the company by the auditor**

| | Codes | Period |
|---|---|---|
| Other attestation missions ............................................................................................................ | 95061 | |
| Tax consultancy ........................................................................................................................... | 95062 | |
| Other missions external to the audit ............................................................................................ | 95063 | 500 |

**Fees for exceptional services or special missions executed in the company by people they are linked to**

| | Codes | Period |
|---|---|---|
| Other attestation missions ............................................................................................................ | 95081 | |
| Tax consultancy ........................................................................................................................... | 95082 | |
| Other missions external to the audit ............................................................................................ | 95083 | |

**Mention related to article 133 paragraph 6 from the Companies Code**

| Nr. | 0455.240.893 | | C 5.17.1 |

## INFORMATION RELATING TO CONSOLIDATED ACCOUNTS

**INFORMATION THAT MUST BE PROVIDED BY EACH COMPANY, THAT IS SUBJECT OF COMPANY LAW ON THE CONSOLIDATED ANNUAL ACCOUNTS OF ENTERPRISES**

~~The enterprise has drawn up publiced a consolidated annual statement of accounts and a management report*~~

**The enterprise has not published a consolidated annual statement of accounts and a management report, since it is exempt for this obligation for the following reason***

The enterprise and its subsidiaries on consolidated basis exceed not more than one of the limits mentioned in art. 16 of Company Law*

~~The enterprise itself is a subsidiary of an enterprise which does prepare and publish consolidated accounts, in which her yearly statement of accounts is included*~~

If yes, justification of the compliance with all conditions for exemption set out in art. 113 par. 2 and 3 of Company Law:

Name, full address of the registered office and, for an enterprise governed by Belgian Law, the company number of the parent company preparing and publishing the consolidated accounts required:

## INFORMATION TO DISCLOSE BY THE REPORTING ENTERPRISE BEING A SUBSIDIARY OR A JOINT SUBSIDIARY

Name, full address of the registered office and, for an enterprise governed by Belgian Law, the company number of the parent company(ies) and the specification whether the parent company(ies) prepare(s) and publish(es) consolidated annual accounts in which the annual accounts of the enterprise are included**

If the parent company(ies) is (are) (an) enterprise(s) governed by foreign law disclose where the consolidated accounts can be obtained**

---

\*    Delete where no appropriate.
\*\*   Where the accounts of the enterprise are consolidated at different levels, the information should be given for the
      consolidated aggregate at the highest level on the one hand and the lowest level on the other hand of which the enterprise
      is a subsidiary and for which consolidated accounts are prepared and published.

| Nr. | 0455.240.893 | | C 6 |

## SOCIAL REPORT

Numbers of joint industrial committees which are competent for the enterprise:

### STATEMENT OF THE PERSONS EMPLOYED
### EMPLOYEES FOR WHOM THE COMPANY HAS SUBMITTED A DIMONA DECLARATION OR ARE RECORDED IN THE GENERAL PERSONNEL REGISTER

| During the period and the previous period | Codes | 1. Full-time (period) | 2. Part-time (period) | 3. Total (T) or total of full-time equivalents (FTE) (period) | 3P.Total (T) or total of full-time equivalents (FTE) (previous period) |
|---|---|---|---|---|---|
| Average number of employees .......... | 100 | 0,2 | | 0,2 (FTE) | 1,0 (FTE) |
| Number of hours actually worked ....... | 101 | 502 | | 502 (T) | 1.839 (T) |
| Personnel costs ................................ | 102 | 125.944 | | 125.944 (T) | 258.833 (T) |
| Advantages in addition to wages ........ | 103 | xxxxxxxxxxxxxxx | xxxxxxxxxxxxxx | (T) | (T) |

| At the closing date of the period | Codes | 1. Full-time | 2. Part-time | 3. Total in full-time equivalents |
|---|---|---|---|---|
| **Number of employees** | 105 | 1 | | 1,0 |
| **By nature of the employment contract** | | | | |
| Contract for an indefinite period ...................................... | 110 | 1 | | 1,0 |
| Contract for a definite period .......................................... | 111 | | | |
| Contract for the execution of a specifically assigned work | 112 | | | |
| Replacement contract ...................................................... | 113 | | | |
| **According to the gender and by level of education** | | | | |
| Male ............................................................................. | 120 | 1 | | 1,0 |
|     primary education ..................................................... | 1200 | | | |
|     secondary education ................................................. | 1201 | | | |
|     higher education (non-university) ............................. | 1202 | | | |
|     university education ................................................. | 1203 | 1 | | 1,0 |
| Female .......................................................................... | 121 | | | |
|     primary education ..................................................... | 1210 | | | |
|     secondary education ................................................. | 1211 | | | |
|     higher education (non-university) ............................. | 1212 | | | |
|     university education ................................................. | 1213 | | | |
| **By professional category** | | | | |
| Management staff ........................................................... | 130 | | | |
| Employees ..................................................................... | 134 | 1 | | 1,0 |
| Workers ......................................................................... | 132 | | | |
| Other ............................................................................. | 133 | | | |

27/29

| Nr. | 0455.240.893 | | C 6 |

## HIRED TEMPORARY STAFF AND PERSONNEL PLACED AT THE ENTERPRISE'S DISPOSAL

| During the period | Codes | 1. Temporary personnel | 2. Persons placed at the disposal of the enterprise |
|---|---|---|---|
| Average number of employees ........................................................................ | 150 | | |
| Number of hours' actually worked ................................................................ | 151 | | |
| Charges of the enterprise ............................................................................ | 152 | | |

## TABLE OF PERSONNEL CHANGES DURING THE PERIOD

### ENTRIES

| | Codes | 1. Full-time | 2. Part-time | 3. Total in full-time equivalents |
|---|---|---|---|---|
| The number of employees for whom the company has submitted a DIMONA declaration or are recorded in the personnel register during the financial year in the general personnel register ................................................ | 205 | | | |
| By nature of the employment contract | | | | |
| Contract for an indefinite period ......................................... | 210 | | | |
| Contract for a definite period ............................................ | 211 | | | |
| Contract for the execution of a specifically assigned work . | 212 | | | |
| Replacement contract .................................................... | 213 | | | |

### DEPARTURES

| | Codes | 1. Full-time | 2. Part-time | 3. Total in full-time equivalents |
|---|---|---|---|---|
| The number of employees with a in the DIMONA declaration indicated or in the general personnel register listed date of termination of the contract during the financial year ................................................................... | 305 | | | |
| By nature of the employment contract | | | | |
| Contract for an indefinite period ......................................... | 310 | | | |
| Contract for a definite period ............................................ | 311 | | | |
| Contract for the execution of a specifically assigned work | 312 | | | |
| Replacement contract .................................................... | 313 | | | |
| According to the reason for termination of the employment contract | | | | |
| Retirement ..................................................................... | 340 | | | |
| Early retirement ............................................................. | 341 | | | |
| Dismissal ...................................................................... | 342 | | | |
| Other reason .................................................................. | 343 | | | |
| Of which    the number of persons who continue to render services to the enterprise at least half-time on a self-employed basis .............. | 350 | | | |

| Nr. | 0455.240.893 | | | C 6 |

**INFORMATION WITH REGARD TO TRAINING RECEIVED BY EMPLOYEES DURING THE PERIOD**

| | Codes | Male | Codes | Female |
|---|---|---|---|---|
| **Total number of official advanced professional training projects at company expense** | | | | |
| Number of participating employees ........................... | 5801 | | 5811 | |
| Number of training hours ........................................ | 5802 | | 5812 | |
| Costs for the company ............................................. | 5803 | | 5813 | |
| of which gross costs directly linked to the training .............................. | 58031 | | 58131 | |
| of which paid contributions and deposits in collective funds .............. | 58032 | | 58132 | |
| of which received subsidies (to be deducted)....................................... | 58033 | | 58133 | |
| **Total number of less official and unofficial advance professional training projects at company expense** | | | | |
| Number of participating employees ........................... | 5821 | | 5831 | |
| Number of training hours ........................................ | 5822 | | 5832 | |
| Costs for the company ............................................. | 5823 | | 5833 | |
| **Total number of initial professional training projects at company expense** | | | | |
| Number of participating employees ........................... | 5841 | | 5851 | |
| Number of training hours ........................................ | 5842 | | 5852 | |
| Costs for the company ............................................. | 5843 | | 5853 | |

Jaarvergadering van Easdaq NV

## Volmacht

Gelieve deze volmacht (die werd vastgesteld door de Raad als standaard volmachtformulier overeenkomstig artikel 30 van de statuten) waar nodig in te vullen en te ondertekenen indien u wenst te worden vertegenwoordigd op de jaarvergadering van Easdaq NV, die zal worden gehouden op of rond 28 juni 2012 (de "AV").

Gelieve daarop beide van volgende daden te stellen:

(i)   deze volmacht onmiddellijk na ontvangst, correct ingevuld en ondertekend, via koerier of per aangetekend schrijven te bezorgen aan EASDAQ NV, 3000 Leuven, Lei 19 bus 11, ter attentie van de heer Anthony Ball (CFO van Equiduct Systems Limited), opdat deze is ontvangen door de Vennootschap ten laatste op 26 juni 2012; EN

(ii)  een kopie van het ingevulde en ondertekende volmachtformulier te verzenden, per e-mail, aan investor-relations@equiduct.eu, ten laatste op 26 juni 2012.

Alle houders van aandelen op naam dienen, overeenkomstig artikel 29 van de statuten, om toegelaten te worden tot de AV, de Raad kennis te geven van hun intentie de AV bij te wonen, via e-mail op investor-relations@equiduct.eu en dit ten laatste op 26 Juni 2012.

Ondergetekende:

Naam:                          _____

Adres/Zetel:                   _____

                               _____

Houder van aantal aandelen:    _____
                               -

Stelt als bijzondere lasthebber aan, individueel en met de macht om in de plaats te stellen:

Anthony Ball, 19 Coleford Road, SW18 1AD, London, Verenigd Koninkrijk

aan wie ondergetekende volmacht verleent om hem/haar te vertegenwoordigen op de jaarvergadering van de vennootschap Easdaq NV, met zetel te Lei 19 bus 11, B-3000 Leuven (België) (ondernemingsnummer 0455.240.893 – RPR Leuven), die zal worden gehouden op de kantoren van Berquin Notarissen, Lloyd Georgelaan 11 te 1000 Brussel, op 28 juni 2012 om 10:00 CET, en die zal beraadslagen omtrent de agenda vermeld als bijlage bij de oproepingsbrief.

JAARVERGADERING VAN EASDAQ NV

Ondergetekende geeft hierbij aan de volmachtdrager volgende instructies om op de AV als volgt te stemmen op de agendapunten vermeld in de oproeping:

| Agendapunt | | ja | neen | onthouding |
|---|---|---|---|---|
| 1. Bestuurders | a. Kennisname ontslag bestuurder | *Aangezien het om een loutere kennisname gaat, dient er geen besluit te worden genomen door de AV* | | |
| | b. Beëindiging/benoeming bestuurders | Ja | Neen | Onthouding |
| 2. Kennisname Gecombineerd Verslag van de Raad van Bestuur | | *Aangezien het om een loutere kennisname gaat, dient er geen besluit te worden genomen door de AV* | | |
| 3. Beslissing overeenkomstig artikel 633 W.Venn. | | Ja | Neen | Onthouding |
| 4. Kennisname verslag Commissaris | | *Aangezien het om een loutere kennisname gaat, dient er geen besluit te worden genomen door de AV* | | |
| 5. Goedkeuring jaarrekening | | Ja | Neen | Onthouding |
| 6. Kwijting bestuurders | | Ja | Neen | Onthouding |
| 7. Kwijting commissaris | | Ja | Neen | Onthouding |
| 8. Machtiging | | Ja | Neen | Onthouding |

Ondergetekende bevestigt hierbij dat hij/zij er kennis van heeft dat de gevolmachtigde, bij gebrek aan instructies van zijnentwege/harentwege, alle voorstellen betreffende de agendapunten zal goedkeuren.

De lasthebber mag verder ondermeer, zonder hiertoe beperkt te zijn:

• Deelnemen aan elke vergadering met dezelfde agenda voor het geval de eerste vergadering niet geldig zou kunnen beraadslagen of niet zou worden (kunnen) gehouden op de hierboven vermelde datum en uur.

JAARVERGADERING VAN EASDAQ NV

- Verklaren dat ondergetekende zichzelf als regelmatig opgeroepen beschouwt, dat hij/zij de bepalingen kent van de artikelen 64 1°, 178, 533 en 535 van het Wetboek van vennootschappen, en dat hij/zij verzaakt aan de oproepingsformaliteiten en -termijn en aan het instellen van een eventuele nietigheidsvordering wegens een onregelmatigheid naar de vorm.

- Verklaren dat ondergetekende de verslagen vermeld op de agenda vooraf heeft ontvangen, dat hij/zij over voldoende tijd beschikte om deze verslagen grondig te bestuderen en dat hij/zij geen vragen of opmerkingen heeft betreffende deze verslagen.

- In het algemeen, alle processen-verbaal, aanwezigheidslijsten, overeenkomsten, bevestigingen, kennisgevingen en ieder ander document tekenen, in de plaats stellen en, in het algemeen, alles doen dat nuttig of noodzakelijk is voor de uitvoering van deze volmacht, voor zover nodig met belofte van bekrachtiging.

Instructies aan de lasthebber

Ondergetekende geeft hierbij uitdrukkelijk opdracht aan de lasthebber om deel te nemen aan de jaarvergaderingen, zelfs indien het bewijs niet voorligt dat de aandeelhouders, de bestuurders, de commissaris en/of de andere relevante houders van effecten geldig zijn opgeroepen tot de jaarvergaderingen en, voor zover toepasselijk, indien de betrokkenen niet allen hebben verzaakt aan (i) de termijnen en de vormvereisten voor oproeping tot de jaarvergaderingen en (ii) het recht om bepaalde verslagen en andere documenten te ontvangen, zoals voorgeschreven door de relevante artikelen van het Wetboek van vennootschappen.

Schadeloosstelling van de lasthebbers

Ondergetekende verbindt er zich hierbij toe om de lasthebber schadeloos te stellen voor elke schade die hij/zij zou kunnen oplopen ten gevolge van enige handeling gesteld ter uitvoering van deze volmacht, op voorwaarde evenwel dat hij/zij de grenzen van zijn/haar bevoegdheden heeft nageleefd. Verder verbindt ondergetekende zich ertoe geen enkele schadevergoeding van hem/haar te vorderen, op voorwaarde evenwel dat laatstgenoemde de grenzen van zijn/haar bevoegdheden heeft nageleefd.

**Gedaan te:** _____(plaats),

**Op:** _____(datum).

_____              _____
(handtekening)                           (handtekening)

JAARVERGADERING VAN EASDAQ NV

_____

(naam)

_____

(functie)

_____

(naam)

_____

(functie)

*Annual General Meeting of Easdaq NV to be held on or about 28 June 2012*

*Unofficial English translation of a Dutch original*

| Power of attorney |
| --- |

Please fill out and sign this proxy (which is the proxy format fixed by the Board in accordance with Article 30 of the Articles of Association) in the appropriate spaces if you wish to be represented at the Annual General Meeting of EASDAQ NV, to be held on or about 28 June 2012 (the "AGM").

Please subsequently perform both of the following actions:

(i) send this proxy, duly completed and signed, by express courier or registered letter to EASDAQ NV, 3000 Leuven, Lei 19, Box 11, for the attention of Mr. Anthony Ball (CFO of Equiduct Systems Limited), so that it is received by the Company <u>at the latest on 26 June 2012</u>; <u>AND</u>

(ii) send a <u>copy</u> of the duly completed and signed proxy form, by e-mail to <u>investor-relations@equiduct.eu</u>, <u>at the latest on 26 June 2012</u>.

In accordance with Article 29 of the Articles of Association, in order to be admitted to the AGM, all owners of registered shares must notify the Board of their intention to attend the AGM by e-mail at <u>investor-relations@equiduct.eu</u> at the latest on 26 June 2012.

**PLEASE ALSO FILL OUT AND SIGN THE DUTCH PROXY FORM ACCORDINGLY**

The undersigned:

**Name:** _____

**Address/registered office:** _____

_____

**Holder of number of shares:** _____

**Appoints as its special proxyholder**, individually and with full power of substitution:

Mr. Anthony Ball, 19 Coleford Road, SW18 1AD, London, United Kingdom,

*Annual General Meeting of Easdaq NV to be held on or about 28 June 2012*

*Unofficial English translation of a Dutch original*

to whom the undersigned gives power of attorney to represent it for the purposes of the Annual General Meeting of the company Easdaq NV, having its registered offices at Lei 19 box 11, B-3000 Leuven (Belgium) (number 0455.240.893 – RPR Leuven) that will be held at the offices of Berquin Notarissen, Lloyd Georgelaan 11, B-1000 Brussels, on or about 28 June 2012 at 10:00 am CET, and that shall resolve on the agenda attached to the notice.

The undersigned hereby gives the special proxyholder the instructions to vote as follows at the AGM, on the items on the agenda mentioned in the notice:

| Item | | **Yes** | **No** | **Abstention** |
|---|---|---|---|---|
| 1.  Directors | a. Acknowledgement resignation Director | *Since it concerns a mere acknowledgement, the AGM need not come to a decision* | | |
| | b. Termination/Appointment Directors | Yes | No | Abstention |
| 2.  Acknowledgement Combined Board Report | | *Since it concerns a mere acknowledgement, the AGM need not come to a decision* | | |
| 3.  Decision pursuant to Article 633 BCC | | Yes | No | Abstention |
| 4.  Ackowledgement Statutory Auditor Report | | *Since it concerns a mere acknowledgement, the AGM need not come to a decision* | | |
| 5.  Approval Annual Accounts | | Yes | No | Abstention |
| 6.  Discharge Directors | | Yes | No | Abstention |
| 7.  Discharge Statutory Auditor | | Yes | No | Abstention |
| 8.  Power of attorney | | Yes | No | Abstention |

The undersigned hereby confirms that it has knowledge of the fact, if it does not give instructions, the special proxyholder will approve all proposals in relation to the items on the agenda.

*Annual General Meeting of Easdaq NV to be held on or about 28 June 2012*

*Unofficial English translation of a Dutch original*

**The proxyholder further may, amongst other things, without limitation:**

- Participate in any meeting with the same agenda (possibly, except for minor details) in case the first meeting could not validly deliberate or could not be held on the date mentioned above.

- Declare that the undersigned considers itself as having been validly convened, that it is aware of the provisions of Articles 64,1°, 178, 533 and 535 of the Belgian Company Code, and that it renounces to the notice period and formalities and to the right to initiate a possible claim to obtain the nullity of any decision taken on the basis of a formal irregularity.

- Declare that the undersigned has received in advance all reports mentioned on the agenda, that it had sufficient time to review them and that it has no questions regarding or remarks in relation to these reports.

- In general, to execute all minutes, attendance lists, agreements, confirmations, notifications and any other document, to substitute and, in general, to do all that is useful or necessary for the performance of this power of attorney, with a promise of ratification, to the extent necessary.

Instructions to the proxyholder

The undersigned hereby explicitly authorizes and instructs the proxyholder to take part in the annual general meeting, even if no proof is presented that the shareholders, the directors, the statutory auditor and/or the other relevant holders of securities have been validly convened for the annual general meeting and, to the extent applicable, if not all relevant parties have renounced to (i) the notice terms and formalities for the annual general meeting and (ii) the right to receive specific reports and other documents, as provided by the relevant provisions of the Belgian Company Code.

