**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
| | : | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS, INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

-----------------------------------------------------------x

## FINAL APPLICATION OF
## ALVAREZ & MARSAL NORTH AMERICA, LLC
## FOR FINAL ALLOWANCE AND APPROVAL OF
## INCENTIVE FEE EARNED COMPRISED OF (i) ASSET MANAGEMENT INCENTIVE
## FEE AND (ii) CLAIMS MANAGEMENT INCENTIVE FEE DURING THE
## <u>PERIOD OF SEPTEMBER 15, 2008 TO MARCH 6, 2012</u>

| | |
|---|---|
| Name of Applicant: | <u>Alvarez & Marsal North America, LLC</u> |
| Authorized to Provide Management Services to: | <u>Debtors and Debtors in Possession</u> |
| Date of Retention: | <u>December 17, 2008 (*nunc pro tunc to* September 15, 2008)</u> |
| Period for Which Compensation and Reimbursement are Sought: | <u>September 15, 2008 to March 6, 2012</u> |
| Amount of Final Base Compensation Sought: | <u>N/A</u> |

| | |
|---|---|
| Asset Management Incentive Fee: | Amount Currently Payable: $14.6 million |
| | Estimated Additional Post-Effective Date Amount:  $52.78 million [1] |
| Claims Management Incentive Fee: | Amount Currently Payable: $16.94 million |
| | Estimated Additional Amount Post-Effective Date:  $6.44 million [2] |
| Amount of Expense Reimbursement Sought As Actual, Reasonable, and Necessary: | N/A |

This is a(n) ____ monthly ___ interim and/or _x_ final application.

---

[1]  These amounts are estimated based on information currently available to Alvarez & Marsal. The substantial services for which Alvarez & Marsal has earned the Asset Management Incentive Fee were provided prior to the Effective Date. In addition, certain post-Effective Date services are being provided by Alvarez & Marsal in order to facilitate final distributions. The amount of those distributions will enable final calculation of the total Asset Management Incentive Fee, which will be calculated and paid in accordance with the Incentive Fee percentage and the final distribution amount. Therefore, the final Asset Management Incentive Fee may be more or less than the estimates herein.

[2]  These amounts are estimated based on information currently available to Alvarez & Marsal. The substantial services for which Alvarez & Marsal has earned the Claims Management Incentive Fee were provided prior to the Effective Date. In addition, certain post-Effective Date claims mitigation services are being provided by Alvarez & Marsal. The final amount of additional claims mitigation will enable calculation of the total Claims Management Incentive Fee, which will be calculated and paid in accordance with the Incentive Fee percentages and final mitigation amounts. Therefore, the final Claims Management Incentive Fee may be more or less than the estimates herein.

### *This Application includes a performance-based incentive fee*

This Application is the final application of Alvarez & Marsal North America, LLC (Alvarez & Marsal), who respectfully requests entry of an order:

(i)     Granting final allowance and approval of an asset management incentive fee of: (i) $14.60 million based upon the April 17, 2012 distribution; and (ii) a future amount that will be calculated in accordance with the applicable terms of Alvarez & Marsal's retention, which calculation is currently estimated, subject to final calculation, at $52.78 million (collectively, the "Asset Management Fee");

(ii)    Granting final allowance and approval of a claims management incentive fee of: (i) $16.94 million; and (ii) an amount that will be calculated in accordance with the applicable terms of Alvarez & Marsal's retention, which calculation is currently estimated, subject to final calculation, at $6.44 million (collectively, the "Claims Management Fee"); and

(iii)   Authorizing the payment to Alvarez & Marsal of the foregoing amounts, including immediate payment of any final amounts that are unpaid at the time of approval of this application.

Dated: June 29, 2012                          ALVAREZ & MARSAL NORTH AMERICA, LLC

                                              By: /s/ John K. Suckow
                                                  John K. Suckow
                                                  Managing Director
                                                  600 Madison Avenue
                                                  8th Floor
                                                  New York, NY 10022

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

|  |  |  |
|---|---|---|
|  | : |  |
| In re | : | Chapter 11 Case No. |
|  | : |  |
| LEHMAN BROTHERS HOLDINGS, INC., *et al.*, | : | 08-13555 (JMP) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

------------------------------------------------------------x

## FINAL APPLICATION OF
## ALVAREZ & MARSAL NORTH AMERICA, LLC
## FOR FINAL ALLOWANCE AND APPROVAL OF
## INCENTIVE FEE EARNED COMPRISED OF (i) ASSET MANAGEMENT INCENTIVE
## FEE AND (ii) CLAIMS MANAGEMENT INCENTIVE FEE DURING THE
## PERIOD OF SEPTEMBER 15, 2008 TO MARCH 6, 2012

### INTRODUCTION

Alvarez & Marsal North America, LLC ("Alvarez & Marsal") files this Final Application

(the "Application"), together with the Declaration of John K. Suckow ("Suckow Declaration"),

which is attached hereto as **Exhibit A**, seeking this Court's final allowance and approval of the

incentive fees payable to Alvarez & Marsal comprised of the asset management incentive fee and the

claims management incentive fee (collectively, the "Incentive Fee") of Alvarez & Marsal in

connection with the interim management services provided by personnel of Alvarez & Marsal and its

wholly-owned subsidiaries and professional service provider affiliates (all of which are owned by

Alvarez & Marsal's parent company and employees) (with Alvarez & Marsal collectively referred to

hereafter as "A&M" or "Alvarez & Marsal") to the above-captioned debtors (collectively, the

"Debtors") in the above-captioned cases (collectively, the "Chapter 11 Cases") for the period from

September 15, 2008 to March 6, 2012 (the "Application Period"). The foregoing fees and expenses

are sought pursuant to Sections 105, 330, and 363(b) of the United States Bankruptcy Code, Rule

2016 of the Federal Rules of Bankruptcy Procedure, the Local Rules for the United States Bankruptcy Court for the Southern District of New York, the Order Establishing Procedures for Interim Compensation and Reimbursement of Professionals, entered by the Bankruptcy Court for the Southern District of New York on May 27, 2009, at Docket No. 614, and this Court's Order entered on December 17, 2008, at Docket No. 2278 (the "Retention Order") attached hereto as **Exhibit B**, which authorized the Debtors to retain Alvarez & Marsal pursuant to the terms of an engagement letter dated September 15, 2008 (the "Engagement Letter") which is attached hereto as **Exhibit C** and determination and payment of the asset management incentive fee and the claims management incentive fee earned by Alvarez & Marsal in accordance with the terms set forth in the Second Supplemental Declaration of Bryan P. Marsal filed November 4, 2008 (the "Second Supplemental Declaration") (Docket No. 1559) which is attached hereto as **Exhibit D**.

In the Retention Order, the Court ordered:

ORDERED that, except with respect to the Incentive Fee (as defined below), payment of which shall be made as provided below, the Debtors are authorized to pay Alvarez & Marsal in such amounts and at such times as is provided in the Engagement Letter without further order of this Court; and it is further

ORDERED that, except with respect to the Incentive Fee (as defined below), Alvarez & Marsal will not be required to submit fee applications pursuant to sections 330 and 331 of the Bankruptcy Code; rather (i) Alvarez & Marsal shall file with the Court and serve upon all parties entitled to receive notice in these cases, quarterly reports of compensation earned and expenses incurred (the "Quarterly Compensation Reports"), and parties in interest shall have the right to object to fees and/or expenses paid within ten (10) days of the filing of the Quarterly Compensation Reports, and (ii) if a timely objection is filed to any fees and/or expenses listed in a Quarterly Compensation Report, the Debtors or Alvarez & Marsal shall schedule a hearing with the Court with respect to such fees and/or expenses; and it is further

ORDERED that the Debtors, and any successors thereof, shall pay and distribute to Alvarez & Marsal certain incentive compensation (the "Incentive Fee") that: (i) shall be comprised of an "Asset Management Incentive Fee" and a "Claims Management Incentive Fee," as those terms are described in the Second Supplemental Declaration; (ii) the amount and manner of payment of which shall be determined in accordance with the terms set forth in the Second Supplemental Declaration; and (iii) the allowance of which shall be

based upon an application for allowance (a) served in accordance with the Case Management Order on not less than fourteen (14) days' notice and (b) subject to objection by any party in interest; and (iv) shall be subject, (a) in the case of the "Claims Management Incentive Fee" to a determination to be made by the Court at the conclusion of the Chapter 11 Cases that Alvarez & Marsal has made a substantial contribution to the management and mitigation of the claims against the estates; and (b) in the case of both the "Asset Management Incentive Fee" and the "Claims Management Incentive Fee," to a reasonableness standard consistent with section 330 of the Bankruptcy Code; ….

The Second Supplemental Declaration sets forth the terms and conditions under which

Alvarez & Marsal are entitled to the Incentive Fee:

> "1. The Incentive Fee has two components, both of which are generally described below: (i) the Asset Management Incentive Fee; and (ii) the Claims Management Incentive Fee. The aggregate amount of both components of the Incentive Fee will be capped at 25% of the hourly professional fees paid to Alvarez & Marsal over the duration of this engagement.

***Asset Management Incentive Fee***

> 2. A portion of the Incentive Fee will be determined by reference to the value of Unsecured Distributions (as defined below). The Debtors, and any successors thereof, shall pay and distribute to Alvarez & Marsal an Incentive Fee equal to 0.175% (17.5 bps) of all Unsecured Distributions greater than $15 billion.

> 3. As used herein, the term "Unsecured Distributions" shall mean any consideration or distribution of any kind or in any form whatsoever paid to, or received or retained by, any unsecured creditor of any Debtor or Non-Debtor affiliate of a Debtor ("Non-Debtor"), or to any reserve or escrow for the benefit of any allowed, disputed or contingent unsecured claim against any Debtor or Non-Debtor, whether distributed pursuant to a plan of reorganization, a plan of liquidation, as an interim or other distribution during the administration of these Chapter 11 cases, or as otherwise distributed following the termination, dismissal or conversion of all or any of these Chapter 11 cases to one or more cases under Chapter 7 of the Bankruptcy Code or otherwise.

> 4. The Incentive Fee for Asset Management shall be payable in installments. Accordingly, an Incentive Fee shall be paid as and when each Unsecured Distribution is made to any unsecured creditor of the Debtors or Non-Debtors. The Incentive Fee for Asset Management shall be paid to Alvarez & Marsal in the same consideration to be received by such creditor(s) (including, without limitation, cash, notes, rights, options, trust certificates, equity or other contractual rights or property)

or, at the option of the Debtors and with consent of the Creditors' Committee, in cash.

5.  For purposes of determining the amount of cash to be paid to Alvarez & Marsal when the applicable Unsecured Distribution consists of non-cash consideration, such non-cash consideration shall be valued as follows:

> (a) if the non-cash consideration includes publicly-traded debt, equity or commodity securities, the value of such securities shall be calculated based on the weighted average of the last sale or closing price during the ten trading days immediately prior to the relevant distribution date;

> (b) if the value of the non-cash consideration cannot be determined under clause (a), but the value is disclosed in a court-approved disclosure statement for any plan of reorganization or plan of liquidation, or any other court-approved disclosure to creditors of the Debtors, the value of the non-cash consideration shall be equal to the value disclosed in such disclosure statement; or

> (c) if the non-cash consideration cannot be valued under clauses (a) or (b), then Alvarez & Marsal will prepare a valuation thereof for the purposes of calculating the Incentive Fee; *provided however*, that if Alvarez & Marsal prepares a valuation and the Creditors' Committee and Alvarez & Marsal are unable to agree regarding the amount of such valuation, then the Bankruptcy Court will determine the value of the non-cash consideration and the Bankruptcy Court's decision will be final and binding on Alvarez & Marsal and all parties in interest.

***Claims Management Incentive Fee***

6.  The Debtors, and any successors thereof, shall pay and distribute to Alvarez & Marsal an Incentive Fee in an amount to be determined at the conclusion of the case based on Alvarez & Marsal's substantial contribution to the management and mitigation of claims against the estates.

## ***Final Application for Allowance***

7.  If Incentive Fees become payable or are otherwise requested in accordance with the terms described above, Alvarez & Marsal will submit an application for their allowance, which application shall be subject to a reasonableness standard consistent with section 330 of the Bankruptcy Code."

## COMPENSATION REQUESTED

1.      The applicable calculations for Alvarez & Marsal's Incentive Fee are:

    a.   Attached as **Schedule 1** are the calculations of the Asset Management Fee (.175% of distributions to unsecured creditors in excess of $15 billion): (i) $14.60 million based upon the April 17, 2012 distribution; and (ii) a future amount that will be calculated in accordance with the applicable terms of Alvarez & Marsal's retention, which amount is currently estimated at $52.78 million; and

    **b.**   Attached as **Schedule 2** are the calculations of the Claims Management Fee: (i) $16.94 million; and (ii) the estimated post-Effective Date amount that will be calculated in accordance with the applicable terms of Alvarez & Marsal's retention, which amount is currently estimated at $6.44 million.

2.      The Asset Management Incentive Fee formula is set forth in the Second Supplemental Declaration at page 3: "[t]he Debtors, and any successors thereof, shall pay and distribute to Alvarez & Marsal an Incentive Fee equal to 0.175% (17.5 bps) of all Unsecured Distributions greater than $15 billion." The term "Unsecured Distributions" is defined as "any consideration or distribution of any kind or in any form whatsoever paid to, or received or retained by, an unsecured creditor of any Debtor or non-debtor affiliate of a Debtor ("Non-Debtor"), or to any reserve or escrow for the benefit of any allowed, disputed or contingent unsecured claim against any Debtor or Non-Debtor…"

3.      As described in Schedule 1A, approximately $23.34 billion in Unsecured Distributions have been paid or reserved. Accordingly, an Asset Management Fee has been earned and is payable to Alvarez & Marsal in the amount of $14.60 million, and, as described in Schedule 1B, Alvarez & Marsal will also be entitled to an additional Asset Management Fee. Certain post-

Effective Date services are being provided by Alvarez & Marsal in order to facilitate final distributions. The amount of those distributions will enable final calculation of the remaining Asset Management Incentive Fee, which additional amount is currently estimated to be $52.78 million. The remaining Asset Management Incentive Fee amount will be calculated and paid in accordance with the Incentive Fee percentage and the final distribution amount.

4.      In addition and as described further in the Suckow Declaration, Alvarez & Marsal rendered significant services and made substantial contributions in connection with the management and mitigation of the claims against the estates.  Alvarez & Marsal was central to the unprecedented elimination of nearly $850 billion worth of claims to date against the estates of Debtors.

5.      The Claims Management Incentive Fee shall be paid "in an amount to be determined at the conclusion of the case based on Alvarez & Marsal's substantial contribution to the management and mitigation of claims against the estates."  Alvarez & Marsal respectfully requests allowance and payment of a Claims Management Fee equal to: (i)  .002% (2 bps) of the amount of claims already mitigated from the original approximately $1.339 trillion in liquidated claims; and (ii) .005% (5 bps) of the amount of post-Effective Date mitigated claims.

6.      The Incentive Fee has been earned in accordance with the terms and conditions of Alvarez & Marsal's appointment in the Chapter 11 Cases.  The Incentive Fee and the other compensation paid to the firm fairly represent extraordinary efforts by Alvarez & Marsal in managing the Debtors and assisting the other professionals in administering these cases.  In particular, and as described in the Suckow Declaration, services of Alvarez & Marsal directly and substantially contributed to the expected realization of unsecured distributions of at least $50 billion and A&M's corresponding management and mitigation of nearly $850 billion of claims to date against the estates.

7.       Alvarez & Marsal performed the services, for which it seeks compensation and final approval, on behalf the Debtors and their estates, and not on behalf of any committee, creditor, or other person.  In addition, Alvarez & Marsal received no payment and no promises of payment from any source, other than the Debtors, for services rendered in any capacity in connection with the matters covered by this Application.  There is no agreement or understanding between Alvarez & Marsal and any other entity for the sharing of compensation received for services rendered in these Chapter 11 Cases.

8.       The overwhelming success of the Lehman bankruptcy is the result of a vision and direction that were established early on, and then managing the execution of that vision throughout the case.  The key elements of this strategy were to:  (i) gain the confidence and support of the court for a somewhat unorthodox, but prudent liquidation strategy; (ii) work collaboratively and transparently with the members and the advisors of the UCC and other key constituents towards a consensual outcome; (iii) implement a "hold strategy", i.e., avoid "fire selling" the Lehman assets to "vultures" in an historically low market and convince all constituencies of the benefits of this strategy; this strategy also called for a number of protective investments to enhance the value of the estates; (iv) collaborate with the foreign administrators and assist them in their proceedings, acknowledging the complexity and interconnectivity of the Lehman creditors; (v) set aggressive timetables (e.g., two year target to exit bankruptcy) to create momentum in the Debtor's estates and establish a coordinated schedule for all the estates around the world; and (vi) approach all matters pragmatically with a goal of reaching a consensual compromise and to avoid costly and protracted litigation wherever possible.  As a result of its global footprint (USA, Asia, Europe, South America) and its multidisciplinary service lines (restructuring, IT, forensic, tax, claims management, etc.), Alvarez & Marsal was uniquely situated to address the Lehman challenges.

9.      The benefits of services by Alvarez & Marsal in these Chapter 11 Cases are significant and widespread.  As set forth in further detail in the Suckow Declaration, Alvarez & Marsal provided an extraordinary array of services to and on behalf of the Debtors in connection with bringing the Chapter 11 Cases to their successful <u>and</u> consensual conclusion.

### FACTUAL SUMMARY

10.      Commencing on September 15, 2008 (the "<u>Commencement Date</u>"), and periodically thereafter, Lehman Brothers Holdings Inc. ("<u>LBHI</u>") and certain of its subsidiaries and affiliates ("<u>Affiliates</u>") commenced the voluntary Chapter 11 Cases.  Prior to September 15, 2008, LBHI and its Affiliates (collectively, "<u>Lehman</u>") was an integrated financial enterprise constituting the fourth largest investment bank in the United States.  Lehman conducted a worldwide business and operations that employed over 25,000 employees.  Lehman's business was operated and managed as an integrated web that reported for management purposes by product lines, and not on a legal entity basis.

11.      Virtually all of Lehman's business segments were operated or were managed out of the "world headquarters" at 745 Seventh Avenue in New York, New York.  LBHI, the ultimate parent of all Lehman legal entities, functioned as the central nerve center and decision maker. Through the LBHI Board of Directors, executive committee and various firm-wide standing committees,[3] LBHI had responsibility and control over firm-wide issues, including decisions concerning strategy, risk, liquidity, funding, operations and new products.  In many instances, there were overlapping directors, officers and committees between LBHI and its Affiliates.  Generally, LBHI directed all operations for the enterprise.

---

[3] The firm-wide standing committee consisted of the Executive Committee, the Management Committee, the Conflicts Task Force, the Finance Committee, the Operating Exposure Committee and the Risk Committee.

12.      LBHI served as the central banker and as the primary conduit for raising the majority of the external financing for operations.  In order to collect, transfer, and distribute funds efficiently, Lehman utilized a centralized cash management system to ensure that all of the units had sufficient funding to operate their respective businesses.  The cash management system facilitated Lehman's cash monitoring, forecasting and reporting, while ensuring compliance with various regulatory requirements.  The capital of each Lehman entity was sourced from a single pool of money that would be swept from many unregulated Affiliates and regulated Affiliates (to the extent permitted) on a daily basis and used the next day to fund operations on an as needed basis without regard to source or legal entity.  The cash management system resulted in tens of thousands of intercompany entries occurring on a daily basis.

13.      Generally, the intercompany balances between LBHI and its Affiliates were running totals that fluctuated daily. Intercompany balances were not "zeroed out"; rather, they were carried over from day to day, month to month and year to year. In addition, many Lehman Affiliates did not have their own bank accounts. Their obligations and receivables were often settled by another Lehman Affiliate, typically Lehman Brothers Inc. ("LBI"), Lehman Brothers International (Europe) ("LBIE") or Lehman Brothers Japan Inc. ("LBJ"), and an intercompany balance was reflected on books and records of the relevant entities. The movement of cash between, as well as the payment of expenses on account of the various legal entities, was accounted for through intercompany accounting.

14.      In the ordinary course, generally all financial reporting for Lehman was done on a consolidated basis at the LBHI level and was broken out by business segments and by geographic region, not by legal entity. Due to the consolidated reporting, material intercompany accounts and

transactions were not reported. With few exceptions (e.g. regulated broker-dealers), most Lehman Affiliates did not publish, disseminate or make available individual financial statements.

15.     Each day, the Lehman global enterprise initiated, participated, and consummated tens of thousands of transactions involving billions of dollars at a velocity that, in retrospect, is almost incomprehensible. Although many of the Lehman Affiliates facially appeared to maintain significant operations, transacted with third parties and had their own assets, it is evident that Lehman operated as a single unified business.

16.     Not surprisingly, the failure of LBHI resulted in the catastrophic downfall of the entire Lehman enterprise and the domino effect causing the Chapter 11 Cases and foreign insolvency proceedings that ensued. Following the commencement of LBHI's original Chapter 11 Case, over eighty insolvency proceedings involving Lehman Foreign Affiliates were initiated in approximately sixteen jurisdictions, including the proceedings of LBIE – the primary operating unit of the Lehman enterprise in Europe, whose size and complexity alone exceeded many domestic investment banks. The prospect of intense adversary proceedings and conflicts loomed over the Chapter 11 Cases.

