**Page 1**

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555 (jmp)

4    Case No. 08-01420 (jmp)(sipa)

5    Hearing re:  Adversary Proceeding 09-01062

6    Hearing re:  Adversary Proceeding 10-02821

7    Hearing re:  Adversary Proceeding 10-02823

8    Hearing re:  Adversary Proceeding 12-01220

9    Hearing re:  Adversary Proceeding 12-01045

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11   In the Matter of:

12

13   LEHMAN BROTHERS HOLDINGS, INC., et al.,

14

15         Debtors.

16

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18    In the Matter of:

19

20   LEHMAN BROTHERS, INC.,

21

22         Debtor.

23

24   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

25

**Page 2**

1                    U.S. Bankruptcy Court

2                    One Bowling Green

3                    New York, New York

4

5

6                    June 13, 2012

7                    10:05 AM

8

9    B E F O R E :

10   HON JAMES M. PECK

11   U.S. BANKRUPTCY JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1   Hearing re:  Debtors' 40th Omnibus Objection to Claims.

2

3   Hearing re:  Second Motion for Order Approving the Trustee's

4   Allocation of Property.

5

6   Hearing re:  Status Conference

7

8   Hearing re:  Status Conference

9

10  Hearing re:  Status Conference

11

12  Hearing re:  Motions to Dismiss

13

14  Hearing re:  Motion to Stay

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Sheri Monroe

Page 4

1  A P P E A R A N C E S :

2  WEIL, GOTSHAL & MANGES, LLP

3       Attorneys for Debtors

4       767 Fifth Avenue

5       New York, NY  10153

6

7  BY:  RICHARD P. KRASNOW, ESQ.

8       ROBERT J. LEMONS, ESQ.

9       MAURICE HORWITZ, ESQ.

10      ZAW WIN, ESQ

11      ELISA R. LEMMER, ESQ.

12      LAUREN ZERBINOPOULOS, ESQ.

13

14  CADWALADER, WICKERSHAM & TAFT, LLP.

15      700 6th Street, NW

16      Washington, DC 20001

17

18  BY:  JOHN H. THOMPSON, ESQ.

19      MARK ELLENBERG, ESQ.

20

21

22

23

24

25

```
 1   HUGHES HUBBARD & REED, LLP
 2        For the SIPA Trustee
 3        One Battery Park Plaza
 4        New York, NY 10004
 5
 6   BY:  DAVID W. WILTENBURG, ESQ.
 7        JAMES B. KOBAK, JR., ESQ.
 8
 9   SECURITIES INVESTOR PROTECTION CORP.
10        805 15th Street, NW
11        Suite 800
12        Washington, DC 20005
13
14   BY:  KENNETH J. CAPUTO, ESQ.
15
16   TROUTMAN SANDERS, LLP
17        The Chrysler Building
18        405 Lexington Avenue
19        New York, NY 10174
20
21   BY:  HOLLACE T. COHEN, ESQ.
22
23
24
25
```

Page 6

1   LOWENSTEIN SANDLER

2        1251 Avenue of the Americas

3        New York, NY  10020

4

5   BY:  MICHAEL S. ETKIN, ESQ.

6

7   BROWN RUDNICK

8        Seven Times Square

9        New York, NY  10036

10

11  BY:  ANDREW DASH, ESQ.

12  DAVIS POLK

13       Attorneys for LBIE

14       450 Lexington Avenue

15       New York, NY  10017

16

17  BY:  JAMES M. MILLERMAN, III, ESQ.

18       TIMOTHY GRAULICH, ESQ.

19       WILLIAM D. POLLAK, ESQ.

20

21  COVINGTON & BURLING, LLP

22       620 8th Avenue

23       New York, NY  10018

24

25  BY:  ROBERT M. HEMM, ESQ.

Page 7

```
 1   LINKLATERS, LLP

 2         1345 Avenue of the Americas

 3         New York, NY  10105

 4

 5   BY:  JAMRES R. WARNOT, JR., ESQ.

 6

 7   GROSS POLOWY ORLANS

 8         900 Merchants Concourse

 9         Suite 412

10         Westbury, NY  11590

11

12   BY:  DENNIS JOSE, ESQ.

13

14   TOMPKINS, MCGUIRE, WACHENFELD & BARRY

15         100 Mulberry Street

16         Suite 5

17         Newark, NJ 07102

18

19   BY:  ANDREW ZACHARDA, ESQ.

20

21

22

23

24

25
```

Page 8

1  MEISTER SEELIG & FEIN, LLP

2        2 Grand Central Tower

3        140 East 45th Street

4        19th Floor

5        New York, NY  10017

6

7  BY:  CHRISTOPHER MAJOR, ESQ.

8        STEPHEN B. MEISTER, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 9

1                    P R O C E E D I N G S

2          THE CLERK:  All rise.

3          THE COURT:  Be seated.  Good morning.

4          MR. HORWITZ:  Good morning, Your Honor.  Maurice

5    Horwitz from Weil, Gotschal & Manges on behalf of Lehman

6    Brothers Holdings, Inc. and certain of its affiliates.

7               The first item on today's agenda is the debtors'

8    40th Omnibus Objection to Claims.  This objection sought to

9    disallow certain claims that were filed after the bar date

10   in violation of this court's July 2nd, 2009 order setting

11   forth the procedures and deadlines for filing proofs of

12   claim in these Chapter 11 cases.

13              Today, LBHI is proceeding as to one claim on the

14   40th Omnibus objection, that is Claim Number 36789, which

15   was filed by West LBAG on October 5th, 2009.

16              The claim was filed 13 days after the September

17   22nd, 2009 bar date, applicable to claims other than those

18   based on Lehman program securities and should be disallowed

19   and expunged as untimely.

20              Your Honor, as this court has recognized in prior

21   decisions, the enforcement of the bar date in these cases is

22   critical.  Under the present circumstances, strict

23   application of the bar date is warranted and West LB's late

24   filed claim should be disallowed.

25              West LB makes, essentially, two arguments for why

1    its claim should be permitted even though it is late, a due

2    process argument and an excusable neglect argument.

3              For excusable neglect, West LB relies primarily

4    on the most important pioneer factor in the Second Circuit,

5    the reason for the delay and the extent to which the delay

6    was in the reasonable control of the claimant.

7              The only evidence submitted by West LB in support

8    of both arguments is the allegation that West LB did not

9    receive actual notice of the bar date.  As we state in our

10   papers, Your Honor, the Second Circuit requires more than a

11   mere denial of receipt to rebut the presumption that notice

12   was received, but the only evidence that West LB has

13   submitted to support its denial of receipt is a misprint in

14   the original affidavit of service that was filed on July

15   10th, 2009 by Hugh Baer (ph) director of client services at

16   Epic Bankruptcy Solutions.

17             The original affidavit erroneously stated that a

18   copy of the bar date order had been delivered to Dusseldorf,

19   Georgia instead of Dusseldorf, Germany.  However, as

20   explained in Mr. Baer's declaration that was filed

21   contemporaneously with LBHI's reply, this error only

22   occurred in the creation of the original affidavit of

23   service.  The error did not occur in the actual mailing of

24   the bar date order and bar date notices.

25             The corrected affidavit of service that was filed

Page 11

1   on June 3rd, 2010 by Mr. Baer indicates that the bar date

2   order and the bar date notices were sent to the correct

3   addresses for creditors located in Dusseldorf, Germany

4   including West LB.

5           With no other evidence to support its denial of

6   receipt, Your Honor, West LB has failed to rebut the

7   presumption that those notices were received.

8           In addition, the corrected affidavit of service is

9   that West LB received actual notice of the bar date in not

10  one, but three of its locations; in Dusseldorf, Germany, in

11  London and in New York.  And that notice of the bar date was

12  served on West LB's counsel of record in these cases.

13          West LB also had constructive notice of the bar

14  date.  As this court is aware notice of the bar date was

15  published in several international newspapers.

16          Furthermore, Your Honor, West LB's own conduct

17  indicates that it knew about the bar date.  It filed three

18  other timely proofs of claim, two of which, Claim Numbers

19  30100 and 30101, were hand delivered on September 22nd,

20  2009.  West LB clearly knew that these claims needed to be

21  actually received on that date as required by the bar date

22  order and it took the necessary steps to insure that they

23  were.

24          The same diligence could have been exercised with

25  respect to Claim Number 36789.  Having been served in three

Page 12

1    different locations and on its counsel of record, West LB

2    cannot credibly argue that it did not receive actual notice

3    of the bar date and that due process prohibits the

4    disallowance of the its claims.

5          Due process requires that notice be reasonably

6    calculated to apprise parties of the pendency of an action.

7    Here, four notices were served in three different cities.

8    And as Mr. Baer states in his declaration, the envelope

9    containing each notice was inscribed with a legend in all

10   capital letters that stated, LEGAL DOCUMENTS ENCLOSED,

11   PLEASE DIRECT TO THE ATTENTION OF ADDRESSEE, PRESIDENT OR

12   LEGAL DEPARTMENT.

13         The service was reasonably calculated and complies

14   with the due process standard set forth in Melane and its

15   progeny (ph).

16         West LB's excusable neglect argument falls short

17   of the pioneer standard for the same reasons.  Even if the

18   bar date order and bar date notices had not been delivered

19   to West LB's Dusseldorf's office in Germany, this court

20   could follow its prior decisions in this case with respect

21   to the late claim of Kesta DePoe (ph), the transcript from

22   that matter is attached to LBHI's reply as Exhibit B.  As

23   well as the Drexel (ph) decision, in which services on

24   Barclay's offices in Connecticut, New York and Australia was

25   found to be sufficient even if notice was not served on

Page 13

1    Barclay's Headquarters in London.

2         The principle in all these matters are the same,

3    it was West LB's obligation and entirely within West LB's

4    control to route any one of the notices served in

5    Dusseldorf, New York or London to the appropriate

6    individuals within its organization.

7         Your Honor, we address each of the pioneer factors

8    in our papers.  I won't go through each of them unless the

9    court wishes for me to elaborate on them.

10        THE COURT:  No need.

11        MR. HORWITZ:  I would just like to briefly note

12   the prejudice argument because it is an important one in

13   these cases.  West LB argues that there's no danger of

14   prejudice because it's situation is unique, as every other

15   creditor has noted.

16        We've heard this argument before and as Your Honor

17   has noted prejudice can't be traced to a single claim, but

18   to the impact that one exception can have on other claims,

19   given the degree of notice that was provided in this case,

20   the impact of an exception would be substantial.

