WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
In re                                              :
                                                   :    **Chapter 11 Case No.**
                                                   :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*    :    **08-13555 (JMP)**
                                                   :
                                    Debtors.        :    **(Jointly Administered)**
                                                   :
-----------------------------------------------------------------x

**NOTICE OF HEARING ON OBJECTION TO CLAIM**
**NO. 17763 FILED BY LAUREL COVE DEVELOPMENT, LLC**

**PLEASE TAKE NOTICE** that on July 3, 2012, Lehman Brothers Holdings Inc.,

as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman*

*Brothers Holdings Inc. and its Affiliated Debtors* [ECF No. 22737] for the entities in the above

referenced chapter 11 cases, filed its objection to claim number 17763 filed by Laurel Cove

Development, LLC (the "Objection"), and that a hearing to consider the Objection will be held

before the Honorable James M. Peck, United States Bankruptcy Judge, in Courtroom 601 of the

United States Bankruptcy Court for the Southern District of New York, One Bowling Green,

New York, New York 10004, on **August 23, 2012 at 10:00 a.m. (prevailing Eastern Time),** or

as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that any responses to the Objection must

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules

of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a) electronically in

accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by

registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest,

on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other

Windows-based word processing format (with a hard copy delivered directly to Chambers), in

accordance with General Order M-182 (which can be found at www.nysb.uscourts.gov), and

shall be served in accordance with General Order M-399, upon (i) the chambers of the Honorable

James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii)

attorneys for Lehman Brothers Holdings Inc., Weil, Gotshal & Manges LLP, 767 Fifth Avenue,

New York, New York 10153 (Attn: Jacqueline Marcus, Esq.); and (iii) the Office of the United

States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn:

Tracy Hope Davis, Esq., Elisabetta Gasparini, Esq. and Andrea B. Schwartz, Esq.), so as to be so

filed and received by no later than **August 9, 2012 at 4:00 p.m. (prevailing Eastern Time)** (the

"Response Deadline").

US_ACTIVE:\44002507\13\58399.0011

**PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and

served with respect to the Objection, the Plan Administrator may, on or after the Response

Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed

order annexed the Objection, which order may be entered with no further notice or opportunity to

be heard offered to any party.

Dated: July 3, 2012
        New York, New York

                              /s/ Jacqueline Marcus
                              Jacqueline Marcus
                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone: (212) 310-8000
                              Facsimile: (212) 310-8007

                              Attorneys for Lehman Brothers Holdings Inc.
                              and Certain of Its Affiliates

US_ACTIVE:\44002507\13\58399.0011

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

In re                                                              :
                                                                   :    **Chapter 11 Case No.**
                                                                   :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,    :    **08-13555 (JMP)**
                                                                   :
                            Debtors.                          :    **(Jointly Administered)**
                                                                   :

------------------------------------------------------------------x

**OBJECTION TO CLAIM NO. 17763
FILED BY LAUREL COVE DEVELOPMENT, LLC**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), as Plan

Administrator pursuant to the *Modified Third Amended Joint Chapter 11 Plan of Lehman*

*Brothers Holdings Inc. and its Affiliated Debtors* (the "Plan") for the entities in the above

referenced chapter 11 cases (collectively, the "Chapter 11 Estates"), files this objection to proof

of claim number 17763 and respectfully represents as follows:

**Preliminary Statement**

        1.    The Plan Administrator files this objection seeking to disallow and

expunge the proof of claim filed by Laurel Cove Development, LLC ("Laurel Cove") against

LBHI (Claim No. 17763) (the "Laurel Cove Claim") on the basis that LBHI does not have any

liability for the claims asserted therein.  The Laurel Cove Claim asserts a claim for damages in

the aggregate amount of $150,000,000 that allegedly resulted from LBHI's alleged failure to fund a Construction Loan (as defined below) to Laurel Cove in accordance with a Loan Agreement (as defined below).

2.        LBHI had sold all of its rights and interests in the Construction Loan prior to the funding requests.  Consequently, LBHI is not liable in any respect for any damages that resulted from a failure to fund the Construction Loan.  LBHI has no liability for any amounts asserted in the Laurel Cove Claim and, thus, the Plan Administrator requests that the Laurel Cove Claim be disallowed and expunged with prejudice.

## Jurisdiction

3.        This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Background

4.        Commencing on September 15, 2008 and periodically thereafter, (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to the Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

5.        On September 23, 2008, a winding-up proceeding was commenced by Lehman Re Ltd. ("Lehman Re") in the Supreme Court of Bermuda (the "Bermuda Court").  By orders of the Bermuda Court, Dan Yoram Schwarzmann and Garth Andrew Calow have been appointed as joint provisional liquidators of Lehman Re.

6.        On August 6, 2009, the joint provisional liquidators on behalf of Lehman Re filed a Verified Petition Under Chapter 15 of the Bankruptcy Code for Recognition of

Foreign Representative and Foreign Main Proceeding and for Additional Relief Under 11 U.S.C.

Section 1521, ECF No. 2, *In re Lehman Re Ltd.*, Case No. 09-14884 (JMP) (Bankr. S.D.N.Y.)

(the "Lehman Re Chapter 15 Case").  On September 24, 2009, the Bankruptcy Court entered an

Order Granting Recognition of Foreign Representative and Foreign Main Proceeding and for

Additional Relief under 11 U.S.C. Section 1521 [ECF No. 56 in the Lehman Re Chapter 15

Case].

7.      On December 6, 2011, the Court entered the order confirming the Plan

[ECF No. 22737].  The Plan became effective on March 6, 2012 (the "Effective Date").

Pursuant to the Plan, the Plan Administrator is authorized to interpose and prosecute objections

to claims filed against the Chapter 11 Estates.

## Relief Requested

8.      The Plan Administrator files this objection pursuant to section 502(b) of

the Bankruptcy Code and Bankruptcy Rule 3007(d) and seeks to disallow and expunge the

Laurel Cove Claim on the basis that LBHI has no liability for such claim.

## The Construction Loan

9.      On May 15, 2007, LBHI entered into a construction loan agreement with

Laurel Cove (the "Loan Agreement"),[1] pursuant to which LBHI agreed to fund loan advances to

Laurel Cove up to the aggregate amount of $121,500,000, to be used in the acquisition and

development of 1,120 acres of land located in College Grove, Williamson County, Tennessee

(the "Construction Loan").  On May 15, 2007, LBHI made the initial advance under the

Construction Loan in the amount of $34,280,308.90.

---

[1] A copy of the Loan Agreement (without exhibits) is attached hereto as Exhibit A.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Loan Agreement.

US_ACTIVE:\44002507\13\58399.0011

10.     The Loan Agreement provided for advances to be made over time as requested by Laurel Cove.  The Loan Agreement contained specific requirements that were required to be satisfied for a funding request to be valid.  Pursuant to section 5.1(b) of the Loan Agreement, in order for any loan advance to be made, Laurel Cove was obligated to give prior written notice to LBHI not less than fifteen days prior to the proposed date for such advance.  According to section 5.1(b) of the Loan Agreement, the following terms, conditions and requirements were required to be satisfied in order for the fifteen day notice period to begin running:

> All such requests for Loan Advances must be in writing, must be for a date which is a Business Day, and must include all Request for Advance Documents (other than the Consultant's Approval Certificate) before the 15-day period begins to run.  Loan Advances shall be made not more frequently than once a month. All Loan Advances must be in an amount not less than $100,000, except that the final Loan Advance may be for the balance of the Loan even if less than $100,000.

*Loan Agreement*, §5.1(b).  The Loan Agreement defines "Request for Advance Documents" as follows:

> Request For Advance Documents. With respect to any Advance for "hard costs" or "soft costs" of construction, Lender shall have received by the time required in Section 5.1(b) . . . each of the following documents (collectively, the "Request For Advance Documents"), each of which must be approved by Lender: (i) a Draw Request; (ii) Borrower's Construction Loan Certificate; (iii) an Architect's Approval Certificate; (iv) a Consultant's Approval Certificate; (v) a Sworn Owner's Statement; (vi) an Application and Certificate For Payment By Contractor for each Contractor Party identified in such Sworn Owner's Statement; (vii) a Contractor's Sworn Statement from each such Contractor Party; (viii) a Partial Waiver of Lien or final waivers of lien where appropriate, from each such Contractor Party; (ix) lien waivers from the subcontractors shown on each such Sworn Contractor's Statement; (x) if Lender requests, copies of invoices and other documents to support the non-construction "soft cost" items contained in the requested Advance; (xi) copies of all Change

4

US_ACTIVE:\44002507\13\58399.0001

Orders to date not previously supplied to Lender; and (xii) such other documents and information as Lender or Lender's Project Consultant may reasonably request.

*Loan Agreement*, §5.2(j).   In accordance with the terms set forth under the Loan Agreement, prior to the Commencement Date, 15 draws in the aggregate amount of approximately $86 million were requested by Laurel Cove and advanced by LBHI.

11.    The Loan Agreement provided that LBHI, as the lender, had the "absolute and unconditional right at any time . . . without requiring any consent or approval from the Borrower . . . to sell, assign, hypothecate or otherwise transfer Lender's interest in the Loan". *Loan Agreement*, §12.17(a).

<u>The Master Repurchase Agreements</u>

12.    On December 4, 1997, LBHI, Lehman Brothers Inc. ("<u>LBI</u>") and Lehman Commercial Paper Inc. ("<u>LCPI</u>") entered into that certain Master Repurchase Agreement (as amended, the "<u>Internal MRA</u>").  Pursuant to the Internal MRA, prior to the Commencement Date, LBHI and Lehman ALI, Inc. ("<u>Lehman ALI</u>") [2] sold to LCPI and/or LBI certain residential and commercial mortgage and mezzanine loans with an obligation to repurchase such loans at a future date (the "<u>Internal MRA Loans</u>").  The respective repurchase dates for the Internal MRA Loans were extended on a regular basis.  The Construction Loan was included among the Internal MRA Loans and thus, sold to LCPI under the Internal MRA.

13.    On July 9, 1999, LCPI and LBI, as sellers, entered into that certain Master Repurchase Agreement with Lehman Re, as buyer (the "<u>Lehman Re MRA</u>").  Pursuant to the Lehman Re MRA, LCPI sold to Lehman Re in exchange for cash payment, certain residential and commercial mortgage loans, including the Construction Loan (collectively, the "<u>Lehman Re</u>

---

[2] Although Lehman ALI was not party to the Internal Lehman Re MRA, the terms of the agreement permitted LBHI to sell loans on behalf of Lehman ALI as its agent.

MRA Loans"). Under the terms of the Lehman Re MRA, LCPI was entitled to receive all income generated under the Lehman Re MRA Loans and remained obligated to repurchase the Lehman Re MRA Loans at a future date.

14.    Pursuant to a Tri-Party Custody Agreement (the "Custody Agreement"), dated as of May 5, 2008, by and among Lehman Re, LCPI and The Bank of New York, as Master Custodian ("BNY"), BNY held the files (collectively, the "Collateral Files") relating to the Lehman Re MRA Loans for the benefit of Lehman Re and LCPI. BNY arranged for several sub-custodians to take custody of the Collateral Files.

15.    On the evening of Sunday, September 14, 2008, Laurel Cove advised TriMont Real Estate Advisors ("TriMont"), the appointed servicer of the Construction Loan, that it was making its sixteenth draw request in the amount of $5,069,485.32 (the "September Draw Request").[3] Due to several defects in the initial September Draw Request, including, among other things, inaccuracies in the formulas used to generate the requested amount, missing lien waivers as required under section 5.2(j) of the Loan Agreement, and the need to reallocate funds to account for interest accrued on the Construction Loan, the September Draw Request was rejected. Laurel Cove subsequently revised and resubmitted the September Draw Request on September 25, 2008.

16.    Prior to the date that Laurel Cove submitted the revised September Draw Request, on September 17, 2008 (the "Default Date"), Lehman Re declared an event of default pursuant to the Lehman Re MRA and notified LCPI in writing that it was in default under the Lehman Re MRA (the "LCPI Default Notice"). On the same day, Lehman Re delivered a letter to BNY advising that there had been an event of default (the "BNY Default Notice"). Copies of

---

[3] On December 10, 2008, responsibility for servicing the Construction Loan was transferred from TriMont to Key Bank Real Estate Capital.

6

the LCPI Default Notice and the BNY Default Notice are attached hereto as <u>Exhibits B</u> and <u>C</u>,
respectively.  In accordance with the Custody Agreement, Lehman Re directed BNY to transfer
the Collateral Files into the name and possession of Lehman Re.  In accordance with this
instruction, BNY issued written notices to the sub-custodians, instructing them to follow the
instructions of Lehman Re concerning the Lehman Re MRA Loans and Collateral Files.

17.    In order to resolve various disputes regarding which parties were entitled
to the benefits of and liable for the obligations under the Lehman Re MRA Loans, LBHI, LCPI,
Lehman ALI and Lehman RE entered into that certain settlement agreement executed on
November 4, 2009 (the "<u>Settlement Agreement</u>") [ECF No. 4980].[4]  The Settlement Agreement
served to memorialize the parties' arrangement under the Lehman Re MRA and to provide
Lehman Re with the necessary documentation evidencing its seizure of the Lehman Re MRA
Loans as of the Default Date.  Specifically, pursuant to the Settlement Agreement, LBHI, LCPI,
Lehman ALI and Lehman Re agreed, *inter alia*, that "(i) Lehman Re is, and has been, the sole
owner of such Mortgage Loans since the Default Date, (ii) Lehman Re shall have all of the
Lehman U.S. Entities' right, title and interest as lender under such Mortgage Loans as of the
Default Date, and (iii) Lehman Re shall have assumed all of the Lehman U.S. Entities'
obligations as lender arising from the documents evidencing the Mortgage Loans as of the
Default Date and thereafter."  *Settlement Agreement*, ¶1.

18.    On October 20, 2008, well after the Default Date on which Lehman Re
acquired ownership of the Construction Loan, Laurel Cove advised TriMont that it was making
its seventeenth draw request in the amount of $5,796,671.68 (the "<u>October Draw Request</u>" and,
together with the September Draw Request, the "<u>Draw Requests</u>").

---

[4] Capitalized terms used in reference to the Settlement Agreement but not defined herein shall have the meanings
ascribed to them in the Settlement Agreement.

## The Laurel Cove Claim

19.    The Laurel Cove Claim, asserts, among other things, that LBHI's alleged
failure to fund Draw Requests in the aggregate amount of $12,973,414.38, as well as its failure to
fund the outstanding balance of the loan in the amount of $34,956,270, resulted in over one
hundred million dollars in consequential damages.  Laurel Cove has failed to submit any
supporting documentation or justification for the damages described in the Laurel Cove Claim or
any evidence that such loss was realized and is not merely hypothetical.  The Laurel Cove Claim
asserts the following damages:

- Loss of 100 membership sales and future dues in excess of $1,000,000.00 because the golf course was not completed on time.  *See Laurel Cove Claim* ¶4.

- $300,000 in fines for failure to mitigate environmental damage caused by water runoff and other required mitigation measures because of the Debtors' failure to fund.  *Laurel Cove Claim* ¶5.

- Cost of re-sprigging the golf course and the additional costs of rebidding the contracts and remobilizing contractors and vendors in excess of $10,000,000. *See Laurel Cove Claim* ¶6.

- Cost of multiple lawsuits filed by contractors, sub-contractors and vendors and related costs of defending the lawsuits which could be hundreds of thousands of dollars.  *See Laurel Cove Claim* ¶7.

- Equity investors' capital at risk in excess of $2,750,000.00 if the project does not get refunded.  *Laurel Cove Claim* ¶8.

- Loss of developer's potential profit in excess of $50,000,000.00 because of failure of Debtor to continue funding the project to completion.  *Laurel Cove Claim* ¶9.

- Loss of letters of credit filed with the county for completion of the golf course and other infrastructure in excess of $5,000,000.00, if the work is not completed.  *See Laurel Cove Claim* ¶10.

- Monthly developer's fees owed to Kenneth A. Jowdy in the amount of $350,000.00.  *See Laurel Cove Claim* ¶11.

- Damage to reputations of the project and the developer with local, state and federal officials because of the failure to complete the project pursuant to entitlement requirements.  *See Laurel Cove Claim* ¶12.

- Potential loss of the use of Gregg Norman's name as designer of the golf course and the loss of opportunity for the course to be a Professional Golf

Association tour facility including hundreds of thousands of dollars in lost golf revenue and lower lot sales. *See Laurel Cove Claim* ¶13.

20.    No further detail or documentation has been submitted with respect to the above list of alleged damages.

## The Laurel Cove Claim Should Be Disallowed and Expunged

21.    The damages asserted in the Laurel Cove Claim allegedly arise as a consequence of the failure to fund certain advances under the Construction Loan. This claim is invalid because neither LBHI nor any of the other Chapter 11 Estates had an obligation to fund the Draw Requests or the remaining outstanding balance of the Construction Loan.

22.    Laurel Cove did not submit any valid funding requests until after the Default Date. The deficiencies in the September Draw Request were not remedied by the Default Date, the date on which Lehman Re seized the collateral subject to the Lehman Re MRA, including, without limitation, the Construction Loan. Following the Default Date neither LBHI nor any of the other Chapter 11 Estates were liable for any draw requests under the Construction Loan.

23.    None of the Chapter 11 Estates have any liability with respect to funding the balance of the Construction Loan. In accordance with the terms of the Internal MRA and then the Lehman Re MRA, LBHI transferred the Construction Loan to Lehman Re prior to the commencement of LBHI's chapter 11 case. As a result, LBHI was no longer an owner of the Construction Loan on such date. Laurel Cove is a sophisticated party that was aware of LBHI's right to transfer the Loan Agreement and, therefore, cannot dispute any such transfer.

24.    As a result of LBHI's transfer of the Loan Agreement to LCPI, LCPI's subsequent sale of the Construction Loan to Lehman Re, and Lehman Re's exercise of its rights under the Lehman Re MRA effective as of September 17, 2008, LBHI and LCPI no longer had

9

any interest in the Loan Agreement.  Accordingly, any portion of the Laurel Cove Claim relating

to or based on the Chapter 11 Estates' alleged failure to fund draw requests should be disallowed

and expunged.

25.     Further, Laurel Cove has failed to provide any supporting documents to

substantiate any of its millions of dollars in purported damages.  The asserted damages appear

speculative at best.  Laurel Cove does not provide any evidence that it incurred such damages or

that any such damages were caused by its failure to receive funding under the Construction Loan.

To the extent the Construction Loan was ultimately funded, or Laurel Cove sustained alternate

financing, the asserted damages simply do not exist.

26.     A filed proof of claim is "deemed allowed, unless a party in interest

objects."  11 U.S.C. § 502(a).  If an objection refuting at least one of the claim's essential

allegations is asserted, the claimant has the burden to demonstrate the validity of the claim.  *See*

*In re Oneida, Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*,

No. 02-41729 (REG), 2007 Bankr. LEXIS 660 at *15 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re*

*Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).  Section 502(b)(1) of the

Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that

"such claim is unenforceable against the debtor and property of the debtor, under any agreement

or applicable law."  11 U.S.C. § 502(b)(1).  Laurel Cove has not satisfied its burden to

demonstrate that it is entitled to collect any amounts under the Laurel Cove Claim from LBHI.

27.     The Plan Administrator has examined the Laurel Cove Claim and has

determined that such claim should be disallowed and expunged on the basis that it provides no

basis of liability as to LBHI or any of the Chapter 11 Estates.  Upon a review of the Laurel Cove

Claim and an internal review of the Chapter 11 Estates' books and records, the Plan

Administrator has determined that the Laurel Cove Claim is based on contractual obligations

owed by a non-debtor.

28.    The Plan Administrator has determined, after a thorough review, that the

Laurel Cove Claim does not contain any actual or contingent claims against LBHI or the Chapter

11 Estates.  The Effective Date has occurred and initial distributions began on April 17, 2012.  If

the Laurel Cove Claim remains on the claims register in the filed amount, the potential exists for

recoveries by Laurel Cove, which does not hold a valid claim against the Chapter 11 Estates.

Accordingly, the Plan Administrator respectfully requests that the Court enter an order

disallowing and expunging the Laurel Cove Claim in its entirety.

## **Reservation of Rights**

29.    The Plan Administrator reserves all rights to object on any basis to the

Laurel Cove Claim in the event that the relief requested herein is not granted.

## **Notice**

30.    No trustee has been appointed in the Chapter 11 Cases.  Notice of this

objection has been provided to (i) the United States Trustee for Region 2; (ii) the Securities and

Exchange Commission; (iii) the Internal Revenue Service; (iv) the United States Attorney for the

Southern District of New York; (v) Laurel Cove; and (vi) all other parties entitled to notice in

accordance with the procedures set forth in the second amended order entered on June 17, 2010,

governing case management and administrative procedures for these cases [ECF No. 9635].  The

Plan Administrator submits that no other or further notice need be provided.

31.    No previous request for the relief sought herein has been made by the Plan

US_ACTIVE:\44002507\13\58399.0011

Administrator or the Chapter 11 Estates to this or any other Court.

       WHEREFORE the Plan Administrator respectfully requests entry of an order

granting the relief requested herein and such other and further relief as is just.

Dated: July 3, 2012
     New York, New York

             /s/ Jacqueline Marcus
             Jacqueline Marcus
             WEIL, GOTSHAL & MANGES LLP
             767 Fifth Avenue
             New York, New York 10153
             Telephone: (212) 310-8000
             Facsimile: (212) 310-8007

             Attorneys for Lehman Brothers Holdings Inc.
             and Certain of Its Affiliates

US_ACTIVE:\44002507\13\58399.0011

# EXHIBIT A

## (Loan Agreement)

# CONSTRUCTION LOAN AGREEMENT

**THIS CONSTRUCTION LOAN AGREEMENT** (together with the Joinder and Consent and the exhibits attached hereto, this "**Loan Agreement**") is made as of May 15, 2007, between **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation, having an office at 399 Park Avenue, 8th Floor, New York, New York 10022 ("**Lender**") and **LAUREL COVE DEVELOPMENT, LLC**, a Tennessee limited liability company, having an office at c/o Laurel CV Management, LLC, 175 East Reno Avenue, Suite C5, Las Vegas, Nevada 89119 ("**Borrower**"). All terms as used in this Loan Agreement shall, unless otherwise defined in the main body of this Loan Agreement, have the meanings given to such terms in **Exhibit A** attached hereto.

## RECITALS

A.     Borrower will acquire the fee estate in certain premises comprising approximately 1,120 acres located in College Grove, Williamson County, Tennessee, which premises are legally described in **Exhibit B** attached hereto (the "**Land**").

B.          Borrower intends to construct on the Land certain improvements generally consisting of infrastructure and amenities for a to-be-built single family residential subdivision containing 820 residential lots and an 18 hole golf course and associated clubhouse, a swimming pool/spa facility, a tennis/coffee shop and a sales center (together with all related utilities, landscaping, access, appurtenances, site work and off-site improvements, and all other interior and exterior improvements, tenant improvements, fixtures, machinery, furnishings, equipment, supplies and other property of any kind to be installed or located on, within or adjacent to the Land in accordance with the Plans, hereinafter collectively referred to as the "**Improvements**"; the Land and Improvements are collectively referred to herein as the "**Project**").

C.     At the request of Borrower, subject to the terms and conditions hereof, Lender has agreed to make loan advances to Borrower of up to ONE HUNDRED TWENTY ONE MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($121,500,000.00) to be applied to acquiring the Land, constructing the Improvements and other Project Costs, all as set forth in the Project Budget.

D.     Laurel Cove Ventures 2007, LLC, and Laurel CV Management, LLC, each a Delaware limited liability company (individually, a "**Member**" and collectively, the "**Members**") are the sole members of Borrower. A complete ownership chart ("**Ownership Chart**") showing all Ownership Interests is attached hereto as **Exhibit C**.

