Hearing Date and Time:  August 15, 2012 at 10:00 a.m. (Prevailing Eastern Time)
Objection Deadline: July 25, 2012 at 4:00 p.m. (Prevailing Eastern Time)

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Gerard Uzzi (GU – 2297)
J. Christopher Shore (JCS – 6031)
Eric K. Stodola (ES – 1111)

*Attorneys for the Ad Hoc Group*
*of Lehman Brothers Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

---------------------------------------------------------------x

**APPLICATION OF THE AD HOC GROUP OF LEHMAN BROTHERS CREDITORS
FOR COMPENSATION FOR PROFESSIONAL SERVICES RENDERED BY, AND
REIMBURSEMENT OF ACTUAL AND NECESSARY EXPENSES OF, ITS
PROFESSIONALS PURSUANT TO SECTION 503(B) OF THE BANKRUPTCY CODE**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

The Ad Hoc Group of Lehman Brothers Creditors (the "Group"), by and through the

undersigned, hereby files this application (the "Application") in the above-referenced chapter 11

cases (the "Chapter 11 Cases") of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated

debtors (collectively with LBHI, the "Debtors") for compensation for professional services

rendered by, and reimbursement of actual and necessary expenses of, its professionals pursuant

to section 503(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the

"Bankruptcy Code").  In support of the Application, the Group respectfully represents as

follows:

## PRELIMINARY STATEMENT[1]

1.      The Debtors' Chapter 11 Cases were the largest, most complex and most

successful in United States history.  For this, the Debtors, their professionals, the Creditors'

Committee, its members and professionals, and this Court and its staff deserve to be

commended.  When reviewing the success of these cases, the Group believes it is also important

to consider the lesser, but still significant, efforts and contributions of the Group and its

professionals who actively contributed to that result.

2.      Specifically, as the Court witnessed throughout these proceedings, the size and

complexity of these Chapter 11 Cases created a need for material input from professionals whose

specific role was to safeguard the parochial interests of certain Debtors or clusters of Debtors

within the Lehman enterprise.  The recognition of the importance of parochial ad hoc

representation within the enterprise is not intended in any way to detract from the herculean

efforts and professionalism of the estate-retained fiduciaries.  Rather, it serves as a testament to

the fact that complex cases and capital structures oftentimes require ad hoc groups of creditors to

"step up to the plate" to facilitate compromise and closure.  The Group did exactly that.   Indeed,

at the confirmation hearing, Mr. Harvey Miller, lead counsel to the Debtors, specifically

identified the Group's efforts as being a key factor in reaching the global creditor settlement that

formed the basis for the consensual plan of reorganization.  As Mr. Miller stated:

> This was not a settlement, Your Honor, that was derived or
> formulated exclusively by the [D]ebtors. The [Creditors'
> Committee] was an active, active participant in the development of
> these compromises and these settlements. And credit must be
> given, Your Honor, to the [Group] and Mr. Uzzi's participation in
> these negotiations as well as the OpCo creditors. The original
> meetings, everybody had to wear a flack jacket. That soon
> dissipated.  So the competence and experience of attorneys and

---

[1]      Capitalized terms used but not defined in this Preliminary Statement shall have the meaning ascribed to
them in the remainder of the Application.

other professionals who support the settlement is outstanding, Your Honor.  Leading members of the bar and expert practitioners in this area.

(Confirmation Hr'g Tr. 41:24-42:10, December 6, 2011.)

3.     To put the import of Mr. Miller's statements regarding potential creditor polarization into context, the enormity of Debtors' capital structure was such that relatively small movements in the plan recoveries of LBHI unsecured creditors equated to hundreds of millions of dollars in actual plan value moving between estates.  Under the initial plan of reorganization proposed by the Debtors, senior noteholders were estimated to receive all-in recoveries of 17.4% of their claims.  The Group was the only collection of LBHI creditors who challenged and objected to that plan treatment, and the only group who spent the time and effort to prepare a defense to downward movement in LBHI recoveries, to establish the means to effectuate that defense (negotiating, for example, the discovery protocol for all plan discovery), to prepare, file and prosecute their own plan and disclosure statement, and ultimately to participate on behalf of LBHI's interests in extensive plan negotiations with the Debtors and their material stakeholders. Under the plan agreed to by the Group and confirmed by the Court, senior noteholders are now estimated to receive recoveries of 21.1% of their claims, an increase of approximately $3.1 billion of distributable value to senior noteholders over the initial proposed LBHI plan treatment (which itself was no guarantee of recovery for LBHI creditors).  While some of that increase can be attributed to factors such as the improvement in asset values, there can be little doubt that LBHI recoveries would have been substantially discounted from where they are today had the Group not first expressed its dissatisfaction with the initial plan of reorganization and later facilitated a path to consensus.

4.     Moreover, while the most visible product of the Group's efforts is the consensual plan that has led to materially enhanced and timely recoveries by LBHI creditors, the Group's

efforts and contributions were not limited to participation in settlement discussions or the

attendant work necessary to position these cases for settlement.  Indeed, from its inception in

2009, and as catalogued herein, the Group repeatedly provided a voice for LBHI stakeholders in

the Chapter 11 Cases, both in the courtroom and behind the scenes with the estate fiduciaries.

Although the Group did not always agree with the Debtors, at all times the Group sought to work

efficiently, constructively and for the benefit of all similarly situated creditors.  The results of

these efforts have been demonstrably beneficial in an amount far in excess of the amount sought

in this Application.  Just as one example, following the filing of the Debtors' motion to monetize

LBHI's equity interests in NBG, the Group immediately established a dialogue with the Debtors,

as it had on many other matters, and worked with the interested parties to explore other ways to

maximize the value of LBHI's equity interests.  As a direct consequence of these negotiations,

this transaction alone improved by approximately $70 million in the Debtors' favor.

        5.        The process employed by the Group both in terms of plan negotiations and

contested matter work has had material costs associated with it, and thus the Group has sought

reimbursement in this Application.   As set forth herein, from its inception through the effective

date, the Group incurred and paid approximately $12.8 million in fees to counsel and financial

advisors for work performed that benefited the LBHI estate.  (As noted herein, fees and costs

incurred for matters other than "LBHI-wide" work or for matters specific to individual members

of the Group are expressly not the subject of this Application.)   With respect to the fees and

costs sought, despite the willingness of the Group to operate without current reimbursement or

the ability to have meaningful official participation on many of the matters that were being

addressed by the Group, the Group has always believed in these cases that all LBHI-centric fees

and costs should be reimbursed by the LBHI estate and allocated among all LBHI stakeholders

in an equitable fashion.  Said another way, to permit an LBHI creditor who never joined the

Group but clearly benefited from the Group's efforts to forgo paying for its de facto advocates

would be a windfall to the "free riders" who sat on the sidelines with respect to the issues most

germane to LBHI recoveries and as a penalty to those who did not.  On the other hand, allowance

of the full amount of the Group's request against the LBHI estate would constitute an

inconsequential reduction in overall LBHI distributions (an amount of less than 0.029% of the

total estimated recoveries) shared ratably by all who benefited from the Group's work.

Accordingly, the Group requests that this Court approve this Application in all respects.

### RELIEF REQUESTED

6.      The Group hereby seeks allowance of compensation for professional services

rendered and reimbursement of expenses incurred by its professionals, White & Case LLP

("White & Case"), AlixPartners, LLP ("AlixPartners"), and Molinaro Advisors LLC ("Molinaro

Advisors"), in each case in connection with the Group's participation in the Chapter 11 Cases in

the aggregate amounts of $10,090,050.39, $1,854,279.97 and $854,928, respectively.

7.      *White & Case*.  The Group seeks payment for professional services rendered by

its attorneys, White & Case, in the aggregate amount of $9,678,385.10 and reimbursement of

expenses incurred by White & Case in the aggregate amount of $411,665.29.  During these

Chapter 11 Cases, White & Case attorneys and paraprofessionals expended a total of 16,228.8

hours for which compensation is requested.  The amounts referenced above do not include

$490,722.60 in fees for professional services rendered by White & Case, which amount was

voluntarily written off by White & Case throughout the course of these Chapter 11 Cases.

Concurrently herewith, the Group is providing the detailed time entries of White & Case's

professionals to (a) the Court, (b) the U.S. Trustee, (c) the Debtors, (d) counsel for the Debtors, (e) counsel for the Creditors' Committee, and (f) counsel for the Fee Committee.

8.      *AlixPartners*.  The Group also seeks payment for professional services rendered by its financial advisor, AlixPartners, in the aggregate amount of $1,771,686.91 and reimbursement of expenses incurred by AlixPartners in the aggregate amount of $82,693.06. During these Chapter 11 Cases, AlixPartners professionals expended a total of 3,670.9 hours for which compensation is requested.  The amounts referenced above do not include approximately $30,000 in fees for professional services rendered by AlixPartners, which amount was voluntarily written off by AlixPartners throughout the course of these Chapter 11 Cases. Concurrently herewith, the Group is providing the detailed time entries of AlixPartners' professionals to (a) the Court, (b) the U.S. Trustee, (c) the Debtors, (d) counsel for the Debtors, (e) counsel for the Creditors' Committee, and (f) counsel for the Fee Committee.

9.      *Molinaro Advisors*.  Finally, the Group also seeks payment for professional services rendered by its consultant, Molinaro Advisors, in the aggregate amount of $830,000 and reimbursement of expenses incurred by Molinaro Advisors in the aggregate amount of $24,928.[2]

## BACKGROUND

10.     Commencing on September 15, 2008, and periodically thereafter, the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases were consolidated for procedural purposes only and are being jointly administered.

