QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Susheel Kirpalani (SK8926)
James C. Tecce (JT5910)
Olga M. Urbieta (OU0612)

*Special Counsel for the Official
Committee of Unsecured Creditors of
Lehman Brothers Holdings Inc., et al.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ------------------------------------------------------- x | | |
| In re: | : | Chapter 11 Case |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., <u>et al.</u> | : | No. 08-13555 (JMP) |
| | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| ------------------------------------------------------- x | | |

**SUMMARY SHEET**

| | |
|---|---|
| **Name and Role of Applicant** | Quinn Emanuel Urquhart & Sullivan, LLP |
| **Authorized to Provide Professional Services to:** | The Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., <u>et al.</u> |
| **Date of Retention** | November 21, 2008 (<u>nunc pro tunc</u> to September 17, 2008) |
| **Compensation Period** | September 17, 2008 – March 5, 2012 |
| **Fees Incurred for Counsel** | $40,757,246.10[1] |
| **Expenses Incurred** | $2,186,638.32[2] |
| **Fee Application** | This is the Final Fee Application Filed by Quinn Emanuel Urquhart & Sullivan, LLP |

---

[1] Quinn Emanuel also seeks $38,435.00 in fees that were inadvertently excluded from previous interim fee applications because among other things, the corresponding fees were processed after the interim fee period and therefore were not included in the application for that particular fee period. It also seeks $245,303.60 in fees that were incurred after the effective date in preparing monthly and interim fee statements as well as this final fee application.

[2] This total includes $6,267.82 in expenses that were inadvertently excluded from previous interim fee applications because among other things, the corresponding expenses were processed after the interim fee period and therefore were not included in the application for that particular period.

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ...................................................................... 2

II.   JURISDICTION AND VENUE ..................................................................... 6

III.  GENERAL BACKGROUND ......................................................................... 7

IV.   RETENTION OF QUINN EMANUEL ......................................................... 7

V.    MONTHLY FEE STATEMENTS AND QUARTERLY APPLICATIONS ...................... 8

VI.   SUMMARY OF PROFESSIONAL SERVICES RENDERED ........................................... 11

      A.    General Case Administration (Hours: 684.00; Fees: $218,164.50) ........................ 11

      B.    Claims Analysis/Objections  (Hours: 602.00, Fees: $320,174.50) ........................ 12

      C.    Hearings and Court Communications (Hours: 1,264.30; Fees: $805,997.50) ........ 18

      D.    Unsecured Creditors Issues/Meetings/Communication  (Hours: 1,053.90, Fees: $743,969.50) ................................................................................. 20

      E.    Non-Derivative Adversary Proceedings (Hours: 68,652.40; Fees: $32,189,677.00) ....................................................................................... 21

            1.    JPMorgan Litigation. .......................................................................... 21

            2.    Citibank Investigation. ........................................................................ 35

            3.    Citibank Litigation. ............................................................................ 35

            4.    Bank of America Litigation. ............................................................... 36

            5.    Barclays Sale Investigation. ............................................................... 39

            6.    Barclays Litigation. ............................................................................ 41

            7.    DIP Reconsideration Motion. ............................................................. 56

            8.    Investigation of Certain Key Parties and Transactions. ...................... 57

      F.    Derivatives/SWAP Agreement Issues  (Hours: 3,264.90, Fees: $2,279,864.00) ....................................................................................... 60

            1.    Ballyrock Adversary Proceeding. ...................................................... 61

            2.    Libra Adversary Proceeding. ............................................................. 64

|        |    | 3.  | Big Bank Settlement Framework. | 66 |
|        |    | 4.  | Derivatives ADR Process. | 66 |
|        | G. | Firm's Own Billing/Fee Applications (Hours: 4,184.50, Fees: $1,602,513.00) | | 67 |
|        | H. | Firm's Own Retention Issues (Hours: 330.40, Fees: $131,504.00) | | 68 |
|        | I. | 2004 Issues  (Hours: 1,244.10, Fees: $597,894.50) | | 68 |
|        | J. | Nonworking Travel  (Hours: 1,939.70, Fees: $1,168,289.50) | | 69 |
| VII.   |    | ALLOWANCE OF COMPENSATION | | 70 |
|        | A. | The Time and Labor Required | | 71 |
|        | B. | The Necessity of The Services and Benefit to the Estate | | 72 |
|        | C. | The Novelty and Difficulty of Issues Presented in the Cases | | 72 |
|        | D. | The Experience, Reputation and Ability of the Attorneys | | 72 |
| VIII.  |    | DISBURSEMENTS | | 73 |
| IX.    |    | NOTICE | | 75 |
| X.     |    | CONCLUSION | | 76 |

**Schedule 1**

**Hours, Rate and Fees for Services Rendered during the Fee Period.**

| Attorneys/ Paraprofessionals | Title | Rate | Total Hours | Total Fees |
|---|---|---|---|---|
| John B. Quinn | Partner | $950.00 | 144.00 | 136,800.00 |
| | | $995.00 | 64.70 | 64,376.50 |
| | | $1,035.00 | 72.20 | 74,727.00 |
| Kathleen Sullivan | Partner | $950.00 | 33.00 | 31,350.00 |
| Robert Hickmott | Partner | $1,035.00 | 0.40 | 414.00 |
| Fred G. Bennett | Partner | $1,035.00 | 10.60 | 10,971.00 |
| Daniel P. Cunningham | Partner | $950.00 | 275.50 | 261,725.00 |
| | | $995.00 | 465.30 | 462,973.50 |
| | | $1,035.00 | 193.20 | 199,962.00 |
| Richard I. Werder, Jr. | Partner | $950.00 | 85.00 | 80,750.00 |
| | | $1,035.00 | 4.60 | 4,761.00 |
| Marc A. Becker | Partner | $950.00 | 81.50 | 77,425.00 |
| Harry A. Olivar, Jr. | Partner | $950.00 | 2.10 | 1,995.00 |
| Richard East | Partner | $950.00 | 26.80 | 25,460.00 |
| Sue Prevezer | Partner | $950.00 | 44.10 | 41,895.00 |
| Stephen R. Neuwirth | Partner | $950.00 | 2.40 | 2,280.00 |
| Faith Gay | Partner | $950.00 | 204.10 | 193,895.00 |
| Michael B. Carlinsky | Partner | $950.00 | 1.80 | 1,710.00 |
| Susheel Kirpalani | Partner | $820.00 | 629.80 | 516,436.00 |
| | | $885.00 | 59.10 | 52,303.50 |
| | | $920.00 | 5.40 | 4,968.00 |
| Andrew Rossman | Partner | $820.00 | 185.90 | 152,438.00 |
| | | $885.00 | 556.70 | 492,679.50 |
| | | $920.00 | 801.00 | 736,920.00 |
| Daniel Bromberg | Partner | $885.00 | 5.30 | 4,690.50 |
| Dominic Surprenant | Partner | $875.00 | 7.90 | 6,912.50 |
| James C. Tecce | Partner | $650.00 | 620.60 | 403,390.00 |
| | | $775.00 | 2919.10 | 2,262,302.50 |
| | | $850.00 | 1805.10 | 1,534,335.00 |
| | | $865.00 | 557.10 | 481,891.50 |
| Jon D. Corey | Partner | $860.00 | 2.40 | 2,064.00 |

| Attorneys/ Paraprofessionals | Title | Rate | Total Hours | Total Fees |
|---|---|---|---|---|
| Eric D. Winston | Partner | $740.00 | 501.30 | 370,962.00 |
| | | $825.00 | 419.40 | 346,005.00 |
| | | $860.00 | 142.30 | 122,378.00 |
| Erica Taggart | Partner | $660.00 | 1628.00 | 1,074,480.00 |
| | | $750.00 | 2130.30 | 1,597,725.00 |
| | | $780.00 | 1045.20 | 815,256.00 |
| Kevin S. Reed | Partner | $775.00 | 21.20 | 16,430.00 |
| Jonathan Pickhardt | Partner | $775.00 | 1.20 | 930.00 |
| Sandy Weisburst | Partner | $775.00 | 38.00 | 29,450.00 |
| Matthew Bunting | Partner | $485.00 | 42.80 | 20,758.00 |
| | | $530.00 | 89.40 | 47,382.00 |
| | | $750.00 | 6.00 | 4,500.00 |
| Joseph G. Minias | Partner | $445.00 | 11.20 | 4,984.00 |
| | | $660.00 | 97.50 | 64,350.00 |
| Adam M. Abensohn | Partner | $650.00 | 101.70 | 66,105.00 |
| Manisha M. Sheth | Partner | $650.00 | 122.70 | 79,755.00 |
| Daniel Holzman | Counsel | $650.00 | 9.60 | 6,240.00 |
| Scott C. Shelley | Counsel | $650.00 | 288.50 | 187,525.00 |
| | | $700.00 | 45.20 | 31,640.00 |
| William G. Berry | Counsel | $670.00 | 65.60 | 43,952.00 |
| Eric M. Kay | Counsel | $650.00 | 2126.60 | 1,382,290.00 |
| | | $700.00 | 1114.10 | 779,870.00 |
| | | $805.00 | 273.70 | 220,328.50 |
| John H. Chun | Counsel | $650.00 | 6.10 | 3,965.00 |
| Andrew Fulton | Associate | $810.00 | 1.00 | 810.00 |
| | | $720.00 | 4.40 | 3,168.00 |
| Christopher Kercher | Associate | $430.00 | 236.30 | 101,609.00 |
| | | $595.00 | 1344.40 | 799,918.00 |
| | | $650.00 | 1173.10 | 762,515.00 |
| Kristin Madigan | Associate | $595.00 | 506.20 | 301,189.00 |
| | | $650.00 | 35.80 | 23,270.00 |
| Robert K. Dakis | Associate | $410.00 | 1060.50 | 434,805.00 |
| | | $430.00 | 1772.80 | 762,304.00 |
| | | $595.00 | 1485.90 | 884,110.50 |
| | | $650.00 | 201.00 | 130,650.00 |

| Attorneys/ Paraprofessionals | Title | Rate | Total Hours | Total Fees |
|---|---|---|---|---|
| Marc A. Palladino | Associate | $390.00 | 114.30 | 44,577.00 |
| | | $400.00 | 501.90 | 200,760.00 |
| | | $535.00 | 57.90 | 30,976.50 |
| | | $590.00 | 12.10 | 7,139.00 |
| Stephen M. Hauss | Associate | $590.00 | 2.00 | 1,180.00 |
| Matthew S. Warren | Associate | $590.00 | 31.90 | 18,821.00 |
| Tyler G. Whitmer | Associate | $390.00 | 311.80 | 121,602.00 |
| | | $400.00 | 1740.80 | 696,320.00 |
| | | $535.00 | 2543.30 | 1,360,665.50 |
| | | $590.00 | 1163.10 | 686,229.00 |
| David S. Mader | Associate | $555.00 | 109.30 | 60,661.50 |
| Matthew R. Scheck | Associate | $390.00 | 12.60 | 4,914.00 |
| | | $495.00 | 1682.70 | 832,936.50 |
| | | $555.00 | 824.10 | 457,375.50 |
| James Shaerf | Associate | $380.00 | 183.50 | 69,730.00 |
| | | $495.00 | 9.10 | 4,504.50 |
| | | $555.00 | 2.80 | 1,554.00 |
| Katherine A. Macfarlan | Associate | $400.00 | 75.30 | 30,120.00 |
| | | $535.00 | 35.70 | 19,099.50 |
| Leah M. Ray | Associate | $535.00 | 306.70 | 164,084.50 |
| Tigran Vardanian | Associate | $400.00 | 166.50 | 66,600.00 |
| | | $535.00 | 357.30 | 191,155.50 |
| Christine D. Ely | Associate | $460.00 | 11.60 | 5,336.00 |
| | | $515.00 | 995.30 | 512,579.50 |
| Olga M. Urbieta | Associate | $370.00 | 444.80 | 164,576.00 |
| | | $380.00 | 1202.00 | 456,760.00 |
| | | $460.00 | 1405.60 | 646,576.00 |
| | | $515.00 | 539.80 | 277,997.00 |
| Zena Jacobsen (Mount-Namson) | Associate | $295.00 | 28.70 | 8,466.50 |
| | | $460.00 | 16.20 | 7,452.00 |
| | | $515.00 | 325.20 | 167,478.00 |
| Justin Brownstone | Associate | $370.00 | 113.40 | 41,958.00 |
| | | $430.00 | 48.50 | 20,855.00 |
| | | $480.00 | 296.70 | 142,416.00 |
| Katherine A. Scherling (Silva) | Associate | $295.00 | 218.40 | 64,428.00 |
| | | $460.00 | 11.70 | 5,382.00 |

| Attorneys/ Paraprofessionals | Title | Rate | Total Hours | Total Fees |
|---|---|---|---|---|
| Rajat Rana | Associate | $445.00 | 56.00 | 24,920.00 |
| Molly Stephens | Associate | $445.00 | 39.10 | 17,399.50 |
| Jake Shields | Associate | $445.00 | 40.10 | 17,844.50 |
| Stan Karas | Associate | $455.00 | 41.80 | 19,019.00 |
| Patrick T. Schmidt | Associate | $400.00 | 22.30 | 8,920.00 |
| | | $445.00 | 3.40 | 1,513.00 |
| Benjamin Odell | Associate | $295.00 | 17.70 | 5,221.50 |
| | | $320.00 | 508.60 | 162,752.00 |
| | | $400.00 | 1849.00 | 739,600.00 |
| | | $445.00 | 1171.10 | 521,139.50 |
| Alex Rossmiller | Associate | $445.00 | 2.60 | 1,157.00 |
| Kate Lydon | Associate | $320.00 | 808.20 | 258,624.00 |
| | | $400.00 | 432.70 | 173,080.00 |
| | | $445.00 | 1322.50 | 588,512.50 |
| Lucy Pert | Associate | $430.00 | 12.00 | 5,160.00 |
| Audrius P. Zakarauskas | Associate | $430.00 | 11.00 | 4,730.00 |
| Laura E. Robbins | Associate | $410.00 | 6.90 | 2,829.00 |
| Danielle Brown | Associate | $410.00 | 138.00 | 56,580.00 |
| Maria Granovsky | Associate | $410.00 | 10.50 | 4,305.00 |
| Jeanine Zalduendo | Associate | $410.00 | 26.20 | 10,742.00 |
| William Adams | Associate | $410.00 | 26.70 | 10,947.00 |
| Deborah Shin | Associate | $400.00 | 180.00 | 72,000.00 |
| | | $410.00 | 1.50 | 615.00 |
| Thomas O'Brien | Associate | $390.00 | 122.10 | 47,619.00 |
| | | $400.00 | 95.20 | 38,080.00 |
| Rebekah Parker | Associate | $400.00 | 23.20 | 9,280.00 |
| Toji Calabro | Associate | $400.00 | 74.60 | 29,840.00 |
| Harrison L. Denman | Associate | $400.00 | 40.30 | 16,120.00 |
| Marissa Miller | Associate | $400.00 | 54.00 | 21,600.00 |
| Chenai Tucker | Associate | $380.00 | 1.40 | 532.00 |
| Mauireann Dennehy | Associate | $380.00 | 3.20 | 1,216.00 |
| Lance Yang | Associate | $295.00 | 215.60 | 63,602.00 |
| | | $370.00 | 369.90 | 136,863.00 |
| | | $380.00 | 156.10 | 59,318.00 |

| Attorneys/ Paraprofessionals | Title | Rate | Total Hours | Total Fees |
|---|---|---|---|---|
| Jeffery L. Brenner | Associate | $295.00 | 30.40 | 8,968.00 |
| | | $370.00 | 7.40 | 2,738.00 |
| Kathryn K. Erno | Associate | $370.00 | 5.50 | 2,035.00 |
| John Lee | Associate | $295.00 | 2.00 | 590.00 |
| Kara Borden | Associate | $320.00 | 5.00 | 1,600.00 |
| Serafina Shishkova | Associate | $295.00 | 56.70 | 16,726.50 |
| | | $320.00 | 7.70 | 2,464.00 |
| Jennifer English | Associate | $295.00 | 14.90 | 4,395.50 |
| Christopher Clark | Attorney | $320.00 | 4443.40 | 1,420,341.00 |
| Adan Powley | Attorney | $320.00 | 32.20 | 10,304.00 |
| Aileen Kim | Attorney | $460.00 | 52.00 | 23,920.00 |
| Cash Rowden | Attorney | $560.00 | 43.70 | 24,472.00 |
| | | $320.00 | 3002.40 | 960,768.00 |
| Diego DiGiovanni | Attorney | $410.00 | 55.80 | 22,878.00 |
| | | $320.00 | 283.80 | 90,816.00 |
| Haley Siman | Attorney | $320.00 | 1012.90 | 324,128.00 |
| Heather Nolan | Attorney | $455.00 | 26.70 | 12,148.50 |
| | | $485.00 | 89.40 | 43,359.00 |
| | | $320.00 | 1937.60 | 620,032.00 |
| Hongxia Gui | Attorney | $270.00 | 2.40 | 648.00 |
| Irene Tokar | Attorney | $320.00 | 1509.90 | 483,168.00 |
| John Volpe | Attorney | $320.00 | 1605.80 | 513,856.00 |
| Kathleen Fay | Attorney | $320.00 | 1917.00 | 613,440.00 |
| Lauren Rosenthal | Attorney | $320.00 | 786.40 | 251,648.00 |
| Malik Burroghs | Attorney | $430.00 | 69.30 | 29,799.00 |
| | | $320.00 | 169.10 | 54,112.00 |
| So Yun Roe | Attorney | $380.00 | 272.50 | 103,550.00 |
| | | $390.00 | 175.60 | 68,484.00 |
| | | $320.00 | 4340.50 | 1,388,960.00 |
| Stephanie McCarthy | Attorney | $430.00 | 6.40 | 2,752.00 |
| | | $320.00 | 687.50 | 220,000.00 |

