**Hearing Date: TBD (Prevailing Eastern Time)**
**Objection Deadline: TBD (Prevailing Eastern Time)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 Case No. |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | 08-13555 (JMP) |
| **Debtors.** | (Jointly Administered) |

**COVER SHEET FOR THE ELEVENTH AND FINAL APPLICATION OF HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC., INVESTMENT BANKER TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR ALLOWANCE OF COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND REIMBURSEMENT OF ACTUAL AND NECESSARY EXPENSES INCURRED FROM SEPTEMBER 17, 2008 THROUGH MARCH 6, 2012**

| | |
|---|---|
| **NAME OF APPLICANT:** | Houlihan Lokey Howard & Zukin Capital, Inc. |
| **AUTHORIZED TO PROVIDE PROFESSIONAL SERVICES AS:** | Investment Banker to the Official Committee of Unsecured Creditors |
| **DATE OF FINAL RETENTION:** | December 17, 2008 (*nunc pro tunc* to September 17, 2008) |
| **PERIOD FOR WHICH FINAL COMPENSATION AND REIMBURSEMENT IS SOUGHT:** | September 17, 2008 – March 6, 2012 |
| **AMOUNT OF COMPENSATION SOUGHT:** | $43,932,513.18 |
| **AMOUNT OF EXPENSES SOUGHT AS ACTUAL AND NECESSARY:** | $564,678.92 |
| **AMOUNT OF COMPENSAION PREVIOUSLY PAID:** | $16,850,666.66 |
| **AMOUNT OF EXPENSES PREVIOUSLY REIMBURSED:** | $559,685.91 |
| **AMOUNT OF UNPAID FEEs:** | $27,081,846.52 |
| **AMOUNT OF EXPENSES YET TO BE REIMBURSED:** | $4,993.01 |

Houlihan Lokey is not seeking any compensation for the preparation of this Application.

This is an: _____ interim ____X____ final application

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | Chapter 11 Case No. |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | **08-13555 (JMP)** |
| **Debtors.** | **(Jointly Administered)** |

**ELEVENTH AND FINAL APPLICATION OF HOULIHAN LOKEY HOWARD &
ZUKIN CAPITAL, INC., INVESTMENT BANKER TO THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS, FOR ALLOWANCE OF COMPENSATION FOR
PROFESSIONAL SERVICES RENDERED AND REIMBURSEMENT OF ACTUAL
AND NECESSARY EXPENSES INCURRED
FROM SEPTEMBER 17, 2008 THROUGH MARCH 6, 2012**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey"), as investment banker to the Official Committee of Unsecured Creditors (the "Committee") of Lehman Brothers Holdings, Inc., ("LBHI") et al., the debtors and debtors-in-possession (collectively, the "Debtors"), and together with their non-debtor affiliates ("Lehman"), hereby submits this eleventh and final application (the "Application") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), pursuant to sections 328, 330 and 331 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991 and amended April 21, 1995 (together, the "Local Guidelines"), the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330, effective

January 30, 1996 (the "U.S. Trustee Guidelines"), and the Fourth Amended Order Pursuant to

Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) Establishing

Procedures for Interim Monthly Compensation and Reimbursement of Expenses of

Professionals, dated April 14, 2011 (the "Interim Compensation Order"), for the allowance of

compensation for professional services rendered from September 17, 2008 through and including

March 6, 2012 (the "Total Compensation Period"), and for reimbursement of expenses incurred

in connection with such services.

By this Application, Houlihan Lokey requests final allowance and approval of

total compensation in the amount of $43,932,513.18 in fees (including the $11,665,846.52

Deferred Fee associated with the Initial Distribution, a $15,000,000.00 Additional Fee and

$17,266,666.66 in Monthly Fees), of which $27,081,846.52 remains unpaid as of the date of this

Application. Houlihan Lokey also requests final allowance and approval of the reimbursement of

actual and necessary expenses in the amount of $564,678.92 posted during the Total

Compensation Period, of which $4,993.01 remains unpaid as of the date of this Application.

Finally, Houlihan Lokey also requests authorization for payment in full of future Deferred Fees,

following each subsequent distribution to unsecured creditors, upon submission by Houlihan

Lokey of a fee statement to the Debtors, the U.S. Trustee, their respective counsel, and

Committee counsel that includes the amount of the Deferred Fee payment request and the total

distributions to unsecured creditors related thereto. In support of this Application, Houlihan

Lokey respectfully represents as follows:

### **BACKGROUND**

1.    <u>Bankruptcy Filing</u>. On September 15, 2008, and periodically thereafter

(the "Petition Date"), the Debtors commenced the Chapter 11 Cases. The Debtors' Chapter 11

Cases have been consolidated for procedural purposes and are being jointly administered

pursuant to Rule 1015(b) of the Bankruptcy Rules. The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      Creditors' Committee. On September 17, 2008, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Committee in the Chapter 11 Cases.

3.      SIPA Trustee. On September 19, 2008, a proceeding (the "SIPA Proceeding") was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"), a wholly owned subsidiary of LBHI and a registered broker-dealer. James W. Giddens, Esq. is the trustee appointed under SIPA (the "SIPA Trustee") administering LBI's estate.

4.      Examiner. The United States Bankruptcy Court for the Southern District of New York (the "Court") approved the appointment of Anton R. Valukas as examiner (the "Examiner") in the Chapter 11 Cases in its Order Approving the Appointment of Examiner, dated January 20, 2009. In accordance with his appointment, the Examiner issued his report on February 8, 2010 under seal, which was subsequently unsealed on March 11, 2010.

5.      Fee Committee. On May 26, 2009, the Court appointed a fee committee (the "Fee Committee") and approved a fee protocol (the "Fee Protocol") in the Chapter 11 Cases. On January 24, 2011, the Court approved the Fee Committee's recommendation to appoint Richard A. Gitlin as the successor Independent Member of the Fee Committee. By motion dated March 11, 2011, the Fee Committee sought authorization to amend the Fee Protocol, which the Court granted on April 14, 2011 (the "Amended Fee Protocol") [Docket No. 15998].

6.    <u>Debtors' Plan and Disclosure Statement</u>. On March 15, 2010, the Debtors filed their Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors [Docket No. 7572]. Subsequently, on April 14, 2010, the Debtors filed their Disclosure Statement for Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code [Docket No. 8332], along with their revised Chapter 11 Plan [Docket No. 8330].

7.    <u>Debtors' First Amended Plan and Disclosure Statement</u>. On January 25, 2011, the Debtors filed their First Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors [Docket No. 14150] and the Debtors' Disclosure Statement for First Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code [Docket No. 14151].

8.    <u>Debtors' Second Amended Plan and Disclosure Statement</u>. Following the filing of competing plans of reorganization by the Ad Hoc Group of Lehman Brothers Creditors (the "<u>Ad Hoc Group Plan</u>") and the Non-Consolidation Plan Proponents (the "<u>Non-Con Plan</u>"), the Debtors filed their Second Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (the "<u>Second Amended Plan</u>") [Docket No. 18204] and the Disclosure Statement for Second Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code [Docket No. 18205] on June 30, 2011.

9.    <u>Debtors' Third Amended Plan and Disclosure Statement</u>. After numerous and lengthy negotiations among the Debtors, the Committee and multiple creditor groups, including Lehman's affiliates in foreign countries (the "<u>Foreign Affiliates</u>"), on September 1, 2011, the Debtors filed the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings

4

Inc. and its Affiliated Debtors (as amended, modified and supplemented, the "Plan") [Docket No. 19627] and the Debtors' Disclosure Statement for the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code (the "Disclosure Statement") [Docket No. 19629]. Also on September 1, 2011, the Court entered an amended order approving the Disclosure Statement, establishing solicitation and voting procedures in connection with the Plan, scheduling a confirmation hearing for December 6, 2011, and establishing notice and objection procedures for the confirmation hearing [Docket No. 19631]. On September 15, 2011, the Court entered an order approving a modification to the Disclosure Statement [Docket No. 20016]. On December 6, 2011, the Court entered an order confirming the Plan [Docket No. 23023]. The Plan went effective at 12:01 a.m. on March 6, 2012 (the "Effective Date").

