Hearing Date: TBD
Objection Deadline: TBD

Dennis F. Dunne
Dennis C. O'Donnell
Evan R. Fleck
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                                                             :
In re:                                                       :          Chapter 11 Case No.
                                                             :
LEHMAN BROTHERS HOLDINGS INC., et al.,                       :          08-13555 (JMP)
                                                             :
                    Debtors.                                 :          (Jointly Administered)
                                                             :
------------------------------------------------------------- x

**FINAL FEE APPLICATION OF MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP,
COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, SEEKING
FINAL APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES
RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM
SEPTEMBER 17, 2008 THROUGH AND INCLUDING MARCH 6, 2012**

| | |
|---|---|
| Name of Applicant: | Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP |
| Authorized to Provide Professional Services to: | Official Committee of Unsecured Creditors |
| Date of Retention: | November 18, 2008 (effective as of September 17, 2008) |
| Period for which compensation and reimbursement is sought: | September 17, 2008 – March 6, 2012 |

Amount of Compensation
requested:                              <u>$144,430,022.50</u>

Amount of Expense
Reimbursement requested:        <u>$6,707,064.31</u>

This is an: _____ interim ___X___ final application.

This is the final fee application filed by Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP in these cases.

**FINAL FEE APPLICATION OF MILBANK, TWEED,
HADLEY & MᶜCLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(SEPTEMBER 17, 2008 – MARCH 6, 2012)**

| Name | Position; Experience | Hourly Rate | Total Hours | Total Compensation |
|---|---|---:|---:|---:|
| Paul Aronzon | Financial Restructuring Partner for 22 years; admitted in 1979. | $1,140 | 15.00 | $17,100.00 |
| | | $1,095 | 82.50 | $90,337.50 |
| | | $1,050 | 192.10 | $201,705.00 |
| | | $995 | 240.30 | $239,098.50 |
| | | $950 | 512.60 | $486,970.00 |
| | | $497.5* | 2.20 | $1,094.50 |
| | | $475* | 4.00 | $1,900.00 |
| Dennis Dunne | Financial Restructuring Partner for 14 years; admitted in 1991. | $1,140 | 92.60 | $105,564.00 |
| | | $1,095 | 741.30 | $811,723.50 |
| | | $1,050 | 1,179.20 | $1,238,160.00 |
| | | $995 | 1,187.50 | $1,181,562.50 |
| | | $950 | 527.50 | $501,125.00 |
| Elizabeth Besio Hardin | Global Finance Partner for 15 years; admitted in 1996. | $1,125 | 3.70 | $4,162.50 |
| | | $1,025 | 144.30 | $147,907.50 |
| | | $975 | 58.80 | $57,330.00 |
| | | $950 | 165.40 | $157,130.00 |
| David Cohen | Litigation Partner for 10 years; admitted in 1994. | $1,125 | 261.10 | $293,737.50 |
| | | $1,025 | 1,564.60 | $1,603,715.00 |
| | | $950 | 1,778.50 | $1,689,575.00 |
| | | $900 | 1,050.50 | $945,450.00 |
| | | $562.5* | 31.30 | $17,606.25 |
| | | $512.5* | 141.10 | $72,313.75 |
| | | $475* | 129.90 | $61,702.50 |
| Wilbur Foster Jr | Financial Restructuring Partner for 21 years; admitted in 1982. | $1,075 | 104.40 | $112,230.00 |
| | | $995 | 1,504.50 | $1,496,977.50 |
| | | $925 | 1,969.90 | $1,822,157.50 |
| | | $875 | 1,769.50 | $1,548,312.50 |
| | | $825 | 266.60 | $219,945.00 |
| Trayton Davis | Alternative Investments Partner for 23 years, admitted in 1981. | $1,075 | 91.60 | $98,470.00 |
| | | $1,025 | 57.50 | $58,937.50 |
| Jay Grushkin | Alternative Investments Partner for 23 years, admitted in 1982. | $1,075 | 17.70 | $19,027.50 |
| | | $1,025 | 32.50 | $33,312.50 |
| Rainer Magold | Leverage Finance Partner for 7 years; admitted in 1986. | $1,075 | 1.80 | $1,935.00 |
| | | $1,025 | 3.50 | $3,587.50 |
| | | $995 | 3.30 | $3,283.50 |

| Name | Description | Rate | Hours | Amount |
|---|---|---|---|---|
| | | $950 | 65.90 | $62,605.00 |
| Andrew Tomback | Litigation Partner for 13 years; admitted in 1987. | $1,075 | 2.70 | $2,902.50 |
| | | $1,025 | 1,010.80 | $1,036,070.00 |
| Dale Ponikvar | Tax Partner for 22 years; admitted in 1981. | $1,075 | 68.30 | $73,422.50 |
| | | $995 | 914.60 | $910,027.00 |
| | | $950 | 1,644.00 | $1,561,800.00 |
| | | $910 | 248.60 | $226,226.00 |
| | | $497.5* | 7.70 | $3,830.75 |
| | | $475* | 7.90 | $3,752.50 |
| Scott Edelman | Litigation Partner for 16 years; admitted in 1989. | $1,050 | 7.50 | $7,875.00 |
| | | $950 | 22.50 | $21,375.00 |
| Paul Wessel | Tax Partner for 16 years; admitted in 1988. | $995 | 49.10 | $48,854.50 |
| | | $925 | 103.30 | $95,552.50 |
| | | $900 | 214.70 | $193,230.00 |
| | | $825 | 69.90 | $57,667.50 |
| David Lamb | Global Corporate Partner for 22 years; admitted in 1992. | $1,030 | 8.50 | $8,755.00 |
| | | $975 | 263.20 | $256,620.00 |
| | | $925 | 295.60 | $273,430.00 |
| | | $900 | 297.00 | $267,300.00 |
| | | $860 | 21.90 | $18,834.00 |
| | | $487.5* | 12.00 | $5,850.00 |
| | | $462.5* | 9.50 | $4,393.75 |
| | | $450* | 15.40 | $6,930.00 |
| Eric Moser | Global Finance Partner for 13 years; admitted in 1991. | $1,030 | 4.60 | $4,738.00 |
| | | $975 | 231.80 | $226,005.00 |
| | | $925 | 517.40 | $478,595.00 |
| | | $900 | 556.00 | $500,400.00 |
| | | $487.5* | .50 | $243.75 |
| Peter Benudiz | Global Corporate Partner for 19 years; admitted in 1987. | $1,025 | 78.90 | $80,872.50 |
| | | $950 | 365.00 | $346,750.00 |
| | | $925 | 510.70 | $472,397.50 |
| | | $810 | 60.50 | $49,005.00 |
| | | $475 | 25.70 | $12,207.50 |
| | | $462.5* | 19.50 | $9,018.75 |
| Linda Dakin-Grimm | Litigation Partner for 12 years; admitted in 1985 | $1,025 | 3.00 | $3,075.00 |
| | | $995 | 19.50 | $19,402.50 |
| | | $950 | 9.10 | $8,645.00 |
| Michael Hirschfeld | Litigation Partner for 30 years; admitted in 1974. | $1,025 | 208.90 | $214,122.50 |
| | | $995 | 31.50 | $31,342.50 |
| | | $950 | 73.90 | $70,205.00 |
| Marcelo Mottesi | Global Securities Partner for 13 years; admitted in 1995. | $1,025 | 268.20 | $274,905.00 |
| | | $995 | 83.20 | $82,784.00 |
| Richard Sharp | Litigation Partner for 9 years; admitted in 1987. | $1,025 | 18.50 | $18,962.50 |
| | | $995 | 10.20 | $10,149.00 |
| Gary Wigmore | Global Project Finance Partner for 25 years; admitted in 1983. | $1,025 | .40 | $410.00 |
| | | $995 | 10.30 | $10,248.50 |
| | | $910 | 43.50 | $39,585.00 |

| | | | | |
|---|---|---|---|---|
| Russell Jacobs | Tax  Partner for 11 years; admitted in 1987. | $995 | 5.00 | $4,975.00 |
| | | $950 | 2.30 | $2,185.00 |
| Thomas C. Janson | Global Corporate Partner for 19 years; admitted in 1985. | $995 | 10.70 | $10,646.50 |
| | | $950 | 188.10 | $178,695.00 |
| Robert Jay Moore | Financial Restructuring Partner for 15 years; admitted in 1977. | $995 | 54.80 | $54,526.00 |
| | | $950 | 374.40 | $355,680.00 |
| | | $475* | 3.00 | $1,425.00 |
| Anthony Root | Global Securities Partner for 15 years. Admitted in 1983. | $995 | 28.10 | $27,959.50 |
| | | $950 | 30.80 | $29,260.00 |
| Andrew Walker | Tax Partner for 9 years; admitted in 1995. | $995 | 19.40 | $19,303.00 |
| | | $925 | 85.00 | $78,625.00 |
| | | $900 | 103.60 | $93,240.00 |
| | | $825 | 8.80 | $7,260.00 |
| John Walker | Global Finance Partner for 11 years; admitted in 1987. | $995 | 406.40 | $404,368.00 |
| | | $950 | 45.40 | $43,130.00 |
| Catherine Marsh | Global Project Finance Partner for 8 years; admitted in 1995. | $975 | 13.60 | $13,260.00 |
| | | $900 | 20.40 | $18,360.00 |
| | | $850 | 21.10 | $17,935.00 |
| | | $780 | 4.80 | $3,744.00 |
| Stacey J. Rappaport | Litigation Partner for 8 years; admitted in 1997. | $975 | 85.70 | $83,557.50 |
| | | $925 | 661.80 | $612,165.00 |
| | | $875 | 159.40 | $139,475.00 |
| | | $825 | 6.30 | $5,197.50 |
| | | $437.5* | 1.00 | $437.50 |
| James Warbey | Global Finance Partner for 7 years; admitted in 1996. | $975 | 82.50 | $80,437.50 |
| | | $925 | 758.00 | $701,150.00 |
| | | $875 | 990.70 | $866,862.50 |
| | | $825 | 865.00 | $713,625.00 |
| | | $462.5* | 15.90 | $7,353.75 |
| | | $437.5* | 4.40 | $1,925.00 |
| Nicholas James Angel | Financial Restructuring Partner for 4 years; admitted in 1986. | $975 | 50.20 | $48,945.00 |
| | | $950 | 226.30 | $214,985.00 |
| | | $925 | 56.60 | $52,355.00 |
| Richard Gray | Global Finance Partner for 21; Admitted in 1982. | $975 | 10.60 | $10,335.00 |
| | | $950 | 27.20 | $25,840.00 |
| | | $910 | 46.10 | $41,951.00 |
| Winthrop Brown | Global Finance Partner for 29 years; admitted in 1975. | $950 | 25.10 | $23,845.00 |
| | | $900 | 481.40 | $433,260.00 |
| | | $860 | 47.60 | $40,936.00 |
| | | $475* | 1.40 | $665.00 |
| Thomas Arena | Litigation Partner for 11 years; admitted in 1991. | $950 | 35.40 | $33,630.00 |
| | | $885 | 86.00 | $76,110.00 |
| Russell Kestenbaum | Tax Partner for 5 years; admitted in 1999. | $950 | 9.00 | $8,550.00 |
| | | $900 | 106.50 | $95,850.00 |
| | | $825 | 281.20 | $231,990.00 |
| | | $775 | 193.00 | $149,575.00 |
| | | $700 | 124.80 | $87,360.00 |
| Gregory Bray | Financial Restructuring Partner | $950 | 73.10 | $69,445.00 |

| | | | | |
|---|---|---|---|---|
| | for 11 years; admitted in 1984. | | | |
| Warren Cooke | Global Finance Partner for 20 years; admitted in 1973. | $950 | 41.40 | $39,330.00 |
| Luc Despins | Financial Restructuring Partner for 10 years; admitted in 1986. | $950 | 117.70 | $111,815.00 |
| Robert Finkel | Global Corporate Partner for 16 years; admitted in 1988. | $950 | 5.80 | $5,510.00 |
| | | $900 | 176.90 | $159,210.00 |
| Brett Goldblatt | Global Corporate Partner for 7 years; admitted in 1998. | $950 | 15.30 | $14,535.00 |
| | | $875 | 95.80 | $83,825.00 |
| | | $825 | 115.30 | $95,122.50 |
| | | $760 | 2.80 | $2,128.00 |
| | | $475* | 8.60 | $4,085.00 |
| Stuart Harray | Global Corporate Partner for 5 years; admitted in 1993. | $950 | 72.70 | $69,065.00 |
| | | $860 | 8.20 | $7,052.00 |
| L. Douglas Harris | Global Finance Partner for 18 years; admitted in 1980. | $950 | 10.50 | $9,975.00 |
| | | $910 | 97.50 | $88,725.00 |
| Helfried Schwarz | Global Transportation and Space Finance Partner for 24 years; admitted in 1989. | $950 | .90 | $855.00 |
| David Stoll | Trust & Estates Partner for 3 years; admitted in 1992. | $950 | 3.60 | $3,420.00 |
| David Wolfson | Global Corporate Partner for 8 years; admitted in 1994. | $950 | 3.10 | $2,945.00 |
| | | $875 | 64.00 | $56,000.00 |
| | | $850 | 369.10 | $313,735.00 |
| | | $810 | 333.30 | $269,973.00 |
| Paul Denaro | Global Securities Partner for 4 years; admitted in 2000. | $925 | 6.80 | $6,290.00 |
| | | $875 | 355.30 | $310,887.50 |
| | | $800 | 695.10 | $556,080.00 |
| | | $740 | 345.80 | $255,892.00 |
| | | $700 | 5.10 | $3,570.00 |
| Michael Bellucci | Global Leveraged Finance Partner for 11 years; admitted in 1994. | $925 | 16.30 | $15,077.50 |
| Robert Finkel | Global Corporate Partner for 15 years; admitted in 1988. | $925 | 45.70 | $42,272.50 |
| | | $825 | 146.20 | $120,615.00 |
| Abhilash Raval | Financial Restructuring Partner for 10 years; admitted in 1997. | $925 | 1.10 | $1,017.50 |
| | | $775 | 9.10 | $7,052.50 |
| | | $700 | 151.20 | $105,840.00 |
| Julian Stait | Litigation Partner for 1 year; admitted in 1988. | $925 | 57.10 | $52,817.50 |
| David Stagliano | Global Finance Partner for 18 years; admitted in 1981. | $910 | 4.60 | $4,186.00 |
| Thomas Ingenhoven | Global Leveraged Finance Partner for 5 years; admitted in 2001. | $900 | 7.70 | $6,930.00 |
| | | $825 | 5.20 | $4,290.00 |
| Albert Pisa | Global Finance Partner for years; admitted in 1997. | $900 | 44.70 | $40,230.00 |
| | | $780 | 6.10 | $4,758.00 |

| | | | | |
|---|---|---|---|---|
| Evan R. Fleck | Financial Restructuring Partner for 2 years; admitted in 2002. | $900 | 209.70 | $188,730.00 |
| | | $850 | 2,356.50 | $2,003,025.00 |
| | | $750 | 2,715.40 | $2,036,550.00 |
| | | $675 | 3,126.60 | $2,110,455.00 |
| | | $605 | 1,023.20 | $619,036.00 |
| | | $425* | 7.00 | $2,975.00 |
| | | $375* | 77.30 | $28,987.50 |
| Langdon Van Norden | Global Finance Partner for 9 years; admitted in 1992. | $900 | 24.10 | $21,690.00 |
| David Perkins | Litigation Partner for 32 years; admitted in 1969. | $885 | 31.10 | $27,523.50 |
| Wayne Aaron | Litigation Partner for 8 years; admitted in 1996. | $875 | 11.60 | $10,150.00 |
| | | $850 | 5.20 | $4,420.00 |
| Patrick Flanagan | Global Leveraged Finance Partner for 6 years; admitted in 1999. | $875 | 16.50 | $14,437.50 |
| Crayton Bell | Global Corporate Partner for 6 years; admitted in 1992. | $850 | 35.50 | $30,175.00 |
| | | $810 | 135.50 | $109,755.00 |
| Robert Liubicic | Litigation Partner for 2 years; admitted in 1999. | $850 | 14.70 | $12,495.00 |
| | | $750 | 306.70 | $230,025.00 |
| | | $685 | 616.30 | $422,165.50 |
| | | $635 | 85.50 | $54,292.50 |
| Debra Alligood White | Global Corporate Partner for 3 years; admitted in 2007. | $850 | 6.60 | $5,610.00 |
| | | $825 | 81.90 | $67,567.50 |
| | | $760 | 7.40 | $5,624.00 |
| Darrel Holstein | Global Corporate Partner for 3 years; admitted in 1989. | $825 | 3.00 | $2,475.00 |
| | | $760 | 18.40 | $13,984.00 |
| Martin Erhardt | Global Corporate Partner for 4 years; admitted in 2000. | $800 | 13.90 | $11,120.00 |
| | | $700 | 7.10 | $4,970.00 |
| | | $635 | 14.60 | $9,271.00 |
| Andrew Leblanc | Litigation Partner for 5 years; admitted in 1998. | $800 | 60.40 | $48,320.00 |
| | | $740 | 11.90 | $8,806.00 |
| Taisa Markus | Global Securities Partner for 3 years; admitted in 1989. | $800 | 10.20 | $8,160.00 |
| Suhrud Mehta | Global Leveraged Finance Partner for 6 years; admitted in 1995. | $800 | 2.00 | $1,600.00 |
| Joshua Zimmerman | Global Securities Partner for 5 years; admitted in 1997. | $800 | 38.90 | $31,120.00 |
| Thomas James Canning | Litigation Partner for 2 years; admitted in 1999. | $795 | 3.80 | $3,021.00 |
| | | $750 | 40.40 | $30,300.00 |
| Matthew Barr | Financial Restructuring Partner for 7 years; admitted in 1997. | $780 | 35.30 | $27,534.00 |
| John Griem, Jr. | Litigation Partner for 7 years; admitted in 1995. | $780 | 3.60 | $2,808.00 |
| Edward Sun | Global Securities Partner for 15 years; admitted in 1996. | $760 | 8.60 | $6,536.00 |

| Name | Description | Rate | Hours | Amount |
|---|---|---|---|---|
| Thomas Kleinheisterkamp | Tax Partner for 3 years; admitted in 2003. | $750 | 8.50 | $6,375.00 |
| Martin Erhardt | Global Corporate Partner for 4 years; admitted in 2000. | $740 | 4.30 | $3,182.00 |
| Risa Rosenberg | Financial Restructuring Of Counsel for 10 years; admitted in 1984. | $950 | 5.90 | $5,605.00 |
| | | $900 | 95.80 | $86,220.00 |
| | | $850 | 358.20 | $304,470.00 |
| | | $825 | 506.20 | $417,615.00 |
| | | $775 | 380.80 | $295,120.00 |
| Dennis O'Donnell | Financial Restructuring Of Counsel for 5 years; admitted in 1992. | $910 | 534.70 | $486,577.00 |
| | | $860 | 3,020.30 | $2,597,458.00 |
| | | $810 | 3,055.90 | $2,475,279.00 |
| | | $785 | 2,787.30 | $2,188,030.50 |
| | | $735 | 1,031.70 | $758,299.50 |
| | | $430* | 52.10 | $22,403.00 |
| | | $405* | 23.70 | $9,598.50 |
| Bruce Todd Gardner | Real Estate of Counsel for 13 years; admitted in 1978. | $870 | 7.40 | $6,438.00 |
| | | $845 | 1.50 | $1,267.50 |
| Leah Karlov | Tax Of Counsel for 2 years; admitted in 2002. | $775 | 6.00 | $4,650.00 |
| Richard Rosberger | Litigation Of Counsel for 4 years; admitted in 1994. | $750 | 650.70 | $488,025.00 |
| Lena Mandel | Senior Attorney for 10 years; admitted in 1991. | $795 | 85.20 | $67,734.00 |
| | | $705 | 682.10 | $480,880.50 |
| | | $685 | 938.40 | $642,804.00 |
| | | $680 | 653.40 | $444,380.00 |
| | | $670 | 227.20 | $152,224.00 |
| | | $352.5* | 1.30 | $458.25 |
| | | $342.5* | .50 | $171.25 |
| Kevin Ashby | Senior Attorney for 9 years; admitted in 2004. | $725 | 66.20 | $47,995.00 |
| | | $715 | 256.40 | $183,326.00 |
| Matthew Mortimer | Tax Associate for 14 years; admitted in 1999. | $765 | 54.10 | $41,386.50 |
| | | $745 | 28.50 | $21,232.50 |
| | | $735 | 32.30 | $23,740.50 |
| Adrian Azer | Litigation Associate for 9 years; admitted in 2003. | $750 | 102.70 | $77,025.00 |
| | | $715 | 1,766.50 | $1,263,047.50 |
| | | $675 | 2,175.60 | $1,468,530.00 |
| | | $625 | 1,514.30 | $946,437.50 |
| | | $585 | 34.10 | $19,948.50 |
| | | $375* | 5.30 | $1,987.50 |
| | | $357.5* | 121.40 | $43,400.50 |
| | | $337.5* | 81.60 | $27,540.00 |
| Edward G. Baldwin | Litigation Associate for 9 years; admitted in 2003. | $750 | 42.00 | $31,500.00 |
| | | $715 | 66.10 | $47,261.50 |
| Drew Batkin | Tax Associate for 10 years; admitted in 2003. | $750 | 105.10 | $78,825.00 |
| | | $715 | 725.40 | $518,661.00 |

| Name | Description | Rate | Hours | Amount |
|---|---|---|---|---|
| | | $695 | 1,113.10 | $773,604.50 |
| | | $650 | 645.20 | $419,380.00 |
| | | $600 | 88.00 | $52,800.00 |
| | | $357.5* | 1.50 | $536.25 |
| | | $347.5* | 3.00 | $1,042.50 |
| Lisa Brabant | Real Estate Associate for 14 years; admitted in 1999. | $750 | 3.50 | $2,625.00 |
| | | $715 | 35.90 | $25,668.50 |
| | | $695 | 84.50 | $58,727.50 |
| | | $685 | 136.20 | $93,297.00 |
| Brian Kinney | Financial Restructuring Associate at Milbank for 10 years; admitted in 2004. | $750 | 3.90 | $2,925.00 |
| | | $625 | 26.60 | $16,625.00 |
| | | $585 | 28.20 | $16,497.00 |
| Aaron Renenger | Litigation Associate for 10 years; admitted in 2002. | $750 | 102.10 | $76,575.00 |
| | | $715 | 1,046.90 | $748,533.50 |
| | | $695 | 1,006.70 | $699,656.50 |
| | | $650 | 234.00 | $152,100.00 |
| | | $357.5* | 6.30 | $2,252.25 |
| | | $347.5* | 2.40 | $834.00 |
| Brian Stern | Global Corporate Associate for 9 years; admitted in 2003. | $715 | 27.00 | $19,305.00 |
| | | $675 | 49.40 | $33,345.00 |
| | | $625 | 92.10 | $57,562.50 |
| Steven Szanzer | Financial Restructuring Associate for 12 years; admitted in 2001. | $750 | 15.10 | $11,325.00 |
| | | $715 | 651.80 | $466,037.00 |
| | | $695 | 816.70 | $567,606.50 |
| | | $650 | 52.90 | $34,385.00 |
| Stephen Tudway | Litigation Associate for 14 years; admitted in 1998. | $750 | 14.30 | $10,725.00 |
| | | $715 | 202.10 | $144,501.50 |
| | | $695 | 218.10 | $151,579.50 |
| | | $685 | 451.70 | $309,414.50 |
| Kristie Hutchinson | Global Leveraged Associate at Milbank for 1 year; | $715 | 11.40 | $8,151.00 |
| Grace Gilligan | Litigation Associate for 8 years; admitted in 2005. | $735 | 368.10 | $270,553.50 |
| | | $695 | 1,243.20 | $864,024.00 |
| | | $650 | 676.40 | $439,660.00 |
| | | $347.5* | 2.70 | $938.25 |
| Justin McClelland | Litigation Associate for 20 years; admitted in 1993. | $695 | 115.30 | $80,133.50 |
| Peter Newman | Financial Restructuring Associate for 8 years; admitted in 2005. | $735 | 2.00 | $1,470.00 |
| | | $695 | 203.00 | $141,085.00 |
| | | $650 | 115.00 | $74,750.00 |
| | | $600 | 233.10 | $139,860.00 |
| | | $550 | 100.50 | $55,275.00 |
| Maximilian Schneider | Global Leveraged Finance Associate for 8 years; admitted in 2005. | $695 | 68.80 | $47,816.00 |
| | | $650 | 139.90 | $90,935.00 |
| | | $600 | 36.70 | $22,020.00 |
| | | $550 | 105.30 | $57,915.00 |

| | | | | |
|---|---|---|---|---|
| Melanie Westover | Litigation Associate for 8 years; admitted in 2005 | $735 | 3.50 | $2,572.50 |
| | | $695 | 61.10 | $42,464.50 |
| | | $650 | 19.50 | $12,675.00 |
| | | $600 | 166.80 | $100,080.00 |
| David Gasperow | Global Securities Associate for 5 years; admitted in 2002. | $695 | 32.90 | $22,865.50 |
| Paul Murphy | Global Project Finance Associate for 16 years; admitted in 1996. | $695 | 3.70 | $2,571.50 |
| Felix Weinacht | Litigation Associate for 9 years; admitted in 2002. | $695 | 37.80 | $26,271.00 |
| Mark Withey | Global Corporate Associate. | $695 | 32.40 | $22,518.00 |
| Simran Bindra | Global Corporate Associate at Milbank for 1 year; admitted in 2001. | $675 | 15.00 | $10,125.00 |
| Karen Gartenberg | Financial Restructuring Associate for 7 years; admitted in 2006. | $675 | 34.50 | $23,287.50 |
| | | $625 | 252.10 | $157,562.50 |
| Sarah A. Sulkowski | Litigation Associate for 7 years; admitted in 2006. | $720 | 11.10 | $7,992.00 |
| | | $675 | 36.10 | $24,367.50 |
| John K. White Jr. | Litigation Associate for 7 years; admitted in 2006. | $720 | 10.90 | $7,848.00 |
| | | $675 | 787.80 | $531,765.00 |
| | | $625 | 1,177.70 | $736,062.50 |
| | | $575 | 823.20 | $473,340.00 |
| David Sieradzki | Litigation Associate for 15 years; admitted in 1996. | $720 | 116.60 | $83,952.00 |
| | | $710 | 72.90 | $51,759.00 |
| Alistair Hill | Global Leveraged Finance Associate for 8 years; admitted in 2003. | $715 | 5.10 | $3,646.50 |
| | | $675 | 50.70 | $34,222.50 |
| Robert Winter | Financial Restructuring Associate for 11 years; admitted in 1997. | $710 | 51.60 | $36,636.00 |
| | | $660 | 8.20 | $5,412.00 |
| Nicholas Bassett | Litigation Associate for 6 years; admitted in 2007. | $695 | 155.40 | $108,003.00 |
| | | $650 | 853.40 | $554,710.00 |
| | | $600 | 1,094.40 | $656,640.00 |
| | | $550 | 1,157.70 | $636,735.00 |
| | | $495 | 17.90 | $8,860.50 |
| | | $347.5* | 10.00 | $3,475.00 |
| | | $325* | 14.00 | $4,550.00 |
| | | $300 | 26.80 | $8,040.00 |
| Melissa Ann Clark | Global Corporate Associate for 6 years; admitted in 2006. | $650 | 29.10 | $18,915.00 |
| | | $600 | 200.60 | $120,360.00 |
| | | $550 | 467.90 | $257,345.00 |
| | | $495 | 31.70 | $15,691.50 |
| James C. Harris | Financial Restructuring Associate for 6 years; admitted in 2008. | $695 | 66.00 | $45,870.00 |
| | | $650 | 429.10 | $278,915.00 |
| | | $600 | 612.90 | $367,740.00 |
| | | $550 | 43.20 | $23,760.00 |

| | | | | |
|---|---|---|---|---|
| Aluyah Imoisili | Litigation Associate for 6 years; admitted in 2006. | $650 | 298.20 | $198,830.00 |
| | | $600 | 204.10 | $122,430.00 |
| | | $550 | 154.90 | $85,195.00 |
| | | $495 | 27.20 | $13,464.00 |
| | | $325* | 52.60 | $17,095.00 |
| | | $300 | 10.40 | $3,120.00 |
| Stephanie Sklar | Real Estate Associate for 6 years; admitted in 2007. | $695 | 5.40 | $3,753.00 |
| | | $650 | 48.30 | $31,395.00 |
| | | $600 | 62.20 | $37,320.00 |
| | | $550 | 33.20 | $18,260.00 |
| Krista Smokowski | Litigation Associate for 6 years; admitted in 2007. | $695 | 12.30 | $8,548.50 |
| Jeremy Sussman | Financial Restructuring Associate for 6 years; admitted in 2007. | $695 | 108.50 | $75,407.50 |
| | | $650 | 745.30 | $484,445.00 |
| | | $600 | 455.10 | $273,060.00 |
| | | $550 | 366.50 | $201,575.00 |
| | | $515 | 174.40 | $86,328.00 |
| Andrew Bierne | Litigation Associate for 14 years; admitted in 1996. | $695 | 129.40 | $89,933.00 |
| | | $685 | 41.70 | $28,564.50 |
| Robert Hora | Litigation Associate for 7 years; admitted in 2003. | $695 | 9.20 | $6,394.00 |
| Cecilio Castillero | Global Finance Associate for 10 years; admitted in 2001. | $685 | 188.60 | $129,191.00 |
| Bradley Edmister | Global Securities Associate for 10 years; admitted in 2000. | $685 | 15.10 | $10,343.50 |
| | | $635 | 26.20 | $16,637.00 |
| Fred Neufeld | Financial Restructuring Associate for 22 years; admitted in 1990. | $685 | 16.10 | $11,028.50 |
| | | $635 | 26.20 | $16,637.00 |
| Katherine Soanes | Global Corporate Associate for 7 years.; admitted in 1996. | $685 | 3.30 | $2,260.50 |
| Oliver Irwin | Global Project Finance Associate for 5 years; admitted in 2007. | $625 | 0 | 0 |
| Nicole Leyton Rosser | Tax Associate for 5 years; admitted in 2008. | $625 | 31.20 | $19,500.00 |
| | | $575 | 99.00 | $56,925.00 |
| | | $515 | 332.40 | $171,186.00 |
| | | $420 | 140.90 | $59,178.00 |
| Gregory Papeika | Financial Restructuring Associate for 5 years; admitted in 2008. | $675 | 10.30 | $6,952.50 |
| | | $625 | 408.50 | $255,312.50 |
| | | $575 | 730.80 | $420,210.00 |
| | | $515 | 22.50 | $11,587.50 |
| Sangyoon Nathan Park | Litigation Associate for 5 years; admitted in 2008. | $675 | 89.10 | $60,142.50 |
| | | $625 | 994.90 | $621,812.50 |
| | | $575 | 632.90 | $363,917.50 |
| | | $312.5* | 5.00 | $1,562.50 |
| | | $287.5* | 6.00 | $1,725.00 |
| Charles Rubio | Financial Restructuring Associate for 5 years; admitted | $625 | 255.00 | $159,375.00 |
| | | $575 | 507.40 | $291,755.00 |

