Objection Deadline: July 25, 2012 at 4:00 p.m. (Prevailing Eastern Time)
Hearing Date and Time: August 15, 2012 at 10:00 a.m. (Prevailing Eastern Time)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                          :
In re                                     :          **Chapter 11**
                                          :          **Case No. 08-13555**
LEHMAN BROTHERS HOLDINGS INC., et al., :          **(Jointly Administered)**
                                          :
Debtors.                                  :
                                          :
----------------------------------------------------------------x

## LEHMAN BROTHERS SPECIAL FINANCING INC. WORKING GROUP'S APPLICATION FOR ENTRY OF AN ORDER, PURSUANT TO 11 U.S.C. §§ 503(b)(3)(D) AND 503(b)(4) FOR ALLOWANCE AND REIMBURSEMENT OF REASONABLE PROFESSIONAL FEES AND ACTUAL, NECESSARY EXPENSES IN MAKING A SUBSTANTIAL CONTRIBUTION IN THESE CASES

Bank of America, N.A., Centerbridge Credit Advisors, LLC, Crédit Agricole Corporate

and Investment Bank, Credit Suisse International, D.E. Shaw Oculus Portfolios, L.L.C., D.E.

Shaw Composite Portfolios, L.L.C., Deutsche Bank AG, Eton Park Capital Management, L.P.,

Goldman Sachs Bank USA, Goldman Sachs International, Merrill Lynch International, Morgan

Stanley & Co. International plc, Morgan Stanley Capital Services, Inc., Oaktree Capital

Management, L.P. (solely in its capacity as agent on behalf of certain funds advised by it or its

respective subsidiaries), Silver Point Finance, LLC (an affiliate of certain claim holders), and the

Royal Bank of Scotland plc ("RBS"), (collectively, the "Working Group") submit this

application (the "Application") for entry of an order, substantially in the form annexed hereto as

Exhibit A, pursuant to sections 503(b)(3)(D) and 503(b)(4) of chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code"), for the allowance and reimbursement by the LBSF estate

of reasonable professional fees and actual, necessary expenses in the amount of $13,710,343 for

making a substantial contribution in these cases.  In support of this Application, the Working

Group respectfully represents:

## **PRELIMINARY STATEMENT**

1.      At the confirmation hearing, the Court described these chapter 11 cases as "the

biggest, the most incredibly complex, [and] the most impossibly challenging international

bankruptcy that ever was."  Transcript of Dec. 6, 2011 Hearing: 68:24-25.  Despite this, the

Court characterized the final result as "the most overwhelming outpouring of creditor consensus

in the history of insolvency law."  Id., at 69:4-6.  The record in these cases undisputedly shows

that the efforts of the Working Group and Blackstone Advisory Partners L.P. ("Blackstone")

played a substantial part in the ultimate resolution of these cases and the "remarkable" consensus

that was approved by the Court on December 6, 2011.  Id., at 68:10.

2.      Specifically, in the latter half of these cases, the central, overarching and most

hotly contested issue among parties in interest was whether Debtors' numerous cases would be

substantively consolidated.  Indeed, this issue was germane to seemingly every creditor body,

many of whom viewed a "consolidating plan" as inappropriate, contrary to applicable law and

prejudicial to their interests.  The efforts of the Working Group and Blackstone were

instrumental in building consensus surrounding these necessarily complex issues.  For nearly two

years, the Working Group and Blackstone worked tirelessly to achieve a settlement with the

Debtors and the Ad Hoc Group (each as defined below), which ultimately resulted in a

comprehensive, global resolution in the summer of 2011, months or even years earlier than most

parties in interest expected resolution, if at all.  Blackstone's efforts ultimately saved the estate

from significant administrative liabilities and advanced the date – and the effective recoveries –

of creditor distributions.  Based on the fees and expenses incurred in the first half of 2011, the

early confirmation of the Settlement Plan saved the Debtors' estates at least $200-$400 million.

3.      For these reasons and for those set forth below, the Working Group respectfully

submits that the payment of Blackstone's fees and expenses is justified in light of the substantial

contribution that such parties made to these cases.  The Working Group and its members reserve

the right to file additional or separate applications for the allowance and payment of reasonable

professional fees and actual, necessary expenses other than the Blackstone fees and expenses for

making a substantial contribution in these cases.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over these cases and the Application pursuant to 28

U.S.C. §§ 157 and 1334.  Venue of these proceedings and this Application is proper in this

District pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief sought herein are sections 503(b)(3)(D) and

503(b)(4) of the Bankruptcy Code.

## OVERVIEW OF LEHMAN AND THE CHAPTER 11 CASES

6.      Prior to the events leading up to these chapter 11 cases, Lehman Brothers

Holdings Inc. ("LBHI") and certain of its direct and indirect subsidiaries (collectively, the

"Debtors" or "Lehman") was the fourth largest investment bank in the United States.   Founded

more than 150 years ago, Lehman was a leader in the global financial markets serving the

financial needs of corporations, governmental units, institutional clients and individuals

worldwide.

7.      In the normal course of business, various subsidiaries of Lehman regularly entered into derivative transactions on a proprietary basis or for third parties in connection with speculative opportunities and/or to manage exposure to market and credit risks.  In this capacity, Lehman entities transacted extensively in derivatives including interest rate, credit, foreign exchange and equity derivatives.  As of August of 2008, Lehman held over 900,000 derivatives positions worldwide.  Among the most common types of transactions to which Lehman was a party were credit default swaps, interest rate swaps, and foreign exchange derivatives.

8.      Among the various Lehman entities, Lehman Brothers Special Financing Inc. ("LBSF") was the largest holder of derivatives positions and the principal dealer in a broad range of derivative products, including interest rate, currency, credit and mortgage derivatives.  As of May 31, 2008, LBSF held approximately $72 billion in financial inventory.  Of LBSF's financial inventory, nearly 80% was comprised of derivatives and government and agency securities.  LBSF's numerous counterparties included large banks, corporations, hedge funds and other institutions.

9.      In the weeks following LBHI's chapter 11 filing on September 15, 2008, certain domestic subsidiaries commenced their own voluntary cases under chapter 11 of the Bankruptcy Code, including LBSF on October 2, 2008.  Over 67,000 proofs of claim were initially filed against the Debtors aggregating to approximately $1.2 trillion.  Claims filed against LBSF on account of derivatives transactions totaled approximately $73.6 billion.  The Debtors' chapter 11 cases were followed by a period of global turmoil in the financial markets, the effects of which have been persistent and which precipitated massive federal intervention to save the financial system.

10.     On September 17, 2008, the United States Trustee for the Southern District of New York (the "US Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"), which consisted of Wilmington Trust Company, as Indenture Trustee, The Bank of NY Mellon, Mizuho Corporate Bank, Ltd., as Agent, Metropolitan Life Insurance Co., Shinsei Bank, Limited, RBS, and RR Donnelley & Sons.  The Creditors' Committee did not include a significant LBSF creditor.[1]

11.     On January 16, 2009, the Court directed the US Trustee to appoint an examiner (the "Examiner") to conduct an investigation into various matters.[2]  On January 19, 2009, the US Trustee appointed Anton R. Valukas as the Examiner in the Debtors' chapter 11 cases.  The Examiner engaged Jenner & Block LLP, as his attorneys, and Duff & Phelps, LLC ("Duff & Phelps") as his financial advisor.  The Examiner filed his report (the "Examiner's Report") on February 8, 2010, consisting of more than 2,200 pages, excluding exhibits and appendices.

## FORMATION OF THE LBSF WORKING GROUP

12.     In late 2009, the Working Group coalesced for the purpose of, *inter alia*, engaging with the fiduciaries of LBSF and their professionals in determining whether it would be appropriate to use the assets of LBSF, through substantive consolidation or otherwise, to benefit

---

[1]     While RBS was appointed to the original Creditors' Committee, the Creditors' Committee's composition was amended on October 3, 2008, at which time RBS was replaced.

[2]     Matters evaluated by the Examiner included the following: (i) whether any Lehman affiliate possessed colorable claims against LBHI or any other Lehman affiliate for potentially voidable transfers or incurrences of debt; (ii) whether there were colorable claims for breach of fiduciary duties and/or aiding or abetting such breaches against officers and directors of the Debtors in connection with the financial condition of Lehman prior to the Commencement Date; (iii) whether assets of any Lehman affiliates were transferred to Barclays Capital as a result of the Barclays sale creating colorable claims that inure to the benefit of such affiliates; (iv) the intercompany accounts and transfers among the Debtors and affiliates during the 30-day period preceding the Commencement Date; (v) the transactions and transfers among the Debtors and prepetition lenders, including JPMorgan, Citigroup, Inc., Bank of America, and the FRBNY; (vi) the transfer of the capital stock of certain subsidiaries of LBI to Lehman ALI on or about September 19, 2008; and (vii) the events that occurred from September 4, 2008 through September 15, 2008, or prior thereto that may have resulted in the commencement of the Debtors' chapter 11 cases.

the creditors of LBHI in chapter 11 plan(s) of these two separate entities.  The use of LBSF's

assets exclusively to satisfy LBSF's obligations to its own creditors undoubtedly would have

resulted in greater and quicker recovery for that creditor constituency than a consolidating

arrangement.  Additionally, many third party creditors with direct claims against LBSF arising

from derivatives transactions also possessed guaranty claims against LBHI which would have

been eliminated in a substantive consolidation of the Debtors.

13.    For these reasons, among others, in January 2010 the Working Group[3] presented a

"white paper" to the Debtors' advisors arguing that substantive consolidation would be

inappropriate.

## BLACKSTONE IS RETAINED

14.    Although the Working Group did not purport to hold a single position on the

matters related to these cases, the Working Group's members acknowledged that they held

similar positions on certain issues, the most critical of which being that they, along with other

operating company creditors, would be disadvantaged by the substantive consolidation of the

Debtors' estates.  Accordingly, in April 2010 the various counsel to members of the Working

Group hired Blackstone to act as the sole financial advisor to the Working Group.[4]

---

[3]    At the time the Working Group presented its "white paper" to the Debtors' advisors, the members of the
Working Group (in alphabetical order) were: Citibank, N.A., Credit Suisse International, D. E. Shaw
Oculus Portfolios, L.L.C., Deutsche Bank AG, Goldman Sachs Bank USA (successor by merger to
Goldman Sachs Capital Markets, L.P.), Goldman Sachs International, Morgan Stanley Capital Services
Inc., Morgan Stanley & Co. International plc., RBS, and TPG Credit Strategies, L.P.  At various times
following presentation of the "white paper" and throughout the Debtors' chapter 11 cases, certain members
of the Working Group ceased their collaboration with the Working Group, and certain other significant
LBSF creditors became members of the Working Group.

