**Objection Deadline: July 25, 2012 at 4:00 p.m. (Prevailing Eastern Time)**
**Hearing Date and Time: August 15, 2012 at 10:00 a.m. (Prevailing Eastern Time)**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Thomas J. Moloney
Sean A. O'Neal

*Attorneys for Goldman Sachs Bank USA*
*and Goldman Sachs International*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **Chapter 11** |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | **Case No. 08-13555 (JMP)** |
| **Debtors.** | **(Jointly Administered)** |

## NOTICE OF APPLICATION OF GOLDMAN SACHS BANK USA AND GOLDMAN SACHS INTERNATIONAL FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 503(b)(3)(D) AND 503(b)(4) FOR ALLOWANCE AND REIMBURSEMENT OF REASONABLE PROFESSIONAL FEES IN MAKING A SUBSTANTIAL CONTRIBUTION IN THESE CASES

      **PLEASE TAKE NOTICE** that a hearing on the annexed application (the "Application") of Goldman Sachs Bank USA and Goldman Sachs International for Entry of an Order Pursuant to 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4) for Allowance and Reimbursement of Reasonable Professional Fees in Making a Substantial Contribution in These Cases will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **August 15, 2012 at 10:00 a.m. (prevailing Eastern Time)** (the "Hearing").

      **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Application shall be in writing, shall conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-399 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York, 10004, Courtroom 601 (ii) Lehman Brothers Holdings Inc., 1271 Avenue of the Americas, 45th Floor, New York, New York 10020 (Attn: John Suckow and William Fox); (iii) Weil, Gotshal & Manges, LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey Miller, Esq. and Richard P. Krasnow, Esq.) counsel for the Debtors; (iv) Milbank, Tweed, Hadley & McCoy LLP, 1 Chase Manhattan Plana, New York, New York 10005 (Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq. and Evan Fleck, Esq.) counsel for the Creditors' Committee; (v) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 22nd Floor, New York, New York 10004 (Attn: Tracy Hope Davis, Esq., Elisabetta G. Gasparini, Esq., and Andrea B. Schwartz, Esq.); (vi) Godfrey & Kahn, S.C., One East Main Street, Suite 500, Madison, Wisconsin 53703 (Attn: Brady C. Williamson, Esq. and Katherine Stadler, Esq.) counsel for the Fee Committee; and (vii) all parties who have requested notice in these chapter 11 cases, so as to be so filed and received by no later than **July 25, 2012 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

       **PLEASE TAKE FURTHER NOTICE** that if an objection to the Application is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

       **PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: July 5, 2012
New York, New York

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: /s/ Sean A. O'Neal
Thomas J. Moloney
Sean A. O'Neal
Member of the Firm
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Attorneys for Goldman Sachs Bank USA and Goldman Sachs International*

**Objection Deadline: July 25, 2012 at 4:00 p.m. (Prevailing Eastern Time)**
**Hearing Date and Time: August 15, 2012 at 10:00 a.m. (Prevailing Eastern Time)**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Thomas J. Moloney
Sean A. O'Neal

*Attorneys for Goldman Sachs Bank USA*
*and Goldman Sachs International*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
:
In re                                              :          **Chapter 11**
:
**LEHMAN BROTHERS HOLDINGS INC., et al.,** :          **Case No. 08-13555 (JMP)**
:
Debtors.                                           :          **(Jointly Administered)**
:
---------------------------------------------------------------x

### APPLICATION OF GOLDMAN SACHS BANK USA AND GOLDMAN SACHS INTERNATIONAL FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 503(b)(3)(D) AND 503(b)(4) FOR ALLOWANCE AND REIMBURSEMENT OF REASONABLE PROFESSIONAL FEES IN MAKING A SUBSTANTIAL CONTRIBUTION IN THESE CASES

Goldman Sachs Bank USA ("GSB") and Goldman Sachs International ("GSI", and

together with GSB, "Goldman Sachs") submit this application (the "Application") for entry of an

order, substantially in the form annexed hereto as Exhibit A, pursuant to sections 503(b)(3)(D)

and 503(b)(4) of Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), for

the allowance and reimbursement by the estate of Debtor Lehman Brothers Special Financing

Inc. ("LBSF") of reasonable professional fees incurred by its outside counsel, Cleary Gottlieb

Steen & Hamilton LLP ("Cleary Gottlieb"), in the amount of $3,292,868.03 for making a

substantial contribution in these cases.  In support of this Application, Goldman Sachs

respectfully represents:[1]

## PRELIMINARY STATEMENT

1.      On December 6, 2011, this Court confirmed a Chapter 11 plan for the Debtors

(the "Plan") that was predicated on an interconnected resolution of virtually all of the contested

issues that had arisen in the Chapter 11 Cases and garnered the support of the overwhelming

majority of the Debtors' voting creditors including Goldman Sachs and other similarly situated

creditors.  After a remarkably competitive Chapter 11 plan process involving the filing of

competing plans of reorganization by the Debtors and two different coalitions of creditor

constituencies, and the subsequent negotiation of a consensual Plan between the Debtors and

these various creditor constituencies, this Court confirmed a Plan for "the biggest, the most

incredibly complex, [and] the most impossibly challenging international bankruptcy that ever

was."  Transcript of Dec. 6, 2011 Hearing: 68:24-25.  The Court characterized the final result as

"the most overwhelming outpouring of creditor consensus in the history of insolvency law."  Id.

at 69:4-6.

2.      The record in these cases undisputedly shows that Goldman Sachs made a

substantial contribution to the Chapter 11 plan process and derivative claims resolution in these

cases.  Specifically, one of the overarching and most hotly contested issues among parties in

interest was whether Debtors' numerous estates would be substantively consolidated.  Indeed,

this issue was germane to every creditor constituency, many of whom viewed a "consolidating

plan" as inappropriate, contrary to applicable law and prejudicial to their interests.

