WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc.*
*and Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | x | |
| | : | |
| In re | : | **Chapter 11** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **Case No. 08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| | : | |
| | : | |
| | x | |

**NOTICE OF**
**MOTION PURSUANT TO RULE 9019 OF THE**
**FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR APPROVAL OF**
**SETTLEMENT AGREEMENT AND INDEMNITY BETWEEN LEHMAN BROTHERS**
**SPECIAL FINANCING INC. AND DEUTSCHE BANK TRUST COMPANY**
**AMERICAS, AS TRUSTEE, RELATING TO CREDIT DEFAULT SWAP AGREEMENT**

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Holdings Inc. (the "Plan Administrator") as Plan Administrator under the Modified

Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated

Debtors, on behalf of Lehman Brothers Special Financing Inc., pursuant to Rule 9019 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for approval of a settlement

agreement and indemnity agreement between LBSF and Deutsche Bank Trust Company

Americas, as Trustee (the "Trustee"), relating to a credit default swap agreement, all as more

fully described in the Motion, will be held before the Honorable James M. Peck, United States

Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House,

Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on

**August 15, 2012 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York,

shall set forth the name of the objecting party, the basis for the objection and the specific grounds

thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order

M-242 (which can be found at *www.nysb.uscourts.gov*) by registered users of the Bankruptcy

Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing

format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New

York 10153, Attn:  Jacqueline Marcus, Esq., attorneys for the Plan Administrator; (iii) the Office

of the United States Trustee for Region 2 (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor,

New York, New York 10004 (Attn: Elisabetta Gasparini, Esq. and Andrea B. Schwartz, Esq.);

(iv) Nixon Peabody LLP, 100 Summer St., Boston, MA 02110, Attn:  Amanda Darwin and

Richard Pedone and (vi) any person or entity with a particularized interest in the Motion, so as to

be so filed and received by no later than **August 8, 2012 at 4:00 p.m. (prevailing Eastern**

**Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

2

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: July 16, 2012
      New York, New York

                /s/ Jacqueline Marcus
                Jacqueline Marcus

                WEIL, GOTSHAL & MANGES LLP
                767 Fifth Avenue
                New York, New York 10153
                Telephone: (212) 310-8000
                Facsimile:  (212) 310-8007

                Attorneys for Lehman Brothers Holdings Inc. and
                Lehman Brothers Special Financing Inc.

US_ACTIVE:\43936239\28\58399.0008

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc. and*
*Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | x | |
| | : | |
| In re | : | **Chapter 11** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* | : | **Case No. 08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| | : | |
| | : | |
| | x | |

**MOTION PURSUANT TO RULE 9019 OF THE**
**FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR APPROVAL OF**
**SETTLEMENT AGREEMENT AND INDEMNITY BETWEEN LEHMAN BROTHERS**
**SPECIAL FINANCING INC. AND DEUTSCHE BANK TRUST COMPANY**
**AMERICAS, AS TRUSTEE, RELATING TO CREDIT DEFAULT SWAP AGREEMENT**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator") as Plan

Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors (the "Plan"), on behalf of Lehman Brothers Special

Financing Inc. ("LBSF" and, collectively with its non-debtor affiliates, "Lehman"), files this

Motion and respectfully represents:

**Background**

1.      Commencing on September 15, 2008, and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with

this Court voluntary cases (together, the "Chapter 11 Cases") under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code").

      2.      On December 6, 2011, the Court approved and entered an order

confirming the Plan [ECF No. 23023].  The Plan became effective on March 6, 2012.

### Jurisdiction

      3.      This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Relief Requested

      4.      By this Motion, the Plan Administrator on behalf of LBSF seeks approval,

pursuant to Bankruptcy Rule 9019, of a settlement, the terms of which are reflected in a

settlement agreement (the "Settlement Agreement") and a related indemnity agreement (the

"Indemnity Agreement"),[1] and that such approval be immediately effective and enforceable.  The

Settlement Agreement provides for resolution of all disputes relating to a swap transaction

described below among LBSF, Gemstone CDO VI Ltd., as Issuer (the "Issuer"), Gemstone CDO

VI Corp., as Co-Issuer (the "Co-Issuer"), and Deutsche Bank Trust Company Americas

("DBTCA" solely in its capacity as trustee under the Indenture dated August 17, 2006 (the

"Indenture"), or the "Trustee," and together with LBSF, the "Parties").  The Plan Administrator

and LBSF have determined, in the exercise of their sound business judgment, that the Settlement

Agreement and the Indemnity Agreement are in the best interests of LBSF, its estate, and its

creditors.  Accordingly, the Plan Administrator on behalf of LBSF, seeks approval of the

Settlement Agreement and the Indemnity Agreement.  Entry of an order approving and

authorizing the Settlement Agreement and the Indemnity Agreement is a condition precedent to

---

[1] A redacted copy of the Settlement Agreement and a copy of the Indemnity Agreement are
attached hereto as Exhibits "A" and "B," respectively.  An unredacted copy of the Settlement
Agreement will be provided to the Court upon request.

US_ACTIVE:\43936239\28\58399.0008

the effectiveness of the Settlement Agreement and the Indemnity Agreement.  In addition, the

Parties seek approval, pursuant to section 105(a) of the Bankruptcy Code, to take certain steps

following the payment of the CDS Payment Amount and the Trustee Amount so that the Trustee

may fully distribute any remaining collateral.

## The Credit Default Swap Agreement and Indenture

5.       LBSF and the Issuer entered into a portfolio of credit derivative swap

transactions (the "Transactions") that were governed by a 1992 ISDA Master Agreement, dated

as of August 16, 2006, (the "ISDA Master Agreement") as amended and supplemented by a

certain Schedule to ISDA Master Agreement, dated as of August 16, 2006, and those certain

confirmations between LBSF and the Issuer, dated August 16, 2006 (collectively, the "Credit

Default Swap Agreement").[2]

6.       Under the Credit Default Swap Agreement, LBSF agreed to make periodic

payments to the Issuer in exchange for the Issuer's promise to make payments to LBSF in

respect of losses incurred on certain specified reference obligations.  In effect, LBSF, as swap

counterparty, purchased protection from the Issuer, which sold protection on the creditworthiness

of the obligations referenced in the Credit Default Swap Agreement.

7.       Under the Indenture, the Issuer issued rated notes that were secured by a

pool of collateral that also secures the Credit Default Swap Agreement.  A significant portion

(representing more than a majority) of such collateral is contained in an account referred to in the

Indenture as the "Synthetic Security Collateral Account" which, as the name implies, was

established to support the Issuer's obligations to LBSF under the Credit Default Swap

Agreement.  Through a series of note purchases, LBSF now owns more than two-thirds of the

---

[2] Copies of the Credit Default Swap Agreement and Indenture are attached hereto as Exhibits
"C" and "D," respectively.  Capitalized terms not otherwise defined herein have the meaning ascribed
to them in the Credit Default Swap Agreement or Indenture.

3

controlling class of notes under the Indenture, as well as remaining the swap counterparty.  The

secured parties under the Indenture include LBSF, in its roles both as a noteholder of the

controlling class and as swap counterparty, other noteholders of the controlling class and other

classes of notes, and the Trustee and other service providers to the Issuer.  The Trustee continues

to hold the collateral on behalf of the secured parties under the Indenture and collects the

proceeds payable on the collateral.

8.      Under the Granting Clause of the Indenture, the Issuer granted to the

Trustee, for the benefit and security of the secured parties, all of its right, title and interest,

whether now owned or hereafter acquired, in, to and under, *inter alia*, the Credit Default Swap

Agreement, amounts on deposit in the Synthetic Security Collateral Account and substantially all

other assets of the Issuer.  The Indenture also irrevocably appointed the Trustee as the true and

lawful attorney of the Issuer, with full power (in the name of the Issuer or otherwise), to exercise

all rights of the Issuer with respect to, *inter alia*, the Credit Default Swap Agreement, amounts

on deposit in the Synthetic Security Collateral Account and such other assets, and to enforce

rights of the Issuer under or arising out of any of, *inter alia*, the Credit Default Swap Agreement,

amounts on deposit in the Synthetic Security Collateral Account and such other assets of the

Issuer.

9.      Under the terms of the Indenture, the Trustee applies payment proceeds

received generally in accordance with a "waterfall" provision.  *See* Indenture § 11.1.  Amounts

payable to LBSF with respect to the Credit Default Swap Agreement, however, are generally not

paid in accordance with the waterfall provisions, but instead, are paid prior to any application of

the waterfall, in accordance with separate provisions in the Indenture.  *See* Indenture § 11.1A.

The payment provisions applicable to LBSF with respect to the Credit Default Swap Agreement

purport to address various scenarios under which amounts are payable by the Issuer to LBSF

4

with respect to the Credit Default Swap Agreement, including payments owed to LBSF upon

termination of the Credit Default Swap Agreement.  These provisions expressly describe that

payments are to be paid to LBSF from the Synthetic Security Collateral Account should the

Issuer be the defaulting party under the Credit Default Swap Agreement.  There are, however, no

comparable provisions that describe how payment is to be made to LBSF upon termination of the

swap should LBSF be the defaulting party, or how amounts contained in the Synthetic Security

Collateral Account are to be applied in that circumstance.

### The Dispute

10.    LBSF received a "Notice Designating An Early Termination Date

Pursuant to Section 6(a) of the ISDA Master Agreement," dated September 16, 2008, with

respect to the Credit Default Swap Agreement.  On September 29, 2008, HBK Master Fund L.P.,

in its capacity as Collateral Manager under the Indenture, delivered a letter to LBSF notifying

LBSF that the termination payment owed by the Issuer to LBSF as of September 16, 2008, was

$206,350,430.45, which amount does not take into account any interest accrued thereon.  As of

the date hereof, however, neither party to the Credit Default Swap Agreement has paid any

amounts (including termination payments) that may have become due to the other party on or

after September 16, 2008, as a result of a dispute between LBSF and the Trustee regarding,

among other things, the terms of the Indenture applicable to the payment of termination

payments owed to LBSF in connection with a termination of the Credit Default Swap Agreement

when LBSF is the defaulting party (the "CDS Payment Dispute").

11.    On September 14, 2010, LBSF filed a complaint against, among others,

the Trustee and the Issuer.  *See* Adversary Proceeding No. 10-03542-JMP (the "Litigation").  At

issue in the Litigation is the CDS Payment Dispute, including questions as to the proper

interpretation of the Credit Default Swap Agreement or the Indenture under which the

5

commencement of LBHI or LBSF's bankruptcy case would operate to deprive LBSF of a valuable property interest, namely its right to be paid its termination payment from, among other things, amounts on deposit in the Synthetic Security Collateral Account. The Litigation relates to the instant CDS Payment Dispute among the Parties, as well as other similar disputes involving other issuers and trustees.

12.    In the Litigation, LBSF seeks a declaratory judgment that provisions purporting to modify LBSF's substantial economic rights to a termination payment premised on the bankruptcy filing of either LBHI or LBSF constitute unenforceable *ipso facto* clauses that inappropriately modify a debtor's interest in property, in violation of sections 365(e)(1) and 541(c)(1) of the Bankruptcy Code. LBSF also seeks a declaratory judgment that effectuation of such provisions violates the automatic stay under section 362(a)(3) of the Bankruptcy Code because it involves an improper exercise of control over property of LBSF's estate. In the alternative, LBSF seeks a declaratory judgment that, if such provisions ultimately are found to be enforceable in whole or in part, they constituted either (i) a preferential transfer of an interest of LBSF in property that may be avoided under section 547 of the Bankruptcy Code, recovered under section 550 of the Bankruptcy Code, and preserved for the benefit of LBSF's estate under section 551 of the Bankruptcy Code; (ii) a constructive fraudulent transfer of an interest of LBSF in property that may be avoided under section 548(a)(1)(B) of the Bankruptcy Code, recovered under section 550 of the Bankruptcy Code, and preserved for the benefit of LBSF's estate under section 551 of the Bankruptcy Code; or (iii) an unauthorized postpetition transfer of property of LBSF's estate that may be avoided under section 549 of the Bankruptcy Code, recovered under section 550 of the Bankruptcy Code, and preserved for the benefit of LBSF's estate under section 551 of the Bankruptcy Code.

13.     The Court issued the Order Extending Stay of Avoidance Actions and Granting Certain Related Relief Pursuant to Section 105(A) of the Bankruptcy Code and Bankruptcy Rule 7004(A)(1), dated January 11, 2012 (the "Stay"), thereby staying the Litigation, to give parties to this and other similar actions time to attempt to resolve their disputes. Accordingly, as a result of the Stay, the Issuer and the Trustee have not answered or otherwise moved for any relief in the Litigation.[3]  At various junctures following the commencement of the Litigation, LBSF and the Trustee have engaged in settlement discussions.

14.     A majority of the controlling class, which is now LBSF due to its purchase of more than two-thirds of the Class A-1 Notes, has the right, among others, to direct the time, method and place of conducting any proceeding, such as the Litigation, for any remedy available to the Trustee, pursuant to Section 5.13 of the Indenture, notwithstanding any other provision of the Indenture.  This right to direct the Trustee with regard to the Litigation is subject to certain conditions, including the Trustee's right to request reasonable indemnification.

15.     Consistent with the rights granted LBSF under the Indenture in its capacity as the majority holder of the controlling class, LBSF has instructed the Trustee, pursuant to a letter dated July 15, 2012, to enter into the Settlement Agreement and to perform its obligations thereunder in order to resolve the CDS Payment Dispute and the Litigation to the extent they involve the Issuer and the Trustee.  The Trustee has advised LBSF that it is prepared to enter into the Settlement Agreement provided:  (i) LBSF executes the Indemnity Agreement, and (ii) the Court approves the terms of the Settlement Agreement and Indemnity Agreement pursuant to the terms of Bankruptcy Rule 9019.

---

[3] By motion dated June 29, 2012, the Plan Administrator has requested a further extension of the Stay.

7

## The Settlement Agreement and Indemnity Agreement

16.     The salient terms of the Settlement Agreement are as follows:

- The Trustee shall pay (a) the CDS Payment Amount (as defined in the Settlement Agreement) to LBSF and (b) the Trustee Amount (as defined in the Settlement Agreement) to the Trustee for its fees and expenses and those of its counsel and financial advisors, in each case without deduction, set-off or counterclaim, from amounts on deposit in the Synthetic Security Collateral Account.

- Following such payments, amounts remaining in the Synthetic Security Collateral Account shall be deemed Principal Proceeds (as defined in the Indenture) and be credited to the Principal Collection Account (as defined in the Indenture), for further application on the next Distribution Date (as defined in the Indenture) in accordance with the terms of the Indenture.

- To the extent LBSF is a holder of Class A-1 Notes on the record date with respect to such Distribution Date, LBSF will be entitled to payments in such capacity in accordance with the Indenture.

- The Parties will exchange a mutual release of all claims related to the Credit Default Swap Agreement, Indenture, and CDS Payment Dispute, provided that LBSF's release is limited to its capacity as counterparty to the Credit Default Swap Agreement and does not deprive LBSF of any of its rights as a holder of Class A-1 Notes.

- Upon receipt of the Settlement Amount in full by LBSF:  (i) LBSF will execute and file on the docket in the Litigation a Stipulation of Dismissal with Prejudice, dismissing the Issuer, Co-Issuer, and the Trustee, solely in the Trustee's capacity as Trustee under the Indenture from the Litigation, and (ii) all proofs of claims filed against the Debtors in respect of the Credit Default Swap Agreement or Indenture will be withdrawn, with prejudice.

- Subject to the terms of the Indemnity Agreement and the payment to the Trustee of the Trustee Amount, each party will bear its own costs and expenses relating to the Litigation and the Settlement Agreement.

- After the payment of the CDS Payment Amount and the Trustee Amount, the collateral will be liquidated pursuant to the Wind-Down Provisions (defined below) and the remaining funds will be distributed in accordance with the Indenture.

17.     The salient terms of the Indemnity Agreement are as follows:

- LBSF agrees to pay to the Trustee, on demand for, and to indemnify and hold harmless from and against, any and all losses, liabilities, judgments, claims,

8

causes of actions, damages, costs (including court costs), expenses, fees (including reasonable legal fees, costs and expenses), penalties, disbursements, and liabilities of any kind or character whatsoever, and whether brought by or involving any third party or LBSF that directly or indirectly arise out of the Indemnity Agreement, any direction provided by LBSF to the Trustee (including a direction to enter into the Settlement Agreement), or payment to LBSF by the Trustee of a termination payment.

- The term of the Indemnity Agreement is limited to the earliest to occur of (A) the sixth anniversary of the final distribution of the proceeds of a liquidation of all of the Collateral and (B) the sixth anniversary of the effective date of the Settlement Agreement, subject to further extension for actions that are pending or threatened in writing prior to the expiration of such term.

- No indemnity is provided by LBSF if there is a final determination by a court of competent jurisdiction that is not subject to review on appeal that any otherwise covered losses are the result of gross negligence, willful misconduct or fraud by the Trustee or any other indemnified person.

### Wind-down and Dissolution of the Issuer

18.    The collateral held by the Trustee for the benefit of the secured parties will be substantially reduced by the payment of the CDS Payment Amount to LBSF and the Trustee Amount to the Trustee.  The remaining collateral will only be sufficient to pay the holders of Class A Notes at any future Distribution Date a portion of the balance of the principal and interest owed to them.  The remaining assets of the Issuer, therefore, will not be sufficient to make any further payments to holders of any other classes of notes.  While section 5.5 of the Indenture requires the Trustee to be instructed by at least two-thirds of the holders of each class in order to liquidate the collateral and distribute the remaining funds in accordance with the waterfall, this provision was not drafted with the expectation that several classes of noteholders would have no economic interest in the collateral.  Requiring the Trustee to continue holding the collateral will not benefit any of the noteholders, and will only result in an unnecessary depletion of value due to the need to pay periodic expenses such as the fees of the Trustee, the Trustee's professionals and other service providers.  Accordingly, LBSF and the Trustee have agreed to the

9

following mechanism (the "<u>Wind-Down Provisions</u>") pursuant to which the remaining collateral

will be distributed following the payment of the CDS Payment Amount and the Trustee Amount:

- As the holder of at least two-thirds of the Class A Notes (*i.e.*, the only class with a remaining economic interest in the collateral), LBSF may give a liquidation direction to the Trustee pursuant to 5.5 of the Indenture and the Indemnity Agreement, instructing the Trustee to liquidate the collateral and distribute the remaining proceeds in accordance with the applicable provisions of the Indenture (the "<u>Liquidation Direction</u>").

- Following receipt of the Liquidation Direction, the Trustee will notify the other noteholders that the holders of at least two-thirds of the Class A Notes have instructed the Trustee to liquidate the collateral and distribute the proceeds thereof in accordance with the Indenture.  Noteholders will be provided with 30 days to object to the liquidation of the collateral.

- If fewer than one-third of the holders of any class of notes object to the liquidation of the collateral, the Trustee will be deemed to have the consent of at least two-thirds of the holders of each class and will liquidate the collateral and distribute the remaining funds in accordance with the terms of the Indenture.

19.    Although the provisions of the Indenture arguably require holders of other

classes of notes to provide a direction similar to the Liquidation Direction, the Parties do not

believe that noteholders of classes other than the Class A Notes will oppose the Liquidation

Direction, given that the remaining collateral is only sufficient to pay the holders of Class A

Notes in any future distribution.  Indeed, given that they have no further economic interest in the

collateral, holders of notes other than Class A Notes would be expected to have no views one

way or another regarding the retention or disposition of the collateral.  However, if more than

one-third of the holders of any class of notes objects to the liquidation of the collateral, the

Trustee will take no further action with respect to the Liquidation Direction and will continue to

administer the collateral in accordance with the Indenture unless and until the direction of two–

thirds majority of that class have been obtained.  As such, the Wind-Down Provisions

summarized above should not affect the substantive rights of any noteholders, and will only

10

serve to expedite the wind-down and dissolution of the Issuer and to maximize the value of the remaining collateral for the benefit of the Issuer's only residual stakeholders, including LBSF.

### The Settlement Agreement and the Indemnity
### Agreement are in LBSF's Best Interests and Should Be Approved

20.     The Plan Administrator on behalf of LBSF submits that the Settlement Agreement and the Indemnity Agreement are in LBSF's best interests and should be approved under Rule 9019 of the Bankruptcy Rules.  Bankruptcy Rule 9019(a) provides "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement." Fed. R. Bankr. R. 9019(a).  This rule empowers bankruptcy courts to approve settlements "if they are in the best interests of the estate." *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).  The settlement need not result in the best possible outcome for the debtor, but must not "fall beneath the lowest point in the range of reasonableness." *Id.*; *see also Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).

21.     Compromises are "a normal part of the process of reorganization." *Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)). Compromises may be effected separately during the reorganization proceedings or in the body of the plan itself.  *In re Drexel Burnham Lambert Group Inc.*, 138 B.R. at 758.  The decision to approve a particular compromise lies within the sound discretion of the bankruptcy court.  *See Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).  The court's discretion may be exercised "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).  A proposed compromise and settlement implicates the issue of whether it is "fair and equitable, and in the best interest of the [debtor's] estate." *In re Best Products*, 165 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations omitted).  The court

11

must apprise itself "of all relevant facts necessary for an intelligent and objective opinion of the

probabilities of ultimate success should the claim be litigated." *Prot. Comm. for Indep.*

*Stockholders of TMT Trailer Ferry, Inc.*, 390 U.S. at 424.

22.     Courts typically consider the following factors in determining whether a

settlement should be approved: (i) the probability of success in litigation, with due consideration

for the uncertainty in fact and law; (ii) the difficulties of collecting any litigated judgment;

(iii) the complexity and likely duration of the litigation and any attendant expense,

inconvenience, and delay; (iv) the proportion of creditors who do not object to, or who

affirmatively support, the proposed settlement; (v) the competence and experience of counsel

who support the settlement; (vi) the relative benefits to be received by members of any affected

class; (vii) the extent to which the settlement is truly the product of arm's-length bargaining and

not the product of fraud or collusion; and (viii) the debtor's informed judgment that the

settlement is fair and reasonable. *See Protective Comm. for Indep. Stockholders of TMT Trailer*

*Ferry, Inc.,* 390 U.S. at 424; *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 804 (Bankr. S.D.N.Y.

1998); *In re Best Prods. Co.*, 168 B.R. at 50.

23.     While a court must "evaluate. . .all. . .factors relevant to a fair and full

assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court

need not conduct a "mini-trial" of the merits of the claims being settled, *Cosoff v. Rodman (In re*

*W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983), or conduct a full independent investigation.

*Drexel Burnham Lambert Group*, 134 B.R. at 496.  Moreover, in reviewing a global

compromise, the court need not be aware of or decide the particulars of each individual claim

resolved by the settlement or "assess the minutia of each and every claim"; rather, the court

"need only canvass the issues and see whether the settlement falls 'below the lowest point in the

range of reasonableness.'" *Shugrue*, 165 B.R. at 123.  As one court explained in assessing a

12

global settlement of claims, "[t]he appropriate inquiry is whether the Settlement Agreement *in its entirety* is appropriate for the . . . estate." *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 430 (S.D.N.Y. 1993), *aff'd* 17 F.3d 600 (2d Cir. 1993) (emphasis added).

24.     The Settlement Agreement and the corresponding Indemnity Agreement will benefit LBSF and its creditors.  First, the settlement will result in a substantial payment to LBSF's estate.  LBSF has determined, in the exercise of its business judgment, that such payment will adequately compensate the estate for the value of its economic position as swap counterparty and two-thirds majority holder of the controlling class of notes.  Second, the Settlement Agreement will avoid future litigation concerning the CDS Payment Dispute because the Parties have agreed to release one another from claims thereunder.  Thus, the Settlement Agreement, and by necessity the Indemnity Agreement, will allow LBSF to capture a substantial amount of the value of the Transactions and notes for its estate, while avoiding the costs associated with continuation of the pending litigation.

25.     For the reasons stated above, and in the Plan Administrator's informed business judgment, the compromises set forth in the Settlement Agreement and the corresponding Indemnity Agreement are a "fair and equitable" resolution of the issues described herein, are well within the "range of reasonableness," and are in the best interests of LBSF's estate and its creditors.  Accordingly, the Plan Administrator requests that the Settlement Agreement and Indemnity Agreement be approved, effective immediately upon entry of an order granting the relief requested herein.

### The Bankruptcy Court Has Authority Pursuant to
### Section 105(a) of the Bankruptcy Code to Approve the Wind-Down Provisions

26.     To comply with these provisions of the Settlement Agreement, the Parties seek approval of the Wind-Down Provisions pursuant to section 105(a) of the Bankruptcy Code

13

so that the remaining collateral may be liquidated and distributed.  This Court has authority

under the broad equitable powers of Bankruptcy Code set forth in section 105(a) to approve the

Wind-Down Provisions.  Courts have used their equitable powers to permit deviations in trust

agreements in order to preserve and protect a trust or where circumstances exist that would

defeat or substantially impair the accomplishment of the purposes of the trust.  *See e.g.*, *In re*

*A.H. Robbins*, 880 F.2d 769, 776 (4th Cir. 1989) (noting that section 105(a) authorizes the court

to "issue any order, process or judgment that is necessary or appropriate to carry out the

provisions" of the Bankruptcy Code and finding that matters relating to the control and

supervision of trusts are within the equity jurisdiction of the court); *In re Joint Eastern and*

*Southern Districts Asbestos Litigation,* 878 F. Supp. 473 (E.D.N.Y. & S.D.N.Y. 1995) and 129

B.R. 710 (E.D.N.Y. & S.D.N.Y. 1991) (holding that section 105(a) authorizes the federal courts

in bankruptcy cases to approve a settlement modifying distributions, obligations, and payment

procedures under a trust).  Similarly here, the Court has authority under section 105(a) of the

Bankruptcy Code to authorize the Trustee to deviate from the terms of the Indenture, where strict

adherence to the terms of the Indenture would frustrate the Issuer's sole remaining economic

stakeholders from maximizing the value of the collateral held under the Indenture by the Trustee

for the benefit of the Issuer's noteholders.

27.    This Court has granted relief in these chapter 11 cases, pursuant to section

105(a) of the Bankruptcy Code, similar to the relief requested in the Motion.  U.S. Bank, as

indenture trustee under several indentures, filed a motion, dated January 28, 2010 [Docket No.

6811] (the "U.S. Bank Motion"), pursuant to section 105(a), for authorization, among other

things, for the disposition of the assets of the Lehman Brothers ABS Enhanced Libor Fund (the

"Feeder Fund") through the exchange of the units in the Feeder Fund for shares in the Lehman

Brothers ABS Enhanced Libor, Ltd. (the "Master Fund") and the transfer of the rights to manage

14

the Master Fund's portfolio to TCW Asset Management Company. On March 25, 2010, this

Court entered an order, pursuant to section 105(a) of the Bankruptcy Code, approving the U.S.

Bank Motion [Docket No. 7830].

28.    Here, the use of the Court's equitable authority is justified and

appropriate. Implementation of the Wind-Down Provisions will leave all noteholders (except the

holders of Class A Notes) in exactly the same position as they would be in otherwise absent

implementation of such provisions. As stated above, after payment of the CDS Payment Amount

to LBSF and the Trustee Amount to the Trustee, the collateral that remains will only be

sufficient to make applicable payments to the holders of Class A Notes on any future

Distribution Date. The holders of all other classes of notes other than Class A should therefore

be indifferent as to whether the remaining collateral is distributed today or at any future date,

because they will never receive a payment under the waterfall in either case. Moreover, any

noteholders who disagree with that conclusion will have the opportunity to lodge an objection

with the Trustee.

29.    On the other hand, liquidation and distribution of the remaining collateral

pursuant to the Wind-Down Provisions is manifestly in the best interests of the holders of Class

A Notes, including LBSF, for two reasons. First, the liquidation will accelerate receipt of

distributions by the only noteholders that would otherwise be entitled to receive any remaining

value – the holders of Class A Notes – of which LBSF holds at least two-thirds (LBSF is entitled

under the express terms of the Indenture to direct liquidation on behalf of the holders of Class A

Notes). Second, liquidation will avoid the diminution of value that would otherwise result from

the continued accrual of the Issuer's administrative expenses if the collateral remains

unliquidated. A failure to act would therefore surely frustrate and impair the intention and

purpose of the Indenture and the Settlement Agreement.

15

## Notice

30.    No trustee has been appointed in the Chapter 11 Cases.  The Plan

Administrator has served notice of this Motion in accordance with the procedures set forth in the

second amended order entered on June 17, 2010, governing case management and administrative

procedures for these cases [ECF No. 9635] on (i) the U.S. Trustee for Region 2; (ii) the

Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the United States

Attorney for the Southern District of New York; (v) the attorneys for the Trustee; and (vi) all

parties who have requested notice in the Chapter 11 Cases.  The Plan Administrator submits that

no other or further notice need be provided.

31.    No previous request for the relief sought herein has been made by the Plan

Administrator to this or any other Court.

WHEREFORE the Plan Administrator on behalf of LBSF respectfully requests

that the Court grant the relief requested herein and such other and further relief as it deems just

and proper.

Dated: July 16, 2012
         New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007
Attorneys for Lehman Brothers Holdings Inc. and
Lehman Brothers Special Financing Inc.

16

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
:
In re                                                  :          **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*    :          **08-13555 (JMP)**
:
**Debtors.**          :          **(Jointly Administered)**
:

_____

### ORDER PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR APPROVAL OF SETTLEMENT AGREEMENT AND INDEMNITY AGREEMENT BETWEEN LEHMAN BROTHERS SPECIAL FINANCING INC. AND DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE, RELATING TO CREDIT DEFAULT SWAP AGREEMENT

Upon the motion, dated July 16, 2012 (the "Motion"), of Lehman Brothers

Holdings Inc. (the "Plan Administrator") as Plan Administrator under the Modified Third

Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors, on

behalf of Lehman Brothers Special Financing Inc. ("LBSF"), pursuant to Rule 9019 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for approval of a settlement

agreement (the "Settlement Agreement") and an indemnity agreement (the "Indemnity

Agreement") between LBSF and Deutsche Bank Trust Company Americas, as Trustee (the

"Trustee"), relating to a credit default swap agreement, all as more fully described in the Motion;

and the Court having jurisdiction to consider the Motion and the relief requested therein in

accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to

Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title

11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided in accordance with the procedures set forth in the amended

order entered on June 17, 2010, governing case management and administrative procedures for

these cases [ECF No. 9635] on (i) the U.S. Trustee for Region 2; (ii) the Securities and Exchange

Commission; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern

District of New York; (v) the attorneys for the Trustee; and (vi) all parties who have requested

notice in the Chapter 11 Cases, and it appearing that no other or further notice need be provided;

and a hearing (the "Hearing") having been held to consider the relief requested in the Motion;

and the Court having found and determined that the relief sought in the Motion is in the best

interests of LBSF, its estate, its creditors, and all parties in interest and that the legal and factual

bases set forth in the Motion establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to Bankruptcy Rule 9019, the Settlement Agreement

and the Indemnity Agreement are approved; and it is further

ORDERED that LBSF is authorized to execute, deliver, implement and fully

perform any and all obligations, instruments, documents and papers and to take any and all

actions reasonably necessary or appropriate to consummate the Settlement Agreement and the

Indemnity Agreement and to perform any and all obligations contemplated therein; and it is

further

2

ORDERED that the Trustee is authorized to pay the CDS Payment Amount[1] and the Trustee Amount from the Synthetic Security Collateral Account, and to distribute the remaining funds in such account, in accordance with the terms of the Settlement Agreement; and it is further

ORDERED that the Trustee is authorized to effectuate the Wind-Down Provisions for the purpose of liquidating any remaining collateral and distributing the proceeds thereof in accordance with the terms set forth in the Indenture; and it is further

ORDERED that the terms of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2012
     New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

US_ACTIVE:\43936239\28\58399.0008