# Exhibit C

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of August 16, 2006

| | | |
|---|---|---|
| **LEHMAN BROTHERS SPECIAL FINANCING INC.** | and | **GEMSTONE CDO VI LTD.** |

have entered and/or anticipate entering into one or more transactions (each a Transaction) that are or will be governed by this Master Agreement, which includes the schedule (the Schedule), and the documents and other confirming evidence (each a Confirmation) exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:

1. **Interpretation**

(a) ***Definitions.*** The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b) ***Inconsistency.*** In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c) ***Single Agreement.*** All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this Agreement), and the parties would not otherwise enter into any Transactions.

2. **Obligations**

(a) ***General Conditions.***

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant

Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b) *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c) *Netting.* If on any date amounts would otherwise be payable:—

(i) in the same currency; and

(ii) in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d) *Deduction or Withholding for Tax.*

(i) *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1) promptly notify the other party ("Y") of such requirement;

(2) pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3) promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4) if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A) the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B) the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

(ii) *Liability*. If:—

(1) X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2) X does not so deduct or withhold; and

(3) a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e) *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3. Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a) *Basic Representations.*

(i) *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii) *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii) *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv) *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v) *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b) *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c) *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d) *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e) *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f) *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4. Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a) *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i) any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii) any other documents specified in the Schedule or any Confirmation; and

(iii) upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b) *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c) *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d) *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e) *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

## 5. Events of Default and Termination Events

(a) *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i) *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii) *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii) *Credit Support Default.*

(1) Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2) the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3) the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv) *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v) *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi) *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b) *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i) *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v) *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

## 6. Early Termination

(a) *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b) *Right to Terminate Following Termination Event.*

(i) *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii) *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii) *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv) *Right to Terminate.* If:—

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c) *Effect of Designation.*

(i) If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii) Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) *Calculations.*

(i) *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii) *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e) *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i) *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii) ***Termination Events.*** If the Early Termination Date results from a Termination Event:—

(1) *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties.* If there are two Affected Parties:—

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) ***Adjustment for Bankruptcy.*** In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) ***Pre-Estimate.*** The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7. Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a) a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b) a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8. Contractual Currency

(a) ***Payment in the Contractual Currency.*** Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b) ***Judgments.*** To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c) ***Separate Indemnities.*** To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d) ***Evidence of Loss.*** For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

## 9. Miscellaneous

(a) *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b) *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c) *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d) *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e) *Counterparts and Confirmations.*

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f) *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g) *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 10. Offices; Multibranch Parties

(a) If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b) Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c) If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

## 11. Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 12. Notices

(a) *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i) if in writing and delivered in person or by courier, on the date it is delivered;

(ii) if sent by telex, on the date the recipient's answerback is received;

(iii) if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv) if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v) if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b) *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 13. Governing Law and Jurisdiction

(a) *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b) *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c) *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d) *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**14. Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a) in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b) in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c) in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d) in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city..

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

(a) the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b) such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| **LEHMAN BROTHERS SPECIAL FINANCING INC.** | **GEMSTONE CDO VI LTD.** |
| --- | --- |
| *(Name of Party)* | *(Name of Party)* |
| By: Jacqueline M. Didier | By: |
| Name: Jacqueline M. Didier | Name: |
| Title: Vice President | Title: |
| Date: | Date: |

(Multicurrency-Cross Border)

**SCHEDULE**
to the
**Master Agreement**
dated as of August 16, 2006
between
**Lehman Brothers Special Financing Inc.** ("Party A"),
a corporation organized under the laws of the State of Delaware,
and
**GEMSTONE CDO VI LTD.** ("Party B"),
an exempted company incorporated with limited liability under the laws of the Cayman Islands

## Part 1. Termination Provisions

In this Agreement:

(a) **"Specified Entity"** means in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transaction), | Not applicable. |
| Section 5(a)(vi) (Cross Default), | Not applicable. |
| Section 5(a)(vii) (Bankruptcy), | Not applicable. |
| Section 5(b)(iv) (Credit Event Upon Merger), | Not applicable. |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transaction), | Not applicable. |
| Section 5(a)(vi) (Cross Default), | Not applicable. |
| Section 5(a)(vii) (Bankruptcy), | Not applicable. |
| Section 5(b)(iv) (Credit Event Upon Merger), | Not applicable. |

(b) **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement.

(c) The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and will not apply to Party B. In connection therewith the following provisions will apply to Party A:

**"Specified Indebtedness"** will have the meaning specified in Section 14 of this Agreement.

**"Threshold Amount"** will mean the lesser of (i) USD 100 million and (ii) 2.0 percent (2.0%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. (**"Lehman Brothers Holdings Inc."** or **"Holdings"**)

**"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be

determined in accordance with generally accepted accounting principles consistently applied.

(d) The **"Automatic Early Termination"** provisions of Section 6(a) will not apply to Party A and will not apply to Party B.

(e) **Payments on Early Termination.** For the purpose of Section 6(e) of this Agreement:

(i) Loss will apply; and

(ii) the Second Method will apply; provided, however, that if there is a Defaulting Party, the obligations of the Non-defaulting Party to pay to the Defaulting Party any amount under Section 6(e) shall not arise until, and shall be subject to the condition precedent that, the Non-defaulting Party shall have received confirmation satisfactory to it in its sole discretion (which may include an opinion of counsel) that the Transactions have been terminated in accordance with Section 6(c); and provided, further, that if under the foregoing provisions it is determined that the Non-defaulting Party is to make a payment to the Defaulting Party, there shall be deducted from the amount of such payment all amounts which the Defaulting Party may be obligated to pay under Section 11.

(f) **"Termination Currency"** means United States Dollars ("USD").

(g) **Additional Termination Events** will apply. Each of the following shall constitute an Additional Termination Event and Section 5(b)(v) is amended by the addition of the following provisions at the end thereof:

"5(b)(v)(A) **Payment of Notes prior to Termination Date**. (i) The Notes are redeemed on any Payment Date prior to the Termination Date pursuant to Section 9.4 of the Indenture, or (ii)(x) all of the Notes are accelerated in accordance with Section 5.2 of the Indenture and (y) the Trustee has proceeded to liquidate any of the Collateral in accordance with the terms of the Indenture, in each case on or before any Payment Date preceding the Termination Date. For all purposes in this Agreement, Party B shall be deemed to be the sole Affected Party with respect to the occurrence of a Termination Event described in this Section 5(b)(v)(A) and all Transactions shall be Affected Transactions."

"5(b)(v)(B) **Supplemental Indentures without Party A's Prior Written Consent.** Party B enters into a supplemental indenture or other modification to the Indenture that (1) could reasonably be expected to have a material and adverse effect on Party A without at least ten (10) Business Days' prior notice to Party A and the prior written consent of Party A. With respect to the above Additional Termination Event, Party B shall be the sole Affected Party."

"5(b)(v)(C) **Failure to Comply with Collateral Requirement.** If at any time Party B fails to comply with the Collateral Requirement (as set forth in Part 5(p) herein)."

"5(b)(v)(D) **Downgrade of Party A.** If either of the following events occur and Party A does not take the appropriate steps set forth in the paragraph below: (i) Party A's Credit Support Provider shall fail to have a short-term rating of "A-1+" or above by S&P or a long-term unsecured debt or counterparty rating of "AA-" or above by S&P or subject to the satisfaction of the Rating Condition by S&P, A+ and so long as Party A has posted collateral pursuant to a Confirmation in an amount equal to the fixed amount payable on the next succeeding fixed rate payment date thereunder, or (ii) Party A's Credit Support Provider shall fail to have both a short-term rating of "Prime-1" and a long-term senior unsecured debt or counterparty rating of "A1" by Moody's which is not on credit watch for possible downgrade or, if Party A's Credit Support Provider does not have a short-term rating by Moody's, Party A's Credit Support Provider shall fail to have a long-term senior unsecured debt or counterparty rating of "Aa3" or above by Moody's which is not on credit watch for possible downgrade. The Ratings set forth above shall be known as the "Required Ratings". So long as Party A has posted collateral pursuant to (i) above, it shall not be an Additional Termination Event unless (A) Party A's Credit Support Provider fails to satisfy the Required Ratings and (ii) Party A fails to take one of the following actions within 30 days of such failure (w) post collateral pursuant to (i) above or (x) assign all of its rights and obligations under the Transactions to a counterparty with the Required Ratings or whose guarantor satisfies the Required Ratings or (y) obtain a guarantor with the Required Ratings or (z) take other steps as each Rating Agency that has downgraded the Synthetic Security Counterparty may require; (B) Party A's Credit Support Provider's long term unsecured debt or counterparty rating is rated below "BBB+" by S&P and the short term rating is rated below "A-2" by S&P and (ii) Party A has failed to within 10 days either assign all of its rights and obligations under the Transactions to a counterparty with the Required Ratings or whose guarantor satisfies the Required Ratings or obtain a guarantor with the Required Ratings. For the purpose of the foregoing Termination Event, Party A shall be the sole Affected Party.

(h) Section 6(b)(iv) is hereby amended by adding the following to the end thereof before the period:

provided, however, that upon the occurrence of an Additional Termination Event described in Section 5(b)(v)(A), an Early Termination Date, if designated by Party A, will occur with respect to each Transaction on the Redemption Date or on such next Payment Date, as applicable, and the amount payable in respect of such Additional Termination Event shall be payable by either party, as applicable, on such Early Termination Date.

(i) The provisions of Section 5(a) and Section 5(b) (as modified in the manner set forth above) will apply to Party A and to Party B as follows:

| **Section 5(a)** | | **Party A** | **Party B** |
|---|---|---|---|
| (i) | "Failure to Pay or Deliver" | Applicable. | Applicable. |
| (ii) | "Breach of Agreement" | Applicable. | Not Applicable. |
| (iii) | "Credit Support Default" | Applicable. | Not Applicable. |
| (iv) | "Misrepresentation" | Applicable. | Not Applicable. |
| (v) | "Default under Specified Transaction" | Not Applicable. | Not Applicable. |

| | | | |
|---|---|---|---|
| (vi) | "Cross Default" | Applicable. | Not Applicable. |
| (vii) | "Bankruptcy" | Applicable. | Applicable, provided that clause (2) thereof shall not apply. |
| (viii) | "Merger Without Assumption" | Applicable. | Not Applicable. |

| **Section 5(b)** | | **Party A** | **Party B** |
|---|---|---|---|
| (i) | "Illegality" | Applicable. | Applicable. |
| (ii) | "Tax Event" | Applicable. | Applicable. |
| (iii) | "Tax Event Upon Merger" | Applicable. | Not Applicable. |
| (iv) | "Credit Event Upon Merger" | Applicable. | Not Applicable. |
| (v)(A) | "Payment of Notes prior to Termination Date" | Not Applicable. | Applicable. |
| (v)(B) | "Supplemental Indentures without Party A's Prior Written Consent" | Not Applicable. | Applicable. |
| (v)(C) | "Failure to Comply with Collateral Requirement" | Not Applicable. | Applicable. |
| (v)(D) | "Downgrade of Party A" | Applicable. | Not Applicable. |

## Part 2. Tax Representations

(a) **Payer Tax Representations.** For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) and 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to Section 3(a) of this Agreement, (ii) the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b) **Payee Tax Representations.**

For the purpose of Section 3(f) of this Agreement, Party B makes the following representations to Party A:

1. Party B is a "non-U.S. branch of a foreign person" for purposes of section 1.1441-4(a)(3)(ii) and a "foreign person" for purposes of section 1.6041-4(a)(4) of the United States Treasury Regulations.

2. Party B is not (i) a bank that has entered into this Agreement in the ordinary course of its trade or business of making loans, as described in section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended (the "Code"), (ii) a 10% shareholder of Party A within the meaning of Code section 871(h)(3)(B), or (iii) a controlled foreign corporation with respect to Party A within the meaning of Code section 881(c)(3)(C).

**Part 3. Agreement to Deliver Documents**

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

(a) Tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| Party B | A correct, complete and executed U.S. Internal Revenue Service Form W-8BEN, or any successor thereto, and appropriate attachments, that eliminates U.S. federal withholding and backup withholding payments under this Agreement. | (i) Before the first Payment Date under this Agreement, (ii) before December 31 of each third succeeding calendar year, (iii) promptly upon reasonable demand by Party A, and (iv) promptly upon learning that any such Form previously provided by Party B has become obsolete or incorrect. |

(b) Other documents to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A | A guarantee of the Credit Support Provider, in the form of Exhibit A to this Schedule. | Upon execution of this Agreement. | Yes |
| Party A | An incumbency certificate of Party A with respect to the signatory of this Agreement and any Credit Support Document to be executed by it. | Upon execution of this Agreement. | Yes |
| Party A | An incumbency certificate of the Credit Support Provider with respect to the guarantee. | Upon execution of this Agreement.. | Yes |

| Party required to deliver document | Form/Document/ Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party B | An incumbency certificate with respect to the signatory of this Agreement | On or prior to the Closing Date. | Yes |
| Party B | An opinion of counsel to Party B substantially in the form set forth in the Indenture. | On or prior to the Closing Date. | Yes |
| Party B | A copy of the resolutions (the "Authorizing Resolution") of the board of directors of Party B, pursuant to which Party B is authorized to enter into this Agreement, and each Transaction entered into under this Agreement. | On or prior to the Closing Date. | Yes |
| Party B | Monthly Report | At such time as each Monthly Report is delivered to the Trustee | No |
| Party B | Note Valuation Report | Each Determination Date or otherwise in accordance with the terms of the Indenture | Yes |
| Party B | All reports that go to the Rating Agencies | As applicable | Yes |
| Party B | Evidence of acceptance of any Process Agent designated by such party of such designation | Upon Execution of this Agreement | Yes |

## Part 4. Miscellaneous

(a) **Addresses for Notices.** For the purpose of Section 12(a):

**Address for notices or communications to Party A:**

Address: Lehman Brothers Special Financing Inc.
745 Seventh Avenue
New York, NY 10019

Attention: Documentation Manager

| | |
|---|---|
| Telephone No.: | (212) 526-7187 |
| Facsimile No.: | (212) 526-7672 |

**Address for notices or communications to Party B:**

| | |
|---|---|
| Address: | Gemstone CDO VI Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093GT<br>Queensgate House<br>Grand Cayman<br>Cayman Islands |
| Attention: | The Directors |
| Telephone No.: | |
| Facsimile No.: | 345-945-7100 |
| with copies to: | Deutsche Bank Trust Company Americas |
| Address: | 1761 East St. Andrew Place<br>Santa Ana, CA 92705 |
| Attention: | CDO Business Unit - Gemstone |
| Facsimile No.: | 714-247-6000 |
| Phone No. | 714-656-2568 |

(b) **Process Agent.** For the purpose of Section 13(c):

Party A appoints as its Process Agent: Not applicable.

Party B appoints as its Process Agent: Not applicable.

(c) **Offices.** The provisions of Section 10(a) will apply to this Agreement.

(d) **Multibranch Party.** For the purpose of Section 10(c) of this Agreement:

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e) **Calculation Agent.** The Calculation Agent is Party A.

(f) **Credit Support Document.** Details of any Credit Support Document:

In the case of Party A: the guarantee of Lehman Brothers Holdings Inc. in the form of Exhibit A to this Schedule

In the case of Party B: The Indenture.

(g) **Credit Support Provider.**

In relation to Party A: Lehman Brothers Holdings Inc. ("Holdings").

In relation to Party B: Not applicable.

(h) **Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of New York.**

(i) **Jurisdiction.** Section 13(b) is hereby amended by: (i) deleting in the second line of Subparagraph (i) thereof the word "non-"; and (ii) deleting the final paragraph thereof.

(j) **Netting of Payments.** Subparagraph (ii) of Section 2(c) of this Agreement will apply to all Transactions.

(k) **"Affiliate"** will have the meaning specified in Section 14 of this Agreement, provided, however, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

**Part 5. Other Provisions**

(a) **General Conditions.** Section 2(a)(iii) is hereby amended by (X) inserting in the third line thereof after the words "and is continuing, (2)" and before the words "the condition precedent" the following phrase "the condition precedent that no Additional Termination Event has occurred and is continuing with respect to which the other party is an Affected Party and with respect to which all outstanding Transactions are Affected Transactions, (3)" and (Y) delete the symbol "(3)" before the words "each other applicable condition" and substitute the symbol "(4)" in lieu thereof.

(b) **Accuracy of Specified Information.** Section 3(d) is hereby amended by inserting in the third line thereof after the words "in every material respect" and before the period the phrase "or, in the case of audited or unaudited financial statements, a fair presentation, in all material respects, of the financial condition of the relevant person."

(c) **No Violation or Conflict Representation.** Section 3(a)(iii) is hereby amended by inserting in the second line thereof after the words "constitutional documents" and before the words ", any order or judgment" the phrase "(including, but not limited to, the Indenture, as amended, and any and all resolutions, investment policies, guidelines, procedures or restrictions)."

(d) **No Bankruptcy Petition.** Party A agrees that it will not, prior to the date which is one year and one day, or, if longer, the applicable preference period then in effect plus one

day, after the payment in full of the Notes issued pursuant to the Indenture institute against, or join any other Person in instituting against, Party B any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under federal or state bankruptcy or similar laws; provided that this provision shall not restrict or prohibit Party A from joining any other person, including, without limitation the Trustee, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings already commenced or other analogous proceedings already commenced under applicable laws. This provision shall survive the termination of this Agreement for any reason whatsoever.

(e) **Transfer**. Notwithstanding the provisions of Section 7, Party A may (i) upon prior notice to each Rating Agency, assign and delegate its rights and obligations under the Agreement in whole or in part to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect on the obligations of the transferor, or (2) subject to Rating Condition, assign and delegate its rights and obligations under this Agreement to one or more institutions without the consent of Party B (unless the consent of Party B is required with respect to any Transaction pursuant to the related Confirmation).

(f) **Limited Recourse.** The liability of Party B in relation to this Agreement and any Confirmation hereunder is limited in recourse to the Collateral (as defined in the Indenture) and any assets of Party B and proceeds thereof applied in accordance with the Priority of Payments set forth in the Indenture. Upon application of the Collateral and proceeds thereof in accordance with the Indenture, Party A shall not been entitled to take any further steps against Party B to recover any sums due but still unpaid hereunder or thereunder, all claims in respect of which shall be extinguished and shall not revive. No recourse shall be had for the payment of any amounts owing in respect of this Agreement against any officer, director, employee, stockholder or incorporator of Party B. This provision shall survive the termination of this Agreement for any reason.

(g) **Additional Definitions.**

"**Indenture**" shall mean the Indenture, dated as of the Closing Date, by and among Party B, as the issuer, GEMSTONE CDO VI CORP. as Co-Issuer and Deutsche Bank Trust Company Americas, as Trustee (as amended, supplemented, waived or otherwise modified from time to time).

Capitalized terms used and not defined herein shall have the meanings assigned thereto or incorporated by reference in the Indenture.

(h) **Trial by Jury**. Each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(i) **Representations.** Section 3 is hereby amended by adding the following additional Subsections:

(i) **No Agency.** It is entering into this Agreement and each Transaction as principal (and not as agent or in any capacity, fiduciary or otherwise).

(ii) **Eligible Contract Participant.** It is an "eligible contract participant" as defined in Section 1a(12) of the Commodity Exchange Act, as amended.

(iii) **No Reliance.** Party A and Party B each acknowledges and agrees that (i) the other party hereunder is acting solely in the capacity of an arm's length contractual counterparty, with respect to this Agreement and any Transaction hereunder, and (ii) the other party hereunder is not acting as its financial advisor or fiduciary (or in any similar capacity) with respect to this Agreement and any Transaction hereunder regardless of whether the other party hereunder provides it with market information or its views. Party A and Party B each represents to the other party hereunder (which representation shall be deemed to be repeated by it on each date on which a Transaction is entered into) that it understands the risks of the Transactions that it enters into and any legal, regulatory, tax, accounting and economic consequences arising therefrom and that its decision to enter into each Transaction has been based solely on its independent evaluation and its representatives in light of its financial capabilities and objectives.

(iv) **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(v) **Compliance with Laws.** Party B is in compliance, in all respects, with all applicable laws, rules, regulations, interpretations, guidelines, procedures, and policies of applicable regulatory authorities affecting Party B, this Agreement, the Transactions, or the performance of Party B's obligations hereunder.

(vi) **Constitutional Documents.** Party B is in compliance, in all respects, with each and every provision in its constitutional documents (including, but not limited to, the Indenture, as amended from time-to-time, and any and all resolutions, investment policies, guidelines, procedures or restrictions) and each Transaction contemplated hereunder is and will be an authorized and permitted transaction thereunder.

(j) **Acknowledgement of Security Interest.** Party A hereby acknowledges and consents to Party B's Grant of all its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, this Agreement (including, without limitation, its right to payments due to it hereunder or with respect hereto), pursuant to the terms of the Indenture to the Trustee, for the benefit of the Secured Parties, and further acknowledges and agrees that the Trustee may directly enforce the

rights of Party B hereunder. Party B hereby irrevocably appoints the Trustee its agent and attorney-in-fact for enforcing its rights hereunder, which appointment is coupled with an interest, and Party B confirms that notice of such appointment has been effectively given to the Trustee. Party A agrees that, unless notified in writing by the Trustee of other payment instructions, any and all amounts payable by Party A to Party B under this Agreement will be paid to the Trustee, at such account as the Trustee specifies in writing to Party A.

(k) **Synthetic Security.** Party B agrees that (i) Party A is one of the Synthetic Security Counterparties (as defined in the Indenture) and (ii) this Agreement (and each Transaction) entered into thereunder) is a Synthetic Security.

(l) **Synthetic Security Transactions.** The parties agree that this Agreement shall only apply to Synthetic Security Transactions and shall not apply to any other Transactions.

(m) **Third-Party Beneficiary.** Party B agrees with Party A (so long as either of Party A and Party B has or may have any obligation under this Agreement) that Party A shall be an express third-party Beneficiary of the Indenture.

(n) **Notices.** For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(o) **Service of Process.** The third sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(p) **Segregated Account.** In connection with each Synthetic Security between Party A and Party B, Party B shall at all times until Party B has no present or future obligations with respect to such Transaction post and maintain cash or Eligible Investments (as defined in the Indenture) in a face amount equal to the notional amount (which may be referenced to as the "Floating Rate Payer Calculation Amount" or by another term) of such Transaction multiplied by the Reference Price with respect to such Transaction (or if no Reference Price is specified, by 100%) to an account (the "Collateral Account") to be held with the Trustee in accordance with the terms of the Indenture (the "Collateral Requirement"). Party B hereby grants to Party A a first-priority security interest in each Collateral Account and the cash or Eligible Investments therein. The Collateral Accounts shall be segregated from the other assets of the Trustee and be held in the name of Party A, as secured party and "customer", within the meaning of Section 4-104 of the Uniform Commercial Code. The obligations of Party B to Party A with respect to each Transaction hereunder shall be secured by a first priority security interest in such Collateral Accounts and the cash or Eligible Investments therein and under no conditions shall the cash or Eligible Investments in such Collateral Account be used by Party B for any purpose other than to fulfill Party B's obligations to Party A in respect of each Transaction until such time as all present and future obligations of Party B to Party A

have been satisfied. Upon the occurrence of a Credit Event, as set forth in the Confirmation with respect to any Synthetic Security, Party A shall be entitled to apply the cash or Eligible Investments in the Collateral Accounts to amounts owed to Party A without further consent of Party B or any other person. Party A and Party B hereby agree that upon the occurrence of a Potential Event of Default, Event of Default or Termination Event, Party A shall be entitled to apply the cash or Eligible Investments in the Collateral Accounts to amounts owed to Party A without further consent of Party B or any other person. Party B shall ensure that cash or Eligible Investments in a face amount equal to the notional amount (which may be referred to as the "Floating Rate Payer Calculation Amount" or by another term) is maintained in the Collateral Accounts at all times; provided, that Party A shall have the right to call for additional cash or Eligible Investments if the Collateral Requirement is not met which Party B shall deliver within one Business Day.

(q) **Amendment**. Party A and Party B may amend this Agreement only if the Collateral Manager has provided its prior written consent to such amendment, which consent shall not be unreasonably withheld, and Rating Condition is provided.

(r) **Consent to Assignment.** Party A hereby acknowledges and consents to the assignment of this Agreement, solely for security purposes, by Party B to LaSalle Bank National Association, as Trustee under the Indenture. The Trustee shall not be deemed to be a party to this Agreement except with respect to Part 5(o); provided, however, that the Trustee, acting on behalf of the holders of the Notes shall have the right to enforce this Agreement against Party A. Party A shall be entitled to rely on any notice or communication from the Trustee to that effect.

(s) **Severability**. If any term, provision, covenant or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement; provided, however, that this severability provision shall not be applicable if any provision of Section 2, 5, 6 or 13 (or any definition or provision in Section 14 to the extent it relates to, or is used in or connection with any such Section) shall be held to be invalid or unenforceable.

(t) **Information Regarding Party B.** Party B represents and covenants that the description of Party B as set forth in the Offering Memorandum dated relating to the Notes has been furnished and approved by Party B and is true and correct as of the date hereof, and Party B agrees to indemnify and hold harmless Party A for any losses, claims, damages or liabilities caused by any untrue or incorrect description of Party B contained therein.

(u) **Authorizing Resolution Representation**. Party B makes the following representation to Party A, which representation shall be deemed repeated at the times set forth in Section 3 of this Agreement and on each date until the termination of this Agreement: "An Authorizing Resolution, as defined in Part 3 of this Schedule, is in full force and effect."

(v) **Waiver of Set-off.** Party A and Party B each irrevocably waives any and all rights it may have to set off, net, recoup or otherwise withhold or suspend or condition payment or performances of any obligation between it and the other party under this Agreement against any obligations between it and the other party under any other agreements. For the avoidance of doubt, this provision shall not cause Party A or Party B to waive any right it may have to net payments in respect of the same transaction or under any Synthetic Security.

(w) **Guarantee Demand.** If Party A fails to pay punctually any amounts under this Agreement, to the extent that Party B desires to exercise its rights under the Guarantee, the Trustee shall on behalf of Party B, make the written demand for payment pursuant to the Guarantee.

(x) **Amendments to Indenture**. Party B and the Trustee agree that they will obtain Party A's written consent at least ten (10) Business Days prior to amending or supplementing the Indenture, if such amendment and/or supplement could: (a) reasonably be expected to have a material and adverse effect on any of Party A's rights or obligations hereunder; or (b) modify the obligations of, or impact the ability of, Party B to fully perform any of Party B's obligations hereunder.

(y) **Outstanding Specified Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(z) **Arms'-Length Transaction**. Party B acknowledges and agrees that Party A has had and will have no involvement in and, accordingly Party A accepts no responsibility for: (i) the establishment, structure, or choice of assets of Party B; (ii) the selection of any person performing services for or acting on behalf of Party B; (iii) the selection of Party A as the Counterparty; (iv) the terms of the Notes; (v) the preparation of or passing on the disclosure and other information contained in any offering circular or similar document for the Notes, the Indenture, or any other agreements or documents used by Party B or any other party in connection with the marketing and sale of the Notes; (vi) the ongoing operations and administration of Party B, including the furnishing of any information to Party B which is not specifically required under this Agreement; or (vii) any other aspect of Party B's existence.

The parties executing this Schedule have executed the Master Agreement and have agreed to the contents of this Schedule.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

*Party A*

By: ______________________
Name:
Title:
Date:

**GEMSTONE CDO VI LTD.**

*Party B*

By: ______________________
Name:
Title:
Date:

DEUTSCHE BANK TRUST COMPANY AMERICAS, as the Trustee

Acknowledged and agreed solely with respect to Part 5(p), 5(w) and 5(x)

By: ______________________
Name:
Title:
Date:

The parties executing this Schedule have executed the Master Agreement and have agreed to the contents of this Schedule.

| **LEHMAN BROTHERS SPECIAL FINANCING INC.** | **GEMSTONE CDO VI LTD.** |
| --- | --- |
| *Party A* | *Party B* |
| By:________________________ | By:________________________ |
| Name: | Name: Carlos Farjallah |
| Title: | Title: Director |
| Date: | Date: |

Deutsche Bank Trust Company Americas, as the Trustee

Acknowledged and agreed solely with respect to Part 5(p), 5(w) and 5(x)

By: ________________________

Name:

Title:

Date:

The parties executing this Schedule have executed the Master Agreement and have agreed to the contents of this Schedule.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

*Party A*

By:________________________________

Name:

Title:

Date:

**GEMSTONE CDO VI LTD.**

*Party B*

By:________________________________

Name:

Title:

Date:

Deutsche Bank Trust Company Americas, as the Trustee

Acknowledged and agreed solely with respect to Part 5(p), 5(w) and 5(x)

By: [signature]

Name: Stephen T. Hessler

Title: Vice President

Date: 08/17/06

EXHIBIT A to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and GEMSTONE CDO VI LTD. ("Party B") have entered into a Master Agreement dated as of August 16, 2006, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a) Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b) Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c) Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d) This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e) Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f) Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By: ______________________________

Name:

Title:

Date:

**CONFIRMATION FOR CMBS SECURITIES**

# LEHMAN BROTHERS

Date: August 17, 2006

To: Gemstone CDO VI Ltd.

From: Lehman Brothers Special Financing Inc.

RE: Credit Derivative Transactions on Mortgage Backed Securities with Pay-As-You-Go or Physical Settlement

---

Dear Sir/Madam:

The purpose of this letter (the "Confirmation") is to confirm the terms and conditions of credit derivative transactions relating to mortgage backed securities entered into between us on the Trade Date specified below (each, a "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

Lehman Brothers Special Financing Inc. ("Party A") and Gemstone CDO VI Ltd. ("Party B") agree that this Confirmation sets forth the terms applicable to separate Credit Derivative Transactions with respect to each mortgage backed security set forth in Annex A and each such mortgage backed security constituting a separate Reference Obligation with respect thereto and that a Confirmation in the form of this Confirmation shall be deemed to be entered into with respect to each such Credit Derivative Transaction.

Party A and Party B further agree that each Transaction (i) constitutes a separate and independent Transaction between Party A and Party B in respect of each Reference Obligation, (ii) shall not be affected by any other Transaction and (iii) shall operate independently of each other Transaction evidenced hereby.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions (the "Credit Derivatives Definitions"), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions and this Confirmation, this Confirmation shall govern.

This Confirmation supplements, forms a part of, and is subject to, the ISDA Master Agreement, dated as of August 17, 2006, as amended and supplemented from time to time (the "Agreement"), between Party A and Party B. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

References in this Confirmation to the "Reference Obligation" shall be to the terms of the Reference Obligation (as defined below) set out in the Underlying Instruments (as defined below) as amended from time to time unless otherwise specified below.

The terms of each Transaction to which this Confirmation relates are as follows:

## 1. General Terms:

| | |
|---|---|
| Trade Date | August 17, 2006 |
| Effective Date: | August 17, 2006 |
| Scheduled Termination Date: | Subject to paragraph 5, the Legal Final Maturity Date of the Reference Obligation, subject to adjustment in accordance with the Following Business Day Convention. |
| Termination Date: | The last to occur of:<br>(a) the fifth Business Day following the Effective Maturity Date;<br>(b) the last Floating Rate Payer Payment Date;<br>(c) the last Delivery Date;<br>(d) the last Additional Fixed Amount Payment Date; and<br>(e) the last Release Date. |
| Floating Rate Payer: | Party B ("Seller") |
| Fixed Rate Payer: | Party A ("Buyer") |
| Calculation Agent: | Party A |
| Calculation Agent City: | New York |
| Business Day | New York |
| Business Day Convention: | Following (which, with the exception of the Effective Date, the Final Amortization Date, each Reference Obligation Payment Date and the period end date of each Reference Obligation Calculation Period, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entity: | With respect to each Transaction, the entity set forth opposite the relevant Reference Obligation in Annex A |
| Reference Obligation: | Each obligation specified in Annex A.<br>Section 2.30 of the Credit Derivatives Definitions shall not apply. |
| Original Principal Amount: | As set forth opposite the relevant Reference Obligation in Annex A. |
| Legal Final Maturity Date: | As set forth opposite the relevant Reference Obligation in Annex A. |
| Initial Factor: | As set forth opposite the relevant Reference Obligation in Annex A. |
| Reference Policy: | Not applicable |
| Reference Price: | 100% |

| | |
|---|---|
| Applicable Percentage: | With respect to a Reference Obligation, on any day, a percentage equal to A divided by B. |

"A" means the product of the Initial Face Amount and the Initial Factor as decreased on each Delivery Date by an amount equal to (a) the outstanding principal balance of Deliverable Obligations Delivered to Seller (as adjusted by the Relevant Amount, if any) divided by the Current Factor on such day multiplied by (b) the Initial Factor.

"B" means the product of the Original Principal Amount and the Initial Factor;

(a) as increased by the outstanding principal balance of any further issues by the Reference Entity that are fungible with and form part of the same legal series as the Reference Obligation; and

(b) as decreased by any cancellations of some or all of the Outstanding Principal Amount resulting from purchases of the Reference Obligation by or on behalf of the Reference Entity.

Initial Face Amount: As set forth opposite the Reference Obligation in Annex A

Reference Obligation Notional Amount: On the Effective Date, the product of:

(a) the Original Principal Amount;

(b) the Initial Factor; and

(c) the Applicable Percentage.

Following the Effective Date, the Reference Obligation Notional Amount will be:

(i) decreased on each day on which a Principal Payment is made by the relevant Principal Payment Amount;

(ii) decreased on the day, if any, on which a Failure to Pay Principal occurs by the relevant Principal Shortfall Amount;

(iii) decreased on each day on which a Writedown occurs by the relevant Writedown Amount;

(iv) increased on each day on which a Writedown Reimbursement occurs by any Writedown Reimbursement Amount in respect of a Writedown Reimbursement within paragraphs (ii) or of the definition of "Writedown Reimbursement"; and

(v) decreased on each Delivery Date by an amount equal to the relevant Exercise Amount minus the amount determined pursuant to paragraph (b) of "Physical Settlement Amount" below, provided that if any Relevant Amount is applicable, the Exercise Amount will also be deemed to be decreased by such Relevant Amount (or increased by the absolute value of such Relevant Amount if such Relevant Amount is

negative) with effect from such Delivery Date;

provided that if the Reference Obligation Notional Amount would be less than zero, it shall be deemed to be zero.

| | |
|---|---|
| Initial Payment: | With respect to each Transaction, the relevant Initial Payment set forth in Annex A attached hereto, which in the aggregate across all the Transactions referenced in Annex A shall equal USD 0.00. |

**2. Fixed Payments:**

| | |
|---|---|
| Fixed Rate Payer: | Buyer |
| Fixed Rate: | As set forth opposite the relevant Reference Obligation in Annex A; subject to adjustment in accordance with paragraph 5 below. |
| Fixed Rate Payer Period End Date: | The first day of each Reference Obligation Calculation Period. |
| Fixed Rate Payer Calculation Date: | With respect to each Fixed Rate Payer Calculation Period, the day falling five Business Days after the Reference Obligation Payment Date occurring on the last day of such Fixed Rate Payer Calculation Period; provided that the final Fixed Rate Payer Calculation Date shall fall on the fifth Business Day following the Effective Maturity Date. |
| Fixed Rate Payer Payment Dates: | With respect to each Fixed Rate Payer Calculation Period, the day falling five Business Days after the Reference Obligation Payment Date immediately prior to such Fixed Rate Payer Calculation Period; provided that (i) the initial Fixed Rate Payer Payment Date shall fall on the fifth Business Day following the Effective Date and (ii) the final Fixed Rate Payer Payment Date shall fall five Business Days after the Reference Obligation Payment Date immediately preceding the Effective Maturity Date.<br><br>For the avoidance of doubt, each Fixed Rate Payer Payment Date shall relate to the Reference Obligation Calculation Period in which it falls |
| Fixed Amount: | With respect to any Fixed Rate Payer Payment Date, an amount equal to the product of:<br><br>(a) the Fixed Rate;<br><br>(b) the Reference Obligation Notional Amount outstanding on the last day of the Reference Obligation Calculation Period related to such Fixed Rate Payer Payment Date, as adjusted for any increases or decreases of the Reference Obligation Notional Amount on the Reference Obligation Payment Date immediately preceding the related Reference Obligation Payment Date; and<br><br>(c) the actual number of days in the related Fixed Rate Payer Calculation Period divided by 360. |
| Additional Fixed Amount Payment Dates: | (a) Each Fixed Rate Payer Calculation Date; and<br><br>(b) in relation to each Additional Fixed Payment Event occurring after the second Business Day prior to the last Fixed Rate Payer Calculation |

Date, the fifth Business Day after Buyer has received notification from the Calculation Agent of the occurrence of such Additional Fixed Payment Event.

Additional Fixed Payments: Following the occurrence of an Additional Fixed Payment Event in respect of the Reference Obligation, Buyer shall pay the relevant Additional Fixed Amount to Seller on the first Additional Fixed Amount Payment Date falling at least two Business Days (or in the case of an Additional Fixed Payment Event that occurs after the second Business Day prior to the last Fixed Rate Payer Calculation Date, five Business Days) after the delivery of a notice by the Calculation Agent to the parties stating that the related Additional Fixed Amount is due and showing in reasonable detail how such Additional Fixed Amount was determined; provided that any such notice must be given on or prior to the fifth Business Day following the day that is one calendar year after the Effective Maturity Date (or, if this Transaction is terminated as a result of the occurrence of an Early Termination Date, the day that is one calendar year after such Early Termination Date); subject to Floating Payment Escrow.

Additional Fixed Payment Event: The occurrence on or after the Effective Date and on or before the day that is one calendar year after the Effective Maturity Date (or, if this Transaction is terminated as a result of the occurrence of an Early Termination Date, the day that is one calendar year after such Early Termination Date) of a Writedown Reimbursement, a Principal Shortfall Reimbursement or an Interest Shortfall Reimbursement.

Additional Fixed Amount: With respect to each Additional Fixed Amount Payment Date, an amount equal to the sum of:

(a) the Writedown Reimbursement Payment Amount (if any);

(b) the Principal Shortfall Reimbursement Payment Amount (if any); and

(c) the Interest Shortfall Reimbursement Payment Amount (if any).

For the avoidance of doubt, each Writedown Reimbursement Payment Amount, Principal Shortfall Reimbursement Payment Amount or Interest Shortfall Reimbursement Payment Amount (as applicable) shall be calculated using the Applicable Percentage which takes into account the aggregate adjustment made to the Applicable Percentage in respect of all Delivery Dates that have occurred prior to the date of such calculation.

**3. Floating Payments:**

Floating Rate Payer: Seller

Floating Rate Payer Payment Dates: In relation to a Floating Amount Event, the first Fixed Rate Payer Calculation Date falling at least two Business Days (or in the case of a Floating Amount Event that occurs on the Legal Final Maturity Date or the Final Amortization Date, the fifth Business Day) after delivery of a notice by the Calculation Agent to the parties or a notice from by Buyer to Seller that the related Floating Amount is due and showing in reasonable detail how such Floating Amount was determined; provided that any such notice must be given on or prior to the fifth Business Day following the Effective Maturity Date.

Floating Payments: If a Floating Amount Event occurs, then on the relevant Floating Rate Payer Payment Date, Seller will pay the relevant Floating Amount to Buyer, subject to Floating Payment Escrow.

Floating Payment Escrow: Notwithstanding anything herein to the contrary, if the Rating Requirement is not satisfied on a Floating Rate Payer Payment Date, Buyer and Seller shall, prior to such Floating Rate Payer Payment Date, select an escrow agent reasonably acceptable to Buyer and Seller and execute an escrow agreement such that:

(i) each amount payable by Seller in connection with Floating Payments (or portion thereof) which relates to a Writedown Amount (each such amount, an "Escrowed Amount") shall be held in an escrow account until the earlier of (a) the day upon which the Rating Requirement is satisfied and (b) the first anniversary of the related Floating Rate Payer Payment Date (the later such date in respect of each Escrowed Amount, the "Release Date"); *provided, however*, if a Writedown Reimbursement in respect of a Writedown Amount occurs prior to the relevant Release Date of the related Escrowed Amount, that portion of the Escrowed Amount equal to the relevant Writedown Reimbursement Payment Amount will be paid by the escrow agent to the Seller on the related Additional Fixed Amount Payment Date; *provided, further* if the Rating Requirement with respect to Moody's is not satisfied on any Floating Rate Payer Payment Date, Escrowed Amounts on deposit in the Escrow Account shall be transferred to the Synthetic Security Issuer Account, and such Escrowed Amounts shall be held in the Synthetic Security Issuer Account until the Release Date with respect to such Escrowed Accounts; and

(ii) all costs or expenses incurred in connection with the Escrow Agreement shall be borne by Seller, subject to a cap of $7,500 *per annum*.

For avoidance of doubt, payment of an Escrowed Amount (or the relevant portion thereof) to Seller by the escrow agent in connection with a Writedown Reimbursement shall satisfy Buyer's obligation to pay the related Additional Fixed Payments.

Floating Amount Event: A Writedown, a Failure to Pay Principal or an Interest Shortfall.

Floating Amount: With respect to each Floating Rate Payer Payment Date, an amount equal to the sum of:

(a) the relevant Writedown Amount (if any);

(b) the relevant Principal Shortfall Amount (if any); and

(c) the relevant Interest Shortfall Payment Amount (if any).

For the avoidance of doubt, each Writedown Amount, Principal Shortfall Amount or Interest Shortfall Payment Amount (as applicable) shall be calculated using the Applicable Percentage which takes into account the aggregate adjustment made to the Applicable Percentage in respect of all Delivery Dates that have occurred prior to the date of such calculation.

Conditions to Settlement: Credit Event Notice

Notifying Party: Buyer

Notice of Physical Settlement

Notice of Publicly Available Information: Applicable

Public Sources: The public sources listed in Section 3.7 of the Credit Derivatives Definitions; provided that Servicer Reports in respect of the Reference Obligation and, in respect of a Distressed Ratings Downgrade Credit Event only, any public communications by any of the Rating Agencies in respect of the Reference Obligation shall also be deemed Public Sources.

Specified Number: 1

provided that if the Calculation Agent has previously delivered a notice to the parties or Buyer has previously delivered a notice to Seller pursuant to the definition of "Floating Rate Payer Payment Dates" above in respect of a Writedown or a Failure to Pay Principal, the only Condition to Settlement with respect to any Credit Event shall be a Notice of Physical Settlement.

The parties agree that with respect to the Transaction and notwithstanding anything to the contrary in the Credit Derivatives Definitions:

(a) the Conditions to Settlement may be satisfied on more than `one occasion;

(b) multiple Physical Settlement Amounts may be payable by Seller;

(c) Buyer, when providing a Notice of Physical Settlement, must specify an Exercise Amount and an Exercise Percentage;

(d) if Buyer has delivered a Notice of Physical Settlement that specifies an Exercise Amount that is less than the Reference Obligation Notional Amount as of the date on which such Notice of Physical Settlement is delivered (calculated as though Physical Settlement in respect of all previously delivered Notices of Physical Settlement has occurred in full), the rights and obligations of the parties under the Transaction shall continue and Buyer may deliver additional Notices of Physical Settlement with respect to the initial Credit Event or with respect to any additional Credit Event at any time thereafter; and

(e) any Notice of Physical Settlement shall be delivered no later than 30 calendar days after the fifth Business Day following the earlier of the Effective Maturity Date and the Optional Step-up Early Termination Date.

Section 3.2(d) of the Credit Derivatives Definitions is amended to delete the words "that is effective no later than thirty calendar days after the Event Determination Date".

Credit Events: The following Credit Events shall apply to this Transaction (and the first sentence of Section 4.1 of the Credit Derivatives Definitions shall be amended accordingly):

Failure to Pay Principal

Writedown

Obligation: Reference Obligation Only

**4. Interest Shortfall**

Interest Shortfall Payment Amount: In respect of an Interest Shortfall, the relevant Interest Shortfall Amount; provided that, if Interest Shortfall Cap is applicable and the Interest Shortfall Amount exceeds the Interest Shortfall Cap Amount, the Interest Shortfall Payment Amount in respect of such Interest Shortfall shall be the Interest Shortfall Cap Amount.

Interest Shortfall Cap: Applicable

Interest Shortfall Cap Amount: As set out in the Interest Shortfall Cap Annex.

Actual Interest Amount: With respect to any Reference Obligation Payment Date, payment by or on behalf of the Issuer of an amount in respect of interest due under the Reference Obligation (including, without limitation, any deferred interest or defaulted interest but excluding payments in respect of prepayment penalties, yield maintenance provisions or principal, except that the Actual Interest Amount shall include any payment of principal representing capitalized interest) to the holder(s) of the Reference Obligation in respect of the Reference Obligation.

WAC Cap Interest Provision: Applicable.

For this purpose, "WAC Cap" means a weighted average coupon or weighted average rate cap provision (however defined in the Underlying Instruments) of the Underlying Instruments that limits, increases or decreases the interest rate or interest entitlement, as set out in the Underlying Instruments on the Effective Date without regard to any subsequent amendment.

Expected Interest Amount: With respect to any Reference Obligation Payment Date, the amount of current interest that would accrue during the related Reference Obligation Calculation Period calculated using the Reference Obligation Coupon on a principal balance of the Reference Obligation equal to:

(a) the Outstanding Principal Amount taking into account any reductions due to a principal deficiency balance or realized loss amount (however described in the Underlying Instruments) that are attributable to the Reference Obligation minus

(b) the Aggregate Implied Writedown Amount (if any)

and that will be payable on the related Reference Obligation Payment Date assuming for this purpose that sufficient funds are available therefor in accordance with the Underlying Instruments. Except as provided in (a) in the previous sentence, the Expected Interest Amount shall be determined without regard to (i) unpaid amounts in respect of accrued interest on prior Reference

Obligation Payment Dates, or (ii) any prepayment penalties or yield maintenance provisions.

The Expected Interest Amount shall be determined:

(x) if WAC Cap Interest Provision is applicable, after giving effect to any WAC Cap; and

(y) if WAC Cap Interest Provision is not applicable, without giving effect to any WAC Cap; and

in either case without regard to the effect of any provisions (however described) of such Underlying Instruments that otherwise permit the limitation of due payments to distributions of funds available from proceeds of the Underlying Assets, or that provide for the capitalization or deferral of interest on the Reference Obligation, or that provide for the extinguishing or reduction of such payments or distributions (but, for the avoidance of doubt, taking account of any Writedown within paragraph (i) of the definition of "Writedown" occurring in accordance with the Underlying Instruments).

Interest Shortfall: With respect to any Reference Obligation Payment Date, either (a) the non-payment of an Expected Interest Amount or (b) the payment of an Actual Interest Amount that is less than the Expected Interest Amount.

Interest Shortfall Amount: With respect to any Reference Obligation Payment Date, an amount equal to the greater of:

(a) zero; and

(b) the amount equal to the product of:

(i) (A) the Expected Interest Amount;

minus

(B) the Actual Interest Amount; and

(ii) the Applicable Percentage;

provided that, with respect to the first Reference Obligation Payment Date only, the Interest Shortfall Amount shall be the amount determined in accordance with (a) and (b) above multiplied by a fraction equal to:

(x) the number of days in the first Fixed Rate Payer Calculation Period; over

(y) the number of days in the first Reference Obligation Calculation Period.

Interest Shortfall Reimbursement: With respect to any Reference Obligation Payment Date, the payment by or on behalf of the Issuer of an Actual Interest Amount in respect of the Reference Obligation that is greater than the Expected Interest Amount.

Interest Shortfall Reimbursement With respect to any Reference Obligation Payment Date, the product of (a) the amount of any Interest Shortfall Reimbursement on such day and (b) the

| | |
|---|---|
| Amount: | Applicable Percentage. |
| Interest Shortfall Reimbursement Payment Amount: | If Interest Shortfall Cap is not applicable, the relevant Interest Shortfall Reimbursement Amount. If Interest Shortfall Cap is applicable, the amount determined pursuant to the Interest Shortfall Cap Annex. |

**5. Consequences of Step up of the Reference Obligation Coupon**

| | |
|---|---|
| Step-up provisions: | Applicable<br><br>If the Step-up provisions are applicable, then the following provisions of this paragraph 5 shall apply. |
| Step-up: | On any day, an increase in the Reference Obligation Coupon due to the failure of the Issuer or a third party to exercise, in accordance with the Underlying Instruments, a "clean up call" or other right to purchase, redeem, cancel or terminate (however described in the Underlying Instruments) the Reference Obligation. |
| Non Call Notification Date: | The date of delivery by the Calculation Agent to the parties or by Buyer to Seller of a Non Call Notice. |
| Non Call Notice: | A notice given by the Calculation Agent to the parties or by Buyer to Seller that the Reference Obligation has not been purchased, redeemed, cancelled or terminated by the Issuer or a third party, in accordance with the Underlying Instruments, pursuant to a "clean up call" or other right to purchase, redeem, cancel or terminate (however described in the Underlying Instruments) the Reference Obligation, which failure will result in the occurrence of a Step up. |
| Increase of the Fixed Rate: | Subject to "Optional Step up Early Termination" below, upon the occurrence of a Step up, the Fixed Rate will be increased by the number of basis points by which the Reference Obligation Coupon is increased due to the Step-up, such increase to take effect as of the Fixed Rate Payer Payment Date immediately following the fifth Business Day after the Non-Call Notification Date. |
| Optional Step up Early Termination: | No later than five Business Days after the Non-Call Notification Date, Buyer shall notify Seller (such notification, a "Buyer Step-up Notice") whether Buyer wishes to continue the Transaction at the increased Fixed Rate or to terminate the Transaction.<br><br>If Buyer elects to terminate the Transaction, the date of delivery of the Buyer Step-up Notice shall be the Scheduled Termination Date (such date, the "Optional Step-up Early Termination Date") and in such case "Increase of the Fixed Rate" in this paragraph 5 shall not apply.<br><br>No amount shall be payable by either party in respect of the Optional Step up Early Termination Date other than any Fixed Amount, Additional Fixed Amount, Floating Amount or Physical Settlement Amount calculated in accordance with the terms hereof. For the avoidance of doubt, the obligation of a party to pay any amount that has become due and payable under the Transaction and remains unpaid as at the Optional Step-up Early Termination Date shall not be affected by the occurrence of the Optional Step-up Early Termination Date. |

If Buyer fails to deliver the Buyer Step-up Notice by the fifth Business Day after the Non-Call Notification Date, Buyer shall be deemed to have elected to continue the Transaction at the increased Fixed Rate as described under "Increase of the Fixed Rate".

If Buyer elects, or is deemed to have elected, to continue the Transaction at the increased Fixed Rate, the Transaction shall continue.

**6. Settlement Terms**

Settlement Method: Physical Settlement

Terms Relating to Physical Settlement:

Physical Settlement Period: Five Business Days

Deliverable Obligations: Exclude Accrued Interest

Deliverable Obligations: Deliverable Obligatio Category: Reference Obligation Only

Physical Settlement Amount: An amount equal to:

(a) the product of the Exercise Amount and the Reference Price; minus

(b) the sum of:

(i) if the Aggregate Implied Writedown Amount is greater than zero, the product of (A) the Aggregate Implied Writedown Amount, (B) the Applicable Percentage, each as determined immediately prior to the relevant Delivery and (C) the relevant Exercise Percentage; and

(ii) the product of (A) the aggregate of all Writedown Amounts in respect of Writedowns within paragraph (i)(B) of the definition of "Writedown" minus the aggregate of all Writedown Reimbursement Amounts in respect of Writedown Reimbursements within paragraph (ii)(B) of the definition of "Writedown Reimbursement" and (B) the relevant Exercise Percentage;

provided that if the Physical Settlement Amount would exceed the product of:

(1) the Reference Obligation Notional Amount as of the date on which the relevant Notice of Physical Settlement is delivered calculated as though Physical Settlement in respect of all previously delivered Notices of Physical Settlement has occurred in full; and

(2) the Exercise Percentage;

then the Physical Settlement Amount shall be deemed to be equal to such product.

Delayed Payment: With respect to a Delivery Date, if a Servicer Report that describes a Delayed Payment is delivered to holders of the Reference Obligation or to the Calculation Agent on or after such Delivery Date, Buyer will pay the applicable Delayed Payment Amount to Seller no later than five Business Days following such Delayed Payment.

Escrow: Applicable

Non-delivery by Buyer or occurrence of the Effective Maturity Date: If Buyer has delivered a Notice of Physical Settlement and:

(a) Buyer does not Deliver in full the Deliverable Obligations specified in that Notice of Physical Settlement on or prior to the Physical Settlement Date; or

(b) the Effective Maturity Date occurs after delivery of the Notice of Physical Settlement but before Buyer Delivers the Deliverable Obligations specified in that Notice of Physical Settlement;

then such Notice of Physical Settlement shall be deemed not to have been delivered and any reference in this Confirmation to a previously delivered Notice of Physical Settlement shall exclude any Notice of Physical Settlement that is deemed not to have been delivered. Sections 9.2(c)(ii) (except for the first sentence thereof), 9.3, 9.4, 9.5, 9.6, 9.9 and 9.10 of the Credit Derivatives Definitions shall not apply.

**7. Additional Provisions:**

*(a) Delivery of Servicer Report*

If either party makes a reasonable request in writing, the Calculation Agent agrees to provide such party with a copy of the most recent Servicer Report promptly following receipt of such request, if and to the extent such Servicer Report is reasonably available to the Calculation Agent (whether or not the Calculation Agent is a holder of the Reference Obligation). In addition, if a Floating Payment or an Additional Fixed Payment is due hereunder, then the Calculation Agent or the party that notifies the other party that the relevant Floating Payment or Additional Fixed Payment is due, as applicable, (the "Notifying Party") shall deliver a copy of any Servicer Report relevant to such payment that is requested by the party that is not the Notifying Party or by either party where the Notifying Party is the Calculation Agent, if and to the extent that such Servicer Report is reasonably available to the Notifying Party (whether or not the Notifying Party is a holder of the Reference Obligation).

*(b) Calculation Agent and Buyer and Seller Determinations*

The Calculation Agent shall be responsible for determining and calculating (i) the Fixed Amount payable on each Fixed Rate Payer Payment Date, (ii) the occurrence of a Floating Amount Event and the related Floating Amount and (iii) the occurrence of an Additional Fixed Payment Event and the related Additional Fixed Amount. The Calculation Agent shall make such determinations and calculations based solely on the basis of the Servicer Reports, to the extent such Servicer Reports are reasonably available to the Calculation

Agent. The Calculation Agent, as applicable, shall, as soon as practicable after making any of the determinations or calculations specified in (i) and (iii) above, notify the parties or the other party, as applicable, of such determinations and calculations.

*(c)* *Adjustment of Calculation Agent Determinations*

To the extent that a Servicer furnishes any Servicer Reports correcting information contained in previously issued Servicer Reports, and such corrections impact calculations pursuant to this Transaction, the calculations relevant to the Transaction shall be adjusted retroactively by the Calculation Agent to reflect the corrected information (provided that, for the avoidance of doubt, no amounts in respect of interest shall be payable by either party and provided that the Calculation Agent in performing the calculations pursuant to this paragraph will assume that no interest has accrued on any adjusted amount), and the Calculation Agent shall promptly notify both parties of any corrected payments required by either party. Any required corrected payments shall be made within five Business Days of the day on which such notification by the Calculation Agent is effective.

*(d)* *No Implied Writedown Amounts or Implied Writedown Reimbursement Amounts*

Notwithstanding anything herein to the contrary, no payments shall be made under this Transaction in connection with an Implied Writedown Amount or an Implied Writedown Reimbursement Amount. For the avoidance of doubt, any references to Implied Writedown shall be disregarded for the purposes of calculating Reference Obligation Notional Amount with respect to any Fixed Payment or Additional Fixed Payment.

**8. Notice and Account Details:**

Telephone, Telex and/or Facsimile Numbers and Contact Details for Notices:

Party A: Lehman Brothers Special Financing Inc.
Attn: John Beaman
Phone: 212-526-0001
Email: jbeaman@lehman.com

With a copy of all notices to:
Jonathan Lai
Structured Products Transaction Management Group
Tel: (212) 526-0806
Fax: (212) 652-0556

Party B: Please advise

Account Details:

| | |
|---|---|
| Account Details of Party A: | JPMorgan Chase Bank<br>ABA No. 021000021<br>Account: 066-143543<br>FBO LBSF |
| Account Details of Party B: | Please advise |

**9. Additional Definitions and Amendments to the Credit Derivatives Definitions**

(a) References in Sections 4.1, 8.2, 9.1 and 9.2(a) of the Credit Derivatives Definitions as well as Section 3(a)(iv) of the form of Novation Agreement set forth in Exhibit E to the Credit Derivatives Definitions to the Reference Entity shall be deemed to be references to both the Reference Entity and the Insurer in respect of the Reference Policy, if applicable.

(b) (i) The definition of "Publicly Available Information" in Section 3.5 of the Credit Derivatives Definitions shall be amended by (i) inserting the words "the Insurer in respect of the Reference Policy, if applicable" at the end of subparagraph (a)(ii)(A) thereof, (ii) inserting the words ", servicer, sub-servicer, master servicer" before the words "or paying agent" in subparagraph (a)(ii)(B) thereof and (iii) deleting the word "or" at the end of subparagraph (a)(iii) thereof and inserting at the end of subparagraph (a)(iv) thereof the following: "or (v) is information contained in a notice or on a website published by an internationally recognized rating agency that has at any time rated the Reference Obligation".

(ii) The definition of "Physical Settlement" in Section 8.1 of the Credit Derivatives Definitions shall be amended by (i) deleting the words "Physical Settlement Amount" from the last line of the second paragraph thereof and (ii) inserting in lieu thereof the words "Exercise Amount".

(iii) The definition of "Physical Settlement Date" in Section 8.4 of the Credit Derivatives Definitions shall be amended by deleting the last sentence thereof.

(c) For the purposes of this Transaction only, the following terms have the meanings given below:

"Actual Principal Amount" means, with respect to the Final Amortization Date or the Legal Final Maturity Date, an amount paid on such day by or on behalf of the Issuer in respect of principal (excluding any capitalized interest) to the holder(s) of the Reference Obligation in respect of the Reference Obligation.

"Aggregate Implied Writedown Amount" means the greater of (i) zero and (ii) the aggregate of all Implied Writedown Amounts minus the aggregate of all Implied Writedown Reimbursement Amounts.

"Current Factor" means the factor of the Reference Obligation as specified in the most recent Servicer Report; provided that if the factor is not specified in the most recent Servicer Report, the Current Factor shall be the ratio equal to (i) the Outstanding Principal Amount as of such date, determined in accordance with the most recent Servicer Report over (ii) the Original Principal Amount.

"Current Period Implied Writedown Amount" means, in respect of a Reference Obligation Calculation Period, an amount determined as of the last day of such Reference Obligation Calculation Period equal to the greater of:

(i) zero; and

(ii) the product of:

(A) the Implied Writedown Percentage; and

(B) the greater of:

(1) zero; and

(2) the lesser of (x) the Pari Passu Amount and (y) the Pari Passu Amount plus the Senior Amount minus the aggregate outstanding asset pool balance securing the payment obligations on the Reference Obligation (all such outstanding asset pool balances as obtained by the Calculation Agent from the most recently dated

Servicer Report available as of such day), calculated based on the face amount of the assets then in such pool, whether or not any such asset is performing.

"Delayed Payment" means, with respect to a Delivery Date, a Principal Payment, Principal Shortfall Reimbursement or a Writedown Reimbursement within paragraph (i) of the definition of "Writedown Reimbursement" that is described in a Servicer Report delivered to holders of the Reference Obligation or to the Calculation Agent on or after such Delivery Date.

"Delayed Payment Amount" means, if persons who are holders of the Reference Obligation as of a date prior to a Delivery Date are paid a Delayed Payment on or after such Delivery Date, an amount equal to the product of (i) the sum of all such Delayed Payments, (ii) the Reference Price, (iii) the Applicable Percentage immediately prior to such Delivery Date and (iv) the Exercise Percentage.

"Distressed Ratings Downgrade" means that the Reference Obligation:

(i) if publicly rated by Moody's, (A) is downgraded to "Caa2" or below by Moody's or (B) has the rating assigned to it by Moody's withdrawn and, in either case, not reinstated within five Business Days of such downgrade or withdrawal; provided that if such Reference Obligation was assigned a public rating of "Baa3" or higher by Moody's immediately prior to the occurrence of such withdrawal, it shall not constitute a Distressed Ratings Downgrade if such Reference Obligation is assigned a public rating of at least "Caa1" by Moody's within three calendar months after such withdrawal; or

(ii) if publicly rated by Standard & Poor's, (A) is downgraded to "CCC" or below by Standard & Poor's or (B) has the rating assigned to it by Standard & Poor's withdrawn and, in either case, not reinstated within five Business Days of such downgrade or withdrawal; provided that if such Reference Obligation was assigned a public rating of "BBB-" or higher by Standard & Poor's immediately prior to the occurrence of such withdrawal, it shall not constitute a Distressed Ratings Downgrade if such Reference Obligation is assigned a public rating of at least "CCC+" by Standard & Poor's within three calendar months after such withdrawal; or

(iii) if publicly rated by Fitch, (A) is downgraded to "CCC" or below by Fitch or (B) has the rating assigned to it by Fitch withdrawn and, in either case, not reinstated within five Business Days of such downgrade or withdrawal; provided that if such Reference Obligation was assigned a public rating of "BBB-" or higher by Fitch immediately prior to the occurrence of such withdrawal, it shall not constitute a Distressed Ratings Downgrade if such Reference Obligation is assigned a public rating of at least "CCC+" by Fitch within three calendar months after such withdrawal.

"Effective Maturity Date" means the earlier of (a) the Scheduled Termination Date and (b) the Final Amortization Date.

"Exercise Amount" means, for purposes of the Transaction, an amount to which a Notice of Physical Settlement relates equal to the product of (i) the original face amount of the Reference Obligation to be Delivered by Buyer to Seller on the applicable Physical Settlement Date; and (ii) the Current Factor as of such date. The Exercise Amount to which a Notice of Physical Settlement relates shall (A) be equal to or less than the Reference Obligation Notional Amount (determined, for this purpose, without regard to the effect of any Writedown or Writedown Reimbursement within paragraphs (i)(B) or (iii) of "Writedown" or paragraphs (ii)(B) or (iii) of "Writedown Reimbursement", respectively) as of the date on which the relevant Notice of Physical Settlement is delivered calculated as though the Physical Settlement of all previously delivered Notices of Physical Settlement has occurred in full and (B) not be less than the lesser of (1) the Reference Obligation Notional Amount as of the date on which the relevant Notice of Physical Settlement is delivered calculated as though Physical Settlement in respect of all previously delivered Notices of Physical Settlement has occurred in full and (2) USD100,000. The cumulative original face amount of Deliverable Obligations specified in all Notices of Physical Settlement shall not at any time exceed the Initial Face Amount.

"Exercise Percentage" means, with respect to a Notice of Physical Settlement, a percentage equal to the original face amount of the Deliverable Obligations specified in such Notice of Physical Settlement divided by an amount

equal to (i) the Initial Face Amount minus (ii) the aggregate of the original face amount of all Deliverable Obligations specified in all previously delivered Notices of Physical Settlement.

"Expected Principal Amount" means, with respect to the Final Amortization Date or the Legal Final Maturity Date, an amount equal to (i) the Outstanding Principal Amount of the Reference Obligation payable on such day (excluding capitalized interest) assuming for this purpose that sufficient funds are available for such payment, where such amount shall be determined in accordance with the Underlying Instruments, minus (ii) the sum of (A) the Aggregate Implied Writedown Amount (if any) and (B) the net aggregate principal deficiency balance or realized loss amounts (however described in the Underlying Instruments) that are attributable to the Reference Obligation. The Expected Principal Amount shall be determined without regard to the effect of any provisions (however described) of the Underlying Instruments that permit the limitation of due payments or distributions of funds in accordance with the terms of such Reference Obligation or that provide for the extinguishing or reduction of such payments or distributions.

"Failure to Pay Principal" means (i) a failure by the Reference Entity (or any Insurer) to pay an Expected Principal Amount on the Final Amortization Date or the Legal Final Maturity Date, as the case may be or (ii) payment on any such day of an Actual Principal Amount that is less than the Expected Principal Amount; provided that the failure by the Reference Entity (or any Insurer) to pay any such amount in respect of principal in accordance with the foregoing shall not constitute a Failure to Pay Principal if such failure has been remedied within any grace period applicable to such payment obligation under the Underlying Instruments or, if no such grace period is applicable, within three Business Days after the day on which the Expected Principal Amount was scheduled to be paid.

"Final Amortization Date" means the first to occur of (i) the date on which the Reference Obligation Notional Amount is reduced to zero and (ii) the date on which the assets securing the Reference Obligation or designated to fund amounts due in respect of the Reference Obligation are liquidated, distributed or otherwise disposed of in full and the proceeds thereof are distributed or otherwise disposed of in full.

"Fitch" means Fitch Ratings or any successor to its rating business.

"Implied Writedown Amount" means, (i) if the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) of the definition of "Writedown" to occur in respect of the Reference Obligation, on any Reference Obligation Payment Date, an amount determined by the Calculation Agent equal to the excess, if any, of the Current Period Implied Writedown Amount over the Previous Period Implied Writedown Amount, in each case in respect of the Reference Obligation Calculation Period to which such Reference Obligation Payment Date relates, and (ii) in any other case, zero.

"Implied Writedown Percentage" means (i) the Outstanding Principal Amount divided by (ii) the Pari Passu Amount.

"Implied Writedown Reimbursement Amount" means, (i) if the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) of the definition of "Writedown" to occur in respect of the Reference Obligation, on any Reference Obligation Payment Date, an amount determined by the Calculation Agent equal to the excess, if any, of the Previous Period Implied Writedown Amount over the Current Period Implied Writedown Amount, in each case in respect of the Reference Obligation Calculation Period to which such Reference Obligation Payment Date relates, and (ii) in any other case, zero; provided that the aggregate of all Implied Writedown Reimbursement Amounts at any time shall not exceed the product of the Pari Passu Amount and the Implied Writedown Percentage.

"Legal Final Maturity Date" means the date set out in paragraph 1 above (subject, for the avoidance of doubt, to any business day convention applicable to the legal final maturity date of the Reference Obligation), provided that if the legal final maturity date of the Reference Obligation is amended, the Legal Final Maturity Date shall be such date as amended.

"Moody's" means Moody's Investors Service, Inc. or any successor to its rating business.

"Outstanding Principal Amount" means, as of any date of determination with respect to the Reference Obligation, the outstanding principal balance of the Reference Obligation as of such date, which shall take into account:

(i) all payments of principal;

(ii) all writedowns or applied losses (however described in the Underlying Instruments) resulting in a reduction in the outstanding principal balance of the Reference Obligation (other than as a result of a scheduled or unscheduled payment of principal);

(iii) forgiveness of any amount by the holders of the Reference Obligation pursuant to an amendment to the Underlying Instruments resulting in a reduction in the outstanding principal balance of the Reference Obligation;

(iv) any payments reducing the amount of any reductions described in (ii) and (iii) of this definition; and

(v) any increase in the outstanding principal balance of the Reference Obligation that reflects a reversal of any prior reductions described in (ii) and (iii) of this definition.

"Pari Passu Amount" means, as of any date of determination, the aggregate of the Outstanding Principal Amount of the Reference Obligation and the aggregate outstanding principal balance of all obligations of the Reference Entity secured by the Underlying Assets and ranking pari passu in priority with the Reference Obligation.

"Previous Period Implied Writedown Amount" means, in respect of a Reference Obligation Calculation Period, the Current Period Implied Writedown Amount as determined in relation to the last day of the immediately preceding Reference Obligation Calculation Period.

"Principal Payment" means, with respect to any Reference Obligation Payment Date, the occurrence of a payment of an amount to the holders of the Reference Obligation in respect of principal (scheduled or unscheduled) in respect of the Reference Obligation other than a payment in respect of principal representing capitalized interest, excluding, for the avoidance of doubt, any Writedown Reimbursement or Interest Shortfall Reimbursement.

"Principal Payment Amount" means, with respect to any Reference Obligation Payment Date, an amount equal to the product of (i) the amount of any Principal Payment on such date and (ii) the Applicable Percentage.

"Principal Shortfall Amount" means, in respect of a Failure to Pay Principal, an amount equal to the greater of:

(i) zero; and

(ii) the amount equal to the product of:

- (A) the Expected Principal Amount minus the Actual Principal Amount;
- (B) the Applicable Percentage; and
- (C) the Reference Price.

If the Principal Shortfall Amount would be greater than the Reference Obligation Notional Amount immediately prior to the occurrence of such Failure to Pay Principal, then the Principal Shortfall Amount shall be deemed to be equal to the Reference Obligation Notional Amount at such time.

"Principal Shortfall Reimbursement" means, with respect to any day, the payment by or on behalf of the Issuer of an amount in respect of the Reference Obligation in or toward the satisfaction of any deferral of or failure to pay principal arising from one or more prior occurrences of a Failure to Pay Principal.

"Principal Shortfall Reimbursement Amount" means, with respect to any day, the product of (i) the amount of any Principal Shortfall Reimbursement on such day, (ii) the Applicable Percentage and (iii) the Reference Price.

"Principal Shortfall Reimbursement Payment Amount" means, with respect to an Additional Fixed Amount Payment Date, the sum of the Principal Shortfall Reimbursement Amounts in respect of all Principal Shortfall Reimbursements (if any) made during the Reference Obligation Calculation Period relating to such Additional Fixed Amount Payment Date, provided that the aggregate of all Principal Shortfall Reimbursement Payment Amounts at any time shall not exceed the aggregate of all Floating Amounts paid by Seller in respect of occurrences of Failure to Pay Principal prior to such Additional Fixed Amount Payment Date.

"Rating Agencies" means Fitch, Moody's and Standard & Poor's.

"Rating Requirement" means, (i) either (A) the long-term debt obligations of the Buyer or its Credit Support Provider are rated at least Aa3 by Moody s (and if rated Aa3 , such rating is not on watch for possible downgrade) or (B)(1) the short-term debt obligations of the Buyer or its Credit Support Provider are rated at least P-1 by Moody s (and if rated P-1 , such rating is not on watch for possible downgrade) and (2) the long-term debt obligations of the Buyer or its Credit Support Provider are rated at least A1 by Moody s (and if rated A1, such rating is not on watch for possible downgrade), and (ii) either (A) the long-term debt obligations of the Buyer or its Credit Support Provider are rated at least AA- by Standard & Poor's, or if a Rating Condition (as defined in the Indenture) with respect to Standard & Poor's has been obtained, A+, and so long as, the Buyer has deposited any required Escrow Amount (as defined in the term Floating Payment Escrow herein) pursuant to an Escrow Agreement or (B) the short-term debt obligations of the Buyer or its Credit Support Provider are rated A-1+ by Standard & Poor's.

"Reference Obligation Calculation Period" means, with respect to each Reference Obligation Payment Date, a period corresponding to the interest accrual period relating to such Reference Obligation Payment Date pursuant to the Underlying Instruments.

"Reference Obligation Coupon" means the periodic interest rate applied in relation to each Reference Obligation Calculation Period on the related Reference Obligation Payment Date, as determined in accordance with the terms of the Underlying Instruments as at the Effective Date, without regard to any subsequent amendment.

"Reference Obligation Payment Date" means (i) each scheduled distribution date for the Reference Obligation occurring on or after the Effective Date and on or prior to the Scheduled Termination Date, determined in accordance with the Underlying Instruments and (ii) any day after the Effective Maturity Date on which a payment is made in respect of the Reference Obligation.

"Relevant Amount" means, if a Servicer Report that describes a Principal Payment, Writedown or Writedown Reimbursement (other than a Writedown Reimbursement within paragraph (i) of "Writedown Reimbursement"), in each case that has the effect of decreasing or increasing the interest accruing principal balance of the Reference Obligation as of a date prior to a Delivery Date but such Servicer Report is delivered to holders of the Reference Obligation or to the Calculation Agent on or after such Delivery Date, an amount equal to the product of (i) the sum of any such Principal Payment (expressed as a positive amount), Writedown (expressed as a positive amount) or Writedown Reimbursement (expressed as a negative amount), as applicable; (ii) the Reference Price; (iii) the Applicable Percentage immediately prior to such Delivery Date; and (iv) the Exercise Percentage.

"Senior Amount" means, as of any day, the aggregate outstanding principal balance of all obligations of the Reference Entity secured by the Underlying Assets and ranking senior in priority to the Reference Obligation.

"Servicer" means any trustee, servicer, sub servicer, master servicer, fiscal agent, paying agent or other similar entity responsible for calculating payment amounts or providing reports pursuant to the Underlying Instruments.

"Servicer Reports" means periodic statements or reports regarding the Reference Obligation provided by the Servicer to holders of the Reference Obligation.

"Standard & Poor's" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. or any successor to its rating business.

"Underlying Assets" means the assets securing the Reference Obligation for the benefit of the holders of the Reference Obligation and which are expected to generate the cashflows required for the servicing and repayment (in whole or in part) of the Reference Obligation, or the assets to which a holder of such Reference Obligation is economically exposed where such exposure is created synthetically.

"Underlying Instruments" means the indenture, trust agreement, pooling and servicing agreement or other relevant agreement(s) setting forth the terms of the Reference Obligation.

"Writedown" means the occurrence at any time on or after the Effective Date of:

(i) (A) a writedown or applied loss (however described in the Underlying Instruments) resulting in a reduction in the Outstanding Principal Amount (other than as a result of a scheduled or unscheduled payment of principal); or

(B) the attribution of a principal deficiency or realized loss (however described in the Underlying Instruments) to the Reference Obligation resulting in a reduction or subordination of the current interest payable on the Reference Obligation;

(ii) the forgiveness of any amount of principal by the holders of the Reference Obligation pursuant to an amendment to the Underlying Instruments resulting in a reduction in the Outstanding Principal Amount; or

(iii) if the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) above to occur in respect of the Reference Obligation, an Implied Writedown Amount being determined in respect of the Reference Obligation by the Calculation Agent;

*provided* that if Party A holds of the Reference Obligation, Party A shall not vote to approve any writedown or applied loss (as set forth in clause (i)(A) hereof); *provided* further, if Party A votes for any writedown or applied loss, then any related writedown or loss amount shall not be a Floating Amount and shall not be payable by Party B.

"Writedown Amount" means, with respect to any day, the product of (i) the amount of any Writedown on such day, (ii) the Applicable Percentage and (iii) the Reference Price.

"Writedown Reimbursement" means, with respect to any day, the occurrence of:

(i) a payment by or on behalf of the Issuer of an amount in respect of the Reference Obligation in reduction of any prior Writedowns;

(ii) (A) an increase by or on behalf of the Issuer of the Outstanding Principal Amount of the Reference Obligation to reflect the reversal of any prior Writedowns; or

(B) a decrease in the principal deficiency balance or realized loss amounts (however described in the Underlying Instruments) attributable to the Reference Obligation; or

(iii) if the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (ii) above to occur in respect of the Reference Obligation, an Implied Writedown Reimbursement Amount being determined in respect of the Reference Obligation by the Calculation Agent.

"Writedown Reimbursement Amount" means, with respect to any day, an amount equal to the product of:

(i) the sum of all Writedown Reimbursements on that day;

(ii) the Applicable Percentage; and

(iii) the Reference Price.

"Writedown Reimbursement Payment Amount" means, with respect to an Additional Fixed Amount Payment Date, the sum of the Writedown Reimbursement Amounts in respect of all Writedown Reimbursements (if any) made during the Reference Obligation Calculation Period relating to such Additional Fixed Amount Payment Date, provided that the aggregate of all Writedown Reimbursement Payment Amounts at any time shall not exceed the aggregate of all Floating Amounts paid by Seller in respect of Writedowns occurring prior to such Additional Fixed Amount Payment Date.

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us by facsimile.

Yours sincerely,

**Lehman Brothers Special Financing Inc.**

By: ______________________

Name:

Title:

Confirmed as of the date first above written:

**Gemstone CDO VI Ltd.**

By: ______________________

Name: Carlos Farjallah

Title: Director

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us by facsimile.

Yours sincerely,

**Lehman Brothers Special Financing Inc.**

By: ______________________

Name:

Title:

Confirmed as of the date first above written:

**Gemstone CDO VI Ltd.**

By: ______________________

Name:

Title:

## Interest Shortfall Cap Annex

If Interest Shortfall Cap is applicable, then the following provisions will apply:

| | |
|---|---|
| Interest Shortfall Cap Basis: | Fixed Cap |
| Interest Shortfall Cap Amount: | If the Interest Shortfall Cap Basis is Fixed Cap, the Interest Shortfall Cap Amount in respect of an Interest Shortfall shall be the Fixed Amount calculated in respect of the Fixed Rate Payer Payment Date immediately prior to the Reference Obligation Payment Date on which the relevant Interest Shortfall occurred<br><br>If the Interest Shortfall Cap Basis is Variable Cap, the Interest Shortfall Cap Amount applicable in respect of a Floating Rate Payer Payment Date shall be an amount equal to the product of:<br><br>(a) the sum of the Relevant Rate and the Fixed Rate applicable to the Fixed Rate Payer Calculation Period immediately preceding the Reference Obligation Payment Date on which the relevant Interest Shortfall occurs;<br><br>(b) the amount determined by the Calculation Agent under sub clause (b) of the definition of "Fixed Amount" in relation to the relevant Fixed Rate Payer Payment Date; and<br><br>(c) the actual number of days in such Fixed Rate Payer Calculation Period divided by 360. |
| Interest Shortfall Reimbursement Payment Amount: | If Interest Shortfall Cap is applicable, then with respect to the first Additional Fixed Amount Payment Date, zero, and with respect to any subsequent Additional Fixed Amount Payment Date and calculated as of the Reference Obligation Payment Date immediately preceding such Additional Fixed Amount Payment Date, as specified by the Calculation Agent in its notice to the parties or by Seller in its notice to Buyer of the existence of an Interest Shortfall Reimbursement, an amount equal to the greater of:<br><br>(a) zero; and<br><br>(b) the amount equal to:<br><br>(i) the product of:<br><br>(A) the Cumulative Interest Shortfall Payment Amount as of the Additional Fixed Amount Payment Date immediately preceding such Reference Obligation Payment Date; and<br><br>(B) the relevant Cumulative Interest Shortfall Payment Compounding Factor for the Fixed Rate Payer Calculation Period immediately preceding such Additional Fixed Amount Payment Date (or 1.0 in respect of any Additional Fixed Amount Payment Date occurring after the final Fixed Rate Payer Calculation Date); |

minus

(ii) the Cumulative Interest Shortfall Amount as of such Reference Obligation Payment Date;

provided that if the Interest Shortfall Reimbursement Payment Amount on an Additional Fixed Amount Payment Date would exceed the Interest Shortfall Reimbursement Amount in respect of the related Reference Obligation Payment Date, then such Interest Shortfall Reimbursement Payment Amount shall be deemed to be equal to such Interest Shortfall Reimbursement Amount.

Cumulative Interest Shortfall Amount

With respect to any Reference Obligation Payment Date, an amount equal to the greater of:

(a) zero; and

(b) an amount equal to:

(i) the Cumulative Interest Shortfall Amount as of the Reference Obligation Payment Date immediately preceding such Reference Obligation Payment Date or, in the case of the first Reference Obligation Payment Date, zero; plus

(ii) the Interest Shortfall Amount (if any) in respect of such Reference Obligation Payment Date; plus

(iii) an amount determined by the Calculation Agent as the amount of interest that would accrue on the Cumulative Interest Shortfall Amount immediately preceding such Reference Obligation Payment Date during the related Reference Obligation Calculation Period pursuant to the Underlying Instruments or, in the case of the first Reference Obligation Payment Date, zero; minus

(iv) the Interest Shortfall Reimbursement Amount (if any) in respect of such Reference Obligation Payment Date.

Upon the occurrence of each Delivery, the Cumulative Interest Shortfall Amount shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following such Delivery divided by (b) the Applicable Percentage immediately prior to such Delivery; provided, however, that if more than one Delivery is made during a Reference Obligation Calculation Period, the Cumulative Interest Shortfall Amount calculated as of the Reference Obligation Payment Date occurring immediately after such Reference Obligation Calculation Period shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following the final Delivery made during such Reference Obligation Calculation Period and (b) the Applicable Percentage immediately prior to the first Delivery made during such Reference Obligation Calculation Period.

Cumulative Interest Shortfall

The Cumulative Interest Shortfall Payment Amount with respect to any Fixed Rate Payer Payment Date and any Additional Fixed Amount Payment Date

Payment Amount:

falling on such Fixed Rate Payer Payment Date shall be an amount equal to the greater of:

(a) zero; and

(b) the amount equal to:

(i) the sum of:

(A) the Interest Shortfall Payment Amount for the Reference Obligation Payment Date corresponding to such Fixed Rate Payer Calculation Date; and

(B) the product of:

(1) the Cumulative Interest Shortfall Payment Amount as of the Fixed Rate Payer Calculation Date immediately preceding such Fixed Rate Payer Payment Date (or zero in the case of the first Fixed Rate Payer Calculation Date); and

(2) the relevant Cumulative Interest Shortfall Payment Compounding Factor;

minus

(ii) any Interest Shortfall Reimbursement Payment Amount paid on such Fixed Rate Payer Calculation Date

With respect to any Additional Fixed Amount Payment Date falling after the final Fixed Rate Payer Calculation Date, the Cumulative Interest Shortfall Payment Amount shall be equal to:

(x) the Cumulative Interest Shortfall Payment Amount as of the Additional Fixed Amount Payment Date immediately preceding such Additional Fixed Amount Payment Date (or as of the final Fixed Rate Payer Calculation Date in the case of the first Additional Fixed Amount Payment Date occurring after the final Fixed Rate Payer Calculation Date); minus

(y) any Interest Shortfall Reimbursement Payment Amount paid on such Additional Fixed Amount Payment Date.

Upon the occurrence of each Delivery, the Cumulative Interest Shortfall Payment Amount shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following such Delivery divided by (b) the Applicable Percentage immediately prior to such Delivery; provided, however, that if more than one Delivery is made during a Reference Obligation Calculation Period, the Cumulative Interest Shortfall Payment Amount calculated as of the Reference Obligation Payment Date occurring immediately after such Reference Obligation Calculation Period shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following the final Delivery

made during such Reference Obligation Calculation Period and (b) the Applicable Percentage immediately prior to the first Delivery made during such Reference Obligation Calculation Period.

Cumulative Interest Shortfall Payment Compounding Factor: With respect to any Fixed Rate Payer Calculation Period, an amount equal to the sum of:

(a) 1.0;

plus

(b) the product of:

(i) the sum of (A) the Relevant Rate plus (B) the Fixed Rate; and

(ii) the actual number of days in such Fixed Rate Payer Calculation Period divided by 360;

provided, however, that the Cumulative Interest Shortfall Payment Compounding Factor shall be deemed to be 1.0 during the period from but excluding the Effective Maturity Date to and including the Termination Date.

Relevant Rate: With respect to a Fixed Rate Payer Calculation Period, the Floating Rate, expressed as a decimal number with seven decimal places, that would be determined if:

(a) the 2000 ISDA Definitions (and not the 2003 ISDA Credit Derivatives Definitions) applied to this paragraph;

(b) the Fixed Rate Payer Calculation Period were a "Calculation Period" for purposes of such determination; and

(c) the following terms applied:

(i) the Floating Rate Option were the Rate Source;

(ii) the Designated Maturity were the period that corresponds to the usual length of a Fixed Rate Payer Calculation Period; and

(iii) the Reset Date were the first day of the Calculation Period;

provided, however, that the Relevant Rate shall be deemed to be zero during the period from but excluding the Effective Maturity Date to and including the Termination Date.

Rate Source: USD-LIBOR-BBA

# Annex A

| | Transaction Terms | | | | | Reference Obligation Details | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Global ID: | Initial Face Amount (USD) | Initial Payment (USD) | Initial Factor | Fixed Rate (%) | Legal final maturity date | Original Principal Amount (USD) | Issuer | Bloomberg ID: | ISIN / CUSIP | Spread/ Coupon |
| 2627756 | 7,000,000 | 0 | 1.0 | 0.98% | 7/10/2039 | 40,008,000 | GSMS 2005-GG4 | GSMS | 36228CWG4 | 5.67% |

**CONFIRMATION FOR RMBS SECURITIES**

# LEHMAN BROTHERS

| | |
|---|---|
| Date: | August 17, 2006 |
| To: | Gemstone CDO VI Ltd. |
| From: | Lehman Brothers Special Financing Inc. |
| RE: | Credit Derivative Transactions on Mortgage Backed Securities with Pay-As-You-Go or Physical Settlement |

---

Dear Sir/Madam:

The purpose of this letter (the "Confirmation") is to confirm the terms and conditions of credit derivative transactions relating to mortgage backed securities entered into between us on the Trade Date specified below (each, a "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

Lehman Brothers Special Financing Inc. ("Party A") and Gemstone CDO VI Ltd. ("Party B") agree that this Confirmation sets forth the terms applicable to separate Credit Derivative Transactions with respect to each mortgage backed security set forth in Annex A and each such mortgage backed security constituting a separate Reference Obligation with respect thereto and that a Confirmation in the form of this Confirmation shall be deemed to be entered into with respect to each such Credit Derivative Transaction.

Party A and Party B further agree that each Transaction (i) constitutes a separate and independent Transaction between Party A and Party B in respect of each Reference Obligation, (ii) shall not be affected by any other Transaction and (iii) shall operate independently of each other Transaction evidenced hereby.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions (the "Credit Derivatives Definitions"), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions and this Confirmation, this Confirmation shall govern.

This Confirmation supplements, forms a part of, and is subject to, the ISDA Master Agreement, dated as of August 17, 2006, as amended and supplemented from time to time (the "Agreement"), between Party A and Party B. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

References in this Confirmation to the "Reference Obligation" shall be to the terms of the Reference Obligation (as defined below) set out in the Underlying Instruments (as defined below) as amended from time to time unless otherwise specified below.

The terms of each Transaction to which this Confirmation relates are as follows:

**1. General Terms:**

| | |
|---|---|
| Trade Date: | August 17, 2006 |
| Effective Date: | August 17, 2006 |
| Scheduled Termination Date: | Subject to paragraph 5, the Legal Final Maturity Date of the Reference Obligation, subject to adjustment in accordance with the Following Business Day Convention. |
| Termination Date: | The last to occur of:<br>(a) the fifth Business Day following the Effective Maturity Date;<br>(b) the last Floating Rate Payer Payment Date;<br>(c) the last Delivery Date;<br>(d) the last Additional Fixed Amount Payment Date; and<br>(e) the last Release Date. |
| Floating Rate Payer: | Party B ("Seller") |
| Fixed Rate Payer: | Party A ("Buyer") |
| Calculation Agent: | Party A |
| Calculation Agent City: | New York |
| Business Day: | New York |
| Business Day Convention: | Following (which, with the exception of the Effective Date, the Final Amortization Date, each Reference Obligation Payment Date and the period end date of each Reference Obligation Calculation Period, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entity: | With respect to each Transaction, the entity set forth opposite the relevant Reference Obligation in Annex A |
| Reference Obligation: | Each obligation specified in Annex A.<br>Section 2.30 of the Credit Derivatives Definitions shall not apply. |
| Original Principal Amount: | As set forth opposite the relevant Reference Obligation in Annex A. |
| Legal Final Maturity Date: | As set forth opposite the relevant Reference Obligation in Annex A. |
| Initial Factor: | As set forth opposite the relevant Reference Obligation in Annex A. |
| Reference Policy: | Not applicable |
| Reference Price: | 100% |

| | |
|---|---|
| Applicable Percentage: | With respect to a Reference Obligation, on any day, a percentage equal to A divided by B.<br><br>"A" means the product of the Initial Face Amount and the Initial Factor as decreased on each Delivery Date by an amount equal to (a) the outstanding principal balance of Deliverable Obligations Delivered to Seller (as adjusted by the Relevant Amount, if any) divided by the Current Factor on such day multiplied by (b) the Initial Factor.<br><br>"B" means the product of the Original Principal Amount and the Initial Factor;<br><br>(a) as increased by the outstanding principal balance of any further issues by the Reference Entity that are fungible with and form part of the same legal series as the Reference Obligation; and<br><br>(b) as decreased by any cancellations of some or all of the Outstanding Principal Amount resulting from purchases of the Reference Obligation by or on behalf of the Reference Entity. |
| Initial Face Amount: | As set forth opposite the Reference Obligation in Annex A |

| | |
|---|---|
| Reference Obligation Notional Amount: | On the Effective Date, the product of:<br><br>(a) the Original Principal Amount;<br><br>(b) the Initial Factor; and<br><br>(c) the Applicable Percentage.<br><br>Following the Effective Date, the Reference Obligation Notional Amount will be:<br><br>(i) decreased on each day on which a Principal Payment is made by the relevant Principal Payment Amount;<br><br>(ii) decreased on the day, if any, on which a Failure to Pay Principal occurs by the relevant Principal Shortfall Amount;<br><br>(iii) decreased on each day on which a Writedown occurs by the relevant Writedown Amount;<br><br>(iv) increased on each day on which a Writedown Reimbursement occurs by any Writedown Reimbursement Amount in respect of a Writedown Reimbursement within paragraphs (ii) or of the definition of "Writedown Reimbursement"; and<br><br>(v) decreased on each Delivery Date by an amount equal to the relevant Exercise Amount minus the amount determined pursuant to paragraph (b) of "Physical Settlement Amount" below, provided that if any Relevant Amount is applicable, the Exercise Amount will also be deemed to be decreased by such Relevant Amount (or increased by the absolute value of such Relevant Amount if such Relevant Amount is negative) with effect from such Delivery Date;<br><br>provided that if the Reference Obligation Notional Amount would be less than zero, it shall be deemed to be zero. |
| Initial Payment: | With respect to each Transaction, the relevant Initial Payment set forth in Annex A attached hereto, which in the aggregate across all the Transactions referenced in Annex A shall equal USD 58,275. |

**2. Fixed Payments:**

| | |
|---|---|
| Fixed Rate Payer: | Buyer |
| Fixed Rate: | As set forth opposite the relevant Reference Obligation in Annex A; subject to adjustment in accordance with paragraph 5 below. |
| Fixed Rate Payer Period End Date: | The first day of each Reference Obligation Calculation Period. |
| Fixed Rate Payer Calculation Date: | With respect to each Fixed Rate Payer Calculation Period, the day falling five Business Days after the Reference Obligation Payment Date occurring on the last day of such Fixed Rate Payer Calculation Period; *provided that* the final Fixed Rate Payer Calculation Date shall fall on the fifth Business Day following the Effective Maturity Date. |

Fixed Rate Payer Payment Dates: With respect to each Fixed Rate Payer Calculation Period, the day falling five Business Days after the Reference Obligation Payment Date immediately prior to such Fixed Rate Payer Calculation Period; *provided that* (i) the initial Fixed Rate Payer Payment Date shall fall on the fifth Business Day following the Effective Date and (ii) the final Fixed Rate Payer Payment Date shall fall five Business Days after the Reference Obligation Payment Date immediately preceding the Effective Maturity Date.

For the avoidance of doubt, each Fixed Rate Payer Payment Date shall relate to the Reference Obligation Calculation Period in which it falls.

Fixed Amount: With respect to any Fixed Rate Payer Payment Date, an amount equal to the product of:

(a) the Fixed Rate;

(b) the Reference Obligation Notional Amount outstanding on the last day of the Reference Obligation Calculation Period related to such Fixed Rate Payer Payment Date, as adjusted for any increases or decreases of the Reference Obligation Notional Amount on the Reference Obligation Payment Date immediately preceding the related Reference Obligation Payment Date; and

(c) the actual number of days in the related Fixed Rate Payer Calculation Period divided by 360.

Additional Fixed Amount Payment Dates:

(a) Each Fixed Rate Payer Calculation Date; and

(b) in relation to each Additional Fixed Payment Event occurring after the second Business Day prior to the last Fixed Rate Payer Calculation Date, the fifth Business Day after Buyer has received notification from the Calculation Agent of the occurrence of such Additional Fixed Payment Event.

Additional Fixed Payments: Following the occurrence of an Additional Fixed Payment Event in respect of the Reference Obligation, Buyer shall pay the relevant Additional Fixed Amount to Seller on the first Additional Fixed Amount Payment Date falling at least two Business Days (or in the case of an Additional Fixed Payment Event that occurs after the second Business Day prior to the last Fixed Rate Payer Calculation Date, five Business Days) after the delivery of a notice by the Calculation Agent to the parties stating that the related Additional Fixed Amount is due and showing in reasonable detail how such Additional Fixed Amount was determined; provided that any such notice must be given on or prior to the fifth Business Day following the day that is one calendar year after the Effective Maturity Date (or, if this Transaction is terminated as a result of the occurrence of an Early Termination Date, the day that is one calendar year after such Early Termination Date); subject to Floating Payment Escrow.

Additional Fixed Payment Event: The occurrence on or after the Effective Date and on or before the day that is one calendar year after the Effective Maturity Date (or, if this Transaction is terminated as a result of the occurrence of an Early Termination Date, the day that is one calendar year after such Early Termination Date) of a Writedown Reimbursement, a Principal Shortfall Reimbursement or an Interest Shortfall Reimbursement.

Additional Fixed Amount: With respect to each Additional Fixed Amount Payment Date, an amount equal to the sum of:

(a) the Writedown Reimbursement Payment Amount (if any);

(b) the Principal Shortfall Reimbursement Payment Amount (if any); and

(c) the Interest Shortfall Reimbursement Payment Amount (if any).

For the avoidance of doubt, each Writedown Reimbursement Payment Amount, Principal Shortfall Reimbursement Payment Amount or Interest Shortfall Reimbursement Payment Amount (as applicable) shall be calculated using the Applicable Percentage which takes into account the aggregate adjustment made to the Applicable Percentage in respect of all Delivery Dates that have occurred prior to the date of such calculation.

**3. Floating Payments:**

Floating Rate Payer: Seller

Floating Rate Payer Payment Dates: In relation to a Floating Amount Event, the first Fixed Rate Payer Calculation Date falling at least two Business Days (or in the case of a Floating Amount Event that occurs on the Legal Final Maturity Date or the Final Amortization Date, the fifth Business Day) after delivery of a notice by the Calculation Agent to the parties or a notice from by Buyer to Seller that the related Floating Amount is due and showing in reasonable detail how such Floating Amount was determined; provided that any such notice must be given on or prior to the fifth Business Day following the Effective Maturity Date.

Floating Payments: If a Floating Amount Event occurs, then on the relevant Floating Rate Payer Payment Date, Seller will pay the relevant Floating Amount to Buyer, subject to Floating Payment Escrow.

For the avoidance of doubt, the Conditions to Settlement are not required to be satisfied in respect of a Floating Payment.

Floating Payment Escrow: Notwithstanding anything herein to the contrary, if the Rating Requirement is not satisfied on a Floating Rate Payer Payment Date, Buyer and Seller shall, prior to such Floating Rate Payer Payment Date, select an escrow agent reasonably acceptable to Buyer and Seller and execute an escrow agreement such that:

(i) each amount payable by Seller in connection with Floating Payments (or portion thereof) which relates to a Writedown Amount (each such amount, an "Escrowed Amount") shall be held in an escrow account until the earlier of (a) the day upon which the Rating Requirement is satisfied and (b) the first anniversary of the related Floating Rate Payer Payment Date (the later such date in respect of each Escrowed Amount, the "Release Date"); *provided, however*, if a Writedown Reimbursement in respect of a Writedown Amount occurs prior to the relevant Release Date of the related Escrowed Amount, that portion of the Escrowed Amount equal to the relevant Writedown Reimbursement Payment Amount will be paid by the escrow agent to the Seller on the related Additional Fixed Amount Payment Date; *provided, further* if the Rating Requirement with respect to Moody's is not satisfied on any Floating Rate Payer Payment Date, Escrowed Amounts on deposit in the Escrow Account shall be transferred to the Synthetic Security Issuer Account, and such Escrowed Amounts shall be held in the Synthetic Security Issuer Account until the Release Date with respect to such Escrowed Accounts; and

(ii) all costs or expenses incurred in connection with the Escrow Agreement shall be borne by Seller, subject to a cap of $7,500 *per annum*.

For avoidance of doubt, payment of an Escrowed Amount (or the relevant portion thereof) to Seller by the escrow agent in connection with a Writedown Reimbursement shall satisfy Buyer's obligation to pay the related Additional Fixed Payments.

Floating Amount Event: A Writedown, a Failure to Pay Principal or an Interest Shortfall.

Floating Amount: With respect to each Floating Rate Payer Payment Date, an amount equal to the sum of:

(a) the relevant Writedown Amount (if any);

(b) the relevant Principal Shortfall Amount (if any); and

(c) the relevant Interest Shortfall Payment Amount (if any).

For the avoidance of doubt, each Writedown Amount, Principal Shortfall Amount or Interest Shortfall Payment Amount (as applicable) shall be calculated using the Applicable Percentage which takes into account the aggregate adjustment made to the Applicable Percentage in respect of all Delivery Dates that have occurred prior to the date of such calculation.

Conditions to Settlement: Credit Event Notice

Notifying Party: Buyer

Notice of Physical Settlement

Notice of Publicly Available Information: Applicable

Public Sources: The public sources listed in Section 3.7 of the Credit Derivatives Definitions; provided that Servicer Reports in respect of the Reference Obligation and, in respect of a Distressed Ratings Downgrade Credit Event only, any public communications by any of the Rating Agencies in respect of the Reference Obligation shall also be deemed Public Sources.

Specified Number: 1

provided that if the Calculation Agent has previously delivered a notice to the parties or Buyer has previously delivered a notice to Seller pursuant to the definition of "Floating Rate Payer Payment Dates" above in respect of a Writedown or a Failure to Pay Principal, the only Condition to Settlement with respect to any Credit Event shall be a Notice of Physical Settlement.

The parties agree that with respect to the Transaction and notwithstanding anything to the contrary in the Credit Derivatives Definitions:

(a) the Conditions to Settlement may be satisfied on more than one occasion;

(b) multiple Physical Settlement Amounts may be payable by Seller;

(c) Buyer, when providing a Notice of Physical Settlement, must specify an Exercise Amount and an Exercise Percentage;

(d) if Buyer has delivered a Notice of Physical Settlement that specifies an Exercise Amount that is less than the Reference Obligation Notional Amount as of the date on which such Notice of Physical Settlement is delivered (calculated as though Physical Settlement in respect of all previously delivered Notices of Physical Settlement has occurred in full), the rights and obligations of the parties under the Transaction shall continue and Buyer may deliver additional Notices of Physical Settlement with respect to the initial Credit Event or with respect to any additional Credit Event at any time thereafter; and

(e) any Notice of Physical Settlement shall be delivered no later than 30 calendar days after the fifth Business Day following the earlier of the Effective Maturity Date and the Optional Step-up Early Termination Date.

Section 3.2(d) of the Credit Derivatives Definitions is amended to delete the words "that is effective no later than thirty calendar days after the Event Determination Date".

Credit Events: The following Credit Events shall apply to this Transaction (and the first sentence of Section 4.1 of the Credit Derivatives Definitions shall be amended accordingly):

Failure to Pay Principal

Writedown

Distressed Ratings Downgrade

| | |
|---|---|
| Obligation: | Reference Obligation Only |

**4. Interest Shortfall**

| | |
|---|---|
| Interest Shortfall Payment Amount: | In respect of an Interest Shortfall, the relevant Interest Shortfall Amount; provided that, if Interest Shortfall Cap is applicable and the Interest Shortfall Amount exceeds the Interest Shortfall Cap Amount, the Interest Shortfall Payment Amount in respect of such Interest Shortfall shall be the Interest Shortfall Cap Amount. |
| Interest Shortfall Cap: | Applicable |
| Interest Shortfall Cap Amount: | As set out in the Interest Shortfall Cap Annex. |
| Actual Interest Amount: | With respect to any Reference Obligation Payment Date, payment by or on behalf of the Issuer of an amount in respect of interest due under the Reference Obligation (including, without limitation, any deferred interest or defaulted interest but excluding payments in respect of prepayment penalties, yield maintenance provisions or principal, except that the Actual Interest Amount shall include any payment of principal representing capitalized interest) to the holder(s) of the Reference Obligation in respect of the Reference Obligation. |
| WAC Cap Interest Provision: | Not Applicable.<br><br>For this purpose, "WAC Cap" means a weighted average coupon or weighted average rate cap provision (however defined in the Underlying Instruments) of the Underlying Instruments that limits, increases or decreases the interest rate or interest entitlement, as set out in the Underlying Instruments on the Effective Date without regard to any subsequent amendment. |
| Expected Interest Amount: | With respect to any Reference Obligation Payment Date, the amount of current interest that would accrue during the related Reference Obligation Calculation Period calculated using the Reference Obligation Coupon on a principal balance of the Reference Obligation equal to:<br><br>(a) the Outstanding Principal Amount taking into account any reductions due to a principal deficiency balance or realized loss amount (however described in the Underlying Instruments) that are attributable to the Reference Obligation minus<br><br>(b) the Aggregate Implied Writedown Amount (if any)<br><br>and that will be payable on the related Reference Obligation Payment Date assuming for this purpose that sufficient funds are available therefor in accordance with the Underlying Instruments. Except as provided in (a) in the previous sentence, the Expected Interest Amount shall be determined without regard to (i) unpaid amounts in respect of accrued interest on prior Reference Obligation Payment Dates, or (ii) any prepayment penalties or yield maintenance provisions.<br><br>The Expected Interest Amount shall be determined: |

(x) if WAC Cap Interest Provision is applicable, after giving effect to any WAC Cap; and

(y) if WAC Cap Interest Provision is not applicable, without giving effect to any WAC Cap; and

in either case without regard to the effect of any provisions (however described) of such Underlying Instruments that otherwise permit the limitation of due payments to distributions of funds available from proceeds of the Underlying Assets, or that provide for the capitalization or deferral of interest on the Reference Obligation, or that provide for the extinguishing or reduction of such payments or distributions (but, for the avoidance of doubt, taking account of any Writedown within paragraph (i) of the definition of "Writedown" occurring in accordance with the Underlying Instruments).

Interest Shortfall: With respect to any Reference Obligation Payment Date, either (a) the non-payment of an Expected Interest Amount or (b) the payment of an Actual Interest Amount that is less than the Expected Interest Amount.

For the avoidance of doubt, the occurrence of an event within (a) or (b) shall be determined taking into account any payment made under the Reference Policy, if applicable.

Interest Shortfall Amount: With respect to any Reference Obligation Payment Date, an amount equal to the greater of:

(a) zero; and

(b) the amount equal to the product of:

(i) (A) the Expected Interest Amount;

minus

(B) the Actual Interest Amount; and

(ii) the Applicable Percentage;

provided that, with respect to the first Reference Obligation Payment Date only, the Interest Shortfall Amount shall be the amount determined in accordance with (a) and (b) above multiplied by a fraction equal to:

(x) the number of days in the first Fixed Rate Payer Calculation Period; over

(y) the number of days in the first Reference Obligation Calculation Period.

Interest Shortfall Reimbursement: With respect to any Reference Obligation Payment Date, the payment by or on behalf of the Issuer of an Actual Interest Amount in respect of the Reference Obligation that is greater than the Expected Interest Amount.

Interest Shortfall Reimbursement Amount: With respect to any Reference Obligation Payment Date, the product of (a) the amount of any Interest Shortfall Reimbursement on such day and (b) the Applicable Percentage.

| | |
|---|---|
| Interest Shortfall Reimbursement Payment Amount: | If Interest Shortfall Cap is not applicable, the relevant Interest Shortfall Reimbursement Amount. If Interest Shortfall Cap is applicable, the amount determined pursuant to the Interest Shortfall Cap Annex. |

**5. Consequences of Step up of the Reference Obligation Coupon**

| | |
|---|---|
| Step-up provisions: | Applicable<br><br>If the Step-up provisions are applicable, then the following provisions of this paragraph 5 shall apply. |
| Step up: | On any day, an increase in the Reference Obligation Coupon due to the failure of the Issuer or a third party to exercise, in accordance with the Underlying Instruments, a "clean up call" or other right to purchase, redeem, cancel or terminate (however described in the Underlying Instruments) the Reference Obligation. |
| Non Call Notification Date: | The date of delivery by the Calculation Agent to the parties or by Buyer to Seller of a Non Call Notice. |
| Non Call Notice: | A notice given by the Calculation Agent to the parties or by Buyer to Seller that the Reference Obligation has not been purchased, redeemed, cancelled or terminated by the Issuer or a third party, in accordance with the Underlying Instruments, pursuant to a "clean up call" or other right to purchase, redeem, cancel or terminate (however described in the Underlying Instruments) the Reference Obligation, which failure will result in the occurrence of a Step up. |
| Increase of the Fixed Rate: | Subject to "Optional Step up Early Termination" below, upon the occurrence of a Step up, the Fixed Rate will be increased by the number of basis points by which the Reference Obligation Coupon is increased due to the Step-up, such increase to take effect as of the Fixed Rate Payer Payment Date immediately following the fifth Business Day after the Non-Call Notification Date. |
| Optional Step up Early Termination: | No later than five Business Days after the Non-Call Notification Date, Buyer shall notify Seller (such notification, a "Buyer Step-up Notice") whether Buyer wishes to continue the Transaction at the increased Fixed Rate or to terminate the Transaction.<br><br>If Buyer elects to terminate the Transaction, the date of delivery of the Buyer Step-up Notice shall be the Scheduled Termination Date (such date, the "Optional Step-up Early Termination Date") and in such case "Increase of the Fixed Rate" in this paragraph 5 shall not apply.<br><br>No amount shall be payable by either party in respect of the Optional Step up Early Termination Date other than any Fixed Amount, Additional Fixed Amount, Floating Amount or Physical Settlement Amount calculated in accordance with the terms hereof. For the avoidance of doubt, the obligation of a party to pay any amount that has become due and payable under the Transaction and remains unpaid as at the Optional Step-up Early Termination Date shall not be affected by the occurrence of the Optional Step-up Early Termination Date. |

If Buyer fails to deliver the Buyer Step-up Notice by the fifth Business Day after the Non-Call Notification Date, Buyer shall be deemed to have elected to continue the Transaction at the increased Fixed Rate as described under "Increase of the Fixed Rate".

If Buyer elects, or is deemed to have elected, to continue the Transaction at the increased Fixed Rate, the Transaction shall continue.

## 6. Settlement Terms

| | |
|---|---|
| Settlement Method: | Physical Settlement |
| Terms Relating to Physical Settlement: | |
| Physical Settlement Period: | Five Business Days |
| Deliverable Obligations: | Exclude Accrued Interest |
| Deliverable Obligations: | Deliverable Obligation Category: Reference Obligation Only |
| Physical Settlement Amount: | An amount equal to: |

(a) the product of the Exercise Amount and the Reference Price; minus

(b) the sum of:

(i) if the Aggregate Implied Writedown Amount is greater than zero, the product of (A) the Aggregate Implied Writedown Amount, (B) the Applicable Percentage, each as determined immediately prior to the relevant Delivery and (C) the relevant Exercise Percentage; and

(ii) the product of (A) the aggregate of all Writedown Amounts in respect of Writedowns within paragraph (i)(B) of the definition of "Writedown" minus the aggregate of all Writedown Reimbursement Amounts in respect of Writedown Reimbursements within paragraph (ii)(B) of the definition of "Writedown Reimbursement" and (B) the relevant Exercise Percentage;

provided that if the Physical Settlement Amount would exceed the product of:

(1) the Reference Obligation Notional Amount as of the date on which the relevant Notice of Physical Settlement is delivered calculated as though Physical Settlement in respect of all previously delivered Notices of Physical Settlement has occurred in full; and

(2) the Exercise Percentage;

then the Physical Settlement Amount shall be deemed to be equal to such product.

| | |
|---|---|
| Delayed Payment: | With respect to a Delivery Date, if a Servicer Report that describes a Delayed Payment is delivered to holders of the Reference Obligation or to the Calculation Agent on or after such Delivery Date, Buyer will pay the applicable Delayed Payment Amount to Seller no later than five Business Days following such Delayed Payment. |
| Escrow: | Applicable |
| Non-delivery by Buyer or occurrence of the Effective Maturity Date: | If Buyer has delivered a Notice of Physical Settlement and:<br><br>(a) Buyer does not Deliver in full the Deliverable Obligations specified in that Notice of Physical Settlement on or prior to the Physical Settlement Date; or<br><br>(b) the Effective Maturity Date occurs after delivery of the Notice of Physical Settlement but before Buyer Delivers the Deliverable Obligations specified in that Notice of Physical Settlement;<br><br>then such Notice of Physical Settlement shall be deemed not to have been delivered and any reference in this Confirmation to a previously delivered Notice of Physical Settlement shall exclude any Notice of Physical Settlement that is deemed not to have been delivered. Sections 9.2(c)(ii) (except for the first sentence thereof), 9.3, 9.4, 9.5, 9.6, 9.9 and 9.10 of the Credit Derivatives Definitions shall not apply. |

**7. Additional Provisions:**

*(a) Delivery of Servicer Report*

If either party makes a reasonable request in writing, the Calculation Agent agrees to provide such party with a copy of the most recent Servicer Report promptly following receipt of such request, if and to the extent such Servicer Report is reasonably available to the Calculation Agent (whether or not the Calculation Agent is a holder of the Reference Obligation). In addition, if a Floating Payment or an Additional Fixed Payment is due hereunder, then the Calculation Agent or the party that notifies the other party that the relevant Floating Payment or Additional Fixed Payment is due, as applicable, (the "Notifying Party") shall deliver a copy of any Servicer Report relevant to such payment that is requested by the party that is not the Notifying Party or by either party where the Notifying Party is the Calculation Agent, if and to the extent that such Servicer Report is reasonably available to the Notifying Party (whether or not the Notifying Party is a holder of the Reference Obligation).

*(b) Calculation Agent and Buyer and Seller Determinations*

The Calculation Agent shall be responsible for determining and calculating (i) the Fixed Amount payable on each Fixed Rate Payer Payment Date, (ii) the occurrence of a Floating Amount Event and the related Floating Amount and (iii) the occurrence of an Additional Fixed Payment Event and the related Additional Fixed Amount. The Calculation Agent shall make such determinations and calculations based solely on the basis of the Servicer Reports, to the extent such Servicer Reports are reasonably available to the Calculation Agent. The Calculation Agent, as applicable, shall, as soon as practicable after making any of the determinations or calculations specified in (i) and (iii) above, notify the parties or the other party, as applicable, of such determinations and calculations.

*(c)* *Adjustment of Calculation Agent Determinations*

To the extent that a Servicer furnishes any Servicer Reports correcting information contained in previously issued Servicer Reports, and such corrections impact calculations pursuant to this Transaction, the calculations relevant to the Transaction shall be adjusted retroactively by the Calculation Agent to reflect the corrected information (provided that, for the avoidance of doubt, no amounts in respect of interest shall be payable by either party and provided that the Calculation Agent in performing the calculations pursuant to this paragraph will assume that no interest has accrued on any adjusted amount), and the Calculation Agent shall promptly notify both parties of any corrected payments required by either party. Any required corrected payments shall be made within five Business Days of the day on which such notification by the Calculation Agent is effective.

*(d)* *No Implied Writedown Amounts or Implied Writedown Reimbursement Amounts*

Notwithstanding anything herein to the contrary, no payments shall be made under this Transaction in connection with an Implied Writedown Amount or an Implied Writedown Reimbursement Amount. For the avoidance of doubt, any references to Implied Writedown shall be disregarded for the purposes of calculating Reference Obligation Notional Amount with respect to any Fixed Payment or Additional Fixed Payment.

**8. Notice and Account Details:**

Telephone, Telex and/or Facsimile Numbers and Contact Details for Notices:

Party A: Lehman Brothers Special Financing Inc.
Attn: Jeong Gu Lee
Phone: 212-526-5461
Email: jglee@lehman.com

With a copy of all notices to:
Jonathan Lai
Structured Products Transaction Management Group
Tel: (212) 526-0806
Fax: (212) 652-0556

Party B: Please advise

Account Details:

| | |
|---|---|
| Account Details of Party A: | JPMorgan Chase Bank<br>ABA No. 021000021<br>Account: 066-143543<br>FBO LBSF |
| Account Details of Party B: | Please advise |

**9. Additional Definitions and Amendments to the Credit Derivatives Definitions**

(a) References in Sections 4.1, 8.2, 9.1 and 9.2(a) of the Credit Derivatives Definitions as well as Section 3(a)(iv) of the form of Novation Agreement set forth in Exhibit E to the Credit Derivatives Definitions to the Reference Entity shall be deemed to be references to both the Reference Entity and the Insurer in respect of the Reference Policy, if applicable.

(b) (i) The definition of "Publicly Available Information" in Section 3.5 of the Credit Derivatives Definitions shall be amended by (i) inserting the words "the Insurer in respect of the Reference Policy, if applicable" at the end of subparagraph (a)(ii)(A) thereof, (ii) inserting the words ", servicer, sub-servicer, master servicer" before the words "or paying agent" in subparagraph (a)(ii)(B) thereof and (iii) deleting the word "or" at the end of subparagraph (a)(iii) thereof and inserting at the end of subparagraph (a)(iv) thereof the following: "or (v) is information contained in a notice or on a website published by an internationally recognized rating agency that has at any time rated the Reference Obligation".

(ii) The definition of "Physical Settlement" in Section 8.1 of the Credit Derivatives Definitions shall be amended by (i) deleting the words "Physical Settlement Amount" from the last line of the second paragraph thereof and (ii) inserting in lieu thereof the words "Exercise Amount".

(iii) The definition of "Physical Settlement Date" in Section 8.4 of the Credit Derivatives Definitions shall be amended by deleting the last sentence thereof.

(c) For the purposes of this Transaction only, the following terms have the meanings given below:

"Actual Principal Amount" means, with respect to the Final Amortization Date or the Legal Final Maturity Date, an amount paid on such day by or on behalf of the Issuer in respect of principal (excluding any capitalized interest) to the holder(s) of the Reference Obligation in respect of the Reference Obligation.

"Aggregate Implied Writedown Amount" means the greater of (i) zero and (ii) the aggregate of all Implied Writedown Amounts minus the aggregate of all Implied Writedown Reimbursement Amounts.

"Current Factor" means the factor of the Reference Obligation as specified in the most recent Servicer Report; provided that if the factor is not specified in the most recent Servicer Report, the Current Factor shall be the ratio equal to (i) the Outstanding Principal Amount as of such date, determined in accordance with the most recent Servicer Report over (ii) the Original Principal Amount.

"Current Period Implied Writedown Amount" means, in respect of a Reference Obligation Calculation Period, an amount determined as of the last day of such Reference Obligation Calculation Period equal to the greater of:

(i) zero; and

(ii) the product of:

(A) the Implied Writedown Percentage; and

(B) the greater of:

(1) zero; and

(2) the lesser of (x) the Pari Passu Amount and (y) the Pari Passu Amount plus the Senior Amount minus the aggregate outstanding asset pool balance securing the payment obligations on the Reference Obligation (all such outstanding asset pool balances as obtained by the Calculation Agent from the most recently dated Servicer Report available as of such day), calculated based on the face amount of the assets then in such pool, whether or not any such asset is performing.

"Delayed Payment" means, with respect to a Delivery Date, a Principal Payment, Principal Shortfall Reimbursement or a Writedown Reimbursement within paragraph (i) of the definition of "Writedown Reimbursement" that is described in a Servicer Report delivered to holders of the Reference Obligation or to the Calculation Agent on or after such Delivery Date.

"Delayed Payment Amount" means, if persons who are holders of the Reference Obligation as of a date prior to a Delivery Date are paid a Delayed Payment on or after such Delivery Date, an amount equal to the product of (i) the sum of all such Delayed Payments, (ii) the Reference Price, (iii) the Applicable Percentage immediately prior to such Delivery Date and (iv) the Exercise Percentage.

"Distressed Ratings Downgrade" means that the Reference Obligation:

(i) if publicly rated by Moody's, (A) is downgraded to "Caa2" or below by Moody's or (B) has the rating assigned to it by Moody's withdrawn and, in either case, not reinstated within five Business Days of such downgrade or withdrawal; provided that if such Reference Obligation was assigned a public rating of "Baa3" or higher by Moody's immediately prior to the occurrence of such withdrawal, it shall not constitute a Distressed Ratings Downgrade if such Reference Obligation is assigned a public rating of at least "Caa1" by Moody's within three calendar months after such withdrawal; or

(ii) if publicly rated by Standard & Poor's, (A) is downgraded to "CCC" or below by Standard & Poor's or (B) has the rating assigned to it by Standard & Poor's withdrawn and, in either case, not reinstated within five Business Days of such downgrade or withdrawal; provided that if such Reference Obligation was assigned a public rating of "BBB-" or higher by Standard & Poor's immediately prior to the occurrence of such withdrawal, it shall not constitute a Distressed Ratings Downgrade if such Reference Obligation is assigned a public rating of at least "CCC+" by Standard & Poor's within three calendar months after such withdrawal; or

(iii) if publicly rated by Fitch, (A) is downgraded to "CCC" or below by Fitch or (B) has the rating assigned to it by Fitch withdrawn and, in either case, not reinstated within five Business Days of such downgrade or withdrawal; provided that if such Reference Obligation was assigned a public rating of "BBB-" or higher by Fitch immediately prior to the occurrence of such withdrawal, it shall not constitute a Distressed Ratings Downgrade if such Reference Obligation is assigned a public rating of at least "CCC+" by Fitch within three calendar months after such withdrawal.

"Effective Maturity Date" means the earlier of (a) the Scheduled Termination Date and (b) the Final Amortization Date.

"Exercise Amount" means, for purposes of the Transaction, an amount to which a Notice of Physical Settlement relates equal to the product of (i) the original face amount of the Reference Obligation to be Delivered by Buyer to Seller on the applicable Physical Settlement Date; and (ii) the Current Factor as of such date. The Exercise Amount to which a Notice of Physical Settlement relates shall (A) be equal to or less than the Reference Obligation Notional Amount (determined, for this purpose, without regard to the effect of any Writedown or Writedown Reimbursement within paragraphs (i)(B) or (iii) of "Writedown" or paragraphs (ii)(B) or (iii) of "Writedown Reimbursement", respectively) as of the date on which the

relevant Notice of Physical Settlement is delivered calculated as though the Physical Settlement of all previously delivered Notices of Physical Settlement has occurred in full and (B) not be less than the lesser of (1) the Reference Obligation Notional Amount as of the date on which the relevant Notice of Physical Settlement is delivered calculated as though Physical Settlement in respect of all previously delivered Notices of Physical Settlement has occurred in full and (2) USD100,000. The cumulative original face amount of Deliverable Obligations specified in all Notices of Physical Settlement shall not at any time exceed the Initial Face Amount.

"Exercise Percentage" means, with respect to a Notice of Physical Settlement, a percentage equal to the original face amount of the Deliverable Obligations specified in such Notice of Physical Settlement divided by an amount equal to (i) the Initial Face Amount minus (ii) the aggregate of the original face amount of all Deliverable Obligations specified in all previously delivered Notices of Physical Settlement.

"Expected Principal Amount" means, with respect to the Final Amortization Date or the Legal Final Maturity Date, an amount equal to (i) the Outstanding Principal Amount of the Reference Obligation payable on such day (excluding capitalized interest) assuming for this purpose that sufficient funds are available for such payment, where such amount shall be determined in accordance with the Underlying Instruments, minus (ii) the sum of (A) the Aggregate Implied Writedown Amount (if any) and (B) the net aggregate principal deficiency balance or realized loss amounts (however described in the Underlying Instruments) that are attributable to the Reference Obligation. The Expected Principal Amount shall be determined without regard to the effect of any provisions (however described) of the Underlying Instruments that permit the limitation of due payments or distributions of funds in accordance with the terms of such Reference Obligation or that provide for the extinguishing or reduction of such payments or distributions.

"Failure to Pay Principal" means (i) a failure by the Reference Entity (or any Insurer) to pay an Expected Principal Amount on the Final Amortization Date or the Legal Final Maturity Date, as the case may be or (ii) payment on any such day of an Actual Principal Amount that is less than the Expected Principal Amount; provided that the failure by the Reference Entity (or any Insurer) to pay any such amount in respect of principal in accordance with the foregoing shall not constitute a Failure to Pay Principal if such failure has been remedied within any grace period applicable to such payment obligation under the Underlying Instruments or, if no such grace period is applicable, within three Business Days after the day on which the Expected Principal Amount was scheduled to be paid.

"Final Amortization Date" means the first to occur of (i) the date on which the Reference Obligation Notional Amount is reduced to zero and (ii) the date on which the assets securing the Reference Obligation or designated to fund amounts due in respect of the Reference Obligation are liquidated, distributed or otherwise disposed of in full and the proceeds thereof are distributed or otherwise disposed of in full.

"Fitch" means Fitch Ratings or any successor to its rating business.

"Implied Writedown Amount" means, (i) if the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) of the definition of "Writedown" to occur in respect of the Reference Obligation, on any Reference Obligation Payment Date, an amount determined by the Calculation Agent equal to the excess, if any, of the Current Period Implied Writedown Amount over the Previous Period Implied Writedown Amount, in each case in respect of the Reference Obligation Calculation Period to which such Reference Obligation Payment Date relates, and (ii) in any other case, zero.

"Implied Writedown Percentage" means (i) the Outstanding Principal Amount divided by (ii) the Pari Passu Amount.

"Implied Writedown Reimbursement Amount" means, (i) if the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) of the definition of "Writedown" to occur in respect of the Reference Obligation, on any Reference Obligation Payment Date, an amount determined by the Calculation Agent equal to the excess, if any, of the Previous Period Implied

Writedown Amount over the Current Period Implied Writedown Amount, in each case in respect of the Reference Obligation Calculation Period to which such Reference Obligation Payment Date relates, and (ii) in any other case, zero; provided that the aggregate of all Implied Writedown Reimbursement Amounts at any time shall not exceed the product of the Pari Passu Amount and the Implied Writedown Percentage.

"Legal Final Maturity Date" means the date set out in paragraph 1 above (subject, for the avoidance of doubt, to any business day convention applicable to the legal final maturity date of the Reference Obligation), provided that if the legal final maturity date of the Reference Obligation is amended, the Legal Final Maturity Date shall be such date as amended.

"Moody's" means Moody's Investors Service, Inc. or any successor to its rating business.

"Outstanding Principal Amount" means, as of any date of determination with respect to the Reference Obligation, the outstanding principal balance of the Reference Obligation as of such date, which shall take into account:

(i) all payments of principal;

(ii) all writedowns or applied losses (however described in the Underlying Instruments) resulting in a reduction in the outstanding principal balance of the Reference Obligation (other than as a result of a scheduled or unscheduled payment of principal);

(iii) forgiveness of any amount by the holders of the Reference Obligation pursuant to an amendment to the Underlying Instruments resulting in a reduction in the outstanding principal balance of the Reference Obligation;

(iv) any payments reducing the amount of any reductions described in (ii) and (iii) of this definition; and

(v) any increase in the outstanding principal balance of the Reference Obligation that reflects a reversal of any prior reductions described in (ii) and (iii) of this definition.

"Pari Passu Amount" means, as of any date of determination, the aggregate of the Outstanding Principal Amount of the Reference Obligation and the aggregate outstanding principal balance of all obligations of the Reference Entity secured by the Underlying Assets and ranking pari passu in priority with the Reference Obligation.

"Previous Period Implied Writedown Amount" means, in respect of a Reference Obligation Calculation Period, the Current Period Implied Writedown Amount as determined in relation to the last day of the immediately preceding Reference Obligation Calculation Period.

"Principal Payment" means, with respect to any Reference Obligation Payment Date, the occurrence of a payment of an amount to the holders of the Reference Obligation in respect of principal (scheduled or unscheduled) in respect of the Reference Obligation other than a payment in respect of principal representing capitalized interest, excluding, for the avoidance of doubt, any Writedown Reimbursement or Interest Shortfall Reimbursement.

"Principal Payment Amount" means, with respect to any Reference Obligation Payment Date, an amount equal to the product of (i) the amount of any Principal Payment on such date and (ii) the Applicable Percentage.

"Principal Shortfall Amount" means, in respect of a Failure to Pay Principal, an amount equal to the greater of:

(i) zero; and

(ii) the amount equal to the product of:

(A) the Expected Principal Amount minus the Actual Principal Amount;

(B) the Applicable Percentage; and

(C) the Reference Price.

If the Principal Shortfall Amount would be greater than the Reference Obligation Notional Amount immediately prior to the occurrence of such Failure to Pay Principal, then the Principal Shortfall Amount shall be deemed to be equal to the Reference Obligation Notional Amount at such time.

"Principal Shortfall Reimbursement" means, with respect to any day, the payment by or on behalf of the Issuer of an amount in respect of the Reference Obligation in or toward the satisfaction of any deferral of or failure to pay principal arising from one or more prior occurrences of a Failure to Pay Principal.

"Principal Shortfall Reimbursement Amount" means, with respect to any day, the product of (i) the amount of any Principal Shortfall Reimbursement on such day, (ii) the Applicable Percentage and (iii) the Reference Price.

"Principal Shortfall Reimbursement Payment Amount" means, with respect to an Additional Fixed Amount Payment Date, the sum of the Principal Shortfall Reimbursement Amounts in respect of all Principal Shortfall Reimbursements (if any) made during the Reference Obligation Calculation Period relating to such Additional Fixed Amount Payment Date, provided that the aggregate of all Principal Shortfall Reimbursement Payment Amounts at any time shall not exceed the aggregate of all Floating Amounts paid by Seller in respect of occurrences of Failure to Pay Principal prior to such Additional Fixed Amount Payment Date.

"Rating Agencies" means Fitch, Moody's and Standard & Poor's.

"Rating Requirement" means, (i) either (A) the long-term debt obligations of the Buyer or its Credit Support Provider are rated at least Aa3 by Moody s (and if rated Aa3 , such rating is not on watch for possible downgrade) or (B)(1) the short-term debt obligations of the Buyer or its Credit Support Provider are rated at least P-1 by Moody s (and if rated P-1 , such rating is not on watch for possible downgrade) and (2) the long-term debt obligations of the Buyer or its Credit Support Provider are rated at least A1 by Moody s (and if rated A1 , such rating is not on watch for possible downgrade), and (ii) either (A) the long-term debt obligations of the Buyer or its Credit Support Provider are rated at least AA- by Standard & Poor's, or if a Rating Condition (as defined in the Indenture) with respect to Standard & Poor's has been obtained, A+, or if a Rating Condition (as defined in the Indenture) with respect to Standard & Poor's has been obtained, A+, and so long as, the Buyer has deposited any required Escrow Amount (as defined in the term Floating Payment Escrow herein) pursuant to an Escrow Agreement, or (B) the short-term debt obligations of the Buyer or its Credit Support Provider are rated A-1+ by Standard & Poor's.

"Reference Obligation Calculation Period" means, with respect to each Reference Obligation Payment Date, a period corresponding to the interest accrual period relating to such Reference Obligation Payment Date pursuant to the Underlying Instruments.

"Reference Obligation Coupon" means the periodic interest rate applied in relation to each Reference Obligation Calculation Period on the related Reference Obligation Payment Date, as determined in accordance with the terms of the Underlying Instruments as at the Effective Date, without regard to any subsequent amendment.

"Reference Obligation Payment Date" means (i) each scheduled distribution date for the Reference Obligation occurring on or after the Effective Date and on or prior to the Scheduled Termination Date,

determined in accordance with the Underlying Instruments and (ii) any day after the Effective Maturity Date on which a payment is made in respect of the Reference Obligation.

"Relevant Amount" means, if a Servicer Report that describes a Principal Payment, Writedown or Writedown Reimbursement (other than a Writedown Reimbursement within paragraph (i) of "Writedown Reimbursement"), in each case that has the effect of decreasing or increasing the interest accruing principal balance of the Reference Obligation as of a date prior to a Delivery Date but such Servicer Report is delivered to holders of the Reference Obligation or to the Calculation Agent on or after such Delivery Date, an amount equal to the product of (i) the sum of any such Principal Payment (expressed as a positive amount), Writedown (expressed as a positive amount) or Writedown Reimbursement (expressed as a negative amount), as applicable; (ii) the Reference Price; (iii) the Applicable Percentage immediately prior to such Delivery Date; and (iv) the Exercise Percentage.

"Senior Amount" means, as of any day, the aggregate outstanding principal balance of all obligations of the Reference Entity secured by the Underlying Assets and ranking senior in priority to the Reference Obligation.

"Servicer" means any trustee, servicer, sub servicer, master servicer, fiscal agent, paying agent or other similar entity responsible for calculating payment amounts or providing reports pursuant to the Underlying Instruments.

"Servicer Reports" means periodic statements or reports regarding the Reference Obligation provided by the Servicer to holders of the Reference Obligation.

"Standard & Poor's" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. or any successor to its rating business.

"Underlying Assets" means the assets securing the Reference Obligation for the benefit of the holders of the Reference Obligation and which are expected to generate the cashflows required for the servicing and repayment (in whole or in part) of the Reference Obligation, or the assets to which a holder of such Reference Obligation is economically exposed where such exposure is created synthetically.

"Underlying Instruments" means the indenture, trust agreement, pooling and servicing agreement or other relevant agreement(s) setting forth the terms of the Reference Obligation.

"Writedown" means the occurrence at any time on or after the Effective Date of:

(i) (A) a writedown or applied loss (however described in the Underlying Instruments) resulting in a reduction in the Outstanding Principal Amount (other than as a result of a scheduled or unscheduled payment of principal); or

(B) the attribution of a principal deficiency or realized loss (however described in the Underlying Instruments) to the Reference Obligation resulting in a reduction or subordination of the current interest payable on the Reference Obligation;

(ii) the forgiveness of any amount of principal by the holders of the Reference Obligation pursuant to an amendment to the Underlying Instruments resulting in a reduction in the Outstanding Principal Amount; or

(iii) if the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) above to occur in respect of the Reference Obligation, an Implied Writedown Amount being determined in respect of the Reference Obligation by the Calculation Agent;

*provided* that if Party A holds the Reference Obligation, Party A shall not vote to approve any writedown or applied loss (as set forth in clause (i)(A) hereof); *provided* further, if Party A votes for any writedown or applied loss, then any related writedown or loss amount shall not be a Floating Amount and shall not be payable by Party B.

"Writedown Amount" means, with respect to any day, the product of (i) the amount of any Writedown on such day, (ii) the Applicable Percentage and (iii) the Reference Price.

"Writedown Reimbursement" means, with respect to any day, the occurrence of:

(i) a payment by or on behalf of the Issuer of an amount in respect of the Reference Obligation in reduction of any prior Writedowns;

(ii) (A) an increase by or on behalf of the Issuer of the Outstanding Principal Amount of the Reference Obligation to reflect the reversal of any prior Writedowns; or

(B) a decrease in the principal deficiency balance or realized loss amounts (however described in the Underlying Instruments) attributable to the Reference Obligation; or

(iii) if the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (ii) above to occur in respect of the Reference Obligation, an Implied Writedown Reimbursement Amount being determined in respect of the Reference Obligation by the Calculation Agent.

"Writedown Reimbursement Amount" means, with respect to any day, an amount equal to the product of:

(i) the sum of all Writedown Reimbursements on that day;

(ii) the Applicable Percentage; and

(iii) the Reference Price.

"Writedown Reimbursement Payment Amount" means, with respect to an Additional Fixed Amount Payment Date, the sum of the Writedown Reimbursement Amounts in respect of all Writedown Reimbursements (if any) made during the Reference Obligation Calculation Period relating to such Additional Fixed Amount Payment Date, provided that the aggregate of all Writedown Reimbursement Payment Amounts at any time shall not exceed the aggregate of all Floating Amounts paid by Seller in respect of Writedowns occurring prior to such Additional Fixed Amount Payment Date.

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us by facsimile.

Yours sincerely,

**Lehman Brothers Special Financing Inc.**

By: ____________________

Name:

Title:

Confirmed as of the date first above written:

**Gemstone CDO VI Ltd.By:** ____________________

Name:

Title:

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us by facsimile.

Yours sincerely,

**Lehman Brothers Special Financing Inc.**

By: ______________________

Name:

Title:

Confirmed as of the date first above written:

**Gemstone CDO VI Ltd.**

By: ______________________

Name: Carlos Farjallah

Title: Director

## Interest Shortfall Cap Annex

If Interest Shortfall Cap is applicable, then the following provisions will apply:

| | |
|---|---|
| Interest Shortfall Cap Basis: | Fixed Cap |
| Interest Shortfall Cap Amount: | If the Interest Shortfall Cap Basis is Fixed Cap, the Interest Shortfall Cap Amount in respect of an Interest Shortfall shall be the Fixed Amount calculated in respect of the Fixed Rate Payer Payment Date immediately prior to the Reference Obligation Payment Date on which the relevant Interest Shortfall occurred<br><br>If the Interest Shortfall Cap Basis is Variable Cap, the Interest Shortfall Cap Amount applicable in respect of a Floating Rate Payer Payment Date shall be an amount equal to the product of:<br><br>(a) the sum of the Relevant Rate and the Fixed Rate applicable to the Fixed Rate Payer Calculation Period immediately preceding the Reference Obligation Payment Date on which the relevant Interest Shortfall occurs;<br><br>(b) the amount determined by the Calculation Agent under sub clause (b) of the definition of "Fixed Amount" in relation to the relevant Fixed Rate Payer Payment Date; and<br><br>(c) the actual number of days in such Fixed Rate Payer Calculation Period divided by 360. |
| Interest Shortfall Reimbursement Payment Amount: | If Interest Shortfall Cap is applicable, then with respect to the first Additional Fixed Amount Payment Date, zero, and with respect to any subsequent Additional Fixed Amount Payment Date and calculated as of the Reference Obligation Payment Date immediately preceding such Additional Fixed Amount Payment Date, as specified by the Calculation Agent in its notice to the parties or by Seller in its notice to Buyer of the existence of an Interest Shortfall Reimbursement, an amount equal to the greater of:<br><br>(a) zero; and<br><br>(b) the amount equal to:<br><br>(i) the product of:<br><br>(A) the Cumulative Interest Shortfall Payment Amount as of the Additional Fixed Amount Payment Date immediately preceding such Reference Obligation Payment Date; and<br><br>(B) the relevant Cumulative Interest Shortfall Payment Compounding Factor for the Fixed Rate Payer Calculation Period immediately preceding such Additional Fixed Amount Payment Date (or 1.0 in respect of any Additional Fixed Amount Payment Date occurring after the final Fixed Rate Payer |

Calculation Date);

minus

(ii) the Cumulative Interest Shortfall Amount as of such Reference Obligation Payment Date;

provided that if the Interest Shortfall Reimbursement Payment Amount on an Additional Fixed Amount Payment Date would exceed the Interest Shortfall Reimbursement Amount in respect of the related Reference Obligation Payment Date, then such Interest Shortfall Reimbursement Payment Amount shall be deemed to be equal to such Interest Shortfall Reimbursement Amount.

Cumulative Interest Shortfall Amount:

With respect to any Reference Obligation Payment Date, an amount equal to the greater of:

(a) zero; and

(b) an amount equal to:

(i) the Cumulative Interest Shortfall Amount as of the Reference Obligation Payment Date immediately preceding such Reference Obligation Payment Date or, in the case of the first Reference Obligation Payment Date, zero; plus

(ii) the Interest Shortfall Amount (if any) in respect of such Reference Obligation Payment Date; plus

(iii) an amount determined by the Calculation Agent as the amount of interest that would accrue on the Cumulative Interest Shortfall Amount immediately preceding such Reference Obligation Payment Date during the related Reference Obligation Calculation Period pursuant to the Underlying Instruments or, in the case of the first Reference Obligation Payment Date, zero; minus

(iv) the Interest Shortfall Reimbursement Amount (if any) in respect of such Reference Obligation Payment Date.

Upon the occurrence of each Delivery, the Cumulative Interest Shortfall Amount shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following such Delivery divided by (b) the Applicable Percentage immediately prior to such Delivery; provided, however, that if more than one Delivery is made during a Reference Obligation Calculation Period, the Cumulative Interest Shortfall Amount calculated as of the Reference Obligation Payment Date occurring immediately after such Reference Obligation Calculation Period shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following the final Delivery made during such Reference

Obligation Calculation Period and (b) the Applicable Percentage

immediately prior to the first Delivery made during such Reference Obligation Calculation Period.

Cumulative Interest Shortfall Payment Amount:

The Cumulative Interest Shortfall Payment Amount with respect to any Fixed Rate Payer Payment Date and any Additional Fixed Amount Payment Date falling on such Fixed Rate Payer Payment Date shall be an amount equal to the greater of:

(a) zero; and

(b) the amount equal to:

(i) the sum of:

(A) the Interest Shortfall Payment Amount for the Reference Obligation Payment Date corresponding to such Fixed Rate Payer Calculation Date; and

(B) the product of:

(1) the Cumulative Interest Shortfall Payment Amount as of the Fixed Rate Payer Calculation Date immediately preceding such Fixed Rate Payer Payment Date (or zero in the case of the first Fixed Rate Payer Calculation Date); and

(2) the relevant Cumulative Interest Shortfall Payment Compounding Factor;

minus

(ii) any Interest Shortfall Reimbursement Payment Amount paid on such Fixed Rate Payer Calculation Date.

With respect to any Additional Fixed Amount Payment Date falling after the final Fixed Rate Payer Calculation Date, the Cumulative Interest Shortfall Payment Amount shall be equal to:

(x) the Cumulative Interest Shortfall Payment Amount as of the Additional Fixed Amount Payment Date immediately preceding such Additional Fixed Amount Payment Date (or as of the final Fixed Rate Payer Calculation Date in the case of the first Additional Fixed Amount Payment Date occurring after the final Fixed Rate Payer Calculation Date); minus

(y) any Interest Shortfall Reimbursement Payment Amount paid on such Additional Fixed Amount Payment Date.

Upon the occurrence of each Delivery, the Cumulative Interest Shortfall Payment Amount shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following such Delivery divided by (b) the Applicable Percentage immediately prior to such Delivery; provided, however, that if more than one Delivery is made during a Reference Obligation Calculation Period, the Cumulative Interest Shortfall Payment Amount calculated as of the Reference Obligation Payment Date occurring immediately after such Reference Obligation Calculation Period shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following the final Delivery made during such Reference Obligation Calculation Period and (b) the Applicable Percentage immediately prior to the first Delivery made during such Reference Obligation Calculation Period.

Cumulative Interest Shortfall Payment Compounding Factor:

With respect to any Fixed Rate Payer Calculation Period, an amount equal to the sum of:

(a) 1.0;

plus

(b) the product of:

(i) the sum of (A) the Relevant Rate plus (B) the Fixed Rate; and

(ii) the actual number of days in such Fixed Rate Payer Calculation Period divided by 360;

provided, however, that the Cumulative Interest Shortfall Payment Compounding Factor shall be deemed to be 1.0 during the period from but excluding the Effective Maturity Date to and including the Termination Date.

Relevant Rate:

With respect to a Fixed Rate Payer Calculation Period, the Floating Rate, expressed as a decimal number with seven decimal places, that would be determined if:

(a) the 2000 ISDA Definitions (and not the 2003 ISDA Credit Derivatives Definitions) applied to this paragraph;

(b) the Fixed Rate Payer Calculation Period were a "Calculation Period" for purposes of such determination; and

(c) the following terms applied:

(i) the Floating Rate Option were the Rate Source;

(ii) the Designated Maturity were the period that corresponds to the usual length of a Fixed Rate Payer Calculation Period; and

(iii) the Reset Date were the first day of the Calculation Period;

provided, however, that the Relevant Rate shall be deemed to be zero during the period from but excluding the Effective Maturity Date to and including the Termination Date.

| | |
|---|---|
| Rate Source: | USD-LIBOR-BBA |