**Exhibit D**

**EXECUTION VERSION**

INDENTURE


As of August 17, 2006


GEMSTONE CDO VI LTD.

as Issuer


GEMSTONE CDO VI CORP.

as Co-Issuer


DEUTSCHE BANK TRUST COMPANY AMERICAS

as Trustee and Securities Intermediary

## TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ...................................................................................................1

GRANTING CLAUSES ..............................................................................................................1

ARTICLE I        DEFINITIONS AND INTERPRETATION ................................................2

    Section 1.1        Definitions .......................................................................................2

    Section 1.2        Assumptions as to Underlying Assets, Etc. ..................................48

    Section 1.3        Rules of Construction ...................................................................49

ARTICLE II        THE NOTES..................................................................................................50

    Section 2.1        Forms Generally ...........................................................................50

    Section 2.2        Authorized Amount; Note Interest Rate; Stated Maturity; Denominations..............51

    Section 2.3        Execution, Authentication, Delivery and Dating..........................52

    Section 2.4        Registration, Transfer and Exchange of Notes .............................53

    Section 2.5        Mutilated, Defaced, Destroyed, Lost or Stolen Notes .................58

    Section 2.6        Payment of Principal and Interest; Rights Preserved ...................59

    Section 2.7        Persons Deemed Owners...............................................................62

    Section 2.8        Cancellation...................................................................................62

    Section 2.9        No Gross Up ..................................................................................63

    Section 2.10        Synthetic Security.........................................................................63

ARTICLE III        CONDITIONS PRECEDENT .......................................................................64

    Section 3.1        General Provisions ........................................................................64

    Section 3.2        Security for the Notes....................................................................66

    Section 3.3        Transfer of Underlying Asset and Eligible Investments...............68

ARTICLE IV        SATISFACTION AND DISCHARGE...........................................................69

    Section 4.1        Satisfaction and Discharge of Indenture.......................................69

    Section 4.2        Application of Trust Money ..........................................................70

    Section 4.3        Repayment of Monies Held by Paying Agent ..............................70

ARTICLE V        EVENTS OF DEFAULT; REMEDIES .........................................................70

    Section 5.1        Events of Default...........................................................................70

    Section 5.2        Acceleration of Maturity; Rescission and Annulment..................72

    Section 5.3        Collection of Indebtedness and Suits for Enforcement by Trustee..........73

    Section 5.4        Remedies .......................................................................................74

    Section 5.5        Preservation of Collateral .............................................................76

    Section 5.6        Trustee May Enforce Claims Without Possession of Notes .........77

    Section 5.7        Application of Money Collected ...................................................77

    Section 5.8        Limitation on Suits .......................................................................77

## TABLE OF CONTENTS

PAGE

Section 5.9     Unconditional Rights of Noteholders to Receive Principal and Interest ...............78

Section 5.10    Restoration of Rights and Remedies .........................................................................78

Section 5.11    Rights and Remedies Cumulative ..............................................................................78

Section 5.12    Delay or Omission Not Waiver ..................................................................................78

Section 5.13    Control by Controlling Class......................................................................................78

Section 5.14    Waiver of Past Defaults..............................................................................................79

Section 5.15    Undertaking for Costs .................................................................................................79

Section 5.16    Waiver of Stay or Extension Laws ............................................................................80

Section 5.17    Sale of Collateral........................................................................................................80

Section 5.18    Action on the Notes ....................................................................................................81

ARTICLE VI     THE TRUSTEE.................................................................................................................81

Section 6.1     Certain Duties and Responsibilities...........................................................................81

Section 6.2     Notice of Default ........................................................................................................82

Section 6.3     Certain Rights of Trustee ...........................................................................................82

Section 6.4     Authenticating Agents.................................................................................................84

Section 6.5     Not Responsible for Recitals or Issuance of Notes ...................................................84

Section 6.6     May Hold Notes ..........................................................................................................84

Section 6.7     Money Held in Trust ...................................................................................................84

Section 6.8     Compensation and Reimbursement............................................................................85

Section 6.9     Corporate Trustee Required; Eligibility .....................................................................86

Section 6.10    Resignation and Removal; Appointment of Successor...............................................86

Section 6.11    Acceptance of Appointment by Successor .................................................................87

Section 6.12    Merger, Conversion, Consolidation or Succession to Business of Trustee ...............88

Section 6.13    Co-Trustees .................................................................................................................88

Section 6.14    Certain Duties Related to Delayed Payment of Proceeds...........................................89

Section 6.15    Representations and Warranties of the Bank...............................................................89

Section 6.16    Eligible Investments; Investments and Withdrawals Under the Initial
               Investment Agreement ................................................................................................90

Section 6.17    Fiduciary for Noteholders Only; Agent for the Interest Rate Swap
               Counterparty and Collateral Manager ........................................................................91

Section 6.18    The Securities Intermediary ........................................................................................91

Section 6.19    Right of Trustee in Capacity of Note Registrar, Paying Agent, Transfer
               Agent, Authenticating Agent, Calculation Agent or Securities Intermediary ..........92

ARTICLE VII    COVENANTS ....................................................................................................................92

Section 7.1     Payment of Principal and Interest................................................................................92

TABLE OF CONTENTS

PAGE

| | | |
|---|---|---|
| Section 7.2 | Maintenance of Office or Agency | 92 |
| Section 7.3 | Money for Note Payments to be Held in Trust | 93 |
| Section 7.4 | Existence of Issuers | 94 |
| Section 7.5 | Protection of Collateral | 95 |
| Section 7.6 | Opinions as to Collateral | 96 |
| Section 7.7 | Performance of Obligations | 96 |
| Section 7.8 | Negative Covenants | 97 |
| Section 7.9 | Statement as to Compliance | 99 |
| Section 7.10 | Consolidation of Issuers | 100 |
| Section 7.11 | Successor Substituted | 102 |
| Section 7.12 | No Other Business | 102 |
| Section 7.13 | Notice of Changes in Ratings; Annual Rating Review | 103 |
| Section 7.14 | Reporting | 103 |
| Section 7.15 | Calculation Agent | 103 |
| Section 7.16 | Listing | 103 |
| Section 7.17 | Amendment of Certain Documents | 104 |
| Section 7.18 | German Foreign Investment Act | 104 |
| Section 7.19 | Compliance With Laws | 104 |
| Section 7.20 | Maintenance of Books and Records | 104 |
| Section 7.21 | [Reserved.] | 105 |
| Section 7.22 | DTC | 105 |
| Section 7.23 | Representations Relating to Security Interests in the Collateral | 105 |
| ARTICLE VIII | SUPPLEMENTAL INDENTURES | 106 |
| Section 8.1 | Supplemental Indentures Without Consent of Securityholders | 107 |
| Section 8.2 | Supplemental Indentures with Consent of Securityholders | 109 |
| Section 8.3 | Execution of Supplemental Indentures | 111 |
| Section 8.4 | Effect of Supplemental Indentures | 111 |
| Section 8.5 | Reference in Notes to Supplemental Indentures | 111 |
| ARTICLE IX | REDEMPTION OF SECURITIES | 111 |
| Section 9.1 | Clean-Up Call Redemption | 111 |
| Section 9.2 | Tax Redemption | 112 |
| Section 9.3 | Auction Call Redemption | 113 |
| Section 9.4 | Optional Redemption | 114 |
| Section 9.5 | Notice of Tax Redemption, Clean-Up Call Redemption, Auction Call | |

## TABLE OF CONTENTS

PAGE

Redemption, Optional Redemption or Stated Maturity by the Issuers ...................115

Section 9.6      Securities Payable on Redemption Date.................................................................116

Section 9.7      Mandatory Redemption ..........................................................................................117

ARTICLE X      ACCOUNTS, ACCOUNTINGS AND RELEASES .................................................117

Section 10.1     Collection of Money...............................................................................................117

Section 10.2     Principal Collection Account; Interest Collection Account; Custodial
Account; Uninvested Proceeds Account; Synthetic Security Collateral
Account; Synthetic Security Issuer Account ...........................................................117

Section 10.3     Payment Account ...................................................................................................120

Section 10.4     Expense Account ....................................................................................................121

Section 10.5     Interest Rate Swap Counterparty Collateral Accounts ...........................................121

Section 10.6     Substituted Collateral Account...............................................................................122

Section 10.7     General Reporting by Trustee .................................................................................123

Section 10.8     Reports by the Issuer ..............................................................................................123

Section 10.9     Release of Securities ..............................................................................................129

Section 10.10    Reports by Independent Accountants......................................................................130

Section 10.11    Reports to Rating Agencies, Etc.............................................................................130

Section 10.12    Tax Matters ............................................................................................................131

ARTICLE XI      APPLICATION OF MONIES..................................................................................132

Section 11.1     Disbursements of Monies from Payment Account ................................................132

Section 11.1A    Allocation Procedures ...........................................................................................136

Section 11.2     Trust Accounts ......................................................................................................137

ARTICLE XII     PURCHASE AND SALE OF UNDERLYING ASSETS AND SUBSTITUTION
CRITERIA................................................................................................................137

Section 12.1     Disposition of Underlying Assets...........................................................................138

Section 12.2     Purchases of Underlying Assets after the Closing Date and Substitution
Criteria...................................................................................................................139

Section 12.3     Conditions Applicable to all Transactions Involving Sale or Grant ......................142

ARTICLE XIII    SECURED PARTIES' RELATIONS .......................................................................142

Section 13.1     Subordination ........................................................................................................142

Section 13.2     Standard of Conduct ..............................................................................................144

ARTICLE XIV    MISCELLANEOUS ................................................................................................144

Section 14.1     Form of Documents Delivered to Trustee ..............................................................144

Section 14.2     Acts of Securityholders .........................................................................................145

Section 14.3     Notices, etc., to Trustee, the Issuers, the Bank, the Collateral Manager, the

TABLE OF CONTENTS

PAGE

|  |  | Rating Agencies, and Hedge Counterparties | 146 |
| Section 14.4 | Notices and Reports to Securityholders; Waiver | 147 |
| Section 14.5 | Effect of Headings and Table of Contents | 148 |
| Section 14.6 | Successors and Assigns | 148 |
| Section 14.7 | Severability | 148 |
| Section 14.8 | Benefits of Indenture | 148 |
| Section 14.9 | Legal Holidays | 148 |
| Section 14.10 | Governing Law | 149 |
| Section 14.11 | Submission to Jurisdiction | 149 |
| Section 14.12. | Counterparts | 149 |
| Section 14.13 | Judgment Currency | 149 |
| Section 14.14 | Liability of Issuers | 150 |

ARTICLE XV    ASSIGNMENT OF MANAGEMENT AGREEMENT, THE COLLATERAL ADMINISTRATION AGREEMENT, ISSUER AGREEMENT ............ 150

| Section 15.1 | Assignment | 150 |
| Section 15.2 | [Reserved] | 151 |
| Section 15.3 | [Reserved] | 151 |
| Section 15.4 | Issuer Agreements, Etc. | 151 |

ARTICLE XVI    INTEREST RATE SWAP AGREEMENT ............................ 152

| Section 16.1 | The Interest Rate Swap Agreement | 152 |

## SCHEDULES

| | |
|---|---|
| SCHEDULE A | SCHEDULE OF CLOSING UNDERLYING ASSETS |
| SCHEDULE B | LIBOR FORMULA |
| SCHEDULE C | FORM OF BAILEE LETTER AGREEMENT |
| SCHEDULE D | AUCTION AGENT FEES |
| SCHEDULE E | STANDARD & POOR'S RECOVERY RATE MATRIX |
| SCHEDULE F | STANDARD & POOR'S RATINGS AND STANDARD & POOR'S ASSET-BACKED SECURITY CATEGORIES |
| SCHEDULE G | AUCTION PROCEDURES |
| SCHEDULE H | FORM OF NOTE DOCUMENT CERTIFICATE |
| SCHEDULE I | FORM OF NOTE OWNER CERTIFICATE |
| SCHEDULE J | RESERVED |
| SCHEDULE K | RESERVED |
| SCHEDULE L | MOODY'S RATING AND MOODY'S WEIGHTED AVERAGE RATING |
| SCHEDULE M | MOODY'S RECOVERY RATE MATRIX |
| SCHEDULE N | CLASS D PRIORITY REDEMPTION AMOUNTS |
| SCHEDULE O | S&P INDUSTRY CLASSIFICATION GROUP |

## EXHIBITS

| | |
|---|---|
| EXHIBIT A-1 | Form of Temporary Regulation S Global Note |
| EXHIBIT A-2 | Form of Permanent Regulation S Global Note |
| EXHIBIT A-3 | Form of Restricted Global Note |
| EXHIBIT A-4 | Form of Definitive Note |
| EXHIBIT B-1 | Form of Clearance System Certificate |
| EXHIBIT B-2 | Form of Certification of Non-U.S. Ownership (Within Clearance System) |
| EXHIBIT C | [Reserved] |
| EXHIBIT D-1 | Form of Restricted Note Transfer Certificate |
| EXHIBIT D-2 | Form of Regulation S Note Transfer Certificate |
| EXHIBIT D-3 | Form of Investor Certificate |
| EXHIBIT E | Form of Funding Certificate |
| EXHIBIT F-1 | Form of Corporate and Tax Opinion of Allen & Overy LLP |
| EXHIBIT F-2 | Form of Security Interest Opinion of Allen & Overy LLP |
| EXHIBIT G | Form of Opinion of Maples and Calder |
| EXHIBIT H | Form of Opinion of Cadwalader, Wickersham & Taft LLP |
| EXHIBIT I | Form of Opinion of Seward & Kissel LLP |
| EXHIBIT J | Form of Synthetic Security Notification for Moody's |
| EXHIBIT K | Form of Synthetic Security (RMBS Securities) |
| EXHIBIT L | Form of Synthetic Security (CMBS Securities) |

## INDENTURE

THIS INDENTURE dated as of August 17, 2006, among:

GEMSTONE CDO VI Ltd., an exempted company with limited liability incorporated under the laws of the Cayman Islands (the "**Issuer**");

GEMSTONE CDO VI Corp., a corporation organized under the laws of the State of Delaware (the "**Co-Issuer**" and, together with the Issuer, the "**Issuers**"); and

Deutsche Bank Trust Company Americas, a banking corporation organized and existing under the laws of the State of New York, as trustee and as securities intermediary (in such capacities, together with its permitted successors hereunder, the "**Trustee**" or the "**Securities Intermediary**").

### PRELIMINARY STATEMENT

The Issuers are duly authorized to execute and deliver this Indenture to provide for the issuance of the Notes as provided in this Indenture. All covenants and agreements made by the Issuers herein are for the benefit and security of the Noteholders, the Interest Rate Swap Counterparty, the Preference Share Paying Agent, the Securities Intermediary, the Collateral Administrator, the Collateral Manager, each Synthetic Security Counterparty, the Initial Investment Agreement Provider and the Trustee (collectively, the "**Secured Parties**"). The Issuers are entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Issuers in accordance with its terms have been done.

### GRANTING CLAUSES

The Issuer hereby Grants to the Trustee, for the benefit and security of the Secured Parties, all of its right, title and interest, whether now owned or hereafter acquired, in, to and under the following: (a) all Underlying Assets and Equity Securities (listed, as of the Closing Date, in the Schedule of Closing Underlying Assets), all payments thereon or with respect thereto, (b) the Accounts and all investment property, money, instruments and other property credited thereto, and Eligible Investments purchased with funds credited to the Accounts and all income from the investment of funds therein, (c) the Interest Rate Swap Agreement, (d) the Management Agreement, the Note Purchase Agreement, the Subscription Agreements, the Collateral Administration Agreement and the Administration Agreement, (e) the trust accounts described in Section 11.2 and all investment property, money, instruments and other property on deposit therein or credited thereto, (f) all accounts, chattel paper, deposit accounts, documents, general intangibles, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, and other minerals, (g) all other property of the Issuer other than Excepted Property, (h) (A) the Synthetic Security Collateral Account, and all investment property, money, instruments and other property credited thereto, and all income, earnings, interest, and other distributions received or receivable in respect thereof, and (B) the Investment Agreement and all income, earnings, interest, and other distributions received or receivable in respect thereof; (i) all proceeds, accessions, profits, income, benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of the property described in the preceding clauses; and (j) all proceeds of the foregoing (collectively, the "**Collateral**"). The Collateral shall not include the Excepted Property. Such Grants are made, however, in trust, to secure the Notes equally and ratably without prejudice, priority or distinction between any Note and any other Note by reason of difference in time of issuance or otherwise, except as expressly provided in this Indenture, and to secure (i) the payment of all amounts due on the Notes and all amounts payable by the Issuer under the Management Agreement and the Interest Rate Swap Agreement in accordance with their terms, (ii) the payment of all amounts due by the Issuer under the Synthetic Securities (iii) the payment of all other amounts payable by the Issuer under this Indenture, and (iv) compliance by the Issuer with the provisions of this Indenture and the Interest Rate Swap Agreement, each as provided in this Indenture.

30775-00034 NY:1268831.8

The Issuer does hereby constitute and irrevocably appoint the Trustee the true and lawful attorney of the Issuer, with full power (in the name of the Issuer or otherwise), to exercise all rights of the Issuer with respect to the Collateral and to ask, require, demand, receive, settle, compromise, compound and give acquittance for any and all moneys and claims for moneys due and to become due under or arising out of any of the Collateral, to indorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings which the Trustee may deem to be necessary or advisable in the premises. The power of attorney granted pursuant to this Indenture and all authority hereby conferred are granted and conferred solely to protect the Trustee's interest in the Collateral and shall not impose any duty upon the Trustee to exercise any power except as expressly provided herein. This power of attorney shall be irrevocable as one granted by way of security and coupled with an interest prior to the payment in full of all the obligations secured hereby.

This Indenture shall constitute a security agreement. Upon the occurrence of any Event of Default with respect to the Notes, and in addition to any other rights available under this Indenture or otherwise available at law or in equity, the Trustee shall have all rights and remedies of a secured party under the laws of the State of New York and other applicable law, and, in addition, shall have the right, subject to compliance with any mandatory requirements of applicable law, to sell or apply any Collateral in accordance with the terms hereof at public or private sale.

It is expressly agreed that anything therein contained to the contrary notwithstanding, the Issuer shall remain liable under any instruments included in the Collateral to perform all the obligations assumed by it thereunder, all in accordance with and pursuant to the terms and provisions thereof, and except as otherwise expressly provided herein, the Trustee shall not have any obligations or liabilities under such instruments by reason of or arising out of this Indenture, nor shall the Trustee be required or obligated in any manner to perform or fulfill any obligations of the Issuer under or pursuant to such instruments or to make any payment, to make any inquiry as to the nature or sufficiency of any payment received by it, to present or file any claim, or to take any action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

The Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof, and agrees to perform the duties provided herein.

Each of the Secured Parties hereby agrees and acknowledges that it shall not have any claim on the Excepted Property.

**ARTICLE I**

**DEFINITIONS AND INTERPRETATION**

**Section 1.1  Definitions.**

Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture. Whenever any reference is made to an amount the determination of which is governed by Section 1.2, the provisions of Section 1.2 shall be applicable to such determination or calculation, whether or not reference is specifically made to Section 1.2, unless some other method of calculation or determination is expressly specified in the particular provision.

"**Accelerated Amortization Date**" means, if no Optional Redemption, Auction Call Redemption, Clean-Up Call Redemption or Tax Redemption has been successfully completed before the August 2014 Distribution Date, the August 2014 Distribution Date.

"**Accelerated Maturity Date**" has the meaning specified in Section 5.5.

"**Accountants' Report**" means a report or reports of a firm or firms of Independent certified public accountants of recognized national reputation appointed by the Issuer pursuant to Section 10.10(a), which may be

2

the firm or firms of independent accountants that reviews or performs procedures with respect to the financial reports prepared by the Issuer or the Collateral Manager.

"**Accountholder**" means each of the persons shown on the records of Euroclear or Clearstream as the holder of a Regulation S Global Note.

"**Accounts**" means each of the Interest Collection Account, the Principal Collection Account, the Payment Account, the Expense Account, the Custodial Account, the Interest Rate Swap Counterparty Collateral Accounts, each Synthetic Security Collateral Account, each Synthetic Security Issuer Account, the Substituted Collateral Account and the Uninvested Proceeds Account.

"**Act and Acts of Securityholders**" have the meanings specified in Section 14.2.

"**Additional Fixed Amounts**" means, with respect to any Synthetic Security, the meaning set forth in such Synthetic Security.

"**Additional Interest Rate Swap Agreement**" means each ISDA Master Agreement, including any schedules and any confirmations thereto, executed after the Closing Date, in each case between the Issuer and the Interest Rate Swap Counterparty; provided that such Additional Interest Rate Swap Agreement has been approved by the Collateral Manager and the Issuer has received Rating Confirmation prior to executing such Additional Interest Rate Swap Agreement.

"**Administration Agreement**" means the Administration Agreement dated the Closing Date between the Administrator and the Issuer, as modified and supplemented and in effect from time to time.

"**Administrative Expenses**" means amounts (including any indemnities) due or accrued with respect to any Distribution Date and payable by the Issuer or the Co-Issuer to (a) the Trustee pursuant to Section 6.8 or any co-trustee appointed pursuant to Section 6.13, (b) the Preference Share Paying Agent, the Preference Share Transfer Agent under the Preference Share Paying Agency Agreement, (c) the Bank under the Collateral Administration Agreement, (d) the Administrator under the Administration Agreement, including provision for the costs and expenses of liquidating the Issuers following redemption of the Securities, and the Share Registrar under the Preference Share Paying Agency Agreement, (e) the Independent accountants, agents and counsel of the Issuers for fees and expenses (including amounts payable in connection with the preparation of tax forms on behalf of the Issuers and any registered office fees), (f) the Rating Agencies for fees and expenses in connection with any rating (including the annual fees payable to the Rating Agencies for monitoring of any rating) of the Notes, including fees and expenses due or accrued in connection with any rating of the Underlying Assets (which shall mean with respect to a Synthetic Security, the related Reference Obligation) or any surveillance of such ratings, (g) the Collateral Manager under this Indenture and the Management Agreement (including amounts payable pursuant to Section 6 of the Management Agreement), (h) the Auction Agent Fees, (i) any other Person in respect of any governmental fee, charge or tax in relation to the Issuers (in each case as certified by an Authorized Officer of the Issuer or the Co-Issuer to the Trustee), (j) the fees and expenses of the Exchange and the Irish Paying Agent, (k) the Initial Purchaser in respect of indemnities under the Note Purchase Agreement and (l) any other Person in respect of any other fees or expenses (including indemnities) permitted under this Indenture and the documents delivered pursuant to or in connection with this Indenture and the Securities; provided that Administrative Expenses shall not include (i) any amounts due or accrued with respect to the actions taken on or in connection with the Closing Date (provided that funds may be withdrawn from the Expense Account prior to the first Determination Date for such purpose provided that the Collateral Manager has approved in writing each such withdrawal in advance), (ii) amounts payable in respect of the Notes, (iii) amounts payable under the Interest Rate Swap Agreement and (iv) any Management Fee payable pursuant to the Management Agreement.

"**Administrator**" means Maples Finance Limited, solely in its capacity as administrator under the Administration Agreement, unless a successor Person shall have become the Administrator pursuant to the applicable provisions of the Administration Agreement, and thereafter Administrator shall mean such successor Person.

30775-00034 NY:1268831.8

"**Affected Party**" or "**affected party**" has the meaning specified in the Interest Rate Swap Agreement.

"**Affiliate**" or "**Affiliated**" means, with respect to a Person, (a) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such Person or (b) any other Person who is a director, Officer, employee, managing member or general partner of (i) such Person or (ii) any such other Person described in clause (a) above or (iii) with respect to the Collateral Manager, any account or fund for which the Collateral Manager or any of the Persons referred to in clauses (a) and (b) acts as investment advisor with discretionary authority. For the purposes of this definition, "control" of a Person shall mean the power, direct or indirect, (A) to vote more than fifty percent (50%) of the securities having ordinary voting power for the election of directors of such Person or (B) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise; provided that neither the Administrator nor any special purpose company to which the Administrator provides directors and/or acts as share trustee shall be an Affiliate of the Issuer.

"**Aggregate Liquidation Preference**" means the product of (x) the Liquidation Preference and (y) the number of Preference Shares Outstanding at the relevant time.

"**Aggregate Outstanding Amount**" means, when used with respect to any of the Notes at any time, the aggregate principal amount of such Notes Outstanding at such time. The Aggregate Outstanding Amount excludes any Deferred Interest with respect to the applicable Class of Notes. When used with respect to any of the Preference Shares at any time, the Aggregate Outstanding Amount means the number of such Preference Shares Outstanding at the relevant time multiplied by the Liquidation Preference.

"**Aggregate Principal/Notional Balance**" means, when used with respect to one or more Pledged Underlying Assets as of any date of determination, the sum of the Principal/Notional Balances of such Underlying Assets on the date of determination; and (ii) with respect to Eligible Investments, the aggregate Balance of such Eligible Investments.

"**Aggregate WAC Change**" means the number, calculated by the Collateral Manager, obtained by adding each positive WAC Change or subtracting each negative WAC Change.

"**Aggregate WAS Change**" means the number, calculated by the Collateral Manager, obtained by adding each positive WAS Change or subtracting each negative WAS Change.

"**Aggregate WAC Change Test**" means a test which is satisfied on any date an Eligible Substitute Asset is purchased if, (i) such date occurs before August 17, 2007 and if the Aggregate WAC Change is negative, the absolute value of the Aggregate WAC Change does not exceed 0.05%, and (ii) if such date occurs on or after August 17, 2007 and if the Aggregate WAC Change for the previous twelve months is negative, the absolute value of the Aggregate WAC Change does not exceed 0.05%.

"**Aggregate WAS Change Test**" means a test which is satisfied on any date an Eligible Substitute Asset is purchased if, (i) such date occurs before August 17, 2007 and if the Aggregate WAS Change is negative, the absolute value of the Aggregate WAS Change does not exceed 0.05%, and (ii) if such date occurs on or after August 17, 2007 and if the Aggregate WAS Change for the previous twelve months is negative, the absolute value of the Aggregate WAS Change does not exceed 0.05%.

"**Alternative Debt Test**" means a test which is satisfied with respect to a security if, on the date the Issuer acquires such security, each of the following is satisfied: (a) such security is in the form of a note or other debt instrument and is treated as debt for corporate law purposes in the jurisdiction of the issuer of such security, (b) the documents pursuant to which such security was offered, if any, do not require that any holder thereof treat such security other than as debt for tax purposes, (c) such security bears interest at a fixed rate per annum or at a rate based upon a customary floating rate index plus or minus a spread and does not provide for any interest based on any other factor, such as the issuer's profits or cash flow, (d) such security had a fixed term at original issuance not in excess of 35 years, (e) such security provides for a fixed principal amount (leaving no amount outstanding) payable no later than its Stated Maturity and (f) such security is rated at least "BBB-" by Standard & Poor's or at least "BBB-" by Fitch or at least "Baa3" by Moody's, and if so rated, such rating is not on watch for downgrade by

4

Moody's, as to ultimate payment of principal and interest; provided that, in the case of a security in the form of a beneficial interest in an entity that is treated (as evidenced by an opinion of counsel or a reference to an opinion of counsel in documents pursuant to which such security was offered) as a grantor trust or partnership for United States Federal income tax purposes (and not as an association taxable as a corporation), any of the conditions specified in clause (a), (b), (c), (d) and (e) may be satisfied by reference to each asset held by such entity rather than by reference to such beneficial ownership interests.

"**Applicable Procedures**" has the meaning specified in Section 2.4(b)(i)(D).

"**Applicable Recovery Rate**" means, with respect to any Underlying Asset (which shall mean with respect to a Synthetic Security, the related Reference Obligation) on any Measurement Date, an amount equal to the lower of (a) the percentage for such Underlying Asset set forth in the Moody's Recovery Rate Matrix attached as Schedule M hereto in (i) the applicable table therein, (ii) the row in such table opposite the applicable percentage of the underlying capital structure and (iii) the column in such table below the rating assigned by Moody's of such Underlying Asset as of the date of issuance of such Underlying Asset, or (b) the percentage for such Underlying Asset set forth in the Standard & Poor's Recovery Rate Matrix attached as Schedule E hereto in (i) the applicable table, (ii) the row in such table opposite the Standard & Poor's Rating of such Underlying Asset as of the date of purchase by the Issuer of such Underlying Asset and (iii)(x) for purposes of determining the Standard & Poor's Recovery Rate, the column in such table below the current rating of the respective Class of Notes or (y) for purposes of determining the Calculation Amount, the column in such table below the current rating of the most senior Class of Notes Outstanding.

"**Asset-Backed Security**" means any U.S. Dollar-denominated asset-backed security (or any security that represents a direct or indirect interest in an asset-backed security) that, at the time of acquisition (or commitment for acquisition) by the Issuer on the Closing Date, is not a Prohibited Asset or a Defaulted Security and which satisfies each of the following conditions:

(a)    it provides for a fixed amount payable in Cash no later than its stated maturity;

(b)    the Underlying Instruments with respect to such Asset-Backed Security do not prohibit it from being purchased by the Issuer and Granted to the Trustee;

(c)    it is not denominated or payable in, or convertible into an obligation or security denominated or payable in, a currency other than U.S. Dollars;

(d)    it does not require the Issuer to make future advances or payments to the obligor or issuer;

(e)    it has a Standard & Poor's Rating (excluding those with a rating from Standard & Poor's which includes the subscript "p", "pi", "q", "r" or "t") and a Moody's Rating;

(f)    it is not Margin Stock and does not provide for conversion into Margin Stock;

(g)    it is not subject to an Offer;

(h)    it (or, if it is a certificate of beneficial interest in an entity that is treated as a grantor trust or a partnership and not as a REMIC or FASIT for U.S. Federal income tax purposes, each of the debt instruments or securities held by such entity) is described in at least one of the following four clauses:

(i)    it is a Public Security that was issued in a firm commitment underwriting for which neither the Collateral Manager nor an Affiliate thereof served as underwriter;

(ii)    it was not purchased by the Issuer (A) directly or indirectly from its issuer, (B) pursuant to a legally binding commitment made before the issuance of the obligation or security or (C) from the Collateral Manager or any of its Affiliates unless such entity (1) regularly acquires securities of the same type for its own account, (2) could have held the obligation or security for its own account consistent with

5

its investment policies, (3) did not identify the obligation or security as intended for sale to the Issuer or the Collateral Manager within 30 days of its issuance and (4) held the obligation or security for at least 30 days;

  (iii) it is a Private Security and

    (A) it was originally issued pursuant to an offering circular, private placement memorandum or similar offering document;

    (B) the Issuer, the Collateral Manager and the Affiliates of the Collateral Manager did not at original issuance acquire twenty percent (20%) or more of the aggregate principal amount of all classes of securities offered by the issuer of the Asset-Backed Security in the offering and any related offering; provided in each case that any acquisition by an Affiliate of the Collateral Manager that is not a member of the Collateral Manager Group shall be included only if the Collateral Manager or any of its employees or agents knew or had reason to know of such acquisition; and

    (C) the Issuer, the Collateral Manager and any Affiliate of the Collateral Manager did not participate in negotiating or structuring the terms of the Asset-Backed Security, except (1) to the extent such participation consisted of an election by the Issuer, the Collateral Manager or an Affiliate of the Collateral Manager to tranche the subordinate classes of securities of an issue in the form of one of the structuring options offered by the issuer of the Asset-Backed Security, (2) for the purposes of (i) commenting on offering documents to an unrelated underwriter or placement agent where the ability to comment on such documents was generally available to investors or (ii) due diligence of the kind customarily performed by investors in securities, or (3) to the extent the Collateral Manager or any Affiliate of the Collateral Manager, either directly or indirectly through a conduit issuer, was the issuer of the Asset-Backed Security; provided that any participation in negotiating or structuring by any Affiliate of the Collateral Manager that is not a member of the Collateral Manager Group shall be included only if the Collateral Manager or any of its employees or agents knew or had reason to know of such participation; or

  (iv) it is either (A) the sole material obligation of a repackaging vehicle formed and operated exclusively to hold a single Asset-Backed Security described in at least one of clauses (h)(i), (h)(ii) or (h)(iii), which vehicle may also hold a derivative financial instrument or guarantee designed solely to offset one or more terms of such Asset-Backed Security or (B) a security issued by a repackaging vehicle that holds one or more Asset-Backed Securities described in at least one of clauses (h)(i), (h)(ii), (h)(iii) or (h)(iv)(A) and which, is treated as a REMIC, FASIT, grantor trust, or partnership for U.S. Federal income tax purposes, and is formed by the Collateral Manager of one of its Affiliates;

  (i) if interest income on an Asset-Backed Security is considered U.S.-source income for U.S. Federal income tax purposes, it is Registered;

  (j) either (A) the Issuer meets the certification and other requirements to receive payments with respect to the Asset-Backed Security free of U.S. and foreign withholding tax, (B) the issuer thereof is required to make additional payments sufficient on an after-tax basis to cover any U.S. and foreign withholding tax imposed on payments made to the Issuer with respect thereto (including any tax on the additional payments described in this paragraph) or (C) the issuer thereof has obtained or expects to obtain in the ordinary course and not more than six weeks following the issuance thereof an exemption from withholding tax for the entire period during which the Notes and the Preference Shares will be outstanding; provided that, for purposes of this clause (h), a determination that an Asset-Backed Security is eligible for exemption from U.S. withholding tax under Section 871(h) or Section 881(c) of the Code may be based on advice of Allen & Overy LLP or an opinion of counsel that the Asset-Backed Security will or should be treated as debt for U.S. Federal income tax purposes;

  (k) (A) the Asset-Backed Security is the obligation of a single issuer incorporated as a corporation under the state or Federal laws of the United States, that is not a U.S. real property holding company; (B) the Issuer

6

has been advised by Allen & Overy LLP or has received an opinion of counsel that owning the Asset-Backed Security will not subject the Issuer to U.S. Federal income tax on a net income basis or cause the Issuer to be treated as engaged in a trade or business within the United States; (C) the Issuer has received an opinion of counsel that the Asset-Backed Security will be treated as debt for U.S. Federal income tax purposes; (D) the Issuer has received an opinion of counsel that for U.S. Federal income tax purposes (a) the issuer of the Asset-Backed Security is a grantor trust and (b) all the assets of the trust are regular interests in a REMIC or FASIT or interest rate floors, caps, swaps or other notional principal contracts (within the meaning of applicable Treasury Regulations), the payments under which are determined solely by reference to interest rates, or (E) the Alternative Debt Test is satisfied, provided that, for purposes of clauses (f), (g), (h) and this clause (i), (1) an opinion of counsel that the issuer of an Asset-Backed Security will be treated as a REMIC or FASIT for U.S. Federal income tax purposes shall be treated as an opinion of counsel that the Asset-Backed Security will be treated as debt for U.S. Federal income tax purposes (unless the Asset-Backed Security is the residual interest in the REMIC or the ownership interest in the FASIT), (2) if there has been no change in the terms of an Asset-Backed Security prior to its acquisition, the Issuer shall be treated as having received an opinion that it will or should be treated as debt if the Issuer either has obtained a tax opinion to that effect rendered at the issuance of such Asset-Backed Security or has received offering documents pursuant to which such Asset-Backed Security was offered that include a tax opinion to such effect or state that an opinion of counsel to such effect has been rendered, and (3) if there has been no change in any of the organizational documents of an entity issuing an Asset-Backed Security since its issuance, the Issuer shall be treated as having received an opinion that such entity will be treated as a corporation, partnership, grantor trust, REMIC or FASIT (as the case may be) for U.S. Federal income tax purposes if the Issuer either has obtained a tax opinion to that effect rendered at the time of the issuance of the Asset-Backed Security or has obtained offering documents that include an opinion of counsel to such effect or state that an opinion of counsel to such effect has been rendered;

(l)     it is not a Synthetic Security;

(m)     acquisition of the Asset-Backed Security will not cause the Issuer to register, or be required to register, under the Investment Company Act;

(n)     it is not convertible into one or more Equity Securities;

(o)     it is not currently deferring interest or a Written Down Security

(p)     it is expected to have an outstanding Principal/Notional Balance of less than $1,000 as of the Stated Maturity of the Notes, assuming a constant prepayment rate since the date of purchase equal to the lesser of (a) 5.0% per annum and (b) the constant prepayment rate reasonably expected by the Collateral Manager as of the date of purchase, or, if constant prepayment rate is not applicable, the slowest prepayment scenario as described in the prospectus relating to such Asset-Backed Security; and

(q)     it will be pledged to the Trustee under this Indenture.

"**Assumed Reinvestment Rate**" means, with respect to any Account or fund securing the Notes, LIBOR minus 1.00%.

"**Auction**" has the meaning specified in Section 9.3.

"**Auction Agent**" means HBK Investments L.P. or a successor thereto pursuant to the Management Agreement; provided however if HBK Investments L.P. or any of its Affiliates intends to submit a bid in an Auction of the Underlying Assets, HBK Investments L.P. shall resign as Auction Agent for that Auction and shall select a Substitute Auction Agent; and thereafter "Auction Agent" shall mean, with respect to such Auction, such Substitute Auction Agent.

"**Auction Agent Fees**" has the meaning specified in Schedule D.

"**Auction Call Redemption**" has the meaning specified in Section 9.3(a).

7

"**Auction Date**" has the meaning specified in Section 9.3(a).

"**Auction Procedures**" means the procedures for the Auction specified in Section 9.3(a) and Schedule G.

"**Authenticating Agent**" means, with respect to the Notes or any Class of the Notes, the Person designated by the Trustee, if any, to authenticate such Notes on behalf of the Trustee pursuant to Section 6.4.

"**Authorized Officer**" means (a) with respect to the Issuer, any Officer of the Issuer who is authorized to act for the Issuer in matters relating to, and binding upon, the Issuer, (b) with respect to the Co-Issuer, any Officer who is authorized to act for the Co-Issuer in matters relating to, and binding upon, the Co-Issuer, (c) with respect to the Collateral Manager, any Officer, employee or agent of the Collateral Manager who is authorized to act for the Collateral Manager in matters relating to, and binding upon, the Collateral Manager with respect to the subject matter of the request, certificate or order in question and (d) with respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any person to act, and such certification may be considered as in full force and effect until receipt by such other party of written notice to the contrary.

"**Automobile Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from installment sale loans made to finance the purchase of, or from leases of, automobiles, generally having the following characteristics: (1) the loans or leases may have varying contractual maturities; (2) the loans or leases are obligations of numerous borrowers or lessors and accordingly represent a diversified pool of obligor credit risk; (3) the repayment stream on such loans or leases is primarily determined by a contractual payment schedule, with early repayment on such loans or leases predominantly dependent upon the disposition of the underlying vehicle; and (4) such leases typically provide for the right of the lessee to purchase the vehicle for its stated residual value, subject to payments at the end of lease term for excess mileage or use.

"**Available Redemption Amount**" means the amount from Disposition Proceeds, Eligible Investments and all other funds in the Accounts which are available on a Redemption Date to pay Excess Principal Proceeds in accordance with the Priority of Payments.

"**Average Life**" means on any Measurement Date on or after the Closing Date with respect to any Underlying Asset (*provided*, that with respect to any Synthetic Security, such determination will be made with respect to the related Reference Obligation), the quotient obtained by dividing (i) the sum of the products of (a) the number of years (rounded to the nearest one tenth thereof) from such Measurement Date to the respective dates of each successive Scheduled Distribution of principal of such Underlying Asset (other than a Defaulted Security or Deferred Interest PIK Bond) (assuming that (A) no collateral defaults or is sold except those that have already defaulted or been sold, (B) prepayment of any Underlying Asset during any month occurs (x) with respect to an Underlying Asset issued no more than six months prior to such Measurement Date, at the rate of prepayment assumed at the time of issuance of such Underlying Asset and (y)with respect to an Underlying Asset issued more than six months prior to such Measurement Date, at the average rate of prepayment observed over the six months immediately preceding such Measurement Date based on available transaction reporting data (and if such data is unavailable, at the assumed constant prepayment rate or prepayment curve set out in the offering document for such Underlying Asset, as determined by the Collateral Manager in its reasonable business judgment), (C) any clean up call, auction call or similar redemption (but not optional redemption) of the Underlying Asset occurs in accordance with the terms of the relevant Underlying Asset and (D) no optional redemption occurs), and (b) the respective amounts of principal of such Scheduled Distributions by (ii) the sum of all successive Scheduled Distributions of principal on such Underlying Asset (other than a Defaulted Security or Deferred Interest PIK Bond).

"**Bailee Letter**" means a letter agreement substantially in the form of Schedule C hereto.

"**Balance**" means at any time, with respect to (A) Cash or Eligible Investments in any Account at such time, the aggregate of the (a) current balance of Cash, demand deposits, time deposits, certificates of deposit and

federal funds; (b) principal amount of interest-bearing corporate and government securities, money market accounts, repurchase obligations and Reinvestment Agreements; and (c) purchase price (but not greater than the face amount) of non-interest-bearing government and corporate securities and commercial paper; and (B) any Investment Agreement, the excess, if any, of (i) the sum of all amounts invested under such Investment Agreement on or before such date over (ii) the sum of all withdrawals made on or before such date under such Investment Agreement.

"**Bank**" means Deutsche Bank Trust Company Americas, a New York banking corporation, in its individual capacity and not as Trustee.

"**Bankruptcy Code**" means the United States Bankruptcy Code, Title 11 of the United States Code, as amended, or, where the context requires, the applicable insolvency provisions of the laws of the Cayman Islands.

"**Bankruptcy Event**", with respect to any Person, means: (a) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) winding up, liquidation, reorganization or other relief in respect of such Person or its debts, or of a substantial part of its assets, under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Person or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days; or an order or decree approving or ordering any of the foregoing shall be entered; or (b) such Person shall (i) voluntarily commence any proceeding or file any petition seeking winding up, liquidation, reorganization or other relief under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (a) of this definition, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Person or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, or (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing.

"**Base Rate**" has the meaning specified in Schedule B.

"**Base Rate Reference Bank**" has the meaning specified in Schedule B.

"**Beneficial Owner**" means any Person owning an interest in a Global Note as reflected on the books of the Depositary or on the books of a Depositary Participant or on the books of an indirect participant for which a Depositary Participant of the Depositary acts as agent.

"**Board of Directors**" means, with respect to the Issuer, the directors of the Issuer duly appointed in accordance with the Issuer Charter, and, with respect to the Co-Issuer, the directors of the Co-Issuer duly appointed by the shareholders of the Co-Issuer.

"**Board Resolution**" means, with respect to either of the Issuers, a resolution of the Board of Directors.

"**Business Day**" means any day other than Saturday, Sunday or a day on which banking institutions are authorized or obligated by law, regulation or executive order to close in New York City, London or any other city in which the Corporate Trust Office is located or, in the case of the final payment of principal or Excess Principal Proceeds, as the case may be, of any Security, in the place of presentation of such Security. To the extent action is required of the Issuer that has not been delegated to the Trustee, the Collateral Manager or any agent of the Issuer located outside of the Cayman Islands, the Cayman Islands shall be considered in determining "Business Day" for purposes of determining when such Issuer action is required. To the extent action is required of the Irish Paying Agent, Dublin, Ireland shall be considered in determining "Business Day" for purposes of determining when such Irish Paying Agent or Transfer Agent action is required.

"**Calculation Agent**" has the meaning specified in Section 7.15.

"**Calculation Amount**" means, with respect to any Defaulted Security, the lesser of (a) the Fair Market Value of such Defaulted Security and (b) the amount obtained by multiplying the Applicable Recovery Rate by the Principal/Notional Balance of such Defaulted Security.

"**Car Rental Fleet Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from leases and subleases of vehicles to car rental systems and their franchisees, generally having the following characteristics: (1) the leases and subleases have varying contractual maturities; (2) the subleases are obligations of numerous franchisees and accordingly represent a very diversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee or third party of the underlying vehicle; and (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the vehicle for its stated residual value, subject to payments at the end of lease term for excess mileage or use.

"**Cash**" means such coin or currency of the United States as at the time shall be legal tender for payment of all public and private debts.

"**Cash Asset**" means any Underlying Asset that is not a Synthetic Security.

"**CDO Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the CDO Securities) on the cash flow from a portfolio of REIT Debt Securities, Synthetic Securities, Asset-Backed Securities, Commercial Mortgage-Backed Securities, Residential Mortgage-Backed Securities, bank loan securities, domestic corporate debt securities, high-grade asset-backed securities and trust preferred securities or any combination of the foregoing, generally having the following characteristics: (1) the securities have varying contractual maturities; (2) the securities are obligations of a relatively limited number of obligors or issuers and accordingly represent a relatively undiversified pool of obligor credit risk; (3) repayment thereof can vary substantially from the contractual payment schedule (if any), with early prepayment of individual securities depending on numerous factors specific to the particular issuers or obligors and upon whether, in the case of securities bearing interest at a fixed rate, such securities include an effective prepayment premium; and (4) proceeds from such repayments can for a limited period and subject to compliance with certain eligibility criteria be reinvested in additional securities.

"**Certificate of Authentication**" has the meaning specified in Section 2.3(f).

"**Class**" means each class of the following Notes: the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes.

"**Class A Interest Distribution Amount**" means the sum of the Class A-1 Interest Distribution Amount and Class A-2 Interest Distribution Amount.

"**Class A Notes**" means the Class A-1 Notes and the Class A-2 Notes.

"**Class A-1 Interest Distribution Amount**" means, with respect to the Class A-1 Notes and (a) the First Distribution Date, the aggregate amount of interest accrued at the Class A-1 Note Interest Rate during the first Interest Period, on the Aggregate Outstanding Amount of the Class A-1 Notes on the Closing Date, and (b) any Distribution Date thereafter, the aggregate amount of interest accrued at the Class A-1 Note Interest Rate during the Interest Period ending immediately prior to such Distribution Date, on the Aggregate Outstanding Amount of the Class A-1 Notes on the first day of such Interest Period (after giving effect to any redemption of the Class A-1 Notes or other payment of principal of the Class A-1 Notes on any preceding Distribution Date) plus any Defaulted Interest not previously paid relating to the Class A-1 Notes plus interest on any such Defaulted Interest that the holders of the Class A-1 Notes are entitled to receive.

"**Class A-1 Note Interest Rate**" means, with respect to any Interest Period, the per annum floating rate at which the Class A-1 Notes will bear interest, equal to LIBOR for each Interest Period plus 0.23%.

"**Class A-1 Notes**" means the Class A-1 Floating Rate Notes due August 2046 issued hereunder by the Issuers on the Closing Date.

"**Class A-2 Interest Distribution Amount**" means, with respect to the Class A-2 Notes and (a) the First Distribution Date, the aggregate amount of interest accrued at the Class A-2 Note Interest Rate during the first Interest Period, on the Aggregate Outstanding Amount of the Class A-2 Notes on the Closing Date, and (b) any Distribution Date thereafter, the aggregate amount of interest accrued at the Class A-2 Note Interest Rate during the Interest Period ending immediately prior to such Distribution Date, on the Aggregate Outstanding Amount of the Class A-2 Notes on the first day of such Interest Period (after giving effect to any redemption of the Class A-2 Notes or other payment of principal of the Class A-2 Notes on any preceding Distribution Date) plus any Defaulted Interest not previously paid relating to the Class A-2 Notes plus interest on any such Defaulted Interest that the holders of the Class A-2 Notes are entitled to receive.

"**Class A-2 Note Interest Rate**" means, with respect to any Interest Period, the per annum floating rate at which the Class A-2 Notes will bear interest, equal to LIBOR for each Interest Period plus 0.40%.

"**Class A-2 Notes**" means the Class A-2 Floating Rate Notes due August 2046 issued hereunder by the Issuers on the Closing Date.

"**Class A/B Coverage Tests**" means, for so long as any Class A Note or Class B Note remains Outstanding, the Class A/B Overcollateralization Test and the Class A/B Interest Coverage Test.

"**Class A/B Interest Coverage Ratio**" has the meaning set forth in the definition of Interest Coverage Ratio.

"**Class A/B Interest Coverage Test**" means, for so long as any Class A Note or Class B Note remains Outstanding, a test that will be satisfied on the Closing Date and on any Measurement Date if the Class A/B Interest Coverage Ratio as of such Measurement Date is equal to or greater than 112%; provided that the Class A/B Interest Coverage Test will be deemed to be satisfied on the First Distribution Date.

"**Class A/B Overcollateralization Ratio**" means, as of any Measurement Date, the number (expressed as a percentage) calculated by dividing the Net Outstanding Underlying Asset Balance on such Measurement Date by the Aggregate Outstanding Amount of the Class A Notes and Class B Notes.

"**Class A/B Overcollateralization Test**" means, for so long as any Class A Note or Class B Note remains Outstanding, a test satisfied on the Closing Date and on any Measurement Date if the Class A/B Overcollateralization Ratio on such Measurement Date is equal to or greater than 110.36%.

"**Class B Interest Distribution Amount**" means, with respect to the Class B Notes and (a) the First Distribution Date, the aggregate amount of interest accrued at the Class B Note Interest Rate during the first Interest Period, on the Aggregate Outstanding Amount of the Class B Notes on the Closing Date, and (b) any Distribution Date thereafter, the aggregate amount of interest accrued at the Class B Note Interest Rate during the Interest Period ending immediately prior to such Distribution Date, on the Aggregate Outstanding Amount of the Class B Notes on the first day of such Interest Period (after giving effect to any redemption of the Class B Notes or other payment of principal of the Class B Notes on any preceding Distribution Date) plus any Defaulted Interest not previously paid relating to the Class B Notes plus interest on any such Defaulted Interest that the holders of the Class B Notes are entitled to receive.

"**Class B Note Interest Rate**" means, with respect to any Interest Period, the per annum floating rate at which the Class B Notes will bear interest, equal to LIBOR for each Interest Period plus 0.50%.

30775-00034 NY:1268831.8

"**Class B Notes**" means the Class B Floating Rate Notes due August 2046 issued hereunder by the Issuers on the Closing Date.

"**Class C Coverage Tests**" means, for so long as any Class A Note, Class B Note or Class C Note remains Outstanding, the Class C Overcollateralization Test and the Class C Interest Coverage Test.

"**Class C Deferred Interest**" means, for so long as any Class A Note or Class B Note is Outstanding, if and to the extent that funds are not available on any Distribution Date to pay the full amount of interest due on the Class C Notes (including as a result of the use of available funds to make payments of principal on the Class A Notes or Class B Notes because a Coverage Test is not satisfied) as a result of the operation of the Priority of Payments, the amount of the unpaid interest on the Class C Notes on such Distribution Date. Any unpaid Class C Deferred Interest will accrue interest at the Class C Note Interest Rate.

"**Class C Interest Coverage Ratio**" has the meaning specified in the definition of Interest Coverage Ratio.

"**Class C Interest Coverage Test**" means, for so long as any Class A Note, Class B Note or Class C Note remains Outstanding, a test that will be satisfied on the Closing Date and on any Measurement Date if the Class C Interest Coverage Ratio as of such Measurement Date is equal to or greater than 110%; provided that the Class C Interest Coverage Test will be deemed to be satisfied on the First Distribution Date.

"**Class C Interest Distribution Amount**" means, with respect to the Class C Notes and (a) the First Distribution Date, the aggregate amount of interest accrued at the Class C Note Interest Rate during the first Interest Period, on the Aggregate Outstanding Amount of the Class C Notes on the Closing Date, and (b) any Distribution Date thereafter, the aggregate amount of interest accrued at the Class C Note Interest Rate during the Interest Period ending immediately prior to such Distribution Date, on the Aggregate Outstanding Amount of the Class C Notes on the first day of such Interest Period (after giving effect to any redemption of the Class C Notes or other payment of principal of the Class C Notes on any preceding Distribution Date) plus any Defaulted Interest not previously paid relating to the Class C Notes plus interest on any such Defaulted Interest that the holders of the Class C Notes are entitled to receive plus interest accrued on the Class C Deferred Interest at the Class C Note Interest Rate during the Interest Period ending immediately prior to such Distribution Date, but excluding any Class C Deferred Interest.

"**Class C Note Interest Rate**" means, with respect to any Interest Period, the per annum floating rate at which the Class C Notes will bear interest, equal to LIBOR for each Interest Period plus 1.30%.

"**Class C Notes**" means the Class C Floating Rate Deferrable Interest Notes due August 2046 issued hereunder by the Issuers on the Closing Date.

"**Class C Overcollateralization Ratio**" means, as of any Measurement Date, the number (expressed as a percentage) calculated by dividing the Net Outstanding Underlying Asset Balance on such Measurement Date by the sum of (a) Aggregate Outstanding Amount of the Class A Notes, Class B Notes and Class C Notes and (b) any outstanding Class C Deferred Interest.

"**Class C Overcollateralization Test**" means, for so long as any Class A Note, Class B Note or Class C Note remains Outstanding, a test satisfied on the Closing Date and on any Measurement Date if the Class C Overcollateralization Ratio on such Measurement Date is equal to or greater than 108.38%.

"**Class D Coverage Tests**" means, for so long as any Class A Note, Class B Note, Class C Note or Class D Note remains Outstanding, the Class D Overcollateralization Test and the Class D Interest Coverage Test.

"**Class D Deferred Interest**" means, for so long as any Class A Note, Class B Notes or Class C Note is Outstanding, if and to the extent that funds are not available on any Distribution Date to pay the full amount of interest due on the Class D Notes (including as a result of the use of available funds to make payments of principal on the Class A Notes, Class B Notes or Class C Notes because a Coverage Test is not satisfied) as a result of the operation of the Priority of Payments, the amount of the unpaid interest on the Class D Notes on such Distribution Date. Any unpaid Class D Deferred Interest will accrue interest at the Class D Note Interest Rate.

12

"**Class D Interest Coverage Ratio**" has the meaning specified in the definition of Interest Coverage Ratio.

"**Class D Interest Coverage Test**" means, for so long as any Class A Note, Class B Note, Class C Note, or Class D Notes remains Outstanding, a test that will be satisfied on the Closing Date and on any Measurement Date if the Class D Interest Coverage Ratio as of such Measurement Date is equal to or greater than 107%; provided that the Class D Interest Coverage Test will be deemed to be satisfied on the First Distribution Date.

"**Class D Interest Distribution Amount**" means, with respect to the Class D Notes and (a) the First Distribution Date, the aggregate amount of interest accrued at the Class D Note Interest Rate during the first Interest Period, on the Aggregate Outstanding Amount of the Class D Notes on the Closing Date, and (b) any Distribution Date thereafter, the aggregate amount of interest accrued at the Class D Note Interest Rate during the Interest Period ending immediately prior to such Distribution Date, on the Aggregate Outstanding Amount of the Class D Notes on the first day of such Interest Period (after giving effect to any redemption of the Class D Notes or other payment of principal of the Class D Notes on any preceding Distribution Date) plus any Defaulted Interest not previously paid relating to the Class D Notes plus interest on any such Defaulted Interest that the holders of the Class D Notes are entitled to receive plus interest accrued on the Class D Deferred Interest at the Class D Note Interest Rate during the Interest Period ending immediately prior to such Distribution Date, but excluding any Class D Deferred Interest.

"**Class D Note Interest Rate**" means, with respect to any Interest Period, the per annum floating rate at which the Class D Notes will bear interest, equal to LIBOR for each Interest Period plus 3.15%.

"**Class D Notes**" means the Class D Floating Rate Deferrable Interest Notes due August 2046 issued hereunder by the Issuers on the Closing Date.

"**Class D Overcollateralization Ratio**" means, as of any Measurement Date, the number (expressed as a percentage) calculated by dividing the Net Outstanding Underlying Asset Balance on such Measurement Date by the sum of (a) Aggregate Outstanding Amount of the Class A Notes, Class B Notes, Class C Notes and Class D Notes, (b) any outstanding Class C Deferred Interest and (c) any outstanding Class D Deferred Interest.

"**Class D Overcollateralization Test**" means, for so long as any Class A Note, Class B Note, Class C Note or Class D Note remains Outstanding, a test satisfied on the Closing Date and on any Measurement Date if the Class D Overcollateralization Ratio on such Measurement Date is equal to or greater than 104.75%.

"**Class D Priority Redemption Amount**" means an amount distributable as principal on the Class D Notes during the Priority Distribution Period pursuant to clause (16) of Section 11.1(a)(i), to the extent of the funds available therefor on any Distribution Date, which amount shall not exceed, for each Distribution Date specified on Schedule N, the amount set forth on Schedule N opposite such Distribution Date.

"**Class E Deferred Interest**" means, for so long as any Class A Note, Class B Note, Class C Notes or Class D Note is Outstanding, if and to the extent that funds are not available on any Distribution Date to pay the full amount of interest due on the Class E Notes (including as a result of the use of available funds to make payments of principal on the Class A Notes, Class B Notes, Class C Notes or Class D Notes because a Coverage Test is not satisfied) as a result of the operation of the Priority of Payments, the amount of the unpaid interest on such Distribution Date. Any unpaid Class E Deferred Interest will accrue interest at the Class E Note Interest Rate.

"**Class E Interest Distribution Amount**" means, with respect to the Class E Notes and (a) the First Distribution Date, the aggregate amount of interest accrued at the Class E Note Interest Rate during the first Interest Period, on the Aggregate Outstanding Amount of the Class E Notes on the Closing Date, and (b) any Distribution Date thereafter, the aggregate amount of interest accrued at the Class E Note Interest Rate during the Interest Period ending immediately prior to such Distribution Date, on the Aggregate Outstanding Amount of the Class E Notes on the first day of such Interest Period (after giving effect to any redemption of the Class E Notes or other payment of principal of the Class E Notes on any preceding Distribution Date) plus any Defaulted Interest not previously paid relating to the Class E Notes plus interest on any such Defaulted Interest that the holders of the Class E Notes are entitled to receive plus interest accrued on the Class E Deferred Interest at the Class E Note Interest Rate during the Interest Period ending immediately prior to such Distribution Date, but excluding any Class E Deferred Interest.

30775-00034 NY:1268831.8

"**Class E Note Interest Rate**" means, with respect to any Interest Period, the per annum floating rate at which the Class E Notes will bear interest, equal to LIBOR for each Interest Period plus 6.00%.

"**Class E Notes**" means the Class E Floating Rate Deferrable Interest Notes due August 2046 issued hereunder by the Issuers on the Closing Date.

"**Clean-Up Call Redemption**" has the meaning specified pursuant to Section 9.1.

"**Clearing Agency**" means an organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"**Clearance System**" Euroclear, Clearstream or DTC.

"**Clearstream**" means Clearstream Banking, société anonyme, a corporation organized under the laws of the Grand Duchy of Luxembourg.

"**Closing Date**" means August 17, 2006.

"**CMBS Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a pool of commercial mortgage loans made to finance the acquisition, construction and improvement of properties or the leasing of such properties to corporate tenants.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Co-Issuer**" means Gemstone CDO VI Corp., a corporation organized under the law of the State of Delaware, unless a successor Person shall have become the Co-Issuer pursuant to the applicable provisions of this Indenture, and thereafter Co-Issuer shall mean such successor Person.

"**Co-Issuers**" or "**Issuers**" means the Issuer and Co-Issuer.

"**Collateral**" has the meaning specified in the Granting Clauses.

"**Collateral Administrator**" means the Bank, solely in its capacity as collateral administrator under the Collateral Administration Agreement, unless a successor Person shall have become the Collateral Administrator pursuant to the applicable provisions of the Collateral Administration Agreement, and thereafter, the Collateral Administrator shall mean such successor Person.

"**Collateral Administration Agreement**" means the collateral administration agreement, dated as of the date hereof, among the Issuer, the Collateral Manager and the Collateral Administrator.

"**Collateral Imbalance Date**" has the meaning set forth in the Interest Rate Swap Agreement.

"**Collateral Manager**" means HBK Investments L.P., unless a Replacement Manager shall have become the collateral manager pursuant to the provisions of the Management Agreement, and thereafter "Collateral Manager" shall mean such Replacement Manager.

"**Collateral Manager Group**" means the Collateral Manager and any directly or indirectly controlled subsidiary of the Collateral Manager.

"**Collateral Manager Securities**" means all Securities beneficially owned by the Collateral Manager or any Affiliate thereof or by an account or fund for which the Collateral Manager or an Affiliate thereof acts as the investment adviser (with discretionary authority).

"**Collateral Quality Tests**" means the Standard & Poor's Minimum Weighted Average Recovery Rate Test, the Moody's Asset Correlation Test, the Moody's Minimum Weighted Average Recovery Rate Test, the Moody's Weighted Average Rating Factor Test, the Weighted Average Coupon Test and the Weighted Average Spread Test.

"**Collection Accounts**" means the Interest Collection Account and the Principal Collection Account.

"**Common Stock**" means, as of the Closing Date, the authorized common stock of the Co-Issuer which will consist of 250 shares of common stock, $1.00 par value, all of which shares will have been issued to the Issuer.

"**Company Announcements Office**" means the Company Announcements Office of the Exchange.

"**Controlling Class**" means (a) the Class A Notes, (b) if there are no Class A Notes Outstanding, the Class B Notes, (c) if there are no Class A Notes or Class B Notes Outstanding, the Class C Notes, (d) if there are no Class A Notes, Class B Notes or Class C Notes Outstanding, the Class D Notes and (e) if there are no Class A Notes, Class B Notes, Class C Notes or Class D Notes Outstanding, the Class E Notes.

"**Corporate Trust Office**" means the designated corporate trust office of the Trustee, currently located at 1761 East St. Andrew Place, Santa Ana, California 92705, Attention: Gemstone CDO VI, telephone number (714) 247-6000, or such other address as the Trustee may designate from time to time by notice to the Securityholders, the Collateral Manager and the Issuer or the principal corporate trust office of any successor Trustee.

"**Coverage Tests**" means the Overcollateralization Tests and Interest Coverage Tests applicable at the time of determination.

"**Credit Card Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from balances outstanding under revolving consumer credit card accounts, generally having the following characteristics: (1) the accounts have standardized payment terms and require minimum monthly payments; (2) the balances are obligations of numerous borrowers and accordingly represent a diversified pool of obligor credit risk; and (3) the repayment stream on such balances does not depend upon a contractual payment schedule, with early repayment depending primarily on interest rates, availability of credit against a maximum credit limit and general economic matters.

"**Credit Risk Obligation**" means (a) during any period which is not a Restricted Trading Period, any Underlying Asset (which shall mean with respect to a Synthetic Security, the related Reference Obligation), other than an Equity Security, whose rating has been downgraded, qualified or withdrawn by Standard & Poor's, Moody's or Fitch or has been put on "negative credit watch" or similar status for possible downgrading, qualification or withdrawal from the ratings that were in place as of the date the Issuer purchased such Underlying Asset or that (i) in the reasonable business judgment of the Collateral Manager (which judgment shall not be called into question as a result of subsequent events), has a significant risk of declining in credit quality or, over time, becoming a Defaulted Security or (ii) it is currently deferring interest or is a Written Down Security; or (b) during a Restricted Trading Period, any Underlying Asset (other than an Equity Security) (i) whose rating has been downgraded, qualified or withdrawn by Standard & Poor's, Moody's or Fitch or has been put on "negative credit watch" or similar status for possible downgrading, qualification or withdrawal from the ratings that were in place as of the date the Issuer purchased such Underlying Asset, (ii) that has experienced an increase in credit spread over the applicable U.S. Treasury Benchmark, the applicable swap benchmark or the applicable LIBOR by (x) 0.40% or more if the original credit spread (as of the date on which such Underlying Asset was first included in the portfolio) was greater than 1.50% or (y) 0.20% if the original credit spread (as of the date on which such Underlying Asset was first included in the portfolio) was less than or equal to 1.50%, or (iii) that is currently deferring interest or is a Written Down Security.

"**Custodial Account**" has the meaning specified in Section 10.2(i).

"**Default**" means any Event of Default or any occurrence that, with notice or the lapse of time or both, would become an Event of Default.

"**Defaulted Interest**" means any interest due and payable in respect of any Class A Note or any Class B Note or, if no Class A Notes or Class B Notes are Outstanding, any Class C Note (other than Class C Deferred Interest), if no Class C Notes are Outstanding, any Class D Notes (other than Class D Deferred Interest) or, if no Class D Notes are Outstanding, any Class E Note (other than Class E Deferred Interest) which is not punctually paid or duly provided for on the applicable Distribution Date or at Stated Maturity and which remains unpaid. In no event shall interest which is deferred and capitalized as Deferred Interest in accordance with Section 2.6(a) constitute Defaulted Interest.

"**Defaulted Security**" means any Pledged Underlying Asset (which shall mean with respect to a Synthetic Security, the related Reference Obligation) or any other security included in the Collateral:

(a)    as to which (i) the issuer thereof has failed to make a scheduled payment of principal or interest without giving effect to any grace period or waiver; provided that a payment default of up to three (3) Business Days with respect to which the Collateral Manager certifies in writing to the Trustee, in its reasonable judgment, is due to non-credit and non-fraud related reasons shall not cause an Underlying Asset to be classified as a Defaulted Security or (ii) pursuant to its Underlying Instruments, there has occurred any default or event of default which entitles the holders thereof, with notice or passage of time or both, to accelerate the maturity (whether by mandatory prepayment, mandatory redemption or otherwise) of all or a portion of the outstanding principal amount of such security, unless (A) in the case of a default or event of default consisting of a failure of the obligor on such security to make required interest payments, such security has resumed current and any due but unpaid payments of interest in Cash (provided that no restructuring has been effected) or (B) in the case of any other default or event of default, such default or event of default is no longer continuing;

(b)    that ranks *pari passu* with or subordinate to any other material indebtedness for borrowed money owed by the issuer of such security (for purposes hereof, "**Other Indebtedness**") if such issuer had defaulted in the payment of principal or interest with respect to such Other Indebtedness; provided that such a payment default of up to three (3) Business Days with respect to which the Collateral Manager certifies in writing to the Trustee, in its reasonable judgment, is due to non-credit and non-fraud related reasons shall not cause an Underlying Asset to be classified as a Defaulted Security; provided further, that in the case of a default or event of default consisting of a failure of the obligor on such security to make required interest payments, such Other Indebtedness has resumed current payments of interest (including all accrued interest) in Cash (whether or not any waiver or restructuring has been effected), provided even further that a security shall be considered a Defaulted Security pursuant to this clause (b) only if either (i) such default or event of default results in the assignment of a rating of "CC" or lower or "D" or "SD" by Standard & Poor's or "Ca" or "C" by Moody's or (ii) the Collateral Manager, based upon due inquiry in accordance with the practices and procedures followed by investment managers of recognized standing, has obtained knowledge of such default or event of default and any characterization by the Collateral Manager of such security other than as a "Defaulted Security" fails to satisfy the Rating Condition;

(c)    as to which a Bankruptcy Event has occurred and is continuing with respect to an entity that is: (i) with respect to securities issued by a Person directly, the special purpose entity that is the issuer of such securities, or (ii) with respect to securities issued by trusts to which an entity deposits assets, either (A) the special purpose entity that is the depositor to the trust that issues such securities, or (B) the trust that issues such securities;

(d)    that is rated (i) "CC" or lower or "D" or "SD" by Standard & Poor's or a rating is withdrawn by Standard & Poor's, or (ii) "Ca" or "C" by Moody's;

(e)    in respect of any Underlying Asset that is a PIK Bond of which there has been a failure to pay interest (i) in a cumulative amount equal to or exceeding the amount of interest due in one payment period (if such Collateral Security is rated (or privately rated for purposes of the issuance of the Securities) below "Baa3" by Moody's) or (ii) for two consecutive payment periods even if by its terms it provides for the deferral and capitalization of interest thereon, but only until such time as payment of interest on such Underlying Asset has

16

resumed and all Deferred Interest has been paid in accordance with the terms of the related Underlying Instrument; or

(f)      which is a Synthetic Security Counterparty Defaulted Obligation.

"**Defaulting Party**" or "**defaulting party**" has the meaning specified in the Interest Rate Swap Agreement.

"**Deferred Interest**" means, with respect to the Class C Notes, the Class D Notes or the Class E Notes, the Class C Deferred Interest, the Class D Deferred Interest or the Class E Deferred Interest, respectively.

"**Deferred Interest PIK Bond**" means, a PIK Bond with respect to which payment of interest either in whole or in part has been deferred in an amount equal to (a) if such PIK Bond has a Moody's Rating of at least "Baa3", the amount of interest payable in respect of the lesser of (x) two payment periods and (y) a period of one year; or (b) if such PIK Bond has a Moody's Rating of below "Baa3", the amount of interest payable in respect of the lesser of (x) one payment period and (y) a period of six months, but only until such time as payment of interest on such PIK Bond has resumed and all capitalized and deferred interest has been paid in accordance with the terms of the relevant Underlying Instruments.

"**Definitive Note**" means Regulation S Definitive Notes.

"**Delivered Obligation**" means, with respect to any Synthetic Security, a Reference Obligation physically delivered to the Issuer.

"**Depositary**" means, with respect to the Notes issued in the form of one or more Global Notes, the Person designated as Depositary pursuant to Section 2.2(e) or any successor thereto appointed pursuant to the applicable provisions of this Indenture.

"**Depositary Participant**" means a broker, dealer, bank or other financial institution or other Person for whom from time to time the Depositary effects book-entry transfers and pledges of notes deposited with the Depositary.

"**Designated Maturity**" means, with respect to any Class of Notes for each Interest Period, three months.

"**Determination Date**" means the last day of a Due Period.

"**Discount Underlying Asset**" means (i) any Underlying Asset (other than a Defaulted Security or a Deferred Interest PIK Bond) that is a Floating Rate Security and has a Moody's Rating of "Aa3" or higher acquired by the Issuer after the Closing Date for an acquisition price of less than 92% of the Principal/Notional Balance of such Underlying Asset, unless the market value for such Underlying Asset equals or exceeds 95% of the Principal/Notional Balance of such Underlying Asset (as certified by the Collateral Manager to the Trustee) for 60 consecutive days, (ii) any Underlying Asset (other than a Defaulted Security or a Deferred Interest PIK Bond) that is a Fixed Rate Security and has a Moody's Rating of "Aa3" or higher acquired by the Issuer after the Closing Date for an acquisition price of less than 85% of the Principal/Notional Balance of such Underlying Asset, unless the market value for such Underlying Asset equals or exceeds 90% of the Principal/Notional Balance of such Underlying Asset (as certified by the Collateral Manager to the Trustee) for 60 consecutive days and (iii) any Underlying Asset (other than a Defaulted Security or a Deferred Interest PIK Bond) that has a Moody's Rating below "Aa3" acquired by the Issuer after the Closing Date for an acquisition price of less than 75% of the Principal/Notional Balance of such Underlying Asset, provided that such Underlying Asset shall cease to be a Discount Underlying Asset at such time as the market value of such Underlying Asset equals or exceeds 85% of the Principal/Notional Balance of such Underlying Asset (as certified by the Collateral Manager to the Trustee) for 60 consecutive days; provided that no Underlying Asset purchased prior to the Closing Date shall be a Discount Underlying Asset.

"**dispose**", "**disposition**" or "**disposed**" means, with respect to (i) an Underlying Asset other than a Synthetic Security, the disposition of such Underlying Asset and (ii) a Synthetic Security (together with the related Reference Obligation), the assignment or termination of such Synthetic Security.

30775-00034 NY:1268831.8

"**Disposition Proceeds**" means all proceeds received on behalf of the Issuer as a result of sales or other dispositions of Pledged Securities, and the termination of the Synthetic Securities and an Interest Rate Swap Agreement, excluding accrued interest and net of any reasonable out-of-pocket expenses of the Collateral Manager or the Trustee in connection with any such sale, other disposition or termination.

"**Distribution**" means any payment of principal of or interest on or any fee, dividend or premium payment made on, or any other distribution in respect of, an obligation or security.

"**Distribution Compliance Period**" means, subject to the requirements of Section 2.4(i), with respect to the Regulation S Notes, the period beginning on the Closing Date and ending on (and including) the 40th day thereafter.

"**Distribution Date**" means (A) the 17th day of each February, May, August and November of each year, commencing with the Distribution Date in November 2006 (subject to Section 14.9), and ending on the August 2046 Distribution Date, and (B) the Accelerated Maturity Date, or if any such day is not a Business Day, the next Business Day thereafter.

"**Dollar**" or "**$**" means a dollar or other equivalent unit in such coin or currency of the United States as at the time shall be legal tender for all debts, public and private.

"**DTC**" means The Depository Trust Company, a New York corporation.

"**Due Date**" means, with respect to a Pledged Security, each date on which a Distribution is due on such Pledged Security.

"**Due Period**" means, with respect to any Distribution Date, the period commencing immediately following the fifth Business Day prior to the preceding Distribution Date (or on the Closing Date, in the case of the Due Period relating to the First Distribution Date) and ending on the fifth Business Day prior to such Distribution Date (or, in the case of the Due Period that is applicable to the Distribution Date relating to the Stated Maturity of the Notes, such Due Period shall end on the day preceding the Stated Maturity).

"**Earnings**" has the meaning set forth in the Investment Agreement.

"**Eligible Investments**" means any Dollar-denominated investment that is not a Prohibited Asset and is one or more of the following (and may include investments for which the Trustee and/or its affiliates provides services):

(a)    Cash;

(b)    direct Registered obligations of, and Registered obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States or any agency or instrumentality of the United States the obligations of which are expressly backed by the full faith and credit of the United States;

(c)    demand and time deposits in, interest bearing trust accounts at, certificates of deposit of, bankers' acceptances payable within 183 days of issuance issued by, or Federal funds sold by any depository institution or trust company incorporated under the laws of the United States or any state thereof and subject to supervision and examination by Federal and/or state banking authorities so long as the commercial paper and/or the debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company) at the time of such investment or contractual commitment providing for such investment have a credit rating of not less than "AA+" by Standard & Poor's, "Aa2" by Moody's, and if so rated, such rating is not on watch for downgrade by Moody's, and "AA+" by Fitch (if rated by Fitch) in the case of long-term debt obligations, or "A-1+" by Standard & Poor's, "P-1" by Moody's, and if so rated, such rating is not on watch for downgrade by Moody's, and "F1+" by Fitch (if rated by Fitch) in the case of commercial paper and short-term debt obligations; provided that (i) in each case, the issuer thereof must have at the time of such investment or contractual commitment providing for such investment a long-term credit rating of not less than "Aa2" by Moody's, and if so rated, such rating is not on watch for downgrade by

Moody's, and "AA+" by Fitch (if rated by Fitch) and (ii) in the case of commercial paper and short-term debt obligations with a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment or contractual commitment providing for such investment a long-term credit rating of not less than "AA+" by Standard & Poor's and "AA+" by Fitch (if rated by Fitch);

(d)        unleveraged repurchase obligations (if treated as debt for tax purposes by the issuer) with respect to (i) any security described in clause (b) above or (ii) any other Registered security issued or guaranteed by an agency or instrumentality of the United States (in each case without regard to the Stated Maturity of such security), in either case entered into with a U.S. Federal or state depository institution or trust company (acting as principal) described in clause (c) above or entered into with a corporation (acting as principal) whose long-term rating at the time of such investment or contractual commitment providing for such investment is not less than "AA+" by Standard & Poor's, "Aa2" by Moody's, and if so rated, such rating is not on watch for downgrade by Moody's, and "AA+" by Fitch (if rated by Fitch) or whose short-term credit rating at the time of such investment or contractual commitment providing for such investment is "A-1+" by Standard & Poor's, "P-1" by Moody's, and if so rated, such rating is not on watch for downgrade by Moody's, and "F1+" by Fitch (if rated by Fitch) at the time of such investment; provided that (i) in each case, the issuer thereof must have at the time of such investment or contractual commitment providing for such investment a long-term credit rating of not less than "Aa2" by Moody's, and if so rated, such rating is not on watch for downgrade by Moody's, "AA+" by Fitch (if rated by Fitch) and (ii) if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment or contractual commitment providing for such investment a long-term credit rating of not less than "AA+" by Standard & Poor's, "Aa2" by Moody's, and if so rated, such rating is not on watch for downgrade by Moody's, and "AA+" by Fitch (if rated by Fitch);

(e)        Registered debt securities bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States or any state thereof that have a credit rating at the time of such investment or contractual commitment providing for such investment of not less than "AA" by Standard & Poor's, "Aa2" by Moody's, and if so rated, such rating is not on watch for downgrade by Moody's and "AA+" by Fitch (if rated by Fitch);

(f)        commercial paper or other short-term obligations with a maturity of not more than 183 days from the date of issuance and having at the time of such investment or contractual commitment providing for such investment a credit rating of "A-1+" by Standard & Poor's and "F1+" by Fitch (if rated by Fitch); provided that (i) in each case, the issuer thereof must have at the time of such investment or contractual commitment providing for such investment a long-term credit rating of not less than "Aa2" by Moody's, and if so rated, such rating is not on watch for downgrade by Moody's and "AA+" by Fitch (if rated by Fitch) and (ii) if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment or contractual commitment providing for such investment a long-term credit rating of not less than "AA" by Standard & Poor's and "AA+" by Fitch (if rated by Fitch);

(g)        Reinvestment Agreements issued by any bank (if treated as a deposit by such bank), or a Registered Reinvestment Agreement issued by any insurance company or other corporation or entity organized under the laws of the United States or any state thereof (if treated as debt for tax purposes by the issuer), in each case, that has a credit rating of not less than "A-1+" by Standard & Poor's, "P-1" by Moody's, and if so rated, such rating is not on watch for downgrade by Moody's and "F1+" by Fitch (if rated by Fitch); provided that (i) in each case, the issuer thereof must have at the time of such investment or contractual commitment providing for such investment a long-term credit rating of not less than "Aa2" by Moody's, and if so rated, such rating is not on watch for downgrade by Moody's, "AA+" by Fitch (if rated by Fitch) and (ii) if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment or contractual commitment providing for such investment a long-term credit rating of not less than "AA" by Standard & Poor's and "AA+" by Fitch (if rated by Fitch);

(h)        any money market fund or similar investment vehicle having at the time of investment therein the highest credit rating assigned by each of the Rating Agencies; provided that (i) such fund or vehicle is formed and has its principal office outside the United States, (ii) no income to be received from such fund or vehicle is or will be

19

subject to deduction or withholding for or on account of any withholding or similar tax, and (iii) the ownership of an interest in such fund or vehicle will not subject the Issuer to net income tax in any jurisdiction;

(i)    any guaranteed investment contract, asset swap, funding agreement, investment agreement or other similar agreement from, or a note or a certificate backed by any guaranteed investment contract, funding agreement, investment agreement or other similar agreement from, a bank, insurance company or other corporation or entity and has a long term unsecured obligation rating of at least "AA-" by Standard & Poor's and at least "Aa3" by Moody's; and

(j)    any other security the acquisition of which satisfies the Rating Condition and the ownership of which will not subject the Issuer to income tax on a net income basis for U.S. Federal income tax purposes;

and, in each case (other than clause (a) or (i) or (j)), with a Stated Maturity (giving effect to any applicable grace period) no later than the Business Day immediately preceding the Distribution Date immediately following the Due Period in which the date of investment occurs; provided that Eligible Investments may not include (i) any security that does not provide for the repayment of a stated fixed amount of principal in one or more installments, any interest-only security, any security purchased at a price in excess of one hundred percent (100%) of the par value thereof or any security whose repayment is subject to substantial non-credit related risk as determined in the reasonable business judgment of the Collateral Manager, (ii) any Floating Rate Security whose interest rate is inversely or otherwise not proportionately related to an interest rate index or is calculated as other than the sum of an interest rate index plus a spread, (iii) any security subject to withholding tax in any jurisdiction or (iv) any security that is subject to an Offer and has not been called for redemption. Notwithstanding the foregoing, Eligible Investments shall not include PIK Bonds, CMBS Securities, RMBS Securities, Margin Stock, Principal Only Securities and any security with a rating from Standard & Poor's which includes the subscript "p," "pi," "q," "r" or "t". The Trustee or its Affiliates are permitted to receive additional compensation that could be deemed to be in the Trustee's economic self-interest for (x) serving as investment advisor, administrator, shareholder servicing agent, custodian or sub-custodian with respect to certain of the Eligible Investments, (y) using Affiliates to effect transactions in certain Eligible Investments and (z) effecting transactions in certain Eligible Investments; provided, however, that such compensation shall not be an amount that is reimbursable or payable by the Issuer or otherwise pursuant to this Indenture. For the avoidance of doubt, an Eligible Investment is not an Underlying Asset.

"**Eligible Substitute Asset**" means any Underlying Asset (which shall mean with respect to a Synthetic Security, the related Reference Obligation):

(i)    which is an RMBS Security or an Other ABS Security;

(ii)    that is not deferring interest and has not capitalized interest that has not been paid in full;

(iii)    that has a Principal/Notional Balance at least equal to that of the Underlying Asset designated for replacement by the Collateral Manager at the time of disposition; provided that if two or more Eligible Substitute Assets are purchased with the Disposition Proceeds of the Underlying Asset designated for replacement by the Collateral Manager, the Aggregate Principal/Notional Balance of such Eligible Substitute Assets shall be at least equal to the Principal/Notional Balance of the Underlying Asset designated for replacement at the time of sale;

(iv)    that has an Average Life that is equal to or shorter than that of the Underlying Asset designated by the Collateral Manager for replacement;

(v)    whose obligor or issuer is incorporated or organized under the laws of the United States;

(vi)    that has a Moody's Rating and Standard & Poor's Rating greater than that or equal to that the Underlying Asset designated for replacement had at the time it was purchased by the Issuer; and

(vii)    that satisfies the Substitution Criteria.

20

"**Equipment Lease Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from leases and subleases of equipment to commercial and industrial customers, generally having the following characteristics: (1) the leases and subleases have varying contractual maturities; (2) the leases or subleases are obligations of a relatively limited number of obligors and accordingly represent an undiversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, sublessee or third party of the underlying equipment; and (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to payments at the end of lease term for excess usage.

"**Equity Security**" means any equity security (which shall mean with respect to a Synthetic Security, the related Reference Obligation) which is acquired by the Issuer as a result of the exercise or conversion of an Underlying Asset, in conjunction with the purchase of an Underlying Asset or in exchange for a Defaulted Security and which does not entitle the holder thereof to receive periodic payments of interest and one or more installments of principal.

"**ERISA**" has the meaning specified in Section 2.4.

"**Euroclear**" means Euroclear Bank S.A./N.V. as operator of the Euroclear System.

"**Event of Default**" has the meaning specified in Section 5.1.

"**Excel Default Model Input File**" means an electronic spreadsheet file including the following information (to the extent such information is not confidential) with respect to each Underlying Asset: (a) the name and country of domicile of the issuer thereof and the particular issue held by the Issuer, (b) the CUSIP or other applicable identification number associated with such Underlying Asset, (c) the par value of such Underlying Asset, (d) the type of issue (including, by way of example, whether such Underlying Asset is a bond, loan or asset-backed security), using such abbreviations as may be selected by the Trustee, (e) a description of the index or other applicable benchmark upon which the interest payable on such Underlying Asset is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR), (f) the coupon (in the case of an Underlying Asset which bears interest at a fixed rate) or the spread over the applicable index (in the case of an Underlying Asset which bears interest at a floating rate), (g) the S&P Industry Classification Group for such Underlying Asset, (h) the stated maturity date of such Underlying Asset, (i) the Standard & Poor's rating of such Underlying Asset or the issuer thereof, as applicable, (j) the priority category assigned by Standard & Poor's to such Underlying Asset, if available, (k) the Balance of the Cash and Eligible Investments in the Accounts and (k) such other information as the Trustee may determine to include in such file.

"**Excepted Property**" means (a) the Preference Share Payment Account and all of the funds and other property from time to time deposited in or credited to the Preference Share Payment Account and the proceeds thereof, (b) $250 representing the paid share capital on the ordinary shares of the Issuer, (c) $250 representing the paid share capital on the Common Stock of the Co-Issuer and (d) $250 representing a profit fee to the Issuer, together with any interest accruing thereon, and the non-interest bearing trust account in which such monies are held.

"**Excess Amounts**" mean the Excess Principal Proceeds and the Excess Interest.

"**Excess Interest**" has the meaning specified in Section 11.1(a)(i).

"**Excess Principal Proceeds**" has the meaning specified in Section 11.1(a)(ii).

"**Exchange**" means the Irish Stock Exchange Limited.

"**Exchange Act**" means the United States Securities Exchange Act of 1934, as amended.

30775-00034 NY:1268831.8

"**Expense Account**" has the meaning specified in Section 10.4.

"**Fair Market Value**" of any Underlying Asset means, at any time, (a) an amount equal to (i) the average of the bona fide bids for such Underlying Asset obtained by the Collateral Manager at such time from any three nationally recognized dealers, which dealers are Independent from one another and from the Collateral Manager, (ii) if the Collateral Manager is in good faith unable to obtain bids from three such dealers, the lesser of the bona fide bids for such Underlying Asset obtained by the Collateral Manager at such time from any two nationally recognized dealers chosen by the Collateral Manager, which dealers are Independent from each other and from the Collateral Manager or (iii) if the Collateral Manager is in good faith unable to obtain bids from two such dealers, the bona fide bid for such Underlying Asset obtained by the Collateral Manager at such time from any nationally recognized dealer chosen by the Collateral Manager, which dealer is Independent from the Collateral Manager, (b) if the Collateral Manager is unable to obtain the required bids pursuant to clause (a) above, the lesser of the bid side prices for such Underlying Asset on such date provided by two pricing services chosen by the Collateral Manager which satisfy the Rating Condition with respect to Standard & Poor's, which pricing services are Independent from each other and the Collateral Manager or (c)  if the Collateral Manager is unable to obtain prices from two pricing services pursuant to clause (b) above, the bid side price provided by one pricing service chosen by the Collateral Manager which satisfy the Rating Condition with respect to Standard & Poor's, which pricing service is Independent from the Collateral Manager, provided that (A) if the Collateral Manager is unable in good faith to obtain bona fide bids on such Underlying Asset pursuant to any of subclauses (i), (ii) and (iii) of clause (a) but is able to obtain bona fide bids from the requisite number of dealers with respect to the same security in a principal amount other than the principal amount of such Underlying Asset in accordance with such subclause, the "Fair Market Value" of such Underlying Asset shall be equal to the amount determined pursuant to such subclause using the bona fide bids (or the bona fide bid) obtained for such security in such other principal amount adjusted to reflect the actual principal amount of such Underlying Asset, (B) if the Collateral Manager is in good faith unable to obtain bona fide bids for such Underlying Asset from at least one nationally recognized dealer or to obtain prices from at least one such pricing service, the "Fair Market Value" of such Underlying Asset will be the lesser of (i) the Standard & Poor's Applicable Recovery Rate for such Underlying Asset and (ii) the value of such Underlying Asset as determined by the Collateral Manager in good faith (and the Collateral Manager will notify each Rating Agency that it has determined the Fair Market Value of such Underlying Asset pursuant to this clause (B)); *provided* that any Fair Market Value determined pursuant to this clause (B) may only be in effect for 30 calendar days, after which, if the Collateral Manager is still unable to obtain bona fide bids for such Underlying Asset from at least one nationally recognized dealer or to obtain prices from at least one such pricing service, the "Fair Market Value" of such Underlying Asset will be zero until such time that the Collateral Manager, acting in accordance with the Standard of Care, is able to obtain bona fide bids for such Underlying Asset from at least one nationally recognized dealer or to obtain prices from at least one such pricing service.

"**FASIT**" means a financial asset securitization investment trust.

"**Fee Cap Amount**" means, on any Distribution Date, 0.02% of the Quarterly Asset Amount per annum, subject to an annual minimum of $60,000.

"**FICO Score**" means the credit score developed by Fair Isaac & Co and provided by Experian (a subsidiary of GUS plc), Trans Union LLC or Equifax Inc.

"**Final Maturity Date**" means, with respect to each Class of Notes, the Stated Maturity or such earlier date, including a Redemption Date or an Accelerated Maturity Date, on which the Aggregate Outstanding Amount of such Class of Notes is paid in full.

"**First Auction Call Date**" has the meaning specified in Section 9.3(a).

"**First Distribution Date**" means the Distribution Date in November 2006.

"**First Master Agreement**" means the form of an 1992 ISDA Master Agreement (Multicurrency Cross Border), together with a schedule thereto, entered into between the Issuer and the First Synthetic Security Counterparty.

"**First Period**" has the meaning specified in Section 14.2(e).

"**First Synthetic Security Confirmation**" means the Synthetic Security Confirmation, related to the First Master Agreement, entered into between the Issuer and the First Synthetic Security Counterparty.

"**First Synthetic Security Counterparty**" means Lehman Brothers Special financing Inc.

"**Fitch**" means Fitch Ratings Inc.

"**Fixed Amount**" means, with respect to a Synthetic Security, the meaning set forth in such Synthetic Security.

"**Fixed Rate Security**" means any Asset-Backed Security other than a Floating Rate Security.

"**Floating Payments**" means, with respect to a Synthetic Security, the meaning set forth in such Synthetic Security.

"**Floating Rate Security**" means (i) any Asset-Backed Security that is expressly stated to bear interest based upon a floating rate index and (ii) any Synthetic Security so designated by the Collateral Manager at the time of purchase.

"**Flow-Through Investment Vehicle**" means any entity (a) that would be an investment company but for the exception in Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act and the amount of whose investment in the Securities exceeds forty percent (40%) of its total assets (determined on a consolidated basis with its subsidiaries), (b) as to which any Person owning any equity or similar interest in the entity has the ability to control any investment decision of such entity or to determine, on an investment-by-investment basis, the amount of such Person's contribution to any investment made by such entity, (c) that was organized or reorganized for the specific purpose of acquiring a Security or (d) as to which any Person owning an equity or similar interest therein was specifically solicited to make additional capital or similar contributions for the purpose of enabling such entity to purchase a Security.

"**Form Approved Synthetic Security**" means a Synthetic Security (i) the Reference Obligation of which, if it were an Underlying Asset, could be acquired by the Issuer without any required action by the Rating Agencies or which would satisfy the Rating Condition, and (ii) the documentation of which conforms (but for the amount and timing of periodic payments, the name of the Reference Obligation, the notional amount, the effective date, the termination date and other similarly necessary changes) to a form that satisfies the Rating Condition, provided that the Synthetic Security documentation that is attached hereby as Exhibit K and L shall be deemed to be a Form Approved Synthetic Security and (iii) with respect to which the Issuer has provided each Rating Agency with written notice of the acquisition of such Synthetic Security within 5 Business Days after such acquisition, and each notice shall include the Moody's Rating, the Moody's Rating Factor, the Moody's Recovery Rate Matrix, the Standard & Poor's Rating and the Standard & Poor's Applicable Recovery Rate, as applicable, for such Synthetic Security. The Moody's Rating of a Form Approved Synthetic Security shall be the Moody's Rating of the underlying Reference Obligation and the Standard & Poor's Rating of a Form Approved Synthetic Security shall be the Standard & Poor's Rating of the underlying Reference Obligation. Standard & Poor's may modify or rescind a Form-Approved Synthetic Security upon 30 days prior written notice, *provided* that such modification or rescission shall apply prospectively.

"**GAAP**" shall have the meaning specified in Section 6.3(k).

"**Global Notes**" means the Regulation S Global Notes and the Restricted Global Notes.

"**Grant**" means to grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, create and grant a security interest in and right of set-off against, deposit, set over and confirm. A Grant of any item of Collateral shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including the immediate continuing right to claim for, collect, receive and receipt for

30775-00034 NY:1268831.8

principal, interest and fee payments in respect of such item of Collateral, and all other funds payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"**High LTV RMBS Security**" means a Residential B/C Mortgage-Backed Security that depends primarily on the cash flow from subprime residential mortgage loans with loan-to-value ratios of greater than 80%.

"**Highest Auction Price**" means, with respect to an Auction Call Redemption, the greater of (a) the highest price bid by any Listed Bidder for all of the Underlying Assets, and (b) the sum of the highest price bid by one or more Listed Bidders for each Subpool. In each case, the price bid by a Listed Bidder shall be the dollar amount which the Auction Agent certifies to the Trustee based on the Auction Agent's review of the bids, which certification shall be binding and conclusive.

"**Holder**," "**Noteholder**," "**Preference Shareholder**" or "**Securityholder**" means, with respect to any Security, the Person in whose name such Security is registered in the Note Register or Share Register, as applicable.

"**Indenture**" means this instrument and, if from time to time supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof, as so supplemented or amended.

"**Independent**" means, as to any Person, any other Person (including, in the case of an accountant, or lawyer, a firm of accountants or lawyers and any member thereof) who (a) does not have and is not committed to acquire any material direct or any material indirect financial interest in such Person or in any Affiliate of such Person, (b) is not connected with such Person as an Officer, employee, promoter, underwriter, voting trustee, partner, director or Person performing similar functions and (c) if required to deliver an opinion or certificate to the Trustee pursuant to this Indenture, states in such opinion or certificate that the signer has read this definition and that the signer is Independent within the meaning hereof. "Independent," when used with respect to any accountant, may include an accountant who audits the books of such Person if, in addition to satisfying the criteria set forth above, the accountant is independent with respect to such Person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants.

"**Initial Interest Rate Swap Counterparty**" means Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.

"**Initial Investment Agreement**" means the guaranteed investment contract, together with the Policy, dated as of the Closing Date, among the Issuer, the Trustee and the Initial Investment Agreement Provider.

"**Initial Investment Agreement Provider**" means Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.

"**Initial Purchaser**" means Lehman Brothers Inc. and Lehman Brothers International (Europe).

"**Initial Rating**" means the ratings specified with respect to each of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes in Section 3.2(c).

"**Institutional Accredited Investor**" means an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) and (7) under the Securities Act) with a net worth of not less than $25 million.

"**Interest Collection Account**" has the meaning specified in Section 10.2(a).

"**Interest Coverage Ratios**" means with respect to (x) the Class A Notes and the Class B Notes (the "Class A/B Interest Coverage Ratio"), (y) the Class C Notes (the "Class C Interest Coverage Ratio") and (z) the Class D Notes (the "Class D Interest Coverage Ratio"), in each case, as of any Measurement Date that will be calculated by dividing:

(a)      (i) the sum (without duplication) of (A) the Scheduled Distributions of interest due (regardless of whether the Due Date for any such interest payment has yet occurred) in the Due Period in which such Measurement Date occurs on (1) the Pledged Underlying Assets and (2) any Eligible Investments held in the Collection Accounts (whether such Eligible Investments were purchased with Interest Proceeds or Principal Proceeds), (B) any fees actually received by the Issuer during such Due Period that constitute Interest Proceeds, (C) the amount, if any, scheduled to be paid to the Issuer by an Interest Rate Swap Counterparty under an Interest Rate Swap Agreement on the Distribution Date relating to such Due Period, and (D) any earnings on Eligible Investments in the Synthetic Security Collateral Account constituting Interest Proceeds, received during the related Collection Period and after the end of the related Collection Period and immediately prior to the related Distribution Date, minus (ii) the sum of (A) the amount, if any, scheduled to be paid to an Interest Rate Swap Counterparty by the Issuer under an Interest Rate Swap Agreement on the Distribution Date relating to such Due Period, (B) the amount, if any, scheduled to be paid to the payment of taxes and filing and registration fees owed by the Issuers, (C) the amount, if any, scheduled to be paid (1) to the payment to the Trustee, the Auction Agent, the Note Registrar, the Share Registrar, the Collateral Administrator and the Administrator of accrued and unpaid fees and expenses owing to them under this Indenture, the Management Agreement, the Preference Share Paying Agency Agreement, the Collateral Administration Agreement and the Administration Agreement, and (2) to the payment of other accrued and unpaid Administrative Expenses of the Issuers (excluding Management Fees and principal and interest on the Notes), to the extent all such payments pursuant to this clause (C) do not exceed for any calendar quarter an amount equal to the Fee Cap Amount plus an amount up to $150,000 per annum, and (D) the amount, if any, scheduled to be paid to the payment to the Collateral Manager of accrued and unpaid Management Fees; by

(b)      an amount equal to (i) in the case of the Class A/B Interest Coverage Ratio, the Class A Interest Distribution Amount and the Class B Interest Distribution Amount payable on the immediately succeeding Distribution Date, or (ii) in the case of the Class C Interest Coverage Ratio, the Class A Interest Distribution Amount, the Class B Interest Distribution Amount and the Class C Interest Distribution Amount payable on the immediately succeeding Distribution Date, or (iii) in the case of the Class D Interest Coverage Ratio, the sum of the Class A Interest Distribution Amount, the Class B Interest Distribution Amount, the Class C Interest Distribution Amount and the Class D Interest Distribution Amount payable on the immediately succeeding Distribution Date.

"**Interest Coverage Tests**" means the Class A/B Interest Coverage Test, the Class C Interest Coverage Test and the Class D Interest Coverage Test.

"**Interest Distribution Amount**" means, with respect to any Distribution Date, the sum of the Class A-1 Interest Distribution Amount, the Class A-2 Interest Distribution Amount, the Class B Interest Distribution Amount, the Class C Interest Distribution Amount, the Class D Interest Distribution Amount and the Class E Interest Distribution Amount.

"**Interest Period**" means, subject to Section 14.9 hereof, (a) with respect to the First Distribution Date and for the purposes of calculating LIBOR and scheduled interest on the Notes payable at the applicable Note Interest Rate on such Distribution Date, the period from and including the Closing Date to and excluding the First Distribution Date, and (b) with respect to each Distribution Date thereafter, the period from, and including, the immediately preceding Distribution Date and ending on, but excluding, such Distribution Date.

"**Interest Proceeds**" means, with respect to any Due Period:

(1) the sum (without duplication) of (a) all payments of interest and other income on the Underlying Assets and Delivered Obligations (other than Defaulted Securities) received in Cash during such Due Period; (b) all payments of interest (including any amount representing the accreted portion of a discount from the face amount of an Eligible Investment) on Eligible Investments in the Collection Accounts received in Cash by the Issuer during such Due Period and all payments of principal, including repayments, on Eligible Investments purchased with amounts from the Interest Collection Account received by the Issuer during such Due Period; (c) all amendment and waiver fees, all late payment fees, and all other fees and commissions received in Cash by the Issuer during such Due Period in connection with such Underlying Assets and Eligible Investments (other than fees and commissions received in respect of Defaulted Securities and Written Down Securities and yield maintenance payments, restructuring and fees included in Principal Proceeds pursuant to clauses (c) and (j) of the definition thereof); (d) all

25

payments of interest received in respect of a Defaulted Security in excess of an amount equal to the Principal/Notional Balance of such Defaulted Security at the time it became a Defaulted Security; (e) all payments received pursuant to the Interest Rate Swap Agreement (excluding any payments received by the Issuer by reason of an event of default or termination event) less any deferred premium payments, if any, payable by the Issuer under the Interest Rate Swap Agreement with respect to such Due Period; (f) all accrued interest received in cash by the Issuer in connection with the sale or liquidation of any Underlying Asset other than accrued interest purchased with Principal Proceeds; (g) any amounts received from each Synthetic Security Counterparty relating to each Synthetic Security with respect to such Due Period (including any Fixed Amounts and Interest Shortfall Reimbursement Payment Amounts but excluding, for the avoidance of doubt, any premium relating to the following Due Period), other than Writedown Reimbursement Payment Amounts, Principal Shortfall Reimbursement Payment Amounts, any upfront payment or any termination payment received with respect to early termination of a Synthetic Security (including proceeds from liquidation of any collateral posted by the Synthetic Security Counterparty to secure its obligations under the Synthetic Securities); (h) all earnings on Eligible Investments on deposit in the Synthetic Security Collateral Account that are transferred to the Interest Collection Account pursuant to Section 10.2(k); (i) all Earnings (as defined in the related Investment Agreement) received by the Issuer and payable under the Investment Agreement on or before the related Distribution Date; and (j) all amounts on deposit in the Expense Account that are transferred to the Payment Account for application as Interest Proceeds pursuant to Section 10.4(a); provided that Interest Proceeds shall in no event include (i) any payment or proceeds specifically defined as "Principal Proceeds" in the definition thereof or (ii) the Excepted Property;

(2) minus any Interest Shortfall Amounts paid by the Issuer to each Synthetic Security Counterparty.

"**Interest Rate Swap Agreement**" means (i) the initial ISDA Master Agreement, including any schedules and any confirmations thereto, each dated the Closing Date, or any replacement thereto and (ii) any Additional Interest Rate Swap Agreement executed after the Closing Date, in each case between the Issuer and the relevant Interest Rate Swap Counterparty.

"**Interest Rate Swap Counterparty**" means the Initial Interest Rate Swap Counterparty or any replacement or additional counterparty which satisfies (or the guarantor of which satisfies) the Interest Rate Swap Counterparty Ratings Requirement should a replacement Interest Rate Swap Agreement or Additional Interest Rate Swap Agreement be entered into pursuant to Section 16.1.

"**Interest Rate Swap Counterparty Collateral Account**" has the meaning specified in Section 10.5.

"**Interest Rate Swap Counterparty Ratings Requirement**" means, with respect to an Interest Rate Swap Counterparty or any transferee thereof, that it shall at all times satisfy the following requirements:

(a)    either:

(1)    the unsecured, unguaranteed and otherwise unsupported short-term debt obligations of the Interest Rate Swap Counterparty or such transferee (or any Affiliate of the Interest Rate Swap Counterparty or such transferee that unconditionally and absolutely guarantees the obligations of the Interest Rate Swap Counterparty or such transferee with respect to the Interest Rate Swap Agreement) are rated at least "A-1" by Standard & Poor's; or

(2)    if the Interest Rate Swap Counterparty or such transferee does not have a short-term credit rating, then the unsecured, unguaranteed and otherwise unsupported senior long-term debt obligations of the Interest Rate Swap Counterparty or such transferee (or any Affiliate of the Interest Rate Swap Counterparty or such transferee that unconditionally and absolutely guarantees the obligations of the Interest Rate Swap Counterparty or such transferee with respect to the Interest Rate Swap Agreement) are rated at least "A+" by Standard & Poor's; and

(b)    either:

26

(1)    the unsecured, unguaranteed and otherwise unsupported long-term senior debt obligations of the Interest Rate Swap Counterparty or such transferee (or any Affiliate of the Interest Rate Swap Counterparty or such transferee that unconditionally and absolutely guarantees the obligations of the Interest Rate Swap Counterparty or such transferee with respect to the Interest Rate Swap Agreement) are rated at least "Aa3" by Moody's and not on watch for possible downgrade and no short-term rating is available from Moody's; or

(2)    the unsecured, unguaranteed and otherwise unsupported short-term senior debt obligations of the Interest Rate Swap Counterparty or such transferee (or any Affiliate of the Interest Rate Swap Counterparty or such transferee that unconditionally and absolutely guarantees the obligations of the Interest Rate Swap Counterparty or such transferee with respect to the Interest Rate Swap Agreement) are rated at least "P-1" by Moody's and not on watch for possible downgrade, and the unsecured, unguaranteed and otherwise unsupported long-term senior debt obligations of the Interest Rate Swap Counterparty or such transferee (or any Affiliate of the Interest Rate Swap Counterparty or such transferee that unconditionally and absolutely guarantees the obligations of the Interest Rate Swap Counterparty or such transferee with respect to the Interest Rate Swap Agreement) are rated at least "A1" by Moody's and not on watch for possible downgrade.

For the purpose of this definition, no direct or indirect recourse against one or more shareholders of an Interest Rate Swap Counterparty (or against any Person in control of, or controlled by, or under common control with, any such shareholder) shall be deemed to constitute a guarantee, security or support of the obligations of such Interest Rate Swap Counterparty.

"**Interest Shortfall Amount**" means, with respect to a Synthetic Security, the meaning set forth therein.

"**Interest Shortfall Reimbursement Payment Amount**" means, with respect to a Synthetic Security, the meaning set forth therein.

"**Investment Agreement**" means the Initial Investment Agreement and any Replacement Investment Agreement, as the context requires.

"**Investment Company Act**" means the U.S. Investment Company Act of 1940, as amended, and the rules thereunder.

"**Irish Paying Agent**" has the meaning specified in Section 7.2.

"**Issue**" means Asset-Backed Securities issued by the same issuer and secured by the same pool of collateral.

"**Issue Price**" has the meaning given to such term in the Preference Share Paying Agency Agreement.

"**Issuer**" means Gemstone CDO VI Ltd., an exempted company with limited liability incorporated and existing under the laws of the Cayman Islands, unless a successor Person shall have become the Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Issuer" shall mean such successor Person.

"**Issuer Charter**" means the Memorandum of Association and Articles of Association of the Issuer, filed under the Companies Law (2004 Revision) of the Cayman Islands, as modified and supplemented and in effect from time to time.

"**Issuer Order**" and "**Issuer Request**" mean, respectively, a written order or a written request, in each case dated and signed in the name of the Issuer by an Authorized Officer of the Issuer and (if appropriate) the Co-Issuer, or by an Authorized Officer of the Collateral Manager where permitted pursuant to this Indenture or the Management Agreement, as the context may require or permit.

"**Issuers**" or "**Co-Issuers**" means the Issuer and the Co-Issuer.

"**Knowledgeable Employee**" means a "knowledgeable employee" (with respect to the Issuer) as specified in Rule 3c-5 promulgated under the Investment Company Act.

"**LIBOR**" has the meaning specified in Schedule B.

"**LIBOR Business Day**" has the meaning specified in Schedule B.

"**LIBOR Determination Date**" has the meaning specified in Schedule B.

"**Liquidation Preference**" means an amount equal to $1,000 per Preference Share.

"**Listing Agent**" means RSM Robson Rhodes LLP.

"**Listed Bidders**" has the meaning specified in Schedule G.

"**London Banking Day**" has the meaning specified in Schedule B.

"**Majority**" means, with respect to any Class or Classes of Notes, the Holders of more than fifty percent (50%) of the Aggregate Outstanding Amount of the Notes of such Class or Classes of Notes, as the case may be, and, with respect to the Preference Shares, a Majority-in-Interest of Preference Shareholders.

"**Majority-in-Interest of Preference Shareholders**" means, at any time, Preference Shareholders whose aggregate Voting Percentages at such time exceed fifty percent (50%) of all Preference Shareholders' Voting Percentages at such time.

"**Management Agreement**" means the Collateral Management Agreement, dated as of the Closing Date, between the Issuer and the Collateral Manager relating to the Securities and the Collateral, as amended from time to time in accordance with the terms thereof and Article XV.

"**Management Fee**" means the fee which will accrue from the Closing Date at a rate per annum of 0.30% on the Quarterly Asset Amount, payable to the Collateral Manager in arrears on each Distribution Date, as compensation for the performance of its obligations as Collateral Manager under the Management Agreement. Any Management Fee accrued prior to the resignation or removal of the Collateral Manager will continue to be payable to the Collateral Manager on the Distribution Date immediately following the effectiveness of such resignation or removal. This payment will be made to the extent of the funds available for such purpose in accordance with the Priority of Payments.

"**Manager Order**" means a written order of an Authorized Officer of the Collateral Manager.

"**Margin Stock**" means "margin stock" as defined under Regulations T, U and X issued by the Board of Governors of the Federal Reserve System.

"**Master Agreement**" means (i) the form of an 1992 ISDA Master Agreement (Multicurrency Cross Border), together with the schedule thereto, entered into between the Issuer and a Synthetic Security Counterparty (other than the First Synthetic Security Counterparty) and (ii) the First Master Agreement.

"**Maturity**" means, with respect to any Note, the date on which all outstanding unpaid principal of such Note becomes due and payable as therein or herein provided, whether at the Stated Maturity or by declaration of acceleration, call for redemption or otherwise.

"**Measurement Date**" means any of the following: (a) any date after the Closing Date on which an Underlying Asset becomes a Defaulted Security, (b) each Determination Date, (c) the last Business Day of any calendar month (other than the month prior to a Determination Date), and (d) with reasonable notice to the Issuer and the Trustee, any other Business Day that any Rating Agency requests be a "Measurement Date"; provided that,

if any such date would otherwise fall on a day that is not a Business Day, the relevant Measurement Date will be the next succeeding day that is a Business Day.

"**Mid-Prime Securities**" means Residential Securities that have a FICO Score above 625 and below 700.

"**Minimum Preference Share Redemption Amount**" means an amount equal to (a) the Aggregate Liquidation Preference minus (b) the aggregate amount of all cash distributions on the Preference Shares (whether in respect of dividends or redemption payments) made to the Preference Share Paying Agent for distribution to the Preference Shareholders prior to the relevant Auction Date.

"**Money**" has the meaning specified in Section 1-201 of the UCC.

"**Monthly Report**" has the meaning specified in Section 10.8(a).

"**Moody's**" means Moody's Investors Service, Inc. and any successor or successors thereto.

"**Moody's Asset Correlation Test**" means a test which is satisfied if the Moody's Correlation Factor is equal to or less than 19.5%; provided that that a single obligation Synthetic Security will be included as an Asset-Backed Security having the characteristics of the related Reference Obligation (and the issuer thereof will be deemed to be the related Reference Obligor and not the Synthetic Security Counterparty). For the purpose of this test, the number of assets is 90.

"**Moody's Correlation Factor**" as of the Closing Date, is 18.6%.

"**Moody's Minimum Weighted Average Recovery Rate Test**" means a test which is satisfied as of the Closing Date if the Moody's Weighted Average Recovery Rate is greater than or equal to 23.5%.

"**Moody's Rating**" has the meaning ascribed to such term in Schedule L.

"**Moody's Weighted Average Rating Factor**" means the number determined by dividing:

(a)     the summation of the series of products obtained for any Underlying Asset that is not a Defaulted Security, by multiplying (i) the Principal/Notional Balance of each such Underlying Asset by (ii) its respective Moody's Rating Factor (as defined in Schedule L), by

(b)     the sum of the Aggregate Principal/Notional Balance of all Underlying Assets that are not Defaulted Securities.

"**Moody's Weighted Average Rating Factor Test**" means a test which is satisfied as of the Closing Date if the Moody's Weighted Average Rating Factor of the Underlying Assets is equal to a numerical value of not more than 650.

"**Moody's Weighted Average Recovery Rate**" means the number obtained by summing the products obtained by multiplying the Principal/Notional Balance of each Underlying Asset (excluding any Defaulted Security) by its applicable recovery rate (determined for purposes of this definition in accordance with Schedule M), dividing such sum by the Aggregate Principal/Notional Balance of all such Underlying Assets, multiplying the result by 100 and rounding up to the first decimal place.

"**Net Outstanding Underlying Asset Balance**" means, as of any Measurement Date, an amount equal to (a) the sum of (i) the Aggregate Principal/Notional Balance on such Measurement Date of all Pledged Underlying Assets, (ii) the Aggregate Principal/Notional Balance of all Specified Assets, and (iii) for each Defaulted Security, the Calculation Amount with respect to such Defaulted Security minus (b) the Aggregate Principal/Notional Balance on such Measurement Date of all Pledged Underlying Assets that are either (i) Defaulted Securities or (ii) Equity Securities; provided that solely for the purpose of calculating the Net Outstanding Underlying Asset Balance in

connection with the Class A/B Overcollateralization Ratio, the Class C Overcollateralization Ratio and the Class D Overcollateralization Ratio:

      (a)      if any Underlying Asset has a Moody's Rating of below "Baa3", and:

      (1)      if on any date the Aggregate Principal/Notional Balance (determined without regard to this clause (a)) of all Underlying Assets (other than Defaulted Assets and Deferred Interest PIK Bonds) that have a Moody's Rating of "Ba1", "Ba2" or "Ba3" exceeds 38.1% of the Aggregate Principal/Notional Balance as of the Closing Date of all Underlying Assets and Principal Proceeds, then the Aggregate Principal/Notional Balance of the Underlying Assets constituting such excess shall be deemed to equal 90% of the actual Aggregate Principal/Notional Balance of such Underlying Assets (determined without regard to this clause (a));

      (2)      if on any date the Aggregate Principal/Notional Balance (determined without regard to this clause (a)) of all Underlying Assets (other than Defaulted Assets and Deferred Interest PIK Bonds) that have a Moody's Rating of "B1", "B2" or "B3" exceeds 5.0% of the Aggregate Principal/Notional Balance as of the Closing Date of all Underlying Assets and Principal Proceeds, then the Aggregate Principal/Notional Balance of the Underlying Assets constituting such excess shall be deemed to equal 80% of the actual Aggregate Principal/Notional Balance of such Underlying Assets (determined without regard to this clause (a)); and

      (3)      if such Underlying Assets (other than Defaulted Assets and Deferred Interest PIK Bonds) have a Moody's Rating of below "B3", then the Aggregate Principal/Notional Balance of such Underlying Assets shall be deemed to equal 50% of the actual Aggregate Principal/Notional Balance of such Underlying Assets (determined without regard to this clause (a)).

Solely for purposes of the calculation of the Class A/B Overcollateralization Ratio, the Class C Overcollateralization Ratio and the Class D Overcollateralization Ratio (and without duplication of any reduction under clauses (a) of the definition of Net Outstanding Underlying Asset Balance), the Principal/Notional Balance of any Discount Underlying Asset shall be the original acquisition price of such Discount Underlying Asset.

"**Non-Subprime Home Equity Loan Asset-Backed Securities**" means Asset-Backed Securities (other than Residential B/C Mortgage-Backed Securities and Residential A Mortgage-Backed Securities) that entitle their holders to receive payments that depend primarily on the cash flow from balances (including revolving balances) outstanding under loans or lines of credit to non-subprime borrowers secured by residential real estate (single or two-to-four-family properties) the proceeds of which loans or lines of credit are not generally used to purchase such real estate or to purchase or construct dwellings thereon (or to refinance indebtedness previously used for such purchase or construction), generally having the following characteristics: (1) the balances have standardized payment terms and require minimum monthly payments; (2) the balances are obligations of numerous borrowers and accordingly represent a diversified pool of obligor credit risk; (3) the repayment stream on such balances does not depend upon a contractual payment schedule, with early repayment depending primarily on interest rates and general economic matters; and (4) the loan or line of credit may be secured by residential real estate with a market value (determined on the date of origination of such loan or line of credit) that is less or more than the original proceeds of such loan or line of credit.

"**Note Interest Rate**" means, with respect to each Class of Notes for any Interest Period, the Class A-1 Note Interest Rate, the Class A-2 Note Interest Rate, the Class B Note Interest Rate, the Class C Note Interest Rate, the Class D Note Interest Rate or the Class E Note Interest Rate, as applicable.

"**Note Offering Circular**" means the Offering Circular, prepared and delivered in connection with the offer and sale of the Notes as amended or supplemented on or prior to the Closing Date.

"**Note Purchase Agreement**" means the Note Purchase Agreement, dated as of the Closing Date, by and among the Issuers and the Initial Purchaser in which the Issuers have agreed to sell the Notes to the Initial Purchaser and the Initial Purchaser has agreed to purchase the Notes from the Issuers.

"**Note Register**" and "**Note Registrar**" have the respective meanings specified in Section 2.4(a).

"**Note Valuation Report**" has the meaning specified in Section 10.8(b).

"**Noteholder**" has the meaning specified under "Holder" above.

"**Notes**" means the Class A Notes, Class B Notes, Class C Notes, Class D Notes and Class E Notes authorized by, and authenticated and delivered under, this Indenture.

"**Offer**" means, with respect to any security, (i) any offer by the issuer of such security or by any other person made to all of the holders of such security to purchase or otherwise acquire such security (other than pursuant to any redemption in accordance with the terms of its Underlying Instruments) or to convert or exchange such security into or for cash, securities or any other type of consideration or (ii) any solicitation by the issuer of such security or any other person to amend, modify or waive any provision of such security or any of its Underlying Instruments.

"**Offering**" means the offering of the Notes under the Note Offering Circular and the Preference Shares under the Preference Share Private Placement Memorandum in privately negotiated transactions.

"**Officer**" means (a) with respect to the Issuer, the Co-Issuer and any corporation, the Chairman of the Board of Directors (or, with respect to the Issuer, any director), the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer or an Assistant Treasurer of such entity; and (b) with respect to any bank or trust company acting as trustee of an express trust or as custodian, any Trust Officer.

"**Opinion of Counsel**" means a written opinion addressed to the Trustee and each Rating Agency (each, a "Recipient") (or, if not addressed to each Rating Agency, one which states that each Rating Agency shall be entitled to rely thereon), in form and substance reasonably satisfactory to each Recipient, of an attorney at law admitted to practice before the highest court of any state of the United States or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands), which attorney may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer, the Co-Issuer or the Collateral Manager, as the case may be, and which attorney shall be reasonably satisfactory to the Trustee. Whenever an Opinion of Counsel is required hereunder, such Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory which opinions of other counsel shall accompany such opinion of Counsel and shall either be addressed to each Recipient or shall state that each Recipient shall be entitled to rely thereon.

"**Optional Redemption**" has the meaning specified in Section 9.4.

"**Ordinary Shares**" means the authorized ordinary shares of the Issuer, which consists of 250 ordinary shares, $1.00 par value per ordinary share, all of which shares have been issued to the Share Trustee.

"**Other ABS Security**" means a CMBS Security, a Credit Card Security or a Student Loan Security.

"**Outstanding**" means (a) with respect to the Notes or a particular Class of Notes, as of any date of determination, all of (i) the Notes or (ii) the Notes of such Class, as the case may be, theretofore authenticated and delivered under this Indenture except:

      (A)     Notes theretofore canceled by the Note Registrar or delivered to the Note Registrar for cancellation;

      (B)     Notes or portions thereof for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for the Holders of such Notes; provided that, if such Notes or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

31

(C)      Notes in exchange for, or in lieu of, other Notes which have been authenticated and delivered pursuant to this Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a holder in due course; and

(D)      Notes alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes have been issued as provided in Section 2.5; and

(b)      with respect to the Preference Shares, as of any date of determination, all of the Preference Shares then issued and which have not theretofore been redeemed;

*provided*, that in determining whether the Holders of the requisite Aggregate Outstanding Amount have given any request, demand, authorization, direction, notice, consent or waiver hereunder, (a) Securities beneficially owned by the Issuer or the Co-Issuer or any other obligor on the Securities or any Affiliate of either of them shall be disregarded and deemed not to be outstanding and (b) Collateral Manager Securities shall be disregarded and deemed not to be outstanding with respect to any vote or consent of the Holders on any assignment or termination of the Management Agreement (including the exercise of any rights to remove the Collateral Manager or terminate the Management Agreement), or any amendment or other modification of the Management Agreement or this Indenture increasing the rights or decreasing the obligations of the Collateral Manager except that, in determining whether the Trustee shall be fully protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Securities that a Trust Officer of the Trustee actually knows to be beneficially owned in the manner indicated in clause (a) or (b) above shall be so disregarded. Securities owned in the manner indicated in clause (a) or (b) above that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Securities and that the pledgee is not the Issuer, the Co-Issuer, the Collateral Manager or any other obligor upon the Securities or any Affiliate of the Issuer, the Co-Issuer, the Collateral Manager or such other obligor or an account for which the Collateral Manager or an Affiliate of the Collateral Manager acts as investment adviser (and for which the Collateral Manager or such Affiliate has discretionary authority).

"**Overcollateralization Ratio**" means the Class A/B Overcollateralization Ratio, the Class C Overcollateralization Ratio or the Class D Overcollateralization Ratio.

"**Overcollateralization Tests**" means the Class A/B Overcollateralization Test, the Class C Overcollateralization Test and the Class D Overcollateralization Test.

"**Paying Agent**" means any Person authorized by the Issuer to pay the principal of or interest on any Notes on behalf of the Issuer as specified in Section 7.2.

"**Payment Account**" has the meaning specified in Section 10.3.

"**Permanent Regulation S Global Note**" means with respect to any Class of Notes, the Temporary Regulation S Global Note issued pursuant to Section 2.1(a), substantially in the form of Exhibit A-2.

"**Permitted Other Jurisdictions**" has the meaning specified in Section 7.10(a)(i).

"**Person**" means an individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, unincorporated association, government or any agency or political subdivision thereof, or any other entity or organization, whether or not a legal entity.

"**Physical Settlement Amounts**" means, with respect to a Synthetic Security, the meaning set forth therein.

"**PIK Bond**" means any Underlying Asset that pursuant to the terms of the related Underlying Instruments (a) permits the payment of interest thereon (with respect to such payments due on or after the date on which the security is purchased by the Issuer) to be deferred and capitalized as additional principal thereof or (b) issues identical (except principal and term) securities in place of payments of interest in Cash.

"**Pledged Securities**" means, on any date of determination, (a) the Underlying Assets, Equity Securities and the Eligible Investments that have been Granted to the Trustee and (b) all non-Cash proceeds thereof, in each case, to the extent not released from the lien of this Indenture pursuant hereto.

"**Pledged Underlying Asset**" means, as of any date of determination, any Underlying Asset that has been Granted to the Trustee and has not been released from the lien of this Indenture pursuant to Section 10.9.

"**Portfolio Characteristics**" has the meaning specified in Section 12.2(b).

"**Preference Share Documents**" means the Preference Share Paying Agency Agreement and the Issuer Charter.

"**Preference Share Paying Agency Agreement**" means the Preference Share Paying Agency Agreement, dated as of the Closing Date, between the Issuer, the Preference Share Paying Agent, the Preference Share Transfer Agent and the Share Registrar.

"**Preference Share Paying Agent**" means the Bank, acting through an affiliate or agent outside the United States, solely in its capacity as Preference Share Paying Agent under the Preference Share Paying Agency Agreement, unless a successor Person shall have become the Preference Share Paying Agent pursuant to the applicable provisions of the Preference Share Paying Agency Agreement, and thereafter, the Preference Share Paying Agent shall mean such successor Person.

"**Preference Share Payment Account**" means a segregated non-interest bearing trust account established by the Preference Share Paying Agent pursuant to the Preference Share Paying Agency Agreement into which the Preference Share Paying Agent will deposit all amounts distributable to the holders of the Preference Shares under the Priority of Payments.

"**Preference Share Private Placement Memorandum**" means the Private Placement Memorandum, prepared and delivered in connection with the offer and sale of the Preference Shares as amended or supplemented on or prior to the Closing Date.

"**Preference Share Redemption Price**" means the price paid to redeem the Preference Shares which is a percentage of the Aggregate Outstanding Amount thereof equal to a fraction the numerator of which is the Available Redemption Amount remaining after giving effect to redemption of the Notes and payment of all fees and expenses of the Issuer in accordance with the Priority of Payments and the denominator of which is the Aggregate Outstanding Amount of the Preference Shares to be redeemed.

"**Preference Share Transfer Agent**" means the Bank, solely in its capacity as Preference Share Transfer Agent under the Preference Share Paying Agency Agreement, unless a successor Person shall have become the Preference Share Transfer Agent pursuant to the applicable provisions of the Preference Share Paying Agency Agreement, and thereafter, the Preference Share Transfer Agent shall mean such successor Person.

"**Preference Shareholder**" has the meaning specified under "Holder" above.

"**Preference Shares**" means the Preference Shares, par value $0.01 per Preference Share, authorized, allotted and issued by the Issuer pursuant to the Preference Share Documents.

"**Prime Securities**" means Residential Securities that have a FICO Score equal to or above 700.

"**Principal/Notional Balance**" or "**Par**" means, as of any date of determination, with respect to any Asset Backed Security, the outstanding principal balance of such Asset Backed Security (excluding any capitalized interest and any negative amortization amounts) and, with respect to any Synthetic Security or a related Reference Obligation, in each case, the Reference Obligation Notional Amount (as defined in the Synthetic Security Confirmation Form) of such Synthetic Security; provided that

(a)      the Principal/Notional Balance of any Equity Security shall be deemed to be zero;

(b)      the Principal/Notional Balance of any Written Down Security shall be reduced to reflect the percentage by which the aggregate par amount of the entire issue of such Underlying Asset (taking into account all securities ranking senior in priority of payment thereto and secured by the same pool of collateral) exceeds the aggregate par amount (including reserved interest or other amounts available for overcollateralization) of all collateral securing such issue (excluding defaulted collateral), as determined by the Collateral Manager using customary procedures and information available in the servicer reports relating to such Underlying Asset.

"**Principal Collection Account**" has the meaning specified in Section 10.2(b).

"**Principal Only Security**" means any security that does not provide for the periodic payment of interest or other distributions (other than distributions consisting of a return of capital) and is not a Zero Coupon Bond.

"**Principal Payment Amount**" means, with respect to any Reference Obligation payment date, the product of (a) the amount of any principal payment (scheduled or unscheduled) other than a payment of principal representing capitalized interest on such date and (b) Applicable Percentage (as defined in the related Synthetic Security Agreement). Any Additional Fixed Amounts are not Principal Payment Amounts.

"**Principal Proceeds**" means, with respect to any Due Period, the sum (without duplication) of: (a) all payments of principal on the Underlying Assets and Eligible Investments (excluding any amount representing the accreted portion of a discount from the face amount of an Eligible Investment) received in Cash by the Issuer during such Due Period including prepayments or mandatory sinking fund payments, or payments in respect of optional redemptions, exchange offers, tender offers, recoveries on Defaulted Securities and Written Down Securities (other than Uninvested Proceeds and payments of principal of Eligible Investments acquired with Interest Proceeds), including the proceeds of a sale of any Equity Security, the proceeds received from any special purpose subsidiary of the Issuer holding an Equity Security, and any amounts received as a result of optional redemptions, exchange offers or tender offers for any Equity Security received in Cash by the Issuer during such Due Period; (b) all payments of principal on Eligible Investments purchased with amounts from the Principal Collection Account (excluding any amount representing the accreted portion of a discount from the face amount of an Eligible Investment) received in Cash by the Issuer during such Due Period; (c) all amendment, waiver, late payment fees, restructuring and other fees and commissions, collected during the related Due Period in respect of Defaulted Securities and Written Down Securities; (d) all payments of interest received in respect of Defaulted Securities up to an amount equal to the Principal/Notional Balance of such Defaulted Security at the time it became a Defaulted Security; (e) any proceeds paid to the Issuer resulting from the termination and liquidation of an Interest Rate Swap Agreement, to the extent such proceeds exceed the cost of entering into a replacement Interest Rate Swap Agreement or Additional Interest Rate Swap Agreement in accordance with the requirements of Section 16.1; (f) any Writedown Reimbursement Amount; (g) any Principal Shortfall Reimbursement Amount; (h) upfront payment or any termination payments received with respect to early termination of a Synthetic Security received from the related Synthetic Security Counterparty pursuant to Section 10.2(k); (i) all amounts transferred from the Synthetic Security Collateral Account to the Principal Collection Account; (j) all payments received in Cash by the Issuer during such Due Period that represent call, prepayment or redemption premiums; (k) all payments of interest received to the extent that they represent accrued interest purchased with Principal Proceeds; (l) all yield maintenance payments received in Cash by the Issuer during such Due Period; (m) any proceeds from the issuance and sale of the Notes and Preference Shares that are not applied to the acquisition of Underlying Assets prior to the Determination Date preceding the First Distribution Date, including amounts on deposit in the Uninvested Proceeds Account, and not deposited into the Expense Account on the Closing Date; (n) any proceeds from the liquidation of Underlying Assets received in cash by the Issuer (excluding (1) all accrued interest received in cash by the Issuer and (2) the Substituted Collateral Proceeds); (o) any Substituted Collateral Proceeds on deposit in the Principal Collection Account; (p) any payment of capitalized interest on any Underlying Assets; (q) any payment of accrued interest paid for with principal proceeds; and (r) all other payments received in connection with the Underlying Assets and Eligible Investments that are not included in Interest Proceeds; provided that in no event shall Principal Proceeds include the Excepted Property.

30775-00034 NY:1268831.8

"**Principal Shortfall Reimbursement**" means, with respect to any Synthetic Security, the meaning set forth therein.

"**Principal Shortfall Reimbursement Payment Amount**" means, with respect to any Synthetic Security, the meaning set forth therein.

"**Priority Distribution Period**" means the period from the Closing Date through and including the Distribution Date in August 2009.

"**Priority of Payments**" has the meaning specified in Section 11.1(a).

"**Private Security**" means any security that is not a Public Security.

"**Proceeding**" means any suit in equity, action at law or other judicial or administrative proceeding.

"**Prohibited Asset**" means any of the following: (a) any asset the ownership of which would cause the Issuer to be subject to income tax on a net income basis in any jurisdiction, or (b) any asset the gain from the disposition of which will be subject to U.S. Federal income or withholding tax under Section 897 or Section 1445 of the Code and Treasury Regulations promulgated thereunder; provided, however, that the Issuer shall set up a special purpose subsidiary (which shall be a corporation for U.S. tax purposes) to receive and hold an Equity Security, unless it has consulted with its tax counsel and has been advised that the Issuer can hold the Equity Security directly without causing the Issuer to be treated as engaged in a trade or business in the United States for U.S. Federal income tax purposes.

"**Public Security**" means any of the following: any security (a) the public resale of which by the Issuer either has been registered under the Securities Act or is exempt from such registration pursuant to Section 4(1) or Rule 144(k) under the Securities Act, (b) issued or guaranteed by Government National Mortgage Association, Federal National Mortgage Association and Federal Home Loan Mortgage Corporation or (c) issued by an issuer organized outside of the United States and registered in the jurisdiction where the issuer is organized.

"**Qualified Bidder**" means (a) a Person whose unsecured debt obligations have been assigned, or whose obligations under the bid letter and resulting purchase agreement will be guaranteed by a Person whose unsecured debt obligations have been assigned, a rating equivalent to the highest rating on the Notes or an unsecured short-term rating of "A-1+" by Standard & Poor's and "P-1" by Moody's, (b) a Person who the Auction Agent believes to be an active purchaser of Asset-Backed Securities with the financial resources available to it to pay the purchase price of the Underlying Assets in a timely fashion or (c) the Collateral Manager of any of its Affiliates; provided that with respect to the Synthetic Securities entered into with the First Synthetic Security Counterparty, the Issuer may, upon reasonable notice to the First Synthetic Security Counterparty, transfer to an Eligible Counterparty, as such term is defined in the schedule to the Master Agreement, or to any other counterparty, in regard to which the First Synthetic Security Counterparty will have the right to approve or disapprove any novation of such Synthetic Security by the Issuer.

"**Qualified Bidder List**" means a list of not less than three Persons prepared by the Auction Agent and delivered to the Trustee at least two Business Days prior to any Auction Date, as the same may be amended and supplemented by the Auction Agent prior to any subsequent Auction Date upon not less than two days prior written notice to the Trustee.

"**Qualified Institutional Buyer**" has the meaning given in Rule 144A under the Securities Act.

"**Qualified Purchaser**" means a "qualified purchaser" as defined in Section 2(a)(51)(A) of the Investment Company Act and related rules, a "knowledgeable employee" with respect to the Issuer as specified in Rule 3c-5 promulgated under the Investment Company Act or a company each of whose beneficial owners is such a qualified purchaser or a knowledgeable employee with respect to the Issuer.

30775-00034 NY:1268831.8

"**Qualifying Investment Vehicle**" means an entity as to which all of the beneficial owners of any securities issued by such entity have made, and as to which (in accordance with the document pursuant to which such entity was organized or the agreement or other document governing such securities) each such beneficial owner must require any transferee of any such security to make, to the Issuer or the Issuers, as the case may be, and the Note Registrar (in the case of the Notes) or Preference Share Paying Agent (in the case of the Preference Shares) each of the representations set forth herein and in this Indenture and the Preference Share Paying Agency Agreement required to be made upon transfer of any of the relevant Class of Notes or Preference Shares (with modifications to such representations satisfactory to the Collateral Manager and the Issuer to reflect the indirect nature of the interests of such beneficial owners in such Notes or Preference Shares).

"**Quarterly Asset Amount**" means, with respect to any Distribution Date, the Net Outstanding Underlying Asset Balance on the first day of the related Due Period.

"**Rating**" means:

(a)    with respect to any Underlying Asset, its Moody's Rating as of any date of determination; and

(b)    with respect to any Underlying Asset, its Standard & Poor's Rating as of as of any date of determination.

"**Rating Agency**" means each of (a) Standard & Poor's, for so long as any of the Outstanding Notes are rated by Standard & Poor's (including any private or confidential rating) and (b) Moody's, for so long as any of the Outstanding Notes are rated by Moody's (including any private or confidential rating) or, with respect to Pledged Securities generally, if at any time Standard & Poor's or Moody's ceases to provide rating services with respect to asset-backed securities, any other nationally recognized investment rating agency selected by the Issuer and reasonably satisfactory to a Majority of each Class of Notes. In the event that at any time Standard & Poor's ceases to be a Rating Agency, references to rating categories of Standard & Poor's in this Indenture shall be deemed instead to be references to the equivalent categories of such other rating agency as of the most recent date on which such other rating agency and Standard & Poor's published ratings for the type of security in respect of which such alternative rating agency is used. In the event that at any time Moody's ceases to be a Rating Agency, references to rating categories of Moody's in this Indenture shall be deemed instead to be references to the equivalent categories of such other rating agency as of the most recent date on which such other rating agency and Moody's published ratings for the type of security in respect of which such alternative rating agency is used. In the event that at any time Fitch ceases to be a Rating Agency, references to rating categories of Fitch in this Indenture shall be deemed instead to be references to the equivalent categories of such other rating agency as of the most recent date on which such other rating agency and Fitch's published ratings for the type of security in respect of which such alternative rating agency is used.

"**Rating Condition**" means, with respect to any action taken or to be taken or any determination made or to be made under this Indenture, a condition that is satisfied when each Rating Agency has confirmed in writing to the Issuer, the Trustee and the Collateral Manager prior to such action or determination that such action or determination will not result in the withdrawal, reduction or other adverse action with respect to any then-current rating of any Class of Notes.

"**Record Date**" means the day on which the recipients of payments in respect of interest and/or principal on a Note or Excess Amounts with respect to a Preference Share to be paid on the next succeeding Distribution Date or Redemption Date are determined, which shall be the fifteenth day prior to the applicable Distribution Date or Redemption Date, and the payees shall be the Securityholders in whose name the applicable Security is registered in the Note Register or the Share Register, as the case may be, as of such date.

"**Redemption Amount**" means with respect to an Auction Call Redemption, Clean-Up Call Redemption, Optional Redemption or Tax Redemption, an amount equal to the sum of (i) each applicable Redemption Price, and (ii) all unpaid Administrative Expenses and any other unpaid expenses and fees then due and payable of the Issuers, including any termination payments payable by the Issuer under the Interest Rate Swap Agreement, the Synthetic

Securities, the Management Fee due to the Collateral Manager and, with respect to an Auction Call Redemption, fees and expenses of the Auction Agent.

"**Redemption Date**" means any date on which an Auction Call Redemption, Clean-Up Call Redemption, Optional Redemption or Tax Redemption occurs.

"**Redemption Date Statement**" has the meaning specified in Section 10.8(c).

"**Redemption Price**" means, with respect to any Note to be redeemed pursuant to Section 9.1, 9.2, 9.3 or 9.4, an amount (determined without duplication) equal to (a) the Aggregate Outstanding Amount of such Note being redeemed plus (b) the accrued and unpaid interest thereon (including Defaulted Interest and Deferred Interest and interest thereon, if any) to the Redemption Date.

"**Reference Banks**" has the meaning specified in Schedule B.

"**Reference Dealers**" has the meaning specified in Schedule B.

"**Reference Obligation**" means, with respect to a Synthetic Security, the meaning set forth therein; provided that any Reference Obligation shall be an Asset-Backed Security that, as of the related trade date, satisfies the Substitution Criteria.

"**Registered**" means, with respect to any obligation or security (a) issued after July 18, 1984 and (b) in registered form for purposes of the Code; provided that an obligation or security that is a certificate of interest in a trust that is treated as a grantor trust and not as a REMIC or FASIT for U.S. Federal income tax purposes will be Registered only if each of the obligations or securities held by such trust was issued after July 18, 1984; *provided*, that if it is a certificate of beneficial interest in an entity that is treated as a partnership for U.S. Federal income tax purposes, each of the obligations or securities held by such entity is in registered form for U.S. Federal income tax purposes and was issued after July 18, 1984.

"**Registrar Office**" means the office of the Note Registrar's agent, currently located at the DB Services Tennessee, 648 Grassmere Park Road, Nashville, Tennessee 37211-3658 Attn: Transfer Services, or such other address as the Note Registrar may designate from time to time by notice to the Trustee, the Collateral Manager and the Issuers or the principal corporate trust office of any successor note registrar.

"**Regulation S**" means Regulation S under the Securities Act.

"**Regulation S Definitive Note**" has the meaning specified in Section 2.4(b)(i)(F).

"**Regulation S Global Note**" has the meaning specified in Section 2.1(a).

"**Regulation S Note**" has the meaning specified in Section 2.1(a).

"**Regulation S Note Transfer Certificate**" has the meaning specified in Section 2.4(b)(i)(C).

"**Regulation U**" means Regulation U of the Board of Governors of the Federal Reserve System, 12 C.F.R. Section 221, or any successor regulation.

"**Reinvestment Agreement**" means a guaranteed reinvestment agreement from a bank, insurance company or other corporation or entity organized under the laws of the United States or any state thereof under which no payments are subject to any withholding tax or, if subject to withholding tax imposed by any jurisdiction, the obligor thereunder is required to make "gross up" payments that cover the full amount of any such withholding tax on an after-tax basis; provided that such agreement provides that it is terminable by the purchaser, without premium or penalty, in the event that the rating assigned to such agreement by any Rating Agency is at any time lower than the rating required pursuant to the terms of this Indenture to be assigned to such agreement in order to permit the purchase thereof.

30775-00034 NY:1268831.8

"**Relevant Jurisdiction**" means, as to any obligor on any Underlying Asset, any jurisdiction (a) in which the obligor is incorporated, organized, managed and controlled or considered to have its seat, (b) where an office through which the obligor is acting for purposes of the relevant Underlying Asset is located, (c) in which the obligor executes Underlying Instruments or (d) in relation to any payment, from or through which such payment is made.

"**Relevant Persons**" has the meaning specified in Section 2.7.

"**REMIC**" means a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

"**Replacement Investment Agreement**" means, if the Initial Investment Agreement is no longer in effect, any replacement investment agreement entered into at such time among the Issuer, the Trustee and the Replacement Investment Agreement Provider.

"**Replacement Investment Agreement Provider**" means, if the Initial Investment Agreement is no longer in effect, any replacement investment agreement provider under a Replacement Investment Agreement.

"**Replacement Manager**" means a successor Collateral Manager appointed pursuant to the Management Agreement.

"**Required Synthetic Security Collateral Amount**" means, with respect to each Synthetic Security Counterparty, an amount equal to, on any date of determination, the Aggregate Principal/Notional Balance of all Synthetic Securities entered into with such Synthetic Security Counterparty. If as of any Determination Date, the amount on deposit in a Synthetic Security Collateral Account exceeds the Required Synthetic Security Collateral Amount, such excess amount will be deposited into the Principal Collection Account and deemed to be Principal Proceeds or with respect to any substitution, deposited into the Substituted Collateral Account.

"**Residential A Mortgage-Backed Securities**" means Asset-Backed Securities (other than Residential B/C Mortgage-Backed Securities and Non-Subprime Home Equity Loan Asset-Backed Securities) that entitle their holders to receive payments that depend primarily on the cash flow from prime residential mortgage loans secured (on a first priority basis, subject to permitted liens, easements and other encumbrances) by residential real estate (single or two-to-four-family properties) the proceeds of which were used to purchase real estate and purchase or construct dwellings thereon (or to refinance indebtedness previously so used), generally having the following characteristics: (1) the mortgage loans have standardized payment terms and require minimum monthly payments; (2) the mortgage loans are obligations of numerous borrowers and accordingly represent a diversified pool of obligor credit risk; (3) repayment of such securities can vary substantially from their contractual payment schedules and depends entirely upon the rate at which the mortgage loans are repaid; and (4) the repayment of such mortgage loans is subject to a contractual payment schedule, with early prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans or securities include an effective prepayment premium and with early repayment depending primarily on interest rates and the sale of the mortgaged real estate and related dwelling and generally no penalties for early repayment.

"**Residential B/C Mortgage-Backed Securities**" means Asset-Backed Securities (other than Residential A Mortgage-Backed Securities and Non-Subprime Home Equity Loan Asset-Backed Securities) that entitle their holders to receive payments that depend primarily on the cash flow from subprime residential mortgage loans secured (on a first priority basis, subject to permitted liens, easements and other encumbrances) by residential real estate (single or two-to-four-family properties), generally having the following characteristics: (1) the mortgage loans have standardized payment terms and require minimum monthly payments; (2) the mortgage loans are obligations of numerous borrowers and accordingly represent a diversified pool of obligor credit risk; (3) repayment of such securities can vary substantially from their contractual payment schedules and depends entirely upon the rate at which the mortgage loans are repaid; and (4) the repayment of such mortgage loans is subject to a contractual payment schedule, with early prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans or securities

include an effective prepayment premium and with early repayment depending primarily on interest rates and the sale of the mortgaged real estate and related dwelling and generally no penalties for early repayment.

"**Residential Securities**" or "**RMBS Securities**" means Residential A Mortgage-Backed Securities, Residential B/C Mortgage-Backed Securities and Non-Subprime Home Equity Loan Asset-Backed Securities.

"**Restricted Global Note**" has the meaning specified in Section 2.1(b).

"**Restricted Note**" has the meaning specified in Section 2.1(b).

"**Restricted Note Transfer Certificate**" has the meaning specified in Section 2.4(b)(i)(B).

"**Restricted Trading Period**" means each day during which (a) the Moody's rating of the Class A Notes or Class B Notes is one or more subcategories below its Initial Rating or (b) the Moody's rating of the Class C Notes, the Class D Notes or the Class E Notes is two or more sub-categories below its Initial Rating; unless the holders of a majority in aggregate outstanding principal amount of the Controlling Class has directed the Issuer to waive the Restricted Trading Period (which waiver may be rescinded by the Controlling Class at any time that such rating requirement is not satisfied).

"**Rule 144A**" means Rule 144A under the Securities Act.

"**Rule 144A Information**" means such information as is specified pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision thereto).

"**S&P Industry Classification Group**" means the classification in Schedule O.

"**Sale**" has the meaning specified in Section 5.17(a).

"**Schedule of Closing Underlying Assets**" means the list of Underlying Assets securing the Notes that is attached as Schedule A, which Schedule shall include the Principal/Notional Balance, interest rate, the Stated Maturity and the Standard & Poor's Rating and the Moody's Rating of each Underlying Asset unless such ratings are private ratings.

"**Scheduled Distribution**" means, with respect to any Pledged Security, for each Due Date, the scheduled payment in Cash of principal and/or interest and/or fee due on such Due Date with respect to such Pledged Security, determined in accordance with the assumptions specified in Section 1.2.

"**Scheduled Preference Share Redemption Date**" means the August 2046 Distribution Date.

"**Second Currency**" has the meaning specified in Section 14.13.

"**Second Period**" has the meaning specified in Section 14.2(e).

"**Section 3(c)(7) DTC Notice**" has the meaning specified in Section 10.8(b).

"**Secured Parties**" has the meaning specified in the Preliminary Statement of this Indenture.

"**Securities**" means the Notes and the Preference Shares.

"**Securities Act**" means the United States Securities Act of 1933, as amended.

"**Securities Intermediary**" has the meaning specified in Section 6.18 hereof.

"**Securityholder**" has the meaning specified under "Holder" above.

"**Servicer**" means, with respect to any Issue of Asset-Backed Securities, the entity that, absent any default, event of default or similar condition (however described), is primarily responsible for servicing, managing, monitoring and otherwise administering the cash flows from which payments to investors in such Asset-Backed Securities are made.

"**Share Register**" has the meaning given to such term in the Preference Share Paying Agency Agreement.

"**Share Registrar**" means Maples Finance Limited, solely in its capacity as Share Registrar under the Preference Share Paying Agency Agreement, unless a successor Person shall have become the Share Registrar pursuant to the applicable provisions of the Preference Share Paying Agency Agreement, and thereafter, the Share Registrar shall mean such successor Person.

"**Share Trustee**" means Maples Finance Limited, a licensed trust company incorporated in the Cayman Islands, which holds all of the outstanding Ordinary Shares of the Issuer under the terms of a declaration of trust.

"**Small Business Loan Securities**" means Asset-Backed Securities (other than Franchise Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from general purpose corporate loans made to small business concerns, including but not limited to those (a) made pursuant to Section 7(a) of the United States Small Business Act, as amended, and (b) partially guaranteed by the United States Small Business Administration. Small Business Loan Securities generally have the following characteristics: (1) the loans have standardized terms; (2) the loans are obligations of a relatively limited number of borrowers and accordingly represent an undiversified pool of obligor credit risk; and (3) repayment thereof can vary substantially from the contractual payment schedule (if any), with early prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans or securities include an effective prepayment premium. For the purpose of this definition, "Franchise Securities" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from (a) a pool of franchise loans made to operators of franchises that provide oil, gasoline, restaurant or food services and provide other services related thereto and (b) leases or subleases of equipment to such operators for use in the provision of such goods and services. They generally have the following characteristics: (1) the loans, leases or subleases have varying contractual maturities; (2) the loans are secured by real property purchased or improved with the proceeds thereof (or to refinance an outstanding loan the proceeds of which were so used); (3) the obligations of the lessors or sublessors of the equipment may be secured not only by the leased equipment but also the related real estate; (4) the loans, leases and subleases are obligations of a relatively limited number of obligors and accordingly represent a relatively undiversified pool of obligor credit risk; (5) payment of the loans can vary substantially from the contractual payment schedule (if any), with prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans include an effective prepayment premium; (6) the repayment stream on the leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, a sublessee or third party of the underlying equipment; (7) such leases and subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to payments at the end of a lease term for excess usage or wear and tear; and (8) the ownership of a franchise right or other similar license and the creditworthiness of such franchise operators is the primary factor in any decision to invest in these securities.

"**Sovereign**" means, when used with respect to any country or obligations, the central or federal executive or legislative governmental authority of such country or, insofar as any obligations are concerned, any agency or instrumentality of such governmental authority (including any central bank or central monetary authority) to the extent such obligations are fully backed by the general taxing power of such governmental authority.

"**Special-Majority-in-Interest of Preference Shareholders**" means, at any time, Preference Shareholders whose aggregate Voting Percentages at such time exceed sixty-six and two-thirds percent (66 ⅔%) of all Preference Shareholders' Voting Percentages at such time.

"**Specified Assets**" means, at any time, (a) Principal Proceeds or Uninvested Proceeds held as Cash, (b) any Substituted Collateral Proceeds on deposit in the Substituted Collateral Account and (c) Eligible Investments purchased with Principal Proceeds or Uninvested Proceeds.

"**Specified Change**" means any amendment or waiver of, or supplement to, an Underlying Instrument governing or relating to an Underlying Asset that (a) reduces the principal amount of such Underlying Asset, (b) reduces the rate of interest or any fee payable on such Underlying Asset, (c) postpones the Due Date of any Scheduled Distribution in respect of such Underlying Asset, (d) alters the pro rata allocation or sharing, or the relative priorities, of Distributions required by such Underlying Instrument, (e) releases any material guarantor of such Underlying Asset from its obligations, (f) terminates or releases any material lien or security interest securing such Underlying Asset, (g) changes any of the provisions of such Underlying Instrument specifying the number or percentage of lenders or holders required to effect any of the foregoing or (h) causes such Underlying Asset to cease to meet the definitional requirements of an Underlying Asset; provided that any amendment, waiver or supplement referred to in any of clauses (a) through (d) shall constitute a "Specified Change" only to the extent the Issuer would be affected thereby.

"**Specified Currency**" has the meaning specified in Section 14.13.

"**Specified Person**" has the meaning specified in Section 2.5.

"**Specified Place**" has the meaning specified in Section 14.13.

"**Standard & Poor's**" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor or successors thereto.

"**Standard & Poor's Applicable Recovery Rate**" means, with respect to any Underlying Asset on any Measurement Date, an amount equal to the percentage for such Underlying Asset (which shall mean with respect to a Synthetic Security, the related Reference Obligation) set forth in the Standard & Poor's Recovery Rate Matrix attached as Schedule E in (x) the applicable table, (y) the row in such table opposite the Standard & Poor's Rating of such Underlying Asset as of the date of purchase by the Issuer of such Underlying Asset and (z)(i) for purposes of determining the Standard & Poor's Recovery Rate, the column in such table below the current rating of the respective Class of Notes or (ii) for purposes of determining the Calculation Amount, the column in such table below the current rating of the most senior Class of Notes Outstanding.

"**Standard & Poor's Asset-Backed Security Category**" means each category of asset-backed security specified in Schedule F.

"**Standard & Poor's CDO Evaluator**" means the dynamic, analytical computer model developed by Standard & Poor's and used to estimate default risk of Asset-Backed Securities and provided to the Collateral Manager and the Trustee on or before the Closing Date, as it may be modified by Standard & Poor's from time to time and provided to the Collateral Manager and the Trustee following the Closing Date.

"**Standard & Poor's Minimum Weighted Average Recovery Rate Test**" means a test which is satisfied as of the Closing Date if the Standard & Poor's Weighted Average Recovery Rate is greater than or equal to (i) with respect to the Class A-1 Notes, 30.0%, (ii) with respect to the Class A-2 Notes, 30.0%, (iii) with respect to the Class B Notes, 35.0%, (iv) with respect to the Class C Notes, 40.5%,(v) with respect to the Class D Notes, 47.5% and (vi) with respect to the Class E Notes, 54.0%.

"**Standard & Poor's Rating**" means, with respect to any Underlying Asset (which shall mean with respect to a Synthetic Security, the related Reference Obligation) (a) if such Underlying Asset is rated either publicly or privately (with the appropriate consent by the obligor having being provided to Standard & Poor's) by Standard & Poor's, the Standard & Poor's Rating shall be such rating, or, if such Underlying Asset is not rated by Standard & Poor's, but the Issuer or the Collateral Manager on behalf of the Issuer has requested that Standard & Poor's perform a credit estimate in respect of such Underlying Asset, the Standard & Poor's Rating shall be the rating so assigned by Standard & Poor's, provided that pending receipt from Standard & Poor's of such rating, such Underlying Asset shall

41

have a Standard & Poor's Rating of "CCC-" if the Collateral Manager believes that such estimate will be at least "CCC-" or (b) if clause (a) is not applicable and such Underlying Asset falls within any asset class listed under Schedule F, the rating thereof determined in accordance with Schedule F.  For so long as any Notes remain Outstanding, prior to or immediately following the acquisition of any Underlying Asst not publicly rated by Standard & Poor's and on or prior to each one-year anniversary of the acquisition of any such Underlying Asset, the Issuer shall submit to Standard & Poor's a request to perform a credit estimate on such Underlying Asset together with all information reasonably required by Standard & Poor's to perform such credit estimate.

"**Standard & Poor's Weighted Average Recovery Rate**" means, as of the Closing Date or any Measurement Date, the number obtained by summing the products obtained by multiplying the Principal/Notional Balance of each Underlying Asset by its Standard & Poor's Applicable Recovery Rate, dividing such sum by the Aggregate Principal/Notional Balance of all such Underlying Assets, multiplying the result by 100 and rounding up to the first decimal place.

"**Stated Maturity**" means, with respect to (a) any security (other than a Note), the date specified in such security as the fixed date on which the final payment of such security is due and payable, (b) any repurchase obligation, the repurchase date thereunder on which the final repurchase obligation thereunder is due and payable, and (c) with respect to the Notes, August 17, 2046, in each case, if such date is not a Business Day, the next following Business Day.

"**Student Loan Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from loans made to students (or their parents) to finance educational needs, generally having the following characteristics:  (1) the loans have standardized terms; (2) the loans are obligations of numerous borrowers and accordingly represent a diversified pool of obligor credit risk; (3) the repayment stream on such loans is primarily determined by a contractual payment schedule, with early repayment on such loans predominantly dependent upon interest rates and the income of borrowers following the commencement of amortization; and (4) such loans may be fully or partially insured or reinsured by the United States Department of Education.

"**Sub-Prime Securities**" means Residential Securities that have a FICO Score equal to or below 625.

"**Subordinate Interests**" has the meanings specified in Section 13.1.

"**Subpool**" means each of the up to eight groups of Underlying Assets on which the Listed Bidders may provide a separate bid in an Auction.

"**Subpool Price**" means the separate bid submitted by a bidder in the Auction for a Subpool of Underlying Assets.

"**Subscription Agreements**" means each of the subscription agreements, dated on or prior to the Closing Date, between the Issuer and the initial purchaser of the Preference Shares named on the signature pages thereof, as modified and supplemented and in effect from time to time.

"**Substitute Auction Agent**" means the Initial Purchaser or another third party selected by the Collateral Manager; provided, however, that (i) no such Substitute Auction Agent shall be allowed to submit a bid in the Auction for which it is acting as Auction Agent and (ii) the Initial Purchaser shall have no obligation to act as Substitute Auction Agent.

"**Substituted Collateral Account**" shall have the meaning specified in Section 10.6(a).

"**Substituted Collateral Proceeds**" shall have the meaning specified in Section 12.1(a)(iv).

"**Substitution**" shall have the meaning specified in Section 12.2(d).

42

"**Substitution Criteria**" shall have the meaning specified in Section 12.2(d).

"**Successor Trustee Ratings Requirement**" shall have the meaning specified in Section 6.11.

"**Synthetic Security Counterparty Ratings Requirements**" means, with respect to a Synthetic Security Counterparty, that it shall at all times satisfy the following applicable requirements:

(a)     so long as the Class A Notes or the Class B Notes are issued and remain Outstanding,

    (1)     either:

        (A)     the unsecured, unguaranteed and otherwise unsupported senior long term debt obligations of Synthetic Security Counterparty or any transferee (or any guarantor of Synthetic Security Counterparty or any transferee that unconditionally and absolutely guarantees the obligations of Synthetic Security Counterparty or such transferee) are rated at least "AA-" by Standard & Poor's or subject to the satisfaction of the Rating Condition with respect to Standard & Poor's "A+" by Standard & Poor's and so long as the Synthetic Security Counterparty has posted collateral as specified in the First Master Agreement; or

        (B)     the unsecured, unguaranteed and otherwise unsupported short term debt obligations of Synthetic Security Counterparty or any transferee (or any guarantor of Synthetic Security Counterparty or any transferee that unconditionally and absolutely guarantees the obligations of Synthetic Security Counterparty or such transferee) are rated at least "A-1+" by Standard & Poor's, and

    (2)     either:

        (A)     the unsecured, unguaranteed and otherwise unsupported long term senior debt obligations of Synthetic Security Counterparty or any transferee (or any guarantor of Synthetic Security Counterparty or any transferee that unconditionally and absolutely guarantees the obligations of Synthetic Security Counterparty or such transferee) are rated at least "Aa3" by Moody's and not on watch for possible downgrade and no short term rating is available from Moody's, or

        (B)     the unsecured, unguaranteed and otherwise unsupported long term senior debt obligations of Synthetic Security Counterparty or any transferee (or any guarantor of Synthetic Security Counterparty or any transferee that unconditionally and absolutely guarantees the obligations of Synthetic Security Counterparty or such transferee) are rated at least "A1" by Moody's and not on watch for possible downgrade and the unsecured, unguaranteed and otherwise unsupported short term debt obligations of Synthetic Security Counterparty or any transferee (or any guarantor of Synthetic Security Counterparty or any transferee that unconditionally and absolutely guarantees the obligations of Synthetic Security Counterparty or such transferee) are rated at least "P 1" by Moody's and not on watch for possible downgrade.

(b)     so long as (i) the Class A Notes and the Class B Notes are no longer Outstanding and (ii) the Class C Notes or the Class D Notes (1) are issued and remain Outstanding and (2) are rated no higher than "A1" by Moody's and no higher than "A" by Standard & Poor's:

    (1)     either:

        (A)     the unsecured, unguaranteed and otherwise unsupported senior long term debt obligations of Synthetic Security Counterparty or any transferee (or any guarantor of Synthetic Security Counterparty or any transferee that unconditionally and absolutely guarantees the obligations of Synthetic Security Counterparty or such transferee) are rated at least "A" by Standard & Poor's, or

30775-00034 NY:1268831.8

(B)      the unsecured, unguaranteed and otherwise unsupported short term debt obligations of Synthetic Security Counterparty or any transferee (or any guarantor of Synthetic Security Counterparty or any transferee that unconditionally and absolutely guarantees the obligations of Synthetic Security Counterparty or such transferee) are rated at least "A-1" by Standard & Poor's, and

(2)      either:

(A)      the unsecured, unguaranteed and otherwise unsupported long term senior debt obligations of Synthetic Security Counterparty or any transferee (or any guarantor of Synthetic Security Counterparty or any transferee that unconditionally and absolutely guarantees the obligations of Synthetic Security Counterparty or such transferee) are rated at least "A2" by Moody's and not on watch for possible downgrade and no short term rating is available from Moody's, or

(B)      the unsecured, unguaranteed and otherwise unsupported long term senior debt obligations of Synthetic Security Counterparty or any transferee (or any guarantor of Synthetic Security Counterparty or any transferee that unconditionally and absolutely guarantees the obligations of Synthetic Security Counterparty or such transferee) are rated at least "A3" by Moody's and not on watch for possible downgrade and the unsecured, unguaranteed and otherwise unsupported short term debt obligations of Synthetic Security Counterparty or any transferee (or any guarantor of Synthetic Security Counterparty or any transferee that unconditionally and absolutely guarantees the obligations of Synthetic Security Counterparty or such transferee) are rated at least "P 2" by Moody's and not on watch for possible downgrade.

All guarantees must meet Standard & Poor's' then current guidelines with respect to guarantees.

"**Synthetic Security**" means a Transaction (as such term is defined in the Synthetic Security Confirmation Form) entered into by the Issuer and a Synthetic Security Counterparty made pursuant to the related Master Agreement and Synthetic Security Confirmation, where the Issuer sells credit protection in relation to an individual Reference Obligation that is an Asset Backed Security.

"**Synthetic Security Collateral Account**" has the meaning specified in Section 10.2.

"**Synthetic Security Collateral Amount**" means, with respect to each Synthetic Security Counterparty, an amount equal to, on any date of determination, the amount on deposit in the related Synthetic Security Collateral Account (including the Aggregate Principal/Notional Balance of the Eligible Investments on deposit in such account, but excluding all earnings on such Eligible Investments).

"**Synthetic Security Confirmation**" means a confirmation of a Transaction (as such term is defined in the Synthetic Security Confirmation Form).

"**Synthetic Security Confirmation Form**" means (i) in the case of Reference Obligations that are RMBS Securities, the Form Approved Synthetic Security attached hereto as Exhibit K and (ii) in the case of Reference Obligations that are CMBS Securities, the Form Approved Synthetic Security attached hereto as Exhibit L, or if not in substance identical to such form, a form approved by each Synthetic Security Counterparty and that satisfies the Rating Condition.

"**Synthetic Security Counterparty**" means (i) any counterparty of the Issuer in a Master Agreement (other than the First Master Agreement) and the related Synthetic Security Confirmation and (ii) the First Synthetic Security Counterparty.

"**Synthetic Security Counterparty Defaulted Obligation**" means a Synthetic Security with respect to which the relevant Synthetic Security Counterparty has defaulted in the performance of its payment obligations under such Synthetic Security.

"**Synthetic Security Issuer Account**" has the meaning specified in Section 10.2.

"**Synthetic Security Termination/Novation Payment (Issuer)**" has the meaning specified in Section 11.1A(v).

"**Tax Event**" means an event which occurs if, whether or not as a result of any change in law or interpretation thereof: (a) any obligor is required to deduct or withhold from any payment under any Underlying Asset to the Issuer for or on account of any tax for whatever reason, whether or not as a result of any change in law or interpretation, and such obligor is not, or will not be, required to pay to the Issuer such additional amount as is necessary to ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Issuer would have received had no such deduction or withholding occurred, (b) the Issuer or an Interest Rate Swap Counterparty is required to deduct or withhold from any payment under an Interest Rate Swap Agreement for or on account of any tax and the Issuer is obligated to pay gross-up amounts to the counterparty, or such Interest Rate Swap Counterparty is not obligated to pay to the Issuer such additional amount as is necessary to ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Issuer would have received had no such deduction or withholding occurred, or (c) any net income, profits or similar tax is imposed on the Issuer.

"**Tax Materiality Condition**" means a condition which will be satisfied during any twelve (12) month period if any combination of Tax Events results in aggregate, in a payment, charge or tax burden to the Issuer in excess of $1,000,000.

"**Tax Redemption**" has the meaning specified in Section 9.2.

"**Temporary Regulation S Global Notes**" means with respect to any Class of Notes, the Temporary Regulation S Global Note issued pursuant to Section 2.1(a), substantially in the form of Exhibit A-1.

"**Trading Gain Payment**" means an early termination payment received by the Issuer from each Synthetic Security Counterparty or any replacement counterparty, as a result of assigning or terminating a Synthetic Security.

"**Trading Loss Payment**" means an early termination payment paid to each Synthetic Security Counterparty or any replacement counterparty, as a result of assigning or terminating a Synthetic Security.

"**Transaction Agreements**" means the Notes, this Indenture, the Interest Rate Swap Agreement, the Management Agreement, the Administration Agreement, the Collateral Administration Agreement, the Note Purchase Agreement, the Preference Share Paying Agency Agreement and the Subscription Agreements, each dated on or prior to the Closing Date.

"**Transfer Agent**" means the Person or Persons authorized by the Issuer to exchange or provide for the registration of the transfer of Securities, including in the case of an exchange or registration of the transfer of Preference Shares, the Preference Share Transfer Agent.

"**Trust Officer**" means, when used with respect to the Trustee, any Officer within the Corporate Trust Office (or any successor group of the Trustee) authorized to act for and on behalf of the Trustee, including any vice president, assistant vice president or other Officer of the Trustee customarily performing functions similar to those performed by the persons who at the time shall be such Officers, respectively, or to whom any corporate trust matter is referred at the Corporate Trust Office because of such person's knowledge of and familiarity with the particular subject.

"**Trustee**" means Deutsche Bank Trust Company Americas, a New York banking corporation organized and existing under the laws of the State of New York, solely in its capacity as trustee hereunder, unless a successor Person shall have become the Trustee pursuant to the applicable provisions of this Indenture, and thereafter Trustee shall mean such successor Person.

"**UCC**" means the New York Uniform Commercial Code.

"**Underlying Asset**" means any Asset Backed Security and each Synthetic Security.

"**Underlying Instruments**" means the indenture or other agreement pursuant to which a Pledged Underlying Asset (which shall mean with respect to a Synthetic Security, the related Reference Obligation), Eligible Investment or Equity Security has been issued or created and each other agreement that governs the terms of or secures the obligations represented by such Pledged Underlying Asset, Eligible Investment or Equity Security or of which holders of such Pledged Underlying Asset, Eligible Investment or Equity Security are the beneficiaries.

"**Uninvested Proceeds**" means, at any time on or prior to the Determination Date prior to the First Distribution Date, the net proceeds received by the Issuer on the Closing Date from the initial issuance of the Securities and deposited in the Uninvested Proceeds Account, to the extent such proceeds have not been invested in Underlying Assets or deposited into the Expense Account in accordance with the terms of this Indenture.

"**Uninvested Proceeds Account**" has the meaning specified in Section 10.2(j).

"**Unit**" means an Asset-Backed Security with a warrant or equity component attached which otherwise satisfies the requirements for Asset-Backed Securities.

"**United States**" and "**U.S.**" means the United States of America, including the States thereof and the District of Columbia.

"**United States Regulations**" 31 C.F.R. Part 357, Subpart B; 12 C.F.R. Part 615, Subparts O, R, and S; 12 C.F.R. Part 987; 12 C.F.R. Part 1511; 24 C.F.R. Part 81, Subpart H; 31 C.F.R. Part 354; 18 C.F.R. Part 1314; and 24 C.F.R. Part 350.

"**Unregistered Securities**" has the meaning specified in Section 5.17(c).

"**U.S. Person**" has the meaning given in Regulation S under the Securities Act.

"**USA PATRIOT Act**" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended.

"**Voting Percentage**" of a Preference Shareholder at any time means the ratio (expressed as a percentage) of a Preference Shareholder's Preference Shares Outstanding to the aggregate Outstanding Preference Shares of all Preference Shareholders at such time.

"**WAC Change**" means, on each date an Eligible Substitute Asset is purchased by the Issuer, any positive or negative change in the Weighted Average Coupon due to the purchase of such Eligible Substitute Asset as calculated by the Collateral Manager.

"**WAS Change**" means, on each date an Eligible Substitute Asset is purchased by the Issuer, any positive or negative change in the Weighted Average Spread due to the purchase of such Eligible Substitute Asset as calculated by the Collateral Manager.

"**Weighted Average Coupon**" means the number (rounded up to the next one-hundredth of one percent (0.01%)) obtained by (i) summing the products obtained by multiplying (A) the current interest rate on each Pledged Underlying Asset that is a Fixed Rate Security (excluding all Defaulted Securities, Written Down Securities and Deferred Interest PIK Bonds) by (B) the Principal/Notional Balance of each such Pledged Underlying Asset and (ii) dividing such sum by the Aggregate Principal/Notional Balance of all Pledged Underlying Assets that are Fixed Rate Securities (excluding all Defaulted Securities, Written Down Securities and Deferred Interest PIK Bonds).

"**Weighted Average Coupon Test**" means a test that is satisfied as of the Closing Date if the Weighted Average Coupon is greater than or equal to 4.90%.

"**Weighted Average Spread**" is the number (rounded up to the next one-hundredth of one percent (0.01%)) obtained by (a) summing the products obtained by multiplying (i) the spread above the floating rate index at which interest accrues on each Underlying Asset that is a Floating Rate Security or the Fixed Amount applicable to a Synthetic Security (in each case, other than Defaulted Securities, Written Down Securities and Deferred Interest PIK Bonds) as of such date by (ii) the Principal/Notional Balance of such Underlying Asset as of such date, and (ii) dividing such sum by the Aggregate Principal/Notional Balance of all Pledged Underlying Assets that are Floating Rate Securities (excluding all Defaulted Securities, Written Down Securities and Deferred Interest PIK Bonds).

"**Weighted Average Spread Test**" means a test that is satisfied as of the Closing Date if the Weighted Average Spread is greater than or equal to 1.80%.

"**Withholding Security**" means any Underlying Asset with respect to which the related trustee or paying agent informs the Issuer, Trustee or Collateral Manager that it intends to withhold, or actually does withhold from payment on such Underlying Asset, amounts in respect of withholding taxes.

"**Writedown Reimbursement Payment Amount**" means, with respect to a Synthetic Security, the meaning set forth therein.

"**Written Down Security**" means, as of any date of determination, any Underlying Asset that is part of an issue as to which the aggregate par amount of the entire class of such Underlying Asset and all other securities secured by the same pool of collateral that rank senior in priority of payment to such class exceeds the aggregate par amount (including reserved interest or other amounts available for overcollateralization) of all collateral securing such issue (excluding defaulted collateral).

"**Zero Coupon Bond**" means any security the terms of which provide for repayment of a stated principal amount on a stated maturity date without periodic payments of interest.

### Section 1.2    Assumptions as to Underlying Assets, Etc.

The provisions set forth in this Section 1.2 shall be applied in connection with all calculations required to be made pursuant to this Indenture, including with respect to Scheduled Distributions on any Pledged Security, or any payments on any other assets included in the Collateral, and with respect to the income that may be earned on Scheduled Distributions on such Pledged Securities and on any other amounts that may be received for deposit in the Collection Accounts.

(a)    All calculations with respect to Scheduled Distributions on the Pledged Securities securing the Notes and any determination of the Average Life of any Underlying Asset, and any determination of the rate at which interest accrues on any Pledged Security, shall be made by the Collateral Manager using (in the case of the Underlying Assets) the assumptions that (i) no Pledged Security defaults or is sold, (ii) prepayment of any Pledged Security during any month occurs at a rate equal to the average rate of prepayment (expressed as a percentage of the pricing prepayment curve calculated as of the last Determination Date) during the period of six consecutive months immediately preceding the current month (or, with respect to any Pledged Security that has not been outstanding for at least six consecutive calendar months, at the rate of prepayment assumed at the time of issuance of such Pledged Security), (iii) any clean-up call with respect to a Pledged Security will be exercised when economic to the Person or Persons entitled to exercise such call, (iv) no other redemption of any Pledged Security will occur except for those that have actually occurred or as to which irrevocable notice thereof shall have been given and (v) no payment of contingent interest will be made. To the extent they are not manifestly in error, any information or report received by the Collateral Manager or Issuer with respect to an Underlying Asset may be conclusively relied upon in making such calculations.

(b)    For purposes of determining compliance with the Interest Coverage Tests, except as otherwise specified in the Interest Coverage Tests, there shall be excluded all scheduled payments (whether of principal, interest, fees or other amounts), including payments to the Issuer in respect of Defaulted Securities or an Interest Rate Swap Agreement that the Collateral Manager has determined in its reasonable business judgment will not be made in Cash or will not be received when due. For purposes of calculating each Interest Coverage Ratio:

(i)       the expected interest income on Underlying Assets and Eligible Investments, the expected amounts receivable under the Interest Rate Swap Agreement, the expected interest payable on the Notes and the expected amounts, if any, payable under or in respect of the Interest Rate Swap Agreement will be calculated using the interest rates applicable thereto on the applicable Measurement Date;

(ii)      accrued original issue discount on Eligible Investments will be deemed to be a scheduled interest payment thereon due on the date such original issue discount is scheduled to be paid; and

(iii)     it will be assumed that no principal payments are made on the Notes during the applicable periods.

(c)       For each Due Period, the Scheduled Distribution on any Pledged Security (other than a Defaulted Security or a Deferred Interest PIK Bond, except as otherwise provided herein, shall be assumed to have a Scheduled Distribution of zero) shall be the sum of (x) the total amount of payments and collections in respect of such Pledged Security that, if paid as scheduled, will be available in the Collection Accounts at the end of the Due Period for payment on the Securities and of certain expenses of the Issuer and the Co-Issuer plus (y) any such amounts received in prior Due Periods that were not disbursed on a previous Distribution Date (provided that such sum shall be computed without regard to any amounts excluded from the determination of compliance with the Coverage Tests pursuant to Section 1.2(b); provided, further that if the Collateral Manager determines in its reasonable business judgment that there is a significant risk that such amounts would be reasonably likely to be subject to disgorgement as a preferential transfer under Section 547 of the Bankruptcy Code such amounts shall be excluded from such determination).

(d)       Subject to Section 1.2(b), each Scheduled Distribution receivable with respect to a Pledged Security shall be assumed to be received on the applicable Due Date, and each such Scheduled Distribution shall be assumed to be immediately deposited in the Interest Collection Account or the Principal Collection Account, as the case may be, and, except as otherwise specified, to earn interest at the Assumed Reinvestment Rate. All such funds shall be assumed to continue to earn interest until the date on which they are required to be available in the Collection Accounts for transfer to the Payment Account and application, in accordance with the terms hereof, to payments of principal of or interest on the Notes and payments of Excess Amounts on the Preference Shares or other amounts payable pursuant to this Indenture.

(e)       With respect to any Underlying Asset as to which any interest or other payment thereon is subject to withholding tax of any Relevant Jurisdiction, each Distribution thereon shall, for purposes of the Coverage Tests and the Collateral Quality Tests, be deemed to be payable net of such withholding tax unless the issuer thereof or obligor thereon is required to make additional payments to fully compensate the Issuer for such withholding taxes (including in respect of any such additional payments). On any date of determination, the amount of any Scheduled Distribution due on any future date shall be assumed to be made net of any such uncompensated withholding tax based upon withholding tax rates in effect on such date of determination.

(f)       Any reference in the definition of "Management Fee" in Section 1.1 to an amount calculated with respect to a period at a per annum rate shall be computed on the basis of a 360 day year of twelve 30-day months.

**Section 1.3       Rules of Construction.**

Unless the context otherwise clearly requires:

(a)       the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

(b)       whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(c)       the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(d)       the word "will" shall be construed to have the same meaning and effect as the word "shall";

(e)       any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein);

(f)       terms used herein that are defined in the UCC and not otherwise defined herein shall have the meanings set forth in the UCC, unless the context otherwise requires;

(g)       any reference herein to any Person, or to any Person in a specified capacity, shall be construed to include such Person's permitted successors and assigns or such Person's permitted successors in such capacity, as the case may be; and

(h)       all references in this instrument to designated "Sections," "clauses" and other subdivisions are to the designated Sections, clauses and other subdivisions of this instrument as originally executed, and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Section, clause or other subdivision.

## ARTICLE II

## THE NOTES

### Section 2.1   Forms Generally.

(a)       Notes offered and sold in reliance on Regulation S (each, a "Regulation S Note"), in the case of the Class A Notes, Class B Notes, Class C Notes, Class D Notes and Class E Notes, shall be issued in the form of Temporary Regulation S Global Notes in fully registered form without interest coupons, substantially in the form of the note attached as Exhibit A-1, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and such legends as may be applicable thereto, which shall be deposited with the Trustee at the Corporate Trust Office, as custodian for DTC and registered in the name of a nominee of DTC, duly executed by the Issuers and authenticated by the Trustee or the Authenticating Agent as hereinafter provided.  The Aggregate Outstanding Amount of each Regulation S Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC or its nominee, as the case may be.  The Temporary Regulation S Global Note of any Class shall be exchanged for a Permanent Regulation S Global Note for such Class after expiration of the Distribution Compliance Period pursuant to and as provided in Section 2.4 in fully registered form without coupons, authenticated and delivered in substantially the form attached hereto as Exhibit A-2.  (each of the Temporary Regulation S Global Notes and the Permanent Regulation S Global Notes shall collectively be referred to herein as the "Regulation S Global Notes").  No Regulation S Global Note may be delivered within the United States or its possessions.

(b)       Notes offered and sold in the United States pursuant to an exemption from the registration requirements of the Securities Act ("Restricted Notes"), in the case of the Notes, shall be issued in fully registered form without interest coupons substantially in the form of the note attached as Exhibit A-3 (each, a "Restricted Global Note"), with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and such legends as may be applicable thereto, which shall be deposited with the Trustee at the Corporate Trust Office, as custodian for DTC and registered in the name of a nominee of DTC, duly executed by the Issuers and authenticated by the Trustee or the Authenticating Agent as hereinafter provided.  The Aggregate Outstanding Amount of each Restricted Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC or its nominee, as the case may be.

(c)       Without unnecessary delay but in any event prior to the termination of the Distribution Compliance Period, the Issuer shall deliver to the Trustee the Permanent Regulation S Global Notes for each Class executed by the Issuer.  Upon the termination of the Distribution Compliance Period, the Temporary Regulation S Global Note for each Class shall be surrendered by the Note Registrar, as custodian for the Depositary, to the

Authenticating Agent at the Authenticating Agent's office, as the Issuer's agent for such purpose (or, at the Trustee's option, Note Registrar, as custodian for the Depositary, shall be instructed by the Trustee or Authenticating Agent to endorse each such Temporary Regulation S Global Note to reduce the principal amount thereof), to be exchanged, in whole or from time to time in part, for a Permanent Regulation S Global Note of the same Class without charge and the Authenticating Agent shall authenticate and deliver to the Note Registrar, as custodian for the Depositary, for delivery in exchange for each such Temporary Regulation S Global Note or the portions thereof to be exchanged, an equal aggregate principal amount of a Permanent Regulation S Global Note of the same Class as shall be specified by the Note Registrar, as custodian for the Depositary; provided, however, that, upon such presentation by the Note Registrar, as custodian for the Depositary: (i) Authenticating Agent receives a certificate substantially in the form set forth in Exhibit B-1, and signed by Euroclear or Clearstream, as applicable, as to the portions of each Temporary Regulation S Global Note held for the respective accounts of Euroclear or Clearstream, as applicable, that it has received from each beneficial owner of the portion of each Temporary Regulation S Global Note then to be exchanged written certification substantially to the effect set forth in Exhibit B-2, with such changes therein as shall be approved by the Issuer, (ii) the Trustee, the Principal Paying Agent and Paying Agent do not have actual knowledge, and have not received notification from the Issuer with respect to the original issuance and distribution of the Regulation S Global Notes that such person has actual knowledge, that such certificate is false, and (iii) the Trustee and the Paying Agent do not have a United States address as the address for payment to any Holder of the Permanent Regulation S Global Note issuable upon such exchange. Notwithstanding the foregoing, in the event of redemption in whole or acceleration of all or any part of the Notes prior to the termination of the Distribution Compliance Period, the Permanent Regulation S Global Note will not be issuable in respect of the Temporary Regulation S Global Note or portion thereof, and payment thereon will be made as provided in the Temporary Regulation S Global Note. Any Temporary Regulation S Global Note presented to the Trustee or the Authenticating Agent for a Permanent Regulation S Global Note shall be endorsed by the Trustee or the Authenticating Agent to reduce the principal amount thereof by the amount so exchanged, and shall then be returned to the Note Registrar, as custodian for the Depositary, pending exchange of the remaining balance thereof pursuant to the terms hereof.

(d)    Regulation S Global Notes and Restricted Global Notes may be exchanged under the limited circumstances set forth in Section 2.4 for Definitive Notes.

(e)    The Issuers in issuing the Notes may use "CUSIP" or "private placement" numbers (if then generally in use), and, if so, the Trustee will indicate the "CUSIP" or "private placement" numbers of the Notes in notices of redemption and related materials as a convenience to Holders; provided that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption and related materials.

### Section 2.2    Authorized Amount; Note Interest Rate; Stated Maturity; Denominations.

(a)    The aggregate principal amount of Notes which may be issued under this Indenture is limited as set forth in subsection (b) below, excluding Notes issued upon registration of, transfer of, in exchange for, or in lieu of, other Notes pursuant to Section 2.4, 2.5 or 8.5.

(b)    Such Notes shall be divided into the following Classes having designations, original principal amounts, original Note Interest Rates and Stated Maturities as follows:

| Designation | Original Principal Amount | Note Interest Rate | Note Stated Maturity |
|---|---|---|---|
| Class A-1 Notes | $446,250,000 | LIBOR + 0.23% | August 17, 2046 |
| Class A-2 Notes | $78,750,000 | LIBOR + 0.40% | August 17, 2046 |
| Class B Notes | $66,500,000 | LIBOR + 0.50% | August 17, 2046 |

30775-00034 NY:1268831.8

| | | | |
|---|---|---|---|
| Class C Notes | $26,000,000 | LIBOR + 1.30% | August 17, 2046 |
| Class D Notes | $35,250,000 | LIBOR + 3.15% | August 17, 2046 |
| Class E Notes | $10,500,000 | LIBOR + 6.00% | August 17, 2046 |

The Notes (including beneficial interests therein, if any) shall be issuable in minimum denominations of $500,000 and in integral multiples of $1,000 in excess thereof.

(c)    Interest shall accrue on the outstanding principal amount of each Class of Notes (determined (i) in the case of the initial Interest Period, as of the Closing Date and (ii) thereafter, as of the first day of each Interest Period and after giving effect to any payment of principal occurring on such day) from the Closing Date and will be payable in arrears on each Distribution Date.  Interest accruing for any Interest Period shall accrue for the period from and including the first day of such Interest Period to and including the last day of such Interest Period.  The Preference Shares shall be entitled to receive Excess Interest pursuant to Section 11.1 to the extent funds are available therefor in accordance with the Priority of Payments.  Interest on the Notes will be calculated on the basis of the actual number of days elapsed in the applicable Interest Period divided by 360.

(d)    The Notes shall be redeemable as provided in Article IX and Section 11.1.

(e)    The Depositary for the Global Notes shall initially be DTC.

(f)    The Notes shall be numbered, lettered or otherwise distinguished in such manner as may be consistent herewith, determined by the Authorized Officer of the Issuers executing such Notes as evidenced by their execution of such Notes.

### Section 2.3  Execution, Authentication, Delivery and Dating.

(a)    The Class A Notes, Class B Notes, Class C Notes, Class D Notes and Class E Notes shall be executed on behalf of the Issuers by an Authorized Officer of the Issuers.  The signatures of such Authorized Officer on the Notes may be manual or facsimile (including in counterparts).

(b)    Notes bearing the manual or facsimile signatures of an individual who was at any time an Authorized Officer of either of the Issuers shall bind such Person, notwithstanding the fact that such individual has ceased to hold such office prior to the authentication and delivery of such Notes or did not hold such office at the date of issuance of such Notes.

(c)    At any time and from time to time after the execution and delivery of this Indenture, the Issuers may deliver Class A Notes, Class B Notes, the Class C Notes, the Class D Notes or the Class E Notes, executed by the Issuers to the Trustee or the Authenticating Agent for authentication, and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

(d)    Each Note authenticated and delivered by the Trustee or the Authenticating Agent to or upon Issuer Order on the Closing Date shall be dated as of the Closing Date.  All other Notes that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

(e)    Notes issued upon transfer, exchange or replacement of other Notes shall be issued in authorized denominations reflecting the original aggregate principal amount of the Notes so transferred, exchanged or replaced, but shall represent only the current outstanding principal amount of the Notes so transferred, exchanged or replaced. In the event that any Note is divided into more than one Note in accordance with this Article II, the original principal amount of such Note shall be proportionately divided among the Notes, as applicable, delivered in

51

exchange therefor and shall be deemed to be the original aggregate principal amount of such subsequently issued Notes.

(f)    No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a certificate of authentication (the "Certificate of Authentication"), substantially in the form provided for herein, executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

### Section 2.4    Registration, Transfer and Exchange of Notes.

(a)    Registration of Notes.  The Trustee is hereby appointed as the registrar hereunder (the "Note Registrar").  The Trustee is hereby appointed as a transfer agent with respect to the Notes (a "Transfer Agent").  The Note Registrar shall keep a register (the "Note Register") at the Registrar Office in which, subject to such reasonable regulations as it may prescribe, the Note Registrar shall provide for the registration of Notes and the registration of transfers of Notes.  Upon any resignation or removal of the Note Registrar, the Issuer shall promptly appoint a successor or, in the absence of such appointment, assume the duties of Note Registrar.  The Issuers may not terminate the appointment of the Note Registrar or any Transfer Agent without the consent of each Holder of Preference Shares.

Subject to this Section 2.4, upon surrender for registration or transfer of any Notes at the office or agency of the Issuers to be maintained as provided in Section 7.2, the Issuers shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denomination and of a like aggregate principal amount.

At the option of the Holder, Notes may be exchanged for Notes of like terms, in any authorized denominations and of like aggregate principal amount, upon surrender of the Notes to be exchanged at such office or agency.  Whenever any Note is surrendered for exchange, the Issuers shall execute and the Trustee shall authenticate and deliver the Notes that the Noteholder making the exchange is entitled to receive.

All Notes issued and authenticated upon any registration of transfer or exchange of Notes shall be the valid obligations of the Issuers, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Notes surrendered upon such registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Issuers and the Note Registrar duly executed, by the Holder thereof or his attorney duly authorized in writing.

No service charge shall be made to a Holder for any registration of transfer or exchange of Notes, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

(b)    Transfers of Notes.

(i)    Subject to Section 2.4(b)(iv), exchanges or transfers of beneficial interests in a Global Note may be made only in accordance with the rules and regulations of the Depositary (and, in the case of a Regulation S Global Note, prior to the end of the Distribution Compliance Period, only to beneficial owners who hold their interests only through Euroclear or Clearstream) and the transfer restrictions contained in the legend on such Global Note and exchanges or transfers of interests in a Global Note may be made only in accordance with the following:

(A)    Subject to clauses (B) through (F) of this Section 2.4(b)(i), transfers of a Global Note shall be limited to transfers of such Global Note in whole, but not in part, to nominees of the Depositary or to a successor of the Depositary or such successor's nominee.

30775-00034 NY:1268831.8

(B)    The Trustee shall cause the exchange or transfer of any beneficial interest in a Regulation S Global Note for a beneficial interest in a Restricted Global Note upon provision to the Trustee, the Note Registrar and the Issuers of a written certification in the form of Exhibit D-1 (a "Restricted Note Transfer Certificate") by the transferor and a written certification in the form of Exhibit D-3 (an "Investor Certificate") by the transferee.

(C)    The Trustee shall cause the exchange or transfer of any beneficial interest in a Restricted Global Note for a beneficial interest in a Regulation S Global Note upon provision to the Trustee, the Note Registrar and the Issuers of a written certification substantially in the form of Exhibit D-2 (a "Regulation S Note Transfer Certificate") by the transferor and an Investor Certificate by the transferee.

(D)    An owner of a beneficial interest in a Regulation S Global Note may transfer such interest in the form of a beneficial interest in such Regulation S Global Note in accordance with the applicable procedures of Euroclear and Clearstream (the "Applicable Procedures") without the provision of written certification, provided that (1) such transfer is not made to a U.S. Person or for the account or benefit of a U.S. Person and is effected through Euroclear or Clearstream in an offshore transaction as required by Regulation S and (2) any transfer not effected in an offshore transaction to a non-U.S. beneficial owner in accordance with Rule 904 of Regulation S may be made only upon provision to the Trustee, the Issuers and the Note Registrar of a Regulation S Note Transfer Certificate and an Investor Certificate; provided, further, that, if clause (2) above does not apply, each such beneficial holder shall be deemed to have made all the applicable representations and agreements contained in the Investor Certificate.

(E)    An owner of a beneficial interest in a Restricted Global Note may transfer such interest in the form of a beneficial interest in such Restricted Global Note without the provision of written certification; provided, however, that each such beneficial holder shall be deemed to have made all the applicable representations and agreements contained in the Investor Certificate.

(F)    The Trustee shall cause the transfer of any beneficial interest in a Global Note for a Definitive Note that is a Regulation S Note (a "Regulation S Definitive Note"), upon provision to the Trustee, the Issuers and the Note Registrar of a Regulation S Note Transfer Certificate by the transferor and an Investor Certificate by the transferee.

(ii)    Subject to Section 2.4(b)(iv), the Trustee shall cause the transfer of (A) any Definitive Note for a beneficial interest in a Regulation S Global Note or a Regulation S Definitive Note, upon provision to the Trustee, the Issuers and the Note Registrar of a Regulation S Note Transfer Certificate by the transferor and an Investor Certificate by the transferee or (B) any Definitive Note for a beneficial interest in a Restricted Global Note, upon provision to the Trustee, the Issuers and the Note Registrar of a Restricted Note Transfer Certificate by the transferor and an Investor Certificate by the transferee.

(iii)    Upon acceptance for exchange or transfer of a beneficial interest in a Global Note for a Definitive Note, or upon acceptance for exchange or transfer of a Definitive Note for a beneficial interest in a Global Note, each as provided herein, the Trustee shall instruct the Depositary to adjust the principal amount of such Global Note on its records to evidence the date of such exchange or transfer and the change in the principal amount of such Global Note.

(iv)    Subject to the restrictions on transfer and exchange set forth in this Section 2.4 and to any additional restrictions on transfer or exchange specified in the Definitive Notes, the Noteholder of any Definitive Note may transfer or exchange the same in whole or in part (in a principal amount equal to the minimum authorized denomination or any larger authorized amount) by surrendering such Definitive Note at the Registrar Office or at the office designated by any Transfer Agent, together with (x) in the case of any transfer, an executed instrument of assignment and (y) in the case of any exchange, a written request for exchange. Following a proper request for transfer or exchange, the Trustee shall (provided it has available in its possession an inventory of Definitive Notes), within five Business Days of such request if

53

made at such Registrar Office, or within ten Business Days if made at the office designated by a Transfer Agent (other than the Trustee), authenticate and make available to the transferee (in the case of transfer) or Noteholder (in the case of exchange) or send by first class mail (at the risk of the transferee in the case of transfer or Noteholder in the case of exchange) to such address as the transferee or Noteholder, as applicable, may request, a Definitive Note or Notes, as the case may require, for a like aggregate principal amount and in such authorized denomination or denominations as may be requested. The presentation for transfer or exchange of any Definitive Note shall not be valid unless made at the Registrar Office or at the office designated by a Transfer Agent by the registered Noteholder in person, or by a duly authorized attorney-in-fact. Beneficial interests in Global Notes shall be exchangeable for Definitive Notes only under the limited circumstances described in Section 2.4(b)(v).

(v)    Interests in a Global Note deposited with or on behalf of the Depositary, Euroclear and/or Clearstream, as applicable, pursuant to Section 2.1 hereunder shall be transferred to the owners of such interests in the form of Definitive Notes only if such transfer otherwise complies with this Section 2.4 (including clauses (b)(i) and (b)(ii)) and (1) the Depositary notifies the Issuer that it is unwilling or unable to continue as Depositary for the Notes, (2) the Depositary ceases to be a "clearing agency" registered under the Exchange Act and a successor Depositary is not appointed by the Issuer within 90 days of such notice, (3) if the transferee of an interest in a Global Note is required by law to take physical delivery of securities in definitive form, (4) Regulation S Global Notes or any of them become immediately due and repayable following an Event of Default, (5) the Depositary, Euroclear or Clearstream is closed for business for a continuous period of 14 days (other than by reason of holiday, statutory or otherwise), (6) the Depositary, Euroclear or Clearstream announces an intention permanently to cease business and no alternative clearance system satisfactory to the Issuer is available, (7) as a result of any amendment to, or change in, the laws or regulations of the Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which becomes effective on or after the Closing Date, the Issuer or any Paying Agent is or will be required to make any deduction or withholding from any payment in respect of the Notes which would not be required were the Notes in definitive registered form or (8) the Issuer so elects by notice to the Noteholders, and the Depositary, Euroclear and/or Clearstream, as the case may be, do not object (as determined by the Issuer).

(vi)    If interests in any Global Note are to be transferred to the Beneficial Owners thereof in the form of Definitive Notes pursuant to Section 2.4(b)(v), such Global Note shall be surrendered by the Depositary, or its custodian on its behalf, to the Registrar Office or to the office designated by the Transfer Agent currently located in Nashville, Tennessee and the Trustee or an Authenticating Agent shall authenticate and deliver without charge, upon such transfer of interests in such Global Note, an equal aggregate principal amount of Definitive Notes of authorized denominations. The Definitive Notes transferred pursuant to this Section 2.4 shall be executed, authenticated and delivered only in the denominations specified in Section 2.2(b) and registered in such names as the Depositary shall direct in writing.

(vii)    For so long as one or more Global Notes are Outstanding:

(A)    the Trustee and its directors, officers, employees and agents may deal with the Depositary for all purposes (including the making of distributions on, and the giving of notices with respect to, the Global Notes);

(B)    unless otherwise provided herein, the rights of Beneficial Owners shall be exercised only through the Depositary and shall be limited to those established by law and agreements between such Beneficial Owners and the Depositary;

(C)    for purposes of determining the identity of and principal amount of Notes beneficially owned by a Beneficial Owner, the records of the Depositary shall be conclusive evidence of such identity and principal amount and the Trustee may conclusively rely on such records when acting hereunder;

54

(D)     the Depositary will make book-entry transfers among the Depositary Participants of the Depositary and will receive and transmit distributions of principal of and interest on the Global Notes to such Depositary Participants; and

(E)     the Depositary Participants of the Depositary shall have no rights under this Indenture under or with respect to any of the Global Notes held on their behalf by the Depositary, and the Depositary may be treated by the Trustee and its agents, employees, officers and directors as the absolute owner of the Global Notes for all purposes whatsoever.

(viii)     The Issuer may impose additional transfer restrictions to comply with the USA PATRIOT Act, or any similar laws or regulations to the extent they are applicable to the Issuer, and each Holder of Securities will be required to comply with such transfer restrictions.

(c)     Denominations; Flow-Through Investment Vehicles; Qualified Purchaser or Knowledgeable Employee Status. No Person may hold a beneficial interest in any Note except in a denomination authorized for the Notes of such Class under Section 2.2(b). No transfer of a Note may be made to a Flow-Through Investment Vehicle other than a Qualifying Investment Vehicle.

Any purported transfer that is not in compliance with this Section 2.4 or the legends on the Notes will be of no force and effect, will be void ab initio, and will not operate to transfer any rights to the transferee, notwithstanding any instructions to the contrary to the Issuers, the Trustee or any intermediary. If any purported transfer of Notes or any beneficial interest therein to a purported transferee does not comply with the requirements set forth in this Section 2.4 or the legends on the Notes then the purported transferor of such Notes or beneficial interest therein shall be required to cause the purported transferee to surrender the Notes or any beneficial interest therein in return for a refund of the consideration paid therefor by such transferee (together with interest thereon) or to cause the purported transferee to dispose of such Notes or beneficial interest promptly in one or more open market sales to one or more persons each of whom satisfies the requirements of this Section 2.4 and the legends on the Notes and such purported transferor shall take, and shall cause such transferee to take, all further action necessary or desirable, in the judgment of the Trustee, to ensure that such Notes or any beneficial interest therein are held by persons in compliance therewith.

If, notwithstanding the restrictions set forth in this Section 2.4, either of the Issuers determines that any Beneficial Owner or Holder of a Restricted Note (i) is a U.S. Person and (ii) is not (A) a Qualified Purchaser, (B) a Knowledgeable Employee or (C) a company each of whose beneficial owners is a Qualified Purchaser and/or a Knowledgeable Employee, the Issuers shall redeem the Restricted Notes (or interest therein) held by such Beneficial Owner or Holder or shall require, by notice to such Beneficial Owner or Holder, as the case may be, that such Beneficial Owner or Holder sell all of its right, title and interest to such Note (or interest therein) to a Person that is a Regulations S transferee or that is both (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser, a Knowledgeable Employee or a company each of whose beneficial owners is a Qualified Purchaser and/or a Knowledgeable Employee with such sale to be effected within 30 days after notice of such sale requirement is given. If such Beneficial Owner or Holder fails to effect the transfer required within such 30-day period, (x) upon written direction from the Collateral Manager or the Issuer, the Trustee shall, and is hereby irrevocably authorized by such Beneficial Owner or Holder to, as the case may be, cause its interest in such Note to be transferred in a commercially reasonable sale (conducted by an investment bank selected by the Trustee with the consent of the Collateral Manager, in accordance with Section 9-610(b) of the UCC as applied to securities that are sold on a recognized market or that may decline speedily in value) to a Person that certifies to the Trustee, the Issuers and the Collateral Manager, in connection with such transfer, that such Person is both (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser, a Knowledgeable Employee or a company each of whose beneficial owners is a Qualified Purchaser and/or a Knowledgeable Employee and (y) pending such transfer, no further payments will be made in respect of such Note (or beneficial interest therein) held by such Holder or Beneficial Owner and the Note shall not be deemed to be Outstanding for the purpose of any vote or consent of the Noteholders. As used in this paragraph, the term "U.S. Person" has the meaning given such term in Regulation S under the Securities Act.

(d)     Legends. Any Note issued upon the transfer, exchange or replacement of Notes shall bear such applicable legend set forth in the relevant Exhibit hereto unless there is delivered to the Trustee, Note Registrar,

Collateral Manager, the Issuer and the Co-Issuer such satisfactory evidence, which may include an Opinion of Counsel, as may be reasonably required by any of the Trustee, Note Registrar, Collateral Manager, the Issuer and the Co-Issuer to the effect that (i) neither such applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of Rule 144A or Regulation S, as the case may be, and to ensure that neither of the Issuers nor the Collateral becomes an investment company required to be registered under the Investment Company Act, and (ii) the Issuers and the Collateral are exempt from registration under the Investment Company Act other than by reason of Section 3(c)(7) thereof. Upon provision of such satisfactory evidence, the Trustee, at the direction of the Collateral Manager, the Issuer and the Co-Issuer, shall authenticate and deliver Notes that do not bear such applicable legend.

(e)        Expenses; Acknowledgment of Transfer.  Transfer, registration and exchange shall be permitted as provided in this Section 2.4 without any charge to the Noteholder except for the expenses of delivery (if any) not made by regular mail and payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith pursuant to Section 2.4. Registration of the transfer of a Note by the Trustee shall be deemed to be the acknowledgment of such transfer on behalf of the Issuers.

(f)        Surrender upon Final Payment.  Subject to Section 2.8, upon final payment due on the Maturity of a Note, the Holder thereof shall present and surrender such Note at the Registrar Office of the Note Registrar or at the office of any Paying Agent.

(g)        Repurchase and Cancellation of Notes.  The Issuers will not purchase, redeem, prepay or otherwise acquire, directly or indirectly, any of the Outstanding Notes except upon the redemption of the Notes in accordance with the terms of this Indenture and the Notes. The Issuers will promptly cancel all Notes acquired by them pursuant to any payment, purchase, redemption, prepayment or other acquisition of Notes pursuant to any provision of this Indenture and no Notes may be issued in substitution or exchange for any such Notes.

(h)        Compliance with Transfer Restrictions.  Notwithstanding anything contained herein to the contrary, neither the Trustee nor the Note Registrar shall be responsible for ascertaining whether any transfer complies with the registration provisions of or exemptions from the Securities Act, applicable state securities laws, the rules of any Depositary, ERISA, the Code or the Investment Company Act; provided that if a certificate is specifically required by the express terms of this Section 2.4 to be delivered to the Trustee or the Note Registrar by a purchaser or transferee of a Note, the Trustee or the Note Registrar, as the case may be, shall be under a duty to receive and examine the same to determine whether the transfer contemplated thereby substantially complies with the express terms of this Indenture and shall promptly notify the party delivering the same if such transfer does not comply with such terms.

(i)        Distribution Compliance Period.  Promptly after completion of distribution of the Notes, the Issuers (or the Issuer, as the case may be) shall deliver to the Trustee a certificate identifying such date and specifying the date on which the Distribution Compliance Period will expire. Absent receipt of such certificate, the Trustee and the Note Registrar shall be entitled to assume that the Distribution Compliance Period has not expired. Notwithstanding the foregoing, the Distribution Compliance Period shall not terminate until the Trustee and the Note Registrar have received a written certificate from the Depositary, together with copies of certificates from Euroclear and Clearstream, certifying that they have received certification of non-U.S. beneficial ownership of one hundred percent (100%) of the Aggregate Outstanding Amount of each Regulation S Global Note (except to the extent of any beneficial owners thereof who acquired an interest therein during the Distribution Compliance Period pursuant to an exemption (other than Regulation S) from registration under the Securities Act).

(j)        Physical Notes.  The Issuers will promptly make available to the Trustee and the Note Registrar without charge a reasonable supply of Definitive Notes in definitive, fully registered form, without interest coupons.

(k)        Investor Certification upon Initial Sale.  Upon the initial sale and purchase of any Notes, each purchaser (other than the Initial Purchaser) shall deliver to the Issuers, the Trustee and the Initial Purchaser an executed Investor Certificate.

30775-00034 NY:1268831.8

(l)    Tax Certifications. The Holder understands that the Issuer may require certification acceptable to it (i) to permit the Issuer to make payments to it without, or at a reduced rate of, withholding or (ii) to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets. The Holder agrees to provide any such certification that is requested by the Issuer.

(m)    Tax Treatment. The Holder acknowledges that it is its intent and that it understands it is the intent of the Issuer that, for purposes of U.S. federal income, state and local income and franchise tax and any other income taxes, the Issuer will be treated as a corporation, the Notes will be treated as indebtedness of the Issuer, and the Preference Shares will be treated as equity in the Issuer; it agrees to such treatment and agrees to take no action inconsistent with such treatment, unless required by law.

(n)    ERISA. In the case of a Class A Note, Class B Note, Class C Note, Class D Note or Class E Note, each original purchaser of a Note or any beneficial interest therein will be required to certify (and each subsequent transferee will be deemed to have represented and agreed) that either (a) it is not an "employee benefit plan" as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan described in section 4975(e)(1) of the Code (each a "Plan"), an entity which is deemed to hold the assets of any such Plan pursuant to 29 C.F.R. Section 2510.3-101, which Plan or entity is subject to Title I of ERISA or Section 4975 of the Code, or a governmental or church plan which is subject to any U.S. Federal, state or local law that is similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Code, or (b) its purchase and ownership of such Note will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental or church plan, any such similar U.S. Federal, state or local law).

### Section 2.5    Mutilated, Defaced, Destroyed, Lost or Stolen Notes.

If (a) any mutilated or defaced Note is surrendered to a Transfer Agent, or if there shall be delivered to the Issuers, the Trustee and a Transfer Agent (each, a "Specified Person") evidence to their reasonable satisfaction of the destruction, loss or theft of any Note, and (b) there is delivered to the Specified Persons such security or indemnity as may reasonably be required by them to save each of them harmless then, in the absence of notice to the Specified Persons that such Note has been acquired by a protected purchaser, the Issuers shall execute and shall direct the Trustee or an Authenticating Agent to authenticate, and upon Issuer Request the Trustee shall authenticate and deliver, in lieu of any such mutilated, defaced, destroyed, lost or stolen Note, a new Note of the same Class as such mutilated, defaced, destroyed, lost or stolen Note, of like tenor (including the same date of issuance) and equal principal amount, registered in the same manner, dated the date of its authentication, bearing interest from the date to which interest has been paid on the mutilated, defaced, destroyed, lost or stolen Note and bearing a number not contemporaneously outstanding.

If, after delivery of such new Note, a protected purchaser of the predecessor Note presents for payment, transfer or exchange such predecessor Note, the Specified Persons shall be entitled to recover such new Note from the Person to whom it was delivered or any Person taking therefrom, other than a protected purchaser, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Specified Persons in connection therewith.

In case any such mutilated, defaced, destroyed, lost or stolen Note has become due and payable, the Issuers in their or its (as applicable) discretion may, instead of issuing a new Note, pay such Note without requiring surrender thereof, except that any mutilated Note shall be surrendered.

Upon the issuance of any new Note under this Section 2.5, the Issuers, the Trustee or any Transfer Agent may require the payment by the registered holder thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Note issued pursuant to this Section 2.5 in lieu of any mutilated, defaced, destroyed, lost or stolen Note, shall constitute an original additional contractual obligation of the Issuers and such new Note shall be

30775-00034 NY:1268831.8