(ii)    the nature, source and amount of any proceeds in the Collection Accounts, including Interest Proceeds and Principal Proceeds, received since the date of determination of the last Monthly Report (or, if more recent, the date of determination of the last Note Valuation Report);

(iii)    with respect to each Underlying Asset (that is not a Synthetic Security) and each Eligible Investment that is part of the Collateral, its Principal/Notional Balance, , annual interest rate, Stated Maturity, issuer, Standard & Poor's Rating (other than any credit estimate, private rating or confidential rating) and Moody's Rating (other than any private or confidential rating, but including whether such security is on watch for possible upgrade or downgrade by Moody's) and an identification of any changes in any such Rating since the last Monthly Report;

(iv)    with respect to each Synthetic Security its maturity date, Principal/Notional Balance, Fixed Payment Amounts (as defined in the relevant Synthetic Security), the obligor of the related Reference Obligation, guarantor on the related Reference Obligation (if any), Moody's Rating and Standard & Poor's Rating;

(v)(A) the identity of each Underlying Asset which became a Credit Risk Obligation, Defaulted Security, Withholding Security or Written Down Security since the date of determination of the last Monthly Report (or, if more recent, the date of determination of the last Note Valuation Report); (B) the identity of each Underlying Asset which has become a Credit Risk Obligation, Defaulted Security, Withholding Security or Written Down Security since the Closing Date indicating the date on which each such Underlying Asset became a Credit Risk Obligation, Defaulted Security, Withholding Security or Written Down Security; and (C) any disposition of an Underlying Asset pursuant to Section 12.1(a) and the identity and sale price, or Trading Gain Payment or Trading Loss Payment, as applicable, of such Underlying Asset;

(vi)    a calculation in reasonable detail necessary to determine compliance with each Coverage Test and, in the case of each Overcollateralization Test, a comparison of the respective Overcollateralization Ratio on such date to the respective Overcollateralization Ratio on the Closing Date and a statement as to whether such tests have been satisfied or have not been satisfied and, if not satisfied, the amount of principal to be paid on each Class of Notes in order to achieve compliance with the Coverage Tests;

(vii)    the identity (to the extent not covered by a preceding clause), and the Aggregate Principal/Notional Balance of (A) Fixed Rate Securities, (B) Floating Rate Securities, (C) Underlying Assets insured by each monoline insurer, (D) Underlying Assets part of the same issue in the case of the five largest such concentrations (by Aggregate Principal/Notional Balance), (E) Underlying Assets serviced by the same Servicer in the case of the five largest such concentrations (by Aggregate Principal/Notional Balance), (F) CMBS Securities, (G) RMBS Securities, (H) Automobile Securities, (I) Car Rental Fleet Securities, (J) CDO Securities, (K) Credit Card Securities, (L) Equipment Lease Securities, (M) Small Business Loan Securities and (N) Student Loan Securities; and

(viii)    Moody's Asset Correlation Test, Moody's Weighted Average Recovery Rate, Moody's Weighted Average Rating Factor, Standard & Poor's Weighted Average Recovery Rate, Weighted Average Coupon, Weighted Average Spread, Aggregate WAC Change Test and Aggregate WAS Change Test.

In addition, the Issuer also shall indicate in each such Monthly Report the respective percentage of the Net Outstanding Underlying Asset Balance for each aggregate amount referred to in clauses (i) and (vii) above.

Within three Business Days after receipt of such Monthly Report, the Collateral Manager or the Issuer shall notify the Trustee if the information contained in the Monthly Report does not conform to the information maintained by them with respect to the Collateral. In the event that any discrepancy exists, the Trustee and the Issuer, or the Collateral Manager on behalf of the Issuer, shall attempt to resolve the discrepancy within two Business Days. If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days cause the Independent accountants appointed by the Issuer pursuant to Section 10.10 to review such Monthly Report and

the Trustee's records to determine the cause of such discrepancy. If such review reveals an error in the Monthly Report or the Trustee's records, the Monthly Report or the Trustee's records shall be revised accordingly and, as so revised, shall be utilized in making all calculations pursuant to this Indenture.

(b)    Distribution Date. The Issuer shall deliver, or cause to be delivered, an accounting ("Note Valuation Report"), determined as of each Determination Date, to Moody's, Standard & Poor's (via e-mail to CDO_Surveillance@standardandpoors.com), the Trustee, the Collateral Manager, the Preference Share Paying Agent, each Synthetic Security Counterparty, the Interest Rate Swap Counterparty, the Initial Investment Agreement Provider, and, upon written request therefor in the form of Schedule I attached hereto certifying that it is a Holder of a Note or beneficial interest in any Note, each Holder of a beneficial interest in a Note (or its designee), and the Depositary (accompanied by a request that it be transmitted to the holders of Notes on the books of the Depositary), not later than two Business Days preceding the related Distribution Date. The Note Valuation Report shall contain the following information (determined, unless otherwise specified below, as of the related Determination Date and based, in part, on information received from the Collateral Manager):

(i)    the Aggregate Outstanding Amount of the Notes of each Class and as a percentage of the original Aggregate Outstanding Amount of the Notes of such Class on the first day of the immediately preceding Interest Period, the amount of principal payments to be made on the Notes of each Class on the next Distribution Date, the amount of any Deferred Interest in respect of each Class of Notes and the Aggregate Outstanding Amount of the Notes of each Class and as a percentage of the original Aggregate Outstanding Amount of the Notes of such Class after giving effect to the principal payments, if any, on the next Distribution Date;

(ii)    the Interest Distribution Amount payable to the Holders of the Notes for the related Distribution Date (in the aggregate and by Class);

(iii)    the Note Interest Rate for each Class of Notes for the Interest Period preceding the next Distribution Date;

(A)    the Administrative Expenses payable on the next Distribution Date; and

(B)    the Management Fee payable on the next Distribution Date;

(iv)    for the Interest Collection Account:

(A)    the Balance credited to the Interest Collection Account at the end of the related Due Period;

(B)    the amounts payable from the Interest Collection Account, pursuant to Section 11.1(a)(i) on the next Distribution Date; and

(C)    the Balance remaining in the Interest Collection Account immediately after all payments and credits to be made on such Distribution Date;

(v)    for the Principal Collection Account:

(A)    the Balance credited to the Principal Collection Account at the end of the related Due Period;

(B)    the amounts payable from the Principal Collection Account pursuant to Section 11.1(a)(ii) on the next Distribution Date; and

(C)    the Balance remaining in the Principal Collection Account immediately after all payments and credits to be made on such Distribution Date;

30775-00034 NY:1268831.8

(vi)    for the Substituted Collateral Account:

(A)    the Balance credited to the Substituted Collateral Account at the end of the related Due Period; and

(B)    the amounts credited to the Substituted Collateral Account and designated as Principal Proceeds to be distributed pursuant to Section 11.1(a)(ii) on the next Distribution Date;

(vii)    the Balance credited to the Expense Account and the Interest Rate Swap Counterparty Collateral Account at the end of the related Due Period;

(viii)    the Aggregate Principal/Notional Balance, Weighted Average Coupon and Weighted Average Spread of all Underlying Assets;

(ix)    the nature, source and amount of any proceeds in the Collection Accounts, including Interest Proceeds and Principal Proceeds, received since the date of determination of the last Monthly Report;

(x)    with respect to each Underlying Asset purchased with Uninvested Proceeds and Substituted Collateral Proceeds, and each Eligible Investment purchased with funds from the Principal Collection Account that is part of the Collateral, its Principal/Notional Balance, annual interest rate, Stated Maturity, issuer, and Standard & Poor's Rating;

(xi)    (A) the identity of each Underlying Asset which became a Defaulted Security or Written Down Security, since the date of determination of the last Monthly Report (or, if more recent, the date of determination of the last Note Valuation Report); and (B) the identity of each Underlying Asset which has become a Defaulted Security or Written Down Security, since the Closing Date indicating the date on which each such Underlying Asset became a Defaulted Security or Written Down Security;

(xii)    the Principal/Notional Balance of any Underlying Asset replaced for acquiring one or more Eligible Substitute Assets and the Aggregate Principal/Notional Balance of such Underlying Assets;

(xiii)    a calculation of each of the items set forth in Section 10.8(a) (determined as of the related Determination Date);

(xiv)    the Preference Shares Outstanding (and as a percentage of the number of Preference Shares Outstanding on the first day of the immediately preceding Interest Period), as reported to the Trustee by the Preference Share Paying Agent, and the amount of Excess Principal Proceeds payable on the next Distribution Date, as determined with the assistance of the Collateral Manager;

(xv)    the Excess Interest payable in respect of the Preference Shares for the related Distribution Date (in the aggregate); and

In addition, the Issuer also shall indicate in each such Note Valuation Report the respective percentage of the Net Outstanding Underlying Asset Balance for each aggregate amount referred to in clauses (i) and (iv) through (vii) of Section 10.8(a) (inclusive), which clauses are incorporated by reference in clause (xi) of this Section 10.8(b). Each Note Valuation Report shall contain instructions to the Trustee to withdraw on the related Distribution Date from the Payment Account and pay or transfer the amounts set forth in such Note Valuation Report in the manner specified therein, and pay or transfer such amounts in accordance with the priorities established in Section 11.1(a).

In addition to the Note Valuation Report, upon the written request of any holder of a beneficial interest in any Note or its designee upon request by the holder therefor in the form of Schedule I certifying that it is such a holder, or any Holder of a Note shown on the Note Register, or any Rating Agency, the Issuer shall deliver to such Holder or Rating Agency, as the case may be, a report containing the number and identity of each Underlying Asset

held by the Issuer on the last day of the Due Period most recently ended (indicating whether any such Underlying Asset is a Defaulted Security (as reported in writing to the Trustee by the Collateral Manager)).

In addition to the foregoing information, each Note Valuation Report shall include a statement (a "Section 3(c)(7) DTC Notice") to the following effect:

> "The Investment Company Act of 1940, as amended (the "Investment Company Act"), requires that each holder of a Note (or any beneficial interest therein) issued by the Issuers that is a U.S. person be a "qualified purchaser" as defined in Section 2(a)(51)(A) of the Investment Company Act and related rules, a "knowledgeable employee" with respect to the Issuer as specified in Rule 3c-5 promulgated under the Investment Company Act or a company each of whose beneficial owners is such a qualified purchaser or a knowledgeable employee with respect to the Issuer (collectively, "Qualified Purchaser"). Under the rules, the Issuers or an agent acting on their behalf must have a "reasonable belief" that each holder of its outstanding securities that is a U.S. person, including transferees, is a Qualified Purchaser. Consequently, each resale of a Note in the United States or to a U.S. Person must be made pursuant to Rule 144A under the Securities Act of 1933, as amended (the "Securities Act"), solely to a purchaser that is a "qualified institutional buyer" within the meaning of Rule 144A ("Qualified Institutional Buyer") and a Qualified Purchaser. Each purchaser of a Restricted Note will be deemed to represent at the time of purchase that: (i) the purchaser is a Qualified Institutional Buyer and also a Qualified Purchaser; (ii) the purchaser is not a dealer described in paragraph (a)(1)(ii) of Rule 144A unless such purchaser owns and invests on a discretionary basis at least $25,000,000 in securities of issuers that are not affiliated persons of the dealer; (iii) the purchaser is not a plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, unless investment decisions with respect to the plan are made solely by the fiduciary, trustee or sponsor of such plan; (iv) the purchaser, and each account for which it is purchasing, is required to hold and transfer at least the minimum denominations of the Notes specified in the Indenture; and (v) the purchaser will provide written notice of the foregoing, and of any applicable restrictions on transfer, to any transferee.

> The Issuers direct that the recipient of this notice, and any recipient of a copy of this notice, provide a copy to any person having an interest in the Note as indicated on the books of The Depository Trust Company or on the books of a participant in The Depository Trust Company or on the books of an indirect participant for which such participant in The Depository Trust Company acts as agent.

> This Indenture provides that if, notwithstanding the restrictions on transfer contained therein, either of the Issuers determine that the owner of a Restricted Note (or any interest therein) (A) is a U.S. person and (B) is not a Qualified Purchaser, either of the Issuers may require, by notice to such Holder, that such Holder sell all of its right, title and interest to such Restricted Note (or interest therein) to a Person that is both (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser, with such sale to be effected within 30 days after notice of such sale requirement is given. If such owner (or holder of a beneficial interest therein) fails to effect the transfer required within such 30-day period, (i) upon written direction from the Collateral Manager or the Issuer, the Trustee shall, and is hereby irrevocably authorized by such owner (or holder of a beneficial interest therein) to, cause its interest in such Note to be transferred in a commercially reasonable sale (conducted by an investment bank selected by the

126

Trustee with the consent of the Collateral Manager, in accordance with Section 9-610(b) of the New York Uniform Commercial Code as applied to securities that are sold on a recognized market or that may decline speedily in value) to a Person that certifies to the Trustee and the Collateral Manager, in connection with such transfer, that such Person is (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser, and (ii) pending such transfer, no further payments will be made in respect of such Note (or interest therein), and the Note shall not be deemed to be Outstanding for the purpose of any vote or consent of the Noteholders. As used in this paragraph, the term "U.S. person " has the meaning given such term within the meaning of the Regulation S."

(c)    Redemption Date Instructions.  Not more than five Business Days after receiving an Issuer Request requesting information regarding a redemption pursuant to Section 9.1, 9.2, 9.3 or 9.4 as of a proposed Redemption Date set forth in such Issuer Request, the Trustee shall provide the necessary information (to the extent it is available to the Trustee) to the Issuer and the Issuer shall compute, or cause the computation of, the following information and prepare a statement (the "Redemption Date Statement") containing the following information:

(i)    the Aggregate Outstanding Amount of the Notes of the Class or Classes to be redeemed as of such Redemption Date;

(ii)    the amount of accrued interest due on such Notes as of the last day of the Interest Period immediately preceding such Redemption Date;

(iii)    the amount in the Interest Collection Account and Principal Collection Account available for application to the redemption of such Notes;

(iv)    the number of Preference Shares to be redeemed as of such Redemption Date;

(v)    the amount of Excess Interest payable in respect of such Preference Shares as of the last day of the Interest Period immediately preceding such Redemption Date; and

(vi)    the amount in the Interest Collection Account and Principal Collection Account available as Excess Principal Proceeds for application towards the redemption of such Preference Shares.

(d)    If the Trustee shall not have received any accounting provided for in this Section 10.8, the Trustee shall use reasonable efforts to cause such accounting to be made by the applicable Distribution Date or Redemption Date, and to the extent the Issuer fails to provide any information or reports pursuant to this Section 10.8, the Trustee shall be entitled to retain an Independent certified public accountant in connection therewith and the reasonable costs incurred by the Trustee for such Independent certified public accountant shall be reimbursed pursuant to Section 6.8.

(e)    The Issuer (or the Collateral Manager) on its behalf shall notify the Rating Agencies promptly after the First Distribution Date, of the Principal/Notional Balance and issuer of all Underlying Assets delivered after the Closing Date and on or prior to First Distribution Date, if any.

(f)    Upon receipt from the Trustee of the Monthly Reports, the Note Valuation Reports, the Distribution Date instructions, the Redemption Date Statements and the certificates required in connection with the purchase and sale of Collateral under the Indenture, the Collateral Manager shall review and verify the contents of the aforesaid reports, instructions, statements and certificates.

(g)    Nothing contained in this Section 10.8 (a) shall constitute the Trustee, the Issuer, the Preference Share Paying Agent and the Collateral Manager as members of any partnership, joint venture, association, syndicate, unincorporated business or other separate entity, (b) shall be construed to impose any liability as such on any of them or (c) shall be deemed to confer on any of them any express, implied or apparent authority to incur any obligation or liability on behalf of any other.

(h)    Upon receipt from the Issuer, the Trustee shall make available the Monthly Report and the Note Valuation Report to each Rating Agency, the Issuer, the Collateral Manager, the Interest Rate Swap Counterparty, the Initial Investment Agreement Provider, each Holder of a Note shown on the Note Register (other than DTC), the Initial Purchaser, the Preference Share Paying Agent, each Transfer Agent, and, upon written request in the form of Schedule I attached hereto certifying that it is a Holder of a Note or beneficial interest in any Note, to each Holder of a Note shown on the Note Register or Holder of a beneficial interest in a Note, to such Holder; provided that the Trustee shall email each Monthly Report or Note Valuation Report in a mutually agreed format at the e-mail addresses set forth in Section 14.3(e).

(i)    Other than with respect to transfers or pledges by the Collateral Manager in connection with financing arrangements for the Collateral Manager, the Collateral Manager shall promptly notify the Trustee and the Issuer of any sale or transfer of Preference Shares owned, directly or indirectly, by the Collateral Manager or its Affiliates to a Person that is not an Affiliate of the Collateral Manager. Upon receipt of such notice, the Trustee shall provide notice of such transfer to the Holders in the next Monthly Report or Note Valuation Report (without disclosing the identity of the transferee), to the extent still Outstanding, of the Class A Notes, Class B Notes, Class C Notes, Class D Notes and Class E Notes shown on the Note Register.

(j)    The Issuer shall provide Standard & Poor's with an Excel Default Model Input File not later than the eighth Business Day after the last day of each month (excluding any month as to which a Note Valuation Report is rendered). The Issuer, at the same time, also shall provide Standard & Poor's with the results of Standard & Poor's CDO Evaluator determined as of the last day of the prior month. All documents in this clause (j) shall be sent via e-mail to CDO_Surveillance@standardandpoors.com.

(k)    The Issuer shall provide the Rating Agencies with a collateral file not later than the eighth Business Day after the last day of each month (including any month as to which a Note Valuation Report is rendered). Such file shall be in a format that can be opened into an Excel spreadsheet. The collateral file shall provide information on the assets within the portfolio as of the date of the most recent Monthly Report issued. The following fields of information on each asset within the portfolio shall be included in the collateral file: obligor or issue name; description of asset type; coupon or spread; CUSIP number or other identifier; par value; Stated Maturity; Standard & Poor's industry classification group; Standard & Poor's Rating; Moody's industry classification group; and Moody's Rating (including whether such security is on watch for possible upgrade or downgrade by Moody's).

(l)    The Issuer shall not disclose the unpublished Standard & Poor's rating of any Underlying Asset without the prior written consent of Standard & Poor's.

## Section 10.9 Release of Securities.

(a)    If no Event of Default has occurred and is continuing and subject to Article XII, the Issuer may, by Issuer Order executed by an Authorized Officer of the Collateral Manager and delivered to the Trustee at least two Business Days prior to the settlement date for any disposition of a Pledged Security certifying that the conditions set forth in Section 12.1 are satisfied, direct the Trustee to release such Pledged Security from the lien of this Indenture against receipt of payment therefor.

(b)    The Issuer may, by Issuer Order executed by an Authorized Officer of the Collateral Manager and delivered to the Trustee at least two Business Days prior to the date set for redemption or payment in full of a Pledged Security, certifying that such Pledged Security is being redeemed or paid in full, direct the Trustee to deliver such Pledged Security to the appropriate paying agent therefor on or before the date set for redemption or payment, in each case against receipt of the redemption price or payment in full thereof.

(c)    If an Underlying Asset is subject to an offer, the Trustee shall, as directed by the Collateral Manager on behalf of the Issuer, take any of the following actions with respect to such Underlying Asset: give consent, grant waiver, vote or exercise any or all other rights or remedies with respect to any such Underlying Asset.

30775-00034 NY:1268831.8

(d)       The Trustee shall credit any proceeds received by it from the disposition of a Pledged Security to the Interest Collection Account or the Principal Collection Account, as the case may be, unless simultaneously applied to the purchase of Eligible Investments as permitted under and in accordance with requirements of Article XII and this Article X.

(e)       The Trustee shall, upon receipt of an Issuer Order at such time as there are no Notes Outstanding and all obligations of the Issuers hereunder have been satisfied, release the Collateral from the lien of this Indenture.

(f)       The Issuer may retain agents (including the Collateral Manager) to assist the Issuer in preparing any notice or other report required under this Article X.

### Section 10.10       Reports by Independent Accountants.

(a)       The Issuer shall appoint a firm of Independent certified public accountants of recognized national reputation for purposes of preparing and delivering the reports or certificates of such accountants required by this Indenture and the Issuer shall permit such Independent certified public accountants to have access to its records with respect to the Collateral and otherwise assist the Independent certified public accountants in the preparation of those reports.  Upon any resignation by such firm, the Issuer shall promptly appoint by Issuer Order delivered to the Trustee and each Rating Agency a successor thereto that shall also be a firm of Independent certified public accountants of recognized international reputation.  If the Issuer shall fail to appoint a successor to a firm of Independent certified public accountants which has resigned within 30 days after such resignation, the Issuer shall promptly notify the Trustee of such failure in writing.  If the Issuer shall not have appointed a successor within ten days thereafter, the Trustee shall promptly appoint a successor firm of Independent certified public accountants of recognized national reputation.  The fees of such Independent certified public accountants and its successor shall be payable by the Issuer or by the Trustee as provided in Section 11.1.

(b)       On the first Business Day following each Distribution Date falling in the month of August, the Issuer shall cause to be delivered to the Trustee, the Collateral Manager and each Rating Agency an Accountants' Report specifying the procedures applied and their associated findings with respect to the Note Valuation Report or Redemption Date Statement prepared with respect to such Distribution Date.  At least 60 days prior to the Distribution Date in August 2007, the Issuer shall deliver or cause to be delivered to the Trustee an Accountant's Report specifying in advance the procedures that such firm will apply in making the aforementioned findings throughout the term of its service as accountants to the Issuer.  The Trustee shall promptly forward a copy of such Accountant's Report to the Collateral Manager, each Synthetic Security Counterparty, the Interest Rate Swap Counterparty and each Holder of Notes of the Controlling Class at the address shown on the Note Register.  The Issuer shall not approve the institution of such procedures if a Majority of the Controlling Class, by notice to the Issuer and the Trustee within 30 days after the date of the related notice to the Trustee, object thereto.  In the event such Independent certified public accountants require the Trustee to agree to the procedures performed by such accountants, the Issuer shall direct the Trustee in writing to agree; it being understood and agreed that the Trustee will deliver such letter of agreement in conclusive reliance upon the direction of the Issuer, and the Trustee makes no independent inquiry or investigation as to, and shall have no obligation or liability in respect of, the sufficiency, validity or correctness of such procedures.

(c)       Any statement delivered to the Trustee pursuant to clause (b) above shall be delivered by the Trustee to any Holder of a Note shown on the Note Register upon written request therefor.

### Section 10.11       Reports to Rating Agencies, Etc.

In addition to the information and reports specifically required to be provided to the Rating Agencies, including reports under Section 10.8, each Synthetic Security Counterparty and the Interest Rate Swap Counterparty pursuant to the terms of this Indenture or the Interest Rate Swap Agreement, the Issuer or the Collateral Manager on behalf of the Issuer shall provide or procure to provide the Rating Agencies, each Synthetic Security Counterparty and the Interest Rate Swap Counterparty with (a) all information or reports delivered to the Trustee hereunder, (b) such additional information as the Rating Agencies, each Synthetic Security Counterparty or the Interest Rate Swap Counterparty may from time to time reasonably request if such information may be obtained and provided without

unreasonable burden or expense and (c) notice of any waiver given pursuant to Section 5.14. The Issuer shall promptly notify the Trustee, each Synthetic Security Counterparty, the Interest Rate Swap Counterparty and the Collateral Manager if the Issuer becomes aware that the rating of any Class of Notes has been, or it is known by the Issuer that such rating will be, changed or withdrawn. The Co-Issuer shall notify the Rating Agencies of any amendment of or modification to its Certificate of Incorporation.

### Section 10.12    Tax Matters.

(a)    The Issuer, and each Holder of any Notes by acceptance of such Notes, each agree to, where permitted by applicable law, treat such Notes as indebtedness of the Issuer for federal, state and local income and franchise tax purposes.

(b)    The Issuer shall provide to any Preference Shareholder (or any Noteholder of a Note that is or may be recharacterized as equity in the Issuer), upon written request therefor, (i) all information that a U.S. shareholder making a "qualified electing fund" ("QEF") election (as defined in the Code) is required to obtain for U.S. federal income tax purposes and (ii) a "PFIC Annual Information Statement" as described in Treasury Regulation § 1.1295-1(g) (or any successor Treasury Regulation or IRS release or notice), including all representations and statements required by such statement, and will take any other steps necessary to facilitate a QEF election by such Preference Shareholder.

(c)    The Issuer and the Trustee agree that they do not intend for this Agreement to represent an agreement to enter into a partnership, a joint venture or any other business entity for U.S. federal income tax purposes. The Issuer and the Trustee shall not represent or otherwise hold themselves out to the IRS or other third parties as partners in a partnership or members of a joint venture or other business entity for U.S. federal income tax purposes.

(d)    Neither the Issuer nor the Trustee shall file or cause to be filed any federal, state or local partnership tax return with respect to this Agreement.

(e)    The Issuer shall not file, or cause to be filed, any income or franchise tax return in any state of the United States unless it shall have obtained advice of counsel prior to such filing that, under the laws of such jurisdiction, the Issuer is required to file such income or franchise tax return.

(f)    The Issuer shall not, and the Collateral Manager shall not cause the Issuer to, engage in any activity or become the owner of any asset if the ownership or disposition of such asset (without regard to the other activities of the Issuer) would cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for U.S. federal income tax purposes.

(g)    If required to prevent the withholding and imposition of United States income tax, the Issuer shall deliver or cause to be delivered a United States Internal Revenue Service Form W-8BEN to each withholding agent related to an item included in the Collateral and each issuer of an Eligible Investment included in the Collateral or Eligible Investment purchased by the Issuer and shall periodically deliver or cause to be delivered updated forms thereafter, prior to the last day of the third succeeding calendar year (or otherwise upon the expiration or obsolescence of such form).

(h)    It is the intention of the parties hereto and, by its acceptance of a Note, each holder of a Note shall be deemed to have agreed not to treat any income generated by such Note as derived in connection with the active conduct of a banking, financing, insurance, or other similar business for purposes of section 954(h)(2) of the Code.

(i)    The Issuer will provide, upon the reasonable request of and payment of the related expenses by, any holder of a Preferred Share, any holder of equity in the Issuer or any Holder of a Note, any information the Issuer has available to it that assists such holders with regard to filing requirements such holders may have as a result of the controlled foreign corporation rules under the Code.

130

## ARTICLE XI

## APPLICATION OF MONIES

### Section 11.1 Disbursements of Monies from Payment Account.

(a)    Notwithstanding any other provision in this Indenture, but subject to the other clauses of this Article XI and Section 13.1, on each Distribution Date, the Trustee shall disburse amounts transferred to the Payment Account from the Collection Accounts pursuant to Section 10.2(f) as follows and for application by the Trustee in accordance with the following priorities (the "Priority of Payments"):

(i)    Interest Proceeds.  On each Distribution Date, Interest Proceeds with respect to the related Due Period will be distributed in the following order of priority:

(1)    to the payment of taxes, government fees and registered office fees owed by the Issuers, if any;

(2)    up to a maximum amount on any Distribution Date equal to the Fee Cap Amount plus an amount up to $150,000 per annum, (i) first, in the following order, to the payment to the Trustee, the Preference Share Paying Agent, the Collateral Administrator and the Administrator of accrued and unpaid fees owing to them under this Indenture; (ii) second, to the payment of other accrued and unpaid Administrative Expenses incurred by or on behalf of the Issuers (including any administrative expenses payable to the Collateral Manager, but excluding the Management Fee and the Auction Agent Fee, if applicable), *provided*, that Administrative Expenses payable to Deutsche Bank Trust Company Americas (in all of its capacities) shall be paid prior to Administrative Expenses payable to any other party under this Section 11.1(a)(i)(2)(ii), Administrative Expenses payable to the Administrator shall be paid prior to Administrative Expenses payable to any other party other than Deutsche Bank Trust Company Americas under this Section 11.1(a)(i)(2)(ii) and that Administrative Expenses payable to parties other than the Trustee and Administrator shall be paid pro rata; and (iii) third, prior to the date on which amounts credited to the Expense Account are transferred to the Payment Account (in connection with the sale or disposition of substantially all of the Issuer's assets) for application as Interest Proceeds pursuant to this Indenture, credited to the Expense Account an amount equal to the lesser of (x) an amount sufficient to cause the Balance of all Eligible Investments and Cash in the Expense Account, immediately after such credit, to equal $150,000 and (y) the amount by which the Fee Cap Amount exceeds the sums paid under clauses (i) and (ii);

(3)    to the payment, pro rata, of any amount scheduled to be paid to an Interest Rate Swap Counterparty pursuant to an Interest Rate Swap Agreement, together with any termination payments (and any accrued interest thereon) payable by the Issuer pursuant to an Interest Rate Swap Agreement and the Synthetic Securities other than amounts payable by reason of an event of default or termination event as to which the Interest Rate Swap Counterparty under such Interest Rate Swap Agreement or the Synthetic Security Counterparty under the Synthetic Securities, as applicable, is the Defaulting Party or the sole Affected Party;

(4)    to the payment to the Collateral Manager of the accrued and unpaid Management Fee;

(5)    to the payment, pro rata, of the Class A-1 Interest Distribution Amount and the Class A-2 Interest Distribution Amount;

(6)    to the payment of the Class B Interest Distribution Amount;

(7)    if either Class A/B Coverage Test is not satisfied on the related Determination Date, and if any Class A Note or Class B Note remains Outstanding, to the payment of principal

131

of, first, the Class A-1 Notes, second, the Class A-2 Notes and third, the Class B Notes to the extent necessary to cause each of the Class A/B Coverage Tests to be satisfied;

    (8)    to the payment of the Class C Interest Distribution Amount;

    (9)    to the payment of Class C Deferred Interest, if any;

    (10)    if either Class C Coverage Test is not satisfied on the related Determination Date and if any Class A Note, Class B Note or Class C Note remains Outstanding, to the payment of principal of, first, the Class A-1 Notes, second, the Class A-2 Notes, third, the Class B Notes and fourth, the Class C Notes, to the extent necessary to cause each of the Class C Coverage Tests to be satisfied;

    (11)    to the payment of the Class D Interest Distribution Amount;

    (12)    to the payment of Class D Deferred Interest, if any;

    (13)    if either Class D Coverage Test is not satisfied on the related Determination Date and if any Class A Note, Class B Note, Class C Note or Class D Note remains Outstanding, to the payment of principal of, first, the Class A-1 Notes, second, the Class A-2 Notes, third, the Class B Notes, fourth, the Class C Notes and fifth, the Class D Notes, to the extent necessary to cause each of the Class D Coverage Tests to be satisfied;

    (14)    to the payment of the Class E Interest Distribution Amount;

    (15)    to the payment of the Class E Deferred Interest, if any;

    (16)    (i) on any Distribution Date occurring on or before the last day of the Priority Distribution Period, to the payment of principal of the Class D Notes in an amount up to the Class D Priority Redemption Amount for such Distribution Date until the 10% of the Aggregate Outstanding Amount of the Class D Notes as of the Closing Date is paid and (ii) on any Distribution Date occurring after the August 2009 Distribution Date to the payment of principal of the Class D Notes until the Class D Notes are paid in full in an amount equal to 15% of the remaining Interest Proceeds on such Distribution Date that would otherwise be paid under clause (20) below but for the application of this clause (16);

    (17)    to the payment, pro rata, of any termination payments (and any accrued interest thereon) payable by the Issuer pursuant to any Interest Rate Swap Agreement and the Synthetic Securities by reason of an event of default or termination event as to which the Interest Rate Swap Counterparty under such Interest Rate Swap Agreement or the Synthetic Security Counterparty under the Synthetic Securities, as applicable, is the Defaulting Party or the sole Affected Party;

    (18)    to the payment of all accrued and unpaid Administrative Expenses of the Issuers (including any accrued and unpaid fees and expenses owing to the Trustee, the Note Registrar, the Preference Share Paying Agent, the Collateral Manager (other than the Management Fee), the Auction Agent, the Share Registrar and the Administrator under this Indenture, the Management Agreement, the Preference Share Paying Agency Agreement and the Administration Agreement) not paid in full pursuant to and in the order stated in clause (2) above (whether as the result of the limitations on amounts set forth therein or otherwise);

    (19)    if no Optional Redemption, Auction Call Redemption, Clean-Up Call Redemption or Tax Redemption has been successfully completed before the Accelerated Amortization Date, on any Distribution Date occurring on or after the Accelerated Amortization Date, first, to the payment of principal of the Class D Notes until the Class D Notes have been paid in full, second, to the payment of principal of the Class C Notes until the Class C Notes have

30775-00034 NY:1268831.8

been paid in full, third, to the payment of principal of the Class B Notes until the Class B Notes have been paid in full, fourth, to the payment of principal of the Class A-2 Notes until the Class A-2 Notes have been paid in full and, fifth, to the payment of principal of the Class A-1 Notes until the Class A-1 Notes have been paid in full; and

(20)    the remainder (the "Excess Interest"), to be released from the lien of this Indenture and paid (upon standing order of the Issuer) to the Preference Share Paying Agent credited to the Preference Share Payment Account for payment (subject to Section 11.1(f)) to the holders of the Preference Shares as a distribution by way of dividend thereon.

(ii)    Principal Proceeds. On each Distribution Date, Principal Proceeds with respect to the related Due Period will be distributed in the following order of priority:

(1)    to the payment of the amounts referred to in clauses (1) through (6) of Section 11.1(a)(i) in the same order of priority specified therein, but only to the extent not paid in full thereunder;

(2)    so long as each of the Overcollateralization Tests is in compliance (after application of the payments under all clauses of Section 11.1(a)(i) and clause (1) above) and remains in compliance (after giving effect to the payments in this clause (2)), to the payment of the Class C Interest Distribution Amount on the Class C Notes, but only to the extent not paid in full in clause (8) of Section 11.1(a)(i);

(3)    so long as each of the Overcollateralization Tests is in compliance (after application of the payments under all clauses of Section 11.1(a)(i)and clauses (1) and (2) above) and remains in compliance (after giving effect to the payments in this clause (3)), to the payment of the Class D Interest Distribution Amount on the Class D Notes, but only to the extent not paid in full in clause (11) of Section 11.1(a)(i);

(4)    to the payment of principal of the Class A-1 Notes until the Class A-1 Notes have been paid in full;

(5)    to the payment of principal of the Class A-2 Notes until the Class A-2 Notes have been paid in full;

(6)    to the payment of principal of the Class B Notes until the Class B Notes have been paid in full;

(7)    to the payment of the amounts referred to in clause (8) and then clause (9) of Section 11.1(a)(i) but only to the extent not paid in full thereunder or hereunder;

(8)    to the payment of principal of the Class C Notes, until the Class C Notes have been paid in full;

(9)    to the payment of the amounts referred to in clauses (11) and (12) of Section 11.1(a)(i) but only to the extent not paid in full thereunder or hereunder;

(10)    to the payment of principal of the Class D Notes until the Class D Notes have been paid in full;

(11)    to the payment of the amounts referred to in clauses (14) and (15) of Section 11.1(a)(i) but only to the extent not paid in full thereunder or hereunder;

(12)    to the payment of principal of the Class E Notes until the Class E Notes have been paid in full;

30775-00034 NY:1268831.8

(13)    to the payment of the amounts referred to in clauses (17) and (18) of Section 11.1(a)(i) but only to the extent not paid in full thereunder or hereunder; and

(14)    the remainder (the "Excess Principal Proceeds"), to be released from the lien of this Indenture and paid (upon standing order of the Issuer) to the Preference Share Paying Agent credited to the Preference Share Payment Account for payment (subject to Section 11.1(f)) to the Holders of Preference Shares as a dividend on the Preference Shares or (in the case of a payment on the Scheduled Preference Share Redemption Date or any other date upon which the Preference Shares are redeemed) as payment by way of redemption of the Preference Share Redemption Price on redemption of the Preference Shares as provided in the Issuer Charter.

(b)    Notwithstanding any of the foregoing provisions, on the Final Maturity Date, the Interest Proceeds, the Principal Proceeds and any funds in the Expense Account will be distributed in the following order of priority: (i) to make payments of the amounts referred to in clauses (1) through (4) of Section 11.1(a)(i) in the same order of priority specified therein; (ii) to make payments on the Notes in the following order: *first*, to the payment, pro rata, of the accrued and unpaid interest (including Defaulted Interest and any interest thereon) on the Class A-1 Notes and the Class A-2 Notes, *second*, to the payment of the Aggregate Outstanding Amount of the Class A-1 Notes and then to the payment of the Aggregate Outstanding Amount of the Class A-2 Notes, *third*, to the payment of the accrued and unpaid interest (including Defaulted Interest and any interest thereon) on the Class B Notes and then to the payment of the Aggregate Outstanding Amount of the Class B Notes, *fourth*, to the payment of the accrued and unpaid interest (including any Class C Deferred Interest and any interest thereon, and any Defaulted Interest and any interest thereon) on the Class C Notes and then to the payment of the Aggregate Outstanding Amount of the Class C Notes, *fifth*, to the payment of the accrued and unpaid interest (including any Class D Deferred Interest and any interest thereon, and any Defaulted Interest and any interest thereon) on the Class D Notes and then to the payment of the Aggregate Outstanding Amount of the Class D Notes, and *sixth*, to the payment of the accrued and unpaid interest (including any Class E Deferred Interest and any interest thereon, and any Defaulted Interest and any interest thereon) on the Class E Notes and then to the payment of the Aggregate Outstanding Amount of the Class E Notes, until each such Class is paid in full; (iii) to make payments of the amounts referred to in clauses (17) and (18) of Section 11.1(a)(i) in the same order of priority specified therein and (iv) the remainder to make dividend or redemption payments, as applicable, to the Preference Shareholders.

(c)    Not later than 12:00 p.m., New York time, on or before the Business Day preceding each Distribution Date, the Issuer shall, pursuant to Section 10.2(f), remit or cause to be remitted to the Trustee to be credited to the Payment Account an amount of Cash sufficient to pay the amounts described in Section 11.1(a) required to be paid on such Distribution Date.

(d)    If, on any Distribution Date, the amount available in the Payment Account from amounts received in or prior to the related Due Period is insufficient to make the full amount of the disbursements required by the statements furnished by or on behalf of the Issuer pursuant to Section 10.8(a), the Trustee shall make the disbursements called for in the order and according to the priority set forth under Section 11.1(a), subject to Section 13.1, to the extent funds are available therefor.

(e)    Except as otherwise expressly provided in this Section 11.1, if on any Distribution Date the amount available in the Payment Account from amounts received in the related Due Period is insufficient to make the full amount of the disbursements required by any lettered subclause of Section 11.1(a)(i) or Section 11.1(a)(ii) to different Persons, the Trustee shall make the disbursements called for by such subclause ratably in accordance with the respective amounts of such disbursements then due and payable to the extent funds are available therefor.

(f)    In the event that amounts distributable to the holders of the Preference Shares pursuant to this Section 11.1 cannot be distributed to such Holders due to restrictions on such distributions under the laws of the Cayman Islands, the Issuer shall notify the Trustee and the Preference Share Paying Agent and all amounts payable to the Preference Shareholders pursuant to this Section 11.1 shall be held in the Preference Share Payment Account until the First Distribution Date, or (in the case of any payment which would otherwise be payable on the Scheduled Preference Share Redemption Date or any Redemption Date upon which the Preference Shares are redeemed) the first Business Day, on which the Issuer notifies the Preference Share Paying Agent such distributions can be made to

134

the holders of the Preference Shares (subject to the availability of such amounts under Cayman Islands law to pay any liability of the Issuer not limited in recourse to the Collateral).

### Section 11.1A    Allocation Procedures.

With respect to the Synthetic Securities, and before any disbursements are made pursuant to Section 11.1 on such date, any (1) Floating Payments and any other amounts due under any Synthetic Security, (2) Physical Settlement Amounts, (3) Principal Payment Amounts, (4) payments of Additional Fixed Amounts, and (5) termination amounts will be allocated in accordance with the allocation procedures described in this Section 11.1A (the "Allocation Procedures") and, unless specifically set forth below, such amounts will not be applied according to the priority of payments set forth in Section 11.1:

    (i)    Floating Payments and other amounts due under the Synthetic Securities.  If on any Business Day, Floating Payments or any other amounts are due and payable by the Issuer in accordance with the provisions of any Synthetic Security, other than Interest Shortfall Amounts and any termination payments with respect to an early termination or an event of default (the "Synthetic Security Payment Amount"), the Trustee shall, on behalf of the Issuer, and pursuant to instruction of the Issuer or Collateral Manager acting on its behalf, subject to the procedures set forth in this Indenture:

    (A)    withdraw from the related Synthetic Security Collateral Account (including by withdrawing the necessary amount from the Investment Agreement) an amount equal to the lesser of (1) the amount credited to such Synthetic Security Collateral Account and (2) the Synthetic Security Payment Amount; and

    (B)    if the amount withdrawn under (A) above is less than the Synthetic Security Payment Amount, withdraw from the Principal Collection Account an amount equal to the lesser of (1) the amount credited to the Principal Collection Account and (2) the Synthetic Security Payment Amount less the amounts withdrawn pursuant to clause (A) above.

The Trustee, on behalf of the Issuer, and pursuant to instruction of the Issuer or Collateral Manager acting on its behalf, shall pay such proceeds to the relevant Synthetic Security Counterparty in an amount equal to the Synthetic Security Payment Amount.

    (ii)    Physical Settlement Amount.  If on any Business Day, the Physical Settlement Amount for any Delivered Obligation is due and payable by the Issuer to the relevant Synthetic Security Counterparty pursuant to the terms of the related Synthetic Security, the Trustee shall, on behalf of the Issuer, and pursuant to instruction of the Issuer or Collateral Manager acting on its behalf, subject to the procedures set forth in this Indenture:

    (A)    withdraw from the related Synthetic Security Collateral Account (including by withdrawing the necessary amount from the Investment Agreement) an amount equal to the lesser of (1) the amount credited to such Synthetic Security Collateral Account and (2) the Physical Settlement Amount; and

    (B)    if the amount withdrawn under (A) above is less than the Physical Settlement Amount, withdraw from the Principal Collection Account an amount equal to the lesser of (1) the amount credited to the Principal Collection Account and (2) the Physical Settlement Amount less the amounts withdrawn pursuant to clause (A) above.

The Trustee, on behalf of the Issuer, and pursuant to instruction of the Collateral Manager, shall pay such proceeds to the relevant Synthetic Security Counterparty in an amount equal to the Physical Settlement Amount.

    (iii)    Principal Payment Amount.  If on any Business Day, there is a Principal Payment Amount with respect to any Reference Obligation under a Synthetic Security, the Trustee shall, on behalf

of the Issuer, and pursuant to instruction of the Collateral Manager, subject to the procedures set forth in this Indenture withdraw on the last day of the related Due Period from the related Synthetic Security Collateral Account (including by withdrawing the necessary amount from the Investment Agreement), an amount equal to the lesser of (1) the amount credited to such Synthetic Security Collateral Account (including the amount that the Issuer can withdraw from the Investment Agreement) and (2) the Principal Payment Amount, and such withdrawn amounts will be deemed to be Principal Proceeds and credited to the Principal Collection Account.

(iv)    Payments of Additional Fixed Amounts. If on any Business Day, the Issuer receives Additional Fixed Amounts, the Issuer shall allocate (i) any Interest Shortfall Reimbursement Payment Amount, into the Interest Collection Account as Interest Proceeds and (ii) any Writedown Reimbursement Payment Amount and any Principal Shortfall Reimbursement Payment Amount into the related Synthetic Security Collateral Account.

(v)    Termination or Novation of a Synthetic Security. If on any Business Day, (A)(x) there is an early termination of a Synthetic Security resulting from a termination event or an event of default pursuant to the terms of the related Synthetic Security, (y) the Issuer is the Defaulting Party or Affected Party (as such term is defined in the related Synthetic Security) and (z) as a result of the termination of the Synthetic Security, a termination payment is due to the Synthetic Security Counterparty or (B) the Issuer novates a Synthetic Security and a payment is due to the replacement synthetic swap counterparty (such amount, the "Synthetic Security Termination/Novation Payment (Issuer)") the Trustee shall, on behalf of the Issuer, and pursuant to written instruction of the Collateral Manager, subject to the procedures set forth in this Indenture:

(A)    withdraw from the Synthetic Security Collateral Account (including by withdrawing the necessary amount from the Investment Agreement) an amount equal to the lesser of (1) the amount credited to the Synthetic Security Collateral Account and (2) the Synthetic Security Termination/Novation Payment (Issuer); and

(B)    if the amount withdrawn under (A) above is less than the Synthetic Security Termination/Novation Payment (Issuer), withdraw from the Principal Collection Account an amount equal to the lesser of (1) the amount credited to the Principal Collection Account and (2) the Synthetic Security Termination/Novation Payment (Issuer) less the amounts withdrawn pursuant to clause (A).

The Trustee, on behalf of the Issuer, shall pay from such proceeds any amounts due to the Synthetic Security Counterparty of the related Synthetic Security (other than with respect to a termination event or event of default where the Synthetic Security Counterparty is the Defaulting Party or Affected Party (as such term is defined in the Synthetic Security)).

**Section 11.2 Trust Accounts.**

All funds held by the Trustee in any Account pursuant to the provisions of this Indenture, and not invested in Underlying Assets or Eligible Investments as herein provided, shall be credited to one or more trust accounts, maintained at a financial institution whose long-term rating is at least "BBB+" by Standard & Poor's, at least "Baa1" by Moody's, and if so rated, such rating is not on watch for downgrade and at least "BBB+" by Fitch, to be held in trust for the benefit of the Noteholders. Except for the period beginning one Business Day prior to each Distribution Date, to the extent funds credited to a trust account exceed amounts insured by the Federal Deposit Insurance Corporation, or any agencies succeeding to the insurance functions thereof, and are not fully collateralized by direct obligations of the United States, such excess shall be invested in Eligible Investments.

## ARTICLE XII

## PURCHASE AND SALE OF UNDERLYING ASSETS AND SUBSTITUTION CRITERIA

## Section 12.1 <u>Disposition of Underlying Assets.</u>

(a)     Subject to Section 10.9, the Issuer will not sell or otherwise dispose of any Underlying Asset, except that:

(i)     the Collateral Manager will at its sole discretion, direct the Trustee to dispose of any Underlying Asset held by the Issuer that is or becomes an Equity Security, Credit Risk Obligation, Withholding Security, Written Down Security or Defaulted Security;

(ii)     any Equity Security must be disposed of within one year after receipt (or within one year of such later date as such security may first be disposed of in accordance with its terms and applicable law); provided that any Equity Security that is Margin Stock or that does not comply with paragraphs (h) through (k) of the definition of Asset Backed Security must be disposed of within five Business Days after the Issuer's receipt thereof (or within five Business Days of such later date as such security may first be disposed of in accordance with its terms);

(iii)     in the event of an Auction Call Redemption, Clean-Up Call Redemption, Optional Redemption or Tax Redemption of the Notes, the Issuer shall dispose of Underlying Assets without regard to the foregoing limitations; provided that (i) the Disposition Proceeds therefrom together with the Balance of the Cash and Eligible Investments in the Accounts (other than the Interest Rate Swap Counterparty Collateral Accounts and the Synthetic Security Issuer Accounts) will be at least sufficient to pay certain expenses and other amounts and redeem in whole but not in part all Notes (pursuant to Article IX) to be redeemed simultaneously at the applicable Redemption Price; and (ii) such Disposition Proceeds are used to make such a redemption;

(iv)     the Collateral Manager may, at its sole discretion, direct the Trustee, in writing, to dispose of any Underlying Asset other than an Equity Security, Credit Risk Obligation, Withholding Security, Written Down Security or Defaulted Security; provided that the Aggregate Principal/Notional Balance of any such Underlying Assets disposed of pursuant to this clause (iv) during the period beginning on the Closing Date and ending on December 31, 2006 or any period beginning on January 1 of each year beginning in 2007 and ending on December 31 of such year does not exceed 20% of the Aggregate Principal/Notional Balance of all Underlying Assets as of the first day of such period;

(v)     on or before the Distribution Date occurring in August 2011 and provided that the Class A/B Overcollateralization Test is in compliance on the relevant Measurement Date, the Collateral Manager may, at its sole discretion, direct the Trustee, in writing, to dispose of any Underlying Asset and the Trustee shall deposit or cause to be deposited the proceeds of such disposition (the "Substituted Collateral Proceeds") into the Substituted Collateral Account. The Collateral Manager may direct the Trustee to apply the amount on deposit in the Substituted Collateral Account to pay the purchase price of Eligible Substitute Assets identified by the Collateral Manager; *provided that*, after giving effect to such sale and the subsequent purchase, the Aggregate Principal/Notional Balance of all Eligible Substitute Assets purchased since the Closing Date shall not exceed 30% of the Net Outstanding Underlying Asset Balance as of the Closing Date; *provided further* that, so long as (a) the Moody's rating of the Class A Notes or Class B Notes is one or more subcategories below its Initial Rating, (b) the Moody's rating of the Class C Notes, the Class D Notes or the Class E Notes is two or more subcategories below its Initial Rating or (c), so long as any Note is Outstanding, the Moody's rating of any Class of Notes has been withdrawn and not reinstated, the Collateral Manager will not be permitted to dispose of Underlying Assets pursuant to this clause (v) unless the holders of a majority in aggregate outstanding principal amount of the Controlling Class has waived such restriction; and

(vi)     the Issuer will seek to sell each Defaulted Security (other than any Underlying Asset that is a Defaulted Security solely because it is rated "CC" or lower or "D" or "SD" by Standard & Poor's) in a commercially reasonable manner and no later than the date (the "Two Year Date") that is two years after such Underlying Asset became a Defaulted Security (or within two years of such later date as such Underlying Asset may first be sold in accordance with its terms and applicable law); provided that the Two

30775-00034 NY:1268831.8

Year Date for any PIK Bond that becomes a Defaulted Security in accordance with clause (e) of the definition of Defaulted Security shall occur on the day that is two years from the date on which there has been a failure to pay interest in an amount equal to or exceeding the amount of interest due in one payment period.

*provided*, that after the occurrence and continuance of an Event of Default, any disposition of Underlying Assets shall be made in accordance with the conditions set forth of Article V.

(b)    After the Closing Date any disposition of an Underlying Asset will be conducted (i) on an "arms-length basis" for a price that, in the judgment of the Collateral Manager, is fair and reasonable and, in the case of Defaulted Security or Written Down Security, not materially less than the Fair Market Value thereof, (ii) in accordance with the requirements of the Management Agreement and this Indenture and (iii) in the case of any such purchase or sale effected with the Collateral Manager, the Issuer, the Trustee or any Affiliate of any of the foregoing, in a secondary market transaction on terms at least as favorable to the Issuer and Noteholders as would be the case if such Person were not so affiliated. The Trustee shall have no responsibility to oversee compliance with the conditions in this Section 12.1 by the other parties.

(c)    In connection with a Clean-Up Call Redemption, Auction Call Redemption or Optional Redemption, Tax Redemption: (i) the Trustee shall release the Underlying Assets from the lien of this Indenture; (ii) the Issuer may not direct the Trustee to sell (and the Trustee shall not be required to release) an Underlying Asset pursuant to this Section 12.1(c) unless the certifications or payments by the Collateral Manager or the Auction Agent required by Sections 9.1 through 9.4 have been delivered to the Trustee; and (iii) all the Underlying Assets to be sold pursuant to this Section 12.1(c) must be sold in accordance with the requirements set forth in Sections 9.1 through 9.4, as applicable.

(d)    Upon payment in full of the Notes, the Trustee shall cause the Issuer, or the Collateral Manager on behalf of the Issuer, to sell and dispose of all the remaining Collateral (other than the Interest Rate Swap Counterparty Collateral Account and the Synthetic Security Issuer Account and any amounts therein) or rights or interest therein at one or more public or private sales called and conducted in any manner permitted by law. Any money collected by the Trustee pursuant to this Section 12.1(d) and any money that may then be held or thereafter received by the Trustee hereunder shall be credited to the Payment Account and be applied subject to Section 11.1.

(e)    Notwithstanding any of the limitations prescribed by the preceding paragraphs of this Section 12.1, if no Event of Default has occurred and is continuing, the Collateral Manager, on behalf of the Issuer, may, at any time, direct the Trustee in writing to dispose of, and the Trustee shall dispose of in the manner so directed by the Collateral Manager in writing, any Delivered Obligation received by the Trustee.

### Section 12.2 <u>Purchases of Underlying Assets after the Closing Date and Substitution Criteria.</u>

(a)    A security may be Granted by the Issuer to the Trustee for inclusion in the Collateral as a Pledged Underlying Asset, and the Trustee shall apply Uninvested Proceeds to pay the purchase price of such security purchased by the Issuer, only if a binding commitment was made by or on behalf of the Issuer on or prior to the Closing Date to purchase such security, as certified to the Trustee.

(b)    The Issuer shall acquire (or shall have committed to acquire with customary settlement procedures in the relevant markets) the portfolio of Underlying Assets on or prior to Closing Date, which portfolio shall have the following characteristics (the "Portfolio Characteristics"):

(i)    the Aggregate Principal/Notional Balance of the portfolio of Underlying Assets (including principal collections on such Underlying Assets credited to the Uninvested Proceeds Account on the Closing Date) shall be at least $700,106,212;

(ii)    each security shall be an Underlying Asset that, at the time of acquisition by the Issuer, was not deferring interest and did not have capitalized interest that had not been paid in full;

138

       (iii)    each of the Collateral Quality Tests shall be satisfied; and

       (iv)    each of the Coverage Tests shall be satisfied.

(c)    The Issuer, pursuant to binding commitments entered into prior to the Closing Date, will use its best efforts to purchase on or before the Closing Date (following for customary settlement procedures following the Closing Date), Underlying Assets having an Aggregate Principal/Notional Balance (including principal collections on such Underlying Assets credited to the Uninvested Proceeds Account on the Closing Date), together with the Aggregate Principal/Notional Balance of all Eligible Investments purchased with Principal Proceeds, not less than $700,106,212.

(d)    For each of the criteria set forth below, compliance with such criterion shall be measured after giving effect to the disposition of an Underlying Asset and the corresponding acquisition of an Eligible Substitute Asset (each disposition and acquisition, a "Substitution"); provided that if prior to giving effect to the disposition relating to a Substitution, any of the criteria (other than paragraphs (i), (ii) and (v) below) is not met, the degree of compliance with such criterion shall not be diminished after giving effect to a Substitution (collectively, the "Substitution Criteria"):

       (i)    after giving effect to a Substitution, the Aggregate Principal/Notional Balance of the purchased Eligible Substitute Assets with a Moody's Rating or a Standard & Poor's Rating of below "Baa3" or "BBB-", respectively, shall not exceed 10% of the Net Outstanding Underlying Asset Balance as of the Closing Date;

       (ii)    after giving effect to a Substitution, the percentages of Underlying Assets that are RMBS Securities and CMBS Securities, respectively, shall not be reduced;

       (iii)    after giving effect to a Substitution, the Aggregate Principal/Notional Balance of all Underlying Assets that are Synthetic Securities shall not exceed 40% of the Net Outstanding Underlying Asset Balance;

       (iv)    after giving effect to a Substitution, the Aggregate Principal/Notional Balance of all Underlying Assets that are Fixed Rate Securities shall not exceed 10% of the Net Outstanding Underlying Asset Balance;

       (v)    after giving effect to a Substitution, the number of issuers of Underlying Assets shall not be reduced;

       (vi)    after giving effect to a Substitution, the Moody's Asset Correlation Test shall be satisfied;

       (vii)    after giving effect to a Substitution, the Aggregate WAC Change Test shall be satisfied;

       (viii)    after giving effect to a Substitution, the Aggregate WAS Change Test shall be satisfied;

       (ix)    after giving effect to a Substitution, the Moody's Minimum Weighted Average Recovery Rate Test shall be satisfied;

       (x)    after giving effect to a Substitution, the Standard & Poor's Minimum Weighted Average Recovery Rate Test shall be satisfied;

       (xi)    after giving effect to a Substitution, the Aggregate Principal/Notional Balance of all Underlying Assets issued by the issuer of such Eligible Substitute Asset shall not exceed 3.00% of the Net Outstanding Underlying Asset Balance; provided that the Aggregate Principal/Notional Balance of all Underlying Assets issued by two such issuers shall not exceed 3.50% of the Net Outstanding Underlying Asset Balance; provided further that the Aggregate Principal/Notional Balance of Underlying Assets that have a Moody's Rating of "Ba1" or below or are rated "BB+" or below by Standard & Poor's (if rated by

30775-00034 NY:1268831.8

Standard & Poor's) and issued by any one issuer shall not exceed 2.75% of the Net Outstanding Underlying Asset Balance; *provided further* that the Aggregate Principal/Notional Balance of all Underlying Assets issued by two such issuers shall not exceed 3.25% of the Net Outstanding Underlying Asset Balance;

(xii)    with respect to the Servicers of the Underlying Asset being acquired, after giving effect to a Substitution, the Aggregate Principal/Notional Balance of all Underlying Assets serviced by one single Servicer does not exceed:

(a)    15% of the Aggregate Principal/Notional Balance of all Underlying Assets, if such Servicer is rated "AA-" (if rated by Standard & Poor's) or higher or "Strong" or higher (if ranked by Standard & Poor's);

(b)    10% of the Aggregate Principal/Notional Balance of all Underlying Assets, if such Servicer is rated "A-" or higher (if rated by Standard & Poor's) or "Above Average" or higher (if ranked by Standard & Poor's) and does not meet the ratings requirements of clause (a) above;

(c)    7.5% of the Aggregate Principal/Notional Balance of all Underlying Assets, if such Servicer is rated "BB+" or higher (if rated by Standard & Poor's) or "Average" or higher (if ranked by Standard & Poor's) and does not meet the ratings requirements of clause (a) or clause (b) above; and

(d)    6% of the Aggregate Principal/Notional Balance of all Underlying Assets, if such Servicer does not meet the rating requirements of clause (a), clause (b) or clause (c) above;

*provided* that Wells Fargo or its Affiliates may constitute up to 20%, Countrywide Home Loans Inc. or its Affiliates may constitute up to 15%, Ameriquest Mortgage Company or its Affiliates may constitute up to 15% and National City Home Loan Services or its Affiliates may constitute up to 12.5% of the Aggregate Principal/Notional Balance of all Underlying Assets;

(xiii)    the legal final maturity of such Underlying Asset is no later than the Stated Maturity; provided that up to 10% of the Aggregate Principal/Notional Balance of the Underlying Assets may have a legal final maturity after the Stated Maturity but in no event shall (A) the legal final maturity of any Underlying Asset occur later than five years after the Stated Maturity of the Notes or (B) the expected maturity of any Underlying Asset occur later than the Stated Maturity of the Notes;

(xiv)    after giving effect to a Substitution, the Aggregate Principal/Notional Balance of all Underlying Assets that are PIK Bonds shall not exceed 10% of the Net Outstanding Underlying Asset Balance;

(xv)    after giving effect to a Substitution, the Aggregate Principal/Notional Balance of all Underlying Assets with negative amortization features shall not exceed 5% of the Net Outstanding Underlying Asset Balance;

(xvi)    after giving effect to a Substitution, the Aggregate Principal/Notional Balance of all Underlying Assets that provide for the periodic payment of interest less frequently than quarterly shall not exceed 5% of the Net Outstanding Underlying Asset Balance and the Aggregate Principal/Notional Balance of all Underlying Assets that provide for the periodic payment of interest less frequently than semi-annually shall not exceed 0% of the Net Outstanding Underlying Asset Balance; and

(xvii)    after giving effect to a Substitution, the Aggregate Principal/Notional Balance of all Underlying Assets issued in transactions managed by the Collateral Manager shall not exceed 2% of the Net Outstanding Underlying Asset Balance; and provided that such Underlying Assets shall only be acquired in secondary market transactions.

140

**Section 12.3 <u>Conditions Applicable to all Transactions Involving Sale or Grant</u>.**

(a)      The Collateral Manager shall not direct the Issuer to purchase any Underlying Asset for inclusion in the Collateral directly from any account or portfolio for which the Collateral Manager serves as investment adviser, unless such transactions would comply with the Investment Advisers Act of 1940, as amended, and the Collateral Manager shall not direct the Issuer to purchase any Underlying Asset for inclusion in the Collateral if such purchase would result in a prohibited transaction tax under ERISA being imposed upon the Issuer. The Trustee shall have no responsibility to oversee compliance with this clause by the other parties.

(b)      Upon any Grant described in Section 12.2, all of the Issuer's right, title and interest to the Pledged Security or Securities shall be Granted to the Trustee pursuant to the Granting Clauses of this Indenture, such Pledged Security or Securities shall be registered in the name of the Trustee, and, if applicable, the Trustee shall receive such Pledged Security or Securities.

## ARTICLE XIII

## SECURED PARTIES' RELATIONS

### Section 13.1 <u>Subordination</u>.

(a)      Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Notes agree for the benefit of the Interest Rate Swap Counterparty that the Notes and the Issuer's rights in and to the Collateral (with respect to all amounts payable to the Interest Rate Swap Counterparty pursuant to Section 11.1(a)(i)(C), the "Subordinate Interests") shall be subordinate and junior to the rights of the Interest Rate Swap Counterparty with respect to payments to be made to the Interest Rate Swap Counterparty pursuant to an Interest Rate Swap Agreement to the extent and in the manner set forth in Section 11.1(a). If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article V, including as a result of an Event of Default specified in Section 5.1(g) or 5.1(h), all amounts payable to the Interest Rate Swap Counterparty pursuant to Section 11.1(a)(i)(C) shall be paid in Cash or, to the extent the Interest Rate Swap Counterparty consents, other than in Cash, before any further payment or distribution is made on account of the Subordinate Interests.

(b)      Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes agree for the benefit of the Holders of the Class A Notes that the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes and the Issuer's rights in and to the Collateral (with respect to the Class A Notes, the "Subordinate Interests") shall be subordinate and junior to the Class A Notes to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1(a). If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article V, including as a result of an Event of Default specified in Section 5.1(g) or 5.1(h), the Class A Notes shall be paid in full in Cash or, to the extent a Majority of the Class A Notes consent, other than in Cash, in either case, in accordance with the Priority of Payments. The Holders of Notes evidencing Subordinate Interests agree, for the benefit of the Holders of the Class A Notes, not to cause the filing of a petition in bankruptcy, insolvency, reorganization, moratorium, receivership, conservatorship or other similar laws now or hereafter in effect against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class A Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(c)      Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class C Notes, the Class D Notes and the Class E Notes agree for the benefit of the Holders of the Class B Notes that the Class C Notes, the Class D Notes and the Class E Notes and the Issuer's rights in and to the Collateral (with respect to the Class B Notes, the "Subordinate Interests") shall be subordinate and junior to the Class B Notes to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1(a). If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article V, including as a result of an Event of Default specified in Section 5.1(g) or 5.1(h), the Class B Notes shall be paid in full in Cash or, to the extent a Majority of the Class B Notes consent, other than in Cash, in either case, in accordance with the Priority of

30775-00034 NY:1268831.8

Payments. The Holders of Notes evidencing Subordinate Interests agree, for the benefit of the Holders of the Class B Notes, not to cause the filing of a petition in bankruptcy, insolvency, reorganization, moratorium, receivership, conservatorship or other similar laws now or hereafter in effect against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class B Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(d)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class D Notes and the Class E Notes agree for the benefit of the Holders of the Class C Notes that the Class D Notes and the Class E Notes and the Issuer's rights in and to the Collateral (with respect to the Class C Notes, the "Subordinate Interests") shall be subordinate and junior to the Class C Notes to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1(a). If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article V, including as a result of an Event of Default specified in Section 5.1(g) or 5.1(h), the Class C Notes shall be paid in full in Cash or, to the extent a Majority of the Class C Notes consent, other than in Cash, in either case, in accordance with the Priority of Payments. The Holders of Notes evidencing Subordinate Interests agree, for the benefit of the Holders of the Class C Notes, not to cause the filing of a petition in bankruptcy, insolvency, reorganization, moratorium, receivership, conservatorship or other similar laws now or hereafter in effect against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class C Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(e)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class E Notes agree for the benefit of the Holders of the Class D Notes that the Class E Notes and the Issuer's rights in and to the Collateral (with respect to the Class E Notes, the "Subordinate Interests") shall be subordinate and junior to the Class D Notes to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1(a). If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article V, including as a result of an Event of Default specified in Section 5.1(g) or 5.1(h), the Class D Notes shall be paid in full in Cash or, to the extent a Majority of the Class D Notes consent, other than in Cash, in either case, in accordance with the Priority of Payments. The Holders of Notes evidencing Subordinate Interests agree, for the benefit of the Holders of the Class D Notes, not to cause the filing of a petition in bankruptcy, insolvency, reorganization, moratorium, receivership, conservatorship or other similar laws now or hereafter in effect against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class D Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(f)    In the event that, notwithstanding the provisions of this Indenture, any holder of any Subordinate Interests shall have received any payment or distribution in respect of such Subordinate Interests contrary to the provisions of this Indenture, then, unless and until all amounts payable to the Interest Rate Swap Counterparty pursuant to Section 11.1(a)(i)(C) or the Class A Notes, Class B Notes, Class C Notes, Class D Notes and Class E Notes, as the case may be, shall have been paid in full in Cash or, to the extent the Interest Rate Swap Counterparty or a Majority of the Class A Notes, Class B Notes, Class C Notes, Class D Notes and Class E Notes, as the case may be, consent, other than in Cash, in either case, in accordance with the Priority of Payments, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to such Interest Rate Swap Counterparty or the Holders of the Class A Notes, Class B Notes, Class C Notes, Class D Notes and Class E Notes, in accordance with the Priority of Payments; provided that, if any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the provisions of this Indenture, including this Section 13.1.

(g)    Each Holder of Subordinate Interests agrees with the Interest Rate Swap Counterparty and all Holders of the Class A Notes the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes as the case may be, that such Holder of Subordinate Interests shall not demand, accept, or receive any payment or distribution in respect of such Subordinate Interests in violation of the provisions of this Indenture including this

30775-00034 NY:1268831.8

Section 13.1; provided that after all amounts payable pursuant to Section 11.1(a)(i)(C) or in respect of the Class A Notes, Class B Notes, Class C Notes, Class D Notes and Class E Notes, as the case may be, have been paid in full, the Holders of Subordinate Interests shall be fully subrogated to the rights of the Interest Rate Swap Counterparty or the Holders of the Class A Notes, Class B Notes, Class C Notes, Class D Notes and Class E Notes, as the case may be. Nothing in this Section 13.1 shall affect the obligation of the Issuer to pay Holders of Subordinate Interests.

### Section 13.2 Standard of Conduct.

In exercising any of its or their voting rights, rights to direct and consent or any other rights as a Secured Party under this Indenture or as a Preference Shareholder, subject to the terms and conditions of this Indenture, including Section 5.9, a Secured Party or Secured Parties or a Preference Shareholder shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any Secured Party, the Issuer or any other Person.

### ARTICLE XIV

### MISCELLANEOUS

### Section 14.1 Form of Documents Delivered to Trustee.

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Authorized Officer of the Issuer, the Co-Issuer or the Collateral Manager may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Authorized Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate of an Authorized Officer of the Issuer, the Co-Issuer or the Collateral Manager or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of the Issuer, the Co-Issuer, the Collateral Manager or any other Person, stating that the information with respect to such factual matters is in the possession of the Issuer, the Co-Issuer, the Collateral Manager or such other Person, unless such Authorized Officer of the Issuer, the Co-Issuer or the Collateral Manager or such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous. Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of the Issuer or the Co-Issuer, stating that the information with respect to such matters is in the possession of the Issuer or the Co-Issuer, unless such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture it is provided that the absence of the occurrence and continuation of a Default is a condition precedent to the taking of any action by the Trustee at the request or direction of the Issuer or the Co-Issuer, then notwithstanding that the satisfaction of such condition is a condition precedent to the Issuers' rights to make such request or direction, the Trustee shall be protected in acting in accordance with such request or direction if a Trust Officer of the Trustee does not have actual knowledge of the occurrence and continuation of such Default as provided in Section 6.1(d).

30775-00034 NY:1268831.8

## Section 14.2 Acts of Securityholders.

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Securityholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Securityholders in person or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action or actions embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Securityholders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Issuers, if made in the manner provided in this Section 14.2.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c)    The principal amount and registered numbers of Notes or the number of Preference Shares held by any Person, and the date of his holding the same, shall be proved by the Note Register or the Share Register, as applicable.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Securities shall bind the Holder (and any transferee thereof) of such Security and of every Security issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee or the Issuers in reliance thereon, whether or not notation of such action is made upon such Security.

(e)    In the event that, pursuant to Section 13(b) of the Management Agreement, Holders of at least sixty-six and two-thirds percent (66 ⅔) in Aggregate Outstanding Amount of any Class of Notes or holders of at least sixty-six and two-thirds percent (66 ⅔) of Preference Shares (excluding from such votes the Collateral Manager Securities if the proposed Replacement Manager is an Affiliate of the Collateral Manager) object to a proposed Replacement Manager within 30 days after such notice (the "First Period"), the Trustee shall notify the Holders of the Securities that such Replacement Manager has been rejected. Such notice shall state that a Majority-in-Interest of Preference Shareholders may nominate a successor Collateral Manager within 60 days after the termination of the First Period (the "Second Period") and specify a date (not more than twenty (20) days after the end of the First Period), time and place for a meeting (which meeting may be held telephonically) at which Holders of the Preference Shares may nominate (if necessary, by a Majority vote of the Holders of the Preference Shares present at such meeting) not more than two proposed successor Collateral Managers (which proposed successor Collateral Managers shall meet the requirements of a Replacement Manager specified in clauses (i) and (ii) of the second paragraph of such Section 13(b). The Trustee shall notify each Holder of a Preference Share and each Noteholder of the successor Collateral Managers proposed at such meeting and request that each Holder of a Preference Share and each Noteholder, by notice given to the Trustee not later than twenty (20) days after such meeting, select a successor Collateral Manager (if there are two proposed successor Collateral Managers) or approve such proposed Collateral Manager (if only one successor Collateral Manager is proposed). If such a successor Collateral Manager is objected to by a Majority-in-Interest of Preference Shareholders or by Holders of sixty-six and two-thirds percent (66 ⅔) in Aggregate Outstanding Amount of any Class of Notes, the Trustee shall notify each Holder of a Preference Share of the failure to appoint a successor Collateral Manager and specify a date (prior to the end of the Second Period), time and place for a meeting (which meeting may be held telephonically) at which a Majority-in-Interest of the Preference Shareholders present (so long as Holders of at least sixty-six and two-thirds percent (66 ⅔) of the Preference Shares are represented at such meeting) may appoint a successor Collateral Manager. The Collateral Manager Securities shall be excluded from the numerator and the denominator in determining whether the approval of Holders of at least sixty-six and two-thirds percent (66 ⅔) of the Preference Shares or Holders of sixty-six and two-thirds percent (66 ⅔) in Aggregate Outstanding Amount of any Class of Notes has been obtained under this subsection (e), except that for purposes of appointing or approving (or objecting to) a successor Collateral Manager that is not an Affiliate of the Collateral Manager, the Notes and Preference Shares which are Collateral Manager Securities shall be included in determining whether the Preference Shares or the Notes have selected or approved (or objected to) such successor Collateral Manager. In the event that a

successor to the Collateral Manager is not appointed within 90 days after its resignation or removal, the Issuer or the Collateral Manager may petition a court to appoint a successor, without obtaining the approval of the Holders of the Notes and the Preference Shares.

**Section 14.3 <u>Notices, etc., to Trustee, the Issuers, the Bank, the Collateral Manager, the Rating Agencies, the Interest Rate Swap Counterparty, the Preference Share Paying Agent or Preference Share Transfer Agent, the First Synthetic Security Counterparty and the Initial Investment Agreement Provider.</u>**

Any request, demand, authorization, direction, notice, consent, waiver or Act of Securityholders or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with:

(a)    (i) the Trustee by any Securityholder or by the Issuer or the Co-Issuer shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by telecopy in legible form, to the Trustee addressed to it at its Corporate Trust Office, or at any other address previously furnished in writing to the Issuers or such Securityholder by the Trustee or (ii) the Note Registrar and the Bank as Paying Agent and Transfer Agent by any Securityholder or by the Issuer or the Co-Issuer shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by telecopy in legible form, to the Bank addressed to at its Registrar Office, or at any other address previously furnished in writing to the Issuers or such Securityholder by the Bank;

(b)    the Issuer by the Trustee, the Co-Issuer or by any Securityholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to the Issuer addressed to it at c/o Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, Attention: the Directors, telecopy no. (345) 945-7100, with a copy to Maples and Calder, P.O. Box 309GT, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands, Attention: Dale Crowley, telecopy no. (345) 949-8080, or at any other address previously furnished in writing to the Trustee by the Issuer;

(c)    the Co-Issuer by the Trustee, the Issuer or by any Noteholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to the Co-Issuer addressed to it at c/o Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711, Attention: Don Puglisi, telecopy no. (302) 738-6680, or at any other address previously furnished in writing to the Trustee by the Co-Issuer (in each case with a copy to the Issuer);

(d)    the Collateral Manager by the Issuers or the Trustee shall be sufficient for every purpose hereunder if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to the Collateral Manager addressed to HBK Investments L.P., 300 Crescent Court Suite 700, Dallas, Texas 75201, Attention: Legal Department, telecopy no. (214) 758-6107, or at any other address previously furnished in writing to the Issuers or the Trustee by the Collateral Manager;

(e)    the Rating Agencies by the Issuers, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy or electronic mail in legible form, (i) in the case of Standard & Poor's, a division of the McGraw-Hill Companies, addressed to Standard & Poor's, 55 Water Street, 41st Floor, New York, New York 10041, telecopy no. (212) 438-2664, Attention: Structured Finance Ratings, Asset-Backed Securities CBO/CLO Surveillance, and by e-mail at: CDO_Surveillance@standardandpoors.com and (ii) in the case of Moody's,

145

addressed to Moody's Investors Service, Inc., 99 Church Street, New York, New York, 10007, telecopy no. (212) 553-0355, Attention: CBO/CLO Monitoring and by e-mail at: cdomonitoring@moodys.com;

(f)   the Interest Rate Swap Counterparty by the Issuers, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered or sent by overnight courier service or by telecopy in legible form to the Interest Rate Swap Counterparty addressed to it at the address specified in the Interest Rate Swap Agreement or at any other address previously furnished in writing to the Issuer or the Trustee by the Interest Rate Swap Counterparty;

(g)   the Preference Share Paying Agent or Preference Share Transfer Agent by any Securityholder or by the Issuer shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by telecopy in legible form, to Deutsche Bank Trust Company Americas, 1761 East St. Andrew Place, Santa Ana, California 92705, Attention: Gemstone CDO VI Ltd., telecopy no. (714) 247-6483, or at any other address previously furnished in writing to the Issuer or such Securityholder;

(h)   the First Synthetic Security Counterparty by the Issuers, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered or sent by overnight courier service or by telecopy in legible form to the First Synthetic Security Counterparty addressed to it at the address specified in the related Synthetic Security or at any other address previously furnished in writing to the Issuer or the Trustee by the First Synthetic Security Counterparty; or

(i)   the Initial Investment Agreement Provider by the Issuers, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered or sent by overnight courier service or by telecopy in legible form, to the Initial Investment Agreement Provider addressed to Rabobank International, 245 Park Avenue, New York, New York 10167, Attention: Financial Administration Department, telecopy no (212) 916-3740, or at any other address previously furnished in writing to the Issuer or the Trustee by the Initial Investment Agreement Provider.

Delivery of any request, demand, authorization, direction, notice, consent, waiver or Act of Securityholders or other documents made as provided above will be deemed effective: (i) if in writing and delivered in person or by overnight courier service, on the date it is delivered; (ii) if sent by facsimile transmission, on the date that transmission is received by the recipient in legible form (as evidenced by the sender's written record of a telephone call to the recipient in which the recipient acknowledged receipt of such facsimile transmission); and (iii) if sent by mail, on the date that mail is delivered or its delivery is attempted; in each case, unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Business Day.

**Section 14.4 Notices and Reports to Securityholders; Waiver.**

Except as otherwise expressly provided herein, where this Indenture provides for a report to Holders or for a notice to Holders of Securities of any event,

(a)   such report or notice shall be sufficiently given to Holders of Securities if in writing and mailed, first class postage prepaid, to each Holder of a Security affected by such event, at the address of such Holder as it appears in the Note Register not earlier than the earliest date and not later than the latest date, prescribed for the giving of such report or notice; and

(b)   such report or notice shall be in the English language.

30775-00034 NY:1268831.8

Such reports and notices will be deemed to have been given on the date of such mailing.

The Trustee will deliver to the Holder of any Security shown on the Note Register any notice or report requested to be so delivered, at the expense of the Issuer. In addition, for so long as any Class of Notes is listed on the Exchange, and so long as the rules of the Exchange so require, notices to the holders of the Notes shall also be delivered by the Trustee to the Company Announcements Office of the Exchange.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Holder of a Security shall affect the sufficiency of such notice with respect to other Holders of Securities.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Securityholders shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

In the event that, by reason of the suspension of the regular mail service as a result of a strike, work stoppage or similar activity, it shall be impractical to mail notice of any event to Securityholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Trustee shall be deemed to be a sufficient giving of such notice.

### Section 14.5 Effect of Headings and Table of Contents.

The Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

### Section 14.6 Successors and Assigns.

All covenants and agreements in this Indenture by the Issuers shall bind their respective successors and assigns, whether so expressed or not.

### Section 14.7 Severability.

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

### Section 14.8 Benefits of Indenture.

The Interest Rate Swap Counterparty, and its successors and assigns shall be a third party beneficiary of each agreement or obligation in this Indenture relating to the rights of the Interest Rate Swap Counterparty hereunder. Each Preference Shareholder and the Preference Share Paying Agent, on the Preference Shareholders' behalf, shall be a third party beneficiary of each agreement or obligation in this Indenture relating to payments to be made by the Issuer to the Preference Shareholders or the Preference Share Paying Agent, the rights and obligations of the Issuer with respect to the Preference Shares, the priority of payments established in Section 11.1 and Article XIII, the right of Preference Shareholders to consent to supplemental indentures and the rights of Preference Shareholders to receive reports and notices hereunder or to give other consents, approvals, notices or directions hereunder. Nothing in this Indenture or in the Securities, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Collateral Manager, the Securityholders and the Interest Rate Swap Counterparty, any benefit or any legal or equitable right, remedy or claim under this Indenture.

### Section 14.9 Legal Holidays.

In the event that the date of any Distribution Date, Stated Maturity, Scheduled Preference Share Redemption Date or Redemption Date shall not be a Business Day, then notwithstanding any other provision of the Notes or this Indenture, payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the nominal date of any such Distribution Date, Stated Maturity,

147

Scheduled Preference Share Redemption Date or Redemption Date, as the case may be, and, in the case of a Distribution Date, any interest (in the case of the Notes) accrued for the period from or after any such nominal date to the next succeeding Business Day shall not be payable on such Business Day but shall be payable on the next following Distribution Date.

### Section 14.10    Governing Law.

THIS INDENTURE AND EACH NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK WITHOUT REFERENCE TO ITS CONFLICT OF LAWS RULES (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.    THE STATE OF NEW YORK SHALL BE THE SECURITIES INTERMEDIARY'S JURISDICTION OF THE SECURITIES INTERMEDIARY FOR PURPOSES OF ARTICLE 8 OF THE UCC AND THE UNITED STATES REGULATIONS.

### Section 14.11    Submission to Jurisdiction.

The Issuers hereby irrevocably submit to the non-exclusive jurisdiction of any New York State or Federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Securities or this Indenture, and the Issuers hereby irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in any such New York State or Federal court.    The Issuers hereby irrevocably waive, to the fullest extent that they may legally do so, the defense of an inconvenient forum to the maintenance of such action or proceeding.    The Issuers irrevocably consent to the service of any and all process in any action or proceeding by the mailing or delivery of copies of such process to it at the office of the Issuer's agent in New York set forth in Section 7.2.    The Issuers agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

### Section 14.12    Counterparts.

This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

### Section 14.13    Judgment Currency.

This is an international financing transaction in which the specification of Dollars (the "Specified Currency"), and the specification of the place of payment, as the case may be (the "Specified Place"), is of the essence, and the Specified Currency shall be the currency of account in all events relating to payments of or on the Securities.    The payment obligations of the Issuers under this Indenture and the Securities shall not be discharged by an amount paid in another currency or in another place, whether pursuant to a judgment or otherwise, to the extent that the amount so paid on conversion to the Specified Currency and transfer to the Specified Place under normal banking procedures does not yield the amount of the Specified Currency at the Specified Place.    If for the purpose of obtaining judgment in any court it is necessary to convert a sum due hereunder or the Securities in the Specified Currency into another currency (the "Second Currency"), the rate of exchange which shall be applied shall be that at which in accordance with normal banking procedures the Trustee could purchase the Specified Currency with the Second Currency on the Business Day next preceding that on which such judgment is rendered.    The obligation of the Issuers in respect of any such sum due from the Issuers hereunder shall, notwithstanding the rate of exchange actually applied in rendering such judgment, be discharged only to the extent that on the Business Day following receipt by the Trustee of any sum adjudged to be due hereunder or under the Securities in the Second Currency the Trustee may in accordance with normal banking procedures purchase and transfer to the Specified Place the Specified Currency with the amount of the Second Currency so adjudged to be due; and the Issuers hereby, as a separate obligation and notwithstanding any such judgment (but subject to the Priority of Payments as if such separate obligation in respect of each Class of Notes or Preference Shares constituted additional principal owing in respect of such Class of Notes or Preference Shares), agree to indemnify the Trustee and each Securityholder against, and to pay the Trustee or such Securityholder, as the case may be, on demand in the Specified Currency,

148

any difference between the sum originally due to the Trustee or such Securityholder, as the case may be, in the Specified Currency and the amount of the Specified Currency so purchased and transferred.

### Section 14.14    Liability of Issuers.

Notwithstanding any other term of this Indenture, the Notes or any other agreement entered into between, inter alia, the Issuer or the Co-Issuer, neither of the Issuers shall have any liability whatsoever to the other under this Indenture, the Notes, any such agreement or otherwise and, without prejudice to the generality of the foregoing, neither the Issuer nor the Co-Issuer shall be entitled to take any steps to enforce, or bring any action or proceeding, in respect of this Indenture, the Notes, any such agreement or otherwise against the other. In particular, neither the Issuer nor the Co-Issuer shall be entitled to petition or take any other steps for the winding up or bankruptcy of the other or shall have any claim in respect of any assets of the other. This Section 14.14 shall survive the termination of this Agreement.

## ARTICLE XV

## ASSIGNMENT OF MANAGEMENT AGREEMENT, THE COLLATERAL ADMINISTRATION AGREEMENT, THE INTEREST RATE SWAP AGREEMENT, THE SYNTHETIC SECURITIES AND THE INITIAL INVESTMENT AGREEMENT

### Section 15.1 Assignment.

(a)    As set forth in the Granting Clauses, the Issuer has Granted to the Trustee, for the benefit of the Secured Parties, all of the Issuer's right, title and interest in, to and under the Management Agreement, the Collateral Administration Agreement, the Synthetic Securities, the Investment Agreement and the Interest Rate Swap Agreement, including (i) the right to give all notices, consents and releases thereunder, (ii) the right to give all notices of termination and to take any legal action upon the breach of an obligation of the Collateral Manager under the Collateral Administration Agreement and the Management Agreement, each Synthetic Security Counterparty under the related Synthetic Security, the Initial Investment Agreement Provider or any Replacement Investment Agreement Provider, as applicable, under the Investment Agreement, or the Interest Rate Swap Counterparty under the Interest Rate Swap Agreement, including the commencement, conduct and consummation of proceedings at law or in equity, (iii) the right to receive all notices, accountings, consents, releases and statements thereunder and (iv) the right to do any and all other things whatsoever that the Issuer is or may be entitled to do thereunder; provided that the Trustee hereby grants the Issuer a license to exercise all of the Issuer's rights pursuant to the Management Agreement, Collateral Administration Agreement, the Synthetic Securities, the Investment Agreement and Interest Rate Swap Agreement without notice to or the consent of the Trustee (except as otherwise expressly required by this Indenture, including as set forth in Section 15.4), which license shall be and is hereby deemed to be automatically revoked (A) upon the occurrence of an Event of Default hereunder until such time, if any, as such Event of Default is cured or waived, (B) with respect to the Management Agreement, the termination of the Collateral Manager pursuant to Section 13 of the Management Agreement or (C) upon a material default in the performance, or breach, of any covenant, representation, warranty or other agreement of the Issuer under the Indenture or in any certificate or writing delivered pursuant thereto or made in connection therewith which proves to be incorrect in any material respect when made, if (a) Holders of at least fifty percent (50%) of the Aggregate Outstanding Amount of the Notes of any Class, Preference Shareholders whose aggregate Voting Percentages are at least fifty percent (50%) of all Preference Shareholders' voting percentages or the Interest Rate Swap Counterparty gives notice of such default or breach to the Trustee and the Collateral Manager or (b) the Collateral Manager, the Issuer or the Co-Issuer has actual knowledge of such default or breach, and in either case, such default or breach (if remediable) continues for a period of 30 days.

(b)    The assignment made under the Granting Clauses is made as collateral security, and the execution and delivery of this Indenture shall not in any way impair or diminish the obligations of the Issuer under the provisions of the Management Agreement, the Collateral Administration Agreement, the Synthetic Securities, the Investment Agreement and the Interest Rate Swap Agreement, and shall not be deemed to transfer to or impose upon the Trustee, or to constitute an assumption by the Trustee of, any of the obligations, liabilities or duties of the Issuer thereunder; and unless and until an Event of Default has occurred and is continuing, the Issuer is hereby granted a

license to exercise its rights and powers under the Management Agreement, the Collateral Administration Agreement, the Synthetic Securities, the Investment Agreement and the Interest Rate Swap Agreement, provided that it does so in accordance with the terms of this Indenture.

(c) On the date on which the obligations of the Issuer hereunder are terminated as set forth in Section 4.1 and the Collateral is released from the lien of the Indenture, all rights Granted to the Trustee for the benefit of the Noteholders shall cease and terminate and all right, title and interest of the Trustee in, to and under the Management Agreement, the Collateral Administration Agreement, the Synthetic Securities, the Investment Agreement and the Interest Rate Swap Agreement shall revert to the Issuer, Collateral Manager, Collateral Administrator, the related Synthetic Security Counterparty, the Initial Investment Agreement Provider or any Replacement Investment Agreement Provider, as applicable, and Interest Rate Swap Counterparty, respectively, and no further instrument or act shall be necessary to evidence such termination and reversion.

(d) The Issuer agrees that the Grant set forth in the Granting Clauses is irrevocable, and that it will not take any action that is inconsistent with the Granting Clauses or make any other assignment inconsistent herewith. The Issuer will, from time to time upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this Indenture as the Trustee may reasonably specify.

### Section 15.2 [Reserved].

### Section 15.3 [Reserved].

### Section 15.4 Issuer Agreements, Etc.

The Issuer hereby agrees, and hereby undertakes to obtain the agreement and consent of the Collateral Manager in the Management Agreement to the following:

(a) the Collateral Manager consents to the provisions of this assignment and agrees to perform any provisions of this Indenture applicable to the Collateral Manager;

(b) the Collateral Manager acknowledges that the Issuer has assigned all of its right, title and interest in, to and under the Management Agreement to the Trustee for the benefit of the Secured Parties, and the Collateral Manager agrees that all of the representations, covenants and agreements made by the Collateral Manager in the Management Agreement are also for the benefit of the Trustee and the other Secured Parties;

(c) the Collateral Manager shall deliver to the Trustee duplicate original copies of all notices, statements, communications and instruments delivered or required to be delivered to the Issuer pursuant to the Management Agreement;

(d) after the Closing Date, the Issuer will not enter into any agreement amending, modifying or terminating the Management Agreement (other than in respect of an amendment or modification of the type that may be made to this Indenture without Securityholder consent or a termination by the Collateral Manager permitted by Section 13 of the Management Agreement) or selecting or consenting to a successor Collateral Manager, (i) without 10 days' prior written notice to each Rating Agency and the Interest Rate Swap Counterparty, (ii) without 10 days' prior written notice thereof to the Trustee, which notice shall specify the action proposed to be taken by the Issuer (and the Trustee shall promptly deliver a copy of such notice to each Securityholder), (iii) without satisfaction of the Rating Condition with respect to such amendment, modification, termination or selection of or consent to a successor Collateral Manager and (iv) in the case of any amendment, modification or termination other than pursuant to Section 13(a) of the Management Agreement, or the selection of or consent to a successor Collateral Manager (other than a successor Collateral Manager that is an Affiliate of the Collateral Manager), if Holders of at least sixty-six and two-thirds percent (66 ⅔) of the Preference Shares (excluding Collateral Manager Securities) or the Interest Rate Swap Counterparty shall, by notice to the Issuer, the Collateral Manager and the Trustee

150

within 30 days after the date of the related notice to the Trustee given as provided in clause (ii) above, object to such amendment, modification or termination or object to such successor Collateral Manager;

(e)    except as otherwise set forth herein and therein (including pursuant to Section 13(a) of the Management Agreement), the Collateral Manager shall continue to serve as Collateral Manager under the Management Agreement notwithstanding that the Collateral Manager shall not have received amounts due it under the Management Agreement because sufficient funds were not then available hereunder to pay such amounts. The Collateral Manager agrees not to institute against, or join any other Person in instituting against, the Issuer or Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under any bankruptcy, insolvency, reorganization or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under this Indenture; provided that nothing in this clause shall preclude, or be deemed to stop, the Collateral Manager from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (x) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer, or (y) any involuntary insolvency proceeding filed or commenced against the Issuer or the Co-Issuer by a Person other than the Collateral Manager or its Affiliates, provided that the obligations of the Issuers hereunder shall be payable solely from the Collateral in accordance with the Priority of Payments;

(f)    the Collateral Manager and the Issuer shall consult with the Trustee with respect to any material adverse or potentially adverse material interest or other material conflict of the Collateral Manager or the Issuer, or any of its Affiliates, relating to any action to be taken with respect to any Pledged Security. If the Collateral Manager determines that it or any of its Affiliates have a material conflict of interest between the Securityholders and any other account or portfolio for which the Collateral Manager or any of its Affiliates is serving as investment adviser which relates to any action to be taken with respect to any Pledged Security and that such conflict of interest was not of a type disclosed in the Note Offering Circular, then the Collateral Manager will give written notice to the Issuer briefly describing such conflict and the action it proposes to take. The Collateral Manager will perform its obligations with respect to any such conflict with the care, skill, prudence and diligence that a prudent person acting in a like capacity and familiar with such matters would use in the resolution of such conflict; and

(g)    the Collateral Manager irrevocably submits to the non-exclusive jurisdiction of any New York State or Federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Securities or this Indenture, and the Collateral Manager irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in any such New York State or Federal court. The Collateral Manager irrevocably waives, to the fullest extent it may legally do so, the defense of an inconvenient forum to the maintenance of such action or proceeding. The Collateral Manager irrevocably consents to the service of any and all process in any action or proceeding by the mailing or delivery of copies of such process to it at the office of the Collateral Manager in New York, New York, or, if no such office is then maintained, at the office of CT Corporation System, 111 Eighth Avenue, New York, New York, New York 10011. The Collateral Manager agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

## ARTICLE XVI

### INTEREST RATE SWAP AGREEMENT

#### Section 16.1 The Interest Rate Swap Agreement.

(a)    On the Closing Date (or any date on which the Issuer enters into a replacement Interest Rate Swap Agreement or an Additional Interest Rate Swap Agreement), (i) the Interest Rate Swap Counterparty (or any Affiliate of the Interest Rate Swap Counterparty that shall have absolutely and unconditionally guaranteed the obligations of such Interest Rate Swap Counterparty under the Interest Rate Swap Agreement) shall satisfy the Interest Rate Swap Counterparty Ratings Requirement and (ii) the Issuer shall Grant the Interest Rate Swap

151

Agreement to the Trustee pursuant to this Indenture. If after the Closing Date, the Interest Rate Swap Counterparty fails to satisfy the Interest Rate Swap Counterparty Ratings Requirement, a Responsible Officer of the Trustee upon receipt of notice of such event, shall provide notice of such event (which may include forwarding any notice received by the Trustee) to the Rating Agencies.

(b)    The Trustee shall, on behalf of the Issuer and in accordance with the Note Valuation Report, pay amounts due to the Interest Rate Swap Counterparty under the Interest Rate Swap Agreement on any Distribution Date in accordance with Section 11.1.

(c)    Subject to the terms hereof, the Trustee, as directed by the Issuer, shall take all reasonable steps necessary to enforce the Issuer's rights under the Interest Rate Swap Agreement, including receiving payments from the Interest Rate Swap Counterparty when due and exercising the Issuer's rights under the Interest Rate Swap Agreement including, without limitation, the Issuer's right to terminate the Agreement if on any date such Interest Rate Swap Counterparty fails to satisfy the Interest Rate Swap Counterparty Ratings Requirement as the Trustee is notified in writing, within:

(i)    30 days of such failure to satisfy the Interest Rate Swap Counterparty Ratings Requirement the Interest Rate Swap Counterparty having to, at its sole option and expense take one of the actions described under (w), (x), (y) and (z) below, or

(ii)    10 days of such failure to satisfy the Interest Rate Swap Counterparty Ratings Requirement and (A) the unsecured, unguaranteed and otherwise unsupported short term debt obligations of the Interest Rate Swap Counterparty are rated below "A-3" by Standard & Poor's (if the Interest Rate Swap Counterparty has a short-term rating from Standard & Poor's) or if the Interest Rate Swap Counterparty does not have a short-term rating from Standard & Poor's, the unsecured, unguaranteed and otherwise unsupported long term senior debt obligations of the Interest Rate Swap Counterparty are rated below "BBB-" by Standard & Poor's or (B) either the unsecured, unguaranteed and otherwise unsupported long-term senior debt obligations of Interest Rate Swap Counterparty are rated "A2" or below by Moody's and no short-term rating is available from Moody's, or the unsecured, unguaranteed and otherwise unsupported long-term senior debt obligations of Interest Rate Swap Counterparty are rated "A3" or below by Moody's and the unsecured, unguaranteed and unsecured, unguaranteed and otherwise unsupported short-term debt obligations of Interest Rate Swap Counterparty are rated "P-2" or below by Moody's, the Interest Rate Swap Counterparty having to, at its sole expense take the action described under (x) below:

(w)    post collateral to secure the Interest Rate Swap Counterparty's obligations under the Interest Rate Swap Agreement (but solely with respect to the Interest Rate Swap Agreement) in a form and amount acceptable to the Issuer and that satisfies the Rating Condition; *provided* that posting under this subclause (w) shall no longer be required upon the occurrence of (A) a Termination Date (as defined in related Interest Rate Swap Transaction), (B) the Interest Rate Swap Counterparty having no further payment obligations under the Interest Rate Swap Transactions or (C) the Issuer being a Defaulting Party or Affected Party thereunder; *provided* that the Interest Rate Swap Counterparty (other than the initial Interest Rate Swap Counterparty) shall, in addition to posting collateral as required in this clause (w), obtain or provide a legal opinion addressed to the Issuer and the Trustee to the effect that the collateral will be available to the Trustee and the Noteholders in the event of the insolvency of such Interest Rate Swap Counterparty;

(x)    assign or transfer all of its rights and obligations under the Interest Rate Swap Agreement (but solely with respect to the Interest Rate Swap Agreement) to a Replacement Interest Rate Swap Counterparty (and provide the Rating Agencies with notice of such assignment or transfer);

(y)    cause an entity that satisfies the Interest Rate Swap Counterparty Ratings Requirement to issue in favor of the Issuer a credit support of the Interest Rate Swap Counterparty's obligations the Interest Rate Swap Agreement (but solely with respect to the

30775-00034 NY:1268831.8

Interest Rate Swap Agreement) acceptable in form and substance to the Issuer and that satisfies the Rating Condition; or

(z)      take other steps as each Rating Agency that has downgraded the Interest Rate Swap Counterparty may require to satisfy the Rating Condition.

(d)      If at any time an Interest Rate Swap Agreement becomes subject to early termination due to the occurrence of an Event of Default or a Termination Event (each as defined in the Interest Rate Swap Agreement) where the Interest Rate Swap Counterparty is the Defaulting Party or the Affected Party, the Issuer and the Trustee shall take such actions (following the expiration of any applicable grace period) to enforce the rights of the Issuer and the Trustee thereunder and under any related Collateral Agreement (as defined in the Interest Rate Swap Agreement) as may be permitted by the terms of the Interest Rate Swap Agreement and consistent with the terms hereof, and shall apply the proceeds of any such actions (including the proceeds of the liquidation of any collateral pledged by such Interest Rate Swap Counterparty) to enter into a replacement Interest Rate Swap Agreement. The Collateral Manager shall, on behalf of the Issuer, arrange for the Issuer to enter into a replacement Interest Rate Swap Agreement after the early termination of such Interest Rate Swap Agreement as a result of either a termination event for which the Interest Rate Swap Counterparty is the sole Affected Party or an event of default under the Interest Rate Swap Agreement where the Interest Rate Swap Counterparty is the Defaulting Party, unless the Rating Condition is satisfied with respect to the failure to enter into a replacement Interest Rate Swap Agreement. The replacement Interest Rate Swap Agreement shall be on substantially the same terms and conditions as the terminated Interest Rate Swap Agreement (except to the extent the Issuer (with the advice of the Collateral Manager) determines that any such term or condition either is not reasonably available in the market or could result in a reduction or withdrawal in the rating of any Class of the Notes, in which event the Rating Condition shall have been satisfied with respect to any change in the terms and conditions), and shall be a replacement Interest Rate Swap Agreement and with an Interest Rate Swap Counterparty with respect to which the Rating Condition shall have been satisfied. Any costs attributable to entering into a replacement Interest Rate Swap Agreement which exceed the sum of the proceeds (if any) of the liquidation of the terminated Interest Rate Swap Agreement that are not otherwise paid by the defaulting Interest Rate Swap Counterparty shall constitute expenses payable under Section 11.1(a)(i)(S). Any excess proceeds of the liquidation of the Interest Rate Swap Agreement remaining after all costs attributable to entering into a replacement Interest Rate Swap Agreement shall constitute Principal Proceeds and shall be deposited into the Principal Collection Account. In addition, the Issuer will use its best efforts to cause the termination of the Interest Rate Swap Agreement to become effective simultaneously with the entry into a replacement Interest Rate Swap Agreement described as aforesaid.

(e)      The Interest Rate Swap Agreement will be governed by, and construed in accordance with, the laws of the State of New York and documented in accordance with the forms adopted by the International Swaps and Derivatives Association, Inc.  The Interest Rate Swap Agreement shall provide that any amount payable to the Interest Rate Swap Counterparty thereunder shall be subject to the Priority of Payments and that any amount payable upon the early termination or liquidation thereof shall be payable only on a Distribution Date in accordance with the Priority of Payments.  The Interest Rate Swap Agreement shall contain appropriate limited recourse and non-petition provisions (to the extent the Issuer has contractual payment or other obligations to the Interest Rate Swap Counterparty with respect thereto) equivalent (mutatis mutandis) to those contained in this Indenture.

(f)      As of the Closing Date, the Issuer may not enter into the Interest Rate Swap Agreement with the Interest Rate Swap Counterparty other than the Person named in the definition of Interest Rate Swap Counterparty, and the Issuer shall not enter into any Additional Interest Rate Swap Agreement except (i) with the consent of the Collateral Manager and the Initial Interest Rate Swap Counterparty and (ii) in compliance with the Rating Condition. In addition, the Issuer shall not agree, without satisfaction of the Rating Condition, to any amendment, modification, or waiver of any provision of any Interest Rate Swap Agreement.

(g)      The Issuer (or the Collateral Manager on its behalf) shall use all reasonable efforts to provide the Interest Rate Swap Counterparty with ten Business Days' prior written notice of any Collateral Imbalance Date.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

30775-00034 NY:1268831.8

IN WITNESS WHEREOF, we have set our hands or, in the case of the Issuer, executed this Indenture as a deed as of the day and year first above written.

Executed as a deed by

GEMSTONE CDO VI LTD.,
    as Issuer

By: _____
    Name:
    Title:  Director

In the presence of: _____
                      Witness

GEMSTONE CDO VI CORP.,
    as Co-Issuer

By: _____
    Name:
    Title:  President

DEUTSCHE BANK TRUST COMPANY AMERICAS,
    as Trustee

By: _____
    Name:  Stephen T. Hessler
    Title:  Vice President

By: _____
    Name:
    Title:  Maged Mecheal
            Assistant Vice President

DEUTSCHE BANK TRUST COMPANY AMERICAS,
    as Securities Intermediary

By: _____
    Name:  Stephen T. Hessler
    Title:  Vice President

By: _____
    Name:
    Title:  Maged Mecheal
            Assistant Vice President

IN WITNESS WHEREOF, we have set our hands or, in the case of the Issuer, executed this Indenture as a deed as of the day and year first above written.

Executed as a deed by

GEMSTONE CDO VI LTD.,
    as Issuer

By: _____
    Name:
    Title:  Director

In the presence of: _____
                                    Witness

GEMSTONE CDO VI CORP.,
    as Co-Issuer

By: _____
    Name:  Donald J. Puglisi
    Title:  President

DEUTSCHE BANK TRUST COMPANY AMERICAS,
    as Trustee

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

DEUTSCHE BANK TRUST COMPANY AMERICAS,
    as Securities Intermediary

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, we have set our hands or, in the case of the Issuer, executed this Indenture as a deed as of the day and year first above written.

Executed as a deed by

GEMSTONE CDO VI LTD.,
    as Issuer

By: _____
    Name:  Carlos Farjallah
    Title:  Director

In the presence of: _____
                  Witness

GEMSTONE CDO VI CORP.,
    as Co-Issuer

By: _____
    Name:
    Title:  President

DEUTSCHE BANK TRUST COMPANY AMERICAS,
    as Trustee

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

DEUTSCHE BANK TRUST COMPANY AMERICAS,
    as Securities Intermediary

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

SCHEDULE A

SCHEDULE OF CLOSING UNDERLYING ASSETS

| Index | CUSIP | TICKER | Par at Closing | Fixed/ Floating | Coupon/ Spread | Moody's Rating | S&P Rating | Specified Type (Asset Class) | Maturity Date |
|-------|-------|--------|----------------|-----------------|----------------|----------------|------------|------------------------------|---------------|
|       |       |        |                |                 |                |                |            |                              |               |

1

SCHEDULE B

LIBOR FORMULA

With respect to each Interest Period, "**LIBOR**" for purposes of calculating the Note Interest Rate for each Class of Notes for such Interest Period will be determined by the Calculation Agent in accordance with the following provisions:

(i)        LIBOR for any Interest Period shall equal the offered rate, as determined by the Calculation Agent, for Dollar deposits of the Designated Maturity which appears on Telerate Page 3750 (or such other page as may replace such Telerate Page 3750 for the purpose of displaying comparable rates), as reported by Bloomberg Financial Markets Commodities News, as of 11:00 a.m. (London time) on the applicable LIBOR Determination Date. "**LIBOR Determination Date**" means, with respect to any Interest Period, the second London Banking Day prior to the first day of such Interest Period.

(ii)       If, on any LIBOR Determination Date, such rate does not appear on Telerate Page 3750 (or such other page as may replace such Telerate Page 3750 for the purpose of displaying comparable rates), as reported by Bloomberg Financial Markets Commodities News, the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to prime banks in the London interbank market for Dollar deposits of three months (except that in the case where such Interest Period shall commence on a day that is not a LIBOR Business Day, for a term of three months commencing on the next following LIBOR Business Day), by reference to requests for quotations as of approximately 11:00 a.m. (London time) on such LIBOR Determination Date made by the Calculation Agent to the Reference Banks. If, on any LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean. If, on any LIBOR Determination Date, fewer than two Reference Banks provide such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in New York City selected by the Calculation Agent (after consultation with the Collateral Manager) are quoting on the relevant LIBOR Determination Date for Dollar deposits for the term of such Interest Period (except that in the case where such Interest Period shall commence on a day that is not a LIBOR Business Day, for a term of three months commencing on the next following LIBOR Business Day), to the principal London offices of leading banks in the London interbank market.

(iii)      In respect of any Interest Period having a designated maturity other than three months, LIBOR shall be determined through the use of straight-line interpolation by reference to two rates calculated in accordance with clauses (i) and (ii) above, one of which shall be determined as if the maturity of the Dollar deposits referred to therein were the period of time for which rates are available next shorter than the Interest Period and the other of which shall be determined as if such maturity were the period of time for which rates are available next longer than the Interest Period; provided that, if an Interest Period is less than or equal to seven days, then LIBOR shall be determined by reference to a rate calculated in accordance with clauses (i) and (ii) above as if the maturity of the Dollar deposits referred to therein were a period of time equal to seven days.

(iv)      If the Calculation Agent is required but is unable to determine a rate in accordance with either of the procedures described in clauses (i) or (ii) above, LIBOR with respect to such Interest Period shall be the arithmetic mean of the offered quotations of the Reference Dealers as of 10:00 a.m. (New York time) on the first day of such Interest Period for negotiable U.S. Dollar certificates of deposit of major U.S. money market banks having a remaining maturity closest to the Designated Maturity.

(v)       If the Calculation Agent is required but is unable to determine a rate in accordance with any of the procedures described in clauses (i), (ii) or (iv) above, LIBOR with respect to such Interest Period will be calculated on the last day of such Interest Period and shall be the arithmetic mean of the Base Rate for each day during such Interest Period.

1

For purposes of clauses (i), (iii), (iv) and (v) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point. For the purposes of clause (ii) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one thirty-second of a percentage point.

As used herein:

"**Base Rate**" means a fluctuating rate of interest determined by the Calculation Agent as being the rate of interest most recently announced by the Base Rate Reference Bank at its New York office as its base rate, prime rate, reference rate or similar rate for Dollar loans. Changes in the Base Rate will take effect simultaneously with each change in the underlying rate.

"**Base Rate Reference Bank**" means Deutsche Bank Trust Company Americas, or if such bank ceases to exist or is not quoting a base rate, prime rate, reference rate or similar rate for Dollar loans, such other major money center commercial bank in New York City as is selected by the Calculation Agent after consultation with the Collateral Manager.

"**LIBOR Business Day**" means a day on which commercial banks and foreign exchange markets settle payments in Dollars in New York and London.

"**London Banking Day**" means a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London.

"**Reference Banks**" means four major banks in the London interbank market selected by the Calculation Agent after consultation with the Collateral Manager.

"**Reference Dealers**" means three major dealers in the secondary market for U.S. Dollar certificates of deposit selected by the Calculation Agent after consultation with the Collateral Manager.

The determination of the Note Interest Rate for each Class of Notes by the Calculation Agent shall (in the absence of manifest error) be final and binding upon all parties.

2

SCHEDULE C

FORM OF BAILEE LETTER AGREEMENT

_____ ___, 200

[          ]

Re:    Sale of Underlying Assets from Gemstone CDO VI Ltd. (the "**Seller**") to_____ (the "**Purchaser**") pursuant to that certain Purchase Agreement, dated as of _____, 200__, between the Seller and the Purchaser (the "**Agreement**").

Ladies and Gentlemen:

In connection with the above-referenced transaction, and in consideration of the mutual promises set forth herein, _____ (the "**Trustee**"), the Seller, the Purchaser and _____1 (the "**Bailee**") hereby agree to the terms of this bailee letter (the "**Bailee Agreement**") as follows:

1.    On the date agreed upon by the Purchaser and the Seller (the "**Delivery Date**"), the Seller shall deliver to the Bailee, as Bailee for the Seller, the securities identified on a schedule to be attached hereto as Schedule 1 with respect to such Delivery Date (the "**Underlying Assets**").

2.    On the Delivery Date the Bailee shall issue in the name of the Seller, an initial trust receipt by facsimile evidencing the Seller's ownership of the Underlying Assets in the form of Annex A hereto (the "**Initial Trust Receipt**"), which shall state that the Bailee has received the Underlying Assets listed on the schedule attached to the related Initial Trust Receipt.

3.    On the closing date for the sale of the Underlying Assets to the Purchaser, if the Seller has met the conditions precedent set forth in the Agreement, the Purchaser shall disburse funds to the Seller pursuant to the Agreement. Upon receipt of confirmation (which may be by Fed wire transfer number from the Purchaser) from the Seller that the Purchaser has paid the purchase price as mutually agreed upon by the parties in full in immediately available funds, the Underlying Assets shall be released to the Bailee for the benefit of the Purchaser, and the Bailee

---

1    Bank designated by Purchaser which shall meet the Successor Trustee Ratings Requirements.

shall thereafter be bailee and custodian for the sole benefit of the Purchaser with respect to the Underlying Assets.2 Upon the Bailee's receipt of such confirmation each Initial Trust Receipt with respect to the related Underlying Assets thereafter shall automatically be canceled and shall be marked "Canceled" by Seller and shall be promptly returned to the Bailee.

4.      From the Delivery Date until the closing date for the disposition of the Underlying Assets to the Purchaser, the Bailee shall maintain continuous custody and control of the related Underlying Assets as the sole and exclusive Bailee for the Seller.

5.      Upon payment of the purchase price in full in immediately available funds, each of the Seller and the Trustee hereby releases all security interests, rights, liens or claims of any kind it may have with respect to the related Underlying Assets.  At any time prior thereto the Bailee shall immediately deliver to the Trustee all of the Underlying Assets (i) upon receipt of a written direction from the Trustee to make such a delivery or (ii) if the Bailee shall not have received notice from the Seller, by _____ [date to be specified as no later than the tenth Business Day before the Auction Call Redemption Date or the fifth Business Day before any other Redemption Date], that the Purchaser has paid the purchase price in full in immediately available funds.3

6.      The Bailee shall indemnify and hold the Seller and the Trustee harmless against any and all losses, damages, penalties or expenses incurred arising out of a loss or losses of any related Underlying Assets or any component thereof from and after the Delivery Date to the closing date for the sale of the Underlying Assets to the Purchaser, or arising from the Bailee's negligence, lack of good faith or willful misconduct.

7.      The Seller authorizes the Bailee to make the Underlying Assets available for review to the Purchaser or representatives of the Purchaser.

8.      The agreement set forth in this Bailee Agreement may not be modified, amended or altered, except by written instrument, executed by all of the parties hereto.

9.      For the purpose of facilitating the execution of this Bailee Agreement as herein provided and for other purposes, this Bailee Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute and be one and the same instrument.

---

2       If there are two different purchasers of the Subpools, modify to require that until payment in full in immediately available funds is made for both Subpools, Bailee continues to be the sole and exclusive Bailee for Seller for both Subpools, and security interest of Seller and Trustee will not be released.

3       If there are two different purchasers of the Subpools, modify to require that until payment in full in immediately available funds is made for both Subpools, Bailee continues to be the sole and exclusive Bailee for Seller for both Subpools, and security interest of Seller and Trustee will not be released.

2

10.    This Bailee Agreement shall be construed in accordance with the laws of the State of New York, without reference to its conflict of laws rules (other than Section 5-1401 of the general obligations law, which the parties hereto expressly rely upon in the choice of such law as the governing law hereunder) and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

11.    This Bailee Agreement shall bind and inure to the benefit of and be enforceable by the Seller, the Purchaser, the Trustee and the Bailee and their respective permitted successors and assigns.  The terms "**Seller**," "**Trustee**," "**Bailee**" and "**Purchaser**" herein shall be deemed to include any such permitted successors and assigns thereof.  No party to this Bailee Agreement may assign any or all of its rights and obligations hereunder without the consent of the other party.

12.    Capitalized terms used herein and not otherwise defined shall have the meanings assigned in the Indenture.

3

13.    This Bailee Agreement shall supersede any previous bailee agreements executed with respect to the attached assets.

Very truly yours,


By:                                    , as Seller
Name:
Title:


By:                                    , as Purchaser
Name:
Title:


By:                                    , as Trustee
Name:
Title:

4

ACCEPTED AND AGREED:


By:                              , as Bailee
Name:
Title:

SCHEDULE D

Auction Agent Fees

The Auction Agent Fee shall be (a) $35,000 on the first Auction Date; (b) if the Auction Call Redemption is not successful on the First Auction Call Date, $25,000 on the Distribution Date immediately following the First Auction Call Date; and (c) $15,000 on each Auction Date thereafter, if any.  The Auction Agent Fee accrued prior to the resignation or removal of the Collateral Manager shall continue to be payable to the Collateral Manager on the Distribution Date immediately following the effectiveness of such resignation or removal.

SCHEDULE E

Standard & Poor's Recovery Rate Matrix

A.  If the Underlying Asset (which shall mean with respect to a Synthetic Security, the related Reference
Obligation) is an Asset-Backed Security (other than a CMBS Security) and is the senior-most tranche of
securities issued by the issuer of such Underlying Asset:

| Initial Standard & Poor's Rating of the Underlying Asset at Issuance | Liability Rating assigned by Standard & Poor's | | | | | | |
|---|---|---|---|---|---|---|---|
| | AAA | AA+ AA AA- | A+ A A- | BBB+ BBB BBB- | BB+ BB BB- | B+ B B- | CCC+ CCC CCC- |
| AAA | 80.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| AA+, AA, AA- | 70.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| A+, A, A- | 60.0% | 65.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% |
| BBB+, BBB, BBB- | 50.0% | 55.0% | 65.0% | 75.0% | 85.0% | 85.0% | 85.0% |

B.  If the Underlying Asset (which shall mean with respect to a Synthetic Security, the related Reference
Obligation) is an Asset-Backed Security (other than a CMBS Security) and is not the senior-most tranche
of securities issued by the issuer of such Underlying Asset:

| Initial Standard & Poor's Rating of the Underlying Asset at Issuance | Liability Rating assigned by Standard & Poor's | | | | | | |
|---|---|---|---|---|---|---|---|
| | AAA | AA+ AA AA- | A+ A A- | BBB+ BBB BBB- | BB+ BB BB- | B+ B B- | CCC+ CCC CCC- |
| AAA | 65.0% | 70.0% | 80.0% | 85.0% | 85.0% | 85.0% | 85.0% |
| AA+, AA, AA- | 55.0% | 65.0% | 75.0% | 80.0% | 80.0% | 80.0% | 80.0% |
| A+, A, A- | 40.0% | 45.0% | 55.0% | 65.0% | 80.0% | 80.0% | 80.0% |
| BBB+, BBB, BBB- | 30.0% | 35.0% | 40.0% | 45.0% | 50.0% | 60.0% | 70.0% |
| BB+, BB, BB- | 10.0% | 10.0% | 10.0% | 25.0% | 35.0% | 40.0% | 50.0% |
| B+, B, B- | 2.5% | 5.0% | 5.0% | 10.0% | 10.0% | 20.0% | 25.0% |
| CCC+, CCC, CCC- | 0.0% | 0.0% | 0.0% | 0.0% | 2.5% | 5.0% | 5.0% |

C.  If the Underlying Asset (which shall mean with respect to a Synthetic Security, the related Reference
Obligation) is a CMBS Security:

| Initial Standard & Poor's Rating of the Underlying Asset at Issuance | Liability Rating assigned by Standard & Poor's | | | | | | |
|---|---|---|---|---|---|---|---|
| | AAA | AA+ AA AA- | A+ A A- | BBB+ BBB BBB- | BB+ BB BB- | B+ B B- | CCC+ CCC CCC- |
| AAA | 80.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| AA+, AA, AA | 70.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| A+, A, A- | 60.0% | 65.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% |
| BBB+, BBB, BBB- | 45.0% | 50.0% | 55.0% | 60.0% | 65.0% | 70.0% | 75.0% |
| BB+, BB, BB- | 35.0% | 40.0% | 45.0% | 45.0% | 50.0% | 50.0% | 50.0% |
| B+, B, B- | 20.0% | 25.0% | 30.0% | 35.0% | 35.0% | 40.0% | 40.0% |
| CCC+, CCC, CCC- | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| NR | 0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

3

SCHEDULE F

Part 1 - Standard & Poor's Ratings

Asset classes are eligible for notching if they are not first loss tranches or combination securities. If the security is publicly rated by two agencies, notch down as shown below based on the lowest rating. If the security is publicly rated only by one agency, then notch down what is shown below plus one more notch. The Aggregate Principal/Notional Balance of Underlying Assets the Standard & Poor's Rating of which is based on a Fitch rating or a Moody's rating may not exceed 20% of the Aggregate Principal/Notional Balance of all Underlying Assets, the balance of which must be rated by Standard & Poor's or assigned Standard & Poor's rating estimates,

|  | Issued prior to 8/1/01 Current rating is: | | Issued after 8/1/01 Current rating is: | |
|---|---|---|---|---|
|  | Inv. Grade | Non Inv. Grade | Inv. Grade | Non Inv. Grade |
| 1.CONSUMER ABS | -1 | -2 | -2 | -3 |
|     Automobile Loan Receivable Securities | | | | |
|     Automobile Lease Receivable Securities | | | | |
|     Car Rental Receivables Securities | | | | |
|     Credit Card Securities | | | | |
|     Healthcare Securities | | | | |
|     Student Loan Securities | | | | |
| 2. COMMERCIAL ABS | -1 | -2 | -2 | -3 |
|     Cargo Securities | | | | |
|     Equipment Leasing Securities | | | | |
|     Aircraft Leasing Securities | | | | |
|     Small Business Loan Securities | | | | |
|     Restaurant and Food Services Securities | | | | |
| 3. Non-RE-REMIC RMBS | -1 | -2 | -2 | -3 |
|     Manufactured Housing Loan Securities | | | | |
| 4. Non-RE-REMIC CMBS | -1 | -2 | -2 | -3 |
|     CMBS – Conduit | | | | |
|     CMBS - Credit Tenant Lease | | | | |
|     CMBS – Large Loan | | | | |
|     CMBS – Single Borrower | | | | |
|     CMBS – Single Property | | | | |
| 5. CBO/CLO CASHFLOW SECURITIES | -1 | -2 | -2 | -3 |
|     Cash Flow CBO – at least 80% High Yield Corporate | | | | |
|     Cash Flow CBO – at least 80% Investment Grade Corporate | | | | |
|     Cash Flow CLO – at least 80% High Yield Corporate | | | | |
|     Cash Flow CLO – at least 80% Investment Grade Corporate | | | | |

| | | | | |
|---|---|---|---|---|
| 6. REITs | -1 | -2 | -2 | -3 |
| REIT – Multifamily & Mobile Home Park | | | | |
| REIT – Retail | | | | |
| REIT – Hospitality | | | | |
| REIT – Office | | | | |
| REIT – Industrial | | | | |
| REIT – Healthcare | | | | |
| REIT – Warehouse | | | | |
| REIT – Self Storage | | | | |
| REIT – Mixed Use | | | | |
| | | | | |
| 7. SPECIALTY STRUCTURED | -3 | -4 | -3 | -4 |
| Stadium Financings | | | | |
| Project Finance | | | | |
| Future flows | | | | |
| | | | | |
| 8. RESIDENTIAL MORTGAGES | -1 | -2 | -2 | -3 |
| Residential "A" | | | | |
| Residential "B/C" | | | | |
| Home equity loans | | | | |
| | | | | |
| 9. REAL ESTATE OPERATING COMPANIES | -1 | -2 | -2 | -3 |

Part 2 - Standard & Poor's Asset Backed Categories

Each of the following categories of asset backed security shall constitute a separate asset backed class. Securities not included in any of these categories shall be assigned by Standard & Poor's.

Structured Finance Sectors

1.      ABS Consumer
2.      ABS Commercial
3.      CDOs
4.      CMBS Diversified – Conduit and CTL
5.      CMBS – Large Loan, Single Borrower and Single Property
6.      REITs
7.      RMBS A
8.      RMBS B&C, HELs, HELOCs and Tax Lien
9.      Manufactured Housing
10.     Project Finance
11.     U.S. Agency – Explicitly Guaranteed
12.     Monoline/FER Guaranteed
13.     Non-FER Company Guaranteed
14.     FFELP Student Loan (Over 70% FFELP)

Part 3 - Standard & Poor's Asset Classes Not Eligible to be Notched

The following asset classes are not eligible to be notched. Credit estimates must be performed.

2

Asset Type

1.     Non-U.S. Structured Finance Securities
2.     Guaranteed Securities
3.     CDOs of Structured Finance and Real Estate Securities
4.     CBOs of CDOs
5      . CLOs of Distressed Debt
6.     Mutual Fund Fee Securities
7.     Catastrophe Bonds
8.     First Loss Tranches of any securitization
9.     Synthetics
10.    Synthetic CBOs
11.    Combination Securities
12.    Re-REMICs
13.    Market value CDOs
14.    Net Interest Margin Securities (NIMs)
15.    Structured Settlement Obligations
16.    Any asset class not listed on Part 1 above

3

SCHEDULE G

Auction Procedures

The following sets forth the auction procedures (the "**Auction Procedures**") to be followed in connection with a sale effected pursuant to Section 9.3 of the Indenture. Capitalized terms used herein that are not otherwise defined shall have the meanings described thereto in the Indenture.

I. Pre-Auction Process

(a)    The Auction Agent will initiate the Auction Procedures at least 24 Business Days prior to each Auction Date by:

(i)    with the assistance of the Collateral Manager, preparing a list containing the names of the issuer and guarantor (if any), the par amount and the CUSIP number (if any) with respect to each Underlying Asset and such other information as shall be notified to the Trustee by the Collateral Manager;

(ii)    with the assistance of the Collateral Manager, preparing a list of the constituents of each Subpool which shall be based upon the Collateral Manager's good faith determination of the composition of Subpools that will maximize Disposition Proceeds; provided that the maximum number of Subpools shall be eight; and

(iii)    directing the Trustee to send the lists prepared pursuant to clauses (i) and (ii) above to the Qualified Bidders identified on the then-current Qualified Bidder List (the "**Listed Bidders**") and requesting bids on the Auction Date.

(b)    The general solicitation package which the Trustee shall deliver to the Listed Bidders will include: (i) a form of a purchase agreement provided to the Trustee by the Collateral Manager (which shall, among other things, provide that (A) upon satisfaction of all conditions precedent therein, the purchaser is irrevocably obligated to purchase, and the Issuer is irrevocably obligated to sell, the Underlying Assets (or relevant Subpool, as the case may be) on the date and on the terms and conditions set forth therein and (B) if the Subpools are to be sold to more than one bidder, the consummation of the purchase of each Subpool must occur simultaneously and the closing of each purchase is conditional on the closing of each of the other purchases); (ii) the minimum purchase price; (iii) a formal bid sheet (which shall permit the relevant bidder to bid for all of the Underlying Assets, any Subpool or separately for each of the Subpools) provided to the Trustee by the Collateral Manager including a representation from the bidder that it is eligible to purchase all of the Underlying Assets; (iv) a detailed timetable; and (v) copies of all transfer documents provided to the Trustee by the Collateral Manager (including transfer certificates and subscription agreements which a bidder must execute pursuant to the Underlying Instruments and a list of the requirements which the bidder must satisfy under the Underlying Instruments (i.e., Qualified Institutional Buyer, Qualified Purchaser, etc.)).

(c)    The Trustee shall send solicitation packages to all Listed Bidders at least 15 Business Days before the Auction Date. No later than 10 Business Days before the Auction Date, Listed Bidders may submit written due diligence questions relating to the legal documentation and other information contained in the general solicitation package (including comments on the draft purchase agreement to be used in connection with the Auction (the "**Auction Purchase Agreement**")) to the Collateral Manager; provided that the Collateral Manager shall only be obligated to answer questions relating to the Collateral to the extent that it is able to do so by reference to information which it is required to provide under the Management Agreement. The Collateral Manager shall be solely responsible for (i) responding to all relevant questions and/or comments submitted to it in accordance with the foregoing and (ii) distributing the questions, answers and revised final Auction Purchase Agreement to all Listed Bidders at least five Business Days prior to the Auction Date.

(d)    To the extent that the information contained in the list of Underlying Assets or general solicitation package and delivered to the Listed Bidders pursuant to clauses (a), (b) and (c) above is provided to the Trustee by the Collateral Manager and is not true or accurate in any respect or is misleading in any respect, the Collateral Manager shall indemnify the Trustee and its officers, directors, employees and agents for, and hold them harmless against, any loss, liability or expense (including reasonable counsel fees) incurred without negligence, willful misconduct or bad faith on their part, arising out of or in connection with the provision of such information by the Collateral Manager to the Trustee, including the costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of their powers or duties hereunder.

II. Auction Process

(a)    The Collateral Manager or its Affiliates will be allowed to bid in the Auction if it deems appropriate, but will not be required to do so. The Collateral Manager or its Affiliates shall not bid in the Auction if it is the Auction Agent.

(b)    On the Auction Date, all bids will be due by facsimile to the offices of the Trustee by 11:00 a.m., New York City time, with the winning bidder to be notified by 2:00 p.m., New York City time. All bids from Listed Bidders will be due on the bid sheet contained in the solicitation package. Each bid shall be for the purchase and delivery to one purchaser of (i) all (but not less than all) of the Underlying Assets or (ii) all (but not less than all) of the Underlying Assets that constitute the components of one or more Subpools.

(c)    If the Trustee receives fewer than two bids from Listed Bidders to purchase all of the Underlying Assets or to purchase each Subpool, the Trustee shall decline to consummate the sale.

(d)    Subject to clause (c), the Auction Agent shall identify as the winning bidder the bid or bids that result in the Highest Auction Price (in excess of the minimum purchase price) from one or more Listed Bidders.

(e)    Upon notification to the winning bidder(s), the winning bidder (or, if the Highest Auction Price requires the sale of Subpools to more than one bidder, each winning bidder) will be required to deliver to the Trustee a signed counterpart of the Auction Purchase Agreement no later than 4:00 p.m. New York City time on the Auction Date. The winning bidder (or, if the Highest Auction Price requires the sale of Subpools to more than one bidder, each winning bidder) shall be required to pay the full purchase price in cash prior to the sixth Business Day following the relevant Auction Date, at which time all monies will be transferred into the Collection Account. If payment in full of the purchase price is not made when due (or, if the Subpools are to be sold to more than one bidder, if any bidder fails to make payment of the purchase price when due), the Trustee on behalf of the Issuer shall decline to consummate the sale of each Subpool and shall give notice (in accordance with Section 9.3 of the Indenture) that the Auction Call Redemption will not occur.

30775-00034 NY:1268831.8

SCHEDULE H

Form of Note Document Certificate

Address this Certificate to either of these two entities:

> [Deutsche Bank Trust Company Americas as Trustee
> 1761 East St. Andrew Place
> Santa Ana, California 92705]
>
> [Gemstone CDO VI Ltd.
> c/o Maples Finance Limited
> P.O. Box 1093GT
> Queensgate House, South Church Street
> George Town
> Grand Cayman
> Cayman Islands]

The undersigned hereby certifies that it is the beneficial owner of $[_____] in principal amount of the [Class A-1 Floating Rate Notes] [Class A-2 Floating Rate Notes] [Class B Floating Rate Notes] [Class C Floating Rate Deferrable Interest Notes] [Class D Floating Rate Deferrable Interest Notes][Class E Floating Rate Deferrable Interest Notes] due August 17, 2046 of Gemstone CDO VI Ltd. and Gemstone CDO VI Corp., and hereby requests the Trustee to provide to it a copy of the Indenture at the following address:

> Name:
> Address:

The beneficial owner is [PLEASE CHECK WHERE APPROPRIATE]:

____    the Holder of a Definitive Note whose name appears on the Note Register; or

____    the holder of a beneficial interest in a Global Note that holds its interest through [INSERT NAME] that has provided a letter (attached hereto) acknowledging the same.

IN WITNESS WHEREOF, the undersigned has caused this certificate to be duly executed this ____ day of _____, ____.

[NAME OF NOTE OWNER]

By:
    Authorized Signature

2

SCHEDULE I

Form of Note Owner Certificate

Address this Certificate to either of these two entities:

        [Deutsche Bank Trust Company Americas as Trustee
        1761 East St. Andrew Place
        Santa Ana, California 92705]

        [Gemstone CDO VI Ltd.
        c/o Maples Finance Limited
        P.O. Box 1093GT
        Queensgate House, South Church Street
        George Town
        Grand Cayman
        Cayman Islands]

        The undersigned hereby certifies that it is the beneficial owner of $[_____] in principal amount of the [Class A-1 Floating Rate Notes] [Class A-2 Floating Rate Notes] [Class B Floating Rate Notes] [Class C Floating Rate Deferrable Interest Notes] [Class D Floating Rate Deferrable Interest Notes][Class E Floating Rate Deferrable Interest Notes] due August 17, 2046 of Gemstone CDO VI Ltd. and Gemstone CDO VI Corp., and hereby requests the Trustee to provide to [it at the following address] [access to the Trustee's website in order to obtain] the [Monthly Report specified in Section 10.8(a)] [Note Valuation Report specified in Section 10.8(b)] [to provide to it at the following address notices pursuant to Section 6.2] of the Indenture:

        Name:
        Address:

        IN WITNESS WHEREOF, the undersigned has caused this certificate to be duly executed this ____ day of _____, ____.

                        [NAME OF NOTE OWNER]

                     By:
                           Authorized Signature

SCHEDULE J

[Reserved]

SCHEDULE K

[Reserved]

SCHEDULE L

MOODY'S RATING AND MOODY'S WEIGHTED AVERAGE RATING

The "**Weighted Average Rating**" on any Measurement Date is the number determined by dividing (i) the sum of the series of products obtained for Underlying Assets (other than Underlying Assets which the Asset Manager reasonably believes will default with respect to payment when next due and any Defaulted Securities) by multiplying the Principal/Notional Balance on such Measurement Date of each such Underlying Asset by its respective Moody's Rating Factor on such Measurement Date by (ii) the sum of the Aggregate Principal/Notional Balance on such Measurement Date of all Underlying Assets that are not Underlying Assets which the Asset Manager reasonably believes will default with respect to payment when next due and any Defaulted Securities. The "**Moody's Rating Factor**" relating to any Underlying Asset is the number set forth in the table below opposite the Moody's Rating of such Underlying Asset:

| Moody's Rating | Moody's Rating Factor |
|---|---|
| Aaa | 1 |
| Aa1 | 10 |
| Aa2 | 20 |
| Aa3 | 40 |
| A1 | 70 |
| A2 | 120 |
| A3 | 180 |
| Baa1 | 260 |
| Baa2 | 360 |
| Baa3 | 610 |
| Ba1 | 940 |
| Ba2 | 1,350 |
| Ba3 | 1,766 |
| B1 | 2,220 |
| B2 | 2,720 |
| B3 | 3,490 |
| Caa1 | 4,770 |
| Caa2 | 6,500 |
| Caa3 | 8,070 |
| Ca or lower | 10,000 |

The "**Moody's Rating**" of any Underlying Asset (which shall mean with respect to a Synthetic Security, the related Reference Obligation) will be determined as follows:

with respect to any Asset-Backed Security, for determining the Moody's Rating as of any date of determination:

(i)      if such Asset-Backed Security is publicly rated by Moody's, the Moody's Rating shall be such rating, or, if such Underlying Asset is not publicly rated by Moody's, but the Issuer or the Collateral Manager on behalf of the Issuer has requested that Moody's assign a rating to such Underlying Asset, the Moody's Rating shall be the rating so assigned by Moody's;

(ii)      If such Asset-Backed Security is not publicly rated by Moody's, then the Moody's Rating of such Asset-Backed Security may be determined using any one of the methods below:

(A)      with respect to any ABS type Residential Security not publicly rated by Moody's, if such ABS type Residential Security is publicly rated by Standard & Poor's, then the Moody's Rating thereof will be (1) one subcategory below the Moody's equivalent rating assigned by Standard & Poor's if the rating assigned by Standard & Poor's is "AAA"; (2) two rating

subcategories below the Moody's equivalent rating assigned by Standard & Poor's if the rating assigned by Standard & Poor's is below "AAA" but above "BB+" and (3) three rating subcategories below the Moody's equivalent rating assigned by Standard & Poor's if the rating assigned by Standard & Poor's is below "BBB-"; and

(B)    with respect to any other type of Asset-Backed Securities, pursuant to any method specified by Moody's;

*provided* that

(V)    the rating of either Rating Agency used to determine the Moody's Rating pursuant to any of clauses (i) or (ii) above shall be a public, non-exclusive rating (but not a rating estimate) that addresses the obligation of the obligor to pay principal of and interest on the relevant Underlying Asset in full and is monitored on an ongoing basis by the relevant Rating Agency,

(W)    the Aggregate Principal/Notional Balance of Underlying Assets the Moody's Rating of which is based on a Standard & Poor's Rating may not exceed 20% of the Aggregate Principal/Notional Balance of all Underlying Assets, the balance of which must be rated by Moody's or assigned Moody's rating estimates,

(X)    the ratings of no more than 10% of the Aggregate Principal/Notional Balance of all Underlying Assets may be assigned rating factors derived via notching from single-rated instruments,

(Y)    with respect to any one Rating Agency, the single-rated notched bucket may be no larger than 7.5% of the Aggregate Principal/Notional Balance of all Underlying Assets and

(Z)    if an Underlying Asset

(A)    is placed on a watch list for possible upgrade by Moody's, the Moody's Rating applicable to such Underlying Asset shall be two rating subcategories above the Moody's Rating applicable to such Underlying Asset immediately prior to such Underlying Asset being placed on such watch list, if such Underlying Asset is rated below "Aaa" by Moody's unless rated "Aa1", in which case only one subcategory above; and

(B)    is placed on a watch list for possible downgrade by Moody's, the Moody's Rating applicable to such Underlying Asset shall be (i) one rating subcategory below the Moody's Rating applicable to such Underlying Asset immediately prior to such Underlying Asset being placed on such watch list, if such Underlying Asset is rated "Aaa" by Moody's or (ii) two rating subcategories below the Moody's Rating applicable to such Underlying Asset immediately prior to such Underlying Asset being placed on such watch list, if such Underlying Asset is rated below "Aaa" by Moody's; and

*provided further* that, with respect to notched ratings on certain asset classes, the Moody's Rating shall be determined in conjunction with the notching conventions set forth below.

**S&P**

The following notching conventions are appropriate for S&P-only rated tranches. (The figures represent the number of notches to be subtracted from the S&P rating. For example, a "1" applied to an S&P rating of BBB implies a Moody's rating of Baa3.)

2

| ASSET CLASS | AAA to AA- | A+ to BBB- | Below BBB- |
|---|---|---|---|
| Auto loan | 1 | 2 | 3 |
| Car Rental Fleet | 1 | 2 | 3 |
| CDO Domestic Corporate Debt | No notching permitted | No notching permitted | No notching permitted |
| CDO Structured Product | No notching permitted | No notching permitted | No notching permitted |
| Consumer Asset-Backed | 1 | 2 | 3 |
| Credit Card | 1 | 2 | 3 |
| Equipment Lease | 1 | 2 | 3 |
| Manufactured Housing Securities | 1 | 2 | 3 |
| Small Business Loan | 1 | 2 | 3 |
| Student Loan | 1 | 2 | 3 |

| Residential Mortgage Related (note that rating category groups differ here from above) | AAA | AA+ to BBB- | Below BBB- |
|---|---|---|---|
| Jumbo A | 1 | 2 | 3 |
| Alt –A or mixed pools | 1 | 3 | 4 |
| HEL (including Residential A, Residential B&C) | 1 | 2 | 3 |

**Fitch**

The following notching conventions are with respect to Fitch:

| Residential Mortgage Related | AAA | AA+ to BBB- | Below BBB- |
|---|---|---|---|
| Jumbo A | 1 | 2 | 4 |
| Alt –A or mixed pools | 1 | 3 | 5 |
| HEL (including Residential A, Residential B&C) | No notching | No notching | No notching |

For dual-rated Jumbo A or Alt-A transactions, take the lower of the two ratings on the security, apply the appropriate single-rated notching guideline from above, then go up by 1/2 notch. For dual-related HEL (including Residential A, Residential B&C) transactions, apply the Standard & Poor's-only rated tranche notching guidelines as set forth above.

3

**CMBS**

The following CMBS notching conventions are with respect to S&P and Fitch:

| Commercial Mortgage Backed Securities | | |
|---|---|---|
| **ASSET CLASS** | **Tranche Rated by Fitch and S&P; no tranche in deal rated by Moody's** | **Tranche Rated by Fitch and/or S&P; at least one other tranche in deal rated by Moody's** |
| Conduit* | 2 notches from lower of Fitch/S&P | 1.5** notches from lower of Fitch/S&P |
| Credit Tenant Lease | Follow corporate notching practice | Follow corporate notching practice |
| Large Loan | No notching permitted | |

\* For this purpose, conduits are defined as fixed rate, sequential pay, multi-borrower transactions having a Herfindahl score of 40 or higher at the loan level with all collateral (conduit loans, A notes, large loans, CTLs and any other real estate collateral) factored in.

\*\* A 1.5 notch haircut implies, for example, that if the S&P/Fitch rating were BBB, then the Moody's rating factor would be halfway between the Baa3 and the Ba1 rating factors.

4

SCHEDULE M

## MOODY'S RECOVERY RATE MATRIX

The recovery rate with respect to a Synthetic Security will be calculated using the related Reference Obligation.

### ABS Type Diversified ABS Securities[1]:

| % of Underlying Capital Structure[2] | Initial Rating of Underlying Asset[3] | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 70% | 60% | 50% | 40% |
| <=70%, >10% | 75% | 70% | 60% | 50% | 40% | 30% |
| <=10% | 70% | 65% | 55% | 45% | 35% | 25% |

### ABS Type Diversified Residential Securities[4]:

| % of Underlying Capital Structure[2] | Initial Rating of Underlying Asset[3] | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| <=70%, >10% | 75% | 70% | 55% | 45% | 35% | 25% |
| <=10%, >5% | 65% | 55% | 45% | 40% | 30% | 20% |
| <=5%, >2% | 55% | 45% | 40% | 35% | 25% | 15% |
| <=2% | 45% | 35% | 30% | 25% | 15% | 10% |

### ABS Type Undiversified ABS Securities[5]:

| % of Underlying Capital Structure[2] | Initial Rating of Underlying Asset[3] | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| <=70%, >10% | 75% | 70% | 55% | 45% | 35% | 25% |
| <=10%, >5% | 65% | 55% | 45% | 35% | 25% | 15% |
| <=5%, >2% | 55% | 45% | 35% | 30% | 20% | 10% |
| <=2% | 45% | 35% | 25% | 20% | 10% | 5% |

1

**ABS Type Low-Diversity CDO Securities[6]:**

| % of Underlying Capital Structure[2] | Initial Rating of Underlying Asset[3] | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 80% | 75% | 60% | 50% | 45% | 30% |
| <=70%, >10% | 70% | 60% | 55% | 45% | 35% | 25% |
| <=10%, >5% | 60% | 50% | 45% | 35% | 25% | 15% |
| <=5%, >2% | 50% | 40% | 35% | 30% | 20% | 10% |
| <=2% | 30% | 25% | 20% | 15% | 7% | 4% |

**ABS Type High-Diversity CDO Securities[7]:**

| % of Underlying Capital Structure[2] | Initial Rating of Underlying Asset[3] | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| <=70%, >10% | 75% | 70% | 60% | 50% | 40% | 25% |
| <=10%, >5% | 65% | 55% | 50% | 40% | 30% | 20% |
| <=5%, >2% | 55% | 45% | 40% | 35% | 25% | 10% |
| <=2% | 45% | 35% | 30% | 25% | 10% | 5% |

[1]      "**ABS Type Diversified ABS Securities**" refer to Automobile Securities, Car Rental Fleet Securities, Credit Card Securities and Student Loan Securities.

[2]      Initial par amount of tranche to which Underlying Asset relates divided by initial par amount of total securities issued by Underlying Asset issuer.

[3]      The recovery rate for Underlying Assets rated Caa1, Caa2 or Caa3 is assumed to be 10%.

[4]      "**ABS Type Diversified Residential Securities**" refer to Residential A Mortgage-Backed Securities, Residential B/C Mortgage-Backed Securities, Non-Subprime Home Equity Loan Asset-Backed Securities and Manufactured Housing Securities.

[5]      "**ABS Type Undiversified ABS Securities**" refer to Equipment Lease Securities and CMBS Securities.

[6]      "**ABS Type Low-Diversity CDO Securities**" refer to any CDO Securities that are not High-Diversity Securities.

2

(7)        "**ABS Type High-Diversity CDO Securities**" refer to any CDO Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a portfolio of commercial and industrial bank loans, other asset-backed securities or corporate debt securities (or any combination of the foregoing) that are obligations of obligors or issuers that represent a relatively diversified pool of obligor credit risk having a Moody's Asset Correlation Factor lower than 0.20 or a Moody's diversity score higher than 15.  The "**Moody's Asset Correlation Factor**" is a single number determined in accordance with the asset correlation methodology provided from time to time by Moody's and listed in the latest Monthly Report or indenture of such CDO Security.

3

SCHEDULE N

Class D Priority Redemption Amounts

| Distribution Date | Class D Priority Redemption Amount |
|---|---|
| November 2006 | $293,750 |
| February 2007 | $293,750 |
| May 2007 | $293,750 |
| August 2007 | $293,750 |
| November 2007 | $293,750 |
| February 2008 | $293,750 |
| May 2008 | $293,750 |
| August 2008 | $293,750 |
| November 2008 | $293,750 |
| February 2009 | $293,750 |
| May 2009 | $293,750 |
| August 2009 | $293,750 |

1