TRACY HOPE DAVIS
United States Trustee for Region 2
U.S. Department of Justice
Office of the U.S. Trustee
33 Whitehall Street, 21st Floor
New York, New York 10004
(212) 510-0500
By:    Susan D. Golden, Esq.
       Andrea B. Schwartz, Esq.
       Trial Attorneys

<u>Hearing Date and Time</u>:
**August 15, 2012, at 10:00 a.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
                       :

In re                    :         Chapter 11
                       :

LEHMAN BROTHERS HOLDINGS INC.  :
  <u>et</u> <u>al.</u>,                  :         Case No. 08-13555 (JMP)
                       :

                     :

           Debtors.    :         (Jointly Administered)
                     :
-----------------------------------------------------x

**OMNIBUS OBJECTION OF THE UNITED STATES TRUSTEE TO
APPLICATIONS OF: (I) THE <u>AD</u> <u>HOC</u> GROUP OF LEHMAN BROTHERS
CREDITORS, (II) THE <u>AD</u> <u>HOC</u> GROUP OF HOLDERS OF NOTES ISSUED BY
LEHMAN BROTHERS TREASURY CO. B.V. AND GUARANTEED BY LEHMAN
BROTHERS HOLDINGS, INC., (III) GOLDMAN BANK USA AND GOLDMAN
INTERNATIONAL, AND (IV) THE LEHMAN BROTHERS SPECIAL FINANCING
INC. WORKING GROUP, FOR ALLOWANCE AND PAYMENT OF FEES AND
<u>REIMBURSEMENT OF EXPENSES PURSUANT TO 11 U.S.C. § 503(B)</u>**

TO:    THE HONORABLE JAMES M. PECK,
       UNITED STATES BANKRUPTCY JUDGE:

       Tracy Hope Davis, the United States Trustee for Region 2 (the "United States Trustee"),

by and through her counsel, respectfully submits this omnibus objection (the "Objection") to the

applications (each an "Application" and collectively, the "Applications") of: (i) the <u>Ad</u> <u>Hoc</u>

Group of Lehman Brothers Creditors (the "<u>Ad</u> <u>Hoc</u> Creditor Group"), (ii)  the <u>Ad</u> <u>Hoc</u> Group of

Holders of Notes Issued by Lehman Brothers Treasury Co. B.V. and Guaranteed by Lehman

Brothers Holdings, Inc. (the "LBT Ad Hoc Group"), (iii) the Lehman Brothers Special Financing

Inc. Working Group (the "LBSF Working Group") and (iv) Goldman Bank USA and Goldman

International ("Goldman" and together with the Ad Hoc Creditor Group, the LBT Ad Hoc Group

and the LBSF Working Group, the "Applicants") for allowance and payment of fees and

reimbursement of expenses incurred by their professionals pursuant to Section 503(b) of title 11,

United States Code (the "Bankruptcy Code").  ECF Nos. 29195, 29222, 29239 and 29240.  In

support hereof, the United States Trustee respectfully states as follows:

## I.  INTRODUCTION

The Bankruptcy Code provides that, in certain limited circumstances, a creditor that

makes a substantial contribution in a bankruptcy case may recover its actual and necessary

expenses in retaining an attorney or accountant.  This provision of the Bankruptcy Code,

however, is construed narrowly and is not intended to change the basic rule that the attorney

must look to his own client for payment.

Collectively, the four creditors here seek reimbursement for fees and expenses that total

more than $33 million.  Should reimbursement of the requested fees and expenses be granted,

fees and expenses awarded to the professionals in these cases, including ordinary course

professionals, will aggregate almost $1.5 billion.

Below is a chart setting forth the specific requests for reimbursement for fees and

expenses that are sought by the Applicants:

| Lehman Brothers Holdings, Inc., et al. Case No. 08-13555 (JMP) Section 503(b) Applications ($33 Million Aggregate) | | | | | |
|---|---|---|---|---|---|
| Applicant | Professional | Period | Fees | Expenses | Total |
| Ad Hoc Creditor Group | White & Case LLP "White & Case" | 5/1/09 - 3/6/12 | $9,678,385.10 | $411,665.29 | $10,090,050.39 |
| | AlixPartners LLP "Alix" | 4/12/10 - 3/6/12 | $1,771,686.91 | $82,693.06 | $1,854,379.97 |
| | Molinaro Advisors LLC "Molinaro" | 5/1/09 - 9/30/11 | $830,000.00[1] | $24,928.00 | $854,928.00 |
| LBT Ad Hoc Group | Brown Rudnick LLP "Brown Rudnick" | 9/1/09 - 3/6/12 | $3,626,023.26 | $114,994.59 | $3,741,017.85 |
| Goldman | Cleary Gottlieb Steen & Hamilton LLP "Cleary Gottlieb" | 4/17/09 - 10/25/11 | $3,292,868.03 | $0.00 | $3,292,868.03 |
| LBSF Working Group | Blackstone Advisory Partners, L.P. "Blackstone" | 3/18/10- 12/6/11 | $13,622,222.00 | $88,121.00 | $13,710,343.00 |
| Total | | | $32,821,185.30 | $722,401.94 | $33,543,587.24 |

This Office has reviewed the Applications guided by the standards for "substantial contribution" pursuant to Section 503(b)(3) of the Bankruptcy Code and "reasonableness," pursuant to Section 330 of the Bankruptcy Code. As discussed in detail below, the United States Trustee objects to certain of these fees because (i) the Applicants have not met their burden to proof to establish that that they provided a substantial contribution to all creditors and the estates

---

[1] As discussed in greater detail in paragraph 34 below, Molinaro initially was retained directly by Paulson & Co., Inc. ("Paulson"), until September 2011, when it was retained by the Ad Hoc Creditor Group. See Ad Hoc Creditor Group App. at 6, n.2.

3

as a whole, thereby entitling them to a substantial contribution claim and/or (ii) the Applicants

seek payment for non-attorney and accountant professional services to which they are not

entitled pursuant to the plain meaning of Section 503(b) of the Bankruptcy Code.  Given the

statutory and case law precedent, the United States Trustee proposes:

A.   **Ad Hoc Creditor Group:**

(i)   **White & Case:**  Should the Court determine that the Applicant has met its

burden of proving that it conferred a substantial benefit to the estate under

Sections 503(b)(3) and (4), the Court should direct that the Application be

supplemented to provide time records and expense detail that comply with

the Fee Guidelines to ensure a proper reasonableness review under Section

330 of the Bankruptcy Code.

(ii)   **AlixPartners:**  The United States Trustee objects to reimbursement to the

Applicant for the fees and costs of this professional.  Sections 503(b)(3)

and (4) by their terms provide for recovery only of the fees and expenses

of a creditor's attorneys and accountants.

(iii)   **Molinaro Advisors:**  The United States Trustee objects to reimbursement

to the Applicant for the fees and costs of this professional.  Sections

503(b)(3) and (4) by their terms provide for recovery only of the fees and

expenses of a creditor's attorneys and accountants.

B.   **LBT Ad Hoc Group**

(i)   **Brown Rudnick:**  The United States Trustee objects to reimbursement to

the Applicant for the fees and costs of this professional.  The Applicant

4

has failed to demonstrate that its actions resulted in a substantial benefit to

the Debtors' estate under Sections 503(b)(3) and (4).

C.    **Goldman**

(i)    **Cleary Gottlieb:**   Should the Court determine that the Applicant has met

its burden of proving that it conferred a substantial benefit to the estate

under Sections 503(b)(3) and (4), the Court should direct that the

Application be supplemented to provide time records and expense detail

that comply with the Fee Guidelines to ensure a proper reasonableness

review under Section 330 of the Bankruptcy Code.

D.    **LBSF Working Group**

(i)    **Blackstone:**  The United States Trustee objects to reimbursement to the

Applicant for the fees and costs of this professional.   Sections 503(b)(3)

and (4) by their terms provide for recovery only of the fees and expenses

of a creditor's attorneys and accountants.

## II.    FACTS

*The Chapter 11 Filings*

1.    On September 15, 2008, and periodically thereafter (collectively, the "Petition

Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of title 11 of the

Bankruptcy Code.

2.    According to Ian T. Lowitt, the Chief Financial Officer, Controller and Executive

Vice President of Lehman Brothers Holdings, Inc. ("LBHI"), prior to the Petition Date, Lehman

Brothers, Inc. ("LBI") was the fourth largest investment bank in the United States.   See Affidavit

of Ian T. Lowitt, Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern

District of New York in Support of First-Day Motions and Applications, sworn to on September

14, 2008, at ¶ 5.  ECF No. 2.

3.      On September 17, 2008, the United States Trustee appointed an Official

Committee of Unsecured Creditors (the "Creditors' Committee").  ECF No. 62.  During the

period between the Petition Date and confirmation, the United States Trustee modified the

constitution of the Creditors' Committee.  See ECF Nos. 592, 6217, and 7034.

4.      On September 19, 2008, the Securities Investor Protection Corporation ("SIPC")

instituted an action against LBI under the Securities Investor Protection Act of 1970.

Accordingly, a SIPC trustee is administering the LBI estate.

5.      No Chapter 11 trustee was appointed in these cases.

*Multiple Plans and Confirmation*

6.      On March 15, 2010, the Debtors filed their proposed Joint Chapter 11 Plan of

LBHI and its affiliated debtors (the "Debtors' Plan").  ECF No. 7572.  Thereafter, the Debtors

amended the Debtors' Plan several times.  See ECF Nos. 8330, 8332, 14150, 14151, 18124 and

18125.

7.      On December 15, 2010, and April 25, 2011, two groups of creditors, namely, the

Ad Hoc Creditor Group[2] and the "Non-Consolidation Group,"[3] (which later became known as

---

[2] The Ad Hoc Creditor Group was formed in May 2009, by three of the Debtors'
creditors:  (a) Elliott Management Corporation, (b) King Street Capital Management, L.P., and
(c) Paulson.  See Ad Hoc Creditor Group Application at ¶ 14.  When the Ad Hoc Creditor Group
filed their plan, the members held over $19 billion of claims across the Lehman capital structure
and approximately $16 billion of senior unsecured claims against LBHI.  As of March 21, 2011,
the Ad Hoc Creditor Group was comprised of the following thirteen entities: California Public

the LBSF Working Group), respectively, proposed alternative plans.  See ECF Docket Nos.

13504, 13505, 16315, 16316, 16229 and 16230.  The central difference among the plans

concerned whether the Debtors' estates could or should be substantively consolidated.  Id.

Through its plan (the "Sub-Con Plan"), the Ad Hoc Creditor Group proposed full substantive

consolidation.  Id.  The Non-Consolidation Group asserted that there was no basis for substantive

consolidation and proposed a plan (the "Non-Con Plan") that did not provide for substantive

consolidation.  Id.

    8.    On July 1, 2011, the Debtors filed another version of the Debtors' Plan and the

Ad Hoc Creditor Group and the Non-Consolidation Group agreed to suspend prosecution of their

plans, subject to confirmation of the Debtors' Plan which incorporated a global settlement (the

"Global Settlement") of all of the issues raised by, among others, the Ad Hoc Creditor Group and

---

Employees' Retirement System, Canyon Capital Advisors LLC, City of Fremont, County of San
Mateo, Fiduciary Counselors Inc., Fir Tree, Inc., Gruss Asset Management, L.P., Owl Creek
Asset Management, LP, Pacific Investment Management Company LLC, Paulson & Co. Inc.,
Perry Capital LLC on behalf of one or more investment funds for which an affiliate acts as
investment advisor or general partners, Taconic Capital Advisors L.P., Vallejo Sanitation and
Flood Control District.  See Second Supplemental Statement of White & Case LLP Pursuant to
Bankruptcy Rule 2019. (ECF No. 15216).

    [3] The Non-Consolidation Group was comprised of the following entities: Deutsche Bank
AG; State Street Bank and Trust Company; Cyrus Capital Partners, LP; SilverPoint Capital, L.P.;
York Capital Management Global Advisors, LLC; Morgan Stanley & Co. International plc.;
Morgan Stanley Capital Services; D.E. Shaw Composite Portfolios, L.L.C.; D.E. Shaw Oculus
Portfolios, L.L.C.; Goldman Sachs Bank USA; Goldman Sachs International; Credit Agricole
CIB, Credit Suisse International; and certain funds managed by and/or affiliated with: Angelo,
Gordon & Co., L.P., Contrarian Capital Management LLC, Goldentree Asset Management LP,
Hayman Capital Management, LP, Knighthead Capital Management, LLC, Mason Capital
Management LLC, Mount Kellett Capital Management, Oaktree Capital Management, L.P., and
Serengeti Asset Management LP.

the Non-Consolidation Group.  This agreement was memorialized in a stipulation that was "so

ordered" by the Court on July 21, 2011.  <u>See</u> ECF No. 18686.

9.    On December 6, 2011, the Court entered an order (the "Confirmation Order"),

pursuant to which it confirmed the Debtors' Plan and approved the Global Settlement.  ECF No.

23023.

10.    On March 6, 2012, the Debtors filed a notice providing that the Debtors' Plan had

become effective on that date (the "Effective Date").  (ECF No. 26039).

11.    According to the Debtors' Plan, applications for final fees, including applications

for awards under Section 503(b) of the Bankruptcy Code were to be filed no later than 120 days

after the Effective Date.  Debtors' Plan at § 2.2.

### III.    LEGAL STANDARDS

**A.    Substantial Contribution**

**(i)    <u>11 U.S.C. § 503(b)</u>**

12.    Sections 503(b)(3)(D) and (4) of the Bankruptcy Code provide, in part:

> (b) After notice and a hearing, there shall be allowed
> administrative expenses, other than claims allowed under section
> 502(f) of this title, including –
> * * *
>
>> (3) the actual, necessary expenses, other than
>> compensation and reimbursement specified in
>> paragraph (4) of this subsection, incurred by –
>> * * *
>>> (D) a creditor . . . or a committee
>>> representing creditors or equity
>>> security holders other than a
>>> committee appointed under section
>>> 1102 of this title, in making a

8

> substantial contribution in a case
> under chapter 9 or 11 of this title;
> * * *
>
> (4) reasonable compensation for professional
> services rendered by an attorney or an accountant of
> an entity whose expense is allowable under
> paragraph (3) of this subsection, based on the time,
> the nature, the extent and the value of such services,
> and the cost of comparable services other than in a
> case under this title, and reimbursement for actual,
> necessary expenses incurred by such attorney or
> accountant . . . .

11 U.S.C. §§ 503(b)(3)(D) and (4).

    **(ii)**  **Narrow Construction**

    13.    Compensation based upon a "substantial contribution" is designed to meet policy objectives of encouraging meaningful participation in the reorganization process while keeping fees and administrative expenses at a minimum to preserve as much of the estate as possible for creditors. In re U.S. Lines, Inc., 103 B.R. 427, 430 (Bankr. S.D.N.Y. 1989). Thus, Section 503(b) of the Bankruptcy Code is narrowly construed. See In re Bayou Group LLC, 431 B.R. 549, 560 (Bankr. S.D.N.Y. 2010) ("[T]he section's policy of promoting meaningful creditor participation in the reorganization process is in tension with the contrasting policy, noted above, that provisions establishing administrative expenses should be construed narrowly and administrative expenses kept to a minimum."); see also In re Villa Luisa, L.L.C., 354 B.R. 345, 348 (Bankr. S.D.N.Y. 2006) ("Claims for substantial contribution are . . . narrowly construed and are subject to strict scrutiny") (citing U.S. Lines, 103 B.R. at 429); In re Granite Partners, L.P., 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997) ("'substantial contribution provisions must be

9

narrowly construed' including to 'discourage mushrooming expenses' and 'do not change the basic rule that the attorney must look to his own client for payment.'").

### (iii)  **Burden of Proof on Applicant**

14.     Whether a creditor has made a substantial contribution in a reorganization case is a question of fact.  See In re Hooker Invs., Inc., 188 B.R. 117, 120 (S.D.N.Y. 1995).  The burden of proof rests on the applicant to show by a preponderance of the evidence that the services it rendered provided a substantial benefit to the estate.  In re Best Prods. Co., 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994); see also Villa Luisa, 354 B.R. at 348 (it is exceedingly difficult to satisfy the burden of proof because a litigant is presumed to act in its own interest).  To meet the evidentiary threshold, the movant must establish that "'[its] services have some *causal relationship* to the contribution.'  Mere conclusory statements regarding the causation or provision of a substantial contribution are insufficient to establish that a substantial contribution has been made."  U.S. Lines, 103 B.R. at 430.  (emphasis in the original).

### (iv)  **Actual and Demonstrable Benefit to the Estate At-Large**

15.     The inclusion of Section 503(b)(4) in the Bankruptcy Code does not change the general rule that an attorney must look to his client for payment of his fees.  Granite Partners, 213 B.R. at 445.  Rather, compensation under "substantial contribution" grounds "is limited to those extraordinary actions that lead to an 'actual and demonstrable benefit to the debtor's estate, the creditors, and to the extent relevant, the stockholders.'"  In re Randall's Island Family Golf Ctrs., Inc., 300 B.R. 590, 598 (Bankr. S.D.N.Y. 2003) (quoting In re Jensen-Farley Pictures, Inc., 47 B.R. 557, 569 (Bankr. D. Utah 1985)); accord Best Prods., 173 B.R. at 866 and In re Alert Holdings, Inc., 157 B.R. 753, 757 (Bankr. S.D.N.Y. 1993).

10

16.    In determining whether a creditor has made a substantial contribution, courts

generally consider the following factors:

    a.    whether the services benefitted the creditor or all creditors;

    b.    whether the services provided a direct, significant and demonstrable
        benefit to the estate; and

    c.    whether the services rendered were duplicative of services rendered by
        attorneys for the committee, the committees themselves, or the debtor and
        its attorneys.

Best Prods., 173 B.R. at 865.

17.    Active participation alone is insufficient to give rise to a substantial contribution

claim. Granite Partners, 213 B.R. at 446; see also In re Big Rivers Elec. Corp., 233 B.R. 739,

749-50 (W.D. Ky. 1998) (actions taken by claimants in doing such things as documenting

transactions that formed the basis of debtor's plan of reorganization, sharing expense of audit of

environmental issues relating to debtor's plans, assisting debtor in negotiating certain contracts,

and analyzing debtor's manpower issues, lacked any motivation to benefit or increase the

bankruptcy estate but, instead, were designed solely to increase claimant's economic position,

and so claimants were not entitled to recover on their claims for substantial contribution).

Participating in the negotiating, drafting and confirmation of a reorganization plan is not

sufficient to support a substantial contribution claim. See Granite Partners, 213 B.R. at 449; see

also In re Sentinel Mgmt., 404 B.R. 488, 496 (Bankr. N.D. Ill. 2009) (noting that negotiation,

even when hard fought by parties involved, of a provision in Chapter 11 plan is an expected and

routine activity, that does not give rise to a substantial contribution to the estate).

       (v)      **Insubstantial and Duplicative Services are Not Compensable**

18.      Requests for compensation for insubstantial or duplicative services or services that deplete rather than increase the size of estate assets should be denied.  U.S. Lines, 103 B.R. at 429-430; see also In re Asarco, LLC, No. 05-21207, 2010 WL 3812642, at *8 (Bankr. S.D.N.Y. Tex. Sep. 28, 2010) ("Activities of a creditor or their counsel that are ordinary, expected, routine, or duplicative do not constitute a substantial contribution to a debtor's estate.").  An applicant cannot recover fees related to case administration, monitoring and education, including attending hearings, reviewing documents and consulting with clients because these services are performed for the client, not the estate.  Granite Partners, 213 B.R. at 453-54.  Further, because settlement negotiations require the participation of many parties-in-interest, they usually do not give rise to substantial contribution claims.  See Matter of Columbia Gas Sys., Inc., 224 B.R. 540, 549 (Bankr. D. Del. 1998) (creditor's Section 503(b) claims were rejected where the evidence showed that the participation of many parties was needed to effectuate a settlement); see also In re Alumni Hotel Corp., 203 B.R. 624, 632 (Bankr. E. D. Mich. 1996) (successful reorganizations require consensual activity and if one applicant's fees are approved, others might argue they also made a substantial contribution).

**B.**      **Reasonableness**

       (i)      **11 U.S.C. § 503(b)**

19.      Under Section 503(b) of the Bankruptcy Code, a creditor who makes a substantial contribution is entitled to reasonable fees and necessary expenses of its attorneys and accountants.  Alert Holdings, 157 B.R. at 757.  Under Section 503(b)(4), the Court retains the right to review professional fees for reasonableness but the applicant must first establish that it

12

made a substantial contribution.  In re Mariner Post-Acute Network, Inc., 267 B.R. 46, 61

(Bankr. D. Del. 2001).  To the extent that "substantial contribution" is proven, then the standards

as set forth in Section 330 of the Bankruptcy Code apply in determining the extent the fees and

expenses of the professional are reimbursable under Section 503(b)(4).  See, e.g. In re Wind

N'Wave, 509 F.3d 938, 944 (9th Cir. 2007); In re Celotex Corp., 227 F.3d 1336, 1341 (11th Cir.

2000).

      **(ii)**    **11 U.S.C. § 330**

20.    The reasonableness standard set forth in 11 U.S.C. § 330 provides, in part:

> (a)(1)  After notice . . . and a hearing . . . the court may award to a .
> . . professional person employed under section 327 or 1103 –
>
> > (A) reasonable compensation for actual, necessary
> > services rendered by the . . . professional person or
> > attorney and by any paraprofessional employed by
> > any such person; and
> >
> > (B) reimbursement for actual and necessary expenses.

11 U.S.C. § 330(a)(1).

21.    Factors that the Court considers in determining reasonableness are set forth in

Sections 330(a)(3), (4) and (6).  Section 330(a)(3) of the Bankruptcy Code provides:

> (3) In determining the amount of reasonable compensation, to be
> awarded to . . . a professional person, the court shall consider the
> nature, the extent, and the value of such services, taking into
> account all relevant factors, including –
>
> > (A) the time spent on such services;
> >
> > (B) the rates charged for such services;
> >
> > (C) whether the services were necessary to the
> > administration of, or beneficial at the time at which

13

the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3)(A) through (F).

22.    Under Section 330(a)(4) of the Bankruptcy Code:

(a)(4) the court shall not allow compensation for --

(i) unnecessary duplication of services; or

(ii) services that were not -

      a.    reasonably likely to benefit the debtor's estate; or

      b.    necessary to the administration of the case.

11 U.S.C. § 330(a)(4).

23.    The applicant has the burden of proving that the services rendered were actual and necessary, and that the compensation sought was reasonable. In re Bennett Funding Group, Inc., 213 B.R. 234, 244 (Bankr. N.D.N.Y. 1997). The services must be both necessary and reasonable. In re Keene Corp., 205 B.R. 690, 696 (Bankr. S.D.N.Y. 1997). Services are

14

necessary if they benefit the estate.  Id.  "The determination of reasonableness is an objective test

that considers what services a reasonable lawyer or legal firm would have performed in the same

circumstances."  In re Ames Dep't. Stores, Inc., 76 F.3d 66, 72 (2d Cir.1996) (citing In re

Taxman Clothing Co., 49 F.3d 310, 315 (7th Cir.1995)); accord In re Drexel Burnham Lambert

Group, Inc., 133 B.R. 13, 23 (Bankr. S.D.N.Y. 1991).

24.     Applicants must support their requests for fees and expenses with specific,

detailed and itemized documentation to meet their burden of proof.  Bennett Funding, 213 B.R.

at 244-45.  Under Section 330(a)(1)(B), a professional seeking an expense reimbursement from

the estate "must furnish enough specificity for the Court to establish whether a given expense

was both actual and necessary."  In re Fibermark, Inc., 349 B.R. 385, 399 (Bankr. D. Vt. 2006).

Expenses are actual if they are actually incurred and necessary if "reasonably needed to

accomplish proper representation of the client."  In re Korea Chosun Daily Times, Inc., 337 B.R.

758, 769 (Bankr. E.D.N.Y. 2005).

25.     In the Southern District of New York, applicants must also comply with United

States Trustee Fee Guidelines (the "UST Guidelines"), the Court's Amended Guidelines for Fees

and Disbursements for Professionals in Southern District of New York Bankruptcy Cases

(General Order M-389) (as amended) (the "Amended Court Guidelines") (collectively, the "Fee

Guidelines").  The Fee Guidelines require, among other things, that applicants arrange detailed

time entries in project categories, see UST Guidelines Section 4(i), and file a certification with

their applications.  See Amended Court Guidelines at 1.

15

# IV.    THE OBJECTION

## A.    The Ad Hoc Creditor Group

26.    The Ad Hoc Creditor Group seeks allowance of compensation for three of its professionals, including: White & Case, Alix and Molinaro.  Ad Hoc Creditor Group App. at ¶¶ 7-9.  The aggregate amount of fees and expenses sought is: $10,090,050.39, $1,854,279.97, and $854,928.00, respectively.  Id.

27.    The Ad Hoc Creditor Group was comprised of holders of a significant amount of LBHI's senior notes.  Its stated focus was to maximize the value of the LBHI estate.  Id. at ¶ 3. The Ad Hoc Creditor Group contends that it was the only voice exclusively setting forth the interests of the LBHI estate and its creditors.  Id. at ¶¶ 3, 13.  The Ad Hoc Creditor Group argues that it represented the sole pool of LBHI creditors who (i) challenged and objected to the Debtors' Plan treatment of the senior noteholders, (ii) spent the time and effort to prepare a defense to maximize the recovery for LBHI, (iii) prepared and filed the Sub-Con Plan, and (iv) participated on behalf of LBHI's interest in extensive plan negotiations with the Debtors and their material stakeholders.  Id. at ¶ 3.

28.    The Ad Hoc Creditor Group claims that it made a substantial contribution in these cases because it (i) increased the recoveries to the senior noteholders of LBHI by approximately $3.1 billion, (ii) increased the recoveries to the unsecured creditors of LBHI by approximately $2.4 billion, (iii) actively participated and contributed to the resolution of inter-debtor disputes, (iv) contributed to the resolution of requests for relief made by the Debtors against third parties (the "NBG Transaction"), which added a minimum of $70 million to the LBHI estate, (v) filed

the Sub-Con Plan and (vi) actively negotiated and contributed to the formulation, drafting and

acceptance by every class of the Debtors' Plan.  Id. at ¶¶ 3, 47, 50, 66, 71, 76.

> *(i)    White & Case*

28.    The Ad Hoc Creditor Group seeks an allowance as an administrative expense for

the legal fees of its counsel, White & Case, whose professionals billed a total of approximately

16,000 hours, and have charged the Ad Hoc Creditor Group for fees aggregating approximately

$9.7 million and expenses aggregating approximately $411,000.00, respectively.  If the Court

finds that the Ad Hoc Creditor Group has made a substantial contribution in these cases, then the

Ad Hoc Creditor Group will be allowed the reasonable compensation for its counsel pursuant to

Section 503(b)(3) and (4) of the Bankruptcy Code.

29.    The Ad Hoc Creditor Group's request for these fees, however, impermissibly

covers a time period that exceeds the time in which the asserted substantial contribution was

made.  The Ad Hoc Creditor Group requests as part of its Section 503(b) claim all of the legal

fees that it incurred since the time that it was formed in May 2009, through the Effective Date.

Although the Court may determine that the Ad Hoc Creditor Group did, in fact, make a

substantial contribution, it does not necessarily follow that the Ad Hoc Creditor Group should be

allowed as a cost of the estates' administration all of the legal fees that it incurred in these cases.

30.    Section 503(b) of the Bankruptcy Code is to be construed narrowly.  Villa Luisa,

354 B.R. at 348; Granite Partners, 213 B.R. at 445.  Thus, any administrative expense claim that

the Court may allow for White & Cases's legal fees should be narrowly tailored to reflect the

services that comprise the substantial contribution, i.e., the Sub-Con Plan, the NBG Transaction,

the Global Settlement and confirmation of the Debtors' Plan.

17

31.     The White & Case time records present significant obstacles to performing a "reasonableness" review, as required by Sections 330 and 503(b) of the Bankruptcy Code, because they do not comply with the Fee Guidelines.  Specifically, the time entries are not arranged by project categories.  See UST Guidelines at (b)(4)(i).  In addition, many of the time entries are vague and many are "lumped," in violation of Section (b)(4)(v) of the UST Guidelines.

32.     As Judge Bernstein stated in Granite Partners:

> It would require a herculean task on my part to segregate the compensable from noncompensable services, assuming that I could even do so based simply upon the descriptions in the time records.  I should not be obliged to pick apart the fee application to explain which services are not compensable; the [law] Firm is required to prove, by a preponderance of the evidence, which services are.").

Granite Partners, 213 B.R. at 452.

33.     The Ad Hoc Creditor Group Application also does not allocate which expenses it claims are related to the substantial contribution that it made in these cases.  In addition, the description of the expense detail does not comply with the Fee Guidelines because there only is a general breakdown of categories of expenses incurred by month, rather than a detailed expense breakdown supported by backup documentation.  See UST Guidelines at (b)(5).  Moreover, many of the expense reimbursements included in the Ad Hoc Creditor Group Application represent overhead costs that simply are non-compensable, including word processing, faxing, "professional service," "miscellaneous" and copying.  See Fibermark, 349 B.R. at 399; Bennett Funding, 213 B.R. at 248 (Bankr. N.D.N.Y. 1997); UST Guidelines, 4(b)(5)(vii).  To the extent that the Court finds that the Ad Hoc Creditor Group made a substantial contribution in these cases, the Ad Hoc Creditor Group Application should be supplemented to provide time records

18

and expense detail and backup that comply with the Fee Guidelines and, therefore, permit a proper reasonableness review.

     *(ii)    Alix*

34.     The <u>Ad Hoc</u> Creditor Group seeks payment for professional services rendered by its financial advisor, Alix, in the aggregate amount of approximately $1.8 million in fees and approximately $83,000.00 in expenses.  The <u>Ad Hoc</u> Creditor Group, however, is not entitled to recover Alix's fees and expenses as an administrative expense under Section 503(b) of the Bankruptcy Code because, by its terms, the statute provides for recovery of only the fees and expenses of the creditor's attorneys and accountants.  11 U.S.C. § 503(b)(4); <u>see also</u> <u>Granite Partners</u>, 213 B.R. at 454 (only accountants and attorneys are entitled to fees and expenses under Section 503(b)); <u>Keene Corp.</u>, 208 B.R. at 116 n.8; <u>Columbia Gas</u>, 224 B.R. at 550 n.3 (Bankr. D. Del. 1998) (expenses for professionals other than attorneys and accountants are not reimbursable under Section 503(b)(4)).

35.     Indeed, in an analogous context, the Second Circuit Court of Appeals in <u>In re Palm Coast, Matanza Shores Limited Partnership</u>, 101 F.3d 253 (2d Cir. 1996), strictly construed the language of Section 327(d) in holding that a Chapter 11 trustee could not hire his real estate firm because "a bankruptcy trustee may not hire his or her firm in a non-lawyer or non-accounting capacity" under the language of that statutory section.  <u>Id.</u> at 258.  Section 101(1) of the Bankruptcy Code defines an accountant as "authorized under applicable law to practice public accounting, and includes professional accounting association, corporation, or partnership, if so authorized."  11 U.S.C. § 101(1).  The <u>Ad Hoc</u> Creditor Group has not asserted that Alix is licensed as an accounting firm or that Alix performed services in any capacity other than that of

a financial advisor.  Accordingly, the United States Trustee proposes that the Court deny this request in its entirety.

(iii)    *Molinaro*

36.    The Ad Hoc Creditor Group seeks payment for professional services rendered by its consultant, Molinaro, in the aggregate amount of $830,000.00 in fees and reimbursement of out-of-pocket expenses in the aggregate amount of approximately $25,000.00.  Molinaro initially was retained directly by Paulson & Co., Inc. ("Paulson"), until September 2011, when it was retained by the Ad Hoc Creditor Group.  See Ad Hoc Creditor Group App. at 6, n.2. Approximately, $720,000.00 of the fees sought by the Ad Hoc Creditor Group for the services rendered by Molinaro is for services provided when Molinaro was engaged by Paulson.  Id.  The Ad Hoc Creditor Group asserts that, "[a]lthough not retained formally by the Group until September 2011, Molinaro Advisors provided services directly for the Group's benefit and, ultimately, LBHI's benefit.  Accordingly, the amounts set forth herein relating to Molinaro Advisors include certain amounts paid by Paulson during the period of May 2009 through September 2011. Such amounts exclude payment for services that were provided solely to Paulson."  Id.  The Ad Hoc Creditor Group Application, however, does not identify the amount of fees that it seeks which were incurred by Molinaro when it worked solely for Paulson and which fees it claims were for services that also benefitted the estate.

37.    The Ad Hoc Creditor Group Application provides that Molinaro was retained to provide advice with respect to the Debtors' prepetition business operations and general accounting practices, including the manner in which large investment banks perform intercompany accounting.  Ad Hoc Creditor Group Application at ¶ 21.  By its own admission,

20

approximately $720,000.00 of its substantial contribution claim relating to Molinaro's fees,

relates to services that Molinaro provided while it was engaged solely by Paulson.  Ad Hoc

Creditor Group Application at ¶ 6, n.2.

38.    In addition, Molinaro's professionals are not lawyers or accountants.  Thus, for

the reasons stated with respect to Alix's fees above at paragraphs 34 and 35, the Ad Hoc Creditor

Group may not recover from the estates Molinaro's fees and expenses because these expenses

are not provided for under Section 503(b).  Accordingly, the United States Trustee proposes that

the portion of the Ad Hoc Creditor Group's claim relating to the fees and expenses of Molinaro

be denied in its entirety.

**B.    The LBT Ad Hoc Group**

39.    The LBT Ad Hoc Group seeks allowance of compensation for its counsel, Brown

Rudnick in the aggregate amount of approximately $3.75 million.  LBT Ad Hoc Group App. at

2.  Specifically, Brown Rudnick's fees are approximately $3.6 million in fees and $115,000.00 in

expenses.  Id.

40.    The members of the LBT Ad Hoc Group are the beneficial holders of nearly $3

billion in the face amount of notes (the "LBT Notes") issued by Lehman Brothers Treasury, Co.

B.V. ("LBT," a foreign subsidiary of LBHI that is subject to Dutch insolvency proceedings).

See LBT Ad Hoc Group App. at ¶ 13.  The LBT Notes were guaranteed by LBHI (the "LBHI

Guaranty Claims").  Id. at 1.  Thus, the LBT Ad Hoc Group had primary claims against LBT as

the issuer of the LBT Notes.  Id. at ¶ 2.  Because the LBT Notes were guaranteed by LBHI, the

LBT Ad Hoc Group held the LBHI Guaranty Claim against LBHI in its U.S. Chapter 11 case.

Id. at ¶ 13.

21

41.     Pursuant to intercompany loan agreements, LBT lent substantially all of the
proceeds of the LBT Notes to LBHI.  Id.  Accordingly, LBT also held an intercompany claim
against LBHI (the "LBT Intercompany Claim").  Id. at ¶ 2.  As a primary beneficiary of the LBT
Intercompany Claim and the direct holder of the LBHI Guaranty Claims, the LBT Ad Hoc Group
was interested in the resolution of the substantive consolidation issue, which, if granted, would
have eliminated all intercompany claims between the Lehman affiliates, including the LBT
Intercompany Claim.  Id. at ¶ 14.  Despite their opposition to the substantive consolidation of the
Debtors' estates, the LBT Ad Hoc Group shared a common interest with the Ad Hoc Creditor
Group in ensuring that LBHI received a fair distribution of the Debtors' assets.  Id.

42.     The LBT Ad Hoc Group asserts that it made a substantial contribution in these
cases by: (i) being involved in the plan negotiations and helping to facilitate the Global
Settlement, inter-debtor disputes and the treatment of their claims; (ii) engaging in a dialogue
with the Debtors regarding the appropriate valuation methodologies to use with respect to the
structured securities claims (i.e., the "SSVM Proposal"), (iii) providing the Debtors and the
Creditors' Committee with various analyses of the substantive consolidation of LBT and other
foreign affiliates, (iv) assisting several members of the LBT Ad Hoc Group in their roles as co-
proponents of the Non-Con Plan, and (v) having several members of the LBT Ad Hoc Group
become initial signers of the Plan Support Agreement.  LBT Ad Hoc Group App. at ¶ 18.

43.     By its application, the LBT Ad Hoc Group has failed to demonstrate that its
involvement in these cases provided a "direct, significant and demonstrable benefit" to the
estates, thus entitling it to a substantial contribution claim.  See Best Prods., 173 B.R. at 865.
Despite conclusory and unsubstantiated claims that its work benefitted "other holders of claims

22

based on Structured Securities and other unsecured creditors generally," LBT <u>Ad</u> <u>Hoc</u> Group

App. at ¶ 24, the LBT <u>Ad</u> <u>Hoc</u> Group has failed to demonstrate how its participation resulted in a

substantial benefit to all creditors in these cases.  <u>Id.</u>  The services that the LBT <u>Ad</u> <u>Hoc</u> Group

asserts support its substantial contribution claim appear to have benefitted solely the LBT <u>Ad</u>

<u>Hoc</u> Group and not even the general unsecured creditors of the LBHI estate, let alone all

creditors of these estates.

44.    In addition, the LBT <u>Ad</u> <u>Hoc</u> Group asserts that its interests were aligned with the

<u>Ad</u> <u>Hoc</u> Creditor Group's interests.  This claim, however, is belied by the fact that if the Sub-Con

Plan would have been confirmed, then the LBT <u>Ad</u> <u>Hoc</u> Group would have been "out of the

money" due to the elimination of the LBT Intercompany Claim.

45.    Courts have found that:

> For a contribution to qualify as "substantial," it must be more than an incidental
> contribution that arose from actions the applicant has taken in furtherance of its
> own interest.  An applicant is presumed to have acted in furtherance of its own
> interest until it satisfies the court that its actions transcended self-interest.  The
> term "substantial contribution" should be applied in a manner that excluded
> reimbursement for actions taken primarily to serve the applicants' interest and
> which it would have taken absent an expectation of reimbursement from the
> bankruptcy estate.

<u>In re Philadelphia Newspapers, LLC</u>, 445 B.R. 450, 463 (Bankr. D. Del. 2010) (quoting <u>Ideal</u>

<u>Aerosmith, Inc. v. Carco Elecs.</u> (<u>In re Carco Elecs.</u>), 346 B.R. 377, 387 (Bankr. W.D. Pa. 2006));

<u>see also</u> <u>Best Prods.</u>, 173 B.R. at 865 (same).  As the LBT <u>Ad</u> <u>Hoc</u> Group states, the "efforts of

Brown Rudnick and the LBT <u>Ad</u> <u>Hoc</u> Group were critical in securing the treatment of the LBT-

related claims as provided under the Plan."  LBT <u>Ad</u> <u>Hoc</u> Group App. at ¶ 6.  Notably, the LBT

<u>Ad</u> <u>Hoc</u> Group Application is silent as to how this treatment benefits any creditor other than the

23

members of the LBT Ad Hoc Group.

46.     The LBT Ad Hoc Group also has failed to demonstrate that any of the services that Brown Rudnick performed were not duplicative of the services performed by the other professionals in these cases.  See U.S. Lines, 103 B.R. at 429-30 (requests for compensation for insubstantial or duplicative services or services that deplete rather than increase the size of estate assets should be denied).  The LBT Ad Hoc Group Application states that Brown Rudnick participated in multiple meetings with various constituencies regarding the resolution of many different issues, prepared a series of written analyses, helped develop discovery protocols, and was integrally involved in the intense negotiations leading up to the Global Settlement and, ultimately, confirmation of the Debtors' Plan.  LBT Ad Hoc Group Application at ¶¶ 5, 18.  The LBT Ad Hoc Group also claims responsibility for the development and filing of the Non-Con Plan, which, as discussed below, apparently was spearheaded by Goldman and its counsel, Cleary Gottlieb.  Id. at ¶ 18.  A review of Goldman's 503(b) Application, and specifically Cleary Gottlieb's time records, reveals that the majority of the work underlying the Non-Con Plan was undertaken by Cleary Gottlieb and not Brown Rudnick.

47.     As stated above at paragraph 18, the law is clear that Brown Rudnick's role as an active participant does not entitle the LBT Ad Hoc Group to a Section 503(b) claim.  See Granite Partners, 213 B.R. at 446.  In fact, the LBT Ad Hoc Group, through Brown Rudnick, was one of many participants in numerous settlement negotiations and was not solely and directly responsible for enhancing the treatment of any one creditor constituency, aside from the members of its group.  See Columbia Gas, 224 B.R. at 549 (creditor's Section 503(b) claims were rejected where the evidence showed that the participation of many parties was needed to

24

effectuate a settlement).

48.      If, on the other hand, the Court determines that the LBT Ad Hoc Group made a

substantial contribution in these cases, then the Court must determine whether the fees and

expenses sought are reasonable under Sections 330 and 503(b) of the Bankruptcy Code.  Similar

to the problems presented by the White & Case time records, a reasonableness determination

cannot be made because the time records fail to comply with the Fee Guidelines.

49.      Specifically, Brown Rudnick's time records: (i) are not arranged in project

categories as required by UST Guidelines Section (b)(4)(I), (ii) provide no indication of who the

timekeepers are or their billing rates as required by UST Guidelines Section (b)(3)(iii), (iii)

include many time entries that are vague and/or "lumped," and (iv) do not provide any

information, break-down, or documentation to support the out-of-pocket expense reimbursements

as required by UST Guidelines Section (b)(5).

50.      To the extent that the Court finds that the LBT Ad Hoc Group made a substantial

contribution in these cases, then the LBT Ad Hoc Group Application should be supplemented to

provide time records and expense detail and backup that comply with the Fee Guidelines and,

therefore, permit a proper reasonableness review.

51.      In addition, the LBT Ad Hoc Group Application does not provide from which

Debtor's estate it seeks to be compensated as required by the Debtors' Plan.  See Confirmed Plan

at §§ 2.1, 6.3.  The LBT Ad Hoc Group's request, if allowed by the Court, should be paid from

the estate of LBT, which is subject to the Dutch insolvency proceedings.

C.    **Goldman**

52.    Goldman seeks allowance of compensation for its counsel, Cleary Gottlieb, in the

approximate amount of $3.3 million.  Among the many Lehman debtors, Lehman Brothers

Special Financing, Inc. ("LBSF") held the most derivatives and was the principal dealer in a

broad range of derivative products.  Goldman App. at ¶ 12.  In late 2009, Goldman and other

LBSF creditors formed the LBSF Working Group[4] for the purpose of engaging with the

fiduciaries of LBSF and their professionals to determine the best way to administer the assets of

LBSF.  Id. at ¶ 16.

53.    Goldman asserts that it, individually, made a substantial contribution because

played a lead role in, among other things, (i) opposing substantive consolidation, (ii) drafting the

Non-Con Plan, (iii) negotiating the Plan Support Agreement, (iv) working with other derivative

creditors and the Debtors to achieve a consensual framework to value and resolve derivative

claims and (v) recharacterizing intercompany payables, all of which led to the Global Settlement

and avoided extraordinary litigation costs for the Debtors.  Goldman App. at ¶¶ 2-5.

54.    Goldman asserts that by opposing the substantive consolidation and drafting and

filing the Non-Con Plan, Goldman helped to design a comprehensive, confirmable joint plan for

all of the Debtors and their claimants, and not solely for those Debtors that owed money to

---

[4] Although the LBSF Working Group's constituency changed over time, the members included:
Bank of America, N.A., Centerbridge Credit Advisors, LLC, Crédit Agricole Corporate and
Investment Bank, Credit Suisse International, D.E. Shaw Oculus Portfolios, L.L.C., D.E. Shaw
Composite Portfolios, L.L.C., Deutsche Bank AG, Eton Park Capital Management, L.P.,
Goldman Sachs Bank USA, Goldman Sachs International, Merrill Lynch International, Morgan
Stanley & Co. International plc, Morgan Stanley Capital Services, Inc., Oaktree Capital
Management, L.P. (solely in its capacity as agent on behalf of certain funds advised by it or its
respective subsidiaries), Silver Point Finance, LLC (an affiliate of certain claim holders), and the
Royal Bank of Scotland plc.

Goldman.  Id. at ¶ 43.  Goldman also contends that the Non-Con Plan was a necessary pre-condition to arriving at a position that was acceptable to many Lehman constituencies, and that the derivatives framework produced benefits to all creditors by resolving impediments to their distributions.  Id.  Finally, Goldman argues that it, and Cleary Gottlieb, served as voices for significant creditor interests at the Debtors' operating companies, which did not have their own independent management teams or creditors' committees.  As a result, Goldman's and Cleary's work benefitted every creditor constituency and saved the estates at least $200-$400 million.  Id. at ¶41.

55.    Goldman seeks reimbursement of the legal fees it incurred from its counsel, Cleary Gottlieb.  The Goldman Application provides that Cleary Gottlieb's professionals expended a total of approximately 5,200 hours for which compensation is requested in the amount of approximately $3.3 million Goldman App. at ¶ 48.  The Goldman Application states that it does not seek reimbursement for all fees incurred by Cleary Gottlieb, but rather the fees sought are limited to services performed that resulted in a substantial contribution in these cases. Id.

56.    If the Court finds that Goldman's efforts led to the Global Settlement, the resolution of potential derivative actions and saved the estates between $200 and $400 million, Goldman would be entitled to a substantial contribution claim under Section 503(b) of the Bankruptcy Code.

57.    Like the other applications, the Goldman Application provides Cleary Gottlieb's time records, but those time records do not comply with the Fee Guidelines.  As stated herein, because of these deficiencies a proper reasonableness review cannot be undertaken at this time.

27

Further, many of the time entries for which Cleary Gottlieb seeks compensation do not appear to relate anything other than routine services, such as: (i) attendance at omnibus hearings, (ii) review of various motions and pleadings filed in the cases, (iii) attending pitch meetings, (iv) upkeep of calendaring of matters, and (v) various other tasks for which no substantive contribution has been demonstrated.  See WorldWide Direct, 259 B.R. at 62-3; Granite Partners, 213 B.R. at 452-3; Rail Pass Express, 227 B.R. at 138.

58.    In addition, any award for substantial contribution should be limited to tasks related to the drafting of the Non-Con Plan, the derivative framework, the time spent negotiating the Global Settlement and Plan Support Agreement.  A review of the Cleary Gottlieb time records reveals that approximately 4300 hours were spent on these tasks.  Multiplying these hours by a blended hourly rate of $628.00, the total fees to be awarded should not exceed $2.7 million.  This amount, however, would have to be supported by a supplemental application that contains time records that comply with the Fee Guidelines and be subject to a proper reasonableness review.

**D.    LBSF Working Group**

59.    The LBSF Working Group seeks allowance and reimbursement of the professional fees[5] incurred by its financial advisor Blackstone in the amount of approximately $13.7 million and the reimbursement of Blackstone's expenses in the amount of $90,000.00.

60.    The LBSF Working Group's fee request for Blackstone is comprised of the following:

---

[5] Although Goldman is a member of the LBSF Working Group, the LBSF Working Group, itself, retained Blackstone.  Goldman was the only entity that retained Cleary Gottlieb.  LBSF Working Group App. at ¶ 12.

28

(i)  a total of $2,115,343.00[6] to be paid to members of the LBSF Working Group as reimbursement for monthly fees and expenses paid to/invoiced by Blackstone for services rendered from March 18, 2010, through December 6, 2011, per the terms of the Engagement Letter; and

(ii)  a total of $11,595,000 to be paid directly to Blackstone for the following fees earned per the terms of the Engagement Letter:

   a.  $3,095,000, representing total Accrued Monthly Fees from March 18, 2010, through December 6, 2011, and

   b.  $8,500,000 for the Completion Fee for the filing of the Non-Con Plan.

LBSF Working Group App. at 31.

61.  As stated above at paragraphs 34 and 35, payment of services of a professional which is not an attorney or accountant does not fall within the purview of section 503(b) and should be disallowed in its entirety.  See Granite Partners, 213 B.R. at 446.  The United States Trustee, therefore, proposes that the Court deny this request in its entirety.

REMAINDER OF PAGE INTENTIONALLY BLANK

---

[6] This sum represents monthly advisory fees aggregating $2,027,222 and $88,121.00 of out-of-pocket expenses.

## IV.    CONCLUSION

For the reasons set forth above, the United States Trustee respectfully requests that the

Court sustain the Objection and grant such other and further relief as is just.

Dated:  New York, New York
        July 25, 2012

                                Respectfully submitted,

                                TRACY HOPE DAVIS
                                UNITED STATES TRUSTEE

                                By____/s/ Susan D. Golden____
                                    Susan D. Golden
                                    Andrea B. Schwartz
                                    Trial Attorneys
                                    33 Whitehall Street, 21st Floor
                                    New York, New York 10004
                                    (212) 510-0500