# EXHIBIT D

## Dow Corning Claims

K&E 17882834

| | PROOF OF CLAIM |
|---|---|
| **United States Bankruptcy Court/Southern District of New York**<br>Lehman Brothers Holdings Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 5076<br>New York, NY 10150-5076 | |

| In Re:<br>Lehman Brothers Holdings Inc., et al.<br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held<br>LEHMAN BROTHERS SPECIAL FINANCING INC. | Case No. of Debtor<br>08-13888 (JMP) |

**UNIQUE IDENTIFICATION NUMBER: 888013520**

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)        0000043840

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

| Name of Creditor: (and name and address where notices should be sent if different from Creditor) | | CLAIM:<br>Your Claim is Scheduled by the indicated Debtor as: |
|---|---|---|
| LBH (MERGE2.DBF,SCHED_NO) SCHEDULE #: 888013520*****<br>DOW CORNING CORPORATION<br>2200 W. SALZBURG ROAD<br>MIDLAND, MI 48686-0994<br>Mail # C01232<br>Attn: Angela Cole<br>Tel: 989-496-6267<br>Email: angela.cole@dowcorning.com | (with a copy to)<br>Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Attn: Leonard Klingbaum<br>Attn: Peter Tsao<br>Tel: 212-446-4800<br>Email: lklingbaum@kirkland.com | ☐ Check this box to indicate that this claim amends a previously filed claim.<br><br>Court Claim Number: _____<br>(if known)<br><br>Filed on: _____ | SCHEDULE G - EXECUTORY CONTRACT OR UNEXPIRED LEASE<br><br>DESCRIPTION:<br>DERIVATIVE MASTER ACCOUNT NUMBER 24830DOWC |

| Name and address where payment should be sent (if different from above) | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. | |
|---|---|---|
| Telephone number:              Email Address: | | |

**1.    Amount of Claim as of Date Case Filed:** $ 3,612,935.35

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete Item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☒ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

**2.    Basis for Claim:** See attachment and to be completed questionnaire.
(See instruction #2 on reverse side.)

**3.    Last four digits of any number by which creditor identifies debtor:** N/A
  **3a. Debtor may have scheduled account as:** N/A
  (See instruction #3a on reverse side.)

**4.    Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
  Nature of property or right of setoff: ☐ Real Estate    ☐ Motor Vehicle    ☐ Other
  Describe: _____
  Value of Property: $ _____    Annual Interest Rate _____ %
  Amount of arrearage and other charges as of time case filed included in secured claim, if any:
  $_____    Basis for perfection: _____
  Amount of Secured Claim: $_____    Amount Unsecured: $_____

**6.    Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

**5.    Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

Amount entitled to priority:

$_____

**7.    Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8.    Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
**DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.**
If the documents are not available, please explain:
See attachment and to be completed on-line questionnaire.

**FOR COURT USE ONLY**

**FILED / RECEIVED**

OCT 22 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date:<br>11/22/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>ANGELA M. COLE<br>Attorney | *Angela M. Cole* |
|---|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## DELEGATION OF SIGNATORY AUTHORITY

I, J. Donald Sheets of Dow Corning Corporation (the "Company"), do hereby delegate to Angela M. Cole, a Company Attorney, full authority to sign all creditor bankruptcy-related documents that relate to the Company and all of its subsidiaries on behalf of the Company.

This Delegation of Authority is effective June 30, 2007, and will continue until revoked or the named individual is no longer serving in the designated capacity, whichever comes earlier.

The delegation set forth herein cannot be sub-delegated.

**DOW CORNING CORPORATION**

By: _____

J. Donald Sheets
Vice President, Chief Financial Officer
& Americas Area President

Date: _____

**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LEHMAN BROTHERS | ) | Case No. 08-13555 (JMP) |
| HOLDINGS INC., *et al.*, | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**ATTACHMENT TO PROOF OF CLAIM OF DOW CORNING
CORPORATION AGAINST LEHMAN BROTHERS SPECIAL FINANCING INC.**

**A.    General Background**

1.     On or after September 15, 2008 (the **"Petition Date"**), Lehman Brothers Holdings Inc. (**"LBHI"**) and certain of its subsidiaries (collectively with LBHI, the **"Debtors"**) commenced voluntary cases under title 11 of chapter 11 of the United States Code (the **"Bankruptcy Code"**). Pursuant to the order dated July 2, 2009 (the **"Bar Date Order"**), the Debtors have set September 22, 2009 as the date by which claims against them have to be filed (the **"Bar Date"**). Additionally, the Debtors have set October 22, 2009 as the date by which parties must complete an on-line questionnaire with respect to certain prepetition "Derivative Claims" and "Guarantee Claims," as such terms are defined in the Bar Date Order.

2.     This attachment (this **"Attachment"**) is filed by the Dow Corning Corporation (the **"Claimant"**), as a supplement to the Claimant's written proof of claim and the to-be submitted on-line questionnaire (together, the **"Proof of Claim"**) against Lehman Brothers Special Financing Inc. (**"LBSF"**), a Debtor in these chapter 11 cases.  All statements and assertions made in the Proof of Claim are incorporated herein by reference.

**B.      Basis for Claim**

3.      Claimant and LBSF are parties to that certain ISDA Master Agreement, dated as of February 21, 2005 (the "**Swap Agreement**").  Pursuant to the Swap Agreement, the parties entered into certain transactions which remained outstanding as of the Petition Date.  The Swap Agreement and the pertinent trade details with respect to the Swap Agreement are annexed as **Exhibit A** hereto.

4.      On September 16, 2008, Claimant sent LBSF a Notice of Default (the "**Notice**") designating September 16, 2008 (the "**Early Termination Date**") as the Early Termination Date (as defined in the Swap Agreement) because an event of default arose under section 5(a)(vii) of the Swap Agreement (the "**Event of Default**"), triggered by LBHI, as Credit Support Provider (as defined in the Swap Agreement) of the Counterparty in the Schedule, filing for bankruptcy protection on September 15, 2008.

5.      Claimant on September 29, 2008, sent LBSF a demand for $3,612,935.35 based on termination of the Swap Agreement and calculated pursuant to the Claimant's rights under the Swap Agreement.  The $3,612,935.35 demand does not include interest, fees and expenses. Based on the foregoing, Claimant asserts an unsecured claim against LBSF in the total amount of $3,612,935.35.  A statement showing the calculations implemented to determine the value of the terminated Swap agreement is annexed as **Exhibit B** hereto.

6.      Claimant contends this Proof of Claim is timely because (a) this Proof of Claim reflects a scheduled liability pursuant to Exhibit G on LBSF's filed schedules and statements, attached hereto as **Exhibit C**, (b) the Notice made the Debtors aware of this claim prior to the Bar Date and (c) this Proof of Claim was timely filed in the Lehman Brothers Inc. SIPA Proceeding (the "**SIPA Proceeding**") (Case No. 08-01420) prior to the Bar Date, a confirmation

2

of which is attached here to as **Exhibit D**. Moreover, Claimant is promptly filing this Proof of Claim after receiving notice from the SIPA Proceeding of filing error.

## C.    Reservation of Rights

7.    Claimant reserves its right to seek any and all interest that it may be entitled to, including default interest, accrued and accruing, as well as any and all fees, costs, and expenses that it may seek reimbursement for, including attorneys' fees, advisors' fees and any other related expenses.

8.    The filing of this Attachment and the Proof of Claim (including any documents or attachments submitted in connection therewith) do not constitute a concession or admission by Claimant of liability, of any facts, or as to whether all or a portion of the claims are prepetition or postpetition in connection with any claim that has been or may be asserted against Claimant or against the Debtors and their estates.

9.    Claimant has filed this Attachment and Proof of Claim (including any documents or attachments submitted in connection therewith) under compulsion of the Bar Date Order entered in the Debtors' chapter 11 cases and to protect Claimant from forfeiture of its claims against the Debtors by reason of the dates established thereby. Claimant reserves the right to amend and/or supplement this Attachment and the Proof of Claim at any time, including after the Bar Date, in any manner, and/or to file additional proofs of claim for any additional claims that may be based on the same or additional documents or grounds of liability or to assert that such claims are entitled to rights and priorities afforded under sections 365, 503 or 507 of the Bankruptcy Code.

10.    The filing of this Attachment and the Proof of Claim are not and shall not be deemed or construed as: (a) a waiver or release of Claimant's rights against any person, entity, or property, or a waiver of the right to compel the Debtors to return property of Claimant

3

currently in the possession of the Debtors; (b) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant; (c) a waiver or release of Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters herein, whether or not the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a consent by Claimant to a jury trial in a Bankruptcy Court or any other court in any proceeding as to any and all matters herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver or release of Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding that may be commenced in this case against or otherwise involving Claimant; or (g) an election of remedies.

11.    All notices regarding this Attachment and the Proof of Claim should be sent to Dow Corning Corporation, 2200 W. Salzburg Road, Mail # C01232, Auburn, Michigan 48611, Attn: Angela Cole, with a copy to (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Leonard Klingbaum, Esq. and Peter Tsao, Esq.

4

**Exhibit A**

(Multicurrency-Cross Border)



International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of February 21, 2005

**LEHMAN BROTHERS**                 and            **DOW CORNING CORPORATION**
**SPECIAL FINANCING INC.**

have entered and/or anticipate entering into one or more transactions (each a Transaction) that are or will be governed by this Master Agreement, which includes the schedule (the Schedule), and the documents and other confirming evidence (each a Confirmation) exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:

1.      **Interpretation**

(a)      *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)      *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this Agreement), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

(i)    in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

(i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

(ii) *Liability*. If: —

(1) X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2) X does not so deduct or withhold; and

(3) a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(e), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations.*

(i)    *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)    *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3

ISDA® 1992

(b)    *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.    **Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.    Events of Default and Termination Events

(a)    *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default.*

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

5                                                                ISDA® 1992

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i) *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v) *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

ISDA® 1992

6.    **Early Termination**

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If: —

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

8

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c) *Effect of Designation.*

(i)   If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)   Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) *Calculations.*

(i)   *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)   *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e) *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)   *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

ISDA® 1992

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii) *Termination Events*. If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    **Contractual Currency**

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA® 1992

**9.    Miscellaneous**

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

### 12.    Notices

(a)    *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

        (i)    if in writing and delivered in person or by courier, on the date it is delivered;

        (ii)    if sent by telex, on the date the recipient's answerback is received;

        (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

        (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

        (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

### 13.    Governing Law and Jurisdiction

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

        (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

        (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

### 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)   the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)   such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS
SPECIAL FINANCING INC.
*(Name of Party)*

DOW CORNING CORPORATION
*(Name of Party)*

By: _____

Name:

Title:

Date:    Allyson M. Carine
Authorized Signatory

By: _____

Name:    Ron R. Sexton

Title:    Treasurer

Date:    February 21, 2005

18

(Multicurrency-Cross Border)

**SCHEDULE**
to the
Master Agreement
dated as of February 21, 2005
between
**LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Party A"),
a corporation organized under the laws of
the State of Delaware
and
**DOW CORNING CORPORATION** ("Party B"),
a corporation organized under the laws of
the State of Michigan

**Part 1: Termination Provisions**

In this Agreement:

(a)    **"Specified Entity"** means:

in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Lehman Brothers Finance S.A. and |
| | Lehman Brothers Commercial Corporation |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

(b)    **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement.

(c)    The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and will apply to Party B.

The following provisions apply:

**"Specified Indebtedness"** will have the meaning specified in Section 14 of this Agreement.

**"Threshold Amount"** means the lesser of (i) USD 75 million and (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in the case of Party A and Holdings (or its equivalent in any other currency), and the lesser of (i) USD 25 million and (ii) three percent (3%) of the Stockholders' Equity of Party B, in the case of Party B (or its equivalent in any other currency).

For purposes hereof, **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)    The **"Credit Event Upon Merger"** provisions of Section 5(b)(iv) will apply to Party A and Party B; provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers Holdings Inc. or the resulting, surviving or transferee entity of Holdings, as the case may be, fails to

19

maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"). In the event of a split rating, the lower rating shall be determinative.

(e)      "**Automatic Early Termination**" provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)      **Payments on Early Termination.** For the purpose of Section 6(e) of this Agreement, Loss and the Second Method will apply.

(g)      "**Termination Currency**" means United States Dollars ("USD").

(h)      **Additional Termination Events** will not apply.

**Part 2: Tax Representations**

(a)      **Payer Tax Representations.** For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction(s) of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position.

(b)      **Payee Tax Representations.** For the purpose of Section 3(f) of this Agreement, Party A represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware and Party B represents that it is a corporation duly organized and validly existing under the laws of the State of Michigan.

(c)      **Tax Representations in Confirmations.** For purposes of Sections 2(d)(i)(4) and 3(f), any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

**Part 3: Agreement to Deliver Documents**

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)    Party A and Party B will deliver forms and/or documents described in Section 4(a)(iii) of this Agreement upon reasonable demand by the other party.

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Incumbency certificate or other evidence reasonably satisfactory to the other party of the authority and genuine signature of the individual signing the Agreement and any Credit Support Document on behalf of such party to execute the same. | Upon execution of this Agreement. | Yes |
| Party A and Party B | Evidence reasonably satisfactory to the other party of the authority of such party and its Credit Support Provider to enter into the Agreement, any Credit Support Document and each Transaction entered into hereunder. | Upon execution of this Agreement. | Yes |
| Party A and Party B | A copy of the annual report (in the case of Party A, of its Credit Support Provider) containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | Upon request. | Yes |
| Party A and Party B | For its most recent fiscal quarter, a copy of the unaudited financial statements of (in the case of Party A, its Credit Support Provider), prepared in accordance with generally accepted accounting principles consistently applied. | Upon request. | Yes |
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of this Schedule. | Upon execution of this Agreement. | No |

**Part 4: Miscellaneous**

(a)     **Addresses for Notices.** For the purpose of <u>Section 12(a)</u> of this Agreement:

| Address for notices or communications to **Party A**: | |
|---|---|
| | |
| Address: | Lehman Brothers Special Financing Inc. c/o Lehman Brothers Inc. Transaction Management Group Corporate Advisory Division 745 Seventh Avenue New York, NY 10019 |
| | |
| Attention: | Documentation Manager |
| Telephone No.: | (212) 526-7187 |
| Facsimile No.: | (212) 526-7672 |
| | |
| | For all purposes. |
| **Address for notices or communications to Party B:** | |
| | |
| Address: | Dow Corning Corporation 2200 W. Salzburg Road Midland, Michigan  48686-0994 |
| | |
| Attention: | General Counsel |
| Telephone No.: | 989-496-5020 |
| Facsimile No.: | 989-496-8307 |
| | |
| | For all purposes. |

(b)     **Process Agent.** For the purpose of <u>Section 13(c)</u> of this Agreement:

| Party A appoints as its Process Agent: | Not applicable. |
|---|---|
| Party B appoints as its Process Agent: | CT Corporation System 1633 Broadway New York, New York 10019. |

(c)     **Offices.** The provisions of <u>Section 10(a)</u> will apply to this Agreement.

(d)     **Multibranch Party.** For the purpose of <u>Section 10(c)</u> of this Agreement:

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e)     **Calculation Agent.** The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(f)     **Credit Support Document.** Details of any Credit Support Document, each of which is incorporated by reference in, constitutes part of, and is in connection with, this Agreement and each Confirmation (unless provided otherwise in a Confirmation) as if set forth in full in this Agreement or such Confirmation:

In the case of **Party A:**  Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.

22

In the case of Party B:  Not applicable.

(g)   **Credit Support Provider.**

| Credit Support Provider means in relation to Party A: | Lehman Brothers Holdings Inc. |
|---|---|

| Credit Support Provider means in relation to Party B: | Not applicable. |
|---|---|

(h)   **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(i)   **Netting of Payments.** Subparagraph (ii) of Section 2(c) of this Agreement will not apply to any Transactions.

(j)   **"Affiliate"** will have the meaning specified in Section 14 of this Agreement, provided, however, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

(k)   **Jurisdiction.** Section 13(b) is hereby amended by: (i) deleting in the second line of subparagraph (i) thereof the word "non-"; and (ii) deleting the final paragraph thereof.


**Part 5: Other Provisions**

(a)   **Representations.** Section 3 of this Agreement is hereby amended by adding the following additional subsections:

(g)   *No Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of the Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(h)   *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(i)   *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

(j)   *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

(k)   *Eligible Contract Participant.* It is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act.

(b)   **Set-off.** Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

(f)   *Set-off.*

(i)   In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default, Credit Event Upon Merger, or an Additional Termination Event and the designation of an Early Termination Date pursuant to Section 6 of the Agreement

23

with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation).

(ii)   For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date.

(iii)  If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained.

(iv)   This clause (f) shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement.

(c)    **Transfer.** Notwithstanding anything to the contrary in <u>Section 7</u> of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be otherwise identical to the guarantee then in effect of the obligations of the transferor.

(d)    **Notices.** For the purposes of <u>subsections (iii)</u> and <u>(v)</u> of <u>Section 12(a)</u>, the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(e)    **Service of Process.** The penultimate sentence of <u>Section 13(c)</u> shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(f)    **Outstanding Specified Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(g)    **Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(h)    **Accuracy of Specified Information.** <u>Section 3(d)</u> is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

(j)    **Escrow Payments.** If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in

24

the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5:00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(k)     **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

(l)     **Amend and Restate Prior Agreement.** This Agreement supersedes and replaces the International Foreign Exchange Master Agreement dated as of January 17, 1997, and amended as of December 10, 1998 between Party A and Party B.

(m)     **Representations.** The words "in any material contract" are inserted into Section 3(a)(iii) after the word "restriction" and before the word "binding."

**Part 6: Additional Terms for FX Transactions and Currency Options**

(a)     **Incorporation and Amendment of 1998 FX and Currency Option Definitions**

    (i)     <u>Incorporation of 1998 FX and Currency Option Definitions</u>. The 1998 FX and Currency Option Definitions, as amended from time to time (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation.

    (ii)     <u>Amendment of 1998 FX and Currency Option Definitions</u>. The following amendments are made to the 1998 Definitions:

    Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):

    **Currency Obligation.** "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(b)     **Confirmations.** Any confirmation (whether provided by mail, facsimile or other electronic means) in respect of any FX Transaction or Currency Option Transaction into which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement, even where not so specified in such confirmation; and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as expressly modified therein.

(c)     **Netting and Related Provisions.** Section 2(c) shall not apply to FX Transactions or Currency Option Transactions. In lieu thereof, the following shall apply:

    (i)     <u>Netting, Discharge and Termination of FX Transactions</u>. The following provisions shall apply to FX Transactions:

    Unless otherwise agreed by the parties, whenever an FX Transaction is entered into between the parties which creates a Currency Obligation in the same currency and for the same Settlement

Date, as an existing Currency Obligation between the parties, such Currency Obligations shall automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation under which the party having the obligation to deliver the greater aggregate amount of currency shall be obligated to deliver the excess of such greater aggregate currency amount over such lesser aggregate currency amount. Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement.

(ii)    Netting, Discharge and Termination with Respect to Currency Option Transactions.   The following provisions shall apply to Currency Option Transactions:

Unless otherwise agreed by the parties, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, having the same identical terms, written by the other party; and, upon the occurrence of such termination or discharge, neither party shall have any further obligation to the other party in respect of the parts so terminated and discharged (except for the obligation of either party to pay any Premium due, but not paid, thereunder); and the remaining portion of any Currency Option Transaction, which is partially discharged and terminated, shall continue to be a Currency Option Transaction under this Agreement.

(d)    **Inconsistencies.** In the event of any conflict between:

(i)     the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this Agreement shall supersede;

(ii)    the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states that it shall so prevail and has been signed by both parties, its terms shall supersede the terms of this Agreement;

(iii)   the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction Confirmation and this Agreement, the terms of the Confirmation shall supersede.

(e)    **Definitions.** Section 14 is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

| LEHMAN BROTHERS SPECIAL FINANCING INC. | DOW CORNING CORPORATION |
|---|---|
| *(Name of Party)* | *(Name of Party)* |

By: _____            By: _____

Name: _____                     Name:   Ron R. Sexton

Title: _____                     Title:    Treasurer

Date:   **Allyson M. Carine**            Date:    February 21, 2005
        **Authorized Signatory**

26

EXHIBIT A to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and DOW CORNING CORPORATION ("Party B") have entered into a Master Agreement dated as of [date], as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, 399 Park Avenue, 11th Floor, New York, NY 10022 USA (Facsimile No.

1

(212) 526-0339) with a copy to Lehman Brothers Special Financing Inc., c/o Lehman Brothers Inc., Corporate Advisory Division, Attention: Transaction Management Group, 745 Seventh Avenue, New York, NY 10019 USA.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name:

Title:

Date:

# LEHMAN BROTHERS

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and DOW CORNING CORPORATION ("Party B") have entered into a Master Agreement dated as of February 21, 2005, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)   Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)   Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)   Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)   This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)   Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)   Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

# LEHMAN BROTHERS

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, 399 Park Avenue, 11th Floor, New York, NY 10022 USA (Facsimile No. (212) 526-0339) with a copy to Lehman Brothers Special Financing Inc., c/o Lehman Brothers Inc., Corporate Advisory Division, Attention: Transaction Management Group, 745 Seventh Avenue, New York, NY 10019 USA.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name:   **Oliver Budde**

Title:   **Vice President**

## CERTIFICATE OF INCUMBENCY

I, Anna Walters, a duly elected, qualified and acting Assistant Secretary of Lehman Brothers Special Financing Inc., a Delaware corporation (the "Corporation"), do hereby certify that the persons listed below are authorized and empowered in the name and on behalf of the Corporation as Authorized Signatories and that the signature appearing opposite their name is the specimen signature of such persons:

**NAME:**                              **SIGNATURE:**


Zdenka Griswold


Allyson Carine


IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of this Corporation this 10th day of Apr l , 2002.


SEAL                    LEHMAN BROTHERS SPECIAL FINANCING INC.

                        Name: Anna Walters
                        Title: Assistant Secretary

CERTIFICATE OF INCUMBENCY

I, Cindy S. Gregoire, a duly elected, qualified and acting Assistant Secretary of Lehman Brothers Special Financing Inc., a Delaware corporation (the "Corporation"), do hereby certify that the person listed below holds the office in the Corporation indicated opposite his name on the date hereof and that the signature appearing opposite his name is the genuine signature of such person:

| NAME: | OFFICE: | SIGNATURE: |
|---|---|---|
| Oliver Budde | Assistant Secretary | |

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 23rd day of September, 2002.

[SEAL]

LEHMAN BROTHERS SPECIAL FINANCING INC.

Cindy S. Gregoire
Assistant Secretary

## SECRETARY'S CERTIFICATE

The undersigned, an Assistant Secretary of Lehman Brothers Special Financing Inc., a Delaware corporation (the "Corporation"), does hereby certify that attached hereto as Exhibit A is a true, correct and complete excerpt of resolutions duly adopted by the Board of Directors of the Corporation, which resolutions are in effect as of the date hereof.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of October 2004.

SEAL

LEHMAN BROTHERS SPECIAL
FINANCING INC

By: _____
          Aaron Guth
          Assistant Secretary

**Exhibit A**

FURTHER RESOLVED, that this Corporation (a) be and hereby is authorized to enter into: rate swap transactions; swap option transactions; basis swap transactions; credit default transactions; forward rate transactions; commodity swap transactions; commodity option transactions; commodity spot and forward transactions; total return and reverse total return swap transactions; equity or equity index swap transactions; index options and index swap transactions; interest rate option transactions; foreign exchange transactions; non-deliverable forward transactions; interest rate cap, floor, corridor and collar transactions; currency swap transactions; cross-currency swap transactions; currency spot and forward transactions; interest rate spread-lock transactions; interest rate-lock transactions; float forward transactions; currency option transactions; credit protection transactions; credit spread transactions; debt service deposit transactions; debt service reserve fund transactions; weather derivatives transactions; energy derivatives transactions; forward purchase or sale of a commodity or currency; any other similar transactions (including options with respect to any of these transactions) howsoever designated; and any combination of these transactions (each a "Transaction" and, collectively, "Transactions"), and (b) may enter into Transactions on terms satisfactory to the President, and Managing Director, any Senior Vice President, any Vice President or the Treasurer of this Corporation, and such other acts and things as may be advisable or necessary to carry out and effect the full intent and purpose of this resolution; and

FURTHER RESOLVED, that each of the President, any Managing Director, any Senior Vice President, any Vice President and the Treasurer of this Corporation be and hereby is authorized to execute, in the name of and on behalf of the Corporation, any form of document or agreement with respect to any Transactions and to do such other acts and things as may be advisable or necessary to carry out and perform, on the part of this Corporation, any such agreement, or in order to carry out and effect the full intent and purpose of this resolution; and

FURTHER RESOLVED, that any and all prior actions taken, and any and all Transactions entered into, on behalf of this Corporation by the President, any Managing Director, any Senior Vice President, any Vice President or the Treasurer of this Corporation, prior to the date of this resolution be and hereby are ratified; and

FURTHER RESOLVED, that any one of the President, any Managing Director and the Treasurer (each such officer, an "Authorized Officer") shall have the authority to designate and/or terminate the designation of those individuals who can, in the name of and on behalf of the Corporation, enter into Transactions or execute, any form of document or agreement, in connection therewith; and

FURTHER RESOLVED, that the Corporation hereby adopts any form of resolution which an Authorized Officer shall approve as necessary, appropriate or desirable in order to carry out the purpose and intent of the preceding resolution and directs that the Secretary or an Assistant Secretary file a copy of each form of resolution so approved in the appropriate Minute Book of the Corporation.

Form **W-9**
(Rev. January 2003)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer
Identification Number and Certification**

Give form to the
requester. Do not
send to the IRS.

Print or type
See Specific Instructions on page 2.

Name
**Dow Corning Corporation**

Business name, if different from above.

Check appropriate box: ☐ Individual/ Sole proprietor  ☑ Corporation  ☐ Partnership  ☐ Other ▶ ................    ☑ Exempt from backup withholding

Address (number, street, and apt. or suite no.)
**Tax Department CO1112; P.O. Box 994**

City, state, and ZIP code
**Midland, MI 48686-0994**

Requester's name and address (optional)

List account number(s) here (optional)

**Part I    Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Note: If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number
| | | | | | | |

**or**

Employer identification number

**Part II    Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. person (including a U.S. resident alien).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

Sign Here    Signature of U.S. person ▶ _Ron K. Sexton_    Date ▶ 4/5/05

## Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

U.S. person. Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

Note: If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

Foreign person. If you are a foreign person, use the appropriate Form W-8 (see Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

Nonresident alien who becomes a resident alien. Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the recipient has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

Cat. No. 10231X    Form **W-9** (Rev. 1-2003)

## DOW CORNING CORPORATION
### CERTIFIED COPY OF RESOLUTION

The undersigned, Paul A. Marcela, Assistant Secretary of Dow Corning Corporation, a corporation organized and existing under the laws of the State of Michigan, U.S.A. (the "Company"), does hereby certify that the Board of Directors of the Company unanimously approved and adopted the following resolution, effective as of March 4, 2004, which is now in full force and effect:

> RESOLVED, that the Chairman of the Board, the President, the Chief Executive Officer, the Vice President, Planning and Finance & Chief Financial Officer, the Treasurer, and the Secretary, acting singly, in strict compliance with the Financial Risk Management Policy of the Corporation (the "FRMP"), are hereby authorized on behalf of the Corporation and its wholly and partially-owned subsidiaries, to (a) use interest rate futures, options, swaps, and other interest-related financial instruments for the purpose of mitigating the effects of adverse movements in interest rates on corporate earnings or cash flow, (b) enter into energy commodity financial instruments for the purpose of protecting the value of anticipated future cash outflows and (c) use foreign exchange forward contracts, currency options and swaps, and other currency-related financial instruments for the purposes of (i) preserving the value of assets; (ii) protecting the value of anticipated future income, cash inflows and cash outflows; and (iii) exchanging one currency for another; and

> FURTHER RESOLVED, that the Audit Committee of the Board of Directors shall review and approve the FRMP, and any changes thereto, prior to implementation of the FRMP, which addresses authority to enter into transactions; authorization limits, the purpose of risk management; qualification criteria for transactions, counter-parties and financial instruments; and the objectives and frequency of the Finance Committee's review and approval process; and

> FURTHER RESOLVED, that the Finance Committee shall review and approve the strategy underlying the transactions to be entered into pursuant to these resolutions and shall conduct annual reviews of plans, positions and performance relative to such transactions; and

> FURTHER RESOLVED, that said Officers are hereby authorized to take all actions necessary to accomplish these resolutions, including delegations of authority.

> FURTHER RESOLVED, that such authority shall extend through March 31, 2005.

IN WITNESS WHEREOF, the undersigned has subscribed his signature and the seal of the Company on this 23rd day of February, 2005.

Paul A. Marcela
Assistant Secretary



September 16, 2008

**VIA HAND DELIVERY AND**
**VIA FACSIMILE :(212) 526-7672**

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Corporate Advisory Division
Transaction Management Group
745 Seventh Avenue
New York, NY 10019
Attention:    Documentation Manager

Ladies and Gentlemen:

Dow Corning Corporation ("Dow Corning") and Lehman Brothers Special Financing Inc. ("LBSF") are parties to an ISDA Master Agreement dated as of February 21, 2005 (together with the Transactions and Confirmations related thereto (including the Transactions referred to on Schedule A hereto), and the Schedule forming a part thereof, collectively, the "ISDA Agreement"). Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the ISDA Agreement.

One or more Events of Default have occurred and are continuing under the Master Agreement including under Section 5(a)(vii) and Section 5(a)(iii) of the Master Agreement as a result of the filing by the Credit Support Provider of a case under Chapter 11 of the United States Bankruptcy Code.

Dow Corning hereby designates September 16, 2008 as an Early Termination Date in respect of all Transactions outstanding under the ISDA Agreement.

Please contact the undersigned at (989) 496-3271 with any questions.

Yours truly,

DOW CORNING CORPORATION

By: _____
Name: Jan O. Hjalber
Title:  Treasurer

## SCHEDULE A – TRANSACTIONS

| Transaction | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Bank Reference No. | 8175L2E858401 | 8242L1G081101 | 8242L1G071101 | 11705664 |
| Account | DCC | DCC | DCC | DCC |
| Trade Date | 6/23/2008 | 8/29/2008 | 9/29/2008 | 4/21/2008 |
| Value Date | 10/28/2008 | 9/25/2008 | 9/25/2008 | 10/31/2008 |
| Bought/Call CCY | USD | USD | USD | USD |
| Bought Amount | 37,328,012.29 | 1,894,877.86 | 11,747,296.00 | 14,285,714.29 |
| Sold/Put CCY | EUR | CAD | EUR | CNY |
| Sold Amount | 24,231,825.35 | 2,000,000.00 | 8,000,000.00 | 100,000,000.00 |
| Rate | 1.540454 | 1.055477 | 1.468412 | 7.00 |
| Instrument Type | Forward | Forward | Forward | Option |

2

## Trade Ticket

| | |
|---|---|
| FXall Deal ID | 7560361 |
| Currency Pair | EUR/USD (Quoted USD per EUR) |
| Provider | WACHOVIA |
| Trade Date | 16-Sep-2008 |

| | |
|---|---|
| Product | FORWARD |
| Executed by | besauve |
| Executed on | 16-Sep-2008 16:21:06 GMT |

**Summary**

| Value Date | Allocations | Side CCY | Amount Side | CCY | Amount | Spot | Pts | All-in | Other |
|---|---|---|---|---|---|---|---|---|---|
| 28-Oct-2008 | 1 | Sell EUR | 24,231,825.35 Buy | USD | 34,192,922.96 | 1.413 | -19.25 | 1.411075 | |

**Booking Details**

| Value Date | Account | Side CCY | Amount Side | CCY | Amount | Spot | Pts | All-in |
|---|---|---|---|---|---|---|---|---|
| 28-Oct-2008 | dcc | Sell EUR | 24,231,825.35 Buy | USD | 34,192,922.96 | 1.413 | -19.25 | 1.411075 |

**Provider Prices**

| Bank | Value Date | Bid | | | Ask | | | Difference |
|---|---|---|---|---|---|---|---|---|
| | | Spot | Pts | All-in | Spot | Pts | All-in | |
| CITI | 28-Oct-2008 | 1.4129 | -21.42 | 1.410758 | | | | $7,682 |
| GS | 28-Oct-2008 | 1.4130 | -30.70 | 1.409930 | | | | $27,745 |
| JPMC | 28-Oct-2008 | 1.4125 | -23.35 | 1.410165 | 1.4125 | -23.35 | 1.410165 | $22,051 |
| MS | 28-Oct-2008 | 1.4129 | -22.35 | 1.410665 | | | | $9,935 |
| WACHOVIA | 28-Oct-2008 | 1.4130 | -19.25 | 1.411075 | 1.4136 | -15.79 | 1.412021 | $0 |
| FXall IQ | 28-Oct-2008 | 1.4127 | -18.9721 | 1.410800 | | | | $6,664 |



## Trade Ticket



| FXall Deal ID | 7560305 |
| Currency Pair | EUR.USD (Quoted USD per EUR) |
| Provider | WACHOVIA |
| Trade Date | 16-Sep-2008 |

| Product | FORWARD |
| Executed by | besauve |
| Executed on | 16-Sep-2008 16:17:58 GMT |

### Summary

| Value Date | Allocations | Side CCY | Amount Side | CCY | Amount | Spot | Pts | All-In | Other |
|---|---|---|---|---|---|---|---|---|---|
| 25-Sep-2008 | 1 | Sell EUR | 8,000,000.00 Buy | USD | 11,304,880.00 | 1.4129 | 2.1 | 1.41311 | |

### Booking Details

| Value Date | Account | Side CCY | Amount Side | CCY | Amount | Spot | Pts | All-In |
|---|---|---|---|---|---|---|---|---|
| 25-Sep-2008 | dcc | Sell EUR | 8,000,000.00 Buy | USD | 11,304,880.00 | 1.4129 | 2.1 | 1.41311 |

### Provider Prices

| Bank | Value Date | Bid | | | Ask | | | Difference |
|---|---|---|---|---|---|---|---|---|
| | | Spot | Pts | All-In | Spot | Pts | All-In | |
| BTMU | 25-Sep-2008 | 1.4126 | 1.00 | 1.412700 | - | - | - | $3,280 |
| CITI | 25-Sep-2008 | 1.4129 | 1.50 | 1.413050 | - | - | - | $480 |
| GS | 25-Sep-2008 | 1.4129 | -9.95 | 1.411905 | - | - | - | $9,640 |
| JPMC | 25-Sep-2008 | 1.4127 | -3.00 | 1.412400 | 1.4127 | -3.00 | 1.412400 | $5,680 |
| WACHOVIA | 25-Sep-2008 | 1.4129 | 2.10 | 1.413110 | 1.4133 | 5.10 | 1.413810 | $0 |
| FXall IQ | 25-Sep-2008 | 1.4132 | -2.6053 | 1.412900 | | | | $1,680 |



# Trade Ticket

| FXall Deal ID | 7560288 |
| Currency Pair | USD CAD (Quoted CAD per USD) |
| Provider | BTMU |
| Trade Date | 16-Sep-2008 |

| Product | FORWARD |
| Executed by | besauve |
| Executed on | 16-Sep-2008 16:16:27 GMT |

**Summary**

| Value Date | Allocations | Side CCY | Amount Side | CCY | Amount | Spot | Pts | All-in |
|---|---|---|---|---|---|---|---|---|
| 25-Sep-2008 | 1 | Sell CAD | 2,000,000.00 Buy | USD | 1,863,290.38 | 1.0735 | -1.3 | 1.07337 |

**Booking Details**

| Value Date | Account | Side CCY | Amount Side | CCY | Amount | Spot | Pts | All-in | Other |
|---|---|---|---|---|---|---|---|---|---|
| 25-Sep-2008 | doc | Sell CAD | 2,000,000.00 Buy | USD | 1,863,290.38 | 1.0735 | -1.3 | 1.07337 | |

**Provider Prices**

| Bank | Value Date | Bid | | | Ask | | | Difference |
|---|---|---|---|---|---|---|---|---|
| | | Spot | Pts | All-in | Spot | Pts | All-in | |
| BTMU | 25-Sep-2008 | - | - | - | 1.0735 | -1.30 | 1.073370 | $0 |
| CITI | 25-Sep-2008 | - | - | - | 1.0735 | -0.61 | 1.073439 | $119 |
| GS | 25-Sep-2008 | - | - | - | 1.0736 | 14.21 | 1.075021 | $2,861 |
| JPMC | 25-Sep-2008 | 1.0737 | -0.86 | 1.073614 | 1.0737 | -0.86 | 1.073614 | $423 |
| WACHOVIA | 25-Sep-2008 | 1.0726 | -2.29 | 1.072371 | 1.0741 | -1.74 | 1.073926 | $964 |
| FXall IQ | 25-Sep-2008 | | | | 1.0735 | 0.2747 | 1.073500 | $225 |

## SAUVE, BRAD E. (BESAUVE)

**From:** Blankinship, Jon [jon.blankinship@citi.com]
**Sent:** Tuesday, September 16, 2008 12:52 PM
**To:** SAUVE, BRAD E. (BESAUVE)
**Subject:** RE: CNY PUT OPTION PRICE NEEDED

Brad - using a spot ref 6.8400, I see the premium as USD 18,400.

Please call if you would like to trade,
Jon

-------------------------------------------
Jon Blankinship | Vice President, Global Corporate Sales | Foreign Exchange | Citigroup | 212 723 6768 | TF 800.345 6364

This e-mail message is Market Commentary. Please see the following disclaimer URL.
https://www.citigroupgcib.com/data/documents/MarketCommentaryDisclaimer.pdf

**From:** brad.sauve@dowcorning.com [mailto:brad.sauve@dowcorning.com]
**Sent:** Tuesday, September 16, 2008 12:13 PM
**To:** Blankinship, Jon [CMB-FICC]
**Subject:** CNY PUT OPTION PRICE NEEDED

Jon,

Can you tell me what the option premium is for Dow Corning to buy a CNY put struck at 7.00 on 100 million CNY for expiration October 31, 2008?

Brad E. Sauve
Corporate Treasury Department
Dow Corning Corporation
PO Box 994, CO-1116
2200 W. Salzburg Rd.
Midland, MI 48686-0994
Phone: (989) 496-1863
Fax: (989) 496-8379
E-mail: brad.sauve@dowcorning.com

## SAUVE, BRAD E. (BESAUVE)

**From:**    Mellinger, Paula [Paula.Mellinger@gs.com]
**Sent:**    Tuesday, September 16, 2008 12:23 PM
**To:**    SAUVE, BRAD E. (BESAUVE)
**Subject:** RE: CNY PUT OPTION PRICE NEEDED

Hi again Brad,

So I'm using a a spot reference of 6.8460 and an ATMF of 6.8470, and a vol of 6.50%. This gives me a USD premium of $29,000.

**From:** brad.sauve@dowcorning.com [mailto:brad.sauve@dowcorning.com]
**Sent:** Tuesday, September 16, 2008 12:12 PM
**To:** Mellinger, Paula
**Subject:** CNY PUT OPTION PRICE NEEDED

Paula,

Can you tell me what the option premium is for Dow Corning to buy a CNY put struck at 7.00 on 100 million CNY for expiration October 31, 2008?

Brad E. Sauve
Corporate Treasury Department
Dow Corning Corporation
PO Box 994, CO-1116
2200 W. Salzburg Rd.
Midland, MI 48686-0994
Phone: (989) 496-1863
Fax: (989) 496-8379
E-mail: brad.sauve@dowcorning.com

**SAUVE, BRAD E. (BESAUVE)**

| | |
|---|---|
| **From:** | librada.z.killian@jpmorgan.com |
| **Sent:** | Tuesday, September 16, 2008 12:34 PM |
| **To:** | SAUVE, BRAD E. (BESAUVE) |
| **Subject:** | Re: Need Price for CNY PUT OPTION |

Hi Brad,

The Usd Call/Cny Put to Oct 31st would cost you $20,000
spot reference 6.85

let me know how we look

Librada Zamora Killian
Executive Director
Foreign Exchange & Interest Rate Derivatives
JPMorgan Chase Bank, N.A.
librada.z.killian@jpmorgan.com
800-621-1144
312-732-2030

‹brad.sauve@dowcorning.com›

09/16/2008 11:10 AM

To ‹librada.z.killian@jpmorgan.com›
cc
Subject Need Price for CNY PUT OPTION

Librada,

Can you tell me what the option premium is for Dow Corning to buy a CNY put struck at 7.00 on 100 million
CNY for expiration October 31, 2008?

Brad E. Sauve
Corporate Treasury Department
Dow Corning Corporation
PO Box 994, CO-1116
2200 W. Salzburg Rd.
Midland, MI 48686-0994
Phone: (989) 496-1863
Fax: (989) 496-8379
E-mail: brad.sauve@dowcorning.com

9/16/2008

## SAUVE, BRAD E. (BESAUVE)

**From:**  Smock, David [david.smock@wachovia.com]
**Sent:**  Tuesday, September 16, 2008 12:29 PM
**To:**  SAUVE, BRAD E. (BESAUVE); Butler, Glenn
**Subject:** RE: CNY PUT OPTION PRICE NEEDED

Brad,

The option premium is $36,500

**From:** brad.sauve@dowcorning.com [mailto:brad.sauve@dowcorning.com]
**Sent:** Tuesday, September 16, 2008 12:13 PM
**To:** Butler, Glenn
**Cc:** Smock, David
**Subject:** CNY PUT OPTION PRICE NEEDED

Glenn,

Can you tell me what the option premium is for Dow Corning to buy a CNY put struck at 7.00 on 100 million
CNY for expiration October 31, 2008?

Brad E. Sauve
Corporate Treasury Department
Dow Corning Corporation
PO Box 994, CO-1116
2200 W. Salzburg Rd.
Midland, MI 48686-0994
Phone: (989) 496-1863
Fax: (989) 496-8379
E-mail: brad.sauve@dowcorning.com

Deal Details - Settlement Center                                                        Page 1 of 1

| Matching | Netting | SI | Archive Blotter | Import Deals | REFRESH |
|----------|---------|----|-----------------|--------------|---------|

## Archive Blotter > Deal Details

**Matched**

dowcorning Buys USD 37,328,012.29 vs. EUR 24,231,825.35 with INC@LEHN

| Field | dowcorning | INC@LEHN |
|-------|------------|----------|
| Source | FXall | MT300 |
| FXall Ref. | 6628658_1_0_0 | |
| Reference | 6628658100 | 8175L2E858401 |
| **Economics** | | |
| Account | dcc | dcc |
| Trade Date | 23-Jun-2008 | 23-Jun-2008 |
| Value Date | 28-Oct-2008 | 28-Oct-2008 |
| Bought CCY | USD | USD |
| Bought Amount | 37,328,012.29 | 37,328,012.29 |
| Sold CCY | EUR | EUR |
| Sold Amount | 24,231,825.35 | 24,231,825.35 |
| Rate | 1.540454 | 1.540454 |
| Fixing Date | | |

⊟  **USD Receipt Instructions: Not Present**                                                    c

No Instructions Selected

**Payment Instructions: Not Present**

No Instructions Selected

⊞  **Comments (0)**

⊟  **Audit Trail (3)**

| Time | User | Action Detail |
|------|------|---------------|
| 23 Jun 08 13:51:44 GMT | FXALL | MB: New Message |
| 23 Jun 08 13:52:31 GMT | FXALL | MB: MT300 Received |
| 23 Jun 08 13:52:40 GMT | FXALL | ME: Match |

⊞  **Swift Messaging**

**Exhibit B**



September 29, 2008

**VIA HAND DELIVERY AND**
**VIA FACSIMILE :(212) 526-7672**

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Corporate Advisory Division
Transaction Management Group
745 Seventh Avenue
New York, NY 10019
Attention:    Documentation Manager

## Statement of Calculation

Ladies and Gentlemen:

Reference is made to that certain ISDA Master Agreement dated as of February 21, 2005 (together with the Transactions and Confirmations related thereto (including the Schedule forming a part thereof), collectively, the "ISDA Agreement") between Dow Corning Corporation ("Dow Corning") and Lehman Brothers Special Financing Inc. ("LBSF"). Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the ISDA Agreement. Pursuant to a notice delivered by-hand to you on September 16, 2008, Dow Corning designated September 16, 2008 as an Early Termination Date as a result of the filing by the Credit Support Provider of a case under Chapter 11 of the United States Bankruptcy Code.

This notice is Dow Corning's statement of calculation pursuant to Section 6(d) of the Master Agreement. Set forth on Schedule A hereto is Dow Corning's calculation of the Early Termination Amount, including interest, as of September 29, 2008. Such amount does not include all related reasonable out of pocket fees, costs and expenses, including legal fees, which have been incurred and may continue to be incurred and which may be claimed in accordance with the terms and requirements of the ISDA Agreement.

Also enclosed with this letter are copies of trade documentation supporting the market terms of the replacement positions cited on Schedule A.

We hereby demand payment of the Early Termination Amount in immediately available funds in accordance with the instructions set forth on Schedule B hereto.

Please contact the undersigned at (989) 496-3271 with any questions.

Yours truly,

DOW CORNING CORPORATION

By: _____
Name:  Jan O. Hjalber
Title:  Treasurer

Dow Corning Corporation
Midland, Michigan 48686-0994
Phone: (989) 496-4000
www.dowcorning.com

### SCHEDULE A

### Calculation of Early Termination Amount

Calculation of Early Termination Amount

Value of Early Termination Amount
   at September 29, 2008 (see below)        $ 3,612,935.35

**Terminated Positions**

| Transaction | | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|
| Bank Reference No. | | 8175L2E858401 | 8242L1G081101 | 8242L1G071101 | 11705684 |
| Account | | DCC | DCC | DCC | DCC |
| Trade Date | | 6/23/2008 | 8/29/2008 | 8/29/2008 | 4/21/2008 |
| Value Date | | 10/28/2008 | 9/25/2008 | 9/25/2008 | 10/31/2008 |
| Bought/Call CCY | | USD | USD | USD | USD |
| Bought Amount | A | 37,328,012.29 | 1,894,877.86 | 11,747,296.00 | 14,285,714.29 |
| Sold/Put CCY | | EUR | CAD | EUR | CNY |
| Sold Amount | | 24,231,825.35 | 2,000,000.00 | 8,000,000.00 | 100,000,000.00 |
| Rate | | 1.540454 | 1.055477 | 1.468412 | 7.00 |
| Instrument Type | | Forward | Forward | Forward | Option |

**Replacement Positions**

| Transaction | | 1A | 2A | 3A | 4A |
|---|---|---|---|---|---|
| Counterparty Bank | | WACHOVIA | BTMU | WACHOVIA | CITIBANK |
| Account | | DCC | DCC | DCC | DCC |
| Trade Date | | 9/16/2008 | 9/16/2008 | 9/16/2008 | 9/16/2008 |
| Value Date | | 10/28/2008 | 9/25/2008 | 9/25/2008 | 10/31/2008 |
| Bought/Call CCY | | USD | USD | USD | USD |
| Bought Amount | B | 34,192,922.96 | 1,863,290.38 | 11,304,880.00 | 14,285,714.29 |
| Sold/Put CCY | | EUR | CAD | EUR | CNY |
| Sold Amount | | 24,231,825.35 | 2,000,000.00 | 8,000,000.00 | 100,000,000.00 |
| Rate | | 1.411075 | 1.073370 | 1.413110 | 7.00 |
| Premium | C | NA | NA | NA | 18,400.00 |
| Premium CCY | | NA | NA | NA | USD |
| Instrument Type | | Forward | Forward | Forward | Option |

| | | | | | |
|---|---|---|---|---|---|
| Early Termination Amount | A - B + C | $ 3,135,089.33 | S    31,587.48 | S   442,416.00 | S    18,400.00 |
| Value Date | | 10/28/2008 | 9/25/2008 | 9/25/2008 | 9/16/2008 |
| | | | | | |
| Present Value of Early Termination Amount at Early Termination Date | | $ 3,113,520.64 | S    31,540.79 | S441,762.00 | S    18,400.00 |
| | | | | | |
| Daily interest factor | | 0.016438356% | 0.016438356% | 0.016438356% | 0.016438356% |
| | | | | | |
| Value of Early Termination Amount at September 29, 2008 | | $ 3,120,180.76 | S    31,608.26 | S   442,706.97 | S    18,439.36 |

**Note:** Present value computations are based on a Default Rate equal to the Bloomberg Prime Index plus 1%, which at the Early
Termination Date, and continuing through the date of this Statement of Calculation, was 6.0%.

## SCHEDULE B

### Payment Instructions

Remit payment by wire transfer to the following account:

Citibank, New York
399 Park Avenue
New York, NY 10043
ABA #021000089
Account Name -Dow Corning Corp.
Account Number - 00028839

REPLACEMENT POSITION
TRANSACTION 1A

# Trade Ticket

| Roll Deal ID | 7560361 | | Product | FORWARD |
|---|---|---|---|---|
| Currency Pair | EUR USD (Quoted USD per EUR) | | Executed by | Desauve |
| Provider | WACHOVIA | | Executed on | 16-Sep-2008 16:21:06 GMT |
| Trade Date | 16-Sep-2008 | | | |

**Summary**

| Value Date | Allocations | Amount Side | Side CCY | CCY | Amount Spot | Pts | All-In |
|---|---|---|---|---|---|---|---|
| 26-Oct-2008 | 1 | 24,231,825.35 Buy | Sell EUR | USD | 34,192,922.96  1.413 | -19.25 | 1.411075 |

**Booking Details**

| Value Date | Account | Amount Side | Side CCY | CCY | Amount Spot | Pts | All-In | Other |
|---|---|---|---|---|---|---|---|---|
| 26-Oct-2008 | 882 | 24,231,825.35 Buy | Sell EUR | USD | 34,192,922.96  1.413 | -19.25 | 1.411075 | |

**Provider Prices**

| Bank | Value Date | Bid Spot | Bid Pts | Bid All-In | Ask Spot | Ask Pts | Ask All-In | Difference |
|---|---|---|---|---|---|---|---|---|
| Citi | 26-Oct-2008 | 1.4129 | -21.42 | 1.410755 | - | - | - | $7,682 |
| BS | 26-Oct-2008 | 1.4130 | -20.70 | 1.408930 | - | - | - | $27,745 |
| JPMC | 26-Oct-2008 | 1.4125 | -23.35 | 1.410165 | 1.4125 | -23.35 | 1.410165 | $22,051 |
| AS | 26-Oct-2008 | 1.4129 | -22.35 | 1.410665 | - | - | - | $9,935 |
| WACHOVIA | 26-Oct-2008 | 1.4130 | -19.25 | 1.411075 | 1.4130 | -19.25 | 1.412021 | $0 |
| Roll ID | 26-Oct-2008 | 1.4127 | -18.9721 | 1.410300 | 1.4130 | -15.79 | 1.412021 | $6,664 |

REPLACEMENT POSITION
TRANSACTION 2A

# Trade Ticket

| Xall Deal ID | 73602x8 | | Product | FORWARD |
| Currency Pair | USD.CAD (Quoted CAD per USD) | | Executed by | bosauve |
| Provider | BHNU | | Executed on | 16-Sep-2008 16:18:27 GMT |
| Trade Date | 16-Sep-2008 | | | |

**Summary**

| Value Date | Allocations | Side CCY | Amount Side | CCY | Amount | Spot | Pts | All-In | Other |
|---|---|---|---|---|---|---|---|---|---|
| 15-Sep-2008 | 1 | Sell CAD | 2,000,000.00 Buy | USD | 1,863,290.38 | 1.0735 | -1.3 | 1.07337 | |

**Booking Details**

| Value Date | Account | Side CCY | Amount Side | CCY | Amount | Spot | Pts | All-In |
|---|---|---|---|---|---|---|---|---|
| 15-Sep-2008 | nn | Sell CAD | 2,000,000.00 Buy | USD | 1,863,290.38 | 1.0735 | -1.3 | 1.07337 |

**Provider Prices**

| | | Bid | | | Ask | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Bank | Value Date | Spot | Pts | All-In | Spot | Pts | All-In | Difference | |
| BTMU | 25-Sep-2008 | - | - | - | 1.0735 | -1.30 | 1.073370 | $0 | |
| CITI | 25-Sep-2008 | - | - | - | 1.0735 | -0.61 | 1.073439 | $119 | |
| Bs | 25-Sep-2008 | - | - | - | 1.0736 | 14.21 | 1.075021 | $2,861 | |
| JPMC | 25-Sep-2008 | 1.0737 | -0.66 | 1.073614 | 1.0737 | -0.86 | 1.073614 | $423 | |
| WACHOVIA | 25-Sep-2008 | 1.0726 | -2.29 | 1.072371 | 1.0741 | -1.74 | 1.073926 | $964 | |
| Xall IQ | 25-Sep-2008 | | | | 1.0735 | 0.2747 | 1.073500 | $225 | |

REPLACEMENT POSITION
TRANSACTION 3A

# Trade Ticket

| Deal ID | 7569205 |
| Currency Pair | EUR USD (Quoted USD per EUR) |
| Provider | WACHOVIA |
| Trade Date | 16-Sep-2008 |

| | Product | FORWARD |
| | Executed by | besawe |
| | Executed on | 16-Sep-2008 16:17:58 GMT |

## Summary

| Value Date | Allocations | Side CCY | Amount Side | CCY | Amount Spot | Pts | All-in | Other |
|---|---|---|---|---|---|---|---|---|
| 16-Sep-2008 | | Sell EUR | 8,000,000.00 Buy | USD | 11,304,880.00 1.4129 | 2.1 | 1.41311 | |

## Booking Details

| Value Date | Account | Side CCY | Amount Side | CCY | Amount Spot | Pts | All-in | Other |
|---|---|---|---|---|---|---|---|---|
| 16-Sep-2008 mc | | Sell EUR | 8,000,000.00 Buy | USD | 11,304,880.00 1.4129 | 2.1 | 1.41311 | |

## Provider Prices

| Bank | Value Date | Bid Spot | Bid Pts | Bid All-in | Ask Spot | Ask Pts | Ask All-in | Difference |
|---|---|---|---|---|---|---|---|---|
| BTMU | 25-Sep-2008 | 1.4126 | 1.00 | 1.412700 | - | - | - | $3,280 |
| CITI | 25-Sep-2008 | 1.4129 | 1.50 | 1.413050 | - | - | - | $480 |
| CS | 25-Sep-2008 | 1.4129 | -9.95 | 1.411905 | - | - | - | $9,640 |
| JPMC | 25-Sep-2008 | 1.4127 | -3.50 | 1.412400 | 1.4127 | -3.00 | 1.412400 | $5,680 |
| WACHOVIA | 25-Sep-2008 | 1.4129 | 2.10 | 1.413110 | 1.4133 | 5.10 | 1.413610 | $0 |
| Deal ID | 25-Sep-2008 | 1.4132 | -2.6053 | 1.412900 | - | - | - | $1,680 |

REPLACEMENT POSITION
TRANSACTION 4A

**From:** Trigilio, Carmin [mailto:carmin.trigilio@citi.com]
**Sent:** Thursday, September 18, 2008 11:11 AM
**To:** WISNIEWSKI, PAULETTE L. (PLWISNIE)
**Cc:** Cartwright, Andrew H
**Subject:** DOW CORNING CORPORATION 18Sep08

Hello, please confirm option details with premium value today (18Sep08)

Thanks

### Foreign Exchange Option Confirmation

Ph:  716-730-8032                                              **Your Contacts:**
Fax:  716-898-0606                                            Andrew Cartwright
Email:  FXOptionsBuffalo@Citi.com                   Carmin Trigilio

TRADE 1
**Trade Account** DOW CORNING CORPORATION
NYK DOW CORN

| Option Desc. | Non-Deliverable European Call | | |
|---|---|---|---|
| Reference | 18400 | **Market Cut** | Beijing 9:15AM |
| | | **Premium** | USD 18,400 |
| Trade Date | 16-Sep-08 | **Premium Payment** | Citi Receives |
| Expiry Date | 31-Oct-08 | **Premium Date** | USD |
| Value Date | 04-Nov-08 | | |
| | | **Base Notional** | USD 14,285,714.29 |
| Our Buy/Sell | Sell | **Term Notional** | CNY 100,000,000 |
| C/P on Base | Call | **Strike** | 7 |

Regards,



Carmin Trigilio Jr.
Citi Foreign Exchange
☎ 716-730-7180
✉ carmin.trigilio@citi.com

**Exhibit C**

Case No. 08-13888 (JMP)

Lehman Brothers Special Financing Inc.

Sch G
Executory Contracts and Unexpired Leases
G: Derivative Contracts

| Contract Counterparty | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Contract Description |
|---|---|---|---|---|---|---|---|---|
| DnB NOR Bank ASA | 20, St. Dunstan#apposs Hill | | | London | | EC3R 8HY | United Kingdom | Derivative Master Account Number 092796DNBB |
| DOCHESTER COUNTY SCHOOL DISTRICT NO. 2 (GROWTH) | Dorchester School District Two | 102 Greenwave Blvd. | | Summerville | SC | 29483 | UNITED STATES | Derivative Master Account Number 022706DOCH |
| DOLLAR GENERAL CORP | 100 Mission Ridge | | | Goodlettsville | TN | 37072-2170 | United States | Derivative Master Account Number 070607DOLL |
| DOLOMIT | VIA S. SOFIA 10 | | | MILANO | | 20122 | Italy | Derivative Master Account Number 050907DOLO |
| Dominos Inc | 30 Frank Lloyd Wright Drive | P. O. Box 997 | | ANN ARBOR | MI | 48106-0997 | United States | Derivative Master Account Number 011107DOMI |
| Doris Duke Charitable Foudation | PIMCO | 840 Newport Center Drive | Suite 100 | Newport Beach | CA | 92660 | UNITED STATES | Derivative Master Account Number 0109012626 |
| DORIS DUKE CHARITABLE FOUNDATION (DDCF) | PIMCO | 840 Newport Center Drive | Suite 100 | Newport Beach | CA | 92660 | UNITED STATES | Derivative Master Account Number 0526042616 |
| DORIS DUKE CHARITABLE FOUNDATION (DDCF) | c/o BlackRock Financial Management, Inc. | 40 E. 52nd Street | | New York | NY | 10022 | UNITED STATES | Derivative Master Account Number 101007BL16 |
| DORIS K CHRISTOPHER 1996 TRUST | Western Asset Management Co. | 117 East Colorado Blvd | | Pasadena | CA | 91105 | UNITED STATES | Derivative Master Account Number 121307WES8 |
| Double Black Diamond Offshore LDC | 2100 McKinney Avenue | Suite 1600 | | Dallas | TX | 75201 | United States | Derivative Master Account Number 020507CAR9 |
| Douglas County Housing Authority | 5404 N. 107th Plaza | | | Omaha | NE | 68134 | UNITED STATES | Derivative Master Account Number 110703DOUG |
| Douglasville-Douglas/Brunswick | PO Box 1157 | | | Douglasville | GA | 30133 | United States | Derivative Master Account Number 071994DDB |
| Dow Corning Corporation | 2200 W. Salzburg Road | | | Midland | MI | 48686-0994 | UNITED STATES | Derivative Master Account Number 24830DOWC |
| DOW JONES CDX.NA.HY.3 TRUST 1 DECEMBER 2009 | State Street Bank and Trust | CDO Services Group, Mail Code: EUC108 | 200 Clarendon Street | Boston | MA | 2116 | United States | Derivative Master Account Number 071204CDX1 |
| DOW JONES CDX.NA.HY.3 TRUST 2 DECEMBER 2009 | State Street Bank and Trust | CDO Services Group, Mail Code: EUC108 | 200 Clarendon Street | Boston | MA | 2116 | United States | Derivative Master Account Number 071204CDX2 |

LBSF Schedules 132

**Exhibit D**

### CUSTOMER CLAIM FORM LEHMAN BROTHERS INC. FILING CONFIRMATION

Your customer claim form in the SIPA liquidation of Lehman Brothers Inc. was successfully filed on 1/22/2009 11:11 AM Please print this page as proof of your filing.

| Claim Number |
|---|
| 800001341 |

| First Name | Middle Initial | Last Name |
|---|---|---|
|  |  |  |

| Business Name | Representative Name |
|---|---|
| DOW CORNING CORPORATION | Angela M. Cole |

| Mailing Address |
|---|
| 2200 W. Salzburg Road |

| City | State | Zip Code |
|---|---|---|
| Auburn | MI | 48611 |

**Item 1**

| LBI owes me a credit or cash in the amount of: |
|---|
| 3612935.3500 |

| I owe LBI a debit or cash in the amount of: |
|---|
| 0.0000 |

| Debit balance to be paid: |
|---|
| 0.0000 |

**Item 2**

| LBI owes me securities: |
|---|
| No |

| I owe LBI securities: |
|---|
| No |

**Item 3**

| |
|---|
| claim based on a commodity futures account:<br>No |
| Amount of Claim:<br>$0.00 |
| Basis for Claim: |
| Claim has been estimated: |

## Item 4 - 11

| | |
|---|---|
| 4. Does your claim in any way relate to an entity other than Lehman Brothers Inc. (for example, Lehman Brothers Holdings Inc., or another Lehman subsidiary)?<br><br>The actual counterparty to this claim is Lehman Brothers Special Financing, Inc.; however, Lehman Brothers Holdings Inc. is the guarantor of these obligations. | Yes |
| 5. Has there been any change in your account since September 19, 2008? | No |
| 6. Are you or were you a party to a repurchase or reverse repurchase agreement, director, officer, partner, shareholder, lender to, or capital contributor of LBI? | No |
| 7. Are you related to, or do you have any business venture with, any of the persons specified in "6" above, or any employee or other person associated in any way with LBI? If so, give name(s). | No |
| 8. Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of LBI? | No |
| 9. Is this claim being filed on behalf of a customer of a broker or dealer or bank? If so, provide documentation with respect to each customer on whose behalf you are claiming. | No |
| 10. Have you ever given any discretionary authority to any person to execute securities transactions with or through LBI on your behalf? Give names, addresses and phone numbers. | No |
| 11. Have you or any member of your family ever filed a claim under the Securities Investor Protection Act of 1970? If so, give name of that broker. | No |

## Preparer and Signature Information

| |
|---|
| Full Name: |
| Address (line 1): |
| Address (line 2): |
| City: |

Untitled Page

State/Province:

Country:

Postal Code:

Phone Number:

Email Address:

**H
A
N
D**

**D
E
L
I
V
E
R
Y**

_SM_

**RECEIVED BY:**

_10/22/09_

**DATE**

_1156A_

**TIME**

**United States Bankruptcy Court/Southern District of New York**

Epiq Bankruptcy Solutions, LLC
Attn: Lehman Brothers Holding Claims Processing
757 Third Avenue, 3rd Floor
New York, NY 10017

# PROOF OF CLAIM

| In Re:<br>Lehman Brothers Holdings Inc., et al.<br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held<br>Lehman Bros. Holdings Inc. | Case No. of Debtor<br>08-13555 (JMP) |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)        0000043964

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionaly, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Dow Corning Corporation
2200 W. Salzburg Rd., Mail # C01232
Auburn, MI 48611
Attn: Angela Cole
Tel: 989-496-6267
Email: angela.cole@dowcorning.com

(with a copy to)
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn: Leonard Klingbaum
Attn: Peter Tsao
Tel: 212-446-4800
Email: lklingbaum@kirkland.com

☐ Check box to indicate that this claim amends a previously filed claim.

Court Claim
Number: _____
(if known)

Filed on: _____

Name and address where payment should be sent (if different from above)

Telephone number: _____    Email Address: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1. **Amount of Claim as of Date Case Filed:** $ 3,612,935.35

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☑ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** See attachment and to be completed questionnaire.
(See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** ____N/A____
**3a. Debtor may have scheduled claim as:** ____N/A____
(See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate    ☐ Motor Vehicle    ☐ Other
Describe: _____
Value of Property: $ _____ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$ _____ Basis for perfection: _____
**Amount of Secured Claim:** $ _____    **Amount Unsecured:** $ _____

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**Amount entitled to priority:**

$ _____

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $ _____
(See instruction #6 on reverse side.)

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:
See attachment and to be completed on-line questionnaire.

**FOR COURT USE ONLY**

FILED / RECEIVED
OCT 22 2009
EPIQ BANKRUPTCY SOLUTIONS, LLC

Date:
11/22/09

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

ANGELA M. COLE
Attorney

*Angela M. Cole*

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## DELEGATION OF SIGNATORY AUTHORITY

I, J. Donald Sheets of Dow Corning Corporation (the "Company"), do hereby delegate to Angela M. Cole, a Company Attorney, full authority to sign all creditor bankruptcy-related documents that relate to the Company and all of its subsidiaries on behalf of the Company.

This Delegation of Authority is effective June 30, 2007, and will continue until revoked or the named individual is no longer serving in the designated capacity, whichever comes earlier.

The delegation set forth herein cannot be sub-delegated.

**DOW CORNING CORPORATION**

By: _____

J. Donald Sheets
Vice President, Chief Financial Officer
& Americas Area President

Date: _____

**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LEHMAN BROTHERS | ) | Case No. 08-13555 (JMP) |
| HOLDINGS INC., *et al.*, | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**ATTACHMENT TO PROOF OF CLAIM OF
DOW CORNING CORPORATION AGAINST LEHMAN BROTHERS HOLDINGS INC.**

**A.      General Background**

1.      On or after September 15, 2008 (the "**Petition Date**"), Lehman Brothers Holdings Inc. ("**LBHI**") and certain of its subsidiaries (collectively with LBHI, the "**Debtors**") commenced voluntary cases under title 11 of chapter 11 of the United States Code (the "**Bankruptcy Code**"). Pursuant to the order dated July 2, 2009 (the "**Bar Date Order**"), the Debtors have set September 22, 2009 as the date by which claims against them have to be filed (the "**Bar Date**"). Additionally, the Debtors have set October 22, 2009 as the date by which parties must complete an on-line questionnaire with respect to certain prepetition "Derivative Claims" and "Guarantee Claims," as such terms are defined in the Bar Date Order.

2.      This attachment (this "**Attachment**") is filed by the Dow Corning Corporation (the "**Claimant**"), as a supplement to the Claimant's written proof of claim and the to-be submitted on-line questionnaire (together, the "**Proof of Claim**") against LBHI, a Debtor in these chapter 11 cases.   All statements and assertions made in the Proof of Claim are incorporated herein by reference.

**B.    Basis for Claim**

3.    Claimant and Lehman Brothers Special Financing Inc. ("**LBSF**") are parties to that certain ISDA Master Agreement, dated as of February 21, 2005 (the "**Swap Agreement**"). Pursuant to the Swap Agreement, the parties entered into certain transactions which remained outstanding as of the Petition Date.  The Swap Agreement and the pertinent trade details with respect to the Swap Agreement are annexed as **Exhibit A** hereto.  Pursuant to that certain Guarantee of Lehman Brothers Holdings Inc., annexed as **Exhibit B** hereto, LBHI unconditionally guaranteed the obligations of LBSF arising out of the Swap Agreement.

4.    On September 16, 2008, Claimant sent LBSF a Notice of Default (the "**Notice**") designating September 16, 2008 (the "**Early Termination Date**") as the Early Termination Date (as defined in the Swap Agreement) because an event of default arose under section 5(a)(vii) of the Swap Agreement (the "**Event of Default**"), triggered by LBHI, as Credit Support Provider (as defined in the Swap Agreement) of the Counterparty in the Schedule, filing for bankruptcy protection on September 15, 2008.

5.    Claimant on September 29, 2008, sent LBSF a demand for $3,612,935.35 based on termination of the Swap Agreement and calculated pursuant to the Claimant's rights under the Swap Agreement.  The $3,612,935.35 demand does not include interest, fees and expenses. Based on the foregoing, Claimant asserts an unsecured claim against LBHI, as guarantor of the LBSF obligations, in the total amount of $3,612,935.35.  A statement showing the calculations implemented to determine the value of the terminated Swap agreement is annexed as **Exhibit C** hereto.

6.    Claimant contends this Proof of Claim is timely because (a) this Proof of Claim reflects a scheduled guarantee of LBSF pursuant to Exhibit G on LBHI's filed schedules and statements, attached hereto as **Exhibit D**, (b) the Notice made the Debtors aware of this claim

2

prior to the Bar Date and (c) this Proof of Claim was timely filed in the Lehman Brothers Inc.

SIPA Proceeding (Case No. 08-01420) prior to the Bar Date, a confirmation of which is attached

here to as **Exhibit E**. Moreover, Claimant is promptly filing this Proof of Claim after receiving

notice from the SIPA Proceeding of filing error.

**C.    Reservation of Rights**

7.    Claimant reserves its right to seek any and all interest that it may be entitled to,

including default interest, accrued and accruing, as well as any and all fees, costs, and expenses

that it may seek reimbursement for, including attorneys' fees, advisors' fees and any other

related expenses.

8.    The filing of this Attachment and the Proof of Claim (including any documents or

attachments submitted in connection therewith) do not constitute a concession or admission by

Claimant of liability, of any facts, or as to whether all or a portion of the claims are prepetition or

postpetition in connection with any claim that has been or may be asserted against Claimant or

against the Debtors and their estates.

9.    Claimant has filed this Attachment and Proof of Claim (including any documents

or attachments submitted in connection therewith) under compulsion of the Bar Date Order

entered in the Debtors' chapter 11 cases and to protect Claimant from forfeiture of its claims

against the Debtors by reason of the dates established thereby. Claimant reserves the right to

amend and/or supplement this Attachment and the Proof of Claim at any time, including after the

Bar Date, in any manner, and/or to file additional proofs of claim for any additional claims that

may be based on the same or additional documents or grounds of liability or to assert that such

claims are entitled to rights and priorities afforded under sections 365, 503 or 507 of the

Bankruptcy Code.

10.    The filing of this Attachment and the Proof of Claim are not and shall not be deemed or construed as: (a) a waiver or release of Claimant's rights against any person, entity, or property, or a waiver of the right to compel the Debtors to return property of Claimant currently in the possession of the Debtors; (b) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant; (c) a waiver or release of Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters herein, whether or not the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a consent by Claimant to a jury trial in a Bankruptcy Court or any other court in any proceeding as to any and all matters herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver or release of Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding that may be commenced in this case against or otherwise involving Claimant; or (g) an election of remedies.

11.    All notices regarding this Attachment and the Proof of Claim should be sent to Dow Corning Corporation, 2200 W. Salzburg Road, Mail # C01232, Auburn, Michigan 48611, Attn: Angela Cole, with a copy to (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Leonard Klingbaum, Esq. and Peter Tsao, Esq.

4

**Exhibit A**

(Multicurrency-Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of February 21, 2005

**LEHMAN BROTHERS**         and         **DOW CORNING CORPORATION**
**SPECIAL FINANCING INC.**

have entered and/or anticipate entering into one or more transactions (each a Transaction) that are or will be governed by this Master Agreement, which includes the schedule (the Schedule), and the documents and other confirming evidence (each a Confirmation) exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:

1.    **Interpretation**

(a)    *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)    *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this Agreement), and the parties would not otherwise enter into any Transactions.

2.    **Obligations**

(a)    *General Conditions.*

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

    (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)    promptly notify the other party ("Y") of such requirement;

        (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

    (ii)   *Liability*. If: —

        (1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

        (2)  X does not so deduct or withhold; and

        (3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    **Default Interest; Other Amounts.** Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    **Basic Representations.**

    (i)   *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

    (ii)   *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

    (iii)  *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    (iv)  *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v)   *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

                    **ISDA® 1992**

(b)  *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)  *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)  *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)  *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)  *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)  *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)  any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)  any other documents specified in the Schedule or any Confirmation; and

(iii)  upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)  *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)  *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)  *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)  *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.    **Events of Default and Termination Events**

(a)    *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default*.

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

ISDA® 1992

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i) **Illegality.** Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) **Tax Event.** Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party any additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) **Tax Event Upon Merger.** The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) **Credit Event Upon Merger.** If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v) **Additional Termination Event.** If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) **Event of Default and Illegality.** If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

**ISDA® 1992**

**6.    Early Termination**

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If: —

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    *Calculations.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

9                                    ISDA® 1992

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii) *Termination Events.* If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties.* If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

7.    **Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    **Contractual Currency**

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA® 1992

**9.**   Miscellaneous

(a)   *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)   *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)   *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)   *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)   *Counterparts and Confirmations*.

   (i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

   (ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)   *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)   *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.**   Offices; Multibranch Parties

(a)   If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)   Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)   If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.**   Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

12.   **Notices**

(a)   *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

> (i)   if in writing and delivered in person or by courier, on the date it is delivered;
>
> (ii)   if sent by telex, on the date the recipient's answerback is received;
>
> (iii)   if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);
>
> (iv)   if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or
>
> (v)   if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)   *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

13.   **Governing Law and Jurisdiction**

(a)   *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)   *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

> (i)   submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and
>
> (ii)   waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)   *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)     *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)     in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)     in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)     in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

ISDA® 1992

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS                           DOW CORNING CORPORATION
SPECIAL FINANCING INC.
(Name of Party)                                    (Name of Party)


By: _____          By: _____
Name:                                           Name:   Ron R. Sexton
Title:                                          Title:  Treasurer
Date:        Allyson M. Carine                  Date:   February 21, 2005
             Authorized Signatory

18

(Multicurrency-Cross Border)

SCHEDULE
to the
Master Agreement
dated as of February 21, 2005
between
**LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Party A"),
a corporation organized under the laws of
the State of Delaware
and
**DOW CORNING CORPORATION** ("Party B"),
a corporation organized under the laws of
the State of Michigan

**Part 1: Termination Provisions**

In this Agreement:

(a)      **"Specified Entity"** means:

in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Lehman Brothers Finance S.A. and |
| | Lehman Brothers Commercial Corporation |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

(b)      **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement.

(c)      The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and will apply to Party B.

The following provisions apply:

**"Specified Indebtedness"** will have the meaning specified in Section 14 of this Agreement.

**"Threshold Amount"** means the lesser of (i) USD 75 million and (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in the case of Party A and Holdings (or its equivalent in any other currency), and the lesser of (i) USD 25 million and (ii) three percent (3%) of the Stockholders' Equity of Party B, in the case of Party B (or its equivalent in any other currency).

For purposes hereof, **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)      The **"Credit Event Upon Merger"** provisions of Section 5(b)(iv) will apply to Party A and Party B; provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers Holdings Inc. or the resulting, surviving or transferee entity of Holdings, as the case may be, fails to

19

maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"). In the event of a split rating, the lower rating shall be determinative.

(e)     "Automatic Early Termination" provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)     Payments on Early Termination. For the purpose of Section 6(e) of this Agreement, Loss and the Second Method will apply.

(g)     "Termination Currency" means United States Dollars ("USD").

(h)     Additional Termination Events will not apply.


Part 2: Tax Representations

(a)     Payer Tax Representations.  For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction(s) of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position.

(b)     Payee Tax Representations.  For the purpose of Section 3(f) of this Agreement, Party A represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware and Party B represents that it is a corporation duly organized and validly existing under the laws of the State of Michigan.

(c)     Tax Representations in Confirmations.  For purposes of Sections 2(d)(i)(4) and 3(f), any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

20

**Part 3: Agreement to Deliver Documents**

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)    Party A and Party B will deliver forms and/or documents described in Section 4(a)(iii) of this Agreement upon reasonable demand by the other party.

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Incumbency certificate or other evidence reasonably satisfactory to the other party of the authority and genuine signature of the individual signing the Agreement and any Credit Support Document on behalf of such party to execute the same. | Upon execution of this Agreement. | Yes |
| Party A and Party B | Evidence reasonably satisfactory to the other party of the authority of such party and its Credit Support Provider to enter into the Agreement, any Credit Support Document and each Transaction entered into hereunder. | Upon execution of this Agreement. | Yes |
| Party A and Party B | A copy of the annual report (in the case of Party A, of its Credit Support Provider) containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | Upon request. | Yes |
| Party A and Party B | For its most recent fiscal quarter, a copy of the unaudited financial statements of (in the case of Party A, its Credit Support Provider), prepared in accordance with generally accepted accounting principles consistently applied. | Upon request. | Yes |
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of this Schedule. | Upon execution of this Agreement. | No |

**Part 4: Miscellaneous**

(a)     Addresses for Notices. For the purpose of <u>Section 12(a)</u> of this Agreement:

| Address for notices or communications to **Party A:** | |
|---|---|
| Address: | Lehman Brothers Special Financing Inc.<br>c/o Lehman Brothers Inc.<br>Transaction Management Group<br>Corporate Advisory Division<br>745 Seventh Avenue<br>New York, NY 10019 |
| Attention: | Documentation Manager |
| Telephone No.: | (212) 526-7187 |
| Facsimile No.: | (212) 526-7672 |
| | For all purposes. |

| Address for notices or communications to **Party B:** | |
|---|---|
| Address: | Dow Corning Corporation<br>2200 W. Salzburg Road<br>Midland, Michigan  48686-0994 |
| Attention: | General Counsel |
| Telephone No.: | 989-496-5020 |
| Facsimile No.: | 989-496-8307 |
| | For all purposes. |

(b)     Process Agent. For the purpose of <u>Section 13(c)</u> of this Agreement:

| Party A appoints as its Process Agent: | Not applicable. |
|---|---|
| Party B appoints as its Process Agent: | CT Corporation System<br>1633 Broadway<br>New York, New York 10019. |

(c)     **Offices.** The provisions of <u>Section 10(a)</u> will apply to this Agreement.

(d)     **Multibranch Party.** For the purpose of <u>Section 10(c)</u> of this Agreement:

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e)     **Calculation Agent.** The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(f)     **Credit Support Document.** Details of any Credit Support Document, each of which is incorporated by reference in, constitutes part of, and is in connection with, this Agreement and each Confirmation (unless provided otherwise in a Confirmation) as if set forth in full in this Agreement or such Confirmation:

In the case of **Party A:**  Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.

In the case of Party B:  Not applicable.

(g)    **Credit Support Provider.**

| Credit Support Provider means in relation to Party A: | Lehman Brothers Holdings Inc. |
|---|---|

| Credit Support Provider means in relation to Party B: | Not applicable. |
|---|---|

(h)    **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(i)    **Netting of Payments.** Subparagraph (ii) of Section 2(c) of this Agreement will not apply to any Transactions.

(j)    "**Affiliate**" will have the meaning specified in Section 14 of this Agreement, provided, however, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

(k)    **Jurisdiction.** Section 13(b) is hereby amended by: (i) deleting in the second line of subparagraph (i) thereof the word "non-"; and (ii) deleting the final paragraph thereof.

**Part 5: Other Provisions**

(a)    **Representations.**  Section 3 of this Agreement is hereby amended by adding the following additional subsections:

(g)    *No Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of the Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(h)    *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(i)    *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

(j)    *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

(k)    *Eligible Contract Participant.* It is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act.

(b)    **Set-off.** Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

(f)    *Set-off.*

(i)    In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default, Credit Event Upon Merger, or an Additional Termination Event and the designation of an Early Termination Date pursuant to Section 6 of the Agreement

23

with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation).

(ii)    For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date.

(iii)   If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained.

(iv)    This clause (f) shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement.

(c)     **Transfer.** Notwithstanding anything to the contrary in Section 7 of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be otherwise identical to the guarantee then in effect of the obligations of the transferor.

(d)     **Notices.** For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(e)     **Service of Process.** The penultimate sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(f)     **Outstanding Specified Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(g)     **Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(h)     **Accuracy of Specified Information.** Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

(j)     **Escrow Payments.** If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in

24

the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5:00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(k)    **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

(l)    **Amend and Restate Prior Agreement.** This Agreement supersedes and replaces the International Foreign Exchange Master Agreement dated as of January 17, 1997, and amended as of December 10, 1998 between Party A and Party B.

(m)    **Representations.** The words "in any material contract" are inserted into Section 3(a)(iii) after the word "restriction" and before the word "binding."

**Part 6: Additional Terms for FX Transactions and Currency Options**

(a)    **Incorporation and Amendment of 1998 FX and Currency Option Definitions**

   (i)    Incorporation of 1998 FX and Currency Option Definitions. The 1998 FX and Currency Option Definitions, as amended from time to time (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation.

   (ii)    Amendment of 1998 FX and Currency Option Definitions. The following amendments are made to the 1998 Definitions:

   Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):

   **Currency Obligation.** "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(b)    **Confirmations.** Any confirmation (whether provided by mail, facsimile or other electronic means) in respect of any FX Transaction or Currency Option Transaction into which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement, even where not so specified in such confirmation; and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as expressly modified therein.

(c)    **Netting and Related Provisions.** Section 2(c) shall not apply to FX Transactions or Currency Option Transactions. In lieu thereof, the following shall apply:

   (i)    Netting, Discharge and Termination of FX Transactions. The following provisions shall apply to FX Transactions:

   Unless otherwise agreed by the parties, whenever an FX Transaction is entered into between the parties which creates a Currency Obligation in the same currency and for the same Settlement

25

Date as an existing Currency Obligation between the parties, such Currency Obligations shall automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation under which the party having the obligation to deliver the greater aggregate amount of currency shall be obligated to deliver the excess of such greater aggregate currency amount over such lesser aggregate currency amount. Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement.

(ii)     **Netting, Discharge and Termination with Respect to Currency Option Transactions.** The following provisions shall apply to Currency Option Transactions:

Unless otherwise agreed by the parties, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, having the same identical terms, written by the other party; and, upon the occurrence of such termination or discharge, neither party shall have any further obligation to the other party in respect of the parts so terminated and discharged (except for the obligation of either party to pay any Premium due, but not paid, thereunder); and the remaining portion of any Currency Option Transaction, which is partially discharged and terminated, shall continue to be a Currency Option Transaction under this Agreement.

(d)     **Inconsistencies.** In the event of any conflict between:

(i)     the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this Agreement shall supersede;

(ii)     the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states that it shall so prevail and has been signed by both parties, its terms shall supersede the terms of this Agreement;

(iii)     the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction Confirmation and this Agreement, the terms of the Confirmation shall supersede.

(e)     **Definitions.** Section 14 is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

|  |  |
|---|---|
| **LEHMAN BROTHERS SPECIAL FINANCING INC.** | **DOW CORNING CORPORATION** |
| *(Name of Party)* | *(Name of Party)* |
| By: | By: |
| Name: | Name:  Ron R. Sexton |
| Title: | Title:  Treasurer |
| Date:  **Allyson M. Carine Authorized Signatory** | Date:  February 21, 2005 |

EXHIBIT A to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and DOW CORNING CORPORATION ("Party B") have entered into a Master Agreement dated as of [date], as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, 399 Park Avenue, 11th Floor, New York, NY 10022 USA (Facsimile No.

(212) 526-0339) with a copy to Lehman Brothers Special Financing Inc., c/o Lehman Brothers Inc., Corporate Advisory Division, Attention: Transaction Management Group, 745 Seventh Avenue, New York, NY 10019 USA.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name:

Title:

Date:

2

# LEHMAN BROTHERS

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and DOW CORNING CORPORATION ("Party B") have entered into a Master Agreement dated as of February 21, 2005, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)     Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)     Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)     Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)     This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)     Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)     Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

# LEHMAN BROTHERS

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, 399 Park Avenue, 11th Floor, New York, NY 10022 USA (Facsimile No. (212) 526-0339) with a copy to Lehman Brothers Special Financing Inc., c/o Lehman Brothers Inc., Corporate Advisory Division, Attention: Transaction Management Group, 745 Seventh Avenue, New York, NY 10019 USA.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name:    **Oliver Budde**

Title:    **Vice President**

## CERTIFICATE OF INCUMBENCY

I, Anna Walters, a duly elected, qualified and acting Assistant Secretary of Lehman Brothers Special Financing Inc., a Delaware corporation (the "Corporation"), do hereby certify that the persons listed below are authorized and empowered in the name and on behalf of the Corporation as Authorized Signatories and that the signature appearing opposite their name is the specimen signature of such persons:

**NAME:**                                    **SIGNATURE:**

Zdenka Griswold

Allyson Carine

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of this Corporation this 10th day of ___April___, 2002.

SEAL

LEHMAN BROTHERS SPECIAL FINANCING INC.

Name: Anna Walters
Title: Assistant Secretary

## CERTIFICATE OF INCUMBENCY

I, Cindy S. Gregoire, a duly elected, qualified and acting Assistant Secretary of Lehman Brothers Special Financing Inc., a Delaware corporation (the "Corporation"), do hereby certify that the person listed below holds the office in the Corporation indicated opposite his name on the date hereof and that the signature appearing opposite his name is the genuine signature of such person:

| NAME: | OFFICE: | SIGNATURE: |
|-------|---------|------------|
| Oliver Budde | Assistant Secretary | |

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 23rd day of September, 2002.

[SEAL]                    LEHMAN BROTHERS SPECIAL FINANCING INC.


                          Cindy S. Gregoire
                          Assistant Secretary

## SECRETARY'S CERTIFICATE

The undersigned, an Assistant Secretary of Lehman Brothers Special Financing Inc., a Delaware corporation (the "Corporation"), does hereby certify that attached hereto as Exhibit A is a true, correct and complete excerpt of resolutions duly adopted by the Board of Directors of the Corporation, which resolutions are in effect as of the date hereof.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of October 2004.

SEAL

LEHMAN BROTHERS SPECIAL
FINANCING INC

By: _____
Aaron Guth
Assistant Secretary

**Exhibit A**

FURTHER RESOLVED, that this Corporation (a) be and hereby is authorized to enter into: rate swap transactions; swap option transactions; basis swap transactions; credit default transactions; forward rate transactions; commodity swap transactions; commodity option transactions; commodity spot and forward transactions; total return and reverse total return swap transactions; equity or equity index swap transactions; index options and index swap transactions; interest rate option transactions; foreign exchange transactions; non-deliverable forward transactions; interest rate cap, floor, corridor and collar transactions; currency swap transactions; cross-currency swap transactions; currency spot and forward transactions; interest rate spread-lock transactions; interest rate-lock transactions; float forward transactions; currency option transactions; credit protection transactions; credit spread transactions; debt service deposit transactions; debt service reserve fund transactions; weather derivatives transactions; energy derivatives transactions; forward purchase or sale of a commodity or currency; any other similar transactions (including options with respect to any of these transactions) howsoever designated; and any combination of these transactions (each a "Transaction" and, collectively, "Transactions"), and (b) may enter into Transactions on terms satisfactory to the President, and Managing Director, any Senior Vice President, any Vice President or the Treasurer of this Corporation, and such other acts and things as may be advisable or necessary to carry out and effect the full intent and purpose of this resolution; and

FURTHER RESOLVED, that each of the President, any Managing Director, any Senior Vice President, any Vice President and the Treasurer of this Corporation be and hereby is authorized to execute, in the name of and on behalf of the Corporation, any form of document or agreement with respect to any Transactions and to do such other acts and things as may be advisable or necessary to carry out and perform, on the part of this Corporation, any such agreement, or in order to carry out and effect the full intent and purpose of this resolution; and

FURTHER RESOLVED, that any and all prior actions taken, and any and all Transactions entered into, on behalf of this Corporation by the President, any Managing Director, any Senior Vice President, any Vice President or the Treasurer of this Corporation, prior to the date of this resolution be and hereby are ratified; and

FURTHER RESOLVED, that any one of the President, any Managing Director and the Treasurer (each such officer, an "Authorized Officer") shall have the authority to designate and/or terminate the designation of those individuals who can, in the name of and on behalf of the Corporation, enter into Transactions or execute, any form of document or agreement, in connection therewith; and

FURTHER RESOLVED, that the Corporation hereby adopts any form of resolution which an Authorized Officer shall approve as necessary, appropriate or desirable in order to carry out the purpose and intent of the preceding resolution and directs that the Secretary or an Assistant Secretary file a copy of each form of resolution so approved in the appropriate Minute Book of the Corporation.

| Form **W-9**<br>(Rev. January 2003)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer**<br>**Identification Number and Certification** | Give form to the requester. Do not send to the IRS. |

**Name**
Dow Corning Corporation

Business name, if different from above

Check appropriate box: ☐ Individual/ Sole proprietor  ☑ Corporation  ☐ Partnership  ☐ Other ▶ .................   ☑ Exempt from backup withholding

Address (number, street, and apt. or suite no.)
**Tax Department CO1112; P.O. Box 994**

Requester's name and address (optional)

City, state, and ZIP code
**Midland, MI 48686-0994**

List account number(s) here (optional)

*Print or type — See Specific Instructions on page 2.*

## Part I  Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. For individuals, this is your social security number (SSN). **However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3.** For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note:** *If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.*

Social security number

or

Employer identification number

## Part II  Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), **and**

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, **and**

3. I am a U.S. person (including a U.S. resident alien).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

Sign Here   Signature of U.S. person ▶ *[signature]*   Date ▶ 4/5/05

## Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

**U.S. person.** Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

**Note:** *If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.*

**Foreign person.** If you are a foreign person, use the appropriate Form W-8 (see Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the recipient has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

Cat. No. 10231X    Form **W-9** (Rev. 1-2003)

## DOW CORNING CORPORATION
### CERTIFIED COPY OF RESOLUTION

The undersigned, Paul A. Marcela, Assistant Secretary of Dow Corning Corporation, a corporation organized and existing under the laws of the State of Michigan, U.S.A. (the "Company"), does hereby certify that the Board of Directors of the Company unanimously approved and adopted the following resolution, effective as of March 4, 2004, which is now in full force and effect:

> RESOLVED, that the Chairman of the Board, the President, the Chief Executive Officer, the Vice President, Planning and Finance & Chief Financial Officer, the Treasurer, and the Secretary, acting singly, in strict compliance with the Financial Risk Management Policy of the Corporation (the "FRMP"), are hereby authorized on behalf of the Corporation and its wholly and partially-owned subsidiaries, to (a) use interest rate futures, options, swaps, and other interest-related financial instruments for the purpose of mitigating the effects of adverse movements in interest rates on corporate earnings or cash flow, (b) enter into energy commodity financial instruments for the purpose of protecting the value of anticipated future cash outflows and (c) use foreign exchange forward contracts, currency options and swaps, and other currency-related financial instruments for the purposes of (i) preserving the value of assets; (ii) protecting the value of anticipated future income, cash inflows and cash outflows; and (iii) exchanging one currency for another; and

> FURTHER RESOLVED, that the Audit Committee of the Board of Directors shall review and approve the FRMP, and any changes thereto, prior to implementation of the FRMP, which addresses authority to enter into transactions; authorization limits, the purpose of risk management; qualification criteria for transactions, counter-parties and financial instruments; and the objectives and frequency of the Finance Committee's review and approval process; and

> FURTHER RESOLVED, that the Finance Committee shall review and approve the strategy underlying the transactions to be entered into pursuant to these resolutions and shall conduct annual reviews of plans, positions and performance relative to such transactions; and

> FURTHER RESOLVED, that said Officers are hereby authorized to take all actions necessary to accomplish these resolutions, including delegations of authority.

> FURTHER RESOLVED, that such authority shall extend through March 31, 2005.

IN WITNESS WHEREOF, the undersigned has subscribed his signature and the seal of the Company on this 23rd day of February, 2005.

Paul A. Marcela
Assistant Secretary



September 16, 2008

**VIA HAND DELIVERY AND**
**VIA FACSIMILE :(212) 526-7672**

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Corporate Advisory Division
Transaction Management Group
745 Seventh Avenue
New York, NY 10019
Attention:    Documentation Manager

Ladies and Gentlemen:

Dow Corning Corporation ("Dow Corning") and Lehman Brothers Special Financing Inc. ("LBSF") are parties to an ISDA Master Agreement dated as of February 21, 2005 (together with the Transactions and Confirmations related thereto (including the Transactions referred to on Schedule A hereto), and the Schedule forming a part thereof, collectively, the "ISDA Agreement"). Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the ISDA Agreement.

One or more Events of Default have occurred and are continuing under the Master Agreement including under Section 5(a)(vii) and Section 5(a)(iii) of the Master Agreement as a result of the filing by the Credit Support Provider of a case under Chapter 11 of the United States Bankruptcy Code.

Dow Corning hereby designates September 16, 2008 as an Early Termination Date in respect of all Transactions outstanding under the ISDA Agreement.

Please contact the undersigned at (989) 496-3271 with any questions.

Yours truly,

DOW CORNING CORPORATION

By: _____
Name: Jan O. Hjalber
Title: Treasurer

Dow Corning Corporation
Midland, Michigan 48686-0994

Phone: (989) 496-4000
www.dowcorning.com

## SCHEDULE A – TRANSACTIONS

| Transaction | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Bank Reference No. | 8175L2E858401 | 8242L1G081101 | 8242L1G071101 | 11705664 |
| Account | DCC | DCC | DCC | DCC |
| Trade Date | 6/23/2008 | 8/29/2008 | 9/29/2008 | 4/21/2008 |
| Value Date | 10/28/2008 | 9/25/2008 | 9/25/2008 | 10/31/2008 |
| Bought/Call CCY | USD | USD | USD | USD |
| Bought Amount | 37,328,012.29 | 1,894,877.86 | 11,747,296.00 | 14,285,714.29 |
| Sold/Put CCY | EUR | CAD | EUR | CNY |
| Sold Amount | 24,231,825.35 | 2,000,000.00 | 8,000,000.00 | 100,000,000.00 |
| Rate | 1.540454 | 1.055477 | 1.468412 | 7.00 |
| Instrument Type | Forward | Forward | Forward | Option |



# Trade Ticket

| FXall Deal ID | 7500361 | | Product | FORWARD |
|---|---|---|---|---|
| Currency Pair | EUR/USD (Quoted USD per EUR) | | Executed by | besauve |
| Provider | WACHOVIA | | Executed on | 16-Sep-2008 16:21:06 GMT |
| Trade Date | 16-Sep-2008 | | | |

**Summary**

| Value Date | Allocations | Side CCY | Amount Side | CCY | Amount Spot | Pts | All-in |
|---|---|---|---|---|---|---|---|
| 28-Oct-2008 | 1 | Sell EUR | 24,231,825.35 Buy | USD | 34,192,922.96 1.413 | -19.25 | 1.411075 |

**Booking Details**

| Value Date | Account | Side CCY | Amount Side | CCY | Amount Spot | Pts | All-in |
|---|---|---|---|---|---|---|---|
| 28-Oct-2008 | dcc | Sell EUR | 24,231,825.35 Buy | USD | 34,192,922.96 1.413 | -19.25 | 1.411075 |

**Provider Prices**

| Bank | Value Date | Bid | | | Ask | | | Difference |
|---|---|---|---|---|---|---|---|---|
| | | Spot | Pts | All-in | Spot | Pts | All-in | |
| CITI | 28-Oct-2008 | 1.4129 | -21.42 | 1.410758 | - | - | - | $7,682 |
| GS | 28-Oct-2008 | 1.4130 | -30.70 | 1.409930 | - | - | - | $27,745 |
| JPMC | 28-Oct-2008 | 1.4125 | -23.35 | 1.410165 | 1.4125 | -23.35 | 1.410165 | $22,051 |
| MS | 28-Oct-2008 | 1.4129 | -22.35 | 1.410665 | - | - | - | $9,935 |
| WACHOVIA | 28-Oct-2008 | 1.4130 | -19.25 | 1.411075 | 1.4136 | -15.79 | 1.412021 | $0 |
| FXall IQ | 28-Oct-2008 | 1.4127 | +18.9721 | 1.410800 | - | - | | $6,664 |

## Trade Ticket



FXall Deal ID: 7560305
Currency Pair: EUR.USD (Quoted USD per EUR)
Provider: WACHOVIA
Trade Date: 16-Sep-2008

Product: FORWARD
Executed by: besauve
Executed on: 16-Sep-2008 16:17:58 GMT

### Summary

| Value Date | Allocations | Side CCY | Amount Side | CCY | Amount Spot | Pts | All-in |
|---|---|---|---|---|---|---|---|
| 25-Sep-2008 | 1 | Sell EUR | 8,000,000.00 Buy | USD | 11,304,880.00  1.4129 | 2.1 | 1.41311 |

### Booking Details

| Value Date | Account | Side CCY | Amount Side | CCY | Amount Spot | Pts | All-in |
|---|---|---|---|---|---|---|---|
| 25-Sep-2008 | dcc | Sell EUR | 8,000,000.00 Buy | USD | 11,304,880.00  1.4129 | 2.1 | 1.41311 |

### Provider Prices

| Bank | Value Date | Bid Spot | Bid Pts | Bid All-in | Ask Spot | Ask Pts | Ask All-in | Difference | Other |
|---|---|---|---|---|---|---|---|---|---|
| BTMU | 25-Sep-2008 | 1.4128 | 1.00 | 1.412700 | . | . | . | $3,280 | |
| CITI | 25-Sep-2008 | 1.4129 | 1.50 | 1.413050 | . | . | . | $480 | |
| GS | 25-Sep-2008 | 1.4129 | -9.95 | 1.411905 | . | . | . | $9,640 | |
| JPMC | 25-Sep-2008 | 1.4127 | -3.00 | 1.412400 | 1.4127 | -3.00 | 1.412400 | $5,680 | |
| WACHOVIA | 25-Sep-2008 | 1.4129 | 2.10 | 1.413110 | 1.4133 | 5.10 | 1.413810 | $0 | |
| FXall IQ | 25-Sep-2008 | 1.4132 | -2.6053 | 1.412900 | | | | $1,680 | |



# Trade Ticket

| FXall Deal ID | 7500288 | | Product | FORWARD |
| Currency Pair | USD.CAD (Quoted CAD per USD) | | Executed by | besauve |
| Provider | BTMU | | Executed on | 16-Sep-2008 16:16:27 GMT |
| Trade Date | 16-Sep-2008 | | | |

**Summary**

| Value Date | Allocations | Side CCY | Amount Side | CCY | Amount | Spot | Pts | All-in | Other |
|---|---|---|---|---|---|---|---|---|---|
| 25-Sep-2008 | 1 | Sell CAD | 2,000,000.00 Buy | USD | 1,863,290.38 | 1.0735 | -1.3 | 1.07337 | |

**Booking Details**

| Value Date | Account | Side CCY | Amount Side | CCY | Amount | Spot | Pts | All-in |
|---|---|---|---|---|---|---|---|---|
| 25-Sep-2008 | doc | Sell CAD | 2,000,000.00 Buy | USD | 1,863,290.38 | 1.0735 | -1.3 | 1.07337 |

**Provider Prices**

| Bank | Value Date | Bid | | | Ask | | | Difference |
|---|---|---|---|---|---|---|---|---|
| | | Spot | Pts | All-in | Spot | Pts | All-in | |
| BTMU | 25-Sep-2008 | - | - | - | 1.0735 | -1.30 | 1.073370 | $0 |
| CITI | 25-Sep-2008 | - | - | - | 1.0735 | -0.61 | 1.073439 | $119 |
| GS | 25-Sep-2008 | - | - | - | 1.0736 | 14.21 | 1.075021 | $2,861 |
| JPMC | 25-Sep-2008 | 1.0737 | -0.86 | 1.073614 | 1.0737 | -0.86 | 1.073614 | $423 |
| WACHOVIA | 25-Sep-2008 | 1.0726 | -2.29 | 1.072371 | 1.0741 | -1.74 | 1.073926 | $964 |
| FXall IO | 25-Sep-2008 | | | | 1.0735 | 0.2747 | 1.073500 | $225 |

**SAUVE, BRAD E. (BESAUVE)**

| | |
|---|---|
| **From:** | Blankinship, Jon [jon.blankinship@citi.com] |
| **Sent:** | Tuesday, September 16, 2008 12:52 PM |
| **To:** | SAUVE, BRAD E. (BESAUVE) |
| **Subject:** | RE: CNY PUT OPTION PRICE NEEDED |

Brad - using a spot ref 6.8400, I see the premium as USD 18,400.

Please call if you would like to trade,
Jon

--------------------------------------
Jon Blankinship | Vice President, Global Corporate Sales | Foreign Exchange | Citigroup | 212 723 6768 | TF 800.345
6364

This e-mail message is Market Commentary. Please see the following disclaimer URL.
https://www.citigroupgcib.com/data/documents/MarketCommentaryDisclaimer.pdf

**From:** brad.sauve@dowcorning.com [mailto:brad.sauve@dowcorning.com]
**Sent:** Tuesday, September 16, 2008 12:13 PM
**To:** Blankinship, Jon [CMB-FICC]
**Subject:** CNY PUT OPTION PRICE NEEDED

Jon,

Can you tell me what the option premium is for Dow Corning to buy a CNY put struck at 7.00 on 100 million
CNY for expiration October 31, 2008?

Brad E. Sauve
Corporate Treasury Department
Dow Corning Corporation
PO Box 994, CO-1116
2200 W. Salzburg Rd.
Midland, MI  48686-0994
Phone: (989) 496-1863
Fax: (989) 496-8379
E-mail: brad.sauve@dowcorning.com

**SAUVE, BRAD E. (BESAUVE)**

| | |
|---|---|
| **From:** | Mellinger, Paula [Paula.Mellinger@gs.com] |
| **Sent:** | Tuesday, September 16, 2008 12:23 PM |
| **To:** | SAUVE, BRAD E. (BESAUVE) |
| **Subject:** | RE: CNY PUT OPTION PRICE NEEDED |

Hi again Brad,

So I'm using a a spot reference of 6.8460 and an ATMF of 6.8470, and a vol of 6.50%. This gives me a USD premium of $29,000.

**From:** brad.sauve@dowcorning.com [mailto:brad.sauve@dowcorning.com]
**Sent:** Tuesday, September 16, 2008 12:12 PM
**To:** Mellinger, Paula
**Subject:** CNY PUT OPTION PRICE NEEDED

Paula,

Can you tell me what the option premium is for Dow Corning to buy a CNY put struck at 7.00 on 100 million CNY for expiration October 31, 2008?

Brad E. Sauve
Corporate Treasury Department
Dow Corning Corporation
PO Box 994, CO-1116
2200 W. Salzburg Rd.
Midland, MI 48686-0994
Phone: (989) 496-1863
Fax: (989) 496-8379
E-mail: brad.sauve@dowcorning.com

## SAUVE, BRAD E. (BESAUVE)

**From:** librada.z.killian@jpmorgan.com
**Sent:** Tuesday, September 16, 2008 12:34 PM
**To:** SAUVE, BRAD E. (BESAUVE)
**Subject:** Re: Need Price for CNY PUT OPTION

Hi Brad,

The Usd Call/Cny Put to Oct 31st would cost you $20,000
spot reference 6.85

let me know how we look

Librada Zamora Killian
Executive Director
Foreign Exchange & Interest Rate Derivatives
JPMorgan Chase Bank, N.A.
librada.z.killian@jpmorgan.com
800-621-1144
312-732-2030

<brad.sauve@dowcorning.com>                    To  <librada.z.killian@jpmorgan.com>

09/16/2008 11:10 AM                            cc
                                               Subject  Need Price for CNY PUT OPTION

Librada,

Can you tell me what the option premium is for Dow Corning to buy a CNY put struck at 7.00 on 100 million
CNY for expiration October 31, 2008?

Brad E. Sauve
Corporate Treasury Department
Dow Corning Corporation
PO Box 994, CO-1116
2200 W. Salzburg Rd.
Midland, MI 48686-0994
Phone: (989) 496-1863
Fax: (989) 496-8379
E-mail: brad.sauve@dowcorning.com

9/16/2008

**SAUVE, BRAD E. (BESAUVE)**

**From:**    Smock, David [david.smock@wachovia.com]
**Sent:**    Tuesday, September 16, 2008 12:29 PM
**To:**    SAUVE, BRAD E. (BESAUVE); Butler, Glenn
**Subject:** RE: CNY PUT OPTION PRICE NEEDED

Brad,

The option premium is $36,500

**From:** brad.sauve@dowcorning.com [mailto:brad.sauve@dowcorning.com]
**Sent:** Tuesday, September 16, 2008 12:13 PM
**To:** Butler, Glenn
**Cc:** Smock, David
**Subject:** CNY PUT OPTION PRICE NEEDED

Glenn,

Can you tell me what the option premium is for Dow Corning to buy a CNY put struck at 7.00 on 100 million CNY for expiration October 31, 2008?

Brad E. Sauve
Corporate Treasury Department
Dow Corning Corporation
PO Box 994, CO-1116
2200 W. Salzburg Rd.
Midland, MI  48686-0994
Phone:  (989) 496-1863
Fax: (989) 496-8379
E-mail: brad.sauve@dowcorning.com

Deal Details - Settlement Center                                      Page 1 of 1



Matched

dowcorning Buys USD 37,328,012.29 vs. EUR 24,231,825.35 with INC@LEHN

| Field | dowcorning | INC@LEHN |
|---|---|---|
| Source | FXall | MT300 |
| FXall Ref. | 6628658_1_0_0 | |
| Reference | 6628658100 | 8175L2E858401 |
| **Economics** | | |
| Account | dcc | dcc |
| Trade Date | 23-Jun-2008 | 23-Jun-2008 |
| Value Date | 28-Oct-2008 | 28-Oct-2008 |
| Bought CCY | USD | USD |
| Bought Amount | 37,328,012.29 | 37,328,012.29 |
| Sold CCY | EUR | EUR |
| Sold Amount | 24,231,825.35 | 24,231,825.35 |
| Rate | 1.540454 | 1.540454 |
| Fixing Date | | |

⊟  **USD Receipt Instructions: Not Present**                                      c

No Instructions Selected

**Payment Instructions: Not Present**

No Instructions Selected

⊞  **Comments (0)**

⊟  **Audit Trail (3)**

| Time | User | Action Detail |
|---|---|---|
| 23 Jun 08 13:51:44 GMT | FXALL | MB: New Message |
| 23 Jun 08 13:52:31 GMT | FXALL | MB: MT300 Received |
| 23 Jun 08 13:52:40 GMT | FXALL | ME: Match |

⊞  **Swift Messaging**

**Exhibit B**

EXHIBIT A to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and DOW CORNING CORPORATION ("Party B") have entered into a Master Agreement dated as of [date], as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, 399 Park Avenue, 11th Floor, New York, NY 10022 USA (Facsimile No.

(212) 526-0339) with a copy to Lehman Brothers Special Financing Inc., c/o Lehman Brothers Inc., Corporate Advisory Division, Attention: Transaction Management Group, 745 Seventh Avenue, New York, NY 10019 USA.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name:

Title:

Date:

2

# LEHMAN BROTHERS

### GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and DOW CORNING CORPORATION ("Party B") have entered into a Master Agreement dated as of February 21, 2005, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

# LEHMAN BROTHERS

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, 399 Park Avenue, 11th Floor, New York, NY 10022 USA (Facsimile No. (212) 526-0339) with a copy to Lehman Brothers Special Financing Inc., c/o Lehman Brothers Inc., Corporate Advisory Division, Attention: Transaction Management Group, 745 Seventh Avenue, New York, NY 10019 USA.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name:    **Oliver Budde**

Title:    **Vice President**

**Exhibit C**



September 29, 2008

**VIA HAND DELIVERY AND**
**VIA FACSIMILE :(212) 526-7672**

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Corporate Advisory Division
Transaction Management Group
745 Seventh Avenue
New York, NY 10019
Attention:    Documentation Manager

**Statement of Calculation**

Ladies and Gentlemen:

Reference is made to that certain ISDA Master Agreement dated as of February 21, 2005 (together with the Transactions and Confirmations related thereto (including the Schedule forming a part thereof), collectively, the "ISDA Agreement") between Dow Corning Corporation ("Dow Corning") and Lehman Brothers Special Financing Inc. ("LBSF"). Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the ISDA Agreement. Pursuant to a notice delivered by-hand to you on September 16, 2008, Dow Corning designated September 16, 2008 as an Early Termination Date as a result of the filing by the Credit Support Provider of a case under Chapter 11 of the United States Bankruptcy Code.

This notice is Dow Corning's statement of calculation pursuant to Section 6(d) of the Master Agreement. Set forth on Schedule A hereto is Dow Corning's calculation of the Early Termination Amount, including interest, as of September 29, 2008. Such amount does not include all related reasonable out of pocket fees, costs and expenses, including legal fees, which have been incurred and may continue to be incurred and which may be claimed in accordance with the terms and requirements of the ISDA Agreement.

Also enclosed with this letter are copies of trade documentation supporting the market terms of the replacement positions cited on Schedule A.

We hereby demand payment of the Early Termination Amount in immediately available funds in accordance with the instructions set forth on Schedule B hereto.

Please contact the undersigned at (989) 496-3271 with any questions.

Yours truly,

DOW CORNING CORPORATION

By: _____
Name: Jan O. Hjalber
Title: Treasurer

Dow Corning Corporation
Midland, Michigan 48686-0994

Phone: (989) 496-4000

www.dowcorning.com

## SCHEDULE A

## Calculation of Early Termination Amount

Calculation of Early Termination Amount

Value of Early Termination Amount
  at September 29, 2008 (see below)          $ 3,612,935.35

| Terminated Positions | | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|
| Transaction | | | | | |
| Bank Reference No. | | 8175L2E858401 | 8242L1G081101 | 8242L1G071101 | 11705664 |
| Account | | DCC | DCC | DCC | DCC |
| Trade Date | | 6/23/2008 | 8/29/2008 | 8/29/2008 | 4/21/2008 |
| Value Date | | 10/28/2008 | 9/25/2008 | 9/25/2008 | 10/31/2008 |
| Bought/Call CCY | | USD | USD | USD | USD |
| Bought Amount | A | 37,328,012.29 | 1,894,877.86 | 11,747,296.00 | 14,285,714.29 |
| Sold/Put CCY | | EUR | CAD | EUR | CNY |
| Sold Amount | | 24,231,825.35 | 2,000,000.00 | 8,000,000.00 | 100,000,000.00 |
| Rate | | 1.540454 | 1.055477 | 1.468412 | 7.00 |
| Instrument Type | | Forward | Forward | Forward | Option |

| Replacement Positions | | 1A | 2A | 3A | 4A |
|---|---|---|---|---|---|
| Transaction | | | | | |
| Counterparty Bank | | WACHOVIA | BTMU | WACHOVIA | CITIBANK |
| Account | | DCC | DCC | DCC | DCC |
| Trade Date | | 9/16/2008 | 9/16/2008 | 9/16/2008 | 9/16/2008 |
| Value Date | | 10/28/2008 | 9/25/2008 | 9/25/2008 | 10/31/2008 |
| Bought/Call CCY | | USD | USD | USD | USD |
| Bought Amount | B | 34,192,922.96 | 1,863,290.38 | 11,304,880.00 | 14,285,714.29 |
| Sold/Put CCY | | EUR | CAD | EUR | CNY |
| Sold Amount | | 24,231,825.35 | 2,000,000.00 | 8,000,000.00 | 100,000,000.00 |
| Rate | | 1.411075 | 1.073370 | 1.413110 | 7.00 |
| Premium | C | NA | NA | NA | 18,400.00 |
| Premium CCY | | NA | NA | NA | USD |
| Instrument Type | | Forward | Forward | Forward | Option |

| | | | | | |
|---|---|---|---|---|---|
| Early Termination Amount | A - B + C | $ 3,135,089.33 | $   31,587.48 | $   442,416.00 | $   18,400.00 |
| Value Date | | 10/28/2008 | 9/25/2008 | 9/25/2008 | 9/16/2008 |
| | | | | | |
| Present Value of Early Termination | | | | | |
|   Amount at Early Termination Date | | $ 3,113,520.64 | $   31,540.79 | $441,762.00 | $   18,400.00 |
| | | | | | |
| Daily interest factor | | 0.016438356% | 0.016438356% | 0.016438356% | 0.016438356% |
| | | | | | |
| Value of Early Termination Amount | | | | | |
|   at September 29, 2008 | | $ 3,120,180.76 | $   31,608.26 | $   442,706.97 | $   18,439.36 |

**Note:** Present value computations are based on a Default Rate equal to the Bloomberg Prime Index plus 1%, which at the Early
  Termination Date, and continuing through the date of this Statement of Calculation, was 6.0%.

2

## SCHEDULE B

## Payment Instructions

Remit payment by wire transfer to the following account:

Citibank, New York
399 Park Avenue
New York, NY 10043
ABA #021000089
Account Name -Dow Corning Corp.
Account Number - 00028839



# Trade Ticket

REPLACEMENT POSITION
TRANSACTION 1A

| Xall Deal ID | 7560361 |
|---|---|
| Currency Pair | EUR USD (Quoted USD per EUR) |
| Provider | WACHOVIA |
| Trade Date | 16-Sep-2008 |

| Product | FORWARD |
|---|---|
| Executed by | bessone |
| Executed on | 16-Sep-2008 16:21:06 GMT |

**Summary**

| Value Date | Allocations | Side | CCY | Amount | Side | CCY | Amount | Spot | Pts | All-In |
|---|---|---|---|---|---|---|---|---|---|---|
| 16-Oct-2008 | 1 | Sell | EUR | 24,231,825.35 | Buy | USD | 34,192,922.96 | 1.413 | -19.25 | 1.411075 |

**Booking Details**

| Value Date | Account | Side | CCY | Amount | Side | CCY | Amount | Spot | Pts | All-In |
|---|---|---|---|---|---|---|---|---|---|---|
| 16-Oct-2008 | acc | Sell | EUR | 24,231,825.35 | Buy | USD | 34,192,922.96 | 1.413 | -19.25 | 1.411075 |

**Provider Prices**

| Bank | Value Date | Bid Spot | Bid Pts | Bid All-In | Ask Spot | Ask Pts | Ask All-In | Difference |
|---|---|---|---|---|---|---|---|---|
| CITI | 28-Oct-2008 | 1.4129 | -21.42 | 1.410758 | | | | $7,682 |
| IS | 28-Oct-2008 | 1.4130 | -30.76 | 1.409830 | | | | $27,745 |
| PMC | 28-Oct-2008 | 1.4125 | -23.35 | 1.410165 | 1.4125 | -23.35 | 1.410265 | $22,051 |
| IS | 28-Oct-2008 | 1.4129 | -22.35 | 1.410665 | | | | $9,935 |
| WACHOVIA | 28-Oct-2008 | 1.4130 | -19.25 | 1.411075 | 1.4136 | -15.79 | 1.412021 | $0 |
| Xall IG | 28-Oct-2008 | 1.4127 | -18.9721 | 1.410800 | | | | $6,664 |

# Trade Ticket

REPLACEMENT POSITION
TRANSACTION 2A

**FXall Deal ID** 2590298
**Currency Pair** USD.CAD (Market CAD per USD)
**Provider** BTMU
**Trade Date** 16-Sep-2008

**Product** FORWARD
**Executed by** bresuave
**Executed on** 16-Sep-2008 16:16:27 GMT

## Summary

| Value Date | Allocations | Side CCY | Amount Side | CCY | Amount | Spot | Pts | All-in | Other |
|---|---|---|---|---|---|---|---|---|---|
| 25-Sep-2008 | 1 | Sell CAD | 2,000,000.00 Buy | USD | 1,863,290.38 | 1.0735 | -1.3 | 1.07337 | |

## Booking Details

| Value Date | Account | Side CCY | Amount Side | CCY | Amount | Spot | Pts | All-in |
|---|---|---|---|---|---|---|---|---|
| 25-Sep-2008 | mz | Sell CAD | 2,000,000.00 Buy | USD | 1,863,290.38 | 1.0735 | -1.3 | 1.07337 |

## Provider Prices

| Bank | Value Date | Bid Spot | Bid Pts | Bid All-in | Ask Spot | Ask Pts | Ask All-in | Difference |
|---|---|---|---|---|---|---|---|---|
| BTMU | 25-Sep-2008 | - | - | - | 1.0735 | -1.30 | 1.073370 | $0 |
| CITI | 25-Sep-2008 | - | - | - | 1.0735 | -0.61 | 1.073439 | $119 |
| BS | 25-Sep-2008 | - | - | - | 1.0736 | 14.21 | 1.075021 | $2,861 |
| JPMC | 25-Sep-2008 | 1.0737 | -0.86 | 1.073614 | 1.0737 | -0.86 | 1.073614 | $423 |
| WACHOVIA | 25-Sep-2008 | 1.0726 | -2.26 | 1.072371 | 1.0741 | -1.74 | 1.073926 | $964 |
| RBC IQ | 25-Sep-2008 | | | | 1.0735 | 0.2747 | 1.073500 | $225 |

## Trade Ticket

REPLACEMENT POSITION
TRANSACTION 3A

| XCall Deal ID | 7590305 | | Product | FORWARD |
| Currency Pair | EUR USD (Quoted USD per EUR) | | Executed by | behave |
| Provider | WACHOVIA | | Executed on | 16-Sep-2008 16:17:56 GMT |
| Trade Date | 16-Sep-2008 | | | |

**Summary**

| Value Date | Allocations | Side CCY | Amount Side | CCY | Amount Spot | Pts | All-in |
|---|---|---|---|---|---|---|---|
| 25-Sep-2008 | : | Sell EUR | 8,000,000.00 Buy | USD | 11,304,880.00 1.4129 | 2.1 | 1.41311 |

**Booking Details**

| Value Date | Account | Side CCY | Amount Side | CCY | Amount Spot | Pts | All-in |
|---|---|---|---|---|---|---|---|
| 25-Sep-2008 dtc | | Sell EUR | 8,000,000.00 Buy | USD | 11,304,880.00 1.4129 | 2.1 | 1.41311 |

**Provider Prices**

| Bank | Value Date | Bid Spot | Bid Pts | Bid All-in | Ask Spot | Ask Pts | Ask All-in | Difference |
|---|---|---|---|---|---|---|---|---|
| ITAU | 25-Sep-2008 | 1.4126 | 1.00 | 1.412700 | - | - | - | $3,280 |
| CITI | 25-Sep-2008 | 1.4129 | 1.50 | 1.413050 | - | - | - | $480 |
| CS | 25-Sep-2008 | 1.4129 | -9.95 | 1.411905 | - | - | - | $9,640 |
| JPMC | 25-Sep-2008 | 1.4127 | -3.00 | 1.412400 | 1.4127 | -3.00 | 1.412400 | $5,680 |
| WACHOVIA | 25-Sep-2008 | 1.4129 | 2.10 | 1.413110 | 1.4133 | 5.10 | 1.413610 | $0 |
| Rabb IQ | 25-Sep-2008 | 1.4132 | -2.6053 | 1.412590 | | | | $1,680 |

Note N/A - Provider not available

REPLACEMENT POSITION
TRANSACTION 4A

**From:** Trigilio, Carmin [mailto:carmin.trigilio@citi.com]
**Sent:** Thursday, September 18, 2008 11:11 AM
**To:** WISNIEWSKI, PAULETTE L. (PLWISNIE)
**Cc:** Cartwright, Andrew H
**Subject:** DOW CORNING CORPORATION 18Sep08

Hello, please confirm option details with premium value today (18Sep08)

Thanks

### Foreign Exchange Option Confirmation

Ph: 716-730-8032                          Your Contacts:
Fax: 716-898-0606                         Andrew Cartwright
Email: FXOptionsBuffalo@Citi.com          Carmin Trigilio

TRADE 1
Trade Account  DOW CORNING CORPORATION
               NYK DOW CORN

| Option Desc. | Non-Deliverable European Call | | |
|---|---|---|---|
| Reference | 18400 | Market Cut | Beijing 9:15AM |
| | | Premium | USD 18,400 |
| Trade Date | 16-Sep-08 | Premium Payment | Citi Receives |
| Expiry Date | 31-Oct-08 | Premium Date | USD |
| Value Date | 04-Nov-08 | | |
| | | Base Notional | USD 14,285,714.29 |
| Our Buy/Sell | Sell | Term Notional | CNY 100,000,000 |
| C/P on Base | Call | Strike | 7 |

Regards,



Carmin Trigilio Jr.
Citi Foreign Exchange
☎ 716-730-7180
✉ carmin.trigilio@citi.com

**<u>Exhibit D</u>**

Case No. 08-13555 (JMP)

Lehman Brothers Holdings Inc.

Sch G
Executory Contracts and Unexpired Leases
G: Corporate Guarantee

| Contract Counterparty | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Contract Description |
|---|---|---|---|---|---|---|---|---|
| Lehman Brothers Holdings Plc | Registered: 25 Bank Street | | | London | | E14 5LE | UNITED KINDOM | Blanket Corporate Guarantee by Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., dated 6/9/05 |
| Lehman Brothers International (Europe) | 25 Bank Street | | | London | | E14 5LE | UNITED KINDOM | Blanket Corporate Guarantee by Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., dated 6/9/05 |
| Lehman Brothers Japan Inc. | 6-10-1 Roppongi Minato-ku | | | Tokyo | | | JAPAN | Blanket Corporate Guarantee by Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., dated 6/9/05 |
| Lehman Brothers OTC Derivatives Inc. | c/o Corporation Service Company | 2711 Centerville Rd., Ste. 400 | | Wilmington | DE | 19808 | UNITED STATES | Blanket Corporate Guarantee by Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., dated 6/9/05 |
| Lehman Brothers PTE Ltd. | 5 Temasek Boulevard # 11-01 | Suntec Tower Five | | Singapore | | 38985 | SINGAPORE | Blanket Corporate Guarantee |
| Lehman Brothers Securities Asia Limited | 25/F-26/F; Unite 2706-2714 of 27/F | Two International Finance Tower; 8 Finance Street | | Central Hong Kong | | | CHINA | Blanket Corporate Guarantee by Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., dated 6/9/05 |
| Lehman Brothers Securities N.V. | E-Commercepark, E-Zone Vredehber | | | Curaçao | | | NETHERLANDS ANTILLES | Blanket Corporate Guarantee by Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., dated 6/9/05 |
| Lehman Brothers Special Financing Inc. | c/o Corporation Service Company | 2711 Centerville Rd., Ste. 400 | | Wilmington | DE | 19808 | UNITED STATES | Blanket Corporate Guarantee by Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., dated 6/9/05 |
| Lehman Brothers Treasury Co. B.V. | Atrium Strawinskylkan 3105 | | | Amsterdam | | 1077 ZX | NETHERLANDS | Blanket Corporate Guarantee by Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., dated 6/9/05 |
| Lehman Re Ltd. | CUMBERLAND HOUSE 1 VICTORIA ST | | | HAMILTON | | HM11 | BERMUDA | Blanket Corporate Guarantee by Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., dated 6/9/05 |

Page 2 of 2

LBHI Schedules 423

**Exhibit E**

Untitled Page

## CUSTOMER CLAIM FORM LEHMAN BROTHERS INC. FILING CONFIRMATION

Your customer claim form in the SIPA liquidation of Lehman Brothers Inc. was successfully filed on 1/22/2009 11:11 AM Please print this page as proof of your filing.

| Claim Number |
|---|
| 800001341 |

| First Name | Middle Initial | Last Name |
|---|---|---|
| | | |

| Business Name | Representative Name |
|---|---|
| DOW CORNING CORPORATION | Angela M. Cole |

| Mailing Address |
|---|
| 2200 W. Salzburg Road |

| City | State | Zip Code |
|---|---|---|
| Auburn | MI | 48611 |

### Item 1

| LBI owes me a credit or cash in the amount of: |
|---|
| 3612935.3500 |

| I owe LBI a debit or cash in the amount of: |
|---|
| 0.0000 |

| Debit balance to be paid: |
|---|
| 0.0000 |

### Item 2

| LBI owes me securities: |
|---|
| No |

| I owe LBI securities: |
|---|
| No |

### Item 3

| claim based on a commodity futures account: |
| No |

| Amount of Claim: |
| $0.00 |

| Basis for Claim: |

| Claim has been estimated: |

### Item 4 - 11

| | |
|---|---|
| 4. Does your claim in any way relate to an entity other than Lehman Brothers Inc. (for example, Lehman Brothers Holdings Inc., or another Lehman subsidiary)?<br><br>The actual counterparty to this claim is Lehman Brothers Special Financing, Inc.; however, Lehman Brothers Holdings, Inc. is the guarantor of these obligations. | Yes |
| 5. Has there been any change in your account since September 19, 2008? | No |
| 6. Are you or were you a party to a repurchase or reverse repurchase agreement, director, officer, partner, shareholder, lender to, or capital contributor of LBI? | No |
| 7. Are you related to, or do you have any business venture with, any of the persons specified in "6" above, or any employee or other person associated in any way with LBI? If so, give name(s). | No |
| 8. Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of LBI? | No |
| 9. Is this claim being filed on behalf of a customer of a broker or dealer or bank? If so, provide documentation with respect to each customer on whose behalf you are claiming. | No |
| 10. Have you ever given any discretionary authority to any person to execute securities transactions with or through LBI on your behalf? Give names, addresses and phone numbers. | No |
| 11. Have you or any member of your family ever filed a claim under the Securities Investor Protection Act of 1970? If so, give name of that broker. | No |

### Preparer and Signature Information

| Full Name: |

| Address (line 1): |

| Address (line 2): |

| City: |

Untitled Page

| State/Province: |
| Country: |
| Postal Code: |
| Phone Number: |
| Email Address: |

H
A
N
D

D
E
L
I
V
E
R
Y

_SY_____
**RECEIVED BY:**

_10/22/09_____
**DATE**

_1156A_____
**TIME**

## CLAIM FORM FILING CONFIRMATION

**Your claim form was successfully filed on 10/22/2009 at 10:23 AM Central. Please print this page as proof of your filing.**

**DOW CORNING CORPORATION**
**2200 W. SALZBURG ROAD**
**MIDLAND, MI 48686-0994**

| | |
|---|---|
| Name of Debtor | Lehman Brothers Special Financing Inc. (08-13888) |
| Please identify the counterparties, guarantor and/or credit support provider to the derivative contract. | Counterparties are Lehman Brothers Special Financing Inc. and Dow Corning Corporation; Guarantor of Lehman Brothers Special Financing Inc. is Lehman Brothers Holdings Inc. |
| Have you entered into a termination agreement with the Debtors establishing the agreed upon amounts due in respect of derivative contracts? | Selected: No |
| Have the derivative contracts matured or been terminated? | Selected: Yes |

| Item | Amount due to Debtor | Amount due from Debtor |
|---|---|---|
| Transaction Valuations | $0.00 | $3,612,935.35 |
| Unpaid Amounts | $0.00 | $0.00 |
| Collateral | $0.00 | $0.00 |
| Interest | $0.00 | $0.00 |
| Other costs | $0.00 | $0.00 |
| **DERIVATIVE CLAIM AMOUNT** | | $3,612,935.35 |

Provide the derivative claim amount by supplying each line item included in the calculation thereof.

Documentation of Transactions: Please provide copies of all master agreements and schedules thereto, netting agreements, credit support agreements, guarantees (other than confirmations) evidencing the transactions, in each case that relate to the claim.

| Documents |
|---|
| Dow Corning - ISDA Agreement.pdf |

Termination Notice: Please provide a copy of the termination notice, including evidence supporting delivery date of the termination notice.

| Documents |
|---|
| Dow Corning - LBSF Termination Notice.pdf |
| Dow Corning - LBSF Termination Notice - Hand Delivery Receipt.pdf |

Valuation Statement: Please provide a copy of the valuation statement. Please identify any collateral that has been posted by any party in connection with the transactions and any claims of set-off against other transactions reflected in the claim.

| Documents |
|---|
| Dow Corning - LBSF Statement of Calculation.pdf |

Individual Trade Level Detail: Please provide with respect to each transaction (i) the valuation date (to the extent not included in your valuation statement) and value and (ii) details for the purpose of identifying and reconciling each transaction (e.g. including, as applicable, trade id, electronic trade reference id, trade type, product, trade date, reference obligation or reference entity, factor and original contract notional amount, quantity/unit of measure, currency, price or strike price, buy/sell, call or put, cap or floor, effective date, and maturity date. (For the avoidance of doubt, you are not required to submit each and every one of the foregoing)). Please provide this information in Microsoft Excel format.

| Documents |
|---|
| Terminated Positions.xls |

ISDA Master Agreements Specifying Market Quotation Methodology: If not already provided in the valuation statement, provide the date and identity of and quotations received from Reference Market-makers or other persons (i.e. name of institution) concerning the transactions.

Selected: No

ISDA Master Agreements Specifying Loss Methodology: To the extent applicable, if not already provided in the valuation statement, provide the date and identity of and quotations received from Reference Market-makers or other persons (i.e. name of institution) concerning the transactions.

Selected: Yes

ISDA Master Agreements Specifying Close-Out Amount Methodology: To the extent applicable, if not already provided in the valuation statement, provide the date and identity of and quotations received from Reference Market-makers or other persons (i.e. name of institution) concerning the transactions.

Selected: No

ISDA Master Agreements Specifying Any Other Methodology: To the extent applicable, if not already provided in the valuation statement, provide the date and identity of and quotations received from Reference Market-makers or other persons (i.e. name of institution) concerning the transactions.

Selected: Yes
ISDA Agreement also refers to 'Second' Methodology in addition to "Loss" Methodology.

Non-ISDA Master Agreements: To the extent applicable, if not already provided in the valuation statement, provide the date and identity of and quotations received from Reference Market-makers or other

Selected: No

persons (i.e. name of institution) concerning the transactions.

Replacement Transactions: If you replaced a terminated transaction
with a transaction with the same economic terms as the terminated
transaction, provide documentation evidencing such replacement
transaction and the quotation(s) used, including specifying any cash      Selected: No
(or other consideration) paid or received by or to any person to
replace the transactions, the name of each entity that effectuated a
replacement and when any such transactions were effected.

## CLAIM FORM FILING CONFIRMATION

**Your claim form was successfully filed on 10/22/2009 at 10:26 AM Central. Please print this page as proof of your filing.**

**DOW CORNING CORPORATION**
**2200 W. SALZBURG ROAD**
**MIDLAND, MI 48686-0994**

Name of Debtor, or other entity, against which you have a direct claim (the "Obligor")

Lehman Brothers Special Financing Inc. (08-13888)

List the agreement(s) under which your claim arises against the Obligor and, unless you have uploaded information in compliance with question 4a of the Derivative Questionnaire, provide documentation evidencing your claim and supporting the calculation of the claim amount.

| Documents |
|---|
| Dow Corning - ISDA Agreement.pdf |

List the agreement(s) under which your claim arises against the Obligor and, unless you have uploaded information in compliance with question 4a of the Derivative Questionnaire, provide documentation evidencing your claim and supporting the calculation of the claim amount.

Also completed Derivative Questionnaire for this claim.

| Documents |
|---|
| Dow Corning - ISDA Agreement.pdf |

Amount of claim against Obligor

$3,612,935.35

Name of Debtor that guarantees the payment/obligations of the Obligor against which you have a direct claim (the "Guarantor"):

Lehman Brothers Holdings Inc. (08-13555)

Please upload the specific promise, representation and/or agreement(s) (including any corporate resolutions) under which your claim arises against the Guarantor and describe the obligations/performance that is guaranteed. If you do not have possession of such document, please upload a written explanation of such guarantee in reasonable detail. You do not need to comply with this question if you have uploaded information in compliance with question 4a of the Derivative Questionnaire.

| Documents |
|---|
| Dow Corning - LBHI Guarantee.pdf |

Please upload the specific promise, representation and/or agreement(s) (including any corporate resolutions) under which your claim arises against the Guarantor and describe the obligations/performance that is guaranteed. If you do not have possession of such document, please upload a written explanation of such guarantee in reasonable detail. You do not need to comply with this question if you have uploaded information in compliance with question 4a of the Derivative Questionnaire.

Also completed Derivative Questionnaire for direct claim.

| Documents |
|---|
| Dow Corning - LBHI Guarantee.pdf |

Amount of claim against the Guarantor

$3,612,935.35