STAGG, TERENZI, CONFUSIONE & WABNIK, LLP    HEARING DATE: 08/23/12
401 Franklin Avenue Suite 300    TIME: 10:00 A.M.
Garden City, New York 11530
(516)812-4500
Ronald M. Terenzi Esq. (RMT-6416)
Cara M. Goldstein, Esq. (CMG-3517)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
In re:

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

    Case No. 08-13555 (JMP)

    Debtors.
----------------------------------------------------------X

# LAUREL COVE DEVELOPMENT, LLC'S RESPONSE TO LEHMAN BROTHERS HOLDINGS INC'S OBJECTION TO CLAIM NO. 17763

Laurel Cove Development, LLC ("Laurel Cove"), by its attorneys, Stagg, Terenzi, Confusione & Wabnik, LLC, submits the instant response to Lehman Brothers Holding Inc.'s ("LBHI" or the "Plan Administrator") objection (the "Objection") to Claim No. 17763 filed by Laurel Cove and in support thereof respectfully sets forth as follows:

1.    Pursuant to the Objection, LBHI seeks to disallow and expunge the proof of claim filed by Laurel Cove designated as Claim No. 17763, on the basis that LBHI does not have any liability for the claims asserted by Laurel Cove since LBHI sold all of its rights and interests in the Construction Loan which provide the basis for Laurel Cove's Claim. As set forth below, Laurel Cove vehemently disputes the theory of LBHI's Objection to its Claim.

2.    Laurel Cove entered into a Construction Loan Agreement with LBHI and no other entity. The mere fact that LBHI may have sold its rights and interests in the Construction Loan to

1

a third party does not alter the fact that LBHI, and not some third party with which Laurel Cove has no privity, remains liable to Laurel Cove for any damages in connection with its breach of the Construction Loan Agreement. Accordingly, Laurel Cove requests that this Court deny LBHI's Objection to Claim and allow the Laurel Cove Claim in its entirety.

## BACKGROUND

3. On or about May 15, 2007, Laurel Cove and LBHI entered into a certain Construction Loan Agreement ("Loan Agreement"), a copy of which is attached as Exhibit "A" to LBHI's Objection, whereby LBHI agreed to provide Laurel Cove with funding in an amount up to, but not to exceed, $121,500,000.00 for the construction of a project consisting of single family residential subdivision with up to 820 residential units, an 18-hole golf course designed by Greg Norman, with associated clubhouse, a swimming pool/spa facility, a tennis/coffee shop, and a sales center in College Grove, Williamson County, Tennessee (the "Project").

4. The Loan Agreement provides, among other things, that LBHI shall provide the funding by way of periodic advances. An initial advance of $34,280,308.09 was to be made upon the closing of the Loan Agreement, with subsequent advances to be made upon written request by Laurel Cove, which Laurel Cove could not request more than once per month and which had to be a minimum amount of $100,000.00. The funds were to be used only for Project costs as set forth in the Project Budget attached to the Loan Agreement.

5. In addition, the Loan Agreement provided for the granting of a security interest in the Project and its assets to LBHI.

6. LBHI made the initial advance upon the closing of the Loan Agreement and, subsequent thereto, made an additional 15 advances through August 2008.

7. On September 15, 2008 (the "Filing Date") LBHI and certain of its subsidiaries filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court bearing case no.: 08-13555. By order dated September 17, 2008, this Court directed the joint administration of the cases.

8. From May 2007 through the Filing Date advances were made under the Loan Agreement and construction advanced. As of the Filing Date, the principal balance under the Loan Agreement was approximately $86,543,730.00. At that time, Laurel Cove was in full compliance with all of its obligations under the Agreement.

9. Laurel Cove submitted the funding requests in September for work completed in August on September 13, 2008 and submitted the funding request in October for work completed in September. All draw requests were submitted in exactly the same form as the prior 15 draw requests that had been funded and approved without a problem through August 2008. Laurel Cove also prepared a draw request for November 2008 in the exact form as it did for the prior requests, but it was advised by LBHI not to submit it while a determination was being made regarding continued funding of the project by LBHI. However, LBHI failed to provide funding for those requests in violation of the Loan Agreement. In fact, LBHI failed to fund any advances to Laurel Cove after the Filing Date, even though the LBHI was still obligated under the Loan Agreement to provide approximately $34 million in additional construction advances. Contrary to the assertions made in LBHI's Objection, LBHI did not notify Laurel Cove of any defects in these requests for advances.

10. Phase I of the Project was to be completed by August 2009 and construction was on schedule to meet that deadline. However, with the funds to complete the Project having been withheld by LBHI in violation of the Loan Agreement, work on the Project soon ceased and the

3

condition of the Project was rapidly deteriorating.

11. As a direct result of LBHI's failure to advance funds in accordance with the Loan Agreement, work on the Project was brought to a virtually complete halt due to Laurel Cove's inability to pay its contractors, vendors and related professionals, whom are currently owed approximately $12 million and some of whom have had liens placed on the Project. Furthermore, the cessation of work on the Project resulted in the loss and/or withdrawal of commitments to purchase residential lots, as well as deposits for golf club memberships, at a cost to Laurel Cove of tens of millions of dollars.

12. Moreover, the withholding of funding by LBHI resulted in Laurel Cove being unable to continue to maintain the property. As a result many of the improvements made at the Project fell into disrepair and actually deteriorated causing erosion and requiring mitigation measures to avoid substantial penalties from State and local authorities.

13. Due to the lack of funding by LBHI, the Project also began to be cited by the local municipalities for failure to maintain the property, including the lake, as well as accruing interest and penalties for failure to pay local taxes, all to the detriment and damage of Laurel Cove.

14. Phase I of this Project was on schedule, had substantial sales already under contract, and was to actually be completed by August of 2009. Instead, as a direct result of LBHI's breach of the Loan Agreement, the Project stalled, the pre-completion contracts were withdrawn by the builders and purchasers, the property was deteriorating, Laurel Cove was being fined by the local municipalities and was accruing interest and penalties on unpaid bills including local taxes.

15. In an effort to prevent the Project from becoming a complete failure, Laurel Cove searched for and in fact found, an alternate lending source willing to finance the Project to completion. As expected the new lender required that LBHI subordinate its lien to that of the new

lender. Despite repeated efforts to discuss same with LBHI, neither LBHI nor its representatives would cooperate with Laurel Cove in order to secure this new funding. Part of the feedback Lurel Cove received from LBHI was that it was unclear, or not fully documented, exactly who held the loan as between LBHI and Lehman Re Ltd ("Lehman Re").

16. Despite LBHI's failure to fund any advances in violation of the Loan Agreement, which was the direct cause of Laurel Cove having no monies with which to pay its contractors, vendors and related professionals, ironically it was LBHI, who on or about June 2, 2009, sent Laurel Cove a default letter (the "Default Letter") stating that Laurel Cove had "failed to prosecute construction of the Project with good faith and diligence in compliance with the Construction Schedule so that each portion of the work will be substantially completed . . . by the Required Completion Date."

17. Laurel Cove was therefore cast into the *Kafka* like scenario of being declared in default by its lender for failing to pay its bills which was in turn the direct result of the failure of the same lender to fund under the Loan Agreement. The fact is that LBHI committed the first material breach of the Loan Agreement thereby excusing Laurel Cove of further performance.

18. In response thereto, on or about June 9, 2009, Laurel Cove filed a motion for an order (i) directing LBI to assume or reject the Loan Agreement; and (ii) granting related relief (the "Assume or Reject Motion") in the LBHI bankruptcy proceeding.

19. Pursuant to the Assume or Reject Motion, Laurel Cove requested that LBHI be directed to forthwith elect to either assume the Loan Agreement, in which case it would be required to cure its defaults thereunder by providing Laurel Cove with the funds it had thus far failed to advance, or reject the Agreement, agree to subordinate it's lien on the Project to a new lender so that Laurel Cove could finally obtain the remainder of the financing it so desperately needed to

5

complete the Project and recognize that Laurel Cove would have a claim for damages incurred by the breach of the Loan Agreement.

20. The Assume or Reject Motion was adjourned from time to time in the hopes that the parties could reach some type of consensual resolution of these issues.

21. However, unbeknownst to Laurel Cove, in August 2009, LBHI filed a motion for approval of settlement with Lehman Re Ltd. (the "Settlement Motion") which among other things, sought Court approval of LBHI's assignment of numerous agreements with third parties, including the Loan Agreement, to Lehman Re, effective as of September 17, 2008 (2 days after the Filing Date), without any discussion or requirement that these agreements first be assumed and any defaults cured and without requiring notice to the other parties in interest, i.e., the parties to these assigned contracts. The Settlement Motion was approved by an order of this Court on August 27, 2009 (the "Settlement Order"). Notwithstanding numerous attempts to reach out to LBHI's counsel regarding the parameters of the Settlement Order and LBHI's ability to bypass Section 365(d)(2) of the Bankruptcy Code, no comprehensive response was received.

22. Laurel Cove had previously reached out to Lehman Re in an effort to negotiate a resolution. Lehman Re did in fact provide some minimal funding necessary to prevent a total collapse of the Project through Protective Advances. The parties did have some discussion over the summer of 2009 about a buyout of Lehman Re's position. The price offered by Lehman Re was acceptable to Laurel Cove but while the terms were being discussed, Lehman Re took the position that because of action by the Bankruptcy Court they were stayed from any further discussions with Laurel Cove and there was a question about who currently had authority to act on the Loan Agreement between LBHI and Lehman Re. This of course occurred prior to the Settlement Order which decided who owned the Loan Agreement.

6

23. After the issuance of the Settlement Order, it appears that Lehman Re made some type of surreptitious deal with Laurel Cove's contractors who had placed mechanic's liens on the Project. As part of the deal with the contractors, the property was scheduled for an imminent sale through foreclosure by Lehman Re who then took the position that it held the mortgage pursuant to the assignment by LBHI as granted by the Settlement Order issued by this Court. This despite the fact that the Laurel Cove has not been involved or noticed with respect to the assumption, assignment, or the negotiations with its contractors.

24. On January 15, 2010, Laurel Cove moved by order to show cause for an order (i) staying the Successor Trustee's sale of the Property, and (ii) either invalidating LBHI's assignment of the Property or compelling compliance with Section 362(d)(2) of the Bankruptcy Code. Laurel Cove argued that given that the foreclosure sale of the Property was scheduled in Tennessee for Friday, January 22, 2010, if the sale is allowed to proceed, Laurel Cove will suffer irreparable harm in that it will lose title to the Property and the value of its investment in the Project without having the opportunity to first have the violation of its rights adjudicated by the Court. Moreover, Laurel Cove argued that since these matters are inextricably intertwined with the proceedings ongoing in the Bankruptcy Court and the application of the Bankruptcy Code this matter must therefore be decided in this Court and not the Tennessee State Court. Lehman Re filed opposition to the order to show cause. On January 20, 2010 a hearing on the order to show cause was held before this Court at which time the Court denied the relief requested by Laurel Cove finding that there was no basis for seeking such extraordinary relief on an emergency basis and that the Tennessee court is the best place to resolve any disputes relating to the property.

25. On September 18, 2009, Laurel Cove filed a proof of claim against LBHI in the amount of $150,000,000 which was designated a Claim No. 17763 (the "Laurel Cove Claim"). A

7

copy of the Laurel Cove Claim is attached hereto as Exhibit "A".

## LAUREL COVE HAS A VALID CLAIM AGAINST LBHI

26. Pursuant to Section 12.33 of the Construction Loan Agreement, the construction, validity and performance of the Loan Agreement shall be governed by and construed in accordance with the laws of the State of New York. It is well established in New York that a party to a contract is not released from liability under the contract simply by the assignment of the contract. *see* *Worldcom, Inc. v. Prepay USA Telecom, Corp.,* 294 A.D.2d 157, 158 (2nd Dept. 2002); *Mandel v. Fisher,* 205 A.D.2d 375, 376 (1st Dept. 1994); *Matter of Auerbach v. State Tax Commn.,* 142 A.D.2d 390, 394 (3rd Dept. 1988); *John W. Cowper Co. v. CDC–Troy, Inc.,* 50 A.D.2d 1076 (4th Dept. 1975); *Toroy Realty Corp., v. Ronka Realty Corp.,* 113 A.D.2d 882, 883 (2nd Dept. 1985); *Iorio v. Superior Sound,* 49 A.D.2d 1008 (4th Dept. 1975); *Goldome v. Bonuch,* 112 A.D.2d 1025, 1026 (2nd Dept. 1985); *Absolute Financial Services, LLC., v. 535 Broadhollow Realty, LLC.,* 292 A.D.2d 327, 328 (2nd Dept. 2002); *S & L Paving Corp. v. MacMurray Tractor,* 61 Misc.2d 90, 93 (Sup Ct, Onondaga County, 1969).

27. "[I]n order to relieve the original ... assignor from its continuing liability after assignment, it must be expressly shown that the [other contracting party] not only consented to the assignment, but accepted the assignee in place of the [assignor]." *185 Madison Assocs. v. Rejan,* 174 A.D.2d 461 (1st Dept. 1991). Such release of the assignor must either be expressly stated by an agreement between the contracting party and the assignor "specifically provid[ing] for a release of liability upon assignment" *Matter of Auerbach,* 142 A.D.2d at 394; *Mandel,* 205 A.D.2d at 376), or "implied from facts other than the [other contracting party's] mere consent to the assignment and

8

its acceptance of [performance] from the assignee." *185 Madison Assocs.*, 174 A.D.2d at 461; *see also* *Mandel,* 205 A.D.2d at 376).

28.  In the instant case, it is undeniable that Laurel Cove did not either expressly or impliedly consent to the assignment of LHBI's obligations under the Construction Loan. While Section 12.17(a) of the Loan Agreement may authorize LBHI to assign its interest under the Construction Loan, it does not provide for the assignment of LBHI's obligations thereunder. Certainly there is no other documents which might indicate Laurel Cove's consent to the assignment of LBHI's obligations under the Construction Loan. Therefore, there is no basis to find that LBHI was relieved from its obligations under the Loan Agreement.

29.  The assignment was effective on September 17, 2008, only two days after the Filing Date. As previously stated, LBHI's assignment of the Loan Agreement was without notice to Laurel Cove and without complying with the mandates of the Bankruptcy Code to cure the defaults prior to assumption and assignment.

30.  Laurel Cove did not receive notice of the Settlement Motion and was thus denied the opportunity to object to the assignment of the Loan Agreement without any requirement that the defaults, i.e. the failure to fund advances, be cured.

31.  In fact, due to the delay and uncertainty surrounding the Construction Loan and LBHI's failure to fund, Laurel Cove filed the Motion to Assume or Reject. Unfortunately, the Property was ultimately the subject of a foreclosure sale.

32.  Moreover, LBHI's argument that Laurel Cove did not submit any valid funding requests until after the Default Date is without merit and is unsupported by any documentary evidence which proves that Laurel Cove's made a deficient advance request prior to the Default Date.

33.     In accordance with the affidavit of William J. Najam, Jr., the vice president and general counsel of Laurel Cove (the "Najam Affidavit"), attached hereto as Exhibit "B", Laurel Cove submitted the funding requests in September for work completed in August on September 13, 2008 and submitted the funding request in October for work completed in September. All draw requests were submitted in exactly the same form as the prior 15 draw requests that had been funded and approved without a problem through August 2008. Laurel Cove prepared a draw request for November 2008 in the exact form as it did for the prior requests, but it was advised by LBHI not to submit it while a determination was being made regarding continued funding of the project by LBHI. As evidence of the validity of these funding requests, attached to the Najam Affidavit as Exhibit "1" is a copy of the last draw request that was actually funded by LBHI made in August 2008, together with a copy of the three subsequent requests for September 2008, October 2008, and November 2008, respectively, which were not funded. A review of these draw requests shows that the unfunded requests were substantially the same as those prior requests which were funded.

34.     Further pursuant to the Najam Affidavit, Laurel Cove never received notice from LBHI that the September through November 2008 requests were deficient in any way. Nor did Laurel Cove ever receive any notice from LBHI that Laurel Cove was in default under the terms of the Loan Agreement. It was not until Laurel Cove reached a negotiating impasse with LBHI regarding continued funding of the project in the Spring of 2009, and an impasse with LBHI's successor in interest, Lehman Re with regard to the possible acquisition of the Note, that Laurel Cove received the Notice of Default which was dated June 9, 2009, a copy of which is attached to the Najam Affidavit as Exhibit "2". Each item on the Notice of Default, failure to prosecute construction, pay project costs, maintain insurance, pay and discharge liens, pay taxes, etc. were directly attributable to the fact that LBHI failed to fund the last three Draw Requests submitted by

Laurel Cove. As a result of LBHI's failure to fund the project in accordance with the terms of the Loan Agreement, Laurel Cove, did indeed, fail to prosecute construction or pay its bills

35. Clearly, the allegation by LBHI that Laurel Cove made a deficient request, was merely an excuse by LBHI, on the eve of bankruptcy, to attempt to avoid liability to Laurel Cove for failing to fund under the Construction Loan resulting in the downward spiral of the Project.

36. Finally, LBHI asserts that Laurel Cove has failed to provide support documents to substantiate its claim. Attached to the proof of claim annexed hereto as Exhibit "A" is a detailed list of the damages incurred by Laurel Cove as a result of LBHI's breach of the Construction Loan Contract. As set forth in detail in the attached Najam Affidavit, these damages include the following:

    A. <u>Lost profit from failure of the project to be completed</u>: while there are many variables, the best place to start with projections is with the numbers that were accepted by LBHI as a pro-forma budget in funding the loan.

- The Project Cash Flow which was accepted by Lehman in funding the project showed a Gross Income from the sale of 820 Lots of $165,029,189.00, Project Costs of $104,569,144.00 showing a projected profit from the sale of Lots of approximately <u>$60,460,045.00</u>. The projections on Lot sales was purposely set low by the Developer in seeking financing based on Builder Lot sales that were already under contract. It was anticipated that Lot pricing on individual lot sales would increase as the project was completed and amenities were ready for use. In addition, we had hoped to be able to get a zone change on a parcel to the rear of the property from single family to multi-family. While we did not have a subdivision plan developed as yet for that parcel, we believe that it could have easily added Ten Million or more to the net profit of the project. A copy of the Laurel Cove Pro Forma Projected Cash Flow Statement is attached to the Najam Affidavit as Exhibit "3".[1]

- Since project partners acted as the exclusive real estate brokers on all sales,

---

[1] The Laurel Cove Pro Forma Projected Cash Flow Statement was extremely difficult to reproduce but has been attached hereto for convenience. A digital copy is available upon request.

there is an additional projected loss of real estate broker commissions in excess of $10,000,000 on all sales and re-sales.

B. <u>Lost profit from Golf Membership Sales</u>: the Golf Operations Budget accepted by Lehman projected Golf and Social Membership Initiation Fees of $3,450,000.00 at sell out. The Initiation Fee had been kept particularly low at $5000.00 and we had tentatively agreed to increase the Initiation Fee to $10,000.00 which would have substantially increased the gross membership revenue. Over $250,000.00 had been collected from prospective members before start of golf course construction and there was a general excitement in the Nashville area about the Greg Norman signature course which was being designed to accommodate a major PGA Professional Tour event with PGA input from the beginning of design of the course. In addition to the Initiation Fees collected, within two years of opening the golf course for play, the Operations Budget for the golf course, tennis and recreational center, restaurant, snack shop, convenience store and banquet facilities projected Gross Profit after cost of goods sold of $6,862,420.00 and Total Expenses of $4,585,083 resulting in a net operating income of $2,277,337.00 <u>annually</u>. A twenty year projection on lost profit from golf operations at approximately $2,000,000.00 per year would be in excess of $20,000,000.00. A copy of the Golf Operations Pro Forma is attached to the Najam Affidavit as Exhibit "4".

C. <u>Cost of multiple lawsuits filed by contractors</u>: as of March 20, 2009, contractor, sub-contractor and supplier lawsuits, liens and notices of claims and the amount of all claims of which Laurel Cove was aware totaled $12,010,392.55.

D. <u>Loss of equity investors' capital</u>: LBHI accepted documentation from the original investors of equity investments in the project totaling $2,145,000.00 and LBHI required an additional equity investment from the developer of $250,000.00 at closing for a total of lost equity

of $2,395,000.00.

    E. <u>Loss related to Letters of Credit</u>: the amount of all bonds required by Williamson County and put in escrow by Laurel Cove Development, LLC was a total of $8,796,057.00. On March 13, 2012, Williamson County filed a lawsuit requesting a release of the balance of all remaining bond funds in the name of Laurel Cove that had not been paid out to contractors and vendors as follows:

| | |
|---|---:|
| Wastewater Disposal and Treatment | $ 492,500 |
| Wastewater Collection | 186,500 |
| Landscaping | 407,500 |
| Roads, Drainage & Erosion Control | 150,000 |
| Golf Course and Open Space Amenity | $3,742,445 |
| TOTAL | <u>$4,978,945</u> |

While all of the bond funds were drawn down on the LBHI Loan for which letters of credit were issued by our bank, Laurel Cove has not objected to the county's request for release and distribution of the funds to contractors and vendors who have completed work on the project. However, Laurel Cove has lost the benefit of the full amount of the Laurel Cove bond funds totaling $8,796,057.00 as a result of the LBHI default under the Construction Loan Agreement.

    F. <u>Monthly Developer's fees</u>: by agreement with LBHI, the agreed upon Developer's Fee paid by Laurel Cove to Kenneth A. Jowdy was $50,000.00 per month, plus office and staff expenses. The amount due as a Developer's fee not drawn or paid for the balance of 2009 was $500,000.00. If we project an additional five years conservatively to repayment of the loan, the lost Developer's Fee owed by Laurel Cove to Mr. Jowdy would be approximately $3,500,000.00. In addition, by agreement with LBHI, Laurel Cove's partner Philip Jones of Tentara Partners, who acted as on site Project Manager, received $33,333.33 per month, plus office and staff expenses for his services with a Project Management balance due for 2009 of

13

$333,333.30. If we project an additional five years conservatively to repayment of the loan, the lost Project Management Fee would be approximately $2,333,333.10.

37. Based on the foregoing, Laurel Cove has incurred no less than $109,504,827.60 in damages.

38. LBHI has not disputed the validity of any of these damages but merely argues that it is not liable to Laurel Cove because LBHI had no obligation to fund the Draw Requests or the remaining outstanding balance of the Loan. As Laurel Cove has previously established that LBHI does remain liable to Laurel Cove despite any assignment to Lehman Re, Laurel Cove respectfully requests that this Court allow the Laurel Cove Claim in its entirety.

## CONCLUSION

39. Based on the foregoing, Laurel Cove requests that this Court deny LBHI's Objection to Claim and allow the Laurel Cove Claim in its entirety.

**WHEREFORE**, Laurel Cove respectfully request that this Court enter an order (i) denying LBHI's Objection to Laurel Cove's Claim No. 17763; (ii) allowing the Laurel Cove Claim No. 17763; and (iii) granting such other and further relief as may be just and proper.

Dated: Garden City, New York
       August 7, 2012

**STAGG, TERENZI, CONFUSIONE
 & WABNIK LLP**
Attorneys for Laurel Cove
Development, LLC

By:   \s\ Ronald M. Terenzi
      Ronald M. Terenzi (RMT-6416)
      401 Franklin Avenue
      Garden City, New York 11530
      (516) 812-4500

O:\Bankruptcy\Cara Goldstein\LAUREL COVE\RESPONSE TO OBJECTION TO CLAIM.docx