UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

                Debtors.
------------------------------------------------------------X

HEARING DATE: 08/23/12
TIME: 10:00 A.M.

Case No. 08-13555 (JMP)

### WILLIAM J. NAJAM, JR.'S AFFIDAVIT IN SUPPORT OF LAUREL COVE DEVELOPMENT, LLC'S RESPONSE TO LEHMAN BROTHERS HOLDINGS INC'S OBJECTION TO CLAIM NO. 17763

STATE OF NEW YORK   )
                              )SS.:
COUNTY OF NASSAU   )

      **WILLIAM J. NAJAM, JR**, being duly sworn, deposes and says:

      1.     I am the vice president and general counsel of Laurel Cove Development, LLC ("Laurel Cove"), a creditor in the above-captioned bankruptcy proceeding and as such I have personal knowledge of the facts and circumstances surrounding this matter.

      2.     I submit this affidavit in support of Laurel Cove's response to Lehman Brothers Holding Inc.'s ("LBHI" or the "Plan Administrator") objection (the "Objection") to Claim No. 17763 filed by Laurel Cove (the "Laurel Cove Claim").

      3.     I have been advised by my counsel that LBHI has objected to the Laurel Cove Claim on the basis that LBHI does not have any liability for the claims asserted by Laurel Cove

1

since LBHI sold all of its rights and interests in the Construction Loan which provide the basis for Laurel Cove's Claim.

4.     I have been further advised by my counsel that pursuant to the relevant case law, the mere fact that LBHI may have sold its rights and interests in the Construction Loan to a third party does not alter the fact that LBHI, and not some third party with which Laurel Cove has no privity, remains liable to Laurel Cove for any damages in connection with its breach of the Construction Loan Agreement.

5.     Pursuant to LBHI's Objection, LBHI asserts that Laurel Cove did not submit any valid funding requests until after the Default Date. This is simply not true.

6.     Laurel Cove submitted the funding requests in September for work completed in August on September 13, 2008 and submitted the funding request in October for work completed in September. All draw requests were submitted in exactly the same form as the prior 15 draw requests that had been funded and approved without a problem through August 2008. Laurel Cove prepared a draw request for November 2008 in the exact form as it did for the prior requests, but it was advised by LBHI not to submit it while a determination was being made regarding continued funding of the project by LBHI. In addition, Laurel Cove has residual bills totaling in excess of $2,000,000 which have never been put in draw requests, copies of which can be made available upon request. As evidence of the validity of these funding requests, attached hereto as Exhibit "1" is a copy of the last draw request that was actually funded by LBHI made in August 2008, together with a copy of the three subsequent requests for September 2008, October 2008, and November 2008, respectively, which were not funded.

7.     The exact same format was used for the unfunded requests as the prior funded requests. Moreover, Laurel Cove never received notice from LBHI that the September through

November 2008 requests were deficient in any way. Nor did Laurel Cove ever receive any notice from LBHI that Laurel Cove was in default under the terms of the Loan Agreement.

8. It was not until Laurel Cove reached a negotiating impasse with LBHI regarding continued funding of the project in the Spring of 2009, and an impasse with LBHI's successor in interest, Lehman Re with regard to the possible acquisition of the Note, that Laurel Cove received the Notice of Default which was dated June 9, 2009, a copy of which is attached hereto as Exhibit "2". Each item on the Notice of Default, failure to prosecute construction, pay project costs, maintain insurance, pay and discharge liens, pay taxes, etc. were directly attributable to the fact that LBHI failed to fund the last three Draw Requests submitted by Laurel Cove. As a result of LBHI's failure to fund the project in accordance with the terms of the Loan Agreement, Laurel Cove, did indeed, fail to prosecute construction or pay its bills.

9. It is important to note that as of the Spring of 2009, the feedback that Laurel Cove was receiving from LBHI was that it was unclear, or not fully documented, exactly who held the loan as between LBHI and Lehman Re Ltd.

10. LBHI also argues that Laurel Cove has failed to provide support documents to substantiate its claim. Attached to the proof of claim annexed to the response as Exhibit "A" is a detailed list of the damages incurred by Laurel Cove as a result of LBHI's breach of the Construction Loan Agreement between LBHI and Laurel Cove dated May 15, 2007 which was provided to LBHI. Laurel Cove can provide back-up support for any portion of the Laurel Cove Claim that LBHI requests. To date, LBHI has not requested such additional documentation from Laurel Cove.

11. Specifically, the various portions of the Laurel Cove Claim can be supported as follows:

    A. <u>Lost profit from failure of the project to be completed</u>: while there are many

3

variables, the best place to start with projections is with the numbers that were accepted by LBHI as a pro-forma budget in funding the loan.

- The Project Cash Flow which was accepted by Lehman in funding the project showed a Gross Income from the sale of 820 Lots of $165,029,189.00, Project Costs of $104,569,144.00 showing a projected profit from the sale of Lots of approximately $60,460,045.00. The projections on Lot sales was purposely set low by the Developer in seeking financing based on Builder Lot sales that were already under contract.[1] It was anticipated that Lot pricing on individual lot sales would increase as the project was completed and amenities were ready for use. In addition, we had hoped to be able to get a zone change on a parcel to the rear of the property from single family to multi-family. While we did not have a subdivision plan developed as yet for that parcel, we believe that it could have easily added Ten Million or more to the net profit of the project. A copy of the Laurel Cove Pro Forma Projected Cash Flow Statement is attached hereto as Exhibit "3".[2]

- Since project partners acted as the exclusive real estate brokers on all sales, there is an additional projected loss of real estate broker commissions in excess of $10,000,000 on all sales and re-sales.

B.  <u>Lost profit from Golf Membership Sales</u>: the Golf Operations Budget accepted by Lehman projected Golf and Social Membership Initiation Fees of $3,450,000.00 at sell out. The Initiation Fee had been kept particularly low at $5000.00 and we had tentatively agreed to increase the Initiation Fee to $10,000.00 which would have substantially increased the gross membership revenue. Over $250,000.00 had been collected from prospective members before start of golf course construction and there was a general excitement in the Nashville area about the Greg Norman signature course which was being designed to accommodate a major PGA Professional Tour event with PGA input from the beginning of design of the course. In addition to

---

[1] Prior to the funding of the LBHI Construction Loan, Semi-Custom and Custom Home Builders had already entered into contracts for the bulk purchase of 450 Lots with an average cost of between $135,000 and $220,000 each.
[2] The Laurel Cove Pro Forma Projected Cash Flow Statement was extremely difficult to reproduce but has been attached hereto for convenience. A digital copy is available upon request.

4

the Initiation Fees collected, within two years of opening the golf course for play, the Operations Budget for the golf course, tennis and recreational center, restaurant, snack shop, convenience store and banquet facilities projected Gross Profit after cost of goods sold of $6,862,420.00 and Total Expenses of $4,585,083 resulting in a net operating income of $2, 277,337.00 annually. A twenty year projection on lost profit from golf operations at approximately $2,000,000.00 per year would be in excess of $20,000,000.00. A copy of the Golf Operations Pro Forma is attached hereto as Exhibit "4".

C. <u>Cost of multiple lawsuits filed by contractors</u>: as of March 20, 2009, contractor, sub-contractor and supplier lawsuits, liens and notices of claims and the amount of all claims of which Laurel Cove was aware totaled $12,010,392.55.

D. <u>Loss of equity investors' capital</u>: LBHI accepted documentation from the original investors of equity investments in the project totaling $2,145,000.00 and LBHI required an additional equity investment from the developer of $250,000.00 at closing for a total of lost equity of $2,395,000.00.

E. <u>Loss related to Letters of Credit</u>: the amount of all bonds required by Williamson County and put in escrow by Laurel Cove Development, LLC was a total of $8,796,057.00. On March 13, 2012, Williamson County filed a lawsuit requesting a release of the balance of all remaining bond funds in the name of Laurel Cove that had not been paid out to contractors and vendors as follows:

| | |
|---|---:|
| Wastewater Disposal and Treatment | $ 492,500 |
| Wastewater Collection | 186,500 |
| Landscaping | 407,500 |
| Roads, Drainage & Erosion Control | 150,000 |
| Golf Course and Open Space Amenity | $3,742,445 |
| TOTAL | $4,978,945 |

While all of the bond funds were drawn down on the LBHI Loan for which letters of credit were issued by our bank, Laurel Cove has not objected to the county's request for release and distribution of the funds to contractors and vendors who have completed work on the project. However, Laurel Cove has lost the benefit of the full amount of the Laurel Cove bond funds totaling $8,796,057.00 as a result of the LBHI default under the Construction Loan Agreement.

F. <u>Monthly Developer's fees</u>: by agreement with LBHI, the agreed upon Developer's Fee paid by Laurel Cove to Kenneth A. Jowdy was $50,000.00 per month, plus office and staff expenses. The amount due as a Developer's fee not drawn or paid for the balance of 2009 was $500,000.00. If we project an additional five years conservatively to repayment of the loan, the lost Developer's Fee owed by Laurel Cove to Mr. Jowdy would be approximately $3,500,000.00. In addition, by agreement with LBHI, Laurel Cove's partner Philip Jones of Tentara Partners, who acted as on site Project Manager, received $33,333.33 per month, plus office and staff expenses for his services with a Project Management balance due for 2009 of $333,333.30. If we project an additional five years conservatively to repayment of the loan, the lost Project Management Fee would be approximately $2,333,333.10.

12. Based on the foregoing, Laurel Cove requests that the Laurel Cove Claim be allowed in its entirety.

**WHEREFORE**, Laurel Cove respectfully request that this Court enter an order (i) denying

LBHI's Objection to Laurel Cove's Claim No. 17763; (ii) allowing the Laurel Cove Claim No. 17763 in its entirety; and (iii) granting such other and further relief as may be just and proper.

Dated: August 6, 2012

_____
WILLIAM J. NAJAM, JR.
VICE PRESIDENT
LAUREL COVE DEVELOPMENT LLC

State of CT
County of Fairfield        )ss.: Danbury

On the 6th day of Aug. in the year 2012, before me, the undersigned, personally appeared William J. Najam, Jr., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public

MONTSERRAT LEROUX
Notary Public
State of Connecticut
My Commission Expires May 30, 2015

O:\Bankruptcy\Cara Goldstein\LAUREL COVE\NAJAM AFF IN SUPPORT OF RESPONSE TO OBJ TO CLAIM.docx

7