HEARING DATE AND TIME:  AUGUST 23, 2012 AT 10:00 AM (EST)
RESPONSE DEADLINE:  AUGUST 9, 2012 AT 4:00 PM (EST)

JOHN H. SNYDER PLLC
John H. Snyder, Esq.
555 Fifth Avenue, Suite 1700
New York, New York 10017
Tel:  (212) 856-7280
Fax:  (646) 304-9230
john@jhsnyderlaw.com

*Counsel to Russell Schreiber and Andrew Weber*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ———————————————— : | |
| : | |
| IN RE LEHMAN BROTHERS : | Ch. 11 Case No. 08-13555 (JMP) |
| HOLDINGS, INC., et al. : | |
| : | |
| ———————————————— : | |

**RESPONSE OF RUSSELL SCHREIBER AND ANDREW WEBER TO
DEBTORS' THREE HUNDRED TWENTY-NINTH OMNIBUS OBJECTION
TO CLAIMS (MISCLASSIFIED CLAIMS) AND CROSS-MOTION
TO SET A HEARING DATE FOR THE ALLOWANCE OF
ADMINISTRATIVE EXPENSE CLAIMS**

Russell Schreiber and Andrew Weber (together, the "Claimants"), by and

through their undersigned counsel, hereby files this response to the Debtors' Three

Hundred Twenty-Ninth Omnibus Objection to Claims (Misclassified Claims)

("329th Objection"), dated July 10, 2012 (Dkt # 29324) as it relates to claims 13321

(Schreiber) and 66938 and 66940 (Weber) (collectively, the "Claims") and related

cross-motion for the allowance of administrative expense claims pursuant to Bankruptcy Code ("Code") Section 503(b)(1) as follows:

## Jurisdiction and Venue

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

2.      On September 15, 2008 (the "Petition Date"), Lehman Brothers Holdings Inc. ("LBHI") and a number of its affiliates (collectively, the "Debtors") filed a voluntary petition for relief pursuant to chapter 11 of the Code in the United States Bankruptcy Court for the Southern District of New York (the "Court").

3.      On July 2, 2009, the Court established September 22, 2009 as the bar date for filing proofs of claim in this case.[1]  On review of the docket, this Court did not set forth a deadline for parties to file requests for the allowance of administrative expenses pursuant to Code Section 503(b)(1).

4.      On September 17, 2009, Schreiber timely filed a proof of claim in this case for $240,098.  A copy of Schreiber's proof of claim is attached as Exhibit 1.  The proof of claim bears the number 13321 and is reflected on the Debtors' claim schedule (see Dkt # 29324 at pp. 25 of 31 (ECF stamp page number)) (the "Schreiber Claim").  The Schreiber Claim represents an estimation of the amount of tax

---

[1]      Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice thereof and Approving the Proof of *Claim Form*, approved and entered by the Bankruptcy Court on July 2, 2009 (the "Bar Date Order") (Dkt # 4271).

equalization payments (as described below) owed by LBHI for services rendered before the Petition Date.

5.    Also on September 17, 2009, Weber timely filed two proofs of claim for $71,434.67 and $32,829.00.  Copies are attached as <u>Exhibit 2</u>.  The proofs of claim bear the numbers 66938 and 66940 and are reflected on the Debtors' claim schedule (*see* Dkt # 25059 at pp. 38 & 52 of 62 (ECF stamp page numbers)) (the "<u>Weber Claims</u>").  Claim #66938 for $71,434.67 relates to tax equalization payments owed by LBHI.  Claim #66940 for $32,829.00 relates to LBHI's non-payment of Weber's UK taxes from October through December 2008, which LBHI was obligated to pay under its expatriate arrangement with Weber.

6.    The Claimants were employees of the Debtors both before and after the Petition Date.  Each of the Claimants was assigned to work in London for large portions of 2008.  In exchange for agreeing to work overseas, they were entitled to certain compensation in addition to what they would have earned if they were employed in the U.S.  *See, e.g.*, Ltr. from Heather Rychener, Lehman Brothers' Vice President of International Human Resources to Andrew Weber, dated June 14, 2007 (the "<u>June 14th Letter</u>") a copy of which is attached as <u>Exhibit</u> 3 (stating that expatriate employees are entitled "to receive expatriate benefits / allowances as outlined in the Foreign Assignment Handbook.").  One of the most material expatriate benefits was tax equalization payments whereby the Debtors agreed to pay the difference between the Claimants' U.K. tax liability and what the Claimants' U.S. tax liability would have been if their income was only subject to the

U.S. Tax Code.  The June 14th Letter also stated that "[t]he Firm reserves the right to make changes to the terms set forth in this letter and its enclosure, to its Foreign Assignment Handbook, and to its general international assignment policies and practices at any time."

7.      The "Foreign Assignment Handbook for EAP Expatriates" (the "Foreign Assignment Handbook"), a copy of which is attached as Exhibit 4 (*see, in particular*, pp. 16–17), describes the Tax Equalization Policy.  The Foreign Assignment Handbook states that "[u]pon completion of your tax returns, there is a reconciliation between you and the Firm."  *Id.* at 16–17.  Despite an informal request to Debtors' counsel, Claimants' counsel have not had the opportunity to review the actual Tax Equalization Policy referred to in the Foreign Assignment Handbook.  *See* Exhibit 5 and ¶ 13 herein.

8.      Under Weber's expatriation arrangement, in addition to tax equalization payments, the Debtors directly paid Weber's U.K. taxes and paid him a true-up for the income represented by the payment of these taxes.  The Debtors were current on these taxes until the Petition Date at which point they ceased making tax payments.

9.      Following the Petition Date, Weber's pre-bankruptcy duties remained unchanged until early December 2008.  At that point, Weber was asked by representatives of LBHI to assist them in working out the U.S. Debtor Group's derivatives portfolio.  This new arrangement was formalized in a compensation agreement entered into between LBHI and Weber, dated December 17, 2008,

providing for continuation of his employment and specifying his compensation for the 2009 calendar year. *See* Exhibit 6. This agreement did not purport to alter the terms of Weber's expatriation arrangement. All of Weber's expatriation benefits remained in effect including the Tax Equalization Policy and the Debtors' obligations to pay Weber's U.K. taxes.[2] Weber remained with LBHI until August 31, 2011. During this time, he served as European Head of Derivatives and Global Head of Business Development for LAMCO LLC, the Debtors' asset manager.

10.    Meanwhile, Schreiber was retained to work on Lehman Brothers International Europe In Administration's insolvency proceeding in London. Schreiber's employer did not change. In January 2009, he was retained for further work and his employer was changed to LBHI. Schreiber was seconded to Lehman Brothers Limited ("LBL"). At all times, Schreiber's status as U.S. expatriate staff was acknowledged and maintained. He continued to be employed by LBHI until July 24, 2009 at which time he terminated his employment with LBHI and was retained pursuant to a separate employment agreement by LBL. Unlike Weber, who received no performance bonuses in 2008, Schreiber received three separate bonus that were paid respectively in October and December 2008, and February 2009.[3] Schreiber never received tax equalization payments on these bonuses.

---

[2]    The Claimants need discovery to ascertain the exact amount owed as administrative expenses. The Claimants assert that Weber is owed at least $32,829.00 for non-payment of his tax claims, as well as additional amounts to be established at trial for tax equalization payments.

[3]    Schreiber's post-petition tax equalization payments depend on, inter alia, whether LBHI would have imputed an implied New York State residency

11.    At the time of the petition, the Claimants were proactive in seeking assurance that the Debtors would honor all compensation obligations. Specifically, soon after the Petition Date, Weber expressed concerns to management and human resources personnel that his U.K. taxes were not being paid, and both Claimants expressed concern that the Tax Equalization Policy might not remain in effect. They were told by LBHI that such matters could not be directly addressed and that they should file proofs of claim in this case. Significantly, the Claimants were never told that the tax equalization payments would not be made or that the Tax Equalization Policy was ineffective post-petition.

12.    The Debtors identified each of the Claimants' expatriation agreements in the Debtors' "Schedule G – Executory Contracts and Unexpired Leases", filed with the Court on March 12, 2009. (*See* Dkt 29389, at page 9/476).

13.    On February 7, 2012, the Debtors interposed the Debtors' Two Hundred Fifty Fourth Omnibus Objection to Claims (Employment-Related Claims) ("254th Objection"), dated February 7, 2012 (Dkt # 25059). Prior to opposing that objection, on February 19, 2012, the undersigned counsel sought to undertake informal discovery in order to further investigate the facts and documents relating to the Claims. *See* Exhibit 6. Specifically, the Claimants sought access to the full Tax Equalization Policy as well as information regarding the accrual of this benefit post-petition. The Debtors declined to provide any documents on these matters. Instead

---

to Schreiber during the post-petition period. The Claimants expect to develop facts relating to this in discovery. If LBHI would not have imputed New York residency, Schreiber's post-petition claim could be high as $190,000 or more.

they invoked a discovery stay previously ordered by this Court.  Out of abundance of
caution and to avoid the appearance of seeking improper discovery, the undersigned
counsel withdrew his requests for documents.

14.    On July 12, 2012, the Debtors interposed the Debtors' Three Hundred
Twenty-Ninth Omnibus Objection to Claims (Misclassified Claims) ("329th
Objection", together with the 254th Objection, the "Objections") in which they argue
that the Claims should not be afforded priority status beyond the statutory
limitations in Code Section 507(a)(4) because they were entirely based on pre-
petition services.  As was the case with regards to the 254th Objection, the
Claimants are now forced to respond to the 329th Objection without access to the
documents that the Debtors claim to have reviewed and referred to in interposing
the 329th Objection.

15.    Nonetheless, the Debtors have failed to adequately rebut the priority of
the Claims.  Specifically, the Debtors ignore the fact that substantial portions of the
Claims are based on services that the Claimants provided to the estate post-
petition.    These entitle the Claimants to the allowance and payment of
administrative expense claims.    Therefore, the Claimants are hereby
simultaneously responding to the 329th Objection and cross-moving to schedule a
hearing for the allowance of administrative expenses.

## RELIEF REQUESTED AND BASIS THEREFOR

16.    The Claimants request that the Court deny the Debtors' 329th Objection
insofar as it seeks to disallow the priority status of the Claims beyond the statutory
limitation provided in Code Section 507(a)(4).  Since a portion of the Claims is

entitled to administrative expense treatment, the Claimants therefore request that

the Court schedule a hearing at a convenient date to determine the allowance and

amount of the Claimants' entitlement to administrative expenses.    Finally, the

Claimants request that the Court adjourn the 329th Objection with regards to the

Claims and consolidate this Response and Cross-Motion with the Debtors'

Objections.

**A.    The Debtors Have Failed to Meet their Burden of Proof and Thus the Court Should Deny the Objection as it Pertains to the Claims.**

17.    Under Code Section 502, a filed proof of claim is deemed allowed.    The

Code "establishes a burden-shifting framework for proving the amount and validity

of a claim.    The creditor's filing of a proof of claim constitutes prima facie evidence

of the amount and validity of the claim.    The debtor must introduce evidence to

rebut the claim's presumptive validity."    *In re Harford Sands Inc.*, 372 F.3d 637,

640 (4th Cir. 2004) (internal citations omitted).    *See also In re Spiegel, Inc.*, 2007

WL 2456626, at *15 n.6 (S.D.N.Y. Aug. 22, 2007).

18.    Fundamental principles of bankruptcy law require that the Debtors

introduce admissible evidence to overcome the prima facie validity of a claim and to

shift the burden of proof back to the Claimants.    "Mere denial of [a] claim's validity

or amount is not sufficient to rebut prima facie effect of [the] proof of claim."    Hon.

Barry Russell, Bankruptcy Evidence Manual, § 301.13(3) (West Group, 1999) (*citing*

*In re O'Connor*, 153 F.3d 258 (5th Cir. 1998); *In re Brown*, 221 B.R. 46 (Bankr. S.D.

Ga. 1998); *In re Narragansett Clothing Co.*, 143 B.R. 582, 583 (Bankr. D.R.I. 1992)).

19.    The 329th Objection does not provide any evidence refuting the validity of

the Claimants' priority status based on post-petition services provided to the estate.

In contrast to the extensive documentation provided by the Claimants in support of

the Claims, the Debtors merely offer unsupported statements that the Claims are

entirely subject to the $10,950 statutory limit provided in Code Section 507(a)(4),

without any supporting affidavit or documentation.

**B.     The Court Should Schedule a Hearing On this Motion to Allow a Portion of the Claims as Administrative Expenses.**

15.    Code Section 503(b), which governs the allowance of administrative

expenses, provides:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including –
> (1)(A) the actual, necessary costs and expenses of preserving the estate including– (i) wages, salaries, and commissions for services rendered after the commencement of the case; . . . .

11 U.S.C. § 503(b)(1)(A)(i).  Administrative expenses "receive highest priority in

corporate bankruptcy proceedings." *In re Bethlehem Steel Corp.,* 479 F.3d 167 (2d

Cir. 2007) (*citing* 11 U.S.C. § 507(a)(1)).

16.    A claim is entitled to administrative priority if "it arises out of a

transaction between the creditor of the bankrupt's trustee or debtor-in-possession,

and 'only to the extent that the consideration supporting the claimant's right to

payment was both supplied to and beneficial to the debtor-in-possession in the

operation of the business.'" *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*,

789 F.2d 98, 101 (2d Cir. 1986) (citations omitted); *In re Episode USA, Inc.*, 202 B.R.

691, 696 (Bankr. S.D.N.Y. 1996) (Administrative expenses are those that arise from

a "transaction with the estate or consideration must have been given to the estate,

and the debt must have benefitted the estate.").

17.     Administrative priority is not based on an obligation's due date, but rather, depends on the date of the consideration underlying the claim. *In re A.C.E. Elevator Co., Inc.*, 347 B.R. 473, 481 (Bankr. S.D.N.Y. 2006).    An employee's right to compensation is afforded administrative expense priority to the extent that the provided services to the debtor post-petition.   *See Bethlehem Steel*, 479 F.3d at 172.   Consideration is furnished to the estate post-petition where the debtor-in-possession induces post-petition performance or where performance is rendered to the estate on a contract not rejected by the debtor-in-possession.   *In re ICS Cybernetics, Inc.*, 111 B.R. 32, 37 (Bankr. N.D.N.Y. 1989).

18.     Here, the Debtors' obligation to make tax equalization payments arose from the Claimants' pre-petition employment contracts and expatriation agreements (collectively, the "Employment Contracts") which were executory contracts of the Debtors.   The Claimants provided consideration to the estate through the performance of their duties as the Debtors' employees.   This is the very type of service that Code Section 503(b) is meant to encourage because Congress recognized that a debtor's rehabilitation prospects necessarily depended on retaining employees by giving highest priority to the payment of their compensation.   *See Amalgamated*, 789 F.2d at 101 ("Congress granted priority to administrative expenses in order to the facilitate the efforts of the trustee or debtor in possession to rehabilitate the business . . ."); *In re Swiss Chalet, Inc.*, 2012 WL 2856102 at *4 (Bankr. D.P.R. July 11, 2012) ("A principal aim of Section 503 is to

encourage parties to render post-petition services to debtors by ensuring that payments will be made on a priority basis in the post-petition period."). The Debtors induced performance because they continued to employ the Claimants post-petition and did not alter the terms of the Employment Contracts until months after the Claimants had performed post-petition services. These "services rendered" to the estate entitled the Claimants to tax equalization payments and (for Weber) the payment of U.K. taxes and a true-up payment.

19.    In addition, Schreiber is entitled to an administrative expense claim for tax equalization payment related to the bonuses that he received post-petition to the extent that the bonuses were earned for services rendered to the Debtors post-petition. *See In re Cardinal Indus., Inc.*, 160 B.R. 83, 85 (Bankr. S.D. Ohio 1993) (a bonus is earned when services giving rise to right to payment were performed). It was the Debtors policy to pay year-end bonuses in the early part of the following year. *See* Ltr. From Deborah Millstein, Lehman Brothers Senior Vice President to Andrew Weber, dated July 6, 2007, attached as <u>Exhibit</u> 7 (stating that "the Firm" pays its 2007 bonus distribution on or about January 31, 2008). Schreiber never received tax equalization payments for the bonuses paid to him post-petition, but should have.

## C.    The Claims are Valid Despite the Debtors' Efforts to Retroactively Change the Terms of the Expatriate Policies.

20.    The Debtors may contend that they retroactively eliminated the Debtors' obligations to make payments under the Claimants' expatriate agreements. For instance, on January 23, 2009, Wendy Uvino, a Lehman human resources employee,

wrote to Weber and Schreiber informing them that "it is no longer practical to operate a Tax Equalization Policy" (the "Memo"). A copy of the Uvino Memo is attached as Exhibit 8. The Uvino Memo states that "[f]or the period 15 September 2008 to 31 December 2008, tax equalization will not apply. You will be personally liable for any and all taxes on your Lehman Brothers compensation."

21.    The Uvino Memo does not change the Employment Contracts' legal status as executory contracts that had not been assumed or rejected, nor could it *retroactively* eliminate the rights of Claimants to tax equalization payments. *See In re Hooker Investments*, 145 B.R. 138, 144 (Bankr. S.D.N.Y. 1992) (*citing In re Jolly*, 574 F.2d 349, 351 (6th Cir. 1978), cert. denied, 439 U.S. 929 (1978) (employment contracts are executory because performance was due from both sides and therefore they are subject to rejection under the Code Section 365.); *In re FBI Distrib. Corp.*, 330 F.3d 36. 44 (1st Cir. 2003) ("Congress's . . . failure to provide special treatment to garden variety employment contracts indicates that Congress intended that employment contracts be subject to the general principles governing executory contracts . . ."). Further, the Debtors' listing of each of the Claimants' expatriation agreements on Schedule G is an acknowledgment of these agreements' status as executory contracts. *See In re Dispirito*, 371 B.R. 695, 698 (Bankr. D.N.J. 2007) ("It is generally accepted that information contained in a debtor's bankruptcy schedules may be considered as an admission."); *In re Arcella-Coffman*, 318 B.R. 463, 475, 476 (Bankr. N.D. Ind. 2004) ("The debtor is of course in the best position to initially evaluate and the state nature . . .of his / her debts and property.").

22.    When parties continue to perform under an unassumed contract, the contract passes through the bankruptcy unaffected. *In re Shoppers Paradise*, 8 B.R. 271 (Bankr. S.D.N.Y. 1980) ("Until assumed or rejected, an executory contract . . . remains in force and if neither assumed nor rejected, passes with other property of the debtor to the reorganized corporation."); *In the Matter of Greystone III Joint Venture*, 995 F.2d 1274, 1281 (5th Cir. 1991) (if a debtor neither assumes nor rejects an executory contract, the contract continues in effect); *In re Cajun Elec. Power Coop. Inc.*, 230 B.R. 715, 734 (Bankr. M.D. La. 1999) (executory contracts which are neither assumed nor rejected during a Chapter 11 proceeding flow through the proceeding "without alteration").

23.    The Employment Contracts remained in force post-petition throughout 2008 because they were neither assumed nor rejected. From the Petition Date until the date forward, the Debtors and Claimants continued to perform in accordance with the terms of the Employment Contracts.

24.    Similarly, the Uvino Memo's statement that the Debtors would no longer make tax equalization payments does not represent a breach of the contract nor does it alter the continuous effectiveness of the Employment Contracts.[4]  At most, Debtors arguably attempted to change their expatriation policy *on a going forward basis* (however, on the point of whether Debtors could do that, as a contractual

---

[4]    It would not be proper for the Claimants to acquire a rejection damages claim (which would be treated as a general unsecured claim) wherein there has been no contractual rejection and for the reasons stated throughout this Response and Cross-Motion, the Claimants are entitled to administrative expense claims.

matter, Claimants reserve their rights). Whether or not Debtors could change their tax equalization policy going forward, they certainly cannot refuse to pay a benefit that was already earned and owed.

25. The Claimants are entitled to post-petition administrative expense claims for the value of their performance including wages, taxes that the Debtors were contractually obligated to pay and tax equalization payments earned from the Petition Date forward. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984) ("If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services."); *In re El Paso Refinery, L.P.*, 220 B.R. 37 (Bankr. W.D. Tex. 1998) ("[I]f the non-debtor party performs on the executory contract post-petition, it is entitled to a post-petition administrative claim for the reasonable value of such performance.").

D.    **The Claimants' Request is Timely Filed**

21.    Section 503(a) of the Code states:

> (a) [a]n entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause.

11 U.S.C. § 503(a). The Code and the Bankruptcy Rules are silent as to when a request is "timely" filed or when it is appropriate for a court to permit tardy filing. *See Texas Comptroller of Public Accounts v. Megafoods Stores*, 163 1071 (9th Cir. 1998) ("There is no bar date to filing requests for the allowance of administrative expenses under Section 503."). The Bar Date Order in this case is only applicable to

claims. Upon review of the docket, there is no separate bar date for the filing of administrative expense requests and the Court should find that the Claimants' request herein is timely filed.[5]

20.    The "timely filed" language in Code Section 503(a) is meant to serve "the important purpose of enabling the parties to a bankruptcy case to identify with reasonable promptness the identity of those making claims against the bankruptcy estate and the general amount of the claims, a necessary step in achieving the goal of successful reorganization." *First Fidelity Bank, N.A., N.J. v. Hooker Invs., Inc.*, 937 F.2d 833, 840 (2d Cir. 1991).

21.    The Debtors and other parties in interest have been on notice of the existence of these expenses since the Claimants filed proofs of claim in September 2009. Numerous courts have treated the filing of proofs of claim as requests for payment under 503(a). *See, e.g., In re Hemingway Trans.*, *993 F.2d 915, 928–29* (1st Cir.), *cert denied*, 510 U.S. 303 (1993); *In re Fas Mart Convenience Stores, Inc.*, 320 B.R. 587, 593–594 (Bankr. E.D. Va. 2004), *In re Toms*, 229 B.R. 646, 655 (Bankr. E.D. Pa. 1999). Similarly, the filing of an adversary proceeding asserting the right to an administrative expense may provide the requisite notice to the Debtors. *See In re BFW Liquidation, LLC*, 471 B.R. 652, 663 (Bankr. N.D. Ala. 2012) (filing of adversary proceeding put trustee on notice of claimant's assertion of an

---

[5]    Article 2.2 of the confirmed Modified Third Amended Joint Plan of Lehman Brothers Holdings Inc. and its Affiliate Debtors (the "Plan") does set a deadline for filing requests for allowance of certain types of administrative expenses related to compensation for services of estate-retained professionals. (Dkt # 23023-1). But this section does not affect requests for administrative expenses made by the Debtors' employees pursuant to Code Section 503(b)(1).

administrative expense). Additionally, the Uvino Memo demonstrates that the Debtors were aware that the Claimants expectation of entitlement to post-petition tax equalization payments.

22. Were the Court to somehow find that the Claimants' requests are untimely, the circumstances of this matter and the larger case warrant a finding that "cause" exists to accept the Claimants' late filing. Bankruptcy Rule 9006(b)(1), provides, in pertinent part: "[W]hen an act is required or allowed to be done at or within a specified period . . . the court for cause shown may at any time in its discretion . . . permit the act to be done where the failure to act was the result of excusable neglect." FED R. BANKR. 9006(b)(1).

23. In interpreting this Rule, the Supreme Court has stated that, (i) neglect encompasses "inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control," and (ii) whether or not such neglect is "excusable" is an equitable matter, "taking into account all relevant circumstances surrounding the party's omission." *See generally Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P.*, 507 U.S. 380, 388, 395 (1993). The Supreme Court set forth four factors to be considered: (1) the danger of prejudice to the debtor; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith. *Id.* at 395.

24. First, the allowance of some portion of the Claims as administrative expenses would not materially prejudice the Debtors nor "jeopardize the success of

16

the reorganization." *See Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.)*, 419 F.3d 115, 130 (2d Cir. 2005). As recognized by this Court, this bankruptcy case is the "biggest, the most incredibly complex, the most impossibly challenging international bankruptcy that ever was." Tr. Of Hr'g, dated December 6, 2011, at 68:24–25 (Dkt 23130). While the amounts represented by the Claims are substantial to the Claimants, the magnitude of the Claims is insignificant compared to the hundreds of billions of dollars that are being distributed under the Plan. The Debtors are not harmed by having to respond to this Motion. The Debtors are familiar with the operation of the Tax Equalization Policy and the other facts underlying the Claims and the payment of the Claims will have no material effect on the Debtors.

25.    Second, there has been a minimal delay. The claims reconciliation process has only been going on for a few months and is likely to last for a very long time. *See, e.g.*, *In re Enron,* 2003 WL 21756785, at *4–5 (Bankr. S.D.N.Y. July 30, 2003). Including the Claims among the many requests for allowance of administrative expenses will not adversely "impact on judicial proceedings" in this case. *See id.*

26.    Third, any delay in filing the request is excusable. At the time that the Claimants filed the Claims, pursuant to suggestions from the Debtors' management and human resources personnel, they were not informed that they may have administrative expense claims against the estate. In any event, excusable neglect is "not limited strictly to omissions caused by circumstances beyond the control of the movant." *See Pioneer,* 507 U.S. at 392. The Claimants have in no way sat on their

rights or filed to take filing deadlines seriously.  *See id.*; *Enron*, 419 F.3d at 126–27.

27.    Finally, the Claimants have acted prudently, properly and in good faith at all times during this proceeding.  The Claimants tried to resolve their issues without resorting to filing this Cross-Motion.  But the Debtors were not readily available to negotiate because they spent over three years intensely focused on prosecuting and negotiating a plan of reorganization and they were intent on filing and prosecuting the Objections to the Claims.  Little would have been gained by attempting to divert the Debtors' attention to addressing the Claims earlier in this case.  As soon as the Debtors objected to the Claims, the Claimants sprung into action by contacting the Debtors regarding their need for information and responding to the Debtors' Objections.

## RESERVATION OF RIGHTS

28.    The execution and filing of this Response and Cross-Motion is not and shall not be deemed:  (a) a waiver or release of the Claimants' rights against any entity or person liable for all or any part of their Claims or other liabilities; (b) a consent by the Claimants to the jurisdiction of this Court with respect to any proceeding commenced in these cases against or otherwise involving the Claimants; (c) a waiver of the right to withdraw the reference with respect to the Claims, any objection or other proceedings commenced with respect thereto or any other proceedings commenced in this case against or otherwise involving the Claimants; (d) a waiver or release by the Claimants of any right to trial by jury, or a consent by the Claimants to a trial by jury, in this Court or any court; (e) a waiver of any right to the subordination or recharacterization, in favor of the Claimants, of

indebtedness or liens held by any creditors of the Debtors or any of their affiliates; (f) an election of remedies which waives or otherwise affects any other remedy; or (g) a waiver of the Claimants' rights to amend or supplement the Proofs of Claim or this Response and Cross Motion.

29.     This Response and Cross-Motion includes citations to the applicable authorities and a discussion of their application.    Accordingly, Claimants respectfully request that such citations and discussion satisfy the requirement that Claimants submit a separate memorandum of law pursuant to Rule 9013-1-(b) of the Local Bankruptcy Rules.

## **CONCLUSION**

30.     For all of the foregoing reasons and authorities, as well as those to be advanced at oral argument, the Claimants respectfully request that the Court adjourn the Debtors' 329th Objection as it pertains to Messrs. Schreiber and Weber and their Claims and hear such objection in connection with a hearing on the Claimants' request for administrative expense treatment.

31.     The Court should grant the Cross-Motion by entering an order substantially in the form annexed hereto.    The Court should schedule an evidentiary hearing on the amounts of the administrative expense claims.     In addition, the Court should order such other relief as the Court deems just and proper.

WHEREFORE, Claimants request that the 329th Objection be denied as to Messrs. Schreiber and Weber and their Claims and that a hearing be scheduled to determine the allowance and amount of a portion of the Claims as administrative expenses.

Dated:　　　New York, New York
　　　　　　August 9, 2012

JOHN H. SNYDER PLLC

/s/_____
John H. Snyder, Esq.
Jeb L. Singer, Esq. (of counsel)
555 Fifth Avenue, Suite 1700
New York, New York 10017
Tel:  (212) 856-7280
Fax:  (646) 304-9230
john@jhsnyderlaw.com

*Counsel to Russell Schreiber and Andrew Weber*

## CERTIFICATE OF SERVICE

I certify that on August 9, 2012, I caused the Response of Russell Schreiber and Andrew Weber to Debtors' Three Hundred Twenty-Ninth Omnibus Objection to Claims (Misclassified Claims) to be served as follows:

1) Electronically via ECF filing (electronically filed on August 9, 2012);

2) By U.S. Mail as follows:

Honorable James M. Peck
One Bowling Green
New York, NY 10004

Office of the United States Trustee for Region 2
Attn: Tracy Hope Davis, Esq., Elisabetta Gasparini, Esq. and Andrea B. Schwartz, Esq.
33 Whitehall Street, 21st Floor
New York, NY 10004

Weil Gotshal & Manges LLP
Attn: Robert J. Lemons, Esq.
767 Fifth Avenue
New York, NY 10153

Milbank, Tweed, Hadley & McCloy LLP
Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq.
1 Chase Manhattan Plaza
New York, NY 10005

/s/ John H. Snyder, Esq.