# EXHIBIT A
**(Master Credit Agreement)**

EXECUTION COPY

# MASTER CREDIT AGREEMENT

Among

## 250 EAST BORROWER, LLC,
as Borrower

and

## LEHMAN BROTHERS HOLDINGS INC.
(individually and as lead arranger and administrative agent for itself and certain co-lenders),
as Lender

Dated:  December 29, 2006

## TABLE OF CONTENTS

**Page**

| | | | |
|---|---|---|---|
| I | DEFINITIONS; PRINCIPLES OF CONSTRUCTION | | 2 |
| | Section 1.1 | Capitalized Terms | 2 |
| | Section 1.2 | Principles of Construction | 2 |
| II | GENERAL TERMS | | 2 |
| | Section 2.1 | Loan Commitment; Disbursement to Borrower | 2 |
| | Section 2.2 | Mandatory Prepayments | 3 |
| | Section 2.3 | Fees | 3 |
| | Section 2.4 | Option to Extend | 3 |
| | Section 2.5 | Additional Fee | 4 |
| | Section 2.6 | Application of Prepayments on the Loan | 4 |
| III | CONDITIONS PRECEDENT | | 4 |
| IV | REPRESENTATIONS AND WARRANTIES | | 4 |
| | Section 4.1 | Borrower Representations | 4 |
| | Section 4.2 | Survival of Representations | 15 |
| V | BORROWER COVENANTS | | 15 |
| | Section 5.1 | Existence; Compliance with Legal Requirements | 15 |
| | Section 5.2 | Hazardous Substances | 16 |
| | Section 5.3 | Certain Prohibited Actions | 16 |
| | Section 5.4 | Taxes and Other Charges | 16 |
| | Section 5.5 | Performance of Agreements | 17 |
| | Section 5.6 | Notices | 17 |
| | Section 5.7 | Access to Premises | 18 |
| | Section 5.8 | Compliance | 18 |
| | Section 5.9 | Cooperate in Legal Proceedings | 18 |
| | Section 5.10 | Insurance Benefits and Condemnation Proceeds | 18 |
| | Section 5.11 | Further Assurances | 18 |
| | Section 5.12 | Financial Reporting | 19 |
| | Section 5.13 | Title to the Property | 20 |
| | Section 5.14 | Estoppel Statements | 21 |
| | Section 5.15 | Leasing Matters | 21 |
| | Section 5.16 | Business Purposes | 24 |

## TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| Section 5.17 | Property Manager | 24 |
| Section 5.18 | Contracts | 26 |
| Section 5.19 | Access Laws | 26 |
| Section 5.20 | Operation of Property | 27 |
| Section 5.21 | Maintenance of Property; Payment for Labor and Materials | 27 |
| Section 5.22 | Transfer or Encumbrance of the Property | 28 |
| Section 5.23 | ERISA | 30 |
| Section 5.24 | Affiliate Transaction | 31 |
| Section 5.25 | Service Rights | 31 |
| Section 5.26 | Purchase Options | 31 |
| Section 5.27 | Confirmation of Representations, Warranties and Covenants | 31 |
| Section 5.28 | Subdivision Maps | 31 |
| Section 5.29 | Conversion Construction | 32 |
| Section 5.30 | Intentionally omitted | 32 |
| Section 5.31 | Rent Stabilized Units | 32 |
| Section 5.32 | Equity Contribution | 32 |
| Section 5.33 | Anti-Terrorism | 32 |
| VI | CASUALTY; CONDEMNATION; ESCROWS | 33 |
| Section 6.1 | Insurance; Casualty and Condemnation | 33 |
| Section 6.2 | Tax and Insurance Escrows | 42 |
| VII | DEFAULTS | 43 |
| Section 7.1 | Event of Default | 43 |
| Section 7.2 | Remedies | 46 |
| Section 7.3 | Right of Entry | 49 |
| Section 7.4 | Costs of Enforcement | 49 |
| Section 7.5 | Violation of Legal Requirements | 50 |
| Section 7.6 | Remedies Cumulative | 50 |
| VIII | SECONDARY MARKET TRANSACTIONS AND CO-LENDING | 50 |
| Section 8.1 | Generally | 50 |
| Section 8.2 | Co-Lending | 52 |
| Section 8.3 | Several Liability | 55 |
| Section 8.4 | Appointment | 55 |

ii

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| Section 8.5 | Reliance on Agent | 55 |
| Section 8.6 | Powers | 56 |
| Section 8.7 | Disbursements | 56 |
| Section 8.8 | Distribution and Apportionment of Payments | 57 |
| Section 8.9 | Approval of Loan Documents | 59 |
| Section 8.10 | Agency Provisions Relating to Collateral | 59 |
| Section 8.11 | Lender Actions Against Borrower or the Collateral | 59 |
| Section 8.12 | Assignment and Participation | 59 |
| Section 8.13 | Ratable Sharing | 59 |
| Section 8.14 | General Immunity | 60 |
| Section 8.15 | No Responsibility for Loan, Recitals, Etc | 60 |
| Section 8.16 | Action on Instructions of Lenders | 60 |
| Section 8.17 | Employment of Agents and Counsel | 60 |
| Section 8.18 | Reliance on Documents; Counsel | 60 |
| Section 8.19 | Rights as a Lender | 61 |
| Section 8.20 | Successor Agent | 61 |
| Section 8.21 | Costs of Secondary Market Transactions | 61 |
| IX | EXCULPATION | 61 |
| Section 9.1 | Non-Recourse Provisions | 61 |
| Section 9.2 | Partial Recourse | 62 |
| Section 9.3 | Full Recourse | 63 |
| Section 9.4 | Recourse Events | 64 |
| Section 9.5 | No Waiver | 64 |
| X | INDEMNIFICATION | 64 |
| Section 10.1 | General Indemnification | 64 |
| Section 10.2 | ERISA Indemnification | 66 |
| Section 10.3 | Duty to Defend; Attorneys' Fees and Other Fees and Expenses | 66 |
| Section 10.4 | Changes in Laws Regarding Taxation | 66 |
| Section 10.5 | No Credits on Account of the Debt | 66 |
| Section 10.6 | Recording of Security Instruments | 66 |
| Section 10.7 | Brokers and Financial Advisors | 67 |
| XI | WAIVERS | 67 |

# TABLE OF CONTENTS
## (continued)

Page

| | | | |
|---|---|---|---|
| | Section 11.1 | Waiver of Counterclaim | 67 |
| | Section 11.2 | Marshalling and Other Matters | 68 |
| | Section 11.3 | Waiver of Notice | 68 |
| | Section 11.4 | Trial by Jury | 68 |
| XII | MISCELLANEOUS | | 69 |
| | Section 12.1 | Survival | 69 |
| | Section 12.2 | Governing Law | 69 |
| | Section 12.3 | Modification; Waiver in Writing | 71 |
| | Section 12.4 | Delay Not a Waiver | 71 |
| | Section 12.5 | Notices | 71 |
| | Section 12.6 | Headings | 73 |
| | Section 12.7 | Severability | 73 |
| | Section 12.8 | Preferences | 73 |
| | Section 12.9 | Expenses | 73 |
| | Section 12.10 | Relationship of Borrower and Lender | 74 |
| | Section 12.11 | No Joint Venture or Partnership; No Third Party Beneficiaries | 74 |
| | Section 12.12 | Publicity | 75 |
| | Section 12.13 | Subrogation | 75 |
| | Section 12.14 | Duplicate Originals; Counterparts | 75 |
| | Section 12.15 | Liability | 75 |
| | Section 12.16 | Prior Agreements | 75 |
| | Section 12.17 | No Usury | 76 |
| | Section 12.18 | Construction | 76 |
| | Section 12.19 | Lender's Discretion | 76 |
| | Section 12.20 | Lender | 77 |
| | Section 12.21 | Limitation on Liability | 78 |
| | Section 12.22 | Lockbox | 78 |
| | Section 12.23 | Appointment of Servicer and Delegation of Lender Rights | 78 |
| | Section 12.24 | Cross-Default; Cross-Collateralization; Waiver of Marshalling of Assets | 78 |
| | Section 12.25 | Delay Outside Lender's Control | 79 |
| | Section 12.26 | Right of Lender to Make Advances | 79 |

iv

**TABLE OF CONTENTS**
**(continued)**

Page

XIII    CONVERSION TO CONDOMINIUM .............................................................................79

    Section 13.1     Submission ..........................................................................79

    Section 13.2     Unit Sales Contracts ..........................................................81

    Section 13.3     Sales Contract Deposits.....................................................82

    Section 13.4     Monthly Sales Contract Reports .......................................82

    Section 13.5     After Conversion to Condominium.....................................82

    Section 13.6     Unit Releases......................................................................84

    Section 13.7     Application of Net Sales Proceeds .....................................85

    Section 13.8     Borrower's Covenants and Warranties ..............................85

SCHEDULES

Schedule I          Definitions
Schedule II         Conditions Precedent
Schedule III        Pending Litigation
Schedule IV         Disclosure Schedule
Schedule V          Leasing Guidelines
Schedule VI         Release Prices
Schedule VII        Acquisition and Pre-Development Budget

# MASTER CREDIT AGREEMENT

THIS MASTER CREDIT AGREEMENT, dated as of December 29, 2006 (as such agreement may be amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), is among LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, (individually and as lead arranger and administrative agent for itself and certain co-lenders), having an address at 399 Park Avenue, 8th Floor, New York, New York 10022 ("**Lender**"), and  250 EAST BORROWER, LLC, a Delaware limited liability company ("**Borrower**"), having an address at c/o 216 East 49th Street, 5th Floor, New York, New York 10017.

# W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲:

A.    Borrower has applied to Lender for a loan of up to $39,425,299.14, which shall consist of (i) an acquisition loan in the amount of $36,374,382.14 to finance the acquisition of the Property (the "**Acquisition Loan**"), (ii) a project loan in the amount of $3,050,917 to, among other things, finance certain pre- development costs of the Improvements (the "**Project Loan**"), and (iii) a building loan in the amount of the Building Loan Amount (as hereinafter defined) to finance, among other things, certain construction costs associated with the construction and development of the Project (the "**Building Loan**"; the Acquisition Loan, the Building Loan and the Project Loan are sometimes collectively referred to herein as the "**Loan**").

B.    To evidence the Acquisition Loan, Borrower has executed and delivered in favor of Lender an Acquisition Loan Promissory Note of even date herewith in the maximum principal amount of $36,374,382.14 (as amended, restated, supplemented, split, severed, consolidated, assigned or otherwise modified from time to time, the "**Acquisition Loan Note**"). The Acquisition Loan shall be advanced and repaid in accordance with this Agreement and the Acquisition Loan Note.  To secure the Acquisition Loan Note, Borrower has granted for the benefit of Lender inter alia, (i) an Acquisition Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Financing Statement of even date herewith encumbering the Project (as amended, restated, supplemented or otherwise modified from time to time, the "**Acquisition Loan Mortgage**") and (ii) the absolute Assignment of Rents and Leases of even date herewith (as amended, restated, supplemented, or otherwise modified from time to time, "**Assignment of Rents and Leases**").

C.    To evidence the Project Loan, Borrower has executed and delivered in favor of Lender a Project Loan Promissory Note of even date herewith in the maximum principal amount of $3,050,917 (as amended, restated, supplemented, split, severed, consolidated, assigned or otherwise modified from time to time, the "**Project Loan Note**").  The Project Loan shall be advanced and repaid in accordance with this Agreement and the Project Loan Agreement between Borrower and Lender of even date herewith (as amended, restated, supplemented or otherwise modified from time to time, the "**Project Loan Agreement**").  To secure the Project Loan Note, Borrower has granted for the benefit of Lender, inter alia, (i) a Project Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Financing Statement of even date herewith encumbering the Project (as amended, restated, supplemented,

or otherwise modified from time to time, the "**Project Loan Mortgage**") and (ii) the Assignment of Rents and Leases.

D.    Borrower intends to develop upon the Land containing in the aggregate approximately 8,900 square feet of vacant land into an multi-family residential and commercial condominium apartment complex consisting of approximately 7,139 net sellable square feet of retail condominium unit(s) on the first floor and approximately 8,089 net sellable square feet of retail or commercial space on the second floor (the "**Retail Units**") and approximately 80,860 net sellable square feet of residential condominium units on the remaining floors (the "**Residential Units**"), all to be constructed on the Land in accordance with the Plans and Specifications (as hereinafter defined) (collectively, the "**Improvements**"). The Land, the Improvements and all related improvements and facilities, now or hereafter existing, whether above or below ground/street level, together with all rights, privileges, easements, hereditaments and appurtenances thereunto relating or appertaining, and all fixtures and equipment required for, or otherwise intended for use in connection with, the operation thereof, including, without limitation, the Air Rights, are sometimes collectively referred to herein as the "**Project**".

E.    On the Building Loan Opening Date (as hereinafter defined), Borrower shall release the Building Loan Promissory Note in the form attached hereto as **Exhibit A** in the amount of the Building Loan Amount (the "**Building Loan Note**") executed on the date hereof and delivered into escrow with Lender. The Building Loan shall be advanced and repaid in accordance with this Agreement and the Building Loan Agreement between Borrower and Lender in the form attached hereto as **Exhibit B** (the "**Building Loan Agreement**") executed on the date hereof and delivered into escrow with Lender. To secure the Building Loan Note, Borrower shall grant for the benefit of Lender, inter alia, (i) a Building Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Financing Statement in the form attached hereto as **Exhibit C** (the "**Building Loan Mortgage**").

NOW, THEREFORE, in consideration of the making of the Loan by Lender to Borrower and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## I    DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1    Capitalized Terms.** All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in **Schedule I** attached hereto.

**Section 1.2    Principles of Construction**. All references to sections, schedules and exhibits are to sections, schedules and exhibits in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined and "including" means including without limitation. Whenever the context requires, each gender shall include all other genders. All exhibits and schedules attached hereto are incorporated herein by reference for all purposes.

2

## II  GENERAL TERMS

### Section 2.1    Loan Commitment; Disbursement to Borrower.

### Section 2.1.1  The Loan.

(a)      Subject to and upon the terms and conditions set forth herein, including without limitation, the provisions of Section 2.1.1(c)(i) hereof, and the other Loan Documents, Lender hereby agrees to make Advances of the Loan from time to time during the period from the date hereof to the Building Loan Opening Deadline and Borrower agrees to accept such Advances.  At no time throughout the term of the Loan shall the maximum principal amount of the Loan (the "**Maximum Loan Amount**") exceed in the aggregate (i) prior to the Building Loan Opening Date, $39,425,299.14 and (ii) on and after the Building Loan Opening Date, such amount as Lender may determine in its discretion pursuant to subsection (c)(i) hereof.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, no Advances under the Loan shall be made in respect of any amount that constitutes a Cost of Improvement (as such term is defined in the Lien Law of the State of New York, as amended from time to time) prior to the Building Loan Opening Date.

(b)      The Acquisition Loan shall be funded in one Advance on the Closing Date for and/or in connection with the acquisition of the Property in accordance with the terms and conditions of this Agreement; and the Project Loan shall be funded in more than one Advance in accordance with the terms and conditions of this Agreement and the Project Loan Agreement.

(c)      In addition to any requirements and conditions set forth elsewhere in this Agreement and in the Building Loan Agreement, the Building Loan Opening Date shall not occur unless and until the following shall have occurred as determined by Lender in its discretion:

(i)      The Maximum Loan Amount shall be modified, allocated, and/or re-allocated between the Acquisition Loan, the Building Loan and the Project Loan by Lender in its discretion;

(ii)      Borrower's plans for the development and operation of the Project shall be submitted to Lender and shall be substantially similar in form and substance as those plans submitted to Lender by Borrower in connection with Borrower's application for the Loan or otherwise acceptable to Lender in its discretion;

(iii)      The Project Loan Note in the amount allocated to the Project Loan (the "**Project Loan Amount**"), the Project Loan Agreement and the Project Loan Mortgage shall be executed by Borrower and delivered to Lender ;

(iv)      The Building Loan Note in the amount allocated to the Building Loan (the "**Building Loan Amount**"), the Building Loan Agreement and the Building Loan Mortgage shall be executed by Borrower and delivered to Lender;

3

(v)    All of the conditions precedent to the initial advance under the Building Loan Agreement have been fully satisfied in accordance with the provisions therein;

(vi)    No Default or Event of Default shall exist.

(vii)    The Project Loan Documents shall be subordinated to the Building Loan Documents; and

(viii)    All of the documents required under the Building Loan Agreement, the Project Loan Agreement for the initial advance thereunder, and such other documents and information as Lender may reasonably request, including amendatory, confirmatory and ratification documents by Borrower and the Guarantors shall be delivered to Lender in form and substance acceptable to Lender in its discretion on or before the Building Loan Opening Deadline.

(d)    The Loan shall be evidenced by the Notes.  Borrower hereby agrees to accept the Loan and to use the proceeds thereof only as provided herein and in the Building Loan Agreement and the Project Loan Agreement.  All of the obligations of Borrower arising under this Agreement and the other Loan Documents shall constitute one joint and several obligation of Borrower, secured by the Property.

(e)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon a Securitization of the Loan, any or a portion of unfunded amounts under any Loan (to the extent such Loan has been opened) may be advanced and deposited into reserve accounts controlled by Lender.  Any such advance of the Loans and deposit into the reserve accounts shall be deemed to have been paid to and received by Borrower and shall be added to the outstanding principal balance of the applicable Loan and shall bear interest at the Applicable Interest Rate (as defined in the applicable Note).  Amounts in such reserve accounts shall be disbursed to Borrower only upon satisfaction of the same conditions that would have been required for an Advance of such amounts under the applicable Loan Agreements.

(f)    Construction (i.e. pouring of concrete for foundations) shall have commenced before January 1, 2008 or such other date on which the effective date of the any applicable laws with respect to the 421-a Certificates may be amended or modified.  In addition, any agreements between the sellers under the Purchase Agreements for the 421-a Certificates and the New York City Department of Housing Preservation and Development that are necessary for the effectiveness of the 421-a Certificates shall have been executed and delivered.

**Section 2.1.2    Use of Proceeds.**  Borrower shall use the proceeds of the Loan in accordance with the Certificate of Sources and Uses of Funds and for no other purpose.

**Section 2.2    Mandatory Prepayments**.  At the Lender's discretion, the Loan is subject to mandatory prepayment in certain instances of Casualty and Condemnation (each, a **"Casualty/Condemnation Involuntary Prepayment"**), in the manner and to the extent set forth in this Agreement.  Each Casualty/Condemnation Involuntary Prepayment not made on a Payment Date shall include all accrued and unpaid interest that would have accrued on such prepayment through the next Payment Date.

4

**Section 2.3   Fees.** On the date of execution of this Agreement, Borrower shall pay to Lender the Origination Fee as a fee for Lender arranging the Loan. On the date of the funding of the first advance under the Building Loan Agreement (or such earlier date that Lender has the right so to fund), Borrower shall pay to Lender an additional origination fee equal to 1% of the principal amount of the Building Loan as a fee for Lender arranging the Building Loan.

**Section 2.4   Mandatory Extension .** Borrower hereby agrees to use good faith efforts to provide to Lender all of the documentation and information required by Lender under this Agreement, the Building Loan Agreement and the Project Loan Agreement on a timely basis to permit Lender determine whether Lender will open the Building Loan and the Project Loan or any portion thereof, offer a new construction loan on terms acceptable to Lender in its discretion, or decline to open the Building Loan and Project Loan or make another construction loan. In the event the Lender elects to open the Building Loan and the Project Loan, or any portion thereof, in accordance with the provisions of this Agreement, the Building Loan Agreement, and the Project Loan Agreement, the Loan shall be automatically extended from the Initial Maturity Date to the Extended Maturity Date subject to the following conditions precedent being satisfied:

(a)   Borrower shall deliver to Lender an Interest Rate Cap Agreement in accordance with the provisions of Section 2.7;

(b)   Borrower shall establish such reserve funds for Taxes, Insurance Premiums and Interest on the Loan as Lender may reasonably required.

(c)   Borrower shall execute or cause the execution of all documents reasonably required by Lender to memorialize the extension and shall deliver to Lender, at Borrower's sole cost and expense, a Datedown Endorsement to each of the Title Insurance Policies that shall show no encumbrances on the Property other than the Permitted Encumbrances and shall otherwise not show any matter not permitted by the Loan Documents;

(d)   Borrower shall have provided to Lender an estoppel certificate in compliance with Section 5.14 (a) of this Agreement; and

(e)   Borrowers shall have provided Lender with evidence that the maturity date of the Mezzanine Loan has been extended to a date no earlier than the Extended Maturity Date.

During the period from the Initial Maturity Date through the Extended Maturity Date, the terms and conditions of this Agreement and the other Loan Documents, as modified and approved by Borrower and Lender, shall remain unmodified and in full force and effect.

Unless otherwise agreed to in writing by Lender, there shall be no further extension of the Maturity Date beyond the Extended Maturity Date. If for any reason Lender elects not to open the Building Loan and Project Loan, Borrower shall have no right to extend the maturity date of the Loan, and in such event, the outstanding principal balance of the Loan and all other Obligations shall be due and payable to Lender on the Initial Maturity Date. Borrower shall pay all the reasonable costs and expenses incurred in connection with the extension of the Maturity Date including, without limitation, the reasonable fees and

disbursements of Lender's counsel, any title insurance premiums (if any) and charges, recording charges, recording taxes and other related expenses.

**Section 2.5    Additional Fee.** The Additional Fee shall be deemed earned in full as of the Closing Date and shall be payable on the earliest to occur of the date of prepayment of the Loan, the Maturity Date or the occurrence of an Event of Default. In the event of any partial prepayment permitted or required under any Note or this Agreement, such partial prepayment shall be accompanied by a partial payment of the Additional Fee in an amount equal to the product of $500,000.00 times a fraction, the numerator of which is the amount of the partial principal prepayment and the denominator of which is $100,000,000.00.

**Section 2.6    Application of Prepayments on the Loan.** Notwithstanding anything to the contrary contained in this Agreement, the other Loan Agreements, the Notes or any of the other Loan Documents, all prepayments of the Loan resulting from the application of funds in the Lockbox Account and the application of funds in the Release Prices Account shall, in the absence of an Event of Default, be applied by Lender on a pro-rata basis between the Notes based on the outstanding principal balance of each Note on the date of such prepayment in accordance with the applicable provisions of the Lockbox Agreement. All other prepayments of the Loan, whether voluntary or involuntary, mandatory or optional and including all prepayments made following the occurrence of an Event of Default, may be applied by Lender as Lender, in its discretion, may determine.

**Section 2.7    Interest Rate Cap Agreement.**

(a)    On or before the Building Loan Opening Deadline, Borrower shall obtain, or cause to be obtained, and shall thereafter maintain in effect, an Interest Rate Cap Agreement with an Acceptable Counterparty, which shall be coterminous with the Loan (and shall be extended to the Extended Maturity Date, if applicable), shall have a notional amount not less than the aggregate principal amount of the Loan and shall at all times have a LIBOR Rate strike rate equal to the Strike Rate. On or before the Building Loan Opening Date, Borrower shall obtain, or cause to be obtained, and shall thereafter maintain in effect, an additional Interest Rate Cap Agreement with an Acceptable Counterparty, which shall be coterminous with the Building Loan, shall have a notional amount not less than the aggregate principal amount of the Building Loan and shall at all times have a LIBOR Rate strike rate equal to the Strike Rate. The Acceptable Counterparty shall be obligated under each such Interest Rate Cap Agreement to make monthly payments equal to the excess of the LIBOR Rate over the Strike Rate, calculated on the notional amount. The notional amount of each Interest Rate Cap Agreement may be reduced (and Lender shall consent to such reduction) from time to time in amounts equal to any prepayment of the principal (if any) of the Loan in accordance with the applicable Notes and the other Loan Documents. Each Interest Rate Cap Agreement shall be written on the then current standard ISDA documentation, and shall provide for interest periods and calculations consistent with the payment terms of this Agreement.

(b)    On or before the Closing Date, Borrower shall collaterally assign to Lender, pursuant to an Assignment of Interest Rate Cap Agreement, in form and substance reasonably satisfactory to Lender, all of its right, title and interest to receive any and all payments under the Interest Rate Cap Agreement in effect on the Closing Date (and any related

guarantee, if any) and shall deliver to Lender an executed counterpart of such Interest Rate Cap Agreement and notify the Acceptable Counterparty of such collateral assignment (either in such Interest Rate Cap Agreement or by separate instrument). On or before the Building Loan Opening Date, Borrower shall also collaterally assign to Lender, pursuant to an Assignment of Interest Rate Cap Agreement, all of its right, title and interest to receive any and all payments under the Interest Rate Cap Agreement pertaining to the Building Loan (and any related guarantee, if any) and shall deliver to Lender an executed counterpart of such Interest Rate Cap Agreement and notify the Acceptable Counterparty of such collateral assignment (either in such Interest Rate Cap Agreement or by separate instrument). The Acceptable Counterparty shall agree in writing to make all payments it is required to make under each such Interest Rate Cap Agreement directly to the Lockbox Account, or, if the Lockbox Account has not yet been established pursuant to the requirements of Section 5.29 hereof, directly to Lender. At such time as the Loan is repaid in full, all of Lender's right, title and interest in each Interest Rate Cap Agreement shall terminate and Lender shall promptly execute and deliver at Borrower's sole cost and expense, such documents as may be required to evidence Lender's release of such Interest Rate Cap Agreement and to notify the Acceptable Counterparty of such release.

(c)    Borrower shall comply with all of its obligations under the terms and provisions of each Interest Rate Cap Agreement. All amounts paid by the Acceptable Counterparty under any Interest Rate Cap Agreement shall be deposited immediately (i) into the Lockbox Account to be applied in accordance with the Lockbox Agreement, or (ii) if the Lockbox Agreement is not yet in effect pursuant to the requirements of Section 5.29 hereof, directly to Lender. Borrower shall take all actions reasonably requested by Lender to enforce Lender's rights under each Interest Rate Cap Agreement in the event of a default by the Acceptable Counterparty and shall not waive, amend or otherwise modify any of its rights thereunder.

(d)    In the event of any downgrade, withdrawal or qualification of the rating of the Acceptable Counterparty below "AA-" by Standard & Poor's Rating Group, "Aa3" by Moody's Investors Service, Inc. or an equivalent credit rating by any other Rating Agency, Borrower shall within 15 days following receipt of notice from Lender or Servicer of such downgrade, withdrawal or qualification, either (x) cause such Acceptable Counterparty to post collateral on terms acceptable to each Rating Agency or (y) replace each Interest Rate Cap Agreement then in effect with a Replacement Interest Rate Cap Agreement with an Acceptable Counterparty acceptable to each Rating Agency. Notwithstanding the foregoing, if the Acceptable Counterparty's rating is downgraded to "A" (or the equivalent) or lower, only the option described in clause (y) will be acceptable.

(e)    In the event that Borrower fails to purchase and deliver to Lender any Interest Rate Cap Agreement or any Replacement Interest Rate Cap Agreement as and when required hereunder, Lender may purchase such Interest Rate Cap Agreement and the cost incurred by Lender in purchasing such Interest Rate Cap Agreement shall be paid by Borrower to Lender with interest thereon at the Default Rate from the date such cost was incurred by Lender until such cost is paid by Borrower to Lender.

(f)    Each Interest Rate Cap Agreement shall contain the following language or its equivalent: "In the event of any downgrade, withdrawal or qualification of the rating of the

7

Acceptable Counterparty below "AA-" by Standard & Poor's Rating Group, "Aa3" by Moody's Investors Service, Inc. or an equivalent credit rating by any other Rating Agency, the Acceptable Counterparty must, within 15 days, either (x) post collateral on terms acceptable to each Rating Agency or (y) find a replacement Acceptable Counterparty, at the Acceptable Counterparty's sole cost and expense, acceptable to each Rating Agency (notwithstanding the foregoing, if the Acceptable Counterparty's rating is downgraded to "A" or lower, only the option described in clause (y) will be acceptable); provided that, notwithstanding such a downgrade, withdrawal or qualification, unless and until the Acceptable Counterparty transfers the Interest Rate Cap Agreement to a replacement Acceptable Counterparty pursuant to the foregoing clause (y), the Acceptable Counterparty will continue to perform its obligations under the Interest Rate Cap Agreement. Failure to satisfy the foregoing shall constitute an Additional Termination Event as defined by Section 5(b)(v) of the ISDA Master Agreement, with the Acceptable Counterparty as the Affected Party."

(g)    In connection with an Interest Rate Cap Agreement, Borrower shall obtain and deliver to Lender a opinion of counsel from counsel for the Acceptable Counterparty (upon which Lender and its successors and assigns may rely) acceptable to Lender in its discretion, which opinion shall provide, in relevant part, that:

(i)    the Acceptable Counterparty is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Cap Agreement;

(ii)    the execution and delivery of the Interest Rate Cap Agreement by the Acceptable Counterparty, and any other agreement which the Acceptable Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

(iii)    all consents, authorizations and approvals required for the execution and delivery by the Acceptable Counterparty of the Interest Rate Cap Agreement, and any other agreement which the Acceptable Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and

(iv)    the Interest Rate Cap Agreement, and any other agreement which the Acceptable Counterparty has executed and delivered pursuant thereto, has been duly executed and delivered by the Acceptable Counterparty and constitutes the legal, valid and binding obligation of the Acceptable Counterparty, enforceable against the Acceptable Counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

8

**Section 2.8    Optional Method for Payment of Interest**. An interest reserve for the Building Loan shall be established and disbursed as set forth in the Building Loan Agreement. An interest reserve for the Project Loan shall be established and disbursed as set forth in the Project Loan Agreement. The interest reserve for the Acquisition Loan shall be disbursed as set forth in the balance of this Section 2.8. Included as a Budget Line Item in the Project Loan Budget is a line item for interest on the Acquisition Loan (the "Acquisition Loan Interest Reserve"). Provided no Default or Event of Default exists beyond any applicable notice and cure periods, and subject to the provisions of this Section 2.8, disbursements (each, an "Acquisition Loan Automatic Interest Reserve Payment") shall be made by Lender on behalf of the Borrower to Lender on each Payment Date in accordance with the terms of this Agreement and shall be made by a bookkeeping entry on Lender's records reflecting, as a disbursement under the Project Loan, the applicable amount funded from the Acquisition Loan Interest Reserve. Any disbursements from the Acquisition Loan Interest Reserve shall be deemed to have been paid to and received by Borrower and shall be added to the outstanding principal balance of the Project Loan and shall bear interest at the Applicable Interest Rate (as defined in the Acquisition Loan Note). Interest at the Applicable Interest Rate will be charged on any disbursed portion of the Acquisition Loan Interest Reserve as and when advanced, but interest will not be charged on the undisbursed portion of the Acquisition Loan Interest Reserve. Borrower recognizes that the payment of interest by Acquisition Loan Automatic Interest Reserve Payments is for its convenience and benefit. Lender shall have no obligation to fund any Acquisition Loan Automatic Interest Reserve Payments so long as any Event of Default shall exist under the Loan. If at any time or from time to time throughout the Loan Lender determines, in the exercise of its reasonable discretion, that there shall exist an insufficient amount in the Acquisition Loan Interest Reserve to fully fund any Acquisition Loan Automatic Interest Reserve Payment that shall thereafter become due through the Maturity Date, and there are no Cost Savings (as defined in the Project Loan Agreement) in other Budget Line Items to be allocated to the Acquisition Loan Interest Reserve, Borrower shall, within seven (7) Business Days after receipt of Lender's written notice to such effect, deposit with Lender such amount as shall be required by Lender to fully fund any such Acquisition Loan Automatic Interest Reserve Payments and Lender shall credit such amounts to the Acquisition Loan Interest Reserve line item in the Project Loan Budget. Lender shall not be required to pay and Borrower shall not be entitled to receive interest on such amounts so deposited. Borrower's failure to make any such deposits in a timely manner shall be an Event of Default. If at any time the Acquisition Loan Interest Reserve shall become depleted, interest shall be payable on the relevant payment date in accordance with the terms of this Agreement from funds other than the Loan or the Acquisition Loan Interest Reserve. The Acquisition Loan Interest Reserve shall be available only for the disbursement of the periodic payments of interest due to Lender on the Acquisition Loan. Borrower shall have the right on any payment date to pay the interest owing on the Acquisition Loan from funds other than the Project Loan or the Acquisition Loan Interest Reserve. Any funds disbursed from the Acquisition Loan Interest Reserve in the manner provided in this Section 2.8, shall have been deemed paid to and received by Borrower.

9

## III CONDITIONS PRECEDENT

As a material inducement to Lender to make the Loan, Borrower hereby represents and warrants to Lender that Borrower has satisfied (except to the extent specifically set forth on **Schedule IV**) all of the conditions precedent set forth in **Schedule II** attached hereto, and Borrower acknowledges that Lender would not fund the Loan unless all of such conditions precedent were satisfied (or waived in writing by Lender) by the Closing Date.

## IV REPRESENTATIONS AND WARRANTIES

**Section 4.1    Borrower Representations**. Borrower represents and warrants to the Lender as of the date hereof and as of the date of each Advance, except as otherwise disclosed on the Disclosure Schedule attached hereto as **Schedule IV** that:

(a)    Organization. To the best of Borrower's knowledge, Borrower has been duly organized and is validly existing and in good standing in the jurisdiction in which it is organized. Borrower is duly qualified to do business and is in good standing in the State of New York and in each jurisdiction where Borrower is required to be so qualified in connection with its properties, businesses and operations, including without limitation, the State of Delaware. Borrower has all necessary rights, Licenses, permits, authorizations, approvals, governmental and otherwise, and full power and authority to own the Property and carry on its business as proposed to be conducted. Borrower has the full right, power and authority to operate and lease the Property, to encumber the Property as provided herein and to perform all of the other obligations to be performed by Borrower under the Loan Documents. The sole business of Borrower is the ownership, constructions, development and operation of the Property.

(b)    Enforceability. Each Borrower Party has taken all necessary action to authorize the execution, delivery and performance of the obligations of this Agreement and the other Loan Documents to which it is a party, and such obligations shall be the valid and binding obligations of the respective Borrower Parties. This Agreement and such other Loan Documents to which Borrower Party is a party have been duly executed and delivered by or on behalf of Borrower Party and Borrower Party has obtained or received all required consents and approvals, corporate, governmental or otherwise, and this Agreement and such other Loan Documents to which Borrower Party is a party constitute legal, valid and binding obligations of each Borrower Party enforceable against each Borrower Party in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization and similar laws affecting rights of creditors generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law). The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by any Borrower Party, including the defense of usury or similar doctrines, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable except to the extent such unenforceability may be the result of bankruptcy, insolvency, reorganization or similar laws affecting rights of creditors generally or general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law), and Borrower has not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

10

(c)    No Conflicts. The execution and delivery of this Agreement and the other Loan Documents and the performance of the obligations thereunder by the Borrower Parties will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, operating agreement, certificate of incorporation, bylaws or any other agreement or instrument to which Borrower is a party or by which any of Borrower's properties or assets are subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or Governmental Authority having jurisdiction over Borrower or any of Borrower's respective properties or assets, and any consent, approval, authorization, order, License, registration or qualification of or with any court or any such regulatory authority or other Governmental Authority or body required for the execution, delivery and performance by the Borrower Parties of this Agreement or any other Loan Documents has been obtained and is in full force and effect.

(d)    Litigation. To Borrower's best knowledge, there are no actions, suits, proceedings or investigations at law or in equity now pending or, to Borrower's best knowledge, threatened against or affecting any Borrower Party or the Property, other than as described on **Schedule III**.

(e)    Agreements. Borrower is not a party to any agreement or instrument or subject to any restriction, which has a Material Adverse Effect on Borrower or the Property. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which Borrower is a party or by which Borrower or the Property is bound. Borrower has no Indebtedness under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation of the Property and (b) obligations under the Loan Documents.

(f)    Title. Borrower has good, marketable and insurable fee simple title to the real property comprising the Property, free and clear of all Liens whatsoever except the Permitted Encumbrances. The Security Instruments, when properly recorded in the appropriate records, together with the Uniform Commercial Code financing statements filed in connection with the Loan, will create (i) valid, perfected Liens on the Property, subject only to the Permitted Encumbrances and (ii) perfected security interests in and to (or perfected collateral assignments of), all personality (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances. The Permitted Encumbrances do not materially and adversely affect the value of the Property, the use of the Property for the use being made thereof as of the date of this Agreement, the operation of Property or Borrower's ability to repay the Loan in full. To the best of Borrower's knowledge, there are no claims for payment for work, labor or materials affecting the Property, which will become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents. Borrower has paid in full for, and is the owner of, all furnishings, fixtures and equipment used in connection with the operation of the Property, free and clear of any and all security interests, Liens or encumbrances, except the Liens and security interest created by the Loan Documents. There are no prior assignments of Leases

11

or any portion of the Rents due and payable or to become due and payable, which are presently outstanding. There are no options, rights of first refusal, rights of first offer or similar rights, which affect the Property or any portion thereof.

(g)    No Bankruptcy Filing. (A) (i) Borrower is solvent (within the meaning of all Bankruptcy Laws) and no bankruptcy, reorganization, insolvency or similar proceeding with respect to any Borrower Party under any Bankruptcy Law has been initiated, and (ii) the entering into the Loan Documents to which any Borrower Party is a party does not constitute a fraudulent conveyance by any Person; and (B) no petition in bankruptcy has been filed by or against Borrower, any Borrower Party, or any Affiliate of Borrower or any Borrower Party in the last seven (7) years, and none of Borrower, any Borrower Party, or any related entity, or any principal, any general partner or member thereof, in the last seven (7) years has ever made any assignment for the benefit of creditors or taken advantage of any applicable Bankruptcy Laws. To the best of Borrower's knowledge, no Borrower Party has entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and Borrower Party has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total liabilities, including subordinated, unliquidated, disputed or contingent liabilities, including the maximum amount of its contingent liabilities and its debts as such debts become absolute and matured. Borrower's assets are not currently and, immediately following the execution and delivery of the Loan Documents will not constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, nor does it believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of the obligations of Borrower).

(h)    Full and Accurate Disclosure. No statement of fact made by any of the Borrower Parties in this Agreement or in any of the other Loan Documents, nor any written materials relating to the business, operations or condition (financial or otherwise) of any of the Borrower Parties or the Property that were supplied to Lender in connection with Lender's due diligence investigation (other than financial projections in respect of which no representation is made) contains (or, in the case of such written material, at the time supplied contained) any untrue statement of a material fact or omits (or omitted, as the case may be) to state any material fact necessary to make the statements contained therein or in any of the Loan Documents not misleading.

(i)    Regulatory. None of the Borrower Parties is an "employee benefit plan" (as defined in Section 3(3) of ERISA), subject to Title I of ERISA, and none of the assets of the Borrower Parties constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101. In addition, (i) none of the Borrower Parties is a "governmental plan" within the meaning of Section 3(32) of ERISA and (ii) transactions by or with any of the Borrower Parties are not subject to state statutes regulating investments of, and fiduciary obligations with respect to, governmental plans. No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other

purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents. Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the Code. Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (iii) subject to any other federal or state law or regulation which purports to restrict or regulate Borrower's ability to borrow money.

(j)     Compliance. To the best of Borrower's knowledge, Borrower and the Property (and the uses thereof) comply with all applicable Legal Requirements in all material respects. Borrower has obtained and will obtain all necessary certificates, licenses and other approvals, governmental and otherwise, and all required zoning, building code, land use, environmental and other similar permits or approvals (collectively, the "**Licenses**"), including certificates of completion and certificates of occupancy, necessary for the construction and operation of the Property for its intended uses and for the conduct of Borrower's business and each Tenant's business and all such Licenses remain in full force and effect. To the best of Borrower's knowledge, there exists no fact or circumstance that would permit any of the foregoing to revocation, suspension, forfeiture or modification. Neither Borrower nor the Property is in default or violation of any material order, writ, injunction, decree or demand of any Governmental Authority. There has not been committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. The Plans and Specifications, the construction contemplated pursuant thereto and the use of the Property contemplated thereby comply and shall comply with applicable Legal Requirements, including all applicable zoning resolutions, building codes and Environmental Laws. The Project is a permitted use under applicable zoning laws and under all covenants, conditions or agreements affecting the Project, including but not limited to any set back restrictions, any zoning lot restrictions, and any zoning lot and development agreements. The Project is in compliance with all applicable land use laws, regulations and ordinances and all covenants, conditions or agreements affecting the Project, including but not limited to any set back restrictions, any zoning lot restrictions, and any zoning lot and development agreements. The Project is zoned in accordance with all applicable governmental rules, ordinances, regulations and laws so as to permit the Improvements and Borrower is not aware of any problem or requirement respecting zoning ordinances, rules or regulations or any covenants, conditions, easements, restrictions or agreement affecting the Project, including but not limited to any set back restrictions, any zoning lot restrictions, and any zoning lot and development agreements that would jeopardize the existence, operation or construction of the Project, the completion of the Improvements or the demolition of the buildings located on the Property on the Closing Date. To the best of Borrower's knowledge, there are no pending or threatened actions, suits or proceedings to revoke, attack, invalidate, rescind or modify the zoning of the Project, or any governmental approvals heretofore issued with respect to the Project or any part thereof, or asserting that such governmental approvals or the zoning of the Project do not permit the use of the Improvements and the rest of the Project as contemplated by the Loan Documents.

13

(k)    Financial Information.

(i)    The rent rolls (if applicable), balance sheets, income statements and statements of cash flow and other financial data that have been delivered to Lender in respect of the Property and each applicable Borrower Party, including those required under Article III (A) are with respect to those items relating to each Borrower Party, true, complete and correct in all material respects, and with respect to those relating to the Property, are to the best of Borrower's knowledge, true, complete and correct in all material respects, (B) accurately represent the financial condition of the Property (to the best of Borrower's knowledge) and/or the applicable Borrower Party as of the date of such reports or statements and contain no material misrepresentation or omission, and (C) have been prepared in accordance with Acceptable Accounting Principles consistently applied throughout the periods covered, except as disclosed therein, and (D) have not been amended, modified or revised in any manner. Borrower has no material Indebtedness, liabilities, contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that may have a Material Adverse Effect, except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no Material Adverse Change in the financial condition, operations or business of Borrower, any Borrower Party, or the Property (to the best of Borrower's knowledge) from that set forth in said financial statements.

(ii)    To the best of Borrower's knowledge, each Borrower Party has filed all federal, state, county, municipal, and city income and other tax returns required to have been filed by them and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by them. No Borrower Party knows of any basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

(l)    Casualty; Condemnation and Assessments. The Property is free from damage by Casualty. No Condemnation or other proceeding has been commenced or, to the best of Borrower's knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of any roadways providing access to the Property or for any easements or public right-of-ways. To the best of Borrower's knowledge, there are no pending or proposed special or other assessments for public improvements affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments, and to the knowledge of the Borrower, there are no other facts or circumstances which would cause the Taxes and Other Charges for the Property for the Fiscal Year in which the Closing Date occurs or the next following Fiscal Year to be significantly higher than the Taxes and Other Charges for the Property assessed and imposed for the Fiscal Year prior to the Fiscal Year in which the Closing Date occurs.

(m)    Insurance. Borrower has obtained and has delivered to Lender a certificate(s) of insurance satisfactory to Lender reflecting the insurance coverages, amounts and other requirements set forth in this Agreement and there have been no acts or omissions that would impair the coverage of any such Policies or the benefits of the mortgagee endorsements, and, unless previously delivered to Lender, Borrower shall deliver to Lender certified copies of all such Policies within ten (10) Business Days following the date of this Agreement.

14

(n)    Use; Certificate of Occupancy; Licenses; Utilities. The Property is current is, or will be not later than the Building Loan Opening Deadline, vacant land and will be developed for multi-family residential and commercial purposes and other appurtenant and related uses in accordance with applicable law and the terms of the Loan Documents. All required certificates of occupancy (or local equivalents) required for such uses have been obtained or shall be obtained upon completion of the construction of Project in accordance with the terms and conditions of this Agreement and the Building Loan Agreement, and the use being made of the Property shall be in conformity, in all material respects, with the certificates of occupancy (or local equivalents) issued for the Property. To the best of Borrower's knowledge, the Property has rights of access to public ways and is served by public water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its current and any intended use. All public utilities necessary for the use and the enjoyment of the Property are located either in the public rights-of-way abutting the Property (which are connected so as to serve the Property without passing through other property) or in recorded easements serving the Property and such easements are set forth and insured in the Title Insurance Policies. All roads and other access necessary for the current and any intended use of the Property have been completed and dedicated to public use and accepted by all Governmental Authorities and are adequate for the Property's current and intended use.

(o)    Physical Condition. The Project, including the Improvements and all portions thereof, is and shall be in good condition, order and repair in all material respects. To Borrower's actual knowledge, there exists no structural or other material defects or damages in any Property, whether latent or otherwise, and Borrower has not received notice from any insurance company, bonding company or any other Person of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any Policy or bond. All costs and expenses of any and all labor, materials, supplies and equipment used in the construction of the Improvements have been paid in full.

(p)    Survey; Flood Zone; Separate Tax Lot. The Survey for the Property delivered to Lender in connection with this Agreement have been prepared in accordance with the provisions of Section (b)(iv) of **Schedule II**. To the best of Borrower's knowledge, all of the Improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no Improvements on adjoining properties encroach upon the Property, no easements or other encumbrances upon the Property encroach upon any of the Improvements. The Property is comprised of one (1) or more parcels, which constitute one or more separate tax lots, and does not constitute a portion of any other tax lot not a part of the Property. None of the Improvements on the Property is located in any area identified by the Federal Emergency Management Agency as an area having special flood hazards or, if any portion of the Improvements or the Property is located within such area, Borrower has obtained and will maintain the insurance prescribed in Section 6.1.1(a)(ii).

(q)    Leases. The Property is not subject to any Leases other than Leases approved by Lender in accordance with the provisions of Section 5.15 hereof. . All Security Deposits relating to any Leases reflected on any rent rolls delivered to Lender or Servicer have been collected by the Borrower except as noted on the rent rolls, and the Security Deposits constitute all of the tenant Security Deposits required to be held by the Borrower as the landlord

under the Leases. To the best of Borrower's knowledge, no Person has any possessory interest in the Property or the right to occupy the same except under and pursuant to the provisions of the Leases. All commercial Leases are by their terms subordinate to the Lien of the Security Instruments. Borrower is the sole owner of the landlord's interest in the Leases affecting and none of the Leases or Rents have been assigned, pledged or hypothecated except in connection with the Loan, and, except as shown on the rent rolls from time to time delivered to Lender, none of the Rents have been discounted, released, waived or compromised. To the best of Borrower's knowledge, (a) none of the Rents have been collected for more than one (1) month in advance; (b) the premises demised under the Leases have been completed and the Tenants have accepted the same and have taken possession and have commenced paying Rent; (c) there exist no offsets or defenses to the payment of any portion of the Rents; (d) no Lease contains any option to purchase, right of first offer, right of first refusal to purchase, or any other similar provision; (e) there are no adjustments or changes to the Rent payable by any Tenant under any Lease; (f) except as disclosed in the rent rolls delivered from time to time to Lender, there are no security or other deposits held pursuant to any Lease; (g) Borrower has not received written notice challenging the validity or enforceability of any Lease; (h) there are no agreements with Tenants other than as set forth in the Leases, including any revisions, amendments or modifications of the Leases; (i) there are no brokerage commissions or finder's fees due or payable with respect to any Leases; and (j) except as set forth in the rent rolls delivered from time to time to Lender, the Leases are in full force and effect and there are no material defaults thereunder by Borrower or any Tenant, and there are no conditions that, with the passage of time or the giving of notice, or both, would constitute material defaults thereunder.

(r)    Filing and Recording Taxes. All transfer taxes, recording taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes or recording taxes, charges or fees or similar charges required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Property to the Borrower has been paid or will be paid on the Closing Date. All mortgage, mortgage recording, stamp, intangible or other similar taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including the Security Instruments, have been paid.

(s)    Single-Purpose. Borrower hereby represents and warrants to, and covenants with, Lender that as of the date hereof and until such time as the Debt shall be paid in full:

(i)    Borrower has not owned, does not currently own and will not own any asset or property other than (A) the Property and (B) incidental personal property necessary for the ownership or operation of the Property.

(ii)    Borrower not has engaged in and will not engage in any business other than the ownership, renovation, construction, management, leasing of the Property and the conversion of the Property to condominium form of ownership and disposition of the Units therein in accordance with the terms of the Loan Documents.

(iii)    Borrower has not incurred and will not incur any Indebtedness, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation), other than the Debt and unsecured trade debt none of which is or shall be at any time more than sixty (60) days past due (unless same is being contested in accordance with applicable Legal Requirements and the Loan Documents and Lender has been notified in writing of same) and does not and shall not exceed in the aggregate at any time the Maximum Permitted Trade Payables. Except as permitted by Section 5.22(f), no constituent member, partner or shareholder of Borrower (direct or indirect, and no matter how remote) has incurred or will incur any Indebtedness secured (directly or indirectly) by such Person's legal or beneficial ownership interest in Borrower or any constituent member, partner or shareholder of Borrower (direct or indirect, legal or beneficial, and no matter how remote). No Indebtedness other than the Debt may be secured (superior, subordinate or pari passu) by the Property or any portion thereof.

(iv)    Borrower has not made and will not make any loans or advances to any Person (including any Affiliate or constituent party), or has acquired or shall acquire obligations or securities of any Borrower Party or any Affiliate of Borrower or any Borrower Party.

(v)    Borrower is and will remain solvent and Borrower has at all times during its existence paid and will continue to pay its debts, liabilities and expenses (including, as applicable, shared personnel and overhead expenses) only from Borrower's assets as the same shall become due.

(vi)    Borrower has done or caused to be done and will do all things necessary to observe limited liability company and other organizational formalities and preserve Borrower's existence.

(vii)    Borrower has at all times during its existence maintained and will continue to maintain all of Borrower's books, records, financial statements and bank accounts separate from those of any other Person, and Borrower will file its own tax returns. Borrower has at all times during its existence maintained and will continue to maintain Borrower's books, records, resolutions and agreements as official records.

(viii)    Borrower is and will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other Person (including any Affiliate of Borrower or any constituent party of Borrower), has at all times conducted and will continue to conduct business in its own name, has at all times corrected and shall correct any known misunderstanding regarding its status as a separate entity, has not identified and shall not identify itself as a division or part of any other Person and has maintained and shall continue to maintain and utilize separate stationery, invoices and checks bearing its own name.

(ix)    Borrower has maintained and will continue to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(x)      None of the Borrower nor any constituent party of Borrower will seek or effect the liquidation, dissolution, winding up, consolidation or merger, in whole or in part, of Borrower.

(xi)     Borrower has not commingled and will not commingle its funds and other assets with those of any other Person, and the Borrower has not controlled and will not control the decisions with respect to the daily affairs of any other Person.

(xii)    Borrower has maintained and will continue to maintain its assets in such a manner that it would not be costly or difficult to segregate, ascertain or identify its assets from those of any Affiliate or constituent party of Borrower or any other Person.

(xiii)   Borrower has not held, does not currently hold and will not hold itself out to be responsible for the debts or obligations of any other Person.

(xiv)    Borrower has at all times during its existence held, and will continue to hold, all of its assets in its own name.

(xv)     Borrower has not at any time during its existence guaranteed or become obligated for, and will not in the future guarantee or become obligated for, the debts of any other Person.

(xvi)    Except as specifically provided in the Loan Documents, no other Person has ever guaranteed or become obligated for Borrower's debts at any time during Borrower's existence, and except as specifically provided in the Loan Documents, Borrower will not permit any other Person to guarantee or become obligated for its debts at any time in the future.

(xvii)   Borrower has not at any time during its existence held, and will not in the future, hold out Borrower's credit as being available to satisfy the obligations of any other Person.

(xviii)  No other Person has ever held, and Borrower will not permit any other Person to hold, out Borrower's credit as being available to satisfy the obligations of any other Person.

(xix)    Borrower has not at any time during its existence bought or held, and will not in the future buy or hold, evidence of Indebtedness issued by any of its Affiliates or equity interest holders (direct or indirect, legal or beneficial).

(xx)     Borrower has at all times during its existence allocated fairly and reasonably (and paid or charged for, as applicable), and will continue to allocate fairly and reasonably (and pay or charge for, as applicable), any overhead expenses that are shared with an Affiliate of Borrower, including paying for office space provided by and services performed by any employee of an Affiliate of Borrower.

18

(xxi)   Except as provided in the Loan Documents, Borrower has not at any time during its existence pledged, and will not in the future pledge, its assets for the benefit of any other Person.

(xxii)   No other Person has ever pledged, and Borrower will not permit any other Person to pledge, Borrower's assets for such other Person's benefit.

(xxiii)   No other Person has ever identified, and Borrower will not permit any other Person to identify, Borrower as a division of any other Person.

(xxiv)   Omitted.

(xxv)   Borrower shall at all times cause there to be at least one duly appointed member (the "**Independent Manager**") of Borrower reasonably satisfactory to Lender who shall not have been at the time of each such individual's initial appointment, and may not have been at any time during the preceding five years, and shall not be at any time while serving in the capacity of the Independent Manager, either (A) a shareholder of, or an officer, director (other than as the Independent Manager), partner or employee of, the Borrower or any of its shareholders, partners, members, subsidiaries or Affiliates, (B) a shareholder, director, officer, employee, partner, member or customer of, or supplier or service provider to (including professionals), or other Person who derives more than 10% of its purchases, revenues, compensation, or other financial remuneration from its activities with, Borrower, the corporation or other entity for which he or she acts as the Independent Manager (if other than Borrower) or any of the shareholders, directors, officers, employees, partners, members, subsidiaries or Affiliates of Borrower, or such corporation or other entity or who otherwise is financially dependent upon Borrower, such corporation or other entity or any of the shareholders, directors, officers, employees, partners, members, subsidiaries or Affiliates of Borrower or such corporation or other entity, (C) a Person controlling or under common control with any such shareholder, officer, director, partner, member, employee, supplier or customer, or (D) a family member (by blood or marriage) of any such shareholder, officer, director, partner, member, employee, supplier or customer.  As used herein, the term "**control**" has the meaning set forth in the definition of Affiliate.

(xxvi)   Borrower shall not cause or permit the Borrower to take any action which, under the terms of any operating agreement or any voting trust agreement with respect to any limited liability company interest requires a vote of the Independent Manager unless at the time of such action the Independent Manager shall have approved the taking of such action.

(xxvii)  Borrower shall conduct its business and affairs so that all assumptions made in any Non-Consolidation Opinion are at all times true and correct in all respects.

(t)   Hazardous Substances.  Borrower hereby represents and warrants to Lender that the representations and warranties contained in the Environmental Indemnity are true and correct.  Except for any specific limitation contained in the Environmental Indemnity, this representation and warranty shall survive any termination, satisfaction, or assignment of this

Agreement and the exercise by Lender of any of its rights or remedies hereunder, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

(u)    <u>Intentionally omitted.</u>

(v)    <u>Contracts.</u>  Except as disclosed to Lender in writing, there are no service, maintenance or other contracts affecting the use, operation or maintenance of the Property that (a) involves more than $100,000 in compensation or expenditures per annum, or (b) is not terminable on one month's notice or less without cause and without penalty or premium. True and correct copies of all material contracts affecting the use, operation or maintenance of the Property (regardless of the dollar amount of such contracts or the termination provision set forth therein) (together with all amendments, modifications or supplements thereto) have been delivered to Lender or Servicer. There are no service, maintenance or other similar contracts affecting the Property that are not cancellable by Borrower on no more than 30 days' notice, other than those approved by Lender in its discretion. All service, maintenance or other contracts affecting the Property from time to time entered into by the Borrower or any of its Affiliates have been entered into at arms-length in the ordinary course of Borrower's or such Affiliate's business. To the best of Borrower's knowledge, all service, maintenance or other contracts affecting the Property not entered into by the Borrower or its Affiliate, if any, have been entered into at arms-length in the ordinary course of business and provide for the payment of fees in amounts and upon terms not in excess of existing market rates.

(w)    <u>Principal Place of Business.</u>  Borrower's principal place of business as of the date hereof is: c/o 216 East 49th Street, 5th Floor, New York, New York 10017.

(x)    <u>Borrower's Ownership Structure.</u>  Attached hereto as **Exhibit D** is a true and correct description of Borrower's ownership structure, setting forth all Persons who own, directly or indirectly, legal or beneficial ownership interests in Borrower.

(y)    <u>Service Rights.</u>  No Service Rights have been granted to any Person in connection with or relating to the Property or any Tenant or an Affiliate of any Tenant. To the extent Service Rights have been granted to any Person as set forth on **Schedule IV**, the Borrower (and no other Person) is entitled to receive any and all compensation with respect to the Service Rights.

(z)    <u>Affiliate Transaction.</u>  Except as set forth on **Schedule IV**, Borrower has not entered into any Affiliate Transactions. Any agreement with an Affiliate of Borrower shall either (i) provide that such agreement may be terminated on no more than 30 days prior notice, with or without cause, and without penalty, or (ii) be subject to a consent and recognition agreement in form and substance reasonably acceptable to Lender, and providing that if Lender acquires the Property or an ownership interest in Borrower, directly or indirectly, then Borrower's Affiliate agrees that Lender (or such purchaser at foreclosure) may terminate the agreement at any time upon notice to the Affiliate with or without cause or the payment of any premium or penalty. If such agreement is not terminated in accordance with the immediately preceding sentence, Lender shall have the right, and Borrower hereby irrevocably authorizes Lender and irrevocably appoints Lender as Borrower's attorney-in-fact coupled with an interest, at Lender's sole option, to terminate the agreement on behalf of and in the name of Borrower,

20

and Borrower hereby releases and waives any claims against Lender arising out of Lender's exercise of such authority.

(aa)    Loan Proceeds.  No Affiliate of Borrower or any Person in which Borrower or any Affiliate of Borrower owns an interest (direct, indirect or beneficial interest in Borrower) or is receiving any portion of the proceeds of the Loan other than Janoff & Gurevich, L.L.P. (for legal fees), TranContinental (for title fees), and Continental Realty (for management fees and sales commissions) as set forth on the Acquisition and Pre-Development Budget.

(bb)    Conditions Precedent.  Borrower has fulfilled and satisfied all of the conditions precedent set forth on **Schedule II**.

(cc)    Rent Stabilized Units**.**  The Property is not subject to any rent control, stabilization or other similar laws that would restrict the sale of any Units.

(dd)    Air Rights and 421-a Certificates.  To the best of Borrower's knowledge, there exists no facts or circumstances that would limit, prevent, restrict or other have a Material Adverse Effect on Borrower's acquisition of the Air Rights or 421-A Certificates under the applicable Purchase Agreements, including without limitation, the occurrence of any defaults thereunder.  Borrower has delivered to Lender true and complete copies of the Purchase Agreements with respect to the Air Rights and 421-a Certificates.

**Section 4.2    Survival of Representations**.  Borrower agrees that all of the representations and warranties of Borrower set forth in Section 4.1 and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower; provided, however, that particular representations and warranties shall survive the complete payment of the Debt as specifically provided herein and/or in the other Loan Documents.  All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf. Borrower acknowledges that the representations and warranties contained in the Loan Documents are a material inducement to Lender to make the Loan.

## V  **BORROWER COVENANTS**

From the date hereof and until payment and performance in full of all Obligations of Borrower under the Loan Documents, Borrower hereby covenants and agrees with Lender that:

**Section 5.1    Existence; Compliance with Legal Requirements**.  Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, Licenses, permits and franchises and to comply with all Legal Requirements applicable to Borrower and the Property.  Borrower shall not dissolve, terminate, liquidate, merge with, consolidate into or acquire another Person without Lender's prior written consent.  Borrower shall at all times maintain, preserve and protect all franchises and trade names and preserve all of its property used or useful in the conduct of its business and shall keep the Property in good working order and repair, and from time to time make, or cause to be made,

21

all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto. Borrower will not change its name, identity (including its trade name or names) or, if not an individual, its corporate, partnership or other structure without Lender's prior written consent. Borrower shall not allow or permit any change in the use of the Property (other than the conversion to condominium) without Lender's prior written consent. Borrower will qualify to do business and will remain in good standing under the laws of the state in which the Property is located and in each jurisdiction as and to the extent the same is required for the ownership, maintenance, management and operation of the Property and the conversion of the Property to condominium form of ownership and disposition of the Units therein.

Section 5.2    **Hazardous Substances**. Borrower shall comply strictly and in all respects with the covenants set forth in Sections 1 and 2 of the Environmental Indemnity.

### Section 5.3    **Certain Prohibited Actions.**

(a)    Borrower shall not enter into any line of business other than the ownership and operation of the Property and either the rental (subject to Lender's approval in its discretion and the Leasing Guidelines) or the conversion of the Property to condominium form of ownership and disposition of the Units therein, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business. Borrower shall not directly or indirectly do any of the following: (i) change its principal place of business or chief executive office without first giving Lender 30 days' prior written notice thereof and executing and delivering to Lender or, if applicable, authorizing Lender to file, such additional UCC-3 Financing Statements as Lender may require in order to reflect such change in Borrower's principal place of business or chief executive office and to maintain the perfection of all Liens and security interests created by the Loan Documents; or (ii) take any action or permit any action or inaction which could result in Borrower not being in compliance with Section 4.1(s); or (iii) cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business in its reasonable judgment. Borrower shall comply in all respects with Section 4.1(s) of this Agreement.

(b)    Borrower shall not, nor shall it permit any Borrower Party to, make any material change, amendment or modification to the Organizational Documents of any Borrower Party, including without limitation, any special purpose entity provisions therein.

### Section 5.4    **Taxes and Other Charges**.

(a)    Subject to the provisions of Section 6.2 hereof, Borrower shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable. Borrower will deliver to Lender or Lender's designee receipts for payment or other evidence satisfactory to Lender that the Taxes and Other Charges have been so paid or are not then delinquent no later than thirty (30) days prior to the date on which the Taxes and/or Other Charges would otherwise be delinquent if not paid. Borrower shall not suffer and Borrower shall promptly cause to be paid and discharged any Lien which may be or becomes a Lien against the Property, and shall promptly pay for all utility services provided to the Property. Borrower shall furnish to Lender a cash deposit, or an

22

indemnity bond satisfactory to Lender with a surety satisfactory to Lender, in an amount equal to 125% of any Lien claim, plus a reasonable additional sum to pay all costs, interest and penalties that may be imposed or incurred in connection therewith, and shall provide Lender with an endorsement to the Title Insurance Policies insuring over any such Lien claims in form satisfactory to Lender, all to assure payment of the matters under contest and to prevent any sale or forfeiture of Borrower's Property or any part thereof.

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges or the existence of any Lien, provided that (i) no Default or Event of Default exists, (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of all Leases and other documents or instruments to which Borrower is subject and shall not constitute a default thereunder, and such proceeding shall be conducted in accordance with all Legal Requirements, (iii) Borrower shall notify Lender in writing of any such contest and shall diligently and in good faith contest such Taxes, Other Charges or Lien by appropriate legal proceedings which shall operate to prevent the enforcement or collection thereof and the sale of Borrower's Property or any part thereof, in satisfaction thereof; (iv) Borrower shall have furnished to Lender a cash deposit, or an indemnity bond satisfactory to Lender with a surety satisfactory to Lender, in an amount equal to 125% of the Taxes, Other Charges or Lien claim, plus a reasonable additional sum to pay all costs, interest and penalties that may be imposed or incurred in connection therewith, or has otherwise provided Lender with an endorsement to the Title Insurance Policies insuring over any such Taxes, Other Charges or Lien claims in form satisfactory to Lender, all to assure payment of the matters under contest and to prevent any sale or forfeiture of Borrower's Property or any part thereof; and (v) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes, Other Charges or Lien, together with all costs, interest and penalties which may be payable in connection therewith.  In addition, if the Taxes, Other Charges or Lien are not paid in full when Borrower commences such contest, then such proceeding shall suspend the collection of Taxes, Other Charges or Lien from Borrower's Property.  Lender may pay over any such cash deposit or part thereof held by Lender or liquidate any other security and pay same over to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established. Notwithstanding the foregoing, Borrower shall immediately upon request of Lender pay (and if Borrower shall fail so to do, Lender may, but shall not be required to, pay or cause to be discharged or bonded against) any such Taxes, Other Charges or Lien claim notwithstanding such contest, if in the good faith opinion of Lender, the Property or any part thereof or interest therein may be in danger of being sold, forfeited, foreclosed, terminated, canceled or lost.  In addition, Borrower shall pay to Lender upon demand, any costs incurred by Lender in ensuring compliance by Borrower with this Section 5.4, including attorneys' fees, monitoring and evaluating expenses and any tax service fees.  The covenants, representations, warranties and obligations of Borrower set forth in the Loan Documents with respect to Liens, Lien claims and Other Charges are hereinafter called the "Lien Obligations".

Section 5.5    **Performance of Agreements**.  Borrower shall observe, perform and satisfy all the terms, provisions, covenants and conditions of, and shall pay when due all principal, interest, costs, fees and expenses to the extent required under, the Loan Documents. Borrower shall observe and perform each and every term to be observed or performed by

Borrower pursuant to the terms of any other agreement or recorded instrument affecting or pertaining to Borrower or Borrower's Property, or given by Borrower to Lender for the purpose of further securing the Obligations.

Section 5.6    **Notices**.  Borrower shall give written notice to Lender of any litigation in excess of $50,000 (other than claims for which Borrower is fully insured) or material governmental proceedings pending or threatened against Borrower or the Property.  Borrower shall promptly advise Lender of any Material Adverse Change and of the occurrence of any Default or Event of Default.

Section 5.7    **Access to Premises**.  Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon not less than forty-eight hours (48) hours advance notice or such shorter period of notice as circumstances may dictate.

Section 5.8    **Compliance**.  Borrower shall not commit or allow any other Person in occupancy of or involved with the operation or use of the Property to commit any act or omission affording any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.  Borrower shall keep and maintain all Licenses necessary for the operation of the Property for its intended use.

Section 5.9    **Cooperate in Legal Proceedings**.  Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority, which may in any way affect the rights of Lender hereunder, or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

Section 5.10    **Insurance Benefits and Condemnation Proceeds**.  Borrower shall fully cooperate with Lender in obtaining for Lender the benefits of any Insurance Proceeds and Condemnation Proceeds lawfully or equitably payable in connection with the Property or any part thereof, and Lender shall be reimbursed for any reasonable expenses incurred in connection therewith (including reasonable attorneys' fees and disbursements, expense of an appraisal on behalf of Lender in case of a fire or other Casualty affecting the Property or any part thereof) out of such Insurance Proceeds or Condemnation Proceeds, as applicable.

Section 5.11    **Further Assurances**.  Borrower will, at their cost and without expense to Lender, do, execute, acknowledge and deliver all and every such further reasonable acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfers, boundary surveys, footing or foundation surveys, plans and specifications, appraisals, title and other insurance reports and agreements and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender, the property and rights hereby mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of Borrower's covenants under this Agreement or for filing or recording the Security Instruments, or for complying with all Legal Requirements.

24

Borrower, on demand, will execute and deliver, or authorize Lender to file, as applicable, one or more financing statements, chattel mortgages or other instruments, to evidence or perfect more effectively the security interest of Lender in the Property, and if Borrower fails to execute and deliver, or authorize any of the foregoing within five (5) days after such request by Lender, Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender pursuant to this Section 5.11, and hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, any such financing statements, chattel mortgages or other instruments, and Borrower hereby acknowledges and agrees that it shall have no claim or cause of action against Lender arising out of Lender's exercise of Lender's rights under this Section 5.11 or the execution and/or recordation of any instruments by or on behalf of Borrower pursuant to the foregoing power of attorney, unless such claim or cause of action results from Lender's gross negligence or willful misconduct.

### Section 5.12    Financial Reporting.

(a)    Borrower will keep and maintain or will cause to be kept and maintained in accordance with Acceptable Accounting Principles, proper and accurate books, records and accounts reflecting all of the financial affairs, income and expenses of Borrower and the Property.  Lender shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts at the office(s) of Borrower or other Persons maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire.  After the occurrence of an Event of Default beyond any applicable notice and cure periods, Borrower shall pay any costs and expenses incurred by Lender to examine any of their accounting records as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.  Borrower shall furnish or make available to Lender and its agents convenient facilities for the examination and audit of any of its books and records.

(b)    Borrower will furnish to Lender annually, within one hundred twenty (120) days following the end of each Fiscal Year, a complete copy of Financial Statements for Borrower for Fiscal Year prepared in accordance with Acceptable Accounting Principles and certified by an Approved Accounting Firm.  Borrower's annual Financial Statements shall be accompanied by (A) a certified rent roll, if applicable, in a format consistent with the certified rent roll delivered by Borrower on or before the Closing Date or otherwise acceptable to Lender and (B) an Officer's Certificate stating that such annual Financial Statements present fairly the financial condition of Borrower and Borrower's Property and, if applicable, that the rent roll is true, correct, accurate and complete in all material respects and that the Leases identified thereon (and previously delivered to Lender) have not been amended, modified or canceled.

(c)    Borrower will furnish, or cause to be furnished, to Lender on or before twenty-five (25) days after the end of each calendar month the following items accompanied by an Officer's Certificate stating that such items are true, correct and complete in all material respects and fairly present the financial condition and results of the operations of Borrower and Borrower's Property (subject to normal year-end adjustments) as applicable:  (A) monthly and year to date Financial Statements; (B) to the extent applicable, a rent roll in a format consistent with the rent roll delivered by Borrower on the Closing Date or otherwise acceptable to Lender;

(C) the actual capital expenditures for Borrower's Property with respect to such period; (D) to the extent applicable, all new Leases, Lease amendments or other documents affecting the Rents executed since the last such statement; and (E) a comparison of the budgeted income and expenses and the actual income and expenses for such period.

(d)    In addition to the Acquisition and Pre-Development Budget provided to Lender on or before the Closing Date, Borrower shall prepare and deliver to Lender, within sixty (60) days prior to the beginning of each Fiscal Year of Borrower, an annual budget including all planned capital expenditures in respect of Borrower's Property for such ensuing Fiscal Year (the "**Annual Budget**"). Each Annual Budget shall be prepared and submitted in the form acceptable to Lender and shall set forth in reasonable detail all budgeted items of income and expense (whether from operations, capital items or otherwise). Each Annual Budget shall contain, among other things, limitations on management fees (not to exceed 3%) in the aggregate and payments to Affiliates of any Borrower Party. Lender shall have the right to approve each Annual Budget. In the event that Lender objects to the proposed Annual Budget submitted by Borrower, Lender shall advise Borrower of such objections within fifteen (15) Business Days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objection) and Borrower shall promptly revise such Annual Budget and resubmit the same to Lender until Lender approves an Annual Budget in respect of the Property. Each such Annual Budget approved by Lender in accordance with terms hereof shall hereinafter be referred to as an "**Approved Annual Budget**". Until such time that Lender approves a proposed Annual Budget for the Property, the most recently Approved Annual Budget for the Property, if any, shall apply; provided that such Approved Annual Budget shall be adjusted to reflect actual increases in real estate taxes, insurance premiums, and utilities expenses.

(e)    Borrower shall furnish to Lender, within ten (10) Business Days after request (or as soon thereafter as may be reasonably possible) such further detailed information, including Borrower's tax returns, with respect to the operation of Borrower's Property and the financial affairs of Borrower or the Property as may be reasonably requested by Lender.

(f)    Borrower shall also, if requested by Lender to do so, use commercially reasonable efforts to obtain any financial information relating to (i) any commercial Tenant requested by Lender which Borrower has the right to obtain pursuant to any commercial Lease, and (ii) any Borrower Party other than Borrower.

(g)    Borrower shall furnish to Lender monthly sales reports with respect to Unit sales in accordance with Section 13.4.

### Section 5.13    Title to the Property.

(a)    Borrower will warrant and defend (i) the title to its Property and every part thereof, subject only to Liens permitted hereunder (including Permitted Encumbrances), (ii) all rights of Borrower or its Affiliates under the Purchase Agreements with respect to the Air Rights and the 421-a Certificates, and (iii) the validity and priority of the Liens of the Security Instruments and the Assignment of Leases encumbering the Property and the perfection and priority of the Liens created by the Loan Documents, including any UCC Financing Statements, subject only to Liens permitted hereunder (including Permitted Encumbrances), in each case

26

against the claims of all Persons whomsoever. Borrower shall reimburse Lender on demand for any losses, costs, damages or expenses (including reasonable attorneys' fees and court costs) incurred by Lender if an interest in the Property, other than as permitted hereunder, is claimed by another Person.

(b)    If requested by Lender (but not more than one time during any twelve (12) month period), Borrower shall provide Lender with Datedown Endorsements with respect to the Property.

(c)    Borrower shall comply with all of its obligations under the terms and provisions of each Purchase Agreement for the Air Rights and the 421-a Certificates. Borrower shall immediately notify Lender if any seller under a Purchase Agreement does not achieve any of the construction or other benchmarks set forth in such Purchase Agreement. Borrower shall take all actions reasonably requested by Lender to enforce Lender's rights under each Purchase Agreement in the event of a default by a counterparty thereto and shall not waive, amend or otherwise modify any of its rights thereunder. Notwithstanding the foregoing, Borrower will not exercise any of its remedies under any of the Purchase Agreements without Lender's consent. If for any reason the Borrower shall not acquire the Air Rights or 421-a Certificates in accordance with the provisions of the applicable Purchase Agreements, Borrower shall take all actions necessary or required to acquire such replacement rights as Lender shall determine in its discretion.

(d)    Borrower will complete the acquisition of the Air Rights and 421-a Certificates on or before the respective closing dates under the applicable Purchase Agreements, and prior to the issuance of certificates of occupancy for all Units. Upon occurrence of the closing under each of the Purchase Agreements, Borrower will cause the certificates evidencing the Air Rights or 421-a Certificates, as the case may be, to be issued in Borrower's name and shall hold them in a secure location at its address first set forth above. Notwithstanding the foregoing, if required by Lender, Borrower shall cause all certificates or other documents evidencing the Air Rights or the 421-a Certificates to be promptly deposited with Lender.

(e)    Borrower will timely file and prosecute applications to the New York City Department of Housing Preservation and Development for preliminary and final certificates of eligibility for Section 421a real property tax exemption for the Property. Borrower will, in a timely manner, send any notices required to be delivered under the Purchase Agreements, and shall promptly deliver to Lender the AIA Forms G702 when received. The obligations, covenants, representations and warranties of Borrower set forth in the Loan Documents with respect to the Air Rights, the 421-a Certificates and any applicable Purchase Agreements are hereinafter called the "Development Rights Obligations".

## Section 5.14    Estoppel Statements.

(a)    Within fifteen (15) days after the end of each Fiscal Year and at any time within ten (10) days after request by Lender, Borrower shall furnish Lender or any proposed assignee of Lender with a written statement, duly acknowledged and certified by Borrower,

setting forth (A) the original principal amount of the Notes, (B) the unpaid principal amount of the Notes, (C) the then current rate of interest of the Notes, (D) the terms of payment, (E) the date installments of interest and/or principal were last paid, (F) that, except as provided in such statement, there are no defaults or events which with the passage of time or the giving of notice or both, would constitute an event of default under the Loan Documents, (G) that the Loan Documents are valid, legal and binding obligations of the Borrower Parties and have not been modified or if modified, giving particulars of such modification, (H) whether any offsets or defenses exist with respect to the Loan or Lender and, if any are alleged to exist, a detailed description thereof, (I) whether or not, to the best knowledge of the Borrower, any of the lessees under the Leases are in default under the Leases, and, if any of the lessees are in default, setting forth specific nature of all such defaults, and (J) as to any other matters reasonably requested by Lender.

(b)      Upon Lender's request, Borrower shall promptly request within five (5) Business Days, and thereafter use Borrower's commercially reasonable efforts to obtain, estoppel certificates or subordination, non-disturbance and attornment agreements from any one or more commercial Tenants identified by Lender attesting to such facts regarding the applicable Lease as required by the applicable Lease or if no form is required by the applicable Lease, attesting to such facts regarding the applicable Lease as may be reasonably requested by Lender. If any commercial Tenant fails to deliver any estoppel certificate as aforesaid within the longer of (i) the applicable time period set forth in the commercial Tenant's Lease, if any, or (ii) fifteen (15) days after Borrower's request therefor, then the Borrower shall, upon request by Lender, execute and deliver such estoppel certificate (to the best of Borrower's knowledge) on behalf of such commercial Tenant, and Borrower shall continue to use commercially reasonable efforts (as described above) to obtain such estoppel certificate.

(c)      Provided that no Event of Default shall have occurred beyond any applicable notice and cure periods, and in connection with a proposed repayment of the Loan in full, within ten (10) days after written request by Borrower, Lender shall furnish Borrower with a payoff letter indicating the outstanding principal amount of the Notes, all accrued and unpaid interest on the Notes through the date of such payoff letter (together with a per diem amount for any interest accruing thereafter, if determinable), the amount of any Yield Maintenance Amount (as defined in the Notes) that would be due and payable to Lender if the Loan were to be repaid in full on the date of the payoff letter and any other amounts due and payable to Lender as of the date of the payoff letter, including, without limitation, the Additional Fee.

### Section 5.15   Leasing Matters.

(a)      Subject to compliance with the Leasing Guidelines, Borrower shall not enter into any new Leases at the Property without Lender's prior written approval . All residential Leases shall be written on the standard form of lease, which has been approved by Lender without material changes unless approved by Lender in writing. Borrower shall not enter into, or materially amend, modify or terminate any Lease without Lender's prior written approval and otherwise in accordance with the Leasing Guidelines. All residential and commercial Leases entered into by or on behalf of Borrower in accordance with this Section 5.15 shall contain provisions (i) informing the Tenant that Lender has the right at any time to notify the Tenant to make all payments due pursuant to such Tenant's Lease directly to Lender at such

28