address and in such manner as Lender shall designate, (ii) authorizing the Tenant to make such payments in accordance with such direction, (iii) irrevocably directing such Tenant to pay and deliver all amounts accruing or coming due under such Tenant's Lease to Lender in accordance with any such notice without any obligation to inquire into or determine (a) the reasons for paying or delivering such amounts to Lender, (b) the application of such amounts, (c) the status of the Borrower's relations with Lender or its agent, (d) whether an Event of Default has occurred, or (e) whether the demand is in compliance with the Loan Documents, (v) requiring the Tenant (other than a residential Tenant) to give Lender written notice of any default by the landlord under such Tenant's Lease and a reasonable period of time within which to cure such default prior to such Tenant taking any actions to remedy such default or to cancel the Lease, (iv) requiring the Tenant (other than a residential Tenant) to provide upon fifteen (15) days' written notice, an estoppel certificate in a form to be provided by Lender confirming its subordination and attornment to Lender and certifying to Lender such matters as are requested by Lender, or as otherwise set forth in the Lease, and (vi) pursuant to which the Tenant acknowledges that, in the event Lender or Lender's designee or a purchaser at foreclosure or otherwise becomes owner of the Property through foreclosure or otherwise, Lender shall not be liable for any acts, omissions, events or conditions arising prior to the time Lender became the record owner of the Property. All Leases shall provide that they are subordinate to the Security Instruments and that the Tenant agrees to attorn to Lender. No material changes shall be made to any standard lease form approved by Lender in its discretion without Lender's prior written consent. None of the Leases (whether currently in effect or hereafter entered into) contain or will contain any option to purchase, any right of first offer or any right of first refusal to purchase the Property or any portion thereof.

(b) Borrower (A) shall not enter into any Major Lease or amend the terms of any Major Lease (whether existing on the Closing Date or thereafter executed) in any respect and shall not enter into any Minor Lease or amend the terms of any Minor Lease (whether existing on the Closing Date or thereafter executed) in any material respect unless the Minor Lease to be executed (or the existing Minor Lease to be amended or modified) complies with the Leasing Guidelines and the other requirements of the Loan Documents, including the provisions of this Section 5.15, in either case, without the prior written consent of Lender which will not be unreasonably withheld; (B) shall not convey or transfer or suffer or permit a conveyance or transfer of the Property or of any interest therein so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, any commercial Tenants or commercial Leases; (C) shall not consent to any assignment of or subletting under the commercial Leases which is not in accordance with their terms, without the prior written consent of Lender, not to be unreasonably withheld, and if such commercial Lease requires Borrower's consent to such assignment or subletting, then Borrower shall also obtain Lender's consent thereto prior to granting the Borrower's consent, except as specifically permitted by the Leasing Guidelines, provided any amounts payable to Borrower or any Affiliate of any Borrower Party as landlord pursuant to, or in any manner whatsoever related to, any assignment or sublease of a commercial Lease shall be deemed to be Rents and shall be deposited into the Lockbox Account and, further provided that the consent of Lender shall be required even if the terms of the commercial Lease permit any such assignment or sublease, if any such assignment or sublease is to Borrower or any Affiliate of any Borrower Party; (D) shall not alter, modify or change the terms of any guaranty, letter of credit or other credit support with respect to any of the commercial Leases (the "**Lease Guaranty**") or cancel or terminate such Lease Guaranty without the prior written

29

consent of Lender, not to be unreasonably withheld, except, as to a Minor Lease only, as specifically permitted by the Leasing Guidelines; and (E) shall not cancel or terminate any commercial Lease or accept a surrender thereof unless such termination is a result of Tenant's breach of the terms of the Lease, without Lender's prior written consent, not to be unreasonably withheld. Any consideration paid in connection with any such cancellation, surrender, assignment, sublease or termination shall be deemed to be Rents and may be deposited into the Lockbox Account by Lender or Servicer. Borrower shall deliver to Lender copies of all commercial Leases and all modifications, amendments or other documents (whether or not same requires Lender approval under this Section 5.15) promptly after execution and delivery thereof, together with an Officer's Certificate stating that same does not require Lender's consent pursuant to this Agreement (unless such consent was obtained as required hereby).

(c)     Borrower (A) shall duly and punctually observe and perform all the obligations imposed upon the landlord under each of the Leases affecting the Property and shall not do or permit to be done anything to impair the value of such Leases as security for the Debt; (B) shall for Major Leases promptly send copies to Lender of all notices of default which Borrower shall send or receive under any of such Leases; (C) shall enforce in a commercially reasonable manner all of the terms, covenants and conditions contained in each of such Leases on the part of the Tenant thereunder to be observed or performed; provided, however, with respect to multifamily residential properties, a residential Lease may be terminated in the event of a default by the Tenant thereunder; (D) shall not collect any of the Rents more than one (1) month in advance (provided that a Security Deposit shall not be deemed rent collected in advance); (E) shall not execute any other assignment of, or further mortgage or encumber, the landlord's interest in the Leases or the Rents; and (F) shall execute and deliver at the request of Lender all such further assurances, confirmations and assignments in connection with the Leases as Lender shall from time to time reasonably require, and Borrower hereby authorizes each Tenant to accept performance of any of the landlord's obligations under the Leases from Lender. Lender shall have the right, at Borrower's expense, but shall not be obligated, to cure any default by any Borrower under any of the Leases which Borrower is not proceeding diligently to cure, and this provision shall be deemed to be a written authorization and each Tenant shall be entitled to rely thereon. Such curing by Lender of a default by Borrower under any of the Leases shall not release Borrower in any way from liability to Lender for Borrower's failure to discharge Borrower's duty to so cure that default. Any and all sums expended by Lender with respect to any such cure, together with interest thereon at the Default Rate from the date paid by Lender until repaid by Borrower, shall immediately be due and payable to Lender by Borrower on demand and shall be secured by the Security Instruments and by all of the other Loan Documents. Lender, Servicer and any Person designated by Lender or Servicer are hereby authorized by Borrower to directly communicate with any of the Tenants or the Property Manager at any time and from time to time regarding such matters as Lender deems appropriate, and Borrower hereby acknowledges and agrees that Borrower shall have no claim or cause of action against Lender arising out of such communications.

(d)     Within fifteen (15) Business Days of the full execution of any Major Lease or Minor Lease, the Borrower shall provide Lender with a copy of such Lease together with an Officer's Certificate stating that such Lease complies with the provisions of this Agreement and the other Loan Documents. Lender and Borrower agrees that the Security Deposits (i) shall be maintained as required by the applicable Legal Requirements, and (ii) shall

be returned if and when required by the applicable Leases and Legal Requirements, provided, that, Borrower shall be solely responsible for compliance with the terms of the applicable Lease and Legal Requirements and Lender and Servicer shall in no event be liable for any failure of Borrower to so comply.

(e)    Notwithstanding any provisions herein to the contrary, no warrants, stock options or similar rights in any Tenant or any Affiliate thereof, any licensee or any other Person providing any services related to or for the benefit of the Property may be granted to Borrower, any Borrower Party, any Principal or any of their respective Affiliates, without Lender's prior written consent, which consent may be withheld in Lender's discretion, and which consent may be conditioned upon, among other things, (i) Lender's receipt of a perfected security interest in such warrants, stock options or similar rights as security for the Debt, or (ii) Lender's receipt and approval of an agreement, satisfactory to Lender in Lender's sole and absolute discretion, granting to Lender a percentage (determined by Lender in its discretion) of the rights granted to Borrower, any Borrower Party, any Principal or any of their respective Affiliates in connection with such warrants, stock options or similar rights.

**Section 5.16    Business Purposes**.  The Loan is solely for the business purpose of the Borrower, and is not for personal, family, household, or agricultural purposes.

### Section 5.17    Property Manager.

(a)    Borrower shall not, without the prior written consent of Lender, execute, orally agree upon, amend or modify in any material respect, cancel, surrender or terminate any Property Management Agreement or allow any Property Management Agreement to terminate or otherwise replace any Property Manager of the Property or enter into any other Property Management Agreements without the prior written consent of Lender.  Borrower shall (i) diligently perform and observe all of the terms, covenants and conditions of a  Property Management Agreement on the part of Borrower to be performed and observed by Borrower so that the rights of Borrower under a Property Management Agreement remain unimpaired; and (ii) promptly notify Lender of the giving of any notice by a Property Manager to Borrower of any default by Borrower in the performance or observance of any of the terms, covenants or conditions of a Property Management Agreement on the part of Borrower and deliver to Lender a true copy of each such notice.  Borrower shall promptly enforce the performance and observance of all of the material covenants required to be observed and performed by a Property Manager.  If Borrower shall default in the performance or observance of any material term, covenant or condition of a Property Management Agreement on the part of Borrower to be performed or observed beyond any applicable notice and grace periods contained therein, then without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of Borrower's obligations hereunder or under a Property Management Agreement, Lender shall have the right (without Borrower's permission, consent or knowledge), but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of a Property Management Agreement on the part of Borrower to be performed or observed to be so promptly performed or observed on behalf of Borrower, to the end that the rights of Borrower in, to and under a Property Management Agreement shall be kept unimpaired and free from default, and a Property Manager is authorized to accept the performance of any of Borrower's obligations

31

under a Property Management Agreement from Lender or Lender's designee. Lender and any Person designated by Lender shall have, and are hereby granted, the right to enter upon the Property at any time and from time to time for the purpose of taking any such action, and Lender, Servicer and any Person so designated by Lender or Servicer is hereby authorized by Borrower to directly communicate with a Property Manager, and Borrower hereby acknowledges and agrees that Borrower shall have no claim or cause of action against Lender arising out of such communications. If a Property Manager under a Property Management Agreement shall deliver to Lender a copy of any notice sent to any Borrower of an uncured default under such Property Management Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender in good faith, in reliance thereon. Borrower shall, from time to time, use good faith, commercially reasonable efforts to obtain from a Property Manager under a Property Management Agreement such certificates of estoppel with respect to compliance by Borrower with the terms of such Property Management Agreement as may be requested by Lender.

(b)    Borrower covenants and agrees with Lender that (i) t payment of fees and expenses under any Property Management Agreement shall be subordinate (in lien and in payment) to the Liens of the Security Instruments and other Loan Documents and if any Property Manager is an Affiliate of any Borrower Party, then the applicable Property Management Agreement shall provide that Property Manager shall not be permitted to receive any fees, expenses or other payments at any time that an Event of Default is continuing (or after giving effect to such payment would occur), (ii) a Property Management Agreement shall provide that such fees and other payments shall be paid only when not prohibited by the Loan Documents, (iii) aProperty Management Agreement shall provide that such Property Management Agreement may be terminated by Lender at any time for cause (including a Property Manager's gross negligence, willful misconduct, fraud or breach of such Property Management Agreement) or at any time following the occurrence and during the continuance of an Event of Default or if there is a change in the identity of a Property Manager or its controlling parties without the consent of Lender and upon such termination, the Borrower shall replace the terminated Property Manager with a property manager selected by Borrower and approved by Lender, and (iv) a Property Management Agreement shall require a Property Manager to give Lender written notice of any default by Borrower under such Property Management Agreement and a reasonable period of time within which to cure such default prior to a Property Manager taking any action to remedy such default or to cancel such Property Management Agreement. Borrower further covenants and agreed that Borrower shall require a Property Manager to maintain, at all times that all or any portion of the Debt remains outstanding, worker's compensation insurance, fidelity bond and errors and omissions insurance, each in compliance with Legal Requirements and the Loan Documents. If a substitute property manager is appointed, then such substitute property manager shall be Independent, shall be approved in writing in advance by Lender and shall execute and deliver to Lender a consent and subordination in the same form as the Consent and Recognition Agreement before such Property Manager shall be entitled to receive any compensation under a Property Management Agreement or otherwise.

(c)    Without limitation of the foregoing, if (i) any Property Manager shall commence any case, proceeding or other action under any Bankruptcy Law or there shall be commenced against any Property Manager any such case, proceeding or other action which remains undismissed, undischarged or unbonded for a period of ninety (90) days or (ii) an Event

of Default shall occur and be continuing, then Lender, at its option, may require Borrower to engage a bona-fide, independent third party management agent selected by Borrower and approved by Lender in its discretion (the "**New Property Manager**") to manage the Property. If Borrower fails to select a substitute Property Manager within thirty (30) days after being required to do so pursuant to the preceding sentence or if Lender does not approve Borrower's proposed Property Manager within such period, then Lender may, at Lender's sole option, select any nationally recognized property management firm (or Affiliate thereof) as the New Property Manager, and Borrower shall be deemed to have consented thereto. The New Property Manager shall be engaged by Borrower pursuant to written management agreement that comply with the terms hereof and are otherwise satisfactory to Lender in all material respects.

**Section 5.18   Contracts**.  Borrower shall deliver or cause to be delivered to Lender copies of all contracts or other agreements (and all amendments, modifications or supplements thereto), whether now existing or hereafter entered into, affecting Borrower or the use, maintenance, management or operation of the Property, including any options to purchase or rights of first offer or first refusal to purchase the Property or any portion of the Property. Borrower shall not enter into any service, maintenance or other contract affecting its Property without Lender's prior written consent (which will not be unreasonably withheld) that (a) involves more than $100,000 in expenditures, or (b) is not terminable on one month's notice or less without cause and without penalty or premium. All service, maintenance or other contracts affecting the Property shall be arms-length transactions, in the ordinary course of the Borrower's business and shall provide for the payment of fees in amounts and upon terms not in excess of existing market rates. Borrower shall not enter into any brokerage agreements with respect to leasing or sales without the prior written consent of Lender.

**Section 5.19   Access Laws**.

(a)   Borrower agrees that the Property shall at all times strictly comply to the extent applicable with the requirements of the Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 327, 42 U.S.C. § 12191, et seq., as hereafter amended, the Fair Housing Amendments Act of 1988 (if applicable), as amended, all state and local laws and ordinances related to handicapped access and all rules, regulations, and orders issued pursuant thereto including the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities, as amended (collectively, "**Access Laws**") and all other Legal Requirements upon written request by Lender, and Borrower shall provide Lender with an architect's certificate, engineer's certificate, or such other reasonable evidence as Lender may request evidencing compliance with Access Laws. Borrower shall be solely responsible for all such costs of compliance and reporting under all Access Laws.

(b)   Notwithstanding any provisions set forth herein or in any other document regarding Lender's approval of alterations of the Property, Borrower shall not alter the Property in any manner which would increase its responsibilities for compliance with the applicable Access Laws without the prior written approval of Lender. Lender's approval of the plans, specifications, or working drawings, as may be required under the applicable terms of this Agreement or the other Loan Documents, for any alterations of the Property shall create no responsibility or liability on behalf of Lender for their completeness, design, sufficiency or their compliance with Access Laws or any other Legal Requirements. The foregoing shall apply to

33

tenant improvements constructed by Borrower or by any Tenants. Lender may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer, or other Person acceptable to Lender.

(c)    Borrower agrees to give prompt notice to Lender of the receipt by Borrower of any complaints related to violation of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

**Section 5.20    Operation of Property**. Borrower shall not enter into, execute, initiate, join in, acquiesce in or otherwise subject any portion of the Property to, or consent to any change in, any restrictive covenant, easement, agreement, zoning or similar law or other public or private restriction limiting, defining, changing or conditioning the uses which may be made of the Property or any part thereof, without Lender's prior written approval. If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, the Borrower will not cause or permit the nonconforming use to be discontinued or abandoned without the express written consent of Lender. Borrower shall not (i) change the use of the Property, or (ii) take any steps whatsoever to convert the Property, or any portion thereof, to a condominium or cooperative form of ownership, except in accordance with Article XIII hereof, unless otherwise consented to by Lender in Lender's discretion. Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way impair the value of the Property or the security of this Agreement. Borrower will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of Borrower's Land, regardless of the depth thereof or the method of mining or extraction thereof. Borrower shall not commit, permit or suffer to exist any act or omission that would cause any risk of forfeiture as against Borrower's Property or any part thereof or any monies paid in performance of the Obligations. Borrower shall not suffer, permit or initiate the joint assessment of the Property with any other real property constituting a tax lot separate from the Property.

**Section 5.21    Maintenance of Property; Payment for Labor and Materials.**

(a)    Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any Casualty, or become damaged, worn or dilapidated and shall complete and pay for (or cause the Tenants to pay for) any structure at any time in the process of construction or repair on the Property. Borrower will promptly pay when due all bills and costs for labor, materials and specifically fabricated materials incurred in connection with the Property and never permit to exist beyond the due date thereof in respect of the Property or any part thereof any Lien or security interest, even though subordinate to the Liens and the security interests of the Security Instruments, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional Lien or security interest other than the Lien created by the Loan Documents and the Permitted Encumbrances.

(b)    Borrower shall cause the Property to be maintained in a good and safe condition and repair. Except for the Construction Work, the Improvements shall not be

34

removed, demolished or altered in any material respect nor shall any additional improvements be constructed without the prior, written consent of Lender.

### Section 5.22   Transfer or Encumbrance of the Property.

(a)    Borrower acknowledges that Lender, in agreeing to make the Loan, has examined and relied on the creditworthiness and experience of the Borrower Parties in owning and operating properties such as the Property, and that Lender will continue to rely on Borrower's ownership and operation of the Property as a means of maintaining the value of the Property as security for repayment of the Debt. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt, Lender can recover all or a portion of the Debt by a sale of the Property or a part thereof. Accordingly, subject to the terms of this Section 5.22, and, except for Permitted Transfers, Borrower shall not, without the prior written consent of Lender, sell, convey, alienate, mortgage, encumber, pledge or otherwise Transfer the Property, or any part thereof or any interest therein, directly or indirectly, or permit the Transfer of the Property, or any part thereof or any interest therein, other than pursuant to Leases of space pursuant to Section 5.15 and sales of Units pursuant to Section 13.6.

(b)    A Transfer of a Property within the meaning of this Section 5.22 shall be deemed to include: (A) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof or any interest therein for a price to be paid in installments; (B) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder, or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents, except as specifically permitted by the Loan Documents; (C) if Borrower or any partner or member of Borrower (or any indirect owner of a legal or beneficial interest in Borrower or any constituent partner or member of Borrower no matter how remote) is a corporation, the Transfer of such corporation's stock or any portion thereof (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock in one or a series of transactions by which any of such corporation's stock or any portion thereof shall be vested in a party or parties who are not now existing stockholders as of the date hereof or results in any change in the ultimate ownership or control of such corporation (no matter how remote); (D) if Borrower or any partner or member of Borrower (or other indirect owner of a legal or beneficial interest in Borrower or any constituent partner or member of Borrower no matter how remote) is a limited or general partnership, joint venture or limited liability company, the change, removal, resignation or addition of a partner, joint venturer or member or the Transfer of the partnership or membership interest of any partner or any member or the Transfer of the legal or beneficial interest of any joint venturer, partner or member; (E) if Borrower is a limited or general partnership, joint venture, limited liability company, trust, nominee trust, tenancy in common or other unincorporated form of business association or form of ownership interest, the Transfer of any legal or beneficial interest (including any economic or profits interest) of any Person having a direct or indirect legal or beneficial ownership interest in Borrower, including any legal or beneficial interest in any constituent partner or member of Borrower; (F) except as otherwise provided in the Loan Documents, any instrument subjecting Property to a condominium regime or transferring ownership to a cooperative corporation; (G) the dissolution or termination of Borrower or any

35

general partner, managing member, manager or member manager of Borrower or any constituent member or partner of Borrower or the merger or consolidation of Borrower or any general partner or member of Borrower with any other Person; (H) any transfer of a direct or indirect, legal or beneficial ownership interest in Borrower other than Permitted Transfers; (I) any other transaction other than a Permitted Transfer, pursuant to which any Person not holding a direct or indirect, legal or beneficial ownership interest in Borrower on the Closing Date acquires a direct or indirect (and no matter how remote), legal or beneficial ownership interest in Borrower; (K) any swap, derivative or other transaction shifting the risks and rewards of ownership of Property, unless otherwise expressly required by the Loan Documents; (L) any transaction pursuant to which any Person is granted an option to purchase all or any portion of Property or any direct, indirect, legal or beneficial interest in Borrower; and (M) any transaction, agreement or arrangement pursuant to which any Person is given any right to control, direct or veto any material actions or decisions by Borrower, directly or indirectly, whether through an ownership interest, contract right or otherwise.

(c)     Lender shall not be required to demonstrate any actual impairment or prejudice of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon any Transfer (other than a Permitted Transfer or other Transfer specifically permitted by this Agreement) without Lender's prior written consent which may be granted, withheld, delayed or conditioned in Lender's discretion. This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer. Notwithstanding anything to the contrary contained in this Section 5.22, (a) no transfer (whether or not such transfer shall constitute a Transfer or Permitted Transfer) shall be made to any Prohibited Person and (b) except for Transfers of Units made in accordance with the provisions of this Agreement, Borrower shall, prior to any Transfer, and if required by Lender, deliver a Non-Consolidation Opinion to Lender, which opinion shall be in form, scope and substance acceptable in all respects to Lender.

(d)     Lender's consent to one Transfer of the Property shall not be deemed to be a waiver of Lender's right to require such consent to any future Transfer. Any Transfer of the Property made in contravention of this Section 5.22 shall be null and void and of no force and effect.

(e)     Borrower agrees to bear and shall pay or reimburse Lender on demand for all reasonable costs and expenses (including title search costs, title insurance endorsement premiums and reasonable attorneys' fees and disbursements) incurred by Lender in connection with the review, approval and documentation of any proposed Transfer whether or not such consent is granted, withheld, conditioned or denied.

(f)     Without limiting the generality of the restrictions on Transfers set forth in this Section 5.22, each and/or any Transfer shall be conditioned upon the satisfaction of one or more of the following conditions as may be deemed reasonably appropriate or desirable by Lender under the circumstances (a) a modification of the terms hereof, the Notes, the Security Instruments or the other Loan Documents; (b) an assumption of this Agreement, the Notes, the Security Instruments and the other Loan Documents as so modified by the proposed transferee, subject to the provisions of Section 9.1 hereof; (c) payment of all of reasonable fees and expenses incurred in connection with such Transfer including, without limitation, the cost of any

36

third party reports, legal fees and expenses, Rating Agency fees and expenses or required legal opinions; (d) the delivery of a Non-Consolidation Opinion reflecting the proposed Transfer, satisfactory in form and substance to Lender; (e) the proposed transferee's continued compliance with the representations and covenants set forth herein; (f) the delivery of evidence satisfactory to Lender that the single purpose nature and bankruptcy remoteness of the Borrower, its shareholders, partners or members, as the case may be, following such Transfer are in accordance with the then current standards of Lender and the Rating Agencies; and (g) confirmation in writing from the Rating Agencies to the effect that such Transfer will not result in a re-qualification, reduction or withdrawal of the then current rating assigned to the Securities or any class thereof in any applicable Securitization. In addition to the foregoing, each and/or any Transfer shall be conditioned upon the satisfaction of such other conditions as Lender shall determine in its discretion to be in the interest of Lender, including, without limitation, the creditworthiness, reputation and qualifications of the transferee with respect to the Loan and the Property or any part thereof.

(g)     Notwithstanding the foregoing terms of this Section 5.22, provided, that (i) no Default or Event of Default shall then exist beyond any applicable notice and cure periods, (ii) the total of the principal indebtedness of the Mezzanine Loan does not exceed $11,755,027 in the aggregate, and (iii) the consummation of the Mezzanine Loan shall not result in any lien or security interest encumbering the Property, Mezzanine Borrower shall be permitted to make and accept a Mezzanine Loan. For the purposes hereof, a "Mezzanine Loan" shall mean a mezzanine loan made by Mezzanine Lender to Mezzanine Borrower and shall be secured by a pledge of the membership interests of Mezzanine Borrower in Borrower and other pledges of certain direct and indirect interests in Borrower as more particularly set forth in the documents governing the Mezzanine Loan, in form and content satisfactory to Lender. In the event of a conflict or inconsistency between any provision of the Loan Documents and any documents executed by Borrower, Mezzanine Borrower or Guarantors in connection with the Mezzanine Loan, the terms of the Loan Documents shall prevail. Notwithstanding that Lender may have reviewed documents executed by Borrower, Mezzanine Borrower, any Borrower Party or Guarantors in connection with the Mezzanine Loan, Lender shall not be deemed to have accepted or approved any inconsistencies or conflicts between the Loan Documents or the documents evidencing the Mezzanine Loan, nor shall Lender be deemed to have waived any terms or requirements of the Loan Documents. Borrower agrees that (A) prior to the Building Loan Opening Date, any advances of the Loan and the Mezzanine Loan shall be made concurrently in the following proportion: 77.9% (for the Loan) and 22.1% (for the Mezzanine Loan), and (B) on and after the Building Loan Opening Date, no advances of the Project Loan shall occur unless and until the Mezzanine Loan has been fully advanced.

(h)     Notwithstanding anything in this Agreement to the contrary, Borrower shall at all times cause Gurevich and Spitzer to have an ownership interest, directly or indirectly, in Borrower of at least 50% in the aggregate and Gurevich shall at all times control and be responsible for the management and day-to-day operations of Borrower and Project Owner.

**Section 5.23   ERISA**.

(a)     Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, under the Loan Documents (or the exercise by Lender

of any of its rights under the Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

      (b)     Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender, that (i) Borrower is not an "employee benefit plan" as defined in <u>Section 3(3)</u> of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of <u>Section 3(32)</u> of ERISA or treats as holding assets of any such plan by reason of such plans ownership of an interest in Borrower; (ii) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) one or more of the following circumstances is true:

      (i)     Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3-101(b)(2);

      (ii)     Less than 25 percent of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2); or

      (iii)     Borrower qualifies as an "operating company" or a "real estate operating company" within meaning of 29 C.F.R. § 2510.3-101(c) or (e) or an investment company registered under The Investment Company Act of 1940.

      **Section 5.24**   **Affiliate Transaction**.  Borrower shall not enter into any Affiliate Transaction without the prior written consent of Lender, which may be withheld in Lender's discretion and in any event only upon such terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any such Affiliate; provided; however, if the Property Manager is an Affiliate of any Borrower Party, Lender's execution of the Consent and Recognition Agreement shall be deemed approval of such Affiliate Transaction.  Lender hereby acknowledges that the Affiliate Transactions described in the Acquisition and Pre-Development Budget with Janoff & Gurevich, L.L.P., Continental Realty and TransContinental Abstract are hereby consented to by Lender.

      **Section 5.25**   **Service Rights**.  Borrower shall not allow any Service Rights to be granted by any Person other than Borrower (including the Property Manager, any Affiliate of Borrower or any Principal), and any Service Rights granted by any Person other than Borrower shall be null and avoid ab initio.

      **Section 5.26**   **Purchase Options**.  Borrower shall deliver to Lender true and correct copies of any Purchase Agreement, any option agreement and any rights of first offer or rights of first refusal to purchase the Property or any portion thereof, or any other similar agreement, together with all amendments and modifications thereto, within five (5) Business days after the execution thereof.  The requirement for delivery of the foregoing shall not be deemed to imply Lender's consent thereto.

      **Section 5.27**   **Confirmation of Representations, Warranties and Covenants**.
In addition to and not in limitation of the covenants and agreements of Borrower contained in this Agreement, if requested by Lender, Borrower shall deliver, in connection with any

Secondary Market Transaction, one or more Officer's Certificates certifying as to the accuracy of all representations and warranties made by Borrower in the Loan Documents as of the Closing Date and as of the date of the closing of such Secondary Market Transaction.

> **Section 5.28    Subdivision Maps.**  Prior to entering into, agreeing to or recording any map, plat, parcel map, lot line adjustment or other subdivision map of any kind covering any portion of Property (collectively, a "**Subdivision Map**"), or amending, modifying, terminating or taking any material action with respect to any Subdivision Map, the Borrower shall submit such Subdivision Map to Lender for Lender's review and approval, which approval may be withheld in Lender's discretion.  As a condition precedent to approval by Lender, if required by Lender, (i) Borrower shall execute, acknowledge and deliver to Lender such amendments to the Loan Documents as Lender may reasonably require to reflect the change in the legal description of the Property resulting from the recordation of any Subdivision Map, and (ii) Borrower shall deliver to Lender, at Borrower's sole expense, title endorsements to the Title Insurance Policies in form and substance satisfactory to Lender insuring the continued first, second and third priority Liens of the Security Instruments.  Subject to the execution and delivery by Borrower of any documents required under this Section 5.28, Lender shall, if required by applicable law, sign any Subdivision Map approved by Lender pursuant to this Section 5.28.

> **Section 5.29    Cash Management**.  Upon Substantial Completion of the Project and written notice from Lender, Borrower shall be required to execute and deliver the Lockbox, Pledge and Security Agreement in form and substance reasonably satisfactory to Lender (as amended, restated, supplemented or otherwise modified and as in effect from time to time, the "**Lockbox Agreement**") and otherwise establish and maintain the accounts, reserves and cash management system contemplated therein.

> **Section 5.30    Intentionally Omitted**.

> **Section 5.31    Intentionally Omitted** .

> **Section 5.32    Equity Contribution**.  Until such time as the Loan has been indefeasibly paid in full (together with all interest thereon and other sums payable with respect thereto), Borrower shall keep the Equity Contribution invested in the Property as equity and shall not permit any return of the Equity Contribution.

> **Section 5.33    Anti-Terrorism**.

> (a)    None of the Borrower nor any other Person owning a direct or indirect, legal or beneficial interest in Borrower is in violation of any Legal Requirement, including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (the "**Executive Order**"), the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56, the "**Patriot Act**").

> (b)    None of the Borrower, Mezzanine Borrower, Guarantors or any of their respective constituents, investors (direct or indirect and whether or not holding a legal or beneficial interest) or affiliates, any of their respective brokers or other agents, if any, acting or

benefiting, directly or indirectly, in any capacity in connection with the Loan, is a "**Prohibited Person**" which is defined as follows:

(i)      a Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)      a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)      a Person with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering Legal Requirements, including the Executive Order and the Patriot Act;

(iv)      a Person who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(v)      a Person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gov/ofac/t11sdn.pdf or at any replacement website or other replacement official publication of such list; and

(vi)      a Person who is affiliated with a Person listed above.

(c)      None of the Borrower, Mezzanine Borrower, Guarantors or any of their respective affiliates, investors or constituents or any of their respective brokers or other agents, if any, acting in any capacity in connection with the Loan are or will at any time hereafter (i) conduct any business or engage in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purposes of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order or the Patriot Act.

(d)      Borrower covenants and agrees to deliver to Lender any certification or other evidence requested from time to time by Lender in its discretion, confirming compliance with this Section 5.33.

(e)      (i) None of the funds or other assets of Borrower, Mezzanine Borrower, or any Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person (as defined below); (ii) no Embargoed Person has any interest of any nature whatsoever in Borrower, Mezzanine Borrower, or any Guarantor, as applicable (whether directly or indirectly); and (iii) none of the funds of Borrower, Mezzanine Borrower, or any Guarantor, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower, Mezzanine Borrower, or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law. "**Embargoed Person**" means any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the

International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the
Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated
thereunder with the result that the investment in Borrower or Guarantors as applicable (whether
directly or indirectly), is prohibited by law or the Loan made by the Lender is in violation of
applicable law.

## VI  CASUALTY; CONDEMNATION; ESCROWS

### Section 6.1     Insurance; Casualty and Condemnation.

#### Section 6.1.1  Insurance.

(a)     Subject to the terms of Section 13.5(b), Borrower shall obtain and
maintain, or cause to be maintained, during all times that any sum is outstanding under the Note
or the other Loan Documents ("**Term**"), insurance for Borrower and Borrower's Property
providing at least the following coverages:

(i)     Comprehensive all risk insurance on the Improvements and all
personal property, including fire, lightning, vandalism and malicious mischief, boiler and
machinery, contingent liability from Operation of Building Laws, Demolition Costs and
Increased Cost of Construction Endorsements, and, if required by Lender, floor and/or
earthquake coverage, in each case (A) in an amount equal to 100% of the "full replacement
cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of
costs of excavations, foundations, underground utilities and footings) with a waiver of
depreciation, but the amount shall in no event be less than the outstanding principal balance of
the Loan; (B) containing an agreed amount endorsement with respect to the Improvements and
all personal property waiving all co-insurance provisions; (C) providing for no deductible in
excess of the lesser of $25,000 and one percent (1%) of the face value of such policy; and (D)
containing an "**Ordinance or Law Coverage**" or "**Enforcement**" endorsement if any of the
Improvements or the use of Borrower's Property shall at any time constitute legal non-
conforming structures or uses.  The full replacement cost shall be redetermined from time to time
(but not more frequently than once in any six (6) calendar months) at the request of Lender by an
appraiser or contractor designated and paid by Borrower and approved by Lender, or by an
engineer or appraiser in the regular employ of the insurer providing the relevant coverage.  After
the first appraisal, if permitted by Lender, additional appraisals may be based on construction
cost indices customarily employed in the trade.  No omission on the part of Lender to request any
such ascertainment shall relieve Borrower of any of its obligations under this Section.

(ii)     Borrower shall obtain flood hazard insurance if any portion of the
Improvements is currently or at any time in the future identified by the Federal Emergency
Management Agency as an area having special flood hazards and in which flood insurance has
been made available under the National Flood Insurance Act of 1968 (and any amendment or
successor act thereto) or otherwise being designated as a "special flood hazard area or part of a
100 year flood zone", in an amount equal to 100% of the full replacement cost of the
Improvements; provided, however, that a portion of such flood hazard insurance may be
obtained under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of
1973 or the National Flood Insurance Reform Act of 1994, as each may be amended.

41

(iii)     Earthquake insurance in amounts and in form and substance satisfactory to Lender in the event the Property is located in an area with a high degree of seismic activity, provided that the insurance pursuant to clauses (ii) and (iii) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under Section 6.1.1.(a)(i) except that the deductible on such insurance shall not be in excess of five percent (5%) of the appraised value of the Property or such other amount as may be agreed to by Lender.

(iv)     Commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a combined single limit of not less than $1,000,000 or such higher amount as may be required by Lender; (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; and (4) blanket contractual liability for all written and oral contracts.

(v)     Business income insurance (A) with loss payable to Lender, (B) covering all risks required to be covered by the insurance provided for in Section 6.1.1(a)(i); (C) containing an unlimited indemnity period pertaining to the time to repair and rebuild; (D) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and all personal property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date of the loss, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (E) in an amount of insurance equal to two (2) times the projected gross income from the Project (including rents). The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate (subject to Lender's review and approval) of the gross income from the Property for the succeeding twelve (12) month period. All Insurance Proceeds payable to Lender pursuant to this Section 6.1.1(a)(v) shall be held by Lender and shall be applied to the Obligations from time to time due and payable hereunder and under the Loan; provided, however, that nothing herein contained shall be deemed to relieve any Borrower of its obligations to pay the Obligations on the respective dates of payment provided for in the Notes except to the extent such amounts are actually paid out of the proceeds of such business income insurance.

(vi)     Workers compensation insurance, subject to the statutory limits of the state in which the Property is located, and employer's liability insurance with a limit of at least $1,000,000 per accident and per disease per employee, and $1,000,000 for disease aggregate in respect of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable).

(vii)     Comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the comprehensive all risk insurance required under Section 6.1.1(a)(i).

(viii)    Umbrella liability insurance in an amount not less than $25,000,000 per occurrence on terms consistent with the commercial general liability insurance policy required under Section 6.1.1(a)(iv).

(ix)    If applicable, motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence of $1,000,000.

(x)    In the event that the Property or any part of the Improvements constitutes a legal non-conforming use under applicable building, zoning or land use laws or ordinances which are in affect at the time of loss or at the time of reconstruction, the policy shall include an ordinance or law coverage endorsement which will contain Coverage A: "Loss Due to Operation of Law" (with a minimum liability limit equal to Replacement Cost With Agreed Value Endorsement), Coverage B: "Demolition Cost" and Coverage C: "Increased Cost of Construction" coverages.

(xi)    Insurance for loss resulting from perils and acts of terrorism on terms (including amounts) consistent with the insurance required under Section 6.1(a)(i), (iv), (v), (vi), (viii) and (ix) above, at all times during the term of the Loan.

(xii)    Such other insurance and in such amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

(b)    All insurance provided for in Section 6.1.1(a) shall be obtained under valid and enforceable policies ("**Policies**" or in the singular, "**Policy**"), in such forms and, from time to time after the date hereof, in such amounts as may be satisfactory to Lender, issued by financially sound and responsible insurance companies authorized to do business in the State in which the Property is located and approved by Lender.  Except as otherwise approved by Lender in its discretion, the insurance companies must have a claims paying ability/financial strength rating of "A" (or its equivalent) or better by at least two (2) Rating Agencies (one of which shall be S&P if it is rating any Securities and one of which shall be Moody's if it is rating any Securities), or if only one Rating Agency is rating any such Securities, then only by such Rating Agency (each such insurer shall be referred to below as a "**Qualified Insurer**").  The Policies shall designate Lender as first mortgagee, except as to general liability, worker's compensation, umbrella liability and automobile policies under which Lender shall be named as an additional insured.  Not less than thirty (30) days prior to the expiration dates of the Policies theretofore furnished to Lender pursuant to Section 6.1.1(a), certified copies of the Policies marked "premium paid" or accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder ("**Insurance Premiums**"), shall be delivered by Borrower to Lender; provided, however, that in the case of renewal Policies, Borrower may furnish Lender with binders therefor to be followed by the original Policies when issued.

(c)    Borrower shall not obtain (i) any umbrella or blanket liability or casualty Policy unless, in each case, such Policy is approved in advance in writing by Lender (which

43

approval will not be unreasonably withheld) and Lender's interest is included therein as provided in this Agreement and the Loan Documents and such Policy is issued by a Qualified Insurer, or (ii) separate insurance concurrent in form or contributing in the event of loss with that required in Section 6.1.1(a) to be furnished by, or which may be reasonably required to be furnished by, Borrower. In the event Borrower obtains separate insurance or an umbrella or a blanket Policy, Borrower shall notify Lender of the same and shall cause certified copies of each Policy to be delivered as required in Section 6.1.1(a). Any blanket Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 6.1.1(a).

(d)     All Policies of insurance provided for or contemplated by Section 6.1.1(a), except for the Policy referenced in Section 6.1.1(a)(vii), shall name Lender and the Borrower as the insured or additional insured, as their respective interests may appear, and in the case of property damage, boiler and machinery, flood and earthquake insurance, shall contain a so-called New York standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender. Without limitation to the foregoing, Lender shall be named under a Lender's Loss Payable Endorsement (acceptable to Lender) on all insurance policies which Borrower actually maintain with respect to the Property.

(e)     All Policies of insurance provided for in Section 6.1.1(a) shall contain clauses or endorsements to the effect that:

(i)     No act or negligence of Borrower, or anyone acting for Borrower, or of any Tenant under any Lease or other occupant, or failure to comply with the provisions of any Policy which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned.

(ii)     The Policy shall not be materially changed (other than to increase the coverage provided thereby) or cancelled without at least 30 days written notice to Lender and any other party named therein as an insured.

(iii)     Each Policy shall provide that the issuers thereof shall give written notice to Lender if the Policy has not been renewed thirty (30) days prior to its expiration.

(iv)     Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(v)     The insurer waives all rights of subrogation in a manner acceptable to Lender.

(f)     Borrower shall furnish to Lender, on or before thirty (30) days after the close of each calendar year, an Officer's Certificate stating the amounts of insurance maintained in compliance herewith, the risks covered by such insurance and the insurance company or companies which carry such insurance and, if requested by Lender, verification of the adequacy of such insurance by an independent insurance broker or appraiser acceptable to Lender.

44

(g)    If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower or any other Person to take such action as Lender deems necessary to protect Lender's interest in the Property, including the obtaining of such insurance coverage as Lender in Lender's discretion deems appropriate, and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Loan Documents and shall bear interest at the Default Rate.

(h)    In the event of foreclosure of any Security Instrument, or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of the Borrower in and to such Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

(i)    Within thirty (30) days after request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices of similarly situated lenders, and the like.

(j)    If the Property or any portion of the Property is damaged or destroyed, in whole or in part, by fire or other casualty, whether insured or uninsured (a "**Casualty**"), the Borrower shall give prompt written notice thereof to Lender. Following the occurrence of a Casualty, the Borrower shall, regardless of whether Insurance Proceeds are available, promptly proceed to restore, repair, replace or rebuild the same to be of at least equal value and of substantially the same character as prior to such damage or destruction, all to be effected in accordance with applicable law and the terms and conditions of the Loan Documents. The expenses incurred by Lender in the adjustment and collection of Insurance Proceeds shall become part of the Debt and be secured by the Loan Documents and shall be reimbursed by Borrower to Lender upon demand.

(k)    Borrower shall comply with all insurance requirements of any insurer of the Property or any portion thereof and shall not bring or keep or permit to be brought or kept any article upon any of the Property or any portion thereof or cause or permit any condition to exist thereon which would be prohibited by an insurance requirement, or would invalidate any Policies then in effect or any of the insurance coverage required hereunder to be maintained by Borrower on or with respect to any part of the Property pursuant to this Agreement.

(l)    Any reimbursement due to Lender pursuant to this Section 6.1.1 must be paid within ten (10) days (or sooner if required), or such amount shall accrue interest at the Default Rate until paid to Lender.

(m)    Lender shall not be responsible for nor incur any liability for the insolvency of any insurer or other failure of any insurer to perform, even though Lender has caused the insurance to be placed with the insurer after failure of any Borrower to furnish such insurance. Borrower shall not obtain insurance for the Property in addition to that required by Lender without the prior written consent of Lender, which consent will not be unreasonably

withheld provided that (i) Lender is named insured on such insurance, (ii) Lender receives complete copies of all policies evidencing such insurance, and (iii) such insurance complies with all of the applicable requirements set forth herein.

### Section 6.1.2   Casualty and Application of Proceeds.

(a)    In case of loss or damages covered by any of the Policies, the following provisions shall apply:

(i)    In the event of a Casualty with respect to the Property that is less than $500,000 in the aggregate, the Borrower may settle and adjust any claim without the consent of Lender and retain the proceeds thereof.

(ii)    In the event of a Casualty with respect to the Property in excess of $500,000 if each of the following is true at all times: (A) the Insurance Proceeds are sufficient to pay for the Restoration as determined by Lender; (B) after such Restoration, the Property will adequately secure the outstanding balance of the Loan; (C) no Default or Event of Default exists; (D) less than fifteen percent (15%) of the total floor area of the Improvements with respect to the Property has been substantially damaged, destroyed, or rendered unusable as a result of the Casualty; (E) Lender shall be satisfied that the Restoration will be completed on or before the earlier of (i) six (6) months prior to the Maturity Date, or (ii) twelve (12) months after the occurrence of the Casualty; (F) the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements; and (G) the Casualty does not result in the loss of access to the Property or the Improvements, then the Insurance Proceeds shall be deposited with Lender and after reimbursement of any expenses incurred by Lender, such Insurance Proceeds shall be maintained and applied to pay for the cost of restoring, repairing, replacing or rebuilding the Property or part thereof subject to the Casualty ("**Restoration**"), in the manner set forth herein.  The Borrower hereby covenants and agrees to commence and diligently to prosecute such Restoration; provided that: (a) Borrower shall pay all costs (and if required by Lender, Borrower shall deposit the total thereof with Lender in advance) of such Restoration in excess of the net Insurance Proceeds made available pursuant to the terms hereof; (b) the Restoration shall be done in compliance with all applicable Legal Requirements; (c) Borrower shall commence the Restoration as soon as reasonably practicable (but in no event later than thirty (30) days after settlement with the applicable insurance carrier regarding the Insurance Proceeds arising from the Casualty) and shall diligently pursue the same to satisfactory completion; (d) the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements, including any applicable Environmental Laws; and (e) Lender shall have received evidence satisfactory to Lender that, during the period of the Restoration, the sum of (A) income derived from the Property, as reasonably determined by Lender, plus (B) proceeds of rent loss insurance or business interruption insurance, if any, to be paid, will equal or exceed the sum of (1) expenses in connection with the operation of the Property, (2) the required payments of principal and interest on the Loan, and (3) the other payments required pursuant to this Agreement or the Loan Documents.

(b)    Except as provided above in Section 6.1.2(a), the Insurance Proceeds collected upon any Casualty shall be deposited with Lender and at Lender's option (in its

discretion), be applied to the payment of the Debt after reimbursement of any expenses incurred by Lender or, if Lender so elects (without any obligation to do so), after reimbursement of any expenses incurred by Lender, Lender or Servicer shall hold such amount and such proceeds shall be maintained and applied in accordance with the Loan Documents to pay for the cost of any Restoration in the manner set forth herein. Any such application to the Debt shall be at Lender's discretion, except as specifically provided herein to the contrary, and shall be applied to those payments of principal and interest (including any Additional Fee) last due under the Notes or as otherwise determined by Lender and shall not postpone or reduce any payments otherwise required pursuant to the Notes and the other Loan Documents or otherwise determined by Lender.

(c)     In the event Borrower is entitled to reimbursement out of Insurance Proceeds held by Lender, such Insurance Proceeds shall be disbursed from the Lender from time to time (but not more than once per month) upon Lender being furnished with: (i) evidence satisfactory to Lender of the estimated cost of completion of the Restoration; (ii) evidence satisfactory that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other Liens or encumbrances of any nature whatsoever on the Borrower's Property arising out of the Restoration which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the Title Insurance Company; (iii) sufficient funds, or at Lender's option, assurances satisfactory to Lender that such funds are available, in addition to the Insurance Proceeds, to complete the proposed Restoration; (iv) such architect's certificates, waivers of Lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey and such other evidences of cost, payment and performance as Lender may reasonably require and approve; and (v) all plans and specifications for such Restoration, such plans and specifications to be delivered and approved by Lender prior to commencement of any work.

(d)     All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and, if required by Lender, by an independent consulting engineer selected by Lender. Lender shall have the use of the plans and specifications and all permits, Licenses and approvals required or obtained in connection with the Restoration. The identity of the general contractor engaged in the Restoration, as well as the general contract under which it has been engaged, shall be subject to prior review and acceptance by Lender. All reasonable costs and expenses incurred by Lender in connection with making the Insurance Proceeds available for the Restoration, including reasonable counsel fees and disbursements, shall be deducted by Lender from such insurance proceeds.

(e)     In addition, no payment made prior to the final completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time except as may be provided in a general contractor's agreement approved by Lender; funds other than Insurance Proceeds shall be disbursed prior to disbursement of such Insurance Proceeds; and at all times, the undisbursed balance of such Insurance Proceeds remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in

the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all Liens or claims for Lien. Any surplus which may remain out of Insurance Proceeds after payment of such costs of Restoration shall be applied to the Loan in such order and manner as Lender may elect.

### Section 6.1.3  Condemnation.

(a)    Borrower shall promptly give Lender written notice of the actual or threatened commencement of any condemnation or eminent domain proceeding against any of the Property or any part thereof or the Improvements or any part thereof (a "**Condemnation**") and shall deliver to Lender copies of any and all papers served by or on or received by any of the Borrower Parties in connection with such Condemnation. Following the occurrence of a Condemnation, the Borrower, regardless of whether an Award is available, shall promptly proceed to restore, repair, replace or rebuild the Property to the extent practicable to be of at least equal value and of substantially the same character as prior to such Condemnation, all to be effected in accordance with all Legal Requirements.

(b)    Lender is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment ("**Award**") for any taking accomplished through a Condemnation and to make any compromise or settlement in connection with such Condemnation, subject to the provisions of this Section. Notwithstanding any taking in connection with a Condemnation by any public or quasi-public authority (including any transfer made in lieu of or in anticipation of such a Condemnation), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Notes and the other Loan Documents and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Lender to expenses of collecting the Award and to discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided in the Note. Borrower shall cause any Award that is payable to Borrower to be paid directly to Lender.

(c)    The proceeds of the Award collected upon any Condemnation shall be deposited directly with Lender pursuant to Section 6.1.3(b) and at Lender's option (in its discretion), shall be applied to the payment of the Debt (after reimbursement of any expenses incurred by Lender) or, if Lender so elects (without any obligation to do so), (after reimbursement of any expenses incurred by Lender), Lender or Servicer shall hold such amount and such proceeds shall be maintained and applied in accordance with the Loan Documents to pay for the cost of any Restoration in the manner set forth herein. Any such application to the Debt shall be at Lender's discretion and shall be applied to those payments of principal and interest last due under the Notes or as otherwise determined by Lender and shall not postpone or reduce any payments otherwise required pursuant to the Notes and the other Loan Documents. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of such Award, Lender shall have the right, whether or not a deficiency judgment shall be recoverable or shall have been sought, recovered or denied, to receive all or a portion of said Award sufficient to pay the outstanding balance of the Debt.

(d)     In the event Borrower is entitled to reimbursement out of the Condemnation Proceeds held by Lender, such Condemnation Proceeds shall be disbursed from Lender from time to time (but not more than once per month) upon Lender being furnished with: (i) evidence satisfactory to Lender of the estimated cost of completion of the Restoration; (ii) evidence satisfactory that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other Liens or encumbrances of any nature whatsoever on Borrower's Property arising out of the Restoration which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the Title Insurance Company; (iii) sufficient funds, or at Lender's option, assurances satisfactory to Lender that such funds are available, in addition to the Condemnation Proceeds, to complete the proposed Restoration; (iv) such architect's certificates, waivers of Lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey and such other evidences of cost, payment and performance as Lender may reasonably require and approve; and (v) all plans and specifications for such Restoration, such plans and specifications to be delivered and approved by Lender prior to commencement of any work.

(e)     All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and, if required by Lender, by an independent consulting engineer selected by Lender. Lender shall have the use of the plans and specifications and all permits, Licenses and approvals required or obtained in connection with the Restoration. The identity of the general contractor engaged in the Restoration, as well as the general contract under which it has been engaged, shall be subject to prior review and acceptance by Lender. All costs and expenses incurred by Lender in connection with making the Condemnation Proceeds available for the Restoration, including reasonable counsel fees and disbursements, shall be deducted by Lender from such Condemnation Proceeds.

(f)     In addition, no payment made prior to the final completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time except as may be provided in a general contractor's agreement approved by Lender; funds other than Condemnation Proceeds shall be disbursed prior to disbursement of such Condemnation Proceeds; and at all times, the undisbursed balance of such Condemnation Proceeds remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all Liens or claims for Lien. Any surplus, which may remain out of the Condemnation Proceeds after payment of such costs of Restoration, shall be applied to the Loan in such order and manner as Lender may elect.

**Section 6.2     Tax and Insurance Escrows**.  Borrower shall pay to Lender on each Payment Date (a) one-twelfth of the Taxes that Lender reasonably estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates and (b) one-twelfth of the Insurance Premiums that Lender estimates will be payable for the renewal of the coverage afforded by the Policies for the succeeding annual period upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least

thirty (30) days prior to the expiration of the Policies (all amounts in clauses (a) and (b) above hereinafter called the "**Tax and Insurance Escrow Fund**"). Borrower shall also deposit with Lender on the Closing Date such amount as is required by Lender in order to provide adequate funds therefor on the first payment date for such Taxes and Insurance Premiums. The Tax and Insurance Escrow Fund and the payments of interest or principal or both, payable pursuant to the Notes, shall be added together and shall be paid as an aggregate sum by Borrower to Lender in immediately available funds. Lender will apply the Tax and Insurance Escrow Fund to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Section 5.4 and under the other Loan Documents provided no Event of Default has occurred and is continuing. In making any payment relating to the Tax and Insurance Escrow Fund, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax Lien or title or claim thereof. Borrower shall arrange for any such bills, statements or estimates to be delivered to Lender at least fifteen (15) Business Days prior to the date any such payment is due. If the amount of the Tax and Insurance Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Section 5.4, Lender shall, in its discretion, return any excess to Borrower or, at Lender's option, credit such excess against future payments to be made to the Tax and Insurance Escrow Fund. In allocating such excess, Lender may deal with the Person shown on the records of Lender to be the owner of the Property. Any amount remaining in the Tax and Insurance Escrow Fund after the Debt has been paid in full shall be returned to Borrower, or at Lender's option, may be deducted from the Loan payoff amount. In allocating such excess, Lender may deal with the Person shown on the records of Lender to be the owner of the Property. If at any time Lender reasonably determines that the Tax and Insurance Escrow Fund is not or will not be sufficient to pay the items set forth in clauses (a) and (b) above, Lender shall notify Borrower of such determination and Borrower shall increase their monthly payments to Lender by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to delinquency of the Taxes and/or thirty (30) days prior to expiration of the Policies, as the case may be.

## VII    DEFAULTS

### Section 7.1    Event of Default.

(a)    Each of the following shall constitute an event of default hereunder (an "**Event of Default**"):

(i)    if (A) any payment of principal or interest due pursuant to any Note, this Agreement or any of the other Loan Documents, including the payment due on the Maturity Date, is not paid on or prior to the date the same is due or (B) any other portion of the Debt, which by the terms of the Loan Documents becomes due and payable, is not paid within ten (10) days after payment of same is demanded by Lender;

(ii)    any of the Taxes or Other Charges (other than any of the same payable on a Payment Date) are not paid on or before the tenth (10th) day after the same are due and payable except to the extent sums sufficient to pay such Taxes and Other Charges have been deposited with Lender in accordance with terms of this Agreement and Lender fails to pay same;

50

(iii)    the Policies are not kept in full force and effect, or certified copies of the Policies are not delivered to Lender within twenty (20) days of request by Lender;

(iv)    a Transfer (other than a Transfer specifically authorized and permitted by Section 5.22) shall occur without Lender's prior written consent;

(v)    any representation or warranty made by Borrower or any of the Borrower Parties herein or in any other Loan Document, or in any material report, certificate, financial statement or other instrument, agreement or document furnished to Lender in connection with the Loan, shall have been false or misleading in any material respect as of the date the representation or warranty was made (disregarding any knowledge qualifiers thereof contained in the Loan Documents); provided, however, if such false or misleading representation or warranty is susceptible of being cured within thirty (30) days, the same shall be an Event of Default hereunder only if the same is not cured within a reasonable time not to exceed thirty (30) days after notice from Lender;

(vi)    if (a) Borrower or any Borrower Party shall commence any case, proceeding or other action (1) under any existing or future Bankruptcy Laws, or (2) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for Borrower or Borrower Party or for all or any substantial part of the assets of Borrower or Borrower Party, or Borrower or any Borrower Party shall make a general assignment for the benefit of creditors; or (b) there shall be commenced against Borrower or any Borrower Party any case, proceeding or other action of a nature referred to in clause (a) above which (1) results in the entry of an order for relief or any such adjudication or appointment or (2) remains undismissed, undischarged or unbonded for a period of ninety (90) days; or (c) there shall be commenced against Borrower or any Borrower Party any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within ninety (90) days from the entry thereof; or (d) Borrower or any Borrower Party shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (a), (b), or (c) above; or (e) Borrower or any Borrower Party shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

(vii)    if Borrower shall be in default under any other permitted mortgage, deed of trust or security agreement covering any part of the Property whether it be superior or junior in Lien to any Security Instrument and whether it be permitted under the Loan Documents or if Borrower shall be in default of any other Indebtedness, secured or unsecured, owed by Borrower to any Person; provided, however, the foregoing shall not be deemed to permit Borrower to incur any other Indebtedness unless expressly permitted by the Loan Documents;

(viii)    if Borrower or any Person owning a direct or indirect interest in Borrower shall be in default under any pledge agreement or security agreement covering any part of the equity interests in Borrower and whether it be permitted or prohibited under the Loan Documents;

51

(ix)    subject to Borrower's right to contest in Section 5.4, if the Property becomes subject to any mechanic's or materialman's lien or other Lien except a Lien for local real estate taxes and assessments not then due and payable and the Lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days or more;

(x)    except as permitted or contemplated in the Loan Documents with respect to the demolition of any structures existing on the Property on the date hereof, the alteration, improvement, demolition or removal of any of the Improvements without the prior consent of Lender;

(xi)    intentionally omitted;

(xii)    Borrower fails to observe or perform any covenant, condition, agreement or obligation hereunder or under the other Loan Documents beyond any applicable cure period contained herein or therein, or if no cure period is provided, such failure is not cured (i) in the case of any default which can be cured by the payment of a sum of money, within ten (10) days after written notice from Lender to Borrower, or (ii) in the case of any such failure which cannot be cured by the payment of a sum of money, within thirty (30) days after written notice from Lender to Borrower; provided, however, with respect to this clause (ii), if such default is reasonably susceptible of cure, but not within such thirty (30) day period, then Borrower may be permitted up to an additional ninety (90) days to cure such failure provided, that Borrower diligently and continuously pursues such cure;

(xiii)    Borrower is in breach of Sections 4.1(s) or 5.3;

(xiv)    if Borrower violates or does not comply with any of the provisions of Section 4.1(s) or if any managing member or manager or the SPE Member of Borrower violates or does not comply with any of the provisions of Section 4.1(s);

(xv)    the prohibition, enjoining or interruption of Borrower's right to occupy, use or lease the Property for a continuous period of more than thirty (30) days;

(xvi)    (i) the condemnation, seizure or appropriation of, or occurrence of an uninsured Casualty with respect to any material portion of the Property; or (ii) the sequestration or attachment of, or any levy or execution upon the Property, any other collateral provided by Borrower under any of the Loan Documents, or any substantial portion of the other assets of Borrower, which sequestration, attachment, levy or execution is not released, expunged or dismissed prior to the earlier of thirty (30) days or the sale of the assets affected thereby;

(xvii)    the failure at any time of any Security Instrument to be a valid first, second or third lien, as applicable, upon the Property or any portion thereof, other than as a result of any release or reconveyance of such Security Instrument with respect to all or any portion of the Property pursuant to the terms and conditions of this Agreement;

(xviii)    the discovery of any significant Hazardous Substances in, on or about the Property subsequent to the Closing Date and Borrower's failure to remediate in accordance with the terms of the Environmental Indemnity. Any such Hazardous Substances

52

shall be "significant" for this purpose if the presence of said Hazardous Substances, in Lender's discretion, have a Material Adverse Effect on the value of such Property;

(xix)   any of the assumptions contained in the Non-Consolidation Opinion delivered to Lender in connection with the Loan, or in any other Non-Consolidation Opinion delivered subsequent to the closing of the Loan, are or shall become untrue in any material respect;

(xx)   any statements made in any certificates, separateness agreements or similar documents delivered in connection with the Non-Consolidation Opinion (whether delivered in connection with closing the Loan or thereafter), and whether delivered to Lender or the attorneys rendering such Non-Consolidation Opinion, are or shall become untrue in any material respect;

(xxi)   the occurrence of any Recourse Event without regard to any grace, notice or cure period, if any, provided in the Guaranty of Recourse Obligations (but subject to any applicable notice and cure periods set forth herein);

(xxii)   there is any material deviation from the Plans and Specifications without the prior written approval of Lender, or there is incorporated into the Construction Work any substantially defective workmanship or materials, which said deviation or defect is not commenced to be corrected within ten (10) days after written notice thereof and such correction diligently pursued to its conclusion within sixty (60) days after such commencement; provided, however, with respect to this clause (xxii), if such default is reasonably susceptible of cure, but not within such sixty (60) day period, then Borrower may be permitted up to an additional sixty (60) days to cure such failure provided, that Borrower diligently and continuously pursues such cure;

(xxiii)   any Construction Work is constructed on or over any easement, building line, wetland or other area where building is not permissible or there appears on any survey required hereunder encroachments which have occurred without the approval of Lender, and in either case, which are not commenced to be removed or corrected within ten (10) days after receipt of Lender's notification to Borrower of the existence thereof and such removal or correction diligently continued to its conclusion within sixty (60) days after such commencement; provided, however, with respect to this clause (xxiii), if such default is reasonably susceptible of cure, but not within such sixty (60) day period, then Borrower may be permitted up to an additional sixty (60) days to cure such failure provided, that Borrower diligently and continuously pursues such cure;

(xxiv)   there occurs a cessation of the work prior to completion of the Construction Work with respect to the Property for a continuous period of forty-five (45) days or more for any reason (other than Excusable Delay) not consented to in writing by Lender;

(xxv)   the Construction Expenses for the Construction Work exceed the sum of the remaining amounts available for such work under the Loan in accordance with the Construction Budget plus the remaining amount of Borrower's Deposit, and the Borrower fails to