fees and charges for examinations of title to the Project and for mortgagee title insurance and
endorsements thereto (including Datedown Endorsements) which are being or may in the future
be issued by the Title Insurance Company; (xii) all taxes and charges relating to the perfection of
Lender's security interests, including, without limitation, all mortgage recording taxes payable
now or in the future; (xiii) all registration, recording and filing fees and charges in connection
with the Loan; (xiv) fees and charges of Lender's insurance consultant and the environmental
engineers preparing any environmental assessment or environmental audits as are to be
performed at Borrower's expense pursuant to the terms of this Agreement; (xv) costs for certified
copies of instruments; (xvi) all brokerage fees and commissions payable in connection with the
Loan; and (xvii) the fees and expenses of the Consultant (as defined in the Building Loan
Agreement). Any cost and expenses due and payable to Lender shall be payable within five (5)
Business Days of demand, shall be secured by the Loan Documents, and if not paid when due,
shall bear interest at the Default Rate until paid. Borrower acknowledges and agrees that the
obligations of Borrower under this Section 12.9 are not subject to or conditioned upon Lender
making any Advances of the Loan to Borrower.

Section 12.10 **Relationship of Borrower and Lender**. The relationship between
Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other
special relationship with Borrower, and no term or condition of any of the Notes, the Security
Instruments, this Agreement and the other Loan Documents shall be construed so as to deem the
relationship between Borrower and Lender to be other than that of the debtor and creditor
relationship established pursuant to the Loan Documents. The relationship of Borrower and
Lender is created and governed solely by the Loan Documents.

Section 12.11 **No Joint Venture or Partnership; No Third Party
Beneficiaries**.

(a)    Any provision herein or in any of the other Loan Documents to the
contrary notwithstanding, Lender, by virtue of its acceptance of this Agreement and the making
of the Loan or any approval rights Lender may have herein or in any of the Loan Documents
shall not be deemed to constitute Lender a mortgagee-in-possession, tenant-in-common, or in
control of, or a partner or joint venturer with, or insider (within the meaning of Section 101(31)
of the Bankruptcy Code) of, any Borrower Party or any other Person; and Borrower shall
indemnify Lender against, shall hold Lender harmless from, and shall reimburse Lender for, any
and all claims, demands, judgments, penalties, fines, liabilities, costs, damages and expenses,
including court costs and reasonable attorneys' fees incurred by Lender (whether incurred in
connection with nonjudicial action, prior to trial, at trial, or on appeal or review) in any action
against or involving Lender resulting from such a construction of the Loan Documents.

(b)    Any inspection of the Property, any review or approval of any plans,
contracts, subcontracts (including environmental reviews, audits, assessments and/or reports
relating to the Property), and review or approval of budgets, expenses or obligations or any
analysis of the Property made by Lender or any of its agents, architects or consultants is intended
solely for the benefit of Lender and shall not be deemed to create or form the basis of any
warranty, representation, covenant, implied promise or liability to Borrower or any of their
employees or agents, any guest or invitee upon the Property, or any other Person.

(c)    Except as otherwise provided in Article VIII hereof, this Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and any Servicer appointed by Lender and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender, the Servicer appointed by Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained in the Loan Documents. Except as otherwise provided in Article VIII hereof, all conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's discretion, Lender deems it advisable or desirable to do so.

**Section 12.12  Publicity**. All news releases, publicity or advertising by the Borrower Parties or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents or to Lender, or any of their Affiliates shall be subject to the prior written approval of Lender, which approval shall not be unreasonably withheld.

**Section 12.13  Subrogation**. If any or all of the proceeds of the Notes have been used to extinguish, extend or renew any Indebtedness heretofore existing against the Property or any part thereof, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, Liens, titles, and interests existing against the Property or any part thereof heretofore held by, or in favor of, the holder of such Indebtedness and such former rights, claims, Liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the Lien and security interest created herein as cumulative security for the repayment of the Debt, the performance and discharge of the Obligations.

**Section 12.14  Duplicate Originals; Counterparts**. This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute one agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

**Section 12.15  Liability**. Borrower shall be jointly and severally liable for all obligations of Borrower under this Agreement and the other Loan Documents. The obligations and liabilities of Borrower hereunder shall be joint and several irrespective of whether a Borrower is primarily responsible for such obligation or liability. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

**Section 12.16  Prior Agreements**. This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such

parties, whether oral or written, including any term sheets, discussion outlines or commitment letters (as same may be amended) between any of the Borrower Parties and Lender are superseded by the terms of this Agreement and the other Loan Documents.

Section 12.17 **No Usury**. Any provision herein, in any Loan Document or any other document executed or delivered in connection with the Loan, or in any other agreement or commitment, whether written or oral, expressed or implied, to the contrary notwithstanding, Lender shall not in any event be entitled to receive or collect, nor shall or may amounts received hereunder be credited, so that Lender shall be paid, as interest, a sum greater than the maximum amount permitted by applicable law to be charged to the Person primarily obligated to pay the Debt and the Obligations at the time in question. If any construction of this Agreement, any other Loan Document, or any other document executed or delivered in connection herewith, indicates a different right given to Lender to ask for, demand or receive any larger sum as interest, such is a mistake in calculation or wording which this clause shall override and control, it being the intention of the Borrower and Lender that this Agreement, any other Loan Document and any other documents executed in connection herewith conform strictly to applicable usury laws. In no event shall the amount treated as the total interest exceed the maximum amount of interest which may be lawfully contracted for, charged, taken, received or reserved by Lender in accordance with the applicable usury laws, taking into account all items which are treated as interest under applicable law, computed in the aggregate over the full term of the Loan evidenced hereby. In the event that the aggregate of all consideration which constitutes interest under applicable law that is taken, reserved, contracted for, charged or received under this Agreement, any other Loan Document and any other documents executed in connection herewith shall ever exceed the maximum nonusurious rate under applicable law, any sum in excess thereof shall be applied to the reduction of the unpaid principal balance of the Debt and the Obligations, and if the Debt and the Obligations are paid in full, any remaining excess shall be paid to Borrower. In determining whether or not the interest paid or payable, under any specific contingency, exceeds the maximum nonusurious rate under applicable law, if any, the Borrower and Lender shall, to the maximum extent permitted under applicable law, (a) characterize any nonprincipal amount as an expense or fee rather than as interest, (b) exclude voluntary prepayments and the effects thereof, or (c) "spread" the total amount of interest throughout the entire term of the Debt and the Obligations so that the interest rate is uniform throughout the entire term of the Debt and the Obligations; provided, however, that if the Debt and Obligations are paid and performed in full prior to the end of the full contemplated term thereof, and if the interest received for the actual period of existence thereof exceeds the maximum nonusurious rate, if any, Lender shall refund to Borrower the amount of such excess.

Section 12.18 **Construction**. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender by virtue of the fact that this Agreement or any of the Loan Documents has originated with Lender as drafter. Borrower acknowledges that Borrower has reviewed this Agreement and the other Loan Documents and have had the opportunity to consult with counsel on same. This Agreement and the other Loan Documents, shall therefore be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties to the Loan Documents. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any

statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.

Section 12.19 **Lender's Discretion**. Whenever pursuant to this Agreement or any of the Loan Documents, Lender may approve or disapprove any act (or any action) or any document, delivery or other item, or where Lender's consent or approval is required in any respect or where any document or other item must be satisfactory to Lender, except in those specific instances where Lender has specifically agreed not to unreasonably withhold Lender's consent pursuant to the terms of this Agreement or any of the Loan Documents, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory or to grant or withhold consent shall be in the sole, absolute and unfettered discretion of Lender, without any express or implied obligation of reasonableness or good faith whatsoever and shall be final and conclusive. Borrower acknowledges and agrees that in no circumstance shall Borrower have any claim or cause of action, in contract or in tort, against Lender as a result of the granting or withholding of any such consent or approval. The inclusion of references to Lender's sole or absolute discretion in any particular provisions of this Agreement or any of the Loan Documents shall not limit or affect the applicability of this Section to all provisions of this Agreement or any of the Loan Documents, including those provisions wherein a specific reference to Lender's sole and absolute discretion is not made. Without limiting the preceding provisions of this Section, in the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or in bad faith or unreasonably delayed acting in any case where, by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or in good faith or promptly, Borrower agrees that neither Lender, Servicer nor their agents or employees shall be liable for any monetary damages (including any special, consequential or punitive damages whatsoever), whether in contract, tort (including negligence and strict liability) or any other legal or equitable principles, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably or in good faith shall be determined by an action seeking declaratory judgment.

Section 12.20 **Lender**. The rights of Lender pursuant to this Agreement and the other Loan Documents are in addition to all of the rights of Lender or any Affiliate of Lender may now or hereafter have by virtue of any ownership, directly or indirectly, in Borrower or any Affiliate of Borrower. In acting as Lender pursuant to this Agreement or the Loan Documents, Borrower acknowledges that Lender shall owe no duties of any kind to Borrower or any other Person (other than those specifically stated in the Loan Documents) on account of such role of Lender or any Affiliate of Lender or by virtue of any ownership interest in Borrower or such Affiliates (directly or indirectly) or otherwise, and there shall be no limitations on Lender's rights or remedies or Lender's ability to act solely in Lender's best interests or in Lender's discretion, notwithstanding the role of Lender or any such Affiliate of Lender may have by virtue of any ownership interest in Borrower or any Affiliate of Borrower. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to Lender under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by Lender or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire (directly or indirectly) in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing

with respect to Lender's exercise of any such rights or remedies. No assignee of any of Lender's
rights with respect to the Loan or the Loan Documents shall be prejudiced or affected by the
status of Lender or any such Affiliate of Lender as a member, partner, stockholder or other
owner of Borrower or any Affiliate of any Borrower or any actions taken or not taken by Lender
or its Affiliates prior to the assignment to the then current Lender and upon any such assignment,
such assignee shall be in the same position as if such assignee had originated the Loan itself as of
the date of such assignment and shall not be subject to any offsets, counterclaims or defenses to
which Lehman Brothers Holdings Inc. or any other Person which may from time to time be the
"Lender" hereunder or their respective Affiliates might be subject. Borrower acknowledges that
Lender and its Affiliates engage in the business of real estate financings and other real estate
transactions and investments, which may be viewed as adverse to or competitive with the
business of Borrower or its Affiliates.

**Section 12.21** **Limitation on Liability**. Notwithstanding anything contained
herein to the contrary, Borrower agrees that none of Lender, Servicer or their agents or
employees shall be liable to Borrower for any monetary damages (including any special,
consequential or punitive damages whatsoever), whether in contract, tort (including negligence
and strict liability) or any other legal or equitable principle (including without limitation, with
respect to any acts of Lender pursuant to Section 12.26 hereof) and Borrower's sole remedies
shall be limited to commencing an action for specific performance.

**Section 12.22** **Lockbox**. Upon Substantial Completion of the Project , Borrower
shall be required to execute and deliver the Lockbox Agreement, which provides, among other
things, that all Rents and other sums collected from, or arising with respect to, the Property be
deposited in one or more accounts established in connection with such Lockbox Agreement. The
Borrower shall pay all costs and expenses required under the Lockbox Agreement. Upon the
occurrence of an Event of Default, Lender may apply any sums then held pursuant to the
Lockbox Agreement to the payment of the Debt in any order in Lender's sole discretion. Until
expended or applied, amounts held pursuant to the Lockbox Agreement shall constitute
additional security for the Debt.

**Section 12.23** **Appointment of Servicer and Delegation of Lender Rights**.
Borrower acknowledges and agrees that at the option of Lender, the Loan may be serviced by a
servicer/trustee (the "**Servicer**") selected by Lender and Lender may delegate all or any portion
of its responsibilities under this Agreement and the other Loan Documents to the Servicer
pursuant to a servicing agreement between Lender and Servicer; provided, however, such
delegation will not release Lender from any of its obligations under the Loan Documents.
Borrower shall be responsible for paying to Servicer on each Payment Date a monthly servicing
fee of 0.15% per annum of the then outstanding principal amount of the Loan. Borrower shall
also be responsible for the payment of all out-of-pocket costs and expenses incurred by Servicer
in connection with the Loan (including the review and approval of or consent to Leases and
Condominium Documents and the negotiation of subordination, non-disturbance and attornment
agreements, property inspections, casualty or condemnation matters or in connection with any
Default or Event of Default). Any action or inaction taken by the Servicer pursuant to this
Agreement and the Loan Documents shall be binding to the same extent as if taken by Lender,
and Borrower shall be entitled to rely on all actions and directions given by Servicer with respect

to all matters concerning the Loan and Loan Documents unless and until Borrower receive contrary written instructions from the Lender.

Section 12.24 **Cross-Default** . Borrower acknowledges that Lender has made the Loan to Borrower upon the security of its interest in the Property. Borrower agrees that the Security Instruments are and will be cross-defaulted with each other so that (i) an Event of Default under any of the Security Instruments shall constitute an Event of Default under each of the other Security Instruments which secure any of the Notes; and (ii) an Event of Default under any Note or this Agreement shall constitute an Event of Default under each Security Instrument.

Section 12.25 **Delay Outside Lender's Control**. Lender shall not be liable in any way to Borrower or any third party for Lender's failure to perform or delay in performing under the Loan Documents (and Lender may suspend or terminate all or any portion of Lender's obligations under the Loan Documents) if such failure to perform or delay in performing results directly or indirectly from, or is based upon, the action, inaction, or purported action, of any Governmental Authority, or because of war, rebellion, insurrection, strike, lock-out, boycott or blockage (whether presently in effect, announced or in the sole judgment of Lender deemed probable), or from any Act of God or other cause or event beyond Lender's control.

Section 12.26 Right of Lender to Make Advances. If Borrower has failed to perform any of Development Rights Obligations, Lender may (but shall not be obligated to), upon not less than five (5) days' written Notice to Borrower, perform any such Development Rights Obligations; provided, however, that if in Lender's judgment, such failure to perform has resulted in an emergency, no written Notice shall be required. Any amounts expended by Lender to perform any such Development Rights Obligations shall constitute protective advances evidenced by the Notes (even if the principal balance of the Notes plus the amount of such protective advances would then exceed the aggregate face amount of the Notes), payable on demand and secured by the Security Instruments and the other Loan Documents.

## XIII   CONVERSION TO CONDOMINIUM

Section 13.1 **Submission**. The provisions of this Article XIII shall become effective on the Building Loan Opening Date and this Article XIII shall have no force or effect in the event the Building Loan is not opened. No later than the Outside Conversion Date, Borrower shall have converted the Property to a condominium form of ownership (the "**Condominium**") and after the Offering Plan has been "accepted for filing" marketing Units for sale; provided, however, that the Property shall not be converted unless and until the following conditions have been satisfied:

(a)     The Condominium shall contain at least the Required Units and related amenities.

(b)     Borrower, as sponsor, shall prepare and cause to be "accepted for filing" by the New York State Department of Law ("**NYSDOL**") a Condominium Offering Plan (the "**Offering Plan**") for the Units. The Offering Plan shall comply with all applicable Condominium Laws and Lender shall receive reasonably satisfactory evidence that the Borrower

has satisfied all requirements of applicable laws, rules and regulations to complete the Conversion of the Property and offer Units for sale.

(c)     Borrower shall cause the Offering Plan to be declared effective in accordance with applicable law; provided, however, that Borrower shall not cause, permit or allow the Offering Plan to be declared effective and no documents shall be recorded against the title to the Land without the prior written reasonable consent of Lender.  Lender shall not unreasonably withhold its consent to, and shall join in, such documents submitted for its review, provided that:

(i)     No Event of Default shall then exist.

(ii)     Borrower shall pay any and all expenses incurred by Lender (including reasonable attorneys' fees and costs) in connection with such review and the preparation, execution and delivery of Lender's consent and joinder (which shall be in recordable form if necessary).

(iii)     The document proposed for recordation shall be of a type customarily used or required in the ordinary course of converting residential buildings to condominium in New York in accordance with applicable laws and the requirements of governmental authorities and utilities.

(iv)     The document proposed for recordation shall not materially reduce the amount of saleable square feet in the Improvements (other than exclusion of a "superintendent's apartment"), nor restrict the use of the Property in a manner that reduces the value of Lender's security, nor place unequal or unreasonable burdens (such as non-customary assessment obligations) on the Property, nor impose any obligation whatsoever on Lender prior to Lender's acquiring title to the Property through foreclosure or otherwise, except to the extent specifically required under the New York Condominium Act.

(v)     The Condominium Documents shall not be fraudulent or contain any materially false misrepresentation or statement with intent to deceive or defraud prospective purchasers.

(vi)     The document proposed for recordation shall include provisions satisfactory to Lender recognizing and protecting the rights and interests of Lender as the primary lender for the Property, and such other customary provisions which Lender may reasonably deem appropriate.

(vii)     The Title Insurance Company shall have agreed to issue a standard ALTA 4 condominium endorsement (with such modifications thereto as shall be reasonably requested by Lender) to the Title Insurance Policies with respect to the Units to be created upon due recordation of the Condominium Documents.

(viii)     The Borrower shall execute any documents requested by Lender in order to evidence the assignment of its developer's rights in the condominium Property to Lender, and Borrower shall pay for the cost and expense of documenting such assignments, including without limitation, all reasonable attorneys' fees and costs associated therewith.

(ix)    Lender shall have received evidence reasonably satisfactory to Lender that all Condominium Documents comply with all applicable laws and that all required governmental approvals to the Condominium Documents have been obtained.

(x)    Lender shall receive evidence reasonably satisfactory to Lender that the program for the sale of Units shall be in full compliance with all applicable laws and not entail any other consideration or factor which would cause the sales to be considered sales of securities under applicable federal and state securities laws.

(xi)    Notwithstanding anything to the contrary set forth herein, no Condominium Documents shall be recorded against the title to any Land and no Units shall be released from the lien of the Security Instruments until the Borrower has obtained no less than _____ Qualified Sales Contracts. In the event that the Conversion has not been completed on or before the Outside Conversion Date, Lender shall have no obligation to consent to the Conversion nor be under any obligation to give its consent to any of the foregoing, it being understood that following the Outside Conversion Date, Lender shall have sole and absolute discretion to approve the Conversion and may condition such approval on a modification to the terms hereof and/or the establishment of certain reserves and other deposits.

(d)    At all times, Borrower shall comply with the New York Condominium Act, Section 352 of the General Business Law, the rules and regulations of the New York State Attorney General, the Martin Act, the Interstate Land Sales Full Disclosure Act and all other applicable laws, statutes, rules and regulations pertaining to condominium conversions and the sale of Units (collectively, "**Condominium Laws**").

(e)    Prior to the Borrower submission thereof to the applicable Governmental Authority, if required under applicable Condominium Laws, the Borrower shall provide Lender and its counsel with copies of all Condominium Documents. Before any of the Condominium Documents are filed or submitted by the Borrower for recordation or are utilized by the Borrower in connection with the creation, establishment, marketing or operation of the Condominium, the Borrower shall have obtained Lender's written consent of each such Condominium Document (which consent shall not be unreasonably withheld). Lender shall use reasonable efforts to review any request for approval of the Condominium Documents within seven (7) days after submission of such request to Lender but failure to so respond shall not constitute approval of the Condominium Documents or a default by Lender under this Agreement. Lender further agrees to execute and deliver to Borrower a subordination of the Liens of the Security Instruments to the Condominium Documents in form and content reasonably satisfactory to Lender and otherwise consistent with customary practices in the State of New York.

(f)    The Borrower shall market the Units for sale at no less than the applicable Minimum Sales Prices.

**Section 13.2    Unit Sales Contracts**. All sales contracts for the purchase and sale of Units must be entered into on the Borrower's standard contract form contained in the Condominium Documents, as approved by Lender, must be for a purchase price no less than the Minimum Sales Price and must call for a total deposit of at least ten percent (10%) of the

purchase price (the "**Minimum Contract Deposit**") and otherwise satisfy the requirements of a Qualified Sales Contract. The Borrower shall perform every obligation of the Borrower under or in connection with all sales contracts and shall not commit any default under any sales contract. The Borrower shall not materially modify or amend, nor terminate nor cancel (except in the event of a default by the applicable purchaser) any sales contract without the prior written consent of Lender, which Lender may grant or withhold in its sole discretion. The Borrower shall give prompt notice to Lender of any notice received by the Borrower alleging any default by the Borrower under any sales contract. The Borrower shall provide Lender with copies of all written purchase agreements for the sale of Units within ten (10) Business Days after execution by the Borrower. No contract for the sale of a Unit shall be for a sales price less than the Minimum Sales Price for such Unit without Lender's prior written consent. There shall be no sales of Units to Affiliates of the Borrower without Lender's prior written consent. The Borrower hereby collaterally assigns to Lender and grant a security interest in all of its right, title and interest in and to all purchase agreements for the Units now or hereafter entered into as additional security for the payment of the Loan.

      **Section 13.3**    **Sales Contract Deposits**. All sales contracts for the purchase and sale of Units shall require a total deposit equal to the Minimum Contract Deposit, due and payable at the time the sales contract is executed by the purchaser. All deposits made by purchasers of Units shall be deposited in an escrow account with an escrow agent reasonably acceptable to Lender pursuant to an independent escrow agreement reasonably acceptable to Lender in all respects and in accordance with applicable Condominium Laws. As additional security for the Loan, the Borrower hereby assigns to Lender all of its rights under the escrow agreement and to the sums on deposit pursuant thereto, to the extent the Borrower may lawfully do so under applicable law. The Borrower shall not use any such deposits or any portion thereof for costs incurred in connection with the construction of any improvements in and to the Property or any part thereof or for any other purposes, it being the intent that the full amount of each deposit shall be held in escrow until such time as the Unit with respect to which the same has been deposited has been conveyed to a purchaser in accordance with the terms and conditions of the applicable purchase agreement and the Net Sales Proceeds is paid to Lender, or until the purchaser thereunder has defaulted and the Borrower is entitled to the deposit. All amounts deposited with the Borrower for "upgrades" or "extras" shall constitute Property Revenue (as such term is defined in the Lockbox Agreement) and shall be deposited into the Lockbox Account within one (1) Business Day of receipt by the Borrower.

      **Section 13.4**    **Monthly Sales Contract Reports**. Following execution of the first purchase agreement, the Borrower shall deliver to Lender, commencing on the Tuesday of the first week after the closing of the Loan and thereafter on or before the first Tuesday of each ensuing month, a report on Unit sales during the preceding month and containing such other information about the Property which Lender may request from time to time. The report shall include a copy of each sales contract and shall set forth the sale price, deposit amounts and deposit application for each new contract and reflect any additional deposits received by the Borrower under all previously reported sales contracts.

      **Section 13.5**    **After Conversion to Condominium**. From and after the date that the Property becomes a condominium duly organized and validly existing under the New York Condominium Act as contemplated by this Article XIII, the following provisions shall apply:

(a)     The Borrower shall comply (or cause compliance) with the Condominium Documents and the New York Condominium Act and all rules and regulations promulgated thereunder by any Governmental Authority, as the same may apply to the Property or the owners association or to the Borrower from time to time. The Borrower shall comply with and shall perform all of the Borrower's obligations under the Condominium Documents, all covenants or restrictions applicable to the Property, and all by-laws and rules and regulations of the owners association and any master association or other property owners association applicable to the Property. The Borrower shall not transfer control of the condominium association to non-developer unit owners prior to the time the Borrower is required to do so by the New York Condominium Act. The Borrower shall promptly pay, when due, all dues, assessments, contributions, fees, fines and other charges imposed or levied pursuant to the Condominium Documents, any such covenants or restrictions, or any such by-laws or rules or regulations. If the Borrower shall fail to pay any such sums when required, then Lender at its option may pay them, and any funds so advanced by Lender shall bear interest at the Default Rate under the Notes and be secured as future advances under the Security Instruments and payable on demand.

(b)     The Borrower shall take any and all actions as may be necessary to ensure that the Property is insured with a generally accepted insurance carrier, under a "master" or "blanket" policies of insurance, which provides for hazard, public liability and flood insurance in compliance with the requirements of the Condominium Documents and the Loan Documents. So long as such insurance coverage is maintained by the Condominium Association, the Borrower shall not be required to maintain separate insurance coverage. The Borrower shall provide Lender with the name and address of the insurance trustee (if any) for the Property and shall cause the trustee to acknowledge in writing Lender's interest under the Loan Documents. The Borrower shall deliver to Lender a current certificate of insurance and a copy of each insurance policy as the same may be renewed or replaced from time to time, each of which shall name Lender as the insured mortgagee for the Property, pursuant to a standard mortgagee clause acceptable to Lender, without contribution. The Borrower shall promptly notify Lender of any lapse in such insurance coverage, and to the extent that the Property or any part thereof encumbered by the Security Instruments is not covered by the insurance maintained by the Condominium Association at any time, the Borrower shall obtain and maintain such insurance coverage and shall deliver a copy of the policy to Lender. Lender shall be named as the loss payee under any such policy that is not payable to the insurance trustee (if any) or owners association. If the continuous insurance coverage required hereby is not maintained, then at its option Lender may effect such insurance from year to year and pay the premiums therefor, and any funds so advanced by Lender shall be bear interest at the Default Rate under the Notes and be secured as future advances under the Security Instruments and payable on demand.

(c)     The Borrower will promptly notify Lender of all matters of which it has received notice, or has been placed on inquiry which indicates that a material default by the Borrower under, or material variance from, or material noncompliance with, the Condominium Documents exists or is about to occur and the Borrower shall do all things necessary to cure such default, variance or noncompliance. The Borrower will timely comply with each of its obligations under the Condominium Documents.

(d)     The Borrower shall pay all charges due with respect to the Units and will not, without prior written consent of Lender (unless the following actions are required to effect a

88

matter expressly required by applicable law), vote or take any other action whatsoever at any meeting of the Unit owners, or permit its representatives on the board of directors or other governing board for the Condominium to vote to take any action whatsoever respecting any matter which may affect in any manner the declaration, bylaws, rules and regulations or any other Condominium Documents, the condominium form of ownership or which may result in any charge, assessment or lien against the Units other than customary common charges, assessments and reserves which are consistent with the budget approved by Lender, or which may adversely affect the rights of any Unit owner.

(e)    In the event that the Borrower shall be in default under the declaration, bylaws or other Condominium Documents, or in the event of a Default or Event of Default hereunder or under any of the other Loan Documents, then in any such event, Lender may, at its option, exercise all of the rights and privileges provided to Lender by this Agreement with respect to a Default or Event of Default including, without limiting the generality of the foregoing, the right to exercise all voting rights accruing to a Unit owner and all other rights accruing to a Unit owner. While any such Default or Event of Default continues, the Borrower hereby nominates and appoints Lender irrevocably as the Borrower's proxy and attorney in fact to vote and, as the Borrower's agent, to act with respect to all such rights. Written notice of any such Default or Event of Default from Lender to the Board of Directors of the Condominium Association administering the Condominium shall be deemed conclusive as to such right of Lender to vote and to exercise all such rights.

(f)    The Borrower covenants that it shall not without Lender's prior written consent, further partition or subdivide the Condominium or consent to: (i) the abandonment or termination of the Condominium, or (ii) the effectuation of any decision by the Condominium Association to terminate professional management and assume self-management of Condominium.

(g)    The Borrower covenants to promptly pay, when due, all assessments imposed against the Borrower and the Units owned by it, and the Borrower's percentage interest in and to the common elements by the Condominium Association or other governing body of the Condominium pursuant to the provisions of the Condominium Documents.

(h)    For so long as the Borrower is in control of the Condominium Association, the Borrower shall cause the Condominium Association to comply with the applicable Condominium Documents and all laws, including but not limited to the maintenance of adequate reserves.

**Section 13.6    Unit Releases**.  Provided no Event of Default has occurred and is continuing, Lender shall permit the sale  of an individual Retail Unit or Residential by the Borrower and Lender shall release such individual Retail Unit or Residential Unit from the Security Instruments (each such release being referred to as a "**Unit Release**") upon the Borrower's compliance with the following terms and conditions, in form and substance satisfactory to Lender:

(a)    with respect to the release of a Residential Unit, purchasers for at least the Required Units are unconditionally obligated to close under (i)  Qualified Sales Contracts with

respect to the Retail Units and (ii) Qualified Sales Contracts with respect to the Residential Units;

(b)    No Default or Event of Default shall then exist under this Agreement or any other Loan Document;

(c)    Borrower and Lender shall cooperate to prepare and record the instrument of release, which must be in form and content acceptable to Lender, and Borrower shall reimburse Lender for all out-of-pocket expenses including, without limitation, reasonable legal fees and costs, in connection with any such releases.

(d)    The Borrower shall have given to Lender a written request for the Unit Release accompanied by all evidence, information and other items required by Lender, including, but not limited to, a copy of the Qualified Sales Contract not less than five (5) Business Days prior to the desired Unit Release date;

(e)    The Borrower shall have delivered to Lender a copy of the closing statement for the sale of the Unit certified by the Borrower as true and correct not less than one (1) Business Day prior to the desired Unit Release date.

(f)    For each Unit, Borrower shall pay to Lender in immediately available funds the Net Sales Proceeds for application in accordance with Section 13.7 of this Agreement;

(g)    Upon receipt of the Net Sales Proceeds in immediately available funds, Lender shall deliver to the Borrower or to any closing agent handling a Unit sale, a partial release for that Unit, as applicable;

(h)    Lender shall not be responsible for the actions or omissions of any closing agent in dealing with any such partial releases or partial release funds, nor shall Lender be responsible for the fees, charges, costs or compensation of any such closing agent; and

(i)    It is expressly understood that no release of the lien of the Security Instruments or the other Loan Documents with respect to any Unit shall be granted unless and until (i) the Condominium Documents shall have been declared effective pursuant to the Condominium Laws and otherwise in accordance with the terms of this Article XIII and (ii) Lender shall have received the Net Sales Proceeds for the applicable Unit.

Notwithstanding the provisions of Section 13.6(d) and (e), Lender may, in its sole and absolute discretion, in lieu of requiring that each of the items described in Section 13.6(d) and (e) be delivered to Lender with respect to the release of each Unit from the Lien of the Security Instruments, provide the escrow agent and title insurance company insuring title to the Units upon conveyance to the purchasers thereof with a master payoff letter reasonably satisfactory to such title insurance company to close the transaction setting forth the conditions under which Lender will deliver a Property Release with respect to each of the Units (or any portion thereof as provided therein).

Section 13.7    **Application of Net Sales Proceeds**.  Upon receipt of any Net Sales Proceeds in connection with the sale of a Unit, Lender (or Servicer) shall apply such Net

Sales Proceeds as follows: (i) a portion of the Net Sales proceeds in an amount equal to the Applicable Release Price for the Unit sold and the portion of the Additional Fee attributable to thereto shall be deposited into an interest-bearing account established by the Servicer for the benefit of Lender (the "**Release Prices Account**") and disbursed in accordance with the applicable provisions of the Lockbox Agreement and (ii) the balance of the Net Sales Proceeds (the "**Excess Sales Proceeds**") shall be deposited into the Lockbox Account and disbursed in accordance with the provisions of the Lockbox Agreement.

      **Section 13.8   Borrower's Covenants and Warranties**. All of the provisions of this Article XIII shall be deemed to be covenants and warranties of Borrower and the failure of Borrower to comply strictly with all such requirements shall be deemed to be an Event of Default hereunder which, if not cured within applicable notice and cure periods (if any), shall entitle Lender to exercise all of the rights and privileges provided for herein and in the other Loan Documents in respect of any Default or Event of Default hereunder, including, without limitation, the right, in the place and stead of the Borrower, to take any and all actions which the Borrower, as owner of the Property, would have the right by law to take relative to creating, establishing, marketing and selling the Units and conveying title thereto; and said right to take any and all such actions shall be deemed to be necessary, advisable and proper to conserve the Property under the Loan Documents.

**[SIGNATURE PAGE FOLLOWS]**

91

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**250 EAST BORROWER, LLC,** a Delaware limited liability company

By: _____
Name: Alexander Gurevich
Title:  Authorized Signatory

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.,** a Delaware corporation (individually and as lead arranger and administrative agent for itself and certain co-lenders)

By: _____
Name: _____
Title:  Authorized Signatory

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**250 EAST BORROWER, LLC,** a Delaware limited liability company

By: _____
Name: Alexander Gurevich
Title:   Authorized Signatory

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.,** a Delaware corporation (individually and as lead arranger and administrative agent for itself and certain co-lenders)

By: _____
Name: John Nastasi
Title:   Authorized Signatory

## SCHEDULE I

### Definitions

"**421-A Certificates**" shall mean those certain irrevocable 421-a negotiable certificates issued by the New York City Department of Housing Preservation and Development that Borrower has the right to acquire pursuant to the Purchase Agreements.

"**Air Rights**" shall mean those certain floor area development rights under the Inclusionary Housing Program as set forth in Section 23-90 and Section 23-94 of the Zoning Resolution of the City of New York that Borrower has the right to acquire pursuant to the Purchase Agreements.

"**Acceptable Accounting Principles**" shall mean GAAP or such other accounting methods or principles acceptable to Lender in Lender's discretion from time to time.

"**Access Laws**" shall have the meaning set forth in Section 5.19.

"**Acceptable Counterparty**" means any counterparty to an Interest Rate Cap Agreement that has and shall maintain, until the expiration of the applicable Interest Rate Cap Agreement, a long-term unsecured debt rating of not less than "AA-" by Standard & Poor's Rating Group, "Aa3" by Moody's Investors Service, Inc. or an equivalent long-term unsecured debt rating by any other Rating Agency.

"**Acquisition and Pre-Development Budget**" shall mean the budget attached hereto as Schedule VII (which includes a compilation of the Acquisition Loan Budget and the Project Loan Budget) specifying the cost (direct or indirect) of, inter alia, acquisition of the Land and the Improvements and pre-development of the Improvements.

"**Acquisition Loan**" shall have the meaning set forth in the Recitals of this Agreement.

"**Acquisition Loan Documents**" shall mean, collectively, this Agreement, the Certificate of Sources and Uses, the Payment Direction Letter, the Acquisition Loan Note, the Acquisition Loan Mortgage, the Assignment of Leases, the Assignment of Interest Rate Cap Agreement, the Assignment of Agreements, the Environmental Indemnity, the Consent and Recognition Agreements, the Guaranty of Recourse Obligations, the Guaranty of Completion, all Uniform Commercial Code financing statements filed in connection with the Acquisition Loan and all other documents evidencing, securing or otherwise executed and/or delivered by one or more of the Borrower Parties in connection with the Acquisition Loan.

"**Acquisition Loan Mortgage**" shall have the meaning set forth in the Recitals of this Agreement.

"**Acquisition Loan Note**" shall have the meaning set forth in the Recitals of this Agreement.

"**Additional Fee**" shall mean prior to the Building Loan Opening Date, $265,347;

"**Advance**" shall mean any advance of the Loan made under the Building Loan Agreement or Project Loan Agreement or this Agreement.

"**Affiliate**" shall mean as to any Person, (i) any Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with such Person, (ii) any Person (directly or indirectly) owning or controlling 10% or more of the outstanding voting securities of or other ownership interests in such Person, (iii) any officer, director, partner, employee or member (direct or indirect and no matter how remote) of such Person, (iv) if the such Person is an individual, any entity for which such Person directly or indirectly acts as an officer, director, partner, employee or member, or (v) any entity in which such Person (together with the members of his family if the Person in question is an individual) owns, directly or indirectly through one or more intermediaries an interest in any class of stock (or other beneficial interest in such entity) of 10% or more.  Any reference in this Agreement to a "**Person and an Affiliate**" shall be deemed to refer to such Person and an Affiliate of such Person and any references in this Agreement to a "**Person or an Affiliate**" shall be deemed to refer to such Person or an Affiliate of such Person.  As used in this Agreement, the term "**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policy and/or policies of a Person, whether through ownership of voting securities or other ownership interests, by contract or otherwise.

"**Affiliate Transaction**" or "**Affiliate Agreement**" shall mean any contract, agreement or other arrangement between Borrower (or any other Person if such contract, agreement or other arrangement is in any way related to any Property) and any Borrower Party or any Affiliate of a Borrower Party or pursuant to which Borrower Party or any Affiliate of any Borrower Party or any constituent member, partner or stockholder of Borrower or any Borrower Party or any Affiliate of a Borrower Party (direct or indirect) will receive any benefit of any kind.

"**Agent**" shall have the meaning set forth in Section 8.2.1(a).

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Annual Budget**" shall have the meaning specified in Section 5.12.

"**Applicable Release Price**" shall mean in respect of each Unit, the release price assigned to such Unit by Lender upon its approval of the Minimum Sales Price for such Unit in accordance with the terms hereof.  The Applicable Release Price for all Units shall be incorporated and become a part of **Schedule VI** hereto and **Schedule VI** shall be revised to reflect such Applicable Release Prices.

"**Approved Accounting Firm**" shall mean (a) one of the accounting firms commonly known as a "Big Four" accounting firm or (b) any other certified public accounting firm acceptable to Lender in its discretion (provided, that Lender shall have the right to require, at any time, a "Big Four" accounting firm).

"**Approved Annual Budget**" shall have the meaning set forth in Section 5.12.

I-2

"**Approved Business Plan**" shall mean the acquisition and development of the Land into an 11-story luxury residential tower and conversion of the tower to condominiums consisting of approximately 6,559 net sellable square feet of Retail Units and approximately 27,632 net sellable square feet of Residential Units.

"**Asbestos**" shall have the meaning set forth in the Environmental Indemnity.

"**Assignee**" shall have the meaning set forth in Section 8.2.1(a).

"**Assignment and Assumption Agreement**" shall have the meaning set forth in Section 8.2.1(a).

"**Assignment of Agreements**" shall mean, with respect to the Property, that certain first priority Assignment of Agreements, Permits and Contracts dated as of the date hereof, from Borrower, as assignors, to Lender, as assignee, assigning to Lender, subject to the terms thereof, all of Borrower's interests in and to contracts, Licenses, permits and contracts necessary for the use and operation of the Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Interest Rate Cap Agreement**" shall mean an Assignment of Interest Rate Cap Agreement by Borrower in favor of Lender, in form and substance reasonably satisfactory to Lender, with respect to any Interest Rate Cap Agreement obtained by Borrower in respect of the Loan.

"**Assignment of Leases**" shall mean that certain first priority Absolute Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender, subject to the terms thereof, all of Borrower's interest in and to the Leases and Rents of Borrower's Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Award**" shall have the meaning set forth in Section 6.1.3(b).

"**Bankrupt Guarantor**" shall have the meaning set forth in Section 9.4.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, as amended from time to time.

"**Bankruptcy Laws**" shall mean the Bankruptcy Code together with any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"**Borrower**" shall have the meaning set forth in the preamble.

"**Borrower Parties**" shall mean the collective reference to the Borrower, any guarantor, indemnitor or surety of any of the Obligations and any other Person (other than Lender) that is a party to any of the Loan Documents, other than any Property Manager that is

not an Affiliate of any Borrower. Individually, each of the Borrower Parties may be referred to herein as a "**Borrower Party**".

"**Building Loan**" shall have the meaning set forth in the Recitals of this Agreement.

"**Building Loan Agreement**" shall have the meaning set forth in the Recitals of this Agreement.

"**Building Loan Amount**" shall have the meaning set forth in Section 2.1.1(a)(iii).

"**Building Loan Budget**" shall mean a budget for the improvement of the Project and certain other amounts to be expended in connection with the construction, leasing and development of the Project, which other amounts constitute a Cost of Improvement, including, without limitation, amounts required to pay interest on the Building Loan, which budget sets forth cost estimates for budgeted construction and non-construction categories, and specifies the Hard Costs and Soft Costs required for such work, as such budget may be amended, modified or supplemented from time to time in accordance with the terms and conditions of the Building Loan Agreement.

"**Building Loan Documents**" shall mean, collectively, this Agreement, the Building Loan Agreement, the Certificate of Sources and Uses, the Payment Direction Letter, the Building Loan Note, the Building Loan Mortgage, the Lockbox Agreement, the Assignment of Leases, the Assignment of Interest Rate Cap Agreement, the Assignment of Agreements, the Environmental Indemnity, the Consent and Recognition Agreements, the Guaranty of Recourse Obligations, the Guaranty of Completion, all Uniform Commercial Code financing statements filed in connection with the Building Loan and all other documents evidencing, securing or otherwise executed and/or delivered by one or more of the Borrower Parties in connection with the Building Loan.

"**Building Loan Mortgage**" shall have the meaning set forth in the Recitals of this Agreement.

"**Building Loan Note**" shall have the meaning set forth in the Recitals of this Agreement.

"**Building Loan Opening Conditions**" shall mean the conditions described in Section 2.1.1(c) hereof.

"**Building Loan Opening Date**" shall mean the date no later than the Building Loan Opening Deadline on which all of the Building Loan Opening Conditions shall have been satisfied (and/or otherwise waived by Lender in its discretion) and the first Advance under the Building Loan shall be made.

"**Building Loan Opening Deadline**" shall mean the date which is 6 months following the Closing Date.

I-4

"**Business Day**" shall mean a day on which commercial banks are not authorized or required by law to close in the State of New York or in the State where the Property is located.

"**Casualty**" shall have the meaning set forth in Section 6.1.1(j).

"**Casualty/Condemnation Involuntary Prepayments**" shall have the meaning set forth in Section 2.2.

"**Certificate of Sources and Uses of Funds**" shall mean the Certificate of Sources and Uses of Funds delivered to Lender in connection with the Loan.

"**Closing Date**" shall mean the date of the initial funding of the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Committed Amount**" shall mean the maximum amount each Lender has agreed to lend at any one time outstanding to Borrower as part of the Loan and set forth in the Syndication Documents.

"**Common Elements**" shall mean the portions of the applicable Land and Improvements which may be used by the Unit purchasers in common with each other.

"**Condemnation**" shall have the meaning set forth in Section 6.1.3(a).

"**Condemnation Proceeds**" shall mean any Award in respect of any Condemnation.

"**Condominium**" shall have the meaning set forth in Section 13.1.

"**Condominium Association**" shall mean the condominium association established pursuant to the Condominium Documents.

"**Condominium Documents**" shall mean the declaration of condominium and all related documents, including, without limitation, the prospectus or property report and all exhibits and attachments thereto, the articles and bylaws, the purchase and sale agreement, and any reservation agreement and escrow agreement, pursuant to which the applicable Land and Improvements are submitted to the condominium form of ownership, including all exhibits and attachments thereto, necessary or advisable in connection with the creation, marketing and operation of the Condominium, and all proposed modifications, supplements, revisions and/or amendments thereto, which instruments and amendments are subject to the approval of Lender pursuant to Section 13.1. The Condominium Documents shall include, but shall not be limited to, the following hereafter executed documents or amendments: all documents required by the Condominium Laws to be submitted to tenants at the Property, prospective purchasers of Units or the Division, the Declaration creating the Condominium (including all exhibits and

attachments thereto); all plans, schedules and other details defining the Units, and the general common elements and the limited common elements; the bylaws of the Condominium Association; the rules and regulations of the Condominium Association; and the Management Agreement between the Condominium Association and the firm that initially will be managing the Condominium.

"**Condominium Laws**" shall have the meaning set forth in <u>Section 13.1(d)</u>.

"**Consent and Recognition Agreement**" shall mean: (i) that certain Consent to Assignment of Management Agreement and Estoppel and Recognition Agreements, dated as of the date hereof, executed by the Property Manager, in favor of Lender, (ii) any Consent to Assignment of Agreement and Estoppel and Recognition Agreement executed by any architect, engineer, general contractor, construction manager, subcontractor or any other Person performing labor, services or materials in respect of the Project..

"**Construction**" shall mean any construction work related to the Project.

"**Construction Budget**" shall mean the final construction budget approved by Lender in its discretion.

"**Construction Contract**" shall mean every contract entered into by or among of the Borrower, the construction manager, subcontractors, materialmen, the architect, and the inspecting architect relating to the design and construction of the Construction Work or any portion thereof or providing material therefor or services related thereto.

"**Construction Expenses**" shall mean the expenses incurred by the Borrower in connection with completing the Construction Work.

"**Construction Work**" shall mean all repairs, replacements and improvements to the Property related to the Construction.

"**Conversion**" shall mean the subjecting of the Property to a condominium form of ownership by the recording of a declaration of condominium with respect to such Property.

"**Datedown Endorsement**" shall mean any datedown endorsement to the Building Loan Title Policy or the Project Loan Title Policy (as such terms are defined in the Building Loan Agreement and Project Loan Agreement, respectively), covering Advances made or to be made subsequent to the respective date thereof, as the case may be.

"**Debt**" shall mean the agreeable outstanding principal amount set forth in, and evidenced by, the Notes together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Notes, this Agreement or any other Loan Document.

"**Default**" shall mean the occurrence of any event under this Agreement or under any other Loan Document which, but for the giving of notice or the passage of time, or both, would be an Event of Default.

"**Default Rate**" shall have the meaning set forth in the Note.

"**Embargoed Person**" shall have the meaning set forth in <u>Section 5.33(e)</u>.

"**Enforcement Costs**" shall mean any and all expenses, including legal expenses, attorneys' fees and expert witness fees, (i) described in <u>Section 7.4</u> of this Agreement, (ii) incurred or paid by Lender in protecting Lender's interest in the Property, (iii) incurred in collecting any amount payable under this Agreement or the other Loan Documents, or (iv) incurred in enforcing Lender's rights under this Agreement or the other Loan Documents or with respect to the Property, in each of clauses (i) through (iv) whether or not any legal proceeding is commenced hereunder or thereunder and whether or not any Default or Event of Default shall have occurred and is continuing, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such amounts are repaid to Lender.

"**Environmental Indemnity**" shall mean that certain Environmental and Hazardous Substances Indemnification Agreement dated as of the date hereof, executed by Borrower and Guarantors in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Laws**" shall have the meaning set forth in the Environmental Indemnity.

"**Equity Contribution**" shall have the meaning set forth in **Schedule II** of this Agreement.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**Event of Default**" shall have the meaning set forth in <u>Section 7.1(a)</u>.

"**Excess Sales Proceeds**" shall have the meaning set forth in <u>Section 13.7</u>.

"**Excusable Delay**" shall mean any delay in the Construction of the Improvements in accordance with the Plans and Specifications resulting from acts of God, fire, earthquake, hurricane, flood, explosion, action of the elements, war, invasion, insurrection, riot, mob violence, sabotage, malicious mischief or labor strikes, not within Borrower's reasonable control, (x) with respect to which Lender shall have been provided with written notice of the occurrence thereof within five (5) days after Borrower obtaining knowledge thereof and (y) which are supported by such evidence as Lender shall reasonably request.

"**Executive Order**" shall have the meaning set forth in <u>Section 5.33(a)</u>.

"**Extended Maturity Date**" shall mean 36 months following the date hereof.

"**Financial Statements**" shall mean, with respect to Borrower and the Property, a balance sheet, income statement and statement of changes in financial position prepared in accordance with Acceptable Accounting Principles, and setting forth all items of income and expense and such other information required under Acceptable Accounting Principles to fairly

present the financial position and results of operations of Borrower and the Property and which shall at a minimum be consistent in scope, form and content with such statements delivered to Lender prior to the Closing Date, unless otherwise agreed by Lender, and which are otherwise reasonably acceptable to Lender.

"**Fiscal Year**" shall mean each twelve-month period commencing on January 1 and ending on December 31 during the term of the Loan.

"**Full Recourse Event**" shall have the meaning set forth in Section 9.3.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report, consistently applied.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Gross Sales Proceeds**" shall mean the aggregate amount of sales proceeds payable by the purchaser of any Unit prior to any adjustments or deductions for the payment of the Applicable Release Price, or any fees, costs or expenses or any deposits into any reserves.

"**Guarantors**" shall mean each of the Principals and each other Person, if any, that after the Closing Date becomes a party to each or any of the Guaranty of Recourse Obligations, the Guaranty of Completion and the Environmental Indemnity.

"**Guaranty of Completion**" shall mean that certain Guaranty of Completion executed by Guarantors, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Guaranty of Recourse Obligations**" shall mean that certain Guaranty of Recourse Obligations executed by Guarantors, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Hazardous Substances**" shall have the meaning set forth in the Environmental Indemnity.

"**Improvements**" shall have the meaning set forth in the Security Instruments.

"**Indebtedness**" of a Person, at a particular date, means the sum (without duplication) at such date of (a) all indebtedness or liability for borrowed money; (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the deferred purchase price of property or services (including trade obligations); (d) obligations under letters of credit; (e) obligations under acceptance facilities; (f) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person, or otherwise to assure a creditor against loss; and (g) obligations secured by any Liens, whether or not the obligations have been assumed.

"**Indemnified Parties**" shall mean (a) Lender, (b) any prior or subsequent owner or holder of the Loan, (c) any Servicer or prior Servicer of the Loan, (d) any Investor or any prior Investor, (e) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Investor or other third party, (f) any receiver or other fiduciary appointed in a foreclosure or other proceeding, (g) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing, and (h) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or thereafter or as part of or following a foreclosure of the Loan.

"**Independent**" shall mean, when used with respect to any Person, a Person who (a) is in fact independent, (b) does not have any direct financial interest in any Borrower Party, or in any Affiliate of any Borrower Party or any Affiliate of any constituent partner, shareholder, member or beneficiary of any Borrower Party (direct or indirect), and (c) is not connected with any Borrower Party or any Affiliate of any Borrower Party or any Affiliate of any constituent partner, shareholder, member or beneficiary of any Borrower Party (direct or indirect) as an officer, employee, promoter, underwriter, trustee, partner, member, director or Person performing similar functions. Whenever it is herein provided that any Independent Person's opinion or certificate shall be provided, such opinion or certificate shall state that the Person executing the same has read this definition and is Independent within the meaning thereof.

"**Independent Manager**" shall have the meaning set forth in Section 4.1(s)(xxv).

"**Initial Maturity Date**" shall mean the earlier of (i) 12 months after the date hereof, or (ii) any earlier date on which the entire Loan is required to paid in full, by acceleration or otherwise, under this Agreement or any of the other Loan Documents.

"**Inspecting Architect**" shall mean such person or persons as Lender may designate from time to time to inspect the design and construction of the Conversion Work and to perform other services with respect thereto on behalf of Lender, whether or not such person is a licensed architect.

"**Insurance Premiums**" shall have the meaning set forth in Section 6.1.1(b).

"**Insurance Proceeds**" shall mean all proceeds received under Policies required to be maintained by Borrower.

"**Interest Period**" shall have the meaning set forth in the Notes.

"**Interest Rate Cap Agreement**" shall mean an Interest Rate Cap Agreement (together with the confirmation and schedules relating thereto), in form and substance reasonably acceptable to Lender, between an Acceptable Counterparty and Borrower, obtained by Borrower, pursuant to Section 2.7. After delivery of a Replacement Interest Rate Cap Agreement to Lender, the term "**Interest Rate Cap Agreement**" shall be deemed to mean such Replacement Interest Rate Cap Agreement.

"**Investor**" shall have the meaning set forth in <u>Section 8.1.1</u>.

"**Land**" shall have the meaning set forth in the Security Instruments.

"**Lease**" shall mean any lease, occupancy agreement, sublease, sub-sublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of, any space in the Property, and every modification, amendment, assignment, termination, consent to assignment or other agreement relating to such lease, sublease, sub-sublease or other agreement entered into in connection with such lease, sublease, sub-sublease or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"**Lease Guaranty**" shall have the meaning set forth in <u>Section 5.15(b)</u>.

"**Leasing Guidelines**" shall mean the leasing guidelines set forth in **Schedule V**.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Property or any part thereof or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, Licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including (i) Access Laws, (ii) applicable restrictive covenants, zoning ordinances and building codes, (iii) subdivision and land use laws and regulations, (iv) all applicable health and Environmental Laws and regulations, and (v) all standards and regulations of appropriate supervising boards of fire underwriters and similar agencies.

"**Lehman**" shall mean Lehman Brothers Holdings Inc., a Delaware corporation.

"**Lender**" shall mean Lehman Brothers Holdings Inc., a Delaware corporation, individually and as lead arranger and administrative agent for itself and certain co-lenders; provided, however, with respect to the use of the term in <u>Section 8.2</u>, "**Lender**" shall mean each lending institution that has entered into an Assignment and Assumption Agreement with Agent.

"**LIBOR Rate**" shall have the meaning set forth in the Notes.

"**Licenses**" shall have the meaning set forth in <u>Section 4.1(j)</u>.

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting the Property or any portion thereof, or any interest of Borrower therein, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's or materialmen's liens and other similar liens and encumbrances.