"**Investor**" shall have the meaning set forth in <u>Section 8.1.1</u>.

"**Land**" shall have the meaning set forth in the Security Instruments.

"**Lease**" shall mean any lease, occupancy agreement, sublease, sub-sublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of, any space in the Property, and every modification, amendment, assignment, termination, consent to assignment or other agreement relating to such lease, sublease, sub-sublease or other agreement entered into in connection with such lease, sublease, sub-sublease or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"**Lease Guaranty**" shall have the meaning set forth in <u>Section 5.15(b)</u>.

"**Leasing Guidelines**" shall mean the leasing guidelines set forth in **Schedule V**.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Property or any part thereof or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, Licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including (i) Access Laws, (ii) applicable restrictive covenants, zoning ordinances and building codes, (iii) subdivision and land use laws and regulations, (iv) all applicable health and Environmental Laws and regulations, and (v) all standards and regulations of appropriate supervising boards of fire underwriters and similar agencies.

"**Lehman**" shall mean Lehman Brothers Holdings Inc., a Delaware corporation.

"**Lender**" shall mean Lehman Brothers Holdings Inc., a Delaware corporation, individually and as lead arranger and administrative agent for itself and certain co-lenders; provided, however, with respect to the use of the term in <u>Section 8.2</u>, "**Lender**" shall mean each lending institution that has entered into an Assignment and Assumption Agreement with Agent.

"**LIBOR Rate**" shall have the meaning set forth in the Notes.

"**Licenses**" shall have the meaning set forth in <u>Section 4.1(j)</u>.

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting the Property or any portion thereof, or any interest of Borrower therein, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's or materialmen's liens and other similar liens and encumbrances.

"**Limited Common Elements**" shall mean any other portion of the Improvements whose exclusive use is assigned or to be assigned to a Unit purchaser for additional consideration.

"**Loan**" shall mean the loan made by Lender to Borrower in the original principal amount set forth in, and evidenced by, the Notes executed and delivered by Borrower.

"**Loan Agreements**" shall mean this Agreement, the Building Loan Agreement and the Project Loan Agreement.

"**Loan Documents**" shall mean, collectively, this Agreement, the Acquisition Loan Documents, the Building Loan Documents, the Project Loan Documents, the Certificate of Sources and Uses, the Payment Direction Letter, and all other documents evidencing, securing or otherwise executed and/or delivered by one or more of the Borrower Parties in connection with the Loan. Each of the Loan Documents may be referred to herein individually as a "**Loan Document**".

"**Lockbox Account**" shall have the meaning set forth in the Lockbox Agreement.

"**Lockbox Agreement**" shall have the meaning set forth in <u>Section 5.29</u>.

"**Losses**" shall mean any and all claims, suits, liabilities (including strict and contingent liabilities), actions, proceedings, obligations, debts, damages, losses, costs (including any and all costs and expenses incurred in the preservation, restoration and protection of any of the Property and any and all costs and expenses incurred by Lender to remedy any Partial Recourse Event), any deficiency claim in connection with the foreclosure of any Security Instrument, expenses, diminution in value of any of the Property, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement, consequential or punitive damages payable by Lender or any Indemnified Party, lost profits and damages, costs and expenses of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense), including Enforcement Costs or any other amounts expended by Lender in connection with the Loan.

"**Major Lease**" shall mean any Lease to any Tenant, other than a residential Lease for a single apartment unit, demising premises in excess of 5,000 rentable square feet.

"**Material Adverse Change**" shall mean a material adverse change in (i) the assets, operations, or financial condition of Borrower or the Person in question, (ii) the ability to pay the Debt of Borrower or the Person in question in accordance with the terms hereof and otherwise comply with the material terms of this Agreement and the Loan Documents, (iii) the Property or the value thereof, (iv) the validity, priority or enforceability of this Agreement or any other Loan Document, (v) the ability of Lender to enforce its rights and remedies pursuant to this Agreement or any other Loan Documents, (vi) Lender's Lien on the Property or the priority of such Lien, or (vii) the Loan.

"**Material Adverse Effect**" shall mean a material adverse effect on (i) the assets, operations, or financial condition of Borrower or the Person in question, (ii) the ability to pay the Debt of Borrower or the Person in question in accordance with the terms hereof and otherwise

comply with the material terms of this Agreement and the Loan Documents, (iii) the Property or the value thereof, (iv) the validity, priority or enforceability of this Agreement or any other Loan Document, (v) the ability of Lender to enforce its rights and remedies pursuant to this Agreement or any other Loan Documents, (vi) Lender's Lien on the Property or the priority of such Lien, or (vii) the Loan.

"**Material Agreement**" means any agreement entered into by Borrower or any other Borrower Party (i) affecting or relating to the Property (or any component thereof) requiring the payment of more than $100,000 in payments or liability in any annual period or which is not cancelable without penalty or premium on no more than thirty (30) days notice other than the Management Agreements and the Leases or (ii) that relates to sale or leasing brokerage with respect to any Property.

"**Maturity Date**" shall have the meaning set forth in the respective Notes.

"**Maximum Loan Amount**" shall have the meaning set forth in Section 2.1.1.

"**Maximum Permitted Trade Payables**" shall mean unsecured trade payables incurred in the ordinary course of operating the Property and customarily satisfied within thirty (30) days in the aggregate amount for the Property not to exceed 1% of the Debt.

"**Mezzanine Borrower**" shall mean 250 East Mezzanine, LLC, a Delaware limited liability company.

"**Mezzanine Lender**" shall mean Lehman Brothers Holdings Inc., a Delaware corporation, individually and as lead arranger and administrative agent for itself and certain co-lenders, its successors and permitted assigns.

"**Mezzanine Loan**" shall have the meaning set forth in Section 5.22.

"**Mezzanine Loan Agreement**" shall mean the Mezzanine Construction Loan Agreement dated as of the date hereof between Mezzanine Borrower and Mezzanine Lender executed and delivered in connection with the Mezzanine Loan, as amended, restated, supplemented or otherwise modified from time to time to the extent permitted hereunder.

"**Minimum Contract Deposit**" shall have the meaning set forth in Section 13.2.

"**Minimum Sales Price**" shall mean the minimum sales price for which each Unit may be sold. A schedule of the Minimum Sales Prices for each Unit shall be prepared by Borrower and submitted to Lender for Lender's approval prior to the Building Loan Opening Deadline.

"**Minor Lease**" shall mean any Lease (other than a Lease to a residential Tenant for a single apartment unit) that is not a Major Lease.

"**Net Sales Proceeds**" shall mean, with respect to each Unit sold, the Gross Sales Proceeds (which shall not be less than the applicable Minimum Sales Price) for such Unit less the actual and reasonable expenses of the sale of the applicable Unit as approved by Lender (in

no event to exceed an aggregate of 8% of the gross sales price of the applicable Unit and
excluding any customary prorations for taxes and utility expenses).

"**New Property Manager**" shall have the meaning set forth in Section 5.17.

"**New York Condominium Act**" shall mean Article 9-B of the Real Property
Law of the State of New York and all regulations promulgated thereunder.

"**Non-Bankrupt Guarantor**" shall have the meaning set forth in Section 9.4.

"**Non-Consolidation Opinion**" shall mean an opinion of counsel to the Person in
question (satisfactory to Lender in form and substance and from counsel satisfactory to Lender
and containing assumptions, limitations and qualifications customary for opinions of such type
and satisfactory to Lender) to the effect that a court of competent jurisdiction in a proceeding
under the Bankruptcy Code would not consolidate the assets and liabilities of such Person with
those of any other Person.

"**Notes**" shall mean the Acquisition Loan Note, the Project Loan Note, and, if
applicable, the Building Loan Note, as the same may be amended, restated, replaced,
supplemented or otherwise modified from time to time. Individually, each of the Notes shall be
referred to as a "**Note**".

"**Obligations**" shall mean any and all debt, liabilities and other obligations of
Borrower, including all affirmative and negative covenants, to Lender or of any of the Borrower
Parties in connection with the Loan or pursuant to the Loan Documents, including, without
limiting the generality of the foregoing, the Debt.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower,
which is signed by an authorized senior officer of the manager, managing member or general
partner of Borrower on behalf of Borrower that is acceptable to Lender.

"**Organizational Documents**" shall mean (i) with respect to a corporation, such
Person's certificate of incorporation and by-laws, and any shareholder agreement, voting trust or
similar arrangement applicable to any of such Person's authorized shares of capital stock,
(ii) with respect to a partnership, such Person's certificate of limited partnership, partnership
agreement, voting trusts or similar arrangements applicable to any of its partnership interests,
(iii) with respect to a limited liability company, such Person's certificate of formation, limited
liability company agreement or other document affecting the rights of holders of limited liability
company interests, and (iv) any and all agreements between any constituent member, partner or
shareholder of Borrower, including any contribution agreement or indemnification agreements.
In each case, "Organizational Documents" shall include any indemnity, contribution,
shareholders or other agreement among any of the owners of the entity in question.

"**Origination Fee**" shall mean $530,693.

"**Other Charges**" shall mean all maintenance charges, Pre-development Costs,
charges or amounts payable under any reciprocal easement agreement, ground rents, impositions
other than Taxes, and any other charges (including any charges, payments or amounts, for which

the failure to pay may give rise to a Lien against the Property), including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied, incurred or assessed or imposed against the Property or any part thereof.

"**Outside Conversion Date**" shall mean the date determined by Lender in its discretion on or before the Building Loan Opening Date.

"**Partial Recourse Event**" shall have the meaning set forth in Section 9.2.

"**Participant**" shall have the meaning set forth in Section 8.2.1(g).

"**Participations**" shall have the meaning set forth in Section 8.1.1.

"**Patriot Act**" shall have the meaning set forth in Section 5.33(a).

"**Payment Date**" shall mean the ninth day of each calendar month, or if such first day is not a Business Day, the immediately preceding Business Day.

"**Payment Direction Letter**" shall mean the Payment Direction Letter delivered to Lender in connection with the Loan.

"**Percentage**" means with respect to each Lender, the percentage which its Committed Amount constitutes of the maximum amount of the Loan.

"**Permitted Encumbrances**" shall mean:  (a) the Liens created by the Loan Documents and the Condominium Documents, (b) all Liens, encumbrances and other matters disclosed in each Title Insurance Policy which have been approved by Lender and which do not in any event have a Material Adverse Effect, (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent, and (d) statutory Liens for labor or materials securing sums not yet due and payable, provided the Borrower has given advance written notice of same to Lender.

"**Permitted Transfers**" shall mean a Transfer of any direct or indirect interest in Borrower in connection with (i) transfers to immediate family members for estate planning purposes, or (ii) transfers of up to 49% in any constituent member or partner, in any case, which do not affect the management or control of Borrower jointly by the Principals and which otherwise comply with the requirements set forth in the Loan Documents.  The sale of Units in accordance with the terms of this Agreement shall also be considered a Permitted Transfer.

"**Person**" shall mean any individual, entity, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Plans and Specifications**" shall mean the plans and specifications for the Construction of the Improvements referred to in the Building Loan Agreement and the Project Loan Agreement as approved by Lender and as the same may be amended from time to time with Lender's consent as required hereunder or under the Building Loan Agreement.

"**Policies**" or "**Policy**" shall have the respective meanings specified in Section 6.1.1(b).

"**Pre-development Costs**" shall mean the costs and expenses approved by Lender in its discretion that Borrower or its Affiliates have actually incurred and paid for with respect to acquisition of the Property and development of the Project on or prior to the Closing Date.

"**Premises**" shall have the meaning set forth in the granting clauses of the Security Instruments.

"**Principal**" shall mean, individually, each and collectively, all of Alexander Gurevich ("Gurevich"), Eliyahu Spitzer ("Spitzer"), Michael Steinberg, Albert Ades and Gene Kisselman.

"**Prohibited Person**" shall have the meaning set forth in Section 5.33(b).

"**Project Loan**" shall have the meaning set forth in the Recitals of this Agreement.

"**Project Loan Agreement**" shall have the meaning set forth in the Recitals of this Agreement.

"**Project Loan Amount**" shall have the meaning set forth in Section 2.1.1.

"**Project Loan Budget**" shall mean the budget for a portion of the costs relating to the Project, as the same may be modified, amended or supplemented from time to time in accordance with the terms and conditions of the Project Loan Agreement.

"**Project Loan Documents**" shall mean, collectively, this Agreement, the Project Loan Agreement, the Certificate of Sources and Uses, the Payment Direction Letter, the Project Loan Note, the Project Loan Mortgage, the Lockbox Agreement, the Assignment of Leases, the Assignment of Interest Rate Cap Agreement, the Assignment of Agreements, the Environmental Indemnity, the Consent and Recognition Agreements, the Guaranty of Recourse Obligations, the Guaranty of Payment and Performance, the Guaranty of Completion, all Uniform Commercial Code financing statements filed in connection with the Project Loan and all other documents evidencing, securing or otherwise executed and/or delivered by one or more of the Borrower Parties in connection with the Project Loan.

"**Project Loan Mortgage**" shall have the meaning set forth in the Recitals of this Agreement.

"**Project Loan Note**" shall have the meaning set forth in the Recitals of this Agreement.

"**Property**" shall have the meaning set forth in the granting clause of the Security Instruments.

**"Property Management Agreement"** shall mean any property management agreement, construction management agreement, leasing agreement or any other agreement(s) for similar or related services, each of which must be acceptable to Lender, entered into by and between Borrower and a Property Manager, and pursuant to which such Property Manager is to provide management and other services with respect to Borrower's Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

**"Property Manager"** shall mean a property manager selected or approved by Lender in accordance with this Agreement.

**"Purchase Agreement"** shall mean the purchase agreement, contract of sale or similar agreement pursuant to which Borrower acquired the Property, including without limitation, the Air Rights, together with all amendments, modifications or supplements thereto and any other agreements between the seller thereunder and any of the Borrower Parties or their Affiliates related thereto.

**"Qualified Insurer"** shall have the meaning set forth in **Section 6.1.1(b)**.

**"Qualified Sales Contracts"** shall mean and include only those bona fide, duly executed and delivered sales contracts for the purchase and sale of Units in the Property to unrelated third party purchasers on an all cash basis for a gross contract sales price not less than the applicable Minimum Sales Price, which contracts (i) require a total deposit no less than the Minimum Contract Deposit (ii) prohibit assignment (other than an assignment by the respective purchaser to his immediate family members or to a corporation or other legal entity wholly owned by such purchaser or his immediate family members once all deposits required by the contract have been paid, but without relieving or releasing the original purchaser of any liability under the contract), (iii) contain no rescission rights or contingencies (including, without limitation, financing contingencies) that would enable either party thereto to terminate the contract (other than a material default of the purchaser), (iv) are in form and content acceptable to Lender, and (v) are in good standing and not in default. In the case of a multi-Unit purchaser (including a purchaser and any Affiliate), contract(s) for no more than two (2) contiguous Units will be considered a Qualified Sales Contract.

**"Rating Agency"** shall mean each of Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies (S&P), Moody's Investors Service, Inc., and Fitch, Inc., or any other nationally-recognized statistical rating agency which has been approved by Lender.

**"Recourse Event"** shall mean any Full Recourse Event or any Partial Recourse Event.

**"Release"** shall mean a discharge and satisfaction of the Lien of any Security Instrument.

**"Release Prices Account"** shall have the meaning set forth in Section 13.7.

**"Rent(s)"** shall mean all rents (including fixed minimum rent and percentage rent), rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties

(including all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, expense reimbursements and recoveries (including all assignment fees, consent fees, surrender fees, termination fees and the lessor's share (or the share of any Affiliate of any Borrower Party) of any profits from any Tenant subletting or assignment) from Tenants, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, fees, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources (including any Service Rights granted to any Person and any warrants, stock options or other rights granted to Borrower or its Affiliates in connection with any Lease) whether or not arising from or attributable to the Property or any part thereof, and proceeds, if any, from business interruption or other loss of income insurance, together with all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including all guarantees, letters of credit (including the proceeds thereof) and any other credit support given by any guarantor in connection therewith, cash or securities deposited under the Leases to secure the performance by the Tenants of their obligations thereunder and all rents, additional rents, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Premises and the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt.

"**Replacement Interest Rate Cap Agreement**" means an interest rate cap agreement from an Acceptable Counterparty with terms substantially similar to the Interest Rate Cap Agreement and on the then current standard ISDA form for such product.

"**Required Units**" shall mean that number of Residential Units determined and specified Lender, in its discretion, on or before the Building Loan Opening Date.

"**Restoration**" shall have the meaning set forth in Section 6.1.2(a).

"**Secondary Market Transaction**" shall mean any transaction in which Lender (i) sells the Loan, the Notes and the other Loan Documents to one or more Persons (including any Investors) as a whole loan or a portion thereof, (ii) participates or syndicates the Loan to one or more Investors, (iii) deposits the Loan (or a portion thereof), and the Loan Documents with a trust, which trust may sell certificates to Investors evidencing an ownership interest in the trust assets, including a Securitization, whether or not rated by a Rating Agency (iv) otherwise sells the Loan or interest therein to Investors, or (v) pledges the Loan or any rights thereunder as collateral for any borrowing.

"**Securities**" shall have the meaning set forth in Section 8.1.1.

"**Securitization**" shall have the meaning set forth in Section 8.1.1.

"**Security Deposits**" shall mean all security (whether cash, letter of credit or otherwise) given to any Borrower or any agent or Person acting on behalf of any Borrower in connection with the Leases.

"**Security Instruments**" shall mean the Acquisition Loan Mortgage, the Project Loan Mortgage, and to the extent applicable, the Building Loan Mortgage, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time. Individually, each of the Security Instruments shall be referred to as a "Security Instrument."

"**Service Rights**" shall mean any agreements, contracts, rights, licenses or other interests of any type (whether exclusive or non-exclusive) granted or given to any Person to provide any products or services to or for or with respect to the Property or any part thereof, any Tenant or any occupants of the Property or any part thereof, including any of the same related to telecommunications, internet products or services, including, but not limited to, personal computer hardware and software, internet hardware and software, internet access services, printers, video display systems, audio sound systems and communication telephonic devices, as well as related and complementary products and services and any substitutes for, and items that are a technological evolution of, any of the foregoing products.

"**Servicer**" shall mean the servicer, if any, engaged by Lender with respect to the Loan.

"**Severed Loan Documents**" shall have the meaning set forth in Section 8.1.4.

"**Servicing Fees**" shall mean all fees, costs and expenses payable to any Servicer.

"**Single Purpose Entity**" shall mean an entity, other than an individual, that is formed or organized solely for the purpose of holding, directly, an interest in Borrower, does not engage in any business unrelated to the ownership of such interest, does not have any assets other than those related to the ownership of such interest, has its own separate books and records and its own accounts, and holds itself out as being an entity separate and apart from any other entity, and whose Organizational Documents contain provisions substantively similar to those contained in the Organizational Documents of the Borrower as of the date hereof relating to its purpose and separateness, and the requirement for a springing member or, if such entity is not a corporation, indirect, consent of an Independent Manager to the same types of transactions specified in **Section 4.1(s)(xxv)**.

"**SPE Member**" shall have the meaning set forth in Section 4.1(s)(xxiv).

"**Strike Rate**" shall mean a rate per annum equal to 5.50%.

"**Subdivision Map**" shall have the meaning set forth in Section 5.28.

"**Subsidiary**" shall mean, as to any Person, any other Person of which at least a majority of the outstanding voting stock or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or similar body of such corporation or other entity (irrespective of whether or not at the time stock of any other class or classes of such corporation or other entity shall or might have voting power by reason of the happening of any contingency) is at the time owned or controlled directly or indirectly by such Person or one or more of its Subsidiaries.

I-18

"**Survey**" shall mean the survey of the Property prepared by a surveyor licensed in the state where the Property is located and satisfactory to Lender and the company or companies issuing the Title Insurance Policies, and containing a certification of such surveyor satisfactory to Lender.

"**Syndication Documents**" shall mean the collective reference to all co-lending agreements, participation agreements, intercreditor agreements or other agreements of any kind among the Lenders an/or Agent related to the Loan.

"**Tax and Insurance Escrow Fund**" shall have the meaning set forth in **Section** 6.2.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents now or hereafter levied or assessed or imposed against the Property or any part thereof, including (a) any ad valorem real or tangible personal property taxes levied against the Property or any part thereof and (b) any intangible personal property tax levied or imposed on Lender with respect to its ownership in the Loan.

"**Tenant**" shall mean each Person granted a possessory interest or right to use or occupy all or any portion of the Property pursuant to a Lease.

"**Term**" shall have the meaning set forth in <u>Section 6.1.1(a)</u>.

"**Title Insurance Company**" shall mean a title insurance company (or companies) or authorized agent (or agents) acceptable to Lender that issues the Title Insurance Policies.

"**Title Insurance Policies**" shall mean the ALTA (or equivalent if ALTA is not available in the state where the Property is located) loan title insurance policies (or mortgagee title insurance policy or policies acceptable to Lender) issued with respect to the Property and insuring Lender (in an amount satisfactory to Lender) of the validity and priority of the Liens of the Security Instruments, with all endorsements thereto as required by Lender.

"**Transfer**" shall mean any sale, assignment, conveyance, alienation, mortgage, encumbrance, pledge, hypothecation or other transfer, including any swap, derivative or other transaction shifting the risks and rewards of ownership, whether voluntary or involuntary.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the applicable state or commonwealth in which the Property is located, as the same may be amended from time to time.

"**UCC Financing Statement**" shall mean a financing statement as defined by and in accordance with the requirements of the Uniform Commercial Code including all original financing statements or original fixture financing statements and any amendments, renewals, continuations or assignments thereof evidencing a security interest granted to Lender.

"**Unit**" shall mean an individual retail or residential condominium unit in the Improvements, together with the undivided share in the Common Elements appurtenant to such Unit.  The term "Unit" shall include any Limited Common Elements appurtenant to the Unit.

"**Unit Release**" shall have the meaning set forth in <u>Section 13.6</u>.

## SCHEDULE II

### Conditions Precedent

Each of the following shall be satisfied by Borrower as a condition precedent to the making of the Loan, and shall represent continuing covenants of Borrower after the Closing Date.

(a)    <u>Representations and Warranties; Compliance with Conditions</u>.  The representations and warranties of each Borrower Party contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date and no Material Adverse Change has occurred and no Default or Event of Default shall have occurred and be continuing; and Borrower Party shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on their part to be observed or performed.

(b)    Delivery of Loan Documents; Title Insurance; Reports.

(i)    <u>Notes, Loan Agreements, Security Instruments, Assignments of Leases, Assignments of Agreements and other Loan Documents</u>.  Lender shall have received from Borrower fully executed (and acknowledged if required) counterparts of the Notes and all other Loan Documents and evidence that counterparts of the Security Instruments and the Assignments of Leases have been delivered to the Title Insurance Company for recording, so as to effectively create upon such recording valid and enforceable first, second and third priority Liens upon the Property, in favor of Lender, subject only to the Permitted Encumbrances.

(ii)    <u>UCCs</u>.  Lender shall have received from Borrower (i) such UCC financing statements as Lender shall require, and such financing statements shall have been filed of record in the appropriate filing offices in each of the jurisdictions required by Lender or delivered to the Title Insurance Company for filing so as to effectively create upon such filing a valid and enforceable first, second and third priority Liens on the Property in favor of Lender, subject only to the Permitted Encumbrances and (ii) a list of the principal places of business, tax identification numbers, and doing business names for the Borrower and all other information as Lender may require to properly file such UCC financing statements, all certified by the Borrower.

(iii)    <u>Title Insurance</u>.  Lender shall have received the Title Insurance Policies dated as of the Closing Date, with co-insurance and/or reinsurance and direct access agreements acceptable to Lender.  Such Title Insurance Policies shall (A) provide coverage in amounts satisfactory to Lender, (B) insure Lender that the Security Instruments create valid first, second and third, as applicable, Liens on the Property free and clear of all exceptions from coverage other than Permitted Encumbrances, (C) contain such endorsements and affirmative coverages as Lender may require and which are available in the state where the Property are located, (D) show good and marketable indefeasible fee simple title to the Property vested in the Borrower, (E) name Lender as the insured, and (F) contain no **"creditors' rights"** exception. The Title Insurance Policies shall be assignable.  Lender also shall have received evidence that all premiums in respect of the Title Insurance Policies have been paid.  The Lender shall have

received satisfactory UCC financing statement, tax lien, judgment, bankruptcy, litigation and other Lien searches and reports conducted by a search firm acceptable to the Lender with respect to the Property and the Borrower Parties and all other relevant Persons, such searches to be conducted in each of the locations as shall be required by Lender.

(iv)   Surveys. Lender shall have received a current title survey for the Property, in form and substance satisfactory to Lender in its discretion, certified to the Title Insurance Company and Lender and their successors and assigns pursuant to a certification in the form and content satisfactory to Lender and prepared by a professional and properly licensed land surveyor satisfactory to Lender in accordance with the 1997 Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys (or, if not available, the relevant state equivalent thereof). Each survey should meet the classification of an "**Urban Survey**" and, if available, the following additional items from the list of "**Optional Survey Responsibilities and Specifications**" (Table A) should be added to such survey: 2, 3, 4, 6, 7, 8, 9, 10, 11 and 13 or any other additional items required by Lender. Such survey shall reflect the same legal description contained in the Title Insurance Policies referred to above relating to the Property and shall include, among other things, metes and bounds descriptions of the real properties comprising the Property reasonably satisfactory to Lender. The surveyor's seal shall be affixed to the survey and the surveyor shall provide certifications for the surveys in form and substance acceptable to Lender. The surveyor's certifications shall include a statement that the Property is or is not in an area identified by the Federal Emergency Management Agency as an area having special flood hazards. In addition, the Survey shall meet the requirements of the New York Condominium Act.

(v)   Insurance. Lender shall have received valid certificates of insurance for all Policies required hereunder or under any of the Loan Documents, and evidence of the payment of all premiums payable for the existing policy period, which shall not be less than one year from the Closing Date. Lender shall have received a flood hazard certificate in respect of the Property in form and substance satisfactory to Lender.

(vi)   Zoning. Lender shall have received (a) evidence satisfactory to Lender that (1) any existing improvements on the Land may be demolished (2) the current zoning of the Property (without obtaining any variance) permits the construction of the Improvements, and (3) all entitlements for the construction of the Improvements have been obtained. Lender shall have also received evidence satisfactory to Lender that the Property is independent of any other real property for taxing purposes; and (b) a zoning opinion of counsel acceptable to Lender in its discretion and any other estoppels, consents, recognition agreements or other documents acceptable to Lender in its discretion with respect to the Air Rights and he 421-a Certificates.

(vii)   Encumbrances. Borrower shall have taken or caused to be taken such actions in such a manner so that Lender has a valid and perfected first, second and third priority Liens as of the Closing Date on the Property, subject only to applicable Permitted Encumbrances, and Lender shall have received satisfactory evidence thereof.

(c)   Delivery of Organizational Documents; Consents. Borrower shall have delivered or caused to be delivered to Lender certified copies of all Organizational Documents

related to the Borrower and its direct and indirect members, including good standing certificates, qualifications to do business in the appropriate jurisdictions, resolutions authorizing the entering into of the Loan and incumbency certificates as may be requested by Lender. The Lender shall have received copies of all consents, Licenses and approvals, if any, required in connection with the execution, delivery and performance by the Borrower and its members and the validity and enforceability of the Loan Documents and such consents, Licenses and approvals shall be in full force and effect. Lender shall have received a chart depicting the ownership structure of Borrower, each constituent member of Borrower (including their respective ownership interests, direct or indirect, and capital contributions), which chart shall identify each Person who owns or controls, directly or indirectly, any such member of Borrower.

(d)    Opinions of Borrower's Counsel. Lender shall have received opinions of counsel to the Borrower Parties (i) with respect to non-consolidation, including such Non-Consolidation Opinions, as Lender or any Rating Agency may require; (ii) with respect to due execution, authority, enforceability (including no usury) of the Loan Documents and such other matters as Lender may require; and (iii) with respect to zoning, as Lender may require, all such opinions to be in form, scope and substance satisfactory to Lender and Lender's counsel.

(e)    Budgets. Borrower shall have delivered, and Lender shall have approved, the Acquisition and Pre-Development Budget.

(f)    Taxes, Insurance Premiums and Other Charges. Borrower shall have paid all Taxes, Insurance Premiums and Other Charges relating to the Property which are due and payable or in arrears, including (i) accrued but unpaid Insurance Premiums, (ii) currently due Taxes (including any in arrears) relating to the Property, and (iii) currently due Other Charges relating to the Property, which amounts may be funded with proceeds of the Loan if such proceeds are sufficient therefor and as set forth in the Certificate of Sources and Uses of Funds.

(g)    Intentionally Omitted.

(h)    Payments. All payments, deposits or escrows required to be made or established by the Borrower under this Agreement, and the other Loan Documents on or before the Closing Date shall have been paid and Lender shall have received (i) a settlement statement setting forth the disbursement of the Loan in form and content satisfactory to Lender and (ii) tax and insurance bills for the two calendar years prior to the Closing Date.

(i)    Third Party Reports. Lender shall have received a current seismic report, if required by Lender (prepared by a specialist acceptable to Lender), MAI appraisal report (prepared in compliance with FIRREA) (provided that Lender may accept evidence of value other than an MAI appraisal report, as determined by Lender), and environmental property condition report (Phase I environmental reports for each of the Property and, where environmental consultants recommends, Phase II reports and/or further investigation or as Lender otherwise determines are required); each addressed to Lender and in form and substance satisfactory to Lender and dated within six (6) months of the Closing Date, or if approved by Lender, if such third party reports that are not dated within six (6) months of the Closing Date but are otherwise acceptable to Lender, Borrower have delivered a reliance letter to Lender within six (6) months of the Closing Date that is in form and substance satisfactory to Lender.

An appraiser, engineer and environmental specialist, each satisfactory to Lender, shall perform the appraisal and the structural engineering and environmental property condition reports.

(j)    <u>Financial Statements</u>.  Lender shall have received copies of certified or audited annual Financial Statements (or statements prepared in accordance with procedures agreed upon by Lender) for the Property for the preceding two Fiscal Years, to the extent available from the seller of the Property, prepared in accordance with Acceptable Accounting Principles and otherwise in form and content acceptable to Lender.

(k)    <u>Payoff Letters; Assignments</u>.  Lender shall have received a true and correct copy of the payoff letters for all of the existing debt encumbering the Property.  In addition, for all of the existing debt encumbering the Property which is to be assigned to Lender, if applicable, Lender shall have received the original promissory notes endorsed to the order of Lender, the original mortgages together with an original assignment thereof to Lender in form and substance acceptable to Lender and representations from the lender holding such existing debt as to the outstanding principal balance thereof, no defaults existing thereunder and such other matters as Lender may reasonably require.

(l)    <u>Rent Rolls</u>.  Lender shall have received rent rolls with respect to the Property (with Lease expiration dates) as of the last full month prior to the Closing Date in form and content acceptable to Lender and certified by Borrower as being true, correct, complete and accurate.

(m)    <u>Leases, Contracts and Permits; Subordination</u>.  Lender shall have received copies of all Leases, permits and contracts related to the Property.  Lender shall have received appropriate instruments acceptable to Lender subordinating all of the Leases affecting the Property and any other contractual agreements affecting the Property designated by Lender to the Security Instruments.  Lender shall have received an agreement to attorn to Lender satisfactory to Lender from every Tenant under a Lease (either by separate instrument or pursuant to the terms of the Lease, as elected by Lender).

(n)    <u>Origination Fee</u>.  Lender shall have received the Origination Fee.

(o)    <u>Costs</u>.  Borrower shall have paid all of Lender's cost and expenses associated with the making of the Loan with respect to the Property, including all out-of-pocket due diligence expenses, the cost of all third party reports (such as but not limited to environmental, structural, appraisal and/or market study), legal fees and expenses, survey costs, title costs, etc.

(p)    <u>Separate Lot</u>.  Lender shall have received evidence that the Property (x) is comprised of one (1) or more parcels which constitute a separate tax lot or lots and (y) does not constitute a portion of any other tax lot not a part of the Property.

(q)    <u>Utilities/Parking</u>.  Lender shall have received evidence that all utility services (including utility letters) and parking required for the Property are available (which evidence may consist of the survey set forth in clause (c)(iv) above for the Property reflecting such utility services and parking).

        (r)    <u>Standard Form Lease</u>.  Borrower shall have delivered to Lender for approval by Lender in Lender's discretion, the standard lease form for of the Property.

        (s)    <u>Further Documents</u>.  Lender or its counsel shall have received such other and further approvals, opinions, documents and information as Lender or its counsel may have reasonably requested in form and substance satisfactory to Lender and its counsel.

        (t)    <u>Purchase Documents</u>.  Borrower shall have delivered a true and correct copy of the Purchase Agreements to Lender, together with all amendments and modifications thereto and assignments in respect thereof and all documents, instruments and agreements delivered pursuant thereto and a written certification by Borrower that all closing requirements and conditions under such Purchase Agreements have been satisfied by the seller thereunder and have not been waived.

        (u)    <u>Equity Contribution</u>.  Lender shall have received an Officer's Certificate and other reasonably satisfactory evidence (including invoices, cancelled checks, etc.) of capital contributions by the Principals and all other direct or indirect owners of Borrower in an aggregate amount not less than ten percent (10%) of the total capitalization of the Project that represents acquisition and predevelopment costs associated with the Project (the "**Equity Contribution**").  No funds loaned to or borrowed by any Borrower Party shall count towards the Equity Contribution.

# **SCHEDULE III**

## **Pending Litigation**

None.

## **SCHEDULE IV**

### **Disclosure Schedule**

None.

## SCHEDULE V

### Leasing Guidelines

A.     Minor Leases or Minor Lease Modifications.

(a)     Lender's approval shall not be required for any Minor Leases or amendments, extensions, cancellations, terminations or modifications to Minor Leases (collectively, a "**Minor Lease/Modification**"), if the Minor Lease/Modification meets the following criteria (the "**Minor Lease Leasing Criteria**"):

(1)     The Minor Lease/Modification is being entered into (i) with a Tenant on arms length terms (with no inducements, agreements or other transactions unrelated to the Property or Minor Lease/Modification), (ii) for a fair market rental (taking into account the rental rate, the extent to which the Tenant will bear its pro rata share of operating expenses, escalations, pass throughs, tenant improvements and the term of the Minor Lease/Modification) based on then existing market conditions and in a manner consistent with other first class buildings in the market area.

(2)     The Lease term, including all extension or renewal options shall not exceed ten (10) years.

(3)     The Tenant under the Minor Lease/Modification shall (i) be engaged in a reputable business and have good credit, (ii) have a reputable character, and (iii) not be engaged in any criminal or odious activity, all of the foregoing in accordance with the standards of a "reasonable institutional lender."

(4)     Borrower may amend, cancel, terminate or modify any Minor Lease/Modification if Borrower is acting in a commercially reasonable manner and any fees charged and collected in connection therewith shall be deposited into the Lockbox Account.

(5)     The rights of the Tenant to assign the Minor Lease/Modification or sublet any portion of the demised premises under the Minor Lease/Modification (other than to Affiliates of the Tenant or purchasers of a majority of Tenant's stock or assets) shall (i) be subject to the consent of the landlord, and (ii) provide that the Tenant shall remain primarily liable under the Minor Lease/Modification.

(6)     The Minor Lease/Modification shall not conflict with any existing Leases.

(7)     The Lease shall not contain any option to purchase the Property or any portion thereof, any right of first refusal or right of first offer to lease or purchase the Property or any portion thereof, any right to terminate the lease term (except in the event of the destruction or taking of all or substantially all of the Property), any non-disturbance or similar recognition agreement or any other similar provisions which adversely affect the Property or which might adversely affect the rights of any holder of the Loan.

(8)     The Lease shall comply with the terms of <u>Section 5.15</u>.

(b)     If the Minor Lease/Modification contains any deviations from the Minor
Lease Leasing Criteria set forth above, then such deviations must be approved in writing by
Lender, which approval may be granted or withheld in Lender's commercially reasonable
discretion.

B.     Major Leases or Major Lease Modifications.

Lender's approval, which approval may be granted or withheld in Lender's
commercially reasonable discretion, shall be required for any Major Lease or any amendments,
extensions, cancellations, terminations or modifications to a Major Lease.

D.     Residential Leases.

(a)     Lender's approval shall be required for (i) any residential Leases entered
into on the form of Lease approved by Lender or (ii) any renewals of residential Leases existing
as of the date hereof, provided that such new residential Lease or renewal, as applicable, meets
the following criteria (the "**Residential Lease Leasing Criteria**"):

(1)     With respect to any renewal of an existing Lease, (i) the renewal is
being entered into with an existing Tenant, (ii) the renewal Lease shall be for residential use only
and (iii) the renewal term shall not exceed one year.

(2)     With respect to any new residential Leases, the term of any such
Lease shall not exceed one year.

(3)     The new Lease or renewal Lease shall comply with the terms of
Section 5.15.

(b)     If any new residential Lease or any renewal of an existing residential
Lease contains any deviations from the Residential Lease Leasing Criteria set forth above, then
such deviations must be approved in writing by Lender, which approval may be granted or
withheld in Lender's commercially reasonable discretion.  Lender shall notify the Borrower of its
decision with respect to any such approval within five (5) Business Days of any Borrower's
written request therefor.

(c)     Lender hereby acknowledges that there are 19 Rent Stabilized Units and
that the Residential Lease Leasing Criteria shall not be applicable to such Rent Stabilized Units
for so long as such Leases are subject to any rent stabilization laws.

E.     Credit Support.

Borrower shall not alter, modify, amend, cancel or terminate any guaranty, letter
of credit, or other credit support with respect to any Lease without the prior written consent of
Lender if the Lease, or any modification thereof, would require Lender's approval.  Except as set
forth in a Lease previously approved by Lender, Borrower shall not consent to any assignment or
sublet of any Lease without the prior written consent of Lender if the Lease, or any modification
thereof, would require Lender's approval or if the assignment or sublet is to any Borrower, or an
Affiliate of Borrower.

F.    <u>SNDAs</u>.

Lender shall consider requests by or on behalf of the Borrower that Lender enter into a subordination, non-disturbance and attornment agreement with any Tenant (with respect to Minor Leases, Major Leases or any existing commercial Leases), in Lender's commercially reasonable discretion, provided that the form of subordination, non-disturbance and attornment agreement is reasonably acceptable to Lender.  Lender may also require that any Tenant enter into a subordination, non-disturbance and attornment agreement as a condition to approving any proposed commercial Lease.

G.    <u>Lease Guaranties</u>.

Neither Borrower nor any Affiliate shall enter into any agreement guaranteeing or agreeing to pay rent for any other space for a prospective Tenant, or enter into any similar agreement without the prior written consent of Lender.

H.    <u>Capitalized Terms</u>.  All capitalized terms used in this **Schedule IV** and not otherwise defined herein shall have the meaning set forth in the Loan Agreement.

## SCHEDULE VI

### Minimum Sales Prices and Applicable Release Prices

**[THIS SCHEDULE SHALL BE ATTACHED HERETO UPON APPROVAL BY
LENDER IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT]**

# **SCHEDULE VII**

Acquisition and Pre-Development Budget

**Budget 250 East 49th**
Date: December 20, 2006

| | |
|---|---|
| Cost of vertical development | 121,042,897 |
| Loan amount (tranche B)  @   89.9% | 108,817,564 |
| Developer equity | 12,225,333 |
| Rounded to | 12,225,000 |

total through closing

| | | | Predev Post-Close | Predev Phase Total | Development Phase Total | Total Project Costs | % of Cost |
|---|---|---|---|---|---|---|---|
| Land Cost | - | 44,834,700 | - | 44,834,700 | - | 44,834,700 | 37.0% |
| Tenant Buyouts | | 3,421,305 | | 3,421,305 | | 3,421,305 | 2.8% |
| Tenant Buyouts - Marty Joyce, Jerome O'Connor, HNY Duet | | 630,000 | | 630,000 | | 630,000 | 0.5% |
| Broker Fees | - | 400,430 | - | 400,430 | - | 400,430 | 0.3% |
| Closing Costs | - | 808,677 | - | 808,677 | | 808,677 | 0.7% |
| Interest & Prepayment Penalties | - | 1,281,958 | - | 1,281,958 | | 1,281,958 | 1.1% |
| 421A Deposit | | 134,700 | | 134,700 | | 134,700 | 0.1% |
| Air Rights Deposit | | 365,800 | | 365,800 | | 365,800 | 0.3% |
| Air Rights | - | 1,427,200 | - | 1,427,200 | 1,775,000 | 3,202,200 | 2.6% |
| **Total Acquisition Costs** | - | 53,302,771 | - | 53,302,771 | 1,775,000 | 55,077,771 | 45.5% |
| | | | | | | | |
| **Total 421-A** | 911,000 | 502,800 | - | 1,413,800 | 1,264,200 | 2,678,000 | 2.2% |
| | | | | | | | |
| **Soft Costs** | | | | | | | |
| Design fees | | | | | | | |
| Architect | 930,398 | | 9,220 | 1,400,398 | 299,602 | 1,700,000 | 1.4% |
| Other consultants | 91,247 | - | 50,000 | 141,247 | 60,000 | 201,247 | 0.2% |
| Permits & fees | 14,035 | | 20,000 | 34,035 | 54,279 | 88,314 | 0.1% |
| Insurance | 7,820 | 227,257 | 50,000 | 285,077 | 525,000 | 810,077 | 0.7% |
| Asbestos removal | 40,600 | 14,000 | 18,000 | 72,600 | - | 72,600 | 0.1% |
| Demolition | 400,000 | 265,000 | | 665,000 | | 665,000 | 0.5% |
| Offering plan | | 22,667 | | 22,667 | 52,333 | 75,000 | 0.1% |
| Utilities | - | 25,000 | | 25,000 | 50,000 | 75,000 | 0.1% |
| Marketing | 31,655 | | | 31,655 | 572,980 | 604,635 | 0.5% |
| Developer overhead | 113,750 | - | 60,000 | 173,750 | 1,846,250 | 2,020,000 | 1.7% |
| R E Tax | - | 307,508 | 126,029 | 433,537 | 400,000 | 833,537 | 0.7% |
| Mortgage recording tax &other govt reporting | - | 208,093 | | 208,093 | 1,100,000 | 1,308,093 | 1.1% |
| Transfer tax | | 357,295 | | 357,295 | | 357,295 | 0.3% |
| Gov't recording fees | | 2,995 | | 2,995 | | 2,995 | 0.0% |
| Developer legal acct | 214,448 | 40,000 | - | 254,448 | 75,000 | 329,448 | 0.3% |
| Developer legal Treff and Lowry | - | | | 3,000 | | 3,000 | 0.0% |
| Wachtel and Maysr | - | | | 25,000 | | 25,000 | 0.0% |
| Richard Layton and Finger | - | | | 7,750 | | 7,750 | 0.0% |
| Peter Silverman, Esq | - | | | 25,000 | | 25,000 | 0.0% |
| Cadwalader Wickersham and Taft | - | | | 14,465 | | 14,465 | 0.0% |
| Chang Law | - | | | 1,250 | | 1,250 | 0.0% |
| Lehman Senior/Mezz Origination Fee   1.0% | - | 530,692 | - | 530,692 | 557,327 | 1,088,019 | 0.9% |
| Broker fee -- Ciplet/Shopco | - | | | 500,000 | 350,000 | 850,000 | 0.7% |
| Broker fee -- Carlton/Marcus | 20,000 | | 125,000 | 270,000 | | 270,000 | 0.2% |
| Lender Legal | - | | - | 198,686 | 75,000 | 273,686 | 0.2% |
| Lender Appraisal (CBRE) | - | | - | 16,000 | | 16,000 | 0.0% |
| Lender Engineering (EMG) | - | | - | 2,750 | - | 2,750 | 0.0% |
| Lender Insurance Consultant (Fisher Harris) | - | | - | 850 | - | 850 | 0.0% |
| Title Premium, Fees and Expenses | - | | - | 347,773 | 100,000 | 447,773 | 0.4% |
| Miscellaneous | 344 | 150,000 | - | 150,344 | 185,000 | 335,344 | 0.3% |
| Contingency | - | 230,000 | | 230,000 | 744,030 | 974,030 | 0.8% |
| Rate Cap | - | | 25,000 | 25,000 | - | 25,000 | 0.0% |
| Servicing Fees | - | | 74,000 | 74,000 | 200,000 | 274,000 | 0.2% |
| Lender Construction Consultant | - | 22,000 | 36,000 | 58,000 | 156,000 | 214,000 | 0.2% |
| Interest Reserve | 513,041 | | 3,400,000 | 3,913,041 | 8,086,959 | 12,000,000 | 9.9% |
| **Total Soft Costs** | 2,377,338 | | 3,993,249 | 10,501,399 | 15,489,759 | 25,991,158 | 21.5% |
| | | | | | | | |
| **Hard Costs** | | | | | | | |
| Contractor Price Residential | - | - | - | - | 29,027,700 | 29,027,700 | 24.0% |
| Contractor Price Commercial/Community | - | - | - | - | 3,045,600 | 3,045,600 | 2.5% |
| Contractor Price Basement | - | - | - | - | 884,700 | 884,700 | 0.7% |
| Contractor Total Costs | - | - | - | - | 32,958,000 | 32,958,000 | 27.2% |
| | | | | | | | |
| Contingency @ 12.5% | - | - | - | - | 4,119,750 | 4,119,750 | 3.4% |
| Construction manager fee | - | - | 30,000 | 30,000 | - | 30,000 | 0.0% |
| Survey | - | - | 5,000 | 5,000 | - | 5,000 | 0.0% |
| Sidewalks, bridges, fences | 300 | 6,415 | 15,000 | 21,715 | - | 21,715 | 0.0% |
| Ace Scaffolding | - | | | 19,995 | | 19,995 | 0.0% |
| General conditions | - | - | - | - | 141,508 | 141,508 | 0.1% |
| **Total Hard Costs** | 300 | | 50,000 | 76,710 | 37,219,258 | 37,295,968 | 30.8% |
| | | | | | | | |
| **TOTAL USES** | 3,288,638 | 57,962,792 | 4,043,249 | 65,294,679 | 55,748,217 | 121,042,897 | 100.0% |
| | | | | | | | |
| Lehman Senior Loan | | 38,173,825 | 3,050,917 | 41,224,742 | 43,505,286 | 84,730,028 | 70.0% |
| Lehman Mezzanine Loan | | 10,852,273 | 992,332 | 11,844,605 | 12,242,931 | 24,087,536 | 19.9% |
| Borrower Equity | 3,288,638 | 8,936,695 | | 12,225,333 | | 12,225,333 | 10.1% |
| **TOTAL SOURCES** | 3,288,638 | 57,962,792 | 4,043,249 | 65,294,679 | 55,748,217 | 121,042,897 | 100.0% |

**EQUITY**

| | |
|---|---|
| Alex Equity Invested: | 10,045,972 |
| Eliot Equity Invested: | 8,169,213 |
| Total Equity Invested | 18,215,185 |
| Equity Requirement | (12,225,333) |
| Brrwer Reimburse | 5,989,853 |

**FEES**

| | Predevelopment | Development | Total | |
|---|---|---|---|---|
| LB Sr Orig Fee | 412,247 | 435,053 | 847,300 | 1.00% |
| LB Sr Exit Fee | 206,124 | 217,526 | 423,650 | 0.50% |
| | | | | |
| LB Mazz Orig Fee | 118,446 | 122,429 | 240,875 | 1.00% |
| LB Mazz Exit Fee | 59,223 | 61,215 | 120,438 | 0.50% |
| ORIG FEE ONLY | 530,693.47 | 557,482.17 | 1,088,175.64 | |