**<u>EXHIBIT C</u>**
**(Building Loan Agreement)**

## AMENDED AND RESTATED BUILDING LOAN AGREEMENT

**Dated: as of February 13, 2008**

**by and between**

**250 EAST BORROWER, LLC**
216 East 49th Street, 5th Floor
New York, New York 10017

**and**

**LEHMAN BROTHERS HOLDINGS INC.**
399 Park Avenue, 8th Floor
New York, New York   10022

Original Building Loan Amount: $22,264,070
Amended and Restated Building Loan Amount: $32,122,168.20

### LOCATION OF MORTGAGED PROPERTY

| | |
|---|---|
| **Street Address:** | **250 East 49th Street** |
| **City of** | **New York** |
| **County of** | **New York** |
| **State of** | **New York** |
| **Block:** | **1322** |
| **Lots:** | **27; 126; 28; 127; 128; 29; 129** |

**After filing, please return to:**

**Gibson Dunn & Crutcher LLP**
**200 Park Avenue**
**New York, New York 10166**
**Attn: Andrew Levy, Esq.**

Article 1      INCORPORATION OF RECITALS AND EXHIBITS ........................................ 2

       Section 1.1      Incorporation of Recitals ................................................................. 2

       Section 1.2      Incorporation of Exhibits and Schedules ............................................. 2

Article 2      DEFINITIONS ............................................................................................. 2

       Section 2.1      Defined Terms .................................................................................. 2

       Section 2.2      Use of Defined Terms ....................................................................... 4

       Section 2.3      Use of Recital, Article, Section and Exhibit References ..................... 5

Article 3      BUILDING LOAN ...................................................................................... 5

       Section 3.1      Agreement to Borrow and Lend ........................................................ 5

Article 4      GENERAL REQUIREMENTS PRECEDENT TO BUILDING LOAN
               OPENING ................................................................................................... 5

       Section 4.1      Requirements Precedent to Opening of the Building Loan ................ 5

Article 5      CONSTRUCTION REQUIREMENTS PRECEDENT TO BUILDING
               LOAN OPENING ...................................................................................... 7

       Section 5.1      Required Documents ........................................................................ 7

       Section 5.2      Additional Documents Required ....................................................... 8

       Section 5.3      Lender's Verification of Contracts .................................................... 9

Article 6      BUILDING LOAN BUDGET AND CONTINGENCY ...................................... 9

       Section 6.1      Building Loan Budget ....................................................................... 9

       Section 6.2      Budget Line Items ............................................................................ 9

       Section 6.3      Reallocation of Contingency ........................................................... 10

       Section 6.4      Reallocation Between Budget Line Items ......................................... 11

Article 7      LOAN BALANCING ................................................................................ 11

       Section 7.1      Loan to Be In Balance ..................................................................... 11

       Section 7.2      Lender's Estimate of Cost of Construction ...................................... 12

       Section 7.3      Loan Not In Balance ....................................................................... 12

Article 8      GENERAL PROVISIONS REGARDING ADVANCES .................................... 13

       Section 8.1      General Conditions to Advances ...................................................... 13

       Section 8.2      Timing of Advances ......................................................................... 14

       Section 8.3      Optional Method for Payment of Interest ........................................ 14

       Section 8.4      No Reborrowing .............................................................................. 15

       Section 8.5      Advances into an Escrow ................................................................ 15

## TABLE OF CONTENTS
### (continued)

|  |  |  | Page |
|---|---|---|---|
| Section 8.6 | | Closing of the Hotel | 16 |
| Article 9 | | CONSTRUCTION REQUIREMENTS WITH RESPECT TO ADVANCES | 16 |
| Section 9.1 | | Applicability | 16 |
| Section 9.2 | | Documents to be Furnished | 16 |
| Section 9.3 | | Lender's Right to Employ the Consultant | 17 |
| Section 9.4 | | Retainages | 18 |
| Section 9.5 | | Payments Directly to Contractors and Subcontractors | 18 |
| Section 9.6 | | Distinction Between Various Retainages | 19 |
| Section 9.7 | | Disbursements for Tenant Work | 19 |
| Section 9.8 | | No Advances for Off Site Materials | 19 |
| Article 10 | | REQUIREMENTS FOR FINAL ADVANCE | 19 |
| Section 10.1 | | Conditions to Final Advance | 19 |
| Section 10.2 | | Outside Date for Final Advance | 21 |
| Article 11 | | BORROWER'S AGREEMENTS | 21 |
| Section 11.1 | | Specific Covenants of Borrower | 21 |
| Article 12 | | events of DEFAULT AND REMEDIES | 25 |
| Section 12.1 | | Events of Default and Remedies | 25 |
| Section 12.2 | | Non-Waiver of Remedies | 25 |
| Article 13 | | GENERAL PROVISIONS | 26 |
| Section 13.1 | | Captions | 26 |
| Section 13.2 | | Notices | 26 |
| Section 13.3 | | Entire Agreement; Modification, Waiver | 27 |
| Section 13.4 | | Governing Law | 28 |
| Section 13.5 | | Acquiescence Not to Constitute Waiver of Lender's Requirements | 28 |
| Section 13.6 | | Disclaimer by Lender | 28 |
| Section 13.7 | | Right of Lender to Make Advances to Cure Borrower's Defaults | 29 |
| Section 13.8 | | Definitions Include Amendments | 29 |
| Section 13.9 | | Time Is of the Essence | 30 |
| Section 13.10 | | Execution in Counterparts | 30 |
| Section 13.11 | | Waiver of Punitive or Consequential Damages | 30 |

## TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| Section 13.12 | Claims Against Lender | 30 |
| Section 13.13 | Jurisdiction: Service of Process | 30 |
| Section 13.14 | Severability | 31 |
| Section 13.15 | Waiver of Jury Trial | 31 |
| Section 13.16 | Waiver of Foreclosure Defense | 31 |

## AMENDED AND RESTATED
## BUILDING LOAN AGREEMENT

THIS AMENDED AND RESTATED BUILDING LOAN AGREEMENT (this
"Agreement") is made as of February 13, 2008, by and between 250 EAST BORROWER, LLC,
a Delaware limited liability company, having an office at c/o 216 East 49th Street, 5th Floor, New
York, New York 10017 ("Borrower"), and LEHMAN BROTHERS HOLDINGS INC., a
Delaware corporation, individually and as lead arranger and administrative agent for itself and
certain co-lenders, having an office at 399 Park Avenue, 8th Floor, New York, New York 10022
(collectively, together with its successors and assigns, referred to herein as "Lender").

## RECITALS

A.    Borrower acquired certain real property located at 250 East 49th Street, New
York, New York, the legal description of which is set forth in Exhibit A (the "Land"). The Land
and all related improvements and facilities (including the Improvements), now or hereafter
existing, whether above or below ground/street level, together with all rights, privileges,
easements, hereditaments and appurtenances thereunto relating or appertaining, and all fixtures
and equipment required for, or otherwise intended for use in connection with, the operation
thereof, are collectively referred to herein as the "Project".

B.    The Land is presently vacant and will be improved with multi-family residential
and commercial condominium apartment complex consisting of approximately 7,139 net sellable
square feet of retail condominium unit(s) on the first floor and approximately 8,089 net sellable
square feet of retail or commercial space on the second floor (and approximately 80,860 net
sellable square feet of residential condominium units on the remaining floors (the
"Improvements") and the Borrower intends to effectuate the Conversion (as such term is defined
in the Credit Agreement).

C.    All right, title and interest in, and all obligations under, that certain Building Loan
Agreement dated as of September 12, 2005 and filed with the Office of the New York County
Clerk on December 14, 2005, pursuant to which Amalgamated Bank, as Trustee of Longview
Ultra I Construction Loan Investment Fund, ("Original Lender") agreed to make a loan to 49th
East Develop, LLC ("Original Borrower") in the maximum principal amount of up to
$22,264,070.00 (the "Original Building Loan") on the terms and conditions set forth therein with
respect to certain real property designated on the Tax Map for the Borough of Manhattan in the
City and County of New York as Lots 29, 127, 128, and 129 in Block 1322 and more particularly
described in Exhibit A attached to said Building Loan Agreement (the "Original Property") was
assigned to and assumed by Borrower and Lender and amended by Borrower and Lender
pursuant to that certain Assignment, Assumption and Amendment to Building Loan Agreement
dated as of December 29, 2006 by and between Borrower, Lender, Original Borrower and
Original Lender and filed with the Office of the New York County Clerk on December 29, 2006.
Said Building Loan Agreement was further amended by Borrower and Lender to, inter alia,
cover the Project pursuant to that certain Amendment to Building Loan Agreement dated as of
February 27, 2007 and filed in the Office of the New York County Clerk on March 8, 2007, that

certain Second Amendment to Building Loan Agreement dated as of July 6, 2007 and filed in the
Office of the New York County Clerk on July 11, 2007, that certain Third Amendment to
Building Loan Agreement dated as of December 28, 2007 and filed in the Office of the New
York County Clerk on January 3, 2008, and that certain Fourth Amendment to Building Loan
Agreement dated as of January 25, 2008 and filed in the Office of the New York County Clerk
on January 31, 2008 (said Building Loan Agreement, as amended, being collectively, the
"Original Building Loan Agreement").

      D.     Borrower has applied to Lender for a loan of up to $89,706,154.40 which consists
of (i) an acquisition loan of $36,374,382.14 which was funded in order to finance the acquisition
of the Project (the "Acquisition Loan"), (ii) a building loan of up to $32,122,168.20 to, among
other things, finance certain construction and development costs associated with the Construction
(the "Building Loan"), and (iii) a project loan of up to $21,209,604.06, to, among other things,
finance certain other costs associated with the Construction (the "Project Loan"; the Acquisition
Loan, the Building Loan and the Project Loan are sometimes collectively referred to herein as
the "Loan").

      E.     Lender is willing to increase the amount of the Original Building Loan to equal
the Building Loan and fund the Building Loan in accordance with the terms of this Agreement in
order to allow Borrower to fund certain costs related to the construction of the Improvements but
each advance of such funding is expressly conditioned on: (i) no default having occurred with
respect to the Original Building Loan or the Building Loan; (ii) all conditions precedents set
forth in this Agreement with respect to such advance of the Building Loan, including without
limitations, those conditions precedents set forth in Section 5.2 hereof, have been satisfied as
required under this Agreement; and (iii) the making of each advance of the Building Loan is not
and shall not be construed as a waiver of any defaults under the Original Building Loan or the
Building Loan, or be construed as a reinstatement, satisfaction, or modification of the Original
Building Loan or the Building Loan, or as a waiver, relinquishment or forbearance by Lender of
Lender's rights and remedies under the Original Building Loan and the Building Loan, all of
which defaults, rights and remedies have been and hereby are expressly reserved by Lender.

      F.     To evidence the Building Loan, which shall be advanced in accordance with this
Agreement, Borrower has executed and delivered in favor of Lender that certain Consolidated,
Amended and Restated Building Loan Promissory Note of even date herewith in the maximum
principal amount of $32,122,168.20 (as amended, restated, supplemented or otherwise modified
from time to time, the "Building Loan Note").

      G.     To secure the Building Loan Note, Borrower has granted for the benefit of
Lender, inter alia, (i) the Amended, Restated and Consolidated Building Loan Mortgage and
Security Agreement of even date herewith encumbering the Project (as amended, restated,
supplemented or otherwise modified from time to time, the "Building Loan Mortgage") and
(ii) the Assignment of Rents and Leases dated as of December 29, 2006 (as amended, restated,
supplemented or otherwise modified from time to time, the "Assignment of Rents and Leases").

      H.     This Agreement amends and restates in its entirety the Original Building Loan
Agreement. This Agreement shall not operate to discharge, satisfy, cancel, release or repay, or
be deemed to be a substitution or novation of the indebtedness heretofore incurred with respect

to the Original Building Loan Agreement, which indebtedness is hereby preserved and confirmed.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree that the Original Building Loan Agreement is hereby amended and restated in its entirety as follows:

## ARTICLE 1

### INCORPORATION OF RECITALS AND EXHIBITS

Section 1.1    Incorporation of Recitals.  The foregoing Recitals are made a part of this Agreement.

Section 1.2    Incorporation of Exhibits and Schedules.  All Exhibits and Schedules hereto (whether or not listed in the Table of Contents) are incorporated herein and expressly made a part hereof.

## ARTICLE 2

### DEFINITIONS

Section 2.1    Defined Terms.  All capitalized terms not defined herein shall have the meaning assigned to such terms in that certain Master Credit Agreement dated December 29, 2006 between Borrower and Lender (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").  In addition to the other terms defined herein, the following terms shall have the meanings set forth in this Article.  References to documents and other materials shall include those documents and materials as they may be revised, amended and modified, from time to time, with the prior written approval of Lender.

"Agreement" shall mean this Building Loan Agreement, as originally executed and as the same may hereafter be supplemented, amended or restated from time to time in writing.

"AIA" shall mean the American Institute of Architects.

"Architect" shall mean the architect retained by Borrower and approved by Lender.

"Architect's Contract" shall mean the architect's agreement between Borrower and Architect in form and substance acceptable to Lender for all work to be performed by Architect pursuant to the Plans and Specifications

"Bond(s)" shall mean with respect to any Major Construction Contract (including, without limitation, the General Contractor's Agreement unless otherwise waived by Lender), performance and labor and material payment bonds in the form approved by AIA and identified as form AIA No. A-312 or another form reasonably satisfactory to Lender containing a dual obligee rider, in amounts acceptable to Lender and containing any modifications required by

3

Lender, issued by a surety company licensed to do business in the State of New York and acceptable to Lender as surety, and with Lender, as obligee; and with respect to any other matter to be bonded, a bond in form and content reasonably acceptable to Lender, issued by a surety company licensed to do business in the State of New York and acceptable to Lender as surety, and in an amount acceptable to Lender in its sole discretion.

"Building Loan Budget" shall mean a budget for the Construction Work, and certain other amounts to be expended in connection with the Project, which amounts constitute a Cost of Improvement, including, without limitation, amounts required to pay interest on the Building Loan, which budget sets forth cost estimates for budgeted construction and non-construction categories, and specifies the Hard Costs and Soft Costs required for such work, as such budget may be amended, modified or supplemented from time to time in accordance with the terms and conditions of this Agreement.

"Building Loan Contingency" shall mean the Budget Line Item designated as such in the Building Loan Budget.

"Building Loan Deliveries" means (i) all of the items listed in items (a) through (p) of Section 5.1, (ii) an updated report from the Consultant containing an analysis of the final Construction Budget, the Construction Schedule and the General Contractor Agreement, the updated appraisal, the Minimum Sales Price and Minimum Release Price schedules, the Bonds and the Plans and Specifications.

"Building Loan Opening Conditions" shall have the meaning set forth in Section 4.1.

"Building Loan Opening Date" shall have the meaning set forth in the Credit Agreement.

"Building Loan Title Policy" shall have the meaning set forth in Section 4.1(c)(iii)(B).

"Construction Schedule" shall mean a reasonably detailed time schedule for the Construction Work to be performed by Borrower satisfactory to Lender.

"Consultant" shall mean the construction consultant retained by Lender.

"Contingency" shall mean the Building Loan Contingency and the Project Loan Contingency.

"Cost of Improvement" shall have the meaning prescribed to such term in the Lien Law.

"Cost Savings" means the aggregate amount, if any, by which the amount actually incurred or, in the sole opinion of the Lender, anticipated to be incurred, in a Budget Line Item of the Building Loan Budget is or will be, as the case may be, less than the maximum amount established for such Budget Line Item in the Building Loan Budget.

"Deficiency Deposit" shall have the meaning set forth in Section 7.3(a).

"Engineering Report" shall mean as the date hereof, the engineering report required under Section 4.1(d)(xi) and from and after the date hereof, an engineering report covering the

4

Improvements, and the other improvements comprising part of the Project and such other matters which at the time of a subsequent report are customarily included in engineering reports prepared for institutional lenders and including the results of any tests or inspections performed to determine the adequacy of any Construction for its then present use, and the use contemplated by any of the Leases entered into after the Building Loan Opening Date, and otherwise in scope acceptable to Lender.  Subsequent Engineering Reports, if any, shall either be addressed to Lender or be accompanied by a letter from the engineer confirming that Lender may rely on such Engineering Reports.

"Excusable Delay" shall mean any delay in the Construction of the Improvements in accordance with the Plans and Specifications resulting from acts of God, fire, earthquake, hurricane, flood, explosion, action of the elements, war, invasion, insurrection, riot, mob violence, sabotage, malicious mischief or labor strikes, not within Borrower's reasonable control, (x) with respect to which Lender shall have been provided with written notice of the occurrence thereof within five (5) days after Borrower obtaining knowledge thereof and (y) which are supported by such evidence as Lender shall reasonably request.

"Final Advance" shall mean the last $50,000 of the Building Loan to be advanced by Lender hereunder.

"General Contractor" shall mean the construction manager retained by Borrower and approved by Lender.

"General Contractor's Agreement" shall mean a contract acceptable to Lender between Borrower and the General Contractor for all work to be performed pursuant to the Plans and Specifications.

"Hard Costs" shall mean the aggregate costs of all labor, materials, equipment, and fixtures necessary for completion of the Construction Work, as more particularly set forth in the Building Loan Budget and expenses in respect of supplying goods, services, materials and labor for any Construction Work.

"In Balance" shall have the meaning set forth in Section 7.1(a).

"Lender's Estimate of the Cost of Construction" shall have the meaning set forth in Section 7.2.

"Lien Law" shall mean the Lien Law of the State of New York, as amended from time to time.

"Major Construction Contract" shall mean any construction contract between Borrower (or the General Contractor related to the Project) and any contractor, subcontractor or material supplier, which requires Borrower or the General Contractor to pay, or is anticipated to require Borrower or the General Contractor to pay, fees, charges and other expenses totaling more than $100,000, including without limitation, any construction contracts with respect to the superstructure of the Project, the curtain wall, plumbing and elevators.

"Material Adverse Effect" shall have the meaning set forth in the Credit Agreement.

"Minimum Standards" shall mean the "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys," jointly established and adopted by the American Land Title Association and the American Congress on Surveying and Mapping in 1997.

"Minor Construction Contract" shall mean any construction contract between Borrower and any contractor, subcontractor or material supplier, which requires Borrower (or the General Contractor) to pay, or is anticipated to require Borrower to pay, fees, charges and other expenses totaling less than $100,000 pursuant to any such contract, provided that the fees, charges and other expenses payable under all such contracts which Lender has not otherwise approved does not exceed $500,000 in the aggregate.

"Outside Date" shall have the meaning set forth in Section 10.2.

"Project Loan Contingency" shall mean the Budget Line Item designated as such in the Project Loan Budget.

"Project Loan Title Policy" shall have the meaning set forth in Section 4.1(c)(iii)(C).

"Request for Advance" shall mean a written Request for Advance in the form of Exhibit E annexed hereto executed by Borrower to Lender specifying by name, current address, and amount of all parties to whom Borrower is obligated for labor, materials, or services supplied for the Construction Work and all other expenses incident to the Project, and the construction of the Improvements, whether or not specified in the Building Loan Budget, requesting an Advance for the payment of such items, and accompanied by Certification of Borrower as to Hard Costs (in the form of Exhibit I annexed hereto) and such schedules, certificates, affidavits, releases, conditional waivers, statements, invoices, bills, and other documents referred to in the Request for Advance or as Lender may reasonably request.

"Required Completion Date" shall mean the date which is four (4) months prior to the Maturity Date.

"Section 22 Lien Law Affidavit" shall have the meaning set forth in Section 11.1(d).

"Soft Costs" shall mean interest payable on the principal amount of the Advances made under the Building Loan Note and all other costs in the Building Loan Budget, excluding Hard Costs, which constitute a Cost of Improvement.

"Substantial Completion" shall be deemed to have occurred when (a) the Architect and the General Contractor shall have each delivered and executed a certificate of substantial completion for the Project in the form of AIA Document G704 (April, 1978 edition) or any successor or replacement certificates; (b) there has been issued a temporary certificate of occupancy for all of the Residential Units and related amenities such that Unit owners may legally reside in the Residential Units; (c) Lender shall have received an affidavit of Borrower in form and substance satisfactory to the Agent certifying and warranting, to the best of Borrower's Knowledge that the Project has been constructed in a good and workmanlike manner substantially in accordance with the Plans and Specifications, subject to minor "punch list" items; (d) Lender shall have received one set of the Plans and Specifications, containing all

changes thereto marked thereon, which shall be acceptable to the Lender, and (e) that all utilities, roads, sidewalks and other appurtenances necessary for the Project have been fully installed.

Section 2.2    Use of Defined Terms. Defined terms may be used in the singular or the plural. When used in the singular preceded by "all," "an" or "any", such term shall be taken to indicate one or more members of the relevant class. When used in the plural, such term shall be taken to indicate all members of the relevant class.

Section 2.3    Use of Recital, Article, Section and Exhibit References. The use herein of references to Recitals, Articles, Sections, Schedules and Exhibits shall refer to the referenced Recital, Article or Section in, or Exhibit or Schedule annexed to, this Agreement.

## ARTICLE 3

### BUILDING LOAN

Section 3.1    Agreement to Borrow and Lend. Subject to all of the terms, provisions and conditions set forth in this Agreement and the other Building Loan Documents and provided no Default or Event of Default exists, Lender has agreed to make Advances of the Building Loan from time to time during the period from the date hereof to the Outside Date and Borrower agrees to accept the Building Loan. On the Building Loan Opening Date and on the date of each Advance made under the Building Loan Note, the maximum principal amount of the Building Loan (the "Building Loan Amount") shall not exceed the amount of $32,122,168.20.

## ARTICLE 4

### GENERAL REQUIREMENTS PRECEDENT TO BUILDING LOAN OPENING

Section 4.1    Requirements Precedent to Opening of the Building Loan. The obligation of Lender to make any Advance under the Building Loan shall be subject to the conditions set forth in this Section 4.1, the conditions set forth in Article 5 hereof and any other conditions set forth in this Agreement (collectively, the "**Building Loan Opening Conditions**") on or prior to the date hereof:

(a) No material Default or Event of Default by Borrower or any Guarantor shall exist under this Agreement, the Credit Agreement or any of the other Loan Documents, beyond any applicable notice and cure periods.

(b) Borrower shall have delivered or caused to be delivered to Lender all of the Building Loan Documents, duly and properly executed by Borrower and each Guarantor, as applicable, and Borrower shall have paid all amounts required to be paid by Borrower on or before the date hereof pursuant to Article 6 of the Credit Agreement.

(c) Borrower shall have furnished to Lender the following:

(i)        An NY ALTA (1992) loan policy of title insurance (the "Building Loan Title Policy") in the amount of the Building Loan Amount, together with a pending disbursements clause, issued by the Title Insurance Company to Lender, insuring the

7

Building Loan Mortgage as a valid and subsisting second mortgage lien on the Land, the Improvements, and all appurtenant easements as required by Lender, subject only to the Permitted Exceptions. The Building Loan Title Policy shall be issued by the Title Insurance Company. All reinsurance shall be evidenced by a direct access reinsurance agreement in form and content acceptable to Lender in all respects. The Building Loan Title Policy shall contain such affirmative insurance and endorsements as Lender shall reasonably require.

    (ii)    Opinions of counsel to Borrower and Guarantors, each reasonably acceptable to Lender.

    (iii)    An initial Construction Budget demonstrating a total aggregate amount not to exceed $53,331,772.26 for the Advances to be made under the Building Loan Note and the Project Loan Note.

    (iv)    (A) Certificate of Borrower, stating no proceedings exist affecting Borrower that could have a Material Adverse Effect on Borrower, the Loan or the Project, and (B) a certificate from the Guarantors, to the effect that no proceedings exist affecting any Guarantor which could have a Material Adverse Effect on such Guarantor, in each case, which have not been disclosed to Lender in writing.

    (v)    Borrower and the Guarantors shall have furnished Lender with a certification and, if requested by Lender, evidence satisfactory to Lender that: (A) no condemnation of any portion of the Project, or action which could result in a relocation of any roadways abutting any portion of the Project or the denial of access to any portion of the Project, which could materially affect Lender's security or the operation of the Project, has commenced or is contemplated by any Governmental Authority, and no casualty has occurred and remains unrestored which affects all or any material portion of the Project; and (B) no event has occurred and is continuing that would constitute an Event of Default under the provisions of Section 7.1(a)(vi) of the Credit Agreement.

    (vi)    The Architect, engineer and parties to all Major Construction Contracts and any Minor Construction Contracts required by Lender shall have duly executed and delivered to Lender a consent to the assignment of the Architect's Contract and engineer's contract, in form and substance reasonably satisfactory to Lender, and Lender shall have received the original or a fully executed counterpart thereof.

    (vii)    Lender shall have received an Officer's Certificate and other evidence satisfactory to Lender in its discretion (including invoices, cancelled checks, etc.) of capital contributions by the Principals and all other direct or indirect owners of Borrower in an aggregate amount which when added to the Initial Equity Contribution, equals not less than ten percent (10%) of the total capitalization of the Project, including all Construction Expenses (the "Equity Contribution"), it being agreed and understood that no funds loaned to or borrowed by any Borrower Party shall count towards the Equity Contribution.

(viii)    Lender shall have received an Officer's Certificate and other evidence satisfactory to Lender in its discretion of Borrower's acquisition of the Air Rights and 421-a Certificates (including the originals certificates or other documents evidencing the Air Rights and 421-a Certificates, if delivered to Borrower, or copies thereof, if such certificates or other documents have been filed with the New York City Department of Housing Preservation and Development).

(d)    In consultation with Borrower, Lender shall have determined, in its reasonable discretion, the Required Units, the Outside Conversion Date and the Minimum Sales Price and Applicable Release Price for each Unit.

## ARTICLE 5

### CONSTRUCTION REQUIREMENTS PRECEDENT TO BUILDING LOAN OPENING

Section 5.1    Required Documents.  Borrower has caused the following to be furnished to Lender on or before the date hereof:

(a) An affidavit executed by Borrower, as required by Section 22 of Lien Law, in the form attached hereto as Exhibit D.

(b) all contracts between Borrower and any contractors and material suppliers which are required to perform and complete the Construction and all purchase orders issued to such persons.

(c) A statement from Borrower setting forth a description of all contracts for work or materials let for the Construction setting forth the name or names of the contractor or contractors, the date of the contracts and of any supplements or amendments thereto, the scope of the work covered thereby, and the aggregate amounts payable or estimated to be payable to the contractors thereunder, and further stating whether said contract or contracts embrace all of the work required to be done and all of the materials necessary for completion of the Construction and, if not, setting forth sufficient information to enable Lender to determine the estimated cost of any work or materials not so covered.

(d) Initial sworn statements of the contractors and material suppliers of Borrower to whom payments have already been made, approved by Borrower, the Architect and the Consultant, covering all work done and to be done, together with waivers of lien covering all work and materials for which payments have been made by Borrower prior to the Building Loan Opening Date; provided, however, with respect to any Minor Construction Contract, Borrower may in lieu of such sworn statement deliver copies of invoices for work thereunder which has been paid for by Borrower together with the applicable waivers of lien referenced above.  The sworn statements referenced above shall be set forth as an AIA Form G702/CMA - G703/CMA, or in such other form as shall be satisfactory to Lender and the statements shall be notarized.

(e) All building permits and any special permits, approvals or licenses unconditionally issued by the City of New York which are required in connection with the

Construction of all of the Improvements in accordance with the Plans and Specifications, together with all permits, approvals and licenses required for the Construction to be performed by Borrower (including any and all environmental protection permits and land use permits) have been obtained by Borrower (except for those permits, approvals or licenses which cannot be issued due to the physical stage of the Construction or are not necessary for the particular stage of the Construction on the date hereof, in which event such permits, approvals or licenses shall be obtained by Borrower on a timely basis in accordance with all applicable building, land use and Environmental Laws and delivered to Lender promptly upon receipt of same).

(f)  The Assignment of Agreements, and with respect to the Assignment of Agreements (or any other assignments included in the Loan Documents), consents thereto from such contractors and material suppliers as Lender may require, the Architect, the engineer and all other parties under the contracts assigned as Lender may designate, other than parties to Minor Construction Contracts, together with agreements by such parties, for the benefit of Lender, to perform their respective contracts upon the occurrence of an Event of Default under this Agreement or any of the other Loan Documents.

(g)  The Construction Schedule.

(h)  A report satisfactory to Lender from the Consultant containing an analysis of the Construction Budget, the Construction Schedule, the General Contractor Agreement and all other contracts and subcontracts in connection with the Construction.

(i)  Architect's Contract, and engineer's or construction manager's contract shall have been duly executed and delivered by the parties thereto, shall be in full force and effect, and Lender shall have received a certified or a fully executed counterpart thereof.

(j)  Detailed final (a/k/a "construction") plans and specifications (in duplicate) for the Construction of the Improvements (the "Plans and Specifications") (consistent with the Approved Business Plan), satisfactory to Lender and the Consultant in all respects, including all changes to the date of submission thereof, together with a certificate of the Architect in the form attached hereto as Exhibit D;

(k)  an updated appraisal of the Project reflecting the Plans and Specifications, including a delineation of the Units;

(l)  Builder's risk insurance policy required under the Credit Agreement;

(m)The schedule of Applicable Release Prices and Minimum Sales Prices for each Unit satisfactory to Lender; and

(n)  Such other reports and certifications concerning the Construction as the Consultant shall reasonably require.

Following receipt of all of the items listed in (a) – (n) in form and substance satisfactory to Lender and an updated report satisfactory to Lender in its sole but reasonable discretion from the

Consultant containing an analysis of the final Construction Budget, the Construction Schedule and the General Contractor Agreement, the updated appraisal, the Minimum Sales Price and Minimum Release Price schedules, the Bonds and the Plans and Specifications, Lender shall promptly advise Borrower no later than the date hereof whether the Building Loan Opening Conditions have been satisfied and whether Lender will open the Building Loan or provide Borrower with a new building loan to the extent the Plans and Specification are not consistent with the Approved Business Plan.

Section 5.2    <u>Additional Documents Required</u>.  Borrower shall cause the following to be furnished to Lender on or before February 22, 2008:

(a)    A final Construction Budget acceptable to Lender; and

(b)    Bonds for all Major Construction Contracts (provided, however, that delivery of a Bond for the Major Construction Contract with Rovini Construction with respect to the superstructure or a Bond for the Major Construction Contract with Crowne Architectural Systems with respect to the curtain wall shall not be required to be delivered to Lender) in form acceptable to Lender.

Section 5.3    <u>Lender's Verification of Contracts</u>.  From time to time, Lender may forward to all contractors, material suppliers, architects, engineers and other parties involved in the Construction, a contract verification to ascertain the correctness of the amount of the contract for each such party.  In the event of a discrepancy between the amounts as shown by the executed copies of the contracts and the verification of contract forms, Borrower shall, at Lender's request, cause such discrepancies to be eliminated to Lender's satisfaction.

## ARTICLE 6

## BUILDING LOAN BUDGET AND CONTINGENCY

Section 6.1    <u>Building Loan Budget</u>.  Borrower has submitted to Lender a copy of the Building Loan Budget specifying items constituting a Cost of Improvement to be incurred by Borrower in connection with the presently contemplated Construction.  All changes to the Building Loan Budget (except to the extent otherwise provided in this Article 6 or in Article 7) shall in all respects be subject to the written approval of Lender, which approval shall not be unreasonably withheld or delayed (except as otherwise provided in this Article 6 or in Article 7). Borrower represents and warrants that (i) each Budget Line Item included in the Building Loan Budget is included within the definition of Cost of Improvement, and (ii) a true statement, verified by Borrower, in full compliance with Section 22 of the Lien Law is attached hereto as <u>Exhibit E</u> and the original thereof shall be filed with this Agreement.

Section 6.2    <u>Budget Line Items</u>.  Borrower agrees that each Advance made under the Building Loan Note shall be used only for the Budget Line Item(s) for which such Advance was made.  Following the occurrence of an Event of Default beyond any applicable notice and cure periods, upon advising Borrower, Lender may, at any time and from time to time, disburse proceeds of the Loan for Budget Line Items or for any other purposes as Lender may determine in accordance with Legal Requirements, either by direct payment of such items or by

11

reimbursement to Borrower for payments actually made by Borrower for such items. Lender shall not be obligated to make an Advance for any category of costs set forth as a Budget Line Item if that Advance, together with all Advances previously made for such category of costs, would exceed the amount set forth for such category in such Budget Line Item, as the same may be adjusted as provided herein in accordance with Section 6.3 hereof.

Section 6.3    Reallocation of Contingency.

(a) The Building Loan Budget contains a Budget Line Item for the Building Loan Contingency and the Project Loan Budget contains a Budget Line Item for the Project Loan Contingency, both of which represent amounts necessary to provide assurances to Borrower and Lender that additional funds are available to be used as provided herein and in the Project Loan Agreement if additional costs and expenses are incurred or additional interest accrues on the Loan or unanticipated events or problems arise in connection with any construction or the sale, leasing and development of the Project.

(b) Borrower shall have the right, at any time and from time to time (but not more often than once per calendar month, and then only in connection with a Request for Advance), with the prior consent of Lender, which consent may be granted or withheld in Lender's discretion (it being agreed that Lender shall take into account, among other things, the stage of Construction), to reallocate all or portions of the Building Loan Contingency to one or more specific Budget Line Items in the Building Loan Budget, including amounts which may be necessary to cause a Budget Line Item in the Building Loan Budget to be In Balance (as hereinafter defined), or to a new Budget Line Item on the Building Loan Budget to fund other third-party costs and expenses incurred or to be incurred in connection with the Construction and the development of the Project which would constitute a Cost of Improvement and for which there is no existing Budget Line Item in the Building Loan Budget. Under no circumstances shall Borrower have the right to reallocate any portion of the Building Loan Contingency to the Project Loan. If Lender shall not consent to Borrower's proposed reallocation of a portion of the Building Loan Contingency and if Borrower is therefore unable to cause a Budget Line Item in the Building Loan Budget to be In Balance, and Borrower is unable to reallocate a portion of the Project Loan Contingency thereto pursuant to Section 6.3(c), or Borrower elects not to do so, and if Borrower is unable to demonstrate Cost Savings in other Budget Line Items, provided that the reallocation of Cost Savings attributable to Budget Line Items shall be permitted at Lender's discretion, then Borrower acknowledges that it shall be required to make a Deficiency Deposit, to the extent required in Article 7, even though funds remain in the Building Loan Contingency. In connection with any reallocation of the Building Loan Contingency, Borrower shall execute such documents as Lender may reasonably require, including an amendment to this Agreement and a revised Section 22 Lien Law Affidavit.

(c) Borrower may, with the prior consent of Lender, which may be granted or withheld in Lender's discretion, reallocate amounts from the Project Loan Contingency or any other Project Loan Budget Line Items to the Building Loan. In order for any such reallocation to be effective, Borrower shall execute and exchange with Lender a splitter of the Project Loan Note and Project Loan Mortgage, in form and substance satisfactory to Lender, and such amendments to such other Loan Documents as Lender shall reasonably require and Borrower shall execute and deliver to Lender such additional documents as Lender or the Title Insurance

12

Company shall reasonably require in connection therewith, including but not limited to an amendment to this Agreement and a revised Section 22 Lien Law Affidavit. Borrower, in such circumstances, shall also provide such endorsements to existing title insurance policies or such new title insurance policies as Lender shall reasonably require and Borrower shall pay all premiums, fees and charges in connection therewith or in connection with the recording or filing of any documents executed in connection with such reallocation which are to be recorded or filed.

(d) In addition to the permitted reallocations of the Building Loan Contingency described above, after the occurrence of an Event of Default and while such Event of Default is continuing (or as otherwise provided in Section 8.3 if monies in the Budget Line Item for interest have been depleted or in connection with the provisions of Section 13.7 hereof), Borrower agrees that Lender may, at any time and from time to time without notice, advance the Building Loan Contingency for any purpose as Lender may determine (or to the Budget Line Item for interest, as applicable). Any advance of the Building Loan Contingency made by Lender under this Section 6.3(d) at a time when no Event of Default exists shall be made only to the Budget Line Item for interest, and shall not be made for any other purpose.

(e) No interest shall accrue upon the Building Loan Contingency until disbursement (but not reallocation) thereof, whereupon such disbursement(s) shall be deemed to be an Advance.

Section 6.4    Reallocation Between Budget Line Items. If Borrower shall demonstrate to Lender's satisfaction any Cost Savings in a Budget Line Item in the Building Loan Budget, then Lender shall reallocate any such Cost Savings to another Budget Line Item in the Building Loan Budget as may reasonably be requested by Borrower; provided, however, that no reallocation shall be permitted from the Budget Line Item for interest under the Building Loan and, except as provided in Section 6.3(b), no reallocation shall be permitted from the Building Loan Contingency. If any amounts attributable to Cost Savings are reallocated to the Building Loan Contingency from Budget Line Items, such amounts may thereafter be reallocated to other Budget Line Items with Lender's prior consent in accordance with Section 6.3(b). In connection with any reallocation of the Building Loan Contingency, Borrower shall execute such documents as Lender may reasonably require, including an amendment to this Agreement and a revised Section 22 Lien Law Affidavit.

## ARTICLE 7

## LOAN BALANCING

Section 7.1    Loan to Be In Balance.

(a) Anything contained in this Agreement to the contrary notwithstanding, it is expressly understood and agreed that each Budget Line Item in the Building Loan Budget (other than the Building Loan Contingency) shall at all times be In Balance (as hereinafter defined). Each Budget Line Item in the Building Loan Budget shall be deemed to be in balance ("In Balance") only at such time and from time to time as Lender may determine, in its sole judgment, that the amount remaining unfunded in such Budget Line Item (without taking into

13

account any monies in the Building Loan Contingency, except as applied in accordance with Section 6.3) equals or exceeds (i) with respect to a Building Budget Line Item, the amount necessary to pay for all work covered by such Budget Line Item which is done and not theretofore paid for or to be done in connection with the completion of such work in accordance with the Plans and Specifications (based on Lender's Estimate of the Cost of Construction for such Budget Line Item), and (ii) with respect to any other Budget Line Item in the Building Loan Budget, all costs covered by such Budget Line Item for which Building Loan proceeds are to be disbursed which have been incurred and not theretofore paid for, or which are likely to be incurred in connection with such Budget Line Item.

(b) If Lender shall determine that any Budget Line Item in the Building Loan Budget is not In Balance, Lender shall provide Borrower with such information regarding such determination as Borrower shall reasonably request.

Section 7.2    Lender's Estimate of Cost of Construction. Lender and Borrower agree that Lender has made (and from time to time after the date hereof Lender shall have the right to, and upon request of Borrower, shall, in good faith revise) an estimate of the cost of Construction applicable to each Building Budget Line Item in the Building Loan Budget ("Lender's Estimate of the Cost of Construction"). Lender's Estimate of the Cost of Construction with respect to the Building Budget Line Items in the Building Loan Budget on the Building Loan Opening Date has been made upon the basis of the General Contractor Agreement, executed contracts and purchase orders and, in those instances where contracts or purchase orders have not yet been let, upon the basis of either written bids with responsible contractors, tradesmen and material suppliers satisfactory to Lender or Lender's sole estimate of such costs, after consultation with the Consultant. After the date hereof, Lender's Estimate of the Cost of Construction with respect to the Building Budget Line Items in the Building Loan Budget shall take into account, in addition to the General Contractor Agreement, contracts and purchase orders, other considerations which Lender, in its sole but good faith discretion, deems likely to have an impact upon the cost of Construction (including current costs for and the availability of materials and supplies), the ability of the General Contractor to perform under the General Contractor Agreement and the ability of other parties to perform under and in accordance with the terms of their respective contracts and purchase orders. If there is an "identity of interest" between Borrower and any of Borrower's contractors or material suppliers, any contract between parties having such "identity of interest" shall be regarded solely as an estimate for the purpose of this Section 7.2. There shall be deemed to be an "identity of interest" if Borrower or any Affiliate of Borrower shall act as a contractor or material supplier in its own name or through a separate entity in which it or any entity related to it has a substantial interest and/or control.

Section 7.3    Loan Not In Balance.

(a) Borrower agrees that if for any reason any Budget Line Item in the Building Loan Budget at any time is not In Balance as determined in accordance with Section 7.1(a), regardless of how such condition may have been brought about (including without limitation, pursuant to the provisions of Section 13.7 hereof), Borrower shall, within ten (10) Business Days after written request by Lender (i) deposit with Lender an amount sufficient to cause (after taking into account any other action taken under this Section 7.3(a)) such Budget Line Item to be In Balance (a "Deficiency Deposit"), to be held in accordance with the applicable terms of this

Agreement, which Deficiency Deposit shall be advanced in the same manner as the Loan, (ii) request a reallocation from the Building Loan Contingency to such Budget Line Item to bring the same into balance, to the extent such reallocation is permitted under Section 6.3(b), (iii) request a reallocation from the Project Loan Contingency or other Project Loan Budget Line item to such Building Loan Budget Line Item to bring the same into balance, to the extent such reallocation is permitted under Section 6.3(c) and under the Project Loan Agreement, or (iv) request a reallocation from another Building Loan Budget Line Item which is in surplus or in balance to such Building Loan Budget Line Item to bring the same into balance, to the extent such reallocation is permitted under Section 6.4.

(b) Lender shall not be obligated to make any Advance if, after making any of the reallocations permitted under Article 6, any individual Budget Line Item is not In Balance.

## ARTICLE 8

## GENERAL PROVISIONS REGARDING ADVANCES

Section 8.1    General Conditions to Advances. No Advances of Building Loan proceeds shall be made by Lender until such time as each of the Building Loan Opening Conditions has been received and approved by Lender. Thereafter, subject to the provisions of Section 8.6 hereof, upon Borrower's compliance with and satisfaction of all conditions precedent to Advances set forth in this Article 8 and in Article 9 unless otherwise waived by Lender in its sole discretion, and subject to the restrictions on Advances set forth in this Article 8, Borrower shall be entitled to receive further Advances of the proceeds of the Building Loan, provided that:

(a) Borrower delivers to Lender a Request for Advance and all supporting certificates and other documentation required under this Agreement or otherwise reasonably requested by Lender.

(b) At the time of each Request for Advance, Borrower shall have delivered to Lender a certification that, to Borrower's knowledge, no Default or Event of Default exists under this Agreement or any other Loan Document.

(c) Lender shall not, as of the date of such Request for Advance, have given Borrower notice of the existence of a Default or Event of Default which, in Lender's sole judgment, is material and has not been cured to Lender's satisfaction.

(d) Borrower shall have furnished or caused to be furnished to Lender a Datedown Endorsement to the Building Loan Title Policy dated the date of such requested Advance and showing the Building Loan Mortgage as a prior and paramount lien on the Project, subject only to (i) the Permitted Exceptions and (ii) any other liens or encumbrances consented to in writing by Lender.

(e) each Budget Line Item shall be In Balance as required by Section 7.1.

(f) Borrower shall have delivered a certification in form and substance satisfactory to Lender remaking and reaffirming, as of the then current requisition date, all of the representations and warranties of Borrower set forth in this Agreement, the Credit Agreement or

any other Loan Document, and to the extent such representations or warranties are untrue or must be modified, disclosing to Lender the reasons the same are untrue, or the necessary modifications, provided that Borrower's right to obtain an Advance shall not be affected by any matter so disclosed unless such matter has caused Lender to deliver a notice of the type described in Section 8.1(c) (which notice may be given after the delivery of such certification) or an Event of Default shall exist with respect to such matter.

(g) At the time of each Request for Advance, Borrower shall have delivered to Lender evidence satisfactory to Lender in its discretion that all governmental approvals from the applicable Governmental Authority(ies) then required, if any, relating to such requisition have been obtained, together with copies of such governmental approvals.

(h) Advances for payment of costs of Construction of the Improvements shall not exceed the aggregate of (a) the costs of labor, materials, and services incorporated into the Improvements in accordance with the Construction Budget, plus (b) if approved by Lender, the purchase price of all uninstalled materials to be utilized in the construction of the Improvements stored on the Project, or elsewhere with the written consent of, and in a manner acceptable to, Lender, less (c) retainage, if any, as set forth in Section 9.4, and less (d) all prior Advances for payment of costs of labor, materials, and services for the construction of the Improvements.

(i)    That certain Mezzanine Construction Loan Agreement dated as of December 29, 2006 by and between Lender and 250 East Mezzanine LLC, as amended by that certain First Amendment dated as of February __, 2008 has been fully funded to Borrower in accordance with the terms thereof.

Section 8.2    Timing of Advances.

(a) Upon satisfaction of all conditions to the making of an Advance described or referenced in this Agreement, Lender will, within ten (10) Business Days of Borrower's requisition therefor, advance to Borrower (or such other party as may be permitted hereunder) the amount of the Advance requisitioned (or if the conditions contained herein or therein to the making of an Advance have not been satisfied for the entire amount of an Advance, the portion thereof which may be advanced in accordance with the terms hereof) less the applicable retainage required under Section 9.4 hereof.

(b) Notwithstanding anything to the contrary herein, (i) Lender shall have no obligation to make any Advances after the Maturity Date and (ii) Lender shall have no obligation to make more than one (1) Advance in each calendar month, other than Advances for interest and other amounts owing to Lender under this Agreement, real estate taxes, and Insurance Premiums which may be advanced separately from other Advances when such amounts are due.

Section 8.3    Optional Method for Payment of Interest.  Included as a Budget Line Item in the Building Loan Budget is a line item for interest on the Building Loan (the "Building Loan Interest Reserve").  Provided no Default or Event of Default exists beyond any applicable notice and cure periods, and subject to the provisions of this Section 8.3, disbursements (each, an "Automatic Building Loan Interest Reserve Payment") shall be made on behalf of the Borrower to Lender on each Payment Date in accordance with the terms of the Credit Agreement and shall

be made by a bookkeeping entry on Lender's records reflecting, as a disbursement under the Building Loan, the applicable amount funded from the Building Loan Interest Reserve. Any disbursements from the Building Loan Interest Reserve shall be deemed to have been paid to and received by Borrower and shall be added to the outstanding principal balance of the Building Loan and shall bear interest at the Applicable Interest Rate (as defined in the Building Loan Note). Interest at the Applicable Interest Rate will be charged on any disbursed portion of the Building Loan Interest Reserve as and when advanced, but interest will not be charged on the undisbursed portion of the Building Loan Interest Reserve. Borrower recognizes that the payment of interest by Automatic Building Loan Interest Reserve Payments is for its convenience and benefit. Lender shall have no obligation to fund any Automatic Building Loan Interest Reserve Payments so long as any Event of Default shall exist and be continuing under the Loan. If at any time or from time to time throughout the Loan Lender determines, in the exercise of its sole discretion, that there shall exist an insufficient amount in the Building Loan Interest Reserve for the Building Loan to fully fund any Automatic Building Loan Interest Reserve Payment that shall thereafter become due through the Maturity Date, and there are no Cost Savings in other Budget Line Items to be allocated to the Building Loan Interest Reserve, Borrower shall, within seven (7) Business Days after receipt of Lender's written notice to such effect, deposit with Lender such amount as shall be required by Lender to fully fund any such Automatic Building Loan Interest Reserve Payments and Lender shall credit such amounts to the Building Loan Interest Reserve line item in the Building Loan Budget. Lender shall not be required to pay and Borrower shall not be entitled to receive interest on such amounts so deposited. Borrower's failure to make any such deposits in a timely manner shall be an Event of Default under the Loan. If at any time the Building Loan Interest Reserve shall become depleted, interest shall be payable on the relevant Payment Date in accordance with the terms of this Agreement and the Credit Agreement from funds other than the Building Loan or the Building Loan Interest Reserve. The Building Loan Interest Reserve shall be available only for the disbursement of the periodic payments of interest due to Lender on the Building Loan. Borrower shall have the right on any Payment Date to pay the interest owing on the Building Loan from funds other than the Loan. Any funds disbursed from the Building Loan Interest Reserve in the manner provided in this Section 8.3, shall have been deemed paid to and received by Borrower.

Section 8.4    No Reborrowing. If Borrower makes any voluntary or involuntary prepayment of the Loan at any time or from time to time, such prepaid amounts may not be reborrowed.

Section 8.5    Advances into an Escrow. If any monies are deposited by Lender into an escrow, the proceeds of the Loan so deposited shall be considered advanced to Borrower from the date of deposit into such escrow, and interest shall accrue on those proceeds from that date.

## ARTICLE 9

## CONSTRUCTION REQUIREMENTS WITH RESPECT TO ADVANCES

Section 9.1    Applicability. The provisions of this Article 9 shall apply to all Advances of Building Loan proceeds to the extent utilized to pay for any Construction.

Section 9.2   Documents to be Furnished. As a condition precedent to each Advance of Building Loan proceeds to the extent utilized to pay for any Construction, Borrower shall furnish or cause to be furnished to Lender the following documents covering such Advance, in form and substance reasonably satisfactory to Lender:

(a) a General Contractor's application for payment and draw request certification set forth as AIA Form G702/CMA - G703/CMA together with accurate and complete continuance sheets (AIA Document G703), or in such other similar form as shall be satisfactory to Lender.

(b) contractors' waivers of liens (covering all work performed by each contractor up to and including the work which was the subject of the last payment to such contractor), and all other statements and forms required by the Title Insurance Company in order for it to issue the Building Loan Title Policy and any endorsements, certifications and affirmative coverages required under this Agreement, including a Datedown Endorsement covering the requested Advance, and all other statements and forms required for compliance with the Lien Law, together with such invoices, contracts and other supporting data as Lender may reasonably require;

(c) a Request for Advance executed by Borrower with respect to such Advance and including a certification properly executed by Borrower with respect to each item in any Request for Advance that constitutes "Hard Costs" and each of the supporting documents listed as items (i) – (vi) of the definition of Request for Advance as may be required by Lender;

(d) copies of any executed change orders in excess of $50,000 made prior to the date of Borrower's requisition which have not been previously furnished to Lender or the Consultant;

(e) copies of all construction contracts (including any subcontracts and purchase orders) executed by Borrower (or the General Contractor) with respect to the Construction which have been executed since the later of (i) the Building Loan Opening Date and (ii) the last Request for Advance, but prior to the date of the applicable Request for Advance, and which have not previously been delivered to Lender or the Consultant, together with any Bonds required by Lender with respect thereto;

(f) such other documentation as may be required by the Title Insurance Company if it is administering the Advances and which may be necessary to enable the Title Insurance Company to issue a Datedown Endorsement covering the requested Advance;

(g) if any material dispute exists between or among Borrower, the General Contractor, or, to Borrower's knowledge, any other contractor, subcontractor and/or material supplier, a reasonably detailed written summary of such dispute;

(h) evidence of such builder's risk or other insurance as is required under this Agreement or the Credit Agreement and not previously delivered to Lender;

(i) such other instruments, documents and information pertaining to the Advance as Lender may reasonably require;

18

(j) Borrower shall also furnish to Lender, from time to time, supplementary statements advising Lender of any material changes in the information covered by the statement from Borrower previously furnished pursuant to Section 5.1(c). If no such supplementary statement is furnished in connection with any Advance, Lender shall have the right to require Borrower to certify in writing that to Borrower's knowledge no material changes have occurred since the most recent statement previously furnished;

(k) if required by Lender in its sole and absolute discretion, a legal opinion in form and substance satisfactory to Lender with respect to the Air Rights and 421-a Certificates; and

(l) Borrower shall make available to Lender for inspection and copying at any time during normal business hours, upon advance notice, all lien waivers, sworn statements, invoices, certifications and other documentation supporting Borrower's request for Advances hereunder, relating to any Construction and not otherwise required to be delivered to Lender under this Section 9.2.

If Borrower has failed to satisfy all of the conditions to the making of an Advance under this Agreement, but has satisfied the same with respect to a portion of the monies so requisitioned (e.g., Borrower has failed to deliver a lien waiver with respect to one contractor, but has delivered the same with respect to all other contracts covered by Borrower's Request for Advance), then Lender shall nonetheless advance to Borrower, in accordance with the remaining terms of this Agreement, all amounts requisitioned under Borrower's Request for Advance with respect to which all of the conditions to an Advance under this Agreement have been fully satisfied. With respect to any portion of an Advance for which Borrower has failed to satisfy all of the conditions to the making of an Advance under this Agreement, Borrower may, subject to Section 8.2(b), submit a new Request for Advance for funding of such amounts when the conditions to the making of such an Advance can be satisfied.

Section 9.3    Lender's Right to Employ the Consultant. Lender shall have the right to employ the Consultant to review the Plans and Specifications, the Requests for Advance, and all other matters related to any Construction, and to inspect, during business hours, all Construction and the progress of the same. All fees and expenses of the Consultant shall be borne by Borrower as a Building Loan expense to the extent the same constitute a Cost of Improvement and a Project Loan expense to the extent the same does not constitute a Cost of Improvement, all as provided in Section 12.9 of the Credit Agreement. Lender confirms that under its agreement with the Consultant, the Consultant is required to deliver to Lender in connection with each Advance a certification regarding the performance of the Construction containing similar information as to the Construction as is contained in certain of the certifications of the Architect and General Contractor delivered in connection with the performance of such Construction (e.g., percentage of work complete under any contractor's contract, compliance with Plans and Specifications, etc.). If the Consultant's certificate delivered to Lender sets forth that any certification made by the Architect or the General Contractor with respect to a requested Advance is incorrect in the opinion of the Consultant and sets forth its reasons therefor, then a copy of the Consultant's certificate shall be delivered to Borrower and Borrower shall be bound by the determination of the Consultant, and shall only be entitled to receive funding of such Advance (or any portion thereof) to the extent Borrower would have been entitled to receive the

19

same if the Architect or General Contractor had set forth in their certification the state of facts set forth by the Consultant in its certificate with respect to such disputed matter.

Section 9.4    Retainages. Advances of the available Building Loan proceeds for the Hard Costs (excluding materials and general conditions) of any Construction performed by Borrower shall be limited as to each contract or subcontract to an amount equal to the percentage thereof required by the terms of the contract documents relating thereto, but at no time to exceed ninety percent (90%) of the portion of the total contract price for the Construction represented by work then in place with respect to such contract or subcontract (or materials stored on or off site as permitted under Section 9.8), as certified by the Architect (and subject to a contrary determination of the Consultant of the work then in place being determinative, as provided in Section 9.3); provided, however, after Substantial Completion, as certified by the Architect (but subject to a contrary determination of the Consultant as to whether the same has occurred being determinative, as provided in Section 9.3 above), the retainage from each subsequent Advance shall be reduced to 5%. The retainage under any such contract or subcontract shall be advanced upon (i) completion of all of the work to be performed under such contract or subcontract in accordance with the Plans and Specifications as certified by the Architect (but subject to a contrary determination of the Consultant as to whether the same has occurred being determinative, as provided in Section 9.3 above), and (ii) delivery of a final waiver of lien and sworn statement from the contractor, subcontractor or material supplier; provided, however, with respect to any Minor Construction Contract, Borrower may in lieu of such sworn statement deliver copies of invoices covering such final payment. The sworn statements referenced above shall be set forth as an AIA Form G702/CMA - G703/CMA or in such other form as shall be satisfactory to Lender.

Section 9.5    Payments Directly to Contractors and Subcontractors. Following and during the continuance of an Event of Default by Borrower, Lender may, in its sole discretion, make payments for the cost of any Construction which Borrower has requisitioned to have Lender so pay, directly to any contractor, subcontractor, material supplier or any vendor of fixtures, equipment, furniture, furnishings or other property. Any such direct payments shall be for the account of Borrower. Nothing in this Section 9.5 shall prohibit Lender from making such payments.

Section 9.6    Distinction Between Various Retainages. It is the intention hereof that any retainage resulting from payment of only a percentage of the value of the work as provided in Section 9.4 be entirely separate and distinct from the Contingency.

Section 9.7    No Advances for Off Site Materials. In no event shall Lender be obligated to make any Advance to pay for any materials, equipment or furnishings unless and until such materials are delivered to the Project or incorporated into the Project. Notwithstanding the foregoing, any advances for materials, equipment or furnishings which are owned by Borrower and are not incorporated into the Project as of the date of the request for the Advance, but are to be temporarily stored at the Project or off-site, must be accompanied by (i) proof that the stored materials are included within the coverages of the insurance policies carried by Borrower or proof of other insurance therefor which has been approved by Lender, (ii) evidence satisfactory to Lender that the ownership of such materials is vested in Borrower free of any liens and claims of third parties and (iii) evidence reasonably satisfactory to Lender that such materials are

20

adequately protected against theft or damage. In addition to the foregoing requirements, advances for off site materials, equipment or furnishings will be made in Lender's sole discretion, and only for such materials which are either (a) (i) stored in a bonded warehouse, (ii) separately identified as belonging to the Project, (iii) segregated from other items in the warehouse, and (iv) covered by Borrower's insurance policies or (b) represent deposits or progress payments on contracts provided (i) such contracts are assigned to Lender and (ii) the materials subject to such contracts may not be reasonably procured except pursuant to contracts requiring deposits or progress payments. Lender may require a separate security agreement and Uniform Commercial Code financing statement to cover any such materials, equipment or furnishings stored at the Project (or stored off-site), together with such other information and assurances as Lender may reasonably require.

## ARTICLE 10

### REQUIREMENTS FOR FINAL ADVANCE

Section 10.1   Conditions to Final Advance. Lender will make a Final Advance with respect to any Construction (i.e., the Final Advance for the Construction detailed in the Plans and Specifications) when the following conditions have been complied with:

(a) Evidence that Substantial Completion has been achieved free of mechanic's liens (unless bonded) and security interests (other than the Loan);

(b) Borrower shall have furnished to Lender copies of all final waivers of lien and sworn statements from contractors and material suppliers of Borrower (or its General Contractor) with respect to such Construction; provided, however, with respect to any Minor Construction Contract, Borrower may in lieu of such sworn statement deliver copies of invoices covering such final payment. The sworn statements referenced above shall be in such form as shall be reasonably satisfactory to Lender;

(c) Lender shall have received an opinion or a certificate from the Architect (but subject to a contrary determination of the Consultant as to the matters set forth therein being determinative, as provided in Section 9.3) stating that, based on periodic inspections, (i) such Construction has been completed substantially in accordance with the Plans and Specifications therefor previously approved by Lender and (ii) such Construction, as so completed, is in compliance with all Legal Requirements;

(d) Borrower shall have furnished to Lender copies of all licenses and permits required by any Governmental Authority for the occupancy of the Units;

(e) all other requirements for the making of an Advance for Construction set forth in this Agreement shall have been satisfied and complied with; and

(f) Borrower shall deliver to Lender an "as-built" survey of the Project made by a New York registered or certified land surveyor satisfactory to Lender dated within 30 days of Substantial Completion of the Project. The Survey shall be prepared in accordance with the Minimum Standards. The Survey shall bear a certificate by the Surveyor in the form attached hereto as Exhibit B, which certificate shall include the legal description of the Land and shall be

made in favor of Borrower, Guarantors, Lender and the Title Insurance Company.  In addition, the certificate shall certify that the foundations of all buildings on the Land comply with all applicable setback requirements and do not violate any easements or restrictions applicable to the Project. The Survey shall contain all additional items set forth in Table A to the Minimum Standards, except as otherwise approved by Lender, and shall meet the accuracy requirements for a Class "A" survey.  The Survey shall also show (A) the square footage of the Land; (B) all buildings, improvements, foundations and other structures on the Land, all of which must be within the lot lines and in compliance with all restrictions of record or ordinances relating to the location thereof, (C) that there are no encroachments by improvements located on adjoining property onto the Land or by buildings, improvements, foundations or other structures on the Land onto adjoining property except as noted on the Survey; (D) direct access between the Project and public streets or highways; (E) the flood area designation of the Land shown on the official maps of the Secretary of Housing and Urban Development; (F) whether any portion of the Land lies within a federally or New York State designated wetlands protection area as determined by the maps of the Army Corps of Engineers or the Department of Environmental Conservation, as applicable; and (G) such additional information as may be required by Lender or the Title Insurance Company.

Section 10.2   Outside Date for Final Advance.  Notwithstanding any provision of this Agreement or any of the other Loan Documents to the contrary, Lender's obligation to make any Advance shall cease and terminate thirty (30) days prior to the Maturity Date (the "Outside Date"), after which date there will be no further Advances available to Borrower under the Loan.

## ARTICLE 11

## BORROWER'S AGREEMENTS

Section 11.1   Specific Covenants of Borrower.  Borrower further covenants to and agrees with Lender as follows:

(a)   Construction.  All Construction performed by Borrower will (i) be substantially completed in accordance with the Construction Schedule (subject to the occurrence of an Excusable Delay), (ii) continue with diligence and continuity and (iii) be completed in a good and workmanlike manner with new materials of high quality, free of liens and material defects, in each case, so that Substantial Completion occurs by the Required Completion Date.

(b) All Construction performed by Borrower will be completed substantially in accordance with all applicable Plans and Specifications (or any changes thereto that may be approved in writing by Lender or where Lender's approval is not required as provided in Section 11.1(b)) and in accordance with all requirements of each Governmental Authority, including all requirements and conditions set forth in all permits, licenses and other governmental approvals which have been obtained or are required to be obtained for any Construction and/or the operation of the Project.  Borrower will use the Building Loan proceeds in accordance with the Building Loan Budget to, among other things, perform and complete Construction.

(c) Plans and Specifications.  All Plans and Specifications shall be subject to the prior written approval of Lender and no changes will be made in any Plans and Specifications

22

without the prior written approval of Lender; provided, however, that Borrower may make changes to Plans and Specifications without the approval of Lender if (i) Borrower notifies Lender in writing of such change within five (5) Business Days thereafter; (ii) Borrower obtains the approval of all parties whose approval is required for such change, including any sureties and Governmental Authorities; (iii) the structural integrity of the Improvements is not adversely affected; (iv) no change in the architectural appearance of the Building is effected; (v) the performance of the mechanical, electrical, plumbing, sanitary and life safety systems of the Improvements are not adversely affected; (vi) no change in the number of Units, (vii) the change would not affect the value of the Units or decrease the sales price of any Unit below the Minimum Sales Price for such Unit; and (viii) the change in cost resulting from any one such change does not exceed $20,000 and the aggregate change in cost resulting from all such changes which are not approved by Lender does not exceed $100,000. Lender shall use reasonable efforts to respond to any request for approval of changes to the Plans and Specifications within five (5) Business Days after submission of such request to Lender and Consultant, but failure to so respond shall not constitute deemed approval of any changes to the Plans and Specifications or a default by Lender under this Agreement.

(d) <u>General Contractor Agreement, Extras and Contract Changes</u>. The General Contractor Agreement has been approved by Lender and no changes therein or in any contract entered into by Borrower (or the General Contractor, as its agent) with a contractor, subcontractor or material supplier, other than a Minor Construction Contract (unless such change would cause such contract to no longer be a Minor Construction Contract), shall be made and no extra will be allowed to any of the foregoing without the prior written consent of Lender, unless the cost of such change or extra is less than $20,000 and the aggregate cost of all such changes and extras which have not been approved by Lender does not exceed $100,000; provided that Borrower in all cases shall give Lender a summary of the status of any negotiations relating to extras and contract changes, as required under Section 9.2 and shall notify Lender and Lender's Consultant within ten (10) days if an extra or other contract change has been granted to the General Contractor, or by Borrower (or the General Contractor) to any contractor, subcontractor or material supplier, regardless of whether Lender's consent is required hereunder. Lender agrees to take reasonable steps to respond to any request to approve any contract changes or extras within five (5) Business Days after submission of such request to Lender and Consultant, but failure to so respond shall not constitute deemed approval of any such changes or extras or a default by Lender under this Agreement. Regardless of whether Lender's consent to any contract change is required hereunder, Borrower shall submit to Lender an itemization of construction change orders and requests to reallocate Budget Line Item(s) in the form annexed hereto as <u>Exhibit F</u>.

(e) <u>Sign and Publicity</u>. Upon commencement of any Construction, and if Lender so requests, Borrower shall erect a sign at the Project in a conspicuous location indicating that financing has been provided by Lender. Additionally, if Lender specifically requests, Borrower shall include in any public announcement or media release concerning development of the Project, a statement that Lender has provided financing for the Project.

(f) <u>Proceedings to Enjoin or Prevent Construction</u>. If any proceedings are filed seeking to enjoin or otherwise prevent or declare unlawful any Construction, Borrower shall give immediate notice thereof to Lender and, at Borrower's sole expense (i) cause such proceeding to

23

be contested in good faith and (ii) in the event of an adverse ruling or decision, prosecute all allowable appeals therefrom. Without limiting the generality of the foregoing, Borrower shall resist the entry or seek the stay of any temporary or permanent injunction that may be entered and use its best efforts to bring about a favorable and speedy disposition of all such proceedings, as well as any other proceedings of a similar nature.

(g) Trust Fund. Borrower shall receive all Advances and hold the right to receive all such Advances, as a trust·fund in accordance with the provisions of the Lien Law to be applied first for the purpose of paying the Cost of Improvement, and will apply all such Advances first to the payment of the Cost of Improvement before using any part of such Advances for any other purpose. A true statement under oath by Borrower, as required pursuant to Section 22 of the Lien Law, is attached hereto as Exhibit D (as such statement may hereafter be modified, amended or changed in accordance with the terms of this Agreement, the "Section 22 Lien Law Affidavit"). Borrower shall indemnify Lender and hold Lender harmless from and against any and all claims, damages, judgments, liabilities, costs and expenses of every kind (including, without limitation, attorneys' fees and disbursements and court costs) that Lender may suffer by reason of the foregoing statement being untrue or deficient in any respect.

(h) Mechanic's Liens and Contest Thereof. Borrower will not suffer or permit any mechanic's lien to be filed or otherwise asserted against the Project, and will discharge the same, or cause the same to be discharged, by payment, bonding or otherwise by the earlier of sixty (60) days after receiving notice of the filing of such lien or the next funding date. Notwithstanding the foregoing, if a lien arises out of the acts or omissions of tenants or subtenants at the Project, Borrower shall promptly notify Lender in writing of each such lien and Borrower shall use reasonable efforts to cause the tenants or subtenants to remove the same; provided, however, that Borrower shall not be required to send any notice of default, declare an event of default or otherwise take any enforcement action against such tenant or subtenant unless requested to do so by Lender in accordance with the following sentence. If at any time during the term of the Loan there are outstanding against the Project or any portion thereof mechanic's liens arising from acts of tenants or subtenants which singly or in the aggregate equal or exceed $50,000, Borrower shall, immediately upon the request of Lender, send notices of default and take such enforcement actions as are necessary under the circumstances to cause the discharge (by payment, bonding or otherwise) of such liens, provided that the tenants or subtenants, as the case may be, shall have the grace and/or cure periods set forth in their respective Leases to accomplish such discharge (by payment, bonding or otherwise). If at any time during the term of the Loan, there are outstanding against the Project or any portion thereof, mechanic's liens arising from acts of tenants or subtenants, as the case may be, which remain outstanding for sixty (60) days or more, Borrower shall notify Lender and, at Lender's direction, discharge the same, or cause the same to be discharged, by payment, bonding or otherwise, or Lender may advise Borrower in writing that it may have additional time within which to discharge such liens. The granting of an extension of time pursuant to this Section 11.1(g) and the number of days for such extension shall each be in Lender's sole discretion. Notwithstanding the foregoing, Borrower acknowledges that Lender shall not be required to make any Advances so long as any mechanic's liens are outstanding against the Project; provided, however, that Lender will make Advances notwithstanding the existence of mechanic's liens so long as the Title Insurance Company provides Lender with an endorsement to Lender's title policies insuring Lender against collection

of any such mechanic's liens out of the Project, which endorsement must be acceptable to Lender in form and content in its sole discretion.

(i) <u>Settlement of Mechanic's Lien Claims</u>. If Borrower shall fail to discharge, or cause to be discharged, any mechanic's lien filed or otherwise asserted against the Project within the applicable time period specified in Section 11.1(g) hereof, Lender may, at its election (but shall not be obligated to) but not earlier than twenty (20) Business Days after it gives written notice to Borrower of its intention to do so, (i) procure the release and discharge of any such lien and any judgment or decree thereon, without inquiring into or investigating the amount, validity or enforceability of such lien, and (ii) effect any settlement or compromise of the same, and any amounts expended by Lender in connection therewith, including premiums paid or security furnished in connection with the issuance of any surety company bonds, shall be deemed to constitute protective advances evidenced by the Notes (even if the principal balance of the Notes plus the amount of such protective advances would then exceed the aggregate face amount of the Notes), payable on demand and secured by the Security Instruments and other Loan Documents.

(j) <u>Documents of Further Assurance</u>. Borrower shall, from time to time, upon Lender's request, execute, deliver, record and furnish such documents as Lender may deem necessary or desirable to perfect and maintain perfected as valid liens upon the Project, the liens granted by Borrower to Lender under the Security Instruments and the Assignments of Leases and Rents and the collateral assignments and other security interests under the other Loan Documents as contemplated by the Credit Agreement, this Agreement and the Project Loan Agreement. Each party hereto shall from time to time, upon the reasonable request from another party, execute and deliver such documents deemed necessary or desirable to correct any errors of a typographical nature or inconsistencies which may be contained in any of the Loan Documents or to consummate fully the transactions contemplated under the Credit Agreement, this Agreement and the Project Loan Agreement.

(k) <u>Furnishing Reports</u>. Borrower shall provide to Lender, promptly after Borrower's receipt thereof, copies of all inspections, reports, test results and other material information received by Borrower from time to time from its employees, agents, representatives, architects, engineers and any other parties (including, without limitation, tenants) involved in the Construction and/or the development or operation of the Project, which relate in a material way to Borrower's ability to perform its obligations under the Loan Documents.

(l) <u>Substantial Completion</u>. Borrower shall achieve Substantial Completion no later than the Required Completion Date.

Section 11.2  <u>Specific Representations and Warranties of Borrower</u>. Borrower further represents and warrants to Lender as of the date hereof and as of the date of any Advance of the Loan that:

(a)  Borrower has all necessary rights, Licenses, permits, authorizations, approvals, governmental and otherwise, and full power and authority to own the Property and carry on its business as now conducted.

(b)    Borrower has obtained all necessary Licenses (other than certificates of completion and certificates of occupancy), necessary for the construction and operation of the Property for its current uses and for the conduct of Borrower's business and each occupant's business and all such Licenses remain in full force and effect. None of the foregoing is subject to revocation, suspension, forfeiture or modification.

## ARTICLE 12

### EVENTS OF DEFAULT AND REMEDIES

Section 12.1    Events of Default and Remedies. Upon the occurrence and during the continuance of each Event of Default (as defined in the Credit Agreement), Lender may, at its option, exercise any rights and remedies provided for in the Credit Agreement, the Security Instruments or any other Loan Document, including, but not limited to:

(a) take any action which, in Lender's sole judgment, is necessary or appropriate to effect observance and performance of the covenants, agreements and obligations of Borrower under this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, and for the purpose aforesaid, upon the occurrence of an Event of Default beyond any applicable notice and cure periods, Borrower hereby agrees that Lender shall be entitled, in accordance with Legal Requirements, to (A) pay, settle or compromise all existing bills and claims the nonpayment of which might result in liens against the Project, or take such other action as Lender shall determine to prevent such bills and claims from resulting in liens against the Project, (B) execute all applications and certificates which may be required by any of the Loan Documents, (C) prosecute and defend all actions or proceedings connected with or relating to the Project and (D) take possession of and operate the Project;

(b) withhold further Advances;

(c) declare the Notes to be immediately due and payable;

(d) except as may be otherwise set forth in the Loan Documents, use and apply any additional collateral or any monies deposited by Borrower with Lender to cure any Default or Event of Default or to apply on account of any indebtedness under this Agreement or any of the other Loan Documents which is due and owing to Lender; and

(e) exercise or pursue any other right or remedy permitted under this Agreement, the Credit Agreement, the Security Instruments or any of the other Loan Documents or conferred upon Lender by operation of law.

Section 12.2    Non-Waiver of Remedies. No waiver of any breach, Default or Event of Default under this Agreement or any other Loan Document shall constitute or be construed as a waiver by Lender of any other or subsequent breach, Default or Event of Default under this Agreement or such other Loan Document.

## ARTICLE 13

### GENERAL PROVISIONS

Section 13.1    Captions.  The captions and headings of the various Articles and Sections of this Agreement and the Schedules and Exhibits pertaining hereto are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

Section 13.2    Notices.  All notices, demands, consents, approvals and other communications (collectively, "Notices") hereunder shall be in writing and shall be (1) mailed by certified mail, postage prepaid, return receipt requested, or (2) sent by nationally recognized overnight air courier service, or (3) sent by telecopy (provided an identical Notice is also sent simultaneously by mail or overnight courier as otherwise provided in this Section 13.2).  All such communications shall be mailed, sent or delivered, addressed to the party for whom it is intended at its address set forth below:

| | |
|---|---|
| If to Borrower: | 250 East Borrower, LLC<br>249 E. 49th Street – 5th Floor<br>New York, NY 10017 |
| | and to: |
| | Gurevich & Associates, L.L.P.<br>249 E. 49th Street – 5th Floor<br>New York, NY 10017 |
| If to Lender: | Lehman Brothers Holdings Inc.<br>399 Park Avenue<br>8th Floor<br>New York, New York  10022<br>Attention:<br>Telephone:<br>Facsimile:<br>MTS Nos.: |

with copies (other than of requests for consents or approvals provided for in the Loan Documents and deliveries to be made in connection with Construction and the obtaining of Advances hereunder)

| | |
|---|---|
| to: | Lehman Brothers Holdings Inc.<br>399 Park Avenue<br>8th Floor<br>New York, New York  10022<br>Attention:  David Broderick<br>Telephone:  (212) 526-2453<br>Facsimile:  (646) 758-5311<br>MTS No.: |

and to:                           Gibson Dunn & Crutcher LLP
                                  200 Park Avenue
                                  New York, New York 10166
                                  Attn: Andrew Levy, Esq.
                                  Telephone: (212) 351-4037
                                  Telecopy: (212) 351-4035

or at such other address or to such other addressee as the party to be served with Notice may
have furnished in writing to the party seeking or desiring to serve Notice as a place for the
service of Notice. Notices shall be deemed to have been rendered or given on the date received
before 5 p.m. or otherwise on the next Business Day or on the date they are deemed to be
received as hereinafter set forth. The inability to deliver Notices because of a changed address of
which no Notice was given, or rejection or refusal to accept any Notice offered for delivery shall
be deemed to be receipt of the Notice as of the date of such inability to deliver or rejection or
refusal to accept delivery.

Section 13.3    Entire Agreement; Modification, Waiver. This Agreement and the other
Loan Documents and instruments delivered in connection herewith constitute the entire
agreement among the parties with respect to the Project and the Loan and supersede all prior
agreements, written and oral, relating to the subject matter hereof. Neither Lender nor any
employee of Lender has made or is authorized to make any representation or agreement upon
which Borrower may rely unless such matter is made for the benefit of Borrower and is in
writing and such document is signed by an authorized signatory of Lender. Borrower agrees that
it has not and will not rely on any custom or practice of Lender, or on any course of dealing with
Lender, in connection with the Loan unless such matter is set forth in this Agreement or the other
Loan Documents or in a written instrument made for the benefit of Borrower and signed by an
authorized signatory of Lender. No modification, waiver, amendment, discharge or change of
this Agreement shall be valid unless the same is in writing and signed by the party against which
the enforcement of such modification, waiver, amendment, discharge or change is sought.

Section 13.4    Governing Law. THIS AGREEMENT IS A CONTRACT ENTERED
INTO AND TO BE PERFORMED IN THE STATE OF NEW YORK AND SHALL BE
GOVERNED BY AND CONSTRUED UNDER THE INTERNAL LAWS (AS OPPOSED TO
THE LAWS OF CONFLICTS) OF THE STATE OF NEW YORK. TO THE EXTENT
PERMITTED BY LAW, BORROWER AND GUARANTORS HEREBY WAIVE ANY AND
ALL RIGHTS TO REQUIRE MARSHALING OF ASSETS BY LENDER.

Section 13.5    Acquiescence Not to Constitute Waiver of Lender's Requirements. Each
and every covenant and condition for the benefit of Lender contained in this Agreement may be
waived by Lender; provided, however, that to the extent Lender may have acquiesced in any
noncompliance with any conditions, covenants or obligations of Borrower contained herein, such
acquiescence shall not be deemed to constitute a waiver by Lender of the performance by
Borrower of any subsequent conditions, covenants or obligations to be performed by Borrower
hereunder.

Section 13.6   <u>Disclaimer by Lender</u>.

(a) This Agreement is made for the sole benefit of Borrower and Lender (and each party's permitted successors and assigns and, to the extent expressly provided herein or in the other Loan Documents, Assignees and Participants, if any), and no other person or persons shall have any benefits, rights or remedies under or by reason of this Agreement, or by reason of any actions taken by Lender pursuant to this Agreement. Lender shall not be liable to any party for any debts or claims accruing in favor of any such party against Borrower or others or against the Project. Borrower is not and shall not be an agent of Lender for any purposes. Lender is not and shall not be an agent of Borrower for any purposes. Lender, by making the Loan or any action taken pursuant to any of the Loan Documents, shall not be deemed a partner or a joint venturer with Borrower or a fiduciary of Borrower.

(b) By accepting or approving anything required to be observed, performed, fulfilled or given to Lender pursuant to the Loan Documents, including, without limitation, any Construction Budget, environmental assessment or Engineering Report, or any certificate, statement of profit and loss or other financial statement, survey, appraisal, lease or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance or approval thereof shall not constitute (i) a warranty or representation to anyone with respect thereto by Lender or (ii) a waiver of any of Borrower's or Guarantors' obligations or liabilities under this Agreement or any of the other Loan Documents with respect to any facts, matters or circumstances disclosed in any of the reports or other documents described in this Section 13.6(b); provided, however, Borrower shall be entitled to rely on any such approval or acceptance by Lender as evidencing Borrower's compliance with the requirements of Article 6 hereof relating to Borrower's obligation to provide such Construction Budget, environmental assessment, Engineering Report, certificate, statement of profit and loss or other financial statement, survey, appraisal, lease or insurance policy.

(c) Lender neither undertakes nor assumes any responsibility or duty to Borrower to select, review, inspect, supervise, pass judgment upon or inform Borrower of any matter in connection with the Project, and Borrower shall rely entirely upon its own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or supply of information to Borrower by Lender in connection with such matters is for the protection of Lender only and neither Borrower nor any third party is entitled to rely thereon.

(d) Lender owes no duty of care to protect Borrower with respect to any matter reviewed or investigated by Lender in connection with the Loan.

(e) Lender shall not be directly or indirectly liable or responsible for any loss, claim, cause of action, liability, indebtedness, damage or injury of any kind or character to any person or property arising from any activity on, or occupancy or use of, all or any portion of the Project, including any loss, claim, cause of action, liability, indebtedness, damage or injury caused by, or arising from (i) any defect in any building, structure, grading, fill, landscaping or other Improvements thereon or in any on-site or offsite improvement or other facility therein, thereon or relating thereto, irrespective of whether or not such defect was disclosed in any of the reports or other documents described in Section 13.6(b) above; (ii) any act or omission of

Borrower, or any Guarantor, any Affiliate of Borrower or any Guarantor, or any of Borrower's agents, employees, independent contractors, licensees or invitees; (iii) any accident at the Project or any fire, flood or other casualty or hazard thereon; (iv) the failure of Borrower, or of any of Borrower's licensees, employees, invitees, agents, independent contractors or other representatives to maintain all or any portion of the Project in a safe condition; or (v) any nuisance made or suffered on any part of the Project; except to the extent that any of the circumstances described in clauses (i), (iii) or (v) above are caused by the gross negligence or willful misconduct of Lender or its officers, contractors, employees or agents (provided they are acting in their capacity as such) occurring after Lender enters onto or has possession of the Project pursuant to the terms hereof.

Section 13.7    Right of Lender to Make Advances to Cure Borrower's Defaults. If an Event of Default has occurred and is continuing and Borrower has failed to perform any of Borrower's covenants, agreements or obligations contained in this Agreement or the other Loan Documents or if Borrower has failed to perform the Development Rights Obligations (as defined in the Credit Agreement), Lender may (but shall not be obligated to), upon not less than five (5) days' written Notice to Borrower, perform any of such covenants, agreements and obligations; provided, however, that if in Lender's judgment, such failure to perform has resulted in an emergency, no written Notice shall be required. Any amounts expended by Lender to cure Borrower's defaults or to perform the Development Rights Obligations, including any amounts expended by Lender pursuant to Article 12, shall constitute protective advances evidenced by the Notes (even if the principal balance of the Notes plus the amount of such protective advances would then exceed the aggregate face amount of the Notes), payable on demand and secured by the Security Instruments and the other Loan Documents.

Section 13.8    Definitions Include Amendments. Definitions contained in this Agreement which identify documents, including the other Loan Documents, shall be deemed to include all amendments and supplements to such documents from the date hereof, and all future amendments and supplements thereto entered into from time to time to satisfy the requirements of this Agreement or otherwise with the consent of Lender. Reference to this Agreement contained in any of the foregoing documents shall be deemed to include all amendments and supplements to this Agreement.

Section 13.9    Time Is of the Essence. Time is hereby declared to be of the essence of this Agreement and of every part hereof.

Section 13.10    Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 13.11    Waiver of Punitive or Consequential Damages. In no event shall Lender or Borrower be liable to the other for punitive or consequential damages, whatever the nature of a breach by Lender or Borrower of its obligations under this Agreement or any of the other Loan Documents and Borrower and Lender each, for itself and its respective Affiliates, hereby waives all claims for punitive or consequential damages. Borrower agrees that any amount required to be paid or reimbursed by Borrower to Lender under the terms of this Agreement or any of the

other Loan Documents, or required to be paid by Guarantors to Lender under the terms of the Guarantees or Indemnity Agreement, shall not constitute or be deemed to be punitive or consequential damages.

Section 13.12  <u>Claims Against Lender</u>. If it is determined in a final, non-appealable judgment in any proceedings that Lender has improperly failed to grant its consent or approval, where such consent or approval is required by this Agreement or any other Loan Document to be obtained, Borrower's sole remedy shall be to obtain declaratory relief in a final, non-appealable judgment determining such withholding of consent or approval to have been improper, whereupon such consent shall be deemed given, and Borrower hereby waives, for itself and all its Affiliates, all claims for damages or set-off against Lender resulting from any withholding of consent or approval by Lender.

Section 13.13  <u>Jurisdiction: Service of Process</u>. WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS AGREEMENT, THE PROJECT OR ANY OTHER LOAN DOCUMENT (EACH, A "<u>PROCEEDING</u>"), BORROWER, EACH GUARANTOR AND LENDER IRREVOCABLY (A) SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE COUNTY OF NEW YORK AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT LOCATED IN THE COUNTY OF NEW YORK; AND (B) WAIVE ANY OBJECTION WHICH SUCH PARTY MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVE ANY CLAIM THAT ANY SUCH PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVE THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY. NOTHING IN THIS AGREEMENT SHALL PRECLUDE LENDER FROM ATTEMPTING TO BRING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE LENDER FROM ATTEMPTING TO BRING A PROCEEDING IN ANY OTHER JURISDICTION.

Section 13.14  <u>Severability</u>. If any provision or provisions, or if any portion of any provision or provisions, in this Agreement is found by a court of law to be in violation of any applicable local, state or federal law, statute or ordinance, administrative or judicial decision, or public policy, and if such court declares such portion, provision or provisions of this Agreement to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, and that the remainder of this Agreement shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained herein, and that the rights, obligations and interests of the parties hereto under the remainder of this Agreement shall continue in full force and effect.

Section 13.15  <u>Waiver of Jury Trial</u>. BORROWER AND LENDER EACH HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENTS OR RELATING THERETO OR ARISING FROM THE LENDING RELATIONSHIP WHICH IS THE SUBJECT OF THIS AGREEMENT AND AGREES THAT

ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT
BEFORE A JURY.

Section 13.16 <u>Waiver of Foreclosure Defense</u>. BORROWER HEREBY WAIVES ANY
DEFENSE IT MAY HAVE TO A FORECLOSURE ACTION BASED ON LENDER'S
FAILURE TO NAME ANY TENANT OF THE PROJECT OR ITS SUCCESSOR OR
ASSIGNEE, IF ANY, AS A PARTY TO SUCH FORECLOSURE ACTION.

Section 13.17 <u>Lender's Discretion.</u> Whenever pursuant to this Agreement or any of the
Loan Documents, Lender may approve or disapprove any act (or any action) or any document,
delivery or other item, or where Lender's consent or approval is required in any respect or where
any document or other item must be satisfactory to Lender, except in those specific instances
where Lender has specifically agreed not to unreasonably withhold Lender's consent pursuant to
the terms of this Agreement or any of the Loan Documents, the decision of Lender to approve or
disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory or to
grant or withhold consent shall be in the sole, absolute and unfettered discretion of Lender,
without any express or implied obligation of reasonableness or good faith whatsoever and shall
be final and conclusive. Borrower acknowledges and agrees that in no circumstance shall
Borrower have any claim or cause of action, in contract or in tort, against Lender as a result of
the granting or withholding of any such consent or approval. The inclusion of references to
Lender's sole or absolute discretion in any particular provisions of this Agreement or any of the
Loan Documents shall not limit or affect the applicability of this Section to all provisions of this
Agreement or any of the Loan Documents, including those provisions wherein a specific
reference to Lender's sole and absolute discretion is not made. Without limiting the preceding
provisions of this Section, in the event that a claim or adjudication is made that Lender or its
agents have acted unreasonably or in bad faith or unreasonably delayed acting in any case where,
by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case
may be, has an obligation to act reasonably or in good faith or promptly, Borrower agrees that
neither Lender nor its agents or employees shall be liable for any monetary damages (including
any special, consequential or punitive damages whatsoever), whether in contract, tort (including
negligence and strict liability) or any other legal or equitable principles, and Borrower's sole
remedies shall be limited to commencing an action seeking injunctive relief or declaratory
judgment. The parties hereto agree that any action or proceeding to determine whether Lender
has acted reasonably or in good faith shall be determined by an action seeking declaratory
judgment.

**[Signatures appear on the following page]**

32

Borrower and Lender have executed this Agreement as of the day and year first set forth above.

**BORROWER:**

**250 EAST BORROWER, LLC,** a Delaware limited liability company

By:_____
Name:  Alexander Gurevich
Title:    Authorized Signatory

**LENDER:**
**LEHMAN BROTHERS HOLDINGS INC.,**  a Delaware corporation

By:_____
Name:
Title:

SIGNATURE PAGE TO BUILDING LOAN AGREEMENT

Borrower and Lender have executed this Agreement as of the day and year first set forth above.

**BORROWER:**

**250 EAST BORROWER, LLC,** a Delaware limited liability company
By:_____
Name:  Alexander Gurevich
Title:    Authorized Signatory

**LENDER:**
**LEHMAN BROTHERS HOLDINGS INC.,**  a Delaware corporation

By:_____
Name:    JOHN NASTASI
Title:      AUTHORIZED SIGNATORY

STATE OF NEW YORK   )
                           ) ss.:
COUNTY OF NEW YORK  )

On the ___ day of _____ in the year 2008, before me, the undersigned, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Signature and office of individual
taking acknowledgement

ILONA BABINSKY
Notary Public, State of New York
No. 02BA6139856
Qualified in Queens County
Commission Expires Jan. 17, 2010

My Commission Expires:


STATE OF NEW YORK   )
                           ) ss.:
COUNTY OF NEW YORK  )

On the ____ day of _____ in the year 2008, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Signature and office of individual
taking acknowledgement

My Commission Expires:

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

    On the ____ day of _____ in the year 2008, before me, the undersigned,
personally appeared _____, personally known to me or proved to me on the basis
of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within
instrument, and acknowledged to me that he/she/they executed the same in his/her/their
capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the
person upon behalf of which the individual(s) acted, executed the instrument.


_____
Signature and office of individual
taking acknowledgement


My Commission Expires:


STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

    On the 12 day of February in the year 2008, before me, the undersigned,
personally appeared John Nastasi, personally known to me or proved to me on the basis
of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within
instrument, and acknowledged to me that he/she/they executed the same in his/her/their
capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the
person upon behalf of which the individual(s) acted, executed the instrument.

_____
Signature and office of individual
taking acknowledgement

Notary Public, State of New York
No. 01EM6171082
Qualified in Richmond County
Term Expires July 23, 2011


My Commission Expires:

DEANNA EMILIO
Notary Public, State of New York
No. 01EM6171082
Qualified in Richmond County
Term Expires July 23, 2011

**List of Exhibits**

Exhibit A – Legal Description
Exhibit B – Form of Surveyor's Certificate
Exhibit C – Form of Architect's General Certificate
Exhibit D – Lien Law Section 22 Affidavit
Exhibit E – Form of Borrower's Request for Advances
Exhibit F – Form of Borrower Budget Reallocation Request
Exhibit G – Form of Architect's Certificate Regarding Improvements
Exhibit H – Form of Affidavit of Contractor
Exhibit I – Certification of Borrower as to Hard Costs

## EXHIBIT "A"

Legal Description

### Parcel A

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the westerly side of Second Avenue, distant 70 feet, 5 inches southerly from the corner formed by the intersection of the southerly side of 49th Street with the westerly side of 2nd Avenue;

RUNNING THENCE westerly, parallel with the southerly side of 49th Street, 78 feet;

THENCE southerly parallel with the westerly side of 2nd Avenue, 20 feet;

THENCE easterly parallel with the southerly side of 49th Street and part of the distance through a party wall, 78 feet, to the westerly side of 2nd Avenue; and

THENCE northerly, along said westerly side of 2nd Avenue, 20 feet to the place of BEGINNING.

### Parcel B

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of 49th Street with the westerly side of 2nd Avenue;

RUNNING THENCE southerly along the westerly side of 2nd Avenue, 52 feet, 2½ inches;

THENCE westerly parallel with the southerly side of 49th Street, 20 feet;

THENCE northerly parallel with the westerly side of 2nd Avenue and part of the distance through a party wall, 52 feet 2½ inches to the southerly side of 49th Street;

THENCE easterly along the southerly side of 49th Street, 20 feet to the westerly side of 2nd Avenue, at the point or place of BEGINNING.

## LEGAL DESCRIPTION
### (Continued)

**Parcel C**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the westerly side of 2nd Avenue, distant 52 feet, 2½ inches southerly from the corner formed by the intersection of the southerly side of 49th Street with the westerly side of 2nd Avenue;

RUNNING THENCE westerly, parallel with 49th Street, 20 feet;

THENCE southerly, parallel 2nd Avenue, 18 feet 2½ inches;

THENCE easterly, again parallel with 49th Street, 20 feet to the westerly side of 2nd Avenue;

THENCE northerly, along the westerly side of 2nd Avenue, 18 feet 2½ inches to the point or place of BEGINNING.


**Parcel D**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly side of 49th Street, distant 20 feet westerly from the southwesterly corner of 49th Street and 2nd Avenue;

RUNNING THENCE southerly and parallel with 2nd Avenue and part of the distance through a party wall, 70 feet 5 inches;

THENCE westerly parallel to 49th Street, 20 feet;

THENCE northerly parallel with 2nd Avenue and part of the distance through a party wall, 70 feet 5 inches to the southerly side of 49th Street;

THENCE easterly along the southerly side of 49th Street, 20 feet to the point or place of BEGINNING.

## LEGAL DESCRIPTION
### (Continued)

**Parcel E**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly side of 49th Street, distant 40 feet westerly from the southwesterly corner of 49th Street and 2nd Avenue;

RUNNING THENCE southerly and parallel with 2nd Avenue and part of the distance through a party wall, 70 feet 5 inches;

THENCE westerly parallel to 49th Street, 19 feet;

THENCE northerly parallel with 2nd Avenue and part of the distance through a party wall, 70 feet 5 inches to the southerly side of 49th Street;

THENCE easterly along the southerly side of 49th Street, 19 feet to the point or place of BEGINNING.


**Parcel F**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly side of East 49th Street, distant 78 feet westerly from the corner formed by the intersection of the westerly side of 2nd Avenue with the southerly side of East 49th Street;

RUNNING THENCE westerly, along the said southerly side of East 49th Street, 19 feet;

THENCE southerly, parallel with the said westerly side of 2nd Avenue and part the distance through a party wall 100 feet 5 inches to the center line of the block;

THENCE easterly, along the said center line of the block, parallel with the said southerly side of East 49th Street, 19 feet; and

THENCE northerly, again parallel with the said westerly side of 2nd Avenue and part of the distance through another party wall, 100 feet 5 inches to the point or place of BEGINNING.

## LEGAL DESCRIPTION
### (Continued)

**Parcel G**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly side of East 49th Street, 59 feet westerly from the corner formed by the intersection of the said southerly side of East 49th Street with the westerly side of 2nd Avenue;

RUNNING THENCE southerly, parallel with the westerly side of 2nd Avenue and part of the way through the center of a party wall 70 feet 5 inches;

THENCE westerly, parallel with the said southerly side of East 49th Street, 19 feet;

THENCE northerly, and again parallel with said westerly side of 2nd Avenue and through the center of another party wall, 70 feet 5 inches to the said southerly side of East 49th Street; and

THENCE easterly, along the same, 19 feet to the point or place of BEGINNING.

## LEGAL DESCRIPTION
### (Continued)

**Perimeter Description**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point formed by the intersection of the southerly side of East 49th Street with the westerly side of 2nd Avenue;

RUNNING THENCE southerly along the westerly side of 2nd Avenue 90.00 feet and 5 inches to a point;

THENCE westerly and parallel with the southerly side of East 49th Street 78.00 feet to a point;

THENCE southerly parallel with the westerly side of 2nd Avenue 10.00 feet to a point;

THENCE westerly parallel with the southerly side of East 49th Street 19.00 feet to a point;

THENCE northerly parallel with the westerly side of 2nd Avenue 100.00 feet and 5 inches to a point on the southerly side of East 49th Street;

THENCE easterly along the southerly side of East 49th Street 97.00 feet to the point or place of BEGINNING.

## EXHIBIT "B"

Form of Surveyor's Certificate

### SURVEY REQUIREMENTS

The survey of the Property must be dated no earlier than 60 days prior to the date of the closing. The survey should show the location of any adjoining streets (including their widths and any pavement or other improvements), easements (including the pertinent recording information with respect to all recorded instruments), fences, zoning or restriction setback lines, rights-of-way, utility lines to the points of connection, and any encroachments. The survey should locate all means of ingress and egress to the Property, all easements benefiting the Property (including, without limitation, easements for septic tank usage on adjoining Property of third parties, if applicable), certify the amount of acreage and square footage, indicate the street address of the Property, contain the legal description of the Property, and also contain a location sketch of the Property. The survey should show the location of all improvements as constructed on the Property, all of which must be within the boundary lines of the Property and conform to all applicable zoning ordinances, set-back lines and restrictions and the surveyor should certify compliance with the foregoing. The location of any improvements on the Property should be shown on the survey with the dimensions in relation to the lot and building lines. If deed restrictions, recorded plats or zoning ordinances require any of the improvements to be set back specified distances from street or Property lines, the survey should show measured distances from the improvements to said lines.

Please make certain that the survey designates all courses and distances referred to in the legal description and indicates the names of all adjoining owners on all sides of the Property, to the extent obtainable. Furthermore, the legal description of the Property must be shown on the face of the survey, and it must conform to the legal description contained in the title insurance commitment and policy. Please also make certain that the survey is certified in the following manner:

"We hereby certify to Lehman Brothers Holdings Inc., and [Title Company], their successors, nominees and assigns: (a) that the survey represented herein is an accurate survey of all of the real property legally described herein; (b) that the within survey properly and accurately indicates and locates all improvements on the real property as of the date of the survey; (c) that the within survey was prepared under the direct supervision and control of the undersigned from an actual survey made of the real property legally described herein; (d) that there are no encroachments either across property lines or zoning restriction lines in effect as of the date of the survey; (e) that the within survey properly designates and locates all visible or recorded easements as of the date of the survey; (f) all utility services required for the operation of this property either enter the property through the adjoining public streets or, if they pass through or are located on private land, do so in accordance with easements enuring to the owner of the property; (g) ingress and egress to the subject property is provided by [name of streets or roads] upon which

the property abuts, the same being paved and dedicated rights-of-way maintained by [name of governmental authority]; (h) the property is [or is not] located in an area designated as a special flood hazardous area by the Federal Emergency Management Agency, and lies in a zone "__" of minimum flooding; (i) the subject property does not service any adjoining property for drainage, ingress, egress or any other purpose; (j) that the land, as described on the survey does not constitute an illegal subdivision of land under local, county or city ordinances; and (k) that the within survey was prepared in accordance with the existing code of practice for land surveyors adopted by the American Congress on Surveying and Mapping, [and any applicable state professional surveyors associations and land title associations], and complies with all applicable [state] laws."

## EXHIBIT "C"

<u>Form of Architect's General Certificate</u>

(Attach Detailed Architect Certificate Regarding Plans)

## EXHIBIT "D"

Lien Law § 22 Affidavit

## EXHIBIT "E"

Form of Borrower's Request for Advances

Date: _____, 200\_

Construction Loan No._____

Advance No._____

AMOUNT REQUESTED: $_____

Period Covered:_____

TO:

FROM:

RE:           Building Loan Agreement dated _____ \_\_\_, 2006 between Lehman Brothers Holdings Inc., as Lender, and _____, as Borrower ("Loan Agreement"; all initially capitalized terms unless otherwise defined herein, shall have the meanings set forth in the Loan Agreement)

In accordance with the terms of the Loan Agreement, you are hereby authorized and requested to make immediate disbursement of funds held by you for the Project described in the Loan Agreement in accordance with the documentation attached hereto, which documentation is incorporated herein by this reference and made a part hereof and which documentation includes the following (items enclosed are marked "x" and separately tabbed on the enclosed submission).

_____        Architect's Certificate

_____        Project Budget Summary

_____        Project Budget Reallocation Request

_____        Project Disbursement Schedule

_____        List of Contractors, Subcontractors, Materialmen, Submaterialmen, vendors and service providers (additions since previous request for Advance highlighted)

_____        Lien waivers for all Advances previously disbursed to Contractors, Subcontractors, Materialmen and Submaterialmen and tracking spreadsheets

_____        Original, notarized AIA G702/703 (Construction Contract costs)

_____        Copies of Subcontractor draw requests and invoices for materials and services with applicable Line Item numbers marked thereon (other costs)

1

_____     Documents re:  Stored Materials

_____     Punch Lists

_____     Copies of Change Orders

_____     Retainage Schedule

_____     Certification of General Contractor/Borrower

The undersigned hereby certifies that:

(i)     the labor, services and/or material covered hereby have been performed upon or furnished to the Project;

(ii)     there have been no changes in the Construction Budget, except those approved by you in writing;

(iii)     all construction to date has been performed substantially in accordance with the Plans and Specifications, and there have been no changes in those Plans and Specifications, except as may be expressly permitted by you in writing or otherwise permitted under the Loan Agreement;

(iv)     there have been no changes in the scope or time of performance of the work of construction, nor any extra work, labor or materials ordered or contracted for, nor are any such changes or extras contemplated, except as may be expressly permitted by the Loan Agreement or as have been approved by you in writing and all such construction has been performed in a good and workmanlike manner;

(v)     the payments to be made with the funds requested herein will pay all bills received to date for any labor, materials and services furnished in connection with construction of the Project;

(vi)     all amounts previously disbursed by you for labor, services and/or materials for the Project pursuant to previous requests for funds have been paid to the parties entitled thereto;

(vii)     all conditions to the disbursement of the funds requested herein as set forth in the Loan Agreement have been fulfilled, and to the knowledge of the undersigned, no Event of Default has occurred and is continuing;

(viii)     the payments to be made with the funds requested herein, or with Borrower's funds as approved by Lender, will pay all bills received to date for any labor, materials and services furnished in connection with construction of the Improvements, less Retainage; and

(ix)     all representations and warranties made by Borrower under any Loan Document are true, correct, and not misleading in any material respect as of the date of this Request for Advance, as if such representation and warranty were made on such date.

2

**BORROWER:**

**CONSTRUCTION MANAGER: [if applicable]**

_____

By:      _____
Name:    _____
Title    _____
Date:    _____

APPROVED FOR PAYMENT:

By:_____
Title:_____
Date:_____, 200_

## EXHIBIT "F"

### Form of Project Budget Reallocation Request

BORROWER:                                                    Date: _____, 200_

PROJECT:                                                       Draw No.:_____

ALL Change Orders ("C.O.'s") for direct construction must be referenced on this form and are subject to the Lender's approval as provided in the Building Loan Agreement. Copies of all C.O.'s must be submitted to the Lender, regardless of the Lender's approval limitations.

Please indicate the explanation and provide appropriate documentation for requests to reallocate budget Line Items.

### Budget Reallocations Contained in Current Request for Advance

| AMOUNT | FROM LINE ITEM | TO LINE ITEM | CHANGE ORDER #"s (if any) | EXPLANATION* |
|--------|----------------|--------------|---------------------------|--------------|
|        |                |              |                           |              |
|        |                |              |                           |              |
|        |                |              |                           |              |
|        |                |              |                           |              |
|        |                |              |                           |              |
|        |                |              |                           |              |
|        |                |              |                           |              |

CHANGE ORDER SUMMARY:

$_____   this request

$_____   prior requests

$_____   to date

(C.O.'s #_____)

Borrower's authorized signature below verifies that reallocations described above are approved by Borrower, are valid and reasonable, and that copies of related documentation in the form of Change Orders or invoices as appropriate are attached hereto.

_____

*      Please give detailed explanation, e.g., cost of increased material, deleted item, etc.

**BORROWER:**


**CONSTRUCTION MANAGER: [if applicable]**

_____

By:      _____
Name:  _____
Title    _____
Date:   _____

## **EXHIBIT G**

### Form of Architect's Certificate Regarding Improvements

_____ (the "<u>Architect</u>") hereby certifies to Lehman Brothers Holdings Inc. (the "<u>Lender</u>") as follows:

1.    The Plans and Specifications prepared by Architect are in compliance with all requirements and restrictions of all governmental authorities having or claiming jurisdiction over the Project, including all applicable zoning, building, fire and health ordinances, rules and regulation;

2.    The work completed to the date of the Request for Advance is appropriate to the then-current stage of construction, and is in substantial conformity with the Plans and Specifications;

3.    The percentage of completion of the work on the Improvements is ___%.

Dated this ____ day of _____, 200_.

<br>

By:_____
Name:_____
Title:_____

## **EXHIBIT H**

### Affidavit

LENDER:

OWNER: _____          DATE: _____, 200_

CONTRACTOR:

CONTRACT MANAGER:

PROJECT: _____          AMOUNT: $_____

PERIOD FROM: _____, ____          TO: _____, 200_

RE:                    Building Loan Agreement dated _____, between Lehman
                       Brothers Holdings Inc., as Lender, and _____, as Borrower
                       ("Loan Agreement"; all initially capitalized terms unless otherwise defined
                       herein, shall have the meanings set forth in the Loan Agreement)

BEFORE ME, the undersigned authority, on this day personally appeared the person
executing this affidavit, who, being by me first duly sworn, deposed and said:

"1.      I am the person and officer of Contractor as indicated on the execution line of this
affidavit; I am duly authorized to make this affidavit and to execute and deliver the related
request for payment; and I am familiar with the terms and conditions of the construction contract
(the **"Construction Contract"**) for the Project.

2.      All schedules, reports, statements, and other writings heretofore or herewith
delivered by or on behalf of Contractor to Owner and/or Lender are substantially true and correct
and in all respects what they purport and appear to be.

3.      The Construction Contract is in full force and effect; to Contractor's best
knowledge, no default (nor any event which, with notice or the lapse of time or both, could
become a default) has occurred thereunder; the Work (herein so called, meaning performance
and furnishing of labor and fabrication and furnishing of materials under the Construction
Contract) covered by the current and each prior request for payment has been performed, and the
remaining Work is being performed diligently, without any unreasonable delay, under
Contractor's supervision in accordance with the Construction Contract and, to Contractor's best
knowledge, all applicable laws and regulations, all necessary permits, franchises, and licenses,
and all necessary approvals of, consents, or inspections by, and/or registrations with
governmental or other agencies or instrumentalities in connection with prosecution of the Work
for which Contractor is responsible under the Construction Contract have been obtained or filed
and paid for; and, to Contractor's best knowledge, there exist no violations of any insurance
underwriter's requirements with respect to any or all of the Work and no pending suits by or
before any court or governmental agency or instrumentality in any way related to the location of
the Project and/or prosecution of the Work.

4.    Contractor has received and applied all proceeds payable pursuant to each prior request for payment in accordance therewith and with the Construction Contract; all obligations for any of the Work heretofore incurred and included (a) in any Application for Advance heretofore delivered to Owner have been paid, and (b) in the accompanying request for payment will be paid upon payment to Contractor of the amount requested above; and Contractor is able and agrees to deliver to Owner, if requested, the contracts, bills of sale, or other agreements under which title to any of the Work completed and in course of construction and of all materials acquired or produced by Contractor for the performance of the Work is claimed by Owner.

5.    To Contractor's best knowledge, the insurance described in and required by the Construction Contract is in full force and effect and not subject to any defenses, defaults, or counterclaims.

6.    Neither Contractor, nor, to Contractor's best knowledge, any agent of Contractor, has been served with any written notice that a lien will be claimed for any amount unpaid for materials delivered, labor performed, or services provided in connection with the Work, or any part thereof, and, to Contractor's best knowledge, no valid basis exists for the filing of any mechanic's or materialman's liens or claims with respect to all or any part of the Work and/or the Project, no dispute or disagreements exists under any subcontract relating to any of the Work, and no default has occurred under any such subcontract.

7.    Neither Contractor, nor, to Contractor's best knowledge, any agent of Contractor, has any notice of code violations, injunctions, pending litigation, or any other claims or violations affecting the Project.

8.    I understand that this affidavit is made for the purpose of inducing Lender to advance funds to Owner and for Owner to make payment of such funds to Contractor and that, in so lending funds or making payment, Lender and Owner will rely upon the accuracy of the matters stated in this affidavit."

**AFFIANT:**

_____

Name:_____

Title:_____

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, on the ____ day of _____, 200__, by _____, .

_____

NOTARY PUBLIC in and for
the State of New York

_____

Typed or Printed Name of Notary

My Commission Expires:_____

[SEAL]

## EXHIBIT "I"

Certification as to Hard Costs

Date: _____, 200_

Construction Loan No._____

Advance No._____

AMOUNT REQUESTED: $_____

Period Covered:_____

TO:

FROM:

RE:

The undersigned hereby certifies that:

(i)    the labor, services and/or material covered by the Request for Advance to which this Certificate is attached have been performed upon or furnished to the Project;

(ii)    the payments for Hard Costs to be made with the funds requested in the Request for Advance will pay all bills received to date for any labor, materials and services furnished in connection with construction of the Project; and

(iii)    to the best of our knowledge, all conditions to the disbursement of the funds for labor, services and material requested in the Request for Advance as set forth in the Loan Agreement have been fulfilled.

:

_____

By:    _____
Name:  _____
Title   _____
Date:  _____

# **EXHIBIT D**
## **(Default Letter)**

US_ACTIVE:\44020870\4\58399.0003



September 24, 2008

Lehman Brothers
745 Seventh Avenue
New York, NY 10019
Attn: Robert Guglielmo, Senior Vice President

Re: Default Notice relating to Master Repurchase Agreement

Ladies and Gentlemen:

Reference is hereby made to the Master Repurchase Agreement dated as of December 3, 2002 (including all annexes, schedules and exhibits thereto, collectively, the "MRA"), between Lehman Brothers Inc., Lehman Commercial Paper Inc. ("Lehman") and Swedbank AB, New York Branch. ("Swedbank"). Capitalized terms used herein without definition shall have the meanings specified in the MRA.

The exhibit attached to this letter shows the Purchased Securities that you have failed to repurchase upon the applicable Repurchase Date. Your failure to repurchase such securities on the applicable Repurchase Date is an Event of Default under the MRA and we hereby notify you that we have exercised our option to declare that an Event of Default has occurred with regard to the MRA. As a result, the Repurchase Date for each Transaction under the MRA is deemed to have occurred today and the aggregate Repurchase Prices for all Transactions under the MRA, and any and all other amounts owing by Lehman to Swedbank under the terms of the MRA, are now all immediately due and payable. Without in any way limiting any of Swedbank's rights under the MRA, we are hereby serving this Default Notice on you and notify you of the foregoing.

Swedbank reserves all of its rights and remedies under the MRA and any and all other related documents and agreements, available at law or otherwise, including without limitation all rights and remedies available under Paragraph 11 of the MRA.

SWEDBANK AB (PUBL), NEW YORK BRANCH

By:

Name: John Matthews    Magnus Francke
Title: Senior Vice Presidents

cc:
Michael Bond, via e-mail
Stephen Fischler, via e-mail and telefax

Swedbank AB (publ)    One Penn Plaza, 15th Floor    Tel: +212 486 8400    www.swedbank.us
New York Branch       New York, NY 10119             Fax: +212 486 3220    www.swedbank.se

WSUMPCSRFX01-15      9/19/2008  5:11:09 PM      PAGE     3/003     Fax Server



### The Bank of New York
### TRI-PARTY
### Investor Allocation Detail Report
### Lehman Commercial Paper Inc.

THE BANK OF NEW YORK MELLON

Production Run : 09/19/2008      LCPI

Print Date : 09/19/2008 05:09 PM

| Investor Name : Swedbank New York Branch | Investment Amount : $1,000,000,000.00 |
|---|---|
| Investor Reference No : WSWE | Required Amount : $1,070,000,000.00 |
| Trade Reference No : 9410680 | Trade Margin % : 7.00 |

| Required Amount : | $1,070,000,000.00 |
|---|---|
| Excess Amount : | $40,492,902.94 |

| Investor Name : Swedbank New York Branch | Investment Amount : $350,000,000.00 |
|---|---|
| Investor Reference No : WSWE | Required Amount : $374,500,000.00 |
| Trade Reference No : 941G350 | Trade Margin % : 7.00 |

Asset Grade : C
Pricing Service : Seller

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 102 | WH9158 | WH9158 | 0.0001 | 100.000000 | P | 09/14/2009 | $99,999,999.00 | $99,999,999.00 |
| 102 | WH9167 | WH9167 | 0.0001 | 100.000000 | P | 01/09/2010 | $99,999,999.08 | $99,999,999.00 |
| 102 | WH8855 | WH8855 | 0.0000 | 100.000000 | P | 02/01/2009 | $41,280,008.00 | $41,280,008.00 |
| 102 | WH8538 | WH8538 | 8.0000 | 100.000000 | P | 10/31/2009 | $24,535,881.00 | $24,535,881.00 |
| 102 | WH8014 | WH8014 | 9.0000 | 100.000000 | P | 05/01/2009 | $19,931,702.46 | $19,931,702.46 |
| 102 | WH8501 | 100101819 | 0.0001 | 100.000000 | P | 01/01/2009 | $18,130,000.00 | $18,130,000.00 |
| 102 | WH8727 | 100101982 | 0.0001 | 100.000000 | P | 10/08/2008 | $17,262,780.55 | $17,262,780.55 |
| 102 | WH8012 | 100101858 | 0.0001 | 100.000000 | P | 08/09/2009 | $15,538,779.25 | $15,538,779.25 |
| 102 | WH8555 | 100101910 | 0.0001 | 100.000000 | P | 10/14/2008 | $12,871,478.49 | $12,871,478.49 |
| 102 | WH8598 | WH8598 | 8.0000 | 100.000000 | P | 08/01/2009 | $11,000,000.00 | $11,000,000.00 |
| 102 | WH4815 | 100101277 | 0.0001 | 100.000000 | P | 08/01/2009 | $10,891,229.83 | $10,891,229.83 |
| 102 | WH8944 | 100102038 | 0.0001 | 100.000000 | P | 12/01/2009 | $9,280,030.32 | $9,280,030.32 |
| 102 | WH8954 | 100101907 | 0.0001 | 100.000000 | P | 11/01/2012 | $7,848,189.44 | $7,848,189.44 |
| 102 | WH8540 | WH8540 | 8.0000 | 100.000000 | P | 10/31/2008 | $8,086,480.47 | $8,086,480.47 |
| 102 | WH8273 | 100101787 | 0.0001 | 100.000000 | P | 04/30/2010 | $5,644,482.78 | $5,644,482.78 |
| 102 | WH8559 | WH8559 | 8.0000 | 100.000000 | P | 10/31/2008 | $4,185,814.92 | $4,185,814.92 |
| 102 | WH8948 | 100102040 | 0.0001 | 100.000000 | P | 12/01/2009 | $2,178,905.47 | $2,178,905.47 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Pricing Service Total : | | | | 17 Assets | | | $406,023,730.76 | $406,023,730.76 |
| Grade C Total : | | | | 17 Assets | | | $406,023,730.76 | $406,023,730.76 |
| Total : | | | | 17 Assets | | | $406,023,730.76 | $406,023,730.76 |

| Required Amount : | $374,500,000.00 |
|---|---|
| Excess Amount : | $31,523,730.76 |

Status Key

A - Allocated

P - Preallocated



This document contains information that is confidential and the property of The Bank of New York. It may not be copied, published or used, in whole or in part for any purpose other than expressly authorized by The Bank of New York Copyright (c) 2006 The Bank of New York. All rights reserved

Report ID : dt_alc

Page: 2 of 2

# **<u>EXHIBIT E</u>**
## **(Waiver and Release Agreement)**

## WAIVER AND RELEASE AGREEMENT

This Waiver and Release Agreement (this "**Agreement**") is made and entered into as of this 6th day of November, 2008 (the "**Effective Date**"), by the Borrower (as defined below), the Guarantors (as defined in the Loan Agreement, defined below) and Swedbank (as defined below), and for the benefit of LBHI and LCPI (each as defined below).

Reference is made to (a) that certain Master Credit Agreement dated as of December 29, 2006 (the "**Master Credit Agreement**"), between 250 East Borrower, LLC, a Delaware limited liability company (the "**Borrower**"), and Lehman Brothers Holdings Inc., a Delaware corporation ("**LBHI**"), (b) that certain Project Loan Agreement dated as of December 29, 2006 (as amended by a First Amendment to Project Loan Agreement dated as of July 6, 2007 and by a Second Amendment to Project Loan Agreement dated as of February 13, 2008, collectively, the "**Project Loan Agreement**"), between Borrower and LBHI, (c) that certain Amended and Restated Building Loan Agreement dated as of February 13, 2008, (the "**Building Loan Agreement**"; the Project Loan Agreement, the Master Credit Agreement, and the Building Loan Agreement, collectively, the "**Loan Agreement**"), between the Borrower and LBHI, (d) the note allonges, assignments of mortgage and other instruments of transfer dated as of the Effective Date (the "**LCPI Assignment**"), between LBHI and Lehman Commercial Paper Inc. ("**LCPI**"), and (e) the note allonges, assignments of mortgage and other instruments of transfer dated as of the Effective Date (collectively, the "**Swedbank Assignment**"), between LCPI and Swedbank AB, New York Branch ("**Swedbank**"). Unless defined herein, terms defined in the Loan Agreement are used herein as therein defined.

WHEREAS, as of the Effective Date, LBHI has received from Borrower that certain Application for Payment #14, dated September 25, 2008 (the "**Funding Request**"), and LBHI has not funded such Funding Request;

WHEREAS, pursuant to the terms and conditions of the Swedbank Assignment, Swedbank has agreed to assume, perform, pay or discharge all obligations of LCPI, as successor-in-interest to LBHI pursuant to the terms and conditions of the LCPI Assignment under the Loan Documents as of the Effective Date, and also wishes to so perform, pay and discharge all obligations of LBHI relating to or in connection with the Funding Request;

WHEREAS, the Borrower and the Guarantors have agreed to waive and release Swedbank from any Claims (as defined below) in connection with the Loan, the Funding Request, the Loan Agreements or any of the other Loan Documents in accordance with this Agreement; and

WHEREAS, Swedbank has agreed to waive certain Borrower Defaults and Events of Default which occurred prior to the Effective Date.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements contained herein, the parties hereto agree as follows:

1.    **No Offsets and Defenses.** Each of Borrower and Guarantor hereby acknowledges, confirms, represents and warrants to and agrees with Swedbank, LBHI and LCPI that as of the Effective Date, (i) neither Borrower nor Guarantor shall at any time assert against LBHI and LCPI any claims, offsets, defenses, rights of set-off or counterclaims under, arising out of or in connection with LBHI's or LCPI's actions or inactions in connection with the Loan, the Funding Request, the Loan Agreements or any of the other Loan Documents, whether arising prior to or after the Effective Date, including, without limitation, LBHI's and/or LCPI's failure to fund any previously submitted Funding Request or other funding request transmitted by Borrower to LBHI, or any funding request hereafter submitted by Borrower to LBHI (collectively, "**LB Claims**"); (ii) neither Borrower nor Guarantor shall at any time assert against Swedbank or any successor in interest to Swedbank any claims, offsets, defenses, rights of set-off or counterclaims under, arising out of or in connection with LBHI's, LCPI's or Swedbank's actions or inactions in connection with the Loan, the Funding Request, the Loan Agreements or any of the other Loan Documents, arising prior to the Effective Date including, without limitation, LBHI's, LCPI's and/or Swedbank's failure to fund any previously submitted Funding Request or other funding request transmitted by Borrower to LBHI, arising prior to the Effective Date (collectively, "**Swedbank Claims**"); and (iii) neither Borrower nor Guarantor has any knowledge of any events or circumstances against Swedbank under, arising out of or in connection with Swedbank's actions or inactions in connection with the Loan, the Funding Request, the Loan Agreements or any of the other Loan Documents, including, without limitation, Swedbank's failure to fund any previously submitted Funding Request or other funding request transmitted by Borrower to LBHI prior to the Effective Date.

2.    **Release.** Each of Borrower and Guarantor hereby waives and releases Swedbank from any and all Swedbank Claims and any and all costs, damages, liens, liabilities or expenses of any kind or nature with respect thereto. Each of Borrower and Guarantor hereby waives and releases LBHI and LCPI from any and all LB Claims and any and all costs, damages, liens, liabilities or expenses of any kind or nature with respect thereto. Notwithstanding the foregoing, no waiver or release is granted to Swedbank hereunder in respect of any claims arising after the Effective Date. The foregoing release shall be self-operative and no further instrument or agreement of release shall be necessary to effect the foregoing release.

3.    **Waiver of Event of Default.** Swedbank hereby acknowledges and agrees that Borrower shall not be deemed to be in default under the Loan Documents solely to the extent that any such Default or Event of Default shall (i) exist as of the Effective Date and (ii) directly arise out of or result from LBHI's failure to fund any funding requests transmitted by Borrower to LBHI, provided, however, Borrower shall promptly and expeditiously cure any such default described in (i) and (ii) above out of the advance made pursuant to the Funding Request or out of additional Borrower funds, and nothing herein shall release or be deemed to release Borrower from any of its obligations under the Loan Documents from and after the Effective Date.

2

4.    Entire Agreement.  This Agreement contains the entire agreement of the parties hereto with respect to the subject matter hereof.  This Agreement may not be changed, modified, terminated or discharged orally.

5.    Binding Effect.  All of the terms and conditions contained herein shall be binding on and inure to the benefit of the parties hereto and their respective successors and assigns.

6.    Severability.  If any provision of this Agreement or the application of such provision to any party or circumstance is held invalid, the remainder of this Agreement and the application of such provision to persons or circumstances other than those to which it is held invalid will not be affected thereby.

7.    Multiple Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall constitute an original, and all of which together shall constitute one and the same instrument.

8.    Governing Law.  This Agreement will be enforced, governed by, and construed in accordance with the laws of State of New York.

[Signature pages follow.]



IN WITNESS WHEREOF, the parties have caused this Waiver and Release Agreement to be executed by their respective duly authorized officers as of the day and year first written above.

3

US_ACTIVE:\43260619\11

11/06/08  THU 13:46  FAX 212 883 1424          VANDALE IND. INC          ☑ 002

**GUARANTORS (cont'd):**



Mauro Schiatton, an individual

THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

IN WITNESS WHEREOF, the parties have caused this Waiver and Release Agreement to be executed by their respective only authorized officers as of the day and year first written above.

**BORROWER:**

**2ND EAST BORROWER, LLC**, a Delaware limited liability company

By:_____
Name:
Title:

**GUARANTORS:**

_____
Alexander Chartrand, an individual

_____
Elyahu Spitzer, an individual

_____
Michael Steinberg, an individual

_____
Abbot Adler, an individual

_____
Gena Kirschner, an individual



SWEDBANK AB (publ)
NEW YORK BRANCH

By: _____
    Name: John Matthews
    Title: General Manager

By: _____
    Name: Donald Weiss
    Title: Vice President

EAST\42218695