BROWN RUDNICK LLP
Steven B. Levine
Peter J.M. Declercq
One Financial Center
Boston, MA  02111
Telephone:  (617) 856-8200
Facsimile: (617) 856-8201

*Counsel to the Ad Hoc Group of Lehman Brothers*
*Treasury Co. B.V. Noteholders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x
                                                     :
In re:                                               :    Chapter 11
                                                     :
Lehman Brothers Holdings, Inc., *et al*.             :    Case No. 08-13555 (JMP)
                                                     :
                                                     :    (Jointly Administered)
                    Debtors.                         :
                                                     :
-----------------------------------------------------x

**REPLY OF THE AD HOC GROUP OF HOLDERS OF NOTES ISSUED BY LEHMAN
BROTHERS TREASURY CO. B.V. AND GUARANTEED BY LEHMAN BROTHERS
HOLDINGS, INC. TO THE OMNIBUS OBJECTION OF THE UNITED STATES
TRUSTEE TO APPLICATIONS FOR ALLOWANCE AND PAYMENT
OF FEES AND REIMBURSEMENT OF EXPENSES
PURSUANT TO 11 U.S.C. § 503(B)**

TO:    THE HONORABLE JAMES M. PECK,
       UNITED STATES BANKRUPTCY JUDGE

The LBT Ad Hoc Group[1] (the members of which hold, directly or indirectly, LBT Notes

and, as such, have claims against LBHI based on LBHI's guarantee of the LBT Notes), through

their undersigned counsel Brown Rudnick LLP ("Brown Rudnick"), hereby submits this reply

(the "Reply") to the *Omnibus Objection of the United States Trustee to Applications of: (I) the*

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the *Application
of the Ad Hoc Group of Holders of Notes Issued by Lehman Brothers Treasury Co. B.V. and Guaranteed by Lehman
Brothers Holdings, Inc., Pursuant to 11 U.S.C. § 503(b) for Allowance of Administrative Expenses for Counsel's
Services Incurred in Making a Substantial Contribution in These Chapter 11 Cases*, dated July 5, 2012 [Docket No.
29222] (the "LBT Application").

*Ad Hoc Group of Lehman Brothers Creditors, (II) the Ad Hoc Group of Holders of Notes Issued*

*by Lehman Brothers Treasury Co. B.V. and Guaranteed by Lehman Brothers Holdings, Inc., (III)*

*Goldman Bank USA and Goldman International, and (IV) the Lehman Brothers Special*

*Financing Inc. Working Group, for Allowance and Payment of Fees and Reimbursement of*

*Expenses Pursuant to 11 U.S.C. § 503(b)* [Docket No. 29639] (the "UST Objection"), and

respectfully states as follows:

## PRELIMINARY STATEMENT

1.      No party other than the Office of the United States Trustee ("UST") has

submitted an objection to the LBT Application (or the Applications submitted by other groups).[2]

All of such Applications are unopposed by the Debtors, the Official Committee of Unsecured

Creditors (the "Committee") and all creditors in these cases.[3]

2.      The thrust of the UST's Objection with respect to the LBT Ad Hoc Group

is that it has failed to demonstrate that its and Brown Rudnick's involvement in these cases (i)

provided a "demonstrable benefit" to the Debtors' estates, (ii) benefitted creditors other than the

LBT Ad Hoc Group or (iii) were not duplicative of services performed by the other professionals

in these cases.  See UST Objection ¶¶43, 45.  In addition, the UST submits that all of such

Applications are deficient because they do not comply with the Fee Guidelines (as defined

---

[2]      In addition to the LBT Application, applications (collectively, the "Applications") pursuant to 11 U.S.C. §
553(b) for allowance and payment of fees and reimbursement of expenses incurred in connection with making
substantial contributions were submitted by: (i) the Ad Hoc Group of Lehman Brothers Creditors (the "LBHI Ad
Hoc Group"); (ii) Goldman Bank USA and Goldman International (together, "Goldman"); and (iii) the Lehman
Brothers Special Financing Inc. Working Group  (the "LBSF Working Group").  [Dkt. Nos. 29195, 29239, 29240].

[3]      The Committee has not interposed any objections, but rather has stated that it "believes there are colorable
bases upon which to conclude that the Applicants [including the LBT Ad Hoc Group] have met" the standard for
demonstrating that their actions have resulted in compensable substantial contributions.  See *Omnibus Response of
Official Committee of Unsecured Creditors to Applications for Allowance and Payment of Fees and Reimbursement
of Expenses Pursuant to 11 U.S.C. § 503(b) of: (I) the Ad Hoc Group of Lehman Brothers Creditors, (II) the Ad Hoc
Group of Holders of Notes Issued by Lehman Brothers Treasury Co. B.V. and Guaranteed by Lehman Brothers
Holdings, Inc., (III) Goldman Bank USA and Goldman International, and (IV) the Lehman Brothers Special
Financing Inc. Working Group*, dated August 1, 2012 [Docket No. 29785] (the "Committee Response") ¶ 5.

below), without citing any authority that such guidelines apply beyond professionals retained by a debtor or an official committee or otherwise employed by the estate.

3.      Contrary to the UST's assertions, however, the LBT Ad Hoc Group and Brown Rudnick substantially contributed to the overwhelmingly successful outcome in these Chapter 11 Cases.  As the Committee observed in its Response to the Applications, "The Applicants [a term which includes the LBT Ad Hoc Group] played an integral role in formulating and garnering the necessary support for the Plan.  The success of these efforts was demonstrated by the voting results for the Plan and the fact that, at the time of the confirmation hearing, only one objection to the Plan remained unresolved.  This unprecedented outcome was the result of the Debtors, the Committee and the Applicants [including the LBT At Hoc Group] spending many months working behind the scenes to forge consensus and bring about an expedition resolution of these cases."  See Committee Response ¶ 5.

4.       Indeed, the efforts of the LBT Ad Hoc Group and Brown Rudnick went beyond mere "active participation" in these Chapter 11 Cases and produced a demonstrable benefit to the Debtors' estates and creditors other than the LBT Ad Hoc Group.  See UST Objection ¶ 47.  Among their other contributions to these cases, the LBT Ad Hoc Group and Brown Rudnick:

- Had a pivotal role in formulating and refining the Structured Securities Valuation Methodologies (the "SSVM"), which were used by the Debtors to determine the allowed amounts of thousands of claims and which all creditor constituencies and this Court came to accept as a practical, efficient means for valuing thousands of the complex Structured Securities without the need for the Debtors to resort to costly claim objection procedures and thousands of potential claim litigations;[4]

---

[4]      See *Amended Motion pursuant to Sections 105(a) and 502(b) of the Bankruptcy Code and Bankruptcy Rule 9019 for Approval of Procedures for Determining the Allowed Amount of Claims Based on Structured Securities Issued or Guaranteed by Lehman Brothers Holdings Inc.* [Docket. No. 18127] (the "SSVM Motion") ¶ 30; *Order Pursuant to Sections 105(a) and 502(b) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Procedures*

- Played a primary part in the global plan negotiations between the Debtors and other constituencies, including helping to broker the basic deal between creditors of LBHI who proposed a plan premised on global substantive consolidation and creditors of Lehman Brothers Special Financing, Inc. ("LBSF") who were the proponents of the Non-Consolidation Plan, and greatly enhanced the treatment of all LBT-related claims in these cases (of which the claims held by the LBT Ad Hoc Group's members were only a small fraction); and

- Facilitated the ultimate settlement reached between the Joint Bankruptcy Trustees of LBT (the "JBTs") and the Debtors in respect of the treatment of the LBT Intercompany Claim (the "LBT Settlement") and related issues by making full allowance of that claim in an amount close to the amount which the JBTs had asserted in their proof of claim a condition of their support for the global settlement.  (The Debtors' entry into a settlement agreement with the JBTs shortly after they filed the Plan which was ultimately confirmed became an important milestone on the path to confirmation as it led to many other administrators of Lehman foreign affiliates to enter into their own settlement agreements and support the Plan.)

5.    All of these actions enhanced the recoveries not only for *all* holders of LBT-related claims (including the JBTs and all LBT Noteholders, only a small portion of which were members of the LBT Ad Hoc Group), but because they facilitated the achievement of a fully consensual Plan, all other creditors in these Chapter 11 Cases.  Indeed, the application submitted by Goldman and their counsel estimates that confirmation of the Plan in early December 2011 saved the Debtors' estates approximately $200 million to $400 million in administrative expenses alone.  See Goldman Application ¶ 45.

6.    In light of the significant benefits conferred on the Debtors' estates by the efforts of the LBT Ad Hoc Group and Brown Rudnick, the $3,741,017.85 in fees and expenses that the LBT Ad Hoc Group is seeking to be reimbursed from the LBHI estate[5] – which

---

*for the Determination of the Allowed Amount of Claims Filed Based on Structured Securities Issued or Guaranteed by Lehman Brothers Holdings, Inc.* [Docket No. 19120] (the "SSVM Order").

[5]    The UST's assertion that the LBT Ad Hoc Group should be reimbursed from the estate of LBT, which is subject to Dutch insolvency proceedings, is entirely without merit or logical support.  This Court administers and has jurisdiction over the LBHI estate, the LBT Ad Hoc Group members are creditors of LBHI and, along with

4

represents less than approximately 0.01% of LBHI's net distributable assets – is reasonable under the circumstances and the LBT Application respectfully should be granted.

## REPLY

7.      Sections 503(b)(3) and (4) of the Bankruptcy Code are designed to promote meaningful participation by creditors and their counsel in the reorganization process. See, e.g., In re Richton Int'l Corp., 15 B.R. 854, 855-56 (Bankr. S.D.N.Y. 1981). An applicant under Section 503(b) need not establish that its efforts alone and exclusively resulted in a "substantial contribution" to the debtor's estate, but instead need only demonstrate that a credible connection between its efforts and the reorganization process. See In re Calumet Realty Co., 34 B.R. 922, 926 (Bankr. E.D. Pa. 1983); see also In re Granite Partners, L.P., 213 B.R. 440, 447 (Bankr. S.D.N.Y. 1997). Furthermore, where other creditors and the estate benefitted from the applicant's actions, the fact that the applicant benefitted from its own actions does not bar compensation for a substantial contribution. See Hall Fin. Grp., Inc. v. DP Partners, Ltd. P'ship (In re DP Partners Ltd. P'ship), 106 F.3d 667, 673 (5th Cir. 1997) (holding that "a creditor's motive in taking actions that benefit the estate has little relevance in the determination whether the creditor has incurred actual and necessary expenses in making a substantial contribution to [the estate,]" and that instead, a court "should weigh the cost of the claimed fees and expenses against the benefits conferred upon the estate which flow directly from those actions."); see also In re FF Holdings Corp., 343 B.R. 84, 87 (2006) (even though creditor received a benefit from its

Brown Rudnick, made substantial contributions in these Chapter 11 Cases. The Application seeks recoveries from LBHI's estate for only those activities that resulted in a substantial contributions in *these* Chapter 11 Cases. See Application ¶ 17 n. 8. As noted in the initial LBT Application, the time charges have been allocated as between work done primarily for the U.S. and Dutch proceedings. Whether activities performed in connection with LBT's Dutch proceedings (for which compensation is not been sought hereunder) constitute substantial contributions to the Dutch case is wholly irrelevant to the instant Application.

actions, substantial contribution claim was merited where such actions also benefitted the estate and creditors).

8.      Contrary to the UST's Objection, the LBT Ad Hoc Group and Brown Rudnick have demonstrated  much more than a credible connection between their efforts and the reorganization process in these Chapter 11 Cases.  Moreover, although the LBT Ad Hoc Group benefitted from its own efforts, those efforts also provided a direct, demonstrable benefit to the Debtors' estates and other creditor groups beyond just the members of the LBT Ad Hoc Group.

## A.    Efforts In Connection With Developing and Refining the Structured Securities Valuation Methodologies Provided A Substantial Contribution to the Debtors' Estates

9.      The UST Objection downplays the significant role played by the LBT Ad Hoc Group and Brown Rudnick in actively and constructively assisting in the Debtors' efforts to develop and refine the SSVM over more than a year.  This was a critical and necessary component underpinning the ability of the Debtors' Plan to achieve such broad consensus.

10.     The Structured Securities refer to approximately 5,000 securities with a notional amount of more than $40 billion issued by LBHI and various of its foreign affiliates prior to the commencement of these Chapter 11 Cases, and guaranteed by LBHI.[6]  See SSVM Motion ¶ 2.  While the Structured Securities include the LBT Notes, the term encompasses many other claims of many more Lehman issuers.[7]

---

[6]      Because the Structured Securities generally do not have indenture trustees, the responsibility for filing proofs of claim for the Structured Securities was on the holders and beneficial holders thereof.  See SSVM Motion ¶ 3.  More than 21,000 claims were filed against the Debtors based on the Structured Securities in the aggregate in excess of $55 billion. Id. ¶ 16.

[7]      The Structured Securities include: (i) structured notes issued by LBHI (the "LBHI Structured Notes"); (ii) the LBT Notes; (iii) certificates and warrants issued by Lehman Brothers Securities N.V.; (iv) structured securities issued by Lehman Brothers (Luxembourg) Equity Finance S.A.; (v) certificates issued by Lehman Brothers Finance, S.A.; and (vi) structured notes issued by Lehman Brothers Bankhaus AG.  See SSVM Motion ¶ 14.

11.     Many of the LBT Notes and other Structured Securities were complex structured notes that provided a return to investors at maturity and/or the payment of periodic interest that was linked to the performance of an underlying asset or group of assets (such as global indices, single stocks, currencies, interest rates and various credit derivative instruments and baskets thereof) and calculated pursuant to a complex mathematical formula. Id.  The LBT Ad Hoc Group consisted of institutions which primarily held these type of complex structured notes issued by LBT, as opposed to more conventional instruments providing for payment of a fixed principal amount at maturity and readily calculable payments of periodic interest.

12.     According to the Debtors, the proofs of claim that were filed based on the Structured Securities varied significantly due to the claimants' conceptual confusion and disagreement as to the appropriate valuation methodologies that should be applied to such complex and "idiosyncratic" securities.  Id.  Moreover, reconciling the claims based on Structured Securities presented a "monumental," "laborious and time consuming task" for the Debtors.  Id. ¶¶ 16, 30.  Accordingly, the Debtors needed to develop a practical system for determining the allowed amount of claims based on Structured Securities which would allow them to avoid performing thousands of calculations, engaging in numerous theoretical arguments with holders as to the proper methodology to use in valuing these securities and potentially having to engage in thousands of valuation trials in which not only the correct methodology but also each of the key inputs to be used in connection with whatever methodology was employed might be disputed.  This required the development of a single methodology that was consistent with the requirements of the Bankruptcy Code and, perhaps most importantly, would be perceived as fair and valid by all creditors.

13.     The holders of Structured Securities were not the only ones who had a stake in the debate over how they should be valued. Given the potential magnitude of the Structured Securities claims, all key creditor constituencies' recoveries would be significantly impacted by the aggregate amount of Structured Securities claims allowed in these Chapter 11 Cases and the potential administrative costs of thousands of contested matters.

14.     Because the LBT Ad Hoc Group had already done a good deal of analysis and thinking on the novel legal issues posed by the LBT Notes after it was initially formed in early 2009 in connection with LBT's Dutch bankruptcy proceedings, it was prepared when the Debtors began to solicit the comments and thoughts of key constituencies on these issues early in 2010. Beginning in April 2010, the LBT Ad Hoc Group, by and through Brown Rudnick, provided the Debtors with a steady stream of information and legal analysis relating to, among other things, the appropriate treatment and method for valuing the LBT-related claims (i.e., the LBT Intercompany Claim and the LBHI Guarantee Claim) and other Structured Securities. In addition to discussing and negotiating the appropriate treatment of the LBT-related claims with the Debtors in numerous in-person and telephonic meetings, between early 2010 and Court approval of the SSVM in August, 2011,[8] the LBT Ad Hoc Group, by and through Brown Rudnick, also provided the Debtors with several letters and written analyses containing specific examples of how it proposed that various types of LBT Notes be valued and identifying issues with the Original Plan's[9] treatment of the LBT-related claims and the Debtors' initial proposed valuation methodologies. Among other things, those letters proposed valuation methodologies

---

[8]     These included meetings held on April, May and November of 2010. Such meetings were in addition to numerous informal telephone conferences and discussions that members of the LBT Ad Hoc Group and/or Brown Rudnick had with the Debtors and their professionals regarding the appropriate treatment and valuation of the LBT-related claims.

[9]     On March 15, 2010, the Debtors filed their initial *Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* [Dkt. Nos. 7572] (as revised on April 11, 2010, the "Original Plan").

developed by the LBT Ad Hoc Group that were appropriate for, and intended to simplify, the determination of the amount of claims based on Structured Securities, including, *inter alia*: (i) methods for determining the allowed amount of the LBHI Guarantee Claims;[10] (ii) the appropriate reference date for calculating the fixed and derivative components of the LBT Notes, as well as the applicable foreign exchange rate;[11] and (iii) the different components that should comprise the claim under notes that included optionality or derivative features.[12]  Those letters also provided examples applying the valuation principles proposed by both the Debtors and the LBT Ad Hoc Group to each of the three general categories of Structured Securities (i.e., Par/Par Notes, Zero Coupon Notes and FMV Notes)[13] in order to demonstrate the logic and relative acceptability of the LBT Ad Hoc Group's proposed principles.[14]

15.    On October 29, 2010, after having received and considered comments from the LBT Ad Hoc Group and other constituencies, the Debtors published proposed methodologies for valuing the LBT Notes on www.lehman-docket.com and filed the same with the Securities and Exchange Commission on an 8-K (the "8-K Valuation Principles").  The 8-K Valuation Principles, which proposed to calculate the value of each underlying Structured Security on the basis of Lehman's mark-to-market accounting treatment for each ISIN series prior to the commencement of the Chapter 11 Cases,  incorporated several concepts put forward by the LBT Ad Hoc Group.  The Debtors advanced these 8-K Valuation Principles as a

---

[10]    Proposed in letters dated April 12, 2010 and May 24, 2010.

[11]    Proposed in letters dated April 12, 2010, May 24, 2010 and June 14, 2010.

[12]    Included in letters dated May 24, 2010 and June 14, 2010.

[13]    The LBT Ad Hoc Group, by and through Brown Rudnick, transmitted letters to the Debtors and their professionals concerning the appropriate valuation principles to apply to the LBHI Guarantee Claims on April 12, 2010, May 24, 2010, June 14, 2010, November 24, 2010 and December 3, 2010.

[14]    Included in letters dated May 24, 2010 and June 14, 2010.

"pragmatic" way to determine the allowed amount of the corresponding Note claims without having to perform thousands of calculations for the various Structured Securities.

16.     While the LBT Ad Hoc Group considered the 8-K Valuation Principles as an improvement over methodologies that had been previously discussed with the Debtors, it still perceived several substantial issues with them and several ways in which they were inconsistent with well-established bankruptcy law.

17.     By further proposal letters sent on November 24 and December 3, 2010, the LBT Ad Hoc Group, by and through Brown Rudnick, proposed refinements to the valuation framework in the 8-K Valuation Principles, including, among other things:

- Elimination of a Credit Valuation Adjustment ("CVA") (i.e., a second credit adjustment Lehman had made on its pre-petition books and records as part of its mark-to-market accounting), which it estimated would result in increasing the total allowed amount of the LBT Note Structured Securities claims by approximately $2.9 billion;[15]

- Inclusion of accrued or matured interest due as of the Petition Date for all categories of Notes (and not just the Par/Par Notes) where such interest could be readily determined as required by the Bankruptcy Code, which would result in an overall increase of the allowed amount of the LBT Note Structured Securities claims;[16] and

- Providing that so-call principal-protected Structured Securities notes, which provided for payment of a Final Redemption Amount at maturity equal to the greater of (i) a fixed dollar sum or a specified percentage of the original notional amount on each note, or (ii) a value determined by a formula which referenced some sort of index of securities be valued at the higher of the specified "principal protected" amount or the value reflected on Lehman's books and records rather than just the mark-to-market value as proposed in the 8-k Valuation Principles (which often was significantly lower than the principal protected amount; in this way, a holder of a principal protected note would receive the same treatment as the holder of

---

[15]     Proposal included in letters dated November 24, 2010 and December 3, 2010.

[16]     Proposal included in letters dated November 24, 2010, December 3, 2010 and February 22, 2011.

10

a note that simply provided for payment of a fixed principal amount as required by the Bankruptcy Code).[17]

18.    These suggested refinements were all ultimately incorporated into what became the SVVM, which were attached as Exhibit 11 to the Debtors' Disclosure Statement for their First Amended Plan filed on January 25, 2011 (the "First Amended Plan") and, with some other refinements, approved by this Court in August, 2011.  Following the filing of the First Amended Plan, the LBT Ad Hoc Group continued to work with the Debtors (including by way of further meetings and proposal letters)[18] to ensure that the SSVM would be found acceptable by the Committee and other key creditor constituencies (including the Par/Par Group (defined below) of LBT Noteholders) as an appropriate method for determining the allowed amount of all Structured Securities claims and ultimately approved by the Court.  See SSVM Order.

19.    The Debtors filed the SSVM Motion seeking approval of procedures to determine the allowed amounts of Structured Securities, which included applying the SSVM as a starting point for valuation of all Structured Securities Claims, on June 29, 2011.  On August 5, 2011, Brown Rudnick, on behalf of the LBT Ad Hoc Group, in conjunction with the LBT Noteholders represented by Dewey & LeBoeuf LLP, which primarily held LBT Notes that were categorized as Par/Par Structured Securities (the "Par/Par Group"), filed a joint statement in support of the SSVM Motion [Dkt. No. 19069] (the "SSVM Support Statement"), asserting that the SSVM constituted a reasonable and feasible way to value the Structured Securities that would avoid years of claims litigation.  See SSVM Support Statement ¶ 4.  In addition, Brown Rudnick had calls with the Committee and other key creditor constituencies (including counsel

---

[17]    Proposal included in letters dated November 24, 2010 and December 3, 2010.

[18]    In addition to at least weekly phone calls, the LBT Ad Hoc Group and Brown Rudnick met with the Debtors on February 9, 2011 and sent a further proposal letter dated February 22, 2011, in which these issues were raised.

for certain foreign administrators and other significant holders of Structured Securities issued by Lehman entities other than LBT) in which they explained the operation of the SSVM and lobbied for their support.

20.    The principles that formed the SSVM were ultimately accepted by other creditors of both LBHI and subsidiary issuers of the Structured Securities, and were approved by the Court on August 10, 2011. See SSVM Order. The Debtors used the SSVM to value more than 5,000 Structured Securities with a notional amount of more than $40 billion. See SSVM Motion ¶ 2. The Debtors estimate that Structured Securities claims will ultimately be allowed (based on the SSVM) in the aggregate amount of approximately $37.49 billion.[19]    See Disclosure Statement at 50.

21.    The efforts of the LBT Ad Hoc Group and Brown Rudnick in helping to develop and gain widespread consensus for the SSVM benefitted far more than members of the LBT Ad Hoc Group.    Indeed, the aggregate amount of Structured Securities claims is approximately 13.6% of the total claims against LBHI and the holders of such claims include many creditors of LBT and various other Debtors who are not included in the LBT Ad Hoc Group (whose members held only approximately $3 billion in notional amount of LBT Notes out of the estimated total notional amount of $40 billion in Structured Securities).[20]   Moreover, all creditors benefitted from having a widely-accepted method of valuing the Structured Securities claims and avoiding litigation that the Debtors indicated "would be particularly difficult and costly" due to their complex nature, and "could possibly take years to conclude, delaying

---

[19]    This is compared to the 21,000 proofs of claim initially filed by creditors purporting to represent approximately $55 billion in Structured Securities claims. See SSVM Motion ¶ 16.

[20]    Calculated based on approximately $37.5 billion in Structured Securities Claims out of approximately $272.9 billion in allowed claims against LBHI. See Disclosure Statement at 50; id. at Exhibit 4-11.

distributions to [all] creditors."[21]  Id.  The efforts of the LBT Ad Hoc Group and Brown Rudnick

thus undoubtedly qualify as a substantial contribution for which reimbursement under Sections

503(b)(3) and (4) should be permitted.[22]

> **B.    Efforts In Connection With Negotiating and Brokering Agreements Underlying the Confirmed Plan Provided A Substantial Contribution to the Debtors' Estates**

22.     The UST Objection further minimizes the efforts of the LBT Ad Hoc

Group and Brown Rudnick in negotiating and garnering wide support for the global settlement

embodied in the Plan.  The LBT Ad Hoc Group's unique position as creditors that both held

direct guarantee claims against LBHI and were direct beneficiaries of LBT's Intercompany

Claim against LBHI enabled it and Brown Rudnick to, among other things, facilitate negotiations

and help broker agreements between the Debtors, certain of their non-debtor affiliates (including,

in particular, the JBTs) and the other major creditor groups in these Chapter 11 Cases, which

were advocating for and against substantive consolidation.

23.     The LBT Noteholders hold direct claims against LBT in LBT's Dutch

insolvency proceedings on account of the LBT Notes.  Because the LBT Notes were guaranteed

by LBHI, the LBT Noteholders also held the LBHI Guarantee Claims in LBHI's U.S. Chapter 11

Case.  In addition, because LBT transferred the proceeds of the LBT Notes issuances to LBHI,

LBT's major asset is a direct claim against LBHI (i.e., the "LBT Intercompany Claim") in

LBHI's U.S. Chapter 11 Case.  Therefore, the primary source of recovery for the LBT

---

[21]    The Debtors indicated that in the absence of the SSVM and related Structured Securities claims determination procedures, they "would be forced to file more than 40 separate omnibus claim objections to the Structured Securities Claims and seek to resolve the claims before the Court or through established alternative dispute resolution procedures." SSVM ¶ 30.

[22]    Notably, the UST does not object to allowing Goldman and Cleary to recovery for their efforts in "working with other large derivative creditors and the Debtors to achieve a consensual framework for the valuation of complex derivative claims." Goldman Application, ¶ 5.  It is therefore unclear why the UST would object to the request of the LBT Ad Hoc Group and Brown Rudnick to be reimbursed for substantially similar efforts in the context of the Structured Securities claims framework.

Noteholders in LBT's Dutch insolvency proceedings is LBT's recovery on the LBT Intercompany Claim.

24.     Because they were beneficiaries of both the LBT Intercompany Claim against LBHI and their own guarantee claims against LBHI, members of the LBT Ad Hoc Group were uniquely positioned to help broker a deal in terms of substantive consolidation, which was the major issue in these Chapter 11 Cases. Indeed, given that the LBT Ad Hoc Group members could recover from the LBHI estate both directly as holders of guarantee claims and indirectly as beneficiaries of the LBT Intercompany Claims, the LBT Ad Hoc Group had every motive to insure that all LBHI creditors received a fair allocation of assets of all estates. In that regard, their interests were aligned with those of the LBHI senior noteholders represented by the LBHI Ad Hoc Group.[23] On the other hand, the potential of benefitting from these two claims gave them a common interest in opposing substantive consolidation with the so-called Non-Consolidation Plan proponents.[24]

---

[23]     The UST wrongly asserts that the LBT Ad Hoc Group's interests were not aligned with the LBHI Ad Hoc Group's interests. See UST Objection ¶ 44. Confirmation of the Sub-Con Plan would not have resulted in the LBT Ad Hoc Group being "out of the money" due to the elimination of the LBT Intercompany Claim. Substantive consolidation of the Debtors and their domestic and foreign non-debtor affiliates, to the extent permitted, would have resulted in all of the Debtors and all of their foreign subsidiaries being pooled at LBHI and all worldwide creditors having a single, direct claim against LBHI's worldwide assets.

[24]     Contrary to the UST's assertion, neither Brown Rudnick nor the Ad Hoc Group claims primary responsibility for development and filing of the Non-Con Plan, and they fully acknowledge that such effort was spearheaded by Goldman and its counsel, Cleary Gottleib. See UST Objection ¶ 46. But as the time records submitted in connection with the LBT Application demonstrate, Brown Rudnick and members of the LBT Ad Hoc Group did collectively spend over 50 hours participating in drafting sessions with Cleary Gottlieb and numerous counsel for other creditors developing various aspects of the Non-Con Plan. In addition, Brown Rudnick supported several members of the LBT Ad Hoc Group as co-proponents of the Non-Con Plan. These efforts were designed to serve as a counterbalance to the worldwide consolidation plan put forth by the LBHI Senior Noteholders and to the unfavorable treatment provided under the Debtors' Original Plan as a purported settlement of the risk of substantive consolidation. The success of these efforts is demonstrated by the Debtors' decision to build consensus for a Plan premised on settlements of these issues. Furthermore, these efforts were not undertaken merely to benefit members of the LBT Ad Hoc Group, as evidenced by the fact that the LBT Ad Hoc Group did not pursue the position that would have provided maximum recoveries for LBT Noteholders. Specifically, the LBT Noteholders would have benefitted most from substantive consolidation of the U.S. Lehman entities but non-consolidation of the foreign Lehman entities, including LBT. This position was supported by case law, as there was little or no authority for the proposition that the Court could have exercised its jurisdiction over the foreign Lehman affiliates in disregard of applicable foreign laws and principles of comity and, in many instances, foreign tribunals that were overseeing the

25.      Moreover, because its initial focus was on LBT's Dutch insolvency proceedings, the LBT Ad Hoc Group had developed good relations with the JBTs and a group of holders of more conventional "par/par" LBT Notes and, as outline din more detail below, was in a position to help persuade them to support a plan of reorganization.

26.      While the LBT Ad Hoc Group does not claim sole credit for brokering the global settlement embodied in the Plan (indeed, as the Committee's Response indicates, the Debtors, the Committee and many other parties spent numerous hours working behind the scenes to forge consensus in these Chapter 11 Cases, see Committee Response ¶ 5), its unique position allowed it to play a critical role in the process.  Among its contributions in this regard were:

- Persuading the Debtors and other key constituencies to remove the cap applicable to the LBHI Guarantee Claims and reduce the "plan adjustment" percentage applicable to senior third party guarantee claims (which included the LBHI Guarantee Claims) from 30% (as proposed in the Debtors' First Amended Plan) to 20%, and then convincing members of the Par/Par Group and other LBT Noteholders not to press for an even lower plan adjustment percentage or to participate in the additional recoveries afforded to LBHI Senior Noteholders and general unsecured creditors by virtue of the plan adjustments from creditors of other Debtors;

- Negotiating a full allowance of the LBT Intercompany Claim and treatment as senior debt entitled to pour-overs from subordinated LBHI creditor classes a condition of their support for the Plan, which helped lead to the LBT Settlement and the JBTs' support for the Plan (the Original Plan would have only allowed the LBT Intercompany Claim at 50% of the amount reflected on LBHI's books and records);

- Vocally supporting the concept of allowance of intercompany claims due to LBHI from LBSF and other Debtors at only 80% of the amount due as part of the overall resolution, even though this would diminish the pool of assets available to LBHI creditors; and

- Helping persuade LBHI senior noteholders and the Non-Consolidation Plan proponents to support this global compromise and abandon their separate competing plans.

winding up proceedings of such affiliates.  Rather, the position taken by the LBT Ad Hoc Group was that non-consolidation of all Lehman entities, including domestic entities, was the best course of action.

15

27.     The efforts of Brown Rudnick and the LBT Ad Hoc Group significantly increased the recoveries on the LBT-related claims. Under the Debtors' Original Plan, the LBT Intercompany Claim was allowed at 50% as non-senior debt and the allowed amount of the LBHI Guarantee Claims was capped at $26.4 billion (compared with their face amount of approximately $31.1 billion). The First Amended Plan filed in January 2011 would have allowed the LBT Intercompany Claim in full without deduction, but would have subjected the LBHI Guarantee Claims to a 30% plan adjustment. Under the confirmed Plan, the LBT Intercompany Claim was ultimately allowed in full and treated as senior debt entitled to share in redistributions from subordinated LBHI creditors classes and LBHI Guarantee Claims were subject to only a 20% plan adjustment, were not capped and were treated as senior debt entitled to pour-overs from certain subordinated LBHI claims classes.[25]

28.     Significantly, according to the Disclosure Statement the total estimated recovery on the LBT-related claims (i.e., the LBT Intercompany Claim and the LBHI Guarantee Claims) under the confirmed Plan is approximately 27-28% whereas the total estimated recovery for all LBT-related claims under the Debtors' Original Plan was only approximately 22.0%. Given that members of the LBT Ad Hoc Group only held approximately $3 billion of the more than $34 billion in total notional amount of LBT Notes, there can be no question that the efforts of the LBT Ad Hoc Group conferred substantial benefits on the Debtors' estates, as well as creditors other than the individual members of the LBT Ad Hoc Group.

---

[25]     Notably, the LBT Ad Hoc Group was able to broker the improved treatment for the LBT Intercompany Claim by agreeing to accept certain concessions with respect to treatment on their LBHI Guarantee Claims, the estimated recovery on which dropped from 14.7% in the Debtors' Original Plan to 12.2% in the Debtors' confirmed Plan. Courts may properly consider such concessions in determining whether a creditor made a substantial contribution. See, e.g., In re 9085 E. Mineral Office Bldg., Ltd., 119 B.R. 246, 253 (Bankr. D. Colo. 1990).

C.      **Brown Rudnick's Efforts Were Not Duplicative of Other Estate Professionals**

29.     While Brown Rudnick worked constructively with many professionals in these Chapter 11 Cases, its efforts were not duplicative of theirs.  Its efforts focused on the issues of particular concern to the holders of Structured Securities, with the aim of maximizing the recoveries to LBT Noteholders in particular.  In focusing on these issues, however, Brown Rudnick and the LBT Ad Hoc group could not avoid addressing the major issues in these cases.  The highly successful result in these Chapter 11 Cases is clearly a product of the hard work and efforts of many parties; however, the involvement of many professionals and constituencies in this achievement certainly does not preclude a party from asserting a claim for substantial contribution.

D.      **Compliance with Fee Guidelines**

30.     The UST also asserts, without citation to any legal authority, that even if the LBT Ad Hoc Group has made a substantial contribution, a determination as to whether the fees and expenses sought are "reasonable" under Section 503(b) cannot be made because the time records submitted in support of the LBT Application do not comply with the United States Trustee Fee Guidelines (the "UST Guidelines") and the Court's Amended Guidelines for Fees and Disbursements for Professionals in the Southern District of New York Bankruptcy Cases (General Order M-389) (as amended) (the "Court Guidelines" and, together with the UST Fee Guidelines, the "Fee Guidelines").  See UST Objection ¶ 49.  There is no requirement in the Bankruptcy Code, Bankruptcy Rules or Local Rules that the UST Guidelines and Court Guidelines are meant to apply to counsel for unofficial creditor groups, as opposed to "retained professionals" for the estate or committee seeking reimbursement under 11 U.S.C. § 330(a).  Indeed, the Court Guidelines indicate that they are supplemental to the requirements contained in the UST Guidelines.  See Court Guidelines at 1.  In turn, the UST Guidelines indicate that they

17

relate to applications for compensation and reimbursement of expenses under Section 330 of the Bankruptcy Code.  See UST Guidelines at 1.  This Application is being brought pursuant to Section 503(b) of the Code.

31.     However, if, notwithstanding this, the Court determines that the time records submitted in support of the LBT Application must comply with the Fee Guidelines, Brown Rudnick is prepared to supplement LBT Application with more detailed time records organized by task and expense detail and backup.

### CONCLUSION

WHEREFORE, for the reasons stated herein and in the LBT Application, Brown Rudnick respectfully requests that the Court enter an Order granting the relief requested in the LBT Application.


Dated: August 13, 2012
       New York, New York


                                        By:    /s/ Steven B. Levine
                                               Steven B. Levine
                                               Peter J.M. Declercq
                                               BROWN RUDNICK LLP
                                               One Financial Center
                                               Boston, MA  02111
                                               Telephone:  (617) 856-8200
                                               Facsimile: (617) 856-8201

                                               *Counsel to the Ad Hoc Group of Lehman*
                                               *Brothers Treasury Co. B.V. Noteholders*