B 210A (Form 210A) (12/09)

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF NEW YORK

In re <u>Lehman Brothers Holdings Inc., et al.</u>, Debtors.

Case No. <u>08-13555 (JMP)</u>
(Jointly Administered)

## PARTIAL TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

| Monarch Master Funding Ltd | Deutsche Bank AG, London Branch |
|---|---|
| Name of Transferee | Name of Transferor |

Name and Address where notices to transferee should be sent:

Monarch Master Funding Ltd
c/o Monarch Alternative Capital LP
535 Madison Avenue, Floor 26
New York, NY 10022
Attn: Michael Gillin
Phone: (212) 554-1743
Fax: 1-(866)-741-3564
Email: michael.gillin@monarchlp.com;
fundops@monarchlp.com

Name and Address where transferee payments should be sent (if different from above): N/A

Court Claim # (if known): <u>67080</u>
Total Amount of Claim as Filed: <u>$565,870,087.00</u>
Total Allowed Amount of Claim: <u>$325,000,000.00</u>
Allowed Amount of Claim to be Transferred:
<u>$2,568,025.50</u>

Date Claim Filed: <u>09/20/2010</u>
Debtor: <u>Lehman Commercial Paper Inc.</u>

Name and Address of Transferor:

Deutsche Bank AG, London Branch
c/o Deutsche Bank Securities Inc.
60 Wall Street
New York, New York 10005
Attn:    Rich Vichaidith
Email: richard.vichaidith@db.com

**\*\*PLEASE SEE ATTACHED DOCUMENTS\*\***

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

**MONARCH MASTER FUNDING LTD**

By: Monarch Alternative Capital LP
Its: Advisor

By: _____          Date: August 15, 2012 _____
Name of Transferee/Transferee's Agent

*Penalty for making a false statement: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571.*

Christopher Santana
Managing Principal

## Exhibit A

Evidence of Transfer from Transferor to Transferee

EVIDENCE OF PARTIAL TRANSFER OF CLAIM

TO:        United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court")
           Attn: Clerk

AND TO:    Lehman Commercial Paper Inc. (the "Debtor")
           Case No. 08-13555 (JMP) (Jointly Administered) (the "Case")

Proof of Claim Number 67080

**DEUTSCHE BANK AG, LONDON BRANCH** and its successors and assigns ("Seller"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby certify that it has unconditionally and irrevocably sold, transferred and assigned unto:

**Monarch Master Funding Ltd**
C/O Monarch Alternative Capital LP
535 Madison Avenue
26th Floor
New York, NY 10022
Attn: Michael Gillin
Email: michael.gillin@monarchlp.com; fundops@monarchlp.com
Phone: (212) 554-1743
Fax: (866) 741-3564

and its successors and assigns ("Buyer"), all right, title and interest in and to Proof of Claim Number 67080, solely to the extent of $2,568,025.50, (the "Claim") against Debtor in the Case in the Bankruptcy Court, or any other court with jurisdiction over the bankruptcy proceedings of the Debtor.

Seller hereby waives any objection to the transfer of the Claim to Buyer on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law. Seller acknowledges and understands, and hereby stipulates that an order of the Bankruptcy Court may be entered without further notice to Seller transferring to Buyer the Claim and recognizing the Buyer as the sole owner and holder of the Claim.

You are hereby directed to make all future payments and distributions, and to give all notices and other communications, in respect of the Claim to Buyer.

IN WITNESS WHEREOF, the undersigned has duly executed this Evidence of Partial Transfer of Claim by its duly authorized representative dated August 15 2012.

**DEUTSCHE BANK AG, LONDON BRANCH**

By: _____          By: _____
    Name:  Michael Sutton                   Name:
    Title: Managing Director                Title:
                                                    Philipp Roever
                                                    Vice President

**Monarch Master Funding Ltd**
By: Monarch Alternative Capital LP
Its: Advisor

By: _____
    Name:
    Title:

EVIDENCE OF PARTIAL TRANSFER OF CLAIM

TO:     United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court")
         Attn: Clerk

AND TO:     Lehman Commercial Paper Inc. (the "Debtor")
         Case No. 08-13555 (JMP) (Jointly Administered) (the "Case")

Proof of Claim Number 67080

**DEUTSCHE BANK AG, LONDON BRANCH** and its successors and assigns ("Seller"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby certify that it has unconditionally and irrevocably sold, transferred and assigned unto:

**Monarch Master Funding Ltd**
C/O Monarch Alternative Capital LP
535 Madison Avenue
26th Floor
New York, NY 10022
Attn: Michael Gillin
Email: michael.gillin@monarchlp.com; fundops@monarchlp.com
Phone: (212) 554-1743
Fax: (866) 741-3564

and its successors and assigns ("Buyer"), all right, title and interest in and to Proof of Claim Number 67080, solely to the extent of $2,568,025.50, (the "Claim") against Debtor in the Case in the Bankruptcy Court, or any other court with jurisdiction over the bankruptcy proceedings of the Debtor.

Seller hereby waives any objection to the transfer of the Claim to Buyer on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law. Seller acknowledges and understands, and hereby stipulates that an order of the Bankruptcy Court may be entered without further notice to Seller transferring to Buyer the Claim and recognizing the Buyer as the sole owner and holder of the Claim.

You are hereby directed to make all future payments and distributions, and to give all notices and other communications, in respect of the Claim to Buyer.

IN WITNESS WHEREOF, the undersigned has duly executed this Evidence of Partial Transfer of Claim by its duly authorized representative dated August 15 2012.

**DEUTSCHE BANK AG, LONDON BRANCH**

By: _____
    Name:
    Title:

**Monarch Master Funding Ltd**
By: Monarch Alternative Capital LP
Its: Advisor

By: _____
    Name: Christopher Santana
    Title: Managing Principal

By: _____
    Name:
    Title:

<u>Exhibit B</u>

Proof of Claim

| | |
|---|---|
| *United States Bankruptcy C̲o̲urt̲, ̲Southern District of New York*<br>Lehman Brothers Holdings Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 5076<br>New York, NY 10150-5076 | **PROOF OF CLAIM** |

| In Re:<br>Lehman Brothers Holdings Inc., et al.,<br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) | Filed: USBC - Southern District of New York<br>Lehman Brothers Holdings Inc., Et Al.<br>08-13555 (JMP)     0000067080 |
|---|---|---|
| Name of Debtor Against Which Claim is Held<br>**Lehman Commercial Paper Inc.** | Case No. of Debtor<br>**08-13900** | |

NOTE: This form should not be used to make a claim for an administrative expense arising
after the commencement of the case. A request for payment of an administrative expense
may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make
a claim for Lehman Programs Securities. (See definition on reverse side.)

| | |
|---|---|
| Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)<br><br>Swedbank AB, New York Branch<br>One Penn Plaza, 15th Floor<br>New York, NY 10019<br>Attn: John Matthews<br><br>Telephone number:            Email Address: | ☑ Check this box to indicate that this claim amends a previously filed claim.<br><br>**Court Claim Number: 22118**<br>*(If known)*<br><br>Filed on: **Sept. 21, 2009** |
| Name and address where payment should be sent (if different from above)<br><br><br><br>Telephone number:            Email Address: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

**1.    Amount of Claim as of Date Case Filed:** $    565,870,087

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

**\*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is based on a Derivative Contract or Guarantee.

**2.    Basis for Claim:** See attached addendum to amended proof of claim
(See instruction #2 on reverse side.)

**3.    Last four digits of any number by which creditor identifies debtor:** _____
    3a. **Debtor may have scheduled account as:** _____
        (See instruction #3a on reverse side.)

**4.    Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate    ☐ Motor Vehicle    ☐ Other
Describe: _____
Value of Property: $_____    Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____    Basis for perfection: _____
**Amount of Secured Claim:** $_____    **Amount Unsecured:** $_____

**6.    Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

**5.    Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**Amount entitled to priority:**

$_____

**7.    Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8.    Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

FOR COURT USE ONLY

**FILED / RECEIVED**

SEP 2 0 2010

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date:<br><br>9/17/2010 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>John Matthews    ~~General Manager~~    Donald Weiss    *Weiss VP* |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

September 17, 2010

## ADDENDUM TO AMENDED PROOF OF CLAIM
## OF SWEDBANK AB, NEW YORK BRANCH

<u>Additional Addresses for Notice</u>. Claimant's address is set forth on the first page of this amended proof of claim. Any notice relating to this amended proof of claim should be sent to the address set forth on the first page of this amended proof of claim with additional copies to be sent to the following address:

      DLA Piper LLP (US)
      1251 Avenue of the Americas
      New York, New York 10020
      Attention: William M. Goldman, Esq.

<u>Basis of Claim</u>. This proof of claim amends and supersedes Claim No. 22118 filed on September 21, 2009 (the "<u>Initial LCPI Proof of Claim</u>").

Lehman Commercial Paper Inc. ("<u>LCPI</u>"), Lehman Brothers Inc. and Claimant are parties to a whole loan commercial mortgage Master Repurchase Agreement, dated as of December 3, 2002 (as amended, the "<u>Repurchase Agreement</u>"). On September 24, 2008, Claimant gave written notice to LCPI and certain other entities that an Event of Default existed under the Repurchase Agreement and exercised its right to accelerate the Repurchase Date under the Repurchase Agreement. As a result of LCPI's failure to repurchase the Purchased Securities (as defined in the Repurchase Agreement), Claimant has taken possession and control of the Purchased Securities in accordance with the express terms of the Repurchase Agreement. The unsecured claim covered by this amended proof of claim (as well as the unsecured claim represented by the Initial LCPI Proof of Claim) results from the fact that the value of the Purchased Securities as of September 24, 2008 was less than the amount owed to Claimant under the Repurchase Agreement.

The Initial LCPI Proof of Claim was filed in an unliquidated amount. The purpose of this amendment is to set forth the amount of the difference between the amount owed to Claimant under the Repurchase Agreement as of the Date Case Filed and the value of the Purchased Securities as of September 24, 2008, which is calculated as follows:

Deal No. 1003845:

| | |
|---|---|
| Value Date/Purchase Date: | 08 Sep 2008 |
| Maturity Date/Repurchase Date: | 22 Sep 2008 |
| Commencement Proceeds/Purchase Price: | $350,000,000.00 |
| Repo Rate/Pricing Rate: | 3.91750% |
| Amount owed as of 22 Sep 2008/Repurchase Price: | $350,533,215.28 |

| | |
|---|---|
| Interest from 22 Sep 2008 to 5 Oct 2008 (13 days @ 5%): | $632,907.19 |
| Total owed on Deal No. 1003845 as of October 5, 2008: | $351,166,122.47 |

Deal No. 1003846

| | |
|---|---|
| Value Date/Purchase Date: | 08 Sep 2008 |
| Maturity Date/Repurchase Date: | 08 Oct 2008 |
| Commencement Proceeds/Purchase Price: | $1,000,000,000.00 |
| Repo Rate/Pricing Rate: | 3.98688% |
| Total owed as of 24 Sep 2008: | $1,001,771,946.67 |
| Interest from 24 Sep 2008 to 5 Oct 2008 (11 days @ 5%): | $1,530,484.92 |
| Total owed on Deal No. 1003846 as of 5 Oct 2008: | $1,003,302,431.59 |

Summary

| | |
|---|---|
| Amount Owed on Deal No. 1003845 as of 5 Oct 2008: | $351,166,122.47 |
| Amount Owed on Deal No. 1003846 as of 5 Oct 2008: | $1,003,302,431.59 |
| Total Amount Owed as of 5 Oct 2008: | $1,354,468,554.06 |
| Value of Purchased Securities as of September 24, 2008 | $788,598,467 |
| Difference (unsecured claim) | $565,870,087 |

Documentation. Numerous documents support this amended proof of claim including (a) the Master Repurchase Agreement dated as of December 3, 2002, between Lehman Brothers Inc., LCPI and Claimant; (b) the Addendum to Master Repurchase Agreement, dated as of December 3, 2002; (c) the Amendment to Master Repurchase Agreement and Addendum to Master Repurchase Agreement, dated as of December 10, 2003; (d) Confirmations for Deal No. 1003845 and Deal No. 1003846, each dated September 4, 2008; (e) Tri-Party Custody Agreement dated as of December 23, 2002; (f) Amended and Restated Commitment Letter dated August 26, 2008; and (g) default letter dated August 24, 2008. The documents specifically listed in the preceding sentence are attached hereto. Because of the number and size of other documents supporting this amended proof of claim, they are not being filed but will be provided upon proper request therefor.

---

Repurchase Agreement ¶¶ 11(h), 2(m)(i).

Reservation of Rights

This amended proof of claim is filed solely in connection with Claimant's claim against LCPI pursuant to the Repurchase Agreement. Claimant hereby explicitly reserves the right to assert further, additional and amended claims against LCPI or any of the other Lehman debtors.

By executing and filing this amended proof of claim, Claimant is not (i) waiving or releasing Claimant's rights against any other entity or person or (ii) electing a remedy which waives or otherwise affects any other remedy of Claimant.



# Master Repurchase Agreement

September 1996 Version

Dated as of    **December 3, 2002**

Between:    **Lehman Brothers Inc.**
            **Lehman Commercial Paper Inc.**

and    **Swedbank (ForeningsSparbanken AB (Publ)), New York Branch**

*[complete legal name of counterparty]*

## 1. Applicability

From time to time the parties hereto may enter into transactions in which one party ("Seller")
agrees to transfer to the other ("Buyer") securities or other assets ("Securities") against the transfer
of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such Securities at a
date certain or on demand, against the transfer of funds by Seller. Each such transaction shall be
referred to herein as a "Transaction" and, unless otherwise agreed in writing, shall be governed by
this Agreement, including any supplemental terms or conditions contained in Annex I hereto and
in any other annexes identified herein or therein as applicable hereunder.

## 2. Definitions

(a) "Act of Insolvency", with respect to any party, (i) the commencement by such party as debtor of
any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, moratori-
um, dissolution, delinquency or similar law, or such party seeking the appointment or election
of a receiver, conservator, trustee, custodian or similar official for such party or any substantial
part of its property, or the convening of any meeting of creditors for purposes of commencing
any such case or proceeding or seeking such an appointment or election, (ii) the commence-
ment of any such case or proceeding against such party, or another seeking such an appoint-
ment or election, or the filing against a party of an application for a protective decree under the
provisions of the Securities Investor Protection Act of 1970, which (A) is consented to or not
timely contested by such party, (B) results in the entry of an order for relief, such an appoint-
ment or election, the issuance of such a protective decree or the entry of an order having a sim-
ilar effect, or (C) is not dismissed within 15 days, (iii) the making by such party of a general
assignment for the benefit of creditors, or (iv) the admission in writing by such party of such
party's inability to pay such party's debts as they become due;

(b) "Additional Purchased Securities", Securities provided by Seller to Buyer pursuant to Paragraph
4(a) hereof;

(c) "Buyer's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(d) "Buyer's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Seller's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction;

(e) "Confirmation", the meaning specified in Paragraph 3(b) hereof;

(f) "Income", with respect to any Security at any time, any principal thereof and all interest, dividends or other distributions thereon;

(g) "Margin Deficit", the meaning specified in Paragraph 4(a) hereof;

(h) "Margin Excess", the meaning specified in Paragraph 4(b) hereof;

(i) "Margin Notice Deadline", the time agreed to by the parties in the relevant Confirmation, Annex I hereto or otherwise as the deadline for giving notice requiring same-day satisfaction of margin maintenance obligations as provided in Paragraph 4 hereof (or, in the absence of any such agreement, the deadline for such purposes established in accordance with market practice);

(j) "Market Value", with respect to any Securities as of any date, the price for such Securities on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein (other than any Income credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) as of such date (unless contrary to market practice for such Securities);

(k) "Price Differential", with respect to any Transaction as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction on a 360 day per year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the date of determination (reduced by any amount of such Price Differential previously paid by Seller to Buyer with respect to such Transaction);

(l) "Pricing Rate", the per annum percentage rate for determination of the Price Differential;

(m) "Prime Rate", the prime rate of U.S. commercial banks as published in The Wall Street Journal (or, if more than one such rate is published, the average of such rates);

(n) "Purchase Date", the date on which Purchased Securities are to be transferred by Seller to Buyer;

(o) "Purchase Price", (i) on the Purchase Date, the price at which Purchased Securities are transferred by Seller to Buyer, and (ii) thereafter, except where Buyer and Seller agree otherwise, such price increased by the amount of any cash transferred by Buyer to Seller pursuant to Paragraph 4(b) hereof and decreased by the amount of any cash transferred by Seller to Buyer pursuant to Paragraph 4(a) hereof or applied to reduce Seller's obligations under clause (ii) of Paragraph 5 hereof;

(p) "Purchased Securities", the Securities transferred by Seller to Buyer in a Transaction hereunder, and any Securities substituted therefor in accordance with Paragraph 9 hereof. The term "Purchased Securities" with respect to any Transaction at any time also shall include Additional Purchased Securities delivered pursuant to Paragraph 4(a) hereof and shall exclude Securities returned pursuant to Paragraph 4(b) hereof;

(q) "Repurchase Date", the date on which Seller is to repurchase the Purchased Securities from Buyer, including any date determined by application of the provisions of Paragraph 3(c) or 11 hereof;

(r) "Repurchase Price", the price at which Purchased Securities are to be transferred from Buyer to Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price and the Price Differential as of the date of such determination;

(s) "Seller's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Seller's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(t) "Seller's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Buyer's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction.

## 3. Initiation; Confirmation; Termination

(a) An agreement to enter into a Transaction may be made orally or in writing at the initiation of either Buyer or Seller. On the Purchase Date for the Transaction, the Purchased Securities shall be transferred to Buyer or its agent against the transfer of the Purchase Price to an account of Seller.

(b) Upon agreeing to enter into a Transaction hereunder, Buyer or Seller (or both), as shall be agreed, shall promptly deliver to the other party a written confirmation of each Transaction (a "Confirmation"). The Confirmation shall describe the Purchased Securities (including CUSIP number, if any), identify Buyer and Seller and set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date, unless the Transaction is to be terminable on demand, (iv) the Pricing Rate or Repurchase Price applicable to the Transaction, and (v) any additional terms or conditions of the Transaction not inconsistent with this Agreement. The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and Seller with respect to the Transaction to which the Confirmation relates, unless with

respect to the Confirmation specific objection is made promptly after receipt thereof. In the event of any conflict between the terms of such Confirmation and this Agreement, this Agreement shall prevail.

(c)   In the case of Transactions terminable upon demand, such demand shall be made by Buyer or Seller, no later than such time as is customary in accordance with market practice, by telephone or otherwise on or prior to the business day on which such termination will be effective. On the date specified in such demand, or on the date fixed for termination in the case of Transactions having a fixed term, termination of the Transaction will be effected by transfer to Seller or its agent of the Purchased Securities and any Income in respect thereof received by Buyer (and not previously credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) against the transfer of the Repurchase Price to an account of Buyer.

## 4.   Margin Maintenance

(a)   If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer is less than the aggregate Buyer's Margin Amount for all such Transactions (a "Margin Deficit"), then Buyer may by notice to Seller require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional Securities reasonably acceptable to Buyer ("Additional Purchased Securities"), so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller).

(b)   If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Seller exceeds the aggregate Seller's Margin Amount for all such Transactions at such time (a "Margin Excess"), then Seller may by notice to Buyer require Buyer in such Transactions, at Buyer's option, to transfer cash or Purchased Securities to Seller, so that the aggregate Market Value of the Purchased Securities, after deduction of any such cash or any Purchased Securities so transferred, will thereupon not exceed such aggregate Seller's Margin Amount (increased by the amount of any Margin Excess as of such date arising from any Transactions in which such Seller is acting as Buyer).

(c)   If any notice is given by Buyer or Seller under subparagraph (a) or (b) of this Paragraph at or before the Margin Notice Deadline on any business day, the party receiving such notice shall transfer cash or Additional Purchased Securities as provided in such subparagraph no later than the close of business in the relevant market on such day. If any such notice is given after the Margin Notice Deadline, the party receiving such notice shall transfer such cash or Securities no later than the close of business in the relevant market on the next business day following such notice.

(d)   Any cash transferred pursuant to this Paragraph shall be attributed to such Transactions as shall be agreed upon by Buyer and Seller.

(e) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer or Seller (or both) under subparagraphs (a) and (b) of this Paragraph may be exercised only where a Margin Deficit or Margin Excess, as the case may be, exceeds a specified dollar amount or a specified percentage of the Repurchase Prices for such Transactions (which amount or percentage shall be agreed to by Buyer and Seller prior to entering into any such Transactions).

(f) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer and Seller under subparagraphs (a) and (b) of this Paragraph to require the elimination of a Margin Deficit or a Margin Excess, as the case may be, may be exercised whenever such a Margin Deficit or Margin Excess exists with respect to any single Transaction hereunder (calculated without regard to any other Transaction outstanding under this Agreement).

## 5. Income Payments

Seller shall be entitled to receive an amount equal to all Income paid or distributed on or in respect of the Securities that is not otherwise received by Seller, to the full extent it would be so entitled if the Securities had not been sold to Buyer. Buyer shall, as the parties may agree with respect to any Transaction (or, in the absence of any such agreement, as Buyer shall reasonably determine in its discretion), on the date such Income is paid or distributed either (i) transfer to or credit to the account of Seller such Income with respect to any Purchased Securities subject to such Transaction or (ii) with respect to Income paid in cash, apply the Income payment or payments to reduce the amount, if any, to be transferred to Buyer by Seller upon termination of such Transaction. Buyer shall not be obligated to take any action pursuant to the preceding sentence (A) to the extent that such action would result in the creation of a Margin Deficit, unless prior thereto or simultaneously therewith Seller transfers to Buyer cash or Additional Purchased Securities sufficient to eliminate such Margin Deficit, or (B) if an Event of Default with respect to Seller has occurred and is then continuing at the time such Income is paid or distributed.

## 6. Security Interest

Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, Seller shall be deemed to have pledged to Buyer as security for the performance by Seller of its obligations under each such Transaction, and shall be deemed to have granted to Buyer a security interest in, all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof.

## 7. Payment and Transfer

Unless otherwise mutually agreed, all transfers of funds hereunder shall be in immediately available funds. All Securities transferred by one party hereto to the other party (i) shall be in suitable form for transfer or shall be accompanied by duly executed instruments of transfer or assignment in blank and such other documentation as the party receiving possession may reasonably request, (ii) shall be transferred on the book-entry system of a Federal Reserve Bank, or (iii) shall be transferred by any other method mutually acceptable to Seller and Buyer.

## 8. Segregation of Purchased Securities

To the extent required by applicable law, all Purchased Securities in the possession of Seller shall be segregated from other securities in its possession and shall be identified as subject to this Agreement. Segregation may be accomplished by appropriate identification on the books and records of the holder, including a financial or securities intermediary or a clearing corporation. All of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities, but no such transaction shall relieve Buyer of its obligations to transfer Purchased Securities to Seller pursuant to Paragraph 3, 4 or 11 hereof, or of Buyer's obligation to credit or pay Income to, or apply Income to the obligations of, Seller pursuant to Paragraph 5 hereof.

---

**Required Disclosure for Transactions in Which the Seller Retains Custody of the Purchased Securities**

Seller is not permitted to substitute other securities for those subject to this Agreement and therefore must keep Buyer's securities segregated at all times, unless in this Agreement Buyer grants Seller the right to substitute other securities. If Buyer grants the right to substitute, this means that Buyer's securities will likely be commingled with Seller's own securities during the trading day. Buyer is advised that, during any trading day that Buyer's securities are commingled with Seller's securities, they [will]* [may]** be subject to liens granted by Seller to [its clearing bank]* [third parties]** and may be used by Seller for deliveries on other securities transactions. Whenever the securities are commingled, Seller's ability to resegregate substitute securities for Buyer will be subject to Seller's ability to satisfy [the clearing]* [any]** lien or to obtain substitute securities.

* Language to be used under 17 C.F.R. ß403.4(e) if Seller is a government securities broker or dealer other than a financial institution.
** Language to be used under 17 C.F.R. ß403.5(d) if Seller is a financial institution.

---

## 9. Substitution

(a) Seller may, subject to agreement with and acceptance by Buyer, substitute other Securities for any Purchased Securities. Such substitution shall be made by transfer to Buyer of such other Securities and transfer to Seller of such Purchased Securities. After substitution, the substituted Securities shall be deemed to be Purchased Securities.

(b) In Transactions in which Seller retains custody of Purchased Securities, the parties expressly agree that Buyer shall be deemed, for purposes of subparagraph (a) of this Paragraph, to have agreed to and accepted in this Agreement substitution by Seller of other Securities for Purchased Securities; provided, however, that such other Securities shall have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.

## 10. Representations

Each of Buyer and Seller represents and warrants to the other that (i) it is duly authorized to execute and deliver this Agreement, to enter into Transactions contemplated hereunder and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery and performance, (ii) it will engage in such Transactions as principal (or, if agreed in writing, in the form of an annex hereto or otherwise, in advance of any Transaction by the other party hereto, as agent for a disclosed principal), (iii) the person signing this Agreement on its behalf is duly authorized to do so on its behalf (or on behalf of any such disclosed principal), (iv) it has obtained all authorizations of any governmental body required in connection with this Agreement and the Transactions hereunder and such authorizations are in full force and effect and (v) the execution, delivery and performance of this Agreement and the Transactions hereunder will not violate any law, ordinance, charter, by-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected. On the Purchase Date for any Transaction Buyer and Seller shall each be deemed to repeat all the foregoing representations made by it.

## 11. Events of Default

In the event that (i) Seller fails to transfer or Buyer fails to purchase Purchased Securities upon the applicable Purchase Date, (ii) Seller fails to repurchase or Buyer fails to transfer Purchased Securities upon the applicable Repurchase Date, (iii) Seller or Buyer fails to comply with Paragraph 4 hereof, (iv) Buyer fails, after one business day's notice, to comply with Paragraph 5 hereof, (v) an Act of Insolvency occurs with respect to Seller or Buyer, (vi) any representation made by Seller or Buyer shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, or (vii) Seller or Buyer shall admit to the other its inability to, or its intention not to, perform any of its obligations hereunder (each an "Event of Default"):

(a) The nondefaulting party may, at its option (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), declare an Event of Default to have occurred hereunder and, upon the exercise or deemed exercise of such option, the Repurchase Date for each Transaction hereunder shall, if it has not already occurred, be deemed immediately to occur (except that, in the event that the Purchase Date for any Transaction has not yet occurred as of the date of such exercise or deemed exercise, such Transaction shall be deemed immediately canceled). The nondefaulting party shall (except upon the occurrence of an Act of Insolvency) give notice to the defaulting party of the exercise of such option as promptly as practicable.

(b) In all Transactions in which the defaulting party is acting as Seller, if the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, (i) the defaulting party's obligations in such Transactions to repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase Date determined in accordance with subparagraph (a) of this Paragraph, shall thereupon become immediately due and payable, (ii) all Income paid after such exercise or deemed exercise shall be retained by the nondefaulting party and applied to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder, and (iii) the defaulting party shall immediately deliver to the nondefaulting party any Purchased Securities subject to such Transactions then in the defaulting party's possession or control.

(c) In all Transactions in which the defaulting party is acting as Buyer, upon tender by the nondefaulting party of payment of the aggregate Repurchase Prices for all such Transactions, all right, title and interest in and entitlement to all Purchased Securities subject to such Transactions shall be deemed transferred to the nondefaulting party, and the defaulting party shall deliver all such Purchased Securities to the nondefaulting party.

(d) If the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, the nondefaulting party, without prior notice to the defaulting party, may:

  (i)  as to Transactions in which the defaulting party is acting as Seller, (A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source, against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder; and

  (ii) as to Transactions in which the defaulting party is acting as Buyer, (A) immediately purchase, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, securities ("Replacement Securities") of the same class and amount as any Purchased Securities that are not delivered by the defaulting party to the nondefaulting party as required hereunder or (B) in its sole discretion elect, in lieu of purchasing Replacement Securities, to be deemed to have purchased Replacement Securities at the price therefor on such date, obtained from a generally recognized source or the most recent closing offer quotation from such a source.

Unless otherwise provided in Annex I, the parties acknowledge and agree that (1) the Securities subject to any Transaction hereunder are instruments traded in a recognized market, (2) in the absence of a generally recognized source for prices or bid or offer quotations for any Security, the nondefaulting party may establish the source therefor in its sole discretion and (3) all prices, bids and offers shall be determined together with accrued Income (except to the extent contrary to market practice with respect to the relevant Securities).

(e) As to Transactions in which the defaulting party is acting as Buyer, the defaulting party shall be liable to the nondefaulting party for any excess of the price paid (or deemed paid) by the nondefaulting party for Replacement Securities over the Repurchase Price for the Purchased Securities replaced thereby and for any amounts payable by the defaulting party under Paragraph 5 hereof or otherwise hereunder.

(f) For purposes of this Paragraph 11, the Repurchase Price for each Transaction hereunder in respect of which the defaulting party is acting as Buyer shall not increase above the

amount of such Repurchase Price for such Transaction determined as of the date of the exercise or deemed exercise by the nondefaulting party of the option referred to in sub-paragraph (a) of this Paragraph.

(g) The defaulting party shall be liable to the nondefaulting party for (i) the amount of all reasonable legal or other expenses incurred by the nondefaulting party in connection with or as a result of an Event of Default, (ii) damages in an amount equal to the cost (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of an Event of Default, and (iii) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default in respect of a Transaction.

(h) To the extent permitted by applicable law, the defaulting party shall be liable to the non-defaulting party for interest on any amounts owing by the defaulting party hereunder, from the date the defaulting party becomes liable for such amounts hereunder until such amounts are (i) paid in full by the defaulting party or (ii) satisfied in full by the exercise of the nondefaulting party's rights hereunder. Interest on any sum payable by the default-ing party to the nondefaulting party under this Paragraph 11(h) shall be at a rate equal to the greater of the Pricing Rate for the relevant Transaction or the Prime Rate.

(i) The nondefaulting party shall have, in addition to its rights hereunder, any rights other-wise available to it under any other agreement or applicable law.

## 12. Single Agreement

Buyer and Seller acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, each of Buyer and Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the perfor-mance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder and (iii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.

## 13. Notices and Other Communications

Any and all notices, statements, demands or other communications hereunder may be given by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the address specified in Annex II hereto, or so sent to such party at any other place specified in a notice of change of address hereafter received by the other. All notices, demands and requests hereun-der may be made orally, to be confirmed promptly in writing, or by other communication as specified in the preceding sentence.

14. **Entire Agreement; Severability**

This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions. Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

15. **Non-assignability; Termination**

(a) The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by either party without the prior written consent of the other party, and any such assignment without the prior written consent of the other party shall be null and void. Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. This Agreement may be terminated by either party upon giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

(b) Subparagraph (a) of this Paragraph 15 shall not preclude a party from assigning, charging or otherwise dealing with all or any part of its interest in any sum payable to it under Paragraph 11 hereof.

16. **Governing Law**

This Agreement shall be governed by the laws of the State of New York without giving effect to the conflict of law principles thereof.

17. **No Waivers, Etc.**

No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure herefrom shall be effective unless and until such shall be in writing and duly executed by both of the parties hereto. Without limitation on any of the foregoing, the failure to give a notice pursuant to Paragraph 4(a) or 4(b) hereof will not constitute a waiver of any right to do so at a later date.

18. **Use of Employee Plan Assets**

(a) If assets of an employee benefit plan subject to any provision of the Employee Retirement Income Security Act of 1974 ("ERISA") are intended to be used by either party hereto (the "Plan Party") in a Transaction, the Plan Party shall so notify the other party prior to the Transaction. The Plan Party shall represent in writing to the other party that the Transaction does not constitute a prohibited transaction under ERISA or is otherwise exempt therefrom, and the other party may proceed in reliance thereon but shall not be required so to proceed.

(b) Subject to the last sentence of subparagraph (a) of this Paragraph, any such Transaction shall proceed only if Seller furnishes or has furnished to Buyer its most recent available audited statement of its financial condition and its most recent subsequent unaudited statement of its financial condition.

(c) By entering into a Transaction pursuant to this Paragraph, Seller shall be deemed (i) to represent to Buyer that since the date of Seller's latest such financial statements, there has been no material adverse change in Seller's financial condition which Seller has not disclosed to Buyer, and (ii) to agree to provide Buyer with future audited and unaudited statements of its financial condition as they are issued, so long as it is a Seller in any outstanding Transaction involving a Plan Party.

## 19. Intent

(a) The parties recognize that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Securities subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(b) It is understood that either party's right to liquidate Securities delivered to it in connection with Transactions hereunder or to exercise any other remedies pursuant to Paragraph 11 hereof is a contractual right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as amended.

(c) The parties agree and acknowledge that if a party hereto is an "insured depository institution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract," as that term is defined in FDIA and any rules, orders or policy statements thereunder (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(d) It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation", respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA).

## 20. Disclosure Relating to Certain Federal Protections

The parties acknowledge that they have been advised that:

(a) in the case of Transactions in which one of the parties is a broker or dealer registered with the Securities and Exchange Commission ("SEC") under Section 15 of the Securities Exchange Act of 1934 ("1934 Act"), the Securities Investor Protection Corporation has

taken the position that the provisions of the Securities Investor Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(b) in the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(c) in the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.

|  |  |
|---|---|
| **Lehman Brothers Inc.**<br>**Lehman Commercial Paper Inc.** | **Swedbank (ForeningsSparbanken AB (Publ)), New York Branch**<br>*[complete legal name of counterparty]* |
| By: _T. Courtney Jenkins_ | By: _John Matthews (signature)_ |
| Name: T. COURTNEY JENKINS | Name: JOHN MATTHEWS |
| Title: VICE PRESIDENT | Title: _____ |
| Date: _____ | Date: 12/27/02 |
|  | By: _(signature)_ |
|  | Name: JIM LANGDON |
|  | Title: SVP/Treasurer |
|  | Date: 12/27/02 |

# ANNEX I
## Supplemental Terms and Conditions

This Annex forms a part of the Master Repurchase Agreement dated as of ___December 3, 2002___ (the "Agreement") between LEHMAN BROTHERS INC., LEHMAN COMMERCIAL PAPER INC. and

**Swedbank (ForeningsSparbanken AB (Publ)), New York Branch**

*[complete legal name of counterparty]*

Capitalized terms used but not defined in this Annex I shall have the meanings ascribed to them in the Agreement.

1.  **This Annex I and Annex II shall form part of the Agreement.**

2.  **With respect to individual repurchase transactions, this Agreement shall only apply to the Lehman Brothers entity (i.e. Lehman Brothers Inc., Lehman Commercial Paper Inc.) printed in the confirmation (as described in Section 3(b) herein) provided to the counterparty of the Lehman Brothers entity.**

3.  Definitions. For purposes of the Agreement, the following terms shall have the following meanings:

    (a) "Margin Notice Deadline", 10:00 am New York City time.

    (b) "Business Day" or "business day", with respect to any Transaction hereunder, a day on which regular trading may occur in the principal market for the Purchased Securities subject to such Transaction. In no event shall a Saturday or Sunday be considered a business day.

4.  Purchase Price Maintenance.

    (a) Unless otherwise expressly agreed by the parties hereto, the parties agree that in any Transaction hereunder whose term extends over an Income payment date for the Securities subject to such Transaction, Buyer shall on the date such Income is paid transfer to or credit to the account of Seller an amount equal to such Income payment or payments pursuant to Paragraph 5(i) and shall not apply the Income payment or payments to reduce the amount to be transferred to Buyer or Seller upon termination of the Transaction pursuant to Paragraph 5(ii) of the Agreement.

    (b) Unless otherwise expressly agreed by the parties hereto, notwithstanding the definition of Purchase Price in Paragraph 2 of the Agreement and the provisions of Paragraph 4 of the Agreement, the parties agree (i) that the Purchase Price will not be increased or decreased by the amount of any cash transferred by one party to the other pursuant to Paragraph 4 of the Agreement and (ii) that transfer of cash shall be treated as if it constituted a transfer of Securities (with a Market Value equal to the U.S. dollar amount of such cash) pursuant to Paragraph 4(a) or (b), as the case may be (including for purposes of the definition of "Additional Purchased Securities").

5.  Submission to Jurisdiction and Waiver of Immunity.

    (a) Each party irrevocably and unconditionally (i) submits to the non-exclusive jurisdiction of any United States Federal or New York State court sitting in Manhattan, and any appellate court from any such court, solely for the purpose of any suit, action or proceeding brought to enforce its obligations under the Agreement and (ii) waives, to the fullest extent it may effectively do so, any defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right of jurisdiction on account of its place of residence or domicile.

    (b) To the extent that either party has or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit, or proceeding, from jurisdiction of any court or from set off or any legal process (whether service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) with respect to itself or any of its property, such party hereby irrevocably waives and agrees not to plead or claim such immunity in respect of any action brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement.

**Annex II**
**Names and Addresses for Communications Between Parties**

**LEHMAN BROTHERS**
745 Seventh Avenue, 28th Floor
New York, New York  10019

Attn.: Robert Guglielmo, Senior Vice President
Transaction Management
(212) 526-7121  phone
(212) 526-7672 fax

**Legal/Documentation Information:**

| | |
|---|---|
| Name of Firm: | Swedbank (FöreningsSparbanken AB (Publ)) |
| Address: | One Penn Plaza  (15th Floor) |
| | NY NY |
| | ~~10019~~  10119 |
| Attn: | Jim Lunford / Margarita Salcedo |
| Tel #: | 212 486 8400 |
| Fax #: | 212 486 3220 |

**Business/Trading Information:**

| | |
|---|---|
| Name of Firm: | Swedbank (FöreningsSparbanken AB (Publ)) |
| Address: | One Penn Plaza  (15th Floor) |
| | NY NY |
| | ~~10019~~  10119 |
| Attn: | Jim Lunford / Mike Ferrara / Luis Pino |
| Tel #: | 212 486 3233 |
| Fax #: | 212 486 3222 |

Annex II-1

[PGAWLAdd 11/99—Swedbank_v1]

## ADDENDUM TO MASTER REPURCHASE AGREEMENT

This ADDENDUM AGREEMENT, dated as of _____December 3, 2002_____ is made by and between **Lehman Commercial Paper Inc.** acting as seller ("Seller") and **Swedbank (ForeningsSparbanken AB (Publ)), New York Branch** acting as buyer ("Buyer").

Capitalized terms used herein but not otherwise defined shall have the meanings ascribed thereto in the Repurchase Agreement (as defined below).

### RECITALS

WHEREAS, Buyer and Seller have entered into a Master Repurchase Agreement dated as of December 3, 2002 (the "Repurchase Agreement"); and

WHEREAS, Buyer and Seller desire to supplement and amend the Repurchase Agreement to enter into Transactions involving Assets (as defined below).

NOW, THEREFORE, the parties hereto agree as follows:

1. The definition of "Securities" in Section 1 of the Repurchase Agreement shall be replaced by the term "Assets" and every reference in the Repurchase Agreement to "Securities" shall be replaced by "Assets".

2. The definition of "Market Value" in Section 2 of the Repurchase Agreement shall be replaced by the following definition: "The price at which the Purchased Assets could readily be sold as determined in good faith by Seller.

3. The following definitions are hereby added to Section 2 of the Repurchase Agreement:

"Assets" mean residential, multifamily or commercial mortgage loans, home equity loans, any servicing rights in respect of loans, or other assets agreed to from time to time by Buyer and Seller, or a participating or pro rata interest therein.

"Counterparty" means the third party which sold or pledged the Assets to Seller pursuant to the Underlying Agreement.

"Underlying Agreement" shall mean the agreement pursuant to which the Counterparty sold or pledged the Assets to Seller.

4. Notwithstanding Section 5 of the Repurchase Agreement, all income payments received with respect to the Purchased Assets shall be retained by Seller pending the occurrence of an Event of Default of Seller.

5. The third sentence of Section 8 of the Repurchase Agreement shall be replaced with the following sentence: "All of Seller's interest in the Purchased Assets shall pass to Buyer on the Purchase Date."

6. Seller may substitute other eligible Assets for any Purchased Assets provided that after taking into account such substitution a Margin Deficit shall not occur.

7. Seller hereby assigns to Buyer such representations and warranties with respect to the Assets as are made by the Counterparty to the Seller pursuant to the Underlying Agreement.

IN WITNESS WHEREOF, the parties have duly executed and delivered this Addendum Agreement as of the date first written above.

**LEHMAN COMMERCIAL PAPER INC.**
("Seller")

By: _T. Cutey, J----_

Name: _T. COURTNEY JENKINS_

Title: _VICE PRESIDENT_

**Swedbank (ForeningsSparbanken AB (Publ)),
New York Branch**
("Buyer")

By: _____

Name: _JOHN MATTHEWS_     _JIM LINDQVIST_

Title: _____     _SVP/TREASURER_

## AMENDMENT
### TO MASTER REPURCHASE AGREEMENT
### and ADDENDUM TO MASTER REPURCHASE AGREEMENT
#### dated as of December 10, 2003

This AMENDMENT TO MASTER REPURCHASE AGREEMENT AND ADDENDUM TO MASTER REPURCHASE AGREEMENT (the "Amendment") is made by and among **Lehman Brothers Inc. ("LBI"), Lehman Commercial Paper Inc. ("LCPI")** (collectively "**Lehman**"), **Swedbank (FöreningsSparbanken AB (publ)), New York Branch ("Swedbank-NY")** and **Swedbank (FöreningsSparbanken AB (publ)), Stockholm, Sweden (Swedbank-Stockholm).**

WHEREAS, Lehman and Swedbank-NY entered into that certain *Master Repurchase Agreement* dated as of December 3, 2002 (the "Repo Agreement");

WHEREAS, LCPI and Swedbank-NY entered into that certain *Addendum to Master Repurchase Agreement* dated as of December 3, 2002 (the "WL-Addendum");

WHEREAS, Lehman and Swedbank-NY wish to add Swedbank-Stockholm as an additional party to the Repo Agreement, subject to all of the rights and responsibilities as set forth in such Repo Agreement;

WHEREAS, LCPI and Swedbank-NY wish to add Swedbank-Stockholm as an additional party to the WL-Addendum, subject to all of the rights and responsibilities as set forth in such WL-Addendum;

WHEREAS, Swedbank-Stockholm wishes to become an additional party to, and accepts all of the rights and responsibilities specified in the Repo Agreement and WL-Addendum.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, as applicable, agree that:

1. Swedbank-Stockholm is named a party to the Repo Agreement and WL-Addendum.

2. The term "Swedbank", whenever it appears in the Repo Agreement or WL-Addendum shall, with regard to any Repurchase Transaction, apply to either the New York Branch or the Stockholm Head Office or both of them, depending upon the instructions provided by Lehman with regard to such Repurchase Transaction pursuant to Section 3(a) of the Repo Agreement.

3. The following address shall be contact information for Swedbank-Stockholm in accordance with Paragraph 13 of the Agreement:

Name of Firm:    Swedbank (FöreningsSparbanken AB (publ)),
                Stockholm, Sweden

---

SWEDBANK
(FöreningsSparbanken AB (publ))
Brunkebergstorg 8
·05 34 STOCKHOLM
Sweden

Repo Administration
Tel:    46 8 5859 00 00
Fax:    46 8 21 19 66

Trading
Tel:    46 8 700 99 09
Fax:    46 8 723 7193

Swedbank Markets Legal & Compliance
Tel:    46 8 5859 13 47
Fax:    46 8 723 70 82

13.JUL.2006    9:13    SWEDBANK MARKETS 46 8 7902996                    NR.651    S.3/5

All capitalized terms used and not defined herein shall have the meaning ascribed to them in the Repo Agreement.

This Amendment may be executed in one or more counterparts, and when each party hereto has executed at least one counterpart, this Amendment shall be deemed to be the one and the same document.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their respective authorized officers on the dates written below with date of effect from the date first written above .

Agreed to with respect to the Repo Agreement

LEHMAN BROTHERS INC,
LEHMAN COMMERCIAL PAPER INC.

By: _____

Name: _____

Title: _____

Date: _____ ROBERT E. GUGLIELMO

Agreed to with respect to the WL-Addendum

LEHMAN COMMERCIAL PAPER INC.

By: _____

Name: _____

Title: _____ ROBERT E. GUGLIELMO

Date: _____

Agreed to with respect to the WL-Addendum and Repo Agreement

(FÖRENINGSSPARBANKEN AB (PUBL)), NEW YORK BRANCH

By: _____

Name: _____ JOHN MATTHEWS

Title: _____

Date: _____ 3/17/04

By: _____

Name: _____ JIM LINFSRO

Title: _____ 8VP/TREASURER

Date: _____ 3/17/04

Agreed to with respect to the WL-Addendum and Repo Agreement

SWEDBANK (FÖRENINGSSPARBANKEN AB (PUBL)), STOCKHOLM, SWEDEN

By: _____

Name: _____ PER ASPEGREN

Title: _____

Date: _____

By: _____

Name: _____

Title: _____

Date: _____

## SECRETARY'S CERTIFICATE

The undersigned, an Assistant Secretary of Lehman Brothers Inc. and Lehman Commercial Paper Inc., respectively, a Delaware corporation and a New York corporation (collectively, the "Corporations"), does hereby certify and attest that Robert E. Guglielmo is duly authorized to execute and deliver financing transaction documentation on behalf of the Corporations and that the below listed signature shown opposite his name is his true, correct and complete specimen signature.

Robert E. Guglielmo
Senior Vice President

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Corporation this 4th day of March, 2004.

LEHMAN BROTHERS INC.

BY: _____
Cindy Gregoire
Assistant Secretary

SEAL

LEHMAN COMMERICAL PAPER INC.

BY: _____
Cindy Gregoire
Assistant Secretary

SEAL



**Swedbank**

One Penn Plaza
15th Floor
New York, NY 10119
(212) 486-8400

04 September, 2008

LEHMAN COMMERCIAL PAPER, INC.

745 SEVENTH AVENUE

4TH FLOOR

ATTN: SALINA10285-1000

NEW YORK

As principal we confirm the following PURCHASE from you.

REVERSE REPURCHASE AGREEMENT

| | |
|---|---|
| Deal No:   1003845 | Deal Date:   04 Sep 2008 |
| | Value Date:   08 Sep 2008 |
| | Maturity Date:   22 Sep 2008 |
| | Commencement Proceeds:   350,000,000.00 |
| | Repo Interest:   533,215.28 |
| | Repo Rate:   3.91750000 |
| | Maturity Proceeds:   350,533,215.28 USD |

| Security | Coupon | Mat Date | Quantity | Price/Haircut | Interest/ExchRate | Proceeds/CCY |
|---|---|---|---|---|---|---|
| 7LEHMAN COMML PAPER | 0.00000000 | 14 Oct 2008 | 350,000,000 | 100.00000000 | .00 | -350,000,000.00 |
| 7LEHMAN COMML PAPER | | | | 0.00000000 | 1.00000000 | USD |

Confirmations do not require signature authorization.

(212)548-9462

Swedbank AB (publ)          One Penn Plaza, 15th Floor          Tel: +212 486 8400          www.swedbank.us
New York Branch             New York. NY 10119                 Fax: +212 486 3220          www.swedbank.se



One Penn Plaza
15th Floor
New York, NY 10119
(212) 486-8400

04 September, 2008

LEHMAN COMMERCIAL PAPER, INC.
745 SEVENTH AVENUE
4TH FLOOR
ATTN: SALINA10285-1000
NEW YORK

As principal we confirm the following PURCHASE from you.

REVERSE REPURCHASE AGREEMENT

| | |
|---|---|
| Deal No:    1003846 | |
| Deal Date: | 04 Sep 2008 |
| Value Date: | 08 Sep 2008 |
| Maturity Date: | 08 Oct 2008 |
| Commencement Proceeds: | 1,000,000,000.00 |
| Repo Interest: | 3,322,400.00 |
| Repo Rate: | 3.98688000 |
| Maturity Proceeds: | 1,003,322,400.00 USD |

| Security | Coupon | Mat Date | Quantity | Price/Haircut | Interest/ExchRate | Proceeds/CCY |
|---|---|---|---|---|---|---|
| 7LEHMAN COMML PAPER | 0.00000000 | 14 Oct 2008 | 1,000,000,000 | 100.00000000 | .00 | -1,000,000,000.00 |
| 7LEHMAN COMML PAPER | | | | 0.00000000 | 1.00000000 | USD |

Confirmations do not require signature authorization.

*Faxed*

Swedbank AB (publ)          One Penn Plaza, 15th Floor          Tel: +212 486 8400          www.swedbank.us
New York Branch             New York, NY 10119                 Fax: +212 486 3220         www.swedbank.se

**[Note: The remainder of this Proof of Claim was redacted by Transferee due to volume, and is available from Transferee upon request.]**