DANIEL F. FLYNN
40 HICKORY COURT
MARCO ISLAND, FL 34145

July 18, 2012

Mr. Robert Cordray, Director
Consumer Financial Protection Bureau
Office Number J
1700 G Street, NW
Washington, DC 20552

Director, Office of RESPA
U. S. Department of Housing and Urban Development
451 7th Street, SW, Room 9154
Washington, DC 20410

Gentlemen:

I have addressed this letter to both of you because you are both listed as administrators for RESPA violations. I hope you review this with gravity because it represents gross violations of Section 6 and Section 8 of RESPA. I believe, in addition, that there are elements of fraud and diversion of assets from the Lehman Brothers bankruptcy.

In late 2003, my wife and I received a mortgage loan for $750,000.00 from Arlington Capital Corp. on our principal residence. Arlington then sold this loan to Lehman Brothers Bank, FSB. Approximately a month later, I was advised that the loan had been sold and I received the attached documents from Lehman Brothers. This included a RESPA notice from Lehman. This is the only RESPA notice I received from this entity. Subsequently, I received a notice from Aurora loan Service identifying itself as a Lehman Brothers company. I never received a RESPA notice from Aurora and I never received any notice that it was other than a part of Lehman Brothers.

The section 6 violation is based on the fact that a notice to Aurora was not responded to within the specified twenty business days. And Aurora made no effort to provide the information requested with the specified 60 business days. In fact, it never provided any information establishing a chain of title and demonstrating that they should be the recipient of these funds.

The section 8 violation is based on the fact that Aurora demanded interest from the period after it failed to respond to our RESPA notice. In addition, it arbitrarily assessed over $10,000.00 in unidentified fees, identifying them with the vague category of "corporate advance" and "foreclosure legal fees." In fact, Aurora never filed any foreclosure motion, due principally to the fact that in New Jersey it would have had to produce the original documents proving the chain of title. In addition, I was in a personal bankruptcy and Aurora filed a relief from the stay. It then charged me $800.00 for legal fees, which is barred from the bankruptcy code. Aurora refused to acknowledge this, labeling it a service fee.

I was aware that Lehman Brothers had filed for bankruptcy in 2008. It was my belief that the funds should have been paid to the Lehman estate. In my letter of February 22, 2012, I detail the documents that had been given to us by the McGinnis firm, the party that provided the initial response. I note that

RECEIVED
AUG - 9 2012
U.S. BANKRUPTCY COURT, SE
JMP

all the documents are from 2003 and 2004 and the only party identified is Lehman Brothers, on the sale documents and the warehouse documents. I noted in that letter that the sale proceeds should be paid to the trustee and that Aurora should revert the payments it had collected since the 2008 bankruptcy. Aurora never identified itself as being a party to anyone other than Lehman Brothers. It did announce in 2011 that it was changing its title to Aurora  Bank, FSB.

As you can see from the McGinnis letter, received on January 31, 2012, it starts the pattern of dissembling, stating untrue facts in the second paragraph. Then it goes on to state, in a boxed out section that the firm declares is inadmissible, facts that are not documented. It states that the note is part of a "Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-10." The proper document to provide is the original disclosure filed by Lehman Brothers with the Security Exchange Commission. Instead, it states that Wells Fargo Bank, N.A. is the owner and that Aurora is the servicer. Neither of these statements are supported by any facts.

In fact, the credibility is clouded by the disclosures during the bankruptcy hearings for Lehman. Anton Valukas, the Chairman of Jenner and Block, wrote the examiners report. This report is over 1,000 pages long and it goes into great depth regarding the duplicity of the Lehman executives, noting that their statement for Sarbannes Oxley were not forthcoming and disingenuous. I note that the president of Aurora Was Rick Skagg, who was also a director of Lehman. He was noted in the mortgage banking industry and he had extensive ties with Wells Fargo and other mortgage banks and brokers.

I enclose the information sheet for the examiners report  and for the adminstrator of the Lehman bankruptcy, the Weil law firm. I enclose also a copy of an article detailing the "Case Against Lehman Brothers," based on an April 2012 interview of Anton Valukas by CBS News.

The title company was put on notice that this controversy existed. Yet they treated Aurora as the legitimate holder of the note. In fact, the law firm that Aurora used after McGinnis, Tomkins, McGuire, wrote to the buyers of the property with the intent for them to lobby the title company to pay Aurora, making them complicit in this affair. It is my belief that the owner of this note never received the proceeds of the sale. The mortgage was falsely satisfied, and, in fact, the monies are still owing and due.

It should be noted that the holders of similar Lehman securities are only receiving approximately $.26 on the dollar in the final distribution. The settlement of the bankruptcy was only concluded last month.

I kindly offer this letter with the relevant attachments. It is my request that the lawful owner of the note be identified and that this party should receive the funds, including the payments received by Aurora after the bankruptcy filing by Lehman. I would request that the interest that was charged unlawfully be returned along with the $11,839.00 in illegal fees assessed, identified by various names, including "corporate advance," "foreclosure attorney fees", and "escrow."


Sincerely,

DANIEL F. FLYNN
40 HICKORY COURT
MARCO ISLAND, FL 34145
239-389-0813
DF_FLYNN@MSN.COM


ATTACHMENTS

1.  THE CASE AGAINST LEHMAN BROTHERS, A CBS INTERVIEW WITH ANTON VALUKAS, CHAIRMAN
    OF JENNER & BLOCK ON APRIL 22, 2012.
2.  AT THE SITE "LEHMAN-DOCKET," THERE IS A 42 PAGE REPORT, ENCOMPASSING ALL ASPECTS OF
    THE LEHMAN BANKRUPTCY. I HAVE INCLUDED THE FIRST SIX PAGES.
3.  E-MAIL DATED FEBRUARY 7, 2011 TO TRACY HOPE DAVIS, UNITED STATES TRUSTEE.
4.  E-MAILS DATED APRIL, 21 TO WEIL, GOTSHAL & MANGES AND MAY 1 TO LEHMAN INQUIRY-
    JENNER LAW FIRM.
5.  LETTER DATED FEBRUARY 22, 2012 TO CLEMENT F. LISITSKI, ESQ. THERE IS AN APPENDIX
    CONSISTING OF ELEVEN ITEMS.
6.  THE CORRESPONDENCE BETWEEN MR. LISITSKI AND MY SELF WITH AURORA, PATRIOT TITLE
    AND ITS UNDERWRITER, OLD REPUBLIC.


NOTE: THERE IS CORRESPONDENCE UNDER SEPARATE COVER TO THE COMPTROLLER OF THE CURRENCY
REGARDINGTHE HISTORY OF AURORA AND ITS APPARENT EVOLUTION FROM A SUBSIDIARY OF LEHMAN
BROTHERS TO AURORA BANK, FSB.


CC:
ANTON VALUKAS, ESQUIRE, CHAIRMAN, JENNER & BLOCK, LLP
HARVEY R. MILLER, ESQUIRE, WEIL, GOTSHAL & MANGES, LLP
JUDGE JAMES PECK, UNITES STATES BANKRUPTCY COURT
MS. TRACY HOPE DAVIS, ESQUIRE, UNITED STATES TRUSTEE

CC: W/O ENC
CLEMENT LISITSKI, ESQUIRE
NANCY L. KOCH, ESQUIRE

April 22, 2012 7:03 PM

# The case against Lehman Brothers

*Update: A statement from Ernst and Young: Lehman's bankruptcy occurred in the midst of a global financial crisis triggered by dramatic increases in mortgage defaults, associated losses in mortgage and real estate portfolios, and a severe tightening of liquidity.*

*We firmly believe that our work met all applicable professional standards, applying the rules that existed at the time. Lehman's demise was caused by the global financial crisis that impacted the entire financial sector, not by accounting or financial reporting issues.*

---

(CBS News) It's hard to overstate the enormity of the 2008 collapse of Lehman Brothers. It was the largest bankruptcy in history; 26,000 employees lost their jobs; millions of investors lost all or almost all of their money; and it triggered a chain reaction that produced the worst financial crisis and economic downturn in 70 years.

Yet four years later, no one at Lehman has been held responsible. Steve Kroft investigates the collapse of Lehman Brothers: what the SEC did and didn't know about the firm's finances, the role of a top accounting firm, and why no one at Lehman has been called to account.

---

*The following script is from "The Case Against Lehman" which originally aired on April 22, 2012. Steve Kroft is the correspondent. James Jacoby and Michael Karzis, producers.*

On September 15, 2008, Lehman Brothers, the fourth largest investment bank in the world, declared bankruptcy -- sparking chaos in the financial markets and nearly bringing down the global economy. It was the largest bankruptcy in history -- larger than General Motors, Washington Mutual, Enron, and Worldcom combined. The federal bankruptcy court appointed Anton Valukas, a prominent Chicago lawyer and former United States attorney to conduct an investigation to determine what happened.

**60 Minutes Overtime**

**Kroft: When to give up on accountability »**

Included in the nine-volume, 2,200-page report was the finding that there was enough evidence for a prosecutor to bring a case against top Lehman officials and one of the nation's top accounting firms for misleading government regulators and investors. That was two years ago and there have been no prosecutions. Anton Valukas has never given an interview about his report until now.

Steve Kroft: This is the largest bankruptcy in the world. What were the effects?

Anton Valukas: The effects were the financial disaster that we are living our way through right now.

Steve Kroft: And who got hurt?



Anton Valukas: Everybody got hurt. The entire economy has suffered from the fall of Lehman Brothers.

Steve Kroft: So the whole world?

Anton Valukas: Yes, the whole world.

When Lehman Brothers collapsed, 26,000 employees lost their jobs and millions of investors lost all or almost all of their money, triggering a chain reaction that produced the worst financial crisis and economic downturn in 70 years. Anton Valukas' job was to provide the bankruptcy court with accurate, reliable information that the judges could use to resolve the claims of creditors picking over Lehman's corpse.

Steve Kroft: Had you ever done anything like this before?

Anton Valukas: I've never done anything like Lehman Brothers. I don't think anybody else has ever done anything like Lehman Brothers.

Steve Kroft: So your job, I mean, in some ways, your job was to assess blame?

Anton Valukas: Our job is to determine what actually happened, put the cards face up on the table, and let everybody see what the facts truly are.


Courtesy: Iron Mountain

Valukas' team spent a year and a half interviewing hundreds of former employees, and pouring over 34 million documents. They told of how Lehman bought up huge amounts of real estate that it couldn't unload when the market went south -- how it had borrowed $44 for every one it had in the bank to finance the deals -- and how Lehman executives manipulated balance sheets and financial reports when investors began losing confidence and competitors closed in.

Steve Kroft: Did these quarterly reports represent to investors a fair, accurate picture of the company's financial condition?

Anton Valukas: In our opinion, they did not.

Steve Kroft: And isn't that against the law?

Anton Valukas: It certainly, in our opinion, was against civil law if you will. There were colorable claims that this was a fraud, yes.

By colorable claims Valukus means there is sufficient evidence for the Justice Department or the Securities and Exchange Commission to bring charges against top Lehman executives, including CEO Richard Fuld, for overseeing and certifying misleading financial statements, and against Lehman's accountant, Ernst and Young, for failing to challenge Lehman's numbers.

Anton Valukas: They'd fudged the numbers. They would move what turned out to be approximately $50 billion of assets from the United States to the United Kingdom just before they printed their financial statements. And a week or so after the financial statements had been distributed to the public, the $50 billion would reappear here in the United States, back on the books in the United States.

Steve Kroft: And then the next financial statement, they would move it overseas again, and file the report, and then move it back?

Anton Valukas: Right.

Steve Kroft: It sounds like a shell game.

Anton Valukas: It was a shell game. It was a gimmick.

Lehman misused an accounting trick called Repo 105 to temporarily remove the $50 billion from its ledgers to make it look as though it was reducing its dependency on borrowed money and was drawing down its debt. Lehman never told investors or regulators about it.

Steve Kroft: This is really deception to make the company look healthier than it was?

Anton Valukas: Yes.

Steve Kroft: Deliberate?

Anton Valukas: Yes.

Steve Kroft: How are you so sure of that?

Anton Valukas: Because we read the emails in which we observed the people saying that they were doing it. We interviewed the witnesses who wrote those emails, or some of those emails, and asked them why they were doing it, and they told us they were doing it for purposes of affecting the numbers.

Steve Kroft: Do you think that Lehman executives knew that this was wrong?

Anton Valukas: For some of 'em, certainly. There was concerns being expressed by-- at high levels about whether this is appropriate, what happens if the street found out about it. So, you know, there was a concern that there's a real question about whether we can do this, whether this was right or not.

One of those people was Matthew Lee who had been a senior executive at Lehman and the accountant responsible for its global balance sheet. Lee was one of the first to raise objections inside Lehman about the accounting trick known as Repo 105.

Matthew Lee: It sounded like a rat poison, Repo 105, when I first heard it. So I investigated what it was, and I didn't like what I saw.

Steve Kroft: Was there a point in which you saw the accounting principles employed by Lehman Brothers change?

The case against Lehman Brothers - CBS News
08-13555-jmp Doc 30092 Filed 08/16/12 Entered 08/16/12 12:16:50 Main Document Pg 4 of 7
Pg 7 of 106

Matthew Lee: November 30th, 2007 was the end of our fiscal year. And I fully expected us, you know, to make a loss that year like everyone else. And when I saw we made money -- it was a record year, in fact -- I thought, "That doesn't sound right." You knew the markets were doing badly, so why wasn't Lehman doing badly? And every time I found something and I went to my boss or whoever, no response.

That was 10 months before Lehman Brothers went bankrupt. Lee's position required him to sign off on the accuracy of the firm's accounting practices every quarter. But in November of 2007 he declined to do it.

Steve Kroft: By refusing to sign it, you were saying that you didn't believe the numbers.

Matthew Lee: Correct.

Steve Kroft: That this wasn't a fair and accurate representation of the financial condition of Lehman Brothers.

Matthew Lee: Right. 'Something's up here. Why can't people answer my questions?' You know, 'Why has Repo 105 doubled? Give me an answer.' You know, nothing was said.

Lee continued to press people for more information, but nothing changed. And four months before Lehman collapsed, he sent this letter to Lehman's top executives.

Matthew Lee: 'I've been telling you all year. I've been banging my head against the wall. I'm now putting it in writing.'

Steve Kroft: Says, "it requires me to bring to the attention of management conduct and actions on the part of the firm that I consider to be possibly unethical and unlawful."

Matthew Lee: Yeah.

Steve Kroft: What were you talking about specifically?

Matthew Lee: Well, in that particular letter, I was general. There were so many specifics. I could have written laundry lists.

Steve Kroft: What kind of a response did you get from this letter?

Matthew Lee: It's like throwing a grenade. I wanted to wake somebody up, at least to address the topics.

It worked. Six days after he sent that letter, Matthew Lee was downsized, let go after 14 years. But Lehman executives couldn't ignore the letter and asked their accountants from Ernst and Young to interview Matthew Lee.

Anton Valukas: And in those interviews, we have the notes -- which are part of the report -- he says very specifically $50 billion, Repo transactions, moving money off the balance sheet at quarter end. So our conclusion was Ernst and Young certainly knew it as of that time, and did nothing with it.

The case against Lehman Brothers - CBS News
08-13555-mg    Doc 30093    Filed 08/09/12    Entered 08/16/12 12:16:50    Main Document    Page 5 of 7
Pg 8 of 106

Valukas says Ernst and Young was legally bound to make sure that Lehman's audit committee and its board of directors knew about Lee's allegations of unethical and unlawful accounting practices. But they never did.

Steve Kroft: Did the audit committee know?

Anton Valukas: No.

Steve Kroft: Did the board of directors know?

Anton Valukas: No.

Steve Kroft: Did Dick Fuld know?

Anton Valukas: Did Dick Fuld know? Well, he says no.

The only place Lehman's CEO, Richard Fuld, has publicly answered any questions about his firm's bankruptcy has been in front of Congress.

[Richard Fuld: I have absolutely no recollection whatsoever of hearing anything about or seeing documents related to Repo 105 transactions while I was the CEO of Lehman.]

Anton Valukas: He said the same thing to me face-to-face.

Steve Kroft: Do you believe him?

Anton Valukas: There was evidence which would show that that's not accurate. The president of Lehman Brothers told us that in fact he had conversations with Dick Fuld about this and documents were shared with him which would reflect the Repo 105 transactions and how they were being used. Richard Fuld's view on that was that he has no knowledge of it. You have other evidence that he did. A jury would have to decide who's telling the truth.

But so far there has been no jury to hear the evidence. Despite Valukas' findings -- and the supporting documents and testimony to back them up -- the Securities and Exchange Commission has not brought any charges of any kind against former Lehman executives. For the past few months, we've made numerous requests to interview the SEC's head of enforcement. All of those requests have been declined.

Steve Kroft: The Securities and Exchange Commission has not brought a case.

Anton Valukas: No, they have not.

Steve Kroft: Does that bother you?

Anton Valukas: I'm not permitted to be bothered by that. You know, my job was to set out the facts, lay it out. They have to make their own prosecutive decisions.

There is one plausible explanation why SEC hasn't has not gone after top Lehman executives. As it turns out, some of Lehman's most egregious accounting shenanigans took place right under the noses of government regulators.

08-13555-jmp Doc 30082 th Filed 08/09/12 Entered 08/16/12 12:16:50 Main Document
The case against Lehman Brothers - CBS News Page 6 of 7
Pg 9 of 106

Steve Kroft: How closely was the SEC monitoring Lehman Brothers during this time?

Anton Valukas: They were on premises. They were talking to the Lehman people daily. They officed there.

It was not widely known at the time, but during the last six months of Lehman's existence, teams of officials from the SEC and the Federal Reserve took up residence inside the firm to monitor its precarious financial situation. They were inside the building when Matthew Lee wrote his letter to Lehman executives alleging unlawful accounting practices, and they were there when the practices took place. Valukas says the SEC also knew that Lehman was being less than truthful when it said it had enough assets to survive the crisis. But that and other damaging information was never disclosed to investors who continued to pump billions of dollars into the firm.

Steve Kroft: Should it have been disclosed?

Anton Valukas: Absolutely.

Steve Kroft: Isn't the government, the SEC in this case, the people who were supposed to protect the investors?

Anton Valukas: Yes.

Steve Kroft: Aren't they charged with informing investors?

Anton Valukas: Yes.

Steve Kroft: Why didn't they do it?

Anton Valukas: They may not have had the expertise necessary to understand the material they were receiving. They were getting the material. Whether they understood it is another question.

The very fact that government regulators were inside the company with access to its books and records would complicate any prosecution of Lehman officials.

Until four months ago, David Kotz was the SEC's inspector general. Over the previous four years, he issued more than 100 reports about major deficiencies in the way the SEC did its job.

Steve Kroft: If the SEC knew about some of these problems at Lehman Brothers and they weren't disclosed, doesn't that make it difficult for the SEC enforcement division to come back and bring action against Lehman Brothers? They were there; they saw it.

David Kotz: Yeah. I think that that's definitely an impediment to a potential case. And, certainly, if you go before a jury, the defense lawyers can make a big point about the fact that, "You were there. You knew about it. Why didn't you do anything at the time? Now, you're coming after them."

In fact, former Lehman CEO Richard Fuld seemed too be trying out that defense when he

testified before Congress in 2008.

*[Richard Fuld: Throughout 2008, the SEC and Federal Reserve conducted regular and, at times, daily oversight of our business and our balance sheet. They saw what we saw in real time.]*

Steve Kroft: Let's just assume for a moment that Anton Valukas' findings are true. I mean, isn't this just a free ticket for executives to say, "Well, look. You know, Lehman did so-and-so, and nothin' happened to them."

David Kotz: Right, no I think absolutely, that's a serious problem. I mean, obviously, there has been a tremendous financial crisis. The people who engaged in improper behavior need to be punished. I think it's critical for the SEC to go after not just companies, but also individuals, where they have the evidence to do so.

When Lehman's bankruptcy was finally settled, there were claims against it for $370 billion. The creditors settled for about 20 cents on the dollar. Former CEO Richard Fuld now runs a consulting business in Manhattan. He lost most of his fortune and is embroiled in a raft of litigation, but is still a wealthy man. Most of his senior colleagues at Lehman have landed on their feet.

Ernst and Young, Lehman's accounting firm is now being sued by New York State for aiding and abetting a fraud.

And Matthew Lee the senior account who blew the whistle at Lehman is still looking for work, unconvinced that much has changed in the world of finance over the last four years.

Matthew Lee: You know, the entrepreneurs of Wall Street are continually getting more and more sophisticated. And they don't necessarily want regulators or auditors to fully understand what they're doing.

Steve Kroft: Do you believe the balance sheets of big Wall Street firms if you read them now?

Matthew Lee: These numbers are so big and the financial instruments are so complex that, you know, nobody stands a chance, really, of understanding. I'd have more fun investing in crap tables in Las Vegas than Wall Street firms.

© 2012 CBS Interactive Inc.. All Rights Reserved.

Claim Question? Call: U.S.: 1-866-879-0688, Non-U.S.: 1-503-597-7691    Technical Support
Question? Call: 800 794 4430

Sign In

 debtorMatrix

- Home
- Claims
- Docket
- Key Documents

Lehman Brothers Holdings Inc. (Chapter 11) Change

LEHMAN BROTHERS

Weil

| General Information | Case Information | Bar Date Information and Forms | Distribution Information | Key Parties | Estate Information |
|---|---|---|---|---|---|

### Notice to Holders of Allowed Claims Regarding Plan Distributions

PLEASE TAKE NOTICE that **in order to receive any distributions** to which you may be entitled under the confirmed Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (the "Plan"), **you must submit** to Epiq Bankruptcy Solutions, LLC ("Epiq") **both**

i. the appropriate Internal Revenue Service tax form ("Tax Form"), **and**
ii. a form certifying that neither you nor, to the best of your knowledge, any person or entity for whom you may be acting or who may be the beneficial owner of a claim, security, or interest that is in your name or control is a person or entity with whom it is illegal for a U.S. person to transact under (a) the Office of Foreign Assets Control sanctions regulations or (b) the list of Specially Designated Nationals and Blocked Persons (the "OFAC Certification").

**Unless Epiq receives original copies of each of your properly completed Tax Form and OFAC Certification by March 23, 2012, you will not receive any distributions to which you may be entitled under the Plan on the initial distribution date.***

Blank Tax Forms and OFAC Certification Regarding Status are available for download below:

Tax Forms:
OFAC Certification Regarding Status:

The required forms were previously mailed to all holders of allowed claims. A copy of the most recent letter mailed to parties whom Epiq had not recevied one or both of the required forms by February 10,

2012 (the "Request Letter") is available here. The Request Letter provides additional information concerning the type of Tax Form to be provided based on the nature of the payment and the status of the payee. Forms must be submitted to:

| **If by first-class mail:** |
| --- |
| Lehman Brothers Holdings Claims Processing<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 5076<br>New York, NY 10150-5076 |
| **If by Hand Delivery, Overnight mail or Courier requiring a signature:** |
| Epiq Bankruptcy Solutions, LLC<br>Attn: Lehman Brothers Holdings Claims Processing<br>757 Third Avenue, 3rd Floor<br>New York, NY 10017 |

*Holders of debt securities issued by LBHI for which an indenture trustee is the claim holder do not need to provide to the Debtors a Tax Form or OFAC Certification in order to receive a distribution. The Indenture Trustees are required to provide such forms to the Debtors relating to the claims.

### Requests by Holders of Allowed Claims for Wire Transfers in lieu of Checks

The Debtors are providing creditors the option to have payments sent via wire transfer, for a fee, rather than by check. The **per wire** fee will be $20 for a transfer to a U.S. bank account or $35 for a transfer to a non-U.S. bank account (the "Wire Transfer Fee"). The Wire Transfer Fee will be deducted from the amount of the distribution you would otherwise receive.

Please note that each Debtor will make its own distribution, and if a creditor is entitled to receive payments from more than one Debtor, a Wire Transfer Fee will be deducted **from each payment**. Each Debtor will, however, to the extent practicable, make aggregate distributions on account of all of the claims held by a particular creditor. All payments under the Plan will be made from bank accounts in the United States, denominated in U.S. Dollars.

**In order to receive distributions to which you may be entitled by wire, you must complete and return a Wire Request Form so that it is received by Epiq prior to the distribution record date for a given distribution.** Please contact Epiq via email at lehmancallcenter@epiqsystems.com, or by phone at 866-879-0688 (toll-free from the U.S.), +1 503-597-7691 (non U.S.) for information about how to obtain a Wire Request Form.

### Informational Notices Regarding Distributions on Public Securities Issued by LBHI

In connection with the initial distribution on April 17, 2012, LBHI provided the following notices to the holders of LBHI-issued international securities setting forth the distribution rates for each security covered by a particular notice. The notices were conveyed through the international securities depositories.

- LBHI – 04 12 12 Notice 1 for XS ISIN Codes

- LBHI – 04 12 12 Notice 2 for XS ISIN Codes

- LBHI – 04 12 12 Notice for CA ISIN Codes

- LBHI – 04 12 12 Notice for CH ISIN Codes

The notice provided to holders of LBHI-issued U.S. securities setting forth the distribution rates for such securities can be found on Wilmington Trust's website, located at: http://www.wilmingtontrust.com/lehman

## Key Documents

- Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (Docket No. 22973) (December 5, 2011) (the "Plan") (**Note:** This document is 22 MB. Depending on the speed of your download, this process may take a few minutes.)

- Order Confirming Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (Docket No. 23023) (December 6, 2011)

- Notice of Entry of Order Confirming Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and it's Affiliated Debtors (January 19, 2012)

- Notice to Holders of Allowed Claims (Docket No. 25392) (February 15, 2012)

- Notice of Effective Date and Distribution Date in Connection With the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (Docket 26039) (March 6, 2012)

- Post Effective Date FAQ's (March 16, 2012)

- Notice Regarding Initial Distributions Pursuant To The Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. And Its Affiliated Debtors (Docket 27312) (April 11, 2012)

- Press Release: Initial Distribution Percentages Announced for Lehman Brothers Holdings Inc. and its Debtor Affiliates (April 11, 2012)

- Distribution FAQ's (updated April 20, 2012)

| Official Committee of Unsecured Creditors | Official Committee of Unsecured Creditors Key Professionals | U.S. Trustee | Examiner | Estate Teams |
|---|---|---|---|---|

## Key Professionals

| Debtors' Counsel |
|---|

**Weil Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153
http://www.weil.com
Phone: (212) 310-8000
Fax:     (212) 310-8007
Attn:   Harvey R. Miller, Esq.
        Richard P. Krasnow, Esq.
        Lori R. Fife, Esq.
        Jacqueline Marcus, Esq.
        Robert J. Lemons, Esq.
        Alfredo R. Perez, Esq.

To see a copy of the Order Authorizing the Employment and Retention of Weil, Gotshal & Manges
LLP as Attorneys for the Debtors, please click here. [Docket #1660]

**Lehman Legal Hotline:**
Phone: (212) 310-8040
Email: LehmanTeam@Weil.Com

| **Debtors' Chief Restructuring Officers** |
|---|

**Alvarez & Marsal North America, LLC**
600 Lexington Avenue, 6th Floor
New York, NY 10022
http://www.alvarezandmarsal.com
Phone: (212) 759-4433
Fax:     (212) 759-5532

To see a copy of the Order Authorizing the Debtors to Retain Alvarez & Marsal North America, LLC
to Provide the Debtors a Chief Restructuring Officer and Additional Personnel, and to Appoint the
Chief Restructuring Officer, please click here. [Docket #2278]

| **Debtors' Investment Banker** |
|---|

**Lazard Freres & Co. LLC**
30 Rockefeller Plaza
New York, NY 10020
http://www.lazard.com
Phone: (212) 632-6896
Fax:     (212) 332-1757
Attn:   Barry W. Ridings

To see a copy of the Order Authorizing the Employment and Retention of Lazard Freres & Co. LLC
as Investment Banker to the Debtors, please click here. [Docket #2275]

## Official Committee of Unsecured Creditors

Pursuant to Docket #7034, the following creditors have been appointed to the Official Committee of
Unsecured Creditors in these cases by the Office of the United States Trustee:

**Wilmington Trust Company,**
**as Indenture Trustee**
520 Madison Avenue, 33rd
Floor
New York, New York 10022
Phone:(212) 415-0522
Fax:    (212) 415-0513
Attn:   James J. McGinley,
        Managing Debtor

**The Bank of NY Mellon**
101 Barclay - 8 W
New York, New York 10286
Phone:(212) 815-5373
Attn:   Attn: Gerard Facendola, Vice
        President Corporate Trust

**Mizuho Corporate Bank,**
**Ltd. as Agent**
1251 Avenue of the
Americas
New York, New York
10020-1104
Phone:(212) 282-3486
Fax:    (212) 282-4490
Attn:   Noel P. Purcell,
        Senior Vice
        President

**Metlife**
10 Park Avenue, P.O. Box
1902
Morristown, New Jersey
07962-1902
Phone:(973) 355-4581
Fax:    (973) 355-4230
Attn:   David Yu, Director

**The Vanguard Group Inc.**
P.O. Box 2600, V31
Valley Forge, Pennsylvania 19482
Phone:(800) 523-1036 x13346
Fax:    (610) 407-2875
Attn:   Stewart Hosansky,
        Principal/Senior Analyst

**U.S. Bank. N.A.**
Corporate Trust Services
One Federal Street, 3d
Floor
Boston, MA 02110
Phone:(617) 603-6429
Fax:    (617) 603-6640
Attn:   Laura L. Moran,
        Vice President

**Elliott Management Corp.**
712 Fifth Avenue
New York, NY 10019
Phone:(212) 506-2999
Fax:    (212) 974-2092
Attn:   Ed Joel

## Official Committee of Unsecured Creditors Key Professionals

| |
|---|
| **Counsel for Committee of Unsecured Creditors** |
| **Milbank, Tweed, Hadley & McCloy LLP**<br>1 Chase Manhattan Plaza<br>New York, NY 10005<br>http://www.milbank.com<br>Phone:(212) 530-5000<br>Fax:    (212) 530-5219<br>Attn:   Dennis F. Dunne, Esq.<br>        Evan Fleck, Esq.<br>        Dennis O'Donnell, Esq. |
| **Unsecured Creditors' Investment Banker** |
| **Houlihan Lokey Howard & Zukin Capital, Inc.**<br>225 South Sixth Street, Suite 4950<br>Minneapolis, MN 55402<br>http://www.hlhz.com<br>Phone:(612) 338-2910<br>Fax:    (612) 338-2938 |

Attn:  Eric Siegert

To see a copy of the Order Authorizing Employment and Retention of Houlihan Lokey Howard & Zukin Capital, Inc. as Investment Banker to the Official Committee of Unsecured Creditors, please click here. [Docket #2279]

## U.S. Trustee

The Office of the United States Trustee
33 Whitehall Street
21st Floor
New York, NY 10004
Phone: (212) 510-0500
Fax: (212) 668-2255
Attn: Tracy Hope Davis, Esq., Elisabetta G. Gasparini, Esq., Andrea B. Schwartz, Esq.

## Examiner

To see a copy of the Order Authorizing the Appointment of Anton R. Valukas, as Examiner, please click here. [Docket #2583]

**Counsel for Examiner**

**Jenner & Block LLP**
919 Third Avenue, 37th Floor
New York, New York 10022-3908
http://www.jenner.com
Phone:(212) 891-1600
Fax:    (212) 891-1699
Attn:  Patrick J. Trostle

To see a copy of the Order Authorizing the Examiner to Retain and Employ Jenner & Block LLP as his Counsel Nunc Pro Tunc as of January 19, 2009, please click here. [Docket #2803]

## Estate Teams

For any questions related to the filing of Lehman Brothers Holdings Inc., please see the following information:

Bryan Marsal of Alvarez & Marsal joined Lehman Brothers Holdings Inc (LBHI) in September, 2008 as Chief Restructuring Officer, with responsibility for the oversight of the Chapter 11 process. Bryan was appointed Chief Executive Officer of LBHI on 12/31/08. He and his management team will ensure the orderly restructuring of LBHI and its subsidiaries.

For any questions related to the filing of Lehman Brothers Holdings Inc., please see the following information:

DANIEL F. FLYNN
40 HICKORY COURT
MARCO ISLAND, FL 34145


February 15, 2012


Clement F. Lisitski, Esquire
3318 Simpson Avenue
Ocean City, NJ 08226

Re: Lehman Brothers, Loan 0017009994

Dear Clem:

I reviewed the CD you sent me. Although it appears to have extensive documents, it is all repetition of the same documents from 2003 and 2004. There is one item, which is a copy of the note and settlement documents which has a cover sheet titled "Tompkins, McQuade, Wackenfield & Barry, LLP," but this firm is never identified. There also is a letter sent to McGinnis Tessitore in January of this year, and this produced a loan history.

This does not alter the basic underlying facts. First, the original mortgage note was endorsed to Lehman Brothers with the accompanying executed Allonge. Lehman Brothers is identified as the lender on the Notice of Right to Cancel. Lehman Brothers is identified as the purchaser on the Purchase Advice by Deutsche Bank Trust Company. Lehman Brothers is also name in the "Bailee Letter" issued by Warehouse Bank. A check issued on March 3, 2004 by Aurora Loan Services identifies itself as a Lehman Brothers Company. The attached correspondence from Lehman Brothers dated October 14, 2004 and October 15, 2004 identifies Aurora as its agent. The original underwriting decision dated September 9, 2003 was issued by Lehman Brothers.

Finally, the original Notice of Assignment, Sale or Transfer of Servicing Rights identifies Lehman Brothers Bank, F.S.B. as the Servicer. The accompany RESPA disclosure states that the loan servicer must send you notice in writing of the assignment, sale or transfer of the servicing not less than 15 days before the effective date of the transfer. Lehman Brothers never did that. If Aurora was part of Lehman Brothers, it is my opinion that they have illegally collected payments post petition.

RESPA also imposed duties on the servicer. If a "Qualified Written Request" is sent to the servicer, it is obligated to reply in writing within 20 business days. You sent the attached such letter to Aimee R. Eller, Aurora Legal Department, on December 20, 2011. To date, you have not received a response from Aurora.


Sincerely,

## DANIEL FLYNN

**From:**      "DANIEL FLYNN" <df_flynn@msn.com>
**To:**        <USTP.Region02@usdoj.gov>
**Sent:**      Tuesday, February 07, 2012 3:37 PM
**Attach:**    Aurora-2-2 to Clem.docx; Aurora-Zucker letter.docx; APPENDIX TO LETTER DATED FEBRUARY 2.docx
**Subject:**   Lehman Brothers 08-13555

I read that Tracy Hope Davis was the trustee in this case. Lehman Brothers bought my
mortgage loan in 2003. Somehow, its subsidiary, Aurora Loan Services, is still in
existence. Through a dubious transaction, a law firm, Zucker, Goldberg & Ackerman
created a certificate transferring ownership to Wells Fargo. Wells Fargo, Norwest and
Aurora were the big players in the mortgage backed securities market.

I also have attached an article that describes this. My attorney had written to Aurora. Over
a month later, a firm in Chicago, McGinnis Tessitore Wutscher LLP, provided an oblique
reply. I then received a letter from the Zucker firm as Aurora's representative. I definitely
smell a rat in this. I believe the note is a CDO, or mortgage backed security, that the court
is contemplating reimbursing at $.30 on the dollar. I also believe that Aurora did not have
the right to collect payments on this mortgage from the date of the bankruptcy filing.

Daniel Flynn
df_flynn@msn.com

## DANIEL FLYNN

| | |
|---|---|
| **From:** | "DANIEL FLYNN" <df_flynn@msn.com> |
| **To:** | <LehmanTeam@weil.com> |
| **Sent:** | Saturday, April 21, 2012 1:44 PM |
| **Subject:** | Mortgage pass through certificates |

Lehman Brothers issued many pass through mortgage back CDO's. I received a mortgage from Arlington Capital in 2003. It was purchased by Lehman Brothers and subsequently serviced by its subsidiary, Aurora loan Services. The mortgage is in the amount of $749,500.00. I sold the property in October, 2011. My attorney demanded proof of ownership from Aurora, now calling itself Aurora Bank. He received no response so he wrote again. He received a response from an outside firm that offered no information other than the original documents from 2003 and 2004 that all name Lehman Brothers as the purchaser. The firm, McGinniss of Chicago, refused to address any of my attorney's inquiries and indicated the contents of its letter was not disclosable. The only information offered is that the current owner is Wells Fargo Bank, N.A., in trust for, Structured Adjustable Mortgage Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-10.

It appears that this is a CDO and would be included in the many obligations of Lehman that are subject to a partial payment. Wells Fargo, which, through Rick Scoggs, the president of Aurora and a director of Lehman and frequent partner of Wells Fargo and Norwest, is asserting some type of interest other than than of an investor. It appears to be substituting itself for the mortgagee and asserting rights through Aurora which I don't believe it has. I do not know the status of Aurora other than it was identified as a subsidiary of Lehman. Lehman was identified as the servicing agent. So Aurora, which recently changed its name to Aurora Bank, has not identified its status.

I suggested that the funds from the settlement be paid to Tracy Hope Dave, the United States Trustee for the Lehman case 08-13555. I would deduct and hold in escrow the post petition payments made to Aurora, from October 1, 2008 through 2011. I never received a response

Please advise.

Daniel Flynn

## DANIEL FLYNN

**From:**     "DANIEL FLYNN" <df_flynn@msn.com>
**To:**       "lehmaninquiry" <lehmaninquiry@jenner.com>
**Sent:**     Tuesday, May 01, 2012 2:43 PM
**Attach:**   Lehman-Auroa package-6 pgs.pdf; Clem-2-15- Lehman.pdf; 2.22.12. DFlynn letter.pdf
**Subject:**  Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-10

I received a mortgage from a lender, Arlington Capital, in 2003. Arlington executed an Allonge, selling the mortgage to Lehman Brothers. When we had a settlement scheduled fro this property in October, 2011, we attempted to obtain a pay off from Aurora Loan Services. We ran into difficulty. Aurora Loan Services was a subsidiary of Lehman. It's President was Rick Skogg, who was also a director of Lehman Brothers. In previous articles, he was identified as an active participant with Wells Fargo and NorWest Mortgage in the time period 2003-2007.

Now Aurora was representing itself as an independent entity and its origins were unknown. It had a firm in Chicago send us a letter stating that the owner was Wells Fargo but refused to provide any substantiation as to the chain of title.

I know that the NJ Carpenters Union had a suit over a 2005 Pass Through Certificate. And in reading the CBS report on Lehman Brothers, in which they interviewed Mr. Valukas, The Chairman of Jenner and the author of the Examiners Report of the Lehman bankruptcy, there was significant improprieties. The mortgage is in the amount of $749,950.00. As Aurora refused to provide any evidence that it is in the chain of title, I am seeking direction. I had sent a note to the trustee's office in February, Tracy Hope Davis, but I never received a reply. Last week I sent an e-mail to Lehman-Docket, the site managed by the Weil Law firm, but I have not received a reply. Aurora is using robo mill type law firms to send threatening letters, but they refuse to provide any documentation. The only physical paper is the documents all bearing the name of Lehman Brothers

I will forward to you the two e-mails I referenced.

7/31/2012

DANIEL F. FLYNN
40 HICKORY COURT
MARCO ISLAND, FL 34145


February 22, 2012


Clement F. Lisitski, Esquire
3318 Simpson Avenue
Ocean City, NJ 08226

Re: Lehman Brothers, Loan 0017009994

Dear Clem:

 I reviewed the letter you forwarded from the counsel for Aurora Loan Services, Inc. I note first that I have never had a relationship with an entity titled Aurora Bank; I understand that this is a very recent development.  In the statements made by counsel, I object particularly to the statements "Aurora Bank has the right to enforce the Note" and "the name of the owner is Wells Fargo Bank, N.A, in trust for, Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-10.

As the Appendix to this letter shows, Lehman Brothers engaged in illegal practices in its business affairs, particularly in the packaging of mortgage backed securities, also known as collateral debt obligations (CDO'S). The Examiner's Report documents this thoroughly, going as far as to state that the records of Lehman Brothers will never be deciphered with any clarity.

It is my statement that Lehman Brothers sold mortgage backed securities in numerous transactions. The firm did not sell the actual mortgages and assign the notes. The note originated by Arlington Capital was purchased by Lehman Brothers and given to Aurora Loan Services, its subsidiary, for servicing. When Lehman Brothers filed for bankruptcy in 2008, my obligation to make payments to Aurora Loan Services ended. The fact that they continued to accept payments only confirms that they were operating in collusion. It is well documented that Lehman Brothers, Norwest Mortgage and Wells Fargo had countless entities and that  it is documented that their statements made  in reference to Sarbanes-Oxley were inadequate, and possibly illegal.

The letter refers, on page 4, that it has provided evidence of the transfer of servicing rights. This is irrelevant, except for my comment above that Aurora illegally continued to accept payments from me. I also find counsel's responses deliberately vague or misleading. Reference #1, Aurora Loan Servicing is the possessor of the note, not the owner. The fact that it has the note in its possession does not confer any equity interest in this note to Aurora Loan Services. In fact, the proper name for Aurora Loan Services is Lehman Brothers FSB Doing Business as Aurora Loan Services.

If we cannot reach an amicable resolution of this matter, I would require that the funds be paid to the United States Trustee, Tracy Hope Davis. The Lehman bankruptcy case, 08-13555, has not been closed. Judge James Peck is the presiding judge and the  trustee has the authority to satisfy this mortgage. Aurora Loan Services does not have the authority to satisfy a mortgage note held by Lehman Brothers.

I reviewed the documents on the CD that you sent to me, supplied by McGinnis. Although it appears to have extensive documents, it is all repetition of the same documents from 2003 and 2004. This does not alter the basic underlying facts. First, the original mortgage note was endorsed to Lehman Brothers with the accompanying executed Allonge. Lehman Brothers is identified as the lender on the Notice of Right to Cancel. Lehman Brothers is identified s the ;purchaser on the Purchase Advice by Deutsche Bank Trust Company. Lehman Brothers is also named in the "Bailee Letter" issued by Warehouse Bank. A check issued on March 3, 2004 by Aurora Loan Services identifies itself as a Lehman Brothers Company. The attached correspondence from Lehman Brothers dated October 14, 2004 and October 20, 2004 identifies itself as the owner and servicer. Aurora is mentioned in the October 14, 2004 letter but not identified as a servicer. A letter written by Aurora on October misstates the Arllngton Capital had advised that the loan servicing had been transferred to Aurora. In fact, Lehman's letter of October 20, 2003 specifically states that Lehman Brothers is the servicer and references RESPA.

Finally, the original Notice of Assignment, Sale or Transfer of Servicing Rights identifies Lehman Brothers Bank, F.S.B. as the Servicer. The accompanying RESPA disclosure states that the loan servicer must send you notice in writing of the assignment, sale of transfer of the servicing not less than 15 days before the effective date of the transfer. Lehman Brothers never did that. If Aurora was part of Lehman Brothers, it is my opinion that they have illegally collected payments post petition.

RESPA also imposes duties on the servicer. If a "Qualified Written Request" is sent to the servicer, it is obligated to reply in writing within 20 business days. You sent the attached such letter to Aimee R. Eller, Aurora Legal department, on December 20, 2011. To date, you have not received a response from Aurora addressing the issues raised by you. The letter from the McGinnnis firm is dated January 26, 2012 and addressed to you. It is stamped received by you on January 31, 2012, a clear violation of RESPA.

Sincerely,

Encl:
Appendix #1 & #2

APPENDIX TO LETTER DATED FEBRUARY 25, 2010 RE: LEHMAN BROTHERS

1. REUTERS ARTICLE COMMENTING ON BANKRUPTCY CASE 08-13555, JUDGE JAMES PECK, TRACY HOPE DAVIS, UNITED STATES TRUSTEE

2. ARTICLE POSTED ON MAY 12, 2011 REGARDING RICK SKOGG, COO OF AURORA LOAN SERVICES, INC. AND MANAGING DIRECTOR OF LEHMAN BROTHERS

3. EXCERPTS FROM ARTICLE POSTED NOVEMBER 11, 2011 CASE STUDY ON LEHMAN BROTHERS WITH EMPHASIS ON REPO 105 AND VIOLATIONS OF SARBANES-OXLEY

4. LEHMAN BROTHERS CHAPTER 11 PROCEEDINGS EXAMINERS REPORT, A DOCUMENT IN EXCESS OF 2,000 PAGES. I REFERENCE IN PARTICULAR SECTION 3, ADDRESSING REPO 105 AND SARBANES-OXLEY

5. ARTICLE FROM "FINANCIER WORLDWIDE" DATED FEBRUARY 2012 ADDRESSING LEHMAN'S PLANS TO EXIT BANKRUPTCY. BONDHOLDERS, OWNERS OF LEHMAN'S CDO'S (COLLATERALIZED DEBT OBLIGATIONS A/K/A MORTGAGE BACKED SECURITIES) WOULD RECEIVE LESS THAN $.30 TO $.40 ON THE DOLLAR VALUE

6. PAGES 9-11 OF ARTICLE POSTED MAY 12, 2011 (#2 ABOVE) ADDRESSING THE BIZARRE COMPLEXITY ENGAGED IN BY AURORA.

7. PAGE 22 FROM THE ABOVE ARTICLE DETAILING WELLS FARGO'S INVOLVEMENT WITH LEHAM BROTHERS. NOTE AT THE BOTTOM THAT EXHIBITS ARE INCLUDED IN REFERENCE TO THE SUBSIDIARIES OF WELLS FARGO (MULTIPLE PAGES) AND THE CERTIFICATION PER SARBANES – OXLEY

8. PAGES 37-39 OF THE ABOVE ARTICLE REFERENCING WELLS FARGO BEING FALSELY LISTED AS THE "LENDER" ANDS ITS USE OF A "ROBO LAW MILL" IN NEW JERSEY TO ACCOMPLISH THIS. I BELIEVE THIS IS THE SAME FIRM THAT FILED THE RELIEF FROM STAY MOTION IN ORDER TO PURSUE FORECLOSURE

9. INVESTOPEDIA ARTICLE DATED APRIL 2, 2009 TITLED "CASE STUDY" THE COLLAPSE OF LEHMAN BROTHERS." THIS COMPLEMENTS THE INFORMATION PROVIDED IN #3, ABOVE

10. DOCUMENTS CONFIRMING THE ASSIGNMENT OF THE MORTGAGE ORIGINATED BY ARLINGTON CAPITAL TO LEHMAN BROTHERS DATED OCTOBER 20, 2003. I ALSO ENCLOSE A LETTER DATED MARCH 8, 2004 FROM AURORA LOANS SERVICES, A LEHMAN BROTHERS COMPANY, PROVIDING ME WITH A NOTICE OF RIGHT OF TO CANCEL APPROXIMATELY SIX MONTHS AFTER THE FACT.

11. ARTICLE DATED DECEMBER 2, 2011 ADDRESSING THE CORPORATE MISCONDUCT OF LEHMAN BROTHERS, WITH EMPHASIS ON THE REPO 105 TRANSACTIONS. SEPARATE EXCERPT ATTACHED FROM AN ARTICLE ADDRESSING THE FAILURE OF MF GLOBAL, ATTRIBUTING IT TO  THE USE OF THE "ACCOUNTING MANEUVER" PIONEERED BY LEHMAN BROTHERS.

US Trustee,others object to Lehman bankruptcy plan | Reuters    Page 1 of 6
08-13555-mg    Doc 30093    Filed 08/09/12    Entered 08/16/12 12:16:50    Main Document
Pg 24 of 106



REUTERS    EDITION: U.S.        Register | Sign In

| Home | Business | Markets | World | Politics | Tech | Opinion | Breakingviews | Mone |

**BREAKING NEWS:** Former Credit Suisse trader pleads guilty to wire fraud over 2008 sub

See how easy using a CRM solution can be when it works within Outlook.®    → View the demo    Microso

ARTICLE

**MORE REUTERS RESULTS FOR:**
"lehman brothers bankruptcy trustee"

**MF Global casts spotlight on client fund rules**
Thu, Jan 26 2012

**In MF Global, JPMorgan again at center of a financial failure**
Thu, Jan 19 2012

**Dynegy bankruptcy examiner appointed**
Wed, Jan 11 2012

**MF Global trustee has no plans to transfer more cash**
Thu, Jan 12 2012

**Follow Reuters**

Facebook    Twitter    RSS    YouTube

BANKRUPTCY CASE
08 - 13555   JUAG...

**READ**

**Login** or register

Latest from
My Wire

# US Trustee,others objec bankruptcy plan

Recommend    2 people recommend this. Be the first of your f

Thu Aug 11, 2011 5:25pm EDT

**\* U.S. Trustee, Wilmington Trust amon**

\* Hearing to approve plan outline set for Aug. 30

\* Plan proposes $65 billion in creditor payouts

By Nick Brown

NEW YORK, Aug 11 (Reuters) - Lehman Brothers Hold
(LEHMQ.PK) is facing several new objections to its plar
bankruptcy in U.S. history and repay $65 billion to credi

The company is negotiating intensively with creditors si
reorganization plan in June.

It hopes to win sufficient support by Aug. 30, when U.S.
James Peck decides whether Lehman, once Wall Stree
investment bank, has disclosed enough to warrant senc
creditors for a vote.

But Tracy Hope Davis, the U.S. trustee, said Lehman's

- ■ OREGON LAWS AND FORMS
- ■ Wisconsin Law
  - o Homeowners
    - ■ Attorneys' Network
    - ■ Foreclosure Defense and Offense: The Evolving Mortgage Audit Process
    - ■ The Evolving Mortgage Audit Process
  - o GTC|HONORS REGISTRATION FORM
  - o Attorneys
    - ■ Attorney Network Expands to Over 150 Lawyers in 37 States
      - ■ The Evolving Mortgage Audit and Analysis Process
    - ■ LAWYER-CLIENT JOB FAIR BY TELECONFERENCE — ***SPREAD THE WORD***
    - ■ Find a Lawyer that "Gets It"

- **Tags**

bailout Bank of America bankruptcy BOA borrower borrowers Chapter 13 countrywide credit crisis creditor disclosure discovery Eviction Federal reserve Florida foreclosure foreclosure defense foreclosure offense foreclosures fraud Goldman Sachs HERS investors lender Lender Liability lenders LOAN MODIFICATION lost note MERS modification Mortgage mortgage meltdown note Obama predatory lending quiet title rescission RESPA RICO securitization TILA TILA audit trustee WEISBAND Wells Fargo

- | Search |

## Mary Cochrane on Aurora History and Rick Skogg

Posted on May 12, 2011 by Neil Garfield

Rick Skogg
Aurora Loan Services Inc.
Corporate Headquartes
10350 Park Meadows Drive
Littleton, CO 80124
Telephone: (303) 720-945-3000

Aurora Loan Services & Lehman Brothers
Rick started as 'President' 1997 through 2006
Rick was sooooo good he held two positions
2003-2006
1) Aurora Loan Services COO &
2) Managing Director – Lehman Brothers

Follow

**Lehman Brothers Holdings Inc. (the text-only version of my case study report for Be... Page 8 of 34**
08-13555-mg   Doc 30093   Filed 08/09/12   Entered 08/16/12 12:16:50   Main Document
Pg 26 of 106

3

fixed income, hedge funds, private equity, and structured products. Within Private Asset Management, the Total Portfolio Returns of the Equity Composite was nearly double that of the S&P 500 (*Ibid.*).

Lehman had measurably strengthened its capabilities, adding, for example, a global team investing in Real Estate Investment Trusts based in Amsterdam, a significant team of Infrastructure investors within Private Equity, and a team investing in emerging markets based in New York (*Ibid.*).

# Demise

'I've been in my seat a lot longer than you were ever in yours at Goldman.' Fuld retorted, 'Don't tell me how to run my company. I'll play ball, but at my speed.' The Treasury chief glowered, and quite possibly at that moment, Lehman's fate was sealed (McDonlad & Robinson, 2009).

## The Prime Culprit

In 2003 and 2004, Lehman acquired five mortgage lenders, including subprime lender BNC Mortgage and Aurora Loan Services. These acquisitions in real estate business brought in record revenues that made revenues in the capital markets unit surge 56% from 2004 to 2006, at a rate much higher than investment banking or investment management (see Exhibit 1, 2, and 10). The firm securitised *$146 bn* of mortgages in 2006, a 10% increase from 2005. In 2007, the firm reported net income of a record *$4.2 bn* on revenue of *$19.3 bn* (*Investopedia*).

They got to the point where they created mortgages that were known as 'NINJA' mortgages – No INcome, Job, or Asset, relying solely on the appreciation of housing prices.
– John Thain
Chairman and CEO
Merrill Lynch, 2007-2008
(The Fall of Lehman Brothers, 2009)

## The Beginning of the End

By the first quarter of 2007, cracks in the US housing market were already becoming apparent as defaults on subprime mortgages rose to a seven-year high. On 14 March 2007, one day after the firm's stock had its biggest one-day drop in five years on concerns that rising defaults would affect Lehman's profitability, the firm reported record revenues and profit for the first fiscal quarter (Investopedia). Chris O'Meara, Lehman's CFO, told analysts during a conference call, '[The subprime mortgage business in the US] will continue to face headwinds in the near term, [but Lehman is seeing the return of pricing power and] we expect to see various opportunities from the market dislocation.' (Wong, 2007)

For fiscal year 2007, Lehman raised its firm-wide risk limit from *$2.3 bn* to *$3.3 bn*, justifying it by modifying the way it calculated the amount of risk it could support. In September 2007, Lehman raised the limit again to *$3.5 bn*, and for fiscal year 2008 this number became *$4 bn*. If the same assumptions used for the 2007 calculation had been used for 2008, the resulting risk limit would have been *$2.5 bn*.

Meanwhile, despite its efforts in eliminating mortgage-related jobs and shutting down lender offices, Lehman underwrote more mortgage-backed securities than any other firm, accumulating an *$85 bn* portfolio, four times its shareholders' equity (Investopedia). On 17 March 2008, following the near-collapse of Bear Stearns, the second largest underwriter of mortgage-backed securities, Lehman's share price fell 48% (*Ibid.*). In June,

Follow

Lehman reported its first loss since its independence from American Express.

# The Last Breath

Every one of you should feel confident and proud. Our firm is strong today, and we will emerge from this cycle even stronger. We've done it before, and we will do it again.
– Richard Fuld
Chairman and CEO
Lehman Brothers, 1994-2008
(The Fall of Lehman Brothers, 2009)

During the second quarter, Lehman boosted its liquidity pool to an estimated *$45 bn*, decreased gross assets by *$147 bn*, reduced its exposure to residential and commercial mortgages by 20%, and cut down leverage ratio from 32 to 25 (Investopedia). However, amid plummeting equity markets worldwide in the first week of September 2008, its stock plunged 77% as investors questioned the original plan to keep the firm independent by spinning off a 'SpinCo' that would hold its toxcic real estate assets (Field, Lehman Report: The Business Decisions that Brought Lehman Down, 2010).

A series of plunges in Lehman's stock, spikes in CDS on its debt, clients' pull out, cuts in credit lines, and the report of a loss of *$3.9 bn* in the third quarter and a write-down[6] of *$5.6 bn* gave Lehman Brothers the final blow (Investopedia) (see Exhibit 1, 3, and 5).

With only *$1 bn* left in cash by the end of that week, Lehman was quickly running out of time. As the US Treasury refused monetary injection on 12 September, Bank of America, Lehman's favourite suitor, went on to acquire Merrill Lynch, which was about to take Lehman's position within days, on 13 September, and Barclays PLC discontinued the negotiation of acquisition on 14 September, Lehman Brothers Holdings Inc. was forced to file for Chapter 11 bankruptcy protection on 15 September before NYSE opened on Monday morning (The Fall of Lehman Brothers, 2009). The registered assets amounted to *$691 bn*, making Lehman the largest company that has went bankrupt in history *(The 10 Largest US Bankruptcies, 2009)*.

We were told, 'There isn't going to be a Barclay transaction, and therefore Lehman should be prepared to go into bankruptcy.' And then suddenly they said, 'By midnight.' And, and my response was, 'I don't understand what you're doing. Could you explain what the reason is for this action?' And they said, 'Well, we really don't have to explain a reason. You need us to finance you, and we're not gonna finance you unless you go into bankruptcy.'
– Harvey Miller
Lehman Brothers' bankruptcy attorney
Weil, Gotshal & Manges, LLP
(The Fall of Lehman Brothers, 2009)

# Development
## Barclays PLC

I think all of us would say this is something that we never expected that we can actually combine with a US Bulge Bracket[7] firm. I don't use the word 'transformational' lightly; this transaction was transformational.
– Bob Diamond

Follow

President
Barclays PLC
(*Ibid.*)

Days after Lehman Brothers filed for bankruptcy on Monday, a revised proposal to sell the brokerage part of Lehman Brothers was put before the bankruptcy court, with a *$1.35 bn* plan for Barclays to acquire the core business of Lehman Brothers (mainly Lehman's *$960 mn* Midtown Manhattan office skyscraper), was approved (Bankruptcy of Lehman Brothers). Barclays booked *$4.2 bn* in gains on the deal in 2009 (Demos & Bullock, 2010).

I have to approve this transaction because it is the only available transaction. Lehman Brothers became a victim, in effect the only true icon to fall in a tsunami that has befallen the credit markets. This is the most momentous bankruptcy hearing I've ever sat through. It can never be deemed precedent for future cases. It's hard for me to imagine a similar emergency.
– James Peck
Manhattan court bankruptcy Judge
(Bankruptcy of Lehman Brothers)

# Repo 105 and Sarbanes-Oxley

The comprehensive report of Lehman Brothers Holdings' path to bankruptcy that bankruptcy examiner Anton Valukas released detailed many repeated, deliberate material misstatements the firm made in securities filings and public statements about its financial condition (Field, The Lehman Bankruptcy Report Is a Road Map for Criminal Charges, 2010). The Valukas report said Lehman was essentially faking sales and using the 'proceeds' to pay down liabilities.

Repo 105 (Repo 105) looked just like an ordinary repo transaction; Lehman would give the counterparty highly liquid securities in exchange for cash, and then repay the cash plus interest and get the securities back. However, Repo 105 had two major differences from ordinary repo transactions: first, the interest was 5% instead of the normal 2%; second, a different accounting treatment was used – instead of booking Repo 105s as financing transactions, which would add to both assets and liabilities and have no impact on the balance sheet, Lehman booked them as sales, and the proceeds were used to pay down liabilities (*Ibid.*). Because no US law firm would give a legal opinion that Repo 105 transactions met the requirements for a sale accounting treatment, these trades were routed through its affiliate in Britain (*Ibid.*).

Lehman's auditor, Ernst & Young were fully aware of these Repo 105 transactions but failed to object these operations. Valukas concluded that Ernst & Young was guilty of professional malpractice (*Ibid.*).

Meanwhile, provisions in the Sarbanes-Oxley Act impose criminal liability on executives who falsely certify the accuracy of the financial statements and absence of deficiencies in internal controls regarding the preparation of the financial statements (Kirkendall, 2010).

When I went to college I learned economics lesson 01: You do not finance long-term investments with short-term money; and that's what happened. And I believe it happened because greed took over, and the returns were so big, and so many people were making so much money, that they lost all fear, and risk did not become a factor any more.
– Harvey Miller

Follow

Lehman Brothers' bankruptcy attorney
Weil, Gotshal & Manges, LLP
(The Fall of Lehman Brothers, 2009)

I believe that allowing Lehman Brothers to go bankrupt was a tremendous mistake; the amount of money it would've taken, twenty billion, thirty billion, compared to the destruction in value that followed the Lehman bankruptcy and the complete shutdown of the credit markets the billions and billions and billions of losses that we're experiencing in the markets subsequently.
– John Thain
Chairman and CEO
Merrill Lynch, 2007-2008
(*Ibid.*)

# Questions

1.  If Lehman Brothers had adopted Enterprise Resource Planning, could it have foreseen the irrational amount of risk it had taken and thereby not have exposed itself so severely to the commercial property market that tumbled in 2007 and 2008? If so, when should have been the last chance to adopt ERP, before it acquired subprime lenders in 2003 and 2004, before the housing bubble began to burst, or after it closed part of its Alt-A[8] issuing offices? [see Management Control Systems p220, *Decision 1: choice of controls* (Merchant & Stede, 2007)]

2.  Seeing the manifold claims of the lack of overall managerial competence within Lehman Brothers during its record growth in the global marketplace, could ERP have helped it in planning and budgeting so that Lehman could have been able to manage its operations more effectively and not over-evaluated its assets and liquidity? [see Management Control Systems p329, *Planning and Budgeting* (*Ibid.*)]

3.  Employee incentives were among the highest in Lehman Brothers, but were accompanied by greed and ego; could ERP have helped Lehman identify other, non-material incentives that could have eventually avoided the misfortune? [see Management Control Systems p393 (*Ibid.*)]

4.  Regarding risk control, what would have been the 'optimal control? Could ERP have helped with its identification? [see Management Control Systems p11, *Characteristics of good management control* (*Ibid.*)]

5.  Can the use of ERP in the investment banking industry provide more transparency that has been required by the Sarbanes-Oxley Act and avoid future mutants of Repo 105s? Could it have done that if Lehman Brothers had used it? [see Management Control Systems p578, *The Sarbanes-Oxley Act of 2002* (*Ibid.*)]

6.  Barclays has so far made a huge amount of money from its acquisition of Lehman Brothers, and it is well-known that Lehman would not have been forced to file for bankruptcy should it have had enough cash for a couple of more weeks. Could ERP have helped predict the amount of cash Lehman should have kept in case of emergency so that it could have survived those couple of weeks? Could the use of ERP help increase liquidity of a bank's assets? Could its assessments adjust to the changing liquidity and leverages? [see Management Control Systems p533, *Using Financial Results Controls in the Presence of Uncontrollable Factors* (*Ibid.*)]

7.  To which level can ERP improve an investment bank's position in dealing with risks? Could ERP alone have helped Lehman Brothers survive those couple of weeks? [see Management Control Systems p12, *Control problem avoidance* (*Ibid.*)]

Follow

ABOUT US    OUR PEOPLE    OUR WORK    OUR PUBLIC SERVICE    JOIN US    LIBRARY    SEARCH

| Overview |

**LEHMAN BROTHERS HOLDINGS INC. CHAPTER 11 PROCEEDINGS EXAMINER REPORT**

Jenner & Block is providing links to the Report of the Examiner in the Chapter 11 proceedings of Lehman Brothers Holdings Inc. The Examiner's report, reproduced below in individual Adobe Acrobat PDF files, is divided into nine volumes and features hyperlinks to all of the documents cited in the report's over 8,000 footnotes.

The Examiner in this matter was Anton R. Valukas, Chairman of Jenner & Block.

Please direct any inquiries regarding the below report to: lehmaninquiry@jenner.com.

Examiner's Report:

Volume 1 - Sections I & II: Introduction, Executive Summary & Procedural Background; Section III.A.1: Risk

Volume 2 - Section III.A.2: Valuation; Section III.A.3: Survival

Volume 3 - Section III.A.4: Repo 105

Volume 4 - Section III.A.5: Secured Lenders; Section III.A.6: Government

Volume 5 - Section III.B: Avoidance Actions; Section III.C: Barclays Transaction

Volume 6 - Appendix 1

Volume 7 - Appendicies 2 - 7

Volume 8 - Appendicies 8 - 22

Volume 9 - Appendicies 23 - 24

To order a printed or electronic copy of the Lehman Report, please contact David Collier at david.collier@pb.com.

Chicago    Washington DC    New York    Los Angeles    Extranet    Sitemap    Legal Notices    ATTORNEY SEARCH

*EXAMINORS REPORT*

*Jwo PAGES*

*#3    REPO 105*

*AND VIOLATIONS OF SARBANES- OXLEY*

**One Question Site Survey**
IT TAKES ONLY SECONDS TO ANSWER BELOW

Which statement best describes your company's
current CRM situation?
SELECT ONE ANSWER:

○ Interested in CRM; but have no information yet

○ Gathering initial information about CRM solutions

○ Formally evaluating a CRM solution

○ In the process of making a CRM solution decision

○ Already using a CRM solution

◉ Not interested in a CRM solution

**VOTE AND SEE RESULTS**

POWERED BY ★ vizu        VIEW PRIVACY POLICY

statement is inadequate, citing 23 deficiencies, including
timetable for the bank's liquidation, and a shortage of de
LAMCO, the entity created to manage various assets, in

The U.S. Trustee, a Justice Department agency that ov
cases, can be influential because that office, unlike cred
compliance with bankruptcy laws and does not have a s
outcome.

In addition to Davis, at least a half-dozen bondholders a
filed objections by late Thursday afternoon, ahead of a
of the day.

Among them, Wilmington Trust Co, trustee for between
billion in claims, said Lehman did not give sufficient info
structured securities claims would be treated.

Bundesverland deutscher Banken eV, an association of
vague on how its plan would affect creditors of certain e
affiliates.

Mason Capital Management LLC, which manages abou
affiliate, voiced a similar concern, while other objections
[PWC.UL], Libertyview Capital Management LLC and F

A spokeswoman for Lehman declined to comment.

PAULSON, GOLDMAN

Lehman has gained support for its plan from two key cr
the roughly $320 billion in overall claims.

Those groups -- a bondholder group led by hedge fund
including Goldman Sachs Group Inc (GS.N) and Morga
plans before accepting Lehman's compromise.

Lehman's plan could pay creditors an average 20 cents
more, including derivatives creditors who would see nea

The company has also secured support from a group of
claims.

If Peck approved Lehman's disclosure statement, credit
Nov. 4 and the plan could win the judge's approval the
repaying creditors soon afterward.

Lehman filed for bankruptcy on Sept. 15, 2008, with $6

**Login** or **register**        Latest from
My Wire

larger than any previous U.S. bankruptcy and was cons

crisis.

The case is In re Lehman Brothers Holdings Inc, U.S. B

York, No. 08-13555. (Reporting by Nick Brown; editing I

STOCKS    BONDS NEWS    BONDS    MARKETS    FUNDS NEV

## Related Quotes and News

| COMPANY | PRICE | | RELAT |
|---|---|---|---|
| **Lehman Brothers Holdings Inc**<br>**LEHMQ.PK** | **$0.03**<br>+0.00 | +2.86% | Nomui<br><br>Nomui<br>source<br><br>**More L** |
| **Goldman Sachs Group Inc**<br>**GS.N** | **$114.13**<br>+2.66 | +2.39% | MOVE<br><br>Exclus<br>broker<br><br>**More G** |
| **Morgan Stanley**<br>**MS.N** | **$19.57**<br>+0.92 | +4.93% | Faceb<br>▶ VIDE<br><br>Exclus<br>broker<br><br>**More M** |

Recommend    2 people recommend this. Be the first of your f

Tweet this    Link this    Share this    Digg th

## Videos you may like:    by Taboola



Watch Video

**Iranian military boats approach U.S. vessels: Pen...**

Sat, Jan 14 2012

Login or register    Latest from My Wire

**Worst customer satisfaction**



FINANCIER
WORLDWIDE.com corporatefinanceintelligence

CASSELS BROCK
TORONTO, CANADA

Free trial subscription | Subscribe now | Register for free NEWSwire | Products & services | FW Direct (RSS/XML)

User ID:        password:        Login    $ = requires subscription    search:        Search
☐ remember me    Forgot your password?                                                        Advanced Search

**Print Edition**
February 2012

FINANCIER
A new era under
the Volcker Rule

## Lehman Cleared For Bankruptcy Exit                                     « Back

Selina Harrison, February 2012

Page 3 of 3

But it was not to be. On 12 December 2010, Paulson & Co, Calpers and other bondholders filed a rival plan. Under Lehman's original plan, some of the largest payouts would go to creditors of Lehman Brothers Special Financing Inc, the company's derivatives unit, which included Deutsche Bank, Credit Suisse and Goldman Sachs, among others. Lehman proposed derivatives creditors receive about 38.8 cents on the dollar, while senior bondholders of the parent company would recover about 17.4 cents. However, the bondholder plan proposed to boost bondholders' payouts to 24.5 cents on the dollar, while derivatives creditors would receive 25.7 cents.

Around six weeks later, Lehman filed an amended plan, which disregarded key elements of the bondholders' plan. Lehman said creditors holding senior unsecured claims would recover 21.4 percent of their claims under the new plan, up from 14.7 percent. General unsecured creditors would recover just under 51 cents on the dollar, an increase compared to the previous plan.

**FW Magazine**

Current issue
Subscriptions
Editorial submissions
About FW magazine
FW Digital
Advertising
Media Information
Contact us

**FW Other Services**

Reprints & syndications
Contract publishing
Creative marketing solutions

Free trial subscription
Subscribe now
Products & services

**Follow us...**

twitter.com/
FinancierWW

facebook.com/
FinancierWW



**Options**

☐ Subscribe Now
£ Products and Services
☐ View basket (0) items

**Article options**

☐ Printable Version
☐ Research Assistant
☐ Add to Assistant
☐ Send to a Colleague

**Also in this section**

• A new era under the Volcker Rule
• Using economic uncertainty to your advantage in M&A
• Roundup of M&A activity in 2011
• Bankruptcy & Restructuring: Compendium 2012
• Dispute Resolution & Litigation: Compendium 2012

Unsecured creditors of the firm's commodities business would recover about 50 cents on the dollar, up from around 26 cents on the dollar. Unsecured creditors of Lehman's derivatives business would get about 22 cents on the dollar, largely unchanged from a range of 22-24 cents on the dollar in the previous plan.

Despite the amendment, neither party was happy. Although in March the court gave Lehman until 17 November to secure creditor approval for the plan, on 25 April 2011, led by Goldman Sachs, a group of banks with derivatives claims against Lehman filed a competing plan to the existing two. Under the Goldman Sachs plan, derivatives creditors would receive 26 cents on the dollar, up from 22.3 cents in Lehman's proposal. They would boost their payout by another 15 cents after claiming more money under a guarantee from Lehman's parent. The losers would be senior bondholders, who would get 21.4 cents from Lehman and 16 cents from the group including Goldman Sachs.

In April 2011, the bondholder group won permission to present its plan, alongside Lehman, at a 28 June hearing. Eager to settle the matter once and for all, Lehman spent the next two months revising its plan to appease creditors. When Lehman revealed details of the plan, it announced that warring creditors had reached a settlement on the final payout, and also announced it had recovered another $5bn to repay its creditors.

The settlement plan reallocates some of the guarantee money to bondholders, but gives more to banks. Senior bondholders, with $83bn in claims, will receive 21.1 cents on the dollar, down from 21.4 cents. Recovery on the bulk of derivatives claims, which total about $22bn, would increase from 34 cents on the dollar to 39 cents. For distressed debt hedge funds, including Silver Point and Mount Kellet, with roughly $30bn in claims, recovery increased from 26 to 28 cents on the dollar.

Harvey Miller, the lead bankruptcy lawyer from Weil, Gotshal, revealed Lehman had won support for the plan from 95 percent of voting creditors. A court filing dated 29 November said "The plan to resolve the largest, most complex Chapter 11 case ever filed has received overwhelming support from its impaired worldwide creditor classes."

A day before asking Judge Peck to approve its bankruptcy exit plan, Lehman revealed it had named a new board of seven directors, including two former Goldman Sachs Group partners, to oversee the defunct firm's $65bn liquidation plan. After three turbulent years, on 6 December 2011 Judge Peck gave Lehman permission to begin winding down its remaining operations. Lehman asked to the court to ensure that its bankruptcy exit occur no earlier than 31 January, which would give it time to prepare to stand on its own before beginning to make payouts to creditors.



Talking Point

who will go down in history for looking forward.

There appears not to be a damn thing we consumers as the weakest link can do about the facts of harm and injury, unlawful business acts, brought into the light of day.

I believe because I can that we can do something about that! Joinder State by State!

Congress is going on SUMMER VACTION. Are they worried about their pensions or did they CONGRESS hedge and profit from Abacus too?

How many of you will become homeless this summer?

When CONGRESS comes back to session and the unemployment & food stamp coffers' are empty what we gonna do – gonna do about it? Who thought the day would come when the laws of the United States of America do not apply and were created not to protect consumers and foreign organizations were smarter than the average bear recognized the loophole to secure the properties of the weakest link!

We did allow the United States Government to make deals with the foreign nations. We are not smarter than a 5th Grader. We did allow CONGRESS both HOUSES and the PRESIDENT to take property by deception, for benefit and interest of the United States Government. While we slept and thought laws would keep us safe, while we ignored the cries over the past decade of those harmed, while we allowed third parties to take possession of property in a larcenous manner we sadly learn its out turn and we will not be subjects in COURT under laws of the United States of America. Is the "Last laugh" upon United States whose citizens are the weakest link to destruction of the economy one mortgage at a time? Talk about patience.

Go ahead, trust American sounding banks. Better yet, got any money in your bank account? You better find out who the real owners are. Their commercial advertising is targeted at you not the private money managers. They want your checking accounts, savings accounts, car loans, money market funds, 401K's, annuities, pension plans, and got ya! What ya gonna do when they shut down the account and keep your money? Take them to court? Ha!

Go feed the bear and he will eat you! Forewarned please take heed! DO NOT TRUST the storefronts of financial institutions (foreign owners) who acquired through diversification a trade name that sounds American, e.g. Wells Fargo & Co…

You know the stock exchange symbols & many 'common stockholders' benefit from sale of the common stock. When WFC collapses which has to be a planned future event, as they are the TROJAN HORSE and Wells Fargo Bank NA and First Union merged again when 'Wachovia' acquired by Wells Fargo and who made sure Wells Fargo won the bidding war? Who made sure JPM got Bear Stearns whom without Chase Manhattan Mortgage Corp 'CMMC' would never have been able to secure no-cost loans to fund the originations.

Did you purchase retails financial products and financial services in good faith?

Did you entrust all of your currency with intent to foreign owners who converted all real estate into currency one mortgage at a time, and daily running through their treasuries, each Special-Purpose Vehicles ("SPV's") moved in the pipeline and converted into paper …

What will you do when your paycheck is seized, bank account immediately closed, you will work and have no food, shelter or clothing and become an indentured servant. How many already have? And to whom? Who will be our master's, the Master Servicer?

3.
    **saveamericaone**, on May 13, 2011 at 9:27 am said:

    Registered on SEC, Aurora Loan Services
    does not appear as a Registrant (Public Companies/Funds, Significant Individuals / Owners, et al.);
    nor does Aurora Loan Services appear as a Group Member (Non-Registrant Filers: Partners Follow

Affiliates et al.);

Alas we have (8) Names (Directors, Officers, Attorneys, Accountants, Bankers, Agents, et al.)

Their "Last Filing: and actual /s/ Signatory

3/31/05 Aurora Loan Services LLC
(fka Aurora Loan Services Inc.)
3/31/05 Aurora Loan Services LLC
fka Aurora Loans Services Inc.
3/31/05 Aurora Loan Services LLC
fka Auroa Loan Services Inc. Inc
3/31/05 Aurora Loan Services LLC
fka Aurora Loan Serivces Inc
4/10/09 Aurora Loan Services LLC
4/2/07 Aurora Loan Services
3/30/07 Aurora Loan Services, LLC
3/30/04 Aurora Loan Services Inc.

Why so many different ones? Could the (Directors, Officers, Attorneys, Accountants, Bankers, Agents, et. al) be signing as members (employees) of different Agencies inside of Special-Purpose Vehicles (SPV's)?

YES

Will you be surprised to learn that the
Norwest Asset Securities Corp (NASCOR)
and Structured Asset Securities Corp (SASCOR)
are related SPV's with

Chase Manhattan Mortgage Corp ("CMMC")
symbol "JPM" recognizable? And is it any coincidence that the Federal Reserve and United States Treasury made sure 'Bear Stearns, Co Inc. wound up in the hands of the bailout and in the hands of JPM? Oh, and that PO Box 85071, San Diego CA that somehow relates to Wells Fargo Bank NA (pass through agency) private brand label used by MERS MEMBES on retail documents, legal agreements, promissory notes, mortgage loans, are in Agreements, Agencies, SPV's with….

8 Names (Directors, Officers, Attorneys, Accountants, Bankers, Agents, et al.)
Last Filing Signatory
(more-likely to less-likely)
3/31/05 Aurora Loan Services LLC (fka Aurora Loan Services Inc.)
3/31/05 Aurora Loan Services LLC fka Aurora Loans Services Inc.
3/31/05 Aurora Loan Services LLC fka Auroa Loan Services Inc. Inc
3/31/05 Aurora Loan Services LLC fka Aurora Loan Serivces Inc
4/10/09 Aurora Loan Services LLC
4/2/07 Aurora Loan Services
3/30/07 Aurora Loan Services, LLC
3/30/04 Aurora Loan Services Inc.
3/31/05 Aurora Loan Services LLC (fka Aurora Loan Services Inc.) Latest Filing: 3/31/05 as Signatory
"Aurora Loan Services LLC fka Aurora Loan Services Inc." has been a Signatory for/with the new

following 29 Registrants:
Mortgage Pass-Through Certificates Series 2004-2
Structured Adjustable Rate Mortgage Loan Rate
Structured Adjustable Rate Mortgage Loan Trust
Structured Adjustable Rate Mortgage Loan Trust
Structured Adjustable Rate Mortgage Loan Trust
Structured Adjustable Rate Mortgage Loan Trust
Structured Adjustable Rate Mortgage Loan Trust
Structured Adjustable Rate Mortgage Loan Trust
Structured Adjustable Rate Mortgage Loan Trust
Structured Adjustable Rate Mortgage Loan Trust
Structured Adjustable Rate Mortgage Loan Trust
Structured Adjustable Rate Mortgage Loan Trust
Structured Adjustable Rate Mortgage Loan Trust 2004-5
Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates/Series 2004-14
Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates/Series 2004-15
Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates/Series 2004-16
Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates/Series 2004-17
Structured Asset Investment Loan Trust 2004-10
Structured Asset Investment Loan Trust 2004-6
Structured Asset Investment Loan Trust 2004-8
Structured Asset Investment Loan Trust 2004-BNC1
Structured Asset Investment Loan Trust 2004-Bnc2
Structured Asset Investment Loan Trust Series 2004-11
Structured Asset Sec Corp Mort Pass Thr Certs Series 2004 2
Structured Asset Sec Corp Mort Pass Thr Certs Series 2004 4
Structured Asset Secs Corp Mor Pas Thr Cer Ser 2004 3ac
Structured Asset Securities Corp 2004-S3
Structured Asset Securities Corp Mortgage Pass-through Certificates 2004-S2
Sturctured Asset Securities Corp Mort Pass Thru Ser 2004-1 (3 World Financial Center, NY NY 10285) Filing Agent: Bank of New York Trust Co Global Corp Tr Successor to Jpmorgan Chase Bank Its FA/FA Address 651 Travis Street, Floor 17 Houston 77002 IRS# 13-4994650 SEC CIK# 1051170 'has only been a Filing Agent and has never filed as anGOVERNMENT TRUST 2-F. Signatory /s/ Lawrence M Kusch most interesting of Berkshire Hataway: Associated Banc-Corp
Berkshire Hathaway Finance Corp
Berkshire Hathaway Inc [ formerly NBH Inc ]
BP Capital Markets PLC
Cco Holdings Capital Corp
Cco Holdings LLC
Charter Communications/Inc/MO [ formerly Charter Communications Inc/MO ]
Clevite Industries Inc
Commercial Metals Co
Commonwealth Edison Co
Corning Inc/NY
Equity Residential [ formerly Equity Residential Properties Trust ]
Erp Operating Ltd Partnership
Exelon Capital Trust I                                            Follow

Why focus on 12/31/2005 10K?
The heightened period where MERS humming away, United States Goverment wanted in on the yeilds and $4 to $1 payouts from the ponzi money laundering scheme. Bernie Madeoff with the cash sits in jail alone. When will he have company?

Consumers wondering how did your retail purcahse of a financial products manufactured by an SPV called a 'mortgage loan' and 'promissory note' get in the hands of 'Wells Fargo Bank NA' many wonder. Well you either did business directly with WFHM storefronts or one of their subsidiaries or one of their clients! At the end of the day the transactions were organized in such a fashion if you defaulted you would be harmed by 'a national banking association' and unable to get help in the COURTS. The SPV's made sure all of the foreclosures and/or resulting bankruptcies and taking possession of your property in a larcenous manner would be for the benefit of the SERVICER on the RETAIL side the beneficiary of the unlawful business acts and simply a 'mule'.

WFC's commercial clients like Lehman, JPM dba Chase Manhattan Mortgage Corporation, GMAC-RFC dba GMAC Mortgage CORP, Norwest Mortgage, BANCO Mortgage, ... Handler is Wells Fargo Bank NA as TRUSTEE who push the currency of the comercial investors to the left

Key WFC Affiliates controlled the 'Real Estate Indusry' and Wells Fargo Bank NA as TRUSTEE in Agreements with Aencies were feed literally by the MULES their own ENHANCED private brand labelers whose Cendant Settlement Agencies and SPV's provided the currency via RETAIL transactis handled by 'Mules' who did not know they were bringing the bacon home to 'WFC'

Settlement Agencies and Agents became in 2007 'subsidiaries' of the IPO entities morphed out of Cendant which began in 2005.
Goldman and CDMC for example benefitted from this relationship.

Sorry ERA Franchises, Century 21, Coldwell, Sotherby's, Better Homes & Gardens, and ...
you did not know as ... 'Brokers' 'Agents' 'Dealers' 'Distributors' you were feeding the beast.

Lehman Brothers
Holdings Inc., a Delaware corporation, incorporated on December 29, 1983.
American Express Company, a New York corporation ("American Express"), owns 100 percent of the outstanding common stock of Holdings, which represents approximately 93 percent of Holdings' issued and outstanding voting stock.

Subsidiaries starting in 1993 Lehman:
http://www.secinfo.com/dsvr4.bWg.d.htm

Wells Fargo & Co/MN · 10-K ·
For 12/31/05 · EX-21
Filed On 3/9/06
SEC File 1-02979
Accession Number 950149-6-83
Filing Agent: Bowne of S..Francisco/FA

_____

EX 21 Subidiaries of the Registrant
EX-31.(A) Certification per Sarbanes-Oxley Act (Section 302)

Follow

Credit Suisse (Usa) Inc.

Who, What, When, Where, How, why do they do business as DLJ Mortgage?
c/o'Wells Fargo Bank NA'
PO Box 85071, San Diego CA

And why is PO Box 85071, San Diego, CA
"Wells Fargo Bank NA" listed as LENDER on RESIDENTIAL MORTGAGES when they were
not the LENDER? And why is the falsified Assignment filed by Wells Fargo Home Mortgage
'robo-law mill in New Jersey' as identified as having filed such documents by Chief Justice
Rabner of NJ, why did they issue on 4/24/2009 for Wells Fargo Bank and its Agency 'US Bank
NA' and its 'Issuing Entity' SASCO 2006-WF3 (10K) TRUST FUND of 88 Loan Trusts? the
Assignment, and why did Senior Counel of Zucker Goldberg & Ackerman LLC, Leonard Zucker
signature appear on the falsified Assignment known to be one of the documents filed with
egregious errors as documented by 60 Minyutes? and follow the orders specifically of a one
'Bonnie Schooler' executive assistant of Wells Fargo Home Mortgage who reports to Mary
Coffin EVP who signed the 10K? And how would therefore Mary Coffin be related to the robo-
signatures of CERTIFICATEGATE will co-presidents of WFHM and Mark Oman and David
Hoyt and Howard Atkins and John Stumpf have the answers?
For indeed John Stump publically stated Wells Fargo Bank NA does foreclosures the right way,
one employee does handle the foreclosure (reads and follows the Reconstituted Servicing
Agreement of their Client and order foreclose is imminient 'FCI' and instructs the robol-law firm
int he state who is in Agreement with Wells Fargo Bank NA? Who are they in Agreement with
Norwest Asset Securities Corp?

Anyway, the robo-law firm is paid to process the falsified documents filed with the public offices
and state courts filing documents the COURT expects and assumes to be true.

Wells Fargo Bank NA Assinging to their – that's right their Agency 'US Bank NA' part of
cooperative acquistions and names and unregistered entity not listed on SECINFO.COM but is
paying CERTIFICATEHOLDERS this very day through 'Structured Asset Securities Corp Loan
Trust 2006-WF3'? 4/2009? This one Loan Trust is suppose to be active for 30 years. The 'TRUST
FUND' its inside of 'SASCO 2006-WF3' contains 88 Loan Trusts thru which some of the
Mezzanine Certificates like SASC 'M9' disappear into Abacus 2007-AC1 and I wonder why the
Certificate Holders are being paid this very day on the 'M9' certificates? Did not SASC M9 get
sold to ABACUS 2007-AC1 by LaSalle to Goldman and AIG have to pay out? And if they pulled
out the 'M9' the poor subordinated 'M8's did not know they were not getting paid because M9's
were gone?

I don't know but someone needs to look at this matter.

And what has Structured Asset Securities Corp got to do with all of this?

Yes appears 'Norwest Corp' intention to acquire Wells Fargo set in 1996 and they put into motion
the acquistions of the northwestern cooperative aka 'BANCO' and did collaborate with SPV's and
their Agencies.

Wells FArgo Bank NA, PO Box, 85071, San Diego, CA – and Structured Asset Securities Corp
got to do with 1994 SEC Agreements with Prudential Sercurities, Wells Fargo, Chase Manhattan
Mortgage Corp? (that would be the former America Wells Fargo Bank prior to marraige with
Norwest Corp in 1998. Intent? 1996 Agreement of NASCOR – newly acquired affiliate included

, FArgo Bank NA, PO Box, 85071, San Diego, CA – and Structured Asset Securities Corp got to do with 1994 SEC Agreements with Prudential Sercurities, Wells Fargo, Chase Manhattan Mortgage Corp? (that would be the former America Wells Fargo Bank prior to marraige with Norwest Corp in 1998. Intent? 1996 Agreement of NASCOR – newly acquired affiliate included 'CMMC' Chase Manhattan Mortgage Corp (JPM) and GMAC-RFC (GMAC Mortgage Corp) and ....

Credit Suisse (Usa) Inc
14 Closely Related:
Credit Suisse AG – SEC # 1053092 – 5/12/11
Credit Suisse Group AG – SEC # 1159510 – 5/10/11
Credit Suisse Group Capital (Delaware) LLC II – SEC # 1358079 – 3/25/09
Credit Suisse Group Capital (Delaware) LLC III – SEC # 1358078 – 3/25/09
Credit Suisse Group Capital (Delaware) Trust II – SEC # 1358077 – 3/25/09
Credit Suisse Group Capital (Delaware) Trust III – SEC # 1358076 – 3/25/09
Credit Suisse Group Capital (Guernsey) IX LTD – SEC # 1358083 – 3/25/09
Credit Suisse Group Capital (Guernsey) LTD – SEC # 1358084 – 3/25/09
Credit Suisse Group Capital (Guernsey) X LTD – SEC # 1358082 – 3/25/09
Credit Suisse Group Capital Delaware LLC I – SEC # 1196034 – 3/25/09
Credit Suisse Group Capital Delaware Trust I – SEC # 1196030 – 3/25/09
Credit Suisse Group Finance (Guernsey) LTD – SEC # 1358085 – 3/25/09
Credit Suisse Group Finance Delaware LLC I – SEC # 1196025 – 3/25/09
Donaldson Lufkin & Jenrette Inc/FI – SEC # 906540 – 5/2/96

Registrant
Possibly Inactive per 1/2/02 Form 15
Formerly Assigned On
Credit Suisse First Boston USA Inc 11/16/00
Donaldson Lufkin & Jenrette Inc/NY 3/30/96

Registrants:
9/7/95 5/2/96 Donaldson Lufkin & Jenrette Inc/FI DonLJ U.S. SEC # 906540
9/7/95 5/2/96 Donaldson Lufkin & Jenrette Inc [ now Donaldson Lufkin & Jenrette Inc/FI ] DonLJ U.S. SEC # 906540
5/15/96 3/25/09 Donaldson Lufkin & Jenrette Inc/NY [ now Credit Suisse (Usa) Inc ] DLJ U.S. SEC # 29646

11 Group Members
(Non-Registrant Filers: Partners, Affiliates, et al.)
Last Filing

4/1/04 Donaldson, Lufkin & Jenrette Securities Corporation [ with Axa Financial Inc ]
3
/10/00 Donaldson, Lufkin & Jenrette, Inc. [ with Axa Financial Inc ]
7/17/00 Donaldson/Lufkin & Jenrette/Inc [ with Axa Financial Inc ]

1/4/00 Donaldson Lufkin & Jenrette, Inc. [ with Credit Suisse (Usa) Inc ]

10/11/00 Donaldson Lufkin & Jenrette Inc/NY

1/3/00 Donaldson Lufkin & Jenrette Securities Corporation [ with Credit Suisse (Usa) Inc Follow

5/2/96 Donaldson Lufkin & Jenrette Inc/FI

10/10/96 Donaldson/Lufkin & Jenrette Securities Corp [ with Axa Financial Inc ]

12/6/96 Donaldson/Lufkin & Jenrette Securities Corp [ with Credit Suisse (Usa) Inc ]

3/10/94 Donaldson/Lufkin & Jenrette Securities Corporation [ with Axa Financial Inc ]

2/14/94 Donaldson/Lufkin & Jenrette Securities Corporation [ with Axa Financial Inc ]

10 Names
(Directors, Officers, Attorneys, Accountants, Bankers, Agents, et al.)

4/17/03 Donaldson, Lufkin & Jenrette, Inc.
9/26/02 Donaldson Lufkin & Jenrette
2/20/02 Donaldson, Lufkin & Jenrette Inc.
5/1/01 Donaldson, Lufkin & Jenrette Securities Corporation
3/23/00 Donaldson, Lufkin
12/28/00 Donaldson, Lufkin & Jenrette
7/13/00 Donaldson, Lufkin & Jenrette Securities
7/27/99 Donaldson, Lufkin & Jenrette International
11/13/98 Donaldson Lufkin & Jenrette, Inc.
3/10/98 Donaldson, Lufkin & Jenrette

DLJ: 140 Broadway
New York, New York 10005
212-504-4477 Delaware, U.S.A.
IRS# 13-1898818 12/31 906540
Symbol DonLJ

Similarly-Named Registrant
Donaldson Lufkin & Jenrette Inc/NY
[ now Credit Suisse (Usa) Inc ] formerly Credit Suisse First Boston USA Inc

DLJ Capital Corp
DJL Capital Venture FUND
First Interstate Bank of CA – Trustee
The Northwestern Mutual Life Insurance Co
Lincoln National Income Fund
Security-Connecticut Life Insurance CO.
Lincoln National Life Insurance CO....

What has the "Northwestern Cooperative' Go to do -Got to do with it?

DONALDSON, LUFKIN & JENRETTE, INC
13-1898818
277 PARK AVENUE
NEW YORK, NEW YORK 10172
(212) 892-3000

Follow

**Case Study: The Collapse of Lehman Brothers**
08-13555-mg    Doc 30093    Filed 08/09/12    Entered 08/16/12 12:16:50    Main Document
Pg 41 of 106

Page 1 of 5

Investopedia | FXtrader | Stock Simulator | Financial Edge



Ent

You bank with Bank of America.
Now invest with Merrill Edge.

Your next online trade is on us.
Actually, your next **30** trades.

| Home | Dictionary | Articles | Tutorials | Exam Prep | Forex | Markets |

Stock Analysis  |  Special Features  |  Investing Basics  |  Stocks  |  Mutual Funds  |  View All

Penny stocks can multiply your money. Join free!

# Case Study: The Collapse of Lehman Brothers

Posted: Apr 2, 2009 |  Reprints
 Print   Email

FILED UNDER    BANKING    ECONOMICS    HEDGE FUNDS

No Image Available    **Investopedia Staff**
Contact | Author Bio



Mortgage Rates — Select A Loan Program

| 40 Year Fixed | 3 Year ARM |
| 30 Year Fixed | 1 Year ARM |
| 15 Year Fixed | 30 Year Int Only |
| 10 Year Fixed | 5 Year Int Only |
| 7 Year ARM | 3 Year Int Only |
| 5 Year ARM | 1 Year Int Only |
| Home Equity | Second Mortgage |

◈ AmeriSave

On September 15, 2008, Lehman Brothers filed for bankruptcy. With $639 billion in assets and $619 billion in debt, Lehman's bankruptcy filing was the largest in history, as its assets far surpassed those of previous bankrupt giants such as WorldCom and Enron. Lehman was the fourth-largest U.S. investment bank at the time of its collapse, with 25,000 employees worldwide. Lehman's demise also made it the largest victim, of the U.S. subprime mortgage-induced financial crisis that swept through global financial markets in 2008. Lehman's collapse was a seminal event that greatly intensified the 2008

crisis and contributed to the erosion of close to $10 trillion in market capitalization from global equity markets in October 2008, the biggest monthly decline on record at the time. (For more information on the subprime meltdown, read *Who Is To Blame For The Subprime Crisis?*)

## The History of Lehman Brothers

Lehman Brothers had humble origins, tracing its roots back to a small general store that was founded by German immigrant Henry Lehman in Montgomery, Alabama, in 1844. In 1850, Henry Lehman and his brothers, Emanuel and Mayer, founded Lehman Brothers.

While the firm prospered over the following decades as the U.S. economy grew into an international powerhouse, Lehman had to contend with plenty of challenges over the years. Lehman survived them all – the railroad bankruptcies of the 1800s, the Great Depression of the 1930s, two world wars, a capital shortage when it was spun off by American Express in 1994, and the Long Term Capital Management collapse and Russian debt default of 1998. However, despite its ability to survive past disasters, the collapse of the U.S. housing market ultimately brought Lehman Brothers to its knees, as its headlong rush into the subprime mortgage market proved to be a disastrous step. (To learn more about previous financial disasters, be sure to check out our *Crashes Special Feature*.)

## The Prime Culprit

In 2003 and 2004, with the U.S. housing boom (read, bubble) well under way, Lehman acquired five mortgage lenders, including subprime lender BNC Mortgage and Aurora Loan Services, which specialized in Alt-A loans (made to borrowers without full documentation). Lehman's acquisitions at first seemed prescient; record revenues from Lehman's real estate businesses enabled revenues in the capital markets unit to surge 56% from 2004 to 2006, a faster rate of growth than other businesses in investment banking or asset management. The firm securitized $146 billion of mortgages in 2006, a 10% increase from 2005. Lehman reported record profits every year from 2005 to 2007. In 2007, the firm reported net income of a record $4.2 billion on revenue of $19.3 billion. (Check out the answer to our frequently asked question *What is a subprime mortgage?* to learn more about these loans.)

## Lehman's Colossal Miscalculation

In February 2007, the stock reached a record $86.18, giving Lehman a market capitalization of close to $60 billion. However, by the first quarter of 2007, cracks in the U.S. housing market were already becoming apparent as defaults on subprime mortgages rose to a seven-year high.

**Case Study: The Collapse of Lehman Brothers**       **Page 3 of 5**
08-13555-mg   Doc 30093   Filed 08/09/12   Entered 08/16/12 12:16:50   Main Document
Pg 43 of 106

On March 14, 2007, a day after the stock had its biggest one-day drop in five years on concerns that rising defaults would affect Lehman's profitability, the firm reported record revenues and profit for its fiscal first quarter. In the post-earnings conference call, Lehman's chief financial officer (CFO) said that the risks posed by rising home delinquencies were well contained and would have little impact on the firm's earnings. He also said that he did not foresee problems in the subprime market spreading to the rest of the housing market or hurting the U.S. economy.

### The Beginning of the End

As the credit crisis erupted in August 2007 with the failure of two Bear Stearns hedge funds, Lehman's stock fell sharply. During that month, the company eliminated 2,500 mortgage-related jobs and shut down its BNC unit. In addition, it also closed offices of Alt-A lender Aurora in three states. Even as the correction in the U.S. housing market gained momentum, Lehman continued to be a major player in the mortgage market. In 2007, Lehman underwrote more mortgage-backed securities than any other firm, accumulating an $85-billion portfolio, or four times its shareholders' equity. In the fourth quarter of 2007, Lehman's stock rebounded, as global equity markets reached new highs and prices for fixed-income assets staged a temporary rebound. However, the firm did not take the opportunity to trim its massive mortgage portfolio, which in retrospect, would turn out to be its last chance. (Read more in *Dissecting The Bear Stearns Hedge Fund Collapse*.)

### Hurtling Toward Failure

Lehman's high degree of leverage - the ratio of total assets to shareholders equity - was 31 in 2007, and its huge portfolio of mortgage securities made it increasingly vulnerable to deteriorating market conditions. On March 17, 2008, following the near-collapse of Bear Stearns - the second-largest underwriter of mortgage-backed securities - Lehman shares fell as much as 48% on concern it would be the next Wall Street firm to fail. Confidence in the company returned to some extent in April, after it raised $4 billion through an issue of preferred stock that was convertible into Lehman shares at a 32% premium to its price at the time. However, the stock resumed its decline as hedge fund managers began questioning the valuation of Lehman's mortgage portfolio.

On June 9, Lehman announced a second-quarter loss of $2.8 billion, its first loss since being spun off by American Express, and reported that it had raised another $6 billion from investors. The firm also said that it had boosted its liquidity pool to an estimated $45 billion, decreased gross assets by $147 billion, reduced its exposure to residential and commercial mortgages by 20%, and cut down leverage from a factor of 32 to about 25. (Read *Hedge Fund Failures*

*Illuminate Leverage Pitfalls* to learn more about the double-edged sword of leverage.)

**Too Little, Too Late**
However, these measures were perceived as being too little, too late. Over the summer, Lehman's management made unsuccessful overtures to a number of potential partners. The stock plunged 77% in the first week of September 2008, amid plummeting equity markets worldwide, as investors questioned CEO Richard Fuld's plan to keep the firm independent by selling part of its asset management unit and spinning off commercial real estate assets. Hopes that the Korea Development Bank would take a stake in Lehman were dashed on September 9, as the state-owned South Korean bank put talks on hold.

The news was a deathblow to Lehman, leading to a 45% plunge in the stock and a 66% spike in credit-default swaps on the company's debt. The company's hedge fund clients began pulling out, while its short-term creditors cut credit lines. On September 10, Lehman pre-announced dismal fiscal third-quarter results that underscored the fragility of its financial position. The firm reported a loss of $3.9 billion, including a write-down of $5.6 billion, and also announced a sweeping strategic restructuring of its businesses. The same day, Moody's Investor Service announced that it was reviewing Lehman's credit ratings, and also said that Lehman would have to sell a majority stake to a strategic partner in order to avoid a rating downgrade. These developments led to a 42% plunge in the stock on September 11.

With only $1 billion left in cash by the end of that week, Lehman was quickly running out of time. Last-ditch efforts over the weekend of September 13 between Lehman, Barclays PLC and Bank of America, aimed at facilitating a takeover of Lehman, were unsuccessful. On Monday September 15, Lehman declared bankruptcy, resulting in the stock plunging 93% from its previous close on September 12.

**Conclusion**
Lehman's collapse roiled global financial markets for weeks, given the size of the company and its status as a major player in the U.S. and internationally. Many questioned the U.S. government's decision to let Lehman fail, as compared to its tacit support for Bear Stearns (which was acquired by JPMorgan Chase) in March 2008. Lehman's bankruptcy led to more than $46 billion of its market value being wiped out. Its collapse also served as the catalyst for the purchase of Merrill Lynch by Bank of America in an emergency deal that was also announced on September 15. (To learn more about the financial crisis, read *The 2007-08 Financial Crisis In Review*.)

# RESPA SERVICING DISCLOSURE

Lender: Arlington Capital Mortgage Corp.
33 Witherspoon Street
Princeton, NJ 08542

NOTICE TO FIRST LIEN MORTGAGE LOAN APPLICANTS: THE RIGHT TO COLLECT YOUR MORTGAGE LOAN PAYMENTS MAY BE TRANSFERRED. FEDERAL LAW GIVES YOU CERTAIN RELATED RIGHTS. IF YOUR LOAN IS MADE, SAVE THIS STATEMENT WITH YOUR LOAN DOCUMENTS. SIGN THE ACKNOWLEDGMENT AT THE END OF THIS STATEMENT ONLY IF YOU UNDERSTAND ITS CONTENTS.

Because you are applying for a mortgage loan covered by the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. Section 2601 et seq.) you have certain rights under that Federal law.

This statement tells you about your rights under RESPA. It also tells you what the chances are that the servicing for this loan may be transferred to a different loan servicer. "Servicing" refers to collecting your principal, interest and escrow account payments, if any. If your loan servicer changes, there are certain procedures that must be followed. This statement generally explains those procedures.

### Transfer Practices and Requirements

If the servicing of your loan is assigned, sold, or transferred to a new servicer, you must be given written notice of that transfer. The present loan servicer must send you notice in writing of the assignment, sale or transfer of the servicing not less than 15 days before the effective date of the transfer. The present servicer and the new servicer may combine this information in one notice, so long as the notice is sent to you 15 days before the effective date of transfer. The 15 day period is not applicable if a notice of prospective transfer is provided to you at settlement. The law allows a delay in the time (not more than 30 days after a transfer) for servicers to notify you, upon the occurrence of certain business emergencies.

Notices must contain certain information. They must contain the effective date of the transfer of the servicing of your loan to the new servicer, and the name, address, and toll-free or collect call telephone number of the new servicer, and toll-free or collect call telephone numbers of a person or department for both your present servicer and your new servicer to answer your questions. During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

### Complaint Resolution

Section 6 of RESPA (12 U.S.C. Section 2605) gives you certain consumer rights, whether or not your loan servicing is transferred. If you send a "qualified written request" to your servicer, your servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and the information regarding your request. Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, or must provide you with a written clarification regarding any dispute. During this 60-Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request.

A Business Day is any day in which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

### Damages and Costs

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section.

### Servicing Transfer Estimates

1. The following is the best estimate of what will happen to the servicing of your mortgage loan:

☐ We may assign, sell or transfer the servicing of your loan while the loan is outstanding. We are able
to service your loan and we ☐ will ☐ haven't decided whether to service your loan.
OR
☒ We do not service mortgage loans, ☐ and we have not serviced mortgage loans in the past three years.
We presently intend to assign, sell or transfer the servicing of your mortgage loan. You will be informed
about your servicer.

☐ We assign, sell or transfer the servicing of some of our loans while the loan is outstanding depending on
the type of loan and other factors. For the program you have applied for, we expect to:
☐ sell all of the mortgage servicing
☐ retain all of the mortgage servicing
☐ assign, sell or transfer _____ % of the mortgage servicing

2. For all the first lien mortgage loans that we make in the 12-month period after your mortgage loan is funded,
we estimate that the percentage of mortgage loans for which we will transfer servicing is between:

[0 to 25%] or [NONE]     _____ 26 to 50%     _____ 51 to 75%     __X__ [76 to 100%] or [ALL]

This estimate ☐ does ☐ does not include assignments, sales or transfers to affiliates or subsidiaries. This
is only our best estimate and it is not binding. Business conditions or other circumstances may affect our future
transferring decisions.

3. ☐ We have previously assigned, sold or transferred the servicing of federally related mortgage loans.
OR
☒ This is our record of transferring the servicing of the first lien mortgage loans we have made in the past:

| Year | Percentage of Loans Transferred (Rounded to nearest quartile – 0%, 25%, 50%, 75%, or 100%) |
|------|---------------------------------------------------------------------------------------------|
| 2000 | 100.000 % |
| 2001 | 100.000 % |
| 2002 | 100.000 % |

This information ☒ does ☐ does not include assignments, sales or transfers to affiliates or subsidiaries.

06/04/2003
RICHARD CONITO
Present Servicer or Lender     Arlington Capital        Date

### ACKNOWLEDGMENT OF MORTGAGE LOAN APPLICANT

I/We have read this disclosure form and understand its contents, as evidenced by my/our signature(s) below.
I/We understand that this acknowledgment is a required part of the mortgage loan application.

Applicant MICHELLE A FLYNN        Date        Applicant        Date

Applicant DANIEL F FLYNN        Date        Applicant        Date

Loan No.: 0301060725

VMP MORTGAGE FORMS · (800)521-7291
-952R (9603)02        12/94

You are hereby notified that the servicing of your mortgage loan, that is, the right to collect payments from you, is being sold or transferred from

to **LEHMAN BROTHERS BANK F.S.B.**

, effective 10/20/2003

The assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you this notice at least 15 days before the effective date of transfer, or at closing. Your new servicer must also send you this notice no later than 15 days after this effective date or at closing. [In this case, all necessary information is combined in this one notice.]

Your present servicer is

If you have any questions relating to the transfer of servicing from your present servicer call **Payment Servicing**
between
9:00    a.m. and    4:00    p.m. on the following days : **weekdays**                . This is a toll-free or collect call number.

Your new servicer will be **LEHMAN BROTHERS BANK F.S.B.**

The business address for your new servicer is:**601 5TH AVENUE, SCOTTSBLUFF, NE    69363**

The toll-free or collect call telephone number of your new servicer is **(800) 550-0508**
If you have any questions relating to the transfer of servicing to your new servicer call                 at    **(800) 550-0508**
between    9:00    a.m. and    4:00    p.m. on the following days : **weekdays**
The date that your present servicer will stop accepting payments from you is **11/01/2003**
The date that your new servicer will start accepting payments from you is **12/01/2003**
Send all payments due on or after that date to your new servicer.
The transfer of servicing rights may affect the terms of or the continued availability of mortgage life or disability insurance or any other type of optional insurance in the following manner:

and you should take the following action to maintain coverage:

You should also be aware of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. Section 2605):
During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.
Section 6 of RESPA (12 U.S.C. Section 2605) gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request. If you want to send a "qualified written request" regarding the servicing of your loan, it must be sent to this address:
**LEHMAN BROTHERS BANK F.S.B.**
**601 5TH AVENUE, SCOTTSBLUFF, NE    69363**

Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, and must provide you with a written clarification regarding any dispute. During this 60-Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents.
A Business Day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions.
Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated.

*This notification is a requirement of Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. Section 2605).

## NOTICE OF ASSIGNMENT, SALE, OR TRANSFER OF SERVICING RIGHTS

Borrower Name & Address:
DANIEL F FLYNN
313 GULL ROAD
OCEAN CITY, NJ  08226

Loan Number:
0303060025

You are hereby notified* that the servicing of your mortgage loan, that is, the right to collect payments from you, is being assigned, sold or transferred from Arlington Capital Mortgage Corp.

to LEHMAN BROTHERS BANK F.S.B.
, effective

The assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you this notice at least 15 days before the effective date of transfer, or at closing. Your new servicer must also send you this notice no later than 15 days after this effective date or at closing. [In this case, all necessary information is combined in this one notice.]

Your present servicer is Arlington Capital Mortgage Corp.

If you have any questions relating to the transfer of servicing from your present servicer call Payment Servicing

9:00   a.m. and   4:00   p.m. on the following days : weekdays          . This is a toll-free or collect call number.

Your new servicer will be LEHMAN BROTHERS BANK F.S.B.

The business address for your new servicer is: 601 5TH AVENUE, SCOTTSBLUFF, NE  69363

The toll-free or collect call telephone number of your new servicer is (800)550-0508
If you have any questions relating to the transfer of servicing to your new servicer call
at (800)550-0508
between   9:00   a.m. and   4:00   p.m. on the following days : weekdays
The date that your present servicer will stop accepting payments from you is
The date that your new servicer will start accepting payments from you is
Send all payments due on or after that date to your new servicer.
The transfer of servicing rights may affect the terms of or the continued availability of mortgage life or disability insurance or any other type of optional insurance in the following manner:

and you should take the following action to maintain coverage:

'You should also be aware of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. Section 2605):
During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new servicer as late, and a late fee may not be imposed on you.
Section 6 of RESPA (12 U.S.C. Section 2605) gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request. If you want to send a "qualified written request" regarding the servicing of your loan, it must be sent to this address:

SERVICER {
LEHMAN BROTHERS BANK F.S.B.
601 5TH AVENUE, SCOTTSBLUFF, NE  69363

Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, and must provide you with a written clarification regarding any dispute. During this 60-Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents.
A Business Day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions.
Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated.

*This notification is a requirement of Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. Section 2605).

_____ 09/25/2003         _____ 09/25/2003
PRESENT SERVICER        Date        FUTURE SERVICER        Date

553R (9801).95                12/94

VMP MORTGAGE FORMS - (800)521-7291

## ALLONGE

This Allonge is to be made part of a certain Mortgage Note, and meant to be attached thereto for all purposes.

Borrower(s):       DANIEL F FLYNN
                   MICHELLE C. FLYNN

PAY TO THE ORDER OF
LEHMAN BROTHERS BANK INC.
WITHOUT RECOURSE
LEHMAN BROTHERS BANK, FSB

BY: _____
RICK W. SREARS
VICE PRESIDENT

Property Address:     313 GULL ROAD
                      OCEAN CITY, NJ 08226

PAY TO THE ORDER OF
_____
WITHOUT RECOURSE
LEHMAN BROTHERS HOLDINGS INC.

Date of Mortgage Note:     September 26, 2003

BY: _____
RALPH A. LENZI III
AUTHORIZED SIGNATORY

Pay to the order of LEHMAN BROTHERS BANK, F.S.B., without recourse.

Arlington Capital Mortgage Corp.

BY: _____
S. Frendo-Rosso, Assistant Secretary

Loan No.: 0303060025

and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if : (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
DANIEL F. FLYNN          -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
MICHELLE A. FLYNN        -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

[Sign Original Only]

---

MULTISTATE ADJUSTABLE RATE NOTE–LIBOR SIX-MONTH INDEX(AS PUBLISHED IN THE WALL STREET JOURNAL)–
Single Family–Fannie Mae Modified Instrument          Page 4 of 4                Form 3520 1/01
Document Systems, Inc. (800) 649-1362

 

**WAREHOUSE BANK**
100 CENTURY PARKWAY, 3RD Floor
Mt. Laurel, NJ 08054

October 7, 2003

LEHMAN BROTHERS BANK F.S.B.
2530 SOUTH PARKER ROAD STE 600
AURORA, CO  80014

Attention:     PURCHASING DEPT.

<u>BAILEE LETTER</u>

Re:  Arlington Capital Mortgage Corp.

Sirs:

The undersigned, GMAC Bank, Inc.(the "Lender"),a lender to
Arlington Capital Mortgage Corp. (the "Borrower"), has been requested by the
Borrower to deliver the enclosed original mortgage note(s) and mortgage loan documents
(collectively, the "Collateral") described in the attached Schedule for your inspection
prior to purchase of the Collateral by you pursuant to a certain purchase contract
(the "Purchase Contract") between you and the Borrower.

The Borrower has granted to us as Lender a security interest in and to the Collateral.
We hereby deliver the Collateral to you to be held by you as the Bailee, and by your
receipt of the Collateral you agree to hold the Collateral as Bailee for the benefit
of us as Security Agent pursuant to the applicable provisions of the Uniform Commercial ·
Code and upon the terms and conditions set forth below.

Your obligations as bailee with respect to the Collateral shall terminate without
further action by any party at such time as when you have either (a) purchased the
Collateral by remitting in full the purchase price specified in the Purchase Contract
(the "Purchase Price") by wire transfer in immediately available funds to our account
specified below and such funds have been received in such account; or (b) delivered and
returned the Collateral to us at the address set forth below opposite our signature or
such other address notified by us to you in writing.

INSTRUCTIONS FOR WIRE TRANSFER OF FUNDS:

|  |  |
|---|---|
| To: | Deutsche Bank Trust Company Americas |
|  | New York, NY |
| ABA No.: | 0210-0103-3 |
| Acct. No.: | 00369772 |
| Attention: | GMAC Bank |
| Reference: | Arlington Capital Mortgage Corp. |

Until the Collateral has been purchased by you. in accordance with the Purchase
Contract and the Purchase Price has been remitted or credited and received in full
by us, as set forth above, (a) the Collateral shall remain subject to the liens and
security interests granted by the Borrower to us as Lender for the benefit of
the Lender and (b) the Collateral shall be held by you only for your inspection and
shall not be delivered or released to any party (including, without limitation, the
Borrower) other than us or our designee identified by us to you in writing.

Upon receipt by us of the Purchase Price in full in immediately available funds
in the account specified above, our security interest in the Collateral so purchased
shall automatically terminate and be cancelled and released without notice or demand.
Upon your written request to us, we shall provide you with appropriate filings,
registrations or recordings necessary to effect such termination, cancellation
and release.

Until such time as you have paid the Purchase Price, we as Lender shall
have the right to require you at any time, by written notice to you, to immediately
deliver and return the Collateral to us at the Lender's Address. Notwithstanding
the foregoing, unless the Purchase Price shall have been received by us, you agree to
deliver and return the Collateral to us for our receipt at the Lender's Address
by no later than the date which is 20 calendar days after the date of this letter

without any notice, demand or other action by us.

    You agree that the Purchase Price paid to the Lender with respect to any particular Collateral shall not be reduced due to any adjustments without the prior written approval of the Lender.

    If you are in agreement with the foregoing, please have the enclosed copy of this letter duly executed by your authorized officer and return it to us at the Lender's Address.  In the event that the foregoing is not acceptable to you please deliver and return to us immediately the Collateral at the Lender's Address by same-day or overnight courier delivery.  In the event we do not receive a copy of this letter duly executed by you, then you shall be deemed to have accepted possession of the Collateral as bailee for us as Lender, effective the date first written above, subject to the security interest described above and upon the terms described above.

    This letter shall be governed and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of laws.

WAREHOUSE BANK
100 CENTURY PARKWAY, 3RD Floor
Mt Laurel, NJ 08054
Attention:  Joan Keith

By _____
    JOAN KEITH
    COLLATERAL REPRESENTATIVE

Agreed to and accepted as of the
date first written above:

LEHMAN BROTHERS BANK F.S.B.

By _____
Name:
Title:

Enclosures

## Shipping Schedule

To:      LEHMAN BROTHERS BANK F.S.B.
For:     Arlington Capital Mortgage Corp.
Reference:   203070102

Date:   10/07/03

| Loan ID | Name | Note Amount |
|---------|------|-------------|
| 103080051 | SINCLAIR:CYNTHI | 234,000.00 |
| 203070102 | DONOHUE, BRYANT | 321,450.00 |
| 303060008 | VACCARO, JOHN | 170,000.00 |
| 303060025 | FLYNN: DANIEL | 749,950.00 |
| 4 | | 1,475,400.00 |

## Underwriting Decision Form

**Decision Status: Approved**

| | |
|---|---|
| To:  RICHARD COMITO | Approval Date: 07/16/2003 |
| Branch: Princeton, NJ | TBD Approval Date: |
| Underwritten By: Christian Curran | Denial Date: |
| Approval Expiration Date: 10/05/2003 | Suspended Date: |
| Credit Doc Expiration Date: 10/05/2003 | Withdrawn Date: |

Loan Number: 0303060025
Applicants: DANIEL F FLYNN MICHELLE A FLYNN
Property: 313 GULL ROAD

| | |
|---|---|
| Investor: LEHMAN BROTHERS BANK F.S.B. | Loan Amount: 749,950.00 |
| Investor Loan Number: | Rate: 5.500          Loan Term: 30 |
| Loan Type: Conventional | Subordinate Lien: one hundred eighty thousand and |
| Agency #: | First Lien: 0.00 |
| Loan Product: Jumbo 5 Year/6 Month LIBOR, 6/2/6 Caps, | Appraised Value: 1,750,000.00 |
| Loan Purpose: CASH OUT REFI | Sales Price: |
| Property Type: SFR | LTV: 42.854 |
| Occupancy Type: OWNER OCCUPIED | CLTV: 53.140 |

### CONDITIONS

**\*\*\*  PLEASE SEE BELOW FOR THE PRIOR TO CLOSING CONDITIONS  \*\*\***

1. Title Insurance in the amount of $749,950 from an ACMC approved title insurance company. The insurance binder must show that we will have a valid 1st lien on the property without exception. The binder must include copies of all covenants, agreements, deeds, restrictions and easements of record to which the binder refers.
2. A letter from the title insurance underwriter stating that the settlement agent or attorney is approved by the title insurance company and that protects ACMC against loss caused by improper acts of the settlement agent or attorney.
3. An original Homeowner's Insurance Policy (fire and extended coverage) and paid receipt for one (1) year. The insurance must be rated at least A: VI in the Best's Key Rating Guide. The policy must be effective the day of settlement and must be for no less than $749,950, or the maximum permitted by law.
4. We will order a flood search for the property and will tell you prior to settlement whether the insurance is required. A flood insurance policy must be provided if the property is located in a flood zone. If flood insurance is not required now, but the property is designated after settlement as being in a flood zone, ACMC and/or its assignees will obtain a flood insurance policy for you. You will be advised in writing that flood insurance has been obtained and you will be responsible to pay for it.
5. The interest rate on your loan may not exceed  5.500%.
6. Copy of recorded deed for subject property.
7. Register as a NO DOC loan.
8. Section X to be completed all sections.
9. Subordination agreement for USAA Equity.
10. Flood insurance is required.
11. Pay off mortgage with First National.

**\*\*\*  PLEASE SEE BELOW FOR THE AT CLOSING CONDITIONS  \*\*\***

12. Bring some form of photo I.D. such as a Valid Driver's License or Passport to settlement.
13. Execute Three Day Right of Recission at closing.

Date: 09/11/2003

# LEHMAN BROTHERS BANK FSB

10/14/2003                                          Purchase Suspense

ARLINGTON CAPITAL MORTGAGE
KAREN REHL

     RE: ALS/LBB Loan #: 0017009994
        Borrower: FLYNN
        Seller Loan #: 0303060025
        Commitment #: 73631900
        Commitment Expiration Date:

## I. Purchase Suspense Documentation

Aurora Loan Services Inc., on behalf of Lehman Brothers Bank, FSB, has completed its
review of the purchase file referenced above and is holding the purchase package in
suspense for the following.

  1. NOTE
     ADDITIONAL REQUIREMENT
     PLEASE PROVIDE AN ORIGINAL ALLONGE ENDORSING THE NOTE OVER
     TO LEHMAN BROTHERS BANK,FSB. THE ENDORSEMENT ON THE NOTE IS
     NOT CLEAR.                                         KA

**Please submit all suspense items as a package.  This will assist ALS in expediting the
review process for suspense items.**

Your immediate attention is needed on all items listed in Section I in order to expedite a
final purchasing decision.. The suspense item(s) listed in Section II may not be a complete
schedule of all follow-up conditions.  Please return a copy of this notice along with the
conditions to:
        AURORA LOAN SERVICES INC.
        2530 S. PARKER ROAD, SUITE 601
        AURORA, CO. 80014

or fax to:    303-632-3046
        AURORA LOAN SERVICES INC.
        Attn: Purchasing

If you have any questions or need information as to the status of your conditions, please
feel free to contact: **Client Support at 877-297-5348 or email to** conduit@alservices.com.
We appreciate your business.

Sincerely,


ALS Purchase Coordinator
AURORA LOAN SERVICES INC.
2530 S. PARKER ROAD, SUITE 601
AURORA, CO. 80014
VICTOR MUKASA
Ext.

**Purchasing Fax # 303-632-3046**

Dear Homeowner(s),

Within several weeks, you will receive information from the new mortgage company as to how to make your future payments. Meanwhile, should you need to make a payment, please include one of these Coupons. You may forward your payments to: LEHMAN BROTHERS BANK F.S.B., 601 5TH AVENUE, SCOTTSBLUFF, NE 69363 . Please indicate your new loan number,   on the payment.

--------------------------------------------------------------------------------

## PAYMENT COUPON

**DUE DATE:** *12/1/03*
**LOAN #:** 0017009994
**BORROWER:** DANIEL F FLYNN
MICHELLE C. FLYNN

**SEND PAYMENTS TO:** LEHMAN BROTHERS BANK F.S.B.
601 5TH AVENUE, SCOTTSBLUFF, NE 69363

The following is a breakdown of your first monthly mortgage payment:

| | |
|---|---|
| Interest Payment | 3,437.28 |
| Hazard Insurance | |
| Private Mortgage Insurance | |
| Flood Insurance | |
| Real Estate Taxes | 0.00 |
| Deferred Pre-paid Interest | |
| TOTAL PAYMENT WITH ESCROWS | 3,437.28 |

--------------------------------------------------------------------------------

## PAYMENT COUPON

**DUE DATE:** January 1, 2004
**LOAN #:** 0017009994
**BORROWER:** DANIEL F FLYNN
MICHELLE C. FLYNN

**SEND PAYMENTS TO:** LEHMAN BROTHERS BANK F.S.B.
601 5TH AVENUE, SCOTTSBLUFF, NE 69363

The following is a breakdown of your first monthly mortgage payment:

| | |
|---|---|
| Interest Payment | 3,437.28 |
| Hazard Insurance | |
| Private Mortgage Insurance | |
| Flood Insurance | |
| Real Estate Taxes | 0.00 |
| TOTAL PAYMENT WITH ESCROWS | |

--------------------------------------------------------------------------------

## PAYMENT COUPON

**DUE DATE:** January 1, 2004
**LOAN #:** 0017009994
**BORROWER:** DANIEL F FLYNN
MICHELLE C. FLYNN

**SEND PAYMENTS TO:** LEHMAN BROTHERS BANK F.S.B.
601 5TH AVENUE, SCOTTSBLUFF, NE 69363

The following is a breakdown of your first monthly mortgage payment:

| | |
|---|---|
| Interest Payment | 3,437.28 |
| Hazard Insurance | |
| Private Mortgage Insurance | |
| Flood Insurance | |
| Real Estate Taxes | 0.00 |
| TOTAL PAYMENT WITH ESCROWS | |

16A » Friday, December 2, 2011 » NAPLES·DAILY·NEWS

# Has U.S. learned lesson of Enron 10 years later?

**By Bernard Condon**
Associated Press

NEW YORK — From humble origins as a natural gas distributor, Enron became a trading operation with the Midas touch. It made bets on oil, water, Internet traffic, even the weather. Wall Street's brightest worked there. Its stock tripled in two years. Virtually no one knew how it had made so much money.

Ten years ago Friday came the answer: It hadn't.

Enron's bankruptcy on Dec. 2, 2001, revealed a fraudulent illusion. Investors swore they would not be so profoundly deceived again. But it was only the beginning of a decade when so much in the economy was not as it seemed.

Can't-lose Wall Street guys turned out to be cheats. Home values did not go up forever. Promising signs of recovery after the Great Recession turned out to be nothing, and hard times endure.

The theme was shredded faith — that and debt, the more the better.

"We have faith in the big score," financial historian Charles Geisst said, trying to explain why Americans have, time and again, believed in what was too good to be true.

In the simple story of the past decade, a journey from corporate scandals to a housing bubble, then to a collapse and a frustratingly slow recovery, the villain is Wall Street and the victim Main Street. The reality is more complicated.

## THE BEGINNING

One reason people didn't know how Enron made money was that it was an amalgam of 3,000 private deals that came to light in its collapse, partnerships with names like Raptor, Condor and Chewbacca.

Behind those obscure names, Enron shunted billions of dollars of debt off its books. The company borrowed from Wall Street banks, mutual funds and insurers, pledging its hot stock as collateral.

The collapse wiped out $11 billion in stock value, nearly 10 percent in the 401(k) accounts of Enron employees.

A month later, an outspoken, Harley-riding CEO with an uncanny ability to pull profits out of a seemingly dull New Hampshire manufacturer appeared on BusinessWeek's list of top corporate managers. His name was Dennis Kozlowski. By the end of 2002, he was indicted for stealing $150 million from shareholders, and his company, Tyco International, was bankrupt.

Several other heroes of capitalism toppled after him. Bernard Ebbers drove WorldCom into bankruptcy after misleading investors in his high-flying company in an $11 billion accounting fraud. John Rigas, who turned a $300 purchase into a cable TV empire, was convicted of fraud after prosecutors said he ran Adelphia Communications like a "personal piggy bank," including using $26 million of company money to buy timberland next to his home to preserve his view.

Martha Stewart, who built her cooking and decorating business on an image of homespun goodness, faced a grilling from regulators that suggested a life more tawdry than tidy:

She had dumped shares of a drug company on what appeared to be an illegal tip from her Merrill Lynch broker. She was convicted of lying, though never accused of insider trading. The amount the one-time billionaire saved by selling early was $51,000.

It was a time of plummeting stocks, trashed retirement accounts, lost jobs and lost trust.

Regulators cracked down, offering hope. Congress created a board to police the accounting industry. It also passed the Sarbanes-Oxley Act, requiring executives to sign

See ENRON, 20A

from 16A

off on financial statements so they could be criminally liable for posting phony numbers.

Investors were thought more vigilant, too. But they got sloppy again, and almost immediately.

Around the time of Enron's collapse, press reports detailed how Italy, years earlier, had struck complicated "currency swap" deals with banks so it could borrow money without having to recognize the debt on its books. Later, Greece was shown to have camouflaged its debt in a similar way.

In 2002, no one seemed to care. By the end of the year, Italy was paying about 4 percent a year in interest on its national bonds, roughly what the U.S. was offering and a sign that few investors were worried.

## THE HOUSING BUBBLE

In 2003, as jurors heard how Kozlowski got Tyco to pitch in $1 million for his wife's birthday party, featuring an ice sculpture of Michelangelo's David that urinated vodka, the seeds of a new crisis were being planted.

American consumers had run up debt to record levels by the end of 2003, and more of them than ever were filing for bankruptcy. Yet the stocks of companies extending mortgages to the riskiest borrowers, so-called subprimes, were rising fast.

Subprime was a euphemism for people who had too little income, too much debt, a bad record of paying lenders back — or all three. As home prices rose, worry that they would not meet their mortgage payments was replaced with faith that even if they couldn't, they could always sell the home for more than they borrowed and return the money.

Lenders offered mortgages on top of mortgages — so-called home equity loans that allowed people to tap their magically rising values to raise cash for flat-screen TVs or Caribbean vacations. Or to pay their credit card bills.

Long before the housing boom, Americans were borrowing more, saving less and increasingly convinced they would not suffer the consequences. In the 1980s, Americans saved more than 6 percent of what they earned each year in income. Their debts totaled 70 percent of take-home pay. By 2007, they were saving nearly nothing, and debt had exploded to 140 percent of income.

"People were using their homes like automated teller machines," said David Rosenberg, chief economist at Gluskin Sheff & Associates.

Stoking all this borrowing was the Federal Reserve, which had slashed benchmark interest rates to 46-year lows after the 2000-01 tech-stock bust, pushing the cost of loans lower. Fannie Mae and Freddie Mac, the government-sponsored companies that buy mortgages from lenders, played a role by targeting ever-riskier loans.

Banks bought subprime lenders whole. Elegant mathematical formulas from their "risk management" departments told them their gambles were fine. Standard & Poor's and other credit rating agencies provided reassurance by slapping their highest ratings on bundles of risky mortgages.

Not content to bundle thousands of subprime mortgages into mortgage securities, banks bundled the bundles into something called collateralized debt obligations, or CDOs. Next, they created bundles of bundles of bundles, called CDO-squared.

They created something known as synthetic CDOs that didn't even contain mortgages but merely referenced them, exchanging cash between two parties taking opposing bets that a mortgage lender unconnected to them would get its money back.

By 2006, Enron's former president, Jeffrey Skilling, began serving 24 years in prison. Kenneth Lay, the chairman, died before he could be sentenced. Rigas, the cable titan, got 15 years, Ebbers and Kozlowski 25 each.

## THE COLLAPSE

In 2007, subprime lenders went bust, one after another. Then all the mounting debt, made possible by years of half-truths and self-deceptions, turned the fall of a single industry into a worldwide financial crisis.

In March 2008, investors fearing bad mortgage bets at Bear Stearns pulled money out of the bank, leaving it to collapse into the arms of a rival.

They focused on Lehman Brothers, and it became clear that Lehman had hidden debt just like Enron.

Using a financing technique called Repo 105, the bank had borrowed money in a series of deals structured to make it seem as though it had been "selling" assets to raise money.

Lenders demanded money back, triggering a run on the bank and leaving ordinary investors scrambling to understand just how much the company had borrowed.

Lehman's bankruptcy in September 2008 froze credit worldwide and helped turn the U.S. recession into the worst since the Great Depression.

By the end of 2008, Bernard Madoff was arrested for lying to investors in a $60 billion Ponzi scheme over two decades.

After an overhaul of Wall Street rules last year, broker MF Global turned to the same Lehman-like Repo 105 deals to fuel its bet on indebted European governments. The borrowing helped send the firm run by ex-New Jersey Gov. Jon Corzine into bankruptcy, throwing 1,000 people out of work.

A month after the firm's collapse, regulators still can't find $1.2 billion of customer funds.

## THE RECKONING

Now Europe is paying for years of using government debt to fund early retirements and long vacations that its citizens really couldn't afford.

Frightened investors are buying Treasury bonds, which is making it cheaper than ever for Washington to borrow despite its trillion-dollar-plus deficit.

Stocks have barely moved in the decade of lost faith. On the Friday before the Enron bankruptcy, the S&P 500 closed at 1,139. Last Friday it closed 19 points above that.

The incomes of many middle-class Americans haven't kept up with inflation.

Home prices are still falling.

ognize those bonds on its
balance sheet for all to see.
Instead, they were shunted
"off-balance sheet," their
presence noted deep in
its financial statements.
Some separate filings with
regulators excluded them
entirely.

This sleight-of-hand
was possible thanks to an
accounting maneuver used
by Lehman to hide its debt
before it failed: Instead of
holding onto the bonds it
had just bought, MF Global
"sold" them to other com-
panies in exchange for
cash — with the promise
to buy them back later.

In effect, it was borrow-
ing the cash but not calling
it that since technically it
came from a "sale." And
because the bonds were off
its books, MF Global didn't
have to acknowledge the
risk they posed.

Other firms have struck
similar off-balance-sheet
deals, but poor disclosure
makes them difficult to
track. The lack of detail
about financial compa-
nies' holdings can lead to
panic selling. Fearing an-
other MF Global, investors
started dumping shares of

Alt-A Definition | Investopedia         Page 1 of 6
08-13555-mg    Doc 30093    Filed 08/09/12    Entered 08/16/12 12:16:50    Main Document
Pg 59 of 106



**INVESTOPEDIA**

Sign In | Register |

Home      Dictionary      Articles      Tutorials      Exam Prep      Forex      Markets    S

Acronyms    Buzzwords



You bank with Bank of America. Now invest with Merrill Edge.®

You need guidance to point you in the right direction.

Review your retirement plans with Merrill Edge.®

MERRILL EDG[

LEARN

| Select A Category | Enter Search Term | SEARCH | Foll
|---|---|---|---|

# Alt-A

Filed Under » Real Estate

Tweet 0     0    Like          Feedback    Print    Email



### Definition of 'Alt-A'

A classification of mortgages where the risk profile falls between prime and subprime. The borrowers behind these mortgages will typically have clean <u>credit histories</u>, but the mortgage itself will generally have some issues that increase its risk profile. These issues include higher loan-to-value and debt-to-income ratios or inadequate documentation of the borrower's income.



### Investopedia explains 'Alt-A'

These types of loans are attractive to lenders because the rates are higher than rates on prime classified mortgages, but they are still backed by borrowers with stronger <u>credit ratings</u> than subprime borrowers. However, with the higher rates comes additional risk for lenders because there is a lack of documentation - including limited proof of the borrower's income.



Pic

Te

Le

Ne

Ma

Dc

Learn how to turn $1k to $10k with Penny Stocks!

# Related Definitions

## Loan-To-Value Ratio - LTV Ratio

A lending risk assessment ratio that financial institutions and others lenders examine before
approving a mortgage. Typically, assessments with high LTV ratios are generally seen as ...

Read More »

## Subprime Loan

A type of loan that is offered at a rate above prime to individuals who do not qualify for prime rate
loans. Quite often, subprime borrowers are often turned away from traditional ...

Read More »

## Credit Risk

The risk of loss of principal or loss of a financial reward stemming from a borrower's failure to repay a
loan or otherwise meet a contractual obligation. Credit risk arises whenever a ...

Read More »

## CMG Plan

A mortgage plan in which a borrower's mortgage is structured like a checking account, where
paychecks are deposited directly into the mortgage account and the mortgage balance is reduced ...

Read More »

## Default Risk

The event in which companies or individuals will be unable to make the required payments on their
debt obligations. Lenders and investors are exposed to default risk in virtually all ...

Read More »

## No Income / No Asset Mortgage - NINA

A type of reduced documentation mortgage program in which no income and no assets are disclosed
on the loan application, but employment is verified. NINA loans usually fall into the ...

Read More »

## No Documentation Mortgage - No Doc

A type of reduced-documentation-required mortgage program in which income and assets aren't

disclosed on the loan application and employment isn't verified. However, a credit check is ...

Read More »

## Subprime

A classification of borrowers with a tarnished or limited credit history. Lenders will use a credit scoring system to determine which loans a borrower may qualify for. Subprime loans ...

Read More »

## No-Ratio Mortgage

A mortgage program in which a borrower's income isn't used or reported in qualifying the borrower for the mortgage under the standard debt-to-income ratio requirements. The loan is ...

Read More »

## B/C Loan

A classification of loans associated with the borrowers that have tainted or limited credit histories. Generally, B/C refers to any loan that is classified as subprime, or a "B" or "C" ...

Read More »

Show More 'Related Definitions'



# Nearby Definitions

Alphabet Broker

Alphabet Rounds

Alphabet Stock

Alston D. Correll

Alt-A

Altered Check

Alternate Beneficiary

Alternate Transferee

Alternative Asset

08-13555-mg    Doc 30093    Filed 08/09/12    Entered 08/16/12 12:16:50    Main Document
Pg 62 of 106

Bloomberg Businessweek
Go To Businessweek.com

Wednesday February 1, 2012

Blo**Get o**ur new FREE iPad app now

# Lehman Enters Final Bankruptcy Phase as Judge /

December 08, 2011, 7:01 AM EST

- Recommend
- Tweet ‹ 0
- Share
- 0
- Business Exchange
- E-mail
- Print

*By Linda Sandler*

Dec. 7 (Bloomberg) -- Lehman Brothers Holdings Inc. won a federal judge's approval to begin the final phase
defunct securities firm said it would begin to distribute some of its $23 billion in available cash.

The bankruptcy may have reached its halfway point, as Lehman's plan calls for liquidation of its remaining as
$65 billion. Lehman, once the fourth-largest investment bank, collapsed in September 2008 with assets of $6

U.S. Bankruptcy Judge James Peck approved the plan after the objection of one final creditor was overcome
$450 billion in claims, which is a "huge achievement," Peck said yesterday. The case was the "most impossit

Lehman, which was run by Chief Executive Officer Richard Fuld when its collapse helped bring on the worst (
settled a fight with creditors in a June payment plan that allotted more money to derivatives claimants includir
as Paulson & Co. Both groups had proposed rival plans to pay Lehman's debts.

Problems Overcome

Lehman overcame "almost insurmountable" problems in resolving competing liquidation plans, lawyer Harvey
plan has the support of 95 percent of Lehman creditors, Miller said. The firm's advisers did a "good job" guidir

Lehman's $4 billion of 5.625 percent notes due in January 2013 fell 1 cent to 25.875 cents on the dollar as of
bond price reporting system of the Financial Industry Regulatory Authority. The notes have climbed from 23 c

Lehman CEO Bryan Marsal has said he aims to raise $65 billion from the firm's assets in the next few years,
quarter. Lehman and its affiliates had more than $23 billion of cash available on Oct. 31 after spending almos
according to a filing.

The company will distribute some of the $23 billion to creditors in the first quarter, Lehman has said.

'Common Sense'

"This case has required compromise and common sense, diligence and determination, and the reconciliation

irreconcilable," said Marsal, co-founder of Alvarez & Marsal, the professional services firm that has been man
an e-mailed statement. "Confirmation of this plan is a testament to the enormous efforts of the many stakehol
compromise plan and did yeoman's work to achieve it."

Marsal has estimated that the final claims will total $370 billion, giving the average creditor less than 18 cents
would recover 21.1 cents on the dollar under the new plan, compared with 21.4 cents under the firm's previou

The bondholder group including Paulson and the California Public Employees' Retirement System, or Calper
have paid bondholders 25.4 cents on the dollar. Senior bondholders were offered 16 cents in a rival proposal
including Goldman Sachs and Morgan Stanley.

Claims on Lehman's derivatives unit would be paid 27.9 cents to 32 cents, while commercial paper claims wo
each dollar of their investment, court papers show.

Special Financing Unit

A guaranteed claim against Lehman's special financing unit would get 27.9 cents on the dollar, plus more tha
parent, or a total of about 39 cents. That is more than Lehman offered in an earlier plan, though less than the
Sachs group.

Calpers paid more than 100 cents on the dollar for some of its claims, while Paulson paid 9 cents or less for s

Lehman quickened its effort to get out of bankruptcy in June, after being mired in disputes as it neared three

Separately, a group of Lehman Brothers' underwriters agreed to pay $417 million to settle a class-action laws
dark about Lehman's exposure to mortgage-backed securities in 2008, according to a Dec. 2 filing in federal

Fuld and other former Lehman executives in August had agreed to settle the investors' claims for $90 million

Goldman Subpoenaed

Lehman this month subpoenaed Goldman Sachs for documents relating to derivatives claims. Many banks a
contracts, including Deutsche Bank AG. More than 20 "formal" objections to the overall plan were withdrawn

Lehman has winnowed down claims from 67,000 filed originally demanding about $1.2 trillion from what was
Oct. 31, it raised $13.8 billion from derivatives. Real estate sales fetched $3.9 billion through June 30. Marsal
2014.

Lehman failed because of too much debt and risky real estate investments, according to a bankruptcy examir
$613 billion in debt.

The case is In re Lehman Brothers Holdings Inc., 08-13555, U.S. Bankruptcy Court, Southern District of New

The shareholders lawsuit is In re Lehman Brothers Equity/Debt Securities Litigation, 09-MD-02017, U.S. Distr
(Manhattan).

—With assistance from Pierre Paulden in New York and Edvard Pettersson in Los Angeles. Editors: Fred Stra

To contact the reporter on this story: Linda Sandler in New York at lsandler@bloomberg.net.

To contact the editor responsible for this story: John Pickering at jpickering@bloomberg.net.

- Recommend
- Tweet ⟨ 0
- 
- 0
- Business Exchange
- E-mail
- Print

## VIDEOS YOU MIGHT LIKE

by Taboola


**Videos: News & Business Videos - Businessweek**
Videos about breaking news. Watch news videos online…


**Big Number: $100 Billion**
Feb. 1 (Bloomberg) -- Bloomberg's Betty Liu reports…


**Portugal, Italy to Follow Greece Out of Euro**
Feb. 1 (Bloomberg) -- Gabriel Stein, a director at Lombard…

READER DISCUSSION

Like

Add New Comment


Type your comment here.

Real-time updating is **paused**. (Resume)

Showing 0 comments

M Subscribe by email    S RSS

About | Advertising | Custom Publishing | EDGE Programs | Reprints | Terms of Use | Dis
©2012 BLOOMBERG L.P. ALL RIGHTS RESERVED.  | MADE IN NYC

# ATTENTION INVESTORS IN LEHMAN BROTHERS PRINCIPAL PROTECTED NOTES

DID UBS OR YOUR BROKERAGE FIRM SELL YOU **LEHMAN BROTHERS** PRINCIPAL PROTECTED NOTES AS A SAFE OR LOW RISK INVESTMENT?

*IF YOU LOST OVER $100,000 IN LEHMAN BROTHERS PRINCIPAL PROTECTED NOTES, PLEASE CONTACT US IMMEDIATELY TO DISCUSS YOUR LEGAL OPTIONS TO RECOVER YOUR LOSSES. ALL CONSULTATION ARE FREE.*

ACT QUICKLY TO PROTECT YOUR LEGAL RIGHTS.
Accepting cases for losses sustained in 2008.

## Call Toll Free
## 1-866-372-8311 or 954-763-4700

**SE SONN | EREZ**
ATTORNEYS FOR INVESTORS

500 East Broward Boulevard, Suite 1700
Ft. Lauderdale, FL 33394 • www.sonnerez.com
ALL CONSULTATIONS ARE FREE. NO FEE IF NO RECOVERY*
*Clients responsible for costs.

December 20, 2011


<u>*Via fax and regular mail*</u>
Aimee R. Eller
Aurora Bank, Legal Department
10350 Park Meadows Drive
Littleton, CO  80124

      Re:    **313 Gull Road, Ocean City, New Jersey**

Dear Ms. Eller:

      I represent Sun & Fun Real Estate, LLC and Michelle Flynn, its sole member and a debtor in a certain note and allonge whereby Arlington Capital Mortgage Corp. endorsed the note to Lehman Brothers Holdings, Inc., payable to the order of Lehman Brothers Bank, FSB, without recourse. The loan given to her and her husband, Daniel Flynn was in the sum of $749,950.00 and was secured by a mortgage on 313 Gull Road, Ocean City, New Jersey.

      The mortgage was to MERS and lender Lehman Brothers as a result of the allonge attached to the note.  The note contained an addendum that provided for interest payments only to be made. I have enclosed both the mortgage and the note  and allonge for your review.

      I want to make arrangements for my client to pay any valid sums due for the balance of the mortgage.  However, I have serious doubts as to what the balance due to Lehman Brothers is, if anything.  What role does Aurora have?  Is it the loan servicer?  Who is Aurora Bank?  What relationship does it have with Aurora Loan Services, LLC?  Please provide me as soon as possible, evidence of the following:

1.     Who holds the original wet-ink note and where is it located for view?
2.     Please provide the note and  a valid chain of custody in the form of valid assignments back to Lehman Brothers.

      I need to insure that I am dealing with the holder of the original note.  Please prove to me your right to enforce the instrument signed as an obligation to Lehman Brothers.

Please contact me as soon as possible as funds cannot be disbursed until I am satisfied they are owed and the proper entity who is entitled to any disbursement as the lender.

Very truly yours,

Clement F. Lisitski

CFL:ep
Enclosures
cc:    Client

# CLEMENT F. LISITSKI, L.L.C.

### Attorney at Law
### 3318 Simpson Avenue
### Ocean City, New Jersey 08226

Clement F. Lisitski

(609) 398-6100
——
(609) 399-8268

January 11, 2012

*Via e-mail*
Libby Zolda, Processing/Closing Coordinator
Patriot Land Transfer Company
5001 Route #42 South, 2nd floor
Turnersville, NJ 08012

> Re:    **Sun and Fun Real Estate, LLC**
> **313 Gull Road, Ocean City, New Jersey**
> **Your File No. PLT-13415**

Dear Libby:

As you are aware, I represent Sun and Fun Real Estate, LLC (Sun) who sold its property at 313 Gull Road, Ocean City, New Jersey, settlement being held on October 19, 2011 with Patriot Title holding settlement. As escrow agreement was entered into with regard to a dispute as to payoff funds on mortgage to Arlington Capital Mortgage, made by Daniel F. Flynn and Michelle A. Flynn in the original amount of $749,950.00. You are currently holding escrow funds in the amount of $800,000.00.

I have made efforts on behalf of Sun and Michelle Flynn to determine who is the holder of the mortgage and note so that the proper party gets paid the correct amount and the mortgage gets discharged.

I represent Michelle Flynn in that regard. The note to Arlington Capital Mortgage Corp. had an allonge whereby Arlington Capital Mortgage endorsed the note to Lehman Brothers Holdings, Inc., payable to the order of Lehman Brothers Bank, FSB, without recourse. The mortgage was held by MERS and the Lender Lehman Brothers as a result of the allonge attached to the note.

I advised Aurora Bank that I desired to make arrangements for my client to pay any **valid** sums due for the balance of the mortgage and asked Aurora what their role and authority is - who holds the original wet note and that I need to see a valid chain of custody in the form of valid assignments back to Lehman Brothers. In other words, I need to insure that I am dealing with the holder of the original note. I need to know the right of Aurora to enforce the instrument signed as an obligation to Lehman Brothers. Aurora has produced nothing at this point. Lehman Brothers went through a bankruptcy proceeding, I understand.

Page 2
January 11, 2012

In light of the aforesaid, I will be commencing a legal action to resolve the matter. On behalf of my client, I demand that you do not pay Aurora the funds and that you pay the payoff amount into Court. Otherwise, the title company will be held responsible.

I will advise you of the status of the filing of the lawsuit. If you have any questions, please call me.

Very truly yours,

Clement F. Lisitski

CFL:ep
Cc: Client

# CLEMENT F. LISITSKI, L.L.C.

ATTORNEY AT LAW
3318 SIMPSON AVENUE
OCEAN CITY, NEW JERSEY 08226

CLEMENT F. LISITSKI

(609) 398-6100
FAX (609) 399-8268

January 17, 2012

*Via fax 866-801-7176*
Aurora Bank
INSURANCE SERVICE CENTER
P.O. Box 2963
Phoenix, AZ  85062-2963

Re:    **FLYNN - 313 Gull Road, Ocean City, New Jersey
Loan #9008-0000-0017009994**

Dear Customer Service Representative:

I spoke to Aaron today, a customer service representative of Aurora Bank Insurance Service Center and advised that I represent the above-designated mortgagor, Michelle Flynn.

I received a letter concerning current hazard insurance coverage, reference #070891974. The property has been sold and funds to pay-off the mortgage to Lehman Brothers, the mortgagee are in the Patriot Land Transfer Title Company escrow account, #5001 Route #42 South, Suite A, Turnersville, NJ  08012.  The executive communications department of Aurora, I am advised by Steve Ward Brown, researcher, is in the process of arranging for proper documentation to be submitted to me to obtain release of funds.

Therefore, do **not** obtain hazard insurance, which would be on a property no longer owned by mortgagor, the mortgagee security being replaced by cash.  My client will not be responsible for payment for any placement of hazard insurance, it is not authorized and would be ineffective, in any event.

Very truly yours,

Clement F. Lisitski

CFL:me
cc:    Client

# CLEMENT F. LISITSKI, L.L.C.

ATTORNEY AT LAW
3318 SIMPSON AVENUE
OCEAN CITY, NEW JERSEY 08226

CLEMENT F. LISITSKI

(609) 398-6100

FAX (609) 399-8268

February 3, 2012

*Via fax 866-801-7176*
Aurora Bank
INSURANCE SERVICE CENTER
P.O. Box 2963
Phoenix, AZ  85062-2963

    Re:   **FLYNN - 313 Gull Road, Ocean City, New Jersey**
              **Loan #9008-0000-0017009994**

Dear Customer Service Representative:

      Regarding the above matter, my paralegal spoke to another customer service representative of Aurora Bank Insurance Service Center today regarding my office receiving a Notice of Placement of Insurance.

      On January 17, 2012, I telephoned Aurora Insurance Service Center advising they are <u>not</u> to obtain hazard insurance, setting forth reasons and faxed the attached letter pursuant to their request.

      The customer service person today advised that I should fax an executed HUD-1 Settlement Statement for your file, which is also attached to this letter.

      Please advise me immediately that this lender placed insurance has been cancelled. Thank you.

                  Very truly yours,

                  Clement F. Lisitski

CFL:me
Enclosures
cc:    Client

A. **Settlement Statement (HUD-1)**

OMB Approval No. 2502-0265

**B. Type of Loan**

| 1. ☐ FHA  2. ☐ RHS  3. ☐ Conv. Unins. | 6. File Number: PLT-13415 | 7. Loan Number: | 8. Mortgage Insurance Case Number: |
|---|---|---|---|
| 4. ☐ VA  5. ☐ Conv. Ins. | | | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower: Brian Forda, 628 Doral Circle, Berwyn, PA - 19312 Beth Forda, 628 Doral Circle, Berwyn, PA - 19312 | E. Name & Address of Seller: Sun and Fun Real Estate, LLC, 40 Hickory Ct, Marco Island, FL - 34145 | F. Name & Address of Lender: cash |
|---|---|---|
| G. Property Location: 313 Gull Rd, Ocean City, NJ 08226-4530 City of Ocean City, County of Cape May Block 70.23 Lot 1 | H. Settlement Agent: , Patriot Land Transfer, LLC 5001 Route 42, Suite A Turnersville, NJ 08012 (856) 227-4990 Place of Settlement: Law Office of Clement F Lisitski Jr 3318 Simpson Ave Ocean City, NJ 08226-2066 | I. Settlement Date: October 19, 2011 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due from Borrower** | | **400. Gross Amount Due to Seller** | |
| 101. Contract sales price | 1,550,000.00 | 401. Contract sales price | 1,550,000.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 21,870.50 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustment for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/town taxes 10/19/2011 to 12/31/2011 | 2,756.50 | 406. City/town taxes 10/19/2011 to 12/31/2011 | 2,756.50 |
| 107. County taxes to | | 407. County taxes to | |
| 108. Assessments to | | 408. Assessments to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| **120. Gross Amount Due from Borrower** | 1,574,627.00 | **420. Gross Amount Due to Seller** | 1,552,756.50 |
| **200. Amounts Paid by or in Behalf of Borrower** | | **500. Reductions in Amount Due to Seller** | |
| 201. Deposit or earnest money | 25,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | 1,552,756.50 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Credit From Commission | 2,000.00 | 504. | |
| 205. | | 505. | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/town taxes to | | 510. City/town taxes to | |
| 211. County taxes to | | 511. County taxes to | |
| 212. Assessments to | | 512. Assessments to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid by/for Borrower** | 27,000.00 | **520. Total Reduction Amount Due Seller** | 1,552,756.50 |
| **300. Cash at Settlement from/to Borrower** | | **600. Cash at Settlement to/from Seller** | |
| 301. Gross amount due from borrower (line 120) | 1,574,627.00 | 601. Gross amount due to seller (line 420) | 1,552,756.50 |
| 302. Less amounts paid by/for borrower (line 220) | 27,000.00 | 602. Less reductions in amount due seller (line 520) | 1,552,756.50 |
| 303. Cash   FROM BORROWER | 1,547,627.00 | 603. Cash   TO SELLER | |

The Public Reporting Burden for this collection of information is estimated at 35 minutes per response for collecting, reviewing, and reporting the data. This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number. No confidentiality is assured; this disclosure is mandatory. This is designed to provide the parties to a RESPA covered transaction with information during the settlement process.

Borrower:  Brian Forda

Borrower:  Beth Forda

Seller:  Sun And Fun Real Estate, LLC

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

October 19, 2011

Settlement Agent:                                    Date:

## L. Settlement Charges

| | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|
| **700. Total Real Estate Broker Fees** | | | |
| Division of commission (line 700) as follows: | | | |
| 701. $77,500.00 | to Re/Max of Ocean City | | |
| 702. $ | to | | |
| 703. Commission paid at settlement | | | 77,500.00 |
| 704. Reimburse for Smoke Detector/Supplies/Inspection | Dorothy Phillips | | 139.08 |
| **800. Items Payable in Connection with Loan** | | | |
| 801. Our origination charge | (from GFE #1) | | |
| 802. Your credit or charge (points) for the specific interest rate chosen | (from GFE A) | | |
| 803. Your adjusted origination charges | (from GFE #2) | | |
| 804. Appraisal fee to | (from GFE #3) | | |
| 805. Credit report to | (from GFE #3) | | |
| 806. Tax service to | (from GFE #3) | | |
| 807. Flood certification | (from GFE #3) | | |
| 808. | (from GFE #3) | | |
| 809. | (from GFE #3) | | |
| 810. | (from GFE #3) | | |
| 811. | (from GFE #3) | | |
| 812. | (from GFE #3) | | |
| 813. | (from GFE #3) | | |
| 814. | (from GFE #3) | | |
| 815. | (from GFE #3) | | |
| 816. | (from GFE #3) | | |
| **800. Items Required by Lender to Be Paid in Advance** | | | |
| 901. Daily interest charges from 10/19/2011 to 10/31/2011 @ $ /day | (from GFE #3) | | |
| 902. Mortgage insurance premium for months to | (from GFE #3) | | |
| 903. Homeowner's insurance for years to | (from GFE #11) | | |
| 904. | | | |
| 905. | | | |
| **1000. Reserves Deposited with Lender** | | | |
| 1001. Initial deposit for your escrow account | (from GFE #9) | | |
| 1002. Homeowner's insurance | months @ $ per month | | |
| 1003. Mortgage insurance | months @ $ per month | | |
| 1004. Property taxes | months @ $ per month | | |
| 1005. | months @ $ per month | | |
| 1006. | months @ $ per month | | |
| 1007. Aggregate Adjustment | | | |
| **1100. Title Charges** | | | |
| 1101. Title services and lender's title insurance | Patriot Land Transfer, LLC (from GFE #4) | 692.50 | |
| 1102. Settlement or closing fee | Patriot Land Transfer, LLC    162.50 | | 162.50 |
| 1103. Owner's title insurance | Patriot Land Transfer, LLC (from GFE #5) | 4,863.00 | |
| 1104. Lender's title insurance | 25.00 | | |
| 1105. Lender's title policy limit (N/A) | | | |
| 1106. Owner's title policy limit $1,550,000.00 | | | |
| 1107. Agent's portion of the total title insurance premium  Patriot Land Transfer, LLC | $4,158.55 | | |
| 1108. Underwriter's portion of the total title insurance premium  Old Republic National Title Insurance Company | $728.45 | | |
| 1109. Record Discharge of LP | Patriot Land Transfer, LLC | | 100.00 |
| 1110. Release of Mortgage | Patriot Land Transfer, LLC | | 76.00 |
| 1111. Release & Tracking Fee | ReQuire, Inc. | | 35.00 |
| 1112. | | | |
| 1113. | | | |
| 1114. | | | |
| 1115. | | | |
| **1200. Government Recording and Transfer Charges** | | | |
| 1201. Government recording charges | Clerk of CAPE MAY County (from GFE #7) | 100.00 | |
| 1202. Deed $100.00 | Mortgage $    Releases $100.00 | | 100.00 |
| 1203. Transfer taxes | Clerk of CAPE MAY County (from GFE #8) | 15,600.00 | |
| 1204. City/County tax/stamps | Deed $    Mortgage $ | | |
| 1205. State tax/stamps | Deed $16,230.00    Mortgage $ | | 16,230.00 |
| 1206. Mansion Tax | Clerk of CAPE MAY County    15,600.00 | | |
| 1207. | | | |
| **1300. Additional Settlement Charges** | | | |
| 1301. Required services that you can shop for | (from GFE #6) | | |
| 1302. 3rd Qtr Taxes + Interest | Ocean City | | 3,588.81 |
| 1303. 4th Qtr 2011 Taxes | Ocean City | | 3,473.93 |
| 1304. Pest Inspection | Affordable Pest | 85.00 | |
| 1305. CapeAtlantic Food Services LLC escrow | Patriot Land Transfer, LLC | | 275,000.00 |
| 1306. Proceeds Escrow | Patriot Land Transfer, LLC | | 420,729.68 |
| 1307. Survey | Paul Koelling and Assoc | 650.00 | |
| 1308. | | | |
| 1309. | | | |
| 1310. | | | |
| | | 21,870.50 | 797,133.88 |



**McGinnis Tessitore Wutscher LLP**

The Loop Center Building
105 W. Madison Street
Suite 1800
Chicago, Illinois 60602
Tel. (312) 416-6170
Fax (866) 581-9302
www.mtwllp.com

**Aaron Freeman**
*Of Counsel*
afreeman@mtwllp.com

January 26, 2012

**Via Regular Mail**

Daniel F. and Michelle A. Flynn
c/o Clement F. Lisitski, Esq.
Clement F. Lisitski, LLC
3318 Simpson Avenue
Ocean City, NJ 08226

**RE:    Purported Qualified Written Request**
         **Borrower(s): Daniel F. and Michelle A. Flynn**
         **Property Location: 313 Gull Road, Ocean City, NJ 08226**
         **Loan Number: 0017009994**

Dear Daniel F. and Michelle A. Flynn:

This law firm represents Aurora Bank FSB ("Aurora Bank") in connection with the above-referenced matter. This is not an attempt to collect a debt. This letter responds to your purported "qualified written request" allegedly dated December 22, 2011, a copy of which is included here for your ease of reference.

As you know, Aurora Bank has previously provided you with extensive information and disclosures regarding the loan or debt referenced above. Nevertheless, **please read the following disclosures carefully:**

---

This notice is intended only for the person to whom it is addressed. Please do not read or copy this notice if you are not that person. If you received this notice in error, please notify Aurora Bank immediately, and return the notice to us as soon as possible.

This law firm and its lawyers are not debt collectors, and this is not an attempt to collect any debt. However, any information obtained may be used for the purposes of debt collection.

As of January 17, 2012, the amount of the debt was $763,524.49. A copy of the payoff statement for this debt is included with this letter, and includes important additional information.

We do not accept payments. Any payments should be made to Aurora Bank, at the address indicated on the enclosed payoff statement.

---

**CALIFORNIA · ILLINOIS · WASHINGTON, D.C.**

## MTW

**McGinnis Tessitore Wutscher LLP**

Because of interest, late charges, and other charges that may vary from day to day, the amount due on the day that you pay may be greater than the amount shown above. Hence, if you pay the amount shown above, an adjustment may be necessary after Aurora Bank receives your payment, in which event Aurora Bank will inform you before depositing any check for collection.

For further information, please contact:

> Aurora Bank Customer Service
> 2617 College Park
> Post Office Box 1706
> Scottsbluff, Nebraska 69363-1706
> Telephone: (800) 550-0508

Unless you dispute the validity of the debt, or any portion thereof, within 30 days after your receipt of this notice, the debt will be assumed to be valid. Please note, however, that the law does not require Aurora Bank to wait until the end of this thirty day period before Aurora Bank moves forward with any collection efforts.

Aurora Bank has the right to enforce the Note evidencing the debt, and has the right to receive payment of the debt for and on behalf of the owner of the debt.

The name of the current owner of the debt is: Wells Fargo Bank, N.A., in trust for, Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-10 - 9062 Old Annapolis Road – Columbia, MD 21045 - Telephone: 410-884-2000.

We include with this letter various documents verifying and evidencing the debt, including but not limited to copies of the note, security instrument, payoff statement, and payment history.

The name and address of the original creditor is: Arlington Capital Mortgage Corp. – 2 Greenwood Square – Bensalem, PA 19020.

Please note that this letter and the related documents are provided for informational purposes only, and in response to your inquiry. If you are making payments on the debt pursuant to a Chapter 13 bankruptcy plan, please also note that the documents may not reflect developments that may recently have occurred in connection with your Chapter 13 bankruptcy. In such a case, please contact us for the most up to date information.

To the extent that statements in your letter consist of allegations of wrongdoing of any nature by Aurora Bank or otherwise, all such allegations are denied.

Subject to and without waiving any objections, Aurora Bank responds to your requests as follows below.

You have stated:

**MTW**

McGinnis Tessitore Wutscher LLP

Aaron Freeman
*Of Counsel*
Page 3 of 5

*...I have serious doubts as to what the balance due to Lehman Brothers is, if anything. What role does Aurora have? Is it the loan servicer? Who is Aurora Bank? What relationship does it have with Aurora Loan Services, LLC?*

Subject to and without waiving any objections, Aurora Bank refers to the information provided in the box disclosure section, above and further states that it is the holder of the Note and/or custodian of the loan documents and has the right to enforce the Note evidencing the debt, as the current servicer, master servicer and/or sub-servicer of this loan, and therefore has the right to receive payment for and on behalf of the owner of the loan; Aurora Bank refers to the copy of the Note, including all addenda and riders and to the copy of the Security Instrument and other documents enclosed with this letter.

*Request: 1. Who holds the original wet-ink note and where is it located for view?*

**Response:** Subject to and without waiving any objections, Aurora Bank states that it is the holder of the Note and/or custodian of the loan documents, has the right to enforce the Note evidencing the debt, as the current servicer, master servicer and/or sub-servicer of this loan, and therefore has the right to receive payment for and on behalf of the owner of the loan. Aurora Bank further refers to the copy of the Note, Security Instrument and other documents enclosed with this letter and affirmatively states that it can produce the original borrower's Note in open court during litigation, should the need arise. You may contact Aurora Bank's counsel at the name/address listed at the top of this letter to make arrangements to view the Note at their Chicago, Illinois office.

*Request: 2. Please provide the note and a valid chain of custody in the form of valid assignments back to Lehman Brothers.*

**Objection:** This request is vague, ambiguous and unintelligible. Aurora Bank is not able to discern the intended time or scope with respect to your request as presented and therefore is not able to respond to this request without further clarification from you. Nevertheless, subject to and without waiving any objections, and to the extent a response may be necessary, Aurora Bank refers to the copy of the borrower's Note enclosed with this letter; as that copy indicates, the Note is endorsed in blank. As the Note is in Aurora Bank's possession and control, Aurora Bank has the right to receive payment of the debt for and on behalf of the owner of the debt, and has the right to enforce the Note evidencing the debt as the current servicer, master servicer and/or sub-servicer of this loan.

*Request: Please prove to me your right to enforce the instrument signed as an obligation to Lehman Brothers.*

**Objection:** This request is vague, ambiguous and unintelligible. Aurora Bank is not able to discern the intended time or scope with respect to your request that Aurora Bank "prove to me your right to enforce the instrument," and therefore is not able to respond to this request without further clarification from you. Nevertheless, subject to and without waiving any objections,



**McGinnis Tessitore Wutscher LLP**

Aurora Bank refers to the information provided in the box disclosure section above, and further states that copies of the Note, including all addenda and riders that you executed to receive the loan, copies of the Security Instrument and related loan origination documents, copies of a payment history and payoff statement for the debt, correspondence informing you of the transfer of servicing rights, servicing disclosures, as well as additional documentation evidencing or otherwise verifying the debt, are all enclosed with this letter.

For simple factual inquiries regarding the servicing of the loan(s) at issue, please contact Aurora Bank's Customer Service Help Desk at:

> Aurora Bank Customer Service
> Aurora Bank FSB
> 2617 College Park
> Post Office Box 1706
> Scottsbluff, Nebraska 69363-1706
> Telephone: (800) 550-0508

Origination and the underwriting and closing of the loan transaction questions should be directed to:

> Executive Communications
> Aurora Bank FSB
> 10350 Park Meadows Drive
> Littleton, Colorado 80124
> Telephone (866) 420-3167

Otherwise, please contact the undersigned at the address and/or telephone number given above.

If you are interested in requesting a loan modification, please complete the enclosed loan modification applications in accordance with the instructions provided with each application and return them to Aurora Bank.

**Please note that all of the required financial information and documentation described within the instructions provided with each application must be received by Aurora Bank before a full evaluation of the application can be made.**

**MTW**

**McGinnis Tessitore Wutscher LLP**

Thank you for your anticipated cooperation.

Sincerely,

*Aaron Freeman*

Aaron Freeman
*Of Counsel*

Enc.

# CLEMENT F. LISITSKI, L.L.C.

### ATTORNEY AT LAW
3318 SIMPSON AVENUE
OCEAN CITY, NEW JERSEY 08226

CLEMENT F. LISITSKI

(609) 398-6100

FAX (609) 399-8268

March 7, 2012

*Via  e-mail*
Andrew P. Zacharda, Esq.
Tompkins, McGuire, Wachenfeld & Barry, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ  07102

RE:    313 Gull Road, Ocean City, New Jersey 08226
Mortgage and Loan to Michelle A. Flynn and Daniel F. Flynn
Loan # 0017609994
Arlington Capital Mortgage Corp., assigned to Lehman Brothers
Serviced by Aurora Loan Services, LLC

Dear Mr. Zacharda:

I was copied on your e-mail concerning the outstanding mortgage and loan to Michelle A. Flynn and Daniel F. Flynn with regard to the 313 Gull Road property.  The property was sold.  I represented Michelle A. Flynn in the sale, which was sold by a Limited Liability Company by the name of Sun and Fun Real Estate, LLC, of which Michelle was the sole member.  Settlement was scheduled for October 19, 2011.  The title agency handling the transaction was Patriot Land Transfer, LLC, located at 5001 Route 42 South, Turnersville, New Jersey 08012.

My client and her husband have had major problems with Aurora Loan Services, which remain to this date and have resulted in the need to employ my office for legal services.  Perhaps you can assist in resolving them.

Libby Zolda, of Patriot Land Transfer, handled the matter for the title company.  She had difficulty getting a payoff figure from Aurora.  I was advised by her that if she did not have a payoff letter by settlement, the matter would <u>not</u> close.  The sale was in jeopardy.

After Aurora was not responding, and Libby kept me abreast of this fact, I faxed a letter to the Ackerman Law Firm who I learned represented Aurora in some capacity and demanded a payoff letter immediately be sent to the title company.  In that letter, I also

1

demanded evidence of Aurora being the proper entity owed the funds, proof of authentic and valid assignment from Lehman Brothers, and the proper amount due. I have never received adequate proof and could not have my client be subject to paying the wrong party, the wrong payoff, and still be obligated to the holder of the note and mortgage. I attach a copy of my letter dated October 14, 2011, along with the written request for a payoff by Libby Zolda of Patriot.

On October 17, 2011, your office sent to Libby a copy of a payoff statement, which is attached. I don't know what capacity your office represented Aurora.

On October 18, 2011, Libby received a copy of a similar payoff statement from Aimee R. Eller, Esq. of Aurora legal. Enclosed is a copy of said payoff. This did not solve the proper payee problem.

At settlement, the payoff sums went into escrow until the matter could be resolved. On December 22, 2011, I wrote the enclosed letter to Aimee Eller, Esq. who provided the original payoff statement and requested information to establish which entity was entitled to the funds. Who is the holder of the original note?

On January 3, 2012, I received a letter from customer service dated December 23, 2011, which I attach, stating that I would receive a response under separate cover.

I received a call from Simon Ward Brown of the executive communications department on January 17, 2012, advising me that I would hear from outside counsel in writing within the week with supporting documentation concerning the proper payee. On January 30, 2012, I received the enclosed correspondence dated January 23, 2012, stating that I would receive a response under separate cover.

On or about January 30, 2012, I received correspondence dated January 26, 2012, from Aaron Freeman of the McGinnis Tessitore Wutscher law firm in Chicago, which letter attempted to provide documentation to prove that Aurora Bank was the proper payee. Please see a copy of this letter which is attached. Unfortunately, there was no evidence that Lehman Brothers signed the note. There was no tracing of the note from Lehman to Aurora.

On January 27, 2012, the Zucker Ackerman firm wrote directly to my client with a payoff amount as of January 30, 2012. I enclose a copy of this letter.

In the interim, Aurora gave notice that it intended to place insurance on the property that was no longer owned by my client. I objected in a timely manner, which was ignored, and insurance premiums were added to the payoff. My client has had to incur legal fees as a result of Aurora's inability to show that it is entitled to the funds and the failure to provide a valid payoff figure, as my client disputes the payoff figure provided.

2

My client was ready to pay the loan in full on October 19, 2011. Four different lawyers have become involved, Aimee Eller, the Ackerman firm, the McGinnis firm and now your firm. I don't know which actually represents Aurora with respect to this problem.

Daniel Flynn, who was representing himself, sent me a letter dated February 22, 2012, expressing his objections. I enclose the same for your review.

My client and Mr. Flynn will pay what they believe is the proper payoff as of October 19, 2011, deducting my counsel fees, made payable to the Lehman Brother's trustee in bankruptcy unless a resolve is not reached quickly.

Please review the within and contact me this week to resolve the matter. If it has to be litigated, I will seek additional counsel fees and a reduced payoff as a result of Aurora's bad faith.

Very truly yours,

Clement F. Lisitski

CFL:ep
Enclosures
Cc:   Michelle A. Flynn
      Daniel F. Flynn
      Libby Zolda, Patriot Land Transfer
      Aimee R. Eller, Esq.

3

# ▨▨ Aurora Bank FSB

10350 PARK MEADOWS DRIVE • LITTLETON, CO 80124

March 23, 2012

**VIA FACSIMILE TRANSMISSION** (609) 399-8268

Mr. Clement F. Lisitski, Esquire
Clement F. Lisitski, L.L.C.
Attorney At Law
3318 Simpson Avenue
Ocean City, NJ 08226

Re:   **Borrowers: Daniel F. Flynn and Michelle A. Flynn**
      **Aurora Bank Loan No.: 0017009994**
      **Property Address: 313 Gull Road, Ocean City, NJ 08226**

Dear Mr. Mitchell:

On March 3, 2012, Aurora Bank FSB ("Aurora Bank") received your written communication with respect to the above-referenced mortgage loan account.

As of the date of this letter, the above-referenced mortgage loan account is due for the August 1, 2011 through March 1, 2012 monthly payments, including all allowable fees, costs, and advances provided by the mortgage loan documents. Further, the above-referenced mortgage loan account has not yet been referred to our Foreclosure Department.

Our records indicate that Aurora Bank generated payoff statement letters on the above-referenced mortgage loan account on October 3, 2011, October 5, 2011, October 17, 2011, and January 17, 2012. Our records further indicate that on November 4, 2011, Aurora Bank received an invoice for a non-escrowed Flood Insurance Policy for the above-referenced mortgage loan account. By letter dated November 13, 2011, we informed Mr. and Mrs. Flynn that Aurora Bank is requiring evidence of a current Flood Insurance Policy on the above-referenced loan account. By letter dated November 20, 2011, we informed Mr. and Mrs. Flynn that Aurora Bank is requiring evidence of a current Homeowners Insurance Policy on the above-referenced loan account. As of the date of this letter, Aurora Bank has not received written evidence of either an active Flood Insurance Policy or a Homeowners Insurance Policy on the above-referenced loan account. Due to the fact that Aurora Bank has not received written evidence of either an active Flood Insurance Policy or a Homeowners Insurance Policy for the above-referenced mortgage loan account, forced placed insurance policies have been put into place to protect the asset.

To address your concerns with respect to Aurora Bank's authority to receive payoff funds on the above-referenced mortgage loan account, we referred your written request dated December 22, 2011 to outside counsel on December 23, 2011. By letter dated January 26, 2012 (copy enclosed), McGinnis Tessitore Wutscher LLP responded to your written communication dated December 22, 2011.


Member
FDIC

Mr. Clement F. Lisitski, Esquire
March 23, 2012
Page 2

On March 9, 2012, I had a telephone conversation with you to discuss your and Mr. and Mrs. Flynn's concerns.  Pursuant to your request, on March 9, 2012, I sent you an electronic mail enclosing a copy of the original Promissory Note and the Allonge (copy enclosed) along with my direct contact information.

I trust that this letter responds to your and Mr. and Mrs. Flynn's concerns.  If you or Mr. and Mrs. Flynn have any further questions or concerns pertaining to this matter, please contact the Aurora Bank Executive Communications Department by calling 1-866-420-3167, Monday through Friday between the hours of 8:00 a.m. and 5:00 p.m. (MST).

Sincerely,

Simon Ward Brown
Executive Communications


Enclosures

# CLEMENT F. LISITSKI, L.L.C.

ATTORNEY AT LAW
3318 SIMPSON AVENUE
OCEAN CITY, NEW JERSEY 08226

CLEMENT F. LISITSKI

(609) 398-6100

FAX (609) 399-8268

April 11, 2012

*via e-mail*
Dan and Michelle Flynn
40 Hickory Court
Marco Island, FL 35145

Re:    **Aurora - 313 Gull Road, Ocean City, New Jersey**

Dear Dan and Mickey:

Although I have attempted to resolve the Aurora loan payoff since settlement, short of litigation, I have not been able to do so. In the interim, interest is running each month. I am concerned for you both.

The dilemma that you face is that Aurora has not provided me with evidence that the note and mortgage gas been assigned from Lehman brothers to Aurora. I have asked for this for months. Lehman Brothers is in bankruptcy. If you pay the wrong party, you risk another party seeking the same suns at a later date.

Sufficient monies are in escrow with the title company. However, until they receive a proper payoff letter that is acceptable to us, they won't release the funds and the balance coming to you is held up.

I have written a letter which I am attaching that I propose to send to my current contact with Aurora, Simon Ward Brown of the executive communications department, who corresponded with me last on March 23, 2012. I attach copy of his letter. I also enclose a copy of various account statements received from Aurora.

Litigation is too expensive. I don't know what else to do except try a resolve at a discount.

I have also enclosed a copy of my bill for services rendered through March 31, 2012, which I am reducing by $3,227.08, which exceeds my hourly fees for services provided on the Aurora matter to date to assist you the best I can, my dear friends. We need to resolve this soon as I cannot afford to continue without having to charge you fees for the Aurora dilemma, and you need to stop the interest expense. I will need monies paid toward the balance due on the bill.

I think about you often and pray for peace for both of you and that this matter will finally end.

With His love,

Clement F. Lisitski

CFL:ep
Enclosures

# CLEMENT F. LISITSKI, L.L.C.

ATTORNEY AT LAW
3318 SIMPSON AVENUE
OCEAN CITY, NEW JERSEY 08226

CLEMENT F. LISITSKI

(609) 398-6100

FAX (609) 399-8268

April 13, 2012

*via e-mail and regular mail*
Simon C. Ward Brown
Executive Communications
Aurora Bank, FSB
10350 Park Meadows Drive
Littleton, CO  80124

Re:    **313 Gull Road, Ocean City, New Jersey**

Dear Mr. Brown:

We have a dilemma in this matter that I am attempting to solve short of litigation.

There are certain facts that are not in dispute.  Daniel F. Flynn and Michelle A. Flynn borrowed funds ($749,950.00) from Arlington Capital Mortgage Corp. (Arlington) on 9/26/03, which loan was secured by a mortgage on the premises at 313 Gull Road, Ocean City, New Jersey. The property was transferred to a limited liability company by the name of Sun and Fun Real Estate, LLC, whose sole member is Michelle A. Flynn.  Sun and Fun Real Estate, LLC sold the property and settlement was scheduled for 10/19/11.

Based upon a review of documents signed at the settlement of the mortgage loan, the original mortgage note was endorsed by Arlington to Lehman Brothers (Lehman) by an allonge.  Lehman has indentified itself in correspondence as the owner and servicer of the loan.  Although I have requested proof of an assignment from Lehman, I have never received any such documentation. Your reference to the letter I received from McGinnis does not address any factual issues. It ignores all the substantive issues raised in Mr. Flynn's letter of 2/22/12 (copy enclosed); most obviously, proof of ownership and violations of RESPA.

My client has had the funds with the title company to pay a valid sum owed on the Arlington mortgage to Lehman or other proper entity since 10/19/11.  Although a payoff figure to the proper entity was requested weeks before the settlement, a payoff  figure was provided the day of settlement, but the second requirement of proof of the proper entity to be paid (a chain from Lehman to a legal entity who holds the wet signed note and mortgage) was never provided.  Aurora Bank (Aurora) sent correspondence but no proof that it was the authorized  party to secure the loan and collect what is allegedly owed.

Although the sums from the proceeds of settlement have been escrowed by the title company and are  substituted for the mortgaged premises, even with notice and objection, Aurora charged my client with placed insurance, interest from 10/19/11 and other costs and expenses.

With regard to the insurance placement, when notice was received on 1/6/12 from Aurora concerning providing evidence of current hazard insurance on the property and Aurora sought a response in twenty (20) calendar days, a copy of which is attached, I responded by letter on 1/17/12, advising that the property had been sold and funds sufficient to pay off the mortgage to Lehman were in escrow at Patriot Land Transfer Title Company. I advised that hazard insurance should not therefore be placed as the mortgagee's security was replaced by cash. I enclose a copy of said letter. On 2/3/12, a call from Aurora Bank Insurance Service Center was made to my office about the hazard insurance and my office again advised the representative not to place the insurance. The representative asked me to fax an executed HUD-1 which I did. I confirmed this by letter dated 2/3/12, a copy of which I enclose. No forced insurance should have been placed and my client will not be responsible for the same. Aurora's continued insistence on insuring a non insurable property is unacceptable.

My client has incurred legal fees expenses to attempt to substantiate and verify the proper party to whom to pay the sum due and the proper amount. McGinnis advises that the owner of the note is Wells Fargo Bank, NA, in trust for Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-through Certificates, Series 2004-10, but there is no evidence to support this nor even to indicate it is a collateralized investment.

The account statement from Aurora Bank as of the date of settlement shows a principal balance of $749,945.00 plus interest of $6,642.92 for a total due of $755,612.62 to the proper party which is owed the monies. Considering the counsel fees incurred by my clients, the additional improper fees charged, and the risk taken if my client pays Aurora, who may not have the proper authority to collect, thus exposing my client to face demands for payment from a third party entity, and to end this matter now, my client will authorize payment of the following, in full, to obtain a discharge of the mortgage and cancellation of the note:

$700,000.00 payable in ten (10) days of receipt of a payoff letter in said compromised amount, along with a letter of indemnification from Aurora indemnifying them in the event a third party later demands payment of monies claiming to be the alleged true holder of the note. My client will be responsible for my fees.

Please review the within and advise if we can resolve the matter in this manner. This offer is being made without prejudice to my clients' rights. If we at an impasse, my client has authorized me to direct the Title Company to pay the funds to the United States Trustee representing the Estate of Lehman Brothers. I am sure this party has the authority to satisfy the mortgage. I will deduct the payments made to Lehman-Aurora post petition.

Very truly yours,

Clement F. Lisitski

CFL:ep
Attachments
cc:    Client

2

# TOMPKINS, McGUIRE, WACHENFELD & BARRY, LLP

*Counselors at Law*

FOUR GATEWAY CENTER
100 MULBERRY STREET, SUITE 5
NEWARK, NEW JERSEY 07102-4056
Newark (973) 622-3000
New York (212) 714-1720

**William C. Sandelands**
Partner

FAX (973)623-7780
www.tompkinsmcguire.com

Direct Telephone: (973) 623-7059
wsandelands@tompkinsmcguire.com

April 18, 2012

**BY FAX (856.227.4995) and FIRST CLASS MAIL**

Patriot Land Transfer, LLC
5001 Route 42, Suite A
Turnersville, NJ 08012

Re:  **Flynn/Sun and Fun Real Estate to Forde
313 Gull Road, Ocean City, NJ
Your File #: PLT-13415**

Dear Sir/Madam:

Aurora Bank FSB ("Aurora Bank") has retained my firm in connection with the September 26, 2003 $749,500 mortgage loan between Daniel F. Flynn and Michelle A. Flynn and Arlington Capital Mortgage Corp., its successors and/or assigns (the "Mortgage Loan") secured by a mortgage (the "Mortgage") on the property at 313 Gull Road, Ocean City, NJ (the "Property"). We have been advised that the Property was purportedly sold by Sun and Fun Real Estate, LLC to Brian and Beth Forde (the "Fordes") on or around October 19, 2011 for $1,550,000 and that Patriot Land Transfer, LLC ("Patriot") was the Settlement Agent for that transaction.

The Mortgage Loan was not paid off out of the proceeds of the purported sale of the Property back on or around October 19, 2011 and the Mortgage has not been discharged or canceled of record. As a result, the Mortgage is still a lien against the Property and enforceable as such with priority over any interest purportedly acquired by the Fordes. Unless and until the Mortgage Loan is paid off in full the Mortgage will remain a lien on the Property and Aurora Bank will pursue the remedy of foreclosure.

According to Clement F. Lisitski, Esq., who we understand is counsel for Michelle A. Flynn and, we believe, Sun and Fun Realty, LLC and/or Daniel F. Flynn, Patriot currently holds an undisclosed amount of the proceeds of the sale of the Property to the Fordes in escrow for the purpose of paying off the Mortgage Loan secured by the Mortgage. Please be advised that unless and until the Mortgage Loan is paid in full the Mortgage will continue to encumber the Property. Mr. Lisitsky has advised Aurora Bank that he may direct Patriot to pay the funds it is holding in escrow over to the Trustee in the Lehman Brothers Holdings Inc. ("LBHI") bankruptcy proceedings pending in the Southern District of New York. We caution Patriot that

## TOMPKINS, McGUIRE, WACHENFELD & BARRY

Page 2

doing so could expose Patriot to liability or exposure as LBHI does not have an interest in the Mortgage Loan.

Please do not hesitate to contact me if you have any questions.

Very truly yours,

William C. Sandelands
For   TOMPKINS, McGUIRE, WACHENFELD & BARRY

WCS:ks

c:   Clement F. Lisitski, Esq. (by email)

# TOMPKINS, McGUIRE, WACHENFELD & BARRY, LLP

*Counselors at Law*

FOUR GATEWAY CENTER
100 MULBERRY STREET, SUITE 5
NEWARK, NEW JERSEY 07102-4056
Newark (973) 622-3000
New York (212) 714-1720
FAX (973)623-7780
www.tompkinsmcguire.com

William C. Sandelands
Partner

Direct Telephone: (973) 623-7059
wsandelands@tompkinsmcguire.com

May 11, 2012

**BY EMAIL and FIRST CLASS MAIL**

Clement F. Lisitski, Esq.
CLEMENT F. LISITSKI, L.L.C.
3318 Simpson Avenue
Ocean City, NJ 08226

     **Re:   313 Gull Road, Ocean City, NJ**

Dear Mr. Lisitski:

     During our telephone conversation on April 27, 2012 you advised that to resolve the matter now you were authorized to instruct the escrow agent to pay over to Aurora $755,622.62 in full payment of the mortgage loan. Please be advised that Aurora rejects this short payoff proposal and demands full payment of all amounts due and owing under the mortgage loan. A copy of a Payoff Statement dated May 7, 2012 is annexed. As you can see, $780,028.32 is currently owed.

     For reasons unknown, the settlement agent in the sale of the subject property back on or around October 19, 2011, failed to remit payment of the then due amount, despite the fact the borrowers had been previously making their payments to Aurora and the settlement agent requested and received a Payoff Statement from Aurora prior to closing. As a result of the failure to pay off the mortgage loan, the mortgage is still a lien against the subject property and enforceable as such with priority over any interest purportedly acquired by the purchasers on or around October 19, 2011. Unless paid off in full on or before May 31, 2012, Aurora Bank will pursue its rights and remedies. By separate letter, which I will copy you on, we are advising the purchasers and escrow agent/settlement agent/title insurance carrier of this situation.

               Very truly yours,

               William C. Sandelands
        For    TOMPKINS, McGUIRE, WACHENFELD & BARRY

WCS:ks

# TOMPKINS, McGUIRE, WACHENFELD & BARRY, LLP

*Counselors at Law*

FOUR GATEWAY CENTER
100 MULBERRY STREET, SUITE 5
NEWARK, NEW JERSEY 07102-4056
Newark (973) 622-3000
New York (212) 714-1720
FAX (973)623-7780
www.tompkinsmcguire.com

Direct Telephone: (973) 623-7059
wsandelands@tompkinsmcguire.com

William C. Sandelands
Partner

May 11, 2012

**BY FAX (856.227.4995) and FIRST CLASS MAIL**

Mr. Christian DelGozzo
Patriot Land Transfer, LLC
5001 Route 42, Suite A
Turnersville, NJ 08012

> Re: **Flynn/Sun and Fun Real Estate to Forde**
> **313 Gull Road, Ocean City, NJ**
> **Your File #: PLT-13415**

Dear Mr. DelGozzo:

This letter is sent in furtherance of my April 18, 2012 letter to Patriot Land Transfer, LLC ("Patriot") concerning the above-referenced matter. As I indicated in that letter, Aurora Bank FSB ("Aurora Bank") has retained my firm in connection with the September 26, 2003 $749,500 mortgage loan between Daniel F. Flynn and Michelle A. Flynn and Arlington Capital Mortgage Corp., its successors and/or assigns (the "Mortgage Loan") secured by a mortgage (the "Mortgage") on the property at 313 Gull Road, Ocean City, NJ (the "Property"). We understand that the Property was purportedly sold by Sun and Fun Real Estate, LLC to Brian and Beth Forde (the "Fordes") on or around October 19, 2011 for $1,550,000 and that Patriot was the title agency underwriting a title insurance policy for the Fordes and was the settlement agent for that transaction and is the escrow agent holding certain proceeds of the sale in escrow.

As previously advised, the Mortgage Loan was not paid off out of the proceeds of the purported sale of the Property back on or around October 19, 2011 and the Mortgage has not been discharged or canceled of record. As a result, the Mortgage is still a lien against the Property and enforceable as such with priority over any interest purportedly acquired by the Fordes. Unless and until the Mortgage Loan is paid off in full the Mortgage will remain a lien on the Property.

Demand is hereby made for full payment of all amounts due and owing under the Mortgage Loan. A copy of a Payoff Statement dated May 7, 2012 is annexed. As you can see, $780,028.32 is currently owed. Unless paid off in full on or before May 31, 2012, Aurora Bank will pursue its rights and remedies. We also make demand that Patriot, as agent for the title ~~ance carrier that insured title into the Fordes, advise the title insurer of this claim. We do ~~me have information as to who the title insurer is so leave it to you to forward this

**TOMPKINS, McGUIRE, WACHENFELD & BARRY**

Page 2

claim. I have copied the Fordes on this letter so that they understand that the Property they purchased back in October 2011 is still encumbered by the Mortgage.

Very truly yours,

William C. Sandelands

For    TOMPKINS, McGUIRE, WACHENFELD & BARRY

WCS:ks

c:    Clement F. Lisitski, Esq. (by Email)(w/out enclosure)
Brian and Beth Forde (by First Class Mail)(w/out enclosure)

**PAYOFF STATEMENT**

May 07, 2012

RE:                    G28  XP411

Daniel F Flynn              Loan No: 0017009994

Michelle A Flynn              Loan Type: Conventional

Property Address: 313 Gull Rd

Ocean City NJ 08226


TO:


Daniel F Flynn

Michelle A Flynn

3318 Simpson Ave

Ocean City, NJ 08226


**THIS LOAN IS DUE FOR THE August 01, 2011 MONTHLY PAYMENT**

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

The current total unpaid Principal Balance is:    $      749,945.00

Interest at  2.75000%                        19,191.62

 FROM    THRU    RATE    INTEREST

07/01/11 03/31/12 2.75000    15,467.58

04/01/12 05/30/12 3.00000    3,724.04



Escrow/Impound Overdraft                    6,334.00

| | |
|---|---|
| Corporate Advance | 5,505.00 |
| Unpaid Other Fees | 10.00 |
| Recording Fee | 43.00 |
| Suspense Balance | 1,000.30- |

Total to Satisfy the Mortgage and Release the Lien:$      780,028.32

Additional Unsecured Fees**:

Total Due:                    $      780,028.32

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**INSTRUCTIONS:**

1. All amounts shown in this Payoff Statement are good to

May 31, 2012. Funds received after that date will require an

additional $ 61.64 interest per Day.

The balance due may change if other activity occurs after the issue date

of this Statement. Contact us at the address or toll free number above

to confirm the validity of this Payoff Statement or for a Payoff

Statement after May 31, 2012.


2. Aurora Bank will issue an Amended Payoff Statement if any

previous payment is rejected by the financial institution upon which the

check is drawn. Should any payments applied to this account be

returned to Aurora Bank due to insufficient funds, a stop

payment, or being dishonored for any reason whatsoever, whether before

or after we receive the funds necessary to satisfy the mortgage and

release the lien, the Note will remain unpaid and the lien unsatisfied,

and this Payoff Statement shall be void. The Mortgage or Deed of Trust

NOTE: If the wire is received with insufficient information, it will be returned and interest may continue to accrue until sufficient information and adequate funds are received.

**PAYOFF STATEMENT**

May 07, 2012

Loan No:  0017009994

Mortgagor(s):  Daniel F Flynn

Michelle A Flynn

Property Address:  313 Gull Rd

Ocean City NJ 08226

**ADDITIONAL COMMENTS**

————————

PLEASE NOTE, THIS PAYOFF AMOUNT IS SUBJECT TO CHANGE SINCE THERE ARE

FORECLOSURE ATTORNEY FEES ACCRUING ON THIS LOAN.  THE PAYOFF

WILL NOT BE ACCEPTED AFTER 7:00 PM ET ON 05/30/2012.

AFTER THIS DATE, AN UPDATED PAYOFF STATEMENT WILL NEED TO BE REQUESTED.

NO VERBAL UPDATES WILL BE GIVEN OUT.

Daniel F Flynn

Michelle A Flynn

Clement Lisitski Llc

C/o Clement

3318 Simpson Ave

Ocean City NJ 08226-2086

RE: Loan No. 0017009994

Dear Customer(s):

Per your request, enclosed please find a payoff statement for the above-

referenced loan. Aurora Bank accepts payoff proceeds by certified

funds or wire only. Payoff proceeds must be made payable to and remitted

directly to Aurora Bank. Please refer to the payoff quote for

information on where to mail certified funds or for wiring instructions.

WE DO NOT ACCEPT PERSONAL CHECKS, THIRD PARTY CHECKS, MONEY ORDERS OR

OTHER NEGOTIABLE INSTRUMENTS THAT DO NOT INDICATE THE INSTRUMENT IS A

CASHIER'S CHECK.  ANY PAYOFF PROCEEDS RECEIVED THAT ARE NOT IN THE FORM

OF A CASHIER'S CHECK (EVEN IF THE INSTRUMENT IS STAMPED "CERTIFIED") WILL

BE RETURNED TO THE SENDER.

In the event the payoff proceeds are returned to the sender, interest

may continue to accrue on the loan until adequate payoff funds are

received to satisfy the mortgage and release the lien.

If you have any questions, please contact one of our Customer Service

Representatives at the address above or by calling 800-550-0508.

Sincerely,

**Payoff Quoting Department**

Aurora Bank is a debt collector. Aurora Bank is

attempting to collect a debt and any information obtained will be

used for that purpose. However, if you are in bankruptcy or received

a bankruptcy discharge of this debt, this communication is not an

attempt to collect the debt against you personally, but is notice

of a possible enforcement of the lien against the collateral property.

RE: Loan No. 0017009994

Borrower(s): Daniel F Flynn

Michelle A Flynn

Property Address: 313 Gull Rd

Ocean City NJ 08226


ITEMIZATION OF FEES, COSTS AND OTHER CHARGES

Dear Customer(s):


This Addendum supplements the Payoff Statement.


Below is a detailed itemization of the unpaid fees, costs and other

charges due on the above-referenced loan.


| Description | Unpaid Balance |
| --- | --- |
| Foreclosure Attorney Fees | $5,400.00 |
| Property Value Fee | $105.00 |
| PAYOFF STATEMENT FEE | 10.00 |

will not be released until adequate funds have been received to replace

the returned payments. The borrower(s) will remain liable for any

remaining unpaid portion of the debt resulting from any returned payments.

Aurora Bank reserves the right to demand additional funds before

the release of the security interest to correct any error or omission in

the amounts set forth in the Payoff Statement made in good faith. AURORA

WILL NOT PROVIDE A VERBAL PAYOFF FIGURE.


**Borrower may be responsible for payment of Additional Fees, but payment

of these Additional Fees is not a condition to the release of the lien.

3. If Aurora Bank does not receive sufficient funds to satisfy

the mortgage and release the lien, Aurora Bank will send an

Amended Payoff Statement for the remaining balance. Interest may continue

to accrue until adequate payoff funds are received to satisfy the mortgage

and release the lien. Aurora Bank reserves the right to adjust

the payoff statement figures and demand additional secured funds, as

necessary. The Mortgage or Deed of Trust will not be released until

sufficient funds are received to satisfy the mortgage and release the lien.


4. Aurora Bank will continue to disburse funds for payment of

taxes and hazard insurance from the borrower's escrow account until

adequate and acceptable funds have been received to satisfy the mortgage

and release the lien. Any escrow balance or overpayment will be mailed

directly to the borrower(s) within 30 days after the receipt and

processing of payoff funds. Aurora Bank will not accept or

process escrow assignments. Once the loan has paid in full or matured,

Aurora Bank will no longer make payments for real estate taxes,

hazard insurance, or optional items. Payment of these items will become

the borrower's responsibility; borrower should notify the insurance

carrier and taxing authority accordingly. The escrow balance as of the

date of this statement is -$ 6,334.00.

5. The amounts stated herein may include fees/costs that have not been

incurred as of the date of this statement but which may be incurred on or

before the "good to" date specified herein. Fees/costs that are not

incurred before receiving funds in an amount necessary to satisfy the

mortgage and release the lien will be refunded to borrower. It is

borrower's responsibility to inform us of borrower's forwarding address

for the refund. As permissible by applicable law, a statement fee and/or

fax fee may be billed to your account for each payoff statement ordered.

Such fees will show on your account statement and Payoff Statement under

Statement Fees, Expedited Delivery Fees, and/or Other Fees.

6. Caution-This Payoff Statement does not suspend the borrower's duty to

---------

pay under the loan documents. A late charge in the amount of $    85.93

will be due and added to the payoff amount if the total amount to satisfy

the mortgage and release the lien is not received prior to the expiration

of the applicable grace period in the Note.

Please return a copy of this Payoff Statement with a cashier's check.

WE DO NOT ACCEPT PERSONAL CHECKS, THIRD PARTY CHECKS, MONEY ORDERS OR

OTHER NEGOTIABLE INSTRUMENTS THAT DO NOT INDICATE THE INSTRUMENT IS A

CASHIER'S CHECK. ANY PAYOFF PROCEEDS RECEIVED THAT ARE NOT IN THE FORM

OF A CASHIER'S CHECK (EVEN IF THE INSTRUMENT IS STAMPED "CERTIFIED") WILL

BE RETURNED TO THE SENDER. Payoff proceeds must be made payable to and

remitted directly to Aurora Bank.


Payoff funds will only be accepted by delivery at the following address:

    Aurora Bank

    Attn: Cashiering Department

    10350 Park Meadows Drive

    Littleton, CO  80124


Or, for wire of payoff funds only, please transmit a bank wire in

accordance with the following wiring instructions:

    US Bank, Denver, CO 80202;

    ABA Number: 102-000-021;

    Credit: Aurora Bank-Account Number: 1036-9018-0650

    Reference: Aurora Bank's loan number, Borrower's

    name, your company name, fax and telephone numbers.


The above-referenced bank wire account is for submitting payoff funds via

wire transfer only. Any funds remitted to this account that are not

intended for payoff, or are not in the form of a wire transfer, will be

returned to the remitter once the funds are identified.

# Patriot Land Transfer, LLC

**5001 Route 42, Suite A**
**Turnersville, NJ 08012**
**Telephone: (856) 227-4990 Fax: (856) 227-4995**

May 23, 2012

Clement F. Lisitski, L.L.C.
3318 Simpson Avenue
Ocean City, NJ 08226
Via email: cflisitski@comcast.net

**Reference: PLT-13415**
        **313 Gull Rd**
        **City of Ocean City, County of Cape May, State of New Jersey**
        **Release of Escrow**

Mr. Lisitski:

      Please be advised that we are in receipt of the letter from Tompkins, McGuire, Wachenfeld & Barry, LLP dated 5/11/2012 and the payoff statement that was enclosed dated 5/7/2012.

      In accordance to the escrow agreement dated 10/19/2011 between Sun and Fun Real Estate, LLC (seller), Patriot Land Transfer, LLC (escrow agent) and Old Republic National Title Insurance Company (Company) we are hereby paying the sum of $780,028.32 to Aurora Bank by wire transfer on Friday, May 25, 2012.

      The remaining balance of the escrow in the sum of $19,971.68 will be released to the seller by check and sent by regular mail on Friday, May 25, 2012 as well.

Very truly yours,

**Patriot Land Transfer, LLC**

CC:    Re/Max of Ocean City - Dorothy Phillips via email: dp@doortotheshore.com
        Sun And Fun Real Estate – via email: af-flynn@msn.com
        Mitchell S. Berman, Esq – via email: msb@bermanlawllc.com

# CLEMENT F. LISITSKI, L.L.C.

ATTORNEY AT LAW
3318 SIMPSON AVENUE
CLEMENT F. LISITSKI                OCEAN CITY, NEW JERSEY 08226                (609) 398-6100
FAX (609) 399-8268

May 24, 2012

_**Via fax (856-227-4995) & E-mail only**_

Libby Zolda
Patriot Land Transfer, LLC
5001 Route #42, Suite A
Turnersville, NJ  08012

       Re:    **313 Gull Road, Ocean City, New Jersey**
              **Mortgage and Note, Loan #0017009994**

Dear Libby:

As you know, I represent Michelle A. Flynn, who along with her husband, Daniel F. Flynn is the obligee of a note and mortgage to Arlington Capital Mortgage Corp. dated September 26, 2003 in the original amount of $749,950.00.  The mortgage required only interest payments.

Sun and Fun Real Estate, LLC (Sun), of which Michelle A. Flynn was the sole member, sold the property to Brian Forde and Beth Forde, his wife, settlement occurring on October 19, 2011. Not only was it difficult to obtain a payoff figure from Aurora, as you know,  the alleged servicer for Arlington but based upon the documents signed by the Flynn's at settlement on the mortgage loan, the original mortgage loan was assigned by Arlington to Lehman Brothers, which is in bankruptcy. Since prior to settlement and thereafter, in order to insure the funds were paid to the proper party, and Lehman had identified itself in correspondence as the owner and servicer of the loan, I have attempted to obtain proof of an assignment from Lehman to Aurora Bank, FSB, the alleged servicer. Aurora has failed to provide the proof.  I know that the Title Company also desires to pay the property party.

Yesterday, I received an unsigned letter from Patriot Land Transfer, LLC advising that the law firm of Tompkins, McGuire, Wachenfeld & Barry, LLP had provided a payoff statement for funds to be paid to Aurora Bank, FSB and the Title Company intended to pay the sum of $780,028.32 to Aurora Bank by wire transfer on Friday, May 25, 2012 (although the payoff letter demanded payment by May 31, 2012).

On behalf of Michelle Flynn and Sun and Fun Real Estate, LLC, I object for two reasons:

1.      The payoff sum is incorrect.  There are sums added to principal and interest that are improper such as legal fees and escrow.  The payoff letter did not even specifically show how the additional sums were computed.  There was no foreclosure action begun.  Mr. Flynn was in bankruptcy and any proposed action was stayed.

Page 2
May 24, 2012
--------------------------------------------------------------------------------------------------------------------

     2.      Proof of the proper entity to pay has not been provided.

     The Title Co. is not authorized by my client to pay the unauthorized sum demanded to a party which has not proved that it is the authorized payee.

     My client authorizes the release of $755,000 (principal and interest) to the proper party, which the LLC was ready to pay on the date of settlement.

     Please act accordingly.

                     Very truly yours,

                     Clement F. Lisitski

CFL:me
cc:  Mr. Christian DelGozzo, Patriot Land Transfer, LLC
     Regina Townsend, Examiner – Patriot Land Transfer, LLC
     Client

# FAX COVER SHEET

| | |
|---|---|
| TO | |
| COMPANY | |
| FAX NUMBER | 16093998268 |
| FROM | Nkoch . |
| DATE | 2012-05-25 07:07:15 PDT |
| RE | 313 Gull Road, Ocean City, NJ |

## COVER MESSAGE

Please see attached letter and related documents.


Nancy L. Koch, Esq. CTP

Vice President & NJ State Counsel

Old Republic National Title Insurance Company

119 Cherry Hill Road, 1st Floor

Parsippany, NJ  07054

973-541-2400, ext. 12404

201-839-9019 (fax)

nkoch@oldrepublictitle.com <mailto:nkoch@oldrepublictitle.com>



**OLD REPUBLIC** NATIONAL TITLE INSURANCE COMPANY

**119 Cherry Hill Road, Suite 100**
**Parsippany, NJ 07054**
**973-541-2400, ext. 12404**
**nkoch@oldrepublictitle.com**

May 25, 2012

Clement F. Lisitski, Esq.
3318 Simpson Avenue
Ocean City, NJ 08226

Via telecopier only (609) 399-8268

Re:    313 Gull Road, Ocean City, NJ

Dear Mr. Lisitski:

Your letter of May 24, 2012 objecting to the release of the escrow in the above referenced matter has been forwarded to this office. I provide herewith a copy of the Escrow Agreement signed by you on behalf of your client, the Seller, Sun and Fun Real Estate, LLC at closing and draw your attention to the terms and provisions of same. The Agreement provides that the Seller shall either resolve the matter of the Aurora payoff within 3 months of the date of the Agreement (October 19, 2011) or institute legal action in order to do so. The Agreement further provides that should the seller fail to do so, the mortgage payoff plus interest shall be paid to Aurora. The Agreement further provides, "Notwithstanding anything else herein to the contrary, in the event the Flynn's (sic) mortgage issue remaining unresolved as of January 19, 2012, Patriot shall pay to Aurora the then full payoff balance of the mortgage and shall thereafter take whatever steps are necessary to have the mortgage of record discharged."

To our knowledge, your client has neither resolved this matter nor instituted legal action in order to do so. We have received a letter from counsel for Aurora Bank, FSB demanding immediate payoff of the mortgage and threatening our insureds' title. Not only is Patriot Land Transfer, LLC's release of the escrow funds as indicated in their letter of May 23, 2012 appropriate, it is mandated.

The funds will be disbursed as indicated in Patriot Land Transfer LLC's letter today. If you have proof that the matter has been resolved by your clients or in the alternative that they have instituted legal action to do so, it must be provided to me by noon today.

Please be guided accordingly,

Very Truly Yours,

OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY

Nancy L. Koch, Esq. CTP
Vice President & New Jersey State Counsel

cc:    Patriot Land Transfer, LLC