Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555-jmp

4   Adv. Case No. 08-01420-jmp

5   Adv. Case No. 09-01062-jmp

6   Adv. Case No. 10-02821-jmp

7   Adv. Case No. 10-02823-jmp

8   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9   In the Matter of:

10

11   LEHMAN BROTHERS HOLDINGS, INC., et al.

12                Debtors.

13   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

14   In re

15   LEHMAN BROTHERS INC.,

16                Debtor.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19                U.S. Bankruptcy Court

20                One Bowling Green

21                New York, New York

22

23                August 15, 2012

24                10:41 AM

25

Page 2

1    B E F O R E :

2    HON   JAMES M. PECK

3    U.S. BANKRUPTCY JUDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1  Hearing re:  Motion of FirstBank Puerto Rico for (1)

2  Reconsideration, Pursuant to Section 502(j) of the

3  Bankruptcy Code and Bankruptcy Rule 9024, of the SIPA

4  Trustee's Denial of FirstBank's Customer Claim, and (2)

5  Limited Intervention, Pursuant to Bankruptcy Rule 7024 and

6  Local Bankruptcy Rule 9014-1, in the Contested Matter

7  Concerning the Trustee's Determination of Certain Claims of

8  Lehman Brothers Holdings Inc. and Certain of Its Affiliates

9  [ECF No.5197]

10

11  Hearing re:  Turnberry Centra Sub, LLC, et al. v. Lehman

12  Brothers Holdings Inc., et al.

13

14  Hearing re:  Lehman Brothers Holdings Inc. v. Fontainebleau

15  Resorts, LLC, et al. [Adversary Case No. 10-02821]

16

17  Hearing re:  Lehman Brothers Holdings Inc. v. Fontainebleau

18  Resorts, LLC, et al. [Adversary Case No. 10-02823]

19

20  Hearing re:  Motion of Fidelity National Title Insurance

21  Company to Compel Compliance with Requirements of Title

22  Insurance Policies [EFC No. 11513]

23

24  Hearing re:  Motion of Giants Stadium LLC for Leave to

25  Conduct Discovery of the Debtors Pursuant to Federal Rule of

Page 4

1    Bankruptcy Procedure 2004 [ECF No. 16016]

2

3    Hearing re:  Motion of Monti Family Holding Company, Ltd for

4    Leave to Conduce Rule 2004 Discovery of Debtor Lehman

5    Brothers Holdings, Inc. and Other Entities [ECF no. 16083]

6

7    Hearing re:  Amended Motion of Ironbridge Homes, LLC, et al.

8    for Relief from the Automatic Stay [ECF No. 23551]

9

10   Hearing re:  Application of the Ad Hoc Group of Lehman

11   Brothers Creditors for Compensation for Professional

12   Services Rendered by, and Reimbursement of Actual and

13   Necessary Expenses of, Its Professionals Pursuant to Section

14   503(b) of the Bankruptcy Code Rendered By, and Reimbursement

15   of Actual and Necessary Expenses of, Its Professionals

16   Pursuant to Section 503(b) of the Bankruptcy Code [ECF No.

17   29195]

18

19   Hearing re:  Application of the Ad Hoc Group of Holders of

20   Notes Issues by Lehman Bothers Treasury Co. B.V. and

21   Guaranteed by Lehman Brothers Holdings Inc., Pursuant to 11

22   U.S.C. § 503(b) for Allowance Of Administrative Expenses for

23   Counsel's Services Incurred In Making A Substantial

24   Contribution In These Chapter 11 Cases [ECF No. 29222]

25

Page 5

1   Hearing re:  Lehman Brothers Special Financing Inc. Working

2   Group's Application for Entry of an Order, Pursuant to 11

3   U.S.C. §§ 503(b)(3)(D) and 503(b)(4) for Allowance and

4   Reimbursement of Reasonable Professional Fees and Actual,

5   Necessary Expenses in Making a Substantial Contribution in

6   These Cases [ECF No. 29239]

7

8   Hearing re:  Application of Goldman Sachs Bank USA and

9   Goldman Sachs International for Entry of an Order Pursuant

10  to 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4) for Allowance and

11  Reimbursement of Reasonable Professional Fees in Making a

12  Substantial Contribution in These Cases [ECF No. 29240]

13

14  Hearing re:  Cardinal Investment Sub I, L.P. and Oak Hill

15  Strategic Partners, L.P.'s Motion for Limited Intervention

16  in the Contested Matter Concerning the Trustee's

17  Determination of Certain Claims of Lehman Brothers Holdings

18  Inc. and Certain of Its Affiliates [ECF No. 4634]

19

20  Hearing re:  Motion of Elliott Management Corporation For an

21  Order, Pursuant to 15 U.S.C. §§ 78fff-1(b), 78fff-2(b) and

22  78fff-2(c)(1) and 11 U.S.C. § 105(a), (I) Determining the

23  Method of Distribution on Customer Claims and (II) Directing

24  an Initial Distribution on Allowed Customer Claims [ECF no.

25  5129]

Page 6

1    Transcribed by:   Pamela A. Skaw

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES LLP

3         Attorneys for the Debtors

4         767 Fifth Avenue

5         New York, NY 10153

6

7    BY:  JACQUELINE MARCUS, ESQ.

8         EDWARD R. MCCARTHY, ESQ.

9

10   HUGHES HUBBARD & REED LLP

11        Attorneys for SIPA Trustee

12        One Battery Park Plaza

13        New York, NY 10004-1482

14

15   BY:  SARAH LOOMIS CAVE, ESQ.

16        JENNY BAKER STAPLETON, ESQ.

17

18   K & L GATES LLP

19        Attorneys for FirstBank Puerto Rico

20        599 Lexington Avenue

21        New York, NY 10022-6030

22

23   BY:  ROBERT T. HONEYWELL, ESQ.

24        RICHARD S. MILLER, ESQ.

25

Page 8

1   CLEARY GOTTLIEB STEEN & HAMILTON LLP

2        Attorney for Barclays Capital, Inc.

3        One Liberty Plaza

4        New York, NY 10006-1470

5

6   BY:  LINDSEE P. GRANFIELD, ESQ.

7

8   SNR DENTON US LLP

9        Attorney for Hudson City Savings Bank

10       1221 Avenue of the Americas

11       New York, NY 10020-1089

12

13  BY:  HUGH M. MCDONALD, ESQ.

14

15  OTTERBOURG STEINDLER HOUSTON & ROSEN, P.C.

16       Attorney for FDIC

17       230 Park Avenue

18       New York, NY 10169-9100

19

20  BY:  JOHN BOUGIAMAS, ESQ.

21

22

23

24

25

Page 9

1   PAUL HASTINGS LLP

2        Attorney for Carval Investors UK Limited

3        75 East 55th Street

4        New York, NY 10022

5

6   BY:  BRYAN R. KAPLAN, ESQ.

7

8   MEISTER, SEELIG & FEIN LLP

9        Attorneys for Turnberry Centra Sub, LLC, et al.

10        2 Grand Central Tower

11        140 East 45th Street

12        19th Floor

13        New York, NY 0017

14

15   BY:  STEPHEN B. MEISTER, ESQ.

16        CHRISTOPHER J. MAJOR, ESQ.

17

18   ALSO APPEARING TELEPHONICALLY:

19   DAVID EREIRA

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  Be seated, please.

3              MS. CAVE:  Good morning, Your Honor.  Sarah Cave

4      from Hughes, Hubbard & Reed for the SIPA trustee.

5              There's one matter that was on -- that was

6      contested this morning; the motion of FirstBank Puerto Rico.

7      In the time since we arrived at Court this morning, we've

8      been able to work out, at least a preliminary resolution

9      with FirstBank Puerto Rico and the other interested parties,

10     including the Chapter 11 debtors, Barclays and the repo

11     parties.  We all had a chance to confer in the hallway and

12     that preliminary resolution is that the parties have agreed

13     to adjourn the motion to the October 10th omnibus calendar.

14             THE COURT:  Would have been great had you agreed

15     to do all that yesterday.

16             MS. CAVE:  We tried to do that, Your Honor, and

17     were not successful in those efforts yesterday, but being

18     here face-to-face this morning helped us --

19             THE COURT:  Okay.

20             MS. CAVE:  -- get it across the line, and I

21     apologize for making the Court wait this morning but --

22             THE COURT:  I simply note it's the first time in

23     almost four years of Lehman hearings that we've had this

24     sort of personal injury approach to dealing with matters of

25     this sort.  This is not a situation which should be

Page 11

1    precedent for the future.  Matters should be resolved, if at

2    all possible, prior to A hearing and, if we're going

3    forward, we're going forward.

4              MS. CAVE:  Understood, Your Honor.

5              So, the basic resolution, as I said, is that the

6    parties have agreed to adjourn the motion, both the

7    reconsideration aspect as well as the limited

8    intervention.

9              THE COURT:  Were there any substantive agreements

10   reached?

11             MS. CAVE:  In terms of FirstBank Puerto Rico's

12   objection to the trustee -- the SIPA trustee's letter of

13   determination, the SIPA trustee has agreed to accept the

14   objection as filed and deem it filed and pending, and the

15   trustee has reserved his rights -- preserved his rights to

16   object both on the basis of timeliness and on the merits and

17   have that all dealt with at once.

18             And we're also coordinating with the Barclays'

19   adversary proceeding parties as well as the repo parties

20   because they are so many overlapping issues to be able to

21   present all of the merits issues as well as the trustee's

22   timeliness objections -- or timeliness arguments as to the

23   objection to present that all at once to the Court.

24             THE COURT:  And what's happening with

25   intervention?

Page 12

1        MS. CAVE:  Intervention will also be -- that

2   aspect is also being adjourned and I believe that the

3   parties are going to coordinate scheduling of briefing on

4   the intervention issue as well.

5        MR. HONEYWELL:  Good morning, Your Honor.  Robert

6   Honeywell, K&L Gates for FirstBank.

7        Clarification on the intervention.  We've agreed

8   to adjourn to October 10th, but there's no agreement on

9   briefing.  In fact, we probably don't think that will be

10  necessary.  It simply to enable the parties to see what will

11  happen with the debtors and the -- the Chapter 11 debtors,

12  sorry, and the trustee settlement efforts.

13        All parties are reserving all rights to --

14  regarding a settlement motion, if it is ever filed, and the

15  intervention, we're just going to keep it on the calendar

16  until October 10th and see if we need it anymore.  That's

17  the idea there.

18        And the trustee has accurately stated the

19  agreements regarding the reconsideration motion, and all

20  parties are reserving all rights and, in the meantime, until

21  the October 10th hearing, we're going to try to reach an

22  agreement on scheduling because, as mentioned by the

23  trustee, there are some overlapping issues and other parties

24  have a concern about our motion affecting their motion.  So

25  this is just to give us a time to further figure out

Page 13

1    scheduling.

2             THE COURT:  Okay.

3             MR. HONEYWELL:  Thank you, Your Honor.

4             THE COURT:  I guess I'd like some clarification

5    from the trustee as to the order of play here.

6             For all practical purposes, what was supposed to

7    have happened today has simply been kicked down the road to

8    October.  There is, as I understand it, inability to deal

9    with the claims against LBI on the merits, notwithstanding

10   issues surrounding the timeliness of the objection to the

11   trustee's determination, correct?

12            MS. CAVE:  Correct.

13            THE COURT:  But there are certain merits-based

14   issues relating to repo transactions and determinations made

15   with respect to repo claims against the estate.  Is there an

16   understanding as to how that is to be resolved?  We had the

17   test case which is, I believe, scheduled for November.

18            MS. CAVE:  Uh-huh.

19            THE COURT:  I don't know if that's going to stay

20   in November or move.  But I would be interested, at least

21   for purposes of calendar management, to know if any

22   understandings have been reached as to how the repo issues,

23   in particular, will be determined.  Will the test case

24   remain as is?  Is there to be a change in the test case?  I

25   understand rights have been reserved on intervention.  I

Page 14

1      don't know what the timing is in terms of the LBHI versus

2      LBI settlement, which has been long promised but not yet

3      documented.

4             MS. CAVE:  Uh-huh.

5             THE COURT:  So I'd be interested in a fuller

6      status report as to how this is all going to be resolved, if

7      you can give it to me.

8             MS. CAVE:  Sure.  As far as the repo calendar

9      pertains, and those parties are here today, and I'll let

10     them correct me if I'm getting any of this wrong, but we're

11     not proposing any changes in the test case schedule.

12            Simply what we're proposing is that in dealing

13     with FirstBank's objection, both the merits and the

14     timeliness issue, we want to coordinate that with the other

15     briefings and pieces of this case that are farther along,

16     that is, both the repo -- both the repo proceeding as well

17     as the Barclays' adversary proceeding.

18            So I think we're not talking about changing either

19     of those tracks but figuring out the best way to fit

20     FirstBank Puerto Rico and the consideration of its claim in

21     with that in coordination.

22            THE COURT:  Has any judgment been made as to

23     whether the FirstBank claim, in effect, can sit on the

24     sidelines awaiting the outcome of these other matters and,

25     in effect, its disposition would be determined by a

Page 15

1    disposition of the repo test case?  Or are the issues with

2    respect to FirstBank distinguishable?

3              MS. CAVE:  I think it's fair to say that there are

4    some issues about FirstBank Puerto Rico's claim that are

5    distinguishable, but I don't think -- what we've agreed

6    today is not to put them to the side but to coordinate, fit

7    them in, with the other proceedings.  However, we're

8    continuing to discuss that with them and, you know,

9    obviously, I think the trustee's interest is -- the aspects

10   of the case that are farther along, including the repo

11   proceedings, I think that's certainly something that we'll

12   be discussing with FirstBank Puerto Rico in the hopes that

13   that may be a place where we can get to with their claim.

14   But that's -- that determination hasn't been made at the

15   moment.

16             THE COURT:  Okay.  Then I guess I have a question

17   for FirstBank which relates to the Barclays' adversary

18   proceeding.

19             To what extent is the claim against the LBI estate

20   an alternative remedy in reference to the litigation against

21   Barclays?  In other words, can you possibly get relief in

22   both?  They're alternatives, are they not?

23             MR. HONEYWELL:  Yeah, they are legal alternatives,

24   Your Honor.  We believe that they're two different ways to

25   get recovery.  We believe that we have an independence

Page 16

1    customer claim against the LBI estate regardless of what

2    happens in the Barclays' adversary.  The Barclays' adversary

3    is trying specifically to recover collateral.  We believe

4    that the basis of our claim against the LBI estate is under

5    the SIPA statute regardless of what happened to the

6    collateral, because the SIPA statute, of course, says that

7    if any collateral was wrongfully transferred, you continue

8    to have a customer claim.

9              So we're pursuing on parallel tracks and trying to

10   see what the results are of both the alternative remedies.

11             THE COURT:  And is there an effort underway to

12   coordinate these so that we at least have matters in

13   reference to your claimed collateral heard in coordinated

14   proceedings?

15             MR. HONEYWELL:  What FirstBank has agreed to is to

16   allow the Barclays' proceeding to go first, essentially, to

17   resolve whatever it needs to on the current schedule, which

18   is the summary judgment briefing.  And, once they're done on

19   the hearing and on the summary judgment motions, then we'll

20   consider the merits of our customer claim.  But, again, we

21   believe they are legally independent.

22             Barclays seems to think that there might be some

23   impact.  We do not.  So we believe -- they want us to wait.

24   Barclays' counsel can speak for themselves.  They have asked

25   us to wait and we are agreeing to wait.

Page 17

```
 1              THE COURT:  Okay.  I'll hear from Barclays'

 2    counsel on this.

 3              MS. GRANFIELD:  Good morning, Your Honor.

 4    Lindsay Granfield, Cleary, Gotlieb, Steen & Hamilton on

 5    behalf of Barclays Capital.

 6              Yes, Your  Honor, the way in which we think that

 7    they're related is not only as you pointed out, it's kind

 8    of, somewhat of an alternative remedy theory for FirstBank,

 9    but its actual arguments about the meaning of contracts and

10    documents are definitely -- there are some overlap issues in

11    terms of, you know, what is their -- is to mean, what does

12    their collateral schedule mean, and that's how we see it

13    overlapping in substance in terms of having arguments that

14    they may make regarding the claims that we, as part of our

15    summary judgment, may be saying, no, that's not what it

16    means.  It means this or here's the plain meaning of that.

17    So that's how we see it related.

18              THE COURT:  Okay.  Is there anything more that

19    anybody wishes to add at this point?  Is there anybody who

20    understands what was just said?

21         (Laughter)

22              THE COURT:  You're right.  That was supposed to be

23    a joke.

24              MR. MILLER:  Your Honor, I --

25              THE COURT:  Mr. Miller, do you want to come to the
```

1    podium --

2              MR. MILLER:  Yes.

3              THE COURT:  -- if you wish to speak?

4              MR. MILLER:  I was going to ask permission for

5    that.  Thank you.

6              Running the risk of not complicating this at all,

7    what we hope to do between now and October 10, assuming that

8    date's acceptable to you, is to work out some of the issues

9    that you've raised.  I don't want to get into how we got to

10   where we are because that gets more into substance that

11   we've all agreed not to address, but I am personally

12   hopeful, and FirstBank has instructed me that they are

13   willing to try and work with each of the parties to fit into

14   the existing Lehman structure and not disrupt it.

15             THE COURT:  Well, that was certainly the

16   suggestion in the papers that you filed.

17             MR. MILLER:  Thank you.

18             THE COURT:  Okay.  Well, continue to work out the

19   details then and I'll see you next time.

20             MS. CAVE:  Thank you.

21             THE COURT:  We're adjourned until a 2 o'clock

22   hearing.

23             UNIDENTIFIED SPEAKER:  Thank you, Judge.

24        (Recess at 10:53 a.m.)

25             THE COURT:  Be seated, please.  I'd like to start

1   out by expressing some confusion, and I accept the status

2   report filed by Lehman Brothers on the docket as the most

3   current statement of everybody's, or at least of Lehman's

4   view, as to the current status.  There was no counter

5   statement filed by the Turnberry and Fontainebleau parties,

6   but I want you to know that the status report, as filed,

7   differs in tone and content from a conversation that I had

8   with your mediator, Judge Steven Crane, and so I'd like to

9   start with a better understanding as to the true, current

10  status of the mediation.

11          On August 2nd, I received a telephone call in my

12  chambers from Judge Crane, who spoke with one of my law

13  clerks and who asked to be put in contact with me.  I was

14  given his telephone number and I contacted him.  We spoke

15  for perhaps ten minutes.  It is the first time in my

16  experience, both as a practitioner for a very long time and

17  as a Judge, now for close to seven years, that I have ever

18  been contacted by a mediator.

19          The subject matter of the discussion was also, I

20  thought, unusual.  He indicated that he was speaking with me

21  with the consent of the parties, and what he said was that

22  the parties and he believed that the process of reaching a

23  consensual resolution would be facilitated if I were to

24  decide the pending motions to dismiss.  It was my

25  impression, based upon that conversation, that the mediation

Page 20

1    was still alive and that the parties intended to proceed in

2    an effort in good faith to resolve their differences if I

3    were to decide the motions to dismiss.

4         I told Judge Crane that I might simply decide to

5    defer the matter and force the parties back to mediation.

6    And he said in response, well, that would certainly be a

7    message that the parties would need to think about, or words

8    to that effect.

9         That conversation, to the best of my recollection,

10   is different from the status report which provides in clear

11   prose that, for all practical purposes, the efforts to reach

12   a negotiated resolution failed, that the mediation is over,

13   and that, despite best efforts, the parties are unable to

14   act like reasonable adults.  That's not what it said, that's

15   my conclusion.

16        I still don't understand why the parties are

17   unable to act like reasonable adults here, and it occurs to

18   me that this case represents a stark and, frankly,

19   disappointing exception to what has been the pattern and

20   practice throughout the Lehman case, and frankly throughout

21   all of my other experiences, failed mediation is something

22   that I'm not very happy about.

23        So my first question to both sides, without

24   revealing the substance of what went on in the mediation, is

25   is it, in fact, over?  And, if so, why?

Page 21

1          MR. MCCARTHY:  Your Honor, Ed McCarthy on behalf

2    of LBHI and Lehman Brothers Bank.  I'm here with Jackie

3    Marcus of Weil, Gotshal and two client representatives, Joel

4    Halpern (ph) and Joanne Kormansky (ph).

5          We're not happy that the settlement negotiations

6    failed, and they did fail.  But we would like to make three

7    points that we'll address as to why, and without getting

8    into what happened.

9          The first is that Your Honor ordered the parties

10   to settle -- try to settle and that's exactly what they did.

11   Lehman came to the mediations, all four of them, with the

12   right information, the right intent to settle.  We wanted to

13   try to settle and the right people with full authority to

14   settle.  But we're miles apart.  Truly miles apart still,

15   Your Honor.  This isn't a close case.  We're miles apart.

16   The settlement efforts have failed.

17          The second point is that my client came to the

18   mediations, all of them, with the right information to

19   determine that what was being discussed was nowhere even

20   close to the ballpark of what's in the best interests of

21   Lehman's creditors.

22          Lehman looked at the fact of what they see, which

23   is the Soffers undisputedly have $300 million that were lent

24   in hard money.  So they analyzed, they looked at what they

25   have and decided what could we possibly collect from this.

Page 22

1    That's the analysis.  It would be irresponsible to move too

2    far off that analysis.  That's where we're at.

3            And the third, and Ms. Marcus can talk about this

4    better than I can, but Lehman and its creditors are --

5    they're prejudiced by the delay of this litigation.  We

6    tried in our best efforts to try to reach a reasonable

7    settlement.  We'll talk about reasonable figures.  We didn't

8    get there.  The delay may be in the Soffers' best interests

9    not having to pay debts but, in the meantime, Lehman and its

10   creditors sit there while other creditors are going after

11   the Soffers, some very close to judgment, some on the

12   precipice of judgment and Lehman and its creditors are

13   sitting there without any ability to move forward and try to

14   get in line for collection, assuming it gets there.

15           We don't need to guess about what happened at the

16   mediation, Your Honor, and I can understand that you

17   wouldn't want to get into it, but as far as time leading up

18   to it, I know my client spent a great deal of time, and I

19   did too, personally, with them, with the mediator, with

20   opposing counsel and their clients, trying to find a way

21   around the logjam.  It just did not happen.  And it's not

22   going to happen.

23           And it works both ways.  I don't mean to point the

24   finger.  I'm sure the Soffers would have liked to settle for

25   what they view as reasonable.  So would my client.  They

Page 23

1    would like to discuss what they view -- anywhere in the

2    ballpark of what they view as reasonable.  But it's not

3    happening and it's not going to happen, as we see it.  And

4    that's why there is a true impasse.

5           The parties aren't engaged in any further

6    settlement discussions, having moved off their positions

7    since long before August 2nd because the discussions are no

8    longer productive.  And that's our understanding as to what

9    the mediator recognized and why he asked for our joint

10   consent to contact Your Honor.

11          I certainly don't want to put words in his mouth.

12   The failure isn't because of a lack of effort.  We went

13   there four separate times.  In between, we met informally.

14   The mediator used every trick in the book.  He applied

15   pressure where necessary, different methodology to try to

16   get the parties close, it just didn't happen.

17          And remember, this isn't even the first time these

18   parties have tried to discuss settlement.  This isn't that

19   the parties can't talk to each other.  Over the last several

20   years, these parties have met informally and formally trying

21   to get close and it's just not going to happen.

22          That's why, in our view, and I think, Your Honor,

23   appropriately read the tone of our status report, the

24   settlement opportunities are dead right now.

25          There is no more mediation scheduled.  We don't

Page 24

1    know what's going to happen in the future, but all we can do

2    is look at where we're at now and, as we see it, we have no

3    other options other than to proceed with litigation.

4          And that's why, Your Honor, where we're at, which

5    is a true standstill in the litigation, where -- since we

6    moved to dismiss in January, 2012, of course, those are

7    pending, fully argued.  We also have a full stay of

8    discovery because Your Honor I think appropriately pointed

9    out that nothing should move forward in the case until the

10   issues are streamlined and that we get a real framework of

11   what is still in this case.  So nothing is moving forward.

12         THE COURT:  Well, let me stop you on what is still

13   in this case as a jumping off point for further discussion.

14         During argument on the motions to dismiss, my

15   recollection is that some time was spent in assessing what a

16   discovery protocol or program would look like with some

17   concern that it would be far afield of the central issues in

18   dispute if Mr. Meister were to pursue fraudulent inducement

19   claims based upon Repo 105-type theories.

20         When last we were together, Mr. Meister withdrew

21   claims based upon fraudulent inducement in all the

22   litigation, and in the aftermath of that withdrawal you went

23   back to mediation with my strong urging.

24         During this period of time, has any effort been

25   undertaken to develop a discovery protocol for litigation

Page 25

1    that does not include fraudulent inducement claims?  Or is

2    that something to take place only after resolution of the

3    pending motions to dismiss?

4            MR. MCCARTHY:  Internally, on our side, Your

5    Honor, we certainly have looked at what discovery would look

6    like without the Repo 105 claims or defenses -- if that's

7    just carved out of the case.  In fact, we did that before --

8    you remember these claims were amended and the Repo 105

9    arguments were added.  So we know what discovery would look

10   like if this case was really about the loans and just the

11   loan documents in dispute.

12           And since Your Honor advised us to go back to

13   mediation, and we did just that, we have looked at what our

14   discovery schedule would look like.  We've pushed out dates

15   and done it even before this hearing so we have an idea of

16   what it might look like.

17           But, as we see it, it's more than just the

18   arguments regarding Repo 105, the debtor would cause this

19   discovery to be a huge burden beyond what it needs to be.

20           There's also a claim and a defense in this case

21   that somehow these loans relate to the Adventura Mall

22   project, which is a totally separate deal, a totally

23   separate property in Florida, with totally different

24   parties.  And we talked about that at the motion to dismiss

25   hearing, Your Honor.

Page 26

1          So, in our view, the burdensomeness of the

2     unnecessary discovery would not only relate to the Repo 105

3     arguments.  We're hopeful that a ruling or some advice from

4     Your Honor could make it so that what does move forward, in

5     a streamline fashion, is truly discovery that relates to the

6     negotiations of these loans and what happened during these

7     loans and these properties that are really at dispute.

8          THE COURT:  Okay.  There's an aspect of this that

9     I'm still finding a little hard to fully understand, and so

10    I'm going to ask a somewhat similar question to the one I

11    started with but with a slightly different emphasis.

12         When I spoke to retired Judge Crane, in his

13    capacity as mediator, he led me to believe -- that doesn't

14    necessarily mean that it was his intent, it's just the

15    conclusion that I reached -- that my deciding the motions to

16    dismiss, one way or the other, would facilitate the

17    prospects of a consensual resolution, because presumably the

18    parties would then have information that they didn't have

19    during the mediation that would presumably lead them to act

20    more realistically in dealing with the issues in dispute.

21         My question to you is do you believe that that's

22    true or do you believe that regardless of my decision with

23    respect to the pending motions, that the atmosphere as

24    between the litigants is so poisonous that it is impossible

25    to reach a resolution consensually?

Page 27

1              MR. MCCARTHY:  Your Honor, I think that I -- I

2      think that I respectfully disagree with what retired Judge

3      Crane -- what came across in your conversation.

4              I think we spent enough time trying to settle this

5      case that we looked at both what it would mean if we won on

6      the motion to dismiss and what it would mean if we lost on

7      the motion to dismiss, instead had to move forward with full

8      discovery and then see what happens next.

9              And, in my opinion, and perhaps the opposing

10     counsel can address it a little more, I think they did the

11     same thing.  Both -- you were very clear, Your Honor, in

12     what you -- your expectations of the parties both times you

13     sent us to mediation.  And we took a full scope of what was

14     out there.  There is no way that anybody could look at what

15     my client did in negotiations and said they were

16     unreasonable in what they were asking for or weren't willing

17     to make large concessions.  It just wouldn't be accurate.

18             And so, because of that, because of what we've

19     already done and the ground we've covered, I think that Your

20     Honor's ruling -- without me being able to look at a crystal

21     ball and say that everything is going to change, in the near

22     term, nothing is going to change.  In the near term,

23     settlement opportunities are dead.

24             My client is always willing to listen to something

25     that comes out there.  The only thing that could lead us to

1   change that decision, that analysis, and we've going back

2   and forth many times with my client, the only thing that

3   could change that is if there is a drastically different

4   position from the opposing counsel.  And we can't force them

5   to do that, just like they couldn't force us to do it.

6        So I don't think that there's any more information

7   that we could get that would lead us to change our position.

8   And, in my opinion, based on the conversations we had, the

9   same is true of the opposing side.

10        THE COURT:  Okay.  Mr. Meister, assuming you're

11   the spokesperson for your side, what do you have to say?

12        MR. MEISTER:  Yes, Your Honor.  Let me see if I

13   can address, I think, the principal question Your Honor is

14   asking, which is are the negotiations alive or are they

15   dead?

16        I have a different view than Mr. McCarthy.  I find

17   myself in a bit of a -- an awkward position because

18   obviously it takes two to tango to put it in a colloquial

19   way and it's, therefore, difficult for one side to say

20   negotiations are not dead if another side says they are

21   dead.  But I think I can shed some light without getting

22   into, of course, any of the specifics of the negotiations.

23        First of all, I'd like to share with the Court

24   that I, too, having practiced for over three decades, do not

25   recall a single instance in which, of course, I've had many

Page 29

1    mediations, in which a mediator contacted the Court.

2           It was my understanding from the unilateral

3    conversations that we had with retired Judge Crane in which

4    he shared with us that the Lehman side was assenting to the

5    telephone call that you received and questioned whether we

6    would assent.

7           It was my clear understanding that the purpose for

8    that call was simply because there was this -- there is a

9    divide between the parties economically on the bid me asks,

10   so to speak, and that that divide was driven, in large part,

11   by differing analyses, I'll say, of the risks of the

12   litigation.

13          And so it was my understanding that the purpose of

14   the Judge -- Judge Crane, the mediator, calling the Court,

15   which is a very unusual step, was precisely because the

16   prospect of mediating a settlement wasn't dead.  Otherwise,

17   why place the call?  Why not simply have a joint filing or a

18   single filing that says mediation was unsuccessful, period.

19   Please decide the motions.  Why place the call in the

20   absence of a perception by all sides, meaning by the two

21   sides and by the mediator, that there was some possibility

22   of getting to yes after there was a decision?

23          Now, I'd like to also share with the Court that in

24   some respects I've always held the view that the decision on

25   what's before the Court, however the Court decides it, will

Page 30

1    not really answer the questions that are -- I guess it

2    could, depending on the words the Court puts into its

3    decision, but do not directly address the issues that were

4    keeping the parties apart.

5            Although the Turnberry parties, my clients, have

6    asserted affirmative claims, some now withdrawn, as Your

7    Honor pointed out, there are separate issues which I briefly

8    addressed when I was last before Your Honor about defenses

9    that are related, I will say, to the same nucleus of facts

10   forming some of the claims but are, nevertheless, defenses.

11           The -- I mean, it's undisputed, for example, in

12   the Fontainebleau situation -- or property, that Lehman did

13   not fund a large part of its loan commitment.

14           Now, there's certainly a dispute about whether

15   Lehman's non-funding of the approximately, I think,

16   $150 million unfunded balance of that loan, threw the

17   property into bankruptcy or whether it would have gone there

18   anyway.  There's a dispute about that but there's no dispute

19   that Lehman didn't fund its loan commitment, and there

20   Lehman's, all of Lehman's claims are based on a guaranty

21   with a burn down provision.

22           So irrespective of how the Court decides our

23   affirmative claims there for affirmative recovery, unless

24   the Court's comments speak to the viability of the defenses

25   as well, that's one of the things that was keeping the

Page 31

1    parties apart.

2           Similarly, in Town Square, where there isn't a

3    guarantee, there's a $95 million loan that was -- where the

4    individual Soffers are co-makers; however, there is an

5    allegation, we think viable, that there was a $625 million

6    take-out commitment that the $95 million was, in essence, a

7    first advance under that commitment and that that commitment

8    is tied by emails to this Adventura loan and that Lehman's

9    insolvency in the third or fourth quarter -- third quarter

10   of 2008, led to that -- to the non-funding of that

11   commitment, and that that gives rise to promissory estoppel

12   type defenses, which may be distinct from the affirmative

13   claims.

14          And so what really happened in this mediation is

15   that Lehman, in my opinion, considered its claims, its

16   claims, sacrosanct and analyzed the situation as a virtual

17   bankruptcy of the Soffers and made the offers that the

18   Soffers were making in that analytical framework rather than

19   considering, not the affirmative claims, but the quality of

20   the defenses and whether, as I argue, there is a reasonable

21   prospect that Lehman wouldn't be successful in its own

22   affirmative recovery.

23          So I just express this to you because I think what

24   Judge Crane had in his mind, and certainly my personal

25   understanding of the reason for the call, was that if there

Page 32

1    were a decision that clarified those issues, it would

2    perhaps get the parties to yes.  There were substantial

3    offers from both sides.  There was a substantial gap, no

4    question.

5            The total amount of the claims is about

6    $450 million, so you're dealing with -- your dealing with

7    individuals, so you're dealing with a sizeable sum of money.

8    So you can imagine that a substantial offer could be made

9    without it being a great majority of the potential

10   $450 million recovery.

11           But I would say to Your Honor that if Lehman

12   continues to analyze the issue solely on what I call this

13   virtual bankruptcy of the Soffers framework, then I don't

14   think we will get to yes.  If Lehman considers the risks in

15   the litigation, or if the decision, one way or the other,

16   speaks to those risks in terms of defenses then I suppose it

17   would be helpful.

18           So, we broke up the mediation because there was

19   this large gap between the bid and the ask and we just felt

20   that we couldn't make any more headway in discussing with

21   the judge and with Lehman the risks of the litigation.  And

22   Lehman, as I understood it, was saying, you know, maybe if

23   we get a decision, we can have clarity one way or the other

24   and either we will then, depending on what happens, resume

25   settlement talks or just move forward with the litigation.

Page 33

```
 1          We would still very much like to settle.  We are,

 2    of course, prepared to move forward with the litigation

 3    responsibly and as efficiently as possible.  We've thought

 4    about the discovery with the excise claims.  We haven't

 5    proposed a formal plan to Lehman.

 6          I don't know, Your Honor, I hope I'm addressing

 7    Your Honor's --

 8          THE COURT:  No, that was all responsive.  Thank

 9    you.

10          MR. MEISTER:  Okay.  Thank you, Your Honor.

11          THE COURT:  Well, here's what I'm going to do.

12    I'm going to provide guidance with respect to the pending

13    motions to dismiss and, based upon statements that I'm

14    making, will prepare an appropriate order.

15          The motion to dismiss has effectively been

16    modified by the conduct of the parties in that fraudulent

17    inducement claims, that represented a very significant and

18    integrated part of the claims and defenses of the Turnberry

19    group parties, were withdrawn.

20          And one of the challenges that I've had in the

21    aftermath of Mr. Meister's withdrawal of those claims when

22    last we were together, has been to understand what's left by

23    virtue of the excision of those claims.

24          As I understand the world view of Lehman and the

25    world view of the Turnberry parties, Lehman views each
```

Page 34

1      transaction as independent and isolated, and the Turnberry

2      parties view all of these transactions as effectively within

3      a pool of related transaction.  That world view leads to a

4      very different perception of what the litigation is actually

5      about, at least as I see it.

6              Lehman views it as somewhat surgical.  They have

7      fully integrated separate loan documents.  They have the

8      ability to pursue rights and remedies with respect to

9      breaches under those documents, and there's effectively no

10     crossover among the various transactions.

11             On the other hand, the Turnberry parties view

12     their relationship with Lehman Brothers as one relationship

13     that has a number of identifiable subparts.  It's for that

14     reason that so much attention has been paid to the Adventura

15     Mall.  It's role in a securitization that Lehman put

16     together and presumably its connection in the mind of the

17     Soffers to their overall relationship with Lehman as lender.

18             In effect, from their perspective as principals,

19     there were some quid pro quos that went outside the borders

20     of the actual loan documentation.

21             Now, from the Court's perspective, world views

22     have nothing to do with the matters that are before the

23     Court.  Although I recognize that that may be what is

24     motivating the parties, not only in their litigation

25     judgments but in their behaviors as they think about

Page 35

1   exposure and risk relative to the negotiations just

2   described on the record.

3          That having been said, what I am left with is a

4   very easy decision.

5          In part because the Turnberry parties have given

6   up their claims and defenses based on fraudulent inducement,

7   the contracts themselves are not subject to credible attack

8   and their terms and conditions drive the outcome.

9          A litigation in which a litigant can say the

10  contract shouldn't be enforced because we were fraudulently

11  induced into signing it is very different from a litigation

12  in which those same parties are raising promissory estoppel

13  and unjust enrichment type claims.

14         Those claims under applicable and controlling law

15  are, in my judgment, no longer viable, and I'm not saying

16  they ever were viable.

17         For reasons that I articulated in another

18  unrelated Lehman adversary proceeding several years ago, the

19  language of the contracts actually matter.  The case I'm

20  referring to is LH 1440.  In that case contract language

21  permitted certain parts of an overall lending relationship

22  that was separately documented to be separately assigned as

23  part of a Repo transaction.

24         The facts and circumstances are entirely different

25  from those presented here, but the legal principle is the

Page 36

1    same.  What the documents say matters and will be enforced.

2         And so, in this instance, the integration language

3    in each of the relevant underlying transaction documents

4    make it virtually impossible for the Soffers to be taking

5    the position that they're now taking in a litigation that no

6    longer includes fraudulent inducement claims, because

7    there's no longer an effective challenge to the

8    enforceability of the transaction documents themselves.

9         Nothing that I have said here is going to change

10   the world view of either Lehman or the Turnberry parties.

11   That presumably will continue.  But as to the current

12   posture of the litigation itself, Lehman's motions to

13   dismiss are granted as to the remaining counts that are the

14   subject to those motions to dismiss.

15        I will entertain an appropriate order consistent

16   with these remarks and I, once again, encourage the parties

17   to act with each other like reasonable adults.

18        Presumably, based upon what has been said,

19   particularly by Mr. Meister, Lehman's approach to this

20   includes an assessment of both legal entitlement and

21   collection risk.  That, to me, appears to be a rational way

22   to approach what is, effectively, a collection claim.

23        There are defenses to those claims that presumably

24   continue with respect to the breach of contract claims that

25   are in the lawsuit.  Those, it seems to me, can still become

Page 37

1     the basis for a rational exchange of views as to how best to

2     settle the differences that the parties have with each

3     other.

4           If Lehman, as it professes, is concerned about

5     timing and the prejudice of delay, the best outcome is a

6     settlement, not only because of the obvious expenses of

7     ongoing litigation, but also because whenever there may be a

8     dispositive motion and/or a trial, that is only the first

9     step in a final adjudication.  This has the potential of

10    being both unpleasant and long-lasting.

11          I presume the parties will act in their own

12    economic interests and I wish you well.  I'll see you next

13    time.  Please submit an order.

14          MR. MCCARTHY:  Your Honor, may I, with one

15    question?  For discovery purposes, in the meantime, while we

16    wait for an order or decide what we will do in settlement as

17    well, should we get together and put together a discovery

18    plan?

19          THE COURT:  You should act like a reasonable

20    litigator.

21          MR. MCCARTHY:  Understood, Your Honor.  We will.

22          THE COURT:  That means you should put together

23    some kind of discovery plan, frankly, one that, I thought,

24    might have been done already but choose your poison.

25          MR. MCCARTHY:  Thank you, Your Honor.

Page 38

1          (Whereupon these proceedings were concluded at 2:42 PM)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

3                        RULINGS

4                                          Page      Line

5    Motion of FirstBank Puerto Rico for (1)

6    Reconsideration, Pursuant to Section 502(j)

7    of the Bankruptcy Code and Bankruptcy Rule

8    9024, of the SIPA Trustee's Denial of

9    FirstBank's Customer Claim, and (2) Limited

10   Intervention, Pursuant to Bankruptcy Rule

11   7024 and Local Bankruptcy Rule 9014-1, in

12   the Contested Matter Concerning the

13   Trustee's Determination of Certain Claims

14   of Lehman Brothers Holdings Inc. and

15   Certain of Its Affiliates                18        18

16

17   Lehman Brothers Holdings, Inc.'s

18   Motions to Dismiss Granted as to

19   Remaining Counts Subject to the

20   Motions to Dismiss                       33        11

21

22

23

24

25

Page 40

1           C E R T I F I C A T I O N

2

3    I, Pamela A. Skaw, certify that the foregoing transcript is

4    a true and accurate record of the proceedings.

5

6

7

8    Pamela    Digitally signed by Pamela A
             Skaw
             DN: cn=Pamela A Skaw, o, ou,
9    A Skaw   email=digital1@veritext.com,
             c=US
             Date: 2012.08.16 15:34:46 -04'00'

10

11

12

     Veritext

13

     200 Old Country Road

14

     Suite 580

15

     Mineola, NY 11501

16

17

     Date:  August 16, 2012

18

19

20

21

22

23

24

25