## EXHIBIT A
**(Master Credit Agreement)**

# MASTER CREDIT AGREEMENT

Among

## HALE AVENUE BORROWER, LLC,
as Borrower

and

## LEHMAN BROTHERS HOLDINGS INC.
(individually and as lead arranger and administrative agent for itself and certain co-lenders),
as Lender

Dated:  August 2, 2007

## TABLE OF CONTENTS

Page

I    DEFINITIONS; PRINCIPLES OF CONSTRUCTION.................................................2

    Section 1.1    Capitalized Terms.................................................................2

    Section 1.2    Principles of Construction ...................................................2

II    GENERAL TERMS ..................................................................................3

    Section 2.1    Loan Commitment; Disbursement to Borrower .......................3

    Section 2.2    Mandatory Prepayments ......................................................3

    Section 2.3    Fees..................................................................................3

    Section 2.4    Intentionally Reserved.........................................................3

    Section 2.5    Additional Fee ...................................................................3

    Section 2.6    Application of Prepayments on the Loan .................................4

    Section 2.7    Interest Rate Cap Agreement................................................4

    Section 2.8    Optional Method for Payment of Interest................................6

III    CONDITIONS PRECEDENT.....................................................................7

IV    REPRESENTATIONS AND WARRANTIES .................................................7

    Section 4.1    Borrower Representations ....................................................7

    Section 4.2    Survival of Representations................................................18

V    BORROWER COVENANTS ....................................................................18

    Section 5.1    Existence; Compliance with Legal Requirements...................19

    Section 5.2    Hazardous Substances .......................................................19

    Section 5.3    Certain Prohibited Actions ................................................19

    Section 5.4    Taxes and Other Charges...................................................20

    Section 5.5    Performance of Agreements ...............................................21

    Section 5.6    Notices ............................................................................21

    Section 5.7    Access to Premises ...........................................................21

    Section 5.8    Compliance......................................................................21

    Section 5.9    Cooperate in Legal Proceedings .........................................21

    Section 5.10    Insurance Benefits and Condemnation Proceeds....................21

    Section 5.11    Further Assurances ..........................................................22

    Section 5.12    Financial Reporting .........................................................22

    Section 5.13    Title to the Property.........................................................24

    Section 5.14    Estoppel Statements..........................................................24

i

# TABLE OF CONTENTS
## (continued)

|  |  |  | Page |
|---|---|---|---|
| Section 5.15 | Leasing Matters | | 25 |
| Section 5.16 | Business Purposes | | 27 |
| Section 5.17 | Property Manager | | 28 |
| Section 5.18 | Contracts | | 29 |
| Section 5.19 | Access Laws | | 30 |
| Section 5.20 | Operation of Property | | 30 |
| Section 5.21 | Maintenance of Property; Payment for Labor and Materials | | 31 |
| Section 5.22 | Transfer or Encumbrance of the Property | | 31 |
| Section 5.23 | ERISA | | 34 |
| Section 5.24 | Affiliate Transaction | | 35 |
| Section 5.25 | Service Rights | | 35 |
| Section 5.26 | Purchase Options | | 35 |
| Section 5.27 | Confirmation of Representations, Warranties and Covenants | | 35 |
| Section 5.28 | Subdivision Maps | | 35 |
| Section 5.29 | Cash Management | | 36 |
| Section 5.30 | Intentionally Reserved | | 36 |
| Section 5.31 | Intentionally Reserved | | 36 |
| Section 5.32 | Equity Contribution | | 36 |
| Section 5.33 | Anti-Terrorism | | 36 |
| VI | CASUALTY; CONDEMNATION; ESCROWS | | 38 |
| Section 6.1 | Insurance; Casualty and Condemnation | | 38 |
| Section 6.2 | Tax and Insurance Escrows | | 46 |
| VII | DEFAULTS | | 47 |
| Section 7.1 | Event of Default | | 47 |
| Section 7.2 | Remedies | | 51 |
| Section 7.3 | Right of Entry | | 53 |
| Section 7.4 | Costs of Enforcement | | 54 |
| Section 7.5 | Violation of Legal Requirements | | 54 |
| Section 7.6 | Remedies Cumulative | | 54 |
| VIII | SECONDARY MARKET TRANSACTIONS AND CO-LENDING | | 55 |
| Section 8.1 | Generally | | 55 |
| Section 8.2 | Co-Lending | | 57 |

LEGAL_US_E # 74780894.5 35267.00105

# TABLE OF CONTENTS
## (continued)

| | | Page |
|---|---|---|
| Section 8.3 | Several Liability | 59 |
| Section 8.4 | Appointment | 60 |
| Section 8.5 | Reliance on Agent | 60 |
| Section 8.6 | Powers | 60 |
| Section 8.7 | Intentionally Omitted | 60 |
| Section 8.8 | Intentionally Omitted | 60 |
| Section 8.9 | Approval of Loan Documents | 60 |
| Section 8.10 | Agency Provisions Relating to Collateral | 61 |
| Section 8.11 | Lender Actions Against Borrower or the Collateral | 61 |
| Section 8.12 | Assignment and Participation | 61 |
| Section 8.13 | Intentionally Omitted | 61 |
| Section 8.14 | General Immunity | 61 |
| Section 8.15 | No Responsibility for Loan, Recitals, Etc | 61 |
| Section 8.16 | Action on Instructions of Lenders | 61 |
| Section 8.17 | Employment of Agents and Counsel | 62 |
| Section 8.18 | Reliance on Documents; Counsel | 62 |
| Section 8.19 | Rights as a Lender | 62 |
| Section 8.20 | Successor Agent | 62 |
| Section 8.21 | Costs of Secondary Market Transactions | 62 |
| IX | EXCULPATION | 62 |
| Section 9.1 | Non-Recourse Provisions | 62 |
| Section 9.2 | Partial Recourse | 63 |
| Section 9.3 | Full Recourse | 64 |
| Section 9.4 | Recourse Events | 65 |
| Section 9.5 | No Waiver | 65 |
| X | INDEMNIFICATION | 66 |
| Section 10.1 | General Indemnification | 66 |
| Section 10.2 | ERISA Indemnification | 67 |
| Section 10.3 | Duty to Defend; Attorneys' Fees and Other Fees and Expenses | 67 |
| Section 10.4 | Changes in Laws Regarding Taxation | 67 |
| Section 10.5 | No Credits on Account of the Debt | 68 |
| Section 10.6 | Recording of Security Instruments | 68 |

LEGAL_US_E # 74780894.5 35267.00105

# TABLE OF CONTENTS
## (continued)

| | | | Page |
|---|---|---|---|
| | Section 10.7 | Brokers and Financial Advisors | 68 |
| XI | WAIVERS | | 69 |
| | Section 11.1 | Waiver of Counterclaim | 69 |
| | Section 11.2 | Marshalling and Other Matters | 69 |
| | Section 11.3 | Waiver of Notice | 69 |
| | Section 11.4 | Trial by Jury | 70 |
| XII | MISCELLANEOUS | | 70 |
| | Section 12.1 | Survival | 70 |
| | Section 12.2 | Governing Law. | 70 |
| | Section 12.3 | Modification; Waiver in Writing | 72 |
| | Section 12.4 | Delay Not a Waiver | 72 |
| | Section 12.5 | Notices | 72 |
| | Section 12.6 | Headings | 74 |
| | Section 12.7 | Severability | 74 |
| | Section 12.8 | Preferences | 74 |
| | Section 12.9 | Expenses | 75 |
| | Section 12.10 | Relationship of Borrower and Lender | 76 |
| | Section 12.11 | No Joint Venture or Partnership; No Third Party Beneficiaries | 76 |
| | Section 12.12 | Publicity | 77 |
| | Section 12.13 | Subrogation | 77 |
| | Section 12.14 | Duplicate Originals; Counterparts | 77 |
| | Section 12.15 | Liability | 77 |
| | Section 12.16 | Prior Agreements | 77 |
| | Section 12.17 | No Usury | 77 |
| | Section 12.18 | Construction | 78 |
| | Section 12.19 | Lender's Discretion | 78 |
| | Section 12.20 | Lender | 79 |
| | Section 12.21 | Limitation on Liability | 80 |
| | Section 12.22 | Lockbox | 80 |
| | Section 12.23 | Appointment of Servicer and Delegation of Lender Rights | 80 |
| | Section 12.24 | Cross-Default | 80 |
| | Section 12.25 | Delay Outside Lender's Control | 81 |

LEGAL_US_E # 74780894.5 35267.00105

# TABLE OF CONTENTS
## (continued)

| | | | Page |
|---|---|---|---|
| XIII | CONVERSION TO CONDOMINIUM | | 81 |
| | Section 13.1 | Submission | 81 |
| | Section 13.2 | Unit Sales Contracts | 83 |
| | Section 13.3 | Sales Contract Deposits | 83 |
| | Section 13.4 | Monthly Sales Contract Reports | 84 |
| | Section 13.5 | After Conversion to Condominium | 84 |
| | Section 13.6 | Unit Releases | 86 |
| | Section 13.7 | Application of Net Sales Proceeds | 87 |
| | Section 13.8 | Borrower's Covenants and Warranties | 87 |

SCHEDULES

| | |
|---|---|
| Schedule I | Definitions |
| Schedule II | Conditions Precedent |
| Schedule III | Pending Litigation |
| Schedule IV | Disclosure Schedule |
| Schedule V | Leasing Guidelines |
| Schedule VI | Release Prices |
| Schedule VII | Acquisition and Pre-Development Budget |

EXHIBITS

| | |
|---|---|
| Exhibit A | Chart of Ownership Structure |
| Exhibit B | Violations |

LEGAL_US_E # 74780894.5 35267.00105

# MASTER CREDIT AGREEMENT

THIS MASTER CREDIT AGREEMENT, dated as of August 2, 2007 (as such agreement may be amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), is among LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, (individually and as lead arranger and administrative agent for itself and certain co-lenders), having an address at 399 Park Avenue, 8th Floor, New York, New York 10022 ("**Lender**"), and HALE AVENUE BORROWER, LLC, a Delaware limited liability company ("**Borrower**"), having an address at c/o Gurevich & Associates, LLP, 216 East 49th Street, 5th Floor, New York, New York 10017.

## W I T N E S S E T H:

A.     Borrower has applied to Lender for a loan of up to $16,487,792.22, which shall consist of (i) an acquisition loan in the amount of $14,057,792.22 to finance the acquisition of the Property (the "**Acquisition Loan**") and (ii) a project loan in the amount of $2,430,000.00 to, among other things, finance certain non-construction development costs of the Improvements (the "**Project Loan**"; the Acquisition Loan and the Project Loan are sometimes collectively referred to herein as the "**Loan**").

B.     To evidence the Acquisition Loan, Borrower has executed and delivered in favor of Lender an Acquisition Loan Promissory Note of even date herewith in the maximum principal amount of $14,057,792.22 (as amended, restated, replaced, supplemented, split, severed, consolidated, assigned or otherwise modified from time to time, the "**Acquisition Loan Note**"). The Acquisition Loan shall be advanced and repaid in accordance with this Agreement and the Acquisition Loan Note. To secure the Acquisition Loan Note, Borrower has granted for the benefit of Lender inter alia, (i) that certain Acquisition Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Financing Statement of even date herewith encumbering the Project (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Acquisition Loan Mortgage**") and (ii) that certain Absolute Assignment of Rents and Leases of even date herewith (as amended, restated, replaced, supplemented, or otherwise modified from time to time, "**Assignment of Rents and Leases**").

C.     To evidence the Project Loan, Borrower has executed and delivered in favor of Lender a Project Loan Promissory Note of even date herewith in the maximum principal amount of $2,430,000.00 (as amended, restated, replaced, supplemented, split, severed, consolidated, assigned or otherwise modified from time to time, the "**Project Loan Note**"). The Project Loan shall be advanced and repaid in accordance with this Agreement and that certain Project Loan Agreement between Borrower and Lender of even date herewith (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Project Loan Agreement**"). To secure the Project Loan Note, Borrower has granted for the benefit of Lender, inter alia, (i) that certain Project Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Financing Statement of even date herewith encumbering the Project (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Project Loan Mortgage**") and (ii) the Assignment of Rents and Leases.

D.    Borrower intends to develop upon the Land a residential and commercial condominium apartment complex (the "**Condominium**") consisting of approximately (i) 35,381 net sellable square feet of community facility unit(s) below grade and on the ground and mezzanine floors, (ii) 25,115 net sellable square feet of commercial space below grade and on the ground floor of a newly constructed structure adjacent to the existing improvements located on the Land (collectively, the "**Retail Units**") and (iii) approximately 97,264 net sellable square feet of residential condominium units on the remaining floors (collectively, the "**Residential Units**"), all to be constructed on the Land in accordance with the Plans and Specifications (as hereinafter defined).  The Land, the Improvements (including the Condominium) and all related improvements and facilities, now or hereafter existing, whether above or below ground/street level, together with all rights, privileges, easements, hereditaments and appurtenances thereunto relating or appertaining, and all fixtures and equipment required for, or otherwise intended for use in connection with, the operation thereof, are sometimes collectively referred to herein as the "**Project**".

NOW, THEREFORE, in consideration of the making of the Loan by Lender to Borrower and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## I    DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1    Capitalized Terms**.  All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in **Schedule I** attached hereto.

**Section 1.2    Principles of Construction**.  All references to sections, schedules and exhibits are to sections, schedules and exhibits in or to this Agreement unless otherwise specified.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined and "including" means including without limitation.  Whenever the context requires, each gender shall include all other genders.  All exhibits and schedules attached hereto are incorporated herein by reference for all purposes.

## II    GENERAL TERMS

**Section 2.1    Loan Commitment; Disbursement to Borrower**.

**Section 2.1.1    The Loan**.

(a)    Subject to and upon the terms and conditions set forth herein and the other Loan Documents, Lender hereby agrees to make the Loan to Borrower on the Closing Date in the original principal amount of up to $16,487,792.22; provided, however, that (a) the proceeds of the Acquisition Loan shall be fully funded in one Advance on the Closing Date and applied to (i) the refinancing of existing indebtedness incurred by Borrower in connection with its acquisition of the Land and existing improvements located thereon and (ii) certain closing costs incurred by Borrower in connection with the making of the Loan, each in accordance with the terms and conditions of this Agreement; and (b) the proceeds of the Project Loan shall be funded

in more than one Advance in accordance with the terms and conditions of the Project Loan Agreement to be applied by Borrower to, among other things, the costs of the Pre-Development Work. The Loan shall be evidenced by the Notes. Borrower hereby agrees to accept the Loan and to use the proceeds thereof only as provided herein and in the Project Loan Agreement. All of the obligations of Borrower arising under this Agreement and the other Loan Documents shall constitute one joint and several obligation of Borrower, secured by the Property. Any amount borrowed and repaid in respect of the Loan may not be reborrowed.

(b)    <u>Holdbacks</u>. Notwithstanding anything to the contrary contained herein, Lender shall only disburse a portion of the Loan proceeds to Borrower on the Closing Date. A portion of the Project Loan proceeds not disbursed to Borrower on the Closing Date in the aggregate amount of $770,000.00 (the "**WCR Holdback**") shall be advanced as set forth in <u>Section 2.8</u> of this Agreement and the Reserve Agreement. A portion of the Loan proceeds not disbursed to Borrower on the Closing Date in the amount of $1,550,000.00 (the "**Interest Holdback**") shall be advanced by the making of Future Interest Fundings as set forth in <u>Section 2.9</u> of this Agreement and the Reserve Agreement. A portion of the Loan proceeds not disbursed to Borrower on the Closing Date in the aggregate amount of $110,000.00 (the "**Tax and Insurance Holdback**") shall be advanced as set forth in <u>Section 2.10</u> of this Agreement and the Reserve Agreement. A portion of the Loan proceeds not disbursed to Borrower on the Closing Date in the aggregate amount of $118,260.00 (the "**Existing Violations Holdback**") shall be advanced as set forth in <u>Section 2.11</u> of this Agreement. Notwithstanding anything to the contrary contained herein, in the event of a Securitization and in accordance with <u>Section 2.12</u> below, any and all unfunded amounts remaining in the WCR Holdback, the Interest Holdback, the Tax and Insurance Holdback and the Existing Violations Holdback shall be automatically disbursed to the Working Capital Reserve, the Interest Reserve, the Tax and Insurance Reserve and the Existing Violations Reserve, respectively, without any requirement that Borrower consent to such advances.

**Section 2.1.2    Use of Proceeds**. Borrower shall use the proceeds of the Loan in accordance with the Certificate of Sources and Uses of Funds and for no other purpose.

**Section 2.2    Mandatory Prepayments**. At the Lender's discretion, the Loan is subject to mandatory prepayment in certain instances of Casualty and Condemnation (each, a "**Casualty/Condemnation Involuntary Prepayment**"), in the manner and to the extent set forth in this Agreement. Each Casualty/Condemnation Involuntary Prepayment not made on a Payment Date shall include all accrued and unpaid interest that would have accrued on such prepayment through the next Payment Date.

**Section 2.3    Fees**. On the date of execution of this Agreement, Borrower shall pay to Lender the Origination Fee as a fee for Lender arranging the Loan.

**Section 2.4    Intentionally Reserved**.

**Section 2.5    Additional Fee**. The Additional Fee shall be deemed earned in full as of the Closing Date and shall be payable on the earliest to occur of the date of prepayment of the Loan, the Maturity Date or the occurrence of an Event of Default.

**Section 2.6    Application of Prepayments on the Loan**. Notwithstanding anything to the contrary contained in this Agreement, the other Loan Agreements, the Notes or any of the other Loan Documents, all prepayments of the Loan shall, in the absence of an Event of Default, be applied by Lender on a pro-rata basis between the Notes based on the outstanding principal balance of each Note on the date of such prepayment. All other prepayments of the Loan, whether voluntary or involuntary, mandatory or optional and including all prepayments made following the occurrence of an Event of Default, may be applied by Lender as Lender, in its discretion, may determine.

**Section 2.7    Interest Rate Cap Agreement**.

(a)    On or before the date which is one hundred and twenty (120) days after the Closing Date, Borrower shall obtain, or cause to be obtained, and shall thereafter maintain in effect, an Interest Rate Cap Agreement with an Acceptable Counterparty, which shall be coterminous with the Loan, shall have a notional amount not less than the aggregate principal amount of the Loan and shall at all times have a LIBOR Rate strike rate equal to the Strike Rate. The Acceptable Counterparty shall be obligated under such Interest Rate Cap Agreement to make monthly payments equal to the excess of the LIBOR Rate over the Strike Rate, calculated on the notional amount. The notional amount of the Interest Rate Cap Agreement may be reduced (and Lender shall consent to such reduction) from time to time in amounts equal to any prepayment of the principal (if any) of the Loan in accordance with the applicable Notes and the other Loan Documents. The Interest Rate Cap Agreement shall be written on the then current standard ISDA documentation, and shall provide for interest periods and calculations consistent with the payment terms of this Agreement.

(b)    On or before the Closing Date, Borrower shall collaterally assign to Lender, pursuant to that certain Assignment of Interest Rate Cap Agreement, in form and substance reasonably satisfactory to Lender, all of its right, title and interest to receive any and all payments under the Interest Rate Cap Agreement (and any related guarantee, if any) and shall deliver to Lender an executed counterpart of such Interest Rate Cap Agreement and notify the Acceptable Counterparty of such collateral assignment (either in such Interest Rate Cap Agreement or by separate instrument). The Acceptable Counterparty shall agree in writing to make all payments it is required to make under each such Interest Rate Cap Agreement directly to Lender. At such time as the Loan is repaid in full, all of Lender's right, title and interest in the Interest Rate Cap Agreement shall terminate and Lender shall promptly execute and deliver at Borrower's sole cost and expense, such documents as may be required to evidence Lender's release of such Interest Rate Cap Agreement and to notify the Acceptable Counterparty of such release.

(c)    Borrower shall comply with all of its obligations under the terms and provisions of the Interest Rate Cap Agreement. All amounts paid by the Acceptable Counterparty under the Interest Rate Cap Agreement shall be deposited immediately into a deposit account controlled by Lender. Borrower shall take all actions reasonably requested by Lender to enforce Lender's rights under the Interest Rate Cap Agreement in the event of a default by the Acceptable Counterparty and shall not waive, amend or otherwise modify any of its rights thereunder.

(d)    In the event of any downgrade, withdrawal or qualification of the rating of the Acceptable Counterparty below "AA-" by Standard & Poor's Rating Group, "Aa3" by Moody's Investors Service, Inc. or an equivalent credit rating by any other Rating Agency, Borrower shall within fifteen (15) days following receipt of notice from Lender or Servicer of such downgrade, withdrawal or qualification, either (x) cause such Acceptable Counterparty to post collateral on terms acceptable to each Rating Agency or (y) replace the Interest Rate Cap Agreement then in effect with a Replacement Interest Rate Cap Agreement with an Acceptable Counterparty acceptable to each Rating Agency.  Notwithstanding the foregoing, if the Acceptable Counterparty's rating is downgraded to "A" (or the equivalent) or lower, only the option described in subclause (y) above will be acceptable.

(e)    In the event that Borrower fails to purchase and deliver to Lender the Interest Rate Cap Agreement or any Replacement Interest Rate Cap Agreement as and when required hereunder, Lender may purchase such Interest Rate Cap Agreement and the cost incurred by Lender in purchasing such Interest Rate Cap Agreement shall be paid by Borrower to Lender with interest thereon at the Default Rate from the date such cost was incurred by Lender until such cost is paid by Borrower to Lender.

(f)    Each Interest Rate Cap Agreement shall contain the following language or its equivalent: "In the event of any downgrade, withdrawal or qualification of the rating of the Acceptable Counterparty below "AA-" by Standard & Poor's Rating Group, "Aa3" by Moody's Investors Service, Inc. or an equivalent credit rating by any other Rating Agency, the Acceptable Counterparty must, within fifteen (15) days, either (x) post collateral on terms acceptable to each Rating Agency or (y) find a replacement Acceptable Counterparty, at the Acceptable Counterparty's sole cost and expense, acceptable to each Rating Agency (notwithstanding the foregoing, if the Acceptable Counterparty's rating is downgraded to "A" or lower, only the option described in subclause (y) above will be acceptable); provided that, notwithstanding such a downgrade, withdrawal or qualification, unless and until the Acceptable Counterparty transfers the Interest Rate Cap Agreement to a replacement Acceptable Counterparty pursuant to the foregoing clause (y), the Acceptable Counterparty will continue to perform its obligations under the Interest Rate Cap Agreement.  Failure to satisfy the foregoing shall constitute an Additional Termination Event as defined by Section 5(b)(v) of the ISDA Master Agreement, with the Acceptable Counterparty as the Affected Party."

(g)    In connection with an Interest Rate Cap Agreement, Borrower shall obtain and deliver to Lender an opinion of counsel from counsel for the Acceptable Counterparty (upon which Lender and its successors and assigns may rely) acceptable to Lender in its discretion, which opinion shall provide, in relevant part, that:

(i)    the Acceptable Counterparty is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Cap Agreement;

(ii)    the execution and delivery of the Interest Rate Cap Agreement by the Acceptable Counterparty, and any other agreement which the Acceptable Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have

been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

(iii)    all consents, authorizations and approvals required for the execution and delivery by the Acceptable Counterparty of the Interest Rate Cap Agreement, and any other agreement which the Acceptable Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and

(iv)    the Interest Rate Cap Agreement, and any other agreement which the Acceptable Counterparty has executed and delivered pursuant thereto, has been duly executed and delivered by the Acceptable Counterparty and constitutes the legal, valid and binding obligation of the Acceptable Counterparty, enforceable against the Acceptable Counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

**Section 2.8    WCR Holdback**.  Upon Borrower's (or Servicer's) delivery to Lender of a WCR Advance Request at least five (5) Business Days prior to the requested date of any advance of the WCR Holdback, and provided further that both immediately prior to the making of any such advance of the WCR Holdback and also after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, then Lender shall advance all or a portion of the WCR Holdback in amount equal to amount specified in such WCR Advance Request for deposit directly into the Working Capital Reserve (and for no other purpose) to be further disbursed to Borrower for purposes of paying all costs incurred by Borrower in connection with the performance of the Pre-Development Work in accordance with the terms hereof and of the Reserve Agreement.  Borrower shall not make a request for an advance of the WCR Holdback more frequently than once in any calendar month.  Any disbursements from the WCR Holdback to the Working Capital Reserve shall be deemed to have been paid to and received by Borrower upon disbursement thereof (and regardless of whether or not such amounts are ever disbursed from the Working Capital Reserve) and shall be added to the outstanding principal balance of the Note and shall bear interest at the Applicable Interest Rate.  Interest at the Applicable Interest Rate will be charged on any disbursed portion of the WCR Holdback as and when advanced (and regardless of whether or not such amounts are ever disbursed from the Working Capital Reserve), but interest will not be charged on the undisbursed portion of the WCR Holdback; provided, however, that no advance of the WCR Holdback shall be made from the period commencing on the first day following a Payment Date through and including the last day of the related Interest Period.

**Section 2.9    Interest Holdback; Future Interest Fundings.**  On each Payment Date, provided no Event of Default has occurred and is continuing beyond any applicable notice and cure periods, Lender shall advance funds from the Interest Holdback, by ledger entry on the

books of Lender, to pay directly to Lender all or any portion of the accrued interest on the Notes due on such Payment Date as more particularly set forth in the Reserve Agreement.

      **Section 2.10   Tax and Insurance Holdback**.  Subject to the terms and provisions of <u>Section 5.4</u> of this Agreement, pursuant to Borrower's written request made to Lender at least five (5) Business Days prior to the requested date of any advance of the Tax and Insurance Holdback, and provided further that both immediately prior to the making of any such advance of the Tax and Insurance Holdback and also after giving effect thereto, no Event of Default shall have occurred and be continuing beyond any applicable notice and cure periods, Lender shall advance all or a portion of the Tax and Insurance Holdback for deposit directly into the Tax and Insurance Reserve (and for no other purpose) to be further disbursed to Borrower in accordance with the terms of the Reserve Agreement.

      **Section 2.11   Existing Violations Holdback**.  Upon Borrower's delivery of evidence to Lender (in form and substance reasonably acceptable to Lender) that each of the violations described on <u>Exhibit B</u> attached hereto shall have been fully cured and settled and provided that Default or Event of Default shall have occurred and be continuing, then Lender shall advance the funds in the Existing Violation Holdback into the Existing Violation Reserve (and for no other purpose) to be further disbursed to Borrower.  Interest at the Applicable Interest Rate will be charged on any disbursed portion of the Existing Violations Holdback as and when advanced (and regardless of whether or not such amounts are ever disbursed from the Exising Violations Reserve).

      **Section 2.12   Funding of Reserves Upon Securitization**.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon a Securitization of the Loan, any or a portion of unfunded amounts under any Loan may be advanced and deposited into reserve accounts controlled by Lender.  Any such advance of the Loans and deposit into the reserve accounts shall be deemed to have been paid to and received by Borrower and shall be added to the outstanding principal balance of the applicable Loan and shall bear interest at the Applicable Interest Rate (as defined in the applicable Note).  Amounts in such reserve accounts shall be disbursed to Borrower only upon satisfaction of the same conditions that would have been required for an Advance of such amounts under the applicable Loan Documents.

### III   CONDITIONS PRECEDENT

      As a material inducement to Lender to make the Loan, Borrower hereby represents and warrants to Lender that Borrower has satisfied (except to the extent specifically set forth on **Schedule IV**) all of the conditions precedent set forth in **Schedule II** attached hereto, and Borrower acknowledges that Lender would not fund the Loan unless all of such conditions precedent were satisfied (or waived in writing by Lender) by the Closing Date.

### IV   REPRESENTATIONS AND WARRANTIES

      **Section 4.1   Borrower Representations**.  Borrower represents and warrants to the Lender as of the date hereof and as of the date of each Advance, except as otherwise disclosed on the Disclosure Schedule attached hereto as **Schedule IV** that:

(a)    Organization. To the best of Borrower's knowledge, Borrower has been duly organized and is validly existing and in good standing in the jurisdiction in which it is organized. Borrower is duly qualified to do business and is in good standing in the State of New York and in each jurisdiction where Borrower is required to be so qualified in connection with its properties, businesses and operations, including without limitation, the State of Delaware. Borrower has all necessary rights, Licenses, permits, authorizations, approvals, governmental and otherwise, and full power and authority to own the Property and carry on its business as now conducted and proposed to be conducted. Borrower has the full right, power and authority to operate and lease the Property, to encumber the Property as provided herein and to perform all of the other obligations to be performed by Borrower under the Loan Documents. The sole business of Borrower is the ownership, constructions, development and operation of the Project as a commercial/residential condominium and the disposition of the related Units in the Project and such other matters as are related and incidental to the foregoing.

(b)    Enforceability. Each Borrower Party has taken all necessary action to authorize the execution, delivery and performance of the obligations of this Agreement and the other Loan Documents to which it is a party, and such obligations shall be the valid and binding obligations of the respective Borrower Parties. This Agreement and such other Loan Documents to which any Borrower Party is a party have been duly executed and delivered by or on behalf of such Borrower Party and such Borrower Party has obtained or received all required consents and approvals, corporate, governmental or otherwise, and this Agreement and such other Loan Documents to which such Borrower Party is a party constitute legal, valid and binding obligations of such Borrower Party enforceable against such Borrower Party in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization and similar laws affecting rights of creditors generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law). The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by any Borrower Party, including the defense of usury or similar doctrines, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable except to the extent such unenforceability may be the result of bankruptcy, insolvency, reorganization or similar laws affecting rights of creditors generally or general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law), and Borrower has not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

(c)    No Conflicts. The execution and delivery of this Agreement and the other Loan Documents and the performance of the obligations thereunder by the Borrower Parties will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, operating agreement, certificate of incorporation, bylaws or any other agreement or instrument to which Borrower is a party or by which any of Borrower's properties or assets are subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or Governmental Authority having jurisdiction over Borrower or any of Borrower's respective properties or assets, and any consent, approval, authorization, order, License, registration or qualification of or with any court or any such regulatory authority or

other Governmental Authority or body required for the execution, delivery and performance by the Borrower Parties of this Agreement or any other Loan Documents has been obtained and is in full force and effect.

(d)    <u>Litigation</u>. To the best of Borrower's knowledge, there are no actions, suits, proceedings or investigations at law or in equity now pending or, to Borrower's best knowledge, threatened against or affecting any Borrower Party or the Property, other than as described on **Schedule III**.

(e)    <u>Agreements</u>. Borrower is not a party to any agreement or instrument or subject to any restriction, which has a Material Adverse Effect on Borrower or the Property. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which Borrower is a party or by which Borrower or the Property is bound. Borrower has no Indebtedness under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation of the Property and (b) obligations under the Loan Documents.

(f)    <u>Title</u>. Borrower has good, marketable and insurable fee simple title to the real property comprising the Property, free and clear of all Liens whatsoever except the Permitted Encumbrances. The Security Instruments, when properly recorded in the appropriate records, together with the Uniform Commercial Code financing statements filed in connection with the Loan, will create (i) valid, perfected Liens on the Property, subject only to the Permitted Encumbrances and (ii) perfected security interests in and to (or perfected collateral assignments of), all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances. The Permitted Encumbrances do not materially and adversely affect the value of the Property, the use of the Property for the use being made thereof as of the date of this Agreement, the operation of the Property or Borrower's ability to repay the Loan in full. To the best of Borrower's knowledge, there are no claims for payment for work, labor or materials affecting the Property, which will become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents. Borrower has paid in full for, and is the owner of, all furnishings, fixtures and equipment used in connection with the operation of the Property, free and clear of any and all security interests, Liens or encumbrances, except the Liens and security interest created by the Loan Documents. There are no prior assignments of Leases or any portion of the Rents due and payable or to become due and payable, which are presently outstanding. There are no options, rights of first refusal, rights of first offer or similar rights, which affect the Property or any portion thereof.

(g)    <u>No Bankruptcy Filing</u>. (A) (i) Borrower is solvent (within the meaning of all Bankruptcy Laws) and no bankruptcy, reorganization, insolvency or similar proceeding with respect to any Borrower Party under any Bankruptcy Law has been initiated, and (ii) the entering into the Loan Documents to which any Borrower Party is a party does not constitute a fraudulent conveyance by any Person; and (B) no petition in bankruptcy has been filed by or against Borrower, any Borrower Party, or any Affiliate of Borrower or any Borrower Party in the last seven (7) years, and none of Borrower, any Borrower Party, or any related entity, or any principal, any general partner or member thereof, in the last seven (7) years has ever made any

assignment for the benefit of creditors or taken advantage of any applicable Bankruptcy Laws. To the best of Borrower's knowledge, no Borrower Party has entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and each Borrower Party has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total liabilities, including subordinated, unliquidated, disputed or contingent liabilities, including the maximum amount of its contingent liabilities and its debts as such debts become absolute and matured. Borrower's assets are not currently and, immediately following the execution and delivery of the Loan Documents will not constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, nor does it believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of the obligations of Borrower).

(h)    Full and Accurate Disclosure. No statement of fact made by any of the Borrower Parties in this Agreement or in any of the other Loan Documents, nor any written materials relating to the business, operations or condition (financial or otherwise) of any of the Borrower Parties or the Property that were supplied to Lender in connection with Lender's due diligence investigation (other than financial projections in respect of which no representation is made) contains (or, in the case of such written material, at the time supplied contained) any untrue statement of a material fact or omits (or omitted, as the case may be) to state any material fact necessary to make the statements contained therein or in any of the Loan Documents not misleading.

(i)    Regulatory. None of the Borrower Parties is an "employee benefit plan" (as defined in Section 3(3) of ERISA), subject to Title I of ERISA, and none of the assets of the Borrower Parties constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101. In addition, (i) none of the Borrower Parties is a "governmental plan" within the meaning of Section 3(32) of ERISA and (ii) transactions by or with any of the Borrower Parties are not subject to state statutes regulating investments of, and fiduciary obligations with respect to, governmental plans. No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents. Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the Code. Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (iii) subject to any other federal or state law or regulation which purports to restrict or regulate Borrower's ability to borrow money.

(j)     Compliance. To the best of Borrower's knowledge, Borrower and the Property (and the uses thereof) comply with all applicable Legal Requirements in all material respects. Borrower has obtained and will obtain all necessary certificates, licenses and other approvals, governmental and otherwise, and all required zoning, building code, land use, environmental and other similar permits or approvals (collectively, the "**Licenses**"), including certificates of completion and certificates of occupancy, necessary for the construction and operation of the Property for its intended uses and for the conduct of Borrower's business and each Tenant's business and all such Licenses remain in full force and effect. To the best of Borrower's knowledge, there exists no fact or circumstance that would subject any of the foregoing to revocation, suspension, forfeiture or modification. Neither Borrower nor the Property is in default or violation of any material order, writ, injunction, decree or demand of any Governmental Authority. There has not been committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. The Plans and Specifications, the construction contemplated pursuant thereto and the use of the Property contemplated thereby comply and shall comply with applicable Legal Requirements, including all applicable zoning resolutions, building codes and Environmental Laws. The Project is a permitted use under applicable zoning laws and under all covenants, conditions or agreements affecting the Project, including but not limited to any set back restrictions, any zoning lot restrictions, and any zoning lot and development agreements. The Project is in compliance with all applicable land use laws, regulations and ordinances and all covenants, conditions or agreements affecting the Project, including but not limited to any set back restrictions, any zoning lot restrictions, and any zoning lot and development agreements. The Project is zoned in accordance with all applicable governmental rules, ordinances, regulations and laws so as to permit the Improvements and Borrower is not aware of any problem or requirement respecting zoning ordinances, rules or regulations or any covenants, conditions, easements, restrictions or agreement affecting the Project, including but not limited to any set back restrictions, any zoning lot restrictions, and any zoning lot and development agreements that would jeopardize the existence, operation or construction of the Project, the completion of the Improvements or the demolition of the existing improvements located on the Property on the Closing Date. To the best of Borrower's knowledge, there are no pending or threatened actions, suits or proceedings to revoke, attack, invalidate, rescind or modify the zoning of the Project, or any governmental approvals heretofore issued with respect to the Project or any part thereof, or asserting that such governmental approvals or the zoning of the Project do not permit the use of the Improvements and the rest of the Project as contemplated by the Loan Documents.

(k)     Financial Information.

(i)     The rent rolls (if applicable), balance sheets, income statements and statements of cash flow and other financial data that have been delivered to Lender in respect of the Property and each applicable Borrower Party, including those required under **Article III** (A) are with respect to those items relating to each Borrower Party and the Property, true, complete and correct in all material respects, (B) accurately represent the financial condition of the Property and/or the applicable Borrower Party as of the date of such reports or statements and contain no material misrepresentation or omission, and (C) have been prepared in accordance

with Acceptable Accounting Principles consistently applied throughout the periods covered, except as disclosed therein, and (D) have not been amended, modified or revised in any manner. Borrower has no material Indebtedness, liabilities, contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that may have a Material Adverse Effect, except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no Material Adverse Change in the financial condition, operations or business of Borrower, any Borrower Party, or, to the best knowledge of Borrower, the Property from that set forth in said financial statements.

(ii)    Each Borrower Party (other than Gennady Kiselman) has and, to the best knowledge of Borrower, Gennady Kiselman has, filed all federal, state, county, municipal, and city income and other tax returns required to have been filed by them and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by them. No Borrower Party knows of any basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

(l)    <u>Casualty; Condemnation and Assessments</u>. The Property is free from damage by Casualty. No Condemnation or other proceeding has been commenced or, to the best of Borrower's knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of any roadways providing access to the Property or for any easements or public right-of-ways. To the best of Borrower's knowledge, there are no pending or proposed special or other assessments for public improvements affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments, and to the knowledge of the Borrower, there are no other facts or circumstances which would cause the Taxes and Other Charges for the Property for the Fiscal Year in which the Closing Date occurs or the next following Fiscal Year to be significantly higher than the Taxes and Other Charges for the Property assessed and imposed for the Fiscal Year prior to the Fiscal Year in which the Closing Date occurs.

(m)    <u>Insurance</u>. Borrower has obtained and has delivered to Lender a certificate(s) of insurance satisfactory to Lender reflecting the insurance coverages, amounts and other requirements set forth in this Agreement and there have been no acts or omissions that would impair the coverage of any such Policies or the benefits of the mortgagee endorsements and, unless previously delivered to Lender, Borrower shall deliver to Lender certified copies of all such Policies within ten (10) Business Days following the date of this Agreement.

(n)    <u>Use; Certificate of Occupancy; Licenses; Utilities</u>. The existing improvements on the Property are currently vacant and will remain so throughout the term of the Loan. To the best of Borrower's knowledge, the Property has rights of access to public ways and is served by public water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its current and any intended use. All public utilities necessary for the use and the enjoyment of the Property are located either in the public rights-of-way abutting the Property (which are connected so as to serve the Property without passing through other property) or in recorded easements serving the Property and such easements are set forth and insured in the Title Insurance Policies. All roads and other access necessary for the current and any intended use of the Property have been completed and dedicated to public use and accepted by all Governmental

Authorities and are adequate for the Property's current and intended use. As of the date hereof, the Property is, as-of-right, subject to the tax exemption benefits afforded under Section 421-a of the Real Property Tax Law of New York.

(o)    Physical Condition. The Project, including the Improvements and all portions thereof, is and shall be in good condition, order and repair in all material respects. To the best of Borrower's knowledge, there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Borrower has not received notice from any insurance company, bonding company or any other Person of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any Policy or bond. All costs and expenses of any and all labor, materials, supplies and equipment used in the construction of the Improvements have been paid in full.

(p)    Survey; Flood Zone; Separate Tax Lot. The Survey for the Property delivered to Lender in connection with this Agreement has been prepared in accordance with the provisions of Section (b)(iv) of **Schedule II**. To the best of Borrower's knowledge, all of the Improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no Improvements on adjoining properties encroach upon the Property, no easements or other encumbrances upon the Property encroach upon any of the Improvements. The Property is comprised of one (1) or more parcels, which constitute one or more separate tax lots, and does not constitute a portion of any other tax lot not a part of the Property. None of the Improvements on the Property is located in any area identified by the Federal Emergency Management Agency as an area having special flood hazards or, if any portion of the Improvements or the Property is located within such area, Borrower has obtained and will maintain the insurance prescribed in Section 6.1.1(a)(ii).

(q)    Leases. As of the Closing Date, the Property is not subject to any Leases. No Person, other than Borrower, has any possessory interest in the Property or the right to occupy the same.

(r)    Filing and Recording Taxes. All transfer taxes, recording taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes or recording taxes, charges or fees or similar charges required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Property to the Borrower have been paid or will be paid on the Closing Date. All mortgage, mortgage recording, stamp, intangible or other similar taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including the Security Instruments, have been paid.

(s)    Single-Purpose. Borrower hereby represents and warrants to, and covenants with, Lender that as of the date hereof and until such time as the Debt shall be paid in full:

(i)    Borrower has not owned, does not currently own and will not own any asset or property other than (A) the Property and (B) incidental personal property necessary for the ownership or operation of the Property.

(ii)    Borrower has not engaged in and will not engage in any business other than the ownership, renovation, construction, management, leasing of the Property and the conversion of the Property to condominium form of ownership and disposition of the Units to be located therein in accordance with the terms of the Loan Documents.

(iii)    Borrower has not incurred and will not incur any Indebtedness, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation), other than the Debt and unsecured trade debt none of which is or shall be at any time more than sixty (60) days past due (unless same is being contested in accordance with applicable Legal Requirements and the Loan Documents and Lender has been notified in writing of the same) and does not and shall not exceed in the aggregate at any time the Maximum Permitted Trade Payables. Except as permitted by Section 5.22, no constituent member, partner or shareholder of Borrower (direct or indirect, and no matter how remote) has incurred or will incur any Indebtedness secured (directly or indirectly) by such Person's legal or beneficial ownership interest in Borrower or any constituent member, partner or shareholder of Borrower (direct or indirect, legal or beneficial, and no matter how remote), provided, however, that Aleksander Gurevich shall be permitted to grant security interests in his indirect ownership interest in Borrower so long as such complies with the definition of "Permitted Indebtedness" set forth herein. No Indebtedness other than the Debt may be secured (superior, subordinate or pari passu) by the Property or any portion thereof.

(iv)    Borrower has not made and will not make any loans or advances to any Person (including any Affiliate or constituent party), and has not acquired and shall not acquire obligations or securities of any Borrower Party or any Affiliate of Borrower or any Borrower Party.

(v)    Borrower is and will remain solvent and Borrower has at all times during its existence paid and will continue to pay its debts, liabilities and expenses (including, as applicable, shared personnel and overhead expenses) only from Borrower's assets as the same shall become due.

(vi)    Borrower has done or caused to be done and will do all things necessary to observe limited liability company and other organizational formalities and preserve Borrower's existence.

(vii)    Borrower has at all times during its existence maintained and will continue to maintain all of Borrower's books, records, financial statements and bank accounts separate from those of any other Person, and Borrower will file its own tax returns. Borrower has at all times during its existence maintained and will continue to maintain Borrower's books, records, resolutions and agreements as official records.

(viii)    Borrower is and will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other Person (including any Affiliate of

Borrower or any constituent party of Borrower), has at all times conducted and will continue to conduct business in its own name, has at all times corrected and shall correct any known misunderstanding regarding its status as a separate entity, has not identified and shall not identify itself as a division or part of any other Person and has maintained and shall continue to maintain and utilize separate stationery, invoices and checks bearing its own name.

(ix)    Borrower has maintained and will continue to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(x)    Neither Borrower nor any constituent party of Borrower will seek or effect the liquidation, dissolution, winding up, consolidation or merger, in whole or in part, of Borrower.

(xi)    Borrower has not commingled and will not commingle its funds and other assets with those of any other Person, and Borrower has not controlled and will not control the decisions with respect to the daily affairs of any other Person.

(xii)    Borrower has maintained and will continue to maintain its assets in such a manner that it would not be costly or difficult to segregate, ascertain or identify its assets from those of any Affiliate or constituent party of Borrower or any other Person.

(xiii)    Borrower has not held, does not currently hold and will not hold itself out to be responsible for the debts or obligations of any other Person.

(xiv)    Borrower has at all times during its existence held, and will continue to hold, all of its assets in its own name.

(xv)    Borrower has not at any time during its existence guaranteed or become obligated for, and will not in the future guarantee or become obligated for, the debts of any other Person.

(xvi)    Except as specifically provided in the Loan Documents, no other Person has ever guaranteed or become obligated for Borrower's debts at any time during Borrower's existence; and except as specifically provided in the Loan Documents, Borrower will not permit any other Person to guarantee or become obligated for its debts at any time in the future.

(xvii)    Borrower has not at any time during its existence held, and will not in the future, hold out Borrower's credit as being available to satisfy the obligations of any other Person.

(xviii)    No other Person has ever held, and Borrower will not permit any other Person to hold, out Borrower's credit as being available to satisfy the obligations of any other Person.

(xix)    Borrower has not at any time during its existence bought or held, and will not in the future buy or hold, evidence of Indebtedness issued by any of its Affiliates or equity interest holders (direct or indirect, legal or beneficial).

(xx)    Borrower has at all times during its existence allocated fairly and reasonably (and paid or charged for, as applicable), and will continue to allocate fairly and reasonably (and pay or charge for, as applicable), any overhead expenses that are shared with an Affiliate of Borrower, including paying for office space provided by and services performed by any employee of an Affiliate of Borrower.

(xxi)    Except as provided in the Loan Documents, Borrower has not at any time during its existence pledged, and will not in the future pledge, its assets for the benefit of any other Person.

(xxii)    No other Person has ever pledged, and Borrower will not permit any other Person to pledge, Borrower's assets for such other Person's benefit.

(xxiii)    No other Person has ever identified, and Borrower will not permit any other Person to identify, Borrower as a division of any other Person.

(xxiv)    [Intentionally Reserved].

(xxv)    Upon commencement of construction of the Project and then, only if required by Lender, Borrower shall at all times cause there to be at least one duly appointed member (the "**Independent Manager**") of Borrower reasonably satisfactory to Lender who shall not have been at the time of each such individual's initial appointment, and may not have been at any time during the preceding five years, and shall not be at any time while serving in the capacity of the Independent Manager, either (A) a shareholder of, or an officer, director (other than as the Independent Manager), partner or employee of, the Borrower or any of its shareholders, partners, members, subsidiaries or Affiliates, (B) a shareholder, director, officer, employee, partner, member or customer of, or supplier or service provider to (including professionals), or other Person who derives more than 10% of its purchases, revenues, compensation, or other financial remuneration from its activities with, Borrower, the corporation or other entity for which he or she acts as the Independent Manager (if other than Borrower) or any of the shareholders, directors, officers, employees, partners, members, subsidiaries or Affiliates of Borrower, or such corporation or other entity or who otherwise is financially dependent upon Borrower, such corporation or other entity or any of the shareholders, directors, officers, employees, partners, members, subsidiaries or Affiliates of Borrower or such corporation or other entity, (C) a Person controlling or under common control with any such shareholder, officer, director, partner, member, employee, supplier or customer, or (D) a family member (by blood or marriage) of any such shareholder, officer, director, partner, member, employee, supplier or customer. As used herein, the term "**control**" has the meaning set forth in the definition of Affiliate.

(xxvi)    Borrower shall not cause or permit the Borrower to take any action which, under the terms of any operating agreement or any voting trust agreement with respect to

any limited liability company interest requires a vote of the Independent Manager unless at the time of such action the Independent Manager shall have approved the taking of such action.

(xxvii)    Borrower shall conduct its business and affairs so that all assumptions made in any Non-Consolidation Opinion are at all times true and correct in all respects.

(t)    <u>Hazardous Substances</u>.  Borrower hereby represents and warrants to Lender that the representations and warranties contained in the Environmental Indemnity are true and correct.  Except for any specific limitation contained in the Environmental Indemnity, this representation and warranty shall survive any termination, satisfaction, or assignment of this Agreement and the exercise by Lender of any of its rights or remedies hereunder, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

(u)    [Intentionally Reserved].

(v)    <u>Contracts</u>.  Except as set forth on **Schedule IV**, there are no service, maintenance or other contracts affecting the use, operation or maintenance of the Property that (a) involve more than $100,000 in compensation or expenditures per annum, or (b) are not terminable on one month's notice or less without cause and without penalty or premium.  True and correct copies of all material contracts affecting the use, operation or maintenance of the Property (regardless of the dollar amount of such contracts or the termination provision set forth therein) (together with all amendments, modifications or supplements thereto) have been delivered to Lender or Servicer.  There are no service, maintenance or other similar contracts affecting the Property that are not cancellable by Borrower on no more than thirty (30) days' notice, other than those approved by Lender in its discretion.  All service, maintenance or other contracts affecting the Property from time to time entered into by Borrower or any of its Affiliates have been entered into at arms-length in the ordinary course of Borrower's or such Affiliate's business.  To the best of Borrower's knowledge, all service, maintenance or other contracts affecting the Property not entered into by the Borrower or its Affiliate, if any, have been entered into at arms-length in the ordinary course of business and provide for the payment of fees in amounts and upon terms not in excess of existing market rates.

(w)    <u>Principal Place of Business</u>.  Borrower's principal place of business as of the date hereof is: c/o Gurevich & Associates, LLP, 216 East 49th Street, 5th Floor, New York, New York 10017.

(x)    <u>Borrower's Ownership Structure</u>.  Attached hereto as **Exhibit A** is a true and correct description of Borrower's ownership structure, setting forth all Persons who own, directly or indirectly, legal or beneficial ownership interests in Borrower.

(y)    <u>Service Rights</u>.  Except as set forth on **Schedule IV**, no Service Rights have been granted to any Person in connection with or relating to the Property or any Tenant or an Affiliate of any Tenant.  To the extent Service Rights have been granted to any Person as set forth on **Schedule IV**, the Borrower (and no other Person) is entitled to receive any and all compensation with respect to the Service Rights.

17

(z)     Affiliate Transaction. Except as set forth on **Schedule IV**, Borrower has not entered into any Affiliate Transactions. Any agreement with an Affiliate of Borrower shall either (i) provide that such agreement may be terminated on no more than thirty (30) days' prior notice, with or without cause, and without penalty, or (ii) be subject to a Consent and Recognition Agreement in form and substance acceptable to Lender, and providing that if Lender acquires the Property or an ownership interest in Borrower, directly or indirectly, then Borrower's Affiliate agrees that Lender (or such purchaser at foreclosure) may terminate the agreement at any time upon notice to the Affiliate with or without cause or the payment of any premium or penalty. If such agreement is not terminated in accordance with the immediately preceding sentence, Lender shall have the right, and Borrower hereby irrevocably authorizes Lender and irrevocably appoints Lender as Borrower's attorney-in-fact coupled with an interest, at Lender's sole option, to terminate the agreement on behalf of and in the name of Borrower, and Borrower hereby releases and waives any claims against Lender arising out of Lender's exercise of such authority.

(aa)     Loan Proceeds. No Affiliate of Borrower or any Person in which Borrower or any Affiliate of Borrower owns an interest (direct, indirect or beneficial interest in Borrower) is receiving any portion of the proceeds of the Loan other than Janoff & Gurevich, L.L.P. (for legal fees), TransContinental Abstract (for title fees) and Continental Realty (for management fees), in each case as set forth on the Pre-Development Budget.

(bb)     Conditions Precedent. Borrower has fulfilled and satisfied all of the conditions precedent set forth on **Schedule II**.

(cc)     Rent Stabilized Units. The Property is not subject to any rent control, stabilization or other similar laws that would restrict the sale of any Units.

Section 4.2     **Survival of Representations**. Borrower agrees that all of the representations and warranties of Borrower set forth in Section 4.1 and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower; provided, however, that particular representations and warranties shall survive the complete payment of the Debt as specifically provided herein and/or in the other Loan Documents. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf. Borrower acknowledges that the representations and warranties contained in the Loan Documents are a material inducement to Lender to make the Loan.

# V   BORROWER COVENANTS

From the date hereof and until payment and performance in full of all Obligations of Borrower under the Loan Documents, Borrower hereby covenants and agrees with Lender that:

Section 5.1     **Existence; Compliance with Legal Requirements**. Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and

effect its existence, rights, Licenses, permits and franchises and to comply with all Legal Requirements applicable to Borrower and the Property. Borrower shall not dissolve, terminate, liquidate, merge with, consolidate into or acquire another Person without Lender's prior written consent. Borrower shall at all times maintain, preserve and protect all franchises and trade names of Borrower or otherwise used in connection with the Project and preserve all of its property used or useful in the conduct of its business and shall keep the Property in good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto. Borrower will not change its name, identity (including its trade name or names) or, if not an individual, its corporate, partnership or other structure without Lender's prior written consent. Borrower shall not allow or permit any change in the use of the Property (other than the development of a condominium ownership regime) without Lender's prior written consent. Borrower will promptly qualify to do business (and will promptly satisfy all publication requirements required in connection therewith) and will remain in good standing under the laws of the state in which the Property is located and in each jurisdiction as and to the extent the same is required for the ownership, maintenance, management and operation of the Property and the development of the Project and disposition of the Units therein.

Section 5.2    **Hazardous Substances**. Borrower shall comply strictly and in all respects with the covenants set forth in Sections 1 and 2 of the Environmental Indemnity.

Section 5.3    **Certain Prohibited Actions**.

(a)    Borrower shall not enter into any line of business other than the ownership and operation of the Property and/or the development of the Project and disposition of the Units therein, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business. Borrower shall not directly or indirectly do any of the following: (i) change its principal place of business or chief executive office without first giving Lender thirty (30) days' prior written notice thereof and executing and delivering to Lender or, if applicable, authorizing Lender to file, such additional UCC-3 Financing Statements as Lender may require in order to reflect such change in Borrower's principal place of business or chief executive office and to maintain the perfection of all Liens and security interests created by the Loan Documents; or (ii) take any action or permit any action or inaction which could result in Borrower not being in compliance with Section 4.1(s); or (iii) cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business in its reasonable judgment. Borrower shall comply in all respects with Section 4.1(s) of this Agreement.

(b)    Borrower shall not, nor shall it permit any Borrower Party to, make any material change, amendment or modification to the Organizational Documents of any Borrower Party, including without limitation, any special purpose entity provisions therein.

Section 5.4    **Taxes and Other Charges**.

(a)    Subject to the provisions of Section 6.2 hereof, Borrower shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or

any part thereof as the same become due and payable. Borrower will deliver to Lender or Lender's designee receipts for payment or other evidence satisfactory to Lender that the Taxes and Other Charges have been so paid or are not then delinquent no later than thirty (30) days prior to the date on which the Taxes and/or Other Charges would otherwise be delinquent if not paid. Borrower shall not suffer and Borrower shall promptly cause to be paid and discharged any Lien which may be or becomes a Lien against the Property, and shall promptly pay for all utility services provided to the Property. Borrower shall furnish to Lender a cash deposit, or an indemnity bond satisfactory to Lender with a surety satisfactory to Lender, in an amount equal to 125% of any Lien claim, plus a reasonable additional sum to pay all costs, interest and penalties that may be imposed or incurred in connection therewith, and shall provide Lender with an endorsement to the Title Insurance Policies insuring over any such Lien claims in form satisfactory to Lender, all to assure payment of the matters under contest and to prevent any sale or forfeiture of Borrower's Property or any part thereof.

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges or the existence of any Lien, provided that (i) no Default or Event of Default exists, (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of all Leases and other documents or instruments to which Borrower is subject and shall not constitute a default thereunder, and such proceeding shall be conducted in accordance with all Legal Requirements, (iii) Borrower shall notify Lender in writing of any such contest and shall diligently and in good faith contest such Taxes, Other Charges or Lien by appropriate legal proceedings which shall operate to prevent the enforcement or collection thereof and the sale of the Property or any part thereof, in satisfaction thereof; (iv) Borrower shall have furnished to Lender a cash deposit, or an indemnity bond satisfactory to Lender with a surety satisfactory to Lender, in an amount equal to 125% of the Taxes, Other Charges or Lien claim, plus a reasonable additional sum to pay all costs, interest and penalties that may be imposed or incurred in connection therewith, or has otherwise provided Lender with an endorsement to the Title Insurance Policies insuring over any such Taxes, Other Charges or Lien claims in form satisfactory to Lender, all to assure payment of the matters under contest and to prevent any sale or forfeiture of the Property or any part thereof; and (v) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes, Other Charges or Lien, together with all costs, interest and penalties which may be payable in connection therewith. In addition, if the Taxes, Other Charges or Lien are not paid in full when Borrower commences such contest, then such proceeding shall suspend the collection of Taxes, Other Charges or Lien from the Property. Lender may pay over any such cash deposit or part thereof held by Lender or liquidate any other security and pay same over to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established. Notwithstanding the foregoing, Borrower shall immediately upon request of Lender pay (and if Borrower shall fail so to do, Lender may, but shall not be required to, pay or cause to be discharged or bonded against) any such Taxes, Other Charges or Lien claim notwithstanding such contest, if in the good faith opinion of Lender, the Property or any part thereof or interest therein may be in danger of being sold, forfeited, foreclosed, terminated, canceled or lost. In addition, Borrower shall pay to Lender upon demand, any costs incurred by Lender in ensuring compliance by Borrower with this Section 5.4, including reasonable attorneys' fees, monitoring and evaluating expenses and any tax service fees. The covenants, representations, warranties and obligations of Borrower set

forth in the Loan Documents with respect to Liens, Lien claims and Other Charges are
hereinafter called the "Lien Obligations".

**Section 5.5    Performance of Agreements**. Borrower shall observe, perform
and satisfy all the terms, provisions, covenants and conditions of, and shall pay when due all
principal, interest, costs, fees and expenses to the extent required under, the Loan Documents.
Borrower shall observe and perform each and every term to be observed or performed by
Borrower pursuant to the terms of any other agreement or recorded instrument affecting or
pertaining to Borrower or the Property, or given by Borrower to Lender for the purpose of
further securing the Obligations.

**Section 5.6    Notices**. Borrower shall give written notice to Lender of any
litigation in excess of $50,000 (other than claims for which Borrower is fully insured) or material
governmental proceedings pending or threatened against Borrower or the Property. Borrower
shall promptly advise Lender of any Material Adverse Change and of the occurrence of any
Default or Event of Default.

**Section 5.7    Access to Premises**. Borrower shall permit agents, representatives
and employees of Lender to inspect the Property or any part thereof at reasonable hours upon not
less than forty-eight (48) hours advance notice or such shorter period of notice as circumstances
may dictate.

**Section 5.8    Compliance**. Borrower shall not commit, or allow any other
Person in occupancy of or involved with the operation or use of the Property to commit, any act
or omission affording any Governmental Authority the right of forfeiture as against the Property
or any part thereof or any monies paid in performance of Borrower's obligations under any of the
Loan Documents. Borrower shall keep and maintain all Licenses necessary for the operation of
the Property for its intended use.

**Section 5.9    Cooperate in Legal Proceedings**. Borrower shall cooperate fully
with Lender with respect to any proceedings before any court, board or other Governmental
Authority, which may in any way affect the rights of Lender hereunder, or any rights obtained by
Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at
its election, to participate in any such proceedings.

**Section 5.10    Insurance Benefits and Condemnation Proceeds**. Borrower
shall fully cooperate with Lender in obtaining for Lender the benefits of any Insurance Proceeds
and Condemnation Proceeds lawfully or equitably payable in connection with the Property or
any part thereof, and Lender shall be reimbursed for any reasonable expenses incurred in
connection therewith (including reasonable attorneys' fees and disbursements, expense of an
appraisal on behalf of Lender in case of a fire or other Casualty affecting the Property or any part
thereof) out of such Insurance Proceeds or Condemnation Proceeds, as applicable.

**Section 5.11    Further Assurances**. Borrower will, at its sole cost and without
expense to Lender, do, execute, acknowledge and deliver all and every such further reasonable
acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfers, boundary
surveys, footing or foundation surveys, plans and specifications, appraisals, title and other

insurance reports and agreements and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender, the property and rights hereby mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of Borrower's covenants under this Agreement or for filing or recording the Security Instruments, or for complying with all Legal Requirements. Borrower, on demand, will execute and deliver, or authorize Lender to file, as applicable, one or more financing statements, chattel mortgages or other instruments, to evidence or perfect more effectively the security interest of Lender in the Property, and if Borrower fails to execute and deliver, or authorize any of the foregoing within five (5) days after such request by Lender, Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender pursuant to this Section 5.11, and hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, any such financing statements, chattel mortgages or other instruments, and Borrower hereby acknowledges and agrees that it shall have no claim or cause of action against Lender arising out of Lender's exercise of Lender's rights under this Section 5.11 or the execution and/or recordation of any instruments by or on behalf of Borrower pursuant to the foregoing power of attorney, unless such claim or cause of action results from Lender's gross negligence or willful misconduct.

### Section 5.12   **Financial Reporting**.

      (a)     Borrower will keep and maintain or will cause to be kept and maintained in accordance with Acceptable Accounting Principles, proper and accurate books, records and accounts reflecting all of the financial affairs, income and expenses of Borrower and the Property. Lender shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts at the office(s) of Borrower or other Persons maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire. After the occurrence of an Event of Default beyond any applicable notice and cure periods, Borrower shall pay any costs and expenses incurred by Lender to examine any of their accounting records as Lender shall determine to be necessary or appropriate in the protection of Lender's interest. Borrower shall furnish or make available to Lender and its agents convenient facilities for the examination and audit of any of its books and records.

      (b)     Borrower will furnish to Lender annually, within one hundred twenty (120) days following the end of each Fiscal Year, a complete copy of Financial Statements for Borrower for such Fiscal Year prepared in accordance with Acceptable Accounting Principles and certified by an Approved Accounting Firm. Borrower's annual Financial Statements shall be accompanied by (A) a certified rent roll, if applicable, in a format consistent with the certified rent roll delivered by Borrower on or before the Closing Date or otherwise acceptable to Lender and (B) an Officer's Certificate stating that such annual Financial Statements present fairly the financial condition of Borrower and the Property and, if applicable, that the rent roll is true, correct, accurate and complete in all material respects and that the Leases identified thereon (and previously delivered to Lender) have not been amended, modified or canceled.

(c)    Borrower will furnish, or cause to be furnished, to Lender on or before twenty-five (25) days after the end of each calendar month the following items accompanied by an Officer's Certificate stating that such items are true, correct and complete in all material respects and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable: (A) monthly and year to date Financial Statements; (B) to the extent applicable, a rent roll in a format consistent with the rent roll delivered by Borrower on the Closing Date or otherwise acceptable to Lender; (C) the actual capital expenditures for the Property with respect to such period; (D) to the extent applicable, all new Leases, Lease amendments or other documents affecting the Rents executed since the last such statement; and (E) a comparison of the budgeted income and expenses and the actual income and expenses for such period.

(d)    In addition to the Pre-Development Budget provided to Lender on or before the Closing Date, Borrower shall prepare and deliver to Lender, within sixty (60) days prior to the beginning of each Fiscal Year of Borrower, an annual budget including all planned capital expenditures in respect of the Property for such ensuing Fiscal Year (the "**Annual Budget**"). Each Annual Budget shall be prepared and submitted in the form acceptable to Lender and shall set forth in reasonable detail all budgeted items of income and expense (whether from operations, capital items or otherwise). Each Annual Budget shall contain, among other things, limitations on management fees (not to exceed 3% in the aggregate) and payments to Affiliates of any Borrower Party. Lender shall have the right to approve each Annual Budget. In the event that Lender objects to the proposed Annual Budget submitted by Borrower, Lender shall advise Borrower of such objections within fifteen (15) Business Days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objection) and Borrower shall promptly revise such Annual Budget and resubmit the same to Lender until Lender approves an Annual Budget in respect of the Property. Each such Annual Budget approved by Lender in accordance with terms hereof shall hereinafter be referred to as an "**Approved Annual Budget**". Until such time that Lender approves a proposed Annual Budget for the Property, the most recently Approved Annual Budget for the Property, if any, shall apply; provided that such Approved Annual Budget shall be adjusted to reflect actual increases in real estate taxes, insurance premiums, and utilities expenses.

(e)    Borrower shall furnish to Lender, within ten (10) Business Days after request (or as soon thereafter as may be reasonably possible) such further detailed information, including Borrower's tax returns, with respect to the operation of the Property and the financial affairs of Borrower or the Property as may be reasonably requested by Lender.

(f)    Borrower shall also, if requested by Lender to do so, use commercially reasonable efforts to obtain any financial information relating to (i) any commercial Tenant requested by Lender which Borrower has the right to obtain pursuant to any commercial Lease, and (ii) any Borrower Party other than Borrower.

(g)    Borrower shall furnish to Lender monthly sales reports with respect to Unit sales in accordance with Section 13.4.

### Section 5.13    Title to the Property.

(a)    Borrower will warrant and defend (i) the title to the Property and every part thereof, subject only to Liens permitted hereunder (including Permitted Encumbrances), and (ii) the validity and priority of the Liens of the Security Instruments and the Assignment of Leases encumbering the Property and the perfection and priority of the Liens created by the Loan Documents, including any UCC Financing Statements, subject only to Liens permitted hereunder (including Permitted Encumbrances), in each case against the claims of all Persons whomsoever. Borrower shall reimburse Lender on demand for any losses, costs, damages or expenses (including reasonable attorneys' fees and court costs) incurred by Lender if an interest in the Property, other than as permitted hereunder, is claimed by another Person.

(b)    If requested by Lender (but not more than one time during any twelve (12) month period), Borrower shall provide Lender with Datedown Endorsements with respect to the Property.

### Section 5.14    Estoppel Statements.

(a)    Within fifteen (15) days after the end of each Fiscal Year and at any time within ten (10) days after request by Lender, Borrower shall furnish Lender or any proposed assignee of Lender with a written statement, duly acknowledged and certified by Borrower, setting forth (A) the original principal amount of the Notes, (B) the unpaid principal amount of the Notes, (C) the then current rate of interest of the Notes, (D) the terms of payment, (E) the date installments of interest and/or principal were last paid, (F) that, except as provided in such statement, there are no defaults or events which with the passage of time or the giving of notice or both, would constitute an event of default under the Loan Documents, (G) that the Loan Documents are valid, legal and binding obligations of the Borrower Parties and have not been modified or if modified, giving particulars of such modification, (H) whether any offsets or defenses exist with respect to the Loan or Lender and, if any are alleged to exist, a detailed description thereof, (I) whether or not, to the best knowledge of the Borrower, any of the lessees under the Leases are in default under the Leases, and, if any of the lessees are in default, setting forth specific nature of all such defaults, and (J) as to any other matters reasonably requested by Lender.

(b)    Upon Lender's request, Borrower shall promptly request within five (5) Business Days, and thereafter use Borrower's commercially reasonable efforts to obtain, estoppel certificates or subordination, non-disturbance and attornment agreements from any one or more commercial Tenants identified by Lender attesting to such facts regarding the applicable Lease as required by the applicable Lease or if no form is required by the applicable Lease, attesting to such facts regarding the applicable Lease as may be reasonably requested by Lender. If any commercial Tenant fails to deliver any estoppel certificate as aforesaid within the longer of (i) the applicable time period set forth in the commercial Tenant's Lease, if any, or (ii) fifteen (15) days after Borrower's request therefor, then the Borrower shall, upon request by Lender, execute and deliver such estoppel certificate (to the best of Borrower's knowledge) on behalf of such commercial Tenant, and Borrower shall continue to use commercially reasonable efforts (as described above) to obtain such estoppel certificate.

(c)    Provided that no Event of Default shall have occurred beyond any applicable notice and cure periods, and in connection with a proposed repayment of the Loan in full, within ten (10) days after written request by Borrower, Lender shall furnish Borrower with a payoff letter indicating the outstanding principal amount of the Notes, all accrued and unpaid interest on the Notes through the date of such payoff letter (together with a per diem amount for any interest accruing thereafter, if determinable), the amount of any Yield Maintenance Amount (as defined in the Notes) that would be due and payable to Lender if the Loan were to be repaid in full on the date of the payoff letter and any other amounts due and payable to Lender as of the date of the payoff letter, including, without limitation, the Additional Fee.

### Section 5.15    Leasing Matters.

(a)    Borrower shall not enter into any residential Leases at the Property. Subject to compliance with the Leasing Guidelines, Borrower shall not enter into any commercial Leases at the Property without Lender's prior written approval. Borrower shall not enter into, or materially amend, modify or terminate any Lease without Lender's prior written approval and otherwise in accordance with the Leasing Guidelines. All commercial Leases entered into by or on behalf of Borrower in accordance with this Section 5.15 shall contain provisions (i) informing the Tenant that Lender has the right at any time to notify the Tenant to make all payments due pursuant to such Tenant's Lease directly to Lender at such address and in such manner as Lender shall designate, (ii) authorizing the Tenant to make such payments in accordance with such direction, (iii) irrevocably directing such Tenant to pay and deliver all amounts accruing or coming due under such Tenant's Lease to Lender in accordance with any such notice without any obligation to inquire into or determine (a) the reasons for paying or delivering such amounts to Lender, (b) the application of such amounts, (c) the status of the Borrower's relations with Lender or its agent, (d) whether an Event of Default has occurred, or (e) whether the demand is in compliance with the Loan Documents, (v) requiring the Tenant to give Lender written notice of any default by the landlord under such Tenant's Lease and a reasonable period of time within which to cure such default prior to such Tenant taking any actions to remedy such default or to cancel the Lease, (iv) requiring the Tenant to provide upon fifteen (15) days' written notice, an estoppel certificate in a form to be provided by Lender confirming its subordination and attornment to Lender and certifying to Lender such matters as are requested by Lender, or as otherwise set forth in the Lease, and (v) pursuant to which the Tenant acknowledges that, in the event Lender or Lender's designee or a purchaser at foreclosure or otherwise becomes owner of the Property through foreclosure or otherwise, Lender shall not be liable for any acts, omissions, events or conditions arising prior to the time Lender became the record owner of the Property. All Leases shall provide that they are subordinate to the Security Instruments and that the Tenant agrees to attorn to Lender. No material changes shall be made to any standard lease form approved by Lender in its discretion without Lender's prior written consent. None of the Leases (whether currently in effect or hereafter entered into) contain or will contain any option to purchase, any right of first offer or any right of first refusal to purchase the Property or any portion thereof.

(b)    Borrower (A) shall not enter into any Major Lease or amend the terms of any Major Lease (whether existing on the Closing Date or thereafter executed) in any respect and shall not enter into any Minor Lease or amend the terms of any Minor Lease (whether existing on the Closing Date or thereafter executed) in any material respect unless the Minor Lease to be

executed (or the existing Minor Lease to be amended or modified) complies with the Leasing Guidelines and the other requirements of the Loan Documents, including the provisions of this Section 5.15, in either case, without the prior written consent of Lender which will not be unreasonably withheld; (B) shall not convey or transfer or suffer or permit a conveyance or transfer of the Property or of any interest therein so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, any commercial Tenants or commercial Leases; (C) shall not consent to any assignment of or subletting under the commercial Leases which is not in accordance with their terms, without the prior written consent of Lender, not to be unreasonably withheld, and if such commercial Lease requires Borrower's consent to such assignment or subletting, then Borrower shall also obtain Lender's consent thereto prior to granting the Borrower's consent, except as specifically permitted by the Leasing Guidelines, provided any amounts payable to Borrower or any Affiliate of any Borrower Party as landlord pursuant to, or in any manner whatsoever related to, any assignment or sublease of a commercial Lease shall be deemed to be Rents and shall be deposited into a deposit account controlled by Lender and, further provided that the consent of Lender shall be required even if the terms of the commercial Lease permit any such assignment or sublease, if any such assignment or sublease is to Borrower or any Affiliate of any Borrower Party; (D) shall not alter, modify or change the terms of any guaranty, letter of credit or other credit support with respect to any of the commercial Leases (the "**Lease Guaranty**") or cancel or terminate such Lease Guaranty without the prior written consent of Lender, not to be unreasonably withheld, except, as to a Minor Lease only, as specifically permitted by the Leasing Guidelines; and (E) shall not cancel or terminate any commercial Lease or accept a surrender thereof unless such termination is a result of Tenant's breach of the terms of the Lease, without Lender's prior written consent, not to be unreasonably withheld.  Any consideration paid in connection with any such cancellation, surrender, assignment, sublease or termination shall be deemed to be Rents and may be deposited by Lender or Servicer into a deposit account controlled by Lender.  Borrower shall deliver to Lender copies of all commercial Leases and all modifications, amendments or other documents (whether or not same requires Lender approval under this Section 5.15) promptly after execution and delivery thereof, together with an Officer's Certificate stating that same does not require Lender's consent pursuant to this Agreement (unless such consent was obtained as required hereby).

(c)     Borrower (A) shall duly and punctually observe and perform all the obligations imposed upon the landlord under each of the Leases affecting the Property and shall not do or permit to be done anything to impair the value of such Leases as security for the Debt; (B) shall for Major Leases promptly send copies to Lender of all notices of default which Borrower shall send or receive under any of such Leases; (C) shall enforce in a commercially reasonable manner all of the terms, covenants and conditions contained in each of such Leases on the part of the Tenant thereunder to be observed or performed; provided, however, with respect to multifamily residential properties, a residential Lease may be terminated in the event of a default by the Tenant thereunder; (D) shall not collect any of the Rents more than one (1) month in advance (provided that a Security Deposit shall not be deemed rent collected in advance); (E) shall not execute any other assignment of, or further mortgage or encumber, the landlord's interest in the Leases or the Rents; and (F) shall execute and deliver at the request of Lender all such further assurances, confirmations and assignments in connection with the Leases as Lender shall from time to time reasonably require, and Borrower hereby authorizes each Tenant to accept performance of any of the landlord's obligations under the Leases from Lender.

Lender shall have the right, at Borrower's expense, but shall not be obligated, to cure any default by Borrower under any of the Leases which Borrower is not proceeding diligently to cure, and this provision shall be deemed to be a written authorization and each Tenant shall be entitled to rely thereon. Such curing by Lender of a default by Borrower under any of the Leases shall not release Borrower in any way from liability to Lender for Borrower's failure to discharge Borrower's duty to so cure that default. Any and all sums expended by Lender with respect to any such cure, together with interest thereon at the Default Rate from the date paid by Lender until repaid by Borrower, shall immediately be due and payable to Lender by Borrower on demand and shall be secured by the Security Instruments and by all of the other Loan Documents. Lender, Servicer and any Person designated by Lender or Servicer are hereby authorized by Borrower to directly communicate with any of the Tenants or the Property Manager at any time and from time to time regarding such matters as Lender deems appropriate, and Borrower hereby acknowledges and agrees that Borrower shall have no claim or cause of action against Lender arising out of such communications.

(d)     Within fifteen (15) Business Days of the full execution of any Major Lease or Minor Lease, the Borrower shall provide Lender with a copy of such Lease together with an Officer's Certificate stating that such Lease complies with the provisions of this Agreement and the other Loan Documents. Lender and Borrower agrees that the Security Deposits (i) shall be maintained as required by the applicable Legal Requirements, and (ii) shall be returned if and when required by the applicable Leases and Legal Requirements, provided, that, Borrower shall be solely responsible for compliance with the terms of the applicable Lease and Legal Requirements and Lender and Servicer shall in no event be liable for any failure of Borrower to so comply.

(e)     Notwithstanding any provisions herein to the contrary, no warrants, stock options or similar rights in any Tenant or any Affiliate thereof, any licensee or any other Person providing any services related to or for the benefit of the Property may be granted to Borrower, any Borrower Party, the Principal or any of their respective Affiliates, without Lender's prior written consent, which consent may be withheld in Lender's discretion, and which consent may be conditioned upon, among other things, (i) Lender's receipt of a perfected security interest in such warrants, stock options or similar rights as security for the Debt, or (ii) Lender's receipt and approval of an agreement, satisfactory to Lender in Lender's sole and absolute discretion, granting to Lender a percentage (determined by Lender in its discretion) of the rights granted to Borrower, any Borrower Party, the Principal or any of their respective Affiliates in connection with such warrants, stock options or similar rights.

Section 5.16  **Business Purposes**. The Loan is solely for the business purpose of the Borrower, and is not for personal, family, household, or agricultural purposes.

Section 5.17  **Property Manager**.

(a)     Borrower shall not, without the prior written consent of Lender, execute, orally agree upon, amend or modify in any material respect, cancel, surrender or terminate any Property Management Agreement or allow any Property Management Agreement to terminate or otherwise replace any Property Manager of the Property or enter into any other Property Management Agreements without the prior written consent of Lender. Borrower shall

(i) diligently perform and observe all of the terms, covenants and conditions of a Property Management Agreement on the part of Borrower to be performed and observed by Borrower so that the rights of Borrower under a Property Management Agreement remain unimpaired; and (ii) promptly notify Lender of the giving of any notice by a Property Manager to Borrower of any default by Borrower in the performance or observance of any of the terms, covenants or conditions of a Property Management Agreement on the part of Borrower and deliver to Lender a true copy of each such notice. Borrower shall promptly enforce the performance and observance of all of the material covenants required to be observed and performed by a Property Manager. If Borrower shall default in the performance or observance of any material term, covenant or condition of a Property Management Agreement on the part of Borrower to be performed or observed beyond any applicable notice and grace periods contained therein, then without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of Borrower's obligations hereunder or under a Property Management Agreement, Lender shall have the right (without Borrower's permission, consent or knowledge), but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of a Property Management Agreement on the part of Borrower to be performed or observed to be so promptly performed or observed on behalf of Borrower, to the end that the rights of Borrower in, to and under a Property Management Agreement shall be kept unimpaired and free from default, and a Property Manager is authorized to accept the performance of any of Borrower's obligations under a Property Management Agreement from Lender or Lender's designee. Lender and any Person designated by Lender shall have, and are hereby granted, the right to enter upon the Property at any time and from time to time for the purpose of taking any such action, and Lender, Servicer and any Person so designated by Lender or Servicer is hereby authorized by Borrower to directly communicate with a Property Manager, and Borrower hereby acknowledges and agrees that Borrower shall have no claim or cause of action against Lender arising out of such communications. If a Property Manager under a Property Management Agreement shall deliver to Lender a copy of any notice sent to Borrower of an uncured default under such Property Management Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender in good faith, in reliance thereon. Borrower shall, from time to time, use good faith, commercially reasonable efforts to obtain from a Property Manager under a Property Management Agreement such certificates of estoppel with respect to compliance by Borrower with the terms of such Property Management Agreement as may be requested by Lender.

       (b)     Borrower covenants and agrees with Lender that (i) any Property Management Agreement and payment of fees and expenses under any Property Management Agreement shall be subordinate (in lien and in payment) to the Liens of the Security Instruments and other Loan Documents and if any Property Manager is an Affiliate of any Borrower Party, then the applicable Property Management Agreement shall provide that Property Manager shall not be permitted to receive any fees, expenses or other payments at any time that an Event of Default is continuing (or after giving effect to such payment would occur), (ii) a Property Management Agreement shall provide that such fees and other payments shall be paid only when not prohibited by the Loan Documents, (iii) any Property Management Agreement shall provide that such Property Management Agreement may be terminated by Lender at any time for cause (including a Property Manager's gross negligence, willful misconduct, fraud or breach of such Property Management Agreement) or at any time following the occurrence and during the

continuance of an Event of Default or if there is a change in the identity of a Property Manager or its controlling parties without the consent of Lender and upon such termination, the Borrower shall replace the terminated Property Manager with a property manager selected by Borrower and approved by Lender, and (iv) a Property Management Agreement shall require a Property Manager to give Lender written notice of any default by Borrower under such Property Management Agreement and a reasonable period of time within which to cure such default prior to a Property Manager taking any action to remedy such default or to cancel such Property Management Agreement. Borrower further covenants and agrees that Borrower shall require each Property Manager to maintain, at all times that all or any portion of the Debt remains outstanding, worker's compensation insurance, fidelity bond and errors and omissions insurance, each in compliance with Legal Requirements and the Loan Documents. If a substitute property manager is appointed, then such substitute property manager shall be Independent, shall be approved in writing in advance by Lender and shall execute and deliver to Lender a Consent and Recognition Agreement before such substitute property Manager shall be entitled to receive any compensation under a Property Management Agreement or otherwise.

(c)     Without limitation of the foregoing, if (i) any Property Manager shall commence any case, proceeding or other action under any Bankruptcy Law or there shall be commenced against any Property Manager any such case, proceeding or other action which remains undismissed, undischarged or unbonded for a period of ninety (90) days or (ii) an Event of Default shall occur and be continuing, then Lender, at its option, may require Borrower to engage a bona-fide, independent third party management agent selected by Borrower and approved by Lender in its sole discretion (the "**New Property Manager**") to manage the Property. If Borrower fails to select a substitute Property Manager within thirty (30) days after being required to do so pursuant to the preceding sentence or if Lender does not approve Borrower's proposed Property Manager within such period, then Lender may, at Lender's sole option, select any nationally recognized property management firm (or Affiliate thereof) as the New Property Manager, and Borrower shall be deemed to have consented thereto. The New Property Manager shall be engaged by Borrower pursuant to a written management agreement that complies with the terms of this Section 5.17 and is otherwise satisfactory to Lender in all material respects.

**Section 5.18    Contracts**. Borrower shall deliver or cause to be delivered to Lender copies of all contracts or other agreements (and all amendments, modifications or supplements thereto), whether now existing or hereafter entered into, affecting Borrower or the use, maintenance, management or operation of the Property, including any options to purchase or rights of first offer or first refusal to purchase the Property or any portion of the Property. Borrower shall not enter into any service, maintenance or other contract affecting the Property without Lender's prior written consent (which will not be unreasonably withheld) that (a) involves more than $100,000 in expenditures, or (b) is not terminable on one month's notice or less without cause and without penalty or premium. All service, maintenance or other contracts affecting the Property shall be arms-length transactions, in the ordinary course of the Borrower's business and shall provide for the payment of fees in amounts and upon terms not in excess of existing market rates. Borrower shall not enter into any brokerage agreements with respect to leasing or sales without the prior written consent of Lender.

### Section 5.19    Access Laws.

(a)    Borrower agrees that the Property shall at all times strictly comply to the extent applicable with the requirements of the Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 327, 42 U.S.C. § 12191, et seq., as hereafter amended, the Fair Housing Amendments Act of 1988 (if applicable), as amended, all state and local laws and ordinances related to handicapped access and all rules, regulations, and orders issued pursuant thereto including the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities, as amended (collectively, "**Access Laws**") and all other Legal Requirements upon written request by Lender, and Borrower shall provide Lender with an architect's certificate, engineer's certificate, or such other reasonable evidence as Lender may request evidencing compliance with Access Laws.  Borrower shall be solely responsible for all such costs of compliance and reporting under all Access Laws.

(b)    Notwithstanding any provisions set forth herein or in any other document regarding Lender's approval of alterations of the Property, Borrower shall not alter the Property in any manner which would increase its responsibilities for compliance with the applicable Access Laws without the prior written approval of Lender.  Lender's approval of the plans, specifications, or working drawings, as may be required under the applicable terms of this Agreement or the other Loan Documents, for any alterations of the Property shall create no responsibility or liability on behalf of Lender for their completeness, design, sufficiency or their compliance with Access Laws or any other Legal Requirements.  The foregoing shall apply to tenant improvements constructed by Borrower or by any Tenants.  Lender may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer, or other Person acceptable to Lender.

(c)    Borrower agrees to give prompt notice to Lender of the receipt by Borrower of any complaints related to violation of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

### Section 5.20    Operation of Property.  Borrower shall not enter into, execute, initiate, join in, acquiesce in or otherwise subject any portion of the Property to, or consent to any change in, any restrictive covenant, easement, agreement, zoning or similar law or other public or private restriction limiting, defining, changing or conditioning the uses which may be made of the Property or any part thereof, without Lender's prior written approval.  If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, the Borrower will not cause or permit the nonconforming use to be discontinued or abandoned without the express written consent of Lender.  Borrower shall not (i) change the use of the Property, or (ii) take any steps whatsoever to convert the Property, or any portion thereof, to a condominium or cooperative form of ownership, except in accordance with Article XIII hereof, unless otherwise consented to by Lender in Lender's discretion.  Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way impair the value of the Property or the security of this Agreement.  Borrower will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal,

or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof. Borrower shall not commit, permit or suffer to exist any act or omission that would cause any risk of forfeiture as against the Property or any part thereof or any monies paid in performance of the Obligations. Borrower shall not suffer, permit or initiate the joint assessment of the Property with any other real property constituting a tax lot separate from the Property. Borrower shall diligently pursue the qualification of the Property for all available tax exemption benefits afforded under Section 421-a of the Real Property Tax Law of New York. In addition to the foregoing, in the event that a change of law occurs which results in the Property no longer being afforded tax exemption benefits under Section 421-a of the Real Property Tax Law of New York on an as-of-right basis, then Borrower shall, upon Lender's consent, diligently proceed to purchase negotiable certificates under Section 421-a which will afford tax exempt benefits on the Property under Section 421-a of the Real Property Tax Law of New York.

**Section 5.21    Maintenance of Property; Payment for Labor and Materials.**

(a)    Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any Casualty, or become damaged, worn or dilapidated and shall complete and pay for (or cause the Tenants to pay for) any structure at any time in the process of construction or repair on the Property. Borrower will promptly pay when due all bills and costs for labor, materials and specifically fabricated materials incurred in connection with the Property and never permit to exist beyond the due date thereof in respect of the Property or any part thereof any Lien or security interest, even though subordinate to the Liens and the security interests of the Security Instruments, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional Lien or security interest other than the Lien created by the Loan Documents and the Permitted Encumbrances.

(b)    Borrower shall cause the Property to be maintained in a good and safe condition and repair. Except for the Construction Work, the Improvements shall not be removed, demolished or altered in any material respect nor shall any additional improvements be constructed without the prior written consent of Lender.

**Section 5.22    Transfer or Encumbrance of the Property.**

(a)    Borrower acknowledges that Lender, in agreeing to make the Loan, has examined and relied on the creditworthiness and experience of the Borrower Parties in owning and operating properties such as the Property, and that Lender will continue to rely on Borrower's ownership and operation of the Property as a means of maintaining the value of the Property as security for repayment of the Debt. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt, Lender can recover all or a portion of the Debt by a sale of the Property or a part thereof. Accordingly, subject to the terms of this Section 5.22, and, except for Permitted Transfers, Borrower shall not, without the prior written consent of Lender, (i) effectuate a Transfer, or (ii) sell, convey, alienate, mortgage, encumber, pledge or otherwise Transfer the Property, or any part thereof or any interest therein, directly or indirectly, or permit the Transfer of the Property, or any part thereof or any interest therein, other than pursuant to Leases of space pursuant to Section 5.15 and sales of Units pursuant to Section 13.6.

(b)    A Transfer within the meaning of this Section 5.22 shall be deemed to
include: (A) an installment sales agreement wherein Borrower agrees to sell the Property or any
part thereof or any interest therein for a price to be paid in installments; (B) an agreement by
Borrower leasing all or a substantial part of the Property for other than actual occupancy by a
space tenant thereunder, or a sale, assignment or other transfer of, or the grant of a security
interest in, Borrower's right, title and interest in and to any Leases or any Rents, except as
specifically permitted by the Loan Documents; (C) if Borrower or any partner or member of
Borrower (or any indirect owner of a legal or beneficial interest in Borrower or any constituent
partner or member of Borrower no matter how remote) is a corporation, the Transfer of such
corporation's stock or any portion thereof (or the stock of any corporation directly or indirectly
controlling such corporation by operation of law or otherwise) or the creation or issuance of new
stock in one or a series of transactions by which any of such corporation's stock or any portion
thereof shall be vested in a party or parties who are not now existing stockholders as of the date
hereof or results in any change in the ultimate ownership or control of such corporation (no
matter how remote); (D) if Borrower or any partner or member of Borrower (or other indirect
owner of a legal or beneficial interest in Borrower or any constituent partner or member of
Borrower no matter how remote) is a limited or general partnership, joint venture or limited
liability company, the change, removal, resignation or addition of a partner, joint venturer or
member or the Transfer of the partnership or membership interest of any partner or any member
or the Transfer of the legal or beneficial interest of any joint venturer, partner or member; (E) if
Borrower is a limited or general partnership, joint venture, limited liability company, trust,
nominee trust, tenancy in common or other unincorporated form of business association or form
of ownership interest, the Transfer of any legal or beneficial interest (including any economic or
profits interest) of any Person having a direct or indirect legal or beneficial ownership interest in
Borrower, including any legal or beneficial interest in any constituent partner or member of
Borrower; (F) except as otherwise provided in the Loan Documents, any instrument subjecting
Property to a condominium regime or transferring ownership to a cooperative corporation;
(G) the dissolution or termination of Borrower or any general partner, managing member,
manager or member manager of Borrower or any constituent member or partner of Borrower or
the merger or consolidation of Borrower or any general partner or member of Borrower with any
other Person; (H) any transfer of a direct or indirect, legal or beneficial ownership interest in
Borrower other than Permitted Transfers; (I) any other transaction other than a Permitted
Transfer, pursuant to which any Person not holding a direct or indirect, legal or beneficial
ownership interest in Borrower on the Closing Date acquires a direct or indirect (and no matter
how remote), legal or beneficial ownership interest in Borrower; (J) any swap, derivative or other
transaction shifting the risks and rewards of ownership of Property, unless otherwise expressly
required by the Loan Documents; (K) any transaction pursuant to which any Person is granted an
option to purchase all or any portion of Property or any direct, indirect, legal or beneficial
interest in Borrower; and (L) any transaction, agreement or arrangement pursuant to which any
Person is given any right to control, direct or veto any material actions or decisions by Borrower,
directly or indirectly, whether through an ownership interest, contract right or otherwise.

(c)    Notwithstanding the foregoing, a Permitted Transfer shall be permitted
without the Lender's consent provided that (i) if such sale or conveyance occurs after a
Securitization, the Rating Agencies shall have confirmed in writing that such sale or conveyance
will not result in a requalification, reduction, downgrade or withdrawal of the ratings in effect
immediately prior to such sale or conveyance for the Securities or any class thereof issued in

connection with a Securitization which are then outstanding, and (ii) the Borrower provides
Lender with a certificate stating that the following conditions have been satisfied: (A) no Event
of Default shall have occurred and be continuing beyond any applicable notice and cure period
and such sale or conveyance shall not result in an Event of Default; (B) the requirements for a
Single Purpose Entity pursuant to Section 4.1(s) hereof and the organizational documents of the
Borrower continue to be satisfied; (C) to the extent required by the commercial mortgage backed
securities criteria of the Rating Agencies, Lender has received a Non-Consolidation Opinion
which may be relied upon by Lender, the Rating Agencies and their respective counsel,
successors and assigns, with respect to the Transferee and its applicable affiliates, which Non-
Consolidation Opinion shall be reasonably acceptable to Lender and, after a Securitization, the
Ratings Agencies; (D)if following such sale or conveyance, Property Manager will not be the
property manager of the Properties, then the property manager of the Properties must be a New
Property Manager.

(d)     In the event Lender, in its reasonable discretion, determines that any of the
foregoing conditions has not been satisfied, Lender shall notify Borrower in writing of such
determination no later than five (5) Business Days after Lender's receipt of the Borrower's
certification.

(e)     Lender shall not be required to demonstrate any actual impairment or
prejudice of its security or any increased risk of default hereunder in order to declare the Debt
immediately due and payable upon any Transfer (other than a Permitted Transfer) without
Lender's prior written consent which may be granted, withheld, delayed or conditioned in
Lender's discretion. This provision shall apply to every Transfer regardless of whether voluntary
or not, or whether or not Lender has consented to any previous Transfer. Notwithstanding
anything to the contrary contained in this Section 5.22, (i) no Transfer (whether or not such
Transfer shall constitute a Permitted Transfer) shall be made to any Prohibited Person and (ii)
except for Transfers of Units made in accordance with the provisions of this Agreement,
Borrower shall, prior to any Transfer, and if required by Lender, deliver a Non-Consolidation
Opinion to Lender, which opinion shall be in form, scope and substance acceptable in all
respects to Lender.

(f)     Lender's consent to one Transfer of the Property shall not be deemed to be
a waiver of Lender's right to require such consent to any future Transfer of the Property. Any
Transfer of the Property made in contravention of this Section 5.22 shall be null and void and of
no force and effect.

(g)     Borrower agrees to bear and shall pay or reimburse Lender on demand for
all reasonable costs and expenses (including title search costs, title insurance endorsement
premiums and reasonable attorneys' fees and disbursements) incurred by Lender in connection
with the review, approval and documentation of any proposed Transfer whether or not such
consent is granted, withheld, conditioned or denied.

(h)     Without limiting the generality of the restrictions on Transfers set forth in
this Section 5.22, each and/or any Transfer shall be conditioned upon the satisfaction of one or
more of the following conditions as may be deemed reasonably appropriate or desirable by
Lender under the circumstances (i) a modification of the terms hereof, the Notes, the Security

Instruments or the other Loan Documents; (ii) an assumption of this Agreement, the Notes, the
Security Instruments and the other Loan Documents as so modified by the proposed transferee,
subject to the provisions of Section 9.1 hereof; (iii) payment of all of reasonable fees and
expenses incurred in connection with such Transfer including, without limitation, the cost of any
third party reports, legal fees and expenses, Rating Agency fees and expenses or required legal
opinions; (iv) the delivery of a Non-Consolidation Opinion reflecting the proposed Transfer,
satisfactory in form and substance to Lender; (v) the proposed transferee's continued compliance
with the representations and covenants set forth herein; (vi) the delivery of evidence satisfactory
to Lender that the single purpose nature and bankruptcy remoteness of the Borrower, its
shareholders, partners or members, as the case may be, following such Transfer are in
accordance with the then current standards of Lender and the Rating Agencies; and
(vii) confirmation in writing from the Rating Agencies to the effect that such Transfer will not
result in a re-qualification, reduction or withdrawal of the then current rating assigned to the
Securities or any class thereof in any applicable Securitization. In addition to the foregoing, each
and/or any Transfer shall be conditioned upon the satisfaction of such other conditions as Lender
shall determine in its discretion to be in the interest of Lender, including, without limitation, the
creditworthiness, reputation and qualifications of the transferee with respect to the Loan and the
Property or any part thereof.

     (i)     [Intentionally Reserved]

     (j)     Notwithstanding anything in this Agreement to the contrary, Borrower
shall at all times cause Alexander Gurevich to have an ownership interest, directly or indirectly,
in Borrower of at least 51% in the aggregate and Alexander Gurevich shall at all times control
and be responsible for the management and day-to-day operations of Borrower. Any breach of
this Section 5.22(j) shall constitute a prohibited Transfer and shall be deemed an automatic Event
of Default hereunder.

### Section 5.23  ERISA.

     (a)     Borrower shall not engage in any transaction which would cause any
obligation, or action taken or to be taken, under the Loan Documents (or the exercise by Lender
of any of its rights under the Loan Documents) to be a non-exempt (under a statutory or
administrative class exemption) prohibited transaction under ERISA.

     (b)     Borrower further covenants and agrees to deliver to Lender such
certifications or other evidence from time to time throughout the term of the Loan, as requested
by Lender, that (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of
ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of
Section 3(32) of ERISA or treats as holding assets of any such plan by reason of such plans
ownership of an interest in Borrower; (ii) Borrower is not subject to state statutes regulating
investments and fiduciary obligations with respect to governmental plans; and (iii) one or more
of the following circumstances is true:

     (i)     Equity interests in Borrower are publicly offered securities, within
the meaning of 29 C.F.R. § 2510.3-101(b)(2);

(ii)    Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2); or

(iii)    Borrower qualifies as an "operating company" or a "real estate operating company" within meaning of 29 C.F.R. § 2510.3-101(c) or (e) or an investment company registered under The Investment Company Act of 1940.

**Section 5.24    Affiliate Transaction**.  Borrower shall not enter into any Affiliate Transaction without the prior written consent of Lender, which may be withheld in Lender's sole discretion and in any event only upon such terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any such Affiliate; provided; however, if the Property Manager is an Affiliate of any Borrower Party, Lender's execution of the Consent and Recognition Agreement shall be deemed approval of such Affiliate Transaction.  Lender hereby acknowledges that the Affiliate Transactions described in the Pre-Development Budget with Gurevich & Associates, L.L.P., Continental Realty and TransContinental Abstract are hereby consented to by Lender.

**Section 5.25    Service Rights**.  Borrower shall not allow any Service Rights to be granted by any Person other than Borrower (including the Property Manager, any Affiliate of Borrower or the Principal), and any Service Rights granted by any Person other than Borrower shall be null and void ab initio.

**Section 5.26    Purchase Options**.  Borrower shall deliver to Lender true and correct copies of any Purchase Agreement, any option agreement and any rights of first offer or rights of first refusal to purchase the Property or any portion thereof, or any other similar agreement, together with all amendments and modifications thereto, within five (5) Business Days after the execution thereof.  The requirement for delivery of the foregoing shall not be deemed to imply Lender's consent thereto.

**Section 5.27    Confirmation of Representations, Warranties and Covenants**.  In addition to and not in limitation of the covenants and agreements of Borrower contained in this Agreement, if requested by Lender, Borrower shall deliver, in connection with any Secondary Market Transaction, one or more Officer's Certificates certifying as to the accuracy of all representations and warranties made by Borrower in the Loan Documents as of the Closing Date and as of the date of the closing of such Secondary Market Transaction.

**Section 5.28    Subdivision Maps**.  Prior to entering into, agreeing to or recording any map, plat, parcel map, lot line adjustment or other subdivision map of any kind covering any portion of Property (collectively, a "**Subdivision Map**"), or amending, modifying, terminating or taking any material action with respect to any Subdivision Map, the Borrower shall submit such Subdivision Map to Lender for Lender's review and approval, which approval may be withheld in Lender's sole discretion.  As a condition precedent to approval by Lender; if required by Lender, (i) Borrower shall execute, acknowledge and deliver to Lender such amendments to the Loan Documents as Lender may reasonably require to reflect the change in the legal description of the Property resulting from the recordation of any Subdivision Map, and (ii) Borrower shall deliver to Lender, at Borrower's sole expense, title endorsements to the Title Insurance Policies

in form and substance satisfactory to Lender insuring the continued first, second and third priority Liens of the Security Instruments, as applicable. Subject to the execution and delivery by Borrower of any documents required under this <u>Section 5.28</u>, Lender shall, if required by applicable law, sign any Subdivision Map approved by Lender pursuant to this <u>Section 5.28</u>.

**Section 5.29 <u>Pre-Development Work; Demolition; Preliminary Plans and Specifications; Material Agreements</u>.** (a) Borrower and Lender acknowledge that Borrower intends to construct and develop the Project on the Land and that certain pre-development work with respect to the Project will occur during the term of the Loan. Such pre-development work (collectively, the "**Pre-Development Work**") shall (a) include (i) Borrower's employment of the Architect and Engineer (pursuant the terms of the Architect's Contract and Engineer's Contract) for purposes of preparing and submitting for approval, as required by Applicable Laws, all plans and specifications required for the Project, (ii) Borrower's submission of all applications, materials and other documents which are necessary in order for Borrower to obtain all necessary consents, certificates, licenses, permits and other approvals required in connection with the construction of the Residential Development, (iii) Borrower's retention of a general contractor or construction manager acceptable to Lender pursuant to the terms of a general construction contract or construction management agreement acceptable to Lender, (iv) the preparation of the condominium documents to be utilized in connection with creating the Condominium, and (v) certain demolition work at the Property to extent that the contract(s) and contractor(s) related to such demolition work have been approved by Lender, in each case, to the extent provided for in the Pre-Development Budget and (b) be conducted by Borrower in accordance with the Pre-Development Budget. Borrower shall submit WCR Advance Requests to Lender in accordance with <u>Section 2.6</u> of this Agreement. All funds disbursed to Borrower from the WCR Holdback in accordance with <u>Section 2.8</u> of this Agreement shall be applied by Borrower to pay for costs incurred by Borrower in connection with the performance of the Pre-Development Work. Notwithstanding anything to the contrary contained herein, Borrower shall not commence the demolition of any existing Improvements on the Land or the construction of any buildings, fixtures or other improvements of any kind on the Premises without obtaining the prior written consent of all necessary Governmental Authorities and without obtaining Lender's (i) approval of all contracts related thereto, (ii) approval of all contractors which Borrower propose to perform such demolition work and (iii) receipt of evidence acceptable to Lender that all insurance required in connection with the performance of such demolition work shall have been obtained by Borrower.

(b) Borrower shall submit to Lender for its approval a set of preliminary plans and specifications for the Project (including all site plans, subdivision plans and any other plans and specifications required for the Project ) prepared by the Architect and/or the Engineer (the "**Preliminary Plans and Specifications**") as and when available. Each material addition to or modification of any approved Preliminary Plans and Specifications or the Pre-Development Budget must be acceptable to Lender. Borrower shall diligently pursue the obtaining of all necessary permits, certificates, licenses and other approvals required for the construction of the Project by Applicable Law, including, but not limited to, site plan approvals, subdivision approvals, building permits and environmental clearance as required by Applicable Laws. Borrower shall not enter into any Master Construction Contract or any Material Agreement without the prior consent of Lender. Borrower shall collaterally assign to Lender, using Lender's standard form of collateral assignment, consent and recognition agreement, the Master

Construction Contract, the Architect's Contract and the Engineer's Contract. Borrower shall not agree to any modification or to any termination of the Master Construction Contract, Architect's Contract, the Engineer's Contract or any Material Agreement without the prior approval of Lender. Borrower shall furnish Lender with such information regarding the general contractor or construction manager, as applicable, which is a party to the Master Construction Contract, the Architect and/or the Engineer as Lender may request.

Section 5.30    **No Modifications**. Neither Borrower nor any Borrower Party shall modify or attempt to modify the Pre-Development Budget, any Construction Contract, any Material Agreement or the Preliminary Plans and Specifications without the prior express written consent of the Lender.

Section 5.31    **Construction Consultant**. Borrower acknowledges that Lender retains the right, at Borrower's sole cost and expense, at any time during the term of the Loan, to retain a Construction Consultant to act as a consultant and only as a consultant to Lender in connection with the construction of the Project and review and approval of plan and specification, payment and performance bonds, Construction Contracts, change orders, draw requests and other construction-related matters, (ii) Construction Consultant shall in no event or under any circumstance have any power or authority to make any decision or to give any approval or consent or to do any other act or thing which is binding upon Lender and any such purported decision, approval, consent, act or thing by Construction Consultant on behalf of Lender shall be void and of no force or effect, (iii) Lender reserves the right to make any and all decisions required to be made by Lender under this Agreement and the other Loan Documents and to give or refrain from giving any and all consents or approvals required to be given by Lender under this Agreement and the other Loan Documents and to accept or not accept any matter or thing required to be accepted by Lender under this Agreement and the other Loan Documents, in each instance in its sole and absolute discretion (unless provided otherwise in the Loan Documents), and without in any instance being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or report provided or not provided, by Construction Consultant to Lender or any other person or party with respect thereto, (iv) Lender reserves the right in its sole and absolute discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by Construction Consultant to Lender or any other person or party, and (v) Lender reserves the right in its sole and absolute discretion to replace Construction Consultant with another construction consultant at any time and without prior notice to or approval by Borrower, provided, however, that Lender agrees that it will notify Borrower if such replacement has occurred, it being understood and agree, however, that Lender's failure to so notify shall not be a default hereunder.

Section 5.32    **Equity Contribution**. Until such time as the Loan has been indefeasibly paid in full (together with all interest thereon and other sums payable with respect thereto), Borrower shall keep the Equity Contribution invested in the Property as equity and shall not permit any return of the Equity Contribution.

Section 5.33    **Anti-Terrorism**.

(a)      None of the Borrower nor any other Person owning a direct or indirect, legal or beneficial interest in Borrower is in violation of any Legal Requirement, including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (the "**Executive Order**"), the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56, the "**Patriot Act**") or any other Legal Requirement relating to terrorism or money laundering.

(b)      None of the Borrower, Guarantors nor any of their respective constituents, investors (direct or indirect and whether or not holding a legal or beneficial interest) or affiliates, nor any of their respective brokers or other agents, if any, acting or benefiting, directly or indirectly, in any capacity in connection with the Loan, is a "**Prohibited Person**" which is defined as follows:

(i)      a Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)      a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)      a Person with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering Legal Requirements, including the Executive Order and the Patriot Act;

(iv)      a Person who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(v)      a Person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gov/ofac/t1 1sdn.pdf or at any replacement website or other replacement official publication of such list; and

(vi)      a Person who is affiliated with a Person listed above.

(c)      None of the Borrower, Guarantors or any of their respective affiliates, investors or constituents or any of their respective brokers or other agents, if any, acting in any capacity in connection with the Loan are or will at any time hereafter (i) conduct any business or engage in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purposes of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order or the Patriot Act.

(d)    Borrower covenants and agrees to deliver to Lender any certification or other evidence requested from time to time by Lender in its discretion, confirming compliance with this Section 5.33.

(e)    (i) None of the funds or other assets of Borrower or any Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person (as defined below); (ii) no Embargoed Person has any interest of any nature whatsoever in Borrower or any Guarantor, as applicable (whether directly or indirectly); and (iii) none of the funds of Borrower or any Guarantor, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law. "**Embargoed Person**" means any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower or any Guarantor as applicable (whether directly or indirectly), is prohibited by law or the Loan made by the Lender is in violation of any applicable Legal Requirements.

## VI    CASUALTY; CONDEMNATION; ESCROWS

### Section 6.1    Insurance; Casualty and Condemnation.

### Section 6.1.1    Insurance.

(a)    Subject to the terms of Section 13.5(b), Borrower shall obtain and maintain, or cause to be maintained, during all times that any sum is outstanding under the Note or the other Loan Documents ("**Term**"), insurance for Borrower and the Property providing at least the following coverages:

(i)    Comprehensive all risk insurance on the Improvements and all personal property, including fire, lightning, vandalism and malicious mischief, boiler and machinery, contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements, and, if required by Lender, floor and/or earthquake coverage, in each case (A) in an amount equal to 100% of the "full replacement cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation, but the amount shall in no event be less than the outstanding principal balance of the Loan; (B) containing an agreed amount endorsement with respect to the Improvements and all personal property waiving all co-insurance provisions; (C) providing for no deductible in excess of the lesser of $25,000 and one percent (1%) of the face value of such policy; and (D) containing an "**Ordinance or Law Coverage**" or "**Enforcement**" endorsement if any of the Improvements or the use of Borrower's Property shall at any time constitute legal non-conforming structures or uses.  The full replacement cost shall be redetermined from time to time (but not more frequently than once in any six (6) calendar months) at the request of Lender by an appraiser or contractor designated and paid by Borrower and approved by Lender, or by an

engineer or appraiser in the regular employ of the insurer providing the relevant coverage. After the first appraisal, if permitted by Lender, additional appraisals may be based on construction cost indices customarily employed in the trade. No omission on the part of Lender to request any such ascertainment shall relieve Borrower of any of its obligations under this Section.

(ii)    Borrower shall obtain flood hazard insurance if any portion of the Improvements is currently or at any time in the future identified by the Federal Emergency Management Agency as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968 (and any amendment or successor act thereto) or otherwise being designated as a "special flood hazard area or part of a 100 year flood zone", in an amount equal to 100% of the full replacement cost of the Improvements; provided, however, that a portion of such flood hazard insurance may be obtained under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended.

(iii)    Earthquake insurance in amounts and in form and substance satisfactory to Lender in the event the Property is located in an area with a high degree of seismic activity, provided that the insurance pursuant to clauses (ii) and (iii) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under Section 6.1.1.(a)(i) except that the deductible on such insurance shall not be in excess of five percent (5%) of the appraised value of the Property or such other amount as may be agreed to by Lender.

(iv)    Commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a combined single limit of not less than $1,000,000 or such higher amount as may be required by Lender; (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; and (4) blanket contractual liability for all written and oral contracts.

(v)    Business income insurance (A) with loss payable to Lender, (B) covering all risks required to be covered by the insurance provided for in Section 6.1.1(a)(i); (C) containing an unlimited indemnity period pertaining to the time to repair and rebuild; (D) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and all personal property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date of the loss, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (E) in an amount of insurance equal to two (2) times the projected gross income from the Project (including Rents). The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate (subject to Lender's review and approval) of the gross income from the Property for the succeeding twelve (12) month period. All Insurance Proceeds payable to Lender pursuant to this Section 6.1.1(a)(v) shall be held by Lender and shall be applied to the Obligations from time to time due and payable hereunder and under the Loan; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the Obligations on the

respective dates of payment provided for in the Notes except to the extent such amounts are actually paid out of the proceeds of such business income insurance.

(vi)    At all times during which structural construction, repairs or alterations are being made or demolition being performed with respect to the Improvements, Borrower's insurance shall include (A) contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) the insurance provided for in Section 6.1.1(a)(i) written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to Section 6.1.1(a)(i), (3) including permission to occupy the Property, and (4) with an agreed amount endorsement waiving co-insurance provisions.

(vii)    Workers compensation insurance, subject to the statutory limits of the state in which the Property is located, and employer's liability insurance with a limit of at least $1,000,000 per accident and per disease per employee, and $1,000,000 for disease aggregate in respect of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable).

(viii)    Comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the comprehensive all risk insurance required under Section 6.1.1(a)(i).

(ix)    Umbrella liability insurance in an amount not less than $25,000,000 per occurrence on terms consistent with the commercial general liability insurance policy required under Section 6.1.1(a)(iv).

(x)    If applicable, motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence of $1,000,000.

(xi)    In the event that the Property or any part of the Improvements constitutes a legal non-conforming use under applicable building, zoning or land use laws or ordinances which are in affect at the time of loss or at the time of reconstruction, the policy shall include an ordinance or law coverage endorsement which will contain Coverage A: "Loss Due to Operation of Law" (with a minimum liability limit equal to Replacement Cost With Agreed Value Endorsement), Coverage B: "Demolition Cost" and Coverage C: "Increased Cost of Construction" coverages.

(xii)    Insurance for loss resulting from perils and acts of terrorism on terms (including amounts) consistent with the insurance required under Section 6.1(a)(i), (iv), (v), (vi), (viii) and (ix) above, at all times during the term of the Loan.

(xiii)    Such other insurance and in such amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

(b)    All insurance provided for in <u>Section 6.1.1(a)</u> shall be obtained under valid and enforceable policies ("**Policies**" or in the singular, "**Policy**"), in such forms and, from time to time after the date hereof, in such amounts as may be satisfactory to Lender, issued by financially sound and responsible insurance companies authorized to do business in the State in which the Property is located and approved by Lender. Except as otherwise approved by Lender in its discretion, the insurance companies must have a claims paying ability/financial strength rating of "**A**" (or its equivalent) or better by at least two (2) Rating Agencies (one of which shall be S&P if it is rating any Securities and one of which shall be Moody's if it is rating any Securities), or if only one Rating Agency is rating any such Securities, then only by such Rating Agency (each such insurer shall be referred to below as a "**Qualified Insurer**"). The Policies shall designate Lender as first mortgagee, except as to general liability, worker's compensation, umbrella liability and automobile policies under which Lender shall be named as an additional insured. Not less than thirty (30) days prior to the expiration dates of the Policies theretofore furnished to Lender pursuant to <u>Section 6.1.1(a)</u>, certified copies of the Policies marked "premium paid" or accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder ("**Insurance Premiums**"), shall be delivered by Borrower to Lender; provided, however, that in the case of renewal Policies, Borrower may furnish Lender with binders therefor to be followed by the original Policies when issued.

(c)    Borrower shall not obtain (i) any umbrella or blanket liability or casualty Policy unless, in each case, such Policy is approved in advance in writing by Lender (which approval will not be unreasonably withheld) and Lender's interest is included therein as provided in this Agreement and the Loan Documents and such Policy is issued by a Qualified Insurer, or (ii) separate insurance concurrent in form or contributing in the event of loss with that required in <u>Section 6.1.1(a)</u> to be furnished by, or which may be reasonably required to be furnished by, Borrower. In the event Borrower obtains separate insurance or an umbrella or a blanket Policy, Borrower shall notify Lender of the same and shall cause certified copies of each Policy to be delivered as required in <u>Section 6.1.1(a)</u>. Any blanket Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of <u>Section 6.1.1(a)</u>.

(d)    All Policies of insurance provided for or contemplated by <u>Section 6.1.1(a)</u>, except for the Policy referenced in <u>Section 6.1.1(a)(vii)</u>, shall name Lender and the Borrower as the insured or additional insured, as their respective interests may appear, and in the case of property damage, boiler and machinery, flood and earthquake insurance, shall contain a so-called New York standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender. Without limitation to the foregoing, Lender shall be named under a Lender's Loss Payable Endorsement (acceptable to Lender) on all insurance policies which Borrower actually maintains with respect to the Property.

(e)    All Policies of insurance provided for in <u>Section 6.1.1(a)</u> shall contain clauses or endorsements to the effect that:

(i)    No act or negligence of Borrower, or anyone acting for Borrower, or of any Tenant under any Lease or other occupant, or failure to comply with the provisions of

any Policy which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned.

(ii)    The Policy shall not be materially changed (other than to increase the coverage provided thereby) or cancelled without at least thirty (30) days written notice to Lender and any other party named therein as an insured.

(iii)    Each Policy shall provide that the issuers thereof shall give written notice to Lender if the Policy has not been renewed thirty (30) days prior to its expiration.

(iv)    Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(v)    The insurer waives all rights of subrogation in a manner acceptable to Lender.

(f)    Borrower shall furnish to Lender, on or before thirty (30) days after the close of each calendar year, an Officer's Certificate stating the amounts of insurance maintained in compliance herewith, the risks covered by such insurance and the insurance company or companies which carry such insurance and, if requested by Lender, verification of the adequacy of such insurance by an independent insurance broker or appraiser acceptable to Lender.

(g)    If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower or any other Person to take such action as Lender deems necessary to protect Lender's interest in the Property, including the obtaining of such insurance coverage as Lender in Lender's discretion deems appropriate, and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Loan Documents and shall bear interest at the Default Rate.

(h)    In the event of foreclosure of any Security Instrument, or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of the Borrower in and to such Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

(i)    Within thirty (30) days after request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices of similarly situated lenders, and the like.

(j)    If the Property or any portion of the Property is damaged or destroyed, in whole or in part, by fire or other casualty, whether insured or uninsured (a "**Casualty**"), the Borrower shall give prompt written notice thereof to Lender.  Following the occurrence of a Casualty, the Borrower shall, regardless of whether Insurance Proceeds are available, promptly proceed to restore, repair, replace or rebuild the same to be of at least equal value and of substantially the same character as prior to such damage or destruction, all to be effected in

accordance with applicable law and the terms and conditions of the Loan Documents. The expenses incurred by Lender in the adjustment and collection of Insurance Proceeds shall become part of the Debt and be secured by the Loan Documents and shall be reimbursed by Borrower to Lender upon demand.

(k)    Borrower shall comply with all insurance requirements of any insurer of the Property or any portion thereof and shall not bring or keep or permit to be brought or kept any article upon any of the Property or any portion thereof or cause or permit any condition to exist thereon which would be prohibited by an insurance requirement, or would invalidate any Policies then in effect or any of the insurance coverage required hereunder to be maintained by Borrower on or with respect to any part of the Property pursuant to this Agreement.

(l)    Any reimbursement due to Lender pursuant to this Section 6.1.1 must be paid within ten (10) days (or sooner if required), or such amount shall accrue interest at the Default Rate until paid to Lender.

(m)    Lender shall not be responsible for nor incur any liability for the insolvency of any insurer or other failure of any insurer to perform, even though Lender has caused the insurance to be placed with the insurer after failure of Borrower to furnish such insurance. Borrower shall not obtain insurance for the Property in addition to that required by Lender without the prior written consent of Lender, which consent will not be unreasonably withheld provided that (i) Lender is named insured on such insurance, (ii) Lender receives complete copies of all policies evidencing such insurance, and (iii) such insurance complies with all of the applicable requirements set forth herein.

## Section 6.1.2  Casualty and Application of Proceeds.

(a)    In case of loss or damages covered by any of the Policies, the following provisions shall apply:

(i)    In the event of a Casualty with respect to the Property that is less than $500,000 in the aggregate, the Borrower may settle and adjust any claim without the consent of Lender and retain the proceeds thereof.

(ii)    In the event of a Casualty with respect to the Property in excess of $500,000 if each of the following is true at all times: (A) the Insurance Proceeds are sufficient to pay for the Restoration as determined by Lender; (B) after such Restoration, the Property will adequately secure the outstanding balance of the Loan; (C) no Default or Event of Default exists; (D) less than fifteen percent (15%) of the total floor area of the Improvements with respect to the Property has been substantially damaged, destroyed, or rendered unusable as a result of the Casualty; (E) Lender shall be satisfied that the Restoration will be completed on or before the earlier of (i) six (6) months prior to the Maturity Date, or (ii) twelve (12) months after the occurrence of the Casualty; (F) the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements; and (G) the Casualty does not result in the loss of access to the Property or the Improvements, then the Insurance Proceeds shall be deposited with Lender and after reimbursement of any expenses incurred by Lender, such Insurance Proceeds shall be maintained and applied to pay for the cost of restoring,

repairing, replacing or rebuilding the Property or part thereof subject to the Casualty
("**Restoration**"), in the manner set forth herein. The Borrower hereby covenants and agrees to
commence and diligently prosecute such Restoration; provided that: (a) Borrower shall pay all
costs (and if required by Lender, Borrower shall deposit the total thereof with Lender in advance)
of such Restoration in excess of the net Insurance Proceeds made available pursuant to the terms
hereof; (b) the Restoration shall be done in compliance with all applicable Legal Requirements;
(c) Borrower shall commence the Restoration as soon as reasonably practicable (but in no event
later than thirty (30) days after settlement with the applicable insurance carrier regarding the
Insurance Proceeds arising from the Casualty) and shall diligently pursue the same to satisfactory
completion; (d) the Restoration shall be done and completed by Borrower in an expeditious and
diligent fashion and in compliance with all applicable Legal Requirements, including any
applicable Environmental Laws; and (e) Lender shall have received evidence satisfactory to
Lender that, during the period of the Restoration, the sum of (x) income derived from the
Property, as reasonably determined by Lender, plus (y) proceeds of rent loss insurance or
business interruption insurance, if any, to be paid, plus (z) any excess funds deposited by
Borrower, will equal or exceed the sum of (1) expenses in connection with the operation of the
Property, (2) the required payments of principal and interest on the Loan, and (3) the other
payments required pursuant to this Agreement or the Loan Documents.

   (b) Except as provided above in Section 6.1.2(a), the Insurance Proceeds
collected upon any Casualty shall be deposited with Lender and at Lender's option (in its
discretion), be applied to the payment of the Debt after reimbursement of any expenses incurred
by Lender or, if Lender so elects (without any obligation to do so), after reimbursement of any
expenses incurred by Lender, Lender or Servicer shall hold such amount and such proceeds shall
be maintained and applied in accordance with the Loan Documents to pay for the cost of any
Restoration in the manner set forth herein. Any such application to the Debt shall be at Lender's
discretion, except as specifically provided herein to the contrary, and shall be applied to those
payments of principal and interest (including the Additional Fee) last due under the Notes or as
otherwise determined by Lender and shall not postpone or reduce any payments otherwise
required pursuant to the Notes and the other Loan Documents or otherwise determined by
Lender.

   (c) In the event Borrower is entitled to reimbursement out of Insurance
Proceeds held by Lender, such Insurance Proceeds shall be disbursed from the Lender from time
to time (but not more than once per month) upon Lender being furnished with: (i) evidence
satisfactory to Lender of the estimated cost of completion of the Restoration; (ii) evidence
satisfactory that (A) all materials installed and work and labor performed (except to the extent
that they are to be paid for out of the requested disbursement) have been paid for in full, and
(B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices
of intention to file same, or any other Liens or encumbrances of any nature whatsoever on the
Property arising out of the Restoration which have not either been fully bonded to the
satisfaction of Lender and discharged of record or in the alternative fully insured to the
satisfaction of Lender by the Title Insurance Company; (iii) sufficient funds, or at Lender's
option, assurances satisfactory to Lender that such funds are available, in addition to the
Insurance Proceeds, to complete the proposed Restoration; (iv) such architect's certificates,
waivers of Lien, contractor's sworn statements, title insurance endorsements, bonds, plats of
survey and such other evidences of cost, payment and performance as Lender may reasonably

require and approve; and (v) all plans and specifications for such Restoration, such plans and specifications to be delivered and approved by Lender prior to commencement of any work.

(d)    All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and, if required by Lender, by an independent consulting engineer selected by Lender. Lender shall have the use of the plans and specifications and all permits, Licenses and approvals required or obtained in connection with the Restoration. The identity of the general contractor engaged in the Restoration, as well as the general contract under which it has been engaged, shall be subject to prior review and acceptance by Lender. All reasonable costs and expenses incurred by Lender in connection with making the Insurance Proceeds available for the Restoration, including reasonable counsel fees and disbursements, shall be deducted by Lender from such insurance proceeds.

(e)    In addition, no payment made prior to the final completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time except as may be provided in a general contractor's agreement approved by Lender; funds other than Insurance Proceeds shall be disbursed prior to disbursement of such Insurance Proceeds; and at all times, the undisbursed balance of such Insurance Proceeds remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all Liens or claims for Lien. Any surplus which may remain out of Insurance Proceeds after payment of such costs of Restoration shall be applied to the Loan in such order and manner as Lender may elect.

## Section 6.1.3  Condemnation.

(a)    Borrower shall promptly give Lender written notice of the actual or threatened commencement of any condemnation or eminent domain proceeding against the Property or any part thereof or the Improvements or any part thereof (a "**Condemnation**") and shall deliver to Lender copies of any and all papers served by or on or received by any of the Borrower Parties in connection with such Condemnation. Following the occurrence of a Condemnation, Borrower, regardless of whether an Award is available, shall promptly proceed to restore, repair, replace or rebuild the Property to the extent practicable to be of at least equal value and of substantially the same character as prior to such Condemnation, all to be effected in accordance with all Legal Requirements.

(b)    Lender is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment ("**Award**") for any taking accomplished through a Condemnation and to make any compromise or settlement in connection with such Condemnation, subject to the provisions of this Section. Notwithstanding any taking in connection with a Condemnation by any public or quasi-public authority (including any transfer made in lieu of or in anticipation of such a Condemnation), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Notes and the other Loan Documents and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Lender to expenses of collecting the

Award and to discharge of the Debt. Lender shall not be limited to the interest paid on the
Award by the condemning authority but shall be entitled to receive out of the Award interest at
the rate or rates provided in the Note. Borrower shall cause any Award that is payable to
Borrower to be paid directly to Lender.

      (c)     The proceeds of any Award collected upon any Condemnation shall be
deposited directly with Lender pursuant to Section 6.1.3(b) and at Lender's option (in its
discretion), shall be applied to the payment of the Debt (after reimbursement of any expenses
incurred by Lender) or, if Lender so elects (without any obligation to do so), (after
reimbursement of any expenses incurred by Lender), Lender or Servicer shall hold such amount
and such proceeds shall be maintained and applied in accordance with the Loan Documents to
pay for the cost of any Restoration in the manner set forth herein. Any such application to the
Debt shall be at Lender's discretion and shall be applied to those payments of principal and
interest (including any portion of the Additional Fee) last due under the Notes or as otherwise
determined by Lender and shall not postpone or reduce any payments otherwise required
pursuant to the Notes and the other Loan Documents. If the Property is sold, through foreclosure
or otherwise, prior to the receipt by Lender of such Award, Lender shall have the right, whether
or not a deficiency judgment shall be recoverable or shall have been sought, recovered or denied,
to receive all or a portion of said Award sufficient to pay the outstanding balance of the Debt.

      (d)     In the event Borrower is entitled to reimbursement out of the
Condemnation Proceeds held by Lender, such Condemnation Proceeds shall be disbursed from
Lender from time to time (but not more than once per month) upon Lender being furnished with:
(i) evidence satisfactory to Lender of the estimated cost of completion of the Restoration;
(ii) evidence satisfactory that (A) all materials installed and work and labor performed (except to
the extent that they are to be paid for out of the requested disbursement) have been paid for in
full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens
or notices of intention to file same, or any other Liens or encumbrances of any nature whatsoever
on the Property arising out of the Restoration which have not either been fully bonded to the
satisfaction of Lender and discharged of record or in the alternative fully insured to the
satisfaction of Lender by the Title Insurance Company; (iii) sufficient funds, or at Lender's
option, assurances satisfactory to Lender that such funds are available, in addition to the
Condemnation Proceeds, to complete the proposed Restoration; (iv) such architect's certificates,
waivers of Lien, contractor's sworn statements, title insurance endorsements, bonds, plats of
survey and such other evidences of cost, payment and performance as Lender may reasonably
require and approve; and (v) all plans and specifications for such Restoration, such plans and
specifications to be delivered and approved by Lender prior to commencement of any work.

      (e)     All plans and specifications required in connection with the Restoration
shall be subject to prior review and acceptance in all respects by Lender and, if required by
Lender, by an independent consulting engineer selected by Lender. Lender shall have the use of
the plans and specifications and all permits, Licenses and approvals required or obtained in
connection with the Restoration. The identity of the general contractor engaged in the
Restoration, as well as the general contract under which it has been engaged, shall be subject to
prior review and acceptance by Lender. All costs and expenses incurred by Lender in connection
with making the Condemnation Proceeds available for the Restoration, including reasonable
counsel fees and disbursements, shall be deducted by Lender from such Condemnation Proceeds.

(f)     In addition, no payment made prior to the final completion of the
Restoration shall exceed ninety percent (90%) of the value of the work performed from time to
time except as may be provided in a general contractor's agreement approved by Lender; funds
other than Condemnation Proceeds shall be disbursed prior to disbursement of such
Condemnation Proceeds; and at all times, the undisbursed balance of such Condemnation
Proceeds remaining in the hands of Lender, together with funds deposited for that purpose or
irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose,
shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion
of the Restoration, free and clear of all Liens or claims for Lien. Any surplus, which may remain
out of the Condemnation Proceeds after payment of such costs of Restoration, shall be applied to
the Loan in such order and manner as Lender may elect.

**Section 6.2     Tax and Insurance Escrows**.  Borrower shall pay to Lender on
each Payment Date (a) one-twelfth of the Taxes that Lender reasonably estimates will be payable
during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds
to pay all such Taxes at least thirty (30) days prior to their respective due dates and (b) one-
twelfth of the Insurance Premiums that Lender estimates will be payable for the renewal of the
coverage afforded by the Policies for the succeeding annual period upon the expiration thereof in
order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least
thirty (30) days prior to the expiration of the Policies (all amounts in clauses (a) and (b) above
hereinafter called the "**Tax and Insurance Escrow Fund**"). Borrower shall also deposit with
Lender on the Closing Date such amount as is required by Lender in order to provide adequate
funds therefor on the first payment date for such Taxes and Insurance Premiums. The Tax and
Insurance Escrow Fund and the payments of interest or principal or both, payable pursuant to the
Notes, shall be added together and shall be paid as an aggregate sum by Borrower to Lender in
immediately available funds. Lender will apply the Tax and Insurance Escrow Fund to payments
of Taxes and Insurance Premiums required to be made by Borrower pursuant to Section 5.4 and
under the other Loan Documents provided no Event of Default has occurred and is continuing.
In making any payment relating to the Tax and Insurance Escrow Fund, Lender may do so
according to any bill, statement or estimate procured from the appropriate public office (with
respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into
the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale,
forfeiture, tax Lien or title or claim thereof. Borrower shall arrange for any such bills, statements
or estimates to be delivered to Lender at least fifteen (15) Business Days prior to the date any
such payment is due. If the amount of the Tax and Insurance Escrow Fund shall exceed the
amounts due for Taxes and Insurance Premiums pursuant to Section 5.4, Lender shall, in its
discretion, return any excess to Borrower or, at Lender's option, credit such excess against future
payments to be made to the Tax and Insurance Escrow Fund. In allocating such excess, Lender
may deal with the Person shown on the records of Lender to be the owner of the Property. Any
amount remaining in the Tax and Insurance Escrow Fund after the Debt has been paid in full
shall be returned to Borrower, or at Lender's option, may be deducted from the Loan payoff
amount. In allocating such excess, Lender may deal with the Person shown on the records of
Lender to be the owner of the Property. If at any time Lender reasonably determines that the Tax
and Insurance Escrow Fund is not or will not be sufficient to pay the items set forth in clauses (a)
and (b) above, Lender shall notify Borrower of such determination and Borrower shall increase
its monthly payments to Lender by the amount that Lender estimates is sufficient to make up the

deficiency at least thirty (30) days prior to delinquency of the Taxes and/or thirty (30) days prior
to expiration of the Policies, as the case may be.

## VII  DEFAULTS

### Section 7.1    Event of Default.

(a)    Each of the following shall constitute an event of default hereunder (an
"**Event of Default**"):

(i)    if (A) any payment of principal or interest due pursuant to any
Note, this Agreement or any of the other Loan Documents, including the payment due on the
Maturity Date, is not paid on or prior to the date the same is due or (B) any other portion of the
Debt, which by the terms of the Loan Documents becomes due and payable, is not paid within
ten (10) days after payment of same is demanded by Lender;

(ii)    any of the Taxes or Other Charges (other than any of the same
payable on a Payment Date) are not paid on or before the tenth (10th) day after the same are due
and payable except to the extent sums sufficient to pay such Taxes and Other Charges have been
deposited with Lender in accordance with terms of this Agreement and Lender fails to pay same;

(iii)    the Policies are not kept in full force and effect, or certified copies
of the Policies are not delivered to Lender within twenty (20) days of request by Lender;

(iv)    a Transfer (other than a Transfer specifically authorized and
permitted by Section 5.22) shall occur without Lender's prior written consent;

(v)    any representation or warranty made by Borrower or any of the
Borrower Parties herein or in any other Loan Document, or in any material report, certificate,
financial statement or other instrument, agreement or document furnished to Lender in
connection with the Loan, shall have been false or misleading in any material respect as of the
date the representation or warranty was made (disregarding any knowledge qualifiers thereof
contained in the Loan Documents); provided, however, if such false or misleading representation
or warranty is susceptible of being cured within thirty (30) days, the same shall be an Event of
Default hereunder only if the same is not cured within a reasonable time not to exceed thirty (30)
days after notice from Lender;

(vi)    if (A) Borrower or any Borrower Party shall commence any case,
proceeding or other action (1) under any existing or future Bankruptcy Laws, or (2) seeking
appointment of a receiver, trustee, custodian, conservator or other similar official for Borrower
or Borrower Party or for all or any substantial part of the assets of Borrower or Borrower Party,
or Borrower or any Borrower Party shall make a general assignment for the benefit of creditors;
or (B) there shall be commenced against Borrower or any Borrower Party any case, proceeding
or other action of a nature referred to in clause (A) above which (1) results in the entry of an
order for relief or any such adjudication or appointment or (2) remains undismissed,
undischarged or unbonded for a period of ninety (90) days; or (C) there shall be commenced
against Borrower or any Borrower Party any case, proceeding or other action seeking issuance of
a warrant of attachment, execution, distraint or similar process against all or any substantial part

of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within ninety (90) days from the entry thereof; or (D) Borrower or any Borrower Party shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (A), (B), or (C) above; or (E) Borrower or any Borrower Party shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

        (vii)    if Borrower shall be in default under any other permitted mortgage, deed of trust or security agreement covering any part of the Property whether it be superior or junior in Lien to any Security Instrument and whether it be permitted under the Loan Documents or if Borrower shall be in default of any other Indebtedness, secured or unsecured, owed by Borrower to any Person; provided, however, the foregoing shall not be deemed to permit Borrower to incur any other Indebtedness unless expressly permitted by the Loan Documents;

        (viii)    [Intentionally Reserved]

        (ix)    subject to Borrower's right to contest in <u>Section 5.4</u>, if the Property becomes subject to any mechanic's or materialman's lien or other Lien except a Lien for local real estate taxes and assessments not then due and payable and the Lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days or more;

        (x)    except as permitted or contemplated in the Loan Documents, the alteration, improvement, demolition or removal of any of the Improvements without the prior consent of Lender;

        (xi)    intentionally omitted;

        (xii)    Borrower fails to observe or perform any covenant, condition, agreement or obligation hereunder or under the other Loan Documents beyond any applicable cure period contained herein or therein, or if no cure period is provided, such failure is not cured (A) in the case of any default which can be cured by the payment of a sum of money, within ten (10) days after written notice from Lender to Borrower, or (B) in the case of any such failure which cannot be cured by the payment of a sum of money, within thirty (30) days after written notice from Lender to Borrower; provided, however, with respect to this clause (B), if such default is reasonably susceptible of cure, but not within such thirty (30) day period, then Borrower may be permitted up to an additional ninety (90) days to cure such failure provided, that Borrower diligently and continuously pursues such cure;

        (xiii)    Borrower is in breach of <u>Sections 4.1(s) or 5.3</u>;

        (xiv)    if Borrower violates or does not comply with any of the provisions of <u>Section 4.1(s)</u> or if any managing member or manager or the SPE Member of Borrower violates or does not comply with any of the provisions of <u>Section 4.1(s)</u>;

        (xv)    the prohibition, enjoining or interruption of Borrower's right to occupy, use or lease the Property for a continuous period of more than thirty (30) days;

(xvi)    (A) the condemnation, seizure or appropriation of, or occurrence of an uninsured Casualty with respect to any material portion of the Property; or (B) the sequestration or attachment of, or any levy or execution upon the Property, any other collateral provided by Borrower under any of the Loan Documents, or any substantial portion of the other assets of Borrower, which sequestration, attachment, levy or execution is not released, expunged or dismissed prior to the earlier of thirty (30) days or the sale of the assets affected thereby;

(xvii)    the failure at any time of any Security Instrument to be a valid first, second or third lien, as applicable, upon the Property or any portion thereof, other than as a result of any release or reconveyance of such Security Instrument with respect to all or any portion of the Property pursuant to the terms and conditions of this Agreement;

(xviii)    the discovery of any significant Hazardous Substances in, on or about the Property subsequent to the Closing Date and Borrower's failure to remediate in accordance with the terms of the Environmental Indemnity.  Any such Hazardous Substances shall be "significant" for this purpose if the presence of said Hazardous Substances, in Lender's discretion, has a Material Adverse Effect on the value of the Property;

(xix)    any of the assumptions contained in the Non-Consolidation Opinion delivered to Lender in connection with the Loan, or in any other Non-Consolidation Opinion delivered subsequent to the closing of the Loan, are or shall become untrue in any material respect;

(xx)    any statements made in any certificates, separateness agreements or similar documents delivered in connection with the Non-Consolidation Opinion (whether delivered in connection with closing the Loan or thereafter), and whether delivered to Lender or the attorneys rendering such Non-Consolidation Opinion, are or shall become untrue in any material respect;

(xxi)    the occurrence of any Recourse Event without regard to any grace, notice or cure period, if any, provided in the Guaranty of Recourse Obligations (but subject to any applicable notice and cure periods set forth herein);

(xxii)    [Intentionally Reserved];

(xxiii)    [Intentionally Reserved];

(xxiv)    [Intentionally Reserved];

(xxv)    the expenses for the Pre-Development Work exceed the sum of the remaining amounts available for such work under the Loan in accordance with the Pre-Development Budget, and the Borrower fails to deposit such additional funds as Lender determines are necessary in its discretion, within ten (10) days after notice from Lender in accordance with Section 7.3 of the Project Loan Agreement;

(xxvi)    Borrower fails or refuses to complete the Pre-Development Work in accordance with this Agreement;