(xxvii)    if an event occurs which, under the terms of this Agreement or any other Loan Document, which by such terms is deemed to constitute an "Event of Default" under such Loan Document (subject to any applicable notice and cure periods set forth therein);

(xxviii)    (i) any Guarantor fails in any material respect to perform or observe any term, covenant or agreement in any of the Loan Documents to which it is a party; or (ii) any Loan Document is for any reason revoked or invalidated, in whole or in any part (including with respect to future advances), or otherwise ceases to be in full force and effect; or (iii) any Borrower Party contests in any manner the validity or enforceability of any Loan Document to which it is a party or denies that it has any further liability or obligation thereunder; or

(xxix)    if Borrower is in breach of the Lien Obligations.

**Section 7.2    Remedies.**

(a)    Upon the occurrence of any Event of Default beyond any applicable notice and cure periods, Lender may take such action, without notice (but subject to any notices to be delivered in connection with an Event of Default as otherwise specified in this Agreement), demand, presentment, protest or other requirements of any kind (all of which are expressly waived by Borrower), as Lender deems advisable to protect and enforce its rights and remedies against Borrower or any of them and/or any Borrower Party and in and to the Property or any part thereof, including the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(i)    declare the entire Debt to be immediately due and payable;

(ii)    exercise any of the rights or remedies specified in Article X of any of the Security Instruments or any other provision of any of the Security Instruments;

(iii)    apply any sums then deposited with Lender or with any Servicer or other third party under the control of Lender and any other sums held in escrow or otherwise by Lender, including the Reserves, in accordance with the terms of this Agreement or any other Loan Document to the payment of the following items in any order in Lender's discretion: (A) Taxes and Other Charges; (B) Insurance Premiums; (C) interest on the unpaid principal balance of the Notes; (D) amortization of the unpaid principal balance of the Notes; and (E) all other sums payable pursuant to the Notes, this Agreement and the other Loan Documents, including advances made by Lender pursuant to the terms of this Agreement;

(iv)    pursue such other rights and remedies as may be available at law or in equity or under the Uniform Commercial Code including the right to receive and/or establish a lock box for all Rents, proceeds from the Intangibles (as defined in the Security Instruments) and any other receivables or rights to payments of Borrower relating to the Property;

(v)    with or without actual or threatened waste to the Property, Lender shall, at Lender's discretion, be entitled, and is hereby expressly and irrevocably authorized, upon application to a court of competent jurisdiction, without notice to Borrower, or any other party (any and all such notice being waived hereby) and without regard to the adequacy of any

security for the Debt or the solvency of Borrower or any other party liable for payment of the Debt, to appoint a receiver(s), on an emergency basis or otherwise (and if allowed by applicable law, on an ex parte basis), to take possession of and to operate the Property or any portion thereof, and at Lender's option, to collect the Rents. Borrower irrevocably waives all notice of and defenses and objections to the appointment of such receiver. Borrower further irrevocably agrees that the occurrence of any Event of Default per se would create an emergency and the necessity for immediate actions; and

(vi)     pursue any other right or remedy allowed by any Loan Document or applicable law.

(b)     Upon the occurrence and during the continuance of an Event of Default, interest on the outstanding principal balance of the Loan and, to the extent permitted by law, overdue interest and other amounts due in respect of the Loan, shall accrue at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein. Interest at the Default Rate shall be computed from the occurrence of the Event of Default until the actual receipt and collection of the Debt (or that portion thereof that is then due). To the extent permitted by applicable law, interest at the Default Rate shall be added to the Debt, shall itself accrue interest at the same rate as the Loan and shall be secured by the Security Instruments. This paragraph shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default; the acceptance of any payment of by Lender shall not be deemed to cure or constitute a waiver of any Event of Default; and Lender retains its rights under this Agreement and the other Loan Documents to accelerate and to continue to demand payment of the Debt upon the happening of any Event of Default, despite any payments made to Lender after the occurrence of such Event of Default.

(c)     Lender may resort to any remedies and the security given by any of the Loan Documents in whole or in part, and in such portions and in such order as determined by Lender in its discretion. No such action shall in any way be considered a waiver of any rights, benefits or remedies evidenced or provided by the Notes, the Security Instruments or any of the other Loan Documents. The failure of Lender to exercise any right, remedy or option provided in any of the Loan Documents shall not be deemed a waiver of such right, remedy or option or of any covenant or obligation secured by the Notes, the Security Instruments or the other Loan Documents. No acceptance by Lender of any payment after the occurrence of any Event of Default and no payment by Lender of any obligation for which Borrower is are liable hereunder shall be deemed to waive or cure any Event of Default, or Borrower's liability to pay such obligation. No sale of all or any portion of the Property, no forbearance on the part of Lender, and no extension of time for the payment of the whole or any portion of the Debt or any other indulgence given by Lender to Borrower, shall operate to release or in any manner affect the interest of Lender in the remaining Property or the liability of Borrower to pay the Debt. No waiver by Lender shall be effective unless it is in writing signed by Lender and then only to the extent specifically stated.

(d)     With respect to Borrower and the Property, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Property or any portion thereof for the satisfaction of any of the Debt, and Lender may seek satisfaction out of

the Property or any part thereof or decline to do so, in Lender's discretion. In addition, Lender
shall have the right from time to time to partially foreclose any of the Security Instruments in any
manner and for any amounts secured by such Security Instrument then due and payable as
determined by Lender in Lender's discretion including, without limitation, the following
circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the
payment of one or more scheduled payments of principal and interest, Lender may foreclose the
Security Instruments or any of them to recover such delinquent payments, or (ii) in the event
Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender
may foreclose the Security Instruments or any of them to recover so much of the principal
balance of the Loan as Lender may accelerate and such other sums secured by the Security
Instruments as Lender may elect. Notwithstanding one or more partial foreclosures, the Property
shall remain subject to the Security Instruments to secure payment of sums secured by Security
Instruments and not previously recovered.

(e)    Additionally, upon the occurrence of any Event of Default beyond any
applicable notice and cure periods or if any Borrower Party fails to make any payment or to do
any act as required in any of the Loan Documents, Lender may, but without any obligation to do
so and without notice to or demand on any Borrower Party and without releasing any Borrower
Party from any obligation under the Loan Documents, make or do the same in such manner and
to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized
to enter upon the Property for such purposes or appear in, defend, or bring any action or
proceeding to protect its interest in the Property or to foreclose the Loan Documents or collect
the Debt, and the cost and expense thereof (including reasonable attorneys' fees and
disbursements to the extent permitted by law), with interest at the Default Rate (as defined in the
Note) for the period after notice from Lender that such cost or expense was incurred to the date
of payment to Lender, shall constitute a portion of the Debt, shall be secured by the Loan
Documents and shall be due and payable to Lender upon demand.

(f)    No delay or omission to exercise any remedy, right or power accruing
upon an Event of Default, or the granting of any indulgence or compromise by Lender shall
impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any
such remedy, right or power may be exercised from time to time and as often as may be deemed
expedient. A waiver of one Default or Event of Default shall not be construed to be a waiver of
any subsequent Default or Event of Default or to impair any remedy, right or power of Lender.
Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a
deficiency judgment or preserve a deficiency claim in connection with the foreclosure of the
Security Instruments to the extent necessary to foreclose on all or any portion of the Property, the
Rents or any other collateral.

**Section 7.3    Right of Entry**. In addition to any other rights or remedies
granted under this Agreement, Lender and its agents shall have the right to enter and inspect the
Property at any reasonable time during the term of the Loan. The cost of such inspections or
audits, including the cost of all follow up or additional investigations or inquiries deemed
reasonably necessary by Lender, shall be borne by Borrower. The cost of such inspections, if not
paid for by Borrower following demand, may, at Lender's option, be added to the principal
balance of the sums due under the Notes and shall bear interest thereafter until paid at the
Default Rate.

**Section 7.4   Costs of Enforcement**.  In the event of the (i) exercise of any remedy by Lender under this Agreement or the other Loan Documents or following the occurrence of an Event of Default, (ii) foreclosure of any mortgage prior to or subsequent to a Security Instrument in which proceeding Lender is made a party, (iii) bankruptcy, insolvency, reorganization, rehabilitation, liquidation or other similar proceeding in respect of any Borrower Party or an assignment by any Borrower Party for the benefit of its creditors, (iv) enforcement of any obligations of or collection of any payments due from any Borrower Party under this Agreement, the other Loan Documents or with respect to the Property, or (v) incurring of any costs or expenses by Lender in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out", then Borrower, its successors or assigns, shall pay to Lender on demand any and all reasonable expenses, including legal expenses and attorneys' fees, incurred or paid by Lender in protecting Lender's interest in the Property or in collecting any amount payable hereunder or in enforcing Lender's rights hereunder with respect to the Property, whether or not any legal proceeding is commenced hereunder or thereunder and whether or not any Default or Event of Default shall have occurred and is continuing, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence or willful misconduct of Lender.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) to the maximum extent allowed by law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of Lender's remedies against the Property and the Security Instruments have been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

**Section 7.5   Violation of Legal Requirements**.  If the Property is not in compliance with one, some or all of any material Legal Requirements, Lender may reasonably impose additional requirements upon the Borrower in connection therewith including, without limitation, monetary reserves or financial equivalents.

**Section 7.6   Remedies Cumulative**.  The rights, powers and remedies of Lender under this Agreement and the other Loan Documents shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower or any of the Borrower Parties pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's discretion.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.  Any and all amounts collected or retained by Lender after an Event of Default has occurred, including interest at the Default Rate, late charges or any escrowed amount, may be applied by Lender to payment of the Debt in any order or priority that Lender in its discretion may elect.

## VIII    SECONDARY MARKET TRANSACTIONS AND CO-LENDING

### Section 8.1    Generally.

Section 8.1.1    Sale of Notes and Securitization. Lender may, without the consent of Borrower or any other Person, at any time, sell, transfer or assign the Notes, the Security Instruments and the other Loan Documents, and any or all servicing rights with respect thereto, or grant participations therein (the "**Participations**") or issue mortgage pass-through certificates or other securities ("**Securities**") evidencing a beneficial interest in a rated or unrated public offering or private placement (a "**Securitization**"), in all cases, with or without novation. Lender may forward to each potential purchaser, transferee, assignee, servicer or investor in any Participations, Securitizations or Secondary Market Transaction (collectively, an "**Investor**") or any Rating Agency rating any Securities and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, any Borrower Party, and the Property, whether furnished by Borrower, any Borrower Party or otherwise, as Lender determines necessary or desirable. Lender may also disclose to such parties any lending relationship in addition to the Debt which Lender may have with Borrower and/or any Borrower Party and/or any of their Affiliates. Borrower, on behalf of itself and all Borrower Parties, irrevocably waive any and all rights they may have under applicable state or federal law to prohibit such disclosure, including but not limited to any right of privacy.

Section 8.1.2    Cooperation. Borrower agrees that the Loan Documents shall be sufficient evidence of the obligations of Borrower to each Investor, and Borrower further agrees to reasonably cooperate with Lender in connection with any sale, assignment, conveyance, alienation or pledge or other transfer made or any Securities created pursuant to this Section, including the delivery of an estoppel certificate required in accordance with Section 5.14 and such other documents as may be reasonably requested by Lender (provided that any such document shall not increase in any material respect the obligations of Borrower under the Loan Documents). In furtherance of the foregoing, Borrower shall (i) reasonably cooperate with Lender so that the Lender may perform or cause to be performed, at Lender's sole expense, such site inspections, appraisals, market studies, environmental reviews and reports (Phase I and, if appropriate, Phase II), engineering reports and other due diligence investigations of the Property, as required by Lender or as may be requested by the Rating Agencies in connection with a Securitization; (ii) cause counsel to render any Non-Consolidation Opinions requested by the Rating Agencies (which may be relied upon by an Investor and the Rating Agencies and their respective counsel) and cause counsel to render or update any other opinions (which may be relied upon by an Investor and the Rating Agencies and their respective counsel) customary in a securitized transaction, which counsel and opinions shall be in substantially the same form and substance as those delivered on the Closing Date or otherwise satisfactory to Lender, the Investor and the Rating Agencies, with such modifications as may be reasonably requested by the Rating Agencies; (iii) furnish and the Borrower, on behalf of itself and all Borrower Parties, consent to Lender furnishing to such Investors or such prospective Investors or such Rating Agency any and all information concerning the Property, the Leases, if any, the financial condition of Borrower and any Borrower Party as may be reasonably requested by Lender, any Investor, any prospective Investor or any Rating Agency in connection with any sale or transfer of Participations or Securities; (iv) make such representations and warranties as of the closing of

any securitization with respect to the Property, Borrower any Borrower Party and the Loan
Documents as are customarily provided in securitization transactions and as may be requested by
any Investor or the Rating Agencies, provided, that making such representations and warranties
shall not increase Borrower's obligations under the Loan Documents in any material respect; (v)
execute such amendments to the Loan Documents and Organizational Documents of Borrower or
Borrower's direct or indirect members or partners as may be reasonably requested by the Lender
or desired by the Rating Agencies or otherwise to effect the Securitization (provided that any
such amendment shall not increase in any material respect the obligations of Borrower under the
Loan Documents); (vi) have appropriate representatives available for Investor meetings and/or
tours of the Property upon reasonable notice, (vii) execute documentation reasonably acceptable
to Lender and its counsel which establishes a loan agency role (which Agent may be any holder
of the Loan) and the right to assign direct interests in the Loan to a syndicate of lenders
(provided that it does not increase Borrower's obligations under the Loan) and (viii) the ability to
tranche the Loan into senior and subordinate claims (each claim to be evidenced by separate
notes payable to each syndicate member in the amount of each member's portion of such claim).
Lender may forward to each Investor or any Rating Agency rating any Securities, each
prospective Investor, and any organization maintaining databases on the underwriting and
performance of commercial mortgage loans, all documents and information which Lender now
has or may hereafter acquire relating to the Loan or to Borrower, to any Borrower Party, or to the
Property.

**Section 8.1.3  Secondary Market Transaction Indemnification**. It is
understood that the information provided by, or on behalf of, Borrower or any Borrower Party to
Lender in connection with the Loan or subsequent to the date hereof which is delivered in
connection with any Loan Document may ultimately be incorporated into the offering documents
for a Secondary Market Transaction and thus various Investors may also see some or all of such
information. Lender and all of the aforesaid third-party advisors and professional firms shall be
entitled to rely on the information supplied by, or on behalf of, Borrower and Borrower shall
indemnify Lender as to any losses, claims, damages or liabilities that arise out of or are based
upon any untrue statement or alleged untrue statement of any material fact contained in such
information or arise out of or are based upon the omission or alleged omission to state therein a
material fact required to be stated in such information or necessary in order to make the
statements in such information, or in light of the circumstances under which they were made, not
misleading. Lender may publicize the existence of the Loan in connection with its marketing for
a Secondary Market Transaction or otherwise as part of its business development.

**Section 8.1.4  Splitting the Loan**. Lender shall have the right from time to time
to sever each Note and the other Loan Documents into one or more separate notes (including
multiple component notes or tranches which may have different interest rates, amortization
payments, principal amounts and maturities, or resulting in a first or second lien, or resulting in
priority of the mortgages of the Loan being recast, mortgages and other security documents or
recasting a portion of the Loan into one or more mezzanine loans which shall be made to one or
more newly created bankruptcy remote single purpose entities that own 100% of the direct or
indirect ownership interests in Borrower, which will be secured by, among other things, a pledge
of such ownership interests (the "**Severed Loan Documents**")) in such denominations and
priorities as Lender shall determine in its discretion for purposes of evidencing and enforcing its
rights and remedies provided hereunder (and such new notes or modified note shall have the

same initial weighted average coupon as the original note (assuming a full funding of the
Loan)(but such new notes or modified note may subsequently change the weighted average
coupon (or such weighted average coupon may change as a result of changes in interest rates
generally) and apply principal, interest rates and amortization of the Loan between the
components in a manner specified by Lender in its discretion)); provided, however, that except
as set forth in the previous parenthetical, that the terms, provisions and clauses of the Severed
Loan Documents shall be no more adverse to Borrower and/or Guarantor than those contained in
the Notes, this Agreement, the Security Instruments and the other Loan Documents. Borrower
shall cooperate with Lender to effectuate the same and shall execute and deliver to Lender from
time to time, promptly after the request of Lender, a severance agreement and such other
documents, modifications, amendments (provided that any such document, modification or
amendment shall not increase in any material respect the obligations of Borrower under the Loan
Documents), opinions and title insurance as Lender shall request in order to affect the severance
described in the preceding sentence, all in form and substance reasonably satisfactory to Lender
such that the pricing and marketability of the Securities and the size of each class of Securities
and the rating assigned to each such class by the Rating Agencies shall provide the most
favorable rating levels and achieve the optimum bond execution for the Loan. In the event of
any prepayment of the Loan, Lender shall be entitled to apply the amount of such prepayment to
one or more of the new component notes as Lender in its discretion decides (including, without
limitation, the right to apply principal sequentially starting with the most senior part, note,
component or loan). Borrower hereby absolutely and irrevocably appoints Lender as Borrower's
true and lawful attorney, coupled with an interest, in Borrower's name and stead to make and
execute all documents necessary or desirable to effect the aforesaid severance, Borrower
ratifying all that its said attorney shall do by virtue thereof. Borrower hereby acknowledges and
agrees that Borrower shall have no claim or cause of action against Lender arising out of
Lender's execution and/or recordation of any instruments by or on behalf of Borrower pursuant
to the foregoing power of attorney.

**Section 8.2    Co-Lending.** The provisions of this Section 8.2 shall apply in the
event the Lender elects to syndicate the Loan in accordance with the provisions of this
Section 8.2, it being agreed that Lender may elect to modify (or substitute these provisions in
their entirety) in its discretion.

**Section 8.2.1 Assignments and Participations.**

(a)    Each Lender shall have the right to assign, transfer, sell, negotiate, pledge
or otherwise hypothecate this Agreement and any of its rights and security hereunder and under
the other Loan Documents to any other Person (an "**Assignee**") as specified in the Syndication
Documents or with the prior written consent of the administrative agent for the Loan (the
"**Agent**") which Agent shall be appointed by Lehman (and which may in Lehman's discretion,
be Lehman or any other Person). Any such consent by the Agent may be withheld as specified
in the Syndication Documents. The Agent may designate any Assignee accepting an assignment
of a specified portion of the Loan to be a "**Co-Agent**", an "**Arranger**" or similar title, but such
designation shall not confer on such Assignee the rights or duties of the Agent, unless so
specified in the Syndication Documents. Upon the execution, delivery, approval (if required),
and acceptance, and upon the effective date specified in, the applicable assignment and
assumption agreement from the assigning Lender to the Assignee (the "**Assignment and**

Assumption Agreement"), (a) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Assumption Agreement, have the rights and obligations of a Lender hereunder and under the other Loan Documents, and Borrower hereby agrees that all of the rights and remedies of Lender in connection with the interest so assigned shall be enforceable against Borrower by an Assignee with the same force and effect and to the same extent as the same would have been enforceable but for such assignment, and (b) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder and under the other Loan Documents have been assigned by it pursuant to such Assignment and Assumption Agreement, relinquish its rights and be released from its obligations hereunder and thereunder.

(b)    By executing and delivering an Assignment and Assumption Agreement, the assigning Lender thereunder and the Assignee thereunder confirm to and agree with each other and the other parties hereto that except as otherwise provided for in the Assignment and Assumption Agreement, (i) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any other Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document or any other instrument or document furnished in connection therewith; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower, the Guarantor or any other Person or the performance or observance by the Borrower, the Guarantor or any other Person of any of their obligations under any Loan Document or any other instrument or document furnished in connection therewith; (iii) such Assignee confirms that it has received a copy of this Agreement together with such financial statements, Loan Documents and other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into the Assignment and Assumption Agreement and to become a Lender hereunder; (iv) such Assignee will, independently and without reliance upon Agent, the assigning Lender or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such Assignee appoints and authorizes the Agent to take such action as the Agent on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to Agent by the terms hereof and thereof, together with such powers as are reasonably incidental thereto; and (vi) such Assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Loan Documents are required to be performed by it as a Lender.

(c)    Agent shall maintain a copy of each Assignment and Assumption Agreement delivered to and accepted by it and shall record in its records the names and addresses of each Lender and the Committed Amount of, and Percentage of the Loan owing to, such Lender from time to time. Borrower, the Agent and Lenders may treat each entity whose name is so recorded as a Lender hereunder for all purposes of this Agreement.

(d)    Upon receipt of an Assignment and Assumption Agreement executed by an assigning Lender and an Assignee, Agent shall, if such Assignment and Assumption Agreement has been properly completed and consented to if required herein, accept such Assignment and Assumption Agreement, and record the information contained therein in its

records, and the Agent shall use its commercially reasonable efforts to give prompt notice thereof to Borrower (provided that neither the Agent nor the Lenders shall be liable for any failure to give such notice).

(e)     Borrower shall use reasonable efforts to cooperate with Agent and each Lender in connection with the assignment of interests under this Agreement or the sale of participations herein, including, but not limited to, the payment of any and all legal, title and other fees and costs of the Agent in connection with such assignment up to an aggregate amount of $25,000. Borrower shall also be responsible for any and all legal, title or other fees and costs of any other Lender in connection with the assignment of such Lender's interests in this Agreement.

(f)     Anything in this Agreement to the contrary notwithstanding, and without the need of consent or to comply with any of the formal or procedural requirements of this Agreement, including this Article VIII, any Lender may at any time and from time to time pledge and assign all or any portion of its rights under all or any of the Loan Documents as permitted by the Syndication Documents; provided that no such pledge or assignment shall release such Lender from its obligations hereunder.

(g)     Unless otherwise provided in the Syndication Documents, each Lender shall have the right, without the consent of the Borrower, to sell participations to one or more other Lenders (a "**Participant**") in or to all or a portion of its rights and obligations under the Loan and the Loan Documents; provided, however, that (i) such Lender shall remain solely responsible to the other parties hereto for the performance of its obligations under this Agreement, (ii) the Borrower, the Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and with regard to any and all payments to be made under this Agreement, and (iii) the holder of any such participation shall not be entitled to voting rights under this Agreement or the other Loan Documents (but such holder may contract with the Lender selling such Participant its interest in such Lender's share of the Loan as to voting of such Lender's interest under Section 8.2.1, provided that any such agreement by a Lender shall bind only such Lender alone and not Borrower, the other Lenders or the Agent).

(h)     Borrower acknowledges and agrees that Lenders may provide to any Assignee or Participant originals or copies of this Agreement, any other Loan Document and any other documents, instruments, certificates, opinions, insurance policies, letters of credit, reports, requisitions and other materials and information of every nature or description, and may communicate all oral information, at any time submitted by or on behalf of Borrower or Guarantor or received by any Lender in connection with the Loan or with respect to Borrower, provided that prior to any such delivery or communication, such Assignees or Participants shall agree to preserve the confidentiality of any of the foregoing to the same extent that such Lender agreed to preserve such confidentiality. In order to facilitate assignments to Assignees and sales to Participants, Borrower shall execute such further documents, instruments or agreements as Lenders may reasonably require; provided, that except as set forth in this Agreement, Borrower shall not be required to execute any document or agreement which would materially decrease their rights, or materially increase their obligations, relative to those set forth in this Agreement

or any of the other Loan Documents (including financial obligations, personal recourse, representations and warranties and reporting requirements).

**Section 8.3     Several Liability**. Anything in this Agreement contained to the contrary notwithstanding, the obligations of each Lender to Borrower under this Agreement are several and not joint and several; each Lender shall only be obligated to fund its Percentage of each disbursement to be made hereunder up to the amount of its Committed Amount.

**Section 8.4     Appointment**.

**Section 8.4.1**  Lehman and/or any other Person appointed as Agent by the Syndication Documents is hereby appointed as Agent hereunder and under each other Loan Document, and each Lender hereby authorizes the Agent to act as agent for Lender and to take such actions as Lender is obligated or entitled to take under the provisions of this Agreement and the other Loan Documents and to exercise such powers as are set forth herein or therein, together with such other powers as are reasonably incidental thereto. Agent shall not have a fiduciary relationship with respect to Borrower or any Lender by reason of this Agreement.

**Section 8.4.2**  The provisions of this Article are solely for the benefit of the Agent and the Lenders. Neither Borrower nor any Borrower Party shall have any rights to rely on or enforce any of the provisions hereof except as provided in <u>Section 8.5</u>. In performing its functions and duties under this Agreement, the Agent shall act solely as agent for the Lenders and does not assume, and shall not be deemed to have assumed, any obligations toward or relationship of agency or trust with or for Borrower or any Borrower Party.

**Section 8.5     Reliance on Agent**. All acts of and communications by the Agent, as agent for the Lenders, other than approvals, waivers or consents requiring the consent of all of the Lenders or the Required Lenders pursuant to this Agreement or the Syndication Documents, shall be deemed legally conclusive and binding; and Borrower and any third party (including any court) shall rely on any and all communications or acts of the Agent with respect to the exercise of any rights or the granting of any consent or approval on behalf of Lender in all circumstances where an action by Lender is required or permitted pursuant to this Agreement or the provisions of any other Loan Document or by applicable law without the right or necessity of making any inquiry of any individual Lender as to the authority of Agent with respect to such matter. In no event shall any of the foregoing limit the rights or obligations of any Lender with respect to any other Lender pursuant to this <u>Article VIII</u>.

**Section 8.6     Powers**. The Agent shall have and may exercise such powers under the Loan Documents or the Syndication Documents as are specifically delegated to the Agent by the terms of each thereof, together with such powers as are reasonably incidental thereto, and may exercise all other powers of Lender as are not made subject to the consent of the Required Lenders or to the consent of all Lenders pursuant to <u>Section 8.9</u>. The Agent shall not be considered, or be deemed, a separate agent of the Lenders hereunder, but is, and shall be deemed, acting in its contractual capacity as Agent, exercising such rights and powers under the Loan Documents and the Syndication Documents as are specifically delegated to the Agent or Agent is otherwise entitled to take hereunder. Agent shall have no implied duties to the Lenders,

or any obligation to the Lenders to take any action except any action specifically provided by the
Loan Documents or the Syndication Documents to be taken by the Agent.

### Section 8.7   Disbursements.

Section 8.7.1   Subject to the disbursement requirements set forth in this
Agreement, at least two (2) Business Days (by 11:00 a.m. Eastern Standard Time) prior to each
date a disbursement of the Loan is to be made hereunder pursuant to this Agreement, the Agent
shall notify each Lender of the proposed disbursement. Each Lender shall make available to the
Agent the amount of such Lender's Percentage of such disbursement (with respect to such
Lender, such amount being referred to herein as a "**Required Lender Advance**") in immediately
available funds not later than 11:00 a.m. (Eastern Standard Time) on the date such disbursement
is to be made (such date being referred to herein as a "**Funding Date**") or as otherwise provided
in the Syndication Documents. Unless the Agent shall have been notified by any Lender prior to
such time for funding in respect of any Required Lender Advance that such Lender does not
intend to make available to the Agent such Lender's Required Lender Advance, the Agent may
assume that such Lender has made such amount available to the Agent and the Agent, in its sole
discretion, may, but shall not be obligated to, make available to Borrower a corresponding
amount. If such corresponding amount is not in fact made available to the Agent by such Lender
on or prior to the respective Funding Date, such Lender agrees to pay and Borrower agree to
repay to Agent forthwith on demand such corresponding amount together with interest thereon,
for each day from the date such amount is made available to Borrower until the date such amount
is paid or repaid to Agent, at (A) in the case of such Lender, the federal funds effective rate, and
(B) in the case of Borrower, the interest rate applicable at the time to a disbursement made on
such Funding Date or as otherwise provided in the Syndication Documents. If such Lender shall
pay to Agent such corresponding amount, such amount so paid shall constitute such Lender's
Required Lender Advance, and if such Lender and the Borrower shall have paid and repaid,
respectively, such corresponding amount, Agent shall promptly return to Borrower such
corresponding amount in same day funds.

Section 8.7.2   Requests by the Agent for funding by the Lenders of
disbursements of the Loan may be made by facsimile. Except as may be otherwise provided in
the Syndication Documents, each Lender shall make its Required Lender Advance available to
the Agent in Dollars and in immediately available funds to such Lender and account as the Agent
may designate, not later than 11 a.m. (Eastern Standard Time) on the Funding Date. Nothing in
this Section 8.7 shall be deemed to relieve any Lender of its obligation hereunder to make any
Required Lender Advance on any Funding Date, nor shall any Lender be responsible for the
failure of any other Lender to perform its obligations to make any Required Lender Advance
hereunder, and the Committed Amount of any Lender shall not be increased or decreased as a
result of the failure by any other Lender to perform its obligation to make any Required Lender
Advances hereunder.

Section 8.7.3   The Agent will forward to each Lender copies of each request for
advance made by Borrower by 11:00 a.m. (Eastern Standard Time) two (2) Business Days prior
to the date the Lender is required to fund its Percentage of any Required Lender Advance.
Delivery of the Request for Advance documents shall be a condition to funding any Required
Lender Advance.

### Section 8.8    Distribution and Apportionment of Payments.

Section 8.8.1  Subject to the terms of this Agreement, payments actually received by Agent for the account of the Lenders shall be paid to them promptly after receipt thereof by Agent, but in any event on or before the time specified in the Syndication Documents, or if no such time is specified, within one (1) Business Day after Agent's receipt thereof; provided that, if any such payments are not distributed to the Lenders within such time period, Agent shall pay to such Lenders interest thereon at the rate specified in the Syndication Documents, or if no such rate is specified in the Syndication Documents, at the lesser of (i) the federal funds effective rate and (ii) if the applicable payment represents repayment of a portion of the principal of the Loan, the rate of interest applicable to such portion of the Loan, from the date of receipt of such funds by Agent until such funds are paid in immediately available funds to such Lenders, provided such funds are received by Agent not later than 11:00 a.m. (Eastern Standard Time) on the date of receipt. All payments of principal and interest in respect of the Loan, all payments of the fees described in this Agreement, and all payments in respect of any other obligations of Borrower under the Loan Documents shall be allocated among such of Lenders as are entitled thereto in accordance with the Syndication Documents. The Agent shall distribute to each Lender at its primary address set forth herein or in its Assignment and Assumption Agreement, or at such other address as a Lender may request in writing, such funds as it may be entitled to receive, provided that the Agent shall in any event not be bound to inquire into or determine the validity, scope or priority of any interest or entitlement of any Lender and may suspend all payments and seek appropriate relief (including, without limitation, instructions from the Required Lenders, or all Lenders, as applicable, or an action in the nature of interpleader) in the event of any doubt or dispute as to any apportionment or distribution contemplated hereby. The order of priority herein and in the Syndication Documents is set forth solely to determine the rights and priorities of the Lenders as among themselves and may at any time or from time to time be changed by the Lenders as they may elect, in writing, without necessity of notice to or consent of or approval by Borrower.

Section 8.8.2  Except as otherwise provided in the Syndication Documents, if a Lender (a "**Defaulting Lender**") defaults in making any Required Lender Advance or paying any other sum payable by it hereunder, such sum together with interest thereon at the rate specified in the Syndication Documents, or if no such rate is specified at the Default Rate, from the date such amount was due until repaid (such sum and interest thereon as aforesaid referred to, collectively, as the "**Lender Default Obligation**") shall be payable by the Defaulting Lender (i) to any Lender(s) which elect, at their sole option (and with no obligation to do so), to fund the amount which the Defaulting Lender failed to fund or (ii) to Agent or any other Lender which under the terms of this Agreement is entitled to reimbursement from the Defaulting Lender for the amounts advanced or expended. Notwithstanding any provision hereof to the contrary, but except as otherwise provided in the Syndication Documents, until such time as a Defaulting Lender has repaid the Lender Default Obligation in full, all amounts which would otherwise be distributed to the Defaulting Lender shall instead be applied first to repay the Lender Default Obligation (to be applied first to interest at the rate specified above and then to principal) until the Lender Default Obligation has been repaid in full (whether by such application or by cure by the Defaulting Lender), whereupon such Lender shall no longer be a Defaulting Lender. Any interest collected from Borrower on account of principal advanced by any Lender(s) on behalf of a Defaulting Lender shall be paid to the Lender(s) who made such advance and shall be credited

against the Defaulting Lender's obligation to pay interest on the amount advanced at the rate
specified above. Except as otherwise provided in the Syndication Documents, if no other Lender
makes an advance a Defaulting Lender failed to fund, a portion of the indebtedness of Borrower
to the Defaulting Lender equal to the Lender Default Obligation shall be subordinated to the
indebtedness of Borrower to all other Lenders and shall be paid only after the indebtedness of
Borrower to all other Lenders is paid. The provisions of this Section shall apply and be effective
regardless of whether an Event of Default occurs and is then continuing, and notwithstanding (i)
any other provision of this Agreement to the contrary or (ii) any instruction of Borrower as to
their desired application of payments. Except as otherwise provided in the Syndication
Documents, no Defaulting Lender shall have the right to vote on matters which are subject to the
consent or approval of Required Lenders or all Lenders and while any Lender is a Defaulting
Lender the requisite percentage of Lenders which constitutes the Required Lenders shall be
calculated exclusive of the Percentage of the Defaulting Lender. Except as otherwise provided
in the Syndication Documents, the Agent shall be entitled to (i) withhold or set off, and to apply
to the payment of the Lender Default Obligation, any amounts to be paid to such Defaulting
Lender under this Agreement, and (ii) bring an action or suit against such Defaulting Lender in a
court of competent jurisdiction to recover the Lender Default Obligation and, to the extent such
recovery would not fully compensate the Lenders for the Defaulting Lender's breach of this
Agreement, to collect damages. In addition, except as otherwise provided in the Syndication
Documents, the Defaulting Lender shall indemnify, defend and hold Agent and each of the other
Lenders harmless from and against any and all claims, actions, liabilities, damages, costs and
expenses (including attorneys' fees and expenses), plus interest thereon at the Default Rate, for
funds advanced by Agent or any other Lender on account of the Defaulting Lender or any other
damages such persons may sustain or incur by reason of or as a direct consequence of the
Defaulting Lender's failure or refusal to abide by its obligations under this Agreement.

**Section 8.8.3** At least five (5) Business Days prior to the first date on which
interest or fees are payable hereunder for the account of any Lender, each Lender that is not
incorporated under the laws of the United States of America, or a state thereof, agrees that it will
deliver to the Agent two duly completed copies of United States Internal Revenue Service Form
1001 or 4224, certifying in either case that such Lender is entitled to receive payments under this
Agreement and the Note without deduction or withholding of any United States federal income
taxes. Each Lender which so delivers a Form 1001 or 4224 further undertakes to deliver the
Agent two additional copies of such form (or a successor form) on or before the date that such
form expires or becomes obsolete or after the occurrence of any event requiring a change in the
most recent forms so delivered by it, and such amendments thereto or extensions or renewals
thereof as may be reasonably requested by the Agent, in each case certifying that such Lender is
entitled to receive payments under this Agreement and the Note without deduction or
withholding of any United States federal income taxes, unless an event (including without
limitation any change in treaty, law or regulation) has occurred prior to the date on which any
such delivery would otherwise be required which renders all such forms inapplicable or which
would prevent such Lender from duly completing and delivering any such form with respect to it
and such Lender advises the Agent that it is not capable of receiving payments without any
deduction or withholding of United States federal income tax.

**Section 8.9    Approval of Loan Documents**. Each Lender authorizes and
directs the Agent to enter into the Loan Documents for the benefit of the Lenders.

**Section 8.10    Agency Provisions Relating to Collateral.**

**Section 8.10.1** Except as otherwise provided in the Syndication Documents, the Agent is hereby authorized on behalf of all Lenders, without the necessity of any notice to or further consent from any Lender (but subject to any applicable notice and cure rights of Borrower set forth in the Loan Documents), at any time and from time to time, to take any action with respect to any collateral for the Loan or any Loan Document which may be necessary to preserve and maintain such collateral or to perfect and maintain perfected the liens upon such collateral granted pursuant to this Agreement and the other Loan Documents.

**Section 8.10.2** Except as provided in this Agreement, the Agent shall have no obligation whatsoever to any Lender or to any other person or entity to assure that any collateral exists or is owned by Borrower or is cared for, protected or insured or has been encumbered or that the liens granted herein or in any of the other Loan Documents or pursuant hereto or thereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority.

**Section 8.11    Lender Actions Against Borrower or the Collateral.** Each Lender agrees that it will not take any action, nor institute any actions or proceedings, against Borrower or any other person hereunder or under any other Loan Documents with respect to exercising claims against the Borrower or rights in any collateral except as specifically permitted by the Syndication Documents and the Loan Documents.

**Section 8.12    Assignment and Participation.** No Lender shall be permitted to assign or sell all or any portion of its rights and obligations under this Agreement to any Borrower Party.

**Section 8.13    Ratable Sharing.** Subject to Sections 8.7 and 8.8, Lenders agree among themselves that (i) with respect to all amounts received by them which are applicable to the payment of the Loan, equitable adjustment will be made so that, in effect, all such amounts will be shared among them ratably in accordance with the Syndication Documents, whether received by voluntary payment, by the exercise of the right of set-off or bankers' lien, by counterclaim or cross action or by the enforcement of any or all of the Loan Documents or any collateral and (ii) if any of them shall by voluntary payment or by the exercise of any right of counterclaim, set-off, bankers' lien or otherwise, receive payment of a proportion of the aggregate amount of the Loan held by it which is greater than the amount to which it is entitled pursuant to the Syndication Documents on account of the Loan, the one receiving such excess payment shall purchase, without recourse or warranty, an undivided interest and participation (which it shall be deemed to have done simultaneously upon the receipt of such payment) in such obligations owed to the others so that all such recoveries with respect to such obligations shall be applied ratably in accordance with the Syndication Documents; provided, that if all or part of such excess payment received by the purchasing party is thereafter recovered from it, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to that party to the extent necessary to adjust for such recovery, but without interest except to the extent the purchasing party is required to pay interest in connection with such recovery. Borrower agree that any Lender so purchasing a participation from another Lender pursuant to this Section may, to the fullest extent permitted by law and in compliance with the

Loan Documents, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of Borrower in the amount of such participation.

**Section 8.14    General Immunity**.  Neither Agent nor any of its directors, officers, agents or employees shall be liable to Borrower, Guarantor or any Lender for any action taken or omitted to be taken by Agent or its directors, officers, agents or employees hereunder or under any other Loan Document or in connection herewith or therewith, except for its or their own gross negligence or willful misconduct.

**Section 8.15    No Responsibility for Loan, Recitals, Etc.**  Neither Agent nor any of its directors, officers, agents or employees shall be responsible for or have any duty to ascertain, inquire into, or verify (i) any statement, warranty or representation made in connection with any Loan Document or any use of the Loan; (ii) the performance or observance of any of the covenants or agreements of any party to any Loan Document; (iii) the satisfaction of any condition specified in this Agreement; or (iv) the validity, effectiveness or genuineness of any Loan Document or any other instrument or writing furnished in connection therewith, provided that the foregoing shall not release Agent from liability for its gross negligence or willful misconduct.

**Section 8.16    Action on Instructions of Lenders**.  The Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder and under any other Loan Document in accordance with written instructions signed by all the Lenders (or the requisite Lenders, if such action may be directed hereunder by the requisite Lenders), and such instructions and any action taken or failure to act pursuant thereto shall be binding on all of Lenders.

**Section 8.17    Employment of Agents and Counsel**.  The Agent may undertake any of its duties as Agent hereunder and under any other Loan Document by or through employees, agents, and attorneys-in-fact.

**Section 8.18    Reliance on Documents; Counsel**.  The Agent shall be entitled to rely upon any notice, consent, certificate, affidavit, letter, telegram, statement, paper or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons, and, in respect to legal matters, upon the opinion of counsel selected by the Agent, which counsel may be an employee of Agent, provided that the foregoing shall not release the Agent from liability for its gross negligence or willful misconduct.  Any such counsel shall be deemed to be acting on behalf of Lender in assisting the Agent with respect to the Loan, but shall not be precluded from also representing Agent in any matter in which the interests of Agent and the other Lenders may differ.

**Section 8.19    Rights as a Lender**.  With respect to its Committed Amount, if any, Agent shall have the same rights, powers and obligations hereunder and under any other Loan Document as any Lender and may exercise such rights and powers as though it were not an Agent, and the term "Lender" or "Lenders" shall, unless the context otherwise indicates, include Agent in its individual capacities.  The Borrower and each Lender acknowledge and agree that Agent and/or its Affiliates may accept deposits from, lend money to, hold other investments in,

and generally engage in any kind of trust, debt, equity or other transaction or have other relationships, in addition to those contemplated by this Agreement or any other Loan Document, with Borrower or any of its Affiliates in which Borrower or such Affiliates are not restricted hereby from engaging with any other person.

Section 8.20    **Successor Agent**.  Agent may, without the prior approval of Borrower, on not less than thirty (30) days prior written notice, resign from the performance of all its functions and duties hereunder and a successor Agent may be appointed as set forth in the Syndication Documents.  Agent shall turn over all funds held by Agent pursuant to this Agreement to such successor Agent.

Section 8.21    **Costs of Secondary Market Transactions**.  Notwithstanding anything to the contrary contained in this Article VIII, Borrower shall not be liable for any costs, fees or expenses incurred by Lender with respect to any Secondary Market Transactions and co-lending described in this Article VIII.

# IX    EXCULPATION

Section 9.1    **Non-Recourse Provisions**.

(a)    Subject to the qualifications below and the provisions of Sections 9.2, 9.3 and 9.4, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Notes, this Agreement, the Security Instrument or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower or the partners or members of Borrower, except that Lender may bring any foreclosure action, action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon Lender's interest under the Notes, this Agreement, the Security Instruments and the other Loan Documents, or in the Property or any portion thereof, the Rents or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that except as specifically provided in Sections 9.2 and 9.3, any judgment in any such action or proceeding shall be enforceable against Borrower and/or Borrower's members and/or partners only to the extent of Borrower's and/or Borrower's partners' and/or members' interest in the Property or any portion thereof, in the Rents and in any other collateral given to Lender, and Lender, by accepting the Notes, this Agreement, the Security Instruments and the other Loan Documents, agrees, unless deemed necessary by Lender to preserve potential liability of any Person for a Recourse Event, that Lender shall not sue for, seek or demand any deficiency judgment against Borrower or any other Person in any such action or proceeding under or by reason of or under or in connection with the Notes, this Agreement, the Security Instruments or the other Loan Documents.

(b)    The provisions of this Article IX shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (ii) impair the right of Lender to name the Borrower or any of them or any other Person as a party defendant in any action or suit for foreclosure and sale under any Security Instrument provided no money judgment is sought against them (except as otherwise provided in this Article IX); (iii) affect the validity or enforceability of any guaranty, including, without limitation, the Guaranty of Recourse Obligations, or the Environmental Indemnity made in

connection with the Loan or any of the rights and remedies of Lender thereunder; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignments of Leases; (vi) constitute a prohibition against Lender to seek a deficiency judgment against any Person potentially liable therefor in order to fully realize the security granted by the Security Instruments or any other Loan Document or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against the Property or any portion thereof; or (vii) prohibit Lender from taking any action to perfect the Liens and security interests of the Loan Documents.

        **Section 9.2    Partial Recourse.** Notwithstanding any provision of this Agreement to the contrary and in addition to the rights of Lender set forth in Section 9.3 (and not in limitation thereof), the provisions of this Article IX shall not constitute a waiver of the right of Lender to enforce the joint and several liability and/or obligation of Borrower or any other Person liable for the Obligations (including any Guarantor), by money judgment, specific performance or otherwise, to the extent of any Losses incurred by Lender arising out of or attributable to or relating to any of the following (collectively, the **"Partial Recourse Events"** and individually, a **"Partial Recourse Event"**): (i) the gross negligence or willful misconduct of Borrower or any other Borrower Party with respect to the Property; (ii) the voluntary physical waste or willful destruction of any of the Property or any portion thereof by Borrower or any other Borrower Party, or any of their respective agents, managers, officers, employees or Affiliates, including the removal of any portion of the Property in violation of the Loan Documents; (iii) the failure to remove or insure over any mechanic's lien in violation of the Loan Documents; (iv) a failure by Borrower to pay Taxes or Other Charges in accordance with the Loan Documents; (v) Borrower or any of the Borrower Parties in any judicial or quasi-judicial case, action or proceeding directly or indirectly contests the validity or enforceability of the Loan Documents or directly or indirectly contests or intentionally hinders, delays or obstructs the pursuit of any rights or remedies by Lender (including the commencement and/or prosecution of a foreclosure action, judicial or non-judicial, the appointment of a receiver for the Property or any portion thereof or any enforcement of the terms of the Assignment of Leases) after an Event of Default; provided, however, that this clause (v) shall not apply to any particular Borrower Party or otherwise pertain to any action of any Borrower Party which solely contends and alleges only that as a factual matter all of the Borrower Parties are in fact in full compliance with all Obligations under the Loan Documents and that no Event of Default has occurred and is continuing; provided that any liability under this clause (v) shall be limited to Lender's reasonable attorney's fees; (vi) any amendment or modification of any of the Organizational Documents of Borrower, the sole member of Borrower or any of the Borrower Parties or of any Material Agreement or Affiliate Agreement shall occur without the prior written consent of Lender, to the extent required herein; (vii) any Borrower Party, or any Affiliate of any Borrower Party, shall seek a jury trial in any action or proceeding against Lender, whether arising under the Loan Documents or otherwise; (viii) any Borrower Party, or any Affiliate of any Borrower Party, shall make a counterclaim against Lender, Servicer or their Affiliates in violation of Section 11.1 in any action or proceeding, whether arising under the Loan Documents or otherwise; (ix) the failure of Borrower to pay Lender's or Servicer's costs and expenses in accordance with Section 12.23; (x) the misapplication or misappropriation of any Security Deposits, including any Security Deposits received by Tenants and not deposited into an escrow account for the benefit of such Tenants, except to the extent any such Security Deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of an

Event of Default; (xi) any violation, breach or failure to comply with Section 12.9 (after an Event of Default); (xii) if Borrower or any Borrower Party intentionally fails to comply with any Legal Requirement; (xiii) any assertion by Borrower or any other Borrower Party that (a) Lender has modified the Loan Documents other than by a written instrument signed by Lender, (b) Lender has waived the provisions of the Loan Documents by failing to require Borrower's strict performance of the terms thereof, or (c) Lender's and Borrower's relationship is other than that of a debtor/creditor arising under the Loan Documents; or (xiv) failure to maintain the insurance coverages required by Section 6.1 or any failure of Borrower to pay any deductible under any Policy after a loss covered by such Policy.

Section 9.3    Full Recourse. In addition to the rights of Lender set forth in Section 9.2 (and not in limitation thereof), the Debt shall be fully recourse to Borrower and the provisions of Section 9.1(a) shall be wholly inapplicable ab initio, and Borrower shall be fully personally liable for all of the Debt upon the occurrence of any of the following (collectively, the "Full Recourse Events", and individually, a "Full Recourse Event"): (a) any fraud or intentional material misrepresentation in connection with the Loan which has a Material Adverse Effect on the value of the Property or any other collateral for the Loan whether made prior to or after the Closing Date; (b) the intentional misappropriation, misapplication, conversion or application in violation of the Loan Documents (including interference with the operation of the any lockbox agreement entered into by Borrower and Lender) by Borrower or Guarantor (which shall include any use of Loan proceeds other than as specified in the Certificate of Sources and Uses) of (1) any Insurance Proceeds, (2) any Awards, Condemnation Proceeds or other amounts payable in connection with the Condemnation of all or a portion of the Property, (3) any Rents and/or Security Deposits received or collected by any Borrower Party or any Affiliate of any Borrower Party and not applied in accordance with the Loan Documents or (4) any Gross Sale Proceeds received by any Borrower Party in connection with the sale of the Units or any other sales proceeds from any portion of the Property after the failure to cure such breach within ten (10) days after Borrower's receipt of notice from Lender; (c) any voluntary action by Borrower or any Borrower Party which result in a violation, breach or failure to comply with Section 5.22; (d) any of the events described in Section 7.1(a)(vi) shall occur (other than with respect to any case, proceeding or other action under any existing or future Bankruptcy Laws, or seeking appointment of a receiver, trustee, custodian, conservator or other similar official commenced against Borrower by Lender); (e) if any Borrower Party incurs any Indebtedness in violation of the express restrictions of prohibitions contained in the Loan Documents and such violation is not cured within ten (10) days after receipt of notice from Lender; or (f) a breach by Borrower of the provisions of Section 4.1(s) (other than with respect to subsections (v), (ix) and (xx) thereof).

Section 9.4    Recourse Events. Notwithstanding anything to the contrary in this Article IX, (a) if any of the actions constituting a Recourse Event are subject to a specified notice and cure period in the Loan Documents, the same shall not give rise to personal liability for the payment and performance of the Obligations until the expiration of any such notice and cure period, and (b) a voluntary bankruptcy filing by any one Guarantor that is an individual ("Bankrupt Guarantor") will not result in the personal liability of any other Guarantor ("Non-Bankrupt Guarantor") provided the Loan is not otherwise in default and shall remain in full force and effect. In addition to the foregoing, a voluntary bankruptcy filing by not more than one Guarantor shall not constitute an Event of Default hereunder provided (x) the remaining Guarantors satisfy the Financial Covenant Tests (as defined in the Guaranty of Recourse

Obligations), as determined by Lender in accordance with its customary practices, or
(y) Borrower replaces such Guarantor with an individual or entity acceptable to Lender in its
discretion. Any replacement or substitution of a Guarantor with another Guarantor may be
conditioned upon the delivery to Lender of a Non-Consolidation Opinion with respect to such
Guarantor as requested by Lender. Liability for the payment and performance of the Obligations
as a result of a Partial Recourse Event shall exclude any consequential or speculative damages.
Notwithstanding anything to the contrary in this Article IX, if (i) the Project is conveyed by
foreclosure of any Mortgage, exercise of power of sale under any Mortgage, a deed in lieu of
foreclosure, or by reason of any other remedy set forth in the Loan Documents, (ii) Borrower,
any of the Principal, any Guarantor or any of their Affiliates is no longer in possession or control
of the Project and (iii) Borrower and any other Borrower Party consents to, and is cooperating in
good faith with Lender in connection with, any such foreclosure or other exercise of remedies
and neither Borrower nor any other Borrower Party is contesting or otherwise interfering with
any such foreclosure or other exercise of remedies in any manner, then the indemnities with
respect to any Partial Recourse Event or Full Recourse Event, as the case may be, shall not apply
with respect to Losses that arise on or following the date of such conveyance except to the extent
arising from acts of Borrower or any Borrower Party which occur thereafter.

Notwithstanding anything set forth in Article IX to the contrary, nothing
contained in this Article IX shall alter or limit the liability of any Person under any other
environmental indemnity agreement, guaranty agreement or any other agreement given by such
other Person to Lender.]

**Section 9.5   No Waiver**. Notwithstanding anything to the contrary in this
Agreement or any of the other Loan Documents (including the provisions of this Article IX)
Lender shall not be deemed to have waived any right which Lender may have under
Sections 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim
for the full amount of the Debt or to require that all collateral shall continue to secure all of the
Debt owing to Lender in accordance with the Loan Documents.

# X   INDEMNIFICATION

**Section 10.1   General Indemnification**. In addition to any other
indemnifications provided herein or in the other Loan Documents, Borrower shall, at Borrower's
sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified
Parties from and against any and all Losses imposed upon or incurred by or asserted against any
Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or
more of the following: (a) any accident, injury to or death of persons or loss of or damage to
property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks,
curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or
condition in, on or about the Property or any part thereof or on adjoining sidewalks, curbs,
adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or
services or the furnishing of any materials or other property in respect of the Property or any part
thereof; (d) any failure of the Property to be in compliance with any Legal Requirement; (e) any
failure of the Property to comply with any Access Laws; (f) any representation or warranty made
in any of the Loan Documents being false or misleading in any material respect as of the date
such representation or warranty was made or the use or intended use of the proceeds of the Loan;

(g) any claim by brokers, finders or similar Persons claiming to be entitled to a commission in connection with the Loan (other than one claiming to have dealt exclusively with Lender) or any Lease or other transaction involving the Property or any part thereof; and (h) the claims of any Tenant (except any claims of Tenants first accruing after the date Lender or Lender's Affiliate takes title to the Property); provided, however, that Borrower shall not have any obligation to Lender hereunder to the extent that such Losses arise from the gross negligence or willful misconduct of Lender. To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that Borrower are permitted to pay and satisfy under applicable law and this indemnification provision shall be enforced to the maximum extent allowed by law. Any amounts payable to Lender by reason of the application of this paragraph shall be secured by the Loan Documents and shall become immediately due and payable and shall bear interest at the Default Rate from the date of demand until paid. The obligations and liabilities of Borrower under this <u>Section 10.1</u> shall be joint and several and shall survive termination, satisfaction, or assignment of this Agreement, the repayment of the Debt and the exercise by Lender of any of its rights or remedies hereunder, including the acquisition of Property by foreclosure or a conveyance in lieu of foreclosure. WITHOUT LIMITATION TO THE FOREGOING, BORROWER HEREBY AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER, ITS DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, SUCCESSORS AND ASSIGNS FROM AND AGAINST ANY AND ALL LOSSES, DAMAGES, LIABILITIES, CLAIMS, ACTIONS, JUDGMENTS, COURT COSTS AND LEGAL OR OTHER EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND EXPENSES) WHICH LENDER MAY INCUR AS A DIRECT OR INDIRECT CONSEQUENCE OF: (A) THE PURPOSE TO WHICH BORROWER APPLY THE LOAN PROCEEDS; (B) THE FAILURE OF BORROWER TO PERFORM ANY OBLIGATIONS AS AND WHEN REQUIRED BY THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; (C) ANY FAILURE AT ANY TIME OF ANY OF BORROWER'S REPRESENTATIONS OR WARRANTIES TO BE TRUE AND CORRECT; OR (D) ANY ACT OR OMISSION BY BORROWER, CONSTITUENT PARTNER OR MEMBER OF BORROWER, ANY CONTRACTOR, SUBCONTRACTOR OR MATERIAL SUPPLIER, ENGINEER, ARCHITECT OR OTHER PERSON OR ENTITY WITH RESPECT TO ANY PORTION OF THE PROPERTY. BORROWER SHALL IMMEDIATELY PAY TO LENDER UPON DEMAND ANY AMOUNTS OWING UNDER THIS INDEMNITY, TOGETHER WITH INTEREST FROM THE DATE THE INDEBTEDNESS ARISES UNTIL PAID AT THE RATE OF INTEREST APPLICABLE TO THE PRINCIPAL BALANCE OF THE NOTES. BORROWER'S DUTIES AND OBLIGATIONS TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER SHALL SURVIVE CANCELLATION OF THE NOTES AND THE RELEASE, RECONVEYANCE OR PARTIAL RECONVEYANCE OF THE SECURITY INSTRUMENTS.

    **Section 10.2    ERISA Indemnification**. Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's discretion) that Lender may incur, directly or indirectly, as a result of a default under <u>Sections 4.1(i) or 5.23</u>.

**Section 10.3    Duty to Defend; Attorneys' Fees and Other Fees and Expenses**.
Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party
(if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and
other professionals reasonably approved by the Indemnified Parties. Notwithstanding the
foregoing, any of the Indemnified Parties may, in their discretion, engage their own attorneys
and other professionals to defend or assist them, and, at the option of Indemnified Parties, their
attorneys shall control the resolution of claim or proceeding. Upon demand, Borrower shall pay
or, in the discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the
payment of the reasonable fees and disbursements of attorneys, engineers, environmental
consultants, laboratories and other professionals in connection therewith; provided, however, that
all of the Indemnified Parties shall be defended by one firm of attorneys unless Lender in good
faith determines that more than one law firm should be retained because of conflicts of interest or
potential conflicts of interest.

**Section 10.4    Changes in Laws Regarding Taxation**. If any law is enacted or
adopted or amended after the date of this Agreement which deducts the Debt from the value of
the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on
the Debt or Lender's interest in the Property, Borrower will pay such tax, with interest and
penalties thereon, if any. In the event Lender is advised by counsel chosen by Lender that the
payment of such tax or interest and penalties by Borrower would be unlawful or taxable to
Lender or unenforceable or provide the basis for a defense of usury, then in any such event,
Lender shall have the option, by written notice of not less than ninety (90) days, to declare the
Debt immediately due and payable.

**Section 10.5    No Credits on Account of the Debt**. Borrower will not claim or
demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or
Other Charges assessed against the Property, or any part thereof, and no deduction shall
otherwise be made or claimed from the assessed value of the Property, or any part thereof, for
real estate tax purposes by reason of the Loan Documents or the Debt. In the event such claim,
credit or deduction shall be required by law, Lender shall have the option, by written notice of
not less than ninety (90) days, to declare the Debt immediately due and payable.

**Section 10.6    Recording of Security Instruments**. Borrower forthwith upon
the execution and delivery of this Agreement and thereafter, from time to time upon five (5) days
notice from Lender, will cause the Security Instruments, and any other Loan Document creating
a Lien or security interest or evidencing the Lien thereof upon the Property or any part thereof
and each instrument of further assurance to be filed, registered or recorded in such manner and in
such places as may be reasonably required by Lender or by any present or future law in order to
publish notice of and fully to protect the Lien or security interest thereof upon, and the interest of
Lender in, the Property or any part thereof or to correct any error in the legal description of any
of the Property. Borrower will pay all filing, registration or recording fees, and all reasonable
expenses incident to the preparation, execution and acknowledgment of the Security Instruments,
any mortgages supplemental thereto, any security instruments with respect to the Property or any
part thereof, any such other Loan Document and any instrument of further assurance, and all
federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of
or in connection with the execution and delivery of the Security Instruments, any mortgages
supplemental thereto, any security instruments with respect to the Property or any part thereof,

any such other Loan Document or any instrument of further assurance, except where prohibited by law so to do. Borrower shall hold harmless and indemnify Lender, Servicer, their respective successors and assigns, against any liability incurred by reason of the imposition of any tax on the making and recording of the Security Instruments or any other Loan Document. If at any time any Governmental Authority shall require revenue or other stamps to be affixed to any of the Loan Documents, or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any. Borrower hereby absolutely and irrevocably appoints Lender as Borrower's true and lawful attorney, coupled with an interest, in Borrower's name and stead to make and execute all documents necessary or desirable to effect the provisions of this Section 10.6 if Borrower fails to do so for five days after demand by Lender. Borrower hereby ratifies all that Borrower's said attorney(ies) shall do by virtue of such power or authority. Borrower hereby acknowledges and agrees that Borrower shall have no claim or cause of action against Lender arising out of Lender's execution and/or recordation of any instruments by or on behalf of Borrower pursuant to the foregoing power of attorney.

Section 10.7    **Brokers and Financial Advisors**. Borrower hereby represents that Borrower has not dealt with any financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement except Shopco Properties Corp. Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein. The provisions of this Section 10.7 shall survive the expiration and termination of this Agreement and the payment of the Debt.

# XI    WAIVERS

Section 11.1    **Waiver of Counterclaim**. All amounts due under this Agreement or the other Loan Documents shall be payable without setoff, counterclaim or any deduction whatsoever. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against Borrower by Lender or its agents, including Servicer, or otherwise offset any obligations to make payments required under the Loan Documents. Any Investor or assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which Borrower may otherwise have against any assignor of the Loan Documents, and no such unrelated offset, counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon the Loan Documents, and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower. If Borrower is indebted to Lender pursuant to more than one note or pursuant to any subordinate loan documents, (i) the preceding provisions shall apply to any note or other loan documents assigned or transferred by Lender, even if one or more notes are retained by Lender, and (ii) Borrower waives and releases any right to assert any claim, cause of action, offset or defense against Lender with respect to the Loan or the Loan Documents which is any way related to such other note or subordinate loan documents.

Section 11.2    **Marshalling and Other Matters**. Borrower hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement

and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein and the pleading of any statute of limitations as a defense to payment of the Debt or performance of the Obligations. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of any Security Instrument on behalf of Borrower, and on behalf of each and every Person acquiring any interest in or title to the Property subsequent to the date of this Agreement and on behalf of all Persons to the extent permitted by applicable law. Borrower hereby waives and renounces all homestead and exemption rights provided by the Constitution and the laws of the United States and of any state, in and to the Property as against the collection of the Debt, or any part thereof. The interests and rights of Lender under the Notes, the Security Instruments or in any of the other Loan Documents shall not be impaired by any indulgence, including (i) any renewal, extension or modification which Lender may grant with respect to any of the Debt, (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Lender may grant with respect to the Property or any portion thereof; or (iii) any release or indulgence granted to any maker, endorser, Borrower Party or surety of any of the Debt.

Section 11.3   **Waiver of Notice**. Borrower shall not be entitled to, and hereby waive the right to receive, any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.

Section 11.4   **Trial by Jury**. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THE LOAN DOCUMENTS, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE MODIFICATION THEREOF OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THE LOAN DOCUMENTS (AS NOW OR HEREAFTER MODIFIED) OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF ANY RIGHT THEY MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

## XII   MISCELLANEOUS

Section 12.1   **Survival**. This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant to any of the Loan Documents, including the Certificate of Sources and Uses and the Payment Direction Letter, shall survive the making by Lender of the Loan and the execution and delivery to Lender

of the Notes, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

### Section 12.2   Governing Law.

(A)   THIS AGREEMENT WAS NEGOTIATED IN WHOLE OR IN PART IN THE STATE OF NEW YORK, AND MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTES DELIVERED PURSUANT TO THIS AGREEMENT WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS) AND ANY LEGAL REQUIREMENT OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE APPLICABLE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTE, AND THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. THIS CHOICE OF GOVERNING LAW IS MADE PURSUANT TO NEW YORK GENERAL OBLIGATION LAW SECTION 5-1401.

(B)   ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, OR AT LENDER'S SOLE OPTION AND ELECTION IN THE STATE WHERE THE PROPERTY IS LOCATED, AND, IN EITHER INSTANCE, BORROWER WAIVES ANY OBJECTIONS WHICH BORROWER MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR

PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT NEW YORK SECRETARY OF STATE AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. A COPY OF SUCH SERVICE OF PROCESS SHALL BE DELIVERED TO: GUREVICH & ASSOCIATES, LLP, 216 EAST 49TH STREET, 5TH FLOOR, NEW YORK, NEW YORK 10017. BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

(C)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER BROUGHT BY BORROWER AGAINST LENDER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ARISING OUT OF THE LENDER-BORROWER RELATIONSHIP CREATED BY THE LOAN DOCUMENTS (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) WHICH IN ANY EVENT SHALL BE SUBJECT TO THE LIMITATIONS OF <u>SECTION 12.21</u>, MAY ONLY BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK AND BORROWER HEREBY WAIVES ANY RIGHT TO BRING ANY CLAIM OR CAUSE OF ACTION IN ANY OTHER JURISDICTION AND HEREBY AGREES NOT TO DO SO.

Section 12.3    <u>Modification; Waiver in Writing</u>. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of any other Loan Document, nor consent by Lender to any departure by any Borrower Party from the Obligations, shall in any event be effective unless the same shall be in a writing signed by the Person against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on any Borrower Party shall entitle any Borrower Party to any other or future notice or demand in the same, similar or other circumstances.

Section 12.4    <u>Delay Not a Waiver</u>. Neither any failure nor any delay on the part of Lender in insisting upon strict performance or compliance of any term, condition, covenant or

agreement, or Lender's delay in exercising any right, power, remedy or privilege hereunder, or under the Notes or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

**Section 12.5    Notices**. All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing (including by facsimile) and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, or (c) by facsimile (with a copy sent contemporaneously by certified or registered United States mail, postage prepaid) answer back acknowledged), addressed as follows:

If to Borrower:     Hale Avenue Borrower, LLC
216 East 49th Street, 5th Floor
New York, New York 10017
Attention: Alexander Gurevich
Telephone: 212-829-9200
Facsimile: 212-829-9838

with a copy to:

Gurevich & Associates, LLP
216 East 49th Street, 5th Floor
New York, New York 10017
Attention: Tatiana A. Shestova, Esq.
Telephone: 212-829-9200
Facsimile: 212-829-9838

and

Simon Singer
494 8th Avenue, 21st Floor
New York, New York 10001
Telephone:
Facsimile:

|                  |                                                      |
|------------------|------------------------------------------------------|
| If to Lender:    | Lehman Brothers Holdings Inc.                        |
|                  | 399 Park Avenue                                      |
|                  | 8th Floor                                            |
|                  | New York, New York 10022                             |
|                  | Attention: Carmine Visone and Christopher McKenna    |
|                  | Telephone: (212) 526-1796                            |
|                  | Facsimile: (646) 758-3140                            |
|                  | MTS Nos.: WH6409                                     |

with copies to:

Lehman Brothers Holdings Inc.
399 Park Avenue
8th Floor
New York, New York 10022
Attention: David Broderick
Telephone: (212) 526-2453
Facsimile: (646) 758-5311
MTS No.: WH6409

and

Paul Hastings Janofsky & Walker LLP
75 East 55th Street
New York, New York 10022
Attention: Kenneth Friedman, Esq.
Telephone: (212) 318-6025
Facsimile: (212) 319-4090

|                    |                                   |
|--------------------|-----------------------------------|
| with a copy to     | TriMont Real Estate Advisors      |
| Servicer:          | Monarch Tower                     |
|                    | 3424 Peachtree Road NE            |
|                    | Suite 2200                        |
|                    | Atlanta, Georgia 30326            |
|                    | Attention: J. Gregory Winchester  |
|                    | Telephone: (404) 420-5600         |
|                    | Facsimile: (404) 420-5610         |
|                    | MTS No.: WH6409                   |

or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section. A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day, in the case of facsimile, upon completion of transmission (which is

confirmed by telephone or by a statement generated by the transmitting machine) with receipt
acknowledged by the recipient thereof.

Section 12.6  **Headings**.  The Article and/or Section headings and the Table of
Contents in this Agreement are included herein for convenience of reference only and shall not
constitute a part of this Agreement for any other purpose. "Section" refers to the entire
Section and not to any particular subsection, paragraph or other subdivision. Reference to days
for performance shall mean calendar days unless Business Days are expressly indicated.

Section 12.7  **Severability**.  If any provision or obligation under this Agreement
and the other Loan Documents shall be determined by a court of competent jurisdiction to be
invalid, illegal or unenforceable, that provision shall be deemed severed from the Loan
Documents and the validity, legality and enforceability of the remaining provisions or
obligations shall remain in full force as though the invalid, illegal, or unenforceable provision
had never been a part of the Loan Documents.

Section 12.8  **Preferences**.  Lender shall have the continuing and exclusive right
to apply or reverse and reapply any and all payments by any of the Borrower Parties to any
portion of the Obligations.  To the extent any of the Borrower Parties makes a payment or
payments to Lender, which payment or proceeds or any part thereof are subsequently
invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a
trustee, receiver or any other party under any Bankruptcy Law, state or federal law, common law
or equitable cause, then, to the extent of such payment or proceeds received, the Obligations or
part thereof intended to be satisfied shall be revived and continue in full force and effect, as if
such payment or proceeds had not been received by Lender.

Section 12.9  **Expenses**.  Borrower covenants and agrees to pay to Lender upon
receipt of written notice from Lender all reasonable costs and expenses (including reasonable
attorneys' fees and disbursements) incurred by Lender in connection with (i) the preparation,
negotiation, execution and delivery of this Agreement and the other Loan Documents and the
consummation of the transactions contemplated hereby and thereby and all the costs of
furnishing all opinions by counsel for the Borrower Parties (including any opinions requested by
Lender as to any legal matters arising under this Agreement or the other Loan Documents with
respect to the Property); (ii) the ongoing performance of and compliance with the respective
agreements and covenants of the Borrower Parties contained in this Agreement and the other
Loan Documents; (iii) Lender's ongoing performance and compliance with all agreements and
conditions contained in this Agreement and the other Loan Documents, including Lender's
administration and servicing of the Loan; (iv) the negotiation, preparation, execution, delivery
and administration of any consents, amendments, waivers or other modifications to this
Agreement and the other Loan Documents and any other documents or matters requested by
Lender; (v) securing compliance with any requests made by any Borrower Party pursuant to any
provision of any of the Loan Documents; (vi) the filing and recording of the Loan Documents,
title insurance and reasonable fees and expenses of counsel for providing to Lender all required
legal opinions, and other similar expenses incurred in creating and perfecting the Liens in favor
of Lender pursuant to this Agreement and the other Loan Documents; (vii) enforcing or
preserving any rights, in response to third party claims or the prosecuting or defending of any
action or proceeding or other litigation, in each case against, under or affecting any Borrower

Party, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan; (viii) costs incurred by Lender in the review of easements, lot line agreements or similar matters, the review and approval of or consent to Leases and the negotiation of subordination, non-disturbance and attornment agreements, and other similar items required by Borrower in connection with Borrower's use and enjoyment of the Property; (ix) costs incurred by Lender in responding to any subpoena or participating in, observing or preparing for any deposition or other legal or quasi-legal process; (x) the amounts described in Section 7.4; (xi) appraisal fees (whether or not the appraiser is retained by Lender or Borrower); (xii) fees and charges for surveys and Engineering Reports (as defined in the Building Loan Agreement); (xiii) fees and charges for examinations of title to the Project and for mortgagee title insurance and endorsements thereto (including Datedown Endorsements) which are being or may in the future be issued by the Title Insurance Company; (xiv) all taxes and charges relating to the perfection of Lender's security interests, including, without limitation, all mortgage recording taxes payable now or in the future; (xv) all registration, recording and filing fees and charges in connection with the Loan; (xvi) fees and charges of Lender's insurance consultant and the environmental engineers preparing any environmental assessment or environmental audits as are to be performed at Borrower's expense pursuant to the terms of this Agreement; (xvii) costs for certified copies of instruments; (xviii) all brokerage fees and commissions payable in connection with the Loan; and (xix) the fees and expenses of the Consultant (as defined in the Building Loan Agreement). Any cost and expenses due and payable to Lender shall be payable within five (5) Business Days of demand, shall be secured by the Loan Documents, and if not paid when due, shall bear interest at the Default Rate until paid. Borrower acknowledges and agrees that the obligations of Borrower under this Section 12.9 are not subject to or conditioned upon Lender making any Advances of the Loan to Borrower.

Section 12.10 **Relationship of Borrower and Lender**. The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or condition of any of the Notes, the Security Instruments, this Agreement and the other Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of the debtor and creditor relationship established pursuant to the Loan Documents. The relationship of Borrower and Lender is created and governed solely by the Loan Documents.

Section 12.11 **No Joint Venture or Partnership; No Third Party Beneficiaries**.

(a)    Any provision herein or in any of the other Loan Documents to the contrary notwithstanding, Lender, by virtue of its acceptance of this Agreement and the making of the Loan or any approval rights Lender may have herein or in any of the Loan Documents shall not be deemed to constitute Lender a mortgagee-in-possession, tenant-in-common, or in control of, or a partner or joint venturer with, or insider (within the meaning of Section 101(31) of the Bankruptcy Code) of, any Borrower Party or any other Person; and Borrower shall indemnify Lender against, shall hold Lender harmless from, and shall reimburse Lender for, any and all claims, demands, judgments, penalties, fines, liabilities, costs, damages and expenses, including court costs and reasonable attorneys' fees incurred by Lender (whether incurred in connection with nonjudicial action, prior to trial, at trial, or on appeal or review) in any action against or involving Lender resulting from such a construction of the Loan Documents.

(b)    Any inspection of the Property, any review or approval of any plans, contracts, subcontracts (including environmental reviews, audits, assessments and/or reports relating to the Property), and review or approval of budgets, expenses or obligations or any analysis of the Property made by Lender or any of its agents, architects or consultants is intended solely for the benefit of Lender and shall not be deemed to create or form the basis of any warranty, representation, covenant, implied promise or liability to Borrower or any of their employees or agents, any guest or invitee upon the Property, or any other Person.

(c)    Except as otherwise provided in Article VIII hereof, this Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and any Servicer appointed by Lender and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender, the Servicer appointed by Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained in the Loan Documents. Except as otherwise provided in Article VIII hereof, all conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's discretion, Lender deems it advisable or desirable to do so.

**Section 12.12 Publicity**. All news releases, publicity or advertising by the Borrower Parties or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents or to Lender, or any of their Affiliates shall be subject to the prior written approval of Lender, which approval shall not be unreasonably withheld.

**Section 12.13 Subrogation**. If any or all of the proceeds of the Notes have been used to extinguish, extend or renew any Indebtedness heretofore existing against the Property or any part thereof, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, Liens, titles, and interests existing against the Property or any part thereof heretofore held by, or in favor of, the holder of such Indebtedness and such former rights, claims, Liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the Lien and security interest created herein as cumulative security for the repayment of the Debt, the performance and discharge of the Obligations.

**Section 12.14 Duplicate Originals; Counterparts**. This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute one agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

**Section 12.15 Liability**. If Borrower consists of more than one Person, the obligations and liabilities of each Person hereunder shall be joint and several irrespective of

whether a particular Borrower is primarily responsible for such obligation or liability. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

Section 12.16 **Prior Agreements**. This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, including any term sheets, discussion outlines or commitment letters (as same may be amended) between any of the Borrower Parties and Lender are superseded by the terms of this Agreement and the other Loan Documents.

Section 12.17 **No Usury**. Any provision herein, in any Loan Document or any other document executed or delivered in connection with the Loan, or in any other agreement or commitment, whether written or oral, expressed or implied, to the contrary notwithstanding, Lender shall not in any event be entitled to receive or collect, nor shall or may amounts received hereunder be credited, so that Lender shall be paid, as interest, a sum greater than the maximum amount permitted by applicable law to be charged to the Person primarily obligated to pay the Debt and the Obligations at the time in question. If any construction of this Agreement, any other Loan Document, or any other document executed or delivered in connection herewith, indicates a different right given to Lender to ask for, demand or receive any larger sum as interest, such is a mistake in calculation or wording which this clause shall override and control, it being the intention of the Borrower and Lender that this Agreement, any other Loan Document and any other documents executed in connection herewith conform strictly to applicable usury laws. In no event shall the amount treated as the total interest exceed the maximum amount of interest which may be lawfully contracted for, charged, taken, received or reserved by Lender in accordance with the applicable usury laws, taking into account all items which are treated as interest under applicable law, computed in the aggregate over the full term of the Loan evidenced hereby. In the event that the aggregate of all consideration which constitutes interest under applicable law that is taken, reserved, contracted for, charged or received under this Agreement, any other Loan Document and any other documents executed in connection herewith shall ever exceed the maximum nonusurious rate under applicable law, any sum in excess thereof shall be applied to the reduction of the unpaid principal balance of the Debt and the Obligations, and if the Debt and the Obligations are paid in full, any remaining excess shall be paid to Borrower. In determining whether or not the interest paid or payable, under any specific contingency, exceeds the maximum nonusurious rate under applicable law, if any, the Borrower and Lender shall, to the maximum extent permitted under applicable law, (a) characterize any nonprincipal amount as an expense or fee rather than as interest, (b) exclude voluntary prepayments and the effects thereof, or (c) "spread" the total amount of interest throughout the entire term of the Debt and the Obligations so that the interest rate is uniform throughout the entire term of the Debt and the Obligations; provided, however, that if the Debt and Obligations are paid and performed in full prior to the end of the full contemplated term thereof, and if the interest received for the actual period of existence thereof exceeds the maximum nonusurious rate, if any, Lender shall refund to Borrower the amount of such excess.

Section 12.18 **Construction**. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender by virtue of the fact that this Agreement or any of the Loan Documents has originated with Lender as drafter. Borrower

acknowledges that Borrower has reviewed this Agreement and the other Loan Documents and
has had the opportunity to consult with counsel on same. This Agreement and the other Loan
Documents, shall therefore be construed and interpreted according to the ordinary meaning of the
words used so as to fairly accomplish the purposes and intentions of the parties to the Loan
Documents. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely
on its own judgment and advisors in entering into the Loan without relying in any manner on any
statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate
of Lender.

      **Section 12.19 Lender's Discretion**. Whenever pursuant to this Agreement or
any of the Loan Documents, Lender may approve or disapprove any act (or any action) or any
document, delivery or other item, or where Lender's consent or approval is required in any
respect or where any document or other item must be satisfactory to Lender, except in those
specific instances where Lender has specifically agreed not to unreasonably withhold Lender's
consent pursuant to the terms of this Agreement or any of the Loan Documents, the decision of
Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or
not satisfactory or to grant or withhold consent shall be in the sole, absolute and unfettered
discretion of Lender, without any express or implied obligation of reasonableness or good faith
whatsoever and shall be final and conclusive. Borrower acknowledges and agrees that in no
circumstance shall Borrower have any claim or cause of action, in contract or in tort, against
Lender as a result of the granting or withholding of any such consent or approval. The inclusion
of references to Lender's sole or absolute discretion in any particular provisions of this
Agreement or any of the Loan Documents shall not limit or affect the applicability of this
Section to all provisions of this Agreement or any of the Loan Documents, including those
provisions wherein a specific reference to Lender's sole and absolute discretion is not made.
Without limiting the preceding provisions of this Section, in the event that a claim or
adjudication is made that Lender or its agents have acted unreasonably or in bad faith or
unreasonably delayed acting in any case where, by law or under this Agreement or the other
Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably
or in good faith or promptly, Borrower agrees that neither Lender, Servicer nor their agents or
employees shall be liable for any monetary damages (including any special, consequential or
punitive damages whatsoever), whether in contract, tort (including negligence and strict liability)
or any other legal or equitable principles, and Borrower's sole remedies shall be limited to
commencing an action seeking injunctive relief or declaratory judgment. The parties hereto
agree that any action or proceeding to determine whether Lender has acted reasonably or in good
faith shall be determined by an action seeking declaratory judgment.

      **Section 12.20 Lender**. The rights of Lender pursuant to this Agreement and the
other Loan Documents are in addition to all of the rights of Lender or any Affiliate of Lender
may now or hereafter have by virtue of any ownership, directly or indirectly, in Borrower or any
Affiliate of Borrower. In acting as Lender pursuant to this Agreement or the Loan Documents,
Borrower acknowledges that Lender shall owe no duties of any kind to Borrower or any other
Person (other than those specifically stated in the Loan Documents) on account of such role of
Lender or any Affiliate of Lender or by virtue of any ownership interest in Borrower or such
Affiliates (directly or indirectly) or otherwise, and there shall be no limitations on Lender's
rights or remedies or Lender's ability to act solely in Lender's best interests or in Lender's
discretion, notwithstanding the role of Lender or any such Affiliate of Lender may have by virtue

of any ownership interest in Borrower or any Affiliate of Borrower. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to Lender under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by Lender or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire (directly or indirectly) in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. No assignee of any of Lender's rights with respect to the Loan or the Loan Documents shall be prejudiced or affected by the status of Lender or any such Affiliate of Lender as a member, partner, stockholder or other owner of Borrower or any Affiliate of Borrower or any actions taken or not taken by Lender or its Affiliates prior to the assignment to the then current Lender and upon any such assignment, such assignee shall be in the same position as if such assignee had originated the Loan itself as of the date of such assignment and shall not be subject to any offsets, counterclaims or defenses to which Lehman Brothers Holdings Inc. or any other Person which may from time to time be the "Lender" hereunder or their respective Affiliates might be subject. Borrower acknowledges that Lender and its Affiliates engage in the business of real estate financings and other real estate transactions and investments, which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

Section 12.21 **Limitation on Liability**. Notwithstanding anything contained herein to the contrary, Borrower agrees that none of Lender, Servicer or their agents or employees shall be liable to Borrower for any monetary damages (including any special, consequential or punitive damages whatsoever), whether in contract, tort (including negligence and strict liability) or any other legal or equitable principle (including without limitation, with respect to any acts of Lender pursuant to Section 12.26 hereof) and Borrower's sole remedies shall be limited to commencing an action for specific performance.

Section 12.22 [Intentionally Reserved]

Section 12.23 **Appointment of Servicer and Delegation of Lender Rights**. Borrower acknowledges and agrees that at the option of Lender, the Loan may be serviced by a servicer/trustee (the "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement between Lender and Servicer; provided, however, such delegation will not release Lender from any of its obligations under the Loan Documents. Borrower shall be responsible for paying to Servicer on each Payment Date a monthly servicing fee of 0.15% per annum of the then outstanding principal amount of the Loan. Borrower shall also be responsible for the payment of all out-of-pocket costs and expenses incurred by Servicer in connection with the Loan (including the review and approval of or consent to Leases and Condominium Documents and the negotiation of subordination, non-disturbance and attornment agreements, property inspections, casualty or condemnation matters or in connection with any Default or Event of Default). Any action or inaction taken by the Servicer pursuant to this Agreement and the Loan Documents shall be binding to the same extent as if taken by Lender, and Borrower shall be entitled to rely on all actions and directions given by Servicer with respect to all matters concerning the Loan and Loan Documents unless and until Borrower receive contrary written instructions from the Lender.

**Section 12.24  Cross-Default**.  Borrower acknowledges that Lender has made the Loan to Borrower upon the security of its interest in the Property.  Borrower agrees that the Security Instruments are and will be cross-defaulted with each other so that (i) an Event of Default under any of the Security Instruments shall constitute an Event of Default under each of the other Security Instruments which secure any of the Notes; and (ii) an Event of Default under any Note or this Agreement shall constitute an Event of Default under each other Note and under each Security Instrument.

**Section 12.25  Delay Outside Lender's Control**.  Lender shall not be liable in any way to Borrower or any third party for Lender's failure to perform or delay in performing under the Loan Documents (and Lender may suspend or terminate all or any portion of Lender's obligations under the Loan Documents) if such failure to perform or delay in performing results directly or indirectly from, or is based upon, the action, inaction, or purported action, of any Governmental Authority, or because of war, rebellion, insurrection, strike, lock-out, boycott or blockage (whether presently in effect, announced or in the sole judgment of Lender deemed probable), or from any Act of God or other cause or event beyond Lender's control.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**HALE AVENUE BORROWER, LLC**, a Delaware limited liability company

By: _____
Name: Alexander Gurevich
Title: Authorized Signatory

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation (individually and as lead arranger and administrative agent for itself and certain co-lenders)

By:_____
Name:
Title:   Authorized Signatory

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**HALE AVENUE BORROWER, LLC**, a Delaware limited liability company

**By:** _____
**Name:**  Alexander Gurevich
**Title:**  Authorized Signatory

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.,** a Delaware corporation (individually and as lead arranger and administrative agent for itself and certain co-lenders)

By:_____
Name:     Christopher McKenna
Title:  Authorized Signatory

## SCHEDULE I

### Definitions

"**Acceptable Accounting Principles**" shall mean GAAP or such other accounting methods or principles acceptable to Lender in Lender's discretion from time to time.

"**Acceptable Counterparty**" means any counterparty to an Interest Rate Cap Agreement that has and shall maintain, until the expiration of the applicable Interest Rate Cap Agreement, a long-term unsecured debt rating of not less than "AA-" by Standard & Poor's Rating Group, "Aa3" by Moody's Investors Service, Inc. or an equivalent long-term unsecured debt rating by any other Rating Agency.

"**Access Laws**" shall have the meaning set forth in Section 5.19.

"**Acquisition Loan**" shall have the meaning set forth in the Recitals of this Agreement.

"**Acquisition Loan Documents**" shall mean, collectively, this Agreement, the Certificate of Sources and Uses, the Payment Direction Letter, the Acquisition Loan Note, the Acquisition Loan Mortgage, the Assignment of Leases, the Assignment of Interest Rate Cap Agreement, the Assignment of Agreements, the Environmental Indemnity, the Consent and Recognition Agreements, the Guaranty of Recourse Obligations, all Uniform Commercial Code financing statements filed in connection with the Acquisition Loan and all other documents evidencing, securing or otherwise executed and/or delivered by one or more of the Borrower Parties in connection with the Acquisition Loan.

"**Acquisition Loan Mortgage**" shall have the meaning set forth in the Recitals of this Agreement.

"**Acquisition Loan Note**" shall have the meaning set forth in the Recitals of this Agreement.

"**Additional Fee**" shall mean $164,877.92;

"**Advance**" shall mean any advance of the Loan made under the Project Loan Agreement or this Agreement.

"**Affiliate**" shall mean as to any Person, (i) any Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with such Person, (ii) any Person (directly or indirectly) owning or controlling 10% or more of the outstanding voting securities of or other ownership interests in such Person, (iii) any officer, director, partner, employee or member (direct or indirect and no matter how remote) of such Person, (iv) if the such Person is an individual, any entity for which such Person directly or indirectly acts as an officer, director, partner, employee or member, or (v) any entity in which such Person (together with the members of his family if the Person in question is an individual) owns, directly or indirectly through one or more intermediaries an interest in any class of stock (or other beneficial interest in such entity) of 10% or more. Any reference in this Agreement to a

"**Person and an Affiliate**" shall be deemed to refer to such Person and an Affiliate of such Person and any references in this Agreement to a "**Person or an Affiliate**" shall be deemed to refer to such Person or an Affiliate of such Person.  As used in this Agreement, the term "**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policy and/or policies of a Person, whether through ownership of voting securities or other ownership interests, by contract or otherwise.

"**Affiliate Transaction**" or "**Affiliate Agreement**" shall mean any contract, agreement or other arrangement between Borrower (or any other Person if such contract, agreement or other arrangement is in any way related to any Property) and any Borrower Party or any Affiliate of a Borrower Party or pursuant to which Borrower Party or any Affiliate of any Borrower Party or any constituent member, partner or stockholder of Borrower or any Borrower Party or any Affiliate of a Borrower Party (direct or indirect) will receive any benefit of any kind.

"**Agent**" shall have the meaning set forth in Section 8.2.1(a).

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Annual Budget**" shall have the meaning specified in Section 5.12.

"**Approved Accounting Firm**" shall mean (a) one of the accounting firms commonly known as a "Big Four" accounting firm or (b) any other certified public accounting firm acceptable to Lender in its discretion (provided, that Lender shall have the right to require, at any time, a "Big Four" accounting firm).

"**Approved Annual Budget**" shall have the meaning set forth in Section 5.12.

"**Architect**" shall mean Ryback Architects, P.C., or such other architect as may be approved by Lender.

"**Architect's Contract**" means that certain Preliminary Agreement, dated as of May 4, 2006, by and between Borrower and Architect, or such other contract or agreement by and between Borrower and Architect as may be approved by Lender in accordance with the terms hereof.

"**Asbestos**" shall have the meaning set forth in the Environmental Indemnity.

"**Assignee**" shall have the meaning set forth in Section 8.2.1(a).

"**Assignment and Assumption Agreement**" shall have the meaning set forth in Section 8.2.1(a).

"**Assignment of Agreements**" shall mean, with respect to the Property, that certain first priority Assignment of Agreements, Permits and Contracts dated as of the date hereof, from Borrower, as assignors, to Lender, as assignee, assigning to Lender, subject to the terms thereof, all of Borrower's interests in and to contracts, Licenses, permits and contracts

necessary for the use and operation of the Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Interest Rate Cap Agreement**" shall mean an Assignment of Interest Rate Cap Agreement by Borrower in favor of Lender, in form and substance reasonably satisfactory to Lender, with respect to any Interest Rate Cap Agreement obtained by Borrower in respect of the Loan.

"**Assignment of Leases**" shall mean that certain first priority Absolute Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender, subject to the terms thereof, all of Borrower's interest in and to the Leases and Rents of Borrower's Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Award**" shall have the meaning set forth in Section 6.1.3(b).

"**Bankrupt Guarantor**" shall have the meaning set forth in Section 9.4.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, as amended from time to time.

"**Bankruptcy Laws**" shall mean the Bankruptcy Code together with any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"**Borrower**" shall have the meaning set forth in the preamble.

"**Borrower Parties**" shall mean the collective reference to the Borrower, any guarantor, indemnitor or surety of any of the Obligations and any other Person (other than Lender) that is a party to any of the Loan Documents, other than any Property Manager that is not an Affiliate of Borrower. Individually, each of the Borrower Parties may be referred to herein as a "**Borrower Party**".

"**Business Day**" shall mean a day on which commercial banks are not authorized or required by law to close in the State of New York or in the State where the Property is located.

"**Casualty**" shall have the meaning set forth in Section 6.1.1(j).

"**Casualty/Condemnation Involuntary Prepayments**" shall have the meaning set forth in Section 2.2.

"**Certificate of Sources and Uses of Funds**" shall mean the Certificate of Sources and Uses of Funds delivered to Lender in connection with the Loan.

"**Closing Date**" shall mean the date of the initial funding of the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Committed Amount**" shall mean the maximum amount each Lender has agreed to lend at any one time outstanding to Borrower as part of the Loan and set forth in the Syndication Documents.

"**Condemnation**" shall have the meaning set forth in Section 6.1.3(a).

"**Condemnation Proceeds**" shall mean any Award in respect of any Condemnation.

"**Condominium**" shall have the meaning ascribed to such term in the Recitals to this Agreement.

"**Consent and Recognition Agreement**" shall mean any consent to assignment of agreement and estoppel and recognition agreement, in form and substance acceptable to Lender, executed by any architect, engineer, general contractor, construction manager, subcontractor or any other Person performing labor, services or materials in respect of the Project.

"**Construction Contract**" shall mean every contract entered into by or among Borrower, the general contractor or construction manager, as applicable, subcontractors, materialmen, the Architect, and the inspecting architect relating to the design and construction of the Project or any portion thereof or providing material therefor or services related thereto.

"**Datedown Endorsement**" shall mean any datedown endorsement to the Building Loan Title Policy or the Project Loan Title Policy (as such terms are defined in the Building Loan Agreement and Project Loan Agreement, respectively), covering Advances made or to be made subsequent to the respective date thereof, as the case may be.

"**Debt**" shall mean the agreeable outstanding principal amount set forth in, and evidenced by, the Notes together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Notes, this Agreement or any other Loan Document.

"**Default**" shall mean the occurrence of any event under this Agreement or under any other Loan Document which, but for the giving of notice or the passage of time, or both, would be an Event of Default.

"**Default Rate**" shall have the meaning set forth in the Note.

"**Defaulting Lender**" shall have the meaning set forth in Section 8.8.2.

"**Embargoed Person**" shall have the meaning set forth in Section 5.33(e).

"**Enforcement Costs**" shall mean any and all expenses, including legal expenses, attorneys' fees and expert witness fees, (i) described in Section 7.4 of this Agreement,

(ii) incurred or paid by Lender in protecting Lender's interest in the Property, (iii) incurred in collecting any amount payable under this Agreement or the other Loan Documents, or (iv) incurred in enforcing Lender's rights under this Agreement or the other Loan Documents or with respect to the Property, in each of clauses (i) through (iv) whether or not any legal proceeding is commenced hereunder or thereunder and whether or not any Default or Event of Default shall have occurred and is continuing, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such amounts are repaid to Lender.

"**Engineer**" shall mean The Office of James Ruderman, LLP, or such other engineer as may be approved by Lender.

"**Engineer's Contract**" means that certain Agreement, dated as of July 18, 2007, by and between Borrower and Engineer, or such other contract or agreement by and between Borrower and Engineer as may be approved by Lender in accordance with the terms hereof.

"**Environmental Indemnity**" shall mean, collectively, (i) that certain Environmental and Hazardous Substances Indemnification Agreement (Acquisition Loan), (ii) that certain Environmental and Hazardous Substances Indemnification Agreement (Building Loan), and (iii) that certain Environmental and Hazardous Substances Indemnification Agreement (Project Loan), each dated as of the date hereof, executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Laws**" shall have the meaning set forth in the Environmental Indemnity.

"**Equity Contribution**" shall have the meaning set forth in **Schedule II** of this Agreement.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**Event of Default**" shall have the meaning set forth in Section 7.1(a).

"**Excusable Delay**" shall mean any delay in the Construction of the Improvements in accordance with the Plans and Specifications resulting from acts of God, fire, earthquake, hurricane, flood, explosion, action of the elements, war, invasion, insurrection, riot, mob violence, sabotage, malicious mischief or labor strikes, not within Borrower's reasonable control, (x) with respect to which Lender shall have been provided with written notice of the occurrence thereof within five (5) days after Borrower obtaining knowledge thereof and (y) which are supported by such evidence as Lender shall reasonably request.

"**Executive Order**" shall have the meaning set forth in Section 5.33(a).

"**Existing Violations Holdback**" shall have the meaning ascribed to such term in Section 2.1.1(b).

"**Existing Violations Reserve**" shall mean a deposit account controlled by Lender.

"**Financial Statements**" shall mean, with respect to Borrower and the Property, a balance sheet, income statement and statement of changes in financial position prepared in accordance with Acceptable Accounting Principles, and setting forth all items of income and expense and such other information required under Acceptable Accounting Principles to fairly present the financial position and results of operations of Borrower and the Property and which shall at a minimum be consistent in scope, form and content with such statements delivered to Lender prior to the Closing Date, unless otherwise agreed by Lender, and which are otherwise reasonably acceptable to Lender.

"**Fiscal Year**" shall mean each twelve-month period commencing on January 1 and ending on December 31 during the term of the Loan.

"**Full Recourse Event**" shall have the meaning set forth in Section 9.3.

"**Funding Date**" shall have the meaning set forth in Section 8.7.1.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report, consistently applied.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Guarantors**" shall mean, collectively, Alexander Gurevich and each other Person, if any, that after the Closing Date becomes a party to each or any of the Guaranty of Recourse Obligations and the Environmental Indemnity.

"**Guaranty of Recourse Obligations**" shall mean, collectively, (i) that certain Guaranty of Recourse Obligations (Acquisition Loan), and (ii) that certain Guaranty of Recourse Obligations (Project Loan), each executed by Guarantors, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Hazardous Substances**" shall have the meaning set forth in the Environmental Indemnity.

"**Improvements**" shall have the meaning set forth in the Security Instruments.

"**Indebtedness**" of a Person, at a particular date, means the sum (without duplication) at such date of (a) all indebtedness or liability for borrowed money; (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the deferred purchase price of property or services (including trade obligations); (d) obligations under letters of credit; (e) obligations under acceptance facilities; (f) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person,

or otherwise to assure a creditor against loss; and (g) obligations secured by any Liens, whether or not the obligations have been assumed.

"**Indemnified Parties**" shall mean (a) Lender, (b) any prior or subsequent owner or holder of the Loan, (c) any Servicer or prior Servicer of the Loan, (d) any Investor or any prior Investor, (e) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Investor or other third party, (f) any receiver or other fiduciary appointed in a foreclosure or other proceeding, (g) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing, and (h) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or thereafter or as part of or following a foreclosure of the Loan.

"**Independent**" shall mean, when used with respect to any Person, a Person who (a) is in fact independent, (b) does not have any direct financial interest in any Borrower Party, or in any Affiliate of any Borrower Party or any Affiliate of any constituent partner, shareholder, member or beneficiary of any Borrower Party (direct or indirect), and (c) is not connected with any Borrower Party or any Affiliate of any Borrower Party or any Affiliate of any constituent partner, shareholder, member or beneficiary of any Borrower Party (direct or indirect) as an officer, employee, promoter, underwriter, trustee, partner, member, director or Person performing similar functions. Whenever it is herein provided that any Independent Person's opinion or certificate shall be provided, such opinion or certificate shall state that the Person executing the same has read this definition and is Independent within the meaning thereof.

"**Independent Manager**" shall have the meaning set forth in Section 4.1(s)(xxv).

"**Inspecting Architect**" shall mean such person or persons as Lender may designate from time to time to inspect the design and construction of the Pre-Development Work and to perform other services with respect thereto on behalf of Lender, whether or not such person is a licensed architect.

"**Insurance Premiums**" shall have the meaning set forth in Section 6.1.1(b).

"**Insurance Proceeds**" shall mean all proceeds received under Policies required to be maintained by Borrower.

"**Interest Holdback**" shall have the meaning ascribed to such term in Section 2.1.1(b).

"**Interest Period**" shall have the meaning set forth in the Notes.

"**Interest Rate Cap Agreement**" shall mean an Interest Rate Cap Agreement (together with the confirmation and schedules relating thereto), in form and substance reasonably acceptable to Lender, between an Acceptable Counterparty and Borrower, obtained by Borrower, pursuant to Section 2.7. After delivery of a Replacement Interest Rate Cap Agreement to

Lender, the term "**Interest Rate Cap Agreement**" shall be deemed to mean such Replacement Interest Rate Cap Agreement.

"**Interest Reserve**" shall have the meaning ascribed to such term in the Reserve Agreement.

"**Investor**" shall have the meaning set forth in Section 8.1.1.

"**Land**" shall have the meaning set forth in the Security Instruments.

"**Lease**" shall mean any lease, occupancy agreement, sublease, sub-sublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of, any space in the Property, and every modification, amendment, assignment, termination, consent to assignment or other agreement relating to such lease, sublease, sub-sublease or other agreement entered into in connection with such lease, sublease, sub-sublease or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"**Lease Guaranty**" shall have the meaning set forth in Section 5.15(b).

"**Leasing Guidelines**" shall mean the leasing guidelines set forth in **Schedule V**.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Property or any part thereof or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, Licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including (i) Access Laws, (ii) applicable restrictive covenants, zoning ordinances and building codes, (iii) subdivision and land use laws and regulations, (iv) all applicable health and Environmental Laws and regulations, and (v) all standards and regulations of appropriate supervising boards of fire underwriters and similar agencies.

"**Lehman**" shall mean Lehman Brothers Holdings Inc., a Delaware corporation.

"**Lender**" shall mean Lehman Brothers Holdings Inc., a Delaware corporation, individually and as lead arranger and administrative agent for itself and certain co-lenders; provided, however, with respect to the use of the term in Section 8.2, "**Lender**" shall mean each lending institution that has entered into an Assignment and Assumption Agreement with Agent.

"**Lender Default Obligation**" shall have the meaning set forth in Section 8.8.2.

"**LIBOR Rate**" shall have the meaning set forth in the Notes.

"**Licenses**" shall have the meaning set forth in Section 4.1(j).

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting the Property or any portion thereof, or any interest of Borrower therein, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's or materialmen's liens and other similar liens and encumbrances.

"**Loan**" shall mean the loan made by Lender to Borrower in the original principal amount set forth in, and evidenced by, the Notes executed and delivered by Borrower.

"**Loan Agreements**" shall mean, collectively, this Agreement and the Project Loan Agreement.

"**Loan Documents**" shall mean, collectively, this Agreement, the Acquisition Loan Documents, the Project Loan Documents, the Certificate of Sources and Uses, the Payment Direction Letter, and all other documents evidencing, securing or otherwise executed and/or delivered by one or more of the Borrower Parties in connection with the Loan, as each may be amended, restated, replaced or otherwise modified from time to time. Each of the Loan Documents may be referred to herein individually as a "**Loan Document**".

"**Losses**" shall mean any and all claims, suits, liabilities (including strict and contingent liabilities), actions, proceedings, obligations, debts, damages, losses, costs (including any and all costs and expenses incurred in the preservation, restoration and protection of any of the Property and any and all costs and expenses incurred by Lender to remedy any Partial Recourse Event), any deficiency claim in connection with the foreclosure of any Security Instrument, expenses, diminution in value of any of the Property, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement, consequential or punitive damages payable by Lender or any Indemnified Party, lost profits and damages, costs and expenses of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense), including Enforcement Costs or any other amounts expended by Lender in connection with the Loan.

"**Major Lease**" shall mean, collectively, (a) any Lease to any Tenant, other than a residential Lease for a single apartment unit, demising premises in excess of 5,000 rentable square feet and (b) any Lease to any Tenant related to the operation of the parking garage located on the Property.

"**Master Construction Contract**" shall mean a general construction contract or construction management agreement, in form and substance acceptable to Lender, by and between Borrower and a general contractor or a construction manager, as applicable, acceptable to Lender.

"**Material Adverse Change**" shall mean a material adverse change in (i) the assets, operations, or financial condition of Borrower or the Person in question, (ii) the ability to pay the Debt of Borrower or the Person in question in accordance with the terms hereof and otherwise comply with the material terms of this Agreement and the Loan Documents, (iii) the Property or the value thereof, (iv) the validity, priority or enforceability of this Agreement or any

other Loan Document, (v) the ability of Lender to enforce its rights and remedies pursuant to this Agreement or any other Loan Documents, (vi) Lender's Lien on the Property or the priority of such Lien, or (vii) the Loan.

"**Material Adverse Effect**" shall mean a material adverse effect on (i) the assets, operations, or financial condition of Borrower or the Person in question, (ii) the ability to pay the Debt of Borrower or the Person in question in accordance with the terms hereof and otherwise comply with the material terms of this Agreement and the Loan Documents, (iii) the Property or the value thereof, (iv) the validity, priority or enforceability of this Agreement or any other Loan Document, (v) the ability of Lender to enforce its rights and remedies pursuant to this Agreement or any other Loan Documents, (vi) Lender's Lien on the Property or the priority of such Lien, or (vii) the Loan.

"**Material Agreement**" means any agreement entered into by Borrower or any other Borrower Party (i) affecting or relating to the Property (or any component thereof) requiring the payment of more than $100,000 in payments or liability in any annual period or which is not cancelable without penalty or premium on no more than thirty (30) days notice other than the Management Agreements and the Leases or (ii) that relates to sale or leasing brokerage with respect to any Property.

"**Maturity Date**" shall have the meaning set forth in the respective Notes.

"**Maximum Permitted Trade Payables**" shall mean unsecured trade payables incurred in the ordinary course of operating the Property and customarily satisfied within thirty (30) days in the aggregate amount for the Property not to exceed one percent (1%) of the Debt.

"**Minor Lease**" shall mean any Lease (other than a Lease to a residential Tenant for a single apartment unit) that is not a Major Lease.

"**New Property Manager**" shall have the meaning set forth in Section 5.17.

"**Non-Bankrupt Guarantor**" shall have the meaning set forth in Section 9.4.

"**Non-Consolidation Opinion**" shall mean an opinion of counsel to the Person in question (satisfactory to Lender in form and substance and from counsel satisfactory to Lender and containing assumptions, limitations and qualifications customary for opinions of such type and satisfactory to Lender) to the effect that a court of competent jurisdiction in a proceeding under the Bankruptcy Code would not consolidate the assets and liabilities of such Person with those of any other Person.

"**Notes**" shall mean, collectively, the Acquisition Loan Note and the Project Loan Note, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time. Individually, each of the Notes shall sometimes be referred to as a "**Note**".

"**Obligations**" shall mean any and all debt, liabilities and other obligations of Borrower, including all affirmative and negative covenants, to Lender or of any of the Borrower Parties in connection with the Loan or pursuant to the Loan Documents, including, without limiting the generality of the foregoing, the Debt.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower, which is signed by an authorized senior officer of the manager, managing member or general partner of Borrower on behalf of Borrower that is acceptable to Lender.

"**Organizational Documents**" shall mean (i) with respect to a corporation, such Person's certificate of incorporation and by-laws, and any shareholder agreement, voting trust or similar arrangement applicable to any of such Person's authorized shares of capital stock, (ii) with respect to a partnership, such Person's certificate of limited partnership, partnership agreement, voting trusts or similar arrangements applicable to any of its partnership interests, (iii) with respect to a limited liability company, such Person's certificate of formation, limited liability company agreement or other document affecting the rights of holders of limited liability company interests, and (iv) any and all agreements between any constituent member, partner or shareholder of Borrower, including any contribution agreement or indemnification agreements. In each case, "Organizational Documents" shall include any indemnity, contribution, shareholders or other agreement among any of the owners of the entity in question.

"**Origination Fee**" shall mean $164,877.92.

"**Other Charges**" shall mean all maintenance charges, charges or amounts payable under any reciprocal easement agreement, ground rents, impositions other than Taxes, and any other charges (including any charges, payments or amounts, for which the failure to pay may give rise to a Lien against the Property), including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied, incurred or assessed or imposed against the Property or any part thereof.

"**Partial Recourse Event**" shall have the meaning set forth in Section 9.2.

"**Participant**" shall have the meaning set forth in Section 8.2.1(g).

"**Participations**" shall have the meaning set forth in Section 8.1.1.

"**Patriot Act**" shall have the meaning set forth in Section 5.33(a).

"**Payment Date**" shall mean the ninth (9th) day of each calendar month, or if such first day is not a Business Day, the immediately preceding Business Day.

"**Payment Direction Letter**" shall mean the Payment Direction Letter delivered to Lender in connection with the Loan.

"**Percentage**" means with respect to each Lender, the percentage which its Committed Amount constitutes of the maximum amount of the Loan.

"**Permitted Encumbrances**" shall mean: (a) the Liens created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in each Title Insurance Policy which have been approved by Lender and which do not in any event have a Material Adverse Effect, (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent, and (d) statutory Liens for labor or materials securing sums not yet due and payable, provided the Borrower has given advance written notice of same to Lender.

"**Permitted Transfers**" shall mean a Transfer of any direct or indirect interest in Borrower in connection with (i) transfers to immediate family members for estate planning purposes, or (ii) transfers of up to forty-nine percent (49%) in any constituent member or partner, in any case, which do not affect the management or control of Borrower by the Principal and which otherwise comply with the requirements set forth in the Loan Documents, provided, however, that in no case shall any Transfer which results in Alexander Gurevich (a) owning less than an fifty-one percent (51%) indirect interest in Borrower or (b) no longer managing or controlling Borrower, be deemed to be a Permitted Transfer.

"**Person**" shall mean any individual, entity, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Preliminary Plans and Specifications**" shall have the same meaning as set forth in Section 5.29(b).

"**Policies**" or "**Policy**" shall have the respective meanings specified in Section 6.1.1(b).

"**Pre-Development Budget**" shall mean the final construction budget attached hereto as Schedule VII.

"**Pre-Development Work**" shall have the meaning ascribed to such term in Section 5.29 hereof.

"**Premises**" shall have the meaning set forth in the granting clauses of the Security Instruments.

"**Principal**" shall mean Alexander Gurevich.

"**Prohibited Person**" shall have the meaning set forth in Section 5.33(b).

"**Project**" shall have the meaning set forth in the Recitals of this Agreement.

"**Project Loan**" shall have the meaning set forth in the Recitals of this Agreement.

"**Project Loan Agreement**" shall have the meaning set forth in the Recitals of this Agreement.

"**Project Loan Amount**" shall have the meaning set forth in Section 2.1.1.

"**Project Loan Budget**" shall mean the budget (which shall be a component of the Pre-Development Budget) for a portion of the costs relating to the Pre-Development Work, as the same may be modified, amended or supplemented from time to time in accordance with the terms and conditions of the Project Loan Agreement.

"**Project Loan Documents**" shall mean, collectively, this Agreement, the Project Loan Agreement, the Certificate of Sources and Uses, the Payment Direction Letter, the Project Loan Note, the Project Loan Mortgage, the Assignment of Leases, the Assignment of Interest Rate Cap Agreement, the Assignment of Agreements, the Environmental Indemnity, the Consent and Recognition Agreements, the Guaranty of Recourse Obligations, all Uniform Commercial Code financing statements filed in connection with the Project Loan and all other documents evidencing, securing or otherwise executed and/or delivered by one or more of the Borrower Parties in connection with the Project Loan.

"**Project Loan Mortgage**" shall have the meaning set forth in the Recitals of this Agreement.

"**Project Loan Note**" shall have the meaning set forth in the Recitals of this Agreement.

"**Property**" shall have the meaning set forth in the granting clause of the Security Instruments.

"**Property Management Agreement**" shall mean any property management agreement, construction management agreement, leasing agreement or any other agreement(s) for similar or related services, each of which must be acceptable to Lender, entered into by and between Borrower and a Property Manager, and pursuant to which such Property Manager is to provide management and other services with respect to Borrower's Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Property Manager**" shall mean a property manager selected or approved by Lender in accordance with this Agreement.

"**Purchase Agreement**" shall mean the purchase agreement, contract of sale or similar agreement pursuant to which Borrower acquired the Property, together with all amendments, modifications or supplements thereto and any other agreements between the seller thereunder and any of the Borrower Parties or their Affiliates related thereto.

"**Qualified Insurer**" shall have the meaning set forth in **Section 6.1.1(b)**.

"**Rating Agency**" shall mean each of Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies (S&P), Moody's Investors Service, Inc., and Fitch, Inc., or any other nationally-recognized statistical rating agency which has been approved by Lender.

"**Recourse Event**" shall mean any Full Recourse Event or any Partial Recourse Event.

"**Release**" shall mean a discharge and satisfaction of the Lien of any Security Instrument.

"**Rent(s)**" shall mean all rents (including fixed minimum rent and percentage rent), rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties

(including all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, expense reimbursements and recoveries (including all assignment fees, consent fees, surrender fees, termination fees and the lessor's share (or the share of any Affiliate of any Borrower Party) of any profits from any Tenant subletting or assignment) from Tenants, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, fees, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources (including any Service Rights granted to any Person and any warrants, stock options or other rights granted to Borrower or its Affiliates in connection with any Lease) whether or not arising from or attributable to the Property or any part thereof, and proceeds, if any, from business interruption or other loss of income insurance, together with all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including all guarantees, letters of credit (including the proceeds thereof) and any other credit support given by any guarantor in connection therewith, cash or securities deposited under the Leases to secure the performance by the Tenants of their obligations thereunder and all rents, additional rents, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Premises and the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt.

"**Replacement Interest Rate Cap Agreement**" means an interest rate cap agreement from an Acceptable Counterparty with terms substantially similar to the Interest Rate Cap Agreement and on the then current standard ISDA form for such product.

"**Required Lender Advance**" shall have the meaning set forth in Section 8.7.1.

"**Reserve Agreement**" means that certain Reserve and Security Agreement, dated as of the date hereof, by and between Borrower and Lender, as the same may be amended, restated, replaced or otherwise modified from time to time.

"**Restoration**" shall have the meaning set forth in Section 6.1.2(a).

"**Secondary Market Transaction**" shall mean any transaction in which Lender (i) sells the Loan, the Notes and the other Loan Documents to one or more Persons (including any Investors) as a whole loan or a portion thereof, (ii) participates or syndicates the Loan to one or more Investors, (iii) deposits the Loan (or a portion thereof), and the Loan Documents with a trust, which trust may sell certificates to Investors evidencing an ownership interest in the trust assets, including a Securitization, whether or not rated by a Rating Agency, (iv) otherwise sells the Loan or interest therein to Investors, or (v) pledges the Loan or any rights thereunder as collateral for any borrowing.

"**Securities**" shall have the meaning set forth in Section 8.1.1.

"**Securitization**" shall have the meaning set forth in Section 8.1.1.

"**Security Deposits**" shall mean all security (whether cash, letter of credit or otherwise) given to any Borrower or any agent or Person acting on behalf of Borrower in connection with the Leases.

"**Security Instruments**" shall mean the Acquisition Loan Mortgage and the Project Loan Mortgage, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time. Individually, each of the Security Instruments shall be referred to as a "Security Instrument."

"**Service Rights**" shall mean any agreements, contracts, rights, licenses or other interests of any type (whether exclusive or non-exclusive) granted or given to any Person to provide any products or services to or for or with respect to the Property or any part thereof, any Tenant or any occupants of the Property or any part thereof, including any of the same related to telecommunications, internet products or services, including, but not limited to, personal computer hardware and software, internet hardware and software, internet access services, printers, video display systems, audio sound systems and communication telephonic devices, as well as related and complementary products and services and any substitutes for, and items that are a technological evolution of, any of the foregoing products.

"**Servicer**" shall mean the servicer, if any, engaged by Lender with respect to the Loan.

"**Servicing Fees**" shall mean all fees, costs and expenses payable to any Servicer.

"**Severed Loan Documents**" shall have the meaning set forth in Section 8.1.4.

"**Single Purpose Entity**" shall mean an entity, other than an individual, that is formed or organized solely for the purpose of holding, directly, an interest in Borrower, does not engage in any business unrelated to the ownership of such interest, does not have any assets other than those related to the ownership of such interest, has its own separate books and records and its own accounts, and holds itself out as being an entity separate and apart from any other entity, and whose Organizational Documents contain provisions substantively similar to those contained in the Organizational Documents of the Borrower as of the date hereof relating to its purpose and separateness, and the requirement for a springing member or, if such entity is not a corporation, indirect, consent of an Independent Manager to the same types of transactions specified in **Section** 4.1(s)(xxv).

"**SPE Member**" shall mean a member of Borrower that is a Single Purpose Entity.

"**Strike Rate**" shall mean a rate per annum equal to 5.50%.

"**Subdivision Map**" shall have the meaning set forth in Section 5.28.

"**Subsidiary**" shall mean, as to any Person, any other Person of which at least a majority of the outstanding voting stock or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or similar body of such corporation or other entity (irrespective of whether or not at the time stock of any other class or

classes of such corporation or other entity shall or might have voting power by reason of the
happening of any contingency) is at the time owned or controlled directly or indirectly by such
Person or one or more of its Subsidiaries.

"**Survey**" shall mean the survey of the Property prepared by a surveyor licensed
in the state where the Property is located and satisfactory to Lender and the company or
companies issuing the Title Insurance Policies, and containing a certification of such surveyor
satisfactory to Lender.

"**Syndication Documents**" shall mean the collective reference to all co-lending
agreements, participation agreements, intercreditor agreements or other agreements of any kind
among the Lenders and/or Agent related to the Loan.

"**Tax and Insurance Escrow Fund**" shall have the meaning set forth in
Section 6.2.

"**Tax and Insurance Holdback**" shall have the meaning ascribed to such term in
Section 2.1.1(b).

"**Tax and Insurance Reserve**" shall have the meaning ascribed to such term in
the Reserve Agreement.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water
rates or sewer rents now or hereafter levied or assessed or imposed against the Property or any
part thereof, including (a) any ad valorem real or tangible personal property taxes levied against
the Property or any part thereof and (b) any intangible personal property tax levied or imposed
on Lender with respect to its ownership in the Loan.

"**Tenant**" shall mean each Person granted a possessory interest or right to use or
occupy all or any portion of the Property pursuant to a Lease.

"**Term**" shall have the meaning set forth in Section 6.1.1(a).

"**Title Insurance Company**" shall mean a title insurance company (or
companies) or authorized agent (or agents) acceptable to Lender that issues the Title Insurance
Policies.

"**Title Insurance Policies**" shall mean the ALTA (or equivalent if ALTA is not
available in the state where the Property is located) loan title insurance policies (or mortgagee
title insurance policy or policies acceptable to Lender) issued with respect to the Property and
insuring Lender (in an amount satisfactory to Lender) of the validity and priority of the Liens of
the Security Instruments, with all endorsements thereto as required by Lender.

"**Transfer**" shall mean any sale, assignment, conveyance, alienation, mortgage,
encumbrance, pledge, hypothecation or other transfer, including any swap, derivative or other
transaction shifting the risks and rewards of ownership, whether voluntary or involuntary.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the applicable state or commonwealth in which the Property is located, as the same may be amended from time to time.

"**UCC Financing Statement**" shall mean a financing statement as defined by and in accordance with the requirements of the Uniform Commercial Code including all original financing statements or original fixture financing statements and any amendments, renewals, continuations or assignments thereof evidencing a security interest granted to Lender.

"**Unit**" shall mean an individual commercial or residential condominium unit to be created in connection with Project.

"**WCR Advance Request**" shall have the meaning ascribed to such term in the Reserve Agreement"

"**WCR Holdback**" shall have the meaning ascribed to such term in <u>Section 2.1.1(b)</u>.

"**Working Capital Reserve**" shall have the meaning ascribed to such term in the Reserve Agreement.

## **SCHEDULE II**

## **Conditions Precedent**

Each of the following shall be satisfied by Borrower as a condition precedent to the making of the Loan, and shall represent continuing covenants of Borrower after the Closing Date.

(a)    Representations and Warranties; Compliance with Conditions.    The representations and warranties of each Borrower Party contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date and no Material Adverse Change has occurred and no Default or Event of Default shall have occurred and be continuing; and Borrower Party shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on their part to be observed or performed.

(b)    Delivery of Loan Documents; Title Insurance; Reports.

(i)    Notes, Loan Agreements, Security Instruments, Assignments of Leases, Assignments of Agreements and other Loan Documents.    Lender shall have received from Borrower fully executed (and acknowledged if required) counterparts of the Notes and all other Loan Documents and evidence that counterparts of the Security Instruments and the Assignments of Leases have been delivered to the Title Insurance Company for recording, so as to effectively create upon such recording valid and enforceable first, second and third priority Liens upon the Property, in favor of Lender, subject only to the Permitted Encumbrances.

(ii)    UCCs.    Lender shall have received from Borrower (i) such UCC financing statements as Lender shall require, and such financing statements shall have been filed of record in the appropriate filing offices in each of the jurisdictions required by Lender or delivered to the Title Insurance Company for filing so as to effectively create upon such filing a valid and enforceable first, second and third priority Liens on the Property in favor of Lender, subject only to the Permitted Encumbrances and (ii) a list of the principal places of business, tax identification numbers, and doing business names for the Borrower and all other information as Lender may require to properly file such UCC financing statements, all certified by the Borrower.

(iii)    Title Insurance.    Lender shall have received the Title Insurance Policies dated as of the Closing Date, with co-insurance and/or reinsurance and direct access agreements acceptable to Lender. Such Title Insurance Policies shall (A) provide coverage in amounts satisfactory to Lender, (B) insure Lender that the Security Instruments create valid first, second and third, as applicable, Liens on the Property free and clear of all exceptions from coverage other than Permitted Encumbrances, (C) contain such endorsements and affirmative coverages as Lender may require and which are available in the state where the Property are located, (D) show good and marketable indefeasible fee simple title to the Property vested in the Borrower, (E) name Lender as the insured, and (F) contain no **"creditors' rights"** exception. The Title Insurance Policies shall be assignable. Lender also shall have received evidence that all premiums in respect of the Title Insurance Policies have been paid. The Lender shall have

received satisfactory UCC financing statement, tax lien, judgment, bankruptcy, litigation and other Lien searches and reports conducted by a search firm acceptable to the Lender with respect to the Property and the Borrower Parties and all other relevant Persons, such searches to be conducted in each of the locations as shall be required by Lender.

(iv)    Surveys.  Lender shall have received a current title survey for the Property, in form and substance satisfactory to Lender in its discretion, certified to the Title Insurance Company and Lender and their successors and assigns pursuant to a certification in the form and content satisfactory to Lender and prepared by a professional and properly licensed land surveyor satisfactory to Lender in accordance with the 1997 Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys (or, if not available, the relevant state equivalent thereof). Each survey should meet the classification of an "**Urban Survey**" and, if available, the following additional items from the list of "**Optional Survey Responsibilities and Specifications**" (Table A) should be added to such survey: 2, 3, 4, 6, 7, 8, 9, 10, 11 and 13 or any other additional items required by Lender.  Such survey shall reflect the same legal description contained in the Title Insurance Policies referred to above relating to the Property and shall include, among other things, metes and bounds descriptions of the real properties comprising the Property reasonably satisfactory to Lender. The surveyor's seal shall be affixed to the survey and the surveyor shall provide certifications for the surveys in form and substance acceptable to Lender. The surveyor's certifications shall include a statement that the Property is or is not in an area identified by the Federal Emergency Management Agency as an area having special flood hazards.  In addition, the Survey shall meet the requirements of the New York Condominium Act.

(v)    Insurance.  Lender shall have received valid certificates of insurance for all Policies required hereunder or under any of the Loan Documents, and evidence of the payment of all premiums payable for the existing policy period, which shall not be less than one year from the Closing Date. Lender shall have received a flood hazard certificate in respect of the Property in form and substance satisfactory to Lender.

(vi)    Zoning.  Lender shall have received (a) evidence satisfactory to Lender that (1) the current zoning of the Property (without obtaining any variance) permits the construction of the Project and Improvements, and (2) all entitlements for the construction of the Project and Improvements have been obtained. Lender shall have also received evidence satisfactory to Lender that the Property is independent of any other real property for taxing purposes; and (b) a zoning opinion of counsel acceptable to Lender in its discretion.

(vii)    Encumbrances.  Borrower shall have taken or caused to be taken such actions in such a manner so that Lender has a valid and perfected first, second and third priority Liens as of the Closing Date on the Property, subject only to applicable Permitted Encumbrances, and Lender shall have received satisfactory evidence thereof.

(c)    Delivery of Organizational Documents; Consents.  Borrower shall have delivered or caused to be delivered to Lender certified copies of all Organizational Documents related to the Borrower and its direct and indirect members, including good standing certificates, qualifications to do business in the appropriate jurisdictions, resolutions authorizing the entering into of the Loan and incumbency certificates as may be requested by Lender. The Lender shall

have received copies of all consents, Licenses and approvals, if any, required in connection with
the execution, delivery and performance by the Borrower and its members and the validity and
enforceability of the Loan Documents and such consents, Licenses and approvals shall be in full
force and effect. Lender shall have received a chart depicting the ownership structure of
Borrower, each constituent member of Borrower (including their respective ownership interests,
direct or indirect, and capital contributions), which chart shall identify each Person who owns or
controls, directly or indirectly, any such member of Borrower.

     (d)    Opinions of Borrower's Counsel. Lender shall have received opinions of
counsel to the Borrower Parties (i) with respect to non-consolidation, including such Non-
Consolidation Opinions, as Lender or any Rating Agency may require; (ii) with respect to due
execution, authority, enforceability (including no usury) of the Loan Documents and such other
matters as Lender may require; and (iii) with respect to zoning, as Lender may require, all such
opinions to be in form, scope and substance satisfactory to Lender and Lender's counsel.

     (e)    Budgets. Borrower shall have delivered, and Lender shall have approved,
the Final Project Budget.

     (f)    Taxes, Insurance Premiums and Other Charges. Borrower shall have paid
all Taxes, Insurance Premiums and Other Charges relating to the Property which are due and
payable or in arrears, including (i) accrued but unpaid Insurance Premiums, (ii) currently due
Taxes (including any in arrears) relating to the Property, and (iii) currently due Other Charges
relating to the Property, which amounts may be funded with proceeds of the Loan if such
proceeds are sufficient therefor and as set forth in the Certificate of Sources and Uses of Funds.

     (g)    Intentionally Omitted.

     (h)    Payments. All payments, deposits or escrows required to be made or
established by the Borrower under this Agreement, and the other Loan Documents on or before
the Closing Date shall have been paid and Lender shall have received (i) a settlement statement
setting forth the disbursement of the Loan in form and content satisfactory to Lender and (ii) tax
and insurance bills for the two calendar years prior to the Closing Date.

     (i)    Third Party Reports. Lender shall have received a current seismic report,
if required by Lender (prepared by a specialist acceptable to Lender), MAI appraisal report
(prepared in compliance with FIRREA) (provided that Lender may accept evidence of value
other than an MAI appraisal report, as determined by Lender), and environmental property
condition report (Phase I environmental reports for each of the Property and, where
environmental consultants recommends, Phase II reports and/or further investigation or as
Lender otherwise determines are required); each addressed to Lender and in form and substance
satisfactory to Lender and dated within six (6) months of the Closing Date, or if approved by
Lender, if such third party reports that are not dated within six (6) months of the Closing Date
but are otherwise acceptable to Lender, Borrower have delivered a reliance letter to Lender
within six (6) months of the Closing Date that is in form and substance satisfactory to Lender.
An appraiser, engineer and environmental specialist, each satisfactory to Lender, shall perform
the appraisal and the structural engineering and environmental property condition reports.

(j)    <u>Financial Statements</u>.  Lender shall have received copies of certified or audited annual Financial Statements (or statements prepared in accordance with procedures agreed upon by Lender) for the Property for the preceding two Fiscal Years, to the extent available from the seller of the Property, prepared in accordance with Acceptable Accounting Principles and otherwise in form and content acceptable to Lender.

(k)    <u>Payoff Letters; Assignments</u>.  Lender shall have received a true and correct copy of the payoff letters for all of the existing debt encumbering the Property.  In addition, for all of the existing debt encumbering the Property which is to be assigned to Lender, if applicable, Lender shall have received the original promissory notes endorsed to the order of Lender, the original mortgages together with an original assignment thereof to Lender in form and substance acceptable to Lender and representations from the lender holding such existing debt as to the outstanding principal balance thereof, no defaults existing thereunder and such other matters as Lender may reasonably require.

(l)    <u>Rent Rolls</u>.  Lender shall have received rent rolls with respect to the Property (with Lease expiration dates) as of the last full month prior to the Closing Date in form and content acceptable to Lender and certified by Borrower as being true, correct, complete and accurate.

(m)    <u>Leases, Contracts and Permits; Subordination</u>.  Lender shall have received copies of all Leases, permits and contracts related to the Property.  Lender shall have received appropriate instruments acceptable to Lender subordinating all of the Leases affecting the Property and any other contractual agreements affecting the Property designated by Lender to the Security Instruments.  Lender shall have received an agreement to attorn to Lender satisfactory to Lender from every Tenant under a Lease (either by separate instrument or pursuant to the terms of the Lease, as elected by Lender).

(n)    <u>Origination Fee</u>.  Lender shall have received the Origination Fee.

(o)    <u>Costs</u>.  Borrower shall have paid all of Lender's cost and expenses associated with the making of the Loan with respect to the Property, including all out-of-pocket due diligence expenses, the cost of all third party reports (such as but not limited to environmental, structural, appraisal and/or market study), legal fees and expenses, survey costs, title costs, etc.

(p)    <u>Separate Lot</u>.  Lender shall have received evidence that the Property (x) is comprised of one (1) or more parcels which constitute a separate tax lot or lots and (y) does not constitute a portion of any other tax lot not a part of the Property.

(q)    <u>Utilities/Parking</u>.  Lender shall have received evidence that all utility services (including utility letters) and parking required for the Property are available (which evidence may consist of the survey set forth in clause (c)(iv) above for the Property reflecting such utility services and parking).

(r)    <u>Standard Form Lease</u>.  Borrower shall have delivered to Lender for approval by Lender in Lender's discretion, the standard lease form for of the Property.

(s)    Further Documents.  Lender or its counsel shall have received such other and further approvals, opinions, documents and information as Lender or its counsel may have reasonably requested in form and substance satisfactory to Lender and its counsel.

(t)    Purchase Documents.  Borrower shall have delivered a true and correct copy of the Purchase Agreements to Lender, together with all amendments and modifications thereto and assignments in respect thereof and all documents, instruments and agreements delivered pursuant thereto and a written certification by Borrower that all closing requirements and conditions under such Purchase Agreements have been satisfied by the seller thereunder and have not been waived.

(u)    Equity Contribution.  Lender shall have received an Officer's Certificate and other reasonably satisfactory evidence (including invoices, cancelled checks, etc.) of capital contributions by the Principal and all other direct or indirect owners of Borrower in an aggregate amount not less than $8,750,000 (the "**Equity Contribution**") of which no less than $3,000,000 shall be in the form of cash contributions (with the balance being comprised of imputed land value attributable to the Property).  No funds loaned to or borrowed by any Borrower Party shall count towards the Equity Contribution nor shall any fees, commissions or other amounts paid to any Affiliate of Borrower.

## <u>SCHEDULE III</u>

### <u>Pending Litigation</u>

None.

# SCHEDULE IV

## Disclosure Schedule

None.

## SCHEDULE V

## Leasing Guidelines

A.    Minor Leases or Minor Lease Modifications.

(a)    Lender's approval shall not be required for any Minor Leases or amendments, extensions, cancellations, terminations or modifications to Minor Leases (collectively, a "**Minor Lease/Modification**"), if the Minor Lease/Modification meets the following criteria (the "**Minor Lease Leasing Criteria**"):

(1)    The Minor Lease/Modification is being entered into (i) with a Tenant on arms length terms (with no inducements, agreements or other transactions unrelated to the Property or Minor Lease/Modification), (ii) for a fair market rental (taking into account the rental rate, the extent to which the Tenant will bear its pro rata share of operating expenses, escalations, pass throughs, tenant improvements and the term of the Minor Lease/Modification) based on then existing market conditions and in a manner consistent with other first class buildings in the market area.

(2)    The Lease term, including all extension or renewal options shall not exceed ten (10) years.

(3)    The Tenant under the Minor Lease/Modification shall (i) be engaged in a reputable business and have good credit, (ii) have a reputable character, and (iii) not be engaged in any criminal or odious activity, all of the foregoing in accordance with the standards of a "reasonable institutional lender."

(4)    Borrower may amend, cancel, terminate or modify any Minor Lease/Modification if Borrower is acting in a commercially reasonable manner and any fees charged and collected in connection therewith shall be deposited into a deposit account controlled by Lender.

(5)    The rights of the Tenant to assign the Minor Lease/Modification or sublet any portion of the demised premises under the Minor Lease/Modification (other than to Affiliates of the Tenant or purchasers of a majority of Tenant's stock or assets) shall (i) be subject to the consent of the landlord, and (ii) provide that the Tenant shall remain primarily liable under the Minor Lease/Modification.

(6)    The Minor Lease/Modification shall not conflict with any existing Leases.

(7)    The Lease shall not contain any option to purchase the Property or any portion thereof, any right of first refusal or right of first offer to lease or purchase the Property or any portion thereof, any right to terminate the lease term (except in the event of the destruction or taking of all or substantially all of the Property), any non-disturbance or similar recognition agreement or any other similar provisions which adversely affect the Property or which might adversely affect the rights of any holder of the Loan.

(8)    The Lease shall comply with the terms of <u>Section 5.15</u>.

(b)    If the Minor Lease/Modification contains any deviations from the Minor Lease Leasing Criteria set forth above, then such deviations must be approved in writing by Lender, which approval may be granted or withheld in Lender's commercially reasonable discretion.

B.    <u>Major Leases or Major Lease Modifications</u>.

Lender's approval, which approval may be granted or withheld in Lender's commercially reasonable discretion, shall be required for any Major Lease or any amendments, extensions, cancellations, terminations or modifications to a Major Lease.

D.    <u>Residential Leases</u>.

Lender's approval shall be required for any residential Leases.

E.    <u>Credit Support</u>.

Borrower shall not alter, modify, amend, cancel or terminate any guaranty, letter of credit, or other credit support with respect to any Lease without the prior written consent of Lender if the Lease, or any modification thereof, would require Lender's approval. Except as set forth in a Lease previously approved by Lender, Borrower shall not consent to any assignment or sublet of any Lease without the prior written consent of Lender if the Lease, or any modification thereof, would require Lender's approval or if the assignment or sublet is to any Borrower, or an Affiliate of Borrower.

F.    <u>SNDAs</u>.

Lender shall consider requests by or on behalf of the Borrower that Lender enter into a subordination, non-disturbance and attornment agreement with any Tenant (with respect to Minor Leases, Major Leases or any existing commercial Leases), in Lender's commercially reasonable discretion, provided that the form of subordination, non-disturbance and attornment agreement is reasonably acceptable to Lender. Lender may also require that any Tenant enter into a subordination, non-disturbance and attornment agreement as a condition to approving any proposed commercial Lease.

G.    <u>Lease Guaranties</u>.

Neither Borrower nor any Affiliate shall enter into any agreement guaranteeing or agreeing to pay rent for any other space for a prospective Tenant, or enter into any similar agreement without the prior written consent of Lender.

H.    <u>Capitalized Terms</u>. All capitalized terms used in this **Schedule IV** and not otherwise defined herein shall have the meaning set forth in the Loan Agreement.

## <u>SCHEDULE VI</u>

[Intentionally Reserved]

# **SCHEDULE VII**

Pre-Development Budget

[See attached.]

2300 Cropsey Avenue
Brooklyn, NY

Project Budget + Sources & Uses          version 1

| Project Budget | | % | $/SF | Acquisition | Building | Project | Total Senior Loan | Sponsor Equity | Lehman Equity |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Senior Loan | | | | |
| **CLOSING** | | | | | | | | | |
| Equity | | 8,750,000.00 | 34.7% | $88.11 | | | - | 4,383,750.00 | 4,366,250.00 |
| Loan Payoff | | | | | | | | | |
| NYCB Loan Payoff | | 12,510,122.92 | 49.6% | $125.98 | 12,510,122.92 | - | 12,510,122.92 | | |
| Less: NYCB Demo reserve (to be funded into NYLand) | | (500,000.00) | -2.0% | ($5.04) | (500,000.00) | - | (500,000.00) | | |
| Less: Banco Popular (credit against due to Boris) | | (64,307.96) | -0.3% | ($0.65) | (64,307.96) | - | (64,307.96) | | |
| Less: HSBC Bank funds (to be wired into NY Land) | | (44,000.00) | -0.2% | ($0.44) | (44,000.00) | - | (44,000.00) | | |
| Adjustment | | 0.00 | | | | | - | | |
| Subtotal | | 11,901,814.96 | 47.2% | $119.85 | 11,901,814.96 | - | 11,901,814.96 | | |
| | | | 0.0% | $0.00 | | | - | | |
| Amount of Boris payoff being funded with debt | | 6,318.61 | | | 6,318.61 | | 6,318.61 | | |
| Fee Premium | | | 0.0% | $0.00 | | - | - | | |
| Senior Mortgage Premium | | | 0.0% | $0.00 | | - | - | | |
| PL Mortgage Premium | x | 2,100.00 | 0.0% | $0.02 | 2,100.00 | - | 2,100.00 | | |
| Endorsements | x | 19,369.00 | 0.1% | $0.20 | 19,369.00 | - | 19,369.00 | | |
| Register Abstract Title Charges | x | 490.00 | 0.0% | $0.00 | 490.00 | - | 490.00 | | |
| Lien/Judgment/Pending Litigation Searches | x | 1,500.00 | 0.0% | $0.02 | 1,500.00 | - | 1,500.00 | | |
| Settlement Statement/Etax Prep | x | 2,100.00 | 0.0% | $0.02 | 2,100.00 | - | 2,100.00 | | |
| ECB Escrow | x | 85,000.00 | 0.3% | $0.86 | 85,000.00 | - | 85,000.00 | | |
| Certified Copies - Mortgage Chain | | | 0.0% | $0.00 | - | - | - | | |
| Title Insurance | x | 83,373.00 | 0.3% | $0.84 | 83,373.00 | - | 83,373.00 | | |
| City/County stamps | | 0.00 | 0.0% | $0.00 | | - | - | | |
| State stamps | | 0.00 | 0.0% | $0.00 | | - | - | | |
| Recording Fees | x | 2,500.00 | 0.0% | $0.03 | 2,500.00 | - | 2,500.00 | | |
| Mortgage Tax to NYLS | x | 111,658.40 | 0.4% | $1.12 | 111,658.40 | - | 111,658.40 | | |
| | | | 0.0% | $0.00 | | - | - | | |
| Design Fees | | 0.00 | 0.0% | $0.00 | | - | - | | |
| Permits & fees, including expediter | | 0.00 | 0.0% | $0.00 | | - | - | | |
| Insurance | x | 75,000.00 | 0.3% | $0.76 | 75,000.00 | - | 75,000.00 | | |
| RE Tax | x | 781,560.48 | 3.1% | $7.87 | 781,560.48 | - | 781,560.48 | | |
| Violations | x | 118,260.00 | 0.5% | $1.19 | 118,260.00 | - | 118,260.00 | | |
| Developer Legal/Accounting | | 50,000.00 | 0.2% | $0.50 | 50,000.00 | - | 50,000.00 | | |
| Lehman Senior Origination Fee | | 164,877.92 | 0.7% | $1.66 | 164,877.92 | - | 164,877.92 | | |
| Broker Fee - Shopco | | 314,878.00 | 1.2% | $3.17 | 314,878.00 | - | 314,878.00 | | |
| Lender Legal - Paul Hastings | | 190,000.00 | 0.8% | $1.91 | 190,000.00 | - | 190,000.00 | | |
| Lender Legal (Zoning Counsel) | | 10,000.00 | 0.0% | $0.10 | 10,000.00 | - | 10,000.00 | | |
| Appraisal - Cushman & Wakefield | x | 12,500.00 | 0.0% | $0.13 | 12,500.00 | - | 12,500.00 | | |
| Lender Construction Consultant - Joe Speranza | x | 22,400.00 | 0.1% | $0.23 | 22,400.00 | - | 22,400.00 | | |
| EMG - Phase 1 | x | 2,250.00 | 0.0% | $0.02 | 2,250.00 | - | 2,250.00 | | |
| EMG - Geotech | x | 24,212.50 | 0.1% | $0.24 | 24,212.50 | - | 24,212.50 | | |
| Lender - Market Consultant (Phil) | x | 2,500.00 | 0.0% | $0.03 | 2,500.00 | - | 2,500.00 | | |
| Lender Insurance Consultant | | 1,275.00 | 0.0% | $0.01 | 1,275.00 | - | 1,275.00 | | |
| Lender zoning consultant - Howard Goldman | | 0.00 | 0.0% | $0.00 | | - | - | | |
| Miscellaneous | | 0.00 | 0.0% | $0.00 | | - | - | | |
| Third Party Interest Reserve | | 0.00 | 0.0% | $0.00 | | - | - | | |
| EMG - Asbestos desk review | x | 800.00 | 0.0% | $0.01 | 800.00 | - | 800.00 | | |
| EMG - Asbestos survey | x | 12,000.00 | 0.0% | $0.12 | 12,000.00 | - | 12,000.00 | | |
| Environmental Violations | | 0.00 | 0.0% | $0.00 | | - | - | | |
| NYCB preparation of assignment documents | x | 1,050.00 | 0.0% | $0.01 | 1,050.00 | - | 1,050.00 | | |
| Buyer Counsel Fees | x | 20,000.00 | 0.1% | $0.20 | 20,000.00 | - | 20,000.00 | | |
| Accounting Fees - Lester | x | 5,000.00 | 0.0% | $0.05 | 5,000.00 | - | 5,000.00 | | |
| | | | 0.0% | $0.00 | | - | - | | |
| Working capital disbursed to Borrower | | 33,004.35 | 0.1% | $0.33 | 33,004.35 | | 33,004.35 | | |
| **SUBTOTAL LAND ACQUISITION & CLOSING** | | **22,807,792.22** | **90.4%** | **$229.68** | **14,057,792.22** | - | **14,057,792.22** | **4,383,750.00** | **4,366,250.00** |
| **HARD COSTS** | | | | | | | | | |
| | | | 0.0% | $0.00 | - | - | | | |
| | | | 0.0% | $0.00 | - | - | | | |
| | | | 0.0% | $0.00 | - | - | | | |
| | | | 0.0% | $0.00 | - | - | | | |
| Hard Cost Contingency | | 0.00 | 0.0% | $0.00 | - | - | | | |
| **SUBTOTAL HARD COSTS** | | **0.00** | **0.0%** | **$0.00** | - | - | | | |
| **SOFT COSTS** | | | | | | | | | |
| Design Fees | | 200,000.00 | 0.8% | $2.01 | - | 200,000.00 | 200,000.00 | | |
| Permits & fees, including expediter | | 25,000.00 | 0.1% | $0.25 | - | 25,000.00 | 25,000.00 | | |
| Offering Plan | | 25,000.00 | 0.1% | $0.25 | - | 25,000.00 | 25,000.00 | | |
| Marketing | | 25,000.00 | 0.1% | $0.25 | - | 25,000.00 | 25,000.00 | | |
| RE Tax | | 110,000.00 | 0.4% | $1.11 | - | 110,000.00 | 110,000.00 | | |
| Lender Construction Consultant - Joe Speranza | | 40,000.00 | 0.2% | $0.40 | - | 40,000.00 | 40,000.00 | | |
| Fidelity Insurance | | 5,000.00 | 0.0% | $0.05 | - | 5,000.00 | 5,000.00 | | |
| Interest Rate Cap | | 200,000.00 | 0.8% | $2.01 | - | 200,000.00 | 200,000.00 | | |
| Servicing Fees | | 50,000.00 | 0.2% | $0.50 | - | 50,000.00 | 50,000.00 | | |
| Interest Reserve | | 1,550,000.00 | 6.1% | $15.61 | - | 1,550,000.00 | 1,550,000.00 | | |
| Contingency | | 200,000.00 | 0.8% | $2.01 | - | 200,000.00 | 200,000.00 | | |
| **SUBTOTAL SOFT COSTS** | | **2,430,000.00** | **9.6%** | **$24.47** | - | **2,430,000.00** | **2,430,000.00** | | |
| **CONSTRUCTION LOAN INTEREST** | | | | | | | | | |
| Construction Loan 8Mb Interest Funded at Closing | | | 0.0% | $0.00 | | - | - | | |
| Construction Loan Interest | | | 0.0% | $0.00 | | - | - | | |
| **SUBTOTAL CONSTRUCTION LOAN INTEREST** | | **0.00** | **0.0%** | **$0.00** | | - | - | | |
| **GRAND TOTAL** | | **25,237,792.22** | **100.0%** | **$254.15** | **14,057,792.22** | **2,430,000.00** | **16,487,792.22** | **4,383,750.00** | **4,366,250.00** |

$25,237,792  TRUE          Net SF 99,304          $13,857,792.22    0    2,630,000.00  0    $16,487,792  TRUE

# EXHIBIT A

## Chart of Ownership Structure

[See attached.]



## **EXHIBIT B**

Existing Violations