# **EXHIBIT B**
## **(Project Loan Agreement)**

# PROJECT LOAN AGREEMENT

## Dated: as of August 2, 2007

### by and between

## HALE AVENUE BORROWER, LLC

### and

## LEHMAN BROTHERS HOLDINGS INC.

## LOCATION OF MORTGAGED PROPERTY

> **Street Address: 2300 Cropsey Avenue**
> **City of Brooklyn**
> **County of Kings**
> **State of New York**
> **Block: 6471**
> **Lot: 109**

### After filing, please return to:

**Paul, Hastings, Janofsky & Walker LLP**
**75 East 55th Street**
**New York, New York 10022**
**Attn: Kenneth Friedman, Esq.**

Article 1      INCORPORATION OF RECITALS AND EXHIBITS ......................................2

    Section 1.1      Incorporation of Recitals ......................................2

    Section 1.2      Incorporation of Exhibits and Schedules...........................2

Article 2      DEFINITIONS ......................................2

    Section 2.1      Defined Terms ......................................2

    Section 2.2      Use of Defined Terms......................................5

    Section 2.3      Use of Recital, Article, Section and Exhibit References......................5

Article 3      PROJECT LOAN ......................................5

    Section 3.1      Agreement to Borrow and Lend ......................................5

Article 4      GENERAL REQUIREMENTS PRECEDENT TO PROJECT LOAN OPENING......................................5

    Section 4.1      Requirements Precedent to Opening of the Loan......................5

Article 5      [INTENTIONALLY RESERVED]......................................6

Article 6      ACQUISITION AND PRE-DEVELOPMENT BUDGET AND CONTINGENCY ......................................6

    Section 6.1      Acquisition and Pre-Development Budget ......................6

    Section 6.2      Budget Line Items ......................................6

    Section 6.3      Reallocation of Contingency ......................................6

    Section 6.4      Reallocation Between Budget Line Items ......................7

Article 7      LOAN BALANCING......................................8

    Section 7.1      Loan to Be In Balance ......................................8

    Section 7.2      Lender's Estimate of Cost ......................................8

    Section 7.3      Loan Not In Balance ......................................9

Article 8      GENERAL PROVISIONS REGARDING ADVANCES......................................9

    Section 8.1      General Conditions to Advances ......................................9

    Section 8.2      Timing of Advances ......................................10

    Section 8.3      Optional Method for Payment of Interest......................10

    Section 8.4      No Reborrowing ......................................11

    Section 8.5      Advances into an Escrow ......................................11

Article 9      [INTENTIONALLY RESERVED]......................................12

Article 10      12

Article 11      BORROWER'S AGREEMENTS ......................................12

# TABLE OF CONTENTS
**(continued)**

**Page**

| | | |
|---|---|---|
| Section 11.1 | Specific Covenants of Borrower | 12 |
| Section 11.2 | Specific Representations and Warranties of Borrower | 13 |
| Article 12 | EVENTS OF DEFAULT AND REMEDIES | 14 |
| Section 12.1 | Events of Default and Remedies | 14 |
| Section 12.2 | Non-Waiver of Remedies | 14 |
| Article 13 | GENERAL PROVISIONS | 15 |
| Section 13.1 | Captions | 15 |
| Section 13.2 | Notices | 15 |
| Section 13.3 | Entire Agreement; Modification, Waiver | 15 |
| Section 13.4 | Governing Law | 15 |
| Section 13.5 | Acquiescence Not to Constitute Waiver of Lender's Requirements | 15 |
| Section 13.6 | Disclaimer by Lender | 16 |
| Section 13.7 | Right of Lender to Make Advances to Cure Borrower's Defaults | 17 |
| Section 13.8 | Definitions Include Amendments | 17 |
| Section 13.9 | Time Is of the Essence | 17 |
| Section 13.10 | Execution in Counterparts | 17 |
| Section 13.11 | Waiver of Punitive or Consequential Damages | 17 |
| Section 13.12 | Claims Against Lender | 18 |
| Section 13.13 | Jurisdiction: Service of Process | 18 |
| Section 13.14 | Severability | 18 |
| Section 13.15 | Waiver of Jury Trial | 19 |
| Section 13.16 | Waiver of Foreclosure Defense | 19 |
| Section 13.17 | Lender's Discretion | 19 |

## PROJECT LOAN AGREEMENT

THIS PROJECT LOAN AGREEMENT (this "Agreement") is made as of August 2, 2007, by and between HALE AVENUE BORROWER, LLC, a Delaware limited liability company, having an office at c/o 216 East 49th Street, 5th Floor, New York, New York 10017 ("Borrower"), and LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, individually and as lead arranger and administrative agent for itself and certain co-lenders, having an office at 399 Park Avenue, 8th Floor, New York, New York 10022 (collectively, together with its successors and assigns, referred to herein as "Lender").

## RECITALS

A.    Borrower previously acquired certain real property located at 2300 Cropsey Avenue, Borough of Brooklyn, City of New York, State of New York, the legal description of which is set forth in Exhibit A attached hereto (the "Land"). The Land and all related improvements and facilities (including the Improvements, as defined below), now or hereafter existing, whether above or below ground/street level, together with all rights, privileges, easements, hereditaments and appurtenances thereunto relating or appertaining, and all fixtures and equipment required for, or otherwise intended for use in connection with, the operation thereof, are collectively referred to herein as the "Project".

B.    The Land is presently improved with one building and will be further improved to create a multi-family residential and commercial condominium apartment complex consisting of (i) 35,381 net sellable square feet of commercial condominium unit(s) (which shall include community facility(ies)) below grade and on the ground and mezzanine floors, (ii) 25,115 net sellable square feet of commercial space below grade and on the ground floor of a newly constructed structure adjacent to the existing improvements located on the Land (collectively, the "**Retail Units**") and (iii) approximately 97,264 net sellable square feet of residential condominium units on the remaining floors (collectively, the "Improvements") and the Borrower intends to effectuate the Construction Work (as such term is defined in the Credit Agreement as defined below) to be performed in accordance with the Plans and Specifications (as defined in the Credit Agreement) and the terms of the Loan Documents (as defined in the Credit Agreement).

C.    Borrower has applied to Lender for a loan of up to $16,487,792.22, which shall consist of (i) an acquisition loan of $14,057,792.22 which was funded in order to finance the acquisition costs of the Land and the existing Improvements (the "Acquisition Loan") and (ii) a project loan of up to $2,430,000.00, to, among other things, finance certain other costs (including certain pre-development costs) associated with the Pre-Development Work (the "Project Loan"; and together with the Acquisition Loan and the Building Loan are sometimes collectively referred to herein as the "Loan").

D.    To evidence the Project Loan, Borrower has executed and delivered in favor of Lender that certain Project Loan Note, of even date herewith, in the maximum principal amount of up to $2,430,000.00 (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Project Loan Note").

E.    The Project Loan shall be advanced in accordance with this Agreement and that certain Master Credit Agreement dated of even date herewith between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Credit Agreement").

F.    To secure the Project Loan Note, Borrower has granted for the benefit of Lender, inter alia, that certain (i) Project Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Financing Statement of even date herewith encumbering the Project (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Project Loan Mortgage") and (ii) Absolute Assignment of Leases and Rents of even date herewith (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Assignment of Rents and Leases").

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

## ARTICLE 1

## INCORPORATION OF RECITALS AND EXHIBITS

Section 1.1    Incorporation of Recitals.  The foregoing Recitals are made a part of this Agreement.

Section 1.2    Incorporation of Exhibits and Schedules.  All Exhibits and Schedules hereto (whether or not listed in the Table of Contents) are incorporated herein and expressly made a part hereof.

## ARTICLE 2

## DEFINITIONS

Section 2.1    Defined Terms.  All capitalized terms not defined herein shall have the meaning assigned to such terms in the Credit Agreement.  In addition to the other terms defined herein, the following terms shall have the meanings set forth in this Article.  References to documents and other materials shall include those documents and materials as they may be revised, amended and modified, from time to time, with the prior written approval of Lender.

"Agreement" shall mean this Project Loan Agreement, as originally executed and as the same may hereafter be supplemented, amended or restated from time to time in writing.

"Budget Line Item" shall mean each individual category of direct and indirect costs set forth in the Pre-Development Budget.

"Consultant" shall mean the construction consultant retained by Lender.

"Cost of Improvement" shall have the meaning prescribed to such term in the Lien Law.

"Cost Savings" means the aggregate amount, if any, by which the amount actually incurred or, in the sole opinion of the Lender based on evidence provided by Borrower, anticipated to be incurred, in a Budget Line Item of the Project Loan Budget is or will be, as the case may be, less than the maximum amount established for such Budget Line Item in the Project Loan Budget.

"Deficiency Deposit" shall have the meaning set forth in Section 7.3(a).

"Excusable Delay" shall mean any delay in the construction of the Improvements in accordance with the Plans and Specifications resulting from acts of God, fire, earthquake, hurricane, flood, explosion, action of the elements, war, invasion, insurrection, riot, mob violence, sabotage, malicious mischief or labor strikes, not within Borrower's reasonable control, (x) with respect to which Lender shall have been provided with written notice of the occurrence thereof within five (5) days after Borrower obtaining knowledge thereof and (y) which are supported by such evidence as Lender shall reasonably request.

"Final Advance" shall mean the last $50,000 of the Project Loan to be advanced by Lender hereunder.

"General Contractor" shall mean a general contractor or construction manager retained by Borrower and approved by Lender in accordance with the terms of the Loan Documents.

"In Balance" shall have the meaning set forth in Section 7.1(a).

"Lender's Estimate of the Cost" shall have the meaning set forth in Section 7.2.

"Lien Law" shall mean the Lien Law of the State of New York, as amended from time to time.

"Non-Construction Expenses" means all non-construction-related costs and expenses incurred by Borrower in connection with the performance of the Pre-Development Work (including costs of consultants, architects, engineers and other customary non-construction costs).

"Outside Date" shall have the meaning set forth in Section 10.1.

"Pre-Development Budget" shall mean the budget attached to the Credit Agreement as Schedule VII.

"Pre-Development Work" shall have the meaning ascribed to such term in the Credit Agreement.

"Project Loan Budget" shall mean the budget (which shall be a component of the Pre-Development Budget) for the portion of the costs relating to the Project which are indirect costs and which do not constitute a Cost of Improvement, including, but not limited to, amounts required to pay interest on the Project Loan and Acquisition Loan, a copy of which is attached to the Credit Agreement as Schedule VI thereto, as the same may be modified, amended or supplemented from time to time in accordance with the terms and conditions of this Agreement.

"Project Loan Contingency" shall mean the Budget Line Item designated as such in the Project Loan Budget.

"Project Loan Title Policy" shall mean a NY ALTA (1992) loan policy of title insurance in the amount of the Project Loan, together with a pending disbursements clause, issued by the Title Insurance Company to Lender, insuring the Project Loan Mortgage as a valid and subsisting second mortgage lien on the Land, the Improvements and all appurtenant easements as required by Lender, subject only to the lien of the Acquisition Loan Mortgage and the Permitted Encumbrances. The Project Loan Title Policy shall be issued by the Title Insurance Company. All reinsurance shall be evidenced by a direct access reinsurance agreement in form and content acceptable to Lender in all respects. The Project Loan Title Policy shall contain such affirmative insurance and endorsements as Lender shall require.

"Request for Advance" shall mean a written Request for Advance in the form of Exhibit E annexed hereto executed by Borrower to Lender specifying by name, current address, and amount of all parties to whom Borrower is obligated for all Soft Costs, requesting an Advance for the payment of such items, and accompanied by Certification of Borrower as to Soft Costs (in the form of Exhibit I annexed hereto) and such schedules, certificates, affidavits, releases, conditional waivers, statements, invoices, bills, and other documents referred to in the Request for Advance or as Lender may reasonably request.

"Soft Costs" shall mean interest payable on the principal amount of the Advances made under the Project Loan Note and Acquisition Loan Note and all other Non-Construction Expenses in the Pre-Development Budget.

Section 2.2    Use of Defined Terms. Defined terms may be used in the singular or the plural. When used in the singular preceded by "all," "an" or "any", such term shall be taken to indicate one or more members of the relevant class. When used in the plural, such term shall be taken to indicate all members of the relevant class.

Section 2.3    Use of Recital, Article, Section and Exhibit References. The use herein of references to Recitals, Articles, Sections, Schedules and Exhibits shall refer to the referenced Recital, Article or Section in, or Exhibit or Schedule annexed to, this Agreement.

## ARTICLE 3

## PROJECT LOAN

Section 3.1    Agreement to Borrow and Lend. Subject to all of the terms, provisions and conditions set forth in the Credit Agreement, this Agreement and the other Project Loan Documents and provided no Default or Event of Default exists, Lender has agreed to make Advances of the Project Loan from time to time during the period from the date hereof to the Outside Date and Borrower agrees to accept the Project Loan. On the Closing Date and on the date of each Advance made under the Project Loan Note, the maximum principal amount of the Project Loan (the "Project Loan Amount") shall not exceed the amount of $2,430,000.00. Notwithstanding anything to the contrary contained herein or in any other Loan Document, no

Advances of the Project Loan shall be made in respect of any amount that constitutes a Cost of Improvement.

## ARTICLE 4

## GENERAL REQUIREMENTS PRECEDENT TO LOAN OPENING

Section 4.1    Requirements Precedent to Opening of the Project Loan.  Provided that all of the conditions set forth in Section 4.1 of the Project Loan Agreement have been satisfied, the obligation of Lender to make any Advance under the Project Loan shall be subject to the conditions set forth in this Section 4.1 and the conditions set forth in Article 5 hereof (collectively, the "**Project Loan Opening Conditions**"):

(a) No material Default or Event of Default by Borrower or any Guarantor shall exist under this Agreement, the Credit Agreement or any of the other Loan Documents, beyond any applicable notice and cure periods.

(b) Borrower shall have delivered or caused to be delivered to Lender all of the Project Loan Documents, duly and properly executed by Borrower and each Guarantor, as applicable, and Borrower shall have paid all amounts required to be paid by Borrower on or before the date hereof pursuant to Article 6 of the Credit Agreement.

(c) Borrower shall have furnished to Lender the following:

(i)    An NY ALTA (1992) loan policy of title insurance (the "Project Loan Title Policy") in the amount of the Project Loan Amount, together with a pending disbursements clause, issued by the Title Insurance Company to Lender, insuring the Project Loan Mortgage as a valid and subsisting second mortgage lien on the Land, the Improvements, and all appurtenant easements as required by Lender, subject only to the Permitted Exceptions.  The Project Loan Title Policy shall be issued by the Title Insurance Company.  All reinsurance shall be evidenced by a direct access reinsurance agreement in form and content acceptable to Lender in all respects.  The Project Loan Title Policy shall contain such affirmative insurance and endorsements as Lender shall reasonably require.

(ii)    A Survey of the Property satisfactory to Lender

(iii)    Opinions of counsel to Borrower and Guarantors, each reasonably acceptable to Lender.

(iv)    A copy of any and all Material Agreements and Construction Contracts in effect as of the Closing Date;

(v)    A "Phase I" environmental survey or audit of the Property dated not earlier than thirty (30) days prior to the date hereof, prepared at Borrower's sole expense by a qualified environmental consultant satisfactory to Lender.  The environmental survey shall, at a minimum, (A) include asbestos inspection and oil tank testing, if any; (B) disclose any existing or potential Hazardous Substances contamination

or physical conditions that may result in such contamination at, under, in or on the Property; (C) include results of all sampling or monitoring data to confirm the extent of existing or potential Hazardous Substances contamination at, under, in or on the Property, including the results of any leak detection tests on any underground storage tanks; (D) describe response actions appropriate to remedying any existing or potential Hazardous Material contamination; (E) report the estimated costs of any appropriate response; and (F) address such other matters as Lender may request. The environmental survey shall either be addressed to Lender or be accompanied by a letter from the environmental consultant confirming that Lender may rely on such environmental survey. If asbestos exists at the Property, the following must be included in the environmental survey: (A) the precise location and condition of the asbestos; (B) remediation required under Environmental Laws; (C) existence of any remediation plans, including, without limitation, a discussion regarding encapsulation and/or removal as required by Law; (D) impact of the Pre-Development Work upon the asbestos; (E) existence of any plans to mitigate the impact of the Pre-Development Work on the asbestos; and (F) impact of such plans upon the Loan;

(vi)     An Engineering Report which shall be satisfactory to Lender in all respects;

(vii)     Evidence satisfactory to Lender that the Property is benefited by such easements or other rights as may be necessary for pedestrian ingress and egress, the maintenance of utilities and other site improvements and the operation of the Property, including any reciprocal easement and/or operating agreement for the Property. Such evidence may include information shown on the Survey and endorsements to the Acquisition Loan Title Policy Building Loan Title Policy and the Project Loan Title Policy;

(viii)     Current tax lien, bankruptcy and judgment searches against Borrower and the Guarantor. Current searches of all Uniform Commercial Code financing statements filed with the Secretary of States of the States of New York and Delaware, against Borrower, as debtor, which searches shall show that no Uniform Commercial Code financing statements are filed or recorded against any of Borrower, any direct or indirect member of the Borrower or any Guarantor in which the collateral is described as direct or indirect interests in Borrower or as personal property or fixtures constituting a part of, or used in connection with, the Property;

(ix)     An appraisal of the Property certified to Lender in form and substance acceptable to Lender;

(x)     The Pre-Development Budget demonstrating a total aggregate amount not to exceed $16,487,792.22 for the Advances to be made under the Loan;

(xi)     Written evidence that all property or similar taxes and assessments, special or otherwise, which are due and payable and all other taxes, fees, assessments and charges levied or assessed against all or any part of the Property which are due and payable (collectively, "Impositions") have been or will be fully paid. The Title Insurance

Policies showing that all Impositions are paid or deleting the same as exceptions to coverage will satisfy the condition of this Section 4.1(d)(xiv) as of the date hereof;

(xii)    (A) Certificate of Borrower, stating no proceedings exist affecting Borrower that could have a Material Adverse Effect on Borrower, the Loan or the Project, and (B) a certificate from the Guarantors, to the effect that no proceedings exist affecting any Guarantor which could have a Material Adverse Effect on such Guarantor, in each case, which have not been disclosed to Lender in writing.

(xiii)    Borrower and the Guarantors shall have furnished Lender with a certification and, if requested by Lender, evidence satisfactory to Lender that: (A) no condemnation of any portion of the Project, or action which could result in a relocation of any roadways abutting any portion of the Project or the denial of access to any portion of the Project, which could materially affect Lender's security or the operation of the Project, has commenced or is contemplated by any Governmental Authority, and no casualty has occurred and remains unrestored which affects all or any material portion of the Project; and (B) no event has occurred and is continuing that would constitute an Event of Default under the provisions of Section 7.1(a)(vi) of the Credit Agreement.

(xiv)    The General Contractor, if any, Architect, Engineer, shall have duly executed and delivered to Lender a consent to the assignment of the Master Construction Agreement (if such exists as of the Closing Date), Architect's Contract, and Engineer's Contract, in form and substance reasonably satisfactory to Lender, and Lender shall have received the original or a fully executed counterpart thereof.

(xv)    Lender shall have received an Officer's Certificate and other evidence satisfactory to Lender in its discretion (including invoices, cancelled checks, etc.) that Borrower is in compliance with the Equity Contribution requirements set forth in the Credit Agreement.

(d)    Borrower shall have satisfied all of the conditions precedent set forth on Schedule II attached to the Credit Agreement (except to the extent specifically set forth on Schedule IV attached to the Credit Agreement);

(e)    Borrower shall have submitted and Lender shall have approved the Preliminary Plans and Specifications;

(f)    Lender shall have received and approved all Construction Contracts, if any, (including all contractors and subcontractors which are parties thereto) in effect on the date of such Advance which relate to the performance and completion of the Pre-Development Work;

(g)    Lender shall have received and approved a Certificate of Sources and Uses with respect to the proceeds of the Loan;

(h)    Borrower shall have collaterally assigned all Construction Contracts, if any, to Lender via collateral assignment in form and substance acceptable to Lender;

(i)       Borrower shall deliver to Lender evidence, reasonably acceptable to Lender, that all building permits and any special permits, approvals or licenses issued by the City and State of New York which are required in connection with the performance of the Pre-Development Work, if any, together with all other permits, approvals and licenses required for the Pre-Development Work to be performed and completed (including any and all environmental protection, building and zoning permits and approvals), have been obtained by Borrower (except for those permits, approvals or licenses which cannot be issued due to the physical stage of the Pre-Development Work or are not necessary for the particular stage of the Pre-Development Work on the date of the applicable Advance, in which event (i) Borrower shall deliver evidence to Lender, in form and substance acceptable to Lender, that the Pre-Development Work may be performed by Borrower "as of right" and (ii) such permits, approvals or licenses shall be obtained by Borrower on a timely basis in accordance with all applicable building, land use and Environmental Laws and delivered to Lender at the earliest possible date);

## ARTICLE 5

## [INTENTIONALLY RESERVED]

## ARTICLE 6

## PROJECT LOAN BUDGET AND CONTINGENCY

Section 6.1    Project Loan Budget.  Borrower has submitted to Lender a copy of the Pre-Development Budget in accordance with the provisions of the Credit Agreement.  All changes to the Pre-Development Budget (except to the extent otherwise provided in this Article 6 or in Article 7) shall in all respects be subject to the written approval of Lender, which approval may be withheld in Lender's sole discretion (except as otherwise provided in this Article 6 or in Article 7).

Section 6.2    Budget Line Items.  Borrower agrees that each Advance made under the Project Loan Note shall be used only for the Budget Line Item(s) for which such Advance was made.  Following the occurrence of an Event of Default beyond any applicable notice and cure periods, upon advising Borrower, Lender may, at any time and from time to time, disburse proceeds of the Loan for Budget Line Items or for any other purposes as Lender may determine in accordance with Legal Requirements, either by direct payment of such items or by reimbursement to Borrower for payments actually made by Borrower for such items.  Lender shall not be obligated to make an Advance for any category of costs set forth as a Budget Line Item if that Advance, together with all Advances previously made for such category of costs, would exceed the amount set forth for such category in such Budget Line Item, as the same may be adjusted as provided herein in accordance with Section 6.3 hereof.

Section 6.3    Reallocation of Contingency.

(a) The Pre-Development Budget contains a Budget Line Item for the Project Loan Contingency which represents amounts necessary to provide assurances to Borrower and

Lender that additional funds are available to be used as provided herein if additional costs and expenses are incurred or additional interest accrues on the Loan or unanticipated events or problems arise in connection with any Pre-Development Work.

(b) Borrower shall have the right, at any time and from time to time (but not more often than once per calendar month, and then only in connection with a Request for Advance), with the prior consent of Lender, which consent may be granted or withheld in Lender's discretion, to reallocate all or portions of the Project Loan Contingency to one or more specific Budget Line Items in the Pre-Development Budget, including amounts which may be necessary to cause a Budget Line Item in the Pre-Development Budget to be In Balance (as hereinafter defined), or to a new Budget Line Item on the Pre-Development Budget to fund other third-party costs and expenses incurred or to be incurred in connection with the Pre-Development Work which would not constitute a Cost of Improvement and for which there is no existing Budget Line Item in the Pre-Development Budget. Any request for reallocation shall be made in the form attached hereto as Exhibit F. If Lender shall not consent to Borrower's proposed reallocation of a portion of the Project Loan Contingency and if Borrower is therefore unable to cause a Budget Line Item in the Pre-Development Budget to be In Balance, and if Borrower is unable to reallocate a portion of the Project Loan Contingency thereto pursuant to Section 6.3(c), or Borrower elects not to do so, and if Borrower is unable to demonstrate Cost Savings in other Budget Line Items, provided that the reallocation of Cost Savings attributable to Budget Line Items shall be permitted at Lender's discretion, then Borrower acknowledges that it shall be required to make a Deficiency Deposit, to the extent required in Article 7, even though funds remain in the Project Loan Contingency.

(c) [Intentionally Reserved]

(d) In addition to the permitted reallocations of the Project Loan Contingency described above, after the occurrence of an Event of Default and while such Event of Default is continuing (or as otherwise provided in Section 8.3 if monies in the Budget Line Item for interest have been depleted or in connection with the provisions of Section 13.7 hereof), Borrower agrees that Lender may, at any time and from time to time without notice, advance the Project Loan Contingency for any purpose as Lender may determine (or to the Budget Line Item for interest, as applicable). Except as set forth in Section 6.3(b), any advance of the Project Loan Contingency made by Lender under this Section 6.3(d) at a time when no Event of Default exists shall be made only to the Budget Line Item for interest, and shall not be made for any other purpose.

(e) No interest shall accrue upon the Project Loan Contingency until disbursement (but not reallocation) thereof, whereupon such disbursement(s) shall be deemed to be an Advance.

Section 6.4   Reallocation Between Budget Line Items. If Borrower shall demonstrate to Lender's satisfaction any Cost Savings in a Budget Line Item in the Project Loan Budget, then Lender shall reallocate any such Cost Savings to another Budget Line Item in the Project Loan Budget as may reasonably be requested by Borrower; provided, however, that no reallocation shall be permitted from the Budget Line Item for interest under the Project Loan and, except as provided in Section 6.3(b), no reallocation shall be permitted from the Project Loan

Contingency. If any amounts attributable to Cost Savings are reallocated to the Project Loan Contingency from Budget Line Items, such amounts may thereafter be reallocated to other Budget Line Items with Lender's prior consent in accordance with Section 6.3(b). In connection with any reallocation of the Project Loan Contingency, Borrower shall execute such documents as Lender may reasonably require, including an amendment to this Agreement.

## ARTICLE 7

## LOAN BALANCING

Section 7.1    <u>Loan to Be In Balance</u>.

(a) Anything contained in this Agreement to the contrary notwithstanding, it is expressly understood and agreed that each Budget Line Item in the Pre-Development Budget (other than the Project Loan Contingency) shall at all times be In Balance (as hereinafter defined). Each Budget Line Item in the Pre-Development Budget shall be deemed to be in balance ("In Balance") only at such time and from time to time as Lender may determine, in its sole judgment, that the amount remaining unfunded in such Budget Line Item (taking into account a reasonable allocation of any monies in the Project Loan Contingency, to be applied in accordance with Section 6.3, or any Cost Savings from any other Budget Line Item, except as applied in accordance with Section 6.4) equals or exceeds (i) with respect to a Pre-Development Line Item, the amount necessary to pay for all work covered by such Budget Line Item which is done and not theretofore paid for or to be done in connection with the completion of such work (based on Lender's Estimate of the Cost for such Budget Line Item), and (ii) with respect to any other Budget Line Item in the Pre-Development Budget, all costs covered by such Budget Line Item for which Project Loan proceeds are to be disbursed which have been incurred and not theretofore paid for, or which are likely to be incurred in connection with such Budget Line Item.

(b) If Lender shall determine that any Budget Line Item in the Pre-Development Budget is not In Balance, Lender shall provide Borrower with such information regarding such determination as Borrower shall reasonably request.

Section 7.2    <u>Lender's Estimate of Cost</u>. Lender and Borrower agree that Lender has made (and from time to time after the date hereof Lender shall have the right to, and upon request of Borrower, shall, in good faith revise) an estimate of the cost of each Project Loan Budget Line Item in the Pre-Development Budget ("Lender's Estimate of the Cost"). Lender's Estimate of the Cost with respect to the Project Loan Budget Line Items in the Pre-Development Budget on the Closing Date has been made upon the basis of the executed contracts and purchase orders satisfactory to Lender or Lender's estimate of such costs, determined in its sole discretion, after consultation with the Consultant. After the date hereof, Lender's Estimate of the Cost with respect to the Project Loan Budget Line Items in the Project Loan Budget shall take into account, contracts and purchase orders, other considerations which Lender, in its sole but good faith discretion, deems likely to have an impact upon the Soft Costs, the ability of parties to perform under and in accordance with the terms of their respective contracts and purchase orders, as applicable. If there is an "identity of interest" between Borrower and any of Borrower's contractors or material suppliers, any contract between parties having such "identity of interest" shall be regarded solely as an estimate for the purpose of this Section 7.2. There shall be deemed

to be an "identity of interest" if Borrower or any Affiliate of Borrower shall act as a contractor or material supplier in its own name or through a separate entity in which it or any entity related to it has a substantial interest and/or control.

Section 7.3    Loan Not In Balance.

(a) Borrower agrees that if for any reason any Budget Line Item in the Pre-Development Budget at any time is not In Balance as determined in accordance with Section 7.1(a), regardless of how such condition may have been brought about (including without limitation, pursuant to the provisions of Section 13.7 hereof), Borrower shall, within ten (10) Business Days after written request by Lender (i) deposit with Lender an amount sufficient to cause (after taking into account any other action taken under this Section 7.3(a)) such Budget Line Item to be In Balance (a "Deficiency Deposit"), to be held in accordance with the applicable terms of this Agreement, which Deficiency Deposit shall be advanced in the same manner as the Loan proceeds, (ii) request a reallocation from the Project Loan Contingency to such Budget Line Item to bring the same into balance, to the extent such reallocation is permitted under Section 6.3(b), (iii) request a reallocation from the Project Loan Contingency or other Project Loan Budget Line item to such Project Loan Budget Line Item to bring the same into balance, to the extent such reallocation is permitted under Section 6.3(c), or (iv) request a reallocation from another Project Loan Budget Line Item which is in surplus or In Balance to such Project Loan Budget Line Item to bring the same into balance, to the extent such reallocation is permitted under Section 6.4.

(b) Lender shall not be obligated to make any Advance if, after making any of the reallocations permitted under Article 6, any individual Budget Line Item is not In Balance.

## ARTICLE 8

## GENERAL PROVISIONS REGARDING ADVANCES

Section 8.1    General Conditions to Advances.   (a) The initial Advance to Borrower of the Project Loan proceeds shall be in the amount of $0.00 and will be made by Lender on the Closing Date. Except for Advances from the Holdbacks (as defined in the Reserve Agreement) pursuant to the terms of the Credit Agreement and Reserve Agreement, Lender will have no obligation to make any further Advances under the Project Loan unless and until Borrower shall have complied with and satisfied all conditions precedent to Advances set forth in this Article 8 and in Articles 4, 5 and 9 of this Agreement, unless otherwise waived by Lender in its sole discretion. Subject to the restrictions on Advances set forth in this Article 8, Borrower shall be entitled to receive further Advances of the proceeds of the Project Loan, provided that:

(i). Borrower delivers to Lender a Request for Advance and all supporting certificates and other documentation required under this Agreement or otherwise reasonably requested by Lender.

(ii). At the time of each Request for Advance, Borrower shall have delivered to Lender a certification that, to Borrower's knowledge, no Default or Event of Default exists under this Agreement or any other Loan Document.

(iii). Lender shall not, as of the date of such Request for Advance, have given Borrower notice of the existence of a Default or Event of Default which, in Lender's sole judgment, is material and has not been cured to Lender's satisfaction.

(iv). Borrower shall have furnished or caused to be furnished to Lender a Datedown Endorsement to the Project Loan Title Policy dated the date of such requested Advance and showing the Project Loan Mortgage as a valid second lien on the Project, subject only to (a) the Permitted Encumbrances (including the Acquisition Loan Mortgage) and (b) any other liens or encumbrances consented to in writing by Lender.

(v). Each Advance shall be in accordance with the Project Loan Budget and each Budget Line Item shall be In Balance as required by Section 7.1.

(vi). Borrower shall have delivered a certification in form and substance satisfactory to Lender remaking and reaffirming, as of the then current requisition date, all of the representations and warranties of Borrower set forth in this Agreement, the Credit Agreement or any other Loan Document, and to the extent such representations or warranties are untrue or must be modified, disclosing to Lender the reasons the same are untrue, or the necessary modifications, provided that Borrower's right to obtain an Advance shall not be affected by any matter so disclosed unless such matter has caused Lender to deliver a notice of the type described in Section 8.1(b) (which notice may be given after the delivery of such certification) or an Event of Default shall exist with respect to such matter.

(vii). At the time of each Request for Advance, Borrower shall have delivered to Lender evidence satisfactory to Lender in its discretion that all governmental approvals from the applicable Governmental Authority(ies) then required, if any, relating to such requisition have been obtained, together with copies of such governmental approvals.

(b)     Lender shall make Advances of Project Loan Proceeds to pay for the Non-Construction Expenses in accordance with the Pre-Development Budget, provided that Lender receives a request therefor from Borrower at least ten (10) Business Days in advance together with such supporting documentation as Lender may reasonably require (including, but not limited to all invoices, bills and receipts related to the Non-Construction Expense to be paid with such Advance of Project Loan proceeds). Upon written request from Borrower at least five (5) Business Days in advance and upon Lender's reasonable approval of such Non-Construction Expenses (and the supporting documentation relating thereto), Lender shall disburse to Borrower (or if requested by Borrower, directly to the applicable payee) Project Loan proceeds in an amounts necessary to pay for the approved Non-Construction Expenses.

(c)     Each Request for an Advance of Project Loan proceeds shall specify (i) the dollar amount for the specific Non-Construction Expenses for which such Advance is requested and (ii) the cost of all contracted labor or other services applicable to each Non-Construction Expense for which such Advance is being made. Each request for an Advance shall include copies of invoices for all services provided and all applications for payment for such services. In no event shall Borrower be entitled to request more than one disbursement of Project Loan proceeds per month.

(d)      Lender may Advance the amount for all invoices for Non-Construction Expenses directly to Borrower (or may disburse the amount for such Non-Construction Expenses directly to the applicable payee) and, to the extent the funds are disbursed to Borrower, Borrower covenants and agrees to promptly pay such Non-Construction Expenses.      Additionally, if required by Lender or Servicer, Borrower may be required to obtain Lien waivers, in form and substance acceptable to Lender, from each Person who receives payment in an amount equal to or greater than $25,000 for completion of such Person's work.      Any Lien waiver delivered hereunder shall conform to the requirements of applicable Legal Requirements and the requirements of the Loan Documents and shall cover all work and/or services performed and materials supplied by that Person through the date covered by the current disbursement request. No further disbursements of Project Loan proceeds shall be made unless and until Borrower provides Lender or Servicer with evidence that amounts previously disbursed to Borrower pursuant to the terms hereof were paid to the applicable payee and otherwise expended in accordance with the Pre-Development Budget.

Section 8.2      Timing of Advances.

(a)      Upon satisfaction of all conditions to the making of an Advance described or referenced in this Agreement, Lender will, within ten (10) Business Days of Borrower's requisition therefor, advance to Borrower (or such other party as may be permitted hereunder) the amount of the Advance requisitioned (or if the conditions contained herein or therein to the making of an Advance have not been satisfied for the entire amount of an Advance, the portion thereof which may be advanced in accordance with the terms hereof).

(b)      Notwithstanding anything to the contrary herein, (i) Lender shall have no obligation to make any Advances after the Maturity Date and (ii) Lender shall have no obligation to make more than one (1) Advance in each calendar month, other than Advances for interest and other amounts owing to Lender under this Agreement, real estate taxes, and Insurance Premiums which may be advanced separately from other Advances when such amounts are due.

Section 8.3      Optional Method for Payment of Interest.  Included as a Budget Line Item in the Pre-Development Budget is the unfunded amount of $1,550,000.00 for interest on the Project Loan and the Acquisition Loan (the "Project Loan Interest Reserve").  Provided no Default or Event of Default exists beyond any applicable notice and cure periods, and subject to the provisions of this Section 8.3, disbursements (each, an "Automatic Project Loan Interest Reserve Payment") shall be made by Lender on behalf of the Borrower from the Project Loan Interest Reserve to Lender on the payment dates on which interest is due and owing in accordance with the terms of the Credit Agreement and shall be made by a bookkeeping entry on Lender's records reflecting, as a disbursement under the Project Loan, the applicable amount funded from the Project Loan Interest Reserve.  Any disbursements from the Project Loan Interest Reserve shall be deemed to have been paid to and received by Borrower and shall be added to the outstanding principal balance of the Project Loan and shall bear interest at the Applicable Interest Rate (as defined in the Project Loan Note).  Interest at the Applicable Interest Rate will be charged on any disbursed portion of the Project Loan Interest Reserve as and when advanced, but interest will not be charged on the undisbursed portion of the Project Loan Interest Reserve.  Borrower recognizes that the payment of interest by Automatic Project Loan Interest Reserve Payments is for its convenience and benefit.  Lender shall have no obligation to fund

any Automatic Project Loan Interest Reserve Payments so long as any Event of Default shall exist and be continuing under the Loan. If at any time or from time to time throughout the term of the Loan, Lender determines, in the exercise of its sole discretion, that there shall exist an insufficient amount in the Project Loan Interest Reserve for the Project Loan to fully fund any Automatic Project Loan Interest Reserve Payment that shall thereafter become due through the Maturity Date, and there are no Cost Savings in other Budget Line Items to be allocated to the Project Loan Interest Reserve, Borrower shall, within seven (7) Business Days after receipt of Lender's written notice to such effect, deposit with Lender such amount as shall be required by Lender to fully fund any such Automatic Project Loan Interest Reserve Payments and Lender shall credit such amounts to the Project Loan Interest Reserve line item in the Project Loan Budget. Lender shall not be required to pay and Borrower shall not be entitled to receive interest on such amounts so deposited. Borrower's failure to make any such deposits in a timely manner shall be an Event of Default under the Loan. If at any time the Project Loan Interest Reserve shall become depleted, interest shall be payable on the relevant Payment Date in accordance with the terms of this Agreement from funds other than the Loan or the Project Loan Interest Reserve. The Project Loan Interest Reserve shall be available only for the disbursement of the periodic payments of interest due to Lender on the Loan. Borrower shall have the right on any Payment Date to pay the interest owing on the Loan from funds other than the Loan or the Project Loan Interest Reserve. Any funds disbursed from the Project Loan Interest Reserve in the manner provided in this Section 8.3, shall have been deemed paid to and received by Borrower.

Section 8.4    No Reborrowing.    If Borrower makes any voluntary or involuntary prepayment of the Loan at any time or from time to time, such prepaid amounts may not be reborrowed.

Section 8.5    Advances into an Escrow.  If any monies are deposited by Lender into an escrow, the proceeds of the Loan so deposited shall be considered advanced to Borrower from the date of deposit into such escrow, and interest shall accrue on those proceeds from that date.

## ARTICLE 9

## CONSTRUCTION REQUIREMENTS WITH RESPECT TO ADVANCES

Section 9.1    Applicability.  The provisions of this Article 9 shall apply to all Advances of Project Loan proceeds.

Section 9.2    Documents to be Furnished.  As a condition precedent to each Advance of Project Loan proceeds, Borrower shall furnish or cause to be furnished to Lender the following documents covering such Advance, in form and substance reasonably satisfactory to Lender:

(a) intentionally omitted.

(b) all statements and forms required by the Title Insurance Company in order for it to issue the Project Loan Title Policy (as such term is defined in the Project Loan Agreement)and any endorsements, certifications and affirmative coverages required under this Agreement, including a Datedown Endorsement covering the requested Advance, and all other

statements and forms required for compliance with the Lien Law, together with such invoices, contracts and other supporting data as Lender may reasonably require;

(c) a Request for Advance executed by Borrower with respect to such Advance and including a certification properly executed by Borrower with respect to each item in any Request for Advance that constitutes "Soft Costs" and each of the supporting documents listed as items (i) – (vi) of the definition of Request for Advance as may be required by Lender;

(d) copies of any executed change orders in excess of $50,000 made prior to the date of Borrower's requisition which have not been previously furnished to Lender or the Consultant;

(e) copies of all construction contracts (including any subcontracts and purchase orders) executed by Borrower (or the General Contractor) with respect to the Soft Costs which have been executed since the later of (i) the Closing Date and (ii) the last Request for Advance, but prior to the date of the applicable Request for Advance, and which have not previously been delivered to Lender or the Consultant, together with any payment and performance bonds required by Lender with respect thereto;

(f) such other documentation as may be required by the Title Insurance Company if it is administering the Advances and which may be necessary to enable the Title Insurance Company to issue a Datedown Endorsement covering the requested Advance;

(g) if any material dispute exists between or among Borrower, the General Contractor, or, to Borrower's knowledge, any other contractor, subcontractor and/or material supplier, a reasonably detailed written summary of such dispute;

(h) evidence of such builder's risk or other insurance as is required under this Agreement or the Credit Agreement and not previously delivered to Lender;

(i) such other instruments, documents and information pertaining to the Advance as Lender may reasonably require;

(j) Borrower shall also furnish to Lender, from time to time, supplementary statements advising Lender of any material changes in the information covered by the statement from Borrower previously furnished pursuant to Section 5.1(c). If no such supplementary statement is furnished in connection with any Advance, Lender shall have the right to require Borrower to certify in writing that to Borrower's knowledge no material changes have occurred since the most recent statement previously furnished; and

(k) Borrower shall make available to Lender for inspection and copying at any time during normal business hours, upon advance notice, all lien waivers, sworn statements, invoices, certifications and other documentation supporting Borrower's request for Advances hereunder, relating to any Soft Costs and not otherwise required to be delivered to Lender under this Section 9.2.

If Borrower has failed to satisfy all of the conditions to the making of an Advance under this Agreement, but has satisfied the same with respect to a portion of the monies so

requisitioned (e.g., Borrower has failed to deliver a lien waiver with respect to one contractor, but has delivered the same with respect to all other contracts covered by Borrower's Request for Advance), then Lender shall nonetheless advance to Borrower, in accordance with the remaining terms of this Agreement, all amounts requisitioned under Borrower's Request for Advance with respect to which all of the conditions to an Advance under this Agreement have been fully satisfied. With respect to any portion of an Advance for which Borrower has failed to satisfy all of the conditions to the making of an Advance under this Agreement, Borrower may, subject to Section 8.2(b), submit a new Request for Advance for funding of such amounts when the conditions to the making of such an Advance can be satisfied.

Section 9.3    Lender's Right to Employ the Consultant.    Lender shall have the right to employ the Consultant to review the Requests for Advance, and all other matters related to any Soft Cost. All fees and expenses of the Consultant shall be borne by Borrower as a Project Loan expense to the extent the same does not constitute a Cost of Improvement, all as provided in Section 12.9 of the Credit Agreement.

Section 9.4    Intentionally Omitted.

Section 9.5    Payments Directly to Contractors and Subcontractors.    Following and during the continuance of an Event of Default by Borrower, Lender may, in its sole discretion, make payments for the Soft Costs which Borrower has requisitioned to have Lender so pay, directly to any contractor, subcontractor, material supplier or any vendor of fixtures, equipment, furniture, furnishings or other property. Any such direct payments shall be for the account of Borrower. Nothing in this Section 9.5 shall prohibit Lender from making such payments.

## ARTICLE 10

## OUTSIDE DATE FOR FINAL ADVANCE

Section 10.1    Outside Date for Final Advance.    Notwithstanding any provision of this Agreement or any of the other Loan Documents to the contrary, Lender's obligation to make any Advance shall cease and terminate thirty (30) days prior to the Maturity Date (the "Outside Date"), after which date there will be no further Advances available to Borrower under the Loan.

## ARTICLE 11

## BORROWER'S AGREEMENTS

Section 11.1    Specific Covenants of Borrower.    Borrower further covenants to and agrees with Lender as follows:

(a)    Construction.    All work performed by Borrower in connection with Soft Costs will (i) be substantially completed in accordance with the development plan for the Project approved by Lender (subject to the occurrence of an Excusable Delay), and (ii) continue with diligence and continuity until completion.

(b) Borrower will use the Project Loan proceeds in accordance with the Pre-Development Budget.

(c) <u>Mechanic's Liens and Contest Thereof</u>.  Borrower will not suffer or permit any mechanic's lien to be filed or otherwise asserted against the Project, and will discharge the same, or cause the same to be discharged, by payment, bonding or otherwise by the earlier of sixty (60) days after receiving notice of the filing of such lien or the next funding date. Notwithstanding the foregoing, if a lien arises out of the acts or omissions of tenants or subtenants at the Project, Borrower shall promptly notify Lender in writing of each such lien and Borrower shall use reasonable efforts to cause the tenants or subtenants to remove the same; provided, however, that Borrower shall not be required to send any notice of default, declare an event of default or otherwise take any enforcement action against such tenant or subtenant unless requested to do so by Lender in accordance with the following sentence.  If at any time during the term of the Loan there are outstanding, against the Project or any portion thereof, mechanic's liens arising from acts of tenants or subtenants which singly or in the aggregate equal or exceed $50,000, Borrower shall, immediately upon the request of Lender, send notices of default and take such enforcement actions as are necessary under the circumstances to cause the discharge (by payment, bonding or otherwise) of such liens, provided that the tenants or subtenants, as the case may be, shall have the grace and/or cure periods set forth in their respective Leases to accomplish such discharge (by payment, bonding or otherwise).  If at any time during the term of the Loan, there are outstanding, against the Project or any portion thereof, mechanic's liens arising from acts of tenants or subtenants, as the case may be, which remain outstanding for sixty (60) days or more, Borrower shall notify Lender in writing and, at Lender's direction, discharge the same, or cause the same to be discharged, by payment, bonding or otherwise, or Lender may advise Borrower in writing that it may have additional time within which to discharge such liens. The granting of an extension of time pursuant to this Section 11.1(c) and the number of days for such extension shall each be in Lender's sole discretion.  Notwithstanding the foregoing, Borrower acknowledges that Lender shall not be required to make any Advances so long as any mechanic's liens are outstanding against the Project; provided, however, that Lender will make Advances notwithstanding the existence of mechanic's liens so long as the Title Insurance Company provides Lender with an endorsement to Lender's title policies insuring Lender against collection of any such mechanic's liens out of the Project, which endorsement must be acceptable to Lender in form and content in Lender's sole discretion.

(d) <u>Settlement of Mechanic's Lien Claims</u>.  If Borrower shall fail to discharge, or cause to be discharged, any mechanic's lien filed or otherwise asserted against the Project within the applicable time period specified in Section 11.1(c) hereof, Lender may, at its election (but shall not be obligated to) but not earlier than twenty (20) Business Days after it gives written notice to Borrower of its intention to do so, (i) procure the release and discharge of any such lien and any judgment or decree thereon, without inquiring into or investigating the amount, validity or enforceability of such lien, and (ii) effect any settlement or compromise of the same, and any amounts expended by Lender in connection therewith, including premiums paid or security furnished in connection with the issuance of any surety company bonds, shall be deemed to constitute protective advances evidenced by the Notes (even if the principal balance of the Notes plus the amount of such protective advances would then exceed the aggregate face amount of the Notes), payable on demand and secured by the Security Instruments and other Loan Documents.

(e) <u>Documents of Further Assurance</u>.  Borrower shall, from time to time, upon Lender's request, execute, deliver, record and furnish such documents as Lender may deem necessary or desirable to perfect and maintain perfected as valid liens upon the Project, the liens

granted by Borrower to Lender under the Security Instruments and the Assignment of Rents and Leases and the collateral assignments and other security interests under the other Loan Documents as contemplated by the Credit Agreement and this Agreement. Each party hereto shall from time to time, upon the reasonable request from another party, execute and deliver such documents deemed necessary or desirable to correct any errors of a typographical nature or inconsistencies which may be contained in any of the Loan Documents or to consummate fully the transactions contemplated under the Credit Agreement and this Agreement.

(f) <u>Furnishing Reports</u>. Borrower shall provide to Lender, promptly after Borrower's receipt thereof, copies of all inspections, reports, test results and other material information received by Borrower from time to time from its employees, agents, representatives, architects, engineers and any other parties (including, without limitation, tenants) involved in the development of the Project and/or the development or operation of the Project, which relates to Borrower's ability to perform its obligations under the Loan Documents.

Section 11.2    <u>Specific Representations and Warranties of Borrower</u>. Borrower further represents and warrants to Lender as of the date hereof and as of the date of any Advance of the Loan that:

(a)    Borrower has all necessary rights, Licenses, permits, authorizations, approvals, governmental and otherwise, and full power and authority to own the Property and carry on its business as now conducted.

(b)    Borrower has obtained all necessary Licenses (other than certificates of completion and certificates of occupancy), necessary for the construction and operation of the Property for its current and intended uses and for the conduct of Borrower's business and each occupant's business and all such Licenses remain in full force and effect. None of the foregoing is subject to revocation, suspension, forfeiture or modification.

# ARTICLE 12

## EVENTS OF DEFAULT AND REMEDIES

Section 12.1    <u>Events of Default and Remedies</u>. Upon the occurrence and during the continuance of each Event of Default (as defined in the Credit Agreement) Lender may, at its option, exercise any rights and remedies provided for in the Credit Agreement, the Security Instruments or any other Loan Document, including, but not limited to:

(a) take any action which, in Lender's sole judgment, is necessary or appropriate to effect observance and performance of the covenants, agreements and obligations of Borrower under this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, and for the purpose aforesaid, upon the occurrence of an Event of Default beyond any applicable notice and cure periods, Borrower hereby agrees that Lender shall be entitled, in accordance with Legal Requirements, to (i) pay, settle or compromise all existing bills and claims the nonpayment of which might result in liens against the Project, or take such other action as Lender shall determine to prevent such bills and claims from resulting in liens against

the Project, (ii) execute all applications and certificates which may be required by any of the Loan Documents, (iii) prosecute and defend all actions or proceedings connected with or relating to the Project and (iv) take possession of and operate the Project;

(b) withhold further Advances;

(c) declare the Notes to be immediately due and payable;

(d) except as may be otherwise set forth in the Loan Documents, use and apply any additional collateral or any monies deposited by Borrower with Lender to cure any Default or Event of Default or to apply on account of any indebtedness under this Agreement or any of the other Loan Documents which is due and owing to Lender; and

(e) exercise or pursue any other right or remedy permitted under this Agreement, the Credit Agreement, the Security Instruments or any of the other Loan Documents or conferred upon Lender by operation of law.

Section 12.2    Non-Waiver of Remedies.    No waiver of any breach, Default or Event of Default under this Agreement or any other Loan Document shall constitute or be construed as a waiver by Lender of any other or subsequent breach, Default or Event of Default under this Agreement or such other Loan Document.

# ARTICLE 13

## GENERAL PROVISIONS

Section 13.1    Captions.    The captions and headings of the various Articles and Sections of this Agreement and the Schedules and Exhibits pertaining hereto are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

Section 13.2    Notices.    All notices, demands, consents, approvals and other communications shall be given and become effective as provided in Section 12.5 of the Credit Agreement.

Section 13.3    Entire Agreement; Modification, Waiver.    This Agreement and the other Loan Documents and instruments delivered in connection herewith constitute the entire agreement among the parties with respect to the Project and the Loan and supersede all prior agreements, written and oral, relating to the subject matter hereof.    Neither Lender nor any employee of Lender has made or is authorized to make any representation or agreement upon which Borrower may rely unless such matter is made for the benefit of Borrower and is in writing and such document is signed by an authorized signatory of Lender.    Borrower agrees that it has not and will not rely on any custom or practice of Lender, or on any course of dealing with Lender, in connection with the Loan unless such matter is set forth in this Agreement or the other Loan Documents or in a written instrument made for the benefit of Borrower and signed by an authorized signatory of Lender.    No modification, waiver, amendment, discharge or change of this Agreement shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment, discharge or change is sought.

Section 13.4    Governing Law.    THIS AGREEMENT IS A CONTRACT ENTERED INTO AND TO BE PERFORMED IN THE STATE OF NEW YORK AND SHALL BE GOVERNED BY AND CONSTRUED UNDER THE INTERNAL LAWS (AS OPPOSED TO THE LAWS OF CONFLICTS) OF THE STATE OF NEW YORK.    TO THE EXTENT PERMITTED BY LAW, BORROWER AND GUARANTORS HEREBY WAIVE ANY AND ALL RIGHTS TO REQUIRE MARSHALING OF ASSETS BY LENDER.

Section 13.5    Acquiescence Not to Constitute Waiver of Lender's Requirements.    Each and every covenant and condition for the benefit of Lender contained in this Agreement may be waived by Lender; provided, however, that to the extent Lender may have acquiesced in any noncompliance with any conditions, covenants or obligations of Borrower contained herein, such acquiescence shall not be deemed to constitute a waiver by Lender of the performance by Borrower of any subsequent conditions, covenants or obligations to be performed by Borrower hereunder.

Section 13.6    Disclaimer by Lender.

(a) This Agreement is made for the sole benefit of Borrower and Lender (and each party's permitted successors and assigns and, to the extent expressly provided herein or in the other Loan Documents, Assignees and Participants, if any), and no other person or persons shall have any benefits, rights or remedies under or by reason of this Agreement, or by reason of any actions taken by Lender pursuant to this Agreement.    Lender shall not be liable to any party for any debts or claims accruing in favor of any such party against Borrower or others or against the Project.    Borrower is not and shall not be an agent of Lender for any purposes.    Lender is not and shall not be an agent of Borrower for any purposes.    Lender, by making the Loan or any action taken pursuant to any of the Loan Documents, shall not be deemed a partner or a joint venturer with Borrower or a fiduciary of Borrower.

(b) By accepting or approving anything required to be observed, performed, fulfilled or given to Lender pursuant to the Loan Documents, including, without limitation, any budgets, environmental assessment or engineering report, or any certificate, statement of profit and loss or other financial statement, survey, appraisal, lease or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance or approval thereof shall not constitute (i) a warranty or representation to anyone with respect thereto by Lender or (ii) a waiver of any of Borrower's or any Guarantor's obligations or liabilities under this Agreement or any of the other Loan Documents with respect to any facts, matters or circumstances disclosed in any of the reports or other documents described in this Section 13.6(b); provided, however, Borrower shall be entitled to rely on any such approval or acceptance by Lender as evidencing Borrower's compliance with the requirements hereof and the other Loan Documents relating to Borrower's obligation to provide such budgets, environmental assessment, Engineering Report, certificate, statement of profit and loss or other financial statement, survey, appraisal, lease or insurance policy.

(c) Lender neither undertakes nor assumes any responsibility or duty to Borrower to select, review, inspect, supervise, pass judgment upon or inform Borrower of any matter in connection with the Project, and Borrower shall rely entirely upon its own judgment with respect

to such matters, and any review, inspection, supervision, exercise of judgment or supply of information to Borrower by Lender in connection with such matters is for the protection of Lender only and neither Borrower nor any third party is entitled to rely thereon.

(d) Lender owes no duty of care to protect Borrower with respect to any matter reviewed or investigated by Lender in connection with the Loan.

(e) Lender shall not be directly or indirectly liable or responsible for any loss, claim, cause of action, liability, indebtedness, damage or injury of any kind or character to any person or property arising from any activity on, or occupancy or use of, all or any portion of the Project, including any loss, claim, cause of action, liability, indebtedness, damage or injury caused by, or arising from (i) any defect in any building, structure, grading, fill, landscaping or other Improvements thereon or in any on-site or offsite improvement or other facility therein, thereon or relating thereto, irrespective of whether or not such defect was disclosed in any of the reports or other documents described in Section 13.6(b) above; (ii) any act or omission of Borrower, or any Guarantor, any Affiliate of Borrower or any Guarantor, or any of Borrower's agents, employees, independent contractors, licensees or invitees; (iii) any accident at the Project or any fire, flood or other casualty or hazard thereon; (iv) the failure of Borrower, or of any of Borrower's licensees, employees, invitees, agents, independent contractors or other representatives to maintain all or any portion of the Project in a safe condition; or (v) any nuisance made or suffered on any part of the Project; except to the extent that any of the circumstances described in clauses (i), (iii) or (v) above are caused by the gross negligence or willful misconduct of Lender or its officers, contractors, employees or agents (provided they are acting in their capacity as such) occurring after Lender enters onto or has possession of the Project pursuant to the terms hereof.

Section 13.7   Right of Lender to Make Advances to Cure Borrower's Defaults.   If an Event of Default has occurred and is continuing and Borrower has failed to perform any of Borrower's covenants, agreements or obligations contained in this Agreement or the other Loan Documents, Lender may (but shall not be obligated to), upon not less than five (5) days' written notice to Borrower, perform any of such covenants, agreements and obligations; provided, however, that if in Lender's judgment, such failure to perform has resulted in an emergency, no written notice shall be required. Any amounts expended by Lender to cure Borrower's defaults, including any amounts expended by Lender pursuant to Article 12, shall constitute protective advances evidenced by the Notes (even if the principal balance of the Notes plus the amount of such protective advances would then exceed the aggregate face amount of the Notes), payable on demand and secured by the Security Instruments and the other Loan Documents.

Section 13.8   Definitions Include Amendments.   Definitions contained in this Agreement which identify documents, including the other Loan Documents, shall be deemed to include all amendments and supplements to such documents from the date hereof, and all future amendments and supplements thereto entered into from time to time to satisfy the requirements of this Agreement or otherwise with the consent of Lender. Reference to this Agreement contained in any of the foregoing documents shall be deemed to include all amendments and supplements to this Agreement.

Section 13.9    Time Is of the Essence.  Time is hereby declared to be of the essence of this Agreement and of every part hereof.

Section 13.10    Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 13.11    Waiver of Punitive or Consequential Damages.  In no event shall Lender or Borrower be liable to the other for punitive or consequential damages, whatever the nature of a breach by Lender or Borrower of its obligations under this Agreement or any of the other Loan Documents and Borrower and Lender each, for itself and its respective Affiliates, hereby waives all claims for punitive or consequential damages.  Borrower agrees that any amount required to be paid or reimbursed by Borrower to Lender under the terms of this Agreement or any of the other Loan Documents, or required to be paid by Guarantors to Lender under the terms of any guaranty or indemnity, shall not constitute or be deemed to be punitive or consequential damages.

Section 13.12    Claims Against Lender.  If it is determined in a final, non-appealable judgment in any proceedings that Lender has improperly failed to grant its consent or approval, where such consent or approval is required by this Agreement or any other Loan Document to be obtained, Borrower's sole remedy shall be to obtain declaratory relief in a final, non-appealable judgment determining such withholding of consent or approval to have been improper, whereupon such consent shall be deemed given, and Borrower hereby waives, for itself and all its Affiliates, all claims for damages or set-off against Lender resulting from any withholding of consent or approval by Lender.

Section 13.13    Jurisdiction: Service of Process.  WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS AGREEMENT, THE PROJECT OR ANY OTHER LOAN DOCUMENT (EACH, A "PROCEEDING"), BORROWER, EACH GUARANTOR AND LENDER IRREVOCABLY (A) SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE COUNTY OF NEW YORK AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT LOCATED IN THE COUNTY OF NEW YORK; AND (B) WAIVE ANY OBJECTION WHICH SUCH PARTY MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVE ANY CLAIM THAT ANY SUCH PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVE THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY. NOTHING IN THIS AGREEMENT SHALL PRECLUDE LENDER FROM ATTEMPTING TO BRING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE LENDER FROM ATTEMPTING TO BRING A PROCEEDING IN ANY OTHER JURISDICTION.

Section 13.14    Severability.  If any provision or provisions, or if any portion of any provision or provisions, in this Agreement is found by a court of law to be in violation of any

applicable local, state or federal law, statute, ordinance, administrative or judicial decision, or public policy, and if such court declares such portion, provision or provisions of this Agreement to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, and that the remainder of this Agreement shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained herein, and that the rights, obligations and interests of the parties hereto under the remainder of this Agreement shall continue in full force and effect.

Section 13.15 <u>Waiver of Jury Trial</u>. BORROWER AND LENDER EACH HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENTS OR RELATING THERETO OR ARISING FROM THE LENDING RELATIONSHIP WHICH IS THE SUBJECT OF THIS AGREEMENT AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

Section 13.16 <u>Waiver of Foreclosure Defense</u>. BORROWER HEREBY WAIVES ANY DEFENSE IT MAY HAVE TO A FORECLOSURE ACTION BASED ON LENDER'S FAILURE TO NAME ANY TENANT OF THE PROJECT OR ITS SUCCESSOR OR ASSIGNEE, IF ANY, AS A PARTY TO SUCH FORECLOSURE ACTION.

Section 13.17 <u>Lender's Discretion.</u> Whenever pursuant to this Agreement or any of the Loan Documents, Lender may approve or disapprove any act (or any action) or any document, delivery or other item, or where Lender's consent or approval is required in any respect or where any document or other item must be satisfactory to Lender, except in those specific instances where Lender has specifically agreed not to unreasonably withhold Lender's consent pursuant to the terms of this Agreement or any of the Loan Documents, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory or to grant or withhold consent shall be in the sole, absolute and unfettered discretion of Lender, without any express or implied obligation of reasonableness or good faith whatsoever and shall be final and conclusive. Borrower acknowledges and agrees that in no circumstance shall Borrower have any claim or cause of action, in contract or in tort, against Lender as a result of the granting or withholding of any such consent or approval. The inclusion of references to Lender's sole or absolute discretion in any particular provisions of this Agreement or any of the Loan Documents shall not limit or affect the applicability of this Section to all provisions of this Agreement or any of the Loan Documents, including those provisions wherein a specific reference to Lender's sole and absolute discretion is not made. Without limiting the preceding provisions of this Section, in the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or in bad faith or unreasonably delayed acting in any case where, by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or in good faith or promptly, Borrower agrees that neither Lender nor its agents or employees shall be liable for any monetary damages (including any special, consequential or punitive damages whatsoever), whether in contract, tort (including negligence and strict liability) or any other legal or equitable principles, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender

has acted reasonably or in good faith shall be determined by an action seeking declaratory judgment.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

Borrower and Lender have executed this Agreement as of the day and year first set forth above.

**BORROWER:**

**HALE AVENUE BORROWER, LLC,** a
Delaware limited liability company

By:_____
Name: Alexander Gurevich
Title: Authorized Signatory

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.,** a Delaware
corporation (individually and as lead arranger and
administrative agent for itself and certain co-lenders)

By:_____
Name:
Title:

Borrower and Lender have executed this Agreement as of the day and year first set forth above.

**BORROWER:**

**HALE AVENUE BORROWER, LLC**, a
Delaware limited liability company

By:_____
Name: Alexander Gurevich
Title: Authorized Signatory

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation (individually and as lead arranger and administrative agent for itself and certain co-lenders)

By:_____
Name:        CHRISTOPHER McKENNA
Title:        AUTHORIZED SIGNATORY

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

On the **31** day of *July* in the year 2007, before me, the undersigned, personally appeared Alexander Gurevich, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_TShestova_

Signature and office of individual
taking acknowledgement

SHESTOVA TATIANA
Notary Public - State of New York
No. 02SH6128022
Qualified in New York County
My Commission Expires June 6, 2009

My Commission Expires:

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

On the _____ day of _____ in the year 2007, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____

Signature and office of individual
taking acknowledgement

My Commission Expires:

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK   )

On the ____ day of _____ in the year 2007, before me, the undersigned, personally appeared Alexander Gurevich, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Signature and office of individual
taking acknowledgement

My Commission Expires:

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK   )

On the 31st day of July in the year 2007, before me, the undersigned, personally appeared Christopher McKenna, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Signature and office of individual
taking acknowledgement

My Commission Expires:

LAUREN P. SCHMAUCH
NOTARY PUBLIC, State of New York
No. 01SC5031836
Qualified in Queens County
Commission Expires 08/15/2010

## List of Exhibits and Schedules

Exhibit A – Legal Description
Exhibit B – Intentionally Omitted
Exhibit C – Intentionally Omitted
Exhibit D – Intentionally Omitted
Exhibit E – Form of Borrower's Request for Advances
Exhibit F – Form of Project Budget Reallocation Request
Exhibit G – Intentionally Omitted
Exhibit H – Intentionally Omitted
Exhibit I – Certification of Borrower as to Soft Costs

## EXHIBIT "A"

Legal Description

ALL that certain plot, piece or parcel of land situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, being more particularly bounded and described as follows:

BEGINNING at a point on the southwesterly side of Cropsey Avenue (120 feet wide) 418 feet 4 – 7/8 inches (Deed) 418.41 feet (actual) west from the corner formed by the intersection of the southwesterly side of Cropsey Avenue, with the northwesterly side of 24th Avenue;

RUNNING THENCE southwesterly at right angles to the southwesterly side of Cropsey Avenue, 200 feet and 7 – ¾ inches (Deed) 200.65 feet (actual) to the northeasterly side of Shore Parkway;

THENCE northwesterly along the northeasterly side of Shore Parkway 236 feet 10 – ¼ inches (Deed) 236.85 feet (actual) to the land now or formerly of Felix Kaufman;

THENCE northeasterly along the said line forming an interior angle of 85 degrees 20 minutes, 21 seconds with the northeasterly side of Shore Parkway, 210 feet 3 – 7/8 inches (Deed) 201.32 feet (actual), to the southwesterly side of Cropsey Avenue;

THENCE southeasterly along the said southwesterly side of Cropsey Avenue 220 feet 6 inches (Deed) 220.50 feet (actual) to the point or place of BEGINNING.

# EXHIBIT "B"

Intentionally Omitted

## EXHIBIT "C"

Intentionally Omitted

## EXHIBIT "D"

Intentionally Omitted

## EXHIBIT "E"

Form of Borrower's Request for Advances

Date: _____, 200_

Construction Loan No._____

Advance No._____

AMOUNT REQUESTED: $_____

Period Covered:_____

      TO:

FROM:

RE:      Project Loan Agreement dated _____ ___, 2007 between Lehman Brothers Holdings Inc., as Lender, and Hale Avenue Borrower, LLC, as Borrower ("Loan Agreement"; all initially capitalized terms unless otherwise defined herein, shall have the meanings set forth in the Loan Agreement)

In accordance with the terms of the Loan Agreement, you are hereby authorized and requested to make immediate disbursement of funds held by you for the Project described in the Loan Agreement in accordance with the documentation attached hereto, which documentation is incorporated herein by this reference and made a part hereof and which documentation includes the following (items enclosed are marked "x" and separately tabbed on the enclosed submission).

_____      Project Budget Summary

_____      Project Budget Reallocation Request

_____      Project Disbursement Schedule

_____      Copies of Change Orders

_____      Certification of General Contractor/Borrower

The undersigned hereby certifies that:

(i)      the labor, services and/or material covered hereby have been performed upon or furnished to the Project;

(ii)      there have been no changes in the Pre-Development Budget, except those approved by you in writing;

(iii)      intentionally omitted;

(iv)    there have been no changes in the scope or time of performance of the work, nor any extra work, labor or materials ordered or contracted for, nor are any such changes or extras contemplated, except as may be expressly permitted by the Loan Agreement or as have been approved by you in writing and all such work has been performed in a good and workmanlike manner;

(v)    the payments to be made with the funds requested herein will pay all bills received to date for any labor, materials and services furnished in connection with the Soft Costs of the Project;

(vi)    all amounts previously disbursed by you for labor, services and/or materials for the Project pursuant to previous requests for funds have been paid to the parties entitled thereto;

(vii)    all conditions to the disbursement of the funds requested herein as set forth in the Loan Agreement have been fulfilled, and to the knowledge of the undersigned, no Event of Default has occurred and is continuing;

(viii)    the payments to be made with the funds requested herein, or with Borrower's funds as approved by Lender, will pay all bills received to date for any labor, materials and services furnished in connection with construction of the Improvements; and

(ix)    all representations and warranties made by Borrower under any Loan Document are true, correct, and not misleading in any material respect as of the date of this Request for Advance, as if such representation and warranty were made on such date.

**BORROWER:**

HALE AVENUE BORROWER, LLC, a
Delaware limited liability company

By:_____
Name:
Title:

**CONSTRUCTION MANAGER: [if applicable]**

By:_____
Name:
Title:

APPROVED FOR PAYMENT:

By:_____
Title:_____
Date:_____, 200_

## EXHIBIT "F"

### Form of Project Budget Reallocation Request

BORROWER:                                           Date: _____, 200_
PROJECT:                                            Draw No.:_____

ALL Change Orders ("C.O.'s") for direct construction must be referenced on this form and are subject to the Lender's approval as provided in the Project Loan Agreement. Copies of all C.O.'s must be submitted to the Lender, regardless of the Lender's approval limitations.

Please indicate the explanation and provide appropriate documentation for requests to reallocate budget Line Items.

### Budget Reallocations Contained in Current Request for Advance

| AMOUNT | FROM LINE ITEM | TO LINE ITEM | CHANGE ORDER #"s (if any) | EXPLANATION* |
|--------|----------------|--------------|---------------------------|--------------|
|        |                |              |                           |              |
|        |                |              |                           |              |
|        |                |              |                           |              |
|        |                |              |                           |              |
|        |                |              |                           |              |
|        |                |              |                           |              |
|        |                |              |                           |              |

CHANGE ORDER SUMMARY:

$_____ this request
$_____ prior requests
$_____ to date
        (C.O.'s #_____)

Borrower's authorized signature below verifies that reallocations described above are approved by Borrower, are valid and reasonable, and that copies of related documentation in the form of Change Orders or invoices as appropriate are attached hereto.

---

*        Please give detailed explanation, e.g., cost of increased material, deleted item, etc.

**BORROWER:**

HALE AVENUE BORROWER, LLC, a
Delaware limited liability company

By:_____
Name:
Title:

**CONSTRUCTION MANAGER: [if applicable]**

By:_____
Name:
Title:

# EXHIBIT "G"

## Intentionally Omitted

## EXHIBIT "H"

Intentionally Omitted

## EXHIBIT "I"

### Certification as to Soft Costs

Date: _____, 200_

Loan No._____

Advance No._____

AMOUNT REQUESTED: $_____

Period Covered:_____

TO:

FROM:

RE:

The undersigned hereby certifies that:

(i)     the labor, services and/or material covered by the Request for Advance to which this Certificate is attached have been performed upon or furnished to the Project;

(ii)     the payments for Soft Costs to be made with the funds requested in the Request for Advance will pay all bills received to date for any labor, materials and services furnished in connection with construction of the Project; and

(iii)     to the best of our knowledge, all conditions to the disbursement of the funds for labor, services and material requested in the Request for Advance as set forth in the Loan Agreement have been fulfilled.

:

_____

By:     _____
Name:   _____
Title   _____
Date:   _____

## EXHIBIT C
### (Default Letter)

US_ACTIVE:\44010622\7\58399.0003



September 24, 2008

Lehman Brothers
745 Seventh Avenue
New York, NY 10019
Attn: Robert Guglielmo, Senior Vice President

Re: Default Notice relating to Master Repurchase Agreement

Ladies and Gentlemen:

Reference is hereby made to the Master Repurchase Agreement dated as of December 3, 2002 (including all annexes, schedules and exhibits thereto, collectively, the "MRA"), between Lehman Brothers Inc., Lehman Commercial Paper Inc. ("Lehman") and Swedbank AB, New York Branch. ("Swedbank"). Capitalized terms used herein without definition shall have the meanings specified in the MRA.

The exhibit attached to this letter shows the Purchased Securities that you have failed to repurchase upon the applicable Repurchase Date. Your failure to repurchase such securities on the applicable Repurchase Date is an Event of Default under the MRA and we hereby notify you that we have exercised our option to declare that an Event of Default has occurred with regard to the MRA. As a result, the Repurchase Date for each Transaction under the MRA is deemed to have occurred today and the aggregate Repurchase Prices for all Transactions under the MRA, and any and all other amounts owing by Lehman to Swedbank under the terms of the MRA, are now all immediately due and payable. Without in any way limiting any of Swedbank's rights under the MRA, we are hereby serving this Default Notice on you and notify you of the foregoing.

Swedbank reserves all of its rights and remedies under the MRA and any and all other related documents and agreements, available at law or otherwise, including without limitation all rights and remedies available under Paragraph 11 of the MRA.

SWEDBANK AB (PUBL), NEW YORK BRANCH

By:
Name: John Matthews   Magnus Francke
Title: Senior Vice Presidents

cc:
Michael Bond, via e-mail
Stephen Fischler, via e-mail and telefax

WSUMPCSRFX01-15        9/19/2008  5:11:09 PM    PAGE    3/003    Fax Server



### The Bank of New York
### TRI-PARTY
### Investor Allocation Detail Report
### Lehman Commercial Paper Inc.

THE BANK OF NEW YORK MELLON

Production Run : 09/19/2008        LCPI

Print Date : 09/19/2008 05:09 PM

Investor Name : Swedbank, New York Branch
Investor Reference No : WSWE
Trade Reference No : 9410680

Investment Amount : $1,000,000,000.00
Required Amount : $1,070,000,000.00
Trade Margin % : 7.00

Required Amount :  $1,070,000,000.00

Excess Amount :  $40,482,902.94

Investor Name : Swedbank, New York Branch
Investor Reference No : WSWE
Trade Reference No : 9416350

Investment Amount : $350,000,000.00
Required Amount : $374,500,000.00
Trade Margin % : 7.00

Asset Grade : C
Pricing Service : Seller

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 102 | WH9158 | WH9158 | 0.0001 | 100.000000 | P | 09/14/2009 | $99,999,999.00 | $99,999,999.00 |
| 102 | WH9167 | WH9167 | 0.0001 | 100.000000 | P | 01/09/2010 | $99,999,999.00 | $99,999,999.00 |
| 102 | WH8855 | WH8855 | 0.0000 | 100.000000 | P | 02/01/2009 | $41,280,000.00 | $41,280,000.00 |
| 102 | WH8538 | WH8538 | 8.0000 | 100.000000 | P | 10/31/2008 | $24,535,881.00 | $24,535,881.00 |
| 102 | WH8614 | WH8614 | 5.0000 | 100.000000 | P | 05/01/2009 | $19,531,702.46 | $19,531,702.46 |
| 102 | WH8501 | 100101819 | 0.0001 | 100.000000 | P | 01/01/2009 | $18,130,000.00 | $18,130,000.00 |
| 102 | WH8727 | 100101982 | 0.0001 | 100.000000 | P | 10/08/2008 | $17,282,780.55 | $17,282,780.55 |
| 102 | WH8612 | 100101858 | 0.0001 | 100.000000 | P | 08/09/2009 | $15,538,779.25 | $15,538,779.25 |
| 102 | WH8555 | 100101910 | 0.0001 | 100.000000 | P | 10/14/2008 | $12,871,478.49 | $12,871,478.49 |
| 102 | WH8598 | WH8598 | 8.0000 | 100.000000 | P | 08/01/2009 | $11,000,000.00 | $11,000,000.00 |
| 102 | WH4815 | 100101277 | 0.0001 | 100.000000 | P | 08/01/2009 | $10,891,229.83 | $10,891,229.83 |
| 102 | WH8944 | 100102038 | 0.0001 | 100.000000 | P | 12/01/2009 | $9,280,030.32 | $9,280,030.32 |
| 102 | WH8954 | 100101907 | 0.0001 | 100.000000 | P | 11/01/2012 | $7,848,169.44 | $7,848,169.44 |
| 102 | WH8540 | WH8540 | 8.0000 | 100.000000 | P | 10/31/2008 | $8,088,480.47 | $8,088,480.47 |
| 102 | WH8273 | 100101767 | 0.0001 | 100.000000 | P | 04/30/2010 | $5,644,482.76 | $5,644,482.76 |
| 102 | WH8559 | WH8559 | 8.0000 | 100.000000 | P | 10/31/2008 | $4,185,814.92 | $4,185,814.92 |
| 102 | WH8948 | 100102040 | 0.0001 | 100.000000 | P | 12/01/2009 | $2,178,905.47 | $2,178,905.47 |

Pricing Service Total :        17 Assets                    $406,023,730.76        $406,023,730.76

Grade C Total :        17 Assets                    $406,023,730.76        $406,023,730.76

Total :        17 Assets                    $406,023,730.76        $406,023,730.76

Required Amount :  $374,500,000.00

Excess Amount :  $31,523,730.76

Status Key

A - Allocated

P - Preallocated

This document contains information that is confidential and the property of The Bank of New York. It may not be copied, published or used, in whole or in part for any purpose other than expressly authorized by The Bank of New York Copyright (c) 2006 The Bank of New York. All rights reserved

Report ID  dl_alc