# EXHIBIT A

**(Credit Protection Trust 207 Swap Agreement)**

(Multicurrency-Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of July 15, 2005

**LEHMAN BROTHERS SPECIAL FINANCING INC.**      and      **CREDIT PROTECTION TRUST 207**

and      **FINANCIAL SECURITY ASSURANCE INC.**

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.      **Interpretation**

(a)      *Definitions.*  The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.*  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)      *Single Agreement.*  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i)   Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)  Each obligation of each party under Section 2(a)(i) is subject to  (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b)     *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)     *Netting.* If on any date amounts would otherwise be payable:—

    (i)     in the same currency; and

    (ii)     in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)     *Deduction or Withholding for Tax.*

    (i)     *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)     promptly notify the other party ("Y") of such requirement;

        (2)     pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)     promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)     if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

           (A)     the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

           (B)     the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

**ISDA® 1992**

(ii)   *Liability*. If: —

(1)   X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)   X does not so deduct or withhold; and

(3)   a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)   *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.   Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)   *Basic Representations*.

(i)   *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)   *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)   *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)   *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)   *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

ISDA® 1992

(b)      *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)      *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)      *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)      *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)      *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.      **Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)      *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)      any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)     any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)      *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)      *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)      *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)      *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

**ISDA® 1992**

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

## 5.    Events of Default and Termination Events

(a)    *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

    (i)    *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

    (ii)    *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

    (iii)    *Credit Support Default*.

        (1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

        (2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

        (3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

    (iv)    *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

    (v)    *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

    (vi)    *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

**ISDA® 1992**

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)     *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

**ISDA® 1992**

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)    *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

        (1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)    *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)    *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)    *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v)    *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

                                    **ISDA® 1992**

**6.    Early Termination**

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If: —

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c) **Effect of Designation.**

(i)     If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) **Calculations.**

(i)     **Statement.** On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    **Payment Date.** An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e) **Payments on Early Termination.** If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)     **Events of Default.** If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  *Termination Events*. If the Early Termination Date results from a Termination Event: —

(1)  *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties*. If there are two Affected Parties: —

(A)  if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)  if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

**ISDA® 1992**

7.    **Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)      a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)      a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    **Contractual Currency**

(a)      *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)      *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)      *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)      *Evidence of Loss*. For tbe purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**ISDA® 1992**

**9.    Miscellaneous**

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes  all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall he entered into as soon as practicable and may he executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.     Notices**

(a)     *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)   if in writing and delivered in person or by courier, on the date it is delivered;

(ii)   if sent by telex, on the date the recipient's answerback is received;

(iii)   if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)   if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)   if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)     *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.     Governing Law and Jurisdiction**

(a)     *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)     *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)   submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)   waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)     *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

**ISDA® 1992**

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

**ISDA® 1992**

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

**ISDA® 1992**

07/15/2005   15:39   LEHMAN → 919175220455   NO.64E   D02

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS SPECIAL
FINANCING INC.
(Name of Party)

CREDIT PROTECTION TRUST 207
(Name of Party)
By FSA Administrative Services, LLC,
solely as Trustee and not in its individual
capacity
By FSA Portfolio Management Inc., Member

Name:

Title:   Allyson M. Carine
Authorized Signatory

Date:

Name:

Title:

Date:

FINANCIAL SECURITY ASSURANCE INC.
(Name of Party)

Name:

Title:

Date:

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**
*(Name of Party)*

Name:

Title:

Date:

**CREDIT PROTECTION TRUST 207**
*(Name of Party)*
**By FSA Administrative Services, LLC, solely as Trustee and not in its individual capacity**
**By FSA Portfolio Management Inc., Member**

Name:     BRUCE E. STERN

Title:     MANAGING DIRECTOR

Date:

**FINANCIAL SECURITY ASSURANCE INC.**
*(Name of Party)*

Name:

Title:

Date:

# SCHEDULE

## to the

## MASTER AGREEMENT

dated as of July 15, 2005

among:          **LEHMAN BROTHERS SPECIAL FINANCING INC.**
("Party A"),

**CREDIT PROTECTION TRUST 207**
("Party B" or the "Trust")

and             **FINANCIAL SECURITY ASSURANCE INC. ("FSA")**

## Part 1. Termination Provisions

(a)     "**Specified Entity**" shall not apply in relation to either Party A or Party B.

(b)     The "**Credit Support Default**" provisions of Section 5(a)(iii) will apply to Party A but will not apply to Party B.

(c)     The "**Misrepresentation**" provisions of Section 5(a)(iv) will not apply in relation to either Party A or Party B.

(d)     The "**Default under Specified Transaction**" provisions of Section 5(a)(v) will not apply in relation to either Party A or Party B.

(e)     The "**Cross Default**" provisions of Section 5(a)(vi) will not apply in relation to either Party A or Party B.

(f)     The "**Credit Event Upon Merger**" provisions of Section 5(b)(iv) will not apply in relation to either Party A or Party B.

(g)     The "**Automatic Early Termination**" provision of Section 6(a) will not apply in relation to either Party A or Party B.

(h)     **Payments on Early Termination.** "**Loss**" and "**Second Method**" will apply for the purpose of Section 6(e) of this Agreement; provided, however, that

(a)     Section 6(e) shall apply only where an Early Termination Date is designated by Party A after an FSA Event of Default has occurred and is continuing;

(b)     with respect to an Early Termination Date designated as a result of an Event of Default with respect to Party A described in Section 5(a)(i) or Section 5(a)(viii), (i) Party A shall pay to Party B the Accrued Fixed Payment Amount and any applicable Makewhole Amount under the Credit Swap Transaction on the Early Termination Date and (ii) the terms of the Credit Swap Transaction shall continue to apply with respect to,

and Party B shall be required to pay to Party A after the Early Termination Date, any Cash Settlement Amount and any payment in respect of a Quotation (as defined in the Credit Swap Transaction) provided by Party B that would have been payable under the terms of the Credit Swap Transaction as a result of satisfaction of the Conditions to Settlement on or prior to the Early Termination Date, and no other termination payment shall be payable by either party and neither party shall have any further liability in respect of termination of this Agreement; and

(c)      with respect to an Early Termination Date designated as a result of an Event of Default with respect to Party A other than as set forth in (b) above, or any event described in Section 5(b)(i), Section 5(b)(ii) or Section 5(b)(iii) with respect to which Party A or Party B is the Affected Party, (i) Party A shall pay to Party B the Accrued Fixed Payment Amount on the Early Termination Date and (ii) the terms of the Credit Swap Transaction shall continue to apply with respect to, and Party B shall be required to pay to Party A after the Early Termination Date, any Cash Settlement Amount and any payment in respect of a Quotation (as defined in the Credit Swap Transaction) provided by Party B that would have been payable under the terms of the Credit Swap Transaction as a result of satisfaction of the Conditions to Settlement on or prior to the Early Termination Date, and thereafter no other termination payment shall be payable by either party and neither party shall have any further liability in respect of termination of this Agreement or any Affected Transaction; and

"Accrued Fixed Payment Amount" means, as of any Early Termination Date, the amount of the accrued and unpaid portion of Fixed Amounts under the Credit Swap Transaction for the period from and including the Fixed Rate Payer Payment Date, if any, immediately preceding the Early Termination Date to which Fixed Payments have been made to, but excluding, the Early Termination Date. For the avoidance of doubt, the Accrued Fixed Payment Amount shall be zero at any time after Party A pays the Present Value Payment under the Credit Swap Transaction.

"FSA Event of Default" means that any one of the following events shall have occurred and be continuing:

(i)      FSA fails to make a payment required under the Policy in accordance with its terms;

(ii)      FSA (A) files any petition or commences any case or proceeding under any provision or chapter of the federal Bankruptcy Code, Title 11 of the United States Code, as amended (the "Bankruptcy Code") or any other similar federal or state law relating to insolvency, bankruptcy, rehabilitation, liquidation or reorganization, (B) makes a general assignment for the benefit of its creditors, or (C) has an order for relief entered against it under the Bankruptcy Code or any other similar federal or state law relating to insolvency, bankruptcy, rehabilitation, liquidation or reorganization which is final and nonappealable; and

(iii)      a court of competent jurisdiction, the New York Department of Insurance or other competent regulatory authority enters a final and nonappealable order,

2

judgment or decree (1) appointing a custodian, trustee, agent, rehabilitator, liquidator or receiver for FSA or for all or any material portion of its property or (2) authorizing the taking of possession by a custodian, trustee, agent, rehabilitator, liquidator or receiver of FSA (or the taking of possession of all or any material portion of the property of FSA).

Notwithstanding FSA's designation as a Credit Support Provider hereunder, no other event or occurrence with respect to FSA shall constitute an Event of Default under this Agreement.

"Makewhole Amount" means, with respect to the Credit Swap Transaction, if an Early Termination Date occurs or is effectively designated on or prior to the Scheduled Termination Date under the Credit Swap Transaction, (i) the present value of the Fixed Amounts that would have been payable by Party A under such Credit Swap Transaction after the relevant Early Termination Date until (and including) the Scheduled Termination Date under the Credit Swap Transaction, assuming for the purpose of such calculation a constant Fixed Rate Payer Calculation Amount at its value as of the Early Termination Date, discounting each Fixed Amount from the date on which it would have been received to the Early Termination Date at a rate equal to the value of "USD-LIBOR-BBA" as determined as of the Early Termination Date for a Designated Maturity equal to the period from (and including) the Early Termination Date to (but excluding) the scheduled Fixed Rate Payer Payment Date minus (ii) the Accrued Fixed Payment Amount. For the avoidance of doubt, the Makewhole Amount shall be zero at any time after Party A pays the Present Value Payment under the Credit Swap Transaction.

"Credit Swap Transaction" means the Transaction between Party A and Party B documented by a Confirmation dated July 15, 2005.

(i)     **"Termination Currency"** means USD.

(j)     **"Additional Termination Event"** will not apply.

(k)     **Additional Event of Default.** It shall be an additional Event of Default, with Party B as the Defaulting Party, if any FSA Event of Default shall have occurred and be continuing.

(l)     **Gross Up To Avoid Tax Termination.** Notwithstanding Section 6(b)(iv) of the Agreement, neither party may designate an Early Termination Date under the Agreement as a result of a Termination Event described in Section 5(b)(ii) or Section 5(b)(iii) of the Agreement without affording 15 days' prior written notice to the other party. If after receipt of such notice the party which is not the Affected Party or Burdened Party validly and irrevocably elects to accept payment net of, or make payments grossing up for, the Tax that gave rise to such Termination Event so as to remove the effect of such Tax on the payments made or received by the Affected Party or Burdened Party, then such Termination Event shall be deemed not to have occurred.

3

**Part 2. Tax Representations.**

For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following Payor Representation:

> It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.
> There are no Payee Representations.

**Part 3. Agreements to Deliver Documents.**

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)     Tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| Party A and Party B | Any form, document or certificate reasonably required by the other party to enable it to pay free of or at a reduced rate of withholding tax | As soon as practicable after written request is made |

(b)     Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A/Party B | Certificate or other documents evidencing the capacity of the party to enter into this Agreement and Transaction | On execution hereof | Yes |

4

|  |  |  |  |
|---|---|---|---|
|  | hereunder and the authority of the person(s) executing this Agreement or a Confirmation, as the case may be. |  |  |
| Party B | Quarterly unaudited financial statements of such party's Credit Support Provider prepared in accordance with generally accepted accounting principles in the country in which such Credit Support Provider is organized (if such Credit Support Provider prepares quarterly financial statements and such financial statements are not publicly available). | Promptly after request | No |
| Party A/Party B | Annual audited financial statements of such party (or, in the case of Party B, its Credit Support Provider) prepared in accordance with generally accepted accounting principles in the country in which the party is organized (or, in the case of Party B, its Credit Support Provider), if such financial statements are not publicly available. | Promptly after request | No |
| Party A/Party B | Credit Support Document | On or before execution of this Agreement | No |
| Party A | Opinion of in-house counsel in form and substance satisfactory to FSA regarding Party A's Credit Support Document | Upon execution | No |

| Party B | Opinion of in-house counsel of Party B's Credit Support Provider in form and substance satisfactory to Party A regarding Party B's Credit Support Document. | Upon execution | No |
|---------|------|------|------|

**Part 4. Miscellaneous.**

(a)    **Addresses for Notices.**   For the purpose of Section 12(a) of this Agreement:

Address for notices or communications to Party A:

Address:      Lehman Brothers Special Financing Inc.
Attention:      James Lee
Facsimile No: 646-758-4123      Telephone No: 212-526-1700
Electronic Messaging System Details:  JamesLee@Lehman.com

Address for notices or communications to Party B:

FSA Administrative Services, LLC, as Trustee
for Credit Protection Trust 207
31 West 52nd Street,
New York, New York  10019
U.S.A.
Attention: Bruce Stern
Facsimile No.: 212-339-0892
Telephone No.: 212-826-0100

with copies to:

Financial Security Assurance Inc.
31 West 52nd Street,
New York, New York  10019
U.S.A
Attention: Insured Portfolio Management Department
Re: Credit Protection Trust 207; Policy No. 51648-N
Confirmation No.: 212-826-0100
Telecopy No.: 212-339-3518
                        212-339-3529

(in each case in which notice or other communications to FSA refers to an Event of Default, Termination Event or Credit Event, or with respect to which failure on the part of FSA to respond shall be deemed to constitute consent or acceptance, then a copy of such notice or other communication should also be sent to the attention of each of the General Counsel and the Head-Financial Guaranty Group and shall be marked to indicate "URGENT MATERIAL

6

ENCLOSED"; provided, however, that failure to comply with these instructions shall not constitute an Event of Default on the part of Party A or a waiver of its rights under this Agreement).

(b)    **Process Agent**.  For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent .......... Not applicable
Party B appoints as its Process Agent .......... Financial Security Assurance Inc.
31 West 52nd Street
New York, New York 10019
U.S.A.
Attention:  General Counsel

(c)    **Offices**.  The provisions of Section 10(a) will not apply to this Agreement.

(d)    **Multibranch Party**.  Neither party is a Multibranch Party.

(e)    **Calculation Agent**. The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction, and unless an Event of Default with respect to Party A has occurred and is continuing, in which case the Calculation Agent will be a financial institution selected in good faith by Party B which would qualify as a Reference Market-Maker.

(f)    **Credit Support Documents**. Details of Credit Support Documents:

Party A:  A guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit B to the Schedule.

Party B: Financial Security Assurance Inc., Financial Guaranty Insurance Policy No. 51648-N dated July 15, 2005 (the "Policy") in the form attached as Exhibit A.

(g)    **Credit Support Provider**. Credit Support Provider means:

in relation to Party A:  ..... Lehman Brothers Holdings Inc. ("Holdings")
in relation to Party B:  ..... Financial Security Assurance Inc.

(h)    **Governing Law**. This Agreement will be governed by and construed in accordance with the laws of the State of New York, including Section 5-1401 of the General Obligations Law of New York, but otherwise without regard to conflicts of laws principles.

(i)    **Netting of Payments**. Subsection (ii) of Section 2(c) of this Agreement will apply.

(j)    "**Affiliate**" will have the meaning specified in Section 14 of this Agreement; provided, however, that with respect to Party A, such definition shall exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

7

**Part 5.  Other Provisions.**

(a)    **FSA.** FSA is a party to this Agreement solely for the purpose of exercising such rights or
enforcing such provisions as are purported to be granted to or for the benefit of FSA
hereunder and has no obligations in respect of any Transaction under this Agreement,
other than as set forth in the Policy.

(b)    **Additional Representations.** Each of Party A and Party B represents and warrants to
the other that (i) it is entering into this Agreement and each Transaction as principal (and
not as agent or in any other capacity, fiduciary or otherwise); (ii) it is an "eligible contract
participant" as that term is defined in Section 1a(12) of the Commodities Exchange Act,
as amended; (iii) it is acting for its own account and is not acting as a fiduciary for, or a
financial or investment adviser to the other party (or in any similar capacity); (iv) it is not
relying upon any communications (whether written or oral) from the other party as
investment advice or as a recommendation to enter into this Agreement, any Credit
Support Document to which it is a party and each Transaction hereunder (other than the
representations expressly set forth in this Agreement and in any such Credit Support
Document), it being understood that information and explanations related to the terms
and conditions of a Transaction shall not be considered investment advice or a
recommendation to enter into that Transaction; (v) it has not received from the other
party any assurance or guarantee as to the expected results of any Transaction; and (vi) it
has consulted with its own legal, regulatory, tax, business, investment, financial and
accounting advisors to the extent it has deemed necessary, and it has made its own
independent investment, hedging, and trading decisions based upon its own judgment and
upon any advice from such advisors as it has deemed necessary and not upon any view
expressed by other party.

(c)    **Non-Petition.** Party A agrees that, so long as no FSA Event of Default has occurred and
is continuing, it will not institute against, or join any person in instituting against Party B
any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, or
other proceeding under any bankruptcy or similar law, prior to the expiration of the Term
of the Policy (as the words "Term of this Policy" are therein defined) without the prior
written consent of FSA.

(d)    **Set-Off.** The respective obligations of Party A and Party B under this Agreement shall
not be subject to any defense, counterclaim or right of set-off (other than the right of set-
off against collateral (if any) posted under this Agreement) which either party may have
against the other party, whether in respect of this Agreement or otherwise. Section 6(e) is
amended by adding the word "not" between the words "will" and "be" in the final
sentence of the first paragraph thereof.

(e)    **Enforcement of Rights.** Party A and Party B acknowledge and agree that FSA may
directly enforce the rights of Party B under this Agreement. Party B hereby irrevocably
designates FSA its agent and attorney-in-fact for purposes of enforcing such rights, which
designation is coupled with an interest; provided, that only one of Party B or FSA shall
pursue Party B's rights hereunder and the commencement of an action to pursue

8

Party B's rights by Party B or FSA shall permanently supersede any right to do so by the other entity.

(f) **Trustee Capacity.** It is expressly understood and agreed by the parties hereto that insofar as this Agreement is executed on behalf of the Trust (i) this Agreement is executed and delivered by FSA Administrative Services, LLC, not in its individual capacity, but solely as Trustee under the Trust Agreement in the exercise of the powers and authority conferred and vested in it, (ii) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as representations, warranties, covenants, undertakings and agreements by FSA Administrative Services, LLC in its individual capacity, but is made and intended for the purpose of binding only the Trust and (iii) under no circumstances shall FSA Administrative Services, LLC, in its individual capacity, be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement.

(g) **Modification to Events of Default and Termination Events.** Notwithstanding any other provision of this Agreement, Party A will not, without the prior written consent of FSA, deliver any notice to Party B pursuant to Section 6, or take any other action to terminate any one or more Transactions, unless either (i) a Termination Event with respect to which Party A has the right to designate an Early Termination Date has occurred or (ii) an Event of Default has occurred and is continuing with respect to Party B and an FSA Event of Default shall also have occurred and be continuing. If no FSA Event of Default has occurred and is continuing, unless FSA otherwise agrees in writing, (X) Section 2(a)(iii)(1) shall have no application with respect to the obligations of Party A and (Y) Party A will not make a transfer pursuant to Section 7(b) without the prior written consent of FSA, which shall not be unreasonably withheld. Upon the occurrence of a Tax Event in respect of Party A, Party A may transfer all of its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices so that such Tax Event ceases to exist, provided that no such transfer shall be made (1) if it would cause an Event of Default or Termination Event to occur and (2) without the prior written consent of FSA, which consent will not be withheld if FSA's policies in effect at such time would permit it to enter into, or guarantee the obligations of any entity such as Party B under, a transaction on the terms proposed.

(h) **Subrogation.** Subject to and conditioned upon payment of any amount owed under this Agreement by or on behalf of FSA, Party A shall assign to FSA all rights to the payment of amounts to the extent of and with respect to such payments made by FSA and FSA may exercise any right, power or the like of Party A with respect thereto. Party A and Party B agree that without the need for any further action on the part of FSA, FSA shall be fully subrogated to all of the rights to payment of Party A with respect to and to the extent that payments are made under the Policy by or on behalf of FSA.

So long as no FSA Event of Default has occurred and is continuing, Party A shall, at FSA's expense, cooperate in all material respects with any request by FSA for action to preserve or enforce FSA's rights or interest under these presents, including, without

9

limitation, upon the occurrence and continuance of an Event of Default or Termination Event, a request to institute proceedings for the collection of all amounts then payable under this Agreement, enforce any judgment obtained and collect from Party B moneys adjudged due, and take any other appropriate action to protect and enforce the rights and remedies of FSA hereunder.

FSA shall be entitled, as subrogee, to recover from Party B any amounts paid by FSA on behalf of Party B, notwithstanding that a failure to pay by Party B may not constitute an Event of Default with respect to Party B hereunder. Party A agrees that any payment by FSA or any agent or designee thereof on Party B's behalf will be applied solely in respect of Party B's obligations in respect of Scheduled Payments (as defined in the Policy).

(i)     **Control in Insolvency Proceedings.** Party A agrees that, so long as no FSA Event of Default shall have occurred and be continuing, FSA may at any time during the continuation of any proceeding by or against Party B under any applicable bankruptcy, insolvency, receivership, rehabilitation or similar law (an "Insolvency Proceeding") direct all matters relating to such Insolvency Proceeding, including, without limitation, (i) all matters relating to any claim in connection with any Insolvency Proceeding seeking the avoidance as a preferential transfer (a "Preference Claim") of any amount paid by Party B under this Agreement, (ii) the direction of any appeal or any order relating to any Preference Claim and (iii) the posting of any surety, supersedeas or performance bond pending any such appeal. In addition, and without limitation of the foregoing, as set forth in Part 5(h), FSA shall be subrogated to, and Party A hereby delegates and assigns, to the fullest extent permitted by law, the rights of Party A in the conduct of any Insolvency Proceeding, including, without limitation, all rights of any party to an adversary proceeding and with respect to action relating to any court order issued in connection with any such Insolvency Proceeding. Party A shall furnish to FSA records evidencing Scheduled Payments which have been made by Party B and which have been subsequently recovered from Party A.

(j)     **No Third Party Beneficiaries.** This Agreement shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Except as otherwise expressly provided herein, no other entity shall have any right or obligation hereunder.

(k)     **Tax Refunds.** Section 2(d) is amended by adding the following paragraph at the end thereof:

(iii)    *Refunds.* If Y has paid any amount pursuant to Section 2(d)(ii) and X subsequently receives any refund of any amount deducted or withheld in respect thereof from any revenue authority it shall promptly pay the amount refunded over to Y, together with any interest received thereon.

(l)     **Expenses.** Section 11 is amended by adding the following paragraph at the end thereof:

In the event that the Defaulting Party is Party A, such reasonable out-of-pocket expenses shall also include the reasonable legal fees incurred by FSA by reason of the enforcement and protection of

10

Party B' s rights under this Agreement; provided, that only one of FSA and Party B may be indemnified under Section 11 and the claim by one party shall permanently supersede any claim by the other party.

(m)     **Article 76.**  Party A acknowledges and Party B represents that Party B's Credit Support Document is not covered by the property/casualty insurance security fund specified in Article 76 of the New York Insurance Law.

(n)     **Actions by Party B**.  Any notice sent by Party B designating an Early Termination Date shall be ineffective unless and until such designation is consented to in writing by FSA, and such consent is delivered to Party A. No Transactions may be entered into, and no waiver or amendment of any provision of any Confirmation or any other terms of this Agreement may be made without the prior written consent of FSA.

(o)     **Policy-Related Tax Information.**  Party A will deliver to FSA, or to such government or taxing authority as FSA may direct, upon reasonable demand by FSA, any form or document that may be required or reasonably requested in writing in order to allow FSA to make a payment under the Policy without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of Party A), with any such document to be accurate and completed in a manner reasonably satisfactory to FSA and to be executed and to be delivered with any reasonably required certification.

(p)     **Amendment to Section 5(b)(i).**  The existing text of Section 5(b)(i) after the heading "Illegality" shall be amended by inserting "(A)" and there shall be added at the end of the existing text the word "or" and a new subclause (B), reading as follows:

"(B)  any force majeure event or governmental act prevents such party (which will be the Affected Party) to perform its payment obligations under this Agreement, or for any Credit Support Provider of such party to perform its payment obligations under the relevant Credit Support Document, or such performance is rendered impossible; provided, however that in such event the Affected Party or its Credit Support Provider, as applicable, shall (i) use commercially reasonable efforts to perform its payment obligations under this Agreement or the relevant Credit Support Document, as applicable, notwithstanding such force majeure event, governmental act or impossibility of performance and (ii) perform its payment obligations under this Agreement or the relevant Credit Support Document, as applicable, promptly following cessation of such force majeure event, governmental act or impossibility of performance."

(q)     **Transfer.**  Notwithstanding anything to the contrary in Section 7 of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to Holdings or any Affiliate of Holdings; provided that (i) if such transfer is to an entity other than Holdings, Party B is furnished with a guarantee of Holdings of such transferee's obligation in substantially the form of the guarantee of Holdings delivered in connection with this Agreement; (ii) each Payor Tax Representation will continue to be

11

true following such transfer; (iii) as a result of such transfer, no Event of Default or Termination Event would occur or continue to exist; and (iv) Party B and FSA will not be subject as a result of the transfer to any material increase in cost of capital or increased reserve or similar requirements relating to the Credit Swap Transaction or the Policy. Upon such assignment Party A shall be fully released from any and all obligations and liabilities related to the interests assigned.

(r)  **Notices.**  For the purposes of <u>subsections (iii)</u> and <u>(v)</u> of <u>Section 12(a)</u>, the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(s)  **Service of Process.**  The penultimate sentence of <u>Section 13(c)</u> shall be amended by adding the following language at the end thereof:  "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(t)  **Waiver of Trial By Jury.**  Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(u)  **Accuracy of Specified Information.**  <u>Section 3(d)</u> is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:
Title:    Allyson M. Carine
        Authorized Signatory

CREDIT PROTECTION TRUST 207

By: FSA Administrative Services, LLC,
    solely as Trustee and not in its individual capacity
    By: FSA Portfolio Management, Inc. Member

By: _____
    Name:
    Title:

FINANCIAL SECURITY ASSURANCE INC.

By: _____
    Name:
    Title:

13

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
      Name:
      Title:

CREDIT PROTECTION TRUST 207

By: FSA Administrative Services, LLC,
      solely as Trustee and not in its individual capacity
      By: FSA Portfolio Management, Inc. Member

By: _____
      Name:   BRUCE E. STERN
      Title:   MANAGING DIRECTOR

FINANCIAL SECURITY ASSURANCE INC.

By: _____
      Name:
      Title:

13

**Exhibit A**
**[Copy of Policy]**

**Exhibit B**
**[Copy of Lehman Guarantee]**

15

# LEHMAN BROTHERS

**EXECUTION COPY**

**Transaction**

Date:  15 July, 2005

To:  FSA Administrative Services, LLC
as Trustee for Credit Protection Trust 207
31 West 52nd Street
New York, New York  10019

From:  Lehman Brothers Special Financing Inc.
Jonathan Lai – Structured Products Transaction Management Group
Facsimile:  212-652-0556 (United States of America)
Telephone:  212-526-0806

Ref. Numbers:  Risk ID: 472966L / Effort ID: N636075 / Global Deal ID: 2153891

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to set forth the terms and conditions of the Credit Derivative Transaction entered into on the Trade Date specified below (the "Transaction") between Lehman Brothers Special Financing Inc. ("Party A"), Credit Protection Trust 207 ("Party B"), as acknowledged and agreed to by Financial Security Assurance Inc. ("FSA").  This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions, each as published by the International Swaps and Derivatives Association, Inc. (together, the "Credit Derivatives Definitions"), are incorporated into this Confirmation.  In the event of any inconsistency between the Credit Derivatives Definitions and this Confirmation, this Confirmation will govern.

This Confirmation supplements, forms a part of and is subject to the ISDA Master Agreement dated as of 15 July, 2005, as amended and supplemented from time to time (the "Agreement") between Party A, Party B and FSA.  All provisions contained in, or incorporated by reference in, the Agreement shall govern this Confirmation except as expressly modified below.  This Confirmation relates to a basket of Reference Entities (as described below).  Each settlement in respect of a Reference Entity following a Credit Event will terminate only the corresponding portion of this Transaction, as outlined below.  Upon the occurrence of an Event Determination Date with respect to a Reference Entity, additional Credit Events with respect to that Reference Entity will not have any effect on this Transaction (a) unless that Reference Entity subsequently becomes a Successor to another Reference Entity in respect of which an Event Determination Date has not occurred and (b) except as otherwise provided in the "Successors" provision below.  This Transaction contemplates that there may be more than one Credit Event and accordingly more than one Event Determination Date and more than one settlement and that the Credit Derivatives Definitions (and in particular the definition of Termination Date) should, for the purposes of this Transaction, be interpreted accordingly.

The terms of the Transaction to which this Confirmation relates are as follows:

**1. General Terms:**

| | |
|---|---|
| Trade Date: | 06 May, 2005 |
| Effective Date: | 07 May, 2005 |
| Scheduled Termination Date: | 20 June, 2010 |
| Termination Date: | The Scheduled Termination Date; provided that: |

(a)    if the Outstanding Swap Notional Amount is reduced to zero prior to the Scheduled Termination Date, the Termination Date shall be the Cash Settlement Date relating to the Incurred Loss Amount or Incurred Recovery Amount that causes the Outstanding Swap Notional Amount to be reduced to zero; and

(b)    if the last Cash Settlement Date occurs after the Scheduled Termination Date, the Termination Date shall be such Cash Settlement Date.

| | |
|---|---|
| Floating Rate Payer: | Party B ("Seller") |
| Fixed Rate Payer: | Party A ("Buyer") |
| Original Swap Notional Amount: | USD 100,000,000.00 |
| Attachment Point: | 32.75% |
| Exhaustion Point: | 62.75% |
| Reference Entity Credit Position: | 1 / 95 |
| Tranche Size: | Exhaustion Point minus Attachment Point |
| Implicit Portfolio Size: | Original Swap Notional Amount divided by Tranche Size |
| Reference Entity Notional Amount: | With respect to each Reference Entity, Implicit Portfolio Size multiplied by Reference Entity Credit Position, subject to adjustment as provided in Section 2.2 of the Credit Derivatives Definitions, as modified by the "Successors" provision below. |
| Loss Threshold Amount: | Implicit Portfolio Size multiplied by Attachment Point |
| Recovery Threshold Amount: | (a) Implicit Portfolio Size multiplied by (b) 100% minus Exhaustion Point |

Lehman Sunset Park HY CDS (CDX) Confirmation EC.DOC

| | |
|---|---|
| Calculation Agent: | Party A |
| Business Day: | New York and London |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day) |
| Reference Entities: | Each entity listed on Annex A attached hereto, as amended from time to time (and each Successor to any of such entities determined pursuant to Section 2.2 of the Credit Derivatives Definitions as modified below). |
| Reference Obligation(s): | With respect to each Reference Entity, the Benchmark Obligation, if specified in the Reference Obligation Identification Notice and each obligation of such Reference Entity that (a) is identified in the relevant Reference Obligation Identification Notice and (b) meets, as of the Valuation Date, the Required Criteria. |
| Required Criteria: | The applicable Reference Obligation Category and Reference Obligation Characteristics as specified herein and the criteria set forth in Section 2.15(a)(i)-(iii) of the Credit Derivatives Definitions, provided, references to Delivery Date shall mean the Valuation Date, references to the Notice of Physical Settlement shall mean the Reference Obligation Identification Notice, and references to Delivery of obligations shall mean valuation of obligations pursuant to the Valuation Method set forth below. |
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Standard Specified Currencies; and in respect of any Reference Entity for which "Singapore" is the jurisdiction specified in Annex A, Standard Specified Currencies and Domestic Currency |
| | Only in respect of any Reference Entity for which "Singapore" is the jurisdiction specified in Annex A, Not Sovereign Lender |
| | Not Contingent |

Risk ID: 472966L / Effort ID: N636075 / Global Deal ID: 2153891

Assignable Loan

Consent Required Loan, except in respect of any Reference Entity for which "Singapore" is the jurisdiction specified in Annex A

Transferable

Maximum Maturity: 30 years

Not Bearer

Successors:

Section 2.2(a) of the Credit Derivatives Definitions is amended by deleting the words "for the entire Credit Derivative Transaction" from Section 2.2(a)(i) and (ii) of the Credit Derivatives Definitions and replacing them with the words "in respect of such Reference Entity"; and by deleting the words "for a New Credit Derivative Transaction" from Section 2.2(a)(iii) and (iv) of the Credit Derivatives Definitions.

Section 2.2(d)(i) of the Credit Derivatives Definitions is amended by replacing "a Credit Derivative Transaction" with "a Reference Entity"; and the last line of Section 2.2(d) of the Credit Derivatives Definitions is amended by replacing "each relevant Credit Derivative Transaction" with "each relevant Reference Entity".

Section 2.2(e) of the Credit Derivatives Definitions is deleted and replaced in its entirety by the following:

"Where, pursuant to Section 2.2(a), one or more Successors have been identified in respect of a Reference Entity that has been subject to the relevant Succession Event (the "Affected Entity"), (i) the Affected Entity will no longer be a Reference Entity for purposes of the Credit Derivative Transaction (unless it is a Successor as described in Section 2.2(e)(ii) below), (ii) each Successor will be deemed a Reference Entity for purposes of the Credit Derivative Transaction, (iii) the Reference Entity Notional Amount for each such Successor will equal the Reference Entity Notional Amount of the Affected Entity immediately prior to the application of Section 2.2 divided by the number of Successors and (iv) the

Calculation Agent may make any modifications to the terms of the Credit Derivative Transaction required to preserve the economic effects of the Credit Derivative Transaction prior to the Succession Event (considered in the aggregate)."

Subject to the final paragraph of these "Successors" provisions, if a Successor is already a Reference Entity at the time Section 2.2 of the Credit Derivatives Definitions is applied (and is not itself the Affected Entity), the Reference Entity Notional Amount with respect to such Reference Entity shall be equal to the sum of (a) the Reference Entity Notional Amount in respect of the Reference Entity immediately prior to the application of Section 2.2 of the Credit Derivatives Definitions and (b) the Reference Entity Notional Amount in respect of such Reference Entity as a result of the application of Section 2.2(e)(iii) of the Credit Derivatives Definitions (as amended hereby).

If a Successor is already a Reference Entity at the time Section 2.2 of the Credit Derivatives Definitions is applied and, as a result of the relevant Succession Event, such Reference Entity would have more than one Reference Obligation, (a) the immediately preceding paragraph shall not apply, (b) there shall be deemed to be a separate Reference Entity hereunder associated with each such Reference Obligation, (c) the Reference Entity Notional Amount of the Reference Entity that was already a Reference Entity immediately prior to the application of Section 2.2 of the Credit Derivatives Definitions shall equal the Reference Entity Notional Amount in respect of such Reference Entity immediately prior to such application, (d) the Reference Entity Notional Amount of the Successor determined by application of Section 2.2 of the Credit Derivatives Definitions shall equal the amount determined by application of Section 2.2(e)(iii) of the Credit Derivatives Definitions (as amended hereby) and (e) the Conditions to Settlement may be satisfied, and settlement with respect thereto may occur, separately for each such Reference Entity.

All Guarantees:

Applicable, unless "North America" is specified as the jurisdiction opposite a Reference Entity in

Annex A.

Reference Price:                                    100%

## 2. Fixed Payments:

Fixed Rate Payer Calculation Amount:

For any Fixed Rate Payer Calculation Period, an amount determined by the Calculation Agent equal to (a) the sum of the Outstanding Swap Notional Amount as at 5 p.m. in the Calculation Agent City on each day in such Fixed Rate Payer Calculation Period, divided by (b) the actual number of days in such Fixed Rate Payer Calculation Period.

If an Event Determination Date and a related Calculation Date occur in the same Fixed Rate Payer Calculation Period, then for purposes of determining the Fixed Rate Payer Calculation Amount, the Outstanding Swap Notional Amount shall be deemed to have been reduced by the related Incurred Loss Amount (if any) and the related Incurred Recovery Amount (if any) with respect to such Calculation Date on the day following the relevant Event Determination Date (notwithstanding that such Incurred Loss Amount and/or such Incurred Recovery Amount are in fact determined on the Calculation Date).

In respect of each Calculation Date, if (a) the associated Event Determination Date and such Calculation Date occur in different Fixed Rate Payer Calculation Periods, and (b) (i) the sum of the Aggregate Loss Amount and (1) the Reference Entity Notional Amount for the related Reference Entity multiplied by (2) the associated Selected Proportion, is greater than the Loss Threshold Amount, or (ii) the sum of the Aggregate Recovery Amount and (1) the Reference Entity Notional Amount multiplied by (2) the associated Selected Proportion for the related Reference Entity, is greater than the Recovery Threshold Amount, then for purposes of determining the Fixed Rate Payer Calculation Amount(s):

(x)    the Outstanding Swap Notional Amount shall for the purpose of calculating a Fixed Amount be deemed to have been reduced by the Reference Entity Notional Amount of the related Reference Entity multiplied by the associated Selected Proportion, from, but excluding, the Event

Determination Date to, but excluding, such Calculation Date; and

(y)    on the Fixed Rate Payer Payment Date related to the Fixed Rate Payer Calculation Period during which such Calculation Date occurred (or in the case of a Calculation Date occurring after the last Fixed Rate Payer Payment Date, on such Calculation Date), Buyer shall pay to Seller an amount equal to (1) (I) the related Reference Entity Notional Amount multiplied by the associated Selected Proportion minus (II) the related Incurred Loss Amount (if any) minus (III) the related Incurred Recovery Amount (if any) multiplied by (2) the Fixed Rate multiplied by (3) the number of days from, but excluding, the Event Determination Date to, but excluding, such Calculation Date divided by (4) 360.

| | |
|---|---|
| Outstanding Swap Notional Amount: | At any time on any day, the greater of: |

(a)    zero; and

(b)    the Original Swap Notional Amount minus the sum of all Incurred Loss Amounts and all Incurred Recovery Amounts in respect of each Reference Obligation for which a Calculation Date has occurred at or prior to such time.

| | |
|---|---|
| Fixed Rate Payer Payment Dates: | Each March 20, June 20, September 20 and December 20 commencing on June 20, 2005 and ending on and including the earlier to occur of the Scheduled Termination Date and the Termination Date. |

Section 2.10 of the Credit Derivatives Definitions is amended by deleting the last four lines thereof, beginning with ", provided".

| | |
|---|---|
| Fixed Rate Payer Calculation Period: | Section 2.9 of the Credit Derivatives Definitions is amended by replacing the words "the earlier to occur of the Scheduled Termination Date and the Event Determination Date" with "the earlier to occur of the Scheduled Termination Date and the Calculation Date on which the Outstanding Swap Notional Amount is reduced to zero". |

Section 5.4 of the Credit Derivatives Definitions is amended by replacing the words "the earlier to occur of the Scheduled Termination Date and the

Event Determination Date" with "the earlier to occur of the Scheduled Termination Date and the Calculation Date on which the Outstanding Swap Notional Amount is reduced to zero".

Fixed Rate:

0.25% per annum

Fixed Rate Day Count Fraction:

Actual/360

Present Value Payment:

Notwithstanding Article V (Fixed Amounts) of the Credit Derivatives Definitions, on any Present Value Payment Date Buyer shall immediately pay Seller an amount (the "Present Value Payment") equal to the present value, determined as of the Present Value Payment Date, of the remaining Fixed Amounts that would have been payable by Buyer on each Fixed Rate Payer Payment Date occurring after the Present Value Payment Date, assuming for the purpose of such calculation a constant Fixed Rate Payer Calculation Amount equal to the value of the Outstanding Swap Notional Amount as of the Present Value Payment Date and discounting each Fixed Amount from the date on which it would have been received to the Present Value Payment Date at a rate equal to the value of "USD-ISDA-Swap Rate" as determined on the Present Value Payment Date for a Designated Maturity equal to the period from (and including) the Present Value Payment Date to (but excluding) the scheduled Fixed Rate Payer Payment Date, applying linear interpolation.

"Present Value Payment Date" means any date prior to the designation of an Early Termination Date on which an Event of Default described in Section 5(a)(vii) of the Agreement has occurred and is continuing with respect to Buyer and Buyer has failed to make, when due, any payment or delivery under this Transaction required to be made (notwithstanding that Seller has not given notice of such event or taken any other action to terminate the Agreement).

Notwithstanding Article V (Fixed Amounts) of the Credit Derivatives Definitions, Buyer shall have no further liability to pay Fixed Amounts in respect of any Fixed Rate Payer Payment Date to the extent such Fixed Amounts have been included in the determination of a Present Value Payment which has been paid by Buyer.

**3. Floating Payments:**

Conditions to Settlement:

Credit Event Notice

Notifying Party: Buyer or Seller

Reference Obligation Identification Notice; provided, however, that Buyer may notify Seller (in writing and subject to the requirements regarding notices set forth in Section 1.10) that Buyer is changing one or more Reference Obligations or the detailed description thereof, but each such other notice must be effective on or prior to the third Business Day immediately preceding the Valuation Date or, if the Reference Obligation Identification Notice contains any Failed Obligations, the Valuation Date; provided, further, that Buyer may correct any errors or inconsistencies in the detailed description by notice to Seller (given as aforesaid) prior to the Valuation Date.

Notice of Publicly Available Information: Applicable

Reference Obligation Identification Notice:

A written notice from Buyer to Seller (subject to the requirements regarding notices set forth in Section 1.10) the form of which is attached hereto as Annex B, that (1) contains a detailed description of each obligation selected by Buyer, including the outstanding principal balance of each such obligation and, if available, the CUSIP or ISIN (and if such identifying number is not available, the rate and tenor) and (2) is effective on or prior to the third Business Day immediately preceding the Valuation Date, the form of which is attached hereto as Annex B; provided, however, that (I) the aggregate Currency Amount with respect to the outstanding principal balance of each obligation selected shall be between (a) the lower of (i) the minimum denomination of that obligation and (ii) USD 100,000 and (b) the Reference Entity Notional Amount and (II) the aggregate Currency Amount with respect to all obligations selected with respect to a single Reference Entity shall be no greater than the related Reference Entity Notional Amount.

Failed Obligation:

Any obligation other than the Benchmark Obligation specified in a Reference Obligation Identification Notice that (1) meets the Required Criteria as of the third Business Day immediately preceding the Valuation Date, (2) Buyer reasonably expects to meet the Required Criteria as of the Valuation Date, and (3) does not meet the Required Criteria on the relevant Valuation Date.

Credit Events:

The following Credit Event(s) shall apply to this Transaction:

Bankruptcy

Failure to Pay

Grace Period Extension: Not Applicable

Obligation(s):

Obligation Category

In respect of any Reference Entity for which "North America" or "Europe" is the jurisdiction specified in Annex A:

Borrowed Money

In respect of any Reference Entity for which "Singapore" is the jurisdiction specified in Annex A:

Bond or Loan

Obligation Characteristics

In respect of any Reference Entity for which "North America" or "Europe" is the jurisdiction specified in Annex A:

None

In respect of any Reference Entity for which "Singapore" is the jurisdiction specified in Annex A.

Not Subordinated
Specified Currency: Standard Specified Currencies and Domestic Currency
Not Sovereign Lender

Risk ID: 472966L / Effort ID: N636075 / Global Deal ID: 2153891

Lehman Sunset Park HY CDS (CDX) Confirmation EC.DOC

Excluded Obligations:                           None

**4. Settlement Terms:**

Settlement Method:                              Cash Settlement

Settlement Currency:                            USD

Currency Amount:                                Section 8.9 of the Credit Derivatives Definitions is deleted and replaced in its entirety by the following:

"Currency Amount" means, whenever an amount is specified to be determined by reference to a Currency Amount, and (a) where such amount is denominated in the Settlement Currency, such amount, and (b) where such amount is denominated in a currency other than the Settlement Currency, such amount converted to the Settlement Currency using the Currency Rate."

Currency Rate:                                  The rate determined by the Calculation Agent equal to the rate of conversion of the currency of the Reference Obligation to the Settlement Currency by reference to the Federal Reserve Bank of New York 10:00 a.m. (New York time) mid-point rate as displayed on Reuters Page FEDSPOT on the Valuation Date, or in such other commercially reasonable manner as it shall determine after consultation with the parties.

Valuation Date:                                 Single Valuation Date: In respect of each Reference Obligation, the day selected by the Calculation Agent as such, which day shall be a day which falls on or after the forty-fifth Business Day immediately following the Event Determination Date and on or before the Latest Permissible Valuation Date. The Calculation Agent shall notify the parties in writing of such selection at least three Business Days prior to the applicable Valuation Date.

Latest Permissible Valuation Date:              The one hundred twentieth Business Day immediately following the Event Determination Date.

Valuation Time:                                 11:00 a.m. in the principal trading market for the relevant Reference Obligation.

Lehman Sunset Park HY CDS (CDX) Confirmation EC.DOC

| | |
|---|---|
| Quotation Method: | Bid |
| Quotation Amount: | With respect to each Reference Obligation, the outstanding principal balance of the Reference Obligation set forth in the Reference Obligation Identification Notice. |
| Dealers: | Each dealer (other than Buyer or any Affiliate of Buyer) in obligations of the type of Reference Obligation(s) for which Quotations are to be obtained, selected by the Calculation Agent from the list of Eligible Dealers (or, in the case of Section 7.7(b) of the Credit Derivatives Definitions, the relevant party or Seller, as applicable) in good faith and in a commercially reasonable manner (without the requirement of consultation with the parties or the other party, as the case may be), provided that (a) the Seller Designated Dealer will also be a Dealer, (b) the Calculation Agent (or the relevant party, as applicable) will solicit Quotations from the Seller Designated Dealer and any Quotation provided by the Seller Designated Dealer will be considered in the same manner as other Quotations in determining the Final Price, and (c) any Quotation provided by the Seller Designated Dealer shall be deemed to be a firm quotation. |
| Eligible Dealer: | Any of the following dealers or any dealer which is mutually agreed upon by Buyer and Seller (or any affiliate thereof which acts as a dealer in obligations of the type of Obligation(s) for which Quotations are to be obtained or any successor thereto): |
| | Citigroup Global Markets Inc.; J.P. Morgan Securities Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Credit Suisse First Boston LLC; Deutsche Bank AG; Bear, Stearns & Co. Inc.; Prudential Securities Inc.; Morgan Stanley & Co., Incorporated; Goldman, Sachs & Co.; and Dresdner Bank AG. |
| Seller Designated Dealer: | (1) Any designee of Seller (i) that is FSA; (ii) the obligations of which are guaranteed by FSA; or (iii) the long-term debt obligations of which are rated at least A+ by Standard and Poor's Rating Services, a Division of The McGraw-Hill Companies, Inc. and A1 by Moody's Investors Service Inc. or (2) if there is no such designee, |

Seller.

| | |
|---|---|
| Seller Quotation Terms: | Beginning the first day upon which the Aggregate Loss Amount is greater than or equal to the Loss Threshold Amount or the Aggregate Recovery Amount is greater than or equal to the Recovery Threshold Amount, the Calculation Agent shall provide telephonic notice to a Designated Seller Responsible Person pursuant to Paragraph 5(f) below of the Final Price (before application of Seller Quotation Terms) for a Reference Obligation immediately upon such determination; and, notwithstanding that the Seller Designated Dealer may have provided a Quotation in respect of such Reference Obligation, the Calculation Agent shall attempt to obtain a Quotation from Seller which is higher than the relevant Final Price (before application of Seller Quotation Terms) and such Quotation shall be deemed to be a firm quotation (such notice and solicitation, "Seller Notification"). |
| | If Seller provides Calculation Agent with a Quotation greater than the relevant Final Price (before application of Seller Quotation Terms)within fifteen minutes after receiving the Seller Notification, such Quotation shall be deemed to be the Final Price with respect to the Reference Obligation. |
| Cash Settlement Date: | Each date that is three Business Days after a Calculation Date. |
| Cash Settlement Amount: | With respect to a Cash Settlement Date, the Incurred Loss Amount for the related Calculation Date. |
| Quotations: | Exclude Accrued Interest |
| Valuation Method: | Highest; provided, however, that if such Reference Obligation is a Loan, any consent for Delivery shall be deemed to have been obtained |
| Calculation Date: | With respect to a Reference Obligation, (a) the Business Day on which the Final Price can first be determined in respect of such Reference Obligation or (b) the date on which the associated CDS Amount can be determined (if applicable). Where two or more of (a) and/or (b) apply (or (a) or (b) apply more than once) to a single Reference Entity on a single day, such day shall be treated as two or |

Risk ID: 472966L / Effort ID: N636075 / Global Deal ID: 2153891

Lehman Sunset Park HY CDS (CDX) Confirmation EC.DOC

more Calculation Dates, as the case may be, for the related Reference Entity.

Calculations:

If any day is (a) a Calculation Date with respect to more than one Reference Entity, or (b) two or more, as the case may be, Calculation Dates with respect to a single Reference Entity, the Loss Amount, Recovery Amount, Aggregate Loss Amount, Aggregate Recovery Amount, Outstanding Swap Notional Amount, Incurred Loss Amount and Incurred Recovery Amount with respect to each Reference Entity shall be calculated in the order of delivery of the relevant Credit Event Notices or, if any of the relevant Credit Event Notices are delivered at the same time, in a sequential order determined by the Calculation Agent.

For the avoidance of doubt, with respect to the same Reference Entity, there may be more than one Calculation Date, Loss Amount, Recovery Amount, Incurred Loss Amount, Incurred Recovery Amount, Cash Settlement Amount and Cash Settlement Date.

Selected Proportion:

In respect of a Reference Obligation, the Currency Amount of the outstanding principal balance of such Reference Obligation set forth in the Reference Obligation Identification Notice divided by the aggregate Currency Amount with respect to the outstanding principal balance of each Reference Obligation set forth in the Reference Obligation Identification Notice with respect to the associated Reference Entity.

Incurred Loss Amount:

With respect to a Reference Obligation and a Calculation Date, an amount, calculated on that Calculation Date, equal to the lowest of:

(a)      the Loss Amount;

(b)      the Aggregate Loss Amount (including the related Loss Amount for that Reference Obligation and Calculation Date) minus the Loss Threshold Amount (subject to a minimum of zero); and

(c)      the Outstanding Swap Notional Amount (prior to any reduction thereto in respect of that Reference Obligation and Calculation Date).

| | |
|---|---|
| Loss Amount: | With respect to a Reference Obligation and a Calculation Date, an amount calculated on that Calculation Date equal to (A) in the case of (a) of the definition of Calculation Date, (i) (100% minus the Final Price for that Reference Obligation and Calculation Date) multiplied by (ii) the Reference Entity Notional Amount for the related Reference Entity multiplied by (iii) the Selected Proportion for that Reference Obligation (subject to a minimum of zero) or (B) in the case of (b) of the definition of Calculation Date, the CDS Amount for that Reference Entity. |
| Aggregate Loss Amount: | At any time on any day, the aggregate of all Loss Amounts calculated hereunder with respect to all Reference Entities. |
| Incurred Recovery Amount: | With respect to a Reference Obligation and a Calculation Date, an amount, calculated on that Calculation Date, equal to the lowest of: |

(a)     the Recovery Amount;

(b)     the Aggregate Recovery Amount (including the related Recovery Amount for that Reference Obligation and Calculation Date) minus the Recovery Threshold Amount (subject to a minimum of zero); and

(c)     the Outstanding Swap Notional Amount (prior to any reduction thereto in respect of that Reference Entity and Calculation Date).

| | |
|---|---|
| Recovery Amount: | With respect to a Reference Obligation and a Calculation Date, an amount calculated on that Calculation Date equal to (A) in the case of (a) of the definition of Calculation Date, (i) the lesser of 100% and the Final Price for that Reference Obligation and Calculation Date multiplied by (ii) the Reference Entity Notional Amount for the related Reference Entity multiplied by (iii) the Selected Proportion for that Reference Obligation and Calculation Date or (B) in the case of (b) of the definition of Calculation Date, (i) the Replacement Transaction Notional Amount minus (ii) the CDS Amount. |
| Aggregate Recovery Amount: | At any time on any day, the aggregate of all Recovery Amounts calculated hereunder with |

respect to all Reference Entities.

Final Price:

Notwithstanding Section 7.4 of the Credit Derivatives Definitions, and subject to the Seller Quotation Terms, with respect to each Reference Obligation, the price of such Reference Obligation, expressed as a percentage, determined in accordance with the applicable Valuation Method.

CDS Amount:

In respect of each Reference Obligation for which the jurisdiction specified in Annex A in respect of the related Reference Entity is "North America", in the event that if no Calculation Date has occurred on or prior to the third Business Day immediately following the Latest Permissible Valuation Date (such applicable date, the "CDS Determination Date"), an amount determined by the Calculation Agent (the "CDS Amount") in accordance with the following:

(a)      on the CDS Determination Date, the Calculation Agent shall request at least five Eligible Dealers to each provide its firm offer price (each, an "Offer Price"), which shall be expressed as a single upfront payment in the Settlement Currency and less than or equal to the Replacement Transaction Notional Amount, for the entry into a transaction equivalent to the relevant CDS Replacement Transaction (except that Seller is the buyer of credit protection) on that date;

(b)      the Calculation Agent shall promptly notify the parties of the Eligible Dealers from which it has solicited Offer Prices and the Offer Prices, if any, provided by each such Eligible Dealer; and

(c)      the CDS Amount shall be equal to (i) the lowest Offer Price or (ii) if the Calculation Agent does not obtain at least one Offer Price, the Replacement Transaction Notional Amount.

Seller and Buyer shall be deemed to have entered into the CDS Replacement Transaction on the date the CDS Amount is determined and, in consideration therefor, Buyer shall pay to Seller on the related Cash Settlement Date the lowest Offer Price (or, if the Calculation Agent does not obtain at least one Offer Price, the Replacement

Transaction Notional Amount).

| CDS Replacement Transaction: | A single name physically settled credit default swap transaction referencing the Reference Entity for the Reference Obligation in respect of which the CDS Amount is being calculated and under which Buyer is the buyer of credit protection, where: |

(a)    the Floating Rate Payer Calculation Amount is equal to (i) the Reference Entity Notional Amount multiplied by (ii) the Selected Proportion (the "Replacement Transaction Notional Amount");

(b)    all terms relevant to a single name physically settled credit default swap transaction (including, without limitation, the definitions of Deliverable Obligations and the Deliverable Obligation Characteristics) are identical to the terms specified herein;

(c)    the Conditions to Settlement have been satisfied on exactly the same basis with respect to such Reference Entity under the CDS Replacement Transaction as they were for this Transaction; and

(d)    Buyer has delivered a Notice of Physical Settlement specifying the Reference Obligations.

| Benchmark Obligation: | The obligation specified in Annex A in respect of the relevant Reference Entity, or any Substitute Benchmark Obligation. |

| Substitute Benchmark Obligation: | A substitute obligation specified to replace the obligation specified in Annex A in relation to a Reference Entity in the circumstances and the manner set out in Section 2.30 of the Credit Derivatives Definitions as if the Benchmark Obligation were a Reference Obligation. |

## 5.  Additional Provisions:

(a)    Notwithstanding anything to the contrary in the Credit Derivatives Definitions and subject to the conditions set forth in Section 1.10, all notices required to be delivered hereunder shall be delivered in writing.

(b)    Annex A will be deemed amended from time to time to reflect any modifications required under Section 2.2 of the Credit Derivatives Definitions (as amended hereby), and the "Reference Obligation(s)" and "Successors" provisions above.

Lehman Sunset Park HY CDS (CDX) Confirmation EC.DOC

(c)    The Calculation Agent will inform the parties as soon as reasonably practicable following the determination thereof of the amount of (i) any Loss Amount or Recovery Amount in respect of a Reference Obligation, irrespective of whether or not the Aggregate Loss Amount or Aggregate Recovery Amount, as applicable, is less than or equal to the Loss Threshold Amount or Recovery Threshold Amount, respectively, and (ii) any Incurred Loss Amount or Incurred Recovery Amount in respect of a Reference Entity.

(d)    In respect of this Transaction, Section 2.19(b)(i)(A) of the Credit Derivatives Definitions shall be amended by replacing (i) the words "most senior Reference Obligation in priority of payment" in the second line thereof with the words "Benchmark Obligation"; (ii) replacing the words "Reference Obligation is specified" in the third line thereof with the words "Benchmark Obligation is specified in Annex A"; (iii) the word "relevant" immediately before the words "Reference Entity" in the fifth line thereof; and (iv) the words "Reference Obligation" in the eighth and tenth lines thereof with "Benchmark Obligation".

(e)    Section 2.31 of the Credit Derivatives Definitions shall not apply to this Transaction.

(f)    (i) For purposes of (A) obtaining Quotations from the Seller Designated Dealer (if FSA or Seller is the Seller Designated Dealer) as required under "Dealers" above and (B) notifying Seller of the Final Price in connection with the Seller Notification, the Calculation Agent shall contact at least one Designated Seller Responsible Person by telephone at the telephone number designated by Seller as provided in clause (ii) below. If the Seller Designated Dealer is not FSA or Seller, Seller shall provide Buyer with contact information for a designated person to act on behalf of the Seller Designated Dealer.

(ii) For purposes of this Section 5(f), (A) "Designated Seller Responsible Person" shall mean, (1) initially, Steven Tremblay (telephone no. 212-339-5616), (2) David Mahoney (telephone no. 212-339-3431) and any additional or substitute person that Seller may designate in writing as a "Designated Seller Responsible Person" or (3) any such other person who is identified by Seller to Buyer at the time of valuation as the senior member of Seller's surveillance department and (B) the telephone number to be used by Buyer to reach a Designated Seller Responsible Person shall be as listed above or provided to the Buyer at the time of valuation, except as otherwise specified by Seller to Buyer on or prior to the applicable date.

(g)    (i) Notwithstanding anything to the contrary, if Seller as a Seller Designated Dealer or pursuant to the Seller Quotation Terms has provided a Quotation, Seller's obligation to make any and all payments related to Buyer's delivery, novation, transfer, assignment or sale of any obligation for which Seller has provided a Quotation shall be considered a payment obligation of the Seller under this Confirmation.

(ii) In connection with the forgoing, Seller may designate any of its Affiliates to accept delivery, novation, transaction, assignment or sale of such obligation and make any or all related payments (such party, the "designee"). Such designation shall not relieve Seller of any of its obligations under section 5(g)(i); provided, if the designee has performed the obligations of the Seller under section 5(g)(i), then the Seller shall be discharged of its obligations to Buyer to the extent of such performance; provided further, if, as a result of such designation, (1) it would be illegal due to any applicable law or regulation for the designee to perform any of Seller's obligations under 5(g)(i), the Seller shall not be permitted to designate such designee or (2) Buyer's delivery, novation, assignment or sale of such obligation to the designee would give rise to any tax, loss or cost to Buyer, then the Seller shall not be permitted to designate such designee unless the Buyer has received an indemnity acceptable to it from Seller with respect to such tax, loss or cost.

(iii) Pursuant to any purchase and sale of an obligation (except in relation to Direct Loan Participations) set forth above, Buyer shall be deemed to represent to Seller on the date of delivery, novation, transfer, assignment or sale (as applicable) that it has conveyed (or caused to be conveyed) to Seller, or the designee (if applicable), all right, title and interest in such obligations on such date free and clear of any and all liens, charges, claims or encumbrances (including, without limitation, any right of set off by or of the issuer, any counterclaim, defense, other than a counterclaim or defense based on (a) any lack or alleged lack of authority or capacity of an issuer to enter to the related obligation, (b) any actual or alleged unenforceability, illegality, impossibility or invalidity with respect to any obligation, (c) any applicable law, order, regulation, decree or notice however described, or the promulgation of, or any change in, the interpretation by any court, tribunal, regulatory authority or similar administrative or judicial body with competent or apparent jurisdiction of any applicable law, order, regulation, decree or notice, however described, or (d) the imposition of, or any change in, any exchange controls, capital restrictions or any other similar restrictions imposed by any monetary or other authority, however described. Subject to reasonable verification by Buyer, Buyer shall indemnify and hold harmless Seller for any loss, liability, claim, damage and expense whatsoever incurred arising out of Buyer's breach of the representations contained in this section 5(g)(iii).

(iv) Buyer shall also be deemed to represent to Seller, that, unless Seller has received an indemnity acceptable to Seller from Buyer with respect to the following, delivery of such obligations will not require or cause Seller, or the designee (if applicable), to assume, and will not subject Seller, or the designee (if applicable), to any obligation, liability or commitment to lend additional funds (including any outstanding contingent commitment) (in each case other than (a) immaterial, nonpayment obligations and any assignment or transfer fee in respect of Loans, and (b) obligations arising under customary provisions in respect of borrowed money, including but not limited to requirements that holders thereof indemnify or reimburse a trustee, administrative or fiscal agent or similar person or entity for costs, liabilities or expenses and customary pro rata sharing provisions requiring any amount received by a lender through payment, set-off or otherwise other than through the procedures set forth in the relevant loan documentation to be shared with other lenders).

(v) For avoidance of doubt, any breach of the representations contained in section 5(g)(iii) and 5(g)(iv) shall not constitute an event of default in respect of the Agreement.

## 6. Notice and Account Details:

Telephone, Telex and/or Facsimile Number and Contact Details for Notice:

| | |
|---|---|
| Buyer: | James Lee<br>Telephone No.: 212 526 1700<br>Facsimile No.: 646 758 2456 |
| CC: | Transaction Management<br>Facsimile: (212) 652-0556<br>(United States of America) |
| Seller: | FSA Administrative Services LLC,<br>as Trustee for Credit Protection Trust 207<br>31 West 52nd Street<br>New York, New York 10019<br>USA |

Risk ID: 472966L / Effort ID: N636075 / Global Deal ID: 2153891

Lehman Sunset Park HY CDS (CDX) Confirmation EC.DOC

Attention: Bruce Stern
Phone: 212-826-0100
Facsimile: 212-339-0892
Email: generalcounsel@fsa.com

With a copy to:

Financial Security Assurance Inc.
31 West 52nd Street
New York, New York 10019
USA
Attention: Insured Portfolio Management Department
Re: Credit Protection Trust 207 (Lehman Sunset Park HY CDS)
Confirmation No: 212-826-0100
Telecopy No: 212-339-3518
Email: cdoreports@fsa.com

Account Details:

Account of Buyer:

| | |
|---|---|
| For the Account of: | Lehman Brothers Special Financing Inc. |
| Name of Bank: | JP Morgan Chase Bank, New York |
| Account No: | 006-143543 |
| Fed ABA No: | 021000021 |

Account of Seller:

The Bank of New York
ABA Number:  021 000 018
For the account of:  Financial Security Assurance Inc.
Account Number: 8900297263
Policy Number: 51648-N (Lehman Sunset Park HY CDS)

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us in its entirety, to us at facsimile number (212) 652-0556 (United States of America), Attention: Documentation.

Risk ID: 472966L / Effort ID: N636075 / Global Deal ID: 2153891

Page 20 of 24

Lehman Sunset Park HY CDS (CDX) Confirmation EC.DOC

Yours sincerely,

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By:

Name:

Title:

Accepted and agreed to:

**CREDIT PROTECTION TRUST 207**
By: FSA Administrative Services, LLC,
solely as Trustee and not in its individual capacity

By: FSA Portfolio Management Inc., Member

By: _____

Name:
Title:

Consent for purposes of Part 5(n) of the Schedule:

**FINANCIAL SECURITY ASSURANCE INC.**

By: _____

Name:
Title:

Yours sincerely,

**LEHMAN BROTHERS SPECIAL
FINANCING INC.**


By: _____
Name:
Title:

Accepted and agreed to:

**CREDIT PROTECTION TRUST 207
By:  FSA Administrative Services, LLC,
solely as Trustee and not in its individual capacity**

**By:  FSA Portfolio Management Inc., Member**

By: _____

Name:    BRUCE E. STERN
Title:    MANAGING DIRECTOR


**Consent for purposes of Part 5(n) of the Schedule:**

**FINANCIAL SECURITY ASSURANCE INC.**


By: _____

Name:
Title:


Risk ID: 472966L / Effort ID: N636075 / Global Deal ID: 2153891

Page 21 of 24

Lehman Sunset Park HY CDS (CDX) Confirmation EC.DOC

## Annex A

| Reference Entity | Jurisdiction | ISIN / CUSIP | Coupon | Maturity |
|---|---|---|---|---|
| ABITIBI-CONSOLIDATED INC. | North America | 003924AG2 | 8.550% | 8/1/2010 |
| AK Steel Corporation | North America | 001546AE0 | 7.875% | 2/15/2009 |
| Allegheny Energy Supply Company, LLC | North America | 017363AE2 | 8.250% | 4/15/2012 |
| Allied Waste North America, Inc. | North America | 01958XBH9 | 7.375% | 4/15/2014 |
| Altria Group, Inc. | North America | 02209SAA1 | 7.000% | 11/4/2013 |
| Amkor Technology, Inc. | North America | 031652AM2 | 9.250% | 2/15/2008 |
| Aquila, Inc. | North America | 918005AY5 | 9.950% | 2/1/2011 |
| Argosy Gaming Company | North America | 040228AL2 | 7.000% | 1/15/2014 |
| Arrow Electronics, Inc. | North America | 042735AK6 | 7.500% | 1/15/2027 |
| ArvinMeritor, Inc. | North America | 043353AA9 | 8.750% | 3/1/2012 |
| AT&T Corp. | North America | 001957BC2 | 9.050% | 11/15/2011 |
| Avnet, Inc. | North America | 053807AK9 | 9.750% | 2/15/2008 |
| Aztar Corporation | North America | 054802AH6 | 7.875% | 6/15/2014 |
| Bombardier Capital Inc. | North America | 09774LAG3 | 6.125% | 6/29/2006 |
| Bowater Incorporated | North America | 102183AJ9 | 6.500% | 6/15/2013 |
| Caesars Entertainment, Inc. | North America | 700690AN0 | 7.500% | 9/1/2009 |
| Cardinal Health, Inc. | North America | US14149YAF51 | 6.750% | 2/15/2011 |
| Case New Holland Inc. | North America | 147446AA6 | 9.250% | 8/1/2011 |
| CELESTICA INC. | North America | 15101QAB4 | 7.875% | 7/1/2011 |
| Citizens Communications Company | North America | 17453BAB7 | 9.250% | 5/15/2011 |
| CMS Energy Corporation | North America | 125896AH3 | 7.500% | 1/15/2009 |
| Corning Incorporated | North America | 219350AG0 | 6.300% | 3/1/2009 |
| Crompton Corporation | North America | 227116AE0 | 9.875% | 8/1/2012 |
| Crown European Holdings SA | Europe | 228344AC1 | 9.500% | 3/1/2011 |
| CSC Holdings, Inc. | North America | 126304AP9 | 7.625% | 4/1/2011 |
| Cummins Inc. | North America | 231021AJ5 | 7.125% | 3/1/2028 |
| D.R. Horton, Inc. | North America | 23331AAD1 | 8.000% | 2/1/2009 |
| DANA CORPORATION | North America | 235811AK2 | 6.500% | 3/1/2009 |
| Delhaize America, Inc. | North America | 246688AE5 | 8.125% | 4/15/2011 |
| Delphi Corporation | North America | 247126AB1 | 6.500% | 5/1/2009 |
| Dole Food Company, Inc. | North America | 256605AJ5 | 8.625% | 5/1/2009 |
| Eastman Kodak Company | North America | 277461BD0 | 7.250% | 11/15/2013 |
| EchoStar DBS Corporation | North America | 27876GAM0 | 5.750% | 10/1/2008 |
| Edison Mission Energy | North America | 281023AG6 | 9.875% | 4/15/2011 |
| Electronic Data Systems Corporation | North America | 285661AD6 | 6.500% | 8/1/2013 |
| FAIRFAX FINANCIAL HOLDINGS LIMITED | North America | 303901AF9 | 6.875% | 4/15/2008 |
| FelCor Lodging Limited Partnership | North America | 31430QAL1 | 9.000% | 6/1/2011 |
| FLEXTRONICS INTERNATIONAL LTD. | Singapore | 33938EAH0 | 6.500% | 5/15/2013 |
| HCA Inc. | North America | 404119AE9 | 6.950% | 5/1/2012 |
| Hilton Hotels Corporation | North America | 432848AU3 | 7.625% | 5/15/2008 |
| Host Marriott, L.P. | North America | 40423QAF4 | 7.875% | 8/1/2008 |
| Houghton Mifflin Company | North America | 441560AK5 | 8.250% | 2/1/2011 |
| Huntsman International LLC | North America | 447012AB1 | 10.125% | 7/1/2009 |
| IKON Office Solutions, Inc. | North America | 451713AC5 | 7.300% | 11/1/2027 |
| Intelsat, Ltd. | North America | 45820EAH5 | 6.500% | 11/1/2013 |
| INVENSYS plc | Europe | XS0187275952 | 9.875% | 3/15/2011 |
| Iron Mountain Incorporated | North America | 462846AB2 | 7.750% | 1/15/2015 |
| ISTAR Financial Inc. | North America | 45031UAB7 | 6.000% | 12/15/2010 |

| Reference Entity | Jurisdiction | ISIN / CUSIP | Coupon | Maturity |
|---|---|---|---|---|
| JetBlue Airways Corporation | North America | 477143AB7 | 3.500% | 7/15/2033 |
| KB Home | North America | 48666KAF6 | 7.750% | 2/1/2010 |
| Liberty Media Corporation | North America | 530718AC9 | 5.700% | 5/15/2013 |
| Lucent Technologies Inc. | North America | 549463AD9 | 5.500% | 11/15/2008 |
| Lyondell Chemical Company | North America | 552078AQ0 | 9.500% | 12/15/2008 |
| MEDIACOM LLC | North America | 58445MAJ1 | 9.500% | 1/15/2013 |
| MGM MIRAGE | North America | 552953AF8 | 6.000% | 10/1/2009 |
| Nalco Company | North America | 629855AD9 | 7.750% | 11/15/2011 |
| Navistar International Corporation | North America | 63934EAE8 | 9.375% | 6/1/2006 |
| NOVA CHEMICALS CORPORATION | North America | 66977WAF6 | 6.500% | 1/15/2012 |
| NRG Energy, Inc. | North America | 629377AQ5 | 8.000% | 12/15/2013 |
| Omnicare, Inc. | North America | 681904AF5 | 8.125% | 3/15/2011 |
| Owens-Illinois Inc. | North America | 690768BC9 | 7.350% | 5/15/2008 |
| PANAMSAT CORPORATION | North America | 697933AL3 | 6.375% | 1/15/2008 |
| Parker Drilling Company | North America | 701081AK7 | 10.125% | 11/15/2009 |
| PolyOne Corporation | North America | 73179PAD8 | 10.625% | 5/15/2010 |
| Pride International, Inc. | North America | 74153QAE2 | 7.375% | 7/15/2014 |
| Primedia Inc. | North America | 74157KAF8 | 8.875% | 5/15/2011 |
| R.J. Reynolds Tobacco Holdings, Inc. | North America | 76182KAN5 | 7.250% | 6/1/2012 |
| Reliant Energy, Inc. | North America | 75952BAF2 | 9.250% | 7/15/2010 |
| Rite Aid Corporation | North America | 767754AH7 | 7.125% | 1/15/2007 |
| Saks Incorporated | North America | 79377WAA6 | 8.250% | 11/15/2008 |
| SERVICE CORPORATION INTERNATIONAL | North America | 817565AP9 | 7.700% | 4/15/2009 |
| Sinclair Broadcast Group, Inc. | North America | 829226AM1 | 8.000% | 3/15/2012 |
| Six Flags, Inc. | North America | 83001PAD1 | 8.875% | 2/1/2010 |
| Smithfield Foods, Inc. | North America | 832248AH1 | 7.750% | 5/15/2013 |
| Solectron Corporation | North America | 834182AN7 | 9.625% | 2/15/2009 |
| Standard Pacific Corp. | North America | 85375CAN1 | 6.875% | 5/15/2011 |
| Starwood Hotels & Resorts Worldwide, Inc. | North America | 85590AAD6 | 7.875% | 5/1/2012 |
| Sun Microsystems, Inc. | North America | 866810AF1 | 7.650% | 8/15/2009 |
| TECO Energy, Inc. | North America | 872375AC4 | 7.200% | 5/1/2011 |
| Tembec Industries Inc. | North America | 87971KAC1 | 8.500% | 2/1/2011 |
| TENET HEALTHCARE CORPORATION | North America | 88033GAT7 | 6.375% | 12/1/2011 |
| The AES Corporation | North America | 00130HAQ8 | 9.500% | 6/1/2009 |
| The Goodyear Tire & Rubber Company | North America | 382550AE1 | 6.375% | 3/15/2008 |
| The Premcor Refining Group Inc. | North America | 74047PAC8 | 9.500% | 2/1/2013 |
| TOYS "R" US, INC. | North America | 892335AH3 | 7.625% | 8/1/2011 |
| Triad Hospitals, Inc. | North America | 89579KAE9 | 7.000% | 11/15/2013 |
| TRW Automotive Inc. | North America | 87264QAM2 | 9.375% | 2/15/2013 |
| Union Carbide Corporation | North America | 905581AV6 | 6.700% | 4/1/2009 |
| Unisys Corporation | North America | 909214BE7 | 7.875% | 4/1/2008 |
| United Rentals (North America), Inc. | North America | 911365AN4 | 6.500% | 2/15/2012 |
| UnumProvident Corporation | North America | 91529YAC0 | 7.625% | 3/1/2011 |
| VINTAGE PETROLEUM, INC. | North America | 927460AK1 | 8.250% | 5/1/2012 |
| Visteon Corporation | North America | 92839UAB3 | 8.250% | 8/1/2010 |
| Watson Pharmaceuticals, Inc. | North America | 942683AB9 | 1.750% | 3/15/2023 |
| Xerox Corporation | North America | 984121BE2 | 9.750% | 1/15/2009 |

Lehman Sunset Park HY CDS (CDX) Confirmation EC.DOC

**Annex B**

[Form of Reference Obligation Identification Notice]

# LEHMAN BROTHERS

### REFERENCE OBLIGATION IDENTIFICATION NOTICE

[FSA Administrative Services LLC,
as Trustee for Credit Protection Trust 207
31 West 52nd Street
New York, New York 10019 USA
Attention: Bruce Stern
Phone: 212-826-0100
Facsimile: 212-339-0892]

Copy to:

[Financial Security Assurance Inc.
31 West 52nd Street
New York, New York 10019 USA
Attention: Insured Portfolio Management Department
Re: Credit Protection Trust 207 (Lehman Sunset Park HY CDS)
Phone: 212-826-0100
Facsimile: 212-339-3518]

Re:      [The Credit Derivative Transaction with, a Trade Date of 06 May, 2005, a Scheduled Termination Date of 20 June, 2010, under which Credit Protection Trust 207 sold credit protection to Lehman Brothers Special Financing Inc. (the "Transaction").]

Dear Sirs:

Reference is made to the Credit Event Notice dated [DATE] whereby [we] notified [you] of the occurrence of a [          ] Credit Event with respect to [REFERENCE ENTITY]. Terms used but not otherwise defined herein shall have the meanings given to them in the confirmation evidencing the Transaction (the "Confirmation").

We hereby designate a Valuation Date of [DATE], and identify the following obligation as a Reference Obligation(s) and specify the related Reference Obligation Notional Amount(s) in respect of such Valuation Date:

Reference Obligation(s):

[ISSUER, CUSIP / ISIN, COUPON, MATURITY, OUTSTANDING PRINCIPAL BALANCE(S):]

Reference Obligation Notional Amount(s):

USD [            ]

If you have any questions regarding this matter, please contact [James Lee] at [(212) 526-0806].

LEHMAN BROTHERS SPECIAL FINANCING INC.
745 SEVENTH AVENUE
NEW YORK, NEW YORK 10019

Risk ID: 472966L / Effort ID: N636075 / Global Deal ID: 2153891

Page 24 of 24

# LEHMAN BROTHERS

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and Credit Protection Trust 207 ("Party B") have entered into a Master Agreement dated as of July 15, 2005, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)   Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)   Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)   Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)   This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)   Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)   Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

1

# LEHMAN BROTHERS

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, 399 Park Avenue, 11ᵗʰ Floor, New York, NY 10022 USA with a copy to Lehman Brothers Special Financing Inc., c/o Lehman Brothers Inc., Corporate Advisory Division, Attention: Transaction Management Group, 745 Seventh Avenue, New York, NY 10019 USA.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name:   James J. Killerlane III

Title:   Vice President

Date:   July 14, 2005

2



**FINANCIAL
SECURITY
ASSURANCE**®

# FINANCIAL GUARANTY
# INSurance policy

OBLIGOR: Credit Protection Trust 207                              Policy No.: 51648-N
OBLIGATIONS: The Obligations as Defined in Endorsement No. 1    Date of Issuance: July 15, 2005

FINANCIAL SECURITY ASSURANCE INC. ("Financial Security"), for consideration received, hereby UNCONDITIONALLY AND IRREVOCABLY GUARANTEES to each Holder, subject only to the terms of this Policy (which includes each endorsement hereto), the full and complete payment by the Obligor of Scheduled Payments of principal of, and interest on, the Obligations.

For the further protection of each Holder, Financial Security irrevocably and unconditionally guarantees:

(a)   payment of the amount of any distribution of principal of, or interest on, the Obligations made during the Term of this Policy to such Holder that is subsequently avoided in whole or in part as a preference payment under applicable law (such payment to be made by Financial Security in accordance with Endorsement No. 1 hereto).

(b)   payment of any amount required to be paid under this Policy by Financial Security following Financial Security's receipt of notice as described in Endorsement No. 1 hereto.

Financial Security shall be subrogated to the rights of each Holder to receive payments under the Obligations to the extent of any payment by Financial Security hereunder.

Except to the extent expressly modified by an endorsement hereto, the following terms shall have the meanings specified for all purposes of this Policy. "Holder" means the registered owner of any Obligation as indicated on the registration books maintained by or on behalf of the Obligor for such purpose or, if the Obligation is in bearer form, the holder of the Obligation. "Scheduled Payments" means payments which are scheduled to be made during the Term of this Policy in accordance with the original terms of the Obligations when issued and without regard to any amendment or modification of such Obligations thereafter; payments which become due on an accelerated basis as a result of (a) a default by the Obligor, (b) an election by the Obligor to pay principal on an accelerated basis or (c) any other cause, shall not constitute "Scheduled Payments" unless Financial Security shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration. "Term of this Policy" shall have the meaning set forth in Endorsement No. 1 hereto.

This Policy sets forth in full the undertaking of Financial Security, and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto, or by the merger, consolidation or dissolution of the Obligor. Except to the extent expressly modified by an endorsement hereto, the premiums paid in respect of this Policy are nonrefundable for any reason whatsoever, including payment, or provision being made for payment, of the Obligations prior to maturity. This Policy may not be cancelled or revoked during the Term of this Policy. THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

In witness whereof, FINANCIAL SECURITY ASSURANCE INC. has caused this Policy to be executed on its behalf by its Authorized Officer.

FINANCIAL SECURITY ASSURANCE INC.

By_____
                                    Authorized Officer

A subsidiary of Financial Security Assurance Holdings Ltd.
31 West 52nd Street, New York, NY 10019                    (212) 826-0100
Form 100NY (5/89)

ENDORSEMENT NO. 1
TO FINANCIAL GUARANTY INSURANCE POLICY


FINANCIAL SECURITY ASSURANCE INC.

OBLIGOR: Credit Protection Trust 207

OBLIGATIONS:   Scheduled Payments by the Obligor under the USD 100,000,000 Original
Swap Notional Amount credit default swap Transaction documented by the
Confirmation (as defined below) under a Master Agreement (the "Master
Agreement") dated as of July 15, 2005, among the Obligor, Lehman
Brothers Special Financing Inc. and Financial Security Assurance Inc.
(Lehman Sunset Park HY CDS)

POLICY NO.: 51648-N

DATE OF ISSUANCE: July 15, 2005

1.   Definitions.  For all purposes of this Policy, the terms specified below shall have
the meanings or constructions provided below.  Capitalized terms used herein and not otherwise
defined herein shall have the meanings provided in the Master Agreement unless the context
shall otherwise require.

"Business Day" means any day (other than a Saturday or Sunday) that in the City of New
York is neither a legal holiday nor a day on which banking institutions are authorized or
obligated by law or executive order to be closed.

"Confirmation" means the Confirmation (as defined in the Master Agreement) dated as of
July 15, 2005 and bearing a written acknowledgment by Financial Security, and without regard
to any subsequent amendment or modification thereof except amendments or modifications to
which Financial Security has given its prior written consent.

"Financial Security" means Financial Security Assurance Inc. and its successors and
assigns.

"Holder" means Lehman Brothers Special Financing Inc. or any successor to or assignee
of its rights and obligations under the Obligations as permitted under the Master Agreement.

"Policy" means this Financial Guaranty Insurance Policy and includes each endorsement
thereto.

"Receipt" and "Received" mean actual delivery to each of Financial Security and the
Fiscal Agent (as defined below), if any, prior to 12:00 noon, New York City time, on a Business
Day; delivery either on a day that is not a Business Day, or after 12:00 noon, New York City
time, shall be deemed to be Receipt on the next succeeding Business Day.  If any notice or
certificate given hereunder by the Holder is not in proper form or is not properly completed,

Policy Number 51648-N                              Date of Issuance:  July 15, 2005

executed or delivered in all material respects, it shall be deemed not to have been Received, and
Financial Security or its Fiscal Agent shall promptly so advise the Holder and the Holder may
submit an amended notice.

"Scheduled Payment Date" means (i) each Cash Settlement Date determined in
accordance with the terms of the Confirmation, or any other date on which a payment is due by
the Obligor under the Confirmation, or (ii) in the case of a Termination Payment, the date for
payment determined in accordance with Section 6(d)(ii) of the Master Agreement.

"Scheduled Payments" means (1) any and all payments in respect of any Scheduled
Payment Date which are specified in the Confirmation and required to be paid by the Obligor to
the Holder in accordance with the terms of Section 2 of the Master Agreement (but not Section
2(d) or Section 2(e)) and (2) amounts which are required to be paid by the Obligor to the Holder
in accordance with the terms of Section 6(d)(ii) of the Master Agreement as a result of early
termination of the Master Agreement or any individual Transaction thereunder (a "Termination
Payment"); in each case in accordance with the original terms of the Master Agreement and
without regard to any subsequent amendment or modification thereof except amendments or
modifications to which Financial Security has given its prior written consent.  Scheduled
Payments shall not include any amounts due in respect of the Obligations attributable to any
increase in interest rate, penalty or other sum payable by the Obligor by reason of any default or
event of default in respect of the Obligations, or by reason of any deterioration of the
creditworthiness of the Obligor (without prejudice to the inclusion of Termination Payments).
Scheduled Payments shall not include, nor shall coverage be provided under this Policy in
respect of, any taxes, withholding or other charge imposed by any governmental authority due in
connection with the payment of any Scheduled Payment to the Holder.

"Term of this Policy" means the period from and including the Date of Issuance to and
including the date on which (i) all Scheduled Payments have been paid or delivered,
respectively; (ii) any period during which any Scheduled Payment could have been avoided in
whole or in part as a preference payment under applicable bankruptcy, insolvency, receivership
or similar law shall have expired; and (iii) if any proceedings requisite to avoidance as a
preference payment have been commenced prior to the occurrence of (i) and (ii), a final and
nonappealable order in resolution of each such proceeding has been entered.

    2.      Notices and Conditions to Payment in Respect of Scheduled Payments.
Following Receipt by Financial Security of a Notice of Claim and Certificate from the Holder in
the form attached as Exhibit A to this Endorsement, Financial Security will pay any amount
payable hereunder in respect of Scheduled Payments on the Obligations on (i) in respect of the
first Scheduled Payment Date after Receipt by Financial Security of the first Notice of Claim and
Certificate, the later to occur of (a) 10:00 a.m., New York City time, on the third Business Day
following such Receipt; and (b) 10:00 a.m., New York City time, on the Scheduled Payment
Date on which such payment is due on the Obligations and (ii) in respect of each subsequent
Scheduled Payment Date after Receipt by Financial Security of such Notice of Claim and
Certificate, 10:00 a.m., New York City time, on the Scheduled Payment Date on which such
payment is due on the Obligations.  Payments due hereunder in respect of Scheduled Payments

2

Policy Number 51648-N                          Date of Issuance:  July 15, 2005

will be disbursed to the Holder by wire transfer of immediately available funds to such account
as the Holder shall specify in writing at the time of or prior to the delivery of the Notice of Claim
and Certificate in respect of such Scheduled Payment.

    Financial Security shall be entitled to pay any amount hereunder in respect of Scheduled
Payments on the Obligations, including any amount due on the Obligations on an accelerated
basis, whether or not any notice and certificate shall have been Received by Financial Security as
provided above; provided, however, that by acceptance of this Policy the Holder agrees to
provide upon request to Financial Security a Notice of Claim and Certificate in respect of any
such payments or deliveries made by Financial Security.  Financial Security's obligation
hereunder in respect of Scheduled Payments shall be discharged to the extent funds are disbursed
by Financial Security as provided herein whether or not such funds are properly applied by any
custodian or agent appointed by the Holder.

    3.    Notices and Conditions to Payment in Respect of Scheduled Payments Avoided
as Preference Payments.  If any Scheduled Payment is avoided as a preference payment under
applicable bankruptcy, insolvency, receivership or similar law, Financial Security will pay such
amount out of the funds of Financial Security on the later of (a) the date when due to be paid
pursuant to the Order referred to below or (b) the first to occur of (i) the fourth Business Day
following Receipt by Financial Security from the Holder of (A) a certified copy of the order of
the court or other governmental body of competent jurisdiction to the effect that the Holder is
required to return principal or interest paid on the Obligations during the Term of this Policy
because such payments were avoidable as preference payments under applicable bankruptcy law
(the "Order"), (B) a certificate of the Holder that the Order has been entered and is not subject to
any stay and (C) an assignment duly executed and delivered by the Holder in such form as is
reasonably required by Financial Security and provided to the Holder by Financial Security,
irrevocably assigning to Financial Security all rights and claims of the Holder relating to or
arising under the Obligations against the estate of the Obligor or otherwise with respect to such
preference payment or (ii) the date of Receipt by Financial Security from the Holder of the items
referred to in clauses (A), (B) and (C) above if, at least four Business Days prior to such date of
Receipt, Financial Security shall have Received written notice from the Holder that such items
were to be delivered on such date and such date was specified in such notice.  Such payment
shall be disbursed to the receiver, conservator, debtor-in-possession or trustee in bankruptcy
named in the Order, and not the Holder directly (unless the Holder has previously paid such
amount to the receiver, conservator, debtor-in-possession or trustee in bankruptcy named in the
Order, in which case such payment shall be disbursed to the Holder upon proof of such payment
reasonably satisfactory to Financial Security).

    4.    Governing Law.  This Policy shall be governed by and construed in accordance
with the laws of the State of New York without giving effect to the conflict of laws principles
thereof.

    5.    Fiscal Agent.  At any time during the Term of this Policy, Financial Security may
appoint a fiscal agent (the "Fiscal Agent") for purposes of this Policy by written notice to the
Holder at the notice address specified in the Master Agreement specifying the name and notice

3

Policy Number 51648-N                              Date of Issuance: July 15, 2005

address of the Fiscal Agent. From and after the date of receipt of such notice by the Holder, (i)
copies of all notices and documents required to be delivered to Financial Security pursuant to
this Policy shall be simultaneously delivered to the Fiscal Agent and Financial Security and shall
not be deemed Received until Received by each, and (ii) all payments required to be made by
Financial Security under this Policy may be made directly by Financial Security or by the Fiscal
Agent on behalf of Financial Security. The Fiscal Agent is the agent of Financial Security only
and the Fiscal Agent shall in no event be liable to any Holder for any acts of the Fiscal Agent or
any failure of Financial Security to deposit, or cause to be deposited, sufficient funds to make
payments due under the Policy.

6.    Notices. All notices to be given hereunder shall be in writing (except as otherwise
specifically provided herein) and shall be mailed by registered mail or personally delivered or
telecopied to Financial Security as follows:

> Financial Security Assurance Inc.
> 31 West 52nd Street
> New York, New York 10019
> U.S.A.
> Attention: Managing Director – Surveillance
> Telecopy No.: (212) 339-3518
> Confirmation No.: (212) 826-0100
> Email: cdoreports@fsa.com

Financial Security may specify a different address or addresses by writing mailed or
delivered to the Holder.

7.    Priorities. In the event that any term or provision of the face of this Policy is
inconsistent with the provisions of this Endorsement, the provisions of this Endorsement shall
take precedence and shall be binding.

8.    Exclusions From Insurance Guaranty Funds. This Policy is not covered by the
Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance
Law. This Policy is not covered by the Florida Insurance Guaranty Association created under
Part II of Chapter 631 of the Florida Insurance Code. In the event Financial Security were to
become insolvent, any claims arising under this Policy are excluded from coverage by the
California Insurance Guaranty Association, established pursuant to Article 14.2 of Chapter 1 of
Part 2 of Division 1 of the California Insurance Code.

9.    Waiver of Defenses. To the fullest extent permitted by applicable law, Financial
Security agrees not to assert, and hereby waives, for the benefit of each Holder, all rights
(whether by counterclaim, setoff or otherwise) and defenses (other than the defense of fraud on
the part of the Holder), whether acquired by subrogation, assignment or otherwise, to the extent
that such rights and defenses may be available to Financial Security to avoid payment of its
obligations under this Policy in accordance with the express provisions of this Policy. Nothing
in this paragraph shall be construed to limit or otherwise impair Financial Security's right to

4

Policy Number 51648-N                                    Date of Issuance:  July 15, 2005

pursue recovery or claims (based on contractual rights, securities law violations, fraud or other causes of action) against any person or entity, or to require payment by Financial Security of any amounts that have been previously paid or that are not otherwise due in accordance with the express provisions of this Policy or the Obligations.  Nothing in this Policy shall be construed to require payment to the extent any force majeure event or governmental act prevents Financial Security from performing its obligations under this Policy or such performance is otherwise rendered impossible, in which event Financial Security agrees to (i) use commercially reasonable efforts to perform its obligations under this Policy notwithstanding such force majeure event, governmental act or impossibility of performance and (ii) perform its obligations under this Policy promptly following cessation of such force majeure event, governmental act or impossibility of performance.  Notwithstanding the foregoing, nothing in this Policy shall be construed to (i) limit the right of the Obligor or Financial Security to enforce the obligations of the Holder under the terms of the Master Agreement or any Transaction or (ii) require payment to the extent that the Obligor is not obligated to make a Scheduled Payment under any Transaction in accordance with Section 2(a)(iii) of the Master Agreement due to a failure of a condition precedent or otherwise pursuant to the terms of such Master Agreement or such Transaction (including without limitation the netting provisions of Section 2(c) and Section 6 of the Master Agreement).

        10.    <u>Assignment of Financial Security Obligations</u>.  The obligations of Financial Security hereunder may be assigned to any Affiliate (as defined in the Master Agreement) of Financial Security, provided that at the time of such assignment the insurance strength or insurance financial strength of such Affiliate is rated at least equal to the insurance strength or insurance financial strength of Financial Security by Moody's and S&P (each as defined in the Master Agreement).

        11.    <u>Surrender of Policy</u>.  The Holder shall surrender this Policy to Financial Security for cancellation upon expiration of the Term of this Policy.



Policy Number 51648-N

Date of Issuance:  July 15, 2005

IN WITNESS WHEREOF, FINANCIAL SECURITY ASSURANCE INC. has caused
this Endorsement No. 1 to be executed by its Authorized Officer.

FINANCIAL SECURITY ASSURANCE INC.

By:  _____

Authorized Officer

COPY

6

Exhibit A
To Endorsement No. 1

## NOTICE OF CLAIM AND CERTIFICATE

Financial Security Assurance Inc.
350 Park Avenue
New York, NY 10022

      The undersigned, a duly authorized officer of Lehman Brothers Special Financing Inc. (or any permitted successor or assignee of its rights under the Obligations defined below) (the "Holder"), hereby certifies to Financial Security Assurance Inc. ("Financial Security"), with reference to Financial Guaranty Insurance Policy No. 51648-N dated July 15, 2005 (the "Policy") issued by Financial Security in respect of the Master Agreement dated as of July 15, 2005, between Credit Protection Trust 207 (the "Obligor"), the Holder and Financial Security (the "Master Agreement" and the Scheduled Payments thereunder, as defined in the Policy, the "Obligations"), that:

     (i)    The Holder is the Holder under the Policy.

     (ii)    As of 12:00 noon New York time on the third Business Day occurring prior to the Scheduled Payment Date to occur on [date], the Holder has not been advised in writing by the Obligor as to a source of funds reasonably satisfactory to the Holder sufficient to make payment in full of a Scheduled Payment required to be made on such Scheduled Payment Date. The Scheduled Payment has been calculated as follows: [show calculation].

     (iii)    Accordingly, the Holder is hereby making a claim under the Policy for the amount of the foregoing Scheduled Payment and subsequent Scheduled Payments. The Holder will withdraw this Notice of Claim and Certificate, or submit a restated Notice of Claim and Certificate reducing the amount of the claim hereunder, if the required amount of the Scheduled Payment has been reduced (including reduction to zero) on or prior to the date Financial Security is required to make payment or delivery under the Policy.

     (iv)    If the Holder receives from the Obligor and Financial Security an amount in excess of a Scheduled Payment, the Holder shall immediately return the excess amount to Financial Security.

     (v)    The Holder hereby assigns to Financial Security the rights of the Holder with respect to the Obligations (including the Master Agreement) to the extent of any payments made to the Holder by Financial Security under the Policy. The foregoing assignment is in addition to, and not in limitation of, rights of subrogation otherwise available to Financial Security in respect of such payments.

A-1

Policy Number 51648-N

Date of Issuance:  July 15, 2005

Payments to Financial Security in respect of the foregoing assignment shall in all cases be subject to and subordinate to the rights of the Holder to receive all Scheduled Payments in respect of the aforementioned Obligations.  The Holder shall take such action and deliver such instruments as may be reasonably requested or required by Financial Security to effectuate the purpose or provisions of this clause (v).

(vi)    The Holder hereby agrees that, so long as no FSA Event of Default (as defined in the Master Agreement) shall have occurred and be continuing, Financial Security may at any time during the continuation of any proceeding by or against the Obligor under any applicable bankruptcy, insolvency, receivership, rehabilitation or similar law (an "Insolvency Proceeding") direct all matters relating to such Insolvency Proceeding, including without limitation, (A) all matters relating to such Insolvency Proceeding seeking the avoidance as a preferential transfer of any payment made with respect to the Obligations (a "Preference Claim"), (B) the direction of any appeal of any order relating to any Preference Claim at the expense of Financial Security and (C) the posting of any surety, supersedeas or performance bond pending any such appeal.  In addition, so long as no FSA Event of Default has occurred and is continuing, the Holder hereby agrees that Financial Security shall be subrogated to, and the Holder hereby assigns, to the fullest extent permitted by law, the rights of the Holder in the conduct of any Insolvency Proceeding, including, without limitation, all rights of any party to an adversary proceeding or action with respect to any court order issued in connection with any such Insolvency Proceeding.

(vii)    Payment should be made by wire transfer directed to the following account in New York City:



A-2

Policy Number 51648-N                                    Date of Issuance:  July 15, 2005

Unless the context otherwise requires, capitalized terms used in this Notice of Claim and Certificate and not defined herein shall have the meanings provided in the Policy.

IN WITNESS WHEREOF, the Holder has executed and delivered this Notice of Claim and Certificate as of the _____ day of _____, _____.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By_____

Title_____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

For Financial Security or
Fiscal Agent Use Only

Wire transfer sent on _____ by _____

Confirmation Number _____



A-3