Dr. Madelyn Antoncic
3251 Prospect Street NW  Unit 302
Washington, D.C.  20007
(202) 458 – 0774



The Honorable James M. PeckAugust 12, 2012
United States Bankruptcy Court
Southern District of New York
One Bowling Green  Courtroom 601
New York, New York  10004

Dear Judge Peck,

My name is Dr. Madelyn Antoncic. I am a Per Se writing to let you know of my hardship as you consider my multiple claims.

As you no doubt know, I was the Chief Risk Officer at Lehman from 2002 to 2007. It is well documented, including in the Examiner's Report, that beginning in 2006, I began to vocalize my concern about the risk we were taking at Lehman. My concern was that we were taking too much risk and too concentrated risk. As you may know by early 2007, Dick Fuld made it very clear and very publicly known he did not appreciate hearing my perspective and thus, I was side-lined. At that time Joe Gregory made it very clear to me the Firm considered me a valued employee and did not want me to leave the Firm, they just wanted me to step down from being the CRO. Furthermore, Joe told me I could do anything I wanted and he suggested I thought about how I could use my background to focus on external issues including potentially developing a client facing/revenue producing role. At that point I turned my attention to working externally on regulatory policy issues.

I give you this background since my claim is a <u>joint claim</u> for both <u>deferred compensation plus</u>, a <u>compensation guarantee</u> from Joe Gregory representing 2008 compensation. I am also requesting severance which, unlike all other employees whose employment did not continue, I did not receive any deferred compensation.

I would like you to know several things about my situation.

Firstly, at the time of the bankruptcy employees were either give employment in one of the firms which bought the various Lehman entities or were given severance pay. Given my unique situation I was not part of any department. Thus, I was not part of any unit which went to one of the purchaser firms nor was I given any severance. No one communicated anything to me about anything.

The only communication I received from senior management at the time of the bankruptcy was through my lawyer telling me that Dick Fuld's lawyer called to threaten me that "he would come after me if I tried to get my '15 minutes' of fame." That was something which would never even

cross my mind since it is not my style. While countless individuals have asked me in various ways, for various reasons, to speak about the Lehman situation, I have graciously declined. I was even approached and asked to join one of the major hedge funds from the ad hoc creditor committee. I was uncomfortable with the idea of working with them since I did not want even the appearance of impropriety.

I have incurred substantial legal fees having spent considerable time preparing and then meeting with Mr. Volukas and his team. When I called the Estate to inquire about legal coverage, A&M wanted to have me use one of their lawyers and wanted to " prep" me for the meetings. I, of course, did not consider it appropriate to be prepped by them and I viewed using their chosen lawyer as a conflict so I hired my own lawyer. Recently, just this past month, I once again had to pay legal fees out of my own pocket while I was questioned by LBI counsel acting on behalf of the Trustee. There is a possibility he will come back to me to depose me.

To add to the challenging financial situation as a result of the bankruptcy, some of the substantial medical bills I incurred associated with my husband's death have not been paid due to the bankruptcy. This is in spite of the fact that I submitted these claims before the bankruptcy and the insurance did not process them correctly. Having gone back to the insurance company to show them the claims were improperly processed, they informed me it didn't matter since Lehman was now bankrupt.

At the same time, I have continued to make substantial philanthropic contributions most notably for cancer research. I became very involved in cancer research with my husband's passing away in December 2005. While I did not have a job for 19 months following the bankruptcy, and while I lost a substantial amount of my savings through the very avoidable, Lehman bankruptcy, I still felt it was the right thing to do to make good on my commitments.

I am just a humble person who tried in vain to prevent an unbelievable catastrophe. I was ridiculed internally at Lehman while I tried and was told I was "old school" and was then pushed aside. Given my husband's then concurrent long battle with cancer and subsequent passing, it was not realistic or practical for me to leave the Firm in early 2007. My plan was to make the best of a bad situation, bide my time and assess my potential options.

Last July, 2011, I joined the World Bank as Treasurer and Vice President. This is a very rewarding job and allows me to use my background to help achieve our dream which is a world without poverty.

**My Request**

I am respectfully requesting positive consideration be given to:
1. my claim for $3.8 million 2008 compensation guarantee,
2. severance which every other Lehman employee who did not remain employed by one of the surviving legal entities received,
3. my deferred compensation.

As I indicated in my appeal, the deferred compensation was never treated as equity at Lehman in the way they accounted for it, expensed it, capitalized it and taxed the employees for it, so for them to now claim it is equity, is just wrong and one more example of hubris.

I am attaching a copy of my February 19, 2012, objection to the reclassification of my deferred compensation claim and objection to the responses to the Debtors' Annotated Reply.

Judge Peck, despite every effort I made to prevent the catastrophic failure of Lehman Brothers, I was unable to prevail. As a result, I suffered significant financial difficulty, as have many people, due to no fault of my own. By the very nature of my role at Lehman it was necessary for me to remain unemployed for a material period of time which I am sure you can appreciate was economically and emotionally difficult and has created a financial hardship. I hope you will take some compassion on my situation and consider my case favorably.

At a very minimum I believe I should be treated equally to all other employees and get my severance pay. I also believe I should get paid my guaranteed compensation. I understand the Estate threw this claim out totally and did not even bring it to your attention for consideration. Their contention is while my responsibilities were global and I oversaw risk for every legal entity at the LBH level, my pay check was technically from LBI. Frankly, that really does not matter since LBH guaranteed all legal entities including LBI if through no other way by virtue of the agreement LBH signed with JPM on the morning of September 9, 2008, guaranteeing all legal entities. Lastly, I also hope and request you look favorably on my request for my deferred compensation which as evidenced by how we were taxed and how Lehman expensed and accounted for it proves it was never equity.

Very respectfully yours,

*M. Antoncic* (signature)

Dr. Madelyn Antoncic

*attachment: MA Objection dated 2/19/12* (handwritten)

February 19, 2012

To: United States Bankruptcy Court

    Southern District of New York

In re:  Lehman Brothers Holdings Inc., et al., Debtors

    Chapter 11 Case No.  08-13555 (JMP) (Jointly Administered)

On January 24, 2012, Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors and debtors in possession (collectively, the "Debtors") filed their supplemental annotated omnibus reply to responses to Debtors' One Hundred Eighteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) (the "Annotated Reply"). A status hearing (the "Hearing") to update the Court and respondents on the status of the matter was to be held before the Honorable James M. Peck, United States Bankruptcy Judge, in Courtroom 601 or the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Ney York, New York 10004.

Regarding Claims to be reclassified

| *Creditor Name and Address*: | |
|---|---|
| Antoncic, Madelyn | Claim Number: 16516 |
| 350 East 57th Street | Date Filed: 9/18/2009 |
| Apartment 13 A | Classification and Amount: |
| New York, New York  10022 | Priority: $477,386.90 |
|  | Unsecured: $9,727,184.10 |
|  | Guaranteed compensation:  $3,807,143 |
| 646-497-0719 | Total: $14,011,714 |

I object to the reclassification of my deferred compensation claim and I object to the responses to the Debtors' Annotated Reply.

I would also like to further respectfully request Judge Peck to note that my original claim was a compound claim. My claim was for deferred compensation of $10,204,571 plus a claim for $3,807,143 which was guaranteed to me in the Spring of 2007 by Joseph Gregory, President and COO of Lehman Brothers Holdings Inc. The guarantee was to pay me in 2008 at least equal to 2007 ordinary compensation value. This was a guarantee by the President of LBHI. Should there be any question concerning the legal entities from which this payment was to come, I would further like to note that not only did LB Holdings Inc guarantee other Lehman entities and

subsidiaries implicitly in practice and in general, but the LBHI guarantee of other Lehman entities and subsidiaries was crystallized and further evidenced in writing on the morning of September 10, 2008, prior to the bankruptcy filing.

Lastly, I would like to respectfully request Judge Peck to note that unlike all other employees of Lehman Brothers and its subsidiaries, I never received any severance or continuation of employment. Given my unique position at Lehman, of which I am sure the Judge is aware, I was not part of any unit in the Firm and so as of the bankruptcy filing date in September 2008, I was never notified by anyone about any employment or about any severance pay. No one spoke with me about anything. I was uniquely excluded from everything.

Most likely just due to the chaos surrounding the bankruptcy and due to the fact that I was not part of any unit in the Firm, unlike every other employee, I was never included in any list of employees in terms of continued employment or in terms of receiving severance if such continued employment was not forthcoming. It wasn't until October that I was separately contacted by A&M to see if I was willing to help them sort out the derivatives portfolio, which I did, most notably the portfolio with JPM as Lehman's counterpart.

I am requesting that I be treated as every other employee who lost his/her job and that I receive my severance pay.

I would further respectfully request Judge Peck to note I am now Vice President and Treasurer of the World Bank and moved to Washington DC in July. So I would like to request that my file be updated with my new address. While I would like to formally thank the lawyers of Weill, Gotshal & Manges LLP for allowing me an extension to respond to the Annotated Reply, in the future I would be better positioned to reply in the appropriate timely manner if correspondence went to my proper address.

I object to the reclassification of my deferred compensation claim to equity and I object to the responses to the Debtors' Annotated Reply for two basic, fundamental reasons.

1. Firstly, I note the debtor is using section 510 (b) of the Bankruptcy code as the fundamental reason deferred compensation is equity. It is material to note that for the years prior to 2005, the Plan explicitly had a provision for treating LBHI's failure to honor its obligations under the Plan as claims arising from the purchase or sale of common stock within the meaning of section 510 (b) of the Bankruptcy code. However, Lehman purposely and intentionally removed that provision in Plans for subsequent years. Thus, unlike fiscal years prior to 2005, the Plan for fiscal years 2005, 2006, 2007, and 2008 does not contain a provision treating LBHI's failure to honor its obligations under the Plan as claims arising from the purchase or sale of common stock within the meaning of section 510 (b) of the Bankruptcy code. The fact that the provision was there in all of the previous years and then was purposely excluded in 2005 and in subsequent years, shows the intent of Lehman was to not use this provision of protection under 510 (b) of the code.

2. <u>The second fundamental reason I object to the reclassification is in how deferred compensation was treated in fact and in reality.</u> One can call something anything one wants, but the proof of what it actually is lies in how it is legally treated. In this case, deferred compensation was NOT treated like equity in any way. I cite below all of the ways deferred compensation was treated which shows it was never treated or intended to be treated like equity. But I would like to highlight what are perhaps the two most important treatments which prove it was never equity but instead was compensation.

   A. <u>Firstly, the US Tax code taxes gains on equity as capital gains and compensation as ordinary income.</u> One current debate right now is the way gains should be taxed on Private Equity Firms. Owners of private equity firms say their investments are equity and therefore any gains should be taxed at the capital gains tax rate. Others are trying to argue the gains represent compensation and should be taxed at ordinary income tax rates. The US Government clearly sees the gains as capital gains and clearly sees the owners of private equity firms as owners of equity.

   The debate can inform the decision at hand. <u>Was the deferred compensation paid to its employees by Lehman equity or compensation? The answer should lie in how the payments to employees were treated by the U.S. Government and by the tax code. All payments once the deferred compensation was vested and distributed were treated and taxed as ordinary income. If, the deferred compensation was equity then tax liabilities would have been treated as capital gains as they are for shareholders of Private Equity Firms. But at Lehman, they weren't. All distributions were compensation and thus ordinary income, and, therefore, taxed as ordinary income.</u>

   B. <u>The other material fact is how Lehman accounted for the deferred compensation and when and how it bought back stock to prevent dilution. Under Generally Accepted Accounting Principles (GAAP) the compensation owed yet deferred under the compensation scheme was not equity. It only became common stock issuable once the compensation was amortized. It only became equity once it was delivered which was 5 years after it was granted.</u>

   <u>Since the deferred compensation was not immediately expensed or amortized, under GAAP it was not equity. All financial statements issued by the Debtor reflected the fact that the deferred compensation was not equity.</u> The practice of the Debtor was to amortize the deferred compensation over 3 and 5 year horizons (i.e., part of deferred compensation in any one year was amortized over 3 years; part was amortized over 5 years; and the discount at which it was awarded was likewise amortized ). Only once deferred compensation was amortized was it reflected in the Debtor's balance sheet in the Equity account as Common Stock issuable.

   Thus, prior to amortization deferred compensation was NOT equity. After the deferred compensation was amortized it was only Common Stock ISSUABLE. Common Stock issuable means common stock capable of being issued. It does NOT mean common stock ISSUED. Only after the deferred compensation was delivered (i.e., after 5 years) was it equity. My claim is for deferred compensation which was not delivered and thus, was not equity.

In fact, in the footnotes of the Debtor's Annual report it states "...the RSU Trust has had <u>no effect on total equity</u>, net income, or earnings per share of the company."

Moreover, the practice of the Debtor was to buy-back stock in the market once it issued stock to employees. This practice was done to prevent dilution. The Debtor ONLY bought back stock in the market to prevent dilution once the deferred compensation was amortized and once the deferred compensation was reflected in the Debtor's balance sheet in the Equity account as Common Stock *issuable*. These buy-backs were done as an offsetting entry in the Equity account. These buy-backs were done in anticipation, and for the management, of the Debtor's delivery of equity at a future date. <u>The practice of only buying back stock to prevent dilution only once the deferred compensation was amortized is further evidence that the Debtor NEVER considered the deferred compensation awards as equity under GAAP</u>.

<u>I believe it is also important for the Court to know that the practice of deferring a portion of compensation earned by an employee in any one year was long held and established at the Debtor.</u> This practice was established well before the Debtor was a public company and thus well before there was any outstanding equity in the Debtor. Thus, it is impossible that that compensation was equity since the practice existed well before there ever was any equity.

Specifically, well prior to the Debtor's spin-off and IPO in 1994, the Debtor used such a "compensation scheme" of deferring a portion of each year's earned compensation until paying it out at a pre-specified future date. <u>Since this practice existed well before the Debtor was ever a public company, it was impossible that this deferred compensation represented equity in the Debtor since no equity existed</u>. Instead, it was a scheme designed to hold-back compensation earned by employees (payable by the Debtor) until a future distribution date. This very practice was continued once the Debtor became a public company. The deferred compensation represents a liability of the Debtor to employees.

The way the U.S. Government treated the deferred compensation for tax purposes; the practices of the Debtor with respect to intentionally removing a provision for treating LBHI's failure to honor its obligations under the Plan as claims arising from the purchase or sale of common stock within the meaning of section 510 (b) of the Bankruptcy code; and the financial reporting, filings with regulators, the audited financials, the Debtors' stock buy-back program, all shows deferred compensation was not equity or meant to be treated as equity under the bankruptcy code.

Additional evidence that deferred compensation was not equity nor intended to be equity lies in how employees were required to treat the deferred compensation. Specifically, employees were not permitted to hedge the deferred compensation in any way including by shorting the Debtor's stock. Moreover, employees did not have voting rights attached to their deferred compensation in the way common equity holders did.

Now, after the fact, the Debtor can call deferred compensation anything it wants. But while the Debtor was a going concern all actions and intentions make it clear that deferred compensation was not equity.

By Madelyn Antoncic, Ph.D.

Submitted to
The Honorable James M. Peck
One Bowling Green  Courtroom 601
New York, New York  10004

Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn: Robert J. Lemons, Esq. and Mark Bernstein, Esq.

The Office of the United States Trustee for Region 2
33 Whitehall Street  21st floor
New York, New York 10004
Attn: Tracy Hope Davis, Esq., Elisabetta Gasparini, Esq., and Andrea Schwartz, Esq.

Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York  10005
Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq.