WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard L. Levine
Robert J. Lemons
Michael J. Firestone

*Attorneys for Lehman Brothers Holdings Inc.*
*and Certain of its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>Debtor. | Chapter 11 Case<br>No. 08-13555 (JMP)<br><br>(Jointly Administered) |
| Lehman Brothers Holdings Inc., as Plan Administrator, and Lehman Brothers Commercial Corp.,<br><br>    Plaintiffs,<br><br>  v.<br><br>Ford Global Treasury, Inc.,<br><br>    Defendant. | Adv. Proc. No. 12-_____<br><br>**ADVERSARY**<br>**PROCEEDING**<br>**COMPLAINT** |

Plaintiffs Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as Plan Administrator

under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and

Its Affiliated Debtors (the "Plan"), and Lehman Brothers Commercial Corp. ("LBCC"), by their undersigned attorneys, allege the following on knowledge as to themselves and their own acts and information and belief as to all other matters against defendant Ford Global Treasury, Inc. ("Ford Global"):

## I. NATURE OF THIS ACTION

1. This action is brought to force Ford Global to pay the millions of dollars it owes to LBCC for the benefit of LBCC's unsecured creditors under the contractual terms the parties agreed to with respect to multiple foreign currency trading transactions between Ford Global and LBCC. Ford Global voluntarily terminated those transactions following LBHI's filing for protection under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

2. LBCC and Ford Global entered into a standard form 1992 Multicurrency—Cross Border ISDA Master Agreement (the "Master Agreement"), dated as of February 17, 2003, including a schedule thereto (the "Schedule", and together with the Master Agreement, the "Agreement"). LBHI acted as LBCC's credit support provider under the Agreement. As of the Commencement Date (as defined below), LBCC and Ford Global had entered into numerous foreign currency hedging transactions under the Agreement, sixty-two of which (collectively, the "Transactions") were still outstanding on the Early Termination Date (as defined below).

3. LBCC commenced its chapter 11 case on October 5, 2008. LBCC's chapter 11 case was consolidated with LBHI's already filed chapter 11 case for procedural purposes only and the cases were jointly administered pursuant to Bankruptcy Rule 1015(b).

4. Plaintiffs bring this action to enforce the terms of the Agreement, which Ford Global breached when it terminated the Transactions by, among other things: (i) failing to

2

comply with section 562 of the Bankruptcy Code, and the agreed-upon methodology for determining the payment due upon termination set forth in the Agreement; (ii) failing to calculate the termination amount owed in good faith pursuant to section 6(d) of the Agreement; and (iii) failing to make a payment to LBCC of approximately $7.8 million as required by section 6(e) of the Agreement.

5. Accordingly, Plaintiffs seek a judgment awarding damages of approximately $7.8 million plus contractual interest calculated at the Default Rate (as that term is defined in the Agreement). Plaintiffs also seek a declaratory judgment that (i) in withholding the full amount of the properly calculated termination payment owed by Ford Global to LBCC (the "Settlement Amount"), Ford Global violated section 362(a)(3) of the Bankruptcy Code; (ii) the properly calculated Settlement Amount is property of LBCC's estate under section 541 of the Bankruptcy Code; and (iii) Ford Global is required to turn over, under section 542 of the Bankruptcy Code, the properly calculated Settlement Amount.

## II. JURISDICTION AND VENUE

6. Commencing on September 15, 2008, and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries, including LBCC (collectively, the "Debtors") commenced with this Court voluntary cases under chapter 11 of title 11 of Bankruptcy Code.

7. This adversary proceeding is commenced pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as well as sections 541(a) and 542(b) of the Bankruptcy Code, and New York law, which governs the Agreement pursuant to Part 4(h) of the Schedule.

8. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

9. This adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

10. Venue is proper in this Court under 28 U.S.C. § 1409(a) because LBHI's and LBCC's bankruptcy cases are pending in this district.

### III. THE PARTIES

11. Plaintiff LBHI is a corporation organized and incorporated under the laws of the state of Delaware, with its former principal business address at 745 Seventh Avenue, New York, New York 10019, and its current principal business address at 1271 Sixth Avenue, New York, New York 10020.

12. Plaintiff LBCC is a corporation organized and incorporated under the laws of the state of Delaware, with its former principal business address at 745 Seventh Avenue, New York, New York 10019, and its current principal business address at 1271 Sixth Avenue, New York, New York 10020.

13. On December 6, 2011, the Court approved and entered an order confirming the Plan. The Plan became effective on March 6, 2012. Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute actions on behalf of the estate of LBCC.

14. Upon information and belief, Ford Global is a subsidiary of the Ford Motor Company, with its principal place of business in Dearborn, Michigan. Among other things, Ford Global enters into foreign currency transactions in order to limit the Ford Motor Company's exposure to currency fluctuations.

### IV. FACTUAL ALLEGATIONS

15. Following execution of the Agreement, LBCC and Ford Global entered into numerous foreign currency exchange transactions. The Transactions at issue were still outstanding in mid-September 2008.

16. The Agreement identifies a series of events or circumstances, the occurrence of which constitutes an "event of default" entitling the non-defaulting party to terminate all outstanding transactions. See Agreement § 5(a). Section 5(a)(vii) of the Agreement provides that the bankruptcy of either party or any credit support provider of a party (e.g., LBHI) is one such event of default.

17. After the occurrence of an event of default, the non-defaulting party may terminate all outstanding transactions by delivering a notice to the defaulting party specifying the relevant event of default (the "Notice of Early Termination"). See id. §§ 6(a) and (b). In the Notice of Early Termination, the non-defaulting party is required to designate the date of delivery or a date up to twenty days in the future upon which the early termination will take effect (the "Early Termination Date"). See id. § 6(a). On or as soon as reasonably practicable following the Early Termination Date, the non-defaulting party must provide the defaulting party with a statement (the "Calculation Statement") calculating the termination amount to be paid to whichever party is "in-the-money" on the open transaction or transactions regardless of which party has defaulted. See id. §§ 6(d)(i) and (ii); Schedule Part 1(f)(i).

18. On September 19, 2008, LBCC received by hand delivery a Notice of Early Termination from Ford Global (the "Ford Global Termination Notice"), asserting that an event of default under the Agreement had occurred based upon LBHI's September 15, 2008 bankruptcy filing and invoking Ford Global's right to terminate the Transactions. The Ford Global

5

Termination Notice of Early purported to designate September 18, 2008, the day <u>before</u> delivery, as the Early Termination Date.

19. In addition to the copy of the Ford Global Termination Notice that was delivered to LBCC by hand on September 19, 2008, Ford Global claims that it sent a copy of said Notice of Early Termination to LBCC by facsimile on September 18, 2008. While LBCC has no record of ever receiving such a facsimile, the Agreement expressly provides that notice of early termination "may not be given by facsimile transmission." <u>See id.</u>, § 12 (a). As a result, any delivery by facsimile would be a nullity.

20. Therefore, pursuant to Sections 6(a) and 12(a) of the Agreement, the Early Termination Date is September 19, 2008, because LBCC received hand delivery of the Termination Notice on that date.

21. Sections 562(a) and (b) of the Bankruptcy Code provide that where a "swap participant liquidates, terminates or accelerates" a swap agreement, "damages shall be measured as of the earliest of . . . (2) the date or dates of such liquidation, termination or acceleration" provided that there are commercially reasonable determinants of value on that date. If no such commercially reasonable determinants of value exist on that date, then damages "shall be measured as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value." 11 U.S.C. § 562(b). Under section 562(c) of the Bankruptcy Code, a swap participant seeking to use a date <u>other than</u> the date of the liquidation, termination or acceleration "has the burden of proving that there were no commercially reasonable determinants of value as of" the date of liquidation, termination or acceleration.

6

22. Here, commercially reasonable determinants of value for the Transactions existed on September 19, 2008, the Early Termination Date. Ford Global, however, failed to use such determinants of value in purporting to calculate the Settlement Amount owed by Ford Global to LBCC.

23. Specifically, by letter dated December 16, 2008, Ford Global sent to LBCC a Calculation Statement. According to such Calculation Statement (the "Ford Global Calculation Statement"), a net Settlement Amount of $9,915,742 was payable by Ford Global to LBCC with respect to the sixty-two Transactions.

24. In calculating such amount, Ford Global not only violated Sections 562(a) and (b) of the Bankruptcy Code because it utilized determinants of value from dates other than the Early Termination Date, but it also breached the Agreement, including because the Agreement provides that upon early termination the non-defaulting party is required to calculate the settlement amount using the Market Quotation methodology (as defined in the Agreement), as of the Early Termination Date. See Agreement, Schedule Part 1(f)(i).

25. The Market Quotation methodology requires the non-defaulting party to solicit quotations from "Reference Market-makers" – defined as four leading dealers in the relevant market, selected in good faith by the non-defaulting party from among dealers of the highest credit standing trading in the relevant market. See id. § 14 (Definitions of "Market Quotation" and "Reference Market-maker"). Each quotation must be for an amount that would be paid by the dealer to the non-defaulting party or paid by the non-defaulting party to the dealer if the quoting Reference Market-maker were to enter into a replacement transaction with the non-defaulting party which "would have the effect of preserving for such party the economic

7

equivalent of any payment or delivery . . . in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the Early Termination Date, have been required after that date." Agreement § 14 (Definition of "Market Quotation"). If, as a result of the solicitation process, the non-defaulting party receives four quotations, the non-defaulting party calculates the result of the Market Quotation process as the mean of the four quotations. See id. If exactly three quotations are received, the non-defaulting party must disregard the highest and the lowest quotations and utilize the middle quotation. See id. If fewer than three quotations are provided, then the Market Quotation methodology cannot be used and the non-defaulting party must revert to the alternative "Loss" methodology for calculating the termination payment owed. See id.

26.    Upon information and belief, on September 18 and 19, 2008, Ford Global contacted by phone the London offices of four Reference Market-makers – BNP Paribas, HSBC, Royal Bank of Scotland, and Barclays Capital – and asked whether they would be willing to provide quotations. Ford Global claims it was told by the four Reference Market-makers that they would provide Ford Global with "indicative," but not "actionable" or "binding" quotations – i.e., the Reference Market-makers were willing to provide quotations representing good faith valuations of the Transactions but not offers by the Reference Market-makers to enter into actual replacement transactions.

27.    Also upon information and belief, following the close of business on September 19, 2008, Ford Global belatedly solicited quotations from these same four Reference Market-makers but for quotations as of 9:00 London time on September 22, 2008 – one business day

after the Early Termination Date of September 19, 2008.   This request for quotations as of a date <u>after</u> the Early Termination Date violated both the Bankruptcy Code and the Agreement.

28.   On September 22, 2008, each of the four Reference Market-makers provided indicative quotations to Ford Global as of September 22, 2008.   Ford Global subsequently concluded, without foundation, that the quotations received were not commercially reasonable because they were indicative, not actionable, and that therefore Market Quotation could not be determined.

29.   The Agreement provides that if, for any terminated transaction, "a Market Quotation cannot be determined, or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result," the non-defaulting party is required to use the "Loss" methodology to calculate the termination amount in respect of any such terminated transaction.   <u>Id.</u>, § 14 (Definition of "Settlement Amount").   "Loss" is defined as "the amount the non-defaulting party reasonably determines in good faith to be its total losses and costs (or gain)" incurred in connection with the terminated transactions.   <u>Id.</u>, § 14 (Definition of "Loss").   Loss may include any loss of bargain, cost of funding, or, at the election of the determining party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them).   <u>Id.</u>

30.   Importantly, Loss is to be determined "as of the relevant Early Termination Date, or if that is not reasonably practicable, as of the earliest date thereafter that is reasonably practicable."   <u>Id.</u>

9

31. After breaching the Agreement by failing to follow the prescribed Market Quotation process and then breaching the Agreement by determining without a reasonable basis that indicative quotations were not commercially reasonable, Ford Global further breached the Agreement in its calculation of Loss. Specifically, Ford Global calculated Loss based on replacement transactions it entered into mostly on dates <u>subsequent</u> to the Early Termination Date. In fact, Ford Global entered into new trades for only ten of the sixty-two terminated Transactions on September 19, 2008, the Early Termination Date; Ford Global replaced fifty-one of the sixty-two Transactions (through ninety-two new trades) during the week of September 22, 2008, during which the market moved dramatically against LBCC; the final Transaction was not replaced by Ford Global until one month later. The Transactions, however, could all have been replaced on September 19, 2008, as the market was sufficiently liquid on that day and transactions of the type at issue here trade regularly and are not exotic financial instruments.

32. Nevertheless, notwithstanding the requirements of section 562 of the Bankruptcy Code and of the Agreement that Loss be calculated as of the Early Termination Date, Ford Global purported to calculate the Settlement Amount under Loss by passing through to LBCC the net amount it received to enter into the replacement transactions over the course of a month, less Ford Global's claimed fees and expenses, for a total of $9,915,742. Because, as noted, the relevant foreign currency exchange markets moved against LBCC's position with respect to the Transactions after the September 19, 2008 Early Termination Date and during the week of September 22, 2008, when Ford Global entered into most of the new trades, Ford Global's purported Settlement Amount was millions of dollars less than the termination amount to which LBCC was entitled. Indeed, given the values of the Transactions on the Early Termination

Date as demonstrated by reliable determinants of value as of such date, the purported Settlement Amount calculated by Ford Global of approximately $9.9 million was not commercially reasonable and did not reflect a good faith calculation by Ford Global of its total gain under Loss.

33. Unfortunately, because Market Quotations may not be obtained retroactively, there is no longer any ability to calculate the proper Settlement Amount using Market Quotation. As a result, the Settlement Amount owed to LBCC must be determined under an appropriate application of Loss. The best measure of Ford Global's Loss – its actual gain – results from using an industry standard valuation model with inputs derived from publicly available information provided by leading dealers in the relevant market. Such a calculation results in a Loss amount as of the Early Termination Date of $17,748,645 in favor of LBCC. This market-standard valuation methodology is a commercially reasonable determinant of value as of September 19, 2008 under section 562 of the Bankruptcy Code, is the best measure of Ford Global's "Loss," and is the proper way to determine the Settlement Amount owed to LBCC.

34. Since Ford Global only paid LBCC approximately $9,915,742, under section 562 of the Bankruptcy Code and the Agreement, Ford Global owes LBCC the difference, $7,832,903, plus interest on such amount at the Termination Rate (as defined in the Agreement) through October 19, 2008, and at the Default Rate (as defined in the Agreement) subsequent thereto aggregating to $6,290,853 in interest through and including September 17, 2012, for a total due and owing from Ford Global to LBCC as of September 18, 2012 of $14,123,756.

## COUNT I

**(Damages as a Result of the Violation of Section 562 of the Bankruptcy Code and Breach of the Agreement)**

35. LBHI and LBCC repeat and reallege each and every allegation set forth in paragraphs 1 through 34 above as if fully set forth herein.

36. The Bankruptcy Code required that Ford Global determine the Settlement Amount as of the Early Termination Date because there were commercially reasonable determinants of value for the Transactions on that day.

37. The Agreement required Ford Global to calculate the Settlement Amount under Market Quotation but Ford Global breached the Agreement by failing to solicit quotations on the Early Termination Date.

38. Ford Global violated section 562 and breached the Agreement when it purported to determine Loss as an alternative to Market Quotation by basing its calculation on the amounts it received for new trades to replace the terminated Transactions that were mostly entered into after the Early Termination Date, when all of the Transactions could have been replaced on the Early Termination Date.

39. The wide disparity between the value of the Transactions as of the Early Termination Date (approximately $17.7 million) and Ford Global's purported Settlement Amount (approximately $7.8 million) demonstrates that Ford Global did not make a reasonable and good-faith determination of its Loss, in further breach of the Agreement.

40. Additionally, New York law, which governs the Agreement, imposes an implied covenant of good faith and fair dealing in every contract, which requires that contracting parties refrain from arbitrary or unreasonable conduct that would prevent the other contracting party from receiving the fruits of the contract. Ford Global's reliance on replacement trades entered

into subsequent to the Early Termination Date constituted arbitrary or unreasonable behaviour in violation of the implied covenant of good faith and fair dealing.

41. As a result of Ford Global's violation of section 562 and breach of the Agreement in its purported calculation of the Settlement Amount, LBCC has been damaged in an amount to be proven at trial, but no less than $7,832,903, an amount representing the disparity between the proper Settlement Amount as calculated by LBCC and the amount already paid by Ford Global, plus contractual interest through and including September 17, 2012 of $6,290,853, for a total of $14,237,756 as of September 18, 2012.

## COUNT II

### (Declaratory Judgment that Ford Global Is Willfully Violating the Automatic Stay)

42. LBHI and LBCC repeat and reallege each and every allegation set forth in paragraphs 1 through 41 above as if fully set forth herein.

43. Pursuant to section 362(a)(3) of the Bankruptcy Code, the filing of a voluntary case under chapter 11 of the Bankruptcy Code operates to stay "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" absent an order of the Bankruptcy Court granting relief from the stay. 11 U.S.C. § 362(a)(3).

44. As fully alleged above, Ford Global's purported Settlement Amount was improperly calculated and Ford Global owes multi-million payable to LBCC that constitutes property of LBCC's estate. Ford Global's withholding of such payable constitutes an "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

45. Under section 105(a) of the Bankruptcy Code, this Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). This Court may grant damages to punish violations of the automatic stay.

46. There is an actual controversy between the parties on this issue because Ford Global is actively withholding property of the estate from LBCC and denies it violated Section 562 or the Agreement in its calculation of the Settlement Amount.

47. Accordingly, pursuant to 28 U.S.C. 2201 and Bankruptcy Rule 7001, LBCC is entitled to (1) a declaration that Ford Global has acted in violation of section 362 of the Bankruptcy Code; and (2) pursuant to section 105(a) of the Bankruptcy Code, an award of monetary damages in an amount to be proven at trial and including (but not limited to) LBCC's actual damages, costs, contractual interest, and attorneys' fees and expenses on account of Ford Global's knowing and willful violation of the automatic stay.

## COUNT III

### (Turnover of the Properly Calculated Settlement Amount Pursuant to Section 542(b) of the Bankruptcy Code)

48. LBHI and LBCC repeat and reallege each and every allegation set forth in paragraphs 1 through 47 above as if fully set forth herein.

49. Section 542(b) of the Bankruptcy Code expressly provides that ". . . an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor." 11 U.S.C. § 542(b). As fully alleged above, under section 6(d)(ii) of the Agreement and section 542(b) of

the Bankruptcy Code, Ford Global was obligated to pay LBCC the properly calculated Settlement Amount; its failure to do so made the amount still due and owing a matured debt.

50. If Ford Global had properly calculated the Settlement Amount, the amount due and owing to LBCC from Ford Global as of September 19, 2008, the Early Termination Date, would be no less than $17,748,645. This amount is property of the LBCC estate under section 541(a) of the Bankruptcy Code.

51. There is an actual controversy between the parties on this issue because Ford Global is actively withholding property of the estate from LBCC and denies it violated section 562 of the Agreement in its calculation of the Settlement Amount. Ford Global paid to LBCC $9,915,742, but continues to withhold $7,832,903, plus contractual interest.

52. Accordingly, pursuant to 28 U.S.C. 2201 and Bankruptcy Rule 7001, LBCC is entitled to (1) a declaration that the properly calculated Settlement Amount is property of the estate under Section 541(a) of the Bankruptcy Code; and (2) a declaration that, pursuant to section 542(b) of the Bankruptcy Code, Ford Global is required to pay amounts due to LBCC with contractual interest.

**PRAYER FOR RELIEF**

WHEREFORE, LBHI, in its capacity as Plan Administrator, and LBCC respectfully request that judgment be entered as follows:

      A.    On Count I, a judgment finding that Ford Global violated the Bankruptcy Code and breached the Agreement by failing to properly calculate the Settlement Amount and awarding LBCC damages in an amount to be determined at trial but, in all events, no less than the sum of $7,832,903, plus accrued but unpaid contractual interest of at least $6,290,853 through and including September 17, 2012;

      B.    On Count II, a declaratory judgment that, in withholding the properly calculated Settlement Amount payable by Ford Global to LBCC under the Agreement, Ford Global has acted in violation of section 362 of the Bankruptcy Code and that, pursuant to section 105(a) of the Bankruptcy Code, LBCC is entitled to an award of damages in an amount to be determined at trial and including (but not limited to) LBCC's actual damages, contractual interest, costs, and attorneys' fees and expenses incurred on account of Ford Global's knowing and willful violation of the automatic stay;

      C.    On Count III, a declaratory judgment that the properly calculated Settlement Amount, payable by Ford Global to LBCC, is property of LBCC's estate under section 541 of the Bankruptcy Code and requiring Ford Global to turn over, under section 542 of the Bankruptcy Code, the sum of $7,832,903 plus accrued but unpaid contractual interest thereon, as applicable;

      D.    Pre-judgment and post-judgment interest; and

      E.    For such other and further relief, including interest, costs, and attorneys' fees, as the Court deems just and proper.

Dated: New York, NY
       September 18, 2012

                              */s/ Robert J. Lemons*
                              Richard L. Levine
                              Robert J. Lemons
                              Michael J. Firestone
                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, NY 10153-0019
                              Telephone: (212) 310-8000
                              Facsimile:   (212) 310-8007

                              *Attorneys for Debtors and Plaintiffs*
                              *LBHI and LBCC*

17