Hearing Date and Time: September 27, 2012 at 10:00 a.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                            :

**In re**                      :        **Chapter 11 Case No.**
                             :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*   :        **08-13555 (JMP)**
                             :

               **Debtors.**     :        **(Jointly Administered)**
                             :
-------------------------------------------------------------------x

**PLAN ADMINISTRATOR'S REPLY TO LAUREL COVE**
**DEVELOPMENT, LLC'S RESPONSE TO OBJECTION TO CLAIM NO. 17763**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), as Plan

Administrator pursuant to the *Modified Third Amended Joint Chapter 11 Plan of Lehman*

*Brothers Holdings Inc. and its Affiliated Debtors* (the "Plan") for the entities in the above

referenced chapter 11 cases (collectively, the "Chapter 11 Estates"), files this reply (the "Reply")

to *Laurel Cove Development, LLC's Response to Lehman Brothers Holdings Inc.'s Objection to*

*Claim No. 17763*, filed on August 9, 2012 [ECF No. 29912] (the "Response"), and respectfully

represents as follows:

## Preliminary Statement

1.        On July 3, 2012, the Plan Administrator filed the *Objection to Claim No. 17763 Filed by Laurel Cove Development, LLC* [ECF No. 29187] (the "Objection").[1]  The Objection seeks to disallow and expunge the proof of claim filed by Laurel Cove Development, LLC ("Laurel Cove") against LBHI [Claim No. 17763] (the "Laurel Cove Claim"), primarily on the basis that LBHI and LCPI had sold all of their rights and interests in the Construction Loan prior to the funding requests made by Laurel Cove and, thus, do not have any liability for the claims asserted therein.

2.        On September 17, 2008, shortly after the commencement of LBHI's chapter 11 case, Lehman Re declared an event of default pursuant to the Lehman Re MRA and seized, *inter alia*, the Construction Loan.  At this time, there were no outstanding valid draw requests made by Laurel Cove.  On August 27, 2009, the Court entered an order (the "Settlement Order") [ECF No. 4980] approving the form of that certain settlement agreement among LBHI, LCPI, Lehman ALI and Lehman Re, that was executed on November 4, 2009 (the "Settlement Agreement").  The Settlement Agreement, *inter alia*, resolved disputes regarding which parties were entitled to the benefits of and liable for the obligations under the Lehman Re MRA Loans.  A copy of the Settlement Order is attached hereto as Exhibit A.  The Settlement Order provides that Lehman Re is, and has been, the sole owner of the Construction Loan since September 17, 2008 (the "Default Date"), and is liable for all obligations of LBHI and LCPI as of the Default Date.  *Settlement Order* at 2.  Accordingly, the Court has already found and determined that LBHI and LCPI's transfer of their ownership interests and obligations under the Construction Loan were valid.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Objection.

US_ACTIVE:\44075654\7\58399.0011

3.      The Response, like the one page Laurel Cove Claim, fails to establish that LBHI or any of the other Chapter 11 Estates is liable for amounts requested in the Laurel Cove Claim.  The Response contains unfounded claims, many of which were already heard and determined by the Court over two years ago, and ignores the facts and circumstances surrounding the Construction Loan.  Moreover, Laurel Cove's contention that LBHI or LCPI remains liable under the Construction Loan, is belied by its conduct over the past three years.

4.      The Plan Administrator submits that the Objection should be granted and the Laurel Cove Claim expunged.

## The Response

5.      Laurel Cove asserts in the Response that the Court should deny the Objection for the following reasons: (i) the Draw Requests were valid; (ii) Laurel Cove did not receive notice of the motion to approve the Settlement Agreement and was thus denied the opportunity to object; and (iii) Laurel Cove did not expressly or impliedly consent to the assignment of LBHI's obligations under the Construction Loan.  As set forth below, none of Laurel Cove's contentions is valid, and, therefore, the Laurel Cove Claim should be expunged.

## The Plan Administrator's Reply to the Response

### *The Draw Requests Were Deficient*

6.      Both the Response and the affidavit of William J. Najam Jr. filed in support thereof (the "Najam Affidavit") include the patently false contentions that the September Draw Request was not defective and that Laurel Cove was not notified of any defects.  *See Response*, ¶¶ 9, 32, 34; *Najam Affidavit*, ¶ 7.

7.      The facts speak for themselves.  Patricia Formisano, the comptroller of Laurel Cove, submitted the September Draw Request on Sunday, September 14, 2008.  On

3

September 15, 2008, TriMont, the servicer of the Construction Loan, notified Ms. Formisano *via*

e-mail of two defects in the September Draw Request. Ms. Formisano acknowledged the errors

identified by TriMont and stated that she would revise the September Draw Request accordingly

and resubmit it to TriMont. Subsequent submissions of the September Draw Request continued

to contain errors and Ms. Formisano was notified by TriMont of such each time. Copies of the e-

mails exchanged between Ms. Formisano and TriMont from September 14, 2008 through

September 25, 2008 are attached hereto as Exhibit B.

        8.     The Najan Affidavit states that Exhibit 1 attached thereto contains copies

of the Draw Requests. *See Najan Affidavit*, ¶ 6. None of the exhibits attached to the Najan

Affidavit provides a true and complete copy of an actual draw request as required under the Loan

Agreement or as submitted by Laurel Cove. Indeed, each of the alleged draw requests states in

paragraph 3 that an application for payment and summary sheet is attached. *See Najan Affidavit*,

Exhibit 1. No such application or summary sheet is attached to the Najan Affidavit or the

Response. Further, as evidenced by the e-mail correspondence between Ms. Formisano and

TriMont, dated September 23, 2008, in which Ms. Formisano provided a copy of a lien waiver

from a subcontractor, LBHI and TriMont consistently required compliance with sections 5.1(b)

and 5.2(j) of the Loan Agreement. The Response misleadingly claims that LBHI funded

advances under the Construction Loan pursuant to a two page boiler plate affidavit and nothing

more; that is simply not the case.

        9.     The record, therefore, demonstrates that the September Draw Request was

defective and that Laurel Cove was aware of the defect.

4

*The Settlement Agreement is Valid and Enforceable*

10.    The Response contends that the Settlement Agreement effected an assumption and assignment of the Construction Loan without notice to Laurel Cove, in contravention of section 365 of the Bankruptcy Code.  *Response*, ¶¶ 21, 23, 29.  This argument is flatly wrong.

11.    First, as set forth in the Laurel Cove Objection, the Construction Loan was sold to Lehman Re pursuant to the Lehman Re MRA.  The language in the Settlement Order provides that the Lehman Re MRA Loans were not, and never were, property of LBHI's estate or LCPI's estate.  There was, thus, no need for LBHI or LCPI to assume and assign the Construction Loan under section 365 of the Bankruptcy Code.  Indeed, paragraph 13 of the Settlement Agreement expressly provides that "[n]othing in this [Settlement] Agreement is or shall be construed to be an assumption or an assumption and assignment of the MRA by LBHI or LCPI pursuant to the Bankruptcy Code, including under section 365 thereof . . ."  *Settlement Agreement*, ¶ 13.

12.    Second, the Court has already determined that Laurel Cove had actual notice of the Settlement Agreement prior to the entry of the Settlement Order.  Specifically, an emergency hearing was held on January 20, 2010 (the "January 2010 Hearing"), in respect of the *Motion of Laurel Cove Development, LLC for an Order (i) Staying the Successor Trustee's Sale; (ii) Either Invalidating Assignment to the Debtor or Compelling Compliance with Section 365(d)(2) of the Bankruptcy Code; (iii) Shortening Time and Limiting Notice; and (iv) for Such Other Relief as May be Just and Proper*, submitted in the Lehman Re Chapter 15 Case.  A copy of the transcript of the January 2010 Hearing is attached hereto as Exhibit C.

5

13.     At the January 2010 Hearing, the Court addressed whether Laurel Cove had actual notice that Lehman Re and not LBHI was the appropriate party-in-interest with respect to the obligations under the Construction Loan and whether the assignment of the Construction Loan to Lehman Re was valid. The Court determined, and Laurel Cove conceded, that Laurel Cove had actual notice of the Settlement Agreement prior to the hearing for approval of the Settlement Agreement. Moreover, counsel for Laurel Cove also conceded at the January 2010 Hearing that, at least as of October and November 2009, it was "absolutely" aware that Lehman Re was the appropriate party with which to discuss any protective payments and settlement issues with respect to the Construction Loan. *See Hr'g. Tr.* at 27:1-6.

14.     The Court should find, as it did at the January 2010 Hearing, that Laurel Cove's attempt to collaterally attack the validity and enforceability of the Settlement Order "is based upon allegations that are simply not credible." *Hr'g. Tr.* at 41:7-10.

*The Obligations Under the Construction*
 *Loan Were Assigned to Lehman Re*

15.     The Response states that LBHI was not relieved of its obligation to fund the Construction Loan because, *inter alia*, Laurel Cove never gave its actual or implied consent. *Response*, ¶ 28. This argument should be rejected because it is inconsistent with the language of the Construction Loan as well as with Laurel Cove's conduct.

16.     Laurel Cove acknowledges in the Response that, pursuant to section 12.17(a) of the Loan Agreement, LBHI had the absolute and unconditional right at any time to sell, assign or transfer its interest in the Construction Loan without Laurel Cove's consent. *See Response*, ¶ 28. Section 12.17(a) of the Loan Agreements states the following:

     (a)    <u>Assignment</u>. Borrower acknowledges and agrees that Lender shall have the absolute and unconditional right at any time after the date hereof and at any time during the term of the Loan without requiring any consent or

6

> approval from Borrower, any other Loan Party or any other Person to sell,
> assign, pledge, hypothecate or otherwise transfer Lender's interest in the
> Loan, in whole or in part, or to place one or more participation interests
> therein, or to effect a syndication or securitization of the Loan, in one or
> more separate transactions, in each case to or with such Persons . . . and on
> such terms and conditions as Lender shall deem to be appropriate in the
> exercise of its sole and absolute discretion.

*Loan Agreement*, §12.17(a).  While Laurel Cove contends that LBHI could only assign its rights

and not its obligations under the Construction Loan, the explicit language of section 12.17(a)

does not support this interpretation.  Laurel Cove, as a sophisticated borrower, could have

negotiated a more restrictive provision and did not do so.

17.     Laurel Cove's conduct throughout these chapter 11 cases reflects, at a

minimum, that Laurel Cove provided implied consent to the assignment of LBHI and LCPI's

obligations under the Construction Loan and accepted Lehman Re as its *de facto* lender.  As the

Court determined at the January 2010 Hearing, Laurel Cove had actual notice of the Settlement

Agreement and the contents thereof, yet failed to raise any objections.  *Hr'g. Tr.* at 12:14-21.

Additionally, Laurel Cove received notice of the hearing on the recognition of Lehman Re's

Chapter 15 Case, was informed that the joint provisional liquidators were asserting an interest in

the property subject to the Construction Loan, and failed to appear or contest Lehman Re's

claim.  *See Hr'g. Tr.* at 15:9-17, 24:7-10.  Moreover, (i) Laurel Cove received over $800,000 in

advances under the Construction Loan from Lehman Re, (ii) the notice of default sent to Laurel

Cove, dated June 2, 2009 and referenced in paragraph 16 of the Response, came from Lehman

Re, (iii) Laurel Cove entered into a pre-negotiation letter, dated April 7, 2009, solely with

Lehman Re, and (iv) Laurel Cove negotiated solely with Lehman Re throughout autumn of 2009.

18.     Finally, Laurel Cove raised the issue of privity between itself and Lehman

Re at the January 2010 Hearing.  At that time, the Court stated that with respect to "the question

US_ACTIVE:\44075654\7\58399.0011

of privity . . . it becomes a kind of quaint notion in a world in which loans are routinely

transferred and securitized . . . As a sophisticated commercial loan borrower, Laurel Cove has a

hard time saying we don't have privity with a party that's in control of the loan." *Hr'g. Tr.* at

*24:7 -17.* The Court should find Laurel Cove's assertion that it lacked privity with Lehman Re

unfounded.

19.     The conduct of LBHI, LCPI, Lehman Re and Laurel Cove demonstrates

that LBHI and LCPI's obligations under the Construction Loan were in fact transferred to

Lehman Re. The Court has now determined twice that the Settlement Order, including the

assignment to Lehman Re of the Construction Loan and all obligations thereunder, is valid.

Laurel Cove should not be permitted to collaterally attack the Court's prior findings and

resuscitate arguments that have been rejected previously.

*None of the Chapter 11 Estates are*
<u>*Liable for the Alleged Damages*</u>

20.     The Laurel Cove Claim asserts a claim for damages in the aggregate

amount of $150,000,000 and the Response states that Laurel Cove has incurred no less than

$109,504,827.60 in damages. *Response*, ¶ 37. Contrary to Laurel Cove's assertion in the

Response, the Plan Administrator disputes the validity of the damages alleged in the Laurel Cove

Claim and set forth in the Response. *Objection*, ¶ 19. Moreover, paragraph 29 of the Objection

states that "[t]he Plan Administrator reserves all rights to object on any basis to the Laurel Cove

Claim . . ." *Objection*, ¶ 29.

21.     On July 2, 2009, this Court entered an order setting forth the procedures

and deadlines for filing proofs of claim in these chapter 11 cases (the "<u>Bar Date Order</u>") [ECF

No. 4271]. The Bar Date Order requires, among other things, that "each Proof of Claim must:

. . . (vi) include supporting documentation or an explanation as to why documentation is not

8

available." *Bar Date Order* at 6.  The supporting documentation requirement was specifically

set forth on the face of the Court-approved proof of claim form.  *Id.* at Exhibit B.  This

requirement for proofs of claim is not a unique one.  Indeed, this Court and others in the

Southern District of New York have entered similar orders requiring that proofs of claim include

supporting documentation or an explanation as to why documentation is unavailable.  *See In re*

*Finlay Enterprises, Inc.*, No. 09-14873 (JMP) (Peck, J.), Oct. 20, 2009 Order [ECF No. 316] at

6; *see also In re AGT Crunch Acquisition LLC, et al.*, No. 09-12889 (REG) (Gerber, J.), Oct. 14,

2009 Order [ECF No. 554] at 2-3.  The Bankruptcy Rules' official proof of claim form also

includes this standard requirement.

        22.     Laurel Cove's attempt to substantiate the damages alleged in the Laurel

Cove Claim by providing an itemized list is not sufficient proof of damages and fails to comply

with the requirements of the Bar Date Order.  *See Response*, ¶ 36; *Najam Affidavit*, ¶ 11.  LBHI

and LCPI are not liable in any respect for damages, to the extent any were incurred, that resulted

from Lehman Re's failure to fund the Construction Loan.  Moreover, LBHI and LCPI have no

liability for and contest the validity of any damages asserted in the Laurel Cove Claim or the

Response.

**<u>Conclusion</u>**

        23.     For the reasons set forth above and in the Objection, the Plan

Administrator submits that it has met the burden of establishing that the relief requested in the

9

Objection is appropriate.  Accordingly, the Response should be overruled and the Laurel Cove

Claim should be expunged.

WHEREFORE the Plan Administrator respectfully requests that the Court

(i) overrule the Response, (ii) grant the relief sought in the Objection, and (iii) grant the Chapter

11 Estates such other and further relief as is just.

Dated: September 21, 2012
       New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

## **EXHIBIT A**

Settlement Order

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                            :
In re                                                       :        Chapter 11 Case No.
                                                            :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                    :        08-13555 (JMP)
                                                            :
                                      Debtors.              :        (Jointly Administered)
                                                            :
------------------------------------------------------------x

## ORDER PURSUANT TO SECTION 105 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 AUTHORIZING AND APPROVING SETTLEMENT WITH LEHMAN RE LTD.

Upon the motion, dated August 5, 2009 (the "Motion"), of Lehman Brothers

Holdings Inc. ("LBHI") and Lehman Commercial Paper Inc. ("LCPI" and, together with LBHI

and their affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors-in-

possession, the "Debtors"), pursuant to section 105 of title 11 of the United States Code (the

"Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") for authorization to enter into and approval of a settlement pursuant to an

agreement substantially consistent with the form agreement annexed to the Motion as Exhibit A

(the "Settlement Agreement"); and the Court having jurisdiction to consider the Motion and the

relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order

M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All

Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the

Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b);

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Motion having been provided in accordance with the procedures set forth in

the amended order entered February 13, 2009 governing case management and administrative

procedures [Docket No. 2837] to (i) the United States Trustee for the Southern District of New

York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities

and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for

the Southern District of New York; (vi) counsel to Lehman Re and (vii) all parties who have

requested notice in these chapter 11 cases, and it appearing that no other or further notice need be

provided; and the Court having found and determined that the relief sought in the Motion is in

the best interests of the Debtors, their estates and creditors, and all parties in interest and that the

legal and factual bases set forth in the Motion and on the record establish just cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefore, it is

ORDERED that the Motion is granted; and it is further

FOUND AND DETERMINED that, based on factual and legal bases set forth in

the Motion, the Mortgage Loans (as defined in the Settlement Agreement) are not and were not

property of LBHI's estate or LCPI's estate; and it is further

FOUND AND DETERMINED that, based on factual and legal bases set forth in

the Motion, neither LBHI nor LCPI have assumed or assumed and assigned nor will assume or

assume and assign that certain Master Repurchase Agreement, dated as of July 9, 1999, by and

among LCPI, Lehman Brothers Inc. ("LBI") and Lehman Re Ltd. ("Lehman Re") pursuant to the

Bankruptcy Code, including section 365 thereof, in connection herewith or with the Settlement

Agreement or any of the transactions contemplated thereby; and it is further

ORDERED that, pursuant to sections 105 and Bankruptcy Rule 9019, the

Settlement Agreement is approved, and LCPI and LBHI are duly authorized to (i) enter into an

agreement substantially consistent with the Settlement Agreement and to consummate all of the

transactions contemplated thereby and (ii) execute and deliver such assignments, allonges,

conveyances, and other documents, and instruments of transfer and to take such other actions as

may be reasonably necessary to consummate the Settlement Agreement, it being understood that

any actions described in this paragraph taken by the Debtors or their affiliates may be taken

without the necessity of any further Court proceedings or approval and shall be conclusive and

binding in all respects on all parties in interest in these cases; and it is further

ORDERED that the Settlement Agreement and any related agreements,

documents or other instruments may be modified, amended or supplemented by the parties

thereto, in a writing signed by such parties, and in accordance with the terms thereof, without

further order of the Court, *provided* that any such modification, amendment or supplement does

not have a material adverse effect on the Debtors' estates; and it is further

ORDERED that, pursuant to and to the extent provided by the terms of the

Settlement Agreement, Lehman Re shall assume all of the obligations of LBHI, LCPI and

Lehman ALI Inc. as lender arising from the documents evidencing the Mortgage Loans as of

September 17, 2008, and thereafter; and it is further

ORDERED that nothing in the Motion, Settlement Agreement or herein shall

affect or be construed as affecting the rights of LBI arising from or relating to any transactions

entered into by it under the Initial MRA or the MRA (as respectively defined in the Motion) or

the right of LBI to pursue Claims (as defined in he Motion) arising from or relating to the Initial

MRA or the MRA, LBHI, LCPI, Lehman Re and their respective affiliates having agreed that

they shall not assert a defense, including but not limited to res judicata and collateral estoppel, to

any Claim asserted by LBI based upon this Order approving the Motion and the Settlement

Agreement; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and/or interpretation of this Order.


Dated:  New York, New York
        August 27, 2009

                                        _____s/ James M .Peck_____
                                        Honorable James M. Peck
                                        United States Bankruptcy Judge

# **EXHIBIT B**

Formisano E-mail Correspondences

US_ACTIVE:\44075654\1\58399.0011

**Arthur, Candace**

| | |
|---|---|
| **From:** | Patti Formisano <pf@legacyproperties.com> |
| **Sent:** | Thursday, September 25, 2008 7:01 PM |
| **To:** | Lane, Nick |
| **Subject:** | Re: Laurel Cove Draw 16 |

Sorry - i am doing this all long distance from Vegas. We'll fix it.
Sent from my Verizon Wireless BlackBerry

---

**From**: "Lane, Nick" <nlane@trimontrea.com>
**Date**: Thu, 25 Sep 2008 17:31:25 -0400
**To**: Patti Formisano<pf@legacyproperties.com>
**Subject**: RE: Laurel Cove Draw 16
Your totals were not summing correctly and you weren't including TM fees or datedown.   If you don't use the sum function you will consistently have problems with totals because whenever you add rows they will not be included in the total.

here is the right total (excluding working capital)

---

**From:** Patti Formisano [mailto:pf@legacyproperties.com]
**Sent:** Thursday, September 25, 2008 3:43 PM
**To:** Lane, Nick
**Subject:** RE: Laurel Cove Draw 16

Attached is the revised draw sheet.  My left to fund amount does not match yours though....

Thanks,

*Patricia Formisano*
*Legacy Properties, LLC*
*457 Main Street, Unit 1A*
*Danbury, CT 06811*
*203-794-1105*
*203-803-5128 cell*
*203-794-1135 fax*
*pf@legacyproperties.com*

---

**From:** Lane, Nick [mailto:nlane@trimontrea.com]
**Sent:** Tuesday, September 23, 2008 6:09 PM
**To:** Patti Formisano
**Subject:** RE: Laurel Cove Draw 16

So you know, there is $29,886,559.46 left to fund after this draw.  This also does not include this months interest payment which has not yet been processed.

**From:** Patti Formisano [mailto:pf@legacyproperties.com]
**Sent:** Tuesday, September 23, 2008 6:03 PM
**To:** Lane, Nick
**Subject:** RE: Laurel Cove Draw 16

Yes. There is a formatting error in that section. It is going to take some time to correct. I will need to get this to you in the AM.

---

**From:** Lane, Nick [nlane@trimontrea.com]
**Sent:** Tuesday, September 23, 2008 5:52 PM
**To:** Patti Formisano
**Subject:** RE: Laurel Cove Draw 16

Would you correct your Balance to Complete column too?

---

**From:** Patti Formisano [mailto:pf@legacyproperties.com]
**Sent:** Tuesday, September 23, 2008 2:49 PM
**To:** Lane, Nick
**Subject:** Re: Laurel Cove Draw 16

Yes i was going to let you know that. We want to keep it separate, if that's okay with you.
Sent from my Verizon Wireless BlackBerry

**From:** "Lane, Nick" <nlane@trimontrea.com>
**Date:** Tue, 23 Sep 2008 14:17:02 -0400
**To:** Patti Formisano<pf@legacyproperties.com>
**Subject:** RE: Laurel Cove Draw 16
It looks like the TriMont Fee is NOT pulling into the draw request total. It would make more sense to put it below, in Debt Service. It gets paid out of the Interest Holdback so is reducing the holdback each time.

---

**From:** Patti Formisano [mailto:pf@legacyproperties.com]
**Sent:** Tuesday, September 16, 2008 10:49 PM
**To:** Lane, Nick; Ken Ayers
**Cc:** Keebler, Bradley
**Subject:** RE: Laurel Cove Draw 16

Okay - it took some doing but we adjusted the budget so that the Current budget reflects through Draw 15 and gave more than enough money to the interest reserve to cover through December when we will start closing lots. I think we're good. Let me know if you feel differently.

Patti

---

**From:** Lane, Nick [nlane@trimontrea.com]
**Sent:** Tuesday, September 16, 2008 8:45 AM
**To:** Patti Formisano; Ken Ayers
**Cc:** Keebler, Bradley
**Subject:** RE: Laurel Cove Draw 16

There needs to be money allocated for interest on the loan. As we have discussed, there is not enough money in the holdback to carry next months payment. The money from commissions was going to be added to the holdback.

2

**From:** Patti Formisano [mailto:pf@legacyproperties.com]
**Sent:** Monday, September 15, 2008 7:07 PM
**To:** Lane, Nick; Ken Ayers
**Cc:** Keebler, Bradley
**Subject:** RE: Laurel Cove Draw 16

The debt service is supposed to reflect Trimont's fee not the interest on the loan. I will redo the current budget with Draw 15 and send it to you tonight or tomorrow morning.

*Patricia Formisano*
*Legacy Properties, LLC*
*457 Main Street, Unit 1A*
*Danbury, CT 06811*
*203-794-1105*
*203-803-5128 cell*
*203-794-1135 fax*
*pf@legacyproperties.com*

---

**From:** Lane, Nick [mailto:nlane@trimontrea.com]
**Sent:** Monday, September 15, 2008 5:18 PM
**To:** Patti Formisano; Ken Ayers
**Cc:** Keebler, Bradley
**Subject:** RE: Laurel Cove Draw 16

After a preliminary review of this spreadsheet there are 2 issues:

1. The $274K allocated to debt service is not going to be enough to carry the loan for the 2 remaining months through the November payment. After the September 9 payment there is approximately $600K left in the holdback. The 10/9 payment will be around $900,000 after the current draw and then the 11/9/08 interest payment will be at least this much.

$600,000 approximate current holdback balance
-900,000 approximate 10/9/08 debt service
-950,000 approximate 11/9/08 debt service
-1,250,000 approximate Holdback shortfall through November

Obviously the above numbers are contingent upon a number of things including date the current draw is funded and the amount and timing of Draw 17.

2. The spreadsheet sent had old numbers in the "Current Budget" column D. This column needs to reflect the amounts in "Revised Budget" Column (Column E) from the last draw (Draw 15).

Thanks,

Nick

---

**From:** Patti Formisano [mailto:pf@legacyproperties.com]
**Sent:** Sunday, September 14, 2008 5:08 PM
**To:** Keebler, Bradley; Lane, Nick; mike@mdelvin.com
**Cc:** Ken Jowdy; Ken Ayers; Bill Najam; philip@tentarapartners.com; bethany@tentarapartners.com; lfraser@thebridgesrsf.com; Isilda Pereira; Patti Formisano; Chenynene Palmer
**Subject:** Laurel Cove Draw 16

Brad and Nick,

Here is the spreadsheet for Laurel Cove Draw 16. We are requesting $5,069,485.32 this month. You should have received the hardcopies. Ken Ayers, Leilani, and Bethany revamped the budget as we discussed when we met in August. I have made those changes on the spreadsheet attached. The budget revisions were too many to indicate the money moved from one line to another so please forgive that part for this draw. We should have minimal budget revisions going forward, and I will indicate them as usual on all draws going forward. Please let me know if you have any questions.

Thanks.

Patti

*Patricia Formisano*
*457 N. Main Street, 1A*
*Danbury, CT 06811*
*203-794-1105*
*203-794-1135 fax*
*203-803-5128 cell*
*pf@legacyproperties.com*

**Arthur, Candace**

| | |
|---|---|
| **From:** | Patti Formisano <pf@legacyproperties.com> |
| **Sent:** | Tuesday, September 23, 2008 4:54 PM |
| **To:** | Lane, Nick |
| **Subject:** | FW: Couple Lien Waivers |
| **Attachments:** | SKMBT_C25208092309590.pdf |

Here are lien waivers for Watson Well and The Turf Company for Laurel Cove.  They were missed in the draw and I am sure you will need them.

**From:** Bethany Jones [bethany@tentarapartners.com]
**Sent:** Tuesday, September 23, 2008 4:14 PM
**To:** Patti Formisano; Isilda Pereira
**Subject:** Couple Lien Waivers

Here are a couple lien waivers that weren't turned in with the draw package, for Watson Well and The Turf Company, just in case Trimont asks for them.  Are we still on track for the draw to fund tomorrow?  Just curious since the vendors always ask.

Bethany Jones
Director of Operations
Tentara Partners, Inc.
6568 Arno Road
College Grove, TN 37046
(615) 368-3044 (o)
(615) 405-4070 (c)
(615) 368-3095 (f)
www.tentarapartners.com

1

Sep 18 2008 8:57AM    WATSON COMPANY    6152732856    P. 1

From:

Watson well (615)73-2856

08/29/2008 09:57    #455 P.001/001

# AFFIDAVIT OF ORIGINAL CONTRACTOR

1. APPLICATION #

2. State of Tennessee                                                     County of _____    Date: 9-15-08
(JoLinda Watson ), being duly sworn, says that he/she is ( V. Pres           ),of (Watson Co ), having a contract with
Laurel Cove Development, LLC,              for building said structure situated on or around or in front of described property:
NAME                                       ADDRESS                          ADDRESS
Laurel Cove Development                    6588 Arno Road                   College Grove, TN 37046

## SUB-CONTRACTORS
Affiant further says that the following shows the names and addresses of every sub-contractor in the employ of _____ giving the amount,
if any, which is due, or to become due, to them, or any of them, for work done, or machinery, material, or fuel furnished to date hereof, under
said contracts.
3

| NAME | ADDRESS | TRADE | AMOUNT |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

## MATERIALS
Affiant further says that the following shows the names and addresses of every person furnishing machinery, material or fuel to _____
giving the amount, if any, which is due, or to become due, to any of them, for machinery, material or fuel furnished to date hereof, under said
contracts.
4

| NAME | ADDRESS | MATERIALS | AMOUNT |
|---|---|---|---|
| SUPPLIED FROM PAID STOCK |  |  |  |

## LABOR
Affiant further says that the following shows the names and addresses of every unpaid laborer, for _____
under said contract, giving the amount, if any which is due, or to become due, for labor done to date hereof.
5

| NAME | ADDRESS | HOURS | AMOUNT |
|---|---|---|---|
| EVERY LABORER HAS BEEN PAID IN FULL |  |  |  |

6. Affiant further states that there is due or to become due to contractor for work performed or machinery, material, or fuel furnished to _____
to date hereof under said contracts, the sum of (from line #18 from AIA page 1).............    $38,412.00

The amounts due or to become due to said sub-contractors, material-men, and laborers, for work performed, machinery or fuel furnished to
the date hereof, to 9-15-08  are fully and correctly set forth opposite their names, respectively, in the aforesaid statements.

Affiant further says that Watson Co has not employed or purchased or procured machinery, material or fuel from, or sub-contracted with any
person, firm or corporation, other than those above mentioned; and owes for no labor performed, or machinery, material or fuel furnished,
under said contracts, other than above set forth.

JoLinda Watson                           V. Pres.
NAME                                      TITLE

Subscribed and sworn to before me this 15 day of Sept ,2008

Notary Public: _____

My Commission expires: 5/24/2010

MOLLY B. THWEATT
STATE
OF
TENNESSEE
NOTARY
PUBLIC
DeKALB COUNTY

# AFFIDAVIT OF ORIGINAL CONTRACTOR

1. APPLICATION #

Date:

2. State of Tennessee                                          County of _Williamson_
(                              ), being duly sworn, says that he/she is (                    ), of ( _The Turf Co._ ), having a contract with
Laurel Cove Development, LLC,        for building said structure situated on or around or in front of described property:

| NAME | ADDRESS | ADDRESS |
|---|---|---|
| Laurel Cove Development | 6568 Arno Road | College Grove, TN 37046 |

## SUB-CONTRACTORS

Affiant further says that the following shows the names and addresses of every sub-contractor in the employ of _The Turf Co._ giving the amount, if any, which is due, or to become due, to them, or any of them, for work done, or machinery, material, or fuel furnished to date hereof, under said contracts.

3

| NAME | ADDRESS | TRADE | AMOUNT |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

## MATERIALS

Affiant further says that the following shows the names and addresses of every person furnishing machinery, material or fuel to _____ giving the amount, if any, which is due, or to become due, to any of them, for machinery, material or fuel furnished to date hereof, under said contracts.

4

| NAME | ADDRESS | MATERIALS | AMOUNT |
|---|---|---|---|
| SUPPLIED FROM PAID STOCK |  |  |  |

## LABOR

Affiant further says that the following shows the names and addresses of every unpaid laborer, for _____ under said contract, giving the amount, if any which is due, or to become due, for labor done to date hereof.

5

| NAME | ADDRESS | HOURS | AMOUNT |
|---|---|---|---|
| EVERY LABORER HAS BEEN PAID IN FULL |  |  |  |

6. Affiant further states that there is due or to become due to contractor for work performed or machinery, material, or fuel furnished to_____ to date hereof under said contracts, the sum of (from line #18 from AIA page 1)............... $10.00 $48,657.84

The amounts due or to become due to said sub-contractors, material-men, and laborers, for work performed, machinery or fuel furnished to the date hereof, to_____ are fully and correctly set forth opposite their names, respectively, in the aforesaid statements.

Affiant further says that _____ has not employed or purchased or procured machinery, material or fuel from, or sub-contracted with any person, firm or corporation, other than those above mentioned, and owes for no labor performed, or machinery, material or fuel furnished, under said contracts, other than above set forth.

_Jimmy Parson_                        _President - owner_
                          NAME                                  TITLE

Subscribed and sworn to before me this 19th day of _September_ 2008

Notary Public: _Mary Ray_

My Commission expires: _3/7/10_

MARY L. RAY
STATE
OF
TENNESSEE
NOTARY
PUBLIC
WILLIAMSON COUNTY

# **EXHIBIT C**

January 2010 Hearing Transcript

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-14884-jmp

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN RE LTD.,


        Debtor.


- - - - - - - - - - - - - - - - - - - -x


            U.S. Bankruptcy Court

            One Bowling Green

            New York, New York


            January 20, 2010

            2:47 PM



B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

```
                                                                2

 1

 2    Motion of Laurel Cove Development LLC for an Order (i) Staying

 3    the Successor Trustee's Sale; (ii) Either Invalidating

 4    Assignment to the Debtor or Compelling Compliance with Section

 5    365(d)(2) of the Bankruptcy Code; (iii) Shortening Time and

 6    Limiting Notice; and (iv) for Such Other Relief as May be Just

 7    and Proper

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sharona Shapiro
```

3

1

2      A P P E A R A N C E S :

3      WEIL, GOTSHAL & MANGES, LLP

4            Attorneys for Chapter 11 Debtors

5            767 Fifth Avenue

6            New York, NY 10153

7

8      BY:   YEHUDAH L. BUCHWEITZ, ESQ.

9

10

11     CADWALADER, WICKERSHAM & TAFT LLP

12           Attorneys for Joint Provisional Liquidators

13           One World Financial Center

14           New York, NY 10281

15

16     BY:   GREGORY M. PETRICK, ESQ.

17

18

19     MILBANK, TWEED, HADLEY & MCCLOY, LLP

20           Attorneys for the Official Committee of

21            Unsecured Creditors

22           One Chase Manhattan Plaza

23           New York, NY 10005

24

25     BY:   DENNIS C. O'DONNELL, ESQ.

4

1

2    STAGG, TERENZI, CONFUSIONE, & WABNIK, LLP

3        Attorneys for Laurel Cove Development, LLC

4        401 Franklin Avenue, Suite 300

5        Garden City, NY 11530

6

7    BY:   RONALD M. TERENZI, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

```
 1                    P R O C E E D I N G S
 2          THE COURT:  Be seated, please.  This is an application
 3   brought by Laurel Hill (sic) for extraordinary relief.  And
 4   this was scheduled by the Court on Friday, if I recall
 5   correctly.
 6          MR. TERENZI:  That's correct, Judge.
 7          THE COURT:  Originally it was my intention for this to
 8   be scheduled for tomorrow afternoon which is a Lehman adversary
 9   proceeding day and it was scheduled, as I understand it, for
10   today in order to accommodate the alleged emergency in
11   Tennessee.
12          I've taken a look at the papers that had been filed in
13   response to this application and these papers call into
14   question the accuracy of certain representations made in the
15   papers which led to the scheduling of this matter, and
16   additionally question the procedural suitability of proceeding
17   today without an adversary proceeding.
18          I'm particularly concerned about the alleged
19   representations, and I have personally presided over the Lehman
20   docket and the Lehman Re docket since both of those cases were
21   commenced.  And Laurel Cove, in particular, has been a matter
22   that has regularly been on the agenda in the LBHI case and has
23   been adjourned.  Most recently it was listed, if I recall
24   correctly, for the January omnibus hearing date and was
25   adjourned from that date to, I believe, February 10.
```

6

1          The Laurel Cove matter is also familiar to me in that

2     I presided in, I believe it was August of last year, in

3     connection with the approval of a global settlement arrangement

4     between LBHI and Lehman Re.  The fact that this is coming

5     before the Court on an emergency basis is truly extraordinary,

6     and I believe that counsel for the movant has a burden to

7     satisfy, for even being here today, even before we get to the

8     merits.

9          So step one is why are we here today as an emergency

10    instead of having dealt with this in the ordinary course of

11    this bankruptcy case on one of the many days when the Laurel

12    Cove matter was properly scheduled on the omnibus hearing

13    agenda.  I want to know the answer to that, and I also want to

14    know counsel's response to the alleged misrepresentations which

15    have been identified, in particular by LBHI in its papers,

16    because that goes to the integrity of the process.

17         We'll get to other aspects of this after dealing with

18    those first two.  And I'll hear from movant's counsel as to

19    those initial matters which I'm going to hear first, and then

20    we'll move onto other issues, including whether or not this is

21    a procedurally improper request for relief, in which case I

22    could throw everybody out of court promptly.

23         MR. TERENZI:  Thank you, Judge.  Ronald Terenzi of

24    Stagg, Terenzi, Confusione, & Wabnik, attorneys for Laurel Cove

25    Development.

7

1            Judge, answering your first inquiry as to why this was

2      adjourned so many times, it wasn't dealt with in the course.

3      The first several adjournments, all except for the last two,

4      were requested by Lehman because they weren't ready to deal

5      with this issue because they were dealing between Lehman and

6      Lehman Re as to who actually owned this.  So it was at their

7      request that this was put over several times until they signed

8      their settlement agreements in November because they really

9      couldn't deal with it.

10            Laurel Cove Development has been trying to deal with

11      anyone who would listen to move this project forward.  When

12      Lehman filed for bankruptcy in September, this project was on

13      schedule, not in default, everything was being paid, the

14      construction schedule was right on time, it was scheduled to

15      have Phase 1 completed in August of '09, and it was only as a

16      result of Lehman's ceasing the funding of this project that all

17      of this stopped.

18            And it was June 2nd of '09 that they received the

19      default notice from Lehman Re.  Of course they had no privity

20      with Lehman Re, but the default notice, Judge, scheduled

21      fifteen different items of default but all of them related to

22      the inability for them to continue with construction because

23      they weren't funded.  So that is why this thing got put over so

24      many times.

25            Speaking to what I believe that you're referring to as

8

1    far as misrepresentation to his notice, Judge, that was raised

2    by Ms. Singer's affidavit -- is that what you're referring to

3    as far as misrepresentations?

4            THE COURT:  There were, I believe, three separate

5    areas of misrepresentation.

6            MR. TERENZI:  Your Honor, the first allegation of

7    notice by Ms. Singer in her affidavit, the Lehman affidavit,

8    talks about the debtor's opposition to our motion to compel

9    assumption or rejection of the contract.

10            In their opposition, it is a fact that in a footnote

11    they raised -- and I want to give you the quotes on this,

12    Judge -- they raised in a footnote an issue with Lehman Re, and

13    I'm quoting from that footnote in pertinent part, Judge:

14    "Lehman Re claims an ownership interest in the lender's

15    position.  The ownership interest has yet to be determined.

16    The precise ownership is not relevant to this motion."  That's

17    in a footnote, Judge.

18            In their main opposition they never once state:  "You

19    can't force us to assume or reject because we don't own it,

20    this is not property of the estate."  They didn't argue any of

21    that, Judge.  They argued that we can't be forced to assume or

22    reject this early in the case, this is too much of a

23    complicated case.  And our suggestion that they assent to our

24    substituting lenders has not basis in law effect.  Those are

25    the things that they argued.  They never once in that

VERITEXT REPORTING COMPANY

212-267-6868                                                    516-608-2400

9

1    opposition, Judge, argued that this was now owned by them, this

2    was not property of the estate, and it was not theirs to assume

3    or reject.  Never, Judge.

4         Now, the other notice that they say that we got was

5    pursuant to a conversation of August 24 between myself and

6    counsel for Lehman Holdings when she asked for an additional

7    adjournment because she says, "We're close to settling things

8    with Re."  And she says, "As a matter of fact, there's a motion

9    to approve an order approving that settlement."  I said,

10   "Really?  Can you send me a copy of that?"

11        And on the 24th, as she states in her affidavit, she

12   did in fact send me a copy of that motion and proposed order,

13   and she rightly says that was two days before the hearing.

14   What she leaves out, Judge, is that on the 24th was two days

15   past the objection date on that motion, which was the 21st.  So

16   that's a little bit disingenuous, Your Honor, that we had

17   notice in time to appear and object to those things.

18        Your Honor, in all instances we continued to work with

19   Lehman and Lehman Re to try and resolve this thing, either by

20   bringing substituted financing -- we had substituted financing

21   in place if they were to agree with that; by buying them out --

22   we were willing to buy them out, we had some negotiations

23   toward that end that never consummated and then communications

24   shut down sometime in the beginning of November; or to

25   reinstate the loan and continue funding.

10

1          Judge, we were in compliance with this at every step

2      of the way.  It was only their lack of funding that stopped

3      this project from going forward.  Now they're trying to

4      disenfranchise my client from their property for a foreclosure

5      sale in Tennessee.  Judge, we can't bring up these

6      counterclaims without violating the stay.  We can't bring in

7      Lehman Holdings, which is not a party to that in Tennessee,

8      which is the only party that we have privity with.

9          Your Honor, this involves both debtors.  Our inability

10     to bring counter-claims because of the stay, it impacts greatly

11     on our different areas of the bankruptcy law, and it impacts on

12     this Court's order.  Your Honor, you signed an order on August

13     27th that had a finding that this was not property of the

14     estate from day one, despite the fact that they had been

15     arguing this, and even the settlement documents that they

16     signed in November don't talk -- although they said in the

17     recital that this was never property of the estate, the actual

18     substance of the document talks about assumption and assignment

19     and the assumption and assignment documents.

20         Your Honor, I believe that if you were aware of the

21     consequence of the finding that they put in that order that

22     this was never property of the estate and that they would not

23     have to cure the defaults in lack of funding, and had the

24     parties-in-interest, the other parties to those loan agreements

25     been noticed on that and made this Court aware of the

11

1    consequences of that finding, I don't think that Your Honor

2    would have signed that finding so easily because it impacted

3    greatly on the other parties to these loan agreements that they

4    now were, in effect and in reality, form over substance, Judge,

5    assuming and assigning these contracts without having to cure

6    their defaults from failing to fund this project from

7    September, and then having the audacity of calling us in

8    default because we weren't able to keep up with the

9    construction timelines because they failed to fund.

10           Your Honor, there is nowhere that they have or could

11   ever say that we were in default at any time prior to their

12   failure to fund.  Your Honor, we have been trying to get their

13   attention, trying to work this out with them.  We were told,

14   oh, we don't know what's happening yet until November when they

15   have signed the settlement documents, and then next thing you

16   know blackout, no communication, and next thing you know we

17   have a foreclosure sale, Judge.  That's why we were caught

18   unaware of this foreclosure sale.  They've been working with us

19   by funding some distress bills that had to be paid to stop some

20   impending things.

21           We had no idea that they were -- we're not sure about

22   this, Your Honor, but we had heard that they made a deal with

23   the contractors at the Development that they're going to

24   foreclose and sell this thing to the contractor.

25           We've been shut out, Judge, despite the fact that

12

1    we've appeared, we've tried to assert, we made that motion to

2    assume and assign, the adjournments were theirs, Judge, were

3    theirs.  And the notice issue is nonsense, Judge.  We were

4    given notice a day late and a dollar short, Judge.  So that

5    affidavit is disingenuous.  I hope that addresses your initial

6    concerns.

7          THE COURT:  Well, it raises a number of issues that I

8    think both Lehman Re and LBHI should respond to, and the

9    committee can respond as well.  But initially, before getting

10    into the merits, I'm concerned as to whether or not there have

11    been accurate representations made in the papers that got us

12    here this afternoon on an emergency basis.

13          And what you've effectively said is you believe that

14    you were duped, in effect.  But it's also true that before the

15    hearing that took place in August and before the entry of the

16    order, which has become final, concerning the settlement

17    between LBHI and Lehman Re, not only with respect to Laurel

18    Cove but a host of other financial assets, you did -- or

19    someone in your office did have actual notice before that

20    hearing and no one appeared at the hearing to contest or oppose

21    the relief.

22          The order that you refer to from August 27th of 2009

23    was an order that was entered, if I recall correctly, as an

24    uncontested matter on that omnibus calendar for August.  And if

25    you were on notice before the hearing that there was a problem,

13

1    it still raises the question as to why no one showed up.

2         Additionally, the fact that Laurel Cove matters have

3    been on the omnibus calendar and adjourned from time to time

4    thereafter, raises a host of questions as to the adequacy of

5    Laurel Cove's own diligence in understanding the facts and

6    circumstances.  This was not hidden under a barrel, this was on

7    a public electronic docket in a matter in which you and others

8    clearly had an active interest, and I can't understand why you

9    didn't know about this until it was literally the eleventh

10   hour.

11        MR. TERENZI:  What we didn't know, Judge -- just

12   speaking for a moment to the August 27th hearing, the notice on

13   that motion said if objections were not received by August 21st

14   the order will be granted as uncontested, and it was beyond

15   August 21st.  Perhaps in our best diligence, perhaps we should

16   have shown up on the 27th, Your Honor, but we were past the

17   deadline to object in the notice.

18        And Your Honor, we had hoped that -- and we were never

19   getting any other message from Lehman or Lehman Re that they

20   needed to settle their internal differences and then they would

21   be able to deal with us.  We had always hoped that once their

22   internal differences were settled we could put this project

23   back on track.  We had no idea and were caught unaware and by

24   surprise at the tactic to foreclose based on those ridiculous

25   defaults that were caused by their breach of the contract.

14

1     That's what caught us by surprise, their tactic to go that

2     direction.

3          We were talking with them at all times on how to put

4     this thing back on a project.  Your Honor, should we have not

5     believed them and been cynical and moved ahead?  Perhaps,

6     Judge.  But we're talking about a substantial impact on my

7     client's property rights here, Judge, and I don't believe that

8     they had due process.  Did they have opportunities where they

9     could have been more diligent?  I think you're probably right,

10    Your Honor.  But did they have due process to lose their

11    property based on a default that was caused by Lehman's failure

12    to fund and breach of their loan obligation?  Judge, that's

13    just not right.  It's just not right, Judge.

14         THE COURT:  I'll hear from -- in whatever order is

15    preferred, I'll hear from Lehman Re and LBHI.

16         Also, just for future reference to counsel for Laurel

17    Cove on this, it has become a custom of the case for Lehman

18    Brothers Holdings, Incorporated to be referred to by the

19    initials LBHI, and your papers refer to LBHI as LBI which is

20    another entity that we deal with in the case.

21         MR. TERENZI:  I will note that, Judge.

22         THE COURT:  To the extent there is any future  --

23         MR. TERENZI:  Yes, Judge.

24         THE COURT:  -- for purposes of filing papers in this

25    case you should use the proper designation.

15

1          Let me hear from the parties in any order that they

2    choose.

3          MR. PETRICK:  Good afternoon, Your Honor, Gregory

4    Petrick of Cadwalader, Wickersham & Taft on behalf of the joint

5    provisional liquidators, Jeffrey Hunter and Peter Mitchell of

6    Lehman Re.

7          Your Honor, I'll just try to confine my remarks at

8    this juncture to the initial questions that you raised.  I

9    note, Your Honor, that you may recall back from the hearings on

10   the recognition of the Chapter 15 hearing that all parties with

11   an interest in any of the properties were served with those

12   papers noting that Lehman Re, the joint provisional

13   liquidators, were asserting an interest.  This precedes the

14   settlement agreement or it was about the same time as the

15   settlement agreement.

16         THE COURT:  I recall that Laurel Cove was one of the

17   parties that was involved at that time.

18         MR. PETRICK:  And you may recall, Your Honor, that

19   three or four lien holders who had existing liens against the

20   Laurel Cove property showed up and objected to the Chapter 15

21   and that was worked out in the context of giving them a period

22   of time to put together a best offer.

23         The point I'm trying to make is that none of this

24   proceeding relating to these properties was done in the quiet

25   of the night.  People with an interest in Laurel Cove certainly

VERITEXT REPORTING COMPANY

212-267-6868                                                    516-608-2400

16

1    had notice of it, appeared in this hearing to protect their

2    rights.

3            Counsel suggests that there's been a lack of due

4    process, but I think it's been demonstrated that there's been

5    ample opportunity -- ample notice and ample opportunity to come

6    here and protect its rights.  What he seems to be complaining

7    about is that there is no equity interest in this property and

8    he is going to be foreclosed out.

9            If they have defenses to the foreclosure, they have

10   the ability to show up in Tennessee and assert those defenses.

11   And they also have the ability that if they think that

12   something improper has happened here, failure to fund, they can

13   assert those claims in this proceeding and in the LBHI

14   proceeding in some fashion.

15           But the fact of the matter is that at least -- and I

16   think counsel acknowledges this -- at least as of August that

17   they were aware the settlement agreement was being signed which

18   confirmed the ownership interest of these loans in Lehman Re.

19   And they sat on their hands from August until January to come

20   to this Court and do anything about it.

21           And it was only when the eve of this foreclosure

22   sale -- the foreclosure sale is scheduled for this Friday -- it

23   was only on the eve of that foreclosure sale that they come in

24   and filed a motion, which we have some procedural issues with,

25   and we also would note on the merits that there are no -- there

17

1    is no information before this Court which would warrant the

2    extraordinary relief of injunctive relief.

3         But put all that aside, Your Honor, I mean, the fact

4    of the matter is that they've sat on their hands and came in

5    here five months after that order was issued, or nearly five

6    months, and now are asking Your Honor to take the extraordinary

7    relief of preventing the JPLs from exercising their duties to

8    protect their creditors by taking a possession of the asset of

9    this estate, on really no basis other than, you know, it's not

10   fair.  And Your Honor, that is not legally sufficient from our

11   mind.  And I don't think there's any question here, based on

12   counsel's remarks, that there was certainly notice and

13   opportunity of what was going on; they could come in and

14   protect their rights.

15        THE COURT:  Can you tell me, if you know from your

16   personal knowledge, of any contact between Lehman Re as lender

17   and Laurel Cove as borrower during the period between the

18   approval of the settlement in August of 2009 and the

19   commencement of the foreclosure?

20        MR. PETRICK:  Your Honor, my understanding is that

21   from time to time there have been discussions between one of

22   the JPLs and one of the representatives of Laurel Cove or

23   representatives of people acting on behalf of Laurel Cove about

24   the possible refinancing, a possible transaction.  To my

25   knowledge, no offer was ever presented in writing, nothing

18

1   concrete was ever presented.

2          I know that we were advised by the borrower of the

3   need for protective advances, taxes that were due, insurance,

4   other expenses that were necessary to fund to protect the

5   property.  And in fact, the JPLs funded over 800,000 dollars

6   since August to secure the property and take care of other

7   things necessary to protect the property.  So there have been

8   discussions regarding protecting of the property; there's never

9   been an offer or a discussion of a concrete basis of a

10  settlement offer of any way.  And they're certainly able to

11  show up on Friday and come with new money and, you know, take

12  the property if they can.

13         THE COURT:  Well, what happens on Friday is not before

14  me today.

15         MR. PETRICK:  I understand, Your Honor.

16         THE COURT:  But what is before me today, at least as a

17  threshold inquiry, is whether Laurel Cove had actual notice

18  that the real party-in-interest here was Lehman Re and not

19  LBHI, and at what point in the procedural history leading up to

20  today such notice was given and how such notice was given.  Can

21  you enlighten me on those topics?

22         MR. PETRICK:  Yeah, well, I think -- certainly I think

23  leading up -- the position of the JPLs has always been, since

24  the beginning of their involvement in this case back to

25  September of '08, is that they own these loans in question,

19

1     that they bought them pursuant to the master purchase

2     agreement.

3          The issue that was always outstanding is that the loan

4     files did not contain allonges which are necessary papers to

5     effectively be able -- for the JPLs to effectively be able to

6     foreclose, to effectively be able to transfer the property.

7     That's always been the position that Lehman Re has taken with

8     Laurel Cove and every other borrower right from the beginning

9     of the case.  And I don't think that that's anything new with

10    respect to Laurel Cove.

11         What changed, I think, after Your Honor as a matter of

12    public record approved the settlement, is that that last

13    obstacle of not having the allonges was clarified.  It was a

14    matter of public record in a court order that confirmed

15    ownership of those loans in Lehman Re.

16         From the period of September to December there was the

17    right of exclusivity to negotiate with respect to that

18    property, which was a matter of entering a court record at the

19    recognition hearing with respect to the lien holders.  I think

20    we notified the borrower and the borrower certainly contacted

21    us in December before that period expired and we told them that

22    that period had another two weeks to run -- it was around the

23    beginning of December -- that exclusivity period expired about

24    December 15th, more or less, and we said we can't talk to you

25    because we're still in this exclusive period with the lien

20

1    holders.

2           So you know, to my mind there was no -- I mean, there

3    is no question that they had notice that any defects or any

4    imperfections in the ability of the JPLs to deal with this

5    property was cured as of August, and they certainly knew that

6    and had ample notice of it, no question in my mind at all about

7    that, Your Honor.

8           MR. BUCHWEITZ:  Hello, Your Honor.  Yehudah Buchweitz,

9    Weil, Gotshal for the LBHI debtors.  I just want to address a

10   few points that counsel for Laurel Cove raised and point to a

11   few places in the papers that we've submitted that show that

12   everything we've submitted was above board and accurate.

13          One, with respect to August, Ms. Singer's declaration

14   says -- even though there wasn't an e-mail on it -- that on

15   August 3rd she had a telephone conversation -- this is

16   paragraph 6 of the declaration -- with Mr. Terenzi and telling

17   him that Lehman Re and LBHI had come to an agreement confirming

18   that Lehman Re was the owner of the Laurel Cove loan but that

19   the settlement agreement wouldn't be finalized in time, and

20   asking for an adjournment.  And that was agreed to.  And two

21   days later the papers were put on the public record, this very

22   public record that, as Your Honor knows, thousands of people

23   look at every day.

24          Prior to that hearing, as you noted, Ms. Singer and

25   Mr. Terenzi had a conversation and we e-mailed the settlement

21

1   papers. Subsequent to that date, the closing of the agreements

2   that were approved by Your Honor went forward and we forwarded

3   those papers to Mr. Terenzi and we said, "Okay, now it's all

4   settled, please withdraw your motion." And that was November

5   9, 2009.

6          Since that time, this motion, as Your Honor has noted,

7   was on the calendar three different times, and at each time we

8   were ready to go, we wanted to come in. In fact, we told Mr.

9   Terenzi that we intended to file a supplemental objection. And

10  I drafted that supplemental objection and it refers to Your

11  Honor's order of August 27th saying it's been found and

12  determined it's not a property of the estate, the whole thing

13  is over, move on. And despite our request that he withdraw the

14  motion, November, December, and most recently January 8th,

15  after the date of this notice of sale which we knew nothing

16  about, Mr. Terenzi requested and we agreed to an adjournment.

17         As far as one of the things he mentioned, he said

18  once -- you know, he had hoped once the internal differences

19  between Lehman and Lehman Re would be settled he'd be able to

20  deal with someone. And we said we agree with that, that's

21  fine. The issues were settled with Your Honor's August 27th

22  order and then with the subsequent closing documents, and at

23  that point LBHI, LCPI were done and we said that. we said this

24  is moot, Your Honor's already made a determination and it's

25  over, deal with Lehman Re.

22

1        Unless Your Honor has any other questions on these

2    issues --

3        THE COURT:  I guess my only other question relates to

4    the substance of the conversations that took place in November,

5    December, and January relating to the adjournments of the

6    listed Laurel Cove matter on the omnibus agenda for those days.

7        MR. BUCHWEITZ:  Yeah.

8        THE COURT:  And two points of clarification.  One,

9    were the adjournments in November, December, and January at the

10   request of LBHI, or at the request of Laurel Cove?  And

11   secondly, to the extent you know, what were the stated reasons

12   for adjourning the matter from day to day throughout that

13   period?

14       MR. BUCHWEITZ:  The answer to your first question is

15   from November, December, and January it was solely at the

16   request of Laurel Cove, unquestionably.  As far as January

17   goes, I know, I called Mr. Terenzi, I called his colleague, no

18   response.  I emailed them both, nothing.  Then Mr. Terenzi

19   emailed me and asked me if he could put it over one more time

20   and I said I agree, fine.

21       THE COURT:  Without getting --

22       MR. BUCHWEITZ:  It's his motion.

23       THE COURT:  -- without getting into the specifics as

24   to why.

25       MR. BUCHWEITZ:  As to January, that's a -- yes.

VERITEXT REPORTING COMPANY

23

1          THE COURT:  Okay.

2          MR. BUCHWEITZ:  As far as the earlier dates, I could

3    refer to Ms. Singer's declaration, and -- and I do not have

4    personal knowledge of that.

5          THE COURT:  If you don't have personal knowledge,

6    well, we'll leave it alone.

7          MR. BUCHWEITZ:  Thank you, Your Honor.

8          THE COURT:  Okay.  Is anyone -- Mr. O'Donnell.

9          MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Melbank,

10   Tweed, Hadley & McCloy on behalf of the official committee in

11   the LBHI case.  Very briefly, we are here today because the

12   committee worked closely with the debtors, the LBHI debtors

13   here, in formulating and getting the settlement approved.

14          We believe it's in the best interest of the estate and

15   any challenge to it, such as being raised here, we think is

16   inappropriate.  It clearly was entered with adequate notice.

17   The papers demonstrate that everything we've heard today, I

18   think simply underline -- underlines the fact that at the very

19   latest, on August 24th, pursuant to Ms. Singer's email, counsel

20   for, and the movant here, had notice, and this should be viewed

21   as a final order as a result.

22          THE COURT:  Okay.

23          MR. TERENZI:  May I just briefly respond?

24          THE COURT:  Mr. Terenzi, again we're not -- we're

25   dealing with only this preliminary question --

24

1          MR. TERENZI:  Absolutely, Judge.

2          THE COURT:  -- as to -- as to --

3          MR. TERENZI:  Sure.

4          THE COURT:  -- the adequacy of notice to your client.

5          MR. TERENZI:  I just want to address some of the

6    things that counsel for Re said.  They said that they we didn't

7    appear on the hearings when they were filed by Chapter 15.  We

8    were for the Chapter 15 because part of the reason for the

9    Chapter 15 is to stop the lien holders on our property from

10   filing mechanic's liens, so we weren't opposed to that.  He

11   also says that we can bring our defenses in Tennessee.  We

12   can't bring LBHI in Tennessee and they're the persons that we

13   have privity for.  We can't -- I'm not even -- we don't have

14   privity with Re.  They may be obligated under their agreement

15   with LBHI, but we have no privity with them.  As --

16         THE COURT:  I guess I don't understand that comment.

17   I'm going to ask for some clarifications.  This is a loan --

18         MR. TERENZI:  Constructional loan, Judge.

19         THE COURT:  -- that I -- as I understand was

20   originally made by LCPI, that's Lehman Bros. Commercial

21   Paper --

22         MR. BUCHWEITZ:  Correct.

23         MR. PETRICK:  Actually, Your Honor --

24         MR. PETRICK:  -- I think it was that the loan was

25   actually made by LBHI --

25

1          MR. BUCHWEITZ:  Right, and then it was REPOed to LCPI.

2          MR. PETRICK:  -- and then REPOed to Lehman Commercial

3     Paper.

4          THE COURT:  Okay.  It was REPOed to LCPI and then it

5     was further REPOed to Lehman Re?

6          MR. PETRICK:  Correct, Your Honor.

7          THE COURT:  So, the question of privity, which is

8     obviously a concept I'm familiar with because I'm an old person

9     who started practicing law many years ago, but it becomes a

10    kind of quaint notion in a world in which loans are routinely

11    transferred and securitized, and even in the most routine

12    mortgage foreclosure case in a Chapter 13 context, identifying

13    the servicer or special servicer, the party that has rights to

14    pursue the foreclosure can be a difficult process.  As a

15    sophisticated commercial loan borrower, Laurel Cove has a hard

16    time saying we don't have privity with a party that's in

17    control of the loan.

18         MR. TERENZI:  Your Honor, my point is to bring all the

19    issues that we've discussed today into the Tennessee court,

20    when it impacts on Your Honor's order, on the notice in this

21    Court, on the impact of 366 and the assumption and assign the

22    provisions of the code -- I think I misspoke on the code

23    section --

24         THE COURT:  You probably meant 365.

25         MR. TERENZI:  -- 365.  I did, Judge.  To bring those

26

1  before the Tennessee court, we thought, Judge, that that was

2  more properly brought before you, who had both debtors before

3  him and knew the history of this case.

4          Your Honor, I want to make another point; counsel for

5  Re talked about communications between Re and Laurel Cove.

6  But, in fact, there were intense communications between Laurel

7  Cove and Re in the October, November time frame.  At which

8  time, there was a settlement offer made, and the numbers

9  accepted by my client, but the terms they were seeking to

10  negotiate when the curtain came down and they said we can't

11  talk to you for a time.

12          And then, that -- that expired December 14th.  On

13  December 15th, my client wrote a letter saying "Can we renew

14  these negotiations where we left them off?  What's happening?"

15  and we haven't heard back.  They've been trying to communicate,

16  and they have -- they've communicated about the protective

17  payments, but they haven't gotten back to us on the settlement

18  issues.

19          So there was settlement discussions.  Of course, those

20  settlement discussions were settlement discussions and so I

21  can't disclose them, but there were clear -- and I have all the

22  emails that went back and forth between the clients.

23          THE COURT:  All right.  I don't need to know anything

24  about those conversations, but --

25          MR. TERENZI:  You just asked about communications.

27

1          THE COURT:  -- but, you're acknowledging, are you not,

2    that in October and November, at least as of those months, you

3    and or your client representatives had actual knowledge that

4    the party to talk to about this was Lehman Re, not LBHI?

5          MR. TERENZI:  Absolutely, Judge.  Absolutely.  At the

6    time we were talking directly to Re.  We did know that, Judge.

7    But again, we had hoped to work this out.  Your Honor, to have

8    a foreclosure sale go ahead when the only thing that we did was

9    stop construction, that's the basis of our default, because

10   they stopped funding, that's the position that we're in.

11         We're losing our property because they're saying we're

12   in default and they have the ability to foreclose, not because

13   we didn't pay our mortgage payments, not because we didn't do

14   anything that we were obligated to do, but because they failed

15   to fund, Judge.  That's the inequity here, the fundamental

16   inequity here, and Your Honor, we only sought at all times to

17   rehabilitate and move forward with this project.  We weren't

18   looking to hide, we weren't looking to get over on anyone, we

19   weren't looking not to appear.  All we were doing was trying to

20   get this project back on track.

21         We were surprised by the foreclosure.  We were shocked

22   by the foreclosure, Judge.  And it doesn't seem right that we

23   lose our property based on the default that is explicitly tied

24   to their breach of contract, Judge.

25         THE COURT:  Let me ask you this question.  What if any

28

1    papers have been filed by Laurel Cove in defense of the

2    foreclosure action in the courts of Tennessee?

3            MR. TERENZI:  Nothing, Judge.  The -- we got notice of

4    that a week -- three days before we filed papers with this

5    Court, Judge, and we were told by local counsel in Tennessee

6    that the only way to stop the foreclosure sale is to post a

7    bond in a significant amount of the outstanding obligation,

8    which we don't have.

9            THE COURT:  All right, so you've basically been

10   advised that it would be futile for Laurel Cove to take action

11   under applicable Tennessee procedure.

12           MR. TERENZI:  Futile, in that it would require up --

13           THE COURT:  Futile, in the sense that it would require

14   the posting of a bond in an amount that exceeds the resources

15   of Laurel Cove or its investors.

16           MR. TERENZI:  That's correct, Judge.

17           THE COURT:  All right.  Thank you.  On the procedural

18   question, I think that I'm going to reserve judgment until I

19   hear more, but I believe that Laurel Cove is in a difficult

20   position here in arguing that there should be any collateral

21   attack on an order of this Court that was entered in August of

22   this year, at a time when counsel for Laurel Cove acknowledges

23   having received the settlement documentation prior to the entry

24   of that order.

25           And additionally acknowledges having an actual

29

1   awareness that the real party in interests at the property

2   level was Lehman Re and not LBHI, and that Lehman Re was the

3   party with whom all negotiations had to take place.  That alone

4   could be cause for the Court to deny the application.

5          But I think I have other reasons to deny it, and I'm

6   going to find as many as I can find.  One is the procedural

7   basis for denying it, which is that the only way that an

8   extraordinary remedy such as a TRO can be obtained is by means

9   of an adversary proceeding.  And I'm going to put that one on

10  the shelf, too.

11         I want to hear the merits, succinctly, assuming the

12  very best case that could be put on by Laurel Cove, why on

13  earth should this Court intervene to protect a property which

14  counsel acknowledges cannot be protected in all practical terms

15  under applicable Tennessee law?

16         That's a very troublesome notion, particularly in a

17  context in which an extraordinary remedy is being sought,

18  literally hours before the foreclosure sale is to take place,

19  and when local counsel has said there's basically nothing you

20  can do in Tennessee in practical terms, which means that you're

21  coming before this Court to achieve what can't be achieved in

22  Tennessee, which certainly seems like forum shopping to me.

23         MR. TERENZI:  Your Honor, the meritorious defense is

24  my argument.  We have a meritorious defense to this

25  foreclosure, and that is alleging breach by Lehman/Lehman Re.

30

1    Your Honor, that's a violation of the stay.  How are we going

2    to do that in Tennessee when we're stayed from doing that?

3    That's -- that was the basis of -- the procedural basis for

4    this motion, as opposed to an injunction which was required in

5    that adversary proceeding.

6         We ask this Court to say that by operation of the

7    automatic stay of 362, that the Tennessee action should be

8    stayed until those other issues which would otherwise be stayed

9    for us to assert in Tennessee are determined in this Court.

10   And that was the procedural basis of this, and not seeking an

11   injunction which I'm aware needs an adversary proceeding.

12        THE COURT:  You said a lot there and I'm not sure I

13   followed every one of those words.  Stated simply, what is the

14   relief that you seek today?

15        MR. TERENZI:  We seek for this Court to say that the

16   Tennessee foreclosure should be stayed by operation of 362 --

17        THE COURT:  Who's the plaintiff in that action?

18        MR. TERENZI:  The plaintiff is Re, but we have

19   counter-claims that we can't assert because of the stay.  We

20   have good and meritorious defenses and counter-claims based on

21   their breach on that agree -- of that agreement by failure to

22   fund, which we can't assert because of operation of the

23   automatic stay.  And we're saying that this Court should deal

24   with those issues before any Tennessee foreclosure should be

25   able to go through.

VERITEXT REPORTING COMPANY

31

1       THE COURT:  But you're not asking for relief from the

2  automatic stay.  You're not asking for stay relief here, nor

3  have you sought a stipulation from counsel for Lehman Re to do

4  that.

5       MR. TERENZI:  That's right, Judge, because we -- it

6  was our belief that those issues belonged in this Court, not in

7  Tennessee court, because it involved the two debtors, this

8  Court's order, all these noti -- all these things that we've

9  been talking about today, whether there was proper notice, all

10  these things have to be -- need to be addressed and we felt

11  that this is the proper Court to adjudicate those things, and

12  not the Tennessee court, who have very limited understanding as

13  to the bankruptcy proceedings in this Court --

14       THE COURT:  Why are the bankruptcy proceedings

15  relevant to what appears to be a garden variety foreclosure

16  action brought in Tennessee, pursuant to Tennessee real

17  property law and procedure?

18       MR. TERENZI:  Because it's not a garden variety

19  foreclosure, Judge.  It just isn't, Judge.  It's -- this isn't

20  a case where we fail to pay a mortgage and they're foreclosing.

21  This isn't -- this is not that case, Judge.  This is my clients

22  losing their property because of Lehman's bankruptcy prevent --

23  they weren't able to fund.  We weren't able to counter-claim

24  and sue them for breach of contract on that because of the

25  stay, Judge.  And we're losing our property because they

32

1   defaulted on this obligation to fund us.

2           THE COURT:  Well, Mr. Terenzi, at least since August

3   of 2009, if not earlier, and we could go back to September of

4   2008, when all Lehman related businesses very publicly hit the

5   wall and started to crash and burn.

6           As borrower, Laurel Cove was well aware that it had

7   borrowed money from LBHI and whether it ended up in the hands

8   of Lehman Re or LCPI, or any other affiliate that had the

9   Lehman name attached to it.  Laurel Cove was aware that it had

10  trouble, and needed to do something to either refinance the

11  property, or to protect itself.  And as far as I can tell, with

12  the exception of the motion that was filed to compel

13  assumption, has done nothing.

14          MR. TERENZI:  Your Honor, that's just not true.  Since

15  the filing, my client has worked closely with Lehman and Lehman

16  Re to try and resolve this issue.  They came with a substitute

17  lender before the June 2nd default, before my motion.  They

18  came with a substitute lender, asking Lehman, can we substitute

19  you in a lending, you are going to have to take a subordinate

20  position.  There was discussions about that.

21          There was discussions about a buyout, and there was

22  a -- discussions about reinstating the loan.  There have always

23  been discussions.  There were always -- my clients has always

24  been engaged, Your Honor.  We didn't just sit there, sitting on

25  their hands, as counsel would have you believe.  That did not

33

1    happen.   There were constant communications between my client

2    and her -- and both Lehman and Lehman Re.

3          At all times, Judge, and it never stopped until the

4    blackout period that happened mid-November to the second week

5    in December, December 14th, and on December 15th, my client is

6    in communication with them again.

7          We did not sit on our hands, Judge; we at all times

8    tried to move this project forward and rehabilitate it.  Not

9    once did we sit on our hands.  Now, can you Monday morning

10   quarterback this, Judge, and say we could have done this and we

11   could have done this differently?  Sure, Judge, but did we sit

12   on our hands?  Judge, we didn't, not for a moment, not for a

13   moment.

14         And, again Judge, I have to go back.  This is based on

15   the default of Lehman to fund, that's why we're in foreclosure;

16   not any obligation that we failed to commit to.  Not one,

17   Judge.  And we're losing our property.  And we were at all

18   times in contact with them.  There -- there was -- I have

19   printed email, Judge, just from October, November, about

20   actually agreeing on a price until a blackout came and all

21   negotiations stopped.  Suddenly we were told, "We can't talk to

22   you until December 14th".  December 15th, my client

23   communicates.

24         Judge, we weren't sitting on our hands.  We have a

25   meritorious defense.  We did nothing wrong.  We did not breach

34

1   this agreement, Lehman did.  And because of the procedural

2   posture now, we're in a position that in the Tennessee state

3   court, we're going to lose our property.

4           THE COURT:  Have any claims been filed?

5           MR. TERENZI:  Yes, Judge.

6           THE COURT:  I'm not done with my statement.

7           MR. TERENZI:  I'm sorry.

8           THE COURT:  Have any claims been filed by Laurel Cove

9   in the Lehman bankruptcy cases prior to the bar date for

10  damages allegedly falling from the failure to fund this loan?

11          MR. TERENZI:  Yes, Judge.

12          THE COURT:  And what's the amount of the claim?  Is it

13  unliquidated?

14          MR. TERENZI:  Judge, I don't have the amount at my

15  fingertips.  It's millions of dollars.  But we did allege the

16  breach and all the incidental damages that were caused by that

17  breach.  And we did file that proof of claim and we filed it

18  before the bar date.  Absolutely.  And it has not objected to.

19  Judge, we tried to assert ourself and we tried to mitigate our

20  damages.  We tried to habilitate this loan.  Could we have done

21  things differently?  Sure.  Did we stood [sic] on our hands?

22  Absolutely not, Judge.

23          THE COURT:  Okay.  I understand.  I think I understand

24  your position.  To the extent that the statements just made by

25  counsel represent a request for relief based upon the merits,

35

1    I'll give counsel an opportunity to respond although there's no

2    evidence that has been presented by Laurel Cove.  It's just

3    argument of counsel.

4          MR. PETRICK:  Correct, Your Honor.  The point I was

5    going to make, Your Honor, was that to get injunctive relief,

6    if it were properly before the Court, there would have to be a

7    demonstration of likelihood of success on the merits.  That's

8    one prong.

9          I am not quite sure in my mind how they would prevail

10    on that, the success indicating the foreclosure sale.  One of

11    the exhibits to our papers is a letter from the Provisional

12    Liquidators to the borrower noting fifteen different defaults.

13    Counsel keeps referring to or trying to suggest that each of

14    those defaults are defaults that were caused by the failure of

15    LBHI to fund.  I would note for the record, Your Honor, that at

16    least some of those defaults are events unrelated as a

17    requirement that there be a guarantor -- a guaranty of the loan

18    by a guarantor with a network of a hundred million dollars.

19    That is a default of that requirement.  It has nothing to do

20    with LBHI.  And there's numerous other defaults.

21          But the point I'm trying to make, Your Honor, is that

22    on the basis of the record before you, there is, I believe, no

23    evidence to support a finding that the borrower could prevail

24    on any action if you defeat the foreclosure action.  And

25    certainly, if they have defenses there, they are free to go to

36

1    Tennessee and assert them under applicable law.  There's

2    nothing about the automatic stay that would prohibit them for

3    doing that.

4         The second point, Your Honor, is the likelihood of

5    irreparable harm.  We believe that the owner in this property

6    has no equity value.  But if we're wrong in that, and if we're

7    wrong in anything with respect to how notice was given or the

8    foreclosure sale was conducted or whether or not there were

9    meritorious defenses, there is a proof of claim in LBHI's case

10   that has been filed.  There's a proof of claim that's been

11   filed in Lehman Re's case even though we don't have a bar date

12   and I don't think claims are proper in the Chapter 15.  But

13   they have filed for whatever it's worth a hundred million

14   dollar claim in our case.

15        There are other avenues where money damages would be

16   available to Laurel Cove that would defeat the irreparable harm

17   prong of the injunctive relief.  Thank you, Your Honor.

18        THE COURT:  Okay.  Anything -- is there anything more

19   Mr. Terenzi?  You don't need to have anything more but this is

20   an opportunity for you to get in your last licks.

21        MR. TERENZI:  Yes, Judge.  Just as far as evidence of

22   a meritorious defense, we have a client affidavit saying that

23   we were never in default up to September that we submitted due

24   and required documentation to Laurel -- to Lehman in September

25   and October and they failed to fund.  They had never disputed

37

1    that fact, that we were not in default and they failed to fund.

2    They defaulted on this obligation first.  That is uncontested.

3    You have a client affidavit from someone with personal

4    knowledge stating that they did not and cannot refute that.  We

5    have good and meritorious defenses here, Judge.

6             THE COURT:  All right.  This is a matter brought on by

7    order to show cause by Laurel Cove Development LLC seeking

8    relief that is, in effect, an attempt to obtain a stay courtesy

9    an order of this Court of proceedings that are currently

10   pending the state of Tennessee commenced by Lehman Re to

11   foreclose on the property owned by Laurel Cove.  This is

12   argument only and not an evidentiary hearing inasmuch as none

13   of the declarations that have been referenced by the various

14   parties have been offered into evidence nor the declarance here

15   for cross-examination.  Nonetheless, I believe that the Court

16   has a sufficient understanding of the legal arguments being

17   made and the factual basis for those arguments to be able to

18   rule in connection with the pending motion for an order staying

19   the successor trustee's sale.

20            The motion brought by Laurel Cove seeks a host of

21   unconventional relief.  Point one is a request for a stay of

22   the sale.  Point two is a request for an order invalidating the

23   assignment that was made to Lehman Re that this Court approved

24   by order of August 27, 2009, or alternatively, compelling

25   compliance with Section 365(d)(2) of the Bankruptcy Code.

38

1          I will note that for purposes of the argument that has

2     been presented this afternoon, there has been virtually no

3     mention of 365(d)(2) nor has there been any serious argument

4     with regard to the invalidation of the assignment approved by

5     order of the Court last year.

6          Instead, counsel for Laurel Cove makes a generalized

7     equitable argument that it is unfair for Laurel Cove to be

8     exposed to a foreclosure in Tennessee because it did nothing

9     wrong in the sense of its observance of covenants and

10    obligations assumed under the construction loan for the project

11    in Tennessee.

12         What Mr. Terenzi asks for is about as procedurally

13    convoluted as anything that the Court has in the past had

14    occasion to consider.  The effect of granting the relief sought

15    by Laurel Cove would be to stay a state law foreclosure

16    proceeding without going through the procedural requirements

17    for obtaining an injunction.

18         Mr. Terenzi also is candid enough to acknowledge that

19    one of the reasons that may or may not be the principal reason

20    that Laurel Cove has elected to seek relief from this Court is

21    that, as a practical matter, it would not have been possible to

22    obtain a stay of the proceeding under applicable Tennessee law

23    because local counsel in Tennessee has confirmed that such a

24    stay could only be obtained upon the posting of a bond in an

25    amount that exceeds the current ability of Laurel Cove to post.

39

1          And so, by indirection, Laurel Cove seeks to obtain a

2     functional equivalent of the stay without following the

3     procedures generally available both in Tennessee and in this

4     court for obtaining such a stay.

5          He argues that because the automatic stay associated

6     with the recognition of Lehman Re's Chapter 15 case stands in

7     the way of raising as counterclaims defenses to the foreclosure

8     proceeding, and because this Court, as opposed to a Tennessee

9     Court, is more familiar with both bankruptcy principles and the

10    complicated factual history leading up to the foreclosure, that

11    it makes sense for matters in dispute between the parties

12    concerning the property and defaults under the loan to be heard

13    here rather than in Tennessee.

14         I reject those arguments.  A Tennessee court is

15    perhaps the best place I can imagine to resolve any disputes

16    relating to rights in and to real estate located within

17    Tennessee and to the rights of the parties in connection with

18    real estate projects undertaken within the state.

19         As to the foreclosure action itself, if Laurel Cove

20    had wanted to do so, it could have earlier sought relief from

21    the automatic stay to the extent it is even applicable to this

22    proceeding by means of a stipulation from counsel for Lehman Re

23    or by means of earlier presentation of a motion for relief from

24    the automatic stay.

25         The Court considers it notable that even today counsel

40

1    for Laurel Cove is not seeking relief from the automatic stay

2    to make any arguments that could be available in Tennessee but

3    instead is using the automatic stay as a means by indirection

4    to obtain the functional equivalent of a temporary restraining

5    order or a preliminary injunction to stop a properly noticed

6    foreclosure sale in Tennessee.

7            This rises to the level of sophistry.  The fact that

8    the automatic stay may or may not impair the ability of Laurel

9    Cove to raise defenses in Tennessee truly is irrelevant.

10   Counsel has acknowledged that there is no ability, in practical

11   terms, to obtain relief in Tennessee and, moreover, has said

12   that a claim has already been properly filed, and I make no

13   judgment as to what that claim may or may not realize in the

14   Lehman bankruptcy cases, either as to LBHI, Lehman Re or both.

15   To the extent that a claim has been properly filed and to the

16   extent there is any merit to the allegations of damage caused

17   by defaults on the part of any Lehman entity, that is a matter

18   to be heard and determined in the future here.

19           Additionally, the Court has spent some time

20   considering questions of notice and a credibility of assertions

21   that have been made seeking to invoke on an emergency basis the

22   Court's equitable powers literally days before the scheduled

23   sale.  The Court does not fault counsel for endeavoring to

24   obtain relief by all available means.  But the Court considers

25   this last ditch attempt to block a foreclosure sale to be a

41

1   highly questionable procedure.  Based on the acknowledged

2   facts, counsel for Laurel Cove knew in August of 2009 that all

3   disputes between LBHI and Lehman Re concerning control of this

4   particular loan had been resolved in favor of Lehman Re and

5   that an order of the Court was entered on August 27, 2009 which

6   has become final.

7           To the extent that the current procedure represents an

8   attempt to collaterally attack the validity and enforceability

9   of that order, that effort is too late and is based upon

10  allegations that are simply not credible.

11          Laurel Cove knew or should have known, at least as

12  early as August of 2009, that the real party in interest with

13  whom it needed to deal at the property level was Lehman Re.

14  Additionally, counsel acknowledges that, at least as early as

15  October and November of last year, Laurel Cove recognized that

16  the one party with whom it would be dealing in order to save

17  the property was Lehman Re.  Under the circumstances, there

18  simply is no merit to the argument that there is anything about

19  the resolution of the dispute as embodied in the settlement

20  agreement that is unfair as to Laurel Cove.  Additionally, it

21  has been acknowledged that during the period of at least

22  November, December and January in matter on the omnibus

23  calendar relating to Laurel Cove, has been adjourned at the

24  request of counsel for Laurel Cove.

25          The procedural history of this dispute makes it

42

1    absolutely clear that there is no credible basis for seeking

2    extraordinarily relief on an emergency basis days before a

3    scheduled foreclosure sale.

4          The motion of Laurel Cove is denied without prejudice

5    to any claims that Laurel Cove may properly prove by reason of

6    the timely filed proofs of claim in the Lehman bankruptcy

7    cases.  I'll accept an order.

8          MR. TERENZI:  Thank you, Judge.

9          THE COURT:  We're adjourned.

10          MR. PETRICK:  Thank you, Your Honor.

11     (Whereupon these proceedings were concluded at 3:56 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

43

1

2

3                          I N D E X

4

5                        R U L I N G S

6   DESCRIPTION                                PAGE LINE

7

8   Motion of Laurel Cove Development LLC        42      3

9   for an Order (i) Staying the Successor

10  Trustee's Sale; (ii) Either Invalidating

11  Assignment to the Debtor or Compelling

12  Compliance with Section 365(d)(2)of the

13  Bankruptcy Code; (iii) Shortening Time

14  and Limiting Notice; and (iv) for Such

15  Other Relief as May be Just and Proper

16  Denied

17

18

19

20

21

22

23

24

25

44

```
1

2                    C E R T I F I C A T I O N

3

4       I, Sharona Shapiro, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6       Sharona          Digitally signed by Sharona Shapiro
                          DN: cn=Sharona Shapiro, o, ou,
                          email=digital1@veritext.com, c=US
        Shapiro          Date: 2010.01.22 14:44:40 -05'00'
7       _____

8       Sharona Shapiro

9       AAERT Certified Electronic Transcriber (CET**D-492)

10

11      Veritext LLC

12      200 Old Country Road

13      Suite 580

14      Mineola, NY 11501

15

16      Date: January 22, 2010

17

18

19

20

21

22

23

24

25
```