STAMELL & SCHAGER, LLP
One Liberty Plaza, 35th Floor
New York, NY 10006-1404
Telephone: (212) 566-4047
Facsimile: (212) 566-4061
Email: schager@ssnyc.com
Richard J. Schager, Jr.

*Attorneys for Claimant(s)*
*Paola Biraschi, et al.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                                                             :
In re                                                        :   Chapter 11 Case No.
                                                             :
LEHMAN BROTHERS HOLDINGS INC., et al.,                       :   08-13555 (JMP)
                                                             :
                                        Debtors.             :   (Jointly Administered)
                                                             :
------------------------------------------------------------ x

## RESPONSES OF CLAIMANTS MICHAEL K. McCULLY, MICHAEL J. MULLEN AND OTHER CLAIMANTS, IN OPPOSITION TO DEBTORS' 313th OMNIBUS OBJECTIONS TO CLAIMS (TO RECLASSIFY PROOFS OF CLAIM AS EQUITY INTERESTS)

**This Statement of Opposition to the Debtors' 313th Omnibus Objection** is submitted on behalf of claimants Michael K. McCully, Michael J. Mullen, and the other claimants listed on Exhibit A hereto (collectively, the "Claimants"). Each of the Claimants is submitting a supporting affidavit, filed as an Exhibit to this Opposition. Debtors' 313th Omnibus Objection is the tenth in a series of Omnibus Objections attempting to reclassify as equity interests the claims of former employees for unpaid compensation. Debtors' Objection should be denied because:

- By clothing these employee deferred compensation agreements in the garb of equity stock option plans (which they are not), Debtors are asking the Court to see equity that is simply not there. Granting stock options is issuing securities; promising compensation for services is not. Claimants, and others similarly situated, were not "awarded" equity; rather, portions of their declared bonuses or earned commissions were withheld to secure the performance of ongoing

services. As Professors Slain and Kripke described in the study widely considered its legislative history, the purpose of §510(b) was to subordinate securities fraud claims to the level of equity because "the reliance interests of *laborers*, lenders and trader creditors" deserved greater protection than securities fraud claimants. Applying § 510(b) to reclassify these deferred compensation claims as equity completely up-ends the Slain/Kripke analysis.[1]

- Debtors have characterized Claimants' claim as an attempt to "bootstrap" an equity claim into a contract claim, but this is exactly the opposite of what Debtors' 313th Omnibus Objection seeks.[2] Debtors' petition and schedules, as well as the compensation plan documents of pre-petition Lehman Brothers Holdings ("LBH"), recognize that the claims of these Claimants and others similarly situated are executory contract claims for employee compensation, with priority for a portion as recognized by 11 U.S.C. § 507(a)(4). Debtors' Objection is an effort "reclassify" these compensation claims to the same level as that of defrauded purchasers of securities, whose claims are sourced in corporate and securities law, not contract law.

- The fundamental reason for subordinating an equity claim to unsecured creditors' claims is that shareholders provide an "equity cushion" on which creditors rely in dealing with the Debtor pre-petition. Debtors here have failed to describe the mechanics of the compensation agreements at issue, and failed to document that these compensation claims were anything but contract obligations to employees. The RSU Agreements provided no equity cushion.

Debtors' claim that McCully and other employees are attempting to bootstrap their compensation claims from equity into contract is drawn from a 19th century case presenting the rhetorical argument that "[w]hen a corporation becomes bankrupt, the temptation to lay aside the garb of a stockholder, and to assume the role of a creditor, is very strong. . . . ."[3] Putting aside

---

[1] J. Slain & H. Kripke, *The Interface between Securities Regulation and Bankruptcy - Allocating the Risk of Illegal Securities Issuance between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261, 299 (1973) (emphasis added) ("Slain & Kripke"). In *In re Enron Corp.*, 341 B.R. 141, 163-64 (SDNY Ban'cy 2006), Judge Gonzales recognized the Slain & Kripke article as "the journal article that motivated the promulgation of" § 510(b), and noted that Congress had "broadly adopted the legal principles articulated by Slain and Kripke" in drafting the statute. *Enron*, 341 B.R. at 163. On the Appellate level, the Second Circuit noted the influence of the Slain & Kripke article (*In re Med Diversified, Inc.*, 461 F.3d 251, 255-56 (2d Cir. 2006)), and the Third Circuit also noted that "Congress relied heavily on" the article (*In re Telegroup, Inc.*, 281 F.3d 133, 139 (3d Cir. 2002)).

[2] Debtors' December 15, 2011 Omnibus Reply to Responses to Debtors' 118th, 130th, 131st, 133rd, 134th, 135, 176th, and 207th Omnibus Objections to Claims (to Reclassify Proofs of Claims as Equity Interests) (the "Dec. 15 Omnibus Reply") at ¶ 15; Debtors' January 24, 2012 Supplemental Annotated Omnibus Reply to Debtors' 73rd, 118th, 130th, 131st, 133rd, 134th, 135, 176th, and 207th Omnibus Objections to Claims (to Reclassify Proofs of Claims as Equity Interests) (the "Jan. 24 Supplemental Reply") at ¶ 20.

[3] *Newton Nat'l Bank v. Newbegin*, 74 F. 135, 140 (8th Cir. 1896).

2

the holding of the case (the shareholder-claimant there *was* permitted to proceed with his creditor's claims) courts in this circuit have applied the bootstrap concept from *Newton Nat'l* only where the claim was unambiguously an equity claim sourced in corporate or securities law.[4] In addition, while the Second Circuit adopted the analysis of Judge Gonzales in *Enron*, that Court did so only with the action that caution should "guard[ ] against attempts by a bankruptcy debtor to cloth a general creditor in the garb of a shareholder," particularly where (as here) the claimant has never received his or her equity. *In re Med Diversified, Inc.*, 461 F.3d 251, 258, 46 Bankr. Ct. Dec. 76 (2d Cir. 2006); *See In re CITGroup Inc.*, 460 B.R. 633, 643 (SDNY Ban'cy 2011) (same). The Court "acknowledge[d] the outer boundaries of the statute's text and purpose," 461 F.3d at 259, and noted that nothing in its analysis in that case or in *Enron* would require

> subordination of a claim simply because the identity of the claimant happens to be...one who completed a bargain to become a shareholder, when the claim lacks any caused relationship to the purchase or sale of stock and when subordinating the claim would not further the policies underlying § 510(b)...

461 F.3d at 259 *quoting In re Telegroup, Inc.*, 281 F.3d 133, 144 n.2 (3d Cir. 2002) (internal punctuation omitted).

Debtors have not differentiated among the various compensation plans at issue, but rather have presented a "garb of a stockholder" argument drawn largely from stock option cases that address materially different facts. Unlike the defrauded stockholders in *Stirling Homex* and the holders of stock options in *In re Enron*, Claimants here and others similarly situated were never

---

[4] Citing *Newton Nat'l* in *In re Enron*, Judge Gonzales was looking at the rights of employees who were holders of securities -- stock options -- and found that these security holders failed to distinguish their claims from those of any other holder of stock options "who is unable to exercise his options because the share price has declined." *In re Enron*, 341 B.R. 141, 158, 160 (S.D.N.Y. Ban'cy 2006). In citing the case in *In re Stirling Homex*, the Second Circuit was looking at the rights of stockholders "whose claims are grounded on fraud or securities law violations committed upon them as stockholders . . . ." *In re Stirling Homex*, 579 F. 2d 206, 210, 213-14 (2d Cir. 1978).

security holders, and the case law indicates they never had the rights of an equity holder. *Fleet Boston Financial v. Alt*, 668 F. Supp. 2d 277, 279-80 (D. Mass 2009), *aff'd*, 638 F.3d 70 (1st Cir. 2011). Until Debtors began the series of Omnibus Objections (described in n.2 above) directed at holders of RSUs and CSAs, Debtors and the pre-petition LBH recognized that. Claimants, and others similarly situated, have only the contractual deferred compensation rights that are the basis for their claim. They have no corporate and securities law rights, and the "stockholders' garb" Debtors have woven from them is simply not there.

## PROCEDURE POSTURE

This Opposition to Debtors' 313th Omnibus Objection is submitted on behalf of two subclasses of Claimants with three claims for unpaid compensation.

The two subclasses are (i) salaried personnel, from whose year-end bonus an identified portion was withheld to secure the performance of future services, with the promise to provide shares of stock in the future, and (ii) commissioned sales persons, from whose monthly commissions an identified portion was withheld, which at year-end was converted to the same contract promise, also securing the performance of future services.

The three claims include (a) the unpaid bonuses of salaried employees who performed the services requested until Lehman Brothers Holdings' Petition Date (as described in each of the Claimants' Affirmations filed herewith), (b) the unpaid commissions of the commissioned sales people, who also performed the services requested until the Petition Date, and (c) the unpaid commissions of the commissioned sales people for the period between December 2007 and August 2008, which commissions remained a cash obligation and were never converted to the contract promise to provide shares of stock.

Debtors do not contend that any tax was withheld from the amounts claimed, that any taxable compensation was reported to tax authorities, or that the pre-petition Lehman Brothers claimed any compensation deduction. As described below, Debtors' documents concede that portions of Claimants bonuses and commissions were withheld, and Debtors do not document that any shares of stock were purchased in the Claimants' names with the funds withheld. No compensation or other property was provided in return for the funds withheld, other than the contract promises described above.

Claimants have filed claims for earned and unpaid compensation. In several cases Debtors documents instructed claimants to file their claims that way. *E.g.*, Brewer, Aff. ¶ 7, DeJesus Aff. ¶ 5, McCully Aff. ¶ 7, Olivier Aff. ¶ 7, Shapiro Aff. ¶ 6.

Two years after the Petition Date, Debtors changed their position and began to file their motions to "reclassify" these employee claims for unpaid compensation to "equity" claims. On their face Debtors papers are potentially insufficient. The Plan Documents to which they point are incomplete and incorrectly summarized. None are properly authenticated, and Debtors papers are completely void of any statement by a present or former Lehman Brothers employee stating that the reclassification position taken in the papers prepared by Debtors' professionals is in fact what the Plan Documents intended. Nor do Debtors produce any contemporaneous document (with one outlier exception discussed below, which was soon eliminated) suggesting that Lehman Brothers intended to treat its employees in this manner.

## RSUs WERE A CONTRACT PROMISE, NOT AN EQUITY AWARD

In their 313th Omnibus Objection, as well as in their two Replies in support of the nine prior Omnibus Objection, Debtors have asked this Court to ignore the critical facts of the RSU and CSA agreements. In their eagerness to characterize every one of a variety of deferred

5

compensation plans as "equity based compensation," Debtors fail to address the specific contract provisions of these RSU/CSA Agreements, including their contingent nature and the ongoing services required before they ripened into a right to be paid. As discussed below, Debtors also fail to address how "equity" can be characterized as "awarded" when there is no taxation on the "award" (or deduction by Debtors upon granting the award) until much later, after the performance or lapse of the contract obligations. These are distinctions the Court cautioned Debtors' to address in the hearing on December 23, 2011 (Hrg. ¶¶ at 103-05), and they remain unaddressed.

Pre-petition Debtor Lehman Brothers Holdings, Inc. ("LBH") had the option to issue equity awards, and did issue equity awards, the most common of which were stock options. Several years of Stock Option Plans pursuant to which stock options were issued are attached to Debtors' Dec. 15 Omnibus Reply. (Doc. 23470, at pp. 22-41, relating to plan documents for 2001-03.) In each case, the equity award was a *present* issue of a security:

> [Y]ou are hereby granted . . . a non-qualified stock option to purchase the number of common shares . . . set forth on the award statement . . . with an exercise price of . . . $63.40 per share . . . .

Debtors' Dec. 15 Omnibus Reply, Doc. 23470 at p. 23 (2001 Stock Option Plan ¶ 1); *see* second 2001 Stock Option Plan ¶ 1 (*id.* at 27), 2002 Stock Option Plan ¶ 1 (*id.* at p. 31), 2003 Stock Option Plan ¶ 1 (*id.* at p. 35), and second 2003 Stock Option Plan ¶ 1 (*id.* at p. 39) (all with the same language).

Unlike the stock options, however, the RSU Agreements did not provide for the present issue of a security, but only a contract promise to issue a security in the future -- "the *conditional right* to receive one share of Lehman Brothers common stock five years after the RSU or CSA is granted, *assuming continued employment* with the firm." *See, e.g.*, Debtors' Dec. 15 Omnibus

Reply, Doc. 23470, 2003 Award Program at p. 44 (emphasis added). The RSUs and CSAs did not represent a current entitlement, but rather shares "which you will be entitled to receive at that time [five years hence] *provided you meet certain terms and conditions.*" *Id.* at 45 (emphasis added). In contrast, immediately after this proviso making the contract obligation conditional, LBH described the stock options that would be issued under the same program: The stock option language *does not contain the same proviso* making the stock option grant conditional. *Id.* (Doc. 23470, at p. 45). This document is unambiguous in describing the RSU and CSA Agreement as having ongoing contract obligations and conditions that stock options did not have. The stock options constituted a present equity award; the RSU Agreement was a conditional contract undertaking to provide compensation in the future.[5]

Debtors claim that the 2003 and 2004 Plan Documents contain the advice that any claim arising from LBH's failure to deliver promised shares due to bankruptcy would be headed on an equity claim under § 510(b). However, of the Plan Documents Debtors have submitted to the Court (none properly authenticated), only the 2004 Plan Document contains this purported advice. Dec. 15 Omnibus Reply at p. 59. None of the other twelve Plan Documents submitted by Debtors (two for 2001, one for 2002, three for 2003, one for 2005, one for 2006, two for 2007 and two for 2008) contain comparable language. While Debtors may be able to produce a 2003 Plan Document that contains the language they claim, the consistency of the documents post-2004 suggests that the language was intentionally elided, and a reasonable inference is that it appeared in one of thirteen Plan Documents Debtors have submitted by mistake.

---

[5] The only appellate authority we have located on the issue of what rights are provided with RSUs and CSAs is *Fleet Boston Financial v. Alt*, 668 F. Supp.2d 277 (D. Mass 2009), *aff'd*, 638 F.3d 70(1st Cir. 2011). The District Court held there that holders of RSUs had no standing under corporate law, because RSUs was not corporate stock and holders of RSUs "never acquired stockholder status." 668 F. Supp.2d at 279-80. Even the fact that the issuer recorded the RSU holders as putative stockholders did not give them standing as stockholders. *Id.* at 281. The court also rejected the argument that the plaintiffs were "equitable stockholders." *Id.* at 282.

## DEBTORS RECOGNIZED THAT THE RSUS PRESENTED AN
## EXECUTORY CONTRACT CLAIM, NOT A SECURITIES CLAIM

LBH also demonstrated in the RSU Agreements that it viewed the RSUs as a salary holdback to ensure future contract performance. Each year's Plan presented an "Award Schedule" in the form of a chart that provided the "Total Compensation Range," followed by columns that designated the "Amount of Total Compensation ('TC')" for various levels of employees and the portion of their Total Compensation that would be held back. The RSU/CSA compensation was described as an "Equity-*based* Award" (emphasis added), measured in dollars or as a percentage of total dollar-measured compensation. *See, e.g.*, Debtors' Dec. 15 Omnibus Reply, Doc. 23470 at p. 63 (Agreement for 2004) and 71 (Agreement for 2005). The compensation promises under the Agreements were subject to rescission in the event of termination of employment. *E.g.*, Debtors' Dec. 15 Omnibus Reply, Doc. 23470, at p. 58 (Agreement for 2004 at ¶ 4(d)), p. 66 (Agreement for 2005 at ¶ 4(d)), and p. 74 (Agreement at ¶ 4(d)). In certain circumstances even vested RSUs and CSAs were subject to rescission. (*id.*, in each Agreement at ¶ 4(d)(ii)), and unvested RSUs and CSAs were always subject to rescission in certain circumstances (*id.*, in each Agreement at ¶ 4(d)(i) & (iii)).

In light of the contract language in the Agreements described above, it comes as no surprise that it was initially *Debtors* who classified the RSU and CSA claims as executory contract claims and not equity claims. Shortly after filing their Petition, Debtors sent to many Claimants a partially completed Proof of Claim, containing a code for the claim -- "LBH (MERGE2.DBF.SCHED_NO) SCHEDULE #: 555231120" -- with the Notice of Scheduled Claim on the Proof of Claim form already *completed by Debtors* to state:

> Schedule G - Executory Contract or Unexpired Lease
>
> Description:

8

Restricted Stock Unit Agreement. *See, e.g.,* Brewer Aff. ¶ 7, DeJesus Aff. ¶ 5, McCully Aff. ¶ 7 & Ex. 1. As stated by these Claimants, the typewritten portions of this Exhibit are the portions completed by Debtors, including the characterization of the claim as a contract claim.

After having instructed Claimants to file their RSU Claims as an executory contract claims, on June 4, 2012 Debtors filed their 313th Omnibus Objection to reclassify the RSU and CSA claims as equity interest claims. This Omnibus Objection was the tenth in a series of similar Objection, all having the goal of depriving former employees of their compensation.

As stated by Claimants in their supporting affidavits, the economic substance of RSU/CSA Agreements is that a portion of their declared bonuses were not paid, but rather were reserved for future payment five years hence, assuming continued employment and the performance of other contractual obligations. As recognized by several Claimants who also were issued stock options, the grant of a stock option involved the issuance of security, which was exercisable at a fixed price into another security, LBH shares, in accordance with its terms. *E.g.*, Broadbent Aff. ¶ 12, D'Amadeo Aff. ¶ 11, Howard Aff. ¶ 11, Lewis Aff. ¶ 15, McCully Aff. ¶¶ 13-15, McGee Aff. ¶ 11, & Ward Aff. ¶ 13. Claimants received no such rights from the RSU and CSA Agreements, which only promised compensation after continued performance of contract obligations for five years. *Id.* at ¶¶ 12-13.

The RSU and CSA Agreements, Debtors' Petition, and Debtors' handling of the Proof of Claim forms in July 2009, all point to treatment of the RSUs and CSAs as executory contracts. Debtors' efforts in the 313th Omnibus Objection to subordinate to the level of equity the compensation claims of Claimants and others similarly situated, filed almost two years later in April 2011, is belated effort to retract Debtors original (and proper) classification.

9

Debtors' charge that it is Claimants and others similarly situated who are trying to change the classification of their claims, to "bootstrap" themselves to the creditor level, is simply belied by the record.

### THE RSU AGREEMENTS PROVIDED NO "EQUITY CUSHION" WARRANTING SUBORDINATION TO UNSECURED CREDITORS

Neither in their 313th Omnibus Objection, nor in their two Replies to the responses in opposition to the nine prior Omnibus Objections, do Debtors attempt to describe the mechanics by which the RSU and CSA Agreements were performed or how, ultimately, the executory contract rights to compensation were to ripen into rights to LBH stock. As outlined in the Claimants' Affidavits, when they were provided with notice of their annual bonuses, the Notice would set forth the portion of the bonuses that were to be reserved for RSUs and CSAs. At the time the bonuses were issued there were no vested rights provided by the RSU and CSA Agreements, and no vested rights to receive LBH shares. Claimants were given the cash portion of their bonuses, recognized as ordinary income, and Debtors would take a compensation deduction for the amount of the cash bonus. Broadbent Aff. ¶ 9, D'Amadeo Aff. ¶ 8, Engel Aff. ¶ 5, Howard Aff. ¶ 8, King Aff. ¶ 6, McCully Aff. ¶ 11, McGee Aff. ¶ 7, Mullen Aff. ¶ 8, Shapiro Aff. ¶ 9, Ward Aff. ¶ 10. Overseas CSA claimants report the same tax treatment. Biraschi Aff. ¶ 6, Brewer Aff. ¶ 1, Collier Aff. ¶ 11, DeJesus Aff. ¶ 10, Goldberg Aff. ¶ 11, Neville Aff. ¶ 11, Olivier Aff. ¶ 11, Santodomingo Aff. ¶ 9, Smith Aff. ¶ 11, Snelling Aff. ¶ 11, Graves Aff. ¶ 11, Lewis Aff. ¶ 11. Claimants did not pay taxes on the portion of the bonus reserved by the RSU Agreement, and Debtors have not claimed that they took a compensation deduction for this portion of the bonus. There is nothing in this description of how the RSU Agreements operated to suggest that any creditor could have found them to provide any equity cushion, and Debtors have failed to place anything in the record to suggest otherwise. *See In re*

*Stirling Homex*, 579 F.2d 206, 213-14 (2d Cir. 1978) (discussing creditors' reliance on the protection provided by the "equity cushion"); *Newton Nat'l Bank v. Newbegin*, 74 F. 135, 140 (8th Cir. 1896) (creditors who "elected to take obligations of the reorganized bank" with knowledge of an investor's claim were not entitled to claim status superior to that of the investor).

Further, with respect to U.S. based employees issued RSUs, the provisions of the Internal Revenue Code that would apply to the issuance of equity illustrate that the RSUs were not equity when issued, but rather contract obligations contingent on future performance, and overseas employees issued CSAs indicate in their affirmations the same treatment. Section 83(a) of the Internal Revenue Code specifies the circumstances under which property transferred in connection with the performance of services is to be included in gross income. Under I.R.C. § 83(a), the fair market value of "property transferred" in connection with "the performance of services" is included in the gross income of the person who performed the services. This provision applies equally to RSUs and stock options. The reason stock options are not taxed as "property transferred" is that there is a special provision, I.R.C. ¶ 83(e)(3), stating that § 83 does not apply to "the transfer of an option without a readily ascertainable fair market value . . . ." RSUs did not benefit from any comparable provision, yet they also were not taxed at the time of the entry into the executory contract, and no tax was imposed when the RSUs "vested" some years later. No tax was assessed on the bonus until shares were issued pursuant to the executory contract. Further, a critical fact illustrating that the Claimants never held equity before shares were issued is that, five years after the grant, cash was withheld to pay the federal withholding tax before the shares were issued to the RSU or CSA holder. *E.g.*, McCully Aff. ¶ 11; Debtors Dec. 15 Omnibus Reply, Doc. 23470, p. 59 at ¶ 15 (LBH was to "withhold applicable taxes from

11

all amounts payable to you"). In addition, LBH received no corresponding deduction before the bonus was converted to issued shares. The reason is not, as in the case of stock options, because of a provision similar to I.R.C. § 83(e)(3), but because there was no property transferred to Claimants on which a tax could be imposed or for which LBH could claim a deduction.[6]

Finally, tax concepts strongly suggest that the source of this money for tax payment was the cash withheld from the employee's bonuses or commissions at the time of the grant. If equity had been purchased for the holder of RSUs or CSAs at the time of the grant, then at the time of payment of the withholding tax some of that equity would have been sold to raise cash for the tax payment. Any such sale would be a taxable transition. The Claimants Affirmations consistently indicate that LBH reported no such transaction.

In sum, Debtors have failed to establish that the holders of RSUs and CSAs are equity holders, or that the RSU Agreements are anything other than right to be compensated in the future for services rendered and ongoing. Until the time that the executory contract was fully performed, Claimants (and others similarly situated) had no income, no stock, no voting rights, no rights to transfer, no rights that in any way resemble the rights of a holder of a present equity interest, and no property of the type that would be subject to tax under the Internal Revenue Code.

The significances of the lack of any transfer of property is of particular is made clear by reverting to the Slain & Kripke analysis. The purpose of their article was "to consider the impact of [securities fraud] claims on the distribution of assets in bankruptcy ...." Slain & Kripke at

---

[6] I.R.C. § 409A, while added to the Code only in 2004 and for amounts deferred after Dec. 31, 2004, also supports the view that no tax could be imposed until the issuance of shares. Distributions were not permitted until a specified date and acceleration of benefits was not permitted. See I.R.C. § 409A(a)(1)(A)(i)(I), (a)(2) & (a)(3); Debtors' Dec. 15 Omnibus Reply, Doc. 23470, p. 60 at ¶ 16 (stating intention to comply with I.R.C. § 409A(a)(1)).

267. The authors noted that the "two classes of investors" who could benefit if securities law remedies were available in bankruptcy were "stockholders and subordinated lenders . . . ." *Id.*

> [I]nvestors in stock and subordinated debentures may be able to bootstrap their way to parity with, or preference over, general creditors even in the absence of express contractual rights. This unexpected result is the product of the unthinking application of the policies underlying the securities laws at the expense of policies underlying bankruptcy distribution... [T]his favored treatment is clearly outside the original contemplation of both the securityholders and the general creditors affected.

*Id.* at 268. That "original contemplation" of the stockholders and general creditors is that stockholders provide an "equity cushion" against which the creditors extend credit, and if stockholders ranks equally with creditors, "an exponential increase in the exposure of general creditors results." *Id.* at 271. The Slain and Kripke proposal that became § 510(b) was based on the view that "[t]he absolute priority rule mandates the complete subordination of equity claims against a bankrupt to the claims of general creditors," and that an exception from that rule mistakenly been carved out for fraud claims under the securities laws.

> The exception does not acknowledge the fact that the general creditor relies on the existence of an equity cushion in case of his debtor's bankruptcy ... In sum, the exception [for securities fraud claims] gives full recognition to the interests of shareholders, but neglects the interests and expectations of *laborers*, lenders and trade creditors...

*Id.* at 298 (emphasis added). The purpose of § 510(b) was to remove the exception to the absolute priority rule for securities fraud claims, of which Slain and Kripke were critical because

13

"purchasers of stock and subordinated debt have by their investments invited reliance by others who deal with the issuer." *Id.* at 299.

Nowhere in the 313th Omnibus Objection or in the nine reclassification objections that preceded it do Debtors point to any financial statement presentation documenting the unpaid compensation due to Claimants as an equity cushion. Similarly, the Unsecured Creditors Committee, in expressing its own conclusory and self-interested view that these Claimants for unpaid deferred compensation are not unsecured creditors, provides no basis for a conclusion that <u>any</u> unsecured creditor relied on the equity cushion provided by unpaid compensation. Statement of Official Committee of Unsecured Creditors in Support of Debtors' 73rd, 118th, 130th, 131st, 133rd, 134th, 135th and 176th Omnibus Objections to Claims, Dec. 20, 2011, Docket 23604.

The irony of the application of § 510(b) to unpaid compensation claims is that, in addition to these former employees not having or making securities fraud claims of the type Slain and Kripke thought should be subordinated, the authors repeatedly showed concern that the wage claims of employees having priority over securities fraud plaintiffs, to the same degree as other lenders and trade creditors. *Id.* at 286, 298 & 299.

Debtors' 313th Omnibus Objection should be denied. Seeing the RSU Agreements for what they are, they promised to pay employees in five years for ongoing services. Unlike stock options, there was no grant of equity until after five years. The Bankruptcy Code gives unsecured creditors priority over equity holders. As Debtors initially recognized, employees asserting contract rights to compensation are included in that class.

Debtors' 313th Omnibus Objection should be denied. Seeing the RSU Agreements for what they are, they promised to pay employees in five years for ongoing services. Unlike stock options, there was no grant of equity until after five years. The Bankruptcy Code gives unsecured creditors priority over equity holders. As Debtors initially recognized, employees asserting contract rights to compensation are included in that class.

Respectfully submitted,

By: _____
Richard J. Schager, Jr., Esq.
STAMELL & SCHAGER LLP
One Liberty Plaza, 35th Floor
New York, New York 10006-1404
Telephone: (212) 566-4057
Facsimile: (212) 566-4061
schager@ssnyc.com

July 6, 2012

# EXHIBIT A

# RESPONSES OF MICHAEL K. McCULLY, MICHAEL J. MULLEN, ET AL., IN OPPOSITION TO DEBTORS 313th OMNIBUS OBJECTION, (OPPOSITION TO DOCKET 28433)

| CLAIMANT | CLAIM NO. |
|---|---|
| BIRASCHI, PAOLA | 34980 |
| BREWER, KAREN | 11297 |
| BROADBENT, WILLIAM | 65126 |
| COLLIER, MICHAEL | 11588 |
| D'AMADEO, JOSEPH | 19076 |
| DE JESUS, NESTOR | 34492 |
| ENGEL, STEVEN | 15255 |
| GOLDBERG, LOUISE | 19518 |
| GRAVES, ADRIAN | 24498 |
| HOWARD, NICHOLAS | 28279 |
| KING, HARRIET CHAN | 34546 |
| LEWIS, SARAH | 8812 |
| McCULLY, MICHAEL | 65949 |
| McGEE, HUGH | 31081 |
| MULLEN, MICHAEL | 27599 |
| NEVILLE, IAN | 31678 |
| OLIVIER, HELMUT | 14855 |
| PATTERSON, MARTIN | 16289 |
| SANTODOMINGO, ALVARO | 19947 |

| SEWARD, BRIAN | 11590 |
|---|---|
| **CLAIMANT** | **CLAIM NO.** |
| SHAPIRO, ROSS | 31374 |
| SMITH, MARGARET | 11054 |
| SNELLING, STEPHEN | 8813 |
| WARD, PETER | 9915 |
| WILKINSON, TIMOTHY | 34829 |

17