WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0019
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007
Peter D. Isakoff
Denise Alvarez

*Attorneys for Lehman Brothers Holdings Inc.*
*and Lehman Brothers Commercial Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>Debtor. | Chapter 11 Case<br>No. 08-13555 (JMP)<br><br>(Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC., LEHMAN BROTHERS COMMERCIAL CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>UNIPOL BANCA S.p.A.,<br><br>Defendant. | Adv. Proc. No. 12-_____<br><br>**COMPLAINT** |

Plaintiffs Lehman Brothers Holdings Inc. ("LBHI") on behalf of itself and as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors for certain entities in the above-referenced chapter 11 cases (the "Plan") and Lehman Brothers Commercial Corporation ("LBCC") (collectively, "Lehman" or the "Chapter 11 Estates"), by their undersigned attorneys, allege the following against Defendant, Unipol Banca S.p.A. ("Unipol"):

US_ACTIVE:\44090826\6\58399.0008

# I.  NATURE OF THE ACTION

1.      Between April 6, 2007 and June 28, 2007, Lehman Brothers Commercial Corporation ("LBCC") and Unipol entered into four (4) foreign exchange ("FX") transactions (the "Transactions"), the economic terms of which are documented by written confirmations (the "Confirmations").  The Confirmations are attached hereto as Exhibits A through D.  Each Confirmation constitutes a binding agreement between LBCC and Unipol with regard to each Transaction.  The Confirmations each incorporate the 1992 version of the pre-printed multicurrency cross-border Master Agreement published by the International Swaps and Derivatives Association Inc. ("ISDA Master Agreement") and the 1998 FX and Currency Option Definitions, published by the International Swaps and Derivatives Association, Inc. ("ISDA"), the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions").  *See* Exs. A-D (Confirmations); Ex. E (ISDA Master Agreement); Ex. F (1998 Definitions) (together, the "Agreements").[1]

2.      Commencing on September 15, 2008, and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under title 11 of the United States Code (the "Bankruptcy Code").

3.      LBCC commenced its chapter 11 case on October 5, 2008.  LBCC's chapter 11 case was consolidated with LBHI's chapter 11 case for procedural purposes only, and the cases were jointly administered pursuant to Bankruptcy Rule 1015(b).

---

[1] There is disagreement about whether the counterparty to the Transactions with Unipol is LBCC or Lehman Brothers Special Financing Inc. ("LBSF").  Lehman's records indicate that they were entered into by LBSF and not LBCC.  Unipol disagrees.  This issue will be resolved by the parties or determined by a court in due course.  If the correct counterparty is LBSF, then the Transactions are subject to an ISDA Master Agreement between LBSF and Unipol, which is governed by the laws of England and Wales.  However, if the correct counterparty to any of the Transactions is LBCC, the Transactions may be subject to the statute of limitations to commence a breach of contract action for the sale of goods under New York law, which expires four years from the date that the Transactions matured.  The earliest Transaction matured on September 30, 2008.  Thus, Lehman had to file this protective Complaint to preserve its potential claims against Unipol under New York law and nothing contained herein shall be construed as an admission that the Transactions were with LBCC.

2

4.      Plaintiffs bring this action to enforce the terms of the Agreements governing the Transactions, which Unipol breached, among other things, by (a) not treating LBCC's options with respect to the Transactions as automatically exercised as required by the 1998 Definitions incorporated into the Confirmations, and (b) failing to make payment to LBCC on the specified settlement date, being the second business day after the exercise of the option under each of the Agreements which automatically occurred upon the expiration of each Transaction, causing damage to Plaintiffs.

5.      Plaintiffs further seek a declaratory judgment that:  (1) by withholding amounts payable to LBCC, Unipol violated section 362(a)(3) of the Bankruptcy Code;  (2) the amounts owed by Unipol to LBCC pursuant to the Agreements are property of LBCC's estate under section 541 of the Bankruptcy Code; and (3) Unipol is required to turn over, under section 542 of the Bankruptcy Code, the full amount owed to LBCC, plus accrued interest.  Accordingly, Plaintiffs seek an Order directing that Unipol pay LBCC a total of $4,479,618.

## II.  JURISDICTION AND VENUE

6.      This adversary proceeding is commenced pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as well as sections 541(a) and 542(b) of the Bankruptcy Code and New York law.

7.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

9.      Venue is proper in this Court under 28 U.S.C. § 1409(a) because LBCC's bankruptcy case is pending in this district.

3

### III. THE PARTIES

10.    LBHI is a corporation organized and incorporated under the laws of the state of Delaware, with its former principal business address at 745 Seventh Avenue, New York, New York 10019 and its current principal business address at 1271 Sixth Avenue, New York, New York 10020.

11.    LBCC is a corporation organized and incorporated under the laws of the state of Delaware, with its former principal business address at 745 Seventh Avenue, New York, New York 10019 and its current principal business address at 1271 Sixth Avenue, New York, New York 10020.

12.    On December 6, 2011, the Court approved and entered an order confirming the Plan.  The Plan became effective on March 6, 2012.  Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute actions on behalf of the estate and LBCC's estate.

13.     Unipol is a bank, with its head office located in Bologna, Italy.  The Transactions, governed by and entered into by LBCC and Unipol pursuant to the Confirmations, are governed by New York law.

### IV. FACTUAL ALLEGATIONS

14.    Each Confirmation constitutes a binding agreement between LBCC and Unipol and sets forth the economic terms of the related Transaction.  Each of the Confirmations states, "this Confirmation shall itself evidence a complete and binding agreement between you and us as to the terms of the Transaction to which this Confirmation relates."  Ex. A-D at 1.

15.    The Confirmations incorporate various documents and terms by reference, including the form ISDA Master Agreement and the 1998 Definitions. *See* Ex. A-D.

4

16.     With respect to the ISDA Master Agreement, the Confirmations state, "this Confirmation, together with all other documents referring to the [ISDA Master Agreement] . . . confirming transactions . . . entered into between us (notwithstanding anything to the contrary in a Confirmation), shall supplement, form a part of, and *be subject to an agreement in the form of the [ISDA Master Agreement] as if we had executed an agreement in such form* (but without any Schedule except for the election of the laws of the State of New York as the governing law and the U.S. Dollar as the Termination Currency) on the Trade Date of the first such Transaction between us." Ex. A- D at 1 (emphasis added). LBCC and Unipol did not execute a separate ISDA Master Agreement. Thus, the terms set forth in the form ISDA Master Agreement are incorporated into each Confirmation and govern the Transactions.

17.     The ISDA Master Agreement provides that the payment terms contained in the Confirmations are enforceable and binding as between the parties. *See* Ex. E, § 2(i) ("Each party will make payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement").

18.     The 1998 Definitions likewise are incorporated into the Confirmations and thus govern the Transactions between LBCC and Unipol. Specifically, the Confirmations state that "the 1998 FX and Currency Option Definitions, as published by ISDA, the Emerging Markets Traders Association and The Foreign Exchange Committee . . . are incorporated into this Confirmation." Ex. A- D at 2.

19.     With regard to the specific Transactions, which are FX options contracts, the Confirmations provide that LBCC, as the buyer of the options, has the right to exercise on the expiration date set forth in the Confirmations, its option to purchase from Unipol (the seller) at

5

the strike price a specified quantity of the call currency, and to sell to Unipol at the strike price a specified quantity of the put currency.  Ex. A- D.

20.    The options with respect to the Transactions became exercisable on the expiration dates identified in the Confirmations, which are set forth in the chart below (the "Expiration Dates").

| Transaction No. | Expiration Date |
|---|---|
| 10167582 (Ex. A) | 9/30/2008 |
| 10261306 (Ex. B) | 10/10/2008 |
| 10261337 (Ex. C) | 10/10/2008 |
| 10799777 (Ex. D) | 11/26/2008 |

21.    The 1998 Definitions, which are incorporated into the Confirmations, provide that "If 'Automatic Exercise' is specified *(or deemed specified)* to be applicable to a Currency Option Transaction and at the Expiration Time on the Expiration Date the Currency Option Transaction has not been exercised, *then it will be deemed exercised as of that time if the In-the-Money Amount of the Currency Option Transaction at such Expiration Time equals or exceeds the product of (i) one percent of the Strike Price multiplied by (ii) the Call Currency Amount or the Put Currency Amount, as appropriate, unless Buyer notifies Seller (by telephone or in writing)  prior to the Expiration Time that it does not wish Automatic Exercise to occur . . . Unless the parties otherwise specify, Automatic Exercise will be deemed to apply to a Currency Option Transaction."*  Ex. F, § 3.6(c) (emphasis added) (the "Automatic Exercise Provision").

6

22.     In respect of each Transaction, at the expiration time on the Expiration Date, the in-the-money amount for such Transaction exceeded one percent of the strike price multiplied by the put currency amount or the call currency amount, as appropriate.  Therefore, under section 3.6(c), the options were deemed automatically exercised by LBCC.  None of the exceptions in section 3.6(c) apply here.  LBCC, as the buyer, did not notify Unipol that LBCC did not wish the automatic exercise of the options to occur.  Nor do the Confirmations indicate that the Automatic Exercise Provision would not apply to the Transactions.  Thus, upon each of the Expiration Dates, each option under each of the Agreements is deemed to have been automatically exercised.  As a result, the Confirmations required Unipol to make a payment to LBCC on the settlement date of each Transaction, which, according to the Confirmations, is two business days after the Expiration Date of each Transaction.  Unipol failed to do so.  Indeed, nearly four years later, Unipol has yet to make a payment to LBCC in connection with the Transactions.

## COUNT I

**(Breach of the Agreements by Failure to Pay LBCC Amounts Due Upon LBCC's Exercise of its Options with Respect to the Transactions)**

23.     LBCC repeats and realleges each and every allegation set forth in paragraphs 1 through 22 as if fully set forth herein.

24.     The Agreements required Unipol to deem that, upon the Expiration Dates, the options with respect to the Transactions were automatically exercised, and thus, make payment to LBCC in accordance with the automatic exercise of the options.

25.     Unipol breached the Agreements by failing to treat LBBC's option with respect to each Transaction as automatically exercised and by failing to make the requisite payment to LBCC in connection with the automatic exercise of the options.

7

26.     Unipol's breach of each Agreement resulted in damage to LBCC in at least the following amounts for each Transaction:

| Transaction No. | Damage to LBCC |
|---|---|
| 10167582 | $278,260 |
| 10261306 | $2,648,549 |
| 10261337 | $662,137 |
| 10799777 | $890,672 |
| **TOTAL** | $4,479,618 |

27.     As a result of such breach, LBCC should be awarded damages in an amount to be determined at trial, but no less than $4,479,618, representing the total amount owed by Unipol to LBCC due to the automatic exercise of LBCC's options under the Agreements.

## COUNT II

### (Breach of the Implied Covenant of Good Faith and Fair Dealing by Failure to Act in Good Faith)

28.     LBCC repeats and realleges each and every allegation set forth in paragraphs 1 through 27 as if fully set forth herein.

29.     The Agreements are governed by New York law.  New York law imposes an implied covenant of good faith and fair dealing in every contract which requires that contracting parties refrain from arbitrary or unreasonable conduct that would prevent the other contracting party from receiving the fruits of the contract.

30.     Unipol failed to act in good faith by refusing to acknowledge that the option under each of the Agreements had been automatically exercised.

8

31.     Unipol therefore, breached the implied covenant of good faith and fair dealing and the overarching duty imposed on the parties to commercial contracts, by failing to act in good faith in its performance under the Agreements.  As a result of such breach, LBCC should be awarded damages in an amount to be determined at trial, but no less than $4,479,618, representing the total amount owed by Unipol to LBCC due to the automatic exercise of LBCC's options under the Agreements.

## COUNT III

### (Declaratory Judgment that Unipol Is Willfully Violating the Automatic Stay)

32.     LBCC repeats and realleges each and every allegation set forth in paragraphs 1 through 31 as if fully set forth herein.

33.     Pursuant to section 362(a)(3) of the Bankruptcy Code, the filing of a voluntary case under chapter 11 of the Bankruptcy Code operates to stay "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" absent an order of the Bankruptcy Court granting relief from the stay.  11 U.S.C. § 362(a)(3).

34.     To the extent this Court finds that Unipol withheld amounts owed to LBCC under Agreements, such amounts constitute property of LBCC's estate.   Unipol's withholding of such payables therefore constituted, and continues to constitute, an "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

35.     Under section 105(a) of the Bankruptcy Code, this Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this

US_ACTIVE:\44090826\6\58399.0008

title." 11 U.S.C. § 105(a).  Under this section, this Court may grant damages to punish violations of the automatic stay.

36.    Accordingly, to the extent this Court finds that Unipol withheld amounts owed to LBCC under the Agreements, LBCC is entitled to (1) a declaratory judgment that Unipol acted in express violation of section 362 of the Bankruptcy Code; and (2) pursuant to section 105(a) of the Bankruptcy Code, an award of monetary damages, in an amount to be determined at trial and including (but not limited to) LBCC's actual damages, costs, and attorneys' fees and expenses, on account of Unipol's knowing and willful violation of the automatic stay.

## COUNT IV

### (Turnover of the Amounts Owed to LBCC Upon the Exercise of LBCC's Options Under the Agreements Pursuant to Section 542(b) of the Bankruptcy Code)

37.    LBCC repeats and realleges each and every allegation set forth in paragraphs 1 through 36 as if fully set forth herein.

38.    Section 542(b) of the Bankruptcy Code expressly provides that ". . . an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, *shall pay such debt to*, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor."  11 U.S.C. § 542(b) (emphasis added).  The Agreements clearly obligated Unipol to pay the amount owed to LBCC upon the automatic exercise of LBCC's options under the Agreements.  Unipol's failure to do so was in express violation of the Agreements.

39.    The total amount owed to LBCC by Unipol upon the exercise of LBCC's options is at least $4,479,618.  This amount constitutes property of the LBCC estate under

10

section 541(a) of the Bankruptcy Code.  Accordingly, LBCC requests an order under section

542(b) of the Bankruptcy Code requiring Unipol to pay $4,479,618 to LBCC.

### **PRAYER FOR RELIEF**

WHEREFORE, LBCC respectfully requests that judgment be entered as follows:

A.      On Count I, a judgment finding that Unipol breached the Agreements by

failing to pay the amounts due to LBCC upon the automatic exercise of LBCC's option under

each of the Agreements and awarding LBCC damages in an amount to be determined at trial but,

in all events, no less than the sum of $4,479,618.

C.      On Count II, a judgment finding that (i) Unipol breached the covenant of

good faith and fair dealing under New York law; and (ii) Unipol failed to apply the standard of

commercial reasonableness required for all commercial transactions under New York law; and

awarding damages by reason thereof in an amount to be determined at trial but, in all events, no

less than the sum of $4,479,618.

D.      On Count III, a declaratory judgment that in withholding the amounts

owed to LBCC by Unipol upon the automatic exercise of LBCC's option under each of the

Agreements, Unipol has acted in express violation of sections 362 of the Bankruptcy Code; and

that pursuant to section 105(a) of the Bankruptcy Code, LBCC is entitled to an award of

damages, in an amount to be determined at trial and including (but not limited to) LBCC's actual

damages, costs, and attorneys' fees and expenses, incurred on account of Unipol's knowing and

willful violation of the automatic stay;

E.      On Count IV, a judgment that the amounts owed upon the automatic

exercise of LBCC's option under each of the Agreements, payable by Unipol to LBCC, are

11

property of LBCC's estate under section 541 of the Bankruptcy Code and requiring Unipol to

turn over, under section 542 of the Bankruptcy Code, the sum of at least $4,479,618.

        F.      For such other and further relief, including interest, costs, and attorneys'

fees, as the Court deems just and proper.

Dated: New York, New York
       September 27, 2012

                                 /s/ Peter D. Isakoff
                                 Peter D. Isakoff
                                 Denise Alvarez

                                 WEIL, GOTSHAL & MANGES LLP
                                 767 Fifth Avenue
                                 New York, NY 10153-0019
                                 Telephone: (212) 310-8000
                                 Facsimile:  (212) 310-8007

                                 *Attorneys for Lehman Brothers Holdings Inc.*
                                 *and Lehman Brothers Commercial Corporation*

12

## EXHIBIT A

**Confirmation for Transaction No. 10167582**

# MODIFICATION

**Lehman Brothers Commercial Corporation (LBCC)**
**Confirmation of Foreign Exchange Derivative Product**

On any notice of errors/omissions, kindly quote our reference:     9366333

Date      : 06/28/07
To        : Unipol Banca SPA
From      : Lehman Brothers Commercial Corporation (LBCC)
            FX Option Trade Support
            70 Hudson Street
            Jersey City, New Jersey 07302
            Telephone  : (201) 499-6595
            Fax        : (646) 758-5976

Subject   : OTC Currency Option Confirmation

The purpose of this communication is to set forth the terms and conditions of the Foreign Exchange Currency Option Transaction entered into, on the Trade Date specified below between Unipol Banca SPA ("Party B") and Lehman Brothers Commercial Corporation (LBCC) ("Party A"). This communication constitutes a "Confirmation" as referred to in the Master Agreement or Master Form below, as applicable.

If you and we are parties to a Master Agreement that sets forth general terms and conditions applicable to Currency Options Transactions between us (the "Master Agreement"), this Confirmation supplements, forms a part of, and is subject to such Master Agreement. If you and we are not yet parties to such Master Agreement, this Confirmation shall itself evidence a complete and binding agreement between you and us as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the 1992 version of the preprinted multicurrency cross-border Master Agreement published by the International Swaps and Derivatives Association Inc. ("ISDA") (the "Master Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained in or incorporated by reference in that agreement upon its execution will govern this Confirmation, except as expressly modified below. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the Master Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation), shall supplement, form a part of, and be subject to an agreement in the form of the Master Form as if we had executed an agreement in such form (but without any Schedule except for the election of the laws of the State of New York as the governing law and the U.S. Dollar as the Termination Currency) on the Trade Date of the first such Transaction between us. In the event of any inconsistency between the provisions of that agreement and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

Page 1 of 4 Pages
Lehman Brothers Commercial Corporation (LBCC)
Confirmation of Foreign Exchange Derivative Product

On any notice of errors/omissions, kindly quote our reference:     9366333

Party A and Party B each represents that entering into the transaction is
authorized and does not violate any laws of its jurisdiction of
organization or residence or the terms of any agreement to which it is a
party.  Party A and Party B each represents that (i) it is not relying on
the other party in connection with its decision to enter into this
Transaction, and neither party is acting as an advisor to or fiduciary of
the other party in connection with this Transaction regardless of whether
the other party provides it with market information or its views; (ii) it
understands the risks of the Transaction and any legal, regulatory, tax,
accounting, and economic consequences resulting therefrom; and (iii) it
has determined based upon its own judgment and upon any advice received
from its own professional advisors as it has deemed necessary to consult
that entering into the Transaction is appropriate for such party in light
of its financial capabilities and objectives. Each party to the Transaction
represents that upon due execution and delivery of such Confirmation, it
will constitute a legally valid and binding obligation, enforceable
against it in accordance with its terms, subject to applicable
principles of bankruptcy and creditors' rights generally and to equitable
principles of general application.

The definitions and provisions contained in the 2000 ISDA Definitions and
the June 2000 version Annex thereto,  as published by ISDA (the "Swap
Definitions") and the 1998 FX and Currency Option Definitions, as published
by ISDA, the Emerging Markets Traders Association and The Foreign Exchange
Committee, (the "1998 Definitions") are incorporated into this Confirmation.
In the event of any inconsistency between the Swap Definitions and the
1998 Definitions, the 1998 Definitions will govern. In the event of any
inconsistency between either such set of definitions and this Confirmation,
this Confirmation will govern.

Page 2 of 4 Pages
Lehman Brothers Commercial Corporation (LBCC)
Confirmation of Foreign Exchange Derivative Product

On any notice of errors/omissions, kindly quote our reference:   9366333

We confirm that we have entered into the following Knock-In Option with
you which has features that differ from a standard Currency Option as a
result of which it may only be exercised if   Knock-In Event has occurred
in relation to it.

eference Number              :    9366333
rade Date                    :  06/28/07

```
Buyer                      : Lehman Brothers Commercial Corporation (
Seller                     : Unipol Banca SPA
In Strike Price            :  115.00000USD-JPY
Calculation Agent          : Lehman Brothers Commercial Corporation (
Currency Option Style      : E
Call Currency and Amount   : JPY      61,000,000.00
Put  Currency and Amount   : USD         500,000.00
Strike Price               :  122.0000000      JPY  PER  USD
Option Expiration Date     : 09/30/08
Option Expiration Time     : 1415/FFT
Settlement Date            : 10/02/08
Premium                    :   2,650,000.00  JPY
Price                      :  530.0000000  JPY per       10000 USD
Premium Payment Date       : 07/02/07
```

1. **Definitions:**

The following terms shall have the meanings set forth below.

"Barrier Period" means the period commencing on 09/30/08 and ending on 09/30/08.


"Knock-In Event", with respect to this Knock-In Option, means that at any time during the Barrier Period, the Spot Rate is equal to or beyond the In-Strike Price as determined by the Calculation Agent, in good faith and in a commercially reasonable manner.

"Knock-In Option" shall mean this Option.

"Spot Rate" means the exchange rate expressed in the same units of currency as described above, at the time at which such exchange rate is to be determined in the Spot Market for FX Transactions in the Currency Pair which is the subject of this Knock-In Option as determined by the Calculation Agent in good faith and in a commercially reasonable manner.

"Spot Market" means the global spot foreign exchange market, which, for these purposes, shall, unless otherwise agreed, be treated as being open continuously from 5:00 a.m. Sydney time on a Monday in any week to

Page 3 of 4 Pages
Lehman Brothers Commercial Corporation (LBCC)
Confirmation of Foreign Exchange Derivative Product

_____
On any notice of errors/omission, kindly quote our reference:    9366333

5:00 p.m. New York time on the Friday of that week.

2. **Notification of Knock-In Event.** The Calculation Agent shall promptly notify the other party of the occurrence of a Knock-In Event, as the case may be, in relation to this Knock-In Option. A failure to give such notice shall not however prejudice or invalidate the occurrence or effect of the Knock-In Event.

3. **Exercise and Settlement.** A Knock-In Option may be exercised only on the Expiration Date at the Expiration Time and provided that a Knock-In Event has occurred at or prior to exercise.

Please confirm that the foregoing correctly sets forth the terms of our agreement with respect to the Transaction by signing in the space

provided below and sending a copy of our executed Confirmation by FAX
(212) 528-4786 to Lehman Brothers Commercial Corporation (LBCC)
Foreign Exchange Options Support.

It has been a pleasure working with you on this transaction and we look
forward to working with you again in the future.

Very truly yours
Lehman Brothers Commercial Corporation (LBCC)



Accepted & Agreed:Unipol Banca SPA

**UNIPOL BANCA S.p.A.**
Uffido Estero

By: _____

Page 4 of 4 Pages

## EXHIBIT B

**Confirmation for Transaction No. 10261306**

**MODIFICATION**

Lehman Brothers Commercial Corporation (LBCC)
Confirmation of Foreign Exchange Derivative Product



On any notice of errors/omissions, kindly quote our reference:     8823567

Date      : 04/06/07
To        : Unipol Banca SPA
From      : Lehman Brothers Commercial Corporation (LBCC)
            FX Option Trade Support
            70 Hudson Street
            Jersey City, New Jersey 07302
            Telephone : (201) 499-6595
            Fax       : (646) 758-5976

Subject   : OTC Currency Option Confirmation

The purpose of this communication is to set forth the terms and conditions
of the Foreign Exchange Currency Option Transaction entered into, on the
Trade Date specified below between Unipol Banca SPA
("Party B") and Lehman Brothers Commercial Corporation (LBCC) ("Party A").
This communication constitutes a "Confirmation" as referred to in the
Master Agreement or Master Form below, as applicable.

If you and we are parties to a Master Agreement that sets forth general
terms and conditions applicable to Currency Options Transactions between
us (the "Master Agreement"), this Confirmation supplements, forms a part of,
and is subject to such Master Agreement. If you and we are not yet parties
to such Master Agreement, this Confirmation shall itself evidence a complete
and binding agreement between you and us as to the terms of the Transaction
to which this Confirmation relates. In addition, you and we agree to use all
reasonable efforts promptly to negotiate, execute and deliver an agreement
in the form of the 1992 version of the preprinted multicurrency cross-border
Master Agreement published by the International Swaps and Derivatives
Association Inc. ("ISDA") (the "Master Form"), with such modifications as
you and we will in good faith agree. Upon the execution by you and us of
such agreement, this Confirmation will supplement, form part of, and be
subject to that agreement. All provisions contained in or incorporated by
reference in that agreement upon its execution will govern this Confirmation,
except as expressly modified below. Until we execute and deliver that
agreement, this Confirmation, together with all other documents referring to
the Master Form (each a "Confirmation") confirming transactions (each a
"Transaction") entered into between us (notwithstanding anything to the
contrary in a Confirmation), shall supplement, form a part of, and be
subject to an agreement in the form of the Master Form as if we had executed
an agreement in such form (but without any Schedule except for the election
of the laws of the State of New York as the governing law and the U.S. Dollar
as the Termination Currency) on the Trade Date of the first such Transaction
between us. In the event of any inconsistency between the provisions of
that agreement and this Confirmation, this Confirmation will prevail for the
purpose of this Transaction.

Page 1 of 4 Pages
Lehman Brothers Commercial Corporation (LBCC)
Confirmation of Foreign Exchange Derivative Product

On any notice of errors/omissions, kindly quote our reference:     8823567

Party A and Party B each represents that entering into the transaction is authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party.  Party A and Party B each represents that (i) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (ii) it understands the risks of the Transaction and any legal, regulatory, tax, accounting, and economic consequences resulting therefrom; and (iii) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Each party to the Transaction represents that upon due execution and delivery of such Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The definitions and provisions contained in the 2000 ISDA Definitions and the June 2000 version Annex thereto,  as published by ISDA (the "Swap Definitions") and the 1998 FX and Currency Option Definitions, as published by ISDA, the Emerging Markets Traders Association and The Foreign Exchange Committee, (the "1998 Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either such set of definitions and this Confirmation, this Confirmation will govern.

Page 2 of 4 Pages
Lehman Brothers Commercial Corporation (LBCC)
Confirmation of Foreign Exchange Derivative Product

On any notice of errors/omissions, kindly quote our reference:   8823567

We confirm that we have entered into the following Knock-In Option with you which has features that differ from a standard Currency Option as a result of which it may only be exercised if   Knock-In Event has occurred in relation to it.

    eference Number         :     8823567
    rade Date               :  04/06/07

```
Buyer                          : Lehman Brothers Commercial Corporation (
Seller                         : Unipol Banca SPA
In Strike Price                :   1.59950EUR-CHF
Calculation Agent              : Lehman Brothers Commercial Corporation (
Currency Option Style          : E
Call Currency and Amount       : CHF        9,717,000.00
Put  Currency and Amount       : EUR        6,000,000.00
Strike Price                   :      1.6195000      CHF  PER  EUR
Option Expiration Date         : 10/10/08
Option Expiration Time         : 1415/FFT
Settlement Date                : 10/14/08
Premium                        :            196,500.00  CHF
Price                          :      3.2750000  CHF per          1 EUR
Premium Payment Date           : 04/11/07
```

1. Definitions:

The following terms shall have the meanings set forth below.

   "Barrier Period" means the period commencing on 10/10/08 and ending
on 10/10/08.


   "Knock-In Event", with respect to this Knock-In Option, means that at
any time during the Barrier Period, the Spot Rate is equal to or beyond
the In-Strike Price as determined by the Calculation Agent, in good faith
and in a commercially reasonable manner.

   "Knock-In Option" shall mean this Option.

   "Spot Rate" means the exchange rate expressed in the same units of
currency as described above, at the time at which such exchange rate is
to be determined in the Spot Market for FX Transactions in the Currency
Pair which is the subject of this Knock-In Option as determined by the
Calculation Agent in good faith and in a commercially reasonable manner.

   "Spot Market" means the global spot foreign exchange market, which,
for these purposes, shall, unless otherwise agreed, be treated as being
open continuously from 5:00 a.m. Sydney time on a Monday in any week to

Page 3 of 4 Pages
Lehman Brothers Commercial Corporation (LBCC)
Confirmation of Foreign Exchange Derivative Product

─────────────────────────────────────────────────────────────
On any notice of errors/omission, kindly quote our reference:    8823567

5:00 p.m. New York time on the Friday of that week.

2. Notification of Knock-In Event. The Calculation Agent shall promptly
notify the other party of the occurrence of a Knock-In Event, as the case
may be, in relation to this Knock-In Option. A failure to give such
notice shall not however prejudice or invalidate the occurrence or
effect of the Knock-In Event.

3. Exercise and Settlement.  A Knock-In Option may be exercised only on
the Expiration Date at the Expiration Time and provided that a Knock-In
Event has occurred at or prior to exercise.


Please confirm that the foregoing correctly sets forth the terms of our
agreement with respect to the Transaction by signing in the space

provided below and sending a copy of our executed Confirmation by FAX
(212) 528-4786 to Lehman Brothers Commercial Corporation (LBCC)
Foreign Exchange Options Support.

It has been a pleasure working with you on this transaction and we look
forward to working with you again in the future.

Very truly yours
Lehman Brothers Commercial Corporation (LBCC) ◄

Accepted & Agreed:Unipol Banca SPA

                                    UNIPOL BANCA S.p.A.
                                      Uffido Estero
                    By: _____

Page 4 of 4 Pages

## EXHIBIT C

**Confirmation for Transaction No. 10261337**

MODIFICATION

Lehman Brothers Commercial Corporation (LBCC)
Confirmation of Foreign Exchange Derivative Product

On any notice of errors/omissions, kindly quote our reference:    9273542


Date      : 06/15/07
To        : Unipol Banca SPA
From      : Lehman Brothers Commercial Corporation (LBCC)
            FX Option Trade Support
            70 Hudson Street
            Jersey City, New Jersey 07302
            Telephone : (201) 499-6595
            Fax       : (646) 758-5976

Subject   : OTC Currency Option Confirmation

The purpose of this communication is to set forth the terms and conditions
of the Foreign Exchange Currency Option Transaction entered into, on the
Trade Date specified below between Unipol Banca SPA
("Party B") and Lehman Brothers Commercial Corporation (LBCC) ("Party A").
This communication constitutes a "Confirmation" as referred to in the
Master Agreement or Master Form below, as applicable.

If you and we are parties to a Master Agreement that sets forth general
terms and conditions applicable to Currency Options Transactions between
us (the "Master Agreement"), this Confirmation supplements, forms a part of,
and is subject to such Master Agreement. If you and we are not yet parties
to such Master Agreement, this Confirmation shall itself evidence a complete
and binding agreement between you and us as to the terms of the Transaction
to which this Confirmation relates. In addition, you and we agree to use all
reasonable efforts promptly to negotiate, execute and deliver an agreement
in the form of the 1992 version of the preprinted multicurrency cross-border
Master Agreement published by the International Swaps and Derivatives
Association Inc. ("ISDA") (the "Master Form"), with such modifications as
you and we will in good faith agree. Upon the execution by you and us of
such agreement, this Confirmation will supplement, form part of, and be
subject to that agreement. All provisions contained in or incorporated by
reference in that agreement upon its execution will govern this Confirmation,
except as expressly modified below. Until we execute and deliver that
agreement, this Confirmation, together with all other documents referring to
the Master Form (each a "Confirmation") confirming transactions (each a
"Transaction") entered into between us (notwithstanding anything to the
contrary in a Confirmation), shall supplement, form a part of, and be
subject to an agreement in the form of the Master Form as if we had executed
an agreement in such form (but without any Schedule except for the election
of the laws of the State of New York as the governing law and the U.S. Dollar
as the Termination Currency) on the Trade Date of the first such Transaction
between us. In the event of any inconsistency between the provisions of
that agreement and this Confirmation, this Confirmation will prevail for the
purpose of this Transaction.

Page 1 of 4 Pages
Lehman Brothers Commercial Corporation (LBCC)
Confirmation of Foreign Exchange Derivative Product

Party A and Party B each represents that entering into the transaction is
authorized and does not violate any laws of its jurisdiction of
organization or residence or the terms of any agreement to which it is a
party.  Party A and Party B each represents that (i) it is not relying on
the other party in connection with its decision to enter into this
Transaction, and neither party is acting as an advisor to or fiduciary of
the other party in connection with this Transaction regardless of whether
the other party provides it with market information or its views; (ii) it
understands the risks of the Transaction and any legal, regulatory, tax,
accounting, and economic consequences resulting therefrom; and (iii) it
has determined based upon its own judgment and upon any advice received
from its own professional advisors as it has deemed necessary to consult
that entering into the Transaction is appropriate for such party in light
of its financial capabilities and objectives. Each party to the Transaction
represents that upon due execution and delivery of such Confirmation, it
will constitute a legally valid and binding obligation, enforceable
against it in accordance with its terms, subject to applicable
principles of bankruptcy and creditors' rights generally and to equitable
principles of general application.

The definitions and provisions contained in the 2000 ISDA Definitions and
the June 2000 version Annex thereto,  as published by ISDA (the "Swap
Definitions") and the 1998 FX and Currency Option Definitions, as published
by ISDA, the Emerging Markets Traders Association and The Foreign Exchange
Committee, (the "1998 Definitions") are incorporated into this Confirmation.
In the event of any inconsistency between the Swap Definitions and the
1998 Definitions, the 1998 Definitions will govern. In the event of any
inconsistency between either such set of definitions and this Confirmation,
this Confirmation will govern.

Page 2 of 4 Pages
Lehman Brothers Commercial Corporation (LBCC)
Confirmation of Foreign Exchange Derivative Product
_____
On any notice of errors/omissions, kindly quote our reference:    9273542

We confirm that we have entered into the following Knock-In Option with
you which has features that differ from a standard Currency Option as a
result of which it may only be exercised if   Knock-In Event has occurred
in relation to it.

Reference Number            :    9273542
Trade Date                  :  06/15/07

Buyer                          : Lehman Brothers Commercial Corporation (
Seller                         : Unipol Banca SPA
In Strike Price                :    1.59950EUR-CHF
Calculation Agent              : Lehman Brothers Commercial Corporation (
Currency Option Style          : E
Call Currency and Amount       : CHF       2,429,250.00
Put  Currency and Amount       : EUR       1,500,000.00
Strike Price                   :    1.6195000      CHF   PER   EUR
Option Expiration Date         : 10/10/08
Option Expiration Time         : 1000/NY   *1430 / ECB FIXING PLEASE CHECK AND SEND BACK A*
Settlement Date                : 10/14/08              *AMENDED CONFIRMATION. THANKS*
Premium                        :            25,500.00  CHF
Price                          :    1.7000000  CHF per          1 EUR
Premium Payment Date           : 06/19/07

*UNIPOL BANCA S.p.A.*
*Ufficio Estero*

## 1. Definitions:

The following terms shall have the meanings set forth below.

   "Barrier Period" means the period commencing on 10/10/08 and ending
on 10/10/08.


   "Knock-In Event", with respect to this Knock-In Option, means that at
any time during the Barrier Period, the Spot Rate is equal to or beyond
the In-Strike Price as determined by the Calculation Agent, in good faith
and in a commercially reasonable manner.

   "Knock-In Option" shall mean this Option.

   "Spot Rate" means the exchange rate expressed in the same units of
currency as described above, at the time at which such exchange rate is
to be determined in the Spot Market for FX Transactions in the Currency
Pair which is the subject of this Knock-In Option as determined by the
Calculation Agent in good faith and in a commercially reasonable manner.

   "Spot Market" means the global spot foreign exchange market, which,
for these purposes, shall, unless otherwise agreed, be treated as being
open continuously from 5:00 a.m. Sydney time on a Monday in any week to

Page 3 of 4 Pages
Lehman Brothers Commercial Corporation (LBCC)
Confirmation of Foreign Exchange Derivative Product

---

On any notice of errors/omission, kindly quote our reference:   9273542

5:00 p.m. New York time on the Friday of that week.

2. Notification of Knock-In Event. The Calculation Agent shall promptly
notify the other party of the occurrence of a Knock-In Event, as the case
may be, in relation to this Knock-In Option. A failure to give such
notice shall not however prejudice or invalidate the occurrence or
effect of the Knock-In Event.

3. Exercise and Settlement.  A Knock-In Option may be exercised only on
the Expiration Date at the Expiration Time and provided that a Knock-In
Event has occurred at or prior to exercise.

Please confirm that the foregoing correctly sets forth the terms of our
agreement with respect to the Transaction by signing in the space

provided below and sending a copy of our executed Confirmation by FAX
(212) 528-4786 to Lehman Brothers Commercial Corporation (LBCC)
Foreign Exchange Options Support.

It has been a pleasure working with you on this transaction and we look
forward to working with you again in the future.

Very truly yours
Lehman Brothers Commercial Corporation (LBCC)



Accepted & Agreed:Unipol Banca SPA


                    By: _____


Page 4 of 4 Pages

## EXHIBIT D

**Confirmation for Transaction No. 10799777**

MODIFICATION

Lehman Brothers Commercial Corporation (LBCC)
Confirmation of Foreign Exchange Derivative Product

On any notice of errors/omissions, kindly quote our reference:    9140056

Date     : 05/25/07
To       : Unipol Banca SPA
From     : Lehman Brothers Commercial Corporation (LBCC)
           FX Option Trade Support
           70 Hudson Street
           Jersey City, New Jersey 07302
           Telephone : (201) 499-6595
           Fax       : (646) 758-5976

Subject  : OTC Currency Option Confirmation

The purpose of this communication is to set forth the terms and conditions
of the Foreign Exchange Currency Option Transaction entered into, on the
Trade Date specified below between Unipol Banca SPA
("Party B") and Lehman Brothers Commercial Corporation (LBCC) ("Party A").
This communication constitutes a "Confirmation" as referred to in the
Master Agreement or Master Form below, as applicable.

If you and we are parties to a Master Agreement that sets forth general
terms and conditions applicable to Currency Options Transactions between
us (the "Master Agreement"), this Confirmation supplements, forms a part of,
and is subject to such Master Agreement. If you and we are not yet parties
to such Master Agreement, this Confirmation shall itself evidence a complete
and binding agreement between you and us as to the terms of the Transaction
to which this Confirmation relates. In addition, you and we agree to use all
reasonable efforts promptly to negotiate, execute and deliver an agreement
in the form of the 1992 version of the preprinted multicurrency cross-border
Master Agreement published by the International Swaps and Derivatives
Association Inc. ("ISDA") (the "Master Form"), with such modifications as
you and we will in good faith agree. Upon the execution by you and us of
such agreement, this Confirmation will supplement, form part of, and be
subject to that agreement. All provisions contained in or incorporated by
reference in that agreement upon its execution will govern this Confirmation,
except as expressly modified below. Until we execute and deliver that
agreement, this Confirmation, together with all other documents referring to
the Master Form (each a "Confirmation") confirming transactions (each a
"Transaction") entered into between us (notwithstanding anything to the
contrary in a Confirmation), shall supplement, form a part of, and be
subject to an agreement in the form of the Master Form as if we had executed
an agreement in such form (but without any Schedule except for the election
of the laws of the State of New York as the governing law and the U.S. Dollar
as the Termination Currency) on the Trade Date of the first such Transaction
between us. In the event of any inconsistency between the provisions of
that agreement and this Confirmation, this Confirmation will prevail for the
purpose of this Transaction.

Page 1 of 4 Pages
Lehman Brothers Commercial Corporation (LBCC)
Confirmation of Foreign Exchange Derivative Product

On any notice of errors/omissions, kindly quote our reference:    9140056

Party A and Party B each represents that entering into the transaction is authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party.  Party A and Party B each represents that (i) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (ii) it understands the risks of the Transaction and any legal, regulatory, tax, accounting, and economic consequences resulting therefrom; and (iii) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Each party to the Transaction represents that upon due execution and delivery of such Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The definitions and provisions contained in the 2000 ISDA Definitions and the June 2000 version Annex thereto, as published by ISDA (the "Swap Definitions") and the 1998 FX and Currency Option Definitions, as published by ISDA, the Emerging Markets Traders Association and The Foreign Exchange Committee, (the "1998 Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either such set of definitions and this Confirmation, this Confirmation will govern.

Page 2 of 4 Pages
Lehman Brothers Commercial Corporation (LBCC)
Confirmation of Foreign Exchange Derivative Product
_____
On any notice of errors/omissions, kindly quote our reference:   9140056

We confirm that we have entered into the following Knock-In Option with you which has features that differ from a standard Currency Option as a result of which it may only be exercised if   Knock-In Event has occurred in relation to it.

Reference Number              :   9140056
Trade Date                    :  05/25/07

```
Buyer                         : Lehman Brothers Commercial Corporation (
Seller                        : Unipol Banca SPA
In Strike Price               :    2.23000GBP-CHF
Calculation Agent             : Lehman Brothers Commercial Corporation (
Currency Option Style         : E
Call Currency and Amount      : CHF      2,330,000.00
Put  Currency and Amount      : GBP      1,000,000.00
Strike Price                  :    2.3300000      CHF  PER  GBP
Option Expiration Date        : 11/26/08
Option Expiration Time        : 1000/NY
Settlement Date               : 11/28/08
Premium                       :       46,165.00  CHF   46,150.00 CHF
Price                         :    4.6165000   CHF per       1 GBP
Premium Payment Date          : 05/30/07  05/25/07  PLEASE CHECK ON REUTERS CONFIRMATION
                                                    1624 GMT 250507/9135 AND SEND BACK,
                                                    AMENDED CONFIRMATION. THANKS.
```

1. **Definitions:**

The following terms shall have the meanings set forth below. UNIPOL BANCA S.p.A.
Ufficio Estero

    "Barrier Period" means the period commencing on 05/25/07 and ending
on 11/26/08.


    "Knock-In Event", with respect to this Knock-In Option, means that at
any time during the Barrier Period, the Spot Rate is equal to or beyond
the In-Strike Price as determined by the Calculation Agent, in good faith
and in a commercially reasonable manner.

    "Knock-In Option" shall mean this Option.

    "Spot Rate" means the exchange rate expressed in the same units of
currency as described above, at the time at which such exchange rate is
to be determined in the Spot Market for FX Transactions in the Currency
Pair which is the subject of this Knock-In Option as determined by the
Calculation Agent in good faith and in a commercially reasonable manner.

    "Spot Market" means the global spot foreign exchange market, which,
for these purposes, shall, unless otherwise agreed, be treated as being
open continuously from 5:00 a.m. Sydney time on a Monday in any week to

Page 3 of 4 Pages
Lehman Brothers Commercial Corporation (LBCC)
Confirmation of Foreign Exchange Derivative Product

_____
On any notice of errors/omission, kindly quote our reference:     9140056

5:00 p.m. New York time on the Friday of that week.

2. **Notification of Knock-In Event.** The Calculation Agent shall promptly
notify the other party of the occurrence of a Knock-In Event, as the case
may be, in relation to this Knock-In Option. A failure to give such
notice shall not however prejudice or invalidate the occurrence or
effect of the Knock-In Event.

3. **Exercise and Settlement.** A Knock-In Option may be exercised only on
the Expiration Date at the Expiration Time and provided that a Knock-In
Event has occurred at or prior to exercise.

Please confirm that the foregoing correctly sets forth the terms of our
agreement with respect to the Transaction by signing in the space

provided below and sending a copy of our executed Confirmation by FAX
(212) 528-4786 to Lehman Brothers Commercial Corporation (LBCC)
Foreign Exchange Options Support.

It has been a pleasure working with you on this transaction and we look
forward to working with you again in the future.

Very truly yours
Lehman Brothers Commercial Corporation (LBCC)



Accepted & Agreed:Unipol Banca SPA

By: _____

Page 4 of 4 Pages

## EXHIBIT E

**ISDA Master Agreement**

**(Multicurrency — Cross Border)**



# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of .......................................

...........………….……………..….…....……… and …………..……………......……………………........

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

**1.      Interpretation**

(a)      *Definitions*. The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency*.  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement*.  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.      Obligations**

(a)      *General Conditions*.

(i)   Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.


(b)    *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting*. If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)   in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

    (i)    *Gross-Up*. All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)    promptly notify the other party ("Y") of such requirement;

        (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

           (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

           (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

**ISDA® 1992**

    (ii)   *Liability*. If: —

        (1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

        (2)  X does not so deduct or withhold; and

        (3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.**    **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations*.

    (i)   *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

    (ii)   *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

    (iii)  *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    (iv)  *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v)  *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

    **ISDA® 1992**

(b)     *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)     *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)     *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)     *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)     *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.    Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)     *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

> (i)     any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

> (ii)    any other documents specified in the Schedule or any Confirmation; and

> (iii)   upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)     *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)     *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)     *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)     *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

**ISDA® 1992**

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.    **Events of Default and Termination Events**

(a)    *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default*.

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

5 **ISDA® 1992**

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) **Bankruptcy**. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) **Merger Without Assumption**. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)      *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

**ISDA® 1992**

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i)    *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1)    to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)    to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)    *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii)    *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv)    *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v)    *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

**ISDA® 1992**

6.    **Early Termination**

(a)    *Right to Terminate Following Event of Default*. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event*. If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties*. If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate*. If: —

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

**ISDA® 1992**

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c) **Effect of Designation.**

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) **Calculations.**

(i)    **Statement**. On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    **Payment Date**. An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e) **Payments on Early Termination**. If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    **Events of Default**. If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation*. If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss*. If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation*. If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  **Termination Events**.  If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  **Adjustment for Bankruptcy**. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  **Pre-Estimate**. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

**ISDA® 1992**

**7.      Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)      a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)      a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.      Contractual Currency**

(a)      *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)      *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)      *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)      *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

11                                                              **ISDA® 1992**

9.    **Miscellaneous**

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    **Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.    **Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

**ISDA® 1992**

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

> (i)    if in writing and delivered in person or by courier, on the date it is delivered;

> (ii)    if sent by telex, on the date the recipient's answerback is received;

> (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

> (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

> (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

> (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

> (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.



*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

**ISDA® 1992**

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

**ISDA® 1992**

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

.................................................................
(Name of Party)

.................................................................
(Name of Party)

By: ............................................................

Name:
Title:
Date:

By: ............................................................

Name:
Title:
Date:

**ISDA® 1992**

(Multicurrency — Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

## SCHEDULE
## to the
## Master Agreement

dated as of .......................................................................

between ...................................................................... and ...............................................................................
                         ("Party A")                                ("Party B")

Part 1.   **Termination Provisions.**

(a)   *"Specified Entity"* means in relation to Party A for the purpose of: —

Section 5(a)(v),   .........................................................................................................................................

Section 5(a)(vi),   .........................................................................................................................................

Section 5(a)(vii),   .........................................................................................................................................

Section 5(b)(iv),   .........................................................................................................................................

and in relation to Party B for the purpose of:—

Section 5(a)(v),   .........................................................................................................................................

Section 5(a)(vi),   .........................................................................................................................................

Section 5(a)(vii),   .........................................................................................................................................

Section 5(b)(iv),   .........................................................................................................................................

(b)   *"Specified Transaction"* will have the meaning specified in Section 14 of this Agreement unless

another meaning is specified here   ..........................................................................................................

.........................................................................................................................................................................

.........................................................................................................................................................................

(c)   The *"Cross Default"* provisions of Section 5(a)(vi) will/will not * apply to Party A

will/will not * apply to Party B

If such provisions apply:—

*"Specified Indebtedness"* will have the meaning specified in Section 14 of this Agreement unless

another meaning is specified here ...........................................................................................................

.........................................................................................................................................................................

---

\*   Delete as applicable.

               **ISDA® 1992**

*"Threshold Amount"* means ........................................................................................................................

...................................................................................................................................................................

(d) The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) will/will not * apply to Party A
will/will not * apply to Party B

(e) The *"Automatic Early Termination"* provision of Section 6(a) will/will not * apply to Party A
will/will not * apply to Party B

(f) *Payments on Early Termination*. For the purpose of Section 6(e) of this Agreement: —

(i) Market Quotation/Loss * will apply.

(ii) The First Method/The Second Method * will apply.

(g) *"Termination Currency"* means ........................................................, if such currency is specified and
freely available, and otherwise United States Dollars.

(h) *Additional Termination Event* will/will not apply*. The following shall constitute an Additional
Termination Event: — ........................................................................................................................

.............. ...................................................................................................................................

...................................................................................................................................................

...................................................................................................................................................

...................................................................................................................................................

...................................................................................................................................................

For the purpose of the foregoing Termination Event, the Affected Party or Affected Parties shall be: — ...

...................................................................................................................................................

Part 2. **Tax Representations**.

(a) *Payer Representations*. For the purpose of Section 3(e) of this Agreement, Party A will/will not* make the
following representation and Party B will/will not* make the following representation: —

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue
authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax
from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made
by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy
of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the
satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy
and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of
this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of
this Agreement, *provided* that it shall not be a breach of this representation where reliance is placed on
clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of
material prejudice to its legal or commercial position.

(b) *Payee Representations*. For the purpose of Section 3(f) of this Agreement, Party A and Party B make the
representations specified below, if any:

(i)     The following representation will/will not* apply to Party A and will/will not apply to Party B: —

It is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits"
provision, as the case may be, the "Interest" provision or the "Other Income" provision (if any) of the
Specified Treaty with respect to any payment described in such provisions and received or to be received

---

*  Delete as applicable.

**ISDA® 1992**

by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the Specified Jurisdiction.

If such representation applies, then: —

**"Specified Treaty"** means with respect to Party A    ......................................................................................

**"Specified Jurisdiction"** means with respect to Party A    ......................................................................

**"Specified Treaty"** means with respect to Party B    ......................................................................................

**"Specified Jurisdiction"** means with respect to Party B    ......................................................................

(ii)  The following representation will/will not* apply to Party A and will/will not* apply to Party B: —

Each payment received or to be received by it in connection with this Agreement will be effectively connected with its conduct of a trade or business in the Specified Jurisdiction.

If such representation applies, then: —

**"Specified Jurisdiction"** means with respect to Party A    ......................................................................

**"Specified Jurisdiction"** means with respect to Party B    ......................................................................

(iii)  The following representation will/will not* apply to Party A and will/will not* apply to Party B: —

(A)  It is entering into each Transaction in the ordinary course of its trade as, and is, either (1) a recognised U.K. bank or (2) a recognised U.K. swaps dealer (in either case (1) or (2), for purposes of the United Kingdom Inland Revenue extra statutory concession C17 on interest and currency swaps dated March 14, 1989), and (B) it will bring into account payments made and received in respect of each Transaction in computing its income for United Kingdom tax purposes.

(iv)  Other Payee Representations: —  ......................................................................................

..............................................................................................................................................................

..............................................................................................................................................................

..............................................................................................................................................................

N.B. The above representations may need modification if either party is a Multibranch Party.

---

\* Delete as applicable.

**ISDA® 1992**

Part 3. **Agreement to Deliver Documents**.

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable: —

(a) Tax forms, documents or certificates to be delivered are: —

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| ..................................... | ..................................................... | ..................................................... |
| ..................................... | ..................................................... | ..................................................... |
| ..................................... | ..................................................... | ..................................................... |
| ..................................... | ..................................................... | ..................................................... |
| ..................................... | ..................................................... | ..................................................... |

(b) Other documents to be delivered are: —

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| ................................. | ................................................. | ......................................... | Yes/No* |
| ................................. | ................................................. | ......................................... | Yes/No* |
| ................................. | ................................................. | ......................................... | Yes/No* |
| ................................. | ................................................. | ......................................... | Yes/No* |
| ................................. | ................................................. | ......................................... | Yes/No* |

Part 4. **Miscellaneous.**

(a)     *Addresses for Notices*. For the purpose of Section 12(a) of this Agreement: —

Address for notices or communications to Party A: —

Address:    ................................................................................................................................

Attention:  ................................................................................................................................

Telex No.: ................................................................    Answerback:  .............................................

Facsimile No.: ................................................................    Telephone No: .............................................

Electronic Messaging System Details: ........................................................................................

Address for notices or communications to Party B: —

Address:    ................................................................................................................................

Attention:  ................................................................................................................................

Telex No.: ................................................................    Answerback:  .............................................

Facsimile No.: ................................................................    Telephone No.: .................................................

Electronic Messaging System Details: ....................................................................................................

(b) ***Process Agent.*** For the purpose of Section 13(c) of this Agreement: —

Party A appoints as its Process Agent ....................................................................................................

Party B appoints as its Process Agent ....................................................................................................

(c) ***Offices.*** The provisions of Section 10(a) will/will not* apply to this Agreement.

(d) ***Multibranch Party***. For the purpose of Section 10(c) of this Agreement: —

Party A is/is not* a Multibranch Party and, if so, may act through the following Offices: —

................................    ..............................    ...........................................

................................    ..............................    ...........................................

Party B is/is not* a Multibranch Party and, if so, may act through the following Offices: —

................................    ..............................    ...........................................

................................    ..............................    ...........................................

(e) ***Calculation Agent.*** The Calculation Agent is ...................................................., unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(f) ***Credit Support Document***. Details of any Credit Support Document: — .......................................

........................................................................................................................................................

........................................................................................................................................................

........................................................................................................................................................

(g) ***Credit Support Provider***. Credit Support Provider means in relation to Party A, ...............................

........................................................................................................................................................

........................................................................................................................................................

Credit Support Provider means in relation to Party B, ...............................................................

........................................................................................................................................................

........................................................................................................................................................

(h) ***Governing Law***. This Agreement will be governed by and construed in accordance with English law/the laws of the State of New York (without reference  to  choice of law doctrine) *.

---

* Delete as applicable.

**ISDA® 1992**

(i)    *Netting of Payments*. Subparagraph (ii) of Section 2(c) of this Agreement will not apply to the following Transactions or groups of Transactions (in each case starting from the date of this Agreement/in each case starting from ………………………………… *) ……………………………..………

………………………………………………………………………………………………………………

………………………………………………………………………………………………………………

(j)    *"Affiliate"* will have the meaning specified in Section 14 of this Agreement unless another meaning is specified here

………………………………………………………………………………………………………………

………………………………………………………………………………………………………………

Part 5. **Other Provisions**.

---

\* Delete as applicable.

    **ISDA® 1992**

# **EXHIBIT F**

## **1998 Definitions**

# 1998 FX and

# Currency

# Option Definitions

## ISDA®

**INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, INC.**

## EMTA®

**EMERGING MARKETS TRADERS ASSOCIATION**

# THE FOREIGN EXCHANGE COMMITTEE

Copyright ©1998 by

INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, INC.

EMERGING MARKETS TRADERS ASSOCIATION

THE FOREIGN EXCHANGE COMMITTEE

**ISDA, EMTA and The Foreign Exchange Committee consent to the use and photocopying of this documentation for the preparation of agreements with respect to derivative transactions. ISDA, EMTA and The Foreign Exchange Committee do not, however, consent to the reproduction of this document for purposes of public distribution or sale.**

To obtain written permission for any use of this document (other than for the preparation of agreements with respect to derivative transactions), please contact:

INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, INC.
600 Fifth Avenue, 27th Floor
Rockefeller Center
New York, N.Y. 10020-2302

# TABLE OF CONTENTS

**Page**

INTRODUCTION TO THE 1998 FX AND CURRENCY
OPTION DEFINITIONS ............................................................    iv

## ARTICLE 1

### CERTAIN GENERAL DEFINITIONS

| | | |
|---|---|---|
| SECTION 1.1. | Business Day .................................................. | 1 |
| SECTION 1.2. | Business Day Convention ................................. | 4 |
| SECTION 1.3. | Calculation Agent ........................................... | 4 |
| SECTION 1.4. | Confirmation ................................................... | 4 |
| SECTION 1.5. | Currency Option Transaction ........................... | 4 |
| SECTION 1.6. | Currency Pair ................................................. | 4 |
| SECTION 1.7. | Deliverable .................................................... | 5 |
| SECTION 1.8. | Deliverable Currency Option Transaction ........ | 5 |
| SECTION 1.9. | Deliverable FX Transaction ............................ | 5 |
| SECTION 1.10. | ECU Settlement Day ...................................... | 5 |
| SECTION 1.11. | Euro Settlement Date ..................................... | 5 |
| SECTION 1.12. | FX Transaction .............................................. | 5 |
| SECTION 1.13. | Non-Deliverable ............................................ | 5 |
| SECTION 1.14. | Non-Deliverable Currency Option Transaction .............. | 6 |
| SECTION 1.15. | Non-Deliverable FX Transaction ..................... | 6 |
| SECTION 1.16. | Certain Definitions Relating to Non-Deliverable FX Transactions and Non-Deliverable Currency Option Transactions............................. | 6 |
| SECTION 1.17. | Notional Amount............................................. | 7 |
| SECTION 1.18. | Principal Financial Center ............................... | 7 |
| SECTION 1.19. | Reference Currency ........................................ | 7 |
| SECTION 1.20. | Reference Currency Buyer ............................... | 7 |
| SECTION 1.21. | Reference Currency Notional Amount ............... | 7 |
| SECTION 1.22. | Reference Currency Seller ............................... | 8 |
| SECTION 1.23. | Rounding ....................................................... | 8 |
| SECTION 1.24. | Settlement Date .............................................. | 8 |
| SECTION 1.25. | Trade Date ..................................................... | 8 |
| SECTION 1.26. | Transaction .................................................... | 8 |

# ARTICLE 2

## GENERAL TERMS RELATING TO FX TRANSACTIONS

| | | |
|---|---|---|
| SECTION 2.1. | Certain Definitions and Provisions Relating to FX Transactions ................................................. | 8 |
| SECTION 2.2. | Terms Relating to Settlement ................................................... | 9 |

# ARTICLE 3

## GENERAL TERMS RELATING TO CURRENCY OPTION TRANSACTIONS

| | | |
|---|---|---|
| SECTION 3.1. | Certain Definitions and Provisions Relating to Currency Option Transactions ...................................... | 9 |
| SECTION 3.2. | Option Style ........................................................... | 10 |
| SECTION 3.3. | Option Type ........................................................... | 10 |
| SECTION 3.4. | Terms Relating to Premium ................................................... | 11 |
| SECTION 3.5. | General Terms Relating to Exercise ....................................... | 11 |
| SECTION 3.6. | Additional Terms Relating to Exercise ................................... | 12 |
| SECTION 3.7. | Terms Relating to Settlement .................................................. | 13 |
| SECTION 3.8. | Averaging ................................................................... | 14 |

# ARTICLE 4

## CALCULATION OF RATES FOR CERTAIN SETTLEMENT RATE OPTIONS

| | | |
|---|---|---|
| SECTION 4.1. | Certain Published and Displayed Sources ............................... | 15 |
| SECTION 4.2. | Annex A .............................................................. | 16 |
| SECTION 4.3. | Currencies .............................................................. | Annex A |
| SECTION 4.4. | Principal Financial Center ....................................... | Annex A |
| SECTION 4.5. | Settlement Rate Options ....................................... | Annex A |
| SECTION 4.6. | Certain Definitions Relating to Settlement Rate Options ........ | Annex A |
| SECTION 4.7. | Corrections to Published and Displayed Rates ....................... | Annex A |

# ARTICLE 5

## DISRUPTION EVENTS

| | | |
|---|---|---|
| SECTION 5.1. | Disruption Events .................................................. | 16 |
| SECTION 5.2. | Disruption Fallbacks ................................................... | 20 |
| SECTION 5.3. | Additional Terms Relating to the Delivery of Benchmark Obligations ................................................. | 27 |
| SECTION 5.4. | Certain Definitions Relating to Disruption Events and Disruption Fallbacks ...................................... | 29 |

## EXHIBIT I

Sample Form for a Letter Agreement ................................................... 33

## EXHIBIT II

Sample Forms of Specific Provisions for Different Types of Transactions:

| | | |
|---|---|---|
| A. | Deliverable FX Transaction ........................................... | 36 |
| B. | Non-Deliverable FX Transaction. ................................. | 37 |
| C. | Deliverable Currency Option Transaction ..................... | 38 |
| D. | Non-Deliverable Currency Option Transaction .............. | 40 |
| E. | Disruption Events and Disruption Fallbacks for an FX or Currency Option Transaction ......................................... | 43 |

INDEX OF TERMS ................................................................................. 47

## INTRODUCTION TO THE 1998 FX AND
## CURRENCY OPTION DEFINITIONS

The 1998 FX and Currency Option Definitions (the "Definitions") are intended for use in confirmations of individual transactions ("Confirmations") governed by (i) the 1992 ISDA Master Agreements (the "ISDA Master Agreements") published by the International Swaps and Derivatives Association, Inc. ("ISDA"), (ii) the International Foreign Exchange and Options Master Agreement ("FEOMA"), the International Foreign Exchange Master Agreement ("IFEMA") and the International Currency Options Market Master Agreement ("ICOM"), each published by The Foreign Exchange Committee (the "FX Committee") in association with the British Bankers' Association, the Canadian Foreign Exchange Committee and the Tokyo Foreign Exchange Market Practices Committee and (iii) other similar agreements. Copies of the ISDA Master Agreements are available from the executive offices of ISDA. Copies of the FEOMA, IFEMA and ICOM are available from the FX Committee at the Federal Reserve Bank of New York. A sample form of letter agreement constituting a Confirmation is attached as Exhibit I to these Definitions. Exhibits II-A and II-B set out specific provisions to document privately negotiated FX transactions, Exhibits II-C and II-D set out specific provisions to document privately negotiated currency option transactions and Exhibit II-E sets out specific provisions to document certain event risks that may be associated with privately negotiated FX and currency option transactions.

The purpose of these Definitions is to provide the basic framework for the documentation of privately negotiated FX and currency option transactions, including those transactions previously documented under the 1992 ISDA FX and Currency Option Definitions (the "1992 Definitions"). The Definitions are primarily an expansion of the 1992 Definitions and cover a wider range of currencies and transactions. The most significant new concepts in the Definitions are the inclusion of certain Disruption Events and Disruption Fallbacks, which will enable parties to a transaction to allocate certain event risks by providing an agreed upon method for settling a transaction upon the occurrence of those events. These concepts may be applicable to certain FX and currency option transactions, such as those involving emerging market currencies. A second principal change is the inclusion of currency spot rate definitions that can be utilized for non-deliverable or cash-settled transactions.

The 1991 ISDA Definitions (the "1991 Definitions"), the 1992 Definitions, the 1993 ISDA Commodity Derivatives Definitions, the 1996 ISDA Equity Derivatives Definitions, the 1997 ISDA Government Bond Option Definitions and the ISDA Confirmation of OTC Credit Swap Transaction served, in part, as the basis for certain of the definitions and provisions contained in these Definitions (modified, in some cases, as a result of input from participants in a working group comprised of representatives from the member institutions of ISDA, the Emerging Markets Traders Association ("EMTA") and the FX Committee (collectively, the "Sponsoring Organizations")). The definitions and provisions in these Definitions were developed by the working group based, in large part, on market practice. Inevitably, in certain areas market practice has not been uniform or has otherwise not provided definitive guidance. The working group has given studied consideration to these issues in formulating the provisions set out in these

Definitions. Each member of the working group has, where appropriate, sought the views of its own trading, operational, legal, compliance and other relevant personnel. None of this, however, obviates the need for each user of these Definitions to review the provisions of these Definitions carefully and to form its own independent judgment on the appropriateness of these Definitions for use by the institution in documenting privately negotiated FX and currency option transactions.

As in the case of other product-specific definitions published by ISDA, parties using these Definitions to document a privately negotiated FX or currency option transaction may adapt or supplement the standard provisions set out in these Definitions in accordance with the specific economic terms agreed between the parties to the relevant transaction. For the sake of relative simplicity and ease of use, the Sponsoring Organizations have not attempted to cover every type of FX or currency option transaction which has been or may be done in privately negotiated currency transactions. Parties may, however, find these Definitions a useful starting point when drafting a Confirmation for a product type not directly covered by these Definitions including, for example, a swap or other derivative transaction involving emerging market currencies. Parties also may want to incorporate into a Confirmation both the Definitions and the 1991 Definitions in order to document a swap transaction involving currencies. However, in doing so, parties should be aware that certain provisions in the Definitions may be inconsistent with provisions in the 1991 Definitions (or any other definitions booklet published by ISDA that the parties may incorporate into a Confirmation). Parties should specify which definitions booklet prevails in the event of such an inconsistency for the purpose of the relevant transaction.

The Definitions may be updated periodically to include additional definitions and provisions, although it is not anticipated that they will be changed substantively unless then prevailing market practice supports such a change. However, it is anticipated that currency and currency spot rate definitions will be added or changed from time to time as transactions involving rates and currencies not included in the Definitions become more prevalent and to reflect market practice. Accordingly, these sections of the Definitions are set forth in Annex A and are being released in a loose-leaf format so as to accommodate such additions and changes. At any time a copy of the then current version of these Definitions and Annex A may be obtained by contacting any of the Sponsoring Organizations. The Sponsoring Organizations also intend to make the latest version of Annex A available on the Internet. To avoid potential confusion, parties to a transaction may want to specify the version of Annex A that is being incorporated by reference to a date (*e.g.*, "March 1998 version") or an "as amended through" date (*e.g.*, "March 1998 version as amended through December 10, 1998"). Unless otherwise agreed, parties will be deemed to have incorporated Annex A as amended through the date on which the parties enter into an FX or currency option transaction.

The Sponsoring Organizations have provided these Definitions to assist the smooth and efficient functioning of privately negotiated FX and currency option transactions by providing a common set of terms for parties to use in preparing Confirmations of privately negotiated FX and currency option transactions. *The precise documentation of each individual transaction remains, however, the responsibility of the parties concerned. None of the Sponsoring Organizations*

*assumes responsibility for any use to which these Definitions may be put, including, without limitation, any use of these Definitions in connection with any privately negotiated FX or currency option transaction. Each party to a transaction evidenced by a Confirmation referring to or incorporating these Definitions must satisfy itself that the Definitions are appropriate for the transaction, have been properly used and/or adapted in the Confirmation for the transaction and that the Confirmation has generally been properly drafted, in each case, to reflect the commercial intentions of the parties.*

None of the Sponsoring Organizations has undertaken to review all applicable laws and regulations of any jurisdiction in which these Definitions may be used or any jurisdiction whose currency may be the subject of a privately negotiated FX or currency option transaction, and therefore parties are advised to consider the application of any relevant jurisdiction's regulatory, tax, accounting, exchange or other requirements that may exist in connection with entering into and documenting such a transaction.

**1998 FX AND CURRENCY
OPTION DEFINITIONS**

Any or all of the following definitions and provisions may be incorporated into a document by wording in the document indicating that, or the extent to which, the document is subject to the 1998 FX and Currency Option Definitions (as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee). Given the anticipated changes in Annex A of the Definitions, which contains the currency and currency spot rate definitions, parties to a transaction may want to specify the version of Annex A that is being incorporated by reference to a date or an "as amended through" date. Unless otherwise agreed, parties will be deemed to have incorporated Annex A as amended through the date on which the parties enter into the relevant FX or currency option transaction. All definitions and provisions so incorporated in a document will be applicable to that document unless otherwise provided in that document, and all terms defined in these Definitions and used in any definition or provision that is incorporated by reference in a document will have the respective meanings set forth in these Definitions unless otherwise provided in that document. Any term used in a document will, when combined with the name of a party, have meaning in respect of the named party only.

## ARTICLE 1

### CERTAIN GENERAL DEFINITIONS

**Section 1.1.    Business Day.** "Business Day" means for purposes of:

(a)    the definition of Settlement Date and Premium Payment Date,

(i)    a day on which commercial banks effect (or, but for the occurrence of any Disruption Event applicable to a Transaction, would have effected) delivery of the currency to be delivered on such Settlement Date or Premium Payment Date, respectively, in accordance with the market practice of the foreign exchange market in the place(s) specified for that purpose in a Confirmation generally or specifically for purposes of either the Settlement Date or Premium Payment Date, respectively, or

(ii)    if a place is not so specified,

(A)    a day on which commercial banks effect (or, but for the occurrence of any Disruption Event applicable to a Transaction, would have effected) delivery of the currency to be delivered on such Settlement Date or Premium Payment Date, respectively, in accordance with the market practice of the foreign exchange market in the Principal Financial Center of such currency;

(B)    a day that is an ECU Settlement Day, where the currency to be delivered on such Settlement Date or Premium Payment Date, respectively, is the European Currency Unit;

§1.1(a)(ii)(C)

(C)    a day that is a Euro Settlement Date, where the currency to be delivered on such Settlement Date or Premium Payment Date, respectively, is euro; or

(D)    a day that is a Business Day, an ECU Settlement Day or a Euro Settlement Date, as the case may be, in respect of each relevant currency where the currencies to be delivered on such Settlement Date or Premium Payment Date, respectively, are different currencies (unless market practice in the relevant foreign exchange markets otherwise provides);

(b)    the definition of Valuation Date or Averaging Date,

(i)    a day on which commercial banks are open (or, but for the occurrence of any Disruption Event applicable to a Transaction, would have been open) for business (including dealings in foreign exchange in accordance with the market practice of the foreign exchange market) in the place(s) specified for that purpose in a Confirmation generally or specifically for purposes of the Valuation Date or Averaging Date, respectively, or

(ii)    if a place is not so specified,

(A)    a day on which commercial banks are open (or, but for the occurrence of any Disruption Event applicable to a Transaction, would have been open) for business (including dealings in foreign exchange in accordance with the market practice of the foreign exchange market) in the Principal Financial Center of the Reference Currency or, in the case of a Currency Option Transaction where such a currency is not specified, the Call Currency and the Put Currency, and the places where the offices through which each party is transacting are located, as specified in a Confirmation;

(B)    a day that is an ECU Settlement Day and a Business Day in the places where the offices through which each party is transacting are located, where the payment obligation in respect of the Valuation Date or Averaging Date, respectively, is to be made in, or calculated by reference to, the European Currency Unit; or

(C)    a day that is a Euro Settlement Date and a Business Day in the places where the offices through which each party is transacting are located, where the payment obligation in respect of the Valuation Date or Averaging Date, respectively, is to be made in, or calculated by reference to, euro;

(c)    the definition of Exercise Date, Specified Exercise Date, Exercise Period and Expiration Date, in the case of a Currency Option Transaction,

(i)    a day on which commercial banks are open for business (including dealings in foreign exchange in accordance with the market

§ 1.1(e)(ii)

practice of the foreign exchange market) in the place(s) specified for that purpose in a Confirmation generally or specifically for purposes of the Exercise Date, Specified Exercise Date, Exercise Period or Expiration Date, respectively, or

(ii)    if a place is not so specified, a day on which commercial banks are open for business (including dealings in foreign exchange in accordance with the market practice of the foreign exchange market) in the place where the office through which Seller is transacting is located, as specified in a Confirmation;

(d)    the provisions of each Settlement Rate Option defined in these Definitions or in a Confirmation (subject to Section 1.1(b)),

(i)    a day on which commercial banks are open (or, but for the occurrence of any Disruption Event applicable to a Transaction, would have been open) for business (including dealings in foreign exchange in accordance with the market practice of the foreign exchange market) in the place(s) specified for that purpose in a Confirmation generally or specifically for purposes of that Settlement Rate Option, or

(ii)    if a place is not so specified (unless otherwise provided in these Definitions),

(A)    a day on which commercial banks are open (or, but for the occurrence of any Disruption Event applicable to a Transaction, would have been open) for business (including dealings in foreign exchange in accordance with the market practice of the foreign exchange market) in the Principal Financial Center of the Reference Currency;

(B) a day that is an ECU Settlement Day where the Reference Currency is the European Currency Unit; or

(C) a day that is a Euro Settlement Date where the Reference Currency is euro; and

(e)    any other provision of these Definitions or a Confirmation,

(i)    a day on which commercial banks are open for business (including dealings in foreign exchange in accordance with the market practice of the foreign exchange market) in the place(s) specified for that purpose in a Confirmation as Business Day(s) generally or specifically for the relevant purpose, or

(ii)    if a place is not so specified, a day on which commercial banks are open for business (including dealings in foreign exchange in accordance with the market practice of the foreign exchange market) in the places where the offices through which each party is transacting are located, as specified in a Confirmation.

§ 1.2

**Section 1.2.    Business Day Convention.** (a) "Business Day Convention" means the convention for adjusting any relevant date if it would otherwise fall on a day that is not a Business Day. The following terms, when used in conjunction with the term "Business Day Convention" and a date, will mean that an adjustment will be made if that date would otherwise fall on a day that is not a Business Day, so that:

(i)    if "Following" is specified, that date will be the first following day that is a Business Day;

(ii)    if "Modified Following" or "Modified" is specified, that date will be the first following day that is a Business Day unless that day falls in the next calendar month, in which case that date will be the first preceding day that is a Business Day;

(iii)    if "Nearest" is specified, that date will be the first preceding day that is a Business Day, if the relevant date otherwise falls on a day other than a Sunday or a Monday, and will be the first following day that is a Business Day, if the relevant date otherwise falls on a Sunday or a Monday; and

(iv)    if "Preceding" is specified, that date will be the first preceding day that is a Business Day.

(b)    The Business Day Convention applicable to a date that is specified in these Definitions or in a Confirmation to be subject to adjustment in accordance with an applicable Business Day Convention will be (i) the Business Day Convention specified for that date in these Definitions or in that Confirmation or, (ii) if such a convention is not so specified for that date but is specified for a Transaction, the Business Day Convention specified in the Confirmation for that Transaction.

**Section 1.3.    Calculation Agent.** "Calculation Agent" means the party to the Transaction (or a third party) designated as such for the Transaction. Whenever a Calculation Agent is required to act, it will do so in good faith and in a commercially reasonable manner, and its determinations and calculations will be binding in the absence of manifest error.

**Section 1.4.    Confirmation.** "Confirmation" means one or more documents or other confirming evidence exchanged between the parties, which, taken together, are effective to confirm all the terms of a Transaction.

**Section 1.5.    Currency Option Transaction.** "Currency Option Transaction" means a transaction entitling Buyer, upon exercise, to purchase from Seller at the Strike Price a specified quantity of Call Currency and to sell to Seller at the Strike Price a specified quantity of Put Currency.

**Section 1.6.    Currency Pair.** "Currency Pair" means, (a) in respect of a Deliverable FX Transaction, the currencies specified as being deliverable for a Transaction in the related Confirmation, (b) in respect of a Non-Deliverable FX

§1.13(a)

Transaction, the Reference Currency and the Settlement Currency and (c) in respect of a Currency Option Transaction, the Call Currency and the Put Currency.

**Section 1.7.        Deliverable**.        If "Deliverable" is specified in a Confirmation or is deemed specified, it means that "Deliverable" is applicable to the Transaction and that such Transaction will settle in accordance with the provisions of,

(a)      in the case of an FX Transaction, Section 2.2(a); and

(b)      in the case of a Currency Option Transaction, Section 3.7(a),

except as otherwise provided in Section 3.6(c) and Article 5. Unless the parties otherwise specify, Deliverable will be deemed to apply to a Transaction.

**Section 1.8.        Deliverable    Currency    Option    Transaction.** "Deliverable Currency Option Transaction" means a Currency Option Transaction to which Deliverable applies.

**Section 1.9.        Deliverable  FX  Transaction.**  "Deliverable  FX Transaction" means an FX Transaction to which Deliverable applies.

**Section 1.10.        ECU Settlement Day.** "ECU Settlement Day" means any day that (a) is not either (i) a Saturday or a Sunday or (ii) a day which appears as an ECU Non-Settlement Day on the display designated as page "ISDE" on the Reuter Monitor Money Rates Service (or a day so designated by the Euro Banking Association, if ECU Non-Settlement Days do not appear on that page) and, if ECU Non-Settlement Days do not appear on that page (and are not so designated), a day on which payments in the European Currency Unit cannot be settled in the international interbank market and (b) is a day on which payments in the European Currency Unit can be settled by commercial banks and in foreign exchange markets in the place in which the relevant account for payment is located.

**Section 1.11.        Euro Settlement Date.** "Euro Settlement Date" means any day on which the Trans-European Automated Real-Time Gross Settlement Express Transfer (TARGET) System is open.

**Section 1.12.        FX Transaction.** "FX Transaction" means a transaction providing for the purchase of an agreed amount in one currency by one party to such transaction in exchange for the sale by it of an agreed amount in another currency to the other party to such transaction.

**Section 1.13.        Non-Deliverable.** If "Non-Deliverable", "Cash Settlement" or "In-the-Money Settlement" is specified in a Confirmation, it means that "Non-Deliverable" is applicable to the Transaction and that such Transaction will settle in accordance with the provisions of,

(a)      in the case of an FX Transaction, Section 2.2(b); and

§ 1.13(b)

(b)      in the case of a Currency Option Transaction, Section 3.7(b),

except as otherwise provided in Article 5.

**Section 1.14.      Non-Deliverable Currency Option Transaction.** "Non-Deliverable Currency Option Transaction" means a Currency Option Transaction to which Non-Deliverable applies.

**Section 1.15.      Non-Deliverable FX Transaction.** "Non-Deliverable FX Transaction" means an FX Transaction to which Non-Deliverable applies.

**Section 1.16.      Certain Definitions Relating to Non-Deliverable FX Transactions and Non-Deliverable Currency Option Transactions.** When used in relation to a Non-Deliverable FX Transaction or a Non-Deliverable Currency Option Transaction, the following terms have the indicated meanings:

(a)      "Rate Calculation Date" means the Valuation Date or Averaging Date, as appropriate.

(b)      "Settlement Currency" means the currency specified as such in the related Confirmation or determined in accordance with Section 5.2(c)(x)(A).

(c)      "Settlement Rate" means, for any Valuation Date in respect of a Settlement Date, the currency exchange rate equal to (i) the Settlement Rate specified or otherwise determined as provided in the related Confirmation or, (ii) if a Settlement Rate or a means of determining a Settlement Rate is not so specified, the Spot Rate for that Valuation Date.

(d)      "Settlement Rate Option" means, in respect of the calculation of a Settlement Currency Amount or an In-the-Money Amount, the Settlement Rate Option specified as such in the related Confirmation (or deemed specified pursuant to Section 4.1 or Article 5) which may be specified by reference to any of the terms defined in these Definitions or defining the Settlement Rate Option in the related Confirmation.

(e)      "Spot Rate" means, for any Rate Calculation Date, the currency exchange rate determined in accordance with the specified (or deemed specified) Settlement Rate Option, or if a Settlement Rate Option is not specified (or deemed specified), the currency exchange rate at the time at which such rate is to be determined for foreign exchange transactions in the relevant Currency Pair for value on the Settlement Date, as determined in good faith and in a commercially reasonable manner by the Calculation Agent.

(f)      "Valuation Date" means each date (i) specified as the Valuation Date or otherwise determined as provided in the related Confirmation, or (ii) determined in accordance with Section 5.1(d)(vi) or Section 5.2(c)(x)(A), which is a day in respect of which a Spot Rate is to be determined for purposes of determining the Settlement Rate, subject to adjustment in accordance with the Preceding Business Day Convention unless another Business Day Convention is specified to be applicable to that Valuation Date. Unless otherwise specified in the related

§ 1.21(b)

Confirmation, the Valuation Date will be, (i) in respect of an FX Transaction, two Business Days prior to the Settlement Date and (ii) in respect of a Currency Option Transaction, the Exercise Date.

**Section 1.17.**          **Notional Amount.** "Notional Amount" means,

(a)       in respect of a Deliverable FX Transaction or a Deliverable Currency Option Transaction, the quantity of currency specified as such in the related Confirmation or determined in accordance with Section 5.2(c)(x)(A); and

(b)       in respect of a Non-Deliverable FX Transaction or a Non-Deliverable Currency Option Transaction, the quantity of Settlement Currency specified as such in the related Confirmation or, if such an amount is not specified, (i) in the case of a Non-Deliverable FX Transaction, the quantity of the Settlement Currency equal to the Reference Currency Notional Amount divided by the Forward Rate or, (ii) in the case of a Non-Deliverable Currency Option Transaction, whichever of the Call Currency Amount or the Put Currency Amount that is denominated in the Settlement Currency.

**Section 1.18.**          **Principal Financial Center.** "Principal Financial Center" means, in respect of a Transaction and a currency, the financial center or centers specified as such in the related Confirmation or, if none is specified, the financial center or centers indicated for such currency in Annex A of these Definitions.

**Section 1.19.**          **Reference Currency.** "Reference Currency" means, in respect of a Transaction, the currency specified as the Reference Currency or the local currency, as the case may be, in the related Confirmation.

**Section 1.20.**          **Reference Currency Buyer.** "Reference Currency Buyer" means, in respect of a Transaction, the party specified as such in the related Confirmation or, if such a party is not specified, the party to which the Reference Currency is owed (or would have been owed if the Transaction were a Deliverable Transaction) on the Settlement Date.

**Section 1.21.**          **Reference Currency Notional Amount.** "Reference Currency Notional Amount" means,

(a)       in respect of a Deliverable FX Transaction or a Deliverable Currency Option Transaction, the quantity of Reference Currency specified as such in the related Confirmation; and

(b)       in respect of a Non-Deliverable FX Transaction or a Non-Deliverable Currency Option Transaction, the quantity of Reference Currency specified as such in the related Confirmation or, if such an amount is not specified, (i) in the case of a Non-Deliverable FX Transaction, the quantity of Reference Currency equal to the Notional Amount multiplied by the Forward Rate or, (ii) in the case of a Non-Deliverable Currency Option Transaction, whichever of the Call Currency Amount or the Put Currency Amount that is denominated in the Reference Currency.

-7-

§ 1.22

**Section 1.22.      Reference Currency Seller.** "Reference Currency Seller" means, in respect of a Transaction, the party specified as such in the related Confirmation or, if such a party is not specified, the party which owes (or would have owed if the Transaction were a Deliverable Transaction) the Reference Currency on the Settlement Date.

**Section 1.23.      Rounding.** For purposes of any calculations referred to in these Definitions (unless otherwise specified in a Confirmation), (a) all percentages resulting from such calculations will be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point (*e.g.*, 9.876541% (or .09876541) being rounded down to 9.87654% (or .0987654) and 9.876545% (or .09876545) being rounded up to 9.87655% (or .0987655)) and (b) any currency amounts used in or resulting from such calculations will be rounded in accordance with the relevant market practice.

**Section 1.24.      Settlement Date.** "Settlement Date" means, in respect of a Transaction, the date (a) specified as the Settlement Date or the Payment Date, as the case may be, or otherwise determined as provided in the related Confirmation, or (b) determined in accordance with Section 5.2(c)(x)(A) or Section 5.2(c)(xi), subject to adjustment in accordance with the Following Business Day Convention unless another Business Day Convention is specified to be applicable to that Settlement Date.

**Section 1.25.      Trade Date.** "Trade Date" means, in respect of a Transaction, the date specified as the Trade Date, Contract Date, Create Date or Deal Date, as the case may be, in the related Confirmation, which date is the day on which the parties enter into the Transaction.

**Section 1.26.      Transaction.** "Transaction" means an FX Transaction, a Currency Option Transaction or any other transaction with respect to which the parties indicate these Definitions apply in the related Confirmation.

## ARTICLE 2

GENERAL TERMS RELATING TO FX TRANSACTIONS

**Section 2.1.      Certain Definitions and Provisions Relating to FX Transactions.** When used in relation to an FX Transaction, the following terms have the indicated meanings:

(a)      **Forward Rate.** "Forward Rate" means the currency exchange rate, expressed as the amount of Reference Currency per one unit of Settlement Currency, specified as such in the related Confirmation or, if such a rate is not specified, the currency exchange rate (i) obtained by dividing the Reference Currency Notional Amount by the Notional Amount or (ii) determined in accordance with Section 5.2(c)(x)(A).

§ 3.1(c)

**Section 2.2.    Terms Relating to Settlement.**

(a)    **Deliverable FX Transaction.** On the Settlement Date in respect of a Deliverable FX Transaction, each party will pay the amount specified as payable by it in the related Confirmation, subject to any applicable condition precedent and any applicable provisions of Article 5.

(b)    **Non-Deliverable FX Transaction.**

(i)    On the Settlement Date in respect of a Non-Deliverable FX Transaction, (A) if the Settlement Currency Amount is a positive number, the Reference Currency Buyer will pay that amount in the Settlement Currency to the Reference Currency Seller or, (B) if the Settlement Currency Amount is a negative number, the Reference Currency Seller will pay the absolute value of that amount in the Settlement Currency to the Reference Currency Buyer, in each case subject to any applicable condition precedent and any applicable provisions of Article 5.

(ii)    Settlement Currency Amount. "Settlement Currency Amount" means an amount expressed in the Settlement Currency calculated on a formula basis as follows:

$$\text{Settlement Currency Amount} = \left[ \text{Notional Amount} \quad x \quad \left( 1 - \frac{\text{Forward Rate}}{\text{Settlement Rate}} \right) \right]$$

where both the Forward Rate and the Settlement Rate are quoted in terms of the amount of Reference Currency per one unit of Settlement Currency.

## ARTICLE 3

GENERAL TERMS RELATING TO CURRENCY OPTION TRANSACTIONS

**Section 3.1.    Certain Definitions and Provisions Relating to Currency Option Transactions.** When used in relation to a Currency Option Transaction, the following terms have the indicated meanings:

(a)    **Buyer.** "Buyer" means the party specified as such in the related Confirmation, which party will, on the Premium Payment Date, pay to Seller the Premium.

(b)    **Call Currency.** "Call Currency" means the currency specified as such in the related Confirmation or, if such a currency is not specified, the currency that is to be purchased by Buyer.

(c)    **Call Currency Amount.** "Call Currency Amount" means the aggregate amount of Call Currency to be purchased upon the exercise (or deemed exercise) of the Currency Option Transaction as specified in the related Confirmation or, if such an amount is not specified, the Put Currency Amount

§ 3.1(c)

multiplied by the Strike Price (where the Strike Price is expressed as the amount of Call Currency to be paid per one unit of Put Currency).

(d)     **Put Currency.** "Put Currency" means the currency specified as such in the related Confirmation or, if such a currency is not specified, the currency that is to be sold by Buyer.

(e)     **Put Currency Amount.** "Put Currency Amount" means the aggregate amount of Put Currency to be sold upon the exercise (or deemed exercise) of the Currency Option Transaction as specified in the related Confirmation or, if such an amount is not specified, the Call Currency Amount divided by the Strike Price (where the Strike Price is expressed as the amount of Call Currency to be paid per one unit of Put Currency).

(f)     **Seller.** "Seller" means the party specified as such in the related Confirmation, which party grants to Buyer, upon the exercise (or deemed exercise) of a Currency Option Transaction, (i) if Deliverable is applicable, the right, but not the obligation, to cause Seller to pay to Buyer the Call Currency Amount on the Settlement Date and (ii) if Non-Deliverable is applicable, the right, but not the obligation, to cause Seller to pay to Buyer the In-the-Money Amount, if any, on the Settlement Date.

(g)     **Strike Price.** "Strike Price" means the currency exchange rate specified as such in the related Confirmation, which is the currency exchange rate at which the Currency Pair will be exchanged upon the exercise (or deemed exercise) of the right or rights granted pursuant to a Currency Option Transaction.

**Section 3.2.          Option Style.**

(a)     **American.** "American" means a style of Currency Option Transaction pursuant to which the right or rights granted are exercisable during an Exercise Period that consists of more than one day.

(b)     **Bermuda.** "Bermuda" or "Mid-Atlantic" means a style of Currency Option Transaction pursuant to which the right or rights granted are exercisable only on the Specified Exercise Date or Specified Exercise Dates, as the case may be.

(c)     **European.** "European" means a style of Currency Option Transaction pursuant to which the right or rights granted are exercisable only on the Expiration Date.

**Section 3.3.          Option Type.**

(a)     **Call.** "Call" means a type of Currency Option Transaction entitling, subject to any applicable condition precedent and any applicable provisions of Article 5, Buyer upon exercise:

(i)     in the case of a Deliverable Currency Option Transaction, to purchase from Seller the Call Currency Amount at the Strike Price; and

§ 3.5(b)

(ii)     in the case of a Non-Deliverable Currency Option Transaction, to receive from Seller the In-the-Money Amount, if positive, calculated in accordance with Section 3.7(c),

in each case, as more particularly provided in or pursuant to the related Confirmation.

(b)     **Put.** "Put" means a type of Currency Option Transaction entitling, subject to any applicable condition precedent and any applicable provisions of Article 5, Buyer upon exercise:

(i)     in the case of a Deliverable Currency Option Transaction, to sell to Seller the Put Currency Amount at the Strike Price; and

(ii)     in the case of a Non-Deliverable Currency Option Transaction, to receive from Seller the In-the-Money Amount, if positive, calculated in accordance with Section 3.7(c),

in each case, as more particularly provided in or pursuant to the related Confirmation.

**Section 3.4.     Terms Relating to Premium.**

(a)     **Premium; Price.** "Premium" means, in respect of a Currency Option Transaction and a Premium Payment Date, the amount, if any, that is specified or otherwise determined as provided in the related Confirmation and, subject to any applicable condition precedent, is payable by Buyer to Seller on the Premium Payment Date or on each Premium Payment Date if more than one is specified, for value on such date. Instead of specifying the Premium as an amount, the Premium may be specified by the parties as a "Price", which will be stated as a percentage of the Call Currency Amount or the Put Currency Amount, as appropriate.

(b)     **Premium Payment Date.** "Premium Payment Date" means, in respect of a Currency Option Transaction, one or more dates specified as such or otherwise determined as provided in the related Confirmation, subject to adjustment in accordance with the Following Business Day Convention unless another Business Day Convention is specified to be applicable to that Premium Payment Date.

**Section 3.5.     General Terms Relating to Exercise.**

(a)     **Commencement Date.** "Commencement Date" means, in respect of a Currency Option Transaction, the date specified as such in the related Confirmation or, if such a date is not specified, the Trade Date.

(b)     **Exercise Date.** "Exercise Date" means, in respect of a Currency Option Transaction, the day during the Exercise Period on which the rights granted pursuant to that Currency Option Transaction are exercised or deemed to be exercised.

-11-

§ 3.5(c)

(c)    **Exercise Period.** "Exercise Period" means, (i) in respect of an American style Currency Option Transaction, all Business Days in the period from, and including, the Commencement Date to, and including, the Expiration Date between 9:00 a.m. (local time in the place where the office through which Seller is transacting is located, as specified in the related Confirmation) and the Latest Exercise Time, (ii) in respect of a European style Currency Option Transaction, the Expiration Date between 9:00 a.m. (local time in the place where the office through which Seller is transacting is located, as specified in the related Confirmation) and the Expiration Time and (iii) in respect of a Bermuda style Currency Option Transaction, each Specified Exercise Date in the period from, and including, the Commencement Date to, and including, the Expiration Date between 9:00 a.m. (local time in the place where the office through which Seller is transacting is located, a specified in the related Confirmation) and the Latest Exercise Time.

(d)    **Expiration Date.** "Expiration Date" means, in respect of a Currency Option Transaction, the date specified as such in the related Confirmation, subject to adjustment in accordance with the Following Business Day Convention unless another Business Day Convention is specified to be applicable to that Expiration Date.

(e)    **Expiration Time.** "Expiration Time" means, in respect of a Currency Option Transaction, the time specified as such in the related Confirmation.

(f)    **Latest Exercise Time.** "Latest Exercise Time" means, in respect of a Currency Option Transaction, (i) on any day other than the Expiration Date, the time specified as such in the related Confirmation or, if such a time is not specified, the Expiration Time and (ii) on the Expiration Date, the Expiration Time.

(g)    **Notice of Exercise.** "Notice of Exercise" means, in respect of a Currency Option Transaction, irrevocable notice delivered by Buyer to Seller prior to or at the Expiration Time on the Expiration Date (which may be delivered by facsimile, electronic messaging system or orally, including by telephone, unless the parties otherwise agree with respect to a Currency Option Transaction) of Buyer's exercise of the right or rights granted pursuant to a Currency Option Transaction.

(h)    **Specified Exercise Date.** "Specified Exercise Date" means, in respect of a Bermuda style Currency Option Transaction, each date specified as such or otherwise determined as provided in the related Confirmation, subject to adjustment in accordance with the Following Business Day Convention unless another Business Day Convention is specified to be applicable to that Specified Exercise Date.

**Section 3.6.        Additional Terms Relating to Exercise.**

(a)    **Exercise.** Buyer may exercise the right or rights granted pursuant to a Currency Option Transaction only by giving a Notice of Exercise during the Exercise Period, unless Automatic Exercise applies and the Currency Option Transaction is deemed exercised. If a Notice of Exercise has not been received by

§ 3.7(b)

Seller prior to or at the Expiration Time on the Expiration Date (and Automatic Exercise is specified as not applicable in the related Confirmation), the right or rights granted pursuant to the Currency Option Transaction will expire and become void and of no effect. Unless otherwise specified in a Confirmation, a Currency Option Transaction may be exercised only in whole.

(b)    **Effectiveness of Notice of Exercise.** A Notice of Exercise is effective, (i) in the case of an American style Currency Option Transaction, (A) if received at or prior to the Latest Exercise Time, upon receipt thereof by Seller or (B) if received after the Latest Exercise Time, as of 9:00 a.m. (local time in the place where the office through which Seller is transacting is located, as specified in the related Confirmation) on the next following Business Day, if any, in the Exercise Period, (ii) in the case of a Bermuda style Currency Option Transaction, if received at or prior to the Latest Exercise Time on a Specified Exercise Date, upon receipt thereof by Seller and (iii) in the case of a European style Currency Option Transaction, if received at or prior to the Expiration Time on the Expiration Date, upon receipt thereof by Seller.

(c)    **Automatic Exercise.** If "Automatic Exercise" is specified (or deemed specified) to be applicable to a Currency Option Transaction and at the Expiration Time on the Expiration Date the Currency Option Transaction has not been exercised, then it will be deemed exercised as of that time if the In-the-Money Amount of the Currency Option Transaction at such Expiration Time equals or exceeds the product of (i) one percent of the Strike Price multiplied by (ii) the Call Currency Amount or the Put Currency Amount, as appropriate, unless Buyer notifies Seller (by telephone or in writing) prior to the Expiration Time that it does not wish Automatic Exercise to occur. In the case of a Deliverable Currency Option Transaction, if Automatic Exercise occurs, Seller may elect to settle such Currency Option Transaction in accordance with either Section 3.7(a) or Section 3.7(b). In either case, Seller will notify Buyer of its election of the method of settlement as soon as reasonably practicable after the Expiration Time. Unless the parties otherwise specify, Automatic Exercise will be deemed to apply to a Currency Option Transaction.

**Section 3.7.    Terms Relating to Settlement.**

(a)    **Deliverable Currency Option Transaction.** In respect of an Exercise Date under a Deliverable Currency Option Transaction, on the Settlement Date Buyer will pay to Seller the Put Currency Amount and Seller will pay to Buyer the Call Currency Amount, subject to the provisions of Section 3.6(c), any other applicable condition precedent and any applicable provisions of Article 5.

(b)    **Non-Deliverable Currency Option Transaction.** In respect of an Exercise Date under a Non-Deliverable Currency Option Transaction, Seller will pay to Buyer the In-the-Money Amount, if positive, on the Settlement Date, subject to any applicable condition precedent and any applicable provisions of Article 5.

§ 3.7(c)

(c)    **In-the-Money Amount.** "In-the-Money Amount" means, in respect of a Valuation Date:

(i)    if the parties have specified a Settlement Currency in a Confirmation (or if a Settlement Currency is deemed specified pursuant to Section 5.2(c)(x)(A)), the amount, if positive, expressed in the Settlement Currency calculated on a formula basis as follows:

(A)    in the case of a Currency Option Transaction where the Reference Currency is the Put Currency and the Settlement Currency is the Call Currency:

$$\mathit{In\text{-}the\text{-}Money\ Amount} = \left[ \mathit{Call\ Currency\ Amount} \quad x \quad \left( \frac{\mathit{Settlement\ Rate} - \mathit{Strike\ Price}}{\mathit{Settlement\ Rate}} \right) \right]$$

where both the Strike Price and the Settlement Rate are quoted in terms of the amount of Reference Currency per one unit of Settlement Currency; and

(B)    in the case of a Currency Option Transaction where the Reference Currency is the Call Currency and the Settlement Currency is the Put Currency:

$$\mathit{In\text{-}the\text{-}Money\ Amount} = \left[ \mathit{Put\ Currency\ Amount} \quad x \quad \left( \frac{\mathit{Strike\ Price} - \mathit{Settlement\ Rate}}{\mathit{Settlement\ Rate}} \right) \right]$$

where both the Strike Price and the Settlement Rate are quoted in terms of the amount of Reference Currency per one unit of Settlement Currency; or

(ii)    if a Settlement Currency is not specified (or deemed specified), the amount, if positive, calculated on a formula basis as follows:

(A)    in the case of a Call, the excess of the Settlement Rate over the Strike Price, multiplied by the Call Currency Amount, where both the Strike Price and the Settlement Rate are quoted in terms of the amount of Put Currency to be paid per one unit of Call Currency; and

(B)    in the case of a Put, the excess of the Strike Price over the Settlement Rate, multiplied by the Put Currency Amount, where both the Strike Price and the Settlement Rate are quoted in terms of the amount of Call Currency to be paid per one unit of Put Currency.

**Section 3.8.    Averaging.** If Averaging Dates are specified in a Confirmation, then notwithstanding any other provisions of these Definitions, the

§ 4.1(b)

following provisions will apply to the determination of the Settlement Rate in relation to a Valuation Date:

(a)    **Averaging Date.** "Averaging Date" means, in respect of a Valuation Date, each date specified as such or otherwise determined as provided in a Confirmation, subject to adjustment in accordance with the Preceding Business Day Convention unless another Business Day Convention is specified to be applicable to that Averaging Date.

(b)    **Settlement Rate.** For purposes of determining the Settlement Rate in relation to a Valuation Date, the Settlement Rate will be the arithmetic mean of the Spot Rates on each Averaging Date (or, if different, the day on which rates for each Averaging Date would, in the ordinary course, be published or announced by the relevant price source).

(c)    **Market Disruption.** Unless the parties otherwise specify, in the case where it becomes impossible to obtain the Spot Rate on an Averaging Date (or, if different, the day on which rates for that Averaging Date would, in the ordinary course, be published or announced by the relevant price source), such Averaging Date will be deemed not to be a relevant Averaging Date for purposes of determining the relevant Settlement Rate. If, through operation of this provision there would not be an Averaging Date with respect to the relevant Valuation Date, the provisions of Article 5 will apply for purposes of determining the relevant Spot Rate on the final Averaging Date with respect to that Valuation Date as if such Averaging Date were a Valuation Date on which a Price Source Disruption had occurred.

## ARTICLE 4

CALCULATION OF RATES FOR CERTAIN SETTLEMENT RATE OPTIONS

**Section 4.1.    Certain Published and Displayed Sources.**

(a)    **Multiple Price Sources.** If the currency exchange rate specified in the applicable Settlement Rate Option is published or announced by more than one price source and the price source referred to in such Settlement Rate Option fails to publish or announce that currency exchange rate on the Rate Calculation Date (or, if different, the day on which rates for that date would, in the ordinary course, be published or announced by such price source), then the Spot Rate for that Rate Calculation Date will be determined as if the parties had specified any other available price source which actually publishes or announces such currency exchange rate on such Rate Calculation Date (or, if different, the day on which rates for that date would, in the ordinary course, be published or announced by the relevant price source) as the applicable Settlement Rate Option.

(b)    **Official Successor Rate.** If the currency exchange rate specified in the applicable Settlement Rate Option is reported, sanctioned, recognized, published, announced or adopted (or other similar action) by the relevant Governmental Authority, and such currency exchange rate ceases to exist and is

§ 4.1(b)

replaced by a successor currency exchange rate that is reported, sanctioned, recognized, published, announced or adopted (or other similar action) by such Governmental Authority (the "Official Successor Rate"), then the Spot Rate for the relevant Rate Calculation Date will be determined as if the parties had specified any available price source which publishes or announces the Official Successor Rate (including, but not limited to, an official publication of that Governmental Authority) on such Rate Calculation Date (or, if different, the day on which rates for that date would, in the ordinary course, be published or announced by the relevant price source) as the applicable Settlement Rate Option.

**Section 4.2.    Annex A.** The remaining provisions of this Article are published in Annex A, which may be amended from time to time. Unless otherwise specified in a Confirmation, parties will be deemed to have incorporated Annex A as amended through the Trade Date of a Transaction.

## ARTICLE 5

### DISRUPTION EVENTS

**Section 5.1.    Disruption Events.**

(a)    "Disruption Event" means an event that, if applicable to a Transaction, would give rise in accordance with an applicable Disruption Fallback to either an alternative basis for determining the Settlement Rate or an alternative basis for settling the Transaction (which may include "No-Fault Termination" of that Transaction).

(b)    A Disruption Event is applicable to a Transaction if it is specified in the related Confirmation or if, pursuant to Section 5.1(e), it is deemed to have been specified for that Transaction.

(c)    If the parties have executed:

(i)    an ISDA Master Agreement or a 1987 Interest Rate and Currency Exchange Agreement, as amended and supplemented, (each a "Master Agreement") which governs a Transaction and if an event or circumstance that would otherwise constitute or give rise to an Illegality (as such term is defined in the Master Agreement) or, if applicable, an Impossibility (as such term is defined in the Schedule to the Master Agreement) also constitutes a Disruption Event that is applicable to that Transaction, then such event or circumstance will be treated as a Disruption Event and will be deemed not to constitute an Illegality or Impossibility, as the case may be, for purposes of these Definitions and that Master Agreement; or

(ii)    a FEOMA, IFEMA or ICOM (as amended and supplemented) which governs a Transaction, and if an event or circumstance that would otherwise constitute or give rise to a force majeure, act of state, illegality or impossibility for purposes of Section 9 of such FEOMA,

§ 5.1(d)(v)

Section 6 of such IFEMA or Section 9 of such ICOM also constitutes a Disruption Event that is applicable to that Transaction, then such event or circumstance will be treated as a Disruption Event and will be deemed not to constitute a force majeure, act of state, illegality or impossibility, as the case may be, for purposes of these Definitions and that FEOMA, IFEMA or ICOM, as appropriate.

(d)    When used in relation to a Transaction in conjunction with the term "Disruption Event" and for purposes of Section 5.1(e), the following terms have the indicated meanings:

(i)    "Benchmark Obligation Default" means, with respect to any Benchmark Obligation, the occurrence of a default, event of default or other similar condition or event (however described) including, but not limited to, (A) the failure of timely payment in full of any principal, interest or other amounts due (without giving effect to any applicable grace periods) in respect of such Benchmark Obligation, (B) a declared moratorium, standstill, waiver, deferral, Repudiation or rescheduling of any principal, interest or other amounts due in respect of such Benchmark Obligation or (C) the amendment or modification of the terms and conditions of payment of any principal, interest or other amounts due in respect of such Benchmark Obligation without the consent of all holders of such Benchmark Obligation. The determination of the existence or occurrence of any default, event of default or other similar condition or event shall be made without regard to any lack or alleged lack of authority or capacity of the relevant entity to issue or enter into such Benchmark Obligation.

(ii)    "Dual Exchange Rate" means, with respect to the Settlement Rate Option applicable to a Transaction, that the currency exchange rate specified in such Settlement Rate Option splits into dual or multiple currency exchange rates.

(iii)    "General Inconvertibility" means the occurrence of any event that generally makes it impossible to convert the Event Currency into the Non-Event Currency in the Event Currency Jurisdiction through customary legal channels.

(iv)    "General Non-Transferability" means the occurrence of any event that generally makes it impossible to deliver (A) the Non-Event Currency from accounts inside the Event Currency Jurisdiction to accounts outside the Event Currency Jurisdiction or (B) the Event Currency between accounts inside the Event Currency Jurisdiction or to a party that is a non-resident of the Event Currency Jurisdiction.

(v)    "Governmental Authority Default" means, with respect to any security or indebtedness for borrowed money of, or guaranteed by, any Governmental Authority, the occurrence of a default, event of default or other similar condition or event (however described) including, but not limited to, (A) the failure of timely payment in full of any principal, interest or other amounts due (without giving effect to any applicable grace periods)

§ 5.1(d)(v)

in respect of any such security, indebtedness for borrowed money or guarantee, (B) a declared moratorium, standstill, waiver, deferral, Repudiation or rescheduling of any principal, interest or other amounts due in respect of any such security, indebtedness for borrowed money or guarantee or (C) the amendment or modification of the terms and conditions of payment of any principal, interest or other amounts due in respect of any such security, indebtedness for borrowed money or guarantee without the consent of all holders of such obligation. The determination of the existence or occurrence of any default, event of default or other similar condition or event shall be made without regard to any lack or alleged lack of authority or capacity of such Governmental Authority to issue or enter into such security, indebtedness for borrowed money or guarantee.

(vi)    "Illiquidity" means it becomes impossible to obtain a firm quote of the Settlement Rate for the Minimum Amount (either in one transaction or a commercially reasonable number of transactions that, when taken together, total the Minimum Amount) on the Valuation Date (or, if different, the day on which rates for that Valuation Date would, in the ordinary course, be published or announced by the relevant price source) or by such other date (the "Illiquidity Valuation Date") as is specified for such purpose in the related Confirmation. If an Illiquidity Valuation Date is specified for a Transaction and an Illiquidity Disruption Event occurs on such date, then for purposes of any relevant Disruption Fallbacks in Section 5.2, the Illiquidity Valuation Date will be deemed to be the Valuation Date for that Transaction.

(vii)    "Inconvertibility/Non-Transferability" means the occurrence of any event which constitutes a General Inconvertibility Disruption Event, a General Non-Transferability Disruption Event, a Specific Inconvertibility Disruption Event and a Specific Non-Transferability Disruption Event.

(viii)    "Material Change in Circumstance" means the occurrence of any event (other than those events specified as Disruption Events in this Section 5.1(d)) in the Event Currency Jurisdiction beyond the control of the parties to a Transaction which makes it impossible (A) for a party to fulfill its obligations under that Transaction and (B) generally to fulfill obligations similar to such party's obligations under that Transaction.

(ix)    "Nationalization" means any expropriation, confiscation, requisition, nationalization or other action by any Governmental Authority which deprives a party to the Transaction (or any of its Relevant Affiliates), of all or substantially all of its assets in the Event Currency Jurisdiction.

(x)    "Price Materiality" means the Primary Rate differs from the Secondary Rate by at least the Price Materiality Percentage.

(xi)    "Price Source Disruption" means it becomes impossible to obtain the Settlement Rate on the Valuation Date (or, if different, the day on which rates for that Valuation Date would, in the ordinary course, be published or announced by the relevant price source).

(xii)   "Specific Inconvertibility" means the occurrence of any event that makes it impossible for a party to the Transaction (or the Relevant Class, if any) to convert the Minimum Amount of the Event Currency into the Non-Event Currency in the Event Currency Jurisdiction, other than where such impossibility is due solely to the failure by that party (or Relevant Class, as the case may be) to comply with any law, rule or regulation enacted by any Governmental Authority (unless such law, rule or regulation is enacted after the Trade Date of the Transaction and it is impossible for such party (or Relevant Class, as the case may be), due to an event beyond the control of that party (or Relevant Class), to comply with such law, rule or regulation).

(xiii)   "Specific Non-Transferability" means the occurrence of any event that makes it impossible for a party to the Transaction (or the Relevant Class, if any) to deliver (A) the Non-Event Currency from accounts inside the Event Currency Jurisdiction to accounts outside the Event Currency Jurisdiction or (B) the Event Currency between accounts inside the Event Currency Jurisdiction or to a party that is a nonresident of the Event Currency Jurisdiction, other than where such impossibility is due solely to the failure by that party (or Relevant Class, as the case may be) to comply with any law, rule or regulation enacted by any Governmental Authority (unless such law, rule or regulation is enacted after the Trade Date of the Transaction and it is impossible for such party (or Relevant Class, as the case may be), due to an event beyond the control of that party (or Relevant Class), to comply with such law, rule or regulation).

(e)   Unless the parties otherwise provide in a Confirmation:

(i)   if the parties do not specify any Disruption Event in a Confirmation, then (A) in respect of a Deliverable Transaction, no Disruption Events will be deemed to have been specified and (B) in respect of a Non-Deliverable Transaction, Price Source Disruption will be deemed to have been specified;

(ii)   if "General Inconvertibility/Non-Transferability" is specified in a Confirmation as a Disruption Event, then the General Inconvertibility and General Non-Transferability Disruption Events will apply to the Transaction;

(iii)   if "Party Specific Events" is specified in a Confirmation as a Disruption Event, then the Specific Inconvertibility and Specific Non-Transferability Disruption Events will apply to the Transaction; and

(iv)   notwithstanding clauses (i)-(iii) above, if one or more Disruption Events are specified in a Confirmation, then (A) in respect of a Deliverable Transaction, only the Disruption Events specified will apply to the Transaction and (B) in respect of a Non-Deliverable Transaction, Price Source Disruption and the Disruption Events specified will apply to the Transaction.

§ 5.1(f)

(f)    If, after the Trade Date of a Transaction, a Disruption Event applicable to that Transaction has occurred and is continuing in respect of that Transaction,

(i)    in the case of any Disruption Event other than Dual Exchange Rate, Illiquidity, Material Change in Circumstance, Price Materiality and Price Source Disruption, on the day that is the Settlement Date for that Transaction;

(ii)    in the case of Dual Exchange Rate, Price Materiality or Price Source Disruption, on the day that is the Valuation Date for that Transaction (or, if different, the day on which rates for that Valuation Date would, in the ordinary course, be published or announced by the relevant price source);

(iii)    in the case of Illiquidity, (A) if an Illiquidity Valuation Date is specified, on the day that is the Illiquidity Valuation Date for that Transaction or, (B) if such a date is not specified, on the day that is the Valuation Date for that Transaction (or, if different, the day on which rates for that Valuation Date would, in the ordinary course, be published or announced by the relevant price source); and

(iv)    in the case of Material Change in Circumstance, on the day that is the Valuation Date (or, if different, the day on which rates for that Valuation Date would, in the ordinary course, be published or announced by the relevant price source) or the Settlement Date for that Transaction,

then the Settlement Rate for that Transaction will be determined or the Transaction will be settled, as the case may be, in accordance with the terms of the first applicable Disruption Fallback pursuant to Section 5.2. For purposes of this subsection (f) only, the definition of Business Day in Section 1.1 as applied to the definition of Valuation Date and Settlement Date will include any day on which, in the case of a Valuation Date, commercial banks would have been open or, in the case of a Settlement Date, commercial banks would have effected delivery of the currency to be delivered, but for the occurrence in the Event Currency Jurisdiction of a banking moratorium or other similar event related to any Disruption Event applicable to a Transaction.

(g)    If "Calculation Agent Determination of Disruption Event" is specified as applicable in a Confirmation, the Calculation Agent, after consultation with the parties or the other party, will determine in good faith whether a Disruption Event applicable to a Transaction has occurred.

**Section 5.2.    Disruption Fallbacks.**

(a)    "Disruption Fallback" means a source or method that, if applicable to a Transaction, gives rise to either an alternative basis for determining the Settlement Rate or an alternative basis for settling a Transaction (which may include "No Fault Termination" of that Transaction), as the case may be, when a Disruption Event has occurred and is continuing on the relevant date set forth in Section 5.1(f).

§ 5.2(c)(iv)

(b)      A Disruption Fallback is applicable to a Transaction if it is specified in the related Confirmation or if, pursuant to Section 5.2(e), it is deemed to have been specified for that Transaction.

(c)      When used in relation to a Transaction in conjunction with the term "Disruption Fallback" and for purposes of Section 5.2(e), the following terms have the indicated meanings:

(i)      "Assignment of Claim" means that, in respect of a Nationalization Disruption Event, the party or, if applicable, its Relevant Affiliate (the "Nationalized Party") whose assets are subject to such an event (the "Nationalized Assets") will assign its official claim against any Governmental Authority with respect to the occurrence of such Nationalization Disruption Event (the "Claim") in an amount as determined below for recovery of the Nationalized Assets to the other party to the Transaction ("X") if such assignment is permitted under applicable law. If such assignment is not permitted under applicable law (and unless otherwise specified in a Confirmation), the Nationalized Party will transfer a beneficial interest in the Claim to X. The amount of the Claim to be assigned or the beneficial interest in the Claim to be transferred pursuant to the foregoing provisions will be an amount equal to the Event Currency Amount.

(ii)      "Calculation Agent Determination of Settlement Rate" means that the Calculation Agent will determine the Settlement Rate (or a method for determining the Settlement Rate), taking into consideration all available information that in good faith it deems relevant.

(iii)      "Deliverable Substitute" means that on the Settlement Date, in respect of a Non-Deliverable FX Transaction or a Non-Deliverable Currency Option Transaction, the Reference Currency Buyer will pay an amount equal to the Notional Amount to an account designated by the Reference Currency Seller and the Reference Currency Seller will pay an amount equal to the Reference Currency Notional Amount to an account designated by the Reference Currency Buyer.

(iv)      "Escrow Arrangement" means that each party will, if it is legally able, pay any amount payable by it on the Settlement Date pursuant to a Transaction into escrow (the "Escrow Amount"). Each party will use reasonable efforts to deposit (or cause its escrow agent to deposit) the Escrow Amount in a segregated interest bearing account or otherwise invest the Escrow Amount in a mutually agreeable investment, in each case as more particularly provided in the related Confirmation. The Escrow Amount plus the interest, if any, earned on the Escrow Amount will be delivered to the other party when the applicable Disruption Event ceases to exist, unless that Disruption Event continues to exist (measured from, and including, the Settlement Date) for consecutive Business Days equal to the Maximum Days of Disruption. In that case, the party obligated to pay the Non-Event Currency will deliver (or cause its escrow agent to deliver) the Escrow Amount plus the interest, if any, earned on the Escrow Amount, to

§ 5.2(c)(iv)

the other party on that last consecutive Business Day and the party obligated to pay the Event Currency will deliver the Escrow Amount plus the interest, if any, earned on the Escrow Amount, when the applicable Disruption Event has ceased to exist.

(v) "Fallback Reference Price" means, in respect of a Dual Exchange Rate Disruption Event, an Illiquidity Disruption Event, a Price Source Disruption Event or a Price Materiality Disruption Event, that the Calculation Agent will determine the Settlement Rate for a Transaction on the relevant Valuation Date (or, if different, the day on which rates for that Valuation Date would, in the ordinary course, be published or announced) pursuant to the first of the alternate Settlement Rate Options, if any, specified as a Fallback Reference Price for such purpose in these Definitions or the related Confirmation that is not subject to a Disruption Event.

(vi) "Local Asset Substitute-Gross" means that,

(A) in respect of a Deliverable Transaction, the Event Currency Seller will Deliver Benchmark Obligations with a Specified Value equal to the Event Currency Amount to an account designated by the Event Currency Buyer and the Event Currency Buyer will pay an amount in the Non-Event Currency equal to the Non-Event Currency Amount to an account designated by the Event Currency Seller;

(B) in respect of a Non-Deliverable Transaction where the Event Currency is the Reference Currency, the Reference Currency Seller will Deliver Benchmark Obligations with a Specified Value equal to the Reference Currency Notional Amount to an account designated by the Reference Currency Buyer and the Reference Currency Buyer will pay an amount in the Settlement Currency equal to the Notional Amount to an account designated by the Reference Currency Seller; and

(C) in respect of a Non-Deliverable Transaction where the Event Currency is the Settlement Currency, the Reference Currency Buyer will Deliver Benchmark Obligations with a Specified Value equal to the Notional Amount to an account designated by the Reference Currency Seller and the Reference Currency Seller will pay an amount in the Reference Currency equal to the Reference Currency Notional Amount to an account designated by the Reference Currency Buyer,

in each case, as more particularly provided in Section 5.3 and the related Confirmation.

(vii) "Local Asset Substitute-Net" means that the party obligated to pay the Settlement Currency Amount or the In-the-Money Amount, as the case may be, instead will Deliver to an account designated by the other party Benchmark Obligations with a Specified Value equal to the Event

Currency Amount, as more particularly provided in Section 5.3 and the related Confirmation.

(viii)    "Local Currency Substitute" means that,

(A) in respect of a Deliverable Transaction, such Transaction will be converted into a Non-Deliverable Transaction in accordance with the provisions of the Non-Deliverable Substitute Disruption Fallback and the party obligated to pay (after giving effect to such conversion) the Settlement Currency Amount or the In-the-Money Amount, as the case may be, will instead deliver on the Settlement Date to an account designated by the other party in the Event Currency Jurisdiction, an amount of Event Currency equal to the Event Currency Amount; and

(B) in respect of a Non-Deliverable Transaction, the party obligated to pay the Settlement Currency Amount or the In-the-Money Amount, as the case may be, will instead deliver on the Settlement Date to an account designated by the other party in the Event Currency Jurisdiction an amount of Event Currency equal to the Event Currency Amount.

(ix)    "No Fault Termination" means that the Transaction will terminate in accordance with the applicable provisions set forth in Section 6 of the ISDA Master Agreement (which provisions, excluding Section 6(b)(iii), are hereby incorporated by reference into these Definitions), as if: (A) an "Additional Termination Event" had been specified and had occurred, (B) any applicable grace periods had lapsed, (C) any notice was effective on the date No Fault Termination became the applicable Disruption Fallback, (D) there were two "Affected Parties" and (E) the Transaction was the only "Affected Transaction". On the date No Fault Termination becomes the applicable Disruption Fallback, either Affected Party may, by notice to the other party, designate such date as an "Early Termination Date" and (unless otherwise specified in the related Confirmation) it will be deemed that "Loss" applies (irrespective of the payment measure, if any, elected by the parties under the Master Agreement, if any, governing the Transaction) and the Termination Currency is the Non-Event Currency. The terms "Additional Termination Event", "Affected Parties", "Affected Transaction", "Early Termination Date", "Loss" and "Termination Currency Equivalent" have the meanings provided for in the ISDA Master Agreement.

(x)    "Non-Deliverable Substitute" means that, in respect of a Deliverable FX Transaction or a Deliverable Currency Option Transaction, the payment obligations will be replaced by an obligation to pay an amount that would be due pursuant to these Definitions as if such Transaction were a Non-Deliverable FX Transaction or a Non-Deliverable Currency Option Transaction, as the case may be, together with interest on such amount at a rate per annum equal to the cost (without proof or evidence of such cost) to the relevant party (certified by it) of funding that amount, as appropriate, for

§ 5.2(c)(x)

the period from, and including, the original date that, but for the occurrence of a Disruption Event, would have been the Settlement Date to, but excluding, the actual date of payment of that amount. For purposes of this clause, unless otherwise specified in a Confirmation:

(A)    ·the Valuation Date will be the original date that, but for the occurrence of a Disruption Event, would have been the Settlement Date, the Settlement Rate will be determined as if the Settlement Rate Option were Currency-Reference Dealers, the Settlement Date will be the date determined in accordance with the relevant market practice with respect to such a Non-Deliverable Transaction, the Reference Currency will be the Event Currency, the Settlement Currency will be the Non-Event Currency, the Reference Currency Notional Amount will equal the Event Currency Amount, and the Notional Amount will equal the Non-Event Currency Amount; and

(B)    in the case of an FX Transaction, the Forward Rate will be the currency exchange rate, expressed as an amount of Event Currency per one unit of Non-Event Currency, obtained by dividing the Event Currency Amount by the Non-Event Currency Amount.

(xi)    "Settlement Postponement" means that the Settlement Date for the Transaction will be deemed to be the first succeeding Business Day on which the applicable Disruption Event ceases to exist, unless that Disruption Event continues to exist (measured from the original date that, but for the occurrence of a Disruption Event, would have been the Settlement Date) for consecutive Business Days equal in number to the Maximum Days of Disruption. In that case, the last such consecutive Business Day will be the Settlement Date and (A) if, in conjunction with Settlement Postponement, Escrow Arrangement is specified as applicable to the Transaction, the provisions of the Escrow Arrangement Disruption Fallback will be applicable to that Transaction or, (B) if Escrow Arrangement is not specified as applicable to the Transaction, the next Disruption Fallback specified in the related Confirmation will apply to that Transaction. On the original date that, but for the occurrence of a Disruption Event, would have been the Settlement Date, each party required to deliver a payment under a Transaction that is postponed pursuant to the foregoing provisions will use reasonable efforts to deposit such amount in a segregated interest bearing account or otherwise invest that amount in a mutually agreeable investment.

(d)    The parties may specify in a Confirmation other Disruption Fallbacks that will apply to a Transaction.

§ 5.2(e)(i)(E)(2)

(e)        Unless the parties otherwise provide in a Confirmation and subject to Section 5.2(g),

(i)        if the parties do not specify any Disruption Fallbacks in a Confirmation with respect to an applicable Disruption Event, the following Disruption Fallbacks will be deemed to have been specified (in the following order) for the Transaction with respect to the Disruption Event indicated:

(A)        in respect of General Inconvertibility, General Non-Transferability, Inconvertibility/Non-Transferability, Specific Inconvertibility and Specific Non-Transferability,

(1)        in the case of a Deliverable Transaction, Non-Deliverable Substitute or, in the case of a Non-Deliverable Transaction, Local Currency Substitute; and

(2)        Settlement Postponement;

(B)        in respect of Benchmark Obligation Default and Governmental Authority Default,

(1)        Local Asset Substitute-Gross, where the Benchmark Obligation so Delivered must be, in the case of Benchmark Obligation Default, the Benchmark Obligation subject to that default or, in the case of Governmental Authority Default, an obligation subject to that default; and

(2)        Settlement Postponement;

(C)        in respect of Nationalization,

(1)        Settlement Postponement; and

(2)        Assignment of Claim;

(D)        in respect of Price Materiality, the Fallback Reference Price specified for such purpose or, if none is specified, the Fallback Reference Price as if Currency-Reference Dealers were the alternate Settlement Rate Option;

(E)        in respect of Illiquidity and Price Source Disruption,

(1)        the Fallback Reference Price specified for such purpose or, if none is specified, the Fallback Reference Price as if Currency-Reference Dealers were the alternate Settlement Rate Option; and

(2)        Calculation Agent Determination of Settlement Rate;

-25-

§ 5.2(e)(i)(F)

(F)    in respect of Dual Exchange Rate, the Fallback Reference Price specified for such purpose or, if none is specified, Calculation Agent Determination of Settlement Rate; and

(G)    in respect of Material Change in Circumstance, each party will, promptly upon becoming aware of the Material Change in Circumstance Disruption Event, negotiate in good faith and in a commercially reasonable manner to agree with the other party on an alternative basis for determining the Settlement Rate or an alternative basis for settling the Transaction in accordance with then prevailing market practice and if the parties have not so agreed on or before the Maximum Days of Disruption, the Transaction will terminate in accordance with the provisions of "No Fault Termination".

(ii)    in each of clauses (A) through (G), if "Conversion" is specified in a Confirmation, it means that the first Disruption Fallback will be, (A) in the case of a Deliverable Transaction, Non-Deliverable Substitute and (B) in the case of a Non-Deliverable Transaction, Deliverable Substitute and in each case, the subsequent Disruption Fallbacks will be applied after giving effect to such conversion into a Deliverable Transaction or a Non-Deliverable Transaction, as the case may be; and

(iii)    other than as provided in subsection (f) below, if one or more Disruption Fallbacks are specified in a Confirmation, then only the Disruption Fallbacks specified will apply to the Transaction (in the order so specified).

(f)    Unless otherwise specified in a Confirmation, if none of the applicable Disruption Fallbacks provides the parties with a means of determining the Settlement Rate or settling the Transaction, as the case may be, the Transaction will terminate in accordance with the provisions of "No Fault Termination".

(g)    Unless otherwise specified in a Confirmation, if more than one Disruption Event applicable to a Transaction has occurred and is continuing on the Settlement Date, then all such Disruption Events must be remedied in respect of such Transaction in accordance with the terms of the applicable Disruption Fallbacks in the following order:

(i)    if Dual Exchange Rate, Illiquidity, Price Materiality or Price Source Disruption is applicable to the Transaction and is not remedied before the Settlement Date, then the Disruption Fallbacks specified or deemed specified with respect to Dual Exchange Rate, Illiquidity, Price Materiality or Price Source Disruption, respectively, must be applied to that Transaction (in the specified order) until the Dual Exchange Rate Disruption Event, Illiquidity Disruption Event, Price Materiality Disruption Event or Price Source Disruption Event is remedied and a Settlement Rate is determined;

§ 5.3(a)

(ii)     if Nationalization is applicable to the Transaction, then the Disruption Fallbacks specified or deemed specified with respect to Nationalization must be applied to that Transaction (in the specified order) until such Nationalization Disruption Event is remedied. If the Transaction settles in accordance with the provisions of the Assignment of Claim Disruption Fallback set forth in Section 5.2(c)(i), then the Disruption Events listed in clauses (iii)-(v) below will be deemed remedied in respect of such Transaction;

(iii)     if Benchmark Obligation Default or Governmental Authority Default is applicable to the Transaction, then the Disruption Fallbacks specified or deemed specified with respect to Benchmark Obligation Default or Governmental Authority Default, as the case may be, must be applied to that Transaction (in the specified order) until such Benchmark Obligation Default Disruption Event or Governmental Authority Default Disruption Event is remedied. If the Transaction settles in accordance with the provisions of the Local Asset Substitute-Gross Disruption Fallback set forth in Section 5.2(c)(vi), then the Disruption Events listed in clauses (iv) and (v) below will be deemed remedied in respect of such Transaction;

(iv)     if General Inconvertibility, General Non-Transferability, Inconvertibility/Non-Transferability, Specific Inconvertibility or Specific Non-Transferability is applicable to the Transaction, then the Disruption Fallbacks specified or deemed specified with respect to General Inconvertibility, General Non-Transferability, Inconvertibility/Non-Transferability, Specific Inconvertibility or Specific Non-Transferability, respectively, must be applied to that Transaction (in the specified order) until such General Inconvertibility Disruption Event, General Non-Transferability Disruption Event, Inconvertibility/Non-Transferability Disruption Event, Specific Inconvertibility Disruption Event or Specific Non-Transferability Disruption Event is remedied; and

(v)     if Material Change in Circumstance is applicable to the Transaction, then the Disruption Fallbacks specified or deemed specified with respect to Material Change in Circumstance must be applied to that Transaction (in the specified order) until such Material Change in Circumstance Disruption Event is remedied.

**Section 5.3.          Additional Terms Relating to the Delivery of Benchmark Obligations.**

(a)     **Delivery of Benchmark Obligations.** On the Settlement Date, the party obligated to Deliver the Benchmark Obligations will initiate Delivery of such Benchmark Obligations (through the relevant clearance system, if any) and such Delivery will be made for good value on the first day on which settlement of a novation, transfer, assignment or sale, as appropriate, of such Benchmark Obligations executed on the Settlement Date would customarily take place (the "Physical Settlement Date"). The other party to the Transaction will pay the amount payable by it, if any, on the Physical Settlement Date together with interest on such amount at a rate per annum equal to the cost (without proof or evidence

§ 5.3(a)

of such cost) to the party obligated to Deliver the Benchmark Obligations (certified by it) of funding that amount, as appropriate, for the period from, and including, the original date that, but for the occurrence of a Disruption Event, would have been the Settlement Date to, but excluding, the actual date of payment of that amount. Unless otherwise specified in a Confirmation, such Delivery and such payment will be made on a delivery versus payment basis.

(b)    **Failure to Deliver Benchmark Obligations Due to an Event Beyond the Control of the Parties.** If, due to an event beyond the control of the parties, it is impossible or illegal for the relevant party to Deliver the Benchmark Obligations on the Physical Settlement Date (including without limitation, as a result of failure of the relevant clearance system or due to any law, regulation or court order, but not including as a result of market conditions), then the Benchmark Obligations will be Delivered on the first succeeding day on which Delivery of such Benchmark Obligations can take place unless such an event prevents Delivery for five Business Days. In that case, or if due to an event beyond the control of the party taking Delivery of such Benchmark Obligations, it is impossible or illegal for that party to take such Delivery on the Physical Settlement Date, the Transaction will settle in accordance with the next applicable Disruption Fallback.

(c)    **Performance by a Designee.** Either party (the "designator") may designate any of its affiliates (the "designee") to Deliver or take Delivery of, as the case may be, the Benchmark Obligations and otherwise to perform such party's obligations to Deliver or take Delivery, as the case may be, in respect of a Transaction and the designee may assume such obligations. Such designation shall not relieve the designator of any of its obligations under a Transaction. If the designee actually performs the obligations of the designator under a Transaction, then the designator will be discharged of its obligations to the other party to the extent of such performance. If, as a result of such designation, (1) it would be illegal due to any applicable law or regulation affecting the transfer of Benchmark Obligations for the designee to so Deliver or take Delivery of such Benchmark Obligations, (2) such Delivery would give rise to any Tax (as such term is defined in the ISDA Master Agreement) or (3) such Delivery would give rise to any loss or cost to the non-designating party, then such designation may not be made.

(d)    **Stamp Tax.** Notwithstanding any other provision of these Definitions or the Confirmation, if any stamp, registration, documentation or similar tax is payable in connection with the Delivery of the Benchmark Obligations, payment of such tax shall be made by the party that would in the ordinary course bear such cost under a contract for purchase of the Benchmark Obligations.

(e)    **Representation and Agreement.** The party obligated to Deliver the Benchmark Obligations represents on the Physical Settlement Date and on any subsequent date that physical settlement is effected (which representation shall survive the Physical Settlement Date and any such subsequent date) that it has conveyed to the other party (or, if applicable, its designee) all right, title and interest in the Benchmark Obligations, free and clear of all claims, charges, liens and encumbrances. The party which receives the Benchmark Obligations agrees

§ 5.4(f)

(which agreement shall survive the Physical Settlement Date) to execute, deliver, file and record any specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by the other party in connection with such party's Delivery of the Benchmark Obligations.

**Section 5.4.       Certain Definitions Relating to Disruption Events and Disruption Fallbacks.**

(a)       **Benchmark Obligation.** "Benchmark Obligation" means, in respect of a Transaction, each obligation specified as such in the related Confirmation.

(b)       **Deliver.** "Deliver" means to deliver, novate, transfer, assign or sell, as appropriate, in the manner customary for the settlement of the relevant Benchmark Obligation (which shall include executing all necessary documentation and taking any other necessary actions), in order to convey all right, title and interest in the Benchmark Obligation, free and clear of all claims, charges, liens and encumbrances. "Delivery" and "Delivered" will be construed accordingly.

(c)       **Event Currency.** "Event Currency" means, (i) in respect of a Deliverable Transaction, the currency specified as such in the related Confirmation and (ii) in respect of a Non-Deliverable Transaction, the currency specified as such in the related Confirmation or, if such a currency is not specified, the Reference Currency.

(d)       **Event Currency Amount.** "Event Currency Amount" means, (i) in respect of a Deliverable Transaction, the quantity of Event Currency specified as such in the related Confirmation or, if such an amount is not specified, the quantity of Event Currency that is owed by the Event Currency Seller on the Settlement Date, (ii) in respect of a Non-Deliverable Transaction where the Event Currency is the Reference Currency, (A) in the case of a Non-Deliverable FX Transaction, the Settlement Currency Amount multiplied by the Settlement Rate or (B) in the case of a Non-Deliverable Currency Option Transaction, the In-the-Money Amount multiplied by the Settlement Rate, and (iii) in respect of a Non-Deliverable Transaction where the Event Currency is the Settlement Currency, (A) in the case of a Non-Deliverable FX Transaction, the Settlement Currency Amount or (B) in the case of a Non-Deliverable Currency Option Transaction, the In-the-Money Amount.

(e)       **Event Currency Buyer.** "Event Currency Buyer" means, (i) in respect of a Deliverable Transaction, the party specified as such in the related Confirmation or, if such a party is not specified, the party to which the Event Currency is owed on the Settlement Date, (ii) in respect of a Non-Deliverable Transaction where the Event Currency is the Reference Currency, the Reference Currency Buyer and (iii) in respect of a Non-Deliverable Transaction where the Event Currency is the Settlement Currency, the Reference Currency Seller.

(f)       **Event Currency Jurisdiction.** "Event Currency Jurisdiction" means, in respect of a Transaction, the country for which the Event Currency is the lawful currency.

§ 5.4(g)

(g)     **Event Currency Seller.** "Event Currency Seller" means, (i) in respect of a Deliverable Transaction, the party specified as such in the related Confirmation or, if such a party is not specified, the party which owes the Event Currency on the Settlement Date, (ii) in respect of a Non-Deliverable Transaction where the Event Currency is the Reference Currency, the Reference Currency Seller and (iii) in respect of a Non-Deliverable Transaction where the Event Currency is the Settlement Currency, the Reference Currency Buyer.

(h)     **FEOMA.** "FEOMA" means the standard form 1997 International Foreign Exchange and Options Master Agreement (FEOMA) published by The Foreign Exchange Committee in association with the British Bankers' Association, the Canadian Foreign Exchange Committee and the Tokyo Foreign Exchange Market Practices Committee.

(i)     **Governmental Authority.** "Governmental Authority" means any de facto or de jure government (or any agency or instrumentality thereof), court, tribunal, administrative or other governmental authority or any other entity (private or public) charged with the regulation of the financial markets (including the central bank) of the Event Currency Jurisdiction.

(j)     **ICOM.** "ICOM" means the standard form 1997 International Currency Options Market Master Agreement (ICOM) published by The Foreign Exchange Committee in association with the British Bankers' Association, the Canadian Foreign Exchange Committee and the Tokyo Foreign Exchange Market Practices Committee. Such term shall also include each of the 1992 versions of ICOM published by The Foreign Exchange Committee and the British Bankers' Association (and any other similar version adopted by industry groups for jurisdictions other than the U.S. and the U.K.) and, notwithstanding any changes in section numbers, headings, definitions and the like, any reference herein to a provision in the 1997 ICOM shall be deemed a reference to the equivalent provision in such earlier versions.

(k)     **IFEMA.** "IFEMA" means the standard form 1997 International Foreign Exchange Master Agreement (IFEMA) published by The Foreign Exchange Committee in association with the British Bankers' Association, the Canadian Foreign Exchange Committee and the Tokyo Foreign Exchange Market Practices Committee. Such term shall also include each of the 1993 versions of IFEMA published by The Foreign Exchange Committee and the British Bankers' Association (and any similar version adopted by industry groups for jurisdictions other than the U.S. and the U.K.) and, notwithstanding any changes in section numbers, headings, definitions and the like, any references herein to a provision in the 1997 IFEMA shall be deemed a reference to the equivalent provision in such earlier versions.

(l)     **ISDA Master Agreement.** "ISDA Master Agreement" means the standard form 1992 ISDA Master Agreement (Multicurrency-Cross Border) published by the International Swaps and Derivatives Association, Inc.

(m)     **Maximum Days of Disruption.** "Maximum Days of Disruption" means, in respect of a Transaction and for purposes of (i) the definition of Escrow

-30-

§ 5.4(v)

Arrangement and Settlement Postponement and (ii) the provisions relating to Material Change in Circumstance in Section 5.2(e)(i)(G), the number of Business Days specified as such in the related Confirmation.

(n)    **Minimum Amount.**  "Minimum Amount" means, in respect of a Transaction, the amount specified as such in the related Confirmation or, if such an amount is not specified, (i) for purposes of the definition of Illiquidity, the Reference Currency Notional Amount and (ii) for purposes of the definition of Specific Inconvertibility, the Event Currency equivalent of US $1.

(o)    **Non-Event Currency.**  "Non-Event Currency" means, in respect of a Transaction, the currency of the Currency Pair that is not the Event Currency.

(p)    **Non-Event Currency Amount.**  "Non-Event Currency Amount" means, in respect of a Transaction, the quantity of Non-Event Currency specified as payable by the Event Currency Buyer in the related Confirmation.

(q)    **Price Materiality Percentage.**  "Price Materiality Percentage" means, in respect of a Transaction and for purposes of the definition of Price Materiality, the percentage specified as such in the related Confirmation.

(r)    **Primary Rate.**  "Primary Rate" means, in respect of a Transaction and for purposes of the definition of Price Materiality, the rate determined using the Settlement Rate Option specified for such purpose in the related Confirmation.

(s)    **Relevant Affiliate.**  "Relevant Affiliate" means, in respect of a Transaction and any party thereto, the entities specified as such in the related Confirmation or, if such entities are not specified, in relation to any party, any entity controlled, directly or indirectly, by such party, any entity that controls, directly or indirectly, such party or any entity directly or indirectly under common control with such party. For this purpose, "control" of any entity or party means ownership of a majority of the voting power of the entity or party.

(t)    **Relevant Class.**  "Relevant Class" means, in respect of a Transaction and for purposes of the definition of Specific Inconvertibility and Specific Non-Transferability, any group or class specified as such in the related Confirmation.

(u)    **Repudiation.**  "Repudiation" means that, in respect of a Transaction, (i) for purposes of the definition of Benchmark Obligation Default, the issuer of or any party to, as the case may be, the relevant Benchmark Obligation disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of the Benchmark Obligation in any material respect and (ii) for purposes of the definition of Governmental Authority Default, the relevant Governmental Authority disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of any security, indebtedness for borrowed money or guarantee of such Governmental Authority in any material respect.

(v)    **Secondary Rate.**  "Secondary Rate" means, in respect of a Transaction and for purposes of the definition of Price Materiality, the rate

§ 5.4(w)

determined using the Settlement Rate Option specified for such purpose in the related Confirmation.

(w)    **Specified Value.** "Specified Value" means, in respect of a Transaction and a Benchmark Obligation, any of the following values, as specified in the related Confirmation: (i) the outstanding principal balance (as valued on the Settlement Date), (ii) the stated principal balance, (iii) the face value or (iv) the market value (as valued on the Settlement Date).

EXHIBIT I
to 1998 FX and Currency Option Definitions

**Introduction, Standard Paragraphs and Closing for a
Letter Agreement Confirming a Transaction**

*Heading for Letter*

[Letterhead of Party A]

[Date]

**Transaction**

[Name and Address of Party B]

Dear [       ]:

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). [This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.] [1]

The definitions and provisions contained in the 1998 FX and Currency Option Definitions (as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee) are incorporated into this Confirmation. In the event of any inconsistency between those definitions and provisions and this Confirmation, this Confirmation will govern. [2]

1. This Confirmation supplements, forms a part of, and is subject to, [describe master agreement] dated as of [date], as amended and supplemented from time to time (the "Agreement"), between [Name of Party A] ("Party A") and [Name of Party B] ("Party B"). All provisions contained in the Agreement govern

---

[1]  Include if applicable.

[2]  If, for an FX Transaction or Currency Option Transaction, the parties also wish to incorporate the 1991 ISDA Definitions, this paragraph should be replaced by the following: "The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by the International Swaps and Derivatives Association, Inc. (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions, as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern."

EXHIBIT I
to 1998 FX and Currency Option Definitions

this Confirmation except as expressly modified below.[3] The terms of the Transaction to which this Confirmation relates are as follows:

[INSERT RELEVANT ADDITIONAL PROVISIONS FROM
EXHIBIT II-A, II-B, II-C or II-D AND, IF APPLICABLE, EXHIBIT II-E]

[3][5].     Calculation Agent:

[4][6].     Account Details:

        Account for payments to Party A:

        Account for payments to Party B:

[5][7].     Offices:

        (a) The Office[s] of Party A for the Transaction is [are]     ; and

        (b) The Office[s] of Party B for the Transaction is [are]

[[6][8].     Broker/Arranger:]

[[7][9].     Governing Law: [English law] [the laws of the State of New York (without reference to choice of law doctrine)][4]

[[8] [10].     [Business Day:]

[[9][11].     [Business Day Convention:]

---

[3]  If the parties have not yet executed, but intend to execute, an Agreement include, instead of this paragraph, the following: "This Confirmation evidences a complete and binding agreement between you and us as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of [specify master agreement] (the "Master Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained in or incorporated by reference in that agreement upon its execution will govern this Confirmation except as expressly modified below. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the Master Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation), shall supplement, form a part of, and be subject to an agreement in the form of the Master Form as if we had executed an agreement in such form [(but without any Schedule except for the election of [English Law] [the laws of the State of New York] as the governing law and [specify currency] as the Termination Currency)] on the Trade Date of the first such Transaction between us. In the event of any inconsistency between the provisions of that agreement and this Confirmation, this Confirmation will prevail for the purpose of this Transaction."

[4]  Delete if this Confirmation is part of a master agreement.

EXHIBIT I
to 1998 FX and Currency Option Definitions

---

This Confirmation supersedes and replaces any other confirmation (including a SWIFT MT300 or phone confirmation), if any, sent in connection with this Transaction on or prior to the date hereof.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter substantially similar to this letter, which letter sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours sincerely,

[PARTY A]

By:_____
    Name:
    Title:

Confirmed as of the date
first above written:

[PARTY B]

By:_____
    Name:
    Title:

EXHIBIT II-A
to 1998 FX and Currency Option Definitions

**Additional Provisions for a
Confirmation of a Deliverable FX Transaction[5]**

[See Exhibit I for the introduction, standard paragraphs and closing for the letter agreement and Exhibit II-E for terms relating to Article 5.]

    2. The terms of the particular Transaction to which this Confirmation relates are as follows:

(a) General Terms:

    Trade Date:

    [Amount and currency payable by Party A:][6]

    [Amount and currency payable by Party B:][6]

    Settlement Date:

[(b) Other terms and conditions:]

---

  [5] Many market participants may choose, instead of using this form, to confirm Deliverable FX Transactions (to which Article 5 does not apply) automatically upon entry of the trade details, including a Confirmation sent by SWIFT message or otherwise issued automatically and mailed on a pre-printed form.

  [6] For Deliverable FX Transactions, parties will need to include in their Confirmation sufficient information to allow a determination of the respective amounts of currency to be exchanged by the parties to the relevant FX Transaction.

EXHIBIT II-B
to 1998 FX and Currency Option Definitions

**Additional Provisions for a Confirmation of
a Non-Deliverable FX Transaction**

[See Exhibit I for the introduction, standard paragraphs and closing for the letter agreement and Exhibit II-E for terms relating to Article 5.]

    2. The terms of the particular Transaction to which this Confirmation relates are as follows:

(a) General Terms:

    Trade Date:

    [Date of Annex A:][7]

    Reference Currency:

    [Reference Currency Notional Amount:][8]

    [Notional Amount:][8]

    [Forward Rate:][8]

    Reference Currency Buyer:

    Reference Currency Seller:

    Settlement Currency:

    Settlement Date:

    Settlement:                       Non-Deliverable[9]

    [Settlement Rate:][Settlement Rate Option:[10]]

    Valuation Date:[11]

[(b) Other terms and conditions:]

---

[7] Parties should include this date for Non-Deliverable FX Transactions if they wish to modify the presumption set forth in Section 4.2 that Annex A is incorporated as amended through the Trade Date of the relevant FX Transaction.

[8] For Non-Deliverable Transactions, parties will need to specify either (a) a Reference Currency Notional Amount and a Notional Amount or (b) a Forward Rate and either a Reference Currency Notional Amount or a Notional Amount.

[9] Deliverable is presumed to apply to a Transaction therefore parties must specify that the relevant FX Transaction is Non-Deliverable.

[10] Parties should specify this information if they wish to modify the presumption in Section 1.16(e) that the Calculation Agent will determine the Spot Rate for the relevant Valuation Date. If parties choose "Currency-Reference Dealers" as the Settlement Rate Option and if they wish to modify the presumptions set forth in Article 4, they should specify the: (i) Reference Dealers (the presumption is four leading dealers in the relevant market selected by the Calculation Agent), (ii) Specified Office (the presumption in most cases will be the on-shore office in the Principal Financial Center of Reference Currency), (iii) Specified Rate (the presumption is the average of the Reference Currency bid and offer rate), (iv) Specified Amount (the presumption is an amount equal to the Reference Currency Notional Amount) and (v) Specified Time.

[11] Parties should include this date if they wish to modify the presumption set forth in Section 1.16(f) that the Valuation Date will be two days prior to the Settlement Date.

EXHIBIT II-C
to 1998 FX and Currency Option Definitions

### Additional Provisions for a Confirmation of
### a Deliverable Currency Option Transaction

[See Exhibit I for the introduction, standard paragraphs and closing for the letter agreement and Exhibit II-E for terms relating to Article 5.]

    2. The terms of the particular Transaction to which this Confirmation relates are as follows:

(a) General Terms:

Trade Date:

[Commencement Date:][12]

| | |
|---|---|
| Buyer: | [Party A] [Party B] |
| Seller: | [Party A] [Party B] |
| Currency Option Style: | [American/Bermuda/European] |
| Currency Option Type:[13] | [[    ][14] Put/[    ][15] Call] |

Call Currency [and Call Currency Amount]:[16]

Put Currency [and Put Currency Amount]:[16]

[Strike Price:][16]

Expiration Date:

| | |
|---|---|
| Expiration Time: | [  ] [a.m./p.m.] (local time in [    ]) |
| [Latest Exercise Time:[17] | [  ] [a.m./p.m.] (local time in [    ])] |
| [Automatic Exercise: | Inapplicable][18] |

---

[12]  Parties should include this date if they wish to modify the presumption set forth in Section 3.5(a) that the Commencement Date will be the Trade Date.

[13]  Parties should classify their transaction as a Put and/or a Call, with respect to the corresponding currency.

[14]  Parties should insert the appropriate currency, which will be the same currency as the Put Currency.

[15]  Parties should insert the appropriate currency, which will be the same currency as the Call Currency.

[16]  For Deliverable Currency Option Transactions, parties will need to specify either (a) a Call Currency Amount and a Put Currency Amount or (b) a Strike Price and either a Call Currency Amount or a Put Currency Amount.

[17]  Parties should include this time if they wish to modify the presumption set forth in Section 3.5(f) that the Latest Exercise Time will be the Expiration Time.

[18]  Parties should include this information if they wish to modify the presumption set forth in Section 3.6(c) that Automatic Exercise applies to a Currency Option Transaction.

EXHIBIT II-C
to 1998 FX and Currency Option Definitions

Settlement Date:[19]                                    [The [ ] Business Day following the
                                                        Exercise Date.] [specify date]

[Exercise Period:][20]

[Specified Exercise Date(s):][21]

[Premium:][22]

[Price:][22]

Premium Payment Date:

[(b) Other terms and conditions:][23]

---

[19] Parties may wish to specify the Settlement Date in respect of the Expiration Date.

[20] Parties may wish to modify the Exercise Period presumed for an American style Currency Option Transaction. For example, additional references are necessary if there are multiple Exercise Periods.

[21] Parties should include this information for a Bermuda style Currency Option Transaction.

[22] Parties may specify a Premium, or a Price expressed as a percentage of the Call Currency Amount or the Put Currency Amount, as appropriate.

[23] For example, these other terms and conditions might include, among other things, whether the option may be exercised in part.

EXHIBIT II-D
to 1998 FX and Currency Option Definitions

**Additional Provisions for a Confirmation of
a Non-Deliverable Currency Option Transaction**

[See Exhibit I for the introduction, standard paragraphs and closing for the letter agreement and Exhibit II-E for terms relating to Article 5.]

    2. The terms of the particular Transaction to which this Confirmation relates are as follows:

(a) General Terms:

    Trade Date:

    [Date of Annex A:][24]

    [Commencement Date:][25]

    Buyer:                             [Party A][Party B]

    Seller:                             [Party A][Party B]

    Currency Option Style:            [American/Bermuda/European]

    Currency Option Type:[26]         [[     ][27]Put/[    ][28]Call]

    Call Currency [and Call Currency Amount]:[29]

    Put Currency [and Put Currency Amount]:[29]

    Strike Price:

    [Reference Currency:][30]

    [Settlement Currency:][30]

---

[24] Parties should include this date for Non-Deliverable Currency Option Transactions if they wish to modify the presumption set forth in Section 4.2 that Annex A is incorporated as amended through the Trade Date of the relevant Currency Option Transaction.

[25] Parties should include this date if they wish to modify the presumption set forth in Section 3.5(a) that the Commencement Date is the Trade Date.

[26] Parties should classify their transaction as a Put and/or a Call, with respect to the corresponding currency.

[27] Parties should insert the appropriate currency, which will be the same currency as the Put Currency.

[28] Parties should insert the appropriate currency, which will be the same currency as the Call Currency.

[29] For a Non-Deliverable Currency Option Transaction, parties will need to specify either a Call Currency Amount or a Put Currency Amount and a Strike Price.

[30] Parties must include this information if they wish the In-the-Money Amount to be calculated in accordance with the provisions of Section 3.7(c)(i) and if they wish the provisions of Article 5 to be applicable to the relevant Non-Deliverable Currency Option Transaction.

EXHIBIT II-D
to 1998 FX and Currency Option Definitions

[Settlement Rate:][Settlement Rate Option:[31]]

Expiration Date:

| | |
|---|---|
| Expiration Time: | [ ] [a.m./p.m.] (local time in [     ]) |
| [Latest Exercise Time:[32] | [ ] [a.m./p.m.] (local time in [     ])] |
| [Automatic Exercise: | Inapplicable][33] |
| Settlement: | Non-Deliverable[34] |
| Settlement Date:[35] | [The [ ] Business Day following the Exercise Date.] [specify date] |

[Valuation Date:][36]

[Averaging Date(s):]

[Exercise Period:][37]

[Specified Exercise Date(s):][38]

[Premium:][39]

---

[31] Parties should specify this information if they wish to modify the presumption in Section 1.16(e) that the Calculation Agent will determine the Spot Rate for the relevant Valuation Date or Averaging Date, as the case may be. If parties choose "Currency-Reference Dealers" as the Settlement Rate Option and if they wish to modify the presumptions set forth in Article 4, they should specify the: (i) Reference Dealers (the presumption is four leading dealers in the relevant market selected by the Calculation Agent), (ii) Specified Office (the presumption in most cases will be the on-shore office in the Principal Financial Center of the Reference Currency), (iii) Specified Rate (the presumption is the average of the Reference Currency bid and offer rate), (iv) Specified Amount (the presumption is an amount equal to the Reference Currency Notional Amount) and (v) Specified Time.

[32] Parties should include this time if they wish to modify the presumption set forth in Section 3.5(f) that the Latest Exercise Time will be the Expiration Time.

[33] Parties should include this information if they wish to modify the presumption set forth in Section 3.6(c) that Automatic Exercise applies to a Currency Option Transaction.

[34] Deliverable is presumed to apply to a Transaction, therefore parties must specify that the relevant Currency Option Transaction is Non-Deliverable.

[35] Parties may wish to specify the Settlement Date in respect of the Expiration Date.

[36] Parties should include this date if they wish to modify the presumption set forth in Section 1.16(f) that the Valuation Date will be the Exercise Date.

[37] Parties may wish to modify the Exercise Period presumed for an American style Currency Option Transaction. For example, additional references are necessary if there are multiple Exercise Periods.

[38] Parties should include this information for a Bermuda style Currency Option Transaction.

[39] Parties may specify a Premium, or a Price expressed as a percentage of the Call Currency Amount or the Put Currency Amount, as appropriate.

EXHIBIT II-D
to 1998 FX and Currency Option Definitions

[Price:][39]

Premium Payment Date:

[(b) Other terms and conditions:][40]

---

[40] For example, these other terms and conditions might include, among other things, whether the option may be exercised in part.

EXHIBIT II-E
to 1998 FX and Currency Option Definitions

**Additional Provisions for a Confirmation of
an FX or Currency Option Transaction**

[See Exhibits I and II-A, II-B, II-C or II-D for the introduction, standard paragraphs, general terms and closing for the letter agreement.]

3. Additional terms of the particular Transaction to which this Confirmation relates are as follows:

(a) General Terms:

Event Currency: [41]

[Event Currency Amount:]

[Event Currency Buyer:]

[Event Currency Seller:]

4. The Disruption Events and Fallbacks applicable to the particular Transaction to which this Confirmation relates are as follows:[42]

[(a) Price Source Disruption
Fallback Reference Price:                                    [Settlement Rate:][Settlement Rate
                                                             Option:]][43]

[[(a)] [(b)] Disruption Event(s):][44]

    [Benchmark Obligation Default:                          Applicable
        Benchmark Obligation:
        Specified Value:[45]]

    [Dual Exchange Rate:                                    Applicable
        Fallback Reference Price:                           [Settlement Rate:][Settlement Rate Option:]]

    [General Inconvertibility:                              Applicable

---

[41] For Deliverable Transactions, the Event Currency must be specified for the provisions of Article 5 to be operable. For Non-Deliverable Transactions, parties should specify an Event Currency if they wish to modify the presumption set forth in Section 5.4(c) that the Event Currency is the Reference Currency.

[42] Parties should specify (a) Disruption Events if they wish to modify the presumptions set forth in Section 5.1(e)(i) and (b) Disruption Fallbacks if they wish to modify the presumptions set forth in Section 5.2(e). Any Disruption Fallbacks specified should be in reference to the applicable Disruption Event.

[43] This Disruption Event is presumed to apply to all Non-Deliverable Transactions. The presumed Disruption Fallback for this Disruption Event is Fallback Reference Price and, unless otherwise specified, the Fallback Reference Price will be based on the Settlement Rate Option, "Currency-Reference Dealers". If parties do not alter this fallback and wish to modify the presumptions set forth in Article 4 for such Settlement Rate Option, they should specify the following information: (i) Reference Dealers (the presumption is four leading dealers in the relevant market selected by the Calculation Agent), (ii) Specified Office (the presumption in most cases will be the on-shore office in the Principal Financial Center of the Reference Currency), (iii) Specified Rate (the presumption is the average of the Reference Currency bid and offer rate), (iv) Specified Amount (the presumption is an amount equal to the Reference Currency Notional Amount) and (v) Specified Time.

[44] The parties should specify Disruption Events if they wish to modify the presumptions set forth in Section 5.1(e)(i).

[45] The presumed Disruption Fallback for this Disruption Event is Local Asset Substitute-Gross. Therefore, parties should specify the Specified Value of the Benchmark Obligation.

-43-

EXHIBIT II-E
to 1998 FX and Currency Option Definitions

Maximum Days of Disruption:][46]

[General Non-Transferability:                              Applicable
Maximum Days of Disruption:][46]

[Governmental Authority Default:                          Applicable
Specified Value:[47]
Maximum Days of Disruption:][46]

[Illiquidity:                                             Applicable
Minimum Amount:
Fallback Reference Price:              [Settlement Rate:][Settlement Rate Option:[48]]
Illiquidity Valuation Date:]

[Inconvertibility/Non-Transferability:                    Applicable
Minimum Amount:]
[Relevant Class:]
Maximum Days of Disruption:][46]

[Material Change in Circumstance:                         Applicable
Maximum Days of Disruption:[49]]

[Nationalization:                                         Applicable
[Relevant Affiliates:]
Maximum Days of Disruption:][50]

---

[46] One presumed Disruption Fallback for this Disruption Event is Settlement Postponement. Therefore, parties should specify the Maximum Days of Disruption. In the case of a Deliverable Transaction, another presumed Disruption Fallback is Non-Deliverable Substitute; parties should consider whether they wish to modify the presumptions set forth in Section 5.2(c)(x) of the Definitions for such Disruption Fallback.

[47] A presumed Disruption Fallback for this Disruption Event is Local Asset Substitute-Gross. Therefore, parties should specify the Specified Value of the Benchmark Obligation.

[48] The presumed Disruption Fallback for this Disruption Event is Fallback Reference Price and, unless otherwise specified, the Fallback Reference Price will be based on the Settlement Rate Option, "Currency-Reference Dealers". If parties do not alter this fallback and wish to modify the presumptions set forth in Article 4 for such Settlement Rate Option, they should specify the following information: (i) Reference Dealers (the presumption is four leading dealers in the relevant market selected by the Calculation Agent), (ii) Specified Office (the presumption in most cases will be the on-shore office in the Principal Financial Center of the Reference Currency), (iii) Specified Rate (the presumption is the average of the Reference Currency bid and offer rate), (iv) Specified Amount (the presumption is an amount equal to the Reference Currency Notional Amount) and (v) Specified Time.

[49] Parties should specify this information for purposes of Section 5.2(e)(i)(G) of the Definitions.

[50] A presumed Disruption Fallback for this Disruption Event is Settlement Postponement. Therefore, parties should specify the Maximum Days of Disruption.

EXHIBIT II-E
to 1998 FX and Currency Option Definitions

[Price Materiality:                                        Applicable
    Primary Rate:
    Secondary Rate:
    Price Materiality Percentage:
    Fallback Reference Price:            [Settlement Rate:][Settlement Rate Option:[50]]]

[Specific Inconvertibility:            Applicable
    [Minimum Amount:]
    [Relevant Class:]
    Maximum Days of Disruption:][46]

[Specific Non-Transferability:       Applicable
    [Relevant Class:]
    Maximum Days of Disruption:][46]

[General Inconvertibility/
    Non-Transferability:              Applicable]

[Party Specific Events:               Applicable]

[Calculation Agent Determination
    of Disruption Event:              Applicable]

[[(b)][(c)] Disruption Fallbacks:][51]

    [Assignment of Claim:][52]

    [Calculation Agent Determination
        of Settlement Rate:]

    [Deliverable Substitute:]

    [Escrow Arrangement:
        Maximum Days of Disruption:][53]

---

[50] The presumed Disruption Fallback for this Disruption Event is Fallback Reference Price and, unless otherwise specified, the Fallback Reference Price will be based on the Settlement Rate Option, "Currency-Reference Dealers". If parties do not alter these fallbacks and wish to modify the presumptions set forth in Article 4 for such Settlement Rate Option, they should specify the following information: (i) Reference Dealers (the presumption is four leading dealers in the relevant market selected by the Calculation Agent), (ii) Specified Office (the presumption in most cases will be the on-shore office in the Principal Financial Center of the Reference Currency), (iii) Specified Rate (the presumption is the average of the Reference Currency bid and offer rate), (iv) Specified Amount (the presumption is an amount equal to the Reference Currency Notional Amount) and (v) Specified Time.

[51] All Disruption Fallbacks specified should reference the applicable Disruption Event.

[52] Unless otherwise specified, either the Claim or a beneficial interest in the Claim can be assigned or transferred, as the case may be, pursuant to this Disruption Fallback.

[53] Insert additional details regarding the escrow arrangement.

EXHIBIT II-E
to 1998 FX and Currency Option Definitions

[Fallback Reference Price:[55]

    Dual Exchange Rate:             [Settlement Rate:] [Settlement Rate Option:]

    Illiquidity:                    [Settlement Rate:] [Settlement Rate Option:]

    Price Source Disruption:         [Settlement Rate:] [Settlement Rate Option:]

    Price Materiality:             [Settlement Rate:] [Settlement Rate Option:]]

[Local Asset Substitute-Gross:
    Benchmark Obligations:
    Specified Value:]

[Local Asset-Substitute-Net:
    Benchmark Obligations:
    Specified Value:]

[Local Currency Substitute:]

[No Fault Termination:[56]             Inapplicable]

[Non-Deliverable Substitute:[57]
    [Valuation Date:]
    [Settlement Date:]
    [Settlement Currency:]
    [Settlement Rate:][Settlement Rate Option:]

[Settlement Postponement:
    Maximum Days of Disruption:][58]

[Conversion:                  Applicable]

---

[55] If parties choose "Currency-Reference Dealers" as the Settlement Rate Option and wish to modify the presumptions set forth in Article 4 for such Settlement Rate Option, they should specify the: (i) Reference Dealers (the presumption is four leading dealers in the relevant market selected by the Calculation Agent), (ii) Specified Office (the presumption in most cases will be the on-shore office in the Principal Financial Center of the Reference Currency), (iii) Specified Rate (the presumption is the average of the Reference Currency bid and offer rate), (iv) Specified Amount (the presumption is an amount equal to the Reference Currency Notional Amount) and (v) Specified Time.

[56] This Disruption Fallback will apply if none of the applicable Disruption Fallbacks provides the parties with a means of settling the Transaction.

[57] Parties should include this information for Deliverable Transactions where General Inconvertibility, General Non-Transferability, Inconvertibility/Non-Transferability, Specific Inconvertibility and Specific Non-Transferability apply if they wish to modify the presumptions set forth in Section 5.2(c)(x) of the Definitions.

[58] Parties should include this information if any of the following applies to a Transaction: General Inconvertibility, General Non-Transferability, Inconvertibility/Non-Transferability, Nationalization, Specific Inconvertibility, Specific Non-Transferability, General Inconvertibility/Non-Transferability or Party Specific Events.

## INDEX OF TERMS

| **Term** | **Page** | **Section** |
|---|---|---|
| Affected Parties | 23 | 5.2(c)(ix) |
| Affected Transaction | 23 | 5.2(c)(ix) |
| American | 10 | 3.2(a) |
| Assignment of Claim | 21 | 5.2(c)(i) |
| Automatic Exercise | 13 | 3.6(c) |
| Averaging Date | 15 | 3.8(a) |
| Benchmark Obligation | 29 | 5.4(a) |
| Benchmark Obligation Default | 17 | 5.1(d)(i) |
| Bermuda | 10 | 3.2(b) |
| Business Day | 1 | 1.1 |
| Business Day Convention | 4 | 1.2 |
| Buyer | 9 | 3.1(a) |
| Calculation Agent | 4 | 1.3 |
| Calculation Agent Determination of Disruption Event | 20 | 5.1(g) |
| Calculation Agent Determination of Settlement Rate | 21 | 5.2(c)(ii) |
| Call | 10 | 3.3(a) |
| Call Currency | 9 | 3.1(b) |
| Call Currency Amount | 9 | 3.1(c) |
| Cash Settlement | 5 | 1.13 |
| Claim | 21 | 5.2(c)(i) |
| Commencement Date | 11 | 3.5(a) |
| Confirmation | 4 | 1.4 |
| Contract Date | 8 | 1.25 |
| Conversion | 26 | 5.2(e)(ii) |
| Create Date | 8 | 1.25 |
| Currency Option Transaction | 4 | 1.5 |
| Currency Pair | 4 | 1.6 |
| Currency-Reference Dealers | Annex A | 4.5(e)(iv) |
| Deal Date | 8 | 1.25 |
| Deliver | 29 | 5.4(b) |
| Deliverable | 5 | 1.7 |
| Deliverable Currency Option Transaction | 5 | 1.8 |
| Deliverable FX Transaction | 5 | 1.9 |
| Deliverable Substitute | 21 | 5.2(c)(iii) |
| designator | 28 | 5.3(c) |
| designee | 28 | 5.3(c) |
| Disruption Event | 16 | 5.1(a) |
| Disruption Fallback | 20 | 5.2(a) |
| Dual Exchange Rate | 17 | 5.1(d)(ii) |
| Early Termination Date | 23 | 5.2(c)(ix) |
| ECU Settlement Day | 5 | 1.10 |
| Escrow Amount | 21 | 5.2(c)(iv) |
| Escrow Arrangement | 21 | 5.2(c)(iv) |
| Euro Settlement Date | 5 | 1.11 |

| **Term** | **Page** | **Section** |
|---|---|---|
| European | 10 | 3.2(c) |
| Event Currency | 29 | 5.4(c) |
| Event Currency Amount | 29 | 5.4(d) |
| Event Currency Buyer | 29 | 5.4(e) |
| Event Currency Jurisdiction | 29 | 5.4(f) |
| Event Currency Seller | 30 | 5.4(g) |
| Exercise Date | 11 | 3.5(b) |
| Exercise Period | 12 | 3.5(c) |
| Expiration Date | 12 | 3.5(d) |
| Expiration Time | 12 | 3.5(e) |
| Fallback Reference Price | 22 | 5.2(c)(v) |
| FEOMA | 30 | 5.4(h) |
| Following | 4 | 1.2(a)(i) |
| Forward Rate | 8 | 2.1(a) |
| FX Transaction | 5 | 1.12 |
| General Inconvertibility | 17 | 5.1(d)(iii) |
| General Non-Transferability | 17 | 5.1(d)(iv) |
| General Inconvertibility/Non-Transferability | 19 | 5.1(e)(ii) |
| Governmental Authority | 30 | 5.4(i) |
| Governmental Authority Default | 17 | 5.1(d)(v) |
| ICOM | 30 | 5.4(j) |
| IFEMA | 30 | 5.4(k) |
| Illegality | 16 | 5.1(c)(i) |
| Illiquidity | 18 | 5.1(d)(vi) |
| Illiquidity Valuation Date | 18 | 5.1(d)(vi) |
| In-the-Money Amount | 14 | 3.7(c) |
| In-the-Money Settlement | 5 | 1.13 |
| Inconvertibility/Non-Transferability | 18 | 5.1(d)(vii) |
| ISDA Master Agreement | 30 | 5.4(l) |
| Latest Exercise Time | 12 | 3.5(f) |
| Local Asset Substitute—Gross | 22 | 5.2(c)(vi) |
| Local Asset Substitute—Net | 22 | 5.2(c)(vii) |
| Local Currency Substitute | 23 | 5.2(c)(viii) |
| Loss | 23 | 5.2(c)(ix) |
| Master Agreement | 16 | 5.1(c)(i) |
| Material Change in Circumstance | 18 | 5.1(d)(viii) |
| Maximum Days of Disruption | 30 | 5.4(m) |
| Mid-Atlantic | 10 | 3.2(b) |
| Minimum Amount | 31 | 5.4(n) |
| Modified | 4 | 1.2(a)(ii) |
| Modified Following | 4 | 1.2(a)(ii) |
| Nationalization | 18 | 5.1(d)(ix) |
| Nationalized Assets | 21 | 5.2(c)(i) |
| Nationalized Party | 21 | 5.2(c)(i) |
| Nearest | 4 | 1.2(a)(iii) |
| No Fault Termination | 23 | 5.2(c)(ix) |
| Non-Deliverable | 5 | 1.13 |
| Non-Deliverable Currency Option Transaction | 6 | 1.14 |
| Non-Deliverable FX Transaction | 6 | 1.15 |

| **Term** | **Page** | **Section** |
|---|---|---|
| Non-Deliverable Substitute | 23 | 5.2(c)(x) |
| Non-Event Currency | 31 | 5.4(o) |
| Non-Event Currency Amount | 31 | 5.4(p) |
| Notice of Exercise | 12 | 3.5(g) |
| Notional Amount | 7 | 1.17 |
| Official Successor Rate | 16 | 4.1(b) |
| Party Specific Events | 19 | 5.1(e)(iii) |
| Payment Date | 8 | 1.24 |
| Physical Settlement Date | 27 | 5.3(a) |
| Preceding | 4 | 1.2(a)(iv) |
| Premium | 11 | 3.4(a) |
| Premium Payment Date | 11 | 3.4(b) |
| Price | 11 | 3.4(a) |
| Price Materiality | 18 | 5.1(d)(x) |
| Price Materiality Percentage | 31 | 5.4(q) |
| Price Source Disruption | 18 | 5.1(d)(xi) |
| Principal Financial Center | 7 | 1.18 |
| Primary Rate | 31 | 5.4(r) |
| Put | 11 | 3.3(b) |
| Put Currency | 10 | 3.1(d) |
| Put Currency Amount | 10 | 3.1(e) |
| Reference Currency | 7 | 1.19 |
| Reference Currency Buyer | 7 | 1.20 |
| Reference Currency Notional Amount | 7 | 1.21 |
| Reference Currency Seller | 8 | 1.22 |
| Relevant Affiliate | 31 | 5.4(s) |
| Relevant Class | 31 | 5.4(t) |
| Repudiation | 31 | 5.4(u) |
| Secondary Rate | 31 | 5.4(v) |
| Seller | 10 | 3.1(f) |
| Settlement Currency | 6 | 1.16(b) |
| Settlement Currency Amount | 9 | 2.2(b)(ii) |
| Settlement Date | 8 | 1.24 |
| Settlement Postponement | 24 | 5.2(c)(xi) |
| Settlement Rate | 6 | 1.16(c) |
| Settlement Rate Option | 6 | 1.16(d) |
| Specific Inconvertibility | 19 | 5.1(d)(xii) |
| Specific Non-Transferability | 19 | 5.1(d)(xiii) |
| Specified Exercise Date | 12 | 3.5(h) |
| Specified Value | 32 | 5.4(w) |
| Spot Rate | 6 | 1.16(e) |
| Strike Price | 10 | 3.1(g) |
| Tax | 28 | 5.3(c) |
| Termination Currency Equivalent | 23 | 5.2(c)(ix) |
| Trade Date | 8 | 1.25 |
| Transaction | 8 | 1.26 |
| Valuation Date | 6 | 1.16(f) |