Page 1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case Nos. 08-13555 (JMP)

4           08-01420 (JMP)(SIPA)

5           (Jointly Administered)

6  - - - - - - - - - - - - - - - - - - - - - - - - - - x

7  In Re:

8  LEHMAN BROTHERS HOLDINGS, INC., et al.,

9           Debtors.

10 - - - - - - - - - - - - - - - - - - - - - - - - - - x

11 In Re:

12 LEHMAN BROTHERS, INC.,

13           Debtor.

14 - - - - - - - - - - - - - - - - - - - - - - - - - - x

15

16               U.S. Bankruptcy Court

17               One Bowling Green

18               New York, New York

19

20               September 19, 2012

21               10:01 AM

22

23 B E F O R E :

24 HON JAMES M. PECK

25 U.S. BANKRUPTCY JUDGE

08-13555-mg   Doc 31158   Filed 09/20/12   Entered 10/01/12 16:00:32   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 2 of 90

Page 2

1    Hearing re:   Application of the Ad Hoc Group of Lehman

2    Brothers Creditors for Compensation for Professional

3    Services Rendered by, and Reimbursement of Actual and

4    Necessary Expenses of, Its Professionals Pursuant to

5    Section 503(b) of the Bankruptcy Code Rendered by, and

6    Reimbursement of Actual and Necessary Expenses of, Its

7    Professionals Pursuant to Section 503(b) of the Bankruptcy

8    Code [ECF No. 29195]

9

10   Hearing re:   Application of the Ad Hoc Group of Holders of

11   Notes Issued by Lehman Brothers Treasury Co. B.V. and

12   Guaranteed by Lehman Brothers Holdings, Inc., Pursuant to 11

13   U.S.C. § 503(b) for Allowance of Administrative Expenses for

14   Counsel's Services Incurred in Making A Substantial

15   Contribution in These Chapter 11 Cases [ECF No. 29222]

16

17   Hearing re:   Application of Goldman Sachs Bank USA and

18   Goldman Sachs International for Entry of an Order Pursuant

19   to 11 U.S.C. § 503(b)(3)(D) and 503(b)(4) for Allowance and

20   Reimbursement of Reasonable Professional Fees in Making a

21   Substantial Contribution in These Cases [ECF No. 29240]

22

23   Hearing re:   Trustee's Motion for Authorization to Sell

24   Shares of Navigator Holdings, Ltd., and Related Relief

25   [LBI ECF No. 5220]

08-13555-mg   Doc 31158   Filed 09/20/12   Entered 10/01/12 16:00:32   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 3 of 90

Page 3

1   Hearing re:  Motion of Elliott Management Corporation For an

2   Order, Pursuant to 15 U.S.C. § 78fff-1(B), 78fff-2(B) and

3   78fff-2(C)(1) and 11 U.S.C. § 105(A),(I) Determining the

4   Method of Distribution on Customer Claims and (II) Directing

5   an Initial Distribution on Allowed Customer Claims

6   [LBI ECF No. 5129]

7

8   Hearing re:  Motion of Fidelity National Title Insurance

9   Company to Compel Compliance with Requirements of Title

10   Insurance Policies [ECF No. 11513]

11

12   Hearing re:  Motion of Giants Stadium, LLC, for leave to

13   Conduct Discovery of the Debtors Pursuant to Federal Rule of

14   Bankruptcy Procedure 2004 [ECF No. 16016]

15

16   Hearing re:  Amended Motion of Ironbridge Homes, LLC, et al.

17   for Relief from the Automatic Stay [ECF No. 23551]

18

19   Hearing re:  Lehman Brothers Special Financing Inc. Working

20   Group's Application for Entry of an Order, Pursuant to

21   11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4) for Allowance and

22   Reimbursement of Reasonable Professional Fees and Actual,

23   Necessary Expenses in Making a Substantial Contribution in

24   These Cases [ECF No. 29239]

25

Page 4

1   Hearing re:  Cardinal Investment Sub I, L.P. and Oak Hill

2   Strategic Partners, L.P.'s Motion for Limited Intervention

3   in the Contested Matter Concerning the Trustee's

4   Determination of Certain Claims of Lehman Brothers Holdings,

5   Inc., and Certain of Its Affiliates [LBI ECF No. 4634]

6

7   Hearing re:  Motion of Grace Farrelly for Relief from

8   Automatic Stay [ECF No. 25205]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  William Joshua Garling

Page 5

```
 1   A P P E A R A N C E S :

 2   WEIL, GOTSHAL & MANGES LLP

 3        Attorney for the Debtors

 4        767 Fifth Avenue

 5        New York, NY 10153-0119

 6

 7   BY:  RICHARD P. KRASNOW, ESQ.

 8        AMANJIT S. ARORA, ESQ.

 9        GARRETT A. FAIL, ESQ.

10

11   DAVIS POLK

12        Attorneys for Lehman Brothers International Europe

13        450 Lexington Avenue

14        New York, NY 10017

15

16   BY:  JAMES M. MILLERMAN, III, ESQ.

17        TIMOTHY GRAULICH, ESQ.

18

19   LEVINE LEE LLP

20        Attorney for the SIPA Trustee
                              th
21        570 Lexington Avenue, 7  Floor

22        New York, NY 10022

23

24   BY:  KENNETH E. LEE, ESQ.

25
```

Page 6

1   HUGHES HUBBARD & REED LLP

2       Attorneys for the SIPA Trustee

3       One Battery Park Plaza

4       New York, NY 10004-1482

5

6   BY:  JAMES B. KOBAK, JR., ESQ.

7        DAVID W. WILTENBERG, ESQ.

8        JEFFREY S. MARGOLIN, ESQ.

9

10  BROWN RUDNICK LLP

11      Attorney for Ad Hoc Group of LBT Noteholders

12      Seven Times Square

13      New York, NY 10036

14

15  BY:  STEVEN B. LEVINE, ESQ.

16

17  BROWN RUDNICK LLP

18      Attorney for Ad Hoc Group of LBT Noteholders

19      One Financial Center

20      Boston, MA 02111

21

22  BY:  BEN CHAPMAN

23

24

25

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 7 of 90

Page 7

1    BINGHAM McCUTCHEN, LLP

2        Attorney for Elliott Management Corporation

3        300 Park Avenue

4        New York, NY 10022-4689

5

6    BY:   JOSHUA DORCHAK, ESQ.

7

8    BINGHAM McCUTCHEN, LLP

9        Attorney for Elliott Management Corporation

10       One Federal Street

11       Boston, MA 02110-1726

12

13   BY:   EDWIN E. SMITH, ESQ.

14

15   ANDERSON KILL & OLICK, PC

16       Attorney for Elliott Management Corporation

17       1251 Avenue of the Americas

18       New York, NY 10020

19

20   BY:   TODD E. DUFFY, ESQ.

21       JEFFREY GLEN, ESQ.

22

23

24

25

Page 8

1    GODFREY KAHN S.C.

2         Attorney for the Fee Committee

3         One East Main Street, Suite 500

4         P.O. Box 2719

5         Madison, WI 53701-2719

6

7    BY:  KATHERINE STADLER, ESQ.

8

9    CLEARY GOTTLIEB STEEN & HAMILTON, LLP

10        Attorneys for Goldman Sachs

11        One Liberty Plaza

12        New York NY 10006-1470

13

14   BY:  SEAN A. O'NEAL, ESQ.

15        HUMAYUN KHALID, ESQ.

16        JOSH E. ANDERSON, ESQ.

17

18   MILBANK, TWEED, HADLEY & MCCLOY LLP

19        Attorney for the Official Creditor Committee

20        One Chase Manhattan Plaza

21        New York, NY 10005-1413

22

23   BY:  DENNIS F. DUNNE, ESQ.

24

25

Page 9

1   GIBSON DUNN & CRUTCHER, LLP

2        Attorney on PWC, Liquidator of Lehman Brothers Finance

3        200 Park Avenue

4        New York, NY 10166-0193

5

6   BY:  OLIVER M. OLANOFF, ESQ.

7

8   STROOCK & STROOCK & LAVAN LLP

9        Attorney for Goldman Sachs Investment Partners

10        Master Fund, L.P.

11        180 Maiden Lane

12        New York, NY 10038-4982

13

14   BY:  HAROLD A. OLSEN, ESQ.

15

16   JONES DAY

17        Attorney for WL Ross & Co.

18        901 Lakeside Avenue

19        Cleveland, OH 44114-1190

20

21   BY:  DAVID G. HEIMAN, ESQ.

22

23

24

25

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 10 of 90

Page 10

1    UNITED STATES DEPARTMENT OF JUSTICE

2        Attorney for the Office of the United States Trustee

                                   st
3        33 Whitehall Street, 21  Floor

4        New York, NY 10004

5

6    BY:  ANDREA B. SCHWARTZ, ESQ.

7         SUSAN GOLDEN, ESQ.

8

9    COVINGTON & BURLING, LLP

10        The New York Times Building

11        620 Eighth Avenue

12        New York, NY 10018-1405

13

14   BY:  DIANNE COFFINO, ESQ.

15

16   SECURITIES INVESTOR PROTECTION CORPORATION

17        805 15th St., N.W., Suite 800

18        Washington, D.C. 20005-2215

19

20   BY:  KENNETH J. CAPUTO, ESQ.

21

22

23

24

25

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 11 of 90

Page 11

1                      P R O C E E D I N G S

2               THE COURT:  Be seated, please.

3               Good morning and happy anniversary.

4               This is the fourth anniversary of the commencement

5      of the SIPA case and the fourth anniversary of the sale

6      hearing to Barclays.

7               MR. SHORE:  Good morning, Your Honor.

8               THE COURT:  Good morning.

9               Nice to see you, again.

10              MR. SHORE:  Chris Shore from White & Case.

11              I'm first on the agenda and I think we just agreed

12     that I would just stand up and start.

13              We're here on the application of the ad hoc group

14     of Lehman Brothers' creditors for reimbursement of fees and

15     expenses incurred in connection with the prosecution of

16     these cases under Section 503(b).  We filed our motion on

17     July 3rd seeking $9.68 million in attorneys' fees and

18     411,000 in expenses, 1.77 million in fees and 82,000 in

19     expenses of AlixPartners, our FA, and 830,000 in fees and

20     24,000 in expenses for Molinaro and advisors, an essentially

21     non-testifying expert.

22              We received no objection from LBHI or any other

23     debtor.

24              We did get an objection from the U.S. Trustee.

25     With respect to the attorneys' fees, they had raised

08-13555-mg   Doc 31158   Filed 09/20/12   Entered 10/01/12 16:00:32   Main Document
Pg 12 of 90
LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 12

1    objections about the keeping of time and the following of

2    guidelines and a more substantive objection as to whether

3    the financial advisors can get paid at all under Section

4    503(b).

5              There was also a response by the committee

6    suggesting that the fee review committee may want to review

7    the fees and expenses.

8              We adjourned the initial application to address

9    the concerns, in particular, the U.S. Trustee's concerns.

10   We had numerous calls with them and two in-person meetings

11   and as a result of that, we agreed to resolve the attorneys'

12   fees and expenses today and defer the issue of the financial

13   advisors and that substantive issue of law as to whether

14   they can get reimbursed at all under Section 503(b) to a

15   later date.

16             And I think you'll find that the other

17   applications are going to proceed on that basis as well

18   today.

19             We have agreed to a $455,000 reduction in fees and

20   to defer $115,000 of expenses related to FAs to a later date

21   to resolve the U.S. Trustee's objections, with respect to

22   lumping of time, duplication of efforts and time spent doing

23   what the U.S. Trustee contends is unreimbursable time.

24             We, obviously, thank the U.S. Trustee for spending

25   a great deal of time, both with us and with the other ad hoc

08-13555-mg   Doc 31158   Filed 09/20/12   Entered 10/01/12 16:00:32   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 13 of 90

Page 13

1   counsel and financial advisors, to address those concerns.

2          Where we stand today, then, we're currently

3   pressing an application for $9,107,547.18 in fees and

4   $411,665.29 in expenses, for an aggregate of $9,519,212.47.

5          All of that are fees and expenses actually paid by

6   members of the group to White & Case for its efforts in

7   representing the ad hoc group.  They respect fees and

8   expenses under 503(b)(3)(d) incurred by the group in what we

9   contend was a substantial contribution to the LBHI stake in

10  these cases.

11         In the application of paragraphs 13 through 57, we

12  laid out our view as to how the group did provide a

13  substantial contribution, including its involvement in the

14  plan process and negotiations, addressing inter-estate

15  sensitivities and monitoring LBHI specific issues.

16         White & Case did represent individual creditors or

17  group-specific activities.  That time has been taken out of

18  the application and we wrote off approximately 500- -- or

19  have not pressed 500,000, approximately, of fees which would

20  be not LBHI-centric, but rather either group-centric or

21  creditor-centric.

22         No party has objected to the contention and the

23  evidence of substantial contribution by the group.  I'm

24  happy to address any concerns or questions the Court might

25  have with that and we would ask Your Honor to grant the

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 14

1    application, just with respect to White & Case for the fees

2    and expenses and then defer and we need a setting for a

3    later date to address the issue on the financial advisors.

4          THE COURT:  Okay.  I'm kind of surprised to see

5    you stand as the first order of business today, and one of

6    the consequences of doing this piece mail, applicant by

7    applicant, is there a lack of full context in the record as

8    to what has preceded this and I just wanted to make a couple

9    comments.

10         First of all, I fully accept the proposition that

11   your group made a substantial contribution in the case and I

12   base that not only on my review of your application, but

13   also on the basis of my empirical experience and having sat

14   here through every hearing that this case has had over the

15   last four years.

16         The accomplishments in this bankruptcy case speak

17   for themselves and no one group can take credit for it; it's

18   an interactive process that produced a consensual outcome of

19   remarkable proportions.  That having been said, I think it's

20   also important to note for the record that in the interval

21   following the filing of the substantial contribution

22   applications, not only brought on behalf of your clients,

23   but on behalf of the other applicants today, the fee

24   committee weighed in with a suggestion that its mandate be

25   expanded to include a review and analysis of each of the

LEHMAN BROTHERS HOLDINGS, INC.; ET AL.

Page 15

1    applications, including the application that you're

2    advancing.

3            One consequence of that, and I just wanted to put

4    this on the record, is that a telephone conference took

5    place a few weeks ago, during which the Office of the United

6    States Trustee, through the U.S. Trustee herself, made a

7    specific request that decisions be deferred with respect to

8    the role of the fee committee until each of the applicants

9    had a full opportunity to discuss the objections that had

10   been lodged by the Office of the U.S. Trustee.

11           I take it from the comments that you've just made,

12   Mr. Shore, that during the interval between that telephone

13   conference and today's hearing, conversations took place at

14   some length between each of the applicants and the office of

15   the U.S. Trustee, and that issues with respect to the amount

16   of your application, and I take it from the other filings,

17   each of the other applications had been resolved in a

18   setting in which the Office of the United States Trustee has

19   not acknowledged that, in fact, substantial contribution as

20   been shown, that being a question for the Court.

21           I simply wanted to put that context into not only

22   the assessment of your application, but each of the other

23   applications that will be following yours.

24           MR. SHORE:  Thank you very much, Your Honor.  I

25   appreciate the Court's comments.

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 18 of 90

Page 16

1          I think the -- to the extent necessary -- the

2     creditors' committee, who had made the suggestion that the

3     fee committee look at it can address whether their concerns

4     have been resolved, and I also believe the U.S. Trustee can

5     speak to the issue of the resolution that I've announced on

6     the record and also the lack of any need to go to the review

7     committee at this point since they performed the substantive

8     review of the fee applications on a line-by-line basis.

9          THE COURT:  Now, just so I'm clear, and something

10    that I think is obvious, the approval of this application

11    for substantial contribution does not result in a windfall

12    or a double payment to White & Case; instead, White & Case

13    is acting as a representative of its clients and the

14    approval of the application will, in effect, reimburse to

15    some extent amounts that have been previously billed and

16    collected from your client group.

17         MR. SHORE:  That is correct, Your Honor.

18         THE COURT:  Okay.  Fine, you're application is

19    approved, but I do have one question and it's a question

20    that relates not only to your application, but to other

21    applications that are pending today.

22         It is not clear to me how the unresolved legal

23    question associated with substantial contribution for

24    financial advisors is to be resolved.  Is that a subject

25    that is something that can be negotiated or is this a

Page 17

1    principle dispute that will ultimately involve the

2    presentation of conflicting views and an adjudication?

3                MR. SHORE:  I think that remains to be seen.

4    Where we stand right now, we have an application on file and

5    a partial, now, unresolved objection from the U.S. Trustee.

6    We have committed to sit down with the U.S. Trustee and meet

7    to discuss the issue further, to have the financial

8    advisors, one of whom has already met -- from our group --

9    has already met with the U.S. Trustee's Office to see if we

10   can come to some consensual resolution of the issue that

11   would not require the Court to have to resolve the legal

12   issue.

13                To the extent that we can't resolve that and we

14   believe that we can get it probably done in the near term

15   and look for an October setting on this, we would envision

16   filing reply papers on our application laying out our views

17   as to why financial advisors can be reimbursed under 503(b)

18   and then we'll address it in front of the Court.

19                THE COURT:  Okay.

20                MR. SHORE:  And we have been working cooperatively

21   and we're hopeful that we can come to some principle

22   resolution between the parties and not have to involve the

23   Court.

24                THE COURT:  All right.  Fine.

25                Thank you very much.

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 18 of 90

Page 18

1           MR. SHORE:  Thank you, Your Honor.

2           I have an on-going commitment with ResCap right

3   now, if I may excuse myself, Your Honor?

4           THE COURT:  You may be excused.

5           MR. SHORE:  Thank you.

6           MS. SCHWARTZ:  Your Honor, may I make one comment?

7           THE COURT:  Surely.

8           MS. SCHWARTZ:  For the record, Andrea Schwartz on

9   behalf of Tracy Hope-Davis, the United States Trustee.

10          Good morning, Your Honor.

11          THE COURT:  Good morning.

12          MS. SCHWARTZ:  And with me, here, is Susan Golden.

13  As Mr. Shore said, they spent a good period of time talking

14  with us on the phone -- "they" being Mr. Shore, his

15  colleagues.  We also met with Lisa Donahue from AlixPartners

16  to discuss the United States Trustee's objection.

17          We also met all -- just so that you have the

18  context, Your Honor -- we also met with all the other

19  applicants for -- the other 503(b) applicants -- their

20  professionals.  So, we met with the Brown Rudnick attorneys.

21  We met with the Cleary Gottlieb attorneys.  We've also met

22  with Blackstone; we've had an initial meeting with

23  Blackstone.

24          I think it's important to advise the Court that we

25  had extremely positive discussions with the professionals.

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 19

1    They were very candid discussions.

2            As Mr. Shore mentioned, we did our U.S. Trustee

3    thing and did a line-by-line of all the time records and we

4    spoke with them about all of the issues and concerns that we

5    had.  The applicants met our issues 100 percent.  I mean we

6    really -- it was a very positive experience with respect to

7    those meetings.

8            With respect to the other -- and as you'll hear

9    today, Your Honor, we have -- and as Your Honor noted, we

10   didn't take a position on substantial contribution; we

11   deferred -- we believe that was for the Court.  We didn't

12   object, but we believe that was a Court finding.

13           With respect to the financial advisors, we have

14   met, as I said, with Blackstone and we have met with

15   AlixPartners.  We haven't yet had a meeting with

16   Mr. Molinaro because of scheduling and the holidays, et

17   cetera.  In addition, for personal matters, the United

18   States Trustee has been out of commission for the past week

19   due to family issues, but we expect to continue those

20   discussions.

21           And what we're trying to do, Your Honor, is trying

22   to see if there's some way we can reach a resolution without

23   having to bring a legal issue before the Court.  That's --

24   we're all trying to put our heads together and seeing -- you

25   know, we're talking very openly and what the issues are and

1     seeing if that's possible.  And that's what our goal is at

2     this point.

3                  I think Mr. Shore had put the adjourned date out

4     to the 10th of October, if I'm correct?  Right.

5                  And that seems to work with all the parties, so

6     we're hoping that we will be able to be back before the

7     Court by the 10th to either advise the Court one way or the

8     other, whether we've been able to have a resolution or

9     whether or not there will be a legal issue that will have to

10    be decided by the Court.

11                 THE COURT:  Okay.

12                 MS. SCHWARTZ:  Thank you, Your Honor.

13                 THE COURT:  I appreciate that report.

14                 MR. LEVINE:  Good morning, Your Honor.

15                 Steven Levine, Brown Rudnick, LLP, for an ad hoc

16    group of LBT, the noteholders.

17                 I don't want to repeat what Mr. Shore said, but I

18    want to highlight some things because our contributions took

19    place largely outside of the Court's purview.  We went

20    into --

21                 THE COURT:  I'd like to interject and just say

22    that substantially all of the substantial contributions that

23    are at issue are took place outside of the Court's purview.

24    It's not limited to yours.

25                 One of the challenges in a case such as this is

08-13555-mg   Doc 31158   Filed 09/20/12   Entered 10/01/12 16:00:32   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 21 of 90

Page 21

1    that the contribution is evident only after the fact, not

2    while it's occurring.  The fact that consensus was reached

3    is the principle evidence on the basis of which I'm able to

4    draw these conclusions, not on the basis of close inspection

5    of what you've done.

6            MR. LEVINE:  Thank you, Your Honor.

7            So, let me highlight some of the aspects of our

8    application.  First, our initial application was

9    approximately $3.8 million dollars.  That represented a good

10   faith allocation of time for which we felt was justified for

11   a substantial contribution claim.  We also have an on-going

12   representation in Europe and we excluded all that time, so

13   the amount that we initially sought was a little bit more

14   than half of the total fees in the case.

15           Secondly, we went through the process with the

16   U.S. Trustee's Office as others have described and we're

17   thankful for their time and willing to work constructively

18   with us, and as a result of that process, our total fees

19   were reduced by -- and expenses -- were reduced by

20   approximately $397,000 to roughly $3.3 million dollars.

21           All of our fees have been paid by our clients and

22   since I have a client sitting in the courtroom, I can assure

23   you that all of the fees that we get allowed by this Court

24   will be returned pro rata to our clients.  There's nothing

25   here that Brown Rudnick will get any sort of windfall; we've

LEHMAN BROTHERS HOLDINGS, INC.; ET AL.

Page 22

1    been fully paid and just want to reimburse our client for

2    the expenses they incurred during the case or the portion

3    that represents a substantial contribution.

4              Again, no one contested the -- whether or not we

5    made a substantial contribution in the case.  The U.S.

6    Trustee took no position as the Court well knows.  The

7    official creditors' committee included us among all

8    applicants in saying that we had a colorable claim.

9              I can -- if it's helpful to the Court, I can go

10   into more detail of exactly what we did.  As we said in your

11   papers, our two primary areas of contribution related to the

12   structured settlement valuation methodology.  My client's

13   notes were complicated notes that didn't simply provide for

14   fixed payment for payment of principal and interest on a

15   fixed date.  They were the reverse side of derivative

16   transactions, so that many of them provided for a payment

17   equal to the movement in a public or privately traded stock

18   index or public or private stocks on a date far into the

19   future.

20             Some of them had a final payment equal to the

21   greater of a fixed percentage of par or what amount that

22   could be derived from the formula.  We spent a lot of time

23   and effort over the two years culminating in August of 2011

24   working with the debtors and other constituencies in the

25   case to come up with a valuation methodology that was

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 23

1    practical, easily applied; otherwise, the debtor might have

2    faced 3500 plus separate valuation trials and was perceived

3    as being fair, not only by all those people who held

4    structured securities, but by all of the participants in the

5    case.

6          The total amount of structured securities claims

7    were about $40 billion dollars.  Our client's share of that

8    nominally is around $3 billion dollars.  So this was a

9    benefit to all other structured security claimants and also

10   helped in the resolution of the case.

11         In terms of the global settlement, our clients

12   held notes that were initially issued by LBT, which is

13   Lehman's Dutch finance subsidiary.  All those note proceeds

14   were lent through an intercompany claim to LBHI, so our

15   claimants were the primary beneficiaries of two claims

16   against LBHI.  The notes were directly guaranteed by LBHI

17   and they had the benefit of an intercompany claim from LBT.

18         An as LBHI creditor, they shared and interest with

19   Mr. Shore's clients in maximizing the pool of assets

20   available to LBHI, but as claimants who held two claims

21   against the single debtor who were the direct beneficiaries

22   of the one claim and held a guaranteed claim on another,

23   they were adamantly opposed to substantive consolidation.

24   So, in that sense, we had a commonality of interest with the

25   non-consolidation proponents because the last thing we

Page 24

1    wanted to see would be all the estates consolidate and have

2    one claim.

3         We were able to weave that, and, we think, play a

4    constructive role in reaching a global resolution, one that

5    benefitted all LBT constituents, not just our clients and

6    increased the total pool.  And in our papers, we quantified

7    what the benefits were and go into more detail what exactly

8    our contributions were.

9         Again, I can answer any questions or expand on

10   that if the Court would like.

11        THE COURT:  I do have one question which may

12   reflect a lack of full appreciation of the role played by

13   your group, so this would be useful for me to know.

14        To what extent did your group interact with Rutger

15   Schimmelpenninck and the LBT case in Europe, and also

16   counsel for Mr. Schimmelpenninck, here in the United States,

17   in pursuing your respective positions, and to what extent

18   were you, in effect, a free agent?

19        MR. LEVINE:  We interacted with the Dutch joint

20   bankruptcy trustees and their counsel constantly.  The co-

21   lead partner on this engagement was one of our restructuring

22   partners in London, who's Dutch by birth in training, so, we

23   were able to work together and interact with the Dutch joint

24   bankruptcy trustees and their counsel in the Netherlands.

25   In fact, we met with them as recently as last Tuesday to

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 25 of 90

Page 25

1    discuss the Dutch case, and at the same time work with them

2    and Tom Mayer who represented the joint bankruptcy trustee

3    in the United States in fashioning a holistic solution that

4    will cover both sides.  In that regard, I know a lot more

5    about how you hummelgate (ph) an accord, which is the Dutch

6    version of confirm a plan than I ever thought I would when I

7    went to law school.

8              And we spent a lot of time in our negotiations

9    with the debtors helping to deal with issues that ultimately

10   ended up in the settlement agreement reached between the

11   joint bankruptcy trustees and the debtors, such as the

12   allowed amount of the intercompany claim, which was all part

13   of the U.S. settlement.  So, it was an integrated

14   representation on both sides of the Atlantic that, I think,

15   worked well for our clients and worked well for both the

16   cases.

17             THE COURT:  All right.

18             As you correctly observed at the outset, your

19   substantial contribution is harder to identify from the

20   bench than it is from the prospected of those who

21   participated in meetings, negotiations and conferences that

22   lead to the settlement that I'm aware familiar with.

23             But in the absence of objection and on the basis

24   of your application and the representations that you've made

25   today, I find that your group did make a substantial

08-13555-mg   Doc 31158   Filed 09/20/12   Entered 10/01/12 16:00:32   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 28 of 90

Page 26

1    contribution and I approve your application.

2             MR. LEVINE:  Thank you, Your Honor.

3             MR. O'NEAL:  Good morning, Your Honor.

4             THE COURT:  Good morning.

5             MR. O'NEAL:  Sean O'Neal, Cleary Gottlieb, on

6    behalf of Goldman Sachs Bank and Goldman Sachs

7    International, we, like others have filed a substantial

8    contribution claim on behalf of Goldman Sachs.  Our

9    procedural posture is very similar to the procedural posture

10   of the other applicants that you've heard from today.

11            Initially, the U.S. Trustee had filed an objection

12   questioning some of the fees set forth in our application.

13   We had a series of conversations and meetings and ultimately

14   were able to resolve their concerns by eliminating

15   approximately $180,000 from our request.

16            The creditors' committee didn't object.  The

17   debtors didn't object.  There was a question about whether

18   or not the fee committee should become involved, but based

19   on discussions with the fee committee, they told us that

20   they did not need to -- or expect to become involved if we

21   had resolved the U.S. Trustee's objections.

22            So, from our perspective, there are no outstanding

23   objections and nobody has contested whether or not Goldman

24   Sachs made a substantial contribution.  We recognize that

25   this is, ultimately, the Court's determination.

 1          Our application and supporting declaration set

 2     forth the tasks that we did and the services we provided,

 3     that we believe constitute a substantial contribution.

 4     Notably, we excluded Goldman's specific actions, such as the

 5     proof of claim and other actions and focused only on those

 6     activities that would contribute substantially to the

 7     estates.

 8          In particular, during the course of these cases,

 9     Cleary Gottlieb and Goldman Sachs took the lead role in

10     drafting position papers that were circulated among the

11     debtors and various creditor constituencies concerning some

12     of the most relevant and hot topics in the bankruptcy,

13     substantive consolidation, recharacterization, racers and

14     other matters.

15          We had also, at Cleary, took the lead role, and

16     nobody has contested that, in drafting and negotiating the

17     non-con plan and the related disclosure statement.  And we

18     will be taking the lead incompetent negotiating the planned

19     support agreement and the sequencing stipulation and all of

20     the documents that flowed from the global settlement.

21          Keep in mind that the non-con plan proponent group

22     was a diverse group of approximately 20 creditors across

23     various levels of the capital structure, so mostly, LBSF,

24     but LCPI and other operating companies.  And as you recall,

25     our main goal was to not have a substantive consolidation

08-13555-mg   Doc 31158   Filed 09/20/12   Entered 10/01/12 16:00:32   Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 28 of 90

Page 28

```
 1     plan and to respect the separateness of the various

 2     operating entities.

 3              In addition, Cleary Gottlieb and Goldman Sachs

 4     took the lead role in improving the proposed framework for

 5     the settlement of the big bank derivative claims.  As you

 6     may remember, there were approximately $10 billion in claims

 7     and we were able to arrive at a negotiated settlement

 8     through the drafting and negotiation of a model termination

 9     agreement that was adopted by, I think, at the time of

10     confirmation, 8 of 10 of the big bank creditors.

11              So, through all these efforts, Goldman Sachs

12     operated as a voice of a variety of creditor constituencies

13     at the operating company level, and, you know, as I

14     mentioned, there are no pending objections, so we would

15     request that Your Honor would approve our application as

16     modified to accommodate the U.S. Trustee's concerns.

17              THE COURT:  What happens to the money?

18              MR. O'NEAL:  Certainly.

19              Goldman has paid nearly all of the fees that we're

20     seeking, so, clearly, we will not be seeking to double dip,

21     and the fees that will -- or the amount that will be paid by

22     LBSF will be sent to Goldman Sachs to reimburse it for its

23     payment of our fees.

24              THE COURT:  Is there any sharing understanding in

25     place between Goldman and any other similarly situated
```

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 29 of 90

Page 29

1     members of the group of creditors opposed to consolidation?

2              MR. O'NEAL:  Not with respect to Cleary's fees.

3     Cleary's -- the engagement was with Goldman Sachs.

4              THE COURT:  All right.

5              MR. O'NEAL:  Your Honor, I do have a proposed form

6     of order.

7              THE COURT:  Is that consistent with the one that

8     I've seen most recently?

9              MR. O'NEAL:  It is; it's the one that we filed

10    yesterday.

11             THE COURT:  Okay.  That's fine.  You can hand that

12    up.

13             And to be clear, for reasons similar to the ones

14    that were expressed during Mr. Shore's presentation, the

15    dialectic of a consolidation plan, a non-consolidation plan

16    and a plan in the middle prove to be a useful means to

17    putting this case to a culmination of a consensus and no one

18    party can take credit, but all parties can take credit.

19             I find that there was a substantial contribution,

20    so you're application is approved.

21             MR. O'NEAL:  Thank you, Your Honor.

22             I have a hearing in ResCap as well, so if I may

23    be --

24             THE COURT:  You may be excused.

25             MR. LEVINE:  Your Honor, may I be excused?

Page 30

1           THE COURT:  Anybody who wants to be excused can

2    leave.

3           MR. LEVINE:  Thank you, Your Honor.

4           MS. SCHWARTZ:  Thank you, Your Honor.

5           MR. KOBAK:  Good morning, Your Honor.

6           James Kobak, Hughes Hubbard & Reed, on behalf of

7    the SIPA trustee.

8           Your Honor, there's two matters on our calendar

9    for today.  The first is our motion for approval of the

10   Navigator Gas entity, which has been opposed by Elliott, and

11   the second is Elliott's motion with respect to an all-cash

12   interim distribution.

13          I believe Mr. Ross and others familiar with the

14   Navigator transaction may be here in court and I think if

15   Your Honor agrees, we would proceed to go ahead with that

16   matter first, which Mr. Lee is going to handle for the

17   trustee.

18          THE COURT:  That's fine.  Let's proceed with that.

19          MR. KOBAK:  Thank you.

20          MR. LEE:  Good morning, Your Honor.

21          Ken Lee from Levine Lee for the SIPA trustee.

22          Your Honor, we are moving this morning for the

23   approval of the sale of LBI shares in Navigator Holdings,

24   Ltd., to the WL Ross & Co. As Your Honor's aware, we were

25   here before Your Honor on August 23rd when Your Honor

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 31

1    entered the procedures order without any objection from any

2    party, and we have, since that time, made some supplemental

3    submissions as well as a supplemental declaration, as well

4    as a response to the one objection that was received from

5    Elliott.

6            Without spending a lot of time repeating what we

7    put in those papers, I would just briefly summarize here

8    that we're talking about a minority interest in a privately

9    held company.  The shares are not traded on an exchange and

10   there appears to be no active trading market for these

11   shares.  And as has been pointed out in the papers, there

12   are significant challenges with selling an interest of this

13   sort and in this situation.

14           The trustee retained direct corporate finance to

15   advise him on two separate matters.  The first would be the

16   process that was undertaken to attempt to find a buyer for

17   these shares and the second was that Deloitte performed an

18   analysis that attempted to imply a price for the Navigator

19   shares and the conclusion was a process that resulted in the

20   current proposed transaction with WL Ross at a price that

21   falls in the middle of the range that was the result of the

22   Deloitte analysis prior to Deloitte taking in discounts for

23   things like lack of control, liquidity, marketability, or

24   the existence of a shareholder rights agreement, all of

25   which are present, as Your Honor is aware in this matter.

LEHMAN BROTHERS HOLDINGS, INC.; ET AL.

Page 32

1           There were no objections as of August 23rd to the

2    procedures order, and since that time, there has been a

3    marketing and solicitation effort by the trustee's

4    representatives to find other bidders who might be prepared

5    to make a higher bid for these shares.  As we have

6    demonstrated and set forth in the supplemental papers,

7    approximately 100 entities were contacted and the result of

8    that process has been no offer to purchase these shares.

9    And beyond that, no conversations which give the trustee any

10   confidence that there is a potential buyer out there for

11   whom it would be worth pursuing discussions at the risk of

12   losing the current transaction which is on the table with WL

13   Ross.

14           Under the purchase agreement, Ross may terminate

15   the purchase agreement on -- after October 5th if a sale

16   order is not entered by this Court.  And so, what we're

17   talking about is an opportunity to sell these shares for

18   $100 million dollars or alternatively, I suppose if the

19   objectors would have their way, so not approve that

20   transaction, run the risk of Ross terminating and then going

21   out into the world so see what we can achieve, and it's the

22   trustee's business judgment that he has conducted an

23   appropriate process under challenging circumstances, and

24   that it is certainly better for the estate and for the

25   customers and creditors of the LBI estate to go forward with

 1    this transaction.

 2          We regard the Elliott motion as little more than

 3    Monday morning quarterbacking.  We have set forth our

 4    response to their objection in our papers and Ross has also,

 5    specifically, and quite clearly demonstrated some of the

 6    factual misstatements by the Elliott objection.

 7          And unless Your Honor has further questions at

 8    this time from me, I would propose that I sit down and

 9    reserve the right to respond if there are other parties that

10    wish to discuss these matters, here, before Your Honor.

11          THE COURT:  I have just a few questions.

12          One relates to timing.  I take it that given the

13    amount of the transaction, which is material in the context

14    of most bankruptcy case -- frankly, in the context of most

15    transactions -- but in the context of this case, your own

16    papers identify the amount at issue as essentially a

17    rounding error in the numbers that we're dealing with.  I

18    have the recollection of .065 percent as being what this

19    amounts to in estate assets.

20          Given that both the motion and the objection

21    inconsequential to me, I must say that right at the outset.

22    It's consequential to the purchaser, who is obtaining

23    control, and it's clearly consequential to the estate in

24    converting any liquid asset to cash, which is consistent

25    with the trustee's mission.  So, I don't have any quarrel

Page 34

 1   with respect to that.

 2         I do question the timing, though.  How did this

 3   come about now as an issue as opposed to last year or six

 4   months from now, and what's the consequence to the estate,

 5   if any, other than the loss of $25 per share, if this is

 6   deferred?  Those are my fundamental questions to you.

 7         MR. LEE:  Yes, Your Honor.

 8         Well, as Your Honor pointed out, one of the jobs

 9   of the trustee is to monetize assets to so, that they are

10   available for distribution, both to customers as well as

11   general creditors.  And as we've discussed, this particular

12   asset is a highly illiquid one, and one that in its current

13   form, does not lend itself to the trustee's fulfillment of

14   those responsibilities and so the trustee already took and

15   effort beginning in the summer to attempt to find a way to

16   monetize those shares and obtained a financial advisor to

17   assist him in that regard.

18         Given the challenges and restrictions that come

19   with trying to sell a block of shares like this, he worked

20   very hard to find a way to monetize those assets and found a

21   way to do so at a price that, based on objective measures,

22   appears to be a reasonable one in the trustee's judgment.

23         So, yes, there is also the what if kind of Monday

24   morning quarterbacking where you say, What if the trustee

25   has taken a different approach or what if we reject this

LEHMAN BROTHERS HOLDINGS, INC.; ET AL.

Page 35

1    deal now and wait around to see what we might get.  And

2    certainly, the theoretical possibility is perhaps somebody

3    else comes along and offers more and we can make an

4    arrangement with the Navigator board that was acceptable to

5    them under these circumstances, but there's the equal, and,

6    if not, we believe, the greater possibility that, in fact,

7    that won't happen.  And if that is the case, and Ross is

8    still interested after that process has played itself out, I

9    think we can all be certain that Ross will not be offering

10   $25 a share, but will offering something significantly lower

11   than that.

12           THE COURT:  Well, we don't actually know that.

13           MR. LEE:  We don't know any of this, Your Honor,

14   but the question, I think, for the Court is has the trustee

15   exercised reasonable business judgment in making the

16   determination that this is the best thing for the estate,

17   and in the trustee's judgment it is, and we don't believe

18   that any of the issues raised by Elliott are sufficient to

19   challenge the reasonable exercise of his business judgment.

20           THE COURT:  Let me ask you about the

21   representations made in the Cleary supplemental declaration.

22   I read that as an indication that between the approval of

23   the sale procedures and today's hearing, some significant

24   effort was undertaken to identify perspective purchasers.

25   It was not clear to me from reading that, that a similarly

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 36

1    diligent effort was undertaken prior to the sale procedures

2    being entered on August 23, and so one of my concerns and I

3    would just like express this now, is that the ability to

4    find a buyer after one has signed with Wilbur Ross at a

5    certain fixed price may be less favorable than if multiple

6    buyers had been solicited prior to entering into that

7    agreement.

8            So part of the concern I have, and it really

9    hasn't been expressed in the Elliott objection as much as

10   it's just an impression from reading the declaration, is

11   that more may have been done for optical purposes in the

12   brief period that we have between August and today to

13   solicit potential purchasers than was done prior to signing

14   with Mr. Ross' company.

15           MR. LEE:  Your Honor, I would say in response to

16   that that the experience of the last few weeks confirms that

17   the results would not likely have been different if that

18   effort had been taken earlier.  Given the particular nature

19   of these shares and the very aggressive position taken by

20   the Navigator board that it intends to use the shareholder

21   rights plan to defend the company.  And we were aware of

22   that in the summer and the trustee made the judgment that

23   rather than having Deloitte make the 100 phone calls at that

24   time, that the focus of the effort will be, as Mr. Coury

25   (ph) set forth in his first declaration, to try and contact

Page 37

1    the most likely parties that would be interested in

2    acquiring these shares under the circumstances and try a do

3    a deal.

4           The second thing I would say is that once we

5    entered into discussions with the Ross company, they made it

6    clear to us that they wanted us to enter into a deal with

7    them quickly and not for us to go out and market these

8    shares to other parties, and you'll recall that the first

9    iteration of the purchase agreement contained a no-shop

10   provision that prevented us from doing so.  And at the time,

11   the trustee had a different judgment to make which was do we

12   continue to negotiate with Ross on these terms and try and

13   find a deal or do we say, you know what, we want to go ahead

14   and do some open marketing anyway and run the risk that Ross

15   leaves the table as well.

16          So, that was the kind of judgment that the trustee

17   had to make and we believe was a reasonable one given the

18   circumstances at the time.

19          THE COURT:  Okay.  But in an answer to my

20   question, many solicitations took place in the last few

21   weeks than took place prior to August 23rd.

22          MR. LEE:  That is correct.

23          THE COURT:  Okay.  Those were my questions.

24   Thank you.

25          MR. LEE:  Thank you, Your Honor.

1              MR. DORCHAK:  Good morning, Your Honor.

2              Joshua Dorchak with Bingham McCutchen, for Elliott

3       Management Corporation.

4              I won't go over the details of our objection that

5       we filed, but I wanted to follow up on a couple of things,

6       first, that you mentioned, Your Honor.  The first is to deal

7       with the rounding error issue.  The minimalistic percentage

8       that the trustee applied to the value of these shares, by

9       comparison with the estate, used a number of $117 billion

10      dollars as the aggregate estate.

11             Now, that may have been true on the filing date,

12      but with the transfer -- I believe is that takes into

13      account the accounts that have transferred to Barclays --

14             THE COURT:  How can you ignore the transfer to

15      Barclays?  It's the most significant transaction that has

16      ever taken place in the context of any SIPA case in history.

17      Are you saying that we should disregard it?

18             MR. DORCHAK:  I'm saying today the value of those

19      accounts that were transferred has nothing to do with the

20      recovery by the --

21             THE COURT:  By recovering by claims traders?

22             MR. DORCHAK:  -- creditors still left in the case.

23             THE COURT:  By parties who choose to buy into a

24      case after the commencement of the case and then who seek to

25      get in the way of transactions for financial advantage?

08-13555-mg   Doc 31158   Filed 09/20/12   Entered 10/01/12 16:00:32   Main Document
Pg 39 of 90
LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 39

 1             MR. DORCHAK:  By parties who hold customer claims

 2    and unsecured general claims.

 3             THE COURT:  Yes, but Elliott bought into this.

 4    There's nothing wrong with that.  It's very hard to buy into

 5    this and then assume a righteous indignation posture.

 6             MR. DORCHAK:  Elliott bought these claims, as you

 7    said, Your Honor, there's nothing wrong with that, and then

 8    became a creditor with the same standing who had been there

 9    from the very beginning, as far as I stand.

10             THE COURT:  This isn't a question of standing;

11    it's sort of a question of your moral position in the case.

12             MR. DORCHAK:  All right, Your Honor.

13             I still want to talk about the rounding error

14    thing, but if I can address --

15             THE COURT:  No, you're fine.  You can talk about

16    the rounding error, it's just a question of the denominator.

17    What's in the denominator is everything that has been

18    administered in this case.

19             What is in the denominator from your perspective

20    is what's left.  I understand that.

21             MR. DORCHAK:  The material denominator for the

22    parties who hold claims today is like 26 billion the

23    aggregate assets of the estate, at least using the April

24    or -- I believe the April or May numbers.

25             But, as far as I understand it, these shares are

```
 1    not claimed as customer property -- subject to customer

 2    property claims.  They would actually be in the general

 3    estate, and if I'm right about the current numbers there,

 4    the current proposal for the general estate on the second

 5    allocation motion, as supplemented, is $1.8 billion dollars.

 6              So, the math I did, Your Honor, was $110 million

 7    dollars that's -- we hope to do better, but $110 million

 8    dollars divided by $1.8 billion dollars and I got 6.11

 9    percent for that, which, I think, the practical number that

10    we should be looking at.

11              THE COURT:  Are you the expert witness for these

12    purposes?

13              MR. DORCHAK:  No, Your Honor.

14              I'm just taking issue with the use of the 117

15    percent.

16              THE COURT:  Do you have any expert witnesses?

17              MR. DORCHAK:  No.

18              THE COURT:  Do you have any witnesses?

19              MR. DORCHAK:  I don't have any witnesses on behalf

20    of my client.

21              THE COURT:  Do you have any evidence to present?

22              MR. DORCHAK:  I can describe why we are here and

23    why we made the objection.

24              THE COURT:  Well, I read the objection --

25              MR. DORCHAK:  Okay.
```

```
 1              THE COURT:  -- and I understand some of the

 2     positions that you express, but I'm really talking more

 3     about what I should expect at today's hearing other than

 4     argument.

 5              MR. DORCHAK:  We do not have an affirmative

 6     witness of our own.  If there's an opportunity to cross

 7     examine Mr. Coury (ph) we could consider that as part of --

 8     to flush out the record, but we don't have a witness of our

 9     own.

10              THE COURT:  Are there any questions that you

11     intend to ask Mr. Coury, with respect to his declaration?

12              MR. DORCHAK:  Not with respect to what's in his

13     declaration itself -- with respect to what's not in his

14     declaration would be allowed.

15              THE COURT:  So, is it your intention to have an

16     evidentiary hearing or just to make argument?

17              MR. DORCHAK:  This is not an evidentiary hearing,

18     Your Honor, I understand that.

19              THE COURT:  This is a contested matter.

20              MR. DORCHAK:  Right.

21              THE COURT:  And I'm asking you whether or not you

22     have any present intention to convert this into an

23     evidentiary hearing.

24              MR. DORCHAK:  If Mr. Coury is available for -- if

25     they're proffering him to be cross examined, we would want
```

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 42

1    to cross examine him.

2            If that can't happen now for procedural reasons or

3    because the Court wishes not to do it that way, we would

4    defer.

5            THE COURT:  Well, I think, perhaps, the most

6    important procedural issue that we have is that Mr. Ross is

7    here.  He was a declarant with respect to the papers filed

8    in opposition to your objection that I read last evening.

9    So he's a declarant (indiscernible - 10:51:42) person, as

10   someone who has endorsed the factual statements made in the

11   papers filed on his behalf, I assume Mr. Coury is present as

12   a declarant and available for examination.  So, in a sense,

13   there is already evidence in the record.

14           You've indicated that you have no witnesses and no

15   evidence to present, but you might ask some questions.

16   There's a timing issue here in that we have a transaction --

17   there is no other transaction, and there is a deadline for

18   closing in transaction.  We need to get on with it, so I

19   just wanted to find out if we're going to have argument, in

20   which I can assess the relative strengths of the argument or

21   if we're going to have a full-blown evidentiary hearing.

22           If we're going to do that, we may or may not have

23   sufficient time to complete today, in which case we're going

24   to have to make some other scheduling arrangements in order

25   to accommodate the transaction.  I don't know if parties are

1    aware of this, but I must leave today by 12:30, because I'm

2    speaking at NYU Law School this afternoon, so we have this

3    morning to get this done.

4            I'm asking you what your intentions are.

5            MR. DORCHAK:  If this must happen in the next 35

6    minutes, and leaving aside that there's something else on

7    the calendar, Your Honor, I would like to continue to my

8    argument for another 5 or 10 minutes in perhaps of in lieu

9    of the cross-examination and of a desire to cooperate and be

10   efficient.  But I feel like I would present Elliott's side

11   of the story.

12           THE COURT:  I've Elliott's side of the story.  If

13   you want to embellish it with something that's not in your

14   papers, feel free to do that.  I've read your papers.

15           MR. DORCHAK:  Okay.  But you've also read the

16   supplemental filings that came after our objection, and to

17   which we haven't had a chance to respond, including the Ross

18   materials.  So, let me follow-up on that, which I haven't

19   been able to address before, and let me do it this way.

20           After Elliott read the motion and found a couple

21   of things concerning about the proposed transaction, mainly

22   the time and the poison pill that seemed to be doing the

23   opposite of what a poison pill is supposed to do and the

24   price that seemed low given the circumstances, we contacted

25   Hughes Hubbard and we had some discussions -- actually,

Page 44

1    eventually had a discussion with Mr. Ross --

2            THE COURT:  Can I stop you for a second?

3            You said the price seemed low.

4            MR. DORCHAK:  Correct.

5            THE COURT:  In whose judgment?

6            MR. DORCHAK:  Well, obviously, we've seen what

7    Mr. Coury thought the price range should be -- it was in his

8    declaration, I understand that -- but the simple -- without

9    being a financial expert myself, Your Honor, the response

10   that we had to the price was how could it be the same as the

11   price that the Ross company paid in the fourth quarter of

12   2011 and in the first quarter of 2012, for positions which

13   did not give it control over the company, and that at a time

14   when the company wasn't doing as well financially as it was

15   when these negotiations were on-going.  So -- but, without

16   being an expert, it seems like there should have been two

17   elements to bump up that $25 number and it didn't get bumped

18   up once, yet alone twice.  That was the concern about the

19   price.

20           In these conversations that I mentioned, which I

21   can't go into detail about a definition, I will say that we

22   did make some progress and we appreciated the -- we

23   appreciate the cooperation of Hughes Hubbard, as we always

24   do, and we appreciated that Mr. Ross actually took the time

25   and come and tell us some facts that made us a little bit

LEHMAN BROTHERS HOLDINGS, INC.; ET AL.

Page 45

1    more comfortable about the Ross company's.

2            So, the scope of our concerns were narrowed, and

3    the supplemental filing by Ross sort of shows -- in a way,

4    it shows things we don't need to argue about.  Just like we

5    don't have a problem with the efforts that the trustee made

6    post-agreement to sell these shares to the Ross Co., to go

7    out, pick up the phone and try again.

8            Our concern is with the effort or the lack of

9    effort at the front-end of the transaction, especially the

10   failure to push back on the board a little bit to insist

11   upon rights as a shareholder, insist upon the right to

12   examine the books and the records, to push back a little

13   harder on a board that seemed very uncooperative.

14   Mr. Butters, the CEO, I got the impression that he was

15   basically thumbing his nose at the trustee's advisors.

16           And I think -- in a nutshell, we said it in our

17   objection that the trustee gave in too easily on this one,

18   and that's what concerned us and that's why we filed the

19   objection.  We still feel like the deal wasn't good enough

20   because this poisoned pill that was put in place by the

21   company at a time -- I'm not even sure about the timing,

22   Your Honor, but around the time that Ross expressed a desire

23   to purchase these shares.

24           You've got a pill that's designed to make sure

25   that nobody gets control of the company and it's all of a

Page 46

1   sudden waived for the benefit of the one guy who can

2   purchase these shares and obtain control of the company, and

3   that didn't smell right to Elliott, and Elliott figures,

4   well, why didn't the trustee get the same bad smell in their

5   knows and push back on the board a little bit.

6          So, that's the essence of our objection.  We

7   talked about it with them.  We didn't quite get comfortable.

8   We got comfortable on the Ross side, but not so comfortable

9   on the trustee's efforts to push a little harder on upfront.

10          And this is the first of, perhaps, many assets

11   that are going to come before you in this case being

12   liquidated, when everybody wants it to be the highest price.

13   And you want it -- stand up now and say this sounds like one

14   that the trustee didn't push hard enough for.

15          And if the trustee's response is, Don't worry,

16   it's de minimis, that doesn't make us feel better.  If a

17   $110 million dollar asset is de minimis in the case, and

18   then therefore no one has to concern themselves with how

19   much the asset is sold for, I think that's a problem, too,

20   Your Honor.

21          THE COURT:  Well, I do think that that's really

22   what the trustee was saying.  I think the trustee was

23   attempting to put what is obviously a material transaction

24   in the context of a very, very big pool of assets.  You're

25   looking at the pool as a much smaller pool because your

LEHMAN BROTHERS HOLDINGS, INC.; ET AL.

Page 47

1    concern is not what happened from years ago in the sale to

2    Barclays, because what's happening now, and in that respect,

3    from the back of your envelope, you see this as a much more

4    material component of assets that might be available to

5    general creditors.

6            MR. DORCHAK:  Correct.

7            THE COURT:  So, I understand that.

8            I also don't for a moment discount the importance

9    of a $110 million dollar transaction.  In any context it is,

10   objectively, a significant transaction.  The issue is as an

11   insider to a process that has been not only been run by the

12   trustee and his advisors, but the subject of declarations by

13   Mr. Ross individually and by Mr. Coury, and given your own

14   acknowledgment that you have no independent evidence to

15   present, in what respect is your outsider's view of what you

16   think the right process should be in any way meaningful for

17   the Court in assessing a process that is prima fascia fair,

18   based upon the representations of the trustee and his

19   advisors?

20           MR. DORCHAK:  Your Honor, once this became a

21   Section 363 sale, according to the law, as I understand it,

22   once we get past the prima fascia business judgment issue,

23   we get to an examination of notice and sufficiency of price

24   and good faith and we're still focused on a sort of simple

25   caveman lawyer, not an accountant level, with how that $25

Page 48

```
 1    amount can be a fair amount in a sense of the highest amount
 2    that could have been reasonably achieved here.  With a
 3    little more pushback, it could have bumped up.
 4         THE COURT:  Well, it's equal to the amount of
 5    other transactions that recently closed between Navigator
 6    and WL Ross.  It's -- to the extent that there's a
 7    comparable transaction, we have it.  What you're suggesting
 8    is that -- if I'm understanding your position -- this is a
 9    much more important transaction to WL Ross because it
10    includes what should be a control premium in your view --
11         MR. DORCHAK:  Right.
12         THE COURT:  -- but based upon the papers that I've
13    read from the purchaser, that may be illusory because there
14    are various restrictions upon the purchaser that have been
15    put in place by the board, so that what might to an outsider
16    appear to be control, within the board may not be control at
17    all.
18         MR. DORCHAK:  I can respond directly to that, Your
19    Honor.  Again, I'm a simple lawyer, I'm not a mathematician.
20         THE COURT:  You're not that simple.
21         MR. DORCHAK:  Okay.
22         THE COURT:  Self-deprecation really doesn't work
23    here.
24         MR. DORCHAK:  I know, but when it comes to
25    business transactions.  I don't do corporate transactions,
```

08-13555-mg   Doc 31158   Filed 09/20/12   Entered 10/01/12 16:00:32   Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 49 of 90

Page 49

1  that's not my thing, but it seems to be that acquiring 61

2  percent of the company is acquiring control.  And if you

3  have a standstill in place that says for three years you can

4  only make minimal purchases, okay.  The fact is three years

5  from now -- you're making a long-term investment, and in

6  three years from now, you're going to control the company

7  and you're giving the trustee zero premium for that.

8          And the $25 -- don't forget the other thing -- if

9  I may, Your Honor, the $25, you say it's a comparable

10 transaction back in the end of 2011 and the beginning of

11 2012, but we know the company was doing better in the second

12 quarter than it was in the first quarter of 2011 when $25

13 was a good price.

14         It seems that perhaps the trustee didn't know that

15 the company was doing better because there's another strange

16 time issue in the matter, Your Honor.  The same day that the

17 trustee signs the share of purchase agreement with the Ross

18 company is the same day that the second quarter financials

19 become public, and I don't know that the trustee ever

20 questioned to get an advanced copy of those numbers or how

21 much they tried to find out about the current financial

22 status of the company when they were negotiating this deal,

23 as opposed to March 31st numbers that Mr. Coury says in his

24 declaration was talking about.

25         Meanwhile, the Ross Co. has two members on the

LEHMAN BROTHERS HOLDINGS, INC.; ET AL.

Page 50

1    board, so that gave them access to financial and other

2    information that was available to insiders and not available

3    to the trustee.  Again, the trustee has been shut out by

4    information from the CEO.  They offer to go and enter a new

5    confidentiality agreement and the CEO says no, and in the

6    share of purchase agreement, we have an explicit

7    acknowledgment amongst the parties that the Ross Co. is

8    doing this transaction with perhaps superior knowledge.

9            And again, why not push back on that?  Why not try

10   to get the best information possible?  Level the playing

11   field with the person you're bargaining with a bit better.

12           These are on-the-face-of-the-deal type questions,

13   Your Honor, that I don't think you need an expert witness to

14   (indiscernible - 11:04:04).

15           THE COURT:  Well, actually, you might.

16           Anyone can -- in the words of trustee's counsel --

17   try to be a Monday morning quarterback with respect to a

18   transaction that has already been fully vetted, documented

19   and ready to close.  One of the more difficult aspects of

20   your position is that I would suggest that you don't have

21   someone sitting in the back of the courtroom, say, mystery

22   purchaser examine as identified in the papers, who would be

23   coming forward as your buddy and suggesting, You know what,

24   we're prepared to pay more, but it's subject to diligence

25   and it's going to take a little bit a time and we're not

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 51 of 90

Page 51

1    committed, but we think a fair price is $25 plus something.

2             MR. DORCHAK:  There's a reason why there's nobody

3    here in the courtroom in that position, Your Honor, which is

4    that the poison pill froze all the bidding.

5             THE COURT:  I'm not quite -- I'm not quite -- I'm

6    not quite done with my hypothetical.

7             MR. DORCHAK:  Sorry.

8             THE COURT:  My hypothetical is not geared to why

9    there's nobody here, as much as the fact that there's nobody

10   here making it very difficult to, in effect go with the risk

11   of no transaction, because the trustee's business judgment

12   is that a transaction with Mr. Ross' company at this price

13   represents a reasonable exercise of judgment now, especially

14   informed by the marketing of the company that took place

15   over the last few weeks which produced only company X, and

16   company X, an allegedly aggressive competitor was not

17   prepared to commit.

18            MR. DORCHAK:  Again, Your Honor, post-deal with

19   Ross and pre-deal with Ross, I'm not sure that there's much

20   of a point in going out and calling a thousand or a million

21   people to try and get bids on the shares because the poison

22   pill made it pointless, economically, for anyone to buy it.

23            The board didn't seem inclined -- I'm not sure

24   that the trustee actually asked the board to waive the pill

25   with respect to anybody else pre-Ross transaction, but it

Page 52

```
 1    certainly seemed like the board wasn't in the mood to do

 2    that.  Ross was an exception to them somehow -- I don't know

 3    how -- but the pill had been waived once to the guy who

 4    would get control, I agree, three years later, but not for

 5    anybody else.

 6             So, of course, there's no other bids; that was our

 7    problem.  A 363 sale, you think there would be some sort of

 8    an auction, not necessarily published in the Wall Street

 9    journal, you know, just throwing the word out there

10    generally, but at lowest a healthy competitive process, as

11    opposed to one that shut everybody down.  I was trying to

12    come up with some metaphor -- they should be liquid shares,

13    but the pill, you know, it didn't just chill the bidding, it

14    froze it.

15             I was trying to come up with a way of saying that

16    these shouldn't be shares that you can't sell to anybody.

17    The reason you can't sell them to anybody is this pill with

18    the dubious selective enforcement by the board.

19             THE COURT:  Well, speaking of selective

20    enforcement, in order to do anything about this in a sense

21    of taking affirmative action, you basically have to go and

22    litigate this in the Marshall Islands; isn't that right?

23             MR. DORCHAK:  The trustee needn't file suit in the

24    Marshall Islands to push back on the board about the --

25    about its -- about number one, the trustee's right through
```

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 53 of 90

Page 53

1    LBI.

2            THE COURT:  But that's not really practical, is

3    it?  I mean let's just think about it.  You're suggesting

4    that what the trustee should have done was to change the

5    landscape of the business to, in fact, become an aggressive

6    acquirer to interfere with corporate governing judgments

7    made by the board and to take the hostile position with

8    respect to the company, at least threaten it?

9            That's kind of amazing.  I was reading that and

10   thinking, Are you serious in suggesting that that's what the

11   trustee should have done here?  I suppose you were; you put

12   the name on the papers.

13            MR. DORCHAK:  I'm still, serious, Your Honor, that

14   they're --

15            THE COURT:  And you're saying that not doing that

16   represents some deviation from the exercise of appropriate

17   business judgment?

18            MR. DORCHAK:  I'm saying that not doing that and

19   perhaps not pursuing other sources -- I hate to use the

20   colloquial phrase, again -- but push back other ways -- in

21   not pushing back in other ways that the trustee could

22   have -- not that this isn't a matter of his business

23   judgment, but that the result is a price that's not fair

24   because it doesn't reflect an aggressive attempt to get the

25   highest price.

 1          THE COURT:  I understand your position.

 2          MR. DORCHAK:  Okay.  Can I address the moral

 3     question, Your Honor, which I haven't yet?

 4          THE COURT:  Sure.

 5          MR. DORCHAK:  Okay.  I can do it by referring back

 6     to occurred in this -- the hearing before we get here, in

 7     fact.

 8          The issue is Elliott bought these claims,

 9     post-filing date.

10          THE COURT:  There's nothing wrong with that.

11          MR. DORCHAK:  Nothing with that, and so far so

12     good, Your Honor; nothing wrong with that.

13          The point they want to make is when Elliott acts

14     in its own interests, economic interests, like everybody

15     practically, that appears before Your Honor, that it isn't

16     necessarily not good for everybody.

17          And just really quickly to hearken back, we

18     already heard about the substantial contributions of some

19     folks in the first part of today's session, but Elliott was

20     involved in the planned negotiation process that lead to

21     the -- I agree, the incredible result, the plan that you

22     confirmed, Your Honor Elliott and another claims traders.

23     If you look at the list of planned support parties, in

24     Exhibit 4, I think it is to the plan, and you take away the

25     Lehman affiliates, you're left with the so-called big banks

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 55 of 90

Page 55

1    and secondary market participants.

2          And by the way, many of the big banks have desks

3    that participate in the secondary market, so thanks to the

4    aggregation of positions and the narrowing of field for

5    negotiations, it's actually the secondary market that got

6    that deal done.  I'm not saying that it's the only thing,

7    Your Honor, but that was -- those folks made a material

8    contribution to getting that case done.

9          I don't think debtor's counsel or committee's

10   counsel would disagree with what I just said.  It rendered

11   negotiations practicable when there wouldn't have been if

12   all the claims were scattered.

13          And the second thing I wanted to mention, also

14   from December of last year when the LBH -- the Lehman

15   Chapter 11 creditors made a motion to sell their interests

16   in Neuberger Berman.  Elliott and some other creditors

17   thought the terms weren't good enough for the debtors and

18   the hearing was adjourned and the debtors worked

19   cooperatively with Elliott, the other potential objectors

20   and the buyers, and what you do you know; the result was a

21   deal with improved terms for the estate, the sale went

22   forward on the adjourned hearing date with a better result

23   for the debtors and it was -- Your Honor approved it and

24   everybody one.  The buyers didn't quite so good a terms as

25   they originally had, but it was good enough that they went

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 56 of 90

Page 56

1    through with it and that effort helped everybody.

2              I think I've made my point.  Elliott is not an

3    altruist, but it is also true that what Elliott -- the

4    concern that Elliott takes in its own economic interest in

5    the case is beneficial to all the creditors.  That's my

6    comment on the moral question, Your Honor.

7              THE COURT:  Okay.  And I wasn't suggesting in

8    reference to the moral position of your client that there

9    was anything inappropriate about what Elliott has done or is

10   doing or immoral in the sense of something wrong about what

11   Elliott is doing.  I'm simply making an observation as a

12   party in interest that entered the SIPA case voluntarily, it

13   did so in order to profit for purchasing something at a

14   price on the day of acquisition that would be presumably

15   less than the amount to be realized when claims are

16   ultimately paid here.  We're going to be getting to that

17   question of ultimate payment promptly.

18              And in that sense, it makes it somewhat more

19   difficult to assume a position of moral indignation or

20   outrage as to something that's happening in the on-going

21   administration of the case, particularly when unlike a

22   Chapter 11 case, the SIPA trustee and SIPC, itself, is

23   entitled to a fair amount of appropriate deference from the

24   Court in the exercise of business judgment.  So, it becomes

25   much harder, I think, for any party in interest to take the

Page 57

 1    position that you're taking and I think you're in a somewhat

 2    less favorable position simply because of the circumstances

 3    and you've been so characterized in the papers in which your

 4    client has been called -- as if in slight disparagement -- a

 5    claims trader.

 6             I'm not disparaging Elliott as a claims trader or

 7    any other claims trader and I also acknowledge the fact that

 8    the liquidity associated with the trading in Lehman trades

 9    represented a favorable development for purposes of forming

10    creditor groups and having those groups available to

11    negotiate for real economic interest that ultimately lead to

12    our plan, but that's not this case.

13             MR. DORCHAK:  Thank you very much for those

14    comments, Your Honor.

15             I acknowledge that there is discretion in the

16    trustee.  I acknowledge that the business judgment standard

17    gives -- sets a high bar for those who would seek to object

18    to a proposed course of action that falls under the business

19    judgment rule.  I am content to conclude our objection at

20    that point.  I don't see we need -- having gotten what I

21    wanted to say out, Your Honor, I don't see any need to call

22    any witnesses and we will rest our objection at this point,

23    unless you have further questions.

24             THE COURT:  I don't.

25             MR. DORCHAK:  Thank you, Your Honor.

Page 58

1            MR. HEIMAN:  Good morning, Your Honor.

2            THE COURT:  Good morning.

3            It looks like Mr. Ross has called in one of the

4    big guns.

5            MR. HEIMAN:  Well, I appreciate those remarks, and

6    happy anniversary to you.

7            And I might say congratulations for being able to

8    look back rather than look forward over the four-year

9    period.  It's quite a legacy.

10           My name is David Heiman, Jones Day.

11           And I'm here on behalf of WL Ross & Co., the buyer

12   under the stock purchase agreement.

13           I would like to introduce -- you've already

14   acknowledged his presence -- but I would like to introduce

15   Mr. Ross, Wilbur Ross, who is the Chairman and Chief

16   Executive Officer of WL Ross & Co., and as Your Honor noted,

17   he is a declarant, and perhaps as contrasted to the

18   objectors, he is here to speak to any questions Your Honor

19   may have whatsoever.

20           And I, having worked with Mr. Ross for many years,

21   I can tell you that he will answer them succinctly to clear

22   up any problems or issues you may have, and we welcome that

23   if you so choose.

24           As I was approaching the podium, of course, I'm

25   reconfiguring everything I was going to say based on your

LEHMAN BROTHERS HOLDINGS, INC.; ET AL.

Page 59

1    remarks.  I think you've covered the water front that is put

2    forth in our papers as well as the trustee papers and from

3    our standpoint makes the objection look -- I hate to use the

4    word "ridiculous" because that's viewed generally as

5    hyperbole, but I'm searching for another word and don't find

6    it.

7           So, I think what I'd like to do first is address a

8    couple of the questions that you asked as it relates to

9    Mr. Ross.  Obviously, I can't answer for the trustee.

10          You asked, Why the timing, why now?

11          He will have to answer that, not me, but I can

12   make some observations at least, that perhaps now is

13   actually the very best time based on the fact that the stars

14   aligned and Wilbur Ross and WL Ross & Co. appeared as the

15   only buyer, perhaps the only buy ever, who knows?

16          I mean the rates agreement that is the subject of

17   a lot of complaint is there.  There's no way to blow away

18   that rates agreement.  I don't care if you go to the

19   Marshall Islands or Delaware.  Obviously, Navigator is miles

20   away from this courtroom and is not the subject of any

21   controversy in this courtroom, so, you know, the rates

22   agreement, and the way the board acts with regard to

23   strategic buyers and others is there.  No one in this

24   courtroom can do anything about it.

25          Timing as to Mr. Ross is, you know, the classic

LEHMAN BROTHERS HOLDINGS, INC.; ET AL.

Page 60

1    private equity investor's timing.  Time is money.  Dollars

2    have to be deployed.  $110 million dollars in the scope of

3    this case is still money and if the sale is not approved, he

4    will go use it elsewhere.  He wants to buy this stock.  He

5    wanted to buy it even though there was a rates agreement

6    that precluded him from doing so.  He went to the company at

7    arm's length and asked for a waiver.

8          Yes, he's on the board, but no board member that

9    he -- that represents WL Ross & Co. was involved in that

10   discussion.  He agreed to some onerous conditions, and I

11   think maybe Your Honor meant it or didn't, but you said you

12   understand the timing.  I think -- and I'm not quoting

13   you -- but I had a sense at the outset you said you wanted

14   to know -- you could understand why Ross wanted to move now

15   to, I think you said to obtain control.  I think you said

16   that.

17         So, I would like to add least address that

18   because -- and you can ask Mr. Ross this -- he is not

19   obtaining control.  He has no interest in obtaining control.

20   He agreed not to obtain control, but he believes in the

21   shipping industry in the long-term.  And so he's putting hit

22   dollars in a place that he knows and God knows he's made

23   other long-term bets that other people would have bet

24   against and succeeded, so hopefully he will here.

25         THE COURT:  Mr. Heiman, just for clarity, the

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 61

1    percentage held by LBI when aggregated with the percentages

2    of equity currently held by WL Ross and/or its nominees

3    would equal more than 50 percent.

4             MR. HEIMAN:  61 percent, yes.

5             THE COURT:  So, in that sense, it's a controlling

6    interest in the outstanding equity of the privately held

7    company.

8             MR. HEIMAN:  Okay.  Maybe that's definitional,

9    but --

10            THE COURT:  I just want to be clear on this.

11            MR. HEIMAN:  Absolutely.  61 percent, with which

12   he can do nothing; in fact, less than he can do today.

13            You've read the conditions of the standstill.  The

14   rates agreement is the plain vanilla rates agreement that

15   exists across corporate America.  There's nothing we can do

16   about that.  Nothing you can do about it.

17            The control of information is in Navigator; not in

18   Mr. Ross or the trustee.  The trustee can speak to that as

19   well.

20            There are many other things I could say about

21   this, but you've done -- you've covered so much I think it's

22   best for me not to repeat things you've already brought up.

23   I would just like to say that the trustee solicited WL Ross

24   & Co., so that if there's any implication -- and we felt

25   that there was and we weren't happy about it -- the

Page 62

 1      implication of somehow that Ross had an inside track and

 2      exploited its position.  That is not the case.  The trustee

 3      came to them.

 4            Why?  Well, it's obvious.  They own stock -- and

 5      this is what they do for a living; they invest money.  Why

 6      isn't that appropriate?  Why isn't that fortunate for this

 7      estate?  That's why the timing is good.

 8            Ross negotiated the standstill at arm's length

 9      like anyone else.  There's no evidence that anyone else in

10      the world who might have an interest in this business was

11      entered in similar terms and the bottom line is that we're

12      here today with the cash -- very simple transaction.  A

13      minority share of stock that is sitting here doing nothing

14      and will not do anything in exchange for $110 million

15      dollars cash, and we've all been through many sale hearings

16      where they were complaining, perspective purchasers about

17      the process, about the effort of the debtor, whether they

18      were closed out or treated unfairly or couldn't get

19      information.

20            With where are they today?  There is no one

21      waiting in the wings and we don't believe that there ever

22      will be, so we think it's a clear case.  Let's get this

23      company -- I'm sorry -- these shares sold and get the cash

24      into the estate.

25            Thank you, Your Honor.

LEHMAN BROTHERS HOLDINGS, INC.; ET AL.

Page 63

1          THE COURT:  Any other position as to be expressed

2   here?

3          MR. LEE:  Your Honor, Ken Lee, for the trustee.

4          If I may, since there have been some comments

5   about the trustee's exercise of his judgment, I just want to

6   respond briefly to them.  Obviously we disagree with

7   Elliott's contentions and I'm going to address the fact that

8   their allegation that the trustee should have been more

9   aggressive and gave in too easily.  I think these are very

10  easy things to say looking in hindsight, but quite to the

11  contrary, we think that given the special challenges

12  involved in trying to sell these shares, we think this deal

13  is actually quite good and people should be saying that the

14  trustee actually did quite a good job in managing to bring

15  this deal in.

16          With respect to giving in too easily regarding the

17  shareholder rights plan as Mr. Dorchak seemed to concede,

18  really what he's suggesting is that we should have pursued

19  active litigation against the Navigator board, both in the

20  form of a proxy contest to replace the board members or

21  perhaps litigation regarding the shareholder rights plan,

22  which I think it's likely that if we had pursued that, we

23  wouldn't be here today with the deal that's on the table and

24  it's not clear what would have happened as a result of that

25  protracted process.  For that reason, we think that the

Page 64

1    trustee's process and decisions showed very good judgment.

2            With respect to the issue about the control

3    premium, as has already been indicated by Mr. Ross' counsel,

4    it's not quite control that he is getting of this company.

5    But there's another thing that I wanted to point out, which

6    is if Elliott can tell me how you can extract a control

7    premium from a person as smart as Mr. Ross when he knows

8    well that there isn't any bidder in the world who would be

9    acquiring control if they acquired the 34 percent that we're

10   selling.

11           Even if we had no shareholder rights plan and we

12   had -- with an open market process and all of these things

13   which he imagines that he might have, you know, Mr. Ross is

14   the only person who would break the 50 percent mark by

15   acquiring 34 percent; nobody else would.  And so, it's not

16   clear to me that it's possible under those circumstances to

17   get him to pay the so-called control premium, even if that

18   were a possibility.

19           So, for all of those reasons, we urge that the

20   Court approve their motion.

21           Thank you, Your Honor.

22           THE COURT:  The Elliott objection is overruled and

23   the transaction proposed by the trustee is approved.

24           I think that we've fully vetted the issues here

25   through colloquy, although there is evidentiary support for

08-13555-mg   Doc 31158   Filed 09/20/12   Entered 10/01/12 16:00:32   Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 65 of 90

Page 65

 1    the Court's finding in the declarations of Mr. Coury of

 2    Deloitte and the declaration submitted by Mr. Ross,

 3    personally, in connect with the WL Ross position papers that

 4    were filed yesterday.

 5            The transaction is what it is in the sense that

 6    this is not your typical sale of public securities that

 7    could be sold into a market.  It's a private transaction,

 8    irrespective a Marshall Islands' company that happens to

 9    have adopted a so-called poison pill, the shareholder rights

10    agreement that we've been adverting to during discussions

11    this morning.

12            The existence of that agreement necessarily limits

13    the marketability of the shares in question.  The fact that

14    there has been a selective waiver of the agreement in favor

15    of Mr. Ross' company indicates that at least this moment

16    Mr. Ross's company is the only known permissible purchaser

17    for these shares and the price being offered fits within the

18    range of value that has been ascribed to the shares by

19    Deloitte, the only expert that has provided evidence in

20    connection with this contested matter.  In fact, the record

21    speaks for itself, this is not only an objectively fair

22    price, it's a price being paid by the only identifiable

23    purchaser in a position to make the payment.

24            As to timing, a question that the Court

25    independently interjected into this discussion, now is as

Page 66

1    good a time as any, and it is difficult for Elliott in

2    particular to be pressing for a liquidation of all assets

3    held by the trustee in order to facilitate a distribution on

4    the one hand and to be opposing the terms of a private sale

5    on the other.

6              For the reasons expressed, the transaction is

7    approved.  I just need an order.

8              MR. LEE:  Thank you, Your Honor.

9              MR. HEIMAN:  Thank you, Your Honor.

10             MR. KOBAK:  Your Honor, the next matter and the

11   final matter on our calendar today is the Elliott motion

12   with respect to distribution, which is, I believe,

13   Mr. Duffy's motion.

14             MR. DUFFY:  Your Honor, my partner, Mr. Glen will

15   be arguing this morning.

16             THE COURT:  Okay.

17             MR. GLEN:  Good morning, Your Honor.

18             For Elliott Management, Your Honor, Jeffrey Glen,

19   Anderson Kill.

20             The motion we're here on this morning, as the

21   Court has alluded to the previous argument, is to have the

22   Court determine that the method of distribution to allow

23   customers -- customer claims should be one that requires a

24   conversion of the cash and prompt distribution; and the key

25   to this is promptness and practicality.

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 87 of 90

Page 67

1              The statute that we're dealing with contemplates

2        prompt payments out to customers.  It's before four years.

3        I don't think anyone can take the position that promptness

4        is any longer a relevant consideration here.  So, the

5        question is what to do next, and the trustee's position

6        appears to be --

7              THE COURT:  I just have to interject.  Promptness

8        is still a relevant consideration here.  It is relevant that

9        the trustee engage in transactions and settlements that are

10       calculated to maximize the realization of customers in this

11       estate as promptly as practicable.  It's still a relevant

12       consideration.

13             MR. GLEN:  We agree with that, Your Honor.

14             But the statute, the SIPA statute is set up in a

15       way in which it contemplates what this Court and what the

16       trustee and what everybody did promptly in getting the

17       materials -- the customers to Barclays very swiftly.  That

18       is what was done well and it was done quickly, but what each

19       customer is entitled to is their net equity valued at the

20       time of the filing date and there's tension there.

21             Even if you were to hand out the customer accounts

22       the day after the filing date, there would have been some

23       market movement and that market movement would be in

24       contradiction to the measurement of the net equity at the

25       time -- as valued on the filing date.

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 68 of 90

Page 68

1          And that tension, Congress, by enacting SIPA,

2     determined that by moving the accounts of customers out of

3     the bankrupt broker to other brokers who could then allow

4     the customers to engage in their own decision to hold or to

5     sell superceded the definition as set out in statute of what

6     net equity is.

7          Now, in a matter of days or weeks or months,

8     there's no problem with.  One goal, the goal of customer

9     autonomy, and getting the customers back into the ability to

10    do what they wish with their own securities supercedes the

11    fluctuations that occur, both up and down, in the net equity

12    itself, but now we're four years later.

13         Over four years, the fluctuations have

14    overwhelmingly surpassed the issue of customer autonomy.

15         THE COURT:  Let me break in and just ask

16    something.  I don't mean to interfere with the flow of your

17    argument, but I've read all the papers, including the papers

18    in opposition to what your requesting, and those papers have

19    suggested that you've raised some good points, but this is

20    the wrong time to be deciding this motion.

21         The matter should be adjourned.  Certain parties

22    say it should be adjourned sine die.  Some parties say it

23    should be adjourned for 60 days.  Many parties acknowledge

24    that negotiations, sensitive negotiations, are currently and

25    actively being pursued between LB on the one hand and the

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 69 of 90

Page 69

1   trustee on the other, a negotiation that is material to the

2   development of a prompt from today's perspective resolution.

3           Why are we proceeding with your motion today and

4   why shouldn't I simply adjourn it now?

5           MR. GLEN:  I think that is the key question, Your

6   Honor.

7           Today is two and a half months after the filing of

8   this motion.  Was the motion properly filed back in the late

9   spring?  It was then three years and three quarters from the

10  time of the filing date.  At what point does a customer like

11  Elliott find itself entitled to say that we understand that

12  the trustee is acting in good faith.  We understand this is

13  the largest SIPA proceeding in the history of the world, but

14  it has been over three years and we have been held up.  We

15  have nothing back.  We don't have securities.  We don't have

16  cash.  We have no way to move -- a situation in which other

17  customers with allowed claims find themselves as well.

18          At some point Elliott decided we will bring this

19  to the Court to bring to a head the problem of how long does

20  promptness have to wait, and then two and a half months have

21  gone by, and the position is taken by the various Lehman

22  groups that you mentioned, none of them tell us what the

23  plan is.

24          Now, it may be because there are sensitive

25  negotiations going on -- we're not party to that -- but, at

Page 70

1   the end of the day, those negotiations result in, for

2   example, a mixture of the provision of specific securities

3   and cash, that has to be offered to everybody else.  At what

4   point can the everybody elses come before you, Your Honor,

5   and say, Not enough already -- that's not the right

6   analogy -- but it is time for this to be moved to a point

7   where we are no longer the necessarily inactive

8   participants.

9          So, the answer to your question, Your Honor, is

10   this motion could have been brought two years ago or it

11   could have been brought yesterday or it could be brought a

12   year from now.  We have no control.

13          THE COURT:  Yes, but the issue is not when you

14   bring the motion.  That's entirely up to your client's

15   impatience and the judgment of counsel.  The issue is when

16   should the Court adjudicate the motion?  The question is

17   given what I know, why is today a day -- is judgment day for

18   purposes of your motion, as opposed to 60 days from now or

19   90 days from now or 6 months from now to use your moving

20   target?

21          My point is it's not about the filing, but about

22   whether I should, as some parties have proposed, reserve

23   judgment.  In a sense, we're all here today, so I'm prepared

24   to hear what people have to say, but my inclination based

25   upon what I know is not to grant your motion today.

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 71 of 90

Page 71

1          MR. GLEN:  I understand the distinction Your Honor

2     is drawing between the right to unilaterally determine when

3     we bring this to the Court and the Court's obligation to

4     make its own determination as to what the fair on the

5     premise.

6          But over two and a half months happens to bring us

7     to the end of summer, which is a time that the trustee

8     proposed to the Court for its plan on how to turn the assets

9     into cash and make a distribution or make some other

10    distribution.

11         I am not saying that the trustee is not working

12    hard or that the trustee is not acting in good faith, and it

13    may very well be that things take longer than they otherwise

14    necessarily do, but what is a better way to sound the alarm

15    than to make the motion and have the Court then adjudicate

16    it.

17         The motion simply requires that the distributions

18    across the boards to the allowed claimants be in the form of

19    cash.  We do not know -- at least I do not know -- the

20    parameters of the negotiations that are going on, but I do

21    believe that as an accurate under both SIPA and the

22    bankruptcy law, that the methodology that results in the

23    distributions pursuant to the negotiations will have to be

24    followed for the other parties.  You can't treat people in

25    equally in that regard, and we have no input there.

Page 72

1          Now, were the Court to adjourn, as the Court

2     indicates its predilection may be at this point, I'm not

3     saying that the alarm will not be heard by the trustee.  We

4     are here.  They are here.  The position the Court has thus

5     far articulated is not to deny the motion on the merits, at

6     least at this point, but to adjourn it.

7          But what does adjourning get?  All it does is

8     allowed trustee to continue to engage in the negotiations,

9     whatever they may be, that have been going on for a very

10    long time.

11         Our motion simply says whatever those negotiations

12    are -- and this will not affect the dollar amount --

13    whatever those negotiations are, at the end of the day, what

14    the approved claimants will receive is dollar bills.

15         THE COURT:  Well, that's part of the problem.  The

16    cart that you have wheeled into the courtroom -- there's a

17    horse out there that actually should have come in here

18    first.  And so part of the problem is sequencing in the

19    exercise of sound business judgment, based upon information

20    that you and your client may know nothing about.

21         The parties that have responded to your client's

22    motion have in no way castigated Elliott for filing the

23    motion.  In fact, your sounding of the shofar at this season

24    with respect to the timing of distribution and the

25    methodology to be applied is very appropriate.

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 73

1           No one is saying that Elliott, just because

2    they're a claims trader as was said in the last motion,

3    doesn't have the right to be impatient.

4           I'm impatient.  I suspect that SIPC is impatient.

5    I suspect that every customer is impatient, and we're

6    talking about this, as I noted at the outset, on the fourth

7    anniversary of the file of the case.  There needs to be an

8    end to this.

9           But Elliott is not the only party in interest that

10   recognizes that.  Based upon everything I know, all parties

11   are committed in good faith to getting to some appropriate

12   conclusion as promptly as possible.

13          So, what we're talking about today is not whether

14   your motion makes sense, it may or may not make sense.  One

15   thing is clear to me:  I can't decide it today based upon

16   what you now know, and one of those data points came from

17   creditor's committee.

18          The committee filed a succinct statement of

19   recognizing some merit to the position being expressed by

20   Elliott, but at the same time, noted that this was not the

21   right time to decide the motion.  A similar petition was

22   advanced by the ad hoc committee, not surprisingly, because

23   they now work in the same law firm, but I also recognize

24   that they represent different constituencies.

25          The point to me, now, is since I'm inclined to, in

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 74 of 90

Page 74

1    effect, grant the request for adjournment, or

2    alternatively --

3            MR. GLEN:  Yes.

4            THE COURT:  -- if I don't adjourn it, so simply

5    reserve judgment, which is maybe worse than adjournment.  At

6    least adjournment is another date with destiny for marking

7    time.

8            I'd like to know why we have to press forward with

9    this today in your view.

10           MR. GLEN:  Well, Your Honor, we believe the Court

11   ought to press forward today for the reasons I've

12   articulated and which we've articulated in our brief.  I'm

13   not for a moment suggesting that the Court would be acting

14   in a misexercise of discretion.  To put the case off, the

15   Court's position, as stated, makes a lot of sense.

16           But, our position is to push as hard as we can.

17   If the Court believes that we are, say, at one extreme of a

18   continuum of persons of interest here, and that that is too

19   extreme a position for the Court to adopt today, then we

20   would ask the Court to establish the shortest possible

21   adjournment date.

22           THE COURT:  Okay.

23           MR. GLEN:  If the Court has no further questions?

24           THE COURT:  No, I think we've really touched on

25   what I think is the key to the present motion.

08-13555-mg   Doc 31158   Filed 09/20/12   Entered 10/01/12 16:00:32   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 75 of 90

Page 75

1           MR. GLEN:   Thank you.

2           THE COURT:   I can hear from everybody who wants to

3      be heard on this now, but understand that I have read every

4      submission.

5           MR. KOBAK:   James Kobak, Hughes Hubbard & Reed for

6      the trustee.

7           I think Your Honor has made your inclinations

8      clear, so I'll be very brief.  I think there's widespread

9      agreement as Your Honor noted by almost everybody, if not

10     everybody, other than Elliott and their counsel that now is

11     not the time for this motion, whatever its merits might be

12     and we do have thoughts about the merits.

13          We are in the midst of the discussions with

14     interests that will determine whether there's a possibility

15     of doing 100 percent or a very substantial distribution.  A

16     lot of resources are being devoted to this very complicated

17     and important effort, not only by the trustee, but by the

18     attorneys for LBIE and others.

19          We should not be distracted.  We should not be

20     hamstrung by some schedule.  We shouldn't be required to

21     adopt a one-size-fits-all fire sale method that's

22     inconsistent with the interests of many customers, who have

23     expressed a preference for a return of shares in kind.

24          I do want to make it clear that the trustee is

25     working on contingency plans for a partial distribution.  If

1    it does not appear shortly, the pending discussions will

2    bear fruit.  The trustee's goal is it's always been to make

3    distributions that make sense, whether partial or complete,

4    as soon as possible.

5          At the beginning of the case, as Your Honor noted,

6    we transferred 10s of thousands of customers and billions of

7    dollars of property to both Barclays and to Neuberger Berman

8    when that was feasible, but the clausen (ph) difficulties of

9    a partial distribution are substantial and very

10   disadvantageous to customers.

11         On the idea that cash -- everything ought to be

12   reduced to cash, I think that oversimplifies a lot of

13   problems.  There are a lot of customers who do not want to

14   receive cash; they want to receive their shares.  The

15   statute does say that it's the trustee's duty to return

16   property in kind to the maximum extent practicable in the

17   wording of the statute.  We don't contend that that doesn't

18   mean that the trustee has some degree of flexibility, but

19   clearly, there's a fiduciary duty to get property back in

20   kind to customers where that's possible.

21         A cash distribution involves very severe tax

22   consequences for people who face a forced liquidation in

23   effect of their sale of their securities and may have to pay

24   capital gains on it which can be a very severe penalty in

25   many cases.

1          It's also not simple to sell our portfolio.  We

2     have some 3500 QCIPs that we have had to hire BlackRock to

3     try to value.  They've so far valued 5 or 600 of those.

4     They're now in the process of determining how many of the

5     other 3,000 they're even able to price for us.

6          So, the idea that we have a portfolio that can be

7     quickly or easily sold or will achieve value if it's sold is

8     very simplified, but I think we will know in a fairly short

9     period of time whether we have a way forward to get people

10    close to 100 percent.  When we have that, if we have it in

11    place, we will come forward with a motion, a series of

12    motions in all probability that will detail exactly what our

13    plan for distribution is, what people will be receiving, how

14    we are proposed to go about it.  Elliott and everybody else

15    in this courtroom and every other customer in the case will

16    have an opportunity to be heard on that motion at that time.

17         But we emphatically think this is not the time to

18    be distracted from what we ought to be doing, which is

19    talking to LBIE, talking to LBHI, talking to the other

20    affiliates to see if we can get a substantial distribution

21    for everybody.

22         THE COURT:  I think that's a laudable goal and I

23    think you should have some more time to achieve it, but I

24    also think that to the extent that you can share it, it

25    would be constructive for parties who were observing this

Page 78

1   hearing to have some reasonable expectations as to when

2   these things foreseeably will occur.

3           Can you tell us anything more or is it simply not

4   possible to provide projections as to when this itch will be

5   scratched?

6           MR. KOBAK:  I think if Your Honor were -- and I

7   had actually suggested this to Elliott -- if Your Honor were

8   to adjourn the motion for 60 days, I certainly think by that

9   time we would know whether we had an alternate deal or not;

10  and if not, we would have started devoting even more time to

11  contingency planning as to how we would do a partial

12  distribution.

13          THE COURT:  All right.  Thank you.

14          MR. CAPUTO:  Good morning, Your Honor.

15          Kenneth Caputo, on behalf of the Securities

16  Investor Protection Corporation.

17          I will confine my remarks, Your Honor, to the

18  inclined ruling of the Court to put this matter over.  I

19  second the statements by Mr. Kobak on behalf of the trustee

20  that a 60-day time period does seem appropriate.

21          I did want to state on the record that for all of

22  the parties attending here today and maybe listening on the

23  phone, SIPC is committed to this process and is engaged in

24  the process in many ways.  I, personally, am involved.  My

25  team back in Washington spends considerable amount of time

LEHMAN BROTHERS HOLDINGS, INC.; ET AL.

1    on the matter.

2           SIPC is substantially committed as an enterprise

3    to getting this matter moved forward to a resolution.  I'll

4    reserve argument on the merits of the Elliott motion for a

5    date when it is adjourned to, but I didn't want to state

6    affirmatively on the record that even Kenneth Caputo hears

7    the shofar and SIPC hears the shofar.

8           THE COURT:  Now, that's a major statement.

9        (Laughter)

10          MR. GRAULICH:  Good morning, Your Honor.

11          Timothy Graulich of Davis Polk & Wardwell for the

12   joint administrators of Lehman Brothers International

13   Europe, and, I, too, will greatly truncate my comments this

14   morning in light of Your Honor's preliminary views.

15          One thing that I did want to put on the record is

16   the word "impatient."  We've heard from Elliott's counsel

17   that there is a degree of impatience.  I'm sure the trustee

18   is impatient.  I can represent on the record that LBIE is

19   impatient.

20          THE COURT:  I already said that I was.

21          MR. GRAULICH:  Yeah, and Your Honor -- so, we

22   share the impatience.

23          We're impatient, not just in our own capacity, but

24   in the fiduciary capacity for our hundreds of customers, who

25   already have an 8 billion plus allowed customer claim that

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 80 of 90

Page 80

1    we need to find a solution to the distribution issues in

2    order to facilitate distributions to -- on our claim and the

3    other allowed claims.  So, we share the impatience.

4            But that being said, this motion does alight upon

5    the very issues that we are discussing with the trustee,

6    with respect to a global settlement of the LBIE issues,

7    which involve among other things, not surprisingly, the

8    method of distribution on allowed customer claims.

9            So, therefore, going forward today would, in fact,

10   not only potentially interfere with those discussions, I

11   would like to actually note that this motion today is

12   actually interfering with discussions.  There are a few

13   folks in the gallery today with British accents that would

14   rather be next door with Mr. Kobak and myself actually

15   negotiating a settlement, as opposed to listening to the

16   motions today.

17           Our clients have been in this week for very

18   important meetings with the trustee trying to advance the

19   ball, and as soon as this hearing is over, we're going to

20   retreat back to Hughes Hubbard's offices to continue those

21   discussions.

22           So, this is not -- I just want to make it clear

23   for everybody, including Your Honor, that all available

24   capacities being dedicated to try and move this process

25   forward as expeditiously as possible.  In fact, I'm sure

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 81 of 90

Page 81

1    that the 60-day period that was referred to by Mr. Kobak

2    does not suggest that the trustee thinks that it will take

3    60 more days to figure out whether or not they will come to

4    an agreement with LBIE.

5            I can assure the Court that we will not be -- we

6    do not envision that it would take 60 days to figure out if

7    there's going to be a deal or not.  The very much -- the

8    expectation is this week in particular, the progress that we

9    can make this week and sort of feedback that we get from the

10    trustee even later today about certain particular points, I

11    think, will go a long way to demonstrate whether or not we

12    can reach a resolution of the LBIE issues.

13            So, while it may be appropriate to have this

14    hearing adjourned for 60 days, I did not any suggestion to

15    think that we think that there's going to be another 60-day

16    process of trying to get to an agreement.  I think that

17    process is measured in days or perhaps weeks, but certainly

18    not months, because as Mr. Kobak suggests -- and this is

19    true for LBIE as well -- if we can't reach an agreement,

20    we're each going to have to think of contingency planning on

21    how to best administer our respective estates if there can't

22    be a resolution.

23            So, we're cautiously optimistic.  We're working

24    hard, but there are certainly issues that separate us and

25    the meetings this week will go a long way to determining

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 82 of 90

Page 82

1    whether or not we can, in fact, reach our mutual goal of

2    getting to a deal.

3         THE COURT:  Fine.  We should get you back to those

4    meetings as promptly as possible.

5         MR. GRAULICH:  Thank you, Your Honor.

6         MR. KRASNOW:  Your Honor, Richard Krasnow, Weil,

7    Gotshal & Manges, on behalf of LBHI and its affiliated

8    controlled debtors.

9         THE COURT:  Didn't you retire?

10        MR. KRASNOW:  Obviously, it was semi-retirement.

11   I advised the Court at the last hearing that I was reminded

12   of that movie the Godfather.  I certainly do not want to

13   analogize this situation to the Corleones, but I am still

14   involved.

15        THE COURT:  Okay.  Well, good to see you.

16        MR. KRASNOW:  Your Honor, a couple of

17   observations.

18        We do think that the concepts that were outlined

19   in the Elliott motion are interesting in terms of the format

20   of distributions.  We believe that there will be

21   complexities involved no matter what the considerations will

22   be, and we do note, Your Honor, in reading the papers that

23   were filed, both by the trustee and SIPC, that while there's

24   certainly differences to the word "must" and the word "may,"

25   we read the positions that were being taken by both the

08-13555-mg    Doc 31158    Filed 09/20/12    Entered 10/01/12 16:00:32    Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 83 of 90

Page 83

1    trustee and SPIC as meaning that there is flexibility, and

2    indeed, when one can look at the proper context within which

3    the decision will be made, at least initially by the trustee

4    as to how to satisfy customer claims, that indeed cash will

5    be amongst the things that the trustee will be considering

6    in the context of satisfying customer claims as they relate

7    to securities.

8              But we, with others, believe that now is not the

9    time to make that determination.  It must be made in the

10   right context and it is a theme that we have certainly

11   stated any number of times including with respect to the

12   allocation motion, that in order to determine what is to be

13   distributed, you really must have a better sense of what

14   those customer claims are and the most significant customer

15   claims, at least, that have been asserted after ours -- in

16   fact, ahead of ours -- are those that have been asserted by

17   LBIE.

18             So, we concur that now is not the time to decide

19   the issue.  Now is not the time for the trustee to make the

20   determination as to how she -- he should exercise his

21   discretion subject to Your Honor's approval and that this

22   matter should be put over.

23             In that regard, however, having dates, we believe,

24   is helpful, and while we concur that this matter should be

25   put over, picking up on the observation that was just made

1   by LBIE's counsel, perhaps it would be helpful for a shorter

2   adjournment so that the Court might be in a position to hear

3   a status report as to the fundamental issues as to where

4   things stand on the settlement negotiations, and if things

5   are closer to resolution or that have been resolved, perhaps

6   even in principle, at least to hear that.

7            And so we would suggest that while this matter

8   ought to be deferred, perhaps for reporting purposes,

9   something shorter than 60 days might be appropriate.

10           Thank you, Your Honor.

11           THE COURT:  Okay.  Thank you, Mr. Krasnow.

12           MR. DUNNE:  Good morning, Your Honor.

13           Dennis Dunne, for the official creditors

14   committee.

15           I'll be brief.  I'm not going to parrot all the

16   remarks, I just want to make two observations.  One, on the

17   merits, I don't think there's a lot of dispute at the end of

18   the day, meaning under SIPA, I think that everybody

19   recognizes there's a strong presumption in favor of in-kind

20   distributions.  It's not irrebuttable.  It's not a

21   categorical rule that applies across all assets and across

22   all time.  They also have a duty to maximize value for their

23   creditors.

24           Behind that presumption of in-kind distributions

25   rests the policy of fostering smooth functioning of the

08-13555-mg   Doc 31158   Filed 09/20/12   Entered 10/01/12 16:00:32   Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 85 of 90

Page 85

1    capital markets by getting those assets up and out of a

2    stockbroker's liquidating estate within a relatively short

3    time from the commencement of a case.  It's always just

4    allowing investors to proceed with their economic lives.

5              At this point in the case, four years to the day,

6    so long ago, I think we actually were debating how to

7    reference the case.  In the first few days, I recall an SIPC

8    reference until we all finally landed on SIPC as the correct

9    -- or more convenient, at least, pronunciation.

10             I think the markets have moved on and the

11   remaining investors have been forced to kind of rejigger

12   their economic lives without the receipt of these

13   securities.  So, I think that the unassailable point, and I

14   think the trustee recognizes, is that at this point in time,

15   they have more flexibility to monetize some of their

16   positions and distribute cash than they did earlier in the

17   case.

18             So, while the creditors committee believes that

19   Elliott may be correct on the law, that doesn't require the

20   trustee to actually monetize those assets, but it's one of

21   the weapons they have in their arsenal as to facility

22   distributions.

23             But there's also no magic to now, and there is a

24   risk to now.

25             We've heard what those risks are.  We're at a

1    sensitive period of time in the negotiations with LBIE, so

2    we concur, and I think what you hear is the collective

3    judgment of the parties speaking X Elliott, that there

4    should be an adjournment.  We had proposed 60 days.  We

5    think that that is reasonable.

6           Thank you, Your Honor.

7           THE COURT:  Okay.

8           Do you have anything further to add?

9           MR. GLEN:  Nothing further, Your Honor.

10          THE COURT:  Fine.

11          I think that there is a clear consensus to adjourn

12   the hearing without getting into the merits of the position

13   expressed by Elliott in its motion or the defense has raised

14   by the SIPA trustee and SIPC in response to the motion.

15          It is clear to the Court that this is perhaps the

16   worst day for us to be deciding this motion, given the

17   statements made by counsel for LBIE, that parties are

18   actually poised to continue extensive negotiations that may

19   materially facilitate the resolution of the largest claim in

20   the estate, and, thereby, facilitate decisions by the

21   trustee that will lead to, from the perspective of today, a

22   prompt distribution.

23          And so, I'm going to adjourn in for approximately

24   60 days, but I am also going to ask that this be scheduled

25   for, simply, a status conference at willfully the midpoint

1    between today and 60 days out.  I don't have the calendar in

2    mind for when dates have already been reserved, but you'll

3    know just by checking your own calendars.

4              And with that, we're adjourned.

5              UNIDENTIFIED MALE SPEAKER:  Thank You, Your Honor.

6              UNIDENTIFIED MALE SPEAKER:  Thank You, Your Honor.

7

8              (Whereupon these proceedings were concluded at

9    12:04 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **I N D E X**

2

3     RULINGS                                    Page    Line

4     Application of the Ad Hoc Group of Lehman    16      21

5     Brothers Creditors for Compensation for

6     Professional Services Rendered by, and

7     Reimbursement of Actual and Necessary

8     Expenses of, Its Professionals Pursuant to

9     Section 503(b) of the Bankruptcy Code

10    Rendered by, and Reimbursement of Actual

11    and Necessary Expenses of, Its Professionals

12    Pursuant to Section 503(b) of the Bankruptcy

13    Code [ECF No. 29195]

14

15    Application of the Ad Hoc Group of Holders    26       1

16    of Notes Issued by Lehman Brothers Treasury

17    Co. B.V. and Guaranteed by Lehman Brothers

18    Holdings, Inc., Pursuant to 11 U.S.C. § 503(b)

19    for Allowance of Administrative Expenses for

20    Counsel's Services Incurred in Making A

21    Substantial Contribution in These Chapter 11

22    Cases [ECF No. 29222]

23

24

25

Page 89

| | RULINGS | Page | Line |
|---|---|---|---|
| 1 | RULINGS | Page | Line |
| 2 | Application of Goldman Sachs Bank USA and | 29 | 20 |
| 3 | Goldman Sachs International for Entry of an | | |
| 4 | Order Pursuant to 11 U.S.C. § 503(b)(3)(D) | | |
| 5 | and 503(b)(4) for Allowance and Reimbursement | | |
| 6 | of Reasonable Professional Fees in Making a | | |
| 7 | Substantial Contribution in These Cases | | |
| 8 | [ECF No. 29240] | | |
| 9 | | | |
| 10 | Trustee's Motion for Authorization to Sell | 64 | 23 |
| 11 | Shares of Navigator Holdings, Ltd., and | | |
| 12 | Related Relief [LBI ECF No. 5220] | | |
| 13 | | | |
| 14 | | | |
| 15 | Motion of Elliott Management Corporation | 87 | 3 |
| 16 | For an Order, Pursuant to | | |
| 17 | 15U.S.C. § 78fff-1(B), 78fff-2(B) and | | |
| 18 | 78fff-2(C)(1) and 11 U.S.C. § 105(A),(I) | | |
| 19 | Determining the Method of Distribution | | |
| 20 | on Customer Claims and (II) Directing an | | |
| 21 | Initial Distribution on Allowed Customer | | |
| 22 | Claims [LBI ECF No. 5129] | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

1             C E R T I F I C A T I O N

2

3    I, William J. Garling, certify that the foregoing transcript

4    is a true and accurate record of the proceedings.

5

6

7    WILLIAM     Digitally signed by William
              Garling
8    Garling   DN: cn=William Garling, o, ou,
              email=digital1@veritext.com,
9              c=US
              Date: 2012.09.20 15:41:02 -04'00'

10

Veritext

11

200 Old Country Road

12

Suite 580

13

Mineola, NY 11501

14

Date:  September 20, 2012

15

16

17

18

19

20

21

22

23

24

25