Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555 (JMP)

4    - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    LEHMAN BROTHERS HOLDINGS, INC., et al.

7              Debtors.

8    - - - - - - - - - - - - - - - - - - - - -x

9

10

11

12                   U.S. Bankruptcy Court

13                   One Bowling Green

14                   New York, New York

15

16                   September 27, 2012

17                   10:03 AM

18

19

20

21   B E F O R E:

22   HON. JAMES M. PECK

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  TIFFANY

Page 2

1    HEARING re One Hundred Forty-Third Omnibus Objection to

2    Claims (Late-Filed Claims)[ECF No. 16856]

3

4    HEARING re Three Hundred Twenty-Ninth Omnibus Objection to

5    Claims (Misclassified Claims)[ECF No. 29324]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sheila Orms

Page 3

1    A P P E A R A N C E S :

2

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Lehman Brothers Holdings, Inc.

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:   MARK I. BERNSTEIN, ESQ.

9         MAURICE HORWITZ, ESQ.

10

11   DWYER & WING, PC

12        Attorneys for Kuykendall

13        1503 Brady Street

14        Davenport, IA  52801

15

16   BY:   STEPHEN WING, ESQ. (TELEPHONICALLY)

17

18   ALSO APPEARING:

19   KAREN SIMON KREIGER, PRO SE

20   MR. BOWMANS, DEMINOR (TELEPHONICALLY)

21

22

23

24

25

Page 4

1   TELEPHONE APPEARANCES:

2

3   ANATOLY BUSHLER, FARALLON CAPITAL MANAGEMENT

4   MICHAEL NEWMEISTER, STUTMAN, TREISTER & GLATT, FOR ELLIOTT

5   TEL LEV-ARI, PRO SE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

08-13555-mg    Doc 31259    Filed 09/28/12    Entered 10/09/12 14:44:38    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 5 of 49

Page 5

1                    P R O C E E D I N G S

2              THE COURT:  Be seated, please.

3              MR. HORWITZ:  Good morning, Your Honor, Maurice

4    Horwitz, Weil Gotshal & Manges on behalf of Lehman Brothers

5    Holdings, Inc. as plan administrator.

6              The first item on today's agenda is a carryover

7    from the 143rd omnibus objection to claims, which sought to

8    disallow certain claims on the grounds that they were filed

9    after the bar date in violation of the bar date order in

10   these cases.

11             Today LBHI is proceeding as to seven claims on the

12   143rd objection.  All seven of these claims, which are based

13   on Lehman program securities were filed on February 4th,

14   2010.  That's approximately three months after the bar date

15   applicable to Lehman program securities, which was November

16   2nd, 2009.

17             Nine were responses were filed in connection with

18   these claims, and the plan administrator filed an omnibus

19   reply to these responses this past Monday, that's ECF No.

20   31068.

21             I should correct one thing misstated in the reply,

22   which is that we state that the claimants do not plead

23   excusable neglect citing Pioneer.  In fact, seven of the

24   responses do cite to Pioneer, and provide a reason for the

25   delay in their response.

08-13555-mg    Doc 31259    Filed 09/28/12    Entered 10/09/12 14:44:38    Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 6 of 49

Page 6

1           The plan administrator in evaluating each of the

2    responses has considered based upon the reasons given in all

3    nine responses, whether the claimants would be able to

4    satisfy the rigorous standard of excusable neglect in the

5    Second Circuit.  Having reviewed the responses, the plan

6    administrator has concluded that the claimants do not

7    satisfy the standard for excusable neglect, and that the

8    claims should be expunged.

9           As this Court is aware, in Pioneer, the U.S.

10   Supreme Court held that the determination of whether neglect

11   is excusable is an equitable one, and that Courts should

12   consider four factors in making this determination.  One,

13   the prejudice to the debtors; two, the length of the delay

14   and its potential impact on judicial proceedings; three, the

15   reason for the delay, including whether it was within the

16   reasonable control of the claimant; and four, whether the

17   claimant acted in good faith.

18           Significantly, the Second Circuit does not give

19   equal weight to all four factors.  The third factor, the

20   reason for the delay is the most important.  And the

21   determination will typically turn on the reason for the

22   delay.

23           The nine responses that were filed all point to the

24   same reason for the delay, which is a breakdown in

25   communication between the claimants, their banks, and their

Page 7

1    purported advisor, an entity called Deminor International

2    which filed seven responses on behalf of each of the

3    claimants.   In these responses, Deminor states that the

4    claims were late because the bank thought that the claimant

5    would file the claim, whereas the claimant thought that the

6    bank would file the claim.

7         Two of the claimants also filed their own

8    responses, Francois Bernier and Claude Fitvoye.   These

9    responses are somewhat difficult to follow.   One is actually

10   handwritten in French.   Both appear to confirm that there

11   was indeed a fatal breakdown of communication among these

12   parties.

13        Both claimants state that they obtained blocking

14   numbers and any other necessary documentation, such as

15   powers of attorney, and forwarded these documents to

16   Deminor, authorizing Deminor to file the claims on their

17   behalf.

18        It therefore appears that these two claimants did

19   not think that their bank would file their claims, but

20   rather that Deminor was going to file the claims.   In fact,

21   in the case of Mr. Fitvoye he attaches a letter from

22   Citibank dated October 15th, 2009, which confirms with him

23   his preference for Citibank to file a claim on his behalf,

24   and stating that he or a third party would be responsible

25   for the filing.

08-13555-mg    Doc 31259    Filed 09/28/12    Entered 10/09/12 14:44:38    Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 8 of 49

Page 8

1          Your Honor, the miscommunication among these

2     parties is the only reason offered to explain why the claims

3     were filed nearly three months after the applicable bar

4     date.  Neither the claimants, nor their purported adviser

5     argue that any other Pioneer factors weigh in their favor.

6     They do not allege confusion or lack of notice regarding the

7     application of the bar date to their claims.  And they

8     apparently knew to follow the procedures to obtain blocking

9     numbers for the claims, as required by the bar date order.

10    Nevertheless, the proofs of claims were -- the proofs of

11    claim were not filed until February of 2010.

12          Any one of the claimants, their banks or their

13    advisors could have filed proofs of claim on behalf of the

14    claimants.  The debtors recognized that the issuance of

15    Lehman program securities involves a number of different

16    parties from account holders, to holders, to clearing

17    agencies, and so on.  And for this reason, the bar date

18    order provides that claims based on Lehman program

19    securities shall not be disallowed on the ground that such

20    claims were not filed by the proper party or an authorized

21    agent.

22          Despite this, the proofs of claim were not received

23    on or before the applicable bar date is required by the bar

24    date order.  Indeed, according to Deminor, and as it states

25    in its response, it was not until January of 2010 that the

08-13555-mg    Doc 31259    Filed 09/28/12    Entered 10/09/12 14:44:38    Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 9 of 49

Page 9

1   claimants even realized that the proofs of claim had never

2   been filed.

3          The claimants failure to communicate with their

4   advisors and their failure to follow-up and ensure that the

5   proofs of claim had been timely filed is a factor entirely

6   within the reasonable control of the claimants, and does not

7   alone support a finding of excusable neglect.

8          As noted in LBHI's reply, this Court has previously

9   considered this very type of miscommunication, in which

10  claimant's advisors and other parties involved in the

11  ownership of Lehman program securities failed to agree or

12  communicate effectively among themselves as to who would

13  file a guarantee claim against LBHI.

14         In a reported decision cited in our papers, this

15  Court found that such miscommunication, carelessness, or

16  inattention to detail, or in -- pardon me, inattention to

17  the guarantee claim was entirely within the control of the

18  claimant and its advisors, and did not establish excusable

19  neglect.

20         Here, Your Honor, the plan administrator submits

21  that the Court should follow its prior decision and find

22  that in these circumstances as well, the claimants have not

23  made a sufficient showing for a finding of excusable

24  neglect.  Accordingly, unless the Court has any questions,

25  the plan administrator respectfully requests that the 143rd

1    omnibus objection to claims be granted with respect to the

2    claims listed on Exhibit B of LBHI's reply.

3        THE COURT:  It's a very complete and compelling

4    argument, but I do have a few questions for you.

5        One frankly relates to whether there can ever be a

6    case of excusable neglect under these circumstances.  What

7    should or could the claimants have done under these

8    circumstances, given the fact that there was a dropped ball,

9    a failure to file, but an intention to file, compliance with

10   the blocking number requirements, and general reliance upon

11   others to do what, I suppose the claimants assumed would be

12   done without having clarified exactly who would do it.

13       What could a claimant do in order to satisfy the

14   Pioneer standards?  Have you thought about that?  Because

15   one of the things that bothers me is that this is almost a

16   per se problem, the failure to file timely appears not to

17   have any excuse, forget excusable neglect.

18       MR. HORWITZ:  Your Honor, one thing that I have

19   considered and I think sort of eluded to in saying what the

20   bar date order -- that the bar date order provides, that the

21   debtors wouldn't object, or that the claim wouldn't be

22   disallowed on the grounds that the wrong party filed the

23   claim.

24       The claimants could have themselves filed proofs of

25   claim and instructed everybody to file a proof of claim on

08-13555-mg   Doc 31259   Filed 09/28/12   Entered 10/09/12 14:44:38   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 11 of 49

Page 11

 1    their behalf, so that at least somebody would have indicated

 2    the claimant's intention to hold LBHI liable for a guarantee

 3    issued in respect to the securities that they held.  They

 4    could have done that and didn't.  That is one thing that

 5    they could have done.

 6            THE COURT:  Is it your position that if they had

 7    acted more promptly that would've been some indication that

 8    they were more diligently pursuing their rights?  Is the

 9    fact that there's a uniform three month delay here a factor

10    to be considered?

11            MR. HORWITZ:  I think it's a factor to be

12    considered in demonstrating the opposite, just their failure

13    to -- their inattention to detail with respect to these

14    claims.  I don't think that if they had acted promptly and

15    managed to file the claims a week later that the claims

16    would be anymore timely than they are now.

17            THE COURT:  I recognize that they're not timely.

18    But let's just -- I'm trying to explore with you how to most

19    properly draw a line that does allow for excusable neglect

20    when a good reason has been shown for it.  And to see if

21    there is any reason, other than the one you've identified

22    which is filing multiple claims, to grant relief in a case

23    of a late filed claim based upon Lehman program securities.

24            Is it your position that this is an absolute date

25    which if missed is not subject to any reasonable excuse?

08-13555-mg    Doc 31259    Filed 09/28/12    Entered 10/09/12 14:44:38    Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 12 of 49

Page 12

1          MR. HORWITZ:  The -- any claimant is free to assert

2      that it is -- that excusable neglect is present, but I

3      hesitate to provide claimants whose claims have yet to be

4      scheduled for hearing with options to -- for them to assert

5      that perhaps they haven't thought of, for why their claims

6      should be allowed.

7              This Court has previously allowed, I believe, has

8      allowed claims recognizing that in some circumstances it's

9      possible for a claimant not to have known whether the

10     provisions of the bar date order applied to their claims,

11     and that the November 2nd bar date applied to their claims

12     as opposed to the October bar date.

13             But in these circumstances, the problem is that

14     it's clear from the response as filed that the claimants had

15     absolutely no confusion about the application of the bar

16     date order.  They understood it very well.

17             You know, if they failed -- if everybody failed --

18     dropped the ball, it was not just one ball, everybody had

19     the opportunity to file a claim, if nobody did anything,

20     it's really difficult for the debtors to have any sympathy

21     for this -- for these circumstances.

22             THE COURT:  I guess the question comes down to

23     this.  Is it excusable neglect for a party that wants very

24     much to comply with the bar date not to have provided clear

25     and unambiguous instructions to one party or another to file

Page 13

1    the claim on time?

2           MR. HORWITZ:  That would.  I don't think that would

3    lead to a finding of excusable neglect that the party didn't

4    give clear instructions to their agent.  I mean, it was

5    really -- it's really the responsibility of the claimant.  I

6    think it really goes to what -- I mean, what is the claimant

7    responsible for, either to file the claim or to clearly

8    instruct any authorized agent to file the claim on their

9    behalf.

10          THE COURT:  See, we've had situations in the past

11   involving employees within the same global organization who

12   assumed that one or the other was going to be responsible

13   for the filing of a proof of claim, and I found that that

14   was not, based upon the facts presented, sufficient for

15   excusable neglect.

16          One of the things that may distinguish this, and

17   I'm just exploring it with you, is that in each instance

18   we're dealing with individual securities holders, all

19   located outside the United States, all seeking to comply

20   with what I'll describe as unconventional provisions in

21   reference to a proof of claim because they involve the need

22   to get a blocking number to deal with claims arising under

23   Lehman program securities, a unique kind of investment.  And

24   they actually took steps to file the claim through agents.

25   And then didn't do more until it was too late.

1          And I'm wondering if you're able to give me more

2     comfort that I currently have that, in fact, my prior

3     rulings apply to this situation, and should be applied to

4     this situation.  That's part one of my question.

5          Part two of my question is whether it would truly

6     prejudice Lehman and its estate during this phase of the

7     bankruptcy for these individuals to be found to have

8     actually complied with the excusable neglect standard,

9     because they did up to the point of the filing date

10    everything they believed necessary to comply.

11         MR. HORWITZ:  Just answer the -- I'll take the

12    questions in order.  One thing I'll point out is that, this

13    is actually something that Deminor points out in their

14    response, I haven't verified this, but they state that they

15    did file -- they managed to file proofs of claim on behalf

16    of all their other clients.  And I don't believe this is the

17    only example of Lehman program securities being filed on

18    behalf of claimants by either an advisor or bank.  That is

19    to say, if every other or most other claimants or holders of

20    Lehman program securities were able to effectively

21    communicate among themselves and their advisors and file

22    timely claims, that to me is an indication that it's

23    something within the realm of possibility.  Well within the

24    realm of possibility for most holders of these securities.

25         I don't think that the claimants who did file

08-13555-mg    Doc 31259    Filed 09/28/12    Entered 10/09/12 14:44:38    Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 15 of 49

Page 15

 1    timely claims are anymore sophisticated, or at least any --

 2    most of them are probably about the same level of

 3    sophistication as these claimants.

 4         THE COURT:  We haven't really touched on this and

 5    before you get to the prejudice question, I want to ask you

 6    this delicate question.  Is this a situation of potential

 7    advisor malpractice?

 8         MR. HORWITZ:  That is, I will say -- just to

 9    preface my answer, I don't really know the relationship

10    between Deminor and the claimants other than what Deminor

11    states in its papers.  I don't know under what law that

12    relationship has been memorialized, if it has been

13    memorialized.  I note that Deminor is located in Brussels.

14    These claimants are located throughout Europe, so I wouldn't

15    know just under what rules would apply to the relationship

16    between Deminor and the claimants.  If --

17         THE COURT:  I agree with you, I have no idea.

18         MR. HORWITZ:  If this were -- if these were my

19    clients, that might be a different question, and it would be

20    something I'd be concerned about as an attorney, but I just

21    don't know what rules apply to Deminor.

22         THE COURT:  All right.  Now, let's go to the

23    question of prejudice to Lehman, an entity which has just

24    announced the distribution of another 10 plus billion

25    dollars to creditors, and it has in the past distributed

08-13555-mg   Doc 31259   Filed 09/28/12   Entered 10/09/12 14:44:38   Main Document
Pg 16 of 49
LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 16

1   some 22 and a half billion dollars.  So we're talking about

2   a distribution scheme that's well under way.  How does

3   allowing these claims impact a 65 billion dollar plus

4   estate?

5           MR. HORWITZ:  Your Honor, the prejudice element is,

6   I think I've stated before, it applies not only to the

7   debtors but other creditors.  There are other creditors

8   whose claims have been expunged already for this very

9   reason.  Either because they didn't respond to an objection,

10  or if they did, I mean, there's at least one whose claim was

11  expunged in a reported decision.  That reported decision now

12  has given notice to everyone else that's a creditor in these

13  cases that they shouldn't bother to try to file a late claim

14  on the grounds that they realized they miscommunicated with

15  their advisors.

16          I don't know specifically how many claims, late

17  claims remain that would -- where the circumstances would be

18  the same as these, but I do know there are a few still set

19  -- yet to be set for hearing where claimants have said there

20  was a miscommunication among the advisor and the claimant

21  and the bank.

22          In addition, claimants continue to file late

23  claims.  We continue to file objections to claims that are

24  filed three years after the bar date, four years after the

25  bar date.  And I have -- and we don't know how many

08-13555-mg   Doc 31259   Filed 09/28/12   Entered 10/09/12 14:44:38   Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 17 of 49

Page 17

1    claimants who are out there that might see a decision

2    entered allowing these claims because this was found to be

3    an excusable neglect and might decide that it's time for

4    their claims to be considered for the same reasons.

5            Because I can't quantify that, I can't say exactly

6    what the prejudice would be, but that would impact -- it

7    could impact, at least the administration of the claims in

8    these cases, which continues to be -- it's a work in

9    progress that will take a long time to complete.

10           As far as late claims just in general, there are

11   still over $200 million worth of asserted claims filed by

12   claimants who filed their claims after the bar date and have

13   yet to be set for hearing.  We're going through them one-by-

14   one and considering each response very carefully, and

15   ensuring that we can set them for hearing on dates that

16   claimants say that they'll be able to attend.

17           So a decision like this could impact any one of

18   those claims, just because in each one, there's a -- some

19   variation of I was confused, or I, you know -- and some of

20   them may involve attorneys who didn't file claims on time.

21   So it would give people a hook that the debtors certainly

22   haven't anticipated it after the reported decision that

23   found these circumstances not to be excusable neglect.

24           THE COURT:  Okay.  And one more question --

25           UNIDENTIFIED:  (indiscernible) was any of the

08-13555-mg    Doc 31259    Filed 09/28/12    Entered 10/09/12 14:44:38    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 18 of 49

Page 18

```
 1    payments have (indiscernible) respond?

 2              THE COURT:  You're going to have to identify

 3    yourself.  I didn't even realize that somebody was --

 4              MS. ARI:  Apologies.  My name is Tel Lev Ari.  I'm

 5    claim number 65858 (indiscernible) so I'm not even sure

 6    (indiscernible) my claim, but I'm one of the claimants that

 7    (indiscernible).

 8              THE COURT:  I'm -- is this a claimant that's on the

 9    list?

10              MR. HORWITZ:  This claim has not been set for

11    hearing today.

12              MS. ARI:  Oh (indiscernible) this is why I'm

13    calling.

14              THE COURT:  Where are you located?

15              MS. ARI:  I'm located in the UK which is why

16    (indiscernible) saying that the hearing is scheduled for

17    today.

18              THE COURT:  Well, I don't know when your claim is

19    scheduled for hearing, but it's not on the notice of matters

20    to be heard this morning.  So --

21              MS. ARI:  Okay.

22              THE COURT:  -- I'm looking at the behavior of the

23    lawyers who are representing Lehman, I can tell that they're

24    confused as to why you're on the line right now.  I know

25    that I am.  So nothing is going to happen that will affect
```

Page 19

1   your claim today, because I'm not deciding any issues with

2   respect to it, and I haven't prepared to do that.  I don't

3   know the facts of your claim.

4            MS. ARI:  Okay.  So (indiscernible).

5            THE COURT:  So --

6            MS. ARI:  (indiscernible) my hearing?

7            THE COURT:  Well, my suggestion is that you contact

8   counsel for Lehman at Weil Gotshal & Manges and try to find

9   out the status of your claim and when it's going to be

10  scheduled for further hearing.  But you're certainly welcome

11  to continue to listen, but I'm not going to be deciding any

12  issues that relate to you today.

13           MS. ARI:  Okay.  No, I appreciate (indiscernible)

14  but thank you, and I will be (indiscernible).

15           THE COURT:  Okay.  Thank you.

16           MR. BOWMANS:  Hello, Your Honor.  (indiscernible)

17  on the line on behalf of Deminor.

18           THE COURT:  That's fine.  I'm going to give you an

19  opportunity to speak in just a moment.

20           MR. BOWMANS:  Thank you very much.

21           THE COURT:  I wanted to ask one more question of

22  Mr. Horowitz before turning this over to you or to any other

23  claimant or claimant representative who wishes to be heard

24  on this issue.  And that is, I read the handwritten petition

25  that was in French, and I couldn't understand it, and didn't

Page 20

1    have a translation for it.  Have you had it translated?  Do

2    you know what it says?

3              MR. HORWITZ:  I do know what it says.  I can --

4              THE COURT:  Can you give me the substance of it as

5    best you can --

6              MR. HORWITZ:  Yes.

7              THE COURT:  -- recognizing that I don't accept it

8    as anything other than your best attempt to paraphrase the

9    meaning.

10             MR. HORWITZ:  This is the response of Claude

11   Fitvoye.  He says that he obtained -- he says that his bank

12   obtained a settlement for him for a certain amount, but that

13   it was not satisfactory to him, that he thinks he deserves

14   more.  He took the steps necessary to obtain a blocking

15   number and forwarded this information to Deminor.  He states

16   that he was -- happened to be out of town during the week

17   that he -- that I guess it was Citibank sent him a letter

18   with the blocking number, so he wasn't able to forward it to

19   Deminor in time for Deminor to file the claim on his behalf.

20   That's basically the substance of his response.

21             The one thing that I found confusing about this is

22   that despite -- yet he said he forwarded this information to

23   Deminor a few days after the bar date past, in fact, I think

24   the day after, because the day before was a holiday.  But

25   the claims were still not filed until February 4th, 2010,

08-13555-mg    Doc 31259    Filed 09/28/12    Entered 10/09/12 14:44:38    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 21 of 49

Page 21

 1    his claim still not filed until February 4th, 2010.

 2           I don't know based on his response or Deminor's

 3    response what transpired between that date and the date that

 4    the claims were actually filed.  Deminor on behalf of Mr.

 5    Fitvoye also says that it was not until January 2010 that

 6    the claimants realized that the claims had not been filed

 7    and contacted Deminor.

 8           THE COURT:  All right.  Thank you for that.  And is

 9    this Mr. Bowmans (ph) who's on the line for Deminor?

10           MR. BOWMANS:  Yes, that's me, thank you.

11           THE COURT:  I'll hear what you have to say, sir.

12           MR. BOWMANS:  Okay.  Well, I first of all wanted to

13    clarify (indiscernible) to the relationship between Deminor

14    and these clients, more in particular the persons for whom

15    we objected.  Deminor is a firm that is consisting

16    (indiscernible) in various kind of situations where they

17    have lost money, and we try to recover those monies for

18    them, and mostly in Europe, but in this case, part of the

19    work had to be done in the U.S.  Actually these persons of

20    the Lehman securities (indiscernible) and they claim that

21    they didn't receive right information about a product that

22    they bought and the risk.  And so our mandate from these

23    clients was to try to recover some of the money that they

24    had lost not from Lehman Brothers itself, but from the banks

25    who had sold these products to them in their own country.

08-13555-mg    Doc 31259    Filed 09/28/12    Entered 10/09/12 14:44:38    Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 22 of 49

Page 22

1   And in this case, all these persons are (indiscernible)

2   persons who bought their securities I think from Citibank.

3           Now, we were in discussions with Citibank

4   (indiscernible) the end of 2009 with regards to a possible

5   settlement.  And the settlement was actually reached in

6   early 2010.

7           Some of the clients mandated us (indiscernible)

8   Lehman Brothers bankruptcy (indiscernible) our clients

9   mandated us much later, and some at the end of 2009.  I do

10  not know in particular for all these clients here whom we're

11  discussing about when precisely they (indiscernible).

12          And when we heard about the need to file proof of

13  claim to the Lehman Brothers bankruptcy, we wrote a letter

14  to our clients saying that we were at their disposal if they

15  had questions, if they wanted us to assist them, but that

16  this was (indiscernible) would normally be taken care of by

17  the bank.  And that the bank had to get the blocking number,

18  that the bank would send to them, and that if they wanted us

19  to do something for them, to help them file the claim for

20  them, then we needed to have a power of attorney from them,

21  and we needed to get the blocking number that the bank had

22  communicated to them because we needed that information in

23  order to fill out the claim forms.

24          Now, it seems that some persons have misunderstood

25  communication or have been confused by the communication

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 23

1    they were getting from their bank, and what they were

2    getting from us.  And I'm absolutely open about it, and some

3    persons have not been able to either they didn't understand

4    or some understood (indiscernible) not being able to send

5    the power of attorney or the blocking number to us in due

6    time.  And that's why the filing was not made.

7           When the settlement was done with Citibank Belgium

8    in January 2010, with the payment (indiscernible) generated

9    and this explains probably why we wrote you a letter in

10   February, and some of these clients didn't receive the full

11   amount of the settlement because the settlement was composed

12   of damages on the one hand, and the price for taking over

13   the Lehman securities.

14          And for those clients (indiscernible) appears that

15   no regular finding had been made, Citibank said for these

16   clients, we'll only pay the damages part, we will not pay

17   the part that we consider the failing of the underlying

18   securities.  That's when we understood that for these

19   clients no regular claim had been filed.  And that's when we

20   immediately -- when we understood that this was the case, we

21   filed, we sent the letter to the Lehman bankruptcy to file

22   the claim.

23          Now, what happened between the end of November and

24   the February letter, these people (indiscernible)

25   information to us, asking whether the claim form had been

LEHMAN BROTHERS HOLDINGS, INC.; ET AL.

Page 24

1    filed or not.  We don't think so.  We don't think that we

2    were notified by them.  We just filed all claim forms for

3    which we had received proper instructions and the blocking

4    number by the due date.  And for some others for whom we

5    didn't receive information in time, we didn't file any

6    claim, and we took action when we understood that these

7    people were excluded at the beginning of February.

8              I think that explains the situation.

9              THE COURT:  Now --

10             MR. BOWMANS:  So clearly for these people, there's

11   never been an intention not to file, there's never been an

12   intention to be negligent.  What we can say then

13   (indiscernible) is that it is a communication problem

14   between various parties about the steps that had to be taken

15   in order to comply with the (indiscernible).

16             THE COURT:  All right.  I have a couple of

17   questions for you, Mr. Bowmans.  What is your position with

18   Deminor?

19             MR. BOWMANS:  I'm a director at Deminor

20   International.

21             THE COURT:  And you're located in Brussels?

22             MR. BOWMANS:  Yes.

23             THE COURT:  And you indicated that you, on behalf

24   of your client investors, reached a settlement with Citibank

25   in reference to Lehman program securities sold through

1       Citibank to these investors; is that correct?

2              MR. BOWMANS:  Yes, that's correct.

3              THE COURT:  And was that a global settlement, in

4       the sense that there was one settlement amount that you

5       ended up allocating to your clients or was there a separate

6       settlement for each of the investors based upon the facts

7       and circumstances of their individual claims?

8              MR. BOWMANS:  Actually, Citibank committed under

9       the settlement agreement to pay -- to owe their clients 65

10      percent of the principal amount of the bond, plus the

11      opportunity for the client to reinvest that money with

12      Citibank at a very favorable interest rate, which that we

13      valued the settlement and (indiscernible) 70 percent of the

14      nominal value.  And every client, in order to benefit from

15      that settlement that we had negotiated, had to sign the

16      settlement agreement.  And upon signing of the settlement

17      agreement, they transferred their securities to Citibank and

18      then received the sum that was agreed, i.e., 65 percent plus

19      the reinvestment (indiscernible).

20             THE COURT:  Do you --

21             MR. BOWMANS:  One of the conditions of the

22      settlement agreement was that the claim form had to be --

23      that a proof of claim had been correctly filed with the

24      Lehman bankruptcy.

25             THE COURT:  So if I understand this correctly, at

1    the time of the settlement, which was entered into after the

2    bar date; is that correct, or was it --

3           MR. BOWMANS:  After discussions had started at the

4    end of I think right before or right after when on November

5    2, it was in that period, that settlement discussions

6    started.  They lasted until early January, and then the

7    settlement was (indiscernible).

8           THE COURT:  All right.  So if I understand this

9    correctly, your clients potentially have suffered two

10   adverse consequences in reference to this, I just want to be

11   clear on this point.

12          MR. BOWMANS:  Yes.

13          THE COURT:  By virtue of the objection to the

14   allowance of these late claims, they stand to lose not

15   distributions in reference to the Lehman bankruptcy, but

16   instead distributions that are at a notionally greater

17   percentage recovery that would otherwise be payable by

18   Citibank and that that is not available to them because

19   their claims are not yet allowed claims in the bankruptcy;

20   is that correct?

21          MR. BOWMANS:  Because of the fact that the proof of

22   claim was not correctly filed, the ownership of the

23   securities was not transferred under the settlement

24   agreement to Citibank.  So the persons are still owners of

25   those securities.  They have received an amount of damages

08-13555-mg   Doc 31259   Filed 09/28/12   Entered 10/09/12 14:44:38   Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 27 of 49

Page 27

 1    and which is about 65 percent, but I believe it was reduced

 2    to 40 percent, but their (indiscernible) I would have to

 3    check because it's already almost two years ago.  But they

 4    still remain owners of those securities, and if their claim

 5    is now rejected, and that will be (indiscernible) then still

 6    benefit from payments from the Lehman bankruptcy.  I don't

 7    know if that's an answer to your question.

 8         THE COURT:  Well, it both answers it and confuses

 9    me a little bit.  What I'm trying to understand is whether

10    allowance of these late claims results in a payment

11    obligation from Lehman or whether it simply allows the

12    claimant to obtain a greater recovery from Citibank.

13         MR. BOWMANS:  Okay.  No, it's the -- it would not

14    recover anything anymore from Citibank.  That settlement is

15    done and it's completed.  If this claim will be allowed,

16    then the owner of the securities will benefit from pay outs

17    from the Lehman bankruptcy like any other owner of

18    securities and still holds a claim, so there is no payment

19    to be received from Citibank any longer.

20         THE COURT:  Okay.  And do you have other clients

21    that engaged Deminor International to act on their behalf

22    who fully complied with the bar date, and who has as a

23    result of full compliance with the bar date, received the 65

24    percent more or less settlement from Citibank and

25    transferred their securities to Citibank in accordance with

1     the arrangements you've described?

2          MR. BOWMANS:  Yes, absolutely, and that's the large

3     majority of the clients.  I think in total we had around 800

4     clients in Belgium, but not all of these clients were

5     Citibank clients (indiscernible) had purchased securities

6     from Deutsche Bank or (indiscernible) some other banks.  And

7     the large -- all except these I believe seven persons, and

8     for all those we -- I have to be precise, we didn't file the

9     claim form for all those 800 because I would say that the

10    majority of these persons just asked the bank to file the

11    claim for them.  Citibank did file a claim form for a large

12    group of its clients, including clients for whom we were

13    acting.  And some other clients wanted us to be involved in

14    it, wanted us to do the claim form.  They had lost

15    confidence in their bank, they were in litigation for it,

16    they had (indiscernible) to the bank.  (Indiscernible) and

17    they asked us to do it.

18          I don't know exactly the number of people for whom

19    we filed claim form, must be a couple of hundred, maybe 200

20    or 300, or something like that.  And then you have these

21    seven persons for who no claim form was filed, neither by

22    Citibank nor by us.  And that's what we are trying to

23    explain and we are extremely open on that.  It is the

24    problem of communication where the client, I believe, has

25    not fully understood who would do what in this respect.

Page 29

1        THE COURT:  So do I understand from what you've

2    just said that the vast majority of your clients numbering

3    in the hundreds perhaps have no difficult in complying with

4    the bar date, and in fact, did so or caused others to do so

5    in their behalf by the deadline?

6        MR. BOWMANS:  That's correct.  And it's yeah,

7    beyond any doubt.

8        THE COURT:  And do you have any explanation other

9    than the general statement of confusion or perhaps neglect,

10   that resulted in these seven claimants not having filed

11   their proofs of claim by the bar date?

12       MR. BOWMANS:  (Indiscernible) things, but it's not

13   neglect because these -- otherwise, these people would not

14   have come to us to give the mandate to recover the monies

15   from Citibank.  And these sort of people who were fairly

16   unhappy to the fact that they owned these securities that

17   were sold to them, that they had never understood really

18   what they were about.

19       So these were active investors, actively trying to

20   recover their monies.  And more precisely, these investors

21   have not been able to give the instructions to us, I'm

22   afraid I cannot tell you because I can only say that we

23   didn't receive the necessary instructions in due time.  And

24   some people we -- I remember very well, it was a

25   (indiscernible) period, a lot of investors were contacting

08-13555-mg   Doc 31259   Filed 09/28/12   Entered 10/09/12 14:44:38   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 30 of 49

Page 30

1    us at the time when these claim forms had to be sent to

2    (indiscernible) and some of them had not yet entered into a

3    contract with us, they were trying to understand how this

4    recovery action would work, what they needed to do, and if

5    they wanted to be part of it.

6           And we have not been able to contact all these

7    persons by phone to say, look, we haven't received anything

8    from you yet, you have to act et cetera.  We have just --

9    you know, taking the instructions that we have received and

10   done our job.

11          And, yes, after the fact it has appeared that some

12   of these people didn't send us instructions, and I cannot

13   say more about precise reasons why.  I know that some people

14   have (indiscernible) a holiday or (indiscernible).  We don't

15   know more about the precise (indiscernible).

16          THE COURT:  Okay.  Well, I'm going to break in now

17   and make a few comments about the procedural setting of

18   today's hearing, and to ask some questions of debtor's

19   counsel, which can be answered right now or after a period

20   of reflection following a break.

21          But there are a couple of things that troubled me

22   about where we are.  One is, Mr. Bowmans is a very

23   articulate spokesperson on behalf of Deminor International

24   and its clients, and has provided a great deal of

25   information that I did not have before we started this

LEHMAN BROTHERS HOLDINGS, INC.; ET AL.

1    process.

2         But he is speaking to me by telephone from

3    Brussels.  He is not a witness who has been qualified to

4    testify today.  It is unclear to me whether he is testifying

5    as, if you can call this discussion testimony, purely as a

6    fact witness or as a combined fact and expert witness.  I

7    assume he's just a fact witness, but I don't know how he

8    knows everything that he knows.  I don't know whether he was

9    personally involved in everything that he is describing, or

10   whether he is relating information that he has obtained from

11   others who work at Deminor, either as his colleagues or his

12   subordinates.

13        I don't know the specifics of the settlement that

14   he has described with Citibank.  I haven't seen that

15   documentation.  It may or may not be relevant to consider in

16   deciding how to deal with these disputed claims.  And I

17   suppose that my greatest procedural hesitation at this

18   moment relates to the fact that the record is not yet

19   legitimate in the sense of including admissible evidence,

20   although the statements made by Mr. Bowmans are certainly

21   persuasive.

22        Whether or not they ultimately change the outcome

23   is unclear.  Whether the debtors would wish to examine Mr.

24   Bowmans in a deposition under oath, or have testimony taken

25   consistent with today's colloquy with him at a further

08-13555-mg    Doc 31259    Filed 09/28/12    Entered 10/09/12 14:44:38    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 32 of 49

Page 32

1    hearing, I don't know.  Whether Mr. Bowmans practically

2    could participate in the hearing after being sworn in

3    accordance with the law of Belgium, and participate by video

4    conference, so that he doesn't have to travel here is

5    another possibility.

6           But it seems to me that I've heard enough to have

7    more questions than I have answers about the matter that's

8    before the Court right now.  And one of the questions

9    relates to the circumstances of each individual's confusion.

10   This becomes a very difficult fact question that I'm not

11   sure fits under the same category.

12          Mr. Bowmans is speaking on behalf of a class of

13   firm clients, and really can't speak to what they did or

14   didn't do or why they failed to do what virtually everybody

15   else did.  So at some level, the failure of this small group

16   to do what everybody else in the class did is a negative

17   fact from the perspective of these individuals.

18          And while Mr. Bowmans has provided a very helpful

19   description of the context in which this arises, he is

20   necessarily unable to state what each individual did or

21   didn't do, why they dropped the ball.  And in effect, each

22   individual claimant's efforts to comply and individual story

23   with a reference to how and why they were confused and

24   whether anyone is responsible for that confusion remains to

25   be developed.

 1          In the response that counsel characterized by

 2    Claude Fitvoye, which is in French and I can't read, but

 3    could be translated, the characterization suggested that he

 4    was away at the time, and without being specific because I

 5    can't be at this juncture, appears to have relied on others

 6    while he was away.

 7          That may or may not change the legal analysis as to

 8    whether or not that's a good reason, but it raises the

 9    question as to whether each of these individuals may have

10    some particularized set of circumstances to assert.  The

11    Deminor International papers are almost verbatim the same

12    for each claimant, and necessarily fail to provide

13    specifics.

14          So I'm left in something of a cloud on this.  I'm

15    not sure that I have a sufficient record.  I may never have

16    a sufficient record given language difficulties, geography,

17    and the amounts involved which indicate that these mostly

18    pro se claimants may have some difficulty in providing the

19    information because they don't have counsel and they're

20    foreigners.

21          So for all of these reasons, I'm going to reserve

22    decision with respect to this, and give the debtors an

23    opportunity to consider how most practically to proceed at

24    this point.  It occurs to me that Mr. Bowmans' a non-lawyer,

25    may be a useful counterparty to engage in some set of

08-13555-mg    Doc 31259    Filed 09/28/12    Entered 10/09/12 14:44:38    Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 34 of 49

Page 34

 1    procedures that may enable me to decide these issues with a

 2    clearer record.  I appreciate his time today, but I also

 3    find that while accepting what he said as the functional

 4    equivalent of testimony that he would give if he were sworn

 5    as a witness, I remain unable to, in fact, treat it as sworn

 6    testimony.  And I also recognize that the debtors may need

 7    an opportunity to examine him and, in effect, cross-examine

 8    him with regard to what he said.

 9              So for those reasons, this will be adjourned and

10    I'll give the debtors an opportunity to give some thought as

11    to how you want to deal with this at future hearings.

12              MR. HORWITZ:  Thank you, Your Honor.

13              THE COURT:  And let me also ask just in case I've

14    left something out, if there's anyone else either in person,

15    in court or on the telephone who has anything to say with

16    regard to these matters that we've just talked about?

17              (No response)

18              THE COURT:  Hearing nothing, we'll move on to the

19    next agenda item.

20              MR. HORWITZ:  I'll turn the podium over to my

21    colleague, Mark Bernstein.

22              MR. BERNSTEIN:  Good morning, Your Honor, Mark

23    Bernstein from Weil on behalf of Lehman Brothers Holdings,

24    Inc. as plan administrator.

25              The next item on the agenda is the 329th omnibus

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 35

1    objection.  This is a carryover from a prior hearing.  This

2    -- the 329th omnibus objection relates to claims that were

3    filed by employees that asserted priority under Section 507

4    of the Bankruptcy Code.

5          LBHI is not here today contesting the merits of the

6    claims or whether such claims are actually entitled to such

7    priorities under 507.  The 329th omnibus objection only

8    seeks to reclassify any amounts asserted in the claims in

9    excess of the caps provided in Section 507, in order to

10   allow LBHI to more closely align their reserves with their

11   -- what their maximum multiple distributions may be, and

12   reserves all rights to object to these claims based on the

13   merits and whether any parts of them are ultimately entitled

14   to 502 priority in the future.

15         There were five responses filed to the objection.

16   One of the responses that was initially scheduled for

17   today's hearing was a response of Russell Schreiber and

18   Andrew Weber.  Those claims have other components as well

19   that do not specifically relate to this objection, and we've

20   been working with those claimants to resolve those claims in

21   a separate fashion, so that this objection has been

22   adjourned with respect to Mr. Schreiber and Weber.

23         With respect to Nikki Marshall and Riccardo

24   Banchetti, they did file responses; however, their responses

25   did not oppose the relief sought in this objection.  It only

```
 1    sought to clarify that they weren't -- they still disputed

 2    the separate objection seeking to reclassify their

 3    restricted stock units as equity and we concede that this

 4    has no bearing on those objections in any way.

 5           The two remaining responses that we received were

 6    the responses of Karen Simon Kreiger and Charles Kuykendall.

 7    The response of -- the claim of Ms. Kreiger is based on

 8    certain compensation that Ms. Kreiger received during her

 9    employment at Lehman starting in 2003 where she received a

10    certain amount of restricted stock units, and also her

11    holdings of common stock including in her 401K account.

12           Ms. Kreiger checked the box on her proof of claim

13    indicating that her claim was entitled to priority under

14    507(a)(5) and also checked the "other" box.

15           Neither of these claims, whether they're RSUs or

16    common stock is of the type entitled to priority under 507,

17    but in any event, in this instance, we are -- they are -- to

18    the extent they ever are, they are subject to the caps of

19    507(a).  And as a result, we're seeking to reclassify just

20    the portion in excess of the 10,950 cap that was in effect

21    on the filing date.

22           Ms. Kreiger's response indicates that these amounts

23    were discretionary deductions that were not part of her --

24    and were part of her income, and therefore, should be

25    considered as lost compensation.  We don't dispute that in
```

Page 37

1    any way, and sounds accurate, but that doesn't mean the

2    entire amount is entitled to priority, potentially just up

3    to the caps set forth in 507.

4           The claim of Charles Kuykendall is a claim for

5    deferred -- based on a deferred compensation plan that E.F.

6    Hutton had created prior to its merger with Lehman.  E.F.

7    Hutton was acquired by Lehman at one point, and it is the

8    debtor's belief that actually LBI did assume the obligations

9    under this plan, and we've objected to this claim on the

10   173rd omnibus objection on those grounds.

11          Mr. Kuykendall did respond and we've adjourned that

12   matter.  He has requested some discovery and we're going to

13   go through that process at some point.  But in any event,

14   today again we're just seeking to reclassify the portion of

15   his claim in excess of the cap, and Mr. Kuykendall has

16   stopped working even at E.F. Hutton in 1994, according to

17   his papers, clearly none of that falls within the 180 day

18   requirements of Section 507, and therefore, is not entitled

19   to priority distributions.

20          I believe Ms. Kreiger is in the courtroom today and

21   Mr. Kuykendall's attorney I believe said he was going to be

22   dialing in.  I'm happy to answer any questions Your Honor

23   may have at this point.

24          THE COURT:  I have no questions.

25          MR. WING:  Your Honor, Steve Wing, I'm the attorney

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 38

1    for Mr. Kuykendall.

2             THE COURT:  Well, you just jumped on lines because

3    I was about to say I have no questions at this time.

4             MR. WING:  Sorry, Your Honor.

5             MR. BERNSTEIN:  Thank you, Your Honor.

6             THE COURT:  No problem, it's one of the problems of

7    appearing by telephone.

8             What do you have to say?

9             MR. WING:  Well, Your Honor, I think it's been

10   succinctly stated that my client although he filed his claim

11   pro se and indicated that it was covered as a priority claim

12   under 507(a)(5), it wasn't (indiscernible) within the last

13   180 days.  It isn't entitled to priority probably, and you

14   know, that won't be finally determined until we actually get

15   to address the merits of the claim which looks like it's

16   going to be a long time down the road.

17            And so I don't see where we're accomplishing

18   anything here, because to say that his claim should be split

19   into a part that would be subject to the cap and a part that

20   wouldn't be is kind of repudiated by what counsel for the

21   debtor has just said.  That they don't think that it would

22   be (indiscernible) priority anyway, and therefore splitting

23   the claim and having to potentially litigate two issues

24   instead of one makes no sense at all.  I don't see how it

25   provides any progress or forward motion with regard to the

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

1    Chapter 11 plan.

2         They don't plan to allow this claim or make a

3    decision as to allow this claim.  They're not admitting that

4    it qualifies under the statute as a priority claim.  In

5    fact, they're clearly denying it, and they may even be

6    right.  But they -- this motion doesn't even really apply to

7    my client.  And for that reason, I think it should be denied

8    because it's not appropriate and the basis set forth, and

9    the motion itself is inapplicable to my client and factually

10    in error.

11         MR. BERNSTEIN:  Your Honor, the claim of Mr.

12    Kuykendall was filed in the amount of $348,273.  Based on

13    the terms of the Lehman plan, we are required to reserve

14    that exact amount for it because it was filed as priority.

15         What the motion seeks to do is to determine that

16    only in any circumstance up to 10,950 will be priority,

17    we'll reserve 10,950 dollar-for-dollar, and then anything

18    above the 10,950 the approximately 340,000 or 338,000 we've

19    reserved based on his -- the distributions on -- as an

20    unsecured claim on this claim.

21         So there is significant benefit to the debtors and

22    will enable the debtors to make more significant

23    distributions along with the other claims that were

24    reclassified pursuant to this objection.

25         As to whether we agree or disagree whether it will

LEHMAN BROTHERS HOLDINGS, INC.; ET AL.

Page 40

1   ultimately be determined as priority is something that can

2   be determined in the future, and there's no reason that this

3   objection needs to be held off until an ultimate

4   determination on the merits or ultimate priority with

5   respect to any priority of the claim is made.

6          THE COURT:  It also sounds to me as if counsel for

7   this claimant, for all practical purposes, acknowledges that

8   there's some merit to the argument that this is not a

9   priority claim.

10         The Court doesn't need to decide that one way or

11  the other right now except to say that it is a material

12  benefit to the estate that that which is being reserved as a

13  priority claim be limited to the 507(a) cap, and not be

14  unlimited in amount as reflected in the claim.

15         And so this objection will be allowed with respect

16  to that issue.  With the understanding that it doesn't in

17  any way prejudice other issues concerning the treatment of

18  Mr. Kuykendall's claim.

19         I would also suggest for what it may be worth, that

20  since counsel is now involved on behalf of the claimant that

21  some thoughtful attention to the claim might be worthwhile,

22  and in recognition of the fact that anyone who worked for

23  E.F. Hutton in 1994 could not possibly be asserting a

24  priority claim today based upon anything I know, some

25  thought might be given to reclassifying even the 507(a)

08-13555-mg   Doc 31259   Filed 09/28/12   Entered 10/09/12 14:44:38   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 41 of 49

Page 41

1      portion by agreement.

2             MR. BERNSTEIN:  Certainly, Your Honor.  We'll reach

3      out to Mr. Kuykendall's counsel.

4             THE COURT:  Okay.

5             MR. BERNSTEIN:  The other claimant is Ms. Kreiger,

6      who I said is in the courtroom today.

7             THE COURT:  Okay.  Ms. Kreiger.  You can come

8      forward and speak to me from the podium.

9             MR. WING:  Your Honor, since you're done with my

10     client, I'm going to end my involvement in the call.

11            THE COURT:  That'll be fine, you can hang up.

12            MR. WING:  Thank you, Your Honor.

13            MS. KREIGER:  Your Honor, going through my third

14     very public employer bankruptcy is just unconscionable.

15     Every effort was made by me to learn from the lessons of the

16     first and second bankruptcies at Drexel Bernel & Baher (ph)

17     and Centennial Government Securities respectively and

18     minimize my investment in an organization where I had a

19     dependency on my annual earning stream.

20            My employment with Lehman Brothers commenced in

21     November 1990.  Unfortunately Lehman Brothers management

22     made a decision in 1994 shortly after became a publicly

23     traded firm to establish a stock award program that provides

24     every member of Lehman Brothers with an ownership interest

25     in the firm and a requirement that the stake be held for

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 42

1      five years.

2              As noted in their annual stock award distribution

3      to its employees, the program provides an incentive to think

4      and act like an owner everyday, and allow all participants

5      to share in the firm's financial success over time.

6              Upon further review of the Lehman Brothers stock

7      award program documentation it states, "All bonus eligible

8      members of the firm receive a portion of their compensation

9      in restricted stock units.  Each RSU represents the right to

10     receive one share of the Lehman Brothers common stock five

11     years after the RSU is granted.  RSUs have been awarded to

12     you as part of your annual bonus payable for the years'

13     performance.  The portion of the compensation paid in RSUs

14     increases as the amount of your total compensation rises.

15     On November 30th of each year, the restriction period will

16     end and your vested RSUs will convert to Lehman Brothers

17     common stock.  Once your RSU converts to common stock, you

18     may continue to hold those shares or sell them, subject to

19     any compliance restrictions on employees trading Lehman

20     Brothers stock.  The RSUs cannot be sold before conversion."

21             The operating terms of the Lehman Brothers stock

22     program have repeatedly communicated that it was funded

23     through a mandatory deduction of a portion of our annual

24     compensation, and therefore, should be treated as it is lost

25     compensation in a priority secured claim.

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 43

1          Further supporting this is the notion that I was

2     neither in any position to make a choice regarding my desire

3     to become a participant, nor could I make any investment

4     decisions during the restricted period.  Choices to hold or

5     sell the restricted stock units were only available after

6     the completion of the vesting period.

7          In addition, all offer letters to new employees

8     issued after the commencement of the Lehman Brothers stock

9     award program included the following wording, "The

10    performance year ending your compensation will be as

11    follows, salary, bonus at the firm's option a portion of

12    your current and future year's total compensation, combined

13    salary, bonus, and other compensation will be paid in

14    restricted stock units pursuant to the firm's employee stock

15    award program as then in effect.  While the above

16    compensation commitments will be honored, this letter is not

17    a contract of continuing employment."

18         In light of my previous employer's history and my

19    personal circumstances of being a young widow with two

20    children that I had to raise through college until

21    adulthood, I chose to sell most of my restricted stock units

22    each year in order to pay for their raising through to their

23    college education and graduation.

24         While I most certainly thought and acted like an

25    owner during my 18 years at Lehman Brothers everyday, the

Page 44

1    management decision to establish this program handcuffed my

2    ability to manage my RSU investments as I have managed my

3    other investments.  I was dependent upon decisions outside

4    of my control.

5            My objection to the 329th omnibus motion is only

6    associated to the restricted stock units where I have no

7    ability to make prudent investment decisions.  I have

8    excluded those shares that I kept beyond the restricted

9    period where I had a discretionary ability to make personal

10   investment decisions.

11           In summary, I am asking the Court to rule that the

12   portion of my claim associated to the unvested restrict

13   stock units which equated to $164,319.52 be treated as if it

14   was lost compensation and a priority secured claim.  Thank

15   you.

16           THE COURT:  Thank you, Ms. Kreiger.  What's the

17   debtor's position with regard to this?  I think I probably

18   know it, because we've heard a lot about RSUs in other

19   hearings.

20           MR. BERNSTEIN:  Certainly, Your Honor.  Mark

21   Bernstein again from Weil on behalf of Lehman.

22           The claims of Ms. Kreiger that relate to restricted

23   stock units are being handled in the group with the other

24   restricted stock unit claims.  Ms. Kreiger has been involved

25   and has signed the -- signed up to participate in the

08-13555-mg    Doc 31259    Filed 09/28/12    Entered 10/09/12 14:44:38    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 45 of 49

Page 45

1    discovery that is ongoing and we spoke earlier.  She hasn't

2    been able to get access to the data room, but we'll

3    certainly work with her to get access, but --

4              THE COURT:  Okay.

5              MR. BERNSTEIN:  -- the merits of the claim will be

6    dealt with in that litigation with all other RSU claims.

7              The fact that the RSUs and whether or not they're

8    compensation is certainly an argument that -- people are

9    making in relation to the merits is not determinative as to

10   whether or not they should be treated as priority claims.

11             Unfortunately the 507 cap to the extent these

12   claims are priority, the cap still applies to them, and

13   there's no circumstances under which the claim can be

14   allowed in a priority amount's great than 10,950.  And even

15   if that -- and it's still unclear whether or not that will

16   even happen based on the RSU litigation.

17             So a majority of these RSUs I would add were earned

18   starting -- again, starting in 2003, going up to 2007, and

19   not within 180 days as required by the statute.  There does

20   appear to be a small portion of less than $10,000 that was

21   earned within the RSUs that were distributed in I think July

22   or August of 2008.  But even that amount is below the cap

23   which we're seeking to, at least at this point, permit the

24   claim to remain standing in the priority amount.

25             So we believe the objection should be granted, and

08-13555-mg    Doc 31259    Filed 09/28/12    Entered 10/09/12 14:44:38    Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 46 of 49

Page 46

1    any amounts in excess of the cap should be classified as

2    unsecured claims.

3         THE COURT:  Well, let me understand and in asking

4    this question, it may also help Ms. Kreiger understand

5    precisely what this objection is seeking to do.

6         Is it correct that the only thing that you are

7    seeking to do is to treat her claim as misclassified to the

8    extent that it seeks priority treatment of the entirety of

9    her RSU claim, and that what you are seeking to do is to

10   reclassify it so that anything in excess of the $10,950 cap

11   of 507(a) becomes an unsecured claim, with the understanding

12   that it becomes an unsecured claim that is subject to an

13   ongoing objection to have it reclassified as equity?

14        MR. BERNSTEIN:  That's exactly what we're seeking

15   to do in this objection.

16        THE COURT:  All right.  The objection as it relates

17   to this claim is allowed without prejudice to Ms. Kreiger's

18   ability to continue to prosecute her rights with respect to

19   further reclassification of the claim to equity.

20        I would note that issues relating to the proper

21   classification and treatment of RSU related claims remains

22   an ongoing and unresolved issue in the case.  And based upon

23   an argument that took place several months ago, it's my

24   understanding that it will take a considerable period of

25   time for the parties who are involved in this to complete

Page 47

1    requested discovery to file supplemental papers if any are

2    going to be filed, and for the disputes that are at issue

3    here, to be fully ripe for adjudication.

4         Nothing that's happening with respect to the 329th

5    omnibus objection to claims will impact in any way the

6    resolution of that unresolved question.

7         I view Ms. Kreiger's statements just made as

8    statements that primarily relate to the broader question of

9    how RSUs are to be classified.  And there's nothing that has

10   been said either by her or by me in this regard that will

11   impact the ultimate decision, although what she has said

12   today may well be incorporated into the record or become

13   part of the record in some other way when that matter is

14   heard on the merits.

15        MR. BERNSTEIN:  Your Honor, that concludes the

16   agenda for today's hearing.

17        THE COURT:  Fine.  We're adjourned until next time,

18   thank you.

19   (Proceedings concluded at 11:18 AM)

20

21

22

23

24

25

Page 48

1                      R U L I N G S

2

3    DESCRIPTION                              PAGE      LINE

4    Kuykendall - 329th Omnibus Objection      40         6

5    to Claims

6

7    Kreiger - 329th Omnibus Objection         46        16

8    to Claims

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

08-13555-mg    Doc 31259    Filed 09/28/12    Entered 10/09/12 14:44:38    Main Document
LEHMAN BROTHERS HOLDINGS, INC.; ET AL.
Pg 49 of 49

Page 49

1              C E R T I F I C A T I O N

2

     I, Sheila G. Orms, certify that the foregoing is a correct

3    transcript from the official electronic sound recording of

4    the proceedings in the above-entitled matter.

5

6    Dated:  September 28, 2012

7    Sheila                    Digitally signed by Sheila Orms
                                DN: cn=Sheila Orms, o, ou,
                                email=digital1@veritext.com,
8    Orms                       c=US
                                Date: 2012.09.28 15:00:08 -04'00'

9    Signature of Approved Transcriber

10

11

     Veritext

12

     200 Old Country Road

13

     Suite 580

14

     Mineola, NY 11501

15

16

17

18

19

20

21

22

23

24

25