**Hearing Date:  October 31, 2012, 10 a.m.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

| | | |
|---|---|---|
| | : | Chapter 11 |
| In re | : | |
| | : | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | |
| | : | Jointly Administered |
| Debtors. | : | |

---------------------------------------------------------------- x

### RESPONSE OF CANARY WHARF TO OBJECTION
### TO PROOFS OF CLAIM NUMBERS 14824 AND 14826

David B. Tulchin
Marc De Leeuw
John J. Jerome
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for Canary Wharf Management*
*Ltd., Heron Quays (HQ2) T1 Limited and*
*Heron Quays (HQ2) T2 Limited*

October 12, 2012

# TABLE OF CONTENTS

Page

BACKGROUND ..................................................................................................4

    A.    Background to the Lease ...........................................................4

    B.    The Lease ...................................................................................6

    C.    LBHI's U.S. Bankruptcy and LBL's U.K. Administration ........10

    D.    LBL Vacated the Property and Canary Wharf
        Mitigated Its Losses ..................................................................11

    E.    Canary Wharf's Damages .......................................................16

    F.    The Objection by LBHI ...........................................................18

RESPONSES TO OBJECTIONS ........................................................................19

    I.    LBHI's Obligations in the Indemnity Are Not Discharged
        Because of a "Material Variation" of the Lease ......................20

        A.    Material Variations Do Not Discharge
            Indemnitors Like LBHI ..............................................21

        B.    Under Paragraph 6 of the Indemnity,
            LBHI's Obligations Cannot Be Discharged by a
            Material Variation ......................................................23

        C.    The Releases in the LBL Forfeiture Agreement
            Were Not a Material Variation of the Lease .............24

    II.    LBHI Is Liable to Canary Wharf Under
        Paragraph 1 of the Indemnity .................................................25

        A.    LBHI Is Obligated to Pay Canary Wharf's Losses Caused
            by LBL's Default Under Paragraph 1 of the Indemnity ...........25

        B.    LBHI Is Liable for Canary Wharf's Losses Caused
            by LBL's Repudiatory Breach of the Lease ..............26

        C.    Paragraph 7 of the Indemnity Does Not Limit LBHI's
            Liability Under Paragraph 1 ......................................28

    III.    Canary Wharf Is Entitled to Damages from LBHI's Anticipatory
        Breach of Its Obligation to Take a New Lease .......................30

## TABLE OF CONTENTS
### (continued)

Page

IV.   Canary Wharf Is Entitled to the Full Amount of Its Damages ..............................31

    A.   All of Canary Wharf's Damages Are Recoverable ...................................32

    B.   The Bankruptcy Cap of Section 502(b)(6) Does Not Apply .....................33

    C.   Even If It Applied, the Cap Limits Only "Rent Reserved," Not Other Amounts Due Under the Lease ............................35

CONCLUSION ....................................................................................................................36

# TABLE OF AUTHORITIES

Page(s)

### CASES

*Estate of Ginor* v. *Landsberg*,
   1998 WL 514304 (2d Cir. June 16, 1998) ............................................................ 34

*In re Andover Togs, Inc.*,
   231 B.R. 521 (Bankr. S.D.N.Y. 1999) .................................................................. 35

*In re Barney's Inc.*,
   206 B.R. 328 (Bankr. S.D.N.Y. 1997) .................................................................. 33

*In re El Toro Materials Co., Inc.*,
   504 F.3d 978 (9th Cir. 2007) ........................................................................... 32, 35

*In re Jiminez*,
   2008 WL 2026147 (Bankr. S.D.N.Y. May 9, 2008) ............................................ 30

*In re McSheridan*,
   184 B.R. 91 (B.A.P. 9th Cir. 1995) .................................................................. 32, 35

*In re Oneida Ltd.*,
   400 B.R. 384 (Bankr. S.D.N.Y. 2009) .................................................................. 19

*In re PCH Assocs.*,
   804 F.2d 193 (2d Cir. 1986) .................................................................................. 33

*In re Rock & Republic Enterprises, Inc.*,
   2011 WL 2471000 (Bankr. S.D.N.Y. June 20, 2011) ...................................... 32, 35

*In re Spiegel, Inc.*,
   2007 WL 2456626 (S.D.N.Y. Aug. 22, 2007) ...................................................... 19

*In re United Cigar Stores Co. of America*,
   86 F.2d 629 (2d Cir. 1936) ............................................................................... 32, 35

*Int'l Trade Admin.* v. *Rensselaer Polytechnic Institute*,
   936 F.2d 744 (2d Cir. 1991) .................................................................................. 33

*Intern. Min. & Resources S.A.* v. *American Gen. Resources. Inc.*,
   1999 WL 672907 (S.D.N.Y. Aug. 27, 1999) ........................................................ 31

*Meyer* v. *Insurance Co. of America*,
   1998 WL 709854 (S.D.N.Y. Oct. 9, 1998) ........................................................... 34

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Mitchell* v. *Washingtonville Cent. School Dist.*,
190 F.3d 1 (2d Cir. 1999) ....................................................... 34

*Rainey Brothers Ltd.* v. *Kearney*,
1990 N.I. 18 (Court of Appeal) ....................................................... 27, 28

*Vossloh Aktiengesellschaft* v. *Alpha Trains (UK) Ltd*,
[2010] EWHC 2443 (Ch), [2011] 2 All ER (Comm) 307 ..................................................... 21

*Wolters Kluwer Financial Services Inc.* v. *Scivantage*,
2007 WL 1098714 (S.D.N.Y. April 12, 2007) ..................................................... 19

### STATUTES

11 U.S.C. § 502 ....................................................... passim

11 U.S.C. § 503(b) ....................................................... 31

### OTHER AUTHORITIES

Fed. R. Bankr. P. 3001(f) ....................................................... 19

Susan S. K. Lee, *Capital and Operating Leases - A Research Report*,
FED. ACCOUNTING STANDARDS ADVISORY BD. (Oct. 2003) ..................................................... 34

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------ x
                                                             :
In re                                                        :
                                                             :
LEHMAN BROTHERS HOLDINGS INC., et al.,                       :
                                                             :
                                  Debtors.                   :
                                                             :
------------------------------------------------------------ x
```

Chapter 11

Case No. 08-13555 (JMP)

Jointly Administered

## RESPONSE OF CANARY WHARF TO OBJECTION
## TO PROOFS OF CLAIM NUMBERS 14824 AND 14826

1.      In its Objection, filed August 15, 2012 (the "Objection"), Lehman

Brothers Holdings Inc. ("LBHI") seeks to escape its contractual obligations to pay Canary

Wharf amounts due under a lease, dated March 16, 2005 (the "Lease"), and expunge two

claims filed by Canary Wharf (Nos. 14824 and 14826) (the "Claims").[1]  The Lease, which is

for property at 25 Bank Street in London, England, including a 30-story office building, is

governed by English law.  LBHI argues -- without offering any opinion on English law in

support -- that because Canary Wharf forfeited the Lease in December 2010 after the tenant

(Lehman Brothers Limited ("LBL")) defaulted, LBHI's obligations as indemnitor to pay

Canary Wharf have been discharged or, at the very least, substantially reduced.  LBHI is

wrong as a matter of English law.  As explained in the accompanying declaration of Laurence

Rabinowitz, a distinguished Queen's Counsel since 2002 and a well-recognized expert in

English commercial disputes, LBHI as "Surety" (i) undertook an independent, primary

obligation to pay Canary Wharf the amounts due under the Lease and (ii) agreed to indemnify

---

[1] In this Response, "Canary Wharf," a group of companies that develops, invests in and
manages properties, includes Claimants Canary Wharf Management Ltd., Heron Quays (HQ2)
T1 Limited and Heron Quays (HQ2) T2 Limited, as well as certain affiliates of Claimants that
agreed in March 2001 to construct the 25 Bank Street building and/or agreed with JPMorgan
Chase, N.A. to a long-term lease for the property in December 2010.

Canary Wharf for all losses "arising directly or indirectly out of any default by the Tenant."

Under applicable English law, the December 2010 forfeiture does not alter those obligations

at all.  The Claims should be allowed.

2.     *First*, LBHI argues that Canary Wharf's releases of claims for LBL

administration expenses -- *i.e.*, expenses payable in U.K. administration in priority to the

claims of other creditors -- as part of the December 2010 forfeiture constitute a material

variation of the Lease under English law that terminate LBHI's obligations.  As Q.C. Rabinowitz

explains, this is not correct.  LBHI provided by contract an "indemnity," which under English

law is a primary obligation to Canary Wharf that is unaffected by any material variation of the

Lease.  Further, LBHI explicitly agreed that "any variation of the terms of this Lease" would

not "release discharge or in any way lessen or affect the liability" of LBHI to pay Canary

Wharf.  And, in any event, Q.C. Rabinowitz concludes that under English law, a release of a

claim for an administration expense, which arises under English insolvency law (as opposed

to an unsecured claim for rent, which arises under a lease), is not a material variation of a

lease.  *See* Part I, *infra*.

3.     *Second*, LBHI argues (without offering any opinion or analysis of

English law) that it is not liable because the December 2010 forfeiture terminated the Lease as

to the tenant (LBL), and LBHI's liability is co-extensive with LBL's.  This is incorrect under

English law.  The terms of the Lease provide that LBHI is obligated to "indemnify and keep

indemnified" Canary Wharf for "all claims demands losses damages liability costs fees and

expenses whatsoever sustained by [Canary Wharf] by reason of or arising directly or

indirectly out of any default by the Tenant."  As Q.C. Rabinowitz explains, this obligation is

not co-extensive with LBL's, and requires that LBHI pay Canary Wharf for all amounts due

under the Lease (including rent) that Canary Wharf will fail to obtain because of LBL's default. *See* Part II.A, *infra*. Moreover, as Q.C. Rabinowitz concludes, under English law, LBL committed a "repudiatory breach" by failing to pay rent after March 2010. This breach entitled Canary Wharf to damages from LBHI for all the amounts due under the Lease (less mitigation). *See* Part II.B, *infra*.

4.     *Third*, LBHI argues (again without offering any opinion or analysis of English law) that its obligations to pay Canary Wharf after forfeiture are terminated as of the date another tenant signed a lease for the property, and points out that JPMorgan Chase N.A. ("JPMorgan") signed a new lease in December 2010. Again, as Q.C. Rabinowitz explains, LBHI's obligations are not so limited under English law. In the case of forfeiture, the Lease provides *additional* remedies above and beyond LBHI's primary obligation to pay all of Canary Wharf's losses from LBL's default, not exclusive remedies. *See* Part II.C, *infra*. Additionally, one of those additional forfeiture remedies was that Canary Wharf could require LBHI to take a new lease on the same terms. Under English law, LBHI's confirmation in December 2010 that it would not take a new lease constituted an anticipatory repudiation that provides an independent basis for Canary Wharf's claims against LBHI. *See* Part III, *infra*.

5.     *Fourth*, LBHI argues that even if Canary Wharf's claims are allowed, many of the amounts sought are unrecoverable, and any recoverable amounts would be capped pursuant to 11 U.S.C. § 502(b)(6). These arguments are wrong as a matter of both English law (as Q.C. Rabinowitz explains) and U.S. bankruptcy law, both of which allow recovery of all amounts sought. And the cap in Section 502(b)(6) only applies to leases of real property, whereas -- as LBHI represented repeatedly to the Securities and Exchange

Commission ("SEC") -- the Lease here is a capital lease, which falls in a different category.

LBHI is judicially estopped from contending otherwise now. *See* Part IV, *infra*.[2]

6.       In short, under English law, this Court should hold LBHI to its

contractual obligations to pay Canary Wharf the unpaid amounts due under the Lease. The

Court should strike the Objection.

## BACKGROUND

A.       **Background to the Lease**

7.       LBHI was the ultimate parent of the companies known as Lehman

Brothers, one of the largest investment banks in the United States before its collapse in 2008.

(LBHI Form 8-K, filed with the SEC on April 16, 2010 (Ex. 1)[3] at Exhibit 99.1 pp. 2, 32.)

LBL was a subsidiary of LBHI with operations in England. (LBHI Form 8-K, filed with the

SEC on September 19, 2008 (Ex. 2) at 2, Exhibit 99.2 p. 2.)

8.       Canary Wharf is in the business of property development, investment

and management. (2011 Canary Wharf Group plc Annual Report (Ex. 3) at 8-11, 44, 61.)

Over the past twenty years, Canary Wharf has redeveloped an area in London, England into a

new business district known as Canary Wharf by designing, constructing and managing office

space and retail facilities. (*Id.* at 6.)

---

[2]  LBHI also contends that Canary Wharf has not provided evidence of dilapidations (the cost of bringing the building into the condition specified in the Lease) and that this portion of the Claims should be disallowed and expunged unless proof of these damages is offered. (Objection ¶ 24.) Canary Wharf provided a calculation of these amounts in a claim summary submitted to LBHI in October 2009 and, in any event, Canary Wharf is providing additional evidence concerning these amounts with this Response. *See* ¶¶ 40-41, *infra*. Thus, this LBHI argument is moot.

[3]  References herein to "Ex. __" are to exhibits attached to the Declaration of Marc De Leeuw, executed October 12, 2012.

9.      In March 2001, LBHI, LBL and Canary Wharf entered into a contract pursuant to which Canary Wharf would build an office building at 25 Bank Street in London, England.  (Agreement for Lease, March 30, 2001 (Ex. 4) at 1.)  The contract provided that the building would be designed and constructed according to LBL's specifications and at the expense of Canary Wharf.  (*Id.* §§ 1.11, 4.3, 6.1.)  Once completed, LBL would enter into a 30-year lease for the 25 Bank Street property and become the tenant of the building.  (*Id.* at 1, §§ 1.43, 1.92, 22.1 & Annexure 8.)  LBHI agreed that it would execute the lease as "Surety." (*Id.* § 22.1, Annexure 8 at Lease Particulars ¶ 3.)

10.     Construction of the office building was completed in August 2003. (Songbird Estates plc[4] AIM Admission Document, dated April 23, 2004 (Ex. 5) at 70.)  It has 30 floors and more than one million square feet (with 996,367 square feet of office net internal area).  (*Id.*; Declaration of Anthony Jordan, Vice President of Business Development at Canary Wharf Group plc, executed Oct. 12, 2012 ("Jordan Decl.") ¶ 17.)[5]

11.     LBHI, LBL and Canary Wharf executed a lease for the property, dated March 16, 2005 (the "Lease").  (Lease (Ex. 6) Lease Particulars ¶¶ 1, 3, 5.)  In early 2004, LBHI stated in its 2003 10-K that the Lease "qualifies for capital lease treatment" and continued this accounting in a number of its subsequent SEC filings.[6]

---

[4] Songbird Estates plc is the ultimate parent company of Canary Wharf.  (2011 Canary Wharf Group plc Annual Report (Ex. 3) at 55.)

[5] Mr. Jordan's responsibilities at Canary Wharf Group plc, the parent company of Claimants, include leading a team that analyzes potential real estate developments, establishes technical standards for each new development, and assists with marketing CWG's new properties to potential tenants.  (Jordan Decl. ¶ 2.)

[6] LBHI Form 10-K, for the period ended Nov. 30, 2003 (Ex. 7) at Exhibit 13.01 p. 92; LBHI Form 10-K for the period ended Nov. 30, 2004 (Ex. 8) at 111; LBHI Form 10-K for the period ended Nov. 30, 2005 (Ex. 9) at 98; LBHI Form 10-K for the period ended Nov. 30, 2006 (Ex. 10) at 105; LBHI Form 10-K for the period ended Nov. 30, 2007 (Ex. 11) at 122.

### B.    The Lease

12.    The Lease is for a term of 30 years commencing July 3, 2003.  (Lease

(Ex. 6) Lease Particulars ¶ 6.)  The Lease states that it "shall be governed by and construed in

all respects in accordance with the Laws of England . . . ."  (*Id.* § 8.16.)

### 1.    Amounts Due Under the Lease

13.    Under the terms of the Lease, the Tenant, defined as LBL (Lease

(Ex. 6) Lease Particulars ¶ 3), is obligated to pay Canary Wharf:

- *Rent*:  "the rents reserved by this Lease at the times and in the manner" set out in Section 3 (*id*. § 4.1) (*see* ¶ 14, *infra*);

- *Insurance*:  "the whole of all sums . . . which the Landlord shall from time to time be liable to pay for insuring the Demised Premises" (Lease (Ex. 6) § 3(b));[7]

- *Estate Service Charges*:  "the payments to be made to the Management Company (subject to Clause 8.6) in accordance with Clause 9," entitled "Service Charge," which include the maintenance of, among other things, all roads, pipes, lighting, trash, and security (*id*. §§ 1.24, 3(c), 9.2, Schedule 6 Part A);[8]

14.    Under the Lease, LBL was required to pay, on a quarterly basis, annual

rent for the indicated periods as follows:

(a)    £54,234,529 from November 9, 2008 to November 8, 2009;

(b)    £55,861,565 from November 9, 2009 to November 8, 2010;

(c)    £57,537,412 from November 9, 2010 to November 8, 2011;

(d)    £59,263,534 from November 9, 2011 to November 8, 2012; and

(e)    £61,041,440 from November 9, 2012 to November 8, 2013 and for each additional year through the end of the Lease term (unless it can be determined on certain review dates that market rent for those additional years is greater, in which case market rent would be charged).

---

[7] The "Landlord" was defined in the Lease to include Canary Wharf.  (Lease (Ex. 6) Lease Particulars ¶ 3.)

[8] The "Management Company" was defined in the Lease to include Canary Wharf.  (Lease (Ex. 6) Lease Particulars ¶ 3.)

(Lease (Ex. 6) § 3(a), Schedule 3 Part B § 4, Lease Particulars ¶¶ 8-13.)  LBL also was

obligated to pay "car parking rent" of £640,000 for (a) October 10, 2005 to January 2, 2009;

(b) January 3, 2009 to November 8, 2009; and (c) each year thereafter during the Lease term

(or market rent, if that is greater on certain review dates).  (*Id*. § 3(a), § 4.1, Schedule 3 Part A

§§ 2-3.)  LBL began paying rent on August 31, 2004.  (*Id*. Lease Particulars ¶ 14.)

15.      Pursuant to Section 8 of the Lease, entitled "Forfeiture," if any rent,

estate service charges or insurance is "unpaid for twenty one (21) days after becoming

payable (whether formally demanded or not)," then Canary Wharf may re-enter the property

and terminate the lease "without prejudice to any rights or remedies which may then have

accrued to the Landlord or the Management Company against the Tenant in respect of any

antecedent breach of any of the covenants contained in this Lease."  (Lease (Ex. 6) § 8.1.)

16.      The Lease also requires that LBL pay "all existing and future" taxes

(Lease (Ex. 6) § 4.3(a)) and building service charges, which include the costs of electricity,

telephone, water and gas (*id*. § 4.3(d)).

17.      Additionally, the Lease requires that LBL "[i]mmediately prior to the

expiration or sooner determination of the Term at the cost of the Tenant . . . put or reinstate

the Demised Premises in or to a condition commensurate with that described in the

specification annexed hereto entitled 'Minimum Standard Developer's Finish for Tenant

Work.'"  (Lease (Ex. 6) § 4.10, Annexure.)  LBL also must keep the building in "good and

substantial repair" and "keep all plant machinery and other equipment . . . properly

maintained and in good working order and condition."  (Lease (Ex. 6) §§ 4.5, 4.6.)  The

portions of a building that fall below the specified condition in a lease are often referred to in

the United Kingdom as "dilapidations."  (Jordan Decl. ¶ 6.)

**2.      LBHI's Obligations to Pay the Amounts Due**

18.      LBHI is defined in the Lease as the "Surety."  (Lease (Ex. 6) Lease Particulars ¶ 3.)  Section 10 of the Lease, entitled "THE SURETY'S COVENANTS," provides that "IN consideration of this demise having been made at its request the Surety HEREBY COVENANTS with the Landlord and as a separate covenant with the Management Company as a primary obligation in the terms contained in Schedule 4."  (Lease (Ex. 6) § 10.)

19.      Paragraph 1 of Schedule 4, entitled "Indemnity by Surety," provides as follows:

> The Surety hereby covenants with the Landlord and as a separate covenant with the Management Company as a primary obligation that [i] the Tenant or the Surety shall at all times until the Tenant shall cease to be bound by the Tenant's covenants in the Lease during the Term duly perform and observe all the covenants on the part of the Tenant contained in this Lease including the payment of the rents hereby reserved and all other sums payable under this Lease in the manner and at the times herein specified and [ii] the Surety shall indemnify and keep indemnified the Landlord and the Management Company against all claims demands losses damages liability costs fees and expenses whatsoever sustained by the Landlord or the Management Company by reason of or arising directly or indirectly out of any default by the Tenant in the performance and observance of any of its obligations or the payment of any rents and other sums

> Provided That the Landlord and the Management Company shall notify the Tenant of any such actions or other matters and take all reasonable steps to mitigate such losses having regard to the nature of the breach[.]

(Lease (Ex. 6) Schedule 4 ¶ 1 (bracketed numbers added for explanatory purposes in the

Declaration of Laurence Rabinowitz Q.C., executed October 11, 2012 ("Rabinowitz Decl.")

¶ 49).)  (Schedule 4 is hereafter sometimes referred to as "the Indemnity.")[9]

20.     In Paragraph 6 of the Indemnity, LBHI agreed that the following events

and conduct would <u>not</u> "release discharge or in any way lessen or affect the liability of the

Surety under this Lease":

- "any variation of the terms of this Lease," subject to a statute not relevant here (Rabinowitz Decl. at 15 n.15); and

- "any other act omission matter or thing whatsoever whereby but for this provision the Surety would be exonerated either wholly or in part (other than a release under seal given by the Landlord and/or the Management Company as the case may be)."

(Lease (Ex. 6) Schedule 4 ¶¶ 6(d), (g).)

21.     Under Paragraph 7 of the Indemnity, LBHI "further covenant[ed]" that

should the Lease be disclaimed or forfeited,

> THEN the Surety shall if the Landlord by notice in writing given to the Surety within one hundred and eighty (180) days after such disclaimer or other event so requires accept from and execute and deliver to the Landlord a counterpart of a new lease of the Demised Premises (duly stamped at the Surety's expense) for a term commencing on the date of the disclaimer or other event and continuing for the residue then remaining unexpired of the Term such new lease to be at the cost of the Surety and to be at the same rents and subject to the same covenants conditions and provisions as are contained in this Lease[.]

---

[9] As Q.C. Rabinowitz explains, Paragraph 2 of the Indemnity contains further LBHI primary obligations to Canary Wharf.  Rabinowitz Decl. ¶ 39(5).  Under Paragraph 2, LBHI is "jointly and severally liable with the Tenant (whether before or after any disclaimer by a liquidator or trustee in bankruptcy) for the fulfilment of all the obligations of the Tenant under this Lease" and states that Canary Wharf "may proceed against the Surety as if the Surety was named as the Tenant in this Lease."  (Lease (Ex. 6) Schedule 4 ¶ 2.)  Similarly, in Paragraph 3 of the Indemnity, LBHI "waives any right to require the Landlord or the Management Company to proceed against the Tenant or to pursue any other remedy whatsoever which may be available to the Landlord or the Management Company before proceeding against the Surety."  (Lease (Ex. 6) Schedule 4 ¶ 3.)

(Lease (Ex. 6) Schedule 4 ¶ 7(a).)  Should Canary Wharf "not require the Surety to take a new

lease," the Lease provides that "upon demand" LBHI would pay Canary Wharf "a sum equal

to the Rent and other sums that would have been payable under this Lease but for the

disclaimer or other event in respect of the period from and including the date of such

disclaimer or other event until the expiration of one hundred and eighty (180) days therefrom

or until the Landlord shall have granted a lease of the Demised Premises to a third party

(whichever shall first occur)."  (Lease (Ex. 6) Schedule 4 ¶ 7(b).)

22.    In sum, LBHI as Surety has a "primary obligation" to perform all of the

Tenant's covenants in the Lease and to indemnify Canary Wharf against all its losses "arising

directly or indirectly out of any default by the Tenant."  (Lease (Ex. 6) Schedule 4 ¶ 1.)  And

LBHI also agreed that these obligations would not be discharged or diminished by any

variation of the terms of the Lease or any other act or omission by Canary Wharf.  (*Id.*

Schedule 4 ¶ 6.)  As discussed in Parts I-II, *infra*, these provisions preclude LBHI's

unsupported arguments in the Objection that it is no longer liable to pay Canary Wharf for the

Claims.  As Q.C. Rabinowitz explains, under English law, these provisions require LBHI to

pay Canary Wharf for the unpaid amounts due under the Lease (less mitigation) without

regard to any agreements entered into between LBL and Canary Wharf, and provide Canary

Wharf a remedy even in the case of forfeiture.  (*See*, *e.g.*, Rabinowitz Decl. ¶ 80.)

**C.    LBHI's U.S. Bankruptcy and LBL's U.K. Administration**

23.    On September 15, 2008, LBHI filed for bankruptcy in the Southern

District of New York under chapter 11 of the Bankruptcy Code, and LBL was placed into

administration in the United Kingdom.  (Order Confirming Modified Third Amended Joint

Chapter 11 Plan of LBHI, entered Dec. 6, 2011 ¶ D (ECF# 23023) ("Dec. 6, 2011 Order")

(Ex. 12); Joint Administrators' Progress Report on LBL in Administration, dated April 14,

2009 ("April 14, 2009 Administrators' Report") (Ex. 13) at 5, 22.)  Neither company intended

to reorganize its business and emerge from bankruptcy; instead, both sought to liquidate.

(*See*, *e.g.*, Dec. 6, 2011 Order (Ex. 12) ¶ X; April 14, 2009 Administrators' Report (Ex. 13)

at 3.)

        24.      On September 17, 2009, Canary Wharf filed proofs of claim against

LBHI (the "Claims").  (Proofs of Claim, filed Sept. 17, 2009 (Exs. 14-15).)[10]  The first Claim

(No. 14826) estimated $4.28 billion in damages if LBL stopped paying rent and other charges

under the Lease.  (Heron Quays Proof of Claim (Ex. 14) at Addendum ¶ 2.)  It was clear that

this would occur soon thereafter because the rent due under the Lease was significantly above

market and LBL intended to liquidate.  (Jordan Decl. ¶ 4.)  Canary Wharf also "expressly

reserve[d] any rights or rights of action" it had or may have against LBHI with respect to its

right to require LBHI to take a new lease under Paragraph 7(a) of the Indemnity.  (Heron

Quays Proof of Claim (Ex. 14) at Addendum ¶ 3.)  The second Claim (No. 14824) estimated

$195,550,000 in damages for estate service charges due under the Lease.  (Canary Wharf

Management Proof of Claim (Ex. 15) at Addendum ¶ 2.)

        25.      On October 16, 2009, Canary Wharf submitted "Guarantee Claim

Summaries" for the Claims to LBHI.  (Claim Summaries, dated Oct. 16, 2009 (Ex. 16).)  The

"Guarantee Claim Summaries" included, among other things, schedules detailing Canary

Wharf's calculation of each component of the estimated Claims.  (*Id.*)

    **D.**    **LBL Vacated the Property and Canary Wharf Mitigated Its Losses**

        26.      In March 2010, LBL vacated the property at 25 Bank Street.  (Joint

Administrators' Progress Report on LBL in Administration, dated April 13, 2010 (Ex. 17) at

---

[10] This Court required that proofs of claim be filed by September 22, 2009.  (Order, entered
July 2, 2009 at 2 (ECF # 4271).)

1, 4, 14.)  LBL's administrators stopped paying rent and other amounts due under the Lease as of March 31, 2010.  (Jordan Decl. ¶ 5.)

27.    Subtenants Nomura International plc ("Nomura"), the New York Stock Exchange ("NYSE") and Jones Lang LaSalle ("JLL") continued to occupy a portion of the building after March 31, 2010.  (Jordan Decl. ¶ 11.)  From September 2008 through December 2010, these subtenants collectively paid Canary Wharf £51,903,248 in respect of the amounts due under the Lease.  (*Id*.)

28.    In an effort to further mitigate its losses, Canary Wharf sought a new tenant for the 25 Bank Street property.  (Jordan Decl. ¶ 7.)  The building's enormous size -- more than one million square feet -- combined with low demand in the market made finding a new tenant very challenging.  (*See*, *e.g.*, Letter from Dan Roberts of CB Richard Ellis to Richard Archer of Canary Wharf Group plc, dated Oct. 13, 2010 (Ex. 18).)  Additionally, when LBL's administrators vacated the building, LBL failed to fulfill its obligation under Section 4.10 of the Lease to fix dilapidations by "reinstat[ing] the Demised Premises in or to a condition commensurate with that described in the specification annexed hereto entitled 'Minimum Standard Developer's Finish for Tenant Work.'"  (Jordan Decl. ¶ 6; Lease (Ex. 6) § 4.10.)  It is customary in the UK for new tenants to be offered property at the beginning of a tenancy in a condition similar to the standard specified in the Lease.  (Jordan Decl. ¶ 6.)

29.    In March 2010, Canary Wharf began negotiations with JPMorgan on a possible long-term lease of the 25 Bank Street property.  (Jordan Decl. ¶ 7.)  JPMorgan and Canary Wharf signed a memorandum of understanding in August 2010, which included basic economic terms under which JPMorgan would take a 999-year lease of the property.  (Jordan Decl. ¶ 7.)  The parties agreed that JPMorgan would lease the property "as is," *i.e.*, JPMorgan would be responsible for any repairs or construction necessary to fix dilapidations.  (Jordan

Decl. ¶ 7.)  During negotiations, Canary Wharf thus estimated the amount of these

dilapidations and accounted for them in determining the upfront payment to be made by

JPMorgan to Canary Wharf at the time the lease was signed.  (Jordan Decl. ¶ 7.)  Similarly,

JPMorgan estimated the amount it would spend on repairs in evaluating the transaction.

(Declaration of William Viets, executed Oct. 11, 2012 ("Viets Decl.") ¶ 4.)[11]

　　　　　30.　　The August 2010 memorandum of understanding provided for

JPMorgan to pay Canary Wharf £495 million at the time the lease was signed and for Canary

Wharf Contractors Limited ("CWCL") to complete up to £25 million in construction costs for

repairs of a limited set of specified dilapidations (not all those required) as well as certain

additional improvements at no cost to JPMorgan.  (Jordan Decl. ¶ 8.)  The net value to Canary

Wharf of the deal thus would have been £470 million.  (Jordan Decl. ¶ 8.)

　　　　　31.　　To complete the deal with JPMorgan and mitigate its damages, Canary

Wharf needed to terminate the Lease and retake possession of the property.  Under English

law, forfeiture allows a landlord to bring the lease to an end and re-enter the property after the

occurrence of an event specified in the lease.  Rabinowitz Decl. ¶ 16.  Canary Wharf had the

right under English law to forfeit the lease after LBL failed to make rental payments, but

needed the LBL administrators' consent or leave of a court to do so because LBL was in

administration.  Rabinowitz Decl. ¶ 16.

　　　　　32.　　In a letter agreement between LBL, its administrators and Canary

Wharf, dated December 3, 2010 (the "LBL Forfeiture Agreement"), Canary Wharf agreed to

exercise its "right to forfeit the Lease by peaceable re-entry" before 11:59 p.m. on December

10, 2010.  (LBL Forfeiture Agreement (Ex. 19) § 2.)  LBL agreed to pay Canary Wharf

---

[11] Mr. Viets was JPMorgan's lead internal counsel for the transaction with Canary Wharf.
(Viets Decl. ¶ 3.)

"£1.5m on the date of forfeiture" in exchange for LBL being "unconditionally and irrevocably released and discharged from any claims as an administration expense for" (i) "unpaid rent" and (ii) "any estate service charge and other sums that fell due and were payable under the Lease" before the date of forfeiture.  (LBL Forfeiture Agreement (Ex. 19) §§ 4(a), 4(c).) Canary Wharf explicitly conditioned these releases on LBL's agreement that Canary Wharf "may claim against LBL as an unsecured creditor for any unpaid rent and estate charge and any other sums falling due under the Lease up to the date of forfeiture." (*Id.* § 4.)  Thus, in the LBL Forfeiture Agreement, Canary Wharf released claims for administration expenses, but explicitly retained its right to pursue any amounts due under the Lease as an unsecured creditor.

33.    In December 2010, LBHI confirmed that it would not take a new lease pursuant to Paragraph 7(a) of the Indemnity.  From December 8 to December 10, 2010, counsel for Canary Wharf (Andrew Dietderich of the firm of Sullivan & Cromwell LLP) and counsel for LBHI (Richard Krasnow of the firm of Weil, Gotshal & Manges LLP) exchanged certain e-mails concerning a proposed exchange of information about the JPMorgan agreement.  (Ex. 20.)  On December 8, Canary Wharf's counsel sought to "confirm[] that you do not want [to] take up the 25 Bank Street lease on its initial terms." (*Id.* at Dec. 8, 2010 5:02 p.m. e-mail.)  Canary Wharf's counsel explained that confirmation of that position "is important to both my client [Canary Wharf] and the tenant [JPMorgan]" because "[i]t is not tenable for either of them that you reserve the right to compete with the new tenant for the space" while confidential information is exchanged.  (*Id.*)  After several more e-mails, Canary Wharf's counsel again asked "whether you want a new lease on initial terms.  It is important to know this so we can do a mitigation deal that is in everyone's interest." (*Id.* at Dec. 8, 2010, 6:59 p.m. e-mail.)  On December 9, LBHI's counsel responded:  "We have consulted

with our client and, on the assumption that the economic terms of the proposed transaction
[with JPMorgan] are as was described to us at the December 6, 2010 meeting, then LBHI
would not elect to enter into a lease for the premises on the same terms as the current
CW/LBL lease." (*Id.* at Dec. 9, 2010, 12:39 p.m. e-mail.)[12]

34.    JPMorgan, certain of its affiliates and Canary Wharf executed a 999-
year lease for the 25 Bank Street property (the "JPM Lease") and an agreement relating to the
lease, both dated December 20, 2010. (JPM Lease, dated Dec. 20, 2010 (Ex. 21) Prescribed
Clauses LR1, LR6 & p. 11; Agreement Relating to the Sale of a Lease, dated Dec. 20, 2010
(Ex. 22).) Pursuant to those documents, JPMorgan paid £470 million to Canary Wharf.
(Jordan Decl. ¶ 9; JPM Lease (Ex. 21) Prescribed Clause LR7, § 2.3; Agreement Relating to
the JPM Lease (Ex. 22) §§ 1, 4.1.) The amount of this payment took into account
dilapidations to the building, the cost of the correction of which CWCL estimated to be
£56,145,280.45 in September 2010. (Jordan Decl. ¶ 9.) JPMorgan also agreed to pay Canary
Wharf (i) £1,000 per year in ground rent (subject to review every ten years), and (ii) estate
service charges. (JPM Lease (Ex. 21) at 5, 9, §§ 2.3, 3.1, 3.4, 7.1.1 & Schedule 6.) JPMorgan
is responsible for paying any taxes, building service charges, insurance and repair and
maintenance. (Jordan Decl. at 6 n.3.)

35.    In light of its mitigation of damages, Canary Wharf entered into a
Stipulation with LBHI, so ordered by this Court on September 1, 2011, agreeing to a limit on
its Claims. (Stipulation, Agreement and Order, entered Sept. 1, 2011 (ECF # 19644)
(Ex. 23).) In that stipulation, Canary Wharf agreed to limit its $4.28 billion claim (No.

---

[12] As discussed above (¶¶ 29-30, *supra*), in August 2010 -- months before the December 6,
2010 meeting -- Canary Wharf and JPMorgan agreed to an agreement in principle, including
economic terms.

14826) for rent, insurance, dilapidations, costs, building service charges and taxes to $770

million. (*Id.* ¶ 2.) For its other claim for estate service charges (No. 14824), Canary Wharf

agreed to a limit of $9.15 million. (*Id.*)

### E.    Canary Wharf's Damages

36.    Subtenants and the JPM Lease mitigated some, but not close to all, of

the losses that Canary Wharf estimated in its September 2009 proofs of claim. These losses

fall into four basic categories of damages.[13]

37.    ***Amounts Owed Pre-Forfeiture.*** From the commencement of LBL's

administration in September 2008 through December 2010 (*i.e.*, through forfeiture of the

Lease), Canary Wharf was owed £131,784,619.28 in rent, insurance and estate service

charges under the Lease. (Jordan Decl. ¶ 11.) Canary Wharf received £101,520,066.20 for

these amounts from LBL, its administrators and subtenants Nomura, the NYSE and JLL,

leaving £30,264,553.08, or $48,556,448.96, unpaid before forfeiture of the Lease. (*Id.*)[14]

38.    ***Amounts That Would Have Been Paid Post-Forfeiture.*** Canary

Wharf's damages for amounts that were to be paid under the Lease after December 2010 are

the difference between (a) the aggregate present value of (i) the amounts to be paid by LBL

under the Lease plus (ii) the property on expiry of the Lease in July 2033, and (b) the

aggregate present value of (i) amounts that were paid or are to be paid under the JPM Lease

less (ii) Canary Wharf's costs in reletting the property to JPMorgan. Canary Wharf would

---

[13] To calculate damages in dollars, the British pound amounts are converted using the exchange rate of $1.6044 per pound current as of October 11, 2012. Currencies, THE WALL STREET JOURNAL, Oct. 12, 2012, at C4.

[14] This total includes £1,759,754.10, or $2,823,349.48, in estate service charges. (Jordan Decl. at 5 n.1.) LBL, its administrators and the subtenants paid any taxes due in this period. (*Id.* ¶ 11.) No building service charges were payable in this period. (*Id.*)

have received £861,552,088.39 under the Lease for rent (discounted to December 2010[15]

using a rate of 4.75%, which reflects a reasonable market rate based on the quality of the

building and the lease terms).  (Jordan Decl. ¶ 12.)  JPMorgan paid £470 million to Canary

Wharf in December 2010 and will pay £21,096.47 (using the same discount rate of 4.75%) in

ground rent.  (Jordan Decl. ¶ 13.)[16]  Canary Wharf also incurred £6,006,672 in costs to complete

the JPMorgan deal, including retenanting costs and closing costs.  The difference between the

rental amounts that Canary Wharf would have received from LBL and the amounts paid by

(or to be paid by) JPMorgan (less Canary Wharf's costs to complete the JPMorgan deal) is

£397,537,663.92, or $637,809,427.99 using a current exchange rate.  (Jordan Decl. ¶ 13.)  In

addition to this amount, Canary Wharf's damages also include the value of the property in

July 2033.  This is because Canary Wharf would have retaken possession of the property at

that time under the Lease whereas the JPM Lease expires in December 3009.

       39.    A portion of these damages is the cost of fixing dilapidations to the

building as both parties factored that cost into the amount JPMorgan paid in December 2010

when it leased the building on an "as is" basis.  *See* ¶ 29, *supra*.[17]

---

[15] For simplicity, Canary Wharf has discounted the figures above to December 2010 when
JPMorgan and Canary Wharf entered a new lease.  Once the Objection is resolved, these
figures will be updated to present value.

[16] JPMorgan is paying insurance, service charges, and taxes and is responsible for repair and
maintenance (which includes what Canary Wharf had estimated in its October 16, 2009
Guaranty Claim Summaries for Mechanical & Electrical ("M&E") Replacement Costs).
(Jordan Decl. at 6 n.3.)  Therefore, Canary Wharf no longer seeks these portions of the Claims
for the amounts that would have been paid under the Lease post-forfeiture.

[17] Dilapidations must be calculated as a portion of Canary Wharf's damages only if the Court
concludes that the statutory cap in 11 U.S.C. § 502(b)(6) applies to the Claims, because the
law is clear that this cap does not apply to damages from dilapidations.  *See* ¶ 86, *infra*.  If the
Court determines that the cap does not apply, Canary Wharf's damages for this period need
not be split between unpaid rent and dilapidations, but rather can be calculated more simply as
described above in ¶ 38.

40.    ***Dilapidations.***  As noted above (¶ 17, *supra*), the Lease required that upon vacancy, LBL must "put or reinstate the Demised Premises in or to a condition commensurate with that described in the specification annexed hereto entitled 'Minimum Standard Developer's Finish for Tenant Work.'"  (Lease (Ex. 6) § 4.10, Annexure.)  CWCL estimated in September 2010 that it would cost £56.35 per square foot in demolition and construction to bring the building into the condition specified in the LBL lease:  £11.35/sf to remove LBL's alterations to the building and £45/sf to complete the construction necessary to put the building in the condition specified in the Lease.  (Jordan Decl. ¶ 17.)  At 996,367 square feet of net usable office space, the total cost would have been £56,145,280.45, or $90,079,487.95.  (Jordan Decl. ¶ 17.)  Canary Wharf incorporated these dilapidations estimates into its valuation of the 25 Bank Street property and the amount it would accept as an upfront payment from JPMorgan.  (Jordan Decl. ¶ 17.)

41.    In comparison, JPMorgan estimated that it would cost about £100 million ($160.4 million) to repair dilapidations to the building and make additional improvements to the building.  (Viets Decl. ¶ 4.)  The £100 million estimate was considered as part of JPMorgan's internal approval process for the transaction with Canary Wharf.  (*Id.*)

42.    ***Costs.***  In its October 2009 "Guarantee Claim Summaries" detailing the Claims, Canary Wharf estimated that costs, including legal costs associated with collecting unpaid Lease amounts, totaled $845,582.00.  (Claim Summaries, dated Oct. 16, 2009 (Ex. 16).)  LBHI has not objected to this estimated amount or the evidence submitted to support that amount.  (*See* Objection ¶¶ 24-25.)

**F.    The Objection by LBHI**

43.    On August 15, 2012, LBHI filed an objection to the Claims pursuant to 11 U.S.C. § 502(b) and Rule 3007(d) of the Federal Rules of Bankruptcy Procedure,

requesting that the Court "disallow and expunge the Claim[s]." (Objection ¶ 3 (ECF#

30055).)  LBHI there argues that (1) it has no obligations to pay Canary Wharf because of a

material variation of the Lease (Objection ¶¶ 17-20); (2) LBL has no post-forfeiture

obligations to pay Canary Wharf because LBHI's obligations are co-extensive with LBL's

(Objection ¶ 21); and (3) LBHI's obligations in the Indemnity cannot extend past December

20, 2010 (the date of the JPM Lease) (Objection ¶ 22).  These arguments are not supported by

any opinion as to English law (which, all agree, governs).  LBHI also argues that, even if its

obligations continued, the Claims should be reduced because certain damages are not

recoverable and all damages are subject to the statutory cap in 11 U.S.C. § 502(b)(6).

(Objection ¶¶ 23, 25.)  As shown below, LBHI is incorrect in each respect.

### RESPONSES TO OBJECTIONS

44.    A properly filed proof of claim is *prima facie* evidence of the validity

and amount of the claim.  Fed. R. Bankr. P. 3001(f).  The burden then shifts to the objector to

show "sufficient evidence" negating such *prima facie* validity.  *See*, *e.g.*, *In re Oneida Ltd*.,

400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Spiegel, Inc.*, Nos. 03-11540, 06-13477,

2007 WL 2456626, at *15 n.6 (S.D.N.Y. Aug. 22, 2007).

45.    It is undisputed that the Claims were properly filed.  LBHI has not met

its burden or even seriously attempted to do so.  And LBHI may not wait until reply to present

an opinion or analysis of English law in an effort to support its Objection.  "It is established

beyond peradventure that it is improper to sandbag one's opponent by raising [a] new matter

in reply."  *Wolters Kluwer Financial Services Inc*. v. *Scivantage*, No. 07-2352, 2007 WL

1098714, at *1 (S.D.N.Y. Apr. 12, 2007) (internal citation and alteration omitted).

46.    The Lease is "governed by and construed in all respects in accordance with the Laws of England."  (Lease (Ex. 6) § 8.16.)  Although LBHI has not provided an opinion on English law, Canary Wharf here supplies the Court with the declaration of Laurence Rabinowitz, Q.C., on the English law issues relevant here.  Q.C. Rabinowitz has been practicing law in England since 1987, was made a Queen's Counsel in 2002, and has been a Bencher of Middle Temple (*i.e.*, a member of its governing body) since 2008. Rabinowitz Decl. ¶ 3.  He has been recognized as a "star individual" in several fields, including commercial dispute resolution, in the latest editions of *Chambers UK Bar* and *Legal 500* (two leading guides to the legal profession in England).  *Id.*  Q.C. Rabinowitz regularly serves as counsel in the High Court in London, as well as in the Court of Appeal and Supreme Court (and, prior to its replacement as England's highest court by the Supreme Court in October 2009, in the House of Lords).  *Id.* ¶ 4.  Q.C. Rabinowitz concludes, as explained in more detail below and in his accompanying declaration, that LBHI's arguments that its obligations to Canary Wharf have been discharged are baseless under English law.  The Claims should be allowed.

I.    **LBHI's Obligations in the Indemnity Are Not Discharged Because of a "Material Variation" of the Lease.**

47.    LBHI argues that the Claims should be "disallowed and expunged in their entirety" because the releases of claims for administration expenses in Section 4 of the LBL Forfeiture Agreement "constitute material variations to the Lease to which LBHI did not consent" and thus the Indemnity is "unenforceable as a matter of English law."  (Objection ¶ 20; *see also id.* ¶¶ 17-19.)  As Q.C. Rabinowitz explains, this argument fails for three independent reasons.  *First*, LBHI agreed to an indemnity, not a guarantee, and thus a material variation does not discharge its obligations as a matter of English law.  *Second*, even if the

Court were to determine that LBHI were a guarantor, LBHI explicitly agreed in the Indemnity

to remain liable after a material variation and this agreement will be enforced by English

courts.  *Third*, the releases in the LBL Forfeiture Agreement relied on by LBHI are not, under

English law, a material variation of the Lease.

### A.    Material Variations Do Not Discharge Indemnitors Like LBHI.

48.    As Q.C. Rabinowitz explains in his declaration, under English law,

there is a fundamental difference between two types of contracts of suretyship:  guarantees

and indemnities.  Rabinowitz Decl. ¶¶ 33-34 (citing *Vossloh Aktiengesellschaft* v. *Alpha

Trains (UK) Ltd* [2010] EWHC 2443 (Ch), [2011] 2 All ER (Comm) 307).  Under English

law, in a guarantee, a guarantor promises to pay only if the principal fails to perform.  *Id*. ¶ 35

(citing *Vossloh* ¶ 23).  An "essential feature of a true contract of guarantee is that the liability

of the guarantor is always secondary to that of the principal," and under the principle of "co-

extensiveness," a guarantor is "generally liable to the creditor only to the same extent as the

principal is liable to the creditor."  *Id.* (citing *Vossloh* ¶ 24).

49.    In contrast, under English law, in an indemnity, an indemnitor promises

to pay as a primary obligation independent of the principal's obligations.  Rabinowitz Decl.

¶ 36.  As Q.C. Rabinowitz explains, the "essential feature of a contract of indemnity is that a

primary (rather than secondary) liability falls upon the giver of the indemnity and (unless

given only jointly with the principal) this obligation is wholly independent of any liability that

may arise as between the creditor and the principal."  *Id*. (citing *Vossloh* ¶ 25).  Thus, "the

principle of co-extensiveness does not apply" to indemnities.  *Id*. (citing *Vossloh* ¶ 26).

50.    The differences between a guarantee and an indemnity under English

law are particularly significant where, as here, a party claims a material variation of the

principal contract.  Rabinowitz Decl. ¶ 37.  Under English law, a material variation to which a

guarantor does not consent will relieve the guarantor of its obligations.  *Id*. ¶¶ 27-28.  As

LBHI says in the Objection:  "[A] *guarantee* is discharged if there is a material variation to

the underlying contract to which the *guarantor* does not consent."  (Objection ¶ 17 (emphasis

supplied); *see also* Rabinowitz Decl. ¶ 27.)  Because an indemnitor has a principal obligation

that is not co-extensive with any other obligation, no corresponding rule exists under English

law that an indemnitor is automatically discharged as the result of a material variation of the

principal contract.  Rabinowitz Decl. ¶ 37.

     51.     As Q.C. Rabinowitz concludes, the terms of the Lease confirm that

LBHI's obligations here are those of an indemnitor, not a guarantor.  Rabinowitz Decl. ¶ 39.

In Section 10 of the Lease, LBHI agreed to "a primary obligation in the terms contained in

Schedule 4."  (Lease (Ex. 6) § 10.)  Paragraph 1 of Schedule 4 is entitled "Indemnity by

Surety," and the obligations therein again are agreed to "as a primary obligation," the

hallmark of an indemnity.  Lease (Ex. 6) Schedule 4 ¶ 1; Rabinowitz Decl. ¶ 39(2).

     52.     In Paragraph 1, LBHI agrees that it will (i) "indemnify and keep

indemnified" Canary Wharf "against all claims demands losses damages liability costs fees

and expenses whatsoever" suffered by Canary Wharf as a result of LBL's failure to pay rent

and other sums due under the Lease, and (ii) perform the covenants of the Lease, rather than

simply agree that it would ensure that LBL performs the covenants.  Rabinowitz Decl. ¶ 49;

Lease (Ex. 6) Schedule 4 ¶ 1.

     53.     Paragraph 2 of Schedule 4 further confirms that LBHI is an indemnitor

and not a guarantor.  In Paragraph 2, LBHI agreed (i) to be "jointly and severally liable" for

LBL's obligations under the Lease (in other words, to be a primary obligor), and (ii) that

Canary Wharf may "proceed against the Surety [*i.e.*, LBHI] as if the Surety was named as the Tenant in this Lease."  Rabinowitz Decl. ¶ 39(5); Lease (Ex. 6) Schedule 4 ¶ 2.

54.      Similarly, Paragraph 6 provides that certain events will not "release discharge or in any way lessen or affect the liability of the Surety," consistent with the principle that LBHI's obligations are not co-extensive with those of LBL.  Rabinowitz Decl. ¶ 39(6); Lease (Ex. 6) Schedule 4 ¶ 6.  Q.C. Rabinowitz explains that Paragraph 6 should be read under English law as confirming "'for the avoidance of doubt' that dealings between Claimants and the Tenant would not impact LBHI's liability under the indemnity." Rabinowitz Decl. ¶ 39(6).

55.      Therefore, even if there was (as LBHI contends) a material variation of the Lease, LBHI, as indemnitor, was not discharged under English law.  Rabinowitz Decl. ¶ 40.

**B.      Under Paragraph 6 of the Indemnity, LBHI's Obligations Cannot Be Discharged by a Material Variation.**

56.      Even if LBHI were a guarantor, its obligations in this case would not be discharged by what LBHI contends was a material variation.  This is because LBHI agreed in the Indemnity that its obligations to pay Canary Wharf would remain in full after a material variation.  Rabinowitz Decl. ¶ 41.

57.      Under English law, parties to a contract may agree, and such an agreement is fully enforceable, that a material variation does not relieve a guarantor of its obligations.  Rabinowitz Decl. ¶¶ 41-42.  If parties so agree, the English default rule (that a material variation relieves a guarantor of its obligations) is inapplicable.  Rabinowitz Decl. ¶ 42.  Here, in Paragraph 6(d) of Schedule 4, LBHI agreed (subject to a statute not applicable here) that "any variation of the terms of this Lease" would not "release discharge or in any

- 23 -

way lessen or affect the liability of the Surety [*i.e.*, LBHI] under this Lease." Lease (Ex. 6)

Schedule 4 ¶ 6(d); Rabinowitz Decl. ¶ 39(6) & p. 15 n.15. Additionally, Paragraph 6(g) of

Schedule 4 is a catch-all provision stating that "any other act omission matter or thing

whatsoever" does not release or otherwise discharge LBHI. Lease (Ex. 6) Schedule 4 ¶ 6(g);

Rabinowitz Decl. ¶ 39(6). A material variation of the Lease is covered by both of these

provisions, and thus, the default rule does not apply under English law. Rabinowitz Decl. ¶ 43.

        **C.**    **The Releases in the LBL Forfeiture Agreement**
                    **Were Not a Material Variation of the Lease.**

      58.    LBHI claims that the LBL Forfeiture Agreement constitutes a material

variation of the Lease because the releases therein "remove[] the ability of the Landlord to

pursue the Tenant for obligations arising prior to the forfeiture, which otherwise would have

been paid in full as an administrative expense under English law." (Objection ¶ 19.) This is

incorrect as a matter of English law.

      59.    The releases are explicitly limited to only "claims as an administration

expense." LBL Forfeiture Agreement (Ex. 19) § 4; Rabinowitz Decl. ¶ 44.[18] Further, Canary

Wharf expressly reserved its rights under the Lease to "claim against LBL as an unsecured

creditor for any unpaid rent and estate charge and any other sums falling due under the Lease

up to the date of forfeiture." LBL Forfeiture Agreement (Ex. 19) § 4; Rabinowitz Decl. ¶ 44.

      60.    By releasing only claims for administration expenses and expressly

reserving Canary Wharf's claims for unpaid rent and other amounts due under the Lease, the

LBL Forfeiture Agreement does not amount to a material variation under English law.

---

[18] LBHI also claims that Canary Wharf released LBL of "all claims arising after the forfeiture
of the Lease." (Objection ¶ 19.) This is incorrect. As Q.C. Rabinowitz explains, the releases
were only for "claims as an administrative expense" due "before the date of forfeiture."
Rabinowitz Decl. ¶ 44 (citing LBL Forfeiture Agreement (Ex. 19) § 4).

Rabinowitz Decl. ¶ 48.  As Q.C. Rabinowitz explains, under English law, claims for

administration expenses -- like the ones released here in the LBL Forfeiture Agreement --

arise under English insolvency legislation, not the Lease.  Rabinowitz Decl. ¶ 47.  Therefore,

releasing the claims could not constitute a variation of the Lease; rather, the claims for rent

and other amounts due that arose under the Lease were expressly preserved.  Rabinowitz

Decl. ¶¶ 46, 48.[19]

## II.     LBHI Is Liable to Canary Wharf Under Paragraph 1 of the Indemnity.

### A.     LBHI Is Obligated to Pay Canary Wharf's Losses Caused by LBL's Default Under Paragraph 1 of the Indemnity.

61.     Under Paragraph 1 of the Indemnity, LBHI agreed to pay the amounts

sought in the Claims.  Under English law, this Court must hold LBHI to that promise.

62.     Paragraph 1 contains two independent obligations.  Rabinowitz Decl.

¶¶ 49-52; Lease (Ex. 6) Schedule 4 ¶ 1.  These two obligations are contained in the same

sentence, and are separated with the word "and," making clear that these are separate LBHI

obligations.  Rabinowitz Decl. ¶ 52.  First, LBHI agreed to "perform and observe all the

covenants on the part of the Tenant contained in this Lease including the payment of the rents

hereby reserved and all other sums payable under this Lease" until "the Tenant shall cease to

be bound by the Tenant's covenants in the Lease."  (Lease (Ex. 6) Schedule 4 ¶ 1.)  Second,

LBHI agreed to "indemnify and keep indemnified" Canary Wharf "against all claims

demands losses damages liability costs fees and expenses whatsoever sustained by" Canary

Wharf "by reason of or arising directly or indirectly out of any default by the Tenant in the

---

[19] Further, LBHI wrongly assumes that for it to be liable, Canary Wharf must have the ability to pursue LBL for unpaid amounts.  As discussed above at ¶¶ 51-54, LBHI agreed as a primary obligation to pay Canary Wharf and, under English law, LBHI's obligations are not co-extensive with LBL's.  Additionally, LBHI "waive[d] any right to require the Landlord or the Management Company to proceed against the Tenant."  (Lease (Ex. 6) Schedule 4 ¶ 3.)

performance and observance of any of its obligations or the payment of any rents and other

sums."  (Lease (Ex. 6) Schedule 4 ¶ 1.)

63.     In the Objection, LBHI relies solely on the first obligation in Paragraph

1 to argue that LBHI's obligations in the Indemnity are "co-extensive with the Tenant's

responsibilities under the Lease" and "cease when the Tenant's obligations under the Lease

cease."  (Objection ¶ 21.)  LBHI ignores the second obligation in Paragraph 1.  Rabinowitz

Decl. ¶¶ 52-53.  Indeed, in making its argument that LBHI's obligations are co-extensive with

LBL's, LBHI simply replaces the second obligation with an ellipsis.  (Objection ¶ 21.)

Pretending that this second obligation does not exist will not make it go away.

64.     Under English law, the second (and independent) obligation requires

LBHI to pay Canary Wharf for its losses and damages from LBL's default.  Rabinowitz Decl.

¶ 54; Lease (Ex. 6) Schedule 4 ¶ 1.  LBL stopped paying any rent or other amounts due under

the Lease after March 2010 (¶ 26, *supra*), defaulting on its obligations under the Lease.

Rabinowitz Decl. ¶ 54.  This default caused Canary Wharf significant losses in the form of the

unpaid rent and other amounts due under the Lease.  (¶¶ 37-42, *supra*.)  Canary Wharf now

seeks to recover those losses in the Claims.  Applying English law, Canary Wharf may do so

under Paragraph 1 of the Indemnity.  Rabinowitz Decl. ¶ 54.[20]

### B.      LBHI Is Liable for Canary Wharf's Losses Caused by LBL's Repudiatory Breach of the Lease.

65.     Even under the first obligation in Paragraph 1 (Lease (Ex. 6) Schedule

4 ¶ 1; Objection ¶ 21), LBHI is obligated to pay Canary Wharf the unpaid rent and other

---

[20] In Paragraph 2, LBHI agreed to be "jointly and severally liable" with LBL for "the
fulfilment of all the obligations of the Tenant under this Lease."  (Lease (Ex. 6) Schedule 4
¶ 2.)  This provision similarly gives rise to a Canary Wharf claim for damages.  Rabinowitz
Decl. ¶ 65.

amounts due under the Lease.  This is because under English law, LBL committed a

"repudiatory breach" of the Lease when it stopped paying rent after March 2010.  Rabinowitz

Decl. ¶ 56.  Such a breach gives rise to a damages claim for the entire value of the Lease less

mitigation.  *Id.*

       66.     As Q.C. Rabinowitz explains, he would expect an English court to

follow the decision of the Northern Ireland Court of Appeal in *Rainey Brothers Ltd.* v.

*Kearney*, 1990 N.I. 18 (Court of Appeal) (Hutton, C.J.), and hold "that a landlord is entitled to

recover damages for loss of future rent where the lease is forfeited for a repudiatory breach by

the tenant."  Rabinowitz Decl. ¶ 56(8).[21]  In *Rainey Brothers*, a tenant signed a 20-year lease

and stopped paying rent after four years.  In the fifth year, the landlord re-entered the

premises for non-payment of rent and terminated the lease.  *Rainey Brothers*, 1990 N.I. at 19.

The landlord subsequently relet the premises at a rent lower than that agreed to by the original

tenant.  *Id*.  The court held that "a lessor who terminates a lease for non-payment of rent may

recover damages to compensate him for the loss of rent which would have been payable under

the lease."  *Id*. at 19-20.  The court also noted that the lease with the original tenant had a

provision that upon re-entry "this demise should be absolutely determined but without any

prejudice to any claim by the Lessor in respect of any antecedent breach of any covenant or

provision herein contained."  *Id*. at 19.  The court concluded that the landlord could recover

damages for the loss of rent between termination and the granting of the new lease as well as

the difference between the new and old leases' rent.  *Id*. at 19-21.

---

[21] Q.C. Rabinowitz explains that an English court would follow this Northern Ireland decision
because (i) English courts typically give great deference to the courts of Northern Ireland,
(ii) the jurist who authored the *Rainey Brothers* decision (Lord Hutton) subsequently served in
the House of Lords, then England's highest court, and (iii) the opinion considers and
expressly relies on decisions by English courts.  Rabinowitz Decl. ¶ 56(7).

67.     Here, LBL committed a repudiatory breach under English law when it stopped paying rent after March 2010, and thus Canary Wharf's claim for damages for the unpaid rent and other amounts due under the Lease (less mitigation) arose at that time. Rabinowitz Decl. ¶ 56(9).  The fact that Canary Wharf forfeited the Lease in December 2010 -- the principal basis for LBHI's objection (Objection ¶¶ 21-22) -- does not alter or eliminate Canary Wharf's damages claim, just as termination of the lease by re-entry did not do so in *Rainey Brothers*.  Rabinowitz Decl. ¶ 57.  Indeed, Section 8.1 of the Lease, similar to the lease in *Rainey Brothers*, confirms that Canary Wharf's damages claim is unaffected by forfeiture:  after forfeiture, Canary Wharf could re-enter the property and terminate the lease "without prejudice to any rights or remedies which may then have accrued" to Canary Wharf "against the Tenant in respect of any antecedent breach of any of the covenants contained in this Lease."  (Lease (Ex. 6) § 8.1.)

### C.     Paragraph 7 of the Indemnity Does Not Limit LBHI's Liability Under Paragraph 1.

68.     LBHI also argues that even if it were liable to pay Canary Wharf under the Indemnity, its liability ceased on December 20, 2010 -- the date of the JPM Lease -- pursuant to Paragraph 7(b) of the Indemnity.  (Objection ¶ 22.)  That paragraph provides for certain damages that are available in the case of disclaimer or forfeiture of the Lease.  (Lease (Ex. 6) Schedule 4 ¶ 7(b).)  Applying English contract construction principles, LBHI's argument is incorrect.

69.     As Q.C. Rabinowitz explains, Paragraph 7 does not set forth Canary Wharf's exclusive rights in the case of forfeiture.  Rabinowitz Decl. ¶¶ 61-62.  Rather, that provision contains *additional* remedies that Canary Wharf may seek after a disclaimer or

forfeiture, and thus does not preclude Canary Wharf's claims under Paragraph 1.  Rabinowitz

Decl. ¶¶ 61-68.

70.     Q.C. Rabinowitz explains that under English law (and logic), Paragraph

7 must be interpreted as an additional right to Paragraph 1.  First, nothing in the language of

Paragraph 7 limits or eliminates the rights of Canary Wharf to damages under other

provisions (such as Paragraph 1) of the Indemnity.  Rather, Paragraph 7 begins by stating that

LBHI "further covenants" before discussing the parties' rights or obligations thereunder.

(Lease (Ex. 6) Schedule 4 ¶ 7.)  And Paragraph 1 does not limit the rights and obligations

provided therein, such as by providing that the indemnification obligations are applicable

"unless governed by Paragraph 7."  (*Id.* Schedule 4 ¶ 1.)  Thus, the plain language of the

Indemnity permits Canary Wharf to seek a remedy under *either* Paragraph 1 or Paragraph 7.

Rabinowitz Decl. ¶¶ 61-64.

71.     Second, Paragraph 2 confirms that Paragraph 7 does not set forth

Canary Wharf's exclusive remedy with respect to the subjects of Paragraph 7 (disclaimer or

forfeiture of the Lease).  Even though Paragraph 7 addresses rights and obligations after

disclaimers by a liquidator or trustee in bankruptcy, Paragraph 2 provides that LBHI is

"jointly and severally liable" with LBL "whether before or after any disclaimer by a liquidator

or trustee in bankruptcy."  (Lease (Ex. 6) Schedule 4 ¶ 2.)  This language makes clear that

Paragraph 7 is not exclusive and that Canary Wharf may pursue claims based on other

provisions of the Indemnity even if it could also do so under Paragraph 7.  Rabinowitz Decl.

¶¶ 65-66.

72.     Therefore, as Q.C. Rabinowitz explains, after LBL breached the

Lease, Canary Wharf could seek damages under English law for the amounts due under the

Lease (less mitigation) pursuant to Paragraph 1.  Canary Wharf also had two alternatives in

the case of forfeiture of the Lease:  (1) request LBHI enter a new lease on the same terms as

the Lease; or (2) collect a payment of 180 days of rent and other sums due under the Lease

(or until Canary Wharf entered into a new lease).  (Lease (Ex. 6) Schedule 4 ¶ 7.)  The

former option would help Canary Wharf mitigate its losses without the trouble of having to

seek out a new tenant.  The latter would permit Canary Wharf to recover a specified amount

of damages while it found a new tenant.  Rabinowitz Decl. ¶ 63.  But neither option would

preclude Canary Wharf from seeking damages under other provisions of the Indemnity.

73.    Thus, because Canary Wharf has a right to amounts sought under

Paragraph 1, it need not rely on Paragraph 7 at all.  Rabinowitz Decl. ¶ 68.  Although Canary

Wharf also has a claim under Paragraph 7 for the reasons discussed below, the Claims may be

allowed pursuant to Paragraph 1 alone.[22]

### III.    Canary Wharf Is Entitled to Damages from LBHI's Anticipatory Breach of its Obligation to Take a New Lease.

74.    Under English law, in December 2010, LBHI anticipatorily breached

its obligation in Paragraph 7(a) to take a new lease on the same terms as the Lease.  This

resulted in damages to Canary Wharf from the unpaid rent and other amounts that would have

been owed under the new lease.  This forms an independent basis for the Claims.[23]

---

[22] LBHI's argument also would penalize Canary Wharf for mitigating its losses by substantially reducing the Claims.  A bankruptcy court has the inherent power to prevent such an inequitable result.  *See, e.g.*, *In re Jiminez*, No. 98-4471, 2008 WL 2026147, at *9 (Bankr. S.D.N.Y. May 9, 2008) (Peck, J.) ("[T]he Court needs to consider principles of equity and fairness in determining" the validity and amount of a claim).

[23] The Claims "expressly reserved" Canary Wharf's claim for damages under Paragraph 7(a) of the Indemnity.  *See* ¶ 24, *supra*.

75.    As Q.C. Rabinowitz explains, an English court would be expected to rule that a party has anticipatorily breached a contract if, prior to the time required to perform an obligation, the party expresses an intention not to perform the obligation.  Rabinowitz Decl. ¶ 71.  *Accord*, *Intern. Min. & Resources S.A.* v. *American Gen. Resources. Inc.*, No. 87-3988, 1999 WL 672907, at *3 (S.D.N.Y. Aug. 27, 1999) (holding that under English law, anticipatory repudiation may occur if "either party absolutely refuses").

76.    Under English law, Canary Wharf was entitled upon forfeiture in December 2010 to require LBHI to take a new lease on the same terms as the Lease. Rabinowitz Decl. ¶ 72; Lease (Ex. 6) Schedule 4 ¶ 7(a).  It was clear to all concerned at that time that LBHI would not and could not as a practical matter comply with this obligation -- LBHI had previously declared bankruptcy, was liquidating its business, and could not have taken the substantially above-market rate Lease (*see* ¶¶ 23-24, *supra*) without subjecting itself to a $2.6 billion administrative claim (*see* 11 U.S.C. § 503(b)).  Further, in early December 2010, LBHI expressly confirmed to Canary Wharf that "it would not elect to enter into a lease for the premises on the same terms as the current CW/LBL lease."  (Ex. 20.)  As Q.C. Rabinowitz concludes, based on these facts, an English court likely would hold that LBHI committed an anticipatory breach of Paragraph 7(a) of the Indemnity and award Canary Wharf the value of the remaining term of the Lease (less mitigation).  Rabinowitz Decl. ¶ 72.  Thus, LBHI's anticipatory breach provides an independent basis for the Claims.

## IV.    Canary Wharf Is Entitled to the Full Amount of Its Damages.

77.    LBHI also contends in the Objection that even if the Claims are allowed to move forward, certain damages sought by Canary Wharf are "unrecoverable termination damages" and, in any event, all of Canary Wharf's damages would "be subject to

the statutory cap on claims resulting from the termination of a lease of real property pursuant to section 502(b)(6) of the Bankruptcy Code." (Objection ¶¶ 23, 25.) Both of these arguments are wrong.

### A. All of Canary Wharf's Damages Are Recoverable.

78.     LBHI cites nothing in support of its contention that the portions of the Claims for dilapidations, service charges and costs are "unrecoverable termination damages." (Objection ¶ 25.)[24] As Q.C. Rabinowitz explains, "[c]laims in respect of dilapidations, service charges and/or legal costs would each be regarded under English law as a claim for ordinary compensatory damages that are recoverable. These damages would not be regarded as an unrecoverable penalty for the early termination of the Lease." Rabinowitz Decl. ¶ 22(6).

79.     Further, to the extent LBHI argues that these amounts are not recoverable under U.S. bankruptcy law, it is also incorrect. U.S. courts hold that damages collateral to the Lease are recoverable, including the loss in value of leased property during a debtor's tenancy. *See, e.g., In re Rock & Republic Enterprises, Inc.*, No. 10-11728, 2011 WL 2471000, at \*25 (Bankr. S.D.N.Y. June 20, 2011); *In re El Toro Materials Co., Inc.*, 504 F.3d 978, 980-81 (9th Cir. 2007). Thus, dilapidations, which a landlord must incur to avoid a reduction in property value, are fully recoverable under U.S. bankruptcy law. The same is true for legal costs associated with collecting amounts owed under the Lease, *see Rock & Republic Enterprises*, 2011 WL 2471000, at \*25, and service charges, *see In re United Cigar Stores Co. of America*, 86 F.2d 629, 633 (2d Cir. 1936); *In re McSheridan*, 184 B.R. 91, 100 (B.A.P. 9th Cir. 1995).

---

[24] LBHI does not extend this argument to Canary Wharf's claims for rent, taxes, and insurance.

**B.      The Bankruptcy Cap of Section 502(b)(6) Does Not Apply.**

80.      LBHI's contention that even if the damages sought by Canary Wharf

are recoverable, they should be subject to the statutory cap in 11 U.S.C. 502(b)(6) (the "Cap"

or "Section 502(b)(6)"), also fails.  The Cap limits recovery only on damages claims

"resulting from the termination of a lease of real property."  11 U.S.C. § 502(b)(6).  When a

party enters into a capital lease, however, section 502(b)(6) does not apply.  *In re PCH*

*Assocs.*, 804 F.2d 193, 199 (2d Cir. 1986); *accord Int'l Trade Admin.* v. *Rensselaer*

*Polytechnic Institute*, 936 F.2d 744, 748 (2d Cir. 1991); *In re Barney's Inc.*, 206 B.R. 328,

332-33 (Bankr. S.D.N.Y. 1997).  Here, as LBHI represented in its financial statements filed

with the SEC, the Lease was a capital lease.  In any event, LBHI's representations judicially

estop it from contending otherwise now.

81.      In deciding whether a lease falls within the meaning of Section

502(b)(6) or whether it is a capital lease and thus excluded from the Cap, courts apply federal

common law to determine:

> whether the parties intended to impose obligations and confer
> rights significantly different from those arising from the
> ordinary landlord/tenant relationship.  The use of terms such as
> 'lease' or 'landlord' and 'tenant' does not automatically
> transform an agreement into a bona fide lease for the purposes
> of this section of the Code; rather, a court must look to the
> economic substance of the transaction and not its form.

*Int'l Trade Admin.*, 936 F.2d at 748 (citations and quotations omitted).  An important

indicator of a capital lease is a shift in indicia of ownership -- such as responsibility for

property taxes, operating expenses, and insurance.  *Id.* at 750-51.  Here, consistent with its

structure as a capital lease, the Lease called for LBL (and LBHI) to pay all three of those

costs.  (Lease (Ex. 6) §§ 3(b), 4.3.)

82.     In any event, LBHI is judicially estopped from arguing that the Cap

applies.  "Judicial estoppel prevents a party from asserting a factual position in a legal

proceeding that is contrary to a position previously taken by that party."  *Mitchell* v.

*Washingtonville Cent. School Dist.*, 190 F.3d 1, 6 (2d Cir. 1999) (internal quotations and

alterations omitted).  In addition to positions taken by a party in a prior court proceeding,

"statements to administrative agencies . . . may also give rise to judicial estoppel."  *Id.* at 6;

*see also Estate of Ginor* v. *Landsberg*, No. 97-9061, 1998 WL 514304, at *1 (2d Cir. June 16,

1998) (party who obtained tax deduction by representing on tax return that note was included

in partnership's property was estopped, in subsequent litigation, from claiming to contrary);

*Meyer* v. *Insurance Co. of America*, No. 97-4678, 1998 WL 709854, at *10 (S.D.N.Y. Oct. 9,

1998) (party to litigation bound by sworn representations in previous representations to the

IRS, even if representations were false when made).

83.     Here, LBHI has repeatedly represented in its financial statements --

and, presumably, in its tax returns -- that the Lease is not a "lease of real property," but rather

a capital lease.  For example, in its 2003 annual report, LBHI asserted that the Lease

"qualifies for capital lease treatment."  (*See* Ex. 7 at 92.)  LBHI continued to treat the Lease as

a capital lease in its annual reports for each of 2004, 2005, 2006, and 2007 -- *i.e.*, in every

year through its filing for bankruptcy.  (*See* Ex. 8 at 111; Ex. 9 at 98; Ex. 10 at 105; Ex. 11

at 122.)  This classification entitled LBHI to certain benefits, including the abilities (i) to

classify the property underlying the Lease as an asset, and thereby to claim depreciation on

the property for tax purposes, and (ii) to deduct the interest portion of the payments on the

Lease.  *See* Susan S. K. Lee, *Capital and Operating Leases – A Research Report*, FED.

ACCOUNTING STANDARDS ADVISORY BD., at 13-14.  LBHI thus may not now change its

position and is estopped from arguing that the Lease is a "lease of real property" under

Section 502(b)(6).  The Court should hold that the Cap does not apply.

>    **C.    Even If It Applied, the Cap Limits Only "Rent Reserved,"
>          Not Other Amounts Due Under the Lease.**

84.    Even if the Court were to apply Section 502(b)(6) to the Claims,

recovery would be limited by the Cap only with respect to the portions of the Claims

considered "rent reserved."  11 U.S.C. 502(b)(6).

85.    Rent reserved includes only damages for rent and rent-related expenses

that would have come due, without acceleration, after the date of termination.  11 U.S.C.

502(b)(6)(A).  This includes damages for unpaid rent, insurance and service charges.  *See In

re Andover Togs, Inc.*, 231 B.R. 521, 540-42 (Bankr. S.D.N.Y. 1999); *United Cigar Stores

Co. of America*, 86 F.2d at 633.  *See also McSheridan*, 184 B.R. at 100.

86.    On the other hand, "there is no cap with respect to the amount of

pre[termination] unpaid rent that a landlord can recover."  *Rock & Republic Enterprises, Inc.*,

2011 WL 2471000, at *17.  Thus, the damages for unpaid rent, insurance and service charges

that came due, without acceleration, prior to forfeiture of the Lease will be recoverable in full.

11 U.S.C. 502(b)(6)(B).  Likewise, "[d]amages that do not result from the termination of a

lease are not subject to the cap imposed under Bankruptcy Code section 502(b)(6)."  *Rock &

Republic Enterprises, Inc.*, 2011 WL 2471000, at *25.  This would include damages for

dilapidations and costs (including attorneys' fees).  *Id.*; *El Toro Materials*, 504 F.3d at 980-

81.

## CONCLUSION

87.    For the foregoing reasons, the Court should reject LBHI's Objection,

allow Canary Wharf's Claim No. 14826 in full (subject to the limits that Canary Wharf agreed

to in the Stipulation, Agreement and Order, entered Sept. 1, 2011 (ECF # 19644) (Ex. 23)),

and Claim No. 14824 for $2,823,349.48, and grant such other relief as may be appropriate.

Dated:  October 12, 2012

Respectfully submitted,

/s/ David B. Tulchin
David B. Tulchin
Marc De Leeuw
John J. Jerome
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for Canary Wharf Management
Ltd., Heron Quays (HQ2) T1 Limited and
Heron Quays (HQ2) T2 Limited*