# Exhibit 6

**C L I F F O R D**

**C H A N C E**

LIMITED LIABILITY PARTNERSHIP

DATED   16 MARCH   2005

(1)    Landlord:
HERON QUAYS (HQ2) T1 LIMITED and
HERON QUAYS (HQ2) T2 LIMITED

(2)    Management Company:
CANARY WHARF MANAGEMENT LIMITED

(3)    Landlord's Guarantor:
CANARY WHARF HOLDINGS LIMITED

(4)    Tenant:
LEHMAN BROTHERS LIMITED

(5)    Surety
LEHMAN BROTHERS HOLDINGS INC

COUNTERPART

# U N D E R L E A S E

- of -

25 Bank Street, Canary Wharf
London E14 5LE (Parcel HQ2)

| | |
|---|---|
| TERM COMMENCES: | 3 July 2003 |
| YEARS: | 30 |
| TERM EXPIRES: | 2 July 2033 |
| RENT: | £41,955,013 p.a. exclusive (subject to fixed increases and to review) |
| CAR PARKING RENT: | £640,000 p.a. exclusive (subject to review) |

## CONTENTS

| Clause | | Page |
|---|---|---|

Lease Particulars ................................................................................................. 1

1.  Definitions .................................................................................................. 1

2.  Interpretation ............................................................................................. 9

3.  Demise And Rents ..................................................................................... 11

4.  Tenant's Covenants .................................................................................... 13
    - 4.1  Rents .................................................................................... 13
    - 4.2  Interest On Arrears ............................................................. 13
    - 4.3  Outgoings ............................................................................ 14
    - 4.4  Utility Authorities ............................................................... 15
    - 4.5  Repairs ................................................................................. 15
    - 4.6  Plant And Machinery ........................................................... 15
    - 4.7  Decorations .......................................................................... 15
    - 4.8  Cleaning ............................................................................... 16
    - 4.9  Not Used .............................................................................. 16
    - 4.10  Yield Up .............................................................................. 16
    - 4.11  Rights Of Entry By Landlord And The Management Company ...................... 17
    - 4.12  To Comply With Notices .................................................... 17
    - 4.13  Overloading Floors And Services And Installation Of Wiring Etc. ............. 19
    - 4.14  Pipes .................................................................................... 19
    - 4.15  Cooking ............................................................................... 19
    - 4.16  Dangerous Materials And Use Of Machinery ..................... 20
    - 4.17  Not Used .............................................................................. 20
    - 4.18  User ...................................................................................... 20
    - 4.19  Alterations Signs And Visual Amenity ................................ 21
    - 4.20  Works Carried Out To The Demised Premises .................... 23
    - 4.21  Alienation ............................................................................ 23
    - 4.22  Registration Of Dispositions .............................................. 34
    - 4.23  Disclosure Of Information .................................................. 34
    - 4.24  Landlord's Costs ................................................................. 34
    - 4.25  Statutory Requirements ....................................................... 35
    - 4.26  Planning Acts ....................................................................... 35
    - 4.27  Statutory Notices ................................................................ 37
    - 4.28  Defective Premises .............................................................. 37
    - 4.29  Fire Precautions And Equipment Etc. ................................. 37
    - 4.30  Encroachments And Easements ........................................... 37
    - 4.31  Reletting And Sale Notices .................................................. 38
    - 4.32  Indemnity ............................................................................. 38
    - 4.33  Value Added Tax .................................................................. 38
    - 4.34  Regulations .......................................................................... 40
    - 4.35  Covenants Affecting Reversion ........................................... 40
    - 4.36  External Lights .................................................................... 40
    - 4.37  Landlord's Release .............................................................. 40

8.18    Maintenance Of Covenant Strength ...................................................................57

9.    Service Charge ...............................................................................................58

10.   The Surety's Covenants ....................................................................................66

11.   Agreement For Lease.......................................................................................66

12.   New Tenancy ..................................................................................................66

13.   Renewal...........................................................................................................67

14.   Landlord's Guarantor........................................................................................68
      14.1   Covenant By Landlord's Guarantor .......................................................68
      14.2   Landlord's Guarantor Jointly And Severally Liable With Landlord...................68
      14.3   Waiver By Landlord's Guarantor ...........................................................68
      14.4   Postponement Of Claims By Landlord's Guarantor Against Landlord ...............69
      14.5   Postponement Of Participation By Landlord's Guarantor In Security.................69
      14.6   No Release Of Landlord's Guarantor......................................................69
      14.7   Benefit Of Guarantee .........................................................................70

Schedule 1 RIGHTS GRANTED ................................................................................71

Schedule 2 EXCEPTIONS AND RESERVATIONS ........................................................77

Schedule 3            ..................................................................................81
      Part A    Car Parking Rent Review...........................................................81
      Part B    Rent Reviews .........................................................................84

Schedule 4 COVENANTS BY THE SURETY ...............................................................90

Schedule 5 MATTERS TO WHICH THE DEMISED PREMISES ARE SUBJECT ...........................94

Schedule 6 ESTATE SERVICES...............................................................................95

Schedule 7 NOT USED............................................................................................102

Schedule 8 AUTHORISED GUARANTEE AGREEMENT ..................................................103

Schedule 9 EXPERT DETERMINATION .....................................................................107

Schedule 10 ADDITIONAL COVENANTS TO BE GIVEN BY THE TENANT AND AN UNDERTENANT109

## LEASE PARTICULARS

| | | |
|---|---|---|
| 1. | DATE: | 16th day of MARCH 2005 |

| | | |
|---|---|---|
| 2. | LEASE OR UNDERLEASE: | Underlease |

3. PARTIES

(a) LANDLORD: **HERON QUAYS (HQ2) T1 LIMITED** and **HERON QUAYS (HQ2) T2 LIMITED** both of whose registered offices are at One Canada Square Canary Wharf London E14 5AB (Company registration numbers 4290562 and 4290529 respectively)

(b) MANAGEMENT COMPANY: **CANARY WHARF MANAGEMENT LIMITED** whose registered office is at One Canada Square Canary Wharf London E14 5AB (Company registration number 2067510)

(c) LANDLORD'S GUARANTOR: **CANARY WHARF HOLDINGS LIMITED** whose registered office is at One Canada Square Canary Wharf London E14 5AB (Company registration number 2798284)

(d) TENANT: **LEHMAN BROTHERS LIMITED** whose registered office is at 25 Bank Street, London E14 5LE (Company registration number 00846922)

(e) SURETY: **LEHMAN BROTHERS HOLDINGS INC** of 3 World Financial Centre, New York, New York 10285 and whose address for service in England and Wales is c/o Lehman Brothers Limited, 25 Bank Street, London E14 5LE

| | | |
|---|---|---|
| 4. | DEMISED PREMISES: | ALL THAT land and premises including (if any) the dockbed and water thereover the quayside and the parts of the dock walls located therein and the Building and more particularly shown edged red on Plan 1 together with the land and premises shown edged red on Plans 2 - 39 and shown in vertical section edged red on Plans 40 - 43 |

| | | |
|---|---|---|
| 5. | BUILDING: | The building known as 25 Bank Street, Canary Wharf, London E14 5LE (Parcel HQ2), Canary Wharf, West India Docks, Isle of Dogs, London E14 or buildings at |

|  |  | any time during the Term on the whole or any part of the Demised Premises and each and every part of them |
|---|---|---|
| 6. | TERM AND TERM COMMENCEMENT DATE: | 30 years commencing on 3 July 2003 |
| 7. | INITIAL RENT: | FORTY ONE MILLION, NINE HUNDRED AND FIFTY FIVE THOUSAND AND THIRTEEN POUNDS (£41,955,013) (exclusive of VAT (if any)) |
| 8. | YEAR SIX RENT | FIFTY FOUR MILLION TWO HUNDRED AND THIRTY FOUR THOUSAND FIVE HUNDRED AND TWENTY NINE POUNDS (£54,234,529) (exclusive of VAT (if any)) |
| 9. | YEAR SEVEN RENT: | FIFTY FIVE MILLION EIGHT HUNDRED AND SIXTY ONE THOUSAND FIVE HUNDRED AND SIXTY FIVE POUNDS (£55,861,565) (exclusive of VAT (if any)) |
| 10. | YEAR EIGHT RENT: | FIFTY SEVEN MILLION FIVE HUNDRED AND THIRTY SEVEN THOUSAND FOUR HUNDRED AND TWELVE POUNDS (£57,537,412) (exclusive of VAT (if any)) |
| 11. | YEAR NINE RENT: | FIFTY NINE MILLION TWO HUNDRED AND SIXTY THREE THOUSAND FIVE HUNDRED AND THIRTY FOUR POUNDS (£59,263,534) (exclusive of VAT (if any)) |
| 12. | YEAR TEN RENT: | SIXTY ONE MILLION FORTY ONE THOUSAND, FOUR HUNDRED AND FORTY POUNDS (£61,041,440) (exclusive of VAT (if any)) |
| 13. | INITIAL CAR PARKING RENT: | SIX HUNDRED AND FORTY THOUSAND POUNDS (£640,000) (exclusive of VAT (if any)) |
| 14. | RENT COMMENCEMENT DATE: | (a) 31 August 2004 in respect of the First £13,412,084 of the Initial Rent;<br><br>(b) 30 September 2004 in respect of the next £9,550,417 of the Initial Rent; |

|  |  |  |  |
|---|---|---|---|
|  |  |  | and |
|  |  | (c) | 9 November 2004 in respect of the remaining £18,992,512 of the Initial Rent |
| 15. | CAR PARKING RENT COMMENCEMENT DATE: |  | 10 October 2005 |
| 16. | CAR PARKING REVIEW DATE: |  | 3 January 2009 |
| 17. | REVIEW DATES: |  | 9 November 2013 and every fifth anniversary of such day during the Term and also the day preceding the expiry of the contractual term granted by this Lease |
| 18. | ESTATE SERVICE CHARGE PERCENTAGE: |  | The percentage to be established pursuant to Clause 9.1(f) (subject to Clause 9.8) |
| 19. | PERMITTED USER: |  | Professional or commercial offices and uses ancillary thereto |

**T H I S    L E A S E**  made on the Date and **BETWEEN** the Parties specified in the Particulars

**W I T N E S S E T H** as follows:-

1.    **DEFINITIONS**

IN this Lease the following expressions shall have the following meanings:-

1.1    **"Acceptable Assignee"** means:-

(a)    An Entity which has (or whose obligations will be guaranteed by an Entity which has) continuously for a period of two (2) years immediately preceding the date of the application to assign maintained and which on the date of the transfer to it of this Lease still maintains:

(i)    in respect of its senior unsecured unsubordinated and unguaranteed long term debt obligations a credit rating of A or better from Standard & Poor's Ratings Group, a division of McGraw-Hill Inc (**"Standard & Poor's"**) or A2 from Moody's Investors Service (**"Moody's"**); or

(ii)    a long-term counterparty credit rating of A or better from Standard & Poor's or A2 from Moody's; or

(iii)    credit ratings in respect of its senior unsecured unsubordinated and unguaranteed long term debt or in respect of its long term counterparty status from other major rating agencies acceptable to the Landlord acting reasonably equivalent to or better than any one of the credit ratings described in (i) and (ii) above;

AND WHERE

(iv)    at the date of the application to assign and the date immediately prior to completion of the proposed assignment the proposed assignee's credit rating or that of its guarantor (as applicable) has not been placed on Credit Watch nor has been accorded negative or developing rating outlook or equivalent (other than with a view to a possible upgrade) by either Standard and Poor's or Moody's

(b)    an Entity which (taking into account any guarantee given) who does not adversely affect (otherwise than to an immaterial extent) the market value of the Landlord's interest in the Demised Premises by taking an assignment of this Lease when compared with the position immediately prior to the proposed assignment (whether or not the Landlord has any intention at the time of selling or raising money on the security of its reversionary interest in the Demised Premises) by a hypothetical tenant who has at that point:-

(i)    in respect of its senior unsecured unsubordinated and unguaranteed long term debt obligations a credit rating of A from Standard & Poor's or A2 from Moody's;

(ii)    a long-term counterparty credit rating of A from Standard & Poor's or A2 from Moody's

The market value of the Landlord's interest in the Demised Premises shall be calculated having regard to the valuation guidelines set out in the RICS Appraisal and Valuation Manual current at the date of the said valuation or such alternative valuation practice for institutional investment office properties as is in common use for office premises of similar Net Internal Area to the Demised Premises in London at the said date; or

(c)    the Crown or a Secretary of State or other Minister of the Crown on behalf of the Crown in order to perform the functions of the Crown or any body corporate agency or other body whose obligations are directly guaranteed to the Landlord by or in the name of the Crown or a Secretary of State or other Minister of the Crown on behalf of the Crown;

PROVIDED THAT where any relevant agency rebases redesignates or otherwise changes the substance of or criteria for a relevant rating as referred to above (or the number of grades or rankings above or below the relevant rating) or does any other act or thing so that the comparative creditworthiness strength or substance reflected in any of the ratings referred to above is changed then there shall be deemed substituted for the ratings referred to above such new or revised ratings as will then reflect and be equivalent to the relative creditworthiness strength and substance implied by the above ratings at the date hereof to the intent and effect that the substituted rating shall be equivalent mutatis mutandis to the current standards of creditworthiness strength and substance reflected in such current ratings AND PROVIDED FURTHER THAT in the event that the credit rating agencies of Standard and Poor's and Moody's cease to exist or no longer carry out such evaluations such other method of accounting will be used to assess the credit rating of the proposed assignee or proposed guarantor as is commonly used at that time in the market as a substitute for the Standard & Poor's or Moody's rating system as is agreed between the Landlord and the Tenant. If there is no such substitute then a firm of Chartered Accountants or a chartered accountant who is a member of the Institute of Chartered Accountants and who is jointly appointed by the Landlord and the Tenant shall make such decision acting as an expert and if the identity of such expert cannot be agreed then the matter shall be referred for decision to the President of the Royal Institution of Chartered Accountants

1.2    **"Accountant"** means a Chartered Accountant or firm of Chartered Accountants appointed or employed by the Management Company or a Group Company of the Management Company to perform the functions of the Accountant under this Lease

1.3    **"Adjacent Parcel"** means the property currently known as Parcel HQ1, Heron Quays and shown edged blue and marked HQ1 on Plan 1

1.4    **"Adjacent Parcel Owner"** means the freeholder and any tenant and any other occupier of the Adjacent Parcel

1.5    **"Adjoining Property"** means all parts of the Estate (other than the Demised Premises) and any land and/or buildings from time to time adjoining or neighbouring the Estate

1.6    **"Agreement for Lease"** means the Agreement for Lease relating to the Demised Premises dated 30 March 2001 made between Heron Quays Properties Limited (1), Canary Wharf Group plc (2), Lehman Brothers Limited (3) and Lehman Brothers Holdings Inc (4) as varied by a notice served by the Tenant on 10 May 2001 so as to be in the form of the Restated and Amended Agreement for Lease forming Annexure 1 to a Deed of Variation Option dated 30 March 2001 between Heron Quays Properties Limited (1) Canary Wharf Group plc (2) Lehman Brothers Limited (3) Lehman Brothers Holding Inc (4) and Canary Wharf (Car Parks) Limited (5) and as further varied by a Deed of Variation and Agreement dated 12 December 2003 and entered into between Heron Quays Properties Limited (1) Canary Wharf Estate Limited (2) Canary Wharf Holdings Limited (3) Canary Wharf (Car Parks) Limited (4) Canary Wharf Contractors Limited (5) Lehman Brothers Limited (6) Lehman Brothers Holdings Inc (7) and Lehman Brothers Lease & Finance No. 1 Limited (8);

1.7    **"Base Rate"** means the Base Rate for the time being of Barclays Bank PLC or some other London clearing bank nominated from time to time by the Landlord or in the event of Base Rate ceasing to exist such other reasonable comparable rate of interest as the Landlord shall from time to time determine

1.8    **"Building"** means the Building briefly described in the Particulars and each and every part thereof and all the appurtenances belonging thereto including:-

    (a)    for the avoidance of doubt, the foundations of the Building;

    (b)    all landlord's fixtures and fittings in or upon the same;

    (c)    all additions alterations and improvements thereto (excluding all tenant's and trade fixtures and fittings); and

    (d)    for the avoidance of doubt, the surface of the roof of the Building

1.9    **"Car Park"** means the car parks within the Estate (other than the car parking area (if any) within the Building) designated as such from time to time in writing by the Landlord

1.10    **"Car Park Barrier Location"** means the area hatched blue on Plan 50

1.11    **"Car Park Regulations"** means the regulations set out in a manual which has been made available to the Tenant and which may be updated from time to time and such substituted or additional reasonable Car Park Regulations as the Landlord may from time to time notify in writing to the Tenant for the general management oversight and security of the Car Park

1.12   **"Car Parking Rent"** means the aggregate rent per annum in respect of the Car Parking Spaces calculated in accordance with paragraph 2 of Part A of Schedule 3

1.13   **"Car Parking Spaces"** means Two Hundred and Fifty Six (256) car parking spaces comprised within the Demised Premises

1.14   **"Demised Premises"** means the Demised Premises as briefly described in the Particulars including:-

(a)   the Building

(b)   all Pipes in, upon, under and over and in each case exclusively serving the same

(c)   all Landlord's fixtures fittings plant machinery ducting sprinklers apparatus and equipment now or hereafter in or upon and exclusively serving the Demised Premises and

(d)   all additions alterations and improvements to the Demised Premises

(e)   the structure of the tunnel section hatched blue on Plan 4 (the **"Demised Truck Tunnel Section"**)

(f)   for the avoidance of doubt, the joint forming part of the exterior wall of the Building facing the Adjacent Parcel which is affixed to the Building and which covers the gap between the Building and the building constructed on the Adjacent Parcel

but nevertheless excluding:-

(i)   any Pipes which are in, upon, under or over the Demised Premises belonging to public utilities or statutory undertakers and/or those which serve the Adjoining Property

(ii)   the airspace above a height of 165.02 metres above Ordnance Datum in respect of the part of the Demised Premises shown edged green on Plan 44 (the **"Tower"**) and a height of 60.20 metres above Ordnance Datum in respect of the part of the Demised Premises shown edged blue on Plan 45 (the **"Podium"**)

(iii)   the subsoil below the lowest basement slab of the Building save for the piles supporting such basement slab

(iv)   the rooms provided for London Electricity plc, the British Telecommunications plc and/or Cable & Wireless plc room and/or other telecommunications or utility providers, all of which are coloured brown on Plans 4 and 5

(v)   the finishes of the walls, ceiling and wearing surface of the Demised Truck Tunnel Section and the volumetric airspace enclosed by them

(vi) the wearing surface of the ground level arcade shown hatched blue on Plan 6 together with the airspace up to (but excluding) the underside of the ceiling of such arcade

(vii) the DLR Stanchion

(viii) the wearing surface at concourse level of the DLR Tunnel hatched green on Plan 6 together with the airspace up to (but excluding) the underside of the ceiling of the DLR Tunnel and the west wall of the Building

1.15 **"Development"** means development as defined in Section 55 of the Town and Country Planning Act 1990

1.16 **"DLR Lease"** means the lease dated 17 July 1987 made between London Docklands Development Corporation (1) and London Regional Transport (2) or any replacement lease therefor and/or with only such amendments from time to time which in either case do not increase the obligations of the Tenant hereunder or which may be approved by the Tenant such approval not to be unreasonably withheld or delayed in respect of any matters relating to the safety or operational requirements of Docklands Light Railway Limited

1.17 **"DLR Stanchion"** means the DLR Stanchion passing through Levels B3 to B1 Mezzanine of the Building and shown coloured yellow on Plans 2-5 (inclusive)

1.18 **"DLR Tunnel"** means the area shown hatched green on Plan 6

1.19 **"Docklands Light Railway"** means the light railway operated at the date hereof by Docklands Light Railway Limited

1.20 **"Docklands Light Railway Limited"** means Docklands Light Railway Limited or any person or persons for the time being entitled to the DLR Lease or any successor entity responsible for the operation of the Docklands Light Railway or like responsibilities or entity

1.21 **"Entity"** means a body corporate or department body or agency falling within the definition set out in Clause 1.1(c) or other business organisation or partnership

1.22 **"Estate"** means the land and water areas known as Canary Wharf, London E14 shown edged green on Plan 1 with any additional land and water areas in which the Landlord or a Group Company of the Landlord shall acquire a freehold or leasehold interest and which the Landlord from time to time reasonably designates as part of the Estate and all buildings and appurtenances thereon and all additions alterations and improvements thereto

1.23 **"Estate Common Parts"** means those parts of the Estate and the Adjoining Property (not being publicly adopted) which are from time to time intended for the common use and enjoyment of the tenants of the Estate (including the Tenant) and persons claiming through or under them or reasonably designated as such by the Landlord (whether or

- 5 -

not other parties are also entitled to use and enjoy the same) but excludes all car parks within the Estate

1.24    **"Estate Services"** means the services set out in Part A of Schedule 6 insofar as the same are attributable to the Estate excluding the Car Park

1.25    **"Force Majeure"** means any cause beyond the reasonable control of the Landlord or the Management Company and the Landlord and Management Company shall take all reasonable steps to minimise the length of any period so caused

1.26    **"Green Road"** means the road referred to in paragraph 1.3 of Schedule 1 of the Transfer dated 16 March 1998 made between London Docklands Development Corporation (1) and Canary Wharf Investments Limited (2) (the **"Transfer"**)

1.27    **"Group Company"** in relation to any company (the **"Relevant Company"**) means a company which is for the time being a subsidiary of or the holding company of the Relevant Company or which is another subsidiary of the holding company of the Relevant Company (in each case within the meaning of Section 736 of the Companies Act 1985, as amended by the Companies Act 1989)

1.28    **"HM Customs & Excise"** means HM Customs & Excise or any other person, authority, body or official which is from time to time responsible for the care, management or administration of Value Added Tax

1.29    **"Insurance Premium Tax"** mean insurance premium tax as provided for in the Finance Act 1994 and includes any other tax from time to time replacing it or of a similar fiscal nature

1.30    **"Insured Risks"** means (to the extent that the same are insurable with insurers of repute in the global insurance market) fire storm tempest flood earthquake lightning explosion impact aircraft (other than hostile aircraft) and other aerial devices and articles dropped therefrom riot civil commotion malicious damage or damage caused as a result of terrorist activity bursting or overflowing of water tanks apparatus or Pipes and such other risks as the Landlord may from time to time reasonably specify (or insure against in accordance with Clause 7.1(e) subject to such exclusions excesses limitations terms and conditions as may be imposed by the insurers

1.31    **"Interest Rate"** means three percentage points (3%) per annum above Base Rate

1.32    **"Irrecoverable VAT"** means any Value Added Tax (in relation to Rent only) comprised in any consideration paid or payable by the Tenant in relation to supplies made by the Landlord to the Tenant by reason of this Lease and to the extent that the Tenant does not (or would not if appropriate claims had been made in due time) receive and is not entitled to receive a credit in full as "input tax" (as the expression "input tax" is defined in Section 24 of the Value Added Tax Act 1994) under Sections 25 and 26 of that Act

1.33    "Jubilee Place" means the retail mall adjoining the Building and known as Jubilee Place

1.34    "Jubilee Place Link" means the area shown coloured purple on Plan 4 which forms part of Jubilee Place which for the avoidance of doubt shall consist only of the area at basement level 1 for the purpose of access between Jubilee Place and the Demised Premises at that level

1.35    "Landlord" means the party named as "Landlord" in the Particulars and includes the person for the time being entitled to the reversion immediately expectant on the determination of the Term

1.36    "Landlord's Solicitors" means Clifford Chance LLP, 200 Aldersgate Street, London EC1A 4JJ (Ref: AMB) or such other firm of solicitors as shall be notified in writing by the Landlord to the Tenant

1.37    "this Lease" means this Underlease and any document which is made supplemental hereto or which is entered into pursuant to or in accordance with the terms hereof

1.38    "Lehman Group Company" shall have the same meaning as set out in relation to "Group Company" but with the substitution of the figure of 25% for the words "a majority" whenever the words "a majority" appear in Section 736 of the Companies Act 1985, as amended by the Companies Act 1989

1.39    "Lettable Areas" means those parts of any building (including the Building) leased or intended to be leased to occupational tenants but excluding any parts of such building leased or intended to be leased to public utilities for the purposes of the carrying out of their statutory obligations

1.40    "Management Company" means the party named as "Management Company" in the Particulars or such other company with appropriate expertise as may be substituted therefor by the Landlord by notice in writing to the Tenant pursuant to Clause 8.6 PROVIDED THAT in the event of any such substitution then at the request of either the Landlord or the Tenant the substituted management company the Tenant and any Surety shall enter into a Deed by which the Tenant and the Surety covenant with the new management company and the new management company covenants with the Tenant in the terms of the covenants between the Management Company the Tenant and any Surety contained in this Lease

1.41    "Net Internal Area" shall have the meaning given to it by the Code of Measuring Practice published on behalf of the Royal Institution of Chartered Surveyors and the Incorporated Society of Valuers and Auctioneers (Fifth Edition December 2001 or such subsequent edition as shall generally be used by measurement surveyors) and shall be determined from time to time by the Estate Surveyor (as defined in Clause 9.1(g)) acting properly and professionally (ignoring works carried out by or on behalf of tenants or occupiers before or during the subsistence of the lease or underlease in existence at the time of such determination)

1.42    **"Particulars"** means the descriptions and terms appearing on the preceding pages headed "Lease Particulars" which comprise part of this Lease

1.43    **"Pass Doors"** means the doors located between the Jubilee Place Link and Jubilee Place

1.44    **"Permitted Part"** means the separate unit of accommodation as defined in Clause 4.21.1(c)(ii)(1)

1.45    **"Pipes"** means all pipes sewers drains ducts conduits gutters watercourses wires cables channels flues service corridors trunking and all other conducting media and any ancillary apparatus

1.46    **"Plan 1" "Plan 2" "Plan 3" etc.** means the plans annexed hereto and respectively so marked

1.47    **"Planning Acts"** means the Town and Country Planning Act 1990 the Planning (Listed Buildings and Conservation Areas) Act 1990 the Planning (Hazardous Substances) Act 1990 the Planning (Consequential Provisions) Act 1990 the Planning and Compensation Act 1991 and any other town and country planning or related legislation

1.48    **"Quarterly Day"** means each of the 1st day of January 1st day of April 1st day of July and 1st day of October

1.49    **"Regulations"** means the regulations set out in a manual which has been made available to the Tenant and which may be updated from time to time and such substituted or additional reasonable Regulations as the Landlord may from time to time notify in writing to the Tenant for the general management oversight and security of the Estate

1.50    **"Rent"** means the sums payable from time to time pursuant to Clause 3(a)

1.51    **"Small Suite"** means the separate unit of accommodation as defined in Clause 4.21.1(c)(ii)(2)

1.52    **"Subleases"** means the leases of each of floors 14-21 (inclusive) dated the date of this Lease and entered into Between (1) Lehman Brothers Limited (2) Heron Quays Properties Limited (3) Canary Wharf Holdings Limited and (4) Canary Wharf Management Limited (each being a **"Sublease"**)

1.52A    **"Sublet Premises"** means those parts of the Demised Premises as the Tenant from time to time notifies to the Landlord as being those that the Tenant has, following the grant of any necessary licence to sublet (if required pursuant to this Lease), sublet to a subtenant or subtenants who has or have in respect of such sublet premises agreed directly with the Management Company for the provision of the Estate Services by the Management Company and the payment for such services by the subtenant (and for the avoidance of doubt the definition of Sublet Premises shall include the premises demised by each of the Subleases, during the term of the Subleases)

1.53    **"Superior Landlord"** means the person or persons for the time being entitled to the estate which is reversionary upon the Landlord's estate under the Superior Lease

1.54    **"Superior Lease"** means the Lease dated 16th March 1998 and made between London Docklands Development Corporation (1) and Heron Quays Properties Limited (2) with only such amendments from time to time which do not increase the obligations of the Tenant hereunder but for the purposes of this Lease

1.55    **"Surety"** means the party (if any) named as "Surety" in the Particulars and any other party who during the Term acts as Surety and in the case of an individual includes his personal representatives

1.56    **"Tarmac Road"** means the Tarmac Road defined in the Transfer (defined in Clause 1.26)

1.57    **"Tenant"** means the party named as "Tenant" in the Particulars and includes the Tenant's successors in title and assigns and in the case of an individual includes his personal representatives

1.58    **"Tenant's Category "A" Works"** and **"Tenant's Category "B" Works"** mean respectively the works described as such in any Memorandum signed on behalf of and exchanged between each of the Landlord the Tenant and the Surety pursuant to and in accordance with Clause 15.2 of the Agreement for Lease and any such works collectively being called the **"Tenant's Works"**

1.59    **"Tenant's Solicitors"** means Freshfields Bruckhaus Deringer, 65 Fleet Street, London EC4Y 1HS (Ref: Christopher Morris) or such other firm of solicitors as shall be notified in writing by the Tenant to the Landlord

1.60    **"Term"** means, subject to the provisions of Clause 13, the term of years stated in the Particulars and includes the period of any holding over or any extension or continuation whether by statute or common law

1.61    **"Value Added Tax"** and **"VAT"** mean value added tax as provided for in the Value Added Tax Act 1994 and includes any other tax from time to time replacing it or of a similar fiscal nature

1.62    **"Winter Garden"** means the parcel of land adjacent to the Building and shown hatched green on Plan 46

1.63    **"Working Day"** means any day (other than a Saturday or a Sunday) upon which clearing banks in the United Kingdom are open to the public for the transaction of banking business and

1.64    **"1954 Act"** means the Landlord and Tenant Act 1954

2.    **INTERPRETATION**

UNLESS the context otherwise requires:-

2.1    where two or more persons are included in the expression "the Tenant" and/or "the Surety" and/or "the Landlord" the covenants which are expressed to be made by the Tenant and/or the Surety and/or the Landlord shall be deemed to be made by such persons jointly and severally

2.2    words importing persons shall include firms companies and corporations and vice versa

2.3    any covenant or regulation to be observed by any party hereto not to do any act or thing shall include an obligation not to cause permit or suffer such act or thing to be done

2.4    references either to any rights or powers of the Landlord or the Management Company or the rights of the Tenant in relation to the Adjoining Property shall be construed as extending respectively to the Superior Landlord and all persons authorised by the Landlord and/or the Management Company and the Superior Landlord and as the case may be by the Tenant

2.5    reference to the requirement of any consent and/or approval from and/or registration with the Landlord and/or the Management Company shall be construed as also including a requirement for the consent and/or approval of and/or registration with the Superior Landlord where the Superior Landlord's consent and/or approval would be required under the terms of the Superior Lease except that nothing herein shall be construed as imposing on the Superior Landlord any obligation (or indicating that such an obligation is imposed on the Superior Landlord by virtue of the terms of the Superior Lease) not unreasonably to refuse any such consent and/or approval

2.6    any reference to a statute (whether specifically named or not) shall include any amendment or re-enactment of such statute for the time being in force and all instruments orders notices regulations directions bye-laws permissions and plans for the time being made issued or given thereunder or deriving validity therefrom

2.7    the titles and headings appearing in this Lease are for reference only and shall not affect its construction

2.8    all agreements and obligations by any party contained in this Lease (whether or not expressed to be covenants) shall be deemed to be and shall be construed as covenants by such party

2.9    save where expressly provided to the contrary, all sums payable by the Tenant or the Surety pursuant to this Lease shall be deemed to be exclusive of any Value Added Tax which may be chargeable on the supply or supplies for which such sums (or any part of such sums) are the whole or part of the consideration for Value Added Tax purposes

2.10    any reference to any right, entitlement or obligation of any person under the laws in relation to Value Added Tax, or any business carried on by any person for Value Added Tax purposes, shall (where appropriate and unless the context otherwise requires) be construed, at any time when such person is treated as a member of a group for the purposes of section 43 of the Value Added Tax Act 1994, to include a reference

to the right, entitlement or obligation under such laws of, or the business carried on for Value Added Tax purposes by, the representative member of such group at such time (the term "representative member" to be construed in accordance with the said section 43) and

2.11    any reference to the making of any election (or the entering into an agreement with a third party the effect of which is or may be to require the making of an election) to waive exemption made or to be made by any person pursuant to paragraph 2 of Schedule 10 to the Value Added Tax Act 1994 shall be construed to include a reference to (i) the making of any such election made or to be made pursuant to such paragraph by any relevant associate of such person or (ii) becoming a relevant associate of someone who has made such an election (the term "relevant associate" to be construed in accordance with paragraph 3 of the said Schedule 10) PROVIDED THAT nothing in this Clause 2.11 shall deem or otherwise treat an election to have been made when an election has not in fact been made

2.12    Without limiting the circumstances in which the Tenant would be treated as making an election, the Tenant shall be treated as making an election where the Tenant enters into an agreement with a third party the effect of which is that the Tenant is or may be required to make an election and the Tenant makes an election pursuant to such agreement

3.    **DEMISE AND RENTS**

THE Landlord HEREBY DEMISES unto the Tenant the Demised Premises TOGETHER WITH the rights and easements specified in Schedule 1 EXCEPT AND RESERVING the rights and easements specified in Schedule 2 SUBJECT TO all rights easements quasi-easements privileges covenants restrictions and stipulations of whatsoever nature affecting the Demised Premises including the matters contained or referred to in the Deeds mentioned in Schedule 5 TO HOLD the Demised Premises unto the Tenant from and including the Term Commencement Date for the Term YIELDING AND PAYING unto the Landlord by way of rent and (where expressly provided hereunder) the Management Company during the Term:-

(a)    yearly and proportionately for any fraction of a year:-

(i)    for the period commencing on the Term Commencement Date and expiring on the 30th day of August 2004 the sum of one peppercorn (if demanded); and

(ii)    for the period commencing on the 31st day of August 2004 and expiring on the 29th day of September 2004 the sum of one million one hundred and two thousand three hundred and sixty three pounds (£1,102,363) such sum to be paid on the 31st day of August 2004; and

(iii)    for the period commencing on the 30th day of September 2004 and expiring on the 8th day of November 2004 the sum of two million five hundred and seventy nine thousand three hundred and forty nine

pounds (£2,579,349), such sum to be paid on the 1st day of October 2004; and

(iv)     for the period commencing on the 9th day of November 2004 and expiring on the 31st day of December 2004 the sum of six million ninety two thousand and ninety eight pounds (£6,092,098) such sum to be paid on the 1st day of October 2004; and

(v)      for the period commencing on the 1st day of January 2005 and expiring on the 8th day of November 2008 the Initial Rent, the first payment of the Initial Rent being a proportionate sum in respect of the period from and including the 1st day of January 2005 to the 31st day of March 2005 to be made on the 1st day of January 2005; and

(vi)     for the period commencing on the Car Parking Rent Commencement Date and expiring on the 2nd day of January 2009 the Initial Car Parking Rent, the first payment of the Initial Car Parking Rent being a proportionate sum in respect of the period from and including the Car Parking Rent Commencement Date to the 1st day of January 2006 to be made on the Car Parking Rent Commencement Date; and

(vii)    for the period of one year commencing on 9th day of November 2008, the Year Six Rent; and

(viii)   for the period commencing on the 3rd of January 2009 and expiring on the 8th day of November 2009 the Car Parking Rent; and

(ix)     for the period of one year commencing on the 9th day of November 2009, the aggregate of the Year Seven Rent and the Car Parking Rent; and

(x)      for the period of one year commencing on the 9th day of November 2010, the aggregate of the Year Eight Rent and the Car Parking Rent; and

(xi)     for the period of one year commencing on the 9th day of November 2011, the aggregate of the Year Nine Rent and the Car Parking Rent;

(xii)    for the period of one year commencing on the 9th day of November 2012 the aggregate of the Year Ten Rent and the Car Parking Rent; and

(xiii)   from and including each Review Date (as that term is defined in Schedule 3) such Rent as shall become payable under and in accordance with the provisions of Part B of Schedule 3;

in each case to be paid to the Landlord (by Banker's Standing Order if the Landlord so requires by equal quarterly payments in advance on each Quarterly Day in every year

The Landlord shall supply to the Tenant a written statement setting out the payments due by Bankers Standing Order as soon as reasonably practicable following payment

(b)     from and including 3 July 2003 the whole of all sums (including, without limitation, Insurance Premium Tax and the cost of periodic valuations for insurance purposes but not more than once in every twelve (12) months) which the Landlord shall from time to time be liable to pay for insuring the Demised Premises against the Insured Risks pursuant to Clause 7.1(a) and the other matters referred to in Clauses 7.1(c) to 7.1(e) (inclusive) and for insuring against loss of rents pursuant to Clause 7.1(b) such sums to be paid to the Landlord on written demand

(c)     the payments to be made to the Management Company (subject to Clause 8.6) in accordance with Clause 9

(d)     the moneys referred to in Clauses 4.2 and 4.33 to be paid to the Landlord or the Management Company as therein provided

(e)     any other moneys which are by this Lease stated to be recoverable as rent in arrear to be paid to the Landlord or the Management Company on written demand

4.     **TENANT'S COVENANTS**

THE Tenant HEREBY COVENANTS with the Landlord and as a separate covenant with the Management Company as follows:-

4.1     **Rents**

To pay the rents reserved by this Lease at the times and in the manner aforesaid without any abatement set-off counterclaim or deduction whatsoever (save those that the Tenant is required by law to make) and so that the Landlord shall receive full value in cleared funds on the date when payment is due

4.2     **Interest on arrears**

(a)     Without prejudice to any other right remedy or power herein contained or otherwise available to the Landlord or the Management Company if any of the rents reserved by this Lease (whether formally demanded or not) or any other sum of money payable to the Landlord or the Management Company by the Tenant under this Lease shall not be paid so that the Landlord receives full value in cleared funds:-

        (i)     in the case of the Rent and any sum representing Value Added Tax chargeable in respect of or by reference to it, within 5 days of the date when payment is due (or, if the due date is not a Working Day, 5 days from the next Working Day after the due date); or

(ii)    in the case of any other rents or sums within fourteen (14) days after the date when payment has become due

to pay interest thereon at the Interest Rate from the date on which payment was due to the date of payment to the Landlord or the Management Company (as the case may be) (both before and after any judgment)

(b)    Without prejudice to any other right, remedy or power contained in this Lease or otherwise available to the Landlord, if the Landlord shall properly decline to accept any of the rents or other sums of money so as not to waive any existing breach of covenant, the Tenant shall pay interest on such rents and other sums of money at the Interest Rate from and including the date when payment was due (or, where applicable, would have been due if demanded on the earliest date on which it could have been demanded) to the date when payment is accepted by the Landlord

## 4.3   Outgoings

(a)    To pay and discharge all existing and future rates taxes duties charges assessments impositions and outgoings whatsoever or (where such outgoings relate to the Demised Premises and other premises) a due proportion thereof to be reasonably determined by the Landlord which now are or may at any time during the Term be payable in respect of the Demised Premises (and all car parking spaces designated for the Tenant) whether by the owner or the occupier of them (excluding any tax payable by the Landlord occasioned by the grant of and any disposition of or dealing with any interests in the reversion to this Lease or the receipt of rent hereunder)

(b)    If the Landlord the Tenant and/or the Management Company wishes to contest any outgoings as aforesaid or to appeal any assessments related thereto or to withdraw any such contest or appeal they will keep each other informed of such matters and give each other the opportunity to comment on the relevant matter and they will supply to each other forthwith upon receipt copies of any such appeals or assessments and will execute forthwith on request all consents authorisations or other documents as are required to give full effect to the foregoing

(c)    None of the Landlord or the Tenant or the Management Company shall agree any such outgoings or any assessments related thereto without the prior approval in writing of the other two parties (such approval not to be unreasonably withheld) and in agreeing such assessments each party shall keep the others fully informed and pay due heed to any representations made by the other two parties and once approval is given the other two parties will execute forthwith on written request any documents required to give effect to such agreement

(d)     To pay all charges for electricity telephone water gas (if any) and other services and all sewage and environmental charges consumed in the Demised Premises including any connection charge and meter installation costs and rents

### 4.4    Utility authorities

To pay to the Landlord or as it may direct an amount equal to any rebate or rebates which the Tenant or any undertenant may receive from public utilities in respect of the capital costs incurred by the Landlord the London Docklands Development Corporation (or any successor body) or some party (other than the Tenant) of providing water foul and surface water drainage gas electricity and telecommunications

### 4.5    Repairs

(a)     To repair and keep in good and substantial repair and condition free from all defects the Demised Premises and, as often as may be necessary, reinstate, rebuild or renew each part of them

(b)     To replace from time to time any of the Landlord's fixtures and fittings which become in need of replacement with new ones which are similar in type and quality and

(c)     To keep all parts of the Demised Premises which are not built on in a good and clean condition, adequately surfaced and free from weeds, and any landscaped areas properly cultivated and maintained, and any trees preserved

in the case of paragraphs (a) and (b) above, damage by the Insured Risks excepted save to the extent that payment of the insurance moneys shall be withheld by reason of any act neglect or default of the Tenant or any undertenant or any person under its or their control unless and to the extent that the Tenant shall have made good the deficiency in the insurance moneys

### 4.6    Plant and machinery

To keep all plant machinery and other equipment (not being moveable property of the Tenant or any undertenant or any permitted occupier of the Demised Premises) in the Demised Premises properly maintained and in good working order and condition (damage by the Insured Risks excepted save to the extent that payment of the insurance moneys shall be withheld by reason of any act neglect or default of the Tenant or any undertenant or any person under its or their control unless and to the extent that the Tenant shall have made good the deficiency in the insurance moneys)

### 4.7    Decorations

As often as may be reasonably necessary taking into account the nature of the Building and the Estate to prepare and decorate or otherwise treat as appropriate all parts of the Demised Premises required to be so treated and to wash down all washable surfaces

4.8 **Cleaning**

As often as may be reasonably necessary taking into account the nature of the Building and the Estate to keep the Demised Premises and exterior of all windows, window frames and other glass at the Demised Premises in a clean condition

4.9 **Not Used**

4.10 **Yield up**

(a) Immediately prior to the expiration or sooner determination of the Term at the cost of the Tenant:-

(i) If required by the Landlord to replace any of the Landlord's fixtures and fittings which shall be missing or damaged with new ones of similar kind and quality or (at the option of the Landlord) to pay to the Landlord the cost of replacing any of the same

(ii) to remove from the Demised Premises any moulding or sign of the name or business of the Tenant or occupiers and all tenant's fixtures fittings furniture and effects and to make good to the reasonable satisfaction of the Landlord all damage caused by such removal

(iii) only if required by the Landlord or if the Tenant (in the case of its fixtures and fittings) so requires to remove all video data and sound communications conducting material installed in the Demised Premises by or at the request of the Tenant or any undertenant

(iv) The Tenant shall, if and to the extent required by the Landlord to put or reinstate the Demised Premises in or to a condition commensurate with that described in the specification annexed hereto entitled "Minimum Standard Developer's Finish for Tenant Work", which, for the avoidance of doubt but without prejudice to the generality of the foregoing, shall include removal of all alterations and additions carried out by or on behalf of the Tenant whether before or after the commencement of the Term and the making good of all damage caused by such removal, in all cases to the Landlord's reasonable satisfaction but shall exclude removal of all Base Building Modifications (as defined in the Agreement for Lease) save for the increased fuel oil storage to support full load operation from 24 hours to 48 hours including any structural reinforcement, rooms etc. and the Main Data Centre on level 2 and "hub" rooms on each level.

PROVIDED THAT the Tenant may by giving written notice to the Landlord at least 6 months prior to the determination of the Term opt to pay to the Landlord a lump sum equal to the proper cost of so reinstating the Demised Premises and of the removal or reinstatement of any alterations carried out to the Demised Premises, in each case as described and in accordance with the Tenant's obligations contained in Clause 4.10(a)(iv);

(b)    At the expiration or sooner determination of the Term quietly to yield up the Demised Premises to the Landlord in good and substantial repair and condition in accordance with the covenants and other obligations on the part of the Tenant contained in this Lease

4.11    **Rights of entry by Landlord and the Management Company**

To permit the Landlord and the Management Company with all necessary materials and appliances at all reasonable times upon reasonable prior notice (except in cases of emergency) but subject to the Tenant's reasonable security requirements which have been previously notified to the Landlord in writing and accompanied by an agent of the Tenant (which the Tenant agrees to provide) to enter and remain upon the Demised Premises:-

(a)    to view and examine the state and condition of the Demised Premises and to take schedules of the Landlord's fixtures

(b)    to exercise any of the rights excepted and reserved by this Lease; and

(c)    for any other purpose connected with the management of or the interest of the Landlord in the Demised Premises

Provided That the Landlord and the Management Company shall exercise such rights in a way that causes as little inconvenience and disruption as is reasonably practicable, making good any physical damage caused to the reasonable satisfaction of the Tenant

4.12    **To comply with notices**

(a)    Whenever the Landlord shall give written notice to the Tenant of any breach of covenant to remedy such breach as soon as reasonably practicable

(b)    If the Tenant shall fail within twenty-one (21) days of such notice or as soon as reasonably possible in the case of emergency to commence and then diligently to continue to comply with such notice the Landlord may without further notice enter the Demised Premises and carry out or cause to be carried out all or any of the works referred to in such notice and all proper costs and expenses thereby incurred shall be paid by the Tenant to the Landlord on demand and in default of payment shall be recoverable as rent in arrear

Provided Always That where such notice pursuant to Clause 4.12(a) is given by the Landlord in relation to any breach of any of Clauses 4.5, 4.7 or 4.14 and such breach is:-

(i)    not one which is likely to result in structural damage to the Building or damage to any Adjoining Property; and

(ii)    not clearly visible (other than on close inspection) from the exterior of the Demised Premises or from any Estate Common Parts forming part of the

Demised Premises or from any part of the Demised Premises to which visitors to them have access;

(iii)    not one which adversely affects the value of the Landlord's reversion in the Building other than to an immaterial extent; and

(iv)    not one which affects the Landlord's reversion in and/or operation on the remainder of the Estate other than to an immaterial extent; and

(v)    not one which causes the Landlord or the Management Company to be in breach of a statutory obligation; and

(vi)    not one which interferes with the Landlord's exercise of the Exceptions and Reservations contained in Schedule 2 of the Lease other than to an immaterial extent; and

the Tenant shall (acting reasonably) be entitled to serve a written counter-notice on the Landlord certifying that this proviso applies and the reasons therefor and confirming that the Tenant will reimburse to the Landlord all costs, expenses, losses, damages incurred and in respect of all actions, proceedings, claims and liabilities arising out of suspension of the effect of a notice served by the Landlord pursuant to Clause 4.12(a) (if applicable) (a **"Tenant's Operational Convenience Notice"**). If the Landlord (acting reasonably) accepts the reasons set out in the Tenant's Operational Convenience Notice, then from the date of service of such Tenant's Operational Convenience Notice the Tenant's obligations under this Clause 4.12 so far as they relate to a Landlord's notice in respect of which such Tenant's Operational Convenience Notice has been given shall be suspended for a period of twelve (12) months. Upon the expiry of such period of suspension the Landlord's notice given under Clause 4.12(a) shall apply with its full force and effect and shall be deemed to extend and apply to any further Tenant's breach of covenant consequential upon such suspension and the Tenant shall not be entitled to serve more than one Tenant's Operational Convenience Notice in respect of any one such Landlord's notice. If the Landlord (acting reasonably) does not accept the reasons set out in the Tenant's Operational Convenience Notice, then the Landlord shall inform the Tenant together with reasoning for such decision within 10 Working Days of receipt of the Tenant's Operational Convenience Notice and the Tenant may refer the matter for independent determination by a Chartered Surveyor with not less than 10 years post qualification experience nominated by the President for the time being of the Royal Institute of Chartered Surveyors (or his duly appointed deputy or anyone authorised by him to make appointments on his behalf) on the terms set out in paragraphs 1, 2 and 6 of Schedule 9. If the Landlord does not notify the Tenant within 10 Working Days of receipt of the Tenant's Operational Convenience Notice the Landlord shall be deemed to accept the reasons set out in the Tenant's Operational Convenience Notice. Notwithstanding any Tenant's Operational Convenience Notice nothing in this proviso shall prevent the Landlord from serving further notices under Clause 4.12 either in circumstances where the Landlord believes the breach of covenant to which a Tenant's Operational Convenience Notice applies has become of

such a nature and/or extent that it is no longer a breach to which this proviso applies or any other breach of covenant

4.13    **Overloading floors and services and installation of wiring etc.**

(a)    Not to do anything which may subject the Demised Premises to any strain beyond that which it is designed to bear with due margin for safety and to pay to the Landlord on demand all costs reasonably incurred by the Landlord in obtaining the opinion of a qualified structural engineer as to whether the structure of the Demised Premises is being or is about to be overloaded

(b)    To observe the weight limits prescribed for all lifts in the Building

(c)    Not to use or permit or suffer to be used any electrical or electronic apparatus or equipment that does not comply with any relevant British standard or code of practice (or any replacement thereof) relating to such apparatus or equipment and in addition not to install or use any electrical or electronic equipment or apparatus unless it has been fitted with an efficient suppresser so as to prevent any interference with radio or television reception telecommunications transmission electrical or electronic apparatus or equipment or the operation of any other equipment in any Adjoining Property

(d)    To procure that on each and every underletting the proposed undertenant supplies to the Tenant plans showing details of the cables installed in or upon any part of the Building or the Estate by the undertenant in the Demised Premises (and to impose on the undertenant an obligation to update such plans if it installs any further cables) and to allow the Landlord to inspect such plans on reasonable written notice (but not more than once in any twelve month period). The Tenant agrees at the end or sooner determination of the Term it shall provide to the Landlord all such plans as it shall have obtained from its undertenants and that to the extent that plans have not been supplied by such undertenant it shall use reasonable endeavours to procure the labelling of such cables so as to properly identify them. The Tenant hereby consents at the end or sooner determination of the Term to disclosure by the relevant utility providers of details of such cables to the Management Company

4.14    **Pipes**

Not to overload or obstruct any Pipes or discharge into any Pipes any oil or grease or any noxious or deleterious substance which may cause an obstruction or become a source of danger or injure the Pipes or the drainage system of the Building or the Adjoining Property

4.15    **Cooking**

To take all necessary steps to ensure that all smells and fumes caused by permitted cooking refuse or food shall be removed from the Demised Premises in a manner and by means approved by the Landlord and in any event so as to ensure that in the

reasonable opinion of the Landlord no nuisance or annoyance shall be caused to the Landlord or any of the tenants or occupiers of the Adjoining Property

### 4.16    Dangerous materials and use of machinery

Not to bring in any part of the Demised Premises anything which is or is likely to become dangerous offensive combustible especially inflammable radioactive or explosive or which might increase the risk of fire or explosion or which would cause or be likely to cause nuisance annoyance disturbance or damage to the Landlord or any tenant owner or occupier of any part of the Estate PROVIDED THAT this Clause shall not prevent the use of anything utilised in connection with a modern office building and the activities carried on thereat

### 4.17    Not used

### 4.18    User

(a)    Not to use or occupy the Demised Premises for any purpose except for the Permitted User

(b)    Not to use the Demised Premises or any part thereof for any auction or public meeting public exhibition (other than where attendees at such meeting or exhibition have been invited by prior individual invitation) or public entertainment or for gambling or as a club or for the business of a turf accountancy estate agency travel agency staff or employment agency or Government Department in any such case where services are provided principally to visiting members of the public

(c)    Not to use the Demised Premises or any part thereof for any dangerous noisy noxious or offensive trade business or occupation whatsoever nor for any illegal or immoral purpose nor for residential purposes

(d)    Not to leave the Demised Premises continuously unoccupied for more than 7 days without:-

(i)    notifying the Landlord and

(ii)    providing such caretaking and security arrangements as the Landlord shall reasonably require in order to protect the Demised Premises and its contents and to deal with any emergency

(e)    To ensure that at all times the Landlord and the Management Company have written notice of the name home address and home telephone number of at least two keyholders of the Demised Premises

(f)    not to use the airspace above a height of 160.02 metres above Ordnance Datum in respect of the Tower or the airspace above a height of 54.86 metres above Ordnance Datum in respect of the Podium (the **"Podium Airspace"**) other than for the installation and maintenance of additional plant satellite dishes aerials

and other equipment used in connection with the use of the remainder of the Building and on the following conditions namely:

(i) all necessary consents and permissions required under the Planning Acts and other relevant statutes having first been obtained by the Tenant

(ii) no office space shall be created above the heights referred to in this Clause and no plant shall be installed which or of the nature of which has previously been installed in the Building so as to enable the Tenant to create further areas within the Building to be occupied as office space,

(iii) in relation to any such installation in the Podium Airspace such items shall tastefully be screened using materials and a design approved in writing by the Landlord (such approval not to be unreasonably withheld or delayed) so that they are hidden from view from elsewhere in the Estate

(iv) the Landlord's prior written consent to such installation having been obtained (such consent not to be unreasonably withheld or delayed (it being agreed that it shall be reasonable to withhold such consent where the installation of any such items might detract from the visual amenity of the Building or the Estate))

4.19    **Alterations signs and visual amenity**

4.19.1  (a) Without prejudice to the rights granted in paragraphs 5 and 6 of Schedule 1 not to erect any new structure or building in or on the Demised Premises or any part thereof nor to merge or join the Demised Premises or any part thereof with any Adjoining Property nor to alter add to or change the exterior of the Building or external parts of the Demised Premises or the height elevation or external architectural or decorative design or appearance (whether by alterations, additions or changes to the interior or exterior of the Demised Premises) of the Demised Premises Provided That this Clause 4.19.1(a) will not prevent the Tenant from carrying out such alterations (subject to, if the alterations would otherwise require consent under this Clause obtaining the Landlord's consent (such consent not to be unreasonably withheld or delayed)) where they are necessary to comply with statutory obligations Provided Further That, for the avoidance of doubt, nothing in this exception will allow the Tenant to make alterations which extend or increase the height or size of the Building or are incapable of being fully reinstated at the expiry or sooner determination of the Term;

(b) Not to alter divide cut maim or remove any of the principal or load-bearing walls floors beams or columns within or enclosing the Demised Premises nor to make any other alterations or additions to or which affect the structure of the Building Provided That, subject to Clause 4.19.1(d) and to any such alterations not adversely affecting the structural

- 21 -

integrity and/or the external appearance of the Demised Premises, the Tenant may with the prior written consent of the Landlord (such consent not to be unreasonably withheld or delayed) make openings through the floor slabs dividing the floors of the Demised Premises to install staircases (one per floor) in order to connect floors within the Demised Premises, make minor openings in the beams and internal walls of the Demised Premises and affix additional beams or otherwise strengthen the structure if there is a need for local strengthening or make other alterations to the walls floors or columns (including attachment of fixtures and fittings to the same)

(c)    Subject to the other sub-clauses of this Clause 4.19, the Tenant may carry out non-structural alterations or additions which do not involve any works to or affect any structural parts of the Demised Premises (other than simple affixation) without having to obtain the Landlord's consent Provided That the Tenant complies with the remainder of this Clause 4.19

(d)    Not to carry out any alterations or additions which are incapable of being fully reinstated at the expiry or sooner determination of the Term

(e)    Promptly to make good all damage caused to any parts of the Demised Premises or any Adjoining Property in the carrying out of any alterations or additions

(f)    As soon as practicable (and not more than thirty days) following completion of the approved or permitted alterations or additions (the "Alterations") the Tenant shall supply to the Landlord (i) a set of as-built drawings showing the Alterations as actually carried out together with a complete set of updated DWG files (or their equivalent) on computer disc reflecting the changes to the Tenant's Works and (ii) a copy of the health and safety file kept available for inspection pursuant to the Construction (Design Management) Regulations 1994 and any subsequent legislation of a similar nature PROVIDED THAT in the case of alterations or additions permitted under Clause 4.19.1(c) the Tenant shall only be required to supply the information referred to in this Clause 4.19.1(f) to the Landlord once in each year of the Term (save for the last year of the Term) within one (1) calendar month after the anniversary of the Term Commencement Date and in the last year of the Term no later than three (3) calendar months prior to the last day of the Term (howsoever determined)

(g)    Not to carry out any alteration or addition to the Demised Premises which would impede (otherwise than to an immaterial extent) the exercise of the rights reserved by paragraphs 12 and 13 of Schedule 2

4.19.2    save as provided for in paragraphs 5 and 6 of Schedule 1 not to erect or display on the exterior of the Demised Premises or in the windows thereof so as to be visible from the exterior any pole aerial or advertisement

4.20    **Works carried out to the Demised Premises**

Without prejudice to the provisions of Clause 4.19 or to any covenants and conditions which the Landlord may require or impose in giving consent for alterations or additions to the Demised Premises to carry out any alterations additions repairs replacements or other works to or in respect of the Demised Premises promptly and in a good and workmanlike manner and in accordance with the reasonable requirements of the Landlord (which shall be consistent with the then general requirements for works of a similar nature on the Estate) notified in writing to the Tenant and in particular but without prejudice to the generality thereof:-

(a)    any works the carrying out of which may in the Landlord's reasonable opinion constitute a nuisance or disrupt the businesses or activities of other tenants or occupiers of the Estate or the public shall be performed outside the hours of 9.00 am to 6.00 pm on Monday to Friday (inclusive)

(b)    any works within the Demised Premises affecting the structure of the Building or any mechanical electrical utility sprinkler communications air conditioning alarm or other similar systems within the Building or the Demised Premises shall:-

(i)    during the period when any contractor remains liable pursuant to a collateral warranty in respect of the part of the Building the subject of such works either be performed at the Tenant's expense by the contractor or contractors who provided a collateral warranty in connection with the relevant part of the Building or, if the Tenant requires any such works to be carried out by any other contractor then, it shall (by deed) release the Developer and the Developer's Surety (in each case as defined in the Agreement for Lease from any obligations either may have in connection with the part of the Building the subject of such works pursuant to the Agreement for Lease in connection with Latent Defective Works (as defined in the Agreement for Lease) or

(ii)    after the period of expiry of any collateral warranty relating to the part of the Building the subject of such works, by such reputable suitably experienced contractor as the Tenant may appoint

4.21    **Alienation**

4.21.1    (a)    Not to assign or charge any part or parts (as distinct from the whole) of the Demised Premises and not to agree so to do

(b)    Not to part with possession of or share the occupation of the whole or any part or parts of the Demised Premises or agree so to do or permit any person to occupy the same save by way of an assignment or underlease of the whole of the Demised Premises or an underlease of a Permitted Part thereof (as hereinafter defined) in accordance with the provisions of this Clause PROVIDED THAT nothing contained in this Clause 4.21 shall prevent the Tenant from sharing occupation of the

whole or any part or parts of the Demised Premises with a company which is and remains a Group Company of the Tenant so long as such occupation shall not create the relationship of landlord and tenant between the Tenant and the Group Company and notice of the sharing of occupation and the name of the Group Company concerned is given to the Landlord within ten (10) Working Days after the sharing begins and Provided Further That if and for so long as Lehman Brothers Limited is Tenant nothing contained in this Clause 4.21 shall prevent Lehman Brothers Limited from

(i)     sharing occupation of the whole or any part of the Demised Premises with a company which is and remains a Lehman Group Company and so long as such occupation shall either not create the relationship of landlord and tenant between the Tenant and the Lehman Group Company and notice of the sharing of occupation and the name of Lehman Group Company concerned is given to the Landlord within ten (10) Working Days after the sharing begins or

(ii)    underletting in aggregate of all such underlettings up to 100,000 square feet of Net Internal Area to Lehman Group Companies for a term of years expiring at least one year prior to the determination of the Term where :-

(1)    before any such underletting is completed or, if earlier, before the undertenant becomes contractually bound to take the underlease the underlease is validly excluded from the operation of sections 24 to 28 (inclusive) of the 1954 Act in accordance with the provisions of Section 38A of the 1954 Act; and

(2)    before any such underletting is completed or, if earlier, before the undertenant becomes contractually bound to take the underlease the Tenant provides to the Landlord such written evidence as shall be reasonably satisfactory to the landlord of such valid exclusion as referred to in sub-paragraph (1) above; and

(3)    the underlease incorporates the agreement or a reference to the agreement between the parties under Section 38A(1) of the 1954 Act for the exclusion of Sections 24 to 28 of the 1954 Act in relation to such underlease; and

(4)    the underlease incorporates a reference to the notice served by the Tenant on the undertenant and to the declaration or statutory declaration made by the undertenant under Section 38A(3) of the 1954 Act

and each undertenant shall have covenanted by deed with the Landlord in the form of the covenants contained in Schedule 10 and each underlease contains provisions for automatic determination if this Lease is assigned to an Entity who is not a Lehman Group Company or if any undertenant shall cease to be a Lehman Group Company (each such underlease being a "**Lehman Group Underletting**")

(c)   Not to underlet any part or parts of the Demised Premises (as distinct from the whole) otherwise than on the following conditions:-

    (i)   each of floors 9 - 31 (inclusive) (each such floor a "**Tower Floor**") of the Demised Premises (excluding any Tower Floor on which any Small Suite is located from time to time where there shall be no such restriction on numbers save to the extent of the minimum and maximum amount of square feet permitted in respect of a Small Suite) shall not at any time be in the occupation of more than four (4) persons and each of floors 1 - 7 (inclusive) shall not at any time be in the occupation of more than six (6) persons, in each case the Tenant and any Group Company of the Tenant sharing occupation with the Tenant pursuant to the proviso to Clause 4.21.1(b) counting as one and

    (ii)   each separate unit of accommodation to be underlet or retained shall comprise either:-

        (1)   not less than five thousand square feet and shall be capable of being occupied and used as a separate and self-contained unit with all necessary and proper services ("**a Permitted Part**"); or

        (2)   not less than one thousand square feet and not more than five thousand square feet located on no more than two (2) contiguous Tower Floors selected by the Tenant from time to time (a "**Small Suite**")

    (iii)   if the Landlord shall reasonably so require, the Tenant shall obtain an acceptable guarantor for any proposed undertenant and such guarantor shall execute and deliver to the Landlord a deed containing covenants by that guarantor (or, if more than one, joint and several covenants) with the Landlord, as a primary obligation, in the terms contained in Schedule 4 (with any necessary changes as the Landlord or the Tenant may reasonably require to reflect a change in the law or the then market practice) Provided That this Clause 4.21.1(c)(iii) shall not apply to a Lehman Group Underletting or an underletting of a Small Suite or to any underlease or underleases for a term of less than ten years where:-

(1)   before any such underletting is completed or, if earlier, before the undertenant becomes contractually bound to take the underlease the underlease is validly excluded from the operation of sections 24 to 28 (inclusive) of the 1954 Act in accordance with the provisions of Section 38A of the 1954 Act; and

(2)   before any such underletting is completed or, if earlier, before the undertenant becomes contractually bound to take the underlease the Tenant provides to the Landlord such written evidence as shall be reasonably satisfactory to the landlord of such valid exclusion as referred to in sub-paragraph (1) above; and

(3)   the underlease incorporates the agreement or a reference to the agreement between the parties under Section 38A(1) of the 1954 Act for the exclusion of Sections 24 to 28 of the 1954 Act in relation to such underlease; and

(4)   the underlease incorporates a reference to the notice served by the Tenant on the undertenant and to the declaration or statutory declaration made by the undertenant under Section 38A(3) of the 1954 Act

and where the Net Internal Area demised by such underlease or the aggregate of all such underleases does not exceed 200,000 square feet and the Tenant and any Group Company or Lehman Group Company if the Tenant is Lehman Brothers Limited of the Tenant remains in actual occupation of the whole of the remainder of the Demised Premises ("**Non-Guaranteed Underlettings**") but if the Tenant obtains a guarantor for any such underlease (other than an underlease of a Small Suite or a Lehman Group Underletting) it shall procure that the guarantor shall execute and deliver to the Landlord a deed containing covenants by that guarantor (or, if more than one, joint and several covenants) with the Landlord, as a primary obligation, in the terms contained in Schedule 4 (with any necessary changes as the Landlord or the Tenant may reasonably require to reflect a change in the law or the then current market practice) and

(iv)   prior to the grant of any underlease of a Permitted Part which comprises less than one whole floor of the Demised Premises or of a Small Suite or, if earlier, prior to the undertenant becoming contractually bound to take such an underlease

(1)    the underlease shall be validly excluded from the operation of sections 24 to 28 (inclusive) of the 1954 Act in accordance with the provisions of Section 38A of the 1954 Act; and

(2)    the Tenant shall provide to the Landlord such written evidence as shall be reasonably satisfactory to the landlord of such valid exclusion as referred to in sub-paragraph (1) above; and

(3)    the underlease shall incorporate the agreement or a reference to the agreement between the parties under Section 38A(1) of the 1954 Act for the exclusion of Sections 24 to 28 of the 1954 Act in relation to such underlease; and

(4)    the underlease shall incorporate a reference to the notice served by the Tenant on the undertenant and to the declaration or statutory declaration made by the undertenant under Section 38A(3) of the 1954 Act

(v)    no underlease of a Small Suite may be granted for a term exceeding ten (10) years

(d)    Not to underlet the whole of the Demised Premises otherwise than on the condition that if the Landlord shall reasonably so require, the Tenant shall obtain an acceptable guarantor for any proposed undertenant and such guarantor shall execute and deliver to the Landlord a deed containing covenants by that guarantor (or, if more than one, joint and several covenants) with the Landlord, as a primary obligation, in the terms contained in Schedule 4 (with any necessary changes) the Landlord or the Tenant may reasonably require to reflect a change in the law or the then current market practice

(e)    (i)    Not to underlet the whole of the Demised Premises or a Permitted Part other than a Lehman Group Underletting at a fine or a premium or at a rent less than the open market rental value of the Demised Premises or (as the case may be) of a Permitted Part in each case at the time of such underlease Provided That nothing in this Clause 4.21.1(e)(i) shall prevent the Tenant from underletting any Small Suite at a rent less than the open market rental value of the Small Suite in question at the time of the grant of such underlease if the undertenant of such underlease has covenanted with the Landlord in the form of covenants contained in Schedule 10

(ii)    No underletting of the whole or any part of the Demised Premises other than a Lehman Group Underletting or an Underlease of a Small Suite (where the undertenant of such Small Suite has

covenanted with the Landlord in the form of the covenants contained in Schedule 10) can take place on terms whereby any rent-free or concessionary rent period or financial inducement given is less than or materially more than that which is customary at the time in the open market

Provided Always That the provisions of this Clause 4.21.1(e) shall not apply in the case of any underlease of a whole floor or less for a term of less than ten years where:-

(1) before any such underletting is completed or, if earlier, before the undertenant becomes contractually bound to take the underlease the underlease is validly excluded from the operation of sections 24 to 28 (inclusive) of the 1954 Act in accordance with the provisions of Section 38A of the 1954 Act; and

(2) before any such underletting is completed or, if earlier, before the undertenant becomes contractually bound to take the underlease the Tenant provides to the Landlord such written evidence as shall be reasonably satisfactory to the landlord of such valid exclusion as referred to in sub-paragraph (1) above; and

(3) the underlease incorporates the agreement or a reference to the agreement between the parties under Section 38A(1) of the 1954 Act for the exclusion of Sections 24 to 28 of the 1954 Act in relation to such underlease; and

(4) the underlease to incorporate a reference to the notice served by the Tenant on the undertenant and to the declaration or statutory declaration made by the undertenant under Section 38A(3) of the 1954 Act

and which would otherwise be in breach of this Clause 4.21.1(e) where the Tenant and the undertenant shall have covenanted by deed with the Landlord in the form of the covenants contained in Schedule 10

(f) Without prejudice to the foregoing provisions not to charge or underlet the whole of the Demised Premises nor to underlet a Permitted Part other than a Lehman Group Underletting or an underletting of a Small Suite or Non-Guaranteed Underlettings without the prior written consent of the Landlord such consent not to be unreasonably withheld or delayed nor to assign the whole of the Demised Premises otherwise that in strict compliance with Clause 4.21.2

(g) Prior to any permitted underlease to procure that the undertenant enters into direct covenants with the Landlord as follows:-

(i)    an unqualified covenant by the undertenant that the undertenant shall not assign or charge (or agree so to do) any part or parts (as distinct from the whole) of the premises to be thereby demised and shall not (save by way of an assignment or underlease of the whole or an underlease of a Permitted Part or of a Small Suite or a Lehman Group Underletting in accordance with the provisions of this Clause 4.21) part with possession of or share the occupation of the whole or any part of the premises to be thereby demised or agree so to do or permit any person to occupy the same Provided That nothing shall prevent the undertenant from sharing occupation of the whole or any part or parts of the underlet premises with a company which is and remains a Group Company of the undertenant or a Lehman Group Company if the undertenant is a Lehman Group Company so long as such occupation shall not create the relationship of landlord and tenant between such undertenant and the Group Company and notice of the sharing of occupation and the name of the Group Company concerned is given to the Landlord within five (5) Working Days after the sharing begins

(ii)    a covenant by the undertenant that the undertenant shall not assign charge or underlet other than to a Lehman Group Company where the undertenant is a Lehman Group Company (or agree so to do) the whole of the premises to be thereby demised or underlet (or agree so to do) a Permitted Part without (in each case) obtaining the prior written consent of the Landlord such consent not to be unreasonably withheld or delayed

(iii)    a covenant by the undertenant to perform and observe all the tenant's covenants and the other provisions contained in

    (1)    this Lease (other than the payment of the rents) so far as the same are applicable to the premises to be thereby demised and including in particular (but without limitation) the conditions set out in Clause 4.21.1(c) Provided That this Clause 4.21.1(g)(iii)(1) will not apply to an undertenant of a Small Suite; and

    (2)    the permitted underlease

(h)    Every permitted underlease shall contain:-

(i)    provisions for the review of the rent thereby reserved (which the Tenant hereby covenants to operate and enforce) on an upwards only basis on every fifth anniversary of the term commencement date of such underlease in accordance with the provisions set out in Schedule 3 hereto mutatis mutandis and with references to

"Assumed Premises" being deemed to be references to premises demised by the permitted underlease Provided that this Clause 4.21.1(h)(i) will not apply to a Lehman Group Underletting or to an underlease of a Small Suite or to an underlease for a period less than ten (10) years where:-

(1) before any such underletting is completed or, if earlier, before the undertenant becomes contractually bound to take the underlease the underlease is validly excluded from the operation of sections 24 to 28 (inclusive) of the 1954 Act in accordance with the provisions of Section 38A of the 1954 Act; and

(2) before any such underletting is completed or, if earlier, before the undertenant becomes contractually bound to take the underlease the Tenant provides to the Landlord such written evidence as shall be reasonably satisfactory to the landlord of such valid exclusion as referred to in sub-paragraph (1) above; and

(3) the underlease incorporates the agreement or a reference to the agreement between the parties under Section 38A(1) of the 1954 Act for the exclusion of Sections 24 to 28 of the 1954 Act in relation to such underlease; and

(4) the underlease to incorporate a reference to the notice served by the Tenant on the undertenant and to the declaration or statutory declaration made by the undertenant under Section 38A(3) of the 1954 Act

(ii) a covenant by the undertenant (which the Tenant hereby covenants to enforce) prohibiting the undertenant from doing or suffering any act or thing in relation to the premises underlet in breach of the provisions of this Lease Provided That this Clause 4.21.1(h)(ii) will not apply to an underlease of a Small Suite or to a Lehman Group Underletting

(iii) a condition for re-entry on breach of any covenant by the undertenant

(iv) (subject to the provisions of Clause 4.21.1(g)) the same provisions (mutatis mutandis) as are set out in Clause 4.21 Provided That this Clause 4.21.1(h)(iv) will not apply to an underlease of a Small Suite or to a Lehman Group Underletting

(v) a covenant by the undertenant that, except where any statutory provision prohibits or modifies the right of a tenancy to compensation being reduced or excluded by agreement no

undertenant (whether immediate or not) shall be entitled on quitting the underlet premises or any part thereof to claim any compensation from the Landlord under the Landlord and Tenant Act 1954

(i)    Insofar as it is not a breach of this Lease to enforce the performance and observance by every such undertenant of the covenants provisions and conditions of the underlease and not at any time to waive any breach of the same

(j)    To procure that the principal rent is reviewed under any permitted underlease in accordance with the terms thereof

(k)    Not to vary the terms of any permitted underlease (or agree so to do) in a way which is inconsistent with this Lease without the prior written consent of the Landlord such consent not to be unreasonably withheld or delayed

(l)    To procure that the rents reserved by any permitted underlease shall not be commuted or payable more than one quarter in advance and not to permit the reduction of any rents reserved by any such underlease unless in either case the Landlord's consent (not to be unreasonably withheld or delayed) is first obtained

(m)    No undertenant will be permitted to underlet or retain any Small Suites and, for the avoidance of doubt, the only permitted dealings of part by an undertenant will be of a Permitted Part

4.21.2    (a)    For the purposes of Section 19(1A) of the Landlord and Tenant Act 1927 it is agreed that the Landlord may withhold consent to an assignment of the whole of the Demised Premises if:

(i)    the proposed assignee or any proposed guarantor for it (other than any guarantor under an authorised guarantee agreement or referred to in Clause 4.21.2(b)(i)) is not an Acceptable Assignee; or

(ii)    the proposed assignee or any proposed guarantor for it is a company which is a Group Company of the Tenant unless the proposed assignee or any proposed guarantor for it or the combination of the proposed assignee and any proposed guarantor for it constitutes an Acceptable Assignee as defined by Clause 1.1(a); or

(iii)    the proposed assignee or any proposed guarantor for it (other than any guarantor under an authorised guarantee agreement as referred to in Clause 4.21.2(b)(i)) is any person or Entity who has the right to claim sovereign or diplomatic immunity or exemption from

liability from the covenants on the part of the Tenant contained in this Lease; or

(iv)   the proposed assignee or any proposed guarantor for it (other than any guarantor under an authorised guarantee agreement as referred to in Clause 4.21.2(b)(i)) is a corporation registered in or an individual resident in a jurisdiction in which a judgment obtained in the Courts of England and Wales is unlikely to be enforced without any re-examination of the merits of the case; or

(v)   the proposed assignee or any proposed guarantor for it (other than any guarantor under an authorised guarantee agreement as referred to in Clause 4.21.2(b)(i)) is any person or Entity in relation to whom any of the events mentioned in Clause 8.1 of this Lease would have occurred if that person or Entity were the Tenant under this Lease; or

(vi)   any sum due from the Tenant under this Lease remains unpaid Provided That the Landlord notifies the Tenant that such sum being outstanding is the basis for consent being refused; or

(vii)   there is a material outstanding breach of covenant on the part of the Tenant which relates to the repair of the Demised Premises unless the proposed assignee covenants with the Landlord to remedy the same as soon as reasonably practicable

(b)   For the purposes of S19 (1A) of the Landlord and Tenant Act 1927 and S16 of the Landlord and Tenant (Covenants) Act 1995 it is further agreed that any consent of the Landlord to an assignment of the whole of the Demised Premises may be subject to:

(i)   a condition requiring that before the Tenant completes the assignment of this Lease the Tenant executes and delivers to the Landlord a deed which shall be prepared by the Landlord's solicitors containing covenants on the part of the Tenant in the form of those contained in Schedule 8 Provided That the Tenant shall not be required to enter into such a deed if the proposed assignee or any proposed guarantor for it or the combination of the proposed assignee and any guarantor for it is an Entity which meets the tests set out in Clause 1.1(a) but substituting for the reference to "A or better" from Standard & Poor's a reference to "A+ or better" and for the reference to "A2" from Moody's a reference to "A1" on each occasion such references appear

(ii)   a condition, as a separate and severable obligation from that set out in Clause 4.21.2(b)(i), requiring that before the Tenant completes the assignment of this Lease any party who has covenanted on

behalf of the Tenant as Surety, executes and delivers to the Landlord the deed to be entered into by the Tenant pursuant to Clause 4.21.2(b)(i) amended so as to incorporate the provisions of Clause 8.18 of this Lease (mutatis mutandis) Provided That the Surety shall not be required to enter into such a deed if the proposed assignee or any proposed guarantor for it or the combination of the proposed assignee and any proposed guarantor for it is an Entity which meets the tests set out in Clause 1.1(a) but substituting for the reference to "A or better" from Standard & Poor's a reference to "A+ or better" and for the reference to "A2" from Moody's a reference to "A1" on each occasion such references appear

(iii)   a condition that the assignment is completed within three months of the date of the consent and that if it is not the consent shall be void but that if the assignment does take place notwithstanding the fact that the consent is void any of the guarantees referred to in Clause 4.21.2(b)(i) and (ii) and 4.21.2(b)(iv) shall nevertheless remain in full force and effect

(iv)   save in the case where a proposed assignee is an Acceptable Assignee (other than by virtue of its proposed guarantor) a condition that before the Tenant completes the assignment of the Lease, if the Landlord acting reasonably determines it to be necessary, one or more guarantors acceptable to the Landlord, acting reasonably, covenant by deed with the Landlord in the form of guarantee set out in Schedule 4

(v)   a condition that prior to any permitted assignment it is procured that the assignee enters into a direct covenant with the Landlord and the Management Company that with effect from the date of the assignment until the first subsequent assignment which is not an excluded assignment (as the expression is defined in the Landlord and Tenant (Covenants) Act 1995) the proposed assignee will pay the rents hereby reserved and perform and observe the covenants by the Tenant contained in this Lease

(c)   Without prejudice to the provisions of Clauses 4.21.2(a) and (b) the Tenant shall not assign the whole of the Demised Premises without the prior written consent of the Landlord and except in relation to the circumstances mentioned in Clause 4.21.2(a) and the conditions mentioned in Clause 4.21.2(b) such consent shall not be unreasonably withheld or delayed.   The parties agree that in considering whether or not the Landlord is reasonably withholding such consent due and proper regard shall be had to the provisions and effect of the Landlord and Tenant (Covenants) Act 1995

(d)     Clauses 4.21.2(a) and 4.21.2(b) shall operate without prejudice to the Landlord's right to refuse such consent on any other ground or grounds where such refusal would be reasonable or to impose further conditions upon the grant of consent where such imposition would be reasonable

4.21.3   If at any time any one or more provisions of this Clause 4.21 is or becomes invalid or illegal or unenforceable in any respect under any law the validity legality and enforceability of the remaining provisions hereof shall not be in any way affected or impaired thereby

4.21.4   Any question of whether or not any of the circumstances set out in Clause 4.21.2(a) exist in relation to a proposed assignment of the whole of the Demised Premises or as to whether any of the conditions referred to in Clause 4.21.2(b) should be imposed shall be determined by the Landlord and if the Landlord determines that any such circumstances exist and as a consequence of it wishes to withhold its consent to the proposed assignment, or that any such conditions should be imposed, the Landlord shall give written notice to that effect to the Tenant and such notification shall be binding on the Tenant unless the Tenant serves on the Landlord a counternotice ("the Counternotice") within ten (10) Working Days requiring the Landlord's determination to be reviewed by an expert in accordance with Schedule 9

## 4.22   Registration of dispositions

Within twenty-eight (28) days of every assignment transfer assent underlease assignment of underlease mortgage charge or any other disposition whether mediate or immediate of or relating to the whole or any part or parts of the Demised Premises to supply to the Landlord a certified copy of the document evidencing or effecting such disposition and on each occasion to pay to the Landlord or its solicitors a reasonable registration fee

## 4.23   Disclosure of information

Whenever the Landlord shall reasonably request to supply full particulars of all occupations and derivative interests in the Demised Premises however remote or inferior

## 4.24   Landlord's costs

Within ten (10) Working Days of demand, to pay and indemnify the Landlord and the Management Company against all reasonable costs fees charges disbursements and expenses properly incurred by them:-

(a)     in relation to or in bona fide contemplation of the preparation and service of a notice under Section 146 of the Law of Property Act 1925 and of any proceedings under Section 146 or 147 of that Act (whether or not any right of re-entry or forfeiture has been waived by the Landlord or a notice served under Section 146 is complied with by the Tenant or the Tenant is relieved under the

provisions of that Act and even though forfeiture may be avoided otherwise than by relief granted by the Court)

(b)    in relation to or in bona fide contemplation of the preparation and service of all notices and schedules relating to wants of repair whenever served (but relating only to such wants of repair that accrued during the Term)

(c)    in connection with the recovery or attempted recovery of arrears of rent or other sums due from the Tenant or in procuring the remedying of the breach of any covenant by the Tenant

(d)    in relation to any application for consent required or made necessary by this Lease (such costs to include reasonable management and monitoring fees and expenses) whether or not the same is granted (except in cases where the Landlord is obliged not to unreasonably withhold or delay its consent and the withholding or delaying of its consent is unreasonable) or whether the application be withdrawn

## 4.25    Statutory requirements

(a)    At the Tenant's own expense to comply in all respects with every statute now in force or which may after the date of this Lease be in force and any other obligation imposed by law and all regulations laws or directives made or issued by or with the authority of The European Commission and/or The Council of Ministers relating to the Demised Premises or their use, including the Offices, Shops and Railway Premises Act 1963, the Fire Precautions Act 1971, the Defective Premises Act 1972, the Health and Safety at Work etc. Act 1974 and the Environmental Protection Act 1990

(b)    To execute all works and provide and maintain all arrangements on or in respect of the Demised Premises or their use which are required by any statute now in force or which may after the date of this Lease be in force or by any government department, local, public or other competent authority or court of competent jurisdiction acting under or in pursuance of any statute, whether any of the same are required to be carried out by the landlord, tenant or occupier, and shall reimburse the Landlord all proper costs, charges, fees and expenses of, or incidental to, the execution of any works or the provision or maintenance of any arrangements so required to be carried out by (or on behalf of) the Landlord

(c)    Not to do or omit to be done in or near the Demised Premises any act or thing by reason of which the Landlord or any other occupier may under any statute or non-statutory regulations become liable to pay any penalty damages compensation costs charges or expenses

## 4.26    Planning Acts

(a)    To comply with the provisions and requirements of the Planning Acts insofar as they relate to or affect the Demised Premises and to indemnify and keep the

Landlord indemnified against all actions proceedings demands costs expenses and liability in respect of any contravention PROVIDED THAT the Landlord shall use all reasonable endeavours to mitigate the effect of such actions proceedings demands costs expenses and liability and shall notify the Tenant as soon as reasonably practicable after becoming aware of any such actions proceedings demands costs expenses and liability and shall pay due heed to any representations made by the Tenant in settling any such actions proceedings demands costs expenses and liabilities

(b)    Not to apply for planning permission or for other consents required under the Planning Acts in respect of the Demised Premises or for certificates or determinations as to lawful use without the prior written consent of the Landlord, such consent not to be unreasonably withheld or delayed where under the relevant provisions of this Lease the consent of the Landlord is not required or cannot be unreasonably withheld or delayed in respect of the matters the subject of the application or where the Tenant is complying with its obligations under this Lease or statute in respect of the matters the subject of the application and where the Landlord has so consented it shall not unreasonably object or make representations against such application

(c)    At the Tenant's own expense to obtain and, if appropriate, renew any planning permission and any other consent and serve all necessary notices required for the carrying out by the Tenant of any operations or the commencement or continuance of any use of the Demised Premises

(d)    To pay and satisfy any charge or levy that may hereafter be imposed under the Planning Acts in respect of any Development by the Tenant on or at the Demised Premises

(e)    The Tenant shall not implement any planning permission or consent required under the Planning Acts before it has been produced to and approved in writing by the Landlord such approval not to be unreasonably withheld or delayed

(f)    Unless the Landlord shall otherwise direct to carry out and complete before the expiration or sooner determination of the Term:-

(i)    any works stipulated to be carried out to the Demised Premises as a condition of any planning permission granted during the Term and implemented by the Tenant or any undertenant or permitted occupier and

(ii)    any Development begun by the Tenant or any undertenant or permitted occupier upon the Demised Premises in respect of which the Landlord shall or may be or become liable for any charge or levy under the Planning Acts

(g)    If and when called upon so to do to produce to the Landlord as soon as reasonably practicable all plans documents and other evidence as the Landlord may reasonably require in order to satisfy itself that the provisions of this Clause have been complied with in all respects

4.27    **Statutory notices**

Within fourteen (14) days after receipt of the same (or sooner if requisite having regard to the time limits stated therein) to produce to the Landlord a copy and any further particulars required by the Landlord of any notice or order or proposal for the same given to the Tenant and relevant to the Demised Premises or the occupiers thereof or of the Estate and without delay to take all necessary steps to comply with the notice or order so far as the same is the responsibility of the Tenant and at the reasonable request of the Landlord but at the joint cost of the Landlord and the Tenant to make or join with the Landlord in making such objection or representation against or in respect of any such notice order or proposal as the Landlord shall reasonably deem expedient

4.28    **Defective premises**

Immediately upon becoming aware of the same, to give written notice to the Landlord of any defect in the Demised Premises which might give rise to an obligation on the Landlord to do or refrain from doing any act or thing so as to comply with the duty of care imposed on the Landlord pursuant to the Defective Premises Act 1972 and at all times to display and maintain all notices which the Landlord may from time to time reasonably require to be displayed in relation thereto

4.29    **Fire precautions and equipment etc.**

To comply with the requirements and recommendations of the fire authority and/or the requirements of the insurers of the Demised Premises and the reasonable requirements of the Landlord in relation to fire precautions affecting the Demised Premises

4.30    **Encroachments and easements**

(a)    Not to stop up or obstruct any of the windows or lights belonging to the Demised Premises other than to a non-material proportion of the windows or any façade of the Building nor to permit any new window opening doorway passage Pipes or other encroachment or easement to be made or acquired into upon or over the Demised Premises or any part thereof and in case any person shall attempt to make or acquire any encroachment or easement to give written notice thereof to the Landlord immediately the same shall come to the notice of the Tenant and at the request of the Landlord to adopt such means as may be reasonably required by the Landlord for preventing any such encroachment or the acquisition of any such easement

(b)    Not to give to any person any acknowledgement that the Tenant enjoys the access of light to any of the windows or openings of the Demised Premises by the consent of such person nor to pay any sum of money or enter into any agreement with any person for the purpose of inducing or binding such person to abstain from obstructing the access of light to any of the windows or openings and in the event of any person doing or threatening to do anything which obstructs the access of light to any of the windows or openings forthwith to notify the Landlord of the same

4.31  **Reletting and sale notices**

During the six (6) months preceding the expiration or sooner determination of the Term to permit all persons with the written authority of the Landlord and accompanied by an agent of the Tenant (which the Tenant agrees to provide) to view the Demised Premises at all reasonable hours in the daytime upon prior appointment having been made

4.32  **Indemnity**

To keep the Landlord and the Management Company fully indemnified from and against all actions proceedings claims demands losses costs expenses damages and liability arising from any breach of the Tenant's covenants or other obligations contained in or ancillary to this Lease but the Landlord and the Management Company shall take every reasonable step in order to mitigate the extent and effect of such actions, proceedings, claims, demands, losses, costs, expenses, damages and liabilities and shall notify the Tenant as soon as reasonably practicable after becoming aware of any actions, proceedings, claims, demands, losses, costs, expenses, damages and liabilities and shall pay due heed to any representations made by the Tenant in settling any actions, proceedings, claims, demands, losses, costs, expenses, damages and liabilities.

4.33  **Value Added Tax**

4.33.1  Not at any time during the Term to make an election to waive exemption from VAT pursuant to paragraph 2 of Schedule 10 the Value Added Tax Act 1994 or otherwise take any action, the effect of which would be that VAT could be chargeable in respect of rents payable by or to the Tenant in relation to the Demised Premises or any estate or interest therein or derived therefrom Provided That this Clause 4.33.1 shall not apply where the Landlord is in breach of Clause 6.4

4.33.2  Where, pursuant to the terms of this Lease, the Landlord or the Management Company (for the purposes of this Clause 4.33.2, the **"Supplier"**) makes or is deemed to make a supply to the Tenant for Value Added Tax purposes and Value Added Tax is or becomes chargeable on such supply, the Tenant shall (in addition to and at the same time as providing any other consideration for such supply)

(a)  if any other consideration given for such supply consists wholly of money; or

(b)  if such other consideration does not consist wholly of money,

pay to the Supplier a sum equal to the amount of such Value Added Tax and the Supplier shall provide the Tenant with a Value Added Tax invoice in respect of such supply

4.33.3    Where, pursuant to the terms of this Lease, the Tenant is required to reimburse the Landlord or the Management Company or any other person (for the purposes of this Clause 4.33.3, the "Recipient") for any cost, fee, charge, disbursement or expense (or any proportion of it), the Tenant shall also reimburse the Recipient for any part of such cost, fee, charge, disbursement or expense (or proportion of it) which represents Value Added Tax, save to the extent that the Recipient is entitled to credit or repayment in respect of such Value Added Tax from HM Customs & Excise

4.33.4    For the avoidance of doubt, neither the Landlord nor the Management Company shall be under a duty to exercise or not to exercise any option or right conferred on the Landlord or the Management Company by the legislation relating to Value Added Tax (including any regulations made thereunder) so as to reduce or avoid any liability to Value Added Tax referred to in Clauses 4.33.2 or 4.33.3 above or so as to entitle or enable the Landlord or the Management Company (as the case may be) to so obtain a credit for such Value Added Tax as referred to in Clause 4.33.3 above

4.33.5    To inform the Landlord and to keep the Landlord informed in writing of the extent to which any Value Added Tax payable by the Tenant is or will become Irrecoverable VAT in respect of which the Tenant is entitled to an indemnity under Clause 6.4.2

4.33.6    Where the Tenant intends to make a claim under Clause 6.4.2, within forty-five (45) Working Days of the end of the prescribed accounting period (in this Lease the term "prescribed accounting period" to be construed in accordance with Section 25 of the Value Added Tax Act 1994) of the Tenant in which any relevant Irrecoverable VAT was incurred by the Tenant, to provide the Landlord with written evidence reasonably acceptable to the Landlord (including, without limitation, reasonable details of the calculation of the amount of such Irrecoverable VAT) of the amount of the Irrecoverable VAT incurred by the Tenant in such prescribed accounting period

4.33.7    To discuss with the Landlord in good faith the extent to which the amount of any Irrecoverable VAT may be eliminated or reduced, to consider in good faith any request made by the Landlord that the Tenant contests by appropriate means the recoverability as VAT of the Irrecoverable VAT the subject of a claim under Clause 6.4.2, and to use reasonable endeavours to eliminate or reduce so far as possible the amount of any Irrecoverable VAT in respect of which the Tenant is entitled to an indemnity under Clause 6.4.2 including (without limitation) either becoming or seeking to become a member of a group of companies for Value Added Tax purposes where the Tenant is not such a member (but is eligible to become so) or remaining such a member (as the case may be) or by any other means whatsoever, provided that this Clause 4.33.7 shall not require the Tenant to take any action which might reasonably be expected to increase the burden of Value Added Tax or direct

taxes on the Tenant and any Group Company unless the Landlord indemnifies the Tenant and any Group Company against such increased tax

4.33.8 Where the Tenant has been indemnified by the Landlord for any amount under Clause 6.4.2 and it transpires that such amount is not Irrecoverable VAT, immediately to repay to the Landlord such amount

### 4.34 Regulations

Insofar as the same relate to the Demised Premises or the activities acts or omissions of the Tenant or any undertenant or any persons under its or their control to comply or procure compliance with the Regulations

### 4.35 Covenants affecting reversion

By way of indemnity only to perform and observe the provisions of the deeds and documents referred to in Schedule 5 hereto so far as the same are still subsisting and capable of taking effect and relate to or affect the Demised Premises

### 4.36 External Lights

To turn on the external lights on the Building so as to light up (and keep lit) the ground level arcade shown hatched blue on Plan 6 between dusk and dawn each day and to illuminate (and keep lit) the exterior of the Building by the use of the external lights at such times as shall be reasonably requested by the Landlord

### 4.37 Landlord's Release

Not to unreasonably withhold or delay its consent to an application by the Landlord for a release of its obligations under the Landlord and Tenant (Covenants) Act 1995 having regard to all the circumstances and upon such a release being given the Landlord's Guarantor shall forthwith automatically be likewise released.

### 4.38 Helipad

Not to construct a helipad on the top or on any other part of the Building without the consent of the Landlord

### 4.39 Jubilee Place Link

4.39.1 To clean and maintain the floor wall and ceiling finishes within the Jubilee Place Link

4.39.2 At all times, subject to any cause beyond the reasonable control of the Tenant (the Tenant taking all reasonable steps to minimise the length of any period so caused), to supply lighting, air conditioning, sprinkler and fire alarm services to the Jubilee Place Link

4.39.3  To repair and keep in good and substantial repair and condition the Pass Doors and as often as may be necessary to reinstate rebuild or renew each part of them

4.39.4  At the expiration or sooner determination of the Term to yield up the Pass Doors in good and substantial repair and condition

4.39.5  As often as may be necessary taking into account the nature of the Building and Jubilee Place to keep the glass on the side of the Pass Doors facing the Demised Premises clean

4.39.6  At all times to provide electrical power to the Pass Doors

4.39.7  From time to time upon the Management Company's reasonable request to use all reasonable endeavours to agree a regime regarding the locking and unlocking of the Pass Doors in order to satisfy both the Tenant's reasonable security requirements and the reasonable security requirements of the owners and managers of Jubilee Place

4.40  **Car Park Barriers**

Upon the written request of the Landlord or the Management Company at the end or sooner determination of the Term to reinstate any car park barriers and card readers installed within the Car Park Barrier Location (together with any associated power and control cabling running thereto)

5.  **MANAGEMENT COMPANY'S COVENANTS**

THE Management Company COVENANTS with the Tenant and as a separate covenant with the Landlord as follows:

5.1  **Estate Services**

Save in respect of the Sublet Premises, to perform and observe and/or to procure to be performed and observed the Estate Services PROVIDED THAT neither the Landlord nor the Management Company shall be liable to the Tenant in respect of any failure or interruption or delay in the provision of any such services caused by Force Majeure; and

5.2  **Jubilee Place Link**

5.2.1  As often as may be necessary taking into account the nature of the Building and Jubilee Place to keep the glass on the side of the Pass Doors facing Jubilee Place clean or to procure that such glass is kept clean

5.2.2  From time to time upon the Tenant's reasonable request to use all reasonable endeavours to agree a regime regarding the locking and unlocking of the Pass Doors in order to satisfy both the Tenant's reasonable security requirements and the reasonable security requirements of the owners and managers of Jubilee Place

6.    **LANDLORD'S COVENANTS**

THE Landlord COVENANTS with the Tenant:-

6.1    **Quiet enjoyment**

That the Tenant (without prejudice to Clause 8.1) may peaceably hold and enjoy the Demised Premises during the Term without any interruption by the Landlord or any person lawfully claiming through under or in trust for it or by title paramount

6.2    **Guarantee of Management Company's Obligations**

That the Management Company or the Landlord will perform the covenants on the part of the Management Company contained in this Lease

6.3    **Superior Title**

By way of indemnity only against any claims by any Superior Landlord to pay the rents reserved by and (save insofar as the same are the responsibility of the Tenant under this Lease) observe and perform the conditions and covenants imposed on the lessee in the Superior Lease and to use reasonable endeavours to procure that the Superior Landlord observes and performs the conditions and covenants imposed on the lessor in the Superior Lease

6.4    **Value Added Tax**

6.4.1    Not at any time during the Term to make a voluntary election to waive exemption from VAT pursuant to paragraph 2 of Schedule 10 to the Value Added Tax Act 1994 or otherwise take any action, the effect of which could be that VAT could be chargeable in respect of rents payable by or to the Tenant in relation to the Demised Premises EXCEPT ALWAYS where the Tenant is in breach of Clause 4.33.1

6.4.2    In the event that the Landlord shall at any time before the expiry or sooner determination of the Term make or have made or be deemed to have made an election to waive exemption from VAT pursuant to paragraph 2 of Schedule 10 to the Value Added Tax Act 1994 (for the purposes of this Clause 6.4, an **"election"**) in relation to all or any part of the Demised Premises:

(a)    subject to Clause 6.4.2(ii), where an election is a voluntary election, the Landlord shall indemnify (the **"Indemnity"**) the Tenant for any Value Added Tax payable by the Tenant in relation to supplies made by the Landlord to the Tenant under this Lease to the extent that such Value Added Tax is Irrecoverable VAT, together with any costs and expenses reasonably and properly incurred by the Tenant as a direct result of such Irrecoverable VAT; and

(b)    if as a result of making an election which is not a voluntary election an amount is recovered from HM Customs & Excise in respect of VAT

incurred by the Landlord in relation to the Building which would not have been recovered but for the election, the Landlord shall pay to the Tenant or any Group Company nominated by the Tenant an amount equal to the sum recovered (net of the Landlord's costs and expenses reasonably and properly incurred in recovering the relevant amount (including irrecoverable VAT related thereto and excluding recoverable VAT in relation thereto) and taking into account the Landlord's after tax position in respect of both the receipt of the sum recovered and the payment to the Tenant under this Clause)

PROVIDED THAT the amount payable by the Landlord under this Clause 6.4.2(ii) shall not exceed the aggregate from time to time of the amounts which would have been paid or payable throughout the Term under the Indemnity had the election been a voluntary election

6.4.3   Where the Landlord makes an election which is not a voluntary election, and there has been any change of law where the effect of that change of law is an increase in the rate of Value Added Tax applicable to supplies made by the Landlord to the Tenant under this Lease, the Indemnity shall apply as if the VAT rate had remained at 17.5% notwithstanding such increase in the rate

6.4.4   Without limiting the circumstances in which the Landlord would be treated as making a voluntary election, the Landlord shall be treated for the purposes of this Clause as making a voluntary election where:

(a)   the Landlord enters into an agreement with a third party the effect of which is that the Landlord is or may be required to make an election and the Landlord makes an election pursuant to such agreement; or

(b)   the Landlord is treated as having made an election as a result of the Building being linked internally or by a covered walkway to another building in respect of which a voluntary election has been made by the Landlord

6.4.5   Where the Tenant has been indemnified by the Landlord for any amount under Clause 6.4.2 and the amount of any Irrecoverable VAT is subsequently increased (by virtue of the amount of VAT recovered by the Tenant being adjusted by way of decrease), such adjusting payment or payments shall be made by the Landlord to the Tenant as are appropriate to ensure that the Tenant is effectively indemnified in accordance with Clause 6.4.2(i) against the Irrecoverable VAT as so increased

## 6.5   Directional Signage

That it shall install and maintain at the expense of the Tenant within the Estate Common Parts and, subject to the rights of other occupiers, on other parts of the Estate appropriate directional signage to the Demised Premises referring to the Tenant as the Landlord considers appropriate, acting reasonably having regard to:-

(a)  the size and location of the Demised Premises relative to other buildings and parts of the Estate;

(b)  the nature and quality of the Estate; and

(c)  the principles of good estate management

### 6.6    Jubilee Park

Not to build on the area shown hatched blue on Plan 46 save first for incidental or ancillary structures consistent with its use as a public open space and secondly for skylights into the underground retail areas but to maintain the same as a public open space

### 6.7    Winter Garden

For the benefit only of Lehman Brothers Limited to maintain the Winter Garden as a winter garden provided that the Landlord may alter the Winter Garden to such other area of public open space or amenity with the consent of the Tenant which the Tenant may in its absolute discretion withhold

### 6.8    Indemnity

The Landlord shall:

(a)  indemnify the Tenant against all costs claims damages demands losses expenses and liabilities the Tenant incurs in relation to the Docklands Light Railway or its use; and

(b)  at the Tenant's cost and if so requested in writing by the Landlord claim such costs claims damages demands losses expenses and liabilities in the Landlord's name against Docklands Light Railway Limited as the Tenant shall request

Provided always that the Landlord's liability under this clause shall be limited to those costs claims damages demands losses expenses and liabilities which it recovers from Docklands Light Railway Limited pursuant to the DLR Lease

### 7.    INSURANCE

### 7.1    Landlord to insure

THE Landlord shall insure and keep insured with some insurance company of repute or with Lloyd's Underwriters through such agency (if any) as the Landlord may from time to time determine (whether or not a Group Company of the Landlord) (subject to such exclusions excesses and limitations as may be reasonable or as may from time to time be imposed by the insurers):-

(a)    (i)    the Demised Premises (including without limitation the Tenant's Category "A" Works) and

(ii) subject to notification by the Tenant to the Landlord of the full reinstatement cost of such items pursuant to and in accordance with Clause 7.3, any installations fittings and equipment resulting from the carrying out of the Tenant's Category "B" Works or from any other works (not being works to the structure of the Building or the Tenant's Category "A" Works) at any time carried out by or on behalf of the Tenant or any undertenant in accordance with the terms hereof or in pursuance of any rights hereby granted in accordance with their terms (in all such cases as notified in writing to the Landlord) (all such installations fittings and equipment being hereinafter referred to as **"Tenant's Insured Fittings"**)

in both such cases against loss or damage by the Insured Risks in such sum as shall be the full reinstatement cost thereof including Value Added Tax architects' surveyors' and other professional fees and expenses incidental thereto the cost of shoring up demolition and site clearance and similar expenses

(b) loss of the Rent and the rents reserved under Clauses 3(c) and 3(e) payable under this Lease, (making due allowance for increases provided for in Schedule 3) for five (5) years or such longer period as the Landlord may from time to time reasonably deem to be necessary having regard to the likely period required for obtaining planning permission and reinstating the Demised Premises and the Tenant resuming occupation or such longer period as the Tenant may in writing request

(c) any engineering and electrical plant and machinery being part of the Demised Premises against sudden and unforeseen damage breakdown and inspection to the extent that the same is not covered by paragraph (a) of this Clause

(d) property owner's liability and such other insurances as the Landlord may from time to time in the interests of good estate management deem necessary to effect; and

(e) the Demised Premises against such other risks as the Tenant acting reasonably shall request in writing (subject to the prior payment by the Tenant of any additional premium (including, without limitation, Insurance Premium Tax) to the Landlord) and provided (and to the extent) that the same are insurable in the global insurance market

## 7.2 Commissions and restriction on Tenant insuring

(a) The Landlord shall be entitled to retain and utilise as it sees fit any commission attributable to the placing of such insurances and the payment of any insurance sums and the Landlord shall use reasonable endeavours to obtain in any property insurance policy effected pursuant to the Landlord's insurance obligations set out in Clause 7.1(a) - 7.1(e) (inclusive) and at the sole cost and expense of the Tenant a waiver of subrogation against the Tenant and undertenants and other permitted occupiers

(b)    The Tenant shall not take out any insurances in respect of any matters which the Landlord is required to insure under Clause 7.1

## 7.3    Landlord's fixtures and Tenant's Insured Fittings

The Tenant shall notify the Landlord in writing of the full reinstatement cost of any fixtures and fittings installed at any time and which are or may become landlord's fixtures and fittings and of all Tenant's Insured Fittings for the purpose of enabling the Landlord to effect adequate insurance cover for the same

## 7.4    Landlord to produce evidence of insurance

At the request of the Tenant the Landlord shall as soon as reasonably practicable produce to the Tenant reasonable evidence of the terms of the insurance policy or policies and the fact that the policy or policies is or are subsisting and in effect and that the Tenant's interest is noted and that the insurers have been requested to notify the Tenant if any policy is cancelled, lapses or is varied (which the Landlord shall use all reasonable endeavours to procure)

## 7.5    Cesser of rent

7.5.1    In case the Estate Common Parts the Demised Premises or in either case any part thereof shall be destroyed or damaged by any of the Insured Risks so as to render the whole or any part of the Demised Premises unfit for use and occupation or inaccessible and the insurance shall not have been vitiated or payment of the policy moneys refused in whole or in part as a result of some act or default of the Tenant any undertenant or occupier of any part of the Demised Premises or any of their respective agents, licensees, visitors or contractors or any person under the control of any of them then the Rent and the rents reserved under Clauses 3(c) and 3(e) or a fair proportion thereof according to the nature and extent of the damage sustained shall be suspended and any Rent and the rents reserved under Clauses 3(c) to 3(e) or a fair portion thereof paid in advance by the Tenant shall be repaid by the Landlord to the Tenant until the Demised Premises or the parts of the Estate Common Parts required for full vehicular access thereto or the part or parts destroyed or damaged shall be again rendered fit for use and occupation and/or accessible or until the expiration of five (5) years (or such other longer period as shall be insured by the Landlord) from the date of the destruction or damage (whichever is the earlier) and any dispute regarding the cesser of rent shall be referred to a single arbitrator to be appointed, in default of agreement, upon the application of either party, by or on behalf of the President for the time being of The Royal Institution of Chartered Surveyors in accordance with the provisions of the Arbitration Act 1996

7.5.2    If the damage or destruction described in Clause 7.5.1 shall occur prior to the Rent Commencement Date then (to the extent that such damage or destruction would have given rise to suspension of the Rent if it had occurred after the

Rent Commencement Date) then the Rent Commencement Date shall be deferred by one day for every day from the date of damage or destruction until the date when the Demised Premises shall again be fit for occupation or use so long as the Landlord has obtained loss of rent insurance cover for the period of such deferment (which the Landlord shall use reasonable endeavours to obtain) and it remains available and in force but so that in circumstances where partial damage or destruction only has occurred to the Demised Premises the Rent Commencement Date shall be so deferred only in relation to a fair proportion of the Rent according to the nature and extent of the damage sustained

### 7.6    Destruction of the Demised Premises

(a)    If the Demised Premises or any part thereof or any necessary access thereto is destroyed or damaged by any of the Insured Risks then:-

(i)    unless payment of the insurance moneys shall be refused in whole or in part by reason of any act or default of the Tenant any undertenant or occupier of any part of the Demised Premises or any of their respective agents, licensees, visitors or contractors or any person under the control of any of them and

(ii)    subject to the Landlord being able to obtain any necessary planning permission and all other necessary licences, approval and consents (which the Landlord shall use its reasonable endeavours to obtain without being obliged to institute any appeals) and

(iii)    subject to the necessary labour and materials being and remaining available

the Landlord shall (subject to Clause 7.7) FIRST lay out the net proceeds of such insurance proceeds received by the Landlord in respect of such damage (other than any in respect of loss of rents and the Tenant's Insured Fittings) (the **"Building Proceeds"**) in the rebuilding and reinstatement of the premises so destroyed or damaged (excluding Tenant's Insured Fittings) substantially as the same were prior to any such destruction or damage (but not so as necessarily to provide accommodation identical in layout) and in the event of any shortfall in the Building Proceeds the same shall be paid by the Landlord AND SECONDLY (if any Tenant's Insured Fittings shall have been destroyed or damaged) pay to the Tenant the net proceeds (subject to the deduction of any excess applicable to such items by the insurer) of such insurance applicable to the Tenant's Insured Fittings as defined in Clause 7.1(a)(ii) up to the reinstatement value of the Tenant's Insured Fittings (as notified pursuant to Clause 7.3) destroyed or damaged (such value in default of agreement to be settled by arbitration in the manner provided for in Clause 7.5) to enable the Tenant to apply the same towards the reinstatement of the Tenant's Insured Fittings to a standard no less than MSDF and in case such moneys in respect

of the Tenant's Insured Fittings shall be insufficient for that purpose the Landlord shall incur no liability to the Tenant in respect of such deficiency and the Tenant shall make up any such deficiency where the Landlord has complied with its obligations under Clause 7.1(a)(ii) out of its own moneys

(b)    On completion of the rebuilding and reinstatement where such works of rebuilding or reinstatement have been of a material nature and extent the Landlord shall use reasonable endeavours to procure that the Tenant receives duty of care warranties from any contractors with material design responsibility and the architect, structural engineer, service engineer, mechanical and electrical engineer and vertical transport engineer who have been employed by the Landlord (or on its behalf) in such rebuilding and reinstatement as such may be usually available from such consultants, a contractors in accordance with market practice at the relevant time

## 7.7    Option to determine

If during the last five (5) years of the Term the Demised Premises or a substantial proportion thereof shall be so destroyed or damaged by any of the Insured Risks as to render the whole or substantially the whole of the Demised Premises unfit for or incapable of use and occupation or inaccessible then either the Landlord or the other party may determine this Lease and any binding commitment that may have come into existence by the exercise of the option contained in Clause 13 by giving to the Tenant and the Management Company not less than six (6) months' written notice to be given at any time within twelve (12) months after such destruction or damage and such determination shall be without prejudice to any claim by either party against the other in respect of any antecedent breach of covenant Provided That if this Lease and such binding commitment shall be determined then the Landlord shall not be required to lay out the net proceeds of such insurance and the net proceeds of such insurance shall be applied by the Landlord as follows:-

(a)    the moneys representing loss of rents shall belong to the Landlord absolutely

(b)    the Landlord shall be entitled first absolutely to moneys attributable to the full reinstatement cost of the Demised Premises (excluding Tenant's Insured Fittings) including Value Added Tax architects' surveyors' and other professional fees and expenses incidental thereto and the cost of shoring up demolition and site clearance and similar expenses (all as estimated at the date of the Landlord's notice) having regard to the likely period required for obtaining planning permission and all other necessary consents and for reinstating the Demised Premises such estimated amount to be agreed between the Landlord and the Tenant and in default of agreement to be settled by arbitration in the manner provided for in Clause 7.5

(c)    any moneys applicable to the Tenant's Insured Fittings destroyed or damaged (such value in default of agreement to be settled by arbitration in the manner provided for in Clause 7.5) shall belong to the Tenant absolutely; and

(d)    any further moneys then remaining shall belong to the Landlord absolutely

7.8    **Payment of insurance moneys refused**

If the payment of any insurance moneys is refused as a result of some act or default of the Tenant any undertenant or occupier of any part of the Demised Premises or any of their respective agents, licensees, visitors or contractors or any person under the control of any of them the Tenant shall pay to the Landlord on demand the amount so refused except to the extent that it relates to Tenant's Insured Fittings

7.9    **Insurance becoming void**

The Tenant shall not do or omit to do anything that could cause any policy of insurance in respect of or covering the Demised Premises or any Adjoining Property to become void or voidable wholly or in part nor (unless the Tenant has previously notified the Landlord and agreed to pay the increased premium) anything whereby any increased or loaded premium may become payable and the Tenant shall on demand pay to the Landlord all increased expenses incurred by the Landlord in renewing any such policy

7.10    **Requirements of insurers**

The Tenant shall at all times comply with all the requirements of the Landlord's insurers so far as such requirements are known by the Tenant and relate to the Demised Premises or the conduct of persons using the Demised Premises or the Estate

7.11    **Notice by Tenant**

The Tenant shall give notice to the Landlord forthwith upon the happening of any event or thing which might affect or give rise to a claim under any insurance policy relating to the Demised Premises or any Adjoining Property

7.12    **Benefit of other insurances**

If the Tenant shall become entitled to the benefit of any insurance on the Demised Premises which is not effected or maintained in pursuance of the obligations herein contained then the Tenant shall apply all moneys received from such insurance (insofar as the same shall extend) in making good the loss or damage in respect of which the same shall have been received

8.    **PROVISOS**

PROVIDED ALWAYS AND IT IS HEREBY AGREED AND DECLARED as follows:-

8.1    **Forfeiture**

Without prejudice to any other right remedy or power herein contained or otherwise available to the Landlord or the Management Company:-

(a)    if any of the rents reserved by this Lease or any sums due pursuant to Clause 3(c) or any part of them shall be unpaid for twenty one (21) days after becoming payable (whether formally demanded or not) or

(b)    if any of the covenants by the Tenant contained in this Lease (other than Clause 8.13) shall not be performed and observed or

(c)    if the Tenant, for the time being, and/or the Surety (if any) (being a body corporate):-

    (i)    calls, or a nominee on its behalf calls, a meeting of any of its creditors; or makes an application to the Court under Section 425 of the Companies Act 1985; or submits to any of its creditors a proposal under Part I of the Insolvency Act 1986; or enters into any arrangement, scheme, compromise, moratorium or composition with any of its creditors (whether under Part I of the Insolvency Act 1986 or otherwise); or

    (ii)    has an administrative receiver or a receiver or a receiver and manager appointed in respect of the Tenant's or the Surety's property or assets or any part; or

    (iii)    resolves or the directors or shareholders resolve to present a petition for an administration order in respect of the Tenant or the Surety (as the case may be); or an administrator is appointed; or

    (iv)    has a winding-up petition or petition for an administration order presented against it (otherwise than for frivolous or vexatious reasons) and in any case which has not been withdrawn within twenty one (21) days; or passes a winding-up resolution (other than a voluntary winding-up whilst solvent for the purposes of an amalgamation or reconstruction which has the prior written approval of the Landlord such approval not to be unreasonably withheld or delayed); or calls a meeting of its creditors for the purposes of considering a resolution that it be wound-up voluntarily; or resolves to present its own winding-up petition; or is wound-up (whether in England or elsewhere); or has a liquidator or provisional liquidator appointed shall cease for any reason to maintain its corporate existence; or is struck off the register of companies; or otherwise ceases to exist Provided That this Clause 8.1(c)(iv) shall not apply to an amalgamation merger or reconstruction resulting in a solvent corporation and where in the case of the Tenant the guarantee of the Surety is maintained; or

(d)    if the Tenant for the time being and/or the Surety (if any) (being an individual or if more than one individual, then any one of them) makes an application to the Court for an interim order under Part VIII of the Insolvency Act 1986 or convenes a meeting of or enters into any arrangement scheme compromise moratorium or composition with any of his creditors or any of them (whether pursuant to Part VIII of the Insolvency Act 1986 or otherwise) or has a

bankruptcy petition presented against him or is adjudged bankrupt or has a receiver appointed in respect of the Tenant's or the Surety's property or assets or any part; or

(e)    if analogous proceedings or events to those referred to in this Clause shall be instituted or occur in relation to the Tenant, for the time being, and/or the Surety (if any) elsewhere than in the United Kingdom PROVIDED THAT this Clause 8.1(e) shall not apply to an amalgamation merger or reconstruction resulting in a solvent corporation and where in the case of the Tenant the Surety is maintained

THEN and in any such case the Landlord may at any time thereafter re-enter the Demised Premises or any part thereof in the name of the whole and thereupon the Term shall absolutely cease and determine but without prejudice to any rights or remedies which may then have accrued to the Landlord or the Management Company against the Tenant in respect of any antecedent breach of any of the covenants contained in this Lease

## 8.2    No implied easements

Nothing herein contained shall impliedly confer upon or grant to the Tenant any easement right or privilege other than those expressly granted by this Lease

## 8.3    Exclusion of warranty as to user

Nothing contained in this Lease or in any agreement leading to its grant or in any consent granted by the Landlord under this Lease shall imply or warrant that the Demised Premises may be used under the Planning Acts for the use herein authorised or any use subsequently authorised

## 8.4    Landlord's and Management Company's obligations

The Landlord and the Management Company shall keep the Tenant fully indemnified from and against all actions proceedings claims demands losses costs expenses damages (other than in respect of loss of profits loss of business or indirect losses or consequential damages of any kind) and liability directly arising from any failure of the Landlord or the Management Company to perform any of their respective covenants or other obligations under this Lease (except the obligation to insure pursuant to Clause 7.1) subject to the Tenant having given prior written notice to the Landlord or the Management Company (as the case may be) of such failure and the Landlord or the Management Company (as the case may be) has failed within a reasonable time to remedy the same and then in such case the Landlord and/or the Management Company (as the case may be) shall be liable to compensate the Tenant only for loss or damage sustained by the Tenant after such reasonable time has elapsed but the Tenant shall take every reasonable step in order to mitigate the extent and effect of such actions proceedings claims demands losses costs expenses damages or liabilities and shall notify the Landlord and the Management Company immediately on becoming aware of any actions, proceedings, claims, demand, losses, costs, expenses, damages and

liabilities and shall pay due heed to any representations made by the Landlord and the Management Company in settling any actions

8.5    **Exclusion of Landlord's and Management Company's liability**

Neither the Landlord nor the Management Company shall be liable to the Tenant nor shall the Tenant have any claim against the Landlord or the Management Company in respect of:-

(a)    any failure or interruption or delay in the provision of Estate Services caused in any case by Force Majeure but the Management Company shall use reasonable endeavours to cause the service in question to be reinstated with the minimum of delay

(b)    any loss or damage or interference or annoyance suffered by the Tenant during the carrying out by the Landlord or the Management Company of works which may appear to the Landlord or the Management Company acting reasonably to be necessary or desirable

(c)    any loss or inconvenience occasioned by the closing or breakdown of any mechanical equipment or by the failure of power supply to any mechanical equipment or whilst any repairs are carried out thereto

(d)    any loss of or damage to or theft from any car using the Car Park or any loss or damage or injury suffered by any driver of or passenger in such car,

Provided Always That:

(i)    the Landlord or the Management Company shall notify the Tenant of any of the above events or matters which are in the Management Company's reasonable opinion likely adversely to affect the Tenant as soon as reasonably practicable after they have become aware of the same

(ii)    the Landlord and/or the Management Company shall use their reasonable endeavours to minimise and mitigate any losses, damages, delays, disruptions or annoyance caused or likely to be caused by reason of any of the aforesaid matters or things

(iii)   none of the aforesaid exclusions of liability shall be available to the extent that they arise by reason of any breach of any of its obligations by the Landlord or the Management Company or others acting for them or under their authority or control whether by reason of negligence or wilful act

8.6    **Right for Landlord to perform or to nominate another company to perform Management Company's obligations**

At any time and from time to time during the Term the Landlord may on giving written notice to the Tenant and the Management Company nominate another company to

undertake or exercise or itself undertake or exercise any of the obligations rights and discretions of the Management Company herein contained in which event:

(a)    the Management Company shall transfer to such nominated company or to the Landlord (as the case may be):

    (i)    any monies held by it or on its behalf for the provision of the Estate Services

    (ii)    the benefit of any rights vested in the Management Company in relation to any plant equipment machinery clothing or other chattels and contracts and other things in action which have been acquired for the provision of the Estate Services from monies contributed by the Tenant and the other tenants and occupiers of the Estate as part of the Estate Expenditure

(b)    any references herein to the Management Company shall be construed as references to such nominated company or the Landlord (as the case may be)

(c)    the benefit of the Tenant's covenants to the Management Company in this Lease shall be enforceable by such nominated company or the Landlord (as the case may be)

## 8.7    Development of Adjoining Property

(a)    The Tenant shall make no objection or representation nor institute any proceedings whether by way of injunction or for damages or otherwise and shall not permit or suffer any undertenant or other occupier of or any person with any interest in any part of the Demised Premises to do any such things by reason or in consequence of any noise disturbance annoyance or inconvenience occasioned by any works by or on behalf of the Landlord or the Management Company or any owner or tenant on any Adjoining Property unless and to the extent that any such person or any person carrying on the works on behalf of them is in breach of their respective statutory obligations in which case the Tenant may make complaint to the relevant enforcement authority and pursue a claim against any such person or persons carrying on the works on behalf of any of them an PROVIDED THAT the Landlord and the Management Company hereby covenant to use all reasonable endeavours to keep any noise disturbance annoyance or inconvenience by any such works to a minimum

(b)    The Tenant agrees with the Landlord and the Management Company that notwithstanding any other provision of this Lease the Tenant will have no claim against the Landlord or the Management Company in connection with or arising from any works carried out on beneath or in the vicinity of the Estate for the purpose of or in connection with the construction and/or maintenance of the London Underground or Docklands Light Railway system(s)

(c)    Not to use or carry out any works on any part of the Demised Premises or on any part of the Estate in the immediate vicinity of the Docklands Light Railway for

any purpose which would materially adversely affect the construction or operation of the Docklands Light Railway or the use thereof as a railway station

(d)  Not without the prior written consent of the Landlord and the operator of the Docklands Light Railway (in the case of the Landlord such consent not to be unreasonably withheld or delayed) to install or use or permit to be installed or used on the Demised Premises or on any part of the Estate in the immediate vicinity of the tracks upon which the Docklands Light Railway operates any electrical or electronic apparatus or equipment which would cause or would be likely to cause interference with electrical or electronic apparatus or equipment used in connection with the operation of the Docklands Light Railway

8.8  **Not Used**

8.9  **Not Used**

8.10  **Notices**

(a)  Any demand or notice required to be made given to or served on the Tenant or the Surety under this Lease shall be in writing and shall be validly made given or served if addressed to the Tenant or the Surety respectively (and if there shall be more than one of them then any one of them) and delivered personally or sent by pre-paid registered mail addressed (in the case of a company) to its registered office or (whether a company or individual) its last known address or (in the case of a notice to the Tenant), if there is no subsisting underletting of the whole, the Demised Premises

(b)  Any notice required to be served on the Landlord or the Management Company shall be in writing and shall be validly given or served if addressed to the Landlord or the Management Company respectively and delivered personally or sent by pre-paid registered mail to its registered office

8.11  **Invalidity of certain provisions**

If any term of this Lease or the application thereof to any person or circumstances shall to any extent be invalid or unenforceable the same shall be severable and the remainder of this Lease or the application of such term to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law

8.12  **Plans drawings etc**

Both (i) the Landlord and the Management Company and (ii) the Tenant shall have an irrevocable and assignable licence free from any copyright claim as from the expiry or sooner determination of this Lease to use and reproduce all plans drawings specifications models and other information required to be furnished by the Tenant to the Landlord and vice versa under this Lease or any agreement preceding this Lease

but so that the Landlord and the Management Company and the Tenant shall use the same only in connection with the use ownership operation maintenance and alteration of the Demised Premises and the Tenant shall deliver all such documents to the Landlord and vice versa promptly upon the expiry or sooner determination of this Lease

8.13    **Confidentiality provision**

(a)    None of the parties to this Lease shall without the prior written consent of all the other parties to this Lease disclose or publish to any third party ("**Disclosure**") or wilfully or negligently permit or cause Disclosure of any financial or other details whatsoever naming the parties hereto or otherwise relating to the transaction hereby effected except:-

(i)    any particular extracts or details which must be the subject of Disclosure in order to comply with any Stock Exchange or any statutory requirements of the lawful requirements of any regulatory, governmental or official body

(ii)    to group companies or professional advisers of each of the parties who need to know such details and who have first agreed to be bound by the provisions of this Clause 8.13

(iii)    to the extent necessary to comply with any legal obligation or legal requirement

(iv)    to the extent necessary to comply with or give effect to the terms of this Lease

(v)    to the Inland Revenue or HM Customs & Excise or any other governmental, public or official body for taxation, rating or registration purposes

(vi)    to the extent they are already in the public domain, otherwise than as a result of a breach of this Clause 8.13

(b)    This Clause 8.13 shall remain in effect until the expiry of a period of 2 years from the date hereof

(c)    This Clause 8.13 shall not apply to Disclosure by or on behalf of any party to this Lease to any third parties and/or their professional advisers in pursuance of bona fide rent review arbitrations or determinations or negotiations or other legal proceedings adjudications or bona fide negotiations or dealings with and/or relating to the Estate and/or the Demised Premises or any part of either including for the avoidance of doubt disclosures by the Landlord to any financier or mortgagee or prospective financier or mortgagee of the Estate and/or the Demised Premises or any part of either or the disposal of or acquisition of an interest in the whole or any part of the relevant party or any Group Company of the relevant party or any financing by the relevant party or any Group Company

of the relevant part or any Disclosure to any insurers or prospective insurers of the Estate and/or the Demised Premises or any part of them or works in connection with or items on the same

### 8.14   Waiver etc. of regulations

(a)   The Landlord reserves the right to rescind alter or waive any of the Regulations at any time where in its reasonable judgment it deems reasonably necessary desirable or proper in the interest of good estate management having regard to the nature and quality of the Demised Premises and the Estate and no alteration or waiver in favour of one tenant of the Estate shall operate as an alteration or waiver in favour of any other tenant of the Estate

(b)   Neither the Landlord nor the Management Company shall be responsible to the Tenant for the non-observance by any tenant of the Estate or any other person of any of the Regulations

PROVIDED THAT the Landlord and the Management Company will not in the exercise of this Clause unfairly discriminate between the Tenant and other tenants and occupiers of the Estate in the way in which the Regulations are enforced or applied having regard to the principles of good estate management and the nature and quality of the Estate

### 8.15   Third Party Rights

Other than in relation to paragraph 15 of Schedule 2 a person who is not a party to this Lease has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Lease but this does not affect any right or remedy of a third party which exists or is available apart from that Act

### 8.16   Applicable Law and Jurisdiction

This Lease shall be governed by and construed in all respects in accordance with the Laws of England and proceedings in connection therewith shall be subject (and the parties hereby submit) to the non-exclusive jurisdiction of the English Courts and for the purposes of Rule 6.15 of Civil Procedure Rule 1998 and any other relevant Rules thereof the Tenant and the Surety hereby irrevocably agree that any process may be served upon them by leaving a copy addressed to them at its or their address as stated above or at such other address for service within England and Wales as may be notified in writing from time to time to the Landlord and the Management Company

### 8.17   Representations

The Tenant acknowledges that this Lease has not been entered into in reliance wholly or partly on any statement or representation made by or on behalf of the Landlord except any such statement or representation that is expressly set out in this Lease or in written replies to enquiries raised by the Tenant's Solicitors of the Landlord's

Solicitors or in written information supplied by the Landlord's Solicitors in response to such enquiries

## 8.18    Maintenance of covenant strength

8.18.1    If at any time any group restructuring or transfer of assets or liabilities or business merger or amalgamation of any entity takes place which results in the credit rating of Lehman Brothers Holdings Inc. from Standard & Poor's Rating Group a division of McGraw Hill Inc. (subject to the provisions of the second proviso to the definition of Acceptable Assignee (mutatis mutandis) in the event that Standard and Poor's ceases to exist or no longer carries out such evaluations) in respect of its senior unsecured unsubordinated and unguaranteed long term debt no longer being the highest such rated covenant of all Group Companies of Lehman Brothers Holdings Inc. (excluding for these purposes Lehman Brothers, Inc; Lehman Brothers Japan Inc.; Lehman Brothers Financial Products Inc.; Lehman Brothers Derivatives Products Inc.; Lehman Re Ltd (Bermuda); Lehman Brothers International Europe; Lehman Brothers Bankhaus AG; Lehman Brothers Bank FSB; Lehman Brothers Syndicated Loan Funding Trust (LSLFT) and successors to and, in each case whether or not similar to the foregoing and in any jurisdiction, additional regulated rated entities which would suffer a capital charge or other increased cost imposed by reason of capital adequacy measures by any regulatory authority in any jurisdiction, or which would be prohibited from giving such a guarantee under any applicable law or regulation in any jurisdiction or which would suffer from crowding out of other business by giving such a guarantee or equivalent entities within the Group Companies of Lehman Brothers Holdings Inc. and in addition non-regulated credit-wrapped entities set up for the purpose of a specific business and special purpose vehicles set up for the purposes of raising off or on balance sheet finance in any jurisdiction (but so that the Tenant and Surety agree and confirm that the general wording of this exclusion shall be applied in good faith and not so as to undermine the intent that the Tenant and the Surety are to procure that (subject to the exclusions) the highest rated entity in the Group from time to time will act as the Surety) (each an "**Excluded Group Company**")) the Tenant shall forthwith notify the Landlord and if so requested by the Landlord shall procure that the Group Company of Lehman Brothers Holdings Inc. which is not an Excluded Group Company and which has the highest such rating (the "**Additional Party**") as quickly as reasonably practicable enters into a deed of novation (the "**Deed of Novation**") in such form as the Landlord shall reasonably require of the Surety's obligations under this Lease and shall expressly confirm that its liability extends to events or matters arising from the date of this Lease and on completion of the Deed of Novation Lehman Brothers Holdings Inc. shall be released absolutely from its obligations under this Lease and the Landlord and the Landlord's Surety shall expressly confirm that Lehman Brothers Holdings

Inc. has no liability whatsoever in respect of this Lease as from the date of this Lease.

8.18.2    If the Additional Party is not a limited company incorporated in England and Wales the Tenant shall procure that a Letter of Opinion is provided in relation to the Additional Party upon completion of the Deed of Novation

8.18.3    As from the date of completion of the Deed of Novation the provisions of Clause 8.18.1 shall apply to the Additional Party as if it were named in place of Lehman Brothers Holdings, Inc. in Clause 8.18.1

9.    **SERVICE CHARGE**

9.1    FOR the purpose of this Lease the following expressions shall have the following meanings:-

(a)    "Additional Building" means any building on the Estate (except for those buildings built upon parcels B-1 B-2 B-3 B-4 B-4A B-5 DS-1 DS-2 DS-5 DS-6 DS-7 DS-8 DS-8A HQ-2 HQ-4 RT-1 RT-2 FC-1 FC-2 FC-3 FC-4 FC-5 FC-6 WF-9 5 Chancellor Passage and Nash Court) and used or intended to be used for Office Use Retail Use or Hotel Use where in respect of that building either:-

(i)    at least two (2) years shall have elapsed since the issue of a practical completion certificate for that entire building under the building contract relating thereto; or

(ii)    at least 50% of the Net Internal Area of the Lettable Areas therein has become occupied

(b)    "Advance Estate Payment" shall mean the aggregate of all Estate Payments on Account made in any Estate Financial Year

(c)    "Estate Computing Date" means the first day of July in each year and the anniversary of that date in each succeeding year or such other date as the Management Company may from time to time nominate

(d)    "Estate Expenditure" means the aggregate of:-

(i)    all costs fees expenses and outgoings whatsoever (whether or not of a recurring nature) incurred in respect of or incidental to the provision of all or any of:-

(1)    the Estate Services and

(2)    the costs and expenses set out in Part B of Schedule 6

(whether or not the Landlord or the Management Company is obliged by this Lease to incur the same) and (when any expenditure is incurred in relation to the Estate and other premises) the proportion of

such expenditure which is reasonably attributable to the Estate as determined from time to time by the Estate Surveyor

(ii) such sums as the Management Company shall consider desirable to set aside from time to time (which setting aside shall be deemed to be an item of expenditure actually incurred) for the purpose of providing for periodically recurring items of expenditure, whether or not of a capital nature and whether recurring at regular or irregular intervals and for anticipated expenditure in respect of any of the Estate Services to be provided or other items within Part B of Schedule 6 (the "Estate Reserve Fund") (it being agreed that if the Management Company shall set up the Estate Reserve Fund it shall take all reasonable steps to do so in a tax efficient manner)

(iii) the cost of replacement of any item where such replacement is reasonably necessary whether or not the replacement item is of a superior quality design or utility to the item being replaced

(iv) interest payments credited to the Tenant under Clause 9.5(b) and credited or paid to any tenants of premises within the Estate under the provisions of clauses similar to the said Clause

(v) any sums representing Value Added Tax which is chargeable in respect of or in connection with any such items in paragraphs (i) (ii) (iii) and (iv) above (save to the extent that the Management Company is entitled to credit or repayment in respect of such Value Added Tax from HM Customs & Excise)

but shall exclude:-

(aa) any capital expenditure incurred in the initial construction of any building or any erection within the Estate or for the purpose of the initial establishment of the services described in Schedule 6

(bb) any expenditure referable to operating charges and expenses and maintenance of any Car Park

and there shall be deducted from the foregoing for the purposes of calculating the Estate Expenditure the following:-

(aaa) any contributions in respect of Estate Services or the costs set out in Part B of Schedule 6 recoverable in the relevant Estate Financial Year under leases or agreements for leases relating to premises which for that Estate Financial Year are not included within the definition of Y for the purposes of Clause 9.1(f)

(bbb) any revenue received from a third party (other than a tenant in its capacity as such) derived from the rendering of Estate Services or any activity the cost of which is included in Part B of Schedule 6 and

(ccc) any contribution in respect of the rendering of any of the Estate Services or any activity the cost of which is included in Part B of Schedule 6 recoverable in the Relevant Financial Year where any such Estate Services or other activity was provided at the request of or for the benefit of any tenants or occupiers of the Estate and which would not have been provided but for such request

(ddd) interest payments received from the Tenant under Clause 9.5(a) and from other tenants within the Estate under the provisions of clauses similar to the said Clause in relation to Estate Expenditure

(eee) any contributions in respect of Estate Services or the costs set out in Part B of Schedule 6 recoverable in the relevant Estate Financial Year from the tenants, occupiers or owners of premises within an Additional Building where the Landlord has excluded such Additional Building from the calculation of the Estate Service Charge Percentage pursuant to sub-clause 9.1(f)

(fff) any insurance proceeds or damages or compensation received by the Landlord or the Management Company in respect of an item the cost of which is included in Estate Expenditure Provided That there shall be no such deduction in circumstances where the Tenant has been indemnified in respect of such costs pursuant to Clause 21 of the Agreement for Lease

(e)    "Estate Financial Year" means the period from an Estate Computing Date to but not including the next succeeding Estate Computing Date

(f)    "Estate Service Charge Percentage" means the figure calculated as follows:-

$$\frac{X-S}{Y} \times 100$$

where:-

$X =$

(a)    327,124 square feet in respect of the period commencing on the 31st day of August 2003 and expiring on the 29th day of September 2003;

(b)    560,061 square feet in respect of the period commencing on the 30th day of September 2003 and expiring on the 8th day of November 2003; and

(c)    the Net Internal Area of the Demised Premises in respect of the period commencing on the 9th day of November 2003 and during the remainder of the Term

S =     the aggregate Net Internal Areas of the Sublet Premises

Y =     the aggregate Net Internal Areas of the Lettable Areas of the buildings built or intended to be built and used or intended to be used for Retail Use Hotel Use or Office Use (as hereinafter defined) on those parts of the Estate known as parcels B-1 B-2 B-3 B-4 B-4A B-5 DS-1 DS-2 DS-5 DS-6 DS-7 DS-8 DS-8A HQ-2 HQ-4 RT-1 RT-2 FC-1 FC-2 FC-3 FC-4 FC-5 FC-6 WF-9 5 Chancellor Passage and Nash Court

PROVIDED THAT as from each Estate Computing Date during the Term Y shall (in addition to the buildings referred to in the above definition) include the Net Internal Area of the Lettable Areas within a building which is an Additional Building where in respect of that building at that Estate Computing Date either:-

(i)    at least two (2) years shall have elapsed since the issue of a practical completion certificate for that entire building under the building contract relating thereto or

(ii)    at least 50% of the Net Internal Area of the Lettable Areas therein has become occupied

PROVIDED FURTHER THAT the Landlord may acting reasonably in the interests of good estate management having regard to the quality and nature of the Estate exclude an Additional Building from Y subject to the Landlord deducting contributions recoverable from the tenants occupiers and owners of the Additional Building in respect of Estate Services from Estate Expenditure pursuant to sub-clause 9.1(d)(eee)

(g)    "Estate Surveyor" means a chartered surveyor or firm of chartered surveyors appointed or employed by the Management Company or a Group Company of the Management Company to perform the functions of the Estate Surveyor hereunder

(h)    "Estimated Estate Expenditure" means for any Estate Financial Year such sum as the Management Company shall notify in writing to the Tenant as a reasonable estimate of the Estate Expenditure referred to in Parts A and B of Schedule 6 for such Estate Financial Year after deducting any anticipated Estate Appropriation (as defined in Clause 9.3(a)) provided that the Management Company may from time to time during any such Estate Financial Year notify the Tenant in writing of a revised figure for the Estimated Estate Expenditure

(i)      "Hotel Use" means use as a hotel including uses within hotels of banqueting rooms conference facilities and areas used for Retail Use within hotels

(j)      "Office Use" means use as an office and includes banking halls and trading floors

(k)      "Retail Use" means use for:-

    (1)    all types of retailing including hairdressers snackbars travel agents funeral directors and showrooms

    (2)    banks building societies estate agents betting offices and similar uses where the services are provided principally to visiting members of the public

    (3)    restaurants cafes public houses winebars and food take aways

9.2

(a)      The Tenant covenants with the Landlord and as a separate covenant with the Management Company to pay to the Management Company:-

    (1)    the Estate Service Charge Percentage (as indicated in the last available Certificate by the Estate Surveyor issued pursuant to Clause 9.3 but subject to the provisions of Clause 9.4) of the Estate Estimated Expenditure in advance by equal quarterly instalments on the Quarterly Days during the Estate Financial Year the first payment being a proportionate sum in respect of the period from and including 31st day of August 2003 to the next Quarterly Day to be made on the 31st day of August 2003 and

    (2)    (if the Estimated Estate Expenditure is revised as contemplated above) within 14 days after written demand the Estate Service Charge Percentage of the amount by which any such revised figure for the Estimated Estate Expenditure exceeds the figure previously notified to the Tenant

(b)      Each such payment made by the Tenant under Clause 9.2(a) is referred to in this Lease as an "Estate Payment on Account"

9.2A    The Tenant covenants with the Landlord and the Management Company, by way of indemnity only, that for so long as any tenant or subtenant of any of the Sublet Premises is bound to pay the Management Company sums for the provision of Estate Services in respect of such Sublet Premises the Tenant shall indemnify and keep indemnified on demand the Management Company against such sums Provided That the Landlord or the Management Company shall notify the Tenant of any failure by any subtenant of any Sublet Premises to make such payments

9.2B    The Tenant covenants with the Landlord and the Management Company that, at the written request of the Landlord or the Management Company, it will provide to the Landlord and the Management Company, as soon as reasonably practicable following receipt of such written request, details of the Net Internal Area from time to time of the Sublet Premises

9.3    The Management Company shall, as soon as reasonably practicable after the end of each Estate Financial Year, prepare and send to the Tenant:-

(a)    an account or accounts, each duly certified by the Accountant, showing the Estate Expenditure for the Estate Financial Year and the amount (if any) which the Management Company has chosen to utilise from the Estate Reserve Fund in defraying Estate Expenditure pursuant to Clause 9.7 (the "**Estate Appropriation**") and containing a fair summary of the various items comprising the Estate Expenditure

(b)    a certificate or certificates by the Estate Surveyor showing the Estate Surveyor's calculation of the Estate Service Charge Percentage for the Estate Financial Year

(c)    a statement or statements of the Estate Service Charge Percentage of the Estate Expenditure for the Estate Financial Year after taking into account the Estate Appropriation and the same shall (save for obvious error or fraud) be conclusive evidence for the purposes of this Lease of all matters of fact referred to in each said account certificate and statement

(d)    subject to the Tenant paying the proper costs of the Landlord and the Management Company (including but not limited to the costs of security supervision and assistance) the Tenant may in relation to the account certificate or statement in respect of the Estate Expenditure within two months of receiving such account certificate or statement (time being of the essence) by giving written notice to the Landlord and the Management Company have access to and inspect the service charge books of account (or the electronic equivalent thereof) and all vouchers receipts invoices and other documentation relevant to the calculation of the relevant expenditure for that Estate Financial Year and the immediately preceding Estate Financial Year for the purpose of inspection and verification Provided Always That such right may not be exercised more frequently than once in every year

(e)    at any time within ninety (90) days after the Tenant has access to inspect the books of account pursuant to paragraph (d) the Tenant may by written notice served on the Management Company dispute the relevant account of the basis that any item of expenditure or part thereof has been improperly incurred in such account and the Tenant shall set out the reasons for the dispute in such notice and the items in dispute **PROVIDED THAT** if the Tenant does not give any such notice within the said period (as to which time shall be of the essence) it shall be deemed to have agreed the relevant account

(f) in the event that the Tenant and the Management Company are unable to agree upon the items disputed by the Tenant and the Management Company in the notice given under sub-clause (e) then either of them may require the dispute to be referred to an independent expert (acting as such) who shall be a chartered surveyor with not less than ten (10) years' experience of managing substantial multi-tenanted properties and who shall be appointed in default of agreement on the application of either party to the President for the time being of the Royal Institution of Chartered Surveyors or his duly appointed deputy and if such independent expert shall be or become unable or unwilling to act the referral procedure referred in this sub-clause may be repeated as many times as may be necessary provided that for the avoidance of doubt it is agreed that the Management Company may require to have included in the relevant account during the period that reference is being made to the independent expert any item of expenditure which may properly be included in the Estate Expenditure for the Estate Financial Year in question but which had been inadvertently omitted

(g) the costs of any expert appointed shall be borne as the expert shall direct

(h) notwithstanding any such dispute the Tenant shall pay the amount demanded in respect of the Estate Expenditure in the relevant account and in the event that the expert determines the Estate Expenditure to be a lower or higher sum than that specified in the disputed account then the Management Company shall as soon as reasonably practicable issue a duly corrected account and either the Management Company shall refund within fourteen (14) days of the issue of such corrected account all service charge overpaid by the Tenant or the Tenant shall within fourteen (14) days of receipt of the corrected account pay the balance due to the Management Company as the case may require

9.4

(a) For the purposes of Clause 9.2 until such time as a certificate is issued by the Estate Surveyor pursuant to Clause 9.3 the Estate Service Charge Percentage shall be:

(i) 1.2320% in respect of the period commencing on the 31st day of August 2003 and expiring on the 29th day of September 2003; and

(ii) 3.4987% in respect of the period commencing on the 30th day of September 2003 and expiring on the 8th day of November 2003; and

(iii) 8.0064% in respect of the period commencing on the 9th day of November 2003

(b) For the purposes of Clause 9.2 after such time as a certificate is issued by the Estate Surveyor pursuant to Clause 9.3 the Estate Service Charge Percentage shall be as indicated in the last available certificate issued by the Estate Surveyor pursuant to Clause 9.3

9.5

(a) If the Estate Service Charge Percentage of the Estate Expenditure for any Estate Financial Year (after taking into account the Estate Appropriation) shall exceed the Advance Estate Payment for that Estate Financial Year the excess together with interest thereon at the Base Rate calculated from and including the Estate Computing Date next following the end of that Estate Financial Year until the date of payment shall be paid by the Tenant to the Management Company on demand or

(b) If the Estate Service Charge Percentage of the Estate Expenditure for any Estate Financial Year (after taking into account the Estate Appropriation) shall be less than the Advance Estate Payment for that Estate Financial Year the overpayment made by the Tenant together in each case with interest thereon at the Base Rate calculated as aforesaid up to the date when the next Estate Payment on Account is due shall be credited to the Tenant against the next Estate Payment on Account

9.6 Any omission by the Management Company to include in Estate Expenditure in any Estate Financial Year a sum expended in that Estate Financial Year shall not preclude the Management Company from including such sum in Estate Expenditure in any of the five subsequent Estate Financial Years immediately following such Estate Financial Year as the Management Company shall reasonably determine

9.7

(a) The Estate Reserve Fund set up and operated in accordance with prudent accounting principles and in a tax efficient manner and shall be held upon trust during the period of eighty (80) years from the date of this Lease (which shall be the perpetuity period applicable hereto) respectively for the persons who from time to time shall be tenants or occupiers of the Estate and each shall be held in a separately designated interest bearing bank account and the Management Company shall utilise the same, with interest accruing thereon but after deducting tax payable thereon and on such interest in defraying expenditure of the nature referred to in Clause 9.1(d)(ii) and at the expiry of such perpetuity period the sums standing to the credit of the Estate Reserve Fund and unexpended shall be paid respectively to the persons who shall then be the tenants of the Estate in shares equal to their respective Estate Service Charge Percentage the Management Company being entitled absolutely to any share payable in respect of any Lettable Area which is unlet at such time

(b) The Management Company shall procure that upon the service by the Landlord of notice under Clause 8.6 the Estate Reserve Fund (or so much thereof as remains after the defraying of such expenditure as aforesaid) shall be transferred to the Landlord or any other company nominated by the Landlord in such notice to be held upon the relevant trusts referred to in Clause 9.7(a) and upon the terms therein mentioned

9.8 If at any time or times during the Term the Management Company considers that circumstances have arisen making the Estate Service Charge Percentage or the formula for calculating the same on the basis specified in Clause 9.1 unreasonable or inequitable the Management Company may give written notice to the Tenant requiring a variation to the Estate Service Charge Percentage or the said formula which is fair and reasonable in all the circumstances and in the event of there being any dispute regarding such variation the matter shall be referred to a single arbitrator to be appointed in default of agreement upon the application of the Management Company or the Tenant by or on behalf of the President for the time being of the Royal Institution of Chartered Surveyors in accordance with the provisions of the Arbitration Acts 1996

9.9 The Management Company may in its absolute discretion discontinue withhold add to commence extend vary or make any alterations to any of the Estate Services or any of the items referred to in Part B of Schedule 6 hereto from time to time if the Management Company shall reasonably deem it desirable to do so in the interests of (or for the comfort of) the owners and tenants on or for the efficient management security and operation of the Estate or for any other reason in the interests of good estate management

9.10 The Tenant covenants with the Landlord and as a separate covenant with the Management Company that the Tenant will pay on demand such charge as may reasonably be determined by the Management Company in respect of any service (whether or not constituting an Estate Service) provided at the request of the Tenant to or for the benefit of the Tenant (whether or not exclusively) at a time or in circumstances when or in which such service would not have been provided but for such request

9.11 The provisions of this Clause shall continue to apply notwithstanding the expiration or sooner determination of the Term but only in respect of the period down to such expiration or sooner determination the Estate Service Charge Percentage of the Estate Expenditure payable for that Estate Financial Year being apportioned for the said period on a daily basis

10. **THE SURETY'S COVENANTS**

IN consideration of this demise having been made at its request the Surety HEREBY COVENANTS with the Landlord and as a separate covenant with the Management Company as a primary obligation in the terms contained in Schedule 4

11. **AGREEMENT FOR LEASE**

This Lease is granted pursuant to the Agreement for Lease

12. **NEW TENANCY**

This Lease constitutes a new tenancy for the purposes of the Landlord and Tenant (Covenants) Act 1995

13.    **RENEWAL**

13.1    The Tenant shall be entitled by service of notice on the Landlord such notice to be served not less than fifteen (15) months before the last day of the contractual term of years originally granted by this Lease (the "**Expiry Date**") to require the Landlord to grant to the Tenant a new lease (in this Clause 13, the "**New Lease**") in accordance with the succeeding provisions of this Clause 13.  Once the Tenant has served a valid notice it shall be irrevocable

13.2    The New Lease shall be in the same form as this Lease save that:-

(a)    (i)    the Rent payable under the New Lease shall be agreed between the parties or failing agreement shall be determined, in each case in accordance with the provisions of Part B of Schedule 3 as if the first day of the term of the New Lease were a Review Date under this Lease

(ii)    if such Rent shall not have been agreed or determined prior to the date fixed for the commencement of the term of the New Lease the provisions of paragraph 8 of Part B of Schedule 3 shall continue in full force and effect (as if the Term had not expired) and any amounts paid thereunder referable to any period after the expiry of the Term shall be treated as pro tanto discharging the liability of the Tenant to pay rent under the New Lease and the memorandum referred to in paragraph 10 of Part B of Schedule 3 shall be completed to record the initial rent payable under the New Lease

(b)    the term of the New Lease will commence on the day following the expiry of the contractual Term

(c)    the New Lease will be for a term of five (5) years

(d)    the New Lease will not contain a provision in the form of this Clause and all references to this Clause 13 contained within other provisions of this Lease shall be deleted and any necessary consequential changes made

(e)    Clause 6.7 of this Lease is deleted

13.3    If there is a guarantor for the Tenant at the time at which the New Lease falls to be granted (other than under an authorised guarantee agreement) then unless the Tenant is an Acceptable Assignee such guarantor shall also be a party to the New Lease (and shall execute the counterpart of the New Lease) and shall covenant with the Landlord in the same terms as it shall previously have covenanted with the Landlord with any necessary changes as either party may reasonably require to reflect the terms of the New Lease and the Landlord's obligation to grant the New Lease shall be conditional on any such guarantor being ready willing and able to be a party to the New Lease as aforesaid

13.4    The Landlord shall procure that the Management Company shall also be a party to the New Lease for the same purposes as in this Lease (and shall execute the counterpart of the New Lease) and covenant with the Tenant in the same terms as in this Lease

13.5    The Landlord shall procure that a draft of the New Lease shall be provided to the Tenant not less than thirty (30) Working Days prior to the Expiry Date and the New Lease shall be completed on the fifth Working Day prior to the Expiry Date

13.6    If the Tenant has exercised the said option and remains ready and willing to take up the New Lease:-

(a)    the Tenant shall not be required to comply with Clause 4.10 of this Lease; and

(b)    Clause 4.7 of this Lease shall take effect as if the words "and also in the last three months of the Term howsoever determined" were omitted and "such decorations and treatment in the last year of the Term to be executed in such colours and materials as the Landlord may reasonably require" were omitted

## 14.    LANDLORD'S GUARANTOR

### 14.1    Covenant by Landlord's Guarantor

The Landlord's Guarantor hereby covenants with the Tenant as a primary obligation that the Landlord shall at all times until the Landlord shall cease to be bound by the Landlord's covenant in the Lease duly perform and observe the covenants on the part of the Landlord contained in this Lease

### 14.2    Landlord's Guarantor jointly and severally liable with Landlord

The Landlord's Guarantor hereby further covenants with the Tenant that the Landlord's Guarantor is jointly and severally liable with the Landlord (whether before or after any disclaimer by a liquidator or trustee in bankruptcy) for the fulfilment of the obligations of the Landlord contained in this Lease and agrees that the Tenant in the enforcement of its rights hereunder may proceed against the Landlord's Guarantor as if the Landlord's Guarantor was named as the Landlord in this Lease

### 14.3    Waiver by Landlord's Guarantor

The Landlord's Guarantor hereby waives any right to require the Tenant to proceed against the Landlord or to pursue any other remedy whatsoever which may be available to the Tenant before proceeding against the Landlord's Guarantor

**14.4    Postponement of claims by Landlord's Guarantor against Landlord**

The Landlord's Guarantor hereby further covenants with the Tenant that the Landlord's Guarantor shall not claim in any liquidation bankruptcy composition or arrangement of the Landlord in competition with the Tenant and whilst any liabilities of the Landlord for which the Landlord's Guarantor is liable to the Tenant under this Lease or the Landlord's Guarantor to the Tenant under this Lease remain outstanding the Landlord's Guarantor shall:-

(a)    remit to the Tenant the proceeds of all judgments and all distributions it may receive from any liquidator trustee in bankruptcy or supervisor of the Landlord; and

(b)    shall hold for the benefit of the Tenant all security and rights the Landlord's Guarantor may have over assets of the Landlord

**14.5    Postponement of participation by Landlord's Guarantor in security**

The Landlord's Guarantor shall not be entitled to participate in any security held by the Tenant in respect of the Landlord's obligations to the Tenant under this Lease or to stand in the place of the Tenant in respect of any such security until all the obligations of the Landlord or the Landlord's Guarantor to the Tenant under this Lease have been performed or discharged

**14.6    No release of Landlord's Guarantor**

None of the following or any combination thereof shall release discharge or in any way lessen or affect the liability of the Landlord's Guarantor under this Lease:-

14.6.1    any neglect delay or forbearance of the Tenant in endeavouring to obtain payment of any amounts required to be paid by the Landlord or in enforcing the performance or observance of any of the obligations of the Landlord under this Lease

14.6.2    any extension of time given by the Tenant to the Landlord

14.6.3    any variation of the terms of this Lease (including any reviews of the rent payable under this Lease) or the transfer of the Landlord's reversion or the assignment of this Lease

14.6.4    any change in the identity constitution structure or powers of any of the Landlord the Landlord's Guarantor the Tenant the Surety or the Management Company or the liquidation administration or bankruptcy (as the case may be) of either the Landlord or the Landlord's Guarantor

14.6.5    any legal limitation or any immunity disability or incapacity of the Landlord (whether or not known to the Tenant or the Management Company) or the fact that any dealings with the Tenant or the Management Company by the Landlord may be outside or in excess of the powers of the Landlord

14.6.6    any other act omission matter or thing whatsoever whereby but for this provision the Landlord's Guarantor would be exonerated either wholly or in part (other than a release under seal given by the Tenant as the case may be or a release effected by virtue of the Landlord and Tenant (Covenants) Act 1995)

## 14.7    Benefit of guarantee

This guarantee shall enure for the benefit of the successor and assigns of the Tenant respectively under this Lease without the necessity for any assignment thereof

**IN WITNESS** whereof this Lease has been executed by the parties as a Deed and delivered on the day and year first above written

## SCHEDULE 1

### RIGHTS GRANTED

1.    **Estate Common Parts**

(Subject to the right for the Landlord or the Management Company to use those parts of the Estate Common Parts suitable for such purposes for displays) the right for the Tenant and all persons expressly or by implication authorised by the Tenant (in common with the Landlord and the Management Company and all other persons having a like right) at all times and for all proper purposes:-

(a)    to pass and repass with or without vehicles over and along all roads accesses and egresses from time to time comprised in the Estate Common Parts and intended for vehicular access (in particular including the tunnel, hatched blue on Plan 47 (the **"Truck Tunnel"**) for service vehicles only but for the avoidance of doubt the Tenant shall have no such rights in respect of the section of the Truck Tunnel hatched green on the said plan

(b)    to pass and repass on foot only over and along such accesses egresses pavements footpaths malls walkways concourses circulation areas staircases travelators escalators ramps and lifts and such other areas as are from time to time comprised in the Winter Garden and the Estate Common Parts and intended for pedestrian access

(c)    to use such parts of the Estate Common Parts as are not referred to in sub-paragraphs (a) and (b) above

until such time (if any) as any of the same are adopted by the highway or other relevant authority and become public thoroughfares

Provided that the Landlord may add to extend (subject to Clauses 6.6 and 6.7) vary or stop-up any of the same from time to time provided that (i) in the case of sub-paragraphs (a) and (b) above reasonable alternative means of access to the Demised Premises are available ensuring the continuance of access to and use and occupation of the Demised Premises and (ii) in the case of sub-paragraph (a) (b) and (c) above so that the Tenant's use and occupation of the Demised Premises is not thereby materially and adversely affected

2.    **Pipes**

The right to the free passage and running of water sewage surface water drainage gas electricity telecommunications and other services or supplies to and from the Demised Premises (subject to the Tenant not overloading or damaging the same) in and through the Pipes in any Adjoining Property serving the Demised Premises in common with the Landlord and all other persons having the like right PROVIDED ALWAYS that the Landlord may vary the route or alter all or any such services or supplies from time to time and the rights hereby granted shall thereupon apply to such services and supplies

as varied or altered, the Landlord using all reasonable endeavours minimise any disruption caused thereby and endeavouring to ensure that so far as shall be reasonably possible no interruption in such services or supplies shall result

3.    **Support**

The right of support and protection for the benefit of the Demised Premises from any other part of the Estate as now enjoyed

4.    **Entry to other parts of the Estate**

The right for the Tenant and all other persons authorised by the Tenant in common with the Landlord and the Management Company and all others having the like rights and easements at all reasonable times to enter other parts of the Estate adjoining the Demised Premises including the roof of the Podium in order to carry out works of repairs or permitted alterations to the Demised Premises or the Pipes serving the same and the right to erect and retain scaffolding and hoardings in a manner and location reasonably required by the Landlord and subject to compliance with any other reasonable requirements of the Landlord and/or Management Company on the following terms and conditions:-

(a)    the Tenant shall except in case of emergency give reasonable prior written notice to the Landlord and the occupiers (if any) of such adjoining premises of its intention to exercise such right;

(b)    the Tenant shall only exercise such right insofar as it cannot reasonably carry out such works of repair and alterations and/or erection of scaffolding from within the Demised Premises; and

(c)    the Tenant shall cause as little inconvenience and damage as reasonably possible and shall without delay make good to the reasonable satisfaction of the Landlord and the occupiers of the adjoining premises all damage thereby occasioned to such adjoining premises or any other part of the Estate

5.    **Signage and Naming Rights**

The right for the Tenant:-

(a)    to display signs on the Building (at high and low levels), subject to the Tenant obtaining at its own cost and expense any necessary planning and other third party approvals and to the Tenant obtaining the prior written consent of the Landlord (such consent not to be unreasonably withheld or delayed, the Landlord being entitled to have regard to the nature and quality of the Estate and to the principles of good estate management) to the height, size, style and position of such sign and the materials to be used in such sign

(b)    to name the Building, subject to the Tenant obtaining at its own cost and expense any necessary planning and other third party approvals and to the Tenant obtaining the prior written consent of the Landlord (such consent not to

be unreasonably withheld or delayed, the Landlord being entitled to have regard to the nature and quality of the Estate and to the principles of good estate management) to the name to be given to the Building

(c)    to affix a sign to the exterior of the Building at ground floor level stating a name approved pursuant to paragraph 5(b) of this Schedule subject to the Tenant obtaining at its own cost and expense any necessary planning and other third party approvals and to the Tenant obtaining the prior written consent of the Landlord (such consent not to be unreasonably withheld or delayed, the Landlord being entitled to have regard to the nature and quality of the Estate and to the principles of good estate management) to the size, style and position of such sign and materials to be used in such sign

## 6.    Pier Rights

The non-exclusive right in common with the Landlord and all other persons with the like right subject to compliance with all regulations relating to the use of the Canary Wharf pier (forming an Estate Common Part) notified by or on behalf of the Landlord to the Tenant from time to time to use the Canary Wharf pier for embarkation and disembarkation purposes onto and from any boat operated by the Tenant or its agent, to provide a boat service for the Tenant's employees, guests and visitors.

## 7.    Additional Rights for Access to the Car Parking Spaces

The non-exclusive right to pass and repass (in common with the Landlord and the Management Company and all other persons having a like right) at all times and for the purpose of gaining vehicular access and egress from the Car Parking Spaces over the estate car park shown hatched green on Plan 48 by such route as the Landlord and/or the Management Company shall from time to time designate acting reasonably and subject to the Car Park Regulations

## 8.    Right to overhang

Subject to obtaining the prior written consent of the Landlord (such consent not to be unreasonably withheld or delayed) and, as the case may be, the Adjacent Parcel Owner, and to compliance by the Tenant with the reasonable requirements of the Landlord and, as the case may be, the Adjacent Parcel Owner, to overhang for such periods as may reasonably be required parts of the Adjoining Property with appropriate equipment for the cleaning and maintenance of the Demised Premises and appropriate security equipment, the Tenant making good any damage caused to the Adjoining Property by such equipment to the Landlord's and, as the case may be, the Adjacent Parcel Owner's, reasonable satisfaction as soon as reasonably practicable

Without prejudice to the generality of the foregoing the Tenant shall be entitled to overhang parts of the Adjoining Property (but not the Adjacent Parcel) with window cleaning cradles only, without any obligation to first obtain such consents subject to complying with all relevant provisions of this Lease

9.    **Canopies**

The right to overhang those parts of the Estate or any Adjoining Property which any canopies above the ground floor entrances overhang from time to time

10.    **Monument**

Subject to obtaining all necessary consents and permissions required under the Planning Acts the right for the Tenant (in this paragraph means Lehman Brothers Limited to erect, repair, clean, replace, renew and maintain a block monument/plinth at ground level on the pavement shown hatched orange on Plan 46 subject to the approval of the Landlord

11.    **Equipment**

Subject to obtaining all necessary consents and permission and the consents of the Landlord (not to be unreasonably withheld or delayed having regard to good estate management and the nature and quality of the Estate) required under the Planning Acts the right for the Tenant and all other persons authorised by the Tenant to install maintain repair replace or renew:

11.1    closed circuit television cameras (in connection with the Tenant's security arrangements) on the exterior of the Building at no higher than second floor level subject to the approval of the Landlord;

11.2    around the perimeter of the Building, such external lighting as the Tenant may reasonably require (in connection with the Tenant's security arrangements) and the Landlord shall approve subject to such lighting being at no higher then second floor level and being;

in each case (where appropriate) together with the right to overhang the Estate Common Parts with such items

12.    **Tarmac Road**

Subject to the Regulations the right for the Tenant and all persons authorised by the Tenant to pass and repass for all proper purposes with or without vehicles (excluding vehicles used for construction purposes) over the Tarmac Road and over the Green Road

13.    **Docklands Light Railway**

To the extent which the Landlord can from time to time grant the same (and the Landlord covenanting to use reasonable endeavours to obtain the same) and subject to the terms of the DLR Lease granted to Docklands Light Railway Limited, the right for the Tenant and all persons authorised by the Tenant to gain access to and from the DLR Tunnel so far as necessary for the exercise of the rights granted in this Schedule and compliance by the Tenant with the covenants on its part contained in this Lease relating to the cleaning, maintenance, repair and (if necessary) rebuild of the Demised

Premises subject to the Tenant giving reasonable prior written notice to Docklands Light Railway Limited (save in the case of emergency) causing the minimum disruption to the operation of the Docklands Light Railway as reasonably practicable complying with the rules and procedures of Docklands Light Railway Limited in relation to such access and without delay making good any physical damage caused thereby; the Landlord agrees with the Tenant that if such rights do not give the Tenant rights reasonably sufficient and necessary to enable it to observe and perform its covenants (and exercise its rights in this Schedule) hereunder in so far as rights over the DLR Tunnel are necessary for such observance and performance then only to the extent such rights are insufficient such of the Tenant's obligations hereunder as can only be fulfilled if the Tenant were to have those sufficient rights shall be suspended from time to time until reasonably sufficient rights are made available to the Tenant

14.    **Right of Escape**

The right for the Tenant and all persons authorised by the Tenant of escape in cases of emergency only over the concourse of the Docklands Light Railways Stations adjacent to the Building

15.    **Jubilee Place Link**

The right for the Tenant and all persons expressly or by implication authorised by the Tenant (in common with the Landlord and the Management Company and all other persons having a like right) at all times and for all proper purposes to pass and repass on foot only over the Jubilee Place Link and to enter the Jubilee Place Link in order to comply with its covenants contained in Clause 4.39 of this Lease

16.    **Car Park Barrier Location**

(a)    The right, subject to the provisions of paragraph 16(c) below, to install car park barriers and card readers within the Car Park Barrier Location and to run any associated power and control cabling thereto from the Demised Premises

(b)    The right for the Tenant and all persons expressly or by implication authorised by the Tenant (in common with the Landlord and the Management Company and all other persons having a like right) at all times to pass and repass on foot or with vehicles over the Car Park Barrier Location to access the Car Parking Spaces:-

   (i)    to inspect cleanse maintain or repair; and

   (ii)    (subject to the Tenant obtaining prior written approval in accordance with paragraph 16(c) below) to renew alter or execute any works to

   any car park barrier, card readers or cabling installed at the Car Park Barrier Location pursuant to paragraph 16(a) above

(c)    The Tenant shall only be entitled to exercise the right set out in paragraph 16(a) and 16(b)(ii) above if it has obtained the prior written approval of the Landlord

to the design of the car park barriers and card readers, which consent the Landlord agrees not to unreasonably withhold or delay

## SCHEDULE 2

### EXCEPTIONS AND RESERVATIONS

The following rights and easements are excepted and reserved out of the Demised Premises to the Landlord and the Superior Landlord and all other persons authorised by either of them or having the like rights and easements:-

1. **Pipes**

   The right to the free passage and running of water sewage surface water drainage gas electricity telecommunications and other services or supplies to and from Adjoining Property in and through any of the Pipes which may at any time be in under or passing through or over the Demised Premises

2. **Entry**

   The right at all reasonable times upon reasonable prior written notice given to the Tenant except in cases of emergency to enter the Demised Premises in order to:-

   (a)     inspect cleanse maintain repair connect to remove lay renew relay replace alter or execute any works to or in connection with the Pipes and any other services in or accessible from the Demised Premises

   (b)     execute repairs decorations alterations and any other works to any Adjoining Property or to do anything which the Landlord or the Management Company may do under this Lease

   (c)     carry out the Estate Services

   (d)     execute any works to any Estate Common Parts

   (e)     inspect, cleanse, maintain repair connect to remove lay renew relay replace alter or execute any works to or in connection with the power supply and lighting to the DLR Tunnel

   (f)     inspect on an annual basis, maintain and repair the connections to the trusses upon which the service booms located above the platforms within the DLR Tunnel are suspended

   PROVIDED THAT the person exercising the foregoing rights shall cause as little inconvenience and damage as reasonably possible to the Tenant and other permitted occupiers for the time being of the Demised Premises and shall comply with the Tenant's reasonable requirements (including without limitation security) details of which shall have been previously notified in writing to the Landlord and shall make good without delay any physical damage thereby caused to the Demised Premises to the reasonable satisfaction of the Tenant AND PROVIDED FURTHER THAT the Landlord shall only exercise such right insofar as its cannot reasonably carry out such works from the Adjoining Property

3.    Scaffolding

The right to erect scaffolding for such period as shall be reasonably necessary for the purposes of repairing or cleaning any buildings now or hereafter erected on the Estate or in connection with the exercise of any of the rights mentioned in this Schedule notwithstanding that such scaffolding may temporarily rest on or about the Demised Premises or restrict the access to or enjoyment and use of the Demised Premises

4.    Light and air etc.

The rights of light air and all other easements and rights now or hereafter enjoyed by the Adjoining Property

5.    Support

The right of support protection and shelter now or hereafter for the benefit of other parts of the Estate from the Demised Premises including (but not limited to) support protection and shelter for any building constructed on the Adjacent Parcel and for the DLR station adjacent to and (where appropriate) above the Demised Premises including without prejudice to the generality of the foregoing the trusses upon which the service booms located above the DLR station platforms are suspended

6.    Building on the Adjoining Property

The right at any time to build on or execute any works to any Adjoining Property or any buildings thereon (including the right to oversail the Demised Premises with cranes and the right to abut with scaffolding) in such manner as the person exercising the right shall think fit notwithstanding the fact that the same may obstruct affect or interfere with the amenity of the Demised Premises or the passage of light and air to the Demised Premises

7.    Alteration of Common Parts

Subject to the rights granted in paragraph 1 of Schedule 1 the right to extend vary or stop-up the Estate Common Parts or any part or parts thereof from time to time if the Landlord shall reasonably deem it desirable for the efficient management security and operation of the Estate or for the comfort of the owners and tenants on the Estate (but not so that the Tenant's use and occupation of the Demised Premises is thereby materially and adversely affected)

8.    Use of Estate Common Parts

The right to regulate and control the use of the Estate Common Parts and to make Regulations for that purpose

9.    Signage and Affixing Items to the Walls of the Building

(Subject to the prior written consent (not to be unreasonably withheld) of the Tenant) the right to (acting reasonably) affix to the outside flank or main walls of the Building

directional information public lighting and street names and any other items which may be requisite in connection with the Estate Services or other articles of a like nature

10. **Statutory Undertakers**

Such appurtenant rights and powers of entry and otherwise as London Electricity plc British Telecommunications plc Cable and Wireless plc or such other public telecommunications operators (the "**Statutory Undertakers**") shall properly require in relation to their operations in the Demised Premises (as approved by the Tenant in writing (such approval not to be unreasonably withheld or delayed)) and such statutory appurtenant rights and powers of entry and otherwise that the Statutory Undertakers shall require to exercise in relation to the same

11. **Right to overhang**

Subject to giving prior written notice to the Tenant and to compliance by the Landlord with the reasonable requirements of the Tenant to overhang for such periods as may reasonably be required parts of the Demised Premises with appropriate equipment for the cleaning and maintenance of any Adjoining Property and appropriate security equipment, the Landlord making good any damage caused to the Demised Premises by such equipment to the Tenant's reasonable satisfaction as soon as reasonably practicable

12. **Pedestrian Easements**

The right at all times and for all proper purposes so far as necessary for the beneficial use and enjoyment of the Adjoining Property to pass and repass on foot only (in common with all others entitled thereto) and for emergency vehicles to pass and repass at all times and for all purposes in performance of their functions over and along the area shown hatched blue on Plan 6 (the "**Pedestrian Easement**") to the extent that the same is included within the Demised Premises and to the intent that the Pedestrian Easement comprises part of the Estate Common Parts Provided That the Tenant shall ensure that at all times the Pedestrian Easement has a minimum vertical clearance of 10 metres

13. **General**

Any rights or easements excepted and reserved in this Schedule over anything which is not in being at the date hereof shall be effective only in relation to any such thing which comes into being before the expiry of eighty (80) years from the date of this Lease (which shall be the perpetuity period applicable hereto)

14. **Truck Tunnel Pipes**

The right for the Landlord to affix and thereafter repair, maintain, replace and renew such Pipes to the Truck Tunnel as the Landlord may deem reasonably necessary provided that in doing so the Landlord shall cause the minimum disruption reasonably practicable and shall without delay made good any physical damage caused thereby.

15. **DLR Stanchion**

The right for Docklands Light Railway Limited and the Landlord to gain access to and from the DLR Stanchion with or without machinery and plant for the purpose of inspection, testing, maintaining, repairing, renewing, replacing or carrying out any other works whatsoever to the DLR Stanchion subject to the person(s) exercising such right giving the Tenant reasonable prior written notice (save in the case of emergency) causing the Tenant the minimum disruption reasonably practicable and without delay making good any physical damage caused thereby

16. **Truck Tunnel**

The right in the case of emergency to use the fire escape from the Truck Tunnel as shown hatched orange on Plans 4 ~~to 6~~ and 5 (inclusive)

17. **Winter Garden Joint**

The right to affix and maintain a joint connecting the Winter Garden to the Building to that part of the exterior of the wall of the Building facing the Winter Garden Provided that in the exercise of such right the Landlord shall prior to affixing anything shall first consult with the Tenant and obtain the Tenant's consent (not to be unreasonably withheld or delayed) as to the nature and means of any affixation

18. **Essential Access**

The right at all times for the purposes of gaining access for all purposes to the London Electricity plc British Telecommunications plc Cable and Wireless plc and other telecommunications or utility providers' rooms to pass and repass on foot only along the passageways shown coloured green and orange on Plans 4 and 5

## SCHEDULE 3

### Part A
### Car Parking Rent Review

1. **Definitions**

In this Part of this Schedule the following expressions shall have the following meanings:-

1.1 **"Car Parking Rent Restrictions"** means the restrictions imposed by any statute for the control of rents in force on the Review Date or on the date on which any increased Car Parking Rent is ascertained in accordance with this Part of this Schedule and which operate to impose any limitation whether in time or amounts on the assessment or the collection of any increase in Car Parking Rent or any part thereof

1.2 **"Car Parking Spaces"** means the 256 car parking spaces which are demised as part of the Demised Premises

1.3 **"HQ3"** means the property currently known as Parcel HQ3, Heron Quays and shown edged red and marked HQ3 on Plan 49

1.4 **"Parking Space Rent"** means the clear yearly rent or licence fee which on the Review Date a tenant bidding to lease the whole of the Demised Premises on the terms of this Lease would offer as part of such bid for the Car Parking Spaces on the following assumptions:-

1.4.1 that the Car Parking Spaces are fit for immediate occupation and use at the Landlord's expense; and

1.4.2 that if the Car Parking Spaces or any part thereof or any parts of the Demised Premises which are from time to time intended by the Landlord as pedestrian and vehicular accessways for the users of the Car Parking Spaces or any of the Estate Common Parts necessary in each case for access to and from the Car Parking Spaces have been destroyed or damaged they have been reinstated to the state and condition assumed by this Schedule; and

1.4.3 that no work has been carried out to the Car Parking Spaces or any part thereof by the Tenant any other tenant or licensee or their respective predecessors in title during the Term which has diminished the rental value of the Car Parking Spaces; and

1.4.4 that all the covenants and other obligations relating to the Car Parking Spaces contained in this Lease have been fully performed and observed apart from Landlord's or Management Company's covenants where the relevant entity is and remains in material breach of covenant having had a notice of and a reasonable period of time to remedy such breach; and

1.4.5    that the Tenant has complied with its obligations contained in this Lease as they would apply to the Demised Premises and to that extent the Car Parking Spaces comply with all statutory and regulatory requirements

but disregarding any effect on the rent of the fact of any occupation by the Tenant or any Group Company of the Tenant of the whole or any part of the Adjacent Parcel and/or HQ3

1.5    **"President"** means the President for the time being of the Royal Institution of Chartered Surveyors and includes the duly appointed deputy of the President or any person authorised by the President to make appointments on his behalf

1.6    **"Review Date"** means the Car Parking Review Date specified in the Particulars

1.7    **"Surveyor"** means an independent chartered surveyor of not less than ten years' standing who is a fellow of the Royal Institution of Chartered Surveyors experienced in the valuation of property similar to the Car Parking Spaces and is acquainted with the market in the City of London and London Docklands and who is also aware of rental values for car parking spaces in London appointed from time to time to determine the Parking Space Rent pursuant to the provisions of this Part of this Schedule and the Surveyor shall act as an arbitrator in accordance with the Arbitration Act 1996

2.    **Review of Car Parking Rent**

From and including the Review Date the Car Parking Rent per annum shall be the greater of either:-

(i)    The Parking Space Rent as ascertained in accordance with the provisions of paragraph 3 of this Part of this Schedule; or

(ii)    256 x Two Thousand Five Hundred Pounds (£2,500)

3.    **Agreement or determination of the Parking Space Rent**

The Parking Space Rent at the Review Date may be agreed in writing at any time between the Landlord and the Tenant but if for any reason the Landlord and the Tenant have not so agreed then from a date three months prior to the Review Date either the Landlord or the Tenant may by notice in writing to the other require the Parking Space Rent to be determined by the Surveyor

4.    **Appointment of Surveyor**

4.1    The Surveyor (in default of agreement between the Landlord and the Tenant) shall be appointed by the President on the written application of either the Landlord or the Tenant made not earlier than three months before the Review Date and not later than the next succeeding Review Date

4.2    The Surveyor appointed under this paragraph shall act as an Arbitrator and the following provisions shall apply:-

4.2.1　The date of the Arbitrator's award shall be deemed to be the date on which a copy of the award is served on the Landlord and the Tenant;

4.2.2　The Arbitrator shall not be entitled to order the rectification setting aside or cancellation of this Lease or any other deed;

4.2.3　The Arbitrator shall be required to make no award prior to the Review Date

## 5.　Fees of Surveyor

The fees and expenses of the Surveyor including the cost of his nomination shall be payable by the Landlord and the Tenant in such proportions as the Surveyor shall at his reasonable discretion direct or in the absence of such a direction in equal shares

## 6.　Appointment of new surveyor

If the Surveyor dies is unwilling to act or becomes incapable of acting or if for any other reason he is unable to act then either the Landlord or the Tenant may request the President to discharge the said surveyor and appoint another surveyor in his place which procedure may be repeated as many times as necessary

## 7.　Interim payments pending determination

7.1　In the event that by the Review Date the Parking Space Rent has not been agreed or determined as aforesaid (the date of agreement or determination being called the "Determination Date" in this Part of this Schedule) then in respect of the period (called the "Interim Period" in this Part of this Schedule) beginning with the Review Date and ending on the day before the Quarterly Day following the Determination Date the Tenant shall continue to pay to the Landlord the Initial Car Parking Rent

7.2　Forthwith following the Determination Date the Tenant shall pay to the Landlord the amount (if any) by which the Initial Car Parking Rent paid on account by the Tenant under the provisions of paragraph 7.1 above in respect of the Interim Period falls short of the aggregate Car Parking Rent payable or determined on the Determination Date in respect of the Interim Period together with interest on such shortfall (calculated from the respective dates on which the instalments would have been payable had the Parking space Rent been determined) at the Base Rate from the date of each relevant underpayment to the date of payment

## 8.　Car Parking Rent Restrictions

If Car Parking Rent Restrictions shall prevent or prohibit either wholly or partially:-

8.1　the operation of the above provisions for review of the Car Parking Rent or

8.2　the normal collection and retention by the Landlord of any increase in the Car Parking Rent or any instalment or part thereof

THEN:

8.2.1    the operation of such provisions for review of the Car Parking Rent shall be postponed to take effect on the first date or dates thereafter upon which such operation may occur

8.2.2    the collection of any increase or increases in the Car Parking Rent shall be postponed to take effect on the first date or dates thereafter that such increase or increases may be collected and/or retained in whole or in part and on as many occasions as shall be required to ensure the collection of the whole increase

AND until the Car Parking Rent Restrictions shall be relaxed either partially or wholly the Car Parking Rent shall be the maximum sum from time to time permitted by the Car Parking Rent Restrictions

9.    **Memorandum of Car Parking Rent**

As soon as the amount of the Car Parking Rent has been agreed or determined a memorandum thereof shall be prepared by the Landlord or its solicitors and thereupon shall be signed by or on behalf of the Landlord and the Tenant and annexed to this Lease and the counterpart thereof and the parties shall bear their own costs in respect thereof

10.    **Time not of the essence**

For the purpose of this Part of this Schedule time shall not be of the essence

**Part B**
**Rent Reviews**

1.    **Definitions**

In this Schedule the following expressions shall have the following meanings:-

1.1    "Review Date" means each of the Review Dates specified in the Particulars and "Relevant Review Date" shall be construed accordingly

1.2    "Assumed Premises" means the Demised Premises on the assumption that:-

(a)    the Tenant's Works have not been carried out and (for the avoidance of doubt) the Tenant has removed all tenant's fixtures and all voluntary improvements and alterations carried out by the Tenant any undertenants (or their respective predecessors in title) or other lawful occupiers (whether or not they increase or decrease the rental value) (reinstating and making good any damage caused to the Demised Premises in so doing) and has left the Demised Premises (constructed and fitted out as described below) as clear space and

(b)    the Demised Premises have at the date on which the Building was actually constructed been constructed and fitted out by the Landlord at its own cost in accordance with the specification and drawings annexed hereto entitled "Rent

Review Specification" and as altered from time to time by alterations carried out by and at the expense of the Landlord and improvements and alterations carried out by the Tenant pursuant to an obligation to the Landlord

(c)     the Demised Premises include the Car Parking Spaces and that the Tenant and all persons expressly or impliedly authorised by the Tenant have the right at all times to park private motor cars within the Car Parking Spaces

1.3     "Open Market Rent" means (subject to paragraph 4 below) the clear yearly rack rent at which the Assumed Premises could be expected to be let as a whole at the Relevant Review Date by a willing landlord to a willing tenant with vacant possession and without any premium or any consideration other than rent for the grant thereof for a term of fifteen (15) years commencing on the Relevant Review Date and with five yearly upward only open market rent reviews and otherwise on the terms and conditions and subject to the covenants and provisions contained in this Lease other than the amount of the Rent payable hereunder (but not omitting the provisions for review thereof contained in this Schedule) and otherwise subject to the provisions for the review of the Rent contained in this Schedule and making the Assumptions but disregarding the Disregarded Matters

1.4     the "Assumptions" means the following assumptions (if not facts) at the Relevant Review Date:-

(a)     that the Assumed Premises are fit for immediate occupation and use for the purposes of the Tenant carrying out its fitting out works; and

(b)     that there shall be no discount reduction or allowance to reflect (or compensate any incoming tenant for the absence of) any rent free or concessionary rent period which reflects the time it would take for the incoming tenant to fit out the Assumed Premises so as to be ready for immediate use or any capital payment or other consideration in lieu of such rent free or concessionary period for fitting out and which would be granted to the willing lessee in the open market at the relevant Review Date so that such Open Market Rent shall be that which would be payable after the expiry of any such rent free or concessionary rent period for fitting out which the willing lessee shall hereby be assumed to have enjoyed or after receipt by the willing lessee of any such capital payment or other consideration in lieu of such rent free or concessionary period for the fit out; and

(c)     that no work has been carried out to the Demised Premises by the Tenant any undertenant or their respective predecessors in title during the Term which has diminished the rental value of the Demised Premises; and

(d)     that if the Demised Premises or the Building have been destroyed or damaged they have been fully rebuilt and reinstated to the state and condition assumed by this Schedule; and

(e)     the Tenant has complied with its obligations contained in this Lease as they would apply to the Demised Premises and that to that extent the Assumed Premises comply with all statutory and regulatory requirements ;and

(f)     that all the covenants contained in this Lease have been fully performed and observed apart from Landlord's or Management Company's covenants where the relevant entity is and remains in material breach of covenants having had notice of and a reasonable period of time to remedy such breach

1.5     the "Disregarded Matters" means:-

(a)     any effect on rent of the fact that the Tenant or any Group Company of the Tenant or any undertenant or their respective predecessors in title have been in occupation of the Demised Premises or any part thereof; and

(b)     any goodwill attached to the Demised Premises by reason of the business then carried on at the Demised Premises by the Tenant or undertenant or their respective predecessors in title or any Group Company of the Tenant; and

(c)     any effect on the rent of the fact of any occupation by the Tenant or any Group Company of the Tenant of the whole or any part of the Adjacent Parcel and/or HQ3

1.6     "Surveyor" means an independent chartered surveyor of not less than ten (10) years' standing who is a fellow of the Royal Institution of Chartered Surveyors and who is experienced in the letting or valuation of buildings similar to the Assumed Premises in the City of London and London Docklands and who is also aware of rental values elsewhere in London appointed from time to time to determine the Open Market Rent pursuant to the provisions of this Schedule and the Surveyor shall act as an arbitrator in accordance with the Arbitration Act 1996

1.7     the "President" means the President for the time being of the Royal Institution of Chartered Surveyors and includes the duly appointed deputy of the President or any person authorised by the President to make appointments on his behalf

1.8     "Rent Restrictions" means the restrictions imposed by any statute for the control of rent in force on a Review Date or on the date on which any increased rent is ascertained in accordance with this Schedule and which operate to impose any limitation whether in time or amounts on the assessment or the collection of any increase in rent or any part thereof

2.      **The Rent**

From and including each Review Date the Rent shall be equal to the Open Market Rent at the Relevant Review Date as ascertained in accordance with the provisions of paragraph 3 below or as determined under the provisions of paragraph 4 below (as the case may be)

3. **Agreement or determination of the Open Market Rent**

The Open Market Rent at any Review Date may be agreed in writing at any time between the Landlord and the Tenant but if for any reason the Landlord and the Tenant have not so agreed then from a date three months prior to the Review Date up to the next succeeding Review Date either the Landlord or the Tenant may by notice in writing to the other require the Open Market Rent to be determined by the Surveyor

4. **Deemed Open Market Rent**

   (a)  If the Open Market Rent at the first Review Date (as such Open Market Rent is ascertained pursuant to paragraph 3 above of this Schedule) is less than the aggregate of the Year Ten Rent and the Car Parking Rent (as at the date immediately preceding the first Review Date) or if the Open Market Rent at that Review Date cannot for any reason be ascertained pursuant to paragraph 3 above then for the purposes of this Schedule the Open Market Rent at such Review Date shall be deemed to be the aggregate of the Year Ten Rent and the Car Parking Rent

   (b)  If the Open Market Rent at any subsequent Review Date (as so ascertained) is less than the Open Market Rent payable immediately preceding the Relevant Review Date as so ascertained above or determined or if the Open Market Rent at the Relevant Review Date cannot for any reason be so ascertained then for the purposes of this Schedule the Open Market Rent at the Relevant Review Date shall be deemed to be the Open Market Rent payable immediately preceding the Relevant Review Date as so ascertained or determined

5. **Appointment of Surveyor**

   (a)  The Surveyor (in default of agreement between the Landlord and the Tenant) shall be appointed by the President on the written application of either the Landlord or the Tenant made not earlier than three months before the Relevant Review Date and no later than the next succeeding Review Date

   (b)  The Surveyor appointed under this paragraph shall act as an Arbitrator and the following provisions shall apply:

      (i)    the date of the Arbitrator's award shall be deemed to be the date on which a copy of the award is served on the Landlord and the Tenant;

      (ii)   the Arbitrator shall not be entitled to order the rectification, setting aside or cancellation of this Lease or any other deed;

      (iii)  the Arbitrator shall have the power to order a provisional award;

      (iv)   the Arbitrator shall not be entitled to require that security is provided in respect of the costs of the arbitration;

(v)     the Arbitrator shall not be entitled to make an award prior to the Relevant Rent Review Date

## 6.   Fees of Surveyor

The fees and expenses of the Surveyor including the cost of his nomination shall be payable by the Landlord and the Tenant in such proportions as the Surveyor shall, at his reasonable discretion, direct

## 7.   Interim payments pending determination

(a)     In the event that by the Relevant Review Date the Rent has not been agreed or determined as aforesaid (the date of agreement or determination being herein called "the Determination Date") then in respect of the period (herein called "the Interim Period") beginning with the Relevant Review Date and ending on the day before the Quarterly Day following the Determination Date the Tenant shall pay to the Landlord Rent at the yearly rate payable immediately before the Relevant Review Date

(b)     Forthwith following the Determination Date the Tenant shall pay to the Landlord the amount (if any) by which the Rent paid on account by the Tenant under the provisions of paragraph 8(a) above in respect of the Interim Period falls short of the aggregate of Rent payable in respect of the Interim Period together with interest on each of the instalments of such shortfall (calculated from the respective dates on which the instalments would have been payable had the Open Market Rent been determined) at the Base Rate from the date of each relevant under payment to the date of payment

## 8.   Rent Restrictions

On each occasion that Rent Restrictions shall prevent or prohibit either wholly or partially:-

(a)     the operation of the above provisions for review of the Rent or

(b)     the normal collection and retention by the Landlord of any increase in the Rent or any instalment or part thereof

THEN in each such case:-

(i)     the operation of such provisions for review of the Rent shall be postponed to take effect on the first date or dates thereafter upon which such operation may occur

(ii)     the collection of any increase or increases in the Rent shall be postponed to take effect on the first date or dates thereafter that such increase or increases may be collected and/or retained in whole or in part and on as many occasions as shall be required to ensure the collection of the whole increase

AND until the Rent Restrictions shall be relaxed either partially or wholly the Rent shall be the maximum sum from time to time permitted by the Rent Restrictions

9.    **Memoranda of reviewed rent**

As soon as the amount of any reviewed Rent has been agreed or determined memoranda thereof shall be prepared by the Landlord or its solicitors and thereupon shall be signed by or on behalf of the Landlord and the Tenant and annexed to this Lease and the counterpart thereof and the parties shall bear their own costs in respect thereof

10.    **Time not of the essence**

For the purpose of this Schedule time shall not be of the essence

## SCHEDULE 4

### COVENANTS BY THE SURETY

1. **Indemnity by Surety**

   The Surety hereby covenants with the Landlord and as a separate covenant with the Management Company as a primary obligation that the Tenant or the Surety shall at all times until the Tenant shall cease to be bound by the Tenant's covenants in the Lease during the Term duly perform and observe all the covenants on the part of the Tenant contained in this Lease including the payment of the rents hereby reserved and all other sums payable under this Lease in the manner and at the times herein specified and the Surety shall indemnify and keep indemnified the Landlord and the Management Company against all claims demands losses damages liability costs fees and expenses whatsoever sustained by the Landlord or the Management Company by reason of or arising directly or indirectly out of any default by the Tenant in the performance and observance of any of its obligations or the payment of any rents and other sums Provided That the Landlord and the Management Company shall notify the Tenant of any such actions or other matters and take all reasonable steps to mitigate such losses having regard to the nature of the breach

2. **Surety jointly and severally liable with Tenant**

   The Surety hereby further covenants with the Landlord and as a separate covenant with the Management Company that the Surety is jointly and severally liable with the Tenant (whether before or after any disclaimer by a liquidator or trustee in bankruptcy) for the fulfilment of all the obligations of the Tenant under this Lease and agrees that the Landlord or the Management Company in the enforcement of its rights hereunder may proceed against the Surety as if the Surety was named as the Tenant in this Lease

3. **Waiver by Surety**

   The Surety hereby waives any right to require the Landlord or the Management Company to proceed against the Tenant or to pursue any other remedy whatsoever which may be available to the Landlord or the Management Company before proceeding against the Surety

4. **Postponement of claims by Surety against Tenant**

   The Surety hereby further covenants with the Landlord and as a separate covenant with the Management Company that the Surety shall not claim in any liquidation bankruptcy composition or arrangement of the Tenant in competition with the Landlord or the Management Company and shall remit to the Landlord the proceeds of all judgments and all distributions it may receive from any liquidator trustee in bankruptcy or supervisor of the Tenant and shall hold for the benefit of the Landlord and the Management Company all security and rights the Surety may have over assets of the Tenant whilst any liabilities of the Tenant or the Surety to the Landlord or the Management Company remain outstanding

5.    **Postponement of participation by Surety in security**

The Surety shall not be entitled to participate in any security held by the Landlord or the Management Company in respect of the Tenant's obligations to the Landlord or the Management Company under this Lease or to stand in the place of the Landlord or the Management Company in respect of any such security until all the obligations of the Tenant or the Surety to the Landlord and the Management Company under this Lease have been performed or discharged

6.    **No release of Surety**

None of the following or any combination thereof shall release discharge or in any way lessen or affect the liability of the Surety under this Lease:-

(a)    any neglect delay or forbearance of the Landlord or the Management Company in endeavouring to obtain payment of the rents or other amounts required to be paid by the Tenant or in enforcing the performance or observance of any of the obligations of the Tenant under this Lease

(b)    any refusal by the Landlord or the Management Company to accept rent tendered by or on behalf of the Tenant at a time when the Landlord was entitled (or would after the service of a notice under Section 146 of the Law of Property Act 1925 have been entitled) to re-enter the Demised Premises

(c)    any extension of time given by the Landlord or the Management Company to the Tenant

(d)    (subject to Section 18 of the Landlord and Tenant (Covenants) Act 1995) any variation of the terms of this Lease (including any reviews of the rent payable under this Lease) or the transfer of the Landlord's reversion or the assignment of this Lease

(e)    any change in the identity constitution structure or powers of any of the Tenant the Surety the Landlord or the Management Company or the liquidation administration or bankruptcy (as the case may be) of either the Tenant or the Surety

(f)    any legal limitation or any immunity disability or incapacity of the Tenant (whether or not known to the Landlord or the Management Company) or the fact that any dealings with the Landlord or the Management Company by the Tenant may be outside or in excess of the powers of the Tenant

(g)    any other act omission matter or thing whatsoever whereby but for this provision the Surety would be exonerated either wholly or in part (other than a release under seal given by the Landlord and/or the Management Company as the case may be)

7.    **Disclaimer or forfeiture of Lease**

(a)    The Surety hereby further covenants with the Landlord and the Management Company that:-

    (i)    if the Crown or a liquidator or trustee in bankruptcy shall disclaim or surrender this Lease or

    (ii)    if this Lease shall be forfeited or

    (iii)    if the Tenant shall cease to exist unless the same occurs as part of an amalgamation merger or reconstruction resulting in a solvent corporation

THEN the Surety shall if the Landlord by notice in writing given to the Surety within one hundred and eighty (180) days after such disclaimer or other event so requires accept from and execute and deliver to the Landlord a counterpart of a new lease of the Demised Premises (duly stamped at the Surety's expense) for a term commencing on the date of the disclaimer or other event and continuing for the residue then remaining unexpired of the Term such new lease to be at the cost of the Surety and to be at the same rents and subject to the same covenants conditions and provisions as are contained in this Lease

(b)    If the Landlord shall not require the Surety to take a new lease the Surety shall nevertheless upon demand pay to the Landlord a sum equal to the Rent and other sums that would have been payable under this Lease but for the disclaimer or other event in respect of the period from and including the date of such disclaimer or other event until the expiration of one hundred and eighty (180) days therefrom or until the Landlord shall have granted a lease of the Demised Premises to a third party (whichever shall first occur)

8.    **Benefit of guarantee and indemnity**

This guarantee and indemnity shall enure for the benefit of the successors and assigns of the Landlord and the Management Company respectively under this Lease without the necessity for any assignment thereof

9.    **Value Added Tax**

Where, pursuant to the terms of this Lease, the Landlord or the Management Company or any other person (for the purposes of this paragraph 9, the "**Supplier**") makes or is deemed to make a supply to the Surety for Value Added Tax purposes and Value Added Tax is or becomes chargeable on such supply, the Surety shall (in addition to and at the same time as providing any other consideration for such supply) pay to the Supplier a sum equal to the amount of such Value Added Tax and the Supplier shall provide the Surety with a Value Added Tax invoice in respect of such supply

10. **Guarantor to join in Authorised Guarantee Agreement**

The Surety covenants with the Landlord, and as a separate covenant with the Tenant, that the Surety will join in, and execute and deliver to the Landlord, any deed which the Tenant (here meaning only the Tenant whose obligations hereunder were originally guaranteed by that Surety) is required to execute and deliver to the Landlord pursuant to Clause 4.21.2(b)(i), so as to give the covenants on the part of the Surety therein contained

## SCHEDULE 5

### MATTERS TO WHICH THE DEMISED PREMISES ARE SUBJECT

Insofar as the same relate to or affect the Demised Premises the matters contained in Property and Charges Registers of Title Number EGL436333 (HQ2 Freehold), EGL430896 (HQ2 Leasehold), Title Number EGL200721 (Canary Wharf Phase I Freehold) and EGL202850 (Canary Wharf Phase I Leasehold), EGL316757 (Canary Wharf Phase II Freehold) and EGL316758 (Canary Wharf Phase II Leasehold) and EGL387040 (Heron Quays Freehold) and EGL387043 (Heron Quays Leasehold) and the rights granted to the tenant in the DLR Lease

## SCHEDULE 6

### ESTATE SERVICES

(a)     In this Schedule:-

    (i)    references to "maintain" shall mean maintain inspect test service repair overhaul amend rebuild renew reinstate replace (and in all such cases to the extent necessary to comply with statutory requirements and requirements of responsible authorities) and shall include where appropriate treat wash down cleanse paint decorate empty and drain and the expression "maintenance" shall be construed accordingly

    (ii)    "Services" shall mean Estate Services

    (iii)    "Serviced Areas" shall mean the Estate Common Parts

(b)     In deciding the extent nature and quality of the Services from time to time the Management Company shall at all times act reasonably and in accordance with the principles of good estate management having regard to the nature and quality of the Estate

(c)     In performing the Services and any other services hereunder the Management Company shall be entitled to employ or procure or permit the employment of managers agents contractors or others

### Part A
### the Services

Subject to paragraphs (a) and (b) above the following services to be carried out in accordance with the principles of good estate management shall constitute the Services:-

1.     **Serviced Areas**

    To maintain the Serviced Areas

2.     **Apparatus plant machinery etc**

    To maintain and operate all apparatus plant machinery and equipment comprised in or otherwise serving the Serviced Areas from time to time and the buildings housing them

3.     **Pipes**

    To maintain all Pipes within the Serviced Areas the use of which is shared by the occupiers of more than one building on the Estate

4.     **Fire alarms etc**

    To maintain any smoke and/or smoke fire alarms and ancillary apparatus and fire prevention and fire fighting equipment and apparatus and other safety equipment and ancillary apparatus and systems comprised in the Serviced Areas and in any event to

maintain fire and smoke detection fire preventive and fire fighting equipment including sprinklers hydrants hosereels extinguishers fire alarms fire escapes and fire escape routes and general means of escape to the extent required to comply in relation to the Serviced Areas with statutory requirements and the requirements of responsible authorities or underwriters or insurance companies

5.  **Lighting**

To keep lit at appropriate times all appropriate parts of the Serviced Areas

6.  **Roads Malls etc open**

Without prejudice to any right of the Landlord or the Management Company hereunder so far as shall be reasonably practicable to keep open and unobstructed the access and circulation areas the roadways streets plazas malls and other vehicular and pedestrian ways and similar areas comprised in the Serviced Areas (subject only to:-

(a)    any temporary closure from time to time or

(b)    closure at such times as are reasonably necessary for reasons of security or operational purposes)

7.  **Security surveillance and visitor control**

To provide security services and personnel including where appropriate in the Management Company's discretion closed circuit television and/or other plant and equipment for the purpose of surveillance and supervision of users of the Serviced Areas Provided that such services and personnel shall not extend to the Demised Premises

8.  **Provision of signs and general amenities**

In the Management Company's discretion to provide and maintain direction signs and notices seats and other fixtures fittings chattels and amenities for the convenience of tenants and their visitors and for the enjoyment or better enjoyment of such parts of the Serviced Areas as are available from time to time for use by the occupiers of and visitors to the Estate and/or members of the public as the Landlord or the Management Company may determine

9.  **Ornamental features gardens etc**

In the Management Company's discretion to provide and maintain hard and soft landscaping and planting within the Serviced Areas including fountains sculptures architectural artistic or ornamental features or murals and to keep all such parts of the Serviced Areas as may from time to time be laid out as landscaping (including water features) neat clean planted (where appropriate) properly tended and free from weeds and the grass cut

10.    **Fixtures fittings etc**

To provide and maintain fixtures fittings furnishings finishes bins receptacles tools
appliances materials equipment and other things for the maintenance appearance
upkeep or cleanliness of the Serviced Areas and the provision of the Services set out in
this part of the Schedule

11.    **Windows**

As often as the Management Company may consider desirable to clean the exterior and
interior of all windows and window frames in any building included in the Serviced
Areas and to provide and maintain cradles runways and carriages in connection with
such cleaning

12.    **Refuse**

To provide and operate or procure the provision and operation of means of collection
compaction and disposal of refuse and rubbish (including litter within the Serviced
Areas and if necessary pest control) from the Serviced Areas and other parts of the
Estate and to provide and maintain plant and equipment for the collection compaction
treatment packaging or disposal of the same

13.    **Traffic**

(So far as the same are not for the time being the exclusive responsibility of a public
authority) to endeavour to control so far as practicable traffic on the roads and service
roads forming part of the Serviced Areas and for that purpose to provide such working
and mechanical systems as the Management Company considers appropriate including
wheel clamping immobilising and removal of vehicles

14.    **Energy and supply services**

To arrange the provision of water fuel oil gas heating cooling air conditioning
ventilation electricity and other energy and supply services to the Serviced Areas as
may be required for use in running or operating any service to the Serviced Areas or
distributed to occupiers of the Estate including so far as appropriate standby power
generators and plant

15.    **Water Areas and Waterside and Riverside Walkways**

To use reasonable endeavours to procure that the responsible party maintains and
operates or (in the Management Company's discretion) to maintain and operate the
dock water retention system comprised in or immediately adjoining the Estate and to
use reasonable endeavours to keep water areas within the Serviced Areas free from
debris refuse and other material and (to the extent reasonably practicable) to take
reasonable steps to treat the same as necessary and to minimise pollution therein and to
provide and maintain such seating security and safety equipment on any waterside
walkways as the Management Company considers appropriate

16.    **Transport Services**

So far as the Landlord or the Management Company considers desirable or appropriate
to provide and (as circumstances permit) operate and maintain vehicles or other modes
of transport staff premises and equipment for a transport service or services within or
for the benefit of the Estate

17.    **Other services**

To provide such other services for the benefit of the Estate or the convenience of the
users or occupiers thereof as the Landlord or the Management Company may in
accordance with the principles of good estate management consider desirable or
appropriate

### SCHEDULE 6
### Part B

1.    **Staff**

The proper cost of staff (including direct or indirect labour) for the provision of
Services to the Serviced Areas and for the general management (including accountancy
functions but excluding rent collection) operation and security of the Serviced Areas
(including traffic control and policing) and all other incidental expenditure including
but not limited to:-

(a)    salaries insurance health pensions welfare severance and other payments
contributions and premiums

(b)    the cost of uniforms working clothes tools appliances materials and furniture
furnishings stationery items and equipment (including telephones) for the
proper performance of the duties of any such staff

(c)    providing maintaining repairing decorating and lighting any accommodation
and facilities for staff including any residential accommodation for staff
employed on the Serviced Areas and all rates gas electricity and other utility
charges in respect thereof and any actual or notional rent for such
accommodation

2.    **Common Facilities**

The amount which shall require to be paid for or towards the proper costs charges fees
and expenses in making laying repairing maintaining and lighting as the case may be
any roads ways forecourts passages pavements party walls or fences party structures
Pipes or other conveniences and easements whatsoever which may belong to or be
capable of being used or enjoyed by the Estate in common with any Adjoining Property

3.    **Transportation Facilities**

The amount which the Landlord or Management Company properly pays for or towards the maintenance and lighting of or security for transportation facilities which provide Services to or for the benefit of the Estate and associated premises and areas and/or the fixtures fittings and equipment thereon but for the avoidance of doubt excluding any contributions which the Landlord or the Management Company may from time to time make towards the Canary Wharf Underground Station (excluding any park areas or other areas to be used as open spaces for the enjoyment of the public which are provided or constructed above the Canary Wharf Underground Station and party structures of such station) or the provision and operation of the Docklands Light Railway (excluding contributions the Landlord or the Management Company make towards the maintenance of the station from time to time)

4.    **Outgoings**

All existing and future rates (including water rates) taxes duties charges assessments impositions and outgoings (whether parliamentary parochial local or of any other description and whether or not of a capital or non-recurring nature) payable in respect of the Serviced Areas or if payable in relation to any part thereof then a due proportion thereof to be determined by the Landlord acting reasonably (save any tax payable by the Landlord occasioned by the grant of and any disposition of or dealing with its reversionary interest) with the Serviced Areas

5.    **Statutory requirements**

The proper cost of carrying out any works to the Serviced Areas required to comply with any statute

6.    **Representations**

The proper cost of taking any steps deemed desirable or expedient by the Landlord or the Management Company for complying with making representations against or otherwise contesting the incidence of the provisions of any statute concerning town planning rating public health highways streets drainage and all other matters relating or alleged to relate to the Serviced Areas or the Estate as a whole or in which occupiers within the Estate have a common interest

7.    **Fees of the Estate Surveyor and the Accountant**

The proper and reasonable fees costs charges expenses and disbursements of the Estate Surveyor and the Accountant for or in connection with the performance of the duties ascribed to the Estate Surveyor and the Accountant respectively under the provisions of Clause 9

8.    **Management**

(a)    The proper and reasonable fees of managing agents employed or retained by the Management Company for or in connection with the general overall

management and administration and supervision of the Estate (excluding rent collection, rent reviews, lettings and disposals)

(b)   A fee to the Management Company in connection with the management of the Estate equal to 10% of the Estate Expenditure (excluding any items in this paragraph 8(a)) but so that if a firm of managing agents is appointed to manage the Estate the fee chargeable by the Management Company in any Estate Financial Year under this paragraph 8(b) shall be reduced (but not below zero) by an amount equivalent to the fees (not including any part of such fees which represents Value Added Tax) charged by such managing agents and included in Estate Expenditure for that Estate Financial Year pursuant to paragraph 8(a) above

9.   **Insurance**

(a)   The proper cost of insuring (including, without limitation, Insurance Premium Tax):-

   (i)    the Serviced Areas against loss or damage by the Insured Risks in such sum as shall in the Landlord's opinion be the full reinstatement cost thereof and including architects' surveyors' and other professional fees (and Value Added Tax thereon) and expenses incidental thereto the cost of shoring up demolition and site clearance compliance with local authority requirements and similar expenses and loss of income (if any) for such period as shall be reasonable having regard to the likely period required for obtaining planning permission and reinstating the Serviced Areas

   (ii)   any engineering and electrical plant and machinery being part of the Serviced Areas against sudden and unforeseen damage breakdown and inspection to the extent that the same is not covered by paragraph 9(a)(i) above

   (iii)  property owners liability and public liability or such other insurances as the Landlord may from time to time deem necessary to effect

(b)   The proper cost of periodic valuations for insurance purposes (but not more than once in any one year)

(c)   Works required to the Serviced Areas in order to satisfy the insurers of the Serviced Areas

(d)   Any amount which may be deducted or disallowed by the insurers pursuant to the excess provision in the Landlord's insurance policy upon settlement or adjudication of any claim by the Landlord

10.    **Public activities**

The proper cost of any displays concerts exhibitions or other forms of public entertainment or activity undertaken within the Serviced Areas and for the benefit or enjoyment of the Estate or its occupiers

11.    **Public toilets**

The proper cost of providing operating and maintaining public toilet facilities within the Serviced Areas or for the benefit or enjoyment of the Estate or its occupiers

12.    **Miscellaneous items**

(a)    The proper cost of leasing or hiring any of the items referred to in Part A or Part B of this Schedule

(b)    Interest commission and fees properly incurred in respect of any moneys included in Estate Expenditure borrowed to finance the provision of services and any of the items referred to in Part A or Part B of this Schedule

## SCHEDULE 7

### NOT USED

## SCHEDULE 8

### AUTHORISED GUARANTEE AGREEMENT

#### TO BE GIVEN BY TENANT PURSUANT TO CLAUSE 4.21.2(b)(i)

**T H I S   D E E D** is made the            day of            20

**B E T W E E N:**

(1)    [                              ] whose registered office is at [                              ]
        (registered number:                    ) (the **"Tenant"**) [and]

(2)    [                              ] whose registered office is at [                              ]
        (registered number:                    ) (the **"Landlord"**) [and]

(3)    [                              ] whose registered office is at [                              ]
        (registered number:                    ) (the **"Guarantor"**)]

**W H E R E A S:-**

(A)    This Agreement is made pursuant to the lease dated [                    ] and made between
        [                              ] (the **"Lease"**) which expression shall include (where
        the context so admits) all deeds and documents supplemental to it (whether expressed
        to be so or not) relating to the premises at [                              ] (the
        **"Premises"**)

(B)    The Tenant holds the Premises under the Lease and wishes to assign the Lease to [
        ] (the **"Assignee"**), and pursuant to the Lease the Landlord's consent is required to
        such assignment (the **"Assignment"**) and such consent is given subject to a condition
        that the Tenant [and the Guarantor] [is/are] to enter into a deed in the form of this
        Deed

**NOW THIS DEED WITNESSES** as follows:-

1.    **Authorised Guarantee**

       Pursuant to the condition referred to above, the Tenant covenants with the Landlord, as
       a primary obligation, that the Assignee or the Tenant shall, at all times during the
       period (the **"Guarantee Period"**) from the completion of the Assignment until the
       Assignee shall have ceased to be bound by the **tenant covenants** (which in this Deed
       shall have the meaning attributed by section 28(1) of the Landlord and Tenant
       (Covenants) Act 1995 (the **"1995 Act"**)) contained in the Lease (including the payment
       of the rents and all other sums payable under the Lease in the manner and at the times
       specified in the Lease), duly perform and observe the tenant covenants

2. **Tenant's liability**

2.1     The Tenant agrees that the Landlord, in the enforcement of its rights under this Deed, may proceed against the Tenant as if the Tenant were the sole or principal debtor in respect of the tenant covenant in question

2.2     For the avoidance of doubt, notwithstanding the termination of the Guarantee Period the Tenant shall remain liable under this Deed in respect of any liabilities which may have accrued prior to such termination

2.3     For the avoidance of doubt the Tenant shall be liable under this Deed for any proper costs and expenses incurred by the Landlord in enforcing the Tenant's obligations under this Deed

3. **Disclaimer of Lease**

The Tenant further covenants with the Landlord that if the Crown or a liquidator or trustee in bankruptcy shall disclaim the Lease during the Guarantee Period the Tenant shall, if the Landlord by notice in writing given to the Tenant within six (6) months after such disclaimer, accept from and execute and deliver to, the Landlord a counterpart of a new lease of the Premises (duly stamped at the Tenant's expense) for a term commencing on the date of the disclaimer and continuing for the residue then remaining unexpired of the term of the Lease, such new lease to be at the same rents and subject to the same covenants and provisions as are contained in the Lease

4. **Supplementary provisions**

By way of provision incidental or supplementary to Clauses 1, 2 and 3 of this Deed:-

4.1     **Postponement of claims by Tenant**

The Tenant further covenants with the Landlord that the Tenant shall:-

4.1.1     not claim in any liquidation, bankruptcy, composition or arrangement of the Assignee in competition with the Landlord and shall (to the extent of its liability hereunder) remit to the Landlord the proceeds of all judgments and all distributions it may receive from any liquidator, trustee in bankruptcy or supervisor of the Assignee;

4.1.2     hold for the benefit of the Landlord all security and rights the Tenant may have over assets of the Assignee relating to liabilities under the Lease whilst any liabilities of the Tenant or the Assignee to the Landlord remain outstanding; and

4.1.3     not exercise any right or remedy in respect of any amount paid or any liability incurred by the Tenant in performing or discharging its obligations contained in this Deed, or claim any contribution from any other guarantor

4.2 **Postponement of participation by Tenant in security**

The Tenant shall not be entitled to participate in any security held by the Landlord in respect of the Assignee's obligations to the Landlord under the Lease or to stand in the place of the Landlord in respect of any such security until all the obligations of the Tenant or the Assignee to the Landlord under the Lease have been performed or discharged

4.3 **No release of Tenant**

None of the following, or any combination of them, shall release, determine, discharge or in any way lessen or affect the liability of the Tenant as principal obligor under this Deed or otherwise prejudice or affect the right of the Landlord to recover from the Tenant to the full extent of this guarantee:-

4.3.1 any neglect, delay or forbearance of the Landlord in endeavouring to obtain payment of any rents or other amounts required to be paid by the Assignee or in enforcing the performance or observance of any of the obligations of the Assignee under the Lease;

4.3.2 any refusal by the Landlord to accept rent tendered by or on behalf of the Assignee at a time when the Landlord was entitled (or would after the service of a notice under Section 146 of the Law of Property Act 1925 have been entitled) to re-enter the Premises;

4.3.3 any extension of time given by the Landlord to the Assignee;

4.3.4 any reviews of the rent payable under the Lease and (subject to Section 18 of the 1995 Act) any variation of the terms of the Lease save where the Tenant was not a party to the variation and where such variation increases its liability under this Agreement or the transfer of the Landlord's reversion;

4.3.5 any change in the constitution, structure or powers of either the Tenant, the Assignee or the Landlord or the liquidation, administration or bankruptcy (as the case may be) of either the Tenant or the Assignee;

4.3.6 any legal limitation, or any immunity, disability or incapacity of the Assignee (whether or not known to the Landlord) or the fact that any dealings with the Landlord by the Assignee may be outside, or in excess of, the powers of the Assignee;

4.3.7 any other deed, act, omission, failure, matter or thing whatsoever as a result of which, but for this provision, the Tenant would be exonerated either wholly or partly (other than a release executed and delivered as a deed by the Landlord or a release effected by virtue of the 1995 Act)

4.4    **Costs of new lease**

The Landlord's reasonable costs in connection with any new lease granted pursuant to Clause 3 of this Deed shall be borne by the Tenant and paid to the Landlord (together with Value Added Tax) upon completion of such new lease

4.5    **Value Added Tax**

Where, pursuant to the terms of this Deed, the Landlord or the Management Company or any other person (for the purposes of this paragraph 4, the **"Supplier"**) makes or is deemed to make a supply to the Tenant for Value Added Tax purposes and Value Added Tax is or becomes chargeable on such supply, the Tenant shall (in addition to and at the same time as providing any other consideration for such supply) pay to the Supplier a sum equal to the amount of such Value Added Tax and the Supplier shall provide the Tenant with a Value Added Tax invoice in respect of such supply

5.    **[Guarantee**

*[If there is a guarantor, repeat the provisions set out in paragraphs 1 to 9 (inclusive) of Schedule 4]*

6.    **Guarantor to join in new lease**

If the Tenant shall be required to take up a new lease pursuant to Clause 3 of this Deed, the Guarantor shall join in, and execute and deliver to the Landlord a counterpart of, such new lease in order to guarantee the obligations of the Tenant under it in the terms of Schedule 4 to the Lease]

**I N    W I T N E S S**    whereof this deed has been executed by the Tenant and is intended to be and is hereby delivered on the date first above written

## SCHEDULE 9

### EXPERT DETERMINATION

1.    If a Counternotice is served in accordance with Clause 4.21.4, the Landlord's determination shall be reviewed by an independent expert who shall act as an expert and not as an arbitrator and who shall be agreed or appointed in accordance with paragraphs 3 and 4. The expert shall:-

    1.1    give notice to the Landlord and the Tenant inviting each of them to submit representations to him within ten (10) Working Days of the notice

    1.2    give notice to each party offering each party an opportunity to make counter-submissions in respect of any such representations within ten (10) Working Days of such notice

    1.3    provide his decision within ten (10) Working Days of receipt of the counter-submissions and give written reasons for his decision

2.    The decision of any such expert shall be conclusive and binding on the Landlord and the Tenant (save in respect of manifest error or fraud). If any expert so agreed or appointed shall die or become unwilling to act or incapable of acting for any reason or fail to act with reasonable expedition, another such expert may be agreed or appointed in his place in like manner

3.    If and to the extent that the Counternotice requires an expert to review the Landlord's determination that any of the circumstances set out in Clause 4.21.2(a)(i)- 4.21.2(a)(ii) exist, the expert shall be a Chartered Accountant with not less than 10 years' post qualification experience immediately preceding the date of the reference to him appointed by agreement between the Landlord and the Tenant or, in the absence of such agreement within ten (10) Working Days, nominated at the request of either of them by the President for the time being of the Institute of Chartered Accountants in England and Wales (or his duly appointed deputy or any one authorised by him to make appointments on his behalf)

4.    If and to the extent that the Counternotice requires an expert to review the Landlord's determination that any of the circumstances set out in Clauses 4.21.2(a)(iii) - 4.21.2(a)(v) exist, the expert shall be a Solicitor with not less than 10 years' post qualification experience immediately preceding the date of the reference to him appointed by agreement between the Landlord and the Tenant or, in the absence of such agreement within ten (10) Working Days, nominated at the request of either of them by the President for the time being of the Law Society in England and Wales (or his duly appointed deputy or any one authorised by him to make appointments on his behalf)

5.    If and to the extent that the Counternotice requires an expert to review the Landlord's determination that any of the circumstances set out in Clauses 4.21.2(a)(vi) to 4.21.2(a)(vii) exist or that any of the conditions referred to in Clause 4.21.2(b) should

- 107 -

be imposed, the expert shall be a Chartered Surveyor with not less than 10 years' post qualification experience immediately preceding the date of the reference to him appointed by agreement between the Landlord and the Tenant or, in the absence of such agreement within ten (10) Working Days, nominated at the request of either of them by the President for the time being of the Royal Institution of Chartered Surveyors (or his duly appointed deputy or anyone authorised by him to make appointments on his behalf)

6.   The fees payable to the President or any such expert shall be borne and paid by the Landlord and the Tenant in such shares and in such manner as the expert shall determine and failing any such decision in equal shares (and if one party shall pay all the fees it shall be entitled to recover from the other any appropriate share which the other should have paid)

## SCHEDULE 10

### ADDITIONAL COVENANTS TO BE GIVEN BY THE TENANT

### AND AN UNDERTENANT

1.    The Tenant and the undertenant shall each covenant (as a separate covenant) with and declare to the Landlord (as to benefit it and its successors in title):-

1.1    that the Landlord has not agreed whether the annual rent to be firstly reserved by the underlease (the **"Rent"**) is the clear rent reasonably obtainable in the open market for the premises underlet

1.2    for a period of three (3) years from the date of the underlease not to disclose or produce and to use reasonable endeavours not to permit its agents (or professional advisers) to disclose (other than to other agents and professional advisers) any details of the terms of the underlease, the Landlord's consent to such underlease, or the Rent in any discussions, negotiations, third party references, or in any arbitration, or any other proceedings whatsoever relating to the rent reviews of the Demised Premises and/or Adjoining Property and or any building or part of any building on the Estate (as each is defined in the Lease) save where required to disclose the same as a matter of law PROVIDED THAT any breach of this clause will not give rise to the Landlord being able to forfeit the Lease and the Landlord's only claim shall be in damages

1.3    if (notwithstanding paragraph 2) any person is required by law to refer in any way to the underlease and/or the terms thereof, or the Rent, in any submission to, or evidence before, any such third party reference, arbitration or other proceedings, or if the arbitrator or third party otherwise becomes aware of the Rent, then the Tenant and the undertenant shall state to the arbitrator and/or third party that the parties have agreed that the arbitrator and/or third party is not to take into account the Rent

2.    The Tenant agrees and covenants with the Landlord that the Rent shall not be taken into consideration, nor referred to, nor produced as evidence in any discussions or negotiations, or in any third party reference, arbitration, or other proceedings whatsoever relating to rent reviews any of premises of which the Tenant (or any Group Company of the Tenant) is the tenant and the Landlord (or any Group Company of the Landlord) is the landlord

# ANNEXURE
## RENT REVIEW SPECIFICATION

**ANNEXURE**

MINIMUM STANDARD DEVELOPER'S FINISH FOR TENANT WORKS

3/28/01

27 March 2001

# CANARY WHARF

## BUILDING HQ2
## LEHMAN BROTHERS

### MINIMUM STANDARD DEVELOPER'S FINISH

## FOR TENANT WORK

1. **FLOORING**

   1.1   Hewetsons Floors or equal raised access floor shall be installed to suit the building design height for the demised premises (generally 200mm average measured from top of slab to top of raised floor). The performance criteria of the system shall meet the working strength requirements of a medium grade platform specification of the Department of the Environment, Property Services Agency document MOB 08-801. The system shall consist of 600mm x 600mm or 750mm x 750mm fully accessible panels on adjustable jacks.

   1.2   600mm x 600mm carpet tiles shall be installed throughout. Quality to be equal to Heuga Connections, Milliken Corporate Square Nova, Interface Palette 3000 or Sommer Avenue.

2. **CEILINGS**

   2.1   Perforated metal pan 750mm x 750mm or 600mm x 600mm lay-in ceiling, Aluminium Ceiling System 15mm x 8mm aluminium capped steel grid shall be installed throughout the demised premises. Ceiling tiles to be powder coated white finish with 16mm thick mineral wool padding. Quality shall be at least equal to SAS Ceilings System 130.

   2.2   Painted drywall window soffits will be installed at the perimeter of the ceiling system to receive perimeter slot diffusers.

   2.3   Lift lobbies shall have painted drylined ceilings.

3. **LIGHTING**

   3.1   600mm x 600mm deep cell parabolic light fixtures, with electronic control gear, shall be installed to maintain a lighting level of 500 lux average in the office areas.

3.2    Fixtures shall be by Creed Light Engineering Limited or equal. Louvre will be low brightness with iridescent specular (highly polished) high purity aluminium curved profile sides, compound curved profile sides and compound curved profile wedge cross blades designed to meet the requirements of CIBSE LG3 Category 2. Each fixture will be fitted with a 750mm x 750mm surround metal frame to allow installation into 750mm x 750mm (where used) ceiling module.

3.3    Switching in all areas shall be controlled by the DDC electronic controller which is provided as part of the air conditioning terminal temperature control unit.

3.4    Incandescent downlights and/or wall washers shall be installed in each lift lobby.

## 4.    WALL FINISHES

4.1    Perimeter walls, columns and core walls shall be fully drylined, taped and sanded, ready for painting.

4.2    All exposed surfaces of drylining shall receive:

a)    One coat of primer sealer
b)    Two coats of emulsion

4.3    Lift lobbies shall have fabric backed vinyl wall covering, 460 grams, with a flame spread of Class 0 and Class I - Carteret by Helen Sheane Wall covering or equal.

4.4    All drylined partitions will receive 100mm high timber (American Cherry or equal) skirting.

## 5.    PARTITIONS, DOORS AND IRONMONGERY

5.1    Two pairs of glass entrance doors with glazed side screens shall be installed at each lift lobby. Doors and screens can be either frameless or framed in timber or aluminium.

## 6.    SPRINKLER/FIRE PROTECTION

6.1    A system of sprinkler protection shall be installed throughout all areas.

6.2    Flush mounted sprinkler heads, as Reliable Model G4, shall be provided to achieve a design density of Ordinary Hazard Group II, in accordance with the requirements of British Standard 5306 Part 2 and the Landlord's insurance requirements.

6.3    The base building fire alarm system shall be extended to provide coverage throughout all areas and shall comply with the requirements of British Standard

5839 Parts 1 and 4.

6.4     The base building public address system, which forms part of the fire alarm installation, shall be extended to provide the required audibility levels of 65dB(A) in all areas.

## 7.     MECHANICAL

7.1     HVAC systems shall be installed in all office areas, consistent with the design criteria indicated in the "Outline Shell & Core Specification".

7.2     Fan assisted terminal variable air volume (FATVAV) boxes shall be installed to serve all general office areas. Perimeter FATVAV boxes shall be equipped with electrical heating coils. Each FATVAV unit shall be provided with a standalone DDC electronic controller connected to a wall mounted room temperature sensor.

7.3     Thermal loading shall be based on the stated "Shell and Core" mechanical system design load. The perimeter zones shall be provided with a terminal at each corner exposure and one for every, approximately, 6 metres by 4.5 metres. Interior areas shall be provided with one terminal for every, approximately, 81 square metres of net internal area.

7.4     Perimeter zones shall be provided with multi-slot continuous or discrete aluminium supply air diffusers located adjacent to each window module. Interior thermal zones shall be provided with one supply air diffuser for 30 square metres. Return air to the ceiling plenum shall be through the heat extract modular light fittings and supplemented with additional return air grilles.

7.5     Primary supply air trunk duct shall be internally or externally lined rectangular sheet metal connected to the base building system at each core. Terminal units shall be connected to the primary trunk duct with insulated round ducting, rigid or flexible types as appropriate. Branch supply air ducting from each terminal unit shall be internally lined. Sheet metal connections to each air distribution device shall be round, rigid or flexible.

## 8.     ELECTRICAL

8.1     Electrak or equal horizontal underfloor power distribution, shall be installed; approx 4.5m on centre.

8.2    One three compartment floor box per 10m5 (108 sq.ft) of net internal area shall
be installed and located in the raised floor. Floor box shall be located centrally
to one side of the panel. Each floor box to contain:

2 No. Unswitched General Purpose Outlets
2 No. Data Blanks
2 No. Telephone Blanks
1 No. 3m tail

Floor boxes manufactured by Thorsman or equal.

# 9    STATUTORY SIGNS/TENANT SIGNS

9.1    Internal signs to exit and hose reels shall be installed as necessary to comply with
statutory and local authority requirements.

# 10    WINDOW COVERING

10.1    25mm wide horizontal solid aluminium slat, silver window blinds manufactured
by Claxton Blinds or equal shall be installed at all perimeter windows.

Signed as a deed by **LEHMAN BROTHERS**                    )
**LIMITED** acting by its attorney                         )
        in the presence of:                  )


Signature of witness:

Name:

Address:


Signed as a deed by **LEHMAN BROTHERS**                    )
**HOLDINGS INC.** a company incorporated in the            )
United States of America by ..............................  )
being a person who, in accordance with the laws of that    )
territory, is acting under the authority of the company    )
in the presence of:                                        )


Signature of witness:

Name:

Address: