UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x
In re                                                          :   Chapter 11
                                                               :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                       :   Case No. 08-13555 (JMP)
                                                               :
                                     Debtors.                  :   Jointly Administered
                                                               :
---------------------------------------------------------------- x

## DECLARATION OF ANTHONY JORDAN

Anthony Jordan hereby declares as follows:

1.  I am the Vice President of Business Development at Canary Wharf Group plc ("CWG"), the parent company of Claimants Canary Wharf Management Ltd., Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited (collectively, "Canary Wharf"). I submit this declaration based on my understanding of the facts and discussions that I have had with (and information I have received from) colleagues within CWG, and to the best of my knowledge and belief, to provide the Court with certain facts relating to Canary Wharf's damages after the administrators of Lehman Brothers Limited ("LBL") stopped paying rent for the property at 25 Bank Street, Canary Wharf, London, England as of March 31, 2010.

2.  I joined CWG in 1989, and have worked continuously in my current position since the late 1990s. In my capacity as Vice President of Business Development, I lead a team of ten employees, who are tasked with, among other things, analysis and initiation of potential real estate developments, establishment of technical standards for each new development, and assisting with the marketing of CWG's new properties to potential tenants. In the course of my duties, I am also involved in many other CWG business activities. I report directly to CWG's Chairman and Chief Executive Officer, Sir George Iacobescu, CBE. In addition to my work at CWG, I am a director of two separate entities engaged in real estate

development, one being a joint venture in which CWG is a 50% partner, the other being a joint venture in which CWG has recently acquired the other partner interests.

*LBL's Default Under the Lease*

3. Canary Wharf, LBL and Lehman Brothers Holdings Inc. ("LBHI"), entered into a lease dated March 16, 2005 (the "Lease"), for the property at 25 Bank Street in London, England, which primarily consists of a 30-floor office building providing more than one million square feet of office and ancillary space.

4. LBHI declared bankruptcy in the United States and LBL entered administration in the United Kingdom in September 2008. At that time, the amounts payable under the Lease were substantially above market. In view of the fact that LBL was liquidating its business, it was clear that LBL's administrators would vacate the property and stop paying the amounts due under the Lease as soon as practicable.

5. LBL's administrators vacated the building in March 2010. LBL's administrators stopped paying rent and other amounts due under the Lease as of March 31, 2010. LBHI has not paid any amounts due under the Lease.

6. After LBL's administrators vacated the building, Canary Wharf Contractors Limited ("CWCL") analyzed the condition of the building. CWCL determined that the building had not been left in the condition specified in the Lease, which is described in the "Minimum Standard Developer's Finish for Tenant Work" Annexure of the Lease, a copy of which is attached hereto as Exhibit A. The Annexure provides for the building to be in a condition that is customary in the UK for offering to new tenants. The Annexure includes specifications for, among other things, the building's raised flooring, ceilings, lighting, wall finishes, lift lobby doors, sprinklers, mechanical and electrical systems and window blinds.

The portions of a building that fall below the specified condition in a lease are often referred to in UK real estate parlance as "dilapidations."

*Canary Wharf's Efforts to Mitigate Its Losses*

7. In order to reduce its losses, Canary Wharf sought a new tenant for the 25 Bank Street property. In March 2010, Canary Wharf began negotiations with JPMorgan Chase Bank, N.A. ("JPMorgan") to take a long-term lease. In August 2010, JPMorgan and Canary Wharf signed a memorandum of understanding, which included the primary economic terms under which JPMorgan would take a 999-year lease of the property. The parties agreed that JPMorgan would take the 25 Bank Street building on an "as is" basis, meaning that JPMorgan would be responsible for any repairs or construction necessary to fix dilapidations. During negotiations, Canary Wharf estimated the amount of these dilapidations and analyzed how much to reduce an upfront payment to be made by JPMorgan to Canary Wharf at the time the lease was signed.

8. The memorandum of understanding provided that JPMorgan would make an upfront payment of £495 million and that CWCL would complete up to £25 million in repairs of a limited set of certain specified dilapidations (not all those required) as well as certain improvements to the building at no cost to JPMorgan. The net value to Canary Wharf of the deal thus would have been £470 million.

9. JPMorgan, certain of its affiliates and Canary Wharf affiliates executed a 999-year lease (the "JPM Lease") and an agreement relating to the lease, both dated December 20, 2010. The upfront payment to Canary Wharf from JPMorgan totaled £470 million. The amount of this payment took into account the cost to repair dilapidations to

the building, which CWCL estimated to be £56,145,280.45 in September 2010. (*See* ¶ 17, below.)

*Canary Wharf's Damages Resulting from LBL's Default*

10.  Canary Wharf's damages from LBL's default under the Lease are composed of the following, which are described in more detail below: (i) amounts that were owed by LBL pre-forfeiture less payments by LBL, its administrators and subtenants; and (ii) the present value of what Canary Wharf would have received under the Lease after forfeiture, plus the value of the building on expiry of the Lease, less what it has received or will receive from JPMorgan (net of Canary Wharf's costs to complete the JPMorgan deal). I also set forth separately Canary Wharf's calculation of the costs of dilapidations in September 2010, which Canary Wharf considered in analyzing the value of the property and agreeing to the £470 million upfront payment by JPMorgan.

11.  *Amounts Owed Pre-forfeiture.* For the period September 2008 through December 31, 2010, LBL owed £131,784,619.28 in rent, insurance and estate service charges under the Lease. Canary Wharf, however, received only £49,616,818.20 from LBL and its administrators. During this period, Canary Wharf also received £51,903,248 in total from subtenants Nomura International plc, the New York Stock Exchange, and Jones Lang LaSalle. Nomura occupied a portion of the building from January 2009 to September 2010, while JLL and the NYSE each occupied a portion of the building from September 2008 through December 2010. Amounts for taxes were also due under the Lease, but those amounts were paid by LBL, its administrators or the subtenants. No building service charges

were payable in this period. Thus, £30,264,553.08 was not paid under the Lease through December 31, 2010.[1] This is $48,556,448.96 using a current exchange rate.[2]

12.  ***Amounts that Would Have Been Paid Post-forfeiture.***  The Lease provided that, for the period from January 1, 2011 through the end of the Lease term, LBL was to pay £1,383,222,418 in rent. Using a discount rate of 4.75% -- which reflects a reasonable market rate based on the quality of the building and the lease terms -- the December 2010 value of this figure is £861,552,088.39.

13.  The JPM Lease and the agreement relating to the lease provide for JPMorgan to make an upfront payment of £470 million in December 2010 (which JPMorgan in fact made). The JPM Lease also provides for yearly ground rent of £1,000. Using the same discount rate of 4.75%, the December 2010 value of the £1,000 annual payments totals £21,096.47. In completing the JPMorgan deal, Canary Wharf also incurred £6,006,672 in costs, including retenanting costs and closing costs. Thus, the difference between the amounts LBL was to pay under the Lease and the amounts received, or to be received from, JPMorgan (net of Canary Wharf's costs) is £397,537,663.92, or $637,809,427.99 using a current exchange rate.

14.  Canary Wharf's damages for amounts that would have been paid after forfeiture (*i.e.*, after December 3, 2010) also must take into account the difference for when the building would be returned to Canary Wharf. Under the Lease, Canary Wharf would have retaken possession of the building as of July 2033, whereas the JPM Lease expires in December 3009.

---

[1] This total includes £1,759,754.10 in estate service charges.

[2] To calculate damages in dollars, the British pound amounts are converted using the exchange rate of $1.6044 per pound current as of October 11, 2012. Currencies, THE WALL STREET JOURNAL, Oct. 12, 2012, at C4.

15. Canary Wharf's damages for amounts to be paid after forfeiture thus are the difference between (a) the aggregate present value of (i) the amounts to be paid by LBL under the Lease plus (ii) the building in July 2033, and (b) the present value of (i) amounts that were paid or are to be paid by JPMorgan less (ii) Canary Wharf's costs to complete the JPMorgan deal.[3]

16. ***Dilapidations***. In determining the upfront payment to be made by JPMorgan, Canary Wharf took into account that LBL had not brought the building into the condition specified in the Lease and that JPMorgan would take the property "as is." In September 2010, CWCL budgeted how much it would cost to bring the building into the condition specified in the Lease by examining the amounts it budgeted to complete similar dilapidations work in other buildings it owned.

17. CWCL concluded that it would have cost £56.35 per square foot to bring the building into the condition specified in the Lease. First, Canary Wharf would "strip out" LBL's fit out of the office space in the building, which would have included, among other things, demolition and furniture removal. CWCL estimated that this would have cost £11.35 per square foot as set forth in the schedule attached as Exhibit B.[4] Second, Canary Wharf would have had to put the building into the condition specified by the Lease. This would have included repairs and construction work on the ceilings, floors, electrical systems, lighting and air conditioning. CWCL estimated that this would have cost £45 per square foot

---

[3] The other amounts due under the Lease -- service charges, taxes, insurance and repair and maintenance (including Mechanical & Electrical ("M&E") Replacement Costs) -- are to be paid by JPMorgan.

[4] The September 2010 estimate from CWCL was based on a slightly higher net internal area (998,878 sf rather than 996,367 sf), an error which was discovered during the evaluation of the JPMorgan transaction in 2010 and that I have corrected in Exhibit B.

as set forth in the schedule attached as Exhibit C. At 996,367 square feet of office net internal area (*i.e.*, the usable office space in the 25 Bank Street building), the total cost would have been £56,145,280.45, or $90,079,487.95 using a current exchange rate. Canary Wharf incorporated these dilapidations estimates into its analysis of the value of the 25 Bank Street property and the amount it would accept as an upfront payment from JPMorgan.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in London, England on October 12, 2012.

_____
Anthony Jordan