1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555(JMP)

4   Adv. Case No. 08-01420(JMP)(SIPA)

5   Adv. Case No. 12-10063(JMP)

6   Adv. Case No. 09-01062(JMP)

7   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

8   In the Matter of:

9

10  LEHMAN BROTHERS HOLDINGS INC., et al.,

11

12         Debtors.

13  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

14  In the Matter of:

15

16  LEHMAN BROTHERS INC.,

17

18         Debtor.

19  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20  In the Matter of:

21

22  LEHMAN BROTHERS AUSTRALIA LIMITED,

23

24         Debtor.

25  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

1    TURNBERRY CENTRA SUB, LLC, et al.,

2                    Plaintiffs,

3            v.

4    LEHMAN BROTHERS HOLDINGS, INC., et al.,

5                    Defendants.

6    - - - - - - - - - - - - - - - - - - - - - - - - - - x

7                    U.S. Bankruptcy Court

8                    One Bowling Green

9                    New York, New York

10

11                   October 10, 2012

12                   10:04 AM

13

14   B E F O R E :

15   HON JAMES M. PECK

16   U.S. BANKRUPTCY JUDGE

17

18

19

20

21

22

23

24

25

1   Hearing re:  Lehman Brothers Special Financing Inc. Working

2   Group's Application for Entry of an Order, Pursuant to 11

3   U.S.C. §§ 503(b)(3)(D) and 503(b)(4) for Allowance and

4   Reimbursement of Reasonable Professional Fees and Actual,

5   Necessary Expenses in Making a Substantial Contribution in

6   These Cases [ECF No. 29239]

7

8   Hearing re:  Application of the Ad Hoc Group of Lehman

9   Brothers Creditors for Compensation for Professional

10  Services Rendered by, and Reimbursement of Actual and

11  Necessary Expenses of, Its Professionals Pursuant to Section

12  503(b) of the Bankruptcy Code Rendered by, and Reimbursement

13  of Actual and Necessary Expenses of, Its Professionals

14  Pursuant to Section 503(b) of the Bankruptcy Code [ECF No.

15  29195]

16

17  Hearing re:  Lehman Brothers Inc. Status Conference

18

19  Hearing re:  In re Lehman Brothers Australia Limited Status

20  Conference

21

22  Hearing re:  Motion of Fidelity National Title Insurance

23  Company to Compel Compliance with Requirements of Title

24  Insurance Policies [ECF No. 11513]

25

Page 4

1   Hearing re:  Motion of Monti Family Holding Company, Ltd for

2   Leave to Conduct Rule 2004 Discovery of Debtor Lehman

3   Brothers Holdings, Inc. and Other Entities [ECF No. 16803]

4

5   Hearing re:  Amended Motion of Giants Stadium LLC for Leave

6   to Conduct Discovery of Debtors Pursuant to Federal Rule of

7   Bankruptcy Procedure 2004 [ECF No. 31105]

8

9   Hearing re:  Amended Motion of IronBridge Homes, LLC, et al

10   for Relief from the Automatic Stay [ECF No. 23551]

11

12   Hearing re:  Turnberry Centra Sub, LLC, et al, v. Lehman

13   Brothers Holdings Inc., et al. [Adversary Case No. 09-01062]

14

15   Hearing re:  Cardinal Investment Sub I, L.P. and Oak Hill

16   Strategic Partners, L.P.'s Motion for Limited intervention

17   in the Contested Matter Concerning the Trustee's

18   Determination of Certain Claims of Lehman Brothers Holdings

19   Inc. and Certain of its Affiliates [LBI ECF No. 4634]

20

21   Hearing re:  Motion of FirstBank Puerto Rico for (1)

22   Reconsideration, Pursuant to Section 502(j) of the

23   Bankruptcy Code and Bankruptcy Rule 9024, of the SIPA

24   Trustee's Denial of FirstBank's Customer Claim, and (2)

25   Limited Intervention, Pursuant to Bankruptcy Rule 7024 and

1    Local Bankruptcy Rule 9014-1, in the Contested Matter

2    Concerning the Trustee's Determination of Certain Claims of

3    Lehman Brothers Holdings Inc. and Certain of Its Affiliates

4    [LBI ECF No. 5197]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Melissa Looney

Page 6

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES LLP

3          Attorneys for Debtors

4          767 Fifth Avenue

5          New York, NY 10153-0119

6

7    BY:  AMANJIT S. ARORA, ESQ.

8          RICHARD W. SLACK, ESQ.

9

10   KIRKLAND & ELLIS LLP

11         Attorney for Lehman Brothers Australia

12         300 North LaSallie Street

13         Chicago, IL 60654

14

15   BY:  JEFFREY W. GETTLEMAN, ESQ.

16

17   WHITE & CASE LLP

18         Attorney for Lehman Brothers Bondholders

19         1155 Avenue of the Americas

20         New York, NY 10036-2787

21

22   BY:  J. CHRISTOPHER SHORE, ESQ.

23

24

25

Page 7

1    DAVIS POLK & WARDWELL LLP

2        Attorney for Lehman Brothers Europe Inc.

3        450 Lexington Avenue

4        New York, NY 10017

5

6    BY:  TIMOTHY GRAULICH, ESQ.

7

8    LINKLATERS, LLP

9        Attorney for Lehman Brothers Europe Inc.

10       1345 Avenue of the Americas

11       New York, NY 10105

12

13   BY:  JAMES R. WARNOT, JR., ESQ.

14

15   HUGHES HUBBARD & REED LLP

16       Attorney for the SIPA Trustee

17       One Battery Park Plaza

18       New York, NY 10004-1482

19

20   BY:  JAMES B. KOBAK, JR. ESQ.

21

22

23

24

25

Page 8

1    SIMPSON THACHER & BARTLETT LLP

2          Attorneys for Blackstone

3          425 Lexington Avenue

4          New York, NY 10017-3954

5

6    BY:  MARK J. THOMPSON, ESQ.

7          NICHOLAS LEON, ESQ.

8

9    UNITED STATES DEPARTMENT OF JUSTICE

10          Attorneys for the United States Trustee

11          33 Whitehall Street, 21st Floor

12          New York, NY 10004

13

14    BY:  ANDREA B. SCHWARTZ, ESQ.

15          SUSAN GOLDEN, ESQ.

16

17    MILBANK, TWEED, HADLEY, & MCCLOY LLP

18          Attorney for the Official Committee

19          One Chase Manhattan Plaza

20          New York, NY 10005-1413

21

22    BY:  DENNIS C. O'DONNELL, ESQ.

23

24

25

Page 9

1    SIPC

2        805 15th Street, N.W.

3        Suite 800

4        Washington, D.C. 20005-2215

5

6    BY:  KENNETH J. CAPUTO, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 10

1                    P R O C E E D I N G S

2            THE COURT:  Be seated.  Good morning.

3            MR. KOBAK:  Your Honor, James Kobak, Hughes

4    Hubbard & Reed for the SIPA Trustee.

5            We've agreed that our one matter could go first

6    because the only matter on our calendar is a status report,

7    which I can make very briefly and very positively, which is

8    to confirm what's already been reported in the press and is

9    on our website that we do indeed have an agreement in

10   principle with LBIE which we're all now in the process of

11   working furiously to document and so forth.

12           Papers with respect to the transaction will be

13   filed before the end of the year along with related motions

14   with respect to allocation of property and post dividend --

15   post filing date dividend and interest.

16           The motion that precipitated this conference was

17   Elliot's motion, which is scheduled for November 14th.

18   We've agreed with them and they're here in court today to

19   postpone the hearing date, if any, on that until the omnibus

20   calendar on December 12, if that's acceptable to Your Honor.

21           THE COURT:  It's perfectly acceptable.

22           MR. KOBAK:  And that concludes my report, Your

23   Honor.

24           I think there are a number of us, if possible, who

25   would like to be excused so we can go back to being

Page 11

1      scriveners.

2                THE COURT:  And so that you can avoid any further

3      public statements on the subject.  Sir, you're all excused.

4                MR. KOBAK:  Thank you very much, Your Honor.

5                (A chorus of thank you)

6                THE COURT:  And thank you for your good work in

7      getting this documented.

8                MR. ARORA:  Good morning, Your Honor.  Amanjit

9      Arora of Weil Gotshal and Manges on behalf of LBHI and some

10     of its affiliates.

11               On today's agenda there are a few uncontested

12     503(b) substantial contribution applications.  If it's okay

13     with Your Honor I'll cede the podium to the applicants.

14               THE COURT:  Fine.  We should hear from the

15     applicants.

16               MR. THOMPSON:  Good morning, Your Honor.  I'm Mark

17     Thompson of Simpson Thacher.  I appear on behalf of

18     Blackstone Advisory Services.  With me in the courtroom is

19     Nicholas Leon (ph) a senior managing director of Blackstone

20     Advisory Services.

21               The application I'm here in respect of is the

22     Lehman Brothers Special Financing, Inc., working group's

23     application for entry of an order granting an application

24     for a substantial contribution in the approximate amount of

25     $13.7 million.

1          The application was filed by several law firms who

2     represented the individual creditors in that working group.

3     They have asked me -- since the principle economics of the

4     application are Blackstone's -- they have asked me as

5     counsel to Blackstone to appear today in support of the

6     application.

7          There was one objection filed, that was the

8     objection of the United States Trustee, that was filed in

9     August.

10          Since August, Blackstone has engaged in settlement

11     discussions with the United States Trustee.  There were at

12     least three and perhaps four discussions.  They took place

13     over the month of September and most recently into October

14     and we have resolved, we believe, the issues that the United

15     States Trustee had raised.

16          The resolution is to reduce the amount of the

17     substantial contribution request by $1 million from 13.7 to

18     $12.7 million.

19          Among the applicants -- as among the applicants,

20     that reduction is being borne by the individual creditors

21     and not by Blackstone.  Blackstone would be paid its full

22     fee.

23          The application originally called for the

24     applicants to be reimbursed for approximately $2.1 million

25     of fees that they had already paid to Blackstone.  They will

1      now receive $1.1 million in reimbursement of that.

2              I am -- I do not believe that there are any

3      counsel to the individual creditors present here today, but

4      I do know from personal observation that the order was sent

5      to them, that they were told that it would occur, that it

6      would be presented today, and I don't believe any of them is

7      here to object to that, Your Honor.

8              I've also been told that Your Honor may desire to

9      have a bit of a statement put on the record in support of

10     the application.  If that's true, I'm prepared to do so,

11     otherwise, I am prepared to rest on the allegations in the

12     application, which are uncontested as to matters of fact.

13             THE COURT:  I think it would be useful if you're

14     prepared to put a statement on the record for me to hear

15     what you have to say.

16             This is a highly unusual request in that there are

17     legal issues that were raised in the objection of the U.S.

18     Trustee.

19             The withdrawal of that objection in recognition of

20     the voluntary reduction of a million dollars in the request

21     doesn't really obviate my obligation to independently assess

22     the application and to also consider the legal grounds that

23     support it.

24             So I think it would be very useful if you made

25     whatever showing you believe appropriate under the

Page 14

```
 1   circumstances.

 2          MR. THOMPSON:  Yes, Your Honor, and just to --

 3   before I do so, as part of the settlement negotiations

 4   Blackstone and the working group never filed a response to

 5   the legal issues that were presented in the objection.  That

 6   was part of our amicable discussions, if you will, was not

 7   to carry the legal issues any further.

 8          THE COURT:  It would have been helpful to the

 9   Court had you done so.

10          MR. THOMPSON:  So -- well, you know, our view is

11   that achieving a settlement was in itself had intrinsic

12   benefits of its own and I hope that will be the Court's

13   final assessment of it.

14          But let me proceed if I may to the -- to a

15   statement in support of the application.

16          As Your Honor obviously knows, and I apologize to

17   the extent that this is redundant from Your Honor's personal

18   knowledge, but I'll try to make a reasonably comprehensive

19   statement.

20          These were jointly administered cases with respect

21   to all the debtors.  Notwithstanding that, the debtor, LBSF,

22   was a extraordinarily large Chapter 11 case of its own.  It

23   did not have a separate debtors' counsel or separate

24   creditors' committees counsel.

25          It held approximately $72 billion of financial
```

1   inventory at the time of filing, principally comprised of

2   derivative positions.  There were over $1 trillion, I

3   believe over $1.2 trillion of proofs of claim filed against

4   LBSF as a separate standalone -- I'm sorry against the

5   debtors and against Lehman Brothers SF there were

6   approximately $74 billion of derivative transactions that

7   were filed as proofs of claim.

8          So this is -- had there not been an LBHI

9   bankruptcy this would have been the largest bankruptcy of

10  all time by itself.

11          In late 2009, approximately a year or so after the

12  cases had commenced, the working group coallesed for the

13  purposes of ensuring that the interests of all LBSF

14  creditors, standalone creditors or standalone claims, were

15  effectively represented in this case.  The working group was

16  not co-extensive with the universe of LBSF creditors, but

17  represented numerous large creditors.

18          And as was disclosed in the application, the

19  membership of that group was informal and shifted from time

20  to time as people sold or acquired further positions.

21          The working group had separate counsel.  Each

22  member of the working group had separate counsel.  There was

23  no common counsel.  At the same time, from an efficiency

24  standpoint, obviously having a single financial advisor was

25  helpful to them and made for a more efficient dialog with

Page 16

1    the debtors' estates, a benefit to the debtors and other

2    parties in interest.

3            Accordingly, in the spring of 2010 they hired

4    Blackstone to be the sole financial advisor to this diverse

5    group of large creditors of LBSF.

6            THE COURT:  Can I just ask a question about how

7    this retention actually worked?  Because the working group

8    membership changed over time.  People came into the group,

9    others left the group, yet Blackstone had a role for the

10   group as it was constituted at any particular point in time.

11   Presumably there were agreements among the parties as to

12   compensation of Blackstone as financial advisor for the

13   group.  How did that work?

14           MR. THOMPSON:  There is an agreement, Your Honor,

15   and it is attached as an exhibit to the application.

16           THE COURT:  Yes, but how did it work in practice

17   when on one hypothetical month the group might include

18   different members than on another hypothetical month and

19   work was being performed for the group in both months?

20           MR. THOMPSON:  Yes.  I think that as a practical

21   matter, as is common in investment banker engagements, the

22   vast bulk of the compensation was deferred until the end of

23   the case.

24           I believe that more than -- if I can do the math

25   quickly in my head -- certainly more than 80 percent of the

Page 17

1   compensation was deferred and was not up fronted to be

2   reimbursed, but was simply deferred with the idea that

3   Blackstone would submit its -- or that they would submit a

4   substantial contribution application and the debtor,

5   assuming it were granted, would write one check for that

6   deferred amount rather than each institution having to go to

7   its, you know, accounting department every month and write,

8   you know -- get authorization every month to write a check

9   and then come into court and have the debtor send them all

10  23 different checks of varying amount.  So --

11          THE COURT:  So is it fair to characterize the

12  substantial contribution claim as a success fee?

13          MR. THOMPSON:  I would say that it is a successful

14  engagement.  I would say that it is not our view that it is

15  a success fee, although I do believe the success has

16  occurred.

17          It is simply typical in these engagements, both in

18  and out of Bankruptcy Court, to defer the compensation, the

19  bulk of it to the end to incentivize the financial advisor

20  to pursue the most efficient resolution of the case, which

21  benefits obviously the clients as well as the estates and

22  other parties in interest.

23          THE COURT:  But that deferred compensation is not

24  fixed, it's contingent.

25          MR. THOMPSON:  It is fixed, Your Honor.  It is --

```
 1              THE COURT:  Well, what if there's no success?

 2              MR. THOMPSON:  It's a fixed amount of eight and a

 3    half million dollars.

 4              THE COURT:  What if the case liquidated without a

 5    plan?  What happens then?

 6              What if the case converted to Chapter 7?

 7              MR. THOMPSON:  It is not payable in a Chapter 7,

 8    but I don't believe that that's --

 9              THE COURT:  Well, it's --

10              MR. THOMPSON:  -- the facts that we're here on

11    today.

12              THE COURT:  Well, I'm just trying to understand a

13    little bit more about Blackstone's expectations with respect

14    to the fee and whether or not it's fair or unfair to

15    characterize it as a success fee based upon how the case

16    turns out.

17              MR. THOMPSON:  Well, again, however the case has

18    turned out in a certain manner.  That manner satisfies the

19    term of the engagement.  I think it is safe to say

20    Blackstone has had throughout this process an expectation

21    that there would be a confirmed Chapter 11 case and that its

22    fee would be paid upon conclusion of that by its clients or

23    by the estates.

24              There were certain contingencies based on whether

25    or not there was a -- which would really relate to how much
```

Page 19

1    work was going to be done -- was there -- as was the case --

2    a need to have plan litigation or to file a separate plan

3    after exclusivity ended.  That was a contingency which

4    happened to have occurred.  Had there been a completely

5    consensual plan, one plan no (indiscernible - 00:12:36) is

6    ever proposed to the Court the fee would have been

7    different.

8            So there were some contingencies, but they -- the

9    fee that is asked for reflects the full satisfaction of the

10   contingencies in the engagement letter.

11           THE COURT:  Okay.

12           MR. THOMPSON:  So after Blackstone was retained in

13   the spring of 2010 it began working very hard on behalf of

14   these many, many creditors.  And its various services. if I

15   may briefly describe them. consisted of helping to resolve

16   -- and I think this is one of the most important points for

17   the estates and the benefit to others -- helping to resolve

18   the complex valuation and quantifications of their clients'

19   claims.  Because each client had an individual interest to

20   maximize its own recovery, but at the same time they all

21   collectively had an interest to resolve their disputes with

22   the estates -- as did the estates and the other creditors --

23   in order to get the distributions out and to maximize value

24   and not fritter them away in professional fees.

25           THE COURT:  If I could just make a slight inquiry

1    as to what you just said.  How do you know that?

2            How do you know what you've just said and how do

3    you know that's a true statement about the mental states of

4    this group and you're here representing Blackstone --

5            MR. THOMPSON:  That's correct.

6            THE COURT:  -- not the group.

7            MR. THOMPSON:  That's correct.

8            The answer is -- if Your Honor needs me to I could

9    put Mr. Leon on the stand and simply take him through that

10   and he could speak to his personal observations, et cetera,

11   but it is the -- what I was describing in terms of the

12   interests of the clients are economic interests, not state

13   of mind.

14           Their economic interest is to maximize their

15   claim, and I respectfully submit this is something that from

16   experience the Court could take judicial notice of.  The

17   clients, as individuals, seek to maximize the interests of

18   their claims, the size of their claims, but at the same time

19   the collective goal of Chapter 11 is to reorganize the

20   company in a reasonably efficient period of time.

21           So I was not trying to speak to them subjectively,

22   I was trying to speak to what I thought was sort of a

23   conventional economic interest that creditors have in a

24   bankruptcy case.

25           THE COURT:  So it's more hypothetical than

Page 21

1    specific to this case?

2              MR. THOMPSON:  I would describe it as a general

3    principle that is applicable in most bankruptcy cases and

4    this would be a specific example of that general principle.

5              THE COURT:  In terms of your own opportunity to

6    observe creditor behavior, were you personally involved in

7    the work of the working group or were you simply --

8              MR. THOMPSON:  Of course not, Your Honor.

9              I'm Blackstone's counsel and I did not attend the

10   meetings at which these creditors were negotiating with

11   Blackstone.

12             THE COURT:  I'm sorry, you did or did not?

13             MR. THOMPSON:  Did not.

14             THE COURT:  Okay.

15             MR. THOMPSON:  And again, if Your Honor feels it's

16   necessary to make a record, Mr. Leon could testify to his

17   personal activities and involvement.

18             THE COURT:  I'm just hearing your statement and

19   reacting to things that occur to me as I'm hearing your

20   statement.

21             MR. THOMPSON:  Sure.

22             THE COURT:  This is all free form.  There's --

23             MR. THOMPSON:  Sure.

24             THE COURT:  -- we don't know yet what's going to

25   happen, do we?

1          MR. THOMPSON:  I certainly do not, Your Honor.

2          As part of its services, Blackstone developed for

3     use among the working group and for sharing with the

4     debtors, which have been sharing with Alveraz & Marsal, et

5     cetera, a complex financial recovery model which showed the

6     recoveries of LBSF creditors vis-à-vis the estate under

7     various scenarios, substantive consolidation, non-

8     consolidation, and alternatives.  This was extremely

9     complex, but it was shared with the debtors and the

10    unsecured creditors' committee in this case.

11         What it allowed was for the working group to

12    analyze -- not unlike what would happen if a committee

13    financial advisor was sharing work with its committee -- to

14    analyze potential settlement mechanisms that could bridge

15    the positions that were being negotiated with the ad hoc

16    committee and with the estate's professionals.

17         And this recovery model, it is submitted and on

18    this record as uncontested, was instrumental in aiding the

19    settlement negotiations with the debtors and the other

20    parties in interest and was in fact used in those settlement

21    negotiations.

22         As Your Honor will recall, consolidation or non-

23    consolidation was a critical issue in the case and it was

24    necessary to analyze intercompany claims, guarantee claims,

25    et cetera, as well as the size of the individual derivative

Page 23

1    claims.

2            There was a term sheet which was produced by the

3    working group and proffered to the debtors in 2010 and this

4    reflected the work product of Blackstone with its clients.

5            As Your Honor knows, an ad hoc group was formed at

6    the holding company level, which subsequently proposed its

7    own plan, and then massive settlement negotiations occurred

8    in the second and third quarter of 2011.

9            There were -- at points according to my client --

10   over 125 different individuals attended these negotiations,

11   including principals for the major creditors as well as

12   attorneys and financial advisors.  There were two formal

13   sessions and countless hours of negotiations.

14           Blackstone was involved in all of the negotiations

15   where the working group was present.  Certain members of the

16   working group were present, but some were not present.  In

17   many ways, Blackstone was the point person for the financial

18   aspects of analyzing and negotiating the comprehensive

19   settlement that enabled the plan to be confirmed in the time

20   in which it was confirmed.

21           As Your Honor recognized at the confirmation

22   hearing the achieving of a consensual settlement among so

23   many large creditors enabled the case to be confirmed in

24   what for the size of the case was an amazingly efficient

25   period of time.

Page 24

```
 1              And it is estimated, based on the run rate of
 2    professional expenses prior to the settlement, that as much
 3    as -- at least $200 million and as much as $400 million was
 4    likely saved to the estate by achieving a consensual
 5    resolution at that point rather than proceeding to a
 6    litigation of the various competing claims.
 7              While Blackstone does not take credit and no
 8    individual party or professional could take credit for the
 9    settlement, Blackstone's clients submit -- have submitted to
10    this application, and certainly Blackstone believes, that
11    its work was a major contributor to the efficiency with
12    which the settlement was achieved, because they worked not
13    just with the other constituencies to resolve issues between
14    the working group and those other constituencies, behind the
15    scenes, they worked within their constituency to resolve the
16    size and quantification of the derivative claims which
17    further reduce major claim litigation in these cases with
18    those major institutions.
19              Your Honor, that is all I would propose to present
20    in the way of facts.
21              Now, the question is raised as to legal argument.
22    This is an uncontested matter.  Our discussions with the
23    U.S. Trustee, we agreed this case would not serve as
24    precedent for any other situations and that's reflected in
25    the order, by the way, that this is a sui generis case, it's
```

Page 25

1    a very -- one of the most unusual cases in American

2    bankruptcy history, and as a result, you know, without

3    saying anything more, we've agreed with them as parties, not

4    to present the legal issues.

5            But if the Court needs legal argument, then you

6    know, if the Court believes that there's an open legal issue

7    that needs to be addressed, then I'm not going to abandon

8    the argument and abandon my client, but I don't want to

9    violate my agreement with the United States Trustee.  It was

10   really a policy issue that we decided we would just -- it

11   would not be litigated in this particular case.

12           THE COURT:  Well, let me respond to that and

13   perhaps also I should hear from counsel for the U.S. Trustee

14   with respect to the things I'm thinking about.

15           It was my understanding when the U.S. Trustee

16   filed its objection to the various substantial contribution

17   applications that certain of those objections related to

18   quantum and reasonableness of the amount being sought.  And

19   certain of the objections related to legal entitlement given

20   the language of 503(b)(4).

21           And speaking for myself, I was surprised when I

22   received the pleading from the U.S. Trustee's Office

23   indicating that this matter had been resolved purely on an

24   economic basis.

25           In other words, the agreement by Blackstone to

1    voluntarily subtract a million dollars from the claim, as

2    you described in your opening presentation, apparently

3    represented a sufficient concession to resolve the issue.

4    And so looking at this purely as a procedural matter, at

5    this moment, what had been a contested matter is no longer a

6    contested matter, although it's listed on the agenda as a

7    contested matter.

8            But I was then left with the problem that

9    bankruptcy judges occasionally face.  Well, what does the

10   statute mean and how should it be properly interpreted under

11   these circumstances?

12           And so without the guidance of formal briefing I

13   spent some time thinking about the issue.  And we did some

14   of our own research and we looked at some of the cases that

15   have dealt with this in this jurisdiction and in other

16   jurisdictions.  And we have pondered collectively what I

17   believe to be a somewhat difficult statutory construct which

18   becomes even more difficult when its compared and contrasted

19   with Section 330 of the Bankruptcy Code, which lists a broad

20   category of professional persons whereas 503(b)(4) appears

21   to limit reasonable compensation for professional services

22   to those rendered by an attorney or an accountant.

23           In trying to construe 503(b)(3) and 503(b)(4)

24   together it is possible for a reasonable mind to come to two

25   different conclusions.

Page 27

1          One conclusion is that the drafters of the Code

2    deliberately limited the category of qualifying

3    professionals to attorneys and accountants for purposes of a

4    substantial contribution claim.

5          Another is that under 503(b)(3) expenses that are

6    necessary are expenses that are compensable expenses to a

7    creditor or a creditor group that qualifies for a

8    substantial contribution.  But that then raises the

9    question, what kinds of expenses are those and are financial

10   advisor expenses -- expenses like flying in an airplane to

11   New York to attend a meeting -- or are they more like the

12   expenses of an attorney that bills by the hour?

13         The point of this colloquy is to let you know that

14   I've thought about this and have my own perspectives on it,

15   but it would be useful, and I think for record purposes,

16   essential to hear your legal argument as to why -- even

17   though this is being limited as a non-precedential special

18   case -- it is nonetheless in your view perfectly appropriate

19   construing the Bankruptcy Code as its written to give your

20   client millions of dollars of compensation.

21         MR. THOMPSON:  Right, Your Honor.  So keeping -- I

22   want to stay for the moment within the spirit of the

23   settlement that we negotiated with the United States

24   Trustee's Office.  And I want to pick up on something that

25   Your Honor said earlier in the colloquy which is that

1   reasonable people could differ.

2          This is a difficult issue.  There are no

3   authoritative or controlling cases, if I may, no controlling

4   opinions in this circuit on this subject.

5          THE COURT:  I perfectly accept that.  In fact one

6   of my legal conclusions, having reviewed the applicable law

7   in this area, is that there is no controlling precedent.

8          MR. THOMPSON:  Yes.  And so again, since I'm here

9   with respect to an order that has been settled with the

10   objector, and again, we have a long standing relationship

11   with the Office of the U.S. Trustee whom we regard as our

12   regulator and we try to make sure that we are faithful to

13   our agreements, Blackstone has agreed to a settlement here

14   and we want to make sure that we stay within that bound.

15          So I think the colloquy we just had supports a

16   finding by the Court that the settlement that's being

17   presented is a reasonable one and that the order -- and I

18   don't really want to speak for the United States Trustee --

19   I want to say again this is a very unusual case, we all

20   recognize that.  The dollars involved in the absolute sense

21   are large.  On the other hand, the dollars involved in this

22   case are gigantic.  So as a proportion it's not at all

23   unusual compared to other Chapter 11 cases.

24          So that's really what I want to say.  I mean I

25   have an agreement with them that I am to present the order

1    as a settlement.  I do have a view, which I would like to --

2    which --

3            THE COURT:  Let's find out if his expressing his

4    view violates some agreement with the U.S. Trustee's Office,

5    and I need to hear from her counsel on this before I hear

6    further from you.

7            MR. THOMPSON:  Yes, I think it is appropriate they

8    speak to this, yes.

9            THE COURT:  And incidentally, none of these

10   strings attached to the settlement were clear to me as I was

11   reading the papers.

12           MR. THOMPSON:  They were in the order.  I

13   apologize, Your Honor.

14           THE COURT:  I haven't looked at the order yet.

15           MR. THOMPSON:  I understand.  It was just

16   negotiated overnight, Your Honor.

17           THE COURT:  You shouldn't assume that I have

18   actually read your proposed order.  I've only -- I only read

19   the withdrawal of the objection.

20           MS. SCHWARTZ:  Good morning, Your Honor.

21           THE COURT:  And then a whole bunch of things that

22   nobody presented to me that we just did on our own.

23           MS. SCHWARTZ:  Good morning, Your Honor.

24           THE COURT:  Good morning.

25           MS. SCHWARTZ:  Andrea Schwartz, for the United

Page 30

1   States Trustee, Tracy Hope Davis.  With me here is Susan

2   Golden, also a trial attorney.

3          Your Honor, Mr. Thompson presented what has gone

4   on between the United States Trustee and the special working

5   group very articulately.  We have spent a great deal of time

6   in multiple discussions, in-person meetings with what we

7   consider to be a very difficult issue in a very unique case.

8   And we have learned a great deal from Mr. Thompson and the

9   Blackstone professionals about the work that they did that

10  Mr. Thompson recited from their papers today.

11         It would in fact violate the terms of the

12  settlement agreement if Mr. Thompson was to express his view

13  on the legal issue.  Part of the resolution here was that

14  the United States Trustee would in fact withdraw her

15  objection.

16         Your Honor should also be aware that there were in

17  fact three applications that were adjourned to today.

18  Blackstone's application sits in a separate factual position

19  from the other two.  And perhaps, Your Honor, if Your Honor

20  would like some, you know, further information with respect

21  to that -- and I'm just making this as a suggestion --

22  perhaps a chambers conference would be appropriate.

23         But what we do feel, Your Honor, is that in any

24  litigation there's litigation risk.  And parties have to

25  assess that.  We met with them, we discussed in full detail

1    the legal issues that Your Honor has taken the time to

2    review with his staff as well.  We also are -- obviously we

3    have come to different conclusions on the actual legal

4    issues.

5            But in order to effectuate what we think is a --

6    an appropriate resolution here, this was the solution that

7    we thought was appropriate in light of the work that they've

8    done, in light of the uniqueness of this case, and that it

9    would not have any precedential value in any other case.

10   So --

11           THE COURT:  Okay.

12           MS. SCHWARTZ:  Thank you, Your Honor.

13           THE COURT:  I accept that.  And then -- we're not

14   going to have legal argument as a result of what I

15   understand to be the agreement reached between Blackstone's

16   counsel and counsel for the U.S. Trustee.

17           But it's probably also unnecessary as well since

18   I've given considerable independent thought to the question.

19   And so it doesn't violate any agreement for me to speak and

20   to state my assessment of 503(b).

21           First of all, I accept the proposition that the

22   Lehman bankruptcy cases are in a class by themselves and

23   that what I'm about to say applies only within these cases

24   and should not be deemed to have precedential impact in

25   other cases.

Page 32

1          That having been said, I have tried in the past to

2     circumscribe the way things I say from the bench are to be

3     used and cited later, but I don't have that ultimate

4     authority.

5          The way the world works today is that virtually

6     everything people say and do, whether for the record or not

7     for the record, have a way of finding themselves into an

8     internet blog, a news report, or somebody's tweet.  And so I

9     recognize that my attempt to put something in a cabin

10    doesn't necessarily mean that it stays there.

11         I also note that there are other cases that are

12    pending in this Court that involve significant legal and

13    factual issues and arise out of financial transactions that

14    while different from the ones presented in Lehman may be

15    comparable.  The ResCap case comes to mind as one such

16    example, but it's just one.

17         One of the consequences of being in a court that

18    happens to be the venue for any number of significant

19    bankruptcy cases is that many of these cases can be

20    characterized as unique or unusually complicated.  And so

21    I'm comfortable putting Lehman in a class by itself given

22    its enormous scale and complexity, but I am unable to limit

23    how people may choose in the future to use the remarks I'm

24    about to make.

25         I simply state that it is my intention that these

Page 33

1    remarks be limited to the Lehman case.  And in that respect,

2    I note that 503(b)(3) and 503(b)(4), the provisions that

3    govern the allowance of a substantial contribution claim as

4    an administrative claim, are, when read together, not models

5    of clarity.

6         It is not my intention today in unscripted remarks

7    from the bench to do a close reading of the two

8    subparagraphs together and come up with a RadLax (ph) like

9    view of what the Code means.  But I would note that one

10   provision is general and the other provision is specific.

11        What I would also note -- and this ties to the

12   unique nature of the Lehman cases -- is that in this

13   extraordinary bankruptcy case a financial advisor was a

14   necessary adjunct to the role of any creditor that was in a

15   position to make a substantial contribution because the

16   nature of the asset pool, the complexity of the underlying

17   legal issues and financial issues associated with that asset

18   pool, and the difficulty in assessing in a meaningful way

19   the economic outcome associated with consolidated or

20   nonconsolidated treatment of the estates all demonstrate to

21   the Court that in this instance a financial advisor was

22   needed.

23        503(b)(3) deals with actual necessary expenses of

24   a creditor entitled to substantial contribution.  For these

25   purposes I'm satisfied that Blackstone, especially with its

Page 34

1    claim trimmed by a million dollars, represents an expense

2    which for this group of creditors was clearly necessary in

3    order for them to understand and adequately and efficiently

4    participate in a settlement process that benefitted the

5    estate not only of LBSF, but of the other debtors as well.

6            Accordingly, I am satisfied that Blackstone, under

7    the agreement with the Office of the United States Trustee,

8    is entitled to the compensation as adjusted.

9            Nothing that I've said here, however, is intended

10   to resolve what may be inherent stress within the language

11   of the statute itself.

12           And I recognize that in a fully litigated context

13   it is possible for a judge sitting where I'm sitting to come

14   to a different conclusion.

15           And I'll take a look at the order, but I'm not

16   going to read it in detail right now.

17           MR. THOMPSON:  Thank you, Your Honor.  The order

18   has been reviewed by the United States Trustee as well a

19   copy has been given to the debtor and the creditors'

20   committee's counsel prior to the hearing.

21           THE COURT:  Fine.  I assume it's in excellent

22   shape.  Thank you.  So that takes care of that one.

23           MR. THOMPSON:  May I be excused, Your Honor?

24           THE COURT:  You may be excused.

25           MR. THOMPSON:  Thank you.

Page 35

1            THE COURT:  What happens next?

2            UNIDENTIFIED SPEAKER:  Mr. Shore?

3            THE COURT:  Good morning, Your Honor.  Chris Shore

4     from White & Case on behalf of the ad hoc group of Lehman

5     Brothers bondholders.

6            We have also some pieces left over from the last

7     hearing which are expenses of AlixPartners -- fees and

8     expenses of AlixPartners, fees and expenses of Molinaro and

9     Associates and a $115,000 White & Case expense which was

10    money paid to Mr. Molinaro, so that would have fallen into

11    -- or it was taken out of the last application on White &

12    Case expenses.

13           So we have an application for a total of

14    $2.824 million of fees and expenses incurred in connection

15    with financial advisor work in connection with the cases.

16           If Your Honor would like me to make a record on

17    that I'm happy to do so.  I've got the same sensitivities

18    with respect to the resolution with the U.S. Trustee, but in

19    light of Your Honor's comments I think we understand, you

20    know, the Court's view on this.  So I'm at Your Honor's

21    pleasure on that.

22           THE COURT:  Just for my benefit clarify to me if

23    there are any distinctions between your agreement with the

24    U.S. Trustee and the agreement with Blackstone, because I

25    had understood from counsel for the U.S. Trustee that

Page 36

1    Blackstone was in a position that was sui generis.

2           MR. SHORE:   There are some factual distinctions

3    between the Blackstone application and the application that

4    was made by White & Case on behalf of -- or for

5    reimbursement of the fees and expenses of the two FAs.  And

6    I can draw Your Honor's attention to that, because I think

7    it plays a little bit differently in the statute.

8           But as far as arguing how that runs through the

9    statute, again, I feel bound not to go into that, but to the

10   extent that the U.S. Trustee has a different view, we can

11   hear from her on that.  But let me lay out the factual

12   distinction.

13          Both Molinaro and Associates -- Sam Molinaro was

14   the former CFO of Bear Sterns.  He was brought in as a non-

15   testifying expert for the group to provide us with

16   information regarding the workings of a large investment

17   bank and the sub-con, non-con issues that arose.

18          AlixPartners was brought in as both non-testifying

19   and testifying experts to deal with issues of preparing

20   modeling, assisting with settlements and then also preparing

21   all the underlying information that was put in the group's

22   disclosure statement.

23          Both of those engagement letters were with White &

24   Case with the ultimate funds paid through directly from the

25   group members to both Molinaro and AlixPartners.

Page 37

1          The AlixPartners application is for essentially

2     1.77 million in fees and 82,000 in expenses.

3          Molinaro works out to $945,000 in fees and 25- or

4     $26,000 in expenses.

5          If Your Honor has further questions with respect

6     to that, but the distinction is that White & Case was the

7     entity that retained these as experts.  And then also there

8     were no contingent fees with it, it was all just either flat

9     monthly fee with hourly top-ups or in the case of

10    AlixPartners a flat hourly fee plus expenses.

11          THE COURT:  I understand the distinction.

12          MR. SHORE:  And then with that, we'd ask Your

13    Honor to grant the application.  I do have an order that I

14    can hand up.

15          THE COURT:  Is there anything that the U.S.

16    Trustee wishes to say?

17          MS. SCHWARTZ:  No, Your Honor.

18          MR. SHORE:  If I may approach, Your Honor?

19          THE COURT:  You may.  I'll simply note that there

20    is a nuance distinction between the application as it

21    relates to AlixPartners and Molinaro and the application

22    that was just approved in reference to Blackstone.

23          But in light of the agreement that has been

24    reached between the Office of the United States Trustee and

25    the applicants, it is probably just as well that I not

Page 38

1  highlight that distinction for purposes of commenting today

2  and would simply approve it for the reasons already given in

3  reference to the Blackstone application.

4          MR. SHORE:  Very good.  Thank you, Your Honor.

5          MS. SCHWARTZ:  And, Your Honor, we would just ask

6  for a little time to talk with Mr. Shore about the form of

7  the order because we hadn't seen it before today.

8          MR. SHORE:  That was my mistake.

9          THE COURT:  That's fine.  I'll wait to --

10          MS. SCHWARTZ:  Thank you so much, Your Honor.

11          THE COURT:  -- to hear from your office indicating

12  that it's in form acceptable to you.

13          MS. SCHWARTZ:  Thank you, Your Honor.  And Your

14  Honor, at this time may I and Susan be excused?

15          THE COURT:  Yes.

16          MS. SCHWARTZ:  Thank you.

17          MR. SHORE:  And myself as well, Your Honor?

18  ResCap is going on the record.

19          THE COURT:  Anybody else who wants to leave is

20  free to go.

21          MS. SCHWARTZ:  Thank you very much, Your Honor.

22          MR. GETTLEMAN:  Good morning, Your Honor.  Jeffrey

23  Gettleman representing the liquidators of Lehman Brothers

24  Australia.

25          THE COURT:  Good morning.

1          MR. GETTLEMAN:  Your Honor, the reason we're here

2     today is because the last time I was before you on a related

3     matter you had inquired about the Chapter 15 case and at

4     that time I said I thought I would be back in 60 days and I

5     was here in June, so clearly I didn't make that date.

6          So rather than keeping Your Honor in the dark, I

7     thought we would be proactive and tell you what was going on

8     in Australia and how that might affect the Chapter 15 case.

9          So I thought the easy or most efficient way of

10    going through this would just be relating to the timing of

11    the Australian proceeding and how that affects the Chapter

12    15 case.

13         So, Your Honor, the -- there is a large group of

14    contingent creditors in the Lehman Brothers Australia case

15    who made claims against the estate based on various types of

16    misrepresentation, breach of fiduciary duty, breach of

17    contracts to give -- or agreements to give investment

18    advisory services.  These contingent creditors consisted of

19    basically local government units and also individual

20    investors.

21         So there was a -- they commenced a case.  They

22    were successful in getting the stay in the Australian

23    proceeding lifted.

24         They filed the case which was before Justice

25    Juarez (ph) in Australia and the final submissions of which

Page 40

1    were made in the middle of last year.  And then Justice

2    Juarez took the case under advisement.

3            At the same time, during 2011, Lehman Brothers

4    Australia or the liquidators asserted claims against two

5    groups of insurers.  One in Australia and one in -- one

6    group in the United States.

7            Based on claims against certain investment

8    management policies the liquidators believe that the

9    policies would have covered at least some of the aspects of

10   the contingent creditors' claims in their own proceeding.

11           So those discussions proceeded throughout 2011 and

12   they culminated in a mediation in December of last year.

13           Shortly after the mediation -- this is only with

14   the U.S. insurers I should clarify.  Shortly after the

15   mediation, the U.S. insurers and liquidators reached an

16   agreement to settle the claims and entered into a settlement

17   agreement.

18           So the -- once the settlement agreement was

19   entered into it changed the, kind of, the dynamics of the

20   Australian proceeding somewhat, because the Australian

21   proceeding was a liquidation, basically a Chapter 7 case.

22           But one of the conditions precedent in the

23   settlement agreement with the U.S. insurers was that Lehman

24   Brothers Australia's creditors or the group of creditors

25   that had these claims had to give releases to the U.S.

Page 41

1    insurers and the U.S. broker.

2              So under Australian law, the -- not the only way,

3    but really the only practical way to give releases is

4    through a scheme of arrangement.  The only other way would

5    be having all 350 creditors sign individual releases which

6    is a little impractical.

7              So at that time the liquidators started thinking

8    about what sort of scheme might be appropriate.  And they

9    were -- the answer to that question in a -- at least in part

10   -- depended on the resolution of the class action by the

11   contingent creditors.  So that's one reason for the delay

12   this year.

13             As Your Honor knows, if you've read our status

14   report, Justice Juarez issued his reasons and judgment on

15   September 21st upholding in large part the claims.  But

16   before that of course, you know, the liquidators actually

17   couldn't really proceed with designing a scheme because, you

18   know, one of the possible outcomes of that proceeding could

19   have been that Justice Juarez could have basically denied

20   the claims.

21             So anyway, fast forward to the present now.

22   What's happening in Australia now is now that that's

23   happened the estate has certain claims to still be resolved,

24   basically intercompany claims, not only with the U.S.

25   debtors, but also with other Lehman entities, Lehman

Page 42

1    Brothers Asia, Lehman Brothers Japan, and LBIE I think are

2    the biggest ones.  So those claims still have to be

3    resolved.

4           And the liquidators believe that the best course

5    in their, you know, capacity as fiduciaries for the estate

6    would be to propose a broad scheme which would encompass

7    basically all of the claims or as many claims as possible.

8           The other alternative would be to propose a scheme

9    that only affected -- or only encompassed the insurance

10   proceeds, and therefore, because if they don't have that,

11   then they lose the benefit of the settlement.  So they can

12   at least proceed that way.

13          They're not going to be able to know until later

14   this year once they have further discussions with

15   stakeholders in Australia and also the other Lehman entities

16   whether, you know, what sort of scheme they can propose.

17          Just so Your Honor knows, the basic underlying

18   reason, or I should say maybe the most important reason for

19   doing a broad scheme, would be a matter of saving estate

20   funds, because the scheme would have a feature that would

21   basically be an ADR process for resolving contingent

22   creditors' claims.

23          Not all of them were members of this class, and of

24   course the Court didn't -- only decided issues that were

25   common among the class.  So there are still quite a few

Page 43

```
1     issues to be decided and each individual claimant still has
2     the right to have their claim adjudicated.
3            So they're hoping that by proposing and getting a
4     scheme of arrangement that has this ADR process built into
5     it, it'll shave several years off of possible litigation
6     with creditors.
7            So, as Your Honor knows, as far as resolving
8     assets and liabilities of the Australian estate, the last
9     time I was here I believe I told -- I advised you that the
10    liquidators were planning to travel to New York to meet with
11    the Lehman U.S. debtors which did happen in September.  And
12    at that time we had some discussions about -- they were
13    broad ranging discussions -- but they focused on the Dante
14    (ph) notes.
15           And so just on that for a second, I mean, I think
16    we have some tentative good news on the Dante front.  I
17    think -- I haven't been involved in anything that's happened
18    since those meetings, so I think Mr. Slack can bring the
19    Court up to date on the current status of those
20    negotiations.
21           THE COURT:  I'm very interested in knowing about
22    it.  And this also explains why Mr. Slack is here today.
23           MR. SLACK:  Good morning, Your Honor.  Richard
24    Slack from Weil.
25           I like to stand here and give you good news and we
```

Page 44

1   do have some good news relating to the Belmont noteholders

2   and the series that they hold.  As a result of the meetings

3   that were just mentioned we have reached a settlement in

4   principle with the Belmont noteholders.  That settlement is

5   still being documented, and that deal, when documented, will

6   still have certain conditions that'll have to be met in

7   order for it to actually resolve the series of notes.

8   Because as we know the Belmont noteholders are just part of

9   the series.

10          So we have a deal with the Belmont noteholders

11   that we hope will in fact then resolve the entire series

12   after we go through certain steps.  But if it all goes as we

13   hope and expect, then, the settlement will resolve a number

14   of things before the Court.

15          It will resolve the Belmont noteholders separate

16   lawsuit that they brought as an adversary proceeding.  It

17   will resolve parts of the avoidance actions that relates to

18   these particular series.  It'll resolve Belmont's appeal of

19   this Court's denial without prejudice of its motion to

20   intervene in those avoidance actions, and it will also

21   resolve certain claims that had been brought relating to

22   those series.

23          So if all goes again as we hope and expect, I

24   think, you know, there's a number of things that may get

25   resolved down the road.

Page 45

1           THE COURT:  I'm delighted to hear that.  This

2    subject was on my mind last week when I saw the Second

3    Circuit's decision remanding an appeal back to the District

4    Court in connection with the without prejudice denial of the

5    motion to intervene in the underlying litigation.

6           In what respect, if at all, does the timing of the

7    documentation of the settlement impact the timing of

8    anything to occur in the District Court with respect to the

9    matter that has been remanded back to the District Court by

10   the circuit?

11          MR. SLACK:  Well, we would hope, Your Honor, that

12   once the deal is papered there'll be notices to the District

13   Court and to this Court that it's been papered, and at that

14   time I would hope that the parties would be both informing

15   and letting the Courts know that there's no need, at least

16   pending certain conditions occurring, for those decisions to

17   come out.

18          You know, with respect to the District Court I

19   think that there is -- there is still some activity that

20   would need to happen before the Court -- District Court

21   would act, because the appeal to the Second Circuit merely

22   sends the case down to the District Court to then decide the

23   merits.

24          As you know the District Court had dismissed the -

25   - had dismissed the appeal on a procedural matter, so it

Page 46

1  goes back now for a decision on the merits, and we haven't

2  had -- we haven't had those kinds of communications yet or

3  briefing or argument with the District Court on those

4  issues.

5          THE COURT:  Well, I would simply note in the

6  interest of judicial economy in all courts that it would be

7  unfortunate for Judge McMahon, assuming that's the judge who

8  is getting it back, to be in any way burdened by what may be

9  a purely hypothetical question at this point.

10         MR. SLACK:  I think your point is well taken and I

11  think it's worth a discussion with the Belmont noteholders

12  as to whether this would be an appropriate time, even if

13  it's not, you know, documented to contact the District

14  Court.

15         THE COURT:  I'm simply conscious of the asymmetry

16  in information that now exists between the Bankruptcy Court

17  and the District Court on this case.

18         MR. SLACK:  Understood, Your Honor.

19         THE COURT:  Okay.

20         MR. GETTLEMAN:  And, Your Honor, one -- to add to

21  Mr. Slack's list of things that would be resolved, there is

22  one other issue -- one other matter which would be resolved,

23  which is the liquidators objection to the LBHI plan based on

24  the assumption of swap agreements, which is still pending.

25         THE COURT:  I didn't even know it was pending.

1          MR. GETTLEMAN:  Well, it's part of a group of

2     contracts that were --

3          THE COURT:  Oh, it's in that category of --

4          MR. GETTLEMAN:  Exactly.

5          THE COURT:  -- contract claims that keeps getting

6     adjourned.

7          MR. GETTLEMAN:  Yes, Your Honor.

8          THE COURT:  Okay.

9          MR. GETTLEMAN:  So, the current status is then, as

10    far as this Court is concerned, one of the other conditions

11    precedent in the agreement with the U.S. insurers is that we

12    have the -- have Your Honor approve the settlement

13    agreement.  So we will be doing that in due course.

14          The liquidators will basically be hitting the

15    road, if you will, over the next several months to probably

16    Hong Kong, London and New York to try to resolve the

17    remaining issues with the other Lehman entities.  And at the

18    same time they'll be negotiating -- try negotiating a scheme

19    with their stakeholders in Australia.

20          They expect to be able to have, at least at this

21    point, their expectation is to have a scheme negotiated by

22    the end of the year and then have applications made to the

23    Australian court for approval at the beginning of next year.

24          So as far as the Chapter 15 case goes, the reason

25    -- one of the main reasons we filed the case, which we filed

1   shortly after the insurance settlement, was to make sure

2   that either the contingent creditors in the class action or

3   any other creditor were prevented from having a right or

4   alleging at least asserting a right of direct action against

5   the U.S. insurer, so we wanted to have the stay in place.

6          So therefore, we'll want to continue to have the

7   stay in place until the scheme in Australia is approved.  So

8   that would be some time next year.

9          So that's kind of where things are and where we

10  hope they'll go.

11         THE COURT:  Okay.  Thank you for the update and

12  for the written status report that was filed on October 8th,

13  which I took a look at in preparation for today's hearing.

14         And I have a hard time getting my mind around a

15  450-page decision of any court, and I -- with no offense to

16  Justice Juarez, I have no intention of reading all 450

17  pages.

18         Have you read all 450 pages?

19         MR. GETTLEMAN:  I have not.  I've read the

20  summary, but I have heard of people that have read the whole

21  450 pages.

22         THE COURT:  Okay.  One just point of personal

23  information I'm interested because I have met Justice Juarez

24  and I also met Justice Jacobson (ph).  Do you know whether

25  the scheme is to be approved in a proceeding before Justice

1    Jacobson and Justice Juarez?

2            MR. GETTLEMAN:  Your Honor, I think I can answer

3    that question if I can consult one of my colleagues on this

4    who knows more about the Australian proceedings.

5            THE COURT:  Okay.

6        (Pause)

7            MR. GETTLEMAN:  The likelihood is that it would be

8    heard by Justice Jacobson, Your Honor.

9            THE COURT:  Fine.  Okay.  Thank you for that.

10           MR. GETTLEMAN:  Thank you, Your Honor.

11           THE COURT:  Is there anything more for today?

12           UNIDENTIFIED:  No.

13           THE COURT:  We are then adjourned.  Thank you.

14           UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

15       (Whereupon these proceedings were concluded at 11:09

16   A.M.)

17

18

19

20

21

22

23

24

25

```
 1                         I N D E X

 2

 3                         RULINGS

 4                                        Page      Line

 5   Lehman Brothers Special Financing Inc.

 6   Working Group's Application for Entry of an

 7   Order, Pursuant to 11 U.S.C. §§ 503(b)(3)(D)

 8   and 503(b)(4) for Allowance and Reimbursement

 9   of Reasonable Professional Fees and Actual,

10   Necessary Expenses in Making a Substantial

11   Contribution in These Cases [ECF No. 29239]   31       21

12

13   Application of the Ad Hoc Group of Lehman

14   Brothers Creditors for Compensation for

15   Professional Services Rendered by, and

16   Reimbursement of Actual and Necessary

17   Expenses of, Its Professionals Pursuant to

18   Section 503(b) of the Bankruptcy Code

19   Rendered by, and Reimbursement of Actual

20   and Necessary Expenses of, Its

21   Professionals Pursuant to Section 503(b)

22   of the Bankruptcy Code [ECF No. 29195]        38        2

23

24

25
```

Page 51

1                        C E R T I F I C A T I O N

2

3       I, Melissa Looney, certify that the foregoing transcript is

4       a true and accurate record of the proceedings.

5

6       **Melissa**                  Digitally signed by Melissa
                                      Looney
                                      DN: cn=Melissa Looney, o, ou,
        **Looney**                    email=digital1@veritext.com,
                                      c=US
7                                     Date: 2012.10.11 14:46:16 -04'00'

8       Melissa Looney

9       AAERT Certified Electronic Transcriber CET**D-607

10

11      Veritext

12      200 Old Country Road

13      Suite 580

14      Mineola, NY 11501

15      Date:  October 11, 2012

16

17

18

19

20

21

22

23

24

25