# EXHIBIT B

1

1

2       IN THE UNITED STATES BANKRUPTCY COURT

        FOR THE SOUTHERN DISTRICT OF NEW YORK

3       CHAPTER 11

        CASE NO. 08-13555 (JMP)

4

5       IN RE:

6       LEHMAN BROTHERS HOLDINGS, et al.,

7

             Debtors,

8       ----------------------------------------

             CONFIDENTIAL TRANSCRIPT OF

9            VIDEOTAPED DEPOSITION

              OF CHRISTINE PROCOPS

10

11           TRANSCRIPT of the stenographic

12      notes of the proceedings in the

13      above-entitled matter, as taken by and

14      before TAB PREWETT, a Registered

15      Professional Reporter, a Certified

16      Shorthand Reporter, a Certified LiveNote

17      Reporter, and Notary Public, held at the

18      Offices of WEIL GOTSHAL & MANGES LLP, 767

19      Fifth Avenue, New York, New York, on

20      Wednesday, May 25, 2011, commencing at

21      10:50 a.m.

22

23

24

25

118

```
 1          Christine Procops
 2   believe today is inaccurate?
 3          MR. CLARK:  Well, objection to
 4   the form.  I mean, this deals with
 5   very complicated financial documents.
 6          MR. SLACK:  Spare me.  Okay.
 7   Spare me the speech.  You can object
 8   to the form.
 9          MR. CLARK:  But it's not just
10   form.
11          MR. SLACK:  If I hear from the
12   witness now, "This is very
13   complicated," that's exactly the kind
14   of thing judges don't like.  So spare
15   me the speech, and let the witness
16   answer the question.
17          MR. CLARK:  I think it's an
18   unreasonable question.  I will let her
19   answer it.
20      A    I don't -- I don't know of
21   anything that is in here that is different.
22   I mean, these -- the swap documents, as I
23   said before, were very complicated.  And I
24   relied on a variety of counsels to consult
25   with on what interpretation of the
```

119

```
 1          Christine Procops
 2   documents were.
 3      Q    Well, I would only note that
 4   Mr. Sinclair asked you the same question I
 5   just did, correct?
 6      A    He did, according to this
 7   E-Mail.
 8      Q    And he was asking that question
 9   of you, correct?
10      A    He was.
11      Q    And as you sit here today, you
12   don't remember your answer to him; is that
13   correct?  Right, that's correct, right?
14      A    Yes.
15      Q    And reading this document
16   doesn't refresh your recollection of your
17   answer to him, yes or no?
18      A    No.
19      Q    Okay.  I didn't ask that
20   question well.  That was my fault.
21          Having read this document, does
22   it refresh your recollection of getting
23   back to Mr. Sinclair and telling him there
24   was anything wrong with the facts as he set
25   out here?
```

120

```
 1          Christine Procops
 2      A    Can you repeat that question.
 3          (Reporter read back pending
 4   question.)
 5      A    I don't remember getting back
 6   to him.  No.
 7      Q    Now, if you look at the second
 8   heading in the middle of the page, it says,
 9   "Swap, Lehman swap termination."
10          Do you see that?
11      A    I do.
12      Q    And it says:
13          "Lehman Brothers Holdings,
14   which acts as guarantor, filed for
15   bankruptcy."
16          Do you see that?
17      A    I do.
18      Q    Does that refresh your
19   recollection that the filing of bankruptcy
20   occurred prior to September 18, 2008?
21      A    I don't remember the specific
22   date of when they filed.
23      Q    Okay.  It says:
24          "Upon sale of special
25   financing, expected as early as the weekend
```

121

```
 1          Christine Procops
 2   of September 20th to 21st, termination of a
 3   swap to standard merger clause would result
 4   in termination fee calculated based on
 5   standard LIBOR swap termination
 6   calculation, not replacement value of swap,
 7   would result in approximately 60 million
 8   liability for club."
 9          Do you see that?
10      A    I do.
11      Q    And do you have an
12   understanding of what Mr. Sinclair is
13   writing here?
14      A    As I said earlier, swap
15   documents were very complicated.  This is
16   not a standard vanilla swap.  I relied on
17   counsel to interpret the documents.  I
18   don't know what the "standard merger
19   clause" is.  I don't know what that means.
20   I do know that there were particular
21   sections of our swap that were different
22   than others.
23      Q    So putting aside whether it's
24   complicated or not complicated, the answer
25   is, is that you don't have an understanding
```

126

Christine Procops

1  see it, "would result in approximately
2  $60 million liability for club."
3
4      Q    So I apologize because it
5  sounds like maybe I wasn't -- I was on the
6  wrong paragraph --
7      A    Paragraph.
8      Q    -- when we were talking.  So
9  let me -- let me try this again so that we
10 are clear.
11         Looking at the paragraph that
12 starts:
13         "Upon sale of special
14 financing, expected as early as the weekend
15 of September 20th to 21st, the termination
16 of a swap pursuant to standard merger
17 clause would result in termination fee
18 calculated based on standard LIBOR swap
19 termination calculation, not replacement
20 value of swap, would result in
21 approximately 60 million liability for
22 club."
23         Do you see that?
24     A    I see that.
25     Q    What was your understanding of

127

Christine Procops

2  the circumstances where a termination of
3  the swap would result in a $60 million
4  liability for the club?
5          MR. CLARK:  Objection.  Lack of
6  foundation.
7      A    I don't recall all of the
8  specifics of the complicated swap
9  documents.
10     Q    As you sit here today, do you
11 have an understanding of how the 60 million
12 liability was calculated?
13     A    I don't remember or know where
14 these numbers came from.
15     Q    Now, you know --
16         MR. CLARK:  Objection to the
17 last question.  Same objection.  Lack
18 of foundation.
19     Q    Now, referring back to
20 exhibit -- we can -- I think it's 8, which
21 is the --
22         MR. SLACK:  Yes, thank you.
23         Is it 8?  Nope, it's not.  I'm
24 sorry about that.
25         MR. CLARK:  The two you said to

128

Christine Procops

1  set aside were 7 and 6.
2
3          MR. SLACK:  6, thank you.
4      Q    And this -- the mark-to-market
5  value of the two swaps to Lehman was
6  approximately 60 million, correct?
7          MR. CLARK:  Objection to the
8  form.
9      A    Can you repeat the question.
10         (Reporter read back pending
11 question.)
12     Q    Looking at -- let me ask it.
13 Looking at Procops Exhibit 6 and the
14 attachments, the mark-to-market valuations
15 that are attached, isn't it true that the
16 mark-to-market valuation of the Lehman swap
17 as of September, 2008, was calculated to be
18 approximately 60 million?
19         MR. CLARK:  Objection to the
20 form.
21     A    According to Exhibit Procops 6,
22 the sum of the two numbers on the
23 mark-to-market statement provided by Lehman
24 seems to be approximately 59 million and
25 change.

129

Christine Procops

2      Q    Approximately how much?
3      A    59 million and change.
4      Q    Yep.  Now, take a look down a
5  little further.
6          MR. CLARK:  I'm sorry.  Which
7  one are you back on?
8          MR. SLACK:  I am now back on
9  Procops Exhibit 10.
10     Q    Looking at the sub-bullet that
11 says:
12         "GS in process of calculating
13 replacement value, but expected to be in
14 the range of 100 million to 125 million net
15 of 60 million termination fee."
16         Do you see that?
17     A    I see that.
18     Q    Does GS refer to Goldman Sachs?
19         MR. CLARK:  Objection to the
20 form.  Lack of foundation.
21     A    GS was something we called
22 Goldman Sachs on occasion, yes.
23     Q    Well, at this time, at or and
24 September 18th, did Giants Stadium ask
25 Goldman Sachs to prepare replacement value

142

Christine Procops

1  exposure is.
2  Q    What is your understanding
3  of -- when you read this, what is your
4  understanding of what the 60 million hedge
5  exposure that's being referred to here
6  refers to?
7       MR. CLARK:  Same objection.
8  A    I don't know what Joe is
9  referring to in particular to that number.
10  Q    And so when you read this, did
11  you ask Mr. Sinclair what he meant?
12       MR. CLARK:  Objection to the
13  form.
14  A    I don't remember having this
15  E-Mail exchange with him.
16  Q    Did you ever send anything
17  additional to Mr. Sinclair that sent the
18  calculation of the 60 million hedge
19  exposure?
20       MR. CLARK:  Objection to the
21  form.
22  A    I do not remember.
23  Q    Who is Anthony Noto?
24  A    He was the former CFO of the

*(lines renumbered as shown on page)*

143

Christine Procops

1  NFL.
2  Q    Was there anyone at Giants
3  Stadium who was more involved in the
4  termination of the Lehman swaps than you
5  were?
6  A    I don't believe so.
7  Q    This was a pretty important
8  five days from September 15th to
9  September 20th; was it not?
10       MR. CLARK:  Objection to the
11  form.
12  A    I think there are a lot of
13  important days.
14  Q    Did you think those were
15  important days?
16  A    I think they were important.
17  Q    Were you more involved in the
18  termination of the Lehman swap than
19  Mr. Mara, John Mara?
20  A    Yes.
21  Q    Were you more involved than
22  Mr. Tisch?
23  A    Yes.
24  Q    Were you more involved than

144

Christine Procops

1  the -- than any marketing person that would
2  have worked for Giants Stadium?
3  A    I don't believe there were
4  marketing people at that time.
5  Q    Is it fair to say that you, in
6  fact, were the point person at Giants
7  Stadium LLC for the discussions that were
8  occurring with respect to the termination
9  of the Lehman swap?
10       MR. CLARK:  Objection to the
11  form.
12  A    I would say that I was involved
13  in the conversations.
14  Q    Was there -- were you the point
15  person for Giants Stadium LLC with respect
16  to the conversations that included Giants
17  Stadium LLC with respect to termination of
18  the Lehman swap?
19       MR. CLARK:  Objection to the
20  form.
21  A    I wouldn't consider myself the
22  point person.
23  Q    Who was the point person for
24  Giants Stadium LLC with respect to the

145

Christine Procops

1  termination of the Lehman swap?
2       MR. CLARK:  Objection to the
3  form."
4  A    I was responsible for
5  representing the Mara and Tisch interests
6  in that entity.
7  Q    And who was the point person
8  for Giants Stadium LLC with respect to the
9  termination of the Lehman swaps?
10       MR. CLARK:  Objection to the
11  form.  Asked and answered.
12  A    I was the financial person
13  responsible for representing the Tisch and
14  Mara interests with regard to financial
15  matters for Giants Stadium LLC.
16       I would not characterize myself
17  as "the point person."
18  Q    And why would you not
19  characterize yourself as the point person
20  for Giants Stadium LLC?
21       MR. CLARK:  Objection to the
22  form.
23  A    Not a term I use.
24  Q    Was there any person at Giants

154

```
 1          Christine Procops
 2   on those calls; is that correct?
 3       A    That's correct.
 4          (Exhibit No. Procops 15, E-Mail
 5       chain with the top E-Mail from Andrew
 6       Dietrich to Ms. Procops and others,
 7       dated September 17, 2008, is marked by
 8       the reporter for identification.)
 9       Q    Putting before you what has
10   been marked as Procops Exhibit 15, which is
11   an E-Mail chain with the top E-Mail being
12   from Andrew Dietrich to you and others,
13   dated September 17, 2008, do you recall
14   receiving this E-Mail?
15       A    I don't remember.
16       Q    Well, I'd like to focus on the
17   E-Mail actually on -- the E-Mail at the
18   bottom, the first E-Mail, which is from you
19   to Deirdre Lewis at BNY Mellon, with a copy
20   to Andrew Dietrich, which is also dated
21   September 17, 2008.
22          Do you see that E-Mail?
23       A    I do.
24       Q    Who is Deirdre Lewis?
25       A    She was our contact at Bank of
```

155

```
 1          Christine Procops
 2   New York.
 3       Q    And what role did Bank of New
 4   York Mellon have with respect to the ARS
 5   securities?
 6       A    They were the trustee in the
 7   transaction.
 8       Q    And did you write the E-Mail
 9   that is set forth here?
10          MR. CLARK:  Objection.
11       A    It appears that it's an E-Mail
12   from me.
13       Q    Do you have any reason to doubt
14   that you sent this E-Mail to Ms. Lewis?
15       A    No.
16       Q    The first sentence says:
17          "We need to brief you and your
18   lawyers tomorrow on developments with our
19   Lehman swap."
20          Do you see that?
21       A    I do.
22       Q    Did you ever have a call with
23   Ms. Lewis or anyone else at BNY Mellon
24   about the Lehman swap?
25       A    I don't remember having a call.
```

156

```
 1          Christine Procops
 2       Q    The next sentence says:
 3          "In short, we must terminate
 4   this swap tomorrow to preserve the value of
 5   Stad Co.'s (significant) claims against the
 6   estate of the Lehman swap counterparty."
 7          Do you see that?
 8       A    I do.
 9       Q    Why was it that Giants Stadium
10   needed to terminate the swap on
11   September 18th to preserve the value of
12   Stad Co.'s claims against the Lehman
13   estate?
14       A    I don't remember all of the
15   details.
16       Q    Do you remember any details?
17       A    Not particularly, no.
18       Q    Well, not particularly, you
19   know, generally, do you remember the
20   details?
21       A    I remember that the documents
22   have a lot of provisions in them that we
23   needed to walk through.  And I remember
24   that they are complicated, and we needed
25   legal interpretation on a lot of them.
```

157

```
 1          Christine Procops
 2       Q    The next line says:
 3          "We are obtaining bond insurer
 4   approval for a short supplemental indenture
 5   addressing the matter and want to walk
 6   through it."
 7          Do you see that?
 8       A    I do.
 9       Q    And do you know what that
10   refers to?
11       A    No.
12       Q    The next line says:
13          "The supplemental indenture
14   will need to be approved and signed by
15   Stad Co. and the trustee tomorrow."
16          Do you see that?
17       A    I do.
18       Q    Why was it the supplemental
19   indenture needed to be approved and signed
20   by Stad Co. and the trustee on
21   September 18, 2008?
22          MR. CLARK:  Objection to the
23   form.
24       A    I don't remember.
25       Q    The next line says:
```

158

1        Christine Procops
2        "Pursuant to the terms in the
3    indenture, it will require only bond
4    insurer consent, which we are obtaining."
5        Do you see that?
6    A    I do.
7    Q    And what's your understanding
8    of why the indenture only required bond
9    insurer consent?
10        MR. CLARK:  Objection to the
11    form.
12    A    I do not know.
13    Q    The next line says:
14        "We also will send the
15    necessary legal opinion."
16        Do you see that?
17    A    I see that.
18    Q    Did Giants Stadium ever send to
19    BNY Mellon a legal opinion in connection
20    with the termination of the swap?
21    A    I don't remember.
22    Q    It then says:
23        "We can explain background on
24    the phone."
25        Does reading that refresh your

159

1        Christine Procops
2    recollection that you had a phone call with
3    BNY and refreshed your recollection as to
4    anything said on that phone call?
5    A    No, it does not.
6    Q    The last line says:
7        "Sorry for the short notice.
8    The supplemental indenture is really only a
9    clarification, but it is critical that it
10    be put in place tomorrow."
11        Why was it critical that the
12    indenture supplement be put in place on
13    September 18th?
14        MR. CLARK:  Objection to the
15    form.
16    A    I don't know.
17        (Exhibit No. Procops 16,
18    Document, Bates No. GStad LB 20291,
19    Chain of E-Mails, the top E-Mail from
20    Daniel Champeau to Ms. Procops on
21    September 18, 6:43 in the morning, is
22    marked by the reporter for
23    identification.)
24    Q    Putting before you what has
25    been marked as Procops Exhibit Number 16,

160

1        Christine Procops
2    which is a chain of E-Mails, the top E-Mail
3    is from Daniel Champeau to you on September
4    18, 6:43 in the morning.
5        I would like to focus you,
6    though, on the second E-Mail in this chain.
7    Do you recall this E-Mail chain?
8    A    I don't remember it.  No.
9    Q    Let me just identify this also
10    as having the Bates No. GStad LB 20291.
11    The second E-Mail is an E-Mail from you to
12    Lisa Citron at FGIC, Jeffrey Fried at FGIC,
13    and Daniel Champeau, amongst others.
14        Do you recall sending this
15    E-Mail?
16    A    I don't remember sending it,
17    no.
18    Q    You don't deny sending this
19    E-Mail; do you?
20    A    No.  It looks like my E-Mail.
21    Q    It says, starting off:
22        "We have been informed that we
23    must terminate the Lehman swaps tomorrow to
24    preserve the value of our significant
25    claims against the estate of the Lehman

161

1        Christine Procops
2    swap counterparty."
3        Who informed you that you had
4    to "terminate the Lehman swaps tomorrow to
5    preserve the value" of "significant claims
6    against the estate of the Lehman swap
7    counterparty"?
8        MR. CLARK:  Objection to the
9    form.
10    A    I'm sure we had various
11    discussions with our counsel.
12    Q    Anyone else?
13    A    Not that I remember.
14    Q    And I am assuming that reading
15    this E-Mail does not refresh your
16    recollection of the reason that Giants
17    Stadium believed it had to terminate the
18    Lehman swaps on September 18th in order to
19    preserve the value of claims against the
20    Lehman estate; is that correct?
21    A    I don't remember any of those
22    dates, no.
23    Q    Putting aside the particular
24    date of September -- whether it was
25    September 17, 18, do you recall that, in

166

Christine Procops

1  question.)
2  A    I believe we have asked Goldman
3  Sachs to assist our counsel in preparing
4  certain calculations.
5  Q    I put before you what has been
6  marked as Procops Exhibit 18, which is,
7  again, a chain of E-Mails and ask whether
8  you recognize this document.
9  A    I don't.
10        (Exhibit No. Procops 18, E-Mail
11        chain, middle E-Mail from Joanne
12        Larkin at Lehman to Ms. Procops, with
13        the subject of Steve Lessing, Bates
14        Nos. GStad LB 58282 and 58283, is
15        marked by the reporter for
16        identification.)
17  Q    It has a Bates number, GStad LB
18  58282 and 58283. The middle E-Mail here is
19  from someone by the name of Joanne Larkin
20  from Lehman to you with the subject of
21  Steve Lessing.
22        Did you recognize that Joanne
23  Larkin was Steve Lessing's assistant?
24  A    She was.

---

167

Christine Procops

1  Q    And the E-Mail says:
2       "Steve and Rob are available at
3  1:00 p.m. today. Can you provide the
4  dial-in number information. Thanks."
5       Do you see that?
6  A    I do.
7  Q    Did you have a conversation
8  with Mr. Taylor and Mr. Lessing on or
9  around September 18th concerning the Lehman
10  swap?
11  A    I don't remember.
12  Q    Do you recall any conversations
13  with Mr. Lessing concerning the Lehman swap
14  during the time frame of Lehman's
15  bankruptcy and the termination issues
16  arising for Giants Stadium?
17  A    No.
18        (Exhibit No. Procops 19, E-Mail
19        chain, Bates Nos. GStad LB 48701 to
20        02, is marked by the reporter for
21        identification.)
22  A    Thank you.
23  Q    I put before you what has been
24  marked s as Procops Exhibit 19, again,

---

168

Christine Procops

1  another E-Mail chain, with the Bates Nos.
2  GStad LB 48701 to 02.
3       Do you recall this set of
4  E-Mails?
5  A    No.
6  Q    There is an E-Mail, the second
7  E-Mail down from Joseph Shanker to a number
8  of individuals, including some from FGIC.
9       Do you see that?
10  A    I do.
11  Q    And that E-Mail says:
12       "I have just been informed that
13  the Lehman broker/dealer is preparing for
14  his bankruptcy filing possibly within the
15  next few hours. The effect of that could
16  be to compromise our ability to collect our
17  substantial claim under the swap."
18       Do you see that?
19  A    I see that.
20  Q    Why was the filing of
21  bankruptcy by the broker/dealer something
22  that could compromise Giants Stadium's
23  ability to collect a claim under the swap?
24        MR. CLARK: Objection to the

---

169

Christine Procops

1  form.
2  A    The swap documents were very
3  complicated legal documents. We relied on
4  our counsel to interpret the provisions
5  within them.
6  Q    As you sit here today, do you
7  know and do you have an understanding of
8  why it is that the filing by the Lehman
9  broker/dealer could compromise Giants
10  Stadium's ability to collect a claim under
11  the swap?
12  A    As I sit here today, I do not
13  understand most of the Lehman entities,
14  much less what you just asked me.
15        Could we take a break? I need
16  to go to the lady's room.
17        MR. CLARK: That's a pretty
18  good reason.
19        MR. SLACK: Yes, I am not done
20  with the document, but I said you are
21  the master of ceremonies. We are
22  going to take a break.
23        THE WITNESS: Thank you.
24        THE VIDEOGRAPHER: The time is

---