CADWALADER, WICKERSHAM & TAFT LLP
700 6th Street, NW
Washington, DC 20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400
Mark C. Ellenberg, Esq.
John H. Thompson, Esq.

*Attorneys for Robert Cody Moore, MaryAnn Brelinsky and Russell Schneider*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------x
In re:                                                             :        Chapter 11
                                                                   :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                           :        Case No. 08-13555 (JMP)
                                                                   :
                    Debtors.                                       :        (Jointly Administered)
-------------------------------------------------------------------- x

**RESPONSE OF ROBERT CODY MOORE, MARYANN BRELINSKY AND RUSSELL
SCHNEIDER TO THE PLAN ADMINISTRATOR'S THREE HUNDRED FORTY-
<u>NINTH OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY CLAIMS)</u>**

           Robert Cody Moore, MaryAnn Brelinsky and Russell Schneider (collectively, the

"<u>Claimants</u>"), by and through their undersigned counsel, respectfully submit this response to the

*Three Hundred Forty-Ninth Omnibus Objection to Claims (No Liability Claims)* (the

"<u>Objection</u>") filed by Lehman Brothers Holdings Inc. ("<u>LBHI</u>"), as Plan Administrator under the

Modified Third Amended Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors, and

state as follows:

<u>**PRELIMINARY STATEMENT**</u>

           1.        The claims at issue here are based on the Claimants' employment

agreements with LBHI.  These contracts guaranteed the Claimants certain bonus and retention

awards.  The Plan Administrator's objection rests on the unsubstantiated assertion that the

Claimants relinquished their rights under their LBHI employment agreements when, after being

terminated by LBHI following its bankruptcy, the Claimants entered into new employment

agreements with Eagle Energy Partners I, L.P.  However, neither LBHI nor any other Lehman

entity is a party to the Claimants' new employment agreements.  Accordingly, the Eagle Energy

agreements do not, and cannot, affect the Claimants' rights against LBHI.  LBHI made a promise

to the Claimants, which should be kept.

## BACKGROUND

**A.      The Claimants' Employment Agreements with Lehman Brothers.**

2.      On or about May 8, 2007, LBHI and certain other Lehman Brothers

entities acquired all of the limited and general partnership interests of Eagle Energy Partners I,

L.P. ("Eagle Energy" or the "Partnership"), a provider of energy-asset management and power-

marketing services based in Houston, Texas (such acquisition, the "Lehman Acquisition").

3.      In June 2007, Robert Cody Moore, MaryAnn Brelinsky and Russell

Schneider each entered into an employment agreement with LBHI, its affiliates and subsidiaries

(together, the "Lehman Employment Agreements").[1]

4.      Mr. Moore's Lehman Employment Agreement provides that, as of the

closing date of the Lehman Acquisition, he was employed by the "Firm" as Head of Power

Trading and Origination in the Commodities Business.  Exhibit A, at 1.  Ms. Brelinsky's Lehman

Employment Agreement provides that as of the closing date of the Lehman Acquisition, she was

employed by the "Firm" as a Power Trader/Originator in the Commodities Business.  Exhibit B,

---

[1] A copy of Mr. Moore's Lehman Employment Agreement is attached hereto as Exhibit A, a copy of Ms.
Brelinsky's Lehman Employment Agreement is attached hereto as Exhibit B and a copy of Mr. Schneider's Lehman
Employment Agreement is attached hereto as Exhibit C.

at 1.  Mr. Schneider's Lehman Employment Agreement required the "Firm" to pay him a

retention award if Mr. Schneider met certain employment conditions.  Exhibit C, at 1.

5.    Each of the Claimants' Lehman Employment Agreements defines the

"Firm" as "Lehman Brothers Holdings Inc. (together with its parents, affiliates, and subsidiaries .

. . )."  Exhibit A, at 1; Exhibit B, at 1; Exhibit C, at 1.  Each of the Lehman Employment

Agreements defines Eagle Energy as a separate entity, and does not include Eagle Energy as an

affiliate or subsidiary of the Firm.  Id.  According to Mr. Moore's and Ms. Brelinsky's Lehman

Employment Agreements, their titles were "submitted for official approval by the Executive

Committee of the Firm's Board of Directors as part of the next quarterly approval process

following the Closing Date."  Exhibit A, at 1; Exhibit B, at 1.  In addition, each of the Claimants'

Lehman Employment Agreements is executed by Mary Pat Archer, a Managing Director of

LBHI.  Exhibit A, at 4; Exhibit B, at 4; Exhibit C, at 2.

6.    According to Mr. Moore's Lehman Employment Agreement, his

compensation included (i) a "minimum bonus in the amount of $250,000, payable at the time the

Firm pays its annual 2008 bonus distribution (on or about January 31, 2009)" (the "Moore Bonus

Payment") and (ii) "a retention award with an aggregate value equivalent to $810,000" (the

Moore Retention Award).  Exhibit A, at 1-2.

7.    According to Ms. Brelinsky's Lehman Employment Agreement, her

compensation included (i) a "minimum bonus in the amount of $200,000, payable at the time the

Firm pays its annual 2008 bonus distribution (on or about January 31, 2009)" (the "Brelinsky

Bonus Payment") and (ii) "a retention award with an aggregate value equivalent to $600,000"

(the "Brelinsky Retention Award").  Exhibit B, at 1-2.

8.      According to Mr. Schneider's Lehman Employment Agreement, he was granted a "retention award with an aggregate value equivalent to $600,000" (the "Schneider Retention Award").

9.      Mr. Moore's and Ms. Brelinsky's Lehman Employment Agreements provided, with respect to their Bonus Payments, "The minimum bonus amounts set forth above will be paid at the times and in the amounts stated except that such bonuses will not be payable if, before the date of the scheduled payment, you have breached any provision of the Covenant Agreements, or you have resigned your employment with the Firm for any reason or you have been terminated from the Firm with 'Cause.'" Exhibit A, at 2; Exhibit B, at 2.

10.     Each Lehman Employment Agreement provided that the Claimants' Retention Awards vested and became payable in equal installments on the first through third anniversaries of the Lehman Acquisition closing date. Exhibit A, at 2; Exhibit B, at 2; Exhibit C, at 1. However, the Lehman Employment Agreements also provided that "[in] the event your employment is terminated by the Firm without Cause before the applicable payment date, you will continue to receive any unpaid Retention Award payments on the applicable payment dates . . . ." Id.

11.     Termination for "Cause" means termination as a result of "(i) misconduct, (ii) breach of [contract][2] or Firm policies or rules, (iii) dishonesty, (iv) violation of laws or regulations, or (v) substantial and continuing failure to perform employment duties or obligations satisfactorily." Id.

---

[2] The Lehman Employment Agreements appear to contain the same typographical error in the definition of termination for "Cause;" specifically, "breach  of contract" is referred to as "breach of Tracker."

4

12.     Mr. Moore's and Ms. Brelinsky's Lehman Employment Agreements also provided that they were "eligible to participate in the Firm's standard employee benefits program."  Exhibit A, at 3; Exhibit B, at 3.

13.     In connection with the Lehman Employment Agreement, each of the Claimants was required to execute a "Lehman Brothers Non-Competition, Non-Solicitation, and Non-Disparagement Agreement" and a "Lehman Brothers Confidentiality Agreement" (together, the "Covenant Agreements").[3]

**B.     The Debtors' Bankruptcy and Sale of Assets to Barclays Capital Inc.**

14.     Beginning on September 15, 2008 and periodically thereafter, LBHI and certain of its subsidiaries commenced voluntary cases in this Bankruptcy Court under chapter 11 of the Bankruptcy Code.

15.     On September 17, 2008, the Debtors filed a motion seeking court approval of the sale of certain assets owned by LBHI and Lehman Brothers Inc. ("LBI") to Barclays Capital Inc.[4]  The bankruptcy court approved the Barclays sale on September 19, 2008.[5]  As of that point, Claimants no longer had the option of continued employment at LBHI.

16.     Subsequently, the Claimants received an email from Barclays offering the Claimants employment beginning on September 22, 2008.[6]  In order to accept, the Claimants were required to send an email to Barclays and attend work on September 22, 2008.  Id. However, the Claimants were informed by Joe Gold, Co-Head of Commodities for Barclays that

---

[3] Copies of the Covenant Agreements are included in Exhibit A, Exhibit B and Exhibit C.
[4] *Debtors' Motion to (A) Schedule a Sale Hearing; (B) Establish Sales Procedures; (C) Approve a Break-Up Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets* [Dkt. No. 60].
[5] *Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases* [Dkt. No. 258].
[6] Email dated September 22, 2008 from Barclays Capital Inc., attached hereto as Exhibit D.

Eagle Energy was not part of the sale to Barclays, and that the LBHI employees assigned to the Eagle Energy unit would not become employees of Barclays.[7]

17.    After it became evident that LBHI did not intend to transfer Eagle Energy to Barclays, certain of the Claimants and other LBHI employees assigned to the Eagle Energy unit brokered a deal with EDF Trading North America LLC and EDF Trading North America Inc. (together, "EDF Trading") to acquire Lehman's partnership interests in Eagle Energy.

### C.    The Debtors' Sale of Eagle Energy to EDF Trading and the Claimants' Employment Agreements with Eagle Energy.

18.    On September 26, 2008, LBHI and certain other Lehman Brothers entities entered into a purchase agreement (the "Purchase Agreement") with EDF Trading, pursuant to which the Lehman entities sold all of their partnership interests in Eagle Energy to EDF Trading.[8]

19.    On October 1, 2008, the Debtors filed a motion seeking court approval of the Purchase Agreement and authority to sell their partnership interests in Eagle Energy to EDF Trading free and clear of all liens, claims, encumbrances and interests under section 363(f) of the Bankruptcy Code (the "363 Sale Motion").[9]

20.    On October 17, 2008, this court entered an order approving the Purchase Agreement and authorizing the Debtors to sell their partnership interests in Eagle Energy to EDF

---

[7] See email dated September 21, 2008 from Joe Gold to Chuck Watson, attached hereto as Exhibit E; see also *Executed Clarification Letter, Exhibit C to Notice of Filing of Purchase Agreement Approved by Order Under 11 U.S.C. 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (a) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (b) Assumption and Assignment of Executory Contracts and Unexpired Leases* [Dkt. No. 280]. During the transition period, the Claimants received approximately two paychecks from Barclays.

[8] A copy of the Purchase Agreement is attached hereto as Exhibit F.

[9] See *The Debtors' Motion for Entry of an Order Pursuant to Sections 363 and 365 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 6004, 6006 and 9019 Authorizing Lehman Brothers Holdings Inc. to (A) Enter Into a Partnership Interests Purchase Agreement, (B) Compromise and Release a Portion of an Intercompany Loan, and (C) Assign the Remainder of Such Intercompany Loan to Purchasers* [Dkt. No. 503].

Trading free and clear of all liens, claims, encumbrances and interests under section 363(f) of the Bankruptcy Code.[10] The Debtors' sale of their interests in Eagle Energy closed on or about October 31, 2008 (such sale, the "EDF Sale").

21. In the Purchase Agreement, which was filed with the Bankruptcy Court as an exhibit to the 363 Sale Motion, the Lehman entities represented and warranted to EDF Trading that "the Partnership has no employees." Purchase Agreement, § 5.18.

22. Furthermore, the Lehman entities represented and warranted to EDF Trading that "the Partnership does not sponsor or maintain any Benefit Plans," including any "employment," "non-competition," "deferred compensation," "executive compensation," "incentive bonus or other bonus" or "other benefit plans." Purchase Agreement, § 5.17(a)-(b).

23. The Purchase Agreement also required the Lehman entities to "use their good faith best efforts to cooperate with Purchasers in identifying those Persons that are exclusively involved in the Business (the "Employees") and extending offers of employment thereto." Purchase Agreement, § 7.13(a). The Purchase Agreement states, "Any Employee who accepts such offer of employment shall become an employee of the Partnership after the Closing Date." Id. (emphasis added).

24. On or about November 1, 2008, the Claimants entered into letter agreements with Eagle Energy setting forth the terms and conditions of their employment (the "Eagle Energy Employment Agreements"). On or about December 31, 2008, the Claimants entered into revised letter agreements with Eagle Energy, which amended and restated the terms

---

[10] See *Order Granting Debtors' Motion for Entry of an Order Pursuant to Section 363 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 6004 and 9019 Authorizing Lehman Brothers Holdings Inc. to (A) Enter Into a Partnership Interests Purchase Agreement, (B) Compromise and Release a Portion of an Intercompany Loan, and (C) Assign the Remainder of Such Intercompany Loan to Purchasers* [Dkt. No. 1126].

and conditions of their employment with Eagle Energy and superseded the November 1, 2008

agreements (the "Amended Eagle Energy Employment Agreements").[11]

### D.    The Claimants' Proof of Claims and the Plan Administrator's Objection.

25.    On February 9, 2009, Mr. Moore filed Claim No. 2643 in the amount of

$790,000 against LBHI and Claim No. 2642 in the amount of $790,000 against LBCS based on

the $250,000 Moore Bonus Payment and $540,000 in payments due under the Moore Retention

Award (together, the "Moore Claims").

26.    On February 9, 2009, Ms. Brelinsky filed Claim No. 2640 in the amount

of $600,000 against LBHI and Claim No. 2641 in the amount of $600,000 against LBCS  based

on the $200,000 Brelinsky Bonus Payment and $400,000 in payments due under the Brelinsky

Retention Award (together, the "Brelinsky Claims").

27.    On August 31, 2009, Mr. Schneider filed Claim No. 9881 in the amount of

$400,000 against LBHI based on payments due under the Schneider Retention Award (the

"Schneider Claim, and together with the Moore Claims and Brelinsky Claims, the "Claims").

28.    On September 21, 2012, LBHI, as Plan Administrator, filed the Objection

to the Claims, asserting that the Chapter 11 Estates have no liability on the Claims.

29.    In its Objection, the Plan Administrator argues that the Claimants

"remained" employees of Eagle Energy following the EDF Sale, and that the Claimants'

Amended Eagle Energy Agreements superseded the Claimants' Lehman Employment

Agreements.  Objection, ¶ 9.  The Plan Administrator argues that because the Claimants entered

into employment agreements with Eagle Energy, their Lehman Employment Agreements are no

---

[11] Copies of the Amended Eagle Energy Employment Agreements will be provided to the Bankruptcy Court upon
request.

longer effective, and the Chapter 11 Estates are not responsible for the Claimants' Bonus

Payments or Retention Award payments.  Id.

## ARGUMENT

30.    A properly filed proof of claim constitutes prima facie evidence of the

validity and amount of the claim.  See Fed. R. Bankr. P. 3001(f).  In order to overcome the prima

facie validity of a claim, a party objecting to the claim must present "evidence in equal force to

the prima facie case . . . which, if believed, would refute at least one of the allegations that is

essential to the claim's legal sufficiency."  In re Onieda, Ltd., 400 B.R. 384, 389 (Bankr.

S.D.N.Y. 2009) (quoting In re Allegheny Int'l, Inc., 954 F.2d 167, 173-174 (3d Cir. 1992)).  An

objecting party cannot merely rely on conclusory statements to overcome the presumption of

prima facie validity.  Instead, the objecting party must produce sufficient rebuttal evidence in

order to shift the burden of proof back to the claimant.  See Allegheny Int'l, 954 F.2d at 174.

31.    In its Objection, the Plan Administrator does not offer any evidence in

support of its assertion that the Chapter 11 Estates are not liable on the Claims.  To succeed on

its argument, the Plan Administrator must come forward with probative evidence that the

Claimants did not enter into employment agreements with LBHI and were never employees of

LBHI.  However, the Plan Administrator has not offered any evidence in support of its argument,

because it cannot.  Instead, the Plan Administrator makes conclusory statements that the

Claimants' Amended Eagle Energy Employment Agreements, to which LBHI was not a party,

somehow amended and superseded the Claimants' Lehman Employment Agreements and

eviscerated their rights thereunder.

32.    Specifically, the Objection refers to documentation provided to the

Chapter 11 Estates by the Claimants to contend that "each of the claimants remained employed

9

by Eagle Energy following the sale of such entity to EDF" and mistakenly concludes that each

Claimant's Amended Eagle Energy Employment Agreement "amends and restates the terms and

conditions" of his or her Lehman Employment Agreement.  Objection, at ¶ 9.[12]  Having reached

this false assumption, the Plan Administrator persists in its error by arguing that the Claimants

"agreed to forgo the right to receive amounts set forth in their [Lehman Employment

Agreements] and to instead receive the amounts set forth in the [Amended Eagle Energy

Employment Agreements]."  Objection, at ¶ 10.  However, no such amendment, restatement and

relinquishment of rights is possible, because the employment agreements in question do not

intersect as a matter of fact or law.

       33.    As the Claimants' Lehman Employment Agreements and Covenant

Agreements demonstrate, the Claimants were employees of LBHI.  Following LBHI's

bankruptcy, the Claimants were terminated by LBHI without "Cause," as defined in the Lehman

Employment Agreements.  LBHI's termination of the Claimants without "Cause" occurred upon

the closing of the Barclays sale.  At a minimum, it occurred upon the closing of the EDF Sale.

Because the Claimants were terminated by LBHI without "Cause," LBHI remains obligated to

the Claimants on their Bonus Payments and Retention Award payments pursuant to the terms of

the Lehman Employment Agreements.

       34.    As the Lehman Employment Agreements make clear, the Claimants were

not employed by Eagle Energy prior to the EDF Sale.  Instead, the Claimants were employed by

LBHI.  As noted above, the "Firm" offering employment to each of the Claimants in the Lehman

Employment Agreements was "Lehman Brothers Holdings Inc. (together with its parents,

affiliates, and subsidiaries . . .)" and each Lehman Employment Agreement was signed by Mary

---

[12] The Plan Administrator mischaracterizes the Claimants' Amended Eagle Energy Employment Agreements as the "Amended Agreements," and the Claimants' Lehman Employment Agreements as the "Original Agreements."

Pat Archer, a Managing Director of LBHI.  Exhibit A, at 1, 4; Exhibit B at 1,4; and Exhibit C at 1, 2.

35.     Furthermore, as represented and warranted by the Debtors in the Purchase Agreement, Eagle Energy had no employees at the time of the EDF Sale.  Purchase Agreement, §§ 5.18.  The Debtors also represented and warranted that Eagle Energy had no employee benefit plans, including "non-competition," "deferred compensation," "executive compensation" or "incentive bonus or other bonus" plans — categories under which the Lehman Employment Agreements and Covenants Agreements fall.  Purchase Agreement, 5.17(a)-(b).  In addition, any employees identified by Lehman as exclusively involved in the business of Eagle Energy, and that accepted offers to work for Eagle Energy, were to become, not remain, employees of Eagle Energy after the EDF Sale closing date.  Purchase Agreement § 7.13(a).

36.     The Purchase Agreement was attached as an exhibit to the 363 Sale Motion.  Thus, the foregoing representations were not only made to EDF Trading, but also to the Bankruptcy Court.  Further, the Claimants' contemporaneous discussions with agents of the Debtors' estate confirmed that the EDF Sale would not prejudice their Claims.[13]  Simply put, the Claimants' Amended Eagle Energy Employment Agreements cannot possibly constitute evidence that LBHI's contractual obligations to the Claimants have been extinguished.

37.     Because the Plan Administrator has failed to come forward with evidence to refute the prima facie validity of the Claims, the Plan Administrator's Objection should be denied.

38.     The Claimants reserve all of their rights, claims and defenses, including, without limitation, the right to discovery in connection with the Plan Administrator's Objection.

---

[13] See email dated September 23, 2008 from Jeremy Davis to Cody Moore and Russell Schneider, among others, attached hereto as Exhibit G.

## CONCLUSION

WHEREFORE, the Claimants respectfully request that the Court (i) overrule the

Objection and allow Claim Nos. 2640, 2641, 2642, 2643 and 9881 in their filed amounts, and (ii)

grant such other and further relief as this Court deems just and proper under the circumstances.

Dated: Washington, DC
       November 13, 2012

                              CADWALADER, WICKERSHAM & TAFT LLP

                              /s/ *Mark C. Ellenberg*
                              Mark C. Ellenberg, Esq.
                              John H. Thompson, Esq.
                              700 6th Street, NW
                              Washington, DC 20001
                              Telephone:  (202) 862-2200
                              Facsimile:  (202) 862-2400

                              *Attorneys for Robert Cody Moore, MaryAnn*
                              *Brelinsky and Russell Schneider*

# **EXHIBIT A**

# LEHMAN BROTHERS

6/14/2007

*By Hand*

Robert Cody Moore

Dear Robert:

In connection with the acquisition of Eagle Energy Parnters I, L.P. ("Eagle") contemplated by the Purchase Agreement, dated as of May 8, 2007, among Lehman Brothers Commodities Services Inc. and the sellers named therein (the "Purchase Agreement"), Eagle and Lehman Brothers Holdings Inc. (together with its parents, affiliates, and subsidiaries, "Lehman" or the "Firm") have agreed that you are key to the business of Eagle and, as such, Lehman and Eagle desire to provide you with an incentive to remain employed with Eagle or its successor in the acquistion through and after the closing date of the Purchase Agreement (the "Closing Date"). Accordingly, Lehman is pleased to offer you the opportunity to receive the compensation described in this letter, subject to the terms and conditions set forth below. Your eligibility to receive such compensation is conditioned on the Closing (as defined in the Purchase Agreement) of the Purchase Agreement, your continued employment with Eagle or its affiliates through the Closing Date, your execution of the "Non-Competition, Non-Solicitation and Non-Disparagement Agreement" and the "Confidentiality Agreement" attached hereto as **Exhibits A and B** (the "Covenant Agreements"), confirmation that you have satisfactorily met all of Lehman's pre-employment requirements, including the successful completion of a criminal background investigation, as well as other conditions set forth in this letter.

Effective as of the Closing Date, you will be employed by the Firm as the Head of Power Trading and Origination in the Commodities Business, reporting initially to Griff Jones. Your corporate title of Senior Vice President will be submitted for official approval by the Executive Committee of the Firm's Board of Directors as part of the next quarterly approval process following the Closing Date.

For the performance year 2007 (the Closing Date through November 30, 2007), performance year 2008 (December 1, 2007 through November 30, 2008) and performance year 2009 (December 1, 2008 through November 30, 2009) your compensation will be as follows:

- Annualized base salary of $170,000 per year.

- A minimum bonus in the amount of $166,667, less applicable deductions, payable at the time the Firm pays its annual 2007 bonus distribution (on or about January 31, 2008).

- A minimum bonus in the amount of $250,000, less applicable deductions, payable at the time the Firm pays its annual 2008 bonus distribution (on or about January 31, 2009).

The foregoing salary will be paid for all periods of your active employment with the Firm in performance years 2007 and 2008. The minimum bonus amounts set forth above will be paid at the times and in the amounts stated except that such bonuses will not be payable if, before the date of scheduled payment, you have breached any provision of the Covenant Agreements, or you have resigned your employment with the Firm for any reason or you have been terminated from the Firm with "Cause". For purposes of this letter, "Cause" means any of the following: (i) misconduct, (ii) breach of Tracker or Firm policies or rules, (iii) dishonesty, (iv) violation of laws or regulations, or (v) substantial and continuing failure to perform employment duties or obligations satisfactorily. The bonus amounts set forth above may be reduced in the event of an approved leave of absence during the applicable performance year. If, during your employment, you should die or become disabled (as defined in the Firm's Long Term Disability Program as then generally in effect and, for purposes of this offer letter, hereinafter referred to as "Disability") before bonuses are paid for performance year 2007 and 2008, your base salary payments will end (subject to salary continuation in the event of Disability) and you or your estate will be paid a pro-rata portion of the guaranteed minimum bonus for such performance year.

At the Firm's discretion, a portion of your 2007 and future years' total compensation (combined base salary, bonus, and other compensation) will be payable in conditional equity awards (restricted stock units, options, and/or other equity-based awards) pursuant to the Firm's Equity Award Program as then generally in effect for employees with your position and corporate title. The terms and conditions of the Equity Award Program, including terms and conditions relating to vesting, exercisability, and forfeiture, will be established by the Firm from time to time in its discretion.

All compensation payments described in this letter will be paid in accordance with our customary payroll practices, and will be subject to applicable payroll and income tax withholding and other applicable deductions. Your compensation for all periods after performance year 2008 will be determined at the Firm's discretion.

Provided you remain actively employed through the payment dates and have not breached any provision of the Covenant Agreements and subject to confirmation that you have satisfactorily met all of Lehman's pre-employment requirements, including the successful completion of a criminal background investigation, as well as other conditions set forth in this letter, the Firm will grant you a retention award with an aggregate value equivalent to $810,000 (the "Retention Award"). The Retention Award will vest and become payable in equal installments, less applicable tax withholding and other deductions, on each of the first through third anniversaries of the Closing Date. In the event your employment with the Firm ends as a result of your resignation for any reason or your termination by the Firm for Cause (as defined above) before the applicable payment date, you will not thereafter receive any further Retention Award payments. In the event your employment is terminated by Firm without Cause before the applicable payment date, you will continue to receive any unpaid Retention Award payments on the applicable payment date(s), provided you have not breached any provision of the Covenant Agreements. In the event your employment is terminated as a result of your death or "Disability" (which, for purposes of this retention award, will mean you are no longer actively working for the Firm and are receiving benefits under the Firm's Long-Term Disability Insurance Plan as in effect from time to time), you or your estate shall receive a lump sum cash payment equivalent to any unpaid portion of the Retention Award as soon as practicable

following such termination.   For purposes of the Firm's Equity Award Program the Retention Payments will not be considered part of your total compensation.

You will also be eligible to participate in the Firm's standard employee benefits program, which will be explained to you separately.  Your participation in and coverage under the Firm's employee benefit and compensation programs shall take into account your prior service with Eagle.

Please understand that the terms and conditions of your employment by the Firm are governed by standard Firm policies.  Among other things, this means that this offer is conditional upon confirmation that as of the Closing Date you have satisfactorily met all pre-employment requirements, including the successful completion of a criminal background investigation

While the foregoing compensation commitments will be honored on the terms outlined above, this offer letter is not a contract of continuing employment.  Your employment by the Firm is for no fixed term, and either you or the Firm may terminate the employment relationship at any time for any reason.

This letter, together with the Covenant Agreements, represent the complete agreement of the parties with respect to your employment with the Firm and, effective as of the closing of the Acquisition, supersedes all prior agreements (whether oral or in writing) between you and the Firm or Eagle or its affiliates.  This offer of employment is conditional upon the closing of the Acquisition and your execution of the Covenant Agreements attached hereto as **Exhibits A and B**.  In the event the Purchase Agreement is terminated, this letter and the Covenant Agreements will be void *ab initio* and of no further force or effect.

By your signature below, you agree that any controversies arising out of or relating to this letter or your employment by the Firm shall be submitted to and settled by arbitration pursuant to the rules as then in effect of the National Association of Securities Dealers or the New York Stock Exchange.

**[CONTINUED ON NEXT PAGE]**

Robert, we are delighted that you will continue to be a part of our organization.  If you agree with the terms outlined in this letter, please sign this letter and the Covenant Agreements and return them to me.  An additional copy of this letter is enclosed for your files.

Sincerely,

*Mary Pat Archer* (PC)

Mary Pat Archer
Managing Director
Fixed Income


Acceptance:

I accept the terms and conditions of this letter. Furthermore, I confirm that I am not aware of any circumstances which may result in me being unable to successfully satisfy the criminal background check requirements outlined in this letter.


_____      _____
Signed                                                                        Date

## EXHIBIT A

# LEHMAN BROTHERS

### Non-Competition, Non-Solicitation, and Non-Disparagement Agreement

| Employee Name (*Print*) | Social Security Number |
|---|---|
| Robert Cody Moore | ███████████ |

In the course of your work, you will become aware of information of a confidential nature pertaining to the business of Eagle Energy ("Eagle"), Lehman Brothers, its parents and affiliates, and its clients (together, the "Firm"). The Firm maintains policies and procedures with respect to the use and the dissemination of confidential information which are summarized in a separate Confidentiality Agreement. Your employment creates a relationship of confidence and trust between you and the Firm with respect to any information applicable to the business of the Firm or applicable to the business of the Firm's clients which may be made known to you by the Firm or by any Firm client, or learned by you in the course of your work. You understand that you have an obligation to preserve the confidentiality of such information and use it only for the purpose for which it was obtained.

In consideration of the transaction contemplated by the Purchase Agreement dated as of May 8, 2007, among Lehman Brothers Commodities Services Inc. and the Sellers named therein (the "Purchase Agreement") as well as the confidential information, goodwill, and any compensation afforded to you pursuant to the Retention Award letter between you and the Firm dated as of 6/14/2007, (the "Retention Award Letter"), the receipt and adequacy of which are hereby acknowledged, you understand and agree that your undertakings set forth below are material and essential terms to the Firm in entering into the Purchase Agreement and the Retention Award Letter, and accordingly you expressly agree that:

1. **Non-Competition.** You acknowledge that the agreements and covenants contained in this Section 1 are essential to protect the value of the business and assets of the Firm and its affiliates and by your prior association with Eagle and subsequent employment with the Firm and its affiliates you have obtained, and will continue to obtain, such confidential information, knowledge, contacts and experience, and there is a substantial probability that such confidential information, knowledge, contacts, and experience could be used to the substantial advantage of a competitor of Eagle or the Firm to Firm's substantial detriment. Therefore, you agree that so long as you are employed by the Firm and for the period commencing as of the closing date of the Purchase Agreement and ending on the later of the third anniversary of the closing date of the Purchase Agreement or the first anniversary of the termination of your employment with the Firm or any of its affiliates except that if such employment is terminated without Cause (as defined in the Retention Award Letter) such period shall end of the date of such termination (the "Non-Competition Restricted Period"), you shall not, and shall cause your controlled affiliates not to, directly or indirectly (other than in your capacity as an employee of the Firm or its affiliates), own, manage, engage in, operate, control, work for, consult with, render services for, do business with, maintain any interest in (proprietary, financial or otherwise) or participate in the ownership, management, operation or control of, any business, whether in corporate, proprietorship or partnership form or otherwise, engaged in the business of energy trading, energy marketing, fuel management services (including managing supply, transportation, storage, logistics, and procurement of fuel), power management services (including managing transmission and marketing of energy, capacity, and any other electric related products or services, including ancillary services), risk management services (including managing transactions for physical,

financial, and derivative product purchases and sales in bilateral, over-the-counter, or exchange-traded markets for the purpose of hedging or mitigating price and delivery risks associated with fuel, energy, capacity, or other electric related products or services, including ancillary services), natural gas transportation and storage optimization services, and retail gas and power supply services, (the "Business") in any geographic region for which you had direct or indirect responsibility on behalf of the Firm or in any geographic region for which you had confidential information of the Firm.

2.  **Non-Solicitation.**  You further agree that so long as you are employed by the Firm and for the period commencing as of the closing date of the Purchase Agreement and ending on the later of the third anniversary of the closing date of the Purchase Agreement or the first anniversary of the termination of your employment with the Firm or any of its affiliates (the "Non-Solicitation Restricted Period") you shall not and shall cause your controlled affiliates not to (other than in your capacity as an employee of the Firm or its affiliates): (i) cause, solicit, induce or encourage any employees, consultants or contractors of the Firm or their subsidiaries or affiliates to leave such employment or service, (ii) hire, employ or otherwise engage any such individual, (iii) cause, induce or encourage any actual or prospective client, customer, supplier, or licensor of the Firm or its subsidiaries (including any existing or former customer of the Firm or its subsidiaries and any Person that becomes a client or customer of the Firm after the consummation of the transactions contemplated by the Purchase Agreement) to terminate or modify any such actual or prospective business relationship with the Firm or its subsidiaries, or (iv) develop a business relationship with any actual or prospective client, customer, supplier, or licensor to cause, induce or encourage such individual to become a customer of any business in which you are engaged that is competitive with the Business. The restrictions relating to actual or prospective clients, customers, suppliers, or licensors in this paragraph apply only to (a) those actual or prospective clients, customers, suppliers, or licensors with whom you had contact on behalf of the Firm during the last twelve months of your employment with the Firm; or (b) any of the Firm's actual or prospective clients, customers, suppliers, or licensors about whom you had any confidential information during the last twelve months of your employment with the Firm. In no event shall it be a violation of this Section 2 to engage in solicitations incidental to general advertising or other general solicitation in the ordinary course not specifically targeted at such persons or to employ any person not solicited in violation hereof.

3.  **Non-Disparagement.**  You agree that, during your employment with the Firm or at any time thereafter, you shall not make any public statement that is materially disparaging of the business of Lehman Brothers Holdings Inc. or Eagle or its subsidiaries, or to the business reputation of any of the executive officers of Lehman Brothers Holdings Inc. or Eagle or its subsidiaries or any of the employees of the Firm who are known to you to be employees of the Firm at the time of any such public statement. Your obligations under this Section 3 shall not apply to disclosures required by applicable law, regulation or order of a court or governmental agency.

You agree that the above obligations and covenants are reasonable in duration and scope, and agree that any arbitration panel or court of competent jurisdiction may reform such obligations to the extent necessary to enforce them under applicable law. You further agree and acknowledge that violation of these obligations and covenants would cause immeasurable and irreparable damage to the Firm and its affiliates. Accordingly, you agree that the Firm is entitled to injunctive relief in any court of competent jurisdiction for any actual or threatened violation of any such obligations, in addition to any other remedies it may have.

Subject to the Firm's right to injunctive relief as outlined above, you agree that any dispute arising out of or relating to your employment by the Firm or the terms of this Agreement will be submitted to

arbitration pursuant to the rules as then in effect of the National Association of Securities Dealers or New York Stock Exchange.

The provisions of this Agreement are in addition to the provisions in any written employment agreement between the Firm and you, and will not affect your responsibilities or any other rights of the Firm under such agreements. This Agreement is not a contract of continuing employment. Employment is for no fixed term, and either you or the Firm may decide to terminate the employment relationship at any time for any reason.

This Agreement shall be governed by New York law, without regard to its choice of law principles, and will be binding on you, your heirs, executors, assigns, and administrators, shall inure to the benefit of the Firm, its successors and assigns, and shall survive the termination of your employment with the Firm, regardless of the manner of such termination.

Each provision of this Agreement will be interpreted on its own. If any provision is held to be unenforceable as written, it will be enforced to the extent reasonable under the circumstances. In any case, the other provisions of this Agreement will not be affected.

This Agreement constitutes the entire agreement among the parties and supersedes all prior agreements or understandings, if any, whether oral or written, with regard to the subject matter hereof. This Agreement is an integrated document and may not be modified or amended except in a writing signed by the parties hereto or their successors in interest.

**I have signed and dated this Agreement below to indicate my agreement to its provisions and to acknowledge that I have received a copy of this Agreement.**

**Employee**

| Employee Name (Please Print) | Employee Signature | Date |
|---|---|---|
|  |  |  |

# EXHIBIT B

# LEHMAN BROTHERS

Confidentiality Agreement

**Please read carefully and sign**

| Name | Social Security Number |
|------|------------------------|
|      |                        |

In the course of your work, you may become aware of information of a confidential nature pertaining to the business of the Firm and its clients. The importance of preserving the confidentiality of such information and using it only for the purpose for which it was obtained cannot be overemphasized. Lehman Brothers and its affiliates (collectively, "LB" or the "Firm") maintain policies and procedures with respect to the use and the dissemination of confidential information which are summarized below.

1.    All information related to the business activities of LB and its clients that may be obtained by you from any source as a result of your employment shall be considered as confidential. Materials contained in client files should always be regarded as confidential. You should always maintain appropriate administrative, technical and physical safeguards over records in your possession to prevent unauthorized access.

2.    Information regarding the business methods, operations or results of LB or its clients may not be disclosed to competitors, to the public or to any person. Nor can the preceding information be otherwise used except as your duties at LB may require or with the prior written approval of an authorized senior officer of LB. This applies to the period of your employment and thereafter. Trade practices, procedures, software or other strategies which you develop in the course of performing responsibilities or using LB equipment, facilities are the property of Firm.

3.    The handling of material, non-public information is covered in LB's "Chinese Wall and Restricted List Policy" and "Code of Conduct".

4.    The execution of transactions for your own accounts or the solicitation or exercise of discretion over the accounts of others is strictly prohibited when you "know" or have "reason to believe" that you possess material, non-public information, regarding the activities or affairs of the issuing company. "Material" information is any information which, if publicly disclosed, would reasonably influence an investor's decision to purchase, sell or hold the subject securities or any other securities affected by the information.

5.    Upon termination of your employment, you are required to deliver to the Firm all documents, recordings and other tangible records (including tapes, discs or other similar media) that contain or are derived from the Firm's, or the Firm's clients', confidential information, and permanently erase, remove and destroy any such confidential information maintained in electronic format.

Any employee who has questions or concerns with respect to the use or dissemination of information relating to the business activities or affairs of LB, its subsidiaries, affiliates or clients or relating to corporate or public finance transactions should consult with the Compliance Department or Law Department for guidance.

The Firm will take strong action (which may include termination of employment) against any person(s) making any improper use of confidential information or contributing to a breach of confidentiality.

*I have reviewed and agree to comply with the LB Confidentiality Policy*

| Signature | Department | Date |
|-----------|-----------|------|
|           |            |      |

# EXHIBIT B

# LEHMAN BROTHERS

6/14/2007
Revised 6/19/2007

*By Hand*

MaryAnn Brelinsky

Dear MaryAnn:

In connection with the acquisition of Eagle Energy Parnters I, L.P. ("Eagle") contemplated by the Purchase Agreement, dated as of May 8, 2007, among Lehman Brothers Commodities Services Inc. and the sellers named therein (the "Purchase Agreement"), Eagle and Lehman Brothers Holdings Inc. (together with its parents, affiliates, and subsidiaries, "Lehman" or the "Firm") have agreed that you are key to the business of Eagle and, as such, Lehman and Eagle desire to provide you with an incentive to remain employed with Eagle or its successor in the acquistion through and after the closing date of the Purchase Agreement (the "Closing Date"). Accordingly, Lehman is pleased to offer you the opportunity to receive the compensation described in this letter, subject to the terms and conditions set forth below. Your eligibility to receive such compensation is conditioned on the Closing (as defined in the Purchase Agreement) of the Purchase Agreement, your continued employment with Eagle or its affiliates through the Closing Date, your execution of the "Non-Competition, Non-Solicitation and Non-Disparagement Agreement" and the "Confidentiality Agreement" attached hereto as **Exhibits A and B** (the "Covenant Agreements"), confirmation that you have satisfactorily met all of Lehman's pre-employment requirements, including the successful completion of a criminal background investigation, as well as other conditions set forth in this letter.

Effective as of the Closing Date, you will be employed by the Firm as a Power Trader/Originator in the Commodites Business reporting initially to Cody Moore. Your corporate title of Vice President will be submitted for official approval by the Executive Committee of the Firm's Board of Directors as part of the next quarterly approval process following the Closing Date.

For the performance year 2007 (the Closing Date through November 30, 2007) and performance year 2008 (December 1, 2007 through November 30, 2008) your compensation will be as follows:

- Annualized base salary of $150,000 per year.

- A minimum bonus in the amount of $133,333, less applicable deductions, payable at the time the Firm pays its annual 2007 bonus distribution (on or about January 31, 2008).

- A minimum bonus in the amount of $200,000, less applicable deductions, payable at the time the Firm pays its annual 2008 bonus distribution (on or about January 31, 2009).

The foregoing salary will be paid for all periods of your active employment with the Firm in performance years 2007 and 2008. The minimum bonus amounts set forth above will be paid at the times and in the amounts stated except that such bonuses will not be payable if, before the date of scheduled payment, you have breached any provision of the Covenant Agreements, or you have resigned your employment with the Firm for any reason or you have been terminated from the Firm with "Cause". For purposes of this letter, "Cause" means any of the following: (i) misconduct, (ii) breach of Tracker or Firm policies or rules, (iii) dishonesty, (iv) violation of laws or regulations, or (v) substantial and continuing failure to perform employment duties or obligations satisfactorily. The bonus amounts set forth above may be reduced in the event of an approved leave of absence during the applicable performance year. If, during your employment, you should die or become disabled (as defined in the Firm's Long Term Disability Program as then generally in effect and, for purposes of this offer letter, hereinafter referred to as "Disability") before bonuses are paid for performance year 2007 and 2008, your base salary payments will end (subject to salary continuation in the event of Disability) and you or your estate will be paid a pro-rata portion of the guaranteed minimum bonus for such performance year.

At the Firm's discretion, a portion of your 2007 and future years' total compensation (combined base salary, bonus, and other compensation) will be payable in conditional equity awards (restricted stock units, options, and/or other equity-based awards) pursuant to the Firm's Equity Award Program as then generally in effect for employees with your position and corporate title. The terms and conditions of the Equity Award Program, including terms and conditions relating to vesting, exercisability, and forfeiture, will be established by the Firm from time to time in its discretion.

All compensation payments described in this letter will be paid in accordance with our customary payroll practices, and will be subject to applicable payroll and income tax withholding and other applicable deductions. Your compensation for all periods after performance year 2008 will be determined at the Firm's discretion.

Provided you remain actively employed through the payment dates and have not breached any provision of the Covenant Agreements and subject to confirmation that you have satisfactorily met all of Lehman's pre-employment requirements, including the successful completion of a criminal background investigation, as well as other conditions set forth in this letter, the Firm will grant you a retention award with an aggregate value equivalent to $600,000 (the "Retention Award"). The Retention Award will vest and become payable in equal installments, less applicable tax withholding and other deductions, on each of the first through third anniversaries of the Closing Date. In the event your employment with the Firm ends as a result of your resignation for any reason or your termination by the Firm for Cause (as defined above) before the applicable payment date, you will not thereafter receive any further Retention Award payments. In the event your employment is terminated by Firm without Cause before the applicable payment date, you will continue to receive any unpaid Retention Award payments on the applicable payment date(s), provided you have not breached any provision of the Covenant Agreements. In the event your employment is terminated as a result of your death or "Disability" (which, for purposes of this retention award, will mean you are no longer actively working for the Firm and are receiving benefits under the Firm's Long-Term Disability Insurance Plan as in effect from time to time), you or your estate shall receive a lump sum cash payment equivalent to any unpaid portion of the Retention Award as soon as practicable

following such termination.   For purposes of the Firm's Equity Award Program the Retention
Payments will not be considered part of your total compensation.

You will also be eligible to participate in the Firm's standard employee benefits program, which
will be explained to you separately.  Your participation in and coverage under the Firm's
employee benefit and compensation programs shall take into account your prior service with
Eagle.

Please understand that the terms and conditions of your employment by the Firm are governed
by standard Firm policies.  Among other things, this means that this offer is conditional upon
confirmation that as of the Closing Date you have satisfactorily met all pre-employment
requirements, including the successful completion of a criminal background investigation

While the foregoing compensation commitments will be honored on the terms outlined above,
this offer letter is not a contract of continuing employment.  Your employment by the Firm is for
no fixed term, and either you or the Firm may terminate the employment relationship at any time
for any reason.

This letter, together with the Covenant Agreements, represent the complete agreement of the
parties with respect to your employment with the Firm and, effective as of the closing of the
Acquisition, supersedes all prior agreements (whether oral or in writing) between you and the
Firm or Eagle or its affiliates, including, but not limited to the agreement between you and Eagle
dated October 1, 2006.  This offer of employment is conditional upon the closing of the
Acquisition and your execution of the Covenant Agreements attached hereto as **Exhibits A and
B.**  In the event the Purchase Agreement is terminated, this letter and the Covenant Agreements
will be void *ab initio* and of no further force or effect.

By your signature below, you agree that any controversies arising out of or relating to this letter
or your employment by the Firm shall be submitted to and settled by arbitration pursuant to the
rules as then in effect of the National Association of Securities Dealers or the New York Stock
Exchange.

**[CONTINUED ON NEXT PAGE]**

MaryAnn, we are delighted that you will continue to be a part of our organization. If you agree with the terms outlined in this letter, please sign this letter and the Covenant Agreements and return them to me. An additional copy of this letter is enclosed for your files.

Sincerely,

*Mary Pat Archer*

Mary Pat Archer
Managing Director
Fixed Income


Acceptance:

I accept the terms and conditions of this letter. Furthermore, I confirm that I am not aware of any circumstances which may result in me being unable to successfully satisfy the criminal background check requirements outlined in this letter.


_____                    ___6/22/07___
Signed                                              Date

# EXHIBIT A

## LEHMAN BROTHERS

**Non-Competition, Non-Solicitation, and Non-Disparagement Agreement**

| Employee Name (*Print*) | Social Security Number |
|---|---|
| MaryAnn Brelinsky | |

In the course of your work, you will become aware of information of a confidential nature pertaining to the business of Eagle Energy ("Eagle"), Lehman Brothers, its parents and affiliates, and its clients (together, the "Firm"). The Firm maintains policies and procedures with respect to the use and the dissemination of confidential information which are summarized in a separate Confidentiality Agreement. Your employment creates a relationship of confidence and trust between you and the Firm with respect to any information applicable to the business of the Firm or applicable to the business of the Firm's clients which may be made known to you by the Firm or by any Firm client, or learned by you in the course of your work. You understand that you have an obligation to preserve the confidentiality of such information and use it only for the purpose for which it was obtained.

In consideration of the transaction contemplated by the Purchase Agreement dated as of May 8, 2007, among Lehman Brothers Commodities Services Inc. and the Sellers named therein (the "Purchase Agreement") as well as the confidential information, goodwill, and any compensation afforded to you pursuant to the offer letter between you and the Firm dated as of June 19, 2007, (the "Offer Letter"), the receipt and adequacy of which are hereby acknowledged, you understand and agree that your undertakings set forth below are material and essential terms to the Firm in entering into the Purchase Agreement and the Retention Award Letter, and accordingly you expressly agree that:

1. <u>Non-Competition</u>. You acknowledge that the agreements and covenants contained in this Section 1 are essential to protect the value of the business and assets of the Firm and its affiliates and by your prior association with Eagle and subsequent employment with the Firm and its affiliates you have obtained, and will continue to obtain, such confidential information, knowledge, contacts and experience, and there is a substantial probability that such confidential information, knowledge, contacts, and experience could be used to the substantial advantage of a competitor of Eagle or the Firm to Firm's substantial detriment. Therefore you agree that so long as you are employed by the Firm and for the period commencing as of the closing date of the Purchase Agreement and ending on the third anniversary of the closing date of the Purchase Agreement, except that if such employment is terminated by the Firm for any reason such period shall end of the date of such termination, (the "Non-Competition Restricted Period"), you shall not, and shall cause your controlled affiliates not to, directly or indirectly (other than in your capacity as an employee of the Firm or its affiliates), own, manage, engage in, operate, control, work for, consult with, render services for, do business with, maintain any interest in (proprietary, financial or otherwise) or participate in the ownership, management, operation or control of, any business, whether in corporate, proprietorship or partnership form or otherwise, engaged in the business of energy trading, energy marketing, fuel management services (including managing supply, transportation, storage, logistics, and procurement of fuel), power management services (including managing transmission and marketing of energy, capacity, and any other electric related products or services, including ancillary services), risk management services (including managing transactions for physical, financial, and derivative product purchases and sales in bilateral, over-the-counter, or exchange-traded markets for the purpose of hedging or mitigating price and delivery risks associated with fuel, energy, capacity, or other electric related products or

services, including ancillary services), natural gas transportation and storage optimization services, and retail gas and power supply services, (the "Business") in any geographic region for which you had direct or indirect responsibility on behalf of the Firm or in any geographic region for which you had confidential information of the Firm.

2. <u>Non-Solicitation</u>.    You further agree that so long as you are employed by the Firm and for the period commencing as of the closing date of the Purchase Agreement and ending on the later of the third anniversary of the closing date of the Purchase Agreement or the first anniversary of the termination of your employment with the Firm or any of its affiliates (the "Non-Solicitation Restricted Period") you shall not and shall cause your controlled affiliates not to (other than in your capacity as an employee of the Firm or its affiliates): (i) cause, solicit, induce or encourage any employees, consultants or contractors of the Firm or their subsidiaries or affiliates to leave such employment or service, (ii) hire, employ or otherwise engage any such individual, (iii) cause, induce or encourage any actual or prospective client, customer, supplier, or licensor of the Firm or its subsidiaries (including any existing or former customer of the Firm or its subsidiaries and any Person that becomes a client or customer of the Firm after the consummation of the transactions contemplated by the Purchase Agreement) to terminate or modify any such actual or prospective business relationship with the Firm or its affiliates or subsidiaries, or (iv) develop a business relationship with any actual or prospective client, customer, supplier, or licensor to cause, induce or encourage such individual to become a customer of any business in which you are engaged that is competitive with the Business. The restrictions relating to actual or prospective clients, customers, suppliers, or licensors in this paragraph apply only to (a) those actual or prospective clients, customers, suppliers, or licensors with whom you had contact on behalf of the Firm during the last twelve months of your employment with the Firm; or (b) any of the Firm's actual or prospective clients, customers, suppliers, or licensors about whom you had any confidential information during the last twelve months of your employment with the Firm. In no event shall it be a violation of this Section 2 to engage in solicitations incidental to general advertising or other general solicitation in the ordinary course not specifically targeted at such persons or to employ any person not solicited in violation hereof.

3. <u>Non-Disparagement</u>.    You agree that, during your employment with the Firm or at any time thereafter, you shall not make any public statement that is materially disparaging of the business of Lehman Brothers Holdings Inc. or Eagle or its subsidiaries, or to the business reputation of any of the executive officers of Lehman Brothers Holdings Inc. or Eagle or its subsidiaries or any of the employees of the Firm who are known to you to be employees of the Firm at the time of any such public statement.  Your obligations under this Section 3 shall not apply to disclosures required by applicable law, regulation or order of a court or governmental agency.

You agree that the above obligations and covenants are reasonable in duration and scope, and agree that any arbitration panel or court of competent jurisdiction may reform such obligations to the extent necessary to enforce them under applicable law.  You further agree and acknowledge that violation of these obligations and covenants would cause immeasurable and irreparable damage to the Firm and its affiliates.  Accordingly, you agree that the Firm is entitled to injunctive relief in any court of competent jurisdiction for any actual or threatened violation of any such obligations, in addition to any other remedies it may have.

Subject to the Firm's right to injunctive relief as outlined above, you agree that any dispute arising out of or relating to your employment by the Firm or the terms of this Agreement will be submitted to arbitration pursuant to the rules as then in effect of the National Association of Securities Dealers or New York Stock Exchange.

The provisions of this Agreement are in addition to the provisions in any written employment agreement between the Firm and you, and will not affect your responsibilities or any other rights of the Firm under such agreements. This Agreement is not a contract of continuing employment. Employment is for no fixed term, and either you or the Firm may decide to terminate the employment relationship at any time for any reason.

This Agreement shall be governed by New York law, without regard to its choice of law principles, and will be binding on you, your heirs, executors, assigns, and administrators, shall inure to the benefit of the Firm, its successors and assigns, and shall survive the termination of your employment with the Firm, regardless of the manner of such termination.

Each provision of this Agreement will be interpreted on its own. If any provision is held to be unenforceable as written, it will be enforced to the extent reasonable under the circumstances. In any case, the other provisions of this Agreement will not be affected.

This Agreement constitutes the entire agreement among the parties and supersedes all prior agreements or understandings, if any, whether oral or written, with regard to the subject matter hereof. This Agreement is an integrated document and may not be modified or amended except in a writing signed by the parties hereto or their successors in interest.

**I have signed and dated this Agreement below to indicate my agreement to its provisions and to acknowledge that I have received a copy of this Agreement.**

**Employee**

| Employee Name (Please Print) | Employee Signature | Date |
|---|---|---|
| Mary Anne Brelinsky | *Mary Anne Brelinsky* | 6/22/07 |

**EXHIBIT B**

# LEHMAN BROTHERS

Confidentiality Agreement

Please read carefully and sign

Name

Mary Anne Brelinsky

In the course of your work, you may become aware of information of a confidential nature pertaining to the business of the Firm and its clients. The importance of preserving the confidentiality of such information and using it only for the purpose for which it was obtained cannot be overemphasized. Lehman Brothers and its affiliates (collectively, "LB" or the "Firm") maintain policies and procedures with respect to the use and the dissemination of confidential information which are summarized below.

1.    All information related to the business activities of LB and its clients that may be obtained by you from any source as a result of your employment shall be considered as confidential. Materials contained in client files should always be regarded as confidential. You should always maintain appropriate administrative, technical and physical safeguards over records in your possession to prevent unauthorized access.

2.    Information regarding the business methods, operations or results of LB or its clients may not be disclosed to competitors, to the public or to any person. Nor can the preceding information be otherwise used except as your duties at LB may require or with the prior written approval of an authorized senior officer of LB. This applies to the period of your employment and thereafter. Trade practices, procedures, software or other strategies which you develop in the course of performing responsibilities or using LB equipment, facilities are the property of Firm.

3. The handling of material, non-public information is covered in LB's "Chinese Wall and Restricted List Policy" and "Code of Conduct".

4.    The execution of transactions for your own accounts or the solicitation or exercise of discretion over the accounts of others is strictly prohibited when you "know" or have "reason to believe" that you possess material, non-public information, regarding the activities or affairs of the issuing company.  "Material" information is any information which, if publicly disclosed, would reasonably influence an investor's decision to purchase, sell or hold the subject securities or any other securities affected by the information.

5.    Upon termination of your employment, you are required to deliver to the Firm all documents, recordings and other tangible records (including tapes, discs or other similar media) that contain or are derived from the Firm's, or the Firm's clients', confidential information, and permanently erase, remove and destroy any such confidential information maintained in electronic format.

Any employee who has questions or concerns with respect to the use or dissemination of information relating to the business activities or affairs of LB, its subsidiaries, affiliates or clients or relating to corporate or public finance transactions should consult with the Compliance Department or Law Department for guidance.

The Firm will take strong action (which may include termination of employment) against any person(s) making any improper use of confidential information or contributing to a breach of confidentiality.

*I have reviewed and agree to comply with the LB Confidentiality Policy*

| Signature | Department | Date |
|-----------|-----------|------|
| | Fixed Income | 6/22/07 |

# **EXHIBIT C**

# LEHMAN BROTHERS

*6/14/2007*

*By Hand*

Russell Schneider

Dear Russell:

In connection with the acquisition of Eagle Energy Parnters I, L.P. ("Eagle") contemplated by the Purchase Agreement, dated as of May 8, 2007, among Lehman Brothers Commodities Services and the sellers named therein (the "Purchase Agreement"), Eagle and Lehman Brothers Holdings Inc. (together with its parents, affiliates, and subsidiaries, "Lehman" or the "Firm") have agreed that you are key to the business of Eagle and, as such, Lehman and Eagle desire to provide you with an incentive to remain employed with Eagle or its successor in the acquistion through and after the closing date of the Purchase Agreement (the "Closing Date"). Accordingly, Lehman is pleased to offer you the opportunity to receive a retention award ("Retention Award"), subject to the terms and conditions set forth below. Your eligibility to receive the Retention Award is conditioned on the Closing (as defined in the Purchase Agreement) of the Purchase Agreement, your execution of the "Non-Solicitation and Non-Disparagement Agreement" and the "Confidentiality Agreement" attached hereto as **Exhibits A and B** (the "Covenant Agreements"), confirmation that you have satisfactorily met all of Lehman's pre-employment requirements, including the successful completion of a criminal background investigation, and your continued employment with Eagle or its affiliates through the Closing Date as well as other conditions set forth in this letter.

Provided you remain actively employed through the payment dates and have not breached any provision of the Covenant Agreements and subject to confirmation that you have satisfactorily met all of Lehman's pre-employment requirements, including the successful completion of a criminal background investigation, as well as other conditions set forth in this agreement, the Firm will grant you a retention award with an aggregate value equivalent to $600,000 (the "Retention Award"). The Retention Award will vest and become payable in equal installments, less applicable tax withholding and other deductions, on each of the first through third anniversaries of the Closing Date.  In the event your employment with the Firm ends as a result of your resignation for any reason or your termination by the Firm for Cause (as defined below) before the applicable payment date, you will not thereafter receive any further Retention Award payments.  In the event your employment is terminated by Firm without Cause before the applicable payment date, you will continue to receive any unpaid Retention Award payments on the applicable payment date(s), provided you have not breached any provision of the Covenant Agreements.  In the event your employment is terminated as a result of your death or "Disability" (which, for purposes of this retention award, will mean you are no longer actively working for the Firm and are receiving benefits under the Firm's Long-Term Disability Insurance Plan as in effect from time to time), you or your estate shall receive a lump sum cash payment equivalent to any unpaid portion of the Retention Payments as soon as practicable following such termination.   For purposes of this Retention Award, "Cause" means any of the following: (i) misconduct, (ii) breach of Firm policies or rules, (iii) dishonesty, (iv) violation of laws or regulations, or (v) substantial and continuing failure to perform employment duties or

Russell Schneider
6/14/2007
Page 2 of 2

obligations satisfactorily. For purposes of Lehman's Equity Award Program the Retention
Award payments will not be considered part of your total compensation.

All payments described in this letter will be paid in accordance with our customary payroll
practices, and will be subject to applicable payroll and income tax withholding and other
applicable deductions. Please understand that the terms and conditions of your employment by
Eagle or Lehman will be governed by applicable Firm policies.

While the foregoing compensation commitments will be honored on the terms outlined above,
this letter is not a contract of continuing employment. Your employment by the Firm is for no
fixed term, and either you or the Firm may terminate the employment relationship at any time for
any reason.

This Retention Award is conditional upon the closing of the Purchase Agreement and your
execution of the Covenant Agreements attached hereto as **Exhibits A and B**. In the event the
Purchase Agreement is terminated, this letter and the Covenant Agreements will be void *ab initio*
and of no further force or effect.

By your signature below, you agree that any controversies arising out of or relating to this letter
or your employment by the Firm shall be submitted to and settled by arbitration pursuant to the
rules as then in effect of the National Association of Securities Dealers or the New York Stock
Exchange.

Russell, we are delighted that you will continue to be a part of our organization. If you agree
with the terms outlined in this letter, please sign this letter and the Covenant Agreements and
return them to me. An additional copy of this letter is enclosed for your files.

Sincerely,

Mary Pat Archer
Managing Director
Fixed Income Division

Acceptance:

I accept the terms and conditions of this offer letter. Furthermore, I confirm that I am not aware
of any circumstances which may result in me being unable to successfully satisfy the criminal
background check requirements outlined in this letter.

_____          _6/22/07_
Signed                                     Date

# LEHMAN BROTHERS

## Non-Solicitation, and Non-Disparagement Agreement

| Employee Name (*Print*) | Social Security Number |
|---|---|
| Schneider, Russell | 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 |

In the course of your work, you will become aware of information of a confidential nature pertaining to the business of Eagle Energy ("Eagle"), Lehman Brothers, its parents and affiliates, and its clients (together, the "Firm"). The Firm maintains policies and procedures with respect to the use and the dissemination of confidential information which are summarized in a separate Confidentiality Agreement. Your employment creates a relationship of confidence and trust between you and the Firm with respect to any information applicable to the business of the Firm or applicable to the business of the Firm's clients which may be made known to you by the Firm or by any Firm client, or learned by you in the course of your work. You understand that you have an obligation to preserve the confidentiality of such information and use it only for the purpose for which it was obtained.

In consideration of the transaction contemplated by the Purchase Agreement dated as of May 8, 2007, among Lehman Brothers Commodities Services Inc. and the Sellers named therein (the "Purchase Agreement") as well as the confidential information, goodwill, and any compensation afforded to you pursuant to the Retention Award letter between you and the Firm dated as of 6/14/2007, (the "Retention Award Letter"), the receipt and adequacy of which are hereby acknowledged, you understand and agree that your undertakings set forth below are material and essential terms to the Firm in entering into the Purchase Agreement and the Retention Award Letter, and accordingly you expressly agree that:

1. <u>Non-Solicitation.</u>  You agree that so long as you are employed by the Firm and for the period commencing as of the closing date of the Purchase Agreement and ending on the later of the third anniversary of the closing date of the Purchase Agreement or the first anniversary of the termination of your employment with the Firm or any of its affiliates you shall not and shall cause your controlled affiliates not to (other than in your capacity as an employee of the Firm or its affiliates): (i) cause, solicit, induce or encourage any employees, consultants or contractors of the Firm or their subsidiaries or affiliates to leave such employment or service, (ii) hire, employ or otherwise engage any such individual, (iii) cause, induce or encourage any actual or prospective client, customer, supplier, or licensor of the Firm or its subsidiaries (including any existing or former customer of the Firm or its subsidiaries and any Person that becomes a client or customer of the Firm after the consummation of the transactions contemplated by the Purchase Agreement) to terminate or modify any such actual or prospective business relationship with the Firm or its affiliates or subsidiaries, or (iv) develop a business relationship with any actual or prospective client, customer, supplier, or licensor to cause, induce or encourage such individual to become a customer of any business in which you are engaged that is competitive with the Business. The restrictions relating to actual or prospective clients, customers, suppliers, or licensors in this paragraph apply only to (a) those actual or prospective clients, customers, suppliers, or licensors with whom you had contact on behalf of the Firm during the last twelve months of your employment with the Firm; or (b) any of the Firm's actual or prospective clients, customers, suppliers, or licensors about whom you had any confidential information during the last twelve months of your employment with the Firm. In no event shall it be a violation of this Section 2 to engage in solicitations incidental to general advertising or other general solicitation in the

ordinary course not specifically targeted at such persons or to employ any person not solicited in violation hereof.

2. <u>Non-Disparagement</u>.  You agree that, during your employment with the Firm or at any time thereafter, you shall not make any public statement that is materially disparaging of the business of Lehman Brothers Holdings Inc. or Eagle or its subsidiaries, or to the business reputation of any of the executive officers of Lehman Brothers Holdings Inc. or Eagle or its subsidiaries or any of the employees of the Firm who are known to you to be employees of the Firm at the time of any such public statement.  Your obligations under this Section 3 shall not apply to disclosures required by applicable law, regulation or order of a court or governmental agency.

You agree that the above obligations and covenants are reasonable in duration and scope, and agree that any arbitration panel or court of competent jurisdiction may reform such obligations to the extent necessary to enforce them under applicable law.  You further agree and acknowledge that violation of these obligations and covenants would cause immeasurable and irreparable damage to the Firm and its affiliates.  Accordingly, you agree that the Firm is entitled to injunctive relief in any court of competent jurisdiction for any actual or threatened violation of any such obligations, in addition to any other remedies it may have.

Subject to the Firm's right to injunctive relief as outlined above, you agree that any dispute arising out of or relating to your employment by the Firm or the terms of this Agreement will be submitted to arbitration pursuant to the rules as then in effect of the National Association of Securities Dealers or New York Stock Exchange.

The provisions of this Agreement are in addition to the provisions in any written employment agreement between the Firm and you, and will not affect your responsibilities or any other rights of the Firm under such agreements.  This Agreement is not a contract of continuing employment.  Employment is for no fixed term, and either you or the Firm may decide to terminate the employment relationship at any time for any reason.

This Agreement shall be governed by New York law, without regard to its choice of law principles, and will be binding on you, your heirs, executors, assigns, and administrators, shall inure to the benefit of the Firm, its successors and assigns, and shall survive the termination of your employment with the Firm, regardless of the manner of such termination.

Each provision of this Agreement will be interpreted on its own.  If any provision is held to be unenforceable as written, it will be enforced to the extent reasonable under the circumstances.  In any case, the other provisions of this Agreement will not be affected.

This Agreement constitutes the entire agreement among the parties and supersedes all prior agreements or understandings, if any, whether oral or written, with regard to the subject matter hereof.  This Agreement is an integrated document and may not be modified or amended except in a writing signed by the parties hereto or their successors in interest.

**I have signed and dated this Agreement below to indicate my agreement to its provisions and to acknowledge that I have received a copy of this Agreement.**

**Employee**

| Employee Name (Please Print) | Employee Signature | Date |
|---|---|---|
| Russell Schneider | | 6-22-07 |

# EXHIBIT B

## LEHMAN BROTHERS

### Confidentiality Agreement

**Please read carefully and sign**

| Name | Social Security Number |
|------|------------------------|
| Russell Schneider | 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 |

In the course of your work, you may become aware of information of a confidential nature pertaining to the business of the Firm and its clients. The importance of preserving the confidentiality of such information and using it only for the purpose for which it was obtained cannot be overemphasized. Lehman Brothers and its affiliates (collectively, "LB" or the "Firm") maintain policies and procedures with respect to the use and the dissemination of confidential information which are summarized below.

1.    All information related to the business activities of LB and its clients that may be obtained by you from any source as a result of your employment shall be considered as confidential. Materials contained in client files should always be regarded as confidential. You should always maintain appropriate administrative, technical and physical safeguards over records in your possession to prevent unauthorized access.

2.    Information regarding the business methods, operations or results of LB or its clients may not be disclosed to competitors, to the public or to any person. Nor can the preceding information be otherwise used except as your duties at LB may require or with the prior written approval of an authorized senior officer of LB. This applies to the period of your employment and thereafter. Trade practices, procedures, software or other strategies which you develop in the course of performing responsibilities or using LB equipment, facilities are the property of Firm.

3.  The handling of material, non-public information is covered in LB's "Chinese Wall and Restricted List Policy" and "Code of Conduct".

4.    The execution of transactions for your own accounts or the solicitation or exercise of discretion over the accounts of others is strictly prohibited when you "know" or have "reason to believe" that you possess material, non-public information, regarding the activities or affairs of the issuing company.  "Material" information is any information which, if publicly disclosed, would reasonably influence an investor's decision to purchase, sell or hold the subject securities or any other securities affected by the information.

5.    Upon termination of your employment, you are required to deliver to the Firm all documents, recordings and other tangible records (including tapes, discs or other similar media) that contain or are derived from the Firm's, or the Firm's clients', confidential information, and permanently erase, remove and destroy any such confidential information maintained in electronic format.

Any employee who has questions or concerns with respect to the use or dissemination of information relating to the business activities or affairs of LB, its subsidiaries, affiliates or clients or relating to corporate or public finance transactions should consult with the Compliance Department or Law Department for guidance.

The Firm will take strong action (which may include termination of employment) against any person(s) making any improper use of confidential information or contributing to a breach of confidentiality.

*I have reviewed and agree to comply with the LB Confidentiality Policy*

| Signature | Department | Date |
|-----------|------------|------|
|  | Controller | 6-22-07 |

# **EXHIBIT D**



**Your Employment Offer - Message (Rich Text)**

File  Edit  View  Insert  Format  Tools  Actions  Form  Layout  Help

Reply | Reply to All

From:     Barclays Capital Employment Offer                          Sent:    Mon 9/22/2008 10:07 PM
To:
Cc:
Subject:  Your Employment Offer

We are pleased to confirm our interest in having you join Barclays.  The transaction gained court approval early Saturday morning and will close on Monday. As a result we are offering you employment with Barclays to begin on Monday, September 22, 2008.

As a Barclays employee, you will continue to receive your current base salary or applicable commission based remuneration. In the next week or so, you will receive additional details concerning your employment if you work in an office outside the United States or if any special arrangements apply to your situation. Initially your medical and other health insurance arrangements will also be the same as they were with Lehman.  Over time, the benefits for Barclays and former Lehman employees will be coordinated.  You will receive information about other benefit programs in the near future.

Your acceptance of employment with Barclays will be indicated by your attendance at work on and after September 22, 2008.  In addition, in order to accept or decline the offer, it is necessary that you send an email to either acceptbarclaysoffer@lehman.com or declinebarclaysoffer@lehman.com. You will be an "at will" employee of Barclays.  This means that either you or Barclays can end our employment relationship at any time, with or without any reason.  As an employee of Barclays, you will be required to comply with all applicable Barclays rules, regulations and policies including, but not limited to, confidentiality and other provisions.

Confidentiality of information is a cornerstone of our business.  Therefore, we must remind you that as an employee of Barclays you may not, directly or indirectly, disclose to anyone outside Barclays, except with Barclays' prior written consent, any confidential or proprietary information concerning Barclays including, without limitation, any information provided during the course of providing services to Barclays or, as part of the transition effort, to Lehman.  This restriction relates to confidential information and proprietary information, processes and trade secrets.  You also may not make use of any such information for your own purposes or for the benefit of anyone or any other entity other than Barclays.  These restrictions will not preclude you from discussing any matter concerning Barclays with any governmental, regulatory or self-regulatory agency if you are compelled to do so by subpoena or other regulatory authority.  By accepting employment with Barclays, you agree to abide by the confidentiality rules in this paragraph and to disclose to Barclays as soon as reasonably practical, all requests for information you are asked to provide by any such agency.

We at Barclays look forward to you joining the team.

Michael Evans

Managing Director,
Global Head of Human Resources for Barclays Capital

# **EXHIBIT E**

**Subject:**                              FW: Eagle Energy

-----Original Message-----
From: Joe.Gold@barclayscapital.com [mailto:Joe.Gold@barclayscapital.com]
Sent: Monday, September 22, 2008 8:37 PM
To: Watson, Chuck
Subject: RE: Eagle Energy

Chuck,

I am not sure if I am more embarrassed or angry.  The e-mails have still not been sent out.  Today, I have gone to
Jonathan Hughes (General Counsel of Barcap), Jerry del Missier (President of Barcap) and Rich Ricci (acting President of
Lehman Brothers Inc.).  They have all approved sending out the e-mails and moving the employees.  The legacy Lehman
people agree.  Tracie Binkley (Head of HR?) confirmed this to me recently.  Sometime today, the people at Alvarez &
Marsal got involved in the issue and somehow put a stop to the e-mail and offers of employment.  I can only assume that
you peaked their interest because of your MOU and they wanted to make sure nothing good happens without them.
I cannot get them to return my call or find them in the Lehman building.
Here are the people that I am chasing:

Brian Marsal - decision maker - I don't have a number Jim Fogerty - mid level - (c) ███████ Robert Hersham - junior
- (o) 212-328-8514
            (m) ████████
Lehman building restructuring room - 212-526-9536

I am trying to give you money with nothing in return.  They don't seem to get that and will not engage with me.  They may
engage with you because you represent a buyer of assets.  I will pick it up again in the morning.

Joe

-----Original Message-----
From: Watson, Chuck [mailto:chuck.watson@lehman.com]
Sent: Monday, September 22, 2008 5:33 PM
To: Watson, Chuck; Gold, Joe: Commodities (NYK)
Subject: RE: Eagle Energy

Still no response.

Chuck
Houston Phone: 281-781-0355
New York Phone: 212-526-5077

> _____
> From:        Watson, Chuck
> Sent: Monday, September 22, 2008 1:37 PM
> To:   'joe.gold@barcap.com'
> Subject:    FW: Eagle Energy
>
> Nothing received yet

> 
> 
> Chuck
> Houston Phone: 281-781-0355
> New York Phone: 212-526-5077
> 
> 
> 
> 
> _____
> From:    Watson, Chuck
> Sent: Monday, September 22, 2008 12:17 PM
> To:  'joe.gold@barcap.com'
> Subject:    Eagle Energy
> 
> None of the Eagle employees have received any emails to indicate they
> have been included in the Barclays transfer. Please let me know what
> you know.
> 
> 
> Chuck Watson
> Chairman, Global Commodities
> Lehman Brothers
> 4700 West Sam Houston Parkway North, Suite 250 Houston, TX 77041
> Houston Phone: 281-781-0355 New York Phone: 212-526-5077
> Blackberry: 347-515-1152
> email: chuck.watson@lehman.com
> 
> 
> 
> 

_____

This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unless specifically indicated, this e-mail is not an offer to buy or sell or a solicitation to buy or sell any securities, investment products or other financial product or service, an official confirmation of any transaction, or an official statement of Barclays. Any views or opinions presented are solely those of the author and do not necessarily represent those of Barclays. This e-mail is subject to terms available at the following link: www.barcap.com/emaildisclaimer. By messaging with Barclays you consent to the foregoing. Barclays Capital is the investment banking division of Barclays Bank PLC, a company registered in England (number 1026167) with its registered office at 1 Churchill Place, London, E14 5HP.  This email may relate to or be sent from other members of the Barclays Group.

_____

*********************************************************************************

This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unless specifically indicated, this e-mail is not an offer to buy or sell or a solicitation to buy or sell any commodities, financial risk management products, or other physical or financial product or service, an official confirmation of any transaction, or an official statement of EDF Trading Limited, EDF Trading Markets Limited, EDF Trading North America, LLC, or any of the EDF Group family of companies.  Any views or opinions presented are solely those of the author and do not necessarily represent those of the foregoing entities.  EDF Trading Markets Limited is authorized and regulated by the Financial Services Authority.  VAT number: GB 735 5479 07. EDF Trading Markets Limited and EDF Trading North America, LLC are members of the EDF Group of companies.  EDF Trading Markets Limited maintains its registered office at 80 Victoria Street, 3rd Floor, Cardinal Place, London, SW1E 5JL.  A Company registered in England No. 4255974.  EDF Trading North America, LLC is headquartered in the United States at 4700 W. Sam Houston Pkwy., Suite 250, Houston, TX  77041
*********************************************************************************

# EXHIBIT F

*Execution Version*

# PURCHASE AGREEMENT

### related to

### Partner Interests in Eagle Energy Partners I, L.P.

### among

**EAGLE ENERGY MANAGEMENT, LLC**
**LEHMAN BROTHERS COMMODITY SERVICES INC.**
**LBMB FUND EAGLE ENERGY HOLDINGS LLC**
**LBMB PARTNERS EAGLE ENERGY HOLDINGS LLC**
**LBMB FUND (B) EAGLE ENERGY HOLDINGS LLC**
**LBMB CAPITAL PARTNERS V EAGLE ENERGY HOLDINGS LLC**
**LEHMAN BROTHERS HOLDINGS INC.**
(as Sellers)

### and

**EDF TRADING NORTH AMERICA MANAGEMENT LLC**
**EDF TRADING NORTH AMERICA INC.**
(as Purchasers)

## DATED AS OF SEPTEMBER 26, 2008

# TABLE OF CONTENTS

**Page**

ARTICLE I      PURCHASE AND SALE OF INTERESTS.................................................. 2
    Section 1.1      Purchased Interests................................................................. 2
    Section 1.2      Other Transactions................................................................ 2
    Section 1.3      Purchase of the Purchased LP Units..................................... 3
    Section 1.4      Purchase of the Purchased GP Units..................................... 3
    Section 1.5      Payment.................................................................................. 3

ARTICLE II      CLOSING ................................................................................................ 3
    Section 2.1      Closing.................................................................................... 3
    Section 2.2      Deliveries by the Sellers at the Closing ................................ 3
    Section 2.3      Deliveries by the Purchasers at the Closing.......................... 4

ARTICLE III      CONDITIONS TO CLOSING .................................................................. 4
    Section 3.1      Conditions to each Party's Obligations................................. 4
    Section 3.2      Conditions to the Purchasers' Obligations............................ 5
    Section 3.3      Conditions to the Sellers' Obligations ................................. 7

ARTICLE IV      REPRESENTATIONS AND WARRANTIES REGARDING
                SELLERS.................................................................................. 7
    Section 4.1      Organization; Good Standing ................................................ 7
    Section 4.2      Ownership............................................................................... 7
    Section 4.3      Authorization ......................................................................... 8
    Section 4.4      Valid Transfer ........................................................................ 8
    Section 4.5      Compliance with Other Instruments ...................................... 8

ARTICLE V      REPRESENTATIONS AND WARRANTIES REGARDING THE
                PARTNERSHIP........................................................................ 8
    Section 5.1      Organization; Good Standing; Qualification ........................ 8
    Section 5.2      Capitalization; Ownership and Voting Rights ...................... 9
    Section 5.3      Material Contracts and Consents ........................................... 9
    Section 5.4      Compliance With Other Instruments .................................... 11
    Section 5.5      Related Party Transactions .................................................. 12
    Section 5.6      Registration Rights............................................................... 12
    Section 5.7      Certain Agreements of Officers and Employees ................. 12
    Section 5.8      Litigation............................................................................... 13
    Section 5.9      Financial Statements and Related Matters ........................... 13
    Section 5.10      Insurance............................................................................. 14
    Section 5.11      Compliance with Laws; Regulatory.................................... 14
    Section 5.12      Environmental..................................................................... 15
    Section 5.13      Market Based Rate Authority ............................................. 15
    Section 5.14      Real Property ...................................................................... 16
    Section 5.15      Assets .................................................................................. 16
    Section 5.16      Intellectual Property and Software...................................... 16
    Section 5.17      Employee Benefit Plans...................................................... 17

# TABLE OF CONTENTS
(continued)

**Page**

Section 5.18    Employment and Labor Matters ....................................................... 18
Section 5.19    PUHCA Regulation ......................................................................... 18
Section 5.20    Trading ............................................................................................ 18
Section 5.21    Brokers ............................................................................................ 18
Section 5.22    Restrictions on Business or Sale of Partnership ............................. 18
Section 5.23    Taxes ............................................................................................... 18

ARTICLE VI    REPRESENTATIONS AND WARRANTIES OF THE
PURCHASERS ................................................................................ 20

Section 6.1    Organization; Good Standing ......................................................... 20
Section 6.2    Authorization .................................................................................. 20
Section 6.3    Litigation ........................................................................................ 20
Section 6.4    Brokers or Finders .......................................................................... 20
Section 6.5    Consents .......................................................................................... 20

ARTICLE VII    ADDITIONAL AGREEMENTS ....................................................... 21

Section 7.1    Conduct of Business ....................................................................... 21
Section 7.2    Access to Information ..................................................................... 24
Section 7.3    Further Assurances; Cooperation .................................................... 24
Section 7.4    Subject Consents and Approvals ..................................................... 24
Section 7.5    Bankruptcy Court Filings ............................................................... 25
Section 7.6    Limited Partner Waiver and Consent .............................................. 25
Section 7.7    Member Waiver and Consent .......................................................... 25
Section 7.8    Public Announcements; Confidentiality .......................................... 25
Section 7.9    Fees and Expenses .......................................................................... 26
Section 7.10    Transfer Taxes ................................................................................ 26
Section 7.11    Insurance ......................................................................................... 26
Section 7.12    Taxes ............................................................................................... 26
Section 7.13    Employee Matters ........................................................................... 29
Section 7.14    Sellers' Representative .................................................................... 30
Section 7.15    Purchasers' Representative .............................................................. 30
Section 7.16    Transition Services Agreement ....................................................... 30
Section 7.17    Office Lease .................................................................................... 31
Section 7.18    Personal Property ............................................................................ 31
Section 7.19    Partnership Interests ....................................................................... 31

ARTICLE VIII    SURVIVAL OF REPRESENTATIONS; INDEMNIFICATION ................. 31

Section 8.1    Survival ........................................................................................... 31
Section 8.2    Agreement to Indemnify ................................................................. 31
Section 8.3    Limitation of Liability ..................................................................... 32
Section 8.4    Conditions of Indemnification ........................................................ 32
Section 8.5    [Reserved] ....................................................................................... 33
Section 8.6    Additional Limitations .................................................................... 33

# TABLE OF CONTENTS
(continued)

**Page**

Section 8.7      Exclusive Remedy ................................................................ 34
Section 8.8      Characterization of Payments ........................................... 34
ARTICLE IX      TERMINATION................................................................ 34
Section 9.1      Termination................................................................ 34
Section 9.2      Procedure and Effect of Termination................................. 35
ARTICLE X      MISCELLANEOUS ............................................................ 36
Section 10.1      Notices ......................................................................... 36
Section 10.2      Entire Agreement ......................................................... 37
Section 10.3      Binding Effect; Assignment; No Third Party Benefit....................... 37
Section 10.4      Severability .................................................................. 37
Section 10.5      Governing Law ............................................................. 38
Section 10.6      Construction................................................................. 38
Section 10.7      Injunctive Relief........................................................... 38
Section 10.8      Consent to Jurisdiction.................................................. 38
Section 10.9      Amendment................................................................... 39
Section 10.10     Waiver.......................................................................... 39
Section 10.11     Counterparts................................................................ 39

# PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (this "Agreement") is made and entered into this 26th day of September, 2008, by and among Lehman Brothers Holdings Inc. ("LBHI"), Eagle Energy Management, LLC (the "GP Seller"), Lehman Brothers Commodity Services Inc. ("Commodity"), LBMB Fund Eagle Energy Holdings LLC ("Main Holdings"), LBMB Partners Eagle Energy Holdings LLC ("Institutional Holdings"), LBMB Fund (B) Eagle Energy Holdings LLC ("B Holdings"), LBMB Capital Partners V Eagle Energy Holdings LLC ("Employee Co-Invest Holdings" and together with the GP Seller (in its capacity as a limited partner of the Partnership (as defined below)), Commodity, Main Holdings, Institutional Holdings and B Holdings, the "LP Sellers" and together with LBHI and the GP Seller (in its capacity as general partner of the Partnership), the "Sellers"), EDF TRADING NORTH AMERICA MANAGEMENT LLC (the "GP Purchaser") and EDF TRADING NORTH AMERICA INC. (the "LP Purchaser" and together with the GP Purchaser, the "Purchasers").

## WITNESSETH:

WHEREAS, Eagle Energy Partners I, L.P. is a Texas limited partnership (the "Partnership");

WHEREAS, Eagle Energy Management LLC, a Delaware limited liability company (the "General Partner"), is the general partner of the Partnership;

WHEREAS, Exhibit A sets forth the issued and outstanding limited partnership interests (the "Limited Partnership Units") in the Partnership as of the date hereof on a fully diluted basis;

WHEREAS, the Limited Partnership Units set forth in Exhibit A (the "Purchased LP Units") are, as of the date hereof, held by relevant LP Sellers as set forth in Exhibit A;

WHEREAS, Exhibit B sets forth the issued and outstanding general partnership interests (the "General Partnership Units" and together with the Limited Partnership Units, the "Units") in the Partnership as of the date hereof on a fully diluted basis;

WHEREAS, the General Partnership Units set forth in Exhibit B (the "Purchased GP Units" and together with the Purchased LP Units, the "Purchased Interests") are, as of the date hereof, held by GP Seller;

WHEREAS, upon the terms and subject to the conditions of this Agreement, at the Closing the Purchasers desire to purchase from the LP Sellers and GP Seller, and the LP Sellers and GP Seller desire to transfer and sell to the Purchasers, the Purchased Interests;

WHEREAS, the General Partner agrees to the transfer and sale of the Purchased LP Units, to the admission of the LP Purchaser as a Substituted Limited Partner (as defined in the Fourth Amended and Restated Agreement of Limited Partnership of the Partnership dated as of June 25, 2007, as amended to date (the "Partnership Agreement")) and to waive certain rights under the Partnership Agreement related to the transactions contemplated by this Agreement;

WHEREAS, the members of the General Partner agree to the transfer and sale of the Purchased GP Units, to the admission of the GP Purchaser as General Partner (as defined in the Partnership Agreement), and to waive certain rights under the Partnership Agreement related to the transactions contemplated by this Agreement;

WHEREAS, the Partnership owes LBHI $663,861,636 under an intercompany loan (the "Intercompany Loan"), which amount is inclusive of amounts owed to the Partnership by Sellers or Sellers' Affiliates in respect of (i) certain clearing account balances totaling $664,784, (ii) certain clearing accounts balances totaling $87,618,882, and (iii) $90,000,000 received by the Partnership from money control wash;

WHEREAS, Commodity owes the Partnership an intercompany receivable of $19,516,553 (the "Intercompany Receivable"), which the parties desire to settle in accordance with the terms and conditions of this Agreement;

WHEREAS, LBHI is a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on September 15, 2008 in the United States Bankruptcy Court for the Southern District of New York (Manhattan) (the "Bankruptcy Court") (Case No. 08-13555) (the "Bankruptcy Case"); and

WHEREAS, subject to the terms and conditions of this Agreement, LBHI desires to forgive, or cause to be forgiven, a portion of the Intercompany Loan and to sell, and LP Purchaser desires to purchase, the balance of the Intercompany Loan, pursuant to section 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as more specifically provided herein;

NOW, THEREFORE, for and in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF INTERESTS

Section 1.1    **Purchased Interests.**  At the Closing, the Purchasers shall pay the Sellers $100.00 in exchange for the Purchased Interests (the "Equity Payment").

Section 1.2    **Other Transactions.**

(a)    At least one day prior to the Closing Date, LBHI shall forgive, and, as applicable, cause its Affiliates to forgive (the "Debt Forgiveness"), $433,378,289 of the Intercompany Loan (the "Debt Forgiveness Amount"), which forgiveness shall be evidenced by a Forgiveness and Release of Indebtedness reasonably satisfactory to the Partnership and the Purchasers.

(b)    At the Closing, LP Purchaser shall pay LBHI $230,483,347 (the "Loan Purchase Amount" and together with the Equity Payment, the "Purchase Price") and LBHI shall assign, or

cause its Affiliates to assign, to the LP Purchaser all rights and interests in the Intercompany Loan, net of the Debt Forgiveness Amount.

(c)    At least one day prior to the Closing Date, all intercompany indebtedness between the Partnership, on the one hand, and the Sellers and their Affiliates, on the other hand, including the Intercompany Receivable, shall be deemed satisfied and paid in full for no additional consideration (any such indebtedness owed by the Partnership which is forgiven shall be included in the definition of Debt Forgiveness).

Section 1.3    **Purchase of the Purchased LP Units**.  At the Closing and on the terms and subject to the conditions set forth in this Agreement, each LP Seller shall transfer and sell to the LP Purchaser the Purchased LP Units set forth opposite each LP Seller's name on Exhibit A for the portion of the Equity Payment set forth opposite such LP Seller's name in Exhibit C, and the LP Purchasers shall purchase such Purchased LP Units.

Section 1.4    **Purchase of the Purchased GP Units**.  At the Closing and on the terms and subject to the conditions set forth in this Agreement, GP Seller shall transfer and sell to the GP Purchaser the Purchased GP Units set forth opposite GP Seller's name on Exhibit B for the portion of the Equity Payment set forth opposite GP Seller's name on Exhibit C.

Section 1.5    **Payment.**  The Purchasers shall pay the Sellers the Equity Payment and shall make payment of the Loan Purchase Amount by wire transfer to a bank account designated by the relevant Seller in writing at least five (5) Business Days prior to the Closing or by such other payment method as is mutually agreed between the relevant Purchaser and such Seller.  As used herein, "Business Day" means any day which is not a Saturday, Sunday or other day on which banks are authorized or required to be closed in the City of New York.

## ARTICLE II

## CLOSING

Section 2.1    **Closing**.  The transfer, purchase and sale of the Purchased Interests, and the consummation of the other transactions contemplated by this Agreement (the "Closing"), shall take place on the third Business Day immediately following the Business Day on which the last of the conditions set forth in Article III has been satisfied or waived, or such other time and date as the Sellers and the Purchasers shall mutually agree either orally or in writing.  The date on which the Closing actually occurs shall be referred to herein as the "Closing Date." None of the actions set forth in Sections 2.2 and 2.3 shall be effective unless and until all of such actions shall have been taken or appropriately waived; but if all such actions are taken or appropriately waived, then the Closing shall be effective as of 12:01 a.m. on the Closing Date.

Section 2.2    **Deliveries by the Sellers at the Closing**.  Subject to the terms and conditions hereof, at the Closing the Sellers will deliver, or cause to be delivered, the following to the Purchaser:

(a)    A certificate duly executed by a duly authorized officer of the General Partner, dated as of the Closing Date, certifying that the Sellers have satisfied the conditions to Closing set forth in Sections 3.2(a) and (b);

(b)    A certificate duly executed by each Seller dated as of the Closing Date and certifying the accuracy of representations and warranties contained in Article IV as it relates to such Seller and the Purchased Interests held by it;

(c)    An executed counterpart of the Transition Services Agreement (the "Transition Services Agreement"), dated as of the Closing Date, in form and substance reasonably acceptable to, and negotiated in good faith by, the Sellers and the Purchasers and which shall include the services and terms described in Section 7.16;

(d)    A copy of all other Seller Material Consents required to be obtained hereunder, all executed by each party whose consent is required thereunder;

(e)    A certificate of each Seller of such Seller's non-foreign status that complies with the requirements of Section 1445 of the Code and applicable Treasury Regulations;

(f)    Assignments of the Purchased Interests; and

(g)    All other documents, instruments and writings reasonably required by the Purchasers to be delivered at or prior to the Closing pursuant to this Agreement.

Section 2.3    **Deliveries by the Purchasers at the Closing**.  Subject to the terms and conditions hereof, at the Closing, the Purchasers will deliver the following to Sellers:

(a)    a certificate duly executed by a duly authorized officer of each Purchaser dated as of the Closing Date and certifying that such Purchaser has satisfied the conditions to Closing set forth in Sections 3.3(a) and 3.3(b);

(b)    the amounts required to be paid by Purchasers pursuant to Article I;

(c)    an executed counterpart of the Transition Services Agreement; and

(d)    all other documents, instruments and writings reasonably required by the Sellers to be delivered at or prior to the Closing pursuant to this Agreement.

## ARTICLE III

## CONDITIONS TO CLOSING

Section 3.1    **Conditions to each Party's Obligations**.  The obligations of the Purchasers and Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, at or prior to the Closing, of the following conditions:

(a)    Any authorizations required by the Federal Energy Regulatory Commission ("FERC") to consummate the transactions contemplated by this Agreement under Section 203 of the Federal Power Act (the "FERC Order") shall have been obtained.

(b)      Any waiting period applicable to the transactions contemplated by this Agreement under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), shall have terminated or expired.

(c)      [Reserved]

(d)      This Agreement is expressly subject to and contingent upon entry of the Approval Order (as defined herein) by the Bankruptcy Court, which shall contain at least clauses (a), (b) and (c) of Section 7.5 hereof.

(e)      There shall not be in effect any Law which would render the parties unable to consummate or perform the transactions contemplated hereby or make such transactions illegal or prohibit, restrict or delay such consummation or performance; and there shall not be in effect any injunction or other order issued by a court of competent jurisdiction restraining or prohibiting the consummation or performance of the transactions contemplated hereby.

Section 3.2    **Conditions to the Purchasers' Obligations**.    The obligations of the Purchasers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, at or prior to the Closing, of the following conditions, any or all of which may be waived in whole or in part by the Purchasers in their sole discretion:

(a)      The representations and warranties of each of the Sellers set forth in Article IV and Article V (without taking account of any materiality or material adverse effect qualification therein) shall be true and correct as of the date hereof and true and correct as of the Closing Date as if made at and as of such date, except for representations and warranties specifically made as of a specific date (which representations and warranties shall be true and correct as at such date) and except where any such failure to be true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (as defined below).

(b)      Each of the Sellers shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

(c)      All Seller Material Consents shall have been received in a form and substance reasonably satisfactory to the Purchasers and their counsel.

(d)      All deliveries required to be delivered by the Sellers pursuant to Section 2.2 hereunder shall have been delivered at or prior to the Closing.

(e)      The parties have agreed upon a list of nine individuals (which list has been initialed by Charles L. Watson and the Purchasers), and retention agreements shall have been executed and delivered by (i) the two individuals designated on the list as "essential employees" and (ii) five of the remaining seven individuals on the list which retention agreements shall be in a form and on terms negotiated in good faith and agreed by the Purchasers and the relevant individual; *provided*, *however*, that the seven requisite retention agreements shall be executed and delivered by the date that is five (5) Business Days prior to the hearing date for approval of the Approval Order and if not so finalized then Purchaser shall be deemed to waive the condition in this Section 3.2(e) unless Purchaser's Representative provides written notice to Sellers before

the end of such fifth (5th) Business Day that Purchaser is terminating this Agreement for the failure of this condition in accordance with Section 9.1(e).

(f)    The Executive Committee and equityholders of the General Partner shall have approved the execution of this Agreement and the related transactions in accordance with the General Partner's Second Amended and Restated Operating Agreement, dated June 25, 2007 (the "Operating Agreement") and the appropriate management authority and equityholders shall have approved the execution of this Agreement and the related transactions in accordance with their constituent documents.

(g)    The General Partner, in its capacity as general partner of the Partnership, shall have approved this Agreement and the related transactions pursuant to Section 15(l) of the Partnership Agreement.

(h)    None of the Partnership or General Partner, which are collectively hereinafter referred to as the "Eagle Entities", shall have experienced any change in the Business, condition (financial or otherwise), affairs, properties, contracts, business relationships, assets or liabilities, individually or in the aggregate, that has had or is reasonably likely to have a material adverse effect on the Partnership, taken as a whole, but excluding, for these purposes, any change or circumstance resulting from (i) changes in general economic conditions, general movements in stock markets, and changes in credit markets in any country in which the Partnership conducts its Business other than those that have a materially disproportionate effect on the Partnership as compared to others in the industry, (ii) changes in conditions (whether political, legal or economic) generally affecting the industry in which the Partnership conducts its Business other than those that have a materially disproportionate effect on the Partnership as compared to others in the industry, (iii) the announcement of this Agreement, the consummation of the transactions contemplated hereby, or the compliance by any of the parties with the terms of this Agreement, or (iv) consequences resulting from LBHI filing a petition under Chapter 11 of the U.S. Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (a "Material Adverse Effect").

(i)    The Purchasers shall have received an unaudited consolidated balance sheet and related statement of earnings, partners' equity and cash flows of the Partnership for the month of September and each later completed calendar month ending thirty (30) days or more immediately prior to the Closing Date prepared in accordance with GAAP and on a basis consistent with the Financial Statements.

(j)    No officer, director, employee or consultant (or anyone acting in any similar capacity to any of the foregoing) of the Partnership or acting in or for the business of the Partnership (the "Business"), nor the Partnership itself (i) shall be under any investigation, or subject to any proceeding, by the Securities and Exchange Commission ("SEC"), FERC, or any other governmental or regulatory or self-regulatory body, or (ii) shall have entered into any settlement with, or be subject to any order (other than orders issued in connection with obtaining any permit, license or approval from any Governmental Entity) by, the SEC, FERC, or any other governmental or regulatory or self-regulatory body.

Section 3.3     **Conditions to the Sellers' Obligations**.  The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction at or prior to the Closing (and shall remain satisfied at and as of the Closing) of the following conditions, any or all of which may be waived, in whole or in part, by the Sellers holding not less than a majority of the outstanding Purchased LP Units:

(a)     The representations and warranties of the Purchasers set forth in Article VI (without taking account of any materiality or material adverse effect qualification therein) shall be true and correct as of the date hereof and true and correct as of the Closing Date as if made at and as of such date, except for representations and warranties specifically made as of a specific date (which representations and warranties shall be true and correct as at such date) and except where any such failure to be true and correct would not reasonably be expected, individually or in the aggregate, to have in a material adverse effect on the ability of the Purchasers to consummate the transactions contemplated by this Agreement and any ancillary agreements to be executed by the Purchasers and delivered at the Closing.

(b)     The Purchasers shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by them on or prior to the Closing Date.

(c)     All deliveries required to be delivered by the Purchasers pursuant to Section 2.3 hereunder shall have been delivered at or prior to the Closing.

(d)     Guaranty of EDF Trading, of even date herewith, is in full force and effect.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES REGARDING SELLERS

The Sellers represent and warrant, jointly and severally, to the Purchasers that:

Section 4.1     **Organization; Good Standing**.   If such Seller is a corporation, partnership or limited liability company, it has been duly formed and is validly existing and in good standing under the laws of the jurisdiction of its formation.

Section 4.2     **Ownership**.   Seller has good title to and holds of record and owns beneficially the Purchased Interests set forth opposite such Seller's name on Exhibit A (for the LP Sellers) or Exhibit B (for the GP Seller), as applicable, and such Seller's Purchased Interests are free of all Liens (as defined in Section 5.4(b)) other than Liens created under applicable state and federal securities laws.   Except as contemplated by this Agreement or the Partnership Agreement:

(i)     No Seller is a party or subject to any agreement or understanding relating to the acquisition, disposition or voting or giving of written consents with respect to any of the Purchased Interests owned by Seller or matter relating thereto; and

(ii)    No Seller has any obligation (contingent or otherwise) to purchase, redeem or otherwise acquire any Units or other securities or any interest therein or to receive any distribution in respect thereof.

Section 4.3    **Authorization**.    Except for such authorization as is required by the Bankruptcy Court (as herein provided), each Seller has all requisite power and authority to execute and deliver this Agreement and to transfer and sell the Purchased Interests owned by such Seller as contemplated by this Agreement, and to carry out the provisions of this Agreement.  Except for the Approval Order and the actions contemplated in Sections 3.2(f)( and (g), all corporate, limited partnership or limited liability company, as applicable, action on the part of any Seller and, to the extent applicable, the holders of its equity interests, necessary for the authorization, execution and delivery of this Agreement by Seller, and the performance of all obligations of such Seller hereunder at the Closing and the authorization, issuance, transfer, sale and delivery of the Purchased Interests in accordance with this Agreement has been taken.  This Agreement has been duly and validly executed and delivered by each Seller and, assuming this Agreement has been duly authorized, executed and delivered by the other parties hereto, constitutes a valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, and (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

Section 4.4    **Valid Transfer**.    Upon transfer to the Purchasers of the Purchased Interests in accordance with the terms of this Agreement for the consideration expressed herein, each Seller will have transferred to the relevant Purchaser good title to the Purchased Interests owned by such Seller free of all Liens other than Liens created under applicable state and federal securities laws.

Section 4.5    **Compliance with Other Instruments**.    Except for the receipt of the Approval Order, the execution, delivery and performance by Seller of this Agreement and the transactions contemplated hereby will not (a) give rise to a right of any party to enjoin the transactions contemplated hereunder pursuant to the terms of any mortgage, indenture, contract, lease, agreement, instrument, judgment, decree, order or writ to which Seller is a party, by which Seller is bound or to which Seller or its assets are subject, or (b) result in the creation of Liens upon any of the Purchased Interests other than Liens created under applicable state and federal securities laws.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES REGARDING THE PARTNERSHIP

Subject at all times to the matters disclosed in the Schedules hereto, Sellers, jointly and severally, represent and warrant to the Purchasers as of the date hereof and as of the Closing Date that:

Section 5.1    **Organization; Good Standing; Qualification**.

(a)    The Partnership is duly organized, validly existing and in good standing under the laws of the State of Texas and has all partnership power and authority to carry on its Business as now conducted.

(b)    The Partnership is duly licensed or qualified to transact business as a foreign entity and is in good standing in each jurisdiction in which the nature of the business transacted by it or the character of the properties owned or leased by it requires such licensing or qualification, except where the failure to be so licensed or qualified would not, individually or in the aggregate, have a Material Adverse Effect.

Section 5.2    **Capitalization; Ownership and Voting Rights**.

(a)    Schedule 5.2(a) sets forth the number of partnership interests or other equity interests of the Partnership that are issued and outstanding as of the date of this Agreement and the owner of such interests.    All of such interests are validly issued, fully paid and non-assessable.  The Partnership has no subsidiaries.

(b)    Other than this Agreement, there is no outstanding option, warrant, right (contingent or other, including conversion, exchange, participation, right of first refusal, co-sale or preemptive rights) or agreement for the purchase or acquisition of any Units, any other interests in the Partnership, or any options, warrants or rights convertible into or exchangeable for any thereof.  Other than this Agreement, there is no commitment to issue, sell or transfer any Units or any interests in the Partnership, or subscriptions, warrants, options, convertible or exchangeable securities or other such rights relating to the Units, or to distribute to holders of its Units any evidence of indebtedness or asset.

(c)    Except as contemplated by this Agreement or the Partnership Agreement:

(i)    there are no restrictions under any contract to which the Partnership or any Seller is a party on the transfer of the Units other than those arising from applicable state and federal securities laws; and

(ii)    no person is entitled under any contract to which the Partnership or any Seller is a party to (A) any preemptive or similar right with respect to the issuance of any Units or any other interests in the Partnership, or (B) any rights with respect to the registration of any Units or any other interests in the Partnership.

Section 5.3    **Material Contracts and Consents**.

(a)    Schedule 5.3(a) sets forth a list of:

(i)    (A) all energy management agreements and asset management agreements, (B) all ISDA master agreements, (C) all natural gas storage and transportation agreements with annual revenues in excess of $100,000, (D) NAESB and EEI master agreements and any other material agreement or contract of a similar character or nature (1) under which annual revenues derived therefrom constitute, in the aggregate, at least 80% of all annual revenues of the Partnership and (2) representing at least 80% of the Partnership annual power or gas transactions (on a volumetric basis) and

(E) to the extent not listed in the foregoing (D), any NAESB and EEI master agreements and any other material agreement or contract of a similar character or nature (1) under which the Partnership derives revenues that are greater than 1% of annual revenues derived by the Partnership with respect to the type of revenues associated with such agreement or contract and (2) representing greater than 1% of the Partnership annual power or gas transactions (on a volumetric basis);

(ii)    all broker, distributor, dealer, franchise, agency, promotion, marketing consulting or similar contracts and agreements to which the Partnership is a party or by which any of the Partnership's assets are bound, except contracts that can be terminated without cause and without penalty by the Partnership with less than sixty-one (61) days advance written notice;

(iii)    all management contracts and contracts with independent contractors or consultants, and all employment agreements to which the Partnership is a party, by which any of the Partnership's assets are bound, or pursuant to which the Business is conducted, except contracts that can be terminated without cause and without penalty with less than sixty-one (61) days advance written notice and contracts which require annual payments (including base salary, bonuses and benefits) annually less than $100,000;

(iv)    all contracts and agreements under which the Partnership has incurred, assumed or guaranteed any outstanding indebtedness for borrowed money, whether as a borrower, lender or guarantor and all related security agreements or similar agreements granting Liens securing such indebtedness for borrowed money;

(v)    all contracts and agreements with any Governmental Entity to which the Partnership is a party, by which the Partnership's assets are bound, or pursuant to which the Business is conducted;

(vi)    all contracts and agreements that limit or purport to limit the ability of the Partnership or any of its respective Affiliates (as defined in this Section 5.3(a)) to compete in any line of business or with any Person or in any geographic area or during any period of time;

(vii)    any material license or other similar agreement involving the use of a Person's Intellectual Property in the Business or operations of the Partnership (other than off-the-shelf software licenses);

(viii)    any material agreement for computer hardware or maintenance, and any material agreement for information technology services or consulting, that is used by the Partnership in the conduct of its Business or operations;

(ix)    all agreements or contracts that grant, license, define, describe, impact or pertain to any of the Registered Intellectual Property, except contracts that can be terminated without cause and without penalty by the Partnership with less than ninety-one (91) days advance written notice;

(x)     all agreements between the Partnership, on the one hand, and any of the Sellers or any Affiliate of any Seller, on the other hand; and

(xi)     any agreement necessary for or used in the conduct of the Business that is entered into by or in the name of any Seller or any Affiliate of a Seller rather than the Partnership.

The contracts listed on <u>Schedule 5.3(a)</u> are collectively referred to as "<u>Material Contracts</u>." As used herein, the term "<u>Affiliate</u>" of, or a person "affiliated" with, a specified person, is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

(b)     <u>Schedule 5.3(b)</u> sets forth a list of all consents, approvals, orders or authorizations of, or registrations, qualifications, designations, declarations or filings (collectively, "<u>Consents</u>") with the United States of America or any other nation, any state, province or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government (the "<u>Governmental Entity</u>") or any Person under any Material Contract that is required to be obtained on the part of the Partnership in connection with the transfer and delivery of the Purchased Interests at the Closing or the operation of the Business of the Partnership after the Closing in substantially the same manner as such Business was operated immediately prior to the Closing.  The Consents denoted with an asterisk (*) in <u>Schedule 5.3(b)</u> are referred to herein as the "<u>Seller Material Consents</u>."

(c)     Except as set forth on <u>Schedule 5.3(c)</u>, the Sellers have provided or made available to the Purchasers copies of all Material Contracts and the Partnership (nor any Seller or Seller Affiliate with respect to the agreements referred to in Section 5.3(a)(xi)) is not in breach or default under any of the Material Contracts.  Except as set forth on <u>Schedule 5.3(c)</u>, all Material Contracts are in full force and effect and, to the Seller's knowledge, the other parties to the Material Contracts are not in breach or default under any such Material Contract.

Section 5.4     **Compliance With Other Instruments**.

(a)     The Partnership is not in violation, breach or default of (i) any provision of its certificate of limited partnership or the Partnership Agreement, (ii) any judgment, decree, order, writ, statute, rule or regulation, license or permit of any Governmental Entity applicable to the Partnership, any of its assets, or the Business, (iii) any provision of any mortgage, indenture, evidence of indebtedness, or any other contract, lease, agreement or instrument to which such Partnership is a party or by which the Partnership, any of its assets, or the assets used in the Business, is bound (excluding any Material Contracts, which are addressed in Section 5.3), except, in the case of the foregoing (ii) and (iii), for any such violation, breach or default that would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

(b)     The execution, delivery and performance of this Agreement and the transactions contemplated hereby will not result in the creation of any Liens upon any of the properties or assets of the Partnership or the Business.  For purposes of this Agreement, the term "<u>Liens</u>" shall mean any mortgages, pledges, security interests, liens, charges, claims, restrictions, easements or

other encumbrances of any nature, but excluding (i) liens for taxes not yet due and payable, (ii) liens imposed by Law and incurred in the ordinary course of business for obligations not yet due and payable, (iii) liens of landlords, carriers, warehousemen, laborers, materialmen and the like, (iv) liens created or represented by any escrow agreement with respect to source codes for software and similar items, (v) liens set forth in any Permit, (vi) liens imposed by any Governmental Entity under any zoning rule or Environmental Law (*provided* that such rule, regulation or law has not been violated), or (vii) liens arising in the ordinary course of business that would not individually or in the aggregate have a Material Adverse Effect.

(c)    Subject to obtaining the consents set forth in Schedule 5.3(b), execution and delivery of this Agreement and the transactions contemplated hereby will not violate any judgment, decree, order, writ, statute, rule or regulation of any Governmental Entity applicable to the Partnership.

Section 5.5    **Related Party Transactions**.  No officer, employee, member or partner of the Partnership or the Business or member of such person's immediate family is indebted to the Partnership, nor is the Partnership indebted (or committed to make loans or extend or guarantee credit) to any of them, other than (a) for payment of salary for services rendered to the Partnership or the Business by such officers, employees, members or partners, and (b) reimbursement for reasonable expenses incurred by such officers, employees or partners on behalf of the Partnership or the Business.  Except as set forth in Schedule 5.5, none of such persons owns, directly or indirectly, a greater than 5% interest in, or is on the board of directors of, any firm, corporation or other entity with which the Partnership is affiliated or with which the Partnership has a business relationship in which during the last three years the Partnership has made payments or received payments in excess of $50,000 in any such year, or any firm, corporation or other entity that competes with the Partnership, except as permitted under the Partnership Agreement.  Except as set forth in Schedule 5.5, and except for the Partnership Agreement and the agreements contemplated hereby or thereby, no such officer, member or partner or any member of their immediate families is a party to or is, directly or indirectly, interested in any agreement, understanding or proposed transaction with the Partnership.

Section 5.6    **Registration Rights**.  The Partnership has not granted or agreed to grant to any person any registration rights relative to the registration of any of its securities under the Securities Act.

Section 5.7    **Certain Agreements of Officers and Employees**.  Except as set forth as Schedule 5.7, to Seller's knowledge, no officer, significant employee or consultant of the Partnership or the Business is, or is expected to be, in violation of any term of any employment contract, patent disclosure agreement, proprietary information agreement, noncompetition agreement, nonsolicitation agreement, confidentiality agreement or any other similar contract or agreement or any restrictive covenant or common law obligation, relating to the right of any such officer, employee, or consultant to be employed or engaged by the Partnership or in the Business because of the nature of the business conducted or to be conducted by the Partnership or relating to the use of trade secrets or proprietary information of others, and, to the Seller's knowledge, the employment or engagement of the officers, employees or consultants of the Partnership or the Business does not subject the Partnership to any liability with respect to any of the foregoing matters.

Section 5.8    **Litigation**.  There is no action, suit, proceeding, investigation pending or threatened in writing against the Partnership which could be reasonably expected (a) to have a Material Adverse Effect or (b) to adversely affect the validity of this Agreement or the transactions contemplated hereby or any action taken or to be taken pursuant hereto.  Except as set forth on <u>Schedule 5.8</u>, the directors, officers or members of senior management of the Partnership or the Business is not and has not been the subject of any regulatory action, suit, proceeding or investigation by any Governmental Entity, regulatory or self-regulatory body, or any regional transmission organization or similar body.

Section 5.9    **Financial Statements and Related Matters**.

(a)    Sellers have delivered to the Purchasers the audited consolidated balance sheet and the related statements of earnings, partners' equity and cash flows of the Partnership for the year ended March 31, 2007, certified by the relevant auditors to have been prepared in accordance with United States generally acceptable accounting principles ("<u>GAAP</u>"), and including all related notes and schedules (the "<u>2007 Audited Financial Statements</u>"), and unaudited consolidated balance sheet and related statement of earnings, partners' equity and cash flows of the Partnership for the month of April 2007 and each later completed calendar month ending thirty (30) days or more immediately prior to the date hereof (the "<u>Interim Financial Statements</u>" and together with the 2007 Audited Financial Statements, the "<u>Financial Statements</u>").  The Financial Statements were prepared in accordance with the books and records of the Partnership in accordance with GAAP, consistently applied throughout the periods indicated.  The Financial Statements have been prepared, and fairly present in all material respects the financial position, results of operations and cash flows of the Partnership for the periods presented, in accordance with GAAP applied on a consistent basis throughout the periods presented.  Except as set forth in the Interim Financial Statements or on <u>Schedule 5.9(a)</u>, since March 31, 2007, the Partnership has not incurred any liabilities or obligations (whether direct, indirect, accrued or contingent) that would be required to be reflected or reserved against in a consolidated balance sheet of the Partnership prepared in accordance with GAAP except for items incurred in the ordinary course of business since the date of the Interim Financial Statements.

(b)    Since March 31, 2007, there has been no Material Adverse Effect.

(c)    Subject to the matters disclosed on <u>Schedule 5.9(c)</u>, the Partnership has in place controls and procedures designed to ensure that financial and accounting information with respect to the Partnership is recorded, processed, summarized and reported on a timely basis.  True and correct copies (or written descriptions thereof) of such controls and procedures have been previously provided to the Purchasers.  Except as set forth on <u>Schedule 5.9(c)</u>, no change in the Partnership's internal controls over financial reporting that occurred since the Partnership's last audit has materially affected, or is reasonably likely to materially affect, the Partnership's internal control over financial reporting.  Except as set forth on <u>Schedule 5.9(c)</u>:

(i)    there are no significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting with respect to the Partnership identified by the auditors of the Partnership; and

(ii)    there is no fraud, whether or not material, with respect to the Partnership of which the Sellers have actual knowledge that involves management of the Partnership or other employees who have a significant role in Partnership's internal controls over financial reporting with respect to the Partnership occurring or discovered since January 1, 2005.

Section 5.10   **Insurance**.  Except as set forth on Schedule 5.10, the Partnership is fully insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are reasonably adequate and customary in the businesses in which it is engaged. Such policies are in full force and effect, and will be in full force and effect at the Closing, and all premiums due thereon have been paid.  All such policies are listed on Schedule 5.10.  The Partnership (or applicable policyholder) has complied in all material respects with the terms and provisions of such policies.  There is no claim pending under any such policy as to which coverage has been questioned, denied or disputed by the underwriter of such policy and the Partnership (or applicable policyholder) is otherwise in compliance with the terms of such policies.  The Partnership (or applicable policyholder) has not received notice of any threatened termination of any such policy or has within the last five years been refused any coverage sought or applied for.  To each Seller's knowledge, no event has occurred that would prevent the Partnership from renewing then existing coverage as and when such coverage expires or obtaining similar coverage from similar insurers.  All workers compensation claims relating to the Partnership or employees of the Business have been fully funded or reserved for on the Financial Statements.

Section 5.11   **Compliance with Laws; Regulatory**.

(a)    The Partnership and the Business is in compliance in all material respects with all Laws (as defined in this Section 5.11 (a)) applicable to it; *provided* that this Section 5.11 does not address Laws relating to taxes (which are covered by Section 5.23), Environmental Laws (which are governed by Section 5.12), the Federal Power Act (which is covered by Section 5.13), the Public Utility Holding Company Act of 2005 (which is covered by Section 5.19), and Laws relating to employment and labor matters (which are covered by Section 5.17 and Section 5.18). Except as set forth on Schedule 5.11(a), the Partnership has made all regulatory filings required by Law in a timely manner.  As used herein, "Laws" mean all laws, statutes, rules, regulations, ordinances, and other pronouncements having the effect of law of any Governmental Entity.

(b)    The Partnership possesses all certificates, authorizations and permits issued by the appropriate federal, state or foreign regulatory authorities necessary to conduct its Business in material compliance with applicable Laws, and the Partnership has not received any notice of proceedings relating to the revocation or modification of any such certificate, authorization or permit.  As of the date of this Agreement, the Partnership is not subject to regulation under the laws of the State of Texas ("Texas Utility Laws") as a "public utility," an "electric utility," a "transmission and distribution utility" or "gas utility."  As of the date of this Agreement, the Partnership is not subject to regulation as a "first purchaser," "common purchaser," retail electric provider, aggregator, or power generator company under the laws of the State of Texas.  Except as set forth on Schedule 5.11(b), no consents, authorizations, or approvals are required to be obtained from the Public Utility Commission of Texas under Texas Utility Laws prior to the consummation of the transactions contemplated by this Agreement.

Section 5.12    **Environmental**.

(a)    The Partnership and the Business (i) is in compliance in all material respects with any and all applicable foreign, federal, provincial, state and local laws and regulations relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants ("Environmental Laws"), (ii) has received all permits, licenses or other approvals required of it under applicable Environmental Laws to conduct its respective businesses in compliance in all material respects with such Environmental Laws, and (iii) is in compliance in all material respects with all terms and conditions of any such permit, license or approval.

(b)    Except as set forth on Schedule 5.12(b), (i) there has been no release, spill, emission, deposit, discharge, disposal, leaching, presence or migration (collectively, "Release") (except for releases in accordance with valid environmental permits) of any "Hazardous Substances" (which term shall mean collectively, any of the following to the extent regulated under Environmental Laws:  contaminants; pollutants; toxic, radioactive or hazardous waste, chemicals, substances, materials and constituents; petroleum and petroleum products; polychlorinated biphenyls; medical waste; infectious waste; asbestos; and urea formaldehyde) into the air, soil, surface water, ground water or water at, on, under, above or from any of the properties owned or leased (excluding leases relating to office space and natural gas storage agreements) by the Partnership, which condition remains uncured, and which requires investigative or remedial action pursuant to any environmental laws and (ii) no soil, air, surface water, ground water or water contamination exists at any of the properties owned or leased (excluding leases relating to office space and natural gas storage agreements) by the Partnership or the Business.

(c)    Except as set forth on Schedule 5.12(c), within the last two (2) years, the Partnership has not received written notice of, and is not, to the Seller's knowledge, the subject of, any actions, causes of action, claims, investigations, demands or notices by any person alleging liability under or noncompliance with any Environmental Law.

Section 5.13    **Market Based Rate Authority**.  Except as set forth on Schedule 5.13, the Partnership, which is required to have on file with FERC rate schedules to make sales of electric energy, capacity, and ancillary services at market-based rates in compliance with the Federal Power Act ("FPA") (a) has market-based rate schedules that have been accepted for filing by FERC, which rate schedules are in full force and effect, (b) has received all blanket authorizations and waivers customarily granted by FERC to parties with market-based rate authorization, and (c) has been granted blanket authorization to issue securities pursuant to Section 204 of the FPA.  The Partnership with market-based rate authorization has complied with all applicable FERC rules and reporting obligations, except for matters for which non-compliance would not reasonably be expected to result in a Material Adverse Effect.  Except as set forth on Schedule 5.13, each of the Transactions that is subject to rate regulation by a Governmental Entity is authorized to take place at market-based rates.  As used herein, "Transactions" means transactions for the purchase and sale of electric energy and capacity, other commodities and/or related products, including transactions providing for financial settlement.

Section 5.14    **Real Property**.  The Partnership is not the tenant of any real property interests, nor does it use any leased real property, except for the real property leased to the Partnership or the Business under the leases set forth on <u>Schedule 5.14</u> (the "<u>Real Property Leases</u>").  The Real Property Leases are in full force and effect, and the Partnership has paid all rent and other charges due, and complied in all material respects with all of its respective obligations, under the Real Property Leases.  Except for the Real Property Leases, the Partnership does not own or hold any interests in real property.

Section 5.15    **Assets**.  Except as set forth in <u>Schedule 5.15</u>, as of the Closing Date the Partnership will own and have good title to all material tangible personal property used in the conduct of its Business that are either (a) located at the Partnership's offices, or (b) used or held for use exclusively for use in the Business, free and clear of all Liens.  The material tangible personal property of the Partnership or used in the Business is in good operating condition and repair, ordinary wear and tear excepted.

Section 5.16    **Intellectual Property and Software**.

(a)    Except as set forth on <u>Schedule 5.16(a)</u>, the Partnership owns, or has a valid and subsisting license or right to use, all Intellectual Property, Software and Data used in, and material to, the operations and business of the Partnership as currently conducted.

(b)    <u>Schedule 5.16(b)</u> sets forth a complete and accurate list of all worldwide patents and patent applications, trademark registrations and copyright registrations, and applications for trademark and copyright registrations, in each case that are owned by the Partnership, any Seller or any of Affiliates of any Seller and used in the Business (the "<u>Registered Intellectual Property</u>").  All of the registrations and applications for registrations are valid and subsisting in good standing.  Except as set forth in <u>Schedule 5.16(b)</u>, (i) the Partnership has title to each item of the Registered Intellectual Property, free and clear of any Lien, (ii) no third party has asserted against the Partnership a claim that the Partnership or the Business is infringing the Intellectual Property of such third party, (iii) to Seller's knowledge, no basis for any such claim exists, (iv) to Seller's knowledge, none of the Intellectual Property used in the conduct of the Business of the Partnership infringes upon or otherwise violates the Intellectual Property rights of others, (v) none of the Registered Intellectual Property is subject to any outstanding order, decree or judgment of any Governmental Entity, and (vi) to Seller's knowledge, no third party is infringing the Intellectual Property owned by the Partnership or the Business.  To Seller's knowledge, all required fees to register and maintain the Registered Intellectual Property that are due have been paid, and none of the Registered Intellectual Property is the subject of any pending opposition proceedings, pending cancellation proceedings, pending interference proceedings or any other similar administrative challenge.

(c)    The Partnership has taken reasonable measures to protect and preserve the confidentiality of the trade secrets and confidential information of the Partnership.  Persons involved in the development and authoring of any Intellectual Property owned by the Partnership have executed agreements vesting or assigning the ownership rights of any Intellectual Property of such Persons in such Intellectual Property to the Partnership or have acted as an employee of the Partnership in the normal scope of his or her employment.  Third Parties with access to the

Intellectual Property have executed confidentiality agreements and have agreed not to disclose any Intellectual Property.

(d)     As used herein:

(i)     "Intellectual Property" means the following intellectual property, whether arising by statute or under common law:  (A) copyrights, registrations and applications for registration thereof, (B) trademarks, service marks, trade names, slogans, domain names, logos, trade dress, and registrations and applications for registrations thereof, (C) patents, as well as any reissued and reexamined patents and extensions corresponding to the patents, and any patent applications, as well as any related continuation, continuation in part and divisional applications and patents issuing therefrom and (D) trade secrets and confidential information, including data, ideas, designs, concepts, compilations of information, methods, techniques, procedures, processes and other know-how, whether or not patentable;

(ii)     "Software" means any instruction or set of instructions that is used (e.g., read, compiled, processed or manipulated) by, in or on any Equipment, including application programming interfaces, source code and object code versions of applications programs, operating system software, software tools, computer software languages and utilities software; in each case, in whatever form or media, including the tangible media upon which they are recorded or printed, together with all corrections, improvements, enhancements, modifications, updates and releases thereof prior to the Closing; and

(iii)     "Data" means all the available data in digital format that is used in the operations and business of the Partnership as currently conducted, including any Transaction data in digital format.

Section 5.17    **Employee Benefit Plans**.

(a)     The term "Benefit Plan" means each employment, consulting, non-competition, non-solicitation, deferred compensation, or executive compensation, incentive bonus or other bonus, employee pension, profit-sharing, savings, retirement, stock option, stock purchase, stock appreciation rights, equity, change of control, severance pay, life, health, disability or accident insurance plan, corporate- owned or key-man life insurance, or other material compensation or benefit plans, programs, arrangements, agreements or commitments, whether or not an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), maintained, sponsored or contributed to by the Partnership or with respect to which the Partnership may have any obligation or liability (contingent, secondary, joint and several, or otherwise) or which cover any Transferred Employee (as defined in Section 7.13(a)).

(b)     The Partnership does not sponsor or maintain any Benefit Plans, nor does it have any liability or obligations under any Benefit Plans.

(c)     Except as set forth in Schedule 5.17(c), neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereunder, either alone or in combination with another event (whether contingent or otherwise), will (i) entitle any

Transferred Employee to any payment, job security or similar benefit, (ii) increase the amount of compensation due to any such employee in any material respect, (iii) accelerate the time of vesting of any compensation, stock incentive or other benefit, (iv) result in any "parachute payment" under section 280G of the Code whether or not such payment is considered to be reasonable compensation for services rendered, or (v) result in any release of any obligation of any Transferred Employee, from or to the Partnership.

Section 5.18    **Employment and Labor Matters**.

The Partnership has no employees, nor does it have any liabilities or obligations under any laws, rules, regulations, orders, rulings, decrees, judgments and awards relating to discrimination, payment of wages, overtime, immigration, affirmative action, fair labor standards and occupational health and safety, wrongful discharge or violation of the personal rights. No action, suit, complaint, charge, arbitration, inquiry, proceeding or investigation by or before any Governmental Entity, brought by or on behalf of any (A) prospective or former employee or (B) labor organization or other representative of any prospective or former employees of the Partnership is pending or, to the Sellers' knowledge, threatened against the Partnership, or against any present or former director or manager. The Partnership is not subject to or otherwise bound by any material consent decree with, or citation by, any Governmental Entity.

Section 5.19    **PUHCA Regulation**.    The Partnership is not subject to regulation as a "public-utility company" within the meaning of the Public Utility Holding Company Act of 2005.

Section 5.20    **Trading**.    The risk management policies of the Partnership that are in force as of the date hereof are attached as Schedule 5.20.    The Partnership has established risk parameters, limits and guidelines in compliance with the risk management policies designed to restrict the level of risk that the Partnership is authorized to take with respect to the net position resulting from the physical and financial commodity transactions, exchange-traded futures and options transactions, over-the-counter transactions and derivatives thereof and similar transactions.

Section 5.21    **Brokers**.    No person has, or as a result of any action taken by the Partnership or any of its authorized agents will have, as a result of the transactions contemplated by this Agreement, any rights, interest or valid claim against or upon the Purchasers or the Partnership for any commission, fee or other compensation as a finder or broker or in any similar capacity.

Section 5.22    **Restrictions on Business or Sale of Partnership**.    Except as set forth on Schedule 5.22, the Partnership is not a party to (i) any agreement, contract or understanding which restricts its activities or (ii) any agreement, contract or understanding which restricts the activities of its limited partners, members or affiliates.

Section 5.23    **Taxes**.    Except as set forth in Schedule 5.23 of the Disclosure Schedule:

(a)    All material Tax Returns required to be filed by the Partnership have been duly and timely filed; each such Tax Return is in all material respects true, correct and complete; all Taxes that are due and payable by the Partnership (whether or not shown on a Tax Return) have

been timely paid in full; all Tax withholding, remittance and deposit requirements imposed on the Partnership have been satisfied in full in all material respects on a timely basis; and there are no Liens for Taxes on any of the assets of the Partnership other than Liens for Taxes not yet due.

(b)    There is no outstanding audit or dispute of or claim against the Partnership relating to Taxes (whether or not such audit, dispute or claim would result in Taxes due from the Partnership), and no Tax audit, adjustment, assessment or deficiency has been asserted or proposed against the Partnership.  The Partnership has not waived any statute of limitations with respect to Taxes or agreed to any extension of time with respect to the filing of a Tax Return or a Tax assessment or deficiency.  No written claim is pending by a taxing authority in a jurisdiction where the Partnership does not file Tax Returns that the Partnership is or may be subject to taxation in that jurisdiction.  The Partnership does not have any liability for the Taxes of any other person by contract, under applicable law, as a transferee or successor, or otherwise.

(c)    The Partnership has been classified as a partnership for United States federal income tax purposes since its inception.

(d)    The Partnership has or will have in effect for the taxable year that includes the Closing Date a valid election under Section 754 of the Code.

(e)    None of the property of the Partnership is "tax-exempt use property" (within the meaning of Section 168(h) of the Code) or "tax-exempt bond financed property" (within the meaning of Section 168(g)(5) of the Code).

(f)    All of the property of the Partnership has been properly listed and described on the property tax rolls for the taxing units in which such property is located and no portion of such property constitutes omitted property for property Tax purposes.

(g)    The Partnership has not engaged in any transaction that would be reportable pursuant to Treasury Regulation Section 1.6011-4.

(h)    The Partnership claiming an exemption with respect to the payment of sales or similar Taxes is entitled under applicable law to such exemption..

(i)    As used herein:

(i)    "Tax" means any U.S. federal, state, provincial, local, or foreign tax, duty, levy or other assessment, including income, capital, goods and services, gross receipts, license, payroll, employment, withholding, excise, severance, stamp, occupation, premium, windfall profit, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever imposed by any Governmental Entity, including any interest, penalty or addition thereto.

(ii)    "Tax Return" means any return, declaration, report, claim for refund, or information return or statement (whether in tangible or electronic form) relating to Taxes,

including any schedule or attachment thereto, and including any amendment thereof, required to be filed with any Governmental Entity.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS

Each Purchaser hereby represents and warrants, jointly and severally, to the Sellers that:

Section 6.1    **Organization; Good Standing**.  The LP Purchaser is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware and has all corporate power and authority to carry on its business as now conducted.  The GP Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of Delaware and has all limited liability company power and authority to carry on its business as now conducted.

Section 6.2    **Authorization**.  Each Purchaser has full power and authority to execute and deliver this Agreement and to carry out the provisions of this Agreement.  Any and all corporate or limited liability company action, as applicable, on the part of the Purchasers necessary for the authorization, execution and delivery of this Agreement and the performance of all obligations of the Purchasers hereunder at the Closing has been taken.  This Agreement has been duly and validly executed and delivered by the Purchasers and, assuming this Agreement has been duly authorized, executed and delivered by the other parties hereto, constitutes a valid and legally binding obligation of the Purchasers, enforceable against the Purchasers in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, and (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

Section 6.3    **Litigation**.  There is no action, suit, proceeding or investigation pending or, to the knowledge of the Purchasers, threatened against any Purchaser which could be reasonably expected to adversely affect the validity of this Agreement or the agreements contemplated hereby or any material action taken or to be taken pursuant hereto or thereto, nor, to the knowledge of the Purchasers, has there occurred any event nor does there exist any condition on the basis of which any such litigation, proceeding or investigation might properly be instituted.

Section 6.4    **Brokers or Finders**.  No person has, or as a result of any action taken by either Purchaser or any of their authorized agents will have, as a result of the transactions contemplated by this Agreement, any rights, interest or valid claim against or upon any Seller for any commission, fee or other compensation as a finder or broker or in any similar capacity.

Section 6.5    **Consents**.  Except for the matters referred to Section 3.1, neither the execution, delivery or performance of this Agreement nor the consummation by Purchasers of the transactions contemplated hereby will (a) require any filing or registration with, or notice or declaration to, or the obtaining of any permit, license, authorization, consent or approval of, any Governmental Entity or (b) require the consent of any Person under any agreement to which any

Purchaser is a party or by which any Purchaser or any of its assets is subject or by which any of them may be bound; excluding from the foregoing clauses (a) and (b) such requirements, notices, declarations, consents or approvals that would not adversely affect the ability of the Purchasers to consummate the transactions contemplated by this Agreement and thereafter perform its obligations thereunder.

## ARTICLE VII

## ADDITIONAL AGREEMENTS

Section 7.1    **Conduct of Business**.

(a)    Except as otherwise set forth in Schedule 7.1(a), as contemplated by this Agreement, as required under applicable Law or by any Governmental Entity, or to the extent that the Purchasers, acting through Robert Quick (the "Purchasers' Representative"), consents in writing, between the date hereof and the Closing, the Sellers shall (as applicable to the Business) and shall cause the Partnership to:

(i)    operate in the ordinary course of the Business, consistent with current practices, including the management of market risk with respect to asset optimization and hedging of portfolio risk consistent with current practices as of the date hereof (except to the extent otherwise provided in this Section 7.1(a)), comply with all material applicable Laws, rules and regulations relating to the Partnership and with the material provisions of the risk management policies disclosed in Schedule 5.20;

(ii)    use commercially reasonable efforts to preserve intact the Business and goodwill of the Partnership and their relationship with material customers and others having material business relationships with the Partnership;

(iii)    maintain the tangible properties and facilities of the Partnership and the Business in good working order and condition, ordinary wear and tear excepted;

(iv)    only open new accounts in compliance with all applicable federal laws, including the USA Patriot Act of 2001;

(v)    conduct all OTC trades in conformity with the standards set forth in Exhibit D;

(vi)    prepare and file all required tax returns with the appropriate Governmental Entity and pay all taxes due;

(vii)    use commercially reasonable efforts to obtain all Tax resale certificates relating to sales which occurred before the date hereof and obtain all Tax resale certificates relating to sales that occur after the date hereof; and

(viii)    promptly notify the Purchasers of any change or condition which might reasonably be expected to have a Material Adverse Effect.

(b)    Except as otherwise set forth in Schedule 7.1(b), as contemplated by this Agreement, as required under applicable law or by any Governmental Entity, or to the extent that the Purchasers Representative consents in writing, between the date hereof and the Closing, the Sellers shall not (as applicable to the Business), and shall cause the Partnership not to:

(i)    modify, amend or voluntarily terminate, prior to the expiration date thereof, any Material Contracts;

(ii)    waive any material default by, or release, settle or compromise any material claim against, any other party thereto;

(iii)    amend the Partnership's organizational documents;

(iv)    incur additional credit exposures to any counterparty in excess of the higher of (1) its existing credit limits and (2) the relevant limits on guarantees provided by such counterparty's credit support providers;

(v)    assign to new counterparties credit limits greater than those previously approved in the Business;

(vi)    enter into any natural gas or power Energy Management Agreement except such agreements relating to the operation of electric generation facilities entered into in the ordinary course of business and consistent with past practice;

(vii)    enter into (1) any storage or transportation agreements with any party that is not a FERC-regulated pipeline with cost based tariffs or (2) except in the ordinary course of business consistent with past practice, any storage or transportation agreements with any party that is a FERC-regulated pipeline with cost based tariffs and that are for a term longer than two years;

(viii)    make any loan of cash to any Person other than loans associated with marketing and trading transactions;

(ix)    hire any new employee or engage any consultant or enter into any agreement or understanding with respect to any such hiring or engagement or enter into an employment agreement with a current employee, or renew, modify or amend the terms of any existing employment agreement or consulting agreement, in any such case that either (1) provides for annual compensation to such employee or consultant in excess of $300,000 or (2) provides for aggregate annual compensation to all such employees or consultants in excess of $1,500,000;

(x)    (A) increase, accelerate the vesting of, guarantee or fund, or agree to increase, accelerate the vesting of, guarantee or fund, the salary, remuneration, benefits, pension or other compensation of any director, officer, employee, service-provider or consultant of the Partnership or the Business or (or make any material increase or decrease in the number of such persons), (B) authorize, guarantee or pay any bonuses or other special payments to any current or former directors, officers, consultants or employees or (C) enter into, adopt, amend or terminate prematurely any Benefit Plan or

benefit plan or other arrangement or agreement that would have been a Benefit Plan were it effective as of the date of this Agreement;

      (xi)     forgive any existing loans or the accrued interest thereon to current or former employees, directors or consultants of the Partnership or the Business;

      (xii)     enter into any material leases of real property, except renewals of existing leases in the ordinary course of business;

      (xiii)     incur, assume or guarantee any new indebtedness or issue any securities convertible or exchangeable for debt securities, other than as contemplated by the Credit Agreement;

      (xiv)     acquire any material assets or properties;

      (xv)     redeem, retire, purchase or otherwise acquire, directly or indirectly, any of their equity interests or declare, set aside or pay any distributions;

      (xvi)     issue any equity interests or any instruments convertible into equity interests or effect a split or reclassification of any capital;

      (xvii)     make any new capital expenditures in excess of $150,000 or which, in the aggregate, would exceed $500,000 other than those provided on Schedule 7.1;

      (xviii)     sell any assets, except in the ordinary course of business and consistent with past practices;

      (xix)     materially change existing or adopt new systems relating to the operations or Business of the Partnership;

      (xx)     Sellers and Sellers' Affiliates will not liquidate, access, sweep or obtain distributions from any bank or similar account in the name of or for the benefit of the Partnership to which any such Seller or Affiliate of Seller otherwise has access; or

      (xxi)     agree to do any of the foregoing.

Section 7.2    **Access to Information**.

(a)    Between the date hereof and the Closing, each Seller will (as applicable to the Business) use its commercially reasonable efforts to cause the Partnership to, during ordinary business hours and upon reasonable notice and request, (i) afford the Purchasers and their representatives reasonable access to all books, records, offices and other facilities and properties of the Partnership and the Business; (ii) furnish the Purchasers with such financial and operating data and other information with respect to the Partnership and the Business, as either Purchaser may from time to time reasonably request (including, without limitation, daily profit and loss, and risk and position, reports); and (iii) make available to the Purchasers a copy of each material report, schedule or other document filed or received by them, including without limitation, documents filed with FERC or any other Governmental Entity having jurisdiction over the Partnership and the Business, as either Purchaser may from time to time reasonably request; *provided, however*, that (1) any such access or activities shall be conducted in such a manner as not to interfere unreasonably with the operation of the Partnership and (2) the Partnership shall not be required to supply the Purchasers with any information that the Partnership shall be legally prohibited to supply.

(b)    After the Closing and until the completion of the Bankruptcy Case, and at Sellers' sole cost and expense, Purchasers shall afford Sellers and their representatives reasonable access to all books and records and personnel of the Partnership and the Business in respect of the period before the Closing and to the extent such access is necessary for purposes of the Bankruptcy Case.

Section 7.3    **Further Assurances; Cooperation**.  Subject to the terms and conditions of this Agreement, each of the parties hereto will use its commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the issuance, transfer, purchase and sale of the Purchased Interests pursuant to this Agreement, including using commercially reasonable efforts to ensure satisfaction of the conditions precedent to each party's obligations hereunder.  None of the parties hereto will, without the prior written consent of the other parties, take or fail to take any action, which would reasonably be expected to prevent or materially impede, interfere with or delay the transactions contemplated by this Agreement. From time to time after the Closing, without further consideration, each party will, at its own expense, execute and deliver such documents to the other parties, and take such other actions, as the other parties may reasonably request in order to more effectively consummate the issuance, transfer, purchase and sale of the Purchased Interests hereunder and the other transactions contemplated by this Agreement.

Section 7.4    **Subject Consents and Approvals**.

(a)    As promptly as reasonably practicable but in no event later than ten (10) Business Days after the date of this Agreement, the Sellers and the Purchasers, as applicable, shall use their commercially reasonable efforts to file with any Governmental Entity having jurisdiction over any of them, any filings required to be made with respect to the transactions contemplated by this Agreement, including but not limited to filings under the HSR Act and as may be necessary to obtain the FERC Order, and shall use commercially reasonable efforts to obtain at

the earliest practicable date all the required regulatory approvals. The parties shall respond promptly to any requests for additional information made by such Governmental Entities. The Purchasers will bear all costs of the preparation and filing of any such filings.

(b)      Each Seller and each Purchaser shall have the right to review in advance all filings to be made with any Governmental Entity in connection with the transactions contemplated hereby.

(c)      As promptly as reasonably practicable following the date hereof, the Sellers and the Purchasers shall use their commercially reasonable efforts to obtain (and shall cooperate with each other in obtaining) all other consents required to be obtained in connection with the transactions contemplated hereby, including without limitation all Seller Material Consents.

Section 7.5    **Bankruptcy Court Filings**.  As promptly as reasonably practicable following the date hereof, LBHI shall file with the Bankruptcy Court a motion pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 (the "Approval Motion") seeking entry of an order (the "Approval Order") of the Bankruptcy Court (a) approving the entry of LBHI into this Agreement and the transactions contemplated hereby to be performed by LBHI, (b) the Debt Forgiveness, (c) the debt assignment under Section 1.2(b) hereof, (d) satisfaction of the Intercompany Receivable under Section 1.2(c) hereof, and (e) conveyance of title free and clear of Liens of the Partnership Interests to the Purchasers, which motion shall be subject to the approval of Purchasers, which approval shall not be unreasonably withheld or delayed. Purchasers agree that they will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Approval Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

Section 7.6    **Limited Partner Waiver and Consent**.  Each LP Seller acknowledges and agrees that by such LP Seller's execution of this Agreement, such LP Seller shall have concurrently granted a waiver and consent waiving any rights, whether under the Partnership Agreement or otherwise, to acquire any of the Purchased LP Units and consenting to the transactions contemplated by this Agreement and all actions taken or to be taken pursuant hereto.

Section 7.7    **Member Waiver and Consent**.  The GP Seller acknowledges and agrees that by its execution of this Agreement, the GP Seller shall have concurrently granted a waiver and consent waiving any rights, whether under the Operating Agreement, Partnership Agreement, or otherwise, to dispose of any of the Purchased Interests and consenting to the transactions contemplated by this Agreement and all actions taken or to be taken pursuant hereto.

Section 7.8    **Public Announcements; Confidentiality**.

(a)      The Sellers shall not, and the Sellers shall cause the Partnership not, to issue any press release or otherwise make a public statement regarding the transactions contemplated by this Agreement without the prior written consent of the Purchasers. The Purchasers will provide to the General Partner a copy of the initial press release proposed to be issued within a reasonable period of time prior to such issuance and consult with the Sellers' Representative, and

consider any of Sellers' comments in good faith, prior to issuing such press release with respect to the transactions contemplated by this Agreement; *provided, however*, that the Purchasers need not obtain the consent of the General Partner in the event that the issuance of the press release is required by law or any rules of the New York Stock Exchange.

(b)        Each of the parties hereto will hold, and will cause its consultants and advisors to hold, in confidence the terms of this Agreement and all documents and information furnished to it in connection with the transactions contemplated by this Agreement and use such information solely for purposes of performing its obligations under this Agreement.

Section 7.9     **Fees and Expenses.**   Except as otherwise expressly provided in this Agreement, all fees and expenses, including fees and expenses incurred in connection with this Agreement and the transactions contemplated herein, shall be paid by the party incurring such fee or expense.

Section 7.10   **Transfer Taxes.**   All transfer, sales, use, documentary, stamp and other similar Taxes payable in connection with the sale, transfer or other disposition of the Purchased Interests or otherwise in connection with the consummation of any of the transactions contemplated by this Agreement ("Transfer Taxes") shall be borne by the Purchasers.

Section 7.11   **Insurance.**   The Sellers shall (as applicable to the Business), and shall cause the Partnership to, maintain in effect all insurance policies covering the assets of the Partnership or the Business up to the Closing and shall use commercially reasonable efforts to obtain from insurers any waivers that are necessary in connection with the transactions contemplated in this Agreement, including, without limitation, any change of control provisions.

Section 7.12   **Taxes.**

(a)     Tax Returns Due On or Prior to Closing.  The General Partner shall cause the Partnership to prepare, and shall file or cause the Partnership to timely file all Tax Returns of the Partnership that are due on or prior to the Closing Date.  In addition, except for Closing Date Returns governed under Section 7.12(c), at least thirty (30) days prior to the due date for filing any federal, state, provincial or local income tax information returns due for the Partnership with respect to a Tax period ending on or before the Closing Date ("Pre-Closing Partnership Returns"), the Sellers' Representative shall provide the Purchasers with a copy of such Tax Return for review and comment together with access to such information and assistance as is reasonably necessary to undertake such review.  The Purchasers shall provide written comments to the Sellers' Representative at least fifteen (15) days prior to the due date of such Tax Returns. The Sellers' Representative shall make such revisions to such Tax Return as are reasonably requested by the Purchasers unless the Sellers' Representative reasonably determines (and notifies the Purchasers in writing at least ten (10) days prior to the due date of such Tax Returns (a "Material Tax Return Dispute Notification")) that the position requested by the Purchasers will materially increase the Sellers' or the Partnership's, liability for Taxes or that such position is inconsistent with past practices.  If the Sellers' Representative has timely provided a Material Tax Return Dispute Notification to the Purchasers, the Sellers' Representative and the Purchasers shall endeavor in good faith to reach a mutually acceptable resolution.  If the Sellers' Representative and the Purchasers are unable to reach a mutually acceptable resolution at least

seven (7) days prior to the due date for the Pre-Closing Partnership Return, the Sellers' Representative and the Purchasers shall submit the issue for resolution to the Accounting Referee. The decision of the Accounting Referee shall be binding on the Sellers' Representative and the Purchasers and the cost of such review shall be borne fifty percent (50%) by the Sellers and fifty percent (50%) by the Purchasers. The Sellers' Representative and the Partnership shall prepare all Tax Returns pursuant to this Section 7.12(a) consistent with past practices and shall not make any elections on such Tax Returns (including elections to change any accounting period) without the written consent of the Purchasers.

(b)    The General Partner shall timely pay, or cause the Partnership to timely pay, all Taxes due from the Partnership on or prior to the Closing Date.

(c)    Tax Returns For Periods Ending On The Closing Date. The Sellers shall prepare, or cause to be prepared, and shall timely file, or cause to be timely filed, all Income Tax Returns that are due after the Closing Date and relate to Tax Periods that end on the Closing Date (the "Closing Date Returns"). The parties hereto agree that the Debt Forgiveness occurred before the Closing and that any Tax consequences arising out of the Debt Forgiveness shall be reported on the Closing Date Returns and shall be solely allocable to the Sellers. The Sellers and the Purchasers shall cooperate in good faith in connection with the exchange of information necessary for the preparation of all such Closing Date Returns. At least thirty (30) days prior to the due date (including extensions) for the filing of any such Closing Date Return Sellers shall provide the Purchasers with a copy of such Tax Return for review and comment together with access to such information and assistance as is reasonably necessary to undertake such review. The Purchasers shall be entitled to provide written comments to Sellers at least fifteen (15) days prior to the due date for such Tax Return. Sellers shall make the reasonable revisions to such Tax Return as are requested by Purchasers

(d)    Tax Returns for Periods Ending After the Closing Date. Other than any Pre-Closing Partnership Returns and Closing Date Returns, the Purchasers shall prepare, or cause the Partnership to prepare, and shall timely file, or cause the Partnership to timely file, all Tax Returns that are due after the Closing Date for the Partnership with respect to any Pre-Closing Taxable Period or any Straddle Taxable Period ("Post-Closing Returns") and shall pay, or cause the Partnership to pay, any Tax shown as due from the Partnership on such Tax Returns. The Purchasers and the Partnership shall prepare all such Tax Returns consistent with past practices and shall not make any elections (including elections to change any accounting period) that could affect any Seller with respect to any Pre-closing Tax Period without the written consent of the Sellers' Representative, which consent shall not be unreasonably withheld or delayed. The Sellers' Representative and the Purchasers will cooperate in good faith in connection with the exchange of information necessary for the preparation of all such Post-Closing Returns.

(e)    Refunds and Credits. Any refunds or credits of Taxes of the Partnership for any taxable period shall be for the account of the Purchaser.

(f)    Cooperation on Tax Matters. After the Closing Date, each Seller shall make reasonably available to the Purchasers, and the Purchasers shall make reasonably available to the Sellers' Representative, all information, records, and documents within their respective possession or control and personnel relating to Tax liabilities or potential Tax liabilities of the

Partnership with respect to Pre-Closing Taxable Periods or Straddle Taxable Periods ("*Tax Records*") until the seventh anniversary of the Closing Date, or for such longer period as may be required by applicable law. After such time, each Purchaser and each Seller may discard or destroy, or cause to be discarded or destroyed, such Tax Records (except as they pertain to an audit proceeding described below). Each Seller shall afford the Purchasers' Representative and each Purchaser shall afford the Sellers' Representative, the right to take extracts therefrom and to make copies thereof to the extent reasonably necessary to permit the Purchasers or the Sellers to prepare Tax Returns, to conduct negotiations with Taxing Authorities, and to implement the provisions of, and to investigate any claims between, the parties arising under the Agreement.

(g)    Audit Proceedings.

(i)    Within ten (10) days after any Purchaser or the Partnership receives a notice ("Audit Notice") of an intention by any Taxing Authority to examine any Tax Return related to Pre-Closing Taxable Period or a Straddle Taxable Period, the Purchasers shall notify the Sellers' Representative of such Audit Notice.

(ii)    If a Tax Contest relates to a Pre-Closing Taxable Period, the Sellers' Representative shall have the right, at the Sellers' expense, to control the conduct and resolution of such Tax Contest; *provided, however*, the Sellers' Representative may not settle any such Tax Contest without the written consent of the Purchasers (which consent shall not be unreasonably withheld or delayed). If the Sellers' Representative notifies the Purchasers' Representative that the Sellers' Representative does not intend to exercise their right to control any Tax Contest for which they have a right to control under this Section 7.12(g)(ii), the Purchasers, at their own expense, may control the conduct and resolution of such Tax Contest; *provided, however*, that the Purchasers may not settle any such Tax Contest without the written consent of the Sellers' Representative (which consent may not be unreasonably withheld or delayed).

(iii)    If a Tax Contest relates to a Straddle Taxable Period, the Purchasers at their own expense shall have the right to control the conduct and resolution of such Tax Contest; *provided*, that the Sellers' Representative at the Sellers' expense shall have a right to participate and consult in any such Tax Contest and the Purchasers' Representative shall periodically notify the Sellers' Representative concerning the status of the Tax Contest; *provided further*, that the Purchasers may not settle any such Tax Contest without the written consent of the Sellers' Representative (which consent may not be unreasonably withheld or delayed). If the Purchasers notify the Sellers' Representative that the Purchasers do not intend to exercise its right to control any Tax Contest for which they have a right to control under this Section 7.11(g)(iii), the Sellers' Representative, at Sellers' own expense, may control the conduct and resolution of such Tax Contest; *provided, however*, the Sellers' Representative may not settle any such Tax Contest without the written consent of Purchasers' Representative (which consent shall not be unreasonably withheld or delayed).

(iv)    Notwithstanding the foregoing in the event of the Tax Contest relating to a Pre-Closing Tax Period or a Straddle Period for which none of the Sellers, or any prior owner of an interest in the Partnership, could potentially incur any liability in the event of

an adverse outcome of such Tax Contest, Purchasers shall be entitled to control such Tax Contest.

(v)    With respect to a Tax Contest that is controlled by Seller, Seller shall (a) keep Purchasers reasonably informed of the conduct of the Tax Contest, (b) provide copies to the Purchasers of all material correspondence between Sellers and the Taxing authority and its agents and (c) to the degree practical, provide the Purchaser with drafts of any material correspondence to be sent to any Taxing authority or its agents in such contest, and consider in good faith any suggestions made by Purchasers.

(h)    Except as required by Laws, neither Purchaser nor the Partnership may amend any Tax Return for a Pre-Closing Period or a Straddle Taxable Period without the consent of the Sellers' Representative, which consent may not be unreasonably delayed or denied.

(i)    As used herein:

(i)    "Taxing Authority" means any Governmental Entity charged with the administration, prosecution, or collection of any Tax.

(ii)    "Tax Contest" means any audit, litigation or other administrative or judicial proceedings involving Taxes.

Section 7.13    **Employee Matters**.

(a)    Sellers agree, subject to any contractual limitations to which they are bound, to use their good faith best efforts to cooperate with Purchasers and assist Purchasers in identifying those Persons that are exclusively involved in the Business (the "Employees") and extending offers of employment thereto. Any Employee who accepts such offer of employment shall become an employee of the Partnership after the Closing Date (such Employees referred to herein as the "Transferred Employees"). Sellers agree to provide Purchasers with such employee census and other information in Sellers' possession or control as Purchasers may reasonably request to facilitate the establishment of Benefit Plans for the Transferred Employees.

(b)    Nothing herein shall operate or be construed (i) as requiring the Purchasers or the Partnership to continue the employment of any specific person or restrict or limit in any way the Purchasers or the Partnership from terminating the employment of any employee of the Partnership following Closing; (ii) to prevent the Purchasers or the Partnership from amending or terminating any Benefit Plan or other employee benefit or compensation plan at any time, in its sole discretion; or (iii) to be an amendment to any Benefit Plan or other employee benefit or compensation plan or prevent the Purchasers or the Partnership from amending or terminating any employee benefit plan at any time, in its sole discretion.

(c)    The covenants contained in this Section 7.13 are only for the benefit of the parties hereto and nothing set forth or referred to in this Section 7.13 shall be deemed to grant any rights or remedies upon any employee of the Partnership or any other Person or make any such employee or any other Person a third party beneficiary hereof.

Section 7.14  **Sellers' Representative**.  Without any further act of any of the Sellers, each of the Sellers hereby appoints LBHI as representative of each Seller (the "Sellers' Representative") and the Sellers' Representative hereby accepts its appointment and agrees to act as the representatives for the Sellers solely for purposes of all matters to which the Sellers' Representative is referred in this Agreement.  Each Seller understands, acknowledges and agrees that it shall be bound by all actions taken by the Sellers' Representative on such matters, and the Purchasers shall be entitled to deal exclusively with the Sellers' Representative on all such matters and shall be entitled to rely conclusively (without further evidence of any kind whatsoever) on any document executed or purported to be executed on behalf of any Seller by the Sellers' Representative with respect thereto, and on any other action taken or purported to be taken on behalf of any Seller by the Sellers' Representative with respect thereto, as fully binding upon such Seller.  Each Seller agrees to reimburse the Sellers' Representative for any expenses paid by the Sellers' Representative on behalf of the Sellers in respect of any expenses due and payable by the Sellers' Representative hereunder; *provided, however*, that a Seller's maximum liability for any such reimbursement amounts shall be equal to the product of such reimbursement amounts multiplied by a fraction, the numerator of which is the aggregate amount of the Purchase Price allocated to such Seller as set forth on the Exhibits to this Agreement and the denominator of which is the sum of all amounts of the Purchase Price allocated to the Sellers as set forth on such Exhibits.  The Sellers' Representative shall at all times act in its capacity as the Sellers' Representative in a manner that the Sellers' Representative believes to be in the best interest of the Sellers.  The Sellers' Representative shall not be liable for any act done or omitted hereunder as the Sellers' Representative except for gross negligence, bad faith or willful misconduct on the part of the Sellers' Representative.  This Section 7.14 shall survive the termination of this Agreement.

Section 7.15  **Purchasers' Representative**.  Without any further act of any of the Purchasers, each of the Purchasers hereby appoints the Purchasers' Representative as representative of each Purchaser and the Purchasers' Representative hereby accepts its appointment and agrees to act as the representatives for the Purchasers solely for purposes of all matters to which the Purchasers' Representative is referred in this Agreement.  Each Purchaser understands, acknowledges and agrees that it shall be bound by all actions taken by the Purchasers' Representative on such matters, and the Purchasers shall be entitled to deal exclusively with the Purchasers' Representative on all such matters and shall be entitled to rely conclusively (without further evidence of any kind whatsoever) on any document executed or purported to be executed on behalf of any Purchaser by the Purchasers' Representative with respect thereto, and on any other action taken or purported to be taken on behalf of any Purchaser by the Purchasers' Representative with respect thereto, as fully binding upon such Purchaser.  The Purchasers' Representative shall at all times act in its capacity as the Purchasers' Representative in a manner that the Purchasers' Representative believes to be in the best interest of the Purchasers.  The Purchasers' Representative shall not be liable for any act done or omitted hereunder as the Purchasers' Representative except for gross negligence, bad faith or willful misconduct on the part of the Purchasers' Representative.  This Section 7.15 shall survive the termination of this Agreement.

Section 7.16  **Transition Services Agreement.**  From the Closing Date to and including ninety (90) days following the Closing Date, Sellers or Sellers' Affiliates will provide, or cause to be provided, to the Partnership the services necessary to operate the Business in a manner

substantially similar to the services such Sellers or Sellers' Affiliates currently provide, and have consistently provided for the ninety (90) day period prior to the Closing Date, to the Partnership, including, without limitation, the following services: (a) payroll, administrative, human resources and information technology services; (b) access to the computer network server and email systems; (c) internet, phone line, cable, utility and other related services; and (d) employees and service providers in a quantity and quality substantially similar to those employed or contracted by Sellers' Affiliates prior to the date hereof, all as further described in the Transition Services Agreement. The services described in the Transition Services Agreement shall be provided to the Partnership at the reasonable direct cost thereof to the Sellers and Sellers' Affiliates, which cost shall be reimbursed to the Sellers in arrears on a monthly basis for services performed. Sellers and Sellers' Affiliates may outsource any of the services to be provided by any of them pursuant to the Transition Services Agreement.

Section 7.17    **Office Lease.**  Prior to the Closing, LBHI shall cause the office lease for the Partnership' office  located at 4700 W. Sam Houston Parkway, Houston, Texas in effect on the date hereof to be either (i) assigned to the Partnership, or (ii) sublet to the Partnership on a back-to back basis.

Section 7.18    **Personal Property.**  Prior to the Closing, LBHI shall, and shall cause the Sellers, to transfer to the Partnership all right, title, and interest thereof in and to, and applicable leasehold interests in, any tangible personal property (a) used in the Business and located at the Partnership's offices in Houston, Texas, Chicago, Illinois, Atlanta, Georgia and Pittsburgh, Pennsylvania or (b) not located at such offices but otherwise exclusively used or held for use in the conduct of the Business.

Section 7.19    **Partnership Interests.**  At the Closing, LBHI shall, and shall cause its subsidiaries to, transfer to the Purchasers all outstanding partnership interests in the Partnership in exchange for aggregate consideration equal to the Equity Payment which shall be payable pursuant to Section 1.5.

## ARTICLE VIII

## SURVIVAL OF REPRESENTATIONS; INDEMNIFICATION

Section 8.1    **Survival**.  The representations and warranties made by the Sellers in this Agreement shall not survive the Closing, except that the representations and warranties made by the Sellers in Section 4.2 (Ownership), Section 4.3 (Authorization), and Section 4.4 (Valid Transfer) shall survive the Closing. The covenants and agreements made by the parties hereto in the last sentence of Section 7.3 (Further Assurances) shall survive the Closing until performed in accordance with their terms.

Section 8.2    **Agreement to Indemnify**.  Subject to the terms and conditions of this Article VIII, the Sellers jointly and severally hereby agree to indemnify, defend and hold harmless the Purchasers and their successors and assigns, representatives and affiliates, and each of their respective directors, officers, partners, members, stockholders, managers, employees and agents (collectively, the "Purchaser Indemnitees") from and against all claims, actions or causes of action, assessments, demands, losses, damages, judgments, settlements, liabilities, costs and

expenses, including interest, penalties and reasonable attorneys' and accounting fees and expenses of any nature whatsoever (collectively, "Damages") asserted against, imposed upon or incurred directly by any Purchaser Indemnitees to the extent resulting from a breach by any Seller of any representation or warranty of any Seller contained in Section 4.2 (Ownership), Section 4.3 (Authorization), and Section 4.4 (Valid Transfer) or any Seller's failure to perform its covenant in the last sentence of Section 7.3.

(a)      Subject to the terms and conditions of this Article VIII, the Purchasers hereby agree to indemnify, defend and hold harmless each Seller, and its successors and assigns, representatives and affiliates, and each of their directors, officers, partners, members, stockholders, managers, employees and agents (collectively, the "Seller Indemnitees"), from and against all Damages asserted against, imposed upon or incurred directly by any Seller Indemnitees to the extent resulting from:

(i)      a breach by any Purchaser of any covenant or agreement of any Purchaser contained in this Agreement; and

(ii)      a breach by any Purchaser of any representation or warranty of any Purchaser contained in Article VI.

Section 8.3    **Limitation of Liability.**  The obligations and liabilities of the Sellers with respect to claims under Section 8.2 hereof made by the Purchasers ("Purchaser Claims") shall not exceed, in the aggregate, the Purchase Price.

Section 8.4    **Conditions of Indemnification**.  The obligations and liabilities of the Sellers to indemnify the Purchaser Indemnitees with respect to Purchasers' Claims under Section 8.2 and of the Purchasers to indemnify the Seller Indemnitees under Section 8.2 hereof with respect to claims by the Sellers ("Sellers Claims"), respectively, resulting from the assertion of liability by third parties shall be subject to the following terms and conditions:

(a)      The indemnified party will give the indemnifying party prompt notice of any such claim, and the indemnifying party may undertake the defense thereof by representatives of its own choosing reasonably satisfactory to the indemnified party; *provided* that failure to provide such notice will not relieve the indemnifying party of its obligations hereunder unless and to the extent it is actually prejudiced by such failure to receive such notice.  If the indemnifying party, within ten (10) days after notice of any such claim, does not elect to defend such claim, the indemnified party will undertake the defense, compromise or settlement of such claim on behalf of and for the account and risk of indemnifying party.

(b)      Anything in this Section 8.4 to the contrary notwithstanding, (i) an indemnified party shall have the right, at its own cost and expense, to participate in the defense, compromise or settlement of such claim (except if there exists an actual or potential conflict of interest between the indemnified party and the indemnifying party (other than the rights to indemnification hereunder)), (ii) the indemnifying party shall not, without the written consent of the indemnified party, settle or compromise any claim or consent to the entry of any judgment (A) which does not include as an unconditional term thereof the giving by the claimant or the plaintiff to the indemnified party of a release from all liability in respect of such claim or (B) as a

result of which injunctive or other equitable relief would be imposed against the indemnified party, and (iii) the indemnified party shall have the right to control the defense or settlement of that portion of any claim which seeks an order, injunction or other equitable relief against the indemnified party which, if successful, could materially interfere with the business, operations, assets, financial condition or prospects of the indemnified party; *provided, however*, that in connection with the defense or settlement of the portion of such claim which seeks equitable relief, the indemnified party shall cooperate with the indemnifying party and use its commercially reasonable efforts to limit the liability of the indemnifying party for the damages portion of such claim.

Section 8.5    [Reserved]

Section 8.6    **Additional Limitations**.    The rights of the Seller Indemnitees and Purchaser Indemnitees to be indemnified under this Article VIII shall be subject to the following limitations:

(a)    No party hereunder shall be entitled to recover Damages under this Article VIII arising out of any breach of a representation or warranty contained in this Agreement to the extent that the purported indemnified party had "knowledge" (as defined in Section 10.6 with respect to such party) that the relevant representation or warranty was materially inaccurate when made.

(b)    No party shall be entitled to recover Damages (i) for punitive, exemplary or special damages of any nature, (ii) for indirect or consequential damages, including damages for lost profit, lost business opportunity or damage to business reputation, or (iii) relating to or arising out of any act or omission of the indemnified party after the date of Closing.

(c)    No party shall be entitled to recover Damages under this Article VIII to the extent such Damages arise out of any changes, after the Closing Date, in applicable Law, or the interpretations thereof.

(d)    [Reserved]

(e)    No indemnified party shall be entitled to recover Damages under this Article VIII to the extent such indemnified party has already recovered, or has the absolute right to recover, Damages from a third party, including pursuant to indemnification under any contract or any rights under any insurance policies held by or for the benefit of such indemnified party (including, for these purposes, any rights of the Partnership under any contract or insurance policy to which it is a party or by which it receives benefits). The amount of Damages required to be paid to indemnify the Purchaser Indemnitees or Seller Indemnitees, as the case may be, pursuant to Section 8.2 shall be reduced to the extent of any amounts actually recovered by the party seeking indemnification after the Closing pursuant to the terms of insurance policies (if any) covering such claim or under any contract with a third party. Without in any way limiting the generality of the foregoing, following the Closing the Purchasers shall cause the Partnership to use their commercially reasonable efforts to collect or recover any amounts available under such insurance coverage or from such other party. In the event there is a subsequent contractual claim or insurance recovery by an indemnified party in respect of an indemnified matter after an

indemnifying party has made payment of any kind on such matter, such indemnified party shall promptly pay over the amount of such contract damages or insurance recovery.

(f)     [Reserved]

(g)     In addition to, and not in limitation of any other provision herein, each indemnified party will use its commercially reasonable efforts to mitigate any Damages with respect to which it may be entitled to seek indemnification pursuant to this Agreement, and no indemnified party shall be entitled to indemnification for Damages to the extent it can be demonstrated that such Damages would not have occurred but for the failure of the indemnified party to mitigate as herein provided.

(h)     If any indemnified party is indemnified for any Damages pursuant to this Agreement with respect to any claim by a third party, then the indemnifying party will be subrogated to all rights and remedies of such indemnified party against such third party and any other party (including, without limitation, any insurance policies maintained by the Partnership before or after the Closing), and the indemnified party will cooperate with and assist the indemnifying party in asserting all such rights and remedies against such parties (with the benefits of any recovery to be distributed to the indemnifying party).

(i)     In no event shall the Sellers be liable to the Purchasers under this Article VIII for indemnification that in any way relates to any past, present or future breach of contract between the Purchasers or any of their Affiliates, on the one hand, and the Partnership (other than this Agreement and the agreements contemplated hereby), on the other hand (it being understood that the parties thereto will only have such contractual rights as provided under the relevant contracts).

Section 8.7     **Exclusive Remedy**.  The remedies set forth in this Article VIII shall be the exclusive remedies of the parties for any breach of a representation, warranty or covenant (other than in the case and to the extent equitable relief is sought) contained in this Agreement or in any closing document executed and delivered pursuant to the provisions hereof.

Section 8.8     **Characterization of Payments**.  Any payment made to the Sellers and the Purchasers pursuant to this Article VIII shall be treated as an adjustment of the Purchase Price for all purposes, including Tax purposes, to the maximum extent permitted by law.

## ARTICLE IX

## TERMINATION

Section 9.1     **Termination**.  This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written consent of (i) the Sellers' Representative and (ii) the Purchasers' Representative;

(b)     by the Sellers' Representative, or the Purchasers' Representative if:  (i) any federal or state court of competent jurisdiction shall have issued an order, judgment or decree

permanently restraining, enjoining or otherwise prohibiting the transactions contemplated hereby, and such order, judgment or decree shall have become final and nonappealable, (ii) any statute, rule, order or regulation shall have been enacted or issued by any Governmental Entity which, directly or indirectly, prohibits the consummation of the transactions contemplated hereby; (iii) the Closing contemplated hereby shall have not occurred on or before December 31, 2008 or such later date as the parties mutually agree upon (the "Termination Date"); *provided, however*, that the right to terminate this Agreement under clause (iii) shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date, or (iv) the Approval Order shall not be obtained prior to November 30, 2008, provided that the right to terminate under this clause (iv) will not be available to the extent the matters set forth in clause (d) or (e) of Section 7.5 hereof are not part of the Approval Order; *provided, further*, that the Termination Date in clause (iii) shall automatically be extended for thirty (30) days or to such later date as the parties mutually agree if (A) the sole reason that the Closing contemplated hereby shall not have occurred is that either (1) the FERC Order shall not have been obtained, or (2) the waiting period refer to in the HSR Act applicable to the transactions contemplated hereby has not expired or is not terminated and (B) the parties determine that the FERC Order is reasonably likely to be obtained or the HSR waiting period is reasonably likely to expire or be terminated in such thirty (30) day period or any longer period mutually agreed by the parties;

(c)    by the Purchasers' Representative if there has been a violation or breach by any Seller of any covenant, representation or warranty contained in this Agreement that would cause any of the conditions set forth in Section 3.2 not to be satisfied, and such condition is either incapable of being satisfied prior to the Termination Date or such violation or breach is not cured within twenty (20) days after receipt by such Seller of written notice specifying particularly such violation or breach, and such violation or breach has not been waived by the Purchaser;

(d)    by the Sellers' Representative if there has been a violation or breach by the Purchasers of any covenant, representation or warranty contained in this Agreement which would cause any of the conditions set forth in Section 3.3 not to be satisfied, and such condition is either incapable of being satisfied prior to the Termination Date or such violation or breach is not cured within twenty (20) days after receipt by the Purchasers of written notice specifying particularly such violation or breach, and such violation or breach has not been waived by such Sellers; and

(e)    by the Purchaser's Representative pursuant to Section 3.2(e).

Section 9.2    **Procedure and Effect of Termination**.  In the event of termination of this Agreement by any or all of the parties pursuant to this Article IX, written notice thereof shall forthwith be given by the terminating party to the other parties, whereupon this Agreement shall forthwith become void and there shall be no liability or obligation on the part of any Seller or any Purchaser or their respective officers, directors, members or partners; *provided, however*, that such termination shall not relieve any party hereto of liability to the other parties hereto for a willful breach of this Agreement by such party prior to such termination and provided further, that the failure to obtain the Approval Order, after compliance with Section 7.5, shall not be deemed a breach of this Agreement.

## ARTICLE X

## MISCELLANEOUS

Section 10.1    **Notices**.  All notices required to be given hereunder shall be in writing and shall be deemed to be duly given if personally delivered, telecopied and confirmed, or mailed by certified mail, return receipt requested, or nationally recognized overnight delivery service with proof of receipt maintained, at the following address (or any other address that any such party may designate by written notice to the other parties):

If to the Sellers, the Sellers' Representative on behalf of the Sellers:

> Lehman Brothers Holdings  Inc.
> c/o Alvarez & Marsal North America, LLC
> 600 Lexington Avenue
> Attention:  Daniel J. Ehrmann, Managing Director
> Fax: 212-759-5532

With a copies to:

> Michael A. Saslaw
> Weil, Gotshal & Manges LLP
> 200 Crescent Court, Suite 300
> Dallas, Texas  75201
> 214-746-7777

> and

> John Allender
> Fulbright & Jaworski L.L.P.
> Fulbright Tower
> 1301 McKinney, Suite 5100
> Houston, Texas 77010
> Fax: 713-651-5246

If to the Purchasers:

> EDF Trading Limited
> Attn: Robert W. Quick, General Counsel
> 80 Victoria Street, Cardinal Place
> London SW 1E 5JL

With a copy to:

> Jeff Schlegel
> Jones Day
> 717 Texas, Suite 3300
> Houston, Texas 77002
> Fax: (832) 239-3600

Any such notice shall, if delivered personally, be deemed received upon delivery; shall, if delivered by telecopy (receipt confirmed), be deemed received on the first Business Day following confirmation; shall, if delivered by overnight delivery service, be deemed received the first Business Day after being sent; and shall, if delivered by mail, be deemed received upon the earlier of actual receipt thereof or five (5) Business Days after the date of deposit in the United States mail.

Section 10.2    **Entire Agreement**.  This Agreement, together with any other writings referred to herein or delivered pursuant hereto, constitutes the entire agreement among the parties hereto and their respective affiliates with respect to the subject matter hereof and supersedes all prior contracts, agreements and understandings, whether written or oral, among the parties hereto and their respective affiliates with respect to the subject matter hereof.

Section 10.3    **Binding Effect; Assignment; No Third Party Benefit**.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors, permitted assigns and legal representatives; and by their signatures hereto, each Seller and each Purchaser intends to and do hereby become bound.  Except as provided in Section 8.2, nothing expressed or mentioned in this Agreement is intended or shall be construed to give any person other than the parties hereto and their respective permitted successors, permitted assigns or legal representatives any legal or equitable right, remedy or claim under, in or in respect of this Agreement or any provision herein contained, except to the extent expressly provided in this Agreement.

Except as otherwise expressly provided in this Agreement, neither this Agreement nor any of the rights, interests, or obligations hereunder shall be assigned by (a) any Seller to any person without the prior written consent of the Purchasers, and (b) any Purchaser to any person, without the prior written consent of the Sellers owning at least ninety percent (90%) of the outstanding Purchased LP Units, which consent shall not be unreasonably withheld or delayed; *provided, however*, that any Purchaser may assign this Agreement without any Seller's consent to an affiliated company or wholly owned subsidiary.

Section 10.4    **Severability**.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement; *provided* that if any such provision may be made enforceable by limitation thereof, then such provision shall be deemed to be so limited and shall be enforceable to the

maximum extent permitted by applicable law.  Furthermore, in lieu of (and to the extent of) each such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

Section 10.5  **Governing Law**.    THIS  AGREEMENT  AND  THE  LEGAL RELATIONS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT, SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO RULES CONCERNING CONFLICTS OF LAWS.

Section 10.6  **Construction**.  Unless the context requires otherwise:  (a) pronouns in the masculine, feminine and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, (b) the term "including" shall be construed to be expansive rather than limiting in nature and to mean "including, without limitation," (c) references to Articles and Sections refer to Articles and Sections of this Agreement; (d) the words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole, including the Exhibits and Schedules attached hereto, and not to any particular subdivision unless expressly so limited, (e) references to Exhibits and Schedules are to the items identified separately in writing by the parties hereto as the described Exhibits and Schedules attached to this Agreement, each of which is hereby incorporated herein and made a part hereof for all purposes as if set forth in full herein, (f) the term "Seller's knowledge," "to Seller's knowledge" and variations thereof shall, except as used in Article IV, mean the knowledge, after due inquiry, of the persons set forth on Schedule 10.6(f), (g) the term "Purchaser's knowledge," "to Purchaser's knowledge" and variations thereof shall mean the actual (and not constructive) knowledge of persons set forth on Schedule 10.6(g) and (h) the phrase "the General Partner shall cause the Partnership" and variations thereof shall be interpreted to mean "the GP Sellers shall cause the General Partner to cause the Partnership." The descriptive headings used herein are inserted for convenience of reference only, do not constitute a part of this Agreement, and shall not affect in any manner the meaning or interpretation of this Agreement.

Section 10.7  **Injunctive Relief**.    The parties hereto acknowledge and agree that irreparable damage could occur in the event any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to seek an injunction or injunctions to prevent breaches of the provisions of this Agreement, and shall be entitled to seek to enforce specifically the provisions of this Agreement, in any court of the United States or any state thereof having jurisdiction, in addition to any other remedy to which the parties may be entitled under this Agreement.

Section 10.8  **Consent to Jurisdiction**.

(a)    The parties hereto hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court, and appropriate appellate courts therefrom, over any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby, and each party hereby irrevocably agrees that all claims in respect of such dispute or proceeding may be heard and

determined in such courts.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  This consent to jurisdiction is being given solely for purposes of this Agreement and is not intended to, and shall not confer consent to jurisdiction with respect to any other dispute in which a party to this Agreement may become involved.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action, or proceeding of the nature specified in subsection (a) above by the mailing of a copy thereof in the manner specified by the provisions of Section 10.1.

(c)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.

Section 10.9  **Amendment**.  This Agreement may be amended at any time, <u>provided</u> that any such amendment is in writing and, if entered into prior to the Closing, is approved by the Purchasers and the Sellers owning at least ninety percent (90%) of the outstanding Purchased LP Units, and, if entered into after the Closing, is approved by the Purchasers and Sellers who, immediately prior to the Closing, owned at least ninety percent (90%) of the outstanding Purchased LP Units.

Section 10.10  **Waiver**.  Any term or condition of this Agreement may be waived at any time by the Purchasers' Representative or the Sellers' Representative, as applicable; *provided* that any such waiver is in writing.  A waiver or consent, express or implied, to or of any breach or default by any person in the performance by that person of its obligations with respect to this Agreement is not a consent or waiver to or of any other breach or default in the performance by that person of the same or any other obligations of that person with respect to this Agreement.

Section 10.11  **Counterparts**.  This Agreement may be executed in any number of counterparts (including facsimile counterparts), all of which together shall constitute a single instrument.  It shall not be necessary that any counterpart be signed by each of the parties hereto so long as each counterpart shall be signed and delivered by one or more of the of the parties hereto and so long as the other parties hereto shall sign and deliver at least one counterpart.

*[**Rest of page intentionally left blank**]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**SELLERS:**

EAGLE ENERGY MANAGEMENT, LLC

By: _____
      Daniel J. Ehrmann, Authorized Signatory

LEHMAN BROTHERS COMMODITY
SERVICES INC.

By: _____
      Daniel J. Ehrmann, Authorized Signatory

LBMB FUND EAGLE ENERGY
HOLDINGS LLC

By: _____
      Daniel J. Ehrmann, Authorized Signatory

LBMB PARTNERS EAGLE ENERGY
HOLDINGS LLC

By: _____
      Daniel J. Ehrmann, Authorized Signatory

LBMB FUND (B) EAGLE ENERGY
HOLDINGS LLC

By: _____
      Daniel J. Ehrmann, Authorized Signatory

LBMB CAPITAL PARTNERS V EAGLE
ENERGY HOLDINGS LLC

By: _____
Daniel J. Ehrmann, Authorized Signatory


LEHMAN BROTHERS HOLDINGS INC.

By: _____
Daniel J. Ehrmann, Authorized Signatory

*Signature Page to Purchase Agreement*

0.

**PURCHASERS:**

EDF TRADING NORTH AMERICA
MANAGEMENT LLC

By: _John H. Rittenhouse_

Name: _John H. Rittenhouse_

Title: _President_

EDF TRADING NORTH AMERICA INC.

By: _____

Name: _____

Title: _____

*Signature Page to Purchase Agreement*

**PURCHASERS:**

EDF TRADING NORTH AMERICA
MANAGEMENT LLC

By:_____
Name:_____
Title:_____


EDF TRADING NORTH AMERICA INC.

By:_____
Name: Robert Quick
Title: President


*Signature Page to Purchase Agreement*

# EXHIBIT G

**Subject:**                    FW: Christine Thomson's comments

_____

**From:** Davis, Jeremy
**Sent:** Thursday, September 25, 2008 4:43 PM
**To:** Watson, Chuck; Jones, Griff; Moore, Cody
**Subject:** FW: Christine Thomson's comments


_____
avis, Jeremy
esday, September 23, 2008 2:26 PM
es, Griff; Hare, Cliff; Watson, Chuck; Schneider, Russell
re, Cody
     Christine Thomson's comments

I talked to her this morning.  Important to note that she knows very little either….

1) no one has been terminated from Lehman
        *only terminations have been people that has specifically declined the Barclays offer

2) regarding your claim to money owed: she's has been told that there is no advantage or disadvantage by accepting

3) What accepting the Barclay's offer does
        - ensures your base salary
        -ensures benefits
        -makes you eligible for severance "consideration"

4) Severance
        -no set formula
        -assume they default to lehman policy for calculation

5) Garden leave
        -she thinks it still applies no matter what (firm policy is 30 days for VP+, 2 weeks for less than VP
        -If lehman can't pay you for the thirty days, they should tell you they can't live up their side, and set you free.


Jeremy Davis
Sr. Vice President
Natural Gas Trading
Lehman Brothers Commodity Services
281-781-0336
jeremy.davis@lehman.com

*****************************************************   *******************
This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not
duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unless specifically
indicated, this e-mail is not an offer to buy or sell or a solicitation to buy or sell any commodities, financial risk management products, or other physical or financial
product or service, an official confirmation of any transaction, or an official statement of EDF Trading Limited, EDF Trading Markets Limited, EDF Trading North
America, LLC, or any of the EDF Group family of companies. Any views or opinions presented are solely those of the author and do not necessarily represent
those of the foregoing entities. EDF Trading Markets Limited is authorized and regulated by the Financial Services Authority. VAT number: GB 735 5479 07. EDF
Trading Markets Limited and EDF Trading North America, LLC are members of the EDF Group of companies. EDF Trading Markets Limited maintains its
registered office at 80 Victoria Street, 3rd Floor, Cardinal Place, London, SW1E 5JL. A Company registered in England No. 4255974. EDF Trading North America,

LLC is headquartered in the United States at 4700 W. Sam Houston Pkwy., Suite 250, Houston, TX 77041
***************************************************************************************