Indemnification of the proxyholder

The undersigned undertakes to indemnify the proxyholder for any damage it could sustain as a result of any action undertaken by the proxyholder in performing this power of attorney, to the extent that the proxyholder has observed the limits of its powers. In addition, the undersigned undertakes not to claim any damages from the proxyholder, to the extent that the proxyholder has observed the limits of its powers.

**Done on:**_____(date).

*Annual General Meeting of Easdaq NV to be held on or about 28 June 2012*

*Unofficial English translation of a Dutch original*

_____        _____

(signature)                                     (signature)


_____        _____

(name)                                          (name)


_____        _____

(function)                                      (function)

BUITENGEWONE ALGEMENE VERGADERING VAN

AANDEELHOUDERS VAN EASDAQ NV DIE ZAL PLAATSVINDEN

OP OF ROND 28 JUNI 2012

EXTRAORDINARY GENERAL MEETING OF THE SHAREHOLDERS

OF EASDAQ NV

TO BE HELD ON OR ABOUT 28 JUNE 2012



**EASDAQ NV** • Lei 19 • Box 11 • B-3000 Leuven • Belgium
**Tel** +32 16 28 41 10 • **Fax** +32 16 28 41 11 • RPR Leuven, VAT BE 0455.240.893

## EASDAQ

Naamloze vennootschap
Maatschappelijke zetel: Lei 19 Bus 11,
B-3000 Leuven, België

RPR Leuven 0455.240.893

(de "**Vennootschap**")

---

#### UITNODIGING VOOR DE BUITENGEWONE ALGEMENE VERGADERING VAN AANDEELHOUDERS VAN EASDAQ NV DIE ZAL PLAATSVINDEN OP OF ROND 28 JUNI 2012

---

*Per aangetekend schrijven.*
*De Bijlagen maken integraal uit van deze uitnodiging.*

Hierbij worden de aandeelhouders, warranthouders, bestuurders en commissaris van EASDAQ NV (de "**Vennootschap**") uitgenodigd voor een Buitengewone Algemene Vergadering van de aandeelhouders van de Vennootschap ("**BAV**") die zal plaatsvinden in de kantoren van Berquin Notarissen, **Lloyd Georgelaan 11, B-1000 Brussel**, om **11:30 CET** op **28 juni 2012**, om te beraadslagen en te beslissen over de punten en voorstellen die hierna zijn uiteengezet.

> Deze oproeping en de overige informatie die ter beschikking wordt gesteld in het kader van Rights Issue vormt geen aanbod of verzoek om in te schrijven op aandelen van Easdaq NV of deze aan te kopen in eender welk rechtsgebied waar een dergelijk aanbod niet is toegelaten vooraleer het werd geregistreerd of gekwalificeerd onder de wetten van het betrokken rechtsgebied. Eveneens vormt het geen aanbod of verzoek aan eender welke persoon die een dergelijk aanbod of verzoek wettelijk gezien niet mag ontvangen. De aandelen van Easdaq NV werden en zullen niet worden geregistreerd onder de US Securities Act van 1933 en effecten mogen niet worden aangeboden of verkocht in de Verenigde Staten zonder registratie onder de US Securities Act van 1933 of registratievrijstelling. Easdaq NV is niet voornemens een aanbod van effecten te organiseren in de Verenigde Staten, Canada, Australië of Japan, of aan enige ingezetene, verblijfhouder of burger van de Verenigde Staten, Canada, Australië of Japan. Noch deze aankondiging noch een kopie ervan mogen rechtstreeks of onrechtstreeks worden verspreid in de Verenigde Staten, Australië, Canada of Japan. De verspreiding van deze aankondiging kan onderworpen zijn aan wettelijke beperkingen en enige personen die de beschikking krijgen over deze aankondiging dienen zich te informeren over eventuele dergelijke beperkingen en deze na te leven.

## Agenda

1. Kennisname en bespreking van het bijzonder verslag van de raad van bestuur overeenkomstig artikel 582 en, in zover als nodig, artikel 596 van het Wetboek van

EXHIBIT 17. Notice with agenda EGM_DUTCH_CLEAN



**EASDAQ NV** • Lei 19 • Box 11 • B-3000 Leuven • Belgium

**Tel** +32 16 28 41 10 • **Fax** +32 16 28 41 11 • RPR Leuven, VAT BE 0455.240.893

vennootschappen ("**W. Venn.**") met betrekking tot: (i) de uitgifte van nieuwe aandelen aan een uitgifteprijs die lager is dan de huidige fractiewaarde van de aandelen; en (ii) inzover als nodig, de beperking van het voorkeurrecht om technische redenen omwille van de uitoefenverhouding onder de Rights Issue (Bijlage 1).

2.  Kennisname en bespreking van het verslag van de commissaris overeenkomstig artikel 582 en, in zover als nodig, artikel 596 W. Venn. met betrekking tot: (i) de uitgifte van nieuwe aandelen aan een uitgifteprijs die lager is dan de huidige fractiewaarde van de aandelen; en (ii) inzover als nodig, de beperking van het voorkeurrecht om technische redenen omwille van de uitoefenverhouding onder de Rights Issue (Bijlage 2).

3.  Beslissing tot verhoging van het kapitaal van de Vennootschap met een maximum bedrag van EUR 7.494.900 (of, in het geval van de uitgifte van aandelen als gevolg van een uitoefening, ten laatste op de BAV, van warrants, ieder hoger bedrag berekend op basis van het nieuwe aantal bestaande aandelen van de Vennootschap na de uitoefening van de warrants en de uitoefenverhouding onder de Rights Issue, zoals hierin uiteengezet) door middel van een kapitaalverhoging in geld, met toepassing van het voorkeurrecht overeenkomstig de artikelen 592-594 W.Venn., en, inzover als nodig, met beperking van het voorkeurrecht, overeenkomstig artikel 596 W.Venn., ten belope van het aantal voorkeurrechten dat niet kan worden uitgeoefend omwille van technische redenen, als gevolg van de gebruikte uitoefenverhouding, door de uitgifte van nieuwe gewone aandelen, met een uitgifteprijs van EUR 0,20 per gewoon aandeel, in overeenstemming met de modaliteiten en voorwaarden van het bijzonder verslag van de raad van bestuur hieraan aangehecht als Bijlage 1 (de "**Rights Issue**"), waarbij de verwezenlijking van de Rights Issue voorwaardelijk is aan een minimum inschrijvingsbedrag van EUR 7.000.000 (de "**Opschortende Voorwaarde**"). Er wordt ook verwezen naar de volmacht die zal worden gegeven onder punt 4 van deze agenda. Vaststelling van de duurtijd van de Aanbiedingsperiode.

4.  Machtiging aan de raad van bestuur van de Vennootschap (de "**Raad**") om alle beslissingen te nemen en alle daden te stellen die nodig of nuttig kunnen zijn om de Rights Issue te implementeren, en die in ieder geval de volgende zaken zal omvatten: (i) implementatie van de Rights Issue, wat in ieder geval de volgende zaken zal omvatten: (a) bepalen van de voorwaarden en methode voor de overdracht (indien van toepassing) en de uitoefening van de voorkeurrechten; en (b) bepalen van het aanvangen van de Aanbiedingsperiode en, naargelang het geval, van de Bijkomende Aanbiedingspriode, alsook de respectievelijke afsluitingsdata; (ii) vaststellen van het vervuld zijn van de Opschortende Voorwaarde; (iii) implementatie van de verwezenlijking van de Rights Issue, *i.e.* het verschijnen voor notaris met het oog op de notariële vaststelling van de Rights Issue en het aantal aandelen uitgegeven onder de Rights Issue, en het wijzigen van artikel 5 van de statuten om de verwezenlijking van de Rights Issue te weerspiegelen; (iv) aanpassen van het aandelenregister en warrantenregister van de Vennootschap; (v) bepalen van het nieuwe maximumbedrag van de kapitaalverhoging

EXHIBIT 17. Notice with agenda EGM_DUTCH_CLEAN



**EASDAQ NV** • Lei 19 • Box 11 • B-3000 Leuven • Belgium
**Tel +32 16 28 41 10 • Fax +32 16 28 41 11** • RPR Leuven, VAT BE 0455.240.893

(dat hoger zal zijn dan EUR 7.494.900) en bepalen van andere elementen van de kapitaalverhoging, indien warrants zouden zijn uitgeoefend voorafgaand aan de Rights Isse; en (vi) in het algemeen, al hetgeen te doen dat nodig of noodzakelijk is in verband met al het voorgaande. De Raad zal het recht hebben om de volmacht bepaald in dit punt 4 van de agenda (geheel of gedeeltelijk) te subdelegeren aan eender welke bestuurder, alleenhandelend en met macht van subdelegatie.

Alle termen met hoofdletter waarnaar verwezen in dit punt 4 van de agenda, worden gedefinieerd in het bijzonder verslag van de Raad, hieraan aangehecht als <u>Bijlage 1</u>.

5. Volmacht, met mogelijkheid tot indeplaatsstelling, om de nodige formaliteiten te vervullen in verband met de "Kruispuntbank voor Ondernemingen", het "Ondernemingsloket" en de BTW, indien nodig.

Overeenkomstig artikel 29 van de statuten, dient iedere eigenaar van aandelen op naam, om te worden toegelaten tot de BAV, zijn intentie om aan de BAV deel te nemen, kenbaar te maken aan de raad van bestuur per e-mail aan at <u>investor-relations@equiduct.eu</u>, en dit ten laatste op <u>26 juni 2012</u>.

Overeenkomstig artikel 30 van de statuten, heeft de raad van bestuur de vorm van de volmachten vastgesteld. Gelieve, aangehecht als <u>Bijlage 3</u> een kopie te vinden van dit volmachtformulier dat kan worden ingevuld en dat daarop dient te worden bezorgd aan de Vennootschap, overeenkomstig de instructies bepaald in dit volmachtformulier, en dit ten laatste op <u>26 juni 2012</u>.

12 juni 2012,

Voor de Raad van Bestuur,

Peter Randall
Bestuurder en bijzondere volmachthouder

<u>*Bijlagen (die integraal deel uitmaken van deze oproeping):*</u>
1. Bijzonder verslag van de Raad van Bestuur overeenkomstig artikel 582, en, inzover als nodig, artikel 596 W.Venn.

EXHIBIT 17  Notice with agenda EGM_DUTCH_CLEAN



**EASDAQ NV** • Lei 19 • Box 11 • B-3000 Leuven • Belgium
**Tel** +32 16 28 41 10 • **Fax** +32 16 28 41 11 • RPR Leuven, VAT BE 0455.240.893

2. Verslag van de Commissaris overeenkomstig artikel 582 , en, inzover als nodig, artikel 596 W.Venn.

3. Volmachtformulier voor aandeelhouders

EXHIBIT 17. Notice with agenda EGM_DUTCH_CLEAN



*Unofficial English translation of a Dutch original*

**EASDAQ NV** • Lei 19 • Box 11 • B-3000 Leuven • Belgium
**Tel** +32 16 28 41 10 • **Fax** +32 16 28 41 11 • RPR Leuven, VAT BE 0455.240.893

## EASDAQ NV

Limited liability company
Registered office: Lei 19 Box 11, 3000 Leuven
Company number: 0455.240.893

(the "**Company**")

### NOTICE FOR THE EXTRAORDINARY GENERAL MEETING OF THE SHAREHOLDERS OF EASDAQ NV TO BE HELD ON OR ABOUT 28 JUNE 2012

*By registered mail.*
*The Exhibits constitute an integral part of this notice.*

Notice is hereby given to the shareholders, warrant holders, directors and statutory auditor of Easdaq NV (the "**Company**") for the Extraordinary General Meeting of the Company's shareholders (the "**EGM**") to be held at the offices of Berquin Notarissen, **1000 Brussels, Lloyd Georgelaan 11**, at **11.30 a.m. CET** on **28 June 2012**, to discuss and decide on the items and proposals set out in the following agenda.

This notice and the other information that is made available in the context of the Rights Issue does not constitute an offer of, or solicitation to subscribe for, shares of Easdaq NV or to buy such shares in any jurisdiction in which such offer would be unlawful prior to its registration or qualification under the laws of such jurisdiction. Neither does it constitute an offer or solicitation to any person to whom it would be unlawful to receive such an offer or solicitation. The shares of Easdaq NV have not been and will not be registered under the US Securities Act of 1933 and the securities may not be offered or sold in the United States without registration under the US Securities Act of 1933 or an exemption from registration. Easdaq NV does not intend to organize an offer of securities in Canada, Australia or Japan, or to any national, resident or citizen of Canada, Australia or Japan. Neither this announcement nor a copy of it may directly or indirectly be distributed in the United States, Australia, Canada or Japan. The distribution of this announcement may be subject to legal restrictions and any persons who acquire this announcement should inform themselves about any such restrictions and observe them.

## Agenda

1. Acknowledgement of and deliberation on the Special Board Report prepared in accordance with Article 582 and, inasmuch as necessary, Article 596 of the Belgian Company Code (the "**BCC**") regarding: (i) the issue of new shares at an issue price that is below the current par value of the shares; and (ii) inasmuch as necessary, the limitation of the shareholders' preferential subscription right for technical reasons in view of the exercise ratio under the Rights Issue (Exhibit 1).

2.  Acknowledgement of and deliberation on the report by the Statutory Auditor prepared in accordance with Article 582 and, inasmuch as necessary, Article 596 BCC regarding: (i) the issue of new shares at an issue price that is below the current par value of the shares and (ii) inasmuch as necessary, the limitation of the shareholders' preferential subscription right for technical reasons in view of the exercise ratio under the Rights Issue (Exhibit 2).

3.  Resolution to increase the Company's share capital with a maximum amount of EUR 7,494,900 (or, in the event of an issuance of shares pursuant to the exercise of warrants at the latest at the EGM, any higher amount calculated on the basis of the new number of shares of the Company in existence after the exercise of warrants and the exercise ratio under the Rights Issue set forth herein) by way of a capital increase in cash, with application of the shareholders' preferential subscription rights in accordance with Articles 592-594 BCC, and, inasmuch as necessary, with limitation of the shareholders' preferential subcription right, in accordance with Article 596 BCC, in the amount of the preferential subscription rights that cannot be exercised for technical reasons, further to the exercise ratio used, through the issuance of new ordinary shares, with an issue price of EUR 0.20 per ordinary share, in accordance with the terms and conditions set out in the Special Board Report attached as Exhibit 1 (the "**Rights Issue**"), whereby the realization of the Rights Issue is subject to a minimum subscription amount of EUR 7,000,000 (the "**Condition Precedent**"). Reference is also made to the proxy to be granted under point 4 of this agenda. Determination of the duration of the Offer Period.

4.  Power of attorney to the Board of Directors of the Company (the "**Board**") to take all decisions and to perform any and all actions that may be necessary or useful to implement the Rights Issue, and which in any event shall include the following: (i) implementation of the Rights Issue, which in any event shall include the following: (a) determination of the terms and method of the transfer (if any) and exercise of preferential subscription rights; and (b) determination of the opening of the Offer Period and, as the case may be, the Additional Offer Period, as well as their respective closing date; (ii) determination of the fulfillment of the Condition Precedent; (iii) implementation of the realization of the Rights Issue, *i.e.* appearing before a notary for the purpose of the notarial recordation of the Rights Issue and the number of shares issued further to the Rights Issue and the amendment of Article 5 of the Articles of Association to reflect the realization of the Rights Issue; (iv) update the Company's shareholders register and warrant register; (v) to determine the new maximum amount of the capital increase (which will be higher than EUR 7,494,900) and other elements of the capital increase, in case warrants would be exercised prior to the Rights Issue; and (vi) in general, doing all that is necessary or useful in connection with any of the foregoing. The Board will have the right to subdelegate (all or parts of) the power of attorney set forth in this point 4 of the agenda to any Director, acting alone, and with power of subdelegation.

All capitalized terms referred to in this point 4 of the agenda are defined in the Special Board Report attached hereto as Exhibit 1.

5. Power of attorney, with power of substitution, to satisfy the required formalities in connection with the "Crossroad Bank for Enterprises", the "Business One-Stop Shop" and the value added tax, if required.

In accordance with Article 29 of the Articles of Association, in order to be admitted to the EGM, all owners of registered shares must notify the Board of their intention to attend the EGM by e-mail at investor-relations@equiduct.eu at the latest on 26 June 2012.

In accordance with Article 30 of the Articles of Association, the Board has fixed the proxy format. Please find attached as Exhibit 3 a copy of the proxy format that can be completed and which subsequently must be provided to the Company, in accordance with the instructions set out in the proxy form, at the latest on 26 June 2012.

****

12 June 2012

For the Board of Directors,

By:             Peter Randall
Function:       Director and Special Proxyholder

**Exhibits (which are an integral part of this notice):**

Exhibit 1    Special Board Report prepared in accordance with Article 582 and, inasmuch as necessary, Article 596 BCC
Exhibit 2    Report by the Statutory Auditor prepared in accordance with Article 582 and, inasmuch as necessary, Article 596 BCC
Exhibit 3    Proxy form



**EASDAQ NV** • Lei 19 • Box 11 • B-3000 Leuven • Belgium
Tel +32 16 28 41 10 • Fax +32 16 28 41 11 • RPR Leuven, VAT BE 0455.240.893

---

## EASDAQ NV

EASDAQ NV
Lei 19 Bus 11, B-3000 Leuven, België
RPR Leuven 0455.240.893

(de "Vennootschap")

---

BIJZONDER VERSLAG VAN DE RAAD VAN BESTUUR OVEREENKOMSTIG ARTIKEL 582 EN, INZOVER
ALS NODIG, ARTIKEL 596 W.VENN. MET BETREKKING TOT: (I) DE UITGIFTE VAN NIEUWE AANDELEN
AAN EEN UITGIFTEPRIJS DIE LAGER IS DAN DE HUIDIGE FRACTIEWAARDE VAN DE AANDELEN; EN (II)
INZOVER ALS NODIG, DE BEPERKING VAN HET VOORKEURRECHT OM TECHNISCHE REDENEN
OMWILLE VAN DE UITOEFENVERHOUDING ONDER DE RIGHTS ISSUE; (MET INBEGRIP VAN
INFORMATIE MET BETREKKING TOT DE MODALITEITEN EN VOORWAARDEN VAN EEN RIGHTS ISSUE)

---

Dit document en de overige informatie die ter beschikking wordt gesteld in het kader van Rights Issue vormt geen aanbod of verzoek om in te schrijven op aandelen van Easdaq NV of deze aan te kopen in eender welk rechtsgebied waar een dergelijk aanbod niet is toegelaten vooraleer het werd geregistreerd of gekwalificeerd onder de wetten van het betrokken rechtsgebied. Eveneens vormt het geen aanbod of verzoek aan eender welke persoon die een dergelijk aanbod of verzoek wettelijk gezien niet mag ontvangen. De aandelen van Easdaq NV werden en zullen niet worden geregistreerd onder de US Securities Act van 1933 en effecten mogen niet worden aangeboden of verkocht in de Verenigde Staten zonder registratie onder de US Securities Act van 1933 of registratievrijstelling. Easdaq NV is niet voornemens een aanbod van effecten te organiseren in de Verenigde Staten, Canada, Australië of Japan, of aan enige ingezetene, verblijfhouder of burger van de Verenigde Staten, Canada, Australië of Japan. Noch deze aankondiging noch een kopie ervan mogen rechtstreeks of onrechtstreeks worden verspreid in de Verenigde Staten, Australië, Canada of Japan. De verspreiding van deze aankondiging kan onderworpen zijn aan wettelijke beperkingen en enige personen die de beschikking krijgen over deze aankondiging dienen zich te informeren over eventuele dergelijke beperkingen en deze na te leven.

De Raad van Bestuur van Easdaq NV (de "**Raad**") legt hierbij aan de buitengewone algemene vergadering van de Vennootschap die zal worden gehouden op of omstreeks 28 juni 2012 de ("**BAV**") haar bijzonder verslag voor overeenkomstig artikel 582 en, inzover als nodig, artikel 596 van het Wetboek van vennootschappen ("**W.Venn.**") met betrekking tot: (i) de uitgifte van nieuwe aandelen aan een uitgifteprijs die lager is dan de huidige fractiewaarde van de aandelen; en (ii) inzover als nodig, de beperking van het voorkeurrecht om technische redenen omwille van de uitoefenverhouding onder de Rights Issue.

Overeenkomstig artikel 582 W.Venn., beschrijft de Raad in dit verslag het doel en de rechtvaardiging van de uitgifte van nieuwe aandelen met een uitgifteprijs die lager is dan de huidige fractiewaarde van de aandelen, en de (financiële) gevolgen van deze transactie voor de

aandeelhouders en warranthouders van de Vennootschap (inbegrepen met betrekking tot hun deelname in de winst en het kapitaal van de Vennootschap).

Er wordt ook verwezen naar het verslag van de Commissaris overeenkomstig artikel 582 W.Venn. en, in zover als nodig, artikel 596 W.Venn. met betrekking tot: (i) de uitgifte van nieuwe aandelen aan een uitgifteprijs die lager is dan de huidige fractiewaarde van de aandelen; en (ii) inzover als nodig, de beperking van het voorkeurrecht om technische redenen omwille van de uitoefenverhouding onder de Rights Issue.

De aandeelhouders zal worden verzocht, op de BAV, om te besluiten over het verhogen van het kapitaal van de Vennootschap met een maximaal bedrag van EUR 7.494.900 (of, in het geval van de uitgifte van aandelen door een uitoefening, ten laatste op de BAV, van warrants, ieder hoger bedrag berekend op basis van het nieuwe aantal bestaande aandelen van de Vennootschap, na de uitoefening van warrants, en de uitoefenverhouding onder de Rights Issue, zoals hierin uiteengezet) door een kapitaalverhoging in geld, met toepassing van het voorkeurrecht overeenkomstig de artikelen 592-594 W.Venn., waarbij elke aandeelhouder het recht heeft in te schrijven op nieuwe gewone aandelen aan een uitgifteprijs van EUR 0,20 (die lager is dan de huidige fractiewaarde van de aandelen in de Vennootschap), op een 100-voor-173 basis (wat inhoudt dat voor iedere 173 aangehouden voorkeurrechten, een aandeelhouder het recht heeft in te schrijven op 100 nieuwe gewone aandelen)(de "**Rights Issue**"). De Raad, in overeenstemming met artikel 584 W.Venn., behoudt het recht om de Rights Issue af te sluiten voor de effectief ontvangen inschrijvingsbedragen, _gesteld dat_ de verwezenlijking van de Rights Issue onderworpen is aan een minimum inschrijvingsbedrag van EUR 7.000.000 (de "**Opschortende Voorwaarde**"). De Opschortende Voorwaarde is bepaald op EUR 7M, in plaats van EUR 7,5M, om te vermijden dat onverwachte gebeurtenissen (zoals de laattijdige betaling door een aandeelhouder die zijn voorkeurrechten zou hebben uitgeoefend) zouden leiden tot het niet voltooien van de Rights Issue.

Overeenkomstig het voorgaande, zullen alle aandeelhouders het recht hebben deel te nemen in de Rights Issue, op een 100-voor-173 basis.

Gezien de uitoefenverhouding van de voorkeurrechten, zullen een aantal voorkeurrechten niet kunnen worden uitgeoefend, aangezien dit mathematisch onmogelijk is. Dit kan een (technische) beperking van het voorkeurrecht inhouden onder artikel 596 W.Venn.

*****

# 1. DOEL EN RECHTVAARDIGING VAN DE RIGHTS ISSUE

## 1.1. Achtergrond

Easdaq NV en haar 100% dochter Equiduct Systems Ltd ("**ESL**") vormen samen een bedrijfseenheid, die, in partnerschap met Börse Berlin AG ("**BSX**"), een handelsplatform aanbiedt ("_Regulated Investment Exchange_" (RIE)) ("**Equiduct**") (een onderdeel van Börse Berlin AG), dat specialiseert in het verbinden van retail order flow met professionele market makers en institutionele spelers.

2

Het bestaande marktmodel werd ingesteld in de tweede helft van 2010 als het gevolg van een controleverwerving in de Vennootschap door een grote, in de Verenigde Staten gevestigde market maker, Citadel (middels haar dochter Citadel Tactical Investments LLC, ("Citadel")), in augustus 2009. In hoofdzaak berekent het business model de gewogen gemiddelde marktprijzen ("Bid" en "Offer") voor individueel genoteerde aandelen ("cash equity shares") en biedt deze aan de markt aan, aan een gegarandeerde prijs. In essentie biedt dit een "beste prijs" aan retail investeerders.

Sinds het opstarten van het nieuwe business model, heeft Equiduct een positieve, zij het trage, vooruitgang geboekt in haar inkomstengroei. Dit werd beïnvloed door moeilijke regulering, harde concurrentie en een extreem moeilijk macro-economisch klimaat, waarbij de volumes en waarde in de handel in aandelen tot 40% zijn gekrompen na de pieken in 2008. Ondanks deze sombere economische achtergrond en de daarmee gepaard gaande problemen, blijft de business van Equiduct een groter marktaandeel te veroveren, en dit ondanks de bestaande tegenspoed.

De Raad (alsook de meerderheidsaandeelhouders van de Vennootschap) gelooft dat het Equiduct business model uniek is, en reeds een wezenlijke waarde vertegenwoordigt. Het is algemeen aanvaard door deze groep dat van "meer van hetzelfde" redelijkerwijze kan worden verwacht dat de activiteiten zullen bestendigen tot een concurrentieel, zelfvoorzienend handelsplatform. Echter, Equiduct heeft nog geen break-even bereikt en als zodanig heeft de Vennootschap gedurende de voorbije jaren haar aandeelhouders gevraagd om de business te financieren in haar pad naar succes. Onder de bestaande beperkingen, en aannemend dat er verdere financiering is (zie onder), wordt op dit ogenblik verwacht dat Equiduct break-even zal bereiken in het begin van het boekjaar 2014.

Hoewel dit een visie is die redelijkerwijs wordt aangehouden door de Raad (gebaseerd op zijn beoordeling van de huidige omstandigheden en waarvan hij op de hoogte is, en op een aantal veronderstellingen waarvan hij gelooft dat ze redelijk zijn), dient het te worden opgemerkt dat hieromtrent geen garanties kunnen worden gegeven. Mededelingen betreffende de toekomst zijn inherent onzeker, en er mag geen overdreven vertrouwen aan worden gehecht, gezien werkelijke resultaten (om een verscheidenheid aan redenen) aanzienlijk kunnen verschillen.

## 1.2.    Huidige situatie

### 1.2.1.  Financiële positie

Gedurende het boekjaar 2011 heeft Equiduct haar tweede volledige jaar van operationeel verhandelen afgerond. Ondanks het genereren van EUR 1,3M aan inkomsten, waren de operationele kosten die gepaard gaan met het platform in het gebied van EUR 8,0M, wat resulteerde in een gemiddelde cash burn van circa. EUR 0,6M per maand, of EUR 7,2M per jaar.

Het bestaande business plan veronderstelt een inkomstengroei over een periode van drie jaar, wat leidt tot break-even tegen het einde van het boekjaar 2013 of in het begin van het boekjaar 2014. Echter, er moet kennis van worden genomen dat het business plan een "stabiel" economisch klimaat veronderstelt, dat de groei niet negatief zou beperken, hetgeen op dit ogenblik moeilijk in te beelden valt.

3

Op datum van dit Verslag, heeft de business liquide activa van ongeveer EUR 4.4M. De Vennootschap heeft echter ook een uitstaande lening met BSX als tegenpartij, onder een leningsovereenkomst tussen de Vennootschap, BSX en de heer Jos B. Peeters (de "**2009 Leningsovereenkomst**"). De hoofdsom onder de 2009 Leningsovereenkomst bedraagt ongeveer EUR 3,2M met (onbetaalde) verworven interesten daarop van ongeveer EUR 0,3M, op datum van dit Verslag, wat resulteert in een totale passiefpost van ongeveer EUR 3,5 M. De vervaldag van de 2009 Leningsovereenkomst (hoofdsom en verworven interesten) was 31 december 2012. Echter, als tegenprestatie voor bepaalde verbintenissen door de Vennootschap, Citadel en Knight (zoals verder omschreven hieronder), heeft BSX ingestemd om de termijn van de 2009 Leningsovereenkomst te verlengen tot 31 december 2013, zoals verder uiteengezet in paragraaf 1.5.

Gezien de bestaande activiteiten, en zonder de Rights Issue (en de Investeringsverbintenis (zoals hierna gedefinieerd)) in rekening te nemen, is er beraamd dat de Vennootschap een negatieve balans zou hebben tegen juni/juli 2012. In dit opzicht verwijst de Raad ook naar haar Bijzonder Verslag opgesteld overeenkomstig artikel 633 W.Venn. (dat is opgenomen in het Gecombineerd Verslag van dezelfde datum als dit Verslag).

### 1.2.2. Financieringsvereisten

De huidige financiële situatie van Equiduct houdt in dat aanzienlijke financiering dient te worden georganiseerd opdat de business kan worden verdergezet uitgaande van de continuïteit van de bedrijfsactiviteiten. Het dient te worden opgemerkt dat dit een verwachte positie is. Het werd duidelijk dat de initiële investeringen gedaan door Citadel (in augustus 2009) en nadien door Knight Capital Group, Inc. ("**Knight**") (in juni 2010) geen voldoende financiering zouden inhouden om de business zelfvoorzienend te maken. Echter, de inkomstengroei is trager dan verwacht, wat op zijn beurt de timing van financieringsvereisten heeft versneld.

De berekening van de volgende financieringstranche neemt de volgende 12 maanden in beschouwing, na juni 2012, en veronderstelt bepaalde voorzichtige en binaire veronderstellingen, als volgt (om iedere twijfel te vermijden, de volgende veronderstellingen nemen de succesvolle verwezenlijking van de Rights Issue niet in rekening):

    I.    Geen verhoging van inkomsten
    II.   Geen verlaging van kosten
    III.  Bestaande cash burn ratio
    IV.  Geen bijkomende investeringen
    V.   Verlenging van de vervaldag van de 2009 Leningsovereenkomst

De voorgestelde financieringsvereisten kunnen bijgevolg als volgt worden bepaald:

| EUR (000) | | Maand | Jaar |
|---|---|---|---|
| Cash burn | | (0.6) | (7.2) |
| BSX Lening: | Hoofdsom | | (3.2) |
| | Interest | | (0.3) |
| | | | (10.8) |

4

| | |
|---|---|
| Cash Balance (einde juni) | 3.8 |
| | (6.9) |
| **Financieringssuggestie** | 7.5 |

Bijgevolg, op basis van een aantal veronderstellingen, en hoewel geen garanties kunnen worden gegeven in dit opzicht, wordt verwacht dat EUR 7,5M Equiducts activiteiten zou financieren gedurende de periode van 12 maanden na juni 2012. Het dient te worden opgemerkt dat niet verwacht wordt dat dit bedrag Equiduct naar break even zou leiden (zie hierboven).

### 1.2.3. Gebruik van financiering

De Vennootschap heeft de intentie om enige bijkomende fondsen die ze zou ophalen door de Rights Issue te gebruiken om de operationele activiteiten van de business verder te zetten. De fondsen zullen bijgevolg worden gebruikt als operationeel werkkapitaal.

Er bestaat een beraming van investering, gespecificeerd in het financieel plan, die in 2012 EUR 0,6M toekent voor het upgraden en onderhouden van de technologische infrastructuur. Het is nog onduidelijk of die investering zal worden gedaan. Het wordt verondersteld dat de snelheid van investeringen in dit opzicht proportioneel zal zijn aan de fondsen gegenereerd door bijkomende cliënten en respectievelijke verhandelingsvergoedingen.

Het dient ook te worden opgemerkt dat Equiduct kan besluiten om prijspromoties aan te bieden aan nieuwe cliënten om nieuwe leden aan te lokken. Dit zou, op de korte termijn, de inkomstenstroom beperken, vandaar de veronderstelling dat de cash burn niet zal worden verminderd, zoals hierboven gesteld.

### 1.3. Financieringsproces

#### 1.3.1. Rights Issue - Bemerkingen

Gezien de nood van de Vennootschap aan bijkomende fondsen, zoals uiteengezet in paragraaf 1.2.2, heeft de Raad de mogelijkheid onderzocht om een "rights issue" de organiseren. Een "rights issue" tracht kapitaal op te halen bij de bestaande aandeelhouders door alle bestaande aandeelhouders de mogelijkheid te bieden in te schrijven op nieuwe aandelen, *pro rata* hun aandeelhouderschap, aan een uitgifteprijs waarvan de Raad gelooft dat deze zou toelaten dat de financieringsronde het vereiste bedrag ophaalt (zoals uiteengezet hierboven). De Raad gelooft dat een rights issue voor een bedrag van ongeveer EUR 7,5M dient te worden georganiseerd, in lijn met de financieringsvereisten die nodig zijn opdat de Vennootschap haar business kan verderzetten uitgaande van de continuïteit van de bedrijfsactiviteiten, gedurende een periode van 12 maanden.

De Raad heeft daarom de interesse gepeild van de bestaande meerderheidsaandeelhouders, Citadel en Knight, om deel te nemen aan een dergelijke rights issue, aangezien deze aandeelhouders in het recente verleden een aanzienlijke participatie in de Vennootschap hebben genomen. Recent hebben Citadel en Knight een *Participation Commitment Letter* ondertekend, aan een uitgifteprijs van EUR 0,20, voor het vereiste bedrag van ongeveer EUR 7,5M,

voorwaardelijk aan een aantal modaliteiten en voorwaarden die worden beschreven in paragraaf 1.4.1.

### 1.3.2.  Derde partij 'strategische investeerder'

Parallel met de gesprekken met Citadel en Knight, heeft de Raad ook gesprekken gestart met een belangrijke derde partij-strategische investeerder. Op datum van dit Verslag werd reeds een NDA verzonden voor tegentekening aan deze derde partij (die mondeling heeft verklaard dat ze zou tegentekenen). De gesprekken waren tot nu toe enkel *"high level"*, en focusten voornamelijk op potentiële gezamenlijke strategische voordelen voor beide partijen.

De Raad gelooft dat deze derde partij (indien deze zou investeren) naar de toekomst toe belangrijke businessondersteuning zou kunnen leveren, alsook ontwikkeling en financiering. Ze zou ook bijkomende *trading flow* op het platform kunnen genereren. De Raad is van mening dat deze derde partij tot nu toe aanzienlijke interesse in de business van de Vennootschap heeft getoond, en dat er een opportuniteit bestaat tot het sluiten van een zekere vorm van strategisch partnerschap.

Echter, de werkelijke wil om te investeren in hoofde van deze derde partij is vooralsnog onbepaald, net als de wijze van enige strategische investering. Bijgevolg voldoet het huidige stadium van de discussies met deze derde partij niet aan de onmiddelijke noodzaak aan financiering, zoals bepaald door de Raad.

### 1.3.3.  "Jumpball" deelneming

De Raad heeft ook overwogen om, als een alternatief en/of verdere strategische optie voor financiering, een "jumpball"-schema te bewerkstelligen. Het principe van een "jumpball"-schema is om de marktdeelnemers te incentiveren om hun business op het platform te verhogen, in een poging om bepaalde criteria te behalen die hen zullen toelaten om opties te verwerven om aandelen in de business aan kopen.

Op datum van dit Verslag, is echter nog geen schema en methodologie vastgesteld om een "jumpball"-schema op te stellen. Als gevolg hiervan heeft de Raad bepaald dat een dergelijk schema niet zou voldoen aan de onmiddellijke vereiste van financiering.

### 1.4.    Kenmerken van de Rights Issue

### 1.4.1.  Citadel / Knight investeringsverbintenis

### 1.4.1.1.  Participation Commitment Letter

De Vennootschap heeft de laatste maanden een aantal gesprekken gevoerd met Citadel en Knight, de twee grootste aandeelhouders. Als resultaat van deze gesprekken, hebben Citadel, Knight en de Vennootschap een *Participation Commitment Letter* ondertekend op 4 juni 2012, waarin elk van Citadel en Knight (onder de voorwaarden hieronder uiteengezet) er zich afzonderlijk toe heeft verbonden om deel te nemen aan de Rights Issue aan een uitgifteprijs van

6

EUR 0,20, waarbij Citadel en Knight zullen deelnemen aan de Rights Issue voor een totaal bedrag van maximaal EUR 7,494,900 (de "**Investeringsverbintenis**"), *i.e.* het maximale bedrag van de Rights Issue (aannemend dat geen warrants zullen worden uitgeoefend). Bijgevolg, indien geen andere aandeelhouders hun voorkeurrecht zouden uitoefenen (en aannemend dat geen warrants zullen worden uitgeoefend, in welk geval de maximale grootte van de Rights Issue zou toenemen), zullen Citadel en Knight inschrijven op het totale bedrag van de Rights Issue.

Om elke twijfel te vermijden, wordt er opgemerkt dat indien warrants zouden worden uitgeoefend, de maximale grootte van de Right Issue zou toenemen, maar dat dit geen effect zou hebben op Citadels en Knights verbintenis (zoals hierboven uiteengezet) om in te schrijven voor een totaal bedrag tot EUR 7.494.900, zodat als gevolg van de Investeringsverbintenis, in ieder geval zou worden ingeschreven op de Rights Issue voor een bedrag van ten minste EUR 7.494.900.

Met betrekking tot de mogelijkheid dat warrants zouden worden uitgeoefend, wordt verwezen naar paragraaf 3.3.

Indien andere aandeelhouders echter hun voorkeurrecht zouden uitoefenen, zou dit het bedrag van de Investeringsverbintenis verminderen. Citadel zal in ieder geval inschrijven voor een bedrag van EUR 2.997.690 (hetgeen overeenkomt met ongeveer 65% van haar huidige aandeelhouderschap) en Knight zal inschrijven voor elk zulk bedrag zo dat het totale bedrag aan inschrijvingen onder de Rights Issue EUR 7.494.900 zal bereiken; Knights verbintenis dient daarbij in wezen als een "*back-stop*" (bij wijze van voorbeeld: indien aandeelhouders (andere dan Citadel en Knight) hun voorkeurrecht zouden uitoefenen voor een totaal bedrag van ongeveer EUR 1.000.000, dan zal Knight inschrijven voor het "resterende" bedrag van ongeveer EUR 3.500.000, opdat het totale investeringsbedrag van EUR 7.494.900 zou worden bereikt).

Er dient echter te worden opgemerkt dat de Investeringsverbintenis onderworpen is aan een aantal opschortende voorwaarden:

- de Wijzigingsovereenkomst (zoals gedefinieerd in paragraaf 1.5) zal ten volle van toepassing blijven en zal niet worden beëindigd;

- de Aandeelhoudersovereenkomst van 24 juni 2010 (zoals van tijd tot tijd gewijzigd) tussen Citadel, Knight, BSX, de heer Jos B. Peeters en de Vennootschap zal worden gewijzigd in overeenstemming met de principes apart overeengekomen door Citadel en Knight.

In dit opzicht merkt de Raad op dat de wijzigingen aan de Aandeelhoudersovereenkomst (die worden verwacht overeen te worden gekomen na de datum van dit Verslag, maar voor de datum van de BAV) ook zullen moeten worden weerspiegeld in de statuten van de Vennootschap, hetgeen een statutenwijziging veronderstelt. Daartoe dient een buitengewone algemene vergadering te worden georganiseerd die zal besluiten over deze wijzigingen, dewelke verwacht wordt plaats te vinden enige tijd na de afsluiting van de Rights Issue.

De Raad is ingelicht door de partijen bij de Aandeelhoudersovereenkomst dat de wijzigingen aan dit document substantieel zullen inhouden dat Knight substantieel dezelfde rechten als Citadel zal hebben met betrekking tot de gereserveerde materies bepaald in de artikelen 18

7

en 33 van de statuten, en dat Knight het recht zal worden toegekend om, in totaal, vier bestuurders te nomineren voor benoeming.

- de Vennootschap is niet het onderwerp van een procedure van ontbinding of vereffening, faillissement of gerechtelijke organisatie, noch werden er daartoe enige stappen ondernomen, ze is ook niet het onderwerp van enige andere gelijkaardige insolventieprocedure onder eender welke toepasselijke wet, noch is ze anderzijds beperkt in haar rechten om te beschikken over haar activa, noch is ze het onderwerp van maatregelen als de aanstelling van een voorlopig bewindvoerder, of van sekwester, noch werden er stappen daartoe ondernomen.

   Om elke twijfel te vermijden: de procedure onder artikel 633 W.Venn., die zal worden toegepast in het kader van de jaarvergadering van de Vennootschap die zal worden gehouden op 28 juni 2012, zal niet worden geacht te vallen onder één van bovenstaande situaties. In dit opzicht verwijst de Raad naar haar Bijzonder Verslag opgesteld overeenkomstig artikel 633 W.Venn. (ingevoegd in het Gecombineerd Verslag van dezelfde datum als dit Verslag).

- de Rights Issue zal worden goedgekeurd door de aandeelhouders van de Vennootschap op de BAV, en de afsluiting van de uitgifte van, en de inschrijving op, de aandelen onder de Rights Issue zal plaatsvinden op of voor 30 september 2012.

   Zoals uiteengezet in het overzicht van de modaliteiten van de Rights Issue (paragraaf 4), verwacht de Raad dat de Rights Issue inderdaad zal worden voltooid voor 30 september 2012.

In de Participation Commitment Letter heeft de Vennootschap ermee ingestemd om een zakenbank te selecteren en aan te stellen om alle strategische opties te onderzoeken.

### 1.4.1.2.    *Uitgifteprijs van de Rights Issue*

Er wordt verwezen naar paragraaf 3 voor de Raad zijn beoordeling en rechtvaardiging van de uitgifteprijs die zal worden toegepast onder de Rights Issue.

### 1.4.2.    *Börse Berlin AG*

### 1.4.2.1.    *Deelname aan de Rights Issue*

BSX, de derde grootste aandeelhouder van de Vennootschap, was ook getoetst met betrekking tot de deelname aan een rights issue. Het is begrepen dat BSX zich op dit ogenblik niet in een positie zou bevinden om deel te nemen aan een rights issue.

### 1.4.2.2.    *Uitgifte van een BSX 2012 Warrant*

Het dient te worden opgemerkt dat, indien de Rights Issue succesvol wordt voltooid, na de voltooiing van de Rights Issue, een buitengewone algemene vergadering van aandeelhouders zal

8

worden gehouden die zal voorgesteld worden te besluiten over de uitgifte van één (1) warrant aan BSX, met een uitoefenprijs die wordt verwacht lager te zijn dan de fractiewaarde van de aandelen op dat ogenblik, en met opheffing van het voorkeurrecht, en die uitoefenbaar zal zijn ofwel: (a) in geld; of (b) in natura, door de inbreng van het saldo (in voorkomend geval) van het kapitaal en verworven interest onder de 2009 Leningsovereenkomst (de "**BSX 2012 Warrant**")(de "**Tweede BAV**"). De uitgifte- en uitoefenvoorwaarden van de BSX 2012 Warrant zullen in detail worden uiteengezet in een bijzonder verslag van de Raad dat zal worden verzonden aan de aandeelhouders samen met de oproeping voor de Tweede BAV.

De uitgifte van een nieuwe warrant aan BSX is een essentieel element van de Rights Issue, die tot doel hebben het financieren van de Vennootschap en het verzekeren van haar levensvatbaarheid op lange termijn, en is bijgevolg in het belang van de Vennootschap. De uitgifte van de BSX 2012 Warrant zal de samenwerking tussen de Vennootschap en BSX verderzetten, en zal BSX toelaten haar huidig belang van 10% (bij benadering) in de Vennootschap te behouden, na de voltooiing van de Rights Issue.

Om de aandeelhouders te informeren, zet de Raad hierbij een samenvatting van de modaliteiten en voorwaarden van de BSX 2021 Warrant uiteen, waarvan wordt verwacht dat ze worden voorgesteld aan de Tweede BAV.

De uitgifte van een nieuwe warrant aan BSX is een essentieel element van de Rights Issue, die erop gericht is de Vennootschap te financieren en haar levensvatbaarheid op lange termijn te verzekeren, en is bijgevolg in het belang van de Vennootschap. De uitgifte van de BSX 2012 Warrant zal de blijvende samenwerking tussen de Vennootschap en BSX voortzetten, en zal BSX toelaten zijn belang in de Vennootschap van (ongeveer) 10% te behouden, na de voltooiing van de Rights Issue.

Met het oog op het informeren van de aandeelhouders, geeft de Raad hier een samenvatting van de modaliteiten en voorwaarden van de BSX 2012 Warrant, die verwacht worden te worden voorgesteld aan de Tweede BAV.

*(i) Uitoefenperiode*

BSX zal gerechtigd zijn de BSX 2012 Warrant uit te oefenen, in één of meerdere keren, gedurende een periode die aanvangt op de Tweede BAV en die eindigt op de derde verjaardag van deze datum.

*(ii) Uitoefenprijs*

De voorgestelde uitgifteprijs per gewoon aandeel bij de (gehele of gedeeltelijke) uitoefening van de BSX 2012 Warrant zal gelijk zijn aan de uitgifteprijs van de Rights Issue (*i.e.* EUR 0,20) en zal daarom lager zijn dan de huidige fractiewaarde van de aandelen.

BSX zal de uitoefenprijs kunnen betalen ofwel: (a) in geld; of (b) in natura, door de inbreng van het saldo (in voorkomend geval) van het kapitaal en verworven interest onder de 2009 Leningsovereenkomst, *i.e.* door de inbreng in natura van de vordering van BSX op de

9

terugbetaling van de gehele of een deel van de bestaande lening uitstaande tussen BSX en de Vennootschap onder de 2009 Leningsovereenkomst ten belope van een bedrag bestaande uit de gehele of een deel van de hoofdsom (EUR 3.244.126,94) met de daarop verworven interest (er wordt hierbij ook verwezen naar paragraaf 1.5).

*(iii) Aandelen waartoe de houder van de BSX 2012 Warrant zal zijn gerechtigd*

In het algemeen, zal de BSX 2012 Warrant recht geven in te schrijven op een dergelijk totaal aantal nieuwe gewone aandelen zodat, na de volledige uitoefening van de BSX 2012 Warrant, BSX 10% van de aandelen zal houden, op "zoals uitgeoefend"-basis (*fully diluted basis*), berekend op basis van het totale aantal bestaande aandelen van de Vennootschap, onmiddellijk na de Rights Issue.

Dergelijk aantal aandelen zal worden berekend door de volgende formule, waarbij de BSX 2012 Warrant recht zal geven op een aantal nieuwe gewone aandelen gelijk aan X:

$$X = \frac{A}{9} - \left( \frac{10}{9} * B \right)$$

Waarbij:

**A** = Volledig Verwaterd Kapitaal (*i.e.k*, het totale aantal uitgegeven aandelen in het kapitaal van de Vennootschap en zulk maximum aantal aandelen in het kapitaal van de Vennootschap dewelke uitgegeven kunnen worden overeenkomstig de uitoefening van enig conversierecht of inschrijvingsrecht uitgegeven door de Vennootschap (met inbegrip van enige warrants en, in het geval van een nieuwe uitgifte van aandelen of warrants, met inbegrip van de nieuwe aandelen of warrants voorgesteld om uit te geven), ongeacht of de voorwaarden voor zulk een uitoefening, conversie of inschrijving voldaan zijn op het moment van de toepassing van deze definitie), onmiddellijk na de voltooiingsdatum van de Rights Issue, <u>exclusief</u> de aandelen die zouden kunnen worden uitgegeven bij de uitoefening van de BSX 2012 Warrant; en

**B** = de som van:

- het aantal aandelen gehouden door BSX op de voltooiingsdatum van de Rights Issue;
- het aantal aandelen dat kan worden uitgegeven bij de uitoefening van de BSX 2009 Warrants, op de voltooiingsdatum van de Rights Issue; en
- het aantal aandelen dat kan worden uitgegeven bij de uitoefening van de BSX 2010 Warrant, op de voltooiingsdatum van de Rights Issue;

Voor de diluering die kan worden veroorzaakt door de uitoefening van de BSX 2012 Warrant, wordt verwezen naar paragraaf 3.2.

*(iv) Algemeen*

10

In het algemeen dient te worden gesteld dat de BSX 2012 Warrant substantieel (*mutatis mutandis*), en in zover dit Verslag daar niet van afwijkt, dezelfde modaliteiten en voorwaarden zal hebben als de warrant die werd uitgegeven aan BSX op 24 juni 2010, zoals uiteengezet in het bijzonder verslag van de Raad met betrekking tot deze warrant, van 7 juni 2010.

## 1.5.  BSX LENING ROLL-OVER

Zoals hierboven opgemerkt, is een belangrijke passiefpost op de balans van de Vennootschap toe te kennen aan een lening met BSX als tegenpartij.

De lening van BSX (*i.e.* hoofdsom en verworven interesten) zou volledig terugbetaalbaar zijn geworden tegen het einde van het boekjaar 2012, onder de oorspronkelijke 2009 Leningsovereenkomst. Echter, als gevolg van de wijziging van de 2009 Leningsovereenkomst, aangegaan door de Vennootschap, de heer Jos B. Peeters en BSX op 4 juni 2012 (de "**Wijzigingsovereenkomst**"), als tegenprestatie voor Citadels en Knights Investeringsverbintenis, alsook de instemming van de Vennootschap om de Master Agreement met BSX  te wijzigen (zoals hieronder besproken), heeft BSX ingestemd om de termijn van de 2009 Leningsovereenkomst te verlengen tot 31 december 2013.

Meer specifiek zal de beëindigingsdatum van de 2009 Leningsovereenkomst de volgende zijn:

(a) indien de Outsourcing Agreement[1] is beëindigd op of na 1 januari 2012, maar voor 31 december 2013, de datum waarop de Outsourcing Agreement is beëindigd; en

(b) in alle omstandigheden anders dan die voorzien in paragraaf (a), 31 december 2013.

Onder voorwaarde van de ondertekening (en het effectief worden) van de Wijzigingsovereenkomst met betrekking tot de 2009 Leningsovereenkomst, hebben de Vennootschap, ESL en BSX overeengekomen de Master Agreement[2] te wijzigen met als effect dat de bepalingen inzake de beëindiging zullen worden gewijzigd om te weerspiegelen dat ieder van BSX en de Vennootschap het recht hebben om de overeenkomst te beëindigen mits de andere partij hiervan niet minder dan 3 (drie) jaar voordien schriftelijk van in kennis te stellen (de overige modaliteiten en voorwaarden inzake beëindiging blijven ongewijzigd).

## 2.  UITGIFTE VAN AANDELEN EN AARD VAN DE UITGEGEVEN AANDELEN

Ten gevolge van de Rights Issue zal de Vennootschap nieuwe aandelen uitgeven aan de aandeelhouders die wensen in te schrijven op de Rights Issue door de uitoefening van hun voorkeurrechten, aan een uitgifteprijs van EUR 0,20 (die lager is dan de huidige fractiewaarde van de aandelen in de Vennootschap) aan een 100-voor-173-basis (wat inhoudt dat voor iedere

---

[1] De Outsourcing Agreement is een overeenkomst tussen BSX, de Vennootschap en ESL, ondertekend op 19/20 maart 2009, die de rechten en verplichtingen bepaalt tussen BSX als de "*Regulated Market Operator*" voor het Equiduct handelsplatform aan de ene kant, en de Vennootschap & ESL als de aanbieder van technische diensten met betrekking tot de operatie van het Equiduct Platform aan de andere kant.

[2] De Master Agreement van 7 augustus 2009 tussen de Vennootschap, ESL en BSX, werd ondertekend om bijkomende leveringen van diensten tussen de partijen te annuleren, aan te passen en/of te wijzigen.

173 aangehouden voorkeurrechten, een aandeelhouder het recht heeft in te schrijven op 100 nieuwe gewone aandelen). De aandelen zullen volledig worden volgestort op het tijdstip van de verwezenlijking van de Rights Issue. De aandelen zullen gewone aandelen zijn, met de rechten daaraan verbonden zoals bepaald in de statuten van de Vennootschap, en zullen zich in alle opzichten *pari passu* verhouden met alle bestaande aandelen van de Vennootschap.

Het dient daarbij te worden opgemerkt dat iedere aandeelhouder (behalve indien hij bij toeval een aantal aandelen zou houden dat een exact veelvoud is van 173) bij uitoefening van zijn voorkeurrechten een overblijvend aantal voorkeurrechten zal hebben (*i.e.*, telkens een aantal lager dan 173). Indien alle veelvouden van 173 voorkeurrechten (naargelang het geval, na te zijn verhandeld, of in de Bijkomende Aanbiedingsperiode (zoals bepaald in paragraaf 4.5)), werden uitgeoefend, zou een totaal van 59 voorkeurrechten niet uitoefenbaar blijven (aannemend dat geen warrants werden uitgeoefend, en dat het maximumbedrag van de kapitaalverhoging bijgevolg EUR 7.494.900 zou bedragen; indien warrants zouden worden uitgeoefend, zou het aantal voorkeurrechten dat onuitoefenbaar zou blijven, wijzigen (overeenkomstig de wiskunde van de uitoefenverhouding) maar zal dit in ieder geval niet hoger zijn dan 172). Inzover als nodig, en indien dit, in theorie, zou vallen onder een (zeer beperkte en technische) beperking van het voorkeurrecht, zal dit Verslag dienen, inzover als nodig, als een Bijzonder Verslag overeenkomstig artikel 596 W.Venn.

Ten gevolge van het bovenstaande moet een aandeelhouder die zou wensen in te schrijven op de Rights Issue, ten minste 173 voorkeurrechten hebben om in te schrijven op een eerste tranche van 100 nieuwe aandelen, en zo verder. Indien het eigen aandeelhouderschap van een aandeelhouder lager zou zijn dan deze drempel, en indien hij wenst deel te nemen in de volgende tranche van 100 aandelen, zal hij voorkeurrechten moeten trachten te verwerven van andere aandeelhouders, gedurende de Aanbiedingsperiode (zulke verwerving van voorkeurrechten dient te worden bevestigd aan de Vennootschap door middel van het Formulier Overdracht Rechten (zoals verder bepaald in paragraaf 4.3)). Echter, aandeelhouders dienen op te merken dat de Vennootschap geen markt in voorkeurrechten zal organiseren.

## 3. UITGIFTE VAN NIEUWE AANDELEN AAN EEN UITGIFTEPRIJS DIE LAGER IS DAN DE HUIDIGE FRACTIEWAARDEN VAN DE AANDELEN

### 3.1. Algemeen

Op de datum van dit Verslag bedraagt het geplaatst kapitaal van de Vennootschap EUR 137.411.819,68 en wordt het vertegenwoordigd door 64.830.944 gewone aandelen, zodat de fractiewaarde ongeveer EUR 2,12 per aandeel bedraagt. De uitgifteprijs per gewoon aandeel onder de Rights Issue zal EUR 0,20 bedragen, en zal bijgevolg lager zijn dan de huidige fractiewaarde van de aandelen.

Onmiddellijk na de Rights Issue, wordt de kapitaalvertegenwoordigende waarde van alle aandelen van de Vennootschap gelijkgeschakeld zodat elk van de aandelen in de Vennootschap vervolgens dezelfde kapitaalvertegenwoordigende waarde zal hebben. De Rights Issue zal bijgevolg een belangrijke impact hebben op de vermogensrechten (*i.e.* onder andere,

12

dividendrechten en rechten op liquidatieopbrengsten) en lidmaatschapsrechten (onder andere, stem- en voorkeurrechten) die aan de bestaande aandelen zijn verbonden.

Echter, zoals uiteengezet in paragraaf 1, de opbrengsten van de Rights Issue zijn essentieel om de Vennootschap toe te laten haar activiteiten verder te ontwikkelen in het verlenen van diensten aan effectenbeurzen en handelsplatformen De voorgestelde uitgifteprijs is volgens de Raad bijgevolg in het belang van de Vennootschap is.

Het dient daarbij te worden opgemerkt dat een uitgifteprijs van EUR 0,20 per aandeel substantieel lager is dan de uitgifteprijs op het tijdstip van de financiering van de Vennootschap in juni 2010 (EUR 0,48) en op het tijdstip van de uitoefening van de Knight Warrant in juni 2011 (EUR 0,69). Deze uitgifteprijs weerspiegelt echter de financiële situatie van de Vennootschap (zoals uiteengezet in paragraaf 1.2) en wordt geacht gepast te zijn om de vereiste financiering op te halen opdat de Vennootschap haar activiteiten kan verderzetten uitgaande van de continuïteit van de bedrijfsactiviteiten (zoals ook uiteengezet in paragraaf 1.2.2). Citadel en Knight hebben de Raad meegedeeld dat ze niet willende waren de Investeringsverbintenis te geven aan een hogere uitgifteprijs dan EUR 0,20. In het licht hiervan, gelooft de Raad dat indien ze de uitgifteprijs hoger had bepaald dan EUR 0,20, het zeer waarschijnlijk zou zijn geweest dat de Rights Issue onsuccesvol zou zijn geweest.

Daarnaast dient het te worden opgemerkt dat, gezien het voorkeurrecht van de aandeelhouders niet wordt opgeheven, alle aandeelhouders de mogelijkheid hebben om in te schrijven op de Rights Issue, *pro rata* hun aandeelhouderschap in de Vennootschap, aan een 100-voor-173 basis, en ze daardoor diluering kunnen vermijden.

## 3.2.    Financiële gevolgen

### 3.2.1.  Financiële gevolgen van de Rights Issue

Zoals uiteengezet in paragraaf 1.4.1, heeft de Vennootschap de Investeringsverbintenis van Citadel en Knight verkregen om in te schrijven op de Rights Issue, voor een totaal bedrag van ongeveer EUR 7,500,000. Het kan bijgevolg worden verwacht dat (op voorwaarde dat de opschortende voorwaarden zoals uiteengezet in paragraaf 1.4.1 worden vervuld) de Rights Issue zal worden voltooid voor het maximale bedrag, en bijgevolg succesvol zal zijn. Indien warrants zouden zijn uitgeoefend, zal het maximumbedrag van de Rights Issue verhogen, en kan hier misschien niet volledig op ingeschreven worden. Echter, overeenkomstig de Investeringsverbintenis (en op voorwaarde dat de opschortende voorwaarden bepaald in paragraaf 1.4 zijn vervuld), kan het worden verwacht dat de Rights Issue zal worden voltooid voor een bedrag van ten minste EUR 7.494.900.

Bij een succesvolle Rights Issue, (en aannemend dat geen warrants worden uitgeoefend) zullen 37.474.500 nieuwe gewone aandelen worden uitgegeven, zodat het totale aantal uitstaande aandelen in de Vennootschap 102.305.444 zal bedragen. Indien warrants worden uitgeoefend, zal het aantal nieuwe gewone aandelen dat kan worden uitgegeven, hoger zijn dan 37.474.500.

13

In het geval een aandeelhouder zou kiezen om zijn voorkeurrechten niet uit te oefenen en dus niet zou deelnemen aan de Rights Issue, zal deze aandeelhouder een diluering ondergaan (Indien de Rights Issue effectief wordt verwezenlijkt voor een bedrag van EUR 7.494.900) van ongeveer 36,63%. Indien warrants zouden worden uitgeoefend, en de warranthouder zou vervolgens deelnemen aan de Rights Issue met de voorkeurrechten verbonden aan de aandelen die werden uitgegeven door deze uitoefening, zullen de aandeelhouders die niet deelnemen aan de Rights Issue een grotere diluering dragen (aangezien het niet kan worden voorspeld of warrants zullen worden uitgeoefend en of deze warranthouders daarop zouden deelnemen aan de Rights Issue, kan deze diluering niet worden gekwantificeerd op deze datum; voor de maximale diluering veroorzaakt door de uitoefening (op zich) van de bestaande warrants, wordt verwezen naar paragraaf 3.3).

De Raad is van mening dat deze potentiële diluering gerechtvaardigd is omwille van de redenen uiteengezet in paragraaf 3.1, en dat de Rights Issue onder haar voorwaarden in het belang is van de Vennootschap.

### 3.2.2. Enkel voor informatiedoeinden: financiële gevolgen van de BSX 2012 Warrant, waarover de Tweede BAV zal besluiten

Er wordt verwezen naar de samenvatting van de modaliteiten en voorwaarden van de BSX 2012 Warrant, waarover verwacht wordt dat de Tweede BAV zal besluiten, zoals bepaald in paragraaf 1.4.2.2. Het dient te worden opgemerkt dat de hierna volgende beoordeling van de diluering die kan worden veroorzaakt bij de uitoefening van de BSX 2012 Warrant, enkel voor informatiedoeleinden is, aangezien de werkelijke diluering pas gekend zal zijn op de voltooiing van de Rights Issue.

Aannemende dat de Rights Issue zal worden voltooid voor een bedrag van EUR 7.494.900, en dat de voltooiingsdatum van de Rights Issue zal vallen na 7 augustus 2012 (wat redelijkerwijze kan worden verwacht, zoals uiteengezet onder sectie 4 van dit Verslag (en wat tot gevolg zou hebben dat de warrants uitgegeven aan BSX en de heer Jos Peeters op 7 augustus 2009 zouden zijn vervallen op 7 augustus 2012, in overeenstemming met hun voorwaarden), zal de BSX 2012 Warrant recht gegeven op (in totaal) 4.251.572 nieuwe gewone aandelen.

Onder de veronderstellingen hierboven gemaakt, indien BSX de BSX 2012 Warrant dus volledig zou uitoefenen na de voltooiing van de Rights Issue, zou een aandeelhouder die niet zou hebben deelgenomen aan de Rights Issue een bijkomende diluering dragen (i.e. "bovenop" de diluering die zou zijn veroorzaakt door het niet deelnemen aan de Rights Issue) van ongeveer 3,96%. Indien deze twee transacties (i.e. de Rights Issue en de uitoefening van de BSX 2012 Warrant) samen zouden worden bekeken, zou een aandeelhouder die niet zou deelnemen aan de Rights Issue en in de veronderstelling van een daaropvolgende volledige uitoefening van de BSX 2012 Warrant, een totale diluering van 36,16% dragen.

### 3.3.   Rechten van Warranthouders

14

Overeenkomstig artikel 501, tweede paragraaf W.Venn., in het geval van een kapitaalverhoging in geld, hebben warranthouders het recht hun warrants uit te oefenen en deel te nemen in deze kapitaalverhoging in geld (met de aandelen aan hen uitgegeven na deze uitoefening) inzover de huidige aandeelhouders van de Vennootschap het recht zouden hebben om deel te nemen aan deze kapitaalverhoging.

Aangezien het voorkeurrecht van de aandeelhouders niet wordt opgeheven met betrekking tot de Rights Issue, kunnen alle aandeelhouders deelnemen aan de Rights Issue. Het is bijgevolg mogelijk dat de warranthouders van de Vennootschap zouden wensen hun warrants uit te oefenen overeenkomst Artikel 501, tweede paragraaf W.Venn., met betrekking tot de Rights Issue, en daaropvolgend deelnemen aan de Right Issue "met" deze nieuw uitgegeven aandelen, door middel van de uitoefening van het voorkeurrecht verbonden aan deze aandelen. Om zijn rechter onder artikel 501 W.Venn. uit te oefenen, dient een warranthouder zijn warrants uitoefenen ten laatste op de BAV.

Indien de bestaande warrants zouden worden uitgeoefend, zou dit tot een diluering leiden ten aanzien van alle aandeelhouders, aangezien hun aandeelhouderschap *pro rata* de totale uitstaande aandelen zou verlagen ten gevolge van de uitgifte van nieuwe aandelen door de uitoefening van de warrants. In het geval de warranthouders zouden deelnemen aan de Rights Issue met de aandelen aan hen uitgegeven door de uitoefening van hun warrants, zou dit een bijkomende diluering veroorzaken ten aanzien van elke aandeelhouder die zou kiezen zijn voorkeurrecht niet uit te oefenen.

Op datum van dit Verslag, bedraagt het totale aantal aandelen dat zou kunnen worden uitgegeven door de uitoefening van alle uitstaande warrants, 2.104.769 gewone aandelen. Het dient daarbij te worden opgemerkt dat alle uitstaande warrants in ieder geval al uitoefenbaar zijn.

In het geval alle uitstaande warrants zouden worden uitgeoefend met betrekking tot de Rights Issue, zou dit een diluering van 3,14% veroorzaken ten aanzien van elke aandeelhouder, voorafgaand aan de Rights Issue. Voor de diluering veroorzaakt door de Rights Issue, wordt verwezen naar paragraaf 3.2.

De agenda van de BAV voorziet het geven van een volmacht aan de Raad om het nieuwe maximale bedrag van de kapitaalverhoging (dat hoger zal zijn dan EUR 7.494.900) en andere elementen van de kapitaalverhoging te bepalen, in het geval warrants zouden worden uitgeoefend voorafgaand aan de Rights Issue. Dit zou noodzakelijk zijn als gevolg van het feit dat, indien warrants zouden worden uitgeoefend, het totale aantal uitstaande aandelen van de Vennootschap verhoogd zou worden (met het aantal aandelen uitgegeven door de uitoefening van warrants). Ten gevolge van de uitoefenverhouding van 100-voor-173 onder de Rights Issue, zou dit tot gevolg hebben dat het maximum aantal aandelen dat kan worden uitgegeven onder de Rights Issue zal toenemen, en bijgevolg dient ook de maximumgrootte van de Rights Issue worden verhoogd.

Deze uitoefening van warrants zou geen gevolgen hebben met betrekking tot de Investeringsverbintenis van Citadel en Knight, die nog steeds zouden inschrijven voor een totaal bedrag tot EUR 7.494.900, zoals bepaald in paragraaf 1.4.1.1.

15

## 4. RIGHTS ISSUE – MODALITEITEN EN VOORWAARDEN

### 4.1.    Inleiding

#### 4.1.1.  Algemeen

In deze sectie wenst de Raad de aandeelhouders te informeren met betrekking tot de verschillende stappen in het Rights Issue-proces.

Op de BAV wordt de aandeelhouders voorgesteld om de Raad (met de mogelijkheid van subdelegatie) een volmacht te geven onder welke de Raad (onder andere) de macht zal worden gegeven om het aanvangen van de Aanbiedingsperiode (zoals hieronder gedefinieerd) te bepalen, en, naargelang het geval, van de Bijkomende Aanbiedingsperiode (zoals hieronder gedefinieerd), alsook de respectievelijke afsluitingsdata, indien de Raad van oordeel zou zijn dat dit in het belang van de Vennootschap zou zijn. Dit zou de nodige flexibiliteit toelaten in de context van de Rights Issue, en de Raad stelt de aandeelhouders daarom voor om deze volmacht goed te keuren.

Onder voorwaarde van het geven van deze volmacht door de BAV, dient de timing van het Rights Issue-proces zoals bepaald in het overzicht hieronder, te worden beschouwd als indicatief (*i.e.*, niet bindend en onderworpen aan wijziging). Indien de Raad zou afwijken van de timing bepaald in dit Verslag, zullen de aandeelhouders hiervan in kennis worden gesteld.

#### 4.1.2.  Overdragen van voorkeurrechten - beperkingen

Zoals bepaald onder paragraaf 4.3 hieronder, kunnen aandeelhouders hun voorkeurrecht verhandelen (*i.e.* overdragen, met of zonder vergoeding) tijdens de Aanbiedingsperiode.

### 4.2.    Inzover als nodig, mededeling overeenkomst artikel 596 W.Venn.

Elke aandeelhouder zal het recht hebben in te schrijven op de Rights Issue, ingevolge zijn voorkeurrecht. De uitoefenverhouding van het voorkeurrecht bedraagt 100-voor-173, wat inhoudt dat voor elke 173 gehouden voorkeurrechten, een aandeelhouder het recht heeft om in te schrijven op 100 nieuwe gewone aandelen.

Aannemende dat geen warrants zullen worden uitgeoefend, zal een maximaal aantal van 37.474.500 nieuwe gewone aandelen worden uitgegeven onder de Rights Issue. Rekening houdend met het totale aantal voorkeurrechten (64.830.944 rechten, *i.e.* het aantal uitstaande aandelen in de Vennootschap), heeft de uitoefenverhouding van 100-voor-173 tot gevolg dat 59 voorkeurrechten niet uitoefenbaar zullen zijn (in het geval dat op de Rights Issue is ingeschreven voor het maximale bedrag), aangezien geen "delen van aandelen" kunnen worden uitgegeven.

Ten gevolge hiervan, zou er kunnen worden overwogen dat het voorkeurrecht van de aandeelhouders wordt beperkt in de zin dat de aandeelhouders, genomen als één groep (en in

16

de veronderstelling van een "perfecte" overdracht van ongebruikte voorkeurrechten onder elkaar, wat echter theorie is), er niet toe in staat zullen zijn een totaal aantal van 59 voorkeurrechten uit te oefenen (indien warrants zouden worden uitgeoefend, zou dit aantal wijzigen (als gevolg van de wiskunde van de uitoefenverhouding), maar zal dit in ieder geval niet hoger zijn dan 172).

Deze "beperking" is echter een zuiver technisch feit (als gevolg van de "wiskunde" van de uitoefenverhouding). In het licht daarvan, en aangezien het aantal niet uitoefenbare rechten (in de veronderstelling van een "perfecte" overdracht van ongebruikte voorkeurrechten onder elkaar, wat echter theorie is) een verwaarloosbaar aantal uitmaakt vergeleken met de uitoefenbare (in de veronderstelling van een "perfecte" overdracht van ongebruikte voorkeurrechten onder elkaar, wat echter theorie is) voorkeurrechten (0,0000009% van de uitoefenbare voorkeurrechten (indien geen warrants zullen worden uitgeoefend)), is het redelijk om te stellen dat de invloed van deze "beperking" verwaarloosbaar is.

### 4.3.    Aanbiedingsperiode

Alle data hieronder vermeld zijn indicatief, en vatbaar voor wijziging.

Na de BAV zal de Raad, bij aangetekend schrijven, een kennisgeving uitsturen aan de aandeelhouders van het aanvangen van de periode gedurende dewelke de aandeelhouders in staat zullen zijn hun respectievelijke voorkeurrechten uit te oefenen en/of te verhandelen (de "**Aanbiedingsperiode**", respectievelijk de "**Aanbiedingsperiodekennisgeving**").

Op datum van dit Verslag, beoogt de Raad de Aanbiedingsperiode open te stellen voor vijftien (15) dagen (*i.e.* de wettelijke minimumtermijn bepaald door artikel 593 W.Venn.). Indien de Raad de volmacht zou worden gegeven waarnaar verwezen in paragraaf 4.1.1, kan de Raad beslissen deze termijn te verlengen.

De Aanbiedingsperiodekennisgeving wordt verwacht te worden verzonden op 29 juni 2012. Overeenkomstig artikel 593 W.Venn., zal de Aanbiedingsperiode aanvangen 8 dagen na deze datum, *i.e.* op 7 juli 2012, en zal deze open blijven voor vijftien dagen, *i.e.* tot en met 21 juli 2012.

Gedurende de Aanbiedingsperiode kunnen de aandeelhouders hun respectievelijke voorkeurrechten uitoefenen en/of verhandelen (en de verkrijgers mogen daarop, gedurende de Aanbiedingsperiode, de voorkeurrechten uitoefenen die aan hen zijn overgedragen).

Aandeelhouders (of verkrijgers van voorkeurrechten) die voorkeurrechten wensen uit te oefenen, dienen daartoe een Uitoefenformulier in te vullen en te ondertekenen (dat zal zijn aangehecht aan de Aanbiedingsperiodekennisgeving). Aandeelhouders die hun voorkeurrecht wensen te verhandelen, moeten kennis geven van deze overdracht door een Formulier Verhandeling Rechten (dat zal zijn aangehecht aan de Aanbiedingsperiodekennisgeving) in te vullen en te ondertekenen. Deze formulieren moeten vervolgens worden gecommuniceerd aan de Vennootschap, op de wijze en tegen de data zoals vermeld in het Uitoefenformulier, resp. Formulier Verhandeling Rechten.

> **Indicatieve Timing - Aanbiedingsperiode**

17

| **Aanbiedingsperiode Start** | 7 juli 2012, 00:00 (CET) |
|---|---|
| **Aanbiedingsperiode Einde** | 21 juli 2012, 24:00 (CET) |

## 4.4.    Na de Aanbiedingsperiode: verwerking van resultaten

Op de eerste werkdag na het afsluiten van de Aanbiedingsperiode (*i.e.* op 23 juli 2012), zullen de resultaten van de Aanbiedingsperiode worden verwerkt.

In het geval alle voorkeurrechten werden uitgeoefend binnen de Aanbiedingsperiode (naargelang het geval, na te zijn verhandeld), zullen de personen die voorkeurrechten hebben uitgeoefend de betalingsdetails worden meegedeeld, voor de inschrijving op de Rights Issue (zoals verder uiteengezet in paragraaf 4.7).

Indien niet alle voorkeurrechten zouden zijn uitgeoefend binnen de Aanbiedingsperiode (naargelang het geval, na te zijn verhandeld), zal de Bijkomende Aanbiedingsperiode (zoals bepaald in paragraaf 4.5) aanvangen.

## 4.5.    Bijkomende Aanbiedingsperiode

De aandeelhouders die hun voorkeurrecht hebben uitgeoefend tijdens de Aanbiedingsperiode (maar niet enige derde aan wie voorkeurrechten zouden zijn overgedragen in de Aanbiedingsperiode, die dan zouden zijn uitgeoefend) zullen de mogelijkheid hebben in te schrijven op het saldo van de Rights Issue (*i.e.*, het aantal nieuwe aandelen dat overeenkomt met de voorkeurrechten die niet werden uitgeoefend gedurende de Aanbiedingsperiode), gedurende een bijkomende periode, op een *pro rata* basis (*i.e. pro rata* hun aandeelhouderschap in de Vennootschap voor de eerste Aanbiedingsperiode tussen de aandeelhouders die hun voorkeurrecht hebben uitgeoefend in de eerste Aanbiedingsperiode en die bijkomende aandelen wensen op te nemen in de bijkomende aanbiedingsperiode) (de "**Bijkomende Aanbiedingsperiode**").

Na het verwerken van de resultaten van de Aanbiedingsperiode, zal de Raad kennis geven (*i.e.* op 24 juli 2012) aan alle aandeelhouders die hun voorkeurrecht hebben uitgeoefend, om hen te informeren over de Bijkomende Aanbiedingsperiode (de "**Bijkomende Aanbiedingsperiode-kennisgeving**").

De Bijkomende Aanbiedingsperiode zal aanvangen op de derde dag nadat de Bijkomende Aanbiedingsperiode-kennisgeving werd verzonden, bij aangetekend schrijven, en zal open blijven gedurende zeven dagen.

Aandeelhouders die wensen deel te nemen aan de Bijkomende Aanbiedingsperiode, zullen het Bijkomende Aanbiedingsperiode-Uitoefenformulier (dat zal zijn aangehecht aan de Bijkomende Aanbiedingsperiode-kennisgeving) dienen in te vullen en ondertekenen. Dit formulier dient vervolgens te worden gecommuniceerd aan de Vennootschap, op de wijze en tegen de datum zoals vermeld in het Bijkomende Aanbiedingsperiode-Uitoefenformulier.

**Indicatieve Timing – Bijkomende Aanbiedingsperiode**

18

| Bijkomende    Aanbiedingsperiode Start | 27 juli 2012, 00:00 (CET) |
| Bijkomende    Aanbiedingsperiode Einde | 5 augustus 2012, 24:00 (CET) |

## 4.6.  Na de Bijkomende Aanbiedingsperiode: verwerking van resultaten (2)

Op de eerste werkdag na de afsluiting van de Bijkomende Aanbiedingsperiode (*i.e.*, op 6 augustus 2012), zullen de resultaten van de Bijkomende Aanbiedingsperiode worden verwerkt. Dan zal worden vastgesteld of de Rights Issue succesvol was, *i.e.* of het minimum inschrijvingsbedrag werd bereikt en of de Opschortende Voorwaarde bijgevolg werd vervuld.

Indien de Opschortende Voorwaarde niet zou zijn vervuld, zal een kennisgeving worden gezonden aan alle aandeelhouders, dat de Rights Issue niet zal worden voltooid.

Indien de Opschortende Voorwaarde wel zou zijn vervuld, zal een kennisgeving worden gezonden aan alle inschrijvers op de Rights Issue, waarin de betalingsinstructies worden uiteengezet (zoals bepaald in paragraaf 4.7).

## 4.7.  Betaling

Op de werkdag na de datum waarop zal zijn vastgesteld dat de Opschortende Voorwaarde werd vervuld (*i.e.*, in het geval er een Bijkomende Aanbiedingsperiode is, op 6 augustus 2012), zal een kennisgeving worden verzonden aan alle personen die voorkeurrechten hebben uitgeoefend, dat de details uiteenzet voor de betaling van hun respectievelijke inschrijvingsbedragen (de "**Betalingskennisgeving**").

Op het einde van de zesde werkdag nadat de Raad de betalingsinstructies heeft verzonden, moeten de respectievelijke inschrijvingsbedragen van de inschrijvers op de Rights Issue zijn gecrediteerd op de geblokkeerde bankrekening geopend door de Vennootschap voor de kapitaalverhoging onder de Rights Issue, overeenkomstig artikel 600 W.Venn. (waarvan de details zullen worden meegedeeld in de Betalingskennisgeving).

| Indicatieve Timing – Betaling | |
| --- | --- |
| Opening betalingsperiode | 6 augustus 2012, 00:00 (CET) |
| Einde betalingsperiode | 14 augustus 2012, 24:00 (CET) |

## 4.8.  Verwezenlijking van de Rights Issue

Zo snel als mogelijk na de afsluitingsdatum van de betalingsperiode, zal de Vennootschap het bankcertificaat overeenkomstig artikel 600 W.Venn. bekomen, dat bewijs uitmaakt dat de inschrijvingsbedragen werden betaald op de geblokkeerde bankrekening.

19

Bij het ontvangen van dergelijk bankcertificaat, zullen twee bestuurders verschijnen bij notaris met het oog op de notariële vaststelling van de verwezenlijking van de kapitaalsverhoging (op basis van een volmacht die hen zal worden gegeven door de BAV).

Na de verwezenlijking van de Rights Issue, zal de Raad het aandelenregister en het warrantenregister van de Vennootschap aanpassen, opdat deze registers de aandelen uitgegeven onder de Rights Issue zouden weerspiegelen.

****

Voor de Raad van Bestuur, 12 juni 2012

Peter Randall, Bestuurder en bijzondere volmachthouder

*Unofficial English translation of a Dutch original*



**EASDAQ NV • Lei 19 • Box 11 • B-3000 Leuven • Belgium**
**Tel +32 16 28 41 10 • Fax +32 16 28 41 11 • RPR Leuven, VAT BE 0455.240.893**

---

## EASDAQ NV

Limited Liability Company
Registered office: Lei 19 Box 11, 3000 Leuven (Belgium)
Company number: 0455.240.893

(the "**Company**")

---

SPECIAL BOARD REPORT IN ACCORDANCE WITH ARTICLE 582 AND, INASMUCH AS NECESSARY, ARTICLE 596 BCC REGARDING: (I) THE ISSUANCE OF NEW SHARES AT AN ISSUE PRICE THAT IS BELOW THE CURRENT PAR VALUE OF THE SHARES; AND (II) INASMUCH AS NECESSARY, THE LIMITATION OF THE SHAREHOLDERS' PREFERENTIAL SUBSCRIPTION RIGHT FOR TECHNICAL REASONS IN VIEW OF THE EXERCISE RATIO UNDER THE RIGHTS ISSUE; (INCLUDING INFORMATION IN RESPECT OF THE TERMS AND CONDITIONS OF A RIGHTS ISSUE)

---

This document and the other information that is made available in the context of the Rights Issue does not constitute an offer of, or solicitation to subscribe for, shares of Easdaq NV or to buy such shares in any jurisdiction in which such offer would be unlawful prior to its registration or qualification under the laws of such jurisdiction. Neither does it constitute an offer or solicitation to any person to whom it would be unlawful to receive such an offer or solicitation. The shares of Easdaq NV have not been and will not be registered under the US Securities Act of 1933 and the securities may not be offered or sold in the United States without registration under the US Securities Act of 1933 or an exemption from registration. Easdaq NV does not intend to organize an offer of securities in Canada, Australia or Japan, or to any national, resident or citizen of Canada, Australia or Japan. Neither this announcement nor a copy of it may directly or indirectly be distributed in the United States, Australia, Canada or Japan. The distribution of this announcement may be subject to legal restrictions and any persons who acquire this announcement should inform themselves about any such restrictions and observe them.

---

The Board of Directors (the "**Board**") of Easdaq NV (the "**Company**" or the "**Issuer**") hereby presents to the extraordinary general meeting of shareholders of the Company that will be held on our about 28 June 2012 (the "**EGM**") its special report in accordance with Article 582 and, inasmuch as necessary, Article 596 of the Belgian Company Code ("**BCC**") regarding: (i) the issuance of new shares at an issue price that is below the current par value of the shares; and (ii) inasmuch as necessary, the limitation of the shareholders' preferential subscription right for technical reasons in view of the exercise ratio under the Rights Issue (the "**Report**").

In accordance with Article 582 BCC, the Board in this Report describes the purpose and justification of the issuance of new shares with an issue price below the current par value of the shares and the (financial) consequences of such transaction for the shareholders and warrantholders of the Company (including in respect of their participation in the profits and the Company's equity).

Reference is also made to the Statutory Auditor's report in accordance with Article 582 BCC and, inasmuch as necessary, Article 596 regarding: (i) the issuance of new shares at an issue price that is below the current par value of the shares; and (ii) inasmuch as necessary, the limitation of the shareholders' preferential subscription right for technical reasons in view of the exercise ratio under the Rights Issue.

The shareholders will be requested, at the EGM, to resolve on increasing the Company's share capital with a maximum amount of EUR 7,494,900 (or, in the event of an issuance of shares pursuant to the exercise of warrants at the latest at the EGM, any higher amount calculated on the basis of the new number of shares of the Company in existence after the exercise of warrants and the exercise ratio under the Rights Issue set forth herein) by way of a capital increase in cash, with application of the shareholders' preferential subscription rights in accordance with Articles 592-594 BCC, each shareholder having the right to subscribe for new ordinary shares, at an issue price per share of EUR 0.20 (which is below the current par value of the shares in the Company), on a 100-for-173 basis (meaning that for every 173 preferential subscription rights held, a shareholder has the right to subscribe for 100 new ordinary shares) (the "**Rights Issue**"). The Board, in accordance with Article 584 BCC, reserves the right to close the Rights Issue for the subscription amounts effectively received, provided that the realization of the Rights Issue will be subject to a minimum subscription amount of EUR 7,000,000 (the "**Condition Precedent**"). The Condition Precedent is set at EUR 7M, rather than EUR 7.5M, with a view to avoiding that unexpected events (such as late payment by a shareholder who would have exercised its preferential subscription rights) would cause the Rights Issue not to close.

Further to the above, all shareholders will have the right to participate in the Rights Issue, on a 100-for-173 basis.

In view of the exercise ratio of the preferential subscription rights, a number of preferential subscription rights will not be able to be exercised, as this is mathematically impossible. This may constitute a (technical) limitation of the shareholders' preferential subscription right under Article 596 BCC.

*****

# 1. PURPOSE AND JUSTIFICATION OF THE RIGHTS ISSUE

## 1.1. Background

Easdaq NV and its wholly owned subsidiary Equiduct Systems Ltd ("**ESL**"), together form a business group, that, in partnership with Börse Berlin AG ("**BSX**"), provides a trading platform - Regulated Investment Exchange (RIE) ("**Equiduct**") (a segment of Börse Berlin AG), that specialises in connecting retail order flow with professional market makers and institutional players.

The existing market model was rolled out in H2 2010 as a result of the large US based market maker, Citadel (through its affiliate Citadel Tactical Investments LLC, ("**Citadel**")) taking a controlling shareholding in the Company, in August 2009. Principally, the business model calculates weighted average market prices (Bid and Offer) for individually listed cash equity shares and offers them to the market at a guaranteed price. In essence this provides a 'best price' to retail investors.

Since inception of the new business model, Equiduct has seen positive, albeit slow progress in its revenue growth. This has been impacted by difficult regulation, stiff competition and an extremely difficult macro-economic climate that has seen volumes and values traded in cash equities, constrict by up to 40% over 2008 peaks. Despite the gloomy economic back drop and associated problems, the Equiduct business has continued to grow market share despite the incumbent adversity.

The Board (as well as the Company's majority shareholders) believe that the Equiduct business model is unique and already represents significant value. It is generally accepted by this group that 'more of the same' can be reasonably expected to eventually see the business cemented as a competitive, self-sufficient trading venue. However, Equiduct has not yet reached break-even point and as such the Company has, over the past years, asked its shareholders to continue funding the business throughout its journey to success. Under existing constraints, and assuming further funding (see below), it is currently expected that Equiduct will subtend towards break-even point early in the financial year 2014.

Although this is a belief reasonably held by the Board (based on its assessment of the current circumstances of which it is aware, and a number of assumptions which it believes to be reasonable), it should be noted that no guarantees can be given in this respect. Forward-looking statements are inherently uncertain, and no undue reliance should be placed on them, as actual results (for a variety of reasons) may differ significantly.

## 1.2.    Current Situation

### 1.2.1.  Financial Position

During FY2011, Equiduct conducted its second full year of operational trading. Despite generating EUR 1.3M in revenues, operating costs associated with running the platform were in the region of EUR 8.0M, resulting in an average cash burn of circa. EUR 0.6M per month, or EUR 7.2M per annum.

The existing business plan determines revenue growth over a three year period that sees the business break even towards the end of the financial year 2013 or early in the financial year 2014. However, it should be noted that the business plan assumes a 'stable' economic environment which would not adversely constrict growth, which is difficult to visualise at present.

At the date of this Report, the business had liquid assets of circa. EUR 4.4M. However, the Company also has a loan liability with BSX as counterparty, under a loan agreement between the

Company, BSX and Mr Jos B. Peeters (the "**2009 Loan Agreement**"). The principal under the 2009 Loan Agreement amounts to approximately EUR 3.2M with (unpaid) interest accrued thereon of approximately EUR 0.3M, as at the date of this Report, resulting in an aggregate liability of approximately EUR 3.5M. The maturity date of the 2009 Loan Agreement (principal and accrued interest) was 31 December 2012. However, in consideration for certain commitments by the Company, Citadel and Knight (further described below), BSX has agreed to extend the term of the 2009 Loan Agreement until 31 December 2013, as further specified in paragraph 1.5.

Given existing activity, and without taking into account the Rights Issue (and the Participation Commitment (as defined below)), it is forecast that the Company would see its balance sheet drop into negative equity by June/July 2012. In this respect, the Board also refers to the Special Board Report prepared in accordance with Article 633 BCC (which is included in the Combined Board Report of even date herewith).

### 1.2.2.  Funding Requirements

The present financial position of Equiduct means that considerable funding needs to be raised in order for the business to continue as a going concern. It should be pointed out that this is the expected position. It became clear that the initial investments made by Citadel (in August 2009) and subsequently by Knight Capital Group, Inc. ("**Knight**") (in June 2010), would not be sufficient funding to see the business through to self-sufficiency. However, revenue growth has been slower than anticipated, which in turn has brought the timing of funding requirements forward.

Calculations on the subsequent funding tranche consider the next 12 months - post June 2012 close and have assumed some prudent and binary assumptions as follows (for the avoidance of doubt, the following assumptions do not take into account the succesful realization of the Rights Issue):

I.     No increase in revenues
II.    No reduction in costs
III.   Existing cash burn rate
IV.    No additional Capital Expenditure
V.     Extension of the maturity date of the 2009 Loan Agreement

The suggested funding requirement can therefore be worked as follows:

| **EUR (000)** | | Month | Year |
|---|---|---|---|
| Cash burn | | (0.6) | (7.2) |
| BSX Loan: | Capital | | (3.2) |
| | Interest | | (0.3) |
| | | | (10.8) |
| Cash Balance (end of June) | | | 3.8 |
| | | | (6.9) |
| **Funding suggestion** | | | 7.5 |

Thus, on the basis of a number of assumptions, and although no guarantees can be given in this respect, it is expected that EUR 7.5M would fund Equiduct's operations over the 12 month period

after June 2012. It should be noted that this amount is not expected to bring Equiduct to the break even point (see above).

### 1.2.3.  Use of Funding

The Company intends to use any additional funds raised through the Rights Issue to continue the operating activities of the business. The funds will therefore be utilised as operational working capital.

There exists a capital expenditure forecast detailed in the financial plan that allocates EUR 0.6M in 2012 for the upgrade and maintenance of technology infrastructure. It is yet unclear if that expenditure will be made. It is assumed that the rate of capital expenditure in this instance will be proportional to funds generated from additional clients and respective trading fees.

It should also be noted that Equiduct may decide to offer 'price-promotions' to new client prospects in order to entice new members. This would in the short term, constrain revenue stream cash flows, hence the assumption of no reduction in cash burn noted above.

## 1.3.    Funding process

### 1.3.1.  Rights Issue - Considerations

Further to the Company's need for additional funding, as set out under paragraph 1.2.2, the Board looked into the possibility of organizing a "rights issue". A "rights issue" attempts to raise finance through the existing shareholders by offering all existing shareholders the possibility to subscribe for new shares, *pro rata* to their shareholding, at an issue price that the Board believes should enable the financing round to raise the required amount of money (as outlined above).
The Board believes that a rights issue for an amount of approximately EUR 7.5M should be organized, in line with the funding requirements needed to continue the Company's business as a going concern over a 12 month period.

For that purpose, the Board sounded the interest for the participation to such a rights issue with its majority shareholders, Citadel and Knight, as such shareholders had in the recent past taken a significant participation in the Company. Recently, Citadel and Knight have been found willing to enter into a Participation Commitment Letter, at an issue price of EUR 0.20, for the required amount of approximately EUR 7.5M, subject to a number of terms and conditions which are described in paragraph 1.4.1.

### 1.3.2.  Third party 'Strategic Investor'

In parallell with the discussions with Citadel and Knight, the Board has also entered into discussions with a significant third party strategic investor. As at the date of this Report, an NDA has been sent for countersignature to such third party (which has verbally indicated that it will be countersigned). The discussions so far have been high level only, and centred mainly on potential joint strategic benefits to both parties.

The Board believes that the third party (if it would invest) could provide significant business support and development and funding, going forward. It would also generate additional trading flow across the platform. The Board is of the view that the third party so far has shown significant interest in the Company's business, and there is an opportunity of conducting some kind of strategic partnership.

However, such third party's actual investment appetite, as well as the shape of any strategic investment, are as yet undetermined. Further to this, the current stage of the discussions with such third party will not satisfy the immediate requirement for funding as determined by the Board.

### 1.3.3. Jumpball participation

The Board has also considered, as an alternative and/or further 'strategic' option for funding, the facilitation of a "jumpball" scheme. The principle of a "jumpball" scheme is to entice market participants to increase the business they conduct across the platform in attempt to meet certain criteria that will allow them to earn options to purchase equity within the business.

However, as at the date of this Report, a scheme and methodology for executing a "jumpball" is yet to be determined. Further to this, the Board determined that such scenario would not satisfy the immediate requirement for funding.

## 1.4.    Specifics of the Rights Issue

### 1.4.1.  Citadel / Knight investment commitment

#### 1.4.1.1.    Participation Commitment Letter

The Company has conducted a number of discussions with Citadel and Knight, the two largest shareholders, over recent months. As a result of such discussions, Citadel, Knight and the Company have executed a Participation Commitment Letter on 4 June 2012, in which each of Citadel and Knight (subject to the conditions set out below) severally undertakes to participate in the Rights Issue at an issue price of EUR 0.20, whereby Citadel and Knight shall participate in the Rights Issue for an aggregate amount of up to EUR 7,494,900 (the "**Investment Commitment**"), *i.e.* the maximum amount of the Rights Issue (in the assumption that no warrants would be exercised). Therefore, if no other shareholders would exercise their preferential subscription right (and if no warrants would be exercised, in which case the maximum size of the Rights Issue would be higher), Citadel and Knight will subscribe for the total amount of the Rights Issue.

For the avoidance of doubt, it is specified that if warrants would be exercised, the maximum size of the Rights Issue would increase, but this would not have any effect on Citadel's and Knight's commitment (as set out above) to suscribe for an aggregate amount of up to EUR 7,494,900, so that further to the Investment Commitment, the Rights Issue would in any event be subscribed for, for at least an amount of EUR 7,494,900.

In respect of the possiblity of warrants being exercised, reference is made to paragraph 3.3.

If other shareholders would however exercise their preferential subscription right, such would decrease the amount of the Investment Commitment. Citadel will in any event subscribe for an amount of EUR 2,997,960 (which is approximately 65% of its current participation in the Company), and Knight will subscribe for any such amount so that the total subscription amount of the Rights Issue will reach EUR 7,494,900; Knight's commitment thereby effectively serves as a "back-stop" (by way of example: if shareholders (other than Citadel and Knight) would exercise preferential subscription rights for an aggregate amount of approximately EUR 1,000,000, then Knight will subscribe for the "remaining" amount of approximately EUR 3,500,000, so as to reach the total investment amount of EUR 7,494,900).

However, it should be noted that the Investment Commitment is subject to a number of conditions precedent:

- the Amendment Agreement (as defined in paragraph 1.5) will remain in full force and will not be terminated;

- the Shareholders' Agreement dated 24 June 2010 (as amended from time to time) between Citadel, Knight, BSX, Mr. Jos B. Peeters and the Company will be amended in accordance with the principles separately agreed by Citadel and Knight.

  In this respect, the Board specifies that the amendments to the Shareholders' Agreement (which are expected to be agreed after the date of this Report but prior to the date of the EGM) will have to be reflected in the Company's Articles of Association as well, which will require an amendment of the Articles of Association. For that purpose, an extraordinary general shareholders meeting that will resolve on such amendments will have to be called, which is expected to occur some time after the completion of the Rights Issue.

  The Board has been informed by the parties to the Shareholders' Agreement that the amendments thereto will substantially be that Knight will substantially have similar rights as Citadel in respect of the reserved matters set forth in Articles 18 and 33 of the Articles of Association, and that Knight will be granted the right to nominate a total of four Directors for appointment.

- the Company is not subject to, and no steps have been taken to initiate, winding-up or dissolution proceedings, proceedings for bankruptcy ("*faillite / faillissement*") or judicial reorganisation ("*réorganisation judiciaire / gerechtelijke reorganisatie*") or any other similar insolvency proceedings under any applicable law or is not otherwise limited in its rights to dispose of its assets, or is not subject to, and no steps have been taken to obtain, measures such as the appointment of a provisional administrator ("*administrateur provisoire / voorlopig bewindvoerder*") or a sequestrator ("*séquestre / sekwester*").

  For the avoidance of doubt: the Article 633 Belgian Company Code procedure, which will be applied in the context of the annual general meeting of the Company that will be held on 28 June 2012, will not be deemed to constitute any of the foregoing. In this respect, the Board refers to its Special Report prepared in accordance with Article 633 BCC (included in the Combined Board Report of even date herewith).

- the Rights Issue will be approved by the shareholders of the Company at the EGM, and the completion of the issue of and subscription for the shares pursuant to the Rights Issue takes place on or before 30 September 2012.

   As set out in the overview of the modalities of the Rights Issue (paragraph 4), the Board expects that the Rights Issue will indeed be completed before 30 September 2012.

Additionally, under the Participation Commitment Letter, the Company has agreed to select and engage an investment bank, by 31 July 2012, to explore all strategic options.

### 1.4.1.2.    Issue Price of the Rights Issue

Reference is made to paragraph 3 for the Board's assessment and justification of the issue price that will be applied under the Rights Issue.

### 1.4.2.  Börse Berlin AG

### 1.4.2.1.    Participation in the Rights Issue

BSX, the third most senior shareholder in the Company, was also polled in respect of their involvement in a rights issue. It is understood that BSX would not be in a position to partake in a rights issue at this stage.

### 1.4.2.2.    Issuance of a BSX 2012 Warrant

It should be noted that, provided that the Rights Issue has succesfully been completed, after the closing of the Rights Issue, an extraordinary general meeting of the shareholders will be held that will be proposed to resolve on the issuance of one (1) warrant to BSX, with an exercise price that is expected to be below the par value of the shares at that time, and with cancellation of the shareholders' preferential subscription right, and which will be exercisable either: (a) in cash; or (b) in kind, by way of the contribution of the balance (if any) of the principal and accrued interest under the 2009 Loan Agreement (the "**BSX 2012 Warrant**") (the "**Second EGM**"). The issue and exercise conditions of the BSX 2012 Warrants will be set out in detail in a special report of the Board of Directors that will be sent to the shareholders together with the notice for the Second EGM.

The issuance of a new warrant to BSX is an essential element of the Rights Issue, which aims at capitalizing the Company and securing its longer term viability, and is therefore in the interest of the Company. The issuance of the BSX 2012 Warrant, will further the continued co-operation between the Company and BSX, and will allow BSX to maintain its current 10% (approximately) interest in the Company, after the completion of the Rights Issue.

With a view to informing the shareholders, the Board hereby sets out a summary of the terms and conditions of the BSX 2012 Warant that are expected to be proposed to the Second EGM.

### (i)  *Exercise period*

BSX will be entitled to exercise the BSX 2012 Warrant, in one or several times, during a period beginning on the date of the Second EGM and ending on the third anniversary thereof.

### (ii)  *Exercise price*

The proposed issue price per ordinary share pursuant to the (full or partial) exercise of the BSX 2012 Warrant will be equal to the issue price under the Rights Issue (*i.e.* EUR 0.20), and will therefore be lower than the current fractional value of the shares.

BSX will be able to pay the exercise price either: (a) in cash; or (b) by way of a contribution in kind, by way of the contribution of the balance (if any) of the principal and accrued interest under the 2009 Loan Agreement, *i.e.* by way of contribution in kind of the claim of BSX to the repayment of all or part of the existing loan outstanding between BSX and the Company further to the 2009 Loan Agreement, consisting of all or a part of the principal amount (i.e. EUR 3,244,126.94) with interest accrued thereon (in this respect, reference is also made to paragraph 1.5).

### (iii)  *Shares to which the holder of the BSX 2012 Warrant will be entitled*

Generally speaking, the BSX 2012 Warrant will give right to subscribe for such aggregate number of new ordinary shares, so that, after the full exercise of the BSX 2012 Warrant, BSX will hold 10% of the shares in the Company, on a fully diluted basis, calculated on the basis of the total number of outstanding shares of the Company, immediately after the Rights Issue.

Such number of shares will be calculated by the following formula, whereby the BSX 2012 Warrant will give right to a number of new ordinary shares equal to X:

$$X = \frac{A}{9} - \left( \frac{10}{9} * B \right)$$

Whereby:

**A** = Fully Diluted Share Capital (*i.e.* the aggregate number of shares in the capital of the Company which are actually in issue and such maximum number of shares in the capital of the Company which may be issued pursuant to the exercise of any rights of conversion or subscription issued by the Company (including any warrants, and, in the case of new issues of shares or warrants, including the new shares or warrants proposed to be issued), irrespective of whether the conditions for such exercise, conversion or subscription are fulfilled at the time of application of this definition) immediately after the completion date of the Rights Issue, <u>excluding</u> the shares that may be issued pursuant to the exercise of the BSX 2012 Warrant; and

**B** = the sum of:

-   the number of shares held by BSX at the completion date of the Rights Issue;

- the number of shares that may be issued pursuant to the exercise of the BSX 2009 Warrants at the completion date of the Rights Issue; and

- the number of shares that may be issued pursuant to the exercise of the BSX 2010 Warrant at the completion date of the Rights Issue.

For the dilution that could be caused further to the exercise of the BSX 2012 Warrant, reference is made to paragraph 3.2.

### (iv) *General*

In general, it should be noted that the BSX 2012 Warrant will substantially (*mutatis mutandis*), and insofar as this Report does not provide otherwise, have the same terms and conditions as the warrant issued to BSX on 24 June 2010, as set out in the Special Board Report in respect of such warrant of 7 June 2010.

## 1.5.    BSX LOAN ROLL-OVER

As noted above, a significant liability attributable to a loan with BSX as counterparty resides on the the Company's balance sheet.

The loan from BSX (*i.e.*, principal and accrued interest) would have been due for repayment in full by the end of the financial year 2012, under the original 2009 Loan Agreement. However, further to an amendment to the 2009 Loan Agreement, entered into by the Company, Mr. Jos B. Peeters and BSX on 4 June 2012 (the "**Amendment Agreement**"), in consideration for Citadel's and Knight's Investment Commitment, as well as the Company's consent to amend the Master Agreement with BSX (as specified below), BSX has agreed to extend the term of the 2009 Loan Agreement until 31 December 2013.

More specifically, the termination date of the 2009 Loan Agreement will be the following:

(a) if the Outsourcing Agreement[1] is terminated on or after 1 January 2012 but before 31 December 2013, the date on which the Outsourcing Agreement is terminated; and

(b) in all circumstances other than as contemplated in paragraph (a), 31 December 2013.

Subject to the execution (and effectiveness) of the Amendment Letter relating to the 2009 Loan Agreement, the Company, ESL and BSX have agreed to amend the Master Agreement[2] to the effect that the provisions on termination will be amended to reflect that each of BSX and the Company have the right to terminate the contract by providing the other party with no less than 3 (three) years' prior written notice (the other provisions on termination remaining unaffected).

---

[1] The Outsourcing Agreement is an agreement between BSX, the Company and ESL, signed on 19/20 March 2009, which stipulates the rights and obligations between BSX as the Regulated Market Operator for the Equiduct trading platform on the one side and the Company & ESL as the provider of technical services in relation to the operation of the Equiduct Platform on the other side.

[2] The Master Agreement, dated 7 August 2009 between the Company, ESL and BSX, was signed to cancel, alter and/or amend additional provisions of services between the parties.

## 2. ISSUE OF SHARES AND NATURE OF SHARES ISSUED

Further to the Rights Issue, the Company will issue new shares to the shareholders that wish to subscribe for the Rights Issue through the exercise of their preferential subscription rights, at an issue price per share of EUR 0.20 (which is below the current par value of the shares in the Company), on a 100-for-173 basis (meaning that for every 173 preferential subscription rights held, a shareholder has the right to subscribe for 100 new ordinary shares). The shares will be fully paid up at the time of the realization of the Rights Issue. The shares will be ordinary shares, with the rights attached thereto pursuant to the Articles of Association of the Company and will rank *pari passu* in all respects with all existing shares of the Company.

It should thereby be noted that each shareholder (unless by coincidence it would hold a number of shares that is an exact multiple of 173) upon exercise of its preferential subscription rights, will have a remaining number of rights (*i.e.*, each time an amount lower than 173). If all multiples of 173 preferential subscription rights (as the case may be, after being traded, or in the Additional Offer Period (as set out in paragraph 4.5)) have been exercised, an aggregate of 59 preferential subscription rights would remain unexercisable (assuming that no warrants have been exercised, and the maximum amount of the capital increase would thus be EUR 7,494,900; if warrants would be exercised, the number of preferential subscription rights that would remain unexercisable, would change (pursuant to the mathematics of the exercise ratio), but will in any event not be higher than 172). Insofar as necessary, and to the extent that this, in theory, could constitute a (very limited and technical) limitation of the preferential subscription right, then this Report will serve, inasmuch as necessary, as a Special Board Report further to Article 596 BCC.

Further to the above, a shareholder that would want to subscribe for the Rights Issue, must have at least 173 preferential subscription rights to subscribe for a first tranche of 100 new shares, and so on. If the shareholder's own shareholding would be below such threshold, and if it wishes to participate for the next tranche of 100 shares, it will need to seek to obtain preferential subscription rights from other shareholders during the Offer Period (such acquisition of rights to be confirmed to the Company through the Rights Transfer Form (as further set forth in paragraph 4.3)). However, shareholders should note that the Company will not organize a market in the preferential subscription rights.

## 3. ISSUANCE OF NEW SHARES AT AN ISSUE PRICE BELOW THE CURRENT PAR VALUE OF THE SHARES

### 3.1. General

As at the date of this Report, the subscribed capital of the Company amounts to EUR 137,411,819.68 and is represented by 64,830,944 ordinary shares, resulting in a fractional value of approximately EUR 2.12 per share. The issue price per ordinary share under the Rights Issue will be EUR 0.20, and will therefore be lower than the current fractional value of the shares.

Immediately after the Rights Issue, the capital representative value of all shares of the Company will be equalized so that each of the Company's shares will henceforth have the same capital representative value. The Rights Issue will therefore have a significant impact on the financial rights (*i.e.*, amongst other things, dividend rights and rights to liquidation proceeds and membership rights (*i.e.*, amongst other things, voting rights and preferential subscription rights) that are attached to the existing shares.

However, as set out in paragraph 1, the proceeds from the Rights Issue are essential to allow the Company to further develop its business in providing services to investment exchanges and platforms. The proposed issue price is therefore believed by the Board to be in the interest of the Company.

It should thereby be noted that an issue price of EUR 0.20 per share is substantially lower than the issue price per share at the occasion of the financing of the Company in June 2010 (EUR 0.48), and at the occasion of the exercise of the Knight Warrant in June 2011 (EUR 0.69) and the partial exercise of the BSX Warrant in November 2011 (EUR 0.69). However, this issue price reflects the financial situation of the Company (as set out in paragraph 1.2) and is deemed appropriate so as to be able to raise the required funding to allow the Company to continue its activities as a going concern (as also set out in paragraph 1.2.2). Citadel and Knight have informed the Board that they were not willing to provide the Investment Commitment at a higher issue price than EUR 0.20. In view thereof, the Board believes that, if it would have set the issue price above EUR 0.20, it would have been very likely that the Rights Issue would have been unsuccessful.

Additionally, it should be noted that as the shareholders' preferential subscription rights will not be cancelled, all shareholders have the opportunity to subscribe for the Rights Issue, *pro rata* to their shareholding in the Company, on a 100-for-173 basis, thereby being able to avoid dilution.

## 3.2.    Financial consequences

### 3.2.1.  *Financial consequences of the Rights Issue*

As set out in paragraph 1.4.1, the Company has obtained the Investment Commitment by Citadel and Knight to subscribe in the Rights Issue, for an aggregate amount of approximately EUR 7,500,000. It can therefore be expected (subject to the conditions precedent set out in paragraph 1.4.1 being fulfilled) that the Rights Issue will be completed for the maximum amount, and will thus be succesful. If warrants would be exercised, the maximum amount of the Rights Issue will increase, and may thus not be fully subscribed for. However, pursuant to the Investment Commitment (and subject to the conditions precedent set out in paragraph 1.4.1 being fulfilled), it can be expected that the Rights Issue will be completed for an amount of at least EUR 7,494,900.

Upon a successful Rights Issue (and assuming that no warrants will be exercised), 37,474,500 new ordinary shares will be issued, bringing the aggregate number of outstanding shares in the Company to 102,305,444. In the event warrants would be exercised, the number of new ordinary shares that can be issued, will be higher than 37,474,500.

In the event a shareholder would choose not to exercise its preferential subscription rights and would thus not participate in the Rights Issue, such shareholder would suffer a dilution (if the Rights Issue would effectively be realized for an amount of EUR 7,494,900) of approximately 36.63%. If warrants would be exercised, and the warrantholder would subsequently participate in the Rights Issue with the preferential subscription rights attached to the shares issued pursuant to such exercise, the shareholders that would not participate in the Rights Issue will suffer a higher dilution (as it cannot be forecast whether warrants will be exercised and whether such warrantholders will subsequently participate in the Rights Issue, such dilution cannot be quantified at the date of this Report; for the maximum dilution caused by the exercise (as such) of existing warrants, reference is made to paragraph 3.3 below).

The Board is of the opinion that such potential dilution is justified for the reasons set out in paragraph 3.1, and that the Rights Issue under its terms is in the interests of the Company.

### *3.2.2.  For information purposes only: financial consequences of the BSX 2012 Warrant, on the issuance of which the Second EGM will resolve .*

Reference is made to the summary of the terms and conditions of the BSX 2012 Warrant on which the Second EGM is expected to resolve, as set out in paragraph 1.4.2.2. It should be noted that the following assessment of the dilution that may be caused by the exercise of the BSX 2012 Warrant, is for information purposes only, as the actual dilution will only be known as of the completion of the Rights Issue.

Assuming that the Rights Issue would be completed for an amount of EUR 7,494,900, and that the completion date of the Rights Issue will be after 7 August 2012 (which can reasonably be expected, as set out in section 4 of this Report (and which would imply that the warrants issued to BSX and Mr Jos Peeters on 7 August 2009 will thus have lapsed on 7 August 2012, in accordance with their terms)), the BSX 2012 Warrant will give right to (in aggregate) 4,251,572 new ordinary shares.

Under the assumptions made here above, if BSX would thus fully exercise the BSX 2012 Warrant after the completion of the Rights Issue, a shareholder that would not have participated in the Rights Issue would suffer an additional (*i.e.*, "on top" of the dilution that would be caused by not participating in the Rights Issue) dilution of approximately 3.96%. If such two transactions (*i.e.* the Rights Issue and the exercise of the BSX 2012 Warrant) would be taken together, a shareholder that would not participate in the Rights Issue and assuming a subsequent exercise in full of the BSX 2012 Warrant, would bear an aggregate dilution of 39.16%.

## 3.3.    Rights of Warrantholders

In accordance with Article 501, second paragraph BCC, in the event of a capital increase in cash, warrant holders have the right to exercise their warrants and to participate in such capital increase in cash (with the shares issued to them further to this exercise) insofar as the current shareholders of the Company would have the right to participate in such capital increase.

As the shareholders' preferential subscription rights will not be cancelled for the purpose of the Rights Issue, all shareholders can participate in the Rights Issue. It is therefore possible that the warrant holders of the Company would wish to exercise their warrants pursuant to Article 501, second paragraph BCC, in connection with the Rights Issue, and subsequently participate in the Rights Issue "with" such newly issued shares, through the exercise of the preferential subscription right attached to such shares. In order to exercise its rights under Article 501 BCC, a warrantholder must exercise its warrants at the latest at the EGM.

If the existing warrants would be exercised, this could cause a dilution for all shareholders, as their shareholding *pro rata* to the total outstanding shares of the Company would decrease further to the issuance of new shares pursuant to the warrants' exercise. In the event the warrantholders would participate in the Rights Issue with the shares issued to them further to the exercise of their warrants, this would cause an additional dilution for each shareholder that would choose not to exercise its preferential subscription right.

As at the date of this Report, the aggregate number of shares that could be issued further to the exercise of all outstanding warrants, is 2,104,769 new ordinary shares. It should thereby be noted that all outstanding warrants are in any event already exercisable.

In the event all outstanding warrants would be exercised in connection with the Rights Issue, this would cause a dilution of 3.14% in respect of each shareholder, prior to the Rights Issue. For the dilution caused by the Rights Issue, reference is made to paragraph 3.2.

The agenda of the EGM provides for the grant of a proxy to the Board to determine the new maximum amount of the capital increase (which will be higher than EUR 7,494,900) and other elements of the capital increase, in case warrants would be exercised prior to the Rights Issue. This would be necessary further to the fact that, in the event of such exercise of warrants, the aggregate number of outstanding shares of the Company will be increased (with the number of shares issued pursuant to the exercise of warrants). Further to the exercise ratio of 100-for-173 under the Rights Issue, this would imply that the maximum number of shares that can be issued under the Rights Issue will increase, and therefore the maximum size of the Rights Issue must also be increased.

Such exercise of warrants would not have any consequences in respect of the Investment Commitment by Citadel and Knight, who would still subscribe for an aggregate amount of up to EUR 7,494,900, as set out in paragraph 1.4.1.1.

## 4. RIGHTS ISSUE – TERMS AND CONDITIONS

### 4.1. Introduction

#### 4.1.1. General

In this section, the Board wishes to inform the shareholders regarding the different steps in the process of the Rights Issue.

At the EGM, the shareholders are proposed to give the Board (with possibility of subdelegation) a power of attorney under which the Board (amongst other things) will be granted the power to determine the opening of the Offer Period (as defined below) and, as the case may be, of the Additional Offer Period (as defined below), as well as their respective closing dates, if it would be of the opinion that such would be in the interest of the Company. This would allow for the necessary flexibility in the context of the Rights Issue, and the Board therefore proposes to the shareholders to approve such power of attorney.

Subject to the EGM granting such power of attorney, the timing of the Rights Issue process as included in the overview that is provided below, should be considered as indicative (*i.e.*, non binding and subject to change). If the Board would deviate from the timing provided in this Report, the shareholders will be given notice thereof.

### 4.1.2.  *Trading of preferential subscription rights - limitations*

As set out under paragraph 4.3 below, shareholders may trade (*i.e.* transfer, with our without consideration) their preferential subscription rights during the Offer Period.

## 4.2.    Inasmuch as necessary, statement pursuant to Article 596 BCC

Each shareholder will have the right to subscribe for the Rights Issue, pursuant to its preferential subscription right. The exercise ratio of the preferential subscription rights is 100-for-173, which means that for every 173 preferential subscription rights held, a shareholder has the right to subscribe for 100 new ordinary shares.

Assuming that no warrants will be exercised, , a maximum number of 37,474,500 new ordinary shares will be issued under the Rights Issue. Taking into account the aggregate number of preferential subscription rights (64,830,944 rights, *i.e.* the number of outstanding shares in the Company), the exercise ratio of 100-for-173 implies that 59 preferential subscription rights will remain unexercisable (in the event the Rights Issue is subscribed for to its maximum amount), as no "parts of shares" may be issued.

Further to this, it could be considered that the shareholders' preferential subscription rights will be limited in the sense that the shareholders, taken as a group (and assuming a "perfect" transfer amongst each other of unused rights, which is theory however), will not be able to exercise an aggregate of 59 preferential subscription rights (if warrants would be exercised, this number would change (pursuant to the mathematics of the exercise ratio), but will in any event not be higher than 172).

This "limitation" is a purely technical fact (pursuant to the mathematics of the exercise ratio). In view thereof, and as the number of non-exercisable rights (assuming a "perfect" transfer amongst each other of unused rights, which is theory however), constitutes a negligible number compared to the exercisable (assuming a "perfect" transfer amongst each other of unused rights, which is theory however) preferential subscription rights (0.0000009% of the exercisable preferential subscription rights(assuming that no warrants will be exercised)), the influence of this "limitation"

(including as to its impact on the financial or membership rights of the shareholders) is, reasonably speaking, negligible.

## 4.3.  Offer Period

All dates mentioned below are indicative, and subject to change.

After the EGM, the Board will send out a notice, by registered letter, to the shareholders of the opening of the period during which the shareholders will be able to exercise and/or trade their respective preferential subscription rights (the "**Offer Period**", respectively the "**Offer Period Notice**").

As at the date of this Report, the Board intends the Offer Period to remain open for fifteen (15) days (*i.e.*, the statutory minimum period provided for by Article 593 BCC). If the Board would be granted the power of attorney referred to in paragraph 4.1, the Board may decide to extend such Offer Period.

The Offer Period Notice is expected to be sent out on 29 June 2012. Pursuant to Article 593 BCC, the Offer Period will open 8 days after such date, *i.e.* on 7 July 2012, and will remain open for fifteen days, *i.e.* through 21 July 2012.

During the Offer Period, the shareholders may exercise their respective preferential subscription rights and/or trade such preferential subscription rights (and the transferees may thereupon, during the Offer Period, exercise the preferential subscription rights transferred to them).

Shareholders (or transferees of preferential subscription rights) that wish to exercise the preferential subscription rights will need to fill out and execute a Rights Exercise Form (which will be attached to the Offer Period Notice). Shareholders that wish to trade their preferential subscription right, must give notice of such trade by completing and executing a Rights Transfer Form (which will be attached to the Offer Period Notice). Such forms must then be communicated to the Company, in the manner and by such dates as indicated on the Rights Exercise Form, resp. Rights Transfer Form.

| Indicative Timing - Offer Period | |
|---|---|
| **Offer Period Start** | 7 July 2012, 00:00 (CET) |
| **Offer Period Closing** | 21 July 2012, 24:00 (CET) |

## 4.4.  Post Offer Period: Collation of results

On the first business day after the closing of the Offer Period (*i.e.* on 23 July 2012), the results of the Offer Period will be collated,

In the event all preferential subscription rights have been exercised within the Offer Period (as the case may be, after being traded), the persons that have exercised the preferential subscription rights will be provided with the payment details for the subscription to the Rights Issue (as further specified in paragraph 4.7).

In the event not all preferential subscription rights would have been exercised within the Offer Period (as the case may be, after being traded), the Additional Offer Period (as specified in paragraph 4.5) will open.

### 4.5.    Additional Offer Period

The shareholders that have exercised their preferential subscription right during the Offer Period (but not any third parties who would have been transferred preferential subscription rights in the Offer Period, which they would have exercised) will have the possibility to subscribe for the balance of the Rights Issue (*i.e.*, the number of new shares that correspond to the preferential subscription rights that have not been exercised during the Offer Period), during an additional period, on a *pro rata* basis (i.e., *pro rata* to their shareholding in the Company prior to the first Offering Period among the shareholders that have exercised their preferential subscription right in the first Offering Period and that wish to take up additional shares in the additional offer period (the "**Additional Offer Period**").

After collating the results of the Offer Period, the Board will send notice (*i.e.*, on 24 July 2012) to all shareholders that have exercised their preferential subscription right, informing them of the details of the Additional Offer Period (the "**Additional Offer Period Notice**").

The Additional Offer Period will open on the third day after the Additional Offer Period Notice has been sent out, by registered letter, and will remain open for seven days.

Shareholders that wish to participate in the Additional Offer Period, will have to complete and execute the Additional Offer Period Form (which will be attached to the Additional Offer Period Notice). Such form must then be communicated to the Company, in the manner and by the date as indicated on the Additional Offer Period Form.

| Indicative Timing – Additional Offer Period | |
| --- | --- |
| **Additional Offer Period Start** | 27 July 2012, 00:00 (CET) |
| **Additional Offer Period Closing** | 5 August 2012, 24:00 (CET) |

### 4.6.    Post Additional Offer Period: Collation of results (2)

On the first business day after the closing of the Additional Offer Period (*i.e.*, on 6 August 2012), the results of the Additional Offer Period will be collated. It will then be determined whether the Rights Issue will have been successful, *i.e.* whether the minimum subscription amount will have been reached and whether the Condition Precedent would thus have been fulfilled.

If the Condition Precedent would not have been fulfilled, a notice will be sent to all shareholders that the Rights Issue will not be completed.

If the Condition Precedent has been fulfilled, a notice will be sent to all subscribers for the Rights Issue, setting out the payment instructions (as specified in paragraph 4.7).

## 4.7.    Payment

On the business day after the date on which it will have been determined that the Condition Precedent has been fulfilled (*i.e.*, if there is an Additional Offer Period, on 6 August 2012), a notice will be sent to all persons that have exercised preferential subscription rights, setting out the details for the payment of their respective subscription amounts (the "**Payment Notice**").

At the end of the sixth business day after the Board has sent out the payment instructions, the respective subscription amounts of the subscribers for the Rights Issue must have been credited on the blocked bank account opened by the Company for the purpose of the capital increase under the Rights Issue, in accordance with Article 600 BCC (the details of which will be provided in the Payment Notice).

| Indicative Timing – Payment | |
|---|---|
| **Opening payment period** | 6 August 2012, 00:00 (CET) |
| **Closing payment period** | 14 August 2012, 24:00 (CET) |

## 4.8.    Realization of the Rights Issue

As soon as possible after the closing date of the payment period, the Company will obtain the bank certificate pursuant to Article 600 BCC, which constitutes proof that the subscription amounts have been transferred to the blocked bank account.

Upon receipt of such bank certificate, two Directors will appear before a notary for the purpose of the notarial recordation of the realization of the capital increase (on the basis of the power of attorney that they will be given by the EGM).

After the realization of the Rights Issue, the Board will update the Company's shareholders register and warrant register, so that such registers would reflect the shares issued further to the Rights Issue.

\*\*\*\*

For the Board of Directors, 12 June 2012

_____

Peter Randall, Director and Special Proxyholder

≡Ⅱ *ERNST & YOUNG*

**Ernst & Young**
**Réviseurs d'Entreprises**
**Bedrijfsrevisoren**
De Kleetlaan 2
B - 1831 Diegem

Tel: +32 (0)2 774 91 11
Fax: +32 (0)2 774 90 90
www.ey.com/be

**Verslag van de commissaris betreffende de uitgifte van aandelen beneden fractiewaarde en met opheffing van het voorkeurrecht, ter gelegenheid van de voorgestelde kapitaalverhoging van Easdaq nv**

Opdracht

Overeenkomstig de artikelen 582 en 596 van het Wetboek van Vennootschappen, brengen wij, op verzoek van de raad van bestuur, in onze hoedanigheid van commissaris, verslag uit over de financiële en boekhoudkundige gegevens opgenomen in het bijgevoegd bijzonder verslag van de raad van bestuur betreffende de uitgifte van aandelen beneden fractiewaarde en met opheffing van het voorkeurrecht (om technische redenen omwille van de uitoefenverhouding).

Voorgenomen verrichting

*Uitgifte van aandelen*

Easdaq nv (de "Vennootschap") zal nieuwe aandelen uitgeven aan een uitgifteprijs van EUR 0,20 per aandeel (wat lager is dan de fractiewaarde van de aandelen van de vennootschap), met een maximale kapitaalverhoging van EUR 7.494.900 (in de veronderstelling dat geen warrants worden uitgeoefend voor de vergadering van de aandeelhouders). Elke aandeelhouder zal het recht hebben in te schrijven op de kapitaalverhoging met een uitoefeningverhouding van 100-voor-173 (dit betekent dat voor elke 173 gehouden voorkeurrechten, een aandeelhouder het recht heeft om in te schrijven op 100 nieuwe gewone aandelen). Indien alle voorkeurrechten zouden uitgeoefend worden, heeft de uitoefenverhouding tot gevolg dat 59 voorkeurrechten niet uitoefenbaar zullen zijn (in de veronderstelling dat geen warrants worden uitgeoefend voor de vergadering van de aandeelhouders). Dit zou in theorie kunnen beschouwd worden als een technische beperking van de voorkeurrechten. Bijgevolg besloot de raad van bestuur dat hun bijzonder verslag overeenkomstig artikel 582, in zover als nodig, ook kan dienen als bijzonder verslag overeenkomstig artikel 596.

Controle

Wij hebben de financiële en boekhoudkundige gegevens opgenomen in het bijgevoegd bijzonder verslag van de raad van bestuur gecontroleerd overeenkomstig de algemene controlenormen van het Instituut van de Bedrijfsrevisoren.

Société civile ayant emprunté la forme d'une société coopérative à responsabilité limitée
Burgerlijke vennootschap die de rechtsvorm van een coöperatieve vennootschap met beperkte aansprakelijkheid heeft aangenomen
RPM Bruxelles - RPR Brussel - T.V.A. - B.T.W. BE 0446.334.711
Banque - Fortis - Bank 210-0905900-69

**ERNST & YOUNG**

De jaarrekening per 31 december 2011 werd door ons onderworpen aan een volkomen controle overeenkomstig de normen van het Instituut van de Bedrijfsrevisoren. Deze controle heeft geleid tot een verklaring zonder voorbehoud.

Het boekhoudkundig eigen vermogen van de Vennootschap, zoals dit blijkt uit de geauditeerde jaarrekening per 31 december 2011, bedraagt EUR 2.950.423. Het eigen vermogen per aandeel bedroeg op dat moment EUR 0,046 (=2.950.423/64.830.944).

We merken op dat de vennootschap bijkomende verliezen heeft geleden sinds 31/12/2011.

<u>Besluit</u>

Als besluit van de door ons uitgevoerde werkzaamheden, verricht overeenkomstig de normen van het Instituut van de Bedrijfsrevisoren, verklaren wij dat de in het bijgevoegd bijzonder verslag van de raad van bestuur vermelde financiële en boekhoudkundige gegevens getrouw zijn en voldoende om de algemene vergadering van aandeelhouders voor te lichten die moet stemmen over de uitgifte van aandelen beneden fractiewaarde en met opheffing van het voorkeurrecht.

Wij willen er tenslotte aan herinneren dat onze opdracht er niet in bestaat een uitspraak te doen betreffende de rechtmatigheid en billijkheid van de verrichting of, met andere woorden, dat ons verslag geen *fairness opinion* inhoudt.

Brussel, 12 juni 2012

Ernst & Young Bedrijfsrevisoren bcvba
Commissaris
vertegenwoordigd door

Christel Weymeersch
Vennoot

*12CW0204*

2

≣Ⅱ *ERNST & YOUNG*

Ernst & Young
Réviseurs d'Entreprises
Bedrijfsrevisoren
De Kleetlaan 2
B - 1831 Diegem

Tel: +32 (0)2 774 91 11
Fax: +32 (0)2 774 90 90
www.ey.com/be

**FREE TRANSLATION FROM THE DUTCH ORIGINAL**

**Report of the statutory auditor regarding the issuance of shares below fractional value and with cancellation of the preferential subscription rights, at the occasion of the anticipated capital increase of Easdaq nv**

Assignment

In accordance with articles 582 and 596 of the Belgian Company Code, we report, as requested by the board of directors, in our capacity of statutory auditor, on the financial and accounting information included in the attached special report of the Board of Directors in connection with the issuance of shares below fractional value and with cancellation of the preferential subscription rights (caused by technical limitations).

Proposed Transactions

*Issue of shares*

Easdaq NV (the "Company") will issue new shares at an issue price of EUR 0,20 per share (which is below the current par value of the shares of the company), increasing the Company's share capital with a maximum amount of EUR 7.494.900 (provided no warrants will be exercised before the shareholders' meeting). Each shareholder will have the right to subscribe for new ordinary shares on a 100 for 173 basis (meaning that for every 173 preferential subscription rights held, a shareholder has the right to subscribe for 100 new ordinary shares). If all multiples of 173 preferential subscription rights would have been exercised, an aggregate of 59 preferential subscription rights would remain unexercisable (provided no warrants will be exercised before the shareholders' meeting). This could in theory be considered as a technical limitation of the preferential subscription rights. As a result, the Board decided that their special board report in accordance with article 582 would serve , inasmuch as necessary, also as special board report further to Article 596.

Société civile ayant emprunté la forme d'une société coopérative
à responsabilité limitée
Burgerlijke vennootschap die de rechtsvorm van een coöperatieve
vennootschap met beperkte aansprakelijkheid heeft aangenomen
RPM Bruxelles - RPR Brussel - T.V.A. - B.T.W. BE 0446.334.711
Banque - Fortis - Bank 210-0905900-69

**≡Ⅱ ERNST & YOUNG**

Control

We have examined the financial and accounting information included in the attached special report of the Board of Directors in accordance with the applicable standards of the Belgian *Instituut van de Bedrijfsrevisoren*.

The Company's annual accounts as of 31 December 2011 have been subject to a full scope audit in accordance with the standards of the Belgian *Instituut van de Bedrijfsrevisoren*. We have issued an unqualified opinion.

The net asset value of the Company based on the audited annual accounts at 31 December 2011 is € 2.950.423. The net asset value per share at that time amounted to € 0,046 (= 2.950.423 / 64.830.944). Note however that the Company has continued losses since 31/12/2011.

Conclusion

In conclusion of our examinations carried out in accordance with the applicable standards of the Belgian *Instituut van de Bedrijfsrevisoren* we certify that the financial and accounting information included in the attached special report of the Board of Directors is true and fair, and adequate to inform the extraordinary meeting of shareholders that has to decide on the issuance of shares below fractional value with the cancellation of the preferential subscription rights.

Finally, we would like to point out that our engagement does not consist in expressing an opinion on the legitimacy and fairness of the transaction or, in other words, our report does not include a fairness opinion.

Brussels, 12 June 2012

Ernst & Young Bedrijfsrevisoren bcvba
Statutory Auditor
represented by

Christel Weymeersch
Partner

*12CW0204*

2

BUITENGEWONE ALGEMENE VERGADERING VAN EASDAQ NV

---

## Volmacht

---

**Gelieve deze volmacht (die werd vastgesteld door de Raad als standaard volmachtformulier overeenkomstig artikel 30 van de statuten) waar nodig in te vullen en te ondertekenen indien u wenst te worden vertegenwoordigd op de buitengewone algemene vergadering van Easdaq NV, die zal worden gehouden op of rond 28 juni 2012 (de "BAV").**

**Gelieve daarop beide van volgende daden te stellen:**

(i)      **deze volmacht onmiddellijk na ontvangst, correct ingevuld en ondertekend, via koerier of per aangetekend schrijven te bezorgen aan EASDAQ NV, 3000 Leuven, Lei 19 bus 11, ter attentie van de heer Anthony Ball (CFO van Equiduct Systems Limited), opdat deze is ontvangen door de Vennootschap ten laatste op 26 juni 2012; EN**

(ii)      **een kopie van het ingevulde en ondertekende volmachtformulier te verzenden, per e-mail, aan investor-relations@equiduct.eu, ten laatste op 26 juni 2012.**

**Alle houders van aandelen op naam dienen, overeenkomstig artikel 29 van de statuten, om toegelaten te worden tot de BAV, de Raad kennis te geven van hun intentie de BAV bij te wonen, via e-mail op investor-relations@equiduct.eu en dit ten laatste op 26 Juni 2012.**

---

Ondergetekende:

**Naam:**                        _____

**Adres/Zetel:**            _____

                                    _____

**Houder van aantal aandelen:**     _____

                                     -

**Stelt als bijzondere lasthebber aan**, individueel en met de macht om in de plaats te stellen:

Anthony Ball, 19 Coleford Road, SW18 1AD, London, Verenigd Koninkrijk

aan wie ondergetekende volmacht verleent om hem/haar te vertegenwoordigen op de buitengewone algemene vergadering van de vennootschap Easdaq NV, met zetel te Lei 19 bus 11, B-3000 Leuven (België) (ondernemingsnummer 0455.240.893 – RPR Leuven), die zal worden gehouden op de kantoren van Berquin Notarissen, Lloyd Georgelaan 11 te 1000 Brussel, op 28 juni 2012 om 11:30 CET, en die zal beraadslagen omtrent de agenda vermeld als bijlage bij de

BUITENGEWONE ALGEMENE VERGADERING VAN EASDAQ NV

oproepingsbrief.

Ondergetekende geeft hierbij aan de volmachtdrager volgende instructies om op de BAV als volgt te stemmen op de agendapunten vermeld in de oproeping:

| Agendapunt | ja | neen | onthouding |
|---|---|---|---|
| 1. Kennisname Bijzonder Verslag van de Raad van Bestuur | *Aangezien het om een loutere kennisname gaat, dient er geen besluit te worden genomen door de BAV* | | |
| 2. Kennisname verslag Commissaris | *Aangezien het om een loutere kennisname gaat, dient er geen besluit te worden genomen door de BAV* | | |
| 3. Kapitaalverhoging | Ja | Neen | Onthouding |
| 4. Machtiging aan de Raad van Bestuur | Ja | Neen | Onthouding |
| 5. Machtiging | Ja | Neen | Onthouding |

Ondergetekende bevestigt hierbij dat hij/zij er kennis van heeft dat de gevolmachtigde, bij gebrek aan instructies van zijnentwege/harentwege, alle voorstellen betreffende de agendapunten zal goedkeuren.

De lasthebber mag verder ondermeer, zonder hiertoe beperkt te zijn:

- Deelnemen aan elke vergadering met dezelfde agenda voor het geval de eerste vergadering niet geldig zou kunnen beraadslagen of niet zou worden (kunnen) gehouden op de hierboven vermelde datum en uur.

- Verklaren dat ondergetekende zichzelf als regelmatig opgeroepen beschouwt, dat hij/zij de bepalingen kent van de artikelen 64 1°, 178, 533 en 535 van het Wetboek van vennootschappen, en dat hij/zij verzaakt aan de oproepingsformaliteiten en -termijn en aan het instellen van een eventuele nietigheidsvordering wegens een onregelmatigheid naar de vorm.

- Verklaren dat ondergetekende de verslagen vermeld op de agenda vooraf heeft ontvangen, dat hij/zij over voldoende tijd beschikte om deze verslagen grondig te bestuderen en dat hij/zij geen vragen of opmerkingen heeft betreffende deze verslagen.

BUITENGEWONE ALGEMENE VERGADERING VAN EASDAQ NV

- In het algemeen, alle processen-verbaal, aanwezigheidslijsten, overeenkomsten, bevestigingen, kennisgevingen en ieder ander document tekenen, in de plaats stellen en, in het algemeen, alles doen dat nuttig of noodzakelijk is voor de uitvoering van deze volmacht, voor zover nodig met belofte van bekrachtiging.

Instructies aan de lasthebber

Ondergetekende geeft hierbij uitdrukkelijk opdracht aan de lasthebber om deel te nemen aan de buitengewone algemene vergaderingen, zelfs indien het bewijs niet voorligt dat de aandeelhouders, de bestuurders, de commissaris en/of de andere relevante houders van effecten geldig zijn opgeroepen tot de buitengewone algemene vergaderingen en, voor zover toepasselijk, indien de betrokkenen niet allen hebben verzaakt aan (i) de termijnen en de vormvereisten voor oproeping tot de buitengewone algemene vergaderingen en (ii) het recht om bepaalde verslagen en andere documenten te ontvangen, zoals voorgeschreven door de relevante artikelen van het Wetboek van vennootschappen.

Schadeloosstelling van de lasthebbers

Ondergetekende verbindt er zich hierbij toe om de lasthebber schadeloos te stellen voor elke schade die hij/zij zou kunnen oplopen ten gevolge van enige handeling gesteld ter uitvoering van deze volmacht, op voorwaarde evenwel dat hij/zij de grenzen van zijn/haar bevoegdheden heeft nageleefd. Verder verbindt ondergetekende zich ertoe geen enkele schadevergoeding van hem/haar te vorderen, op voorwaarde evenwel dat laatstgenoemde de grenzen van zijn/haar bevoegdheden heeft nageleefd.

**Gedaan te:** _____(plaats),

**Op:** _____(datum).


_____                    _____
(handtekening)                             (handtekening)


_____                    _____
(naam)                                     (naam)


_____                    _____
(functie)                                  (functie)

*Extraordinary Shareholders Meeting of Easdaq NV to be held on or about 28 June 2012*

*Unofficial English translation of a Dutch original*

---

## Power of attorney

Please fill out and sign this proxy (which is the proxy format fixed by the Board in accordance with Article 30 of the Articles of Association) in the appropriate spaces if you wish to be represented at the extraordinary shareholders meeting of EASDAQ NV, to be held on or about 28 June 2012 (the "EGM").

Please subsequently perform both of the following actions:

(i) send this proxy, duly completed and signed, by express courier or registered letter to EASDAQ NV, 3000 Leuven, Lei 19, Box 11, for the attention of Mr. Anthony Ball (CFO of Equiduct Systems Limited), so that it is received by the Company <u>at the latest on 26 June 2012</u>; <u>AND</u>

(ii) send a <u>copy</u> of the duly completed and signed proxy form, by e-mail to <u>investor-relations@equiduct.eu</u>, <u>at the latest on 26 June 2012</u>.

In accordance with Article 29 of the Articles of Association, in order to be admitted to the EGM, all owners of registered shares must notify the Board of their intention to attend the EGM by e-mail at <u>investor-relations@equiduct.eu</u> at the latest on 26 June 2012.

### PLEASE ALSO FILL OUT AND SIGN THE DUTCH PROXY FORM ACCORDINGLY

The undersigned:

**Name:**  _____

**Address/registered office:**  _____

_____

**Holder of number of shares:**  _____

**Appoints as its special proxyholder**, individually and with full power of substitution:

Mr. Anthony Ball, 19 Coleford Road, SW18 1AD, London, United Kingdom,