17.     Immediately upon the filing of the Chapter 11 Cases, Alvarez & Marsal was retained by Debtors pursuant to the Engagement Letter, as supplemented by Supplemental Declarations, to make Alvarez & Marsal available to provide interim management  services and to assist the Debtors with the management of their assets and claims against the estates.

18.     The days following September 15, 2008 were permeated with fear and panic in the financial markets. On September 19, 2008, LBHI's operating U.S. broker/dealer, LBI, which employed the bulk of the Debtors' employees (approximately 10,000 individuals), was subjected to liquidation proceedings under the Securities Investor Protection Act of 1970, as amended. In order to preserve the jobs of thousands of employees and provide for the orderly transfer of customer

accounts, the Debtors orchestrated a going concern sale of their North American capital markets business (i.e. the LBI business) to Barclays Capital Inc. ("BarCap").

19.     As a priority, an immediate focus of Alvarez & Marsal was to achieve control of assets and all data, records and other information relating to the Lehman business. The abrupt failure of LBHI initiated a breakdown in Lehman's global financial accounting system and cash management system. The consequent disruption impaired the ability to locate, control and administer the Lehman business. The problem was accentuated by the need to realize value from assets potentially subject to severe and imminent erosion, such as the North American capital markets business and the Neuberger Berman and associated investment management business. The sale of the North American capital markets business that encompassed the assets and business of LBI, within five days of the Commencement Date, resulted in the settlement and transfer of thousands of customer accounts.

20.     Unfortunately, the BarCap transaction essentially stripped the Debtors of employees and systems, and aggravated the initial phase of gaining control of the case administration. However, under the supervision and administration of Alvarez & Marsal, the Debtors (i) established control over their assets; (ii) achieved stability of administration of work streams to maximize values; (iii) established relationships with foreign administrators and fiduciaries facilitated by the international protocol and completion of the "Global Close" to enable the Debtors to deal with claims asserted by the Foreign Affiliates; (iv) developed procedures to unravel and secure the value of the Debtors' massive derivatives portfolio of more than 10,000 contracts and approximately 1.7 million transactions; and (v) developed the foundation for formulating a proposal for a chapter 11 plan that would avoid the incurrence of extended, expensive, and difficult litigation.

21.     While developing and stabilizing the Debtors' infrastructure, Alvarez & Marsal focused on the maximization of value and recovery of their assets. Generally, the Debtors' assets could be categorized in five asset classes: derivatives contracts, real estate assets, commercial loans, private equity/principal investments and bank platforms. Given the enormous number of assets that needed to be administered, sold or otherwise resolved, Alvarez & Marsal established various procedures and protocols that balanced the need for the Debtors to move quickly to secure the value of their assets with appropriate creditor oversight.

22.     These protocols were useful in the control over the sale and/or collection of various assets – including derivative and loan receivables.  Since the Commencement Date through February 29, 2012, the Debtors and their non-Debtor controlled Affiliates have approximately $6.3 billion in gross recoveries from their real estate assets and $16.8 billion from derivative receivables.

23.     In addition to its prominent role in derivatives and the real estate markets, Lehman was a significant participant in the commercial lending industry prior to the Commencement Date and held a significant amount of commercial and residential loans. The primary focus of the Debtors' loan strategy has been the consensual termination and limitation of damages for unfunded loan commitments of the Debtors and the maximizing of recoveries on issued Loans.  By February 29, 2012, the Debtors had terminated unfunded commitments on loans in excess of $30 billion.

24.     To avoid the costs, delays and virtual chaos from the prosecution of competing chapter 11 plans, Alvarez & Marsal led intense negotiations in June 2011 with the major stakeholders, including members of the Ad Hoc Group, members of the Non-Con Plan Proponents, many Lehman Brothers Treasury (Netherlands) ("LBT") Noteholders and various Foreign Administrators, to achieve a consensus to resolve the main issues among the parties. These resolutions were included in the Plan.

15

25.    Alvarez & Marsal successfully resolved disputes with ten of the thirteen largest Big Bank derivatives counterparties.  Settlement agreements were reached for the allowance of their respective Big Bank derivatives claims and the payment of amounts due by such counterparties to the Debtors, in accordance with a settlement framework that applied standardized, uniform and transparent principles and methodologies to calculate such amounts. The application of uniform principles and methodologies and the voluntary settlement entered into by the relevant parties eliminated potential time-consuming and expensive litigation regarding the valuations of thousands of derivatives transactions.

26.    From the outset and at every stage thereafter, Alvarez & Marsal pursued a consensual resolution of issues that it confronted and, most importantly, a consensual chapter 11 plan.

27.    To that end, comprehensive settlements were also reached with foreign administrators and certain third-party creditors.  These settlements reduced the claims of those parties by an aggregate amount of $267 billion.

28.    In the aggregate, 75,322 creditors asserting a total amount of over $405 billion in claims against the Debtors voted on the Plan. The Plan was accepted by 71,553 creditors asserting claims in the aggregate amount of approximately $400 billion against the Debtors (which represents 95% of the creditors and 98.76% of the claims).  Every class of creditors that voted on the Plan overwhelmingly accepted the Plan, including at least 2 classes of each of the 23 Debtors. Of the 134 classes entitled to vote on the Plan, 93 classes accepted the Plan. Significantly, no class voted to reject the Plan.

29.    On December 6, 2011, this Court confirmed the Debtors' Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (Docket #23023) which became effective March 6, 2012.

## **LEGAL STANDARD**

30.     Under section 330(a)(1) of the Bankruptcy Code, the Court may grant approval of payments of reasonable compensation for actual and necessary services rendered to a debtor by its retained professionals based on the nature, extent, and value of the services rendered, time spent on such services, and the cost of comparable services in the market other than in a bankruptcy case. The Court may also grant approval of payments of reimbursement for actual, necessary expenses incurred by such professionals in connection with their retention.

31.     Section 330 of the Bankruptcy Code provides that a court may award a professional employed under section 327 of the Bankruptcy Code "reasonable compensation for actual, necessary services rendered . . . and reimbursement for actual, necessary expenses." Id. § 330(a)(1)(A), (B).

32.     Section 330 of the Bankruptcy Code also sets forth the criteria for the award of such compensation and reimbursement:

> In determining the amount of reasonable compensation to be awarded . . . the court shall consider the nature, extent, and the value of such services, taking into account all relevant factors including –
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

Id. § 330(a)(3).

33.    Throughout the 3 ½ years of the Chapter 11 Cases, Alvarez & Marsal made no increases in the individual hourly rates charged for A&M's services to the estates.  The only adjustments in individual hourly rates for those A&M personnel were as the result of promotions.

34.    In addition to hourly-based fees, section 330 of the Bankruptcy Code permits compensation for incentive-based fees. Such performance fees are appropriate parts of compensation for restructuring consulting firms, and are standard for Alvarez & Marsal engagements of this type, both inside and outside of bankruptcy courts.  Indeed, Alvarez & Marsal and other similar firms price their engagements to include performance incentive-based fees as part of the total compensation packages for such engagements.  Thus, Alvarez & Marsal and other firms rely upon and take into account the negotiated performance incentive-based fee when accepting engagements.

35.    Performance incentive fees are especially appropriate in restructuring cases because clients appreciate an approach which aligns the interests of the client/debtor with the interests of its advisor.  In colloquial terms, such fees demonstrate that a firm such as Alvarez & Marsal, has "skin in the game" along with the debtors undergoing the restructuring.  This alignment of interests inures to the overall benefit of the clients/debtors, as well as their estates and creditors.

36.    Similarly, performance incentive fees are a vital and inseparable component of the overall compensation model for crisis management firms like Alvarez & Marsal.  Denial of such fees in cases such as the Debtors', where a concrete showing of both success and merit is made, would ill-serve restructurings.  Firms would readjust their compensation model by increasing their monthly-based and/or hourly-based fees.  In recognition of these realities, courts have authorized and approved payment of performance incentive-based fees upon a demonstrable showing of

18

restructuring expertise that is transformative, in terms of business viability and value generation. This reasoning is clearly applicable to the engagement and services of Alvarez & Marsal in these Chapter 11 Cases.

37.    As the Bankruptcy Court concluded in In re Cardinal Indus., Inc., 151 B.R. 843, 847 (Bankr. S.D. Ohio 1993):

> Performance-based or success-factor bonuses are a normal part of compensation arrangements for management restructure consultants and … such bonuses generally far exceed the time value of the consultant's services on a lodestar basis.  Indeed, the time value component is referred to as the base salary, apparently payable to the consultant even if success is not achieved.

38.    Courts have evaluated performance incentive fees under both sections 328 and 330 ("reasonableness standard") of the Bankruptcy Code.  In re XO Communications, Inc., 398 B.R. 106 (Bankr. S.D.N.Y. 2008); In re Northwest Airlines Corp., 400 B.R. 393 (Bankr. S.D.N.Y. 2009).  In considering incentive fees, courts consider (i) whether the advisor's services were necessary and beneficial to the debtors' estates at the time the services were rendered; and (ii) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases outside of bankruptcy.  XO Communications at 18.  Where an incentive fee is tied to the results of the bankruptcy case, time spent on the case "may shed little light on the actual value that a financial advisor brought to a transaction."  Id. At 18, fn.9.

39.    When Congress passed the Bankruptcy Reform Act of 1978, it removed the "spirit of frugality" as a factor in bankruptcy fees.  The standard is now the cost of comparable services in a non-bankruptcy setting.  In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13 (Bankr. S.D.N.Y. 1991).  Inasmuch as performance incentive-based fees are a normal part of the fee structures of Alvarez & Marsal and other management restructuring firms, both within and outside of bankruptcy, approval of the Incentive Fee is appropriate and comparable to compensation for similar services.

40.     Examples of significant bankruptcy cases involving performance incentive-based fees awarded to restructuring advisors include the following:

- Enron Corp., 2006 WL 1030421 (Bankr. S.D.N.Y. 2006). Crisis manager received incentive payment of $12 million as a success fee for services as Debtor's interim chairman.

- Calpine Corp., Case No. 05-60200, S.D.N.Y.   Crisis manager was awarded success fees of $6 million. Docket No. 7748.

- Amerco, Case No. 03-52103, D. Nev.  Financial advisor to the debtors was awarded success fees of $5.1 million in 2004.  Docket No. 1074.

- Northwest Airlines, Case No. 05-17930, S.D.N.Y. Financial advisor to the debtors in 2007 was awarded success fees of $13.5 million.  Docket No. 7633.

- Northwestern Corp., In re Northwestern Corp., 324 B.R. 538, rev'd, 355 B.R. 40 (D. Del. 2006). Financial advisor to the debtor was awarded only 50% of its contracted-for success fees, but the case was later reversed. The Court held it was error to reduce the success fees and awarded the full $5.5 million.

- General Motors Corp. n/k/a Motors Liquidation Company, Case No. 09-50026, S.D.N.Y.  Crisis manager to the debtors awarded a $13 million success fee.

- SemGroup, Case No. 08-11525, D. Del.  The Court approved $6.825 million in contingent success fees in 2010.  Docket No. 7408.

41.     Payment of the Incentive Fee to Alvarez & Marsal in these Chapter 11 Cases is reasonable and satisfies the standards of section 330 of the Bankruptcy Code.

42.     The Incentive Fee is particularly warranted because the services provided by Alvarez & Marsal were critical to the consensual chapter 11 plan. Those services resulted in and contributed directly to the incremental value to creditors, the Debtors, and their estates.

43.     Alvarez & Marsal recognizes that its efforts were not the sole cause of the Debtors' successful reorganization. The efforts of the Debtors, their employees and other professionals were

extraordinary.  However, the general economic environment and the specific challenges facing the Debtors and their business were also extraordinary.  Alvarez & Marsal accepted these challenges and risks under those conditions. Working in concert with Debtors' leadership team and other professionals, Alvarez & Marsal provided guidance, advice, management and professional expertise that directly resulted in the outstanding results in these Chapter 11 Cases.

44.     The Suckow Declaration and the attached documents support this request.

#      #      #

## CONCLUSION

45.     In accordance with the Administrative Order, notice of this Application has been

provided to the Notice Parties (as defined therein).

WHEREFORE, Alvarez & Marsal respectfully requests that this Court enter an Order:

(i)     Granting final allowance and approval of the Asset Management Incentive Fee of: (i) $14.60 million based upon the April 17, 2012 distribution; and (ii) a future amount that will be calculated in accordance with the applicable terms of Alvarez & Marsal's retention, which calculation is currently estimated, subject to final calculation, at $52.78 million;

(ii)    Granting final allowance and approval of the Claims Management Incentive Fee of: (i) $16.94 million; and (ii) an amount that will be calculated in accordance with the applicable terms of Alvarez & Marsal's retention, which calculation is currently estimated, subject to final calculation, at $6.44 million; and

(iii)   Authorizing the payment to Alvarez & Marsal any of the foregoing amounts, including immediate payment of any final amounts unpaid at the time of approval of this Final Application; and

(iv)    Awarding such other and further relief that is just and equitable.


Date:  June 29, 2012                    By:___/s/  John K. Suckow_____
                                            John K. Suckow
                                            Managing Director
                                            Alvarez & Marsal North America, LLC
                                            600 Madison Avenue
                                            8th Floor
                                            New York, NY 10022

**<u>Exhibit A</u>**

**John K. Suckow Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                  :
In re                                             :        Chapter 11 Case No.
                                                  :
LEHMAN BROTHERS HOLDINGS, INC., *et al.*, :        08-13555 (JMP)
                                                  :
            Debtors.                              :        (Jointly Administered)
                                                  :
-------------------------------------------------------------x


### DECLARATION OF JOHN K. SUCKOW
### IN SUPPORT OF FINAL FEE APPLICATION OF
### ALVAREZ & MARSAL NORTH AMERICA LLC
### FOR FINAL ALLOWANCE AND APPROVAL OF
### INCENTIVE FEE EARNED COMPRISED OF
### (i)  ASSET MANAGEMENT INCENTIVE FEE AND
### (ii) CLAIMS MANAGEMENT INCENTIVE FEE
### DURING THE PERIOD OF SEPTEMBER 15, 2008 TO MARCH 6, 2012


The undersigned John K. Suckow, submits the following declaration in support of the Final

Fee Application of Alvarez & Marsal North America, LLC, For Final Allowance and Approval of

Incentive Fees Earned Comprised of (i) the Asset Management Incentive Fee and (ii) the Claims

Management Incentive Fee During the Period of September 15, 2008 to March 6, 2012, [1] and

declares that the information herein is true and correct to the best of his knowledge, information, and

belief: I am a managing director of Alvarez & Marsal and have been involved in restructuring

advisory services and related matters for over twenty five years. During the period since the Petition

Date, I have served as an advisor, president and, currently, chief executive officer of Lehman. I am

---

[1] All capitalized terms used but not defined herein have the meaning ascribed to them in the Application.

1

familiar with the services provided to the Debtors by Alvarez & Marsal and the other matters set forth below. [2]

During the Chapter 11 Cases, personnel of Alvarez & Marsal provided substantial services to the Debtors and the estates in the following general areas: (1) crisis management and stabilization, (2) business plan development and asset management, (3) international operations, (4) plan of reorganization, (5) distributions and claims mitigation, and (6) various other services. Personnel services peaked in June of 2009, and Alvarez & Marsal has managed staff levels downward ever since. The vast majority of the 70 full-time equivalent personnel that remain today have been involved in these Chapter 11 Cases from the beginning remain today. This has ensured continuity and institutional knowledge.

Throughout the 3 ½ years of the Chapter 11 Cases, Alvarez & Marsal made <u>no</u> increases in the individual hourly rates charged for A&M's services to the estates. The only adjustments in individual hourly rates for those A&M personnel were as the result of promotions.

## I.    <u>Crisis Management and Stabilization</u>:

1.    The Debtors first contacted Alvarez & Marsal on September 14, 2008 to request that Alvarez & Marsal lead the Debtors through this chapter 11 proceeding. Alvarez & Marsal arrived at the Debtors' premises the next day.

2.    The unplanned bankruptcy filing triggered an abrupt and massive breakdown of the Debtors' information systems. The consequent disruptions impaired the ability to locate, control and administer the Lehman businesses. This was further exacerbated by the sale of Lehman's US, European, and Asian fixed income and broker dealer businesses which employed the bulk of

---

[2] Certain of the information below relates to matters within the personal knowledge of other professionals at A&M and is based on information provided to me by those other professionals.

Debtors' employees. These transactions essentially stripped the Debtors of employees and information systems.

3.     During these early stages, Alvarez & Marsal stepped into the management and employee void to begin identification of assets and legal entities and to start development of a plan to manage the remaining estates.  Alvarez & Marsal divided the estates into seven primary work streams: derivatives, real estate, private equity and principal investments, commercial loans and banks, international assets, claims (including litigation) and administration.

4.     During the first quarter of 2009, Alvarez & Marsal began to build a new Lehman workforce, establish systems through the transition services agreements with Barclays Capital Inc. ("BarCap"), Lehman Brothers International (Europe) ("LBIE") and Lehman Asia, establish protocols with foreign Affiliates, and establish processes and controls around the Lehman assets. For the various asset teams, it was an exceedingly intense period, in which the teams were forced to deal in a highly compressed timeframe with a number of significant "melting" assets (i.e., assets that required immediate attention through investment, restructuring or sale to avoid destruction of their value).

## II.     Business Plan Development and Asset Management

5.     By mid-2009,  Alvarez & Marsal's primary focus was on maximizing asset values and minimizing claims. In order to protect Lehman's interests, numerous investment decisions had to be made; literally hundreds of assets had to be restructured.

### A. Commercial Real Estate

6.     When Alvarez & Marsal assumed management of Lehman's real estate group, three items of critical importance needed to be addressed simultaneously: (i) Lehman no longer had a real estate staff, as substantially all of the Lehman real estate staff had been transferred to BarCap

following consummation of the going concern sale of Lehman's North American capital markets business to BarCap; (ii) Lehman's real estate was encumbered, as significant portions of Lehman's real estate portfolio had been pledged pursuant to repurchase agreements ("Repos") to third parties and participations to foreign Affiliates, to generate liquidity for Lehman; and (iii) day-to-day management of underlying real estate portfolio assets (pledged and unpledged) did not pause in the wake of Lehman's bankruptcy, with issues ranging from relocating stranded construction workers to funding real estate taxes.  Resolution of these challenges was indispensible to Alvarez & Marsal's successful efforts to preserve and enhance the value of Lehman's real estate assets for the benefit of the creditors and the estates.

7.      Within a few weeks of the Petition Date, Alvarez & Marsal had selected 50 former Lehman employees (reaching a high of approximately 70 in 2010) to work with A&M (the "Real Estate Team") and successfully created a department with a mix of bankers, asset managers, finance and legal professionals who retained valuable legacy knowledge regarding the real estate portfolio and the status of pledged assets.  Alvarez & Marsal assumed the executive management role and were responsible for guiding asset-level business plans and strategies, approving all significant decisions, including all fundings into the portfolio, and executing all documents.  A&M also provided staff to supplement the Real Estate Team with real estate specific expertise in bankruptcy, restructuring, construction, land development, securitization structures, finance, valuation, hospitality management, and information systems, among other skills.

8.      Early in the case, several issues became clear about the interaction between the real estate portfolio and the respective pledged assets: (i) many of the pledged assets were in the possession of third-parties, (ii) pledges prevented diversification and monetization strategies via a sale of the real estate, and (iii) encumbered real estate resulted in lower valuations.

9.    To address these problems, Alvarez & Marsal devised and implemented a strategy to assert managerial authority (as legal owner of record) and fund protective advances, while simultaneously pursuing negotiations with counterparties to achieve uncontested economic control of the real estate.  These efforts resulted in a number of court-approved settlements, often involving payment for disputed assets and the allowance of certain claims.   By mid-2011, the issues surrounding the pledged real estate were fully resolved, and the extensive benefits of Alvarez & Marsal's efforts to the estates were readily quantifiable:  $1.4 billion was advanced to repurchase certain disputed real estate assets that ultimately generated material recoveries.   By December 31, 2011, the estates had fully recouped all outlays associated with these settlements.

10.    Within months of the Petition Date, Alvarez & Marsal, with the assistance of the Real Estate Team, developed a business plan for each major real estate asset.  For the nearly 700 deals (involving over one thousand separate capital positions), the overarching strategy was that Lehman would not be a distressed seller.  Alvarez & Marsal's plans for these assets called for stabilization of the assets by resolving capital structures, property and/or development issues and allowed the Debtors to move from merely reacting to emergency situations to executing strategies that maximized value and mitigated liabilities.  Rather than simply hoping that the market in the aftermath of bankruptcy would stabilize, these business plans recognized that stability and simplicity of capital structures typically command a premium over distress and complexity.  This decision generated significant additional recovery versus a portfolio sale in late 2008/early 2009, when the fair value of the unencumbered portfolio was estimated to be less than $2.5 billion.

11.    Over the course of the proceedings, Alvarez & Marsal guided and restructured over 400 real estate assets (including directly participating in the underlying negotiations). Most of the restructurings required several steps due to the portfolio's complexity.  For example, a restructuring

would often involve a multi-party negotiation (or enforcement) with Lehman's partners, counterparties and lenders to resolve property and capital structure issues. While leading this process, Alvarez & Marsal applied a broad spectrum of restructuring strategies: completing developments, mothballing, converting and leasing-up among pay-downs, extensions, conversions, infusions, foreclosures (friendly, contested, judicial, mezzanine), deeds-in-lieu, litigations, auctions, hope notes, trades, etc. across different product types, capitalization structures and partnership arrangements. Most restructurings led to resolutions because they created optionality for Lehman (not restructuring to build a long-term economic interest, but to create exit flexibility). Through February, 2012, approximately 350 deals have been resolved, generating, to date, more than $6.3 billion of cash to the Lehman estates.

12.    In summary, Alvarez & Marsal actively managed the Real Estate Team and the commercial and residential portfolios. These efforts generated significant value through critical decisions (such as managing the pledged collateral while pursuing economic control; working to fix collateral/capital issues; allowing for sales to longer-term, institutional investors rather than opportunistic buyers), as well as through specific deal actions. A&M team members assigned to Lehman's commercial and residential real estate portfolios were required both to navigate complicated capital structures and to manage on-going developments of underlying real estate projects, while also addressing layers of management challenges. This task required an experienced team with an extremely broad range of talents; the outstanding results achieved by that team are significant and wide-ranging.

**B.    *Derivatives***

13.    An area significantly impacted by the Debtors' unplanned bankruptcy proceedings was Lehman's derivatives trading book. Derivatives are securities whose value is derived from one

6

or more underlying assets (i.e., futures contracts, option contracts, and swap contracts). The chaos that ensued from the bankruptcy-induced defaults on almost all derivative contracts was exacerbated by the fact that the derivatives products were not managed by, or booked in, a single unit. Derivatives were managed as a product class that existed across legal entities and businesses – there was <u>no</u> Lehman derivatives department. There was no blueprint for unwinding a derivatives portfolio of the size, scale and complexity of Lehman's portfolio. Lehman's portfolio was comprised of 10,000 contracts, spanning over 1.7 million trades, with $39 trillion in notional value.

14.    Alvarez & Marsal created a derivatives team that consisted of a comprehensive group of experienced financial services professionals (250+ at its peak in 2010) from across Wall Street with varied backgrounds across trading, structuring, operations, risk, legal and finance (the "<u>Derivatives Team</u>")

15.    By mid-2009, Alvarez & Marsal and the Derivatives Team had established a strong, stable derivatives platform, with an organization, infrastructure and strategic framework for maximizing the value of derivative assets and settling derivatives claims at fair values, all in the context of speed and efficiency.

16.    The Derivatives Team led by Alvarez & Marsal developed a comprehensive derivatives unwind blueprint within an organizational structure that ensured synergies and collaboration across key unwind elements, including (a) derivatives portfolio valuation, (b) effective negotiation strategies, (c) creative legal solutions and (d) operational support. As importantly, Alvarez & Marsal ensured that appropriate governance and controls were implemented throughout the unwind process.

17.    Under the supervision of Alvarez & Marsal, the Derivatives Team leveraged creative and unprecedented commercial and legal strategies to unwind the derivatives book including:

- Requirement that derivatives claimants provide comprehensive derivative information in a derivatives questionnaire when filing claims, allowing the estates better information to assess the nature and legitimacy of the claims filed;

- Development of an Alternative Dispute Resolution ("ADR") process that allowed the estates to mandate uncooperative/unresolved counterparties into a mediation process thereby avoiding the bankruptcy court being burdened by unnecessary litigation, and enhancing chances of settlements, reducing costs and timing of proceedings;

- Development and execution of a hedging program using the International Swaps and Derivatives Association's ("ISDA") standard derivative contract (an unusual step for a chapter 11 debtor) to hedge market risk attendant with the live derivatives portfolio;

- Development and execution of a special purpose vehicle ("SPV") note purchasing program to hedge uncertainties around some of the estates' SPV legal risks; and

- Development and execution of an assignment and novation strategy of live derivative contracts in the marketplace, including without the consent of the counterparty, thereby reducing claims against the estates and minimizing market disruption.

18.    One of the key strategic initiatives of Alvarez & Marsal was the "Big Banks Derivatives Settlement Framework."    This created a consistent, uniform and transparent set of standards by which to value the claims filed by large financial institutions against the estates. The thirteen largest financial institutions ("Big Banks") filed $41 billion of direct claims and guarantee claims against the estates. The relationships consisted of fifty thousand trades on average, with a total in excess of 600,000 trades. Each of these relationships could have resulted in years of litigation given their scale and complexity and the technicalities of the legal issues involved. Also, settlement of any of these relationships would have been extremely challenging given the concern that each of

these counterparties had about the treatment of the claims of other institutions. As such, the Derivatives Team, led by Alvarez & Marsal, developed the Big Banks Derivatives Settlement Framework to facilitate resolution of the Big Banks claims in a uniform manner.

19.    Extensive discussions were held with the Big Banks on a bilateral and multilateral basis over a six-month period.  At the end of that period, ten Big Banks approved the framework. This allowed Alvarez & Marsal to reduce $15 billion of filed direct claims to $8 billion and recover over $500 million in cash.  The Big Bank Derivatives Settlement Framework has not only avoided years of disruptive and costly litigation, it has set the threshold for other unresolved derivative claims.  Most importantly, it was instrumental in the plan of reorganization process.

20.    Besides creating an unprecedented derivatives unwind platform and process, and avoiding protracted litigation through the Big Bank Derivatives Settlement Framework and ADR process, Alvarez & Marsal exceeded expectations in terms of asset monetization and claims mitigation. In total through February, the Derivatives Team collected for the estates over $16 billion of cash from derivative receivables, settled $34 billion of direct claims for $19 billion, and resolved approximately 75% of all derivative contracts.

## C.    *Private Equity/Principal Investments*

21.    Within a few months of the Petition Date, Alvarez & Marsal had hired and formed a 38-person team to identify and aggregate all of the estates' principal investments. The team also constructed a portfolio management framework that incorporated multiple business disciplines, including principal investing, corporate strategy, M&A, capital markets and finance experience. The Private Equity and Principal Investments team ("PEPI Team") was formed to consolidate management of Lehman's various investments.  Lehman's pre-petition investments originated across multiple lines of business ("LOB") including: proprietary investment groups, corporate strategy,

equities/fixed income desks, and Lehman-managed private equity funds. The assets originated by these groups included: equity and illiquid fixed-income direct investments in non-affiliated companies and general partner interests in private equity and hedge fund asset managers and limited partner interests in investment funds, representing more than 450 individual positions valued in excess of $15 billion of assets under management, with an additional $4.5 billion of corresponding unfunded pre-petition commitments.

22.    The PEPI investment portfolio was a diverse cross section of the Lehman capital structure, including illiquid senior and mezzanine debt and equity positions.  These required significant attention to address liquidity problems and/or events of default.  This, in turn, required numerous restructurings and/or recapitalizations. The positions were broadly dispersed and directly managed by the various LOB.  This required Alvarez & Marsal to develop a robust asset discovery process to inventory positions, as well as compile detailed legal review of all relevant transaction documents.

23.    Additionally, the PEPI Team was required to take responsibility for Lehman's private equity platform business which operated in six major asset classes:  (i) merchant banking, (ii) real estate, (iii) venture capital, (iv) credit-related investments, (v) private funds investments, and (vi) infrastructure.  Lehman's pre-petition private equity platform raised privately-placed funds in these asset classes, for which it acted as a general partner and in which it had general and limited partner (or side-by-side interests).  In addition, Lehman's principal investments business made other non-fund-related direct investments.

24.    Further, Lehman had formed private equity and other alternative investment funds with third-party investors that were typically organized as limited partnerships.  Lehman often acted as general partner for these funds; however, it did not consolidate these funds.

25.     The PEPI Team developed a two-pronged strategy: (i) provide near-term stabilization and preservation of asset values, and (ii) take a longer-term approach towards value maximization, as indicated by the following examples:

- Within two weeks of the Petition Date, a decision had to be made about whether to honor Lehman's pre-petition obligations for capital calls to its sponsored private equity funds. Failure to honor such commitments would have resulted in an automatic loss of a substantial share (up to 50%) of Lehman's limited partnership investment, its potential removal as general partner, and/or potential legal liability for defaulting on its commitment and, thereby, damaging the funds. Alvarez & Marsal's decision to honor these capital calls and commit close to $100 million sent a strong message to the limited partners that Lehman would stand behind its private equity platforms. It also encouraged the limited partners to honor their commitments since Lehman (as sponsor) had funded its obligations and their failure to do so would prompt Lehman to seek legal and contractual remedies. These actions allowed Lehman to stabilize and preserve the value in its private equity platforms, retain the management teams responsible for operating the funds, and positioned the platforms for successful future monetization.

- In a separate investment, Alvarez & Marsal needed to decide whether to fulfill an equity commitment to Wilton Re, a startup life reinsurance company focused on purchasing closed blocks of life insurance policies. Prior to the bankruptcy, Lehman had committed an additional $122 million to increase its stake in the business. Failure to honor this commitment would have resulted in Lehman forfeiting 90% of its then investment (approximately $178 million). Alvarez & Marsal obtained the support of the court and

stakeholders for this investment.  The investment was recently monetized for approximately $400 million.

## D.    *Neuberger Berman*

26.     Prior to bankruptcy, LBHI began a process to sell Neuberger Berman ("<u>Neuberger</u>") and its associated investment management business.  It was in end-stage negotiations on a potential transaction.  With commencement of the Chapter 11 Cases, Neuberger was faced with a substantial reduction in value due to market turmoil and the run on assets under management. Consequently, these negotiations were rapidly finalized, and a stalking horse offer was executed.  It contained a formula-based sales price which fell drastically as financial markets deteriorated.  Alvarez & Marsal determined that the adjusted proceeds of the stalking horse offer of $745 million were insufficient. An alternative transaction with Neuberger management was initiated to form an employee-led venture, Neuberger Berman Group LLC.  Alvarez & Marsal believed this would preserve the asset's value and enhance future returns to the estates' creditors. The sale transaction, approved by the court in December 2008, contemplated that Lehman have a minority interest and a multiple year plan to monetize value as markets stabilized.

27.     Since the initial transaction closing, two Alvarez & Marsal managing directors served as Neuberger directors monitoring performance and advising on strategy.  In 2011, Alvarez & Marsal led the negotiations with Neuberger for a clear plan to monetize the estates' remaining investment.  The terms were approved by the court in December 2011. The contemplated series of transactions should achieve $1.5 billion in aggregate proceeds to the estates' creditors.  This is nearly <u>double the amount of proceeds of the stalking horse offer</u>. As of March 2012, more than $1 billion of value has been collected and made available for distribution to creditors.

### E.    Loans

28.    As of the Commencement Date, the estates' corporate loan portfolios were comprised of approximately $41 billion in aggregate funding commitments, representing over 500 individual positions located throughout the US, Europe and the Middle East, of which approximately $11 billion represented partially or fully funded loans.

29.    To manage Lehman's loan portfolio, A&M assembled a team of 41 professionals, consisting of 16 front office bankers and 25 loan operations professionals in New York and London (the "Loan Team").  Working with the Loan Team, Alvarez & Marsal took significant measures to stabilize and maximize the recovery value of the Loan portfolio while also seeking to reduce approximately $30 billion of corresponding unfunded commitment liabilities.  Through May 2012, over $29 billion of the original unfunded commitments were successfully eliminated at an aggregate cost of approximately $23 million. The approach developed to manage the Loan portfolio included a credit review process.  Using an internally-designed rating methodology, this resulted in risk-rating each of the obligors and facilities in the portfolio. The ratings on each of the obligors and facilities were continually updated based on financial results, industry trends, market conditions and company-specific events.  The Loan Team also developed individual recovery values by calculating (i) the liquidation value of each facility utilizing estimated enterprise value (discounted cash flow method) and (ii) expected realization value based upon market comparables of similar quality.

30.    Given the weak and illiquid markets that existed from the Petition Date through mid-2010, credits that were trading below their expected realization value or post restructure realization value were held in the portfolio.  Alternatively, credits that could be monetized at or near their expected realization value (largely consisting of troubled credits) were sold.

31.     Before the bankruptcy, various Lehman trading desks were actively engaged in the business of purchasing and selling funded loan participations. As of the Commencement Date, Lehman was a party to in excess of 1,000 opened and unsettled "buy" or "sale" loan participation trades. The Loan Team quickly established a process to evaluate these open loan trades to determine which of these executory contracts should be assumed, rejected or modified based upon the then current market pricing of those positions. Based upon Alvarez & Marsal's open trade analysis, certain uneconomical purchase trades were rejected, or modified, and all pre-petition sales were assumed to the extent such trades could be covered by settling open purchases at current market or from existing inventory positions.

32.     Handling the securitizations was a significant challenge. Nevertheless, through significant efforts by Alvarez & Marsal, a source of significant value was ultimately realized for the estates. Alvarez & Marsal analyzed the Lehman securitizations (which on a combined basis had issued $17.7 billion (par) of notes) to determine the proper ownership of the notes and establish valuation of the underlying assets. Alvarez & Marsal took proactive steps to regain control over the securitizations in order to maximize the value of underlying collateral. For example:

- In connection with the Collateral Disposition Agreement between the estates and JP Morgan Chase ("JPM"), Lehman renegotiated various securitizations among JPM, various foreign affiliates and Citibank, as trustee. LCPI was appointed as collateral manager for over $1 billion in assets.  This allowed the estates to restructure and/or sell these assets to prevent any further deterioration of value.

- Alvarez & Marsal successfully negotiated with Bankhaus to repurchase the SASCO Class A note. By doing so, the estates regained control over a critical piece of the Archstone investment.

### F.    *Woodlands and Aurora Bank*

33.    LBHI is the indirect owner of two non-debtor domestic banks (the "Banks"): Woodlands Commercial Bank ("Woodlands") and Aurora Bank FSB ("Aurora Bank").  Until December 30, 2011, Woodlands was a Utah chartered industrial bank with operations in Salt Lake City, Utah. Woodlands was subject to the regulatory authority of the Federal Deposit Insurance Corporation ("FDIC") and the Department of Financial Institutions of the State of Utah.  Aurora Bank operates a multi-asset loan origination, purchasing, and servicing business, with the loan origination business involving the issuance of residential and commercial mortgages, small business, large corporate, and consumer loans.  Aurora Bank owns Aurora Loan Services, LLC ("Aurora Loan Services"), one of the nation's largest residential loan servicing operations.  Aurora Bank is a federally chartered thrift institution subject to the regulatory authority of the Office of the Comptroller of the Currency, the successor regulator to the Office of Thrift Supervision.  Based on their December 31, 2011 balance sheets, the combined values of LBHI's equity interest in Aurora Bank and Woodlands was reported to be approximately $1.5 billion.

34.    Post-petition, the US financial markets became extremely illiquid, and prices across a broad range of asset classes, including commercial loans, declined precipitously.  In connection with the US market turmoil, the Banks each experienced significant declines in their capital as a result of having previously adopted a "mark to market" accounting regime. Accordingly, regulators threatened to seize the Banks based upon a perceived lack of capital adequacy. Compounding Woodlands' problems was the fact that immediately prior to the chapter 11 filing, Woodlands purchased approximately $535 million of municipal bonds (the "Muni Bonds") from Lehman Brothers, Inc. ("LBI") to supplement the bank's investment portfolio. Contrary to instructions, however, these securities were not segregated into a customer account but held in an LBHI general

15

account.  Shortly following the commencement of the Chapter 11 Cases, JPM seized the Muni

Bonds and sold the securities in conjunction with enforcement of its rights as a secured creditor.

Discovery of this fact heightened capital adequacy concerns of the regulators and posed an

immediate issue for Lehman: either allow the Banks to be seized or commit additional resources to

stabilize them.  Some suggested that the estates should let the Banks be seized and let the FDIC file

an unsecured claim for any deficiency like any other creditors.

35.    In order to preserve the equity value of both Aurora Bank and Woodlands and avoid

the significant losses that could have resulted if the Banks were allowed to fail, LBHI undertook a

series of actions to support the Banks' capital levels and preserve the opportunity to realize the fair

value of the Banks.  LBHI also agreed to provide liquidity support throughout the period of LBHI's

ownership of Aurora Bank through two credit facilities aggregating up to $950 million in secured

financings.

36.    In performing its due diligence with counsel, Alvarez & Marsal recognized that under

section 365(o) of the Bankruptcy Code, passed by Congress at the end of the last banking crisis, the

FDIC had the right to assert a priority claim for any deficiency and, in fact, if unsatisfied after proper

demand, could force a liquidation of the estates under chapter 7 of the Bankruptcy Code.  Alvarez &

Marsal estimated that the FDIC's priority claim could approach $3 billion under a distressed forced

sale scenario.  To avoid this scenario, Alvarez & Marsal petitioned the court, with the support of the

UCC, to permit LBHI to execute a strategy to stabilize the Banks' regulatory capital until a full

settlement of the Banks' claims against Lehman could be negotiated and approved by the various

bank regulators.

37.    Alvarez & Marsal's leadership and persistent negotiations with the regulators allowed

the estates to make protective investments in the two Banks.  These actions avoided a regulatory

seizure and thereby allowed adequate time for the markets to recover so the estates could successfully complete an orderly liquidation of the Banks.

38.      Ultimately, a total of $1.6 billion of assets were contributed to the Banks, inclusive of non-cash assets with a deemed contribution value of approximately $670 million.  LBHI also recovered $800 million of Archstone notes which had been pledged to the Banks prior to the filing date.  Absent the recovery of the Archstone collateral, LBHI's ability to control the ultimate resolution of the Archstone investment would have been jeopardized.  The Bank assets are now being liquidated and/or sold.  Alvarez & Marsal's current estimate is that the estates will receive more than $1.0 billion – in contrast to the initial scenario of seizure of the banks by regulators and the filing of $2.0 to $3.0 billion of <u>priority</u> claims.  The resulting benefit to the estates is in excess of $3.0 billion.

**III.    International Operations**

*A.       Lehman Affiliate Relationships*

39.      Lehman was a global financial services firm that operated through three major hubs (US, UK and Asia) in over 40 countries though 7,900 legal entities. Lehman's cash management system, organizational structure, product lines, operating platforms and technology applications were established on a global basis creating cross-border/cross-entity interdependencies, and they were set up as a matrix with overlapping legal entities, assets, people and systems.

40.      Alvarez & Marsal managed Lehman's international operations -- from the initial chaos created by the unplanned filing through a stable unwinding process.

41.      Immediately following the chapter 11 petition, the global Lehman enterprise began splintering into separate insolvency proceedings across multiple jurisdictions (with over eighty proceedings run by over 15 material administrators).  This chaos was compounded by: (i) the sale of

17

the fixed income businesses along with the US and Asia operating platforms to BarCap in the US and to Nomura in Asia and Europe; (ii) a lack of asset inventory by legal entity and mapping of assets and people to legal entities; (iii) a loss of resources and operational support; and (iv) a shift from "group" interest to "legal entity interest".

42.    The international work performed by Alvarez & Marsal can be generally summarized, as follows:

a.    Phase I: Dealing with Chaos: The work consisted of establishing a local presence in Asia, Europe and Latin America, and dealing immediately with "melting assets" and local funding requests.

b.    Phase II: Gaining Control: This phase consisted primarily of identifying the entities that were affiliated with a US Debtor and not under the control of a local administrator, and regaining control of those entities through bank accounts, cash management, and changing of board slates.

c.    Phase III: Stabilization: Alvarez & Marsal stabilized operations by: (i) securing systems and access to information; (ii) securing local resources and setting up processes and controls; (iii) ensuring payroll continuation by local administrators for legacy businesses outside of the purview of Alvarez & Marsal but value accretive to the estates as well as payment of third party asset managers; and (iv) identifying assets and operating platforms. During this phase it became clear that the interconnectivity and interdependence of the Lehman entities required coordination and cooperation among the different proceedings to enhance overall asset recoveries. Alvarez & Marsal began to set up regular communication channels and informal working protocols with local administrators. In certain instances, Alvarez & Marsal negotiated formal transition services agreements (LBIE, Nomura) that

included information, resource and system sharing provisions. Finally, Alvarez & Marsal proceeded to monetize the assets represented by the remaining operating platforms, including LB Russia's broker dealer division, LB Sweden's IT platform, LB Turkey's broker dealer and NPL platform, LB Brazil' investment banking platform, LB France's investment banking and asset management division, etc.

d.  <u>Phase IV: Business Plan Development</u>: During this phase, Alvarez & Marsal developed detailed asset by asset business plans, developed an orderly asset management and disposition process and ensured integration of the international teams into their respective US asset team (Real Estate, PEPI, Loans, Derivatives). Finally, Alvarez & Marsal ensured that the creditor rights of the Lehman estates were protected through creditor committee representation (LBIE, LBAH, LBCAA, etc.), the filing of protective claims and active participation in the foreign proceedings.

e.  <u>Phase V: Exit Strategies</u>: While managing ongoing operations, asset disposition strategies that focused on intercompany claims reconciliation, valuation and settlement were developed and executed.

### i.  **Asia Exit Strategy**

43.    The vast majority of Lehman's Asian assets were held in legal entities under the control of KPMG Hong Kong (Liquidators of Lehman Brothers Asia Holdings Inc ("<u>LBAH</u>"), Lehman Brothers Commercial Corp Asia ("<u>LBCCA</u>"), four entities in Hong Kong and eight entities in Singapore), and Oh-Ebashi (appointed to oversee the rehabilitation of Lehman Brothers Japan Inc, Sunrise Finance Inc and several other Japanese entities) ("<u>LBJ Estate</u>"). Early on, Alvarez & Marsal realized that LBHI, directly and indirectly, had a significant interest in the recoveries of these foreign estates. Consequently, Lehman approached the KPMG liquidators as early as October 2008 to ensure

collaboration to maximize values in the region through information sharing and through asset maximization cooperation. This strategy resulted in substantially increased recoveries in the region and the cooperative efforts were an incentive for the KPMG liquidators to be the first administrator to sign the Cross Border Protocol (discussed below).

44.    In Japan, Alvarez & Marsal achieved significant results from efforts to protect the estates' interests:

a.    <u>Lavender Sale</u>: The LBJ Estate, through Oh-Ebashi, planned to "fire sale" $5.6 billion in real estate assets in an expedited auction process. LBHI and other affiliates were, through the KPMG controlled entities, large creditors.   Alvarez & Marsal successfully persuaded Oh-Ebashi and the court appointed supervisor to give the Debtors a "last look" in the auction process. Given the volume of assets on a seized up market, with no independent valuation to establish a minimum price, expectations were that the sale would yield as little as 10-15% of book value.  Alvarez & Marsal and KPMG developed a strategy of offering to pay a 5% premium to the market bid if the auction yielded below their minimum.  They also offered other creditors the opportunity to join in this "hold strategy" by rejecting the market bid. This created a market based floor, raised pricing and increased recoveries to 41% of book value of the auctioned assets.

b.    <u>Subordination</u>: Following the success of the Lavender auction, Shinsei Bank filed a suit in the Tokyo District Court requesting that all intercompany claims be subordinated to third-party claims in Japan.   This action put $1.7 billion in value at risk. The court recommended a settlement with Shinsei.  LBHI and KPMG held firm and did not settle. The Shinsei Bank position was ultimately rejected by the Japanese Supreme Court.

45.     In Thailand, a collaborative approach by Alvarez & Marsal with KPMG Hong Kong resulted in KPMG agreeing to allow Alvarez & Marsal to manage the wind-down of eight real estate assets even though the Thailand estates were the direct economic beneficiaries of the assets.  KPMG acknowledged that LBHI had the better resources and historical knowledge of the assets, as well as the ability to engage in a "hold strategy" and make protective investments where needed.

46.     The quality and added value of the work performed by Alvarez & Marsal in Asia is specifically evidenced by the general agreement among the local administrators, in particular KPMG and Oh-Ebashi, to allow the professional fees incurred for these transaction to be reimbursed directly to LBHI through the local asset realizations.  This resulted in the reimbursement of over $23 million of the fees incurred through December 31, 2011, thereby directly increasing recoveries for the estates.

### ii.  India Exit Strategy

47.     Alvarez & Marsal led a team focused on the realization of approximately $1.4 billion from the sale of approximately 250 public and private securities in foreign jurisdictions (mostly in India).  The assets were held in various Mauritius entities and the Kingfisher CLO structure. Dispositions by Alvarez & Marsal were effected while navigating the complex tax and regulatory landscapes of Mauritian, Indian and various other jurisdictions.

### iii.  Europe Exit Strategy

48.     Lehman's London-based businesses were a very significant part of the Lehman enterprise.  LBIE and LBL represented Lehman's European financial and operational hub and were under the control of the UK administration.  This presented massive challenges in the early days of the Chapter 11 Cases. As a result, while a number of legal entities fell within either LBHI's and other administrators' control (especially Switzerland, Luxembourg, and Netherlands), the

operational and financial support for these entities fell within the control of the UK administrators. Thus, the immediate challenges involved mitigating the operational and financial consequences of the UK administrations, in particular their precipitous actions in shutting down systems and restricting access to their people and buildings. Besides actual operating platforms (UK, Italy, France, Turkey, Poland, Sweden, etc.), LBHI was the economic beneficiary of significant and highly regulated activities (derivatives, real estate, loan and intercompany activity) that were subject to the UK administration's operational control.

49.    Alvarez & Marsal in Europe stabilized these activities by deploying an experienced and diverse team.  It set about gaining access to systems, resources and premises and negotiated transitional services with PWC.  In parallel, Alvarez & Marsal focused on divesting melting assets by salvaging some recoveries and minimizing liabilities (primarily employee related), identifying resources and establishing an infrastructure. By the end of Q3 2009, the estates were able to separate from the LBIE controlled premises, as a regulated entity in an independent office.  This resulted in significant savings and more direct and effective management of resources and work streams.

50.    Alvarez & Marsal in Europe peaked at 23 full-time equivalents ("FTEs") in Q2 2009. This team was a combination of people from A&M's restructuring, financial services, consultancy, forensic and tax practices.  As LBHI controlled operations began to be physically separated from the UK administration and as the Lehman staff increased, A&M reduced resources. At the peak, Lehman's resources reached 70 people covering the following areas: real estate, loans, derivatives, private equity, finance, legal and human resources.  IT was outsourced and ultimate oversight was transferred to the US IT team. All these work streams were integrated into the US asset and support functions. As of end of Q1 2012, there were 32 personnel in Europe, of which four were Alvarez & Marsal personnel.

51.     Alvarez & Marsal in Europe also had to deal with extraordinary local challenges that were made even more difficult by the conflicts between UK law and US bankruptcy law and the resulting litigation strategy considerations. Alvarez & Marsal managed the unwinding of multiple tax and financing transactions in the over 100 entities that were designed to generate foreign tax credits and other tax benefits to provide low cost funding.  Exceptional achievements include (i) reconciliation and reduction through settlements and intercompany simplifications of billions of intercompany claims against the estates, (ii) recovery of hundreds of millions of trust assets, (iii) protection of the estates' interests through the filing of billions of intercompany claims in multiple proceedings, (iv) mitigation of enormous potential tax exposures, and (v) recovery of millions of dollars in tax refunds.

### iv.     Latin America Exit Strategy

52.     Lehman's South America positions had been managed primarily by the US or European business lines.  They were smaller in size than in the other regions (less than $1 billion in realizable value).  Alvarez & Marsal in Brazil and Columbia worked to ensure an orderly wind-down of these assets.

53.     Brazil represented the overwhelming majority of assets and potential pitfalls for LBHI in Latin America. Although none of the Latin American jurisdictions forced automatic filings or liquidations, it became quite clear that efforts by Alvarez & Marsal would have to focus on minimizing liabilities, as much as maximizing recoveries.  Two particular cases illustrate how this strategy bore excellent results for LBHI in Brazil:

> (i)     Lehman Brazil: Alvarez & Marsal negotiated the sale of the investment banking operation to BTG, which at the time was a newly created investment bank boutique by a group of former UBS bankers. The speed of the negotiation allowed LBHI to avoid significant statutory severance costs, as well as potential labor litigation; and

(ii)    Libro Securitizadora: this entity was established to hold NPL portfolio acquisitions. The portfolios had deteriorated to the point where the primary focus of the entity had become contingencies management, with the likely scenario of creating a long term tail to the LBHI estate. In order to make it "saleable"' Alvarez & Marsal transferred a series of cash generating and better quality assets into Libro and successfully negotiated the sale of the entity to a local asset management firm.

54.    A&M's local presence and securing of a key Lehman resource, as well as a creative deal structuring approach, allowed the estates to maximize value in Latin America and, more importantly, minimize a potential overhang of liabilities.

**B.    *Cross Border Protocol***

55.    Early on in the Chapter 11 Cases, the court raised concerns about the coordination between and among the various insolvency proceedings around the world and that the lack of cross-border protocols could have potentially adverse effects on recoveries.

56.    Working closely with Weil Gotshal ("Weil"), Alvarez & Marsal developed the first ever cross-border protocol ("Cross Border Protocol") involving multiple international proceedings governed by both civil and common law. The proceedings were brought together in recognition of the fact that Lehman, while a disparate enterprise in some respects, was uniform and united in many others (e.g., cash management and data systems).  The Cross Border Protocol addressed the legal vacuum that exists from the lack of any public laws dealing with the collapse of a global financial services firm. The Cross Border Protocol established several key principles: (1) information sharing, (2) cooperation, (3) fair dealings, (4) asset preservation, (5) proceedings coordination, and (6) resolution of claims.

57.    Alvarez & Marsal visited all the administrators on multiple occasions to convince them that it was in the interest of all constituencies to implement uniform approaches in dealing with common issues and to ensure coordination among all proceedings. On May 12, 2009, the Debtors

and affiliates in Hong Kong, Singapore, Germany and Australia executed the Cross Border Protocol. Subsequently, the Cross Border Protocol was executed by affiliates in the Netherlands, Curacao, Switzerland, Luxembourg, and by the Securities Investor Protection Act Trustee for LBI.  The signatories to the Cross Border Protocol, as well as non-signatory participating affiliates in Bermuda and Japan, held the first multilateral meeting in London on July 16, 2009.  A total of 15 multi-lateral meetings have been held among the parties. The Lehman UK Administration was the only significant group to decline participation.

58.    The importance of the Cross Border Protocol and the early meetings cannot be overstated.  The meetings provided a forum for the participants to become familiar with the representatives of the various Lehman entities, to discuss collective issues, and to become educated in Lehman's pre-petition financial, legal, and operational practices.  Topics that were resolved during the Cross Border Protocol meetings included the following:

- Agreement that the September 14, 2008 final close of Lehman's books and records (the "Global Close") would be used as the basis for agreeing on non-trading intercompany balances.  Many of the foreign affiliates did not have access to the Global Close records, so a concerted effort was made by Alvarez & Marsal and Lehman employees to educate them on the integrity of the close and the reliability of the figures.  Without the common understanding, each entity would have been required to try to piece together its own set of books and records, making reconciliation difficult, if not impossible.

- Agreement that loss method and mid-market valuations were appropriate conventions for agreeing on intercompany derivatives, and that properly served notices were valid for determining termination dates of trades.  Given the range of interpretations and potential

for abuse that Alvarez & Marsal had observed from street derivative counterparties, establishing this set of ground rules for intercompany trades was invaluable.

- Information sharing protocols and the basic understanding that information should be exchanged freely in order to create a level playing field and facilitate settlement negotiations.

- Proceedings coordination.

59.    While the Cross Border Protocol is a non-binding document that was labeled "aspirational", the platform was the basis that enabled Lehman to reach consensual agreements with almost all of the foreign affiliates and achieve a consensual plan of reorganization.  The framework and environment fostered by the Cross Border Protocol can be deemed nothing less than a resounding success.

## C.    *Affiliate Negotiations and Settlements*

### a.    <u>Overview</u>

60.    With the Cross Border Protocol as a guide, Alvarez & Marsal began bi-lateral negotiations with the Lehman foreign affiliates, the objective of which was to resolve consensually all matters between the entities.

61.    One of the first negotiations, spanning much of 2009, was with Bankhaus.  These initial negotiations were not intended to resolve all claims between the Debtors and Bankhaus (which would come later).  Rather, the negotiations were geared toward addressing a specific issue.  Pre-petition, the Debtors and Bankhaus commonly entered into commercial or real estate loans where one of the parties was the lender of record of the loan, and the other would acquire participation interests.  Significant disputes arose over the form of those participations, specifically whether the participant had a direct ownership stake in the loan and was entitled to a share of the

asset, or whether the participation created a debtor/creditor relationship. The disputes were settled in an agreement dated December 15, 2009, which was approved by the court on January 13, 2010. The settlement provided for the Debtors to purchase interests in Bankhaus loans where Bankhaus was either a participant or lender of record. The agreed purchase price was $1.4 billion for loans with aggregate outstanding principal of approximately $3.5 billion. Since then, the Debtors have recovered their purchase price on these acquired loans. More importantly, it is believed that the eventual recoveries will materially exceed the purchase price. As part of the agreement, LCPI allowed a claim of Bankhaus in the amount of $1.0 billion, and LBHI allowed a claim of $1.4 billion, less the recoveries received from the LCPI claim.

62.     The initial plan of reorganization filed in March 2010 provided a compromise of Affiliate Guarantee Claims, causing some of the foreign affiliates to react and engage with the Debtors in settlement negotiations. Once again, it was Bankhaus who was first to the negotiating table. Significant time was invested over the remainder of 2010 towards reaching a deal on all matters with Bankhaus. The estates were ultimately successful in executing a Settlement Agreement with Bankhaus in early 2011 that involved: (i) allowing their claim under the Security & Collateral Agreement at $6.4 billion (vs. their initial claim of $31.4 billion); (ii) the Debtors acquiring CDO Notes issued by Spruce CCS, Verano CCS, and SASCO 2008-C2 LLC for an aggregate purchase price of $957 million – the recoveries from which are expected to exceed the purchase price by more than $600 million; (iii) agreeing to the mechanics of Bankhaus' claims relating to its ownership of the 7th Avenue Notes; and critically, (iv) Plan Support.

63.     The Bankhaus settlement was a major step forward. Other participants in the Cross Border Protocol were surprised that a settlement had been reached with such a key affiliate. Momentum began to build toward additional settlement agreements. During the course of 2011,

settlements were negotiated and reached with Cross Border Protocol participants including Hong Kong, Singapore, Luxembourg, Japan, LBT, and Lehman Brothers Securities (Curacao) ("LBS"). Facts and circumstances were unique to each group, but the common tenets of the settlements were: (i) allowance of guarantee claims against LBHI at significant discounts (ranging anywhere from 28% to 85%, depending on the entity and the type of guarantee); (ii) allowance of the Debtors claims in the foreign proceeding, some of which are expected to generate significant value; (iii) mutual releases from further action, meaning all matters were settled; and (iv) Plan Support.

b.    LBIE

64.    PwC UK oversees more than 50 entities, the most significant of which is LBIE. PwC elected not to sign the Cross Border Protocol and dismissed it as not being in the best interests of their creditors. LBIE is the largest foreign affiliate, and its complicated pre-petition relationships with the Debtors made settlement an enormous challenge. In aggregate, LBIE filed $140 billion in claims against the Debtors. The claims related to the following key issues:

- Derivatives - Over 50,000 derivative trades between LBIE and affiliates, most significantly LBSF, LBF and LBCC. The typical challenges of settling intercompany derivatives were exacerbated dramatically with LBIE, due to the presence of "back-to-back" side letters to the ISDAs. Through the "back-to-back" side letters, LBIE street side counterparty termination amounts (receivables or payables) would pass through to the Debtors. Aggregate direct and guarantee claims asserted by LBIE arising from back-to-back arrangements were approximately $58 billion.

- LB Lux Stock Borrow - LBIE had significant prepetition stock borrow trade activity with LB Luxembourg SA ("LB Lux"). The trades were governed by OSLA/GMRA contracts. LBIE sent termination notices to LB Lux dated March 31, 2009. The value of

the securities at that date gave rise to a significant claim of LBIE against LB Lux, as well as a guarantee claim against LBHI of approximately $6 billion.

- <u>Bankhaus Client Money</u> - On September 12, 2008, LBIE transferred certain clients' money in the aggregate amount of approximately $1 billion to Bankhaus with the understanding that the amounts were to be repaid with interest on September 15, 2008. The amounts were never repaid.

- <u>Lehman Program Securities</u> - LBIE filed an Omnibus claim of $5.3 billion for Lehman-issued debt held for its own house account as well as on behalf of 3rd parties and Affiliates.

- <u>Other Affiliate Receivables</u> - LBIE filed claims for amounts owed to it by Lehman entities in Japan ($19.2 billion), Hong Kong ($11.2 billion), Switzerland ($22.6 billion), LBSF ($1.7 billion), etc. The Corporate Resolution guarantee was typically the basis for such claims. As Alvarez & Marsal analyzed the detail of these claims, the amounts were found to have been significantly overstated.

65.    The eventual settlement reached in October 2011 involved LBHI allowing a claim of LBIE in the amount of $1.1 billion (vs. $113 billion filed), and LBSF allowing a claim of $900 million (vs. $23.7 billion filed). Further, 56 other entities in the PwC UK group were also part of the settlement agreement. These entities filed a total of $26.6 billion in claims against the Debtors ($26.3 billion of which was against LBHI), which were settled for $6.1 billion. Reaching this agreement was the culmination of significant efforts by Alvarez & Marsal and Weil researching the issues, analyzing claim amounts, forming legal defenses, and negotiating within a very broad range of possible outcomes. Not only was the economic outcome significantly beneficial to the estates, it also achieved critical support for the eventual plan from this significant creditor.

66.    In summary, Alvarez & Marsal and the Lehman team have reached settlements with eight foreign affiliate groups.  The highlights of these settlements are, as follows:

- $328 billion of filed claims which were settled for $61 billion (an 81% reduction).

- Allowance of $21 billion in outbound claims against Foreign Affiliates, which are expected to generate significant recoveries over time.

- Acquisition of assets from Bankhaus which are expected to provide significant recoveries over the investment.

- Plan Support provisions were included in every settlement agreement.  Without Plan Support from some of the larger foreign estates, confirmation of the Debtors' Plan would have been difficult and could have been significantly delayed.

c.  <u>LBI</u>

67.    LBI was Lehman's US broker-dealer entity that managed a large number of proprietary and customer account relationships directly and on behalf of other Lehman affiliates.

68.    The LBI administration, subject to the Securities Investor Protection Act of 1970 proceeding, is primarily focused on the return of customer property.  LBI was slow to engage in substantive discussions with the Debtors until the fall of 2010. At that time, a process was implemented for ongoing information exchange and frequent meetings between the LBHI and the LBI Trustee's respective financial and legal teams, as well as the joint reconciliation of the parties' respective claims totaling over $120 billion. The efforts included reconciliation of both the notional amounts and market values for over 160,000 trades and 3,000 different securities. The estates' respective financial and legal advisors engaged in discussions revolving around a number of critical issues including the interpretation of what constitutes a customer claim, valuation issues, impact of

various subordination agreements, unexecuted agreements and set-off between positive and negative net equity accounts, among other matters.

69.    By mid-year 2011, discussions had progressed, and the Debtors and LBI had narrowed the range of issues between the estates. Although the Trustee was only prepared to settle customer claims, Alvarez & Marsal encouraged the Trustee to consider a resolution of all open matters between the estates, including resolution of general claims, tax matters, the PIK Note and the JPM CDA subrogated receivable. In September 2011, the Debtors filed their objection to the Trustee's determination of claims while negotiations continued.   After months of continued discussions, on-going reconciliation efforts and valuation work, and negotiations involving very complex issues, an agreement in principle was reached in February 2012.

d.    Structured Securities

70.    Significant time and expenses to the estates were saved with the consensual approach adopted by Alvarez & Marsal for valuation and settlement of structured securities, also commonly referred to as the Lehman Programs Securities ("LPS"). Alvarez & Marsal developed a practical Structured Securities Valuation Methodology that proved very effective.  It was easy to understand, and the relevant stakeholders were involved throughout the process.

71.    Entities such as LBT, LBS and, to a lesser extent, Lehman Brothers (Luxembourg) Equity Finance S.A. and Bankhaus, had more than $40 billion of these securities outstanding at the time of bankruptcy (approximately 4,700 different issues).  These securities typically had LBHI guarantees associated with them.  Alvarez & Marsal recognized early on that a process was needed to address these instruments. One aspect of such a plan dealt with the claims process for the large

number of claims expected (in the end, approximately 21,000).[3] Another significant piece of the plan was determining how to value the structured securities.

72.     The structured securities included notes, warrants and certificates that provide that the return to investors at maturity and/or periodic interest payments is based on the performance of an underlying asset or groups of assets.  Therefore, it was determined that a reasonable valuation date was the Petition Date.  How to value them, however, was not so easy. Nearly all of the models and tools used to value the structured securities no longer belonged to the Debtors. It became evident that building the models necessary to value the 4,700 structured securities would take a prohibitive amount of time, resources and expense and would potentially result in years of litigation. Since the books and records recorded the structured securities at fair market value and the information related to the Global Close was accessible, Alvarez & Marsal recognized the opportunity to use those recorded values.

73.     Alvarez & Marsal met with large noteholder groups to present ideas related to categorizing the structured securities and how each category would be valued based upon information in the books and records.  So began an intensive process of negotiation, collaboration and compromise that occurred over several months beginning with the filing of an 8-K on October 29, 2010 related to the values of the LBT structured securities (85% of the 4,700 structured securities) and culminating with the information in the plan of reorganization. Throughout this

---

[3] The claims process was streamlined for LPS note holders allowing them to use a specific LPS Proof of Claim ("POC") form requiring minimal information and no attachments. LPS note holders were also given more time to file their claims – November 2, 2009 bar date instead of September 22, 2009 – since many reside outside the United States. One of the requirements of the LPS claims process was that claimants had to obtain a blocking number from an international clearing agency such as Clearstream or Euroclear. This served to "block" trading of the security until after the bar date at which time securities and claims could be traded and transferred.

process, the Lehman team was also engaged with the issuing entities and the UCC to develop the Structured Securities Valuation Methodology for these securities.

74.     By employing this more simplified method and engaging the appropriate stakeholders throughout the process, Alvarez & Marsal effectively made this valuation approach possible. Alvarez & Marsal anticipates relatively few continuing claimant disputes and/or litigation. If Alvarez & Marsal had adopted an alternative approach, the estates would likely still be valuing structured securities.  This would have caused significant delays in the allocation of the security values to claims and, therefore, in payment of claims.

## IV.    **Plan of Reorganization**

75.     With a statutory deadline of 18 months to file a plan of reorganization, Alvarez & Marsal realized that the estates were faced with a number of challenges, each of which had the potential to extend the bankruptcy proceedings by many years, including drawn-out and costly litigation. The challenges related to the allocation of the assets among different creditor groups, rather than around the realization of the estates' assets, as there was seemingly much less controversy around the strategies developed by the Debtors. The challenges were not about increasing the "pie." But they all had the potential to curtail significantly the size of the "pie" as a result of the lengthening of the proceedings and the diversion of the estates' focus and resources for extensive and far-reaching litigation.

76.     Alvarez & Marsal faced enormous plan of reorganization challenges, in particular: (i) size and nature of claims; (ii) substantive consolidation and (iii) conduit entities.

(i)     <u>Size & Nature of Claims:</u>  Alvarez & Marsal confronted not only an unprecedented volume and notional amount of claims, but also unprecedented complexity in the nature of the underlying claims. The volumes and amounts speak for themselves:

over 66,000 claims with over $1.3 trillion in liquidated value. (Unliquidated claims were <u>in addition to</u> this $1.3 trillion amount.)  In terms of complexity, the estates were confronted with $70 billion of derivatives contract claims as a result of nearly 10,000 contracts. This challenge was addressed through the derivative settlement framework.  Also, LBHI received over $250 billion of third party guarantee claims and $224 billion of foreign affiliate guarantee claims. These claims were created as a result of the splintering of the global Lehman enterprise into separate proceedings by legal entity. The affiliate claims were significantly overstated, represented by gross intercompany relationships and were often estimates of potential obligations from other Lehman affiliates claimed under an LBHI board resolution ("<u>Board Resolution Guarantee</u>").  The affiliate claims had the potential to create years of divisive litigation about the legal enforceability of the guarantee documentation and, in particular, the Board Resolution Guarantee.

(ii)    <u>Substantive Consolidation</u>:  Lehman ran its businesses based on product, rather than by legal entity.  This raised significant questions of substantive consolidation and the separateness of each legal entity. The splintering of the global group into separate legal entities and separate administrations exacerbated these issues.  This also raised the question of equitable subordination of intercompany claims from LBHI against its affiliates.

(iii)    <u>Conduit Entities</u>:  Lehman had set up two entities, LBT and LBS, for the express purpose of issuing debt in Europe. These entities issued about $40 billion of debt through approximately 4,700 structured notes which were typically guaranteed by LBHI. The primary asset of these entities was an intercompany receivable against

LBHI. The noteholders of these entities filed about $30 billion (21,000 claims) of third party guarantee claims against LBHI. These notes were highly structured and had complex and exotic component terms. Their valuation required an enormous amount of time and effort, all within the context of avoiding substantial litigation.

77.    To address the various substantive consolidation issues, Alvarez & Marsal performed the following:

- In conjunction with Weil, Alvarez & Marsal conducted a comprehensive investigation of facts supporting/refuting substantive consolidation;

- Reviewed legal standards for substantive consolidation in the 2nd Circuit (e.g., Augie Restivo, etc.), as well as examples of other plans enacting "Subcon" (e.g., Enron);

- Conducted 50 plus interviews with former and current Lehman personnel;

- Examined extensive internal documents and Lehman public documents; and

- Evaluated applicability of "Subcon" to international affiliates and regulated entities.

78.    These challenges resulted in the formation of four principal creditor "blocks." This, in time, led to the formation of various informal and formal creditor groups:

- The direct creditors of LBHI -- largely in favor of substantive consolidation and opposed to third party guarantee claims and any affiliate guarantee claims. This resulted in the formation of the "Ad Hoc Group" of creditors;

- The creditors of the subsidiary operating entities -- in favor of the legal separateness of each of the Lehman debtors, but also opposed to affiliate guarantee claims which resulted in the formation of the "Non Con Alliance";

- The LBT and LBS note holders -- resulted in the formation of two groups represented by separate counsel; and

- The Lehman Affiliates -- wanted allowance of their direct claims against LBHI and the other Debtors and their guarantee claims against LBHI.

79.    Given the complexity of these challenges, and the statutory deadline of eighteen months for the Debtors to file a plan, Alvarez & Marsal realized that Lehman needed to pursue a non-conventional, consensual plan that would require a substantial compromise by all of the Lehman creditors.

80.    On March 15, 2010, the estates filed their first plan (as amended, collectively, the "Plan"), and a disclosure statement was filed on April 14, 2010.  That Plan was premised on the legal separateness of the Lehman entities, but was constructed based on the premise of compromise by (i) adjusting claims to estimated amounts based on global third party claims, (ii) prioritizing third party claims vs. affiliate guarantee claims, and (iii) honoring general intercompany claims based on the Global Close (except for LBT and LBS).

81.    The key premise of the Plan was based on the Lehman affiliates' acknowledgement of the inflation in their claims as compared to the September 14, 2008 balance sheets, the risk of legal enforceability of their guarantee claims, and the prioritization of their third party creditor claims against LBHI.  The Plan set an affiliate guarantee claims pool ($21 billion) based on an estimate of third party liabilities using the Lehman affiliates' September 14, 2008 balance sheet and reducing the intercompany claims of LBT and LBS by 50%.

82.    In addition to developing the Plan framework, Alvarez & Marsal worked closely with Weil in performing the following:

36

- Supervised preparation of a highly-complex recovery model involving over 700 Lehman affiliates with intercompany relationships exceeding $100 billion;

- Prepared exhibits to the Disclosure Statement including recovery analyses for 23 Debtors;

- Prepared 5-year cash flow estimates for assets in Real Estate, Loans, PEPI, and Derivatives asset streams on a Debtor by Debtor basis;

- Prepared estimates of claims at the end of cases; and

- Prepared a liquidation analysis for all Debtors and non-Debtors under LBHI control.

83.    Alvarez & Marsal spent considerable time previewing the Plan with key affiliates (e.g. LBIE, Bankhaus, LBT, Hong Kong, etc.).  Once the Plan was filed, it was reviewed through bilateral meetings (over two dozen in person meetings) and also through affiliate Cross Border Protocol meetings (5 meetings were dedicated to LBHI's plan and disclosure statements). This task of "educating" the foreign administrators on the US bankruptcy process, explaining the Plan, the legal enforceability issues surrounding their guarantee claims, and convincing them that a consensual plan was the only viable alternative, spanned most of 2010.

84.    In parallel, Alvarez & Marsal had multiple meetings with a number of significant creditors and creditor groups including the Ad Hoc group, the Non-Con Alliance, the two LBT groups, as well as an informal cross-holder group formed by a number of large claim holders. The Ad Hoc group was concerned that the plan had not sufficiently addressed the substantive consolidation issues. The LBT noteholders were unhappy about the treatment of their primary obligor's intercompany claims. The Non-Con Alliance wanted a challenge launched against the intercompany claims of LBHI against its affiliates.

85.     During this process and to ensure the support of the Lehman Affiliates, Alvarez & Marsal confirmed to the affiliates that they needed to (i) address the quantum of their claims which would require a uniform set of rules and (ii) perform a reconciliation which was undertaken under the auspices of the Cross Border Protocol and the development of intercompany settlement guidelines.  Alvarez & Marsal also refined the affiliates' views on the filed claims, worked on mitigating claims and developed frameworks for the more complex claims, including the Big Banks Derivatives Settlement Framework (see Derivatives discussion) and the Structured Notes Framework (see Structured Notes discussion).

86.     By December, 2010, the estates had received formal and informal plan proposals from several of the Lehman Affiliates, the Non Con Alliance, the Ad Hoc Group, the informal group of cross holders and the two LBT groups. On December 15, 2010, the Ad Hoc Group filed a Substantive Consolidation Plan.

87.     On January 25, 2011, the estates filed their First Amended Joint Chapter 11 Plan with the support of the UCC. This plan was a compromise plan that was premised on (i) a compromise of 20% probability of substantive consolidation on the debtors and 30% on LBT and LBS; (ii) a compromise of 20% probability on equitable subordination of LBHI intercompany claims against Debtor entities; and (iii) affiliate direct intercompany claims to be admitted based on the Global Close and guarantee claims being allowed based on settlement levels to be agreed upon with the affiliates based on a consistent framework.

88.     During early 2011, Alvarez & Marsal focused on bilateral settlement discussions with the Lehman Affiliates and continued work with the key creditor groups. Alvarez & Marsal and Weil also completed their analysis on substantive consolidation and legal enforceability of guarantee

claims, and made substantial progress in the development of the Big Banks Derivatives Framework and the Structured Notes Framework.

89.     On April 25, 2011, the Non Con Alliance along with the LBT groups filed a non-con plan.

90.     Thus, by May 2011, with two competing plans already on file, Alvarez & Marsal and Weil concluded that it was imperative to seek a compromise among the key groups. Alvarez & Marsal and Weil organized a creditor summit meeting on June 16, 2011 and invited all of the different creditor groups, including the key foreign affiliates, representing 44 major creditors and over 150 people.

91.     At the outset of the meetings, Alvarez & Marsal and Weil proposed a compromise to the LBT and LBS creditors, along with a compromise to the Non Con Alliance creditors. After a marathon day and half of "shuttle diplomacy", the parties managed to reach a tentative compromise settlement between the LBT Note holder groups, the Non-Con Alliance (including the settlement of 7 Big Banks under the Big Banks Derivatives Settlement Framework) and most members of the cross holders.

92.     As such, going into the weekend of June 19, there was a settlement agreement that included most major creditor groups with the exception of the Ad Hoc group and certain LCPI creditors. While this was certainly significant progress, there was a substantial risk of not reaching a consensual plan because the Ad Hoc Group intended to pursue discovery and likely litigate substantive consolidation.

93.     During the weekend of June 19, informal discussions were held with certain members of the Ad Hoc Group and certain other large creditors.  For the first time, the parties saw the possibility of a truly global settlement. Alvarez & Marsal reconvened the key creditor groups for a

negotiation session on Monday, June 20. At the outset of the meeting, the agreements reached on June 16 were outlined for the group.  By the end of the day, the parties were able to reach a compromise among the cross holders, each of the LBT note holder groups, and the Ad Hoc Group. Unfortunately, certain of the Non Con Alliance objected. Over the following three days, Alvarez & Marsal had continuous negotiations with certain members of the Non Con Alliance in order to regain their support while not losing any of the support from the other groups. By June 24, there was an agreement on economic terms that had the support of all of the major Lehman creditor groups, with the exception of certain LCPI creditors. During the following six days, the parties negotiated modifications to the plan, and on June 30, the Debtors filed a plan with the support of the UCC, and 32 individual creditors representing more than $100 billion in claims.

94.     During the five months that ensued, Alvarez & Marsal pursued the path of consensual resolution with affiliates and other creditors that resulted in settlement agreements and plan support agreements with all the major affiliates, including LBIE and its affiliates, an additional three banks under the Big Banks Derivatives Settlement Framework, and several of Lehman's largest creditors, including the BundesBank and GDPF. The parties were also able to reach a compromise with the LCPI creditors.

95.     The consensual plan of reorganization was confirmed on December 6, 2011 with more than 98% voting in favor of the Plan (there was only one objection, and it was resolved during the hearing).  The Debtors emerged from bankruptcy on March 6, 2012, and the new board of directors assumed oversight of the Plan Administrator – Lehman Brothers Holdings Inc.  Since confirmation of the Plan, Alvarez & Marsal has spent significant time and effort assisting the new board of directors selected by the Director Selection Committee and preparing for the first distribution to creditors, which occurred on April 17, 2012.

40

96.    It is important to note that throughout the case, Alvarez & Marsal and the Debtors have been as transparent as possible without compromising recovery to creditors.  In general, Alvarez & Marsal, with outstanding assistance from Weil, worked throughout the case to negotiate settlements - rather than litigate, all done in close coordination with the UCC and its advisors.

## V.    **Distributions and Claims Mitigation**

### A.    *Distributions*

97.    In order to make distributions to creditors in accordance with the confirmed Plan, Alvarez & Marsal developed a complex distribution model that:

- Ensured that all secured, administrative, priority and convenience claims were paid or provided for with appropriate reserves;

- Calculated payments to allowed claims, as well as the amount of cash necessary for reserves for disputed claims;

- Provided for operating expenses, asset preservation and Debtor commitments;

- Calculated Plan Adjustments / Plan Settlements / Sub-Debt Turnover; and

- Had flexible toggles to maximize distributions to creditors while also ensuring sufficient liquidity to manage estate cash needs, including catching up on disputed claims as they become allowed.

98.    Once the distribution model was developed, Alvarez & Marsal turned its focus to increasing the initial and subsequent distributions by substituting Debtor non-cash assets in lieu of cash in the reserve for disputed claims. This required detailed analysis of asset values and projected available cash to develop minimum thresholds for cash reserves and asset-to-reserve ratios.  Such a concept had never been used on such a scale to support billions of dollars of disputed claims.

Additionally, Alvarez & Marsal met with the UCC advisors and secured the UCC's support for the motion which was subsequently approved by the court.

99.     Alvarez & Marsal and the Debtors took additional steps to maximize distributions:

- Worked with Weil to determine that certain secured claims did not require 100% reserves as they were in this category only to protect the creditors' rights to setoff against collateral;

- Analyzed non-debtor balance sheets to verify the estates' ability to move funds to debtors (via intercompany payments or dividends – over $2 billion);

- Initiated a stipulation with the IRS so that each debtor need not reserve the approximately $2 billion filed by the IRS against 8 debtors.  By agreeing to segregate approximately $2.2 billion in cash, the IRS agreed that 7 of the claims could be reserved at zero for distribution purposes.

100.     Finally, Alvarez & Marsal worked with the claims team and Epiq to prepare for the logistics of actual distributions to creditors. To ensure that the process would meet Plan and legal requirements set by the US Treasury, Taxpayer Identification Numbers and OFAC certifications were sought from all creditors with Allowed Claims.

101.     The initial distribution provided for $14.70 billion to 19,200 creditors and $8.70 billion for disputed claims.

**B.     *Claims Mitigation***

102.     Similar to the approach of seeking consensual resolution in other aspects of these cases, Alvarez & Marsal oversaw the process of mitigation of claims in a consensual manner. This approach delivered results more quickly and at significantly less cost than what could have been delivered if an adversarial approach had been taken. A&M delivered this result by committing the

42

right professionals, utilizing the right technology, and by implementing a forward-thinking process designed to maximize value to the estates.

103.    The accomplishments of claims mitigation efforts by Alvarez & Marsal are many. For example, as of May 15, 2012, the Debtors have filed 304 omnibus objections. These have resulted in the withdrawal, expungement or disallowance of 33,500 claims with a face amount of $581.6 billion. Another 24,000 claims in a face amount of $437.3 billion have been reconciled, settled, and allowed. These were eligible for the first distributions. Objections to approximately 3,800 claims in a face amount of approximately $66 billion are pending.

104.    Alvarez & Marsal was able to utilize its resources and technology to implement a process to address the estates' very complex liabilities. This allowed for the efficient reconciliation of claims and did so in a way that 1) minimized the burden on the court, 2) significantly reduced time and legal expenses of claimants in the reconciliation of their individual claims, 3) reduced the burden and cost to the estates and 4) provided a dynamic but reliable and verifiable basis for the Debtors to report numbers to and negotiate with their constituents. This was vital to facilitate the Plan confirmation. Examples of the tools used by Alvarez & Marsal to minimize costs and maximize value in the claims management world include:

- Lehman Reporting Tool. Alvarez & Marsal utilized A&M's proprietary software along with the expertise of its professionals to create a Lehman reporting and data collection tool which served as the informational backbone of the cases. This allowed for reliable numbers to be disseminated quickly and consistently to various constituents, the quality and reliability of which paved the way for rapid settlement discussions, plan modifications and claim reconciliations that served as the basis of the approved Plan.

43

- <u>Bar Date Logistics</u>.  Alvarez & Marsal worked closely with Weil in crafting the bar date motion that anticipated key case issues and informational needs.  The specific relief requested, the novel approach of electronic questionnaires for derivatives and guarantee claims and the elaborate planning and efforts undertaken to address issues of foreign creditors and holders of debt instruments saved the estates millions of dollars in reconciliation effort, provided ready access to information crucial to the plan construct, saved creditors significant time and money in the presentment and reconciliation of claims and allowed for more freely tradable debt instruments.

- <u>Utilization of Non-Alvarez & Marsal Resources</u>.  Alvarez & Marsal made concerted efforts to minimize costs through the use of lower-cost but appropriate resources to perform requisite tasks.  Alvarez & Marsal designed a claims reconciliation strategy that permitted certain work to be parceled out by the Debtors to lower-priced resources. The Lehman Reporting Tool was built so that these resources could be utilized frequently and effectively and for their work to be properly supervised.

- <u>Minimized burden on creditors and the court</u>.  The vast majority of claims that have been reconciled or settled have not been brought before the court as contested matters. This is due to significant pre-planning, review and other efforts of the reconciliation team.  As a direct result, the estates have saved tens of millions of dollars for preparing and litigating numerous matters, the court has been spared the time of hearing such disputes and, importantly, creditors have been spared the time and legal expense that would have been required to pursue contested matters. Additionally, had Alvarez & Marsal not been as successful at consensual resolutions,

it is likely that the claims reconciliation process could have held up confirmation and, ultimately, distributions to creditors.

105.    In addition to the above, Alvarez & Marsal provided other benefits to the estates above and beyond an ordinary role to reconcile and mitigate liabilities.  In particular, Alvarez & Marsal researched and prepared under extreme time pressures the claims of the Lehman entities to be filed in other proceedings in the US and around the world.  Early in the case, Alvarez & Marsal led the process to file over 800 claims in more than 40 proceedings around the world (supplemented by the subsequent filing of hundreds of additional claims), many of which required retention of local counsel, translation of documents and efforts to obtain information in other languages and from systems around the world, both out of the Debtors' immediate control.

## VI.    **Various Other Services**

### A.    *Data*

106.    The primary objective of Alvarez & Marsal's data management team was preservation of source level data residing in production application environments while gaining rights, access and control to pre-bankruptcy data.   Obtaining access and control of this data was required for several reasons including business inquiry, analysis, operations related to the business wind-down efforts, asset management and disposal, regulatory and governmental inquiry, pre-litigation assessment, case preparation, litigation, arbitration, mediation and claims analysis, settlement and resolution. Prior to its bankruptcy filing, Lehman had a multi-billion dollar IT budget and over 6,000 IT employees worldwide. The technology environment included approximately 3,000 production applications, over 3 billion messages (email and instant messages), over 3 petabytes of group/file share information, 4 document management systems, thousands of routine reports, 5 data centers, over 200,000 backup tapes and thousands of servers.

107.    Alvarez & Marsal performed the following work in order to gain rights, access and control of all historical data:

a.    Assessment, inventorying, cataloguing and application tiering;

b.    Preservation and collection of data;

c.    Contract termination, negotiation, administration and management;

d.    Third party preferred provider selection and deployment (e.g. tape restoration);

e.    Data extraction;

f.    Data conversion and migration;

g.    Network infrastructure and storage design, build and deployment (e.g. in-sourced services);

h.    Data interface (e.g. Business Objects) design and development;

i.    Software selection and deployment;

j.    Data hosting;

k.    Database design and development;

l.    Design and deployment of a request tracking system;

m.    Document management systems migration and consolidation;

n.    Derivative data verification, database design, management and reporting;

o.    Electronic data processing;

p.    Group/File share catalogue design and deployment;

q.    Litigation document review management;

r.    Custom report design and development;

s.    Mobile data collections;

t.    Coordination with multiple administrators worldwide;

u.  Management of data security and privacy issues;

v.  Developed and implemented processes for identifying and collecting post bankruptcy data from the LBHI live environments across all data sources;

w.  Designed and deployed standard and defensible processes and procedures for data collection, management, searching, retrieval and production;

x.  Advised Lehman attorneys and outside counsel on best practices in electronic discovery relating to several hundred matters.

108.    The data management team secured the rights and access in order to control historical data of LBHI.  The efforts and tasks identified above allowed the estates to save tens of millions of dollars annually by: (i) eliminating dependence on BarCap for application hosting, support and data restoration services; and (ii) centralizing all data collection, management, searching, retrieval and production services.

109.    Since the Petition Date, Alvarez & Marsal's data management team has been supporting the data needs of the estates for business inquiry, analysis, operations, asset management and disposal, regulatory and governmental inquiry, pre-litigation assessment, case preparation, litigation (including discovery), arbitration, mediation and claims analysis, settlement and resolution. Hundreds of requests for electronically stored information have been facilitated and fulfilled for both legal and financial purposes. These functions are provided by seven full-time LBHI employees, seven A&M full-time equivalents, and on an as needed basis, a variable pool of temporary personnel (hired by the Debtors) based on closely monitored data requests.

**B.**       ***Forensics and Litigation Support***

110.    During the first quarter of the cases, Alvarez & Marsal's forensic team focused much of its efforts on time sensitive priorities that emanated from the confusion created by the sudden bankruptcy filing, including the following:

- An investigation of intercompany activity between LBHI, LBI and LBIE in the days leading up the LBHI's bankruptcy filing.  These efforts were required as a result of press reports and allegations made at the BarCap sale hearing about potential improprieties concerning significant amounts of money transferred from LBIE to LBI just before the LBHI bankruptcy filing.

- In light of the significant allegations and confusion among creditors and former customers of Lehman, the team set up a transaction resolution process to assist in researching inquiries and requests from creditors and former customers.  Lehman developed a presentation for creditors that had filed Rule 2004 Discovery Motions to describe the circumstances of the bankruptcy and the early objectives and priorities of the estates.  This presentation was posted to the LBHI website to address pressing and repeated questions.

- At the request of the UCC, the team evaluated the risk of preference claims in non-debtor affiliates to determine if any of these entities should file their own chapter 11 petitions in order to preserve avoidance actions.

111.    Working with in-house and outside counsel, Alvarez & Marsal began the investigation of several issues that it anticipated would be relevant to the evaluation of potential litigation against third parties, including the following:

- The forensic team began the investigation of cash and other collateral movements in the months and weeks prior to LBHI's bankruptcy filing, including collateral requests made by Citibank, JPM, Bank of America, HSBC, Bank of New York Mellon, Standard Bank and the Federal Reserve (pursuant to various lending programs). These investigative findings were used, for example, to help respond to the Request for Declaratory Judgment filed by Bank of America in connection with its cash setoff in November 2008.

- The team analyzed Lehman's liquidity position and repo financing trends in the weeks leading up to its bankruptcy filing.

- The team held extensive discussions with JPM concerning its alleged overdraft claim and, at the same time, commenced an investigation into JPM's asserted claims against the estates.

- The team assisted counsel in the investigation of the December 2008 settlement between BarCap, JPM and LBI relating to Barclay's acquisition of certain LBI assets in September 2008.

112.    From January 2009 through March 2010, the forensic team served as a primary intermediary to the Examiner and his counsel and financial advisors to ensure the Examiner had the benefit of Alvarez & Marsal's fact gathering and analysis up to that point. The team further served as the primary point of contact for Examiner requests and coordinated with other parts of the estates and BarCap to make certain such requests were being met on a timely basis.

113.    Along with in-house and outside counsel, the forensic team continued the investigation of JPM's pre-bankruptcy collateral demands and alleged overdraft arising from claims in excess of proceeds from collateral dispositions. The estates were managing the assets held by JPM

49

as collateral, but that process was more difficult and inefficient without physical possession and control of the assets.  Accordingly, along with counsel, over several months Alvarez & Marsal negotiated for the return of the unsold collateral held by JPM and ultimately entered into the CDA with JPM which was approved by the Court in March 2010.  The CDA resulted in the return to the estates of billions of dollars of securities and allowed the estates to manage more efficiently the underlying assets and maximize their value for the benefit of the creditors.  Substantially all of these assets are now available for distribution to the creditors to the extent they have been monetized.  The CDA further eliminated the accrual of purported interest charges of nearly $12 million per month being charged by JPM.  The parties to the CDA fully reserved their rights to contest any claims and to pursue return of any of the previously pledged collateral through litigation.  Since March 2010, Alvarez & Marsal has also served as the primary coordinator for administration of the securities returned to the estates and for the quarterly reporting requirements concerning such securities arising from the CDA.

114.    In May 2010, the estates and the UCC filed litigation against JPM to pursue return of the collateral pledged to JPM prior to the bankruptcy filing (the "Collateral Case").  Alvarez & Marsal provided forensic accounting assistance to counsel in connection with the investigation and litigation of JPM's claims against the estates including the repo-related claims and the asset management claims objections.

115.    While the outcomes of the Collateral Case and certain of the claims objections are uncertain at this time, Lehman recently entered into a settlement agreement with JPM to resolve the estates' asset management claim objection at approximately 98% of the amount in dispute, totaling over $700 million in value to the estates which was available for the initial distribution to creditors.

116.    Finally, the forensic team has assisted with numerous other activities including the evaluation of claims and settlement proposals involving LBI, LBIE, short sellers, CME Group and Korean Development Bank.  The forensic team is also providing support for the recently initiated adversary proceeding seeking the return of $2 billion from Citibank.

## C.    *Tax*

117.    At the time of filing, the Lehman tax department lost over two-thirds of its full-time professionals globally (US, Europe, and Asia).  In addition to ongoing compliance and audit activities (including the federal consolidated tax return comprised of over 1,500 legal entities, over 2,000 annual state tax filings, and the management of federal and 50 plus state audits for periods ranging up to 10 to 17 years), the legacy department was further challenged with bankruptcy tax issues and processes with which it had little (or no) experience.  Member's of A&M's tax team on the Lehman case (the "A&M Tax Team") coordinated with the Debtors' newly appointed Global Head of Tax to retain key employees, hire additional employees, establish priorities and protocols, and manage cash taxes (including the acceleration of over $100 million of refunds from federal and state authorities). The collective efforts of the A&M Tax Team and Lehman tax team have produced anticipated cash savings of several billion dollars.

118.    Alvarez & Marsal coordinated with Lehman tax and its legal advisors on the company's federal income tax audits.  Lehman's Global Head of Tax managed direct discussions with the IRS and the DOJ, leveraging senior resources on the A&M Tax Team at critical junctures to design strategies to extend the IRS bar date and achieve significant reductions in proposed assessments prior to the IRS' submission of its proof of claim.  These efforts resulted in a proof of claim that was billions of dollars less than originally anticipated, minimizing the amount of cash to be reserved, and maximizing initial distributions to unsecured creditors.

119.    In support of this effort, the A&M Tax Team utilized A&M's proprietary tax model to manage bankruptcy tax matters, including: timing of cancellation of indebtedness income, tax attribute utilization and preservation, timing of worthless stock deductions, and determination of tax basis.

120.    Alvarez & Marsal played a significant role in numerous other tax matters (achieving underline substantial savings for the estates): settlement of the New York State audit ($1 billion), disposition of REMIC securities ($350 million), settlement of UK group relief ($60 million), termination of pension plan ($60 million), and additional issues with tax savings in excess of $50 million.

121.    Alvarez & Marsal managed the tax claims process and the development of real estates' financial statements for tax purposes and has been actively involved in the reduction of management layers, implementation of process improvements, and accomplishment of certain compliance needs with lower cost resources.  In addition, Alvarez & Marsal had a direct role in the development of the Debtor Allocation Agreement under the Plan, the negotiation of a settlement with LBI with respect to its liabilities in consolidated and combined tax filings, and in mitigating taxes in numerous transactions, including the sale of Neuberger Berman and the disposition of an airport terminal at Kennedy International Airport.

### D.    *Finance and Reporting*

122.    After the sale to BarCap, the estates were left with a skeletal accounting and finance team - only 13 existing Lehman employees and no direct leadership.  Alvarez & Marsal immediately stepped in and provided the necessary leadership to manage the finance group.  Throughout the case, Alvarez & Marsal recruited experienced personnel to work as direct Lehman employees to enhance the Lehman team and to gradually replace Alvarez & Marsal.

123.    On September 25, 2008, Alvarez & Marsal met with senior BarCap (formerly Lehman) management about creating financial statements as of the Petition Date.  Out of this conversation with BarCap, and further conversations with former Lehman employees in Europe and Asia came the concept of the Global Close.  Alvarez & Marsal provided substantial leadership in managing the process that went on in multiple locations around the world. It required significant communications with more than two hundred legal entity and product controllers.  The Global Close contributed to reconciling and identifying (i) control over assets and (ii) intercompany account relationships with foreign administrators and fiduciaries to be relied upon under the succeeding Cross Border Protocol and the various international settlements. It involved the reconciliation and analysis of over $600 billion in third party assets plus over $700 billion in gross intercompany balances amongst LBHI and its Affiliates across more than 1,000 legal entities that were consolidated in the general ledger.  It required an enormous cooperative effort on the part of the foreign Administrators, their financial advisors, legacy Lehman employees and BarCap, Nomura and LBIE TSA employees.  The Global Close was unprecedented as the historical Lehman systems did not have the ability to close mid-month.  Alvarez & Marsal coordinated with Barcap IT (previously Lehman IT) to recreate a "shadow" general ledger environment as well as re-input 84 system feeds into the general ledger.

124.    Alvarez & Marsal led the initiative to eliminate completely the dependency on the BarCap TSA.  Pre-petition, 584 applications supported the various Lehman businesses.  Alvarez & Marsal reduced the applications requirements to 200 post-bankruptcy and further reduced them to 100 currently.  The annual run rate in early 2009 for the TSA was approximately $110 million and was reduced to less than half in 2012. In addition, Alvarez & Marsal was also able to successfully outsource most of the applications, support and processing to third party providers.

125.    Alvarez & Marsal led the migration of over 5 million records from the legacy general ledger and reporting systems. By August 2009, Lehman in the US, Europe and Asia was completely independent of BarCap from processing the Lehman transactions across the general ledger, financial reporting and accounts payable.  In addition, Alvarez & Marsal reduced the complexity of recording financial transactions by reducing the number of automatic system feeds from 84 sub-system feeds to 7, simplifying the account structure by eliminating over 40,000 unique accounts and creating a "cloud" infrastructure environment with flexible access anywhere in the world with low cost technological requirements.

126.    Throughout the case, Alvarez & Marsal was extremely proactive in meeting with the US Trustee's financial staff to share information regarding Lehman's financial reporting complexities and intricacies, providing a business overview for each of the Debtors and periodically reviewing with the UCC and its financial advisors the monthly and quarterly operating reports filed with the Court for public consumption.

127.    In addition to meetings with UCC and its advisors, Alvarez & Marsal professionals also provided access throughout the case to non-UCC creditors to ask questions regarding monthly operating report financial information.  These discussions resulted in expanded reporting, including supplemental schedules and notes to financial statements.

## E.    *Treasury*

128.    The estates began the case with two bank accounts established by BarCap for the proceeds of the asset sales. Recognizing the need for on-line access, transparency, and foreign currency accounts, Alvarez & Marsal established accounts with US Bank and ultimately re-established a relationship with Citibank to access their global on-line banking and investment platform.

129.    Since the filing of the cases through the end of January 2012, the estates had the following account activity:

|  | Legacy (pre-bankruptcy) | New |
|---|---|---|
| Total Accounts | 823 | 296 |
| Closed since filing | (580) | (36) |
| Total Open | 243 | 260 |

130.    As assets were monetized and cash began to accumulate, Alvarez & Marsal established an investment program combining mutual funds (after court approval), Treasury obligations, and other guaranteed investments. Alvarez & Marsal significantly increased the yield on the portfolio by the purchase of TLGP (Temporary Liquidity Guarantee Program) obligations of commercial issuers – notes issued by financial institutions and other corporations with principal and interest guaranteed by the US government. As of April 2012, the estates managed and invested approximately $30 billion.

## F.    Human Resources

131.    As a result of the sale of the fixed income and broker dealer businesses, the Lehman estates were left with a handful of Lehman legacy employees to unwind the business. Alvarez & Marsal had to rebuild a workforce and was able to recruit over a period of time and, successfully retain, through a number of creative incentive plans that aligned the employees' interests with that of the estates' creditors, close to 580 FTEs (at peak). Alvarez & Marsal had to rebuild all support functions such as finance, accounting, legal and human resources. Retention was enhanced by creating a collaborative work environment, but also by Alvarez & Marsal empowering the Lehman

resources. Indeed, after the stabilization phase, Alvarez & Marsal limited their role to leadership functions, restructuring roles and to service areas for which no legacy resources were available (chapter 11 matters, affiliate negotiations, forensics, claims management, tax, etc.). A&M has avoided rotation in its own ranks to ensure continuity and institutional knowledge throughout the case. As such, the vast majority of the 70 full-time equivalent personnel that are currently remaining on the case have been on Lehman since the beginning of the case. Finally, A&M has made every effort throughout the proceedings to actively manage its resources by being mindful of the financial burden to the estates and phase out A&M resources as quickly and wherever practically possible.

132.    The estates had approximately 104 Lehman employees at the end of September 2008, Lehman employees peaked at 582 in June 2009. As of the end of March 2012, Lehman had 365 employees with an expectation of having less than 300 at year end 2012.

133.    Alvarez & Marsal deployed 175 full time equivalents at the peak in July 2009 with the number steadily declining since then. The estates currently have approximately 70 Alvarez & Marsal full time equivalents with an expectation that it will further reduce A&M's involvement by year end and in the years ahead.

## VII.    CONCLUSION

### A.  Cash Flow

134.    As summarized below, the estates under the control of Alvarez & Marsal have monetized assets and received cash through the end of February 2012 (6 days prior to the effective date) of $43.1 billion. In turn, the estates made investments to preserve and maximize asset values of $12.9 billion. To date, the estates incurred cash operating expenses of $3.0 billion. Alvarez & Marsal has been paid $519 million in fees to manage the estates, or approximately 1.2% of collections to

date. Alvarez & Marsal estimates that the estates will collect more than $30 billion subsequent to the

effective date:

**Lehman Brothers Holdings Inc. and Other Controlled Entities**
**Cash Flow Summary  (September 15, 2008 to February 28, 2012)**

|  | Total |
|---|---|
| **Gross Receipts** | |
| *($ in millions)* | |
| Real Estate | $          6,344 |
| Loans | 7,299 |
| Private Equity/Principal Invest. | 5,105 |
| Derivatives | 16,798 |
| Other | |
| Asset Sales | 2,844 |
| Transfers from Other Regions | 1,363 |
| Woodlands Commercial Corporation | 506 |
| Other Collections | 2,882 |
| **Receipts, Subtotal** | **43,141** |
| | |
| **Non-Operating Disbursments** | |
| *(Including asset purchases such as Archstone, Bankhaus, Metlife* | |
| *and Barclay's (Pine) of $4.5 billion)* | |
| Real Estate | (5,058) |
| Loans | (2,283) |
| Private Equity/Principal Invest. | (1,159) |
| Derivatives | (2,277) |
| Other | |
| Aurora Bank / Woodlands Capital Contributions and Settlement | (990) |
| Other Disbursements | (1,089) |
| **Non-Operating Disbursments, Subtotal** | **(12,857)** |
| | |
| **Adjusted Receipts, Total** | **30,284** |
| | |
| **Operating Disbursements** | |
| Professional Fees - Bankruptcy, Legal and Litigation | (1,146) |
| Compensation & Benefits (including A&M) | (1,151) |
| Outsourced Services & IT | (384) |
| Other Operating Disbursements | (318) |
| **Operating Disbursements, Total** | **(2,999)** |
| | |
| **Cash from Operations** | **27,285** |
| FX Fluctuation | (77) |
| **Net Cash Flow** | **$          27,208** |

## B.    Fees and Expenses

135.    Alvarez & Marsal has previously filed fourteen interim fee reports (incorporated by reference herein) as follows:

| Docket No. | Quarterly Filing Date | Covered From | Period To | Fees | Expenses | Total |
|---|---|---|---|---|---|---|
| 2698 | 1/30/2009 | 9/15/2008 | 11/30/2008 | $ 31,349,367 | $ 1,426,960 | $ 32,776,327 |
| 3481 | 4/29/2009 | 12/1/2008 | 2/28/2009 | 42,690,060 | 1,809,516 | 44,499,576 |
| 4531 | 7/30/2009 | 3/1/2009 | 5/31/2009 | 52,227,982 | 1,987,675 | 54,215,657 |
| 5625 | 10/26/2009 | 6/1/2009 | 8/31/2009 | 52,855,924 | 1,562,202 | 54,418,126 |
| 6802 | 1/27/2010 | 9/1/2009 | 11/30/2009 | 45,393,221 | 1,677,970 | 47,071,191 |
| 8727 | 4/28/2010 | 12/1/2009 | 2/28/2010 | 43,181,924 | 1,235,894 | 44,417,818 |
| 10542 | 7/28/2010 | 3/1/2010 | 5/21/2010 | 47,211,682 | 1,418,232 | 48,629,914 |
| 12445 | 10/28/2010 | 6/1/2010 | 8/31/2010 | 42,414,779 | 1,399,394 | 43,814,173 |
| 14166 | 1/26/2010 | 9/1/2010 | 11/30/2010 | 32,563,370 | 1,082,469 | 33,645,839 |
| 16330 | 4/27/2011 | 12/1/2010 | 2/28/2011 | 27,644,873 | 615,281 | 28,260,154 |
| 18789 | 7/26/2011 | 3/1/2011 | 5/31/2011 | 27,752,187 | 597,797 | 28,349,984 |
| 21247 | 10/25/2011 | 6/1/2011 | 8/31/2011 | 26,975,901 | 518,601 | 27,494,502 |
| 24803 | 1/30/2012 | 9/1/2011 | 11/30/2011 | 23,815,205 | 586,402 | 24,401,607 |
| 27660 | 4/30/2012 | 12/1/2011 | 3/5/2012 | 23,098,120 | 427,266 | 23,525,386 |
| | TOTAL through Effective Date | | | $519,174,595 | $ 16,345,659 | $535,520,254 |

136.    No objections were filed with respect to any of these quarterly filings.

## C.    <u>Summary</u>

137.    Much of the success of the Lehman case in terms of quantum and timing of recoveries can be attributed to several principles that Alvarez & Marsal established early on in the cases. Because of its global footprint (US, Asia, Europe, South America) and its multidisciplinary service lines (restructuring, IT, forensic, tax, claims management, etc.), Alvarez & Marsal was uniquely situated to address the Lehman challenges and implement the principles.

138.    The principles guided Alvarez & Marsal's approach throughout the proceedings, and, in particular, significantly influenced the various administrators of the Lehman Affiliates and their respective creditor constituencies. The key principles were: (i) transparency with the bankruptcy court and the various constituencies; (ii) gaining the confidence and support of the court and the constituencies for a somewhat unorthodox, but prudent liquidation strategy; (iii) working collaboratively and transparently with the members and advisors of the UCC and other key constituents; (iv) implementation of a "hold strategy", i.e., avoid "fire selling" the Lehman assets to "vultures" in an historically low market and convincing all constituencies of the benefits of this strategy, including making a number of significant protective investments to enhance the value of the estates; (v) collaboration with the foreign administrators and assisting them in their proceedings by acknowledging the complexity and global interconnectivity of the Lehman estates; (vi) consensus building that led directly to critically important settlements (e.g., Big Bank Settlement, Cross Border Protocol, Affiliate Settlements, Structured Securities Settlement, and Plan Settlement), which, in turn, avoided protracted and drawn-out litigation, (vii) setting aggressive timetables (e.g., two year calendar target to exit bankruptcy) and establishing a coordinated schedule for Lehman bankruptcy proceedings around the world; and (viii) approaching all matters pragmatically with a goal whenever possible of reaching consensual compromises and avoiding costly litigation.

139.    As a direct result of this approach, extraordinary global momentum and consensus was developed. And, in the end, the originally unthinkable was achieved  –  confirmation of a chapter 11 plan of reorganization in thirty nine months and with the support of 98% of creditors.

140.    It remains only to be said that Alvarez & Marsal is extremely proud to have had the privilege to lead the biggest and most complex bankruptcy through such a successful and consensual

resolution, and for the opportunity to work with the remarkable team consisting of Lehman employees and the estates' other professionals.

141.    I declare under penalty of perjury that, to the best of my knowledge, and after reasonable inquiry, the foregoing is true and correct.

Dated:  June 29, 2012                                        /s/ John K. Suckow
                                                                        John K. Suckow

## Exhibit B

## Retention Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                    :
In re                                               :      Chapter 11 Case No.
                                                    :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,            :      08-13555 (JMP)
                                                    :
              Debtors.                              :      **(Jointly Administered)**
                                                    :
                                                    :
-------------------------------------------------------------------x

### FINAL ORDER GRANTING DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE SEEKING AUTHORIZATION TO (A) RETAIN ALVAREZ & MARSAL NORTH AMERICA, LLC TO PROVIDE THE DEBTORS A CHIEF RESTRUCTURING OFFICER AND ADDITIONAL PERSONNEL, AND (B) TO APPOINT THE CHIEF RESTRUCTURING OFFICER, *NUNC PRO TUNC* TO THE COMMENCEMENT DATE

Upon the motion dated October 7, 2008 (the "Motion"), of Lehman Brothers Holdings

Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases (the "Chapter

11 Cases"), as debtors and debtors-in-possession (collectively, the "Debtors"), pursuant to

sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") for

authorization to employ and retain Bryan P. Marsal as Chief Restructuring Officer (the "CRO")

along with such additional personnel of Alvarez & Marsal North America, LLC ("A&M") and

its wholly owned subsidiaries, agents, affiliates (all of which are owned by Alvarez & Marsal

North America, LLC's parent company and employees), and independent contractors as are

necessary to assist the CRO in the performance of his duties, pursuant to that agreement dated

September 15, 2008 among the Debtors and A&M, including that certain indemnification

agreement between Debtors and A&M and incorporated by reference therein (together, the

"Engagement Letter"), all as more fully described in the Motion; and the Official Committee of

Unsecured Creditors and the Office of the United States Trustee having raised informally certain

objections; and the Debtors having addressed such objections; and hearings having been held to

consider the relief requested in the Motion on an interim and final basis; and the Court having

entered an interim order on October 20, 2008, granting the relief requested in the Motion on an

interim basis [Docket No. 1138]; and upon consideration of (i) the Declaration of Bryan P.

Marsal, filed October 8, 2008, and annexed as Exhibit B to the Motion [Docket No. 760], (ii) the

Supplemental Declaration of Bryan P. Marsal, filed November 4, 2008 (the "Supplemental

Declaration") [Docket No. 1366], and (iii) the Second Supplemental Declaration of Bryan P.

Marsal, filed November 17, 2008 (the "Second Supplemental Declaration") [Docket No. 1559];

and the Court having jurisdiction to consider the Motion and the relief requested therein in

accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to

Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title

11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided in accordance with the procedures set forth in the order entered

September 22, 2008, governing case management and administrative procedures [Docket No.

285]; and it appearing that no other or further notice need be provided; and it appearing that

A&M neither holds nor represents any interest adverse to the Debtors' estates; and it appearing

that A&M is "disinterested," as that term is defined in section 101(14) of the Bankruptcy Code;

and the Court having found and determined that the relief sought in the Motion is in the best

interests of the Debtors, their estates and creditors, and all parties in interest and that the legal

and factual bases set forth in the Motion establish just cause for the relief granted herein; and

after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, in accordance with section 363 of the Bankruptcy Code, the

Debtors are authorized to enter into the Engagement Letter, *nunc pro tunc* to September 15,

2008; and it is further

ORDERED that the terms of the Engagement Letter, including without limitation,

the fee provisions and the indemnification provisions, are reasonable terms and conditions of

employment and are approved; *provided that*, the Debtors' indemnification obligations shall be

limited as set forth in the Supplemental Declaration; and it is further

ORDERED that, except with respect to the Incentive Fee (as defined below),

payment of which shall be made as provided below, the Debtors are authorized to pay A&M in

such amounts and at such times as is provided in the Engagement Letter without further order of

this Court; and it is further

ORDERED that, except with respect to the Incentive Fee (as defined below),

A&M will not be required to submit fee applications pursuant to sections 330 and 331 of the

Bankruptcy Code; rather (i) A&M shall file with the Court and serve upon all parties entitled to

receive notice in these cases, quarterly reports of compensation earned and expenses incurred

(the "Quarterly Compensation Reports"), and parties in interest shall have the right to object to

fees and/or expenses paid within ten (10) days of the filing of the Quarterly Compensation

Reports, and (ii) if a timely objection is filed to any fees and/or expenses listed in a Quarterly

Compensation Report, the Debtors or A&M shall schedule a hearing with the Court with respect

to such fees and/or expenses; and it is further

ORDERED that the Debtors, and any successors thereof, shall pay and distribute

to A&M certain incentive compensation (the "Incentive Fee") that: (i) shall be comprised of an

"Asset Management Incentive Fee" and a "Claims Management Incentive Fee," as those terms

are described in the Second Supplemental Declaration; (ii) the amount and manner of payment of

which shall be determined in accordance with the terms set forth in the Second Supplemental

Declaration; and (iii) the allowance of which shall be based up an application for allowance (a)

served in accordance with the Case Management Order on not less than fourteen (14) days'

notice and (b) subject to objection by any party in interest; and (iv) shall be subject, (a) in the

case of the "Claims Management Incentive Fee" to a determination to be made by the Court at

the conclusion of the Chapter 11 Cases that A&M has made a substantial contribution to the

management and mitigation of the claims against the estates; and (b) in the case of both the

"Asset Management Incentive Fee" and the "Claims Management Incentive Fee," to a

reasonableness standard consistent with section 330 of the Bankruptcy Code; and it is further

ORDERED that notwithstanding any applicability of Bankruptcy Rule 6004(h),

the terms and conditions of this Order shall be immediately effective and enforceable upon its

entry; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good

and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) are

waived; and it is further

ORDERED that this Court will retain jurisdiction to construe and enforce the

terms of the Motion, the Engagement Letter, and this Order.

Dated:  New York, New York
        December 17, 2008

_s/ James M. Peck_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit C


**Engagement Letter**

ALVAREZ & MARSAL

600 Lexington Avenue, 6th Floor, New York, NY 10022
Phone: 212.759.4433  Fax: 212.759.5532
www.alvarezandmarsal.com

September 15, 2008

Lehman Brothers Holdings, Inc.
745 Seventh Avenue
New York, NY 10019

Dear Sir/Madam:

This letter confirms and sets forth the terms and conditions, subject to the approval of the Bankruptcy Court, of the engagement between Alvarez & Marsal North America, LLC ("A&M") and Lehman Brothers Holdings, Inc. (the "Company"), including the scope of the services to be performed and the basis of compensation for those services. Upon execution of this letter by each of the parties below and receipt of the retainer described below, this letter will constitute an agreement between the Company and A&M.

1.    Description of Services

    a.    Personnel. In connection with this engagement, A&M shall make available to the Company and its subsidiaries:

        (i)    Bryan P. Marsal to serve as the Chief Restructuring Officer (the "CRO"); and

        (ii)    upon the mutual agreement of A&M and the Board of Directors of the Company (the "Board"), such additional personnel (who may be employees of affiliates of A&M which affiliates are wholly-owned by A&M's parent company and employees) as are necessary to assist in the performance of the duties set forth in clause 1.b below (the "Additional Personnel"). Up to two of such Additional Personnel shall be designated by the Company as executive officers (the "Additional Officers").

Lehman Brothers Holdings, Inc.
September 15, 2008
Page 2

b.    Duties.

(i)    The CRO, together with any Additional Personnel, in cooperation with the Chief Executive Officer of the Company (the "CEO"), shall perform a financial review of the Company, including but not limited to a review and assessment of financial information that has been, and that will be, provided by the Company to its creditors, including without limitation its short and long-term projected cash flows;

(ii)    The CRO and any Additional Personnel shall assist in asset sales, the identification of cost reduction and operations improvement opportunities;

(iii)    The CRO and any Additional Personnel shall assist the CEO in developing for the Board's review possible restructuring plans or strategic alternatives for maximizing the enterprise value of the Company's various business lines;

(iv)    The CRO shall serve as the principal contact with the Company's creditors with respect to the Company's financial and operational matters; and

(v)    The CRO and any Additional Personnel shall perform such other services in connection with the restructuring process as reasonably requested or directed by the Board, the CEO, and other authorized Company personnel.

c.    Reporting. The CRO and any Additional Personnel shall report to the CEO and to the Board.

d.    Employment by A&M. The CRO and any Additional Personnel will continue to be employed by A&M and while rendering services to the Company will continue to work with other personnel at A&M in connection with other unrelated matters, which will not unduly interfere with services pursuant to this engagement. With respect to the Company, however, the CRO and any Additional Officers shall operate under the direction of the Board and A&M shall have no liability to the Company for any acts or omissions of such persons other than caused by their gross negligence or willful misconduct. The CRO shall not undertake

Lehman Brothers Holdings, Inc.
September 15, 2008
Page 3

another client engagement for six (6) months from the date hereof.
To the extent required to provide the services hereunder, the
Additional Officers will devote all of their business time to the
business and affairs of the company but it will not be a breach of
the foregoing for them to attend to administrative matters of A&M.

e.    Projections; Reliance; Limitation of Duties.  You understand that
the services to be rendered by the CRO and any Additional
Personnel may include the preparation of projections and other
forward-looking statements, and that numerous factors can affect
the actual results of the Company's operations, which may
materially and adversely differ from those projections and other
forward-looking statements.   In addition, the CRO and any
Additional Personnel will be relying on information provided by
other members of the Company's management in the preparation
of those projections and other forward-looking statements.  Neither
the CRO, any Additional Personnel nor A&M makes any
representation or guarantee that an appropriate restructuring
proposal or strategic alternative can be formulated for the
Company, that any restructuring proposal or strategic alternative
presented to the Board will be more successful than all other
possible restructuring proposals or strategic alternatives, that
restructuring is the best course of action for the Company or, if
formulated, that any proposed restructuring plan or strategic
alternative will be accepted by any of the Company's creditors,
shareholders and other constituents.  Further, neither the CRO, and
any Additional Personnel nor A&M assumes responsibility for the
selection of any restructuring proposal or strategic alternative that
any such officer assists in formulating and presenting to the Board,
and the CRO and any Additional Personnel shall be responsible for
implementation only of the proposal or alternative approved by the
Board and only to the extent and in the manner authorized and
directed by the Board.

Lehman Brothers Holdings, Inc.
September 15, 2008
Page 4

2. Compensation

    a.    A&M will be paid by the Company for the services of the CRO and any Additional Personnel at the following hourly billing rates. The hourly billing rate for the CRO is $850. The current hourly billing rates for other A&M personnel, based on the position held by such A&M personnel in A&M, are:

| | |
|---|---|
| i. Managing Director | $550 - 850 |
| ii. Director | $450 - 600 |
| iii. Associate | $300 - 450 |
| iv. Analyst | $175 - 300 |

    Such rates shall be subject to adjustment annually at such time as A&M adjusts its rates generally.

    b.    In addition, A&M will be reimbursed by the Company for the reasonable out-of-pocket expenses of the CRO and any Additional Personnel, and if applicable, other A&M personnel, incurred in connection with this assignment, such as travel, lodging, duplications, computer research, messenger and telephone charges. In addition, A&M shall be reimbursed by the Company for the reasonable fees and expenses of its outside counsel incurred in connection with the preparation, negotiation, enforcement and approval of this Agreement. All fees and expenses due to A&M will be billed on a monthly basis or, at A&M's discretion, more frequently.

    c.    The Company shall promptly remit to A&M a retainer in the amount of $2,500,000, which shall be credited against any amounts due at the termination of this engagement and returned upon the satisfaction of all obligations hereunder.

    d.    The Company and A&M recognize that it is appropriate that A&M receive incentive compensation for its services hereunder, in addition to the compensation set forth above. To establish such incentive compensation (the "Incentive Fee"), A&M and the Company will seek to reach agreement within ninety (90) days from the date hereof on the amount of such Incentive Fee and the terms on which it shall be payable.

Lehman Brothers Holdings, Inc.
September 15, 2008
Page 5

3.      Term

The engagement will commence as of the date hereof and may be
terminated by either party without cause by giving 30 days' written notice
to the other party. A&M normally does not withdraw from an engagement
unless the Company misrepresents or fails to disclose material facts, fails
to pay fees or expenses, or makes it unethical or unreasonably difficult for
A&M to continue to represent the Company, or unless other just cause
exists. After notice of termination by the Company, A&M will provide
services as reasonably requested by the Company in connection with the
restructuring process for up to thirty (30) days. In the event of any such
termination, any fees and expenses due to A&M shall be remitted
promptly (including fees and expenses that accrued prior to but were
invoiced subsequent to such termination). If the Company terminates this
engagement without Cause or if A&M terminates this engagement for
Good Reason, A&M shall also be entitled to receive the Incentive Fee
upon the occurrence of the event to be agreed upon if such event occurs
within nine (9) months of the termination.    The Company may
immediately terminate A&M's services hereunder at any time for Cause
by giving written notice to A&M.    Upon any such termination, the
Company shall be relieved of all of its payment obligations under this
Agreement, except for the payment of fees and expenses through the
effective date of termination (including fees and expenses that accrued
prior to but were invoiced subsequent to such termination) and its
obligations under paragraphs 7 and 8. For purposes of this Agreement,
"Cause" shall mean if (i) the CRO or any of the Additional Personnel is
convicted of, admits guilt in a written document filed with a court of
competent jurisdiction to, or enters a plea of nolo contendere to, an
allegation of fraud, embezzlement, misappropriation or any felony; (ii) the
CRO or any of the Additional Personnel willfully disobeys a lawful
direction of the Board; or (iii) a material breach of any of A&M's or the
CRO or any of the Additional Personnel material obligations under this
Agreement which is not cured within 30 days of the Company's written
notice thereof to A&M describing in reasonable detail the nature of the
alleged breach.    For purposes of this Agreement, termination for "Good
Reason" shall mean either its resignation caused by a breach by the
Company of any of its material obligations under this Agreement that is
not cured within 30 days of A&M having given written notice of such
breach to the Company describing in reasonable detail the nature of the
alleged breach.

Lehman Brothers Holdings, Inc.
September 15, 2008
Page 6

4.     No Audit, Duty to Update.

It is understood that the CRO, any Additional Personnel and A&M are not
being requested to perform an audit, review or compilation, or any other
type of financial statement reporting engagement that is subject to the
rules of the AICPA, SEC or other state or national professional or
regulatory body.  They are entitled to rely on the accuracy and validity of
the data disclosed to them or supplied to them by employees and
representatives of the Company.  The CRO, any Additional Personnel and
A&M are under no obligation to update data submitted to them or review
any other areas unless specifically requested by the Board to do so.

5.     No Third Party Beneficiary.

The Company acknowledges that all advice (written or oral) given by
A&M to the Company in connection with this engagement is intended
solely for the benefit and use of the Company (limited to its Board and
management) in considering the matters to which this engagement relates.
The Company agrees that no such advice shall be used for any other
purpose or reproduced, disseminated, quoted or referred to at any time in
any manner or for any purpose other than accomplishing the tasks referred
to herein without A&M's prior approval (which shall not be unreasonably
withheld), except to Company counsel or as required by law.

6.     Conflicts.

A&M is not currently aware of any relationship that would create a
conflict of interest with the Company or those parties-in-interest of which
you have made us aware.  Because A&M is a consulting firm that serves
clients on an international basis in numerous cases, both in and out of
court, it is possible that A&M may have rendered or will render services to
or have business associations with other entities or people which had or
have or may have relationships with the Company, including creditors of
the Company.  In the event you accept the terms of this engagement,
A&M will not represent, and A&M has not represented, the interests of
any such entities or people in connection with this matter. Each of the
Companies acknowledges and agrees that the services being provided
hereunder are being provided on behalf of each of them and each of them
hereby waives any and all conflicts of interest that may arise on account of
the services being provided on behalf of any other Company. Each
Company represents that it has taken all corporate action necessary and is
authorized to waive such potential conflicts of interest.

Lehman Brothers Holdings, Inc.
September 15, 2008
Page 7

7.    Confidentiality / Non-Solicitation.

The CRO, and Additional Personnel and A&M shall keep as confidential all non-public information received from the Company in conjunction with this engagement, except (i) as requested by the Company or its legal counsel; (ii) as required by legal proceedings or (iii) as reasonably required in the performance of this engagement. All obligations as to non-disclosure shall cease as to any part of such information to the extent that such information is or becomes public other than as a result of a breach of this provision. Except as specifically provided for in this letter, the Company on behalf of itself and its subsidiaries and affiliates and any person which may acquire all or substantially all of its assets agrees that, until two (2) years subsequent to the termination of this engagement, it will not solicit, recruit, hire or otherwise engage any employee of A&M who worked on this engagement while employed by A&M ("Solicited Person"). Should the Company or any of its subsidiaries or affiliates or any person who acquires all or substantially all of its assets extend an offer of employment to or otherwise engage any Solicited Person and should such offer be accepted, A&M shall be entitled to a fee from the party extending such offer equal to the Solicited Person's hourly client billing rate at the time of the offer multiplied by 4,000 hours for a Managing Director, 3,000 hours for a Senior Director and 2,000 hours for any other A&M employee. The fee shall be payable at the time of the Solicited Person's acceptance of employment or engagement.

8.    Indemnification.

The Company shall indemnify the CRO and all Additional Personnel to the same extent as the most favorable indemnification it extends to its officers or directors, whether under the Company's bylaws, its certificate of incorporation, by contract or otherwise, and no reduction or termination in any of the benefits provided under any such indemnities shall affect the benefits provided to the CRO or Additional Personnel. The Company shall use its reasonable best efforts to cover the CRO and each Additional Officer under the Company's existing director and officer liability insurance policy. If such insurance is obtained, a Certificate of Insurance evidencing such coverage shall be furnished to A&M and the Company shall give thirty (30) days' prior written notice to A&M of cancellation, non-renewal, or material change in coverage, scope, or amount of such director and officer liability policy. If such insurance is obtained, the Company shall also maintain such insurance coverage for the CRO and

Lehman Brothers Holdings, Inc.
September 15, 2008
Page 8

each Additional Officer for a period of not less than two years following the date of the termination of such officer's services hereunder. The provisions of this section 8 are in the nature of contractual obligations and no change in applicable law or the Company's charter, bylaws or other organizational documents or policies shall affect the CRO's or any Additional Officer's rights hereunder. The attached indemnity provisions are incorporated herein and the termination of this agreement or the engagement shall not affect those provisions, which shall survive termination.

9.      Miscellaneous.

This Agreement shall (together with the attached indemnity provisions be: (a) governed and construed in accordance with the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflict of laws thereof; (b) incorporates the entire understanding of the parties with respect to the subject matter thereof; and (c) may not be amended or modified except in writing executed by each of the signatories hereto.  The Company and A&M agree to waive trial by jury in any action, proceeding or counterclaim brought by or on behalf of the parties hereto with respect to any matter relating to or arising out of the performance or non-performance of the Company or A&M hereunder. The Company and A&M agree that the Bankruptcy Court having jurisdiction over the Company's Chapter 11 case (or any case into which it may be converted) shall have exclusive jurisdiction over any and all matters arising under or in connection with their obligations hereunder. Notwithstanding anything herein to the contrary, A&M may reference or list the Company's name and/or a general description of the services in A&M's marketing materials, including, without limitation, on A&M's website.

The next page is the signature page.

Lehman Brothers Holdings, Inc.
September 15, 2008
Page 9

If the foregoing is acceptable to you, kindly sign the enclosed copy to acknowledge your agreement with its terms.

Very truly yours,

Alvarez & Marsal North America, LLC

By: _____
    Bryan P. Marsal
    Managing Director

Accepted and Agreed:

Lehman Brothers Holdings, Inc.

By: _____
    Name: STEVEN BERKENFELD
    Title: VICE PRESIDENT

## INDEMNIFICATION AGREEMENT

This indemnity is made part of an agreement, dated September 15, 2008 (which together with any renewals, modifications or extensions thereof, is herein referred to as the "Agreement") by and between Alvarez & Marsal North America, LLC ("A&M") and Lehman Brothers Holdings, Inc. (the "Company"), for services to be rendered to the Company by A&M.

A.    The Company agrees to indemnify and hold harmless each of A&M, its affiliates and their respective shareholders, members, managers, employees, agents, representatives and subcontractors (each, an "Indemnified Party" and collectively, the "Indemnified Parties") against any and all losses, claims, damages, liabilities, penalties, obligations and expenses, including the costs for counsel or others (including employees of A&M, based on their then current hourly billing rates) in investigating, preparing or defending any action or claim, whether or not in connection with litigation in which any Indemnified Party is a party, or enforcing the Agreement (including these indemnity provisions), as and when incurred, caused by, relating to, based upon or arising out of (directly or indirectly) the Indemnified Parties' acceptance of or the performance or nonperformance of their obligations under the Agreement; provided, however, such indemnity shall not apply to any such loss, claim, damage, liability or expense to the extent it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from such Indemnified Party's gross negligence or willful misconduct. The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with the engagement of A&M, except to the extent that any such liability for losses, claims, damages, liabilities or expenses are found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from such Indemnified Party's gross negligence or willful misconduct. The Company further agrees that it will not, without the prior consent of an Indemnified Party, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which such Indemnified Party seeks indemnification hereunder (whether or not such Indemnified Party is an actual party to such claim, action, suit or proceedings) unless such settlement, compromise or consent includes an unconditional release of such Indemnified Party from all liabilities arising out of such claim, action, suit or proceeding.

B.    These indemnification provisions shall be in addition to any liability which the Company may otherwise have to the Indemnified Parties. In the event that, at any time whether before or after termination of the engagement or the Agreement, as a result of or in connection with the Agreement or A&M's and its personnel's role under the Agreement, A&M or any Indemnified Party is required to produce any of its personnel (including former employees) for examination, deposition or other written, recorded or oral presentation, or A&M or any of its personnel (including former employees) or any other Indemnified Party is required to produce or otherwise review, compile, submit, duplicate, search for, organize or report on any material within such Indemnified Party's possession or control pursuant to a subpoena or other legal (including administrative) process, the Company will reimburse the Indemnified Party for its out of pocket

1

expenses, including the reasonable fees and expenses of its counsel, and will compensate the Indemnified Party for the time expended by its personnel based on such personnel's then current hourly rate.

C.    If any action, proceeding or investigation is commenced to which any Indemnified Party proposes to demand indemnification hereunder, such Indemnified Party will notify the Company with reasonable promptness; provided, however, that any failure by such Indemnified Party to notify the Company will not relieve the Company from its obligations hereunder, except to the extent that such failure shall have actually prejudiced the defense of such action. The Company shall promptly pay expenses reasonably incurred by any Indemnified Party in defending, participating in, or settling any action, proceeding or investigation in which such Indemnified Party is a party or is threatened to be made a party or otherwise is participating in by reason of the engagement under the Agreement, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Indemnified Party hereby undertakes, and the Company hereby accepts its undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such Indemnified Party is not entitled to be indemnified therefor. If any such action, proceeding or investigation in which an Indemnified Party is a party is also against the Company, the Company may, in lieu of advancing the expenses of separate counsel for such Indemnified Party, provide such Indemnified Party with legal representation by the same counsel who represents the Company, provided such counsel is reasonably satisfactory to such Indemnified Party, at no cost to such Indemnified Party; provided, however, that if such counsel or counsel to the Indemnified Party shall determine that due to the existence of actual or potential conflicts of interest between such Indemnified Party and the Company such counsel is unable to represent both the Indemnified Party and the Company, then the Indemnified Party shall be entitled to use separate counsel of its own choice, and the Company shall promptly advance its reasonable expenses of such separate counsel upon submission of invoices therefor. Nothing herein shall prevent an Indemnified Party from using separate counsel of its own choice at its own expense. The Company will be liable for any settlement of any claim against an Indemnified Party made with the Company's written consent, which consent shall not be unreasonably withheld.

D.    In order to provide for just and equitable contribution if a claim for indemnification pursuant to these indemnification provisions is made but it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) that such indemnification may not be enforced in such case, even though the express provisions hereof provide for indemnification, then the relative fault of the Company, on the one hand, and the Indemnified Parties, on the other hand, in connection with the statements, acts or omissions which resulted in the losses, claims, damages, liabilities and costs giving rise to the indemnification claim and other relevant equitable considerations shall be considered; and further provided that in no event will the Indemnified Parties' aggregate contribution for all losses, claims, damages, liabilities and expenses with respect to which contribution is available hereunder exceed the amount of fees actually received by the Indemnified Parties pursuant to the Agreement. No person found liable for a fraudulent misrepresentation shall be entitled to contribution hereunder from any person who is not also found liable for such fraudulent misrepresentation.

2

E.    The Company and A&M shall seek judicial approval for the assumption of the Agreement or authorization to enter into a new engagement agreement pursuant to either of which A&M would continue to be engaged by the Company, the Company shall promptly pay expenses reasonably incurred by the Indemnified Parties, including attorneys' fees and expenses, in connection with any motion, action or claim made either in support of or in opposition to any such retention or authorization, whether in advance of or following any judicial disposition of such motion, action or claim, promptly upon submission of invoices therefor and regardless of whether such retention or authorization is approved by any court.  The Company will also promptly pay the Indemnified Parties for any expenses reasonably incurred by them, including attorneys' fees and expenses, in seeking payment of all amounts owed it under the Agreement (or any new engagement agreement) whether through submission of a fee application or in any other manner, without offset, recoupment or counterclaim, whether as a secured claim, an administrative expense claim, an unsecured claim, a prepetition claim or a postpetition claim.

F.    The rights provided herein shall not be deemed exclusive of any other rights to which the Indemnified Parties may be entitled under the certificate of incorporation or bylaws of the Company, any other agreements, any vote of stockholders or disinterested directors of the Company, any applicable law or otherwise.

LEHMAN BROTHERS HOLDINGS,  INC.    ALVAREZ & MARSAL NORTH AMERICA, LLC

By: _____        By: _____
    Name: STEVEN BERKENFELD                Bryan P. Marsal, Managing Director
    Title: VICE PRESIDENT

3

## Exhibit D

**Second Supplemental Declaration**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x
                                        :

In re                             :         Chapter 11 Case No.
                                          :

LEHMAN BROTHERS HOLDINGS INC., *et al.*,     :         08-13555 (JMP)
                                          :

                       Debtors.       :         (Jointly Administered)
                                          :
                                          :
---------------------------------------------------------------------x

**NOTICE OF SECOND SUPPLEMENTAL DECLARATION OF BRYAN P. MARSAL IN
SUPPORT OF DEBTORS' MOTION PURSUANT TO
SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE FOR FINAL ORDER
AUTHORIZING THE DEBTORS TO (A) RETAIN ALVAREZ & MARSAL NORTH
AMERICA, LLC TO PROVIDE THE DEBTORS
A CHIEF RESTRUCTURING OFFICER AND ADDITIONAL
PERSONNEL, AND (B) TO APPOINT THE CHIEF RESTRUCTURING
OFFICER, *NUNC PRO TUNC* TO THE COMMENCEMENT DATE**

           **PLEASE TAKE NOTICE** that, on November 17, 2008, Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors in possession (together, the "Debtors") filed the attached Second

Supplemental Declaration of Bryan P. Marsal in Support of the Debtors' Motion Pursuant to

Sections 105(a) and 363(b) of the Bankruptcy Code for Final Order Authorizing the Debtors to

(A) Retain Alvarez & Marsal North America, LLC to Provide the Debtors a Chief Restructuring

Officers and Additional Personnel, and (B) to Appoint the Chief Restructuring Officer, *Nunc Pro Tunc* to the Commencement Date.

Dated: November 17, 2008
New York, New York

/s/ *Richard P. Krasnow*
Richard P. Krasnow, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                 :

In re                               :       Chapter 11 Case No.
                                   :

LEHMAN BROTHERS HOLDINGS INC., *et al.*,    :       08-13555 (JMP)
                                   :

           Debtors.                   :       (Jointly Administered)
                                   :

                                   :
------------------------------------------------------------------x

### SECOND SUPPLEMENTAL DECLARATION OF BRYAN P. MARSAL IN SUPPORT OF DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE FOR FINAL ORDER AUTHORIZING THE DEBTORS TO (A) RETAIN ALVAREZ & MARSAL NORTH AMERICA, LLC TO PROVIDE THE DEBTORS A CHIEF RESTRUCTURING OFFICER AND ADDITIONAL PERSONNEL, AND (B) TO APPOINT THE CHIEF RESTRUCTURING OFFICER, *NUNC PRO TUNC* TO THE COMMENCEMENT DATE

Bryan P. Marsal makes this declaration under 28 U.S.C. § 1746, and states:

1.       I am a Managing Director with Alvarez & Marsal North America, LLC (together with its wholly owned subsidiaries, affiliates (all of which are owned by Alvarez & Marsal North America, LLC's parent company and employees), agents, independent contractors and employees, "A&M"), a restructuring advisory services firm with numerous offices throughout the world. I submit this second supplement (the "Second Supplemental Declaration") to the original declaration (the "Original Declaration") and the supplemental declaration (the "Supplemental Declaration") that I submitted in connection with the motion (the "Motion")[1] of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors") for an order authorizing the employment of A&M as restructuring managers under the terms and conditions

---

[1]      Capitalized terms that are used but not defined in this Second Supplemental Declaration have the meanings ascribed to them in the Motion.

set forth in the Motion.  Except as otherwise noted, I have personal knowledge of the matters set forth herein.

## A&M's Incentive Fee

2.       A&M has many important roles in these chapter 11 cases.  In furtherance of its duties, A&M will manage property of the estates in a way that maximizes the distributable cash or other value to creditors ("Asset Management").  A&M will also oversee the administration of claims filed against the estates so that such claims are appropriately minimized ("Claims Management").  With respect to both Asset Management and Claims Management, A&M serves as a fiduciary to ensure that the Debtors' separate estates are administered in way that is consistent with applicable law for the benefit of all creditors.  Accordingly, cash will be retained and tracked by separate legal entity.  Expenses for the administration of the estates will be allocated on a fair and appropriate basis with transparency to all.

3.       As the manager of the chapter 11 process for the Debtors, and as disclosed in the Original Declaration and the Supplemental Declaration, A&M will seek from the Debtors payment of, among other things, certain incentive compensation (the "Incentive Fee") for the results it obtains in fulfilling its Asset Management and Claims Management functions.  I am submitting this Second Supplemental Declaration for the purpose of describing the elements of the Incentive Fee.

## Incentive Fee Terms

4.       The Incentive Fee has two components, both of which are generally described below:  (i) the Asset Management Incentive Fee; and (ii) the Claims Management Incentive Fee. The aggregate amount of both components of the Incentive Fee will be capped at 25% of the hourly professional fees paid to A&M over the duration of this engagement.

*Asset Management Incentive Fee*

5.      A portion of the Incentive Fee will be determined by reference to the value of Unsecured Distributions (as defined below).  The Debtors, and any successors thereof, shall pay and distribute to A&M an Incentive Fee equal to 0.175% (17.5 bps) of all Unsecured Distributions greater than $15 billion.

6.      As used herein, the term "Unsecured Distributions" shall mean any consideration or distribution of any kind or in any form whatsoever paid to, or received or retained by, any unsecured creditor of any Debtor or non-debtor affiliate of a Debtor ("Non-Debtor"), or to any reserve or escrow for the benefit of any allowed, disputed or contingent unsecured claim against any Debtor or Non-Debtor, whether distributed pursuant to a plan of reorganization, a plan of liquidation, as an interim or other distribution during the administration of these chapter 11 cases, or as otherwise distributed following the termination, dismissal or conversion of all or any of these chapter 11 cases to one or more cases under chapter 7 of the Bankruptcy Code or otherwise.

7.      The Incentive Fee for Asset Management shall be payable in installments. Accordingly, an Incentive Fee shall be paid as and when each Unsecured Distribution is made to any unsecured creditor of the Debtors or Non-Debtors.  The Incentive Fee for Asset Management shall be paid to A&M in the same consideration to be received by such creditor(s) (including, without limitation, cash, notes, rights, options, trust certificates, equity or other contractual rights or property) or, at the option of the Debtors and with the consent of the Creditors' Committee, in cash.

8.      For purposes of determining the amount of cash to be paid to A&M when the applicable Unsecured Distribution consists of non-cash consideration, such non-cash consideration shall be valued as follows:

>   (a) if the non-cash consideration includes publicly-traded debt, equity or commodity securities, the value of such securities shall be calculated based on the weighted average of the last sale or closing price during the ten trading days immediately prior to the relevant distribution date;

>   (b) if the value of the non-cash consideration cannot be determined under clause (a), but the value is disclosed in a court-approved disclosure statement for any plan of reorganization or plan of liquidation, or any other court-approved disclosure to creditors of the Debtors, the value of the non-cash consideration shall be equal to the value disclosed in such disclosure statement;

>   or (c) if the non-cash consideration cannot be valued under clauses (a) or (b), then A&M will prepare a valuation thereof for the purposes of calculating the Incentive Fee; *provided however*, that if A&M prepares a valuation and the Creditors' Committee and A&M are unable to agree regarding the amount of such valuation, then the Bankruptcy Court will determine the value of the non-cash consideration and the Bankruptcy Court's decision will be final and binding on A&M and all parties in interest.

### *Claims Management Incentive Fee*

9.      The Debtors, and any successors thereof, shall pay and distribute to A&M an Incentive Fee in an amount to be determined at the conclusion of the case based on A&M's substantial contribution to the management and mitigation of claims against the estates.

### **Final Application for Allowance**

10.      If Incentive Fees become payable or are otherwise requested in accordance with the terms described above, A&M will submit an application for their allowance, which application shall be subject to a reasonableness standard consistent with section 330 of the Bankruptcy Code.

I declare under penalty of perjury that, to the best of my knowledge, and after reasonable inquiry, the foregoing is true and correct.

Dated this 17th day of November 2008

By:/s/ *Bryan P. Marsal*
       Bryan P. Marsal
       Managing Director

## **Schedule 1**

## ASSET MANAGEMENT FEE CALCULATIONS

*Qualifying Initial Distributions - Alvarez & Marsal Asset Management Incentive Fee*

($ millions)

| Debtor | Qualifying Distributions [1,2] | | |
| --- | --- | --- | --- |
| | Paid | Reserved | Total |
| Lehman Brothers Holdings Inc. | $  9,582.54 | $  5,307.47 | $  14,890.00 |
| Lehman Brothers Special Financing Inc. | 3,428.16 | 1,821.60 | 5,249.76 |
| Lehman Brothers Commodity Services Inc. | 856.69 | 394.64 | 1,251.34 |
| Lehman Commercial Paper Inc. | 567.53 | 49.92 | 617.45 |
| Lehman Brothers Commercial Corporation | 93.40 | 322.62 | 416.01 |
| Lehman Brothers OTC Derivatives Inc. | 77.90 | 138.07 | 215.98 |
| Lehman Brothers Financial Products Inc. | 54.28 | 217.29 | 271.57 |
| Lehman Brothers Derivative Products Inc. | 34.35 | 296.72 | 331.07 |
| Merit LLC | 0.94 | 0.12 | 1.06 |
| BNC Mortgage LLC | 0.01 | 13.96 | 13.96 |
| Structured Asset Securities Corporation | 0.00 | 41.46 | 41.46 |
| CES Aviation LLC | 0.00 | 21.52 | 21.52 |
| CES Aviation V LLC | 0.00 | 2.94 | 2.94 |
| CES Aviation IX LLC | 0.00 | 5.15 | 5.15 |
| LB 745 LLC | 0.00 | 4.05 | 4.05 |
| LB Rose Ranch LLC | - | 0.00 | 0.00 |
| LB 2080 Kalakaua Owners LLC | - | - | - |
| PAMI Statler Arms LLC | - | 0.02 | 0.02 |
| East Dover Limited | 0.00 | 11.54 | 11.54 |
| LUXCO | - | - | - |
| Lehman Scottish Finance LP | - | 0.05 | 0.05 |
| LB Preferred Somerset LLC | - | - | - |
| LB Somerset LLC | - | - | - |
| **Total** | **$  14,695.80** | **$  8,649.14** | **$  23,344.94** |

| | | | |
| --- | --- | --- | --- |
| **Less Distributions Not Subject to Incentive Fee** | | | **$ (15,000.00)** |
| **Net Distributions Subject to Incentive Fee** | | | **$  8,344.94** |
| **Asset Management Incentive Fee Percentage** | | | **0.175%** |
| **Asset Management Incentive Fee Earned for Initial Distributions** | | | **$      14.60** |

[1] *Includes payments made related to Convenience Claims*

[2] *Intercompany eliminations includes all payments made from Debtors to other Debtors and Controlled Non-Debtors of $7 billion and $0.8 billion, respectively.  It does not include (and therefore does not eliminate) approximately $3.3 billion of payments to Non-Controlled Non-Debtor Affiliates.*

**Schedule 1 B**

Lehman Brothers Holdings, Inc. and its Affiliates

*Estimated Total Qualifying Distributions - Alvarez & Marsal Asset Management Incentive Fee*

($ millions)

| Debtor | Total Distributions | Intercompany Eliminations | Equity Eliminations | Net Qualifying Distributions | Less: Prior Qualifying Distributions | Estimated Remaining Distributions |
|---|---|---|---|---|---|---|
| Lehman Brothers Holdings Inc. | $ 42,569.82 | $ (1,330.38) | $ - | $ 41,239.44 | $ (14,890.00) | $ 26,349.43 |
| Lehman Brothers Special Financing Inc. | 12,257.33 | (4,804.89) | - | 7,452.45 | (5,249.76) | 2,202.69 |
| Lehman Brothers Commodity Services Inc. | 1,814.51 | (598.79) | - | 1,215.72 | (1,251.34) | (35.62) |
| Lehman Commercial Paper Inc. | 14,859.39 | (12,205.12) | - | 2,654.27 | (617.45) | 2,036.82 |
| Lehman Brothers Commercial Corporation | 596.52 | (209.14) | - | 387.38 | (416.01) | (28.63) |
| Lehman Brothers OTC Derivatives Inc. | 349.98 | (52.11) | - | 297.87 | (215.98) | 81.89 |
| Lehman Brothers Financial Products Inc. | 487.72 | (203.35) | (223.45) | 60.92 | (271.57) | (210.64) |
| Lehman Brothers Derivative Products Inc. | 400.40 | (112.84) | (201.32) | 86.25 | (331.07) | (244.82) |
| Merit LLC | 32.48 | (23.94) | - | 8.54 | (1.06) | 7.47 |
| BNC Mortgage LLC | 16.88 | - | (3.19) | 13.69 | (13.96) | (0.27) |
| Structured Asset Securities Corporation | 319.38 | (237.47) | - | 81.91 | (41.46) | 40.44 |
| CES Aviation LLC | 23.55 | (17.68) | (4.85) | 1.02 | (21.52) | (20.50) |
| CES Aviation V LLC | 3.49 | (3.21) | - | 0.28 | (2.94) | (2.65) |
| CES Aviation IX LLC | 5.87 | (5.43) | - | 0.44 | (5.15) | (4.71) |
| LB 745 LLC | 348.04 | (36.47) | (309.76) | 1.81 | (4.05) | (2.24) |
| LB Rose Ranch LLC | 3.69 | - | - | 3.69 | (0.00) | 3.68 |
| LB 2080 Kalakaua Owners LLC | 0.33 | (0.26) | - | 0.07 | - | 0.07 |
| PAMI Statler Arms LLC | - | - | - | - | (0.02) | (0.02) |
| East Dover Limited | 52.08 | (2.70) | (49.37) | 0.01 | (11.54) | (11.54) |
| LUXCO | 95.83 | (95.83) | - | - | - | - |
| Lehman Scottish Finance LP | 1.64 | - | (1.64) | - | (0.05) | (0.05) |
| LB Preferred Somerset LLC | - | - | - | - | - | - |
| LB Somerset LLC | - | - | - | - | - | - |
| | $ 74,238.92 | $ (19,939.60) | $ (793.57) | $ 53,505.74 | $ (23,344.94) | $ 30,160.81 |

| | | |
|---|---|---|
| Asset Management Incentive Fee Percentage | | 0.175% |
| Estimated Remaining Asset Management Incentive Fee Calculation | | $ 52.78 [1] |
| Estimated Total Asset Management Incentive Fee | | $ 67.39 |

[1] *These amounts are estimated based on information currently available to Alvarez & Marsal. The substantial services for which Alvarez & Marsal has earned the Asset Management Incentive Fee were provided prior to the Effective Date. In addition, certain post-Effective Date services are being provided by Alvarez & Marsal in order to facilitate final distributions. The amount of those distributions will enable final calculation of the total Asset Management Incentive Fee, which will be calculated and paid in accordance with the Incentive Fee percentage and the final distribution amount. Therefore, the final Asset Management Incentive Fee may be more or less than the estimates herein.*

## Schedule 2

### CLAIMS MANAGEMENT FEES CALCULATIONS

**Schedule 2**

Lehman Brothers Holdings, Inc. and its Affiliates

*Qualifying Claims Mitigation - Alvarez & Marsal Claims Management Incentive Fee*

($ actual)

| Debtor | Original Claims Filed | Mitigated to Date | Remaining Filed Claims | Expected Future Mitigation | Plan Claims Estimate |
|---|---|---|---|---|---|
| Lehman Brothers Holdings Inc. | $ 974,200,000,000.00 | $ (614,800,000,000.00) | $ 359,400,000,000.00 | $ (85,157,327,314.20) | $ 274,242,672,685.80 |
| Lehman Brothers Special Financing Inc. | 242,588,042,573.70 | (184,778,794,605.99) | 57,809,247,967.71 | (9,349,179,906.05) | 48,460,068,061.66 |
| Lehman Brothers Commodity Services Inc. | 9,680,754,211.16 | (4,222,395,786.60) | 5,458,358,424.56 | (1,513,865,556.23) | 3,944,492,868.33 |
| Lehman Commercial Paper Inc. | 48,209,231,819.13 | (14,838,146,728.05) | 33,371,085,091.08 | (2,473,553,923.25) | 30,897,531,167.83 |
| Lehman Brothers Commercial Corporation | 11,059,689,191.14 | (6,583,390,162.66) | 4,476,299,028.48 | (2,607,088,751.65) | 1,869,210,276.83 |
| Lehman Brothers OTC Derivatives Inc. | 7,857,621,155.69 | (4,229,682,502.45) | 3,627,938,653.24 | (2,420,939,046.44) | 1,206,999,606.80 |
| Lehman Brothers Financial Products Inc. | 2,843,117,255.09 | (249,936,558.00) | 2,593,180,697.09 | (2,328,575,190.95) | 264,605,506.14 |
| Lehman Brothers Derivative Products Inc. | 3,117,331,152.90 | (290,708,341.75) | 2,826,622,811.15 | (2,627,537,453.92) | 199,085,357.23 |
| Merit LLC | 335,084,036.96 | 712,744.24 | 335,796,781.20 | (11,970,110.77) | 323,826,670.43 |
| BNC Mortgage LLC | 318,589,607.75 | (181,868,286.09) | 136,721,321.66 | (123,032,644.85) | 13,688,676.81 |
| Structured Asset Securities Corporation | 28,770,520,134.91 | (9,332,077,729.49) | 19,438,442,405.42 | (18,687,846,092.09) | 750,596,313.33 |
| CES Aviation LLC | 5,872,692,874.93 | (5,618,364,389.35) | 254,328,485.58 | (231,256,193.64) | 23,072,291.94 |
| CES Aviation V LLC | 464,906,875.36 | (225,210,180.74) | 239,696,694.62 | (231,423,540.20) | 8,273,154.42 |
| CES Aviation IX LLC | 465,890,894.28 | (225,123,007.16) | 240,767,887.12 | (231,391,644.32) | 9,376,242.80 |
| LB 745 LLC | 504,723,884.22 | (225,158,499.07) | 279,565,385.15 | (231,677,988.69) | 47,887,396.46 |
| LB Rose Ranch LLC | 279,728,707.78 | (180,938,539.20) | 98,790,168.58 | (92,740,605.24) | 6,049,563.34 |
| LB 2080 Kalakaua Owners LLC | 302,220,995.80 | (176,758,717.11) | 125,462,278.69 | (85,053,250.99) | 40,409,027.70 |
| PAMI Statler Arms LLC | 315,201,603.51 | (234,221,425.67) | 80,980,177.84 | 27,778,943.98 | 108,759,121.82 |
| East Dover Limited | 315,820,268.55 | (224,933,717.11) | 90,886,551.44 | (87,455,431.04) | 3,431,120.40 |
| LUXCO | 855,135,554.13 | (176,762,858.11) | 678,372,696.02 | (84,974,556.02) | 593,398,140.00 |
| Lehman Scottish Finance LP | 456,610,865.85 | (224,933,717.11) | 231,677,148.74 | (230,129,692.35) | 1,547,456.39 |
| LB Preferred Somerset LLC | 17,216,667.39 | (7,546,687.10) | 9,669,980.29 | (12,499.90) | 9,657,480.39 |
| LB Somerset LLC | 15,104,409.24 | (7,546,687.10) | 7,557,722.14 | (0.41) | 7,557,721.73 |
| **Total Claims Filed** | $ 1,338,845,234,739.47 | $ (847,033,786,381.67) | $ 491,811,448,357.80 | $ (128,779,252,449.24) | $ 363,032,195,908.56 |
| **Claims Management Incentive Fee Percentages** | | 0.002% | | 0.005% | |
| **Estimated Claims Management Incentive Fee** | | $16.94 million | | $6.44 million [1] | $23.38 million |

[1] *These amounts are estimated based on information currently available to Alvarez & Marsal. The substantial services for which Alvarez & Marsal has earned the Claims Management Incentive Fee were provided prior to the Effective Date. In addition, certain post-Effective Date claims mitigation services are being provided by Alvarez & Marsal. The final amount of additional claims mitigation will enable calculation of the total Claims Management Incentive Fee, which will be calculated and paid in accordance with the Incentive Fee percentages and final mitigation amounts. Therefore, the final Claims Management Incentive Fee may be more or less than the estimates herein.*