21        THE COURT:  Can you describe to me what the

22   prejudice would be at this point, though.  I mean, one of

23   the unusual aspects of the present contested claim matter is

24   that it's arising so late in the proceeding, I don't know if

25   that was a tactical judgment made by West LB not to file a

Page 14

1    motion seeking permission for the claim to be deemed timely

2    filed way back when or whether or not it was simply neglect

3    or whether there's some other reason.  But the litigation

4    that gave rise to my decision, which is published at 433 BR

5    113 and which has been affirmed relates to a whole series of

6    somewhat comparable late claim issues presented to the court

7    and decided all at once, this is now coming much later in

8    the proceeding, after the initial distribution and after

9    confirmation, obviously.

10           So, can you recount how the Lehman Estate would be

11   prejudice today if I were to allow the West LB claim as a

12   late filed claim?

13           MR. HORWITZ:  Your Honor, if this claim is allowed

14   as -- even though it's late -- even though notice was served

15   in four places, including on counsel of record, other

16   claimants could come forward filing motions seeking to have

17   their claims allowed as timely filed, although they're late,

18   regardless of how many notices the debtors served on these

19   organizations.  And the debtors have creditors -- many other

20   creditors are sophisticated global organizations just like

21   West LB, some more sophisticated than others, but many

22   global organizations.

23           And taking the argument that West LB makes to its

24   conclusion, the debtors could have served West LB in every

25   one of its locations all over the world and without serving

Page 15

1    in Dusseldorf, attention to the legal department, West LB

2    would have the ability to still find claims that had

3    overlooked and file them after the bar date.

4          It's the impact that allowing this late claim

5    would have on other claims that have been filed late, that

6    may still be filed late.

7          THE COURT:  Is there any way to quantify that risk

8    or is that just a theoretical proposition?

9          MR. HORWITZ:  Well, there is a way to -- the

10   debtors can look at how many late claims have been -- how

11   many claims were filed after the bar date by such

12   institutions or just from Germany alone there were over

13   1,000 claims that were filed late.  They are in varying

14   amounts, a lot of them are based on Lehman Program

15   Securities.

16         The amounts could -- and it's not just a dollar

17   amount, it is -- it would be the administrative burden of

18   suddenly having to deal with thousands of late claims.  It's

19   also a prejudice to other creditors.  This court has already

20   expunged claims that were filed untimely by other creditors

21   that are similarly like West LB, have multiple offices, that

22   have internal bureaucracies and need to be able to route

23   notices internally to individual people that deal with the

24   transactions that the debtors were in involved in.  If those

25   claims have already been expunged, they've been prejudiced

Page 16

1    if this claim is now allowed.

2             THE COURT:  Okay.

3             MR. THOMPSON:  Good morning, Your Honor.  John

4    Thompson, Cadwalader, Wickersham & Taft on behalf of West

5    LB.

6             Your Honor, the debtors would have you believe

7    that this matter is about excusal neglect, at least in the

8    first instance, but it's not.  It is about due process.

9             If it's about excusal neglect at all it's about

10   excusal neglect in the alternative as we argue.  And this is

11   because Lehman was required to provide West LB notice of the

12   bar date in Dusseldorf, Germany in accordance with the ISDA

13   (ph) contract and it failed to do so.

14            THE COURT:  Let me stop you there because I know

15   that's what your ISDA agreement provides, are you saying

16   that notice provisions in an ISDA agreement and if that

17   trumps all other appropriate notice and that it provides any

18   party to an ISDA agreement an opportunity to make the same

19   argument you're now making?  Because if that's the argument

20   you're making that's the prejudice to Lehman.

21            MR. THOMPSON:  I'm not arguing that, Your Honor.

22   I'm arguing that West LB in Dusseldorf, Germany was a known

23   creditor, known to the debtors --

24            THE COURT:  But you got notice all over the world.

25            MR. THOMPSON:  Your Honor, there is --

1          THE COURT:  You got notice all over the world and

2     the institution knew about the bar date and filed claims

3     before the bar date.

4          MR. THOMPSON:  Your Honor, there's a difference

5     between receiving notice at the New York branch of West LB.

6          THE COURT:  Why?

7          MR. THOMPSON:  Because the New York branch of West

8     LB has a separate operation and there's a reason -- the

9     specific reason for the notice provision in the contract is

10    that there is a specific and unique operation or a separate

11    operation in West LB, New York then there is in West LB,

12    Germany that is for specific regulatory reasons.  They have

13    specific capital requirements, reserve requirements and,

14    indeed, all of that separateness would result in a separate

15    proceeding not unlike the one -- the proceeding before Your

16    Honor in the LBI case in this court and not impact West LB

17    in Dusseldorf, Germany.

18          THE COURT:  Well, nobody's focused yet on whether

19    or not you simply lost this in Dusseldorf.  Because, to me,

20    and you'll have to respond to this, seems to be a question

21    of fact as to whether notice was actually sent to

22    Dusseldorf.  The fact that the original certificate of

23    service contained the blatant error of Dusseldorf, Georgia

24    and I don't know if that means Republic of Georgia or State

25    of Georgia, but it includes that fairly obvious mistake and

Page 18

1    it has been corrected.

2         Assuming for the sake of this argument that the

3    notice was actually sent to Dusseldorf and that the original

4    certificate of service is simply a distraction to be ignored

5    and you lost it or failed to pay attention to it, how can

6    you possibly prevail?

7         MR. THOMPSON:  That would be a different argument,

8    Your Honor.  It's not one --

9         THE COURT:  I know.  It's a different argument.

10        MR. THOMPSON:  It's not one we're making.

11        THE COURT:  But, how do you make -- what is the

12   argument you're making if I accept as true the corrected

13   certificate of service?

14        MR. THOMPSON:  Well, I mean, I suppose that we

15   could default to a excusal neglect standard with the

16   understanding that at least one of the factors would have

17   been predetermined and that is the reason for the delay.

18   But, I think the problem is with Your Honor's premise in

19   that there is -- if you're accepting the declaration for its

20   conclusory statement, that notwithstanding the fact that the

21   exhibits from the original affidavit of service and this

22   service list for the bar date notice were generated from the

23   exact same list of addresses, that somehow the exhibits were

24   incorrect and yet the bar date notices themselves were

25   mailed on proper envelopes, there is no explanation for that

Page 19

1    contention in Mr. Baer's declaration and none is offered in

2    the debtors reply brief.  In fact, there is no explanation,

3    whatsoever, anywhere for that contention and I would say

4    that at a minimum we would require an evidentiary hearing to

5    get to the bottom of that in the associated discovery and

6    deposition that would be necessary of Lehman's declarant.

7    It just can't be accepted on fact that when we know how --

8    and, frankly, they stated that it was generated from the

9    same list of addresses, that one was incorrect and one was

10   correct.

11            THE COURT:  So, you're saying that you want

12   discovery?

13            MR. THOMPSON:  Yes, Your Honor.  At a minimum, we

14   would need it.  I don't think that you need to on this

15   record.  On this record we think you could find either that

16   there is sufficient facts here or sufficient questions to

17   indicate that West LB did not, indeed, receive service in

18   Germany where it was required to per contract and per its

19   due process rights or in the alternative under an excusal

20   neglect standard you could find that the claim could be

21   deemed timely filed.

22            But at a minimum, Your Honor, on this record we

23   cannot -- I don't think you can find, Your Honor, that on

24   this record there are sufficient facts to be able find that,

25   indeed, Germany got service.  And when you couple that --

Page 20

```
 1   when you couple the lack of explanation in Lehman's

 2   declaration with the fact West LB provided a declaration

 3   that said we didn't receive notice.

 4          THE COURT:  Well, that's assumed.  I assume that

 5   if West LB had been keeping its eye on the ball in Germany

 6   since it filed timely proofs of claim with respect to other

 7   claims in the Lehman case, it would have been diligent and

 8   would have filed a timely claim with respect to this

 9   particular ISDA.

10          It doesn't really distinguish West LB from

11   everybody else in the case who has come in claiming

12   excusable neglect, however, particularly for a global

13   financial institution, because it seems to be a case a

14   internal lack of coordination.  Institutionally, West LB had

15   knowledge that there was a bar date.  Institutionally, West

16   LB had knowledge of potential claims arising out of this

17   particular transaction because West LB made the affirmative

18   choice to terminate the trade.  I believe it was September

19   17 that was the early termination date.  Do I have that

20   right?

21          MR. THOMPSON:  That's correct.

22          THE COURT:  Okay.  So, somebody thinking about

23   this particular trade, made a decision, knew about the

24   bankruptcy and institutionally wherever, whether it was New

25   York or some other office knew that there was a proof of
```

Page 21

1    claim obligation, thereby, in my mind, blurring or

2    completely rebutting allegations made in Mr. Chiruben's (ph)

3    declaration, well, that's not how we do business in German

4    insolvency because bar dates aren't an important factor for

5    us to consider.  But so what?  Why is that a defense at

6    anything here?  You're late, and you knew you were late and

7    you didn't seek relief after filing the claim at a time when

8    presumably counsel knew that all manner of claimants were

9    coming into court and seeking on a timely basis, permission

10   for late filed claims.  Why didn't you do that?

11              MR. THOMPSON:  I'll respond to that, Your Honor,

12   and then some of the earlier comments.  First, that the

13   claim was only filed 13 days late, as was noted.

14              THE COURT:  I know it's only 13 days late.

15              MR. THOMPSON:  Your Honor --

16              THE COURT:  It's not as if we're dealing with --

17   but we're dealing with it years later.

18              MR. THOMPSON:  I understand, Your Honor.  There

19   was not only notice of that claim, but a guarantee

20   questionnaire was filed timely, providing the estate with

21   all the information it needed to have, right.  But all of

22   the information that it would need to have to reconcile

23   these claims.

24              Indeed, there was ongoing reconciliation between

25   the parties.  The objection to the claim only came in

Page 22

1    September of 2010, right?  So, the parties were talking

2    prior to 2010 and after 2010 and after the objection was

3    made it was pushed.  Why didn't West LB take action to seek

4    relief?  Because --

5              THE COURT:  Yes, that's the question.

6              MR. THOMPSON:  -- because Lehman was already

7    knowledgeable about the circumstance and talking with West

8    LB on the business side, on reconciling the claim.  A

9    decision was made that that was a way to have it resolved.

10   And that they didn't need to seek --

11             THE COURT:  I presume nobody waived any rights or

12   remedies and that you weren't lulled into inaction as a

13   result of business discussions and that some conscious

14   decision was made to simply finesse this.

15             MR. THOMPSON:  Your Honor, I can't speak to a

16   specific conscious decision to quote, "finesse it."  I think

17   I've explained that there was a desire to resolve this if

18   they could do it consensually and I don't think any rights

19   were waived.  I also don't think there's any prejudice here.

20             You asked counsel with respect to what the

21   prejudice would be.  They haven't made substantial enough

22   distributions to be able to have a concern about needing to

23   claw back anything from other creditors.

24             We're talking about 21.5 million dollar claim and

25   while we would all love to have $21.5 million, I'm sure,

Page 23

1   we're talking about that in comparison to an estate that has

2   582 billion dollar plus in claims against it and a matter

3   for which this court, Your Honor well knows, deals in

4   billions of dollars every day.

5        It's not -- I don't think it's a credible argument

6   to suggest that this claim, with its unique circumstances,

7   having been filed when it was, with a timely questionnaire

8   having been filed represents a prejudice to the estate.

9        To go back, Your Honor, and make sure that we're

10  clear on the transaction, Your Honor, rightly raises that

11  the ISDA was terminated, right?  And all the trades under

12  it.  But, Your Honor said something that suggested this was

13  -- that the was one transaction, it wasn't.  There were

14  multiple transactions and they were set up at multiple

15  different branches and that is exactly why the debtors

16  provided notice or at least attempted to, at multiple

17  locations.  They knew well and good that they needed to

18  provide notice, actual notice to the known creditor in

19  Dusseldorf, Germany, they just didn't do it.

20        THE COURT:  But, they say they did.

21        MR. THOMPSON:  But that's a material issue of

22  fact, Your Honor, that you don't, on this record, have

23  sufficient evidence to find that they did.

24        THE COURT:  Well, let's just say for the sake of

25  discussion that instead of their having been a -- I'm going

Page 24

1    to call it a clerical error and if you want to re-

2    characterize it, you can do that, but it's a declaration

3    that service was made in Dusseldorf, Germany,

4    notwithstanding the fact that in the earlier certificate of

5    service appears to have Dusseldorf, Georgia as the service

6    address.

7             I'll take judicial notice that I'm not aware of a

8    place call Dusseldorf, Georgia and if there is such a place

9    I'd be interested in somebody telling me about that.  So,

10   assume that it's nonsensical, that it's a nonsensical

11   certificate of service in the first instance and it's

12   replaced with the right Dusseldorf, the one that's in

13   Germany, where your client is located; isn't this all a

14   distraction?  Because if the reality is that the service was

15   made in Germany, but misplaced or disregarded or ignored,

16   how does this differ from any other original certificate of

17   service that provides for service of the entire 67,000

18   claims in the case?  Because the opportunism of your

19   argument relates solely, it seems to me, to the fact that

20   there was this mistake made which was corrected.  So, let's

21   just say it was properly correct, how does this differ from

22   any other case in which a big institution misplaces a piece

23   of mail?

24             MR. THOMPSON:  Your Honor, it's difficult to

25   distinguish it in circumstances, but I think that, again,

1    that hypothetical, I don't think is supported or could be

2    supported on these facts.

3              Your Honor, I would just note and I think this

4    goes, at least in part, to your hypothetical, that we did a

5    sampling of -- in light of what was said in this supporting

6    declaration, we did a sampling of the original affidavit of

7    service.  And this is just a random sampling of

8    approximately 200 pages, on everyone of those pages there's

9    a mistake substituting, apparently, Georgia for Germany.

10             Now, I don't disagree that that may be their

11   error, right?  That the systemic error --

12             THE COURT:  That's actually probative of the

13   debtors case not yours.

14             MR. THOMPSON:  Fair enough.  I understand that

15   point, Your Honor, and I understand that I'm making -- when

16   I'm making it that that is a risk.  My point is that it

17   needs a whole lot more explanation than has been provided in

18   Mr. Baer's declaration.  It hasn't been explained.

19             THE COURT:  Well, in all the time that this matter

20   has been pending, both in business discussions and at the

21   level of formal pleadings, has there been any request made

22   to verify and validate the facts concerning the original

23   service of the proof of claim bar date notices in Germany?

24             And also, have you performed an internal review,

25   in effect, scrubbing the systems within West LB's mail room

Page 26

```
 1    the way mail is dealt with that includes a legend that says

 2    this is important, send it to the legal department or you'll

 3    be at your own peril or whatever it said, which is basically

 4    that kind of a warning.

 5              Have you conducted what amounts to an internal

 6    investigation as to how your own client dealt with material

 7    of this sort at that time?

 8              MR. THOMPSON:  Your Honor, we have -- to answer

 9    the second question, we have investigated or conducted an

10    investigation to determine whether there is any legend or

11    ledger to indicate that this notice was received.

12              I understood your question to get broader at the

13    end to suggest -- or to ask whether we had -- whether any

14    type of document of this sort --

15              THE COURT:  Well, here is what it comes down to.

16              MR. THOMPSON:  -- I note that we haven't conducted

17    that --

18              THE COURT:  If we had this problem in a slightly

19    different form during the argument that took place, I

20    believe it was on February 22nd, involving an institution in

21    France that was by its own admission, through counsel,

22    particularly cumbersome in its own internal procedures and

23    the management of mail and I didn't re-read the transcript,

24    but I believe the transcript is attached as an exhibit to

25    the replied papers filed by the debtors.
```

Page 27

```
 1              I remember it fairly well, however because I was
 2    focused on what amounts to -- I'll call it creditor systems
 3    -- creditor internal procedures in dealing with mail as a
 4    factor that the creditor could not rely on in saying that
 5    there had to be strict application of a notice provision in
 6    an ISDA agreement and the reason for it -- and it's not a
 7    decision, it's simply a point of view on my part, is that I
 8    can't allow the requirements of a particular institution
 9    concerning notice to a particular internal mail stop, in
10    this case in Paris, to trump otherwise appropriate notice
11    procedures that are consistent with the bankruptcy rules.
12              If I follow your argument to its logical
13    conclusion several things follow, one is if you really want
14    to open up discovery you're going to end up opening up all
15    kinds of discovery that may be addressed to your own client
16    concerning the way it dealt with information received in
17    Dusseldorf.  The way it dealt internally, if at all, with
18    the coordinated nature of this particular ISDA contract,
19    which by your own statement is one in which there are
20    multiple transactions involved.  There may have been a
21    complete and utter failure of internal coordination.  I
22    don't know that for a fact, but it seems to me that that
23    might be a subject for inquiry if we're going to get into
24    this and convert this into -- as it is now, a contested
25    matter, but one with full discovery.
```

Page 28

```
 1            MR. THOMPSON:  Your Honor, we welcome that, we

 2    have no objections to that kind of investigation.

 3            THE COURT:  Highly wasteful, but we can certainly

 4    pursue that if that's what you wish, it's your client's

 5    money.

 6            MR. THOMPSON:  Your Honor, we have nothing to

 7    hide.

 8            THE COURT:  I'm not talking about whether you have

 9    anything to hide, it may be that when this matter is fully

10    developed, the culpability will be on your side, not on the

11    debtors side.

12            MR. THOMPSON:  Well, see, Your Honor, I don't

13    believe that's --

14            THE COURT:  You welcome that opportunity, I see.

15            MR. THOMPSON:  That's right.  Your Honor, I would

16    just -- I would say -- Counsel, referred to over 1,000

17    claims, late claims in Germany and you have to ask yourself

18    given what we've seen and what we know --

19            THE COURT:  That they were all at the Dusseldorf,

20    Georgia post office; is that what you're saying?

21            MR. THOMPSON:  Well, I will tell you -- and, Your

22    Honor, I have a copy of this if you would like me to

23    approach and I will be happy to share it with Your Honor,

24    but it's not just Dusseldorf, it's a number of German

25    addresses and that affidavit seems to suggest that it is
```

Page 29

1    limited to that city, but it's not.

2              And so all, I guess, we're saying is, there's a

3    reason for this, it's a big problem and it may have been an

4    accident, but it wasn't West LB's accident.

5              THE COURT:  Well, I think part of what I'm

6    struggling with here is the distinction between what appears

7    to be a conspicuously false certificate of service and the

8    actual facts of service itself, because if the mailing as

9    reflected in the Baer supplemental affidavit was, in fact,

10   made to Dusseldorf, Germany, this is a no harm, no foul.

11   This is a situation in which the fact that there was an

12   obviously erroneous certificate was simply a distraction and

13   that the reality is, according to the supplemental

14   affidavit, that proper service was made, which means that

15   this is one of those situations where the presumption of

16   receipt trumps the allegation of, I never got it.

17             MR. THOMPSON:  Your Honor, if that were true, you

18   may be right in that circumstance.  But the problem, Your

19   Honor, is that on this record, with this affidavit, there is

20   insufficient explanation and I think deserved explanation.

21   We have a right to know why this happened and that it,

22   indeed, did not happen with regard to the mailing of the

23   service.  It's not enough to say, as debtor suggests, that

24   publication is not.

25             It's not enough to say, as I've said earlier, that

Page 30

1   it went to another office.  Service needed to be made upon

2   Dusseldorf, Germany and it's not enough to say that we got

3   the first affidavit wrong and we corrected it 11 months

4   later and made sure that it now said Germany.

5            They need to, I think, explain to the court's

6   satisfaction why the same label or the same address that

7   shows up on the affidavit of service in the first instance,

8   was not also contained on the label that went out on the bar

9   date notice.  And I don't think anybody has or can testify

10  to that fact.

11           THE COURT:  Okay.

12           MR. THOMPSON:  Thank you, Your Honor.

13           MR. HORWITZ:  Your Honor, first of all, I would

14  say that it is enough to say that service was delivered to

15  New York and London even if it wasn't delivered to

16  Dusseldorf.  I think we can probably short circuit a lot of

17  what I would say in my rebuttal if I offer -- Mr. Baer is in

18  the courtroom today, he's available for cross-examination.

19  He could elaborate on what's already in his declaration and

20  he can explain how it is that he discovered the error and

21  can probably provide some more explanation as to why it

22  occurred and how he knows that even though the affidavit --

23  the original affidavit says Georgia, the corrected affidavit

24  is, in fact, correct.  That is if the court believes that

25  that is a relevant fact or an important fact.

1           But, I would also point out that LBHI was not even

2      a party to this ISDA agreement.  It issued a guarantee, it's

3      not bound by the notice provisions of that agreement.  So,

4      LBHI provided the notice that -- the best notice it could

5      with every address that it had for West LB, yes, probably

6      based on transactions that it had engaged in with West LB.

7           I also point out that -- to the extent that West

8      LB is now saying that its New York branch is a separate

9      entity that isn't able or doesn't do business with its

10     Dusseldorf office, West LB says in Paragraph 7 of its

11     response that the Dusseldorf office learned about the bar

12     date in -- on a conference call or a conversation with its

13     New York office discussing the transactions with Lehman.

14     This is an admission that West LB knew about the bar date

15     and that it was capable of communicating the fact that there

16     was a bar date to its Dusseldorf office, if that

17     conversation had taken place before the bar date we wouldn't

18     be here.

19           THE COURT:  There's no question that the New York

20     office of West LB knew about the bar date and complied with

21     the bar date and there's also no question that a

22     conversation took place -- at least that's my understanding

23     from the papers, after the bar date with the Dusseldorf

24     branch, as a result of which they scurried about and tried

25     to file the claim as quickly as they could.  But what is

Page 32

1    that an admission of?

2              MR. HORWITZ:  To the extent that they --

3              THE COURT:  Other than that the New York branch

4    was on notice and took appropriate action and the Dusseldorf

5    branch dropped the ball.

6              MR. HORWITZ:  Not only that, I mean, Counsel was

7    saying that the New York branch is so separate that notice

8    to New York wouldn't be sufficient because the two offices

9    operate so separately.  They clearly converse enough that, I

10   mean, we're talking about this very topic and about filing

11   claims against Lehman.

12             THE COURT:  But, we actually don't know that, but

13   that may be a subject for further discovery.

14             MR. HORWITZ:  Your Honor, that's -- I mean, that's

15   all I would add.  The pioneer factors -- the other pioneer

16   factors other than reason for the delay generally weigh in

17   favor of the debtor.  The reason for the delay, what we're

18   focusing on right now is the only one that I think is

19   important and in this case I can't see how there was --

20   there is a valid reason for the delay in filing this claim.

21             And the prejudice, as the court noted, the

22   prejudice is that a decision allowing this claim would,

23   essentially, set the bar for what it is actual adequate

24   notice of a bar date in these cases.  And that could have an

25   impact, a substantial impact on the rest of these cases.

1          THE COURT:  Okay.  I'm going to give counsel for

2     West LB an opportunity to respond to something I'm about to

3     say.

4          As I think about this I have a hard time

5     distinguishing the West LB circumstance from other similar

6     circumstances that were the subject of the court's decision

7     reported at 433 BR 113.  Particularly as it relates to large

8     organizations in which, for example, somebody in one office

9     thought that somebody in a European office was going to be

10    taking care of the particular claim filing by the bar date

11    and it just didn't happen.

12          The part of this story that I'm having some

13    trouble with is, what makes this different from all the

14    situations where I've found that the argument for excusable

15    neglect simply didn't wash and was insufficient?  Because,

16    to me, the particularly difficult facts to overcome here

17    relate to the fact that the same organization took

18    appropriate action on time and that the Dusseldorf branch

19    actually knew about the bankruptcy, was on constructive

20    notice of the bankruptcy and/or was on actual notice of the

21    bankruptcy as a result of a lost piece of mail in

22    Dusseldorf.

23          Because all of this seems to be mostly about what

24    is really a distraction, the fact that there was an

25    apparently false certificate of service filed that was

1    replaced with a correct one.

2            So, why should we spend any time on discovery?

3    Why shouldn't you just simply lose?

4            MR. THOMPSON:  Your Honor, it's just -- these

5    circumstances are distinguishable because one, as I've

6    noted, there is a difference and a material difference for

7    very good U.S. law and regulatory reasons between the New

8    York branch of West LB and the Dusseldorf office, right?

9    And that was recognized specifically in the ISDA contract

10   and the debtors knew that.

11           THE COURT:  What was recognized in the ISDA

12   contract?

13           MR. THOMPSON:  That Dusseldorf, Germany had

14   separate trade confirms, separate trades --

15           THE COURT:  But that was with Lehman Brothers

16   Finance, SA.

17           MR. THOMPSON:  Yes, and it was supported by the

18   guarantees from LBHI on each one of those underlying trades.

19           THE COURT:  Okay.  But, the argument that was just

20   made by counsel for the debtors is that what we're talking

21   about here is a guarantee claim against LBHI.  How does

22   anything in the ISDA with the counter party require LBHI in

23   its capacity as a party with potential guarantee liability,

24   how does that limit their ability to provide generalized

25   notice, including notice by publication in international

Page 35

1   newspapers?

2              MR. THOMPSON:  First, because the contract says so

3   and second, because --

4              THE COURT:  But, it's not a contract with LBHI.

5              MR. THOMPSON:  It is, Your Honor.  They provided

6   that guarantee, they are a party to the contract.

7              THE COURT:  Well, they may have provided the

8   guarantee, but they're not a party to the -- as far as I

9   know, to the specific notice provision and even if they were

10  for reasons that I said earlier, how can an ISDA notice

11  requirement trump a general requirement of notice in a

12  international bankruptcy case?

13             MR. THOMPSON:  Your Honor, the general requirement

14  that we should be dealing with here is the due process

15  requirement is articulated by the Supreme Court.  Right?  I

16  mean, it's not a bankruptcy --

17             THE COURT:  In what respect are you claiming the

18  denial of due process, really?  Are you claiming a denial of

19  due process because you have a bank officer who is able to

20  say, I never saw the proof of claim bar date notice?  Is

21  that it?

22             MR. THOMPSON:  Your Honor, that is part of it.

23  But the other part of it is, there is not a substantial

24  evidentiary record on the part of the debtors that sets

25  forth with sufficient reasons the explanation for why the

Page 36

1   original affidavit had a wrong address and why that same

2   wrong address wasn't reflected in the actual bar date

3   notice, which would have rendered the actual notice

4   ineffective, as a matter of fact.

5           And when you know, and they did know who the

6   actual notice party is to be and we know that why?  Because

7   we look at the affidavit of service, both the original one

8   and the amended one and West LB in Dusseldorf is recognized

9   along with all of the other offices, why?  Because that's

10  what the contract provides.  The debtors know it.  It's an

11  admission against their own interest with respect to that

12  affidavit.

13          And what Melon v Central Hanover Bank says at 339

14  US 306, as well as, City of New York v New York New Haven

15  and Hartford Railroad Company at 344 US 293, they both say

16  that when you have an actual party and you know what the

17  address is, you send it to that party -- that's -- they have

18  to do it, it's required.  It is a due process requirement.

19          THE COURT:  They say they did it.  They say they

20  did it.

21          MR. THOMPSON:  But, Your Honor, we don't know

22  that.

23          THE COURT:  And Mr. Baer is here, if you want to

24  ask him about it.

25          MR. THOMPSON:  And, Your Honor, I will speak to

Page 37

1   that.  We asked if this was an evidentiary hearing, the

2   answer was no, today it's an evidentiary hearing, not fair,

3   right?  We heard about this on Friday through Mr. Baer's

4   testimony.

5           I know Mr. Baer, I like Mr. Baer, I'm happy to

6   have Mr. Baer testify, but not today.

7           THE COURT:  Fine.  We'll have him testify another

8   day.  The parties will confer about any discovery that may

9   be an appropriate part that hearing, it will be scheduled

10  for the next Omnibus hearing date in the afternoon.

11          MR. THOMPSON:  Thank you, Your Honor.

12          THE COURT:  And given the nature of this it could

13  also be scheduled for a claims date depending on which is

14  most convenient for the parties.

15          MR. THOMPSON:  Thank you, Your Honor.

16          MR. HORWITZ:  Thank you, Your Honor.  The next

17  item on the agenda is a status conference with respect to

18  the allocation motion in the LBI proceeding.  I'll turn the

19  podium over to whoever wants to speak.  Mr. Graulich.  Oh,

20  the counsel for the Trustee, I'm sorry.

21          THE COURT:  Right.

22          MR. WILTENBURG:  Good morning, Your Honor.  David

23  Wiltenburg, Hughes, Hubbard & Reed for the SIPA Trustee.

24          The next item on the calendar is a status

25  conference with respect to the Trustee's second motion

Page 38

1    relating to allocation of property of the estate and as the

2    court is aware this is a process that, in effect,

3    establishes the customer estate which is a critical step in

4    a SIPA case.

5            Since the status conference we had with Your Honor

6    last month, the parties have proceeded on a couple of

7    different fronts.  First, I think I'm able to report that

8    the parties -- the principle claimants and the trustee have

9    reached agreement with respect to a number of significant

10   items that are set forth in the Trustee's second allocation

11   motion and even to the point of agreeing on language for a,

12   in effect, a stipulated order that would allocate on current

13   value approximately 15 billion to the customer estate.

14           The proposed order on that has been shared with

15   other interested parties, that is to say, parties who have

16   expressed a desire to be kept informed and they have -- will

17   have an opportunity to comment and hopefully we will be able

18   to submit that, in effect, agreed order to the court by the

19   end of this week.

20           THE COURT:  What will that agreed order provide?

21           MR. WILTENBURG:  Essentially, it will deal with

22   the items that are denominated in the second allocation

23   motion as the core customer property category consisting of

24   securities and cash that were, in effect, set aside by LBI

25   for customers under the applicable SEC regime.  And it will

Page 39

1   cover enumerated compliance failures, that is situations

2   where property should have been set aside for the benefit of

3   customers, but was not.

4           And so it's in total about six of the ten or so

5   items that are enumerated in the second allocation motion

6   that will be, in effect, resolved by this order.

7           There was also a discussion at our chambers

8   conference last month of setting forth bench marks, that is

9   a kind of calendar for discussions and the continuation of

10  the due diligence process to a conclusion.  The parties have

11  exchanged proposals on that and I can report that we're

12  pretty close, although have not finalized, but in the

13  meantime that's not been an obstacle to continued due

14  diligence efforts with respect to the non-agreed items, the

15  items that still remain open.  And so it's our anticipation

16  that that process -- that we will agree on a kind of

17  calendar of dates that are -- will bring the process to a

18  conclusion, but in the meantime we will also continue the

19  process of exchanging information and getting closer,

20  hopefully, to agreement on the open items.

21          THE COURT:  Is that your whole report?

22          MR. WILTENBURG:  Well, essentially -- and I guess

23  the last thought that it's -- you know, we think it's

24  helpful to the process to have dates such as today's date,

25  that, in effect, provide their own kind of benchmark for the

1   parties to shoot for and try to get to a point where

2   something concrete can be reported to Your Honor.

3          THE COURT:  Mr. Wiltenburg, you're very skilled at

4   providing information in a way that's somewhat opaque.  It's

5   not clear to me as a listener what has been accomplished,

6   can you be more specific?

7          MR. WILTENBURG:  Yes, Your Honor.  On the core

8   customer property issue the Trustee's motion included an

9   affidavit by one the Trustee's financial professionals that

10  set forth the securities, the value of the securities that

11  were, in fact, set aside for the benefit of customers

12  pursuant to applicable SEC rules.  And that body of

13  securities, which, you know, on the latest valuation is

14  approximately 10 billion, forms part of what we are terming

15  core customer property.

16          In addition, under the applicable SEC regime, LBI

17  was required to set aside cash corresponding to cash

18  obligations owing to customers and that is the reserve

19  account that, you know, gained fame in the Baclay's

20  litigation and elsewhere.  And it is that body of property

21  plus accretions, cash accretions that in one instance result

22  from distributions with respect to the body of customer

23  securities that were held by the estate and in other cash

24  items that the parties have agreed are fairly allocable to

25  the customer estate.

Page 41

1        And that combination of items, the securities and

2    cash comes to about 13 billion of the 15 billion that I

3    mentioned.

4        And in addition to that, there are several

5    identified items were either LBI did not hold in secure

6    custody customer securities thereby violating the SEC rule

7    or in its calculation of the reserve amount, included debits

8    that were not appropriately included and thereby reducing

9    the lock up, the cash lock up.  And so those items totally

10   approximately 2 billion have also been agreed among the

11   parties.

12        THE COURT:  What does this mean in terms of an

13   interim distribution and what would the timing be of such a

14   distribution?

15        MR. WILTENBURG:  Your Honor, it is, of course, an

16   essential step in doing an interim distribution and, again,

17   aspirationally, we're hoping and have, I think, the

18   intention to make an interim distribution whether this

19   summer or in the fall.

20        THE COURT:  Okay.  Do you have anything more to

21   report?

22        MR. WILTENBURG:  Your Honor, I think that's about

23   it and as I said, we believe it's helpful to the process to

24   have dates such as today's occasion to, in effect, provide a

25   goal for the parties.

Page 42

1           THE COURT:  Okay.  Is there anyone else who wishes

2    to say anything at this time?

3           MR. KOBAK:  Your Honor, James Kobak, Hughes,

4    Hubbard & Reed.  I think -- I had some discussions with the

5    Trustee yesterday that Mr. Wiltenburg may not be completely

6    current on.  It is our intention to make an interim

7    distribution.  If we can get this amount confirmed it will

8    enable us to do that.  So, we are hopeful that this order

9    will be entered.

10          And obviously, if we could allocate some more

11   property or reach agreements with other parties we could

12   make even a more robust interim distribution.  But we have

13   been working very hard on figuring out what form that would

14   take and I'm confident that we will be before Your Honor

15   with a motion before the end of the summer certainly as to

16   how we propose to do it, what the amount of it would be and

17   so forth.

18          THE COURT:  Okay.

19          MR. KOBAK:  Thank you, Your Honor.

20          MR. GRAULICH:  Your Honor, Timothy Graulich of

21   Davis Polk & Wardwll on behalf of LBIE.  Just by way of

22   supplementation and perhaps a small nuance to Mr.

23   Wiltenburg's comments.

24          As Your Honor is aware, LBIE and LBHI have been

25   working together cooperatively with the Trustee in an effort

1    to -- to really do two things, to achieve a floor for an

2    allocation that would help facilitate an interim

3    distribution and we think that a allocation as described by

4    Mr. Wiltenburg would hopefully be sufficient for those

5    purposes.

6             And the second goal is to defer and perhaps

7    eliminate a contentious -- potentially contentious and time

8    consuming dispute with respect to some of these other open

9    items, while the parties continue to the same process that

10   got us to this resolution to try and resolve the balance of

11   the issues.  All the while, trying to preserve parties

12   rights with respect to valuation issues and distribution

13   issues.  So, I think that the order -- at least the version

14   of the order that I have reviewed, I think achieves that,

15   but I did want to just note the fact that there is at least

16   one or two open issues with respect to the order.  We've

17   been work very productively with Hughes Hubbard and I trust

18   that we'll be able to resolve those, but I just wanted to by

19   way of nuance, just indicate that the order isn't entirely

20   agreed, but the devil is in the details when you're talking

21   about $15.7 billion there's no small issues, but I think

22   we're very close.

23             THE COURT:  Great.  Anything from anybody else?

24   Apparently so.

25             MS. COHEN:  Your Honor, Hollace Cohen, Troutman

1    Sanders on behalf of Jason J. Wallace who was a customer of

2    LBI.  We were an objectant in connection with the second

3    allocation motion and I'm only up here to say that we have

4    not yet had an opportunity to review the proposed revised

5    allocation motion or the allocation order and we look

6    forward to receiving it.  Thank you.

7              THE COURT:  Okay.

8              MR. DASH:  Good morning, Your Honor.  Andy Dash,

9    Brown Rudnick on behalf of Providence Equity Partners.  We

10   have had a preliminary look at the proposed order.  We have

11   issues with it that we're working through.  I just wanted to

12   note to the court that the process of the second allocation

13   motion has our objection deadline set, at this point, based

14   on the views of the estate, at the end of June.  We're

15   hoping to work cooperatively, but we can't necessarily

16   promise that we're going to be in a position by the end of

17   this week, that has been suggested, to agree to the terms of

18   the proposed order, but we're going to work towards that end

19   if we can.

20             THE COURT:  Okay.

21             MR. DASH:  Thank you.

22             MR. HEMM:  Good morning, Your Honor.  Robert Hemm

23   of Covington & Burling on behalf of Joy Global, Inc.  Joy

24   Global also holds a customer claim.  Mainly, in respect of

25   its own stock, which is was repurchasing through the Lehman

Page 45

1    Brokerage and on which is has been paying post filing

2    dividends for some three and a half years now.

3           We also received a draft of the revised proposed

4    order late yesterday and there's some language in the order

5    that addresses the legal status of the post filing dividends

6    under SIPA, a matter that as Your Honor may recall was the

7    subject of some dispute in connection with the first

8    allocation order and that was essentially tabled until such

9    time as it was clear whether there was, in fact, going to be

10   a short fall in customer property.

11          We will be reaching out to the Trustee's counsel

12   with respect to the language and just wanted to respectfully

13   ask that, to the extent that we're unable to reach an

14   agreement with Trustee's counsel with respect to the

15   language, that the post include that we have an opportunity

16   to be heard on the matter and we'd just like to reserve our

17   rights on that.  Thank you.

18          THE COURT:  There's something about this process

19   that's making people want to speak, I'm not really sure why.

20          MR. DORCHAK:  Good morning, Your Honor.  Joshua

21   Dorchak, Bingham McCutchen on behalf of Elliott Management

22   Corporation.  I just wanted to add our name to the list of

23   others who have received a copy of the proposed order and

24   are looking at it and haven't yet agreed with its terms.

25          THE COURT:  Okay.  Just to be clear on something.

Page 46

1    If anybody is in the courtroom who's in the position of

2    either having seen the order and not having yet had an

3    opportunity to comment or not having seen the order and

4    wanting an opportunity to comment, everybody will have an

5    opportunity to participate in this process who is affected

6    by it.

7            And if the proposed order is not fully consensual,

8    no doubt, there will be a hearing with respect to all of

9    this, at some appropriate time on notice.

10           MR. CAPUTO:  Thank you, Your Honor.

11           THE COURT:  You're welcome.  Mr. Krasnow, do you

12   have anything to add?

13           MR. KRASNOW:  Your Honor, I do not.

14           THE COURT:  Well then, I have something to say to

15   you.  I have heard through the grapevine that you are very

16   close to retiring from the practice of law.  And I wanted to

17   wish you well and tell you that it's been a pleasure having

18   you appear in this court in this case.  And I hope that

19   retirement and all the things that you do gets you a great

20   deal of pleasure and satisfaction.

21           MR. KRASNOW:  Thank you, Your Honor.  I really do

22   appreciate the Court's comments, however, I cannot help but

23   think of a line, I think it was in the Godfather about

24   someone trying to leave and being brought back in.  So, it

25   may well be, Your Honor, that at least with respect to one

Page 47

1    matter in Lehman, that I've been spending a fair amount of

2    time, that relates to LBI that I will not be able to fully

3    withdraw, but thank you very much.  I appreciate it.

4              THE COURT:  Okay.  Okay.  Is there anything more?

5              (no verbal response)

6              THE COURT:  We're adjourned then.

7              (Whereupon these proceedings were concluded at

8    11:09 AM)

9         ********************************************

10                      P R O C E E D I N G S

11             THE CLERK:  All rise.

12             THE COURT:  Be seated, please.  Good afternoon.

13   Let's proceed.  Don't all speak at once.

14

15             MS. LEMMER: Good afternoon, Your Honor.  Elisa

16   Lemmer from Weil, Gotshal & Manges on behalf of Lehman

17   Brothers Holdings, Inc. and Lehman Brothers Bank FSB.  I'm

18   also joined by colleague, Lauren Zerbinopoulos and our

19   client representative, Joelle Halpern.

20        Would, Your Honor, like appearances in all of the

21   matters pending or should we proceed with the status

22   conference on the Turnberry Fountainebleu matters.

23             THE COURT:  I had, in my mind, treated them as --

24   related.

25             MS. LEMMER:  Understood.  There's another matter

Page 48

1      on the agenda which is why I asked the question.

2              THE COURT:  Let's just deal with the, the

3      Turnberry related matters.

4              MS. LEMMER:  No problem.  Your Honor, at the

5      conclusion of the status conference, excuse me, -- at the

6      conclusion of the status conference --

7              THE COURT:  We may need to call a microphone

8      specialist on that one.

9              MS. LEMMER:  (Laughing)  I'll do my best to fix

10     it.

11             THE COURT:  I think it may be that it's unscrewed

12     and it needs to be turned into its base.

13             MS. LEMMER:  Okay.  There we go.  Thank you, Your

14     Honor.  At the conclusion of the status conference that took

15     place in March before Your Honor, my colleague, Mr.

16     McCarthy, had advised the Court that the parties agreed on a

17     mediator from JAMS, Judge Crane, for which they would meet

18     with and attempt to mediate their disputes.

19             I'm pleased to report that the mediation did take

20     place.  The parties met here in New York for a mediation

21     that spanned two days in mid-May.  But, unfortunately, the

22     parties are not close to settling at this point.  After

23     consideration, the client believes that it is - it's in the

24     best interests of all of the parties here to request a

25     ruling from this Court on the motions to dismiss that were

1     argued in February.

2              THE COURT:  Okay.

3              MS. LEMMER:  A motion to dismiss will have -- a

4     ruling on the motions to dismiss will have a dual effect,

5     Your Honor.  I think it will help frame the issues going

6     forward and it will also help streamline any potential

7     settlement discussions that the parties do have in the

8     future.  In the event, however, that the parties aren't able

9     to reach a settlement, then, of course, that would enable

10    the cases to move forward at a faster pace and, as Your

11    Honor had observed at the previous status conference, these

12    cases have been aging for a while.  So we think, Your Honor,

13    we would respectfully request that the Court issue a ruling

14    on the motions to dismiss and then a related discovery order

15    which I believe Your Honor had indicated would flow

16    following the rulings.

17             THE COURT:  All right.

18             MS. LEMMER:  Thank you, Your Honor.

19             MR. MEISTER:  Good afternoon, Your Honor.  Stephen

20    Meister, Meister, Seelig & Fein, for Turnberry, Jackie and

21    Jeffrey Soffer in the non-Lehman parties in these related

22    adversary proceedings.

23             Your Honor, I would, would respectfully submit

24    that the mediation, which did take place, was  -- I have a

25    more optimistic view than does counsel, who I don't think

Page 50

```
 1    was there for at least all of the time, the two days.  The

 2    second day was quite productive -- a very substantial offer

 3    was made.  I don't regard the parties as terribly far apart

 4    and I do think that  -- there's reason for cautious optimism

 5    that the case will settle.

 6            I would like to apprise the Court that, after the

 7    conclusion of the second day, there were many people, there

 8    were scheduling issues  -- we had agreed upon a third day –

 9    this is before Judge Crane11 –- we had also delivered

10    substantial financial information during the course of the

11    mediation, or prior to the mediation, and the third day was

12    unilaterally terminated by the Lehman side, who, at that

13    time, said they did not have a sufficient opportunity to

14    digest the additional information that my clients had

15    provided.

16            But, there was substantial progress and, as I

17    said, I, I do think, I do think settlement is hopefully

18    within grasp.

19            Your Honor, I wanted to --I've spoken to my client

20    about the motions because we had reason to believe there

21    would be this request to decide them.  And, I'd, I'd like to

22    do what I hope the Court will find helpful.  I,I think that

23    we can, we the Turnberry parties, can offer to stipulate to

24    prongs of the motion to dismiss that is before Your Honor so

25    that Your Honor then does not have to deal with those and
```

Page 51

1   make a decision on those.

2          So, just briefly, in the Town Square  -- there is

3   the Town Square Complaint and then there are two complaints

4   by Lehman.  There is a Town Square complaint by Turnberry

5   and then there are two complaints, one related to the senior

6   loan at the Fontainebleu and one related to the mezzanine

7   loan at the Fountainebleu and then Turnberry parties have

8   answered and counterclaimed with respect to both of those

9   Fountainebleu complaints.

10          Going to Town Square, the Turnberry complaint

11   lists four causes of action -- a fraudulent inducement

12   claim, a breach of contract claim that the ninety-five

13   million dollar bridge loan was not fully funded and a

14   promissory estoppel claim based on the -- commitment that

15   was issued with respect to the six hundred twenty-five

16   million dollar take-out financing at Town Square and an

17   unjust enrichment claim.

18          The Lehman parties have moved to dismiss the

19   first, third and fourth claims.  We would offer to stipulate

20   to the dismissal of the fraudulent inducement claim, the

21   first claim.  That's the only claim that is grounded in the

22   so-called repo 105 transactions that Your Honor had

23   commented on in the oral argument.

24          THE COURT:  I recall my comments.

25          MR. MEISTER:  Right.  Moving to the, to the

Page 52

1    Fountainebleu complaint, as I said, there's one related to

2    the mezzanine loan and one related to the senior loan.

3    They're substantively identical.  The Lehman parties assert

4    three breach of contract claims related to three different

5    guarantees, a limited payment guarantee, a non-recourse

6    carve-out guarantee and a completion guarantee and a fourth

7    unjust enrichment claim.  And, the -- in each case the

8    Turnberry parties have counterclaimed for fraudulent

9    inducement similar to the fraudulent inducement claim in the

10   Town Square, similarly based on the repo 105 financial

11   representations and an unjust enrichment claim.

12          So, following a parallel path, we would offer to -

13   - we would offer to stipulate to the dismissal of the

14   fraudulent inducement which is count one in both of the

15   answer and counterclaim documents filed -- pleadings filed

16   by the Lehman parties.  Hopefully, that assists the Court.

17          I did want to add, Your Honor, that -- one

18   important point that I, I think is not before the Court on

19   the motions to dismiss, is that in the Fountainebleu part of

20   the dispute, which is the lion share monetarily, the claims

21   are unquestionably grounded on a guarantee, or guarantees,

22   whereas in the Town Square, the -- Jacqueline and Jeffrey

23   Soffer are makers to the ninety-five million dollar -- I'll

24   call it the bridge note.

25          The guarantees contain a burn down provision that

Page 53

1    allows the liability, or provides that the liability of the

2    guarantor reduces, pursuant to certain milestones.  I, I

3    simply bring this to the Court's attention because separate

4    and aside from the affirmative or offensive claims that

5    Turnberry has asserted, one of which has now been dismissed

6    by stipulation, in each of the loans at issue in

7    Fontainebleu, there is a, a defense based upon Lehman's

8    alleged prevention of the conditions to the reduction of

9    liability similar to -- it, it's actually a condition

10   precedent except instead of to the formation of a contract

11   to the reduction of liability under a contract and that

12   defense is not subject to any dismissal motion because none

13   of the affirmative defenses has Lehman moved to dismiss.

14   And, so, I only bring this up because I think it is

15   significant and it, it won't be addressed, no matter how you

16   decide the balance of the motions.

17          So, we would, we would like to leave today with a

18   direction, if we can get one, to resume the negotiations

19   because, as I said, a very substantial offer was made and we

20   are optimistic that the matter can be resolved and we'd love

21   to do that and relieve Your Honor of the burden.

22          THE COURT:  I like that message.  But it takes two

23   to tango.  As far as the stipulation with regard to

24   fraudulent inducement claims, in the pleadings, I think that

25   is very helpful particularly because it should make it much

Page 54

1    easier for the parties to develop an acceptable discovery

2    stipulation concerning scope and also duration.  One

3    question I have, and this is really for Lehman, at this

4    point, I'm assuming this is not the first time, although it

5    could be, that you've heard a proposal such as this.  If it

6    is the first time, are you in a position to respond to it?

7    And, given that Mr. Meister's clients, through him, express

8    a desire to move forward with settlement discussions without

9    further ado, is Lehman willing to do that in good faith?

10              MS. LEMMER:  Thank you, Your Honor.  It is the

11   first time that we hear of this proposal to stipulate to

12   dismiss the fraudulent inducement claims.  We did speak with

13   counsel for the Turnberry parties, Soffers, earlier, a few

14   days ago, and this was not part of the conversation.  We're

15   happy that they are stipulating to dismiss those claims but

16   we would still ask the Court respectfully to issue a ruling

17   on the remaining claims that are the subject of the motions

18   to dismiss.  We feel that --

19              THE COURT:  Let's just say I did that.

20              MS. LEMMER:  Yes.

21              THE COURT:  How does that advance the ball?

22              MS. LEMMER:  I think it frames --

23              THE COURT:  Let's just say I ruled against you

24   with respect to the motion to dismiss.

25              MS. LEMMER:  Under--

1          THE COURT:  How are you helped?

2          MS. LEMMER:  Understood, Your Honor.  I think it

3     frames for both of the parties what remaining claims they

4     must tackle either in the litigation going forward or

5     through settlement.  Part of the issues, and I'll, I'll get

6     back to the mediation because some points were made about

7     the mediation that I wasn't --

8          THE COURT:  I don't want to know anything about

9     what went on in the mediation.

10         MS. LEMMER:  Okay.  Understood.  Generally, Your

11    Honor, I think it helps parties, when they mediate, to

12    understand what claims remain viable or potentially viable.

13         THE COURT:  Let me disagree with you.  It-- you

14    should assume for purposes of the mediation, particularly

15    one that already has a mediator in place and that has had

16    several days of mediation under the belts of the parties,

17    that they -- mediation is designed to resolve disputes that

18    could be litigated.  And the parties, especially well

19    advised parties, have the ability to factor into their

20    decision-making some weighted risk assessment as to what

21    could happen in litigation.  Because a motion to dismiss, by

22    its very nature, is interlocutory and does not definitively

23    resolve the claims that had been made--

24         MS. LEMMER:  Uh-huh.

25         THE COURT:  -- I don't see how an expedited

Page 56

```
1    determination of matters that are presently before the Court

2    on the motion to dismiss actually changes anything with

3    respect to mediation assuming that the parties are willing

4    to mediate.  Part of my problem with the presentation I'm

5    hearing is that I hear from Mr. Meister a sense of relative

6    optimism.  I hear from you a sense of relative pessimism.

7              MS. LEMMER:  Uh-huh.

8              THE COURT:  I can't tell whether or not I'm being

9    gamed --

10             MS. LEMMER:  Uh-huh.

11             THE COURT:  --by either or both of you.  And it

12   bothers me.  Because ordinarily in, when parties have

13   engaged in mediation in good faith, they come to a settled

14   view that's not based upon posturing as to whether or not

15   ongoing mediation actually can be productive.  Have you and

16   your client come to a settled view that it is no longer

17   productive to engage in mediation absent some win with

18   respect to a pending motion?  Because, if that's what this

19   is about, I am not inclined to play into your hand.

20             MS. LEMMER:  Understood, Your Honor.  And that it

21   not the case.

22             THE COURT:  Well, I, I, I understand why you would

23   deny that.  But, I'm very concerned about what's going on

24   here.

25             MS. LEMMER:  Let me frame --
```

Page 57

```
 1              THE COURT:  Because I'm not inclined to grant any

 2    motion to dismiss while there is a reasonable prospect for

 3    parties to get to yes and to get to yes by acting

 4    reasonably.

 5              MS. LEMMER:  Understood, Your Honor.  And that's

 6    why, if Your Honor would allow me to frame some of the

 7    points that Mr. Meister made concerning the mediation, the

 8    third day of mediation, I think that would enable the Court

 9    to understand --

10              THE COURT:  I do not want to hear anything about

11    the substance of the mediation.  That's not why I'm here.

12    I'm here to deal with whether or not it would be productive,

13    truly productive, to move into what will be expensive and

14    burdensome discovery, or whether it would be productive for

15    the parties to get back to the table.  Are you telling me

16    that the answer is you would rather spend estate money

17    litigating?

18              MS. LEMMER:  No, Your Honor.  I'm not saying that.

19    What I'm saying --

20              THE COURT:  What are you saying?

21              MS. LEMMER:  I'm saying that the parties are not

22    close.  That --

23              THE COURT:  So what?

24              MS. LEMMER:  -- the optimism --

25              THE COURT:  So what? Get close.
```

Page 58

1          MS. LEMMER:  The, the optimism expressed by Mr.

2     Meister is not shared by us because of the vast differences

3     that, in, basically settlement numbers, Your Honor.

4          THE COURT:  Let me tell you that that happens in

5     every mediation.  Get closer, get back to the table. See me

6     in a month.  I'm not ruling until I hear further from you

7     concerning the third or fourth or fifth days of mediation

8     before your agreed mediator.  And both parties need to be

9     reasonable.  The fact that Mr. Meister has voluntarily

10    withdrawn claims that, to me, when we argued this, seemed to

11    be most problematic, suggests to me that you should be able

12    to get back to the table, refocus and get to yet.  And, if

13    you can't, we can litigate.

14          MS. LEMMER:  May I make a request, Your Honor?

15    Respectfully.  Lehman has always been willing to have

16    conversations, have mediations with the Turnberry parties.

17    What we would like is, when we are dealing with each other

18    that we continue to deal with each other in good faith and

19    provide information.  One of the key obstacles in getting

20    closer is the ability to receive and evaluate all of the

21    necessary information that Lehman would need to evaluate

22    whether it can get closer.

23        So, the request that I would make -- it's more of

24    counsel for the Turnberry parties, but I make it in open

25    Court is that, to the extent that we are talking and we're

1    willing to talk, that parties are providing that information

2    to enable them to move closer.

3                 THE COURT:  I assume the parties who are engaged

4    in good faith bargaining will share the necessary

5    information so that their positions can be understood.  And,

6    it's hardly a request that I need to rule on.  What kind of

7    information are you talking about?

8                 MS. LEMMER:  Your Honor, we have requested

9    financial information and we're beginning to receive some;

10   but we need to evaluate it and receive more in-depth

11   information -- and on a timely basis, too.  That would

12   enable us more carefully to evaluate the requests that are

13   being made of Lehman.

14                THE COURT:  None of this makes sense to me because

15   you're talking in generalities.  I don't know what the

16   problem is.  I'm not in a position to mediate the mediation.

17   And I don't intend to.  I'm here to preside over litigation

18   that is already unduly expensive and protracted.  And I am

19   directing you, and your client, to sit down within the next

20   thirty days, and I believe that you should work through the

21   problems.  If there are obstacles to evaluating proposals,

22   the mediator is in a position to guide the process.  And, if

23   he is not doing an effective job, get yourselves another

24   mediator.

25                MS. LEMMER:  Understood.  Thank you, Your Honor.

Page 60

1           THE COURT:  I'll see you in thirty days for a

2   status report.

3           MR. MEISTER:  Thank you, Your Honor.

4           MS. LEMMER:  Thank you, Your Honor.

5           THE COURT:  By that, I mean the next Lehman

6   adversary date.  I don't know if it's thirty days, or

7   twenty-seven days.

8           MS. LEMMER:  Ok.

9           THE COURT:  And, if you need an adjournment

10  because it would be a waste of time for you to come in, you

11  can have an adjournment assuming the process is moving

12  forward.  If there is a true breakdown in the ability to

13  process this in mediation, I would like notification in

14  advance of the next hearing, so that I can rule from the

15  bench, with respect to the pending motions to dismiss.  I

16  need some advance notice and I would expect at least a week.

17          MR. MEISTER:  Thank you, Your Honor.

18          MR. WIN:  Good afternoon, Your Honor.  Zaw Win,

19  Weil, Gotshal & Manges for Lehman Brothers Holdings, Inc.

20  The next matter on the agenda is the debtors and several

21  other parties' motions to dismiss in the adversary

22  proceeding Williams Pate v. Lehman Brothers Holdings, Inc.

23  That's case number 12-01220.  As the Court may recall, on

24  May 18th at a status conference, or, excuse me, on May 18th,

25  this Court entered a briefing order which established June

Page 61

1    4, 2012 as the deadline for plaintiff to respond to the

2    debtors, or to the motions to dismiss filed by the debtors

3    and the other defendants.

4          The briefing order was served on the plaintiff at

5    all of her known addresses by overnight mail.  No responsive

6    pleadings were filed by that date or thereafter.  Therefore,

7    Lehman Brothers Holdings, Inc. respectfully requests that

8    the Court grant Lehman's motion to dismiss the adversary

9    case with prejudice.

10         THE COURT:  Has anybody had any contact with the

11   plaintiff?

12         MR. WIN:  We have not, Your Honor.

13         THE COURT:  Does anybody have a contact address or

14   telephone number for the plaintiff?

15         MR. WIN:  We have the contact addresses that the

16   plaintiff included in her complaints and, to some extent,

17   the plaintiff controls how we communicate with her by the

18   contact information that she provides us on her public

19   filings.  And so those are the addresses that we've

20   consistently used when we've filed everything that's come up

21   in this case.

22         THE COURT:  One of the things that's troublesome

23   about this case is that, in effect, the plaintiff has filed

24   a pro se complaint against the debtor and non-debtor parties

25   but has done nothing since then to prosecute the litigation

Page 62

1   or to manifest an intention of proceeding with the

2   litigation.  I've reviewed some of the materials that are

3   attached to the Lehman motion to dismiss which includes the

4   series of bankruptcy filings for this plaintiff in Georgia.

5   Has anybody attempted to reach out to the Chapter 13

6   Trustee, parties in that bankruptcy to endeavor to find out

7   what's going on with this individual?  And, that's question

8   one.  Question two, at the last hearing, it's my

9   recollection that you expressed some uncertainty as to

10  whether the property was even still the debtor's property

11  because the foreclosure may have proceeded.  Do you know

12  what the status is with respect to the subject property?

13          MR. WIN:  Answering your questions in reverse

14  order, Your Honor.  Just to be clear.  The property at issue

15  in the foreclosure action is not the debtors' property.  The

16  debtors have no interest in this property.

17          THE COURT:  I realize that.  It's the plaintiff's

18  property.

19          MR. WIN:  That's correct.  As, As I --

20          THE COURT:  And I believe that the plaintiff has

21  brought this litigation, no matter how you style the

22  allegations, in an effort to protect that property from

23  seizure, foreclosure in Georgia.  And, that I, without

24  reading too much between the lines, this appears to be a

25  somewhat desperate last ditch attempt to try to retain

Page 63

1     possession of that property.  That's how it appears to me.

2     I don't know what the fact is.  That's just a conclusion

3     reached from a review of the complaint.  So, that's the

4     property I'm asking about.  Do you know if it's still her

5     property or if it's been taken?

6              MR. WIN: As I understand it, and counsel for

7     Aurora can correct me if I'm wrong, but she remains in

8     possession of the property.  Aurora, as the servicer, has

9     filed an action for a writ of possession in Georgia state

10    court which the plaintiff is, or in the process of, or has

11    sought to remove to the district court in this district,

12    which action I think was transferred to the bankruptcy

13    court.  The action that I'm speaking of has a different case

14    number.  It's case 12-03662.

15             THE COURT:  And what is that litigation?

16             MR. WIN:  To be honest, Your Honor, it's, it's a

17    little bit difficult to tell.  But what it looks like the

18    plaintiff has done is taken the possessory action from the

19    county court in Georgia and filed a motion to-- to remove it

20    to the district court here.  And when she did that, she took

21    the caption from this adversary proceeding and slapped it on

22    the front of those pleadings.  And, I guess it was initially

23    assigned to one of the district court judges, Judge Presca

24    (ph), and Judge Presca subsequently transferred it to the

25    bankruptcy court.  And, as far as I can tell, that's as far

Page 64

1    as we've gotten with that action.

2            THE COURT:  Do you know when that happened?

3    Because I'm not familiar with this.

4            MR. WIN:  It looks like the beginning of May.

5            THE COURT:  All right.

6            MR. WIN:  And, then, with respect to Your Honor's

7    first question, we have not reached out to the Chapter 13

8    Trustee.  But given the actions that the plaintiff has taken

9    with respect to the dispossessory action, it seems likely

10   that since she still resides at that property, that she has

11   been receiving all of the pleadings and filings in this

12   case.

13           THE COURT:  Ok. Well, all of the defendants appear

14   aligned in stating that the plaintiff's pro se complaint

15   under applicable pleading standards fails to state claims on

16   which relief can be granted.  And, alternatively, seek

17   abstention.  Do the parties, recognizing that there is

18   alternative relief sought, have any preference as to whether

19   or not the litigation is dismissed or whether the Court

20   simply abstains?

21           MR. WIN:  The debtors would prefer that the action

22   was dismissed -- primarily because this second -- we'll call

23   it the removal action -- which, again, we're still looking

24   at because we were not parties to the original litigation so

25   it's unclear the extent to which we will or are -- will be

Page 65

1   involved in the removal action.  But, we think that a

2   dismissal would be more useful for resolving the second

3   action in an efficient and inexpensive manner.

4           THE COURT:  Now, since I'm not familiar with the

5   pleadings in the action that has been removed and,

6   apparently assigned here, although it's not part of today's

7   agenda, I'd be interested from the parties who are actually

8   involved in that litigation, if there is any position taken

9   with respect to whether the pending litigation should be

10  dismissed or whether or not I should abstain.

11          MR. ZACHARDA:  Thank you, Your Honor.  Andrew

12  Zacharda on behalf of Aurora Bank FSB.

13          THE COURT:  Please come to the, the actual podium,

14  if you will.

15          MR. ZACHARDA:  Thank you.  Aurora, like Lehman

16  Brothers, would prefer that this action, case number 12-1220

17  be dismissed rather than abstain -- rather than Your Honor

18  abstain from hearing it.  There's ample reasons why the

19  complaint fails to state a claim in this particular action.

20  And, to the extent that there would be any harm to the

21  plaintiff in this action, she is already raised similar

22  issues in the case that is also pending.  And, if I can

23  clarify, procedurally, what has happened with this other

24  case.

25          It appears that, in Georgia. Aurora commenced a

Page 66

1    dispossess action in county court in Forsythe County.  At

2    some point in time, the plaintiff, in this case, Ms.

3    Williams-Pate, attempted to remove that action to this

4    district court and that was given a district court number, a

5    district court docket number -- that counsel recited

6    previously.  That was referred over by order of reference by

7    Judge Presca and it became adversary proceeding number 12-

8    1678 on this Court's docket.  And, so far the only thing on

9    the docket in that case is the actual adversary case and

10   that was entered on the docket on May 31st of this year.

11             THE COURT:  And who are the defendants in that

12   litigation?

13             MR. ZACHARDA:  That's where it gets a little more

14   difficult to give what should be a very simple answer.

15   According to the docket sheet, the defendants are identical

16   to the defendants in this action.  But, I believe that is

17   due to the fact that the plaintiff, Ms. Williams-Pate

18   appended a full copy of the instant adversary complaint on

19   top of her removal papers.  The only parties to the action

20   pending in Forsythe County, Georgia, are Aurora and Ms.

21   Williams-Pate.  So, for that reason, I think perhaps the

22   clerk's office in the southern district, which had a, the

23   exact same caption information on its docket, merely took

24   the front page of what was filed and, for some reason, all

25   of the same parties on that pleading are listed as

Page 67

1       defendants in the other action.

2               THE COURT:  This becomes a sticky problem for

3       purposes of today because even if I were to grant relief

4       with respect to the pending motions to dismiss in the

5       original adversary complaint which was filed here in the

6       first instance by Ms. Williams-Pate, there would still be a

7       pending litigation that, at least nominally, involve the

8       very same parties and you would find yourselves presumably

9       taking appropriate action to try to extricate yourselves

10      from that litigation or to dismiss that litigation.

11              The fact that I'm now learning about this other

12      administrative complication, or procedural complication now

13      leads me to question whether, in the interests of case

14      efficiency, it might be preferable, and I'm simply asking

15      the question, to defer entry of any orders in reference to

16      the first adversary proceeding until after issue has been

17      joined with respect to the second adversary proceeding so

18      that the series of related orders can then be entered

19      adjudicating both.

20              Now, I don't know whether or not, as I say this,

21      it is more sensible to do this sequentially since plaintiff

22      has notice in bold print of the briefing schedule applicable

23      to today's hearing -- in which case, since no opposition has

24      been lodged, I can dismiss the pending litigation, which

25      would then enable the defendants in the apparently

Page 68

1   mislabeled second litigation to seek relief including

2   dismissal or some modification of the pleading in order to

3   remove yourselves as defendants from an action in which the

4   only actual defendant is Aurora.  Doesn't help you, standing

5   at the podium.   But, at least it gets the other parties who

6   are apparently improperly named out of that litigation.

7            I'm speaking literally as I'm thinking the issues

8   through.  I assume the parties have, themselves, given this

9   more thought.

10           MR. ZACHARDA:  Well, I would assume that I've

11  given it more thought because I've been aware of it for

12  longer.  I'm not sure that I've come up with a, a better

13  result than what Your Honor has been contemplating from the

14  bench.

15           To the extent that Lehman Brothers and McCurdy &

16  Candler are, at least, nominal parties in the new action,

17  the allegations are identical to, to the extent that there

18  are allegations, because it's a full complete copy of the

19  instant adversary proceeding stacked on top of the removal

20  of the Forsythe County action.  So, I would imagine that a

21  similar motion would be brought in that new action by those

22  parties because the allegations are one hundred percent

23  identical.  The only thing that the new action adds that is

24  not present in the instant adversary proceeding, is the

25  removal of the dispossess action from Forsythe County,

Page 69

1    Georgia and, in that instance, Aurora would argue more

2    towards abstention because there is an ongoing proceeding

3    and she does have an avenue to seek whatever relief she may

4    seek in Forsythe County against a non-debtor party and have

5    that proceed in the appropriate forum rather than in the

6    middle of a complex Chapter 11 case in New York.

7              MR. JOSE:  If I may, Your Honor.  For the record,

8    Dennis Jose, Gross, Polowy, Orlans representing McCurdy &

9    Candler.  Judge, I see the Court's concerns.  I', I'm

10   thinking of it from a totally different perspective which

11   would be that of the Georgia courts and how they would have

12   to deal with this going forward.  It is my humble

13   suggestion, again I'm open to suggestions from all sides, is

14   that the Court perhaps administratively join both cases and

15   everyone has an opportunity to either make a motion to

16   remand the, the eviction action from this Court back to

17   Georgia, or, otherwise defend their positions.  And, and, a

18   single order, or a single series of orders, on more or less

19   the same date dealing with both cases be rendered such that

20   we can have one single game plan that we can pass on to the

21   lower courts, rather than multiple orders at, at various

22   times -- which sometimes have, I've done a substantial

23   amount of work in state courts, complicates matters for them

24   because they don't understand the procedures here.  But,

25   again, I'm open to suggestions.

Page 70

1          THE COURT:  Well, it certainly does seem to be a

2      procedural mess and it's fairly clear to me from having

3      reviewed the pleadings in adversary 12-01220 that the

4      bankruptcy court is not the proper forum to adjudicate

5      whatever claims Ms. Williams-Pate may have against the

6      defendants.  Inasmuch as Lehman Brothers Holdings, Inc. has

7      no connection to the subject matter of the litigation, and,

8      according to the pleadings that have been filed by Lehman,

9      gave up whatever interest it had years before the bankruptcy

10     was commenced.  The litigation as a result has no connection

11     to the debtor or its property and is also framed in a

12     fashion that it is difficult for a court to make

13     intelligible sense out the relief being sought.  That may be

14     because the plaintiff is acting pro se and perhaps adopting

15     legal conclusions and legal jargon as a means to fill the

16     page.  It does not make much sense to me as a I read it.

17          One thing that does make sense to me, however, is

18     that the plaintiff, as an individual, is seeking relief in

19     reference to her principal residence located in Georgia --

20     and has a series of complaints apparently designed to

21     prolong her period of ongoing occupancy, notwithstanding the

22     fact that she has no equity in the property.  It is apparent

23     from the various schedules appended to the Lehman motion to

24     dismiss that by plaintiff's own acknowledgement in papers

25     filed in her separate bankruptcy cases in Georgia, that she

Page 71

1    is upside down with respect to the amounts owed to the

2    secured creditors and has no equity in the property by a

3    substantial margin.

4              I am assuming, but don't know, that that is what

5    motivates this litigation.  One thing is clear, however,

6    this litigation has nothing to do with the debtor or its

7    creditors and the allegations that have been made against

8    McCurdy & Candler, LLC and Aruora Bank FSB appear to be

9    claims that can just as easily be prosecuted, if not more

10   easily prosecuted, in the Georgia state courts.  For that

11   reason, given the fact that notice of today's hearing has

12   been given to the plaintiff and she has not responded, I

13   would be inclined, were it not for the fact that we have the

14   complication of another related proceeding, to grant the

15   motion to dismiss rather than to abstain.  I am not going to

16   enter that relief today, however, because I believe it would

17   be, frankly, better for all parties for there to be a clean

18   and final disposition of all of the litigation that appears

19   to have been improperly brought in this Court so that it can

20   be disposed of in a single series of orders or in a single

21   order on the same date.

22             I would suggest that one or more of the defendants

23   seek to administratively join these two proceedings so that

24   they can be heard at the same time.  Restate or renew the

25   motions to dismiss in the separate litigation with such

Page 72

1    additions that may be appropriate for Aurora Bank, inasmuch

2    as Aurora Bank appears to be the subject of separate

3    allegations in the litigation that was originally brought in

4    state court in Georgia.  And, that we relist both the

5    pending motions to dismiss and the to be filed motions to

6    dismiss with proper notice having been given to the

7    plaintiff, so that the plaintiff can, in effect, have what

8    amounts to a second bite at the apple in being able to

9    oppose the motions to dismiss, inasmuch as the very same

10   arguments will be made this time in a shadow proceeding.  If

11   Ms. Williams-Pate does nothing after proper notice, I would

12   be inclined to grant the motions to dismiss and not abstain

13   without prejudice so that the plaintiff can proceed in a

14   proper state court forum.

15         The same result would be realized if I were to

16   abstain but I believe that that would leave the litigation

17   in both instances in limbo and would be less clear for all

18   the parties, including the plaintiff.

19         The suggestion that the litigation might be

20   remanded to the state court is another alternative that the

21   parties might want to consider.  But dismissal without

22   prejudice probably leads to the same outcome.

23         MR. WIN:  A practical question, Your Honor.  As

24   far as a briefing schedule for the combined adversary

25   proceeding, would we need to then schedule a status

Page 73

1   conference following the combination of the two proceedings

2   to establish that or is that something that we can take care

3   of at this hearing?

4           THE COURT:  I think that, in recognition of the

5   legal expense which is being churned out on account of this

6   individual's activities, it would be desirable to avoid

7   anybody having to make a separate trip down to bankruptcy

8   court just to schedule the briefing and I would propose that

9   that be done now.  And, everybody can, in effect, look at

10  their respective calendars.   The one problem being that we

11  don't have the other adversary proceeding listed for today's

12  hearing and that the plaintiff is not present.

13          In the context of trying to expedite a resolution

14  and save expense and, perhaps also reach a consensual

15  outcome, assuming that were possible, inasmuch as the

16  plaintiff is involved with Aurora in state court litigation,

17  I have to presume that Aurora's Georgia counsel has had some

18  contact, one way or the other, with Ms. Williams-Pate.  I

19  would suggest that, through Aurora, which is the common

20  principal link, between adversary 12-01220 and the one that

21  has been brought into the district court and referred to me,

22  that we use that as a means to communicate with the

23  plaintiff and to see whether or not the plaintiff would

24  voluntarily agree that the litigation can be brought in a

25  Georgia state court, advising her that the bankruptcy court

Page 74

 1   is inclined to order that.

 2          If she is unwilling to do that, counsel might

 3   identify, with her, an agreed briefing schedule.  If she is

 4   unwilling to agree to a briefing schedule, or if it's not

 5   possible to contact her for purposes of scheduling, I would

 6   suggest that we have a scheduling telephone conference

 7   solely for purposes of reporting on efforts to speak with

 8   the plaintiff and obtain her concurrence to some sort of

 9   orderly procedure for both of these adversary proceedings.

10   And, I can get a status report concerning those efforts to

11   contact her and concerning a proposed briefing schedule

12   which is both acceptable to the defendants and which

13   provides the plaintiff with a reasonable period of time

14   consistent with ordinary practice to respond.

15          She would also have the benefit of what amounts to

16   a second opportunity, to the extent that she wishes to avail

17   herself of it, to interpose objections to the currently

18   pending motions to dismiss which would otherwise have been

19   granted as unopposed.

20          MR. WIN:  Thank you, Your Honor.

21          MR. JOSE:  Judge, Mr. Jose. Would we have an

22   adjourned status hearing on this particular matter at this

23   point, Judge, while we get the administrative --

24          THE COURT:  You can -- I think, given what's, what

25   you have to do, you probably need to put this out about

Page 75

1    sixty days.

2              MR. JOSE:  I agree, Judge.  Would a date be

3    available at this point or should we contact chambers?

4              THE COURT:  You can contact chambers and try to

5    set that up as appropriate.

6              MR. JOSE:  Thank you, Judge.

7              THE COURT:  And, with luck, you'll be able to work

8    this out with the plaintiff.  But, I'm guessing you won't

9    have such luck.

10             MR. WIN:  Thank you, Judge.

11             MR. JOSE:  Thank you.

12             THE COURT:  We're adjourned.

13             (Whereupon, proceedings concluded at 2:57 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 76

1                        **I N D E X**

2

3                          **RULINGS**

4                                              Page        Line

5    Debtors' Fortieth Omnibus Objection        35           7

6    To Claims.

7

8    Second Motion for Order Approving

9    Trustee's Allocation of Property.          --          --

10

11   Motions to Dismiss                         --          --

12

13   Motion to Stay                             --          --

14

15

16

17

18

19

20

21

22

23

24

25

Page 77

```
1              C E R T I F I C A T I O N

2

3    I, Sheri Monroe, certified that the foregoing transcript is

4    a true and accurate record of the proceedings.

5

6

7    Sheri          Digitally signed by Sheri Monroe
                     DN: cn=Sheri Monroe, o, ou,
                     email=digital1@veritext.com,
8    Monroe          c=US
                     Date: 2012.06.22 11:57:49 -04'00'
9

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  June 15, 2012

17

18

19

20

21

22

23

24

25
```