NOW, THEREFORE, in consideration of ten dollars ($10) and other good and valuable consideration, the receipt of which is hereby acknowledged, Lender and Borrower hereby covenant and agree as follows:

ARTICLE I

LOAN PROVISIONS

Section 1.1.    <u>Loan</u>.  Subject to the terms and conditions set forth herein, Lender has agreed to make loan advances to Borrower of amounts up to ONE HUNDRED TWENTY ONE MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($121,500,000.00) (the "**Loan**"), to be applied to acquiring the Land, constructing the Improvements and other Project Costs, all as set forth in the Project Budget.  On the date hereof, upon satisfaction of the terms and conditions contained in this Loan Agreement, Lender will make an advance to Borrower of $34,280,308.09 (the "**Initial Advance**") to provide funds for the acquisition of the Land and for payment of closing expenses and certain other purposes.  Thereafter, upon satisfaction of the terms and conditions in this Loan Agreement, Lender will make advances ("**Loan Advances**") for constructing the Improvements and other Project Costs.  A portion of the Loan in the amount of $9,200,000 (the "**Interest Holdback**") will not be included in the Initial Advance of the Loan Advances, but shall be advanced by the making of Future Interest Fundings as set forth in **Section 1.7** below.

Section 1.2.    <u>Term of Loan</u>.  On the Maturity Date, the entire Debt, if not sooner paid, shall become due and payable in full; provided, however, that if all Contingent Interest has not been paid in full by the Scheduled Maturity Date (as the same may be extended pursuant to the Extension Option), then the Reserved Principal Amount shall remain outstanding until all Contingent Interest has been paid in full or an Event of Default has occurred.

Section 1.3.    <u>Loan Advances</u>.

(a)    <u>Requests For Advances</u>.  Subject to the terms and conditions set forth in this Loan Agreement, Borrower may make requests for Loan Advances in accordance with **Section 5.1**.

(b)    <u>Application</u>.  All proceeds of Loan Advances shall be applied to Project Costs strictly in accordance with the Project Budget.

(c)    <u>Termination of Loan Commitment</u>.  The obligation of Lender to make any Loan Advance hereunder shall terminate on the first to occur of (i) any Unmatured Default or an Event of Default; and (ii) Lender's having made aggregate Advances hereunder in the amount of $121,500,000.00.

(d)    <u>Interest</u>.  Interest on the Loan shall accrue and become payable as set forth in the Note.

(e)    <u>Prepayment</u>.  Voluntary prepayment under the Note may be made only as set forth in the Note.

Section 1.4.    <u>Loan Fee</u>.  On the Closing Date, Borrower shall pay to Lender a loan fee ("**Loan Fee**") equal to $1,215,000.00.  The Loan Fee shall be deemed fully earned on the Closing Date and shall not be refundable for any reason.

ATLANTA:4906205.5

Section 1.5.    <u>Contingent Interest; Buy-Out Rights</u>.

(a)    In addition to the interest provided for in the Note, Borrower shall pay to Lender Contingent Interest in the manner and times hereinafter set forth as additional consideration for the Loan.  Borrower and Lender have specifically negotiated the amount of Contingent Interest payable to Lender as a part of the consideration to Lender for making the Loan and entering into the Loan Documents.  The Borrower acknowledges that Borrower has specifically reviewed and analyzed the amount of interest and Contingent Interest which may become payable to Lender under different circumstances, and that Borrower has freely agreed to pay such interest and Contingent Interest in the amounts specified in the Loan Documents.  Borrower recognizes and agrees that Lender would not make the Loan or enter into the Loan Documents except in reliance upon Borrower's covenant to pay the interest and the Contingent Interest as provided in the Loan Documents, which Contingent Interest constitutes compensation to Lender for its various agreements contained in the Loan Documents.  Borrower's obligation to pay the Contingent Interest shall survive the repayment of the principal and other interest (including Accrued Interest) as provided herein.  Any Contingent Interest which is not paid when due shall be added to principal and shall bear interest at the Default Rate until paid.  It is hereby expressly agreed that the right of Lender to collect the Contingent Interest in full is vested in Lender upon the execution and delivery of the Loan Documents, although the precise amounts of such Contingent Interest shall be later determined as hereinafter provided, and Borrower hereby covenants and agrees that the indebtedness evidenced by the Note shall not be satisfied until all of such Contingent Interest has been determined and paid in full in accordance with the terms of the Loan Documents.  Borrower further recognizes and agrees that except for the release of Finished Lots in accordance with **Section 14.4**, below, Lender shall not be obligated to release any Collateral from the lien and security interest of the Loan Documents until the payment of the Loan in full, including payment of the Contingent Interest in accordance with the Loan Documents.

(b)    Contingent Interest shall be due and payable with respect to the Loan as follows:

(i)    On each Payment Date, fifty percent (50%) of all Net Profits (as hereinafter defined) realized by Borrower from the sale of Finished Lots, or realized by Borrower or the Golf Club from the sale of the first 500 golf course memberships or from any other Gross Receipts shall be payable to Lender on each Payment Date (such amount being referred to as "**Contingent Interest**").  As used herein, "**Net Profits**" shall mean all amounts available for distribution after payment in full of items (1) through (8) in Section 10(a) of the Lockbox Agreement.

(ii)    In addition to the remainder of the Debt, Borrower shall pay to Lender an amount equal to the Liquidated Contingent Interest Amount (as herein defined) if an Event of Default shall occur.  As used herein, the "**Liquidated Contingent Interest Amount**" shall mean (A) $10,000,000.00 during the period from the date of this Note through May 15, 2009, (B) $12,000,000.00 during the period from May 16, 2009 through May 15, 2010, (C) $14,000,000.00 during the period from May 16, 2010 through May 15, 2011, and (D) $16,000,000.00 during the period from May 16, 2011 through the date of payment of such Liquidated Contingent Interest Amount.

3

(c)       Borrower's obligation to pay Contingent Interest as provided herein shall continue until the first to occur of (a) exercise by Borrower of its Buy-Out Right (as hereinafter defined), and (b) the sale of all Finished Lots and the sale of the first 500 golf memberships (the "**Sale Event**").

(d)       Borrower acknowledges and agrees that its obligation to pay the Contingent Interest shall survive beyond the Maturity Date in the event that a Sale Event has not occurred and Borrower has not exercised its Buy-Out Rights as of the Maturity Date.  In such event, Lender's right to receive the Contingent Interest shall continue, and if the Sale Event has not occurred by May 15, 2015, then such failure shall constitute an Event of Default hereunder.

(e)       Upon thirty (30) days prior written notice to Lender, provided that no Unmatured Default has occurred and is continuing and no Event of Default has occurred, Borrower shall have the right to cause Lender to terminate its right to receive Contingent Interest and to release its lien on the Project, upon payment to Lender of the following amounts within the following time periods (the "**Buy-Out Rights**"):

(i)       At any time after the date of this Note through May 15, 2009, (A) the entire then outstanding principal balance of the Loan, together with all outstanding interest and unpaid fees, costs and charges incurred by Lender pursuant to the Loan Documents, plus (B) ten million dollars ($10,000,000), less the sum of all Contingent Interest theretofore paid to Lender.

(ii)       At any time after May 15, 2009 through May 15, 2010, (A) the entire then outstanding principal balance of the Loan, together with all outstanding interest and unpaid fees, costs and charges incurred by Lender pursuant to the Loan Documents, plus (B) twelve million dollars ($12,000,000), less the sum of all Contingent Interest theretofore paid to Lender.

(iii)       At any time after May 15, 2010 through May 15, 2011, (A) the entire then outstanding principal balance of the Loan, together with all outstanding interest and unpaid fees, costs and charges incurred by Lender pursuant to the Loan Documents, plus (B) fourteen million dollars ($14,000,000), less the sum of all Contingent Interest theretofore paid to Lender.

(iv)       At any time after May 16, 2011 through May 15, 2015, (A) the entire then outstanding principal balance of the Loan, together with all outstanding interest and unpaid fees, costs and charges incurred by Lender pursuant to the Loan Documents, plus (B) sixteen million dollars ($16,000,000), less the sum of all Contingent Interest theretofore paid to Lender.

(f)       Notwithstanding any of the foregoing provisions or any other provision of this Agreement or the other Loan Documents, Lender shall in no event be liable to Borrower with respect to any operating loss of the Project or for any reduction in the fair market value of the Project by reason of Lender's entitlement to receive Contingent Interest as provided hereinabove, or otherwise.

4

Section 1.6.    Extension Options.

(a)    Extension Options.  Borrower will have options to extend (the "**Extension Options**") the Scheduled Maturity Date to June 1, 2011 (the "**First Extension Option**") and to further extend the Scheduled Maturity Date to June 1, 2012 (the "**Second Extension Option**") if (and only if) each of the following conditions ("**Extension Conditions**") have been satisfied:

(i)    Borrower shall have delivered to Lender written notice (the "**Extension Notice**") of such extension at least forty-five (45) days but not more than ninety (90) days prior to the Scheduled Maturity Date.  The Extension Notice, upon its delivery to Lender, shall be irrevocable;

(ii)    No Event of Default shall have occurred and no Unmatured Default shall have occurred and be continuing (i) at the time Borrower gives the Extension Notice and (ii) on the Scheduled Maturity Date;

(iii)    On or before the Scheduled Maturity Date, Borrower shall have paid or provided Lender sufficient funds for the payment of all Loan Expenses incurred by Lender in connection with the Extension Option;

(iv)    Each representation and warranty made in the Loan Documents by a Loan Party shall continue to be true and correct as if remade on the Scheduled Maturity Date, and on the Scheduled Maturity Date Borrower shall have delivered an Officer's Certificate to that effect;

(v)    On or before the Scheduled Maturity Date to June 1, 2011 (the "**First Extension Option**") and to further extend the Scheduled Maturity Date Borrower shall have delivered to Lender an updated title report for the Project with an effective date not more than 30 days prior to the Scheduled Maturity Date, which shall not show any exceptions to Borrower's title to the Project other than Permitted Exceptions;

(vi)    On or before the Scheduled Maturity Date, Borrower shall have delivered to Lender UCC Searches, with a search date not more than 30 days prior to the Scheduled Maturity Date, confirming the filing of the Financing Statements in favor of Lender, and disclosing no other security interests, liens, encumbrances, judgments, filed actions or bankruptcy filings by or against Borrower with respect to the Collateral other than the Permitted Exceptions;

(vii)    On or before the Scheduled Maturity Date, Borrower shall have delivered to Lender a Borrower Estoppel Certificate in form and substance acceptable to Lender with an effective date not more than 5 days prior to the Scheduled Maturity Date;

(viii)    On or before the Scheduled Maturity Date, each Loan Party shall have delivered to Lender its current certified financial statement showing no Material Adverse Change;

(ix)    On or before the Scheduled Maturity Date, each Guarantor shall have delivered a reaffirmation of its Guaranty (on a form acceptable to Lender);

5

(x)    If required by Lender, on or before the Scheduled Maturity Date, Borrower shall obtain an Interest Rate Cap Agreement meeting the requirements of this Loan Agreement; and

(xi)    Only with respect to the Second Extension Option, on or before the Scheduled Maturity Date, Borrower shall have paid to Lender the Loan Extension Fee in immediately available United States funds.

In the event that any of the foregoing Extension Conditions is not satisfied strictly in accordance with the terms hereof or waived by Lender in writing, the applicable Extension Option shall be null and void, and the Loan shall mature on the applicable Scheduled Maturity Date.

Section 1.7.    (a)    Interest Holdback; Future Interest Fundings.  On each Payment Date, provided no Event of Default has occured or Unmatured Default has occurred and is continuing, Lender shall advance funds from the Interest Holdback ("**Future Interest Fundings**"), by ledger entry on the books of Lender, to pay directly to Lender all or any portion of the accrued interest on the Note due on such Payment Date, to the extent, but only to the extent, that funds in the Lockbox Account after payment of **items (1), (2), (3), (4) and (5) of Section 10(a)** of the Lockbox Agreement are insufficient therefor. Future Interest Fundings shall only be made to Lender for the payment of interest on the Note as provided above and Lender shall not be obligated to make Future Interest Fundings to reimburse Borrower for any costs or expenses or for any other purpose. Any and all Future Interest Fundings shall be deemed to have been paid to and received by Borrower and shall be added to the outstanding principal balance of the Note and shall bear interest at the Applicable Interest Rate. Interest at the Applicable Interest Rate will be charged on any disbursed portion of the Interest Holdback as and when disbursed through the making of Future Interest Fundings, but interest will not be charged on any undisbursed portion of the Interest Holdback. Borrower recognizes that the payment of interest on the Note by the making of Future Interest Fundings from the Interest Holdback is for its convenience and benefit. Lender shall have no obligation to fund any portion of the Interest Holdback so long as any Event of Default has occurred or any Unmatured Default has occurred and is continuing. Notwithstanding anything to the contrary contained herein, Future Interest Fundings shall be made as provided herein (and subject to the conditions set forth herein) without any requirement that the Borrower make a request therefor.

(b)    Interest Reserve.  Borrower agrees that Lender may elect, in its sole and absolute discretion, to establish a Reserve Account by means of a Loan Advance in such amount as Lender shall determine for the payment of interest accruing on the Loan.  The Reserve Account established for such payments is referred to herein as the "**Interest Reserve**" and will be held in accordance with the Lockbox Agreement. On each Payment Date, and provided that no Unmatured Default has occurred and is continuing and that no Event of Default has occurred, Servicer shall apply sums then present in the Interest Reserve toward (i) the payment of interest on the Loan to the extent, but only to the extent, that funds in the Lockbox Account after payment of items (1), (2), (3) (4) and (5) of **Section 10(a)** of the Lockbox Agreement are insufficient therefor (the "**Interest Shortfall Amount**").    Notwithstanding the preceding sentence, Lender has no obligation to apply, and Borrower has no right to receive, any amount in excess of the balance of the Interest Reserve on any Payment Date and provided further that funds in the Interest Reserve shall be applied no more than one (1) time during any calendar

6

month. Notwithstanding the foregoing, in the event that the funds in the Interest Reserve are insufficient to pay any Interest Shortfall Amount, Borrower shall not be relieved of its obligations under the Loan Documents to pay such Interest Shortfall Amount or any other interest or other amounts due to Lender on such Payment Date.

ARTICLE II

LOAN DOCUMENTS; SECURED OBLIGATIONS

Section 2.1.    <u>Loan Documents</u>. The Obligations shall be evidenced and secured by the Loan Documents, including the following, all dated as of the date hereof (except as otherwise noted below):

    (a)    this Loan Agreement and the Joinder hereto;

    (b)    that certain Secured Promissory Note dated as of the date hereof in the principal amount of $121,500,000.00 given by Borrower to Lender and evidencing the Advances (together with any Amendments thereto, the "**Note**");

    (c)    that certain Construction Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Financing Statement from Borrower in favor of Trustee for the benefit Lender securing the Obligations (together with any Amendments thereto, the "**Security Instrument**");

    (d)    that certain Absolute Assignment of Leases and Rents from Borrower in favor of Lender securing the Obligations (together with any Amendments thereto, the "**Lease Assignment**");

    (e)    that certain Lockbox, Pledge and Security Agreement among Borrower, Servicer and Lender (together with any Amendments thereto, the "**Lockbox Agreement**");

    (f)    the Financing Statements;

    (g)    that certain Guaranty of Recourse Obligations from Guarantor in favor of Lender (together with any Amendments thereto, the "**Guaranty of Recourse Events**");

    (h)    that certain Guaranty of Completion from Guarantor in favor of Lender (together with any Amendments thereto, the "**Completion Guaranty**"); and

    (i)    that certain Environmental Representation, Warranty and Indemnification Agreement from Borrower and Guarantor in favor of Lender (together with any Amendments thereto, the "**Environmental Indemnity**").

Section 2.2.    <u>Obligations</u>.    The grants, assignments, pledges, encumbrances and transfers made under the Loan Documents are given for the purpose of securing (i) payment of the Debt; and (ii) the performance of all other agreements, covenants, conditions and obligations of the Borrower and each other Loan Party contained herein or in the other Loan Documents (collectively, items (i) and (ii) are the "**Obligations**").

7

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.1.    <u>Representations and Warranties</u>.  Recitals A, B, C and D set forth above are made a part of this Article and constitute representations and warranties of Borrower to Lender.  The Borrower further represents and warrants to Lender as follows:

(a)    <u>Initial Advance Conditions</u>.  Borrower has fully satisfied each of the Initial Advance Conditions as of the Closing Date.

(b)    <u>Loan Documents</u>.  Each of the Loan Documents is in full force and effect.

(c)    <u>No Event of Default</u>.  No Event of Default or Unmatured Default has occurred.

(d)    <u>No Set-Off</u>.  The Loan Documents, and the performance of each Loan Party's obligations thereunder, are not subject to any right of rescission, set-off, counterclaim or defense by any Loan Party, including the defense of usury, nor would the exercise of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents or any remedy provided for thereunder unenforceable, and no Loan Party has asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

(e)    <u>Lien of Loan Documents</u>.  Each of the Loan Documents which purports to grant or assign to Lender a Lien on any Collateral creates a valid, enforceable Lien on such Collateral in favor of Lender.  Upon the recording of the Security Instrument and the filing of the Financing Statements and the acknowledgement of the Depository Bank with respect to those items of Collateral described in the Lockbox Agreement, Lender will have a perfected Lien on each item of Collateral.

(f)    <u>Organization; Good Standing; Formation and Organization Documents</u>.  Each Loan Party (other than a Loan Party that is a natural Person) is duly organized, validly existing and in good standing and qualified to do business in the jurisdiction of its organization and the State where the Project is located, and each such Loan Party has all requisite organizational power and authority to execute, deliver and perform its obligations under each Loan Document to which it is a party.  Borrower has delivered to Lender all formation and organizational documents of each Loan Party (other than a Loan Party that is a natural Person), and all such formation and organizational documents remain in full force and effect and have not been amended or modified since they were delivered to Lender.

(g)    <u>Due Authorization; Enforceability</u>.  Each Loan Party and its members, partners, shareholders, officers and/or directors, as applicable, have taken all necessary action to authorize the execution, delivery and performance of each Loan Document, and no consent, authorization or approval of any Person is necessary to authorize each Loan Party to execute, deliver and perform its obligations under each Loan Document to which it is a party, except for the written consent obtained from the Persons set forth on **Exhibit D**, which consents remain in full force and effect, with copies thereof provided to Lender.  Each of the Loan Documents has been duly executed and delivered by or on behalf of each applicable Loan Party, and constitutes

8

the legal, valid and binding obligations of each such Loan Party enforceable against each such Loan Party in accordance with its terms.

(h)    No Conflicts.  The execution, delivery and performance of each Loan Document by each applicable Loan Party does not and will not (i) conflict with, result in or cause any violation under Applicable Law, (ii) conflict with or result in a breach of any term or provision of, or constitute a default under, any of its organizational documents or any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which such Loan Party is bound or by which such Loan Party's property or assets are subject, (iii) result in the creation or imposition of any Lien (other than pursuant to the Loan Documents) upon any of the property or assets of any Loan Party, or (iv) result in any violation of the provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over such Loan Party or any of its properties or assets.

(i)    Consents.  Other than the consents set forth on **Exhibit D** and the permits and licenses set forth on **Exhibit I**, no consent, approval, authorization or order of, or qualification with, any court or Governmental Authority or any other Person is required in connection with the Construction and Use of the Project and the execution, delivery or performance by any Loan Party of the Loan Documents.

(j)    No Litigation.  There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or any other Person now pending or threatened against or affecting the Project, any of the Collateral or any Loan Party other than such actions, suits or proceedings (A) as have been disclosed to Lender in writing and (B) if existing on the Closing Date, are set forth on **Exhibit E** and (C) individually and in the aggregate, are not likely to result in a Material Adverse Change.

(k)    No Restriction.  No Loan Party is in default (after any applicable notice and grace period) in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party which could result in a Material Adverse Change.

(l)    Ownership Interests.  All Ownership Interests are as set forth on **Exhibit C**, and no other Person has any Ownership Interest except as a result, after the Closing Date, of a Permitted Transfer or other Transfer approved by Lender in accordance with **Article IX**.

(m)    Residence; Registered Organization.  Each Loan Party that is not an individual is a registered organization (as defined in the Uniform Commercial Code as in effect in the State of New York) in the State of its organization.

(n)    Financial Condition.  Each financial statement concerning each Loan Party and the Project provided to Lender from time to time fairly and accurately presents, in all material respects the financial position of each such Loan Party and the Project, as the case may be, as of the date of such financial statement. Each such financial statement has been prepared in accordance with the requirements of **Section 7.15(b)**.  Since the Closing Date, there have

9

occurred no changes or circumstances which individually or in the aggregate have had or may result in a Material Adverse Change.

(o)    <u>Fraudulent Transfer; Solvency</u>.  No Loan Party has entered into the Loan Documents with the actual intent to hinder, delay, or defraud any creditor or any other Person, and each Loan Party has received reasonably equivalent value in exchange for its obligations under the Loan Documents.  As of the Closing Date, and after giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of each Loan Party's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed such Loan Party's total Indebtedness.  Each Loan Party's assets, immediately following the execution and delivery of the Loan Documents, will not constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  As of the Closing Date, no Loan Party intends or believes that it will incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of its obligations).

(p)    <u>No Bankruptcy Filing</u>.  As of the Closing Date, no Loan Party is a debtor in any outstanding action or proceeding pursuant to any Bankruptcy Law and no Loan Party is (i) contemplating either the filing of a petition by it under any Bankruptcy Law or the liquidation of all or any portion of its assets or property or (ii) aware that any other Person is contemplating the filing against any Loan Party of a petition under any Bankruptcy Law.

(q)    <u>Single Purpose</u>.  Borrower was formed solely for the purpose of acquiring its direct or indirect interest in the Project.  Each Member is formed solely for the purpose of owing its limited liability company interest in Borrower.  The Golf Club was formed solely for the purpose of leasing and operating the Golf Course when it is constructed.  Furthermore, since the formation of Borrower, each Member and the Golf Club:

(i)    Each of Borrower, each Member and the Golf Club has never had any Indebtedness, nor does any of them have any Indebtedness, other than Permitted Debt;

(ii)    Borrower has not and does not now own any asset or property other than (A) the Project, and (B) Personal Property necessary for the Construction and Use of the Project;

(iii)    Each Member has not and does not now own any asset or property other than its membership interest in the Borrower;

(iv)    The Golf Club has no assets as of the date hereof;

(v)    Each of Borrower, each Member and Golf Club has been and will at all times be a Single Purpose Entity; and

(vi)    Each of Borrower, each Member and the Golf Club has complied and will continue to comply with the provisions of its organizational documents and the laws of the State in which it was formed.

10

(r)    Control.    Guarantor has the power and authority and the requisite Ownership Interests to control the actions of the Borrower.  Without limiting the foregoing, Guarantor has sufficient control over Borrower to cause Borrower to (i) take any action on Borrower's part required by the Loan Documents and (ii) refrain from taking any action prohibited by the Loan Documents.

(s)    Non-Consolidation Opinion.    All of the assumptions contained in the substantive non-consolidation opinion dated as of the Closing Date, prepared by the law firm of Bone McAllester Norton, PLLC are true, accurate and complete.

(t)    Employees.  Borrower does not have any employees.

(u)    Title.  Borrower has good and marketable fee simple title to the Project free and clear of all liens, encumbrances and charges whatsoever other than Permitted Exceptions.  None of the Permitted Exceptions does or will materially interfere with the Intended Use of the Project, with the value of the Project now and on an As Built Basis, or with the ability of any Loan Party to perform its obligations under the Loan Documents.  Each other Loan Party purporting to grant to Lender a Lien on any other Collateral has good and marketable fee simple title to such Collateral free and clear of all liens, encumbrances and charges whatsoever.

(v)    Flood Zone.  No portion of the Land that is to be converted to a Finished Lot or on which the Clubhouse and other Structures or any other above ground structure will be located is located in an area as identified by the Federal Emergency Management Agency or the Federal Insurance Administration as an area having special flood hazards (Zone A or Zone V).

(w)    Parking.  The Project and the Improvements, on an As Built Basis and as operated and maintained, will have located thereon a sufficient number of parking spaces to comply with Applicable Law and with all obligations under the Project Documents.

(x)    Access.  The Land has adequate rights of access to dedicated public ways either abutting the Land or through Easement Areas (and makes no use of any means of access, ingress or egress that is not pursuant to such dedicated public ways or Easement Areas).  Without limiting the foregoing, all roads necessary for the full utilization of the Project for the Intended Use on an As Built Basis (i) have been completed and paid for and dedicated to public use and accepted by the applicable Governmental Authority or (ii) are part of the Project and will be completed in accordance with the Plans.  Vehicular and pedestrian access (including curb cuts) to and from the Project will be permitted to all such streets, roads or highways as shown on the Plans.

(y)    Utilities.  The Land is served by water, electric, sewer, sanitary sewer and storm drain facilities and all other utilities necessary and sufficient for the Intended Use of the Project on an As Built Basis, and such utilities enter the Land directly from a public right-of-way abutting the Land or through Easement Areas, and all such utilities are connected so as to serve the Land without passing over other property other than Easement Areas.

(z)    No Encroachments.  The Improvements, on an As Built Basis, will lie wholly within the boundaries and building restriction lines of the Land and will not encroach upon easements or other encumbrances upon the Land, including any required set-back, and no

11

improvements on adjoining properties encroach upon the Land, and the Improvements, on an As Built Basis.

(aa)    <u>Compliance with Applicable Law; Zoning</u>.  The Project (including the Intended Use) and the Plans are in compliance with, and the Project has been and will be designed, constructed, completed, maintained and operated in compliance with, Applicable Law, including the ADA.  The Project is presently zoned as "Suburban Estate" pursuant to the zoning ordinance of Williamson County, Tennessee.

(bb)    <u>Construction To Date</u>,  Construction of the Project to date has not commenced.

(cc)    <u>Project Budget</u>.  The initial Project Budget approved by Lender is attached hereto as **Exhibit G**.  As of the Closing Date, the Project Budget reflects, and, unless Borrower has informed Lender in writing otherwise, will at all times hereafter reflect, Borrower's best good faith estimate of all Project Costs to be incurred and all Gross Receipts to be received through the Scheduled Maturity Date.

(dd)    <u>Construction Schedule</u>.  The Construction Schedule approved by Lender is attached hereto as **Exhibit H**.  As of the Closing Date, the Construction Schedule reflects, and unless Borrower has informed Lender in writing otherwise, will at all times hereafter reflect, Borrower's best good faith estimate of the dates by which Borrower will have commenced and completed each portion of the construction and development of the Project.

(ee)    <u>Permits and Licenses</u>.  **Exhibit I** attached hereto sets forth a complete list of all licenses and permits required, based on Applicable Law in effect on the Closing Date, to authorize and complete all work included in the Project and operate, lease and maintain the Project for its Intended Use.  Except as set forth on **Exhibit I**, all such licenses and permits have been obtained, paid for and are in full force and effect.  All licenses and permits which have not, as of the Closing Date, been obtained are available and will be obtained as and when required to construct, complete, operate, lease and maintain such Project in accordance with Applicable Law and the Construction Schedule.

(ff)    <u>Forfeiture</u>.  There has not been committed by any Loan Party any act or omission affording any Governmental Authority the right of forfeiture as against (i) the Project or any part thereof, or (ii) any Ownership Interest or (iii) any monies paid in performance of the Obligations or (iv) any license or permit set forth on **Exhibit I**.  No Loan Party has purchased the Project or its Ownership Interest with the proceeds of any illegal activity.

(gg)    <u>Casualty</u>.  Except as disclosed to Lender in writing as a result of events occurring after the Closing Date, the Project has not been damaged or injured as a result of any Casualty.

(hh)    <u>No Condemnation</u>.  Except as disclosed to Lender in writing as a result of events occurring after the Closing Date, no Condemnation proceeding has been commenced, or, to the Borrower's Knowledge, is pending or threatened against the Project or any roadways or Easement Areas providing access to the Project.

12

(ii)    No Violations.  Except as disclosed to Lender in writing with respect to notices received after the Closing Date, no Loan Party has received any notice of violations of any Applicable Law in respect of the Project.

(jj)    Insurance.  Policies satisfying the insurance coverage's, amounts and other requirements set forth in this Loan Agreement are in full force and effect and, to Borrower's Knowledge, no Person, has done, by act or omission, anything which would impair the coverage of any such Policy.

(kk)    Approved Management Agreements.  Borrower has delivered to Lender a true, complete and correct copy of each Approved Management Agreement, each of which is in full force and effect and free from default by Borrower or, to Borrower's Knowledge, the manager thereunder.  Other than the Approved Management Agreements, there are no other agreements in existence relating to the management or operation of the Project.

(ll)    Intentionally Omitted.

(mm)    Intentionally Omitted.

(nn)    Construction Agreements.  **Exhibit K** attached hereto sets forth a list of all Construction Agreements entered into by any Loan Party on or before the Closing Date, and as of the Closing Date there exist no other Construction Agreements other than those set forth on **Exhibit K**, and all other Construction Agreements entered into after the Closing Date shall be in compliance with the Loan Documents.  All Construction Agreements have been or will be entered into in the name of the Borrower or have been duly assigned to and assumed by Borrower.  The Construction Agreements are in full force and effect and there are no defaults thereunder by any Loan Party or, to Borrower's Knowledge, any Contractor Party except as disclosed to Lender in writing.

(oo)    Other Material Agreements.  **Exhibit L** attached hereto sets forth a list of all Other Material Agreements entered into by any Loan Party on or before the Closing Date, and there exist no Other Material Agreements other than those set forth on **Exhibit L**, and all Other Material Agreements entered into after the Closing Date shall be in compliance with the Loan Documents.  All Other Material Agreements have been or will be entered into in the name of the Borrower or have been duly assigned to and assumed by Borrower.  The Other Material Agreements are in full force and effect and there are no defaults thereunder by any Loan Party or, to Borrower's Knowledge, any other party thereto, except as have been disclosed to Lender in writing.

(pp)    Acquisition Documents.  Borrower has or has caused to be delivered to Lender true, correct and complete copies of all Acquisition Documents and there are no Acquisition Documents other than as set forth on **Exhibit M** attached hereto.  Other than as set forth on **Exhibit M** attached hereto, no Person has any material continuing rights or obligations under the Acquisition Documents, other than representations and warranties in favor of Borrower.

(qq)    Taxes and Assessments.  All taxes and governmental assessments relating to the Project are current and are not delinquent.  Each Loan Party has filed, or caused to be filed,

13

all tax returns (federal, state, local and foreign) required to be filed and paid all amounts of taxes shown thereon to be due (including interest and penalties) and has paid all other taxes, fees, assessments and other governmental charges (including mortgage recording taxes, documentary stamp taxes and intangible taxes) owing (or necessary to preserve any liens in favor of Lender) by it, except for taxes which are not yet due and payable. Except as disclosed to Lender in writing with respect to events occurring after the Closing Date, there are no existing, pending or, to Borrower's Knowledge, proposed, special or other assessments for public improvements or otherwise affecting the Project other than as reflected on the Title Insurance Policy.

      (rr)    <u>Separate Tax Lot</u>. The Land consists of a separate tax lot or lots and said lot or lots do not include any property not included within the Land.

      (ss)    <u>ERISA</u>. No Loan Party or any ERISA Affiliate of a Loan Party is an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, and none of the assets any Loan Party constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3 101. The consummation of the transaction contemplated hereby will not constitute or result in any transaction prohibited by Section 406 of ERISA or Section 4975 of the Code.

      (tt)    <u>Margin Stock</u>. No Loan Party is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of the Loan will be used for a purpose which violates, or would be inconsistent with Federal Reserve System Board of Governors' Board Regulation U or X (as such terms are used in Federal Reserve System Board of Governors' Board Regulation U or X or any regulations substituted therefor, as from time to time in effect), or for any purposes prohibited by Applicable Law or by the terms and conditions of the Loan Documents.

      (uu)    <u>Foreign Person</u>. No Loan Party is a "foreign person" within the meaning of § 1445(f)(3) of the Internal Revenue Code.

      (vv)    <u>Investment Company</u>. No Loan Party is (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (iii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

      (ww)    <u>Full and Accurate Disclosure</u>. No statement of fact made by or on behalf any Loan Party in any Loan Document contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no fact known to any Loan Party which has not been disclosed in writing to Lender which has resulted in or may result in a Material Adverse Change. All reports, documents, instruments, information and forms of evidence delivered to Lender concerning the Loan or security for the Loan or required by the Loan Documents are accurate, correct and sufficiently complete to give Lender true and accurate knowledge of their subject matter, and do not contain any misrepresentation or omission.

14

(xx)    <u>Use of Loan Proceeds</u>.  Borrower and Borrower have used the proceeds of the Loan solely for purposes set forth in the Project Budget and each applicable Draw Request.

(yy)    <u>Intentionally Omitted</u>.

(zz)    <u>Environmental</u>.  Except as set forth in the Environmental Reports, (A) the Project and each portion thereof is in full compliance with all applicable Environmental Laws, (B) there have been no past and there are no pending or threatened claims, complaints, notices or requests for information known to or received by any Loan Party with respect to any violation or alleged violation of, or any liability or alleged liability under, any Environmental Law in connection with or relating to the Project or any portion thereof, (C) there have been no releases of Hazardous Materials at, on or under the Project or any portion thereof; (D) there are no underground storage tanks, active or abandoned, owned or leased, at the Project; (E) there are no polychlorinated biphenyls or friable asbestos present at the Project and (F) no condition exists at, on or under the Project or any portion thereof, which with the passage of time or the giving of notice or both would give rise to liability under any Environmental Law.

(aaa)    <u>Lot Sales</u>.  As of the date hereof, Borrower has Qualified Sales Contracts for not less than 500 of the proposed 820 residential lots.

Section 3.2.    <u>Representations and Warranties to be Continuing</u>.  Borrower represents and warrants that all of the representations and warranties in this Loan Agreement are true and correct as of the Closing Date and will be true and correct at the date of the first Loan Advance, and will continue to be true throughout the term of the Loan as if remade at all times afterwards. All representations and warranties made in this Loan Agreement or in any other document delivered to Lender by or on behalf of any Loan Party shall survive the making of the Loan and shall continue in full force and effect until the Obligations are fully satisfied.  Borrower shall inform Lender in writing within five (5) Business Days upon discovering any breach of such representations or warranties, it being understood and acknowledged that any such discovery by any Loan Party or Key Person or any other Person having an Ownership Interest shall be deemed to be discovery by Borrower.

Section 3.3.    <u>Acknowledgment of Lender's Reliance</u>.  The Borrower acknowledges that the Loan and each Advance will be made by Lender in reliance upon the representations and warranties contained in the Loan Documents or any certificate delivered to Lender pursuant to the Loan Documents.  The Lender shall be entitled to such reliance notwithstanding any investigation which has been or will be conducted by Lender or on its behalf.

Section 3.4.    <u>Notice</u>.  Whenever a representation states "except as disclosed to Lender in writing," Borrower shall be deemed to be in breach of such representation if Borrower does not make such disclosure (in a notice given pursuant to **Section 12.10**) within five (5) Business Days of any Loan Party or Key Person or any other Person having an Ownership Interest first learning of any fact, event or circumstance which would be a breach of such representation if not disclosed to Lender in writing.

15

ATLANTA:4906205.5

ARTICLE IV

CONDITIONS PRECEDENT TO INITIAL ADVANCE

Section 4.1.    Initial Advance Conditions.  The obligation of Lender to make the Initial Advance hereunder is subject to the fulfillment by Borrower of the following conditions precedent ("**Initial Advance Conditions**") no later than the Closing Date, each in form and substance satisfactory to Lender (but if any Initial Advance Condition is not fully satisfied by the Closing Date and Lender elects, in its sole and absolute discretion, to proceed with the initial Advance, no such unsatisfied Initial Advance Condition shall be deemed waived (at such time or any other time) unless Borrower gives Borrower written notice that it is permanently waiving any such Initial Advance Condition and thereafter, until such Initial Advance Condition has been fulfilled to Lender's satisfaction or permanently waived by Lender in a written notice to Borrower, such Initial Advance Condition shall automatically be and become a condition precedent to Lender's approval of each subsequent Advance):

(a)    Intentionally Omitted.

(b)    Loan Documents.  Lender shall have received the Loan Documents, in each case, duly executed, delivered and, where appropriate, acknowledged by each applicable Loan Party.

(c)    Representations and Warranties.  The representations and warranties of each Loan Party contained in the Loan Documents shall be true and correct.

(d)    No Event of Default.  No Event of Default or Unmatured Default shall have occurred and shall be continuing; and each Loan Party shall be in compliance with all terms and conditions set forth in each Loan Document on its part to be observed or performed.

(e)    Borrower's Equity.  Lender shall have received an Officer's Certificate and other satisfactory evidence (including invoices, cancelled checks, etc.) of capital contributions to Borrower by the former direct or indirect owners thereof in an aggregate amount not less than $2,145,000.00 and by the current direct or indirect owners thereof in an aggregate amount not less than $250,000.00 (the "**Borrower's Equity**"), and the application to Projects Costs by the Borrower of such Borrower's Equity.  No funds loaned to or borrowed by Borrower shall count towards the Borrower's Equity.

(f)    Material Adverse Change.  No event or series of events shall have occurred which has resulted in or is reasonably likely to result in a Material Adverse Change.

(g)    Litigation.  No law or regulation shall have been adopted, no order, judgment or decree of any Governmental Authority shall have been issued, and no litigation shall be pending, which in Lender's reasonable judgment could result in a Material Adverse Change.

(h)    Casualty.  No Casualty has occurred or Condemnation proceeding has been initiated, which in Lender's sole and absolute discretion, could result in a Material Adverse Change.

ATLANTA:4906205.5

(i)      Closing Expenses.  Lender shall have received reimbursement for all of Lender's Closing Expenses (including Professional Fees).

(j)      Required Deliveries.  Lender shall have received, reviewed and approved each of the items set forth on **Exhibit O** attached hereto, each of which shall be in form and content acceptable to Lender.

## ARTICLE V

## PROCEDURES AND CONDITIONS FOR ADVANCES

This Article contains terms, conditions and delivery requirements which pertain to all Loan Advances under this Loan Agreement.  These terms, conditions and delivery requirements are in addition to those set forth elsewhere in this Loan Agreement.

Section 5.1.    Requests For Advances.

(a)      Project Costs and Line Items.  The Borrower may request Loan Advances under the Loan only for payment of Project Costs which according to the Project Budget are to be funded with Loan Advances.  Further, the amount which Lender shall be obligated to disburse for any item of Project Costs shall not be in excess of the amount shown for that item on the Project Budget.

(b)      Loan Advances.  The Borrower shall give Lender prior written notice of each requested Loan Advance not less than 15 days prior to the proposed date for such Loan Advance.  All such requests for Loan Advances must be in writing, must be for a date which is a Business Day, and must include all Request For Advance Documents (other than the Consultant's Approval Certificate) before the 15-day period begins to run.  Loan Advances shall be made not more frequently than once a month.  All Loan Advances must be in an amount not less than $100,000, except that the final Loan Advance may be for the balance of the Loan even if less than $100,000.

(c)      Intentionally Omitted.

Section 5.2.    Conditions for Advances.  Lender's approval of each Loan Advance shall be subject to the satisfaction, compliance or prior written waiver by Lender of the following conditions:

(a)      Representations and Warranties.  The representations and warranties of each Loan Party contained in the Loan Documents shall be true and correct as if remade on the date of each Advance.

(b)      No Event of Default.  No Event of Default or Unmatured Default shall have occurred and be continuing, and each Loan Party shall be in compliance with all terms and conditions set forth in each Loan Document on its part to be observed or performed.

(c)      Material Adverse Change.  No event or series of events shall have occurred which has resulted in or is reasonably likely to result in a Material Adverse Change.

17

(d)    Casualty and Condemnation.  No Casualty has occurred or Condemnation proceeding has been initiated.

(e)    Balancing.  Lender is satisfied that the Loan is "in balance" in accordance with **Section 6.5**.

(f)    Date Down Endorsements.  Lender shall have received a "date down" endorsement to the Lender's Title Insurance Policy extending the coverage to include the date and amount of the requested Loan Advance and updating the interim mechanic's lien coverage in the Lender's Title Insurance Policy.  In the case of Lender's interim mechanics' lien coverage, such coverage shall be as of the date of such Advance.  Such date down endorsements shall also show no exceptions to title other than the Permitted Exceptions.

(g)    Foundation and Caisson Endorsements.  With respect to the first Advance after the foundations for the Clubhouse and other Buildings are complete, (i) Borrower shall have delivered to Lender a survey from a surveyor licensed in Tennessee locating the foundations and all footings and caissons and showing no encroachments other than Permitted Exceptions and (ii) each Title Company shall have issued foundation and caisson endorsements to the Lender's Title Insurance Policy insuring against encroachments other than Permitted Exceptions.

(h)    Retainage.  Each disbursement for "hard costs" of construction to General Contactor shall be subject to a holdback (the "**Retainage**") of 10% of the amounts due under the General Construction Contract, which amounts may not be released until Substantial Completion, and Borrower shall not, and shall not permit Borrower or any other Person to, request an Advance for such retained amounts prior to Substantial Completion.

(i)    Work In Place.  With respect to each Advance for "hard costs" of construction, subject to **Section 5.2(l)**, the amount of the Loan Advance shall not exceed the cost of the work in place, less Retainage and amounts previously paid in respect of such work in place.

(j)    Request For Advance Documents.  With respect to any Advance for "hard costs" or "soft costs" of construction, Lender shall have received by the time required in **Section 5.1(b) or (c)**, as applicable, each of the following documents (collectively, the "**Request For Advance Documents**"), each of which must be approved by Lender: (i) a Draw Request; (ii) Borrower's Construction Loan Certificate; (iii) an Architect's Approval Certificate; (iv) a Consultant's Approval Certificate; (v) a Sworn Owner's Statement; (vi) an Application and Certificate For Payment By Contractor for each Contractor Party identified in such Sworn Owner's Statement; (vii) a Contractor's Sworn Statement from each such Contractor Party; (viii) a Partial Waiver of Lien or final waivers of lien where appropriate, from each such Contractor Party; (ix) lien waivers from the subcontractors shown on each such Sworn Contractor's Statement; (x) if Lender requests, copies of invoices and other documents to support the non-construction "soft cost" items contained in the requested Advance; (xi) copies of all Change Orders to date not previously supplied to Lender; and (xii) such other documents and information as Lender or Lender's Project Consultant may reasonably request.

18

(k)    <u>Final Advance under General Construction Contract</u>.  With respect to the final Advance (including Retainage) for amounts due under the General Construction Contract (other than Punchlist Items), Lender shall have received the following in form and substance acceptable to Lender: (i) certificates from each of Borrower and Architect certifying, among other matters requested by Lender, completion of the entire Project (other than Punchlist Items) in accordance with the Plans and Applicable Law; (ii) three (3) copies of an "as-built" survey of the Project, showing no encroachments or other matters objectionable to Lender and three (3) copies of complete "as-built" Plans for the Project; (iii) copies of the final unconditional certificate or certificates of occupancy for the entire Project and each and every portion thereof, together with all other licenses and permits necessary for the use and occupancy of the Project and each and every portion thereof; (iv) a final "comprehensive endorsement" and ALTA 3.0 Zoning Endorsement to the Lender's Title Insurance Policy; (v) final lien waivers from the General Contractor and all other contractors, subcontractors and materialmen (on all tiers) claiming by, through or under General Contractor; (vi) an update of the UCC Searches showing no matters which are not Permitted Exceptions; (vii) evidence that Borrower has obtained the insurance required under the Loan Documents upon Substantial Completion; (viii) the approval of the sureties under the Payment and Performance Bonds; and (ix) such other items as Lender shall request.  If any Punchlist Items remain to be completed, such items shall be subject to Lender's approval prior to the final Advance under the General Construction Contract contemplated by this **Section 5.2(k)**, in which case Borrower shall withhold or cause Borrower to withhold from General Contactor a sum not less than 150% of the estimated cost (as approved by Lender) of such Punchlist Items and a like amount shall be withhold from the final Advance under General Construction Contract contemplated by this **Section 5.2(k)**.

(l)    <u>Advances for Stored or Offsite Materials</u>.  With respect to any Advance for materials stored off-site or delivered to the site but not yet incorporated into the Project ("**Stored Materials**"), Lender's shall have received satisfactory evidence that the following are true: (i) the Stored Materials are finished components, ready for installation, and appropriate for purchase during the current stage of construction; (ii) the Stored Materials are stored either at the Project site or located at another site, in either case suitably segregated and marked as owned by Borrower, and that they are protected against theft and damage; (iii) ownership of the Stored Materials has vested in Borrower free of all security interests except the Permitted Exceptions; (iv) Lender has a perfected security interest in the Stored Materials; (v) the Stored Materials are covered by insurance acceptable to Lender; and (vi) the aggregate outstanding amount of Stored Materials for which payment has been made shall not exceed $100,000.

(m)    <u>Required Deliveries</u>.  Lender shall have received, reviewed and approved each of the items set forth on **Exhibit R** attached hereto, each of which shall be in form and content acceptable to Lender.

(n)    <u>Lockbox Account</u>.  The amounts for which a Loan Advance is requested shall not otherwise be available at such time from Gross Receipts in accordance with the terms of the Lockbox Agreement.

(o)    <u>Sale of Finished Lots</u>.  Borrower shall have caused Finished Lots to have been sold in accordance with the terms of the Loan Documents in the number and by the times set forth in **Exhibit V** attached hereto.

ATLANTA:4906205.5

(p)    Termination of Sales Contracts.  Borrower shall fail to have at all times binding sales contracts in existence for at least 500 proposed residential lots in the Project.

Section 5.3.    Disbursement.

(a)    Construction Advances.  Except as Lender otherwise elects, Lender shall make Loan Advances for payment of Project Costs to Servicer in accordance with the wiring instructions set forth on **Exhibit P-10** attached hereto.

(b)    Direct Disbursements.  Lender reserves the right to make disbursements directly to Borrower (including to Lender or its consultants) and to third parties entitled to payment for Project Costs.

Section 5.4.    Representation and Warranty Upon Disbursement.  The acceptance by Borrower or any other Person of any Loan Advance shall constitute Borrower's representation and warranty to Lender that all terms, conditions and requirements under the Loan Documents to such Advance have been satisfied as of the date of such Advance.

ARTICLE VI

CONSTRUCTION COVENANTS

Section 6.1.    Construction Obligations.

(a)    General Obligation.  Borrower shall commence construction of the Project by no later than the Construction Commencement Date and thereafter prosecute construction of the Project with good faith and diligence in compliance with the Construction Schedule so that each portion of the work will be substantially completed by each respective Staged Completion Date and the Project will be completed (including Punchlist Items) by the Required Completion Date.  Borrower acknowledges that each Staged Completion Date and the Required Completion Date is absolute and will not be extended or re-set to a later date because of force majeure or any other reason (other than as a Staged Completion Date may be extended for Excusable Delay in accordance with the definition of Staged Completion Date).

(b)    Compliance.  All construction will be done free of defects in a good and workmanlike manner with materials which are new (unless used materials are otherwise customary as confirmed by Lender's Construction Consultant) and of high quality.  The Project will be equipped and furnished with furnishings, fixtures and equipment which are new and of high quality.  All construction shall be done in compliance with the Plans and with all Applicable Law, and where applicable, the Project Documents.  The Borrower will promptly correct any defects in construction or material deviations from the Plans.  All materials and labor purchased and employed for the Project shall be used solely for the Project and for no other purpose.  Without obtaining Lender's prior written consent, Borrower shall not, acknowledge or accept any claim of any third party that any work or services (or portion or phase thereof) on the Project is complete or substantially complete.

(c)    Intentionally Omitted.

20

(d)    Payment.  Borrower shall pay all Project Costs as they become due and owing, notwithstanding that Lender may not be obligated to make a Loan Advance hereunder or that the amount of any particular Loan Advance may be insufficient to pay such costs, and Borrower shall pay from its own funds any deficiency as an additional equity investment in the Project.

(e)    Payment for Labor and Materials.  Subject to **Section 7.11(c)**, Borrower will promptly pay when due, all Project Costs, and discharge of record within thirty (30) days after the filing thereof any Lien arising from such Project Costs or otherwise (other than Permitted Exceptions).

Section 6.2.    Inspection; Construction Reports.

(a)    Inspection.  Borrower will at all times permit Lender and Lender's consultants and agents, including Lender's Construction Consultant, to inspect the Project and all matters relating to the Construction and Use of the Project during normal business hours. Borrower will, and will cause each Contractor Party to, cooperate to give Lender and its consultants and agents full access to the Project at all times.  Borrower shall invite Lender's Construction Consultant to participate in all scheduled construction meetings between a Loan Party and a Contractor Party.  All inspections by Lender and its consultants and agents shall be for the sole benefit of Lender for its loan administration purposes only.  Neither Lender nor any of its consultants assumes or shall have any responsibility, obligation or liability to any Loan Party or any other Person by reason of Lender's or its consultant's or agent's inspections. Neither any Loan Party nor any other Person may rely on Lender's inspections for any purpose (including stage of completion, adequacy or workmanship, compliance with Applicable Law, conformance with the Plans, or other matters related to the Construction and Use of the Project). Lender's inspection of an item shall not result in any waiver of Lender's rights in the event such item does not conform with this Loan Agreement.

(b)    Construction Reports.  Promptly upon receipt thereof, Borrower shall provide Lender and Lender's Construction Consultant with copies of (i) all material inspections, reports, test results and other information received by Borrower from time to time from its employees, agents, representatives, architects, engineers, consultants, advisors, any Contractor Party or any other Persons involved in the Project, (ii) any notices pertaining to the Project from General Contractor or other Contractor Party and (iii) any notice that any Loan Party receives from any Governmental Authority or any insurance company providing insurance in connection with the Project. The Borrower shall provide to Lender and Lender's Construction Consultant, on the last day of each successive month, details of the progress of the Project including:

(i)    a report on progress of each item set out in the Project Budget;

(ii)    a breakdown of the Project Costs incurred by Borrower in connection with the Project to date;

(iii)    a comparison of Project Costs incurred in connection with each line item set out in the Project Budget as against the anticipated Project Costs of that line item as set out in the Project Budget and any resulting differences; and

21

(iv)     a forecast of Project Costs to be incurred with respect to each line item set out in the Project Budget during the next month and any differences anticipated as a result.

Section 6.3.    Construction Agreements.

(a)     Lender's Consent.    Borrower shall not enter into any Construction Agreement without the prior written consent of Lender, which consent will not be unreasonably withheld, and, if delivered, will be delivered in a reasonable timeframe.  Each such Construction Agreement shall be in form and substance acceptable to Lender in all respects, including the amount of the costs and fees thereunder.  Other than Change Orders made in accordance with **Section 6.3(b)**, Borrower will not, and will not permit or cause Borrower to, amend, modify, supplement or terminate any Construction Agreement, without Lender's approval, including the identity of the party to perform services under such agreement.

(b)     Change Orders.    The Borrower must obtain Lender's prior written approval (which approval will not be unreasonably withheld, and, if delivered, will be delivered in a reasonable timeframe) of any change ("**Change Order**") in the work or materials or Plans which would have the effect of (a) increasing any individual line item in the Project Budget by more than $50,000 or (b) causing the aggregate amount of change orders unapproved by Lender at any time to exceed $100,000, or (c) changing in a material way the overall aesthetic appearance of any component of the Project or the quality of any component of the Project or any significant services or amenities to be provided in connection with the Project or (d) decreasing the value of the Project on an As Built Basis.  For each Change Order (and proposed Change Order with respect to those requiring Lender's Approval), Borrower will furnish copies of the proposed Change Order to Lender and Lender's Construction Consultant.  If as a result of any such Change Order which Borrower proposes or makes (whether or not Lender's approval of the Change Order is required) the Loan will no longer be "in balance", then Borrower must also comply with **Section 6.5**.

(c)     Contractor Party Compliance.    If any Contractor Party under a Construction Agreement is in default in its obligations thereunder to the extent entitling Borrower to rescind or terminate that agreement, then if Lender so requires (but not otherwise), Borrower will promptly use all reasonable efforts to terminate that agreement and appoint a new party in its place, with such identity and terms of appointment as approved by Lender.

(d)     Loan Party Compliance.  Borrower shall, and shall cause each other Loan Party to, as applicable, observe and perform each and every term to be observed or performed by Borrower or such other Loan Party under the Construction Agreements.  Borrower agrees that if Borrower or any other Loan Party receives from any Person any notice or claim of a default or material nonperformance by any Borrower or any other Loan Party under any Construction Agreement: (i) Borrower will immediately transmit a complete copy of each such notice or claim to Lender and will at all times keep Lender informed, on a timely and current basis, of the status of such claim and any resolution or non-resolution thereof; and (ii) if Borrower fails to establish to Lender's satisfaction that (A) such claim has been or definitely will be resolved in a manner, and within such time, as cannot and will not give such Person any basis for upholding a claim that such Loan Party is in default or that such Person is excused from a material performance

22

under the Construction Agreement and (B) no surety under any Payment or Performance Bond may have a defense to, or be excused from performing, its obligations under such bond as a result of or in respect of such claim, then notwithstanding **Section 7.11(c)**, Lender may (but shall not be obligated to), in Lender's sole and absolute discretion and without liability to any Loan Party, pay such sums to the Contractor Party as may be necessary or appropriate, in Lender's sole judgment, to resolve that dispute and to remove any basis for such Person's claim of default or of such Person or surety's being excused from performance, and any amounts so paid or disbursed by Lender shall be deemed Protective Advances.

(e)    Payment and Performance Bonds.  Borrower shall obtain payment and performance bonds ("**Payment and Performance Bonds**") covering (i) 100% of the General Construction Contract and (ii) 100% of all Major Subcontracts.  Such Payment and Performance Bonds will run in favor of Borrower and Lender and must be written in a form satisfactory to Lender, and underwritten by a licensed surety or sureties satisfactory to Lender.

(f)    Recognition Agreements.  At Lender's request, Borrower shall, or shall cause Borrower to, cause the Contractor Party under any Construction Agreement to deliver a Recognition Agreement to Lender satisfactory to Lender in form and substance.

Section 6.4.    Project Budget.

(a)    Project Budget.  The initial Project Budget represents Borrower's best good faith estimate of all Project Costs to be incurred and Gross Receipts to be received through the Scheduled Maturity Date.  The Project Budget shall also at all times include a contingency category in a reasonable amount, as determined and approved by Lender.

(b)    Modifications to Project Budget.  It is expected that the Project Budget may be modified from time to time as Borrower or Lender determine that actual or anticipated Project Costs or actual or anticipated Gross Receipts, or the respective times at which they will be incurred or received, have changed.  Borrower will inform Lender promptly after any Loan Party determines that any line item or category of Project Costs will exceed the amount shown for such line item or category on the Project Budget.  All modifications of the Project Budget must be approved by Lender.

(c)    Contingency.  Any cost savings for any Project Budget line item or category which Lender determine are permanent (so that the amount remaining will not, in Lender's judgment, be needed at any time for payment of items covered by the applicable line item or category, as the case may be) shall be allocated and added automatically to the contingency category.  The contingency category shall not be allocated or used for any Project Costs except pursuant to a modification of the Project Budget approved by Lender as stated above.

Section 6.5.    Loan Balancing.

(a)    In Balance.  The Loan shall be "in balance" at all times as determined by Lender in its sole and absolute discretion.  For purposes of this Loan Agreement, the Loan will be deemed "in balance" only whenever Borrower has expended that amount of its own equity funds for Project Costs to assure Lender that on an individual Project Budget line item basis, and

23

also in the aggregate for the Project Budget as a whole, the undisbursed proceeds of the Loan available for borrowing, together with any Gross Receipts which is reasonably estimated by Lender to be derived from the operation of the Project prior to the Scheduled Maturity Date, will be sufficient to pay, as they become due, all Project Costs not yet paid without utilizing or involving any contingency funds allocated or available in the Project Budget.

(b)    <u>Determination of Balancing</u>.  The initial determination of Loan balancing shall be based upon the Project Budget.  The Lender will periodically re-evaluate the accuracy and adequacy of the Project Budget in connection with the determination of Loan balancing.  If Lender at any time determines that the amount likely to be needed to pay all as-yet unpaid costs of any one or more categories or line items of Project Costs and other operating expenses exceeds the amount of Loan funds then remaining undisbursed and available in each of those categories or line items in the Project Budget, Lender shall so notify Borrower in writing, and shall not be obligated to make any further Loan Advances until Lender determines the Loan is again in balance.

(c)    <u>Deficiency Deposit</u>.  Within ten (10) Business Days of Borrower's receipt of the notice referred to in subsection (b), Borrower shall deposit with Lender an amount of cash (the "**Deficiency Deposit**") sufficient to place the Loan "in balance" or Borrower shall make such other arrangements as Lender may approve to place the Loan "in balance."  Any Deficiency Deposit made with Lender shall not earn interest.  Borrower will pay Lender's normal account opening and administration fees for handling such Deficiency Deposit.  The Deficiency Deposit shall be first exhausted before Lender makes any further Loan Advance.  Disbursement of the Deficiency Deposit must be approved by Lender and shall be subject to Borrower's compliance with all conditions which would be applied to a Loan Advance for the same Project Budget items to which the Deficiency Deposit is to be applied.

(d)    <u>Additional Borrower's Equity</u>.  Borrower will cause its investors to invest such additional funds in Borrower as equity from time to time as may be required to keep the Loan "in balance" as required in this **Section 6.5**.

ARTICLE VII

ADDITIONAL BORROWER'S COVENANTS

Borrower covenants and agrees as follows:

Section 7.1.    <u>Intentionally Omitted</u>.

Section 7.2.    <u>Leases</u>.  Borrower shall not enter into any Lease of the Project or any portion thereof without Lender's prior written consent.

Section 7.3.    <u>Approved Management Agreements</u>.

(a)    <u>Management Generally</u>.  The Project shall at all times during the term of the Loan be managed and operated by Approved Manager(s) pursuant to Approved Management Agreements.  Borrower shall not enter into any management agreement or any brokerage or leasing services agreement for the Project or terminate or replace an Approved Manager or

24

amend or modify in any adverse respect or terminate an existing Approved Management Agreement, without Lender's prior written consent, which consent will not be unreasonably withheld, and, if delivered, will be delivered in a reasonable timeframe.

(b)    Termination Provisions.  Each Approved Management Agreement shall provide that (i) the "property owner" thereunder has the right to terminate said Approved Management Agreement after the occurrence of an Event of Default under the Loan Documents, and (ii) following a sale, change in control, foreclosure or deed-in-lieu of the Project, any successor "property owner" has the right to terminate said Approved Management Agreement, in each case of (i) or (ii) without any penalty or fee (other than accrued and unpaid fees thereunder) upon thirty (30) days prior written notice.  Upon the occurrence of an Event of Default, within five (5) days of Lender's written request (a "**Lender Termination Request**"), Borrower shall issue to the Approved Manager specified in such Lender Termination Request a notice of termination of the applicable Approved Management Agreement (a "**Manager Termination Notice**").  If Lender delivers the Lender Termination Request, upon Lender's further request, Borrower shall cause Borrower to appoint a replacement Approved Manager pursuant to a new Approved Management Agreement, which Approved Manager and Approved Management Agreement shall be subject to Lender's prior written consent, as soon as possible but in no event later than thirty (30) days after delivery of such Lender Termination Request.  If Borrower fails to issue or cause the Borrower to issue the Manager Termination Notice and/or Borrower fails to appoint or cause Borrower to appoint a replacement Approved Manager pursuant to a replacement Approved Management Agreement, Lender shall have the right, and Borrower and each Joinder Party hereby irrevocably authorizes Lender and irrevocably appoints Lender as Borrower's and Joinder Party's attorney-in-fact coupled with an interest, at Lender's sole option, to issue a Manager Termination Notice and/or appoint a replacement Approved Manager pursuant to a replacement Approved Management Agreement on behalf of and in the name of Borrower, and Borrower and each Joinder Party hereby releases and waives any claims against Lender arising out of Lender's exercise of such authority.

Section 7.4.    Other Material Agreements.  Borrower shall not enter into any Other Material Agreement in excess of $50,000 without the prior written consent of Lender, which consent will not be unreasonably withheld, and, if delivered, will be delivered in a reasonable timeframe.  Each such Other Material Agreements shall be in form and substance acceptable to Lender in all respects, including the amount of the costs and fees thereunder.  Except as specifically set forth herein, Borrower will not amend, modify, supplement or terminate an Other Material Agreement, without Lender's prior written consent, including the identity of the party to perform services under such agreement.  If a material or service provider under an Other Material Agreement is in default in its obligations thereunder to the extent entitling Borrower to rescind or terminate that agreement, then if Lender so requires (but not otherwise), Borrower will promptly use all reasonable efforts to terminate that agreement and appoint a new party in its place, with such identity and terms of appointment subject to Lender's prior written approval.  Borrower shall and shall cause each other Loan Party, as applicable, to observe and perform each and every term to be observed or performed by Borrower or such other Loan Party under each Other Material Agreement.

Section 7.5.    Insurance.

25

08-13555-mg   Doc 29187   Filed 07/03/12   Entered 07/03/12 14:55:29   Main Document
Pg 42 of 92

      (a)    Policies. Borrower, at its sole cost and expense, shall insure and keep insured the Project against such perils and hazards, and in such amounts and with such limits, and pursuant to such policies issued by such insurers, as Lender may from time to time require (collectively, "**Policies**"), and, in any event, including:

      (i)    All Risk. Insurance against loss to the Project which during construction shall be on an "All Risk" perils "Builders' Risk", non-reporting "Completed Value" form and after completion of construction shall be on an "All Risk" policy form, in each case covering insurance risks no less broad than those covered under a Standard Multi Peril (SMP) policy form, which contains a Commercial ISO "Causes of Loss - Special Form", including theft, and insurance against such other risks as Lender may reasonably require, including, but not limited to, insurance covering the cost of demolition of undamaged portions of any portion of the Project when required by code or ordinance and the increased cost of reconstruction to conform with current code or ordinance requirements and the cost of debris removal. In addition, during construction such Policies shall cover the following: real estate property taxes; architect, engineering, and consulting fees; legal and accounting fees (including, but not limited to, the cost of in-house attorneys and paralegals); advertising and promotion expenses; interest on money borrowed; additional commissions incurred upon renegotiating leases and any and all other expenses which may be incurred as a result of any property loss or destruction by an insured. Such Policies shall be in amounts equal to the full replacement cost of the Project (other than the Land), including all fixtures, equipment, construction materials and personal property on and off-site. Such Policies shall also contain a 100% co-insurance clause with an agreed amount endorsement (with such amount to include the replacement cost of the foundation and any underground pipes), a permission to occupy endorsement and deductibles which are in amounts acceptable to Lender.

      (ii)    Intentionally Omitted.

      (iii)    Business Interruption. Upon Substantial Completion, business interruption/extra expense insurance in amounts sufficient to pay, during any period in which the Project may be damaged or destroyed, on a gross income basis, for a period of eighteen (18) months or such greater time as Lender may deem appropriate covering all of the following: (i) all business income derived from the Project and (ii) all amounts (including, but not limited to, all impositions, utility charges and insurance premiums) required to be paid by Borrower.

      (iv)    Delayed Opening. Until Substantial Completion, "Delayed Opening" insurance in an amount equal to not less than the estimated annual gross income/rents. Such Policy shall include the standard "Soft Costs" endorsement if not already included within the property section of the Builder's Risk form.

      (v)    Boiler and Machinery. Upon completion, broad form boiler and machinery insurance including business interruption/extra expense and rent and rental value insurance, on all equipment and objects customarily covered by such insurance and/or involved in the heating, cooling, electrical and mechanical systems of the Project (if any are located at the Project), providing for full repair and replacement cost coverage, and other insurance of the types and in amounts as Lender may require, but in no event less than that customarily carried by persons owning or operating like properties.

ATLANTA:4906205.5

(vi)   Workers' Compensation.  During the construction of (or making of any alterations or improvements to) the Project (i) insurance covering claims based on the owner's or employer's contingent liability not covered by the insurance provided in subsection (x) below and (ii) workers' compensation insurance covering all Persons engaged in such alterations or improvements.

(vii)   Flood.  Insurance against loss or damage by flood or mud slide in compliance with the Flood Disaster Protection Act of 1973, as amended from time to time, if the Project is now, or at any time while the Loan remains outstanding shall be, situated in any area which an appropriate Governmental Authority designates as a special flood hazard area, Zone A or Zone V, in amounts equal to the full replacement value of all above grade structures on the Project.

(viii)   Earthquake.  Insurance against loss or damage by earthquake, if the Project is now, or at any time while the Loan remains outstanding shall be, situated in any area which is classified as a Major Damage Zone, Zones 3 and 4, by the International Conference of Building Officials in an amount equal to the probable maximum loss for the Project, fixtures and equipment, plus the cost of debris removal.

(ix)   Public Liability.  Comprehensive liability insurance against death, bodily injury and property damage arising in connection with the Project.  Such Policy shall be written on a Standard ISO occurrence basis form or equivalent form, shall list Borrower as the named insured, shall designate thereon the location of the Project and have such limits as Lender may reasonably require, but in no event less than $1,000,000.  Borrower shall also obtain (or cause Borrower to obtain) excess umbrella liability insurance with such limits as Lender may reasonably require, but in no event less than $50,000,000.00.

(x)   Other Insurance.  Such other insurance relating to the Construction and Use of the Project as Lender may, from time to time, reasonably require, including dramshop.

(b)   Contractor's Insurance.   Prior to Commencement of Construction, Borrower shall, or shall cause Borrower to, furnish to Lender certificates from the insurance carrier for the General Contractor evidencing workers' compensation, employers' liability, commercial auto liability, excess umbrella liability coverage and commercial general liability insurance (including contractual liability and completed operations coverage) written on a standard "ISO" occurrence basis form or its equivalent, with general liability insurance limits as Lender may reasonably require, but in no event less than $1,000,000 per individual, $2,000,000 per occurrence and $50,000,000 in the aggregate.  Lender shall be named as an additional insured under such liability Policies.  Borrower shall cause each subcontractor to maintain commercial general liability, commercial automobile liability, workers' compensation, employers' liability, and excess umbrella liability coverage in form and amount satisfactory to Lender.

(c)   Policy Requirements.

27

ATLANTA:4906205.5

(i)    All insurance shall: (i) be carried by companies with a rating of AA- or better for claims paying ability assigned by Standard & Poor's Rating Group, or, if not rated by Standard & Poor's Rating Group, a Best's rating of A/X, or better, or otherwise acceptable to Lender; (ii) be in form and content acceptable to Lender; (iii) provide for thirty (30) days' advance written notice to Lender before any cancellation, adverse material modification or notice of non-renewal; and (iv) to the extent not otherwise specified herein, contain deductibles and limits which are in amounts acceptable to Lender.

(ii)    All physical damage Policies and renewals (including those required to be maintained under Project Documents) shall contain (i) a standard mortgage clause naming Lender as mortgagee (as its interest may appear), which clause shall expressly state that any breach of any condition or warranty by any Loan Party or any other Person shall not prejudice the rights of Lender under such insurance and shall further waive any rights of subrogation against Lender, and (ii) a loss payable clause in favor of Lender (as their interests may appear) for personal property, contents, inventory, equipment, loss of rents and business interruption. All liability Policies and renewals (including those required to be maintained under Project Documents) shall name Lender as an additional insured. All Policies shall have "pollution exclusions" deleted by endorsement. No additional parties shall appear in the mortgagee or loss payable clause without Lender's prior written consent.

(d)    Delivery of Policies. Any notice pertaining to insurance required pursuant to this **Section 7.5** shall be given in the manner provided in **Section 12.10**. The insurance shall be evidenced by the original Policy or a true and certified copy of the original Policy. Borrower shall use its best efforts to deliver originals or certified copies of all Policies and renewals marked "paid", (or evidence satisfactory to Lender of the continuing coverage) to Lender at least fifteen (15) days before the expiration of existing Policies and, in any event, Borrower shall deliver originals or certified copies of such Policies to Lender at least five (5) days before the expiration of existing Policies. If Lender has not received an original or a certified copy of any Policy or renewal within the time frame herein specified (even if advised verbally or in writing that such Policies have been renewed or otherwise obtained), Lender shall have the right, but not the obligation, to purchase such insurance. Any amounts so disbursed by Lender in so doing shall be deemed to be Protective Advances, but nothing contained in this Section shall require Lender to incur any expense or take any action hereunder, and inaction by Lender shall never be considered a waiver of any right accruing to Lender on account of this Section.

(e)    Separate Insurance. Borrower shall not carry (and shall not allow or permit any other Loan Party to carry) any separate insurance on the Project concurrent in kind or form with any insurance required hereunder or contributing in the event of loss without Lender's prior written consent, and any such Policy shall have attached standard non-contributing mortgagee clause, with loss payable to Lender (as its interests may appear), and shall otherwise meet all other requirements set forth herein.

(f)    Insurance Review. At Lender's option, but not more often than annually, Lender may (i) require Borrower to certify to Lender that insurance required by this **Section 7.5** is in place and (ii) obtain, at Borrower's expense, a report from Lender's Insurance Consultant, certifying that insurance required by this **Section 7.5** is in place.

28

08-13555-mg    Doc 29187    Filed 07/03/12    Entered 07/03/12 14:55:29    Main Document
Pg 45 of 92

(g)    Reserve Account.  If required by Lender, Borrower shall establish a reserve account with Servicer to provide for the payment of premiums on the Policies.

(h)    Waiver of Subrogation; Non-Imputation.  Each Policy shall contain such endorsements thereto in form and content acceptable to Lender to the effect that if Lender acquires any Ownership Interest in any Loan Party, such insurer (i) waives the right to assert any claim, by way or subrogation or otherwise, against any such Loan Party in connection with any claim made under such Policy and (ii) will not deny any claim made by any such Loan Party or raise any defense to coverage under any Policy by reason of any event or circumstances involving such Loan Party and occurring prior to the time Lender acquired its Ownership Interest in such Loan Party.

Section 7.6.    Casualty; Condemnation and Application of Proceeds.

(a)    Casualty.

(i)    Upon the occurrence of a Casualty, Borrower shall give prompt written notice of such damage to Lender and shall promptly commence and diligently prosecute the Restoration of the Project.  Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance or whether Borrower is entitled to use the proceeds of such insurance for the Restoration pursuant to the Loan Documents.

(ii)    Lender shall be authorized, in its sole and absolute discretion, to make proof of loss, settle and/or adjust any claim or proceeding relating to a Casualty regardless of amount without any obligation to consult with Borrower in connection therewith.  It shall be an Event of Default hereunder if any such claim or proceeding is settled or compromised by Borrower on terms that are not approved in writing by Lender in its sole and absolute discretion or if Borrower shall submit any proposed settlement of such claim or proceeding to or any insurer or claims adjuster before Lender shall have approved such proposed settlement or compromise in writing.  Notwithstanding the foregoing, prior to the occurrence of an Event of Default, Borrower may make proof of loss, settle, and/or adjust or compromise any such claim or proceeding which is less than fifty thousand dollars ($50,000) without Lender's consent or approval so long as within ten (10) days following the settlement or compromise Borrower delivers to Lender written notice of the settlement or compromise, together with a memorandum summarizing the relevant and material terms thereof.

(b)    Condemnation.

(i)    Borrower shall promptly give Lender written notice of the actual or threatened commencement of any Condemnation and shall deliver to Lender copies of any and all papers served or received by any Loan Party in connection therewith.  Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation.  Borrower shall diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings.

(ii)    If less than all or substantially all of the Project or any portion thereof are taken by a Condemning Authority, Borrower shall cause Borrower to promptly

29

ATLANTA:4906205.5

commence and diligently prosecute the Restoration of the Project and otherwise comply with the provisions of this **Section 7.6**.

    (c)    <u>Application</u>.

    (i)    Lender shall have the right in its sole and absolute discretion to (A) apply insurance proceeds or any condemnation award (in either case, the "**Loss Proceeds**") to the Debt or (B) make the Loss Proceeds available for Restoration so long as each of the following conditions ("**Restoration Conditions**") is satisfied: (A) no Unmatured Default has occurred and is continuing and no Event of Default has occurred, (B) if such Casualty or Condemnation occurs prior to the Substantial Completion Date, Lender is satisfied that construction of the Project will proceed in compliance with the Construction Schedule and in accordance with the Plans so that each portion of the work will be substantially completed by each respective Staged Completion Date and the Project will be completed (including Punchlist Items) by the Required Completion Date, (C) if such Casualty occurs or Condemnation after the Substantial Completion Date, (x) Lender is satisfied that such repair or restoration can be completed not less than 90 days prior to the Scheduled Maturity Date[, or if the Loan has been extended, 90 days prior to the Extended Maturity Date] and (y) Guarantors provide Lender with a completion guaranty covering such repair or restoration on terms and conditions acceptable to Lender; (D) Loss Proceeds are disbursed in accordance with the same conditions and delivery requirements as Loan Advances and (E) the Loan is or is made to be "in balance" as required by **Section 6.5**. Notwithstanding the foregoing, in the case of Condemnation that is not a Material Condemnation, and in the case of a Casualty in which the amount of the loss is less than $100,000, Lender shall make such Loss Proceeds available for Restoration (subject to the fulfillment of the Restoration Conditions).

    (d)    <u>Adjustment/Loan Expenses</u>. The expenses (including any Professional Fees) incurred by Lender in the adjustment and/or collection of Loss Proceeds or the review or approval of, or participation by Lender in, any matter in connection therewith shall be deemed Loan Expenses.

    (e)    <u>Obligations Not Affected</u>. No Casualty or Condemnation shall excuse or delay Borrower's payment or performance of the Obligations in accordance with the terms of the Loan Documents, and nothing in this **Section 7.6** is intended to impair, waive or condition Lender's right to declare any Event of Default.

    Section 7.7.    <u>Title to Project</u>. Subject to the Permitted Exceptions, Borrower shall (A) warrant and defend title to the Collateral and the Project and every part thereof subject only to Permitted Exceptions, and (B) the validity and priority of the Liens and security interests created by the Loan Documents against the claims of all Persons whatsoever (other than Permitted Exceptions). Borrower shall reimburse Lender for any losses, costs, damages or expenses (including Professional Fees) incurred by Lender if an interest in the Project or the Collateral is claimed by another Person (other than for Permitted Exceptions), and any amounts expended by Lender in respect of such losses, costs, damages or expenses shall be deemed Protective Advances. In furtherance thereof, Borrower hereby assigns to Lender all proceeds payable under Owner's Title Insurance Policy.

ATLANTA:4906205.5

Section 7.8.    Zoning.  Borrower covenants that it will cause the Project to be designed, constructed, completed, maintained and operated in compliance with Applicable Law, including setback, building height, FAR and other bulk requirements.  Without limiting the generality of the foregoing, Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private or public restrictive covenant, zoning law or other restriction, limiting, conditioning, changing, qualifying or defining the uses which may be made of the Project or any part thereof without the prior written consent of Lender.  If under applicable zoning provisions the use of all or any portion of the Project is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or abandoned without the prior written consent of Lender.

Section 7.9.    Subdivision.  Prior to any Person recording or submitting for approval to any Governmental Authority any preliminary, interim or final map, plat, parcel map, lot line adjustment or other subdivision map of any kind covering any portion of the Land or any amendment to any of the foregoing (collectively, "**Subdivision Map**"), Borrower shall submit such Subdivision Map to Lender for Lender's review and approval, which approval will not be unreasonably withheld, and, if delivered, will be delivered in a reasonable timeframe.

Section 7.10.    Maintenance of Project.  Borrower shall maintain the Project in a good and safe condition and repair.  The Improvements, materials, equipment, furniture, fixtures and other articles of personal property located therein and thereon not owned by tenants under Leases (the "**Personal Property**") shall not be removed, demolished or materially altered (except for normal replacement of the Personal Property) without the prior written consent of Lender.

Section 7.11.    Taxes and Liens.

(a)    Taxes and Other Charges.  Subject to **Section 7.11(c)** below, Borrower shall promptly pay all taxes, assessments, governmental licenses and impositions, and other similar charges (the "**Taxes**"), all ground rents, maintenance charges, charges for utility services and similar charges (the "**Other Charges**"), in each case now or hereafter levied or assessed or imposed against the Project or any part thereof as same become due and payable.  Borrower will deliver to Lender, promptly upon Lender's request, evidence satisfactory to Lender that the Taxes and Other Charges have been so paid or are not then delinquent.  Borrower shall furnish to Lender paid receipts for the payment of the Taxes and Other Charges prior to the date the same shall become delinquent.  If required by Lender, Borrower shall establish a reserve account with Servicer to provide for the payment of Taxes.

(b)    Liens.  Subject to **Section 7.11(c)** below, Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien against the Collateral or the Project or any portion thereof other than the Liens created by the Loan.

(c)    Contest.  After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Taxes, Other Charges or any Lien (other than the Lien of the Loan Documents) provided that, and only for so long as (1) no Event of Default has occurred and no Unmatured Default has occurred and is continuing; (2) neither any Collateral nor the Project or any part thereof or

31

interest therein will in the opinion of Lender be in danger of being sold, forfeited, terminated, cancelled or lost; (3) in the case of Taxes, Borrower have paid the same before delinquent even though they are contesting the same; (4) such contest shall be permitted under and be conducted in accordance with Applicable Law and in accordance with the provisions of any other instrument or agreement affecting the Project to which Borrower is subject and shall not constitute a default thereunder; (5) Borrower promptly pays any contested amount if and to the extent the outcome of such contest requires the payment of the same; and (6) unless Borrower shall have paid the same under protest, at Lender's option, Borrower shall have either (i) deposited with Lender adequate cash reserves for the payment thereof, together with all interest and penalties which in Lender's judgment may accrue thereon, or (ii) furnished to Lender such other security (including, without limitation, a surety bond) as Lender may deem adequate to insure the payment of such contested amounts together with all interest and penalties which in Lender's judgment may accrue thereon. Provided that, and for long as, each of the requirements under clauses (1) through (6) inclusive of this **Section 7.11(c)** are satisfied with respect to a Lien being contested by the Borrower, such Lien shall be deemed a Permitted Exception hereunder.

Section 7.12.    Waste. Borrower shall not (a) commit or suffer any waste of the Project, (b) make or permit to be made any change in the use of the Project which will in any way materially increase the risk of fire or other hazard arising out of the Construction and Use of the Project, (c) take or cause to be taken any action that might invalidate or give cause for cancellation of any Policy, or (d) do or permit to be done thereon anything that could in any way impair the value of the Project or any Collateral.

Section 7.13.    Compliance With Laws. Borrower shall promptly comply with all Applicable Law relating to the Project and the Construction and Use thereof. Borrower shall from time to time, upon Lender's request, provide Lender with evidence satisfactory to Lender that the Project complies with all Applicable Law. Borrower shall give prompt notice to Lender of the receipt by Borrower of any notice related to a violation of any Applicable Law and of the commencement of any proceedings or investigations which relate to compliance with Applicable Law.

Section 7.14.    Alterations. Borrower shall not make any material or adverse Alterations to the Project without the prior written consent of Lender. Lender's approval of the plans, specifications, or working drawings for any Alterations of the Project, shall create no responsibility or liability on behalf of Lender for their completeness, design, sufficiency or their compliance with Applicable Law, and such approval shall not be relied on by any Person.

Section 7.15.    Books and Records.

(a)    Inspections. Borrower will keep and maintain on a Fiscal Year basis, in accordance with generally accepted accounting principles consistently applied, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower. Lender shall have the right from time to time at all times during normal business hours to examine such books, records and accounts at the office of Borrower or other Person maintaining such books, records and accounts and to make copies or extracts thereof as Lender shall desire.

32

(b)    Financial Reports.    Borrower shall deliver or cause to be delivered to Lender each of the following:

(i)    annually, within ninety (90) days after the end of each Fiscal Year, complete executed copies of the audited financial statements prepared in accordance with generally accepted accounting principles consistently applied, including a statement of operations (profit and loss), a statement of cash flows, a calculation of net operating income, a balance sheet and such other information as reasonably requested by Lender, covering, in a separate report, the Project and Borrower for such Fiscal Year (A) prepared by an Approved Accounting Firm, and (B) certified by such Approved Accounting Firm as being true, complete and accurate;

(ii)    within forty-five (45) days after the end of each calendar quarter, complete executed copies of unaudited financial statements for the Project and for Borrower for such quarter and the year to date (A) prepared in accordance with generally accepted accounting principles consistently applied;

(iii)    within ten (10) days after the end of each quarter, complete executed copies of unaudited financial statements for the Project for such month and a certified status report concerning the operating performance of the Project, in form and substance satisfactory to Lender;

(iv)    concurrently, copies of all tax returns filed with respect to each Loan Party; and

(v)    within ten (10) days after request, such further detailed information covering the Construction and Use of the Project and the financial affairs of any Loan Party, as may be reasonably requested by Lender.

Each financial statement and other information required by clause (i), (ii), (iii) and (iv) shall also be certified by an officer or other responsible party of the Loan Party providing such statement or other information.

(c)    Officer's Certificates.    From time to time Borrower shall provide Lender with an Officer's Certificates addressing such items as Lender may request.

(d)    Title Reports.    Not more often than quarterly, upon request by Lender, Borrower shall provide Lender with (i) updates to the Lender's Title Insurance Policy and (ii) current UCC Searches.

(e)    Litigation.    Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending against the Project or any Loan Party.

(f)    Bankruptcy.    Borrower shall give prompt written notice to Lender of any voluntary or involuntary bankruptcy, reorganization, insolvency or similar proceeding under any Bankruptcy Law against any Loan Party or any tenant under any Lease.

ATLANTA:4906205.5

Section 7.16.   <u>Affiliate Agreements</u>. Except as set forth in the Approved Management Agreements and any Development Agreement (that has been approved in writing by Lender), Borrower shall not pay, or permit the payment of, development fees, management fees, brokerage or leasing fees or commissions or any other compensation of any form whatsoever to any Loan Party or any direct or indirect partner, member, shareholder or Affiliate thereof, or request disbursement of funds from Lender for such purpose, without the prior written consent of Lender. The payment of any such fees, commissions or other compensation without the prior written consent of Lender shall constitute an Event of Default. Any contracts or agreements relating to the Project in any manner between or among any Loan Party and any other Loan Party or their respective direct or indirect partners, members, shareholders or Affiliates, including the Approved Management Agreements and the Development Agreement ("**Affiliate Agreements**") shall be made on an arm's-length basis and shall be subject to the prior written approval of Lender; and the parties to each Affiliate Agreement shall acknowledge and agree that such agreement is terminable upon notice, without penalty, premium or liability for future or accrued liabilities or obligations, if an Event of Default shall have occurred under the Loan Documents. Following an Event of Default under the Loan Documents, if requested by Lender in writing, Borrower shall terminate any Affiliate Agreements specified by Lender within five (5) days after delivery of Lender's request without payment of any penalty, premium or termination fee.

Section 7.17.   <u>Borrower's Equity</u>.   Until such time as the Debt has been paid in full, Borrower shall keep the Borrower's Equity invested in the Project.

Section 7.18.   <u>Single Purpose Entity</u>.   Each of Borrower, each Member and the Golf Club shall at all times be a Single Purpose Entity, and each of Borrower, each Member and the Golf Club shall not take any action inconsistent with the provisions which embody the requirements for a Single Purpose Entity.

Section 7.19.   <u>Independent Managers</u>.   Since the date hereof, Borrower has had, and at all times while any portion of the Debt remains outstanding, will have two Independent Managers meeting the Independent Manager Definition. Upon Transfer of the Golf Course pursuant to **Section 9.4** hereof, the Golf Club will have two Independent Managers meeting the Independent Manager Definition. Since the date of its formation, each Member has had, and at all times while any portion of the Debt remains outstanding, will have one Independent Manager meeting the Independent Manager Definition.

Section 7.20.   <u>Loan Party Compliance</u>.   Borrower shall take all steps necessary to cause each Loan Party to comply with the terms and provisions of the Loan Documents.

Section 7.21.   <u>Continued Existence</u>.   Borrower shall, and shall cause each Loan Party to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, and material rights, licenses, permits and franchises in compliance with Applicable Law.

Section 7.22.   <u>Conduct of Business</u>.   Borrower and each Loan Party (other than Guarantors) shall not conduct business in any State other than the State in which the Project is located. Borrower shall not make any change in the scope or nature of its business objectives, purposes or operations, or in the location of its "place of business" or "chief executive office" (as

34

such terms are used in the Uniform Commercial Code as in effect in the state of New York) or the State in which it is a registered organization (as defined in the Uniform Commercial Code as in effect in the state of New York), or undertake or participate in activities other than the continuance of its present business (i.e., the Construction and Use of the Project) without Lender's prior written consent.

Section 7.23.    Additional Guarantor Covenants.    Until the Debt and the Obligations have been fully paid and performed, Guarantors shall have the requisite power and authority to control and direct the management and affairs of the Borrower.

Section 7.24.    Key Persons.    The following Persons ("**Key Persons**") shall at all times remain actively involved in the Project:    Kenneth A. Jowdy.    If because of the death or incapacity of any Key Person, or for any other reason, the requirements of the immediately preceding sentence is not satisfied, Borrower shall immediately notify Lender, and in the event Borrower does not so notify Lender or in the event that Borrower does not engage on terms acceptable to Lender a replacement for such Key Person(s) acceptable to Lender within thirty (30) days of such notice, the same shall constitute an Event of Default.    For purposes of this **Section 7.24**, the name of any such replacement Person accepted by Lender shall thereafter be deemed substituted in the first sentence of this **Section 7.24** for the Key Person(s) being replaced.

Section 7.25.    Organizational Documents.    Unless otherwise first consented to by Lender in writing, Borrower and each Loan Party (other than Guarantor) shall not amend or modify its formation and organizational documents without Lender's prior written consent.

Section 7.26.    ERISA.

(a)    Borrower covenants and agrees that it shall not engage in any transaction, nor will it permit or suffer any Loan Party to engage in any transaction, which would cause any obligation or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)    Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as required by Lender in its sole and absolute discretion, that: (i) no Loan Party is an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) no Loan Party is subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) one or more of the following circumstances is true with respect to each Loan Party:  (A) equity interests in such Loan Party are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101(b)(2); (B) less than 25 percent of each outstanding class of equity interests in such Loan Party are held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2); and (C) Loan Party qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. § 2510.3-101(c) or (e) or an investment company registered under The Investment Company Act of 1940.

ATLANTA:4906205.5

Section 7.27.    Environmental.

(a)    Compliance with Environmental Laws.    Borrower will cause the Construction and Use of the Project to be in full compliance at all times with all Environmental Laws.

(b)    Environmental Permits.    Borrower shall obtain and maintain all required permits, approvals, certificates, licenses and other authorizations relating to any Permitted Environmental Use.

(c)    Notification.    Borrower shall immediately notify Lender (with copies where applicable) of any claims, complaints, notices, inquiries or other information which any Loan Party has or may receive or obtain relating to any Environmental Condition of the Project or any surrounding areas.

(d)    Inspection and Reports.    At the request of Lender at any time and from time to time, Borrower shall permit Lender and its consultants and agents to perform an environmental assessment of the Project or any portion thereof, including the preparation of any new or updated Environmental Report.    In connection therewith, Lender and its consultant and agents may enter upon and inspect the Project or any portion thereof and perform tests of the air, soil, ground water and building materials; and Borrower will cooperate and use best efforts to cause tenants and other occupants of the Property to cooperate with Lender and its consultants and agents The cost of any such assessment and any report based thereon will be deemed Loan Expenses (i) if the assessment or report discloses any Environmental Condition which is not a Permitted Environmental Use or (ii) if such assessment was initiated at a time when Lender has reasonable cause to believe that an Environmental Condition exists at the Project which is not a Permitted Environmental Use or (iii) any time after the occurrence of an Event of Default. Borrower and each Joinder Party hereby acknowledge and agree that in no event will Lender, its consultants or agents have any liability to Borrower or any other Loan Party with respect to the results of any such assessment or report.

(e)    Remedies.    In the event of any Environmental Condition affecting the Project which is not Permitted Environmental Use, whether or not any action to correct or ameliorate such Environmental Condition has been ordered by any Governmental Authority or other Person, Lender may (but shall have no obligation), in Lender's sole discretion:

(i)    by notice to Borrower, obligate Borrower to take appropriate action to correct or ameliorate such Environmental Condition, in which event Borrower shall take such action at Borrower's sole expense;

(ii)    enter or cause its agents or consultants to enter upon the Project and take appropriate action to correct or ameliorate the Environmental Condition, in which case Borrower will cooperate and use best efforts to cause tenants and other occupants of the Property to cooperate with Lender and its consultants and agents; and/or

(iii)    exercise any other rights or remedies that Lender may have.

36

ATLANTA:4906205.5

Any expenditures made by Lender in exercising its rights in connection with the foregoing shall be deemed Protective Advances.

Section 7.28.    Interest Rate Cap Agreement.

(a)    Borrower shall obtain and shall maintain in effect, an Interest Rate Cap Agreement with an Acceptable Counterparty, which shall be coterminous with the Loan and have a notional amount as required by Lender and which shall at all times have a strike rate of six percent (6%). The Counterparty shall be obligated under the Interest Rate Cap Agreement to make monthly payments equal to the excess of the LIBOR RATE (as defined in the Note) over the strike rate, calculated on the notional amount. The notional amount of the Interest Rate Cap Agreement may be reduced (and Lender shall consent to such reduction) from time to time in amounts equal to any payment of the principal (if any) of the Loan in accordance with the Loan Documents. The Interest Rate Cap Agreement shall be written on the then current standard ISDA documentation, and shall provide for interest periods and calculations consistent with the payment terms of the Loan Agreement.

(b)    Borrower shall collaterally assign to Lender pursuant to an Assignment of Interest Rate Cap Agreement in form and substance reasonably acceptable to Lender, all of its right, title and interest to receive any and all payments under the Interest Rate Cap Agreement (and any related guarantee, if any) and shall deliver to Lender an executed counterpart of such Interest Rate Cap Agreement and notify the Counterparty of such collateral assignment (either in such Interest Rate Cap Agreement or by separate instrument). The Counterparty shall agree in writing to make all payments it is required to make under the Interest Rate Cap Agreement directly to Lender. At such time as the Loan is repaid in full, all of Lender's right, title and interest in the Interest Rate Cap Agreement shall terminate and Lender shall promptly execute and deliver at Borrower's sole cost and expense, such documents as may be required to evidence Lender's release of the Interest Rate Cap Agreement and to notify the Counterparty of such release.

(c)    Borrower shall comply with all of its obligations under the terms and provisions of the Interest Rate Cap Agreement. Borrower shall take all actions reasonably requested by Lender to enforce Lender's rights under the Interest Rate Cap Agreement in the event of a default by the Counterparty and shall not waive, amend or otherwise modify any of its rights thereunder.

(d)    In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty below "**AA-**" (or the equivalent) by Standard & Poor's Rating Group, Borrower shall replace the Interest Rate Cap Agreement with a Replacement Interest Rate Cap Agreement with an Acceptable Counterparty not later than ten (10) Business Days following receipt of notice from Lender or Servicer of such downgrade, withdrawal or qualification.

(e)    In the event that Borrower fails to purchase and deliver to Lender the Interest Rate Cap Agreement or any Replacement Interest Cap Agreement as and when required hereunder, Lender may purchase such Interest Rate Cap Agreement and the cost incurred by Lender in purchasing such Interest Rate Cap Agreement shall be paid by Borrower to Lender

37

with interest thereon at the Default Rate from the date such cost was incurred by Lender until such cost is paid by Borrower to Lender.

(f)    Each Interest Rate Cap Agreement shall contain the following language or its equivalent: "In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty below "AA-" (or the equivalent) by the Standard and Poor's Rating Group, the Counterparty must, within 30 days, either (x) post collateral on terms acceptable to the Standard and Poor's Rating Group or (y) find a replacement Acceptable Counterparty, at the Counterparty's sole cost and expense, acceptable to the Standard and Poor Rating Group (notwithstanding the foregoing, if the Counterparty's rating downgraded to "A" or lower, only the option described in clause (y) will be acceptable); provided that, notwithstanding such a downgrade, withdrawal or qualification, unless and until the Counterparty transfers the Interest Rate Cap Agreement to a replacement Acceptable Counterparty pursuant to the foregoing clause (y), the Counterparty will continue to perform its obligations under the Interest Rate Cap Agreement. Failure to satisfy the foregoing shall constitute an Additional Termination Event as defined by Section 5(b)(v) of the ISDA Master Agreement, with the Counterparty as the Affected Party."

(g)    In connection with an Interest Rate Cap Agreement, Borrower shall, obtain and deliver to Lender an opinion of counsel from counsel for the Counterparty (upon which Lender and its successors and assigns may rely), provided such opinion is reasonably available at no cost to Borrower, which opinion shall provide, in relevant part, that:

(i)    the Counterparty is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Cap Agreement;

(ii)    the execution and delivery of the Interest Rate Cap Agreement by the Counterparty, and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

(iii)    all consents, authorizations and approvals required for the execution and delivery by the Counterparty of the Interest Rate Cap Agreement, and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and

(iv)    the Interest Rate Cap Agreement, and any other agreement which the Counterparty has executed and delivered pursuant thereto, has been duly executed and delivered by the Counterparty and constitutes the legal, valid and binding obligation of the Counterparty, enforceable against the Counterparty in accordance with its terms, subject to

38

applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

Section 7.29.   Anti-Terrorism.

(a)      None of the Borrower nor any other Person owning a direct or indirect, legal or beneficial interest in Borrower is in violation of Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (the "**Executive Order**"), the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56, the "**Patriot Act**") or any other legal requirement relating to terrorism or money laundering.

(b)      Neither the Borrower, any Loan Party nor any of their respective constituents, investors (direct or indirect and whether or not holding a legal or beneficial interest) or affiliates, any of their respective brokers or other agents, if any, acting or benefiting, directly or indirectly, in any capacity in connection with the Loan, is a "**Prohibited Person**" which is defined as follows:

(i)      a Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)      a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)      a Person with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering Legal Requirements, including the Executive Order and the Patriot Act;

(iv)      a Person who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(v)      a Person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gov/ofac/t11sdn.pdf or at any replacement website or other replacement official publication of such list; and

(vi)      a Person who is affiliated with a Person listed above.

(c)      Neither the Borrower, any Loan Party nor any of their respective affiliates, investors or constituents, acting in any capacity in connection with the Loan are currently or will at any time hereafter (i) conduct any business or engage in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the

ATLANTA:4906205.5

purposes of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order or the Patriot Act.

(d)    Borrower covenants and agrees to deliver to Lender any certification or other evidence requested from time to time by Lender in its reasonable discretion, confirming compliance with this **Section 7.29**.

(i) None of the funds or other assets of Borrower or any Loan Party constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person (as defined below); (ii) no Embargoed Person has any interest of any nature whatsoever in Borrower or any Loan Party, as applicable (whether directly or indirectly); and (iii) none of the funds of Borrower or any Loan Party, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower or any Loan Party, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law. "**Embargoed Person**" means any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower or any Loan Party, as applicable (whether directly or indirectly), is prohibited by law or the Loan made by the Lender is in violation of Applicable Law.

Section 7.30.    Finished Lots.  Borrower covenants and agrees that upon completion of construction, the Project shall contain not less than 820 Finished Lots.

Section 7.31.    Membership Sales.  Borrower covenants and agrees that all sales of golf memberships shall be Qualified Club Sales.  Borrower represents, warrants and agrees that all sales of golf memberships have been or will be made in compliance with Applicable Law.

ARTICLE VIII

INTENTIONALLY OMITTED

ARTICLE IX

TRANSFERS OF INTERESTS

Section 9.1.    Transfer.  Without the prior written consent of Lender, Borrower shall not, and shall not cause, permit or suffer to occur any Transfer of the Project or any other Collateral or any portion thereof or any Ownership Interest (other than a Permitted Transfer and the Transfers described in **Section 9.4** hereof).  Any Transfer of the Project or any other Collateral or any portion thereof or any Transfer of any Ownership Interest (other than a Permitted Transfer), whether or not intentional or unintentional, whether or not within the control of Borrower or any other Loan Party, whether by operation of law or otherwise, without such prior written consent of Lender, shall be an immediate Event of Default.  The provisions of the foregoing two sentences of this **Section 9.1** shall apply to each and every such further Transfer, regardless of whether or not Lender has consented to, or waived its rights hereunder

40

with respect to, any such previous Transfer, and irrespective of whether such further Transfer is voluntary, by reason of operation of law or is otherwise made.

Section 9.2.    Contracts to Transfer.    Without the prior written consent of Lender, Borrower shall not enter into, and shall not cause, permit or suffer any other Person to enter into, any contract, option or other agreement to Transfer the Project or any other Collateral or any portion thereof or any interest therein, including any Ownership Interest (other than with respect to a Permitted Transfer).

Section 9.3.    Costs and Expenses, Further Assurances.    In the case of any proposed Transfer other than any Permitted Transfer, Borrower shall give Lender thirty (30) days prior written notice of such proposed Transfer.  In the case of any Transfer other than a Permitted Transfer which Lender (in its sole and absolute discretion) may approve, as a condition to such Transfer, Borrower shall cause to be delivered to Lender such pledge and security agreements, financing statements and other instruments, to evidence Lender's continuing security interest in the Collateral as Lender may require, and deliver such opinions of counsel and other further assurances as Lender may require.  Borrower shall pay or cause to be paid Lender's and Servicer's out of pocket costs and expenses relating to any such other Lender approved Transfer, or any proposed Transfer which Lender does not approve (including Professional Fees and the Servicer's fees, costs and expenses).

Section 9.4.    Golf Course.  Borrower has informed Lender that Williamson County, Tennessee requires that ownership of the Golf Course be transferred to the Homeowners' Association upon completion thereof and the recording of a Subdivision Map (approved by Lender) with respect thereto.  The Homeowners' Association would thereupon lease the Golf Course to the Golf Club and the Golf Club would operate the Golf Course and would own the Golf Course Improvements.  Lender will consent to such Transfer upon satisfaction of the following conditions:  (i) no Unmatured Default shall have occurred and be continuing, and no Event of Default shall have occurred, (ii) the remainder of the Project, after giving effect to the subdivision and conveyance of the Golf Course, will (A) comply with all zoning ordinances, including, without limitation, those related to parking, lot size and density, (B) be a separate tax parcel or parcels, and not be subject to any lien for taxes due, (C) comply with all subdivision ordinances and regulations, (D) permit the construction and development of the remainder of the Project in accordance with the Plans, and (E) have ingress and egress that is satisfactory to Lender, (iii) execution of such documents by Borrower, the Homeowners' Association and the Golf Club as Lender may require in its sole and absolute discretion to confirm and continue the Lien of Lender for the Obligations (including, without limitation, the Contingent Interest) in the Golf Course and the remainder of the Project, including, without limitation, the execution by the Golf Club of an exculpated guaranty and a deed of trust encumbering the leasehold interest of the Golf Club in the Golf Course and the ownership interest of the Golf Club in the Golf Course Improvements, (iv) delivery of appropriate endorsement to Lender's Title Insurance Policy, (v) payment to Lender by Borrower of Lender's fees and expenses in evaluating and documenting such subdivision, conveyance and continuation of Lender's Lien including, without limitation, attorney's fees, and (vi) the Golf Club shall be a Single Purpose Entity and such shall be reflected in the organizational documents of the Golf Club and the Golf Club shall have two Independent Managers.

41

ARTICLE X

CASH MANAGEMENT

Section 10.1.   <u>Cash Management</u>.  Borrower hereby grants to Lender a security interest in Borrower's right, title and interest in all Gross Receipts whether now existing or hereafter created or arising.  Borrower shall cause all Gross Receipts to be deposited into the Lockbox Account.  All Gross Receipts so deposited shall be applied in accordance with the Lockbox Agreement.

Section 10.2.   <u>Distributions</u>.   Except as set forth in **Section 10.1** and the Lockbox Agreement, at no time that any portion of the Debt remains outstanding shall Borrower cause, permit or suffer to occur any Distribution.  If, however, any Distribution otherwise shall be received by any Loan Party or any other Person (other than Lender), such Loan Party or other Person shall hold the same in trust for the benefit of Lender and immediately deliver the same for deposit into the Lockbox Account.

ARTICLE XI

DEFAULTS; REMEDIES

Section 11.1.   <u>Events of Default</u>.  The term "**Event of Default**" as used in this Loan Agreement shall mean the occurrence of (i) any one or more of the following events set forth in this **Section 11.1** or (ii) any Other Event of Default set forth in **Section 11.2**

(a)      if (i) Borrower shall fail to make any payment to Lender or Servicer under the Loan Documents when due and payable, including, without limitation, the failure to pay the Debt or any portion thereof (other than the Reserved Principal Amount and Contingent Interest that is payable after the Scheduled Maturity Date as the same may be extended pursuant to the Extension Option) on the Maturity Date;

(b)      if any representation or warranty of any Loan Party in any Loan Document or in any certificate, report, financial statement or other instrument or document furnished to Lender by or on behalf of any Loan Party shall have been false or misleading in any material respect when made (or deemed remade in accordance with **Section 3.2**);

(c)      any violation, breach or default under **Section 7.5, Section 7.9, Section 7.11, Section 7.17, Section 7.18, Section 7.19, Section 7.23, Section 7.24, Section 7.25, Section 7.28, Section 7.29, Section 7.30, or Section 7.31** of this Loan Agreement.

(d)      (A) the occurrence of a Material Casualty or Material Condemnation to the Project or (B) the occurrence of any other Casualty or Condemnation to the Project if the Restoration Conditions are not satisfied;

(e)      Any sequestration or attachment of, or any levy or execution upon any portion of the Project or any portion of the Collateral, which sequestration, attachment, levy or execution is not released, expunged or dismissed without, having been exercised or entered in any manner within (10) days of the entry or occurrence thereof;

42

(f)     Any Loan Party shall commence any case, proceeding or other action (i) under any Bankruptcy Law seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (ii) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for any substantial portion of its assets, or any Loan Party shall make a general assignment for the benefit of its creditors;

(g)     there shall be commenced by any Person against any Loan Party any case, proceeding or other action of a nature referred to in subsection (f) above which (i) results in the entry of an order for relief or any such adjudication or appointment, or (ii) remains undismissed, undischarged or unbonded for a period of sixty (60) days;

(h)     Any Loan Party shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in **Section 11.1(e), (f) or (g)** above, including seeking to convert any case filed under Chapter 7 of the federal bankruptcy Law to a Chapter 11 case under federal Bankruptcy Law, or visa versa;

(i)     Any Loan Party shall not, or shall be unable to, or shall admit in writing its inability to, pay its debts generally as they become due;

(j)     if any Loan Party executes any chattel mortgage or other security agreement with respect to any materials, equipment, furniture or fixtures used in Construction and Use of the Project or with respect to any Personal Property, or if any such articles of Personal Property are leased or purchased pursuant to any conditional sales contract or other security agreement or otherwise so that the ownership thereof will not vest unconditionally in Borrower free and clear of the interests of any other Person, or if Borrower does not furnish to Lender on request the contracts, bills of sale, statements, receipted vouchers or other agreements, under which Borrower claims title to such Personal Property;

(k)     if one or more final judgments or decrees shall be entered against any Loan Party which is not fully paid within 30 days;

(l)     if any amounts disbursed under the Loan are applied or used for purposes other than those set forth in the applicable Request for Advance;

(m)     if Borrower fails to make the Deficiency Deposit required by **Section 6.5**;

(n)     if any Loan Party shall incur any Indebtedness other than Permitted Debt;

(o)     if Substantial Completion does not occur by the Required Completion Date, or the work required to be completed by any Staged Completion Date is not complete by such Staged Completion Date or if any Punchlist Items are not completed within 90 days of the Substantial Completion Date;

(p)     intentionally omitted;

(q)     intentionally omitted;

43

(r)    if there shall occur any default, breach or violation of the terms of **Article IX**;

(s)    if any Gross Receipts fail to be deposited into the Lockbox Account or such Gross Receipts are used or applied in violation of the Lockbox Agreement;

(t)    if any Loan Party misapplies or converts any Advances or Loss Proceeds;

(u)    if any Loan Party or Affiliate of any Loan Party shall interfere with any right to cure granted to Lender in any of the Loan Documents;

(v)    if any of the assumptions contained in the substantive non-consolidation opinion dated as of the Closing Date, prepared by Bone McAllester Norton, PLLC is or shall become inaccurate or untrue;

(w)    if an event occurs under the terms of this Loan Agreement or any other Loan Document, which by such terms constitute an "Event of Default" under such Loan Document;

(x)    if a Material Adverse Change occurs which is not remedied to Lender's satisfaction within thirty (30) days of its occurrence;

(y)    intentionally omitted;

(z)    if any Recourse Event occurs;

(aa)    if copies of duly executed fixed-price contracts for subcontractors whose work comprises at least 70% in the aggregate of the cost of completing the Improvements that is not to be completed or performed by the General Contractor are not delivered to Lender prior to approval by Lender of the General Construction Contract and prior to Commencement of Construction;

(bb)    if any two or more sales contracts with master builders for the sale of any of the proposed residential lots in the Project are terminated or otherwise become unenforceable and which sales contracts are not replaced within ninety (90) days; or;

(cc)    if Borrower shall have fallen behind in its obligation to cause Finished Lots to have been sold in accordance with the terms of the Loan Documents in the number set forth in **Exhibit V** attached hereto and by each calendar quarter as set forth in **Exhibit V** attached hereto for more than two calendar quarters;

it being understood and agreed that if any event or circumstance occurs or exists which is an Event of Default under any one subsection of subsections (a) through (cc) (inclusive) of this **Section 11.1**, then an Event of Default under the Loan Documents shall immediately exist regardless of whether any other term or provision of the Loan Documents provides any, or any different, notice, grace period and/or cure rights.

ATLANTA:4906205.5

Section 11.2.  Other Event of Default.  If any event or circumstance exists or has occurred (other than an event or circumstance described in subsection (a) through (cc) (inclusive) of **Section 11.1**) which is a violation, default or breach of any of the terms, provisions or conditions of any of the Loan Documents by Borrower or any other Loan Party, and such violation, default or breach is not fully cured by Borrower or other Loan Party (i) within the notice or cure period, if any, provided for in such Loan Document or (ii) if such Loan Document does not provide for any grace, notice or cure period, within five (5) Business Days after notice from Lender in the case of any such violation, default or breach which can be cured by the payment of money, or (iii) within thirty (30) days after notice from Lender in the case of any other violation, default or breach, then the occurrence of such event or circumstance shall constitute an "**Other Event of Default**" and shall be an Event of Default hereunder.

Section 11.3.  Remedies.

(a)  Upon the occurrence of any Event of Default, Borrower agrees that Lender may (but without any obligation to do so) take such action, without notice or demand, as Lender deems advisable to protect and enforce its rights against Borrower and in and to the Collateral, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole and absolute discretion, without impairing or otherwise affecting the other rights and remedies of Lender (and any and all costs and expenses, including Professional Fees, paid or incurred by Lender in connection with the following shall constitute a Protective Advance):

(i)  declare the entire unpaid Debt to be immediately due and payable; provided, however, if any Event of Default as described in **Section 11.1 (f) or (g)** above shall occur, the entire unpaid Debt shall be automatically due and payable, without any further notice, demand or other action by Lender;

(ii)  institute proceedings, judicial or otherwise, or take any other action, for the enforcement of Lender's rights under the Loan Documents or at law or in equity, including the foreclosure or sale (public or private) of the Collateral or any portion thereof;

(iii)  terminate, in whole or in part, any obligation Lender may have to make any Advance hereunder;

(iv)  institute an action, suit or proceeding in equity for the specific performance of any of the Obligations;

(v)  pay, perform, or cause the performance of any of the Obligations, complete construction of the Project in accordance with the Plans or any other plans or specifications which Lender may specify, terminate or modify any Project Document or enter into any new Project Document, in each case in its own name or in the name of Borrower or any other applicable Loan Party, it being understood and agreed that Borrower and each Joinder Party hereby grant to Lender a power of attorney coupled with an interest to take any such action;

(vi)  recover judgment on the Note either before, during or after any proceedings for the enforcement of the Loan Documents;

45

(vii)   exercise any and all rights and remedies granted to a secured party upon default under the applicable Uniform Commercial Code;

(viii)   exercise all or any one or more of the rights, powers and other remedies available to Lender against any Loan Party under the Loan Documents, at law or in equity, at any time and from time to time, whether or not all or any portion of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceedings or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to the Collateral;

(ix)   apply any sums then deposited in the Lockbox Account and any other sums held in escrow or otherwise by Lender belonging to any Loan Party to the payment of the Debt; and

(x)   pursue such other remedies and rights as Lender may have under applicable law or at equity or available under the Loan Documents.

(b)   Proceeds.   The proceeds of any disposition of the Collateral, or any part thereof, or any other sums collected by Lender pursuant to the Loan Documents, may be applied by Lender to the payment of the Debt or any part thereof in such priority and amounts as Lender in its sole and absolute discretion shall determine.

(c)   Lender Action.   Upon the occurrence of any Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower or any other Loan Party and without releasing Borrower or any other Loan Party from any Obligation, take any action in such manner and to such extent as Lender may deem necessary to protect the Collateral and/or take any action to cure any Event of Default. Borrower, for itself and on behalf of each of the Loan Parties, agrees that Lender is authorized to enter upon the Project for such purposes, or appear in, defend, or bring an action or proceeding to protect its interest in the Project or to collect the Debt, and the cost and expense thereof (including Professional Fees), shall constitute a Protective Advance and shall be payable on demand.

(d)   No Cure.   Lender's exercise of any right or remedy which has the effect of remedying an Event of Default under the Loan Documents shall not constitute a cure or waiver of such Event of Default.

(e)   Intentionally Omitted.

(f)   No Waiver, Etc.   The failure of Lender to insist upon strict performance of any term, covenant or condition contained herein or in the other Loan Documents shall not be deemed to be a waiver, modification, amendment or estoppel thereof. Neither Borrower nor any other Loan Party shall be relieved of or released from its Obligations by reason of (i) the failure of Lender to comply with any request of any Loan Party to take any action to enforce any of the provisions hereof or any other Loan Document, if applicable, (ii) the release, regardless of consideration, of the whole or any part of the Collateral, or of any Person liable for the Debt or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Loan Documents. Lender may resort for the payment of the Debt to any Collateral held by Lender in such order and

46

manner as Lender, in its sole and absolute discretion, may elect. Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to recover against the Collateral under the Loan Documents. The rights of Lender under each of the Loan Documents shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision of any Loan Document to the exclusion of any other provision. Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

ARTICLE XII

MISCELLANEOUS

Section 12.1. <u>Further Assurances</u>. Borrower forthwith upon the execution and delivery of this Loan Agreement and thereafter from time to time at Lender's request, will cause any of the Loan Documents (including any additional Financing Statements or continuation statements) to be filed, registered or recorded in such manner and in such places as may be required by any Applicable Law in order to publish notice of and fully protect, perfect or continue the perfection of any Lien in favor of Lender and the interest of Lender in the Collateral. In addition, Borrower will, at its sole cost and expense, (i) do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered all and every such further acts, deeds, conveyances, mortgages, assignments, financing statements, continuation statements, notices of assignments, transfers and assurances as Lender shall, from time to time, require, for the better assuring, carrying out, conveying, assigning, transferring, pledging, hypothecating, perfecting, preserving and confirming unto Lender the Liens and other property rights granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted or transferred, or intended now or hereafter so to be, under the Loan Documents, or which Borrower or any other Loan Party may be or may hereafter become bound to convey, assign, transfer, pledge, or hypothecate to Lender, or for carrying out the intention or facilitating the performance of the terms of the Loan Documents and (ii) furnish or cause to be furnished to Lender all instruments, documents, surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by Borrower or any other Loan Party pursuant to the terms of the Loan Documents or reasonably requested by Lender in connection therewith. Borrower and each other Loan Party, on demand, will execute and deliver one or more financing statements or other instruments, to evidence more effectively the security interest of Lender in the Collateral. In addition, Borrower and each Joinder Party hereby authorize Lender to execute any such financing statements or other instruments without the signature of Borrower or any Loan Party (where permitted by Applicable Law) or to execute such financing statements and other instruments in the name of Borrower or such Loan Party and Borrower and each Joinder Party hereby grant to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising, perfecting or otherwise protecting any and all rights and remedies available to Lender at law and in equity or under the Loan Documents.

Section 12.2. <u>Bankruptcy</u>. Borrower, Lender and each Joinder Party hereby acknowledge and agree that upon the filing of a bankruptcy petition by or against any Loan Party under any Bankruptcy Law, any amounts held in the Lockbox Account and all other Gross

47

Receipts (whether then already in the Lockbox Account, or then due or becoming due thereafter) shall be deemed not to be property of the bankrupt Loan Party's bankruptcy estate within the meaning of Section 541 of the Bankruptcy Code.  In the event, however, that a court of competent jurisdiction determines that, notwithstanding the foregoing characterization, funds in the Lockbox Account and/or such Gross Receipts do constitute property of such Loan Party's bankruptcy estate, then Borrower, Lender and each Joinder Party hereby further acknowledge and agree that all such funds in the Lockbox Account and the Gross Receipts, whether due and payable before or after the filing of the petition, are and shall be cash collateral of Lender. Borrower and each Joinder Party acknowledge that Lender does not consent to the use of such cash collateral and that, in the event Lender elects (in its sole and absolute discretion) to give such consent, such consent shall only be effective if given in writing signed by Lender.  Except as provided in the immediately preceding sentence, neither Borrower nor any other Loan Party shall have the right to use or apply or require the use or application of such cash collateral unless (i) Borrower or such other Loan Party shall have received a court order authorizing the use of the same, and (ii) Borrower or such other Loan Party shall have provided such adequate protection to Lender as shall be required by the bankruptcy court in accordance with the Bankruptcy Code.

Section 12.3.  Estoppel Certificates.  Borrower, within ten (10) days after request by Lender, shall furnish to Lender a current written statement, dated as of the date of Borrower's response, duly acknowledged and certified, setting forth (i) the unpaid principal amount of the Note, (ii) the rate or rates of interest on the Note, (iii) the terms of payment and Maturity Date of the Note, (iv) the date installments of interest and/or principal were last paid, (v) that, except as specifically provided in such statement and to Borrower's Knowledge, there are no defaults or events which with the passage of time or the giving of notice or both, would constitute an Event of Default under the Loan Documents, (vi) that the Loan Documents are valid, legal and binding obligations of each applicable Loan Party, enforceable against each such Loan Party in accordance with its terms and have not been modified or if modified, giving particulars of such modification, (vii) whether any offsets or defenses exist against the Obligations and, if any are alleged to exist, a detailed description thereof, and (viii) as to any other matters reasonably requested by Lender ("**Borrower Estoppel Certificate**").

Section 12.4.  Lost Documents.  Upon receipt of a "loss of document affidavit" executed by Lender and Lender's indemnity of Borrower (or, as applicable, another Loan Party) with respect to all claims and losses arising from the loss, theft, destruction or mutilation of any of the Loan Documents which are not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such mutilated Loan Document, Borrower will issue, or cause to be issued (in the case of documents issued by other Loan Parties), in lieu thereof, a replacement Loan Document, dated the date of such lost, stolen, destroyed or mutilated Loan Document in the same principal amount thereof and otherwise of like tenor.  Each party shall be liable for its own costs and expenses in preparing and reviewing any replacement documents and otherwise performing its agreements under this **Section 12.4**.

Section 12.5.  Principles of Construction.  The following principles of construction shall apply to this Loan Agreement:

(i)    The titles and headings of the Articles, Sections and subsections of this Loan Agreement have been inserted for convenience of reference only and are not intended

48

to summarize or otherwise describe the subject matter of such Articles, Sections and subsections and shall not be given any consideration in the construction of this Loan Agreement.

(ii)    All references to Sections and Exhibits are to Sections and Exhibits in or to this Loan Agreement unless otherwise specified. Any reference to "this Section" in this Loan Agreement shall mean the Section in which such reference appears, and shall also be deemed refer to the subsections contained in such Section.

(iii)    Unless otherwise specified, the words "hereof", "herein" and "hereunder" and words of similar import, when used in this Loan Agreement, shall refer to this Loan Agreement as a whole and not to any particular provision of this Loan Agreement.

(iv)    The words "includes", "including" and similar terms shall be construed as if followed by the words "without limitation."

(v)    Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

(vi)    To the extent that any provision in this Loan Agreement requires, expressly or implicitly, performance, observance or compliance by any Person other than Borrower, such provision shall be construed as Borrower's obligation to cause such other Person to perform, observe or comply with such provision, and, accordingly, the failure by such Person to perform, observe or comply with such provision shall be considered a breach by Borrower of its obligations under this Loan Agreement.

(vii)    Definitions contained in this Loan Agreement or any other Loan Document which identify documents, including this Loan Agreement or any other Loan Document, shall be deemed to include all Amendments thereto.

Section 12.6.    Parties Bound, Etc.    The provisions of this Loan Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective permitted successors and assigns, provided nothing in this Section shall be deemed to give Borrower or any other Loan Party the right to Transfer any interest in the Project or any of the other Collateral or to Transfer any Ownership Interest except as expressly permitted by **Article IX**.

Section 12.7.    Waivers.    Lender may at any time and from time to time waive any one or more of the conditions, requirements or obligations contained herein, but any such waiver shall be deemed to be made in pursuance hereof and not in modification thereof, and any such waiver in any instance or under any particular circumstance shall not be effective unless in writing and shall not be considered a waiver of such condition in any other instance or any other circumstance.

Section 12.8.    Severability.    If any term, covenant or provision of this Loan Agreement or any other Loan Document shall be held to be invalid, illegal or unenforceable in any respect, this remainder of this Loan Agreement or such other Loan Document shall remain in full force and effect and shall be construed without such term, covenant or provision.

49

Section 12.9.   Release of Collateral.   Lender may release, regardless of consideration, any part of the Collateral without in any way impairing or affecting the validity, priority or perfection of its Lien on or in the remaining Collateral.

Section 12.10. Notices.   Any notice, request, demand, statement, authorization, approval, consent or acceptance made hereunder shall be in writing and shall be (a) hand delivered or (b) sent by overnight delivery via United Parcel Service or other reputable overnight courier service, or (c) sent by registered or certified mail, postage prepaid with return receipt requested, (d) sent by facsimile (with a confirmatory duplicate copy sent by first class United States mail) and shall be deemed given (i) upon delivery, if delivered in person, (ii) one (1) Business Day after being deposited with United Parcel Service or any other reputable overnight courier service for overnight delivery, or (iii) three (3) Business Days after being postmarked if sent by registered or certified mail, return receipt requested, or (iv) upon receipt if sent by facsimile, in each case addressed as follows:

If to Lender:

Lehman Brothers Holdings Inc.
399 Park Avenue, 8th Floor
New York, New York 10022
Attention: Masood Bhatti
Facsimile No. (212) 520-0130

and

Lehman Brothers Holdings Inc.
399 Park Avenue, 8th Floor
New York, New York 10022
Attention: David Broderick
Facsimile No. (646) 758-5311

With a copy to:

McKenna Long & Aldridge LLP
303 Peachtree Street, N.E.
Suite 5300
Atlanta, Georgia 30308
Attention: Charles D. Weiss
Facsimile No. (404) 527-4198

50

And a copy to:

    TriMont Real Estate Advisors
    Monarch Tower
    3424 Peachtree Road, N.E.
    Suite 2200
    Atlanta, Georgia 30326
    Attention: Greg Winchester
    Facsimile No. (404) 420-5610

If to Borrower:

    c/o Laurel CV Management, LLC
    Attention: Mr. Kenneth A. Jowdy
    175 East Reno Avenue, Suite C5
    Las Vegas, Nevada 89119

With a copy to:

    Baker & Hostetler LLP
    666 Fifth Avenue
    New York, New York 10103
    Attention: Laurence S. Markowitz
    Facsimile No. (212) 589-4201

Each party may designate a change of address or facsimile number by notice to the other party sent pursuant to this Section, given at least fifteen (15) days before such change of address is to become effective.

Section 12.11. Modification. This Loan Agreement may not be modified, amended or terminated, except by an agreement in writing executed by Lender and Borrower. Borrower acknowledges that the Loan Documents set forth the entire agreement and understanding of Lender and the Loan Parties with respect to the Loan and that no oral or other agreements, understandings, representations or warranties exist with respect to the Loan other than those expressly set forth in the Loan Documents. All prior agreements among or between such parties, whether oral or written, are superceded by the terms of the Loan Documents.

Section 12.12. Indemnity. Borrower hereby agrees to defend, indemnify and hold harmless Lender, its directors, officers, employees, agents, successors and assigns (each an "**Indemnified Lender Party**") from and against any and all losses, damages, liabilities, claims, actions, judgments, court costs and legal or other expenses (including Professional Fees) which such Indemnified Lender Party may incur as a direct or indirect consequence of: (i) Construction and Use of the Project or any portion thereof; (ii) the compliance of the Project and each portion thereof with Applicable Law, (iii) the purpose to which Borrower or any other Loan Party applies any Advances; (iv) the failure of Borrower to perform, or to cause any Loan Party to perform, any obligations as and when required by any of the Loan Documents; (v) any failure at

51

any time of any of Borrower's or any other Loan Party's representations or warranties to be true and correct; or (vi) any act or omission by Borrower or any other Loan Party or other Person (other than Lender) with respect to the Project or any portion thereof. Borrower shall pay to such Indemnified Lender Party, within ten (10) days of such Indemnified Lender Party's demand therefore, any amounts owing under this indemnity. To the extent that any Lender Indemnified Party has made any payment on account of any matter for which it is indemnified hereunder which is not repaid within such time, Lender shall be deemed to have made a Protective Advance in the amount so owing to such Indemnified Lender Party. Borrower's duty and obligation to defend, indemnify and hold harmless each Indemnified Lender Party shall survive cancellation of the Note, repayment of the Debt and the release or reassignment of any Collateral.

Section 12.13. <u>Lender Consent and Approval</u>. Except as may otherwise be expressly provided to the contrary, wherever pursuant to the this Loan Agreement or any other Loan Document or otherwise with respect to the Loan, Lender exercises any right given to it to consent or not consent, or to approve or disapprove, or any arrangement or term is to be satisfactory to Lender or Lender is otherwise entitled to exercise its judgment or discretion, the decision of Lender to consent or not consent, or to approve or disapprove or to decide that arrangements or terms are satisfactory or not satisfactory or otherwise to exercise its judgment or discretion, shall be in the sole and absolute discretion of Lender and shall be final and conclusive.

Section 12.14. <u>Reasonableness</u>. If at any time Borrower believes that Lender has not acted reasonably in granting or withholding any approval or consent under the Loan Documents or any other document or instrument now or hereafter executed and delivered in connection therewith or otherwise with respect to the Loan, as to which approval or consent either Lender has expressly agreed to act reasonably, or absent such agreement, a court of law having jurisdiction over the subject matter would require Lender to act reasonably, then Borrower's sole remedy shall be to seek injunctive relief or specific performance and no action for monetary damages, consequential damages or punitive damages or any other damages shall in any event or under any circumstance be maintained by Borrower or any other Loan Party against Lender.

Section 12.15. <u>Absolute and Unconditional Obligation</u>. Borrower and each Joinder Party acknowledge that the payment and performance of the Obligations in accordance with the provisions of this Loan Agreement and the other Loan Documents is and shall at all times continue to be absolute and unconditional in all respects, and shall at all times be valid and enforceable irrespective of any other agreements or circumstances of any nature whatsoever which might otherwise constitute a defense to this Loan Agreement or any other Loan Document or the Obligations or otherwise with respect to the Loan.

Section 12.16. <u>Relationship</u>. The relationship of Lender, on the one hand, and Borrower and each other Loan Party, on the other hand, is strictly and solely that of lender and borrower and nothing contained in the Loan Documents or any other document or instrument now or hereafter executed and delivered in connection therewith or otherwise in connection with the Loan is intended to create, or shall in any event or under any circumstance be construed as creating, a partnership, joint venture, tenancy-in-common, joint tenancy or other relationship of any nature whatsoever between Lender, on the one hand, and all or any of Borrower and/or any other Loan Party, on the other hand, other than as lender and borrower. Lender neither

52

undertakes nor assumes any responsibility or duty to Borrower or any other Loan Party, except as expressly provided in this Loan Agreement and the other Loan Documents, or to any other Person.

Section 12.17. Lender Assignment; Securitization.

(a)     Assignment.  Borrower acknowledges and agrees that Lender shall have the absolute and unconditional right at any time after the date hereof and at any time during the term of the Loan without requiring any consent or approval from Borrower, any other Loan Party or any other Person to sell, assign, pledge, hypothecate or otherwise transfer Lender's interest in the Loan, in whole or in part, or to place one or more participation interests therein, or to effect a syndication or securitization of the Loan, in one or more separate transactions, in each case to or with such Persons (including domestic or foreign banks, insurance companies, pension funds, trusts, other institutional lenders or investors, natural persons, grantor trusts, owner trusts, special purpose corporations, REMICs, FASITs, real estate investment trusts and other similar or comparable investment vehicles) (each a "**Lender Transferee**") and on such terms and conditions as Lender shall deem to be appropriate in the exercise of its sole and absolute discretion (in each case, a "**Lender Transfer**").

(b)     Disclosure.  In connection with any Lender Transfer, Lender shall have the absolute and unconditional right without giving notice to or obtaining the prior consent or approval of Borrower or any other Loan Party or any other Person to disclose, deliver and to share with any prospective Lender Transferee, or with any prospective rating agency, or their respective counsel or representatives, such information (financial or otherwise), documents and instruments pertaining to the Loan or any Loan Party or any other Person associated or connected with the Loan or the Collateral or the Project as Lender shall deem to be appropriate in the exercise of its sole and absolute discretion.

(c)     Cooperation.  Borrower shall cooperate, and shall cause each other Loan Party to cooperate, in all reasonable respects with Lender in connection with any Lender Transfer.  Borrower shall execute and deliver, and shall cause each other Loan Party and each other Person associated or connected with the Loan or the Collateral or the Project to execute and deliver, such documents and instruments as may be reasonably necessary to (a) split the Loan into two or more loans evidenced by and pursuant to separate sets of notes and other related loan documents (including multiple component notes or tranches which may have different interest rates, amortization payments, principal amounts and maturities, or resulting in a first or second lien, or resulting in the Loan being recast as a first priority mortgage loan and second priority mortgage loan, or as a first priority mortgage loan and a mezzanine loan), or (b) to modify the terms and provisions of the Loan Documents, in each case to the full extent required by Lender to facilitate any Lender Transfer, it being agreed that (i) any such splitting or modification of the Loan will not materially adversely affect or diminish the rights of any Loan Party as presently set forth in the Loan Documents and will not increase the monetary obligations and liabilities or materially increase the non-monetary obligations of any Loan Party under the Loan Documents, and (ii) if the Loan is split, the retained interest of Lender, if any, in the Loan shall be allocated to or among one or more of such separate loans in a manner specified by Lender in its sole and absolute discretion.

ATLANTA:4906205.5

(d)    <u>Default</u>.  If Borrower shall default in the performance of its obligation as set forth in this **Section 12.17**, and if such default shall not be remedied by Borrower within ten (10) days after notice by Lender, the same shall constitute an Event of Default under this Loan Agreement.

(e)    <u>Notice of Lender Transfer</u>.  Lender shall endeavor to provide notice to Borrower of any Lender Transfer in a reasonably timely manner, but any failure by Lender to provide notice to Borrower shall not give rise to any claim or defense on the part of any of the Loan Parties, or limit the rights of Lender under this **Section 12.17** or the Loan Documents. Until otherwise directed in writing by Lender following a Lender Transfer, Borrower shall continue to make all payments and deposits as required prior to such occurrence.

Section 12.18.  <u>Brokers and Financial Advisors</u>.  Borrower hereby represents to Lender that no Loan Party has dealt with financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Loan Agreement except for Oberon Mezzanine Partners.  Borrower agrees to indemnify and hold the Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind in any way (including Professional Fees) relating to or arising from a claim by any Person that such Person acted on behalf of any Loan Party in connection with the transactions contemplated herein.  The provisions of this Section shall survive the expiration and termination of this Loan Agreement and the repayment of the Debt.

Section 12.19.  <u>Offsets, Counterclaims and Defenses</u>.  Borrower and each Joinder Party hereby waive the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with the Loan or the Loan Documents.  Without limiting in any manner the rights of any Lender Transferee at law or in equity, any Lender Transferee shall take its interest in the Loan free and clear of all offsets, counterclaims or defenses which are unrelated to the Loan.

Section 12.20.  <u>Loan Expenses</u>.  Borrower covenants and agrees to immediately pay Lender and/or Servicer on demand all costs and expenses ("**Loan Expenses**") including Professional Fees, incurred by Lender and/or Servicer in connection with or relating to the Loan, including: (i) Lender's Closing Expenses; (ii) the Loan Parties' ongoing performance of and compliance with their respective agreements and covenants contained in the Loan Documents on their part to be performed or complied with after the Closing Date, including confirming compliance with environmental and insurance requirements; and (iii) any request made to Lender for consent or approval of any matter; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers, extensions or other modifications to the Intercreditor Agreement, the Loan Documents or any other document or matter requested by any Loan Party or by Lender; (v) all federal, state, county and local taxes, filing, registration or recording fees and all other taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of any of Loan Document, including any tax or other charge referred to in **Section 12.21**; (vi) the exercise of Lender's rights under **Section 11.3**; (vii) title insurance premiums and escrow charges; and (viii) Professional Fees incurred by Lender or Servicer in connection with any of the foregoing.  All Loan Expenses incurred by Lender or Servicer shall be due and payable within ten (10) days of demand, and if not so paid

ATLANTA:4906205.5

within such 10-day period, Lender shall be deemed to have made a Protective Advance in the amount so owing to Lender and/or Servicer.

Section 12.21. <u>Loan Taxes</u>. If any law is enacted or adopted or amended after the date of this Loan Agreement which deducts the Debt from the value of the Collateral for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Collateral, Borrower will pay the tax, with interest and penalties thereon, if any. If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note or any of the Loan Documents or impose any other tax or charge on the same, except for any tax or imposition imposed on the income of Lender, Borrower will pay for the same, with interest and penalties thereon, if any. If Applicable Law prevents or prohibits Borrower from so paying or reimbursing Lender, the same shall, at the option of Lender, constitute an Event of Default.

Section 12.22. <u>Protective Advances</u>. Borrower covenants and agrees to immediately pay Lender on demand all costs and expenses, including Professional Fees, incurred by Lender in connection with or as a consequence of any of the following (each a "**Protective Advance**"): (i) any Unmatured Default or Event of Default under the Loan Documents, including any costs and expenses and other amounts expended by Lender or Servicer in curing or attempting to cure the same; (ii) any bankruptcy proceeding of any Loan Party; (ii) the collection of the Debt, (iv) the enforcement of Lender's rights and remedies under the Loan Documents, or enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting the Project, any Loan Party, the Loan Documents, or any Collateral; (v) the payment of any transfer taxes in connection with the exercise of Lender of its right under the Security Instrument; (vi) any payment or other amount which is designated as a Protective Advance by any other provision of the Loan Documents. All Protective Advances made by Lender under the Loan Documents shall be evidenced by, and be deemed to be advanced as principal under, the Note, regardless of whether any such Advance causes the principal balance of the Note to exceed $114,200,000.00, and shall be due and payable on demand. Borrower and each Joinder Party expressly acknowledge that Lender is authorized to make Protective Advances regardless of whether Lender shall have commenced any action or proceeding against Borrower or any other Loan Party. The failure of Borrower to repay Lender for any Protective Advance by Lender in accordance herewith shall constitute an Event of Default hereunder.

Section 12.23. <u>Servicer</u>. Lender has appointed TriMont Real Estate Advisors, Inc. (together with any other Person appointed by Lender to perform such duties "**Servicer**") as its agent to take certain actions and make certain decisions on its behalf in connection with the Loan. From time to time, Lender may appoint any other Servicer in Lender's sole and absolute discretion. Until such time as Lender shall notify Borrower that it is revoking the appointment of any such Servicer, any notice, demand or request from TriMont Real Estate Advisors, Inc. (or any replacement Servicer of which Borrower has received notice from Lender) shall have the same force and effect as any notice, demand or request from Lender.

Section 12.24. <u>Servicer Fees</u>. Borrower shall pay directly to Servicer on the first (1st) Business Day of each calendar month until the Debt has been paid in full a servicing fee equal to

55

the greater of twenty basis point or the actual cost invoiced by Servicer to Lender ("**Servicer Fees**").

Section 12.25. <u>Rescission of Payments</u>.  If at any time all or any part of any payment made by Borrower or any other Loan Party in connection with this Loan Agreement or any other Loan Document is rescinded or returned for any reason whatsoever (including the insolvency, bankruptcy or reorganization of Borrower or any other Loan Party), then the Obligations of Borrower or such other Loan Party shall, to the extent of the payment rescinded or returned, be deemed to have continued in existence notwithstanding such previous payment, and the Obligations of Borrower or such Loan Party under the Loan Documents shall continue to be effective or be reinstated, as the case may be, as to such payment, all as though such previous payment had never been made.

Section 12.26. <u>No Third Party Beneficiary</u>.  No Person other than Lender and Borrower and their permitted successors and assigns or any Indemnified Lender Party shall have any rights under this Loan Agreement.

Section 12.27. <u>Counterparts</u>.  To facilitate execution, this Loan Agreement may be executed in as many counterparts as may be convenient or required.  It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart.  All counterparts shall collectively constitute a single document.  It shall not be necessary in making proof of this Loan Agreement to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto.  Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart.

Section 12.28. <u>Facsimile or Electronic "PDF" Transmission</u>.  Lender, Borrower and each Joinder Party hereby agree that any facsimile or electronic "PDF" signature on any Loan Document or on any notice, document or other certificate delivered pursuant to the Loan Documents shall be deemed to have the same force and effect as an original signature, and to the fullest extent permitted by Applicable Law may be used in lieu of an original signature to evidence the execution and delivery of the document, certificate or instrument to which such facsimile or electronic "PDF" signature is attached.

Section 12.29. <u>Time</u>.  Time is of the essence of each and every term of this Loan Agreement and the other Loan Documents, except and only to the extent specifically waived by Lender in writing.

Section 12.30. <u>Delay Outside Lender's Control</u>.  Lender shall not be liable in any way to Borrower or any other Person for Lender's failure to perform or delay in performing under the Loan Documents (and Lender may suspend or terminate all or any portion of Lender's obligations under the Loan Documents) if such failure to perform or delay in performing results directly or indirectly from, or is based upon, the action, inaction, or purported action, of any governmental or local authority, or because of war, rebellion, insurrection, strike, lock-out, boycott or blockade (whether presently in effect, announced or in the sole judgment of Lender deemed probable), or from any act of God.

ATLANTA:4906205.5

Section 12.31. <u>WAIVER OF STATUTORY RIGHTS</u>. NEITHER BORROWER NOR ANY JOINDER PARTY SHALL APPLY FOR OR AVAIL ITSELF OF ANY APPRAISEMENT, VALUATION, STAY, EXTENSION OR EXEMPTION LAWS, OR ANY SIMILAR LAWS NOW EXISTING OR HEREAFTER ENACTED, IN ORDER TO PREVENT OR HINDER THE ENFORCEMENT OF THE LOAN DOCUMENTS, BUT HEREBY WAIVES THE BENEFIT OF SUCH LAWS TO THE FULL EXTENT THAT IT MAY DO SO UNDER APPLICABLE LAW. BORROWER AND EACH JOINDER PARTY HEREBY WAIVE ANY AND ALL RIGHT TO HAVE THE PROPERTY AND ESTATES COMPRISING THE COLLATERAL MARSHALED AND AGREES THAT ANY COURT HAVING JURISDICTION OVER ANY EXERCISE OF LENDER'S REMEDIES MAY ORDER THE COLLATERAL SOLD AS AN ENTIRETY OR IN SEPARATE PARTS. BORROWER AND EACH JOINDER PARTY HEREBY WAIVE, TO THE FULL EXTENT IT MAY DO SO UNDER APPLICABLE LAW, ANY AND ALL RIGHTS OF REDEMPTION FROM SALE UNDER ANY ORDER OR DECREE OF FORECLOSURE OR UNDER ANY PUBLIC OR PRIVATE SALE GRANTED UNDER ANY STATUTE NOW EXISTING OR HEREAFTER ENACTED.

Section 12.32. <u>USURY LAWS</u>.

(a)     BORROWER AND EACH JOINDER PARTY ACKNOWLEDGE AND AGREE THAT THE CONTINGENT INTEREST COMPONENT OF THE DEBT IS A MATERIAL INDUCEMENT TO LENDER TO MAKE THE LOAN AND ENTER INTO THE LOAN DOCUMENTS, AND THAT LENDER WOULD NOT BE WILLING TO MAKE THE LOAN AND ENTER INTO THE LOAN DOCUMENTS BUT FOR BORROWER'S AGREEMENT TO PAY THE CONTINGENT INTEREST. BORROWER AND EACH JOINDER PARTY FURTHER ACKNOWLEDGE AND AGREE THAT THE PAYMENT OF CONTINGENT INTEREST IS FAIR AND REASONABLE IN LIGHT OF THE SIZE OF THE RISK TAKEN BY LENDER AND THAT PAYMENT OF THE CONTINGENT INTEREST WILL NOT VIOLATE APPLICABLE USURY LAWS. WITHOUT LIMITING THE FOREGOING, BORROWER AND EACH JOINDER PARTY HEREBY WAIVE ANY RIGHT OR DEFENSE THEY MAY HAVE TO THE PAYMENT OF THE CONTINGENT INTEREST BASED ON ANY USURY, PENALTY OR OTHER SIMILAR LAWS.

(b)     WITHOUT LIMITING THE ABOVE, THIS LOAN AGREEMENT AND EACH OF THE OTHER LOAN DOCUMENTS IS SUBJECT TO THE EXPRESS CONDITION THAT AT NO TIME SHALL BORROWER OR ANY OTHER LOAN PARTY BE OBLIGATED OR REQUIRED TO PAY INTEREST ON THE PRINCIPAL BALANCE OF THE LOAN AT A RATE IN EXCESS OF THE MAXIMUM INTEREST RATE WHICH BORROWER OR SUCH LOAN PARTY IS PERMITTED BY APPLICABLE LAW TO CONTRACT OR AGREE TO PAY. IN DETERMINING WHETHER OR NOT THE INTEREST PAID OR PAYABLE EXCEEDS THE MAXIMUM RATE (A) BORROWER OR SUCH LOAN PARTY AND LENDER SHALL TO THE EXTENT PERMITTED UNDER APPLICABLE LAW CHARACTERIZE ANY NON-PRINCIPAL PAYMENT, AS A FEE, PREMIUM OR EXPENSE RATHER THAN INTEREST, AND (B) ALL SUMS PAID OR AGREED TO BE PAID TO LENDER FOR THE USE, FORBEARANCE, OR DETENTION OF THE DEBT, SHALL, TO THE EXTENT PERMITTED BY APPLICABLE LAW, BE AMORTIZED, PRORATED, ALLOCATED, AND SPREAD THROUGHOUT THE FULL

57

STATED TERM OF THE LOAN UNTIL PAYMENT IN FULL SO THAT THE RATE OR AMOUNT OF INTEREST ON ACCOUNT OF THE DEBT DOES NOT EXCEED THE MAXIMUM LAWFUL RATE OF INTEREST.  IF BY THE TERMS OF THE LOAN DOCUMENTS, BORROWER OR SUCH LOAN PARTY IS AT ANY TIME REQUIRED OR OBLIGATED TO PAY INTEREST ON THE PRINCIPAL BALANCE DUE UNDER THE LOAN AT A RATE IN EXCESS OF SUCH MAXIMUM RATE, SUCH INTEREST SHALL BE DEEMED TO BE IMMEDIATELY REDUCED TO SUCH MAXIMUM RATE AND ALL PREVIOUS PAYMENTS IN EXCESS OF THE MAXIMUM RATE SHALL BE DEEMED TO HAVE BEEN PAYMENTS IN REDUCTION OF PRINCIPAL AND NOT ON ACCOUNT OF THE INTEREST DUE.

Section 12.33. <u>GOVERNING LAW</u>.   THIS LOAN AGREEMENT WAS NEGOTIATED IN PART IN THE STATE OF NEW YORK, AND THE LOAN WAS MADE BY LENDER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE LENDER, BORROWER AND EACH JOINDER PARTY AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS LOAN AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (EXCLUDING APPLICATION OF ANY PRINCIPLE OF CONFLICT OF LAWS WHICH WOULD DIRECT THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS LOAN AGREEMENT, AND THIS LOAN AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO §5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

Section 12.34. <u>JURISDICTION</u>.

(a)     <u>SUIT BY BORROWER OR LOAN PARTY</u>.  BORROWER AND EACH JOINDER PARTY HEREBY AGREE THAT ANY LEGAL SUIT, ACTION OR PROCEEDING BROUGHT BY BORROWER AND/OR ANY LOAN PARTY AGAINST LENDER AND/OR SERVICER ARISING OUT OF OR RELATING TO THE LOAN, THIS LOAN AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS SHALL ONLY BE INSTITUTED BY BORROWER OR SUCH OTHER LOAN PARTY IN COURTS OF THE STATE OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK, NEW YORK OR THE UNITED STATES DISTRICT COURT LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK, NEW YORK.  BORROWER AND EACH JOINDER PARTY HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO BRING ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER AND/OR SERVICER ARISING OUT OF OR RELATING TO THE LOAN, THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS IN ANY OTHER COURT OTHER THAN COURTS OF THE STATE OF

ATLANTA:4906205.5

NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK, NEW YORK OR THE UNITED STATES DISTRICT COURT LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK, NEW YORK.

(b)    SUIT BY LENDER.  WITH RESPECT TO ANY CLAIM OR ACTION ARISING HEREUNDER OR UNDER THE OTHER LOAN DOCUMENTS, BORROWER AND EACH JOINDER PARTY (I) IRREVOCABLY SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK, NEW YORK, (II) AGREE THAT ALL SUCH CLAIMS OR ACTIONS MAY BE HEARD AND DETERMINED IN SUCH COURTS OF THE STATE OF NEW YORK OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT AND (III) IRREVOCABLY WAIVE ANY (A) OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS LOAN AGREEMENT OR ANY OTHER LOAN DOCUMENT BROUGHT IN ANY SUCH COURT AND (B) ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  NOTHING IN THIS LOAN AGREEMENT WILL BE DEEMED TO PRECLUDE LENDER FROM BRINGING AN ACTION OR PROCEEDING WITH RESPECT HERETO IN ANY OTHER JURISDICTION.

(c)    AGENT FOR PROCESS.  BORROWER AND EACH JOINDER PARTY WILL MAINTAIN AN AGENT FOR SERVICE OF PROCESS IN NEW YORK, NEW YORK AND GIVE PROMPT NOTICE TO LENDER OF THE ADDRESS OF THE NAME AND ADDRESS OF ANY NEW AGENT APPOINTED BY IT.  BORROWER AND EACH JOINDER PARTY FURTHER AGREE THAT THE FAILURE OF ITS AGENT FOR SERVICE OF PROCESS TO GIVE IT NOTICE OF ANY SERVICE OF PROCESS WILL NOT IMPAIR OR AFFECT THE VALIDITY OF SUCH SERVICE OR OF ANY JUDGMENT BASED THEREON.  IF, DESPITE THE FOREGOING, THERE IS FOR ANY REASON NO AGENT FOR SERVICE OF PROCESS ON BORROWER AVAILABLE TO BE SERVED, THEN BORROWER AND EACH JOINDER PARTY IRREVOCABLY CONSENT TO SERVICE OF PROCESS BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO IT AT ITS ADDRESS GIVEN OR REFERRED TO IN SECTION 12.10 OF THIS LOAN AGREEMENT OR ON THE SIGNATURE PAGE OF THE JOINDER AND CONSENT HERETO.

(d)    DESIGNATION OF AGENT.  BORROWER AND EACH JOINDER PARTY INITIALLY DESIGNATE CT CORPORATION SYSTEMS, INC., WITH OFFICES ON THE DATE HEREOF AT 111 8TH AVENUE, NEW YORK, NEW YORK 10011, TO RECEIVE FOR AND ON BEHALF OF BORROWER OR SUCH JOINDER PARTY (AS THE CASE MAY BE) SERVICE OF PROCESS IN NEW YORK, NEW YORK WITH RESPECT TO THIS AGREEMENT.  BORROWER OR SUCH JOINDER PARTY, AS THE CASE MAY BE, SHALL PROVIDE TO LENDER AT LEAST THIRTY (30) DAYS PRIOR WRITTEN NOTICE BEFORE CHANGING SUCH DESIGNATION.

Section 12.35. WAIVER OF RIGHT TO TRIAL BY JURY.  BORROWER, LENDER AND EACH JOINDER PARTY HEREBY EXPRESSLY WAIVE ANY RIGHT TO TRIAL BY

ATLANTA:4906205.5

JURY FOR ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER THE LOAN DOCUMENTS OR (b) IN ANY WAY RELATING TO THE LOAN DOCUMENTS OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND BORROWER, LENDER AND EACH JOINDER PARTY HEREBY AGREE AND CONSENT THAT ANY OF THEM MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF ANY RIGHT THEY MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

Section 12.36. <u>Right of First Offer</u>. Lender shall have the right, but not the obligation, to provide refinancing for the Project. In the event that lender elects to provide refinancing for the Project, then same shall be on terms and conditions to be set forth in a non-binding term sheet (the "**Term Sheet**") to be delivered by Lender to Borrower within ten (10) days after Borrower has delivered to Lender a complete package of documents and information which are customarily required by Lender in determining whether or not to extend financing, including without limitation comprehensive budgets, detailed plans and specifications and a full set of construction agreements (the "**Required Submission**"). Lender shall not be required to respond to any request for financing unless and until a full and complete Required Submission is delivered to Lender. Borrower shall not obtain refinancing for the Project or enter into a discussions or negotiations with any other Persons with respect to the foregoing or enter into any documentation with respect to the foregoing unless Lender shall have given Borrower written notice that it has declined to exercise its right to provide refinancing for the Project. For the avoidance of doubt, nothing herein shall constitute an offer by Lender to provide refinancing for the Project or shall be deemed to obligate Lender to provide any refinancing for the Project. Lender shall have the right to designate an Affiliate of Lender to provide the contemplated by this Section with respect to the Project. Any default, breach or violation of this **Section 12.36** shall be an automatic Event of Default (without any notice, grace or cure period). Time is of the essence as to the performance of the parties obligations hereunder.

ARTICLE XIII

EXCULPATION

Section 13.1.    <u>Exculpation</u>.

(a)    <u>General Exculpation</u>.    Subject to the qualifications set forth in **Section 13.1(b)** below and the other provisions of this **Article XIII**, Lender shall not enforce the liability and obligation of Borrower or any Loan Party to perform and observe the Obligations by any action or proceeding wherein a money judgment shall be sought against Borrower or such Loan Party personally.

(b)    <u>Certain Exceptions to Exculpation</u>. Notwithstanding **Section 13.1(a)**, the provisions of this **Section 13.1** shall not (i) constitute a waiver, release or impairment of any

ATLANTA:4906205.5

Obligation; (ii) impair the right of Lender to name Borrower, any other Loan Party or any other Person as a party defendant in any remedial action; (iii) affect the validity or enforceability of any Guaranty or impair or limit the personal liability of any Guarantor under any Guaranty; (iv) impair the enforcement of the Security Instrument, or the other Loan Documents in respect of the Collateral described therein, including the right of Lender to obtain the appointment of a receiver, foreclose upon the Project, sell any of the Collateral at a public or private sale; (v) prevent Lender from seeking and obtaining a deficiency judgment against Borrower, any other Loan Party or any other Person or taking any other action or seeking and obtaining any other judgment or remedy against Borrower, any other Loan Party or any other Person in order to (A) fully realize on the Collateral granted by the Loan Documents or (B) recover the full amounts guaranteed under each and every Guaranty or (C) preserve Lender's claims or causes of action or right to proceed under each and every Guaranty or against any other Collateral securing the Obligations; (vi) prohibit Lender from taking any action to perfect the Liens and security interests of the Loan Documents in the Collateral; or (vii) waive any right which Lender may have under Sections 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents or (viii) prohibit Lender from taking any action to enforce the personal liability of the Borrower or any other Loan Party to the extent set forth in **Section 13.2** or **Section 13.3**.

Section 13.2.    <u>Partial Recourse</u>.    Notwithstanding any provision of this Loan Agreement to the contrary, Borrower shall be personally liable for any Losses, and Borrower does hereby agree to indemnify, defend and hold Lender harmless from and against any Losses, incurred by Lender arising out of or attributable or relating to any of the following (each a "**Partial Recourse Event**"):  (i) the gross negligence or willful misconduct of Borrower or any other Loan Party, or any of their agents, managers, officers or employees; or (ii) the physical waste or willful destruction of the Project or any portion thereof by Borrower or any other Loan Party, or any of their agents, managers, officers or employees; or (iii) the removal or disposal of any portion of the Project, including the Personal Property, by Borrower or any other Loan Party, or any of their agents, managers, officers or employees except as expressly permitted by the Loan Documents; or (iv) the failure to maintain the insurance coverages required by **Section 7.5** or any failure of Borrower or any other Loan Party to pay any deductible under any Policy after a loss covered by such Policy; or (v) the intentional failure by Borrower or any other Loan Party to cure any violation of Applicable Law within the time required by Applicable Law; or (vi) any violation of **Section 6.2, Section 7.8, Section 7.9 or Section 7.10** of this Loan Agreement; or (vii) any misappropriation or misapplication of Loss Proceeds, Gross Receipts or Advances, whether or not intentional; or (viii) any breach of **Section 7.25**; or (ix) any Loan Party shall enter into, amend, modify, cancel or terminate any Lease or Project Document in violation of the Loan Documents;  or (x) any failure of Borrower to pay Loan Expenses in accordance with **Section 12.20** or Servicer Fees in accordance with **Section 12.24**; or (xi) any and all amounts Lender or any Affiliate of Lender incurs (whether before or after Lender or such Affiliate becomes the owner any Collateral) in correcting or remedying the cause or the result of any Recourse Event; or (xii) any violation of **Section 7.11(a)** to the extent sufficient funds were available to pay such taxes; or (xiii) any violation of **Section 7.11(b)** to the extent sufficient funds were available to pay such Liens or the work relating to such Liens was not approved by Lender or permitted by the Loan Documents; or (xiv) any violation of **Section 12.19** or **Section 12.35**; or (xv) Borrower or any other Loan Party, or any Affiliate thereof, or any other

ATLANTA:4906205.5

Person at the direction of Borrower or any other Loan Party, in any judicial or quasi-judicial case, action or proceeding, directly or indirectly contests the validity or enforceability of the Loan Documents or directly or indirectly contests or intentionally hinders, delays or obstructs the pursuit of any rights or remedies by Lender (including the commencement and/or prosecution of any judicial or non-judicial foreclosure of the Project or any UCC or other auction or sale (public or private) of any Collateral, or any enforcement of any other remedy under the Loan Documents or pursuant to applicable law); except that, no Partial Recourse Event shall be deemed to have occurred under this clause (xv) merely because Borrower alleges and proves that no default has occurred and that the Borrower is in compliance with the Loan Documents; or (xvi) Borrower or any other Loan Party fails to deliver or fails to cause to be delivered any Gross Receipts to Lender until the Loan (including, without limitation, the Contingent Interest) is paid in full; or (xvii) any violation or breach of **Section 7.30** or **Section 7.31**. The right of the Lender under this **Section 13.2** shall be in addition to, and not in limitation of, any other rights of Lender under this **Article XIII**. Further, it is the intention of the parties that Borrower can be both personally liable for Losses from a Partial Recourse Event and personally liable for the Debt as a result of a Full Recourse Event.

Section 13.3.   Full Recourse.   Notwithstanding **Section 13.1(a)**, the Debt shall be fully recourse to Borrower and the provision of **Section 13.1(a)** shall be wholly inapplicable ab initio, and Borrower shall be fully personally liable for all of the Debt, upon the occurrence of any of the following (each a "**Full Recourse Event**"): (i) any financial information concerning the Project, Borrower or any other Loan Party, whether provided to the Lender before of after the Closing Date, is fraudulent in any material respect; (ii) any other fraud by Borrower or any other Loan Party in connection with the Loan whether prior to or after the Closing Date; or (iii) any violation, breach or failure to comply with **Sections 7.15 (a), (b)(i) through (iv), e and (f) or Section 7.16**; or (iv) any violation, breach or failure to comply with **Section 9.1** (other than an involuntary Transfer which occurs by operation of law) or **Section 9.2**; or (v) any of the events described in **Sections 11.1(f) or (h)** shall occur; or (vi) the theft or conversion by Borrower or any other Loan Party of any Gross Receipts, Loss Proceeds or Advances; or (vii) Borrower shall enter into, amend, modify, cancel or terminate or intentionally cause a dissolution under its organizational documents in violation of the terms of the Loan Documents; or (viii) the failure at any time of the Borrower to be a Single Purpose Entity or failure of Borrower or any Loan Party (other than Guarantors) to have at all times an Independent Manager who satisfies the Independent Manager Definition; or (ix) Borrower or any other Loan Party intentionally and willfully breaches its obligations under any Lockbox Agreement to deposit, or cause to be deposited, amounts required to be deposited into the Lockbox Account; or (x) Borrower or any Loan Party (other than Guarantors) or any other Loan Party intentionally fails to deliver or fails to cause to be delivered any Gross Receipts to Lender until the Loan (including, without limitation, the Contingent Interest) is paid in full; or (xi) Borrower or any Loan Party (other than Guarantors) incurs Indebtedness other than Permitted Debt. The right of the Lender under this **Section 13.3** shall be in addition to, and not in limitation of, the rights of Lender under any under any other provision of this **Article XIII**. Further, it is the intention of the parties that Borrower can be both personally liable for Losses from a Partial Recourse Event and personally liable for the Debt as a result of a Full Recourse Event.

ATLANTA:4906205.5

ARTICLE XIV

SALE OF FINISHED LOTS

Section 14.1.  <u>Lot Sales Contracts</u>.  All sales contracts for the purchase and sale of Finished Lots must be Qualified Sales Contracts and must be entered into on Borrower's standard contract form, a copy of which has been delivered to Lender, as approved by Lender, must be for a purchase price no less than the Minimum Sales Price and must (i) not include a financing contingency, (ii) not permit assignment thereof, and (iii) call for a cash deposit of at least ten percent (10%) of the purchase price at the time of execution.  Borrower shall perform every obligation of Borrower under or in connection with all sales contracts and shall not commit any default under any sales contract.  Borrower may not modify any sales contract in a manner that would be inconsistent with the requirements of (i) through (iii) above, nor shall Borrower materially modify or amend, terminate or cancel (except in the event of a default by the applicable purchaser) any sales contract without the prior written consent of Lender, which Lender may grant or withhold in its sole discretion.  Borrower shall give prompt notice to Lender of any notice received by Borrower alleging any default by Borrower under any sales contract.  Borrower shall provide Lender with copies of all written purchase agreements for the sale of Finished Lots within ten (10) Business Days after execution by Borrower.  There shall be no sales of Finished Lots to Affiliates of Borrower without Lender's prior written consent.

Section 14.2.  <u>Sales Contract Deposits</u>.  All sales contracts for the purchase and sale of Finished Lots shall require an initial cash deposit equal to ten percent (10%) of the purchase price, due and payable at the time the sales contract is executed by the purchaser.  All deposits made by purchasers of Finished Lots shall be deposited in an escrow account with an escrow agent reasonably acceptable to Lender pursuant to an independent escrow agreement reasonably acceptable to Lender in all respects.  Except upon Lender's prior written consent, Borrower shall not use any such deposits or any portion thereof for costs incurred in connection with the construction of any improvements in and to the Project or for any other purposes, it being the intent that the full amount of each deposit, shall be held in escrow until such time as the Finished Lots with respect to which the same has been deposited has been conveyed to a purchaser in accordance with the terms and conditions of the applicable purchase agreement or until the purchaser thereunder has defaulted and the Borrower is entitled to the deposit.

Section 14.3.  <u>Weekly Sales Contract Reports</u>.  Borrower shall deliver to Lender, commencing one month after the Closing Date and thereafter on or before the Tuesday of each ensuing week, a report on sales of Finished Lots and golf memberships during the preceding week and containing such other information about the Project which Lender may request from time to time.  The report shall include a copy of each sales contract and shall set forth the sale price, deposit amounts and deposit application for each new contract and reflect any additional deposits received by Borrower under all previously reported sales contracts.

Section 14.4.  <u>Release of Finished Lots</u>.  Provided no Unmatured Default or Event of Default has occurred, Lender shall permit the sale of Finished Lots by Borrower and Lender shall release such Finished Lots from the Security Instrument (each such release being referred to as a "**Partial Release**") upon compliance with the following terms and conditions, in form and substance satisfactory to Lender:

63

(a)    the remainder of the Project, after giving effect to the Partial Release, will (i) comply with all zoning ordinances, (ii) be a separate tax parcel or parcels and not subject to any lien for taxes due, (iii) comply will all subdivision ordinances and regulations and all other Applicable Laws, (iv) have adequate ingress and egress and (v) be otherwise self-sufficient and legally independent;

(b)    Borrower shall at its own expense prepare and record the Partial Release, which must be in form and content reasonably acceptable to Lender, and Borrower shall reimburse Lender for all out-of-pocket expenses including, without limitation, reasonable legal fees and costs, in connection with any such release.

(c)    Borrower shall have given to Lender a written request for the Partial Release accompanied by all evidence, information and other items required by Lender, including, but not limited to, a copy of the Qualified Sales Contract not less than five (5) Business Days prior to the desired closing date for the sale of the subject Finished Lot;

64

(d)    Borrower shall have delivered to Lender a copy of the closing statement for the sale of the Finished Lots certified by Borrower as true and correct not less than one (1) Business Day prior to the desired closing date for the sale of the Finished Lots;

(e)    For each Finished Lot, Borrower shall pay to Lender in immediately available funds the Net Sales Proceeds for application in accordance with the Lockbox Agreement;

(f)    Upon receipt of the Net Sales Proceeds for the Finished Lots in immediately available funds wire transferred into the Lockbox Account, Lender shall deliver to Borrower or to any closing agent handling a sale of the Finished Lots, a Partial Release for the Finished Lots; and

(g)    Lender shall not be responsible for the actions or omissions of any closing agent in dealing with any such Partial Release or the applicable Net Sales Proceeds, nor shall Lender be responsible for the fees, charges, costs or compensation of any such closing agent.

Section 14.5.    Borrower's Covenants and Warranties.    All of the provisions of this **Article XIV** shall be deemed to be covenants and warranties of Borrower and the failure of Borrower to comply strictly with all such requirements shall be deemed to be an Event of Default hereunder which, if not cured within applicable notice and cure periods (if any), shall entitle Lender to exercise all of the rights and privileges provided for herein and in the other Loan Documents in respect of any default hereunder.

ATLANTA:4906205.5

**IN WITNESS WHEREOF**, Lender and Borrower have duly executed this Loan Agreement the day and year first above written.

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation

By: _____

Print Name CHARLENE H. THOMAS

Its: Authorized Signatory

Loan Agreement

**BORROWER:**

**LAUREL COVE DEVELOPMENT, LLC,** a
Tennessee limited liability company

    By:  **LAUREL CV MANAGEMENT, LLC,**
        its Managing Member

By: _____
    Kenneth A. Jowdy
    President

## JOINDER AND CONSENT

The undersigned (each a "**Joinder Party**," and collectively, the "**Joinder Parties**") has reviewed the Construction Loan Agreement dated as of May 15, 2007 between Lehman Brothers Holdings Inc., a Delaware corporation ("**Lender**"), and Laurel Cove Development, LLC, a Tennessee limited liability company ("**Borrower**"), to which this Joinder and Consent has been attached, and hereby covenants, represents, warrants, acknowledges and agrees that:

(a)     Joinder Party has read and reviewed each of the Loan Documents, and is familiar with the terms and provisions thereof.

(b)     Joinder Party consents to the Borrower's execution of the Loan Documents without reservation or qualification.

(c)     Joinder Party covenants and agrees to cooperate with Lender, Borrower and each other Loan Party in the performance and observance of all covenants and agreements contained in the Loan Agreement and the other Loan Documents on the part of Borrower or any other Loan Party as necessary to comply or facilitate Borrower's or such other Loan Party's compliance therewith.

(d)     WHENEVER ANY PROVISION OF THE LOAN AGREEMENT PROVIDES FOR OR REFERS TO (i) THE ACKNOWLEDGEMENT OR AGREEMENT OF A JOINDER PARTY, (ii) THE WAIVER OR RELEASE OF RIGHTS BY ANY JOINDER PARTY, (iii) THE GRANT BY SUCH JOINDER PARTY OF A POWER OF ATTORNEY IN FAVOR OF LENDER OR (iv) THE APPOINTMENT BY A JOINDER PARTY OF AN AGENT FOR THE SERVICE OF PROCESS, EACH JOINDER PARTY HEREBY CONSENTS TO AND CONFIRMS SUCH ACKNOWLEDGEMENT, AGREEMENT, WAIVER, GRANT OR APPOINTMENT (AS THE CASE MAY BE) AS BEING ITS ACKNOWLEDGMENT, AGREEMENT, WAIVER, GRANT AND APPOINTMENT AS FULLY AS IF SUCH ACKNOWLEDGEMENT, AGREEMENT, WAIVER, GRANT OR APPOINTMENT (AS THE CASE MAY BE) WERE FULLY SET FORTH HEREIN.

(e)     The undersigned Laurel Cove Country Club, LLC ("**Golf Club**") acknowledges and agrees that Lender is entitled to receive Contingent Interest in accordance with the Loan Agreement and Golf Club agrees to pay or cause to be paid any and all Gross Receipts owned by Golf Club or as to which Golf Club has rights to the Lockbox Account for application in accordance with the Lockbox Agreement.

Without limiting Lender's rights under the other Loan Documents, it is hereby expressly understood and agreed that the execution of this Joinder and Consent by any Joinder Party shall not (in and of itself, but without prejudice to any such Obligations of such Joinder Party which may arise under any other Loan Document) make such Joinder Party liable to Lender for the payment of the Debt or the performance of the Obligations.

### [END OF TEXT. SIGNATURES BEGIN ON NEXT PAGE]

ATLANTA:4906205.5

**IN WITNESS WHEREOF,** the undersigned have duly executed this Joinder and Consent the day and year first above written.

GUARANTOR:

_____
Kenneth A. Jowdy

**LAUREL COVE COUNTRY CLUB,**
**LLC,** a Tennessee limited liability company

By: _____
Print Name: Kenneth A. Jowdy
Title: President

**LAUREL COVE VENTURES 2007,**
**LLC,** a Delaware limited liability company

By: **LAUREL CV MANAGEMENT,**
**LLC,** its Managing Member

By: _____
Kenneth A. Jowdy
President

**LAUREL COVE CV MANAGEMENT,**
**LLC,** a Delaware limited liability company

By: _____
Kenneth A. Jowdy
President

## **EXHIBIT B**

**(LCPI Default Notice)**

# LEHMAN RE LTD.

September 17, 2008

LEHMAN BROTHERS
Three World Financial Center, 8th Floor
New York, NY 10285-0800

Attn:  Robert H. Bing
  Central Funding
(212) 526-8634 (phone)
(212) 526-6169 (fax)

Re:  Master Repurchase Agreement

Dear Mr. Bing:

We write to advise you that, pursuant to Paragraph 11 of the Master Repurchase Agreement,
dated as of July 9, 1999 (the "Agreement"), Lehman Re Ltd. has declared an Event of Default
based upon Lehman Commercial Paper Inc.'s failure to comply with Paragraph 4 of that
Agreement.

Very truly yours,

**<u>EXHIBIT C</u>**

**(BNY Default Notice)**



THE BANK OF NEW YORK MELLON

September 17, 2008

Lehman Commercial Paper Inc.
745 Seventh Avenue, Fl. 4
New York, New York 10019
Attn: Robert E. Guglielmo, Senior Vice President,
    Transaction Management

Re: <u>Notice of Default</u>

Ladies and Gentlemen:

Reference is made to that certain Tri-Party Custody Agreement Executed on 17th September 2008 by and among Lehman RE Ltd, Lehman Commercial Paper Inc. and The Bank of New York, as amended from time to time (the "<u>Tri-Party Custody Agreement</u>"). Initially capitalized terms not defined herein shall have the meanings ascribed to such terms in the Tri-Party Custody Agreement.

This letter shall serve as notice to you pursuant to Section 17(b)(i) of the Tri-Party Custody Agreement that we have received a Notice of Default from Buyer. A copy of the Notice of Default is attached hereto.

Very truly yours,

THE BANK OF NEW YORK

By: _____
Name: Glenn Herr
Title: Vice President

# LEHMAN RE LTD.

September 17, 2008

The Bank of New York
101 Barclay Street, Floor 4W
New York, New York 10017

Attention:  Glenn Hett, Vice President
   Clearance & Collateral Management
Telephone:  (212) 815-6268
Fax:  (732) 667-9324/(732) 667-9325

Re:    Tri-Party Custody Agreement by and among Lehman Re Ltd., Lehman Commercial
       Paper Inc., and The Bank of New York

Dear Mr. Hett:

We write to advise you that, pursuant to Section 17 of the Tri-Party Custody Agreement (the
"Tri-Party Agreement") by and among Lehman Re Ltd. ("Lehman Re"), Lehman Commercial
Paper Inc. ("Lehman Commercial Paper"), and The Bank of New York ("BNY"), Lehman has
declared an Event of Default under the Master Repurchase Agreement between Lehman Re and
Lehman Commercial Paper.  In accordance with Section 17(c) of the Tri-Party Agreement,
Lehman Re hereby directs BNY to transfer all property in Buyer's Master Custodial Account (as
that term is defined in the Tri-Party Agreement") to Lehman Re Ltd. and to place that property in
the name of Lehman Re.  Lehman Re also directs BNY to take all such additional steps as may
be required to provide Lehman Re with possession of such property, provided that BNY does not
take any steps to liquidate such property.

Very truly yours,

Cumberland House
1 Victoria Street, 3rd Floor
Hamilton HM 11 Bermuda

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                         :

In re                                    :        **Chapter 11 Case No.**
                                                             :

**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,   :       **08-13555 (JMP)**
                                                             :

                  **Debtors.**         :       **(Jointly Administered)**
                                                             :

-------------------------------------------------------------------x

**ORDER GRANTING OBJECTION TO CLAIM**
**NO. 17763 FILED BY LAUREL COVE DEVELOPMENT, LLC**

Upon the objection, dated July 3, 2012 (the "Objection"),[1] of Lehman Brothers

Holdings Inc. ("LBHI or the "Plan Administrator") as Plan Administrator pursuant to the

*Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its*

*Affiliated Debtors* for the debtors in the above referenced chapter 11 cases, pursuant to section

502 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 3007 of the Federal

Rules of Bankruptcy Procedure, seeking disallowance and expungement of the Laurel Cove

Claim, all as more fully described in the Objection; and due and proper notice of the Objection

having been provided, and it appearing that no other or further notice need be provided; and the

Court having found and determined that the relief sought in the Objection is in the best interests

of LBHI and all parties in interest in the above captioned chapter 11 cases and that the legal and

factual bases set forth in the Objection establish just cause for the relief granted herein; and after

due deliberation and sufficient cause appearing therefor, it is

ORDERED that the relief requested in the Objection is granted; and it is further

---

[1] Terms not defined herein shall have the same meaning ascribed to them in the Objection to the Laurel Cove Claim.

08-13555-mg    Doc 29187    Filed 07/03/12    Entered 07/03/12 14:55:29    Main Document
Pg 92 of 92

ORDERED that pursuant to section 502(b) of the Bankruptcy Code, the Laurel

Cove Claim, which has been assigned claim number 17763 by the Court-appointed claims agent,

is disallowed and expunged in its entirety with prejudice; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.


Dated: _____, 2012
       New York, New York

US_ACTIVE:\44002507\12\58399.0011