---

[2]      Molinaro Advisors was initially retained directly by Paulson & Co. Inc. ("Paulson"), one of the Group's original members, until September 2011, when Molinaro Advisors was retained by the Group.  Approximately $720,000 of the reimbursement sought for Molinaro Advisors relates to services provided while engaged by Paulson.  Although not retained formally by the Group until September 2011, Molinaro Advisors provided services directly for the Group's benefit and, ultimately, LBHI's benefit.  Accordingly, the amounts set forth herein relating to Molinaro Advisors include certain amounts paid by Paulson during the period of May 2009 through September 2011.  Such amounts exclude payment for services that were provided solely to Paulson.

11.    On September 17, 2008, the Office of the United States Trustee appointed one official committee of unsecured creditors (the "Creditors' Committee") pursuant to Sections 1102(a) and 1102(b) of the Bankruptcy Code for all of the Debtors' unsecured creditors.

12.    On January 19, 2009, the Office of the United States Trustee appointed Anton R. Valukas (the "Examiner") as examiner in these cases and, on March 11, 2010, the Examiner filed the Report of Examiner Anton R. Valukas [Docket No. 7531] (the "Examiner's Report").

## PARTICIPATION IN CHAPTER 11 CASES

13.    The Group, through its professionals, has substantially contributed to these Chapter 11 Cases, often acting as the only significant party voicing the exclusive perspective of the interests of the LBHI estate and its particular stakeholders.  The following is a summary of the material issues and matters that the Group and its professionals participated in during these proceedings:

### I.    Group Formation and Initial Views

14.    The Group was formed in May 2009 by three of the Debtors' largest third-party creditors: (a) Elliott Management Corporation, (b) King Street Capital Management, L.P., and (c) Paulson & Co. Inc.  While these initial members held claims across the majority of the Lehman capital structure, their claims were based mostly on senior notes issued by LBHI (the "Senior Notes").  The Group's focus has thus been to maximize the value of LBHI's estate.

15.    During the Group's initial review, it became clear that among the key issues affecting recoveries at LBHI would be the resolution of issues existing between and among the Debtors as well as between and among the Debtors and their non-Debtor affiliates, including (i) the appropriateness of the substantive consolidation of the Debtors and the Lehman enterprise as a whole, (ii) the validity and enforceability of certain guarantee claims asserted against LBHI by

its subsidiaries, (iii) the allowance of claims held by LBHI against certain of its subsidiaries, (iv)

the potential equitable, contractual or statutory subordination of certain claims, and (v) the rights

of certain Debtors with respect to certain assets (collectively, "Inter-Debtor Issues").

16.     For instance, according to the Debtors' March 12, 2009 schedules (the

"Schedules"), the Debtors' books and records reflected that some of LBHI's most significant

assets were receivables from other Debtors and their subsidiaries, including the following:

| DEBTOR | AGGREGATE RECEIVABLES |
|---|---|
| Lehman Commercial Paper Inc. | $24,777,908,608.48 |
| Lehman Brothers Special Financing Inc. | $18,943,812,878.39 |
| Lehman Brothers Commodity Services Inc. | $2,857,706,194.37 |
| Lehman Brothers OTC Derivatives Inc. | $410,317,003.24 |
| Lehman Brothers Commercial Corp. | $284,367,771.43 |

(See Schedules at B.16.)  As a consequence, the Debtors' books and records also reflected that

LBHI was likely the single largest creditor of certain subsidiary Debtors and that its recovery on

those inter-Debtor claims would form a material portion of LBHI's asset base. (See id.)

17.     At the same time, it became apparent that third-party creditors and various foreign

affiliates of LBHI would soon assert hundreds of billions of dollars of purported guarantee

claims against LBHI based on previously undisclosed board resolutions and other intercompany

agreements (the "Board Resolutions").  As an example, one of the Debtors' most significant

foreign affiliates, Lehman Brothers International (Europe) ("LBIE"), asserted the following:

> By, among other things, Unanimous Written Consent of the
> Executive Committee of the Board of Directors of LBHI on June 9,
> 2005, November 7, 2005, May 14, 2007, and April 9, 2008 . . . ,
> LBHI guaranteed all of the obligations of certain of its affiliates.
> Certain of those affiliates are indebted to LBIE. LBHI is also
> indebted to LBIE for those amounts by virtue of [these Board

> Resolutions]. As per the Bar Date Order dated July 2, 2009, LBIE
> will provide the details of all known claims by October 22, 2009 in
> accordance with the requirements of the Guarantee Questionnaire.

(Attachment to Claim of LBIE ¶ 41 [Proof of Claim No. 555198120].)

18.     Although the Debtors were never required to file proofs of claim, if LBHI's

affiliated Debtors were ever required to assert all colorable claims against LBHI, they would

presumably assert claims based on the Board Resolutions.  (See Schedules at 181 (listing

Debtors that purportedly issued Board Resolutions).)  Just as was the case with inter-Lehman

receivables, the allowance of claims based on Board Resolutions could have had a material

influence on the LBHI estate.  Given the interrelatedness of entities, however, it was unclear to

the Group how such issues could be resolved without direct participation by third-party creditors.

19.     In addition, it was evident to the Group that numerous facts relating to the manner

in which the Debtors operated their prepetition business strongly supported the substantive

consolidation of the Debtors and their foreign affiliates.  Indeed, these facts would become even

more apparent upon the release of the Examiner's Report, which concluded as follows:

> Lehman functioned as an integrated company, and in general
> structured and managed its businesses along different product lines
> within the three divisions. Lehman and its subsidiaries typically
> presented themselves to the public as "Lehman" or "Lehman
> Brothers." Customers typically had a relationship with LBI, but
> Lehman employees would book certain trades to the legal entity
> within Lehman that corresponded to the product being traded, or
> that satisfied tax, financing or regulatory considerations. Multiple
> Lehman entities often were used to structure particular types of
> transactions. As a result, customers whose relationships were with
> LBI would, in fact, often have their business transacted through
> other Lehman entities. Those customers generally did not rely on
> the credit rating of those Lehman entities; indeed, those customers
> sometimes were not even aware that Lehman entities other than
> LBI were involved in their transactions.

(Examiner's Report vol. 5 [Docket No. 8307] at 1967-68 (footnotes omitted).)  The Examiner

noted further that in interviews "Lehman personnel asserted that customers did not rely on the

credit ratings of [LBHI affiliate operating companies that regularly traded], with the exception of

LBDP and LBFP [two separately rated entities]."  (Id. at 1970 (footnotes omitted).)

20.    Adding to the complexity of the situation, and due to factors that were beyond

anyone's control, the Debtors were necessarily managed by only one set of restructuring advisors

and represented primarily by one law firm.  In addition, only one official committee for all of the

Debtors' unsecured creditors was appointed and that committee – i.e., the Creditors' Committee

– was also represented primarily by one law firm.  Moreover, the indenture trustees for both the

Senior Notes and the subordinated notes issued by LBHI, which would normally owe duties only

to their respective noteholders, sat on the Creditors' Committee and thus, in some sense, owed

fiduciary duties to all of the Debtors' unsecured creditors, even those who might have interests

substantially adverse to the LBHI estate.  In light of all of the foregoing, the Group had concerns

about whether, as a practical matter, the exclusive interests of LBHI vis a vis its material

subsidiaries could be adequately advocated with respect to the ultimate resolution of the Inter-

Debtor Issues.  One of the principal mandates of the Group then was to ensure that at least one

party in interest stood ready to, if necessary, advocate for the exclusive interests of the LBHI

estate.

21.    During and after this initial review period, White & Case began using publicly

available information to analyze various legal theories and other items associated with the Inter-

Debtor Issues.  This included legal research and analysis related to, among other things:

• the appropriateness of substantively consolidating the Debtors as well as other entities in
the Lehman enterprise, which were often in insolvency proceedings in other jurisdictions;

• the enforceability of guarantee claims generally, including certain of those claims which
might be based on nontraditional purported guarantees, such as:

o the Unanimous Written Consent of the Executive Committee of the Board of
Directors of LBHI dated June 9, 2005, whereby LBHI purports to guarantee all of
the obligations and liabilities of certain subsidiaries listed on Schedule A thereto;

  o  the Guarantee of LBHI dated January 4, 2008 to Standard & Poor's Rating
     Services, whereby LBHI purports to guarantee all of LBIE's liabilities,
     commitments, and obligations to any counterparty of LBIE; and

  o  the Guarantee dated November 21, 2002 by LBHI in favor of Lehman Brothers
     Bankhaus A.G. ("<u>LBB</u>"), whereby LBHI purports to guarantee all of LBB's
     payment obligations to any counterparty of LBB;

- the enforceability of various other third-party and intercompany arrangements, such as
  the LBIE Side Letter, dated July 24, 2006;

- the validity and character of Lehman's intercompany booking entries; and

- the ownership rights of certain Debtors and their affiliates with respect to certain assets
  given the numerous complex intercompany transactions and other financing
  arrangements that took place prior to the petition date.

The complex factual circumstances related to these issues often made conducting meaningful

analyses both difficult and time consuming. To reduce the time and effort needed, however, the

Group and White & Case worked closely with Molinaro Advisors. The Group viewed the chief

employee of Molinaro Advisors, Sam Molinaro, as uniquely qualified to provide advice and

expertise with respect to the Debtors' prepetition business operations and general accounting

practices given his former position as Chief Financial Officer of Bear Stearns. Mr. Molinaro

advised the Group as to certain factual issues including, among other things, the manner in which

large investment banks perform intercompany accounting, and provided insight as to the likely

character of claims asserted by certain affiliates.

        22.    Ultimately, White & Case (with Mr. Molinaro's substantial assistance) prepared a

substantial white paper (the "<u>White Paper</u>") setting forth the Group's initial views and

conclusions with respect to many of the Inter-Debtor Issues. On or about March 9, 2010, the

Group provided a copy of the White Paper to the Debtors and, shortly thereafter, met with the

Debtors' professionals to discuss it. Many of the conclusions set forth in the White Paper were

later validated by inclusion in the Debtors' disclosure statement.

## II.    __Disputes Regarding Debtors' Initial Plan__

23.     On March 15, 2010, the Debtors filed the Joint Chapter 11 Plan of Lehman

Brothers Holdings Inc. and Its Affiliated Debtors [Docket No. 7572].  On April 14, 2010, the

Debtors filed a revised Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its

Affiliated Debtors [Docket No. 8330] (the "Initial Plan") and the Disclosure Statement for the

Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors [Docket No.

8332] (the "Initial Disclosure Statement").  Based on public disclosures available at the time,

including those made in the Initial Disclosure Statement and certain related documents, the

Group did not believe that the Initial Plan necessarily reflected a fair settlement of the Inter-

Debtor Issues as to the LBHI estate.

24.     As a consequence and because of the overall complexity of these Chapter 11

Cases, there was a need to have dedicated financial professionals ready to receive and analyze

non-public information, if necessary, to evaluate the Initial Plan and any amendments thereto.  In

April 2010, the Group thus determined to engage AlixPartners as financial advisor.  AlixPartners

began its work by reviewing available documents including, among others, the Debtors' cash

management motion, the Debtors' schedules of assets and liabilities, the recovery and liquidation

analyses in the Debtors' Initial Disclosure Statement, and various memoranda previously

prepared by White & Case.  AlixPartners also prepared due diligence requests.  During this time,

it worked closely with White & Case to avoid duplicating work already performed.

25.     On April 30, 2010, and May 14, 2010, respectively, the Group met with the

professionals for the Creditors' Committee and the Debtors to discuss its concerns regarding the

Initial Plan.  At these meetings, the Group received no assurances or other indications that the

Initial Plan would be amended.  In fact, at times, the Group was told that the Initial Plan

represented a favorable outcome for the LBHI estate and that the Group should willingly accept

the terms set forth therein.  On June 29, 2010, as a consequence of these discussions, and to

avoid any prejudice that might otherwise arise from remaining silent for a protracted period of

time, the Group filed the Preliminary Objection of the Ad Hoc Group of Lehman Brothers

Creditors to the Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated

Debtors and to the Debtors' Disclosure Statement for Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors [Docket No. 9905] (the "Preliminary Objection").  The

purpose of the Preliminary Objection was to apprise the Court and all parties in interest of the

Group's dissatisfaction with the terms set forth in the Initial Plan as they related to the LBHI

estate.  Subsequently, the Debtors clarified that the Initial Plan was intended as a "placeholder"

and that they anticipated making material revisions to it and the Initial Disclosure Statement.

26.    By the Preliminary Objection, the Group also recommended that the Court

establish a comprehensive plan for conducting discovery with respect to Inter-Debtor Issues in

the event that the settlements proposed in the Initial Plan (or any plan for that matter) were

rejected and that creditors were forced to pursue litigation themselves.  (Preliminary Objection ¶

12.)  In connection therewith, the Group drafted proposed discovery procedures based in large

part on Judge Gerber's scheduling order of inter-debtor disputes and related confirmation issues

in In re Adelphia Communications, 368 B.R. 140, 147 (Bankr. S.D.N.Y. 2007).  The proposed

discovery order provided a mechanism for (i) the Debtors to establish a data room to provide all

information relevant to the Inter-Debtor Issues, (ii) all parties in interest to declare their intent to

participate in discovery, (iii) participating parties to access information and seek additional

disclosures, (iv) the Debtors to produce witnesses for deposition in limited seating over a

controlled period and (v) all participating parties to exchange any expert disclosures and reports

in advance of a confirmation hearing to be scheduled at a future date.  (See Preliminary

Objection at Ex. A.)  It was the Group's firm belief that the establishment of procedures would

have, among other things, the salutary effect of facilitating consensus.  (Id. ¶ 13.)

27.    On July 14, 2010, the Court held a status conference on the Preliminary Objection

and, in particular, the Group's request to establish discovery procedures.  In response to the

Preliminary Objection, counsel for the Debtors stated that the Debtors had no per se objection to

formulating procedures, but that it may be premature given the intent of the Initial Plan:

> It was argued that this was preliminary but in light of Mr. Shore's
> comments, we have no objection, Your Honor, to spending the
> next period between now and the next omnibus hearing in
> negotiating a discovery order, protocol, whatever is necessary in
> this case. But in the context, Your Honor, that the preliminary
> objection is filed to a plan that's not being prosecuted. That plan is
> going to be substantially revised, I believe. And a new disclosure
> statement. So, to a certain extent, this is premature.

(Hr'g Tr. 111:18-112:1, July 14, 2010.)  Counsel for LBIE echoed somewhat similar sentiments:

> Second, Your Honor, more to the point for today and with this I'll
> close. I heard, I think, Mr. Shore volunteered, as well as Mr. Fleck,
> to each be the clearinghouse and essentially hold the pen on these
> proposed procedures. Given, obviously, that Mr. Shore, with all
> due respect, is a strong advocate for a specific point of view and a
> specific outcome on the plan, it's not clear to me that he as a
> nonfiduciary would ever be the appropriate person to coalesce the
> comments and hold the pen or the computer. I would probably
> guess that the debtors would have a much stronger interest in
> helping design the discovery procedures around their own plan.
> We're happy to see what the Court's pleasure is. Mr. Fleck also
> volunteered. I'm not going to volunteer because I think it's not the
> job of an individual creditor with a point of view to say, "Oh, I'll
> help by designing the procedures," but I would have an interest in
> seeing how and who helps design it.

(Hr'g Tr. 116:16-117:6, July 14, 2010.)  Ultimately, and notwithstanding the concerns expressed

by LBIE's counsel at the hearing on the Preliminary Objection, the discovery procedures adopted

would look highly similar to those proposed by the Group in the Preliminary Objection.

28.    In August 2010, AlixPartners executed a non-disclosure agreement with the

Debtors and, with White & Case, gained access to a data room containing thousands of

documents.  AlixPartners proceeded to catalogue and perform an initial review of these

documents.   In connection with this, AlixPartners prepared for and attended numerous

telephonic and live meetings with representatives of the Debtors and Creditors' Committee.

### III.    Proposal and Prosecution of the Group's Plan

29.    With no apparent settlement in sight, on December 15, 2010, the Group filed the

Joint Substantively Consolidating Chapter 11 Plan for Lehman Brothers Holdings Inc. and

Certain of Its Affiliated Debtors Other Than Merit, LLC, LB Somerset LLC and LB Preferred

Somerset LLC Proposed by the Ad Hoc Group of Lehman Brothers Creditors [Docket No.

13504] (the "Group's Plan") and the Disclosure Statement for the Joint Substantively

Consolidating Chapter 11 Plan for Lehman Brothers Holdings Inc. and Certain of Its Affiliated

Debtors Other Than Merit, LLC, LB Somerset LLC and LB Preferred Somerset LLC Proposed

by the Ad Hoc Group of Lehman Brothers Creditors [Docket No. 13505] (the "Group's

Disclosure Statement").

30.    The Group's Plan included certain settlement features designed to avoid the cost

and delay associated with litigation over the appropriateness of substantive consolidation and

other related Inter-Debtor Issues.  In particular, the Group's Plan offered enhanced recoveries to

holders of claims in certain classes that would, absent settlement, be susceptible to substantive

consolidation and other claim-reducing equitable remedies.  The Group believed that these

proposed settlements represented a fair resolution of the Inter-Debtor Issues, and, if ultimately

solicited, creditors across the capital structure would vote to accept the Group's Plan.

31.     The Group's Plan, however, did not rely solely on the prospect of global

settlement.  Instead, it also provided for "litigated outs."  If certain classes of claims did not vote

to accept the settlements, then the Group's Plan would constitute a motion to substantively

consolidate certain of the Debtors and their foreign affiliates with LBHI.  The consequence of

consolidation would be that, except as otherwise provided in the Group's Plan, for the purposes

of making distributions and post-effective date governance, all assets and liabilities of each of

the consolidated Debtors would be treated as though they are merged into and with the assets of

LBHI.  It would also result in the elimination of intercompany claims between the consolidated

Debtors and guarantee claims for which a consolidated Debtor was the primary obligor.

32.      In support of its proposed plan treatments, the Group set forth the factual bases

and legal justifications for substantive consolidation at length in the Group's Disclosure

Statement.  (See Group's Disclosure Statement at 9-28.)   The vast majority of this portion of the

Group's Disclosure Statement was eventually validated by the Debtors themselves.

33.     White & Case was responsible for formulating, drafting and filing the Group's

Plan and the Group's Disclosure Statement.  AlixPartners was responsible for modeling various

recovery scenarios, including settlement proposals made by various parties, and providing the

liquidation and recovery analyses contained in the Group's Disclosure Statement.  To do this,

AlixPartners was required to develop and maintain an understanding of the Debtors' claims

estimates and liquidation and recovery analyses as in the Initial Disclosure Statement.

**IV.     The Discovery Protocol and Positioning for Parallel Solicitation**

34.     Following the Group's actions, the plan process gained some life again.  On

January 25, 2011, the Debtors filed the First Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors [Docket No. 14150] (the "Amended Plan") and the

Disclosure Statement for the First Amended Joint Chapter 11 Plan of Lehman Brothers Holdings

Inc. and Its Affiliated Debtors [Docket No. 14151] (the "Amended Disclosure Statement").

Based on the information included in the Amended Disclosure Statement, the terms set forth in

the Amended Plan were materially better for the LBHI estate than those in the Initial Plan.

35.    Notwithstanding this improvement, the Group believed that the Amended Plan

continued to fall short of a fair settlement.  Additionally, other creditors adverse to the interests

of LBHI began to surface and voice their dissatisfaction with the Amended Plan.  Thus, although

improved, confirmation of the Amended Plan was far from certain.

36.    To create a process that would help define negotiations and facilitate movement

towards confirmation, the Debtors, with the Group's support, filed on March 8, 2011 a Motion

Pursuant to Section 105 of the Bankruptcy Code and Rule 7026 of the Federal Rules of

Bankruptcy Procedure for Authorization to Establish and Implement Procedures in Connection

with Discovery Related to Plan Confirmation [Docket No. 14867] (the "Plan Discovery

Motion").  The procedures proposed in the Plan Discovery Motion were substantially similar to

the procedures suggested by the Group in connection with its Preliminary Objection.  After an

intense period of negotiations with respect to the proposed procedures and certain modifications

made thereto, the Court entered an Order Establishing Schedule and Procedures in Connection

with Discovery Related to Plan Confirmation and Other Issues [Docket No. 16003] (the "Plan

Discovery Order").

37.    At this point, two plans were on file and a process was or would soon be in place

that would permit discovery to be taken as to both.  On March 16, 2011, the Debtors filed a

Motion (I) for Approval of the Disclosure Statement and the Form and Manner of Notice of the

Disclosure Statement Hearing, and (II) Establishing Notice and Objection Procedures for

Confirmation of the Debtors Joint Chapter 11 Plan [Docket No. 15078] (the "<u>Debtors'</u>

<u>Disclosure Statement Motion</u>").  The Debtors' Disclosure Statement Motion sought to schedule a

hearing on the Amended Disclosure Statement, but not the Group's Disclosure Statement.

38.     Thus, on March 29, 2011, the Group filed the Motion of the Ad Hoc Group of

Lehman Brothers Creditors for Entry of (i) an Order Scheduling a Disclosure Statement Hearing

and Approving the Form and Manner of Notice Thereof and (ii) an Order Approving the

Disclosure Statement for the Joint Substantively Consolidating Chapter 11 Plan for Lehman

Brothers Holdings Inc. and Certain of Its Affiliated Debtors Other Than Merit, LLC, LB

Somerset LLC and LB Preferred Somerset LLC [Docket No. 15431] (the "<u>Group's Disclosure</u>

<u>Statement Motion</u>").  The Group's Disclosure Statement Motion sought to schedule a hearing on

the Group's Disclosure Statement concurrently with the Amended Disclosure Statement.

39.     The Debtors' response was twofold.  First, the Debtors immediately filed the

Motion of Lehman Brothers Holdings Inc. to Compel the Ad Hoc Group of Lehman Brothers

Creditors to Comply with Federal Rule of Bankruptcy Procedure 2019 [Docket No. 15461] (the

"<u>2019 Motion</u>").  In addition, on April 8, 2011, the Debtors filed the Debtors' Opposition and

Objection to Motion of the Ad Hoc Group of Lehman Brothers Creditors Dated March 29, 2011

[Docket No. 15744] (the "<u>Debtors' Disclosure Statement Hearing Objection</u>").  The 2019 Motion

sought to bar the Group from participating in these cases until the Group had fully complied with

Rule 2019 of the Federal Rules of Bankruptcy Procedure and the Debtors' Disclosure Statement

Hearing Objection challenged the Group's Disclosure Statement Motion on the basis that the

Debtors should be permitted to solicit the Amended Plan before the Group should be permitted

to solicit the Group's Plan.

40.    The Group met the Debtors' concerns on both of these issues.  First, on April 22,

2011, the Group filed the Verified Statement of the Ad Hoc Group of Lehman Brothers Creditors

Pursuant to Bankruptcy Rule 2019 [Docket No. 16222] and, on May 13, 2011, filed a

Supplemental Verified Statement of the Ad Hoc Group of Lehman Brothers Creditors [Docket

No. 16842].  Indeed, the Group became an advocate for having all creditor groups participating

in the plan process filing similar such statements.  Second, the Group's Disclosure Statement

Motion had garnered significant support from a number of key parties in these cases, including

the Creditors' Committee, LBIE and certain creditors of subsidiary Debtors on the basis that all

timely filed plans and disclosure statements should be considered concurrently.  (See, e.g.,

Response of the Operating Company Creditors to the Motion of the Ad Hoc Group of Lehman

Brothers Creditors Seeking, Among Other Things, An Order Scheduling a Disclosure Statement

Hearing and Approving the Form and Notice Thereof [Docket No. 15825]; Response of the

Official Committee of Unsecured Creditors for Entry of (I) an Order Scheduling a Disclosure

Statement Hearing and Approving the Form and Manner of Notice Thereof and (II) an Order

Approving the Disclosure Statement for the Joint Substantively Consolidation Chapter 11 Plan

for Lehman Brothers Holdings Inc. and Certain of Its Affiliated Debtors [Docket No. 15774];

Response of the Official Committee of Unsecured Creditors for Entry of (I) an Order Scheduling

a Disclosure Statement Hearing and Approving the Form and Manner of Notice Thereof and (II)

an Order Approving the Disclosure Statement for the Joint Substantively Consolidation Chapter

11 Plan for Lehman Brothers Holdings Inc. and Certain of Its Affiliated Debtors [Docket No.

15848].)  In the face of such overwhelming and broadly based support, the Debtors acquiesced to

the concurrent scheduling of disclosure statement hearings and, on April 21, 2011, the Court

entered an Order [Docket No. 16180] providing that all disclosure statements filed at least

twenty-eight days before the relevant objection deadline would be considered.

41.    On April 25, 2011, certain creditors of certain subsidiary Debtors (the "Non-Con

Plan Proponents") filed (i) the Joint Chapter 11 Plan for Lehman Brothers Holdings Inc. and Its

Affiliated Debtors Other Than Merit, LLC, LB Somerset LLC and LB Preferred Somerset LLC

Proposed by the Non-Consolidation Plan Proponents [Docket No. 16229] (the "Non-Con Plan"),

(ii) the Disclosure Statement for the Joint Chapter 11 Plan for Lehman Brothers Holdings Inc.

and Its Affiliated Debtors Other Than Merit, LLC, LB Somerset LLC and LB Preferred Somerset

LLC Proposed by the Non-Consolidation Plan Proponents [Docket No. 16230] (the "Non-Con

Disclosure Statement"), and (iii) a notice of hearing on the Non-Con Disclosure Statement.

42.    On April 27, 2011, the Group filed (i) the Amended Joint Substantively

Consolidating Chapter 11 Plan for Lehman Brothers Holdings Inc. and Certain of Its Affiliated

Debtors Other Than Merit, LLC, LB Somerset LLC and LB Preferred Somerset LLC Proposed

by the Ad Hoc Group of Lehman Brothers Creditors [Docket No. 16315] (the "Group's

Amended Plan"), (ii) the Disclosure Statement for the Amended Joint Substantively

Consolidating Chapter 11 Plan for Lehman Brothers Holdings Inc. and Certain of Its Affiliated

Debtors Other Than Merit, LLC, LB Somerset LLC and LB Preferred Somerset LLC Proposed

by the Ad Hoc Group of Lehman Brothers Creditors [Docket No. 16316] (the "Group's

Amended Disclosure Statement"), and (iii) a notice of hearing on the Group's Amended

Disclosure Statement.

43.    Accordingly, three disclosure statements, each with a different premise, were

positioned for concurrent consideration by the Court: (a) the Amended Disclosure Statement, (b)

the Group's Amended Disclosure Statement, and (c) the Non-Con Disclosure Statement.

V.       <u>**Settlement Discussions and the Confirmed Plan**</u>

44.      In early June 2011, representatives from the Group travelled to London to meet

with representatives of the Debtors' various foreign affiliates regarding the plan process.  Later

that month, the Debtors hosted meetings with various representative groups of creditors,

including the Group, with the goal of negotiating consensual terms of a confirmable plan.  This

conference took place over the course of a week and required parties on certain occasions to

continue negotiating into the early hours of the morning.  As a result of these settlement

conferences, in which the Group's professionals participated, material changes were made to the

Amended Plan, and on July 1, 2011, the Debtors filed the Second Amended Joint Chapter 11

Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors [Docket No. 128204] (as

subsequently amended, the "<u>Confirmed Plan</u>") as well as the Debtors' Disclosure Statement for

the Second Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated

Debtors [Docket No. 128204] (as subsequently amended, the "<u>Approved Disclosure Statement</u>").

As a consequence of the negotiations and modifications, the Group's steering committee and a

number of other material stakeholders entered into plan support agreements with the Debtors.  In

addition, the Group and the Non-Con Plan Proponents agreed to suspend prosecution of their

plans, subject to confirmation of the Confirmed Plan.

45.      On July 6, 2011, to document this settlement, the Debtors filed the Debtors'

Motion for Approval of (I) Stipulation and Order Regarding Chapter 11 Plans and (II) Stay of

Related Discovery [Docket No. 18306] (the "<u>Sequencing Stipulation</u>") and, on July 21, 2011, the

Court entered an Order granting the Sequencing Stipulation [Docket No. 18686].

46.      Finally, the Group participated in the confirmation process including reviewing

and commenting on various plan documents, reviewing and commenting on plan amendments,

filing pleadings in support of confirmation and appearing in support of confirmation at the

confirmation hearing.  The Group also cooperated with the Debtors with respect to matters

arising post confirmation in anticipation of consummation of the Confirmed Plan.

## VI.    The Group's Monitoring of Inter-Debtor Issues

47.    Throughout these cases, the Debtors often sought relief with respect to third

parties on behalf of multiple Debtor entities.  Given the existence and importance of the Inter-

Debtor Issues to the LBHI estate, particularly the potential disputes over asset ownership, the

Group reviewed the Debtors' motions with an eye to avoiding prejudice to the rights of LBHI

and its creditors.  In furtherance of this effort, White & Case vigilantly monitored the docket in

these Chapter 11 Cases as well as certain related cases (including for Lehman Brothers Inc.'s

concurrent proceeding under the Securities Investor Protection Act and certain adversary

proceedings) for motions that either materially affected the Debtors' estates or otherwise

implicated Inter-Debtor Issues.  Given the enormity of the docket, the relative frequency with

which significant pleadings were filed and the often short response time afforded to parties in

interest, this task was significantly more time consuming than it often is in other cases.  When

significant motions were filed, White & Case almost always participated in discussions with the

Group, the Debtors and Debtors' counsel to understand and address any concerns the Group

might have (particularly as to Inter-Debtor Issues) as efficiently and as quickly as possible.

48.    Due to these efforts, the Group identified potential Inter-Debtor Issues and

negotiated a satisfactory resolution in connection with the following motions:

| Date | Filing | Dkt. No. |
|---|---|---|
| 3/29/2009 | Notice of Debtors' Motion for Entry of an Order Pursuant to Sections 105 and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 Authorizing Lehman Commercial Paper Inc. to Settle Dispute with the | 2978 |

| | | |
|---|---|---|
| | Metropolitan Life Insurance Co. | |
| 5/25/2010 | Notice of Lehman Brothers Holdings Inc.'s and Lehman Commercial Paper Inc.'s Motion Pursuant to Section 363 of the Bankruptcy Code for Authority to Transfer Funds to Rosslyn LB Syndication Partner LLC | 9238 |
| 6/23/2010 | Notice of Debtors' Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure for Approval of Settlement Agreement Between Lehman Brothers Holdings, Inc., Lehman Commercial Paper, Inc., Silver Lake Credit Fund, L.P., and Silver Lake Financial Associates, L.P. | 9808 |
| 6/23/2010 | Notice of LBHI's Motion, Pursuant to Sections 105(a), 363(b) and 363(f) of the Bankruptcy Code and Rule 6004(h) of the Bankruptcy Rules, for Authorization to Transfer Certain Mortgage Servicing Rights to Aurora Bank FSB | 9809 |
| 7/27/2010 | Notice of Lehman Brothers Holdings Inc.'s and Lehman Commercial Paper Inc.'s Motion Pursuant to Bankruptcy Rule 9019 to Enter into the Release and Termination of Loan Agreement and Other Documents with TS Boston Core Holdings L.P., 125 High Junior Mezz, L.P., One Federal Intermediate Mezz, L.P., One Federal Junior Mezz, L.P., and Other Borrower Affiliates | 10462 |
| 7/27/2010 | Notice of Motion of Lehman Commercial Paper Inc. Pursuant to Section 363 of the Bankruptcy Code for Authority to (I) Consent to its Non-Debtor Affiliate Lehman Ali Inc. (A) Entry into Plan Support Agreement Related to the Restructuring of Inkeepers USA Trust; and (B) Consummation of the Transactions Set Forth in the Plan Term Sheet; and (II) Provide Funds to Solar Finance Inc., a Non-Debtor Affiliate to Provide Debtor-In-Possession Financing | 10465 |
| 7/27/2010 | Notice of Debtors' Motion Pursuant to Section 363 of the Bankruptcy Code for an Order (I) Allowing LCPI to Acquire Certain Loans Through a Joint Venture and (II) Authorizing LCPI and LBHI to Provide Gap Funding through a Term Loan, Revolver, and Preferred Equity Investment | 10467 |
| 7/28/2010 | Notice of Motion of Lehman Brothers Holdings Inc. Pursuant to Section 363 of the Bankruptcy Code and Rule | 10516 |

| | 6004(h) of the Federal Rules of Bankruptcy Procedure for Authority to Amend Participation Agreements and to Purchase Additional Participation Interests Related to Heritage Fields Property | |

49.     In reviewing these motions, the Group and White & Case were required to participate in numerous telephonic meetings, provide analyses with respect to certain relevant issues, and attend numerous hearings.  Absent the satisfactory resolution achieved by the Group and the global settlement that was ultimately reached, it may have been that the rights of the LBHI estate with respect to certain assets would have been materially prejudiced.

**VII.   General Matters Involving the Group**

**A.    Third-Party Relief**

50.     In addition to plan-related activities, the Group actively participated in the resolution of numerous issues and requests for relief made by the Debtors with respect to third parties.  These did not necessarily require or implicate the allocation of value among the Debtor estates, but instead involved the Debtors seeking to maximize the value of certain assets or reduce certain third-party claims.  One example of this is the Debtors' Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code for Authorization to Monetize Equity Interests in Neuberger Berman Group LLC [Docket No. 21254] (the "Neuberger Berman Motion").

51.     Pursuant to a transaction in May 2009, LBHI and certain of its non-Debtor affiliates (the "Sellers") were issued 93% of the preferred equity, which had a face value of approximately $814 million, and 49% of the common equity (together, the "Neuberger Equity Interests") in a newly-formed company, Neuberger Group LLC ("NBG"), which acquired substantially all of the Neuberger Berman and associated investment management business.  (See Neuberger Berman Motion ¶ 1.)  By the Neuberger Berman Motion, the Debtors sought to monetize the Neuberger Equity Interests through a transaction that the Debtors expected to yield

approximately $1.145 billion and $1.295 billion.  (See Neuberger Berman Motion ¶ 1.)  The

Creditors' Committee supported the proposed transaction.  (Neuberger Berman Motion  ¶ 13; see

also Hr'g Tr. 15:21-16:1, Dec. 14, 2011 ("[T]he committee [and] specifically, as Mr. Fail

mentioned, Houlihan was heavily involved in a long process with the debtors and Neuberger

Berman that resulted in the deal reflected in the motion as filed, which the committee was fully

supportive of, and had every reason to be, given the long course of negotiation.").)

52.    After reviewing the terms of the proposed transaction, the Group had substantial

concerns as to the adequacy of the consideration to be received for the Neuberger Equity

Interests, which constituted one of the LBHI estate's largest remaining assets.  The Group voiced

its concerns to the Debtors and the Creditors' Committee.  The Group and two individual

creditors, one of which was a former member of the Group, eventually stated that they intended

to object to the proposed transaction unless substantial revisions were made.  The Group also

ultimately served discovery requests on both the Debtors and NBG.  To resolve its concerns, the

Group, in coordination with the two other individual creditors, formulated and drafted a term

sheet setting forth proposed amendments and engaged in direct negotiations with the Debtors and

NBG.  As described in greater detail in the Statement of the Ad Hoc Group of Lehman Brothers

Creditors in Support of Debtors' Motion Pursuant to Sections 105 and 363 of the Bankruptcy

Code for Authorization to Monetize Equity Interests in Neuberger Berman Group LLC [Docket

No. 23222], the Debtors were ultimately able to negotiate for additional value exceeding $70

million for the benefit of the Sellers.  Absent the Group's involvement, the Debtors undoubtedly

would not have received the benefit of this substantial additional consideration.

### B.       Transparency

53.       As well, the Group worked to enhance transparency and visibility in these

Chapter 11 Cases for the material benefit of all creditors.  The achievements of the Group in this

regard have appeared primarily in three contexts: (a) procedures adopted to facilitate the

Debtor's management of assets and claims; (b) the Debtors' monthly operating reports and other

periodic reporting; and (c) post-confirmation reporting to be made under the Confirmed Plan.

54.       First, the Group worked throughout these Chapter 11 Cases with the Debtors and

the Creditors' Committee to ensure that any procedures established to restructure, terminate, or

otherwise compromise certain assets of the Debtors' estates included periodic, public reporting

to enable parties in interest to evaluate the ongoing success of such procedures once

implemented.  As a consequence of these efforts, reporting requirements were included in the

following procedures that have been successfully implemented throughout these cases:

| Date | Order | Docket. No. |
|---|---|---|
| 6/3/2009 | Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019(b) Authorizing the Establishment of Procedures to Terminate Unfunded Commitments and Restructure Corporate Loan Agreements | 3753 |
| 8/5/2009 | Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(b) Authorizing the Establishment of Procedures for the Debtors to Compromise and Settle Claims in Respect of the Origination or Purchase of Residential Mortgage Loans | 4706 |
| 9/16/2009 | Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019(b) Authorizing the Establishment of Procedures for the Debtors to Compromise Claims of the Debtors in Respect of Real Estate Loans | 5187 |
| 9/24/2009 | Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Rule 9019 of the Federal Rules of | 5272 |

| | | |
|---|---|---|
| | Bankruptcy Procedure Establishing Procedures for the Debtors to Transfer their Interests in Respect of Residential and Commercial Loans Subject to Foreclosure to Wholly-Owned Non-Debtor Subsidiaries | |
| 1/14/2010 | Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(b) Authorizing the Establishment of Procedures for the Debtors to Compromise and Settle Prepetition Claims Asserted by the Debtors Against Third Parties | 6656 |
| 3/31/2010 | Amended Order Granting Debtors' Motion Pursuant to Sections 105, 363, and 554(a) of the Bankruptcy Code for Authority to Establish Procedures to Sell or Abandon *De Minimis* Assets | 7958 |
| 3/31/2010 | Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 3007 and 9019(b) Approving Settlement Procedures | 7936 |
| 6/17/2010 | Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Rules 6004(h) and 9019(a) for the Establishment of Procedures to Dispose of Real Estate Assets and Modification of the Order Establishing Procedures to (I) Restructure, (II) Make New or Additional Debt or Equity Investments in, and/or (III) Enter into Settlements and Compromises in Connection with Existing Real Estate Investments | 9633 |
| 7/21/2011 | Amended Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 Establishing Procedures to (I) Restructure, (II) Make New Debt or Equity Investments in, and/or (III) Enter into Settlements and Compromises in Connection with Existing Real Estate Investments | 18682 |

55.    Second, the Group, with substantial assistance from Mr. Molinaro, worked closely

with the Debtors and, in some circumstances, the Creditors' Committee to improve the

disclosures made in the Debtors' monthly operating reports.  For example, on August 11, 2009,

the Group made a detailed written request to the Debtors seeking greater financial disclosure

from the Debtors in the monthly operating reports in the form of quarterly balance sheets.[3]  Prior

to this point, the reports had primarily contained only certain schedules of cash receipts and

disbursements, but not any detailed balance sheet information.  (See, e.g., Monthly Operating

Report [Docket No. 3358]; Monthly Operating Report [Docket No. 3622]; Monthly Operating

Report [Docket No. 3916]; Monthly Operating Report [Docket No. 4288]; Monthly Operating

Report [Docket No. 4875]; (each providing certain cursory balance sheet information with

respect to certain debtors and schedules of cash receipts and disbursements).)  Thereafter, the

Debtors disclosed their June 30, 2009 balance sheets at the November 2009 "State of the Estate

Presentation" and began filing quarterly balance sheets beginning as of September 30, 2009.

(See, e.g., November 2009 Monthly Operating Report [Docket No. 6151] (including balance

sheets as of June 30, 2009.)  These quarterly balance sheets contained much of the information

sought by the Group in its written request, including, among other items: (a) supplemental

information regarding financial instruments (see id. at 20); (b) supplemental information

regarding real estate assets (see id. at 14-15); (c) supplemental information regarding derivatives

and hedging (see id. at 18); (d) supplemental information regarding principal investments (see id.

at 17); (e) supplemental information regarding loans (see id. at 16); (f) and supplemental

information regarding pledged inventory (see id. at 19).

56.    The Group's efforts were not limited to written requests; indeed, the Group and

Mr. Molinaro met with the Debtors' finance team on multiple occasions to improve transparency

for all stakeholders.  In addition though, on June 18, 2010, the Group made a further written

request for additional disclosure from the Debtors.[4]  Thereafter, the Debtors made further

additional disclosures, including providing certain entity-specific accounting for certain Debtor-

---

[3]    A copy of such written request is attached hereto as Exhibit A.
[4]    A copy of such written request is attached hereto as Exhibit B.

controlled entities such as Lehman ALI Inc. and Property Asset Management Inc. in certain

portions of both (i) the monthly operating reports (compare Schedule of Cash Receipts and

Disbursements for LBHI and Other Debtors and Other Controlled Subsidiaries in the Monthly

Operating Report for the Period of June 2010 [Dkt. No. 10345] with Monthly Operating Report

for the Period of July 2010 [Dkt. No. 10745] and Monthly Operating Report for the Period of

August 2010 [Dkt. No. 11444]), and (ii) the quarterly balance sheets (compare December 2009

Supplemental Monthly Operating Report [Dkt. No. 8754] with March 2009 Supplemental

Monthly Operating Report [Dkt. No. 10744]).

57.    Third, during the plan process, the Group specifically negotiated with the Debtors

for the inclusion of Section 15.6 in the Confirmed Plan.  Neither the Initial Plan nor the

Amended Plan included periodic reporting requirements that would allow stakeholders or other

parties to assess the Debtors' post-effective date liquidation progress.  (See generally Initial Plan;

Amended Plan.)  The Group, however, had always believed that any confirmed plan should

contemplate periodic reporting from the Debtors sufficient to enable stakeholders to make such

an assessment.  (See Group's Disclosure Statement at Ex. 4.)  Accordingly, the Group worked

with the Debtors to draft a plan provision that would set forth a comprehensive post-effective

date disclosure framework and at the same time provide the Debtors with flexibility in the event

that circumstances rendered those disclosures inappropriate.  This resulted in Section 15.6 of the

Confirmed Plan, which provides that the Debtors shall file with the Court (i) monthly operating

reports similar to those used by the Debtors during the pendency of the Chapter 11 Cases, (ii)

quarterly reports including, among other things, balance sheets by asset type and a section titled

"Management's Discussion and Analysis," and (iii) annual reports reconciling the Debtors' cash

flow estimates and including a description of collections by the Debtors as well as a comparison

of performance relative to forecasted collections and estimates of future costs and expenses of

administration.   (See Confirmed Plan § 15.6 (monthly, quarterly and annual reports).)

## BASIS FOR RELIEF

58.    The amounts sought by the Group in this Application are properly reimbursable

under section 503(b) of the Bankruptcy Code as amounts incurred in connection with the

Group's substantial contribution to LBHI's bankruptcy case.  It has been noted in other contexts

that ad hoc groups often play an "important" role in chapter 11 cases.  In re Northwest Airlines

Corp., 363 B.R. 702, 703 (Bankr. S.D.N.Y. 2007).  In this instance, that the Group's efforts have

substantially contributed to LBHI's chapter 11 case is beyond any credible dispute.

## I.    SECTION 503(B) OF THE BANKRUPTCY CODE REQUIRES REIMBURSEMENT FOR EXPENSES INCURRED IN MAKINGA SUBSTANTIAL CONTRIBUTION TO A CHAPTER 11 CASE

59.    Section 503(b)(3)(D) of the Bankruptcy Code provides that a committee (other

than an official committee) representing creditors "shall" be allowed to recover as administrative

expenses the actual, necessary expenses incurred in making a substantial contribution to a case

under chapter 11. 11 U.S.C. § 503(b)(3)(D); Hall Fin. Group, Inc. v. DP Partners, Ltd., P'ship (In

re DP Partners, Ltd., P'ship), 106 F.3d 667, 671 (5th Cir. 1997) ("This statutory mandate permits

of [sic] no discretionary calls by the court."); see also Northwest Airlines Corp., 363 B.R. at 703

(noting that the Bankruptcy Code specifically contemplates that an unofficial creditors'

committee may be entitled to reimbursement for a substantial contribution).  In addition, section

503(b)(4) provides for reasonable compensation for professional services rendered by an

attorney or accountant to such a creditor.  11 U.S.C. § 503(b)(4); id. at 703 n.1 ("Counsel for an

unofficial committee is also entitled to seek reimbursement [under section 503(b)(4)].").

60.    Accordingly, an unofficial committee of creditors, such as the Group, shall

recover from a debtor's estate (i) actual and necessary expenses and (ii) reasonable fees and

expenses incurred to the extent that the Group made a "substantial contribution" to the debtor's

estate.  See, e.g., In re United States Lines, Inc., 103 B.R. 427, 429 (Bankr. S.D.N.Y. 1989) ("the

threshold test to be met by any section 503 claimant is having made a substantial contribution"),

aff'd, 1991 WL 67464 (S.D.N.Y. Apr. 22, 1991); In re Texaco, Inc., 90 B.R. 622, 627 (Bankr.

S.D.N.Y. 1988); In re McLean Indus., Inc., 88 B.R. 36, 38-39 (Bankr. S.D.N.Y. 1988).

61.    As such, sections 503(b)(3) and (4) are designed to promote meaningful creditor

participation in the reorganization process. See, e.g., In re Richton Int'l Corp., 15 B.R. 854, 855-

56 (Bankr. S.D.N.Y. 1981) (noting that "[t]he policy aim of authorization of such compensation

is to promote meaningful creditor participation in the reorganization process" and that

"[c]oncommitant with the aim of creditor participation is the authorization of compensation for

counsel to creditors") (citations omitted).  An applicant under section 503(b) need not establish

that its efforts alone and exclusively resulted in a "substantial contribution" to a debtor's estate,

but rather, the applicant need only demonstrate a credible connection between his efforts and the

reorganization process. See In re Calumet Realty Co., 34 B.R. 922, 926 (Bankr. E.D. Pa. 1983);

see also In re Granite Partners, L.P., 213 B.R. 440, 447 (Bankr. S.D.N.Y. 1997).

62.    Although the Bankruptcy Code does not define what constitutes a "substantial

contribution," this Court has held that an applicant "substantially contributes" to a case if it has

provided "an actual and demonstrable benefit to the debtor's estate, its creditors, and to the

extent relevant, the debtor's shareholders."  In re United States Lines, Inc., 103 B.R. at 429; see

also In re Texaco, 90 B.R. at 627; In re McLean Indus., Inc., 88 B.R. at 39.  "Broadly speaking,

services which substantially contribute to a case are those which foster and enhance, rather than

retard or interrupt the progress of reorganization."  United States Lines, 103 B.R. at 428.

63.     Courts in the Second Circuit have considered various factors in determining

whether a creditor has conferred an actual demonstrable benefit, including: (i) whether the

services benefited the creditor, the estate itself or all of the parties in the bankruptcy case; (ii)

whether the services resulted in a significant and demonstrably positive benefit to the estate; and

(iii) whether the services duplicated the efforts by others.  Trade Creditor Group v. L. J. Hooker

Corp., Inc. (In re Hooker Invs., Inc.), 188 B.R. 117, 120 (S.D.N.Y. 1995), aff'd, 104 F.3d 349

(2d Cir. 1996).  Courts exercise their discretion and examine the totality of the relevant facts

when determining whether services substantially contribute in a case under chapter 11. See In re

United States Lines, 103 B.R. at 430; see also In re 9085 E. Mineral Office Bldg., Ltd., 119 B.R.

246, 253 (Bankr. D. Colo. 1990) (awarding compensation where applicant's efforts, when

"viewed as a whole", made a substantial contribution to the debtor's estate).

## II.     THE GROUP, THROUGH ITS PROFESSIONALS, PROVIDED A SUBSTANTIAL CONTRIBUTION TO LBHI'S CHAPTER 11 ESTATE

### A.     The Group's Actions Aided in Achieving a Consensual Confirmed Plan and Significantly Benefited the LBHI Estate

64.     Since the Bankruptcy Code's enactment, courts have found that there are two

principal situations in which creditor participation can confer an actual and demonstrable benefit

to a chapter 11 case.  The first of these situations is where the creditor "took an active role in

facilitating the negotiation and successful confirmation of the plan." In re Granite Partners, L.P.,

213 B.R. at 446; see also In re Richton Int'l Corp., 15 B.R. at 855 (awarding fees to applicant

whose "efforts to reconcile the Debtors and creditors and to negotiate and consummate the

reorganization were instrumental in the promulgation of the Plan of Reorganization"); In re 9085

E. Mineral Office Bldg., Ltd., 119 B.R. at 253 (awarding fees to attorney of secured creditor who

formulated a plan of reorganization that provided 100% recovery for unsecured creditors); In re

Encapsulation Int'l, Inc., No. 96-31762WHB, 1998 WL 801898, at *4 (Bankr. W.D. Tenn. Nov.

9, 1998) (reimbursing a creditor for fees and expenses incurred in efforts in connection with

confirmation of consensual plan).  In finding that a creditor's actions in furtherance of a chapter

11 plan provided a substantial contribution, the court in <u>Encapsulation International</u> stated:

> This case would not have reached confirmation without [the
> creditor's] contribution. The debtor's first disclosure and plan
> efforts, while well-intentioned, were doomed to failure.
> Confirmation required consent, as it is doubtful that this debtor could
> have satisfied the cram down requirements of § 1129(b). The
> confirmation prospects took a positive turn when [the creditor]
> drafted what would become a joint disclosure statement and engaged
> in meaningful negotiations with the debtor's attorney that resulted in
> a consensual plan of liquidation. . . . [The creditor's] efforts,
> therefore, brought the debtor and the principal creditors to the point
> of agreement that appears to be the only achievable path that would
> result in a confirmed plan rather than a dismissal or conversion of
> the case – the consensual path. This Court surely should consider the
> results in making a "substantial contribution" analysis.

<u>Id.</u>  Similarly, a creditor's efforts that reached a settlement agreement may also constitute an

actual and demonstrable benefit.  <u>See</u>, <u>e.g.</u>, <u>In re United States Lines</u>, 103 B.R. at 432 (where

creditor's role in the negotiation and approval of a settlement "benefited other creditors as well

as the estate, such services were a substantial contribution under section 503(b)(3)").

65.    The second common situation in which courts have found that a creditor

conferred an actual and demonstrable benefit on the estate is where a creditor "opposed an earlier

plan, and as a result, the court ultimately confirmed a more favorable plan." <u>In re Granite</u>

<u>Partners, L.P.</u>, 213 B.R. at 446; <u>see</u> <u>also</u> <u>In re DP Partners Ltd. P'ship</u>, 106 F.3d at 670, 673-74

(finding availability of an additional $3,000,000 for distribution under prevailing plan of

reorganization was partially attributable to involvement of applicant who filed a competing plan

and set off a bidding war with the debtor and concluding that applicant made substantial

contribution); <u>Marcus Montgomery Wolfson & Burten P.C. v. AM Int'l, Inc. (In re AM Int'l,</u>

<u>Inc.)</u>, 203 B.R. 898, 904-05 (D. Del. 1996) (concluding unofficial equity committee made a

substantial contribution to the estate by (i) opposing a pre-packaged plan that proposed to

eliminate equity and (ii) negotiating a new plan which created value for the estate through the

addition of a warrant structure); <u>Roberts v. Petroleum World, Inc. (Ex parte Roberts)</u>, 93 B.R.

442, 444-45 (D.S.C. 1988) (affirming finding that creditor made substantial contribution where

creditor opposed plan that failed to provide for payment of interest to unsecured creditors and

where confirmed plan ultimately provided for such payments to unsecured creditors).

66.    Here, both situations occurred.  First, by and through its professionals, the Group

aided and participated in the negotiation, formulation and drafting of the Confirmed Plan, and

actively participated in the preparation and proposal of the Confirmed Plan, which was accepted

by every class of creditors and interest holders in these Chapter 11 Cases and approved by this

Court.  In particular, the Group (i) negotiated for the LBHI estate both informally and formally

with the Debtors and a number of significant stakeholders, (ii) reviewed and commented on the

Debtors' proposals from an LBHI perspective with respect to the Confirmed Plan and the

Approved Disclosure Statement, and (iii) ultimately consented to support and vote for the

Confirmed Plan.  In addition to these contributions, and perhaps most importantly, the Group had

filed and stood ready to prosecute the Group's Plan in the absence of a settlement.

67.    This is not a case where the Group's objections and related comments fell short of

"alter[ing] the character of the document."  <u>See</u> <u>Granite Partners, L.P.</u>, 213 B.R. at 449.  Rather,

as set forth in the Approved Disclosure Statement, the Confirmed Plan was materially different

than the Initial Plan and Amended Plan.  (Approved Disclosure Statement at 70 ("During

conferences among the Debtors, their creditors, primarily holding Senior Unsecured Claims

against LBHI . . . [and certain other Claims], reached agreements resulting in further refinement

of the Plan compromise initially proposed by the Debtors.")  Thus, the Group's efforts both

34

"facilitate[ed] the successful reorganization" and "added value" and therefore constitute an

"actual or concrete" benefit to the LBHI estate. In re Granite Partners, L.P., 213 B.R. at 449.

68.    Second, this situation is similar to a number of cases where a court has found that

a creditor made a substantial contribution by opposing an earlier plan and, as a result, the court

confirmed a more favorable plan.  For example, in DP Partners, the debtor filed a plan providing

for approximately $37 million in payments to its creditors.  DP Partners, 106 F.3d at 670.  One

creditor recognized that the plan undervalued the debtor's property holdings and acquired three

small unsecured claims, thus becoming a creditor.  Id.  The creditor subsequently proposed a

competing plan, which set off a bidding war, and, after several amendments, the debtor's plan

was confirmed.  Id.  Due in part to the creditor's actions, however, the confirmed plan provided

approximately $3 million more for the debtor's creditors than the original version.  Id.

69.    The bankruptcy court found that the creditor had made a substantial contribution

to the debtor's case, stating that the creditor's "participation in the case did benefit the [e]state

and make a substantial contribution in terms of (a) discovery of the fraudulent conveyance and

its benefits going to the secured creditor; (b) termination of exclusivity; and (c) causing the

[d]ebtor to change its plan."  Id. at 673.  Further, the creditor's participation in the confirmation

fight resulted in at least a $3 million benefit to all creditors of the estate.  Id.  The bankruptcy

court, however, held that the creditor was entitled to reimbursement for only $12,500 of the

$150,600 it sought, solely on the basis that the creditor had not provided advance notice of its

intent to seek reimbursement.  Id. at 670.  The district court summarily affirmed.  Id.

70.    The debtor and the creditor both appealed.  Id.  On appeal, the creditor argued that

the district court erred in holding that section 503 of the Bankruptcy Code required advance

warning of an intent to seek reimbursement.  Id.  The debtor argued that the district court erred in

affirming the $12,500 fee award because the creditor waived its right to claim expenses and

failed to make a substantial contribution warranting an award of fees and expenses.  Id.  As to the

issue of advance notice, the Fifth Circuit agreed with the creditor that a creditor seeking

reimbursement under section 503 need not provide advance notice of such intent; rather, filing a

timely motion is sufficient.  Id. at 671-72.  As to whether the creditor had made a substantial

contribution, the Fifth Circuit noted that whether a creditor has made a substantial contribution is

a question of fact to be determined on a case-by-case basis.  Id.  For the reasons already stated,

the bankruptcy court had specifically found that the creditor had made a substantial contribution

and, further, this finding was both supported by evidence and not clearly erroneous.  Id.

71.     Here, the Group filed the only opposition to the Debtors' Initial Plan, which, for

the reasons stated above, was materially less favorable to the LBHI estate than the Confirmed

Plan.  Moreover, since the filing of the Initial Plan, the Group has been the only party to

advocate publicly for LBHI with respect to Inter-Debtor Issues.  While nobody can know exactly

what the outcome of these cases would be absent the involvement of the Group, it is certain to

have been a worse outcome for the LBHI estate.  To put the Confirmed Plan in context, when

compared to the Initial Plan, creditors of LBHI are receiving $2.39 billion in additional assets

through the payover provisions alone.  Without question this represents a substantial benefit.

72.     In addition to this increase in available assets for the LBHI estate, instead of the

risk of an unending feud with creditors of subsidiary Debtors, the Confirmed Plan fully resolves

the Inter-Debtor Issues. Consequently, the actions of the Group and its professionals resulted in

additional value for the LBHI estate and more favorable treatment for its creditors.

**B.      The Group Made Substantive Concessions
to Reach the Global Settlement**

73.      Additionally, in negotiating the Confirmed Plan and the plan support agreements

related thereto, the Group agreed to compromise its own recoveries and rights to reach a

consensus and ultimately gain support for a confirmable chapter 11 plan.  Courts properly may

consider such concessions in determining whether a creditor made a substantial contribution.

See, e.g., In re 9085 E. Mineral Office Bldg., Ltd., 119 B.R. at 253 (assessing significance of the

contribution at issue and noting that "[o]nly because of [applicant's] pertinacity and willingness

to compromise its own claim were the other unsecured creditors able to receive payment one-

hundredfold.").  Under the Confirmed Plan and the related plan support agreements, the Group

agreed to support a plan under which the Group had to "give up" its right to pursue various

remedies with respect to the Inter-Debtor Issues, including substantive consolidation.  Absent

this concession, it is unlikely that any subsidiary creditors would have assented to the Confirmed

Plan.  Accordingly, the Group is entitled to reimbursement for this contribution.

**C.      The Group's Actions Outside the Plan Context Have
Provided Additional Benefits to the LBHI Estate**

74.      Notwithstanding that a finding of substantial contribution arises most often in

connection with plan-related activities, court have gone beyond these circumstances and granted

substantial contribution awards, without regard to the plan process, where a creditor's activities

have led to a concrete, measurable monetary benefit to the debtor's estate or saved expenses.  In

re McLean Indus., Inc., 88 B.R. at 39 (objection to a proposed sale of estate property for

$350,000 prompted other objections and an increased bid of $1.5 million); In re Baldwin United

Corp., 79 B.R. at 344 (plan to purchase debtors' asset drew a competing bid, $5 million higher,

which the debtors eventually accepted); In re 9085 E. Mineral Office Bldg. Ltd., 119 B.R. at 255

(creditor filed objection to fee application resulting in an $11,000 reduction thereto).

75.     While the most visible product of the Group's efforts is the consensual Confirmed Plan that has led to the augmentation of the LBHI estate and timely recoveries for all creditors, the Group's efforts and contributions have gone beyond participation in settlement discussions or the attendant work necessary to position these cases for ultimate settlement.  Indeed, from its inception in 2009, the Group has provided a voice for third-party stakeholders in these Chapter 11 Cases, both in the court room and behind the scenes with the estate fiduciaries.  Although the Group did not always agree with the estate fiduciaries on these issues, at all times, the Group sought to work efficiently, constructively and for the benefit of all similarly situated creditors.  The results have been beneficial, in both economically tangible and intangible respects.

76.     An example of the tangible benefits inuring to all creditors include the Debtors' receipt of over $70 million of additional consideration in exchange for the Sellers' interests in NBG.  As described in greater detail above, following the Debtors filing the Neuberger Berman Motion, the Group worked with the Debtors and NBG in order to maximize the value of the Neuberger Equity Interests.  As a consequence of these negotiations and the Group's informal objection to the transaction as originally proposed, such transaction improved by approximately $70 million in the Sellers' favor.  These circumstances are similar to those in McLean.

77.     In McLean, the debtor sought to sell its stock in its subsidiary, which owned a paper mill in Puerto Rico, to Halifax Grain Elevators ("Halifax") for $350,000 subject to court order and higher and better bids.  McLean, 88 B.R. at 37-38.  Halifax was owned in part by Allen Stevens, a director and former officer of the debtor.  Id. at 38.  The debtor chose to accept Halifax's immediate cash offer rather than a lease proposal from a third party that would have provided the debtor with monthly rentals dependent upon the success of the mill, purportedly on account of the speculative nature of the mill's prospective operations.  Id.  At a hearing on the

proposed sale, a creditor asserted an initial objection, raising an issue as to the adequacy of the

proposed purchase price based on a document obtained from a Puerto Rican bank which stated

that the property in question, which was encumbered by a $5 million mortgage, had a value of $7

million.  Id.  Following the objection, other parties in interest asserted their concern for the

propriety of the sale to Halifax.  Id.  An evidentiary hearing was scheduled as to the propriety of

the price.  Id.  In the interim prior to the hearing, bidding for the subsidiary's stock ensued and

such stock was sold to a third party for $1.5 million – i.e., $1.15 million higher.  Id.

78.     The creditor asserted that it raised the sole objection to the original bid, thereby

causing the hearing to be adjourned and permitting the submission of the $1.5 million bid.  Id.

Thus, the creditor claimed sole responsibility for a substantial increase in the value of the estate.

Id.  The creditor submitted a notice of motion, seeking compensation in the amount of

$84,720.00 consisting of $9,720 for attorney's fees and a $75,000 premium for "salvaging"

$1,150,000 for the estate.  Id.  In finding a substantial contribution, the court reasoned:

> We find that SP & B has conferred a benefit upon the estate. The
> "substantial contribution" SP & B made was that it raised the
> initial objection to the sale of the Arecibo stock and thereby
> seemingly prompted others to assert their position concerning the
> propriety of the sale to Halifax. While such objections might have
> been made in any event, it was clear to the Court at the hearing,
> and the transcript confirms, that had the price issue not been raised,
> the objection to the propriety of the transaction might not have
> been made. Indeed, there was concern at the hearing that, since
> approval of the arrangement with Halifax had to be obtained by a
> date certain, an adjournment might prejudice the estate.
>
> We reject the notion, however, that SP & B made the sole
> objection as it claims. After SP & B's initial objection, counsel for
> the Debentureholders Committee expressed reservations regarding
> the stock sale. In fact, it was counsel for that committee who
> actually proposed the adjournment at the February hearing. This
> Court agreed with said counsel and expressed a substantial concern
> regarding Stevens' "insider" status. The February hearing was thus
> adjourned to allow all concerned parties to consider these issues
> more fully.

Id.  As a consequence, the court allowed the majority of the creditor's attorney fees based on

time, but rejected the creditor's request for compensation based on a "salvage" theory.  Id.

79.     The Group provided another tangible benefit to all creditors in connection with

respect to non-cash reserves.  The Group first proposed that the reserves for disputed claims

under any plan of reorganization could be satisfied with non-cash assets of the Debtors.  (See

Group's Plan § 12.7 ("If the Plan Administrator determines in its sole discretion that the value of

the Consolidated Debtors' assets other than Cash exceeds the amount of Cash reserved in the

Disputed Claims Reserve, the Plan Administrator may in its discretion release such Cash for

Distribution to holders of Allowed Claims and fund the Disputed Claims Reserve with Plan

Consideration when realized from the future disposition of assets or other available sources.").)

At the Group's urging, the Debtors ultimately included this provision in their own plan.  (See

Confirmed Plan § 8.4.)  The benefit to creditors as a result of this has undeniably been

substantial.  (See Motion of Lehman Brothers Holdings Inc. for Authority to Use Non-Cash

Assets in Lieu of Available Cash as Reserves for Disputed Claims Pursuant to Section 8.4 of the

Debtors' Confirmed Joint Chapter 11 Plan [Docket No. 24726] ("LBHI estimates that the benefit

to holders of Allowed Claims will be substantial. . . . [I]f the Participating Debtors are authorized

to retain and reserve Non-Cash Assets for Disputed Claims as requested . . . , the Debtors

estimate that LBHI will be able to distribute approximately $4.8 billion (approximately $1.4

billion increase) and LBSF will be able to distribute approximately $5.9 billion (approximately

$1.1 billion increase) to holders of unsecured, non-priority Allowed Claims.").)

80.     The Group also provided substantial intangible benefits inuring to all creditors.

For example, from its inception, the Group fought for increased transparency as to the Debtors'

financial condition in order to enable creditors to better determine the propriety of certain relief

sought by the Debtors, to value their claims and to generally participate in the chapter 11

process.  In particular, the Group worked with the Debtors and the Creditors' Committee to

ensure that any procedures established to restructure, terminate, or otherwise compromise certain

assets of the Debtors' estates included periodic, public reporting to enable parties in interest to

evaluate the ongoing success of such procedures once implemented.

81.    In addition, during the plan process, the Group specifically negotiated for the

inclusion of Section 15.6 of the Confirmed Plan, which generally requires the Debtors to file

periodic reports with the Court following the effective date setting forth certain financial

information.  (See Confirmed Plan § 15.6 (monthly, quarterly and annual reports).)

## REQUEST TO BE HEARD

82.    Given the enormous burdens these cases have imposed on this Court, the Group

has chosen not to burden this Court further with an overly and unnecessarily detailed recitation

of the facts supporting this Application.  Simply, the Group believes this Court is already well

aware of the record of these cases and, as such, has focused on summarizing the material efforts

undertaken by the Group during its involvement in these Chapter 11 Cases.  To the extent this

Court believes that the record is not sufficient or otherwise has any other concerns with respect

to any portion of the relief sought in this Application, the Group respectfully requests an

opportunity to be heard.

## NO PRIOR REQUEST

83.    No prior Application for the relief requested herein has been made to this Court or

any other court.

WHEREFORE, for the foregoing reasons, the Group respectfully requests the Court (i)

enter an Order, substantially in the form of the Order annexed hereto as Exhibit C, authorizing

and directing LBHI to pay the reasonable fees and expenses incurred by the Group's

professionals in these chapter 11 cases, and (ii) grant such further relief as is just and proper.

Dated:  July 3, 2012
       New York, New York

Respectfully submitted,

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Gerard Uzzi (GU – 2297)
J. Christopher Shore (JS – 6031)
Eric K. Stodola (ES – 1111)

By:  /s/ Gerard Uzzi
      Gerard Uzzi

ATTORNEYS FOR THE AD HOC GROUP
OF LEHMAN BROTHERS CREDITORS