| Attorneys/ Paraprofessionals | Title | Rate | Total Hours | Total Fees |
|---|---|---|---|---|
| Stephen Chiu | Attorney | $410.00 | 66.50 | 27,265.00 |
| | | $320.00 | 1695.70 | 542,624.00 |
| Alexander Edelson | Law Clerk | $275.00 | 1.90 | 522.50 |
| Christopher Kulawik | Law Clerk | $295.00 | 50.10 | 14,779.50 |
| Lauren Hilemann | Law Clerk | $320.00 | 28.80 | 9,216.00 |
| Nicholas Hoy | Law Clerk | $320.00 | 173.90 | 55,648.00 |
| Robert Glunt | Law Clerk | $295.00 | 22.00 | 6,490.00 |
| Silena Paik | Law Clerk | $295.00 | 11.80 | 3,481.00 |
| Roy Nelson | Managing Clerk | $280.00 | 20.10 | 5,628.00 |
| | | $305.00 | 50.00 | 15,250.00 |
| | | $315.00 | 13.10 | 4,126.50 |
| Cheyoon Im | Paralegal | $270.00 | 786.90 | 212,463.00 |
| | | $280.00 | 886.20 | 248,136.00 |
| Christine Martinez | Paralegal | $270.00 | 7.20 | 1,944.00 |
| Eva Korol | Paralegal | $270.00 | 4.00 | 1,080.00 |
| Greg Ruben | Paralegal | $280.00 | 5.70 | 1,596.00 |
| Ian Ibarra | Paralegal | $270.00 | 145.80 | 39,366.00 |
| Ian Livengood | Paralegal | $250.00 | 1.30 | 325.00 |
| James Grossell | Paralegal | $270.00 | 0.40 | 108.00 |
| Joan Collopy | Paralegal | $250.00 | 43.70 | 10,925.00 |
| | | $270.00 | 1986.90 | 536,463.00 |
| | | $280.00 | 920.90 | 257,852.00 |
| Jonathan Tap | Paralegal | $280.00 | 5.40 | 1,512.00 |
| Julia Hertz | Paralegal | $280.00 | 3.40 | 952.00 |
| Kristina Grosso | Paralegal | $270.00 | 17.50 | 4,725.00 |
| | | $280.00 | 7.70 | 2,156.00 |
| Lindsey Kelleher | Paralegal | $270.00 | 578.20 | 156,114.00 |
| | | $280.00 | 878.70 | 246,036.00 |
| Mario Gutierrez | Paralegal | $250.00 | 38.40 | 9,600.00 |
| Martine LaCroix | Paralegal | $250.00 | 45.20 | 11,300.00 |
| Maryam Nassiri | Paralegal | $280.00 | 2.10 | 588.00 |
| Megan Kerr | Paralegal | $265.00 | 5.20 | 1,378.00 |
| Sabrina Hasan | Paralegal | $270.00 | 1.50 | 405.00 |
| Sebstian Dinges | Paralegal | $250.00 | 4.30 | 1,075.00 |

| Attorneys/ Paraprofessionals | Title | Rate | Total Hours | Total Fees |
|---|---|---|---|---|
| Shahreen Mehjabeen | Paralegal | $250.00 | 2.60 | 650.00 |
| | | $270.00 | 0.40 | 108.00 |
| Sonal Pandya | Paralegal | $250.00 | 21.50 | 5,375.00 |
| Yiran Gu | Paralegal | $280.00 | 2.80 | 784.00 |
| Dave Scholz | Graphics Coordinator | $250.00 | 7.50 | 1,875.00 |
| Jonathan Land | Lit Support | $365.00 | 1.10 | 401.50 |
| Jonathan Espinosa | Lit Support | $250.00 | 37.10 | 9,275.00 |
| | | $150.00 | 23.50 | 3,525.00 |
| James Bandes | Lit Support | $250.00 | 3.80 | 950.00 |
| Harold Edison | Lit Support | $250.00 | 1.20 | 300.00 |
| Alan Davis | Lit Support | $150.00 | 9.20 | 1,380.00 |
| Arthur Davis | Lit Support | $150.00 | 16.20 | 2,430.00 |
| Arthur Daye | Lit Support | $150.00 | 32.60 | 4,890.00 |
| Boris Sobrevilla | Lit Support | $150.00 | 6.00 | 900.00 |
| Cyrus Wilcox | Lit Support | $150.00 | 4.10 | 615.00 |
| Danny Rose | Lit Support | $150.00 | 37.20 | 5,580.00 |
| David Stanford | Lit Support | $150.00 | 4.60 | 690.00 |
| Gary Soulier | Lit Support | $150.00 | 0.50 | 75.00 |
| Hilary Quatinetz | Lit Support | $150.00 | 83.60 | 12,540.00 |
| Jacob Cisneros | Lit Support | $150.00 | 97.30 | 14,595.00 |
| Jet Ma | Lit Support | $150.00 | 41.80 | 6,270.00 |
| Joe Liao | Lit Support | $150.00 | 190.40 | 28,560.00 |
| Kanstantsin Dziamentsy | Lit Support | $150.00 | 2.80 | 420.00 |
| Konstantin Dementiev | Lit Support | $150.00 | 0.70 | 105.00 |
| Linda Jovel | Lit Support | $150.00 | 14.50 | 2,175.00 |
| Matt Hester | Lit Support | $150.00 | 1.10 | 165.00 |
| Matt Hester | Lit Support | $150.00 | 9.40 | 1,410.00 |
| Michael Lee | Lit Support | $150.00 | 15.90 | 2,385.00 |
| Patricia Chew | Lit Support | $150.00 | 6.40 | 960.00 |
| Raul Vasquez | Lit Support | $150.00 | 213.10 | 31,965.00 |
| Robert Wagner | Lit Support | $150.00 | 2.60 | 390.00 |
| Shane Rocke | Lit Support | $150.00 | 0.50 | 75.00 |
| Tim Chatham | Lit Support | $150.00 | 5.90 | 885.00 |

| Attorneys/ Paraprofessionals | Title | Rate | Total Hours | Total Fees |
|---|---|---|---|---|
| Vince Mesa | Lit Support | $250.00 | 0.90 | 225.00 |
| Wu Kim | Lit Support | $250.00 | 19.90 | 4,975.00 |
| **SUBTOTAL** | | | **83,882.90** | **$40,473,489.50** |
| **Post Effective Date Fees\*** | | | | |
| **March 6 -31, 2012** **Fee Application Preparation** | | | | $60,848.55 |
| **April 2012** **Fee Application Preparation** | | | | $43,717.05 |
| **May 2012** **Fee Application Preparation** | | | | $72,685.50 |
| **June 2012** **Fee Application Preparation** | | | | $68,070.50 |
| **Additional Fees** | | | | $38,435.00 |
| **SUBTOTAL** | | | | **$283,756.60** |
| **TOTAL** | | | | **$40,757,246.10** |

**Blended Hourly Rate for Fees Incurred during Compensation Period**      $482.50

**Blended Hourly Rate for Fees Incurred during Compensation Period (Attorneys Only)**      $563.45

---

\*    This includes fees incurred in preparing monthly applications, the tenth interim fee application, and this final fee application.

## Schedule 2

## Hours and Fees for the Final Compensation Period As Rendered By Category

| Code/Matter[1] | Total Hours | Total Amounts |
|---|---|---|
| Cash Collateral and DIP Financing* | 20.60 | $9,689.00 |
| Claims Analysis/Objections* | 602.00 | $320,174.50 |
| Executory Contracts & Unexpired Leases* | 124.50 | $61,570.50 |
| Liens and Set-Off* | 72.70 | $28,370.00 |
| Other Conflict Roles* | 143.90 | $101,044.00 |
| Stay Relief Matter* | 5.40 | $2,306.00 |
| United Kingdom & European Matters* | 49.10 | $33,306.00 |
| General Case Administration (f/k/a Case Management/Calendar Maintenance) | 684.00 | $218,164.50 |
| Hearings and Court Communications (f/k/a Court Hearings) | 1,264.30 | $805,997.50 |
| Non-Working Travel | 1,939.70 | $1,168,289.50 |
| Unsecured Creditors Issues/Meetings/Communication (f/k/a Committee Administration, Creditor Communication, & Creditors' Committee Meetings) | 1,053.90 | $743,969.50 |
| Other General Business Operations Issues | 153.60 | $115,038.00 |
| Derivatives/SWAP Agreement Issues (f/k/a Derivatives) | 3,264.90 | $2,279,864.00 |
| Plan of Reorganization/Plan Confirmation | 9.20 | $6,709.00 |
| Non-Derivatives Claims Reconciliation Estimations | 46.40 | $34,497.50 |
| Non-Derivative Adversary Proceedings (f/k/a Lender and Counterparty Claims, Litigation/Potential Litigation, Barclay's Transaction Investigation and Litigation, & Special Litigation) | 68,652.40 | $32,189,677.00 |
| 2004 Issues (f/k/a Rule 2004 Investigations) (includes litigation with JP Morgan Bank, N.A., Citibank, N.A., and Bank of America, N.A.) | 1,244.10 | $597,894.50 |
| Examiner Issues | 4.80 | $5,153.50 |

---

[1]    The matter names were changed and combined over the course of the Final Compensation Period, specifically in the Fifth Interim Fee Application at the instruction of the Fee Committee.  In order to avoid confusion, the matter names have been combined for the purposes of Schedule 2, as well as, the Application.

*    This matter category was no longer used after the Fifth Interim Fee Application.

| Code/Matter[1] | Total Hours | Total Amounts |
|---|---|---|
| Firm's Own Billing/Fee Applications (f/k/a Quinn Emanuel Fee Applications) | 4,184.50 | $1,602,513.00 |
| Firm's Own Retention Issues (f/k/a Retention of Professionals) | 330.40 | $131,504.00 |
| Third Party Retention/Fee Application/Other | 32.50 | $17,758.00 |
| **Subtotal** | 83,882.90 | $40,473,489.50 |
| **Post Effective Date Fees\*** | | |
| March 6 -31, 2012 Fee Application Preparation | | $60,848.55 |
| April 2012 Fee Application Preparation | | $43,717.05 |
| May 2012 Fee Application Preparation | | $72,685.50 |
| June 2012 Fee Application Preparation | | $68,070.50 |
| Additional Fees | | $38,435.00 |
| **Post Plan Total** | | $283,756.60 |
| **Grand Total** | | $40,757,246.10 |

---

\*   This includes fees incurred in preparing monthly applications, the tenth interim fee application, and this final fee application.

**Schedule 3**

| DESCRIPTION | AMOUNT |
|---|---|
| Air Travel | $260,147.86 |
| Attorney Services/Travel Agents | $74,367.33 |
| Color Printing | $8,846.32 |
| Conference Call Fees | $4,647.97 |
| Database Licensing Fees | $2,325.57 |
| Deposition Transcripts | $263,173.54 |
| Digitals Prints | $67,150.07 |
| Document Reproduction/Photocopying | $206,492.01 |
| EDD (per GB) (production document electronic storage) | $55,541.75 |
| Equipment/Software (computer equipment and software licenses used in connection with matter) | $3,165.00 |
| Evidence (materials for use at depositions) | $102.45 |
| Express Mail | $55,864.12 |
| Filing Fees | $1,465.11 |
| Hearing Transcripts | $19,830.46 |
| Hosting | $121,752.74 |
| Hotels | $215,659.13 |
| Image Endorsement | $1,799.64 |
| Licensing Fees | $18,460.79 |
| Local Travel | $41,886.44 |
| Meals | $31,677.38 |
| Meals During Travel | $20,381.25 |
| Media Create/Duplication | $15,030.09 |
| Messenger | $9,776.21 |
| Miscellaneous (office supplies purchased from outside vendors for use during hearings/court connection fees, library fees) | $11,133.90 |
| Native File Printing | $1,147.77 |
| OCR | $352.43 |
| Off-site Document Services (e.g., at cost billing - bindings, binder, tabs, folders, copy performed by outside vendors) | $211,496.14 |
| Online Research | $219,890.15 |
| Other Litigation Support Services (including outside labor charges) | $23,640.75 |
| Outside Record Production | $340.94 |
| PACER | $3,578.08 |
| Paralegal Overtime | $14,297.48 |

| DESCRIPTION | AMOUNT |
|---|---:|
| Parking | $4,375.68 |
| Postage | $1,043.54 |
| Professional Services (court and process servers) | $54,066.33 |
| Publication (purchase of research materials) | $23.98 |
| Record Production | $45.00 |
| Telecopier | $361.44 |
| Telephone | $8,734.07 |
| Translation | $250.00 |
| Travel | $15,430.48 |
| Travel (internet/baggage) | $3,404.68 |
| Trial Materials | $8.98 |
| UK Court Ordered Litigation Reimbursement | $50,878.35 |
| Vendor Charges For Document Management System | $21,128.65 |
| Video Deposition Transcripts | $38,855.82 |
| Refund (credit relating to IT expenses) | -$2,623.17 |
| **SUBTOTAL** | **$2,181,404.70** |
| **Additional Expenses** | **$5,233.62** |
| **TOTAL** | **$2,186,638.32** |

QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Susheel Kirpalani (SK8926)
James C. Tecce (JT5910)
Olga M. Urbieta (OU0612)

*Special Counsel for the Official
Committee of Unsecured Creditors of
Lehman Brothers Holdings Inc., et al.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| --------------------------------------------------- x | | |
| In re: | : | Chapter 11 Case |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., | : | No. 08-13555 (JMP) |
| et al. | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| --------------------------------------------------- x | | |

**FINAL APPLICATION OF QUINN EMANUEL URQUHART
& SULLIVAN, LLP FOR ALLOWANCE OF COMPENSATION FOR PROFESSIONAL
SERVICES RENDERED AND EXPENSES INCURRED DURING
THE PERIOD SEPTEMBER 17, 2008 THROUGH MARCH 5, 2012**

Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), Special Counsel to

the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al. (the

"Committee"), by this application (the "Application"), respectfully moves this Court, pursuant to

sections 330 and 331 of title 11 of the United States Code, §§ 101-1532 (the "Bankruptcy Code"),

and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the

Amended Administrative Order, pursuant to sections 105(a) and 331 of the Bankruptcy Code

establishing procedures for interim compensation and reimbursement of expenses of

professionals, dated April 14, 2011, (as amended, the "Compensation Order"), for allowance of

final compensation for professional services rendered in the amount of $40,757,246.10 and

1

reimbursement of actual, reasonable, and necessary out-of-pocket expenses incurred in the

amount of $2,186,638.32 during the period beginning September 17, 2008 through and including

March 5, 2012 (the "Fee Period" or the "Final Compensation Period"), and, in support thereof,

respectfully represents as follows:

## I.    PRELIMINARY STATEMENT

1.        These chapter 11 cases have been marked by exceptionally complex

litigation involving intricate, multi-billion dollar transactions.  As special counsel to the

Committee, Quinn Emanuel has been devoted to substantially advancing the rights of all

unsecured creditors and has made significant contributions to that effort.

2.        As special counsel, Quinn Emanuel was responsible for, among other

things, investigating and prosecuting claims and causes of action against major financial

institutions from which the Committee's main counsel, Milbank, Tweed, Hadley & McCloy LLP

("Milbank Tweed"), is conflicted.  Such financial institutions were parties to complex financial

transactions with Lehman, and include JP Morgan Chase Bank, N.A. ("JPMC"), Citibank, N.A.

("Citibank"), Barclays Capital, Inc. ("Barclays"), and Bank of America, N.A. ("BofA").

Additionally, Quinn Emanuel reviewed the claims of these financial institutions and was

responsible for matters filed by these, and all other entities where the Committee's lead counsel

was conflicted, including with respect to complex derivatives claims filed against the estates.  A

summary of the significant litigations where Quinn Emanuel represented the Committee follows.

3.        JPMC Litigation.  Quinn Emanuel has devoted significant resources

to prosecuting considerable causes of action against JPMC, seeking the recovery of billions of

assets the Committee and the estates maintain were transferred fraudulently, and reconciling the

more than $25 billion in claims JPMC has filed against these estates.  Pursuant to a litigation

protocol among the Debtors and the Committee, Quinn Emanuel has played a lead role with

respect to prosecuting the forty nine (49) count complaint against JPMC seeking, among other things, the recovery of transfers in excess of $8 billion and the avoidance of eleventh-hour guaranties. For example, Quinn Emanuel attorneys have been involved in conducting discovery in connection with the JPMC adversary proceeding, including third party discovery (including through foreign depositions via the Hague Convention) and discovery of high-ranking government officials. Quinn Emanuel attorneys have also engaged in ongoing factual development by reviewing the extensive record, including projects to synthesize and summarize key deposition testimony and documents for later use in expert reports and summary judgment motions.

4.      Quinn Emanuel attorneys have prepared for and taken the depositions of one hundred thirty eight (138) current and former JPMC witnesses and third party witnesses and coordinated with and supported Curtis, Mallet-Prevost, Colt & Mosle LLP (Lehman Brothers Holdings Inc. ("LBHI") counsel) in taking and/or defending an additional eighty eight (88) depositions of former Lehman employees and other third party witnesses. Moreover, time was spent researching recent authorities and preparing a supplemental brief in further opposition to JPMC's motion to dismiss the adversary proceeding.

5.      Quinn Emanuel also worked with retained experts to analyze issues central to the litigation with JPMC and identified and retained additional experts. Quinn Emanuel attorneys have taken the lead in all areas of plaintiffs' work with experts, but have worked in concert with LBHI's counsel, financial advisor and the estate to ensure that pre-existing estate resources are leveraged appropriately to assist and support the work of experts retained specifically for the adversary proceeding and in the analysis of JPMC's claims against the LBHI estate.

3

6.          Quinn Emanuel attorneys have also been engaged in substantial pre-trial motion practice. Quinn Emanuel drafted papers in connection with dispositive motions filed in the proceedings. Quinn Emanuel attorneys also worked closely with co-counsel to prepare extensive briefing on the Supreme Court's decision in *Stern v. Marshall.*

7.          Significant time was also devoted to preparing and filing an objection to portions of JPMC's proofs of claim related to triparty repo financing and pursuing related discovery. Quinn Emanuel attorneys took the lead in drafting an objection to JPMC's claims against the LBHI estate related to derivatives contracts between Lehman Brothers Special Finance ("LBSF") and Washington Mutual Bank, FA ("WaMu" and the objection the "WaMu Objection"). Plaintiffs engaged in negotiations with JPMC leading to an agreement through which JPMC did not oppose the WaMu Objection, which resulted in an $80.3 million reduction in claims against the estate. The Court signed its order to this effect on June 3, 2011.

8.          Finally, Quinn Emanuel filed, litigated, and settled an objection to claims filed against LBHI by funds managed by JPMC affiliates. The negotiations ultimately resulted in a settlement of the objection on favorable terms, returning almost $700 million in cash collateral to the LBHI estate. The Court approved the settlement on February 15, 2012. Quinn Emanuel continues to prosecute the JPMC litigation.

9.          Citibank Litigation. Quinn Emanuel, together with LBHI's counsel, spent significant time reviewing the relationship between Citibank and the Lehman estates, including not only affirmative estate claims but also the reconciliation of the more than $2 billion of claims Citibank has asserted against the Lehman estates. These efforts included, among other things, researching and preparing, with LBHI counsel, a complaint against Citibank. On February 8, 2012, LBHI and the Committee, as proposed intervenor, filed the complaint against Citibank and certain of its affiliates challenging, among other things, Citibank's entitlement to setoff a $2

4

billion special deposit that LBHI provided in June 2008 against Citibank's general indebtedness, the enforceability of Citibank's September 9, 2008 Guaranty, and the right to $500 million transferred to LBI (and then Citibank) on the eve of the bankruptcy filings.

10.        <u>BofA Litigation</u>.  On November 26, 2008, BofA commenced an adversary proceeding seeking a declaratory judgment ratifying a post-petition offset of approximately $509 million dollars deposited by LBSF and LBHI in various BofA accounts against amounts allegedly owed to it under certain derivatives contracts.  On January 2, 2009, the Debtors answered BofA's complaint and filed a counter-suit against BofA.  Quinn Emanuel represented the Committee, as intervenor, in the BofA litigation.

11.        Quinn Emanuel attorneys participated in this litigation on the Committee's behalf including participation at depositions and the submission of summary judgment briefs.  Quinn Emanuel also participated in a three day motion to dismiss hearing on January 2010, after which, on November 16, 2010, the Bankruptcy Court issued its decision (the "<u>BofA Decision</u>") granting a motion for summary judgment filed by LBHI and LBSF and ordering BofA to return $500 million plus interest to the Debtors.  Following an appeal, the proceeding ultimately settled on November 16, 2011.

12.        <u>Barclays Litigation</u>.  In September 2008, the estates sold substantially all of their assets relating to the North American broker-dealer business to Barclays.  After the sale, the Committee became involved in extensive discovery from Barclays concerning the transaction which resulted in each of the Committee, LBHI and the SIPA Trustee filing detailed motions pursuant to Rule 60(b) of the Federal Rules of Civil Procedure seeking relief from the Sale Order (the "<u>Rule 60(b) Motions</u>").  The Rule 60(b) Motions requested reconsideration of the Court's orders approving the sale and, with complaints filed concurrently with those motions, requested the recovery of more than $10 billion to the estates.

13.        The litigation with Barclays intensified as the movants participated in extensive and compressed discovery.  The Court conducted a bench trial that spanned nine months regarding the Rule 60(b) Motions in which Quinn Emanuel attorneys participated extensively on the Committee's behalf.  The Court issued its 103 page decision on the Rule 60(b) Motions in February 2011.

14.        <u>Derivative Transactions</u>.  Quinn Emanuel attorneys devoted significant time to reviewing numerous derivatives transactions to which the Debtors were parties and represented the Committee on numerous derivatives mediations.  As a direct result of the contributions of Quinn Emanuel, the Committee, and the Debtors' other professionals, the estates obtained significant judgments and have preserved and significantly enhanced the value of estate assets.

15.        Quinn Emanuel has been extensively involved in significant, "high stakes" litigation with Lehman's largest and most sophisticated creditors.  These litigations have been complex and protracted involving billions of dollars and myriad complex transactions.  Lehman has been party to most of these proceedings as well; but, on matters where Quinn Emanuel represents the Committee and where the estates are also a party, Quinn Emanuel has made every effort to coordinate its efforts with estate counsel and avoid unnecessary duplication.  Accordingly, the fees and expenses charged by Quinn Emanuel were reasonable, necessary and beneficial to these estates.

## II.    JURISDICTION AND VENUE

16.        This Court has jurisdiction to hear and determine the Application pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 330 and 331 of the Bankruptcy Code.  Pursuant to the Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991 and

amended April 21, 1995 (the "Local Guidelines"), a certification regarding compliance with the

Local Guidelines is attached hereto as Exhibit A.

### III.    GENERAL BACKGROUND

17.    On September 15, 2008, and periodically thereafter (the "Petition

Date"), LBHI, and certain of its subsidiaries and affiliated entities (collectively, the "Debtors")

filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the

"Chapter 11 Cases"). Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors

are operating their business and managing their properties as debtors in possession.

18.    On September 17, 2008, the United States Trustee appointed the

Committee pursuant to section 1102 of the Bankruptcy Code.

### IV.    RETENTION OF QUINN EMANUEL

19.    On October 21, 2008, the Committee filed its Application Under 11

U.S.C. §§ 328 and 1103 and Fed. R. Bankr. P. 2014 and 5002, for Order Authorizing Retention

and Employment of Quinn Emanuel Urquhart Oliver & Hedges, LLP, as Special Counsel, Nunc

Pro Tunc to September 17, 2008 (the "Retention Application").

20.    On November 21, 2008, this Court entered the Final Order

Authorizing Retention and Employment of Quinn Emanuel Urquhart Oliver & Hedges, LLP, as

Special Counsel to the Official Committee of Unsecured Creditors of Lehman Brothers Holdings

Inc. et al., Nunc Pro Tunc to September 17, 2008 (the "Retention Order"). A true and correct

copy of the Retention Order is attached hereto as Exhibit B.

21.      On October 11, 2008, the Debtors filed a Motion Pursuant to Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) for Authorization to Establish Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals (the "Compensation Motion").

22.      The Compensation Order establishes a procedure for, inter alia, the payment of interim fees and expenses to professionals employed by the Committee on a monthly basis. Quinn Emanuel, on a monthly basis, has been preparing and serving monthly fee statements in accordance with the Compensation Order.[1] A copy of the Compensation Order is attached as Exhibit C.

## V.      MONTHLY FEE STATEMENTS AND QUARTERLY APPLICATIONS

23.      Quinn Emanuel submitted its first quarterly fee application on April 10, 2009 requesting $2,129,413.50 in fees and $41,113.30 in expenses for the period commencing September 15, 2008 through January 31, 2009 (the "First Interim Fee Application").

24.      Quinn Emanuel submitted its second quarterly fee application on August 14, 2009 requesting $820,579.50 in fees and $28,104.76 in expenses for the period commencing February 1, 2009 through May 31, 2009 (the "Second Interim Fee Application").

25.      Quinn Emanuel submitted its third quarterly fee application on December 14, 2009 requesting $2,248,453.00 in fees and $144,241.20 in expenses for the period commencing June 1, 2009 through September 30, 2009 (the "Third Interim Fee Application").

26.      Quinn Emanuel submitted its fourth quarterly fee application on April 16, 2010 requesting $2,829,628.18 in fees and $191,748.74 in expenses for the period commencing October 1, 2009 through January 31, 2010 (the "Fourth Interim Fee Application").

27.     Quinn Emanuel submitted its fifth quarterly fee application on August 16, 2010 requesting $3,480,537.09 in fees and $281,095.21 in expenses for the period commencing February 1, 2010 through May 31, 2010 (the "Fifth Interim Fee Application").

28.     Quinn Emanuel submitted its sixth quarterly fee application on December 16, 2010 requesting $3,187,890.63 in fees and $259,395.28 in expenses for the period commencing June 1, 2010 through September 30, 2010 (the "Sixth Interim Fee Application").

29.     Quinn Emanuel submitted its seventh quarterly fee application on June 2, 2011 requesting $4,835,788.00 in fees and $155,800.04 in expenses for the period commencing October 1, 2010 through January 31, 2011 (the "Seventh Interim Fee Application").

30.     Quinn Emanuel submitted its eighth quarterly fee application on August 15, 2011 requesting $5,557,558.50 in fees and $194,469.22 in expenses for the period commencing February 1, 2011 through May 31, 2011 (the "Eighth Interim Fee Application").

31.     Quinn Emanuel submitted its ninth quarterly fee application on December 14, 2011 requesting $6,632,263.50 in fees and $398,662.27 in expenses for the period commencing June 1, 2011 through September 30, 2011 (the "Ninth Interim Fee Application").

32.     Quinn Emanuel submitted its tenth quarterly fee application on May 21, 2012 requesting $8,380,343.00 in fees and $486,774.68 in expenses for the period commencing October 1, 2011 through March 5, 2012 (the "Tenth Interim Fee Application").  A chart summarizing the amounts requested and approved in Quinn Emanuel's prior fee applications is attached hereto as Exhibit D.

---

[1]     Pursuant to the Compensation Order, if no timely objections are filed to Quinn Emanuel's monthly fee statements, Quinn Emanuel is paid 80% of its fees and 100% of its expenses.

33.    This Application is Quinn Emanuel's final fee application and seeks payment of compensation and reimbursement of expenses for services rendered to the Committee in amounts that have been invoiced to the Debtors for the period from September 17, 2008 through March 5, 2012.[2]

34.    This Application requests that the Court (a) approve fees in the total amount of $40,757,246.10, and reasonable out-of-pocket expenses in the amount of $2,186,638.32 incurred by Quinn Emanuel for services rendered in the Chapter 11 Cases during the Fee Period and (b) award and order to be paid to Quinn Emanuel the balance of any such fees, costs and expenses that remain unpaid, after deducting payments already received by Quinn Emanuel pursuant to the Compensation Order.

35.    As of the conclusion of the Fee Period, Quinn Emanuel has incurred fees in the amount of $245,303.60 for the preparation of the December, January, February, and March monthly statements, the Tenth Interim Fee Application, as well as, this Application.

36.    Quinn Emanuel has also incurred $38,435.00 in fees and $5,233.62 in expenses that were inadvertently not included in any of the interim fee applications.

37.    The fees and expenses requested are reasonable, and all amounts requested were for actual and necessary services rendered on behalf of the Committee.

---

[2]    Quinn Emanuel also seeks $38,435.00 in fees that were inadvertently excluded from previous interim fee applications because among other things, the corresponding fees were processed after the interim fee period and therefore were not included in the application for that particular fee period. It also seeks $245,303.60 in fees that were incurred after the effective date in preparing monthly and interim fee statements as well as this final fee application. Furthermore, Quinn Emanuel includes $5,233.62 in expenses that were inadvertently excluded from previous interim fee applications because among other things, the corresponding expenses were processed after the interim fee period and therefore were not included in the application for that particular period.

38.        Quinn Emanuel has not entered into any agreement, express or implied, with any other party for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in these cases. No promises have been received by Quinn Emanuel or any member thereof as to compensation in connection with these cases other than in accordance with the provisions of the Bankruptcy Code.

## VI.    SUMMARY OF PROFESSIONAL SERVICES RENDERED

39.        Pursuant to the guidelines promulgated by the United States Trustee, Quinn Emanuel classified all services performed for which compensation is sought into separate categories. Quinn Emanuel attempted to place the services performed in the category that best relates to the services provided. However, because certain services may relate to one or more categories, services pertaining to one category may be included in another category. Schedule 1, attached hereto, lists each timekeeper, his or her respective billing rate, professional information, and the total number of hours expended on this case. Schedule 2, attached hereto, summarizes the professional and paraprofessional time expended by project category. Timekeeping entries and Quinn Emanuel invoices provide detailed descriptions of all services rendered by each of these categories.

40.        The following summary is intended only to highlight key services rendered by Quinn Emanuel in certain project billing categories where Quinn Emanuel has expended a considerable number of hours on behalf of the Committee, and is not meant to be a detailed description of all of the work performed.

### A.    General Case Administration (Hours: 684.00; Fees: $218,164.50)

41.        Quinn Emanuel served as special counsel to the Committee in respect of numerous matters, including various estate litigations against major financial institutions. As special counsel, Quinn Emanuel also represented the Committee on matters where its main

11

counsel, Milbank Tweed, was conflicted. To that end, its attorneys kept abreast of the various pleadings filed in the Chapter 11 Cases and in various adversary proceedings. Accordingly, throughout the Chapter 11 Cases, time was spent reviewing pleadings filed each day in the Debtors' cases and various adversary proceedings. In order to create cost savings to the estate, Quinn Emanuel arranged for a specially trained staff attorney (who billed at a rate lower than a first year associate) to conduct a review and assessment of newly filed pleadings (including, without limitation, whether the pleadings raised issues of concern to the Committee, or were filed in proceedings where the Committee was a party). In connection with such review, the Quinn Emanuel attorney created and updated reports tracking the status of various matters in the cases and certain of the adversary proceedings. These charges were part of Quinn Emanuel's efforts to prosecute estate claims, were integral to the litigation effort, and were an important part of its role as special counsel to the Committee.

**B.**     **Claims Analysis/Objections  (Hours: 602.00, Fees: $320,174.50)**

42.          Since the inception of the Chapter 11 Cases, Quinn Emanuel attorneys and the Committee's retained professionals continually engaged in the task of reviewing and analyzing a wide variety of claims asserted against the Debtors' estates. The following summaries highlight the key claims reviewed by Quinn Emanuel.

43.          **SMBC Motion.** On October 15, 2008, Sumitomo Mitsui Banking Corporation ("SMBC") filed a motion ("SMBC Motion") seeking relief from the automatic stay to recover certain collateral it maintained was pledged in connection with its credit agreement with certain Lehman entities. After reviewing the SMBC Motion and its effect on the estates, Quinn Emmanuel attorneys coordinated with the Debtors regarding a joint (and non-duplicative) response to the SMBC Motion. On October 31, 2008, Quinn Emanuel, on behalf of the Committee, filed an objection to the SMBC Motion. In support of its objection, (and the Debtors'

objection), Quinn Emanuel attorneys prepared for and attended a deposition of an SMBC

principal.  On November 20, 2008, Quinn Emmanuel prepared for and appeared on behalf of the

Committee at the hearing on the SMBC Motion and the Committee's objection.  In December

2008, the Debtors and Sumitomo entered into a stipulation resolving their dispute (the "Sumitomo

Settlement").  In January 2009, the parties amended the Sumitomo Settlement to make certain

non-substantive changes.  On June 2, 2009, Sumitomo and the Debtors filed a second amendment

to the Sumitomo Settlement (the "Second Amendment").  On or about January 15, 2010, SMBC,

LBHI and Lehman Commercial Paper Inc. ("LCPI") entered into a draft third amendment (the

"Third Amendment") to the Sumitomo Settlement.  The Third Amendment permitted LBHI and

LCPI to promptly liquidate some of Sumitomo's collateral.  Moreover, the Third Amendment

permitted the parties to liquidate more collateral in the future, subject to the Committee's consent.

Quinn Emanuel attorneys analyzed the Sumitomo Settlement and the amendments to determine

the effect on the estates, and to ensure they did not have any negative implications for the

unsecured creditors.  Quinn Emanuel attorneys also dedicated time to consulting with the

Committee's financial advisors regarding the economics of the proposed amendments.

     44.      Barclays-JPMC Settlement.  On December 5, 2008, the Trustee filed

a motion (the "Barclays-JPMC Motion") to approve a settlement between LBI, Barclays, and

JPMC, resolving a dispute over certain funds and cash that Barclays alleged JPMC failed to remit

to Barclays following Barclays' purchase of the Debtors' North American broker-dealer

businesses and certain other assets (the "Sale Transaction").  Quinn Emanuel attorneys reviewed

and analyzed the Barclays-JPMC Motion to ascertain its effect on the estates and specifically the

Committee's investigation into critical aspects of the Sale Transaction and its attempts to arrive at

a final reconciliation.  Quinn Emanuel also prepared a detailed, but limited, objection to the

Barclays-JPMC Motion setting forth extensive facts (through a substantiating declaration)

13

concerning the Sale Transaction (the "Committee Objection"). Quinn Emanuel, on behalf of the Committee, interposed the Committee Objection to the extent that the Barclays-JPMC Motion made definitive findings regarding the Sale Transaction that bound the Committee or its investigation. Quinn Emmanuel also prepared for and appeared on behalf of the Committee at the hearing on the Barclays-JPMC Motion and the Committee Objection on December 22, 2008, after which the Court approved the settlement subject to the critical reservations of rights enunciated by the Committee in its objection.

45.    Barclays-DTC Settlement.  On January 22, 2009, the trustee (the "Trustee") appointed in the SIPA liquidation proceeding of Lehman Brothers Inc. ("LBI") filed a motion (the "Barclays-DTC Motion") to approve a settlement between LBI, Barclays, and the Depository Trust & Clearing Corporation (together with its affiliates, the "DTC") resolving a dispute over securities that were intended to be transferred by the DTC to Barclays as part of the Sale Transaction (but were, in fact, not transferred to Barclays). Quinn Emanuel attorneys analyzed the Barclays-DTC Motion to determine its effect on the Committee's investigation into the Sale Transaction and the estates generally. Quinn Emanuel attorneys also spent time reviewing the relief requested in the Barclays-DTC Motion with counsel to the Trustee and the Debtors to ascertain its benefits and ensure it did not have any negative implications for the Committee or the estates. Following these discussions, Quinn Emanuel prepared and filed, on the Committee's behalf, a limited objection to the Barclays-DTC Motion, which was resolved on the record at the hearing on the Barclays-DTC Motion on February 11, 2009.

46.    Citibank Stipulations    On April 6, 2009, the Debtors filed two notices of presentment of stipulation and order authorizing (1) turnover of postpetition deposits with Citibank, and (2) indemnification of Citibank in respect of any third party claims arising from the turnover of postpetition deposits (the "Citibank Stipulations"). Pursuant to the Citibank

14

Stipulations, Citibank agreed to cooperate with the Debtors to turn over certain postpetition deposits. Both parties reserved their rights with respect to Citibank's assertion of its setoff rights and adequate protection or administrative priority claims with respect to the amounts turned over to the Debtors; the Debtors retained the right to dispute or object to Citibank's claims. Quinn Emanuel attorneys reviewed and analyzed the Citibank Stipulations to ascertain their benefits and ensure they did not have any negative implications for the Committee or the estates. On April 15, 2009, an order authorizing the Citibank Stipulations was entered.

47.    HSBC Stipulation. On May 1, 2009, LBHI and HSBC Bank Plc ("HSBC") filed a proposed stipulation, agreement and order (the "HSBC Stipulation") seeking permission for HSBC to offset considerable amounts against LBHI. The HSBC Stipulation alleged that prior to September 2008, LBHI, Lehman Brothers International (Europe) ("LBIE") and Lehman Brothers Limited maintained customer clearance accounts (the "Customer Accounts") at HSBC. On September 9, 2008, HSBC and LBHI executed a Deed (the "Deed"), creating an LBHI collateral account (the "Collateral Account") and granting HSBC the right to apply funds in the Collateral Account against "Debts." Moreover, on October 31, 2008, the Royal Bank of Scotland ("RBS") mistakenly wired approximately £605,000.00 to an LBHI customer account. As of April 23, 2009, the Customer Accounts were overdrawn by £100,062,061.97. As of April 28, 2009, the Collateral Account balance was €343,446,459.96 (the "Collateral Funds").

48.    The HSBC Stipulation requested authority to set off approximately €343 million in the Collateral Account maintained at HSBC against (i) HSBC's overdraft exposure (which HSBC maintained was approximately £100 million) and (ii) amounts purportedly owing from LBHI to RBS in respect of a misdirected wire transfer (approximately £605 thousand). Given the significance of this transaction, Quinn Emanuel attorneys dedicated

15

time to examining the HSBC Stipulation to determine its effect on the estate, to ensure it did not

have any negative implications for the unsecured creditors.

49.    _Pacific Life Motion._  On October 22, 2009, Pacific Life Insurance

Company ("_Pacific Life_") sought authority to submit a late-filed claim (and related questionnaire)

against LBHI totaling approximately $45.3 million on account of an alleged LBHI guaranty

relating to its 1997 ISDA Master Agreement with LBIE (the "_Pacific Life Motion_").  Pacific Life

maintained it missed the filing deadline because two of its employees monitoring the Debtors'

cases became confused about which of the two would file the claim on Pacific Life's behalf.  The

Debtors objected to the Pacific Life Motion, arguing it failed to satisfy "excusable neglect"

standards because the mistakes that prevented it from complying with the deadline were entirely

within its own control.  After carefully reviewing the Pacific Life Motion, Quinn Emanuel

attorneys submitted a joinder on the Committee's behalf in the Debtors' objection on November

13, 2009.  On November 18, 2009, Quinn Emanuel attorneys argued in support of the

Committee's joinder in the Debtors' objection.

50.    _ZAO-Citibank Motion._  On November 3, 2009, LBHI filed a motion

pursuant to section 542(b) of the Bankruptcy Code, for entry of an order directing ZAO Citibank

(Russia) ("_ZAO_") to turnover post-petition receipts (the "_ZAO Citibank Motion_").  Earlier in the

cases, the estates agreed that Citibank would turn over to the estates the Debtors' various post-

petition receipts deposited in the Debtors' bank accounts with Citibank throughout the world.

Although ZAO is obligated to turn over post-petition receipts pursuant to the turnover stipulation,

Russian law may have prevented Citibank from turning over the funds and thus reinstating the

LBHI's (UK) account into overdraft.  Accordingly, to facilitate compliance with the requirements

of Russian banking and other law, ZAO requested that LBHI obtain an order of the Court

directing it to turn over post-petition receipts from ZAO.  Quinn Emanuel attorneys dedicated

time to reviewing the ZAO Citibank Motion to determine its effect on the estates and unsecured

creditors. Ultimately, the Court granted the ZAO Citibank Motion on December 15, 2009.

51.        Trustee Settlement Motion. On November 20, 2009, the Trustee filed

a motion seeking a limited settlement and compromise (the "Trustee Settlement Agreement")

among the Trustee and Barclays regarding the transfer of certain Private Investment Management

("PIM") customer accounts to Barclays for the benefit of the PIM customers (the "Trustee

Settlement Agreement Motion"). The Trustee Settlement Agreement implemented certain

transactions designed to complete the transfer of the remaining PIM assets to Barclays. In

addition to authorizing the prospective transfers with respect to the PIM accounts, the Trustee

Settlement Agreement also sought to ratify the actions that the Trustee had taken since the filing

date with respect to its prior transfers of customer accounts. As set forth in the Trustee Settlement

Agreement Motion, the Trustee had transferred approximately $92 billion in assets for the benefit

of over 110,000 former LBI customers.

52.        Given the significance of the relief requested, Quinn Emanuel

attorneys dedicated significant time to reviewing and analyzing the motion and the modifications

to determine its effect on the estates and to ensure it did not have any negative implications for

the unsecured creditors, including in connection with the estates' Rule 60(b) litigation involving

Barclays. To that end, Quinn Emanuel attorneys participated in numerous meetings (both

telephonically and in-person) with advisors to the Trustee and LBHI and with the Committee's

financial advisors to gain a better understanding of the Trustee Settlement Agreement and its

potential impact on the Debtors and their estates. On December 14, 2009, an order was signed

approving the Trustee Settlement Agreement, completing the PIM conversion and terminating the

account transfer process.

C.    **Hearings and Court Communications (Hours: 1,264.30; Fees: $805,997.50)**

53.    Throughout the Chapter 11 Cases, Quinn Emanuel attorneys, on behalf of the Committee, have prepared for and attended certain regularly scheduled omnibus hearings where matters being handled by Quinn Emanuel were being presented for consideration, and specially scheduled hearings with respect to adversary proceedings where it represented the Committee.  To prepare for these hearings, Quinn Emanuel attorneys often expended considerable time reviewing and analyzing documents, including correspondence and pleadings, and conducting independent legal and factual research.  Notable court appearances include:

- on February 11, 2009, Quinn Emanuel attorneys were called upon to present oral argument with respect to the Barclays-DTC Motion and the Committee's response to that settlement.

- on December 11, 2009, Quinn Emanuel attorneys prepared for a hearing on Barclays' motion to compel privileged documents from the Committee in the Rule 60 litigation.

- on December 16, 2009, Quinn Emanuel attorneys presented a motion requesting the issue of letters of request regarding discovery in the United Kingdom from the Financial Services Authority (the "FSA") and PricewaterhouseCoopers LLP and PricewaterhouseCoopers International Limited (together, "PwC").

- Quinn Emanuel attorneys appeared at the BofA adversary proceeding summary judgment hearing on December 10, 2009 and an evidentiary hearing starting on January 29, 2010.

- from April 26, 2010 through May 7, 2010, and again on June 21-22, 2010, June 25, 2010, August 23-25, 2010, August 27, 2010, August 30-31, 2010,

18

September 2, 2010, September 7-8, 2010, September 10, 2010, September

20-21, 2010, September 28-30, 2010, October 4-7, 2010, and October 21,

2010, Quinn Emanuel attorneys prepared for and attended the bench trial

on the Rule 60(b) Motions.  The following list explains the tasks assigned

to each attorney present through the Barclays trial:

| TIMEKEEPER | DUTIES |
|---|---|
| Richard I. Werder, Jr. | Prepared to examine certain witnesses; assisted with trial strategy. |
| Susheel Kirpalani | Prepared to examine certain witnesses; assisted with trial strategy. |
| James C. Tecce | Prepared to argue attorney client and work product issues; witness preparation; assisted with trial strategy. |
| Erica Taggart | Prepared to examine certain witnesses; assisted with trial strategy. |
| Eric M. Kay | Familiar with exhibits, documents and witnesses; assisted with trial strategy. |
| Robert K. Dakis | Most familiar with exhibits produced by Barclays and Debtors; conducted spot research assignments; updated exhibit list; added exhibits; assisted with trial strategy. |
| Tyler G. Whitmer | Most familiar with exhibits produced to Barclays; conducted spot research assignments; assisted with trial strategy. |
| Olga M. Urbieta | Conducted spot research assignments; familiar with exhibits and exhibits list; updated exhibit list; added exhibits. |

- on May 10, 2011, Quinn Emanuel attorneys participated in the day-long

  argument on JPMC's motion to dismiss all of the estates' claims against

  JPMC.  In order to streamline trial presentation, John Quinn took a lead

  role of presenting the Committee's position; however, given the importance

19

of the argument and the breadth of the issues, those attorneys responsible for specific issues were also present at the hearings.

- on December 30, 2011, Quinn Emanuel attorneys participated in a hearing on JPMC's motion to withdraw the reference before United States District Court Judge Sullivan.

- on February 15, 2012, Quinn Emanuel attorneys participated in a hearing on the Asset Management Objection (defined below) settlement.

- on April 26, 2012, Quinn Emanuel attorneys participated in a hearing on JPMC's motion to strike portions of the Deficiency Objection (defined below).

| TIME KEEPER | DUTIES |
|---|---|
| Daniel P. Cunningham | Responsible for JPMC derivatives-related matters. |
| Erica Taggart | Responsible for preparing John Quinn for oral argument; responsible for overall JPMC case knowledge and strategy; responsible for litigation aspects of JPMC case. |
| John B. Quinn | Presented oral argument on JPMC's motion to dismiss. |
| James C. Tecce | Responsible for preparing John Quinn for oral argument; responsible for overall knowledge of Lehman case and background; responsible for bankruptcy aspects of JPMC case. |
| Andrew J. Rossman | Assisted in preparation of John Quinn for oral argument; responsible for overall JPMC case knowledge and strategy; responsible for litigation aspects of JPMC case. |

### D.    Unsecured Creditors Issues/Meetings/Communication  (Hours: 1,053.90, Fees: $743,969.50)

54.        Numerous issues arose during the Fee Period requiring meetings of the Committee ("Committee Meetings").  Committee Meetings generally occurred weekly, either via teleconference or in person.  The meetings generally addressed the significant issues in the cases at that time, e.g., the Debtors' pending motions, asset sales, settlements, the status of

20

various investigations, the status of litigations, Committee operational issues, and various other matters related to the Debtors' cases. Quinn Emanuel attorneys were often called upon to present the results of its legal and factual research to the Committee. Due to the enormity of the cases and the complexity of issues, considerable time was often spent preparing for the Committee Meetings.

### E.    Non-Derivative Adversary Proceedings (Hours: 68,652.40; Fees: $32,189,677.00)

55.    Time billed to this category generally relates to litigation that Quinn Emanuel, as special counsel to the Committee, is pursuing or pursued against certain entities in furtherance of the Committee's obligations as a fiduciary for the Debtors' unsecured creditors. Consistent with Quinn Emanuel's role as special counsel to the Committee, the majority of the services Quinn Emanuel provided relate to litigation. For that reason, most of the time in Quinn Emanuel's application falls into this category. It also principally involves claims asserted by the estates against (and claims asserted against the estates by) four primary entities: JPMC, Barclays, BofA, and Citibank totaling billions of dollars and involving a host of complex transactions.

1.    **JPMorgan Litigation**. On December 2, 2009, the Committee and LBHI ("Plaintiffs") co-signed a memorandum (the "Protocol") governing, among other things, the joint prosecution of claims against JPMC. The Protocol provides that the Committee, through its counsel Quinn Emanuel, will play a significant role in any litigation involving the prosecution of these claims. Pursuant to the terms of the Protocol, Quinn Emanuel worked with LBHI's counsel, Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis"), to develop potential claims against JPMC, conduct the legal and fact research required effectively to plead those claims, and draft an adversary complaint.

56.        Quinn Emanuel attorneys also spent considerable time coordinating with Curtis, Alvarez & Marsal ("A&M") and the estate on all issues in the litigation, from strategy to logistics, to avoid duplication of efforts, to establish appropriate distribution of labor and to ensure the effective, and efficient use of estate resources.

57.        Quinn Emanuel attorneys spent considerable time coordinating the research and drafting of the complaint with Curtis.[3]  On May 26, 2010, LBHI and the Committee filed an adversary complaint against JPMC asserting both common law claims and avoidance claims to seek the return of billions of dollars in value to the LBHI estate by invalidating certain guaranties and security agreements entered into in the weeks before LBHI filed for bankruptcy relief.

58.        The complaint identifies the Committee as a proposed plaintiff intervenor.  Accordingly, Quinn Emanuel attorneys spent time drafting a motion for the Committee to intervene in the proceedings, which was filed on May 26, 2010.  Following negotiations among Quinn Emanuel attorneys and counsel to JPMC, on June 24, 2010, the Court issued an order authorizing the Committee's intervention in the JPMC litigation for all purposes.

59.        As set forth more fully below, Quinn Emanuel attorneys have devoted substantial time to prosecuting Plaintiffs' claims against JPMC and defending against counterclaims asserted by JPMC.  In particular, Quinn Emanuel attorneys were involved in

(i) conducting document discovery in connection with the adversary proceeding with JPMC,

(ii) resolving discovery disputes, including with JPMC and Barclays,

---

[3]      Indeed, at this time, the Committee had already requested and obtained Bankruptcy Rule 2004 discovery from JPMC.

(iii) engaging in additional party discovery (including through interrogatories and 30(b)(6) deposition notices), further non-party discovery (including through foreign depositions via the Hague convention), and discovery of high-ranking government officials,

(iv) preparing for and taking one hundred and thirty eight (138) depositions of current and former JPMC and third party witnesses and coordinating and supporting Curtis in participating in an additional eighty eight (88) depositions of former Lehman employees and other third party witnesses,

(v) engaging in ongoing factual development by reviewing the very large record, including projects to synthesize and summarize key deposition testimony and documents for later use in expert reports and summary judgment motions,

(vi) working with retained experts to analyze issues central to the litigation with JPMC and identifying and retaining additional experts,

(vii) working with retained non-testifying experts to analyze issues central to the litigation with JPMC and identifying and retaining additional non-testifying experts,

(viii) preparing responsive papers regarding JPMC's motion to dismiss the JPMC complaint, including a brief in opposition and a supplemental brief months later,

(ix) preparing for and arguing JPMC's motion to dismiss before the Court,

(x) briefing Plaintiffs' motion to dismiss JPMC's amended counterclaims,

(xi) analyzing potential objections to JPMC's claims against the LBHI estate,

(xii) filing, litigating and settling an objection to claims filed against LBHI by funds managed by JPMC affiliates (the "Asset Management Objection").

23

(xiii) preparing and filing an objection to portions of JPMC's proofs of claims related to triparty repo financing (the "<u>Deficiency Objection</u>") and pursuing related discovery,

(xiv) working with Curtis to prepare extensive briefing before this Court on the application of the Supreme Court's decision in *Stern v. Marshall*,

60.        ***Document and Other Discovery***.  Quinn Emanuel attorneys took the lead in the process of seeking discovery from JPMC in the adversary proceeding, drafting several sets of document requests and interrogatories directed to JPMC and serving notices for 30(b)(6) depositions on key topics, each commencing a meet and confer process to determine agreed topics and scope of testimony.

61.        Quinn Emanuel also took the lead in third party discovery, including issuing subpoenas, meeting and conferring with subpoena recipients and reviewing the resulting document productions (consisting of millions of pages).  The Committee issued and served over thirty (30) subpoenas on third parties, including banks, individuals and government agencies, bringing the total for document subpoenas served by all parties in the adversary proceeding to approximately one hundred (100).

62.        Quinn Emanuel attorneys spent significant amounts of time meeting and conferring with counsel for both JPMC and the subpoena recipients regarding document production and other discovery, working toward agreements on the scope and extent of document discovery.  Quinn Emanuel also responded to discovery from JPMC served on the Committee and its financial advisors, relying for coordination on regular calls with a Committee subgroup dedicated to the task.

63.         In coordination with the estate and A&M, Quinn Emanuel established a team of contract attorneys—billed directly through the estate—to review documents produced in the litigation. This document review team—numbering up to thirty attorneys at times during the Fee Period—was trained by Quinn Emanuel attorneys who continued to manage the team on a daily basis. The contract attorneys coded documents on a digital document review platform, isolating important documents for further in-depth review by Quinn Emanuel attorneys. Throughout the review process, Quinn Emanuel staff attorneys and associates provided substantive guidance as the review team supported Quinn Emanuel attorneys working on fact development and deposition preparation. The review team completed the primary review of these productions—approximately one million documents.

64.         *Fact Development and Record Synthesis*. Quinn Emanuel attorneys spent significant time in detailed analysis of the key documents identified by the document review team. Through this analysis, Quinn Emanuel developed document chronologies and factual analyses of key issues in the litigation with JPMC. Combining these chronologies and analyses with legal research on such key issues, the attorneys developed detailed memoranda analyzing these material documents in the context of the overall legal and factual theories of these cases. Quinn Emanuel and Curtis have relied extensively on these memoranda (or "modules") to prepare for depositions and assess the substance of Plaintiffs' claims and JPMC's counterclaims, and will continue to use them for litigation at trial.

65.         *Deposition Discovery*. Quinn Emanuel took the lead in deposition discovery with respect to current and former JPMC witnesses and the bulk of third party witnesses and government entity witnesses. Curtis, on behalf of the estate, focused on former Lehman employees and the remaining third parties. Quinn Emanuel attorneys engaged in meet and confer discussions with subpoena recipients to schedule depositions and resolve any disputes,

including preparing materials required by regulation prior to the depositions of certain employees

of the federal government. Quinn Emanuel also negotiated with JPMC regarding witness

identification and deposition scheduling.

66.    Quinn Emanuel attorneys drafted the papers necessary to secure

depositions of key third parties located outside the United States and began a process of

negotiation that would eventually lead to discovery on written questions from the current and

former Secretaries of the Treasury of the United States.

67.    Quinn Emanuel attorneys took the depositions of seventy eight (78)

JPMC witnesses, including both present and former employees. These witnesses included, by

way of example, (i) one of the lead JPMC negotiators of the guaranties and security agreements at

issue in the JPMC litigation, (ii) a key JPMC credit officer involved in decision making around

JPMC's extensions of credit to Lehman, (iii) a senior manager of JPMC's credit trading desk, (iv)

the JPMC employee responsible for coordinating the liquidation of Lehman collateral following

the bankruptcy, (v) several senior lawyers in the JPMC legal department, including the attorneys

responsible for overseeing the negotiation and drafting of the guaranties and security agreements

at issue in the litigation, (vi) senior JPMC executives involved in the decision to demand

additional collateral from Lehman prior to the bankruptcy, (vii) JPMC professionals involved in

both triparty and derivatives transactions between JPMC and Lehman at issue in the litigation,

and (viii) JPMC employees identified by the Court-appointed Examiner as central to the

JPMC/Lehman relationship. JPMC's most senior executives have also been deposed, including,

JPMC's Chairman and CEO, its Chief Risk Officer, its General Counsel, the head of JPMC's

Treasuries and Securities Services line of business, and the two co-heads of JPMC's Investment

Bank line of business. JPMC witnesses also included less-senior employees and former

employees with key information, including the JPMC relationship manager primarily responsible

for communications with Lehman during 2008 and traders responsible for evaluating Lehman collateral held by JPMC.

68.        Quinn Emanuel attorneys also took the lead for Plaintiffs for the depositions of sixty (60) third party witnesses, primarily from third-party financial institutions, including Barclays but also from government entities like the Federal Reserve Bank of New York. These witnesses included, by way of example, (i) Barclays employees involved in the acquisition by Barclays of certain assets of LBI and both the pre- and post-bankruptcy negotiations leading to that acquisition, (ii) derivatives professionals from key Lehman derivatives counterparties, (iii) senior executives from Bank of America and Merrill Lynch with information regarding Lehman's pre-bankruptcy financial condition, (iv) employees of the Federal Reserve Bank of New York and the Federal Reserve Board of Governors involved in the events surrounding the bankruptcy and JPMC's relationship with Lehman, (v) a key employee of the outside vendor employed by JPMC to value Lehman collateral held by JPMC, (vi) the Chairman and CEO of Barclays, as well as its General Counsel, (vii) senior officials from the Department of the Treasury, (viii) employees of the Bank of New York, and (ix) employees of the Federal Reserve Bank of New York and the Federal Reserve Board of Governors involved in the events surrounding the bankruptcy, including the General Counsel of the Federal Reserve Bank of New York.

69.        In addition to the depositions it led, Quinn Emanuel attorneys worked with Curtis to identify issues and documents central to the eighty-eight (88) depositions of former Lehman executives, employees, financial advisors and legal advisors, third parties, and individuals representing Lehman repo counterparties that Curtis took the lead on during the Fee Period. For very senior Lehman witnesses—including the CFO and Treasurer—Quinn Emanuel attorneys took part in pre-deposition witness meetings and other preparations and questioned the witnesses during the deposition, where appropriate.

27

70.        Quinn Emanuel has employed a streamlined deposition-taking process. To prepare for each deposition, Quinn Emanuel leveraged the document review team to identify relevant documents, which were then passed to an associate or staff attorney. The associate or staff attorney further analyzed the documents to prepare an appropriate set of documents for potential use with the witness at deposition and prepared a bio and smaller set of documents to share with Curtis and the estate to aid in coordination. The partner or associate taking the deposition used the resulting binder of documents to create the outline or notes for use during the deposition.

71.        Quinn Emanuel staff attorneys and associates, managed by senior associates and partners, synthesized and summarized the very large deposition record. These summaries and chronologies have been used with experts while developing expert analyses and may eventually form the basis of motions for summary judgment on discrete issues in the adversary proceeding.

72.        ***Case Development: Experts***.  In addition to the substantial document and deposition discovery undertaken by Quinn Emanuel, Quinn Emanuel attorneys spent significant time working with expert witnesses, including identifying and engaging appropriate experts and working on expert analysis of the key issues in the litigation. Moreover, Quinn Emanuel attorneys consulted with Plaintiffs' retained experts to focus deposition preparation and worked with the experts to prepare materials to be incorporated into expert reports. Quinn Emanuel attorneys have taken the lead in all areas of Plaintiffs' work with experts, but have worked in concert with Curtis, A&M and the estate to ensure that pre-existing estate and A&M resources are leveraged appropriately to assist and support the work of experts retained specifically for the adversary proceeding and analysis of JPMC's claims against the LBHI estate.

28

73.        *Briefing and Argument: JPMC's Motion to Dismiss*.  On August 25, 2010, JPMC filed its motion to dismiss the JPMC complaint in its entirety.  In response, Plaintiffs amended the JPMC complaint on September 15, 2010.  JPMC moved to dismiss the amended complaint in its entirety on October 19, 2010, and Plaintiffs filed a nearly one-hundred and fifty-page opposition brief on December 15, 2010, with Quinn Emanuel taking the lead on sections based on bankruptcy law, including the applicability of the safe harbors.  JPMC filed a further reply brief in support of its motion to dismiss Plaintiffs' complaint on February 2, 2011.  That same day, the International Swaps and Derivatives Association, Inc. and the Securities Industry and Financial Markets Association (together, "Amici"), moved for leave to file a brief as amici curaie in support of JPMC's motion to dismiss.

74.        After negotiating with Amici and JPMC, the parties stipulated to allow Plaintiffs a brief in response to the filing by Amici.  Quinn Emanuel took the lead in drafting the twenty-five page response to the Amici's brief, filed on March 4, 2011.  The drafting of that response required legal research on the application of the Bankruptcy Code safe harbors and analysis of the practical impacts of the arguments in Plaintiffs' opposition to JPMC's motion to dismiss.

75.        The Court heard oral argument on JPMC's motion to dismiss on May 10, 2011.  To prepare for the hearing, Quinn Emanuel attorneys updated legal research related to the motion and developed notes and outlines to be used during oral argument.  Using the materials prepared for the oral argument, Quinn Emanuel attorneys engaged in multiple meetings and preparation sessions in advance of the argument.  Included in these preparations was a joint preparation session with Curtis, which took the lead on certain issues addressed in the motions.  Quinn Emanuel attorneys then participated in the oral argument hearing, including taking the lead on arguing the Bankruptcy Code claims and against application of the safe harbors.

29

76.        ***Briefing: Plaintiffs' Motion to Dismiss JPMC's Counterclaims***. On
February 17, 2011, JPMC filed its amended counterclaims against LBHI in response to Plaintiffs'
motion to dismiss JPMC's original counterclaims. Quinn Emanuel, working with Curtis, took the
lead in preparing Plaintiffs' motion to dismiss the amended counterclaims in their entirety. Quinn
Emanuel researched and drafted sections of the brief seeking to dismiss JPMC's counterclaim for
fraudulent concealment on several grounds, including that JPMC (i) failed to plead reasonable
reliance, (ii) failed to plead an actionable misrepresentation, and (iii) failed to plead scienter.
Quinn Emanuel also drafted the portions of the brief seeking to dismiss JPMC's counterclaims for
fraudulent omission and fraudulent inducement to lend on the same grounds as the fraudulent
misrepresentation counterclaim, as well as the additional ground that LBHI had no duty to
disclose to JPMC. Additionally, Quinn Emanuel drafted the portions of the brief seeking to
dismiss JPMC's counterclaims for aiding and abetting frauds by LBI and Barclays because JPMC
failed adequately to plead the underlying fraud or LBHI's knowledge or substantial assistance.
Plaintiffs filed the motion to dismiss on April 4, 2011.

77.        JPMC opposed Plaintiffs' motion on June 3, 2011. Quinn Emanuel
attorneys spent a significant amount of time analyzing JPMC's arguments in its opposition brief
and preparing Plaintiffs' reply. To do so, Quinn Emanuel attorneys (i) analyzed all of the cases
cited by JPMC in its opposition and the arguments made by JPMC based on those cases, (ii)
engaged in additional legal research in all of the key areas subject to litigation, including JPMC's
allegations that it relied on representations made by LBHI, whether any such reliance was
reasonable (particularly in the face of later representations by Barclays), what qualifies as an
actionable representation of fact, whether the Court's decision in the Barclays Rule 60(b)
litigation precludes JPMC's claims, and whether JPMC's allegations of scienter are sufficient,

and (iii) prepared and filed a nearly fifty-page reply brief in consultation with and with input from Curtis.

78.        *Analysis of JPMC Claims*.  JPMC has filed claims against the estates in excess of $25 billion.  In addition to its work on the adversary proceeding with JPMC, Quinn Emanuel has worked with the Committee's financial advisors, Curtis, the estate and A&M to research JPMC's asserted claims against the estate as part of the claims review and reconciliation process.  As part of that process, Quinn Emanuel attorneys conducted an in-depth analysis of JPMC's claims related to (i) its clearance and triparty services to LBI and the claims (the "Deficiency Claims"), (ii) derivatives contracts between JPMC and its subsidiaries, on the one hand, and LBHI and its subsidiaries, on the other (the "Derivatives Claims"), and (iii) losses by investment funds managed by JPMC and/or its subsidiaries (the "Claimant Funds") related to the Lehman bankruptcy (the "Asset Management Claims").

79.        Quinn Emanuel attorneys worked on legal research related to developing arguments to support objections to all of JPMC's claims against the estates.  Quinn Emanuel attorneys also worked with the experts retained by Plaintiffs to develop and define theories for objecting to the claims.  Quinn Emanuel attorneys took the lead in negotiating with counsel for the claimant funds regarding voluntary discovery related to the Claimant Funds and the Asset Management Claims.

80.        *Claims Objection Process: WAMU Objection*.  Quinn Emanuel attorneys took the lead in drafting an objection to JPMC's claims against the LBHI estate related to derivatives contracts between LBSF and WaMu.  As part of that objection, Quinn Emanuel attorneys engaged in extensive legal research on the ability of a claimant to apply collateral pledged pursuant to a pre-petition security agreement to claims acquired by the claimant post-petition.  Plaintiffs filed the WaMu Objection on April 15, 2011.

31

81.     After the WaMu Objection was filed, Plaintiffs engaged in negotiations with JPMC leading to an agreement through which JPMC did not oppose the WaMu Objection, which resulted in an $80.3 million reduction in claims against the estate. The Court signed its order to this effect on June 3, 2011.

82.     ***The Asset Management Objection***. Quinn Emanuel attorneys filed the Asset Management Objection on October 13, 2011. The Asset Management Objection was an omnibus objection addressing a multitude of claims filed by a host of Claimant Funds. It focused primarily on the issue of whether the Claimant Funds were "affiliates" of JPMC and therefore covered under the guaranty and security agreement executed by LBHI in the week before its bankruptcy. Extensive legal and factual research were required to brief the objection, with Quinn Emanuel attorneys taking the lead in all aspects. Quinn Emanuel Attorneys also took the lead in drafting a reply brief in further support of the Asset Management Objection, which was filed on January 23, 2012.

83.     After filing the Asset Management Objection, Quinn Emanuel attorneys led negotiations with counsel for the Funds, as well as counsel for JPMC. The negotiations ultimately resulted in a settlement of the Asset Management Objection on favorable terms, returning almost $700 million in cash collateral to the LBHI estate. Quinn Emanuel worked with Curtis to draft the papers necessary to secure Court approval of the settlement and participated in the resulting hearing. The Court approved the settlement on February 15, 2012.

84.     ***The Deficiency Objection***. On August 31, 2011, Quinn Emanuel filed the Deficiency Objection on behalf of Plaintiffs. The Deficiency Objection incorporates several theories, including (i) that JPMC failed to dispose of Lehman collateral in a commercially reasonable manner, (ii) that JPMC received consideration from Barclays in settlement and should not be able to achieve a double recovery through its claims against the estate, and (iii) that

JPMC's claims improperly include interest. Quinn Emanuel took the lead in developing the first two theories, including extensive legal research on the application of the Uniform Commercial Code to collateral disposition and the effect of prior settlements on claims in bankruptcy.

85.　　Quinn Emanuel attorneys also worked closely with A&M and non-testifying experts to analyze the factual record related to the collateral disposition. This process involved the review of thousands of documents and a large amount of data from trading systems and JPMC's records on the over four thousand separate securities transactions making up the liquidation. Quinn Emanuel attorneys worked to synthesize the information, informed by expert analysis, to draft the over forty-page Deficiency Objection. Following the filing of the Deficiency Objection, Quinn Emanuel attorneys worked on drafting and serving related discovery requests and continued to work with Curtis to develop a strategy for pursuing the objection through a ruling.

86.　　JPMC responded to the Deficiency Objection on November 15, 2011. Quinn Emanuel attorneys reviewed and considered the response and continued to analyze the facts underlying the Deficiency Objection, working with A&M and retained experts. At the same time, Quinn Emanuel took the lead in an intensive meet and confer dialogue with JPMC's counsel over discovery, ultimately establishing a litigation schedule and beginning document discovery. Quinn Emanuel attorneys worked with Plaintiffs' experts to begin analysis of a very large amount of data JPMC produced from its various systems relating to its liquidation of Lehman collateral. On February 24, 2012—pursuant to the schedule negotiated between the parties—JPMC filed a motion to strike portions of the Deficiency Objection. During the last days of the Fee Period, Quinn Emanuel began drafting a brief in opposition.

87.    ***Derivatives Claims.***  Quinn Emanuel attorneys took the lead in reviewing JPMC's claims by comparing JPMC's actions in closing out derivatives transactions, including the use of add-ons and the manipulation of close-out dates, to the actions of other big-bank derivatives counterparties.

88.    ***Stern v. Marshall Briefing***.  In the summer of 2011, the Supreme Court of the United States issued its decision in *Stern v. Marshall*, which has been argued to impact the ability of bankruptcy courts to enter final orders with respect to certain claims.  Quinn Emanuel attorneys spent considerable time analyzing the *Stern* decision and the opinions on which it was based, as well as subsequent decisions citing to and interpreting *Stern*.  Quinn Emanuel attorneys worked with Curtis to draft papers requested by the Court explaining the impact of the *Stern* decision on the JPMC adversary proceeding and participated in conference calls with the Court and meet and confer discussions with JPMC regarding how to resolve the dispute between the parties concerning whether and how the *Stern* decision affects the case.

89.    ***Miscellaneous Case Issues***.  Quinn Emanuel attorneys spent considerable time negotiating with counsel for JPMC on a wide variety of litigation- related topics, ranging from discovery to scheduling issues.  For example, JPMC and Plaintiffs negotiated extensions to the schedule for the JPMC adversary proceeding filed on March 2, 2011 (signed by the Court on March 22, 2011), July 11, 2011 (signed by the Court on July 27, 2011), September 19, 2011 (signed by the Court on October 3, 2011), and December 16, 2011 (signed by the Court on January 3, 2012).  As another example, on August 11, 2011, Quinn Emanuel wrote to the Court to seek a conference related to a dispute with JPMC regarding deposition scheduling and responded to a letter on the subject from counsel to JPMC on August 17, 2011.  The parties had a conference call with the Court on August 18, 2011.  JPMC initiated a similar process with respect

34

to Barclays witnesses in September, with Quinn Emanuel attorneys participating in discussions between JPMC and Barclays, including a conference call with the Court.

**2. Citibank Investigation.** The December 2, 2009 Protocol also governs the joint prosecution of estate claims against Citibank. It provides that the Committee, through its counsel Quinn Emanuel, will play a lead role in investigating claims against Citibank and in any litigation involving the prosecution of those claims. To that end, the Committee and the estates conducted an investigation of the claims Citibank asserted against the estate and the contours of Citibank's relationship with Lehman.

90.     Quinn Emanuel attorneys worked with the estates to analyze possible claims and causes of action among Citibank and the estates, including Citibank's derivatives claims and other claims to estate assets.

**3. Citibank Litigation.** Quinn Emanuel, together with LBHI's counsel, spent significant time researching, drafting, and revising a complaint against Citibank. In connection with its research, Quinn Emanuel reviewed all of Citibank's claims against the estates, including the approximate $1.9 billion in derivatives claims and LBHI's guaranty. Moreover, in order prosecute the claims in an efficient and economical manner and avoid duplication with respect to the litigation, Quinn Emanuel coordinated its efforts in various conferences with LBHI's counsel, Curtis.

91.     On February 8, 2012, LBHI and the Committee, as proposed intervenor, filed a complaint (the "Citibank Complaint") against Citibank and certain of its affiliates. The Citibank Complaint challenges Citibank's entitlement to a $2 billion deposit at Citibank that LBHI made in June 2008, the enforceability of Citibank's September 9, 2008 Guaranty, and the right to $500 million transferred to LBI (and then Citibank) on the eve of the bankruptcy filings. It also lodges objections to various Citibank (and certain of its affiliates')

claims filed against the estates, including certain derivatives claims filed in the amount of approximately $2 billion.

92.     Among other things, plaintiffs assert that Citibank is wrongfully withholding $2 billion of LBHI cash and that Citibank cannot use that cash to pay itself dollar-for-dollar on billions of dollars in claims that would otherwise be unsecured. According to the plaintiffs, the setoff of the funds violates the Bankruptcy Code, state law and the parties' intent regarding the allowed purpose and usage of those funds. Plaintiffs further contend that Citibank's and its affiliates' claims against the Lehman estates are themselves overstated or invalid, including over $2 billion of miscalculated claims purportedly arising under the parties' derivatives contracts. The Citibank Complaint also seeks the recovery of: (i) $500 million of LBHI cash that LBHI transferred to LBI's account at Citibank, which LBI then transferred to Citibank, hours before the LBHI bankruptcy filing; (ii) hundreds of millions of dollars owed to Lehman under the parties' derivatives contracts; and (iii) more than $200 million owed to LBCC under the parties' clearance agreement.

93.     On February 27, 2012, the Committee was authorized to intervene as a plaintiff in the Citibank adversary proceeding pursuant to a global scheduling stipulation negotiated among LBHI, Citibank and the Committee governing the proceeding.

**4. Bank of America Litigation.** On November 26, 2008, BofA commenced an adversary proceeding seeking a declaratory judgment ratifying a post-petition offset of approximately $509 million dollars deposited by LBSF and LBHI in various BofA accounts against amounts allegedly owed to it under certain derivatives contracts. On January 2, 2009, the Debtors answered BofA's complaint and filed a counter-suit against BofA seeking (a) damages of $501.8 million from BofA and its Cayman Islands affiliates; (b) a declaratory judgment that BofA is legally obligated to return the overdraft deposit account funds to LBHI; (c) the imposition of a

constructive trust respecting the overdraft deposit account funds; (d) a ruling that BofA and BofA

Cayman violated the automatic stay; and (e) an order that BofA turnover and remit to the Debtors

$501.8 million.

94.        Given the size and significance of the claims at issue, e.g., setoff and

safe harbor issues, Quinn Emanuel actively represented the Committee in the proceeding as an

intervenor.  On January 21, 2009, as a result of Quinn Emanuel's negotiations with the Debtors

and BofA, the Committee filed a stipulation memorializing the parties' agreement permitting the

Committee to intervene in the BofA action.

95.        The litigation with BofA concerned complex and novel issues

regarding setoff of funds in a special purpose account.  Quinn Emanuel attorneys participated in

an extensive and protracted discovery process.  Quinn Emanuel attorneys reviewed the document

productions from each of BofA and the Debtors, analyzed the potential claims and defenses based

on the review of the documents produced, and attended numerous depositions scheduled by both

parties.

96.        Quinn Emanuel attorneys also drafted memoranda to summarize the

depositions of various key deponents.  In addition, Quinn Emanuel attorneys prepared for and

attended the remaining depositions of potential trial witnesses.  The parties to the litigation also

submitted expert reports, which Quinn Emanuel attorneys extensively reviewed and analyzed.

97.        Quinn Emanuel attorneys also spent a considerable amount of time

drafting, researching and revising various memoranda in support of LBHI's motion for summary

judgment in September and October of 2009.

98.        The Court heard oral argument on the summary judgment motions.

Quinn Emanuel attorneys prepared to argue the cross-motions for summary judgment at that

hearing.  To that end, Quinn Emanuel attorneys spent time working collaboratively with the

Debtors' counsel in connection with (i) designating deposition testimony; (ii) preparing and reviewing a joint statement of facts; (iii) reviewing relevant documents and conducting additional research; and (iv) preparing an outline and drafting arguments for the hearing. The hearing on the summary judgment motions took place on December 10, 2009.

99.     At the conclusion of the summary judgment hearing, the parties agreed to attend a mediation session on January 19, 2010. (Quinn Emanuel attorneys attended on the Committee's behalf.)

100.     On January 29, 2010, February 1, 2010 and February 2, 2010, an evidentiary hearing was conducted after attempts to mediate the dispute failed. Quinn Emanuel participated in the evidentiary hearing.

101.     At the conclusion of the evidentiary hearing, the Court directed the parties to submit post-trial briefing. In particular, the Court requested that the parties prepare a statement of facts based on the evidence presented at trial. Quinn Emanuel attorneys spent time reviewing the trial testimony and other evidence in order to (i) assist the Debtors in the preparation of their post-trial brief and (ii) prepare the Committee's submission. The briefs were submitted on March 12, 2010.

102.     On November 16, 2010, the Bankruptcy Court issued the BofA Decision granting a motion for summary judgment filed by LBHI and LBSF and ordering BofA to return $500 million plus interest to the Debtors, holding that the account at issue "was intended to function and in practice did function as a segregated account established for the special limited purpose of securing any indebtedness that might arise on account of intra-day overdrafts." As such, BofA's seizure of the collateral violated the automatic stay imposed by section 362 of the Bankruptcy Code, and BofA was not entitled to setoff the $500 million.

103.    On May 20, 2011, the Bankruptcy Court entered final judgment against BofA on all counts of the complaint, and in favor of LBHI on its counterclaim asserted in the adversary proceeding, in the amount of $501,800,000.00 (the "Funds"), plus simple interest on the Funds calculated at the rate of 9% per annum from November 10, 2008 through December 3, 2010 (the "Final Judgment"). Subject to BofA's appellate rights, and following negotiations among the parties, BofA agreed to reimburse the Debtors' and the Committee's attorneys' fees incurred in connection with BofA's stay violation up to $1.25 million dollars.

104.    On May 23, 2011, BofA filed a notice of appeal. On July 1, 2011, BofA filed a brief in support of its appeal. Quinn Emanuel attorneys worked closely with LBHI's counsel to coordinate drafting of responsive appellate papers. Quinn Emanuel thereafter spent time researching and drafting a brief in response to the BofA appeal. As a result of discussions and negotiations among the Debtors and BofA, the parties ultimately came to a settlement agreement. On October 19, 2011, the Bankruptcy Court entered an order approving the settlement. Thereafter, a stipulation of dismissal of appeal was filed and approved on November 16, 2011.

**5. Barclays Sale Investigation.** Quinn Emanuel devoted significant time to the Committee's investigation of the Sale Transaction and the litigation that ensued. Quinn Emanuel attorneys, together with the Committee's financial advisors, worked to ensure that the consideration received by the estate and the assets transferred to Barclays were consistent with the explanations of the Sale Transaction provided to the Court and the Committee. Initially, Quinn Emanuel attorneys spent time (a) propounding document requests on Barclays, (b) meeting with Barclays, and (c) analyzing documents produced by Barclays regarding the Sale Transaction.

105.    In April 2009, the Debtors engaged Jones Day to initiate their own Bankruptcy Rule 2004 investigation into the Sale Transaction. Quinn Emanuel thereafter dedicated time to facilitating Jones Day's transition into the investigation and otherwise coordinating efforts with respect to the Sale Transaction investigation to avoid duplication of efforts.

106.    On May 18, 2009, the Debtors filed a motion (the "Barclays 2004") seeking leave under Bankruptcy Rule 2004 to conduct discovery against Barclays. On June 5, 2009, Quinn Emanuel attorneys, on behalf of the Committee, filed a response to the Barclays 2004 requesting that any order of the Court also provide that the Committee receive copies of all documents produced to LBHI and that the representatives of the Committee be entitled to appear and propound questions at any deposition noticed in accordance with such order. Barclays objected to the Barclays 2004 and the Committee's joinder. On June 25, 2009, the Court granted the Barclays 2004 and authorized the Committee to participate in the Bankruptcy Rule 2004 discovery.

107.    Quinn Emanuel attorneys and Barclays' counsel negotiated a proposed stipulation and order regarding confidentiality in the Barclays 2004 production. Pursuant to the stipulation, Barclays began production of documents. Quinn Emanuel attorneys spent considerable time and effort reviewing these documents in an attempt to ascertain the contours of the Sale Transaction (e.g., the legal rights and entitlements as well as the business dealings) between the Debtors and Barclays.

108.    As with any document production, it was necessary for Quinn Emanuel's professionals to install storage and categorization methods to allow Quinn Emanuel attorneys to better access the material produced. Quinn Emanuel attorneys also coordinated with the

40

Committee's financial professionals in their review of Barclays' documents produced in response to the Bankruptcy Rule 2004 requests.

109.    Quinn Emanuel attorneys then prepared for and attended numerous Bankruptcy Rule 2004 depositions in conjunction with its ongoing investigation of the Sale Transaction. Quinn Emanuel attorneys spent a substantial amount of time analyzing the various depositions and documents. In order to prepare for the depositions, Quinn Emanuel attorneys reviewed relevant documents produced in connection with the Barclays 2004 for each deposition.

**6. Barclays Litigation.** On September 15, 2009 Quinn Emanuel filed its Rule 60(b) Motion, seeking relief from the sale order entered on September 20, 2008 (the "Sale Order"). The Debtors and SIPA Trustee also filed similar motions on the same day.

110.    As set forth more fully below, Quinn Emanuel attorneys devoted substantial time to prosecuting the Committee Rule 60(b) Motion and assisting the movants in prosecuting the Rule 60(b) Motions. In particular, Quinn Emanuel attorneys were involved in (i) continuing discovery and related motion practice in connection with the Rule 60(b) Motions, (ii) preparing a detailed reply brief in response to Barclays 300- plus page objection to the Rule 60(b) Motions, (iii) preparing for and attending thirty seven (37) depositions, (iv) coordinating with the movants and Barclays regarding pre-trial and trial preparations, (v) participating in the trial (i.e., April 26 – May 7, 2010, June 21-22, 2010, June 25, 2010, August 23-25, 2010, August 27, 2010, August 30-31, 2010, September 2, 2010, September 7-8, 2010, September 10, 2010, September 20-21, 2010, September 28-30, 2010, October 4-8, 2010 and October 18, 2010) on the Rule 60(b) Motions and argument for the admission of documents and exhibits, (vi) preparing for and delivering a closing argument on October 21, 2010, and (vii) submitting post-trial briefing (more than 150 pages) on November 22, 2010.

111.     ***Scheduling***.  Given the volume of the Rule 60(b) Motions, Barclays

and the movants entered into extensive negotiations during this period concerning the appropriate

time frame for discovery (including expert discovery).  Ultimately, the parties negotiated a

stipulation for document discovery, depositions, and the resolution of the companion adversary

complaints that each of the movants filed in connection with their Rule 60(b) Motions.  Indeed,

the Committee prepared and filed, in connection with the Committee Rule 60(b) Motion, an

adversary proceeding seeking certain forms of declaratory relief.  On October 15, 2009, the

parties attended a court hearing seeking entry of the stipulation (and resolution of lingering

scheduling disputes).  Ultimately, the parties agreed that discovery would continue in connection

with the motions through March 2010, and Barclays would submit its objection to the motions on

January 29, 2010.

112.     ***Document Discovery***.  Barclays served three requests for the

production of documents on each of the Committee's professionals, Houlihan Lokey

("Houlihan"), Milbank Tweed and FTI Consulting ("FTI").  Quinn Emanuel represented

Houlihan and FTI (in addition to the Committee) in connection with this process.  To that end, it

prepared and served written responses and objections to these demands and coordinated the large-

scale effort of retrieving, and reviewing, responsive documents in response to the subpoenas.

Quinn Emanuel's specially trained staff attorneys assisted with the collection of documents from

the Committee, Houlihan, Milbank, and FTI.  Quinn Emanuel's staff attorneys collected the

voluminous productions, ensured that the productions were properly coded in Quinn Emanuel's

litigation database, eliminated duplicate documents, and reviewed every document for privilege.

These staff attorneys acted under the careful supervision of Quinn Emanuel attorneys that

monitored the document review process.

113.        In connection with the production of documents, Quinn Emanuel attorneys withheld certain documents from production because those documents contained attorney client communications and work product privilege. Quinn Emanuel's staff attorneys also assembled and prepared a detailed privilege log of these documents which was produced to Barclays. Ultimately, Quinn Emanuel produced, on behalf of the Committee, Houlihan and FTI, no less than 51,000 pages of documents to Barclays. As with any document production, it was necessary for Quinn Emanuel's professionals to install storage and categorization methods to allow Quinn Emanuel attorneys to better access the material produced. Quinn Emanuel attorneys also coordinated with the Committee's financial professionals in their review of Barclays' documents.

114.        Barclays also served document requests on all the professionals involved in the transactions, including the LBHI estates' attorneys and financial advisors (e.g., Weil Gotshal & Manges, LLP, Alvarez & Marsal, and Lazard Ltd.) and the LBI estates' advisors (e.g., Hughes Hubbard & Reed and Deloitte), as well as a host of third parties (e.g., the Depository Trust Corporation and Akin Gump Strauss Hauer & Feld LLP). Quinn Emanuel attorneys also reviewed documents produced by these various parties and coordinated with counsel to the other movants regarding production.

115.        Barclays produced documents to the movants. To that end, Quinn Emanuel's staff attorneys and litigation support specialists received, reviewed and coded approximately 13,044 documents produced to the movants. Given the volume of documents produced by both Barclays and the movants, it was essential that these documents be located in a centralized litigation database in order to permit Quinn Emanuel to locate relevant documents in connection with the continued prosecution of the Rule 60(b) Motions. Given the complexity of the operation of the litigation database, the importance of the database to this litigation, and the

importance that the documents in the database be readily accessible, Quinn Emanuel's specially trained staff attorneys and litigation support specialists were tasked with coding documents received and were often called on to search the database for relevant documents.

116.    Indeed, with every new production, Quinn Emanuel staff attorneys and litigation support specialists reviewed and coded documents. Subsequently, Quinn Emanuel staff attorneys would select documents for further review by those Quinn Emanuel attorneys tasked with prosecuting the Committee Rule 60(b) Motion. The ability to search and retrieve documents is a critical aspect of the litigation with universal application. It is required to write briefs (i.e., to identify substantiating documentation), to examine witnesses (i.e., to identify documents for examination) and to present arguments to the Court.

117.    ***Privilege Disputes***. Barclays took the position that the Committee placed "attorney client" communications at issue in prosecuting the Committee Rule 60(b) Motion. To that end, it moved to compel the production of attorney-client communications among the Committee and its counsel and financial advisors. The Committee disputed that assertion, maintaining instead that Barclays was not entitled to these documents.

118.    After meet and confers with Barclays, the parties failed to resolve issues regarding Barclays' document requests. On December 2, 2009, Barclays filed a motion to compel production of documents by the Trustee and the Committee based on a waiver of privilege (the "Motion to Compel"). Quinn Emanuel researched and drafted a motion and brief in opposition to Barclays' Motion to Compel production. Quinn Emanuel's response was filed on December 7, 2009. On December 9, 2009, Barclays filed a reply to the responses by the Trustee and the Committee. In connection with the Motion to Compel, the response and the reply, Quinn Emanuel attorneys spent time preparing to argue the opposition before the Court. On December

11, 2009, the Court heard the parties' arguments on the Motion to Compel and ultimately ruled in favor of the Committee on December 16, 2009.

119.    On April 14, 2010, on the eve of the start of the bench trial on the Rule 60(b) Motions, Barclays filed a second motion seeking production of, inter alia, all Houlihan work product relating to the analysis of the financial terms of the Sales Transaction (the "Work Product Motion") and similar work product prepared by LBHI and the Trustee.  Quinn Emanuel attorneys researched and drafted a response to the Work Product Motion and filed a detailed objection on April 22, 2010 (in which the movants joined).

120.    The Court heard argument on the Work Product Motion on April 26, 2010.  To that end, Quinn Emanuel attorneys spent time outlining and preparing the Committee's argument that the documents Barclays sought were protected by work product privilege.  The Court granted the Work Product Motion as to the Committee on the same date.  To ensure prompt production, leading up to the argument on the Work Product Motion and immediately following the hearing, Quinn Emanuel attorneys reviewed the privilege logs and selected those documents that fell within the scope of the Court's ruling.  Quinn Emanuel then prepared those documents for prompt production to Barclays.

121.    The granting of the Work Product Motion also lead to additional depositions of two Committee witnesses, Mr. Luc Despins and Mr. Saul Burian.  Quinn Emanuel spent time preparing these witnesses for their continued depositions under considerable time constraints.  Indeed, the Work Product Motion was filed on the eve of trial, and Quinn Emanuel allowed Barclays to take these depositions prior to the trial because both Mr. Burian and Mr. Despins were scheduled to testify at the trial.

122.      ***Depositions***.  In addition to propounding document requests, Barclays also served deposition notices on the Committee, Houlihan, Milbank and FTI.  Barclays also noticed a host of depositions for the estates and LBI's principals and professionals.  Quinn Emanuel attorneys dedicated considerable time to preparing the witnesses of its financial advisors for these depositions.  The depositions of the Committee's advisors' witnesses took place on February 10, 2010 (C. Tully), February 12, 2010 (M. Fazio), April 19, 2010 (L, Despins), April 29, 2010 (S. Burian), and April 30, 2010 (L. Despins).

123.      Preparing for depositions involved Quinn Emanuel staff attorneys, under the supervision of a coordinating attorney, performing targeted searches in Quinn Emanuel's litigation database to identify the universe of documents relevant to a particular witness.  Once this process was complete, documents were sent to the Quinn Emanuel attorneys assigned to a particular witness for review.

124.      In addition, the movants served additional deposition notices on Barclays' principals.  Quinn Emanuel attorneys prepared for and attended those depositions on the Committee's behalf.  In preparing for these depositions, Quinn Emanuel staff attorneys would perform targeted searches for relevant documents in the litigation database.  The attorney responsible for attending the deposition would then review the relevant documents that had been gathered in order to select those documents that would be necessary for use at the deposition.  The Quinn Emanuel attorney also often coordinated with counsel to the other movants in order to ensure that there was no unnecessary duplication of efforts in preparing for or taking these depositions.

125.      ***Expert Reports***.  Quinn Emanuel attorneys spent a substantial amount of time reviewing the draft expert reports and the rebuttals.  Moreover, Quinn Emanuel attorneys reviewed numerous documents containing financial information, including the expert reports, the

exhibits and the additional documents produced by Barclays, in order to participate in meetings with the experts, as well as, the depositions themselves.

126.    The movants prepared and submitted seven expert reports and rebuttals to the expert reports filed by Barclays. Quinn Emanuel attorneys coordinated with the movants on the submission of these expert reports. Additionally, Quinn Emanuel attorneys reviewed the reliance materials produced with the expert reports.

127.    ***Foreign Document Request Motion.*** Quinn Emanuel attorneys spent time preparing a subpoena to the FSA and PwC for documents related to the Sale Transaction. Quinn Emanuel on behalf of the Committee filed a motion (the "Assistance Motion") under the terms of the Hague Convention seeking permission to ask a U.K. court to require that the FSA, Barclays' regulator, and PwC, the auditor for Barclays in its deal talks with Lehman, to compel the production of documents in these subpoenas. Pursuant to the Assistance Motion, the Committee sought documents from the FSA and PwC that are highly relevant to the prosecution of the Rule 60(b) Motions filed in these Chapter 11 Cases that could not otherwise be obtained, especially considering that the FSA and PwC are beyond the reach of the U.S. Court's subpoena power.

128.    On December 16, 2009, the Court held a hearing on, and granted the Assistance Motion. On February 11, 2010 and March 2, 2010, the High Court of Justice, Queens Bench Division in the United Kingdom (the "English Court') acted on the letters of request and enabled the Committee to issue document requests to the FSA and PwC.

129.    Thereafter, Quinn Emanuel attorneys negotiated a consensual resolution of Assistance Motion with PwC. Accordingly, PwC produced documents to the Committee, and Quinn Emanuel attorneys spent time reviewing those documents.

130.         Quinn Emanuel also entered into negotiations with the FSA for the consensual production of relevant documents.  The FSA insisted, in sworn affidavits filed in the English Court, that it did not have any responsive documents.  Those affidavits also contained facts outlining the FSA's role with respect to the transaction and certain pre-transaction events.

131.         Ultimately, the Committee negotiated consent decrees with the FSA and PwC.  As a result of the Committee's prosecution of the Assistance Motion in the United Kingdom, and consistent with English law, the United Kingdom High Court entered consent orders directing the reimbursement of the costs incurred by both the FSA and PwC in connection with the settlements.[4]  These settlements resulted in the production of important documents regarding Barclays' dealings with its regulators and auditors (both from Barclays and PwC).  It also enabled the Committee to use the FSA's affidavit in the Rule 60(b) litigation.

132.         ***Committee Reply Brief.***  On January 29, 2010, Barclays filed a voluminous response to the Rule 60(b) Motions.  Quinn Emanuel attorneys spent considerable time analyzing Barclays' three hundred-plus page response in order to prepare a detailed reply brief.  Quinn Emanuel's specially trained staff attorneys assisted the attorneys charged with drafting the reply brief by performing targeted searches of the litigation database in order to identify documents necessary for the Committee's reply brief.  The selected documents were then reviewed by the Quinn Emanuel attorneys drafting the reply and ultimately were synthesized into a thorough timeline of both the events leading up to the Sale Transaction and the Committee's involvement in the sale process.  This task was necessary in order to refute Barclays' statement of facts and arguments.

---

[4]     These costs totaled $50,878.35 (converted from pound sterling to U.S. dollar).

133.        Under the supervision of a coordinating attorney, Quinn Emanuel attorneys also performed legal research on numerous issues raised by Barclays in its reply brief, including, but not limited to: (i) the timeliness of the Rule 60(b) Motions, (ii) the propriety of challenging a sale order, and (iii) the effects of amendments to the Sale Order made without the Committee's consent. In connection with the Committee's reply brief, Quinn Emanuel attorneys also prepared declarations both supporting the Committee's statement of facts and responding to Barclays' statement of facts.

134.        Quinn Emanuel attorneys also spent time coordinating with the other movants regarding legal and factual research and reviewing the draft submissions of the other movants. Such coordination was necessary in order to minimize unnecessary duplication in the three briefs submitted in reply to Barclays' response to the Rule 60(b) Motions. On March 18, 2010, Quinn Emanuel filed the Committee's 150- plus page reply brief.

135.        ***Pre-Trial: Scheduling***. Given the complexity of the issues raised through the Rule 60(b) Motions as well as the numerous parties and witnesses involved, Barclays and the movants entered into extensive negotiations during this period scheduling pre-trial motion practice and trial. Quinn Emanuel attorneys participated in numerous email exchanges, phone calls and in-person discussions regarding the scheduling and coordination of the various witnesses presented by the movants at trial. Moreover, as the Barclays trial was ongoing, depositions were taking place also requiring coordination efforts among the parties. Because of the non-consecutive trial dates and the length of the trial, scheduling required frequent conferences and meetings among all of the parties involved as well as the Court.

136.        ***Pre-Trial:  Motions in Limine***. The movants prepared motions in limine in connection with the trial on the Rule 60(b) motions. Specifically, the Movants submitted (i) a motion to admit into the record (a) all undisputed facts and (b) all facts to which

49

Barclays only lodged a legal, but not factual, objection (the "Undisputed Fact Motion") and (ii) a motion to exclude the trial testimony of Barclays' expert witnesses (the "Motion to Exclude" and together with the Undisputed Fact Motion, the "Motions in Limine").

137.    Quinn Emanuel attorneys reviewed drafts of the Motions in Limine and coordinated with counsel to the Debtors and the Trustee in the preparation and filing of the Motions in Limine. The Undisputed Fact Motion was filed on March 9, 2010. The Motion to Exclude was filed on April 2, 2010.

138.    On April 1, 2010, Barclays filed a response to the Undisputed Fact Motion. Quinn Emanuel attorneys reviewed Barclays' opposition and coordinated with counsel to the other Movants in crafting a strategy for prosecuting the Motion to Exclude. Ultimately, the Undisputed Fact Motion was withdrawn. On April 19, 2010, Barclays filed an opposition to the Motion to Exclude. By agreement, the Movants' reply to Barclays' opposition to the Motion to Exclude was adjourned until August 2010.

139.    Quinn Emanuel attorneys assisted in the preparation of a response to the Barclays Motion to Exclude and a reply in support of the Motions in Limine. Quinn Emanuel attorneys reviewed drafts of the pleadings and coordinated with counsel to the Debtors and the Trustee in the preparation and filing of the responses.

140.    On September 10, 2010, the Court heard argument on the Motions in Limine. Quinn Emanuel attorneys reviewed the motions and coordinated with counsel to the other movants in crafting a strategy for prosecuting the motions. Ultimately, the court denied the Motions in Limine, with one limited exception relating to one of the Trustee's experts.

141.    ***Pre-Trial: Exhibits.*** At the direction of those attorneys tasked with prosecuting the Committee 60(b) Motion, Quinn Emanuel's staff attorneys performed numerous and frequent targeted searches of the litigation database in order to select those documents that

50

would be used as trial exhibits. Quinn Emanuel attorneys then reviewed those documents and from that universe of documents selected the trial exhibits. Quinn Emanuel attorneys then coordinated with counsel to the other movants in preparing a comprehensive list of all trial exhibits. On April 1, 2010, the movants served their exhibits on Barclays.

142.        On April 8, 2010, Barclays served objections to the movants' exhibit list. Quinn Emanuel attorneys then coordinated with other movants' counsel and prepared responses to those Barclays' objections that related directly to the Committee's exhibits.

143.        The movants subsequently made additions to the exhibit list, in support of the Rule 60(b) Motions, which required additional review and coordination among counsel. That task required a review of the entire case record as well as the exercise of judgment regarding which documents to seek to admit into evidence. Altogether, Quinn Emanuel attorneys, together with the other movants' counsel, compiled and submitted 962 exhibits for use during trial. Indeed, effectively moving the movants' exhibits into evidence required a coordinated effort by the Debtors, Trustee and Committee counsel.

144.        Further, additional Quinn Emanuel attorneys were responsible for reviewing and understanding Barclays' exhibit list. Quinn Emanuel reviewed 1108 exhibits propounded by Barclays in support of its opposition to the Rule 60(b) Motions. Quinn Emanuel attorneys analyzed each of Barclays' trial exhibits to determine applicable objections, if any, and coordinated with the Debtors, Trustee and Committee counsel in lodging and prosecuting any objections. This task required Quinn Emanuel attorneys to review the exhibits to which objections were raised and to review both the case record as well as applicable law to prepare for oral argument regarding the admissibility of such exhibits.

145.      Ultimately, in an attempt to minimize the disputes brought before the Court, the Debtors, Trustee and Committee counsel negotiated with Barclays' counsel over the admission of certain exhibits. These negotiations ultimately lead to four stipulations governing the admission of the majority of the exhibits offered in the Barclays litigation. Notwithstanding the four stipulations, as discussed above, the Court heard argument regarding the admission of certain PwC documents and other exhibits on October 8, 2010.

146.      ***Pre-Trial: Designations.*** Quinn Emanuel attorneys also designated the deposition testimony of various witnesses for use at trial. In connection with the deposition designations, Quinn Emanuel spent time reviewing all of the Rule 60(b) Motions, Barclays' response as well as the movants' Rule 60(b) replies in order to ascertain the scope of the designations. It was also necessary for Quinn Emanuel attorneys to review the other movants' deposition designations so as to ensure all facts necessary to the Committee's prosecution of its Rule 60(b) Motion was presented through the designations.

147.      Quinn Emanuel attorneys also spent significant time counter-designating the deposition testimony of various witnesses for use at trial. In connection with the deposition counter-designations, Quinn Emanuel attorneys spent time reviewing Barclays' designations, and the pleadings filed in order to ascertain the scope of the counter-designations. In total, the parties designated and counter-designated 52 deposition transcripts.

148.      Quinn Emanuel attorneys also spent time reviewing and negotiating with Barclays regarding the admission of exhibits through the deposition designations. Most of the objections were resolved by the parties, however, the Court heard arguments regarding the remaining designated exhibits on October 18, 2010.

149.    ***Pre-Trial: Witness Lists***.  Quinn Emanuel dedicated time during this period to coordinating with other movants' counsel to create a complete witness list for the movants' case in the Barclays trial.  Quinn Emanuel attorneys engaged in multiple discussions, extensive review of deposition transcripts, and numerous emails in order to create a list of witnesses for trial.  Subpoenas were required for certain witnesses.  To that end, Quinn Emanuel prepared trial subpoenas for Mr. Klein, Mr. Despins and Mr. Seery.  Quinn Emanuel attorneys further prepared outlines and demonstrative exhibits for use with witnesses scheduled to appear at trial.

150.    ***Trial***.  Quinn Emanuel attorneys devoted significant time and effort to prepare for the trial dates.  Quinn Emanuel attorneys, together with the other movants' counsel, spent considerable time coordinating the numerous tasks involved in preparing for trial as well as general overall trial strategy by email, phone conferences, and in-person meetings.  Coordination has been key in a case with such complex issues and with numerous parties.  The Committee also has dedicated considerable time to coordinating tasks among the three movants to avoid needless duplication of effort.

151.    On April 9, 2010, the Court heard opening arguments in connection with the Barclays trial.  In preparation for opening arguments, Quinn Emanuel attorneys reviewed the voluminous factual record (including the briefing and exhibits) and created a detailed presentation to the Court that outlined the Committee's legal arguments.  Additionally, Quinn Emanuel attorneys spent considerable time reviewing the record to prepare their oral presentation during opening arguments.  In connection with these preparations, Quinn Emanuel attorneys undertook a detailed review and summary of case law presented in both the Committee's briefing respecting the state of the law on the issues raised in the Rule 60(b) Motions.

152.        On April 26, 2010, the evidentiary hearing regarding the Rule 60(b)

Motions began.  Through the course of the 32 days of evidentiary hearings, the Court took

testimony from 38 witnesses and 3 expert witnesses.  Quinn Emanuel attorneys participated in the

direct and cross examinations of witnesses.  As discussed above, considerable effort went into

preparing to take testimony from these witnesses.  Witness preparation involved not only an

extensive review of the documentary evidence and deposition testimony, but also the preparation

of witness outlines.  Once trial began, Quinn Emanuel attorneys reviewed the trial transcripts to

supplement the witness outlines.  Quinn Emanuel attorneys also continually reviewed the exhibit

list and supplemented the list as necessary.  Further, additional Quinn Emanuel attorneys were

responsible for reviewing and understanding Barclays' exhibit list.  Preparation involved not only

an extensive review of the documentary evidence and deposition testimony, but also review of the

expert reports.

153.        Due to the complex nature of the trial issues, various Quinn Emanuel

attorneys were necessary both in trial preparation and at trial.  Mindful of the resources being

devoted to this important trial, Quinn Emanuel worked to reduce the number of attorneys needed

for each trial day.  Indeed, by the start of Barclays' presentation, in September 2010, Quinn

Emanuel scaled its trial team from eight attorneys down to four.  Where possible, Quinn Emanuel

avoided having all four of these core team members at the evidentiary hearing.

154.        ***Closing Argument***.  Quinn Emanuel attorneys spent extensive time

preparing for the Committee's closing presentation.  Quinn Emanuel attorneys reviewed the

evidentiary record created throughout trial, as well as, the pleadings, and caselaw cited therein,

filed during the pendency of the Rule 60(b) trial.  Moreover, Quinn Emanuel attorneys prepared

an extensive multimedia presentation that was used during the oral argument.  In creating the

54

Committee's presentation, Quinn Emanuel attorneys drafted an extensive outline and conducted

multiple moot arguments to refine the presentation.

155.      ***Post-Trial Brief.***  The movants and Barclays submitted post-trial

briefs and findings of fact/conclusions of law on November 22, 2010.  The preparation of the

Committee's post-trial brief proved to be an immense task given the lengthy evidentiary record

and pleadings submitted by all of the parties.  Quinn Emanuel attorneys spent a significant

amount of time researching Rule 60(b) issues, drafting, and revising the post-trial brief.  Indeed,

Quinn Emanuel attorneys were able to synthesize a considerable amount of information into a

171-page pleading.  Quinn Emanuel attorneys also submitted findings of fact and conclusions of

law on that same day.  On February 22, 2011, the Bankruptcy Court issued its memorandum

opinion finding that Rule 60(b) relief was not appropriate.

156.      Quinn Emanuel attorneys spent extensive time reviewing the Court's

opinion and analyzing potential next steps with respect to the same, including examinations of the

impact of the decision on other estate litigations and possible additional litigation.  Quinn

Emanuel attorneys also negotiated and drafted proposed orders with respect to the Court's

opinion.  Coordination was required among the movants in the drafting of such orders.

157.      On July 15, 2011, Barclays filed a notice of appeal to the extent the

Court's order denied Barclays' motion and granted the Trustee's motion.  Quinn Emanuel

attorneys reviewed Barclays' notice of appeal and designation of the record.

158.      Quinn Emanuel drafted and filed a notice of appeal, on the

Committee's behalf.  Quinn Emanuel attorneys then spent time reviewing the trial record in order

to designate the record and to draft a statement of issues on appeal.  Quinn Emanuel attorneys

then spent time reviewing Barclays' counter-designation of the record, filed on August 25, 2011.

159.        After a re-evaluation of the record and a considerable number of discussions with the Committee and the Debtors, it was decided that the Committee would file a stipulation to dismiss its appeal with prejudice.  The stipulation and order were filed on September 23, 2011.

**7.  DIP Reconsideration Motion**.  On September 29, 2008, the Committee filed the Motion of Official Committee of Unsecured Creditors for Reconsideration of Court's September 17, 2008 Interim Order (I) Authorizing Debtor to Obtain Postpetition Financing Pursuant to Sections 363 and 364 of Bankruptcy Code and (II) Granting Liens and Superpriority Claims to Postpetition Lenders Pursuant to Section 364 of Bankruptcy Code (the "Motion for Reconsideration").

160.        The Motion for Reconsideration sought reconsideration of the interim order, dated September 17, 2008 (the "Interim DIP Order"), approving a debtor-in-possession credit agreement, dated September 17, 2008 (the "DIP Credit Agreement"), between LBHI and Barclays.  The Motion for Reconsideration sought reconsideration of the Court's approval of a certain "termination fee" in the principal amount of $7,500,000.00 (the "Termination Fee") that Barclays claimed entitlement to under the terms of that certain fee letter (the "Fee Letter") executed in connection with the DIP Credit Agreement.   The Motion for Reconsideration was adjourned from time to time as the parties considered a negotiated resolution of the matter.

161.        That settlement ultimately was reached.  On January 25, 2012, the Committee, LBHI and Barclays entered into a Stipulation and Order Settling Issues in Connection with the Postpetition Financing of Lehman Brothers Holdings Inc. and Providing for the Release of Funds (the "Stipulation").  Under the terms of the Stipulation, the Termination Fee, which had been held in an escrow account (the "Escrow Account") pending the resolution of the dispute, would be released as follows: (i) $6,250,000 would be transferred to Barclays, and (ii) $1,250,000

56

and the balance of the Escrow Account, including interest accrued thereon, would be transferred to the LBHI estate in full and complete satisfaction and release of all claims relating to the DIP Credit Agreement, the Interim DIP Order, the Fee Letter and the Motion for Reconsideration.

162.        Quinn Emanuel attorneys were an active participant in the negotiations that ultimately culminated in the Stipulation. Toward that end, Quinn Emanuel attorneys spent significant time analyzing the factual and legal issues related to the dispute, evaluating the propriety of the settlement and preparing the Stipulation. On February 7, 2012, the Bankruptcy Court entered an Order approving the Stipulation.

**8.  Investigation of Certain Key Parties and Transactions**. These cases commenced under exigent circumstances starting on September 15, 2008. In the weeks building up to that date, the Debtors were involved in myriad negotiations and transactions concerning possible sales of their assets, financial assistance and other rescue options. Since the bankruptcy filings, the estates were parties to other significant transactions, e.g., the Sale Transaction. Quinn Emanuel was tasked with examining, on the Committee's behalf, certain of these events and transactions. Thus, Quinn Emanuel attorneys devoted and directed an enormous amount of resources into the review and analysis of the Debtors' relationships with these parties and the facts and circumstances surrounding transactions in which they were involved. Quinn Emanuel attorneys prepared and presented to the Committee numerous detailed research memoranda reviewing these investigations.

163.        ***Examiner's Report.***  On March 11, 2010, Anton R. Valukas, the Examiner appointed to the LBHI cases, issued a report (the "Examiner's Report") presenting his findings and conclusions respecting, inter alia, potential estate claims and causes of action. Quinn Emanuel attorneys spent a significant amount of time reviewing the Examiner's Report and incorporating its findings into its own investigations. Quinn Emanuel attorneys also conducted an

independent investigation on the Committee's behalf of certain of the factual and legal assertions

in the Examiner's Report in order to ascertain the effect of such findings on the Committee's

investigations of claims against certain secured lenders and other financial institutions.

164.    ***Avoidance Actions.*** Section 546(c) of the Bankruptcy Code

establishes a two-year deadline for commencing avoidance actions. The deadline for Lehman to

commence avoidance actions expired on September 15, 2010. Quinn Emanuel attorneys spent a

significant amount of time conducting investigations regarding certain secured lenders and

financial institutions to determine whether the estates would need to commence actions or

otherwise take steps to preserve the estates' rights against these lenders.

165.    With respect to the on-going investigations against secured lenders

and financial institutions, during this period, Quinn Emanuel attorneys worked closely with the

estates' professionals in the analysis of potential claims against such entities. The investigations

entailed (i) in-depth research, (ii) multiple conferences, (iii) document review, (iv) drafting

memoranda of law regarding potential claims, (v) reviewing filed proofs of claim, and (vi) the

drafting of pleadings relating to these institutions. Due to the confidential nature of these

investigations, this Application only discusses this investigation in general terms. Ultimately, as a

result of the work of the estate professionals, including Quinn Emanuel, the Debtors filed 65

avoidance actions and obtained over 177 tolling agreements, thereby preserving the Debtors' right

to later commence actions where appropriate.

166.    ***Collateral Disposition Agreement.*** Shortly before LBHI filed for

chapter 11 bankruptcy protection, JPMC demanded that LBHI guarantee all obligations between

JPMC and LBHI and its affiliates, including LBI. JPMC further demanded that LBHI post

collateral to support its guaranty obligations. LBHI consented to JPMC's requests and executed a

guaranty (on September 9, 2008) (the "Guaranty") of the obligations of its affiliates and posted

cash (the "Cash Collateral") and securities (the "Posted Securities", and together with the Cash

Collateral, the "Collateral") to secure the Guaranty. Shortly after LBHI's chapter 11 filing, JPMC

allegedly began liquidating the Posted Securities and applying the proceeds against LBI's

clearance-related obligations, yet, JPMC had not sold certain supposedly illiquid securities (the

"Remaining Securities") and had not, yet, applied the Cash Collateral to LBI's obligations.

167.    On February 24, 2010, LBHI filed a motion seeking approval of an

agreement by which JPMC would return the Remaining Securities to LBHI in exchange for

authorization to apply the Cash Collateral against the Secured Claims (the "Collateral Disposition

Agreement"). The Collateral Disposition Agreement also contained an express reservation of any

and all estate and Committee claims and causes of action, rights and defenses with respect to

JPMC.

168.    Quinn Emanuel undertook, on the Committee's behalf, an extensive

review and analysis of the Collateral Disposition Agreement. In addition to reviewing and

commenting on multiple drafts of the agreements and attending multiple conferences with the

Debtors' professionals, Quinn Emanuel also dedicated considerable time and effort to ensuring

the "litigation neutrality" of the agreement with respect to JPMC. Quinn Emanuel also worked

closely with the Committee's financial advisors to ascertain the economic benefits of the

agreement and to ensure it had a positive economic impact on the estates. By order dated March

24, 2010, the Court approved the Collateral Disposition Agreement.

169.    **SIPA Issues.** Quinn Emanuel attorneys dedicated time to reviewing

certain activity in the Securities Investor Protection Act ("SIPA") case that affected the Debtors'

cases and certain initiatives involving the Committee. These included, without limitation,

settlements negotiated and consummated by the Trustee involving significant financial

institutions that, themselves, have extensive relationships with the Debtors' estates.

170.    ***Settlement Between LBI and JPMC***.  On April 20, 2011, the Trustee and JPMC entered into a settlement agreement (the "LBI Settlement") involving certain disputes between the parties (including a release by LBI of JPMC).  On April 21, 2011, the Trustee filed a motion (the "Settlement Motion") pursuant to Rule 9019(a) of the Bankruptcy Rules seeking approval of the LBI Settlement.

171.    The parties met various times to address the questions and concerns that the LBHI and Committee advisors had regarding the LBI Settlement.  Draft responsive pleadings also were prepared to respond to the settlement, which would be filed, if necessary, absent agreement on the contours of the LBI Settlement.  Ultimately, with modifications to the proposed order approving the LBI Settlement that were heavily negotiated, the Court approved it on June 23, 2011.  The Court's order approving the LBI Settlement between the Trustee and JPMC established generally (among other things) that the LBI Settlement would not affect the rights, claims, defenses or standing asserted by LBHI or the Committee with JPMC.

F.    **Derivatives/SWAP Agreement Issues  (Hours: 3,264.90, Fees: $2,279,864.00)**

172.    Quinn Emanuel attorneys devoted time to reviewing numerous derivatives transactions to which the Debtors were, or are, parties.  The Debtors have been in the process of reconciling and winding down their considerable derivatives trading activities.  Quinn Emanuel attorneys devoted time to diligencing certain of these transactions involving various counterparties, including large financial institutions, to ensure that the value for unsecured creditors has been maximized.

173.    The Debtors have challenged whether counterparties had the right to unilaterally terminate various derivatives transactions as a result of the Debtors' chapter 11 filings.  Given the sheer volume of the Debtors' trading activity, the number of similarly situated

transactions, and the value of such transactions to the estates, the outcome of such challenges can have substantial effect on the Chapter 11 Cases.

174.     On behalf of the Committee, and working with the Committee's financial advisors, and from time to time, the Debtors' professionals, Quinn Emanuel attorneys have devoted substantial time to examining issues, researching legal issues, drafting memoranda, attending mediations, settlement meetings, and hearings, and providing updates to the Committee and its derivatives sub-committee concerning such challenges. Among the litigation matters handled by Quinn Emanuel are/were: the Ballyrock Adversary Proceeding (Adv. Pro. No. 09-01032); the Libra Adversary Proceeding (Adv. Pro. No. 09-01177) and disputes with parties involved in the Libra and MKP Vela transactions; and aspects of the so-called Bank of America "flip" Adversary Proceeding (Adv. Pro. No. 10-03547).

1.  **Ballyrock Adversary Proceeding**. On February 3, 2009, LBSF filed a complaint seeking: (i) a declaratory judgment that (a) the proposed distribution to Ballyrock's investors is improper and (b) termination of the swap agreement was improper; and (ii) a preliminary and permanent injunction, enjoining the Trustee or Ballyrock from taking any action in furtherance of the wrongful termination, including disbursing any of the remaining assets to any party other than LBSF. On February 5, 2009, Wells Fargo filed an answer and complaint in interpleader as trustee and sought a determination as to which, if any, of the parties is entitled to the funds at issue. On March 31, 2009, Ballyrock filed a motion to dismiss the adversary proceeding. On April 2, 2009, Wells Fargo filed a notice of presentment of an order granting Wells Fargo's counterclaim in interpleader.

175.     On April 20, 2009, the Court signed an order granting preservation of status quo for disputed funds, the notice of interpleader request and the payment of trustee fees. On June 3, 2009, the Court signed an order granting interpleader to Wells Fargo. On June 17,

61

2009, certain noteholders filed a memorandum of law in further support of Ballyrock's motion to dismiss. On August 7, 2009, Barclays also filed a reply memorandum in further support of the motion to dismiss.

176.     Quinn Emanuel attorneys, on behalf of the Committee, intervened in this action by stipulation and order entered on July 30, 2009. Quinn Emanuel attorneys spent time drafting, revising and filing a substantive joinder to the Debtors' opposition to Ballyrock's motion to dismiss on August 7, 2009. Thereafter, Quinn Emanuel attorneys spent time preparing for the hearing which took place on September 17, 2009. After a lengthy hearing, the Court took the matter under advisement.

177.     On May 12, 2011, the Bankruptcy Court issued a memorandum decision (followed by an order on June 28, 2011) granting in part and denying in part Ballyrock's motion to dismiss. The Bankruptcy Court denied the motion to dismiss in relation to the two counts that, respectively, seek to invalidate the defaulted synthetic termination payment clause as an ipso facto clause or to enjoin the proposed distribution, and granted the motion as to the count that alleges that ineffective steps were taken to terminate the swap agreement. Quinn Emanuel attorneys spent time reviewing the memorandum decision and conferring with the Debtors regarding the same.

178.     On July 19, 2011, LBSF amended its complaint, seeking the following relief: (i) entry of a declaratory judgment that the provisions modifying LBSF's senior payment priority as a result of LBHI's bankruptcy filing are unenforceable clauses, penalties and violate the automatic stay; (ii) injunctive relief enjoining Ballyrock and the Trustee from taking any action in furtherance of the wrongful attempt to terminate the swap agreement or to distribute any of the collateral proceeds to parties other than LBSF; (iii) in the alternative, for a judgment against the Trustee that the disbursement of funds effected a preferential transfer, a constructive

fraudulent transfer or an unauthorized post-petition transfer that is avoidable and, LBSF is entitled

to recover and preserve senior payment priority for the benefit of its estate; (iv) for a judgment

against the Ballyrock investors for LBSF's security interest in that portion of the collateral

proceeds that was improperly conveyed to such investors by the Trustee; (v) for an order

imposing a constructive trust on the proceeds received by the investors; and (vi) for a declaration

that the termination of the Swap Agreement violated the terms of the indenture and that the swap

agreement remains in effect. Quinn Emanuel attorneys conferred with the Debtors regarding the

amended complaint and reviewed the same.

179.        Throughout the second half of the 2011 calendar year, Quinn

Emanuel attorneys reviewed various pleadings and the Court's order. Indeed, on August 2, 2011,

Ballyrock filed a motion for leave to appeal the issues of the proper scope and application of the

Bankruptcy Code's ipso facto provisions and section 560's safe harbor to swaps. On September

9, 2011, Ballyrock and certain other investors filed answers to LBSF's amended complaint. On

that same day, the Trustee filed a motion to dismiss the adversary proceeding. On September 15,

2011, Blackrock amended its answer to LBSF's amended complaint. On November 4, 2011, the

District Court denied Ballyrock's motion seeking leave to appeal. On November 21, 2011, the

Trustee withdrew the motion to dismiss the adversary proceeding. On December 19, 2011, Wells

Fargo filed its answer to LBSF's amended complaint.

180.        On January 23, 2012, Judge Peck entered a scheduling order and

discovery plan, which, among other things, required all document discovery and fact witness

depositions to be completed by August 17, 2012, all responses to requests for admissions and

contention interrogatories to be completed by November 28, 2012, and all expert depositions to

be completed by December 14, 2012.

2. **Libra Adversary Proceeding**. On May 5, 2009, LBSF and LBHI filed a

complaint for declaratory and injunctive relief against Libra CDO Limited ("Libra"), LaSalle

Bank National Association ("LaSalle"), acting in its capacity as trustee under an indenture (the

"Indenture") pursuant to which Libra raised capital through the issuance of certain notes, BofA

(as successor in interest to LaSalle and with LaSalle, the "Libra Trustee"), and Société Générale,

New York Branch ("SGNY" and together with Libra and the Libra Trustee, the "Defendants").

On June 5, 2009, BofA filed a response to the complaint denying the allegations in the complaint.

Thereafter, on June 19, 2009, LBHI and LBSF filed a motion seeking summary judgment arguing

that no material facts are in dispute, rather, at issue is the proper construction of the contracts. On

June 26, 2009, Defendants filed a motion and memorandum of law in support of their cross-

motion for summary judgment.

181.    Quinn Emanuel attorneys dedicated time to reviewing relevant issues in

this matter. Quinn Emanuel negotiated the Committee's intervention in the adversary proceeding

and researched and wrote a response in opposition to the Defendants' cross-motion for summary

judgment. The Committee intervened in this action by stipulation and order entered on July 16,

2009. On July 17, 2009, LBHI and LBSF filed an opposition to the Defendants' cross-motion for

summary judgment. Also, on July 17, 2009, the Committee filed a response in opposition to

Defendants' cross-motion for summary judgment and a joinder in LBHI and LBSF's opposition

to Libra's cross-motion for summary judgment.

182.    On August 7, 2009, the Committee filed a reply to Defendants' opposition

to LBHI and LBSF's motion for summary judgment, arguing that the Libra parties' arguments

simply ignore the plain meaning of the documents and the economic reality of the integrated

transaction. On August 26, 2009, the Court held a hearing on the summary judgment motions.

The Court took the matters under advisement, but permitted supplemental briefing on two issues.

183.        On September 2, 2009, the Defendants filed a supplemental memorandum of law to address the August 26, 2009 hearing and Lehman's arguments at that hearing. Quinn Emanuel attorneys reviewed the Defendants' supplemental memorandum and then worked quickly to draft and file a response. On September 9, 2009, LBHI, LBSF and the Committee submitted a joint response to BofA's supplemental memorandum of law.

184.        Quinn Emanuel attorneys participated in multiple meetings and conferences with Libra counsel, Debtors' counsel and the Committee's financial advisors regarding the status and implications of this adversary proceeding with respect to other issues in the cases. Moreover, Quinn Emanuel attorneys dedicated significant time discussing issues implicated in this case with the derivatives sub-committee.

185.        Indeed, it was necessary for Quinn Emanuel attorneys to conduct research regarding the implications of this proceeding as well as other legal issues, and draft memoranda regarding the same. The parties have also been engaged in settlement negotiations. On March 16, 2010, the Court arranged for a conference call to hear an update on the settlement discussions. Subsequently, Quinn Emanuel attorneys have been involved in researching and analyzing settlement scenarios to advise the Committee of the propriety of certain of these settlement scenarios.

186.        On September 20, 2010, Lehman filed a motion seeking approval of a settlement with SGNY with respect to the Libra transaction and a similar transaction known as MKP Vela. The settlement requires SGNY to pay $370 million and guarantee further payment of $75 million. The settlement does not resolve disputes with the Libra Trustee or with the MKP Vela trustee, and Lehman, if successful in the litigation, could obtain up to approximately $72.5 million from the proceeds of assets in Libra and MKP Vela. The Committee supported the settlement and spent time not only reviewing the settlement, but also drafting and filing a

statement in support on October 13, 2010. The Libra Trustee and MKP Vela trustee filed

objections to the settlement motion. The settlement motion was heard by the Bankruptcy Court

on October 20, 2010. On October 21, 2010, the Court entered an order approving the settlement

motion.

187.    On March 16, 2012, LBSF, LBHI and SGNY entered into a note

purchase agreement whereby LBSF may purchase Class A-1 Libra notes at a weighted average

price that may not exceed 0.15 in order to facilitate recoveries from the Libra transaction. Quinn

Emanuel spent time negotiating the note purchase agreement and conferring with its financial

advisor regarding the terms.

**3. Big Bank Settlement Framework**. Quinn Emanuel attorneys devoted time to

reviewing and analyzing a proposed framework for resolving disputes regarding over $20 billion

in derivatives claims filed by 13 financial institutions. This "Big Bank" settlement process

involved the review of a complex manual outlining LBSF's proposed calculation of a settlement

framework as well as attending multiple meetings with LBSF and the various derivatives

counterparties affected by the framework.

**4. Derivatives ADR Process**. Quinn Emanuel attorneys also represented the

Committee in a number of pre-mediation negotiations and mediation sessions arising through the

Court-ordered derivatives alternative dispute resolution process. Quinn Emanuel has represented

the Committee with respect to numerous derivatives matters subject to the alternative dispute

resolution process, several of which resulted in mediation sessions (the counterparties to which

are confidential pursuant to the order commencing the ADR process). Before each session, Quinn

Emanuel attorneys would review the confidential mediation statements submitted by the estates

and the counterparty, review all the underlying transaction documents and any related

correspondence, and prepare a detailed memorandum to the Committee discussing the transaction

and recommending an appropriate settlement floor. Quinn Emanuel attorneys would also liaise with representatives for the estates in advance of each mediation session.

### G.    Firm's Own Billing/Fee Applications (Hours: 4,184.50, Fees: $1,602,513.00)

188.    Pursuant to the Bankruptcy Code, Local Rules, and the Compensation Order, Quinn Emanuel prepared and served forty two monthly fee statements (the "Fee Statements") for approval and allowance of compensation for actual, reasonable and necessary professional services rendered, and reimbursement of expenses for actual reasonable and necessary expenses incurred during the Fee Period. Each Fee Statement contained extensive records of the work performed by Quinn Emanuel. Quinn Emanuel attorneys dedicated significant time to reviewing and preparing the Fee Statements.

189.    Quinn Emanuel attorneys also prepared and served ten interim fee applications during this period. Preparing the interim fee applications involved consolidating Quinn Emanuel's fees and expenses for forty two monthly Fee Statements. Extensive time was spent organizing the time entries and preparing the charts and descriptions for work done during the interim fee applications.

190.    Additionally, time was spent responding to the Fee Committee's questions and reports and filing a joinder to Milbank's response to the Fee Committee's report for the third interim period. In connection with the Fee Committee's report, Quinn Emanuel attended a meeting on March 31, 2010 regarding the Fee Committee's concerns. Lastly, Quinn Emanuel attorneys spent time reviewing and revising the overall litigation budget and amending Quinn Emanuel's budget accordingly.

**H.**    **Firm's Own Retention Issues (Hours: 330.40, Fees: $131,504.00)**

191.        Time billed to this category relates to the drafting and filing of Quinn
Emanuel's retention application as well as any subsequent review of documents or information
necessary to ensure appropriate and effective disclosure in connection with Quinn Emanuel's
continued retention.

**I.**    **2004 Issues  (Hours: 1,244.10, Fees: $597,894.50)**

192.        In connection with the Committee's investigations of certain events
that transpired prior to the commencement of the Chapter 11 Cases, certain post-petition
transactions (e.g., the Sale Transaction), and the relationships between the Debtors and their
lenders and counterparties, Quinn Emanuel attorneys attempted to obtain consensual discovery
from various parties.  When those efforts failed, attorneys from Quinn Emanuel prepared and,
when necessary, filed various motions pursuant to Bankruptcy Rule 2004.

193.        JPMC 2004 Motion.  Quinn Emanuel attorneys spent considerable
time researching and drafting a motion (the "JPMC Motion") seeking leave under Bankruptcy
Rule 2004 to conduct discovery against JPMC.  The JPMC Motion sought, generally, documents
regarding (i) the numerous contractual relationships between JPMC and the Debtors, (ii) JPMC's
claims against the Debtors, and (iii) certain events leading to the filing of the Chapter 11 Cases.
On October 2, 2008, Quinn Emanuel, on behalf of the Committee, filed the JPMC Motion.

194.        Both the Debtors and JPMC responded to the JPMC Motion.  Quinn
Emanuel attorneys then engaged in extensive negotiations with counsel to JPMC seeking a
consensual resolution of the JPMC Motion and their objection.  On November 5, 2008, Quinn
Emanuel filed a Stipulation And Consent Order (I) Governing Interim Production of Documents
and (II) Adjourning Remainder of Motion of Official Committee of Unsecured Creditors of
Lehman Brothers Holdings, Inc., et al. For Leave to Conduct Discovery of JPMorgan Chase

68

Bank, N.A. Pursuant to 11 U.S.C. §§ 105(A) and 1103(C) And Federal Rule Of Bankruptcy

Procedure Rule 2004 (the "2004 Stipulation"), which provided JPMC would immediately begin

producing a subset of the documents requested in the JPMC Motion and deferred the balance of

documents to a later date.

195.    Following execution of the 2004 Stipulation, Quinn Emanuel

attorneys dedicated time to negotiating appropriate confidentiality agreements between JPMC and

the Committee governing the handling of documents produced by JPMC pursuant to the 2004

Stipulation.

196.    Pursuant to the 2004 Stipulation, JPMC produced documents. Quinn

Emanuel attorneys spent considerable time and effort reviewing these documents in an attempt to

ascertain the contours of the relationship (e.g., the legal rights and entitlements as well as the

business dealings) between the Debtors and JPMC. Quinn Emanuel also engaged in negotiations

with JPMC's counsel regarding the remaining production not addressed by the 2004 Stipulation.

JPMC also produced documents pursuant to those agreements, which were reviewed by Quinn

Emanuel attorneys.

197.    As with any document production, it was necessary for Quinn

Emanuel's professionals to install storage and categorization methods to allow Quinn Emanuel

attorneys to better access the material produced. Quinn Emanuel attorneys also coordinated with

the Committee's financial professionals in their review of the JPMC documents.

**J.    Nonworking Travel  (Hours: 1,939.70, Fees: $1,168,289.50)**

198.    Time billed under this category was for the necessary time that Quinn

Emanuel attorneys spent traveling on behalf of the Committee to Committee meetings,

depositions and court hearings. Given the compressed time and magnitude of the litigation in

which Quinn Emanuel is involved, it was necessary for attorneys outside of Quinn Emanuel's

New York office to travel to New York to participate in meetings, hearings, and settlement

negotiations and depositions. In the JPMC litigation, there were eighty (80) depositions held in

New York and nineteen (19) held in London. As discussed above, the attendance of these

attorneys was necessary to the effective and efficient representation of the Committee. Thus, time

billed included cross-country air travel relating to this litigation.[5] Quinn Emanuel attorneys also

spent time traveling locally to Court, depositions and in-person meetings with the Debtors and

other third parties.

## VII.    ALLOWANCE OF COMPENSATION

199.    The factors to be considered in awarding attorneys fees as enumerated

in In re First Colonial Corp. of America, 544 F.2d 1291, 1298-99 (5th Cir. 1977), have been

adopted by most courts, including the Bankruptcy Court for the Southern District of New York.

See, e.g., In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 22 n.5 (Bankr. S.D.N.Y.

1991). Indeed, a majority of the First Colonial factors are now codified in section 330(a)(3). See,

e.g., 3 L. King, et al., Collier on Bankruptcy at ¶ 330.04[3][c] (15th ed. rev 2008).

200.    Section 330(a)(1)(A) of the Bankruptcy Code provides, in pertinent

part, that the Court may award to a professional person, "reasonable compensation for actual,

necessary services rendered." Section 330(a)(3)(A), in turn, provides that:

> In determining the amount of reasonable compensation to be awarded,
> the court shall consider the nature, the extent, and the value of such
> services, taking into account all relevant factors, including –
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;

---

[5]        The airfare incurred was not billed at business class fares.

(C) whether the services were necessary to the administration of, or beneficial at the time which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title. 11 U.S.C. § 330(a)(3)(A).

201.    The congressional policy expressed above provides for adequate compensation in order to continue to attract qualified and competent professionals to bankruptcy cases. In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 850 (3d Cir. 1994) ("Congress rather clearly intended to provide sufficient economic incentive to lure competent bankruptcy specialists to practice in the bankruptcy courts.") (citation and internal quotation marks omitted); In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 18 (Bankr. S.D.N.Y. 1991) ("Congress' objective on requiring that the market, not the Court, establish attorneys' rates was to ensure that bankruptcy cases were staffed by appropriate legal specialists."). Quinn Emanuel respectfully submits that the consideration of these factors should result in this Court's allowance of the full compensation sought.

A.    **The Time and Labor Required**

202.    The professional services rendered by Quinn Emanuel have required the continuous expenditure of substantial time and effort, under time pressures which sometimes required the performance of services late into the evening and, on a number of occasions, over weekends and holidays. The services rendered required a high degree of professional competence and expertise in order to be administered with skill and dispatch. During the compensation period, approximately 83,882.90 recorded hours were expended by Quinn Emanuel' s partners, associates, and legal assistants in providing the requested professional services. Quinn Emanuel's

71

hourly billing rates, as set out in Schedule 1, are computed at the rates Quinn Emanuel regularly charges its hourly clients.

**B.    The Necessity of The Services and Benefit to the Estate**

203.    These Chapter 11 Cases are generally regarded as among the most complex and active bankruptcy cases ever filed.  Indeed, many of the complex issues regarding the Debtors' financial contracts are issues of first impression, with far reaching ramifications.  As detailed above, the services Quinn Emanuel provided to the Committee were necessary to preserve and enhance the value of the Debtors' estates and conferred substantial benefit to the Debtors' unsecured creditors.  Quinn Emanuel's services have furthered and will continue to further the Committee's obligations as fiduciary for the Debtors' unsecured creditors and will continue to maximize estate value.

204.    Quinn Emanuel nonetheless made every effort to avoid duplication.  On any matter where Quinn Emanuel attorneys work with estate counsel, Quinn Emanuel aims to coordinate efforts and maintain efficiency.

**C.    The Novelty and Difficulty of Issues Presented in the Cases**

205.    Novel and complex issues have arisen in the course of the Chapter 11 Cases, and it can be anticipated that other such issues will be encountered.  In these cases, as in many others in which the firm is involved, Quinn Emanuel's effective advocacy and creative approach to problem solving have helped clarify and resolve difficult issues and will continue to prove beneficial.

**D.    The Experience, Reputation and Ability of the Attorneys**

206.    Quinn Emanuel has extensive experience in the areas of insolvency, workouts and corporate reorganizations.  Quinn Emanuel's services on behalf of the Committee have been rendered in a highly efficient manner by attorneys who have achieved a high degree of

expertise in these areas.  The skill and competency of the Quinn Emanuel attorneys who have

represented the Committee have ensured that these cases have been administered in the most

efficient and expeditious manner.

## VIII.  DISBURSEMENTS

207.    Quinn Emanuel has incurred a total of $2,186,638.32 in expenses in

connection with representing the Committee during the Final Compensation Period.  Quinn

Emanuel records all expenses incurred in connection with the performance of professional

services.

208.    In connection with the reimbursement of expenses, Quinn Emanuel's

policy is to charge its clients in all areas of practice for expenses, other than fixed and routine

overhead expenses, incurred in connection with representing its clients.  The expenses charged to

Quinn Emanuel's clients include, among other things, telephone and telecopy toll and other

charges, mail and express mail charges, special or hand delivery charges, photocopying charges,

out-of-town travel expenses, local transportation expenses, expenses for working meals,

computerized research, and transcription costs.

209.    Quinn Emanuel charges the Committee for these expenses at rates

consistent with those charged to Quinn Emanuel's other bankruptcy clients, which rates are equal

to or less than the rates charged by Quinn Emanuel to its non-bankruptcy clients.  In accordance

with section 330 of the Bankruptcy Code, the Local Guidelines and with the U.S. Trustee

Guidelines, Quinn Emanuel seeks reimbursement only for the actual cost of such expenses to

Quinn Emanuel.

210.    In providing or obtaining from third parties services which are

reimbursable by clients, Quinn Emanuel does not include in such reimbursable amount any costs

of investment, equipment or capital outlay.

73

211.     Quinn Emanuel regularly charges its non-bankruptcy clients for ordinary business hourly fees and expenses for secretarial, library, word processing and other staff services because such items are not included in the firm's overhead for the purpose of setting the billing rates.  Certain of those expenses have been included in the Application.

212.     Attorneys at Quinn Emanuel have not incurred expenses for luxury accommodations or deluxe meals.  The Application does not seek reimbursement of air travel expenses in excess of coach fares.  Throughout the Final Compensation Period, Quinn Emanuel has been keenly aware of cost considerations and has tried to minimize the expenses charged to the Debtors' estates.

## IX.    <u>NOTICE</u>

213.        Notice of this Application, as set forth in the Interim Compensation

Order, has been given to (a) the Debtors, (b) counsel for the Debtors, (c) the Office of the United

States Trustee, (d) Counsel for the Official Committee of Unsecured Creditors, and (e) the

chairperson of the fee committee.

## X.    CONCLUSION

WHEREFORE, Quinn Emanuel respectfully requests the Court to enter an order, conforming to the amounts set forth in Fee Schedule A (1) attached hereto as Exhibit E (a) allowing Quinn Emanuel (i) compensation for professional services rendered as counsel for the Committee during the Fee Period in the amount of $40,757,246.10 and (ii) reimbursement of expenses incurred in connection with rendering such services in the aggregate amount of $2,186,638.32, for a total award of $42,943,884.42; (b) authorizing and directing the Debtors to pay to Quinn Emanuel any and all such amounts less any amounts already received for services rendered and expenses incurred during the Final Compensation Period; and (c) granting such further relief as is just.

Dated:  July 5, 2012
New York, New York

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By:    /s James C. Tecce
       James C. Tecce

Susheel Kirpalani (SK8926)
James C. Tecce (JT5910)
Olga M. Urbieta (OU0612)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone No.: (212) 849-7000
Facsimile No.: (212) 849-7100

*Special Counsel to Official Committee Of
Unsecured Creditors Of Lehman Brothers
Holdings Inc., et al.*