        10.    Jurisdiction. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Chapter 11 Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2). The statutory predicates for the relief sought herein are sections 328, 330 and 331 of the Bankruptcy Code. Pursuant to the Local Guidelines, a certification regarding compliance with the Local Guidelines is attached hereto as Exhibit "A."

**RETENTION OF HOULIHAN LOKEY
AND SUMMARY OF PROFESSIONAL COMPENSATION
AND REIMBURSEMENT OF EXPENSES REQUESTED**

        11.    On December 17, 2008, pursuant to the Final Order Under 11 U.S.C. §§ 328(a) and 1103 And Fed. R. Bankr. P. 2014 And S.D.N.Y. LBR 2014-1 Authorizing The Retention And Employment Of Houlihan, Lokey, Howard, & Zukin Capital, Inc., As Investment Banker For The Official Committee Of Unsecured Creditors Effective As Of September 17,

2008, and as amended on July 2, 2009 [Docket No. 4265], (the "Retention Order"), the Court authorized Houlihan Lokey's retention as the investment banker for the Committee in these cases. The Retention Order authorized Houlihan Lokey to receive compensation pursuant to the procedures set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Guidelines, the U.S. Trustee Guidelines, and the local rules and orders of this Court.

12.    Houlihan Lokey prepared this Application in accordance with the Local Guidelines, the U.S. Trustee Guidelines and the Interim Compensation Order, and collectively with the Local Guidelines and U.S. Trustee Guidelines, the "Guidelines"). As stated above, a certification regarding compliance with the Guidelines is attached hereto as Exhibit "A".

13.    Houlihan Lokey requests that this Court authorize: (a) the final allowance of compensation for professional services Houlihan Lokey rendered during the Total Compensation Period in the amount of $43,932,513.18, of which $27,081,846.52 remains unpaid as of the date of this Application, and (b) the reimbursement of actual and necessary expenses Houlihan Lokey incurred in connection with the rendition of such professional services in the amount of $564,678.92, of which $4,993.01 remains unpaid as of the date of this Application.

14.    With respect to the Deferred Fee, the Engagement Letter states that it "shall be paid (by the Debtors) as and when each payment or distribution is made to any unsecured creditor of the Debtors" (the "Deferred Fee"). As a result of the effective date of the Plan, the first distribution to unsecured creditors occurred on April 17, 2012 (the "Initial Distribution"). Given that distributions to unsecured creditors will likely be made over a number of years into the future, and so as to minimize the administrative burden with respect to approval of future Deferred Fee payments, Houlihan Lokey seeks authorization from the Court for payment in full of future Deferred Fees, following each subsequent distribution to unsecured

creditors, upon submission by Houlihan Lokey of a fee statement to the Debtors, the U.S. Trustee, their respective counsel, and Committee counsel. Such fee statement will include the amount of the Deferred Fee payment request and the total distributions to unsecured creditors related thereto.

15.    In its Tenth Interim Fee Application, dated May 21, 2012 (the "Tenth Interim Fee Application") [Docket No. 27997], Houlihan Lokey sought approval of a $15,000,000 additional fee (the "Additional Fee"), in addition to its Deferred Fee and Monthly Fee.[1] As described therein, the Additional Fee is *not* a request for a fee enhancement based upon the results achieved by Houlihan Lokey or the massive effort undertaken in these cases, but rather, it is a request that this Court adjust the fees of Houlihan Lokey to take into account certain unforeseeable circumstances that rendered the original terms of the Engagement Letter improvident. Houlihan Lokey's request for the Additional Fee is supported by the Committee.

16.    Pursuant to Bankruptcy Rule 2016(a), there is no agreement or understanding between Houlihan Lokey and any other person for the sharing of compensation to be received for services rendered in these cases.

17.    Houlihan Lokey respectfully submits that (a) the services provided by Houlihan Lokey were necessary for, and beneficial to, the Committee, (b) Houlihan Lokey satisfied the requirements of section 328(a) of the Bankruptcy Code as set forth in Retention Order, and (c) the requested compensation, including the Additional Fee, is appropriate based on the complexity, importance and nature of the necessary services provided by Houlihan Lokey that went well beyond what could have been expected of it at the beginning of these cases as an investment banker for the Committee.

---

[1] More specifically, as part of its Tenth Interim Fee Application, Houlihan Lokey sought approval of the full amount of the Additional Fee and payment of 80% of such amount. As part of this Application, Houlihan Lokey is seeking payment of the remaining 20% of the Additional Fee.

18.    Pursuant to the U.S. Trustee Guidelines and the Retention Order, Houlihan Lokey maintained a schedule setting forth all Houlihan Lokey professionals who performed services in these Chapter 11 Cases during the Total Compensation Period, the capacities in which each such individual is employed by Houlihan Lokey and the aggregate number of hours expended by U.S. restructuring professionals in this matter.

19.    Houlihan Lokey does not maintain, in the normal course of providing financial advisory and investment banking services to its clients, detailed written time records, and does not bill its clients based on the number of hours expended by its professionals. However, Houlihan Lokey maintained written records in hour increments of the time expended by its U.S. restructuring professionals in the rendition of professional services to the Committee in the Total Compensation Period in accordance with the terms of the Guidelines. Such time records were made in connection with the rendition of services by the person rendering such services. Non-U.S. restructuring professionals and all non-restructuring professionals maintained weekly task summaries during the Total Compensation Period and were not required by the Guidelines to maintain hourly time records. Aggregate hours for the U.S. restructuring professionals totaled over 31,000 hours for the period from September 17, 2008 through and including March 6, 2012 (note that this figure excludes, in particular, the hours worked by the sizeable team of Houlihan Lokey's non-restructuring, Financial Advisory Services professionals whose meaningful role is summarized further below).

20.    Houlihan Lokey maintains electronic records of the time expended and expenses incurred in the rendering of the professional services required by the Committee. Copies of these records for the Total Compensation Period were furnished to the Court, the U.S.

8

Trustee, the Debtors, counsel for the Debtors, and the Fee Committee in connection with the filing of the Interim Fee Applications.

21.    Due to the volume of the time and expense records, and consistent with the Interim Compensation Order, these materials were not filed with the Court.  As indicated, copies of these records have previously been provided to the Debtors, the U.S. Trustee, and the Court; additional copies of these records can be provided to these same parties upon request.

22.    Houlihan Lokey has not received any payments from the Debtors other than those sought by this Application and those set forth in Houlihan Lokey's retention application.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

**SUMMARY OF SERVICES RENDERED**

23.     Houlihan Lokey was retained as investment banker to the Committee in respect of all of the Debtors in these unprecedented and complex cases because of Houlihan Lokey's extensive knowledge and reputation in financial restructuring, its familiarity with the issues involved in these cases and the Committee's belief that Houlihan Lokey possesses the requisite resources and is well qualified to represent the Committee. During the Total Compensation Period, Houlihan Lokey rendered a broad range of professional services to the Committee in various areas, addressing critical issues faced by the Committee during these Chapter 11 Cases. The services that Houlihan Lokey performed were substantial and necessary. Houlihan Lokey worked extensively with other professionals retained by the Committee, the Debtors, and the Debtors' professionals (including but not limited to Alvarez & Marsal, LLC ("A&M"), Weil Gothsal & Manges LLC ("Weil") as counsel and Lazard Freres & Co. LLC ("Lazard"), as investment banker), and attempted to perform its services with the minimum amount of duplication with the Committee's and other party's advisors.

24.     During the Total Compensation Period and throughout multiple facets of these Chapter 11 Cases, Houlihan Lokey performed services that were much more considerable than a Committee advisor would expect to perform. In its Tenth Interim Fee Application, Houlihan Lokey requested an Additional Fee (in addition to its Monthly Fees and Deferred Fees) as compensation for these expanded services. As of the filing of this Application the Additional Fee has not yet been approved by the Court. Accordingly, the sections of the Tenth Interim Fee Application in support of the Additional Fee are hereafter incorporated by reference in this Application. As detailed therein, the additional material services which support allowance of the Additional Fee include (i) analyzing and valuing a substantial portion of the Debtors' derivative

contracts, (ii) multiple asset recovery projects, (iii) the development of fundamental Plan concepts and compromises, (iv) settlement negotiations with non-debtor foreign affiliates, and (v) the resolution of Lehman Brothers' two banks and certain structured loan transactions (collectively, items (i) through (v), the "Additional Material Services"). Even though Houlihan Lokey was retained solely as a Committee advisor, given the overwhelming size and complexity of these Chapter 11 Cases, Houlihan Lokey assumed a much more substantial role than would typically be played by a Committee advisor in connection with the Additional Material Services. In these matters, Houlihan Lokey's role went well beyond the customary Committee advisory role envisioned in Houlihan Lokey's Engagement Letter, and with respect to each of the Additional Material Services it worked directly with the Debtors. As described in the Tenth Interim Fee Application, these efforts took several years to perform and it could not have been expected that Houlihan Lokey (or any other non-Debtor professional) would be required to commit the amount of time and resources necessary to perform such tasks. Accordingly, Houlihan Lokey hereby repeats its request, set forth more fully in the Tenth Interim Fee Application, for the adjustment of the terms of Houlihan Lokey's engagement to account for the Additional Material Services which benefitted the Debtors' estates by billions of dollars of value.

25.    The following summarizes the significant professional services rendered by Houlihan Lokey during the Total Compensation Period[2].

**Business Due Diligence & Analysis**

26.    Houlihan Lokey conducted business due diligence and analysis on, and/or had meetings or discussions with, the following key areas and/or individuals in these Chapter 11 Cases, including, among others:

---

[2] The majority of the professional services described below correspond to time records kept by Houlihan Lokey, however, to the extent Additional Material Services included work for which time records were not required to be kept or such services are not otherwise described below, the descriptions of such Additional Material Services set forth in the Tenth Interim Fee Application are incorporated by reference.

(a)      Investment Banking Division ("<u>IBD</u>") Sale Transaction (3000)[3]

(b)      LBI/SIPA/Examiner (1100/4400)

(c)      Investment Management Division ("<u>IMD</u>") / Neuberger Berman
         Spin-Out Transaction (3100/2300)[4]

(d)      Private Equity (2300)[6]

(e)      Real Estate (2200)

(f)      Loan Book (2500)

(g)      Derivatives (2400)

(h)      International Operations and Other Foreign Assets (2700)

(i)      Lehman Banks (Bankhaus, LBCB, LBB, <u>et al.</u>) (2600)

(j)      Capital Structure/Cash Reports/Monthly Operating Report
         (1200/1800/1900/2100/2800)

27.      Houlihan Lokey's primary role was to advise and represent the Committee in connection with the Debtors' vast, varied and complicated assets and operations. To do so, it was necessary for Houlihan Lokey to investigate and analyze the activities and assets of the Debtors and to report significant events and decisions to the Committee and its various subcommittees. In order to complete thorough due diligence processes and enable the Committee to be fully informed, along with the Committee's other professionals (including, but not limited to, FTI Consulting, Inc. ("<u>FTI</u>"), as financial advisor, and Milbank, Tweed, Hadley & McCloy, LLP ("<u>Milbank</u>"), as counsel, and Quinn Emanuel ("<u>Quinn</u>"), as conflicts counsel), when necessary, Houlihan Lokey attended numerous in-person meetings and participated in conference calls with the Debtors and the Debtors' professionals across the areas listed above and met with governmental regulators when necessary. These meetings allowed Houlihan Lokey to become

---

[3] Figure in parentheses indicates the standardized Fee Committee code for hours.

[4] Note that the IMD transaction was originally classified as a Non-Derivative Executory Contract/365 Issue (3100). Currently, the IMD/Neuberger Berman investment resides in the Private Equity (2300) portfolio and Houlihan Lokey records any hours associated with IMD/Neuberger Berman in Private Equity (2300). For consistency purposes, Houlihan Lokey continues to keep the write up regarding Neuberger Berman as its own separate section.

more familiar with the relevant issues concerning the Debtors and their assets and to monitor and participate in the processes of the Debtors and the Debtors' professionals, including sale processes (e.g. IBD, IMD / Neuberger Berman, private equity platforms, loan trading book transactions and derivative settlements). In conjunction with keeping the Committee informed, Houlihan Lokey prepared materials for distribution for weekly Committee and Committee co-chair calls, for regularly scheduled private equity, real estate, derivatives, loan book, and international subcommittee calls, and for monthly in-person Committee meetings. Houlihan Lokey researched underlying issues, compiled and analyzed data provided by the Debtors and the Debtors' professionals, and synthesized this information for the Committee and its subcommittees. Based on all of the meetings, data analysis, and Houlihan Lokey's experience, Houlihan Lokey, along with the Committee's other advisors, continued to refine specific strategies for each of the asset classes.

IBD Sale Transaction (3000)

28.     Houlihan Lokey actively participated in the IBD sale process. Houlihan Lokey attended the sale hearing pertaining to the sale to Barclays Capital, Inc. ("Barclays") on September 19, 2008. After the hearing, Houlihan Lokey was involved in discussions regarding the transaction with the Debtors and Debtors' professionals, reviewed proposed terms and reported progress and notable events to the Committee during numerous conference calls. To facilitate negotiations, Houlihan Lokey reviewed a significant amount of information regarding assets to be transferred to the buyer in the Barclays transaction, including loans and equity holdings. Houlihan Lokey was also integral in identifying issues arising out of the transition services agreement with Barclays, as critical information residing on systems and knowledgeable people purchased by Barclays were not made available to the Debtor and the Debtors'

professionals. The reconciliation process of assets sold to Barclays and assets retained by LBI was an on-going work stream throughout the case, leading up to the Barclays Settlement (as defined below). Houlihan Lokey worked cooperatively with the Committee's other professionals to identify reconciliation issues and potential resolutions. Additionally, Houlihan Lokey assisted the Committee's counsel with various aspects of the settlement between the SIPA Trustee, Barclays, LBI and the Depository Trust & Clearing Corporation (the "DTCC") (the "Barclays Settlement") and the investigation of the events and actions leading up to the asset transfer and the Barclays Settlement. Furthermore, Houlihan Lokey provided key analytics used in the Committee's response to the Barclays Settlement motions.

LBI/SIPA/Examiner (1100/4400)

29.    Periodically throughout these Cases, Houlihan Lokey and other Committee professionals met with the SIPA Trustee regarding LBI and provided updates to the Committee regarding, among other topics, the transfer of assets from LBI to Lehman ALI Inc., the reconciliation of the Barclays/LBI transaction, the remaining assets and the cash position of the LBI estate, the preliminary claims received by the LBI estate, the restitution of customer account balances at LBI, and the estimated timing of the LBI wind-down/liquidation.

30.    Furthermore, Houlihan Lokey reviewed the proposed Barclays Settlement and the supporting documents, to ascertain whether the calculation of the "make whole" payment utilized and the valuation methodology employed by the SIPA Trustee in calculating the settlement payment was reasonable. Houlihan Lokey valued the underlying positions associated with the "make whole" payment utilizing internal securities pricing resources. This analysis was a key component of the Committee's response to the motion filed by the SIPA Trustee regarding the settlement agreement.

31.    On January 26, 2009, Houlihan Lokey attended a meeting with Milbank, FTI, Quinn, and the Examiner to understand the Examiner's role and scope of his assignment. All parties agreed to coordinate to avoid duplication of efforts. Houlihan Lokey participated on multiple calls following the initial meeting referenced above to assist in providing information and relevant perspective to the Examiner's professionals to allow them to ramp-up more quickly. Houlihan Lokey coordinated with the Committee's other professionals to provide appropriate updates to the Committee regarding such activities.

IMD / Neuberger Berman Spin-Out (3100/2300)

32.    Houlihan Lokey was deeply involved with the first IMD / Neuberger Berman sale process and resulting spin-out transaction in 2008/2009. Houlihan Lokey attended countless meetings and aided the Debtors in the negotiations with Bain Capital and Hellman & Friedman, the stalking horse bidders. Houlihan Lokey reviewed the data room associated with the sale process, participated in management presentations and analyzed the stalking horse bid. Houlihan Lokey compiled a list of other potential bidders to ensure that the highest value was received for IMD / Neuberger Berman. Houlihan Lokey also analyzed other potential bidders as part of the stalking horse court hearing in December 2008.

33.    Specifically, in connection with the stalking horse proposal, Houlihan Lokey reviewed, commented on and objected to the proposed transaction terms and conditions, including, but not limited to, the size of the termination fee, expense reimbursement and certain purchase price adjustments. These objections ultimately resulted in more favorable terms from the Debtors' perspective.

34.    The stalking horse proposal contemplated price adjustments based on the movement of the Standard & Poor's 500, which, in addition to other purchase price adjustments,

could have resulted not only in a low value for the business but also provided walk-away rights for the stalking horse bidders. Houlihan Lokey monitored the adjustments to the potential value to the Debtors based on these purchase price adjustments on a near daily basis. When it became evident that the stalking horse proposal may not have been the value-maximizing solution and/or that the walk-away rights hypothetically might be triggered, Houlihan Lokey advocated that a management led spin-out scenario be actively pursued. Houlihan Lokey worked with Milbank, Lazard, and Weil to formulate the most appropriate structure for a management led spin-out scenario. Once the spin-out scenario was structured, Houlihan Lokey summarized the pros and cons of each alternative, which led to the Committee's approval of the spin-out transaction. The transaction provided the Debtors with consideration valued at approximately $1.0 billion at the time (as compared to the approximate $806 million proposed by Bain Capital and Hellman & Friedman) and ultimately led to a monetization event in 2012 for the estate as explained further below.

35.    Houlihan Lokey continued to monitor and analyze Neuberger Berman's performance relative to its peers and explore, in conjunction with the Debtors, strategic alternatives to monetize the position. As such, at the end of 2010, Houlihan Lokey began actively participating in negotiations with Neuberger Berman management and its advisors which ultimately led to an agreement that would provide the Debtors with $814 million of cash at closing for its preferred equity and a gradual exit of the Debtors' remaining equity position over time. It is estimated that the Debtors could potentially realize $1.3-$1.5 billion of value versus the initial management buyout value of $1.0 billion.

36.    Houlihan Lokey conducted extensive analyses, ran numerous scenarios and made several presentations to the Committee to garner support for the refinancing

16

transaction. Houlihan Lokey participated in numerous calls and meetings to negotiate the critical terms of the transaction. In addition, Houlihan Lokey coordinated positions with the Debtors and led the discussions with large creditors that resulted in the modifications that resulted in the consensual transaction on improved terms. On November 9, 2011, the Debtors filed the motion to authorize the transaction [Docket No. 21847], which was then amended on December 9, 2011 [Docket No. 23169]. Houlihan Lokey spent significant time discussing the filed motion with the Committee and Ad Hoc Group throughout November 2011. On December 12, 2011, both the Committee and the Ad Hoc Group filed statements of support for the amended transaction [Docket Nos. 23212 and 23222, respectively]. Throughout 2012, Houlihan Lokey continued to monitor the refinancing transaction.

Private Equity (2300)

37.     Houlihan Lokey devoted substantial time to the private equity work stream. Houlihan Lokey's activities included assisting the Debtors in evaluating (i) monetization strategies related to its general partnership and limited partnership stakes and management contracts in its venture capital, merchant banking and real estate private equity funds, (ii) funding requests, (iii) potential dispositions and (iv) strategies for monetizing assets going forward. In addition, Houlihan Lokey spent considerable time helping Lehman and their professionals proactively manage and reduce Lehman's outstanding unfunded commitments.

38.     To provide the Committee with the most up-to-date view on the underlying portfolio assets of the venture capital and merchant banking funds, Houlihan Lokey analyzed trading and transaction comparables when available from Lehman and otherwise applied industry trends to approximate an updated value. These re-"marks" enabled Houlihan Lokey and the Committee to better evaluate the bids received during the sale processes of these

17

platforms. Houlihan Lokey aided A&M in evaluating the bids in terms of price, deal structure, and the probability of a successful sale. Houlihan Lokey also monitored the real estate private equity platform sale process. Among other things, Houlihan Lokey's role included analysis and review of underlying asset values and certain interim funding decisions. For each of the investment platforms, Houlihan Lokey evaluated the option to retain or sell Lehman's interest in the secondary market, which included analyzing the secondary market pricing trends over the last few years.

39.     Outside of the private equity funds, Lehman has a significant number of direct investments and investments in third party hedge and private equity funds. Houlihan Lokey was actively involved in Lehman's decision to provide on-going funding to some of these investments and to negotiate sales / redemptions. Upon being presented with an opportunity to provide additional value-enhancing capital or dispose of an investment, Houlihan Lokey performed detailed analyses on Lehman's investment in order to better assess the benefits to the estate. These analyses included, but are not limited to, projected cash flow analysis, investment valuation and implied return analysis. In addition, Houlihan Lokey took part in negotiations, alongside Lehman and its counterparts, in order to ensure favorable deal terms for the estate. For example, Houlihan Lokey spent significant time negotiating with R3 Capital management regarding the buyout of the Debtors' 45% general and 48% limited partnership interests. After several months of analysis and negotiations, Houlihan Lokey was able to enhance the recovery to the Debtors versus R3 Capital's initial proposal by over 60%. Houlihan Lokey also had a significant role with respect to the Debtors' Wilton RE investment. Following a 2008 capital call by Wilton Re, Houlihan Lokey negotiated directly with Wilton Re's management and assisted in getting management to reduce the proposed funding price to $50.00 a share. Subsequently, at the

end of the 2011, the Debtors were able to sell its stake back to Wilton Re at $69.00 per share, netting a gross recovery of $390 million and a gain of approximately $90 million for the Debtors.

40.    Furthermore, Houlihan Lokey spent significant time developing a framework to manage the estate's private equity assets on a go-forward basis, specifically discussing potential disposition strategies and situational factors for more illiquid positions. In general, Houlihan Lokey categorized assets into four main strategies: active management, passive management, outright sale and a sale of a participation. Active management investments include assets that would benefit from management by the Debtors or A&M employees (these assets include the larger investments such as D.E. Shaw, etc.). Passive management investments included assets where active management is not required such as LP positions (fully funded and partially funded), direct investments with no board or only observation rights and other smaller direct investments. Outright sale investments included a number of assets that could be sold given that they are public securities. Lastly, the investments characterized as a sale of a participation included a majority of the "high touch" assets that require more day-to-day management in order to facilitate an exit and therefore would likely benefit from a third-party investor.

Real Estate (2200)

41.    Houlihan Lokey primarily focused on Lehman's U.S. commercial real estate asset portfolio. Houlihan Lokey attended the weekly real estate meetings with the Debtors, the Debtors' professionals and FTI. In these meetings, the group discussed weekly fundings, key issues, the process for evaluating property disposition and long term funding decisions, and third-party motions filed against the Debtors and their related action plans. Additionally, the group continued to discuss the overall strategy for U.S. commercial real estate, regarding long

19

term hold and short term sale strategies by asset type, in order to maximize the return for the creditors and best utilize the estate's expertise in certain areas.

42.      At the onset of the case and throughout its progression, Houlihan Lokey and FTI segregated the Debtors' assets in order to minimize any overlap, with the exception of large assets such as Archstone and the land joint ventures ("JV"), where both firms contributed in various aspects of the oversight. As such, Houlihan Lokey, in coordination with FTI, met with the specific asset managers at the Debtors, reviewed deal memos, analyzed strategic alternatives and evaluated underlying cash flows associated with various investment positions. Houlihan Lokey, along with FTI, presented summaries and recommendations (for its respective group of assets) to the real estate subcommittee for its approval for the Debtors to fund / monetize their assets. For example, Houlihan Lokey spent considerable time working with the Debtors and the Debtors' advisors regarding the strategic alternatives for the estate's investments in Innkeepers' hospitality portfolio, which ultimately went through its own separate Chapter 11 process. Alternatives considered included various sale transactions as well as recapitalizations whereby Lehman would have retained a controlling stake in the restructured enterprise. Houlihan Lokey also assisted in evaluating potential strategies and agreements and term sheets with the borrower and other interested parties as a way to maximize value for the Lehman positions. Through numerous presentations and conference calls with the Committee, Houlihan Lokey garnered Committee support at key decision points that enabled the estate to pursue desired outcomes. Ultimately, an auction was held for the 64 hotels owned by Innkeepers and the Chatham Lodging Trust / Cerberus Capital Management Group won the auction with a $1.02 billion purchase price. In addition, Houlihan Lokey, in coordination with FTI, devoted a significant amount of time overseeing the Debtors' process with regards to its Archstone investment. Houlihan Lokey

20

participated in numerous calls and meetings with the Debtors (who initially owned a 47% stake in Archstone). Houlihan Lokey also assisted the Committee in evaluating potential M&A and initial public offering alternatives for Archstone.

43.    In addition, similar to Private Equity, Houlihan Lokey developed, along with FTI and the Debtors and the Debtors' advisors, the protocol for "bucketing" the U.S. commercial assets into potential disposition strategies to facilitate the conversations regarding funding and overall portfolio strategy. In general, the strategies included: wind-downing down the portfolio with a third-party asset manager, structuring a JV with day-to-day management handled by the JV partner, creating a REIT to IPO some of the underlying real estate and issuing collateralized mortgage-backed securities of certain real estate loans.

Loan Book (2500)

44.    Houlihan Lokey initially addressed time-sensitive issues arising from the open loan trades and assisted the Debtors in developing negotiating strategies and negotiating with open trade counter-parties. Houlihan Lokey was intimately involved in each step of the negotiation process, frequently sitting in on resolution conversations, reviewing final settlements, and elevating issues to the subcommittee. Most counterparty negotiations ultimately reached resolution without litigation. However, some counterparties have objected to trade assumptions, and Houlihan Lokey worked with the Debtors' professionals and Milbank to analyze and resolve such conflicts.

45.    Additionally, Houlihan Lokey, undertook significant effort to organize, classify, mark, and understand the funded and unfunded loan assets comprising the entire Lehman Brothers loan book and prepare updates for the Loan Book Subcommittee regarding the same. Houlihan Lokey analyzed and compared the ratings and the marks on the funded loan

21

book assets as prepared by the Debtors with its own analyses and coordinated with the Debtors in tracking higher risk "watch list" loans.

46.     Houlihan Lokey reviewed numerous unfunded commitments and provided assistance to legal counsel in refining the strategy for which unfunded loan commitments should be assumed as part of the Debtors' plan of reorganization in order to mitigate any potential cash reserves that may need to be set aside for cure costs and to meet any future borrowing requests.

47.     Houlihan Lokey also assisted the Debtors in evaluating pledged loan assets that resided in special purpose vehicles ("SPV") where the estate held an equity interest. Significant effort was undertaken to determine where any unsold SPV notes resided as they may have been transferred to Barclays and/or seized by JPMorgan Chase.

48.     In addition to its periodic updates to the Loan Book Subcommittee, Houlihan Lokey performed a comprehensive analysis of the loan book portfolio and maturity profile to formulate an overall loan management and disposition strategy that was used by the Loan Book Subcommittee in discussions with the Debtors regarding the long-term management of the portfolio. Analysis included Houlihan Lokey's consideration and estimation of the remaining life of the case and underlying credit quality of individual borrowers. For select positions, Houlihan Lokey performed credit analysis, worked directly with Lehman employees, and presented final results to the Loan Book Subcommittee for its consideration.

49.     Houlihan Lokey was also involved in efforts by the Debtors to explore various financing and asset management alternatives involving the loan book. Houlihan Lokey, on behalf of the Loan Book Subcommittee, analyzed various alternatives for the ultimate maximization of the loan book value, including disposition, financing and management

alternatives. The Debtors, in consultation with Houlihan Lokey, developed a process to solicit proposals from CLO/loan managers with expertise in the field. The Debtors closely evaluated the proposals received with respect to cost, willingness to cooperate with the Debtors' governance and reporting protocol requirements, the continuity of loan portfolio management, and flexibility to structure and pursue CLO opportunities should the estate and the Loan Book Subcommittee believe that such is a value maximizing strategy going forward. At the conclusion of this process, a CLO/loan manager was selected by the Debtors. Houlihan Lokey worked closely with the Debtors to negotiate an asset management agreement and was able to obtain significant concessions prior to such agreement being filed with and approved by the bankruptcy court. In addition, Houlihan Lokey worked with other potential CLO/loan managers that expressed an interest in the transaction on potentially higher and better terms after the filling of the asset management agreement resulting in further concessions.

50.     Houlihan Lokey also assisted Milbank with the Loan Market Association ("LMA") elevation litigation, aimed at recouping additional funds for the estate, by reviewing and analyzing the LMA transfer, participation, and termination agreements for all elevated loans to verify the amount for each respective commitment. In addition to reviewing the aforementioned documents, Houlihan Lokey also worked with the Debtors to determine the appropriate marks for the elevated loans as of their respective elevation dates and compare those marks to current prices. The result of Houlihan Lokey's analyses was a comprehensive analysis that detailed the value of the elevated loans on a commitment-by-commitment basis.

51.     Furthermore, Houlihan Lokey participated directly with the Debtors in resolving a number of large structured loan situations, including Fusion Funding Ltd./Fusion Funding Luxembourg, Bankhaus participations (including assisting the Debtors with the analysis

of the purchase by the Debtors of these participations, which yielded a significant gain for the estate), Pine CCS, Ltd., Sumitomo Mitsui Banking Corporation and MetLife, Inc. Houlihan Lokey negotiated directly with the counterparties in certain of these situations, which generated in aggregate approximately $2 billion in recovery value and resolved approximately $2 billion in claims.

Derivatives (2400)

52.    Over the course of approximately three and a half years, Houlihan Lokey had up to five employees working full-time out of the Debtors' offices reviewing and analyzing the Debtors' derivative contracts. All in all, Houlihan Lokey analyzed, modeled and developed or reviewed negotiating strategies for approximately 1,500 derivative master agreements that covered approximately two-thirds of all non-"Big Bank" derivative asset value recovered ($6 billion) and claims allowed ($6.1 billion) through the Plan Effective Date. Houlihan Lokey also performed substantial work on the "Big Bank" settlement framework, which required the analysis of over $20 billion of filed claims. By assisting the Debtors, Houlihan Lokey helped resolve nearly all such filed claims at more than a 35% discount to the aggregate filed claim amount.

53.    Experts from Houlihan Lokey's Financial Advisory Services were called upon to assist in unraveling the Debtors' derivatives portfolio beginning in October 2008. Over the course of the next three and a half years, it is estimated that these experts committed over 40,000 hours[5] to reviewing more than 1,500 derivative master agreements that involved approximately 500,000 to 750,000 trade legs, conducting complex valuations of collateral, which included developing intricate proprietary valuation models, reviewing whether the derivatives

---

[5] The Houlihan Lokey experts from Financial Advisory Services, because they are not in the Restructuring Group, were not required by the Retention Order to maintain time records. The total number of hours presented here is a conservative estimate.

were properly terminated and closed out, working with the Debtors to engage with approximately one hundred or more contract counterparties, including intercompany and "Big Bank" derivatives relationships, and developing, reviewing and implementing settlements and resolutions. Other than a few limited exceptions where A&M and the Debtors retained a separate advisor, only the Committee's professionals worked on the analysis and resolution of derivatives transactions. Houlihan Lokey, therefore, was not shadowing or double-checking the efforts of the Debtors' advisors, rather Houlihan Lokey performed unique work that had to be accomplished to resolve these monumental cases.

54.    Houlihan Lokey worked directly with transaction parties and traders to identify relevant settlement issues, provided strategic guidance in developing claim resolution strategies and independently assessed the value of the derivative products and appropriate settlement amounts. The net results were that Houlihan Lokey experts were directly involved in billions of dollars of derivatives-based claims elimination and asset recoveries for these estates.

International Operations and Other Foreign Assets (2700)

55.    As described further in the Tenth Interim Fee Application, Houlihan Lokey played a significant role in resolving the Debtors' relationships with certain of the foreign affiliates including, in particular, LBIE and Bankhaus, In addition to the significant work associated with these key settlements, Houlihan Lokey advised the Committee with respect to a number of other foreign proceedings.

56.    For the Asian proceedings, Houlihan Lokey met in early 2009 with the Debtors and KPMG LLP ("KPMG"), the provisional liquidators (appointed as liquidators in February 2009) for eight Hong Kong entities and certain of the Singaporean entities to discuss the operations, assets and the overall strategy to liquidate and/or sell the assets and settle

intercompany accounts. A large focus was on developing a strategy to maximize the value of the Japanese assets given the material amounts of intercompany receivables owed to the Hong Kong and Singapore entities by Lehman's Japanese entities. To that end, Houlihan Lokey met and held telephonic meetings with KPMG and the Debtors to discuss the Japanese proceedings, real estate assets, and the sale process.

57.    The Debtors sold a number of foreign businesses, including its Indian business processing outsourcing operations, its French investment banking operations, its Russian broker dealer, and its Turkish subsidiary. For the Indian business processing outsourcing operations, Houlihan Lokey summarized the sale process and made a recommendation regarding the final bid for the Committee's approval. For Banque Lehman Brothers, Lehman's French investment banking operations, Houlihan Lokey provided the Committee with the background and status of the situation and an analysis of the proposed transaction for its review and approval. For the Russian broker dealer, Houlihan Lokey analyzed the three possible scenarios of status quo, liquidation, and sale, including reviewing the subsidiary's balance sheet and conducting a liquidation analysis. For the Turkish subsidiary, Houlihan Lokey provided the Committee with an overview presentation of the subsidiary's composition, an update on the sales process and current bids, and a recommendation on the sale and structure of the proposed deal.

58.    Houlihan Lokey continued to coordinate with the Debtors on foreign proceedings and provided updates to the Committee, as appropriate. Additionally, Houlihan Lokey coordinated with A&M to review and comment on transactions involving Lehman Brothers' foreign affiliates that remained under the control of LBHI. These transactions included whole-entity and asset sales and recapitalizations, among other intercompany affairs.

Lehman Banks (2600)

59.    Houlihan Lokey devoted considerable time, working directly with the Debtors, in dealing with the estate's interests in Woodlands Commercial Bank and Aurora Bank FSB, including participating directly in meetings with the FDIC and other regulators. Specifically, Houlihan Lokey provided key assistance in evaluating numerous issues which Houlihan Lokey was uniquely qualified to handle given its considerable experience with failed banking institutions. The issues focused on by Houlihan Lokey included the (i) trade-off between infusion of additional capital into the Banks versus risk of a priority claim being filed by regulators against LBHI, (ii) determination of the best form for additional capital to be infused into the Banks, (iii) mitigation of advance funding needs at Aurora Bank FSB's loan servicer, and (iv) the ultimate global settlement between the Banks, Debtors and regulators. Ultimately, Houlihan Lokey's efforts, along with the Debtors,' turned the Banks from a potential multi-billion dollar liability into an estimated $2 billion positive value for these estates.

Liquidity/Capital Structure/Monthly Operating Reports (1200/1800/1900/2100/2800)

60.    Houlihan Lokey participated in the weekly cash management meetings with FTI and A&M. While funding decisions were made at the asset level and with the specific subcommittees, Houlihan Lokey facilitated many of these decisions through providing situation summaries and leading subcommittee discussions. Additionally, Houlihan Lokey helped A&M and FTI identify the cash distributions and receipts pertaining to each of the major asset work streams. Houlihan Lokey also reviewed and commented on the monthly operating reports and the 13-week cash flow forecasts provided by the Debtors and their advisors. Houlihan Lokey participated in meetings with the Committee's other professionals, the Debtors and their professionals to discuss the reconciliation of the outstanding debt securities of LBHI and its subsidiaries.

61.     Houlihan Lokey analyzed cash distributions and receipts pertaining to each of the major asset work streams. Houlihan Lokey also reviewed and commented on the monthly operating reports and responded to numerous inquiries from public bondholders and the Ad Hoc Group regarding operating reports filed by the Debtors with the Court.

62.     Houlihan Lokey also worked with A&M and legacy estate personnel to manage the growing cash balances of the various Debtors. Houlihan Lokey continued to be involved in the development and oversight of the cash investment portfolio, expanding the universe of estate-approved investments to enhance the returns of invested cash within the guidelines of the Bankruptcy Code.

**Plan Development** (3400)

63.     As detailed further in the Tenth Interim Fee Application, since the beginning of the case, Houlihan Lokey spent considerable time working with the Debtors in all aspects of Chapter 11 plan development. Specifically, Houlihan Lokey was integral in developing the construct of the Plan as well as garnering creditor support. In addition, Houlihan Lokey developed a highly complex and iterative recovery model, which was updated regularly, to produce numerous model simulations and observations to present to the Committee for discussion.

Plan Construct

64.     With respect to the Plan, Houlihan Lokey developed the fundamental Plan mechanics by which the highly charged issues of substantive consolidation and inter-company claim validity were settled through a series of economic compromises, including primarily:

        (a)      a percentage compromise on funding inter-company balances to resolve issues concerning the validity of inter-company claims,

        (b)      a percentage reallocation on guarantee claim recoveries to reflect substantive consolidation risks, and

28

(c) entity-level specific reallocation percentages for creditors of Participating Debtors based on a formula developed by Houlihan Lokey to take into account recovery loss in a substantive consolidation scenario.

65. After developing and reviewing with the Committee numerous versions of a complex iterative model (described in the subsequent section) to integrate these key economic aspects into an alternative plan concept (the "Alternative Plan Concept"), Houlihan Lokey worked collaboratively with the Debtors to develop different plan structures and refined the Alternative Plan Concept directly with the Debtors over several weeks. This required the development by Houlihan Lokey of a mathematic formula to refine the reallocation percentages of subsidiary level creditors to appropriately reflect each affiliate's substantive consolidation risk.

66. The Alternative Plan Concept became the cornerstone of the economic compromise embodied in the Debtors' Plan. Houlihan Lokey also played a significant role, together with the Debtors, in negotiating resolutions to outstanding issues with the various at-large creditors groups, including the Ad Hoc Group, LBHI and Lehman Brothers Special Financing Inc. ("LBSF") unsecured creditors groups.

67. These efforts resulted in the overwhelming, unanimous acceptance of the Plan by all 134 classes of creditors of 23 Debtors. These outstanding results were not without significant additional effort by the Debtors in developing certain other aspects of the Plan, and the Debtors' financial advisor in supplying necessary modeling, documents and back-up, but the significant role that Houlihan Lokey assumed working directly with the Debtors in these matters could not have been anticipated at the outset of its engagement.

LAMCO

68.    Houlihan Lokey coordinated with the Committee's other professionals to evaluate the Debtors' "LAMCO" concept, including reviewing cost projections (e.g. employees, shared services, IT) as compared to a status-quo run-rate of expenses for the estate. Houlihan Lokey also analyzed alternatives for LAMCO, including outsourcing and other hybrid options, and reviewed governance related issues. Additionally, Houlihan Lokey reviewed and negotiated with the Debtors certain terms of the asset management agreement, the contribution agreement, the shared services agreement, and the LLC agreement between Lehman and LAMCO.

**Committee and Advisor Interaction** (200/700/800)

69.    In connection with weekly Committee, subcommittee, and co-chair calls during the Total Compensation Period, Houlihan Lokey drafted multiple presentations with analyses and summaries of the work streams described above in order to keep the Committee and subcommittees well-informed and apprised of situations. Houlihan Lokey coordinated with the Committee's other advisors via calls and meetings. In addition to the full Committee calls, each of the subcommittees continued to have weekly conference calls to discuss asset specific issues and decision points.

**Case Administration and Other** (100/3800/3900/4000/4100/4200/4300/4400/4500/4600/4700)

70.    Houlihan Lokey spent significant time developing its interim and final fee applications, preparing the monthly reimbursement statements and reconciling expense issues with the Fee Committee. While Houlihan Lokey does not generally keep time records, the Retention Order stipulated that all U.S. restructuring personnel keep hourly time and task records. The tracking and compilation of these hours occurred monthly. For all other Houlihan Lokey employees associated with the Chapter 11 Cases, weekly task summaries were required on an individual basis.

30

71.     Houlihan Lokey also provided its input to the Committee's advisors, the Debtors, and the Debtors' advisors regarding litigation issues. Additionally, Houlihan Lokey fielded numerous calls from creditors and other interested parties.

* * *

72.     The professional services performed by Houlihan Lokey were necessary and appropriate to the administration of the Chapter 11 Cases and were in the best interests of the Committee and other parties in interest. Compensation for the services described above is commensurate with the complexity, importance, and nature of the problems, issues, or tasks involved.

## ACTUAL AND NECESSARY DISBURSEMENTS OF HOULIHAN LOKEY

73.     Houlihan Lokey disbursed $564,678.92 as expenses incurred in providing professional services during the Total Compensation Period, which has been adjusted per the Fee Committee guidelines. It is Houlihan Lokey's policy to charge its clients for all actual and necessary expenses incurred in connection with the engagement. The expenses charged to clients include, among other things, telephone and telecopier charges, regular mail and express mail charges, special or hand delivery charges, document processing, photocopying charges, travel expenses, expenses for "working meals," and computerized research. In accordance with the applicable factors enumerated in the Bankruptcy Code, it is respectfully submitted that the amount requested by Houlihan Lokey is fair and reasonable given (a) the complexity of these cases, (b) the time expended, (c) the nature and extent of the services rendered, (d) the value of such services, and (e) the costs of comparable services other than in a case under this title.

74.     In addition, because the location of the Debtors' businesses in relation to Houlihan Lokey's offices, long distance telephone calls were often required. In some instances, overnight delivery of documents and other materials was required as a result of circumstances

31

necessitating the use of such express services. These disbursements are not included in Houlihan Lokey's overhead. Houlihan Lokey made every effort to minimize its disbursements in these cases.

75.     In final review of expenses in connection with the filing this Application, Houlihan Lokey identified certain expense reductions made by the Fee Committee that it believes merit reconsideration, including: (i) the denial in its entirety of a $13,067.70 business-class airfare ticket from New York to Japan for LBJ/LBHI meetings rather than the reduction of such amount to a comparable coach class fare (of approximately $9,000.60), (ii) the arbitrary reduction by 50% in the Fourth Interim Fee Application of certain expense items (airfare, employee parking, ground transportation, lodging and delivery), that gave rise to a $11,905.56 aggregate reduction in reimbursement despite adhering, we believe, to Fee Committee guidelines with respect to such expenses, and (iii) denial of the legal expense reimbursement requests in the Second and Third Interim periods by $21,585.21 in the aggregate (the "Legal Fees"). Houlihan Lokey also identified approximately $15,913.15 in lunch and telecommunication expenses that were approved and reimbursed by the Fee Committee prior to the formal establishment and approval by the court of the Fee Protocol (the "Pre-Approved Lunch/Telecommunication Expense") that ultimately did not allow for the reimbursement of expenses in these categories for which Houlihan Lokey did not seek reimbursement for after this point. While Houlihan Lokey believes that all of the expenses it incurred fall within the scope of its Engagement Letter, in conjunction with the final approval of its expense items, Houlihan Lokey is willing to compromise and forgo the reimbursement of:

(a)     the $4,067.10 difference between business-class and coach roundtrip fare to Japan,

(b)     the Legal Fees and

(c)     the Pre-Approved Lunch/Telecommunication Expense.

76.     Therefore, after netting the aforementioned amounts, Houlihan Lokey requests $564,678.92 in total actual and necessary expenses (of which $4,993.01 remains unpaid).

## THE REQUESTED COMPENSATION SHOULD BE ALLOWED

77.     Houlihan Lokey respectfully submits that the services for which it seeks compensation in the Application were necessary for, and beneficial to, the Committee and that Houlihan Lokey satisfied the requirements of sections 328(a), 330(a), and 331 of the Bankruptcy Code as set forth in the Retention Order. Houlihan Lokey's requested compensation is appropriate based on the complexity, importance and nature of the services provided, and is consistent with the customary compensation charged by comparable professionals both in and out of the bankruptcy context. Houlihan Lokey therefore respectfully requests that the Court grant the relief requested in this Application.

## NO DUPLICATION OF SERVICE

78.     Houlihan Lokey developed a cooperative working relationship on behalf of the Committee with Milbank, the Committee's counsel, Quinn, as the Committee's conflicts counsel and the Committee's financial advisor, FTI. Because each firm was aware of the others' role and services to the Committee, Houlihan Lokey believes that no unnecessary duplication of services occurred.

## NO PRIOR REQUEST

79.     No previous motion for the relief sought herein has been made to this or any other court.

## **CONCLUSION**

WHEREFORE, Houlihan Lokey respectfully requests the Court enter an order conforming to the amounts set forth in Fee Schedule A(1) attached hereto as Exhibit "B" allowing Houlihan Lokey (i) an allowance of compensation and expenses for professional services rendered during the Total Compensation Period in the amount of $44,497,192.10, comprising: (a) $17,266,666.66 of monthly fees (of which $416,000.00 is unpaid), (b) $564,678.92 in adjusted actual and necessary expenses (of which $4,993.01 is unpaid), (c) a first Deferred Fee payment of $11,665,846.52 (of which $11,665,846.52 is unpaid) and (d) an Additional Fee of $15,000,000.00 (of which $15,000,000.00 is unpaid); (ii) such other and further relief as is just and proper, and authorizing and directing the Debtors to pay Houlihan Lokey $27,086,839.53, which includes the Deferred Fee and the Additional Fee and is the difference between (a) the amount of monthly fees and expenses and the Deferred Fee and Additional Fee, $44,497,192.10 and (b) $17,410,352.57, which is the total amount the Debtors have previously paid Houlihan Lokey for services rendered and expenses incurred; and (iii) an allowance for payment in full of future Deferred Fees, following each subsequent distribution to unsecured creditors, upon submission by Houlihan Lokey of a fee statement to the Debtors, the U.S. Trustee, their respective counsel, and Committee counsel that includes the amount of the Deferred Fee payment request and the total distributions to unsecured creditors related thereto.

Dated: New York, New York
      July 5, 2012

HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC.
Investment Banker to the Official Committee of Unsecured Creditors

By: _____

    P. Eric Siegert
    Senior Managing Director

245 Park Avenue, 20th Floor
New York, New York 10167
Telephone:    (212) 497-4100
Facsimile:    (212) 661-1070

**EXHIBIT A**

**SIEGERT CERTIFICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **Chapter 11 Case No.** |
| **LEHMAN BROTHERS HOLDINGS INC., <u>et</u> <u>al.</u>,** | **08-13555 (JMP)** |
| **Debtors.** | **(Jointly Administered)** |

**CERTIFICATION UNDER GUIDELINES FOR FEES AND
DISBURSEMENTS FOR PROFESSIONALS IN RESPECT OF
ELEVENTH AND FINAL APPLICATION OF
HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC.,
<u>FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES</u>**

I, P. Eric Siegert, hereby certify that:

1.      I am a senior managing director with the applicant firm, Houlihan Lokey Howard & Zukin Capital, Inc., ("<u>Houlihan Lokey</u>"), as investment banker for the Official Committee of Unsecured Creditors (the "<u>Committee</u>") for the jointly administered chapter 11 cases of Lehman Brothers Holdings Inc., <u>et. al.</u> (together, the "<u>Debtors</u>"), and submit this certification in respect of compliance with the Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases adopted by the Court on April 19, 1995 (the "<u>Local Guidelines</u>"), the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330, adopted January 30, 1996 (the "<u>UST Guidelines</u>") and the Fourth Amended Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals [Docket No. 15997] (the "<u>Interim Compensation Order</u>," and collectively with the Local Guidelines and UST Guidelines, the "<u>Guidelines</u>").

2.      This certification is made in respect of Houlihan Lokey's application, dated July 5, 2012, (the "<u>Application</u>"), for compensation and reimbursement of expenses for the period commencing September 17, 2008, through and including March 6, 2012, (the "<u>Total Compensation Period</u>") in accordance with the Guidelines.

3.      In respect of section B.1 of the Local Guidelines, I certify that:

(a)     I have read the Application;

(b)     To the best of my knowledge, information, and belief formed after reasonable inquiry, the fees and disbursements sought fall within the Local Guidelines;

(c)     The Application respectfully requests that this Court enter an Order awarding Houlihan Lokey $44,497,192.10, comprising:  (a) $17,266,666.66 of monthly fees (of which $416,000.00 is unpaid), (b) $564,678.92 in adjusted actual and necessary expenses (of which $4,993.01 is unpaid), (c) a first Deferred Fee payment of $11,665,846.52 (of which $11,665,846.52 is unpaid) and (d) an Additional Fee of $15,000,000.00 (of which $15,000,000.00 is unpaid);

(d)     The fees and disbursement requested in the Application are billed in accordance with practices customarily employed by Houlihan Lokey and generally accepted by Houlihan Lokey's clients; and

(e)     In providing a reimbursable service, Houlihan Lokey does not make a profit on that service, whether the service is performed by Houlihan Lokey in-house or through a third party.

4.      In respect of section B.2 of the Local Guidelines and as required by the Interim Compensation Order, I certify that Houlihan Lokey provided, on a monthly basis, statements of Houlihan Lokey's fees and disbursements accrued during the previous month, in accordance with the Interim Compensation Order, to the Debtors, the Debtors' counsel, the Committee's counsel, the Office of the United States Trustee for the Southern District of New York, and the Fee Committee (as defined in the Application).

2

      5.      In respect of section B.3 of the Local Guidelines, I certify that the Debtors,

the Debtors' counsel, the United States Trustee for the Southern District of New York and the

Committee are each being provided a copy of the Application.

Dated: New York, New York    Respectfully submitted,
       July 5, 2012

                      HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC.
                      Investment Banker to the Official Committee of Unsecured
                      Creditors

By:_____
        P. Eric Siegert
        Senior Managing Director

        245 Park Avenue, 20th Floor
        New York, New York 10167
        Telephone:    (212) 497-4100
        Facsimile:    (212) 661-1070

**EXHIBIT B**

SCHEDULE A(1)

CASE NO.:  08-13555 (JMP) (Jointly Administered)

CASE NAME:  IN RE LEHMAN BROTHERS HOLDINGS INC., et al.

| TOTAL COMPENSATION PERIOD SEPTEMBER 17, 2008 – MARCH 6, 2012 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED AND PAYABLE BY DEBTOR** |
| Houlihan Lokey Howard & Zukin Capital, Inc. | 7/5/2012 Docket No. [x] | $43,932,513.18 | $43,932,513.18 | $27,081,846.52 | $27,081,846.52 | $564,678.92 | $564,678.92 |

| TENTH INTERIM FEE PERIOD OCTOBER 1, 2011 – MARCH 6, 2012 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED AND PAYABLE BY DEBTOR** |
| Houlihan Lokey Howard & Zukin Capital, Inc. | 5/21/2012 Docket No. 27997 | $28,745,846.52 [100% of Monthly Fee, 100% of Deferred Fee and 100% of Additional Fee] | $28,745,846.52 [100% of Monthly Fee, 100% of Deferred Fee and 100% of Additional Fee] | $5,749,169.31 [20% of Monthly Fee, 20% of Deferred Fee and 20% of Additional Fee] | $21,748,677.21 [20% of Monthly Fee, 80% of Deferred Fee and 80% of Additional Fee] | $23,058.75[1] | $23,058.75[2] |

---

[1] This figure is the adjusted amount of expenses billed and paid of $22,685.59 plus the expense adjustments of $373.16 per the guidelines of the Fee Committee.

[2] The Fee Committee has not filed its final recommendations on the Tenth Interim Fee Period and thus this figure does not reflect any reductions.

1

**FEE SCHEDULE A(1)**                                                     SO ORDERED: _____

| NINTH INTERIM FEE PERIOD JUNE 1, 2011 – SEPTEMBER 30, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED AND PAYABLE BY DEBTOR** |
| Houlihan Lokey Howard & Zukin Capital, Inc. | 12/14/2011 Docket No. 23319 | $1,600,000.00 | $1,600,000.00 | $0 | $0 | $43,745.69 | $43,745.69 |

| EIGHTH INTERIM FEE PERIOD FEBRUARY 1, 2010 – MAY 31, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED AND PAYABLE BY DEBTOR** |
| Houlihan Lokey Howard & Zukin Capital, Inc. | 8/15/2011 Docket No. 19266 | $1,600,000.00 | $1,600,000.00 | $0 | $0 | $47,312.89 | $46,884.11 |

| SEVENTH INTERIM FEE PERIOD OCTOBER 1, 2010 – JANUARY 31, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED AND PAYABLE BY DEBTOR** |
| Houlihan Lokey Howard & Zukin Capital, Inc. | 6/2/2011 Docket No. 17334 | $1,600,000.00 | $1,600,000.00 | $0 | $0 | $35,936.59 | $35,801.93 |

**FEE SCHEDULE A(1)**

SO ORDERED: _____

| SIXTH INTERIM FEE PERIOD JUNE 1, 2010 – SEPTEMBER 30, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED AND PAYABLE BY DEBTOR |
| Houlihan Lokey Howard & Zukin Capital, Inc. | 12/14/2010 Docket No. 13489 | $1,600,000.00 | $1,600,000.00 | $0 | $0 | $27,042.78 | $26,802.89 |

| FIFTH INTERIM FEE PERIOD FEBRUARY 1, 2010 – MAY 31, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED AND PAYABLE BY DEBTOR |
| Houlihan Lokey Howard & Zukin Capital, Inc. | 8/16/2010 Docket No. 10799 | $1,600,000.00 | $1,600,000.00 | $0 | $0 | $54,675.06 | $53,107.01 |

| FOURTH INTERIM FEE PERIOD OCTOBER 1, 2009 – JANUARY 31, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED AND PAYABLE BY DEBTOR |
| Houlihan Lokey Howard & Zukin Capital, Inc. | 4/14/2010 Docket No. 8328 | $1,600,000.00 | $1,600,000.00 | $0 | $0 | $56,067.42 | $40,506.87 |

3

**FEE SCHEDULE A(1)**

**SO ORDERED:** _____

| THIRD INTERIM FEE PERIOD JUNE 1, 2009 – SEPTEMBER 30, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED AND PAYABLE BY DEBTOR |
| Houlihan Lokey Howard & Zukin Capital, Inc. | 12/14/2009 Docket No. 6194 | $1,600,000.00 | $1,600,000.00 | $0 | $0 | $70,239.57 | $48,377.93 |

| SECOND INTERIM FEE PERIOD FEBRUARY 1, 2009 – MAY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED AND PAYABLE BY DEBTOR |
| Houlihan Lokey Howard & Zukin Capital, Inc. | 8/14/2009 Docket No. 4816 | $1,753,333.33 | $1,753,333.33 | $0 | $0 | $99,265.60 | $82,363.40 |

| FIRST INTERIM FEE PERIOD SEPTEMBER 17, 2008 – JANUARY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED AND PAYABLE BY DEBTOR |
| Houlihan Lokey Howard & Zukin Capital, Inc. | 4/10/2009 Docket No. 3339 | $2,233,333.33 | $2,233,33.33 | $0 | $0 | $159,070.80 | $159,037.33 |

4

**FEE SCHEDULE A(1)**

**SO ORDERED:** _____