| | | | | |
|---|---|---|---|---|
| | in 2008. | $515 | 342.60 | $176,439.00 |
| | | $420 | 115.80 | $48,636.00 |
| Mikhel Schecter | Alternative Investments Associate for 5 years; admitted in 2008. | $625 | 54.30 | $33,937.50 |
| | | $575 | 14.90 | $8,567.50 |
| | | $515 | 58.00 | $29,870.00 |
| Michael Weiner | Litigation Associate for 5 years; admitted in 2008. | $675 | 188.10 | $126,967.50 |
| | | $625 | 8.00 | $5,000.00 |
| Andrew Young | Financial Restructuring Associate for 5 years; admitted in 2006. | $675 | 26.20 | $17,685.00 |
| | | $625 | 614.10 | $383,812.50 |
| | | $575 | 942.80 | $542,110.00 |
| | | $515 | 1,481.70 | $763,075.50 |
| | | $420 | 581.20 | $244,104.00 |
| Irene Bogdashevsky | Financial Restructuring Associate for 8 years; admitted in 2004. | $675 | 131.10 | $88,492.50 |
| | | $625 | 420.90 | $263,062.50 |
| | | $585 | 50.00 | $29,250.00 |
| Nicholas Bragg | Global Finance Associate for 3 years; admitted in 2007. | $675 | 82.40 | $55,620.00 |
| James Bulger | Financial Restructuring Associate for 7 years; admitted in 2004. | $675 | 93.50 | $63,112.50 |
| | | $625 | 626.60 | $391,625.00 |
| | | $585 | 254.30 | $148,765.50 |
| Michael Fleischer | Global Corporate Associate for 6 years; admitted in 2006. | $675 | 92.40 | $62,370.00 |
| Brian Kelly | Global Corporate Associate for 11 years; admitted in 2001. | $675 | 5.80 | $3,915.00 |
| | | $605 | 89.80 | $54,329.00 |
| Samuel Khalil | Financial Restructuring Associate for 8 years; admitted in 2004. | $675 | 2.80 | $1,890.00 |
| | | $625 | 7.50 | $4,687.50 |
| Erika Kuver-Del Duca | Real Estate Associate for 8 years; admitted in 2004. | $675 | 54.20 | $36,585.00 |
| | | $625 | 69.00 | $43,125.00 |
| Neda Matar | Global Finance Associate for 8 years; admitted in 2004. | $675 | 309.20 | $208,710.00 |
| | | $625 | 78.40 | $49,000.00 |
| Rachel Penski Fissell | Litigation Associate for 6 years; admitted in 2006. | $675 | 2.10 | $1,417.50 |
| | | $625 | 62.30 | $38,937.50 |
| Christa Chan-Pak | Global corporate Associate for 6 years; admitted in 2006. | $650 | 3.30 | $2,145.00 |
| Ateesh Chanda | Litigation Associate for 5 years; admitted in 2009. | $650 | 9.10 | $5,915.00 |
| | | $600 | 101.90 | $61,140.00 |
| | | $525 | 566.70 | $297,517.50 |
| | | $440 | 688.80 | $303,072.00 |
| Michael Clarke | Global Finance Associate for 4 years; admitted in 2009. | $650 | 49.60 | $32,240.00 |
| | | $600 | 187.30 | $112,380.00 |
| | | $525 | 157.10 | $82,477.50 |
| | | $440 | 266.00 | $117,040.00 |
| Joanna L. Grossman | Tax Associate for 4 years; admitted in 2009. | $650 | 10.80 | $7,020.00 |
| | | $600 | 547.80 | $328,680.00 |
| | | $525 | 25.00 | $13,125.00 |
| | | $440 | 71.30 | $31,372.00 |
| Jared Joyce- | Financial Restructuring | $650 | 167.00 | $108,550.00 |

| | | | | |
|---|---|---|---|---|
| Schleimer | Associate for 4 years; admitted in 2009. | $600 | 1,738.80 | $1,043,280.00 |
| | | $525 | 1,466.90 | $770,122.50 |
| | | $440 | 1,333.80 | $586,872.00 |
| | | $325* | 1.40 | $455.00 |
| | | $300* | 6.00 | $1,800.00 |
| Roger Lee | Financial Restructuring Associate for 4 years; admitted in 2009. | $600 | 292.80 | $175,680.00 |
| | | $525 | 222.10 | $116,602.50 |
| | | $440 | 435.40 | $191,576.00 |
| Ulric Lewen | Global Securities Associate for 4 years; admitted in 2009. | $650 | 8.10 | $5,265.00 |
| | | $525 | 285.30 | $149,782.50 |
| | | $440 | 711.80 | $313,192.00 |
| Andrea McNamara | Financial Restructuring Associate for Associate for 4 years; admitted in 2009. | $650 | 297.20 | $193,180.00 |
| | | $600 | 2,403.00 | $1,441,800.00 |
| | | $575 | 110.40 | $63,480.00 |
| | | $525 | 1,910.00 | $1,002,750.00 |
| | | $440 | 1,742.20 | $766,568.00 |
| | | $325* | 8.90 | $2,892.50 |
| | | $300* | 52.30 | $15,690.00 |
| | | $275 | 416.90 | $114,647.50 |
| | | $262.5* | 3.30 | 866.25 |
| Gabriel Mpubani | Global Project Finance Associate for 6 years; admitted in 2006. | $650 | 28.10 | $18,265.00 |
| | | $600 | 28.50 | $17,100.00 |
| | | $550 | 100.80 | $55,440.00 |
| Stacey Mesler | Tax Associate for 7 years; admitted in 2003. | $650 | 44.60 | $28,990.00 |
| David Levine | Global Corporate Associate for 10 years; admitted in 2002. | $650 | 62.30 | $40,495.00 |
| Jeffrey Lesovitz | Litigation Associate for 5 years; admitted in 2007 | $650 | 5.50 | $3,575.00 |
| | | $600 | 330.10 | $198,060.00 |
| Jonathan Brown | Global Finance Associate for 5 years; admitted in 2007. | $650 | 11.60 | $7,540.00 |
| | | $600 | 57.10 | $34,260.00 |
| | | $550 | 173.10 | $95,205.00 |
| | | $495 | 120.00 | $59,400.00 |
| Kevin Brown | Tax Associate for 6 years; admitted in 2008. | $650 | 5.80 | $3,770.00 |
| | | $600 | 137.00 | $82,200.00 |
| | | $550 | 41.90 | $23,045.00 |
| Daniel De Souza | Litigation Associate for 6 years; admitted in 2005. | $650 | 398.40 | $258,960.00 |
| Peter Devonshire | Global Finance Associate for 6 years; admitted in 2007 | $650 | 61.30 | $39,845.00 |
| Melissa Gambol | Global Securities Associate for 6 years; admitted in 2007. | $650 | 78.40 | $50,960.00 |
| | | $600 | 1,061.40 | $636,840.00 |
| | | $550 | 164.50 | $90,475.00 |
| Aisha Greene | Global Leveraged Finance Associate for 6 years; admitted in 2005. | $650 | 257.60 | $167,440.00 |
| | | $600 | 123.10 | $73,860.00 |

| Name | Description | Rate | Hours | Amount |
|---|---|---:|---:|---:|
| Emma Hogwood | Litigation Associate for 6 years; admitted in 2006. | $650 | 21.40 | $13,910.00 |
| | | $600 | 205.80 | $123,480.00 |
| Jed Schwartz | Litigation Associate for 5 years; admitted in 2007. | $650 | 38.70 | $25,155.00 |
| | | $600 | 44.80 | $26,880.00 |
| | | $550 | 542.40 | $298,320.00 |
| | | $495 | 64.40 | $31,878.00 |
| Tamieka Spencer Bruce | Litigation Associate for 6 years; admitted in 2008. | $650 | 27.70 | $18,005.00 |
| | | $600 | 36.00 | $21,600.00 |
| Victoria Zhu | Global Corporate Associate for 5 years; admitted in 2008 | $650 | 13.60 | $8,840.00 |
| | | $550 | 26.70 | $14,685.00 |
| Rachel Pojunas | Litigation Associate for 4 years; admitted in 2009. | $600 | 262.80 | $157,680.00 |
| | | $525 | 988.50 | $518,962.50 |
| | | $440 | 1,395.80 | $614,152.00 |
| | | $275 | 53.20 | $14,630.00 |
| Mark Rockefeller | Litigation Associate for 4 years; admitted in 2009. | $650 | 56.60 | $36,790.00 |
| | | $600 | 158.20 | $94,920.00 |
| Scott Rozic | Global Securities Associate for 6 years; admitted in 2004. | $650 | 291.40 | $189,410.00 |
| | | $600 | 727.80 | $436,680.00 |
| | | $550 | 89.60 | $49,280.00 |
| David Zolkin | Global Securities Associate for 11 years; admitted in 1991. | $635 | 24.30 | $15,430.50 |
| Temitope Adesanya | Global Project Finance Associate for 5 years; admitted in 2006. | $625 | 164.10 | $102,562.50 |
| | | $575 | 43.30 | $24,897.50 |
| Jeremy Steckel | Global Securities Associate for 4 years; admitted in 2009. | $600 | 108.20 | $64,920.00 |
| | | $525 | 519.80 | $272,895.00 |
| Anna Thomander | Financial Restructuring Associate for 4 years; admitted in 2009. | $600 | 35.00 | $21,000.00 |
| Diane R. Young | Financial Restructuring Associate for 4 years; admitted in 2009. | $600 | 90.10 | $54,060.00 |
| | | $525 | 38.80 | $20,370.00 |
| | | $440 | 53.90 | $23,716.00 |
| Leo Vellis | Global Securities Associate for 2 years; admitted in 2008. | $600 | 245.20 | $147,120.00 |
| Brittany Akins | Litigation Associate for 3 years; admitted in 2010. | $625 | 41.60 | $26,000.00 |
| | | $550 | 577.60 | $317,680.00 |
| | | $450 | 1,905.50 | $857,475.00 |
| John Calabrese | Litigation Associate for 3 years; admitted in 2010. | $625 | 28.00 | $17,500.00 |
| | | $550 | 467.50 | $257,125.00 |
| | | $450 | 977.40 | $439,830.00 |
| Randy Clark | Tax Associate for 3 years; admitted in 2010. | $625 | 3.40 | $2,125.00 |
| | | $550 | 402.90 | $221,595.00 |
| Brianne Copp | Litigation Associate for 5 years; admitted in 2008. | $625 | 50.60 | $31,625.00 |
| | | $575 | 127.40 | $73,255.10 |
| Anh-duc Cordalis | Global Leveraged Finance Associate for 7 years. | $625 | 2.80 | $1,750.00 |
| Jonathan Goldstein | Global Transportation Finance | $625 | 46.70 | $29,187.50 |

| | | | | |
|---|---|---|---|---|
| | Associate for 6 years; admitted in 2004. | $585 | 23.30 | $13,630.50 |
| Oliver Irwin | Global Project Finance Associate for 5 years; admitted in 2007. | $625 | 4.00 | $2,500.00 |
| Alka Pradhan | Litigation Associate for 5 years; admitted in 2008. | $625 | 79.60 | $49,750.00 |
| Harsha Rao | Global Finance Associate for 2 years; admitted in 2008 | $625 | 54.20 | $33,875.00 |
| | | $515 | 55.40 | $28,531.00 |
| | | $420 | 2.30 | $966.00 |
| Linda Robinson | Global Finance Associate for 6 years; admitted in 2007. | $625 | 116.10 | $72,562.50 |
| Nicholas Robinson | Global Alternative Investments Associate for 7 years; admitted in 2006. | $625 | 4.50 | $2,812.50 |
| Ben Clossick Thomson | Litigation Associate for 6 years; admitted in 2001. | $625 | 138.30 | $86,437.50 |
| Simon Williams | Global Finance Associate for 4 years; admitted in 2008. | $625 | 359.00 | $224,375.00 |
| | | $575 | 281.60 | $161,920.00 |
| Jennie Woltz | Litigation Associate for 5 years; admitted in 2008. | $625 | 254.50 | $159,062.50 |
| | | $575 | 147.30 | $84,697.50 |
| Bradley Friedman | Financial Restructuring Associate for 3 years; admitted in 2010. | $625 | 153.00 | $95,625.00 |
| | | $550 | 1,917.00 | $1,054,350.00 |
| | | $450 | 1,714.50 | $771,525.00 |
| Jacob Jou | Litigation Associate for 3 years; admitted in 2010. | $625 | 145.70 | $91,062.50 |
| | | $550 | 787.80 | $433,290.00 |
| Matthew Kanter | Financial Restructuring Associate for 3 years; admitted in 2010. | $625 | 137.90 | $86,187.50 |
| | | $550 | 1,320.50 | $726,275.00 |
| | | $450 | 1,628.60 | $732,870.00 |
| | | $275 | .50 | $137.50 |
| Denise Linton | Litigation Associate for 3 years; admitted in 2010. | $625 | 272.30 | $170,187.50 |
| | | $550 | 1,300.90 | $715,495.00 |
| | | $450 | 1,368.40 | $615,780.00 |
| Tiara Lipps | Real Estate Associate for 3 years; admitted in 2010. | $550 | 27.30 | $15,015.00 |
| | | $450 | 81.00 | $36,450.00 |
| James Marshall | Global Securities Associate for 3 years; admitted in 2010. | $625 | 2.60 | $1,625.00 |
| | | $550 | 10.30 | $5,665.00 |
| | | $450 | 410.00 | $184,500.00 |
| Andrew Morton | Financial Restructuring Associate for 3 years; admitted in 2010. | $550 | 117.70 | $64,735.00 |
| | | $450 | 260.10 | $117,045.00 |
| Jonathan Ostrzega | Financial Restructuring Associate for 3 years; admitted n 2010. | $550 | 218.70 | $120,285.00 |
| | | $450 | 477.90 | $215,055.00 |
| Neema Saran | Litigation Associate for 3 years; admitted in 2010. | $625 | 19.80 | $12,375.00 |
| | | $550 | 69.00 | $37,950.00 |
| | | $450 | 912.90 | $410,805.00 |
| Brian Sturm | Financial Restructuring | $625 | 62.10 | $38,812.50 |

| | | | | |
|---|---|---|---|---|
| | Associate for 3 years; admitted in 2010. | $550 | 271.90 | $149,545.00 |
| | | $450 | 444.20 | $199,890.00 |
| Jeremy Wells | Global Securities Associate for 3 years; admitted in 2010. | $625 | 175.30 | $109,652.50 |
| | | $550 | 1,190.10 | $654,555.00 |
| | | $450 | 1,113.70 | $501,165.00 |
| Daniel Lin | Global Corporate Associate for 9 years; admitted in 2001. | $625 | 4.80 | $3,000.00 |
| Jihay Kwack | Global Securities for 6 years; admitted in 2004. | $625 | 621.60 | $388,500.00 |
| Douglas Barnes | Global Corporate Associate for 7 years; admitted in 2006. | $625 | 55.20 | $34,500.00 |
| Ana Bast | Global Securities Associate for 5 years; admitted in 2009. | $625 | 123.60 | $77,250.00 |
| Constance Beverley | Litigation Associate for 3 years; admitted in 2008. | $625 | 422.60 | $264,125.00 |
| | | $575 | 1,237.90 | $711,792.50 |
| | | $515 | 1,339.10 | $689,636.50 |
| | | $420 | 24.90 | $10,458.00 |
| | | $312.5* | 2.40 | $750.00 |
| | | $287.5* | 24.00 | $6,900.00 |
| Karen Bhatia | Global Securities Associate for 5 years; admitted in 2007. | $625 | 194.00 | $121,250.00 |
| | | $575 | 80.00 | $46,000.00 |
| Patrick Marecki | Litigation Associate for 7 years; admitted in 2006. | $625 | 141.30 | $88,312.50 |
| Melanie Ann McLaughlin | Financial Restructuring Associate for 5 years; admitted in 2008. | $625 | 37.00 | $23,125.00 |
| | | $575 | 94.00 | $54,050.00 |
| William McNamara | Litigation Associate for 5 years; admitted in 2008. | $625 | 16.70 | $10,437.50 |
| Elisabeth Mullen | Trust and Estates Associate for 5 years; admitted in 2008 | $625 | 2.00 | $1,250.00 |
| Samir Parikh | Financial Restructuring Associate for 6 years; admitted in 2004. | $625 | 264.60 | $165,375.00 |
| | | $585 | 89.80 | $52,533.00 |
| Andrew Sullivan | Global Securities Associate for 3 years; admitted in 2008 | $625 | 39.20 | $24,500.00 |
| | | $575 | 358.70 | $206,252.50 |
| | | $515 | 599.70 | $308,845.50 |
| Dana Roitberg Weir | Litigation Associate for 5 years; admitted in 2006. | $625 | 122.60 | $76,625.00 |
| Jeeseon Ahn | Global Alternative Investments Associate for 4 years; admitted in 2009. | $600 | 2.30 | $1,380.00 |
| | | $525 | 47.40 | $24,885.00 |
| | | $440 | 415.40 | $182,776.00 |
| Merih Altay | Global Corporate Associate for 6 years; admitted in 2006. | $600 | 11.20 | $6,720.00 |
| Victoria Boid | Global Finance Associate for 3 years; admitted in 2007. | $600 | 123.10 | $73,860.00 |
| | | $550 | 262.80 | $144,540.00 |
| La Tonya Brooks | Litigation Associate for 4 years; admitted in 2009. | $600 | 186.60 | $111,960.00 |
| | | $525 | 236.30 | $124,057.60 |
| Gabriel Carnwath | Global Corporate Associate for | $600 | 135.90 | $81,540.00 |

| | | | | |
|---|---|---|---|---|
| | 4 years; admitted in 2009. | | | |
| Kostas Cheliotis | Global Corporate Associate for 8 years; admitted in 2003. | $600 | 35.90 | $21,540.00 |
| Victor Randolph Cinco | Global Corporate Associate for 8 years; admitted in 2008 | $600 | 19.40 | $11,640.00 |
| Joanne Collett | Financial Restructuring Associate for 5 years; admitted in 2008. | $600 $550 | 400.90 163.40 | $240,540.00 $89,870.00 |
| Michael Comerford | Financial Restructuring Associate for 10 years; admitted in 2003. | $600 | 3.40 | $2,040.00 |
| Julie Constantinides | Global Corporate Associate for 4 years; admitted in 2009. | $600 $525 $440 $275 | 26.50 88.20 118.90 15.20 | $15,900.00 $46,305.00 $52,316.00 $4,180.00 |
| Erin Culbertson | Litigation Associate for 2 years; admitted in 2009. | $600 $525 $440 $262.5* | 397.80 1,031.00 407.80 8.20 | $238,680.00 $541,275.00 $179,432.00 $2,152.50 |
| Peter Devonshire | Global Corporate Associate for 3 years; admitted in 2007. | $600 | 396.60 | $237,960.00 |
| Rachel Fink | Global Corporate Associate for 6 years; admitted in 2007. | $600 $550 | 50.80 370.40 | $30,480.00 $203,720.00 |
| Melissa Galicia | Global Transportation and Space Finance Associate for 4 years; admitted in 2009. | $600 $525 $440 | 2.30 392.80 208.50 | $1,380.00 $206,220.00 $91,740.00 |
| Jeremy Hollembeak | Financial Restructuring Associate for 6 years; admitted in 2007. | $600 $550 $495 | 180.70 4.40 29.10 | $108,420.00 $2,420.00 $14,404.50 |
| Lee Kelsall | Global project finance Associate for 4 years; admitted in 2008. | $600 | 10.50 | $6,300.00 |
| Alexander Klein | Global Leveraged Finance Associate for 4 years; admitted in 2009. | $600 | 2.50 | $1,500.00 |
| Brian Lee | Global Finance Associate for 4 years; admitted in 2009. | $600 $525 $440 | 4.20 88.80 437.80 | $2,520.00 $46,620.00 $192,632.00 |
| Grace Lim | Global Corporate Associate for 6 years; admitted in 2005 | $600 | 4.70 | $2,820.00 |
| Ada Liu | Global Project Finance Associate for 5 years; admitted in 2005. | $600 $550 | 26.00 19.20 | $15,600.00 $10,560.00 |
| Luisa Nixon | Global Corporate Associate for 3 years; admitted in 2008. | $600 | 168.40 | $101,040.00 |
| Tanja Olano | Global Corporate Associate for 4 years; admitted in 2009. | $600 | 6.30 | $3,780.00 |
| Sebastian Olk | Global Corporate Associate for | $600 | 1.50 | $900.00 |

| | | | | |
|---|---|---|---|---|
| | 5 years; admitted in 2005 | | | |
| Candice Ota | Global Project Finance Associate for 6 years; admitted in 2007. | $600 | 26.60 | $15,960.00 |
| James Pascale | Global Finance Associate for 5 years; admitted in 2003. | $600 | 11.20 | $6,720.00 |
| Raisa Patron | Global Corporate Associate for 3 years; admitted in 2009 | $600 | 5.20 | $3,120.00 |
| Patricia Janeth Quilizapa | Litigation Associate for 5 years; admitted in 2005. | $600 | 187.90 | $112,740.00 |
| Brendan Riley | Litigation Associate for 2 years; admitted in 2009. | $600 | 35.90 | $21,540.00 |
| | | $525 | 1,124.60 | $590,415.00 |
| | | $440 | 543.20 | $239,008.00 |
| Joanne Robertson | Global Finance Associate for 2 years; admitted in 2009. | $600 | 393.40 | $236,040.00 |
| | | $525 | 640.90 | $336,472.50 |
| | | $440 | 429.00 | $188,760.00 |
| | | $300* | 1.00 | $300.00 |
| | | $262.5* | 2.20 | $577.50 |
| Mary Santanello | Global Finance Associate for 3 years; admitted in 2007 | $600 | 49.30 | $29,580.00 |
| | | $550 | 49.00 | $26,950.00 |
| | | $300* | 1.00 | $300.00 |
| Naomi Slavinski | Tax Associate for 5 years; admitted in 2005 | $600 | 40.00 | $24,000.00 |
| | | $550 | 22.20 | $12,210.00 |
| Stephanie Swanson | Global Securities Associate for 2 years; admitted in 2009. | $600 | 66.00 | $39,600.00 |
| | | $525 | 526.00 | $276,150.00 |
| | | $440 | 769.40 | $338,536.00 |
| Wendy Williams | Global Securities Associate for 4 years; admitted in 2007. | $600 | 470.30 | $282,180.00 |
| | | $550 | 273.90 | $150,645.00 |
| Yeping Zhou | Global Securities Associate for 4 years; admitted in 2007 | $600 | 28.20 | $16,920.00 |
| Husam Badawi | Global Corporate Associate for 3 years; admitted in 2008 | $575 | 208.90 | $120,117.50 |
| | | $515 | 257.50 | 132,612.50 |
| Charbel Barakat | Real Estate Associate for 4 years; admitted in 2006. | $575 | 1.50 | $862.50 |
| Douglas Barnes | Global Corporate Associate for 5 years; admitted in 2006. | $575 | 123.50 | $71,012.50 |
| Ana Bast | Global Securities Associate for 5 years; admitted in 2006 | $575 | 13.90 | $7,992.50 |
| Timo Bauer | Leverages Finance Associate for 2 years; admitted in 2007. | $575 | 3.50 | $2,012.50 |
| | | $525 | 3.00 | $1,575.00 |
| Gina Ciraldo Stabile | Alternative Investments Associate for 3 years; admitted in 2008. | $575 | 2.00 | $1,150.00 |
| | | $515 | 26.00 | $13,390.00 |
| Jonah Crane | Global Corporate Associate for 4 years; admitted in 2006 | $575 | 361.20 | $207,690.00 |
| | | $525 | 427.90 | $224,647.50 |
| | | $262.5* | .50 | $131.25 |
| David Eastlake | Financial Restructuring Associate for 3 years; admitted | $575 | 5.70 | $3,277.50 |
| | | $515 | 438.10 | $225,621.50 |

18

| | | | | |
|---|---|---|---|---|
| | in 2008. | $420 | 241.60 | $101,472.00 |
| Christopher Fickes | Global Transportation Finance Associate for 4 years; admitted in 2006 | $575 | 9.60 | $5,520.00 |
| Philip Gledson | Global Corporate Associate for 4 years; admitted in 2006. | $575 | 11.00 | $6,325.00 |
| Emin Guseynov | Global Leveraged Finance Associate for 3 years; admitted in 2008. | $575 $515 | 12.00 69.90 | $6,900.00 $35,998.50 |
| Dawn Harding | Global Transportation and Space Finance Associate for 3 years. | $575 | 81.50 | $46,862.50 |
| Alexis Hedman | Global Transportation Finance Associate for 4 years; admitted in 2006. | $575 | 125.30 | $72,047.50 |
| Curtis Johnson | Litigation Associate for 3 years; admitted in 2008. | $575 | 99.60 | $57,270.00 |
| Tarnetta Jones | Global Leveraged Finance Associate for 3 years; admitted in 2008. | $575 $515 | 94.30 59.20 | $54,222.50 $30,488.00 |
| Sofia Khan | Litigation Associate for 3 years; admitted in 2008. | $575 $515 | 43.70 548.00 | $25,127.50 $282,220.00 |
| Bria La Salle Mertens | Financial Restructuring Associate for 3 years; admitted in 2008. | $575 $515 | 24.40 26.60 | $14,030.00 $13,699.00 |
| Michael Lee | Global Securities Associate for 5 years; admitted in 2008. | $575 $515 | 472.70 262.30 | $271,802.50 $135,084.50 |
| Michael Lynch | Global Corporate Associate for 3 years; admitted in 2007. | $575 $515 $420 | 1,161.50 946.30 101.60 | $667,862.50 $487,344.50 $42,672.00 |
| Daniel Nauth | Global Securities Associate for 2 years; admitted in 2007. | $575 | 53.80 | $30,935.00 |
| Lindsay Pinto | Litigation Associate for 3 years; admitted in 2007. | $575 $515 | 17.00 794.90 | $9,775.00 $409,373.50 |
| John Spader | Alternative Investments Associate for 4 years; admitted in 2007. | $575 | 466.20 | $268,065.00 |
| Joseph Teltser | Global Corporate Associate for 7 years; admitted in 2006 | $575 | 14.20 | $8,165.00 |
| Laurice Thrasher | Global Leveraged Finance Associate for 3 years; admitted in 2008. | $575 $515 | 44.30 53.10 | $25,472.50 $27,346.50 |
| Gabriel Weaver | Litigation Associate for 6 years; admitted in 2006 | $575 | 38.00 | $21,850.00 |
| Armando Acosta III | Litigation Associate for 11 months; admitted in 2010. | $550 $450 | 758.90 730.40 | $417,395.00 $328,680.00 |

| | | | | |
|---|---|---|---|---|
| John Babtie | Global corporate Associate for 2 years; admitted in 2010 | $550 $450 | 54.20 43.30 | $29,810.00 $19,485.00 |
| Thallen Brassel | Tax Associate for 3 years; admitted in 2010. | $550 $450 | 87.50 877.10 | $48,125.00 $394,695.00 |
| Joyce Chang | Global Corporate Finance Associate for 6 years; admitted in 2007. | $550 | 37.30 | $20,515.00 |
| Ginni Chen | Litigation Associate for 11 months; admitted in 2010. | $550 $450 | 131.70 905.30 | $72,435.00 $407,385.00 |
| Jennie Govey | Financial Restructuring Associate for 3 years; admitted in 2008. | $550 $495 | 116.60 221.20 | $64,130.00 $109,494.00 |
| Daniel Gubitz | Global Corporate Associate for 3 years; admitted in 2004. | $550 | 7.50 | $4,125.00 |
| Gabrielle Haddad | Global Corporate Associate for 3 years; admitted in 2007. | $550 | 100.10 | $55,055.00 |
| Shemetreal Harris | Alternative Investments Associate for 2 years; admitted in 2010. | $550 $450 | 19.80 3.80 | $10,890.00 $1,710.00 |
| Bryan Hunkele | Global Finance Associate for 3 years; admitted in 2007. | $550 | 94.00 | $51,700.00 |
| Shigeyuki Ito | Global Project Finance Associate for 6 years; admitted in 2007. | $550 | 9.40 | $5,170.00 |
| Jason Karaffa | Financial Restructuring Group Associate for 3 years; admitted in 2007. | $550 $495 | 205.50 133.30 | $113,025.00 $65,983.50 |
| Linda Lee | Global Transportation Finance Associate for 3 years; admitted in 2008. | $550 | 3.50 | $1,925.00 |
| Ethan Lee | Litigation Associate for 11 months; admitted in 2010. | $550 $450 | 207.40 906.80 | $114,070.00 $408,060.00 |
| Kathryn Lenahan | Financial Restructuring Associate for 11 months; admitted in 2010. | $550 $450 | 147.70 577.70 | $81,235.00 $259,965.00 |
| Cecilia Ma | Global Corporate Assoicate for 3 years; admitted in 2010. | $550 | 2.00 | $1,100.00 |
| Sara Mischner | Alternative Investments Associate for 3 years; admitted in 2010. | $550 | 51.90 | $28,545.00 |
| Richard Owen | Global Corporate Associate for 3 years; admitted in 2010. | $550 | 20.60 | $11,330.00 |
| James Reilly | Litigation Associate for 3 years; admitted in 2010. | $550 $450 | 25.30 444.80 | $13,915.00 $200,160.00 |
| Katherine Rhodes | Litigation Associate for 3 Years; admitted in 2010. | $550 $450 | 7.50 215.90 | $4,125.00 $97,155.00 |
| Joanne Ricciardiello | Global Transportation and Space Finance Associate for 11 | $550 $450 | 25.80 278.00 | $14,190.00 $125,100.00 |

| | months; admitted in 2010. | | | |
|---|---|---|---|---|
| Elad Roisman | Global corporate Associate for 4 years; admitted in 2007 | $550 $495 | 2.60 151.70 | $1,430.00 $75,091.50 |
| Iiya Ross | Global Securities Associate for 11 months; admitted in 2010. | $550 $450 | 21.70 370.40 | $11,935.00 $166,680.00 |
| Megha Shah | Global Securities Associate for 2 years; admitted in 2010. | $550 $450 | 62.50 592.40 | $34,375.00 $266,580.00 |
| Nehal Siddiqui | Global Corporate Associate for 2 years; admitted in 2010. | $550 $450 | 7.75 188.30 | $4,262.50 $84,735.00 |
| Sunila Sreepada | Litigation Associate for 2 years; admitted in 2010. | $550 $450 | 14.60 142.80 | $8,030.00 $64,260.00 |
| Hyosung Tang | Global Alternative Investments Associate for 4 years; admitted in 2007. | $550 | 27.00 | $14,850.00 |
| Jonathan Walder | Litigation Associate for 1 year; admitted in 2010. | $550 $450 | 2.20 1,037.00 | $1,210.00 $466,650.00 |
| Joshua Weiss | Global Corporate Associate for 2 years; admitted in 2010 | $550 | 2.90 | $1,595.00 |
| Ryan West | Litigation Associate for 11 months; admitted in 2010. | $550 $450 | 14.20 179.40 | $7,810.00 $80,730.00 |
| Brian Youn | Litigation Associate for 2 years; admitted in 2010. | $550 $450 | 7.80 100.90 | $4,290.00 $45,405.00 |
| Catherine Yu | Financial Restructuring Associate for 3 years; admitted in 2007. | $550 $495 | 696.40 687.20 | $383,020.00 $340,164.00 |
| Sonja Andersen | Global Transportation and Space Finance Associate for 2 years; admitted in 2009. | $525 | 350.50 | $184,012.50 |
| Michael Applebaum | Tax Associate for 2 years; admitted in 2009. | $525 $440 | 25.20 99.30 | $13,230.00 $43,692.00 |
| Kurt Avarell | Tax Associate for 2 years; admitted in 2009. | $525 $440 | 199.90 63.90 | $104,947.50 $28,116.00 |
| Adam Bagley | Global Corporate Associate for 2 years; admitted in 2009. | $525 $440 | 63.70 41.70 | $33,442.50 $18,348.00 |
| Douglas Barnes | Global Corporate Associate for 4 years; admitted in 2006. | $525 | 145.60 | $76,440.00 |
| Jennifer Beaudry | Global Securities Associate for 4 years; admitted in 2009. | $525 $440 | 300.10 571.70 | $157,552.50 $251,548.00 |
| Adlin Castro | Global Securities Associate for 4 years; admitted in 2009. | $525 $440 | 234.20 31.90 | $122,955.00 $278,036.00 |
| Wayne Ren Chang | Litigation Associate for 2 years; admitted in 2009. | $525 | 52.10 | $27,352.50 |
| Alecia Chen | Alternative Investments Associate for 4 years; admitted in 2009. | $525 $440 | 17.00 180.50 | $8,925.00 $79,420.00 |
| Michal Dahan | Litigation Associate for 4 | $525 | 9.50 | $4,987.50 |

| | | | | |
|---|---|---|---|---|
| | years; admitted in 2006. | | | |
| Robert Dickens III | Global Finance Associate for 2 years; admitted in 2009. | $525 $440 | 18.10 285.20 | $9,502.50 $125,488.00 |
| Nicole Fidler | Litigation Associate for 4 years; admitted in 2009. | $525 | 359.80 | $188,895.00 |
| Derek Gluckman | Global Transportation and Space Finance Associate for 2 years; admitted in 2009. | $525 $440 | 405.00 301.40 | $212,625.00 $132,616.00 |
| Christopher Hower | Litigation Associate for 2 years; admitted in 2009 | $525 | 112.70 | $59,167.50 |
| Benjamin Keller | Real Estate Associate for 2 years; admitted in 2009. | $525 $440 | 6.90 32.60 | $3,622.50 $14,344.00 |
| Alexander Klein | Global Leveraged Finance Associate for 3 years; admitted in 2009. | $525 | 108.60 | $57,015.00 |
| Marianna Kosharovsky | Global Securities Associate for 2 years; admitted in 2009. | $525 $440 | 424.60 649.60 | $222,915.00 $285,824.00 |
| Karin Kringen | Global Securities Associate for 2 years; admitted in 2009. | $525 $440 | 22.90 606.00 | $12,022.50 $266,640.00 |
| Konata Lake | Global Leveraged Finance Associate for 2 years; admitted in 2009. | $525 | 2.90 | $1,522.50 |
| Kristen Lam | Global Transportation and Space Finance Associate for 2 years; admitted in 2009. | $525 $440 | 172.20 62.80 | $90,405.00 $27,632.00 |
| Alan Lawn | Financial Restructuring Associate for 2 years; admitted in 2009. | $525 $440 $275 | 33.40 1,013.00 362.00 | $17,535.00 $445,720.00 $99,550.00 |
| Timothy Mackey | Global Corporate Associate for 2 years; admitted 2009. | $525 | 7.30 | $3,832.50 |
| Abbey Mansfield | Global Leverage Finance Associate for 2 years; admitted in 2009. | $525 $440 | 173.20 191.50 | $90,930.00 $84,260.00 |
| Jan Nishizawa | Global Corporate Associate for 4 years; admitted in 2009. | $525 $440 $262.5* $220* | 80.70 169.80 13.90 3.00 | $42,367.50 $74,712.00 $3,648.75 $660.00 |
| Hannibal Oezdemir | Global Corporate Associate for 2 years. | $525 | 14.20 | $7,455.00 |
| Tanja Olano | Global Corporate Associate for 4 years; admitted in 2009. | $525 $440 | 115.90 47.90 | $60,847.50 $21,076.00 |
| Raisa Patron | Global Corporate Associate for 3 years; admitted in 2009 | $525 | 4.10 | $2,152.50 |
| Stephen Rose | Global Securities Associate for 4 years; admitted in 2009. | $525 $440 | 284.70 517.50 | $149,467.50 $227,700.00 |
| Thomas Santoro | Litigation Associate for 4 years; admitted in 2009. | $525 | 160.80 | $84,420.00 |

| | | | | |
|---|---|---|---|---|
| Ranee Adipat | Global Securities Associate for 2 years; admitted in 2011. | $460 | 55.00 | $25,300.00 |
| Eluard Alegre | Financial Restructuring Associate for 2 years; admitted in 2011. | $460 $235 | 304.50 8.70 | $140,070.00 $2,044.50 |
| Alicia Bove | Litigation Associate for 2 years; admitted in 2011. | $570 $460 | 265.20 745.20 | $151,164.00 $342,792.00 |
| Matthew Brod | Financial Restructuring Associate for 2 years; admitted in 2011. | $570 $460 $235 | 159.90 1,756.30 22.90 | $91,143.00 $807,898.00 $5,381.50 |
| Hugh Carlson | Litigation Associate for 2 years; admitted in 2011. | $570 $460 | 38.30 232.60 | $21,831.00 $106,996.00 |
| Brenton T. Culpepper | Litigation Associate for 2 years; admitted in 2011. | $570 $460 | 35.10 550.90 | $20,007.00 $253,414.00 |
| Regina Gromen | Alternative Investments Associate for 2 years; admitted in 2011. | $460 $235 | 94.70 14.50 | $43,562.00 $3,407.50 |
| Katie J. Hamilton | Litigation Associate for 2 years; admitted in 2011. | $460 $295 | 31.95 71.60 | $14,697.00 $21,122.00 |
| Nicole J. Lee | Financial Restructuring Associate for 2 years; admitted in 2011. | $570 $460 $235 | 93.90 1,009.80 17.60 | $53,523.00 $464,508.00 $4,136.00 |
| Mark McCrone | Litigation Associate for 2 years; admitted in 2011. | $570 $460 $235 $230* | 288.30 1,007.60 6.60 7.30 | $164,331.00 $463,496.00 $1,551.00 $1,679.00 |
| Michael Price | Financial Restructuring Associate for 2 years; admitted in 2011. | $460 | 109.40 | $50,324.00 |
| Christina Totino | Litigation Associate for 2 years; admitted in 2011. | $570 $460 $235 | 241.30 745.50 5.10 | $137,541.00 $342,930.00 $1,198.50 |
| Greta Ulvad | Financial Restructuring Associate at Milbank for 2 years; admitted in 2011. | $570 | 80.10 | $45,657.00 |
| Jonathan Keen | Financial Restructuring Associate for 2 years; admitted in 2011. | $470 $295 | 24.60 140.80 | $11,562.00 $41,536.00 |
| Lysondra Ludwig | Tax Associate at Milbank for 2 years; admitted in 2012. | $470 | 7.00 | $3,290.00 |
| Andrew Tsang | Financial Restructuring Associate at Milbank for 2 years; admitted in 2012. | $470 | 11.80 | $5,546.00 |
| Matthew Squires | Global Securities Associate for 2 years; admitted in 2009. | $525 | 80.00 | $42,000.00 |
| Andrea Al-Attar | Global Corporate Associate for 3 years; admitted in 2008. | $515 $420 | 10.40 13.30 | $5,356.00 $5,586.00 |

| | | | | |
|---|---|---|---|---|
| Javier Blanco | Global Project Finance Associate for 2 years; admitted in 2008. | $515 | 7.30 | $3,759.50 |
| Andrew Butville | Global Corporate Associate for 2 years; admitted in 2008. | $515<br>$420 | 41.70<br>73.40 | $21,475.50<br>$30,828.00 |
| Juliet Curtin | Litigation Associate for 2years; admitted in 2008. | $515<br>$420 | 26.70<br>49.20 | $13,750.50<br>$20,664.00 |
| James Doench | Global Corporate Associate for 2 years; admitted in 2008. | $515<br>$420 | 56.60<br>46.40 | $29,149.00<br>$19,488.00 |
| Alison Fraser | Global Corporate Associate for 2 years; admitted in 2008. | $515<br>$420 | 28.60<br>70.50 | $14,729.00<br>$29,610.00 |
| Cheryl Isaac | Global Finance Associate for 2 years; admitted in 2008. | $515 | 4.00 | $2,060.00 |
| Elena Kilberg | Litigation Associate for 2 years; admitted in 2008. | $515 | 13.10 | $6,746.50 |
| Laura Kilian | Global Corporate Associate for 2 years; admitted in 2008. | $515<br>$420 | 57.00<br>6.40 | $29,355.00<br>$2,688.00 |
| Apoorv Kurup | Global Corporate Associate for 2 years; admitted in 2009. | $515<br>$420 | 58.70<br>17.50 | $30,230.50<br>$7,350.00 |
| Karen Ma | Financial Restructuring Associate for 2 years; admitted in 2008. | $515 | 16.90 | $8,703.00 |
| Heather Moore | Global Finance Associate for 2 years; admitted in 2008. | $515 | 85.30 | $43,929.50 |
| Mwanga Mtengule | Global Finance Associate for 2 years; admitted in 2008. | $515 | 68.30 | $35,174.50 |
| Ee-Ing Ong | Global Securities Associate for 2 years; admitted in 2008. | $515 | 4.30 | $2,214.50 |
| Andrew Pendleton | Global Project Finance Associate for 2 years; admitted in 2008. | $515 | 9.40 | $4,841.00 |
| Jonathan Petts | Litigation Associate for 2 years; admitted in 2008. | $515<br>$420 | 74.20<br>17.50 | $38,213.00<br>$7,350.00 |
| Dean Sattler | Global Corporate Associate for 2 years; admitted in 2008. | $515 | 14.40 | $7,416.00 |
| Jennie Utsinger | Global Corporate Associate for 2 years; admitted in 2008. | $515<br>$420 | 3.10<br>45.20 | $1,596.50<br>$18,984.00 |
| Masamichi Yamamoto | Global Project Finance Associate for 2 years; admitted in 2008. | $515<br>$420 | 20.10<br>20.30 | $10,351.50<br>$8,526.00 |
| Hongyan Wang | Global Securities Associate for 2 years; admitted in 2008. | $495 | 3.90 | $1,930.50 |
| Matthew Chain | Global Corporate Associate for 1 year; admitted in 2011. | $460<br>$235 | 6.00<br>4.70 | $2,760.00<br>$1,104.50 |
| Dalia De Leon | Global Securities Associate for 1 year; admitted in 2011. | $460 | 4.40 | $2,024.00 |
| Jason Frank | Global Securities Associate for | $460 | 54.00 | $24,840.00 |

| | | | | |
|---|---|---|---|---|
| | 1 year; admitted in 2011. | | | |
| Eric Gold | Alternative Investment Associate for 1 year; admitted in 2011. | $460 | 73.10 | $33,626.00 |
| Timothy Wood | Litigation Associate for 1 year; admitted in 2011 | $460 $295 | 41.40 120.90 | $19,044.00 $35,665.50 |
| Deana Brown | Financial Restructuring Associate for 1 year; admitted in 2011. | $450 $225* | 14.60 18.60 | $6,570.00 $4,185.00 |
| Philippe Danielides | Global Transportation and Space Finance Associate for 1 year; admitted in 2010. | $450 | 85.20 | $38,340.00 |
| Victoria Farren | Alternative Investments Associate for 1 year; admitted in 2010. | $450 | 124.10 | $55,845.00 |
| Julie Fish | Alternative Investments Associate for 1 year; admitted in 2010. | $450 | 85.40 | $38,430.00 |
| Meghan Gabriel | Global Corporate Associate for 1 year; admitted in 2010. | $450 | 10.90 | $4,905.00 |
| Craig Gibson | Global Leveraged Finance Associate for 1 year; admitted in 2010. | $450 | 26.80 | $12,060.00 |
| Vin Ha | Litigation Associate for 1 year; admitted in 2010. | $450 | 677.10 | $304,695.00 |
| Elena Hassan | Global Corporate Associate for 1 year; admitted in 2010. | $450 | 212.00 | $95,400.00 |
| Jacob Jou | Litigation Associate for 3 years; admitted in 2010. | $450 | 444.30 | $199,935.00 |
| Andrea Kelly | Litigation Associate for 1 year; admitted in 2010. | $450 | 90.40 | $40,680.00 |
| Kevin Lee | Global Corporate Associate for 1 year; admitted in 2010. | $450 | 91.20 | $41,040.00 |
| Alastair Macdonald | Global Transportation and Space Finance Associate for 1 year; admitted in 2010. | $450 | 83.10 | $37,395.00 |
| Richard Mo | Global Securities Associate for 1 year; admitted in 2010. | $450 | 204.00 | $91,800.00 |
| Brian Murphy | Global Corporate Associate for 1 year; admitted in 2010. | $450 | 37.00 | $16,650.00 |
| Kathleen Oliver | Global Transportation & Space Finance Associate for 1 year; admitted in 2010. | $450 | 23.50 | $10,575.00 |
| Vanessa Ortblad | Global Project Finance Associate for 1 year; admitted in 2010. | $450 | 48.20 | $21,690.00 |
| Arnaldo Rego, Jr. | Global Securities Associate for 1 year; admitted in 2010. | $450 | 280.60 | $126,270.00 |

| Name | Description | Rate | Hours | Amount |
|---|---|---|---|---|
| Paul Riley | Litigation Associate for 1 year; admitted in 2010. | $450 | 432.60 | $194,670.00 |
| Drew Stewart | Litigation Associate for 1 year; admitted in 2010. | $450 | 40.40 | $18,180.00 |
| Shujun Tian | Global Securities Associate for 1 year; admitted in 2010. | $450 | 180.40 | $81,180.00 |
| Matthew Vidal | Global Securities Associate for 1 year; admitted in 2010. | $450 | 152.90 | $68,805.00 |
| Justin Waldie | Global Leveraged Associate for 1 year; admitted in 2010. | $450 | 30.20 | $13,590.00 |
| Jerry Wang | Alternative Investments Associate for 1 year; admitted in 2010. | $450 | 60.30 | $27,135.00 |
| Pong-Jeh Wang | Global Securities Associate for 1 year; admitted in 2010. | $450 | 102.90 | $46,305.00 |
| Eric Weiss | Litigation Associate for 1 year; admitted in 2010. | $450 | 586.10 | $263,745.00 |
| Zen Zhang | Global Corporate Associate for 1 year; admitted in 2010. | $450 | 43.70 | $19,665.00 |
| Jenny Zhou | Litigation Associate for 1 year; admitted in 2010. | $450 | 479.00 | $215,550.00 |
| Sonja Andersen | Global Transportation & Space Finance Associate for 1 year; admitted in 2009. | $440 | 188.80 | $83,072.00 |
| Tatiana Bayeva | Global Leverage Finance Associate for 1 year; admitted in 2009. | $440 | 20.30 | $8,932.00 |
| Patten Courtnell | Global Corporate Associate for 5 months; admission pending. | $440 | 210.20 | $92,488.00 |
| Frederick Cristman | Global Corporate Associate for 1 year; admitted in 2009. | $440 | 30.50 | $13,420.00 |
| Kinjal Desai | Tax Associate for 1 year; admitted in 2009. | $440 | 86.70 | $38,148.00 |
| Andrew Everett II | Global Corporate Associate for 1 year; admitted in 2009. | $440 $275 | 79.80 10.70 | $35,112.00 $2,942.50 |
| Melanie Fox | Real Estate Associate for 1 year; admitted in 2009. | $440 | 12.00 | $5,280.00 |
| Caitlin Hawks | Litigation Associate for 1 year; admitted in 2009. | $440 | 58.30 | $25,652.00 |
| Stephanie Hutchinson | Litigation Associate for 1 year; admitted in 2009. | $440 | 74.60 | $32,824.00 |
| Peter Idziak | Financial Restructuring Associate for 1 year; admission pending. | $440 $275 | 342.90 35.40 | $150,876.00 $9,735.00 |
| David Kaye | Global Finance Associate for 1 year; admitted in 2009. | $440 | 67.80 | $29,832.00 |
| Joshua Rodzin | Global Finance Associate for 1 | $440 | 178.90 | $78,716.00 |

| | year; admitted in 2009. | | | |
|---|---|---|---|---|
| Iane Saenam | Global Corporate Associate for 1 year; admitted in 2009. | $440 | 27.00 | $11,880.00 |
| Anne Shutkin | Global Project Finance Associate for 1 year; admitted in 2009. | $440 | 48.20 | $21,208.00 |
| Kashif Siddiqui | Global Corporate Associate for 1 year; admitted in 2009. | $440 | 29.30 | $12,892.00 |
| Matthew Squires | Global Securities Associate for 1 year; admitted in 2009. | $440 | 397.00 | $174,680.00 |
| Jeremy Steckel | Global Securities Associate for 4 years; admitted in 2009. | $440 | 701.80 | $308,792.00 |
| Joseph Wang | Financial Restructuring Associate for 1 year; admitted in 2009. | $440 $275 | 224.20 19.10 | $98,648.00 $5,252.50 |
| Samuel Giorgi | International Attorney | $450 $440 | 3.00 89.00 | $1,350.00 $39,160.00 |
| Bijan Ganji | Summer Associate | $235 | 35.40 | $8,319.00 |
| Adam Heasley | Summer Associate | $235 | 9.00 | $2,115.00 |
| Broderick Henry | Summer Associate | $235 | 37.30 | $8,765.50 |
| Edward Mayle | Summer Associate | $235 | 2.50 | $587.50 |
| Benjamin Sayagh | Summer Associate | $235 | 3.00 | $705.00 |
| Tiffani Simmons | Summer Associate | $235 | 7.40 | $1,739.00 |
| John Yarwood | Summer Associate | $235 | 15.50 | $3,642.50 |
| Diane Henderson | Summer Associate | $235 | 8.30 | $1,950.50 |
| Anthony Wong | Summer Associate | $235 | 3.70 | $869.50 |
| Peter Herman | Retired Partner | $850 | 2.50 | $2,215.00 |
| Monica Alston | Case Manager | $260 $255 $250 $245 | 127.30 1,227.10 1,342.60 432.10 | $33,098.00 $312,910.50 $335,650.00 $105,864.50 |
| Abayomi A. Ayandipo | Case Manager | $260 $255 $250 | 114.80 540.40 657.30 | $29,848.00 $137,802.00 $164,325.00 |
| Oscar Castrillon | Case Manager | $260 $255 $250 $245 | 15.30 126.30 58.40 346.50 | $3,978.00 $32,206.50 $14,600.00 $84,892.50 |
| Rena K. Ceron | Case Manager | $225 $215 $210 $200 | 187.10 594.70 615.40 386.10 | $42,097.50 $127,860.50 $129,234.00 $77,220.00 |
| Angel R. Anderson | Case Manager | $260 $255 $215 $185 | 66.40 122.90 386.90 227.10 | $17,264.00 $31,339.50 $83,183.50 $42,013.50 |

| Name | Title | Rate | Hours | Amount |
|---|---|---|---|---|
| | | $170 | 21.00 | $3,570.00 |
| Roger G. Francis | Case Manager | $245 | 4.60 | $1,127.00 |
| Kathleen R. Heinsberg | Case Manager | $245 | 27.40 | $6,713.00 |
| Jennifer L. Russo | Case Manager | $255 | 10.50 | $2,677.50 |
| | | $250 | 42.80 | $10,700.00 |
| | | $235 | 4.50 | $1,057.50 |
| Richard Cosentino | Legal Assistant | $290 | 201.50 | $58,435.00 |
| | | $280 | 1,229.50 | $344,260.00 |
| | | $275 | 943.50 | $259,462.50 |
| | | $270 | 1,129.60 | $304,992.00 |
| | | $265 | 263.50 | $69,827.50 |
| Randy Hooks | Legal Assistant | $290 | 139.00 | $40,310.00 |
| | | $280 | 881.50 | $246,820.00 |
| | | $275 | 855.30 | $235,207.50 |
| | | $270 | 994.70 | $268,569.00 |
| | | $265 | 176.50 | $46,772.50 |
| Kim Strosser | Legal Assistant | $290 | 14.40 | $4,176.00 |
| | | $280 | 163.40 | $45,752.00 |
| | | $275 | 403.20 | $110,880.00 |
| | | $270 | 697.10 | $188,217.00 |
| | | $255 | 137.30 | $35,011.50 |
| Charles J. Sheehan | Legal Assistant | $290 | 52.30 | $15,167.00 |
| | | $280 | 382.90 | $107,212.00 |
| | | $265 | 390.50 | $103,482.50 |
| | | $260 | 639.40 | $166,244.00 |
| | | $255 | 182.40 | $46,512.00 |
| Tobias Brinkmann | Legal Assistant | $245 | 29.90 | $7,325.50 |
| Markus Franken | Legal Assistant | $245 | 2.50 | $612.50 |
| Ahmet Gorgun | Legal Assistant | $245 | 4.90 | $1,200.50 |
| Stefanie Kupczak | Legal Assistant | $245 | 7.50 | $1,837.50 |
| Kenneth G. Micallef | Legal Assistant | $245 | 4.00 | $980.00 |
| Mayuko Ichihara | Legal Assistant | $240 | 2.20 | $528.00 |
| | | $235 | 30.80 | $7,238.00 |
| | | $225 | 16.40 | $3,690.00 |
| Patrice C. Metz | Legal Assistant | $240 | 97.60 | $23,424.00 |
| Marika Tanaka | Legal Assistant | $240 | 1.50 | $360.00 |
| | | $235 | 2.20 | $517.00 |
| | | $225 | 8.80 | $1,980.00 |
| Paul Butters | Legal Assistant | $235 | 37.80 | $8,883.00 |
| | | $225 | 246.80 | $55,530.00 |
| Mary A. Hood | Legal Assistant | $235 | 2.50 | $587.50 |
| | | $225 | 54.70 | $12,307.50 |
| Thomas Manzke | Legal Assistant | $235 | 49.10 | $11,538.50 |
| Takamichi Okubo | Legal Assistant | $235 | 13.50 | $3,172.50 |
| | | $225 | 92.60 | $20,835.00 |

| Name | Title | Rate | Hours | Amount |
|---|---|---|---|---|
| Louisa Crespi | Legal Assistant | $230 | .50 | $115.00 |
| | | $215 | 5.00 | $1,075.00 |
| Dakota Blake | Legal Assistant | $225 | 21.40 | $4,815.00 |
| | | $215 | 25.30 | $5,439.50 |
| | | $210 | 45.50 | $9,555.00 |
| Grace Green | Legal Assistant | $225 | 2.80 | $630.00 |
| | | $185 | 61.80 | $11,433.00 |
| | | $165 | 17.80 | 2,937.00 |
| Dennis Bodenbenner | Legal Assistant | $220 | 9.50 | $2,090.00 |
| Kurt Maitland | Legal Assistant | $215 | 59.40 | $12,771.00 |
| Ken Forman | Legal Assistant | $210 | 25.10 | $5,271.00 |
| | | $200 | 15.40 | $3,080.00 |
| Ali Khan | Legal Assistant | $200 | 3.70 | $740.00 |
| Peter Delfausse | Legal Assistant | $195 | 37.80 | $7,371.00 |
| | | $185 | 30.20 | $5,587.00 |
| | | $170 | 228.40 | $38,828.00 |
| | | $155 | 82.70 | $12,818.50 |
| Charmaine Thomas | Legal Assistant | $210 | 106.30 | $22,323.00 |
| | | $195 | 780.00 | $152,100.00 |
| | | $185 | 576.10 | $106,578.50 |
| | | $170 | 568.70 | $96,679.00 |
| | | $155 | 219.60 | $34,038.00 |
| Chris Georgakis | Legal Assistant | $200 | 3.00 | $600.00 |
| | | $190 | 43.90 | $8,341.00 |
| | | $185 | 13.00 | $2,340.00 |
| Benjamin Harris | Legal Assistant | $195 | 8.90 | $1,735.50 |
| | | $185 | 7.30 | $1,350.50 |
| | | $170 | 26.00 | $4,420.00 |
| Kyle Martin | Legal Assistant | $195 | 347.20 | $67,704.00 |
| | | $185 | 1,632.80 | $302,068.00 |
| | | $175 | 1,922.60 | $336,455.00 |
| | | $160 | 730.70 | $116,912.00 |
| Ricky R. Windom | Legal Assistant | $195 | 2.70 | $526.50 |
| | | $185 | 2.20 | $407.00 |
| Shota Milorava | Legal Assistant | $185 | 3.50 | $647.50 |
| | | $170 | 2.00 | $340.00 |
| Maria A. Nunez | Legal Assistant | $185 | 4.00 | $740.00 |
| Andrew J. Trainor | Legal Assistant | $185 | 2.00 | $370.00 |
| Wendy Sobel Barr | Legal Assistant | $180 | 123.20 | $22,176.00 |
| | | $165 | 331.40 | $54,681.00 |
| Ming Lu | Legal Assistant | $180 | 12.40 | $2,232.00 |
| Jacqueline Brewster | Legal Assistant | $195 | 16.60 | $3,237.00 |
| | | $185 | 259.20 | $47,952.00 |
| | | $175 | 218.20 | $38,185.00 |
| | | $165 | 141.40 | $23,331.00 |
| | | $160 | 112.70 | $18,032.00 |
| Paul M. Butters | Legal Assistant | $185 | 593.80 | $109,853.00 |
| | | $155 | 126.50 | $19,607.50 |

| Name | Title | Rate | Hours | Amount |
|------|-------|------|-------|--------|
| Toi K. Carrion | Legal Assistant | $175 | 41.50 | $7,262.50 |
| | | $160 | 94.90 | $15,184.00 |
| | | $155 | 52.30 | $8,106.50 |
| Michael Giammanco | Legal Assistant | $175 | 29.90 | $5,232.50 |
| Jason Hsu | Legal Assistant | $175 | 359.50 | $62,912.50 |
| | | $165 | 792.20 | $130,713.00 |
| | | $160 | 237.20 | $37,952.00 |
| Liga R. Michailovs | Legal Assistant | $175 | 11.30 | $1,977.50 |
| | | $165 | 7.80 | $1,287.00 |
| Jonathan D. Comick | Legal Assistant | $170 | 35.40 | $6,018.00 |
| Brain Fuller | Legal Assistant | $170 | 309.90 | $52,683.00 |
| | | $155 | 66.90 | $10,369.50 |
| Louisa Kiu | Legal Assistant | $170 | 47.80 | $8,126.00 |
| | | $155 | 4.00 | $620.00 |
| Elliot Law | Legal Assistant | $170 | 802.00 | $136,340.00 |
| | | $155 | 434.80 | $67,394.00 |
| Francesca A. Skrelja | Legal Assistant | $165 | 10.00 | $1,650.00 |
| Sarah P. Steele | Legal Assistant | $165 | 41.50 | $6,847.50 |
| Alexander G. Fishman | Legal Assistant | $160 | 107.20 | $17,152.00 |
| Lorena M. Lucero | Legal Assistant | $160 | 160.40 | $25,664.00 |
| | | $155 | 74.60 | $11,563.00 |
| Catherine K. Cho | Legal Assistant | $155 | 21.00 | $3,255.00 |
| Zhong Li | Legal Assistant | $155 | 6.00 | $930.00 |
| Ziyi Zhou | Legal Assistant | $155 | 4.00 | $620.00 |
| Icsom Jones | Managing Attorney | $215 | 5.90 | $1,268.50 |
| | | $205 | 9.00 | $1,845.00 |
| Mitchell Gaines | Analyst | $230 | 17.50 | $4,025.00 |
| | | $225 | 15.60 | $3,510.00 |
| | | $215 | 68.50 | $14,727.50 |
| Jose L. Vialet | Litigation Support Specialist | $320 | 4.80 | $1,536.00 |
| | | $310 | 3.70 | $1,147.00 |
| Miguel L. Checo | Litigation Support Specialist | $295 | 176.10 | $51,949.50 |
| Bryan D. Loper | Litigation Support Specialist | $295 | 0.70 | $206.50 |
| Theartis Everett | Litigation Support Specialist | $290 | 352.20 | $102,138.00 |
| | | $265 | 89.10 | $23,611.50 |
| | | $255 | 303.70 | $77,443.50 |
| | | $240 | 26.50 | $6,360.00 |
| | | $200 | 93.20 | $18,640.00 |
| James McGuire | Litigation Support Specialist | $295 | 2.40 | $708.00 |
| | | $290 | 50.00 | $14,500.00 |
| | | $285 | 12.70 | $3,619.50 |
| Rhodely Vallon | Litigation Support Specialist | $295 | 154.00 | $45,430.00 |
| | | $290 | 1,131.90 | $328,251.00 |
| | | $285 | 99.30 | $28,300.50 |
| | | $275 | 917.60 | $252,340.00 |
| | | $260 | 240.20 | $62,452.00 |

| Name | Title | Rate | Hours | Amount |
|---|---|---|---|---|
| Joyanne M. Watson | Litigation Support Specialist | $295 | 22.20 | $6,549.00 |
| Janelle S. Blanchard | Litigation Support Specialist | $290 | 32.90 | $9,541.00 |
| | | $285 | 8.50 | $2,422.50 |
| Joseph S. Klock | Litigation Support Specialist | $290 | 38.80 | $11,252.00 |
| | | $285 | 31.60 | $8,690.00 |
| Alexander Sacklowski | Litigation Support Specialist | $290 | 3.70 | $1,073.00 |
| | | $275 | 169.20 | $46,530.00 |
| | | $260 | 64.50 | $16,770.00 |
| Juliana Valles | Litigation Support Specialist | $290 | 11.70 | $3,393.00 |
| Marcin Grabysz | Litigation Support Specialist | $285 | 197.70 | $56,344.50 |
| | | $270 | 117.60 | $31,752.00 |
| Shaun M. De Suze | Litigation Support Specialist | $275 | 22.30 | $6,132.50 |
| Rohan Lee | Litigation Support Specialist | $260 | 711.70 | $185,042.00 |
| Juan Rojas | Litigation Support Specialist | $250 | 10.30 | $2,575.00 |
| | | $240 | 21.80 | $5,232.00 |
| Nga Phan | Litigation Support Specialist | $245 | 3.50 | $857.50 |
| Paul Greengross | Litigation Support Specialist | $200 | 6.90 | $1,380.00 |
| Megan Scanlon | Litigation Support Specialist | $200 | 13.60 | $2,720.00 |
| John McHugh | Litigation Support Specialist | $185 | 2.00 | $370.00 |
| Richard Rose | Litigation Practice Group Coordinator | $245 | 1.50 | $367.50 |
| Sarak Kagen | Librarian | $220 | 4.70 | $1,034.00 |
| Gabrielle Zsebi | Librarian | $220 | 14.20 | $3,124.00 |
| | | $215 | 15.50 | $3,255.00 |
| | | $205 | 15.80 | $3,239.00 |
| Matthew Ottenstein | Librarian | $215 | 12.30 | $2,644.50 |
| | | $205 | 29.10 | $5,965.50 |
| | | $200 | 21.40 | $4,280.00 |
| | | $190 | 4.00 | $760.00 |
| Paula Prudenti | Librarian | $215 | 3.10 | $666.50 |
| Robin Traylor | Librarian | $215 | 52.10 | $11,201.50 |
| | | $205 | 78.45 | $16,082.25 |
| | | $200 | 95.00 | $19,000.00 |
| | | $190 | 4.50 | $855.00 |
| Mayra Cabrera | Librarian | $190 | 2.30 | $437.00 |
| Barbara Peck | Librarian | $190 | 2.00 | $380.00 |
| Joshua Wallach | File Clerk | $135 | 49.00 | $6,615.00 |
| Maria Smilen | File Clerk | $130 | 26.40 | $3,432.00 |
| | | $125 | 79.90 | $9,987.50 |
| | | $115 | 76.50 | $8,797.50 |

FINAL FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>C</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(SEPTEMBER 17, 2008 – MARCH 6, 2012)

| ACTIVITY | HOURS | FEES |
|---|---|---|
| General Case Administration | 5,136.80 | $3,302,668.00 |
| General Case Strategy Meetings | 93.90 | $81,160.00 |
| Project Monitoring/Court Calendar & Docket Maintenance | 6,286.90 | $1,839,993.50 |
| Hearings and Court Communications | 3,268.90 | $1,806,340.50 |
| Non-Working Travel | 1,579.85 | $825,506.25 |
| Interested Party Communications/Website/Lehman Team Hotline | 1,824.50 | $1,027,162.00 |
| Communications with Debtors | 713.90 | $524,262.50 |
| Unsecured Creditors Issues/Meetings/Communications/Creditors' Committee | 10,397.35 | $6,721,515.00 |
| Secured Creditors Issues/Meetings/Communications | 52.20 | $37,872.00 |
| Equity Holders/Motions/Hearings | 79.60 | $42,505.00 |
| LBI/SIPC Coordination and Issues | 3,764.20 | $2,382,158.00 |
| Cash Management | 121.00 | $81,108.00 |
| Insurance Issues | 586.30 | $354,023.50 |
| Employee/ERISA/Benefits/Pension Issues | 1,602.90 | $1,024,720.00 |
| Customer/Vendor Issues | .80 | $143.00 |
| Utilities | 1.40 | $1,069.50 |
| Intellectual Properties | .40 | $240.00 |
| Tax Issues | 9,809.20 | $6,900,709.00 |
| Corporate Governance | 186.00 | $136,675.00 |
| Other General Business Operation Issues | 767.30 | $603,598.00 |
| Intercompany Issues | 2,796.60 | $1,741,439.00 |
| Real Estate Matters | 10,193.60 | $7,014,018.00 |
| Private Equity | 1,844.70 | $1,196,296.50 |
| Derivatives/SWAP Agreement Issues (Including Derivatives- Related Adversary Proceedings, Alternative | 49,365.50 | $31,113,701.50 |

| | | |
|---|---:|---:|
| Dispute Resolution, and Claims Reconciliation and Litigation) | | |
| Loans/Investments | 3,831.50 | $2,213,542.50 |
| Domestic Bank and Related Regulatory Issues | 2,154.50 | $1,542,985.00 |
| International Insolvency Issues | 9,337.95 | $5,873,946.75 |
| Schedules/Statement of Financial | 100.00 | $59,249.50 |
| Non-Derivative Automatic Stay/Safe Harbor Issues | 2,007.30 | $1,035,840.50 |
| Miscellaneous Asset Sales/363 Issues | 4,571.20 | $3,100,921.00 |
| Non-Derivative Executory Contracts/365 Issues | 600.40 | $298,039.50 |
| DIP Financing | 278.80 | $151,815.50 |
| Exit Financing | 4.90 | $4,218.50 |
| Plan of Reorganization/Plan Confirmation/Plan Implementation | 13,658.30 | $8,589,769.00 |
| Disclosure Statement/Solicitation/Voting | 1,325.30 | $794,460.00 |
| Non-Derivative Claims | 38,971.40 | $20,479,478.50 |
| Other Bankruptcy Motions and Matters | 2,660.00 | $1,647,830.50 |
| Non-Derivative Adversary Proceedings Preparation and Litigation | 38,438.40 | $19,297,064.50 |
| Non-Bankruptcy Litigation | 81.40 | $38,748.00 |
| 2004 Issues | 655.50 | $393,516.50 |
| Appeals | 111.00 | $59,439.00 |
| US Trustee Related Issues | 163.10 | $80,143.00 |
| DOJ Issues | 7.80 | $4,271.50 |
| Examiner Issues | 1,409.60 | $864,835.50 |
| Firm's Own Billing/Fee Applications | 14,644.50 | $5,354,227.50 |
| Firm's Own Retention Issues | 2,564.20 | $1,494,313.50 |
| Third Party Retention/Fee Application/Other Issues | 2,052.90 | $1,110,797.00 |
| Stock Loan Litigation | 3,006.10 | $1,557,661.00 |

**FINAL FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>C</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(SEPTEMBER 17, 2008 – MARCH 6, 2012)**

| DISBURSEMENTS | AMOUNT |
| --- | ---: |
| Airfreight | $19,089.13 |
| Cab Fares/Local Travel | $362,008.61 |
| Computer Database Research | $4,057,241.01 |
| Document Production | $227,150.50 |
| Fees | $195,030.44 |
| Global Filings | $21,720.00 |
| Mail | $1,353.06 |
| Meals | $248,784.18 |
| Messenger | $21,980.92 |
| Outside Reproduction | $31,994.42 |
| Photocopies | $941,083.40 |
| Telephone | $216,772.59 |
| Travel | $481,849.91 |

Dennis F. Dunne
Evan R. Fleck
Dennis C. O'Donnell
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x
                                    :

In re:                               :        Chapter 11 Case No.
                                      :

LEHMAN BROTHERS HOLDINGS INC., et al.,  :      08-13555 (JMP)
                                      :

                    Debtors.       :        (Jointly Administered)
                                      :
------------------------------------------------------------- x

**FINAL FEE APPLICATION OF MILBANK, TWEED, HADLEY & McCLOY LLP,**
**COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, SEEKING**
**FINAL APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES**
**RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM**
**SEPTEMBER 17, 2008 THROUGH AND INCLUDING MARCH 6, 2012**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), counsel to the Official

Committee of Unsecured Creditors (the "Committee") of Lehman Brothers Holdings Inc.

("LBHI"), Lehman Brothers Special Financing Inc. ("LBSF"), Lehman Commercial Paper Inc.

("LCPI"), Lehman Brothers Commodity Services Inc. ("LBCS") and their affiliated debtors in

possession (collectively, the "Debtors" and, together with their non-Debtor affiliates, "Lehman"),

hereby submits its application (the "Application") in the above-captioned chapter 11 cases (the

"Chapter 11 Cases"), pursuant to sections 330 and 331 of chapter 11 of title 11 of the United

States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), rule 2016 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rule 2016-1 of the Local

Bankruptcy Rules for the Southern District of New York (the "Local Rules"), the Guidelines for

Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases

adopted by the Court on June 24, 1991, and amended April 21, 1995 (together with Local Rule

2016-1, the "Local Guidelines"), the United States Trustee Guidelines for Reviewing

Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330,

effective January 30, 1996 (the "U.S. Trustee Guidelines"), the Fourth Amended Order Pursuant

to Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) Establishing

Procedures for Interim Monthly Compensation and Reimbursement of Expenses of

Professionals, dated April 14, 2011 [Docket No. 15997] (the "Interim Compensation Order"),

and the guidelines contained in the Fee Committee's Confidential Letter Report on the Sixth

Interim Application of Milbank, dated April 12, 2011 (the "Fee Committee Guidelines"), for an

order: (i) allowing, on a final basis, compensation for professional services rendered from

September 17, 2008 through and including March 6, 2012 (the "Total Compensation Period") in

the amount of $144,430,022.50 and reimbursement of expenses incurred in connection with such

services in the amount of 6,707,064.31 (which constitutes (A) one hundred percent (100%) of the

compensation previously approved by the Court, on an interim basis, for professional services

rendered for the Total Compensation Period in the amount of 126,614,902.52; (B) one hundred

percent (100%) of the expenses previously approved by the Court, on an interim basis, for the

Total Compensation Period in the amount of 6,117,790.43; (C) one hundred percent (100%) of

the compensation previously sought by Milbank for the Total Compensation Period but held

back at the recommendation of the Fee Committee in the amount of 5,827,119.73; and (D) one

hundred percent (100%) of the expenses previously incurred by Milbank for the Total

Compensation Period but held back at the recommendation of the Fee Committee in the amount

of 171,870.09); and (ii) authorizing and directing the Debtors to pay to Milbank the amount of

$12,054,964.50, which is the total amount outstanding to Milbank and unpaid by the Debtors for

services rendered and expenses incurred during the Total Compensation Period.

# I.

## PRELIMINARY STATEMENT

1.        The Committee, represented by Milbank, has worked diligently and

successfully over the past four years to bring about the expeditious resolution of what have been

universally acknowledged to be the largest and most complex chapter 11 cases in history.  In so

doing, the Committee, as the primary voice of the Debtors' many creditors, played a critical role

in what this Court has recognized as a "monumental" and "awe inspiring" achievement – the

formulation and confirmation in just thirty-nine short months of a chapter 11 plan that "yielded

the most overwhelming outpouring of creditor consensus in the history of insolvency law."

(Transcript of Dec. 6, 2011 Hearing, at 69.)

2.        The impact of the Committee's efforts on the Lehman chapter 11 process

was pervasive, leaving its mark on both the day-to-day administration of the Chapter 11 Cases

and their ultimate resolution on a global basis.  On the day-to-day level, the Committee and, on

its behalf, Milbank worked tirelessly to address the many challenges presented by both the

unprecedented complexity of the Chapter 11 Cases and the often disparate positions of the

unsecured creditor groups that the Committee undertook to represent.  As set forth in this

Application, such challenges included, without limitation, (a) working, through various Court-

approved and informal protocols, to facilitate the management and wind-down of each of the

Debtors' discrete asset classes, including the administration and settlement of derivative

transactions, the management of the corporate loan portfolio, and the administration of the real

estate and private equity portfolios; (b) evaluating the claims, factual contentions and legal theories of all key constituencies in the Chapter 11 Cases; (c) developing, on the Committee's own initiative and sometimes at odds with those espoused by the Debtors, legal theories and strategies regarding issues such as substantive consolidation, claims recharacterization, and related issues that would have the effect of reallocating value distributable under the plan from certain creditor groups to others; (d) analyzing issues relating to Lehman Brothers Inc. ("LBI"), which is subject to a separate proceeding (the "SIPA Proceeding") under the Securities Investor Protection Act of 1970 ("SIPA"); (e) working to further the interests of the unsecured creditors in connection with the Debtors' forging of settlements with their affiliates in countries outside of the U.S. (the "Foreign Affiliates"), including Lehman Brothers Bankhaus AG ("Bankhaus") and Lehman Brothers International (Europe) ("LBIE"), among others; and (f) playing a key role in the sale of certain of the Debtors' assets, including their European and Asian operations, their commercial and savings bank assets, and (not once, but twice) Neuberger Berman Group LLC and the rest of the Debtors' investment management division assets (collectively, "Neuberger").

3.      Typical of the Committee's role at this level of the Chapter 11 Cases was its involvement in the Neuberger sale process.  In the early days of the cases, the Committee and its advisors took the lead in negotiating the sale of 51% of the Neuberger equity to existing Neuberger management, to rescue Neuberger from a proposed sale at fire sale prices and preserve its value for future disposition.  Three years later, it was again the Committee and its advisors that led efforts to monetize Lehman's 49% stake in Neuberger, first through months of intensive negotiations with Neuberger management, and, after objections had been raised to the original monetization plan, through a multilateral negotiation among several key creditors, Neuberger, and the Debtors – all to an outstanding result.

4.      Significant as the foregoing achievements were, however, it was on the global level that the Committee's and Milbank's efforts bore the greatest fruit.  It was in this context that Milbank and the Committee's other advisors were instrumental in developing a chapter 11 plan construct that was deemed by this Court to be fair and equitable to all the diverse constituents in the Chapter 11 Cases, and assuring, through the numerous settlements, that the Plan garnered the support of the majority of the Debtors' creditors.

5.      The Committee and its advisors, including Milbank, were not mere bystanders in this process.  To the contrary, Milbank and the Committee's financial advisors developed their own legal theories and strategies regarding, among other matters, the appropriate allocation of value distributable under the Plan to various classes of creditors.  In so doing, the Committee's advisors brought to bear a comprehensive knowledge of each Debtor's assets and claims pool, as well as a global perspective on the key value drivers, each acquired as a result of the Committee's immersion in every aspect of the Chapter 11 Cases.  As a result, the Committee and its advisors became both principal architects and the chief salesmen to the Debtors' creditor constituencies of the plan construct that was embodied in the plan presented for confirmation to this Court on December 6, 2011.

6.      The success of the Committee's and Milbank's efforts became evident at the confirmation hearing.  Voting results showed that in excess of 90% (and, in some classes, close to 100%) of the voting creditors supported the Plan.  After months of arms-length negotiations, only one objection to the Plan remained unresolved, and it too was soon resolved.  The hearing concluded in just two hours, in large part because, as the Court had acknowledged many times, the Committee and the Debtors had spent many months working "behind the scenes" and "outside the courtroom" to forge what the Court described at the hearing as "the most overwhelming outpouring of creditor consensus in the history of insolvency law."  (Dec. 6

5

Transcript at 69, 70.)  Confirmation cleared the way for consummation of the Plan on March 6, 2012,

an initial distribution on April 17, 2012 of $22.5 billion, and projected future distributions in excess

of $50 billion.

7.      For the foregoing general reasons, as well as the more specific ones set

forth herein, Milbank respectfully submits that the fees and expenses incurred during the Chapter

11 Cases on behalf of the Committee were reasonable and provided clear and direct benefits to

the Debtors' estates and their unsecured creditors.

<div align="center">

## II.

## <u>INTRODUCTION</u>

</div>

**A.      <u>Background</u>**

8.      <u>Bankruptcy Filing</u>.  On September 15, 2008, and periodically thereafter

(the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under chapter 11 of the

Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York

(the "<u>Court</u>").  The Debtors' Chapter 11 Cases have been consolidated for procedural purposes

and are being jointly administered pursuant to rule 1015(b) of the Bankruptcy Rules.  The

Debtors are authorized to operate their businesses and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      <u>Creditors' Committee</u>.  On September 17, 2008, the United States Trustee

for Region 2 (the "<u>U.S. Trustee</u>") appointed the Committee in the Chapter 11 Cases.  No other

official committees have been appointed or designated in these cases.

10.      <u>SIPA Trustee</u>.  On September 19, 2008, the SIPA Proceeding was

commenced with respect to LBI, a wholly owned subsidiary of LBHI and a registered broker-

<div align="center">

6

</div>

dealer.  James W. Giddens, Esq. is the trustee appointed under SIPA (the "SIPA Trustee")

administering LBI's estate.

11.    Examiner.  On January 20, 2009, the Court approved the appointment of

Anton R. Valukas as examiner (the "Examiner") in the Chapter 11 Cases [Docket No. 2583].  In

accordance with his appointment, the Examiner issued his report (the "Examiner's Report") on

February 8, 2010 under seal, which was subsequently unsealed on March 11, 2010.  On July 13,

2010, the Court entered an Order discharging the Examiner [Docket No. 10169].

12.    Fee Committee.  On May 26, 2009, the Court appointed a fee committee

(the "Fee Committee") and approved a fee protocol (the "Fee Protocol") in the Chapter 11 Cases.

On January 24, 2011, the Court approved the Fee Committee's recommendation to appoint

Richard A. Gitlin as the successor Independent Member on the Fee Committee.  By motion dated

March 11, 2011, the Fee Committee sought authorization to amend the Fee Protocol, which the

Court granted on April 14, 2011 [Docket No. 15998].

13.    Debtors' Plan and Disclosure Statement.  On March 15, 2010, the Debtors

filed their Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors

[Docket No. 7572].  Subsequently, on April 14, 2010, the Debtors filed the Debtors' Disclosure

Statement for Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors

Pursuant to Section 1125 of the Bankruptcy Code [Docket No. 8332], along with their revised

Joint Chapter 11 Plan [Docket No. 8330] (the "Debtors' Initial Plan").

14.    Debtors' First Amended Plan and Disclosure Statement.  On January 25,

2011, the Debtors filed the First Amended Joint Chapter 11 Plan of Lehman Brothers Holdings

Inc. and its Affiliated Debtors [Docket No. 14150] (the "Debtors' First Amended Plan") and the

Debtors' Disclosure Statement for First Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code

[Docket No. 14151].

15.    Debtors' Second Amended Plan and Disclosure Statement.  Following the

filing of competing plans of reorganization by the Ad Hoc Group of Lehman Brothers Creditors

(the "Ad Hoc Plan") and the Non-Consolidation Plan Proponents (the "Non-Con Plan"), the

Debtors filed their Second Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its

Affiliated Debtors [Docket No. 18204] (the "Debtors' Second Amended Plan") and the Debtors'

Disclosure Statement for Second Amended Joint Chapter 11 Plan of Lehman Brothers Holdings

Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code [Docket No.

18205] on June 30, 2011.

16.    Debtors' Third Amended Plan and Disclosure Statement.  After numerous

and lengthy negotiations among the Debtors, the Committee and multiple creditor groups,

including the Foreign Affiliates, on September 1, 2011, the Debtors filed the Third Amended

Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (as amended,

modified and supplemented, the "Plan") [Docket No. 19627] and the Debtors' Disclosure

Statement for the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and

its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code (the "Disclosure

Statement") [Docket No. 19629].  Also on September 1, 2011, the Court entered an amended

Order approving the Disclosure Statement, establishing solicitation and voting procedures in

connection with the Plan, scheduling a confirmation hearing for December 6, 2011 (the

"Confirmation Hearing"), and establishing notice and objection procedures for the Confirmation

Hearing [Docket No. 19631].  On September 15, 2011, the Court entered an order approving a

modification to the Disclosure Statement [Docket No. 20016].  On December 6, 2011, the Court

entered an Order confirming the Plan [Docket No. 23023].  The Plan went effective at 12:01 a.m.

on March 6, 2012 (the "Effective Date").

17.    Jurisdiction.  This Court has jurisdiction over this matter pursuant to 28

U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases is proper pursuant to 28 U.S.C. §§ 1408

and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  The statutory

predicates for the relief sought herein are sections 330 and 331 of the Bankruptcy Code.

Pursuant to the Local Guidelines, a certification regarding compliance with the Local Guidelines

is attached hereto as Exhibit "A."

**B.    Retention of Milbank and Billing History**

18.    Authorization for Milbank's Retention.  On November 5, 2008, pursuant

to the Interim Order Under 11 U.S.C. § 1103 And Fed. R. Bankr. P. 2014 And 5002 Authorizing

The Retention And Employment Of Milbank, Tweed, Hadley & McCloy LLP, as Counsel for The

Official Committee Of Unsecured Creditors Effective as of September 17, 2008 [Docket No.

1404] (the "Retention Order"), the Court authorized Milbank's retention as counsel for the

Committee in these Chapter 11 Cases.  The Retention Order, which became a final order on

November 21, 2008, authorized Milbank to receive compensation pursuant to the procedures set

forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Guidelines, the U.S. Trustee

Guidelines, and the local orders of this Court.  Among other things, the Retention Order provided

that Milbank's hourly rates are subject to periodic firm-wide adjustments in the ordinary course

of Milbank's business.

19.    Statutory Basis For Application.  Milbank makes this Application for final

approval and allowance of compensation and reimbursement of expenses for the Total

Compensation Period pursuant to section 330 of the Bankruptcy Code.

20.    First Interim Fee Application.  On April 10, 2009, Milbank filed its First

Application Of Milbank, Tweed, Hadley & McCloy LLP, Counsel to Official Committee of

Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From September 17, 2008

Through And Including January 31, 2009 (the "First Interim Fee Application").  In the First

Interim Fee Application, Milbank requested (i) allowance of compensation for professional

services rendered during the period from September 17, 2008 through and including January 31,

2009 (the "First Interim Compensation Period") in the total amount of $12,123,376.00,[1] and

(ii) reimbursement of its actual and necessary expenses incurred during the First Interim

Compensation Period in the amount of $668,388.72.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $10,397,943.56 during the First Interim

Compensation Period.  On August 5, 2009, the Court approved the First Interim Fee Application,

subject to a ten percent holdback pursuant to the recommendation of the Fee Committee.  On

September 10, 2009, the Court approved the release of the remaining holdback, subject to a

$69,990.04 deduction, at the recommendation of the Fee Committee.[2]

21.    Second Interim Fee Application.  On August 14, 2009, Milbank filed its

Second Application Of Milbank, Tweed, Hadley & McCloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From February 1, 2009 Through

And Including May 31, 2009 (the "Second Interim Fee Application").  In the Second Interim Fee

Application, Milbank requested (i) allowance of compensation for professional services rendered

---

[1]    Milbank voluntarily reduced the fees it sought in the First Interim Fee Application by $129,111.00, but
reserved the right to seek the allowance of all or a portion of such fees at a later date.

[2]    Milbank reserved the right to seek at a later date the allowance of all or a portion of such fees.

during the period from February 1, 2009 through and including May 31, 2009 (the "Second

Interim Compensation Period") in the total amount of $16,829,521.00,[3] and (ii) reimbursement

of its actual and necessary expenses incurred during the Second Interim Compensation Period in

the amount of $1,019,754.61.  Pursuant to the Interim Compensation Order, Milbank received

payment in the amount of $14,582,737.21 during the Second Interim Compensation Period.  On

September 25, 2009, the Court approved the Second Interim Fee Application, subject to a ten

percent holdback pursuant to the recommendation of the Fee Committee.  On December 23,

2009, the Court released the ten percent holdback, subject to a $311,734.82 deduction, at the

recommendation of the Fee Committee.[4]

> 22.    Third Interim Fee Application.  On December 14, 2009, Milbank filed its

Third Application Of Milbank, Tweed, Hadley & McCloy LLP, Counsel to Official Committee of

Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From June 1, 2009 Through And

Including September 30, 2009 (the "Third Interim Fee Application").  In the Third Interim Fee

Application, Milbank requested (i) allowance of compensation for professional services rendered

during the period from June 1, 2009 through and including September 30, 2009 (the "Third

Interim Compensation Period") in the total amount of $10,881,540.00,[5] and (ii) reimbursement

of its actual and necessary expenses incurred during the Third Interim Compensation Period in

the amount of $583,803.10.  Pursuant to the Interim Compensation Order, Milbank received

---

[3]    Milbank voluntarily reduced the fees it sought in the Second Interim Fee Application by $154,700.25, on account of, among other things, certain matters identified by the Fee Committee.  Milbank, however, reserved the right to seek the allowance of all or a portion of such fees at a later date.

[4]    Milbank reserved the right to seek at a later date the allowance of all or a portion of such fees.

[5]    Milbank voluntarily reduced the fees it sought in the Third Interim Fee Application by $419,548.50, on account of, among other things, certain matters identified by the Fee Committee.  Milbank, however, reserved the right to seek the allowance of all or a portion of such fees at a later date.

payment in the amount of $7,480,652.96 during the Third Interim Compensation Period.  On

April 9, 2010, the Court approved the Third Interim Fee Application, subject to a $292,555.40

deduction, at the recommendation of the Fee Committee.[6]

       23.     <u>Fourth Interim Fee Application</u>.  On April 16, 2010, Milbank filed its

Fourth Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From October 1, 2009 Through

And Including January 31, 2010 (the "<u>Fourth Interim Fee Application</u>").  In the Fourth Interim

Fee Application, Milbank requested (i) allowance of compensation for professional services

rendered during the period from October 1, 2009 through and including January 31, 2010 (the

"<u>Fourth Interim Compensation Period</u>") in the total amount of $13,595,778.50,[7] and (ii)

reimbursement of its actual and necessary expenses incurred during the Fourth Interim

Compensation Period in the amount of $451,410.54.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $11,341,325.19 during the Fourth Interim

Compensation Period.  On September 7, 2010, the Court approved the Fourth Interim Fee

Application, subject to a holdback of $733,570.87, relating to certain unresolved objections

asserted by the Fee Committee.[8]

       24.     <u>Fifth Interim Fee Application</u>.  On August 16, 2010, Milbank filed its

Fifth Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee of

Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

---

[6]     Milbank reserved the right to seek at a later time the allowance of all or a portion of such fees.

[7]     Milbank voluntarily reduced the fees it sought in the Fourth Interim Fee Application by $111,446.50, on account of, among other things, certain matters identified by the Fee Committee.  Milbank, however, reserved the right to seek the allowance of all or a portion of such fees at a later date.

[8]     Milbank reserved the right to seek the allowance of all or a portion of such fees at a later date.

Rendered And For Reimbursement Of Expenses During Period From February 1, 2010 Through And Including May 31, 2010 (the "Fifth Interim Fee Application").  In the Fifth Interim Fee Application, Milbank requested (i) allowance of compensation for professional services rendered during the period from February 1, 2010 through and including May 31, 2010 (the "Fifth Interim Compensation Period") in the total amount of $19,450,342.75,[9] and (ii) reimbursement of its actual and necessary expenses incurred during the Fifth Interim Compensation Period in the amount of $851,804.27.  Pursuant to the Interim Compensation Order, Milbank received payment in the amount of $16,427,844.72 during the Fifth Interim Compensation Period.  On May 12, 2011, the Court approved the Fifth Interim Fee Application, subject to a holdback of $413,818.13, relating to certain unresolved objections asserted by the Fee Committee.[10]

25.    Sixth Interim Fee Application.  On December 14, 2010, Milbank filed its Sixth Application Of Milbank, Tweed, Hadley & McCloy LLP, Counsel to Official Committee of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services Rendered And For Reimbursement Of Expenses During Period From June 1, 2010 Through And Including September 30, 2010 (the "Sixth Interim Fee Application").  In the Sixth Interim Fee Application, Milbank requested (i) allowance of compensation for professional services rendered during the period from June 1, 2010 through and including September 30, 2010 (the "Sixth Interim Compensation Period") in the total amount of $18,359,367.75,[11] and (ii) reimbursement of its actual and necessary expenses incurred during the Sixth Interim Compensation Period in

---

[9]    Milbank voluntarily reduced the fees it sought in the Fifth Interim Fee Application by $199,247.00, on account of, among other things, certain matters identified by the Fee Committee.  Milbank, however, reserved the right to seek the allowance of all or a portion of such fees at a later date.

[10]    Milbank reserved the right to seek the allowance of all or a portion of such fees at a later date.

[11]    Milbank voluntarily reduced the fees it sought in the Sixth Interim Fee Application by $229,420.50, on account of, among other things, certain matters identified by the Fee Committee.  Milbank, however, reserved the right to seek the allowance of all or a portion of such fees at a later date.

the amount of $792,924.64.  Pursuant to the Interim Compensation Order, Milbank received

payment in the amount of $15,491,759.01 during the Sixth Interim Compensation Period.  On

October 25, 2011, the Court approved the Sixth Interim Fee Application, subject to a

$173,410.66 deduction, at the recommendation of the Fee Committee.[12]

26.    Seventh Interim Fee Application.  On June 2, 2011, Milbank filed its

Seventh Application Of Milbank, Tweed, Hadley & McCloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From October 1, 2010 Through

And Including January 31, 2011 (the "Seventh Interim Fee Application").  In the Seventh Interim

Fee Application, Milbank requested (i) allowance of compensation for professional services

rendered during the period from October 1, 2010 through and including January 31, 2011 (the

"Seventh Interim Compensation Period") in the total amount of $14,180,784.75,[13] and (ii)

reimbursement of its actual and necessary expenses incurred during the Seventh Interim

Compensation Period in the amount of $633,261.80.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $11,995,760.01 during the Seventh Interim

Compensation Period.  On December 20, 2011, the Court approved the Seventh Interim Fee

Application, subject to a $563,718.73 deduction, at the recommendation of the Fee Committee.[14]

27.    Eighth Interim Fee Application.  On August 15, 2011, Milbank filed its

Eighth Application Of Milbank, Tweed, Hadley & McCloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

---

[12]    Milbank reserved the right to seek the allowance of all or a portion of such fees at a later time.

[13]    Milbank voluntarily reduced the fees it sought in the Seventh Interim Fee Application by $133,519.75, on account of, among other things, certain matters identified by the Fee Committee.  Milbank, however reserved the right to seek the allowance of all or a portion of such fees at a later date.

[14]    Milbank reserved the right to seek the allowance of all or a portion of such fees at a later time.

Rendered And For Reimbursement Of Expenses During Period From February 1, 2011 Through

and Including May 31, 2011 (the "Eighth Interim Fee Application").  In the Eighth Interim Fee

Application, Milbank requested (i) allowance of compensation for professional services rendered

during the period from February 1, 2011 through and including May 31, 2011 (the "Eighth

Interim Compensation Period") in the total amount of $14,678,049.25,[15] and (ii) reimbursement

of its actual and necessary expenses incurred during the Seventh Interim Compensation Period in

the amount of $794,661.63.  Pursuant to the Interim Compensation Order, Milbank received

payment in the amount of $11,742,439.40 during the Eighth Interim Compensation Period.  On

December 20, 2011, the Court approved the Eighth Interim Fee Application, subject to a

$1,756,689.00 deduction, at the recommendation of the Fee Committee.[16]

28.    Ninth Interim Fee Application.  On December 14, 2011, Milbank filed its

Ninth Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee of

Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From June 1, 2011 Through and

Including September 30, 2011 (the "Ninth Interim Fee Application").  In the Ninth Interim Fee

Application, Milbank requested (i) allowance of compensation for professional services rendered

during the period from June 1, 2011 through and including September 30, 2011 (the "Ninth

Interim Compensation Period") in the total amount of $12,334,262.25,[17] and (ii) reimbursement

of its actual and necessary expenses incurred during the Ninth Interim Compensation Period in

---

[15]    Milbank voluntarily reduced the fees it sought in the Eighth Interim Fee Application by $191,269.75, on account of, among other things, certain matters identified by the Fee Committee.  Milbank, however, reserved the right to seek the allowance of all or a portion of such fees at a later date.

[16]    Milbank reserved the right to seek the allowance of all or a portion of such fees at a later time.

[17]    Milbank voluntarily reduced the fees it in the Ninth Interim Fee Application by $164,335.25, on account of, among other things, certain matters identified by the Fee Committee.  Milbank, however, reserved the right to seek the allowance of all or a portion of such fees at a later date.

15

the amount of $493,651.21. Pursuant to the Interim Compensation Order, Milbank received

payment in the amount of $10,361,061.01 during the Ninth Interim Compensation Period. No

hearing date has yet been scheduled with respect to the Ninth Interim Fee Application.[18]

> 29. <u>Tenth Interim Application</u>. On May 21, 2012, Milbank filed its Tenth

Application Of Milbank, Tweed, Hadley & McCloy LLP, Counsel to Official Committee of

Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From October 1, 2011 Through

and Including March 6, 2012 (the "<u>Tenth Interim Fee Application</u>" and collectively with the

First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth and Ninth Interim Fee Applications,

the "<u>Interim Fee Applications</u>"). In the Tenth Interim Fee Application, Milbank requested

(i) allowance of compensation for professional services rendered during the period from October

1, 2011 through and including March 6, 2012 (the "<u>Tenth Interim Compensation Period</u>") in the

total amount of $11,988,000.25[19] and (ii) reimbursement of its actual and necessary expenses

incurred during the Tenth Interim Compensation Period in the amount of $417,403.79. Pursuant

to the Interim Compensation Order, Milbank received payment in the amount of $4,133,453.16

during the Tenth Interim Compensation Period. No hearing date has yet been scheduled with

respect to the Tenth Interim Fee Application.[20]

> 30. <u>Application</u>. Milbank makes this application for final allowance of

compensation and reasonable expenses rendered with respect to legal services provided to the

---

[18]    Milbank reserved the right to seek the allowance of all or a portion of such fees at a later time.

[19]    Milbank voluntarily reduced the fees it sought in the Tenth Interim Fee Application by $132,986.25, on account of, among other things, certain matters identified by the Fee Committee. Milbank, however, reserved the right to seek the allowance of all or a portion of such fees at a later date.

[20]    As of the date of this Application, the Fee Committee had not issued its report with respect to the Tenth Interim Fee Application. Milbank reserves its right to seek the allowance of all or a portion of the fees and expenses that the Fee Committee recommends be deducted in connection with the approval of the Tenth Interim Fee Application.

Committee since its appointment through the Effective Date of the Plan (i.e., from September 17, 2008 through and including March 6, 2012).

31.     Milbank has not entered into any agreement, express or implied, with any other party for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in these cases.  No promises have been received by Milbank or any member thereof as to compensation in connection with these cases other than in accordance with the provisions of the Bankruptcy Code.

## III.

## CASE STATUS

32.     Plan Confirmation and Effectiveness.  On September 1, 2011, the Debtors filed the Plan.  This Court held the Confirmation Hearing on December 6, 2011, and the Plan was confirmed by Order of this Court on December 6, 2011 [Docket No. 23023].  The Effective Date of the Plan occurred on March 6, 2012.

33.     Post-Effective Functions of the Committee.  Pursuant to Section 15.1 of the Plan, as of the Effective Date, the Committee was dissolved for all purposes other than, among other things, all matters relating to professional fees and the Fee Committee for the period prior to the Effective Date.  See Plan § 15.1.

## IV.

## APPLICATION

34.     By this Application, Milbank is seeking approval, on a final basis, of the amount of $144,430,022.50 for legal services rendered on behalf of the Committee during the Total Compensation Period and the amount of 6,707,064.31 for reimbursement of expenses incurred in connection with the rendition of such services, for a total award of $151,137,086.81 (the "Total Application Request").

17

35.    The Total Application Request is based upon the fees and expenses requested in the Interim Fee Applications.  Also included in the Total Application Request are fees and expenses incurred in connection with the preparation of the instant Application.[21]

36.    Pursuant to the previously approved interim fee applications and the Interim Compensation Order, Milbank has received payment of $139,082,122.31 on account of legal services rendered and expenses incurred through March 6, 2012.  Milbank seeks a payment of $6,055,974.68, which amount represents the portion of Milbank's fees for legal services rendered and reimbursement of expenses incurred during the Total Compensation Period not previously paid to Milbank.

37.    Milbank also seeks final allowance of the following amounts (each a "Hold Back Amount"), aggregating to a total of $5,998,989.82, that had previously been requested but held back at the recommendation of the Fee Committee: (i) $69,990.04 for the First Interim Compensation Period, (ii) $311,734.82 for the Second Interim Compensation Period, (iii) $292,555.40 for the Third Interim Compensation Period, (iv) $733,570.87 for the Fourth Interim Compensation Period, (v) $413,818.13 for the Fifth Interim Compensation Period, (vi) $173,410.68 for the Sixth Interim Compensation Period, (vii) $563,718.73 for the Seventh Interim Compensation Period, (viii) $1,756,689.00 for the Eighth Interim Compensation Period, and (ix) $1,683,502.15 for the Ninth Interim Compensation Period.[22]

---

[21]    Milbank also seeks compensation for services rendered and reimbursement of expenses incurred in connection with the hearing on this Application.  While typically such amounts are estimated and included in the Total Application Request, due to the anticipated length of the period between the filing of this Application and the hearing thereon, Milbank intends to inform the Court of the amount of such fees and expenses at the time of the final hearing and will request at that time that such fees and expenses be included in the Order granting the Application.

[22]    The Fee Committee has not yet completed its review of the fees and expenses requested for the Tenth Interim Compensation Period.  In addition, pursuant to the Order Authorizing Retention of Richard Gitlin, Fee Committee Chair, and Godfrey & Kahn, S.C. as Counsel to the Fee Committee to Conduct Retrospective Review of Professional Compensation, Nunc Pro Tunc to December 1, 2011 [Docket No. 25827], the Fee Committee has undertaken a retroactive review of the fees and expenses requested in the

38.     The Hold Back Amounts relate to unresolved objections of the Fee

Committee arising in connection with certain issues related to the fees and expenses requested by

Milbank, including the following: (i) the recommended 1% cap on fees in connection with

preparing fee applications, (ii) the sufficiency of detail of service provided or expense incurred,

(iii) compensation for so-called "administrative tasks," (iv) reviewing and editing time entries

and fee applications, (v) transient billers, and (vi) billing rate increases.  Milbank contests each

of these Fee Committee objections and has argued, without limitation, that (i) the recommended

1% cap on fees in connection with the preparation of fee applications is unreasonable and not

supported by precedent, which provides for caps of 3-5%; (ii) the disallowance of fees and

expenses for "insufficient detail" is arbitrary, improper, and punitive to the extent that Milbank

timekeepers are unable to respond to the Fee Committee's concerns; (iii) the disallowance of fees

for administrative tasks is contrary to applicable law and does not account for the unique and

complex demands that the Chapter 11 Cases have imposed on retained professionals, including

Milbank; (iv) most of the professionals labeled "transitory" by the Fee Committee are specialists

who have expertise in certain areas of the law (i.e., tax, finance, derivatives, insurance, real

estate, employment and pension law, and foreign insolvency law) that Milbank's core team of

bankruptcy professionals do not possess and have provided critical expert advice and issue

spotting; and (v) Milbank's annual rate increases were (a) disclosed in the original application to

retain Milbank, (b) consistent with Milbank's past practices (i.e., Milbank has increased rates

annually and uniformly, on a firm-wide and timekeeper-by-timekeeper basis for many years),

and (c) consistent with Milbank's peer firms in national and international markets for the

services of restructuring professionals.  Accordingly, Milbank continues its opposition to the Fee

First, Second, Third, and Fourth Interim Compensation Periods, which review has not yet been completed.
Accordingly, the Hold Back Amount for each of the foregoing compensation periods may change.

Committee's objections with respect to these issues and reasserts its request for the final allowance and payment of the Hold Back Amounts.[23]

39.    Milbank rendered to the Committee all services for which compensation is sought solely in connection with the Chapter 11 Cases, in furtherance of the duties and functions of the Committee.

40.    For the convenience of the Court and parties in interest, a billing summary for the Total Compensation Period is attached as part of the cover sheet, setting forth the name of each attorney and paraprofessional for whose work on these cases compensation is sought, each attorney's year of bar admission, the aggregate amount of time expended by each such attorney or paraprofessional, the hourly billing rate for each such attorney or paraprofessional at Milbank's current billing rates, and an indication of the individual amounts requested as part of the total amount of compensation requested.  In addition, set forth in the billing summary is additional information indicating whether each attorney is a partner, counsel or associate, the number of years each attorney has held such position, and each attorney's area of concentration.

41.    The compensation requested by Milbank is based on the customary compensation charged by comparably skilled practitioners in cases other than cases under the Bankruptcy Code.  The fees charged are billed in accordance with Milbank's existing billing rates and procedures in effect during the Total Compensation Period, as set forth in the Retention Order.  The billing rates Milbank charges for services rendered by its professionals and paraprofessionals in the Chapter 11 Cases (including increases thereof) are the same rates that

---

[23]    Milbank reserves its rights to address more fully these and any other issues raised by the Fee Committee in pleadings to be filed in response to any objection filed by the Fee Committee to this Application.  In fact, Milbank anticipates, based upon conversations with counsel to the Fee Committee, that a briefing and hearing schedule will be set in the near future to facilitate the ultimate resolution of any remaining Fee Committee objections.

Milbank charges for professional and paraprofessional services rendered in non-bankruptcy matters.

42.     Milbank maintains computerized records of the time expended and expenses incurred in the rendering of the professional services required by the Committee. These records are maintained in the ordinary course of Milbank's practice.  Copies of these records for the Total Compensation Period were furnished to the Court, the U.S. Trustee, the Debtors, counsel for the Debtors, and the Fee Committee in connection with the filing of the Interim Fee Applications.[24]

## V.

## SUMMARY OF PROFESSIONAL SERVICES RENDERED

43.     As discussed above, Milbank has previously submitted forty-one (41) fee statements in the Chapter 11 Cases and ten (10) interim fee applications pursuant to the Interim Compensation Order.  Each of these applications, including all exhibits to such applications, are incorporated herein by reference.

44.     To provide an orderly summary of the services rendered by Milbank on behalf of the Committee during the Total Compensation Period, and in accordance with the U.S. Trustee Guidelines, the Fee Committee adopted the following billing categories in connection with these cases:[25]

| | |
|---|---|
| 00100 | General Case Administration |
| 00200 | General Case Strategy Meetings |
| 00300 | Project Monitoring/Court Calendar & Docket Maintenance |
| 00400 | Hearings and Court Communications |

---

[24]     Due to the volume of the time and expense records, and consistent with the Interim Compensation Order, these materials were not filed with the Court.  As indicated, copies of these records have previously been provided to the Debtors, the U.S. Trustee, and the Court; additional copies of these records can be provided to these same parties upon request.

[25]     Milbank adopted these billing codes subsequent to the filing of the Fourth Interim Fee Application.

| | |
|---|---|
| 00500 | Non-Working Travel |
| 00600 | Interested Parties Communications |
| 00700 | Communications with Debtors |
| 00800 | Unsecured Creditors Issues/Meetings/Communications/Creditors' Committee |
| 00900 | Secured Creditors Issues/Meetings/Communications |
| 01000 | Equity Holders/Motions/Hearings/Communications |
| 01100 | LBI/SIPC Coordination and Issues |
| 01200 | Cash Management |
| 01300 | Insurance Issues |
| 01400 | Employee/ERISA/Benefits/Pension Issues |
| 01800 | Tax Issues |
| 01900 | Corporate Governance |
| 02000 | Other General Business Operation Issues |
| 02100 | Intercompany Issues |
| 02200 | Data Preservation/Migration |
| 02300 | Real Estate Matters |
| 02400 | Private Equity |
| 02500 | Derivatives/Swap Agreement Issues |
| 02600 | Loans/Investments |
| 02700 | Domestic Bank and Related Regulatory Issues |
| 02800 | International Insolvency Issues |
| 02900 | Schedules/Statement of Financial Affairs |
| 03000 | Non-Derivative Automatic Stay/Safe Harbor Issues |
| 03100 | Miscellaneous Asset Sales/363 Issues |
| 03200 | Non-Derivative Executory Contracts/365 Issues |
| 03300 | DIP Financing |
| 03400 | Exit Financing |
| 03500 | Plan of Reorganization/Plan Confirmation/Plan Implementation |
| 03600 | Disclosure Statement/Solicitation/Voting |
| 03700 | Non-Derivative Claims Reconciliation, Estimation, Litigation, and Alternative Dispute Resolution and Bar Date Issues |
| 03800 | Other Bankruptcy Motions and Matters |
| 03900 | Non-Derivative Adversary Proceedings Preparation and Litigation |
| 04000 | Non-Bankruptcy Litigation |
| 04100 | Rule 2004 Issues |
| 04200 | Appeals |
| 04300 | US Trustee Related Issues |
| 04400 | SEC/DOJ Issues |
| 04500 | Examiner Issues |
| 04600 | Firm's Own Billing/Fee Applications |
| 04700 | Firm's Own Retention Issues |
| 04800 | Third Party Retention/Fee Application/Other Issues |
| 04900 | Tax Litigation |

45.    The following summary is intended only to highlight key services

rendered by Milbank in certain project billing categories during the Total Compensation Period

where Milbank has expended a considerable number of hours on behalf of the Committee, and is

not meant to be a detailed description of all of the work performed.  Detailed descriptions of the

day-to-day services provided by Milbank and the time expended performing such services in

each project billing category are fully set forth in exhibits to the First, Second, Third, Fourth,

Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Interim Fee Applications.  Such detailed

descriptions demonstrate that Milbank was heavily involved in the performance of services for

the Committee on a daily basis, including night and weekend work, often under extreme time

constraints, to meet the needs of the Committee.  The sheer magnitude of matters in these

Chapter 11 Cases has required substantial and continuing efforts on the part of the Committee

and its professional advisors, including Milbank, to address the many complicated issues and

problems that were presented by these extraordinary and complex cases.

**A.    General Case Administration**

46.    Promptly following the Committee's appointment, Milbank prepared

numerous documents necessary for the efficient administration of the Committee's affairs, e.g.,

by-laws to govern internal Committee decisions and governance, a working-group contact list,

and memoranda summarizing matters requiring the Committee's immediate attention.  Milbank

also developed an elaborate protocol for the organization and delegation of the massive number

of tasks involved to ensure that the Committee was kept aware and apprised of the various

aspects of the Chapter 11 Cases, including frequent meetings among internal team members and

the maintenance of comprehensive rolling task lists, distribution lists, calendar notifications,

project calendars and research status lists on a daily basis.  The protocol also guaranteed that all

matters were addressed without duplication of effort.  Due to the highly complicated nature of

the Debtors' cases, these tasks required the knowledge, expertise, and input of a range of

Milbank timekeepers, from paraprofessionals to senior partners, all of whom were intimately

familiar with the issues and the parties in the Chapter 11 Cases.

47.    In addition, Milbank established a system for the review of all substantive

court filings to provide the Committee with a comprehensive summary and analysis of each

material pleading filed in the Chapter 11 Cases.  Milbank's efforts in setting up efficient and

comprehensive methods of administering the Committee's needs ensured that the Committee had

the information necessary to effectively carry out its fiduciary responsibilities to the unsecured

creditors of each of the Debtors.

**B.    Unsecured Creditors' Issues/Meetings/Communications/Creditors' Committee**

48.    During the Total Compensation Period, the Committee held weekly

telephonic meetings and regular in-person meetings in connection with the regular in-person

meetings with the Debtors.  In addition, the Committee convened special telephonic meetings

dedicated to discussing particular issues of import, most notably the Plan.  Prior to each

Committee meeting, Milbank prepared and distributed memoranda, presentations, analyses, and

other materials for the Committee members' review and consideration.  During the Committee

meetings, Milbank discussed with Committee members and their counsel all significant matters

arising during the Chapter 11 Cases, in particular, asset management and disposition, substantive

consolidation, the Disclosure Statement, the Plan, the Effective Date, and distributions to

creditors, and assisted the Committee in formulating positions with respect to such critical issues.

49.    Through Committee meetings, conference calls and numerous other

communications with members of the Committee, Milbank assisted the Committee in

(i) fulfilling its obligations to unsecured creditors of each of the Debtors' estates, and (ii) making informed decisions regarding the multitude of issues that arose in the Chapter 11 Cases. Indeed, without such meetings and the advice furnished to it by attorneys with expertise in a variety of different practice areas, the Committee could neither have functioned as a committee nor made the many decisions that its statutory role and fiduciary duties required it to make in connection with the Chapter 11 Cases.

### C.    Project Monitoring/Court Calendar & Docket Maintenance

50.    Throughout the Chapter 11 Cases, Milbank maintained internal filing, record-keeping, docket-monitoring, and calendaring systems to organize and track (i) pleadings filed in the Chapter 11 Cases, the SIPA Proceeding, and related adversary proceedings; (ii) ongoing projects; and (iii) upcoming deadlines. On a real-time basis, Milbank downloaded, consolidated, and organized pleadings to ensure efficient access. Milbank also monitored the dockets and summarized and circulated substantive pleadings to the Milbank team. These summaries enabled Milbank to stay abreast of ongoing developments in these cases, facilitated the assignment of projects and helped ensure that deadlines were not missed.

51.    Additionally, Milbank maintained a comprehensive calendar of active matters in these cases. This calendar ensured that Milbank could effectively monitor and update the status of all pending matters, a resource that proved beneficial in responding to inquiries and discussing these matters with the Committee and other parties in interest. Milbank also maintained, and circulated to the Committee, on a weekly basis, a calendar of upcoming motions, hearing dates, and other important deadlines in the Chapter 11 Cases.

D.      **Hearings and Court Communications**

52.      During the Total Compensation Period, Milbank prepared for and
appeared at each of the hearings conducted before this Court, including, among others,
(i) numerous regularly scheduled omnibus hearings; (ii) hearings on claims-related matters;
(iii) special hearings and case conferences; (iv) hearings in the SIPA Proceeding; and (v)
hearings in a wide variety of adversary proceedings arising out of the Chapter 11 Cases and the
SIPA Proceeding.  In addition, Milbank prepared for and attended (i) hearings in the United
States District Court for the Southern District of New York (the "District Court"); and (ii)
hearings in related cases and litigations, including the chapter 11 cases of the SunCal Debtors
and Innkeepers (each as defined herein) and a number of matters before the High Court of Justice
for England and Wales (the "UK High Court").

53.      In advance of each hearing, Milbank conferred internally to address the
issues presented by every motion or other substantive pleading and coordinate a response thereto.
To that end, among other things, Milbank reviewed and analyzed documents, including
correspondence and pleadings, conducted factual and legal research, and met with numerous
parties to work toward the consensual resolution of any objections raised by the Committee or
other parties in interest.  Following each hearing, Milbank promptly advised the Committee of
pertinent Court rulings and developments.

E.      **Interested Party Communications/Website/Lehman Team Hotline**

54.      In accordance with the Stipulation and Agreed Order Between the Debtors
and the Official Committee of Unsecured Creditors Regarding Creditor Access to Information
Pursuant to 11 U.S.C. §§ 105(a), 1102(b)(3) and 1103(c) [Docket No. 498], which the Court
approved on October 1, 2008 (the "Creditor Information Protocol"), Milbank, on behalf of the

26

Committee, established and maintained a public website (the "Committee Website").  The

Committee Website contained a significant amount of content produced by Milbank that was

designed to provide information to creditors worldwide, including, among other things, (i)

general information concerning the Chapter 11 Cases, including adversary proceedings and the

SIPA Proceeding; (ii) highlights of significant events; (iii) a database of the Court's

memorandum decisions and opinions issued in the Chapter 11 Cases, adversary proceedings and

the SIPA Proceeding; (iv) a listing of the orders granting the Debtors' omnibus objections to

claims, detailing the affected claims by claim number; (v) a case calendar; (vi) a catalogue of

materials and important dates and deadlines related to the Disclosure Statement, the Plan, and the

Effective Date; and (vii) answers to frequently asked questions available in several languages.

   55. The Committee Website also acted as a critical pathway for the

dissemination of information between Milbank and the Debtors' creditors.  For example, the

Committee Website permitted creditors to register to receive monthly reports and to submit

inquiries directly to Milbank.  Milbank worked in collaboration with the Debtors' counsel (as

required by the Creditor Information Protocol) to provide prompt and thorough responses to all

such inquiries on a variety of topics, including the proposed treatment of claims under the Plan,

and the Debtors' omnibus claim objection process.

   56. Milbank also spent considerable time working with each of the *ad hoc*

groups that formed during the Chapter 11 Cases, as well as with numerous individual creditors,

to advance the objectives of various creditor constituencies, assist such creditors' understanding

of critical issues in the Chapter 11 Cases, and negotiate resolutions of disputed issues.  At the

Court's direction, Milbank also frequently acted as an information "liaison" between the

Debtors, these *ad hoc* groups, and other creditors.

### F.    Communications with Debtors

57.    Throughout these cases, Milbank communicated frequently, and, at times, daily, with the Debtors' counsel regarding, among numerous other issues, case administration, responses to pleadings, LAMCO (as defined herein), issues related to the Plan and Disclosure Statement, negotiations with the administrators and trustees (the "Foreign Administrators") managing the affairs of the proceedings (the "Foreign Proceedings") initiated by or against the Foreign Affiliates, substantive consolidation, claims based on purported guarantees issued by LBHI of its affiliates' obligations, intercompany claims, and negotiations with the aforementioned *ad hoc* groups.  Furthermore, Milbank prepared for and attended in-person meetings with the Committee members, their financial advisors, FTI Consulting Inc. ("FTI") and Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan"), the Debtors, and their counsel to, among other things, discuss the ongoing administration of the Chapter 11 Cases, the Debtors' emergence from bankruptcy, and confirmation and implementation of the Plan.

### G.    LBI/SIPC Coordination and Issues

58.    Throughout the Chapter 11 Cases, Milbank worked to keep the Committee apprised of all matters in the SIPA Proceeding that may have had an impact on the recoveries of LBI's creditors, which include certain of the Debtors.  In that connection, Milbank attended meetings with the Debtors and the SIPA Trustee, analyzed various motions filed in the SIPA Proceeding and reviewed the SIPA Trustee's bi-annual reports.  Milbank also spent considerable time reviewing and analyzing objections to the SIPA Trustee's determinations of claims filed against LBI and the impact of these determinations on the LBI estate and, ultimately, potential creditor recoveries therefrom.

59.    **SIPA Allocation Motion**.  In addition, Milbank spent considerable time analyzing the issues raised by the SIPA Trustee's motion for an order approving the proposed allocation of property of the LBI estate [Docket No. 1866] (the "SIPA Allocation Motion"), reviewing related discovery, conferring with the Committee's financial advisors, and preparing a response to the SIPA Allocation Motion.  After numerous and lengthy discussions with the SIPA Trustee and his advisors, the Committee ultimately reached a consensual resolution of certain of the issues raised by the SIPA Allocation Motion, which the Court approved on March 2, 2010 [Docket No. 2743].

60.    **Second SIPA Allocation Motion**.  Milbank subsequently reviewed issues raised by the SIPA Trustee's second motion for an order approving the SIPA Trustee's allocation of property of the LBI estate (the "Second SIPA Allocation Motion") [Docket No. 4760].  This involved multiple meetings among Milbank, the Committee's financial advisors, the SIPA Trustee, the Debtors and their respective counsel and financial advisors.  Milbank also researched various issues raised in the Second SIPA Allocation Motion and requested from the SIPA Trustee additional supporting documents regarding the same.  After reviewing and analyzing these additional materials, Milbank drafted a detailed memorandum presenting its analysis and recommendations to the Committee.

61.    **LBI Global Settlement Discussions**.  Milbank also examined various issues stemming from claims filed against the Debtors by the SIPA Trustee and claims filed by the Debtors against the LBI estate.  In connection therewith, Milbank consulted with the Committee's financial advisors and with the Debtors on matters such as, the enforceability of certain subordination agreements entered into by LBI and the value of the Lehman ALI, Inc. ("LALI") payment-in-kind note.  In addition, Milbank and the Debtors' counsel worked closely

29

to prepare for meetings with the SIPA Trustee to discuss various issues related to the

administration of LBI and to reconcile the claims filed between the parties.  Milbank analyzed

multiple rounds of proposals and counter-proposals submitted by the Debtors and the SIPA

Trustee to reconcile such claims by (i) analyzing the factual circumstances with respect to

specific transactions between LBI and one or more of the Debtors, and (ii) researching the

various legal issues related to the treatment of claims under SIPA, the standards for determining

the status of claims filed against a broker-dealer, and the contractual rights underlying certain of

the claims at issue.  In that connection, Milbank drafted a comprehensive memorandum

analyzing for the Committee all of the above-mentioned issues concerning LBI and the Debtors'

claims reconciliation efforts.

### H.      Insurance Issues

62.      In an effort to understand the Debtors' indemnification obligations, at the

outset of these cases, Milbank expended considerable time investigating and evaluating the

Debtors' directors and officers insurance program to ascertain the nature and extent of the

Debtors' insurance coverage.  On November 13, 2008, the Debtors filed a motion for

authorization to advance $3 million in legal costs to several unidentified former employees

[Docket No. 1512].  Milbank evaluated the basis for this motion and the relationship of the

claims at issue to the available insurance coverage.  And as a result, the related Order was

modified to preserve the Debtors' rights under the applicable insurance policies.

63.      Later in these cases, Milbank investigated and evaluated the Debtors'

request to purchase a two-year tail policy to extend the coverage of their existing director and

officer liability insurance policy.  To obtain all relevant information regarding the cost, scope,

and advisability of such purchase, Milbank participated in numerous conferences and meetings,

and exchanged correspondence with, the Debtors' counsel, and ultimately determined not to object to the motion by which the Debtors sought Court approval to purchase the additional coverage.  Milbank also spent considerable time investigating and evaluating the proposed settlement of actions or claims against the Debtors and their directors and officers with insurance proceeds from the Debtors' director and officer insurance policies.

64.    In December 2011, Milbank analyzed the Debtors' motion for authorization to utilize $2 million previously set aside to reimburse directors for costs incurred in connection with new claims asserted between May 2011 and the Effective Date to instead cover ongoing legal costs for directors of LBHI and officers of LAMCO Holdings LLC ("LAMCO") with respect to litigation existing after the Effective Date (the "Defense Costs Motion") [Docket No. 22647].  On behalf of the Committee, Milbank drafted an objection to the Defense Costs Motion indicating the Committee's opposition to the Defense Costs Motion on the ground that the Debtors had failed to demonstrate a sound business justification therefore [Docket No. 23178].  To address the Committee's concerns, the Debtors filed a revised Order clarifying that (i) the defense costs fund would not be replenished once it is exhausted, and (ii) any distributions and/or entitlements that a covered person may have under the Plan with respect to any indemnification proofs of claim that he or she has filed against LBHI would be reduced, on a dollar for dollar basis, by the amount advanced from the defense costs fund to such covered person and/or his or her designated counsel [Docket No. 23595].  On December 22, 2011, the Court entered an order approving the Defense Costs Motion [Docket No. 23660].

## I.        Employee/ERISA/Benefits/Pension Issues

65.        **PBGC Settlement**.  Early in these cases, Milbank analyzed numerous issues related to the various pleadings filed by the Pension Benefit Guaranty Corporation (the "PBGC") in the District Court seeking to terminate the Debtors' retirement plan (the "Retirement Plan").  In connection therewith, Milbank attended hearings before the District Court and conducted several meetings via teleconference with the PBGC and the Debtors to resolve outstanding issues.  Milbank researched standards for involuntary plan termination, assessed the impact of involuntary plan termination on the Debtors' estates and prepared a joinder (the "Joinder") to the Defendants' Memorandum of Law in opposition to the PBGC's Order to Show Cause why the Retirement Plan should not be terminated in accordance with Section 4042(c) of ERISA.  Milbank drafted and filed several letter briefs to the District Court in response to the PBGC's motion to strike the Joinder and in support of the Committee's motion to intervene in the PBGC action.

66.        To resolve the foregoing matter, the Debtors and the PBGC commenced settlement discussions, in which the Committee actively participated.  To assist the Committee in its evaluation of the proposed settlement agreement between the Debtors and the PBGC, Milbank drafted a memorandum addressing the foregoing issues and providing a recommendation as to whether the Committee should consent to the material terms of the proposed agreement.  On behalf of the Committee, Milbank prepared a statement in support of LBHI's motion for authorization and approval of the proposed settlement it had reached with the PBGC [Docket No. 3681].  In addition, Milbank worked with the PBGC and the Debtors to resolve the outstanding issues.  The settlement was eventually finalized and approved by this Court [Docket No. 3751].

32

67.    **UK Pension Proceedings**.  In addition, Milbank devoted substantial time to researching, analyzing and communicating with the Debtors' counsel with respect to certain administrative and judicial proceedings (the "UK Pension Proceedings") in the United Kingdom related to the Debtors' obligations to fund the Lehman Brothers Pension Scheme (the "Pension Scheme"), sponsored by Lehman Brothers Limited ("LBL").  The UK Pensions Regulator commenced the UK Pension Proceedings against LBHI and certain of its non-Debtor affiliates based on a purported funding shortfall in the Pension Scheme and ultimately issued a "financial support directive" imposing liability on LBHI, among others, with respect to this shortfall.  The Debtors subsequently (i) appealed the administrative ruling to issue the financial support directive against LBHI and its non-Debtor affiliate Lehman Brothers Asset Management, LLC (the "Upper Tribunal Proceeding"), and (ii) joined the UK Pensions Regulator as a respondent in a separate case involving the treatment of pension-related liabilities under UK insolvency laws (the "Insolvency Proceeding").  The Debtors obtained a stay in the Upper Tribunal Proceeding pending resolution in the Insolvency Proceeding.  The UK High Court decided, consistent with the Debtors' position, that pension-related liabilities should be treated as an expense of the administration (i.e., entitled to "super-priority" status).  The Foreign Affiliates in administration in the UK appealed the UK High Court's decision to which the Debtors and the UK Pensions Regulator submitted responses.  The Court of Appeal upheld the UK High Court's decision. Shortly thereafter, the Foreign Affiliates appealed the Court of Appeal's decision and the UK Supreme Court has agreed to hear the case, which will likely be heard in early 2013.  In connection with the foregoing, Milbank reviewed the relevant documentation in the UK Pension Proceedings, researched applicable laws, attended the relevant hearings and regularly discussed and analyzed key issues with Debtors and the Committee.

33

**J.**      **Tax Issues**

68.      Throughout the Chapter 11 Cases, Milbank analyzed and evaluated federal, state, local, and international tax issues relating to the Debtors' estates.  A subcommittee (the "Tax Subcommittee") convened, as necessary, to address the myriad tax issues arising in the Chapter 11 Cases.  In addition to attending meetings of the Tax Subcommittee, Milbank participated in weekly Committee calls, met with Debtors' tax department and tax counsel, and reviewed and analyzed (i) tax issues related to the disposition of certain assets; (ii) tax issues related to the activities of the Debtors' banks; (iii) the sale of Real Estate Mortgage Investment Conduits ("REMIC") held by Lehman Pass Through Securities Inc. and LBI; (iv) transactions that were the subject of an ongoing Internal Revenue Service ("IRS") audit against the Debtors' estate, including foreign tax credit claims (e.g., "Voucher" trade and "stock loan" transactions) and the Debtors' corporate-owned life insurance deductions; (v) the Debtors' tax exposure and potential refund claims; (vi) motions and orders to restrict trading of equity and debt claims of the Debtors; (vii) the Debtors' private letter ruling request from the IRS; (viii) foreign tax claims against certain Debtor foreign operations; (ix) tax allocation issues among Debtors, certain non-Debtor affiliates and LBI; (x) the impact of the receipt of government program funds on the use of the Debtors' net operating losses; (xi) the Debtors' use of net operating losses, including the effect new legislation will have on the Debtors' alternative minimum tax position; (xii) tax allocation and other issues under English law; and (xiii) potential structures for the Debtors' plan of reorganization.

69.      At the request of the Committee, Milbank researched, prepared legal memoranda, and corresponded with the Debtors regarding (i) the implications of IRS guidance and legislative developments related to the Debtors' estates; (ii) the potential tax exposure

related to New York State's and New York City's proofs of claim; (ii) choice of forum issues

associated with the determination of the Debtors' tax liability; (iii) the priority of various tax

claims against the Debtors; (iv) tax allocation rules related to Debtors' right to contribution by

subsidiaries; (v) setting off tax penalties with refunds and the allowance of certain refund claims;

(vi) the status of a controlled foreign corporation when placed in receivership; (vii) the Debtors'

right to interest on tax refunds; (viii) the potential exposure for significant tax liabilities related

to the ownership of REMIC residual interests; (ix) potential withholding tax claims against the

Debtors for pre- and postpetition dates; (x) allocation of interest expense and net operating loss

elections under New York law; (xi) subsidiary reporting in the context of combined and

consolidated tax returns; (xii) trigger events for cancellation of debt income; and (xiii) the

potential application of section 505 of the Bankruptcy Code to a determination as to the potential

withholding on distributions made under the Plan.  In addition, Milbank reviewed and analyzed

the proposed settlements among the IRS, Department of Justice, and the Debtors, and between

the Debtors and New York State.

   70. **Tax Litigation**.  Milbank, on behalf of the Committee, intervened in the

Debtors' suit for a tax refund relating to the "Stock Loan" transaction (the "Tax Litigation") and

undertook activities associated with representing the Committee's interests in that litigation.  In

particular, Milbank monitored and participated in the discovery process and analyzed the various

legal issues in connection with the removal of the Tax Litigation to the District Court.  In

addition, Milbank reviewed the Government's discovery productions and privilege logs and

assisted Debtors' counsel in drafting objections to certain privilege claims asserted by the

Government.  Milbank also participated in negotiations with Debtors' counsel and the

Government to attempt to resolve disagreements over such privilege claims.  Finally, Milbank

reviewed third-party document productions made in response to the Government's subpoenas.

**K.**      **Business Plan Review and Analysis**

71.      Throughout the Chapter 11 Cases, Milbank reviewed and analyzed the

myriad issues in connection with a potential business plan for the Debtors, including the

Debtors' proposal to form an asset management company to manage the estates' assets.  Milbank

worked in tandem with the Committee's financial advisors to (i) identify issues related to the

formation, structure, and function of such an asset management company and (ii) craft solutions

to the problems engendered by such issues, which were subsequently discussed and negotiated

with the Debtors and their professionals.  Such discussions culminated in the formation and

documentation of LAMCO, for which the Debtors sought Court approval (the "LAMCO

Motion") [Docket No. 7579].  Milbank filed a statement in support of the LAMCO Motion

[Docket No. 8017], and assisted the Debtors in resolving certain objections interposed to the

LAMCO Motion.  On April 15, 2010, the Court approved the LAMCO Motion, thereby

establishing LAMCO to manage the Debtors' assets [Docket No. 8372].  The Committee also

was involved in the Debtors' subsequent efforts to identify an investor/joint venture partner to

work together with LAMCO to create a platform for the management of third-party assets, until

such efforts ultimately proved unsuccessful.

72.      In addition, Milbank assisted Houlihan and FTI with their review and

analysis of the Debtors' current asset management strategy and various potential alternatives.

This project culminated in the preparation of a comprehensive presentation to the Committee that

outlined the Debtors' asset management options by asset class.  Milbank, Houlihan and FTI

36

discussed these options on both the Committee and subcommittee level to help the Committee evaluate alternatives for the post-Effective Date management of the Debtors' assets.

**L.      Intercompany Issues**

73.      As part of the Committee's work in developing a workable concept for the plan of reorganization, Milbank expended considerable time investigating matters related to intercompany obligations.  In particular, Milbank devoted substantial resources to an analysis of purported guarantees and their potential impact on creditor recoveries.  In this connection, Milbank drafted a memorandum addressing, among other issues, the assertion of a claim by LBIE against LBHI, as purported guarantor for certain of its affiliates, for liabilities owed to LBIE by those affiliates.  Milbank also conducted research regarding, and drafted a memorandum addressing, certain other potential claims based, in part, on LBHI's purported guarantee of certain affiliates' obligations.  Moreover, Milbank analyzed the treatment of the intercompany claims between LBHI and (i) Lehman Brothers Treasury Co. B.V. ("LBT"); (ii) Lehman Brothers Securities N.V. ("LBSNV"); (iii) Lehman Brothers Finance AG ("LBF"); and (iv) Lehman Brothers Commercial Corporation Asia Limited.  In connection therewith, Milbank had numerous discussions with the Debtors, the Debtors' counsel and the Committee's financial advisors regarding the treatment of the LBT and LBSNV intercompany claims under the Plan, as well as the potential impact of alternative treatment on creditor recoveries.

74.      Furthermore, Milbank, along with FTI, conducted an in-depth analysis of the Debtors' intercompany transactions to assess the likelihood that the Court would recharacterize any of the intercompany claims as equity contributions, rather than debt.  In connection with this analysis, Milbank reviewed the agreements documenting intercompany note accounts between Lehman entities, as well as the case law addressing the relevant

recharacterization factors and drafted a comprehensive memorandum to the Committee applying these factors to the intercompany transactions at issue between LBHI and its affiliates. Milbank and FTI spent numerous hours and had several communications with each other and the Debtors evaluating the recharacterization factors against these intercompany transactions, from both a legal and financial perspective. Specifically, Milbank and FTI estimated the likelihood that intercompany claims between LBHI and its affiliates would be recharacterized as equity. That recharacterization risk was then shared with the Debtors and incorporated into the Plan.

75.    **Intercompany Repurchase Agreements**. Finally, Milbank examined the proposed treatment of claims arising in connection with the Debtors' prepetition intercompany repurchase agreements and the considerations affecting such treatment. In connection therewith, Milbank assessed the potential recharacterization of such claims as equity, as well as defenses that could be asserted against recharacterization. In addition, Milbank researched issues related to repurchase agreements, including the application of "safe harbors" under the Bankruptcy Code and the ownership of assets subject to such agreements, and prepared comprehensive memoranda to advise the Committee on such issues.

**M.    Real Estate Matters**

76.    Due to the size, complexity and potential for exposure, at the outset of these cases, the Committee established a subcommittee (the "Real Estate Subcommittee") to evaluate issues relating to the Debtors' extensive real estate portfolio. The Real Estate Subcommittee held regular telephonic meetings throughout these cases to address and make recommendations to the full Committee regarding issues related to the Debtors' real estate holdings in discrete assets and work with the Debtors under Court-approved protocols to maximize the value of the Debtors' real estate assets.

38

77.     The Debtors' real estate portfolio includes commercial, residential and corporate interests in which the Debtors hold both debt and equity positions, often in the form of joint ventures to develop large commercial projects.  During the Chapter 11 Cases, Milbank worked closely with the Committee's financial advisors to assess whether the Debtors should continue to meet various funding obligations.  In connection therewith, Milbank reviewed the Debtors' rights, obligations and exposures relative to joint venture partners, senior secured lenders, unsecured creditors and other third parties to make an impact analysis of the failure to fund capital calls.  Milbank also prepared numerous pleadings, at the Committee's request, joining in the Debtors' objections against the assumption of certain loan agreements.  Finally, Milbank participated in the consensual resolution of several outstanding real estate-related motions.

78.     **Fenway**.  In connection with the Real Estate Subcommittee's consideration thereof, Milbank analyzed the Debtors' proposed settlement relating to the Fenway structure.  Prior to the Petition Date, LCPI and Fenway Capital, LLC ("Fenway") entered into a repurchase agreement whereby LCPI transferred to Fenway interests in certain real property, including interests in certain term loans to various affiliates of SCC Acquisitions, Inc., who were subject to their own bankruptcy proceeding in California (collectively, the "SunCal Debtors").  Fenway used these assets to secure obligations under certain variable funding notes, which were, in turn, used to secure obligations under three commercial paper notes.  In analyzing the proposed settlement, Milbank assessed the impact that the unwinding of the Fenway structure would have on the SunCal Debtors' bankruptcy cases.  Due to concerns that Lehman's prepetition relationships with Fenway may have involved certain improprieties, Milbank conducted additional due diligence and worked with the Debtors to revise the terms of the

Fenway settlement.  With the settlement appropriately tailored and the benefits of the Debtors'

estates clearly established, the Committee supported the transaction [Docket No. 8220], which

was approved by the Court on May 13, 2010 [Docket No. 9030].

79.    **Innkeepers**.  Innkeepers USA Trust and certain of its affiliates

(collectively, "Innkeepers") owned 71 hotel properties throughout the United States.  Prior to the

Petition Date, LALI provided a $220,200,000 floating rate loan to Innkeepers collateralized by

twenty-one hotel properties (the "ALI Mortgage Loan").  As a result of its financial difficulties,

Innkeepers filed for bankruptcy in July 2010.  Milbank, along with the Committee's financial

advisors, carefully evaluated the strategic options available to the Debtors with respect to

Innkeepers.  In connection therewith, Milbank reviewed and analyzed a proposed sale of 64 of

Innkeepers' 71 hotel properties, attended the proceedings in the Innkeepers' chapter 11 cases,

and monitored negotiations among Innkeepers' advisors and the major constituencies in the

Innkeepers' chapter 11 cases regarding the terms of a potential restructuring that would be

beneficial to the Innkeepers' estates and creditors, and that would also enable the Debtors to

maximize the value of the ALI Mortgage Loan.

80.    In the spring of 2011, an auction was held for 64 of Innkeepers' hotels in

which the Debtors participated but which was ultimately won by Cerberus Series Four Holdings

LLC ("Cerberus") and Chatham Lodging Trust ("Chatham" and, together with Cerberus, the

"Cerberus/Chatham Group") with a bid of approximately $1.119 billion.  The Cerberus/Chatham

Group, however, failed to consummate the transaction, invoking the "material adverse effect"

clause in the sale agreement.  Innkeepers then filed a complaint against the Cerberus/Chatham

Group seeking damages from the Cerberus/Chatham Group arising from the failure to close the

transaction.  Milbank monitored the Inkeepers' cases, attended the auction, reviewed the

subsequent complaint filed by Innkeepers, researched legal issues in connection with the material

adverse effect clause, the complaint, and the effect of the Innkeepers proceedings on recoveries

to the Debtors and the Debtors' creditors, and apprised the Real Estate Subcommittee and the full

Committee of relevant developments regarding the sale of Innkeepers' assets.  Eventually,

Innkeepers and the Cerberus/Chatham Group agreed on revised terms for the sale of the 64

hotels, which still provided a substantial payout to the Debtors' creditors.  Milbank analyzed the

revised transaction terms, determined that it was still above the threshold for providing a

substantial benefit to the estates, and recommended that the Committee approve the new deal on

its terms, which the Committee did.

        81.    **Archstone**.  In 2007, certain of the Debtors and their non-Debtor affiliates

made equity investments and loans in connection with the leveraged buyout of Archstone-Smith

Trust ("Archstone"), a publicly-traded real estate investment trust.  The acquisition of Archstone

was financed with more than $16 billion in secured financing either assumed or provided by

affiliates of the Debtors, affiliates of Bank of America, N.A ("Bank of America") and affiliates

of Barclays Capital Real Estate Inc. ("Barclays" and, together with Bank of America, the

"Lenders" and, collectively with affiliates of the Debtors, the "Co-Sponsors").  The Co-Sponsors

invested approximately $4.8 billion in the aggregate in common equity of Archstone, with

approximately $2.4 billion attributable to the Debtors' indirect interests.

        82.    In January 2009, the Court authorized LBHI, LCPI and the Lenders to

commit an additional aggregate amount of $485 million, plus available letters of credit, as new

priority financing to provide Archstone with customary operating liquidity [Docket No. 2677].

The Court subsequently approved a more comprehensive restructuring on May 25, 2010 (and

modifications thereto, approved on November 18, 2010) [Docket No. 12894].  As part of the

modified restructuring, the Co-Sponsors entered into an agreement (the "<u>Bridge Equity
Agreement</u>"), pursuant to which they agreed that if any Co-Sponsor attempted to transfer its
interest in Archstone, the other Co-Sponsors would have a right of first offer (the "<u>ROFO</u>") to
purchase such interests consistent with the terms of said agreement.

83.     In December 2011, the Debtors received the Lenders' ROFO notice,
which provided, in relevant part, for Bank of America and Barclays to transfer approximately
50% of each of their interests in Archstone (approximately 26.5% of total ownership in
Archstone), comprised of equity owned, partnership interests, governance interests, membership
interests, and voting interests (collectively, the "<u>Transferred Securities</u>") to Equity Residential –
a Maryland real estate investment trust and Archstone's biggest competitor – for an aggregate
purchase price of $1.325 billion, subject to certain adjustments for additional expenses.  Pursuant
to the terms of the Bridge Equity Agreement, the Debtors had the right to purchase the
Transferred Securities on the terms set forth on the Lenders' ROFO notice, which right had to be
exercised by December 16, 2011.  In addition, Lehman had 50 days from receipt of the Lenders'
ROFO notice to deliver a binding notice of its decision to exercise the ROFO or tag-along rights
and deposit an amount equal to 5% of the aggregate price for the Transferred Securities.

84.     The Real Estate Subcommittee held weekly meetings regarding the status
of the ROFO.  Milbank and the Committee's financial advisors were also actively involved in
negotiations relating to the Archstone portfolio and were in constant contact with the Debtors
and their advisors regarding whether Lehman should exercise the ROFO or pursue another
course of action.  Milbank reviewed and evaluated numerous internal analyses, valuation models
and other materials assessing the optimal use of the Archstone assets.  After extensive research,
valuation and analysis, and lengthy and detailed deliberations among Milbank, the Committee's

financial advisors and the Committee, Milbank advised the Committee that the exercise of the

ROFO was within the Debtors' sound business judgment.  Accordingly, on behalf of the

Committee, Milbank drafted a statement in support of the Debtors' intent to exercise the ROFO

[Docket No. 24121], which the Court ultimately approved [Docket No. 24197].

85.    **SunCal**.  SunCal is a collection of large-scale residential and commercial

real estate projects in California.  Prior to the Petition Date, LALI, LCPI and certain other non-

Debtor affiliates of LBHI provided debt financing for the SunCal projects totaling over $2

billion.  As a result of its financial difficulties, SunCal and several affiliates became voluntary

and involuntary debtors in two sets of bankruptcy cases in United States Bankruptcy Court for

the Central District of California (the "California Bankruptcy Court").  LCPI filed proofs of

claim against certain of the SunCal Debtors in the first (the "SunCal Pool I Cases") and second

(the "SunCal Pool II Cases," collectively with the SunCal Pool I Cases, the "SunCal Cases") sets

of cases.

86.    Over the course of the Chapter 11 Cases, the SunCal Debtors in the

SunCal Pool II Cases repeatedly sought relief from the automatic stay before this Court and the

California Bankruptcy Court to administer the SunCal Pool II Cases to the extent that such cases,

and the relief requested by the debtors therein, may affect the rights of the Debtors, including,

filing adversary proceedings to equitably subordinate Lehman's claims and interests in the

SunCal Pool II Cases.  Ultimately, the SunCal Debtors' requests were decided in the Court of

Appeals for the Second and Ninth Circuits, which resolved the appeals in the Debtors' favor and

upheld the application of the LCPI's automatic stay.  On behalf of the Committee, Milbank

drafted briefs and appeared at oral argument before the Second Circuit arguing in favor of the

enforcement of the automatic stay.

87.     In addition, Milbank participated in the court-mandated mediation in California regarding the equitable subordination issues and evaluated and potential settlement options, including credit bid amounts for proposed auctions in the SunCal Pool I Cases.  Milbank also reviewed, revised, and analyzed various drafts of the plans of reorganization, the disclosure statements and other related pleadings in the SunCal Cases.  Finally, Milbank attended hearings in this Court and the California Bankruptcy Court in connection with the SunCal Cases and provided reports to the Real Estate Subcommittee and the Committee on the foregoing.

88.     Pursuant to an agreed-upon plan of reorganization, certain of the SunCal properties in the SunCal Pool I cases were sold at an auction on April 5, 2011.  The SunCal Pool II Cases were resolved through a settlement with the SunCal Debtors, which resulted in several of the SunCal properties being conveyed to Lehman.  Lehman's proposed plans of reorganization with certain of the SunCal Debtors in the SunCal Pool II cases were confirmed on January 6, 2012.

89.     **25 and 45 Broad Street**.  LBHI is the holder of senior and mezzanine loans (the "Broad Street Loans") secured by properties located at 25 and 45 Broad Street in New York, NY (collectively, the "Broad Street Properties").  In January 2009, LBHI commenced two separate actions in the Supreme Court of the State of New York (the "State Court") to foreclose on the mortgages encumbering the Broad Street Properties.  As the foreclosure process continued, LBHI sought authority from the Court to invest approximately $25.1 million (the "Additional Investments") in the Broad Street Properties to enhance their value and comply with the relevant New York City regulations [Docket No. 15257].  Milbank and the Committee's financial advisors analyzed the request to make the Additional Investments, as well as other potential strategies with respect to the Broad Street Properties, to assist in the Committee's

determination that allowing the Debtors to make the Additional Investments would generate the highest recovery for creditors by realizing the full potential of the Broad Street Properties. Milbank prepared a statement in support of the Additional Investments, outlining the Committee's belief that these investments would lead to maximum creditor recoveries [Docket No. 15789].  The Court agreed with the Debtors and the Committee, and authorized the Debtors to make the Additional Investments in the Broad Street Properties [Docket No. 16000].

**N.**      **Private Equity**

90.      At the outset of these cases, the Committee established a subcommittee (the "<u>Private Equity Subcommittee</u>") to monitor and analyze developments with respect to the Debtors' private equity assets.  Throughout these cases, the Private Equity Subcommittee held regular meetings to review specific issues surrounding the Debtors' private equity portfolio with a view toward helping the Debtors maximize the value of such portfolio for the benefit of all creditors.

91.      **SkyPower**.  With respect to the proposed sale of Lehman's debt and equity interests in SkyPower, Corp. ("<u>SkyPower</u>"), Milbank worked together with the Committee's financial advisors and the Debtors' counsel to review, analyze, and comment on numerous draft purchase agreements.  On August 12, 2009, SkyPower filed for protection under the Companies' Creditors Arrangement Act ("<u>CCAA</u>") in the bankruptcy court in Canada.  In connection with SkyPower's CCAA filing, Milbank conducted due diligence to verify any potential claims held by LBHI in the CCAA proceeding, reviewed the terms of the sale order under which SkyPower's assets were proposed to be sold, and communicated the status of the CCAA filing to the Private Equity Subcommittee and the full Committee.

45

92.     **D.E. Shaw**.  Milbank also expended considerable time in connection with the twenty percent interest of ARS Holdings II LLC ("ARS Holdings"), a non-Debtor, wholly-owned subsidiary of LBHI, in D.E. Shaw & Co., L.P. and D.E. Shaw & Co., L.L.C. (together "D.E. Shaw").  ARS Holdings was contractually obligated to make certain payments to D.E. Shaw in 2009 and 2011, which obligations were guaranteed by LBHI.  Due to several factors, ARS Holdings did not have sufficient cash to make this capital payment in 2009.  After Milbank and the Committee's financial advisors worked closely with the Debtors and analyzed the documents related to D.E. Shaw, the Committee's advisors agreed with the Debtors that significant value may be recovered if ARS Holdings fulfilled its payment obligation to D.E. Shaw.  As a result, the Debtors filed a motion seeking authority to make an intercompany loan to ARS Holdings to allow it to satisfy its obligation to make such payment to D.E. Shaw [Docket No. 3872].  Milbank analyzed the potential value to the Debtors' estates of making this intercompany loan to ARS Holdings and related capital payment to D.E. Shaw and communicated with the Debtors regarding the Committee's position with respect to this motion.  On June 17, 2009, the Court authorized the Debtors to make this loan [Docket No. 4022].

93.     **One William Street**.  With respect to the assignment of limited partnership interests in One William Street LB Capital Partners, L.P. ("OWS LB"), Milbank worked closely with the Debtors' counsel to review and analyze the terms of the assignment agreement.  At the beginning of these cases, OWS LB was restructured whereby nearly $400 million of unfunded commitments were extinguished.  After the restructuring, OWS LB's performance improved and the Debtors were presented with an opportunity to sell a portion of its position in OWS LB.  In that connection, Milbank, together with the Committee's financial advisors, worked to ensure that recovery was maximized with respect to this assignment for the

benefit of the Debtors' estates. Such efforts culminated in the Debtors negotiating a ten percent increase in the purchase price, while also reducing Lehman's overall exposure to OWS LB.

94. **Quadrant**. The Committee's advisors also reviewed a sale by LBHI of 80,000 Class A shares (the "Class A Shares") that it held in Quadrant Structured Products Company, Ltd. to Magnetar MQ Ltd. for $90.0 million. The Private Equity Subcommittee reviewed the financial terms of the proposed sale and ultimately concluded that the sale was in the best interests of the Debtors' estates and their creditors. In addition, Milbank analyzed the legal issues surrounding the sale, including the fact that the Debtors did not conduct an auction, and determined that the sale – and sale process – satisfied the Debtors' fiduciary duty to ensure the highest possible return on the Class A Shares. As a result, Milbank drafted and filed a statement in support of the Debtors' motion seeking approval of the sale of the Class A Shares [Docket No. 15174], which motion the Court granted on March 24, 2011 [Docket No. 15312].

## O. Derivatives Issues

95. At the outset of these cases, the Committee established a subcommittee (the "Derivatives Subcommittee") to evaluate issues and develop value-maximizing strategies relating to the Debtors' valuable derivatives portfolio. Throughout the Chapter 11 Cases, Milbank conducted regular meetings with the Derivatives Subcommittee to address and, where appropriate, make recommendations to the Committee with respect to specific issues surrounding the Debtors' portfolio of more than 900,000 third-party derivatives transactions.

96. **Procedures Motion**. On November 13, 2008, the Debtors filed a motion seeking approval of procedures (the "Procedures") for (i) the Debtors' assumption and assignment of certain "in the money" prepetition derivative contracts and (ii) entry into settlement agreements that may establish termination payments and the return of collateral and/or

47

property under terminated derivative contracts [Docket No. 1498] (the "Procedures Motion").  At

the direction of the Committee, Milbank drafted and filed an objection to the Procedures Motion

[Docket No. 2194].  In addition, more than one hundred counterparties filed objections, which

Milbank, at the request of the Committee, closely evaluated.  To address the objections of the

counterparties and the Committee, the Committee worked closely with the Debtors to revise the

Procedures to provide for a more active role for the Committee, including requiring the Debtors

to obtain the Committee's consent in order to invoke the Procedures.

97.    On January 16, 2009, this Court granted the Debtors' further motion (the

"Consensual Motion") seeking approval of the assumption and assignment of certain derivatives

contracts either (a) in accordance with their terms or (b) with the consent of the applicable

counterparties [Docket No. 2561].  The Consensual Motion also sought prospective authorization

of a protocol between the Debtors and the Committee to reduce the costs associated with the

consensual assignment of derivative contracts, and to maximize the Debtors' ability to market

derivative contracts.  Pursuant to such protocol, the Committee must analyze and consent to all

derivative transactions before the Debtors can consummate any such transaction.  To that end,

Milbank, together with the Committee's financial advisors, reviewed and advised the Committee

on all aspects of each proposed transaction and presented to the Derivatives Subcommittee for

consultation.

98.    **Derivatives ADR**.  In respect of the Debtors' Motion Pursuant to Section

105(a) of the Bankruptcy Code and General Order M-143 for Authorization to Implement

Alternative Dispute Resolution Procedures for Affirmative Claims of Debtors Under Derivative

Contracts (the "Derivatives ADR Motion"), Milbank worked closely with the Debtors to

improve upon the procedures proposed in the Derivatives ADR Motion.  At the request of the

Committee, Milbank prepared and filed a statement in support of the Derivatives ADR Motion,

[Docket No. 4911], and a statement in further support of the Derivatives ADR Motion [Docket

No. 5140]. On September 17, 2009, this Court entered an order approving the motion (the

"Derivatives ADR Order"), pursuant to which the Committee, the Debtors and counterparties

mediate disputes arising from the closing out of the Debtors' "in-the-money" derivatives

portfolio [Docket No. 5207]. Following entry of the Derivatives ADR Order, Milbank worked

closely with the Debtors to review and respond to counterparty notices filed under the

Derivatives ADR Order, and to evaluate settlement proposals arising under the alternative

dispute resolution process. In addition, Milbank prepared for and participated in mediations on

behalf of the Committee or Derivatives Subcommittee, as applicable. Such efforts have been

instrumental in helping the Debtors achieve settlements in a total of 205 matters involving 227

counterparties, as of June 14, 2012, resulting in the recovery of over $1.16 billion into the

Debtors' estates.

99.    **Derivatives Litigation**. Milbank also addressed issues related to, and

provided recommendations regarding, the highly complex derivatives-related adversary

proceedings commenced by and against the Debtors. To that end, Milbank analyzed derivative

contracts and other related transaction documents, monitored and actively participated in the

derivatives-related adversary proceedings, communicated with the Debtors' counsel and the

Committee's financial advisors, and developed and evaluated strategies to monetize complicated

derivative transactions for the benefit of unsecured creditors of each of the Debtors' estates. In

preparation for representing the Committee in certain of the derivatives-related adversary

proceedings in which the Committee has intervened, Milbank researched complex legal issues

related to, among other things, the treatment of derivative contracts in bankruptcy.

100.    **Metavante**.  Specifically, such research was instrumental to the favorable ruling obtained by the Debtors and the Committee with respect to the Debtors' motion to compel the performance of Metavante Corporation ("Metavante") under a swap agreement [Docket No. 3691] (the "Metavante Motion").  Metavante contended that section 2(a)(iii) of the swap agreement excused its performance thereunder and additionally that sections 560 and 561 of the Bankruptcy Code permitted Metavante to terminate the swap agreement whenever it chose.  Milbank, at the direction of the Committee, filed a substantive statement in support of the Metavante Motion [Docket No. 3958] and a joinder to the Debtors' reply in support of the Metavante Motion [Docket No. 4373], which, among other things, argued that section 2(a)(iii) was an unenforceable *ipso facto* provision and that a counterparty's right to terminate a swap agreement is not unfettered.  In a ruling from the bench during the September 15, 2009 omnibus hearing, this Court granted the Metavante Motion compelling Metavante's performance and also setting the precedent that counterparties cannot suspend performance under prepetition derivative contracts.

101.    **Saphir**.  Such research was also instrumental to the key ruling obtained by the Debtors and the Committee in the Debtors' adversary proceeding against Bank of New York Mellon Corporate Trustee Services Limited ("BNY").[26]  This adversary proceeding arose out of a dispute related to two credit default swap agreements (the "CDS Agreements") between LBSF and Saphir Finance Public Limited ("Saphir"), which were entered into as part of a multi-issuer secured obligation program known as the "Dante Program."  Under the Dante Program, Saphir issued certain notes that were credit-linked to the CDS Agreements.  BNY was the trustee under the trust documents ("Trust Documents") that governed the Saphir transactions.  On May 13,

---

[26]    Lehman Bros. Special Fin. Inc. v. BNY Corp. Trustee Servs. Ltd., Case No. 08-13555, Adversary Proceeding No. 09-01242 (Bankr. S.D.N.Y. 2009).

2009, Perpetual Trustee Company Limited ("Perpetual"), the holder of the Saphir notes,

commenced a suit against BNY in the UK High Court seeking an order directing BNY to make

payment to it, rather than to LBSF, pursuant to certain provisions in the Trust Document that

Perpetual contended subordinated LBSF's right to payment as the result of the Debtors'

bankruptcies.  On May 10, 2009, LBSF filed a complaint in this Court, asserting that such

provisions constituted unenforceable *ipso facto* clauses that did not fall within the limited "safe-

harbor" of section 560 of the Bankruptcy Code.  Recognizing the significance of this litigation to

the recoveries of the Debtors' estates, Milbank intervened in this adversary proceeding on behalf

of the Committee.  On January 25, 2010, this Court issued its decision granting summary

judgment for LBSF finding that: (i) the disputed provisions in the Trust Documents were

unenforceable *ipso facto* clauses; (ii) the *ipso facto* protections of the Bankruptcy Code applied

irrespective of whether the "triggering" event was LBHI's or LBSF's bankruptcy; (iii) any

attempt to enforce the Trust Document provisions would violate the automatic stay; and (iv) the

safe harbor accorded by section 560 of the Bankruptcy Code does not apply to provisions

affecting payment priorities.

　　　　　102.　**Swedbank**.  Milbank also devoted substantial resources to researching and

analyzing the issues presented in the appeal of the contested matter involving Swedbank AB

(publ.) ("Swedbank") and its purported right to set off funds the Debtors had on deposit with

Swedbank against receivables stemming from certain prepetition derivatives contracts between

Swedbank and LBHI and Swedbank and certain affiliates of LBHI.[27]  On May 5, 2010, the Court

issued a memorandum opinion finding that Swedbank did not have a right to effect a non-mutual

setoff [Docket No. 8806].  Immediately thereafter, Swedbank appealed this Court's decision to

the District Court.  In that connection, Milbank conducted extensive research into US and UK

---

[27]　　　Swedbank AB (Publ) v. Lehman Bros. Holdings Inc., Case No. 1:10-cv-04532 (NRB) (S.D.N.Y. 2010).

law regarding setoff rights and prepared and filed an appellate brief in the District Court in support of the Debtors' position and making additional arguments in favor of affirming this Court's decision. The District Court ruled in favor of the Debtors, upholding this Court's decision, and Swedbank appealed the District Court's decision to the Second Circuit. The Second Circuit appeal was ultimately settled out of court.

103. **Derivatives Settlements**. As noted above, in 2008, this Court entered an order [Docket No. 2257] (the "December Order"), pursuant to which the Committee, the Debtors and counterparties negotiate outstanding derivative and guarantee claims of the counterparties or amounts due to the Debtors as they may arise from the closing out of the Debtors' derivatives portfolio. In addition, on March 11, 2009 and April 22, 2010, respectively, this Court entered further orders authorizing the Debtors to grant first priority liens in cash collateral posted in connection with the hedging transactions entered into through certain futures and prime brokerage accounts (the "Hedge Order") [Docket No. 3047], and to purchase and sell notes issued by certain special purpose vehicles that are party to transactions with certain Debtors (the "SPV Notes Purchase Order") [Docket No. 8596]. Furthermore, as described in the Disclosure Statement, the Debtors engaged in negotiations with a number of their largest derivatives counterparties regarding a common approach for settlement of their derivatives claims pursuant to uniform and transparent methodologies (the "Derivatives Framework").

104. Pursuant to the December Order, the Hedge Order, and the SPV Notes Purchase Order, and taking into account the Derivatives Framework, Milbank worked closely with the Debtors to review claims or receivables, hedge proposals, and proposed note purchases, and to arrive at negotiated settlements or transactions with respect thereto. To that end, Milbank analyzed derivative contracts and other documentation, communicated with the Debtors' counsel

and the Committee's financial advisors, and developed and evaluated strategies to monetize such transactions.  Milbank also expended time describing such analyses and recommendations in presentations and memoranda to the Committee or Derivatives Subcommittee, as applicable.

**P.    Loans/Investments**

105.    At the outset of these cases, the Committee established a subcommittee (the "Loan Book Subcommittee") to review and analyze the Debtors' portfolio of commercial loans, and to work with the Debtors and evaluate their proposals regarding the restructuring of the Debtors' loan positions and interests.  In connection therewith, Milbank and the Committee's financial advisors immediately undertook their fiduciary role to analyze, and advise the Loan Book Subcommittee regarding, the Debtors' extensive loan book positions, significant issues and restructuring goals regarding the loans, and options and strategies to manage and monetize the portfolio.  Throughout the course of the cases, Milbank continued to discharge its duties by actively participating in the Loan Book Subcommittee and analyzing and advising the subcommittee and the broader Committee regarding myriad legal issues related to the Debtors' loans, their treatment and management, and the potential implications on the Debtors' estates and creditors.

106.    As described in further detail below, Milbank, among other things, (i) monitored and reviewed various motions, court filings and proposals relating to loan book transactions; (ii) considered factual, financial and legal issues related to the Debtors' loan interests, including, among others, the Debtors' assumption or rejection of loan agreements and open trade confirmations; (iii) worked closely with the Debtors' advisors and creditor constituents to assist in developing Court-approved procedures to execute transactions related to loan commitments and loan restructurings; (iv) considered the Debtors' proposed restructuring,

settlement, compromise or termination of numerous funded and unfunded loan commitments; (v)

conducted research and drafted memoranda analyzing, among other legal issues, the treatment of

participations in the U.S. and UK, loan trading standards, remedies for the failure to fund, and

the nature and treatment of certain loan transfer transactions as "true sales"; (vi) reviewed the

potential elevation of participating lenders to replace the Debtors as administrative agents and/or

lenders in credit facilities; (vii) analyzed motions by borrowers seeking direct relief relating to

their credit agreements; (viii) reviewed and analyzed numerous loan, security and transactional

materials and documentation related to the Debtors' loan positions; and (ix) evaluated the

Debtors' proposal to transition management of the remaining loan positions to an asset manager

and launch potential collateralized loan obligation transactions involving certain loans.

107.    **Open Trades Motions**.  On November 14, 2008, LBHI and LCPI filed a

motion (the "First Open Trades Motion") seeking authority to assume, reject or modify certain

pending trade agreements between the Debtors and certain counterparties to purchase or sell

positions or participations in par or distressed loans at an agreed upon price ("Open Trades")

[Docket No. 1541].  On December 15, 2008, the Debtors filed a second motion (the "Second

Open Trades Motion," and together with the First Open Trades Motion, the "Open Trades

Motion") seeking the same relief for a second group of Open Trades [Docket No. 2242].  In

connection therewith, Milbank worked closely with Houlihan and FTI to review the proposed

treatment of various Open Trades and negotiate modifications to the terms and settlements of the

Open Trades to enhance value for the Debtors' estates.  Milbank also reviewed myriad

counterparty objections and motions relating to the Open Trades Motions, researched the legal

issues raised therein, including setoff under section 553 of the Bankruptcy Code, and filed a

statement in support of the First Open Trades Motion [Docket No. 2228].

108.  **Fusion**.  In particular, Milbank reviewed numerous issues in connection with the Open Trades and related transactions involving the Debtors and Fusion Funding Limited and Fusion Funding Luxembourg, S.a.r.l. (together, "Fusion").  The related transactions included an underlying loan purchase agreement among Bankhaus, LCPI, GE Corporate Financial Services, Inc. ("GE"), and Fusion, whereby LCPI and Bankhaus, among other things, agreed to sell and participate in certain loans to Fusion.  Milbank, the Debtors and other parties-in-interest negotiated the terms of a settlement resolving the disputed GE/Fusion matter.  In connection therewith, Milbank helped develop the terms of a Master Participation Agreement (the "MPA"), providing for LCPI's purchase of participations in certain loans owned by GE.  On December 14, 2009, the Debtors filed a stipulation and proposed order, incorporating a settlement agreement resolving all issues among GE, Fusion, the Debtors and other parties-in-interest, including the cancelation of the related Open Trades, the withdrawal of claims by GE against the Debtors, the integration of the MPA, and the withdrawal of certain motions by both GE and the Debtors as they related to the subject Open Trades.  In connection therewith, on behalf of the Committee Milbank filed a statement in support of the stipulation and settlement [Docket No. 6301], which were approved by the Court [Docket No. 6331].

109.  **Field Point**.  In addition, Milbank reviewed and analyzed the proposed settlement of a dispute between the Debtors and Field Point I.V. S.a.r.l. ("Field Point") regarding the Debtors' proposed assumption of certain Open Trades that required LCPI to sell certain debt interests to Field Point.  Pursuant to the proposed settlement, among other things, the parties agreed to the performance of the Open Trades for a certain discounted price and the withdrawal of Field Point's prior objection to the Open Trades Motions.  On behalf of the Committee,

Milbank reviewed and analyzed the terms of the settlement between the parties, which subsequently was approved by the Court [Docket No. 5547].

110.    **SPV Transactions**.  Moreover, the Loan Book Subcommittee reviewed several structured finance vehicles established by the Debtors, including: (i) a collateralized loan obligation with Pine CCS, Ltd. ("Pine") as the issuer; (ii) a collateralized loan obligation with Spruce CCS Ltd. ("Spruce") as the issuer; (iii) a collateralized loan obligation with Verano CCS Ltd. ("Verano") as the issuer; and (iv) a statutory trust, Restructured Asset Securities with Enhanced Returns Series 2007-7-MM Trust (the "RACERS MM Trust").  In that connection, Milbank analyzed the governing documents of Pine, Spruce and Verano and reviewed the transfers of cash, notes and other assets to determine if there were any possible claims for avoidance.  In connection with the RACERS MM Trust, Milbank reviewed and analyzed the motion filed by LBHI and LCPI seeking to terminate and/or amend certain of the governing documents and remove U.S. Bank National Association as Indenture Trustee, Owner Trustee, Custodian and Administrator & Paying Agent for the RACERS MM Trust [Docket No. 10464].

111.    **Tribune**.  Milbank also analyzed issues related the chapter 11 cases of the Tribune Company and its related subsidiaries (collectively, "Tribune"), with which LCPI has an approximately $200 million participation in certain senior loan indebtedness.  As such, Milbank evaluated, among other things, (i) the potential avoidance of obligations owing to lenders such as LCPI, and (ii) whether, assuming such obligations were avoided, such lenders could enforce contractual payment sharing provisions against co-lenders whose claims were not avoided. Additionally, Milbank monitored the Tribune chapter 11 cases and provided analyses to the Committee of the competing plans of reorganization in those cases, the effect of such plans on LCPI's participations, and various other issues that might have an effect on LCPI's position.

112. **Frasier Sullivan**.  As discussed above, Milbank, together with Houlihan,
evaluated various options proposed by the Debtors to facilitate the management and
monetization of the Loan Book.  One such option related to the possible engagement of a
portfolio manager with broader and more diverse capabilities to monetize the Loan Book using
methods not available to the Debtors.  On July 27, 2011, the Debtors filed a motion (the "CLO
Motion") seeking approval of an asset management agreement, which provided for (i) the
Debtors to hire Fraser Sullivan Investment Management ("Fraser Sullivan") to manage certain
commercial loans (the "Commercial Loan Portfolio"), and (ii) the Debtors to sell commercial
loans to issuers of collateralized loan obligations ("CLOs"), as and when the Debtors and Fraser
Sullivan determined it was appropriate, and to take all other actions necessary, and pay all other
fees and expenses necessary to structure, create and market the CLOs [Docket No. 18810].  On
behalf of the Committee, Milbank drafted a statement in support of the CLO Motion indicating
that the Committee supported the relief requested in the CLO Motion and agreed with the
Debtors that the engagement of Fraser Sullivan to administer the Commercial Loan Portfolio was
in the best interests of the Debtors' estates and their creditors [Docket No. 19221].  On August
17, 2011, the Court approved the relief requested in the CLO Motion [Docket No. 19324].

**Q.      Domestic Bank and Related Regulatory Issues**

113.      During the Chapter 11 Cases, Milbank expended considerable time
analyzing issues related (i) Aurora Bank FSB ("Aurora"), formerly known as Lehman Brothers
Bank, FSB, a federally chartered thrift headquartered in Delaware and overseen by the Office of
Thrift Supervision (the "OTS"), and (ii) Woodlands Commercial Bank, formerly known as
Lehman Brothers Commercial Bank ("Woodlands" and, together with Aurora, the "Banks"), a
Utah industrial bank overseen by the Federal Deposit Insurance Company (the "FDIC," together

with the OTS, the "Regulators").  Due to a number of factors, capital levels at the Banks dropped

below levels generally considered adequate by the Regulators.  As a result, the Regulators

indicated that, unless LBHI took action to support the capital levels at the Banks, they would

seize the Banks and liquidate their respective assets.  Because the Committee's financial advisors

agreed with the Debtors that significant value could be recovered if the Banks' capital and

liquidity issues could be successfully addressed, the Committee supported the Debtors' efforts to

preserve value at the Banks.

114.    Throughout the Chapter 11 Cases, Milbank worked with the Debtors and

the Committee's financial advisors to improve the capital levels at the Banks, avoid potential

seizures and liquidations by the Regulators, and facilitate the resumption of depository functions

at the Banks to preserve and maximize value.  In connection therewith, the Committee

established a subcommittee (the "Bank Regulatory Subcommittee") to analyze the Banks and the

financial and regulatory issues affecting them, and to work with the Debtors to restructure the

Banks.  In connection with the Bank Regulatory Subcommittee, Milbank actively monitored

developing legal and regulatory changes and analyzed various governmental programs, including

the Public-Private Investment Program.

115.    Milbank also worked cooperatively with the Debtors in attempting to

structure solutions to the various issues confronting the Banks, including meeting with the

Regulators to discuss the Banks' alternatives and to negotiate a mutually acceptable solution to

the Banks' regulatory issues.  In that connection, Milbank expended significant time and effort

analyzing the potential value to the Debtors' estates of making capital infusions into the Banks

through a series motions filed by the Debtors to improve the Banks' respective capital positions

to levels the Regulators would find acceptable.  In addition, the Committee's advisors worked

closely with the Debtors and their advisors on finalizing the terms of settlements with the

Debtors and the Banks to achieve the approval of the Regulators to resume normal profit-

generating banking and lending operations.  On September 1, 2010, the Debtors filed motions

seeking approval of such settlements [Docket Nos. 11141, 11142] (together, the "Bank

Settlement Motions").  Milbank analyzed the terms of the settlements and discussed with the

Committee the effect they would have on the potential recovery for creditors in the Chapter 11

Cases.  On behalf of the Committee, Milbank drafted and filed a statement in support of the

Bank Settlement Motions and the settlements contemplated thereby [Docket No. 11470], which

were subsequently approved by the Court and finally executed on November 30, 2010 [Docket

Nos. 11566, 11535].

116.    Subsequent to the granting of the Bank Settlement Motions, Milbank

continued to work with the Debtors on the implementation of the settlements, including through

commencement of a sale process for Aurora and the wind down of Woodlands.  In addition,

Milbank reviewed issues in connection with the commencement of a loan modification litigation

against Aurora.

**R.    International Insolvency Matters**

117.    During the Chapter 11 Cases, Milbank attorneys and paraprofessionals

across various jurisdictions monitored and coordinated with each other, the Debtors, and third

party administrators regarding the status of the Foreign Proceedings in the United Kingdom,

Hong Kong, Japan, France, the Netherlands, Switzerland, Germany, Australia, Singapore, Korea,

the Philippines, China, Cayman Islands, Luxembourg, Taiwan, and Bermuda, among others.

Milbank provided regular updates to the Committee regarding the Foreign Proceedings.

118.    **Multilateral Protocol**.  Milbank also worked with the Debtors and the Foreign Administrators developing protocols that culminated with the adoption of the Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies (the "Protocol").  The Protocol was designed to facilitate the coordination of the U.S. and Foreign Proceedings, and to enable the respective courts and administrators to cooperate in the administration of all proceedings in the interest of the Debtors' creditors, and all of Lehman's creditors worldwide.  By motion, dated May 26, 2009 (the "Protocol Motion"), the Debtors submitted the proposed Protocol for approval by this Court.  At the request of the Committee, Milbank prepared and filed a statement in support of the Protocol Motion [Docket No. 3896], which was approved by the Court on June 17, 2009.  Subsequent to its approval, Milbank participated in the quarterly meetings of the signatories of the Protocol, engaging with the Foreign Administrators to understand their concerns regarding issues in the Chapter 11 Cases, including the Plan.

119.    Furthermore, Milbank worked closely with the Debtors' counsel and the Committee's financial advisors concerning the development and implementation of numerous settlement agreements with the Foreign Affiliates located in the UK, Hong Kong, Japan, the Netherlands, Luxembourg, Singapore, Germany, the Netherlands Antilles and Bermuda.  In connection therewith, Milbank reviewed and commented on numerous drafts of the settlement agreements, researched relevant factual and legal issues implicated thereby, communicated with the Committee's financial advisors and Debtors' counsel, and presented the settlements and any relevant legal issues to the Committee.  In each such instance, based on the foregoing analyses and discussions with the Committee, the Committee concluded that the settlements were in the best interests of the Debtors and supported the Debtors' entry into such settlements.

120.    **Asia Issues**.  Due to the size and complexity of issues related to insolvency proceedings commenced against the Foreign Affiliates in Asia (the "Asian Proceedings"), the Committee established a subcommittee (the "Asia Subcommittee") to monitor, review and analyze issues specific to the Asian Proceedings.  The Asia Subcommittee held regular meetings at the outset of these cases to address and make recommendations to the full Committee regarding the Asian Proceedings, and specifically Project Lavender – involving the sale of certain real estate assets in Japan.  After the close of this sale, Milbank continued to monitor the Civil Rehabilitation Proceedings for the Foreign Affiliates in Japan (collectively, the "Japan Debtors"), including the appeal to the Tokyo High Court of the approval of the civil rehabilitation plans that provided for reduced distributions certain creditors, including LBHI, and the dispute involving Sunrise Finance Co., Ltd. ("Sunrise"), a foreign affiliate under administration in Japan, whereby Shinsei Bank, Ltd. proposed a competing plan of liquidation that subordinated the recoveries of LBHI, among others.

121.    Milbank also devoted significant time analyzing the issues in connection with the claims asserted among the Debtors and their Hong Kong affiliates (collectively, the "HK Debtors"), culminating in the Debtors' settlement with the HK Debtors, which was incorporated into the Plan.

122.    **German Bank Issues**.  Bankhaus is a wholly owned subsidiary of LBHI, and on November 13, 2008, the Frankfurt Local Court (*Amtsgericht*) commenced formal insolvency proceedings against Bankhaus.  On April 29, 2009, Bankhaus filed with the Court a petition under chapter 15 of the Bankruptcy Code.  Throughout these cases, Milbank analyzed numerous issues relating to Bankhaus's intercompany claims against the Debtors and the parties' disputed ownership of certain commercial real estate loans.  In connection therewith, Milbank

worked with the Debtors and Houlihan to negotiate and draft the terms of a settlement

agreement, which provided for, among other things, the Debtors' purchase of the disputed loans

from Bankhaus at a discount, thereby resolving the ownership dispute and settling certain of the

intercompany claims. On behalf of the Committee, Milbank drafted and filed a statement in

support of the Debtors' motion for approval of the settlement agreement with Bankhaus [Docket

No. 6414], which the Court approved on January 14, 2010 [Docket No. 6665].

123.    Later in these cases, as part of Milbank's participation in the negotiations

between Bankhaus and certain of the Debtors, Milbank reviewed and commented on successive

drafts of two proposed note purchase agreements (the "Note Purchase Agreements"), pursuant to

which LBHI agreed to purchase certain notes from Bankhaus. Following these negotiations, the

Debtors filed a motion seeking approval of the Note Purchase Agreements [Docket No. 14743].

After Milbank reviewed and analyzed the relevant issues in connection with the motion, the

Committee determined that the Note Purchase Agreements would maximize recoveries to

unsecured creditors of LBHI and LCPI. Accordingly, Milbank filed a statement in support of the

Debtors' entry into the Note Purchase Agreements [Docket No. 15020]. The Court ultimately

agreed with the Debtors and the Committee, and approved the Note Purchase Agreements

[Docket No. 15278].

124.    **Netherlands Issues**. Prior to the Petition Date, pursuant to certain

agreements, LBHI purportedly assumed guarantee obligations in respect of the payment of

principal and interest under certain notes issued by LBT (the "LBT Notes"). In connection with

the analysis of claims asserted against LBHI arising from the LBT Notes, Milbank researched

and prepared memoranda regarding (i) potential special treatment of the LBT Notes under

foreign law, (ii) the procedures for filing proofs of claim in respect of the LBT Notes, and (iii)

the enforceability of LBHI's guarantee and indemnity obligations in connection with the LBT Notes. Milbank also evaluated the Debtors' proposed treatment under the Plan of LBT's claims and those of the holders of the LBT Notes and the settlement with LBT regarding the allowed amount of such claims.

125. **Bermuda Issues**. On August 6, 2009, Lehman Re, LBHI's affiliate under liquidation in Bermuda, filed a petition in this Court seeking (i) recognition of the Bermuda proceeding under chapter 15 of the Bankruptcy Code and (ii) among other related relief, pursuant to sections 1520 and 1521 of the Bankruptcy Code, (a) issuance of a permanent injunction staying all actions against Lehman Re or in respect of its property, and (b) authority for the Bermuda court-appointed liquidators to investigate, protect, control, and administer Lehman Re's U.S. assets. Milbank, among other things, monitored developments in Lehman Re's chapter 15 case, and analyzed the Debtors' motion seeking approval of a settlement among LBHI, LCPI, LALI and Lehman Re. Pursuant to this settlement, Lehman agreed to execute and deliver to Lehman Re certain assignment documents with respect to certain mortgage loans and confirm that Lehman Re is the sole owner thereof, and, in exchange, Lehman Re agreed to assume Lehman's future funding obligations under the mortgage loans and advance the sum of $1 million. In addition, Milbank reviewed and analyzed issues in connection with the Debtors' proposed settlement of the claims asserted by Lehman Re against LBHI, which settlement was incorporated into the Plan.

126. **Switzerland Issues**. On December 22, 2008, LBF, a Swiss affiliate wholly-owned by LBHI, became the subject of a Swiss *Bankenkonkurs*, or bank/security dealer bankruptcy proceeding (the "Swiss Proceeding"). LBF and the Debtors filed numerous claims against each other that, despite negotiations, they were unable to resolve. As a result of this

ongoing dispute, and because LBF's claim aggregate over $15 billion, Milbank spent significant

time analyzing the legal issues affecting LBF's claims, including the enforceability of the general

guaranty upon which the bulk of LBF's claims were based and whether LBHI could use its claim

against LBF as a setoff.  Such analyses aided in the Committee's determination that LBF's

claims were significantly less than the amount asserted by LBF.  As a result, on behalf of the

Committee, Milbank prepared and filed a statement in support of the Debtors' motion to estimate

LBF's claims for the purpose of establishing reserves [Docket No. 24611].  On January 26, 2012,

the Court ruled that it would estimate LBF's claims at $3 billion for purposes of reserves.

127.    **UK Issues**.  On September 15, 2008, LBIE, along with several other

British subsidiaries and affiliates of the Debtors, were placed into insolvency administration (the

"UK Administration") in the UK and the UK High Court appointed PricewaterhouseCoopers

LLP, as joint administrators (the "Joint Administrators").  Throughout the Chapter 11 Cases,

Milbank monitored developments in the UK Administration, conferred with professionals

involved in the UK Administration and delivered memoranda to the Committee with regard

thereto.  In particular, Milbank performed extensive legal research into the provisions and

practical mechanics of the administration process under English law.  In addition, Milbank

monitored and provided updates and analyses to the Committee on various issues in connection

with the UK Administration including the LBIE Trust Asset Scheme of Arrangement, the

alternative trust asset contractual solution, the Client Money directions hearing, the Joint

Administrators' Progress Reports, the LBIE Global Status hearing, the Trust Asset Bar Date and

distribution process, the RASCALS hearing, the Client Money appeal, and the Lehman Brothers

Asset Management (Europe) Limited disposal.

64

128.    In addition, Milbank analyzed and engaged in discussions with the

Debtors' counsel regarding the appropriate treatment of LBIE's guarantee claims against LBHI.

In connection therewith, Milbank advised the Committee as to LBIE's ability to enforce general

guarantees issued by LBHI and whether LBHI has rights of indemnity, subrogation or

contribution arising from LBHI's payments on account of LBIE's creditors' guarantee claims.

As part of its review of LBIE's claims against the Debtors, Milbank also researched and

analyzed legal issues in connection with (i) the agreement, dated November 1, 2000, entered into

by LBIE and LBHI, which purports to give LBIE the right to assign any receivable it may have

from LBI to LBHI in respect of indebtedness LBIE may have to LBHI; and (ii) the side letter

agreement dated July 24, 2006, entered into by LBIE and LBSF, relating to transactions between

LBIE and LBSF for which LBIE has offsetting transactions on identical terms with clients,

leaving LBIE with no market positions risk.  As a result of the Committee's in depth analysis

regarding LBIE's claims, Milbank, on behalf of the Committee, participated in a multi-day

settlement conference between the Debtors and LBIE that culminated in a settlement of all the

claims asserted among the Debtors and LBIE.

**S.**    **Non-Derivative Automatic Stay/Safe Harbor Issues**

129.    During the pendency of the Chapter 11 Cases, Milbank reviewed

numerous motions filed by parties in interest seeking to lift the automatic stay in order to enforce

various contractual agreements or otherwise exercise rights against the Debtors' estates.

130.    **DnB Lift Stay Motion**.  In particular, Milbank reviewed the motion (the

"DnB Motion") filed by DnB Nor Bank ASA ("DnB"), in which DnB (i) sought relief from the

automatic stay to exercise its right to set off funds in a deposit account that LBHI maintained at

DnB (the "DnB Account") against amounts allegedly owed to it by LBHI under a certain

revolving credit facility between DnB, as lender, and LBHI, as borrower; (ii) sought, in the alternative, adequate protection of its interest in the funds in the DnB Account [Docket No. 465]. Agreeing with the Debtors that the requested setoff was improper, Milbank drafted and filed a joinder to the Debtors' objection to the DnB Motion [Docket No. 1336], which it later supplemented through additional briefing. On May 12, 2009, the Court entered a memorandum decision denying DnB's request on the basis that the debts that DnB sought to set off were not mutual, as the Debtors and the Committee contended [Docket No. 3551]. DnB subsequently appealed this Court's decision, which appeal was settled out of court. On March 22, 2010, the Court entered an order approving the settlement and dismissing the appeal [Docket No. 7694].

131. **Merrill Lynch**. Milbank also analyzed the motion of Merrill Lynch International ("Merrill") seeking relief from the automatic stay to deliver notices of acceleration ("Notices") for certain LBT Notes that were purportedly guaranteed by LBHI [Docket No. 5958]. Milbank prepared and filed a joinder to the Debtors' objection to Merrill's motion arguing the Committee's position that Merrill failed to sufficiently demonstrate cause to lift the stay [Docket No. 6138]. Milbank subsequently played a leading role in negotiating an agreed form of order granting Merrill certain limited relief from the automatic stay but preserving all other rights, claims, and defenses held by the Debtors and the Committee with respect to further relief from the automatic stay [Docket No. 7691].

132. As a result of Merrill's motion, the Debtors filed a motion seeking to modify the automatic stay to permit all holders of the LBT Notes (the "Holders") to deliver Notices to LBHI to accelerate the Holders' claims against LBT in LBT's insolvency proceeding (the "Motion to Allow Acceleration Notices") [Docket No. 8753]. Milbank played a central role in negotiating an agreed form of order and filed, on behalf of the Committee, a statement in

connection with the Motion to Allow Acceleration Notices [Docket No. 9525]. The statement asserted that the motion proposed a reasonable solution to one of the challenges resulting from inconsistencies between Dutch and American laws and that the relief requested by the Debtors should avoid substantial administrative costs to LBHI's estate, while permitting the Holders to pursue their claims.

133.   **Calpers**.  In addition, Milbank analyzed the issues presented in the motion of California Public Employees Retirement System ("CalPERS") for relief from the automatic stay to effect a setoff [Docket No. 4963].  CalPERS sought to set off a debt that it owed to LBSF under a swap agreement against a prepetition claim that CalPERS asserted against LBHI on account of certain unsecured bonds issued by LBHI.  In connection therewith, Milbank drafted and filed on behalf of the Committee a joinder to the Debtors' objection to CalPERS' motion [Docket No. 5944].  After hearing oral arguments on the matter, the Court entered an order denying the relief requested by CalPERS [Docket No. 7049].

134.   **Latshaw**.  Finally, Milbank monitored the disputes among LCPI, Latshaw Drilling Company, LLC and Latshaw Drilling & Exploration Company (together, "Latshaw") regarding (i) an adversary proceeding in Latshaw's chapter 11 cases related to LCPI's claims against Latshaw for amounts owed to LCPI under a prepetition credit agreement; (ii) the Debtors' objection to Latshaw's claim against the Debtors' estates for LCPI's alleged failure to fund under that same credit agreement; and (iii) the Debtors' claim against Latshaw in Latshaw's chapter 11 cases in the United States Bankruptcy Court for the Northern District of Oklahoma (the "Latshaw Bankruptcy Case").  Milbank analyzed the Latshaw Objection and the Latshaw Stipulation, researched the "defensive" use of the automatic stay and worked with the Debtors to revise the Latshaw Stipulation to ensure that the Debtors' rights were protected and that their

67

estates were not adversely affected.  In an effort to resolve their disputes, LCPI and Latshaw

sought approval of a stipulation and agreement (the "Latshaw Stipulation") lifting the automatic

stay in LCPI's chapter 11 case for the limited purpose of permitting Latshaw's objection to

LCPI's claim against Latshaw in the Latshaw Bankruptcy Case (the "Latshaw Objection")

[Docket No. 9738].  The Court approved the Latshaw Stipulation on July 13, 2011 [Docket No.

10171].

135.    Subsequent to the entry of the Latshaw Stipulation, the parties prepared

for trial on the Latshaw Objection in the Latshaw Bankruptcy Case while also engaging in

informal settlement discussions, in which Milbank participated.  Such discussions ultimately

resulted in a settlement resolving all outstanding disputes among Latshaw and LCPI.  Milbank

reviewed the proposed settlement and, on behalf of the Committee, drafted a statement in support

of the settlement [Docket No. 17593] indicating the Committee's conclusion that such settlement

imposed minimal costs on LCPI's estate in exchange for obviating the need to litigate issues

relating to such matters as solvency in a "foreign" court.  The Court ultimately approved the

relief requested in the Latshaw Motion [Docket No. 17761].  The settlement was further

approved by the bankruptcy court in the Latshaw Bankruptcy Case.

**T.    Asset Sales/363 Issues**

136.    Milbank reviewed and analyzed numerous transactions during the Chapter

11 Cases, including sales of the Debtors' broker-dealer operations, investment management

division, overseas assets, back office operations in India, and other numerous individual assets

and contracts.  Given the dramatic commencement of the Chapter 11 Cases, certain of the

Debtors' assets faced severe deterioration in value if not promptly sold.  Milbank worked to

maximize the value of these assets by both zealously advocating the interests of unsecured

creditors of each of the Debtors and working cooperatively with the Debtors to prevent

deterioration in value occasioned by delay.  In that connection, Milbank drafted and

disseminated memoranda to the Committee analyzing proposed transactions and providing

recommended courses of action.  In addition, Milbank regularly updated the Committee with

respect to the material terms of bids received and the status of the sale processes.

137.    **LBI**.  On September 17, 2008, the Debtors filed a motion to establish sale

procedures and schedule a final sale hearing with respect to the sale (the "Barclays Sale") of the

assets of LBI, the Debtors' North American capital markets business, to Barclays Capital, Inc.

("Barclays Capital").  Given the extraordinary nature of the sale transaction, Milbank worked

around the clock with Houlihan to, among other things, review the transaction documentation

and sale procedures, analyze the financial merits of the sale, analyze legal issues associated with

the sale, evaluate the proposed closing conditions, advise the Committee with respect to the

foregoing, and prepare for the hearing.

138.    Following the approval of the Barclays Sale, Milbank continued to work

on matters related to the transaction to ensure that the rights of the Debtors' unsecured creditors

were protected to the fullest extent possible.  Milbank participated in the drafting of the transition

services agreement with Barclays Capital (the "Barclays TSA"), the effective implementation of

which, given the interrelatedness of the Debtors' operations, was of particular importance to the

Committee and to unsecured creditors generally.  In that connection, Milbank worked diligently

to monitor and assess compliance with the Barclays TSA through numerous meetings, telephonic

conferences and correspondence.

139.    Following the expiration of the Barclays TSA, Milbank played a role in

the Debtors' efforts to retain a data processing and workflow automation consultant on a

69

permanent basis.  In August 2009, the Court approved the retention of Omnium LLC (formerly

Citadel Solutions LLC, "Omnium") on an interim basis [Docket No. 4988], as negotiations for a

final agreement continued.  Milbank spent considerable time analyzing the terms of the final

agreement with Omnium, working in close communication with Debtors' counsel.  In March

2010, the Court approved the final retention of Omnium [Docket No. 7812].

140.    **Neuberger**.  In connection with the sale of Neuberger, Milbank, together

with the Houlihan and FTI, consulted extensively with the Debtors and regarding the initial bid

for the Neuberger assets by Bain Capital Group and Hellman & Friedman (the "Neuberger

Stalking Horse Bid").  Milbank was instrumental in negotiating more favorable bidding

procedures, including a significantly reduced break-up fee, compared to the terms initially

contemplated by the Neuberger Stalking Horse Bid.  In the weeks following the Court's approval

of the Neuberger Stalking Horse Bid, it became clear that the Neuberger Stalking Horse Bid

would not be in the best interests of the Debtors' estates.  Thus, Milbank and Houlihan worked

extensively to structure an alternative transaction pursuant to which Neuberger management

would acquire a significant equity interest in the Neuberger business, with LBHI retaining the

rest (the "Neuberger Management Bid").  Milbank attended the auction for the Neuberger assets

and approved the Debtors' selection of the Neuberger Management Bid as the successful bid.

Following the closing of the sale, Milbank continued to work with the Debtors in drafting the

documentation that governs the operation of the Neuberger business.  Milbank's efforts on behalf

of the Committee resulted in a significant value enhancement to the Debtors' estates.

141.    Three years later, it was again the Committee and its advisors that led

efforts to monetize Lehman's 49% stake in Neuberger.  Since late 2010, Lehman and Neuberger

had been exploring alternatives to monetize either a portion or all of Lehman's investment in

Neuberger, including, but not limited to, a partial or full recapitalization of Neuberger and a management buy-out of Lehman's positions.   In the summer of 2011, Lehman and Neuberger reached agreement on a structure, which contemplated a pay down of Lehman's $814 million of preferred units at closing and a gradual buy-out of Lehman's common Class A units over time (the "NB Transaction").   Total consideration to the Debtors' estates was more than $100 million greater than provided for in the Debtors' Disclosure Statement.

142.    Subsequent to the filing of the motion seeking approval of the NB Transaction, certain parties in interest, including the Ad Hoc Group, among others, voiced concerns over the structure and terms of the NB Transaction.   The Committee and its advisors took the lead in forging consensus among the parties, participating in numerous and lengthy negotiations with the Debtors, Neuberger, and the objecting creditors.   These negotiations yielded certain additional benefits to the Debtors' estates and creditors, including, among other things:  (i) the amount of common units to be purchased from the Debtors' estates as part of the NB Transaction was reduced from 20% to 10% of total Neuberger common units, and only 50% of the initial common unit purchases could be made using debt; (ii) the rebate of a portion of the 2011-2012 preferred units return to be remitted to Neuberger was eliminated; (iii) the Debtors received a 2.5% special return (approximately $20 million) on the preferred units at closing; (iv) the 20% discount against equity value paid for the Debtors' shares was reduced to 17.5%; (v) the inclusion of a $125,000 cap on Neuberger's valuation agent's fees; and (vi) the final exit/forced IPO rights were moved up from April 2018 to April 2017.

143.    The Committee, through the involvement of Milbank and its financial advisors, played a role in every aspect of the negotiations between Lehman and Neuberger. Milbank fully analyzed and evaluated the terms of the NB Transaction and, based on such

detailed analysis, aided the Committee in its determination that the proposed transaction was fair,

reasonable and within the Debtors' sound business judgment.   Accordingly, on behalf of the

Committee, Milbank filed a statement in support of the transaction [Docket No. 23212], which

the Court ultimately approved [Docket No. 23348].

144.    **Eagle Energy Sale**.  Early in these cases, Milbank spent considerable time

in connection with the sale of the general and limited partnership interests in Eagle Energy

Partners I, L.P. ("Eagle Energy") and the associated transfer of intercompany indebtedness and

an office lease.  Milbank analyzed the terms of the draft purchase agreement and related ancillary

documents.  Milbank also conducted due diligence to confirm the need for an expedited sale

process and analyzed various legal issues associated with the sale.  Through Milbank's efforts, a

purchase agreement was entered into on September 26, 2008, thereby preserving value for the

benefit of the Debtors' estates.

145.    **Other Asset Sales**.  During the pendency of the Chapter 11 Cases,

Milbank worked on several other asset sales involving the Foreign Affiliates, aircraft, and other

assets.  In that connection, Milbank worked with the Committee's financial advisors, and the

Debtors to identify potential purchasers, negotiate the terms and conditions of purchase

agreements and related transaction documents and advise the Committee on the legal issues

implicated by such transactions.

U.    **Plan of Reorganization/Plan Confirmation/Plan Implementation**

146.    **Substantive Consolidation**.  In connection with the development of a

workable plan of reorganization for the Debtors, Milbank produced a comprehensive analysis of

the potential for substantive consolidation in the Debtors' estates.  In preparing such analysis,

Milbank conducted in-depth research regarding the doctrine of substantive consolidation and

72

analyzed the applicability of the principles articulated in such cases to the facts and

circumstances of the Chapter 11 Cases.  In that connection, Milbank conducted extensive factual

research regarding the inter-relatedness of the Debtors and creditors' reliance thereon, reviewing

documents produced by the Debtors and interviewing creditors.  In addition, Milbank met with

and reviewed white papers from various creditors and creditor groups regarding substantive

consolidation in the Chapter 11 Cases.  Taking into account these differing positions, Milbank

and Houlihan analyzed various scenarios that would serve to settle the issues of substantive

consolidation and had numerous meetings with the Debtors and certain creditor groups with

respect thereto.

       147.  **The First Amended Plan**.  Taking into account the often disparate

opinions of the various creditor groups in these cases, following the filing of the Debtors' Initial

Plan, Milbank assisted the Committee in developing an alternative framework for the plan of

reorganization.  In that connection, Milbank researched and analyzed the various inter-Debtor,

Debtor-creditor, and inter-creditor issues affecting the Chapter 11 Cases, and the feasibility of a

compromise and settlement of such issues.  This analysis led to the formulation of a proposal

(the "Committee Proposal"), premised on a global compromise that addressed the legal risk of

substantive consolidation, the legal risk of the recharacterization of intercompany claims as

equity, challenges to the enforceability of guarantee claims, the unique legal risks facing holders

of claims on account of securities issued by certain of the Foreign Affiliates, and the inter-Debtor

issues concerning the ownership of certain assets.  The Committee Proposal was incorporated the

Debtors' First Amended Plan, which the Debtors filed on January 25, 2011, with the support of

the Committee.

148.    **Plan Discovery Protocol**.  In response to the document request served by the Ad Hoc Group of Lehman Brothers Creditors (the "Ad Hoc Group") seeking discovery on issues related to the Debtors' First Amended Plan, Milbank, the Debtors and certain other creditor groups sought to develop a comprehensive protocol by which creditors could take discovery on plan-related matters (the "Plan Discovery Protocol").  The Plan Discovery Protocol was intended to ensure that the Debtors' unsecured creditors had access to adequate information so that, with proper confidentiality restrictions in place, they could review the pertinent information to make informed decisions on plan issues [Docket No. 16003].

149.    Following the approval of the Plan Discovery Protocol, the Committee was appointed as the Designated Party and in such role, Milbank was responsible for performing the Committee's responsibilities as a facilitator and intermediary for Discovery Requests.  In that connection, Milbank analyzed each of the competing disclosure statements and plans of reorganization to prepare preliminary suggested document requests related to plan issues.  In addition, Milbank reviewed and compiled discovery requests, numbering close to 900, to be served on the Debtors on behalf of numerous creditors and creditor groups.  Milbank also convened a "meet and confer" to discuss such requests and coordinate a streamlined process for the Debtors' response thereto.  Such work continued until the time that this Court entered the Order Granting Debtors Motion for (i) Approval of Stipulation and Order Regarding Chapter 11 Plans and (ii) Stay of Related Discovery [Docket No. 18686].

150.    **The Second Amended Plan**.  Following its filing, Milbank and the Committee's financial advisors worked closely with the Debtors to reach consensual agreements with various of the domestic and foreign creditor groups regarding their potential objections to the Debtors' First Amended Plan.  Milbank and the Committee's financial advisors met with

various creditor groups to discuss each group's position on the Debtors' First Amended Plan, and

alternative proposals to settle certain issues that arose in connection with plan negotiations,

including substantive consolidation, the reconciliation of intercompany and guarantee claims,

and the treatment of claims arising from the structured notes issued by LBHI, LBT and LBSNV.

Milbank also reviewed and analyzed the Ad Hoc Plan and the Non-Con Plan, and regularly

convened with the proponents of these plans, among other creditor groups, to discuss their terms.

These efforts culminated in a series of meeting that took place in June, 2011 among the Debtors,

the Committee's advisors, many of the proponents of the Ad Hoc Plan and the Non-Con Plan

and certain other interested parties to negotiate and ultimately reach consensus on a plan of

reorganization.  In addition to taking part in each of these meetings, Milbank also participated in

numerous meetings and teleconferences with the individual participants, working to find

common ground among the often divergent interests of these creditors.  Throughout this process,

Milbank ensured that the Committee was kept abreast of all developments regarding these

negotiations and that the interests of all unsecured creditors were fully protected under the terms

of the resultant plan of reorganization.  Such efforts ultimately led to the formulation of the

Debtors' Second Amended Plan, filed on June 30, 2011.

   151. **The Plan**.  Following the filing of the Debtors' Second Amended Plan,

Milbank continued to work on the implementation of its corporate governance provisions, which

provided for, among other things, the formation of a committee (the "Director Selection

Committee") to select LBHI's post-Effective Date board of directors.  In that connection,

Milbank convened numerous meetings relating to the formation and mandate of the Director

Selection Committee and aided its members in the execution of their duties.

152.    Milbank also devoted significant time and effort to the process for confirmation of the Plan.  In preparation for the Confirmation Hearing, Milbank (i) reviewed and commented on the documents contained in the Plan Supplement; (ii) analyzed numerous objections to confirmation of the Plan and consulted with the Debtors on responses to and resolutions of such objections; and (iii) researched several legal elements essential to confirmation pursuant to section 1129 of the Bankruptcy Code and other applicable law.  On behalf of the Committee, Milbank filed the Statement of Official Committee of Unsecured Creditors (i) in Support of Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors and (ii) in Response to Objections to Such Plan [Docket No. 22773].  Milbank's efforts played a significant part in the Court's confirmation of the Plan on December 6, 2011.

153.    After the Plan was confirmed, Milbank continued to work to ensure that its terms were implemented and distributions to creditors were effected and maximized.  In that connection, Milbank analyzed LBHI's motion for authority to use non-cash assets in lieu of available cash as reserves for disputed claims pursuant to Section 8.4 of the Plan [Docket No. 24726] (the "Reserve Motion").  Milbank researched relevant legal issues, drafted a memorandum to the Committee analyzing the merits of the Reserve Motion, and provided a recommended course of action.  On behalf of the Committee, Milbank drafted a statement in support of the Reserve Motion [Docket No. 25546] indicating the Committee's agreement with the Debtors that the Reserve Motion reflected a mechanism by which holders of allowed claims would receive the maximum permissible distribution under the Plan, while protecting the rights of other claimants.  On February 22, 2012, the Court entered an order approving the Reserve Motion [Docket No. 25641].

76

## V.    <u>Disclosure Statement/Solicitation/Voting</u>

154.    In connection with the filing of the Disclosure Statement, Milbank researched and analyzed numerous legal issues related to (i) the motion for approval of the Disclosure Statement, (ii) the Debtors' proposed solicitation and voting procedures and (iii) potential deficiencies in the Disclosure Statement in light of the disclosures required under section 1125 of the Bankruptcy Code.  Milbank also expended considerable time and effort working with the Debtors to analyze and respond to objections that were filed in opposition to approval of the Disclosure Statement.  In connection with these efforts, Milbank prepared and filed on behalf of the Committee a statement in support of approval of the Disclosure Statement, which noted, among other things, that the Committee concluded that the Disclosure Statement, as amended in response to the objections filed by various objecting parties in interest and updated to reflect certain developments, provided adequate information to allow any creditor to make an informed decision with respect to the Plan [Docket No. 19459].  Milbank also participated in the hearing before this Court to consider the adequacy of the Disclosure Statement and voting procedures.  On September 1, 2011, this Court approved the Disclosure Statement [Docket No. 19579].

155.    Thereafter, on September 9, 2011, the Debtors filed a motion for approval of a modification to the Disclosure Statement [Docket No. 19813], which sought to amend the description of the types of claims included in LBHI Class 5.  Milbank researched the legal and factual issues raised by such motion and, on behalf of the Committee, filed a statement in connection with motion noting, among other things, that while the potential reclassification impacted the recoveries of the applicable claimants, the Committee's financial advisors had confirmed that the overall impact of such potential reclassification was *de minimis* [Docket No.

19929].  Further, Milbank prepared a letter to the Debtors' unsecured creditors, on behalf of the

Committee, which stated that the Committee supported the Plan and recommended that all

holders of unsecured claims vote to accept the Plan.

**W.**    **Claims Analysis**

156.    **Claims Database**.  At the outset of these cases, Milbank developed an

analytical framework for the review of the Debtors' publicly-traded outstanding debt

instruments.  Such framework was reflected in the operating database ("Database"), which

Milbank continued to expand and refine throughout the pendency of these cases.  Milbank used

the Database to develop and present summary forensic capital structure information to the

Committee and its advisors, as well as to answer individual queries from the Committee and the

Debtors' unsecured creditors about specific Lehman debt instruments.  The Database was also

used to understand the Debtors' and certain Foreign Affiliates' capital structures, review proofs

of claim, establish a basis upon which to determine and validate claim amounts, and analyze

substantive consolidation, intercompany, preference, seniority and other potential issues.  Access

to the Database has proven invaluable to the Committee and its advisors, particularly with

respect to the matters related to the claims reconciliation process and the Plan.

157.    **Bar Date Motion**.  Milbank reviewed the myriad issues raised with

respect to the Debtors' motion (the "Bar Date Motion") to establish the deadline (the "Bar Date")

for filing proofs of claim in the Chapter 11 Cases and establish procedures therefor [Docket No.

3654].  In that connection, Milbank worked with the Debtors and certain parties-in-interest to

cause the proposed procedures for filing proofs of claims to be modified to address concerns

raised by the Committee.  On July 2, 2009, this Court entered an order approving the Bar Date

Motion, and the procedures contained therein for filing proofs of claim [Docket No. 4271], as

modified through the substantial efforts of Milbank in negotiating and brokering a compromise among the Debtors and numerous other parties.

158.     Subsequent to the passage of the Bar Date, numerous claimants filed motions seeking permission to file proofs of claim after the Bar Date.  In connection therewith, Milbank conducted extensive research regarding excusable neglect, the standard for late-filed proofs of claim, and related legal and factual issues.  As a result of such analyses, on behalf of the Committee, Milbank drafted and filed a joinder to the Debtors' objection to the several motions filed by parties seeking to have their late-filed proofs of claim be deemed as timely filed [Docket No. 7544], and took similar positions on the record at the hearings on other similar motions.  On May 20, 2010, this Court issued a memorandum decision denying the motions to file late proofs of claim [Docket No. 9150].

159.     **Bankhaus Claims Classification**.  In January 2010, certain of the Debtors entered into a settlement agreement with Bankhaus (the "Settlement Agreement") that, among other things, fixed the amount of the allowed claims that Bankhaus would have against LBHI and LCPI.  Bankhaus subsequently assigned these claims to a third-party, which then filed a motion seeking the proper classification of such claims under the Plan [Docket No. 20321]. Because of the significant impact that such classification could have on unsecured creditor recoveries, Milbank expended significant time researching and analyzing the terms of the Settlement Agreement and the provisions of the Plan to assist the Committee's understanding of the proper classification of these claims.  On behalf of the Committee, Milbank worked with the Debtors to come to a consensual resolution of this matter.

160.     **Main Street Bondholders Settlement**.  In addition, Milbank conducted research and analyzed issues in connection with the claims arising from a prepetition gas

purchase agreement (the "GPA") that LBCS entered into with Main Street Natural Gas Inc. ("Main Street"), pursuant to which Main Street prepaid LBCS over $680 million for the delivery of natural gas. LBHI guaranteed LBCS's performance under the GPA. To finance this prepayment, Main Street issued a series of bonds with an aggregate face value of over $700 million. The holders of the bonds issued by Main Street (the "Main Street Bondholders") filed claims in the amount of $769 million against LBCS and LBHI. After reviewing the terms of the GPA and the related guarantee and analyzing the relative strengths and weaknesses of the claims and objections thereto, Milbank participated in settlement discussions between the Debtors and the Main Street Bondholders regarding the proper valuation of these claims. Such discussions culminated in a settlement agreement, which the Committee supported by filing a statement [Docket No. 22867], and which this Court approved on December 14, 2011 [Docket No. 23335].

161. **OMX Claims Objection**. On November 10, 2011, LBHI, the Committee, Boise Land & Timber II, LLC ("Boise"), OMX Timber Finance Investments II, LLC ("OMX"), Wells Fargo Bank Northwest, N.A., and certain financial institutions and funds entered into a stipulation (the "Stipulation") concerning the proof of claim filed by OMX (the "OMX Claim") and the disputed portion of the proof of claim filed by Boise (the "Boise Claim"). Milbank analyzed issues raised in connection with the Stipulation and subsequently filed, on behalf of the Committee, a preliminary objection to the OMX Claim and the Boise Claim asserting, among other things, that (i) LBHI had no liabilities under the guaranty at issue because OMX has not served demand notices on LBHI (except to the extent notices may have been served in violation of the automatic stay); and (ii) even if the Court permitted OMX to trigger LBHI's obligations under the guaranty, the OMX Claim was duplicative of the allowed portion of the Boise Claim

[Docket No. 25925].  Subsequent to the filing of this preliminary objection, Milbank, the Debtors, OMX and Boise engaged in settlement discussions.

162.  **RMBS**.  Milbank also assisted in the Debtors' review and reconciliation of the more than $73 billion in claims filed against the Debtors based upon residential mortgage backed securities ("RMBS Claims").  The vast majority of the RMBS Claims are composed of (i) claims filed by the trustees to the RMBS securitizations alleging losses arising from the Debtors' breaches of representations and warranties made in connection with such securitizations (the "Trustee Claims"); and (ii) claims filed by Fannie Mae and Freddie Mac alleging securities laws violations arising from statements made by the Debtors in connection with such securitizations (the "Securities Fraud Claims").  The Trustee Claims were the subject of a hearing held in June 2011, at which the Court refused to sustain the Debtors' objection to such claims and instead urged the parties to work on a negotiated methodology pursuant to which such claims could be valued and ultimately compromised.  Milbank, together with FTI, reviewed the proposed protocol to determine if it would yield allowed claims that fairly represented the Debtors' likely liability.  With respect to the Securities Fraud Claims, Milbank worked with FTI and the Debtors to obtain a better understanding of the statutory bases of, and the ground for potential objection to, such claims.

163.  **Structured Securities Valuation Motion**.  Milbank also analyzed the Debtors' proposed methodology for the valuation of claims arising from certain structured securities issued or guaranteed by LBHI (the "Structured Securities").  The Debtors filed a motion seeking approval of a methodology to value the Structured Securities claims [Docket No. 18127] (the "Structured Securities Motion").  At the direction of the Committee, Milbank, together with FTI, conducted an independent analysis of this methodology and any alternatives

thereto.  As a result of this diligence, the Committee filed a statement in response to the

Structured Securities Motion to provide relevant information regarding the Debtors' valuation

methodologies so that each holder of the Structured Securities could make an informed decision

whether to accept the values of Structured Securities provided by the Debtors [Docket No.

19042].  With additional input from the Committee, the Debtors' amended the methodology,

which this Court approved on August 10, 2011 [Docket No. 19120].  Subsequent to the granting

of the Structured Securities Motion, Milbank continued to work with the Debtors to resolve

outstanding issues regarding the valuation of the Structured Securities claims.

## X.    Other Bankruptcy Motions and Matters

164.    Throughout these cases, Milbank devoted substantial time to researching

and evaluating potential claims on behalf of the Debtors' estates, including voidable transfer

claims.  In particular, Milbank worked with the Debtors, the Debtors' counsel, the Committee's

financial advisors, the Committee's conflicts counsel, the SIPA Trustee and the SIPA Trustee's

advisors to, among other things (i) identify and analyze categories of pre- and postpetition

transfers potentially subject to avoidance and recovery; (ii) analyze the prepetition financial

condition of the Debtors to determine whether the Debtors were insolvent and/or

undercapitalized during any period for purposes of pursuing preference and constructive

fraudulent transfer claims; (iii) investigate and analyze in greater depth particular transfers

identified as potential avoidance targets; (iv) analyze potential legal issues that might arise in

connection with the pursuit of any avoidance actions; and (v) develop litigation strategies.

165.    Milbank analyzed various categories of potentially voidable transfers

based on information provided by the Debtors' advisors and contained the Examiner's Report,

including payments to insiders and vendors, and transfers made in connection with the treasury

and trading activities of the Debtors.  Milbank met and corresponded extensively with the

Committee's financial advisors, and counsel and financial advisors to the Debtors and the SIPA

Trustee to discuss various types of prepetition transfers made by the Debtors, the prepetition

financial condition of the Debtors, various issues relating to the joint pursuit of avoidance actions

by the Debtors and the SIPA Trustee and strategies for sending demand letters and tolling

agreements to and/or filing complaints against transferees.

166.    Milbank also looked into particular transfers in which potential recoveries

for the estates appeared to be substantial, and developed potential theories of recovery for

recovering the value of such transfers.  Through these analyses, Milbank worked with the

Debtors to determine which transfers might create viable causes of action under avoidance and

other theories and which transfers could be eliminated from further consideration.  In particular,

Milbank researched issues such as the general mechanics and legal bases of avoidance actions,

potential recoveries resulting from avoidance actions, legal defenses to avoidance actions,

potentially safe harbored transfers, collateral legal risks of pursuing certain avoidance actions,

Committee standing to pursue avoidance actions and other legal issues that might arise in

connection with particular categories of prepetition transfers.

167.    In addition, Milbank assisted the Debtors' counsel in identifying certain

loan elevations – which were granted by LCPI to certain defendants prior to LCPI's petition date

– as avoidable preferential transfers.  Milbank worked with the Debtors' counsel to recover the

loan elevations by, among other things, analyzing and valuing potential causes of action and

helping the Debtors' counsel frame the issues for the avoidance action proceedings against the

defendants.  As a result of this extensive work, Milbank prepared and filed a motion with the

Court seeking authority to prosecute and, if appropriate, settle such causes of action on behalf of

LCPI [Docket No. 19622] (the "STN Motion").  Upon the granting of the STN Motion, Milbank

reviewed and evaluated the transactional documents relating to the loan elevations, analyzed the

claims and defenses against each of the loan elevation defendants developing settlement

constructs for all, and corresponded with the defendants regarding litigation and/or settlement.

**Y.      Non-Derivative Adversary Proceedings Preparation and Litigation**

168.    Throughout the Chapter 11 Cases, Milbank researched and prepared

memoranda regarding the claims and issues raised by a wide range of pending and potential

lawsuits and settlements impacting the Debtors' estates.  Excluding cases in which the

Committee's interests were represented by conflicts counsel, Milbank monitored developments

in and provided updates in the form of litigation reports and presentations to the Committee with

respect to (i) all pending and potential adversary proceedings commenced, or to be commenced,

in this Court; (ii) prepetition lawsuits commenced against the Debtors and pre- and postpetition

lawsuits against non-Debtor affiliates, officers, directors, and related parties; (iii) litigation issues

similar to those raised, or to be raised, in the Chapter 11 Cases; and (iv) contested matters in the

Chapter 11 Cases (collectively, the "Monitored Matters").  When appropriate and directed by the

Committee, Milbank intervened in the Monitored Matters, prepared pleadings, and participated

in oral arguments and other proceedings with respect to the Monitored Matters.

169.    In addition, Milbank participated in settlement negotiations, hearings,

conferences and mediations on behalf of the Committee.  Milbank also investigated various

issues related to certain participation and other investment agreements involving the Debtors and

reviewed the viability of certain causes of action.  Milbank also analyzed the implications of

recent court opinions on potential claims involving the Debtors and certain third parties.  Finally,

Milbank researched and analyzed issues related to certain claims involving the Debtors and

drafted memoranda relating to the settlement and/or resolution of said claims.

**Z.**    **Examiner Issues**

170.    Milbank reviewed issues related the motion filed by The Walt Disney

Company for the appointment of an examiner in the Debtors' cases (the "Examiner Motion").  At

the direction of the Committee, Milbank drafted and filed a response to the Examiner Motion,

which stated that the appointment of an examiner in these cases was appropriate but argued

against an overly-broad investigative mandate for the examiner [Docket No. 2477].

Accordingly, together with the Debtors, The Walt Disney Company and other parties-in-interest,

Milbank worked to appropriately define the scope of the Examiner's charge.  After the

Examiner's appointment, Milbank endeavored to coordinate with the Examiner in connection

with his preliminary work plan, and thereafter interfaced with the Examiner in course of his

investigation and in subsequent discussions of the report he ultimately issued.

**AA.**    **Third Party Retention/Fee Application/Other Issues**

171.    Throughout these cases, Milbank reviewed and analyzed the retention

applications filed by various professionals to ensure that, among other things, the services

proposed to be provided were reasonable and necessary and not duplicative of those provided by

any other professional.  In that connection, Milbank reviewed and analyzed issues related to the

Debtors' proposed retention of Gleacher & Company Securities, Inc. ("Gleacher"), as the

Debtors' financial advisors in connection with any transaction related to Archstone.  In

particular, Milbank sought to address the Committee's concerns over duplication of efforts and

fees between Gleacher and Lazard Frères & Co, LLC ("Lazard"), the Debtors' investment

bankers.  Accordingly, Milbank prepared and filed an objection to the Debtors' retention of

85

Gleacher [Docket No. 23166], arguing that Gleacher's retention be conditioned on Lazard's

agreement not to seek fees in connection with Archstone.  The parties agreed to the Committee's

condition, and Gleacher's retention, as modified, was ultimately approved [Docket No. 23679].

172.    **Committee Member Fee Application**.  In light of the unprecedented size

and complexity of the Debtors' Chapter 11 Cases and the corresponding burdens that these cases

have imposed on the members of the Committee (the "Committee Members"), and in recognition

of the time and effort devoted by the Committee Members to developing, refining and securing

creditor support for the Plan, the Debtors included a provision in the Plan providing for payment

of the professional fees and expenses incurred by the Committee Members during the pendency

of these cases.  (See Plan at § 6.7).  In this connection and as part of its overall effort to

implement the terms of the Plan, Milbank prepared and filed an omnibus application (the

"Omnibus Application") on behalf of the Committee Members for the reimbursement of

professional fees and expenses [Docket Nos. 24762 and 24881].  In connection with the

Omnibus Application, Milbank also prepared and filed supporting declarations from each of the

Committee Members detailing the extent of his/her work on these cases and explaining the non-

duplicative nature of the work rendered by the Committee Members' professionals.  The

Omnibus Application remains pending while the Committee Members, the Debtors and the U.S.

Trustee work to resolve objections to the relief requested therein.

## VI.

## FACTORS TO BE CONSIDERED IN AWARDING ATTORNEYS' FEES

173.    In assessing the "reasonableness" of the fees requested, courts have looked

to a number of factors, including those first enumerated by the Fifth Circuit in In re First

Colonial Corp. of America, 544 F.2d 1291, 1298-99 (5th Cir. 1977), and thereafter adopted by

most courts.[28]  See In re Nine Assocs., Inc., 76 B.R. 943, 945 (S.D.N.Y. 1987) (adopting First

Colonial/Johnson analysis); In re Cuisine Magazine, Inc., 61 B.R. 210, 212-13 (Bankr. S.D.N.Y

1986) (same); see generally 3 Collier on Bankruptcy ¶ 330.04[3] (Lawrence P. King, et al., eds.,

15th rev. ed. 2009) (enumerating First Colonial and Johnson as the "leading cases to be

considered in determining a reasonable allowance of compensation").  Milbank respectfully

submits that the consideration of these so-called Johnson factors should result in this Court's

allowance of the full compensation requested.

(A)    The Time and Labor Required.  The Debtors' cases are among the largest, most
complex and active bankruptcy cases ever filed.  Accordingly, the professional
services rendered by Milbank on behalf of the Committee required the continuous
expenditure of substantial time and effort, under time pressures which sometimes
required the performance of services late into the evening and, on a number of
occasions, over weekends and holidays.  The services rendered required a high
degree of professional competence and expertise in order to be administered with
skill and dispatch.

(B)    The Novelty and Difficulty of Questions.  Novel and complex issues arose in the
course of these Chapter 11 Cases.  In these cases, as in many others in which the
firm is involved, Milbank's effective advocacy and creative approach to problem
solving helped clarify and resolve difficult issues.

(C)    The Skill Requisite to Perform the Legal Services Properly.  Milbank believes
that its recognized expertise in the area of financial restructuring, its ability to
draw from highly experienced professionals in other areas of its practice such as
securities, structured products, asset divestiture, litigation, and regulatory law and
its practical approach to the resolution of issues help maximize the distributions to
the unsecured creditors of each of the Debtors.

(D)    The Preclusion of Other Employment by Applicant Due to Acceptance of the
Case.  Due to the size of Milbank's financial restructuring department and the
firm as a whole, Milbank's representation of the Committee has not precluded the
acceptance of new clients.  The number of matters that needed attention on a

---

[28]    The factors embraced by the Fifth Circuit in First Colonial were first adopted by the Fifth Circuit's decision
in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), except that First Colonial also
included the "spirit of economy" as a factor expressly rejected by Congress in enacting section 330 of the
Bankruptcy Code.  Stroock & Stroock & Lavan v. Hillsborough Holdings Corp. (In re Hillsborough
Holdings Corp.), 127 F.3d 1398, 1403 (11th Cir. 1997).  A majority of the First Colonial factors are now
codified in section 330(a)(3). 3 Collier on Bankruptcy ¶ 330.04[3].

continuous basis, however, required numerous Milbank attorneys, across multiple practice groups, to commit significant portions of their time to these cases.

(E) <u>The Customary Fee</u>. The compensation sought herein is based upon Milbank's normal hourly rates for services of this kind. Milbank respectfully submits that the compensation sought herein is not unusual given the magnitude and complexity of these cases and the time dedicated to the representation of the Committee. Such compensation is commensurate with fees Milbank has been awarded in other cases, as well as with fees charged by other attorneys of comparable experience.

(F) <u>Whether the Fee is Fixed or Contingent</u>. Milbank charges customary hourly rates, adjusted annually, for the time expended by its attorneys and paraprofessionals in representing the Committee, and Milbank's fee is not outcome dependent.

(G) <u>Time Limitations Imposed by Client or Other Circumstances</u>. As stated above, Milbank has been required to attend to various issues as they have arisen in these cases. Often, Milbank has had to perform these services under significant time constraints requiring attorneys and paraprofessionals assigned to these cases to work evenings and on weekends.

(H) <u>The Amount Involved and Results Obtained</u>. The Committee represents the interests of unsecured creditors of each of the Debtors that, in the aggregate, hold unsecured claims estimated to be valued in the hundreds of billions of dollars in what has been widely described as the largest chapter 11 case ever filed. The Committee's participation, with Milbank's counsel and guidance, greatly contributed to the efficient administration and the successful reorganization of these cases.

(I) <u>The Experience, Reputation and Ability of the Attorneys</u>. Milbank has a sophisticated and nationally recognized corporate reorganization and financial restructuring practice, and Milbank attorneys involved in this representation have played a major role in numerous complex restructurings including, for example, the chapter 11 cases of Lyondell Chemical Company, Nortel Networks Inc., Capmark Financial Group Inc., Hayes Lemmerz International, Inc., DBSD North America, Inc., Refco, Inc., Enron Corp., TOUSA, Inc., Vicorp, Interstate Bakeries Corp., Winn-Dixie Stores, Inc., Fruit of the Loom Inc., Adelphia Communications Corp., Maxxim Medical Group, Inc., RCN Corp., US Airways Group, Inc., Global Crossing Ltd., Fleming Companies, Inc., Dairy Mart Convenience Stores, Inc., Lernout & Hauspie Speech Products N.V., Teligent, Inc., World Access, Inc., ORBCOMM Global, L.P., ICO Global Communications Inc., Safety-Kleen Corp., HomePlace Stores, Inc., Hvide Marine, Inc., Sun TV and Appliances, Inc., Seven-Up/RC Bottling Company of Southern California, Inc. and Ames Department Stores, Inc. Milbank's experience enables it to perform the services described herein competently and expeditiously.

(J)     The "Undesirability" of the Case.  These cases are not undesirable but, as already indicated, have required a significant commitment of time from many of Milbank's attorneys.

(K)     Nature and Length of Professional Relationship.  Milbank was selected as the Committee's counsel shortly after the Committee's formation, on September 17, 2008, and was retained nunc pro tunc to that date pursuant to an order of the Court dated November 21, 2008.  Milbank has been rendering services continuously to the Committee since the Committee was formed, and Milbank has rendered such services in a necessary and appropriate manner.

## VII.

## ALLOWANCE OF COMPENSATION

174.    The professional services rendered by Milbank required a high degree of professional competence and expertise to address, with skill and dispatch, the numerous issues requiring evaluation and action by the Committee.  The services rendered to the Committee were performed efficiently, effectively and economically, and the results obtained benefited not only the members of the Committee, but also the unsecured creditors of each of the Debtors' estates.

175.    With respect to the level of compensation, section 330(a)(1)(A) of the Bankruptcy Code provides, in pertinent part, that the Court may award to a professional person, "reasonable compensation for actual, necessary services rendered."  Section 330(a)(3), in turn, provides that:

> In determining the amount of reasonable compensation to be awarded to . . . [a] professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
>
> (A)     the time spent on such services;
>
> (B)     the rates charged for such services;
>
> (C)     whether the services were necessary to the administration of, or beneficial at the time which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and expertise in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

176. The congressional policy expressed above provides for adequate compensation in order to continue to attract qualified and competent professionals to bankruptcy cases. In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 850 (3d Cir. 1994) ("Congress rather clearly intended to provide sufficient economic incentive to lure competent bankruptcy specialists to practice in the bankruptcy courts.") (citation and internal quotation marks omitted); In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 18 (Bankr. S.D.N.Y. 1991) ("Congress' objective on requiring that the market, not the Court, establish attorneys' rates was to ensure that bankruptcy cases were staffed by appropriate legal specialists.").

177. The total time spent by Milbank attorneys and paraprofessionals during the Total Compensation Period has a fair market value of $144,430,022.50. As shown by this Application and supporting exhibits, Milbank's services were rendered economically and without unnecessary duplication of efforts. In addition, the work involved, and thus the time expended, was carefully assigned in consideration of the experience and expertise required for each particular task.

# VIII.

## EXPENSES

178.    Milbank has incurred a total of $6,707,064.31 in expenses in connection with representing the Committee during the Total Compensation Period.  Milbank records all expenses incurred in connection with the performance of professional services.  In connection with the reimbursement of expenses, Milbank's policy is to charge its clients in all areas of practice for expenses, other than fixed and routine overhead expenses, incurred in connection with representing its clients.  The expenses charged to Milbank's clients include, among other things, telephone and telecopy toll and other charges, mail and express mail charges, special or hand delivery charges, photocopying charges, out-of-town travel expenses, local transportation expenses, expenses for working meals, computerized research and transcription costs.

179.    Milbank charges the Committee for these expenses at rates consistent with those charged to Milbank's other bankruptcy clients, which rates are equal to or less than the rates charged by Milbank to its non-bankruptcy clients.  Milbank seeks reimbursement from the Debtors at the following rates for the following expenses:  (i) ten cents ($0.10) per page for photocopying and printing; (ii) fifty cents ($0.50) for color copies; (iii) no charge for incoming facsimiles; (iv) toll charges only for outgoing facsimiles; and (v) an average of nineteen cents ($0.19) per minute for long distance.  Specifically, with respect to phone charges over $100.00, such charges were generally accrued in connection with (i) conference calls in which the Committee, the Debtors and/or other parties in interest participated; and (ii) mobile phone charges for selected attorneys who were required to participate in Committee conference call while traveling on Committee business.

180.    In accordance with section 330 of the Bankruptcy Code, the Local Guidelines and the U.S. Trustee Guidelines, Milbank seeks reimbursement only for the actual cost of such expenses to Milbank.[29]  Additionally, Milbank has further limited and defined its expenses in accordance with the Fee Committee Guidelines.

181.    In providing or obtaining from third parties services which are reimbursable by clients, Milbank does not include in such reimbursable amount any costs of investment, equipment or capital outlay.

182.    Milbank regularly charges its non-bankruptcy clients for ordinary business hourly fees and expenses for secretarial, word processing and other staff services because such items are not included in the firm's overhead for the purpose of setting the billing rates. However, in light of discussions with Fee Committee, no reimbursement for the charges incurred in connection with such services is requested in the Application.

183.    Attorneys at Milbank have not incurred expenses for luxury accommodations or deluxe meals.  The Application does not seek reimbursement of air travel or train fare expenses in excess of coach fares.[30]  Further, all overtime transportation costs were incurred after 8:00 p.m. for transporting timekeepers to their respective homes.  Moreover, although overtime meal expenses are listed in their actual amounts, per the Fee Committee guidelines, Milbank does not seek reimbursement for overtime meal expenses beyond the $20.00 maximum per meal.  Throughout the Total Compensation Period, Milbank was keenly aware of cost considerations and has tried to minimize the expenses charged to the Debtors' estates.

---

[29]    The cost of expenses Milbank seeks reflects any discounted rates based on volume or other discounts that Milbank anticipates receiving from certain outside vendors; Milbank, however, does not perform a retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted cost of such expenses.

[30]    Except in the instance of Amtrak's Acela Express train, where the lowest class is "business class."

# IX.

## NOTICE

184.    Notice of this Application has been given to (a) the Debtors, (b) counsel

for the Debtors, (c) the United States Trustee, and (d) the Fee Committee.

# X.

## CONCLUSION

WHEREFORE, Milbank respectfully requests the Court to enter an order

(i) allowing Milbank final approval of all fees for professional services rendered during the Total

Compensation Period in the amount of $144,430,022.50 and of reimbursement of all expenses

incurred in connection with such services in the amount of $6,707,064.31; (ii) authorizing and

directing the Debtors to pay to Milbank $12,054,964.50, which is the total amount outstanding to

Milbank and unpaid by the Debtors for services rendered and expenses incurred during the Total

Compensation Period (including amounts previously held back at the recommendation of the Fee

Committee in the amount of $5,998,989.82); and (iii) granting such further relief as is just and

proper.

Dated:  New York, New York
        July 5, 2012

**MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP**

By:  /s/ Dennis F. Dunne_____
Dennis F. Dunne
Evan R. Fleck
Dennis C. O'Donnell
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

# EXHIBIT A

**Certification**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                                                                :

In re:                                                       :                Chapter 11 Case No.
                                                                  :

LEHMAN BROTHERS HOLDINGS INC., <u>et al.</u>,  :                08-13555 (JMP)
                                                                  :

                    Debtors.                        :                (Jointly Administered)
                                                                             :
------------------------------------------------------------- x

**CERTIFICATION UNDER GUIDELINES FOR FEES AND DISBURSEMENTS
FOR PROFESSIONALS IN RESPECT OF FINAL APPLICATION OF MILBANK,
TWEED, HADLEY & M<sup>c</sup>CLOY LLP, COUNSEL TO OFFICIAL
COMMITTEE OF UNSECURED CREDITORS, FOR FINAL APPROVAL
ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND
FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM
<u>SEPTEMBER 17, 2008 THROUGH AND INCLUDING MARCH 6, 2012</u>**

Pursuant to the Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991, and

amended on April 21, 1995 (collectively, the "<u>Local Guidelines</u>"), the United States Trustee

Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed

Under 11 U.S.C. § 330, effective January 30, 1996 (the "<u>U.S. Trustee Guidelines</u>"), and the

guidelines contained in the Fee Committee's Confidential Letter Report on the Sixth Interim

Application of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, dated April 12, 2011 (the "<u>Fee

Committee Guidelines</u>" and, together with the Local Guidelines and the U.S. Trustee Guidelines,

the "<u>Guidelines</u>"), the undersigned, a member of the firm Milbank, Tweed, Hadley & M<sup>c</sup>Cloy

LLP ("<u>Milbank</u>"), counsel to the Official Committee of Unsecured Creditors of Lehman Brothers

Holdings Inc., Lehman Brothers Special Financing Inc., Lehman Commercial Paper Inc. and

their affiliated debtors in possession in the above-captioned cases (collectively, the "<u>Debtors</u>"),

hereby certifies with respect to Milbank's final application for allowance of compensation for

services rendered and for reimbursement of expenses, dated July 5, 2012 (the "Application"), for

the period of September 17, 2008 through and including March 6, 2012 (the "Total

Compensation Period") as follows:

1.    I am the professional designated by Milbank in respect of compliance with

the Guidelines.

2.    I make this certification in support of the Application, for final compensation

and reimbursement of expenses for the Total Compensation Period, in accordance with the Local

Guidelines.

3.    In respect of section A.1 of the Local Guidelines, I certify that:

a.    I have read the Application.

b.    To the best of my knowledge, information and belief formed after
reasonable inquiry, the fees and disbursements sought in the
Application fall within the Guidelines, except as specifically noted
herein and described in the Application.

c.    Except to the extent that fees or disbursements are prohibited by
the Guidelines, the fees and disbursements sought are billed at
rates in accordance with practices customarily employed by
Milbank and generally accepted by Milbank's clients.

d.    In providing a reimbursable service, Milbank does not make a
profit on that service, whether the service is performed by Milbank
in-house or through a third party.[1]

4.    In respect of section A.2 of the Local Guidelines, I certify that Milbank has

provided statements of Milbank's fees and disbursements previously accrued, by filing and

serving monthly statements in accordance with the Interim Compensation Order (as defined in

---

[1]    The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts
which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a
retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted
cost of such expenses.

the Application), except that completing reasonable and necessary internal accounting and

review procedures have at times precluded filing fee statements within the time periods

established in the Interim Compensation Order.

       5.  In respect of section A.3 of the Local Guidelines, I certify that copies of the

Application are being provided to (a) the Court, (b) the Debtors, (c) counsel for the Debtors, (d)

the Office of the United States Trustee for Region 2, and (e) the Fee Committee.

       6.  I certify that the Application for final compensation and reimbursement of

expenses for the Total Compensation Period has been prepared in accordance with the Fee

Committee Guidelines.

Dated:      New York, New York
             July 5, 2012

                      By:  /s/ Dennis F. Dunne
                          Dennis F. Dunne

3

# EXHIBIT B

**Fee Schedule A(1)**

CASE NO.:  08-13555 (JMP) (Jointly Administered)

CASE NAME:  IN RE LEHMAN BROTHERS HOLDINGS INC., et al.

| FIRST INTERIM FEE PERIOD SEPTEMBER 17, 2008 – JANUARY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 4/10/09 Docket No. 3337 | $12,132,376.00 | $12,062,428.50 | $1,213,237.60 | $1,143,247.54 | $668,388.72 | $668,346.18 |

| SECOND INTERIM FEE PERIOD FEBRUARY 1, 2009 – MAY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 8/14/09 Docket No. 4821 | $16,829,521.00 | $16,233,210.42 | $1,682,952.10 | $1,371,217.28 | $1,019,754.61 | $1,006,175.08 |

| THIRD INTERIM FEE PERIOD JUNE 1, 2009 – SEPTEMBER 30, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & | 12/14/09 | $10,881,540.00 | $10,689,053.40 | $1,088,154.00 | $795,598.60 | $583,803.10 | $483,734.30 |

FEE SCHEDULE A(1)

| McCloy LLP | Docket No. 6203 | | | | | | |
|---|---|---|---|---|---|---|---|

| **FOURTH INTERIM FEE PERIOD** <br> **OCTOBER 1, 2009 – JANUARY 31, 2010** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 4/16/10 <br> Docket No. 8432 | $13,595,778.50 | $12,908,822.79 | $1,359,577.85 | $6,211,791.04 | $451,410.54 | $404,795.38 |

| **FIFTH INTERIM FEE PERIOD** <br> **FEBRUARY 1, 2010 – MAY 31, 2010** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 8/16/10 <br> Docket No. 10804 | $19,450,342.75 | $19,041,118.43 | $1,945,034.28 | $11,674,570.75 | $851,804.27 | $847,210.46 |

| **SIXTH INTERIM FEE PERIOD** <br> **JUNE 1, 2010 – SEPTEMBER 30, 2010** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 12/14/10 <br> Docket No. 13493 | $18,359,367.75 | $18,191,238.85 | $1,835,936.78 | $3,681,873.55 | $792,924.64 | $787,642.86 |

**FEE SCHEDULE A(1)**

| SEVENTH INTERIM FEE PERIOD OCTOBER 1, 2010 – JANUARY 31, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 6/2/11 Docket No. 17343 | $14,180,784.75 | $13,617,066.02 | $2,818,286.54 | $2,271,117.05 | $633,261.80 | $631,940.63 |

| EIGHTH INTERIM FEE PERIOD FEBRUARY 1, 2011 – MAY 31, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 8/15/11 Docket No. 19273 | $14,678,049.25 | $12,921,360.25 | $2,935,609.85 | $1,178,920.85 | $794,661.63 | $794,661.63 |

| NINTH INTERIM FEE PERIOD JUNE 1, 2011 – SEPTEMBER 30, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 12/14/11 Docket No. 23418 | $12,334,262.25 | [ ] | $2,466,787.45 | [ ] | $493,651.21 | [ ] |

**FEE SCHEDULE A(1)**

| TENTH INTERIM FEE PERIOD OCTOBER 1, 2011 – MARCH 6, 2012 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 5/21/12 Docket No. 27999 | $11,988,000.25 | [ ] | $9,590,400.20 | [ ] | $417,403.79 | [ ] |

**FEE SCHEDULE A(1)**