[4]    At the time Blackstone was retained, the members of the Working Group (in alphabetical order) were:
Bank of America, N.A., Centerbridge Credit Advisors, LLC, Credit Suisse International, D. E. Shaw
Composite Portfolios, L.L.C., D. E. Shaw Oculus Portfolios, L.L.C., Deutsche Bank AG, Goldman Sachs
Bank USA (successor by merger to Goldman Sachs Capital Markets, L.P.), Goldman Sachs International,
Merrill Lynch International, Morgan Stanley Capital Services Inc., Morgan Stanley & Co. International plc,
certain funds advised by Oaktree Capital Management, L.P. or their respective subsidiaries, and RBS.

15.     Blackstone was engaged to provide the following services, as necessary, per the terms of an engagement letter dated April 1, 2010 (as amended, restated, or supplemented from time to time, the "Engagement Letter"), a copy of which is annexed hereto as Exhibit B: (i) assist in the evaluation of the Debtors' plan or any other plan for LBSF filed in the jointly administered cases of LBHI and its affiliates, including LBSF; (ii) assist in the development of financial data and presentations to counsel for members of the Working Group; (iii) analyze various restructuring scenarios, including consolidated and deconsolidated restructuring scenarios, and the potential impact of these scenarios on the recoveries of the Working Group members; (iv) participate in negotiations among the Working Group, the Debtors and its other creditors, suppliers, lessors and other interested parties; (v) value consideration offered by the Debtors to the Working Group members in connection with a restructuring; (vi) assist in the development of an alternative plan of reorganization; (vii) provide expert witness testimony concerning any of the subjects encompassed by the Engagement Letter; and (viii) provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a restructuring as requested and mutually agreed.

16.     In connection with these services, the Engagement Letter detailed Blackstone's compensation arrangement, which terms are consistent with compensation earned by Blackstone and other advisors for comparable work.  In addition to reimbursement of all reasonable and documented out-of-pocket expenses, Blackstone would receive a monthly advisory fee (the "Monthly Fee") in the amount of $250,000, of which (i) $100,000 would be payable in cash by the members of the Working Group and (ii) $150,000 would be accrued monthly (the "Accrued Monthly Fee") and payable by the members of the Working Group upon the earlier of (a) a consummation of an LBSF plan of reorganization or (b) the initial distribution to LBSF claim

holders pursuant to a plan of reorganization (the "Distribution Date").  Additionally, the

Engagement Letter included a "Completion Fee" of: (x) $2,000,000 if neither of the fees set forth

in (y) or (z) below are paid, payable by the members of the Working Group upon the Distribution

Date with 100% of the Accrued Monthly Fees to be credited against the Completion Fee (such

credits not to exceed $2,000,000), (y) $8,500,000 if the Working Group were to pursue litigation

against the Debtors' plan to a judgment and/or propose its own plan of reorganization, or (z)

$5,000,000 if the Working Group did not pursue litigation against the Debtors' plan and reached

a consensual agreement with the Debtors.  Such Completion Fee in (y) or (z) above would be

payable by the Debtors' estates upon the Distribution Date through an agreed settlement, through

the distribution to the LBSF claim holders, or as an administrative expense pursuant to a

"substantial contribution" application.

17.    As set forth below, with the assistance and advice of Blackstone, the Working

Group played an integral role in negotiating, structuring and building consensus in favor of the

Settlement Plan (as defined below) that was confirmed by the Court on December 6, 2011.

## SUMMARY OF WORK PERFORMED BY THE WORKING GROUP

18.    During the course of their involvement in the Debtors' cases, the Working Group

and Blackstone communicated frequently with the Debtors' professionals and numerous parties

in interest, including advisors to the Creditors' Committee and foreign affiliates, in an effort to

understand the Debtors' complex universe of creditor constituencies, third party claims,

intercompany claims, guaranties, assets, administrative expense allocations and various litigable

issues.

19.    Blackstone worked closely with the Debtors' advisors, Alvarez & Marsal and

Weil, Gotshal & Manges LLP, to review and discuss information concerning the Debtors,

including non-public information.  Blackstone submitted its first information request to the

Debtors in March 2010, and thereafter submitted numerous additional requests.  Blackstone

requested and reviewed information pertaining to, among other things, the following: (i) the

Debtors' organizational and capital structures; (ii) intercompany claims; (iii) various settlements,

transactions and disputes (e.g., Bankhaus, JPMorgan); (iv) assets and liabilities; (v) claims

resolution; (vi) the Debtors' recovery analyses; (vii) LAMCO[5]; (viii) RACERS[6]; (ix)

administrative expenses, including the methodology for allocation of administrative expenses

among the Debtors; (x) post-petition cash sources and uses; and (xi) tax matters.  Blackstone also

met with Duff & Phelps to discuss matters covered in the Examiner's Report.

　　　　20.　　　　As part of this process, Blackstone developed a complex recovery model that

analyzed, among other financial information, each individual Debtor's assets, third-party claims,

intercompany claims and estimated creditor recoveries.  In addition, Blackstone's model

compared creditor recoveries under a "non-con" distribution scheme that would respect the

separateness of the various Debtors and their affiliates with creditors' recoveries under a

substantive consolidation distribution scheme.  This model allowed Blackstone to analyze

various potential settlement mechanisms that could bridge the positions expressed by the

numerous major parties in interest.  In the end, this recovery model was instrumental in

materially aiding settlement negotiations with the Debtors and other parties in interest, including

the Creditors' Committee and the Ad Hoc Group.

---

[5]　　"LAMCO" refers to Legacy Asset Management Company, comprised of LAMCO Holdings LLC and its
wholly-owned subsidiaries.

[6]　　"RACERS" refers to Restructured Assets with Enhanced Returns, comprised of the 2007-A Trust and the
2007-7-MM Trust, each as defined in the Debtors' Disclosure Statement.

21.    On November 23, 2010, as a result of Blackstone's analysis and diligent efforts to develop a mutually acceptable compromise among the members of the Working Group, the Working Group presented the Debtors with a comprehensive settlement term sheet (the "Term Sheet").[7]  Rather than proposing the simple non-consolidation of the Debtors – the optimal outcome for the Working Group's members – the Term Sheet offered concrete compromises with respect to various payment mechanisms contained in the chapter 11 plan that the Debtors had already filed.  Such mechanisms and compromises included, among others things: (i) reduction of the LBSF intercompany payable to LBHI and resolution of certain other intercompany claims; (ii) increases in the Debtors' proposed third party guarantee claim caps; (iii) reallocation of certain administrative expenses; (iv) allowance of RACERS claims; (v) resolution of large creditors' derivatives claims; and (vi) governance.  The Term Sheet was the culmination of the significant due diligence and analysis conducted by the Working Group and Blackstone during the spring, summer and fall of 2010.  After submitting the Term Sheet, Blackstone and certain members of the Working Group continued to meet frequently with the Debtors and their advisors to discuss the terms of a potential settlement.

22.    On December 15, 2010, an ad hoc group of LBHI creditors (the "Ad Hoc Group") proposed a substantively consolidating chapter 11 plan.[8]  Thereafter, substantive consolidation quickly emerged as perhaps the leading dispute among economic stakeholders and the Debtors.

23.    On December 16, 2010, Blackstone led a meeting attended by members of the Working Group, their respective counsel, and the Debtors' advisors where Blackstone presented

---

[7]    One of Blackstone's contributions throughout this process was reconciling the viewpoints of and maintaining a consensus among the various members of the Working Group, who, although sharing a common interest in opposing substantive consolidation, had diverse interests in and perspectives on the chapter 11 cases.

[8]    The Debtors had previously filed an initial and modified chapter 11 plan on March 15, 2010 and April 14, 2010, respectively.

the Working Group's views of the Debtors' plan and potential settlement alternatives. Following

this meeting, Blackstone continued to meet on a regular basis with the Debtors' financial

advisors to discuss the Working Group's proposed changes to the Debtors' plan.

24.      On January 25, 2011, the Debtors filed their first amended joint chapter 11 plan.

The Debtors' plan did not propose "pure" substantive consolidation but rather proposed

settlements of substantive consolidation and certain other issues and related treatment of the

relationships among the Debtors and their affiliates through proposed mechanisms incorporated

into the plan. The Debtors' amended plan was significantly influenced by settlement proposals

made by the Working Group.

25.      On April 27, 2011, the Ad Hoc Group filed its amended substantively

consolidating chapter 11 plan (the "Ad Hoc Plan"). The Ad Hoc Plan provided that all of the

Debtors' respective assets and liabilities be substantively consolidated with certain exceptions

relating to certain of the Debtors' foreign affiliates.[9]

26.      In response, and guided by the belief that Debtors' amended plan would have

significantly overcompensated certain creditors, a group of twenty-three creditors (which

included members of the Working Group)[10] proposed on April 25, 2011 a joint chapter 11 plan

(the "Non-Con Plan").[11] The Non-Con Plan took a diametrically opposite approach for the

reorganization of the Debtors as compared to the Ad Hoc Plan – notably, the Non-Con Plan

---

[9]      The Ad Hoc Group's plan proposed the substantive consolidation of all of the Debtors other than Merit, Somerset and Preferred Somerset.

[10]     The members of the Working Group (in alphabetical order) which proposed the Non-Con Plan were: Crédit Agricole Corporate and Investment Bank, Credit Suisse International, D. E. Shaw Composite Portfolios, L.L.C., D. E. Shaw Oculus Portfolios, L.L.C., Deutsche Bank AG, Goldman Sachs Bank USA (successor by merger to Goldman Sachs Capital Markets, L.P.), Goldman Sachs International, Morgan Stanley Capital Services Inc., Morgan Stanley & Co. International plc, certain funds advised by Oaktree Capital Management, L.P. or their respective subsidiaries, RBS, and Silver Point Finance, LLC (an affiliate of certain claim holders).

[11]     The Non-Con Plan proposed non-consolidated creditor distributions for all of the Debtors other than Merit, Somerset and Preferred Somerset.

proposed a complete separation of the Debtors based upon the individual legal identity of each Debtor.

27.    At that point, the differences in positions among the Debtors, the proponents of the Non-Con Plan, the Ad Hoc Group, and other various parties in interest seemed insurmountable.  In June of 2011, in a major effort to prevent these chapter 11 cases from sinking into a morass of competing plans and substantial litigation, resulting in exorbitant time and economic costs to the ultimate detriment of all stakeholders, the alternative plan groups held intensive in-person negotiations.  Over 125 individuals attended these negotiations, including principals, attorneys and financial advisors for the major stakeholders.  The parties engaged in two formal sessions and countless hours of negotiations with the goal of reaching a mutually acceptable global settlement.  Blackstone and certain members of the Working Group were intimately involved in these meetings, as well as in intensive discussions with the Debtors, members of the Ad Hoc Group, foreign affiliates, and other important parties in the weeks preceding and following the June meetings.  Again, Blackstone's recovery model served as an invaluable resource in advancing these intensive real-time settlement discussions.

28.    As discussions progressed, one issue that was heavily negotiated was the Working Group's request to pay Blackstone's contractual fees and expenses out of distributions from the LBSF estate.  The Debtors deferred making a decision regarding the payment of Blackstone's fees from the LBSF estate, explaining that fee matters should be decided by the fee review committee and the Court.  Ultimately, Blackstone advised the Working Group to accept a global settlement – the settlement that formed the basis for the Settlement Plan – notwithstanding the fact that the settlement did not specifically contemplate the payment of Blackstone's fees.

29.     The intensive June negotiations produced a consensus among many of the major economic stakeholders including the overwhelming majority of the foreign administrators, fiduciaries and receivers.  The negotiations resulted in the Debtors modifying their chapter 11 plan to effectuate the final consensus (such modified plan, the "Settlement Plan").   The Settlement Plan provides for the resolution of numerous issues, *inter alia*: (i) the potential substantive consolidation of the Debtors and certain of their affiliates; (ii) the characterization of intercompany balances owed to LBHI by subsidiary Debtors; (iii) the allowance of certain affiliate claims; (iv) the establishment of ownership and rights of various Debtors and their affiliates with respect to certain assets; and (v) the allocation of costs and expenses among Debtors.

30.     The Settlement Plan resolved issues held by nearly every creditor in the chapter 11 cases.  On December 6, 2011, the Court confirmed the Settlement Plan.  As the Court commented at the confirmation hearing, "[n]ever before have divergent holders of $450 billion in claims recognized the benefits of pragmatic compromise and come together as one in support of a single chapter 11 plan.  This is a monumental achievement in our field, awe-inspiring, really, that, to me, represents the highest and best use of chapter 11 in the public interest."  Transcript of Dec. 6, 2011 Hearing: 69:7-12.

## RELIEF REQUESTED

31.     As described herein, Blackstone and the Working Group made significant, non-duplicative contributions in the Debtors' chapter 11 cases which were essential to achieving the global resolution embodied in the Settlement Plan.  Resolution of the Debtors' cases resulted in tremendous time, resources and financial savings for the benefit of the Debtors' estates.  In recognition of the foregoing, the Working Group hereby requests that the LBSF estate pay

Blackstone's fees and expenses in the amount of $13,710,343, which is composed of the following:

    (i)       a total of $2,115,343[12] to be paid to members of the Working Group as reimbursement for monthly fees and expenses paid to / invoiced by Blackstone for services rendered from March 18, 2010, through December 6, 2011, per the terms of the Engagement Letter; and

    (ii)      a total of $11,595,000 to be paid directly to Blackstone for the following fees earned per the terms of the Engagement Letter:

        a.  $3,095,000, representing total Accrued Monthly Fees from March 18, 2010, through December 6, 2011, and

        b.  $8,500,000 for the Completion Fee.[13]

32.     Blackstone's fees and expenses are reasonable, and payment of such fees and expenses from the LBSF estate is appropriate under the circumstances. Such payment will impose an immaterial burden on LBSF's unsecured creditors, particularly in light of the significant value created through the efforts of Blackstone and the Working Group. If the Court grants the relief requested, estimated recoveries to LBSF unsecured creditors would be reduced by only approximately 0.03%.[14]

## ARGUMENT

### A.    Legal Standard

33.     Section 503(b)(3)(D) of the Bankruptcy Code permits a court to allow, as an administrative expense, the actual and necessary expenses incurred by a creditor who makes a

---

[12]    Total represents $2,027,222 of cash monthly fees and $88,121 of incurred expenses.

[13]    As described in paragraph 16, the Engagement Letter specified that the amount of the Completion Fee would be $8,500,000 if the Working Group were to pursue litigation against the Debtors' plan to a judgment and/or propose its own plan of reorganization. The Completion Fee amount is $8,500,000 due to the fact that the Working Group filed the Non-Con Plan.

[14]    Distributing the requested amount of approximately $13.7 million from the LBSF estate would reduce the value of LBSF assets available for LBSF unsecured creditors from approximately $13.051 billion to approximately $13.037 billion (such amounts are calculated prior to giving effect to the Contribution to Plan Adjustments, as defined in the Settlement Plan). The Debtors' current estimate of LBSF unsecured claims is approximately $47.7 billion.

substantial contribution to a chapter 11 case. See 11 U.S.C. § 503(b)(3)(D). Section 503(b)(4) allows for reimbursement of reasonable compensation for services rendered, and for reimbursement of actual and necessary expenses incurred, by an attorney of any such entity. See 11 U.S.C. § 503(b)(4). The "substantial contribution" inquiry under section 503(b)(3)(D) of the Bankruptcy Code is a factual inquiry. See In re Bayou Grp., LLC, 431 B.R. 549, 560 (Bankr. S.D.N.Y. 2010) (granting substantial contribution claim asserted by unofficial creditors committee comprised of defrauded investors). The "substantial contribution" test is satisfied "where the services rendered have substantially contributed to an actual and demonstrable benefit to the debtor's estate, its creditors, and to the extent relevant, the debtor's shareholders." In re United States Lines, Inc., 103 B.R. 427, 429 (Bankr. S.D.N.Y. 1989) aff'd 1991 U.S. Dist. Lexis 5262 (S.D.N.Y. Apr. 19, 1991) (granting administrative expense status to counsel to creditor in the case for substantial contributions). Under the "substantial contribution" test, compensation is awarded "to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor or estate." Bayou Group, 431 B.R. at 560 (quoting In re Best Prods. Co., Inc., 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994)). The policy underlying the substantial contribution provisions of the Bankruptcy Code is to "promote meaningful creditor participation in the reorganization process." United States Lines, 103 B.R. at 429.[15]

34.     Courts in the Second Circuit have considered various factors in determining whether a creditor has conferred an actual demonstrable benefit, including: (i) whether the services benefited the creditor, the estate itself or all of the parties in the bankruptcy case; (ii) whether the services resulted in a significant and demonstrably positive benefit to the estate; and

---

[15]     While the Court in United States Lines acknowledged a tension between encouraging creditor participation and keeping administrative expenses to a minimum, 103 B.R. at 429, as set forth in Section B.II below, the cost to the LBSF estate of granting this Application pales in comparison to the administrative expenses the estate would have incurred from protracted litigation or an extended plan process.

(iii) whether the services duplicated the efforts by others.  <u>Trade Creditor Group v. L. J. Hooker Corp. (In re Hooker Invs., Inc.)</u>, 188 B.R. 117, 120 (S.D.N.Y. 1995), *aff'd*, 104 F.3d 349 (2d Cir. 1996); <u>In re Bethlehem Steel Corp.</u>, 2003 WL 21738964, at *6 (Bankr. S.D.N.Y. July 28, 2003).

35.    At least one court in this District has awarded fees for substantial contribution where the creditor prompted other to assert a position that ultimately benefitted the estate.  <u>See, e.g.</u>, <u>In re McLean Indus., Inc.</u>, 88 B.R. 36, 38-39 (Bankr. S.D.N.Y. 1988) *aff'd* 1991 U.S. Dist. Lexis 5262 (S.D.N.Y. Apr. 19, 1991).  In <u>In re McLean Indus., Inc.</u>, this Court granted the application of a creditor's attorney where the creditor objected to the debtor's proposed sale agreement, raised a substantial issue as to the sufficiency of the purchase price, and presented evidence of a higher valuation of the debtor's property.  88 B.R. at 38-39.  The <u>McLean</u> court held that, by raising the initial objection to the sale that prompted others to assert questions regarding the propriety of the sale, the creditor's attorney conferred a benefit upon the estate.  <u>Id.</u>  Similarly, in <u>In re Richton Int'l Corp.</u>, 15 B.R. 854 (Bankr. S.D.N.Y. 1981), the court held that counsel for seven bank creditors was entitled to compensation for legal services that facilitated the progress, and substantially aided formulation and adoption, of a plan of reorganization.  Specifically, the <u>Richton Int'l</u> court found that Weil Gotshal's "efforts to reconcile the Debtors and creditors and to negotiate and consummate the reorganization were instrumental in the promulgation of the Plan or Reorganization."  <u>Id.</u>, at 855.

36.    Additionally, courts in other districts have allowed administrative claims for creditors under similar circumstances.  <u>See</u>, <u>e.g.</u>, <u>In re Baldwin-United Corp.</u>, 79 B.R. 321, 344 (Bankr. S.D. Ohio 1987) (awarding substantial contribution claim in a case where creditor's initial bid drew competing bids).  For example, in <u>Hall Fin. Grp., Inc. v. DP Partners, Ltd. P'ship (In re DP Partners Ltd. P'ship)</u>, the United States Court of Appeals for the Fifth Circuit granted a

creditor's motion for allowance of administrative expenses because the ultimate plan provided

approximately $3 million of additional value to the creditors, based in large part on the

competitive bidding by the creditor. 106 F.3d 667 (5th Cir. 1997). In evaluating the

administrative expense request, the DP Partners court held that "a creditor's motive in taking

actions that benefit the estate has little relevance in the determination whether the creditor has

incurred actual and necessary expenses in making a substantial contribution to [the estate]." Id. at

673.  Noting that the substantial contribution standard should be addressed on a case-by-case

basis, the DP Partners court reasoned that a court "should weigh the cost of the claims' fees and

expenses against the benefits conferred upon the estate which flow directly from those actions."

106 F.3d at 673. This "cost-benefit" test has been applied by other courts. See, e.g., Pow Wow

River Campground, Inc., 296 B.R. 81. 89 (Bankr. D.N.H. 2003) (granting a fee application filed

by attorneys representing a prospective purchaser of the debtor's assets where the prospective

purchaser's actions, in objecting to the debtor's plan and causing the debtor to propose a superior

plan, constituted a "substantial contribution").

**B.**     **The Payment of Blackstone's Reasonable and Necessary Fees and Expenses as Substantial Contribution is Justified under the Circumstances**

   **I.**     **Blackstone's and the Working Group's Services Were Provided for the Benefit of the Estate Itself**

37.     Although the Working Group's actions undoubtedly increased recoveries to

Working Group members, the Working Group effectively advocated on behalf of all creditor

constituencies that would have been harmed by the improper substantive consolidation of the

Debtors' estates and the various settlement mechanisms proposed in alternative plans.  Indeed,

the Non-Con Plan itself was designed as a comprehensive, confirmable joint plan for

substantially all of the Debtors and did not limit settlement proposals to matters directly

pertaining to members of the Working Group.  Moreover, the Working Group's extensive

diligence and analysis, negotiations and collaboration with various parties in interest, as well as preparation and filing of the Non-Con Plan, not only resulted in more equitable treatment of numerous creditor constituencies, but enabled relatively quick settlements of numerous seemingly intractable issues among Lehman's creditor constituencies. Blackstone's model was critical in developing the expeditious and broad-based consensus that underlies the Settlement Plan.

38.     Absent an expectation of reimbursement from the estate, the Working Group would not have engaged Blackstone to advocate broadly on behalf of all creditors similarly situated with respect to the issue of substantive consolidation. Indeed, the Engagement Letter specifically contemplates that the $8.5 million Completion Fee "will be payable by the Debtors' estates." At no point did the Working Group anticipate or expect to bear this substantial cost. Therefore, absent this estate "backstop," the estate would not have benefitted from the Working Group's and Blackstone's collective efforts in formulating, developing and nurturing a global resolution to an incredibly complex series of problems.

## II.     Blackstone's and the Working Group's Services Conferred a Direct, Significant and Demonstrably Positive Benefit upon the Estate

39.     The Working Group's efforts resulted in an expedited conclusion of the Debtors' complex chapter 11 cases. Specifically, the negotiated agreement spurred by the Working Group's efforts saved the estate at least several months of continued negotiations, litigation, and other significant administrative resource demands. As the Court recognized at the hearing to approve the disclosure statement, the Settlement Plan "embodies a settlement and compromise of sharply conflicting views in relation to one particular issue; substantive consolidation, that *if litigated will take an unpredictable long time, cost a great deal of money, and be a source of ongoing legal uncertainty*." Transcript of Aug. 30, 2011 Hearing: 88:11-15.

18

40.    Indeed, by settling earlier, the estates saved significant administrative expenses, and creditors will receive increased distributions beginning at an earlier date.  A conservative assumption is that litigation and negotiations over the competing plans would have taken an additional six to twelve months.  Applying that assumption, and using the administrative expense run-rate from the first half of 2011 as a guide,[16] confirmation of the Settlement Plan in early December saved the Debtors' estates approximately $200 million to $400 million in administrative expenses.  The fees and expenses requested in this Application are *de minimis* when considered in light of the savings to the estate made possible by Blackstone's and the Working Group's efforts.

### III.    Blackstone's and the Working Group's Services Were Not Duplicative of Services Performed by Others

41.    The Working Group made significant, non-duplicative efforts to advocate on behalf of all creditor constituencies that would have been harmed by substantive consolidation of the Debtors' estates.  Among other things, the Working Group provided the following services to the Debtors' estates that were not duplicated by other creditors or parties in interest: (i) substantial efforts in drafting and filing the Non-Con Plan, the only "pure" non-consolidation plan filed in the Debtors' bankruptcy cases; (ii) significant time and expense educating creditor constituencies regarding the mechanisms and assumptions underlying the Non-Con Plan, the Ad Hoc Plan and the Debtors' plans, as well as various settlement alternatives related thereto; (iii) extensive negotiating with the Debtors and other parties in interest on behalf of creditor constituencies opposed to substantive consolidation; and (iv) significant, successful efforts indentifying similarly situated creditors and forming an expansive coalition of non-Working

---

[16]    From January 2011 through June 2011, the bankruptcy estates incurred monthly administrative expenses of approximately $35 million.

Group supporters for the Non-Con Plan.  Accordingly, the Working Group's unique efforts were critical to the formulation of the global settlement reached in the summer of 2011 and helped lead to broad-based support for the Settlement Plan.

### IV.    The Professional Services Provided Were Reasonable and the Expenses Incurred Were Actual, Necessary Costs

42.    Apart from the direct and substantial benefit that Blackstone's professional services provided the estate, such services, and the costs incurred in connection therewith, were reasonable, actual and necessary.  The compensation requested herein is commensurate with the complexity, importance, and nature of the problems and issues that manifested themselves in these cases, and the tasks and actions required by Blackstone in response thereto.  The rate structure employed by Blackstone in connection with this engagement is comparable to that employed by Blackstone – and peer professional firms – generally for other complex bankruptcy, insolvency and work-out matters, regardless of whether a fee application is required.  These rates and the rate structure reflect that such restructuring involve complexity, high stakes, and severe time pressures.  As set forth above, the Blackstone's services were performed expediently and efficiently; indeed, by working to build consensus among diverse groups of constituencies, Blackstone's actions helped save the estate hundreds of millions of dollars.  In light of this material savings, Blackstone respectfully submits that the compensation and expense reimbursement sought herein is reasonable.

## CONCLUSION

WHEREFORE, the Working Group respectfully requests entry of an order, substantially in the form of annexed hereto as Exhibit A, granting (i) the Application allowing Blackstone's fees and expenses in the amount of $13,710,343 as an administrative expense claim against the LBSF estate, and directing the payment of the foregoing amount from the LBSF

estate within ten (10) days after the date of entry of the order granting the Application, and (ii)

such other and further relief as the Court deems just and proper.

Dated: July 5, 2012
  New York, New York

*[Signature Pages Follow]*

Respectfully submitted,

BINGHAM MCCUTCHEN LLP
399 Park Avenue
New York, New York 10022
Telephone:  (212) 705-7000
Facsimile:  (212) 752-5378
Joshua Dorchak
joshua.dorchak@bingham.com

By: /s/ Joshua Dorchak
    Joshua Dorchak
    A Member of the Firm

*Attorneys for Deutsche Bank AG*

CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
Howard R. Hawkins, Jr.
Howard.Hawkins@cwt.com

- and -

700 Sixth Street, N.W.
Washington, D.C. 20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400
Mark C. Ellenberg
Mark.Ellenberg@cwt.com
Peter Friedman
Peter.Friedman@cwt.com


By: /s/ Mark C. Ellenberg
     Mark C. Ellenberg
     A Member of the Firm

*Attorneys for Morgan Stanley Capital Services Inc. and Morgan
Stanley & Co. International plc*

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Thomas J. Moloney
tmoloney@cgsh.com
Sean A. O'Neal
soneal@cgsh.com

By: /s/ Sean A. O'Neal
      Thomas J. Moloney
      Sean A. O'Neal
      A Member of the Firm

*Attorneys for D.E. Shaw Oculus Portfolios, L.L.C, D.E. Shaw Composite Portfolios, L.L.C., Goldman Sachs Bank USA, and Goldman Sachs International*

CLIFFORD CHANCE LLP
31 West 52nd Street
New York, New York 10019
Telephone: (212) 878-8000
Facsimile: (212) 878-8375
Andrew Brozman
Andrew.Brozman@CliffordChance.com

By: /s/ Andrew Brozman
     Andrew Brozman
     A Member of the Firm

*Attorneys for Credit Agricole Corporate and Investment Bank*

CRAVATH SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
Richard Levin
RLevin@cravath.com

By: /s/ Richard Levin
     Richard Levin
     A Member of the Firm

*Attorneys for Credit Suisse International*

PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036-8299
Telephone: (212) 969-4053
Facsimile: (212) 969-2900
Irena M. Goldstein
igoldstein@proskauer.com

By: /s/ Irena M. Goldstein
     Irena M. Goldstein
     A Member of the Firm

*Attorneys for The Royal Bank of Scotland plc*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3545
Facsimile: (212) 492-0545
Brian S. Herman
Bhermann@paulweiss.com

By: /s/ Brian S. Hermann
        Brian S. Hermann
        A Member of the Firm

*Attorneys for Eton Park Capital Management, L.P.*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Jeffrey D. Saferstein
jsaferstein@paulweiss.com
Alan W. Kornberg
akornberg@paulweiss.com

By: /s/ Jeffrey D. Saferstein
     Jeffrey D. Saferstein
     Alan Kornberg
     A Member of the Firm

*Attorneys for Oaktree Capital Management, L.P., solely in its capacity as agent on behalf of certain funds advised by it or their respective subsidiaries, and Silver Point Finance, LLC on behalf of its affiliated investment funds)*

SHEARMAN & STERLING LLP

599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
Fredric Sosnick
fsosnick@shearman.com
Ned S. Schodek
ned.schodek@shearman.com

By: /s/ Frederic Sosnick
    Fredric Sosnick

*Attorneys for Bank of America, N.A. and Merrill Lynch
International*

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8651
Facsimile: (212) 728-9651
Matt Feldman
mfeldman@willkie.com
Robin Spigel
rspigel@willkie.com

By: /s/ Matt Feldman
    Matt Feldman
    Robin Spigel
    A Member of the Firm

*Attorneys for Centerbridge Credit Advisors, LLC*

# EXHIBIT A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- X

In re

LEHMAN BROTHERS HOLDINGS INC., et al.,

Debtors.

-------------------------------------------------------------------- X

: Chapter 11

: Case No. 08-13555 (JMP)

: (Jointly Administered)

**ORDER GRANTING LEHMAN BROTHERS SPECIAL FINANCING INC. WORKING
GROUP'S APPLICATION FOR ENTRY OF AN ORDER, PURSUANT TO
11 U.S.C. §§ 503(b)(3)(D) AND 503(b)(4) FOR ALLOWANCE AND REIMBURSEMENT
OF REASONABLE PROFESSIONAL FEES AND ACTUAL, NECESSARY
EXPENSES IN MAKING A SUBSTANTIAL CONTRIBUTION IN THESE CASES**

Upon consideration of the application (the "Application")[1] of Bank of America, N.A.,

Centerbridge Credit Advisors, LLC, Crédit Agricole Corporate and Investment Bank, Credit

Suisse International, D.E. Shaw Oculus Portfolios, L.L.C., D.E. Shaw Composite Portfolios,

L.L.C., Deutsche Bank AG, Eton Park Capital Management, L.P., Goldman Sachs Bank USA,

Goldman Sachs International, Merrill Lynch International, Morgan Stanley & Co. International

plc, Morgan Stanley Capital Services, Inc., Oaktree Capital Management, L.P. (solely in its

capacity as agent on behalf of certain funds advised by it or its respective subsidiaries), Silver

Point Finance, LLC (an affiliate of certain claim holders), and the Royal Bank of Scotland plc,

(collectively, the "Working Group") for allowance and payment by the estates of a Chapter 11

administrative expense claim for reasonable professional fees and actual, necessary expenses

incurred by their advisor Blackstone Advisory Partners L.P. ("Blackstone") pursuant to 11

U.S.C. §§ 503(b)(3)(D) and 503(b)(4) for making a substantial contribution to the above-

captioned jointly administered Chapter 11 cases of Lehman Brothers Holdings Inc. ("LBHI")

---

[1]     Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the
       Application.

and certain of its subsidiaries and affiliates (collectively, the "Debtors"); and it appearing that

this Court has jurisdiction to consider the Application and the relief requested therein in

accordance with 28 U.S.C. §§ 157 and 1334; and it further appearing that this matter is a core

proceeding within the meaning of 28 U.S.C. § 157(b); and it further appearing that venue of this

proceeding and the Application is proper in this District in accordance with 28 U.S.C. §§ 1408

and 1409; and it further appearing that adequate and proper notice of the Application has been

given, and that no other or further notice is necessary; and it further appearing that the relief

requested in the Application is in the best interests of the Debtors, their estates and their

creditors; and after due consideration and sufficient cause appearing therefor, it is hereby:

**ORDERED** that the Application is granted in its entirety;

**IT IS FURTHER ORDERED** that Blackstone is hereby granted, pursuant to sections

503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code, an allowed administrative claim in the

amount of $13,710,343 (the "Administrative Claim Amount") against LBSF;

**IT IS FURTHER ORDERED** that the Debtors are hereby authorized and directed to

pay Blackstone the Administrative Claim Amount in full within ten (10) days after the date of

entry of this Order; and

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction to hear and

determine all matters arising from or related to the relief granted in this Order.


Dated: New York, New York
_____, 2012



_____
HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

## Blackstone Engagement Letter

The ██Blackstone██ Group®

February 10, 2011

To the Undersigned Counsel :

This letter confirms the understanding and agreement (the "Agreement") between Blackstone Advisory Partners L.P. ("Blackstone") and the undersigned counsel ("Counsel"), as counsel to members of the LBSF Public Side Working Group (the "Group"), regarding the retention of Blackstone on an exclusive basis by Counsel effective as of March 18, 2010 (the "Effective Date") as their financial advisor for the purposes set forth herein.

The Group shall initially include Bank of America, N.A., Centerbridge Credit Advisors, LLC, Crédit Agricole Corporate and Investment Bank, Credit Suisse International, D. E. Shaw Composite Portfolios, L.L.C., D. E. Shaw Oculus Portfolios, L.L.C., Deutsche Bank AG, Eton Park Capital Management, L.P., Goldman Sachs Bank USA (successor by merger to Goldman Sachs Capital Markets, L.P.), Goldman Sachs International, Merrill Lynch International, Morgan Stanley Capital Services Inc., Morgan Stanley & Co. International plc, certain funds advised by Oaktree Capital Management, L.P. or their respective subsidiaries, Silver Point Finance, LLC (an affiliate of certain claim holders), and The Royal Bank of Scotland plc (each, a "Member"). It is understood that other claim holders to Lehman Brothers Special Financing Inc. ("LBSF") may from time to time join the Group and that the term "Group" shall include such other claim holders. It is expressly understood that Blackstone is engaged by Counsel and not by the Group. For purposes of this engagement, and as regards the scope of its retention, Blackstone will take direction from and report its views and conclusions only to Counsel and others designated in writing by Counsel to Blackstone. This engagement must be held in the strictest confidence and not discussed with or disclosed to third parties without Counsel's prior written consent.

Under this Agreement, Blackstone will provide financial advisory services to Counsel in connection with a possible restructuring of certain liabilities of LBSF and will assist Counsel in analyzing, structuring, negotiating and effecting a Restructuring pursuant to the terms and conditions of this Agreement. As used in this Agreement, the term "Restructuring" shall mean, collectively, (i) any restructuring, reorganization and/or recapitalization of LBSF pursuant to Chapter 11 of the United States Bankruptcy Code affecting existing or potential debt obligations or other claims, including, without limitation, senior debt, junior debt, derivative claims, trade claims and general unsecured claims (collectively, the "Obligations") and/or (ii) any complete or partial repurchase, refinancing, extension, payment or repayment by the Debtors (as defined in the Joint Chapter 11 Plan of Reorganization of Lehman Brothers Holdings, Inc. and its Affiliated Debtors, dated March 15, 2010 (together with amendments, modifications or revisions to date or in the future, the "Plan")) of any of the Obligations.

The financial advisory services to be rendered by Blackstone will include the following:

(a)    Assist in the evaluation of the Debtors' Plan or any other plan for LBSF filed in the jointly administered cases of Lehman Brothers Holdings Inc. and its affiliates, including LBSF;

(b)    Assist in the development of financial data and presentations to Counsel and/or the Group;

(c)    Analyze various Restructuring scenarios, including consolidated and deconsolidated restructuring scenarios, and the potential impact of these scenarios on the recoveries of the Members under the Restructuring;

(d)    Participate in negotiations among the Group, the Debtors and its other creditors, suppliers, lessors and other interested parties;

(e)    Value consideration offered by the Debtors to the Members in connection with a Restructuring;

(f)    Assist in the development of an alternative plan of reorganization;

(g)    Provide expert witness testimony concerning any of the subjects encompassed by the Agreement; and

(h)    Provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a Restructuring as requested and mutually agreed.

Notwithstanding anything contained in this Agreement to the contrary, Blackstone shall have no responsibility for designing or implementing any initiatives to improve the Debtors' operations, profitability, cash management or liquidity.  Blackstone makes no representations or warranties about the Debtors' ability to (i) successfully improve its operations, (ii) maintain or secure sufficient liquidity to operate its business, or (iii) successfully complete a Restructuring. Blackstone is retained under this Agreement solely to provide advice regarding a Restructuring and is not being retained to provide "crisis management."

Blackstone acknowledges and agrees that it is being engaged to provide its independent professional judgment and expertise.  It will receive exactly the same compensation for its time and expenses no matter what opinions it forms or testimony it gives.

It is agreed that each Member will be responsible for its portion, as set forth in Schedule I hereto (for each Member, its "Share"), of the following fees to Blackstone for its financial advisory services, with no Member of the Group being liable for any other Member's share of the fee obligations (all fees and expenses payable to Blackstone pursuant to this Agreement shall

be payable solely by the Members unless otherwise specified below in sections (ii)(b) and (ii)(c), in which case the Group will fully support the payment of these fees and will not support or agree to a plan of reorganization that does not provide for such payments.  Counsel shall have no obligation to pay Blackstone's fees or expenses):

(i)    a monthly advisory fee (the "Monthly Fee") in the amount of $250,000, of which (a) $100,000 will be payable in cash (the "Cash Monthly Fee") and (b) $150,000 will be accrued monthly (the "Accrued Monthly Fee") and payable upon the earlier of (1) a consummation of an LBSF plan of reorganization or (2) the initial distribution to LBSF claim holders pursuant to a plan of reorganization (the "Distribution Date").  The first Cash Monthly Fee will be payable upon the execution of this Agreement and additional installments of such Cash Monthly Fee will be payable in advance on each monthly anniversary of the Effective Date;

(ii)   an additional fee (the "Completion Fee") of:  (a) $2,000,000 if neither of the fees set forth in (b) or (c) are paid, payable upon the Distribution Date with 100% of the Accrued Monthly Fees to be credited against the Completion Fee (such credits not to exceed $2,000,000), or (b) $8,500,000 if the Group pursues litigation against the Debtors' Plan to a judgment and/or proposes its own plan of reorganization, or (c) $5,000,000 if the Group does not pursue litigation against the Debtors' Plan and reaches a consensual agreement with the Debtors.  Such Completion Fee in (b) or (c) above will be payable by the Debtors' estates upon the Distribution Date (1) through an agreed settlement, (2) through the distribution to the LBSF claim holders or (3) as an administrative expense, and

(iii)  reimbursement of all reasonable and documented out-of-pocket expenses incurred during this engagement (the "Expenses"), including, but not limited to, travel and lodging, direct identifiable data processing, document production, publishing services and communication charges, courier services, working meals, reasonable fees and expenses of Blackstone's counsel and other necessary expenditures, payable upon rendition of invoices setting forth in reasonable detail the nature and amount of such expenses.  In connection therewith, the Group shall pay Blackstone on the Effective Date and maintain thereafter a $25,000 expense advance for which Blackstone shall account upon termination of this Agreement.

The advisory services and compensation arrangement set forth in this Agreement do not encompass other investment banking services or the arranging of debt or equity capital, issuing fairness opinions or any other specific services not set forth in this Agreement.  The terms and conditions of any such investment banking services, including compensation arrangements, would be set forth in a separate written agreement between Blackstone and the appropriate party.

Because Counsel is retaining Blackstone to assist Counsel in providing legal advice to the Group, it is the intention and position of Counsel that Blackstone's work for Counsel will be covered by the attorney work-product doctrine and other applicable privileges.  In connection with this retention, all oral or written communications between Blackstone and any of its employees or advisors, and Counsel or the Group as well as communications between Blackstone and other such persons and any attorney, expert, agent, or employee acting on behalf of Counsel or the Group, shall be regarded as confidential and made solely for the purpose of assisting Counsel in providing legal advice to the Group.  Accordingly, such communications are protected by the attorney-client privilege and the work-product doctrine. Blackstone agrees not to disclose any such communication to any third party without Counsel's prior written consent. In addition, all non-public information obtained in the course of this engagement shall remain confidential and subject to such privileges, and may not be disclosed to any third party, without Counsel's prior written consent.

Subject to the terms of this Agreement, Blackstone acknowledges and agrees that it will comply with the terms of the Common Interest Agreement between the Members, dated November 19, 2009, which has been sent to Blackstone for review.

Except as contemplated by the terms hereof or as required by applicable law or legal process, Blackstone shall keep confidential, for a period from the date hereof until one year following the termination of the Agreement, all material non-public information provided to it by or at the request of Counsel, and shall not disclose such information to any third party or to any of its employees or advisors except to those persons who have a need to know such information in connection with Blackstone's performance of its responsibilities hereunder and who are advised of the confidential nature of the information and who agree to keep such information confidential.   In addition, except as contemplated by the terms hereof or as required by applicable law or legal process, Blackstone shall keep confidential, and shall not disclose to any third-party, including any Member of the Group or any Member's counsel, all materials and information provided to it by and at the request of any individual Member when that Member, prior to the exchange of such materials or information marks the materials in a prominent manner with a designation such as "PRIVILEGED AND CONFIDENTIAL – [MEMBER] MATERIALS."

The Group and Counsel will request that the Debtors furnish or cause to be furnished to Blackstone such information as Blackstone believes appropriate to its assignment (all such information so furnished being the "Information").   The Group and Counsel recognize and confirm that Blackstone (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having independently verified the same, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information,

(c) is entitled to rely upon the Information without independent verification, and (d) will not make an appraisal of any assets in connection with its assignment.

All working papers, records, or other documents, regardless of their nature and the source from which they emanate, in whatever format, including electronic documents (collectively the "Materials"), shall be maintained by Blackstone separately from any other files Blackstone may possess and shall be held by Blackstone solely for Counsel's convenience and subject to Counsel's right to instruct Blackstone with respect to possession and control. Blackstone shall limit access to such materials in such a way as to ensure their continuing confidentiality. Blackstone will immediately return or destroy all documents, records, and working papers to Counsel and/or to each Member's individual counsel upon request, except as otherwise required by applicable law or government regulation.

As part of the agreement to provide services in this matter, Blackstone will immediately notify Counsel if any of the following events occurs: (a) a request by anyone to examine, inspect, or copy any of the Materials; (b) any attempt to serve, or the actual service of any court order, subpoena, or summons upon Blackstone which requires the production of any such Materials. If Blackstone is requested or required to disclose any Materials to a litigant, court, governmental or regulatory agency, stock exchange or similar body, and counsel for any Member may promptly notify Blackstone that a privilege is being asserted with respect to all or any portion of the such Materials, Blackstone will not disclose any portion of such Materials as to which such privilege is asserted, unless it is judicially determined that such Materials are not protected by such privilege.

In the event that, as a result of or in connection with Blackstone's engagement for Counsel, Blackstone becomes involved in any legal proceeding or investigation or is required by government regulation, subpoena or other legal process to produce documents, or to make its current or former personnel available as witnesses at deposition or trial, each Member of the Group will reimburse Blackstone its Share of the reasonable documented fees and expenses of its counsel incurred in responding to such a request. Nothing in this paragraph shall affect in any way the Group's obligations pursuant to the separate indemnification agreement attached hereto.

In connection with this engagement, Counsel may provide Blackstone with documents that are the subject of specific protective orders or confidentiality agreements limiting the use of or access to such documents. In any such instance, Counsel will provide Blackstone with a copy of the relevant confidentiality order or agreement for execution, if necessary. Blackstone agrees that to provide services to Counsel under this agreement it will be bound by the obligations set forth herein, as well as by the terms of any such protective order or confidentiality agreement, and will execute an undertaking setting forth its agreement to such terms.

It may be necessary for Counsel, from time to time, to disclose to Blackstone its legal theories and/or other privileged or confidential information. An essential term of this agreement,

therefore, is that Blackstone not disclose at any time to any third party any theories, opinions, facts, or other information obtained by or through Counsel, except such disclosures as Counsel may authorize in writing.

To protect Counsel's ability to make appropriate objections to disclosure, all written materials prepared by Blackstone in the course of this engagement shall be labeled: "Privileged & Confidential/Attorney Work Product."  All written reports or other documents reflecting Blackstone's findings, conclusions or views on any matter encompassed by this engagement shall be sent to Counsel, to the attention of: Thomas J. Moloney and Seth Grosshandler, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006; Irena Goldstein, Dewey & LeBoeuf LLP, 13 Avenue of the Americas, New York, New York 10019; Matt Feldman, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019-6099; Mark C. Ellenberg, Cadwalader, Wickersham & Taft LLP, 700 Sixth Street, N.W., Washington, DC 20001; Fredric Sosnick, Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York 10022; Richard Levin, Cravath Swaine & Moore LLP, Worldwide Plaza, 825 Eighth Avenue, New York, New York 10019-7475; Jeffrey D. Saferstein and Alan W. Kornberg, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064; Joshua Dorchak, Bingham McCutchen LLP, 399 Park Avenue, New York, New York 10022; Brian Hermann, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064; Andrew Brozman and Sara Tapinekis, Clifford Chance US LLP, 31 West 52nd Street, New York, New York  10019; and Chaim Fortgang and the Legal Department, Silver Point Finance, LLC, Two Greenwich Plaza, Greenwich, CT 06830-7149.

In the event that the Information belonging to the Debtors, the Members or Counsel is stored electronically on Blackstone's computer systems, Blackstone shall not be liable for any damages resulting from unauthorized access, misuse or alteration of such information by persons not acting on its behalf, provided that Blackstone exercises the same degree of care in protecting the confidentiality of, and in preventing unauthorized access to the Debtors', the Group's or Counsel's information that it exercises with regard to its own most sensitive proprietary information.

Except as required by applicable law, any advice to be provided by Blackstone under this Agreement shall not be disclosed publicly or made available to third parties (other than the Counsel's other professional advisors or, if appropriate in the Counsel's judgment, in any filings in a Chapter 11 proceeding) without the prior written consent of Blackstone.  All services, advice and information and reports provided by Blackstone to Counsel in connection with this assignment shall be for the sole benefit of Counsel and the Members and shall not be relied upon by any other person.

Each Member, severally and not jointly, will indemnify Blackstone and its agents, representatives, members and employees for its respective Share of any indemnification costs.  A

copy of our standard form of indemnification agreement is attached to this Agreement as Attachment A.  Blackstone acknowledges Counsel has no obligation to indemnify Blackstone.

We also agree that neither Blackstone nor any of its agents, representatives, members, or employees shall have any liability (whether direct or indirect, in contract or tort or otherwise), to the Group for or in connection with the Engagement except for any such liability for losses, claims, damages or liabilities incurred by us that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the negligence or willful misconduct of Blackstone.

Blackstone's engagement hereunder may be terminated upon 30 days' written notice without cause by either Blackstone or counsel for any Member, on behalf of and with respect to that Member; termination for cause by either party will occur forthwith. Subject in all respects to the provisions of the next succeeding sentence, upon the effective date of termination of the Agreement by counsel for any Member, such Member shall cease to be responsible for payment of its Share of further Monthly Fees and Expenses, which Monthly Fees and Expenses will be reallocated among the remaining Members, but shall continue to be responsible for its Share of the Monthly Fees and Expenses that have already become payable and/or have already accrued, for its Share of the Completion Fee in the event that at any time prior to the expiration of 18 months following the termination of this Agreement by counsel for that Member the Completion Fee comes payable, and for its Share of the Indemnity insofar as the actions giving rise to the Indemnity occurred prior to the date of termination.  Notwithstanding anything to the contrary in the foregoing, (a) the provisions relating to the payment of fees and expenses accrued through the date of termination, the status of Blackstone as an independent contractor and the limitation as to whom Blackstone shall owe any duties will survive any such termination, (b) any such termination shall not affect the Group's obligations under the indemnification agreement attached as Attachment A or Blackstone's confidentiality and privilege obligations hereunder and (c) Blackstone shall be entitled to the applicable Completion Fee (and the Group will have the applicable obligations with respect to reaching an agreement with the Debtors in connection with the Completion Fees in (ii)(b) and (ii)(c) of the fee section in this Agreement) in the event that at any time prior to the expiration of 18 months following the termination of this Agreement a Restructuring is thereafter consummated.

None of the Group or Counsel appear on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury, nor are they prohibited parties according to other U.S. government regulatory or enforcement agencies.

Notwithstanding anything to the contrary provided elsewhere herein, none of the provisions of this letter shall in any way limit the activities of The Blackstone Group L.P. and its affiliates in their businesses distinct from the restructuring advisory business of The Blackstone Group L.P., provided that the confidential information of the Group and/or Counsel is not made available to representatives of The Blackstone Group L.P. and its affiliates who are not involved

in the restructuring advisory business of The Blackstone Group L.P.  Should such confidential information be made available to a Representative of The Blackstone Group L.P. and its affiliates who is not involved in restructuring advisory business of The Blackstone Group L.P., such Representative shall be bound by this letter in accordance with its terms.

This Agreement (including the attached indemnification agreement) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect the Agreement in any other respect, which will remain in full force and effect.  No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in that state.

The Group, Counsel and Blackstone hereby agree that any action or proceeding brought by the Group or Counsel against Blackstone or by Blackstone against the Group or Counsel based hereon or arising out of Blackstone's engagement hereunder, shall be brought and maintained by the Group, Counsel or Blackstone exclusively in the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York.  The Group, Counsel and Blackstone irrevocably submit to the jurisdiction of the courts of the State of New York located in the City and County of New York and the United States District Court for the Southern District of New York and appellate courts from any thereof for the purpose of any action or proceeding based hereon or arising out of Blackstone's engagement hereunder and irrevocably agree to be bound by any judgment rendered thereby in connection with such action or proceedings.  The Group, Counsel and Blackstone hereby irrevocably waive, to the fullest extent permitted by law, any objection they may have or hereafter may have to the laying of venue of any such action or proceeding brought in any such court referred to above and any claim that such action or proceeding has been brought in an inconvenient forum and agrees not to plead or claim the same.

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Blackstone the duplicate copy of this Agreement and the indemnification agreement attached hereto as Attachment A.

Very truly yours,

BLACKSTONE ADVISORY PARTNERS L.P.

By:_____

Name:    Timothy R. Coleman
Title:    Senior Managing Director

Accepted and Agreed to as
of the date first written above:

BINGHAM MCCUTCHEN LLP

By:_____

    Name:
    Title:

CADWALADER, WICKERSHAM & TAFT LLP

By:_____

    Name:
    Title:

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:_____

    Name:
    Title:

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Blackstone the duplicate copy of this Agreement and the indemnification agreement attached hereto as Attachment A.

Very truly yours,

BLACKSTONE ADVISORY PARTNERS L.P.

By:_____

Name:    Timothy R. Coleman
Title:    Senior Managing Director

Accepted and Agreed to as
of the date first written above:

BINGHAM MCCUTCHEN LLP

By:_____
    Name:  Joshua Dorchak
    Title:  Partner

CADWALADER, WICKERSHAM & TAFT LLP

By:_____
    Name:
    Title:

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:_____
    Name:
    Title:

9

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Blackstone the duplicate copy of this Agreement and the indemnification agreement attached hereto as Attachment A.

Very truly yours,

BLACKSTONE ADVISORY PARTNERS L.P.

By:_____

Name:   Timothy R. Coleman
Title:   Senior Managing Director

Accepted and Agreed to as
of the date first written above:

BINGHAM MCCUTCHEN LLP

By:_____

Name:
Title:

CADWALADER, WICKERSHAM & TAFT LLP

By:_____

Name: Mark C. Ellenberg
Title: Partner

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:_____

Name:
Title:

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Blackstone the duplicate copy of this Agreement and the indemnification agreement attached hereto as Attachment A.


Very truly yours,

BLACKSTONE ADVISORY PARTNERS L.P.


By:_____

Name:    Timothy R. Coleman
Title:    Senior Managing Director

Accepted and Agreed to as
of the date first written above:


BINGHAM MCCUTCHEN LLP


By:_____

    Name:
    Title:


CADWALADER, WICKERSHAM & TAFT LLP


By:_____

    Name:
    Title:


CLEARY GOTTLIEB STEEN & HAMILTON LLP


By:_____

    Name: Thomas J. Moloney
    Title: Partner

CRAVATH, SWAINE MOORE LLP

By: _____

    Name: RICHARD LEVIN
    Title: PARTNER

DEWEY & LEBOEUF LLP

By: _____

    Name:
    Title:

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____

    Name:
    Title:

SHEARMAN & STERLING LLP

By: _____

    Name:
    Title:

WILLKIE FARR & GALLAGHER LLP

By: _____

    Name:
    Title:

CRAVATH, SWAINE MOORE LLP

By:_____

    Name:
    Title:

DEWEY & LEBOEUF LLP

By:_____

    Name: *Irena Goldstein*
    Title: *Partner*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:_____

    Name:
    Title:

SHEARMAN & STERLING LLP

By:_____

    Name:
    Title:

WILLKIE FARR & GALLAGHER LLP

By:_____

    Name:
    Title:

CRAVATH, SWAINE MOORE LLP

By:_____

    Name:
    Title:


DEWEY & LEBOEUF LLP

By:_____

    Name:
    Title:


PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _/s/ Alan W. Kornberg_

    Name: Alan W. Kornberg
    Title: Partner


SHEARMAN & STERLING LLP

By:_____

    Name:
    Title:


WILLKIE FARR & GALLAGHER LLP

By:_____

    Name:
    Title:

CRAVATH, SWAINE MOORE LLP

By:_____

   Name:
   Title:

DEWEY & LEBOEUF LLP

By:_____

   Name:
   Title:

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:_____

   Name:
   Title:

SHEARMAN & STERLING LLP

By: _Ledia Donile_

   Name:
   Title:

WILLKIE FARR & GALLAGHER LLP

By:_____

   Name:
   Title:

10

Page 10

CRAVATH, SWAINE MOORE LLP

By:_____

    Name:
    Title:

DEWEY & LEBOEUF LLP

By:_____

    Name:
    Title:

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:_____

    Name:
    Title:

SHEARMAN & STERLING LLP

By:_____

    Name:
    Title:

WILLKIE FARR & GALLAGHER LLP

By:_____

    Name: Matthew A. Feldman
    Title: Partner

10

Page 10-B

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____

Name: Brian S. Hermann
Title: Partner

Clifford Chance US LLP

By: _Andrew Brozman_    1/27/2011
    Name: ANDREW BROZMAN
    Title: PARTNER

BANK OF AMERICA, N.A.

By: _____

Name: Kevin M. Behan
Title: Senior Vice President


CENTERBRIDGE CREDIT ADVISORS, LLC

By: _____

Name:
Title:


CREDIT SUISSE INTERNATIONAL

By: _____

Name:
Title:


CREDIT SUISSE INTERNATIONAL

By: _____

Name:
Title:

BANK OF AMERICA, N.A.

By:_____

    Name:
    Title:


CENTERBRIDGE CREDIT ADVISORS, LLC

By:_____

    Name: Vivek Melwani
    Title: Managing Director


CREDIT SUISSE INTERNATIONAL

By:_____

    Name:
    Title:


CREDIT SUISSE INTERNATIONAL

By:_____

    Name:
    Title:

BANK OF AMERICA, N.A.

By:_____
    Name:
    Title:


CENTERBRIDGE CREDIT ADVISORS, LLC


By:_____
    Name:
    Title:


CREDIT SUISSE INTERNATIONAL

By:_____
    Name: **PETER STEVENS**
    Title: **Managing Director**


CREDIT SUISSE INTERNATIONAL

By:_____
    Name:
    Title: **Jan Przewozniak**
           **Managing Director**


11

D. E. SHAW COMPOSITE PORTFOLIOS, LLC

By: _Mary Reidy_
   Name: Mary Reidy
   Title: Authorized Signatory

D. E. SHAW OCULUS PORTFOLIOS, LLC

By: _Mary Reidy_
   Name: Mary Reidy
   Title: Authorized Signatory

GOLDMAN SACHS BANK USA (successor by merger to Goldman Sachs Capital Markets, L.P.)

By: _____

   Name:
   Title:

GOLDMAN SACHS INTERNATIONAL

By: _____

   Name:
   Title:

D. E. SHAW COMPOSITE PORTFOLIOS, LLC

By:_____

    Name:

    Title:

D. E. SHAW OCULUS PORTFOLIOS, LLC

By:_____

    Name:

    Title:

GOLDMAN SACHS BANK USA (successor by merger to Goldman Sachs Capital Markets, L.P.)

By:_____

    Name:  Susan Rudov

    Title:  authorized signer

GOLDMAN SACHS INTERNATIONAL

By:_____

    Name:

    Title:

D. E. SHAW COMPOSITE PORTFOLIOS, LLC

By:_____
    Name:
    Title:

D. E. SHAW OCULUS PORTFOLIOS, LLC

By:_____
    Name:
    Title:

GOLDMAN SACHS BANK USA (successor by merger to Goldman Sachs Capital Markets, L.P.)

By:_____
    Name:
    Title:

GOLDMAN SACHS INTERNATIONAL

By:_____
    Name:
    Title:  James Powell
             Managing Director

Page 12-B

DEUTSCHE BANK AG

By: _____

Name: _____

Title: Ernest C. Goodrich, Jr.
        Managing Director & Senior Counsel

Steven Kessler
Director

12-B

MERRILL LYNCH INTERNATIONAL

By: _Jane Richmond-Patrick_

    Name:      JANE RICHMOND-PATRICK
    Title:      AUTHORISED SIGNATORY

MORGAN STANLEY CAPITAL SERVICES INC.


By:_____
    Name:
    Title:

MORGAN STANLEY & CO. INTERNATIONAL PLC


By:_____
    Name:
    Title:


OAKTREE CAPITAL MANAGEMENT, L.P., solely in its capacity as agent on behalf of certain funds advised by it or their respective subsidiaries


By:_____
    Name:
    Title:


By:_____
    Name:
      Title:

MERRILL LYNCH INTERNATIONAL

By:_____

    Name:

    Title:

MORGAN STANLEY CAPITAL SERVICES INC.

By:_____

    Name:        **Simon Platel**
    Title:        **Vice President**

MORGAN STANLEY & CO. INTERNATIONAL PLC

By:_____

    Name:

    Title:

OAKTREE CAPITAL MANAGEMENT, L.P., solely in its capacity as agent on behalf of
certain funds advised by it or their respective subsidiaries

By:_____

    Name:

    Title:

By:_____

    Name:

        Title:

13

Page  13

MERRILL LYNCH INTERNATIONAL

By:_____

    Name:

    Title:


MORGAN STANLEY CAPITAL SERVICES INC.


By:_____

    Name:
    Title:


MORGAN STANLEY & CO. INTERNATIONAL PLC

By:_____

    Name:  MASSIMO PIAZZI
    Title:  Authorised Signatory


OAKTREE CAPITAL MANAGEMENT, LP


By:_____

    Name:
    Title:


13

MERRILL LYNCH INTERNATIONAL

By:_____

    Name:

    Title:


MORGAN STANLEY CAPITAL SERVICES INC.

By:_____

    Name:

    Title:


MORGAN STANLEY & CO. INTERNATIONAL PLC

By:_____

    Name:

    Title:


OAKTREE CAPITAL MANAGEMENT, L.P., solely in its capacity as agent on behalf of
certain funds advised by it or their respective subsidiaries

By:_____

    Name: Robert O'Leary

    Title: Managing Director

By:_____

    Name:

    Title: Emily Alexander
           Senior Vice President, Legal


13

THE ROYAL BANK OF SCOTLAND PLC

By: _____

Name:  **Michael T. Fabiano**
Title:   **Managing Director**

ETON PARK CAPITAL MANAGEMENT, L.P., solely on behalf of funds for which it serves as investment manager

By: _____

Name:
Title:

Serge Todorovich
Associate General Counsel
Eton Park Capital Management, L.P.

14-B

CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK.

By: _____ 1/27/11

    Name: Alan Sidrane
    Title:  Managing Director

By: _____ 1/27/2011

    Name: Kathleen Sweeney
    Title:  Managing Director

Page   14-D

SILVER POINT FINANCE, LLC (an affiliate of certain claim holders)

By:_____

Name: Michael Gatto

Title: Authorized Person

14-D

ATTACHMENT A

April 1, 2010

Blackstone Advisory Partners L.P.
345 Park Avenue
New York, NY  10154

INDEMNIFICATION AGREEMENT

Ladies and Gentlemen:

We acknowledge that Counsel (as defined in the Engagement Letter) has engaged Blackstone Advisory Partners L.P. ("Blackstone") to advise and assist in connection with the matters referred to in the letter of agreement dated as of April 1, 2010 (the "Engagement Letter").  Each Member (as defined in the Engagement Letter) agrees, acting severally and not jointly, to indemnify and hold harmless you and your affiliates and your and their respective partners (both general and limited), members, officers, directors, employees and agents and each other person, if any, controlling you or any of your affiliates, each, solely in their capacity as such, (you and each such other person being an "Indemnified Party") from and against its Share (as defined in the Engagement Letter) of any losses, claims, damages, expenses and liabilities whatsoever, whether they be joint or several, related to, arising out of or in connection with the engagement (the "Engagement") under the Engagement Letter and will reimburse each Indemnified Party for its Share of all expenses (including reasonable and documented fees, expenses and disbursements of outside counsel) as they are incurred in connection with investigating, preparing, pursuing, defending or assisting in the defense of any action, claim, suit, investigation or proceeding related to, arising out of or in connection with the Engagement or this agreement, whether or not pending or threatened, whether or not any Indemnified Party is a party and whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by us, provided that if Blackstone brings suit against an  Indemnified Party to collect its fees, the Indemnified Party shall not be responsible for the expenses incurred by Blackstone in seeking recovery of such fees.  We will not, however, be liable under the foregoing indemnification provision for any losses, claims, damages or liabilities (or expenses relating thereto) that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the gross negligence or willful misconduct of Blackstone.

1

If the indemnification provided for in the preceding paragraph is judicially determined to be unavailable to an Indemnified Party in respect of any losses, claims, damages or liabilities referred to herein, then, in lieu of indemnifying such Indemnified Party hereunder, we shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages or liabilities (and expenses relating thereto), in such proportion as is appropriate to reflect the relative fault of each of you and us, as well as any other relevant equitable considerations, with each Member contributing its Share of the amount payable by the Group; provided, however, to the extent permitted by applicable law, in no event shall your aggregate contribution to the amount paid or payable exceed the aggregate amount of fees actually received by you under the Engagement Letter.

Neither party to this agreement will, without the prior written consent of the other party (which consent will not be unreasonably withheld), settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (a "Judgment"), whether or not we or any Indemnified Party are an actual or potential party to such claim, action, suit or proceeding. In the event that we seek to settle or compromise or consent to the entry of any Judgment, we agree that such settlement, compromise or consent (i) shall include an unconditional release of Blackstone and each other Indemnified Party hereunder from all liability arising out of such claim, action, suit or proceeding, (ii) shall not include a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of Blackstone or each other Indemnified Party, and (iii) shall not impose any continuing obligations or restrictions on Blackstone or each other Indemnified Party (except with respect to any obligations in the Agreement regarding confidentiality).

Promptly after receipt by an Indemnified Party of notice of any complaint or the commencement of any action or proceeding with respect to which indemnification is being sought hereunder, such person will notify us in writing of such complaint or of the commencement of such action or proceeding, but failure to so notify us will not relieve us from any liability which we may have hereunder or otherwise, except to the extent that such failure materially prejudices our rights. If we so elect or are requested by such Indemnified Party, we will assume the defense of such action or proceeding, including the employment of counsel reasonably satisfactory to Blackstone and the payment of the reasonable and documented fees and disbursements of such counsel.

In the event, however, such Indemnified Party reasonably determines in its judgment that having common counsel would present such counsel with a conflict of interest or if we fail to assume the defense of the action or proceeding in a timely manner, then such Indemnified Party may employ separate counsel reasonably satisfactory to us to represent or defend it in any such action or proceeding and each Member will pay its Share of the reasonable and documented fees and disbursements of such counsel; provided, however, that we will not be required to pay the fees and disbursements of more than one separate counsel for all Indemnified Parties in any

jurisdiction in any single action or proceeding. In any action or proceeding the defense of which we assume, the Indemnified Party will have the right to participate in such litigation and to retain its own counsel at such Indemnified Party's own expense.

The foregoing reimbursement, indemnity and contribution obligations of the Group (as defined in the Engagement Letter) under this agreement shall be in addition to any rights that an Indemnified Party may have at common law or otherwise, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Group and such Indemnified Party.

The provisions of this agreement shall apply to the Engagement and any written modification of the Engagement and shall remain in full force and effect regardless of any termination or the completion of your services under the Engagement Letter.

This Agreement and the Engagement Letter shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts executed in and to be performed in that state.

                                          Very truly yours,

                                          BANK OF AMERICA, N.A.

                                          By: _____

                                          Name:  Kevin M. Behan
                                          Title: Senior Vice President


                                          CENTERBRIDGE CREDIT
                                          ADVISORS, LLC


                                          By: _____

                                             Name:
                                             Title:

                                          3

jurisdiction in any single action or proceeding.  In any action or proceeding the defense of which we assume, the Indemnified Party will have the right to participate in such litigation and to retain its own counsel at such Indemnified Party's own expense.

The foregoing reimbursement, indemnity and contribution obligations of the Group (as defined in the Engagement Letter) under this agreement shall be in addition to any rights that an Indemnified Party may have at common law or otherwise, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Group and such Indemnified Party.

The provisions of this agreement shall apply to the Engagement and any written modification of the Engagement and shall remain in full force and effect regardless of any termination or the completion of your services under the Engagement Letter.

This Agreement and the Engagement Letter shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts executed in and to be performed in that state.

Very truly yours,

BANK OF AMERICA, N.A.

By:_____

    Name:
    Title:


CENTERBRIDGE CREDIT
ADVISORS, LLC

By:_____

    Name: Vivek Melwani
    Title: Managing Director

Page   4

CREDIT SUISSE INTERNATIONAL

By: _____

   Name:
   Title:   **PETER STEVENS**
           **Managing Director**

CREDIT SUISSE INTERNATIONAL

By: _____

   Name:   **Jan Przewozniak**
   Title:
          **Managing Director**

D. E. SHAW COMPOSITE
PORTFOLIOS, LLC

By: _____

   Name:

   Title:

D. E. SHAW OCULUS PORTFOLIOS,
LLC

By: _____

   Name:
   Title:

4

CREDIT SUISSE INTERNATIONAL


By:_____
    Name:
    Title:


CREDIT SUISSE INTERNATIONAL


By:_____
    Name:
    Title:


D. E. SHAW COMPOSITE
PORTFOLIOS, LLC


By: _Mary Ruidy_____
    Name: Mary Ruidy
    Title: Authorized Signatory


D. E. SHAW OCULUS PORTFOLIOS,
LLC


By: _Mary Ruidy_____
    Name: Mary Reidy
    Title: Authorized Signatory

Page  4-B

DEUTSCHE BANK AG

By:_____

Name:
Title:

Steven Kessler
Director

GOLDMAN SACHS BANK USA
(successor by merger to Goldman Sachs
Capital Markets, L.P.)

By:

Name: Susan Rudov
Title: authorized signatory

GOLDMAN SACHS
INTERNATIONAL

By:

    Name:
    Title:

MERRILL LYNCH INTERNATIONAL

By:

    Name:
    Title:

Page   5

GOLDMAN SACHS BANK USA
(successor by merger to Goldman Sachs
Capital Markets, L.P.)

By:_____
    Name:
    Title:


GOLDMAN SACHS
INTERNATIONAL

By:_____
    Name:
    Title:   James Powell
          Managing Director


MERRILL LYNCH INTERNATIONAL

By:_____
    Name:
    Title:

5

Page   5

DEUTSCHE BANK AG

By:_____

    Name:
    Title:


GOLDMAN SACHS BANK USA
(successor by merger to Goldman Sachs
Capital Markets, L.P.)

By:_____

    Name:
    Title:


GOLDMAN SACHS
INTERNATIONAL

By:_____

    Name:
    Title:


MERRILL LYNCH INTERNATIONAL

By: _Anne Richmond Patrick_

    Name:
    Title:    ANNE RICHMOND-PATRICK
               AUTHORISED SIGNATORY

MORGAN STANLEY CAPITAL
SERVICES INC.

By:

Name:
Title:          **Simon Platel**
                **Vice President**

MORGAN STANLEY & CO.
INTERNATIONAL PLC

By:_____

Name:
Title:

OAKTREE CAPITAL
MANAGEMENT, L.P., solely in its
capacity as agent on behalf of certain
funds advised by it or their respective
subsidiaries

By:_____

Name:
Title:

THE ROYAL BANK OF SCOTLAND
PLC

By:_____

Name:
Title:

6

Page    6

MORGAN STANLEY CAPITAL
SERVICES INC.

By:_____

    Name:
    Title:


MORGAN STANLEY & CO.
INTERNATIONAL PLC

By:_____

    Name:   MASSIMO PIAZZI
    Title:   Authorised Signatory


OAKTREE CAPITAL
MANAGEMENT, LP

By:_____

    Name:
    Title:


THE ROYAL BANK OF SCOTLAND
PLC

By:_____

    Name:
    Title:

6

MORGAN STANLEY CAPITAL
SERVICES INC.

By:_____

   Name:
   Title:


MORGAN STANLEY & CO.
INTERNATIONAL PLC

By:_____

   Name:
   Title:


OAKTREE CAPITAL
MANAGEMENT, L.P., solely in its
capacity as agent on behalf of certain
funds advised by it or their respective
subsidiaries

By:_____

   Name: Robert O'Lean Emily Alexander
   Title: Managing Director Senior Vice President, Leg


THE ROYAL BANK OF SCOTLAND
PLC

By:_____

   Name:
   Title:


6

MORGAN STANLEY CAPITAL
SERVICES INC.


By:_____

    Name:
    Title:


MORGAN STANLEY & CO.
INTERNATIONAL PLC


By:_____

    Name:
    Title:


OAKTREE CAPITAL
MANAGEMENT, L.P., solely in its
capacity as agent on behalf of certain
funds advised by it or their respective
subsidiaries


By:_____

    Name:
    Title:


THE ROYAL BANK OF SCOTLAND
PLC

By:_____

    Name:  Michael T. Fabiano
    Title:  Managing Director

6

ETON PARK CAPITAL
MANAGEMENT, L.P., solely on behalf
of funds for which it serves as
investment manager

By: _____

Name:

Title:            **Serge Todorovich**
**Associate General Counsel**
**Eton Park Capital Management, L.P.**

CREDIT AGRICOLE CORPORATE
AND INVESTMENT BANK

By: _____ 1/27/11

    Name: Alan Sidrane
    Title:   Managing Director

By: _____ 1/27/2011

    Name: Kathleen Sweeney
    Title:   Managing Director

SILVER POINT FINANCE, LLC (an
affiliate of certain claim holders)

AS   By: _____

Name: Michael Gatto
Title: Authorized Person

Accepted and Agreed
to as of the date first
written above:
BLACKSTONE ADVISORY PARTNERS L.P.

By: _____

Senior Managing Director

1

SCHEDULE I

Each Member of the Group shall be responsible for its Share as follows:

| Member | Share |
|---|---|
| Bank Of America, N.A. and Merrill Lynch International | Each one-twenty-fourth (1/24) |
| Centerbridge Credit Advisors, LLC | One-twelfth (1/12) |
| Crédit Agricole Corporate and Investment Bank | One-twelfth (1/12) |
| Credit Suisse International | One-twelfth (1/12) |
| D. E. Shaw Oculus Portfolios, LLC and D. E. Shaw Composite Portfolios, LLC | Each one-twenty-fourth (1/24) |
| Deutsche Bank AG | One-twelfth (1/12) |
| Eton Park Capital Management, L.P. | One-twelfth (1/12) |
| Goldman Sachs Bank USA (successor by merger to Goldman Sachs Capital Markets, L.P.) and Goldman Sachs International | Each one-twenty-fourth (1/24) |
| Morgan Stanley Capital Services Inc. and Morgan Stanley & Co. International plc | Each one-twenty-fourth (1/24) |
| Certain funds advised by Oaktree Capital Management, L.P. or their respective subsidiaries | One-twelfth (1/12) |
| Silver Point Finance, LLC (an affiliate of certain claim holders) | One-twelfth (1/12) |
| The Royal Bank Of Scotland plc | One-twelfth (1/12) |