---

[1]      Of the requested amount, $3,285,908.24 represents amounts for fees invoiced to and already paid by
Goldman Sachs.  The remaining $6,959.79 represents amounts for fees invoiced but not yet paid.

3.      A large, well-financed and effectively represented ad hoc group of creditors of LBHI were outspoken advocates for a substantive consolidation plan.  In order to reach consensus, there needed to be a strong, knowledgeable and respected counterweight group representing other competing interests. Goldman Sachs and its advisors took the lead in opposing substantive consolidation, and did so in a constructive way. Goldman Sachs and its advisors analyzed and helped develop creative compromises embedded in the Plan, including cutting through the issues of substantive consolidation, recharacterization of intercompany payables, administrative expense allocations between LBSF and LBHI, and RACERS.[2]

4.      The efforts of Goldman Sachs and Cleary Gottlieb were instrumental in building consensus surrounding these complex issues.  For nearly two years, Goldman Sachs and Cleary Gottlieb worked to investigate substantive consolidation and related intercompany issues, achieve consensus with other LBSF creditors (and other parties in interest including foreign administrators and creditors of certain foreign Lehman affiliates) on the terms of a competing plan and related disclosure statement that respected the corporate separateness of the various Debtors, and to reach a resolution with the Debtors and other creditor constituencies, which ultimately resulted in a comprehensive, global resolution in the summer of 2011 — months or even years earlier than most parties in interest expected.  Based on the fees and expenses incurred in the first half of 2011, early confirmation of the Plan alone saved the Debtors' estates many millions of dollars.

5.      In addition, Goldman Sachs and Cleary Gottlieb worked with other large derivative creditors and the Debtors to achieve a consensual framework for the valuation of complex derivative claims (the "<u>Derivative Framework</u>").  Goldman Sachs and Cleary Gottlieb's

---

[2]      "RACERS" refers to Restructured Assets with Enhanced Returns, comprised of the 2007-A Trust and the 2007-7-MM Trust, each as defined in the Debtors' Disclosure Statement.

efforts to reach agreement on a framework for valuation methodology and negotiate the form of

the termination agreements resulted in a consensual resolution of large derivative claims in an

aggregate amount materially lower than the corresponding asserted claims. By creating uniform

principles and methodologies and advancing voluntary resolutions of complex issues, the

Derivative Framework and related documentation avoided enormously expensive litigation.

These efforts ultimately saved the estate from significant administrative liabilities and advanced

the date – and the effective recoveries – of creditor distributions.

6.       Goldman Sachs' and Cleary Gottlieb's efforts benefited the LBSF estate, as well

as the Debtors' estates as a whole.  Although Goldman Sachs and Cleary Gottlieb were

protecting Goldman Sachs' interests in improving recoveries upon Goldman Sachs' substantial

claims against LBSF, these efforts went beyond the protection of Goldman Sachs' interests and

substantially benefitted other similarly-situated LBSF creditors.  Moreover, these efforts were

instrumental in reaching a global settlement that substantially benefited other creditor

constituencies and all of the Debtors' estates by avoiding extraordinary litigation costs and

significant delays in realizing creditor recoveries.  Given the size of its claims against LBSF,

Goldman Sachs played a lead role in organizing similarly-situated LBSF creditors to reach a

mutually beneficial resolution.

7.       For these reasons and for those set forth below, Goldman Sachs respectfully

submits that the payment of the reasonable fees incurred by its outside counsel Cleary Gottlieb

for work that substantially benefit the LBSF estate and creditor constituencies is justified.[3]

---

[3]      This Application does not seek reimbursement for all fees incurred by Goldman Sachs or Cleary Gottlieb in
connection with the Debtors' Chapter 11 cases. The fees for which Goldman Sachs seeks reimbursement in
this Application are limited to services performed that resulted in a substantial contribution in these cases.
For example, fees and expenses incurred for the sole benefit of Goldman Sachs (e.g., filing of proofs of
claim) are not included in this Application.  Goldman Sachs reserves the right to file additional or separate
applications for the allowance and payment of reasonable professional fees and actual, necessary expenses
other than the Cleary Gottlieb fees for making a substantial contribution in these cases.

## JURISDICTION AND VENUE

8.      The Court has jurisdiction over these cases and the Application pursuant to 28

U.S.C. §§ 157 and 1334.  Venue of these proceedings and this Application is proper in this

District pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory predicates for the relief sought herein are sections 503(b)(3)(D) and

503(b)(4) of the Bankruptcy Code.

## OVERVIEW OF LEHMAN AND THE CHAPTER 11 CASES

10.      Prior to the events leading up to these Chapter 11 cases, Lehman Brothers

Holdings Inc. ("LBHI") and certain of its direct and indirect subsidiaries (collectively, the

"Debtors" or "Lehman") was the fourth largest investment bank in the United States.   For more

than 150 years, Lehman had been a leader in the global financial markets by serving the financial

needs of corporations, governmental units, institutional clients and individuals worldwide.

11.      In the normal course of business, various subsidiaries of Lehman regularly

entered into derivative transactions on a proprietary basis or for third parties in connection with

speculative opportunities and/or to manage exposure to market and credit risks.  In this capacity,

Lehman entities transacted extensively in derivatives including interest rate, credit, foreign

exchange and equity derivatives.  As of August of 2008, Lehman held over 900,000 derivatives

positions worldwide.  Among the most common types of transactions to which Lehman was a

party were credit default swaps, interest rate swaps, and foreign exchange derivatives.

12.      Among the various Lehman entities, LBSF had the most derivatives positions and

was the principal dealer in a broad range of derivative products, including interest rate, currency,

credit and mortgage derivatives.  As of May 31, 2008, LBSF held approximately $72 billion in

financial inventory.  Of LBSF's financial inventory, nearly 80% was comprised of derivatives

and government and agency securities.  LBSF's numerous counterparties included large banks,

corporations, hedge funds and other institutions.

13.     In the weeks following LBHI's Chapter 11 filing on September 15, 2008, certain

domestic subsidiaries commenced their own voluntary cases under Chapter 11 of the Bankruptcy

Code, including LBSF on October 2, 2008.

14.     On September 17, 2008, the United States Trustee for the Southern District of

New York (the "US Trustee") appointed an official committee of unsecured creditors (the

"Creditors' Committee").  The Creditors' Committee did not include any significant LBSF

creditor.

## GOLDMAN SACHS' RETENTION OF COUNSEL AND COORDINATION WITH OTHER LBSF CREDITORS

15.     GSB (as successor to Goldman Sachs Capital Markets, L.P.) and GSI are party to

certain pre-petition derivative contracts pursuant to which GSB and GSI hold significant

derivative claims against LBSF, with related guaranty claims against LBHI.  In connection with

its claims in these cases, Goldman Sachs retained Cleary Gottlieb as counsel.

16.     In late 2009, Goldman Sachs and other LBSF creditors coalesced into a Working

Group,[4] for the purpose of, *inter alia*, engaging with the fiduciaries of LBSF and their

professionals in determining whether it would be appropriate to use the assets of LBSF, through

substantive consolidation or otherwise, to benefit the creditors of LBHI in Chapter 11 plans of

these two separate entities.  The use of LBSF's assets exclusively to satisfy LBSF's obligations

---

[4]     The other members of the Working Group included, at various times, Bank of America, N.A., Centerbridge Credit Advisors, LLC, Citibank, N.A., Credit Agricole Corporate and Investment Bank, Credit Suisse International, D.E. Shaw Composite Portfolios, L.L.C., D. E. Shaw Oculus Portfolios, L.L.C., Deutsche Bank AG, Eton Park Capital Management, L.P., Merrill Lynch International, Morgan Stanley Capital Services Inc., Morgan Stanley & Co. International plc., The Royal Bank of Scotland plc., TPG Credit Strategies, L.P, Silver Point Finance, LLC (an affiliate of certain claim holders), and certain funds advised by Oaktree Capital Management. L.P. or their respective subsidiaries (collectively, together with Goldman Sachs, the "Working Group").

to its own creditors undoubtedly would have resulted in greater and quicker recovery for that

creditor constituency than a substantively consolidating arrangement.  Additionally, many third

party creditors with direct claims against LBSF arising from derivatives transactions also

possessed guaranty claims against LBHI which would have been eliminated in a substantive

consolidation of the Debtors.  The members of the Working Group collectively retained

Blackstone Advisory Partners L.P. ("Blackstone") as financial advisor.

### SCOPE OF SERVICES PROVIDED BY CLEARY GOTTLIEB

17.    Goldman Sachs relied extensively on its outside counsel, Cleary Gottlieb, for

assistance in analyzing intercompany issues (including substantive consolidation of estates,

recharacterization of intercompany payables, and allocation of administrative expenses between

LBSF and LBHI), investigating complex transaction structures including the RACERS,

reviewing and evaluating the competing Chapter 11 plans proposed by the Debtors and the Ad

Hoc Group (as defined below), negotiating and drafting the Non-Con Plan (as defined below)

with the other Non-Con Plan proponents, negotiating the terms of the Plan and the form of the

plan support agreements with the Debtors and creditor constituencies, and negotiating a

Derivative Framework (as defined below) and the form of the related termination agreements

with the Debtors and large derivative counterparties for valuing complex derivative claims in

these cases.

18.    During the course of their involvement in these cases, Cleary Gottlieb solicited

the input of Blackstone, counsel to other members of the Working Group, and counsel to other

parties in interest (including counsel to the creditors and plan administrators of Lehman's foreign

affiliates) to propose the Non-Con Plan and oppose the competing Chapter 11 plans put forward

by the Debtors and the Ad Hoc Group. As the cases developed further, the priority for Goldman

Sachs and its counsel was to advance proposals for consensual resolution of the issues which, in fact, ultimately served as the underpinnings of the now confirmed Plan.  In parallel with the plan process, Cleary Gottlieb solicited the input of other large derivative counterparties so as to evaluate and respond to the Debtors' proposed framework for the valuation of derivative claims. Cleary Gottlieb evaluated and analyzed  -- and then helped build a global consensus to settle -- legal issues and disputes regarding  the Debtors' complex universe of creditor constituencies, derivative claims, intercompany claims, guaranties, assets, administrative expense allocations and other litigable issues. Cleary Gottlieb's efforts avoided protracted and costly litigation to the benefit of the Debtors' estates.

19.     On behalf of Goldman Sachs, Cleary Gottlieb succeeded in helping to identify and to find creative, consensual resolutions to issues that could otherwise have resulted in years of litigation and a tremendous loss of value to all creditor constituencies. Specifically:

▪   Goldman Sachs and Cleary Gottlieb prepared and shared with the Debtors, the Creditors' Committee and other relevant creditor constituencies, white papers as to the merits of complex factual and legal issues that would determine the appropriate allocation of value among the Debtors estates, including on substantive consolidation, recharacterization, RACERS, and allocation of administrative expenses between LBSF and LBHI.  Goldman Sachs and Cleary Gottlieb also met with these constituencies to discuss these issues. In carrying out this function, Goldman Sachs and Cleary Gottlieb served as a voice for significant creditor interests at the Debtors' operating companies, which did not have their own independent Debtor management teams or official

creditors' committees.  These documents and meetings were key building blocks in reaching the compromise that allowed for a consensual plan in this case.

- In a similar vein, Goldman Sachs and Cleary Gottlieb took a lead role in drafting the Non-Con Plan and related disclosure statement, which required soliciting input from and building consensus with the other proponents of the Non-Con Plan, who represented a range of diverse views and interests in the Debtors' cases. The formation of a group that included the most significant non-holding company creditors was also a critical building block for the successful plan negotiation that ensued.

- Goldman Sachs and Cleary Gottlieb negotiated and helped formulate the discovery protocol governing Chapter 11 plan discovery, resulting in a more streamlined and efficient discovery process to be followed if there were plan related litigation.

- Goldman Sachs and Cleary Gottlieb played a leading role in the global plan negotiations with the Debtors, members of the Ad Hoc Group, foreign affiliates, and other important parties in interest in June 2011.

- Goldman Sachs and Cleary Gottlieb played a leading role in the negotiation of the form of the plan support agreements, the Plan (including numerous exhibits and plan supplement documents), the related disclosure statement and related documentation, including the sequencing stipulation (under which the Ad Hoc Group and certain Non-

Con Plan proponents agreed to hold in abeyance and not prosecute their respective competing Chapter 11 plans).

- Goldman Sachs and Cleary Gottlieb worked closely with other major derivative counterparties, the Debtors and their respective counsel to construct the Derivative Framework and to negotiate the form of the related derivative termination agreements.

- Throughout the plan process and derivative framework discussions, Goldman Sachs and Cleary Gottlieb helped to organize and coordinate with similarly situated creditors.

20.    Starting in January 2010, Cleary Gottlieb prepared and broadly disseminated white papers addressing the merits of complex factual and legal issues that would determine the appropriate allocation of value among the Debtors estates, including (1) a white paper evaluating the risk of substantive consolidation and advocating the use of assets of LBSF only in a standalone plan on January 12, 2010, (2) a recharacterization analysis of LBHI's intercompany payable against LBSF on March 8, 2011, and (3) a presentation on the RACERS structure and claims on March 8, 2011.

21.    On November 23, 2010, Goldman Sachs and other members of the Working Group presented the Debtors with a comprehensive term sheet resolving all outstanding issues (the "Term Sheet").  Rather than proposing the simple non-consolidation of the Debtors – the optimal outcome for Goldman Sachs – the Term Sheet offered concrete compromises with respect to various payment mechanisms contained in the Chapter 11 plan that the Debtors had already filed.  Such mechanisms and compromises included, among others things: (i) reduction of the LBSF intercompany payable to LBHI and resolution of certain other intercompany claims;

(ii) increases in the Debtors' proposed third party guarantee claim caps; (iii) reallocation of certain administrative expenses; (iv) allowance of RACERS claims; (v) resolution of large creditors' derivatives claims; and (vi) governance.  The Term Sheet incorporated analysis conducted by Cleary Gottlieb during the spring, summer and fall of 2010.  After submitting the Term Sheet, Cleary Gottlieb maintained a dialogue with the Debtors' advisors to discuss the terms of a potential resolution.

22.    On December 15, 2010, an ad hoc group of LBHI creditors (the "Ad Hoc Group") proposed a substantively consolidating Chapter 11 plan.[5]  Thereafter, substantive consolidation quickly emerged as perhaps the leading dispute among economic stakeholders and the Debtors.

23.    On January 25, 2011, the Debtors filed their first amended joint Chapter 11 plan. The Debtors' plan did not propose "pure" substantive consolidation but rather proposed resolution of substantive consolidation and certain other issues and related treatment of the relationships among the Debtors and their affiliates through proposed mechanisms incorporated into the plan.

24.    On April 4, 2011, this Court entered an order approving a discovery protocol governing Chapter 11 plan discovery, adopting a streamlined and efficient discovery process to be followed if there were plan related litigation.  Cleary Gottlieb negotiated and helped formulate the discovery protocol, which established a uniform set of plan discovery procedures that helped the Debtors estates avoid the risk of duplicative, overlapping, and burdensome discovery requests at a critical time in their Chapter 11 cases.

---

[5]    The Debtors had previously filed an initial and modified Chapter 11 plan on March 15, 2010 and April 14, 2010, respectively.

25.    On April 27, 2011, the Ad Hoc Group filed its amended substantively

consolidating Chapter 11 plan (the "Sub-Con Plan").  The Sub-Con Plan provided that all of the

Debtors' respective assets and liabilities be substantively consolidated with certain exceptions

relating to certain of the Debtors' foreign affiliates.[6]

26.    In response, and guided by the belief that Debtors' amended plan would have

significantly overcompensated creditors of LBHI at the expense of creditors of LBSF and certain

of Lehman's foreign affiliates, a group of twenty-three creditors (which included Goldman Sachs

and certain members of the Working Group) filed on April 25, 2011 a joint Chapter 11 plan (the

"Non-Con Plan") and related disclosure statement.[7]  The Non-Con Plan took a diametrically

opposite approach for the reorganization of the Debtors as compared to the Sub-Con Plan,

proposing a complete separation of the Debtors based upon the individual legal identity of each

Debtor.  Cleary Gottlieb took the lead role in drafting the Non-Con Plan and disclosure

statement, which required soliciting input from and building consensus with the other proponents

of the Non-Con Plan and other parties in interest, such as Lehman's foreign affiliates.

27.    These efforts by Goldman Sachs and Cleary Gottlieb were necessary in order to

set the stage for the Debtors to perform the remarkable consensus building role they played in

these cases.  In June of 2011, the Debtors convened a meeting of the alternative plan groups and

their other most significant creditors for intensive in-person negotiations.  Over 125 individuals

attended these negotiations, including principals, attorneys and financial advisors for the major

stakeholders.  The parties engaged in two formal sessions and countless hours of negotiations

with the goal of reaching a mutually acceptable global resolution.  Cleary Gottlieb and Goldman

---

[6]    The Ad Hoc Group's plan proposed the substantive consolidation of all of the Debtors other than Merit, Somerset and Preferred Somerset.

[7]    The Non-Con Plan proposed non-consolidated creditor distributions for all of the Debtors other than Merit, Somerset and Preferred Somerset.

Sachs played a leadership role in these meetings, as well as in intensive discussions with the Debtors, members of the Ad Hoc Group, foreign affiliates, and other important parties in the weeks preceding and following the June meetings.

28.    The intensive June negotiations produced a consensus among many of the major economic stakeholders including the overwhelming majority of the foreign administrators, fiduciaries and receivers.  The negotiations resulted in the Debtors modifying their Chapter 11 plan and entering into plan support agreements to effectuate the final consensus of the Plan.   The Plan resolved numerous issues, *inter alia*: (i) the potential substantive consolidation of the Debtors and certain of their affiliates; (ii) the characterization of intercompany balances owed to LBHI by subsidiary Debtors; (iii) the allowance of certain affiliate claims; (iv) the establishment of ownership and rights of various Debtors and their affiliates with respect to certain assets; and (v) the allocation of costs and expenses among Debtors.  Cleary Gottlieb also played a leadership role in the negotiation of the form of the plan support agreements, the Plan (including numerous exhibits and plan supplement documents), the related disclosure statement, and related documentation.

29.    The Plan resolved issues faced by every major creditor constituency in the Chapter 11 cases.  On December 6, 2011, the Court confirmed the Plan.  As the Court commented at the confirmation hearing, "[n]ever before have divergent holders of 450 billion dollars in claims recognized the benefits of pragmatic compromise and come together as one in support of a single Chapter 11 plan.  This is a monumental achievement in our field, awe-inspiring, really, that, to me, represents the highest and best use of Chapter 11 in the public interest."  Transcript of Dec. 6, 2011 Hearing: 69:7-12.

30.     As a critical building block predicate to the negotiation of the Plan, in June 2011 the Debtors and eight (8) of their thirteen (13) largest derivatives counterparties also entered into termination agreements for the allowance of their respective derivatives claims and the payment of amounts due by such counterparties to the Debtors, in accordance with a Derivative Framework applying standardized principles and methodologies to calculate such amounts. The application of uniform principles and methodologies made resolving incredibly complicated issues possible, thereby avoiding enormously expensive litigation regarding the valuations of thousands of derivatives transactions that would have delayed the development of a confirmable plan for years, and eliminating impediments to making meaningful distributions to creditors.

31.     The Derivative Framework and termination agreements reflected the culmination of months of intensive efforts by Goldman Sachs, Cleary Gottlieb and others in building a consensus among the derivative counterparties and negotiating valuation principles with the Debtors' advisors.  Cleary Gottlieb worked closely with counsel to the other derivative counterparties to make framework proposals to the Debtors and negotiate the form of the termination agreements.  Pursuant to such agreements (and corresponding resolutions with additional derivative counterparties in the subsequent months), there was a material reduction in the allowed amount of most of the largest derivatives claims from the amounts originally asserted.

**RELIEF REQUESTED**

32.     Relying extensively on the assistance its outside counsel at Cleary Gottlieb,

Goldman Sachs made a significant, non-duplicative contribution in the Debtors' Chapter 11

cases which was essential to achieving the global resolution embodied in the Plan and the

Derivative Framework.  Resolution of the Debtors' cases resulted in tremendous time, resources

and financial savings for the benefit of the Debtors' estates.  In recognition of the foregoing,

Goldman Sachs hereby requests that the LBSF estate reimburse its outside counsel's fees in the

amount of $3,292,868.03 for services rendered prior to the Effective Date in these Chapter 11

cases.

33.     As noted above, this Application does not seek reimbursement for all fees

incurred by Goldman Sachs or Cleary Gottlieb in connection with these Chapter 11 cases.  This

Application is limited to seeking reimbursement only for services performed that resulted in a

substantial contribution in these Chapter 11 cases benefiting the LBSF estate and the Debtors'

estates as a whole.  The fees sought in this Application are reasonable, and payment of such fees

from the LBSF estate is appropriate under the circumstances.  Such payment will impose an

immaterial burden on LBSF's unsecured creditors, particularly in light of the significant value

created through the efforts of Goldman Sachs and its counsel.

**ARGUMENT**

**A.      Legal Standard**

34.     Section 503(b)(3)(D) of the Bankruptcy Code permits a court to allow, as an

administrative expense, the actual and necessary expenses incurred by a creditor who makes a

substantial contribution to a Chapter 11 case.  <u>See</u> 11 U.S.C. § 503(b)(3)(D).  Section 503(b)(4)

allows for reimbursement of reasonable compensation for services rendered, and for

reimbursement of actual and necessary expenses incurred, by an attorney of any such entity.  See 11 U.S.C. § 503(b)(4).

35.    The "substantial contribution" inquiry under section 503(b)(3)(D) of the Bankruptcy Code is a factual inquiry.  See In re Bayou Grp., LLC, 431 B.R. 549, 560 (Bankr. S.D.N.Y. 2010) (granting substantial contribution claim asserted by unofficial creditors committee comprised of defrauded investors).  The "substantial contribution" test is satisfied "where the services rendered have substantially contributed to an actual and demonstrable benefit to the debtor's estate, its creditors, and to the extent relevant, the debtor's shareholders." In re United States Lines, Inc., 103 B.R. 427, 429 (Bankr. S.D.N.Y. 1989) aff'd 1991 U.S. Dist. Lexis 5262 (S.D.N.Y. Apr. 19, 1991) (granting administrative expense status to counsel to creditor in the case for substantial contributions).  Under the "substantial contribution" test, compensation is awarded "to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor or estate."  Bayou Group, 431 B.R. at 560 (quoting In re Best Prods. Co., Inc., 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994)).

36.    The policy underlying the substantial contribution provisions of the Bankruptcy Code is to "promote meaningful creditor participation in the reorganization process."  In re U.S. Lines, 103 B.R. at 429;[8] see also In re 9085 E. Mineral Office Bldg., Ltd., 119 B.R. 246, 253 (Bankr. D. Colo. 1990) (warning that a narrow application of substantial contribution awards would have a chilling effect upon the section's goal of encouraging meaningful creditor participation).

---

[8]    While the Court in In re U.S. Lines acknowledged a tension between encouraging creditor participation and keeping administrative expenses to a minimum, 103 B.R. at 429, as set forth in Section B.II below, the cost to the LBSF estate of granting this Application pales in comparison to the administrative expenses the estate would have incurred from protracted litigation or an extended plan process.

37.    Although the Bankruptcy Code does not define the term "substantial contribution," this Court has held that an applicant has "substantially contributed" to a Chapter 11 case if it has provided "an actual and demonstrable benefit to the debtor's estate, its creditors, and to the extent relevant, the debtor's shareholders." In re U.S. Lines, 103 B.R. at 429; see also In re Texaco Inc., 90 B.R. 622, 629 (Bankr. S.D.N.Y. 1988); In re McLean Indus., Inc., 88 B.R. 36, 39 (Bankr. S.D.N.Y. 1988).  Courts in the Second Circuit have considered various factors in determining whether a creditor has conferred an actual demonstrable benefit, including: (i) whether the services benefited the creditor, the estate itself or all of the parties in the bankruptcy case; (ii) whether the services resulted in a significant and demonstrably positive benefit to the estate; and (iii) whether the services duplicated the efforts by others.  See  In re Granite Partners, L.P. et al., 213 B.R. 440, 445-6 (Bankr. S.D.N.Y 1997); In re McLean, 88 B.R. at 39; Trade Creditor Group v. L. J. Hooker Corp. (In re Hooker Invs., Inc.), 188 B.R. 117, 120 (S.D.N.Y. 1995), aff'd, 104 F.3d 349 (2d Cir. 1996); In re Bethlehem Steel Corp., No. 02 Civ. 2854(MBM), 2003 WL 21738964, at *6 (S.D.N.Y. July 28, 2003).

38.    Further, courts exercise their discretion and examine the totality of the relevant facts when determining whether a party has "substantially contributed" to a case under Chapter 11.  See In re U.S. Lines, 103 B.R. at 430; see also In re 9085 E. Mineral Bldg., 119 B.R. at 253 (awarding compensation where applicant's efforts, when "viewed as a whole," made a substantial contribution to the debtor's estate).

39.    Courts have allowed substantial contribution claims of competing plan proponents and plan facilitators in other cases, recognizing the tangible benefits conferred on the debtors' estates by creditors who undertook the efforts that Goldman Sachs undertake in these Chapter 11 cases.  In re Rail Pass Exp., Inc, 227 B.R. 136, 138 (Bankr. S.D. Ohio 1998), the court held

that where the creditor's submission of a competing plan resulted in the debtors filing a second

plan that provided more favorable treatment of its unsecured creditors, the creditor had made a

substantial contribution. Similarly, in In re FF Holdings Corp., 343 B.R. 84, 87 (D. Del. 2006)

the creditors played a role similar to Goldman Sachs by being "an active participant in the

negotiations leading to the confirmation of the Debtors' Plan" and by dissuading other creditors

from maintaining objections to the plan. Dissuading the other creditor to drop its objection to the

plan was particularly valuable because, like in Lehman's case, the estate was saved "the potential

losses that could have resulted from a delay in the plan's contribution."  Within this district, in In

re Richton Int'l Corp., 15 B.R. 854 (Bankr. S.D.N.Y. 1981), the court held that counsel for seven

bank creditors was entitled to compensation for legal services that facilitated the progress, and

substantially aided formulation and adoption, of a plan of reorganization.  Specifically, the

Richton Int'l court found that counsel's "efforts to reconcile the Debtors and creditors and to

negotiate and consummate the reorganization were instrumental in the promulgation of the Plan

or Reorganization."  Id., at 855. Like the creditors in the foregoing cases, Goldman and its

advisors took lead roles in first proposing an alternative Ch. 11 plan to promote the interests of

the operating company creditor constituencies, and then in negotiating a global resolution

between the Debtors and competing creditor constituencies.

40.    Courts in this District and beyond have awarded fees for substantial contribution

where -- as Goldman Sachs did in Lehman's cases -- the creditor asserted or prompted others to

assert a competing position that ultimately benefitted the estate.  See, e.g., In re McLean, 88 B.R.

at 38-39.  In In re McLean, this Court granted the allowance of a creditor's attorney fees as

substantial contribution claims where the creditor objected to the debtor's proposed sale

agreement, raised a substantial issue as to the sufficiency of the purchase price, and presented

evidence of a higher valuation of the debtor's property.  Id. at 38-39.  The In re McLean court

held that, by raising the initial objection to the sale that prompted others to assert questions

regarding the propriety of the sale, the creditor's attorney conferred a benefit upon the estate.  Id.

In the present case, Goldman Sachs conferred a similar benefit to the estates with its early and

thorough investigation  and advocacy on the impropriety of substantive consolidation,  the

recharacterization of intercompany debt, allocation of LBSF administrative expenses,

appropriate treatment of RACERS issues and other issues, thereby prompting other creditors and

the Debtors to consider competing alternatives.

41.    Courts undertake a cost-benefit analysis to evaluate the merits of a claimant's

entitlement to substantial contribution.  See, e.g., Hall Fin. Grp., Inc. v. DP Partners, Ltd. P'ship

(In re DP Partners Ltd. P'ship), 106 F.3d 667, 673 (5th Cir. 1997) (holding that "a creditor's

motive in taking actions that benefit the estate has little relevance in the determination whether

the creditor has incurred actual and necessary expenses in making a substantial contribution to

[the estate]", and that instead,  a court "should weigh the cost of the claimed fees and expenses

against the benefits conferred upon the estate which flow directly from those actions."); see also,

In re Pow Wow River Campground, Inc., 296 B.R. 81, 89 (Bankr. D.N.H. 2003) (granting a fee

application filed by attorneys representing a prospective purchaser of the debtor's assets where

the prospective purchaser's actions, in objecting to the debtor's plan and causing the debtor to

propose a superior plan, constituted a "substantial contribution").  In the present case, it is

beyond dispute that the amount of Goldman Sachs' legal fees for which it is seeking a substantial

contribution award – $3,292,868.03 – are immaterial when weighed against the significant value

to the Debtors' estates and creditors created through the efforts of Goldman Sachs, including

savings from the early confirmation of the Plan in the amount of at least $200-$400 million, and

resolution of large derivative claims under the Derivative Framework in an aggregate amount

materially lower than the corresponding asserted primary claims.

42.     As demonstrated herein, applying these substantial contribution factors as a

whole, Goldman Sachs, with the assistance of its counsel Cleary Gottlieb, has conferred an

actual demonstrable benefit to these cases entitling them to an allowed administrative claim.

Such a claim should include reimbursement of the reasonable fees of Cleary Gottlieb in

connection with their efforts.  Indeed, section 503(b)(4) specifically provides that an applicant is

entitled to, as an administrative expense,

> *reasonable compensation for professional services rendered by*
> *an attorney or an accountant of an entity whose expense is*
> *allowable under [section 503(b)(3)]*, based on the time, the nature,
> the extent, and the value of such services, and the cost of
> comparable services other than in a case under this title, and
> reimbursement for actual, necessary expenses incurred by such
> attorney or accountant . . . .

11 U.S.C. § 503(b)(4) (emphasis added).  As Goldman Sachs provided a substantial contribution

to this case and is thus entitled to an allowed administrative claim for their fee under section

503(b)(3)(D) of the Bankruptcy Code, it is also entitled to be reimbursed for Cleary Gottlieb's

reasonable fees and actual, necessary expenses under section 503(b)(4).

**B.     The Payment of Cleary Gottlieb's Reasonable and Necessary Fees as Substantial**
**Contribution is Justified under the Circumstances**

### I.     <u>Goldman Sachs' Services Were Provided for the Benefit of the Estate</u><br><u>Itself</u>

43.     Although Goldman Sachs' actions undoubtedly increased recoveries to Goldman

Sachs, Goldman Sachs' actions benefited very significant creditor constituencies that opposed

the substantive consolidation of the Debtors' estates and the various resolution mechanisms

proposed in alternative plans.  The Non-Con Plan was designed as a comprehensive, confirmable

joint plan for substantially all of the Debtors and their claimants, and not solely for those Debtors

that owed money to Goldman Sachs.  Moreover, Goldman Sachs' extensive diligence and

analysis, negotiations and collaboration with the Debtors' advisors and various parties in interest,

as well as preparation and filing of the Non-Con Plan, was a necessary pre-condition to arriving

at a position that was acceptable to many of Lehman's creditor constituencies.  The Derivative

Framework, which Goldman helped to achieve, also produced benefits to other major derivative

creditors, but more importantly helped to solve a problem that would have impeded distribution

to all creditors.

## II.    Goldman's Services Conferred a Direct, Significant and Demonstrably Positive Benefit upon the Estate

44.    Goldman Sachs' efforts resulted in an expedited conclusion of the Debtors'

complex Chapter 11 cases.  Specifically, the negotiated agreement spurred by Goldman Sachs'

efforts saved the estate many months, if not years, of continued negotiations, litigation, and other

significant administrative resource demands.  As the Court recognized at the hearing to approve

the disclosure statement, the Plan "embodies a settlement and compromise of sharply conflicting

views in relation to one particular issue; substantive consolidation, that if litigated will take an

unpredictable long time, cost a great deal of money, and be a source of ongoing legal

uncertainty."  Transcript of Aug. 30, 2011 Hearing: 88:11-15.

45.    Indeed, by settling earlier, the estates saved significant administrative expenses,

and creditors will receive increased distributions beginning at an earlier date.  An extremely

conservative assumption is that litigation and negotiations over the competing plans would have

taken only an additional six to twelve months.  Applying that assumption, and using the

administrative expense run-rate from the first half of 2011 as a guide,[9] confirmation of the Plan

in early December saved the Debtors' estates approximately $200 million to $400 million in

---

[9]    From January 2011 through June 2011, the bankruptcy estates incurred monthly administrative expenses of
approximately $35 million.

administrative expenses.  The fees requested in this Application are *de minimis* when considered

in light of the savings to the estate made possible by Goldman Sachs' efforts.

**III.** **Goldman Sachs' Services Were Not Duplicative of Services Performed by Others**

46.    Goldman Sachs made significant, non-duplicative efforts that benefited all

creditor constituencies.  Among other things, Goldman Sachs provided the following services to

the Debtors' estates that  -- while necessarily coordinated with a range of creditors and other

parties in interest from time to time -- were not duplicated by any other creditor or party in

interest: (i) substantial efforts in drafting and filing the Non-Con Plan, the only "pure" non-

consolidation plan filed in the Debtors' bankruptcy cases; (ii) development of comprehensive

solutions for the complex RACERS and recharacterization issues that were substantially

embodied in the final plan; (iii) significant time and expense educating creditor constituencies

regarding the mechanisms and assumptions underlying the Non-Con Plan, the Sub-Con  Plan and

the Debtors' plans, as well as various alternatives related thereto; (iv) extensive negotiating with

the Debtors and other parties in interest on behalf of creditor constituencies opposed to

substantive consolidation;  (v) significant, successful efforts indentifying similarly situated

creditors and forming an expansive coalition of non-Working Group supporters for the Non-Con

Plan; and (vi) extensive negotiations with the Debtors and major derivative counterparties in the

formulation of the Derivative Framework.  Accordingly, Goldman Sachs' unique efforts were

critical to the formulation of the global resolution reached in the summer of 2011 and helped lead

to broad-based support for the Plan and the consensual valuation of major derivative claims

under the Derivative Framework.

**IV.** **The Professional Services Provided Were Reasonable and the Fees Incurred Were Actual, Necessary Costs**

47.    Apart from the direct and substantial benefit that Cleary Gottlieb's legal services provided the estate, such services, and the costs incurred in connection therewith, were reasonable, actual and necessary.  As evidenced in the Declaration of Thomas J. Moloney filed concurrently hereto (the "Moloney Declaration"), the compensation requested herein is commensurate with the complexity, importance, and nature of the problems and issues that manifested themselves in these cases, and the tasks and actions required by Cleary Gottlieb in response thereto.  The rate structure employed by Cleary Gottlieb in connection with this engagement is comparable to that employed by Cleary Gottlieb – and peer legal firms – generally for other complex bankruptcy, insolvency and work-out matters, regardless of whether a fee application is required.  These rates and the rate structure reflect that such restructuring involve complexity, high stakes, and severe time pressures.  Cleary Gottlieb's services were performed expediently and efficiently; indeed, by working to build consensus among diverse groups of constituencies, Cleary Gottlieb's actions helped save the estate hundreds of millions of dollars.  In light of this material savings, Goldman Sachs respectfully submits that the compensation sought herein is reasonable.

48.    Goldman Sachs is seeking reimbursement for $3,292,868.03 in connection with Cleary Gottlieb's bill for services rendered in connection with the chapter 11 plan process and derivative claims framework in the above-captioned chapter 11 cases. Cleary Gottlieb attorneys, law clerks and paraprofessionals expended a total of 5,240.90 hours on behalf of Goldman Sachs in these cases for which reimbursement is requested.  Cleary Gottlieb will provide the detailed time entries of its professionals to (a) the Court, (b) the U.S. Trustee, (c) the Debtors, (d) counsel for the Debtors, (e) counsel for the Creditors' Committee, and (f) counsel for the Fee Committee.

## NOTICE

49.        Notice of this Application is being provided to (i) the chambers of the Honorable

James M. Peck, One Bowling Green, New York, New York, 10004, Courtroom 601 (ii) Lehman

Brothers Holdings Inc., 1271 Avenue of the Americas, 45th Floor, New York, New York 10020

(Attn: John Suckow and William Fox); (iii) Weil, Gotshal & Manges, LLP, 767 Fifth Avenue,

New York, New York 10153 (Attn: Harvey Miller, Esq. and Richard P. Krasnow, Esq.) counsel

for the Debtors; (iv) Milbank, Tweed, Hadley & McCoy LLP, 1 Chase Manhattan Plana, New

York, New York 10005 (Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq. and Evan Fleck,

Esq.) counsel for the Creditors' Committee; (v) the Office of the United States Trustee for the

Southern District of New York, 33 Whitehall Street, 22nd Floor, New York, New York 10004

(Attn: Tracy Hope Davis, Esq., Elisabetta G. Gasparini, Esq., and Andrea B. Schwartz, Esq.);

and (vi) Godfrey & Kahn, S.C., One East Main Street, Suite 500, Madison, Wisconsin 53703

(Attn: Brady C. Williamson, Esq. and Katherine Stadler, Esq.) counsel for the Fee Committee.

## NO PRIOR REQUEST

50.     No previous request for the relief sought herein has been made to this or any other

court.

## CONCLUSION

WHEREFORE, Goldman Sachs respectfully requests entry of an order, substantially in the form of annexed hereto as Exhibit A, granting (i) the Application allowing Cleary Gottlieb's fees in the amount set forth herein as an administrative expense claim against the LBSF estate, and directing the payment of such amount from the LBSF estate within ten (10) days after the date of entry of the order granting the Application, and (ii) such other and further relief as the Court deems just and proper.

Dated: July 5, 2012
      New York, New York

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:  /s/ Thomas J. Moloney
     Thomas J. Moloney
     Sean A. O'Neal
     Member of the Firm
     One Liberty Plaza
     New York, New York 10006
     Telephone:  (212) 225-2000
     Facsimile:  (212) 225-3999

     *Attorneys for Goldman Sachs Bank USA and*
     *Goldman Sachs International*

**EXHIBIT A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X
                              :

**In re**                            :         **Chapter 11**

**LEHMAN BROTHERS HOLDINGS INC., et al.,**  :         **Case No. 08-13555 (JMP)**

**Debtors.**                      :         **(Jointly Administered)**

                              :
-------------------------------------------------------------------- X

### ORDER GRANTING APPLICATION OF GOLDMAN SACHS BANK USA AND GOLDMAN SACHS INTERNATIONAL FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 503(b)(3)(D) AND 503(b)(4) FOR ALLOWANCE AND REIMBURSEMENT OF REASONABLE PROFESSIONAL FEES IN MAKING A SUBSTANTIAL CONTRIBUTION IN THESE CASES

Upon consideration of the application (the "Application")[1] of Goldman Sachs Bank USA ("GSB") and Goldman Sachs International ("GSI", and together with GSB, "Goldman Sachs") for allowance and payment by the estates of a Chapter 11 administrative expense claim pursuant to 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4) for making a substantial contribution to the above-captioned jointly administered Chapter 11 cases of Lehman Brothers Holdings Inc. ("LBHI") and certain of its subsidiaries and affiliates (collectively, the "Debtors"); and it appearing that this Court has jurisdiction to consider the Application and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and it further appearing that this matter is a core proceeding within the meaning of 28 U.S.C. § 157(b); and it further appearing that venue of this proceeding and the Application is proper in this District in accordance with 28 U.S.C. §§ 1408 and 1409; and it further appearing that adequate and proper notice of the Application has been given, and that no other or further notice is necessary; and it further appearing that the relief

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Application.

requested in the Application is in the best interests of the Debtors, their estates and their

creditors; and after due consideration and sufficient cause appearing therefor, it is hereby:

**ORDERED** that the Application is granted in its entirety;

**IT IS FURTHER ORDERED** that Goldman Sachs is hereby granted, pursuant to

sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code, an allowed administrative claim in

the amount of $3,292,868.03 (the "Administrative Claim Amount") against LBSF, representing

reimbursement to Goldman Sachs for the fees of its counsel, Cleary Gottlieb Steen & Hamilton

LLP, in connection with Goldman Sachs' efforts in making a substantial contribution in these

cases;

**IT IS FURTHER ORDERED** that the Debtors are hereby authorized and directed to

pay Goldman Sachs the Administrative Claim Amount in full within ten (10) days after the date

of entry of this Order; and

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction to hear and

determine all matters arising from or related to the relief granted in this Order.


Dated: New York, New York
_____, 2012



_____
HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE